```
 1                UNITED STATES DISTRICT COURT
 2                     DISTRICT OF OREGON
 3
 4      THE HON. THOMAS M. COFFIN, JUDGE PRESIDING
 5
 6
 7  UNITED STATES OF AMERICA,        )
                                     )
 8                 Government,       )
                                     )
 9        v.                         )  No. 05-60008-01
                                     )
10  PIROUZ SEDAGHTAY, also known as  )
    Pete Seda, also known as Perouz  )
11  Seda Ghaty, also known as Abu    )
    Yunus,                           )
12                                   )
                   Defendant.        )
13  _____)
14
15
16          REPORTER'S TRANSCRIPT OF PROCEEDINGS
17                     EUGENE, OREGON
18              MONDAY, SEPTEMBER 10, 2007
19                     PAGES 1 - 17
20
21                  Kristi L. Anderson
                    Official Federal Reporter
22                  United States Courthouse
                    405 East Eighth Avenue
23                  Eugene, Oregon 97401
                    (541) 431-4112
24                  Kristi_Anderson@ord.uscourts.gov
25
```

45

```
 1  APPEARANCES OF COUNSEL:
 2
 3  FOR THE GOVERNMENT:   UNITED STATES ATTORNEY
                          BY:  CHRISTOPHER CARDANI, ESQ.
 4                        405 East Eighth Avenue
                          Eugene, Oregon 97401
 5                        (541)465-6771
                          chris.cardani@usdoj.gov
 6
     FOR THE DEFENDANT:   LAWRENCE MATASAR, ESQ.
 7                        621 SW Morrison, Suite 1025
                          Portland, Oregon 97205
 8                        (503)222-9830
                          larry@pdxlaw.com
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                        PROCEEDINGS
 2                  MONDAY, SEPTEMBER 10, 2007
 3         THE CLERK:  Now is the time set for the matter of
 4  the United States of America versus Pirouz Sedaghaty, Case
 5  No. 05-60008, detention hearing.
 6         THE COURT:  All right.  Does either side have
 7  anything else they wish to add to the comments they made at
 8  the last hearing and also the written comments they have
 9  submitted to the court since then?
10         MR. MATASAR:  Not really, Your Honor.  I'm not
11  aware of anything.  If Mr. Cardani submitted something in
12  writing, I haven't seen that, so if he has --
13         THE COURT:  I think everything I have gotten in
14  writing has been from you.
15         MR. MATASAR:  All right.
16         THE COURT:  Have you turned in the -- you said
17  something in your letter about the --
18         MR. MATASAR:  Yes, I have given Lisa Brown today
19  the passports.
20         THE COURT:  Okay.
21         MR. MATASAR:  And also Mr. Seda's wife is present
22  in the courtroom.
23         Would you stand up for the judge.
24         THE COURT:  Okay.  Thank you.
25         Anything else that the government wishes to add?
```

1    MR. CARDANI: Judge, if I could just chronicle a
2   little bit here and then lead to a recommendation.
3        At the conclusion of the detention hearing a
4   couple weeks back, it was my impression that the court
5   wanted more information on the defendant's whereabouts
6   during the last four and a half years.
7        THE COURT: And that was primarily based upon your
8   suggestion that Mr. Seda had entered this country for
9   ulterior motives other than to stand trial on the charges
10  and your suggestions that -- which I took to mean that the
11  government felt that he may constitute a danger to the
12  community. That was the focus.
13       And since then, I glean that the government has
14  backed off that position that he's a danger, and the issue
15  now is whether or not he's a flight risk.
16       MR. CARDANI: I agree with the court's comments.
17  I wouldn't agree with the statement that the government's
18  backing off its concerns.
19       THE COURT: Would you then give me some detailed
20  information about why you believe he's a danger.
21       MR. CARDANI: At this point it's the unknown. It
22  is --
23       THE COURT: Do you have any specific facts or
24  information that would suggest to you that he's a danger?
25       MR. CARDANI: Judge, what that's based on is, in

