1        IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF OREGON

3   UNITED STATES OF AMERICA,          )
                                       )
4                 Plaintiff,           ) No. 05-60008-2-HO
                                       )
5      v.                              ) September 11, 2007
                                       )
6   PIROUZ SEDAGHATY, et al.,          ) Eugene, Oregon
                                       )
7                 Defendants.          )

8

9            TRANSCRIPT OF PROCEEDINGS

10      BEFORE THE HONORABLE MICHAEL R. HOGAN

11        UNITED STATES DISTRICT COURT JUDGE

12

13                    -:-

14            APPEARANCES OF COUNSEL

15   FOR THE PLAINTIFF:    CHRISTOPHER L. CARDANI
                           United States Attorney's Office
16                         405 E. 8th Avenue
                           Suite 2400
17                         Eugene, OR  97401
                           (541) 465-6771
18                         Chris.cardani@usdoj.gov

19   FOR THE DEFENDANT:    LAWRENCE H. MATASAR
                           Lawrence Matasar, P.C.
20                         621 S.W. Morrison Street
                           Suite 1025
21                         Portland, OR  97205
                           (503) 222-9830
22                         Larry@pdxlaw.com

23

24   COURT REPORTER:       Deborah Wilhelm, CSR, RPR
                           P.O. Box 1504
25                         Eugene, OR  97440
                           (541) 431-4113

1           (Tuesday, September 11, 2007; 11:18 p.m.)

2                 P R O C E E D I N G S

3           THE CLERK:  This is the time set for Criminal

4    No. 05-60008-2-HO, USA versus Pirouz Sedaghaty,

5    government's appeal of release order.

6           THE COURT:  Good morning.

7           MR. CARDANI:  Good morning, Judge Hogan.  First

8    of all, thank you for seeing us on such short notice.

9           With me, to my right, is Colleen Anderson, a

10   special agent with IRS; and Dave Carroll, special agent

11   with the FBI.

12          THE COURT:  Uh-huh.

13          MR. CARDANI:  This is a fairly extraordinary

14   appeal.  First time I've appealed a detention decision

15   in my 15 years.  Judge Coffin gave very thoughtful

16   consideration to extensive testimony in this case that

17   was almost a full day of testimony in the case.

18          Ultimately, as the court is aware, Judge Coffin

19   found that although Mr. Seda produces -- presents

20   somewhat of a flight risk, he did not find any evidence

21   of danger to the community.  And he found that

22   conditions could be fashioned which would likely result

23   in Mr. Seda's presence at trial.

24          We respectfully disagree on both fronts with

25   those.  And in terms of presentation, I filed a hasty

1    notice of appeal, given that this just happened
2    yesterday afternoon.

3            I think the clerk's record indicates that
4    Number 28 is the government's memorandum in support of
5    pretrial detention.  It's a document that I filed with
6    Judge Coffin --

7            THE COURT:  I'm going to just interrupt you a
8    second.  I'm sorry.  I should have done this before.  I
9    should probably tell you what I've reviewed.  I did some
10   reading last night.  All right?

11           I have the government's memorandum in support
12   of pretrial detention.  I have -- that is dated a while
13   ago, I would say, if I could find a date here.  It has
14   the exhibits on it, various exhibits, there are photos
15   and other things.  Let me see if I can find a date on
16   it.  21 August '07, 18 pages plus exhibits.  I have
17   Mr. Matasar's letter dated September 7, '07, five pages.
18   And this morning -- I have a -- Ms. Brown came to see me
19   yesterday after Judge Coffin's ruling.  And I asked her
20   for a little one-page memo, which she gave me.  And then
21   she gave me other notes, copies of passports, that sort
22   of thing.  All right?

23           MR. MATASAR:  Your Honor, the defense had also
24   submitted a memorandum to the court.

25           THE COURT:  Okay.

1          MR. MATASAR:  Which was shortly after
2     Mr. Cardani's, with exhibits.

3          THE COURT:  I do not have it.  It's probably in
4     the file.  I asked for the material.  This is what I was
5     given.  So your last letter is the one I read.

6          MR. MATASAR:  Okay.  And that's somewhat
7     comprehensive, but I also filed a memo with some
8     important exhibits that are maybe referred to in my
9     letter.  So that also should be considered before a
10    decision, perhaps.

11         THE COURT:  I'm sorry to interrupt you, but I
12    think you fellows needed to know.

13         MR. MATASAR:  We appreciate it.

14         MR. CARDANI:  That's helpful, Your Honor.  The
15    government believes that there are two prongs justifying
16    the defendant's pretrial detention.  One is danger to
17    the community.

18         The main arguments supporting that are really
19    set forth in the document that the court has,
20    apparently, reviewed, Number 28.

21         That, at the detention hearing, was
22    supplemented by testimony from a percipient witness
23    named Daveed Gartenstein-Ross, who actually worked with
24    the defendant.  He testified about his observations and
25    comings and goings down there in -- for al-Haramain for

1    about a year.  He testified at some length.

2         And, also, we had an international terrorism

3    consultant testify by phone.  And Special Agent Anderson

4    testified.

5         In terms of procedure, I am at a little bit of

6    a loss at how the court wants to proceed.  It seems like

7    there are three options.

8         We can go on what's before the court presently.

9    And given the time for today, I think that's what we

10   have to do.  Since the de novo hearing, we ordered a

11   copy of the transcript of the hearing.  And I didn't

12   order it on an expedited basis.  I ordered it after the

13   hearing not knowing what Judge Coffin was going to do.

14   Kristi Anderson informed me that it's going to be

15   completed probably the week of September 20th unless

16   somebody orders it on an expedited basis.  That has not

17   been done yet.  If it is done, I'm not sure how much

18   longer she will need to get that done.  But if the court

19   is interested in reviewing transcripts of that

20   testimony, that's something that the court can obviously

21   consider.

22         And then the third option would be if the court

23   is interested in it, we're willing to fly the witnesses

24   back here -- I'm sorry, the one witness who testified

25   from the East Coast, to testify, and put Mr. Kohlmann

1  back on the phone or bring him out here, and we have

2  Special Agent Anderson.  So I think those really are the

3  three alternatives.

4      One thing I'm concerned about, though, is

5  before we get too far into this is that Judge Coffin's

6  conditions are set to go into effect probably on Friday.

7  And I asked for a stay so that we could do this appeal.

8  That wasn't granted because it was -- he felt it was

9  somewhat moot, I believe, by logistics.  So if there is

10  any delay after today, then the government will be

11  requesting a stay of Judge Coffin's -- the government

12  does request a stay of that order.

13      Now --

14      MR. MATASAR:  I thought you were done.  Sorry.

15      MR. CARDANI:  So, Judge, I -- in terms of the

16  dangerousness, we presented extensive evidence that

17  Mr. Seda, before he departed the United States, during

18  the middle of the criminal investigation that he knew he

19  was the subject of, ran the al-Haramain Islamic

20  Foundation, the U.S. branch of al-Haramain.  And it was

21  headquartered in Ashland, Oregon.

22      He took money from al-Haramain's parent

23  organization in Riyadh, Saudi Arabia, and with that, we

24  submit, came certain obligations, and that was to spread

25  a real strident, virulent, hateful form of radical Islam

1  called Wahhabi, and an extreme form of Wahhabi Islam at
2  that.

3  And all parties are uncomfortable in discussing
4  religious beliefs and using that against the defendant.
5  I certainly am.  Judge Coffin was.  But it is,
6  unfortunately, part of these proceedings.

7  Mr. Seda was the supervisor of a project
8  through al-Haramain called the Prisoner Project, and
9  distributed incredibly hateful material that's excerpted
10 in the government's memo to U.S. prisoners by the
11 thousands.  It contained a thing called Noble Qur'an,
12 which is a translation of the Qur'an, but it contained
13 from al-Haramain an appendix, number 4, called the Call
14 to Jihad.  And it has nothing to do with the Qur'an.  It
15 is someone's interpretation, recent interpretation, of
16 Qur'anic passages that exhort violence, basically making
17 it obligatory for people following this version of the
18 faith to commit acts of violence to promote the religion
19 against infidels, nonbelievers, Jews, and the like.  And
20 that stuff is in here, and was extrapolated by some of
21 the witness testimony.

22 In addition to that, we have a letter from one
23 of the prisoners who responded to that.  A letter was
24 found during the search warrant at this prayer house in
25 Ashland a while back.  One of the prisoners responded by

1    basically saying here is $10 in support -- thank you for
2    the literature, thank you for the materials you sent me.
3    Here is $10 for the mujahideen.  You can use it to pay
4    for the families of the martyrs, or weapons, or however
5    you like.  And I think that's indicative of the type of
6    project that Mr. Seda was running that the witness,
7    Mr. Gartenstein-Ross, was actually doing for him when he
8    was working down there.  He was sending all this
9    material into the prisons.  It was a recruitment device,
10   for what is largely unknown, but spreading the type of
11   material that's excerpted in the brief.

