1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3    UNITED STATES OF AMERICA,          )
                                        )
4                    Plaintiff,         ) No. 05-60008-2-HO
                                        )
5      v.                               ) September 18, 2007
                                        )
6    PIROUZ SEDAGHATY, et al.,          ) Eugene, Oregon
                                        )
7                    Defendants.        )

8

9              TRANSCRIPT OF PROCEEDINGS

10       BEFORE THE HONORABLE MICHAEL R. HOGAN

11         UNITED STATES DISTRICT COURT JUDGE

12

13                      -:-

14              APPEARANCES OF COUNSEL

15   FOR THE PLAINTIFFS:    CHRISTOPHER L. CARDANI
                            United States Attorney's Office
16                          405 E. 8th Avenue
                            Suite 2400
17                          Eugene, OR  97401
                            (541) 465-6771
18                          chris.cardani@usdoj.gov

19   FOR THE DEFENDANT:     LAWRENCE H. MATASAR
                            Lawrence Matasar, P.C.
20                          621 S.W. Morrison Street
                            Suite 1025
21                          Portland, OR  97205
                            (503) 222-9830
22                          larry@pdxlaw.com

23   PRETRIAL SERVICES:     Lisa Brown

24   COURT REPORTER:        Deborah Wilhelm, CSR, RPR
                            P.O. Box 1504
25                          Eugene, OR  97440
                            (541) 431-4113



INDEX OF EXAMINATIONS

| FOR THE PLAINTIFF: | Direct | Cross | ReD | ReX |
|---|---|---|---|---|
| Colleen Anderson | 24 | 37 | -- | -- |

```
 1              (Tuesday, September 18, 2007; 12:15 p.m.)

 2                  P R O C E E D I N G S

 3         THE CLERK:  This is the time set for Criminal

 4   05-60008-2-HO, United States of America versus Pirouz

 5   Sedaghaty, continuation of hearing on appeal of release

 6   order.

 7         THE COURT:  Good morning, gentlemen.  We'll

 8   wait for your client.

 9         MR. MATASAR:  Good morning.

10         MR. CARDANI:  Good morning, Your Honor.

11         (Defendant enters the courtroom.)

12         THE COURT:  Mr. Matasar.

13         MR. MATASAR:  Good morning, Your Honor.

14         THE COURT:  Good morning.  I received your

15   papers at 3:10 yesterday.

16         MR. MATASAR:  Okay.  And you've had a chance to

17   review them, Your Honor?

18         THE COURT:  I did.

19         MR. MATASAR:  I have little to add to the

20   documents, Your Honor.  I just want to point out one or

21   two of the issues that has happened here.

22         We're going so fast in this kind of proceeding.

23   What typically, in this building or its predecessor and

24   other buildings like it, we are able to look at

25   documents, we are able to think things through in a way
```

1  that gives us time to reflect, and we're much more
2  likely to reach the correct decision.  And we've had --
3  I just want to talk about, a minute or two, about some
4  of the misconceptions that have happened, some in my
5  letter.

6  Most importantly, the different dates on the
7  passport that Judge Coffin noticed.  We're getting
8  documents here and there.  He looks.  He sees.  And he's
9  quite right, there is different dates of birth and
10  different address -- I'm sorry, different spellings of
11  the name on the defendant's Iranian and American
12  passports.  And Judge Coffin was concerned about it.  He
13  talked about it from the bench.  It was not
14  determinative, but it was something that he was
15  concerned about.

16  And as I indicated in my papers, with
17  documentary support, the defendant has had different
18  dates of birth long predating this case.

19  I have obtained his Oregon driver's license.
20  I'm not sure if Ms. Brown typically does this.  What it
21  shows -- and maybe I'll make it an exhibit -- it shows
22  that the record was created in 1976.  And it has the
23  date of birth of 1/2/58.  So there is -- there is no
24  indication that either of these two dates were anything
25  other but some sort of transliteration mistake when

1    Mr. Seda came to the United States in 1976, or when he
2    got his driver's license.

3        Similarly, the specific numbered addresses, I
4    know Ms. Brown in her discussions with me was skeptical,
5    how do people get mail in these countries without
6    specific numbered addresses, with this landmark
7    approach?  What we've tried to do, Your Honor, is
8    explain that this isn't any sort of refusal of Mr. Seda
9    to provide specific addresses.  What happened was he
10   used an approach almost exactly described as the -- as
11   used by people in these countries for a long time.  They
12   are trying to change it, but that was what happened.

13       There is also an error -- you saw -- you said
14   you read my papers.  There is at least one typographical
15   error, something I added at the very end.  There is an
16   error.  We said that we provided the documents -- this
17   is on page seven -- to verify his location at the times
18   he has previously provided.  And I wrote "very."

19       One thing I did write about in my memo, Your
20   Honor, is that we haven't talked a lot about the cases
21   here.  I think in pretrial release setting, it's pretty
22   much based on the statute.  Mr. Cardani and I haven't
23   really had any dispute about *United States versus Smith*,
24   *United States versus Jones*, the Sixth Circuit versus the
25   Ninth Circuit.  Those kinds of arguments are often very,

1    very important.  In here, there is really not much of an
2    issue about what the main legal questions are.  There is
3    one thing, though, that I wanted to mention to the court
4    that I've come across as I've been reading all these
5    cases, and that is in many of them, one of the reasons
6    that argues against release is the overwhelming proof of
7    guilt that the government has shown the court in the
8    case.  Maybe hand-to-hand buys in a cocaine case.  Maybe
9    a surveillance in a bank robbery case.  And those are
10   something that can be considered as perhaps showing some
11   more risk of flight.  Well, we have really the opposite
12   here, Your Honor.

13          In some of my previous memos, I've talked about
14   it.  They have to show a criminal intent.  And we have
15   criminal intent to get this money to people in Chechnya
16   that shouldn't have it, according to the government.
17   There is no loss to the Treasury of the United States.
18   This is only an informational return, and some money
19   taken out of the country.  And yet here, we have two
20   defenses.  One, it did go to charity.  We've presented
21   documents translated from the Russian and all sorts of
22   other documents showing that in an exhibit to my first
23   memo.  And not only that, there is good reason to
24   believe that the people fighting in Chechnya, at least
25   according to some people, are fighting a war of

1    liberation and not a terrorist struggle.  So we have --

2    or maybe just as important -- we think we have a good

3    defense to the charges, so there is much less overall --

4    there is really no flight risk.

5          The defendant -- one more thing about the

6    cases, Your Honor, and I think that's all I'll say.

7    We're aware that this is a case where the court has de

8    novo review of Judge Coffin's decision.  You've stated

9    that on the record, and the law is crystal clear.  On

10   the other hand, he is, as I think you said, a very smart

11   man who you hired.  He saw the same cases.  In some

12   respects, that kind of decision-making is in many ways

13   more powerful than the rules of deference, maybe, for

14   one court and another court.

15         So we do think -- especially when you look at

16   some of the things that he said that I've quoted, some

17   of the other things in the transcripts, we think that

18   his way of looking at this case is something which is

19   very persuasive, if not binding, on this court.

20         THE COURT:  I'll pass along your compliments.

21         MR. MATASAR:  Same for you, Your Honor, either

22   way, Mr. Cardani, everybody.

