```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF OREGON

 3   UNITED STATES OF AMERICA,   )
                                 )
 4              Plaintiff,       ) No. 05-60008-2-HO
                                 )
 5   v.                          ) January 23, 2008
                                 )
 6   PIROUZ SEDAGHATY, et al.,   ) Eugene, Oregon
                                 )
 7              Defendants.      )

 8

 9              TRANSCRIPT OF PROCEEDINGS

10         BEFORE THE HONORABLE MICHAEL R. HOGAN

11           UNITED STATES DISTRICT COURT JUDGE

12                         -:-

13                  APPEARANCES OF COUNSEL

14   FOR THE PLAINTIFF:    CHRISTOPHER L. CARDANI
                           United States Attorney's Office
15                         405 E. 8th Avenue, Suite 2400
                           Eugene, OR  97401
16                         (541) 465-6771

17   FOR THE DEFENDANT:    LAWRENCE H. MATASAR
                           Lawrence Matasar, P.C.
18                         621 S.W. Morrison Street
                           Suite 1025
19                         Portland, OR  97205
                           (503) 222-9830
20
                           STEVEN T. WAX
21                         Federal Public Defender
                           101 S.W. Main Street, Suite 1700
22                         Portland, OR  97204
                           (503) 326-2123
23

24   COURT REPORTER:       Deborah Wilhelm, CSR, RPR
                           P.O. Box 1504
25                         Eugene, OR  97440
                           (541) 431-4113
```

1          (Wednesday, January 23, 2008; 9:43 a.m.)

2                        P R O C E E D I N G S

3          THE CLERK:  This is the time set for Criminal

4  Number 05-60008-2-HO, *United States of America versus

5  Pirouz Sedaghaty*, status conference regarding release.

6          THE COURT:  Just to save some comment, I'm not

7  disposed to allow Mr. Sedaghaty to remain in his current

8  living situation with the residents of the home, whose

9  custody he's agreed to, gone for a three-week period.  I

10 don't know if that's still the situation we're looking

11 at or not.  I'd like to hear about it.

12         MR. MATASAR:  Yes, Your Honor.  We had planned

13 on Mr. Wax handling everything today except for this one

14 little part, so I will address the court first.

15         THE COURT:  This is your part.

16         MR. MATASAR:  But what we have suggested is a

17 two-part plan, if the court were to allow him to remain

18 there while they were away.  They are going on a --

19 Mr. Copeland urged me to explain to the court that it's

20 not a vacation.  They have an educational experience and

21 language school planned for the two weeks.

22         The two-part plan we proposed would be Caren

23 Caldwell, a minister, a Methodist minister, who would

24 check in once a day on the house to make sure that the

25 defendant was present, and also the Ashland Police

1  Department.  Mr. Copeland has spoken both with the chief
2  of the Ashland Police Department, Terry Holderness, and
3  also city administrator, Martha Bennett.  And I'm told
4  that if the court were to see it as appropriate, they
5  would check in on Mr. Seda at least once a day.
6          So we would ask the court to consider that as a
7  reasonable alternative to the current situation.
8          THE COURT:  Well, I appreciate the request.
9  I'm not willing to do that.  Mr. Sedaghaty has had a
10 violation.  It's minor.  But, frankly, my concern is
11 that he seems to be acting rather entitled.
12         And Mr. Wodehouse has put tremendous effort
13 into this.  He talks to me often about this case,
14 probably more communication than I've had for any
15 defendant in the 34 years I've done this from Pretrial
16 Services.  And for Mr. Sedaghaty to send him a text
17 message and to decide to follow his own leading and let
18 Mr. Wodehouse know at the last minute is just not
19 appropriate.
20         And he's going to have -- if he is going to do
21 this sort of thing, he's going to have to make better
22 planning, frankly.  Otherwise, he can't leave and go to
23 these meetings, or to work, and that sort of thing.  And
24 I'm -- we're not going to stretch our resources more,
25 because his attitude is that he's in control.  He's not.

```
 1          MR. MATASAR:  Let me just explain that
 2   situation, Your Honor.
 3          THE COURT:  Sure.
 4          MR. MATASAR:  Since, again, Mr. Wax was
 5   planning to do most of this, but I think I may be more
 6   familiar with that issue.
 7          THE COURT:  Mr. Wax doesn't want to stand up
 8   now anyway.
 9          MR. WAX:  I'll stand for my client anytime,
10   Your Honor.
11          THE COURT:  Yes, I'm sure.  He's happy to have
12   you stand.  You probably ran into a little more than you
13   expected here.
14          MR. MATASAR:  Let's, if I can, Your Honor, try
15   to separate the sort of two things that were going on
16   that day.  At one point, yes, the text message was a
17   request for the defendant to explore certain employment
18   opportunities at a certain place.  He did not get a
19   response from Mr. Wodehouse.  I think the text message
20   says -- it's quoted in here.  I am at Friday prayer.  I
21   may have to stop off the freeway and look into a job
22   potential.
23          THE COURT:  I just read this this morning, and
24   the word I wrote on the top of the paper was "entitled."
25          MR. MATASAR:  I just want the court to
```

