**Steven T. Wax, OSB No. 85012**
**Federal Public Defender**
**101 SW Main Street, Suite 1700**
**Portland, OR  97204**
**Tel: (503) 326-2123**
**Fax: (503) 326-5524**
**Email: steve_wax@fd.org**

**Lawrence Matasar, OSB No. 74209**
**621 SW Morrison Street, Suite #1025**
**Portland, OR 97205**
**Tel: (503) 222-9830**
**Email: larry@pdxlaw.com**

**Attorneys for Defendant**

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CR 05-60008** |
| **Plaintiff,** | |
| | **MEMORANDUM  REGARDING DEFENSE ACCESS TO CLASSIFIED DISCOVERY** |
| **v.** | |
| **PIROUZ SEDAGHATY,** | |
| **Defendant.** | |

Defendant, Pirouz Sedaghaty, through his attorneys, Lawrence Matasar and Federal

Public Defender Steven T. Wax, hereby files this memorandum in support of his motion

**Page 1 -      MEMORANDUM REGARDING DEFENSE ACCESS TO CLASSIFIED DISCOVERY**

regarding access to classified discovery.  In this memorandum, he demonstrates that the government's filing on classified information is inadequate, the Court's role under Section 4 of the Classified Information Protection Act, 18 U.S.C. App. 3 (CIPA) with respect to the information it has received is limited and the defense should play a significant role in that process and that the Court should examine with care the scope of information the government provided to it on September 5, 2008.

**A.    THE GOVERNMENT FILINGS OF SEPTEMBER 5, 2008, ARE INADEQUATE TO PROVIDE THE DEFENSE REQUIRED NOTICE AND THE COURT NECESSARY GUIDANCE.**

In the motions for discovery filed on October 22, 2007, and March 17, 2008, Mr. Sedaghaty sought discovery of classified information.  At a hearing held on April 29, 2008, the Court directed the government to file its classified response to discovery motions on June 30, 2008.  The deadline for that filing was subsequently moved to September 5, 2008. On that date, the government filed three bare bones public documents that said nothing more than that it had made classified ex parte filings under Section 4 CIPA.

**1.    Under CIPA, The Core Discovery Obligation Is The Same As In Any Criminal Case.**

In his earlier pleadings, Mr. Sedaghaty has set out the basic constitutional and rule based discovery obligations on the government.  He has pointed out that these obligations are in no manner limited by the fact that the information a criminal defendant is entitled to receive is classified.  Both Mr. Sedaghaty and the government have provided the Court with the basic law governing use of classified information in criminal cases and the role of CIPA in providing a mechanism that the government can use to protect state secrets while fulfilling its obligations to the defense.  CIPA does not, however, limit the government's

discovery obligations.  *United States v. Pickard*, 236 F.Supp. 2d 1204, 1209 (D. Kan. 2002) ("CIPA does not create any new right of or limits on discovery . . .").  The Department of Justice recognizes this fact in its United States Attorney's Manual.  "Similarly, except as modified by CIPA, the prosecutor's obligation to produce the defendant information found during that review is unaffected by the nature of that information." USAM 9-90.210(B).

2.      **To Assure Compliance With The Government's Discovery Obligations In A CIPA Case, The Government Must Provide A More Detailed Pleading Than Was Filed On September 5, 2008.**

The government's filing on September 5, 2008, provided Mr. Sedaghaty no notice other than that something had been filed under seal with the Court.  The government did not inform him what had been provided to the Court; whether, for example, it had provided the Court with actual classified documents it believes it must disclose, a pleading stating that it does not believe any classified material that must be disclosed exists, or a pleading addressing other subjects related to classified information and CIPA.  As a result, the government failed to provide adequate information for Mr. Sedaghaty to have notice and an opportunity to be heard on discovery issues.  Under CIPA, the government is required to inform Mr. Sedaghaty of, at the very least, the nature of the filing provided to the Court on September 5, 2008.

