# EXHIBIT C



Member Center: Sign In | Register                                             International Edition

SEARCH    ⦿ THE WEB  ○ CNN.COM  [                    ]  Search

**Home Page**
**World**
**U.S.**
**Weather**
**Business**
**Sports**
**Analysis**
**Politics**
**Law**
**Technology**
**Science & Space**
**Health**
**Entertainment**
**Offbeat**
**Travel**
**Education**
**Special Reports**
**Video**
**Autos**
**I-Reports**

SERVICES
**E-mails**
**RSS**
**Podcasts**
**Mobile**
**CNN Pipeline**

SEARCH
⦿ WEB  ○ CNN.COM
[           ]
Search

# POLITICS

## Bush says he signed NSA wiretap order

### Adds he OK'd program more than 30 times, will continue to do so

Saturday, December 17, 2005; Posted: 8:07 p.m. EST (01:07 GMT)

**WASHINGTON (CNN) -- In acknowledging the message was true, President Bush took aim at the messenger Saturday, saying that a newspaper jeopardized national security by revealing that he authorized wiretaps on U.S. citizens after September 11.**

After The New York Times reported, and CNN confirmed, a claim that Bush gave the National Security Agency license to eavesdrop on Americans communicating with people overseas, the president said that his actions were permissible, but that leaking the revelation to the media was illegal.

During an unusual live, on-camera version of his weekly radio address, Bush said such authorization is "fully consistent" with his "constitutional responsibilities and authorities." (Watch Bush explain why he 'authorized the National Security Agency ... to intercept' -- 4:29)

Bush added: "Yesterday the existence of this secret program was revealed in media reports, after being improperly provided to news organizations. As a result, our enemies have learned information they should not have, and the unauthorized disclosure of this effort damages our national security and puts our citizens at risk."

He acknowledged during the address that he allowed the NSA "to intercept the international communications of people with known links to al Qaeda and related terrorist organizations."

The highly classified program was crucial to national security and designed "to detect and prevent terrorist attacks," he added. (Transcript)

The NSA eavesdrops on billions of communications worldwide. Although the NSA is barred from domestic spying, it can get warrants issued with the permission of a special court called the Foreign Intelligence Surveillance Act Court.

The court is set up specifically to issue warrants allowing wiretapping on domestic



President Bush arrives for his radio address in the Roosevelt Room at the White House on Saturday.

Image:                                   NEXT →

### RELATED

- Bush: Patriot Act rejection 'irresponsible'
- Congress has much work to do
- House passes immigration bill
- House rejects Iraq pullout
- Play of the Week: Bush's candor

### QUICKVOTE

Was the New York Times right to publish details of a secret program that allows spies to eavesdrop on Americans without a warrant?

Yes, we need to know          ○
No, security needs secrecy    ○

VOTE  or View Results

### YOUR E-MAIL ALERTS

National Security Agency (NSA) ○

Search Jobs  MORE OPTIONS
Enter Keywords
Enter City    ALL
careerbuilder.com  SEARCH

soil.

## 'Sad day'

After hearing Bush's response, Sen. Russ Feingold, D-Wisconsin, said there was no law allowing the president's actions and that "it's a sad day."

"He's trying to claim somehow that the authorization for the Afghanistan attack after 9/11 permitted this, and that's just absurd," Feingold said. "There's not a single senator or member of Congress who thought we were authorizing wiretaps."

He added that the law clearly lays out how to obtain permission for wiretaps.

"If he needs a wiretap, the authority is already there -- the Federal Intelligence Surveillance Act," Feingold said. "They can ask for a warrant to do that, and even if there's an emergency situation, they can go for 72 hours as long as they give notice at the end of 72 hours."

Bush defended signing the order by saying that two of the September 11 hijackers who flew the plane into the Pentagon -- Khalid Almihdhar and Nawaf Alhazmi -- "communicated while they were in the United States to other members of al Qaeda who were overseas, but we didn't know they were here until it was too late."

He said the authorizations have made it "more likely that killers like these 9/11 hijackers will be identified and located in time, and the activities conducted under this authorization have helped detect and prevent possible terrorist attacks in the United States and abroad."

## Re-authorized 30 times

Sources with knowledge of the program told CNN on Friday that Bush signed the secret order in 2002. The sources refused to be identified because the program is classified.

Bush, however, said he authorized the program on several occasions since the September 11 attacks and that he plans on doing it again.

"I have re-authorized this program more than 30 times," he said. "I intend to do so for as long as our nation faces a continuing threat from al Qaeda and related groups."

