# EXHIBIT D

WSJ.com   MarketWatch.com   Barrons.com   All Things Digital   More

Enter Symbol(s) or Keyword(s)   [SEARCH]

THE WALL STREET JOURNAL.

The Online Journal GET 2 WEEKS FREE   The Print Journal GET 2 WEEKS FREE

User Name:   Password:
☑ Remember Me   Log In ▶
Forgot your username or password? | Subscribe

As of Monday, March 10, 2008   Set My Home Page | Customer Service

News | Today's Newspaper | My Online Journal | Multimedia & Online Extras | Markets Data & Tools | Classifieds

OTHER FREE CONTENT FROM THE WALL STREET JOURNAL

EDITORS' PICKS
Back on the Trail
Courting the Superwealthy
Hillary's Concession
Seeking Steinways
Remembering Piazza
iDaydreaming
Brutal Summer of Flying
MORE EDITORS' PICKS

BLOGS
Most Popular Posts
1.
2. Political Wisdom: Obama and Clinton Perform True to Form
3. Deals of the Day: After a Run on the Bank, a Run on T-Shirts at Bear Stearns
4. How Bad Does It Have To Get Before American Airlines Does A Deal?

SEE ALL BLOGS

MORE FREE CONTENT
» Personal Journal
» Personal Finance
» Leisure
» Markets Data Center
» Video
» Blogs
» Forums
» Interactives
» Autos
» CareerJournal
» Real Estate
» Small Business
» OpinionJournal
» MarketWatch
» AllThingsDigital

PAGE ONE

# NSA's Domestic Spying Grows As Agency Sweeps Up Data

**Terror Fight Blurs Line Over Domain; Tracking Email**

By SIOBHAN GORMAN
*March 10, 2008; Page A1*

WASHINGTON, D.C. -- Five years ago, Congress killed an experimental Pentagon antiterrorism program meant to vacuum up electronic data about people in the U.S. to search for suspicious patterns. Opponents called it too broad an intrusion on Americans' privacy, even after the Sept. 11 terrorist attacks.

But the data-sifting effort didn't disappear. The National Security Agency, once confined to foreign surveillance, has been building essentially the same system.

The central role the NSA has come to occupy in domestic intelligence gathering has never been publicly disclosed. But an inquiry reveals that its efforts have evolved to reach more broadly into data about people's communications, travel and finances in the U.S. than the domestic surveillance programs brought to light since the 2001 terrorist attacks.



**Message Received**

Examples of data the NSA can look at without a judicial warrant in its search for hints of terrorism:

**Email:** Recipient and sender address; subject; time sent

**Internet:** Sites visited and searches conducted

**Cellphone:** Numbers incoming or outgoing; length of call; location

**Phone:** Numbers incoming or outgoing; length of call

**Financial:** Information about bank accounts, wire transfers, credit-card use

**Airline:** Information about passengers

*Getty Images*
The NSA at Fort Meade, Md.

Congress now is hotly debating domestic spying powers under the main law governing U.S. surveillance aimed at foreign threats. An expansion of those powers expired last month and awaits renewal, which could be voted on in the House of Representatives this week. The biggest point of contention over the law, the Foreign Intelligence Surveillance Act, is whether telecommunications and other companies should be made immune from liability for assisting government surveillance.

Largely missing from the public discussion is the role of the highly secretive NSA in analyzing that data, collected through little-known arrangements that can blur the lines between domestic and foreign intelligence gathering. Supporters say the NSA is serving as a key bulwark against foreign terrorists and that it would be reckless to constrain the agency's mission. The NSA says it is scrupulously following all applicable laws and that it keeps Congress fully informed of its activities.

According to current and former intelligence officials, the spy agency now monitors huge volumes of records of domestic emails and Internet searches as well as bank transfers, credit-card transactions, travel and



FIND THE RIGHT CANDIDATE NOW

★ POLITICAL DIARY NEWSLETTER ★
For only $3.95/mo.   [SIGN UP NOW]
That's less than $1 per week!

