*EXHIBIT F*



# The Attorney General
Washington, D.C.

February 28, 2006

The Honorable Arlen Specter
Chairman, Committee on the Judiciary
United States Senate
Washington, D.C. 20510

Dear Chairman Specter:

I write to provide responses to several questions posed to me at the hearing on "Wartime Executive Power and the National Security Agency's Surveillance Authority," held Monday, February 6, 2006, before the Senate Committee on the Judiciary. I also write to clarify certain of my responses at the February 6th hearing.

Except when otherwise indicated, this letter will be confined to addressing questions relating to the specific NSA activities that have been publicly confirmed by the President. Those activities involve the interception by the NSA of the contents of communications in which one party is outside the United States where there are reasonable grounds to believe that at least one party to the communication is a member or agent of al Qaeda or an affiliated terrorist organization (hereinafter, the "Terrorist Surveillance Program").

## Additional Information Requested by Senators at February 6th Hearing

Senator Leahy asked whether the President first authorized the Terrorist Surveillance Program after he signed the Authorization for Use of Military Force of September 18, 2001 ("Force Resolution") and before he signed the USA PATRIOT Act. 2/6/06 Unofficial Hearing Transcript ("Tr.") at 50. The President first authorized the Program in October 2001, before he signed the USA PATRIOT Act.

Senator Brownback asked for recommendations on improving the Foreign Intelligence Surveillance Act ("FISA"). Tr. at 180-81. The Administration believes that it is unnecessary to amend FISA to accommodate the Terrorist Surveillance Program. The Administration will, of course, work with Congress and evaluate any proposals for improving FISA.

Senator Feinstein asked whether the Government had informed the Supreme Court of the Terrorist Surveillance Program when it briefed and argued *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004). Tr. at 207. The question presented in *Hamdi* was whether the military had validly detained Yaser Esam Hamdi, a presumed American citizen who was captured in Afghanistan during the combat operations in late 2001, whom the military had concluded to be an enemy combatant who should be detained in

connection with ongoing hostilities. No challenge was made concerning electronic surveillance and the Terrorist Surveillance Program was not a part of the lower court proceedings. The Government therefore did not brief the Supreme Court regarding the Terrorist Surveillance Program.

Senator Feinstein asked whether "any President ever authorized warrantless surveillance in the face of a statute passed by Congress which prohibits that surveillance." Tr. at 208. I recalled that President Franklin Roosevelt had authorized warrantless surveillance in the face of a contrary statute, but wanted to confirm this. To the extent that the question is premised on the understanding that the Terrorist Surveillance Program conflicts with any statute, we disagree with that premise. The Terrorist Surveillance Program is entirely consistent with FISA, as explained in some detail in my testimony and the Department's January 19th paper. As for the conduct of past Presidents, President Roosevelt directed Attorney General Jackson "to authorize the necessary investigating agents that they are at liberty to secure information by listening devices directed to the conversation or other communications of persons suspected of subversive activities against the Government of the United States." Memorandum from President Roosevelt (May 21, 1940), *reproduced in United States v. United States District Court,* 444 F.2d 651, 670 (6th Cir. 1971) (Appendix A). President Roosevelt authorized this activity notwithstanding the language of 47 U.S.C. § 605, a prohibition of the Communications Act of 1934, which, at the time, provided that "no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person." President Roosevelt took this action, moreover, despite the fact that the Supreme Court had, just three years earlier, made clear that section 605 "include[s] within its sweep federal officers." *Nardone v. United States,* 302 U.S. 379, 384 (1937). It should be noted that section 605 prohibited interception followed by divulging or publishing the contents of the communication. The Department of Justice took the view that interception without "divulg[ing] or publish[ing]" was not prohibited, and it interpreted "divulge" narrowly to allow dissemination within the Executive Branch.

Senator Feingold asked, "[D]o you know of any other President who has authorized warrantless wiretaps outside of FISA since 1978 when FISA was passed?" Tr. at 217. The laws of the United States, both before and after FISA's enactment, have long permitted various forms of foreign intelligence surveillance, including the use of wiretaps, outside the procedures of FISA. If the question is limited to "electronic surveillance" as defined in FISA, however, we are unaware of any such authorizations.

Senator Feingold asked, "[A]re there other actions under the use of military force for Afghanistan resolution that without the inherent power would not be permitted because of the FISA statute? Are there any other programs like that?" Tr. at 224. I understand the Senator to be referring to the Force Resolution, which authorizes the President to "use all necessary and appropriate force against those nations, organizations, or persons" responsible for the attacks of September 11th in order to prevent further terrorist attacks on the United States, and which by its terms is not limited to action

2

against Afghanistan or any other particular nation. I am not in a position to provide information here concerning any other intelligence activities beyond the Terrorist Surveillance Program. Consistent with long-standing practice, the Executive Branch notifies Congress concerning the classified intelligence activities of the United States through appropriate briefing of the oversight committees and congressional leadership.

