# *EXHIBIT G*

FILED

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA 2001 OCT 12 P 3: 05

Alexandria Division           CLERK US DISTRICT COURT
                              ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:04cr385 |
| | ) | |
| ALI AL-TIMIMI | ) | Hon. Leonie M. Brinkema |

## GOVERNMENT'S MOTION TO QUASH DEFENDANT'S REQUEST FOR DISCOVERY

On August 24, 2007, this Court ordered that defense counsel file and serve the government with the defendant's discovery request specifying the particular individuals for whom government surveillance information was sought in accordance with the Court's Order of July 21, 2006.

On September 14, 2007, defense counsel provided the government a letter which detailed discovery requests for extensive information about many individuals, including some with only the most attenuated connection to this case.[1] In light of the government's classified and *ex parte* filing of July 31, 2006, some of the discovery requests are likely to be moot. Nevertheless, while the government has no objection to revisiting the search for discoverable information to the extent that the requests are not moot, the Court should narrow the government's obligation to that consistent with Fed.R.Crim.P. 16, *Jencks*, *Brady*, and *Giglio*.

In short, in accordance with Fed.R.Crim.P. 16, the Court should quash the discovery request to the extent that it seeks information already provided to the Court in July 2006, and to the extent that it seeks disclosure of intercepts of Al-Timimi that are not relevant to the case

---

[1] A copy of that letter is Attachment A to this motion.

*237*

against him.  Further, the Court should quash the discovery request to the extent that it seeks

disclosure of intercepts of communications to which Al-Timimi was not a party, except to the

extent that such communications constitute a prior relevant statement of a government witness

pursuant to *Jencks,* or exculpatory evidence pursuant to *Brady* or *Giglio.*

Procedural Background

On April 26, 2005, Al-Timimi was convicted at trial of the charges against him.  On July

13, 2005, he was sentenced to life in prison upon those convictions.  The next day, he appealed

his convictions to the Fourth Circuit.

On February 16, 2006, Al-Timimi moved the Fourth Circuit to vacate his appeal and

remand to this Court "for further proceedings in light of the recently disclosed domestic

surveillance program operated by the National Security Agency (NSA)."[2]  In his pleading to the

Fourth Circuit, Al-Timimi argued that a remand was justified because:

> The government now concurs with a remand in this case to allow for
> further proceedings in light of the allegations of unlawful surveillance and
> the possible failure to disclose material evidence at trial.  The existence of
> the NSA program is now confirmed by President Bush and many details
> have been confirmed by government officials.  There is ample reason to
> believe that Dr. Al-Timimi may have been subject to such surveillance,
> which was never disclosed at trial. . . . .

*Id.* at 14.

At a hearing before this Court on July 21, 2006, Al-Timimi argued that existence of NSA

intercepts may be significant because (1) the government used FISA evidence that may have been

derived from NSA intercept evidence that was illegally intercepted, and (2) because the

---

[2]  Al-Timimi's memorandum in support of his motion to vacate and remand contained
voluminous exhibits.  Attachment B to this pleading is that memorandum, without any of the
exhibits that he included.

2

government may have exculpatory evidence that it failed to disclose from the NSA terrorist surveillance program. This Court already has examined the application for the FISA surveillance in this case; by Order of January 24, 2007, it ruled that no information in that application was required to be produced under the discovery orders entered in this case. As a result, the only issue remaining before the Court is whether the government may have captured through the NSA terrorist surveillance program exculpatory evidence that it failed to disclose. Even that issue, however, may now be moot.

On July 31, 2006, the United States filed a classified, *ex parte* pleading through counsel assigned to the United States Department of Justice in Washington, D.C., that addressed the search of NSA records for discoverable information regarding Al-Timimi. Undersigned counsel is not cleared to see that pleading. Yet, while the undersigned is not privy to the contents of that pleading, the undersigned has been informed by cleared counsel at the Department of Justice that it addresses at least some of the defendant's discovery requests. We therefore respectfully request, therefore, that in light of the specific discovery the defendant now seeks, the Court review the July 31, 2006 filing again, because at least some of the defendant's discovery requests may now be moot in light of that filing. This review can be accomplished with the assistance of the court security officer, who has possession of the classified pleading. In any event, cleared counsel from the Department of Justice will also soon file a supplemental classified, *ex parte* pleading that will identify those of the defendant's discovery requests that are addressed in the classified filing from July 31, 2006.

To the extent that Al-Timimi's discovery requests are *not* moot in light of the classified filing from July 31, 2006, however, his requests go far beyond what is properly discoverable. We hereby respond to the particular items requested by the defendant:

3

A.   <u>Intercepts of Al-Timimi</u>

Al-Timimi seeks disclosure of all communications in which he was a party that were

intercepted by the NSA. We agree that any communications to which Al-Timimi was a party that

were obtained from a government surveillance program and covered by Fed.R.Crim.P 16 but not

already disclosed should be disclosed or otherwise brought to the attention of the Court. This

search, however, apparently already took place. As we stated in our pleading of July 17, 2006:

> As this Court knows, undersigned counsel is not cleared to receive
> information regarding the NSA's Terrorist Surveillance Program.
> Undersigned counsel, however, has been notified by an attorney at the
> Department of Justice with the appropriate clearance that the records in the
> control of the NSA have indeed been searched, and the government did
> indeed produce to Al-Timimi all of the discovery to which he was entitled.
> Accordingly, we hereby notify the Court that, upon reconsideration, we
> reaffirm the representation made pre-trial that the government produced to
> Al-Timimi all of the discovery to which he was entitled.

In that pleading of July 17, 2006, we further wrote:

> Further, undersigned counsel has been notified that cleared counsel will
> file with the Court a separate - - *ex parte* and classified - - pleading
> providing further details of the search conducted by the government in
> response to the renewed discovery motion and in light of the disclosure of
> the existence of the Terrorist Surveillance Program.

We understand that such an *ex parte* and classified pleading was, in fact, filed with the Court on

July 31, 2006. On this basis, we believe that at least the portion of Al-Timimi's discovery

request seeking disclosure of communications in which he was involved has already been

completed. Indeed, as explained above, we believe that the July 31st pleading is likely to resolve

other portions of his discovery request as well.

Yet, the defense not only seeks all intercepts of communications to which Al-Timimi was

a party, but also all intercepts of communications to which he was not a party but within which

4

he was *referenced*. Unless an intercept consists of exculpatory evidence, however, there is no requirement that the government disclose intercepts that merely *reference* a defendant. Accordingly, to the extent that this portion of Al-Timimi's discovery request was not resolved by the July 31ˢᵗ classified pleading, it should be quashed to the extent that it seeks anything other than exculpatory evidence.

      B.   Intercepts of Al-Hawali and Al-Buthe

      Al-Timimi seeks disclosure of all intercepted communications he had with Al-Hawali and Al-Buthe, and all intercepted communications of either Al-Hawali or Al-Buthe which referenced Al-Timimi. As noted above, we agree that any communications to which Al-Timimi was a party that were obtained from a government surveillance program and covered by Fed.R.Crim.P 16 but not already disclosed or otherwise brought to the attention of the Court should be disclosed or brought to the attention of the Court now. This naturally includes communications between Al-Timimi and Al-Hawali or Al-Buthe; indeed, several of Al-Timimi's conversations with Al-Buthe were intercepted by FISA and turned over to Al-Timimi pre-trial. As noted above, however, the results of the search for these intercepts through the NSA program apparently have been turned over to the Court already.

