# *EXHIBIT H*



FILED
MAILROOM

R 2 1 2008

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

# THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | CR-04-385 |
| | § | |
| V. | § | **Under Seal** |
| | § | |
| DR. ALI AL-TIMIMI, PH.D | § | Hon. Leonie M. Brinkema |
| | § | |
| Defendant. | § | |

## DR. AL-TIMIMI'S CONSENT MOTION
### FOR AN ORDER TO UNSEAL A REDACTED VERSION OF HIS OPPOSITION TO THE GOVERNMENT'S MOTION TO QUASH (DKT. NO. 244)

Pursuant to Local Criminal Rule 47, Dr. Al Al-Timimi, by counsel, respectfully moves this Court for an order that a redacted version of Dr. Al-Timimi's Opposition to the Government's Motion to Quash (Dkt. No. 244) be unsealed. A copy of the proposed redacted version of this pleading is attached as Exhibit A. The government consents to this motion. Dr. Al-Timimi states the following in support of this motion:

1. On November 9, 2007, Dr. Al-Timimi, by counsel, filed a Sealed Opposition to the Government's October 19, 2007 Motion to Quash his discovery requests. (*See* Dkt. No. 244).

2. The Court, in a November 26, 2007 order, stated that it did "not find any reason to maintain this pleading under seal, however, the government has orally advised the Court that there may be portions that should be redacted." (Dkt. No. 247).

3. The Court also ordered that the parties notify the Court of any redactions to Dr. Al-Timimi's Sealed Opposition to the Motion to Quash and that the Court will order that the entire pleading be unsealed if no timely requests are made. (*Id.*).

4. The parties have agreed to the redactions to Dr. Al-Timimi's Opposition to the Motion to Quash set forth in the copy of the pleading attached at Exhibit A.

1

5.    Pursuant to the Court's November 26, 2007 order, Dr. Al-Timimi asks that the attached redacted version of his Opposition to the Motion to Quash be unsealed.

6.    Counsel for the government has indicated that he consents to this motion.

### CONCLUSION

For the foregoing reasons, this consent motion for an order that a redacted version of Dr. Al-Timimi's Opposition to the Government's Motion to Quash (Dkt. No. 244) be unsealed should be granted.

Respectfully submitted,

Dr. Ali Al-Timimi

By Counsel

Jonathan Turley (*pro hac vice* lead counsel)
2000 H St., N.W.
Washington, D.C. 20052
(202) 994-7001 (phone)
(202) 994-9811 (facsimile)


Bryan Cave LLP
700 Thirteenth Street, N.W.
Suite 700
Washington, D.C. 20005-3960
(202) 508-6000 (phone)
(202) 508-6200 (facsimile)

By: _Wm Son_____
William E. Olson (VSB #47251)
Katherine J. Seikaly (VSB #71438)

Dated: April 18, 2008

2

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2008 I served a true and correct copy of the foregoing by e-mail

and U.S.Mail upon:

Mr. Gordon Kromberg, Esq.
Assistant United States Attorney
2100 Jamieson Ave.
Alexandria, Virginia 22314-5794

William E. Olson

3

# EXHIBIT A

FILED

# THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

2007 NOV -9 P 3: 57

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | CR-04-385 |
| | § | |
| v. | § | **UNDER SEAL** |
| | § | |
| DR. ALI AL-TIMIMI, PH.D | § | |
| | § | |
| Defendant. | § | |

### DEFENDANT DR. ALI AL-TIMIMI'S SEALED OPPOSITION
### TO THE GOVERNMENT'S MOTION TO QUASH

Under the directions of the Court on September 14, 2007, Defendant Dr. Ali Al-Timimi

submitted a limited list of individuals subject to discovery requests. On October 19, 2007, the

government filed a motion to quash Defendant's request for discovery. While captioned as

motion to quash the entire request, the government acknowledges that some of the discovery is

legitimately sought by Dr. Al-Timimi and agrees that the government should undertake a new

search for this information.[1]

The government's opposition to the remainder of discovery is based on facially invalid

legal arguments of materiality and discoverability. Once again, the government seeks to prevent

cleared counsel from having any role in the determination of whether evidence is material – even

denying redacted copies, summaries, or mere confirmation of surveillance material. In an added

twist, government counsel is arguing against discoverability of evidence to which even they have

been denied access. Thus, rather than have cleared counsel of record argue the issue of

materiality, the government seeks to have the entire case turn on a secret series of



communications between the court and some unnamed counsel in an unnamed agency. The result is not just a deprivation of basic constitutional and statutory protections but a mockery of the adversarial process. The motion to quash should be denied and the government compelled to either turn over the discovery or supply adequate redacted or summary copies. Moreover, the discovery should be shown to the Court and cleared counsel for the government should enter the case as counsel of record to address such matters. Finally, the government has been referring exclusively to material held by or acquired by the NSA, which is not the sole focus of pre-trial or post-remand motions.

### I.    AFTER DEMANDING CLEARANCES FOR COUNSEL, THE GOVERNMENT SEEKS TO DEPRIVE COUNSEL OF ANY ABILITY TO REVIEW AND ARGUE MATERIALITY.

After this case was remanded for the specific purpose of allowing a review of withheld evidence collected under the NSA domestic surveillance program or any other previously undisclosed program, the government delayed consideration of withheld evidence until counsel received security clearances. Once security clearances were activated, however, the government refused to allow the counsel to review a single piece of withheld evidence or any of the in camera submissions to the Court -- not even redacted or summary versions of the evidence or in camera submissions. Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 170 (1951) (Frankfurter, J., concurring) ("fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights."), *United States v. Harris*, 707 F.2d 653, 662 (2d Cir. 1983) ("our legal system is rooted in the idea that facts are best determined in adversary proceedings; secret, ex parte hearings 'are manifestly conceptually incompatible with our system of criminal jurisprudence.'") (quoting *United States v. Arroyo-Angulo*, 580 F.2d 1137, 1141 (2d Cir. 1978)); *see also United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 551 (1950) (Jackson, J.,

-- 2 --

dissenting) ("The plea that evidence of guilt must be secret is abhorrent to free men."). Such use of secret evidence or submissions undermines a defendant's due process and Sixth Amendment rights. *See United States v. Abuhamra*, 389 F.3d 309 (2d Cir. 2004).

Since the remand of this case, counsel has been forced to argue against imagined arguments known only to the Court and unnamed individuals. To complete this otherworldly process, government counsel now attests in a court filing that an ex parte submission that they are not allowed to read is facially adequate. Thus, at this critical point in the remand, no counsel of record on either side is actively involved in this review. Despite repeated requests for an explanation from the government of why counsel cannot have access to material or review redacted or summary copies, the case has devolved into little more than a private conversation between the Court and shadow counsel.

The Court should reject the current posture of secrecy as preposterous and abusive. The government should have cleared counsel of record making these motions. The government should also explain why opposing counsel cannot have access under traditional classification rules or receive redacted or summary versions of these documents.

