# EXHIBIT 2
# Part 2 of 3

January 2004, the United Nations imposed sanctions on the Al-Haramain offices in Indonesia, Pakistan, Kenya and Tanzania, requiring member nations to impose a travel ban, arms embargo and asset freeze on those entities. The Al-Haramain offices in Bosnia-Herzegovina and Somalia were placed on this same list by the U.N. in March 2002.

26.　I have learned 'Aqeel Abdul-Aziz Al-'Aqeel, the general manager of the Al-Haramain Foundation in Saudi Arabia and the President of AHIF, Inc. here in Oregon, was recently fired from his position in Saudi Arabia. The Wall Street Journal reported on Friday, January 9, 2004, that the Saudi Government removed Al-'Aqeel from his position and the Al-Haramain Foundation had been the subject of intense investigation by the U.S. for possible terrorist links, with several of its regional branches being shut down by U.S. and Saudi officials.

27.　The Washington Post reported in April of 2003 that in a Russian Federal Security Service internal memo, Al-Haramain's director (Aqeel) was accused of exchanging a message with Arab commanders in Chechnya in which he reportedly stated, "Today, AlHaramain has $50 million for the needs of the mujaheddin". However, Aqeel denied allegations that AlHaramain offices used charitable donations to finance terrorist activities and stated, "We do not have any relationship with any terrorist activities. We work under the supervision of the Saudi government."

28.　During the investigation, information was found on an Al-Haramain website, www.alharamain.org, which showed The Al-Haramain Islamic Foundation in Saudi Arabia strongly supported the cause of the mujahideen fighters in Chechnya in 1999 and 2000. Information on their website included reports and articles about the mujahideen in

Affidavit in Support of Search Warrant - Page 11

Chechnya. One report titled "The Latest News About The Jihaad in Chechnya" appeared to give specific information to its readers about the battles between the Russian forces and the mujahideen in Chechnya. An article written by the editor of Al-Haramain, Riyadh's website, dated January 2000, appears to include prayers for the Mujahideen and reads, in part, as follows:

> "My Muslim Brother: Help from you towards us, would be that you raise your hands towards the heavens on a regular basis and make Du'aa to Allah for us and beseech Him, with the following Du'aa:
>
> O Allah! Who sent down The Book...Who makes the clouds drift; Who defeats the armies....Defeat Russia! O All Mighty! O All Powerful! O Allah Indeed we ask that You Scatter their firing, and Shake the earth beneath their feet, and Strike fear in their hearts. O Allah! Cripple their limbs and Blind their sight, and send upon them an epidemic and calamities. O Allah! Separate their gatherings and Scatter their unity, and make their condition severe amongst themselves, and make their plots go against them, and show us in them the amazements of your Power, and make them a lesson for those who do not learn lessons. O Allah! Hurry their destruction, and make their wealth as booty for the Muslims.
>
> O Allah! Aid our Mujaahideen brothers in Chechnya. O Allah! Unify their rows, and gather them on the word of truth. O Allah! Aim their firing and strengthen their determination, and make their feet firm, and

Affidavit in Support of Search Warrant - Page 12

descend upon them tranquility, and satisfy their hearts and guide them to that which is all good. O Allah! Make for them from Yourself an authority, and aid them with the army from Yourself, for to You belong the armies of the heavens and the earth, O Lord of the Worlds. May Salaah and Salaam be upon the Messenger of Allah and upon all his followers and companions. And thusly we pray for all those fighting to protect the honor of Allah's Deen and the protection of the Muslimeen, Aameen, Aameen, Aameen."

## VIOLATION OF TITLE 31 USC §5324

29.    After Mahmoud T El Feki wired approximately $150,000 from London, England to an AHIF, Inc. bank account in Ashland, Oregon on February 24, 2000, U.S. Immigration and Customs Enforcement records show ALBUTHE entered the U.S. from the Kingdom of Saudi Arabia. As documented on immigration form I-94 number 35584030208, ALBUTHE flew into John F. Kennedy (JFK) International Airport in New York on March 7, 2000 and was admitted under admissions code B1, visitor for business. ALBUTHE identified himself on the form as a Saudi Arabian citizen with passport number B049614, a date of birth of December 8, 1961, and claimed a visiting United States address of 1257 Siskiyou Blvd., 212 in Ashland, Oregon.[4]

30.    Bank records show on March 10, 2000 ALBUTHE obtained a portion of the funds El-Feki wired to AHIF, Inc. by purchasing one hundred thirty (130) $1,000 American Express Travelers checks. Al-Haramain had to pay a total of $1,300 to the Bank of

---

[4] As stated above, this is a private mailbox facility utilized by SEDA and AHIF, Inc.

