# EXHIBIT 2
# Part 3 of 3

ALBUTHE as funds used to purchase the Springfield prayer house, showing a total purchase price of $461,541.74.

61.  I have obtained the closing records from the purchase of the Springfield, Missouri prayer house and I reviewed those records with Accountant Wilcox. The closing documents show that AHIF, Inc. purchased the property for $378,291.74, not for the $461,541.74 SEDA reported to AHIF, Inc.'s accountant. Thus, SEDA or his associates appear to have deceived AHIF, Inc.'s accountant by providing the accountant with information which overstated the purchase price of the Springfield, Missouri property by over $80,000. In addition, Accountant Wilcox stated that based on conversations he had with SEDA, it was his understanding that the $21,000 issued to ALBUTHE were funds going back to the original contributor. I have reviewed AHIF, Inc. Quickbook's detail schedule for reimbursed expenses provided to Accountant Wilcox for the preparation of the organization's 2000 Form 990. The detail schedule for reimbursed expenses shows SEDA, or someone assisting him and AHIF, incorrectly listed the $21,000 as a reimbursed expense, rather than as funds being distributed to Chechnya.

62.  After reviewing the aforementioned documents with Accountant Wilcox, he stated the contribution income on AHIF, Inc.'s 2000 Form 990 appears to be understated due to the $21,000 that was disbursed to ALBUTHE and backed out of contribution income. In addition, Accountant Wilcox stated that grants and allocations on AHIF, Inc.'s 2000 Form 990 appears to be understated by over $150,000, due to the disbursement of the funds to ALBUTHE for apparent distribution in Chechnya. Lastly, Accountant Wilcox stated that the cost basis in the Springfield, Missouri prayer house may be overstated due to the fact that the $131,300 disbursed to ALBUTHE for distribution in Chechnya should

Affidavit in Support of Search Warrant - Page 25

not have been added to the cost basis of the asset.

63.    In summary, I believe there is probable cause to believe that the 2000 Form 990 filed by SEDA on behalf of AHIF, Inc. is materially false. Based on various documents described above and information provided by AHIF, Inc.'s accountant, I believe that the following line items on AHIF, Inc.'s 2000 Form 990 are materially false:

- a)  Line 1a is false, in that AHIF, Inc.'s contribution income is understated by at least $21,000;
- b)  Line 22 is false, in that grants and allocations are understated by at least $150,000;
- c)  Line 57a is false, in that the organizations basis in land, buildings, and equipment is overstated by the incorrect addition of the $131,300, which appears to have been disbursed to ALBUTHE for distribution in Chechnya.

64.    Based on the evidence described above, I believe SEDA deliberately attempted to mislead the IRS about the true disposition of the funds received from El-Fiki and given to ALBUTHE. SEDA attempted to disguise the disposition of these funds by causing AHIF, Inc.'s accountant to omit $21,000 from the organization's contribution income, thus allowing the distribution of these funds to ALBUTHE without having to account for the funds on the Form 990. In addition, SEDA mischaracterized the disposition of the $131,300 to ALBUTHE by falsely claiming that the funds were used to purchase the Springfield, Missouri prayer house.

65.    I have consulted with IRS tax exempt experts regarding the false reporting of

Affidavit in Support of Search Warrant - Page 26

the disposition of funds by a tax exempt charitable organization, in the manner shown above. A tax exempt expert has informed me that if a tax exempt charitable organization's Form 990 was false in this regard, then AHIF, Inc.'s tax exempt status may be questioned and/or revoked. If AHIF, Inc.'s status was revoked, AHIF, Inc. would be responsible for paying U.S. taxes and would more likely be scrutinized by the IRS, including IRS Criminal Investigation and other law enforcement agencies.

## LIKELIHOOD OF RECORDS BEING FOUND AT LOCATION

66. The investigation has established SEDA left the U.S. for Saudi Arabia in February of 2003. SEDA told an FBI special agent that he planned on returning to the U.S. on March 11, 2003 or March 12, 2003. Flight records retrieved and analyzed by agents involved in the investigation show SEDA has not returned to the U.S. Currently, there does not appear to be any business or religious activities at 3800 S. Highway 99. The front gate has often been padlocked since SEDA's departure. I know that Pete SEDA's son, Jonah Seda, left the United States in December 2003, but has recently returned and appears to be residing at 3800 S. Highway 99, Ashland, Oregon. Property records reflect that AHIF, Inc. still owns the property. Information received from Pacific Power indicates that the utilities at 3800 S. Highway 99, Ashland, Oregon are still in the name of Al-Haramain and that the last payment was received on January 21, 2004.

67. Although SEDA presently remains abroad, I have reviewed evidence that shows AHIF, Inc. is still operating in Oregon. First, according to a representative of The Mail Stop, a private mail service in Ashland, Oregon, AHIF, Inc. is still actively using its private mail box and the organization's mail is being retrieved regularly by, among others,

Affidavit in Support of Search Warrant - Page 27

Jonah Seda. This representative also stated that Pete SEDA, by way of e-mail, renewed AHIF's private mail box at the Mail Stop for another six months on Februuary 6, 2004. Secondly, AHIF, Inc.'s bank records show that, even though SEDA left the U.S. in February of 2003, the organization is still conducting limited, but continuous bank activity. Bank records show deposits and disbursements from AHIF, Inc.'s main account in Ashland, Oregon continued until June 2003, which indicates AHIF, Inc. was active after SEDA left the U.S. Third, according to Unicom, an internet service provider, Unicom provided internet service to 3800 S. Highway 99, Ashland, Oregon until February 10, 2004, at which time service was canceled. Fourth, according to a representative of Qwest, as of February 10, 2004, there were four active telephone numbers associated with Pete SEDA at 3800 S. Highway 99, Ashland, Oregon.

