# EXHIBIT 8

𝕿𝖍𝖊 𝕹𝖊𝖜 𝖄𝖔𝖗𝖐 𝕿𝖎𝖒𝖊𝖘
nytimes.com



December 16, 2005

# Bush Lets U.S. Spy on Callers Without Courts

By JAMES RISEN and ERIC LICHTBLAU

**Correction Appended**

WASHINGTON, Dec. 15 - Months after the Sept. 11 attacks, President Bush secretly authorized the National Security Agency to eavesdrop on Americans and others inside the United States to search for evidence of terrorist activity without the court-approved warrants ordinarily required for domestic spying, according to government officials.

Under a presidential order signed in 2002, the intelligence agency has monitored the international telephone calls and international e-mail messages of hundreds, perhaps thousands, of people inside the United States without warrants over the past three years in an effort to track possible "dirty numbers" linked to Al Qaeda, the officials said. The agency, they said, still seeks warrants to monitor entirely domestic communications.

The previously undisclosed decision to permit some eavesdropping inside the country without court approval was a major shift in American intelligence-gathering practices, particularly for the National Security Agency, whose mission is to spy on communications abroad. As a result, some officials familiar with the continuing operation have questioned whether the surveillance has stretched, if not crossed, constitutional limits on legal searches.

"This is really a sea change," said a former senior official who specializes in national security law. "It's almost a mainstay of this country that the N.S.A. only does foreign searches."

Nearly a dozen current and former officials, who were granted anonymity because of the classified nature of the program, discussed it with reporters for The New York Times because of their concerns about the operation's legality and oversight.

According to those officials and others, reservations about aspects of the program have also been expressed by Senator John D. Rockefeller IV, the West Virginia Democrat who is the vice chairman of the Senate Intelligence Committee, and a judge presiding over a secret court that oversees intelligence matters. Some of the questions about the agency's new powers led the administration to temporarily suspend the operation last year and impose more restrictions, the officials said.

The Bush administration views the operation as necessary so that the agency can move quickly to monitor communications that may disclose threats to the United States, the officials said. Defenders of the program say it has been a critical tool in helping disrupt terrorist plots and prevent attacks inside the United States.

Administration officials are confident that existing safeguards are sufficient to protect the privacy and civil liberties of Americans, the officials say. In some cases, they said, the Justice Department eventually seeks warrants if it wants to expand the eavesdropping to include communications confined within the United States. The officials said the administration had briefed Congressional leaders about the program and notified the judge in charge of the Foreign Intelligence Surveillance Court, the secret Washington court that deals with national security issues.

The White House asked The New York Times not to publish this article, arguing that it could jeopardize continuing investigations and alert would-be terrorists that they might be under scrutiny. After meeting with senior administration officials to hear their concerns, the newspaper delayed publication for a year to conduct additional reporting. Some information that administration officials argued could be useful to terrorists has been omitted.

**Dealing With a New Threat**

While many details about the program remain secret, officials familiar with it say the N.S.A. eavesdrops without warrants on up to 500 people in the United States at any given time. The list changes as some names are added and others dropped, so the number monitored in this country may have reached into the thousands since the program began, several officials said. Overseas, about 5,000 to 7,000 people suspected of terrorist ties are monitored at one time, according to those officials.

Several officials said the eavesdropping program had helped uncover a plot by Iyman Faris, an Ohio trucker and naturalized citizen who pleaded guilty in 2003 to supporting Al Qaeda by planning to bring down the Brooklyn Bridge with blowtorches. What appeared to be another Qaeda plot, involving fertilizer bomb attacks on British pubs and train stations, was exposed last year in part through the program, the officials said. But they said most people targeted for N.S.A. monitoring have never been charged with a crime, including an Iranian-American doctor in the South who came under suspicion because of what one official described as dubious ties to Osama bin Laden.

The eavesdropping program grew out of concerns after the Sept. 11 attacks that the nation's intelligence agencies were not poised to deal effectively with the new threat of Al Qaeda and that they were handcuffed by legal and bureaucratic restrictions better suited to peacetime than war, according to officials. In response, President Bush significantly eased limits on American intelligence and law enforcement agencies and the military.

But some of the administration's antiterrorism initiatives have provoked an outcry from members of Congress, watchdog groups, immigrants and others who argue that the measures erode protections for civil liberties and intrude on Americans' privacy.

Opponents have challenged provisions of the USA Patriot Act, the focus of contentious debate on Capitol Hill this week, that expand domestic surveillance by giving the Federal Bureau of Investigation more power to collect information like library lending lists or Internet use. Military and F.B.I. officials have drawn criticism for monitoring what were largely peaceful antiwar protests. The Pentagon and the Department of Homeland Security were forced to retreat on plans to use public and private databases to hunt for possible terrorists. And last year, the Supreme Court rejected the administration's claim that those labeled "enemy combatants" were not entitled to judicial review of their open-ended detention.

Mr. Bush's executive order allowing some warrantless eavesdropping on those inside the United States - including American citizens, permanent legal residents, tourists and other foreigners - is based on classified legal opinions that assert that the president has broad powers to order such searches, derived in part from the September 2001 Congressional resolution authorizing him to wage war on Al Qaeda and other terrorist groups, according to the officials familiar with the N.S.A. operation.

The National Security Agency, which is based at Fort Meade, Md., is the nation's largest and most secretive intelligence agency, so intent on remaining out of public view that it has long been nicknamed "No Such Agency." It breaks codes and maintains listening posts around the world to eavesdrop on foreign governments, diplomats and trade negotiators as well as drug lords and terrorists. But the agency ordinarily operates under tight restrictions on any spying on Americans, even if they are overseas, or disseminating information about them.

What the agency calls a "special collection program" began soon after the Sept. 11 attacks, as it looked for new tools to attack terrorism. The program accelerated in early 2002 after the Central Intelligence Agency started capturing top Qaeda operatives overseas, including Abu Zubaydah, who was arrested in Pakistan in March 2002. The C.I.A. seized the terrorists' computers, cellphones and personal phone directories, said the officials familiar with the program. The N.S.A. surveillance was intended to exploit those numbers and addresses as quickly as possible, they said.

