1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FILED '09 JUN 30 17:05 USDC-ORE

UNITED STATES OF AMERICA,                )
                                         )
                    Plaintiff,           ) No. 05-60008-2-HO
                                         )
     v.                                  ) November 12, 2008
                                         )
PIROUZ SEDAGHATY, et al.,                ) Eugene, Oregon
                                         )
                    Defendants.          )


TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL R. HOGAN

UNITED STATES DISTRICT COURT JUDGE


-:-


Deborah Wilhelm, CSR, RPR
Court Reporter
P.O. Box 1504
Eugene, OR  97440
(541) 431-4113

1                    APPEARANCES OF COUNSEL

2

3    FOR THE PLAINTIFF:    CHRISTOPHER L. CARDANI
                           United States Attorney's Office
4                          405 E. 8th Avenue, Suite 2400
                           Eugene, OR  97401
5                          (541) 465-6771
                           chris.cardani@usdoj.gov
6
                           CHARLES F. GORDER, JR.
7                          United States Attorney's Office
                           1000 S.W. Third Avenue, Suite 600
8                          Portland, OR  97204-2902
                           (503) 727-1021
9

10   FOR THE DEFENDANT:    LAWRENCE H. MATASAR
                           Lawrence Matasar, P.C.
11                         621 S.W. Morrison Street
                           Suite 1025
12                         Portland, OR  97205
                           (503) 222-9830
13                         larry@pdxlaw.com

14                         STEVEN T. WAX
                           Federal Public Defender
15                         101 S.W. Main Street, Suite 1700
                           Portland, OR  97204
16                         (503) 326-2123
                           steve_wax@fd.org
17

18

19

20

21

22

23

24

25

```
 1              (Wednesday, November 12, 2008; 12:34 p.m.)
 2                         P R O C E E D I N G S
 3              THE CLERK:  This is the time set for Case No.
 4     05-60008-2-HO, United States of America versus Pirouz
 5     Sedaghaty, status conference and oral argument on
 6     defendant's first motion No. 53 for discovery;
 7     defendant's supplemental motion No. 90 for discovery;
 8     government's motion No. 101 for reciprocal discovery;
 9     defendant's renewed motion No. 135 for modification of
10     the court's order of 5/16/08 and motion to access
11     classified material; defendant's motion No. 137
12     regarding defense access to classified material.
13              THE COURT:  Counsel, good morning.
14              MR. MATASAR:  Good morning.
15              THE COURT:  Or close to it.  I'll make a couple
16     of comments that might shorten our efforts or not.  You
17     probably can get now that I'm going to be proceeding on
18     a rather deliberate basis on some of the materials that
19     the attorneys are interested in, and especially here
20     when I've got the Ninth Circuit speaking about the very
21     material we're talking about.
22              I will tell you that in -- you know, part of
23     one of these processes is undeniably the education of
24     the judge who's not used to handling these everyday, but
25     I like the discussion in the Libby case.  And to me it
```

1    provides a pretty good balance here.  There was a

2    factual difference there.  We had a defendant who was a

3    national -- former national security official.  And I

4    think there is a factual difference which makes a

5    difference.

6         I have thought about -- as you know, in a

7    criminal case, there is some rights that attach that

8    aren't there on a civil case, I completely understand

9    that.  And I've thought about whether or not I should

10   ask -- well, I'm going to do this, I don't have to think

11   about this, I'm going ask for guidance from the parties

12   on how to proceed in a manner that allows some

13   participation of the defendant, at least in an ex parte

14   manner, concerning the defense theory or the possible

15   theory behind a motion to suppress or dismissal.

16        And I note that the government has a brief now

17   that's been submitted and some materials.  I haven't

18   reviewed them.  I've been in court all morning.  I

19   understood some of them may or may not be coming to

20   Eugene today, so that's -- I haven't been in the same

21   town as them so far, I guess.  I will be soon.  And I'm

22   going to review those before I do anything, frankly, but

23   I'm -- I hope we've made progress on the nonsecured

24   discovery items.  We'll talk about those to the extent

25   we need to today.

1              But I am quite chary about getting the cart

2    before the horse here.  And although there apparently

3    was material that was mistakenly got into the public

4    realm, the Ninth Circuit has some pretty strong language

5    that any memory of the contents of the sealed document,

6    even well-reasoned speculation as to the contents, bar

7    disclosure.  And it's barred from discussion until -- it

8    may have been mistakenly released, but not to me.  And

9    I'm going to look at it first.

10             So with those things in mind, at least you know

11   what to try to convince me of or unconvince me of,

12   right?

13             MR. MATASAR:  Your Honor, I think our

14   discussions might go a little bit better if you gave us

15   a few minutes to talk among ourselves.

16             THE COURT:  Yes, wonderful, happy to.

17             (Discussion held off the record.)

18             MR. MATASAR:  Your Honor, as a guide for the

19   proceedings here, let me just tell you how we had

20   divided up the case on the defense side and just ask the

21   court how you want to proceed.

22             We have essentially three issues that we have

23   discussed.  One of which is the nonclassified discovery.