1  large part, the information that the court heard during the
2  last detention hearing where we had concerns about, based on
3  his prior activities, running a computer for these
4  individuals, the issue about the money, things like that
5  when he was running Al-Haramain here, and then leaving
6  during the middle of the investigation and remaining a
7  fugitive for as long as he did.  Those are the bases of the
8  concern.  I think when you add to that --
9        THE COURT:  Do you have any information that you
10 haven't shared with the court?
11       MR. CARDANI:  Nothing that I can add at this time,
12 Your Honor.  But my concern is the unknown.  And that is, I
13 thought the court wanted more information from the
14 defendant.  Put aside the kind of case that this is or is
15 not.  Any defendant before this court that is under
16 indictment that has --
17       THE COURT:  These are not charges that carry a
18 presumption of a danger to the community.
19       MR. CARDANI:  They are not.  They are not.  But
20 any defendant before this court, whether it's a case
21 involving a presumption or not, I think the court would want
22 to know, pretrial services would certainly want to know, in
23 advising this court, where have you been, how do I verify
24 that, what have you been doing, where have you been working,
25 how have you sustained yourself, how many passports do you

1  have.  Give us some ability to make some attempt to verify
2  this information.  Do you have of some bank accounts.
3  Things of the like.  Regardless of the case, regardless of a
4  case involving a presumption or not, I think this court
5  would want -- pretrial would certainly want that information
6  to advise this court on whether a defendant is a flight risk
7  or not.
8         So I thought that was the -- the result of this
9  last hearing, that Ms. Brown was charged with getting more
10 information.
11        THE COURT:  He may be somewhat of a flight risk in
12 that he's a citizen of not only the United States but of
13 Iran, and he could go to Iran and be beyond the reach of the
14 United States.  I understand that.  But he did come back.
15        MR. CARDANI:  He did come back.
16        THE COURT:  Which would indicate that he's not a
17 flight risk since he was safely out of the country and he
18 returned here, knowing that these charges awaited him and
19 knowing that he would be arrested when he arrived, and he
20 subjected himself to the jurisdiction of the court.
21        Now, that, to me, would indicate that whatever
22 concerns one has about him being a flight risk are
23 outweighed by his voluntary return to the United States to
24 stand trial.
25        MR. CARDANI:  Judge, I can't --

1    THE COURT: So we have the issue of where he was,
2 but nonetheless, he did come back. And so on the flight
3 risk issue, that seems to be canceled by his voluntary
4 return.
5    MR. CARDANI: Okay.
6    THE COURT: Which leads us to the only other
7 issue, in my mind, is whether he's a danger to the
8 community. And the government doesn't really have anything
9 that it shared with the court that would substantiate that
10 concern. We have conjecture. We have the expression of a
11 question mark by the government. But we have no details
12 that's been shared with the court that would substantiate
13 any concern about danger. I'm not that influenced by the
14 distribution of *The Noble Qur'ân* since that is a version of
15 *The Qur'ân*. That's the official version of the Saudi Arabia
16 government, and it promotes and distributes that literature
17 itself.
18    MR. CARDANI: That's not entirely true, but I
19 don't know if we need to go down there.
20    The part of *The Noble Qur'ân* that we had problems
21 with is not *The Noble Qur'ân* per se. It's the appendix that
22 Al-Haramain distributes, the appendix which is an appendage
23 to *The Noble Qur'ân* inserted by, I think, Al-Haramain,
24 called *A Call to Jihâd*, in which this court heard
25 exhortations of physical violence to promote Islam. We are

1  not taking on *The Noble Qur'ân*.  We are taking on the
2  appendix that Mr. Seda and his former organization pushed
3  into prisons throughout this United States calling for acts
4  of violence to promote Islam.
5       But Judge, you know, I don't want to beat a dead
6  horse, but I would like to go back to why I think we are
7  here, and that is, this court asked for information.  And,
8  again, regardless of the case -- the type of case it is, we
9  put together some basic questions that, when we had our in
10 camera hearing with Mr. Matasar, I thought that there was an
11 agreement that Mr. Seda would be more forthcoming from
12 Mr. Matasar with information on basic issues.
13      List each of the countries you lived in from
14 February '03 to August '07.  List the cities, addresses,
15 anyone that can confirm it, e-mail contacts, phone contacts,
16 the jobs that you had in each of these places.  Again, how
17 do we verify this.  Give us a telephone number or an e-mail
18 contact of anybody that can verify this type of information.
19 Did you open bank accounts.  List each of the passports you
20 have used from February '03 to August '07.
21      I thought there was an agreement that the
22 defendant would be more forthcoming with information to
23 pretrial services so that pretrial services can do its job
24 in advising you on whether they have been able to confirm
25 this information.