12        What Mr. Seda also did while he was here
13   controlling the U.S. branch of the al-Haramain Islamic
14   Foundation was he was tasked by the parent organization
15   to get an Internet service provider up and running in
16   the United States, taking advantage of our technology,
17   taking advantage of the fact that it's not heavily
18   scrutinized by government, unlike places like Saudi
19   Arabia.

20        And this was -- testimony was received, and
21   it's in the brief as well, that this was used as a
22   platform by an extremely violent religious figure that's
23   been praised by Osama bin Laden.  And this individual
24   used this ISP that Mr. Seda helped get up and running in
25   Ashland, Oregon, to promote his ideas.

1          Later -- later some hard drives were found, and
2    testimony was received before Judge Coffin that a very
3    troubling e-mail that's in the government's brief was
4    found in an e-mail server that was physically located at
5    one time in Ashland, Oregon.  And that e-mail talked
6    about the bombing in Afghanistan which had occurred, I
7    think, three days earlier.

8          And while it was a statement on behalf of Osama
9    bin Laden, we didn't offer it that it is something that
10   he personally wrote, but it was distributed by the Osama
11   bin Laden Brigade, which is a real organization.  It --
12   somewhat based in Saudi Arabia.  The e-mail was tracked
13   back to being distributed from Saudi Arabia.  And it
14   talks about, again, anti-Western statements, the bombing
15   of Afghanistan, and it's a sad day when an Islamic
16   nation lets forces engage in these types of activities,
17   three days after the bombing in Afghanistan occurs after
18   the attacks of September 11th.

19         We also mentioned in the brief that one of the
20   other things that Mr. Seda was big on while he was here,
21   before he fled, was promoting the acts of mujahideen
22   throughout world.  And these are people who commit acts
23   of violence to promote their version of Islam.  And the
24   witness testimony extrapolated on this as well that
25   Mr. Seda was very much in favor of mujahideen causes

1   throughout the world.  And, in fact, tried to raise

2   money for them in Ashland, Oregon.  Approached a

3   witness, showed him a video of mujahideen engaged in

4   acts of combat overseas, and praised, in essence, the

5   acts of mujahideen and made statements in support, and

6   also tried to fund-raise, and did, to some degree, fund-

7   raise.

8        We have evidence in the government's brief of a

9   $2,000 or so wire transfer by Mr. Seda from al-Haramain

10  Islamic Foundation in Oregon to Albania, to the

11  al-Haramain office in Albania.  Testimony at the

12  detention hearing showed that that was the closest, at

13  the time, al-Haramain active office to the fighting in

14  Kosovo, with evolving mujahideen, with the likely

15  inference that this money was destined for support of

16  the mujahideen.

17       The charges in the indictment, while somewhat

18  regulatory, Your Honor, do involve money laundering and

19  tax fraud allegations.  And the essence -- the gravamen

20  of the charges are that Mr. Seda knowingly conspired

21  with an individual named Soliman al-Buthe, who is a

22  Saudi national, who is under indictment, who is a

23  fugitive, conspired with Mr. al-Buthe to, in essence,

24  money launder -- launder $150,000.

25       The transaction is bizarre, but it goes

1   something like this:  The donor in Egypt sent money to
2   the al-Haramain Islamic Foundation organization, was
3   headquartered in Riyadh, Saudi Arabia, offices
4   throughout the world.  Instead of wire transferring the
5   money directly to Saudi Arabia, he transferred $150,000
6   from a bank account in London, Bank of Kuwait, to
7   Ashland, Oregon, and to a bank account that was
8   controlled by Mr. Seda, this defendant, and Soliman
9   al-Buthe.

10          Shortly after the transaction -- and the money
11   was for Chechnya.  And the detention hearing discussed
12   that there was an active war, really, involving Russian
13   soldiers and mujahideen in Chechnya to this day,
14   atrocities have been committed, probably by both sides,
15   but there was a school massacre in Beslan involving the
16   deaths of many children.  A commander of the Chechnyan
17   army took responsibility for that.  Images -- several
18   images of him were found in Mr. Seda's computers in
19   Oregon.  Some of those have been attached as photos.
20   Testimony indicated that these were the commanders,
21   before they were killed themselves, who were promoting
22   the jihad in Chechnya.

23          But back to our transaction.  This Egyptian
24   donor wanted to send $150,000 to al-Haramain for
25   Chechnya, whether it be refugees or direct support of

1   the mujahideen, unclear, but the transaction is very

2   clear.   It went from, as I said, London to Oregon to a

3   bank account controlled by him and Mr. al-Buthe.

4          Mr. al-Buthe gets on a plane, and from Riyadh,

5   Saudi Arabia, flies halfway around the world, spending

6   about $10,000, gets to Ashland, Oregon, goes to the bank

7   with Mr. Seda, and takes that money out of the bank.

8   And withdraws it in the form of 130 one-thousand dollar

9   American Express checks.

10          So Mr. al-Buthe had to sign his name 130 times

11   in the bank with Mr. Seda to get those travelers'

12   checks.   And he also requested and obtained a $20,000 or

13   so check directly to him, perhaps a finder's fee for

14   Mr. al-Buthe, it's unclear.

15          But Mr. al-Buthe then flew directly home to

16   Saudi Arabia with that cash -- with the travelers'

17   checks in his pocket.   He failed to file a form required

18   when one is couriering (sic) more than $10,000 out of

19   the country.   They have to file a form going out or

20   coming in.   Mr. al-Buthe had filed several of these

21   forms on prior occasions when transporting over $700,000

22   in cash into the United States.   He did not file the one

23   going out on this particular transaction.

24          We believe that was to prevent the government

25   from learning about this money, its odd nature.

1          Mr. al-Buthe gets back to Saudi Arabia, cashes

2    those travelers' checks for a fee of about $1300,

3    further deleting the value of that money at the Al Rajhi

4    Bank in Riyadh, Saudi Arabia.

5          Mr. Seda and Mr. al-Buthe are charged with

6    conspiring to defraud the United States in this

7    indictment by preventing the government from learning

8    about this transaction, and affirmatively

9    mischaracterizing it in a tax return filed with the IRS

10   to maintain a charity status, and al-Haramain did, at

11   the time, have religious, tax-free status.

12          They have to file returns with the IRS saying

13   what money it got in, and what it did with it.  And

14   charities can do lots of things, but it has to be

15   charitable in nature.  One cannot be sending -- a

16   charity cannot be sending money to commit acts of

17   violence anywhere in the world.

18          And so the allegations in the indictment is

19   that they intended to do just that, and attempted to

20   pull the wool over the government's eyes by not filling

21   out the forms, and also mischaracterizing, in the tax

22   return, what happened with that money.  And it stated

23   that a building was purchased in Missouri, I believe,

24   rather than its true nature.

25          The nature of the al-Haramain Islamic

 1  Foundation is very troubling.  I won't belabor that.
 2  It's in the government's brief, but over, I think, about
 3  15 of its branches around the world have been directly
 4  associated with acts of international terrorism, some of
 5  which were directly committed against Western interests,
 6  including the bombings of the U.S. embassies in Kenya
 7  and Tanzania in, I believe, 1998.  Al-Haramain was
 8  directly associated with that.  And its branches in that
 9  part of the world, in east Africa, were designated
10  global terrorist organizations by not only the United
11  States, Judge, but by the United Nations, which has its
12  own sanctioning mechanism.

13        Soliman al-Buthe, the codefendant in this case,
14  has been designated by the United States and, I believe,
15  by the United Nations, also as a global terrorist.  The
16  implications from that is you can't engage in financial
17  transactions with people like this as part of the
18  sanctioning mechanisms of the United States and of the
19  United Nations.

20        The United States' office of al-Haramain was
21  designated a while back, 2004 was the initial
22  designation, and it was some time after that the final
23  designation, by the Department of Treasury as a global
24  terrorist organization.

25        Mr. Seda has not been labeled as such, but the

1   business he ran, the charity that he ran in Ashland,
2   Oregon, has been so designated by the United States and
3   by the United Nations.  And effectively shut down,
4   although it's open in -- it's still an active Oregon
5   corporation today.