23         In any event, Your Honor, Mr. Seda -- I also

24   have here, and I guess I'll have these marked -- this

25   marked as an exhibit too, although I cited to it.  I'd

1   like to introduce both the driver's license, and also

2   the third edition of this book.  I quoted some of it in

3   my materials.  But this is a man who has spoken out

4   around the world, around the world, in foreign

5   countries, and in the United States, against terrorism

6   and in favor of peace.  This is not a last-minute

7   finding of religion by somebody who is about to be

8   sentenced to a long prison term.  It's nothing like that

9   at all.

10      It is somebody who -- as Rabbi Zaslow said in

11  his letter to Judge Coffin, it's something -- a position

12  that the defendant has taken at some risk even to

13  himself.  And we think it's all something that should be

14  considered in determining if he should be released.

15      So maybe I'll present the license and the third

16  edition of the book.  I'm sorry, I didn't realize I had

17  stickers.  I'm not sure of the numbering convention in

18  this sort of matter, Your Honor.  Should I be 101 and

19  102 or 1 and 2?  I'll make the *Islam Is* Defendant's 101,

20  and the Oregon driver's license 102.

21      THE COURT:  Without objection, they are

22  received.

23      MR. MATASAR:  Thank you, Your Honor.  And I'm,

24  of course, happy to answer -- whatever questions you

25  have, I want to address.  I know Mr. Cardani and I

1    have -- I don't know if it's going to come up here --

.2   have a pretty serious disagreement about some of the

3    materials that he gave me today.  I'm not sure if that's

4    going to come up, so I'll just leave that for later.

5         THE COURT:  Let me just -- Mr. Cardani, of

6    course you'll have a chance to speak.  But I am going to

7    be interested in your position -- both your positions on

8    whether I should be able to ask questions of your client

9    or case agents in camera in this determination.  I'd

10   like your response to that.  And I will tell you that,

11   you know, part of that comes from some other information

12   that I have received from Pretrial Services since we

13   were together last.

14        For example, I have a copy of what is called a

15   business card from Dubai, a copy of what's called a

16   business card from Syria, neither of which we've been

17   able to confirm any activity under, frankly.  A card

18   that is not really a business card, but it probably is

19   a -- either an agency or a customer card for Ritchie

20   Bros. Auctioneers, and that there were a couple of

21   transactions under.  What I'm told about that is that in

22   order to have -- in order to be in that position of

23   holding that card, you have to make a $25,000 deposit,

24   for example.

25        I just have so many questions about -- and we

1    asked the defendant's wife where he was for

2    two-and-a-half years in Iran.  And she professes not to

3    know.

4           MR. MATASAR:  She was not with him, Your Honor.

5    We have given the Pretrial Services the name and e-mail

6    address of the person that he was with.  She was not

7    allowed to go to Iran.  She was not there.  So that's

8    why she does not have the contact information.  Pretrial

9    Services does.  As far as your question, Your Honor, let

10   me answer that first.

11          THE COURT:  Sometimes I go to Medford, like

12   tomorrow, and my wife will know where I am.  Then I'm

13   going to Palo Alto on Friday.  She'll know where I am.

14          MR. MATASAR:  I believe his wife knew where he

15   was and was in contact with him on almost daily contact

16   via Internet and other ways, Your Honor.  I do not think

17   this is a question.  And if Ms. Brown heard it that way,

18   it's not correct.  I'm certain that she did not say he

19   went away in a black hole and there was no contact for

20   two years.  I just don't think that's what occurred.  I

21   think there was regular contact.

22          And again -- so -- and as far as your question

23   goes, I thought about this.  I have suggested it.  It's

24   fine with me as far as the interview.  If you want to

25   talk to the government's agents, even apart from

1    Mr. Cardani and I, however you want to do this.  I just

2    want to make sure that I have some time, though, to

3    respond to some of the material that Mr. Cardani just

4    gave me today as far as the verification.

5         Another thing, Your Honor, Mr. Cardani told

6    Judge Coffin several times in order to break the wall of

7    secrecy of pretrial documents that Pretrial Services

8    does not have the resources to go to these countries and

9    do this kind of work.  He needed to have his attaches in

10   the foreign countries, the FBI's foreign agents, he

11   needed to have them check this material so that they

12   could verify where the defendant was.

13        However, I am told what has occurred is simply

14   that instead of Ms. Brown making the telephone calls,

15   they've had the case agent, who has been investigating

16   Mr. Seda for four years, making the telephone calls.

17   That's not my understanding of the purpose for breaking

18   down the Pretrial Services' wall.

19        Ms. Brown can make the phone calls from the

20   U.S. just as easily as Ms. Anderson.  I think it's

21   completely contrary to what I think the Pretrial

22   Services' role is.  Of course, Your Honor makes whatever

23   decision you want to make.  But I think that's a concern

24   that I have about how this was done.

25        As far as some of the material that I have

1   seen, again, I just got it late this morning, we have

2   one report that's based on information from a man who

3   didn't give his last name.  We have no idea when he

4   worked there.  And he was asked about a situation that

5   happened in October 19 -- I'm sorry, October 2004.  Why

6   would he remember that?  We don't know if he was working

7   there.  It, instead, looks like the kind of situation

8   which our expert gave in an affidavit that they just

9   don't want to say anything about it.  He said, I don't

10  need to check my computer system.  I would know whether

11  we had any business transactions with the defendant in

12  2004.  There is just -- I'm not sure what could be

13  accomplished.  On the other hand, we have no problem

14  with the court speaking with the defendant, even without

15  the presence of the lawyers.  I think it would, frankly,

16  help.

17          THE COURT:  I would not do that.  More the

18  question is whether either of you have objection to me

19  taking some information, to the extent there is any, in

20  camera on this question.  I have no intention of letting

21  information that's gathered by me for this purpose be

22  used in a prosecution.  But, on the other hand, if

23  either of you object to that, then I'll just consider

24  myself partly in the dark.

25          MR. MATASAR:  No, we do not object, Your Honor.

1     MR. CARDANI:  Good morning, Judge.  We want you
2  to be fully illuminated on every aspect that you can be
3  in making this decision.

4     As these hearings go on and on and on, what I
5  heard last week is that you concluded by suggesting to
6  Mr. Matasar that you needed him to provide more
7  information on three areas:  The passport discrepancies,
8  the financial information about what he's been up to in
9  the last four-and-a-half years as an international
10  fugitive, and where he has resided.

11     Now, I'm not privy to every communication with
12  Pretrial Services, but to the best of my knowledge,
13  there hasn't been a lot of information -- new
14  information given to Pretrial Services since we broke
15  last week.  If there is, I'm not aware of it.

16     THE COURT:  There was a marriage -- copy of a
17  marriage certificate, a copy of a naturalization
18  certificate.

19     MR. CARDANI:  And I saw the filing that
20  Mr. Matasar filed yesterday afternoon.  I've had a
21  chance to review it only this morning, so I don't have a
22  lot of follow-up for that.  But I do have this, Judge,
23  on the passport issue, it's helpful that Mr. Matasar
24  provides this document showing that there was some
25  discrepancies in the date of birth and the name before

1    he fled.  I get that.  I understand that.  But it

2    doesn't answer some of the outstanding questions.