1  understand that this stop was not the detailed
2  employment investigation that was contemplated.  He got
3  a ride from the person who, indeed, was the employer who
4  needed to stop for his own business.  Mr. Seda simply
5  was present in the car, went in while the business owner
6  stopped to do his own business.  There was no
7  employment --
8           THE COURT:  And gets some maps from the
9  visitor's center.
10          MR. MATASAR:  Correct.  While he was waiting
11 for the person who came down, who was driving him, who
12 was doing his own business --
13          THE COURT:  You're doing a fine job.  This is
14 clearly a minor violation.  But what it shows to me is
15 an attitude problem.
16          Mr. Sedaghaty, if he is going to leave, has got
17 to make sure his arrangements help him to meet his
18 commitments to the court.  I've asked Mr. Wodehouse to
19 be rather careful in this case.  He is.  He's a very
20 careful man.
21          MR. MATASAR:  He is.  I know him from another
22 case he had on supervision for two years, correct.  I --
23 go ahead.
24          THE COURT:  No, you don't need to get up.
25          MR. MATASAR:  He's got the courage to stand.

1           THE COURT: He's got the courage to stand up,
2   that's good.
3           MR. WAX: I'm just wondering, Judge, if there
4   is something that you would be comfortable with that
5   might make it a little bit easier for all of us.
6           In the time that I've been dealing with
7   Mr. Sedaghaty and the communications that I've had --
8           THE COURT: Is your -- are you or I pronouncing
9   his name correctly, because we pronounce it different?
10          MR. WAX: Se-dog-ity (phonetic).
11          THE COURT: Se-dog-ity (phonetic), okay, the
12  emphasis on the wrong syl-able (phonetic). Okay.
13          MR. WAX: He is in constant contact with us, as
14  I understand he is with Mr. Wodehouse. And the reality
15  of that contact is, I think, somewhat difficult for all
16  of us. When you said you've had more contact with
17  Mr. Wodehouse in the 34 years you've been on the bench,
18  I think that Mr. Matasar and Mr. Wodehouse and I would
19  probably all say that our tenure as attorneys or as
20  Pretrial officers, this case has been consuming more
21  time on the release conditions than any other.
22          And I'm just wondering whether the difficulty
23  that we're all having could be alleviated somewhat if
24  the conditions were relaxed just a little bit.
25          I appreciate your comment that it appears as

1  though this is an example of a feeling of entitlement.
2  I think that there is another perspective that might be
3  helpful; and that is, if you look at this in the context
4  of the efforts that Mr. Sedaghaty is making to comply
5  with the restrictions and the nature of the
6  communications that we get and Mr. Wodehouse gets about
7  that, for example, when he was up in our office last
8  week, he had a check that needed to be cashed.  And we
9  spent a fair amount of time trying to figure out, could
10 he go to a bank in Portland to cash the check?  And was
11 it consistent with the release conditions for him to go
12 to a bank accompanied by one of the members of the
13 defense team?
14         At least as I understand it, because a fair
15 number of the communications that I get from him, he's
16 asking me, you know, can I do this?  Or I -- you know, I
17 need to go to the bank.  Or what type of work can I look
18 for?  Or, you know, how am I going to get to the mosque
19 and back, et cetera.  And a fair amount of the time, my
20 answer is, Pete, you really need to talk to Ron about
21 that.  And then what I get back from him, or sometimes
22 from Ron is, you know, Steve, I can't deal with that.  I
23 need to speak with the judge.
24         THE COURT:  And he does.
25         MR. WAX:  I appreciate that.  But what I'm