3.      **Under Section 4 of CIPA, If The Government Seeks To Withhold Any Discoverable Information From The Defense, The Court's Role Is Limited To Determining Whether To Permit The Government To Make Certain Specified Redactions, To Provide A Summary Of Certain Documents, Or To Provide An Admission Of Certain Facts.**

Under CIPA, when the government is required to produce classified information in discovery, there is no provision for completely withholding the substance of the discovery from the defendant.  Upon a sufficient showing to the Court, the government may obtain

an order authorizing it to delete specified items of classified information from the documents to be made available to the defendant through discovery, to substitute a summary of the information, or to substitute a statement admitting relevant facts that the classified information would tend to prove.  18 U.S.C. App. III § 4.  None of these options permits the government to fail to provide discoverable information to the defense.

Moreover, before the Court addresses the CIPA Section 4 questions, the government must establish that ex parte communications and filings are necessary. The discussion in *United States v. Libby*, 429 F.Supp.2d 18, (D.D.C. 2006), is instructive.  While authorizing ex parte communication about discovery, the court noted that the government must provide justification for any such effort.  429 F. Supp. at 25.  Nor is a bald assertion that material is classified sufficient.  As held in *United States v. Kimavicius-Viloria*, 144 F.3d 1249, 1261 (9th Cir. 1998), in order for the government to show that material is classified, it "must make a formal claim of state secret privilege."

The CIPA Section 4 procedure is separate and distinct from the hearing later on in the process that takes place to determine the use, relevance or admissibility of a particular piece of classified information in pre-trial or trial proceedings.  18 U.S.C. App. III § 6.  While the Section 6 hearing may take place *in camera*, the defense participates in the hearing. In fact, prior to the hearing, the government must give the defense notice of "the classified information at issue."  18 U.S.C. App. III § 6(b)(1).  The notice identifies the piece of information, previously indicated by the defense in its notice pursuant to section 5, that the government seeks to exclude.

**4.    The Court Should Order That The Defendant Fully Participate In The CIPA Section 4 Process.**

Given the scant filing of September 5, 2008, Mr. Sedaghaty must assume that the government has responded to the discovery motions consistent with its obligations and provided the Court with the wealth of material that it believes must be provided to the defense.  The defense also assumes the government has suggested to the Court the redactions, substitutions, and summaries that it believes it should be permitted to make under Section 4 of CIPA.  Consistent with the flexibility available under CIPA, Mr. Sedaghaty has moved the Court to permit him to participate in the process of determining the form in which discovery is provided.

While ex parte proceedings are permitted under CIPA, the Court retains a great deal of discretion.  For example, in the trial of Colonel Oliver North, the court recognized that while the court and the attorneys fulfilled the purposes of CIPA, they did not always follow it precisely:

> CIPA was ill-suited to a case of this type and amendments are needed to recognize practical difficulties.  For some instances, the Court followed procedures which were not in strict accord with the statutory framework to expedite resolution of unusual problems that arose.  Fortunately, CIPA is a procedural statute, and the legislative history of it shows that Congress expected trial judges to fashion creative solutions in the interests of justice for classified information problems.  *See* H.R. Conf. Rep. No. 96-1436 (96th Cong., 2nd Sess., 11, 14 (1980), U.S. Code Cong. & Admin. News 1980, p. 4294.  The Executive cooperated with the Court by liberally waiving classification objections when to do otherwise might have halted the proceeding and interfered with a fair trial.

*United States v. North*, 713 F.Supp. 1452, 1452-53 (D.D.C. 1989).

In *Libby*, the court recognized that "[t]he determination of what may be useful to the defense can properly and effectively be made only by an advocate."  429 F.Supp at 26.

The Court then balanced the needs of the defense and prosecution by providing "the defendant the opportunity to submit an ex parte affidavit from counsel detailing the defense so that the Court [would] be in a more informed position to determine whether the government's proposed redactions or substitutions for a particular document adequately provide the defendant with what he needs to pursue his defense." *Id*.