The New York Times had not responded to Bush's allegations that the paper endangered national security as of Saturday afternoon.

But in a Friday statement, Executive Editor Bill Keller said the newspaper postponed publication of the article for a year at the White House's request, while editors pondered the national security issues surrounding the release of the information.

But after considering the legal and civil liberties aspects, and determining that the story could be written without jeopardizing intelligence operations, the paper ran the story, Keller said, emphasizing that information about many NSA eavesdropping operations is public record.

CNN has not confirmed the exact wording of the president's order.

The political ramifications of the newspaper's report were felt even before Bush acknowledged the report's veracity.

Senators contemplating a vote Friday on whether to renew some controversial portions of the Patriot Act used The New York Times' report as evidence that the government could not be trusted with the broad powers laid out in the act. (Read about the Patriot Act vote)

In particular, Sen. Arlen Specter, R-Pennsylvania, said such behavior by the executive branch "can't be condoned," and Sen. Charles Schumer, D-New York, said the report swayed his decision on the Patriot Act proposal.

"Today's revelation that the government listened in on thousands of phone conversations without getting a warrant is shocking and has greatly influenced my vote," Schumer said. "Today's revelation makes it very clear that we have to be very careful -- very careful."

Specter, the chairman of the Senate Judiciary Committee, added Friday that his committee would immediately begin investigating the matter.

| Military Intelligence | ○ |
|---|---|
| Civil Rights | ○ |
| Espionage and Intelligence | ○ |

ACTIVATE | or **Create Your Own**

Manage Alerts | What Is This?

*CNN's Kelli Arena contributed to this report.*

**Story Tools**

SAVE THIS    E-MAIL THIS
PRINT THIS   MOST POPULAR

advertisement

Subscribe to Time for $1.99



## TOP STORIES
Home Page

Get up-to-the minute news from CNN

CNN.com gives you the latest stories and video from the around the world, with in-depth coverage of U.S. news, politics, entertainment, health, crime, tech and more.

## TOP STORIES
Home Page

Get up-to-the minute news from CNN

CNN.com gives you the latest stories and video from the around the world, with in-depth coverage of U.S. news, politics, entertainment, health, crime, tech and more.

**International Edition** | Languages | **CNN TV** | **CNN International** | **Headline News** | **Transcripts** | **Advertise with Us** | **About Us**

SEARCH  ◉ THE WEB  ○ CNN.COM  [          ]  Search

© 2007 Cable News Network.
A Time Warner Company. All Rights Reserved.
Terms under which this service is provided to you.
Read our privacy guidelines. Contact us. Site Map.

External sites open in new window; not endorsed by CNN.com
CNN Pipeline Pay service with live and archived video. Learn more
Download audio news  |  Add RSS headlines



For Immediate Release
Office of the Press Secretary
December 17, 2005

## President's Radio Address

The Roosevelt Room

📄 In Focus: Homeland Security

10:06 A.M. EST

THE PRESIDENT: Good morning.

As President, I took an oath to defend the Constitution, and I have no greater responsibility than to protect our people, our freedom, and our way of life. On September the 11th, 2001, our freedom and way of life came under attack by brutal enemies who killed nearly 3,000 innocent Americans. We're fighting these enemies across the world. Yet in this first war of the 21st century, one of the most critical battlefronts is the home front. And since September the 11th, we've been on the offensive against the terrorists plotting within our borders.



One of the first actions we took to protect America after our nation was attacked was to ask Congress to pass the Patriot Act. The Patriot Act tore down the legal and bureaucratic wall that kept law enforcement and intelligence authorities from sharing vital information about terrorist threats. And the Patriot Act allowed federal investigators to pursue terrorists with tools they already used against other criminals. Congress passed this law with a large, bipartisan majority, including a vote of 98-1 in the United States Senate.

Since then, America's law enforcement personnel have used this critical law to prosecute terrorist operatives and supporters, and to break up terrorist cells in New York, Oregon, Virginia, California, Texas and Ohio. The Patriot Act has accomplished exactly what it was designed to do: it has protected American liberty and saved American lives.

Yet key provisions of this law are set to expire in two weeks. The terrorist threat to our country will not

expire in two weeks. The terrorists want to attack America again, and inflict even greater damage than they did on September the 11th. Congress has a responsibility to ensure that law enforcement and intelligence officials have the tools they need to protect the American people.