MORE FROM TODAY'S JOURNAL
$ Subscription may be required | Subscribe Now

**PEOPLE WHO READ THIS...**
Also read these stories:
Are Low P/Es a Valid Reason to Buy Stocks?
Buyout All-Stars Stumble
Wall Street Cheers Spitzer's Fall
Obama Pastor May Violate Tax Laws
Commercial-Property Slump Limited
Recommendations sponsored by:

people ready

NEW! Are you on Facebook?
See what content on this site is popular with your friends! Learn more »

Your Facebook Friends Are Reading
The Republican Health-Care Surrender
Seen by 5 friends | Investment Banking | San Francisco
Bush Affirms U.S. Bond With Israel
Seen by 7 friends | 3 groups | Chicago
Polar Bear Melodrama
Seen by 7 friends | Facebook for UNICEF | Harvard

Provided by SeenThis

▶ **WHAT'S NEWS**
• IEA to Slash Oil-Supply Estimate
• NRG Makes Offer for Calpine
• Fed's Forecast Grows Gloomier
• American Cuts Flights, Adds Fees
• Few Investors Back Say-on-Pay Plans
MORE



telephone records. The NSA receives this so-called "transactional" data from other agencies or private companies, and its sophisticated software programs analyze the various transactions for suspicious patterns. Then they spit out leads to be explored by counterterrorism programs across the U.S. government, such as the NSA's own Terrorist Surveillance Program, formed to intercept phone calls and emails between the U.S. and overseas without a judge's approval when a link to al Qaeda is suspected.

▸ **WHAT'S POPULAR**
1. AMR's Bag Fee Just the Beginning for Travelers
2. Opinion: Democrats and Our Enemies
3. Opinion: Why a Housing Bailout Won't Help
4. Obama's Non-Declaration of Victory
5. Opinion: You Can't Soak the Rich
MORE

The NSA's enterprise involves a cluster of powerful intelligence-gathering programs, all of which sparked civil-liberties complaints when they came to light. They include a Federal Bureau of Investigation program to track telecommunications data once known as Carnivore, now called the Digital Collection System, and a U.S. arrangement with the world's main international banking clearinghouse to track money movements.

The effort also ties into data from an ad-hoc collection of so-called "black programs" whose existence is undisclosed, the current and former officials say. Many of the programs in various agencies began years before the 9/11 attacks but have since been given greater reach. Among them, current and former intelligence officials say, is a longstanding Treasury Department program to collect individual financial data including wire transfers and credit-card transactions.

It isn't clear how many of the different kinds of data are combined and analyzed together in one database by the NSA. An intelligence official said the agency's work links to about a dozen antiterror programs in all.

A number of NSA employees have expressed concerns that the agency may be overstepping its authority by veering into domestic surveillance. And the constitutional question of whether the government can examine such a large array of information without violating an individual's reasonable expectation of privacy "has never really been resolved," said Suzanne Spaulding, a national-security lawyer who has worked for both parties on Capitol Hill.

NSA officials say the agency's own investigations remain focused only on foreign threats, but it's increasingly difficult to distinguish between domestic and international communications in a digital era, so they need to sweep up more information.

**The Fourth Amendment**

In response to the Sept. 11 attacks, then NSA-chief Gen. Michael Hayden has said he used his authority to expand the NSA's capabilities under a 1981 executive order governing the agency. Another presidential order issued shortly after the attacks, the text of which is classified, opened the door for the NSA to incorporate more domestic data in its searches, one senior intelligence official said.