Senator Feingold noted that, on September 10, 2002, then-Associate Deputy Attorney General David S. Kris testified before the Senate Judiciary Committee. Senator Feingold quoted Mr. Kris's statement that "[w]e cannot monitor anyone today whom we could not have monitored this time last year," and he asked me to provide the names of individuals in the Department of Justice and the White House who reviewed and approved Mr. Kris's testimony. Tr. at 225-26. Mr. Kris's testimony was addressing the Government's appeal in 2002 of decisions of the Foreign Intelligence Surveillance Court to the Foreign Intelligence Surveillance Court of Review. In the course of that discussion, Mr. Kris explained the effects of the USA PATRIOT Act's amendments to FISA, and, in particular, the amendment to FISA requiring that a "significant purpose" of the surveillance be the collection of foreign intelligence information. Mr. Kris explained that that amendment "will not and cannot change who the government may monitor." Mr. Kris emphasized that under FISA as amended, the Government still needed to show that there is probable cause that the target of the surveillance is an agent of a foreign power and that the surveillance has at least a significant foreign intelligence purpose. In context, it is apparent that Mr. Kris was addressing only the effects of the USA PATRIOT Act's amendments to FISA. In any event, his statements are also accurate with respect to the President's Terrorist Surveillance Program, because the Program involves the interception of communications only when there is probable cause ("reasonable grounds to believe") that at least one party to the communication is an agent of a foreign power (al Qaeda or an affiliated terrorist organization). Please note that it is Department of Justice policy not to identify the individual officials who reviewed and approved particular testimony.

Senators Biden and Schumer asked whether the legal analysis underlying the Terrorist Surveillance Program would extend to the interception of purely domestic calls. Tr. at 80-82, 233-34. The Department believes that the Force Resolution's authorization of "all necessary and appropriate force," which the Supreme Court in *Hamdi* interpreted to include the fundamental and accepted incidents of the use of military force, clearly encompasses the narrowly focused Terrorist Surveillance Program. The Program targets only communications in which one party is outside the United States and there are reasonable grounds to believe that at least one party to the communication is a member or agent of al Qaeda or an affiliated terrorist organization. The Program is narrower than the wartime surveillances authorized by President Woodrow Wilson (*all* telephone, telegraph, and cable communications into and out of the United States) and President Franklin Roosevelt ("*all . . . telecommunications traffic* in and out of the United States"), based on their constitutional authority and general force-authorization resolutions like the Force Resolution. The Terrorist Surveillance Program fits comfortably within this historical precedent and tradition. The legal analysis set forth in the Department's January 19th paper does not address the interception of purely domestic communications.

3

The Department believes that the interception of the contents of domestic communications would present a different question from the interception of international communications, and the Department would need to analyze that question in light of all current circumstances before any such interception would be authorized.

Senator Schumer asked me whether the Force Resolution would support physical searches within the United States without complying with FISA procedures. Tr. at 159. The Terrorist Surveillance Program does not involve physical searches. Although FISA's physical search subchapter contains a provision analogous to section 109 of FISA, *see* 50 U.S.C. § 1827(a)(1) (prohibiting physical searches within the United States for foreign intelligence "except as authorized by statute"), physical searches conducted for foreign intelligence purposes present issues different from those discussed in the Department's January 19th paper addressing the legal basis for the Terrorist Surveillance Program. Thus, we would need to consider that issue specifically before taking a position.

Senator Schumer asked, "Have there been any abuses of the NSA surveillance program? Have there been any investigations arising from concerns about abuse of the NSA program? Has there been any disciplinary action taken against any official for abuses of the program?" Tr. at 237-38. Although no complex program like the Terrorist Surveillance Program can ever be free from inadvertent mistakes, the Program is the subject of intense oversight both within the NSA and outside that agency to ensure that any compliance issues are identified and resolved promptly on recognition. Procedures are in place, based on the guidelines I approved under Executive Order 12333, to protect the privacy of U.S. persons. NSA's Office of General Counsel has informed us that the oversight process conducted both by that office and by the NSA Inspector General has uncovered no abuses of the Terrorist Surveillance Program, and, accordingly, that no disciplinary action has been needed or taken because of abuses of the Program.

## Clarification of Certain Responses

I would also like to clarify certain aspects of my responses to questions posed at the February 6th hearing.

First, as I emphasized in my opening statement, in all of my testimony at the hearing I addressed—with limited exceptions—only the legal underpinnings of the Terrorist Surveillance Program, as defined above. I did not and could not address operational aspects of the Program or any other classified intelligence activities. So, for example, when I testified in response to questions from Senator Leahy, "Sir, I have tried to outline for you and the Committee what the President has authorized, and that is all that he has authorized," Tr. at 53, I was confining my remarks to the Terrorist Surveillance Program as described by the President, the legality of which was the subject of the February 6th hearing.