      Yet, the defense also asks for intercepts of Al-Hawali and Al-Buthe to which Al-Timimi was a not party but that merely *reference* Al-Timimi. Unless an intercept consists of exculpatory evidence, however, there is no requirement that the government disclose intercepts that merely reference a defendant. Conversations in which Al-Hawali or Al-Buthe referenced Al-Timimi in communications with others hardly could be exculpatory with respect to the directions that Al-Timimi gave to Kwon, Hasan, Aatique, Khan, Royer, and others on September 16, 2001. In any event, to the extent that Al-Timimi believed that Al-Hawali or Al-Buthe possessed exculpatory evidence, he could have called them as witnesses.

5

While the defendant had no obligation to call any witnesses in his trial, he did, in fact, call witnesses such as Yusuf Idris. Al-Timimi claims to have communicated with Al-Hawali and Al-Buthe on many occasions. He could have called Al-Hawali and/or Al-Buthe as witnesses if he had so chosen. He did not. Except to the extent that they might be exculpatory, he is not now entitled to the disclosure of recordings in the possession of the United States of conversations that Al-Hawali or Al-Buthe may have had with other people. Accordingly, to the extent that this portion of Al-Timimi's discovery request was not resolved by the July 31st classified pleading, it should be quashed to the extent that it seeks anything other than exculpatory evidence.

C.  Intercepts of Dar Al-Arqam Defendants and Related Individuals

Al-Timimi seeks all intercepts of Chandia, Chapman, Royer, Hammad, al-Hamdi, Masoud Khan, Kwon, Hasan, Gharbieh, other unspecified members of the "Virginia Jihad," and other unspecified individuals connected with Dar Al-Arqam, that involve or reference Al-Timimi. We agree that any communications to which Al-Timimi was a party that were obtained from a government surveillance program and covered by Fed.R.Crim.P 16 but not already disclosed or brought to the attention of the Court should be disclosed or otherwise brought to the attention of the Court now. This naturally includes communications between Al-Timimi and Chandia, Chapman, Royer, Hammad, Al-Hamdi, Khan, Kwon, Hasan, and Garbieh  - - several of which were intercepted by FISA and turned over to Al-Timimi pre-trial.

Further, we agree that, to the extent that this portion of Al-Timimi's discovery request was not resolved by the July 31st classified pleading, we should search for any communications even referencing Al-Timimi involving Kwon, Hasan, Garbieh, Attique, or Surratt, because they were government witnesses at trial, and their prior statements properly are discoverable pursuant

6

to the *Jencks* Act if such statements were relevant to subject matter of their testimony. As a practical matter, their statements referencing Al-Timimi likely would be relevant to their testimony and likely would be discoverable pursuant to *Jencks*. It was for this reason that, pre-trial, Al-Timimi was provided with virtually all of the emails and recorded conversations in the government's possession involving the government's witnesses.

On the other hand, Al-Timimi is not entitled to discover recorded statements of Royer, Al-Hamdi, Khan, Hammad, Chapman, and Chandia that are not exculpatory, because they did not testify as government witnesses and *Jencks,* therefore, does not apply. Similarly, unless they are exculpatory, Al-Timimi is not entitled to discover recorded statements of other, unspecified individuals that he characterizes as members of the "Virginia Jihad" or connected to Dar Al-Arqam. We will, of course, disclose or otherwise bring to the attention of the Court any exculpatory information to the extent that such information is found but not previously disclosed. Accordingly, to the extent that this portion of Al-Timimi's discovery request was not resolved by the July 31st classified pleading, it should be quashed to the extent that it seeks anything other than exculpatory evidence.

D.  Intercepts of Yusuf Idris and Jaafar Idris

Al-Timimi seeks disclosure of all intercepted communications he had with Yusuf Idris and Jaafar Idris, and all intercepted communications of either Yusuf Idris or Jaafar Idris which referenced Al-Timimi. As noted above, we agree that any communications to which Al-Timimi was a party that were obtained from a government surveillance program and covered by Fed.R.Crim.P 16 but not already disclosed should be disclosed or otherwise brought to the attention of the Court. This naturally includes communications between Al-Timimi and either

7

Yusuf Idris or Jaafar Idris (at least one of which was intercepted by FISA, turned over to Al-Timimi pre-trial, and played during trial).

We further agree that we should search for previously undisclosed intercepts of Yusuf Idris and Jaafar Idris for the time period of approximately September 11, 2001, through September 20, 2001, because such intercepts conceivably could constitute exculpatory evidence reflecting conversations with Kwon or Hasan. Even if such intercepts exist, however, they should not be disclosed in discovery unless they are exculpatory pursuant to *Brady* or *Giglio*. Accordingly, to the extent that this portion of Al-Timimi's discovery request was not resolved by the July 31st classified pleading, it should be quashed to the extent that it seeks anything other than exculpatory evidence.

     E.  Intercepts of Ammar Ammonette

Al-Timimi seeks disclosure of all intercepted communications he had with Ammar Ammonette and all intercepted communications of Ammonette which referenced Al-Timimi. Al-Timimi claims that Ammonette is or was an assistant to Al-Hawali in Saudi Arabia between 2001 and 2003. As noted above, we agree that any communications to which Al-Timimi was a party that were obtained from a government surveillance program and covered by Fed.R.Crim.P 16 but not already disclosed should be disclosed or otherwise brought to the attention of the Court. This naturally includes communications between Al-Timimi and Ammonette. As noted above, however, unless an intercept consists of exculpatory evidence, there is no requirement that the government disclose intercepts that merely reference a defendant. Accordingly, to the extent that this portion of Al-Timimi's discovery request was not resolved by the July 31st classified

8

pleading, it should be quashed to the extent that it seeks anything other than exculpatory evidence.

      F.     Intercepts of Al-Aulaqi, Khafagi, Tahir, and Al-Kahtaini

Al-Timimi seeks disclosure of all intercepts of Anwar Al-Aulaqi, Bassam Khafagi, Adel Tahir, and Mohammad Al-Kahtani that involve or reference Al-Timimi. As noted above, we agree that any previously undisclosed communications to which Al-Timimi was a party that were obtained from a government surveillance program and covered by Fed.R.Crim.P 16 should be disclosed or otherwise brought to the attention of the Court. This naturally includes communications between Al-Timimi and Al-Aulaqi, Khafagi, Tahir, or Al-Kahtani. Again, as noted above, however, there is no requirement that the government disclose intercepts that merely reference Al-Timimi unless they constitute *Jencks* or are exculpatory. Neither Al-Aulaqi, Khafagi, Tahir, nor Al-Kahtani were government witnesses, so *Jencks* does not apply.