Finally, the government continues to refer to evidence derived from interceptions by the NSA. From the outset of this controversy, the defense has sought evidence derived by the NSA domestic surveillance program or other previously undisclosed programs or operations by the federal government. The government in this motion, however, only addresses material held by the NSA, which is clearly not the sole focus of past motions either at trial or after the remand by the Fourth Circuit. Prior motions and the discovery clearly state that the scope "include[s] but not limited to the National Security Agency's (NSA) domestic surveillance program." Def. Ltr. at 1. The defense is now faced with a type of three-card monty game with this evidence. In the

obviously inadequate search of the National Archives, the FBI insisted that it could only look at

FBI files not NSA files of the files of other agencies. Now, the government is making

representations only about NSA files but not files of the FBI or other agencies. The government

is required to disclose evidence in its possession regardless of the acquiring agency or

maintaining agency.

## II.    THE EVIDENCE SOUGHT BY DR. AL-TIMIMI IS CLEARLY MATERIAL AS DEFINED PREVIOUSLY BY THE COURT AND RECOGNIZED BY THE GOVERNMENT.

In his discovery letter, Dr. Al-Timimi, by counsel, gave the government a detailed

request covering a limited number of individuals. (*See* Ex. 1) Beside material on himself, the

obvious members of the alleged "Virginia Jihad" associated by the government with him, and the

Dar Al-Arqam Islamic Center, Dr. Al-Timimi requested material related to only eight other

individuals. Not only did Dr. Al-Timimi explain the relevance of this material but offered to

assist in supplying any further details needed to identify the material. Rather than run the names

and produce an index as a foundation for review, the government seeks a categorical exclusion

made by the Court without review of the evidence.

At issue is material that should have been disclosed under the host of discovery rules

applicable to criminal cases. *See, e.g.*, 18 U.S.C. § 3500 (2000); Fed. R. Crim. P. 12, 12.1, 12.2,

12.3, 16, 26.2 and 46(j); *Giglio v. United States*, 405 U.S. 150 (1972); *Brady v. Maryland*, 373

U.S. 83 (1963). The government has already revealed the existence of documents that was

clearly material to Dr. Al-Timimi's defense and improperly withheld from the defense. The

government only described four documents found in its search of 9-11 Commission material.

Those documents were clearly relevant and should have been turned over to the defense. There

is no explanation for withholding this material in violation of federal rules and in contradiction

-- 4 --

of past statements in court by government counsel.  More importantly, the government claims to have failed to locate a document found by former counsel that revealed surveillance that has not been disclosed to the defense in contradiction of past representations to the Court.  The result is clearly material evidence has been improperly withheld or lost while other potentially material evidence has been withheld from defense review.  Now, the government seeks to narrow the scope of discovery despite the fact that the defendant is arguing for the same standard used by the government to show state of mind and absence of mistake.

> A.    **The Communications Sought by the Defense Fall Squarely Within the Scope of Materiality Articulated Previously by Both the Court and Opposing Counsel.**

The Supreme Court has repeatedly warned that materiality determinations should not be narrowly defined.  *Kyles v. Whitley,* 514 U.S. 419, 437 (1995).  A prosecutor carries the initial duty to uncover all evidence in the government's possession that may favor the defendant.  *See id.* at 436-37.  Evidence is material even if it appears more likely than not that a trial will result in conviction.  *Id.* at 434-35.  Rather, the test is whether the undisclosed evidence would work to "undermine[] confidence in the outcome of the trial."  *Id.*

The government's current position on materiality is significantly different from the position it articulated before and after trial.[2]  Both pre-trial and post-trial, the Court and the government have stressed that evidence is material when it goes to Dr. Al-Timimi's state of mind

---

[2]    As recently disclosed, the government has tried and failed a similar approach in the case of former lobbyists for the American Israel Public Affairs Committee (AIPAC).  While the government sought to narrow the range of materiality as to the testimony of leading officials like Secretary of State Condoleeza Rice, Judge T.S. Ellis III denied the motion and insisted what these officials may have said to the AIPAC lobbyists was material to their state of mind.  Such prior conversations, the court ruled, could help "exculpate the defendants by negating the criminal states of mind the government must prove."  *See* Jerry Markon, *Rice, Others Told to Testify in AIPAC Case*, Washington Post, November 3, 2007, at A6; *United States v. Rosen*, No. 1:05cr225, 2007 WL 3243921, at *7 (E.D. Va. Nov. 2, 2007).

or illuminates the meaning of his past statements. This standard was often used to justify the introduction of evidence such as the statements on the Space Shuttle disaster (made almost seventeen months after the September 16th dinner) over constitutional and evidentiary objections. In the December 3, 2004 hearing (Docket #144), the Court made clear that "the intent of the defendant is going to be a critical factor in this case, and obviously, statements that a defendant makes are a very significant piece of evidence to one's intent." Hearing transcript, Dec. 3, 2004, at 34; *see also id.* ("In other words, I think the probative value is so critical because the statements of a defendant are important windows into that person's intent."). On December 30, 2004 (Docket #40), the Court emphasized again "the heart and soul of this case" involves the words of Dr. Al-Timimi and the "intent of those words." Hearing, Dec. 20, 2004, at 7. The Court decided to adopt a broad standard of materiality despite First Amendment concerns:

> But the reaction of the defendant and statements that he made about those [9-11] events are clearly relevant again to the state of mind and what the defendant intended when he met with various people. So I recognize that it's problematic, and I recognize that this case is permeated with First Amendment issues.

Hearing, March 18, 2005, at 35.

The government has insisted that Dr. Al-Timimi's statements *to anyone at any time* were material when they dealt with 9-11, terrorism, disasters, his views of Islam, or the United States generally. This previously broad view of materiality was expressed in the Government's Response to Defendant's Pretrial Motion (Docket #16):

> At the least, Timimi's statement regarding the Space Shuttle is relevant and material to the proof against him because it shows his motive to counsel his followers to aid the Taliban, levy war against the United States. Similarly, it is relevant and material because it further shows that his advice and counseling to Kwon, Hasan, Khan, Royer, and the others was not inadvertent or made by mistake, and it was not misheard by his listeners.

-- 6 --

*Id.* at 11 n.4. Indeed, the government viewed lectures[3] made over a 12-year period prior to the indictment as material to the trial. In its post-trial motions, the government emphasized that the case turned on what Dr. Al-Timimi understood and advocated as the proper course of Muslims in the post 9-11 world:

> Yet, where Timimi was charged with soliciting treason, it was proper to argue to the jury what Timimi believed Muslims were religiously obligated to do, because his intent was an essential element of the charges against him. Accordingly, it plainly was for the United States to argue that the evidence established that, after 9/11, Timimi believed that Muslims were obligated to fight against American troops in Afghanistan, because that belief helped to establish his criminal intent.