Affidavit in Support of Search Warrant - Page 13

America for the purchase of the travelers' checks. The funds used to purchase these traveler's checks and the bank fees were both withdrawn from AHIF, Inc. account number 2880311561 in Ashland, Oregon. Bank records show that the only two signers on AHIF, Inc. account number 2880311561 are Pete SEDA and Soliman ALBUTHE. Information provided by a Bank of America employee indicates that ALBUTHE came into the Ashland branch on March 10, 2000 with SEDA and SEDA'S son, Jonah, to purchase the traveler's checks.

31.     The bank employee was told by SEDA that they would like to negotiate a check out of the foundation's account for $130,000 worth of traveler's checks in certain denominations. The bank employee told SEDA the bank did not have enough of those denominations and the bank employee tried to convince SEDA to take a cashier's check instead. SEDA said he could not take a cashier's check because the money was to help people and a lot of times these people may not be able to negotiate a cashier's check. Ultimately, the bank employee issued one hundred thirty (130) $1,000 American Express Traveler's checks to ALBUTHE.

32.     Bank records also show that on March 11, 2000 the remaining funds El-Feki wired to AHIF, Inc. were obtained by SEDA through the purchase of a $21,000 Bank of America cashier's check, check number 1001040568. Information provided by a bank employee with Bank of America in Ashland shows SEDA came into the bank's Ashland branch on March 11th to purchase the cashier's check and authorized the check to be issued to ALBUTHE.

33.     Additional records provided pursuant to grand jury subpoena indicate that the $21,000 withdrawn from the AHIF, Inc. account by ALBUTHE and SEDA were intended to

Affidavit in Support of Search Warrant - Page 14

be distributed to persons in Chechnya. These records include a copy of the $21,000 cashier's check payable to ALBUTHE, with the notation, "Donations for Chichania Refugees" handwritten on the front of the check.

34. I have examined copies of two agreements provided under subpoena by Al-Haramain in Oregon. The agreements are between "Soliman" (who I believe to be Soliman Al-Buthe), and "Abu Yunus" (which I know through this investigation is an alias or Muslim name used by Pete SEDA). Both of the agreements appear to have been signed by ALBUTHE and SEDA, dated 4th of Thul Hijjah, 1420.[5] Both agreements state in part that SEDA was turning all monies over to ALBUTHE for the "Brothers and Sisters in Chechnya" and that Abu Yunus was relieved of all responsibilities for the money.

35. The two agreements are slightly different. One states ALBUTHE received $188,465 and contains, in addition to the signatures of SEDA and ALBUTHE, the signatures of two unidentified witnesses. The second agreement, however, states ALBUTHE received $186,644.70, lists a second handwritten date of March 11, 2000, and contains the notation "I deposit the amanet [6] in Alharamain head office for Chechenya Refugees", and appears to have been signed a second time by ALBUTHE.

36. U.S. Immigration and Customs Enforcement records show that on March 12, 2000 ALBUTHE left the United States from JFK International Airport in New York on Saudi Arabian flight 38, as documented on immigration form I-94 number 35584030208. An inspector for Customs and Border Protection determined that on March 12, 2000, Saudi

---

[5] The 4th of Thul Hijiah, 1420 is from the Islamic Calendar, which translated means approximately the 11th of March, 2000.
[6] I have learned from an FBI translator that the word "amanet" in Arabic translates to the phrase "something entrusted with".

Affidavit in Support of Search Warrant - Page 15

Arabian flight 38 flew from New York, New York to Riyadh, Saudi Arabia, connecting to Dhahran.