68. An attorney representing AHIF, Inc. in Oregon has provided me with a great deal of records in response to a Grand Jury subpoena issued to the organization, and has invited the IRS to review additional records. However, I believe there may be additional items at 3800 S. Highway 99, Ashland, Oregon which neither SEDA nor anyone else at AHIF, Inc. in Ashland, Oregon have disclosed to investigators or to AHIF, Inc.'s attorney.

69. Specifically, AHIF, Inc.'s accountant could not provide investigators with transaction details from the organization's Quickbooks program for the 1999 and 2000 tax years. The accountant stated that he did not have these transaction details because SEDA told him they were no longer available for review because AHIF, Inc.'s computer crashed in October of 2001. If SEDA has attempted to disguise financial transactions in a manner described in this affidavit, then I believe there may not have been a computer

Affidavit in Support of Search Warrant - Page 28

crash and there may still be computer and paper records relevant to this investigation at the location. In addition, based on the e-mails described earlier in this affidavit, there appears to be e-mails referred to involving Mahmoud El-Fiki, Pete SEDA and Soliman ALBUTHE which I have not been provided.

70. FBI Special Agent Dave Carroll advised me that during the course of an interview of Pete SEDA on September 15, 2001, he was provided a tour of the upper floor of 3800 S. Highway 99, Ashland, Oregon. He advised me that during this tour, SEDA brought him to a room located above the garage which contained a computer and numerous pamphlets and boxes, as well as a back storage area containing religious reading materials.

71. Therefore, I believe there may still be records relating to the false Form 990 and the CMIR violation still at 3800 S. Highway 99 in Ashland, Oregon. These records may consist of the following financial records and computer data.

**FINANCIAL RECORDS:**

72. From my experience and from consulting with other experienced IRS-CI special agents, I know that individuals normally maintain records of their financial activity, such as receipts for expenditures made with cash and checks, bank records, and other financial documents, in their personal residences and in their businesses. Persons engaged in tax and/or money laundering violations frequently retain records of their transactions for long periods of time within their residence, place of business, rented storage units, vehicles, or other places under their control. These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts,

Affidavit in Support of Search Warrant - Page 29

bank statements, and other records. Records of this kind are also often stored on computer media.

73.     As a criminal investigator with the IRS, I know that to adequately investigate the accuracy of a tax return, especially a business tax return, it is necessary to examine most of the business' records for that year, including all financial documentation concerning income, expenses, asset purchases, communications with tax preparers and other officers.

74.     Persons engaged in tax and/or money laundering violations often maintain such records for long periods of time, particularly when they are involved in ongoing criminal conduct over a long period of time. There are many reasons why criminal offenders maintain evidence for long periods of time. The evidence may be innocuous at first glance (e.g. financial, credit card, and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence.

75.     The criminal offender may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence. The criminal offender may also be under the mistaken belief that he/she has deleted, hidden, or further destroyed any computer-related evidence, but which may be retrievable by a trained forensic computer expert.

Affidavit in Support of Search Warrant - Page 30

COMPUTER DATA:

76.    Based upon information related to me by IRS-CI Special Agent Richard Smith, and others involved in the forensic examination of computers, I know computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

77.    Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

78.    Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden", erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be

Affidavit in Support of Search Warrant - Page 31

extracted.

79. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10'x12'x10' room to the ceiling.

80. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.

81. In addition, computer users can conceal data within another seemingly unrelated innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is

Affidavit in Support of Search Warrant - Page 32

evidence, contraband, or instrumentalities of a crime.

## CONCLUSION

Based on the foregoing, I have probable cause to believe that Soliman ALBUTHE, with the assistance of Pete SEDA has evaded reporting requirements, in violation of Title 31 U.S.C. §5324 and that Pete SEDA has committed the crime of subscribing to a false return in violation of Title 26 U.S.C. §7206(1). I believe ALBUTHE and SEDA committed these crimes while attempting to disguise the true disposition of funds, that if reported correctly, would have caused the IRS and law enforcement to scrutinize their activities and may have jeopardized the organizations tax exempt status.

Therefore, I request that the court authorize a warrant to search 3800 S. Highway 99 in Ashland, Oregon, detailed in Attachment A, for the evidence listed in Attachment B and to seize the same. I request authority to seize all records set forth in Attachment B and to physically seize all computers and related equipment for analysis.

xxxxxxxx

xxxxxxxx

xxxxxxxx

xxxxxxxx

xxxxxxxx

xxxxxxxx

xxxxxxxx

xxxxxxxx

Affidavit in Support of Search Warrant - Page 33

The evidence set forth in this affidavit is true, complete, and accurate to the best of my knowledge and belief.

This affidavit and attachments have been reviewed and approved by Assistant United States Attorney Christopher L. Cardani.

*(signature)*
Colleen Anderson
Special Agent, IRS-CI

Subscribed and sworn to me this 13 day of February, 2004.

*(signature)*
John P. Cooney
United States Magistrate Judge

Affidavit in Support of Search Warrant - Page 34