In addition to eavesdropping on those numbers and reading e-mail messages to and from the Qaeda figures, the N.S.A. began monitoring others linked to them, creating an expanding chain. While most of the numbers and addresses were overseas, hundreds were in the United States, the officials said.

Under the agency's longstanding rules, the N.S.A. can target for interception phone calls or e-mail messages on foreign soil, even if the recipients of those communications are in the United States. Usually, though, the government can only target phones and e-mail messages in the United States by first obtaining a court order from the Foreign Intelligence Surveillance Court, which holds its closed sessions at the Justice Department.

Traditionally, the F.B.I., not the N.S.A., seeks such warrants and conducts most domestic eavesdropping. Until the new program began, the N.S.A. typically limited its domestic surveillance to foreign embassies and missions in Washington, New York and other cities, and obtained court orders to do so.

Since 2002, the agency has been conducting some warrantless eavesdropping on people in the United States who are linked, even if indirectly, to suspected terrorists through the chain of phone numbers and e-mail addresses, according to several officials who know of the operation. Under the special program, the agency monitors their international communications, the officials said. The agency, for example, can target phone calls from someone in New York to someone in Afghanistan.

Warrants are still required for eavesdropping on entirely domestic-to-domestic communications, those officials say, meaning that calls from that New Yorker to someone in California could not be monitored without first going to the Federal Intelligence Surveillance Court.

**A White House Briefing**

After the special program started, Congressional leaders from both political parties were brought to Vice President Dick Cheney's office in the White House. The leaders, who included the chairmen and ranking members of the Senate and House intelligence committees, learned of the N.S.A. operation from Mr. Cheney, Lt. Gen. Michael V. Hayden of the Air Force, who was then the agency's director and is now a full general and the principal deputy director of national intelligence, and George J. Tenet, then the director of the C.I.A., officials said.

It is not clear how much the members of Congress were told about the presidential order and the eavesdropping program. Some of them declined to comment about the matter, while others did not return phone calls.

Later briefings were held for members of Congress as they assumed leadership roles on the intelligence committees, officials familiar with the program said. After a 2003 briefing, Senator Rockefeller, the West Virginia Democrat who became vice chairman of the Senate Intelligence Committee that year, wrote a letter to Mr. Cheney expressing concerns about the program, officials knowledgeable about the letter said. It could not be determined if he received a reply. Mr. Rockefeller declined to comment. Aside from the Congressional leaders, only a small group of people, including several cabinet members and officials at the N.S.A., the C.I.A. and the Justice Department, know of the program.

Some officials familiar with it say they consider warrantless eavesdropping inside the United States to be unlawful and possibly unconstitutional, amounting to an improper search. One government official involved in the operation said he privately complained to a Congressional official about his doubts about the program's legality. But nothing came of his inquiry. "People just looked the other way because they didn't want to know what was going on," he said.

A senior government official recalled that he was taken aback when he first learned of the operation. "My first reaction was, 'We're doing what?' " he said. While he said he eventually felt that adequate safeguards were put in place, he added that questions about the program's legitimacy were understandable.

Some of those who object to the operation argue that is unnecessary. By getting warrants through the foreign intelligence court, the N.S.A. and F.B.I. could eavesdrop on people inside the United States who might be tied to terrorist groups without skirting longstanding rules, they say.

The standard of proof required to obtain a warrant from the Foreign Intelligence Surveillance Court is generally considered lower than that required for a criminal warrant - intelligence officials only have to show probable cause that someone may be "an agent of a foreign power," which includes international terrorist groups - and the secret court has turned down only a small number of requests over the years. In 2004, according to the Justice

Department, 1,754 warrants were approved. And the Foreign Intelligence Surveillance Court can grant emergency approval for wiretaps within hours, officials say.

Administration officials counter that they sometimes need to move more urgently, the officials said. Those involved in the program also said that the N.S.A.'s eavesdroppers might need to start monitoring large batches of numbers all at once, and that it would be impractical to seek permission from the Foreign Intelligence Surveillance Court first, according to the officials.

The N.S.A. domestic spying operation has stirred such controversy among some national security officials in part because of the agency's cautious culture and longstanding rules.

Widespread abuses - including eavesdropping on Vietnam War protesters and civil rights activists - by American intelligence agencies became public in the 1970's and led to passage of the Foreign Intelligence Surveillance Act, which imposed strict limits on intelligence gathering on American soil. Among other things, the law required search warrants, approved by the secret F.I.S.A. court, for wiretaps in national security cases. The agency, deeply scarred by the scandals, adopted additional rules that all but ended domestic spying on its part.

After the Sept. 11 attacks, though, the United States intelligence community was criticized for being too risk-averse. The National Security Agency was even cited by the independent 9/11 Commission for adhering to self-imposed rules that were stricter than those set by federal law.

**Concerns and Revisions**

Several senior government officials say that when the special operation began, there were few controls on it and little formal oversight outside the N.S.A. The agency can choose its eavesdropping targets and does not have to seek approval from Justice Department or other Bush administration officials. Some agency officials wanted nothing to do with the program, apparently fearful of participating in an illegal operation, a former senior Bush administration official said. Before the 2004 election, the official said, some N.S.A. personnel worried that the program might come under scrutiny by Congressional or criminal investigators if Senator John Kerry, the Democratic nominee, was elected president.

In mid-2004, concerns about the program expressed by national security officials, government lawyers and a judge prompted the Bush administration to suspend elements of the program and revamp it.

For the first time, the Justice Department audited the N.S.A. program, several officials said. And to provide more guidance, the Justice Department and the agency expanded and refined a checklist to follow in deciding whether probable cause existed to start monitoring someone's communications, several officials said.