24   One is the motions and such involving the classified

25   discovery.  And the third is the order that the court

1   issued about the secret document in which you indicated

2   that there would be no discussion even among the defense

3   team about that document.  So that's just the ways we've

4   analyzed.

5          THE COURT:  Take the first topic last, please.

6          MR. MATASAR:  The last topic last or the

7   first -- the first topic was nonclassified discovery.

8          THE COURT:  Let's take that at the end.

9          MR. MATASAR:  Okay.  So why don't I take -- the

10  first two are Mr. Wax's.  I'll just talk about the third

11  one, if I can, the document and the order saying we

12  can't talk about it.

13         One thing, Your Honor, that I -- while I don't

14  have the case with me, my reading of the Ninth Circuit's

15  opinion on the secret document case that came down I

16  think in August was not that nobody could discuss it,

17  but only that it couldn't be used to establish standing

18  to file a civil lawsuit.

19         My -- and the court was very concerned about

20  that issue, but during the litigation process of that

21  case, and Erin Hogarty is here.  She would know better

22  than anyone --

23         THE COURT:  We don't get to cite her in court

24  however.

25         MR. MATASAR:  That's fine.  My understanding of

1    that case is simply that they couldn't use it to

2    establish standing, not that the lawyers were not

3    allowed to talk about the document or to prepare legal

4    documents to mention it in general, although they didn't

5    talk about the substance of it.  But I couldn't see

6    anything in the opinion that indicated the lawyers were

7    not allowed to talk about it, or even with the client,

8    only that it couldn't establish standing.

9            THE COURT:  There is this language:  "We are

10    satisfied that the basis for the, quote, state secret,

11    end quote, privilege is exceptionally well documented.

12    Detailed statements underscore that disclosure of

13    information concerning the sealed document and the

14    means, sources, and methods of intelligence gathering in

15    the context of this case would undermine the

16    government's intelligence capabilities and compromise

17    national security."

18            And then, without quoting further, our friends

19    upstairs found that any memory of contents of the

20    document, even well-reasoned speculation, is barred from

21    disclosure.  And I don't see any point -- I don't see

22    any advantage to your client, and if there is some you

23    don't feel you can tell me about because of strategy,

24    then I'll devise a way for you to inform me of that.

25    But I don't see any necessity for it to be discussed

1  until I see the document.

2       And then we have a -- you know, if, after -- if

3  and when I determine that it should be disclosed to your

4  client's constitutional interests, and the government

5  refuses, then the court can fashion a remedy that

6  applies a lot of protections, including the Jencks Act,

7  FISA, Sixth Amendment, Fourth Amendment, et cetera.

8  Those things are all in play here.

9       And it could be -- it could be that this is the

10 rare FISA case in which knowledge of purported

11 surveillance activities must be disclosed to a defendant

12 as an aggrieved person, but I don't know that yet.

13      MR. MATASAR:  First, Your Honor, let me say is

14 if what you're saying is you want to see it before you

15 rule, we have -- there is no rush here.  We're fine with

16 that.

17      THE COURT:  Okay.  See, if you were -- you were

18 not, but if you were a part of the discussions in my

19 chambers, we have come up with all sorts of speculative

20 scenarios, but, of course, we don't have any facts to

21 base anything on.  And we have to look at things first.

22 It's a fun discussion, but that's about it.

23      MR. MATASAR:  Remember, Your Honor, though that

24 in this case, unlike all the others, I have seen the

25 document, as has the defendant.  So we're in a little

1  different situation, but I --

2       THE COURT:  It's different.  But having seen

3  it, it's not enough.  I don't think that makes this the

4  same as the *Libby* case where there was a national

5  security issue.  To me, there is a difference there,

6  despite the fact that your client may have seen it.  And

7  if so, frankly, I don't -- on this record, I don't even

8  know that except for your statement or even your

9  statement that you've seen it except for your statement.

10 We can make a record.

11      MR. MATASAR:  No, I tried not to do it with my

12 statement.  What I tried to do was cite the discussion

13 of the case in the Ninth Circuit opinion in which they

14 said that --

15      THE COURT:  Okay.

16      MR. MATASAR:  -- the lawyer who got the

17 document by mistake sent it to the other lawyers in the

18 case, and then I said I was one of the other lawyers in

19 the case.  So I don't mean to say that I saw it or not.

20 As far as the defendant, what I did was -- I think I

21 quoted from the Ninth Circuit opinion which said that

22 the other directors were given a copy, and I said that

23 he was another director.  So I have not made such

24 specific statements.