1           Now, to the best of my knowledge, there has been
2   very little, hardly any information.
3           THE COURT:  Do you have any information about
4   where Mr. Seda was during this time period?
5           MR. CARDANI:  Bits and pieces.
6           THE COURT:  Do you have any independent
7   information about where he was other than that which he has
8   provided?
9           MR. CARDANI:  If I may have a moment.
10              (Counsel conferred with the agents.)
11          MR. CARDANI:  In answer to the court's question,
12  we do have some information from a confidential source that
13  Mr. Seda was selling vehicles, selling cars in Syria at some
14  point during his time away from the United States.  So we do
15  have that information.
16          THE COURT:  Well, it's somewhat frustrating.
17  Pretrial services confides in the court that it feels that
18  both sides have been less than completely forthcoming with
19  information that pretrial services would like to have.  So
20  I -- certainly it's -- it's frustrating.  If there's
21  information that the government has as well that would help
22  shed light that's not being shared, what are we to do?
23          MR. CARDANI:  Judge, I think, once again, that
24  when we had our chambers conference with you, I thought
25  there was an agreement that the court, through pretrial, was

Case 6:05-cr-60008-AA    Document 45    Filed 09/18/07    Page 10 of 17

concerned about very basic information, residence, jobs, passports. For example, when we had our first detention hearing, the only passport we knew about is the one Mr. Seda came into the United States with.

At that hearing, we then learned that there was this mysterious Iranian passport, we never even knew about. And then it was given to the court, and then we learned about a canceled U.S. passport, which I understand now has come to --

THE COURT: Do we not now have all the passports?

MR. CARDANI: I don't know. And that's the problem. How can we --

MR. MATASAR: Your Honor --

MR. CARDANI: How can we react to information that we don't know about. We'd be happy to assist Ms. Brown and the court in an attempt to verify information that was provided to the court. That was the subject of the in camera meeting we had with you. It was my understanding that information would be coming from Mr. Seda through Mr. Matasar to Ms. Brown, to the court, and then the court would make a determination about whether it could share it with us so that we could help verify this information. We are ready, willing, and able to do that. We have not been given any information since that meeting to do it. We are ready to do it. We have got legal attache offices overseas

that stand ready to work with us, but we have no information. So we are at a loss to answer the court's questions, not because we are not willing to provide information to Ms. Brown, but because the information that I thought the court was going to garner from Mr. Seda has not been forthcoming.

THE COURT: Mr. Matasar.

MR. MATASAR: Your Honor, Mr. Cardani is indicating -- Mr. Cardani is indicating, for example, that there's a mysterious passport. That there's something being hidden. We had explained, and again to Ms. Brown, that -- about the valid passport. There had been a previous canceled passport, which we then provided to her. Similarly, with the Iranian passport.

What Mr. Cardani is trying to do, by asking questions, by asking ten extremely detailed financial questions, he is trying to question the defendant in -- via pretrial services in a very unusual setting. He's indicated he's unwilling to restrict such an investigation to simply the pretrial issues. He's indicated that he could use it in the case-in-chief if he feels that's appropriate.

We have -- he is also making statements which are, in my understanding, factually incorrect. The appendix to *The Noble Qur'ân* came with the books from Saudi Arabia. It was not inserted by Al-Haramain. Indeed, they requested and

1  it eventually got removed.
2           As far as the verification issues, we have given
3  much of that information to pretrial services. They wanted
4  to contact Mr. Seda's wife, Summer. I gave pretrial
5  services, on Monday, Labor Day, her e-mail address and her
6  telephone number. On Tuesday at our meeting, I indicated
7  that she should feel free to call. That's the kind of
8  verification that's typically done in a release hearing.
9  There's not typically a kind of fanning out of government
10 agents wherever the defendant has been, let's say, in a drug
11 case or in any other sort of case. They are asking us for
12 information that is simply not typically provided in a
13 regular case.
14          He did come back, and he's not a danger to the
15 community. The government is making wild accusations. They
16 are trying to link the defendant to Osama bin Laden. They
17 are trying to link him to specific terrorists in Chechnya.
18 There's no evidence of that. They are calling him a Trojan
19 horse from a foreign intelligence service. Certainly, Your
20 Honor, certainly if Mr. Seda were sent from a foreign
21 intelligence service, he'd have an ironclad verification
22 history. We wouldn't be having these problems.
23          These problems are caused by somebody living in
24 countries where they don't have the same kind of addresses
25 that we have where we are asking information from years ago.