6         So what we believe that we have been able to
7   prove, Judge, is that when he was here running this
8   outfit, it was doing bad things.  And because he's
9   taking money from the headquarters, the parent
10  organization, he was doing what they asked him to do.
11  We never alleged, nor do we allege, that he's the type
12  of individual who is going to strap on a bomb and go
13  blow something up.  We don't consider him that kind of
14  direct danger.  Rather, what we consider him to be is
15  someone who will take money to support the causes of
16  extreme Wahhabists that are trying to promote their
17  causes throughout the world, perhaps here in the United
18  States as well.

19        He took money from them before.  He did the
20  acts that I alleged and I talked about earlier.  And
21  especially when I get into the flight evidence and the
22  lack of financial information that we've gotten from the
23  defendant on the last four-and-a-half years of his life,
24  I'll talk about that in a minute, when you put those two
25  things together, it adds up to what we believe to be a

1   danger to the community.

2          And as I said, not a physical danger, but the

3   type of danger where he will resume his activities, and

4   taking money, resources, logistical support from people

5   that are bent on these type of extreme designs.

6          Now, Judge, as the hearing and the -- the

7   detention hearings, I should say, progress, when

8   Mr. Seda voluntarily returned to the United States, and

9   I think that that was Judge Coffin's overwhelming basis

10  for his ruling, is that, yes, there is evidence that

11  he's a flight risk, but he turned himself in, and that

12  is what it is.  He did surrender.  Mr. Matasar called me

13  and said, words to the effect, Mr. Seda is coming back.

14  Here is the day he's coming back.  And we had an agent

15  in Portland.  And he was arrested on August 15th.

16          International efforts to apprehend him were

17  stood down.  He was not arrested oversees because we

18  affirmatively stood down the international efforts.

19          THE COURT:  Sorry, I have really sensitive

20  microphones up here.

21          MR. CARDANI:  We stood down the efforts to

22  arrest him internationally, Judge.  So -- but it is true

23  he did surrender.  He was taken into custody on

24  August 15th, came right down here, and we were off and

25  running on the detention.  Judge, it's been about three

1  weeks, over three weeks, I believe, that he's been in

2  detention.  And I think that it's a fair statement to

3  say that the primary reason he's been in custody so long

4  is because Pretrial Services is recommending that he be

5  detained.  It was their recommendation at the beginning

6  of this, as we went through the hearings, and to the

7  best of my knowledge, it continues to be their

8  recommendation today --

9          MR. MATASAR:  And, Your Honor, if I may be

10  heard, Ms. Brown, I believe, told both me and

11  Mr. Cardani yesterday that she was not making a

12  recommendation.

13          THE COURT:  Well, I'll tell you what her

14  recommendation is after a while.  I know it.

15          MR. MATASAR:  Okay.

16          MR. CARDANI:  Okay.

17          THE COURT:  Okay.

18          MR. CARDANI:  And -- but what troubles, I

19  believe, Ms. Brown is that she has made several

20  attempts, aggressive attempts, to get basic

21  identification information, financial information, and

22  things of the like from Mr. Seda.  And that's not just

23  because of the nature of this case.  It's as it would

24  be, as this court knows from its days as a magistrate

25  judge, in any bail consideration from someone who has

1  been indicted, arrest warrant issued, and somebody who

2  has been absent for four-and-a-half years from the

3  country, two-and-a-half of which he was an international

4  fugitive.  And he knew about the indictment, Judge.  He

5  knew about the arrest warrant two-and-a-half years ago

6  when it came to pass.  It was a public indictment.  So

7  he was an intentional international fugitive for

8  two-and-a-half years.

9       When somebody like that returns, regardless of

10  the charges, regardless of the background of the case,

11  Pretrial Services is charged with getting basic

12  information.  Where did you live?  Who were the contacts

13  that I can have to verify this?  E-mail, phone, whatever

14  you can give me.  How did you support yourself?  How did

15  you pay for rent?  Did you buy a house?  How did you pay

16  for your subsistence?  Who did you work for?  What did

17  you do?  Who are the contacts that I can use to verify

18  that as well?

19       Now, to the best of my knowledge, and we've

20  only gotten limited information from Pretrial, because

21  there have been some objections from Mr. Matasar on how

22  deep the government can get into this, but we asked for

23  information to Judge Coffin, we have asked for access to

24  any information that he's been given so that we can task

25  our overseas offices of the FBI to try to help the court

1    determine whether it's getting accurate information.

2         The only information we got, by and large, was

3    of a very general nature.  Mr. Seda was asked for, I

4    think by Ms. Brown, right from day one, where have you

5    lived?  And this has been an ongoing inquiry.  And I

6    think it was yesterday that for the first time that

7    Mr. Seda, through Mr. Matasar, offered an outline of

8    where he lived for the last four-and-a-half years.  We

9    were provided a copy of that yesterday.  I have looked

10   at it.  It is vague.  It contains no hard addresses.  It

11   contains no contact information on anybody that would be

12   able to verify that.

13        THE COURT:  I know you're a long ways away, but

14   does that look like what you are talking about?

15        MR. MATASAR:  Yes.

16        MR. CARDANI:  Yes.

17        MR. MATASAR:  There were also interviews.

18   Mr. Seda and I spoke well over an hour, and gave almost

19   identical information verbally, but that's a more

20   organized fashion, but, yes, that's correct.

21        THE COURT:  Sure.

22        MR. CARDANI:  But the point, Judge, is that it

23   took quite a while pulling teeth just to get that.  And

24   what that is is not very good.  It lacks details.  It

25   lacks -- if someone like Ms. Brown, or even the

1   government agents, wanted to verify that, it's like

2   reading a MapQuest, you go to this place, and you take a

3   left, and you look for this alley.  It's not very

4   descriptive.

5          And, you know, I think a larger point on this,

6   Judge, is that that doesn't answer the inquiry.  The

7   inquiry is not just where you lived, it's how did you

8   pay for it?  He moved around a lot.  How did he pay for

9   all of this?

10         And I'll get to the passports in a minute, but

11  we know Mr. Seda has traveled extensively, largely

12  throughout the Arab world, in the last four-and-a-half

13  years, extensively.  He had to turn in a passport

14  because it was out of room for stamps at one point.  How

15  did Mr. Seda pay for these travels?  What was the

16  purpose of these travels?  I think that those are

17  unanswered questions, unless there is information that's

18  been given to the court that I'm unaware of.

19         Do you have bank accounts?  Did you have bank

20  accounts there?  Do you have bank accounts here?  The

21  financial information is, I think, the glaring omission.

22  And this is, I think, in part what drove Ms. Brown's at

23  least initial detention recommendation, and I believe

24  current detention recommendation, is that we don't have

25  anywhere near enough information.  The court doesn't.

1    And the government would like to attempt to corroborate

2    this information to the extent that it's there, so that

3    we can determine exactly what he was doing during this

4    four-and-a-half year absence.

5         The passports, another troubling evolution,

6    Mr. Seda was -- when he was arrested on August 15th had

7    the United States passport in his possession that he

8    traveled on.  And that's the one that made its way into

9    evidence at the initial hearing.  We knew from some

10   early conversations that Mr. Seda claimed to have

11   traveled and residence (sic) in Iran and Syria, yet

12   there were no stamps on the passport indicating travel

13   to those countries, a troubling issue.  We raised that

14   as an issue at the first hearing.

15        What we then got from -- Mr. Matasar gave to

16   the court was a -- and it didn't come up until the

17   detention hearing, was somebody gave him a copy of an

18   Iranian passport that we saw for the first time.  And I

19   have a color copy here if the court wishes to look at

20   it.  But there is some troubling aspects to this.

21        First, the photo, Mr. Seda, his U.S.

22   passport -- well, before I get to that.  We learned

23   recently, and this is part of the evolution, that there

24   was a fourth passport, an old U.S. passport, which we

25   now have, a new U.S. passport, which we have, and then

1   we found out about an old Iranian passport that was

2   canceled in 2006.  So here you have Mr. Seda fleeing --

3   or leaving the country, becoming an international

4   fugitive, certainly by the time of the indictment in

5   2005, and he goes and gets an Iranian passport.  He

6   cancels his current Iranian passport, which I have here.

7   And this was good until 2009.  I don't know why he

8   needed a new Iranian passport.  It's got plenty of room

9   left for stamps.  There are empty pages.  And it seems

10  as though it was an otherwise valid Iranian passport.