3            And I think this has been on the table for a

4    long time now.  We don't have answers to why Mr. Seda

5    had a passport, a second passport, the Iranian, when he

6    surrendered here last month.  That didn't get presented

7    to the court until we were well into the detention

8    hearing, when we noticed that there were no travel to

9    Iran and Syria on his U.S. passport.  It was only then

10   that we were presented with the Iranian passport that

11   the court has seen.

12           When you look at that, some unanswered

13   questions that are very important, when he got that

14   Iranian passport in 2006, it was a replacement passport

15   for a previous one, which the court also has.  That

16   previous Iranian passport was good until 2009.  And it

17   had pages and -- it had pages which -- there were blank

18   pages, meaning he could still travel on that passport.

19   He could still use it.  It was valid -- for all intents

20   and purposes, a valid Iranian passport that was good in

21   2006 through 2009.

22           For some unknown reason that has not been

23   explained to me, and I don't think to the court, or to

24   Pretrial, Mr. Seda saw the need to go to Iran and get a

25   new passport in 2006 while -- and he still had a valid

1    passport in Iran.  I don't know the answer to that.  I

2    don't think that there has been a logical explanation

3    for that.  But I do know this:  When he did this, he had

4    been indicted here.  There was a current arrest warrant

5    for him here.  So when he did that in 2006, he was an

6    international fugitive.

7         And while there were discrepancies that

8    preexisted, if you compare the facial appearance of

9    Mr. Seda, they are dramatically different.  On all of

10   the other passport applications -- I'm sorry, passport

11   photos, the U.S. passport -- two U.S. passports, the

12   prior Iranian passport, Mr. Seda's facial appearance has

13   been as how he appears before the court today, with a

14   beard.  The driver's license, which I just saw, was with

15   a beard.  So what we know is that Mr. Seda left with a

16   beard, and all of his identification materials showed

17   him with a beard.  Yet this 2006 passport, which was the

18   replacement passport in Iran, shows a quite different

19   appearance to Mr. Seda.

20        So I think that there is an inference that

21   could be drawn from that, and that is one of flight.

22   That he had in his possession an Iranian passport with a

23   different name -- spelling of his name, and a different

24   date of birth.  Whether it came before or after, I

25   think, is beside the point.  It was a passport that had

1    different information about him with a photo that made
2    him appear differently.  And a passport that was not
3    turned over when he surrendered to U.S. authorities last
4    month.  So I think that the information Mr. Matasar
5    provided is helpful, but doesn't answer the continuing
6    question about why there was a need to get this
7    passport.

8         MR. MATASAR:  Your Honor, do you want me to
9    address that now?

10        THE COURT:  No, thank you.  You'll have a
11   chance.

12        MR. MATASAR:  No, I know that.

13        MR. CARDANI:  On the addresses and employment
14   in foreign countries, I think that there has been a
15   continuous press on Mr. Seda through Pretrial Services
16   and through Judge Coffin, tell us where you lived, tell
17   us how you lived.  Those are normal questions for any
18   international fugitive.  Those questions, by and large,
19   still remain today.

20        And from the government's standpoint, it makes
21   him -- continues to be a flight risk because these are
22   questions that have to be answered to determine what
23   he's been doing and what he's going to do here.  And I'm
24   not giving up on the dangerousness issue, because where
25   has he been getting his money?  If he's been getting his

1    money from the same type of sources that he took before

2    he fled, from al-Haramain officials, from Soliman

3    al-Buthe, a specially designated global terrorist, then

4    that's a problem.  That's a violation of U.S. law, which

5    I'll get into in a minute.

6          So it's gone on and on and on trying to get

7    information from him.  I think it was characterized it's

8    like pulling teeth -- attempting to pull teeth, trying

9    to get the most basic of information financially.

10          Now, Mr. Matasar says in the thing that I read

11    last night that it's really -- not really useful to get

12    any more information to the court on the financial

13    information and the employment information, because it's

14    so difficult to confirm things overseas because of our

15    present relationship with the governments of Iran and

16    Syria.

17          Special Agent Anderson is here.  She can

18    testify.  She can proffer.  She has picked up the phone

19    and called some of the business contacts that Mr. Seda

20    had on the cards that were given to Pretrial Services

21    and to the court in its filing.  Mr. Matasar has made

22    these public.  She just simply picked up the phone and

23    called them, the business contacts.  It was very easy to

24    do.  She got basic information.  She attempted to do

25    some corroboration, some verification, which is what

1   this court wanted at the conclusion of last week's

2   hearing.  And she can provide the court with the

3   information, but a number of points are to be made.

4       We think we have confirmed that Mr. Seda did

5   some limited commercial activity with the -- with Iran

6   while he was in Dubai.  Some sale of some equipment.

7       I'm not an expert in this area, Judge, and if

8   the court looks at information that doesn't come our

9   way, there are laws which prohibit commercial

10  transactions with Iran, and they are known -- the

11  shorthand is IEPA, but it's 50 USC 1701 through 1706.

12  And this makes it a felony to violate executive orders

13  issued by the president.  And there are currently

14  executive orders prohibiting, without a license,

15  commercial activity, unless exempted, with the

16  governments of Iran.  And so it may be the case that

17  Mr. Seda is not providing information about that because

18  he's been violating the law.  Likewise, if he's been

19  accepting funding from Mr. al-Buthe, that's obviously a

20  crime by the same statute.

21      But my point, Judge, is verification can be

22  done, whether it's by Colleen Anderson or by Pretrial,

23  it can be done.

24      When we were with Judge Coffin, the reason we

25  offered to get the attaches overseas is because in

1    certain countries, we do have foreign agents there.
2    It's a time-consuming process to set leads and get
3    information.  We're perfectly willing to do that.  But
4    she was just able to do this by picking up the phone
5    because time is of the essence.  And she was able to do
6    this verification very, very quickly.  And this was
7    coming out of a meeting with Judge Coffin, an in camera
8    meeting, where we talked about some information coming
9    our way.

10        Now, as to use of information, Mr. Matasar also
11   continues to express an apprehension that if they
12   provide information which is incriminating, it can be
13   used against Mr. Seda in a future prosecution.  And
14   there's a statute, 18 USC 3153(c)(1), which, unless
15   certain exemptions apply, prohibit us from using
16   information garnered through the Pretrial Services
17   process as an independent grounds for new prosecution.
18   I don't have a lot of experience in the area, but I did
19   research the statute, and it says clearly we can't do
20   that.

21        So if the only reason we found out that
22   Mr. Seda took money from a designated global terrorist
23   organization or engaged in commercial activity with
24   Iran, we couldn't use that as an independent grounds for
25   prosecution, but it can be used for impeachment purposes

1  if Mr. Seda were to state something falsely in some

2  court proceeding.  So they do have some protections on

3  providing information that the court really does, I

4  suggest, need to verify his activities overseas.

5      Special Agent Anderson can also tell the court

6  that through her limited research she found out that

7  Mr. Seda may have access to a bank account in Dubai.  It

8  hasn't been verified.  But one of the entities she

9  contacted helped broker a transaction, and seems to have

10 suggested that Mr. Seda utilized the Dubai bank account

11 to wire transfer some money.  I don't know if that

12 information has been provided to Pretrial Services, but

13 that's the kind of information I think, again, the court

14 needs to know.  Does he have access to foreign bank

15 accounts that he could use to fund a fugitive existence

16 should he decide to once again flee the United States?