1  wondering is in terms of the reality of the effort that
2  is being made to comply with release conditions, if some
3  of the tension that we're all feeling might dissipate,
4  without any diminution in security, if we could have a
5  little bit more flexibility in terms of, you know, what
6  can he do?  When he gets a check, you know, does he need
7  to get permission in order to go to the bank?
8          And this instance, in terms of going to the
9  mosque and back, we spent a fair amount of time
10 contacting Mr. Ali, the motel owner, and contacting the
11 person in the welcome center to try to figure out, you
12 know, what are we dealing with here?  And the picture
13 that we get is slightly different, I think, than the
14 picture that leads you to say, you know, that here is a
15 man who isn't getting the reality of it, who's feeling a
16 sense of entitlement.  There may be an element of that
17 in there.  But I think there is also an element of the
18 man who is making a very sincere effort.
19         THE COURT:  Mr. Wax, here is what you are
20 having to deal with:  In my first several acquaintances
21 with your client in court, I did not feel he was being
22 straightforward with me.  I felt like he was very
23 reluctant with facts.  Pretrial Services, at least some
24 of them, thought that.  And I had that same feeling,
25 even when we had the in camera hearing in that regard.

```
 1  And it's going to take a while, frankly, to deal with
 2  that past.  That was a strong feeling I had.
 3          MR. WAX:  I hear you.  And I guess I would hope
 4  that you could look at the fact that it has been, I
 5  think, seven weeks now that he has been released.  And
 6  if the only incident that has arisen is a nine-minute
 7  stop where a motel owner, who's giving him a ride home,
 8  stops at his motel, his place of business, for five
 9  minutes, as I understand it, you know, Mr. Seda gets out
10  of the car --
11          THE COURT:  You take that out of context, it's
12  ridiculous, I agree.  You know, you don't have to argue
13  that more than that, I understand.
14          MR. WAX:  Okay.  Our hope today would be that
15  you could feel sufficient comfort looking at the seven
16  weeks to provide either a little bit more discretion to
17  Mr. Wodehouse or to feel that you can repose a little
18  more trust in Mr. Sedaghaty in terms of --
19          THE COURT:  What I'm willing to do is this:
20  I'm willing to sit down with Mr. Wodehouse and have that
21  conversation with him, and --
22          MR. WAX:  Thank you.
23          THE COURT:  -- see how he feels about it,
24  frankly.  And -- but as far as three weeks, you know,
25  he's -- his choices are not very good.  The Y,
```

1  apparently, has been willing to take him in Portland.
2  You can work on your case, I guess, sometime.  I would
3  approve of something like that.  But not someone just
4  checking in once a day.  I'm certainly not going to
5  burden the Ashland police force with doing it.
6           So the request that he be able to stay there
7  with them not there for three weeks is denied.
8           Now, the other -- do you want to talk about the
9  employment situation more?  And then you also have a
10 motion to seal, an ex parte motion to seal, and there is
11 not much you can say about that in court because it has
12 to do with the financial affidavit, and the motion is
13 granted, but I may have more in that regard, but,
14 nevertheless, that motion is granted.  In fact, I'll
15 sign it now.
16           MR. WAX:  Judge, I appreciate that you don't
17 want to burden the Ashland police, and I'm not going to
18 ask you to reconsider that.  I do, however, want you to
19 think about how unusual it is that a local police agency
20 is willing to accommodate one of its town residents in
21 this way.  And at least to us, that speaks a lot about
22 the confidence that the people in Ashland have in
23 Mr. Sedaghaty based on their many, many years of
24 experience.
25           THE COURT:  I'd be interested to know who it

```
 1  was.  I sentenced a child of one of the police officers
 2  there to a sentence that I think they were grateful for.
 3             MR. WAX:  All right.
 4             THE COURT:  I've been around a long time, too.
 5             MR. WAX:  The work situation --
 6             THE COURT:  Yeah, I get along fine in Ashland.
 7             MR. WAX:  What can we do about the work
 8  situation?
 9             THE COURT:  The motion is denied, but I'll
10  allow him to work, not in the used car business, not for
11  someone whose basic charges are money laundering type of
12  charge.  And -- but, sure, I'll allow him to work, but
13  there is going to be some -- but it won't be in that
14  sort of thing where he's buying and selling.  I know he
15  has some background in equipment sales and that sort of
16  thing, fine.  I know he's -- a person can make money
17  buying and selling used cars, but I just don't think
18  that's the right fit for him while we're at this stage
19  of the proceedings.
20             MR. WAX:  Okay.
21             THE COURT:  I'm not going -- it's not going to
22  be an open-ended grant, though.  I want to know what the
23  job is.  So the motion is denied right now.  If you find
24  a job that has enough controls, fine.
25             MR. WAX:  Okay.
```

```
 1          THE COURT:  He should be contributing to his
 2  keep, frankly.
 3          MR. WAX:  Well, which he understand he needs
 4  to, and the catch-22 is he's got to be able to get out
 5  and do it.
 6          THE COURT:  I understand.  We're going to go a
 7  half step at a time here, Mr. Wax.
 8          MR. WAX:  Well, I appreciate that the half step
 9  today is you'll have a chat with Mr. Wodehouse and talk
10  about whether or not we can relax the restrictions.
11          THE COURT:  More importantly -- I think the
12  more important half step is whether or not he can find a
13  job that will work out.  Yeah.  I'll have that talk with
14  Mr. Wodehouse, but I've asked him to be careful, and
15  that's his personality, so I realized who I was asking
16  to do that.
17          MR. WAX:  We appreciate that.  And I guess our
18  hope is that you and he can see that in the seven-week
19  period, he's been developing a track record in this
20  context which we hope will persuade you that he can be
21  trusted.  And it would make, I think, all of our lives
22  just a little bit easier, and it would make -- if he
23  knows that he can't go to the bank without having to,
24  you know, get advanced permission, you know, just as an
25  example, then he doesn't have to call us and say, can I
```