An ex parte filing is, however, inadequate in this case because the government has not provided Mr. Sedaghaty any basis on which he can file anything other than a purely speculative pleading.  In order to strike a proper balance, the Court should direct the court security officer to initiate the process for Mr. Sedaghaty's counsel to obtain the necessary security clearances to review all of the material provided by the government.  Alternatively, Mr. Sedaghaty seeks an order requiring the government to provide him a meaningful unclassified statement of what it filed with the Court on September 5, 2008, and then permit him to make an ex parte filing addressing the decisions on redaction, substitutions, or summaries.

If the government has complied with its discovery obligations, the material the Court has received should include many written and recorded statements by Mr. Sedaghaty. Because the defendant is always entitled to discovery of such statements ( Fed. R. Crim. P. 16 (a)(1)(B)), any effort to redact or substitute portions of such items should be rejected. *United States v. Bailleaux*, 685 F.2d 1105 (9th Cir. 1982), *modified*, *United States v. Miller*, 874 F.2d 1255, 1268 (9th Cir. 1989))

### 5.    The Government Should Have Produced Numerous Documents For The Court From Many Intelligence Agencies.

The government should have provided the Court with a wealth of documents,

transcripts, email records, and records of surveillance dating back to the 1990s.  In order to help the Court determine whether the government has complied with its discovery obligations, Mr. Sedaghaty has provided a declaration (pending classification review) from a high level former intelligence official describing the types and scope of information that the government should have provided to the Court on September 5, 2008.  The declaration amplifies the discussion that follows from the perspective of an insider in the intelligence community.

Although there is no indication Mr. Sedaghaty had been involved with terror activities, the parent organization of Al Haramain USA with which he has been associated has been under suspicion, which would generate substantial information.[1]  The government has investigated the Al Haramain charity since at least the mid to late 1990s.  The 9/11 commission report regarding terrorist financing indicates that the Al Haramain organization "has been on the radar screen of the U.S. government as a potential terrorist financing problem since the mid to late 1990s . . . ."  Ex. A.  In addition, three media reports in March 2000 indicate that the CIA was interested in Al Haramain as a possible suspect in the 1998 bombing of the U.S. Embassy in Kenya.  Ex. A.  This information confirms that the U.S. Intelligence community has been collecting information about Al Haramain since before the tragic events of September 11, 2001, and much of that information may have been collected (assuming it was purely foreign intelligence, without any domestic U.S. connection) without limitation.

---

[1] Al Haramain and AHIF are used to refer to the Saudi Arabia based charity.  Al Haramain U.S.A. and AHIF U.S.A. are used to refer to the Ashland Chapter known as the Al Haramain Islamic Foundation.

**Page 7 -          MEMORANDUM REGARDING DEFENSE ACCESS TO CLASSIFIED DISCOVERY**

Official confirmation of the investigation of Al Haramain is found in a declaration filed by Adam Szubin, the Director of the U.S. Department of the Treasury's Office of Foreign Assets Control, in the designation lawsuit. Ex. B. In September of 2004, United States Treasury Department, specifically the Office of Foreign Assets Control (OFAC), identified the Al Haramain Islamic Foundation and Soliman Al-Buthe, Specially Designated Global Terrorists.[2] Al Haramain U.S.A. challenged this designation in a lawsuit. *Al Haramain Islamic Foundation v. United States Department of Treasury*, No. 07-1155-KI, 2008 WL 2381640 (D. Or. 2007). Specific references to the investigation and designation of Al Haramain and its associates are found on pages 12-30 of Szubin's 31 page declaration. Ex. B.

In this declaration, Director Szubin confirms that: "Action with respect to the U.S. branch of AHIF was closely coordinated within the U.S. Government to ensure that separate law enforcement and designation efforts would not interfere with one another." Ex. B at 17. The declaration confirms that the United States government was investigating Al Haramain since the mid-1990s. Ex. B at 13. It reveals that many different investigative bodies in the government have been involved in investigating Al Haramain and its principles and that there has been some overarching coordination somewhere within the government.