The House of Representatives passed reauthorization of the Patriot Act. Yet a minority of senators filibustered to block the renewal of the Patriot Act when it came up for a vote yesterday. That decision is irresponsible, and it endangers the lives of our citizens. The senators who are filibustering must stop their delaying tactics, and the Senate must vote to reauthorize the Patriot Act. In the war on terror, we cannot afford to be without this law for a single moment.

To fight the war on terror, I am using authority vested in me by Congress, including the Joint Authorization for Use of Military Force, which passed overwhelmingly in the first week after September the 11th. I'm also using constitutional authority vested in me as Commander-in-Chief.

In the weeks following the terrorist attacks on our nation, I authorized the National Security Agency, consistent with U.S. law and the Constitution, to intercept the international communications of people with known links to al Qaeda and related terrorist organizations. Before we intercept these communications, the government must have information that establishes a clear link to these terrorist networks.

This is a highly classified program that is crucial to our national security. Its purpose is to detect and prevent terrorist attacks against the United States, our friends and allies. Yesterday the existence of this secret program was revealed in media reports, after being improperly provided to news organizations. As a result, our enemies have learned information they should not have, and the unauthorized disclosure of this effort damages our national security and puts our citizens at risk. Revealing classified information is illegal, alerts our enemies, and endangers our country.

As the 9/11 Commission pointed out, it was clear that terrorists inside the United States were communicating with terrorists abroad before the September the 11th attacks, and the commission criticized our nation's inability to uncover links between terrorists here at home and terrorists abroad. Two of the terrorist hijackers who flew a jet into the Pentagon, Nawaf al Hamzi and Khalid al Mihdhar, communicated while they were in the United States to other members of al Qaeda who were overseas. But we didn't know they were here, until it was too late.

The authorization I gave the National Security Agency after September the 11th helped address that problem in a way that is fully consistent with my constitutional responsibilities and authorities. The activities I have authorized make it more likely that killers like these 9/11 hijackers will be identified and located in time. And the activities conducted under this authorization have helped detect and prevent possible terrorist attacks in the United States and abroad.

The activities I authorized are reviewed approximately every 45 days. Each review is based on a fresh intelligence assessment of terrorist threats to the continuity of our government and the threat of catastrophic damage to our homeland. During each assessment, previous activities under the authorization are reviewed. The review includes approval by our nation's top legal officials, including the Attorney General and the Counsel to the President. I have reauthorized this program more than 30 times since the September the 11th attacks,

## Archives

Radio Address:
2007
2006
2005
2004
2003
2002
2001

✦ **Radio Interviews**

- 2005
- 2004

and I intend to do so for as long as our nation faces a continuing threat from al Qaeda and related groups.

The NSA's activities under this authorization are thoroughly reviewed by the Justice Department and NSA's top legal officials, including NSA's general counsel and inspector general. Leaders in Congress have been briefed more than a dozen times on this authorization and the activities conducted under it. Intelligence officials involved in this activity also receive extensive training to ensure they perform their duties consistent with the letter and intent of the authorization.

This authorization is a vital tool in our war against the terrorists. It is critical to saving American lives. The American people expect me to do everything in my power under our laws and Constitution to protect them and their civil liberties. And that is exactly what I will continue to do, so long as I'm the President of the United States.

Thank you.

END 10:13 A.M. EST



« Back to Article

# Top Secret: We're Wiretapping You

Ryan Singel   03.05.07

It could be a scene from Kafka or *Brazil*. Imagine a government agency, in a bureaucratic foul-up, accidentally gives you a copy of a document marked "top secret." And it contains a log of some of your private phone calls.

You read it and ponder it and wonder what it all means. Then, two months later, the FBI shows up at your door, demands the document back and orders you to forget you ever saw it.

By all accounts, that's what happened to Washington D.C. attorney Wendell Belew in August 2004. And it happened at a time when no one outside a small group of high-ranking officials and workaday spooks knew the National Security Agency was listening in on Americans' phone calls without warrants. Belew didn't know what to make of the episode. But now, thanks to that government gaffe, he and a colleague have the distinction of being the only Americans who can prove they were specifically eavesdropped upon by the NSA's surveillance program.

The pair are seeking $1 million each in a closely watched lawsuit against the government, which experts say represents the greatest chance, among over 50 different lawsuits, of convincing a key judge to declare the program illegal.

Belew's bout with the Terrorist Surveillance Program began in 2004, when he was representing the U.S. branch office of the prominent Saudi Arabian charity Al-Haramain. Formerly one of the largest charities in Saudi Arabia, Al-Haramain worked to spread a strict view of Islam through philanthropy, missionary work and support for mosques around the world.