Michael Hayden

The NSA "strictly follows laws and regulations designed to preserve every American's privacy rights under the Fourth Amendment to the U.S. Constitution," agency spokeswoman Judith Emmel said in a statement, referring to the protection against unreasonable searches and seizures. The Office of the Director of National Intelligence, which oversees the NSA in conjunction with the Pentagon, added in a statement that intelligence agencies operate "within an extensive legal and policy framework" and inform Congress of their activities "as required by the law." It pointed out that the 9/11 Commission recommended in 2004 that intelligence agencies analyze "all relevant sources of information" and share their databases.

Two former officials familiar with the data-sifting efforts said they work by starting with some sort of lead, like a phone number or Internet address. In partnership with the FBI, the systems then can track all domestic and foreign transactions of people associated with that item -- and then the people who associated with them, and so on, casting a gradually wider net. An intelligence official described more of a rapid-response effect: If a person suspected of terrorist connections is believed to be in a U.S. city -- for instance, Detroit, a community with a high concentration of Muslim Americans -- the government's spy systems may be directed to collect and analyze all electronic communications into and out of the city.

The haul can include records of phone calls, email headers and destinations, data on financial transactions and records of Internet browsing. The system also would collect information about other people, including those in the U.S., who communicated with people in Detroit.

The information doesn't generally include the contents of conversations or emails. But it can give such transactional information as a cellphone's location, whom a person is calling, and what Web sites he or she is visiting. For an email, the data haul can include the identities of the sender and recipient and the subject line, but not the content of the message.

Intelligence agencies have used administrative subpoenas issued by the FBI -- which don't need a judge's signature -- to collect and analyze such data, current and former intelligence officials said. If that data provided "reasonable suspicion" that a person, whether foreign or from the U.S., was linked to al Qaeda, intelligence officers could eavesdrop under the NSA's Terrorist Surveillance Program.

The White House wants to give companies that assist government surveillance immunity from lawsuits alleging an invasion of privacy, but Democrats in Congress have been blocking it. The Terrorist Surveillance Program has spurred 38 lawsuits against companies. Current and former intelligence officials say telecom companies' concern comes chiefly because they are giving the government unlimited access to a copy of the flow of communications, through a network of switches at U.S. telecommunications hubs that duplicate all the data running through it. It isn't clear whether the government or telecom

companies control the switches, but companies process some of the data for the NSA, the current and former officials say.

On Friday, the House Energy and Commerce



An Intelligence Warehouse

1. Domestic agencies, including the departments of Justice, Homeland Security and Treasury, send information obtained under their surveillance programs to the National Security Agency.

2. The NSA, whose charter limits it to foreign spy activites, collects and analyzes this information with sophisticated software systems, where it sifts for patterns that could be related to a terror suspect or high-risk area.

3. The NSA feeds its findings into the effort the administration calls the Terrorist Surveillance Program and shares some of that information with other U.S. security agencies.

Committee released a letter warning colleagues to look more deeply into how telecommunications data are being accessed, citing an allegation by the head of a New York-based computer security firm that a wireless carrier that hired him was giving unfettered access to data to an entity called "Quantico Circuit." Quantico is a Marine base that houses the FBI Academy; senior FBI official Anthony DiClemente said the bureau "does not have 'unfettered access' to any communication provider's network."

The political debate over the telecom information comes as intelligence agencies seek to change traditional definitions of how to balance privacy rights against investigative needs. Donald Kerr, the deputy director of national intelligence, told a conference of intelligence officials in October that the government needs new rules. Since many people routinely post details of their lives on social-networking sites such as MySpace, he said, their identity shouldn't need the same protection as in the past. Instead, only their "essential privacy," or "what they would wish to protect about their lives and affairs," should be veiled, he said, without providing examples.

**Social-Network Analysis**

The NSA uses its own high-powered version of social-network analysis to search for possible new patterns and links to terrorism. The Pentagon's experimental Total Information Awareness program, later renamed Terrorism Information Awareness, was an early research effort on the same concept, designed to bring together and analyze as much and as many varied kinds of data as possible. Congress eliminated funding for the program in 2003 before it began operating. But it permitted some of the research to continue and TIA technology to be used for foreign surveillance.