Second, in response to questions from Senator Biden as to why the President's authorization of the Terrorist Surveillance Program does not provide for the interception of domestic communications within the United States of persons associated with al

4

Qaeda, I stated, "That analysis, quite frankly, had not been conducted." Tr. at 82. In response to similar questions from Senator Kyl and Senator Schumer, I stated, "The legal analysis as to whether or not that kind of [domestic] surveillance—we haven't done that kind of analysis because, of course, the President—that is not what the President has authorized," Tr. at 92, and "I have said that I do not believe that we have done the analysis on that." Tr. at 160. These statements may give the misimpression that the Department's legal analysis has been static over time. Since I was testifying only as to the legal basis of the activity confirmed by the President, I was referring only to the legal analysis of the Department set out in the January 19th paper, which addressed that activity and therefore, of course, does not address the interception of purely domestic communications. However, I did not mean to suggest that no analysis beyond the January 19th paper had ever been conducted by the Department. The Department believes that the interception of the contents of domestic communications presents a different question from the interception of international communications, and the Department's analysis of that question would always need to take account of all current circumstances before any such interception would be authorized.

Third, at one point in my afternoon testimony, in response to a question from Senator Feinstein, I stated, "I am not prepared at this juncture to say absolutely that if the AUMF argument does not work here, that FISA is unconstitutional as applied. I am not saying that." Tr. at 209. As set forth in the January 19th paper, the Department believes that FISA is best read to allow a statute such as the Force Resolution to authorize electronic surveillance outside FISA procedures and, in any case, that the canon of constitutional avoidance requires adopting that interpretation. It is natural to approach the question whether FISA might be unconstitutional as applied in certain circumstances with extreme caution. But if an interpretation of FISA that allows the President to conduct the NSA activities were not "fairly possible," and if FISA were read to impede the President's ability to undertake actions necessary to fulfill his constitutional obligation to protect the Nation from foreign attack in the context of a congressionally authorized armed conflict against an enemy that has already staged the most deadly foreign attack in our Nation's history, there would be serious doubt about the constitutionality of FISA as so applied. A statute may not "*impede* the President's ability to perform his constitutional duty," *Morrison v. Olson*, 487 U.S. 654, 691 (1988) (emphasis added); *see also id.* at 696-97, particularly not the President's most solemn constitutional obligation—the defense of the Nation. *See also In re Sealed Case*, 310 F.3d 717, 742 (Foreign Intel. Surv. Ct. of Rev. 2002) (explaining that "FISA could not encroach on the President's constitutional power"). I did not mean to suggest otherwise.

Fourth, in response to questions from Senator Leahy about when the Administration first determined that the Force Resolution authorized the Terrorist Surveillance Program, I stated, "From the very outset, before the program actually commenced." Tr. at 184. I also stated, "Sir, it has always been our position that the President has the authority under the authorization to use military force and under the Constitution." Tr. at 187. These statements may give the misimpression that the Department's legal analysis has been static over time. As I attempted to clarify more generally, "[i]t has always been the [Department's] position that FISA cannot be

5

interpreted in a way that infringes upon the President's constitutional authority, that FISA must be interpreted, can be interpreted" to avoid that result. Tr. at 184; *see also* Tr. at 164 (Attorney General: "It has always been our position that FISA can be and must be read in a way that it doesn't infringe upon the President's constitutional authority."). Although the Department's analysis has always taken account of both the Force Resolution and the Constitution, it is also true, as one would expect, that the Department's legal analysis has evolved over time.

Fifth, Senator Cornyn suggested that the Terrorist Surveillance Program is designed to address the problem that FISA requires that we already know that someone is a terrorist before we can begin coverage. Senator Cornyn asked, "[T]he problem with FISA as written is that the surveillance it authorizes is unusable to discover who is a terrorist, as distinct from eavesdropping on known terrorists. Would you agree with that?" I responded, "That would be a different way of putting it, yes, sir." Tr. at 291. I want to be clear, however, that the Terrorist Surveillance Program targets the contents of communications in which one party is outside the United States and there are reasonable grounds to believe that at least one party to the communication is a member or agent of al Qaeda or an affiliated terrorist organization. Although the President has authorized the Terrorist Surveillance Program in order to provide the early warning system we lacked on September 11th, I do not want to leave the Committee with the impression that it does so by doing away with a probable cause determination. Rather, it does so by allowing intelligence experts to respond agilely to all available intelligence and to begin coverage as quickly as possible.

Finally, in discussing the FISA process with Senator Brownback, I stated, "We have to know that a FISA Court judge is going to be absolutely convinced that this is an agent of a foreign power, that this facility is going to be a facility that is going to be used or is being used by an agent of a foreign power." Tr. at 300. The approval of a FISA application requires only probable cause to believe that the target is an agent of a foreign power and that the foreign power has used or is about to use the facility in question. 50 U.S.C. § 1805(a)(3). I meant only to convey how cautiously we approach the FISA process. It is of paramount importance that the Department maintain its strong and productive working relationship with the Foreign Intelligence Surveillance Court, one in which that court has come to know that it can rely on the representations of the attorneys that appear before it.

I hope that the Committee will find this additional information helpful.

Sincerely,

Alberto R. Gonzales

cc: The Honorable Patrick Leahy
    Ranking Member

6