Moreover, while the defendant had no obligation to call any witnesses in his trial, he did, in fact, call witnesses. Al-Timimi claims to have communicated with Al-Aulaqi, Khafagi, Tahir and Al-Kahtani on many occasions. He could have called them as his witnesses, but he did not. Except to the extent that they might be exculpatory, he is not now entitled to the disclosure of recordings in the possession of the United States of conversations that Al-Aulaqi, Khafagi, Tahir or Al-Kahtani may have had with other people. It is difficult to conceive of how an intercept of Al-Aulaqi, Khafagi, Tahir, or Al-Kahtani referencing (but not involving) Al-Timimi could be exculpatory - - but we will disclose it or otherwise bring it to the attention of the Court if such an exculpatory intercept exists (and has not already been addressed in the July 31st pleading). Accordingly, to the extent that this portion of Al-Timimi's discovery request was not resolved by

9

the July 31st classified pleading, it should be quashed to the extent that it seeks anything other than exculpatory evidence.

     G.     <u>Intercepts of Al-Timimi's Lawyers</u>

Al-Timimi seeks to discover any intercepts in the government's possession of conversations he had with lawyers Nubani, McMahon, Yamamoto, and MacMahon, as well as conversations among his lawyers that referenced him even without his involvement. It is difficult to imagine how communications involving the lawyers properly could be discoverable under Fed.R.Crim.P. 16, or *Jencks*. It is even more difficult to fathom how communications involving lawyers that Al-Timimi met in 2003 and 2004 somehow could constitute exculpatory evidence for the charges that focused on what Al-Timimi told Kwon, Hasan, Aatique, Khan, and others in September and October 2001. Nevertheless, if communications between Al-Timimi and his attorneys were intercepted pursuant to the NSA program and not addressed by the July 31st pleading, they will be examined by a "taint" team to consider whether they were somehow discoverable.

Conclusion

The government agrees that any communications to which Al-Timimi was a party that were obtained from a government surveillance program and covered by Fed.R.Crim.P 16 but have not previously been disclosed or otherwise brought to the attention of the Court should be disclosed or otherwise brought to the attention of the Court now. Similarly, the government agrees that any communications involving the government's trial witnesses that constitute *Jencks* or that are exculpatory pursuant to *Brady* and *Giglio* that have not previously been disclosed or

10

otherwise brought to the attention of the Court should be disclosed or otherwise brought to the attention of the Court now.  No further discovery should be ordered.

As a result, the Court should quash the discovery request to the extent that it seeks disclosure of intercepts of Al-Timimi that are not relevant to the case against him, in accordance with Fed.R.Crim.P. 16.  Similarly, the Court should quash the discovery request to the extent that it seeks disclosure of intercepts of communications to which Al-Timimi was not a party, except to the extent that such communications constitute a prior relevant statement of a government witness pursuant to *Jencks,* or exculpatory evidence pursuant to *Brady* or *Giglio.*  Finally, the Court should quash the discovery request as moot to the extent that it was resolved by the pleading of July 31, 2006.

Respectfully submitted,

Chuck Rosenberg
United States Attorney

By:    _____
Gordon D. Kromberg
Assistant United States Attorney

_____
John Gibbs
Department of Justice Trial Attorney



THE GEORGE
WASHINGTON
UNIVERSITY
LAW SCHOOL
WASHINGTON DC

JONATHAN TURLEY

J.B. AND MAURICE C. SHAPIRO PROFESSOR
OF PUBLIC INTEREST LAW

September 14, 2007

**Via Facsimile Transmission and U.S. Mail**
Gordon D. Kromberg, Esquire
Assistant United States Attorney
Eastern District of Virginia
2100 Jamieson Street
Alexandria, VA 22314

Re:    **United States v. Al-Timimi, Crim. No. 1:04-385**

Dear Mr. Kromberg:

In compliance with the Court's order of August 24, 2007, I am
sending a list of individuals and organizations that are material to the case of
Dr. Ali Al-Timimi. As discussed before Judge Brinkema, this list has been
narrowed to individuals and organizations clearly material to the case of Dr.
Al-Timimi. We are seeking confirmation of whether any government
agency has investigatory or surveillance material that was not disclosed to
the defense involving each of these individuals or organizations. As you
know, there have been a number of previously undisclosed intelligence
operations revealed in the last two years, including but not limited to the
National Security Agency's (NSA) domestic surveillance program.

The information sought by the defense falls within the scope of Fed.
R. Crim. P. 16 and Brady v. Maryland and its progeny. This information
includes surveillance and documentary records as well as any reports, notes,
grand jury transcripts, summaries, photographs, documents, statements,
tapes, electronic communications (including emails, email headings, and
instant messages), or other tangible evidence in the possession of the United
States government, including such material received from foreign or non-
government sources. The material sought may be stored in audio, electronic,
video, photographic or written format. If the government refuses to turn
over any material on the basis of either materiality objections or privilege
claims, we ask that you confirm the possession of the withheld evidence and
give a summary description so that we may address the matter with the

court.

These requests obviously involve all interceptions or records of statements made by Dr. Al-Timimi. As the Court stressed on December 3, 2004( Docket Number 144), such statements have great probative value "because the statements of the defendant are important windows into that person's intent." The Court went on to reaffirm that "the intent of the defendant is going to be a critical factor in this case, and obviously statements that a defendant makes are a very significant piece of evidence as to intent." We are seeking any communications made to these individuals by Dr. Al-Timimi or any such statements or positions related to Dr. Al-Timimi that they have referenced in their own communications. These include all of the subjects discussed at trial, including but not limited to Dr. Al-Timimi's views on peace, *jihad, hijra*, Al Queda, Osame Bin Laden, the 9-11 attacks, the work of Dar al-Arqam, Mullah Omar, the Taliban, terrorism, Afghanistan, accused terrorists, Solimon Al-Buthe, Zacharias Moussaoui, lashkar-e-Taiba or LET, Kashmir, Dr. Safar Al-Hawali, Muslims dealing with the West or the American government, conferences discussing terrorism or 9-11, the Virginia Jihad Network, the paintball defendants, and charities like Al-Haramain and the Islamic Assembly of North America. The defense should have a complete record of any material that relates to Dr. Al-Timimi in the possession of the government from prior terrorism investigations.

We are seeking the aforementioned material as it relates to any of the following categories. We have supplied a brief description of the individual or organization to assist you in your inquiry. We would be happy to supply additional information if needed to complete your search of government records and files.

1.    **Dr. Ali Al-Timimi.** Any of the previously defined material that references or involves Dr. Al-Timimi or the underlying alleged conspiracy or conspirators. This includes but is not limited to any communications involving Ali Asad Chandia, Seifullah Chapman, Randall "Ismail" Royer, Hammad Abdur-Raheem. Ibraham al-Hamdi, Masoud Kahn, Yong Ki Kwon, Khwaja Hasan, Nabil Gharibieh, or the other alleged members of the Virginia Jihad or paintball conspiracy or their underlying activities. Dr. Al-Timimi made dozens of calls that discussed 9-11 and how Muslims should react to that tragedy as well as other relevant subjects. Many of these were calls with an international component from Bosnia, Saudi Arabia, Australia, England and other countries.