Gov't Resp. to Def.'s Post-Trial Motions (Docket #125) at 12. The government stressed that his alleged views were "corroborated by captured e-mails and publicly – available writings and speeches, in which Al-Timimi espoused support for the Taliban, support for Al-Qaeda, and hatred for the United States." (Gov't Opp. to Def.'s Mot. For Access to Records of the 9/11 Comm. at 3). The government agreed that any topics or subjects raised by the indictment are material, including such general subject categories as "peace." Hearing, Jan. 28, 2005, at 7 ("Your Honor, I agree with what Mr. Yamamoto said, that if they are discussing making peace, that could be *Brady*, and if we have such a thing, it would be turned over, but just conversations about anything other than the topic of the indictment is not *Brady* . . .").

When the government was seeking the introduction of Al-Hawali statements, it agreed with the Court that Dr. Al-Timimi's countervailing views would be equally material. The Court noted on January 28, 2005 that "[t]o the extent that part of the government's case is going to rely upon the statements of Hawali and the adoption of those statements by the defendant, I think the

---

[3]       Indeed, in its December 128, 2004 letter, the government stressed to defense counsel that such statements attributed to Dr. Al-Timimi would be material: "Be aware that what your client said in public lectures may be introduced to show his intent, and an absence of mistake." Gov't Discovery Letter, Dec. 28, 2004 at 3.

-- 7 --

defendant has a right to probe whether the government has evidence that at other times the defendant has diametrically opposed Hawali's views. That, I think, is proper in this case." Hearing, Jan. 28, 2005 (Docket #145) at 8. The government replied that "we agree, Judge, and we do not have anything like that." *Id.* The government's prior position was that any statements recollected or recorded by Dr. Al-Timimi on peace or war or Islamic duties were material. Thus, whether he was quoted or recorded on subjects of his views of religion or the United States, such statements were relevant to the question of whether "Timimi counseled and induced his followers to support terrorist groups that sought to destroy America." Gov't Resp. to Def.'s Pre-Trial Motions at 12.

**B.      Each of the Discovery Requests Relates Directly to a Central Issue in Trial.**

The government concedes that some of the discovery requests made in the letter are valid and require further searching by its agents – yet it asks the Court to quash the discovery entirely. Each of the individuals named in the discovery letter has direct and obvious bearing on Dr. Al-Timimi's defense.

**Dr. Ali Al-Timimi**. The government concedes that any interceptions of Dr. Al-Timimi would have to be disclosed, but insists that it has done so. It, however, limits this representation to "all communications in which he was a party that were intercepted by the NSA." Gov't Mot. at 4. The pre-trial and post-remand motions clearly involve any undisclosed communications, not just those acquired by or held by the NSA. On its face, the government motion fails to address the scope of requested discovery. The government should be required to reveal previously undisclosed communications, regardless of the acquiring agency, as required by federal law. By limiting its representations to the NSA, the government uses extreme measures to bar disclosure to both government and defense counsel. Once again, Dr. Al-Timimi has a

-- 8 --

right to know if he was intercepted under the NSA program or other undisclosed surveillance program so that he may challenge its legality and contribution to his conviction. There is every reason to believe that he was subject to interceptions given the government's statements that it long suspected him of ties to Al Qaeda and Bin Laden as well as his numerous international calls from inside and outside the country.



At trial, FBI Agent John Wyman testified that "the . . . investigation we were conducting, we know of extensive ties between Timimi, Hawaali, and other elements of the broader Al-Qaeda network." Wyman Transcript at 1172.

The evidence that Dr. Al-Timimi was subject to undisclosed surveillance is obvious. The government is suggesting that it does not have a single captured conversation for an almost seventeen month period between 9-11 and February 1, 2003 – not to mention surveillance before 9-11. Yet, we know that Dr. Al-Timimi:

- was interviewed in 1994 by the FBI and the Secret Service regarding his ties to the perpetrators of the first World Trade Center bombing;

- was referenced in the August 6, 2001 Presidential Daily Briefing ("Bin Laden Determined to Strike in US") as one of seventy individuals regarding whom the FBI is conducting full field investigations on a national basis;

- was described to his brother by the FBI within days of the 9-11 attacks as an immediate suspect in the Al-Qaeda conspiracy;

-- 9 --

- was contacted by the FBI only nine days after 9-11 and asked about the attacks and its perpetrators;

- was considered an anthrax weapons suspect;

- 

- was described during his trial by FBI agent John Wyman as having "extensive ties" with the "broader al-Qaeda network";

- was described in the indictment and superseding indictment as being associated with terrorists seeking harm to the United States;

- was a participant in dozens of international overseas calls to individuals known to have been under suspicion of Al-Qaeda ties like Al-Hawali; and

- was associated with the long investigation of the Virginia Jihad group.

It is facially absurd to suggest that the government does not have some of these communications. For years, the FBI has been asking about Dr. Al-Timimi and his associates. He was described as a terrorist suspect long before 9-11. It is preposterous to suggest that his many international and domestic communications were not intercepted. Notably, the government has never been required to submit confirmations of these interceptions and instead has continually hedged on whether they exist – referring to its view of materiality as relieving it of any need to disclose if such communications exist.

This is precisely the reason the Archives material was so important and the reason that the defense sought access to conduct its own search. There are numerous indications that Dr. Al-

-- 10 --

Timimi was under suspicion of these ties for years before his arrest. This is also the reason the defense has asked to see the FISA application. The government is obviously trying to avoid supplying a list of communications involving Dr. Al-Timimi by narrowing the scope of discoverable material and relying entirely on ex parte communications. Worse yet, it is trying to create plausible deniability of knowledge of serious discovery violations by excluding counsel of record for the government and using unnamed individuals to make ex parte arguments to the Court.

**Al-Hawali and Al-Buthe.** The government concedes that any communications between Dr. Al-Timimi and these critical figures in this case must be turned over. Once again, however, the government conspicuously limits its representations to "intercepts through the NSA program" and only states, with regard to this one program, all evidence has "apparently . . . been turned over to the Court already." Gov't Mot. at 5. By the government's admission, any interceptions by any agency involving Dr. Al-Timimi must be disclosed. It has either not attempted to confirm the existence of such evidence in other agencies or refuses to address such evidence in its filings with the Court. Furthermore, as noted below, it is simply wrong as a matter of law when it insists (without a single case citation) that references to Dr. Al-Timimi in third-party communications are not subject to discovery, even when these communications are made by his alleged co-conspirators in the Virginia Jihad.

The conversation with Al-Hawali on September 19, 2001 was central to the indictment and raised at trial. Al-Timimi called Dr. Al-Hawali after the dinner with Kwon on September 16, 2001 and just two hours before he met with Kwon and Hassan for the last time on September 19, 2001. The Al-Hawali conversation was also related to dinner conversations with Dr. Idris that were an issue at trial. Most importantly, these communications offer detailed information on Dr.

-- 11 --

Al-Timimi's state of mind and the meaning of his various statements. For example, in this conversation, Dr. Al-Timimi raised the issue of the need for *hijra* (or migration), a term that became central to his trial. There was also discussion of Dr. Al-Timimi's view of the 9-11 attacks and the need to reach out to the U.S. government –also issues raised in his trial. All of this information is clearly material to Dr. Al-Timimi's defense and trial.