CMIR REQUIREMENTS:

37. From my training and experience, I know that Currency and Monetary Instrument Reports (CMIR's) are used by government agencies, including the IRS, to track currency and other monetary instruments coming into and leaving the U.S. Based on the training and experience of ICE Special Agent Robert Priddy and his conversations with other experienced ICE Special Agents, I also understand the following regarding the laws relating to CMIRs:

38. CMIR reporting requirements are imposed by U.S. Treasury regulations promulgated at Title 31 C.F.R. §103.23, pursuant to Title 31 U.S.C. §5316. In summary, the requirements mandate that any person physically transporting currency or certain monetary instruments, including traveler's checks in any form, in an aggregate amount exceeding $10,000 at any one time, into or out of the United States, must file a CMIR with United States Customs and Border Protection. A review of a CMIR shows that it requires the person filling out the report to provide, in part, information pertaining to the person's identity, information about the exportation or importation of funds, information about the person's business on whose behalf importation or exportation was conducted, information about the type and amount of currency and/or monetary instruments, and the signature of the person completing the report.

39. Title 31 U.S.C. §5324 provides in most pertinent part:

(c) International monetary instrument transactions. No person

Affidavit in Support of Search Warrant - Page 16

000153

    shall, for the purpose of evading the reporting requirements of section 5316— (1) fail to file a report required by section 5316, or cause or attempt to cause a person to fail to file such report;...

  (d) Criminal penalty.— (1) In general.--- Whoever violates this section shall be fined in accordance with title 18, United States Code, imprisoned for not more than 5 years, or both. (2) Enhanced penalty for aggravated cases.— Whoever violates this section while violating another law of the United States or as part of a pattern of illegal activity involving more than $100,000 in a 12 month period shall be fined twice the amount provided in subsection (b) (3) or (c) (3) (as the case may be) of section 3571 of title 18, United States Code, imprisoned for not more than 10 years, or both.

40. The elements of a CMIR violation charged under Title 31 U.S.C. § 5324 most pertinent to this case are:

  (a) The violator transported, shipped, or mailed-or attempted to transport, ship, or mail-currency or other reportable monetary instruments into or out of the United States, or the violator received in the United States currency or other reportable monetary instruments transported, shipped, or mailed from abroad;

  (b) The value of the currency or other reportable monetary instruments

Affidavit in Support of Search Warrant - Page 17

000154

     involved in the violation exceeded $10,000 U.S. in an aggregate amount at any one time; and

  (c) The violator acted for the purpose of evading the requirements by failing to file a report, or causing another to fail to file a report, when required to do so.

41. As stated above, U.S. Immigration and Customs Enforcement records show ALBUTHE left the United States from JFK International Airport in New York on Saudi Arabian flight 38 on March 12, 2000. Officials at ICE informed me that no CMIRs were found related to this departure, nor did ALBUTHE ever file a CMIR reporting that he took the $130,000 in traveler's checks out of the country.

42. Immigration Forms 94 obtained by U.S. Immigration and Customs Enforcement show between October 1997 and April 2001, ALBUTHE crossed the United States border at least thirteen times. During this time period, ALBUTHE filed nine (9) CMIRs, showing he transported a total of $777,845 into the United States. From the nine CMIRs filed by ALBUTHE, seven of them were filed based on ALBUTHE'S transportation of traveler's checks. The filing of nine CMIRs by ALBUTHE, unrelated to the financial transactions detailed earlier in this affidavit, shows that he knew he was required to file the CMIR form while transporting currency or monetary instruments, including traveler's checks, into the United States.

43. A CMIR clearly states on its face that it is required to be filled out by anyone departing or entering the United States, or a person shipping, mailing, or receiving currency or monetary instruments. In addition, the general instructions to the form state

Affidavit in Support of Search Warrant - Page 18

that persons who must file the form are each person who physically transports, mails, or ships, or causes to be physically transported, mailed, or shipped currency or other monetary instruments in an aggregate amount exceeding $10,000 at one time from the United States to any place outside the United States or into the United States from any place outside the United States.

44.    I have reason to believe that ALBUTHE speaks, reads, and/or writes English and therefore was aware of the requirement to report funds exceeding $10,000 while departing the U.S. In addition to filling out CMIRs on nine prior occasions, the investigation has shown that ALBUTHE appears to have written, "I deposit the amanet in Alharamain head office for Chechenya Refugees", on an agreement between him and SEDA and then signed the agreement. A document containing e-mails that was provided by AHIF, Inc., pursuant to a grand jury subpoena also indicates that ALBUTHE reads English. The e-mails were conducted between SEDA and other individuals in English and ALBUTHE appears to have received a carbon copy (Cc:) of these e-mails.