A complaint from Judge Colleen Kollar-Kotelly, the federal judge who oversees the Federal Intelligence Surveillance Court, helped spur the suspension, officials said. The judge questioned whether information obtained under the N.S.A. program was being improperly used as the basis for F.I.S.A. wiretap warrant requests from the Justice Department, according to senior government officials. While not knowing all the details of the exchange, several government lawyers said there appeared to be concerns that the Justice Department, by trying to shield the existence of the N.S.A. program, was in danger of misleading the court about the origins of the information cited to justify the warrants.

One official familiar with the episode said the judge insisted to Justice Department lawyers at one point that any material gathered under the special N.S.A. program not be used in seeking wiretap warrants from her court. Judge Kollar-Kotelly did not return calls for comment.

A related issue arose in a case in which the F.B.I. was monitoring the communications of a terrorist suspect under a F.I.S.A.-approved warrant, even though the National Security Agency was already conducting warrantless eavesdropping.

According to officials, F.B.I. surveillance of Mr. Faris, the Brooklyn Bridge plotter, was dropped for a short time because of technical problems. At the time, senior Justice Department officials worried what would happen if the N.S.A. picked up information that needed to be presented in court. The government would then either have to disclose the N.S.A. program or mislead a criminal court about how it had gotten the information.

Several national security officials say the powers granted the N.S.A. by President Bush go far beyond the expanded counterterrorism powers granted by Congress under the USA Patriot Act, which is up for renewal. The House on Wednesday approved a plan to reauthorize crucial parts of the law. But final passage has been delayed under the threat of a Senate filibuster because of concerns from both parties over possible intrusions on Americans' civil liberties and privacy.

Under the act, law enforcement and intelligence officials are still required to seek a F.I.S.A. warrant every time they want to eavesdrop within the United States. A recent agreement reached by Republican leaders and the Bush administration would modify the standard for F.B.I. wiretap warrants, requiring, for instance, a description of a specific target. Critics say the bar would remain too low to prevent abuses.

Bush administration officials argue that the civil liberties concerns are unfounded, and they say pointedly that the Patriot Act has not freed the N.S.A. to target Americans. "Nothing could be further from the truth," wrote John Yoo, a former official in the Justice Department's Office of Legal Counsel, and his co-author in a Wall Street Journal opinion article in December 2003. Mr. Yoo worked on a classified legal opinion on the N.S.A.'s domestic eavesdropping program.

At an April hearing on the Patriot Act renewal, Senator Barbara A. Mikulski, Democrat of Maryland, asked Attorney General Alberto R. Gonzales and Robert S. Mueller III, the director of the F.B.I., "Can the National Security Agency, the great electronic snooper, spy on the American people?"

"Generally," Mr. Mueller said, "I would say generally, they are not allowed to spy or to gather information on American citizens."

President Bush did not ask Congress to include provisions for the N.S.A. domestic surveillance program as part of the Patriot Act and has not sought any other laws to authorize the operation. Bush administration lawyers argued that such new laws were unnecessary, because they believed that the Congressional resolution on the campaign against terrorism provided ample authorization, officials said.

**The Legal Line Shifts**

Seeking Congressional approval was also viewed as politically risky because the proposal would be certain to face intense opposition on civil liberties grounds. The administration also feared that by publicly disclosing the existence of the operation, its usefulness in tracking terrorists would end, officials said.

The legal opinions that support the N.S.A. operation remain classified, but they appear to have followed private discussions among senior administration lawyers and other officials about the need to pursue aggressive strategies that once may have been seen as crossing a legal line, according to senior officials who participated in the discussions.

For example, just days after the Sept. 11, 2001, attacks on New York and the Pentagon, Mr. Yoo, the Justice Department lawyer, wrote an internal memorandum that argued that the government might use "electronic surveillance techniques and equipment that are more powerful and sophisticated than those available to law enforcement agencies in order to intercept telephonic communications and observe the movement of persons but without obtaining warrants for such uses."

Mr. Yoo noted that while such actions could raise constitutional issues, in the face of devastating terrorist attacks "the government may be justified in taking measures which in less troubled conditions could be seen as infringements of individual liberties."

The next year, Justice Department lawyers disclosed their thinking on the issue of warrantless wiretaps in national security cases in a little-noticed brief in an unrelated court case. In that 2002 brief, the government said that "the Constitution vests in the President inherent authority to conduct warrantless intelligence surveillance (electronic or otherwise) of foreign powers or their agents, and Congress cannot by statute extinguish that constitutional authority."

Administration officials were also encouraged by a November 2002 appeals court decision in an unrelated matter. The decision by the Foreign Intelligence Surveillance Court of Review, which sided with the administration in dismantling a bureaucratic "wall" limiting cooperation between prosecutors and intelligence officers, cited "the president's inherent constitutional authority to conduct warrantless foreign intelligence surveillance."

But the same court suggested that national security interests should not be grounds "to jettison the Fourth Amendment requirements" protecting the rights of Americans against undue searches. The dividing line, the court acknowledged, "is a very difficult one to administer."

Barclay Walsh contributed research for this article.

**Correction:** Dec. 28, 2005, Wednesday:

Because of an editing error, a front-page article on Dec. 16 about a decision by President Bush to authorize the National Security Agency to eavesdrop on Americans and others inside the United States to search for evidence of terrorist activity without warrants ordinarily required for domestic spying misstated the name of the court that would normally issue those warrants. It is the Foreign - not Federal -Intelligence Surveillance Court.

Copyright 2005 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Contact Us | Work for Us | Site Map |

Page 6 of 13

# THE NEW YORKER

ANNALS OF SURVEILLANCE

# STATE SECRETS

*A government misstep in a wiretapping case.*

by Patrick Radden Keefe

APRIL 28, 2008



Was a classified document proof of warrantless surveillance?