25      THE COURT:  Even though I sometimes grumble, I

1   really try to do what the Ninth Circuit says.  It's a
2   pretty good system overall.
3           MR. MATASAR:  And we try to do what you say,
4   Your Honor.  That's how it works.  So let me have --
5           (Discussion held off the record.)
6           MR. MATASAR:  Your Honor, you've indicated
7   awareness of all of the main issues that we have raised,
8   especially the civil versus criminal, the flat out
9   language in the Supreme Court --
10          THE COURT:  I tried to be prepared.
11          MR. MATASAR:  In a criminal case --
12          THE COURT:  I know that the big names are
13  coming to town.
14          MR. MATASAR:  In this case, even though it's a
15  privilege to bore you with a defendant's right to
16  present a defense, I know -- you've indicated you have
17  that, and I think we'll just await further communication
18  from the court.
19          We'd like to know -- once you look at it, we'd
20  like to have one more chance after you've looked at the
21  material, to have a full and frank argument about the
22  decision before you make it.
23          THE COURT:  I want to hear whether -- from both
24  of you what you think about the defense giving me an ex
25  parte brief, sort of what you want me to look for at --

1  with regard to the theory of your defense or theory of

2  certain motions, that sort of thing. I'd like to know

3  about that. I'd like to have the government's view on

4  that. You know, I -- frankly, I don't know this, but I

5  probably won't understand a lot of what I review until I

6  look at the government's brief. I don't know, though,

7  because I haven't seen it. So, you know, the --

8            MR. MATASAR: We'd like to do that.

9            THE COURT: I think that is an opening that I'm

10  possibly giving you. We'll see what the government

11  thinks about it. But, you know, it's not -- you need to

12  educate your judge.

13            MR. MATASAR: I agree, Your Honor. And in the

14  typical case, of course, we're not needing to disclose

15  our strategy and internal theories to the government or

16  to the court, but in this case we understand why it's

17  appropriate. And the court is going to make an in

18  camera inspection. And Mr. Wax -- maybe I'll let him

19  explain why that's the case, but, yes, we would like the

20  opportunity to give you an ex parte -- some ex parte

21  material that will explain why we need certain things.

22            THE COURT: Well, after 36 years in this chair,

23  I already know what your theories are in the drug cases,

24  or you name it.

25            MR. MATASAR: Right. It was planted. It was

1    somebody else's.  It wasn't drugs.  Yes, I'm sure.

2         THE COURT:  You haven't had a new one for a

3    while on some of those cases.  Okay.

4         MR. WAX:  Judge, in terms of the government

5    brief that you mentioned, and the suggestion of an ex

6    parte filing from us, are you thinking about that in

7    terms of the classified document, or are you thinking of

8    it in terms of the submission that the government made

9    on September 5?

10        THE COURT:  The submission the government made

11   on September 5.

12        MR. WAX:  Okay.

13        THE COURT:  Is it September 5 it was made?

14        MR. GORDER:  Yes, Your Honor.

15        THE COURT:  Yes.  All right.

16        MR. WAX:  We would be happy to provide the

17   court with an ex parte filing.  In the pleading that we

18   submitted on October 10th, I believe we indicated that

19   that was one of the things that had happened in some of

20   the other cases that were cited.

21        THE COURT:  I couldn't find that in opinions --

22   in other opinions.  I know it was there.  We had a

23   discussion in chambers about that today, that, you know,

24   do you know of another case where a judge actually did

25   that?  You know, Congress didn't give us a lot of clear

1  guidelines on how to handle this balance between a

2  defendant -- a criminal defendant's rights, and they're

3  significant, and the government's important

4  considerations also, which are also significant.  So

5  sometimes things get compromised.  But there are certain

6  things that we're going to see preserved.

7       What is the government's position on the

8  defense giving me something ex parte basically

9  describing what their theories are so that I can be more

10  sensitive to them than perhaps I wouldn't be otherwise?

11       MR. GORDER:  Your Honor, I guess I'd like to

12  break this down into two separate areas, the document

13  that the defendant has lodged with the court and then

14  the material that we have filed on September 5th.

15       THE COURT:  Yes.

16       MR. GORDER:  With regard to the document the

17  defendant has lodged with the court, I have not seen it,

18  nor has Mr. Cardani.  And so we're kind of -- I mean,

19  this is a very unusual situation.

20       THE COURT:  When I'm talking about input now is

21  not that document.

22       MR. GORDER:  Okay.

23       THE COURT:  I'm talking about material that you

24  or someone up the line filed.

25       MR. GORDER:  Okay.  With regard to that, our

1    position would be that I think you should read the

2    material that we have filed first, and then give us the

3    opportunity to brief whether or not there should be an

4    ex parte submission of the theory of the defense with

5    regard to that.

6          I'm not saying that we would object to that

7    with regard to our material, but I think that's

8    something that we might want to --

9          THE COURT:  It may not be quite fair for me

10   just to pop it on you, so I'm not going to necessarily

11   read the material first.  I might.  But I am not going

12   to bind myself to that.  If you want a little time to

13   file a brief about that, that's fine with me.  I can --

14   you know, I haven't read every case.  I've read the ones

15   I have wanted to see.  And I didn't see one that

16   discussed that.  But it just seems to make some sense to

17   me, frankly.

18         MR. GORDER:  And I would say that at least my

19   experience -- and it's pretty limited, frankly, in this

20   area, too -- the courts have generally at least taken a

21   look at the government's CIPA filings first before --

22         THE COURT:  Sure.

23         MR. GORDER:  -- making any other accommodations

24   along that line.