1  We provided Ms. Brown with business cards, transactions,
2  with evidence indicating that he was essentially living
3  aboveboard and doing what he said he was doing.
4         Beyond that, we are in a very preliminary stage of
5  the case.  We need a much longer time to do it.  We believe
6  that he's not a danger, nor is he a flight risk.
7         THE COURT:  What exactly is pretrial lacking in
8  terms of information about Mr. Seda's whereabouts during the
9  time he was out of this country?
10        MS. BROWN:  Your Honor, we have bits and pieces of
11 information.  You know, I have talked with Mr. Seda and his
12 attorney on two occasions.  Each time we talk, it fills in
13 one or two more pieces.  After we met in chambers on
14 Tuesday, we had agreed that Questions 3, 4, 5, and 10, maybe
15 even 7 would have been answered.  The responses that I got
16 from Mr. Matasar late Thursday evening, early Friday
17 morning, were two additional addresses in Iran, and he did
18 send me some documentation, which I provided you a copy
19 with, a shoe receipt, a driver's license with no picture, a
20 couple other documents that were -- no time frames listed at
21 all whatsoever.  I have no idea if the addresses that he
22 provided me were a week, did he stay there a month, was he
23 there a year.  I have no idea.
24        THE COURT:  All right.  How long will it take you
25 to fill in this gaps?

1   MR. MATASAR: Your Honor, we have -- we have given
2   Ms. Brown a list of places by -- in Saudi Arabia by general
3   description and location. They do not have addresses like
4   we do. We have -- as is the nature, Your Honor, when you
5   are talking about something that happened four years ago
6   when you are moving from place to place, we don't have exact
7   addresses. We have a lot of information.
8   We gave Ms. Brown, I thought, a list, a pretty
9   chronological list of where he was at certain times. His --
10  I also indicated Mr. Seda is -- I don't know if dyslexic is
11  the technical term, but there are reading and comprehension
12  issues as far as some written material. That's why I
13  suggested that he -- that she contact his wife, who is much
14  better on that sort of information. Again, that was a week
15  ago. She could have given much more detailed information
16  about Dubai and Saudi Arabia. She was not present in Iran.
17  However --
18  THE COURT: She's here today.
19  MR. MATASAR: She's here today, correct. I don't
20  think that should --
21  THE COURT: Well, here's what I'm going to do:
22  We'll take a recess on this case until 1:30. I want you to
23  spend the rest of the morning filling in the gaps.
24  I will not consider the danger to the community
25  issue unless the government is forthcoming with specific

```
 1  information on that issue.  I'm not going to be influenced
 2  by vague concerns being expressed.  I get the impression
 3  that if there's information that may be out there that's not
 4  being shared with the court, well, that's the government's
 5  decision, if that's the case.  But I'm not going to be
 6  influenced by vague expressions of concerns.
 7           So to me, the issue is flight risk.  And as I have
 8  said already, the fact that Mr. Seda returned here
 9  voluntarily is a -- in my mind, a very tangible
10  counterweight to the concerns that are being expressed about
11  flight risk.
12           Having said that, Mr. Matasar, I don't understand
13  why it's so difficult to supply information about where your
14  client was at different time periods.
15           MR. MATASAR:  We have, Your Honor.
16           THE COURT:  I don't understand --
17           MR. MATASAR:  We have given -- Ms. Brown is not
18  happy with it.  I think it fair to say that she wants it
19  verified.  But we have provided information and one source
20  for verification.  Again, in a typical situation, the spouse
21  is the verification.
22           THE COURT:  The last comment she made about being
23  provided with a place but not being told how long he stayed
24  there, whether it was a week, whether it was a month,
25  whether it was a year, that's the type of thing that you
```

```
 1  need to fill in.
 2          MR. MATASAR:  I think we have, and we have more,
 3  and we'll work with his wife.
 4          THE COURT:  Very well.  We'll be in recess until
 5  1:30.
 6          THE CLERK:  This court's in recess.
 7                      (Recess.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1    I hereby certify that the foregoing is a true and
2    correct transcript of the oral proceedings had in the
3    above-entitled matter, to the best of my skill and ability,
4    dated this 15th day of September, 2007.

_____
Kristi L. Anderson, Certified Realtime Reporter