11       What we got to the court eventually was a 2006

12  issued passport in the name of Pirouz Sedaghaty.  What's

13  really interesting and I think troubling about this is

14  that the spelling of his last name is slightly

15  different.  The date of birth is different.  And most

16  remarkably, the picture -- if one -- I'm not an expert

17  in this, but if you put the picture side by side, I'd

18  like to tender the color copies to the court, it does

19  not even appear to be, to the naked eye, to be

20  Mr. Sedaghaty.  I believe Mr. Matasar has seen this.

21            MR. MATASAR:  I've seen it.

22            MR. CARDANI:  I'd ask if I could tender these

23  to the court.  I'm showing you the current U.S. passport

24  and the recent Iranian passport, if I might, for the

25  benefit of the clerk.  And one can see those

1    discrepancies, the facial ones, and also of the date of
2    birth and the spelling.
3          So what are we to make, Judge, of the
4    passports, with all of the travel that Mr. Seda has
5    done?  And the passports indicate --
6          MR. MATASAR:  Excuse me, have you given the
7    judge both passports, both Iranian and both American, or
8    just one of each?
9          MR. CARDANI:  I have given him the current U.S.
10   passport and the current Iranian passport.  I have
11   copies of both old ones.
12         MR. MATASAR:  I'd ask that in conjunction he
13   see those as well.
14         MR. CARDANI:  Okay.  I'd tender copies of both
15   the old passports.
16         Judge, what those passports and the cancelled
17   passports show is that Mr. Seda, while an international
18   fugitive from charges in this court, traveled
19   extensively in Iran, Syria, Saudi Arabia, UAE.  And he
20   got an Iranian passport in 2006 that is what I believe
21   to be an attempt to disguise himself by information and
22   facial recognition.  If he has -- if that is true, then
23   that makes him a flight risk in my opinion, despite the
24   fact that he surrendered.
25         And we went round and round with Judge Coffin

1   on this.  And we were not able to overcome his statement

2   that, yes, but he returned.  And my response to that,

3   Judge, is -- and with all due respect to Judge Coffin,

4   who I respect immensely, is that Mr. Seda is back now to

5   fight the charges, as he claims.  And if it's a trial he

6   wants, it's a trial we will give him.  But when you look

7   at what he did before he left the United States, and the

8   operation he was running in al-Haramain internationally

9   and promoting the acts of mujahideen, and the prisoner

10  project, the Internet service provider, all of those

11  things, and he left during the middle of an

12  investigation that he knew he was the subject of, and

13  secreted himself overseas, and remained a fugitive for

14  four-and-a-half years, traveling extensively, with money

15  that is unknown, with jobs that are unknown, with

16  passports that appear to have been altered, then the

17  question that comes up for us is, what else is he going

18  to do while he's here?  And is he going to stick around

19  when it gets hot?  We're going to provide discovery.

20  We're going to enter into the trial prep and the trial

21  phase.  And it's our concern that he is a bona fide

22  flight risk.

23          We also believe, as I said before, that he is a

24  danger, for the reasons -- for the reasons I stated.

25          Judge, in conclusion, what our real concern is,

 1   where has he been getting his money while a fugitive?
 2   Why?  What was the purpose of all his travels?  And how
 3   was it funded?  And if he doesn't have access to a
 4   readily source of independent money here, it's our
 5   concern that he's going to be doing just the same thing,
 6   covertly, overtly, I don't know.  But we have gone round
 7   and round with Mr. Seda.  And the court, through
 8   Pretrial, has asked him for very detailed information,
 9   but fair, basic information of the likes that I've
10   talked about, the occupation, the travel, the money, and
11   I don't believe that those questions have been
12   adequately answered.

13            THE COURT:  Lea -- I'm sorry to -- Ms. Force.

14            THE CLERK:  Yes.

15            (Discussion held off the record between the
16   court and clerk.)

17            THE COURT:  I'm sorry, Mr. Cardani.

18            MR. CARDANI:  Judge, one issue that came up at
19   the detention hearing is that Mr. Seda claimed to
20   Pretrial, through Mr. Matasar, that when he left the
21   United States, he left and had proceeds from the sale of
22   a house, which netted $475,000.  We've looked into that.
23   And it is true that he sold a house and netted roughly
24   $475,000.  But we also know from the escrow records that
25   Mr. Seda had all these credit cards to pay off, and a

1    bunch of other bills that were paid from that money, and

2    that money was reduced down substantially to a figure of

3    $78,000.  And that was over a year before he left the

4    United States.  And we know from bank records that we

5    submitted to Pretrial Services that that money was drawn

6    down as well.  And the bank accounts that we know of

7    showed that Mr. Seda had, at most, $30,000 from bank

8    accounts when he fled the United States in 2003 during

9    the investigation.

10        When the search warrant was done, a year later,

11   Judge Cooney had issued it, Mr. Seda was operating a

12   building for al-Haramain purchased by al-Haramain money

13   that was used as his residence, as a prayer house, and

14   had some land on it.  In trailers on this prayer house,

15   we -- the FBI and IRS found a number of weapons.  Those

16   weapons are delineated in the government's memorandum,

17   several weapons, semiautomatic handguns, ammunition, and

18   the such.

19        We believe that those weapons are now in the

20   possession of Mr. Seda's son.  The weapons were not

21   seized because Mr. Seda at the time, who was gone, had a

22   concealed weapons permit, and the weapons were otherwise

23   lawful.

24        If I may take a look at my notes, Your Honor,

25   if I may have a moment.

1          (Discussion held off the record between the
2    prosecutor and agents.)

3          MR. CARDANI:   Judge, two other matters before I
4    conclude.   Mr. Seda's wife, who I think is in the
5    courtroom, arrived recently into the United States.   I
6    don't know about all the details, but I understand that
7    she knows very little about Mr. Seda's recent travels
8    and what he's been up to.

9          I think that they've been apart the better part
10   of two years, and she did not have any helpful financial
11   information that she was willing to share to the court,
12   to the best of my knowledge.

13         But, Judge, also, the information that has been
14   given is scant.   If there is more information provided,
15   given this record, it should not be accepted at face
16   value.   It cannot be accepted at face value.   And part
17   of the troubling aspects of this is we don't have a
18   Pretrial Service offices in Bahrain or Damascus, Riyadh,
19   or United Arab Emirates.   But we do have some resources
20   that we can use to run down information, and we're
21   willing to do that.

22         One of the problems, though, is if Mr. Seda has
23   been taking money and taking support from people that
24   he's not allowed to, it may be a crime.   And so there is
25   a -- I point that out because I don't want to set a box

1    here for Mr. Seda that he's giving us information that

2    we're, you know, building a potential case against him

3    for. But that is an -- and I don't know if it's true,

4    because we just don't have that information. But given

5    the fact that he hasn't come forward with any

6    information like this, it remains a real concern of

7    ours. We would like to run down the information and are

8    happy to do so, but we do have those concerns.

9         Judge, back to how I opened this, as a matter

10   of procedure, we're perfectly willing to fly the

11   witnesses back out here, and start this from the ground.

12   It's going to take some time. And I'd need a stay of

13   Judge Coffin's order to set this up.

14        Short of that, we can expedite the transcripts

15   from the court reporter and tender them to the court. I

16   haven't spoken to her again about when that can be done,

17   but my guess would be if it's expedited with the court's

18   assistance, it may be done as early as next week, I

19   don't know, from the court reporter. Or the court can

20   consider the submission on the current record.

21        But we feel strongly about this. As I said,

22   it's the first appeal in 15 years I've been doing

23   business here. And we do consider him both a danger to

24   the community and a flight risk.

25        THE COURT: Why do you believe he came back?

1          MR. CARDANI:  Well, there is a lot of

2     litigation going on involving al-Haramain throughout the

3     country.  And I think part of that may be that he's here

4     to promote the litigation.  There is a suit by

5     al-Haramain to reverse the terrorist designation

6     currently filed in Portland.  There is a Ninth Circuit

7     appeal that was heard the very day Mr. Seda returned to

8     the United States, August 15th.  The issue is involving

9     the National Security Agency, and whether they

10    essentially wiretapped conversations between

11    Mr. al-Buthe and civil attorneys in Washington, D.C.  So

12    I think that perhaps it's part -- it's partially to get

13    that going.

14          And there is nothing sinister, necessarily,

15    about that, but if the court wants my opinion, I think

16    it may be that.

17          Maybe it's that he's sick of living overseas,

18    where the freedoms are fewer, and money may be harder to

19    come by, I don't know.

20          But the more sinister explanations could be

21    that he's here to do what he did before, and that's

22    support, in the United States, as a U.S. citizen, the

23    very acts that he took off, when he was under

24    investigation from, in the first place.