17     She also tried to call a number on one of the

18 business calls that Mr. Seda provided.  And this was in

19 Dubai.  And to her surprise, the person that answered

20 this business phone call was one of Mr. Seda's wives or

21 former wives, a woman name Laleh Zahedi, in Dubai.  And

22 so what are we to take from that?

23     The point, I think, is in a business card that

24 Mr. Seda is providing to the court as some evidence of

25 business activity, his wife has an active cell phone.

1   So to this day in 2007, when she calls this business,

2   she answers and says that Mr. Seda is the president of

3   this organization --

4          MS. ANDERSON:  Owner.

5          MR. CARDANI:  -- the owner of this

6   organization.  So she knew from that, that this woman is

7   still a force in his life, has a cell phone that is

8   active, and represents that Mr. Seda has some connection

9   with this business.  Again, that was information that

10  was obtained through a phone call.

11         A couple of other points before I sit down or

12  answer the court's questions.  There has been a

13  continuous statement that these are just tax charges,

14  and somehow this diminishes the charges or to contrast

15  them with more serious charges.

16         While it's true that one count is a tax charge,

17  the other count is a conspiracy to defraud the United

18  States.  And that's a five-year felony.  The tax charge

19  is a three-year felony.  So he faces up to eight years

20  in prison.  And as -- it may come to the point that if

21  there are convictions for these statutes, that there is

22  an enhancement under the sentencing guidelines; that if

23  the government is able to prove that these offenses were

24  committed to influence the conduct of a foreign

25  government that we're at peace with, then that can

1  trigger an enhancement under the guidelines.  And here
2  it may take it right up to the eight-year statutory
3  maximum.

4          I think that the bottom line is this court a
5  week ago asked for more information on these subjects
6  and, with very little exception, it has not been
7  provided.

8          And as time goes on, and this is -- Mr. Seda
9  knows that these are important questions to get him
10  released, by not providing this information, the silence
11  is starting to speak loudly.  I think that we've had now
12  five detention hearings, and continuous attempts to --
13  by Pretrial Services to get information, basic
14  information, that has not been forthcoming.  And I think
15  at this point there are inferences to be drawn from
16  that, especially with the passport, the nature of the
17  countries that have been traveled in, and Mr. Seda's
18  background before he left.

19          On the court's suggestion of an in camera
20  meeting, I have no objection to the court getting
21  information from whatever source it feels appropriate.
22  I would ask that if it meets with Mr. Seda in camera
23  that it be done on the record, that it be sealed, for
24  potential use down the road, and that it be done in, not
25  only Mr. Matasar's presence, but I would suggest that

1    Pretrial Services --

2          THE COURT:  They will be there.

3          MR. CARDANI:  Okay.  But I don't need to -- I

4    don't need to be there and I have no objection to doing

5    that.  But if the court does that, the information, as

6    this court knows, has to be verifiable, if it can be

7    verified.  And we've -- we can show with what she's done

8    that this information can be verified and really should

9    be verified.  And the court needs to know that if he's

10   stating information that's violative of the law, then

11   that is an important factor to consider in whether you

12   should release him, that he's committing crimes while

13   on -- while on fugitive status.

14          Insofar as meeting with government agents, I'm

15   perfectly willing to do whatever the court wants.  If

16   the court wants to go in camera with either one of the

17   agents, I would ask to be there, that it be on the

18   record, and that it be sealed.  But to be honest with

19   you, Judge, really, there are no secrets.  There are

20   limits on the law.  And if there are classified

21   information and things like that, that would be one

22   thing, but insofar as this hunt for information, you

23   know, we can provide this information to the court in an

24   open forum.

25          I might add, I have not shown the Pretrial

1    Services' report to the agents.  The information that

2    they've looked at has come through information from

3    Pretrial Services, Mr. Matasar's own filings, and things

4    of the like.

5            Lastly, would the court want to hear from

6    Special Agent Anderson on the subjects I discussed?

7            THE COURT:  It's up to you.

8            MR. CARDANI:  If I can just -- I don't know if

9    she needs to be sworn or not, or if Mr. Matasar is okay

10   with her standing up and addressing the court.

11           MR. MATASAR:  I just would like to ask her a

12   question or two after she's done.

13           THE COURT:  Probably should be sworn.

14           MR. CARDANI:  Okay.  I'd call Special Agent

15   Colleen Anderson.

16           (The witness was sworn.)

17           THE CLERK:  Please state your full name, and

18   please spell your full name for the record.

19           THE WITNESS:  My name is Colleen Anderson.

20   C-O-L-L-E-E-N, A-N-D-E-R-S-O-N.

21                     DIRECT EXAMINATION

22   BY MR. CARDANI:

23       Q.   Special Agent Anderson, if you could speak into

24   the microphone, make sure the light is on so that I can

25   hear you.  You work for IRS Criminal Investigation?

1    A.    Yes.    I'm a special agent with IRS Criminal

2    Investigations.

3    Q.    Okay.    And you are one of the case agents in

4    this case?

5    A.    Yes.

6    Q.    And you are aware, through these proceedings,

7    that certain information has come up, and there has been

8    an attempt to verify with Judge Coffin, with Pretrial

9    Services, and to some extent, Judge Hogan, information

10   about the defendant?

11   A.    Yes.

12   Q.    And have you participated in an attempt to get

13   that information?

14   A.    Yes, I have.

15   Q.    And it's been kind of fast and furious, but did

16   you generate some reports on some of these contacts that

17   you made?

18   A.    Yes.    I've generated several reports on the

19   phone contacts that I've made.

20   Q.    And you are about to get into that testimony,

21   but these reports I just saw for the first time this

22   morning, but we've made copies for Mr. Matasar and

23   provided them to him this morning?

24   A.    Yes.

25   Q.    Now, can you briefly tell Judge Hogan what you

Anderson - D

1    have done since our last hearing, the one about one week

2    ago, in an attempt to follow-up on some of the

3    employment and financial information regarding

4    Mr. Seda's activities while he was a fugitive?

5        A.    Yes.    Judge, I met with Lisa Brown, and got

6    some copies of what appeared to be business cards or

7    business contacts that Mr. Sedaghaty had provided

8    Pretrial Services for both, I think, UAE and also Syria.

9    And in an attempt to verify the business contacts, one

10   specific, I believe it's Naba Commercial Brokerage,

11   L.L.C., I made approximately -- I believe four contacts

12   with four different companies to try and verify Naba

13   Commercial Brokerage, L.L.C., the validity of the

14   company, and what kind of money it made, you know, what

15   it did, what it did for business, and that kind of

16   thing.

17            MR. CARDANI:    Judge, for your information, this

18   is page -- Mr. Matasar's filing, Exhibit A, pages 4 of

19   9, I believe, contains the business cards that she's

20   talking about right now.

21   BY MR. CARDANI:

22       Q.    So what did you do?

23       A.    First I contacted Ritchie Bros. Auctioneers.

24   One of the cards had Naba Commercial Brokerage, L.L.C.,

25   at the top and Ritchie Bros. Auctioneers at the bottom.

1    To me it appeared that Ritchie Bros. had issued this

2    card.  So I did some Internet research.  And found out

3    that Ritchie Bros. Auctioneers had -- was an

4    international company, and huge in the equipment

5    business, mainly equipment auctions.