1  do this?  He doesn't have to call Ron.  We don't have to
2  call Ron.  Ron doesn't have to call you.  And I think
3  I've made my point.
4          THE COURT:  Yeah, you have.  I understood it
5  anyway, that's all right.
6          MR. WAX:  Thank you.
7          THE COURT:  What else do we have today?  There
8  is one other matter I have, but I'd like to hear
9  anything more that you folks have today.  The other
10 matter that I have is that the woman from the Justice
11 Department, who Mr. Cardani has the unusual situation --
12 a member of the Justice Department in this case is
13 working for me now, and with regard to secure
14 documentation, and that sort of thing.  She's here to
15 meet with me.  My staff is undergoing the secret
16 clearance, investigations, that sort of thing.  And
17 there will be safe for handling documents in my office
18 and a computer that's dedicated, all that sort of thing
19 is being put in place.
20         There is at least one issue that I know -- a
21 specific issue I know I'll want to deal with her today
22 about.  And I'm hoping that one of -- both defense
23 counsel are from Portland.  I am hoping that I can get
24 ahold of you later this morning.
25         MR. MATASAR:  Your Honor, we expect to be in

```
 1    the courthouse at least until noon looking at documents
 2    in Mr. Cardani's office.  So if you just call us there,
 3    that's fine.  I can provide our cell phone numbers, but
 4    we will be in Mr. Cardani's office today.  And if we
 5    decide to leave for some reason or another, we'll check
 6    with the court before we do.
 7              THE COURT:  I plan on this being over by noon,
 8    and I will want to see Mr. Cardani at the same time, but
 9    I know there is at least one specific issue I'm going to
10    want to deal with today.  And the other matters, really,
11    are more preparing our office and staff to handle what
12    may come up.  And I will -- if any of you have any idea
13    of what volume of material we'll be talking about here,
14    it would be nice to know before my discussions this
15    morning, but maybe you don't.
16              MR. MATASAR:  Just a second.
17              (Discussion held off the record between
18    counsel.)
19              MR. WAX:  Certain aspects of this, Judge, that
20    we would be happy to talk with you about ex parte.
21              THE COURT:  I understand. All right.  Thank
22    you.  Well, we'll have that discussion later this
23    morning.  Thank you.
24              (The proceedings were concluded at 10:01 a.m.)
25
```

CERTIFICATE

I, Deborah Wilhelm, Certified Shorthand Reporter for the State of Oregon, do hereby certify that I was present at and reported in machine shorthand the oral proceedings had in the above-entitled matter. I hereby certify that the foregoing is a true and correct transcript, to the best of my skill and ability, dated this 18th day of July, 2008.

Deborah Wilhelm, RPR
Certified Shorthand Reporter
Certificate No. 00-0363