Director Szubin also described that for approximately two years, United States officials and Saudi Arabia government officials discussed and coordinated their response to the threat posed by Al Haramain. Ex. B at 15. In March of 2002, the United States and Saudi governments jointly announced the United State's designation of the AHIF branches

---

[2]Mr. Sedaghaty has not been designated and counsel for Mr. Sedaghaty understand that there is no indication that he will be designated in the future.

in Somalia and Bosnia.  Ex. B at 15.  The declaration goes on to describe the February 2004, execution of search warrants at the property in Ashland, Oregon, that was being used by AHIF-Oregon and the OFAC order blocking the funds, accounts and business records, pending further investigation into AHIF-Oregon's support of, and ties to, terrorists. Ex. B at 17.

The scope of the investigation of Al Haramain and breadth of material the Court should have received is also revealed by the portion of Director Szubin's declaration that explained: "OFAC and other agencies within the United States Government continued to review (1) additional unclassified material; (2) additional classified information; and (3) correspondence between OFAC and AHIF-Oregon, in determining whether to designate AHIF U.S.A. as an SDGT pursuant to E.O. 13224 and IEEPA." Ex. B at 18 (¶ 53.).  Several months later, in June of 2004, the United States designated Aqeel al-Aqil, the former Chairman of AHIF and President of AHIF U.S.A.  Ex. B at 17.  This aspect of the OFAC work is also likely to contain discoverable information in this criminal case.

According to published media reports, interest in the Al Haramain organization increased substantially after September 11, 2001, and it was reportedly a subject of the "Terrorist Surveillance Program," a warrantless wiretapping program unilaterally instituted by President Bush that apparently captured the telephone conversations of co-defendant Soliman Al-Buthe with his American lawyers, without the approval of the Foreign Intelligence Surveillance Court.  Ex. C.

Several articles discuss the publicly known origins of the Terrorist Surveillance Program and the possibility of the existence of other intelligence gathering programs within the United States, instituted after September 11, 2001, that also raise the question of

additional domestic, and warrantless surveillance of Al Haramain in the United States.  Ex.

D.  The disclosure of this classified document has been the subject of extensive litigation

by Al Haramain and was found to have been conducted unlawfully by Judge Vaughn

Walker, who remanded the case for further proceedings to determine whether there was

any remedy available to the Plaintiff's pursuant to the Foreign Intelligence Surveillance Act

(FISA).  *In Re: National Security Agency Telecommunications Records Litigation*, No. 06-

1791-VRW, 2008 WL 2673772 (N.D. Ca. July 2, 2008) (Order pertaining to: *Al-Haramain*

*Islamic Foundation et al v. Bush et al* (C-07-0109 VRW)).  The full text of Judge Walker's

opinion can be found here:

http://www.eff.org/files/Al-HaraFISA-order.pdf.

Many of the examples above demonstrate that Al Haramain and its associates,

including the co-defendant in this case, have been investigated for many years.  In addition,

many of these investigations have led to other cases that are connected to Mr. Sedaghaty

or Mr. Al-Buthe.  Documents that were produced during discovery in those cases involving

Al Haramain and Mr. Al-Buthe ought to be produced here as well.  *See United States v.*

*George*, 786 F.Supp. 11, 13-15 (D.D.C. 1991) (documents that were produced during

discovery in two other Iran-Contra affair cases should be provided to the defense in another

Iran-Contra affair case).

The United Sates may have surveilled Al Haramain U.S.A., Mr. Al-Buthe, and Mr.

Sedaghaty through the use of FISA.  In addition, it has been confirmed that Al Haramain

U.S.A. has been surveilled unlawfully by at least the TSP program.  There is a strong

likelihood that Mr. Sedaghaty, a United States citizen, has been surveilled through other

unlawful methods including other NSA or other intelligence agency sanctioned activities.

Information gathered, classified or unclassified, through both lawful and unlawful surveillance, should be included in the material provided during discovery.