Federal officials were investigating the Ashland, Oregon, branch of the group for alleged links to terrorism, and had already frozen the charity's U.S. assets. Belew was one of several lawyers trying to keep Al-Haramain off a U.S. Treasury Department watch list -- an effort that sent much paperwork flying back and forth between the attorneys and the Treasury Department's Washington D.C. headquarters across the street from the White House.

On Aug. 20, 2004, fellow Al-Haramain attorney Lynne Bernabei noticed one of the documents from Treasury was marked "top secret." Bernabei gave the document to attorneys and directors at Al-Haramain's Saudi Arabia headquarters, and gave a copy to Belew. The document was a log of phone conversations Belew and co-counsel Asim Ghafoor had held with a Saudi-based director for the charity named Soliman al-Buthi.

Al-Buthi was a Saudi government employee who volunteered as coordinator for Al-Haramain's North American branches, including the Oregon branch. In a telephone interview with Wired News, al-Buthi says he's now general manager for the environmental department of the city of Riyadh, working on an anti-bird flu project. He denied having any links to terrorism, now or in 2004. "I feel that Islam is best spread by wisdom not by arms or violence," al-Buthi says.

Despite al-Buthi's claims of innocence, al-Buthi and Al-Haramain's American branch were added to the government's public list of terrorists on Sept. 9, 2004, just weeks after the government turned over the call log to the charity's attorneys. It's not clear when officials realized they'd given a highly classified document to an organization they considered terrorist, but the FBI showed up at Belew's office in October and demanded the call log back, advising the lawyer not to attempt to remember the document's contents.

By then, Belew had given a copy of the document to *Washington Post* reporter David Ottaway, who had been writing about how the government investigated and listed individuals and groups suspected of funding terrorism. Ottaway did not report on the classified call log, and when the FBI called, the *Post* dutifully handed over its copy.

That might have been the end of it. But in December 2005 *The New York Times* revealed that the government had been spying on Americans' overseas communications without warrants, and Al-Haramain's lawyers realized why the FBI had been so adamant about getting the document back.

"I got up in the morning and read the story, and I thought, 'My god, we had a log of a wiretap and it may or may not have been the NSA and on further reflection it was NSA," says Thomas Nelson, who represents Al-Haramain and Belew. "So we decided to file a lawsuit."

The lawyers retrieved one of the remaining copies of the document -- presumably from Saudi Arabia -- and used it to file a complaint in U.S. District Court in Oregon in February of last year. They sought damages from the government of $1 million each for Belew and Ghafoor, and the unfreezing of Al-Haramain's assets, because that action relied on the allegedly illegal spying.

The lawsuit is poised to blow a hole through a bizarre catch-22 that has dogged other legal efforts to challenge the Bush administration's warrantless surveillance.

Since the 2005 *Times* story, and subsequent acknowledgment of the surveillance by the Bush administration, some 50-odd lawsuits have sprung up around the NSA program, taking on the government and various telecom companies who are allegedly cooperating in spying on their customers, including BellSouth, Verizon and Sprint.

Justice Department and phone company lawyers have asserted that the plaintiffs in those cases don't have legal standing to sue, because they have no proof that they were direct victims of the eavesdropping. At the same time, the government claims it doesn't have to reveal if any individual was or was not wiretapped because the "state secrets privilege" permits it to withhold information that would endanger national security.

The tangible document makes Belew's case uniquely positioned to cut through that thicket, says Shayana Kadidal, an attorney with the Center for Constitutional Rights, which represents individuals being held in Guantanamo Bay. The center is also suing to stop the surveillance, but lacks Belew's concrete evidence of monitoring -- arguing instead that the possibility of being monitored hampers its legal work.

"The government's line is that if you don't have evidence of actual surveillance, you lose on standing," says Kadidal. "Out of all the cases, this is the only one with evidence of actual surveillance."

That evidence also gives the courts enough to rule immediately on whether the president had the authority to spy on Belew and Ghafoor without a court order, said Jon Eisenberg, one of Belew's lawyers. "We know how many times he's been surveilled," Eisenberg told a judge last month. "There is nothing left for this court to do except hear oral arguments on the legality of the program."

The Justice Department isn't ready to concede that the two attorneys were swept into the NSA's extrajudicial surveillance. "The government has never confirmed or denied whether plaintiffs were surveilled, much less surveilled under the Terrorist Surveillance Program," spokesman Dean Boyd wrote in an e-mail to Wired News.