Some of it was shifted to the NSA -- which also is funded by the Pentagon -- and put in the so-called black budget, where it would receive less scrutiny and bolster other data-sifting efforts, current and former intelligence officials said. "When it got taken apart, it didn't get thrown away," says a former top government official familiar with the TIA program.

Two current officials also said the NSA's current combination of programs now largely mirrors the former TIA project. But the NSA offers less privacy protection. TIA developers researched ways to limit the use of the system for broad searches of individuals' data, such as requiring intelligence officers to get leads from other sources first. The NSA effort lacks those controls, as well as controls that it developed in the 1990s for an earlier data-sweeping attempt.

Sen. Ron Wyden, an Oregon Democrat and member of the Senate Intelligence Committee who led the charge to kill TIA, says "the administration is trying to bring as much of the philosophy of operation Total Information Awareness as it can into the programs they're using today." The issue has been overshadowed by the fight over telecoms' immunity, he said. "There's not been as much discussion in the Congress as there ought to be."

**Opportunity for Debate**

But Sen. Kit Bond of Missouri, the ranking Republican on the committee, said by email his committee colleagues have had "ample opportunity for debate" behind closed doors and that each intelligence program has specific legal authorization and oversight. He cautioned against seeing a group of intelligence programs as "a mythical 'big brother' program," adding, "that's not what is happening today."

**READ THE RULING**

While the Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," the legality of data-sweeping relies on the government's interpretation of a 1979 Supreme Court ruling allowing records of phone calls -- but not actual conversations -- to be collected without a warrant. Read the ruling.

The legality of data-sweeping relies largely on the government's interpretation of a 1979 Supreme Court ruling allowing records of phone calls -- but not actual conversations -- to be collected without a judge issuing a warrant. Multiple laws require a court order for so-called "transactional" records of electronic communications, but the 2001 Patriot Act lowered the standard for such an order in some cases, and in others made records accessible using FBI administrative subpoenas called "national security letters." (Read the ruling.)

A debate is brewing among legal and technology scholars over whether there should be privacy protections when a wide variety of transactional data are brought together to paint what is essentially a profile of an individual's behavior. "You know everything I'm doing, you know what happened, and you haven't listened to any of the contents" of the communications, said Susan Landau, co-author of a book on electronic privacy and a senior

engineer at Sun Microsystems Laboratories. "Transactional information is remarkably revelatory."

Ms. Spaulding, the national-security lawyer, said it's "extremely questionable" to assume Americans don't have a reasonable expectation of privacy for data such as the subject-header of an email or a Web address from an Internet search, because those are more like the content of a communication than a phone number. "These are questions that require discussion and debate," she said. "This is one of the problems with doing it all in secret."

Gen. Hayden, the former NSA chief and now Central Intelligence Agency director, in January 2006 publicly defended the activities of the Terrorist Surveillance Program after it was disclosed by the New York Times. He said it was "not a driftnet over Lackawanna or Fremont or Dearborn, grabbing all communications and then sifting them out." Rather, he said, it was carefully targeted at terrorists. However, some intelligence officials now say the broader NSA effort amounts to a driftnet. A portion of the activity, the NSA's access to domestic phone records, was disclosed by a USA Today article in 2006.

The NSA, which President Truman created in 1952 through a classified presidential order to be America's ears abroad, has for decades been the country's largest and most secretive intelligence agency. The order confined NSA spying to "foreign governments," and during the Cold War the NSA developed a reputation as the world's premier code-breaking operation. But in the 1970s, the NSA and other intelligence agencies were found to be using their spy tools to monitor Americans for political purposes. That led to the original FISA legislation in 1978, which included an explicit ban on the NSA eavesdropping in the U.S. without a warrant.