-- 2 --

2.    **Dr. Safar Al-Hawali.** Any of the previously defined material that references or involves Dr. Al-Timimi or the underlying alleged conspiracy or conspirators. This includes, but is not limited to any material that references Dr. Al-Timimi, Ali Asad Chandia, Seifullah Chapman, Randall "Ismail" Royer, Hammad Abdur-Raheem. Ibraham al-Hamdi, Masoud Kahn, Yong Ki Kwon, Khwaja Hasan, Nabil Gharibieh, or the other alleged members of the Virginia Jihad or paintball conspiracy or their underlying activities. These calls were made to Mecca, Saudi Arabia in 2001 and 2002. These communications include, but are not limited to, the following examples:

a.    Communications discussing Dr. Al-Timimi's meeting on September 18, 2001 with Dr. Jaafar Idris and Yusuf Idris.

b.    Communications on September 19, 2001, including but not limited to a call that occurred only 23 minutes before Dr. Al-Timimi's first call to Kwon and 1-2 hours prior to Dr. Al-Timimi's lunch with Kwon and Hasan prior to their departure.

c.    Communications with Dr. Al-Timimi on how Muslims should respond to 9-11 and the need for *hijra* (migration).

d.    Conversation in March 2002, during which Dr. Al-Timimi and Dr. Al-Hawali discussed assisting Moussaoui in his defense and the moral dilemma of helping an accused terrorist.

e.    Communications in October 2002, including but not limited to a telephone call between Dr. Al-Timimi and Dr. Al-Hawali tin which they discussed reaching out to President Bush and Congress to try to bridge the divide between the Western and Islamic worlds, particularly to avoid war in Iraq. Osama Bin Laden and the need for international conferences were also discussed during this call. There was an initial call to Nihad Awad to reach Dr. Al-Hawali to set up this call.

3.    **Mr. Soliman Al-Buthe** (Riyadh, Saudi Arabia). Any of the previously defined material that references or involves Dr. Al-Timimi or the underlying alleged conspiracy or conspirators. This includes, but is not limited to any material that references Dr. Al-Timimi, Ali Asad Chandia, Seifullah Chapman, Hammad Abdur-Raheem, Randall "Ismail" Royer, Ibraham al-Hamdi, Masoud Kahn, Yong Ki Kwon, Khwaja Hasan, Nabil Gharibieh, or the other alleged members of the Virginia Jihad or paintball conspiracy or their underlying activities. These calls were made to Mecca, Saudi Arabia in 2001 and 2003. We believe that there were at least 100 such calls in 2002 alone as well as hundreds of emails and facsimile

-- 3 --

transmissions. These communications include, but are not limited to, the following examples:

    a.    Communications in 2002 discussing papers created with Dr. Al-Timimi's direction or supervision dealing with the United States and its relationship to the Muslim world. These include communications referencing papers by Mr. Amir Butler of Australia, Mr. Ismail and Dr. Bassem Khafagi (who was referenced in the search warrant and interviewed by the FBI).

    b.    Communications discussing Dr. Al-Timimi's assistance of Hasan and Chandia.

    c.    Communications regarding Dr. Al-Timimi's work on white papers entitled "How Can We Co-Exist" and "What are we Fighting For?," including drafts sent by facsimile transmission of these papers.

    d.    Communications between Dr. Al-Timimi and Dr. Al-Buthe in the Fall 2002 regarding discussions with Congress, international conferences to address attacks on Muslims, and the Iraq War.

    e.    Communications in 2003 and 2004 addressing the Shuttle disaster and reaching out to Congress and the American people.

    f.    Communications relating to U.S. evangelical attacks on Islam as well as discussion of charities like Al-Haramain and coordinating efforts with Dr. Al-Hawali and Dr. Idris.

    4.    **Paintballers/Virginia Jihad**. Any of the previously defined material that references or involves Dr. Al-Timimi or the underlying alleged conspiracy or conspirators. This includes, but is not limited to any material that references Dr. Al-Timimi, individuals associated with the "paintballers" or "Virginia Jihad" including, **Ali Asad Chandia, Seifullah Chapman, Randall "Ismail" Royer, Hammad Abdur-Raheem. Ibrahim al-Hamdi, Masoud Kahn, Yong Ki Kwon, Khwaja Hasan, Nabil Gharibieh** or the other members of the Virginia Jihad. These calls include, but are not limited to, the following examples:

    a.    Communications relating to their paintball activities.

    b.    Communications relating to traveling abroad after 9-11.

    c.    Communications relating to Dr. Jaafar Idris or Mr. Yusuf Idris.

    d.    Communications by Royer to LET in September 2001.

    e.    Communications of the aforementioned individuals from Pakistan or to Pakistan from September 2001 to March 2002.

    f.    Communications from Hasan while in the United States to
Kwon in Pakistan and Korea.

    5.    **Yusuf Idris and Jaafar Idris.** Any of the previously defined
material that references or involves Dr. Al-Timimi or the underlying alleged
conspiracy or conspirators. Of particular importance are any
communications before or after the dinner with Kwon in September 2001.
The calls to Yosuf and Jaafar Idris were matters raised before and at the trial
of Dr. Al-Timimi. These material issues include, but are not limited to,
discussions of 9-11, Dar Al-Arqam, Kwon, Hassan, Nabil Gharibieh, Royer,
Al-Hawali, Al-Buthe, the Virginia Jihad allegations, Muslims traveling
abroad after 9-11, and Muslim response to 9-11.

    6.    **Ammar Ammonette.** Any of the previously defined material
that references or involves Dr. Al-Timimi or the underlying alleged
conspiracy or conspirators. As associate of Dr. al-Hawali, these calls were
made to Saudi Arabia from 2001 to 2003. These communications include e-
mails that may have originated from or were directed to the following e-mail
addresses: amar_colo@hotmail.com or ammarcolo@hotmail.com). These
communications include discussions of subjects ranging from Dr. Al-
Timimi's work in the United States to Bin Laden to the Muslim response to
9-11, and communications to both President Bush and Congress.
    Ammar Ammonette performed a coordinating role vis-à-vis Dr. Al-
Hawali and Dr. Al-Timimi. However, some of these calls are just between
Dr. Al-Timimi and Mr. Ammonette.

    7.    **Anwar Al-AuLaqi.** Any of the previously defined material that
references or involves Dr. Al-Timimi or the underlying alleged conspiracy
or conspirators. AuLaqi met with Dr. Al-Timimi at his house in October
2002 to discuss his reaction to 9-11, the congressional letter, and other
individuals later associated with his trial. Telephone calls were made to Dar
Al-Arqam and to Dr. Al-Timimi's home. We also ask for any reports or
notes generated in connection with AuLaqi's visit to Dr. Al-Timimi's home
in October 2002 when he was accompanied by Nabil Gharibieh and Rubeel
Iqbal.

    8.    **Bassem Khafagi.** Any of the previously defined material that
references or involves Dr. Al-Timimi or the underlying alleged conspiracy
or conspirators. Khafagi and Al-Timimi discussed his views of 9-11 and
other issues relevant to his trial.

9.    **Adel Tahir.** Any of the previously defined material that references or involves Dr. Al-Timimi or the underlying alleged conspiracy or conspirators. Adel Tahir specifically spoke with Dr. Al-Timimi between 9-11 and the dinner with Kwon. The FBI prepared at least one 302 on his involvement.  There were multiple calls between Dr. Al-Timimi and Tahir in September 2001, including repeated calls on September 13th.

10.    **Mohammad Al-Kahtami.** Any of the previously defined material that references or involves Dr. Al-Timimi or the underlying alleged conspiracy or conspirators.  Dr. Al-Timimi spoke with Kahtami before and after 9-11 on issues related to his trial.