Al-Buthe is equally central to the case. The February 1, 2003 communication with Al-Buthe address his state of mind regarding such subjects as the space shuttle disaster. Al-Timimi's work with Al-Buthe involved central figures later connected to the alleged conspiracy such as Royer and Hasan. The communications are highly probative on the issues addressed at trial. For example, in Winter 2002, Dr. Al-Timimi spoke repeatedly to Al-Buthe about a white paper "How Can We Co-Exist" which was in direct response to the widely distributed paper "What Are We Fighting For?" by the Institute of American Values. Those communications revealed concerns by Dr. Al-Timimi, including hand-written comments faxed to Al-Buthe, that they make it clear that killing Americans is not within the gamut of proper conduct. While the government believes that Dr. Al-Timimi's later views on the Space Shuttle disaster roughly seventeen months after the dinner are clearly material, it refuses to turn over or even recognize the existence of material that is directly linked to the September 16, 2001 dinner.

**Virginia Jihad Conspirators.** Once again, the government admits that direct communications with Dr. Al-Timimi are discoverable under federal law and states that any such communications "not already disclosed or brought to the attention of the Court should be disclosed or otherwise brought to the attention of the Court now." Gov't Mot. at 6. The government agrees that it must do so with regard to "Chandia, Chapman, Royer, Hammad, Al-Hamdi, Khan, Hasan, and Garbieh." *Id.* It further concedes that "to the extent that this portion

-- 12 --

of [Dr.] Al-Timimi's discovery request was not resolved by the July 31st classified pleading, we should search for any communications even referencing Al-Timimi involving Kwon, Hasan, Garbieh, Attique or Surratt." *Id.* However, the government insists (again without a single case citation) that "Al-Timimi is not entitled to discover recorded statements of Royer, Al-Hamdi, Khan, Hammad, Chapman, and Chandia that are not exculpatory, because they did not testify as government witnesses and *Jencks,* therefore, does not apply." *Id.* at 7. As shown below, this argument is legally wrong. Dr. Al-Timimi is entitled to such evidence. Indeed, the government's representation of the law confirms that it adopted an artificially narrow and legally incorrect basis for disclosure at trial. As members of the alleged conspiracy, Royer, Al-Hamdi, Khan, Hammad, Chapman, and Chandia are clearly material to Dr. Al-Timimi's defense. Their communications may contradict government witnesses who claimed that Dr. Al-Timimi was deeply involved in their conspiracy. Moreover, the government is again placing itself in the position of making a determination of what is exculpatory, which it obviously defines in a breathtakingly narrow fashion. Even the omission of references to Dr. Al-Timimi in discussions of the conspiracy or its leadership is probative and exculpatory. At a minimum, such communications should have been revealed to counsel to allow the parties to argue materiality under seal. What is particularly astonishing (and galling) is that the government previously insisted that any statement made to Royer, Khan, and others by Dr. Al-Timimi are critical to the case. Government's Response to Defendant's Pretrial Motion (Docket #16) at 11 n.4. Such communications may be simply relayed by third parties rather than intercepted directly. The government's prior view of materiality encompassed these very individuals regardless of whether they would be called as witnesses.

-- 13 --

**Yusuf Idris and Jaafar Idris**. The government again admits that any communications with either Yusuf Idris or Jaafar Idris by Dr. Al-Timimi should have been disclosed and will be disclosed. *Id.* at 8. It further agrees that it "should search for previously undisclosed intercepts of Yusuf Idris and Jaafar Idris for the time period of approximately September 11, 2001 through September 20, 2001" if the government views them as exculpatory. *Id.* Thus, the government agrees that any references to Dr. Al-Timimi would be discoverable for these third parties. However, the government adopts a nine-day window for discovery, which is facially absurd. While September 2001 is clearly the most compelling period, any communications on Dr. Al-Timimi's views that were raised at trial are equally relevant in confirming his state of mind.

**Ammar Ammonette**. The government again agrees that any interceptions between Ammonette and Dr. Al-Timimi are discoverable. However, it again insists that it alone will determine if the communications are exculpatory. Ammonette was involved in communications on Dr. Al-Timimi's efforts to open up dialogue with President Bush and Congress vis-à-vis the Muslim world. These conversations also addressed Dr. Al-Timimi's views of the 9-11 attacks, a subject that factored prominently in evidence introduced at trial.

**Anwar Al-Aulaqi, Bassem Khafagi, Adel Tahir, and Mohammad Al-Kahtani.** The government concedes that any interceptions of communications between these individuals and Dr. Al-Timimi are discoverable. Gov't Mot. at 9. However, the government reserves the right to decide whether communications exculpatory without explaining its understanding of why the material is sought by the defense or its own view on the "proper" use of such evidence. It also repeats its erroneous argument concerning the need to call witnesses as a prerequisite for some discovery demands.

-- 14 --

Anwar Al-Aulaqi goes directly to Dr. Al-Timimi's state of mind and his role in the alleged conspiracy. The 9-11 Report indicates that Special Agent Ammerman interviewed Al-Aulaqi just before or shortly after his October 2002 visit to Dr. Al-Timimi's home to discuss the attacks and his efforts to reach out to the U.S. government.

Bassem Khafagi was questioned about Dr. Al-Timimi before 9-11 in Jordan, purportedly at the behest of American intelligence. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆ He was specifically asked about Dr. Al-Timimi's connections to Bin Laden prior to Dr. Al-Timimi's arrest. He was later interviewed by the FBI about Dr. Al-Timimi. Clearly, such early investigations go directly to the allegations of Dr. Al-Timimi's connections to terrorists and Bin Laden – ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

Adel Tahir had a direct conversation with Dr. Al-Timimi about what Muslims should do after the 9-11 attacks – two days after the attacks and prior to the September 16, 2001 dinner. This conversation concerned the precise subject of the dinner at the center of the trial. He was viewed as highly relevant by the FBI and the subject of an FBI 302. His references to Dr. Al-Timimi on these subjects would be highly probative and material. In his 2003 affidavit, Tahir directly contradicted the government's representations of the true views of Dr. Al-Timimi, stating that Dr. Al-Timimi advised that he:

> 1). Pray and increase in voluntary worship; 2). Avoid public places, and if I did go to public places I should try to not dress in traditional Muslim garb; and 3). If I ever had contemplated living abroad in a Muslim country, now would be the perfect time to do so.

Tahir Affidavit of August 11, 2003. Tahir further attested that Dr. Al-Timimi "never advised me to live abroad in order to engage in violent Jihad." *Id.*

-- 15 --

Mohammad Al-Kahtani also had conversations with Dr. Al-Timimi on the same subjects raised at this trial. During the trial, Hasan testified for the first time that he met with Al-Kahtani prior to his departure to Pakistan and informed him of his intentions. Any conversation that Hasan had with Al-Kahtani would be material to his testimony and Al-Timimi's role in the alleged conspiracy. It would also establish the sequence of events between the critical dinner and the departure of both Kwon and Hasan. ████████████████████████████████ ██████████████████████████████████████████████████████████ ███████████████████████████The referenced group was headed by Al-Kahtani.