45.    I have attempted to learn the disposition of the $130,000 in traveler's checks and the $21,000 cashier's check obtained by ALBUTHE from AHIF, Inc. funds. An analysis of the American Express Travelers checks indicates ALBUTHE cashed the traveler's checks on approximately March 25, 2000 at Al Rajhi Banking and Investment in the Kingdom of Saudi Arabia.

46.    An analysis of the $21,000 cashier's check ALBUTHE received from SEDA shows the check was deposited into an Al Rajhi Banking and Investment account in the Kingdom of Saudi Arabia. A date for the deposit could not be established due to illegible

Affidavit in Support of Search Warrant - Page 19

bank stamps found on the back of the check, however Arabic markings on the check indicate that the cashier's check was deposited in what appears to be a personal account for ALBUTHE at Al Rajhi Banking and Investment.

47. In summary, I believe there is probable cause to believe that ALBUTHE knowingly failed to file a CMIR when he departed the U.S. on March 12, 2000 with the one hundred thirty (130) $1,000 American Express Traveler's checks. I believe that because SEDA assisted ALBUTHE with the purchase of the traveler's checks, and that the agreements pertaining to the turning over of these funds to ALBUTHE appear to have emanated from AHIF, Inc. in Ashland, Oregon, it is likely additional evidence of the CMIR violation may be located at 3800 S. Highway 99, where I believe AHIF, Inc. has conducted most of its business affairs. Further, since it appears that SEDA and ALBUTHE have attempted to conceal the movement of funds to Chechnya, as more fully described below, there may other similar transactions conducted which we have not yet detected. Therefore, I request authorization to search for evidence of all financial transactions conducted between October 1997 and February 2003 which involved cash, traveler's checks, cashier's checks or money orders, and the individuals or entities set forth in attachment B, for indications of additional CMIR violations.

VIOLATION OF TITLE 26 U.S.C 7206(1)

48. The second violation to be established in this affidavit is the willful filing of a false tax return by SEDA with the IRS for the year 2000. Support for this violation is as follows.

49. IRS records show that SEDA filed a 2000 Form 990, *Return of Organization*

Affidavit in Support of Search Warrant - Page 20

*Exempt From Income Tax,* in October of 2001 on behalf of AHIF, Inc. AHIF, Inc.'s accountant, Thomas J. Wilcox, Certified Public Accountant (CPA), stated that he prepared AHIF, Inc.'s 2000 Form 990 in his office in Medford, Oregon. Accountant Wilcox also told me that the return bared his signature and the signature of SEDA and that SEDA signed the form in his accounting office before the returns were filed with the IRS via certified mail.

**FILING REQUIREMENTS:**

50.    From my experience and from consulting with experienced exempt organization specialists within the IRS, I know that, under the Internal Revenue Code, tax-exempt public charities are required to file annual information returns with the IRS on Form 990, *Return of Organization Exempt From Income Tax,* if their gross receipts during the year exceed $100,000.

51.    Similar to for-profit entities, tax exempt entities are subject to audit by the IRS. If upon review of the organization's Form 990 and backup documentation, the IRS determines the organization is not operating consistently with its tax-exempt purpose, then the IRS may revoke the tax exemption, or impose excise taxes based on the nature and severity of the violation. Once an organization loses tax-exempt status, its total revenues are subject to federal income taxation, based upon its business form (i.e. corporation, partnership, or sole proprietorship).

52.    From my experience, I know that under Title 26 U.S.C. § 7206(1), any person who willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000

Affidavit in Support of Search Warrant - Page 21

($500,000 in the case of a corporation), or imprisoned not more than 3 years, or both, together with the costs of prosecution.

53. The elements of Title 26 U.S.C. § 7206(1) are:

(a) The taxpayer made and subscribed a return, statement, or other document;

(b) The return, statement, or other document contained a written declaration that it was made under the penalties of perjury;

(c) The taxpayer did not believe the return, statement or other document to be true and correct as to every material matter; and

(d) Willfulness.