One Friday afternoon in August, 2004, a Washington, D.C., attorney named Lynne Bernabei received a package from the Department of the Treasury. The government was investigating one of her clients, the American branch of a Saudi charity called the Al Haramain Islamic Foundation, which had been active in fifty countries. Al Haramain had come under scrutiny, as had many other Islamic charities, after the attacks of September 11, 2001, and Treasury Department investigators believed that Al Haramain's American branch, which was based in Oregon, had connections to Al Qaeda. In response to a request from Bernabei for evidence against her client, the government had turned over two sets of documents, primarily media reports that referred to other branches of Al Haramain. None of the materials demonstrated a direct connection between the Oregon branch and Al Qaeda.

Bernabei asked for any classified evidence the government might have, arguing that it was impossible to rebut evidence that she couldn't see. When a third batch of evidence arrived, that August afternoon, the cover letter noted that the enclosed materials were "unclassified," so Bernabei didn't give much thought to the last item, a four-page document stamped "Top Secret." "My impression was that it might have been something that was declassified," she told me recently.

Bernabei photocopied the materials and forwarded them to the half-dozen clients and attorneys associated with the case. Several weeks later, the Treasury Department concluded its investigation, and declared the Oregon branch of Al

Haramain a Specially Designated Global Terrorist entity, citing "direct links" with Osama bin Laden.

Soon afterward, two F.B.I. agents visited Bernabei's office and informed her that a classified document had accidentally been turned over to her. Bernabei told them that she had received only "unclassified" information, but she agreed to retrieve the document from her files. According to Bernabei, one of the agents suggested that as she looked for the document she should try not to think about what it contained. In the following weeks, F.B.I. agents tracked down the copies that she had distributed. One lawyer for Al Haramain had an electronic copy. The F.B.I. asked to purge it from his computers.

Bernabei said that she and her associates did not appreciate the significance of the document, and the government's efforts to recover it, until December, 2005, when the New York *Times* revealed that the Bush Administration had authorized the National Security Agency to employ wiretaps inside the United States without first getting a warrant. The document that the Treasury Department had turned over to Bernabei appears to have been a summary of intercepted telephone conversations between two of Al Haramain's American lawyers, in Washington, and one of the charity's officers, in Saudi Arabia. The government had evidently passed along proof of surveillance to the targets of that surveillance, and supplied the Oregon branch of Al Haramain—a suspected terrorist organization—with ammunition to challenge the constitutionality of the warrantless-wiretapping program.

Well before September 11th, U.S. intelligence agencies had suspicions about the connections between Islamic charities and terrorism. *Zakat*, or charitable tithing, is one of the five pillars of Islam, a duty for observant Muslims, and, by some estimates, Saudi charities raise four billion dollars a year. They establish mosques and community centers, distribute religious literature, and dispatch clerics to spread Wahhabism, the severe strain of fundamentalist Islam that is the official religion of the kingdom. "This is an element of Saudi foreign policy," Lee Wolosky, a member of the National Security Council in the Clinton and Bush Administrations, told me. "It's very well coördinated. It happens at the highest levels of the Saudi state." In 2004, David Aufhauser, who as the Treasury Department's general counsel oversaw its counterterrorism efforts after September 11th, estimated that in recent decades the kingdom had spent "north of seventy-five billion dollars" on Islamic evangelism.

Al Haramain was established, with help from the Saudi royal family, in 1991. Its headquarters were in Riyadh, with offices in foreign countries. Within a few years, the charity was suspected by the C.I.A. of involvement in terrorism. In 1996, a C.I.A. report suggested that a third of Islamic N.G.O.s "support terrorist groups or employ individuals who are suspected of having terrorist connections"; it named Al Haramain as an example. In 1997, a C.I.A. informant in Nairobi said that the local branch of Al Haramain planned to blow up the U.S. Embassy. According to the *Times*, a C.I.A. inquiry turned up no evidence of a plot, but after the bombings of the American Embassies in Tanzania and Kenya, the following year, Kenyan authorities ordered Al Haramain from the country. In a trial on the bombings in New York in 2001, prosecutors introduced a collection of business cards that had been seized from the Nairobi home of Wadih el-Hage, an Al Qaeda operative who was eventually convicted for his role. One belonged to Mansour al-Kadi, an Al Haramain official in Riyadh, who was the titular vice-president of the Oregon branch (though he never played an active role there, and no further connection was made between the charity and the bombings).

Aqeel al-Aqil, who was Al Haramain's director during the nineties, told me by e-mail that he could not control aid and donations once they arrived in areas of conflict, such as Bosnia and Chechnya. "If you give a sack of flour to a needy family," he said, "you cannot guarantee that some of their mujahideen sons will not eat some of the bread made of that flour." U.S. authorities, however, believed that the charities must be held accountable. "Historically, Al Qaeda and other terrorist groups have set up or exploited some charities," Stuart Levey, the Treasury Department's Under-Secretary for Terrorism and Financial Intelligence, told the Senate Finance Committee earlier this month. "Those who reach for their wallets to fund terrorism must be pursued and punished in the same way as those who reach for a bomb or a gun."

After September 11th, the F.B.I. assigned Dennis Lormel, a veteran financial investigator, to look into how Al Qaeda secured its funding. "We latched on to charities immediately," he told me. On September 23, 2001, President Bush signed an executive order authorizing the Treasury Department to "designate" individuals or entities believed to be supporting or "otherwise associated" with terrorism, in order to help shut down what Bush called "the financial foundation of the global terror network."

Designations amount to a kind of economic embargo: anyone who does business with a designated person risks criminal or civil penalties. The Treasury Department can act more quickly than the police or the F.B.I., who may take

action only after an investigation. By preëmptively freezing a suspect's assets, "the government does not have to watch these dollars continue to flow over a period of months or years as it investigates whether it will pursue criminal charges," a department spokesman, Andrew DeSouza, told me.

Authorities also need less evidence for a designation than they would for prosecution, and they can rely on evidence that would not be admissible in a criminal trial. Matthew Levitt, who until last year was deputy assistant secretary for intelligence and analysis at the Treasury Department, says that designations involve "an extremely robust process. This is not something that can be done easily or willy-nilly." But Lormel, who retired from the F.B.I. in 2003, says he would have been "hard pressed" to act on some of the material that Treasury officials used. "Oftentimes, I think they base their evidence on media stories or public-source information, whereas we would never use only that," he told me.