25         With regard to the document they've submitted,

1   and this somehow I'll have to discuss with other folks

2   in Washington.

3           THE COURT:  Sure.

4           MR. GORDER:  It would seem to me that it might

5   be appropriate in that context to have a lawyer for the

6   government participate in that hearing with them so

7   that, you know, whatever this motion to suppress is

8   could be argued by both sides.

9           It would not be Mr. Cardani or myself, because

10  we don't have access to the document and don't expect

11  ever to.  But I would like, I guess, the opportunity to

12  at least brief the former, which is --

13          THE COURT:  How long do you want to file

14  something on that?  Frankly, my -- this is more gut

15  reaction on my part, frankly, you know, I'm tempered by

16  a lot of scar tissue, but not so much in this area.

17  Where do we -- that's what it is.  But if you want a

18  certain amount of time to give me a brief saying "you

19  can't do that, Judge," then I'd be happy to give you the

20  chance.

21          MR. GORDER:  Or we agree that they can do that.

22          THE COURT:  Yeah.

23          MR. GORDER:  Two weeks I think would be

24  sufficient.

25          THE COURT:  All right.  Why don't you do that,

1    if you want to file something, you can.

2           And, Mr. Wax, I don't require it.  I'm not

3    really basing this on a case telling me to do it.

4    I'm -- it just made some sense to me, you know, as --

5    well, all we've done so far in our chambers is play 20

6    questions, you know.  And so what do you -- frankly, the

7    theories we've come up with are not all that

8    sophisticated.  Just trying to make sure these statutes

9    apply as they were intended.  And I think for that

10   Section 4 analysis, that happens after a court

11   determines what a document may appropriately be

12   considered.  So that's -- okay.

13          Where do we need to go from there today?

14          MR. WAX:  Judge, with respect to the classified

15   discovery issues, in the pleading that we filed, we

16   tried to make the point that we believe that the

17   government should be required to provide us with some

18   sense of what they have filed so that we can

19   meaningfully participate in the process.

20          All that happened on September 5 was we

21   received three one-paragraph notices that something had

22   been filed.  And it seems to me that you have, under

23   CIPA and under the case law which has discussed it, the

24   discretion to require the government to first explain to

25   you why the material should be considered classified.

1      Second, the material is, as we understand it,

2 presumptively material that should be provided to us.

3 And that you review under the CIPA is to determine not

4 whether we should get it, but in what form we should get

5 it.  Whether we should receive something that's redacted

6 or something that's substituted or things of that

7 nature.  And the process, I think, can include defense

8 participation in that, particularly since I have, and

9 Mr. Matasar will have because he's been approved for,

10 security clearance at this stage.  So we're feeling

11 particularly handicapped right now.

12      THE COURT:  The next question is need to know,

13 however.  And I realize you both have been approved.

14 And that -- you know, the government is going to have to

15 agree there is a need to know, or I'll determine it.

16 But, yes, I do think you are getting the cart before the

17 horse on this argument you are making.

18      MR. WAX:  It seems to us in terms of need to

19 know, the government has already made the determination

20 by filing material with the court in response to a

21 discovery request that it is discoverable.  And that

22 there is, therefore, a need to know at least in some

23 form.

24      THE COURT:  Well, I will say that there -- you

25 can argue that the government agrees that these

1   materials are discoverable because they were submitted

2   for in camera review.  That's a fair argument.  And I'd

3   like to have the government's response to that.  But it

4   could be that they are discoverable, as you say, as

5   summaries, redactions, that sort of thing, don't you

6   think the court needs to take care of that first if

7   that's the case?

8           MR. WAX:  There is no question the court needs

9   to take care of that.  I think that in terms of allowing

10  meaningful defense participation, the government can, at

11  this stage, provide something to us that is not

12  classified, that says, at least in general, what the

13  material is that they provided to the court.

14          For example, they could say that they have

15  provided, you know, statements of the defendant.  That

16  wouldn't be classified.  And that statement in and of

17  itself wouldn't be classified.  Where those statements

18  came from, might be.

19          They could say we have, you know, provided to

20  the court reports of search activity.  Again, that is

21  not a classified statement.  But, again, it would enable

22  us to have some meaningful input on whether or not this

23  stuff should be given to us in any more complete or

24  specific --

25          THE COURT:  I am listening carefully.  And I --

1   you know, I don't want to speculate.  Let's assume, it's

2   not based on anything except more than possibilities,

3   let's assume the government got more than they should

4   have got without going to the FISA court.  It could be a

5   basis for a motion.  I get it.  We're ahead of that.  If

6   that is a theory you are going to have and facts justify

7   it, and as you know, you can get some things, and then

8   you got to get to the court and so on, okay, I'll go see

9   Judge Leavy and get expert advice on that, but I think

10   we're ahead of that game.

11         MR. WAX:  Let me throw out one other thought,

12   please, and that relates to the declaration that we

13   provided to you from Colonel Lang.  One of our biggest

14   concerns here is that the government has not provided to

15   you everything that they're required to provide.  That

16   is a paramount concern that we have in this case and

17   with respect to whatever review process you are going

18   through.