25          And the reason we don't know any of this is

1   because, by and large, the information that would help
2   us determine that has not been forthcoming.  There is no
3   financial information, that I'm aware of, that is before
4   the court to explain really what he has been doing for
5   the last four-and-a-half years.
6           And if that's the case, given his background
7   and what he did here, all the travelling he's done, it's
8   extremely troubling.  And I think it just raises some
9   very serious questions for the government and for the
10  court.
11          THE COURT:  All right.  Thank you.
12          Mr. Matasar, before you start, I -- the
13  computer does not show a memo filed by you since
14  August 21st.
15          MR. MATASAR:  That's correct, Your Honor.  I
16  believe that is the date.
17          THE COURT:  All right.  So it's the August 21
18  memo I need to read, right?
19          MR. MATASAR:  Yes, and exhibits, correct.
20          THE COURT:  Thank you.
21          MR. MATASAR:  Your Honor, I'm going to start
22  with the end about what Mr. Cardani said, because I
23  think that's the -- the most telling aspect of this
24  case.  When you asked him why you think he came back, he
25  said, first, because he wanted to be involved in the

1    lawsuits and the litigation, that there was some

2    litigation trying to reverse the designation.  I've

3    submitted that lawsuit with my papers.  I've submitted

4    some of the supporting documents for that lawsuit.  Very

5    telling, important litigation.  There is also other

6    litigation concerning a secret document.  There is --

7    that's involved.

8         And if that's why he came back, there is no

9    reason to detain him, except to keep him quiet, and make

10   it difficult for him to do that, if that's why he came

11   back.  If he came back because he was tired of running

12   and he was just -- it was difficult for him being an

13   anti-terrorist, pro-peace Muslim in the Muslim world in

14   this day and age, and I've indicated some of that in my

15   documents, if that's why he came back, being an American

16   living in Iran in this day and age, where there is an

17   anti-American fervor in Iran, if that's why he came

18   back, well, more power to him.  That's not a reason to

19   detain him.

20        If the government's only other reason they gave

21   is saying that he intends to engage in some sort of

22   complicated -- they've even indicated financial --

23   machinations, or what, the court can easily control

24   that.  This court does that.  And Judge Coffin has had

25   people making multi-million dollar -- I wouldn't say

1    it -- in those cases, swindles, frauds allegations, and

2    this court routinely crafts careful conditions to allow

3    people to be out, and yet their bank accounts being

4    maintained.  So if those are the reasons why he came

5    back, he should be released.

6         I am frankly surprised, Your Honor, that

7    Mr. Cardani is even making claims about danger, because

8    this is what Judge Coffin said yesterday.  He said,

9    "There is no presumption from the charges that he's

10   charged with that he's a danger.  And I'm not persuaded

11   by the evidence that the government has presented that

12   he constitutes a danger to the community.  And, in fact,

13   there has been several instances in which the government

14   has stated on the record that they didn't believe he was

15   a physical danger to the community.  Am I correct in

16   that?"  Mr. Cardani says "Yes."

17        So the kind of danger that they are talking

18   about is so vague and diffuse that it can be easily --

19   and we believe there is certainly no support for it, we

20   believe that it could be easily dealt with by release

21   conditions.

22        What you don't have, Your Honor, I don't think

23   now, is the information that Pete Seda is a force for

24   peace in the community, not a danger.  He's written a

25   book on Islam, some of which I've attached.  I've also,

1   I think, cited the entire book, which is available on
2   line, called *Islam Is,* translated into seven languages,
3   distributed widely throughout the world, in the United
4   States and in the Arab world.   It flatly states
5   terrorism is against Islamic principles.   The killing of
6   innocents is murder and a crime against humanity, even
7   during times of war, and even when the other side does
8   not similarly respect human life.   That's his belief.
9   That's what he's always believed.
10        He distributed this literature in foreign
11  governments -- in foreign countries, even while he was
12  gone this recent period of time, causing him to receive
13  threats and other difficulties.
14        There is a letter in my materials from Rabbi
15  Zaslow, the rabbi and spiritual leader of the Ashland
16  synagogue.   And this is what Rabbi Zaslow says, and
17  Judge Coffin, because I believe he felt that the rabbi's
18  comments were important, spoke about them on several
19  occasions as he was making his decision.   Rabbi Zaslow
20  says that from the time he was ordained, which was, I
21  think, in the '80s, until several years after
22  September 11th, quote, Pete Seda was my peace partner in
23  bringing a bit of hope to both the Jewish and Muslim
24  communities of southern Oregon.   He spoke passionately
25  against violence, Islamic terrorism, and for

1    reconciliation with the Jewish community.  He took some

2    personal risks not only to associate himself with the

3    Jewish community here, but to proclaim a very positive

4    public view about Israel.  That's what the rabbi says.

5         We called on a minister, a Lutheran minister,

6    at the hearing who gave similar comments to Judge

7    Coffin.

8         Another thing that is surprising to me, Your

9    Honor, here today to hear Mr. Cardani is to hear him

10   talk about the evidence, which I can only think of is

11   evidence in quotation marks about things that Mr. Seda

12   has done.  This letter that he talks about being found

13   on the servers of a -- some sort of Internet service

14   provider that was somehow linked with the defendant,

15   this letter supposedly from Osama bin Laden in argument

16   was thoroughly discredited at the previous hearing.

17        I am just shocked that Mr. Cardani is standing

18   in a federal courthouse and arguing that somebody should

19   be detained based on Exhibit O.  We -- they had two

20   experts testify at that hearing, Your Honor.  None of

21   them could even read the Arabic.  In this Exhibit O

22   there is Arabic, which is purportedly from Osama bin

23   Laden.  They couldn't read Arabic, yet they're supposed

24   Arabic experts.  Our expert, a professor at the

25   University of California, said having an expert on the

1   Middle East that can't speak Arabic is essentially like

2   having an expert on the United States that doesn't speak

3   English.  It's nonsensical.  But this document, A, our

4   expert explained, that the Arabic is not accurate.  It

5   is not the kind of sentence structure that would even be

6   written by a true Arabic speaker.  And our expert is.

7   He was a -- Professor AbuKhalil was a native Arabic

8   speaker.  I believe he was born in Beirut.  He said that

9   this looked like the kind of thing that came out of

10   perhaps some sort of Internet translation program, or

11   some sort of simple translator, because it doesn't make

12   sense.  Things like, me store go now, that sort of

13   thing.  The government is presenting this.

14        Not only that, the e-mail address that this

15   document supposedly came from is

16   osamabinladen@hotmail.com.  Hard to believe that -- and

17   our expert, who was enough of an expert that he wrote a

18   book on Osama bin Laden, said he was a sophisticated

19   user of the Internet, and would never, in his opinion,

20   have an e-mail address like

21   osamabinladenmuslim@hotmail.com.

22        The government says they don't want religion to

23   be part of this case, yet they bring it up again and

24   again.  They fail to mention that this evil Wahhabi

25   faith is -- both was and is the other official faith of

1   the government of Saudi Arabia.  They don't tell the

2   court, as they very well know from the previous hearing,

3   that the books that the -- that the Saudi Arabian

4   government is the foremost proponent of Islamic

5   literature in the world.  And that as Professor

6   AbuKhalil said, they won't even give you a potato

7   without a book attached.  And when you get a book, you

8   get their version of the book.  That doesn't mean that

9   it's -- there is anything wrong with distributing

10   literature.

11         Mr. Cardani talks about al-Haramain being

12   designated.  That is correct.  The Treasury Department

13   has the power to designate individuals and to designate

14   organizations.  Pete Seda was not designated.  That's an

15   important fact.

16         As far as the delays with Ms. Brown, I know the

17   court has a much closer relationship with Lisa Brown

18   than I do.  We provided her with information.  She

19   simply did not accept what we believe is a fact, that

20   there are no addresses, as we know them, in Saudi

21   Arabia, in Syria, or in the United Arab Emirates.  We

22   gave her as many descriptions as we could as far as

23   where Mr. Seda lived.  As far as Iran, we said there

24   were addresses.  And I gave her the specific addresses

25   in e-mail form, and a way to verify those.

1            In the typical case here, Your Honor, the
2    Pretrial Services will verify with the spouse, will
3    verify with others things like where the defendant was.

4            As far as the tax information, as far as the
5    detailed financial information, I have told Mr. Cardani
6    that we're simply not going to provide that, because
7    this is a tax case.  He has not indicated that the
8    information we provide would not be used against the
9    defendant at trial.  I've asked him that.  He was
10   unwilling to do that on at least two occasions.  In our
11   view, it is not routinely asked in pretrial settings and
12   should not be required here.  The court can make -- and
13   if the court saw the questioning of our character
14   witnesses, we called a Lutheran minister at the hearing
15   to talk about Pete Seda's character, how she knew him,
16   how well she knew him, and what she knew about him.  The
17   questions from the government were simply when is the
18   last time you talked to him?  Where did you see him?
19   Have you been in contact with him?  That sort of thing.

20           We also believe that people will simply not
21   give correct verification information about Mr. Seda,
22   which is another major problem, especially when law
23   enforcement calls.  I indicated -- I talked about that
24   in my letter.