6            So I contacted their Canadian international

7    office.  It's actually the headquarters for their

8    international offices around the world.  So I contacted

9    the Canadian branch, and spoke with -- I think it was an

10   administrative manager there.  And I identified myself,

11   and told her that I was trying to verify any type of

12   business that they had done with Naba Commercial

13   Brokerage, L.L.C.  She informed me that the manager of

14   the Dubai office of Ritchie Bros. Auctioneers happened

15   to be in Canada at that time, and that she could

16   transfer me to him, and I could ask him what type of

17   business contacts were with Naba Commercial Brokerage,

18   L.L.C.

19           So I was transferred to Mr. Pius Meier, who

20   told me that he had been, I believe, the manager there

21   from -- it was -- look at my notes here.  It was -- I

22   think it was from like 2000 through 2007, I believe.  He

23   had been the manager of the Dubai office for many, many

24   years, was very familiar with who they sold to, and who

25   the -- basically the sales of heavy equipment in that

1    region.

2           He told me that his company, Ritchie Bros.

3    Auctioneers, sold a lot of equipment to Iran.   That

4    Mr. Sedaghaty, under Naba Commercial Brokerage, L.L.C.,

5    had only one purchase with their company.   And that was

6    in December of '04 for a total purchase price of about

7    2150.   And that contained two pieces of equipment, one

8    miscellaneous piece for $400, and a forklift for 1750.

9    The 400-piece -- $400 piece of equipment was resold at

10   their auction -- the following auction for $500, less

11   the $100 commission.   So he said basically he just broke

12   even on it.   And the forklift was taken in by

13   Mr. Sedaghaty, which means he came and basically got the

14   forklift.   So the company had not shipped it for him.

15   And Mr. Meier had told me that because they do a lot of

16   business with Iran, a lot of the equipment gets shipped

17   there.

18           And I said, well, do you know the destination

19   of this piece of equipment?   And he goes, well, my guess

20   would be that it would be Iran.   And I said, but how

21   would I actually show the destination of the equipment?

22   And he said, well, since we didn't ship it, the Dubai

23   port authorities actually have -- I think it's Dubai

24   customs authorities actually has paperwork to show that.

25   And he offered to obtain those for me.

1    Q.    Have you got those documents yet?

2    A.    No, I have not.

3    Q.    All right.  And what about other attempts to

4    follow-up on information Mr. Seda provided to the court?

5    A.    Well, in speaking with Mr. Meier at Ritchie

6    Bros. Auctioneers, he told me that there were only two

7    equipment auctioneer houses in all of the Middle East,

8    that would be Ritchie Bros. Auctioneers and a company

9    called Worldwide Auctions.  And he told me that I could

10   probably find contact information for them on their Web

11   site, and gave me their Web site.

12         I went into the Web site, and I found the name

13   of what appeared to be the operating manager for the

14   Dubai office.  I called up that manager on his cell

15   phone.  And he told me that he would do his best to get

16   that information.  I think a day or so after that, I got

17   an e-mail from one of his employees showing that

18   Mr. Sedaghaty had had two purchases with that company,

19   several trucks on one purchase, and a forklift for about

20   22,000, and then a Toyota Land Cruiser on a second

21   purchase for about 9,000.

22         They said that the destination is unknown as to

23   where those were shipped.  Again, I believe from what I

24   was told from the previous manager that that information

25   would be available from the Dubai customs authorities

1    also.

2        And they also told me -- Worldwide Auctions

3    told me that their records show that Mr. Sedaghaty had

4    paid for these purchases from a wire transfer out of a

5    Dubai bank account.  And that if I wanted more detailed

6    information, to recontact them, which I did.  I e-mailed

7    them back and said, yes, please provide those banking

8    records, which I have not received yet.

9    Q.    Now, I'd like to -- there was a Naba Commercial

10   Brokerage, L.L.C., card, in -- again, in Mr. Matasar's

11   submission, page 4 of 9, Exhibit A, listing Mr. Seda as

12   a managing director of Naba Commercial Brokerage in

13   Dubai.  Did you attempt to make contact with Naba

14   Commercial Brokerage?

15   A.    Yes, I did.  I believe -- I don't have it in

16   front of me, but I believe on the Naba Commercial

17   Brokerage, L.L.C., business card that there was an

18   office phone and what appeared to be a cell phone on

19   there.  I called the office phone, but it appeared to be

20   disconnected.  It wouldn't go through.  So then I tried

21   the cell phone.  And a female answered the cell phone.

22   Basically she answered the cell phone hello.  So once

23   she answered the cell phone hello, I believe I said,

24   well, is this Naba Commercial Brokerage, L.L.C.?  And

25   she was a little hesitant, but she finally said, well,

1    yes.  I said, well, may I speak to the owner please?

2    And she said -- basically said, well, he's not here

3    right now.  And I said, well, may I ask the name of the

4    owner?  And she stated Peter Sedaghaty.  And I said,

5    really?  I said, my name is -- I think I identified

6    myself at that point, and said my name is Colleen

7    Anderson.  I'm a special agent with IRS Criminal

8    Investigations.  Who am I speaking with, please?  And

9    she answered Laleh.  And I said, oh, would this be Laleh

10   Zahedi?  And she confirmed that, yes, it was Laleh

11   Zahedi.

12        Q.    Had you known her from before?

13        A.    Yes.  In fact, at that point, when I asked,

14   well, would this be Laleh Zahedi? and she said yes, she

15   hadn't said anything after that, and I said, well,

16   Laleh, this is Colleen Anderson.  You remember me.  I

17   served you with a subpoena on behalf of the al-Haramain

18   Corporation about five years ago, in which at that

19   point, she appeared to want to terminate the

20   conversation.

21        Q.    Okay.  All right.  And anything else on

22   contacts or attempted contacts to verify information?

23        A.    Yes.  I also contacted a WMC Enterprises.  From

24   my understanding, Pretrial Services was given a price

25   quote of some sort from this entity.  This wasn't one of

1    the major auction houses.  It appears to be more of a

2    retail type situation.  So I attempted to call them.

3    And I asked for the manager.  I found the manager's name

4    on their Web site.  And the employee informed me that

5    the manager was in a business meeting of some sort.  And

6    I identified myself, and said, you know, I am calling

7    because I want to try to confirm any business contacts

8    that you've had with Naba Commercial or Pirouz

9    Sedaghaty.  And the employee, he said his name was

10   Monsul, said that there was no business transactions.

11   And I asked him if he could confirm that with his

12   computer system.  And Monsul said that he didn't really

13   need to do that because he would know.  And I said,

14   okay, well, thank you for your time.

15        Q.    And Syria, did you do anything on Syria?

16        A.    I'm sorry, also with WMC Enterprises, after

17   that conversation, I e-mailed the manager to try and

18   confirm that, but I haven't received an e-mail back.