From the available subpoenas in this and other related cases, it appears that more traditional investigations of Al Haramain U.S.A., Soliman Al-Buthe, and Mr. Sedaghaty commenced in October of 2001. *See* Government Discovery 387-389 (Grand Jury Subpoena to Jackson County Title re: any and all records pertaining to Al-Haramain Islamic Foundation); *see e.g.* Ex. E. Notably, this is at the same time that the government began the Terrorist Surveillance Program, which targeted "the contents of communications in which one party is outside the United States and there are reasonable grounds to believe that at least one party to the communication is a member or agent of al Qaeda or an affiliated terrorist organization." Ex. F at 6. The fact that the two investigations began at approximately the same time and so soon after September 11, 2001, strongly suggests the existence of relevant information and knowledge obtained from prior surveillance activities.

It is clear from the public record and from the declaration filed by Mr. Sedaghaty's expert that the Court should have received a wealth of information from the government on September 5, 2008.

**6.    The Court Should Be Wary Of The Government's Response To The Discovery Pleadings In This Case.**

In complying with his/her obligations to provide discovery that is classified, the United States Attorney is obligated to direct inquiries to all United States Departments, law enforcement, and intelligence agencies. USAM 9-90-210. They, in turn, are obligated to provide all discoverable material to the prosecutors in the United States Attorney's office. *Id.* In the normal course, the Court could assume good faith on the government's part in

the discovery process.  Facts specific to this case, and government actions in other cases involving Saudi Arabian charities, reveal that the normal response to the government's actions may not be warranted.   While Mr. Sedaghaty does not question that AUSAs Cardani and Gorder have acted appropriately, as the discussion below reveals, there is a reasonable probability that  the Intelligence Agencies and Department of Justice in Washington, D.C. have not been forthcoming.  If the Court does not find in the September 5, 2008, filings the type and scope of material described by Mr. Sedaghaty's expert, Mr. Sedaghaty seeks hearings at which he can participate regarding the classified discovery process.

During the OFAC litigation, OFAC provided a document labeled "TOP SECRET." 2008 WL 2381640.  It is believed that the "TOP SECRET" document contains a log of communications that included attorney-client privileged communications.   2008 WL 2381640 at *3.  At least two aspects of this document and litigation are relevant to the question of reliance on representations from the United States.  First the government acknowledged engaging in illegal activities against Al Haramain U.S.A. and its directors. These acts eliminate any presumption that the government has acted in good faith.

The second relevant aspect emerges from the declaration filed during the OFAC litigation by Director Szubin.  Ex. B.  When describing the redesignation process, Director Szubin explained that OFAC requested authorization to provide all classified documents in the Administrative Record to the court in an *ex parte*, *in camera* manner, as provided by IEEPA.  Ex. B at 23-24 (¶ 68).  The declaration went on to state:

> OFAC received responses from relevant agencies for all materials.  OFAC received authorization to submit the overwhelming majority of the classified materials to the court *ex parte* and *in camera*.  OFAC did not obtain

authorization to submit a number of classified documents to the court. Additional information concerning these records is set forth in the Classified Addendum to this Declaration that is being submitted separately. These records were not considered or relied upon as a basis for redesignation and are not included in OFAC's Administrative Record.

Ex. B at 24 (¶ 69).

Director Szubin's declaration acknowledges that in the Al Haramain OFAC litigation, some classified information has not been provided to the court. While in that civil case, perhaps, it was acceptable that OFAC simply did not rely on the information while making its redesignation determination, this is a federal criminal case. Under the Fifth and Sixth Amendments, it is imperative that the government be held to its discovery obligations and be required to disclose all information, regardless of embarrassment or disclosure of government illegality. *See Pickard*, 236 F.Supp. at 1209.

The reasons why this Court should view with extreme caution any representations from the government about the completeness of its disclosure are further revealed by examination of the proceedings in the Eastern District of Virginia in Criminal Case No. 04-cr-385, *United States of America v. Ali Al-Timimi*. Prior to trial, the government stated that it was going to use FISA-derived material. Several calls were introduced at trial, including calls with defendant Sedaghaty's co-defendant, Mr. Al-Buthe. On April 26, 2005, Ali Al-Timimi was convicted at trial of providing material support to a terrorist organization. On July 13,2005, he was sentenced to life in prison upon those convictions. He appealed his convictions to the Fourth Circuit. In February 2006, Al-Timimi moved the Fourth Circuit to vacate his appeal and remand to the District Court for further proceedings in light of the then-recently disclosed domestic surveillance program operated by the National Security Agency (NSA). He requested remand also to discover whether the Government had

withheld from the court or opposing counsel matters that derived from TSP.