But if the document is a harmless memo unrelated to NSA surveillance, it's unexpectedly agitating government spooks.

Soon after the lawsuit was filed, the document was whisked out of the courthouse and into a Justice Department-controlled secure room known as a Secure Compartmented Information Facility in Portland, Oregon. According to government filings, it remains classified top secret and contains "sensitive compartmented information" -- meaning information that concerns or is derived from intelligence sources, methods or analytical processes, according to the defense and intelligence communities' own definition.

Even the lawyers who filed the document with the court are no longer allowed to see it; instead, they've been permitted to file declarations, under seal, based on their memory of its contents.

Other aspects of the case also support the plaintiffs' interpretation of the document. Last year, U.S. District Judge Garr King in Portland examined the document and read classified briefs filed by the Justice Department. Then he ordered the government to meet with the plaintiffs to discuss turning over more documents in

discovery. It's not likely the court would have permitted the case to continue if the evidence didn't, in fact, indicate that the pair had been under surveillance.

And if the surveillance had been court ordered and lawful, King would have been obliged to dismiss the lawsuit. Under the Foreign Intelligence Surveillance Act, or FISA, targets of counter-intelligence or counter-terrorism surveillance can only sue the government when no warrant has been issued. Lawyers for Belew and Ghafoor seize on this point. "If there was a FISA warrant, the whole case would have crumbled on the first day," Nelson says. "Its pretty obvious from the government's conduct in the case, there was no warrant."

Justice department lawyers have argued that, even if the pair of lawyers were monitored, judging the president's authority to do so requires looking at the specific reasons why the duo were surveilled. And those facts would be national secrets that would tip off terrorists, so no court can ever rule on the program.

"This is not to say there is no forum to air the weighty matters at issue, which remains a matter of considerable public interest and debate, but that the resolution of these issues must be left to the political branches of government," Justice Department lawyers wrote in a brief on the case.

But the government has a new, and not necessarily friendly, judicial audience for its no-judges-allowed argument. In August, a special court ordered Belew's lawsuit to be consolidated into a single proceeding comprised of 54 other NSA-related lawsuits, before U.S. District Court Chief Judge Vaughn Walker in San Francisco.

Walker has presided over the year-old class-action lawsuit brought by the Electronic Frontier Foundation against AT&T for the phone company's alleged cooperation with the NSA program. The judge made waves in July when he issued a landmark ruling that allowed the AT&T case to proceed, despite the government's claim that the suit must be thrown out because it involved national secrets. Walker ruled that the state-secrets privilege did not apply to the entirety of the case, because the government had admitted the program existed. (Walker recently rejected a motion filed by Wired News seeking the unsealing of evidence in the case.)

The government has appealed that state secrets decision to the 9th Circuit Court of Appeals, and asked the judge to put a stop to all 55 cases pending that appeal. But Walker, a libertarian-leaning Republican, has kept the cases moving, noting that any decision from the appeals court is likely to wind through the court system up to the Supreme Court -- a process that could take years.

Belew's lawsuit, his lawyers submit, is a chance to short circuit that process entirely.

In a hearing in early February, Eisenberg told Walker that the classified document sets the Belew case apart from the other cases, because the judge has enough evidence to decide whether the warrantless surveillance was illegal, without waiting for the 9th Circuit to decide the state secrets issue.

"You need only read the statutes to decide, 'Does the president have the right to do this without a warrant?'" Eisenberg said.

Walker is expected to rule in March on whether to stay the case or set a hearing date, and the document will likely be moved, under guard, from the Portland secure facility to San Francisco, where Walker can review it.

In the meantime, the NSA program is undergoing changes.

In a separate lawsuit last August, Michigan U.S. District Court Judge Anna Diggs Taylor found the NSA surveillance program unconstitutional and illegal -- a decision that's now under appeal in the 6th Circuit. Facing that ruling and growing political pressure, in early January, Attorney General Alberto Gonzales essentially announced the end of the warrantless spying, saying the NSA program will continue, but would begin getting "innovative" court orders from the foreign intelligence court.

With the program now reformed, the Justice Department has asked for several of the lawsuits against the government to be dismissed as moot.

Al-Buthi is now a "specially designated global terrorist," according to the Treasury Department, and he's under indictment in the United States for failing to declare $150,000 in travelers checks raised to help Chechnyan

refugees when he last flew out of the country. He told Wired News that he had always declared money when entering the United States, but wasn't aware he needed to do the same when leaving. He says he's been interrogated twice by Saudi officials and cleared of any wrongdoing.