Big advances in telecommunications and database technology led to unprecedented data-collection efforts in the 1990s. One was the FBI's Carnivore program, which raised fears when it was in disclosed in 2000 that it might collect telecommunications information about law-abiding individuals. But the ground shifted after 9/11. Requests for analysis of any data that might hint at terrorist activity flooded from the White House and other agencies into NSA's Fort Meade, Md., headquarters outside Washington, D.C., one former NSA official recalls. At the time, "We're scrambling, trying to find any piece of data we can to find the answers," the official said.

The 2002 congressional inquiry into the 9/11 attacks criticized the NSA for holding back information, which NSA officials said they were doing to protect the privacy of U.S. citizens. "NSA did not want to be perceived as targeting individuals in the United States" and considered such surveillance the FBI's job, the inquiry concluded.

**FBI-NSA Projects**

The NSA quietly redefined its role. Joint FBI-NSA projects "expanded exponentially," said Jack Cloonan, a longtime FBI veteran who investigated al Qaeda. He pointed to national-security letter requests: They rose from 8,500 in 2000 to 47,000 in 2005, according to a Justice Department inspector general's report last year. It also said the letters permitted the potentially illegal collection of thousands of records of people in the U.S. from 2003-05. Last Wednesday, FBI Director Robert Mueller said the bureau had found additional instances in 2006.

It isn't known how many Americans' data have been swept into the NSA's systems. The Treasury, for instance, built its database "to look at all the world's financial transactions" and gave the NSA access to it about 15 years ago, said a former NSA official. The data include domestic and international money flows between bank accounts and credit-card information, according to current and former intelligence officials.

The NSA receives from Treasury weekly batches of this data and adds it to a database at its headquarters. Prior to 9/11, the database was used to pursue specific leads, but afterward, the effort was expanded to hunt for suspicious patterns.

Through the Treasury, the NSA also can access the database of the Society for Worldwide Interbank Financial Telecommunication, or Swift, the Belgium-based clearinghouse for records of international transactions between financial institutions, current and former officials said. The U.S. acknowledged in 2006 that the CIA and Treasury had access to Swift's database, but said the NSA's Terrorism Surveillance Program was separate and that the NSA provided only "technical assistance." A Treasury spokesman said the agency had no comment.

Through the Department of Homeland Security, airline passenger data also are accessed and analyzed for suspicious patterns, such as five unrelated people who repeatedly fly together, current and former intelligence officials said. Homeland Security shares information with other agencies only "on a limited basis," spokesman Russ Knocke said.

NSA gets access to the flow of data from telecommunications switches through the FBI, according to current and former officials. It also has a partnership with FBI's Digital Collection system, providing access to Internet providers and other companies. The existence of a shadow hub to copy information about AT&T Corp. telecommunications in San Francisco is alleged in a lawsuit against AT&T filed by the civil-liberties group Electronic Frontier Foundation, based on documents provided by a former AT&T official. In that lawsuit, a former technology adviser to the Federal Communications Commission says in a sworn declaration that there could be 15 to 20 such operations around the country. Current and former intelligence officials confirmed a domestic network of hubs, but didn't know the number. "As a matter of policy and law, we can not discuss matters that are classified," said FBI spokesman John Miller.

The budget for the NSA's data-sifting effort is classified, but one official estimated it surpasses $1 billion. The FBI is requesting to nearly double the budget for the Digital Collection System in 2009, compared with last year, requesting $42 million. "Not only do demands for information continue to increase, but also the requirement to facilitate information sharing does," says a budget justification document, noting an "expansion of electronic surveillance activity in frequency, sophistication, and linguistic needs."