11.    **Counsel** communications. Any of the previously defined material that references or involves Dr. Al-Timimi or the underlying alleged conspiracy or conspirators.  At least one telephone call involving Ashraf Nubani and Royer was intercepted by the government.  Other counsel included Martin MacMahon, Alan Yamamoto, and Edward MacMahon.

12.    **Center for Islamic Information and Education** also know as **Dar al-Arqam** in Falls Church, Virginia. Any of the previously defined material that references or involves Dr. Al-Timimi or the underlying alleged conspiracy or conspirators.

13.

If any of these individuals, organizations, references or terms are unclear, I hope that you will not hesitate to contact me.

Thank you for your assistance in this matter.

Sincerely,

Jonathan Turley
Counsel to Dr. Ali Al-Timimi

cc:    William E. Olson, Esq.
Kate Seikaly, Esq.

Case No. 05-4761

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

### UNITED STATES OF AMERICA,
**Plaintiff – Appellee,**

**v.**

### ALI AL-TIMIMI
**Defendant – Appellant.**

_____

## APPELLANT'S UNOPPOSED MOTION TO VACATE AND REMAND
## HIS APPEAL FOR FURTHER PROCEEDINGS

_____

Jonathan Turley
George Washington University Law School
2000 H Street NW
Washington, DC  20052
(202) 994-7001

*Counsel representing Appellant*
*Dr. Ali Al-Timimi*

February 16, 2006

## APPELLANT'S MOTION TO VACATE AND REMAND
## HIS APPEAL FOR FURTHER PROCEEDINGS

Pursuant to Fed. R. App. P. 27, Appellant, Dr. Ali Al-Timimi, respectfully requests

that the Court vacate the appeal and remand to the district court for further proceedings in

light of the recently disclosed domestic surveillance program operated by the National

Security Agency (NSA).

I.    BACKGROUND

A. The Disclosure of a NSA Domestic Surveillance Program.

On December 16, 2005, the New York Times disclosed the existence of a domestic

surveillance program conducted by the NSA that encompassed thousands of interceptions

in the United States without a court order. *See* Exhibit A (James Risen & Eric Lichtblau,

*Bush Lets U.S. Spy on Callers Without Courts*, N.Y. Times, Dec. 16, 2005, at A1).

Government officials were aware that the domestic surveillance program had been

confirmed by reporters and subject to public disclosure for over a year — before this case

ever went to a verdict, let alone an appeal.  Officials asked the New York Times not to

disclose the program, which was never revealed to the district court or defense counsel.

The domestic surveillance program has now been confirmed by President George

W. Bush, Attorney General Alberto Gonzales, Deputy Director of National Intelligence

General Michael Hayden, and other government officials.  *See* Exhibit B (President

George W. Bush, Presidential News Conference (Dec. 19, 2005); Exhibit C (Alberto

1

Gonzales, United States Attorney General, Press Briefing (Dec. 19, 2005); Exhibit D
(General Michael Hayden, Deputy Director of National Intelligence, Remarks at the
National Press Club on NSA Domestic Surveillance (January 23, 2006).

In the State of the Union address, congressional testimony, a "white paper" from the
Justice Department, and various public speeches, government officials have confirmed
the scope and evolution of this program since it began in 2002.[1]  These facts include:

1)     The domestic surveillance program began in September 2002 under the

direction of the NSA.  *See* Exhibits C & D.

2)     A decision was made by the government to intercept domestic calls without

a court order under either Title III of the Omnibus Crime and Control and Safe

Streets Act of 1968, 18 U.S.C. §§2510-22 (2000) or the Foreign Intelligence

Surveillance Act of 1978, 50 U.S.C. §§1801-11 (2000) (hereinafter FISA).

---

[1]     The public statements of the President and other government officials
are an appropriate subject for judicial notice under the federal rules.  *See* Fed. R.
Evid. 201(b); 21B Charles Alan Wright & Arthur R. Miller, *Federal Practice and
Procedure: Federal Rules of Evidence* § 5110.1 (2d ed. 1987).  Appellate courts
are "free to take judicial notice of subsequent developments in cases that are a
matter of public record and are relevant to the appeal." *Rothenberg v. Security
Mgmt. Co.*, 667 F.2d 958, 961 n.8 (11th Cir. 1982); *see also Muth v. United States*,
1 F.3d 246, 250 (4th Cir. 1993).  Failure to consider such new information can
result in a fundamental miscarriage of justice when it goes to the very heart of a
case, as it does here.  *See Muth*, 1 F.3d at 250.

2

3)    The intercepted calls included calls originating in the United States to international recipients as well as a limited number of calls that were entirely domestic without an international component. *See* Exhibits A & E.

4)    The program primarily targeted (a) individuals making international calls or emails and (b) individuals with suspected Al Qaeda ties or suspected ties to other terrorist organizations or individuals. *See* Scott McClellan, White House Press Secretary, White House Regular News Briefing (January 24, 2006) (describing the NSA surveillance program as "focused only on communications in which one person is reasonably suspected of links to al Qaeda or affiliated terrorist organizations and it involves international communications."); Exhibit C ("Another very important point to remember is that we have to have a reasonable basis to conclude that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda, or working in support of al Qaeda.").

5)    Any individual could be subject to the surveillance under this program based solely on the view of an NSA staffer that there is "a reasonable basis to believe" the subject has ties to Al Qaeda or other terrorist groups. *See* Exhibit D.

6)    This standard is intentionally lower than the standard in FISA due to the view that the latter was too restrictive. *See* Exhibit D.

3

7)    This standard is a lower standard than that under FISA, which is itself lower

than the standard used for criminal warrants under the Fourth Amendment. *Id.*

(noting that the NSA program allows gathering of information that "[we] would

not otherwise have been able to get . . . [and] wouldn't be traditionally available

under FISA."); *id.* ("In the instances where this program applies, FISA does not

give us the operational effect that the authorities [sic] that the President has

given us, give[s] us."); *see also* Exhibit C ("the Foreign Intelligence

Surveillance Act provides – requires a court order before engaging in this kind

of surveillance that I've just discussed . . . .").

8)    At least 5000 people have been intercepted under this program and,

according to government officials, "the program has touched many more

Americans than that." *See* Exhibit E (Barton Gellman, *Surveillance Net Yields*

*Few Suspects, NSA's Hunt for Terrorists Scrutinizes Thousands of Americans,*

*but Most Are Later Cleared*, Wash. Post, Feb. 5, 2006, at A1).

9)   When the NSA operation yields incriminating evidence, a surveillance warrant

is sought – a step that the government has taken with regard to "[f]ewer than 10

U.S. citizens or residents a year." *See id.* (Gellman, *supra*, at A1).

10)    Attorneys within the Administration questioned the legality of the program

and Deputy Attorney General Comey refused to reauthorize the program in

4

2004. *See* Exhibit E (Eric Lichtblau & James Risen, *Justice Deputy Resisted Parts of Spy Program*, N.Y. Times, Jan. 1, 2006).

11)    Former NSA Director and current Deputy Director of National Intelligence, General Michael Hayden, consulted with the three most senior lawyers in the NSA's General Counsel's office on the legality of the program. *See* Exhibit D.