The Court previously addressed the obvious materiality of accounts like Tahir's and stressed that "the reaction of the defendant and statements that he made about these [9-11] events are clearly relevant again to the state of mind and what the defendant intended when he met with various people . . . It's relevant evidence to this case." Hearing, March 28, 2005, at 34-35.

The defense is allowed to see such communications and argue for their materiality on such issues as state of mind, even if the communications are with third parties but reference Dr. Al-Timimi in discussions of 9-11, the other alleged co-conspirators, or how to respond post-9-11 to the United States. These interceptions include references made to Dr. Al-Timimi and relevant subjects discussed at Dar Al-Arqam. If Dr. Al-Timimi's views on issues like *jihad* or *hijra* after 9-11 were discussed, such accounts would go directly to his state of mind on such issues raised by the government at trial. Likewise, the thrust of the defense in this case was that Dr. Al-Timimi was not involved and did not encourage these individuals to go to train and fight in Pakistan. The defense further argued that he was not involved in the subsequent planning to go

-- 16 --

overseas. Regardless of whether they were witnesses, their communications on these subjects would be clearly material to the defense.

   **Counsel**. The government insists that it cannot imagine the relevance of any interceptions of counsel for Dr. Al-Timimi but assures the Court that "if communications between Al-Timimi and his attorneys were intercepted pursuant to the NSA program and not addressed by the July 31st pleading, they will be examined by a "taint" team to consider whether they were somehow discoverable." Gov. Mot. at 10. First, once again, the government limits its response to the NSA program despite the clear language of discovery request. Second, it limits its response to intercepts of Dr. Al-Timimi and counsel when the request goes to any interception of his counsel discussing issues or witnesses in his case. Third, the clear relevance is that it would constitute a grave Sixth Amendment violation for which serious charges would be brought against the government and counsel. *See O'Brien v. United States*, 386 U.S 345 (1967); *Black v. United States*, 385 U.S. 26 (1966); *Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1996); *State v. Quattlebaum*, 527 S.E.2d 105, 108-09 (S.C. 2000). Dr. Al-Timimi is entitled to know if such violations occurred. It is not up to a "taint team" to make that decision for him. Finally, interceptions of counsel may include a call between Royer and counsel Nubani from Northern Neck jail during which Royer discussed work for LET before 9-11 and addresses his grand jury testimony related to Dr. Al-Timimi. This communication occurred during Dr. Al-Timimi's trial.

### III.  THE GOVERNMENT IS WRONG IN ITS UNSUPPORTED ASSERTION THAT A DEFENDANT MAY NOT SEEK DISCLOSURE OF COMMUNICATIONS BETWEEN THIRD PARTIES OR NON-WITNESSES.

   The government is advancing a radical interpretation of what the government must produce as evidence in a criminal trial. It has suggested that communications that reference Dr. Al-Timimi are either barred or presumptively barred from disclosure. It further suggests that the

-- 17 --

fact that individuals could have been called as witnesses (but were not) is somehow determinative on the issue of whether the defense was entitled to such evidence before trial. The government further insists that, unless such evidence is exculpatory in its sole judgment, it need not disclose the evidence or even confirm its existence.

Under Rule 16(a)(1)(e), the government is obligated to produce items that are "material to preparing the defense." Courts have rejected the argument that the government's obligations under Rule 16(a)(1)(e) are limited to exculpatory evidence because such an interpretation ignores the language of Rule 16(a)(1)(e) requiring the government to produce items material to the *preparation* of the defense, not just helpful to the defense's case in chief. *See United States v. Marshall*, 132 F.3d 63, 67 (D.C. Cir. 1998) (rejecting the government's argument that its obligations under Rule 16(a)(1)(e) (formerly Rule 16(a)(1)(c)) is limited to helpful or exculpatory material but instead "[t]he rule as written does not compel the conclusion that inculpatory evidence is immune from disclosure. Inculpatory evidence, after all, is just as likely to assist in the 'preparation of the defendant's defense' as exculpatory evidence. In other words, it is just as important to the preparation of a defense to know its potential pitfalls as it is to know its strengths"); *United States v. Safavian*, 233 F.R.D. 12, 15 (D.D.C. 2005).

To determine what is material, "a court must first start with the indictment when determining what is material, as the indictment delineates the evidence to which the defendant's case must respond." *United States v. Libby*, 429 F. Supp. 2d 1, 7 (D.D.C. 2006). The indictment and superceding indictment in this case allege that Dr. Al-Timimi was associated with terrorists seeking harm to the United States. ████████████████████████████ ████████████████████████████. The government alleged that Dr. Al-Timimi encouraged his associates to wage war against the United States and called for violent

*jihad.* As noted above, the Court previously stated that the case turned on the meaning and understanding of these words. Such meaning can only be derived from communications with and about Dr. Al-Timimi on the wide array of subjects raised by the government from making peace with the West to waging violent *jihad* to the meaning of *hijra* to the duties of faithful Muslims after 9-11.

## IV.   THE GOVERNMENT SHOULD CONFIRM THE EXISTENCE OF THE SOUGHT-AFTER DISCOVERY AS A THRESHOLD MATTER.

The government has adopted the most extreme position of secrecy in this case without explaining why cleared counsel cannot review the sealed material under standard rules governing classified information. The Court has previously emphasized that, at a minimum, defense counsel "have a right to have the government affirm or deny that [calls were intercepted]." Hearing, Jan. 28, 2005, at 5.

It is clear that material that should have been disclosed to the defense was not disclosed before trial, including but not limited to the material later discovered by former counsel. The government has accomplished what is expressly forbidden under Classified Information Procedures Act ("CIPA"), 18 U.S.C. App. III (2000). Section 6(c) of the CIPA provides for the very same process advocated by the defense in this case. 18 U.S.C. App. III, § 6(c). Even when a court decides that it may withhold information, the government must supply either "a statement admitting relevant facts that the specific classified information would tend to prove" or "a summary of the specific classified information," so long as the substitute "will provide the defendant with substantially the same ability to make his defense." *Id.* In this way, federal law was designed to guarantee that a "defendant should not stand in a worse position, because of the fact that classified information is involved, then he would without this act." S. Rep. No. 96-823, at 9 (1980), reprinted in 1980 U.S.C.C.A.N. 4294, 4302; *see United States v. Libby*, 467 F. Supp.

-- 19 --

2d 20, 24-26 (D.D.C. 2006); *United States v. Moussaoui*, 382 F.3d 453, 477 (4th Cir. 2004).

In this case, the government has yet to simply confirm the existence of interceptions to allow opposing counsel the opportunity for even a rudimentary argument as to materiality. The defense has offered details that should make such searches of the various government agencies relatively simple. Consider just five calls as examples of clearly material communications that can be searched easily by the government where dates and telephone numbers are known.