54. In AHIF, Inc.'s 2000 Form 990, I believe SEDA attempted to disguise the true disposition of the $150,000 that AHIF, Inc. received from Mahmoud El-Fiki in February of 2000, as described above, in order to prevent law enforcement and/or the IRS from scrutinizing the transaction. SEDA disguised the true disposition of the funds received from El-Fiki by causing the omission of AHIF, Inc.'s receipt of some of the funds and mischaracterizing the utilization of the remaining funds, as explained in detail below.

55. Accountant Wilcox said he first met SEDA in December of 1999 and from his first meeting with SEDA, SEDA told him that he thought the AHIF, Inc. and/or himself would be scrutinized by the U.S. government. Accountant Wilcox said SEDA believed his phones had been tapped for over ten years because the U.S. government thinks all Muslims are Bin Laden followers, but SEDA said this is far from the truth. Therefore,

Affidavit in Support of Search Warrant - Page 22

SEDA told Accountant Wilcox that the books had to be right and clean, because if they are not, AHIF, Inc. will be audited.

56. Accountant Wilcox said the original records and backup documentation for AHIF, Inc. are maintained at the organization's facility at 3800 S. Highway 99 in Ashland. Accountant Wilcox estimated that he has been to AHIF, Inc.'s Ashland facility about four times and the last time he was there was on January 13, 2003, prior to SEDA's departure from the U.S. Accountant Wilcox recalled the Ashland facility contained a downstairs office with two computers, filing cabinets, and banker boxes full of records. Accountant Wilcox told me that AHIF, Inc. used a software accounting program called Quickbooks for the organization's financial transactions and this program was contained in a computer located against the far wall in the downstairs office at 3800 S. Highway 99 in Ashland. Accountant Wilcox said he trained two women named "Laleh" and "Sumer" at 3800 S. Highway 99 in Ashland on how to use the Quickbooks software program.

57. Accountant Wilcox said these two women categorized and input the income and expense items into the AHIF Inc.'s Quickbooks program, while SEDA oversaw them, and they called Wilcox if they had any questions. Accountant Wilcox stated that SEDA told him several times to make sure these women knew the program and to ensure the records were clean. I have attempted to interview Laleh and Sumer by asking them on June 23, 2003 to telephone me to arrange an appointment. Neither of the two women ever contacted me, and I have reason to believe they no longer reside or work at 3800 S. Highway 99, Ashland, Oregon. I have been unable to contact them since June 2003.

58. Accountant Wilcox said he prepared AHIF, Inc.'s returns using information provided by SEDA, which included AHIF, Inc.'s bank statements, bank reconciliation

Affidavit in Support of Search Warrant - Page 23

000160

statements, and summaries from their Quickbooks accounting program. Accountant Wilcox said that with a Quickbook's disk, it is possible for him to get a full detailed income and expense printout for each year. However, he said the transaction details for 1999 and 2000 are no longer available for review because SEDA told him that AHIF, Inc.'s computer crashed in October of 2001.

59.     In an interview with Accountant Wilcox, I showed him several documents pertaining to the apparent disposition of the $150,000 AHIF, Inc. received from El-Fiki in February of 2000, as described in this affidavit. These records included bank documents pertaining to the purchase of the $130,000 in traveler's checks by ALBUTHE, bank documents pertaining to the purchase of the $21,000 cashier's check by SEDA, copies of the two agreements provided by AHIF, Inc. between ALBUTHE and SEDA stating monies were being turned over to ALBUTHE for the Brothers and Sisters in Chechnya, and a copy of the check provided by AHIF, Inc. with the notation, "Donations for Chichania Refugees". After reviewing this documentation, Accountant Wilcox said SEDA did not provide him any records indicating these funds were being sent to Chechnya. He said if he had known about the disposition of the funds in Chechnya, he would have prepared the 2000 Form 990 differently.

60.     Accountant Wilcox stated the information he received from SEDA pertaining to the disposition by AHIF, Inc. of the $131,300 showed the funds were used to purchase the Springfield, Missouri prayer house, described earlier in this affidavit. I have reviewed AHIF, Inc.'s Quickbooks Springfield, Missouri building schedule, which was provided to Accountant Wilcox for preparation of the organization's 2000 Form 990. The schedule shows SEDA, or one of his associates, improperly listed the $131,300 disbursement to

Affidavit in Support of Search Warrant - Page 24