In addition, the Treasury Department may use classified evidence that is never disclosed to the designated party, despite an established principle of the American legal system that the accused should have an opportunity to confront evidence against him. Designations can be challenged before a federal judge, but lawyers for the designated party are not shown all the government's evidence and cannot introduce their own. Nearly five hundred individuals and groups have been labelled Specially Designated Global Terrorists since 2001; there has never been a successful challenge in court. A designation "effectively denies people province over their own property in a largely unreviewable way," Aufhauser, the department's former general counsel, told me. "Such an extraordinary power needs to be exercised with discretion, because it could be constitutionally suspect."

Al Haramain was an early target. Foreign branches—including those in Somalia and Bosnia, which, according to officials, had been directing funds to terrorist groups—were the first to be designated. Lormel dispatched F.B.I. agents to Ashland, Oregon, to investigate the American branch.

Situated in the Rogue Valley, and surrounded by the dramatic foothills of the Siskiyou and Cascade Mountains, Ashland is a semirural community of some twenty thousand people. Main Street is lined with organic restaurants, coffee shops, and independent bookstores, and locals describe the town as unusually liberal for conservative southern Oregon.

Al Haramain Oregon was run by a longtime Ashland resident named Pirouz Sedaghaty, who is known as Pete Seda. Now fifty years old, he grew up in a secular household in Iran, where his father was a general under the Shah. In 1976, when he was eighteen, Seda followed an older brother to Ashland. He enrolled at the local college, but struggled with reading and writing in English, and never graduated. He drifted into environmental activism, demonstrating against the spraying of herbicides in national forests.

In the nineteen-eighties, Seda went into business as the Arborist, transplanting trees and doing landscaping projects. He became more religious, and converted several friends to Islam, outdoorsmen who dressed like lumberjacks—one Ashland resident described them as "Muslim rednecks." He arranged places for Friday prayers, and established a nonprofit group, the Qur'an Foundation, which mailed religious literature to Muslims in prison.

Seda became a fixture at peace rallies and multicultural fairs in Ashland. "He was the go-to guy if you wanted to have an interreligious dialogue," the Reverend Caren Caldwell, a local Protestant minister who has known Seda for twenty years, said. "I'm not a Muslim minister," Seda told worshippers at a local synagogue, where the rabbi often invited him to speak. "I'm just a common brother in our community." He spoke of the importance of monotheism and prayer, and of how terrorism is inimical to the teachings of the Koran. He bought a camel, which he named Mandub ("emissary" in Arabic). He led it down Main Street in the Fourth of July parade.

In 1993, Seda met and married an Iranian woman named Laleh; he lived with her and another woman—whom he considered a second wife—in Ashland. (Seda has two sons, from an earlier marriage.) That woman eventually left, and a college student named Summer Rife moved in. "I met Pete at an academic presentation he was giving on Islam," Rife, who is now twenty-seven, said in an e-mail. (Seda's lawyer advised him against talking to me, but Rife agreed to respond to written questions.) She seems somewhat in thrall to Seda. "If Pete had the means and opportunity, he could really make a positive difference in the world," she wrote. "He is Nobel Prize material."

Soliman al-Buthi, a Saudi who worked for Al Haramain as its treasurer, and who was interested in establishing an American branch, visited Seda in Ashland in 1997. Seda, who was born a Shiite and wore a neatly trimmed beard and fleece jackets, seemed an unlikely partner for Buthi, a Sunni who wore long robes and kaffiyehs. Buthi told me recently that he had heard of Seda's Qur'an Foundation from a mutual friend, and that he chose the Rogue Valley, where there were only a few dozen Muslims, because he wanted to "start small." Buthi offered to turn Seda's shoestring operation

into a well-financed arm of Al Haramain. "He told me that he had become a Sunni," Buthi said, adding, "I don't think there would be any coöperating with a Shia." (Rife told me that Seda "does not believe in sectarianism. We like to say we are Muslim.")

Al Haramain Oregon was incorporated in 1999. Aqeel al-Aqil, in Riyadh, was listed as the titular president, and Seda and Buthi as officers. With a hundred and eighty-eight thousand dollars from Riyadh, Seda bought a split-level house to serve as a prayer space for local Muslims and as a warehouse for literature. He hired a young Wake Forest graduate named Daveed Gartenstein-Ross, who had grown up Jewish in Ashland and converted to Islam in college, to assist him.

At times, Seda seemed to be adopting a more militant set of beliefs. "He said he'd like to go over and fight with the Chechens," Abdullah Cabral, a retired truck driver who in 1999 accompanied Seda on the hajj, told me. "I took it with a grain of salt. You want to leave your business, two young sons, a couple of wives?" But by all accounts Seda was devastated by the events of September 11th. He wrote to Al Haramain headquarters demanding a million dollars for outreach work, and offered to assist the F.B.I. in any way he could. He told a reporter that he was fearful that "all these years of helping with the education and understanding may have come down with the twin towers."

By the summer of 2004, the Treasury Department had designated eleven foreign branches of Al Haramain as supporters of terrorism, along with Aqil, the director, who still lives in Saudi Arabia. "It was under the cloak of charity that Aqeel al-Aqil used the Al Haramain organization to benefit himself and Al Qaeda," Juan Zarate, a deputy assistant secretary in the department, announced in June, 2004.

Three months later, the Treasury Department singled out the Oregon branch. A statement pointed to links with Al Qaeda, asserting that the charity had diverted funds to support "Chechen leaders affiliated with the al-Qaida network." Treasury officials would not elaborate, citing the classified nature of the evidence; Cari Stinebower, a lawyer who until 2005 worked on designations at the Treasury Department, told me that the process relied on information that was too sensitive to be revealed. "In the intelligence community, people love to collect, but they hate to disseminate," she said.