19         You have available to you at this point Colonel

20   Lang's declaration that tries to give some definition of

21   the landscape of material that you should have available

22   to you to review.  The track record of the government in

23   other cases over the past seven years, and in this

24   instance I'm using the government generically, not

25   specifically related to the Assistant U.S. Attorneys in

1   this district.

2          THE COURT:  Of course not.  Mr. Cardani is

3   getting a big promotion.

4          MR. CARDANI:  Am I now a mid-level bureaucrat?

5          THE COURT:  Yes.

6          MR. CARDANI:  I've arrived in life.

7          MR. WAX:  The track record isn't that good.

8   And we're very concerned that what you have may --

9          THE COURT:  That's a fun argument to make,

10  but -- but you don't expect me to operate based on that.

11  We're going to find out what is here.  If -- frankly,

12  they've got a hard oar to pull to convince me not to let

13  you give me something ex parte that sets up some

14  theories here.  They may get there.  But, you know, you

15  are going to have a chance to tell me why they are

16  withholding stuff.

17         I'll talk to you a little later, Erin.  Erin,

18  if you want to come up and sit with David, that's the

19  way to communicate with me in court, you can do that.

20         MR. WAX:  I don't have anything else to add at

21  this point.

22         THE COURT:  So anything else on these issues?

23         How about the non -- the motions that have been

24  around awhile where you're seeking other discovery, and

25  there is a motion for reciprocal discovery and so on,

1    and there is a pile of stuff, I assume, for

2    nonclassified material, I assume that these lawyers can

3    make progress on that, the ones in front of me.

4            MR. CARDANI:   Judge, I think since we met last

5    we have split the cost with the defense and made digital

6    copies through a company in Portland of a voluminous

7    amount of material, bank records, all of the evidence

8    that came out of the search warrants, I believe.

9            The stuff that was in the Eugene discovery room

10   was transported up to Portland.   And at some expense was

11   digitized and provided to the defense.   It's a huge

12   amount of material.   That's been done.

13           Since we've last met, we've also supplemented

14   our nonclassified discovery submissions.   I believe this

15   was batch number five that we turned over to Mr. Wax and

16   Mr. Matasar.

17           So there has been a huge amount of material

18   turned over, although there is some that has not.   And

19   we still have some disagreements.   And we filed early on

20   a government's response to the defendant's first motion

21   for discovery and supplement thereto.   And in that, we

22   did -- as the court knows, in this district, discovery

23   is oftentimes quite open.   We just open up our files to

24   almost everything.   It prevents things like this.   It

25   facilitates plea discussions.   There is all kinds of

1    good reasons for it.  But there are also good reasons

2    why it can't be the case in this case.  And the court is

3    aware of that.  So we're doing our best.

4            THE COURT:  Could you do something to narrow

5    the dispute down so I know what you want me to decide?

6            MR. CARDANI:  Sure, sure, I can give you a

7    couple of examples where we're having some fundamental

8    disagreements with the defense.

9            They are claiming that if we have any

10   information whatsoever that Mr. Sedaghaty did something

11   that was not criminal, and I'm exaggerating, but only

12   slightly, I think, that if we have any evidence that he

13   was not violating the law at any given point in time,

14   that that is discoverable as exculpatory.  And we

15   disagree with that.  We cited cases in that brief that I

16   just referenced why we believe that's not the case.

17   That's one big area.

18           Another big area is we got a series of hard

19   drives from the search warrant that we did way back when

20   down in Ashland.  We have turned over copies of those

21   hard drives.  And they are huge amounts of material.

22   The paper that would be produced from that would

23   probably cover half of this courtroom.  We turned over

24   those hard drives to the defense.  They have at their

25   beck and call an ability to resurrect anything in here

1   that they want.

2          As I understand some of their pleadings, they

3   want us to go further than that and give them any kind

4   of e-mail traffic that came out of those computers and

5   things of the like.  We don't think we need to do that.

6   We have given them the material itself.  And what they

7   may want as exculpatory or what is helpful for the

8   defense from within those computers, they can get.

9          Now, we've gone beyond that and we've flagged

10  certain items that we will be using at trial.  We'll

11  print that out for them.  We'll give them an expert

12  report when it's made.

13         That's another area in some contention.  They

14  want expert reports on some of the forensic computer,

15  that hasn't been done yet.  We're still examining it.

16  Mr. Seda was out of the country for four years.  The

17  investigation, to some extent, went dormant.  Was

18  resurrected when Mr. Seda came back to the United

19  States.  So we're continuing to look into the computers.

20         We are in the process of heading towards doing

21  a forensic report, an expert report, on the computers.

22  We will give them, from that, hard copies of anything

23  that we intend to use at trial.  We will flag some

24  information that may be exculpatory.

25         But the large point is, is they have the

computers.  They can do exactly what we are doing.  And
that is analyze it.  So that's another big area, I
think, that we have some fundamental disagreement on.