25           The differences in the date of birth, I think

```
 1    if the court looks -- I think -- and I'm not an expert
 2    on this.  I believe there -- if you look at all
 3    Mr. Seda's Iranian documents and all his American
 4    documents, there is a difference in the date of birth.
 5    However, they are consistent.  He was born in Iran.  All
 6    those documents have one date.  In the U.S., when he
 7    came here, his citizenship papers and others, I believe,
 8    have this different date.  That happened when he became
 9    a citizen.  It's been consistent throughout the time.
10    There is no recent attempt to --
11         THE DEFENDANT:  When I came to the United
12    States in 1976.
13         MR. MATASAR:  Yes, in 1976.  If you look at the
14    documents, when he came here in 1976, not just recently,
15    if you look at those documents.
16         THE COURT:  Explain that difference in dates
17    again.  I didn't understand it.
18         MR. MATASAR:  Your Honor, I'm not sure of the
19    exact reason why the dates -- and perhaps in a
20    conversion, the birth certificates were different.  I
21    could find that out for you.  I've spoken with other
22    people -- other Middle Eastern people.  I can say that
23    the dates -- the different dates predate this
24    investigation in this case.  That's my main point.  As
25    far as how it originally occurred, I think it occurred
```

1   near the time of his birth -- near the time when he

2   first came to the United States as a student.  So beyond

3   that, I don't know the precise information.

4        In our view, again procedurally, we're open to

5   however you wish to do it, we believe the court has

6   sufficient information, even given these accusations,

7   which have a completely -- we also talked a little bit

8   about the geopolitics, some of which is in my letter,

9   just are, in many ways, nonsensical.

10        Even granting all of that, if you look simply

11   at the charges -- we don't want to make this too

12   complicated.  You look at the charges, you look at the

13   voluntary return, you look at the conditions that can be

14   imposed by the court in a pretrial setting, we simply

15   think the court should release Mr. Seda with the same

16   conditions that Judge Hogan did -- I'm sorry, that Judge

17   Coffin did.

18        Let me also give Your Honor the documents.  I

19   believe you have all of these.  All I'm presenting to

20   the court now, and I would like a copy later, is the

21   material that Lisa Brown gave me that she said that she

22   gave to the government.  I had objected to the

23   government getting some of this material.  I thought it

24   was inconsistent with the Pretrial Services statute.

25   Judge Coffin disagreed.  And I -- but he did agree that

1    I should get all information that was provided to the
2    government.  So I believe the court has all of this, but
3    I just want to make sure.
4         THE COURT:  I think I do.  I've sent for your
5    August 21 memo, also.
6         MR. MATASAR:  Okay.  All right.
7         THE COURT:  Mr. Matasar, why didn't your client
8    disclose the Iranian passport at the first Pretrial
9    Service interview?
10        MR. MATASAR:  I was there, Your Honor.  There
11   was no question that I recall about another passport.
12   As soon as it came up, we gave them the passport at the
13   hearing.  I was unaware that there -- I can't remember
14   exactly what happened.  The way the interview occurred,
15   Your Honor, it was via a kind of Internet phone and a
16   telephone.  Ms. Brown missed several things in that
17   interview.  She told us when we saw her in person that
18   we didn't tell her about Mr. Seda's wife.  And I said,
19   "Yes, we did.  I was there.  We told you about his
20   wife."  And then she looked at her notes, and she said,
21   "Oh, yes, here, I have it.  I wrote it down wrong."  I
22   simply don't recall any sort of question.  As soon as it
23   became an issue, we provided it to the government early
24   on.
25        THE COURT:  Here is what Ms. Brown says in a

1   memo to me today:  When asked about passports, this was

2   on the August 13 interview, the defendant admitted to

3   having a valid American passport.  He failed to report

4   his Iranian passport.  Now, on his arrest, it says his

5   American passport was confiscated.  And then the Iranian

6   passport, when it was questioned at the hearing, was

7   produced.  Which American and which Iranian passport?

8        MR. MATASAR:  The American passport that was

9   seized at the time of arrest was a valid American

10  passport.

11       THE COURT:  Was it the earlier one or the later

12  one?

13       MR. MATASAR:  No.  The -- what happened, Your

14  Honor, was the earlier American passport was surrendered

15  at the Embassy in return for a new one.  It was

16  invalidated.  They punched it in two places.  Okay.  So

17  when he had to travel, he could only travel with a valid

18  passport.  There is a cancelled stamp on it with a date.

19       THE COURT:  Sure.

20       MR. MATASAR:  So that's the American passport.

21  The Iranian passport was obtained before -- or at the

22  time of detention hearing, I think I didn't have a

23  chance to give Mr. Cardani it before the hearing,

24  although I had it before the hearing.  And I gave it to

25  him at the recess.  Then we also found -- or there

1    was -- we were able to get a previously cancelled

2    Iranian passport, which we have provided to the court,

3    through Ms. Brown.

4         The photograph, Your Honor, Mr. Seda, I think,

5    could address this maybe more appropriately and more

6    detail in chambers.  I can only say, and as you can

7    imagine, if you are an American in Iran now, it's an

8    extremely difficult time.  And he had a lot of

9    difficulties there, mostly because of his

10   pro-Americanism, of all things, given where we are here,

11   similarly in United Arab Emirates.  His problem in the

12   Middle East was that he was an American and not what

13   Mr. Cardani wants you to believe.

14        Another thing, Your Honor, at one point

15   Mr. Cardani said, when Judge Coffin asked, "Well, do you

16   think he's a Trojan horse?  Do you think some

17   intelligence service sent him back here in order to

18   wreak havoc?"  And Mr. Cardani said, "Well, maybe, yes,

19   maybe that's the case."

20        THE COURT:  Why was the second American

21   passport obtained?

22        MR. MATASAR:  The second American passport was

23   obtained because the first one was filled up with

24   stamps.  If you look at the first one, you will see it's

25   completely filled.  And Mr. Seda -- because, Your Honor,

1   when you are in Dubai, they have a system which I think

2   was similar to one proposed in the U.S. recently,

3   immigration reform.  If you are not a citizen, you have

4   to leave every 60 days, I believe.

5          THE DEFENDANT:  Fifty-nine days.

6          MR. MATASAR:  Fifty-nine days, in order to

7   leave and reenter and get another temporary Visa.  I

8   think they call them Visa trips.  It's very common.

9   Lots of people do it.  You go out, you come right back

10  in --

11         THE COURT:  I'm aware of that --

12         MR. MATASAR:  -- it's a normal, accepted thing,

13  stamp, stamp, stamp.

14         THE COURT:  -- not in those countries, but I'm

15  aware of it in other countries.

16         MR. MATASAR:  Okay.  Right, right.  So that's

17  what happened.  If you look at it, it's filled, and he

18  turned it in -- if you look at the first American

19  passport, Your Honor, you'll see it's marked

20  "cancelled."  There is a big cancelled stamp on it and a

21  date.  And that's really what happened.  There is no

22  mystery to that.

23         THE COURT:  Why are the names spelled

24  differently?

25         MR. MATASAR:  Your Honor, I think if you look,

1    that's a problem throughout this case.  I think we have

2    a different name -- sometimes I do, the government uses

3    others.  All I can think -- I think there is

4    transliteration problems.

5           (Off-the-record discussion between the

6    defendant and defense counsel.)

7           MR. MATASAR:  As I understand it -- and

8    transliteration may be the wrong word.  That's my word,

9    not my client's word.  I believe the I is used typically

10   in Iran.  The Y is used typically in the U.S.  There are

11   numerous changes throughout time with Arabic spellings.

12   Koran used to be K-O-R-I-N -- sorry, K-O-R-A-N.  Now

13   it's Q-U-R apostrophe A-N.  In translating --

14   transliterating from Arabic to the United States, there

15   is many of those changes.  Also, especially after the

16   revolution.  My client tells me there were problems.

17          Certainly, Professor AbuKhalil is the man who

18   could most explain that.  He's not here.  I just don't

19   know the answers to those questions.

20          Again, what Mister -- what Judge Coffin said

21   was he even ascribed a more negative view of it, that

22   somebody is just trying to avoid detection, and maybe

23   intentionally used the wrong -- used different

24   addresses, which we don't believe is what occurred.

25   Even then, what Judge Coffin said is, I can see somebody

1   doing that, which didn't happen here, nonetheless, he

2   got tired of running, he came back, and, therefore, I

3   can fashion these conditions.

4        So we didn't have a chance there to give him an

5   explanation, but in our view, the voluntary surrender is

6   important, the single most important fact.

7        THE COURT:  How will he support himself if he's

8   released?