19        Q.    Okay.  And anything else?  Syria?

20        A.    Syria, yes.  There was another card, another

21   business card from Syria.  I think it's -- I'm not sure

22   if I can pronounce it right, Letojer.  And --

23        Q.    This is the same exhibit, Judge, Exhibit A,

24   page 4 of 9, this is a business card that Mr. Seda

25   provided to Pretrial on L-E-T-O-J-E-R, there's some

1    English there listing some information in Damascus,

2    Syria.

3         A.    Correct.

4         Q.    What did you do?

5         A.    I called the general phone number on there,

6    what appeared to me to be the office phone number.  And

7    again the mobile phone -- I guess it was a mobile phone

8    was switched off, out of area.  I attempted to call it a

9    couple of times.  It wasn't going through.  So then I

10   attempted to get on the Internet and locate the business

11   in the Syrian yellow pages, and could not locate it

12   there.

13        So I went to the Web site, and the Web site

14   states that the Web page is under construction.  So I

15   thought, well, if the Web page is under construction,

16   I'm going to go to Web archives and see what was on this

17   Web page prior to the construction to maybe learn a

18   little bit about this company.  Maybe there is another

19   number I can call, that kind of thing.  But there is no

20   prior Web archives information on this site.  And so

21   what I did is I went and did some more research to find

22   out when the site was actually listed on the Internet.

23   And it was registered on the Internet as of May of 2007.

24   So it's very recent to the Internet.

25        And then I did some research on the e-mail

1    address that was on that business card.   That comes back

2    to Gmail.   And according to some Internet research,

3    Gmail was not up and running until February of 2007 for

4    private persons and businesses.   So this e-mail address

5    wasn't even valid until sometime after February of 2007.

6    And that's all the information.

7         Q.    Now, in these conversations, did you identify

8    yourself as a criminal investigator here in the United

9    States?

10        A.    Yes, I did.

11        Q.    Despite that, people assisted you?

12        A.    Yes.   And, in fact, they -- the manager of

13   Ritchie Bros. and the manager of Worldwide Auctions was

14   very cooperative.

15        Q.    Now, based on your -- the comings and goings

16   here, are you able to, as an agent, form an opinion as

17   to whether the financial transactions and information

18   you've garnered would indicate that Mr. Seda had the

19   wherewithal from these business transactions to fund

20   lodging, international travel, and subsistence for his

21   time away from the United States for four-and-a-half

22   years?

23             MR. MATASAR:   Objection, Your Honor.   This

24   witness has nowhere near the amount of information to

25   possibly render that sort of opinion based on what she's

1   done.  She's made four phone calls to four people.  It's

2   just completely impossible for her to make that sort of

3   opinion.

4           MR. CARDANI:  I'll restate the question.

5           THE COURT:  (Nodding head.)

6   BY MR. CARDANI:

7     Q.    Based on the information that you obtained and

8   your knowledge that Mr. Seda had -- was it $30,000 in

9   his bank accounts when he left the country in 2003?

10    A.    That's correct.

11    Q.    The accounts that we know about?

12    A.    That's correct.

13    Q.    Based on your experience, how much money did he

14  generate from these business transactions overseas?

15          MR. MATASAR:  Again, if he's only asking about

16  the transactions -- the specific transactions that she

17  looked into, I have no objection.

18          MR. CARDANI:  Okay.  What he said.

19          THE WITNESS:  Specifically, the transactions

20  that I looked into, again, from Ritchie Bros.

21  Auctioneers, it didn't appear that he made any money on

22  one of the sales.  And it doesn't appear you can make a

23  large commission off of a $2,000 piece of equipment.

24  Worldwide Auctions, again, they have just a little bit

25  over $30,000 worth of purchases.  Commissions off of

1    those couldn't have been enough to sustain him for four

2    years.

3    BY MR. CARDANI:

4        Q.    And one thing I forgot to ask you about is, one

5    of these outfits required a $25,000 deposit of some

6    sort?

7        A.    That's correct.  The manager of Ritchie Bros.

8    Auctioneers, which is one of the cards there, stated

9    that in order to participate in one of their auctions

10   that you have to put $25,000 cash down.

11            MR. MATASAR:  Objection, Your Honor.  I have a

12   question in aid of objection.

13            THE COURT:  Go ahead.

14            MR. MATASAR:  Did he tell you you always have

15   to pay $25,000?

16            THE WITNESS:  He said in order to participate,

17   that a customer has to put down 25,000.  Did he say

18   "always"?  No.

19            MR. MATASAR:  Didn't he, in fact, say

20   "usually"?

21            THE WITNESS:  Actually, my notes show that he

22   said to bid in an auction, a customer must register and

23   deposit 25,000 USD with Ritchie Bros.

24            MR. MATASAR:  Isn't that to get the card?

25            THE WITNESS:  No, that's not to get the card.

1    The card is actually issued after a customer's first

2    purchase with an auction.

3          MR. MATASAR:  Usually.

4          MR. CARDANI:  I have no other questions unless

5    the court has any or Mr. Matasar.

6          THE COURT:  Cross.

7                    CROSS-EXAMINATION

8    BY MR. MATASAR:

9    Q.    Miss Anderson, when you called people to get

10   this information, you said you were an IRS agent; is

11   that right?

12   A.    I said I was a special agent with Internal

13   Revenue Service Criminal Investigations.

14   Q.    What did you mention about your ties to the

15   court?

16   A.    I believe that I mentioned that I was

17   attempting to verify information given to me by the

18   court.

19   Q.    Did you say that you were assigned by the

20   court?

21   A.    No, I do not believe I said I was assigned by

22   the court.

23   Q.    Might you have said that as part of your other

24   explaining, that you were asked to verify information

25   given to the court?

1    A.    I don't believe I said that.  My understanding

2  is that I told everyone that I was there to verify

3  information that I had received from the court.

4    Q.    So you verified that there was a Naba

5  Commercial Brokerage, there was such an organization?

6    A.    I verified through Laleh Zahedi that

7  Mr. Sedaghaty was the owner of that entity.  Whether it

8  was a corporation, I could not determine.

9    Q.    Well, didn't you verify from Mr. Meier that

10  their database lists the defendant, and as the managing

11  director of Naba Commercial Brokerage?

12    A.    That's correct.

13    Q.    So you verified that.  Did you verify that Naba

14  and Mr. Seda did business with Mr. Meier and Ritchie?

15    A.    Yes, they did one transaction.

16    Q.    Did you verify that Mr. Seda was -- that this

17  business occurred in Dubai, that Mr. Seda did business

18  with WMC Enterprises in Dubai?

19    A.    Actually, WMC Enterprises stated that they did

20  not have any business transactions with Mr. Sedaghaty or

21  Naba.

22    Q.    I'm sorry, I'm talking about Ritchie Bros.

23    A.    Yes, Ritchie Bros. confirmed that the auction

24  occurred in Dubai.

25    Q.    And there were -- there was more than one

1 transaction between Mr. Seda and Ritchie Bros. in Dubai?

2     A.    There was -- in their records, they show one

3 transaction, two pieces of equipment.

4     Q.    I understand.  But you verified that Mr. Seda

5 had business transactions in Dubai --

6     A.    Yes.

7     Q.    -- did you not?  And at the time period when he

8 said he was in Dubai?

9     A.    I don't believe that I had a time period

10 specific to when he was in Dubai.  My understanding,

11 from what I had received from Pretrial Services at that

12 point in time, was a listing of places he had been, but

13 not necessarily a chronological order or time period.