Surprisingly, the government stipulated to a remand to the district court to consider this question.  Briefing on that issue began in September 2006.  Several facts relevant to this case have emerged:

1.    The government had in fact employed FISA-authorized communication surveillance between Dr. Al-Timimi and numerous individuals, including Soliman Al-Buthe, the co-defendant in the present case.  These had not previously been disclosed.  There is, therefore, reason to be concerned that the government will not readily disclose all of its surveillance activities in this case.

2.    A limited number of communications, including calls with Mr. Al-Buthe, were introduced against Dr. Al-Timimi.  Ex. G at p.5.  It is known that calls between Mr. Al-Buthe and Al-Timimi were surveilled on February 1, 2003.  Ex. H at p. 17.  It is, therefore, likely that information relevant to this case exists in these same sets of calls.

3.    Counsel for the government in Al-Timimi's case was ordered to obtain sufficient security clearances to address the issue of NSA surveillance. Since then, counsel has been so cleared and undertook an in-person review of TSP related information, presumably including surveillance of Al-Buthe.   It has also made several classified submissions to the court regarding relevant intelligence activities.  Following the review, the government reported to the court that all information due to the defendant had been disclosed. Ex. I.  Counsel for Dr. Al-Timimi disputed this, specifically arguing that surveilled communications included faxed transmissions, and characterized surveilled communications as repeated and material. Ex. H at p. 17.  The defendant described a very broad investigation of Al-Timimi, including electronic surveillance of Al-Buthe. Ex.  H at pp.

8-17.

4.    The court, in a hearing on May 16, 2008, noted the repeated sealed submissions by the government that attempted to meet its obligations to disclose all previously undisclosed classified information to the court.  Judge Brinkema voiced her concern that the defendant be able to review some form of the classified information:

> I am proposing to set a conference with you, Ms. Gunning, somebody from the agency, and the Court, and we're going to sit down, and we're going to take these ex parte filings that you've been filing, and we are going to talk about the degree to which they can be redacted so that defense counsel can get some sense as to what has been spoken about or talked about in those documents."

Ex. J at 3.  She also questioned the Government's proper use of the classification system, intimating that the Government had been way too overbroad in its use of the classification shield in preventing the defense from reviewing material.

> I have to tell you that some of the matters that are claimed to be classified simply cannot qualify for any classification in a rational system, and I can't even articulate in an open courtroom those matters, but we will do that.

Ex. J at 4.

The court's consideration of the defense requests for access to the classified material, and the Court's determination of whether anything was improperly withheld is on-going.  It is, therefore, apparent that the court in *Al-Timimi* has been dissatisfied with the candor of the government, suggesting that this Court must be vigilant in its review of classified submissions.  The morass in which Judge Brinkima finds herself as a result of the government's actions is one that this Court should assiduously seek to avoid by intense inquiry into the government's disclosures and involvement of the defense in that process.

**Conclusion**

For all of the reasons set forth herein and in the pleadings regarding discovery and access to and communication about the top secret document previously field with this Court, Mr. Sedaghaty urges this Court to:

1.      Order the government to provide him a meaningful pleading regarding its ex parte filing of September 5, 2008;

2.      Permit him to make an ex parte filing regarding CIPA Section 4 redactions, substitutions, or omissions before issuing its ruling under CIPA Section 4;

3.      View with skepticism the completeness of the government's filings of September 5, 2008.

RESPECTFULLY SUBMITTED this 10th day of October, 2008.


 /s/ Steven T. Wax
Steven T. Wax
Federal Public Defender

 /s/ Lawrence Matasar
Lawrence Matasar
Attorney at Law