Write to Siobhan Gorman at siobhan.gorman@wsj.com

Sponsored Links

Kaplan University Online®
Earn A Masters Degree Online From Kaplan University - Official Site.
www.Kaplan.edu

John McCain on Al Qaeda
Learn About McCain's Position for Fighting Islamic Extremists.
JohnMcCain.com/FIE

Online Currency Trading
Start trading currencies today. Free training. $10 minimum deposit
fx-club.guideq.com

**RELATED ARTICLES FROM ACROSS THE WEB**
Related Content may require a subscription | Subscribe Now -- Get 2 Weeks FREE

**Related Articles from WSJ.com**
- Kazakh Leader's Daughter Monitored U.S. Bribe Case  May. 12, 2008
- FBI Searches Office of Special Counsel, Seizing Data  May. 07, 2008
- Virus in China Highlights an Old Problem  May. 05, 2008
- SEC to Lose Key Enforcement Official  Apr. 25, 2008

**More related content**   *Powered by Sphere*

EMAIL THIS    FORMAT FOR PRINTING    MOST POPULAR    ORDER REPRINTS
YAHOO! BUZZ    DIGG THIS    MY SPACE    Get RSS Feeds    GET RSS FEEDS

Return To Top

**WSJ Digital Network:**
MarketWatch | Barrons.com
AllThingsDigital | Dow Jones News Alerts | MORE

Subscribe   Log In   Take a Tour   Contact Us   Help   Email Setup   Customer Service: Online | Print
Privacy Policy   Subscriber Agreement & Terms of Use   Copyright Policy   Mobile Devices   RSS Feeds
News Licensing   Advertising   About Dow Jones

Copyright © 2008 Dow Jones & Company, Inc. All Rights Reserved
DOWJONES

# THE NEW YORKER

NATIONAL SECURITY DEPT.

## LISTENING IN

by Seymour M. Hersh

MAY 29, 2006



A few days before the start of the confirmation hearings for General Michael Hayden, who has been nominated by President Bush to be the head of the C.I.A., I spoke to an official of the National Security Agency who recently retired. The official joined the N.S.A. in the mid-nineteen-seventies, soon after contentious congressional hearings that redefined the relationship between national security and the public's right to privacy. The hearings, which revealed that, among other abuses, the N.S.A. had illegally intercepted telegrams to and from the United States, led to the passage of the 1978 Foreign Intelligence Surveillance Act, or FISA, to protect citizens from unlawful surveillance. "When I first came in, I heard from all my elders that 'we'll never be able to collect intelligence again,'" the former official said. "They'd whine, 'Why do we have to report to oversight committees?'" But, over the next few years, he told me, the agency did find a way to operate within the law. "We built a system that protected national security and left people able to go home at night without worrying whether what they did that day was appropriate or legal."

After the attacks of September 11, 2001, it was clear that the intelligence community needed to get more aggressive and improve its performance. The Administration, deciding on a quick fix, returned to the tactic that got intelligence agencies in trouble thirty years ago: intercepting large numbers of electronic communications made by Americans. The N.S.A.'s carefully constructed rules were set aside.

Last December, the *Times* reported that the N.S.A. was listening in on calls between people in the United States and people in other countries, and a few weeks ago *USA Today* reported that the agency was collecting information on millions of private domestic calls. A security consultant working with a major telecommunications carrier told me that his client set up a top-secret high-speed circuit between its main computer complex and Quantico, Virginia, the site of a government-intelligence computer center. This link provided direct access to the carrier's network core—the critical area of its system, where all its data are stored. "What the companies are doing is worse than turning over records," the consultant said. "They're providing total access to all the data."

"This is not about getting a cardboard box of monthly phone bills in alphabetical order," a former senior

intelligence official said. The Administration's goal after September 11th was to find suspected terrorists and target them for capture or, in some cases, air strikes. "The N.S.A. is getting real-time actionable intelligence," the former official said.

The N.S.A. also programmed computers to map the connections between telephone numbers in the United States and suspect numbers abroad, sometimes focussing on a geographic area, rather than on a specific person—for example, a region of Pakistan. Such calls often triggered a process, known as "chaining," in which subsequent calls to and from the American number were monitored and linked. The way it worked, one high-level Bush Administration intelligence official told me, was for the agency "to take the first number out to two, three, or more levels of separation, and see if one of them comes back"—if, say, someone down the chain was also calling the original, suspect number. As the chain grew longer, more and more Americans inevitably were drawn in.