12)    General Hayden confirmed that the legal staff of the NSA General Counsel's office were later informed of the program. *Id.*

13)    NSA staff officers routinely review targets of the domestic surveillance program and make their own "reasonable" decision that there is a "connection" to either al Qaeda or any group linked or affiliated with al Qaeda. *Id.*

14)    After Deputy Attorney General Comey (then serving as acting Attorney General while former Attorney General John Ashcroft was in the hospital) refused to sign off on the legality of the program, Administration officials visited Attorney General Ashcroft in the hospital to seek his authorization. Ashcroft also questioned the program's legality and the program was suspended for four months. *Id.*

15)    "In mid-2004, concerns about the program expressed by national security officials, government lawyers and [Judge Colleen Kollar-Kotelly] prompted the Bush administration to suspend elements of the program and revamp it." *See* Exhibit E (Gellman, *supra*, at A1).

5

16)    President Bush has confirmed that the program is on-going and has been reauthorized thirty times. *See* Exhibit B.

17)    Government officials confirmed that the domestic surveillance program was used to intercept communications of Iyman Faris, who was convicted on terrorism charges. *See* Exhibit E (Dan Eggen & Charles Lane, *On Hill, Anger and Calls for Hearings Greet News of Stateside Surveillance,* Wash. Post, Dec. 17, 2005, at A1). It has further been confirmed that the existence of these intercepts was never disclosed to the Court during Faris' trial or appeal. *Id.*

18)    Government officials have also denied that specific individuals were targeted under the program. *See, e.g.,* Exhibit E (*NSA: Amanpour, other CNN Reporters Not Targeted for Surveillance*, CNN, Jan. 6, 2006).

19)    Government officials also confirmed that some suspects were subject to surveillance under both FISA and the NSA program. *Id.*

20)    Operations once attributed to FISA or other lawful programs now appear to have been based on information from the NSA program, information that was shared by the NSA with other agencies. *Id.*

21)    For example, the successful prosecution of Iyman Faris was initially attributed to the Patriot Act, not the NSA surveillance program. *See* Exhibit B (President George W. Bush, George W. Bush Delivers Remarks on the Patriot Act (June 9, 2005)) ("[The FBI] used the Patriot Act to discover that Faris had

6

cased possible targets in New York and that he had reported his findings to al Qaeda."). However, the Administration now claims that the successful prosecution of Iyman Faris is largely attributable to the NSA surveillance program. *See* Exhibit E (Jennifer Loven, *President Acknowledges Approving Secretive Eavesdropping*, Wash. Post, Dec. 19, 2005, at A1).

22)    In some cases, the NSA program was used to secure FISA orders. *See* Exhibit E (CNN.com, *Lawyers: Did NSA Snoop on Suspects?*, at http://www.cnn.com/2005/Law/12/28/lawyers.spying/index.html (last visited Feb. 15, 2006).

23)    In other cases, surveillance under FISA and the NSA program were carried out in simultaneous and separate operations. *See* Exhibit E.

24)    When informed of the NSA program, District Court Judge (and FISA Chief Judge) Colleen Kollar-Kotelly and her predecessor Judge Royce C. Lamberth told the Justice Department that they had serious questions about the legality of the program and wanted to create a firewall between any FISA applications and information from the NSA program. *See* Exhibit E (Carol D. Leonnig, *Secret Court's Judges Were Warned About NSA Spy Data; Program May Have Led Improperly to Warrants*, Wash. Post, Feb. 9, 2006, at A1).

25)    James A. Baker, counsel for intelligence policy in the Justice Department's Office of Intelligence Policy and Review, revealed to the Court that the firewall

7

between FISA and the NSA program had failed on at least two occasions where information from the program was used to secure orders from FISA. *Id.*

26)    Government officials also expressed concerns that the NSA program required the government to offer misleading or false information to federal judges. Exhibit A ("Several government lawyers said there appeared to be concerns that the Justice Department, by trying to shield the existence of the NSA program, was in danger of misleading the court about the origins of the information cited to justify the warrants."); *id.* (noting that officials were concerned that "[t]he government would . . . either have to disclose the NSA program or mislead a criminal court about how it had gotten the information.").

27)    Government officials confirmed that the NSA program "played a critical part in at least two cases that led to the convictions of al Qaeda associates." Exhibit E (Eric Lichtblau & James Risen, *Defense Lawyers in Terror Cases Plan Challenges Over Spy Efforts*, N.Y. Times, Dec. 28, 2005, at A1).

These statements by the President, Attorney General and other government officials have confirmed the critical components of the program. The relation of these facts to the case of Dr. Al-Timimi can be reduced to the following most salient points:

1)    Dr. Al-Timimi was a person of interest for the government in its terrorism investigations after September 11, 2001 when the NSA operation began. *See* Exhibit F (Declaration of Mr. Ed MacMahon).

8

2)    Dr. Al-Timimi was subject to interceptions under FISA and other means for "a significant portion of 2003." Exhibit J (Stipulation No. 60 of Dr. Al-Timimi and the U.S. Government, April 13, 2005); *see also* Exhibit F.

3)    During 2003, "several thousand of the defendant's telephone calls were intercepted." *See* Exhibit F.

4)    "In addition, the government obtained an extensive number of defendant's email messages during that same period." *Id.*

5)    The government has repeatedly asserted that Dr. Al-Timimi has connections to Al Qaeda – a focus of the operation.

6)    The terrorist organization referenced in the indictment, Lakshar-e-Taiba, has been linked by U.S. authorities to Al Qaeda – a focus of the operation.

7)    In September 2001, the FBI interviewed Dr. Al-Timimi and accused him of having knowledge of the 9-11 attacks. *See* Exhibit F.

8)    In September 2001, Dr. Al-Timimi had telephone contacts with Muslims in Saudi Arabia who the government alleged had ties to Al Qaeda. *Id.*

9)    In 2001, 2002 and 2003, Dr. Al-Timimi routinely made international calls to Pakistan, Saudi Arabia and other nations in the Middle East – a focus of the operation. *See* Exhibit F.

9

10)    While the government denied any undisclosed intercepts in this case, many DOJ, FBI, and NSA attorneys were aware of the NSA program, including the top three NSA attorneys and the staff of NSA's General Counsel's office.

11)    Indeed, one member of the Senate Select Intelligence Committee estimated that thousands of officials in the Justice Department, NSA, FBI and other agencies were aware of the NSA program. *See* Exhibit E (*NewsHour with Jim Lehrer* (PBS television broadcast Feb. 8, 2006)) (Senator J.D. Rockefeller IV, ranking minority member of the Senate Select Committee on Intelligence).

12)    Former United States Attorney and acting Deputy Attorney General Paul McNulty has been aware of the the NSA program since December 2005, at the very latest. However, neither Mr. McNulty nor the Justice Department has informed the trial court of possible undisclosed evidence in this case.

13)    Before and during trial, Dr. Al-Timimi asked for any intercepts collected of his communications as well as those of key witnesses and figures in the alleged conspiracy, including but not limited to Masoud Khan, Randall Royer, Yong Kwon, Muhammad Aatique, Khwaja Hasan, Donald Surratt, Safer al-Hawali, and Jafaar Idris. *See* Exhibit F.