1.  Tahir telephone call. On September 13, 2001 at 5:47 p.m., Dr. Al-Timimi spoke to Adel Tahir from his cell phone. The number called was 202-361-7081. This call lastied almost ten minutes was the subject of the Tahir affidavit that offered highly exculpatory information. This communication would have supplied an accurate record of the statements and views of Dr. Al-Timimi.

2.  Al-Hawali telephone calls. On September 19, 2001 at 10:57 a.m., Dr. Al-Timimi called Al-Hawali from his home telephone. Al-Hawali was reached at 966-2-528-1050. This 14-minute conversation addressed a range of highly material subjects, including, but not limited to, their views of 9-11; Dr. Al-Timimi's conversation with Jaafar Idris on September 18, 2001; references to the Kwon dinner on September 16, 2001; the fact that Muslims do not want harm to be done to the American people; securing a trial of Bin Laden through political means; fears of retaliation among American Muslims; and the need to resolve these issues through political means. This call occurred 23 minutes between the documented telephone call between Dr. Al-Timimi and Kwon and 1-2 hours prior to the lunch between Dr. Al-Timimi and Kwon and Hassan – communications at the heart of the later conviction of Dr. Al-Timimi on various counts, including the weapons

-- 20 --

violations. This is precisely the same type of evidence of state of mind that the
government insisted was material and relevant. Indeed, it is far more tailored than
the twelve years of lectures before 9-11 that the government sought to introduce.

3.    Royer/LET Call. As stated at trial, between September 17-20, 2001 (most likely
on September 18, 2001), Royer called LET to discuss sending people to LET.
This call occurred after the Kwon dinner. If Royer discussed *hijra* or other
subjects from the dinner, it would serve to confirm Dr. Al-Timimi's account. It
would also be material if Dr. Al-Timimi was mentioned or omitted in such a key
conversation.

4.    Hasan/Idris Call. As stated at trial, between September 17-20, 2001, Hasan called
Idris. Once again, we have the telephone numbers likely used in these
communications. This call was made to arrange a meeting with Jaafar Idris at the
Borders Bookstore in Bailey's Crossroads. The call itself would contradict
Hasan's rebuttal testimony and rebut the argument by Mr. Kromberg that the jury
should not believe Yosuf Idris, who testified that his father Dr. Jaafar Idris met
Hasan at the bookstore.

5.    Chandia/Al-Timimi Calls. Between December 2001 and January 2002, Dr. Al-
Timimi received e-mails in Saudi Arabia from Chandia in Pakistan. This would
be a prime target for U.S. surveillance programs. When Dr. Al-Timimi called the
first time, he spoke to Chandia's father who is a prominent lawyer and confidant
to Pakistani President Musharraf. In the second call, he spoke to Chandia who
conveyed suggestions from extremists in Pakistan. Dr. Al-Timimi asked Chandia
if he had not been told by Al-Hamdi that Dr. Al-Timimi had told him to tell

-- 21 --

Chandia to stay away from people in LET. This was the subject of a prior

conversation between Dr. Al-Timimi and the FBI in June 2003. It was also the

focus of Andrew Thompson's rebuttal testimony at trial.

These are just five examples of clearly material communication for which the defense can

offer the dates and telephone numbers for any search. As a threshold matter, the government

should be required to confirm to cleared counsel that such interceptions did occur so that

argument can be made on the obvious materiality. This is true for the other individuals and

communications sought by the defense. The government is seeking to prevent defense counsel

from playing any role in articulating the relevance of particular intercepts or communications,

preferring to have the Court perform the function of defense counsel *in camera* on how

important information might be to the defense.

## V.   THE GOVERNMENT SHOULD SUPPLY THE SOUGHT-AFTER DISCOVERY TO THE COURT AND COUNSEL FOR REVIEW UNDER SEAL.

The exclusion of counsel for both the defense and the government from the review of

evidence in the case is inimical to the most fundamental principles of due process and the

adversarial system. The government has notably refused to even supply a confirmation of

interceptions or reports of communications related to Dr. Al-Timimi. Instead, it insists that

unknown individuals will determine what the defense would be able to use in the case as

material. This is squarely at odds with the view that *ex parte* proceedings should be matters of

last resort and, when used extensively as here, threaten the very foundation of the legal system.

*See, e.g., United States v. Rezaq*, 899 F. Supp. 697, 707 (D.D.C. 1995); *United States v. George*,

786 F. Supp. 11, 16 (D.D.C. 1991). As the District of Columbia Circuit has observed, "[i]t is a

hallmark of our adversary system that we safeguard party access to the evidence tendered in

-- 22 --

support of a requested court judgment." *Abourezk v. Reagan*, 785 F.2d 1043, 1060 (D.C. Cir.

1986), affd. 484 U.S. 1 (1987). For that reason the courts have "the firmly held main rule that a

court may not dispose of the merits of a case on the basis of *ex parte, in camera* submissions."

*Abourezk*, 785 F.2d at 1061. In the instant case, it is not even clear if materiality arguments have

been made to the Court in secret. What is clear is that neither defense counsel nor government

counsel have been heard on this critical issue despite their clearances.

The Court previously and repeatedly emphasized that it is not the function of the

government to make these decisions for counsel:

> The Court has to give these [defense] attorneys time to look at and consider that
> information because although the government may believe there's nothing there of any
> value, there may be exculpatory information there especially given the nature of the First
> Amendment issues running through this case.

Hearing, Dec. 30, 2004, at 12. The Court repeated this unwillingness to allow the government to

determine materiality because "what a prosecutor views as potentially *Brady* may not necessarily

capture the full scope because the defense may have a theory of defense that they're not aware of

yet." *Id.* at 13.

In the January 16, 2007 hearing, the Court stressed that disclosure was necessary to allow

for an adversarial process: "Who determines what's relevant? I mean, again, that's why we have

an adversary system. . . . The rule requires that the appropriate categories of information be

turned over to defense counsel. Then they'll rummage through it. It may be in their eyes

important to some theory of defense that, you know, you might not appreciate, I might not

appreciate, but I thought that one of the pretty strong requirements of rule 16 . . ." Hearing, Jan.

16, 2007, at 42. The Court consistently and correctly insisted that the defense should be given

the opportunity to argue what is material:

-- 23 --

material, because I don't represent the defendant, and I don't know exactly the full range of issues that the defense is going to possibly raise. I have a general idea. But our legal system is based on the concept of advocacy in an adversarial system, where both sides are supposed to have sufficient information to be able to represent their clients adequately.

*Id.* at 7. To date, defense counsel has not been able to review a single document sought from the government and materiality decisions have been made exclusively between the Court and an unnamed individual who is not even counsel of record in the case. In a case where a man is facing life in prison, his cleared counsel should be able to make arguments of materiality to the Court based on something more than guesses at what the Court has been shown or what has been omitted in ex parte filings.