Buthi was labelled a Specially Designated Global Terrorist. (He was in Riyadh, where he still works as a municipal-government official.) Pete Seda was not designated; a year and a half earlier, he had left the country, ostensibly to go on the hajj, and had not returned.

Under normal circumstances, Seda, Buthi, and the lawyers representing Al Haramain would never have known that the Treasury Department, in its investigation, had relied on telephone conversations secretly intercepted by the N.S.A. Yet, according to court filings by attorneys who have seen it, the document that the department mistakenly sent Bernabei described intercepted conversations between Buthi, in Riyadh, and two of Al Haramain's attorneys, Asim Ghafoor and Wendell Belew, in Washington. The document was dated May 24, 2004; the conversations took place in March and April—just as the Treasury Department was investigating the charity.

On February 28, 2006, Al Haramain filed suit against the Bush Administration in Oregon federal court, claiming that the government had violated the First, Fourth, and Sixth Amendments, along with the Foreign Intelligence Surveillance Act of 1978, which makes it illegal for the government to use wiretaps in the U.S. without a warrant. The warrantless-wiretapping program has been challenged in numerous lawsuits over the past two years, many brought on behalf of journalists and activists, who make sympathetic plaintiffs but struggle to demonstrate that the government actually listened to them. In 2006, a federal court in Michigan found warrantless surveillance unconstitutional, but an appeals court overturned the ruling, concluding that the plaintiff, the A.C.L.U., could not prove that any individual had been targeted by the program.

In the classified document, Al Haramain appeared to have the proof that the other cases lacked. Although the F.B.I. had retrieved the copies that Bernabei distributed to her fellow-lawyers, it made no effort to recover those which went to Seda and Buthi, who were both living in the Middle East. When Al Haramain's attorneys filed their lawsuit with the court, they included an envelope containing a copy of the document.

Justice Department lawyers objected that the document was too sensitive to be kept at the court. A classified document remains classified even if the government has inadvertently disclosed it, they argued, and the document turned over to Al Haramain was classified at the highest level; it contained Sensitive Compartmented Information, which must be kept in a special facility, called a SCIF. The government maintained that the document should be turned over to the F.B.I. "What if I say I will not deliver it to the F.B.I.?" the judge, Garr King, asked, according to a transcript of the proceedings. "We obviously don't want to have any kind of confrontation with you," a government lawyer,

Anthony Coppolino, replied. "But it has to be secured in a proper fashion." Judge King eventually agreed to transfer the document to a nearby SCIF, at the U.S. Attorney's office in Seattle.

The Bush Administration then moved to dismiss Al Haramain's case, citing the "state-secrets privilege," a controversial legal doctrine that can be used to prevent the introduction of evidence that might jeopardize national security. Judges tend to show deference when the executive branch invokes state secrets; courts have rejected the privilege on fewer than six occasions since it was first recognized by the Supreme Court, in 1953. In that case, U.S. v. Reynolds, the widows of three civilian engineers who died in the crash of an Air Force B-29 sued for negligence. The government would not turn over the accident report, asserting that it contained information about the plane's secret electronic equipment. However, when the report was declassified, in the nineties, there was no mention of secret electronic equipment. It did reveal that the plane lacked standard safeguards to prevent the engine from overheating—the very negligence that the widows had alleged.

Nevertheless, government lawyers still cite Reynolds to argue that the courts should trust the executive on matters of national security. According to a 2005 study by William Weaver and Robert Pallitto, political scientists at the University of Texas at El Paso, the Bush Administration has claimed the state-secrets privilege in recent years with "offhanded abandon." By Weaver and Pallitto's count of reported instances, the privilege was invoked fifty-five times in the half century before 2001; it has been used more than two dozen times in the years since. Its heavy use has drawn criticism from members of Congress, including Senator Arlen Specter, the senior Republican on the Judiciary Committee. "We're going to look back at this period of time two decades from now and see a vast expansion of executive authority," Specter told me this month. "And a big part of it is done by the state-secrets doctrine. Do I think in some cases that the government uses it inappropriately? Absolutely."

In recent years, Justice Department lawyers have used the privilege not only to eliminate key pieces of evidence but also to dismiss potential legal challenges altogether. Last year, a federal appeals court ruled that a German citizen, Khaled el-Masri, who alleges that, in a case of mistaken identity, he was kidnapped and tortured by the C.I.A., cannot sue the United States, because the "very subject matter" of his lawsuit—America's extraordinary-rendition program—is secret. Some, like Senator Patrick Leahy, the chairman of the Senate Judiciary Committee, contend that the Administration is using the state-secrets doctrine to prevent the courts from assessing the legality of controversial programs. The White House "has taken a legal doctrine that was intended to protect sensitive national-security information and seems to be using it to evade accountability for its own misdeeds," Leahy said in February, during a Senate hearing on the privilege.

A senior Justice Department official who was authorized to comment told me that the Bush Administration is trying to protect national-security secrets, not to shield its activities from scrutiny. A challenge to the wiretapping program could proceed, he said, provided the surveillance was "sufficiently well disclosed." But a government document describing that surveillance, such as the one Al Haramain received, would not qualify as disclosure. Only a formal acknowledgment by the government would suffice.

Still, in September, 2006, Judge King refused to throw out Al Haramain's case on state-secrets grounds, noting that President Bush and other officials had already confirmed the existence of the surveillance program. King agreed to bar the classified document from the case, but proposed that the attorneys for Al Haramain file affidavits describing their memories of it, which could be used to prove that Al Haramain had been subjected to surveillance.

None of the lawyers for the charity who have seen the document would describe its contents. But Soliman al-Buthi and the two Washington lawyers, Asim Ghafoor and Wendell Belew, agreed to tell me what they were discussing on the telephone during March and April of 2004, when the surveillance appears to have taken place.