Mr. Wax may have some other items.  But I think
that we need some balls and strikes called by the court
to help us on those issues because I think we're right
on the law.  We've given them an awful lot of material.

And I think that the court's reading of the
material that's been filed on September 5, although it's
on the other side of the house, is also going to give
the court a lot of confidence.  When the court does the
heavy lifting, and I think there's going to be some
heavy lifting, there is an awful lot of material that
will provide the court some context on this whole thing.
I think potential defenses, even from the government's
standpoint, will be somewhat fleshed out.  And I think
the court will be in a better position to make calls on
both sides of the house after it's done the reading in
the briefs that are waiting for the court.

THE COURT:  Okay.  Is this yours, Steve?

MR. WAX:  It is, thank you.

THE COURT:  Okay.

MR. WAX:  With respect to the computers, there
is no question that we have in hand mirrors of the hard
drives.  The problem that we have is that the material

1    on those hard drives is not something you can just put

2    it into a box, hit a button, and it all comes out.  It

3    is an incredibly expensive and time-consuming process to

4    recover data from these machines.  As we all know in a

5    lay sense and I've been learning more than I care to

6    know in a more expert sense, you try to delete something

7    from the machine, it's not deleted, and it's scattered

8    all over creation.

9         As we understand the case and as we have

10   attempted to articulate to the government, on those hard

11   drives there should be a wealth of the accounting

12   information and a wealth of e-mail information, which,

13   from what we have seen, we believe will be primarily, if

14   not entirely, exculpatory.

15        THE COURT:  Do you want -- are you exercising

16   that you want them to do it instead of you?

17        MR. WAX:  We believe they've done it.  Given

18   the amount of time and effort that has been put into

19   this case, what we're -- our understanding is, and our

20   belief is, and if this is wrong, I'm certainly prepared

21   to be corrected on this, if they have printouts of those

22   e-mails, if they have a printout of the QuickBooks files

23   that they have recovered from the computers, then it

24   seems -- rather than putting us to the time and expense

25   of attempting to duplicate that effort, they should

1    provide it to us.

2         We believe that most of it is going to be

3    exculpatory so that there would be a double obligation.

4    Those statements that are statements of the client that

5    they have managed to recover, we're entitled to

6    statements of our client.

7         My understanding of the reality of forensic

8    work is that the government has available to it certain

9    tools that we're not going to have available. And to

10   the extent that their computer experts are able to

11   recover things in a way that a person we could hire

12   cannot, it seems as though, again, it's just

13   fundamentally fair, if they've done it, this is the

14   client's material, give it to us.

15        THE COURT:  Why could they do it better than

16   you could?  Have you ever had your computer hard drive

17   crash?  I have.  I've been charged with the

18   responsibility of getting all the vacation photos off a

19   crashed hard drive.

20        MR. WAX:  Well, we're, unfortunately, looking

21   at hard drives that are -- some of them, you know, we're

22   looking for information from the year 2000.

23        THE COURT:  Yeah.

24        MR. WAX:  And through however many iterations

25   of the QuickBooks program, however many iterations of

1  erasures and non-erasures, and our government agencies,

2  as we understand it, from speaking with our experts,

3  have more tools at their disposal than we're likely to

4  have.

5        THE COURT:  Okay.

6        MR. WAX:  And if they've done it, why not give

7  it to us?  It's part of --

8        THE COURT:  Is this the basic dispute?  Do you

9  agree, Mr. Cardani?

10        MR. CARDANI:  I think it's a dispute.

11        THE COURT:  All right.  Well, tell me what

12  other basic disputes there are.

13        MR. WAX:  All right.  Next basic dispute --

14        THE COURT:  I understand this one.  I'll give

15  you something.

16        MR. WAX:  The next basic dispute runs

17  throughout many of the issues that I flagged in the

18  pleading I filed that I labeled discovery matters in

19  dispute to try to give a guide.  And that has to do with

20  what is or is not exculpatory in this case.

21        The allegations here in their essentially

22  normal tax context require the government to prove

23  willfulness and intent.  The government has said they

24  don't have a smoking gun.  They don't have a statement

25  anywhere that has Mr. Sedaghaty saying "I want this

1    money to be hidden, and I want this money to go to
2    purposes that aren't consistent with the charitable
3    purposes of al-Haramain U.S.A." So they've told us that
4    they are going to attempt to prove those mental state
5    elements through circumstantial evidence.

6              In putting together a defense in that kind of
7    situation, we believe, and we have provided the court
8    law that we believe supports this position, we are
9    entitled to show his intent by not only acts that were
10   committed on October 3rd of 2001 when he signed the
11   return, but other acts that are relevant to the question
12   of his intent on the very subject matter of this
13   indictment; that is whether or not he was attempting to
14   do something with a tax return in order to disguise the
15   fact that he was, as the government alleges, trying to
16   get money to some Chechens who were going to use it for
17   guns.

18              We believe that if he testifies, he is
19   permitted to talk about his intent. And in talking
20   about his intent, he is going to be permitted to talk
21   about his life history of activities of the peaceful and
22   non-terroristic nature. We believe we're entitled to
23   call character witnesses. And character witnesses we
24   could call would be permitted to testify to his
25   character or peacefulness, if you will. "I knew the guy

1    in 1990 and I knew the guy in 2003."