9        MR. MATASAR:  Your Honor, Mr. Seda is a gifted

10  arborist.  I believe, if you look at my materials, when

11  you get them, in the past he's been hired by the City of

12  Eugene, in fact, to solve problems with saving old

13  trees.  He's been hired by the City of Ashland to have

14  similar work, save old growth trees, within a city

15  limit.  We believe there are several places where he'd

16  be able to get work.  Within a week or two, he'd be able

17  to do that.

18       THE COURT:  And how did he support himself for

19  the four-and-a-half years he was out the country.

20       MR. MATASAR:  We provided much of this with

21  Ms. Brown.  And I have materials.  He tried various

22  kinds of consulting work and sales work.  He would work

23  either -- essentially, buying and selling equipment,

24  buying and selling other materials.  He did some

25  consulting work as part of his expertise, his arborist

1     work.  Primarily, though, he would work in sort of sales
2     for legitimate companies.

3             He had a card.  The court will have a card that
4     he used in the United Arab Emirates, a card that he used
5     in Syria, and a card that he used in Saudi Arabia.  All
6     of those -- I'm sorry, two companies.  All of those are
7     in the material that we gave to Ms. Brown.  We also gave
8     some assorted things, which Mr. Cardani sort of implied
9     was nonsense, but in order to show that he was where we
10    said he was, we gave things like a shoe sizing slip that
11    he got when he was buying shoes in Syria.  The point of
12    giving that to her was is that it showed that he was in
13    Syria on a certain date.  That is what we tried to do.
14    And so that she knows that he was where he said he was.

15             THE COURT:  And --

16             MR. MATASAR:  And the community has opened
17    itself up to him.  Jeff Golden, who testified, has
18    indicated -- he's a public radio host, close to -- I
19    think in some of my papers, I say this, there were those
20    who thought he should run against Senator Smith for the
21    United States Senate.  He has indicated Mr. Seda could
22    stay with him.  A lawyer, David Berger, a retired
23    antitrust lawyer from Seattle, who knows Mr. Seda.  The
24    community is behind him.  We hope he can get work, too.
25    I'm sorry.

1          THE COURT:   Where did he live and how was he

2     employed for two years in Iran?

3          MR. MATASAR:   In Iran, we have two -- we have

4     the addresses.   I don't have them in my head.   There is

5     an e-mail that I gave to Ms. Brown which lists both of

6     those addresses.

7          THE DEFENDANT:   Four addresses.

8          MR. MATASAR:   There were two major addresses,

9     there were some other addresses briefly in the meantime.

10         As far as his employment, it was similar

11    consulting.

12         (Discussion held off the record between the

13    defendant and defense counsel.)

14         MR. MATASAR:   Oh, oh, that's it.   I'm sorry,

15    Your Honor, I'm told that one of Iran's largest trading

16    partners, if not the largest, is Dubai.   And there is a

17    huge amount of trade between those two countries.   Dubai

18    is actually one of the United Arab Emirates.   And

19    Mr. Seda was involved in both places.   Remember, he is

20    Iranian.   He has a natural -- has family there, his

21    birth place is there.   And he was trying to work,

22    although it was extremely difficult given his ties to

23    America, trying to work in importing stuff between Saudi

24    Arabia -- I'm sorry, between Dubai and Iran.

25         THE COURT:   What languages other than Farsi and

1    English does he speak?

2         MR. MATASAR:  None, Your Honor.  He is not

3    fluent in Arabic.

4         THE COURT:  Well, some comments.  I'm obligated

5    to take a fresh look when this comes to me.  Of course,

6    I have respect for Judge Coffin.  I hired him because

7    he's smart.  But -- and I hate to ask you to fly all

8    these -- bring these witnesses back, and I don't think

9    it's necessary.  If there is someone you want to hear on

10   the phone, fine.  If transcripts will suffice, they

11   probably would for most of this.

12        My questions have to do more with flight risk.

13   The amount of information, I appreciate the answers

14   you've given me today to my questions, but I could tell

15   you that Pretrial has lots of unanswered questions here.

16        I asked whether -- I asked Ms. Brown whether

17   Judge Coffin had given her authority to look at the

18   affidavit filed in connection with appointment of

19   counsel.  And she said he had, but she had not looked at

20   it.  And, frankly, unless there is an objection, I

21   intend to.

22        MR. MATASAR:  That's fine, Your Honor.

23        THE COURT:  Then there are some detail,

24   frankly, that I'm going to want on some of these areas

25   that I have talked about.

1        MR. MATASAR:  Your Honor, we'll be happy to

2   provide that.  If you want to give that to us from the

3   bench or put it in a minute order, we're happy to

4   provide that.  I expect we can.

5        THE COURT:  Well, with regard to Ms. Brown and

6   her supervisors, I've been contacted by her and those up

7   the line, let's put it that way.

8        MR. MATASAR:  I'm not surprised.

9        THE COURT:  They are concerned about whether

10  the information is verifiable.  They are concerned about

11  the passport issues that I've just been asking you

12  about, and I pointed out some of the questions.  They

13  have questions about this two-year period in Iran where,

14  at least to Ms. Brown, no one, including the defendant's

15  wife, can report where he was staying or how he was

16  employed.

17        MR. MATASAR:  Your Honor, she's not -- it's

18  difficult for her to go to Iran.  She did not go.  And I

19  provided Ms. Brown with the person who was with him.

20        THE COURT:  There is easy communication to Iran

21  though.

22        MR. MATASAR:  Communication, not so much

23  travel.

24        THE COURT:  Yeah.  I'm going to base -- I'll

25  base it on what is in the record, but I have a number of

1    Iranian friends who some are citizens of this country

2    and some not, and they manage to travel some.  And I

3    won't -- that won't be a part of it, but there is

4    telephone service, I know.

5              MR. MATASAR:  Certainly, certainly.  We gave --

6              THE COURT:  Internet service.  My son sent us

7    an e-mail this morning from Shanghai, so the world is

8    getting smaller, not bigger in that regard.

9              MR. MATASAR:  Right.  Women traveling to Iran,

10   different matter.  But in any event, I just want to make

11   clear that there is an e-mail, which I think the court

12   has, where I gave Mr. Seda's addresses to Lisa Brown and

13   a contact person, his ex-wife.

14             THE COURT:  I will study all this material.

15   Here is what Ms. Brown said, to summarize, Pretrial has

16   very limited financial information for the past

17   four-and-a-half years.

18             Now, I am also sensitive to the fact that there

19   is a tax charge here, and a money laundering charge, and

20   some information perhaps can only be submitted in camera

21   to the court.  And I am aware of that.  And if I need

22   help to understand it, I suppose I could retain my own

23   expert to help me in an in camera consideration.  But

24   I'm going to respect the questions they have at this

25   point.

1          With regard to schedule, I am going to continue

2     this consideration to next Tuesday at 1 o'clock.   Judge

3     Coffin's order is stayed until the result of that

4     hearing.

5          And if you want to present -- if you want to

6     call other witnesses or present other information, you

7     know, the sooner you can get it to me, the better,

8     because your client, Mr. Matasar, deserves as speedy a

9     consideration of this as we can give it.

10          MR. MATASAR:   Your Honor, I think you might

11     have a little more persuasiveness with regard to getting

12     the transcript rushed.   I think both Mr. Cardani and I

13     would like to know if the transcript from the previous

14     hearing would be ready by that date.   I think that might

15     allow us to go in one direction rather than another.

16          THE COURT:   I plan to inquire, but I've only

17     been doing this work for 34 years, and court reporters

18     have their own independent spirit on these things.

19          MR. MATASAR:   Yes, I understand.   Let me have a

20     minute.

21          THE COURT:   Sure.

22          MR. CARDANI:   Judge, what we've been discussing

23     is that if the court is not so much interested in

24     hearing evidence on the dangerousness issue, then the

25     testimony that is transcribed was by and large a lot of

1   that.   There was very little that I think the court is

2   going to find of any assistance in the transcripts on

3   the flight issue.   If the court wants to review the

4   dangerousness evidence and those witnesses, we can order

5   an expedited transcript.   It's a funding question.   But

6   we will get it done.   And it would just depend on

7   Ms. Anderson's schedule.   And we can get that done.

8          THE COURT:   Let me just comment about that.

9   It's true that my focus is on the flight risk at this

10  point.

11         With regard to the type of danger you're

12  talking about, I'm not commenting one way or the other

13  about whether it exists, but I believe that I have tools

14  at my disposal to help me.   If I need to control the

15  defendant's travel, or associations, or activities, I

16  can do that.   I can control him, whether computers are

17  available, or whether other kinds of things happen.

18         MR. CARDANI:   So given that, and I don't want

19  to interrupt.