14 That's my understanding.

15     Q.    Did you not get my e-mail to Ms. Brown, which

16 is Exhibit C to the documents that were filed yesterday,

17 that indicate in order where Mr. Seda was?  Six months

18 in Saudi Arabia; and then 18 months in United Arab

19 Emirates, which includes Dubai; and then 18 months in

20 Tehran, Iran; and then one year in Syria, you were

21 totally unaware of that?

22     A.    I'd have to see the exhibit.

23     MR. MATASAR:  May I show Exhibit C to her, Your

24 Honor?

25     THE COURT:  The clerk will assist you,

1   Mr. Matasar.

2          THE WITNESS:   I'm sorry, what was your

3   question?

4   BY MR. MATASAR:

5      Q.   Were you aware of that general information that

6   Mr. Seda had given in order where he was from the time

7   he left the United States two years before the

8   indictment in this case?

9      A.   I believe I had seen this document, if that's

10  your question, yes.

11     Q.   So that would show that he was in Dubai at a

12  certain period of time, right?   If he left in February

13  of 2003, and he was gone for a period of months, and

14  then he went to Dubai, he would be in Dubai at the same

15  period, would he not, that meshes or is verified by the

16  transactions that you have looked into in Dubai?

17     A.   I'd have to do the math, but it appears to be

18  the right time period.

19     Q.   Okay.   Now, you said that you called WMC in

20  Dubai?

21     A.   Yes, I did.

22     Q.   And you tried to talk to a person who was the

23  manager?

24     A.   Yes.   Actually, it was two phones calls.   I

25  called at one point, and the manager wasn't in.   And

1   then I called back slightly later, and spoke with the

2   same employee, and he said that the manager was in a

3   meeting.

4        Q.   Right.  So you don't know if the manager was in

5   or wasn't in or was in a meeting or wasn't in a meeting,

6   you just know that this person that answered the phone

7   told you that -- told you those things, right?

8        A.   Yes, the person who identified himself as

9   Monsul told me that he was in a meeting.

10       Q.   What was Monsul's last name?

11       A.   He didn't give a last time.

12       Q.   Did you ask him for a last name?

13       A.   No.

14       Q.   When did he work at that company?

15       A.   I do not know.

16       Q.   Do you know if he was working there in 2004?

17       A.   No, I do not.

18       Q.   How would you know that he was accurate when he

19   said he would know no matter what the database said

20   whether or not WMC ever had any business with Mr. Seda

21   or Naba Commercial?

22       A.   Well, in an attempt to verify his -- whether or

23   not he was accurate, I then e-mailed the manager at the

24   e-mail address that was listed on their Web site,

25   telling the manager that I had spoken with his employee,

1    Monsul, and that I would like to confirm with him that

2    there were no business transactions.

3        Q.    And the manager said what?

4        A.    I had not received a reply, the time

5    differences.

6        Q.    Wasn't this on September 15th?

7        A.    This would be --

8        Q.    May I have my exhibit?

9        A.    Yes.

10       Q.    Well, your report was written on the 15th?

11       A.    That would have been the date of the contact.

12   I believe -- I'd have to look at my notes -- but I

13   believe that would have been on a weekend, and I called

14   somewhere around 11:00 p.m.  So I would have written the

15   report probably Monday; and while in the office,

16   e-mailed the manager.  That's my -- without my notes,

17   that would be my best guess.

18       Q.    But you haven't heard anything from him since

19   then?

20       A.    No.

21       Q.    It's been days since then?

22       A.    Since Monday.

23       Q.    It's been at least one day and one night, the

24   time frame overnight would not explain it?

25       A.    That's correct.

Anderson - X

1    Q.    There was a document here which caused you to

2    question this, WMC Enterprises, a specific bid form.  Do

3    you remember that?

4    A.    Yes, I was told that there was a specific bid

5    form.  I was faxed a copy of it, but, unfortunately, the

6    faxed part of that did not come out, so I was going off

7    of verbal information.

8    Q.    So you didn't ask him whether or not he could

9    confirm or verify that this is the type of form used by

10   WMC Enterprises for bids?

11   A.    I believe in my e-mail to the manager that I

12   stated that we had information that his company may have

13   given Mr. Sedaghaty a bid.  And I believe I put the date

14   down on the bid.  But, however, I've not received a

15   confirmation from him.

16   Q.    So there is, though, in the documents given to

17   Ms. Brown, a specific form with WMC Enterprises, signed

18   by Mohsin Kamal, is there not?

19   A.    Again, I didn't actually get the document

20   because the fax didn't come through, but --

21   Q.    Let me show it to you.  Well, you knew to call

22   them from Ms. Brown, right?

23   A.    That's correct.

24   Q.    You were trying to verify whether or not they

25   had any dealings with Mr. Seda, right?

1  A.  That's correct.  And Ms. Brown provided me with

2 the name of the manager that had signed this.

3  Q.  Correct.  The name of the manager, the manager

4 signed it, and you are saying that you talked to

5 somebody named Monsul, and he said there was no dealings

6 with Mr. Seda ever.  He didn't even want to look at any

7 documents; isn't that what he told you?

8  A.  He told me that there were no dealings with

9 Mr. Sedaghaty, and that he didn't need to check their

10 database.

11  Q.  He did not need to check?

12  A.  That's correct.

13  Q.  Because he knew there were no dealings?

14  A.  That's what he stated.

15  Q.  Okay.  But that document would seem to indicate

16 that there were at least some dealings?

17  A.  Yes.  And I told him that on the phone, that I

18 had information regarding -- that he had gotten quotes.

19 And he said there were no financial transactions with

20 Mr. Sedaghaty.

21  Q.  Did -- when you talked with Mr. Seda's ex-wife,

22 you told the court that she wanted to terminate the

23 conversation at the end; is that right?

24  A.  That's correct.

25  Q.  Okay.  What did she tell you in terminating the

1  conversation?

2      A.    She told me that she couldn't speak with me any

3  longer, that she needed to contact her attorney, and to

4  call her back in 15 minutes.  And I then asked her what

5  is the name of your attorney, and the phone call was

6  terminated.

7      Q.    So she told you to call her back in 15 minutes?

8      A.    That's correct.

9      Q.    And what did she say when you called her back

10  in 15 minutes?

11     A.    I did not call her back in 15 minutes because

12  she did not provide me with the name of her attorney.

13             MR. MATASAR:  Nothing further.

14             MR. CARDANI:  I have nothing else.

15             THE COURT:  You may step down.

16             MR. CARDANI:  Judge, if I might conclude on

17  this, the point is that we're not presenting this as

18  ironclad proof that's been vetted through an

19  investigative process.  The point is that this should be

20  unnecessary.  For the context of what is before you

21  right now, this is not a trial on the merits.  This is a

22  release decision.  This is information that Mr. Seda,

23  after being a fugitive for four-and-a-half years,

24  traveling all these places, comes into the country,

25  surrenders, and is asked basic questions by Pretrial

1  Services, and is not giving information.  This is

2  information that they've been pressed over and over and

3  over to provide, and they refuse to.  It's coming out in

4  bits and pieces.  And it shouldn't be the case that this

5  has to be done to attempt to confirm.  This is

6  definitely an arm of the court, but as I understand it,

7  these questions have been asked repeatedly, and they

8  have refused -- if I remember the first statement of

9  Pretrial Services' report, he refused to provide any

10  evidence of travel and financial information.  Refused.