FISA requires the government to get a warrant from a special court if it wants to eavesdrop on calls made or received by Americans. (It is generally legal for the government to wiretap a call if it is purely foreign.) The legal implications of chaining are less clear. Two people who worked on the N.S.A. call-tracking program told me they believed that, in its early stages, it did not violate the law. "We were not listening to an individual's conversation," a defense contractor said. "We were gathering data on the incidence of calls made to and from his phone by people associated with him and others." Similarly, the Administration intelligence official said that no warrant was needed, because "there's no personal identifier involved, other than the metadata from a call being placed."

But the point, obviously, was to identify terrorists. "After you hit something, you have to figure out what to do with it," the Administration intelligence official told me. The next step, theoretically, could have been to get a suspect's name and go to the fisa court for a warrant to listen in. One problem, however, was the volume and the ambiguity of the data that had already been generated. ("There's too many calls and not enough judges in the world," the former senior intelligence official said.) The agency would also have had to reveal how far it had gone, and how many Americans were involved. And there was a risk that the court could shut down the program.

Instead, the N.S.A. began, in some cases, to eavesdrop on callers (often using computers to listen for key words) or to investigate them using traditional police methods. A government consultant told me that tens of thousands of Americans had had their calls monitored in one way or the other. "In the old days, you needed probable cause to listen in," the consultant explained. "But you could not listen in to generate probable cause. What they're doing is a violation of the spirit of the law." One C.I.A. officer told me that the Administration, by not approaching the FISA court early on, had made it much harder to go to the court later.

The Administration intelligence official acknowledged that the implications of the program had not been fully thought out. "There's a lot that needs to be looked at," he said. "We are in a technology age. We need to tweak fisa, and we need to reconsider how we handle privacy issues."

Marc Rotenberg, the executive director of the Electronic Privacy Information Center, believes that if the White House had gone to Congress after September 11th and asked for the necessary changes in FISA "it would have got them." He told me, "The N.S.A. had a lot of latitude under FISA to get the data it needed. I think the White House purposefully ignored the law, because the President did not want to do the monitoring under FISA. There is a strong commitment inside the intelligence community to obey the law, and the community is getting dragged into the mud on this."

General Hayden, who as the head of the N.S.A. supervised the intercept program, is seen by many as a competent professional who was too quick to follow orders without asking enough questions. As one senior congressional staff aide said, "The concern is that the Administration says, 'We're going to do this,' and he does it—even if he knows better." Former Democratic Senator Bob Kerrey, who was a member of the 9/11 Commission, had a harsher assessment. Kerrey criticized Hayden for his suggestion, after the *Times* exposé, that the N.S.A.'s wiretap program could have prevented the attacks of 9/11. "That's patently false and an indication that he's willing to politicize intelligence and use false information to help the President," Kerrey said.

Hayden's public confirmation hearing last week before the Senate Intelligence Committee was unlike the tough-minded House and Senate investigations of three decades ago, and added little to what is known about the wiretap program. One unexamined issue was the effectiveness of the N.S.A. program. "The vast majority of what we did with the intelligence was ill-focussed and not productive," a Pentagon consultant told me. "It's intelligence in real time, but you have to know where you're looking and what you're after."

On May 11th, President Bush, responding to the *USA Today* story, said, "If Al Qaeda or their associates are making calls into the United States, or out of the United States, we want to know what they are saying." That is valid, and a well-conceived, properly supervised intercept program would be an important asset. "Nobody disputes the value of the tool," the former senior intelligence official told me. "It's the unresolved tension between the operators saying, 'Here's what we can build,' and the legal people saying, 'Just because you can build it doesn't mean you can use it.' " It's a tension that the President and his advisers have not even begun to come to terms with.