14)    Dr. Al-Timimi alleged that many calls containing exculpatory evidence were never produced by the government, including but not limited to calls in the Fall

10

and Winter of 2002-03 when Dr. Al-Timimi was working with an individual in

Saudi Arabia on a document entitled "How we can co-exist."

15) Likewise, Dr. Al-Timimi alleged that there were calls made to individuals

overseas that dealt with government witnesses like Kwon that were never

produced but contained exculpatory information.

16) Finally, it was established that core conspirators like Kwon, Hasan and

Royer made numerous calls overseas during the relevant period.

17) The government has refused to confirm or deny that there were undisclosed

intercepts involving Dr. Al-Timimi or these other individuals under the NSA

program or other surveillance programs. *See* Exhibit G (correspondence

between AUSA Kromberg and Professor Jonathan Turley).

B.    Attempts by Dr. Al-Timimi to Confirm Undisclosed Intercept Evidence.

Almost immediately after the disclosure of the NSA domestic surveillance

program, counsel for Dr. Al-Timimi sought confirmation of any undisclosed

intercepts of Dr. Al-Timimi or material witnesses in his case. *See* Exhibit G.

Professor Jonathan Turley first contacted AUSA Gordon Kromberg by telephone

and later in a series of letters asking for confirmation of such intercepts as well as

consent for a motion to stay and to remand the case. *Id.* In these letters, three

basic questions were raised as to the existence of undisclosed intercept evidence.

11

*Id.* The government repeatedly refused to answer these questions despite the fact that confirmation would not require identification of the particular operation.

The government responded by stating that it would oppose any motion to stay argument in the case and that it would also oppose any motion to remand the case to the district court. *See* Exhibit G (email from AUSA Kromberg to Professor Turley (January 5, 2006)). In addition, the government requested that counsel for Dr. Al-Timimi renew his security clearance to discuss classified matters.   After the filing of Appellant's Motion to Stay the Briefing Schedule Pending Resolution of Outstanding Issues, the Court ordered the government to respond in an order issued on January 10, 2006.  On January 19, 2006, the government filed an answer dropping its earlier opposition and consenting to the motion.

Professor Turley proceeded to apply for a renewal of his security clearance, which is still pending.  In the meantime, he continued to ask whether undisclosed intercept evidence exists in this case.  Shortly before the filing of this motion, the government responded to a January 27, 2006 letter from Professor Turley again seeking information as well as consent to the motion to remand. *See* Exhibit G (Letter from Professor Turley to AUSA Kromberg (Jan. 27, 2006)).  In its February 2, 2006 letter, the government dropped its opposition and consented to a remand for further proceedings. *See* Exhibit G (Letter from AUSA Kromberg to Professor Turley (Feb. 2, 2006)).

12

C.    Interference with Attorney-Client Communications

On two prior occasions, Dr. Al-Timimi secured extensions of time to file his opening brief due to the denial of confidential attorney-client communications by federal officials. These motions detailed how prison officials (1) routinely opened mail marked as attorney-client material to and from Dr. Al-Timimi, (2) refused to allow counsel to meet with Dr. Al-Timimi in an attorney-client room and required them to speak over a telephone with an officer present in the area, (3) insisted on monitoring any attorney-client telephone calls, and (4) failed to produce Dr. Al-Timimi when counsel traveled to Kentucky to see him.

On January 30, 2006, counsel again attempted to secure a meeting with Dr. Al-Timimi and stated his intention to file for a judicial order to compel the prison to respect his Sixth Amendment rights. *See* Exhibit H (Declaration of Professor Jonathan Turley). On January 31, 2006, the Executive Assistant to the Warden called to confirm that Professor Turley would be allowed to meet in an unmonitored attorney-client room and that such a meeting could be scheduled for the following week. *Id.* The next day, however, Dr. Al-Timimi was transferred from the facility and is now, once again, out of contact with counsel. Repeated attempts by counsel to reach Dr. Al-Timimi have failed. *Id.* It has been over five months since counsel has been able to meet with Dr. Al-Timimi. *Id.*

13

II.   A REMAND IS APPROPRIATE IN THIS CASE TO ALLOW FOR
      FURTHER PROCEEDINGS ADDRESSING THE ALLEGATIONS
      OF UNLAWFUL SURVEILLANCE AND FAILURE TO
      DISCLOSE EVIDENCE AT TRIAL.

A.    <u>Introduction.</u>

The government now concurs with a remand in this case to allow for further

proceedings in light of the allegations of unlawful surveillance and the possible

failure to disclose material evidence at trial. The existence of the NSA program is

now confirmed by President Bush and many details have been confirmed by

government officials. There is ample reason to believe that Dr. Al-Timimi may

have been subject to such surveillance, which was never disclosed at trial.

Moreover, the government will neither confirm nor deny that undisclosed evidence

was obtained through the NSA operation or other sources.

As a general principle, the filing of a notice of appeal divests the district

court of jurisdiction over those aspects of the case that are the subject of the

appeal. *See Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982).

Nevertheless, a party can seek review in some cases simultaneously with an

appeal. *See Crutchfield v. United States Army Corps of Eng'rs*, 230 F. Supp. 2d

673, 680 (E.D.Va. 2002) (noting that the general rule divesting jurisdiction from

the lower court "only applies to prevent a trial court from taking actions that might

duplicate or confuse issues before the appellate court."). However, such collateral

proceedings in this case may create procedural confusion and the pending appeal

14

would proceed without a complete record on the issues before the Court. As this Court has stated, the rule on divesting jurisdiction is a "judge-made doctrine designed to avoid the confusion and waste of time that might flow from putting the same issues before two courts at the same time." *In re Grand Jury Proceedings Under Seal*, 947 F.2d 1188, 1190 (4th Cir. 1991) (quoting 9 J. Moore, et al., Moore's Federal Practice ¶ 203.11 (2d ed. 1991)).

Proceeding with the appeal at this stage would be a waste of judicial resources and deprive Dr. Al-Timimi of information that is potentially determinative in his direct appeal. In light of the government's consent and the absence of any claim of harm or disruption caused by a remand, the case should be returned to the district court for further proceedings.

B.    This Court Has Remanded Cases Whenever Material Questions Remain on the Merits of an Appellate Case.

Federal appellate courts have the authority to remand an appeal for "further proceedings to be had as may be just under the circumstances." 28 U.S.C. § 2106 (2000). Where a material factual dispute exists on appeal with regard to the proceedings below, the United States Court of Appeals for the Fourth Circuit has routinely used this authority to remand to the district court for further hearings on the issue. *See, e.g., United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004) (remanding to lower court to resolve material factual dispute regarding conditions of defendant's plea agreement); *United States v. Taylor*, 13 F.3d 786, 789 (4th Cir.