### CONCLUSION

For the foregoing reasons, Dr. Al-Timimi respectfully requests the government's motion to quash be denied and the government ordered to answer the discovery request from defense counsel.

Respectfully submitted,

Ali Al-Timimi, Ph.D

By Counsel

Jonathan Turley (*pro hac vice* lead counsel)
2000 H St., N.W.
Washington, D.C. 20052
(202) 994-7001 (phone)
(202) 994-9811 (facsimile)

Bryan Cave LLP
700 Thirteenth Street, N.W., Suite 700
Washington, D.C. 20005-3960
(202) 508-6000 (phone)
(202) 508-6200 (facsimile)

By: _____
William E. Olson (VSB #47251)
Katherine J. Seikaly (VSB #71438)
Dated: November 9, 2007

-- 24 --

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2007, a true and correct copy of the foregoing was serve by

courier upon:

Mr. Gordon Kromberg, Esq.
Assistant United States Attorney
2100 Jamieson Ave.
Alexandria, Virginia 22314-5794

William E. Olson

-- 25 --



JONATHAN TURLEY

J.B. AND MAURICE C. SHAPIRO PROFESSOR
OF PUBLIC INTEREST LAW

September 14, 2007

<u>Via Facsimile Transmission and U.S. Mail</u>
Gordon D. Kromberg, Esquire
Assistant United States Attorney
Eastern District of Virginia
2100 Jamieson Street
Alexandria, VA 22314

Re:    United States v. Al-Timimi, Crim. No. 1:04-385

Dear Mr. Kromberg:

In compliance with the Court's order of August 24, 2007, I am
sending a list of individuals and organizations that are material to the case of
Dr. Ali Al-Timimi.  As discussed before Judge Brinkema, this list has been
narrowed to individuals and organizations clearly material to the case of Dr.
Al-Timimi.  We are seeking confirmation of whether any government
agency has investigatory or surveillance material that was not disclosed to
the defense involving each of these individuals or organizations.  As you
know, there have been a number of previously undisclosed intelligence
operations revealed in the last two years, including but not limited to the
National Security Agency's (NSA) domestic surveillance program.

The information sought by the defense falls within the scope of Fed.
R. Crim. P. 16 and <u>Brady v. Maryland</u> and its progeny.  This information
includes surveillance and documentary records as well as any reports, notes,
grand jury transcripts, summaries, photographs, documents, statements,
tapes, electronic communications (including emails, email headings, and
instant messages), or other tangible evidence in the possession of the United
States government, including such material received from foreign or non-
government sources.  The material sought may be stored in audio, electronic,
video, photographic or written format.  If the government refuses to turn
over any material on the basis of either materiality objections or privilege
claims, we ask that you confirm the possession of the withheld evidence and
give a summary description so that we may address the matter with the

THE GEORGE WASHINGTON UNIVERSITY LAW SCHOOL
2000 H STREET, NW • WASHINGTON, DC 20052 • 202-994-7001 • 202-994-9811

EDVA CR-04-385, (254) Consent Motion for an order to unseal a redacted version of his opposition to Gov's motion to quash    Page 32

court.

These requests obviously involve all interceptions or records of statements made by Dr. Al-Timimi. As the Court stressed on December 3, 2004( Docket Number 144), such statements have great probative value "because the statements of the defendant are important windows into that person's intent." The Court went on to reaffirm that "the intent of the defendant is going to be a critical factor in this case, and obviously statements that a defendant makes are a very significant piece of evidence as to intent." We are seeking any communications made to these individuals by Dr. Al-Timimi or any such statements or positions related to Dr. Al-Timimi that they have referenced in their own communications. These include all of the subjects discussed at trial, including but not limited to Dr. Al-Timimi's views on peace, *jihad*, *hijra*, Al Queda, Osame Bin Laden, the 9-11 attacks, the work of Dar al-Arqam, Mullah Omar, the Taliban, terrorism, Afghanistan, accused terrorists, Solimon Al-Buthe, Zacharias Moussaoui, lashkar-e-Taiba or LET, Kashmir, Dr. Safar Al-Hawali, Muslims dealing with the West or the American government, conferences discussing terrorism or 9-11, the Virginia Jihad Network, the paintball defendants, and charities like Al-Haramain and the Islamic Assembly of North America. The defense should have a complete record of any material that relates to Dr. Al-Timimi in the possession of the government from prior terrorism investigations.

We are seeking the aforementioned material as it relates to any of the following categories. We have supplied a brief description of the individual or organization to assist you in your inquiry. We would be happy to supply additional information if needed to complete your search of government records and files.

1.    **Dr. Ali Al-Timimi.** Any of the previously defined material that references or involves Dr. Al-Timimi or the underlying alleged conspiracy or conspirators. This includes but is not limited to any communications involving Ali Asad Chandia, Seifullah Chapman, Randall "Ismail" Royer, Hammad Abdur-Raheem, Ibrahim al-Hamdi, Masoud Kahn, Yong Ki Kwon, Khwaja Hasan, Nabil Gharibieh, or the other alleged members of the Virginia Jihad or paintball conspiracy or their underlying activities. Dr. Ali Timimi made dozens of calls that discussed 9-11 and how Muslims should react to that tragedy as well as other relevant subjects. Many of these were calls with an international component from Bosnia, Saudi Arabia, Australia, England and other countries.

2.   **Dr. Safar Al-Hawali.** Any of the previously defined material that references or involves Dr. Al-Timimi or the underlying alleged conspiracy or conspirators. This includes, but is not limited to any material that references Dr. Al-Timimi, Ali Asad Chandia, Seifullah Chapman, Randall "Ismail" Royer, Hammad Abdur-Raheem. Ibraham al-Hamdi, Masoud Kahn, Yong Ki Kwon, Khwaja Hasan, Nabil Gharibieh, or the other alleged members of the Virginia Jihad or paintball conspiracy or their underlying activities. These calls were made to Mecca, Saudi Arabia in 2001 and 2002. These communications include, but are not limited to, the following examples:

    a.   Communications discussing Dr. Al-Timimi's meeting on September 18, 2001 with Dr. Jaafar Idris and Yusuf Idris.

    b.   Communications on September 19, 2001, including but not limited to a call that occurred only 23 minutes before Dr. Al-Timimi's first call to Kwon and 1-2 hours prior to Dr. Al-Timimi's lunch with Kwon and Hasan prior to their departure.

    c.   Communications with Dr. Al-Timimi on how Muslims should respond to 9-11 and the need for *hijra* (migration).

    d.   Conversation in March 2002, during which Dr. Al-Timimi and Dr. Al-Hawali discussed assisting Moussaoui in his defense and the moral dilemma of helping an accused terrorist.

    e.   Communications in October 2002, including but not limited to a telephone call between Dr. Al-Timimi and Dr. Al-Hawali in which they discussed reaching out to President Bush and Congress to try to bridge the divide between the Western and Islamic worlds, particularly to avoid war in Iraq. Osama Bin Laden and the need for international conferences were also discussed during this call. There was an initial call to Nihad Awad to reach Dr. Al-Hawali to set up this call.