In 2002, scores of prominent Saudis, including Buthi, were named as defendants in a lawsuit brought on behalf of the victims of September 11th. Ghafoor had agreed to represent the Saudis, and Belew was lobbying in Washington on their behalf; the three men had several conversations about the payment of the lawyers' fees, which Buthi was helping to coördinate. I asked whether Buthi might have mentioned any defendants who could have been of interest to U.S. intelligence. Buthi, Belew, and Ghafoor all volunteered the same names: Safar al-Hawali and Salman al-Auda, two radical clerics who have been publicly praised by Osama bin Laden; and Mohammed Jamal Khalifa, a Jidda businessman who was bin Laden's brother-in-law and onetime best friend.

"There's an argument to be made that designating Al Haramain was a mistake," Jon Eisenberg, an appellate lawyer who is representing the charity in its wiretapping lawsuit, and who has seen the document, told me. Still, he said, "it is

not my role to figure out if they are terrorists or not." In court filings, Al Haramain's lawyers have said that something in the document suggests that the surveillance was conducted without a warrant. In Eisenberg's view, the more suspicious Al Haramain seemed, the easier it should have been to obtain one.

When Judge King did not dismiss Al Haramain's case, the Bush Administration appealed. Along with public filings to the federal appeals court in San Francisco, government lawyers included a set of secret arguments that Eisenberg was not allowed to see. Based on his knowledge of the document, Eisenberg decided to guess at these arguments, and counter them.

Because the document was still classified, anything Eisenberg wrote about its contents would become "derivatively classified," so he was obliged to write his brief under supervision—not of the court but of the Litigation Security Section of the Justice Department, his adversary. A security officer, Erin Hogarty, explained the special procedures for the drafting: it must take place at the department's offices in San Francisco; Eisenberg could bring no notes with him, and must use a government computer. Hogarty also said that Steven Goldberg, one of Eisenberg's colleagues, could join him but that Tom Nelson, another lawyer for Al Haramain, could not. According to Eisenberg, Hogarty later told him that the order about Nelson came directly from one of the government lawyers working on the case.

The senior Justice Department official told me that Hogarty had never been explicitly instructed that Nelson could not participate. Rather, she was told that because Nelson had not allowed government technicians to purge his computer of classified information he raised "different security concerns." The Litigation Security Section is ostensibly neutral and independent, but Eisenberg contends that Hogarty, as a Justice Department employee taking orders from government lawyers working on the case, had a conflict of interest, and that allowing his opponents to determine who could contribute to a court filing undermines the fairness of the adversarial process. The official disagreed. "I don't think this episode even begins to raise a serious issue," he said.

Last June, Eisenberg and Goldberg met Hogarty at the Justice Department offices in San Francisco and were escorted to a windowless room. Hogarty took their cell phones and the battery from Eisenberg's laptop. She supplied them with a government computer. The drafting lasted three hours. Eisenberg got hungry, and Hogarty offered him a banana from her lunch. When the brief was completed, Eisenberg and Goldberg printed out copies for the judges and for the government lawyers; because Al Haramain's lawyers did not have security clearance, they were not allowed to keep a copy of the brief they had just written. Hogarty assembled the preliminary drafts and said that she would shred them—and Eisenberg's banana peel, too.

After the drafting session, Hogarty and Eisenberg met once more, to wipe his computer of any classified information. As it happened, the laptop had died of its own accord; Eisenberg and Hogarty agreed to destroy the hard drive. Hogarty had brought a technician with her, and he extracted the hard drive and memory board from the laptop. Then he and Hogarty placed the hard drive on the floor and pounded it with a table leg.

Oral arguments before the Ninth Circuit Court of Appeals in Al Haramain Islamic Foundation, Inc. v. George W. Bush took place in August, 2007, and focussed almost exclusively on the document. Al Haramain's lawyers might think that the document was proof of surveillance, Thomas Bondy, the government's lawyer, argued, but they could be wrong. "Although they think or believe or claim they were surveilled," Bondy concluded, "it's possible that they weren't."

"Basically," Eisenberg told me later, the government is "saying that when it comes to matters of national security there is no truth. We will not confirm or deny. So it doesn't matter what you know."

The appeals-court judges ruled in November that, because of the "cascade of acknowledgments" of the wiretapping program, Al Haramain's case could not be thrown out on the ground that its subject matter was a secret. But, after inspecting the document themselves, they rejected Judge King's suggestion that affidavits describing it could be used in court, calling that solution a "back door around the privilege."

The judges sent the case to a district court to decide one final issue. Without the document or the affidavits describing it, Al Haramain will have trouble proving that it was subject to surveillance. But Eisenberg insisted that he was optimistic. "We're still alive," he said.

On August 15th, as Eisenberg was delivering his oral arguments in the appeals court in California, Pete Seda returned to Oregon. He had been a fugitive for two and a half years, travelling with his wives from Saudi Arabia to the United Arab Emirates, Iran, and Syria. In his absence, federal prosecutors had indicted him, along with Buthi, and when he arrived at the airport in Portland he was arrested. The indictment focussed on an incident in 2000, in

which Buthi had converted a hundred-and-fifty-thousand-dollar donation to Al Haramain Oregon into cashier's and traveller's checks, and had carried the money to Riyadh without declaring it at the airport. The foundation allegedly lied on its tax return to hide the funds. Authorities implied that the donation was intended for the rebels in Chechnya. (Seda has pleaded not guilty; Al Haramain's lawyers say that the money did go to Chechnya, but in support of refugees.) There were no charges of terrorism or terrorist financing.

Ibrahim Warde, a professor at the Fletcher School of Law and Diplomacy, at Tufts, and the author of "The Price of Fear," a critique of the war on terrorist financing, said that the Al Haramain case is typical of the Administration's approach to Islamic charities. "It was a giant bait-and-switch game," he told me. The government "would initially tout the connection with Al Qaeda, and then in the end would nail them on some unrelated infraction having to do with tax evasion or immigration." But Matthew Levitt, the former Treasury Department official, told me that when a designation is followed by a criminal indictment without charges of terrorism defense attorneys are too quick to conclude that their clients are innocent. "The fact that someone is designated and then not charged for that activity means nothing," he said.