2          THE COURT:  Why isn't that -- why can't you dig

3    those people up instead of having the government do it

4    for you?

5          MR. WAX:  Well, we certainly are doing whatever

6    we can, but we know from the discovery that's been

7    provided, that the FBI had contact with Mr. Sedaghaty as

8    early as September 15 of 2001.  We know from the

9    discovery that's been provided that the government was

10   speaking with other people in southern Oregon, Muslims

11   in southern Oregon, Muslims who attended the prayer

12   services at the Ashland prayer house where Mr. Sedaghaty

13   was engaged.  The government will not give us the

14   reports of those conversations.  If they have spoken

15   with people who attended the services in the prayer

16   house, and those people did not say to the government,

17   "oh, yeah, Mr. Sedaghaty, he's talked about raising

18   money to send to the Chechen rebels."  If those people

19   said to the government, "Mr. Sedaghaty is a peace-loving

20   guy.  Mr. Sedaghaty is trying to provide food stuffs to

21   refugees."  And those are in reports that the government

22   has, that's exculpatory.  And that's where we have a

23   fundamental disagreement about what is exculpatory.

24          And I don't think that if it's agreed that what

25   I'm saying is exculpatory that there is any question but

1    that the law requires them to give that to us.  Sure,

2    we're looking for people, but today is 2008.  If they

3    have interviewed people in 2003, 2002, 2001, who said

4    those things, that's exculpatory, and they have an

5    obligation to give it to us.

6         So we just see the definition of exculpatory

7    here very differently.  And we believe that the law

8    supports our use of that type of information at trial.

9    It is material to the defense.

10         And to the extent that they have interviewed a

11    bunch of people who have said those things, they need to

12    give it to us.  To the extent that they have on the

13    computers their forensic information, they have some

14    e-mail traffic that goes between Mr. Sedaghaty and

15    Mr. Wilcox, we're entitled to it.  And it's not enough

16    for them to say, "well, you have the machine yourself

17    and you can go find it."  I don't know if forensically

18    I'm going to be able to.

19         THE COURT:  You've been through it.

20         MR. CARDANI:  We've turned over a lot of this

21    stuff.  Some of the things Mr. Wax says, we agree would

22    be exculpatory.  If there are witness reports saying

23    that Mr. Sedaghaty was raising money for the refugees in

24    Chechnya, that would be exculpatory and would be turned

25    over.  And, in fact, some of that material has.  But

1   it's -- that's a far cry from "he is generally a man of

2   peace."  "He promotes issues of peace."  "I've known

3   Pete for years, and, you know, he's all about peace."

4   That's not exculpatory in the sense --

5             THE COURT:  I get the issue.  I'll look at the

6   paperwork and give you something.

7             MR. CARDANI:  Judge, a few other things.  On

8   the computers, just to be clear, a lot of the material

9   in the computers had, as I understand it talking to the

10  agents who aren't able to be here today, the drives were

11  wiped.  Somebody went through them and erased a series

12  of material.  So a lot of effort has been put into kind

13  of reconstructing this.  And a lot of dialogue has been

14  occurring between the experts we're using and the

15  experts they are using.  We're telling them about what

16  we're doing to get into this.  And what we're doing is

17  we use search terms.  When you have a bunch of material

18  on a computer -- and I'm not real steeped in this like

19  my colleagues, some of my colleagues are, you can do

20  search terms.  Put in "Chechnya" and look for anything

21  that may be wiped out on the computer relating to

22  "Chechnya."  And then look at it for what it will.

23            So I'm hesitant to go too far in saying where

24  we're at because there's been an awful lot of dialogue,

25  continuing dialogue, meaningful dialogue, as I

1   understand it, between their investigators and the

2   people we're using on how to get information out of

3   these computers.  But, you know, we can only go so far

4   in trying to do their work.

5        If something comes across that's exculpatory

6   and it's Chechnyan related, we're going to dig it out

7   and we're going to give it to them.  So we get it in

8   terms of what's exculpatory vis-a-vis the four corners

9   of the indictment.

10        On witness statements, if it's related to a

11   defense we think is coming, if it's related to the

12   indictment itself, they are going to get it.  But just

13   general, every person we've ever talked to about

14   Mr. Seda, any report about Mr. Seda in any government

15   agency's possession, it just goes far beyond anything

16   we're required to do.

17        THE COURT:  Okay.  Are there other subjects we

18   need to talk about today?

19        MR. WAX:  One more, please, and it's again

20   another computer issue.  At the time that Summer Rife

21   came into the country, she was in possession of a laptop

22   computer.  That laptop was seized.  It was mirrored.

23   The government provided us a -- what seemed to be

24   relatively short list of material on that computer.

25   There were a number of redactions in the list that they

1   gave us.  And we believe that the same issue exists with

2   respect to their efforts to recover material from that

3   laptop, and their provision of only a very small part of

4   that.  We do not have a mirror image of that laptop.