20         MR. MATASAR:   Go ahead.

21         MR. CARDANI:   Given that, I'm not sure that the

22  lack of transcripts will be an issue for the court.   I'm

23  willing to let this go forward without those transcripts

24  right now, if Mr. Matasar is.

25         MR. MATASAR:   My concern is if I am going to

1    need to bring real live witnesses to rebut their real

2    live witnesses.  If what Mr. Cardani is saying is he

3    doesn't intend to call additional live witnesses to go

4    into the dangerousness, that's fine with me.  And then I

5    won't either.  And then we'll focus at this hearing on

6    the flight risk, and won't present additional material

7    to the court.

8             THE COURT:  Mr. Matasar, I don't presume to

9    tell you what sort of information that could reflect on

10   the tax charge to make available to the government or to

11   me, but I am willing to look at material in camera.  And

12   to the extent you can give us some confidence to the

13   people advising me on these issues of how someone

14   financially handles this travel, and what their

15   activities were, and given the history of the passport,

16   I'm quite concerned about the fact that the Iranian

17   passport was not disclosed.  And so, you know, that

18   shakes someone's confidence in whether they have them

19   all.  And that's the sort of thing I'm interested in.

20            MR. MATASAR:  I understand that, Your Honor.

21   You are focusing on perhaps hidden assets that might

22   make flight easy rather than how he earned his living in

23   some general sense; is that true?

24            THE COURT:  That's right.

25            MR. MATASAR:  Is that what you are saying?

1         THE COURT:  Yes.

2         MR. MATASAR:  And, again, if you -- if I heard

3    what Ms. Brown said, she said, I asked him about the

4    American passport, and he didn't tell me about the

5    Iranian passport.  I think -- and, again, I have -- I

6    think I have notes, but you can't -- I don't think -- go

7    to Iran and Syria with an American passport.

8         THE COURT:  Could be.

9         MR. MATASAR:  I don't think there was

10   anything -- I don't think there was any intent to hide.

11   I'll get all that for you, Your Honor.  I'm reading Your

12   Honor clearly that one of the things you are concerned

13   about is the Iranian passport and I'll have that

14   material for you.

15        THE COURT:  You tempt me to call my friend Ali

16   who watched the football game with me Saturday.  It may

17   be a quick call.

18        MR. MATASAR:  Not in Ann Arbor.  I was at that

19   one myself.

20        I don't think -- I think he will tell you, Your

21   Honor, that -- probably not the best way for us to go

22   about this, but I don't think an Iranian can go to the

23   country of Iran with an American passport.

24        THE COURT:  I don't know.  He's offered to take

25   me, but maybe he doesn't know.

1                    THE DEFENDANT:  An American can.

2                    MR. MATASAR:  An American can, I think.  I

3       think you can.  Mr. Seda can't.

4                    THE COURT:  Okay.

5                    MR. MATASAR:  So as far as in camera, Your

6       Honor, do you want to simply have an in camera

7       discussion directly with the defendant?  We have no

8       problem with that.

9                    THE COURT:  That would be -- that would

10      probably be helpful but --

11                   MR. MATASAR:  Okay.

12                   THE COURT:  -- we're looking for things that we

13      can verify.

14                   MR. MATASAR:  Right.

15                   THE COURT:  And that doesn't really give us

16      that so much.

17                   MR. MATASAR:  I understand.

18                   THE COURT:  Whether they have addresses in

19      Damascus or so on, I don't know.  I've not been to

20      Damascus, but there is some information that we should

21      be able to verify.

22                   MR. MATASAR:  Okay.

23                   MR. CARDANI:  Judge, a couple of points of

24      clarification.  The Iranian passport, the cancelled one

25      and the current one, neither were on his possession when

1    he was arrested.  They somehow got to Mr. Matasar from a

2    separate source.  They were not with Mr. Seda when he

3    returned to the United States.  I don't know why.

4        I respect that the court is heading towards, on

5    the financial information, and it's a difficult one, but

6    I ask, when the court reviews whatever financial

7    information comes forward, it hasn't been forthcoming to

8    this point, and there is some type of reason for that.

9    And I think there is a probably negative inference at

10   this point that can be drawn from it.

11       MR. MATASAR:  Blame it on me, much of it should

12   be blamed on me, because I specifically said we're

13   not -- we're worried about it.  That's my fault.

14       THE COURT:  We're happy to think negative

15   things of you, Mr. Matasar, if you insist.

16       MR. CARDANI:  There are no negative inferences

17   to Mr. Matasar, I assure you.  He's been a pleasure to

18   work with.

19       But I do want to say this:  Any financial

20   information that comes to the court, Judge, there is

21   some real serious issues with Iran these days.  There

22   are economic sanctions, that I'm sure your friend can

23   attest to.  One can't just go there and engage in all

24   types of acts of commerce as an American citizen without

25   running afoul of economic penalties and criminal

1    penalties.

2            THE COURT:   I've handled some of those cases.

3            MR. CARDANI:   Okay.   So if the court does not

4    want to share the information with us to help run this

5    down, I'd just ask that the court keep that in mind.

6    And if he was committing crimes in Iran by engaging in

7    prohibited activities while an international fugitive

8    with a secondary passport that he got in 2006, with the

9    different facial expression, different date of birth,

10   and a different spelling of his last name, all kinds of

11   negative inferences, I think, should be drawn from that.

12           Now, in terms of what we're able to do for the

13   court to get the court some more information from our

14   standpoint before next Tuesday, are there any issues

15   that the government can address?   Whether one has a

16   fixed address, do people have houses with numbers on

17   them in Syria and Iran, is that going to be of

18   assistance to the court?

19           THE COURT:   Could be.   I don't know.   You know,

20   you both get to box a little bit, because you need to be

21   sensitive to any information you have that could result

22   in further criminal exposure, and Mr. Matasar knows that

23   the more detail he gives me, then the better it's going

24   to be for the case he's making on release, and sometimes

25   people decide not to tell things and take their chances

1    on release.  That's -- those are decisions you folks

2    will have to make.

3            MR. CARDANI:  And the IRS has lots of very good

4    resources at running down financial information.  We all

5    know that.  If there is anything that we can do to help

6    corroborate that to the court, we stand willing to do

7    that as well.

8            But I understand the sensitivities with that.

9    But the financial information is really the huge hole in

10   this, the unexplained hole, how was all this travel

11   funded, and what he did to maintain himself while

12   overseas is the most troubling issue for us in terms of

13   flight risk, along with the passport.

14           So we will do our best to prepare for the

15   hearing anything we can think of, but --

16           MR. MATASAR:  Can I ask why that is, Judge, I'm

17   trying to answer this:  There are two questions that I

18   have so we can try to get the court the best possible

19   information.  One is, we see people, say, selling drugs

20   who are here for the third time, and they want to get

21   out.  And, frankly, they've been selling drugs for the

22   last year.  And -- or defrauding something, whatever.

23   I'm not sure exactly what the link is here because let's

24   say -- and I'm just making this up now --

25           THE COURT:  International -- it's the history

1  of international travel.

2        MR. MATASAR:   It's the travel aspect that's the

3  biggest concern?

4        THE COURT:   Uh-huh.

5        MR. MATASAR:   And can we not -- since the

6  government has not indicated any indication of using

7  this information against the defendant, why not?

8        And Pretrial Services is completely different

9  from the case.   There is a statute that I cited to Judge

10  Hogan (sic), it's generally secret.

11        Why can't we have a general understanding that

12  the -- and this is not -- no violent crimes, of course,

13  would be included, nothing like that, but why can't we

14  have a general understanding from the government that

15  this information would simply not be used against

16  Mr. Seda in this case or to prosecute him in any other

17  case?

18        THE COURT:   You need to discuss that directly

19  with Mr. Cardani.   I'm not going to get involved in

20  that.   I know that other cases are different.

21        After this hearing is over, we have a

22  sentencing hearing on a fraud defendant that Mr. Cardani

23  prosecuted, and I'm not worried about him being able to

24  travel in these countries.

25        MR. MATASAR:   Point taken, Your Honor.

1            THE COURT:  All right.  Thank you.  We'll take

2    it up again next week.

3            Could I see counsel at the side bar on a

4    different matter.

5            (The proceedings were concluded at 12:41 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

I, Deborah Wilhelm, Certified Shorthand Reporter
for the State of Oregon, do hereby certify that I was
present at and reported in machine shorthand the oral
proceedings had in the above-entitled matter.  I hereby
certify that the foregoing is a true and correct
transcript, to the best of my skill and ability, dated
this 22nd day of October, 2007.

Deborah Wilhelm, RPR
Certified Shorthand Reporter
Certificate No. 00-0363