11        Now, if someone wants to be released from this

12  court after being a four-and-a-half year fugitive, they

13  have got to do better than that, I would suggest.

14  They've got to be forthcoming with this court, tell the

15  court -- and if Mr. Matasar and Mr. Seda have this

16  information, I dealt with this auction house, I did

17  this, deal with this person, this is who you can

18  contact, here is his e-mail, here is my wife's name and

19  number, this is the type of thing that we see routinely

20  in cases before the court when release is an issue.  We

21  want hard information for the court, we want hard

22  information from the defendant who is in the best

23  position to know what that information is.  And then the

24  arm of the court attempts to confirm that and verify it

25  so that they can bring their opinion on whether this is

1  someone who should be released or not to the court.

2          Ms. Brown has made the recommendation that this

3  defendant should not be released.  And it's my

4  understanding that's still the current recommendation.

5          So I would just -- I don't know where we're

6  going on this, Your Honor.  We're doing what we can to

7  verify information to bring the information before the

8  court, but it's very difficult when you have someone who

9  is not cooperating with the court to verify the

10  information.  That's all I have.

11          MR. MATASAR:  Your Honor, in some respects I

12  disagree with the fundamental aspect of what Mr. Cardani

13  is saying.  When he says we always see this kind of

14  information, in my experience, we never see this kind of

15  information when you have these kinds of charges.  And

16  so --

17          THE COURT:  Are you interested in giving more

18  information to the court in camera?

19          MR. MATASAR:  We will give -- yes, Your Honor.

20  We can give information to the court in camera, yes.

21  Bank, if you want.  What we're trying -- yeah, I guess

22  the answer to that is yes.  And that's where we're going

23  to stop, that would be fine.

24          Let me just say one more thing that we are --

25  while Mr. Cardani keeps talking about drips and drabs,

1   that is simply, to some degree, a perceptual problem

2   because of misunderstandings.  It is not the case.  We

3   gave Ms. Brown this list or this verbal list of places

4   where he was.  Then we gave it to her in handwritten.

5   Then we had it typed.  However, the problem is not the

6   form.  It's that it was in a way that was simply not

7   familiar to her.

8           THE COURT:  The passport issue is problematic,

9   when he's asked about valid passports and doesn't tell

10  about them.

11          MR. MATASAR:  He was not asked about another

12  passport.  He was not.

13          THE COURT:  The typical -- I wasn't there, of

14  course, but I know that typical language is something

15  like any valid passports.

16          MR. MATASAR:  I was there, Your Honor.  I don't

17  recall the question.  I was there.  As soon as we

18  thought -- found out it was an issue before the hearing,

19  I had this in my pocket on August 22nd, before the

20  hearing.  For one reason or another, like many of these

21  proceedings, it stopped.  Mr. Cardani saw me.  I didn't

22  get it anywhere else.  I was sitting in that chair the

23  whole time.  And at the recess, I gave him the passport.

24  It was not something that happened at the hearing that

25  caused me to give it to him.  I always intended to give

1    it to him.

2            The other issue as far as the other -- the old

3    passports, we've explained that.  It's simply organizing

4    it and understanding it, not unwilling to give it.

5            I have been concerned about the financial

6    information, which I am happy to give to the court.  I'm

7    worried that it simply won't be verified in the same way

8    that we have problems with this.

9            THE COURT:  Time will tell.

10           MR. MATASAR:  I am happy to give it to the

11   court.

12           THE COURT:  I think what we'll do -- I think

13   we'll do that in the courtroom.  I think I'll keep my

14   staff here, and Ms. Brown, you and your client, and

15   we'll clear the courtroom otherwise right now.  Thank

16   you very much.  Sorry for the inconvenience for the

17   others here.  Off the record.

18           (Discussion held off the record.)

19           (Further proceedings were had which were

20   ordered sealed.)

21           ///

22           ///

23           ///

24           ///

25           ///

1              (Mr. Cardani enters the courtroom at 2:18 p.m.)

2              THE COURT:  The regular public can come in, if

3    there is any left.

4              MR. CARDANI:  There is plenty of people out

5    there that would love to come in.

6              THE COURT:  Yeah, they can come in.  Anyone

7    else can come in.  The court is open now.

8              MR. CARDANI:  I'll get the case agents, then,

9    if I may.

10             THE COURT:  Of course.

11             MR. CARDANI:  Excuse me, Your Honor.

12             THE COURT:  All right.  We'll go back on the

13   record.  The -- one of the difficulties in this issue is

14   it has been like pulling teeth to get information.

15   We've been in here quite a long while, and a lot of

16   other information has been disclosed.

17             I'm going to allow Mr. Matasar the opportunity

18   to provide supporting materials and contact numbers.

19   And I'm going take this matter under advisement, and

20   await a further report from Ms. Brown, after she has

21   that information or has had the chance to check it out.

22             She has recommended against release to this

23   point, and I have followed that.  We'll see how this

24   information proves out.

25             Anything further at this time?

1        MR. CARDANI:   Just a point of clarification,

2   Judge.

3        THE COURT:   Yes.

4        MR. CARDANI:   Is there anything that you want

5   Ms. Brown to do in terms of the agents being able to

6   follow-up or is that something you don't want to occur?

7        THE COURT:   Well, Ms. Brown can use whatever

8   assets in that regard that her supervisors believe are

9   appropriate.

10        I am going to build a wall between this inquiry

11   and the prosecution.   As you say, there is a statute on

12   that.   We'll follow it, of course.   You know, it's no

13   different in that way than the fella that went to trial

14   on a marijuana grow in Medford before me the other day.

15   He was acting out and we had him shrunk, and he was

16   quite candid about his activities in the marijuana grow.

17   He had a different position at trial.   He didn't

18   testify, which would have been problematic, but he had a

19   different position there.   And, in fact, I kept the

20   picture from the jury of him in front of the marijuana

21   and the grow.   But, so there are, as those who work in

22   this venue, we know how to do that, and will do that.

23        MR. CARDANI:   And, likewise, if we have

24   follow-up information that comes our way, we can share

25   that with Pretrial Services?

…

1           THE COURT:   Absolutely.   The point is to find

2     out what is happening here.   Some of the -- of course,

3     there can be miscommunications, but there just hasn't

4     been enough communication to -- given this background --

5     to justify the defendant's release, particularly on the

6     appearance question.   And that's what I'm -- I realize

7     you have another point of your argument, but whether

8     people appear or not is really what interests me, at

9     this point.

10          The other side of it, we can control that, I

11    think.   And we have to respect the First Amendment in

12    that regard, too.   So I'm the only one in this room

13    that's given up their First Amendment rights.

14          All right.   We're in recess.

15          (The proceedings were concluded at 2:22 p.m.)

```
 1                       CERTIFICATE

 2          I, Deborah Wilhelm, Certified Shorthand Reporter

 3    for the State of Oregon, do hereby certify that I was

 4    present at and reported in machine shorthand the oral

 5    proceedings had in the above-entitled matter.  I hereby

 6    certify that the foregoing is a true and correct

 7    transcript, to the best of my skill and ability, dated

 8    this 22nd day of October, 2007.

 9

10

11

12                                    Deborah Wilhelm, RPR

13                                    Certified Shorthand Reporter
                                      Certificate No. 00-0363
14

15

16

17

18

19

20

21

22

23

24

25
```