15

1994) (remanding case to address an allegedly unconstitutional search). Other circuits have also used remands to complete records and resolve factual controversies. *United States v. Ceja-Prado*, 333 F.3d 1046, 1051 (9th Cir. 2003) (evidentiary hearing ordered to establish critical issue of age); *United States v. Larson*, 302 F.3d 1016, 1022 (9th Cir. 2002); *United States v. Lott*, 310, F.3d 1231, 1250-53 (10th Cir. 2002) (remand for evidentiary hearing on allegations that defendant was harmed in a breakdown of attorney-client communications); *United States v. Cruz-Rojas*, 101 F.3d 283, 285-86 (2d Cir. 1996) (evidentiary hearing ordered in case on direct appeal to establish firearm violation); *United States v. Agee*, 83 F.3d 882, 885-87 (7th Cir. 1996) (evidentiary hearing ordered on defendant's alleged waiver of appeal); *United States v. Sanchez-Sotelo*, 8 F.3d 202, 212-13 (5th Cir. 1993) (evidentiary hearing ordered to look at the impact of extrinsic evidence introduced by a juror); *United States. v. Schwimmer*, 892 F.2d 237, 244-45 (2d Cir. 1989) (evidentiary hearing held to look into violations of attorney-client confidentiality); *United States v. Semkiw*, 712 F.2d 891, 895 (3d Cir. 1983) (remand for evidentiary hearing into alleged prosecutorial misconduct); *United States v. Lord*, 711 F.2d 887, 891 (9th Cir. 1983) (remand for evidentiary hearing on alleged prosecutorial misconduct).

A remand is especially warranted when a factual dispute primarily relates to purported occurrences outside the courtroom and, "'upon which the record [can],

therefore, cast no real light.'" *White*, 366 F.3d at 302 (quoting *Machibroda v. United States*, 368 U.S. 487, 494–95 (1962)); *see also United States v. Mitchell*, 602 F.2d 636, 639 (4th Cir. 1979) (holding that a remand was necessary to consider new evidence because "the district court certainly, and perhaps this Court also, will be in better position to exercise its functions if the evidence is fully developed upon a hearing.") (quoting *Lyles v. United States*, 272 F.2d 910, 913 (5th Cir. 1959)). For example, in *White*, the United States Court of Appeals for the Fourth Circuit considered a habeas petitioner's contention that the government had promised to allow him to enter a conditional plea, but failed to include it in the plea agreement. *White,* 366 F.3d at 301–02. Both the petitioner and the government "made express representations in their court submissions, acting as officers of the court, and those representations directly contradict[ed] each other." *Id.* at 302. The Fourth Circuit concluded that there was a legitimate factual dispute and that remand was necessary to hold evidentiary hearings on the subject. *Id.*

District courts are generally in a better position to resolve factual disputes and further develop the record. *See, e.g., Rish v. Johnson*, 131 F.3d 1092, 1101 (4th Cir. 1997) (holding that district court is "much better suited" in determining whether there are disputed issues of material fact sufficient to avoid summary judgment); *Taylor*, 13 F.3d at 789 (remanding in light of the court's conclusion that "material facts . . . [were] in conflict" and thus should be addressed first by the district court) (citing

17

*United States v. Berkowitz,* 927 F.2d 1376, 1385 (7th Cir. 1991)).  Since the district

court is already "intimately familiar" with the facts of the case, it is generally better

for the appellate court to allow the lower court to first examine the issue in dispute.

*See Devlin v. Scardelletti*, 536 U.S. 1, 22 (2002).  As in past cases warranting remand,

the Appellant asked specifically for any additional intercepts involving Dr. Al-Timimi

or material witnesses, but was assured that all such intercept evidence had been

disclosed.  *See, e.g., United States v. Librach*, 602 F.2d 165, 167 (8th Cir. 1979).

In the instant case, as discussed above, there are credible reasons to believe

that undisclosed intercepts exist in this case.  Moreover, there remain serious

questions over the legality of any intercepts carried out under the NSA program.

The need for a remand is magnified by four salient facts.  First, this evidentiary

dispute could be determinative for every issue that Dr. Al-Timimi intends to raise

on appeal.  Because this is a case based purely on "violent speech," the words of

Dr. Al-Timimi and other witnesses in intercepted communications go to the heart

of his defense.  Second, the evidence in this case is a mix of classified and

unclassified material.  It will be necessary for counsel and the district court to

address these issues in the appropriate settings and, if necessary, to proceed under

the rules of the Classified Information Procedures Act (CIPA).  Third, the

government has not denied that there are undisclosed intercepts, but only that it

disclosed all intercepts required under federal law – raising questions of fact and

18

law best left to the district court. Finally, since neither of the parties object to a remand, there is no claim of harm or prejudice from a remand. In light of these facts, a remand is warranted to allow evidentiary hearings on this new controversy.

III.    A REMAND WOULD ALSO ALLOW FOR THE DISTRICT
COURT TO ADDRESS OTHER MATERIAL ISSUES,
INCLUDING ACCESS TO CLASSIFIED INFORMATION AND
THE DENIAL OF ATTORNEY-CLIENT COMMUNICATIONS.

A remand in the instant case would also allow the district court to resolve current disputes over access to evidence and the resumption of confidential attorney-client communications. These issues have already delayed this appeal and will likely produce further delays unless resolved. A remand would allow the district court to address the issues in the regular course of its proceedings with counsel.

Government counsel has already stated that Appellant's Counsel would have to renew his clearance before discussion of evidence in the case. *See* Exhibit G (email from AUSA Kromberg to Professor Turley (January 5, 2006)). After the need for a clearance was raised on appeal, Professor Turley immediately requested that his prior Top Secret/Sensitive Compartmentalized Information (TS/SCI) clearance be renewed. A remand would allow time for this clearance to be reactivated and for counsel to review and to discuss the classified evidence in the case.

The long denial of confidential attorney-client communications and repeated transfers of Dr. Al-Timimi can also be addressed on remand. Appellant's Counsel

19

has objected repeatedly to the denial of attorney-client confidentiality as well as other abuses. These abuses led to a request for a formal investigation. *See* Exhibit I (letters from Professor Turley to Attorney General Gonzales et al.). After months of unsuccessful efforts to obtain unmonitored access to his client, the government finally dropped earlier conditions of monitoring and physical barriers. After promising to set up such a confidential meeting at the Kentucky prison, however, the government transferred Dr. Al-Timimi to an unknown facility the very next morning. *Id.* This matter calls for judicial review, a task best left to the trial court.

From the outset, this appeal has been hampered by these unresolved collateral issues. The case is not ripe for appellate review and, before proceeding to the merits on appeal, these issues should be addressed by the district court. Such a remand is in the interests of both justice and judicial efficiency.

IV.    CONCLUSION

In light of the foregoing, the Appellant respectfully requests an order to remand this case to the district court for further proceedings, including evidentiary hearings on the existence of undisclosed intercept evidence relevant to this case.

Jonathan Turley
2000 H Street NW
Washington, DC  20052
(202) 994-7001

*Counsel representing Appellant*
*Dr. Ali Al-Timimi*

20

## CERTIFICATE OF SERVICE

The undersigned counsel of record certifies that, on February 16, 2006, a true and correct copy of the foregoing motion was mailed by first-class mail to Mr. Gordon Kromberg, Esq., Assistant United States Attorney, 2100 Jamieson Ave., Alexandria, Virginia.

Jonathan Turley
2000 H Street NW
Washington, DC  20052
(202) 994-7001

21

## CERTIFICATE OF SERVICE

I hereby certify that, this _19_ day of October 2007, I caused a copy of the attached

GOVERNMENT'S MOTION TO QUASH DEFENDANT'S REQUEST FOR DISCOVERY

and NOTICE OF HEARING to be served first class mail, postage paid, addressed as follows:

Jonathan Turley
2000 H Street, N.W.
Washington, D.C. 20052