3.   **Mr. Soliman Al-Buthe** (Riyadh, Saudi Arabia). Any of the previously defined material that references or involves Dr. Al-Timimi or the underlying alleged conspiracy or conspirators. This includes, but is not limited to any material that references Dr. Al-Timimi, Ali Asad Chandia, Seifullah Chapman, Hammad Abdur-Raheem, Randall "Ismail" Royer, Ibraham al-Hamdi, Masoud Kahn, Yong Ki Kwon, Khwaja Hasan, Nabil Gharibieh, or the other alleged members of the Virginia Jihad or paintball conspiracy or their underlying activities. These calls were made to Mecca, Saudi Arabia in 2001 and 2003. We believe that there were at least 100 such calls in 2002 alone as well as hundreds of emails and facsimile

-- 3 --

transmissions. These communications include, but are not limited to, the following examples:

  a.  Communications in 2002 discussing papers created with Dr. Al-Timimi's direction or supervision dealing with the United States and its relationship to the Muslim world. These include communications referencing papers by Mr. Amir Butler of Australia, Mr. Ismail and Dr. Bassem Khafagi (who was referenced in the search warrant and interviewed by the FBI).

  b.  Communications discussing Dr. Al-Timimi's assistance of Hasan and Chandia.

  c.  Communications regarding Dr. Al-Timimi's work on white papers entitled "How Can We Co-Exist" and "What are we Fighting For?," including drafts sent by facsimile transmission of these papers.

  d.  Communications between Dr. Al-Timimi and Dr. Al-Buthe in the Fall 2002 regarding discussions with Congress, international conferences to address attacks on Muslims, and the Iraq War.

  e.  Communications in 2003 and 2004 addressing the Shuttle disaster and reaching out to Congress and the American people.

  f.  Communications relating to U.S. evangelical attacks on Islam as well as discussion of charities like Al-Haramain and coordinating efforts with Dr. Al-Hawali and Dr. Idris.

  4.  **Paintballers/Virginia Jihad.** Any of the previously defined material that references or involves Dr. Al-Timimi or the underlying alleged conspiracy or conspirators. This includes, but is not limited to any material that references Dr. Al-Timimi, individuals associated with the "paintballers" or "Virginia Jihad" including, Ali Asad Chandia, Seifullah Chapman, Randall "Ismail" Royer, Hammad Abdur-Raheem, Ibrahim al-Hamdi, Masoud Kahn, Yong Ki Kwon, Khwaja Hasan, Nabil Gharibieh or the other members of the Virginia Jihad. These calls include, but are not limited to, the following examples:

  a.  Communications relating to their paintball activities.

  b.  Communications relating to traveling abroad after 9-11.

  c.  Communications relating to Dr. Jaafar Idris or Mr. Yusuf Idris.

  d.  Communications by Royer to LET in September 2001.

  e.  Communications of the aforementioned individuals from Pakistan or to Pakistan from September 2001 to March 2002.

--4--

f.   Communications from Hasan while in the United States to
     Kwon in Pakistan and Korea.

5.   **Yusuf Idris and Jaafar Idris.** Any of the previously defined
material that references or involves Dr. Al-Timimi or the underlying alleged
conspiracy or conspirators.  Of particular importance are any
communications before or after the dinner with Kwon in September 2001.
The calls to Yosuf and Jaafar Idris were matters raised before and at the trial
of Dr. Al-Timimi.  These material issues include, but are not limited to,
discussions of 9-11, Dar Al-Arqam, Kwon, Hassan, Nabil Gharibieh, Royer,
Al-Hawali, Al-Buthe, the Virginia Jihad allegations, Muslims traveling
abroad after 9-11, and Muslim response to 9-11.

6.   **Ammar Ammonette.** Any of the previously defined material
that references or involves Dr. Al-Timimi or the underlying alleged
conspiracy or conspirators.  As associate of Dr. al-Hawali, these calls were
made to Saudi Arabia from 2001 to 2003.  These communications include e-
mails that may have originated from or were directed to the following e-mail
addresses: amar_colo@hotmail.com or ammarcolo@hotmail.com).  These
communications include discussions of subjects ranging from Dr. Al-
Timimi's work in the United States to Bin Laden to the Muslim response to
9-11, and communications to both President Bush and Congress.
     Ammar Ammonette performed a coordinating role vis-à-vis Dr. Al-
Hawali and Dr. Al-Timimi.  However, some of these calls are just between
Dr. Al-Timimi and Mr. Ammonette.

7.   **Anwar Al-AuLaqi.** Any of the previously defined material that
references or involves Dr. Al-Timimi or the underlying alleged conspiracy
or conspirators.  AuLaqi met with Dr. Al-Timimi at his house in October
2002 to discuss his reaction to 9-11, the congressional letter, and other
individuals later associated with his trial.  Telephone calls were made to Dar
Al-Arqam and to Dr. Al-Timimi's home.  We also ask for any reports or
notes generated in connection with AuLaqi's visit to Dr. Al-Timimi's home
in October 2002 when he was accompanied by Nabil Gharibieh and Rubeel
Iqbal.

8.   **Bassem Khafagi.** Any of the previously defined material that
references or involves Dr. Al-Timimi or the underlying alleged conspiracy
or conspirators.  Khafagi and Al-Timimi discussed his views of 9-11 and
other issues relevant to his trial.

-- 5 --

9.      **Adel Tahir.** Any of the previously defined material that references or involves Dr. Al-Timimi or the underlying alleged conspiracy or conspirators. Adel Tahir specifically spoke with Dr. Al-Timimi between 9-11 and the dinner with Kwon. The FBI prepared at least one 302 on his involvement. There were multiple calls between Dr. Al-Timimi and Tahir in September 2001, including repeated calls on September 13th.

10.     **Mohammad Al-Kahtami.** Any of the previously defined material that references or involves Dr. Al-Timimi or the underlying alleged conspiracy or conspirators. Dr. Al-Timimi spoke with Kahtami before and after 9-11 on issues related to his trial.

11.     **Counsel** communications. Any of the previously defined material that references or involves Dr. Al-Timimi or the underlying alleged conspiracy or conspirators. At least one telephone call involving Ashraf Nubani and Royer was intercepted by the government. Other counsel included Martin MacMahon, Alan Yamamoto, and Edward MacMahon.

12.     **Center for Islamic Information and Education** also know as **Dar al-Arqam** in Falls Church, Virginia. Any of the previously defined material that references or involves Dr. Al-Timimi or the underlying alleged conspiracy or conspirators.

13.
If any of these individuals, organizations, references or terms are unclear, I hope that you will not hesitate to contact me.

Thank you for your assistance in this matter.

Sincerely,

Jonathan Turley
Counsel to Dr. Ali Al-Timimi

cc:     William E. Olson, Esq.
        Kate Seikaly, Esq.

-- 6 --