One consideration for prosecutors is that winning convictions on terrorism charges can be difficult. In October, 2007, a major case brought by the government against the Holy Land Foundation, which before it was designated, in 2001, was the largest Islamic charity in the U.S., concluded without a single conviction. Prosecutors had charged the group with providing "material support" for terrorism. One of the jurors described the government's evidence as "strung together with macaroni noodles."

Jeffrey Breinholt, a senior Justice Department official who is currently on leave at the International Assessment and Strategy Center, in Washington, observes that charging suspects with supporting terrorism might require disclosing secret information in court. Seda's case signifies a change in tactics for federal prosecutors, Breinholt told me, toward "Al Capone-ing" suspects—charging them on whatever will secure a conviction.

"If you charge them for things like we charged the guys in Oregon with, there's necessarily going to be less national-security disclosure of information," Breinholt said. "It's a calculated decision to go after them for smaller things." Breinholt and a Justice Department spokesman both noted the success of a case that was decided in Boston in January, in which officials from Care International, another Islamic charity accused of terrorism (and not affiliated with the well-known humanitarian organization of the same name), were convicted on tax charges.

One flaw of this approach is that although it may bring convictions, it seldom results in substantial jail time. When Seda returned to Oregon, the U.S. Attorney's office argued that he should be kept behind bars pending his trial on tax charges. The prosecutor, Chris Cardani, insisted that Seda subscribed to a militant brand of Wahhabi Islam and represented a flight risk. "This is a case about radical forms of religion and the effects it has on people," he said in a detention hearing last summer.

To demonstrate that Seda was a threat, Cardani called on Daveed Gartenstein-Ross, the young Ashland convert who had worked for Seda in the late nineties. Gartenstein-Ross had since converted again, to Christianity. He began coöperating with authorities, supplying them with information on Al Haramain, and eventually wrote a book, "My Year Inside Radical Islam."

Gartenstein-Ross testified that Seda had been opposed to terrorism. But he also pointed to disturbing passages in the Islamic literature that Al Haramain distributed: an appendix in one edition of the Koran that featured a "Call to Jihad"; a book of Islamic guidelines, which declared, "The Last Hour will not appear unless the Muslims fight the Jews and kill them." Still, it was not clear that Seda personally subscribed to these views. "He's a Koranic literalist," Gartenstein-Ross told me. "But if the question is how much he actually read the Koran, the answer is almost never. He didn't read Arabic, and he had trouble reading English. And all of our translations were English-Arabic."

In the hunt for terrorists and those who support them, intelligence analysts construct "link charts" to connect a suspicious individual to his known acquaintances, to their known acquaintances, and so on—an exercise in six degrees of separation. (In 2000, Army intelligence analysts trying to "map" Al Qaeda reportedly described the effort as "the Kevin Bacon game.") In designating Al Haramain Oregon, Treasury Department officials cited "direct links" with Al Qaeda, but have never revealed the precise nature of those links. Stinebower, the former Treasury lawyer, said she was unaware of any internal definition of "direct links." She wouldn't discuss the particulars of the Al Haramain designation, but did say, "It wouldn't have been sufficient that A picks up a phone and calls B, and B picks up a phone and talks to C, therefore A knows C. There would have to be more of a connection than that."

It seems inevitable that, in seeking to identify and disrupt possible terrorist threats, U.S. intelligence will rely on a suspect's circle of associates and his religious beliefs. But the First Amendment prevents authorities from prosecuting people solely on the basis of association or ideology, and espousing radical beliefs is not in itself a criminal act.

"We've put ourselves in a situation where the Department of Justice has jumped into this, saying, If they could be a terrorist, then they're guilty," Karen Greenberg, the executive director of the Center on Law and Security at New York University's law school, told me. "We don't have a body of law that says, If you could be, then you are. If we want to move to that, then we have to think very long and hard. Because the risks are immense."

On November 30th, the government lost its bid to keep Pete Seda detained. "I hope that I can again be a positive part of the community and continue working to bring peace through understanding," Seda said in a statement. He is now under house arrest; his trial will begin this fall.

Last August, the American Bar Association published a report calling for reform of the state-secrets privilege. "There will finally be an instance where you've cried 'state secrets' so many times that a court will not believe it anymore, and potentially something that *is* a state secret will get out," Carrie Newton Lyons, a former C.I.A. officer who chairs the national-security committee of the A.B.A.'s Section of International Law, told me. In January, Senators Ted Kennedy and Arlen Specter introduced a bill to curtail the Administration's use of state secrets by obliging judges to determine themselves whether evidence is too sensitive to be used in court, and requiring the government to submit classified evidence in redacted or summarized form, rather than barring it completely. Specter objects to the notion that judges must defer to the executive on matters of secret evidence. "It's beyond arrogant," he told me. "It's insulting."

In the meantime, Eisenberg is trying to figure out how Al Haramain can prove that it was wiretapped without reference to either the document or the affidavits describing it. This week, a district judge in San Francisco will consider the only remaining issue in the case, an abstruse legal question about the origins of the state-secrets privilege. The government has submitted a series of classified filings, leaving Eisenberg to guess at what they might contain.

"This is the difficulty with classified evidence," David Cole, a law professor at Georgetown who is assisting Lynne Bernabei in her efforts to have Al Haramain's designation lifted, told me. "At the end of the day, you're fighting shadows. How do you defend against what you can't see?"

In October, Bernabei wrote a letter to the Justice Department. The attorneys representing Al Haramain had been dealing with a novel quandary of legal ethics. If they had a reasonable belief that any telephone conversation with Seda or Buthi might be monitored by the N.S.A., could they talk to their clients without violating attorney-client confidentiality? Bernabei requested confirmation that the government was not intercepting her "written or oral communications" with her clients. Two weeks later, she received a response from the lawyers at the Justice Department. They wouldn't confirm or deny. ♦

ILLUSTRATION: GUY BILLOUT

To get more of *The New Yorker*'s signature mix of politics, culture and the arts: **Subscribe Now**