5   Yes, Ms. Rife got the laptop itself back.  But by the

6   time we got into the case and were in a position to try

7   to do something, whatever it was that the government had

8   had to mirror no longer existed because the machine had

9   been used.  So that we are not in a position to use that

10  laptop to try to do a recreation of our own because it

11  was used between the time that the government mirrored

12  it and the time that we were in any position to deal

13  with it.

14          THE COURT:  What would that do besides put more

15  information on it, on the hard drive?

16          MR. MATASAR:  It would cover up the

17  information.  It makes it harder to recover if

18  somebody --

19          THE COURT:  What was the period of time?

20          MR. MATASAR:  -- uses the --

21          MR. WAX:  I don't know precisely, Judge.  And

22  if they have a copy, that -- you know, a mirror that

23  they can give us, we can get a mirror from -- of that

24  and try to do our --

25          THE COURT:  How long did the government have

1    the computer?

2             MR. WAX:  I don't know.

3             MR. CARDANI:  Judge, my understanding is when

4    she came into the United States last year, it was an

5    ICE, Customs took it, mirrored it, and within a matter

6    of time, gave it back to her.

7             THE COURT:  Matter of time?  Twenty minutes?

8    Twenty days?

9             MR. CARDANI:  Ms. Rife is here.  We can ask

10   her.  I think it was a matter of weeks.

11            THE COURT:  You ought to know that.

12            MR. WAX:  We'll find out.  But the relevant

13   time would not be how long the government had it.  I

14   mean, that is one relevant factor.  Another relevant

15   factor is, by the time that we were in a position to try

16   to do something with it, she had used it, it had been

17   used.  And as Mr. Matasar indicated, that adding stuff

18   to it makes the recovery process of whatever existed

19   then more difficult because some of it wouldn't be there

20   anymore.

21            THE COURT:  I understand your issues.  Any

22   others?

23            Mr. Baker, do you need a couple of minutes with

24   me before these people go?

25            MR. BAKER:  Yeah.

1    THE COURT:  All right.  Short recess.

2    (Discussion held off the record.)

3    THE COURT:  Counsel, a couple of additional

4 thoughts.  Mr. Cardani, are you taking the position that

5 you shouldn't have to turn over -- it's been referred to

6 as a mirror, I've never used that term -- of that last

7 computer?

8    MR. CARDANI:  The Rife?  No, we're not taking

9 that position.  We just talked privately.

10    THE COURT:  Then work it out.

11    MR. CARDANI:  We'll work that out.

12    THE COURT:  That didn't sound like a real

13 dispute to me.  I was back there scratching my head,

14 what's going on here?

15    MR. CARDANI:  Judge, there are attorney-client

16 documents on that computer, all right?  So we have

17 stayed away from those computers.  A report was printed

18 out.  We've turned it over to the defense in redacted

19 form because it was redacted from us, too.  We'll figure

20 this thing out.

21    THE COURT:  What I have learned through hearsay

22 is that Judge Rosen in Detroit in the Fawzi Assi case

23 proposed something similar to what I've proposed with

24 regard to ex parte filing by a defendant, that it may or

25 may not have been filed, the case may have been resolved

1    before that happened.  If such a -- if I authorize --

2    Mr. Matasar, I think I was talking to you at the time.

3    If I authorize such an ex parte submittal, I want it

4    prepared on a secured computer, the court security

5    computer.

6         MR. MATASAR:  Your Honor, this is the document

7    that we talked about that would assist you in reviewing

8    the material the government has already --

9         THE COURT:  Yes.  The reason I want it prepared

10   on a court security computer is that just in making

11   reference to theories and so on, it could tend to

12   disclose something that shouldn't be out there in the

13   general computerland.  All right?

14        MR. MATASAR:  Yes.

15        THE COURT:  Okay.

16        MR. CARDANI:  Judge, would that document be

17   submitted through Ms. Hogarty?

18        THE COURT:  Yes, her computer, to make it real

19   clear.

20        MR. WAX:  And would that computer be available

21   to us here in Oregon?

22        MS. HOGARTY:  Yes.

23        THE COURT:  Well, you can negotiate that.

24   We'll make sure it happens in ways that are appropriate.

25        All right.  Anything further at this time?

1    Thank you very much.

2            MR. CARDANI:    Thank you, Judge.

3            MR. MATASAR:    Thank you very much, Your Honor.

4            MR. WAX:    Thank you.

5            (The proceedings were concluded at 1:27 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATE

 2          I, Deborah Wilhelm, Certified Shorthand Reporter

 3     for the State of Oregon, do hereby certify that I was

 4     present at and reported in machine shorthand the oral

 5     proceedings had in the above-entitled matter.  I hereby

 6     certify that the foregoing is a true and correct

 7     transcript, to the best of my skill and ability, dated

 8     this 30th day of June, 2009.

 9

10

11

12                                   Deborah Wilhelm, RPR
                                     Certified Shorthand Reporter
13                                   Certificate No. 00-0363

14

15

16

17

18

19

20

21

22

23

24

25
```