1           IN THE UNITED STATES DISTRICT COURT

FILED '09 JUN 30 17:05 USDC-ORE

2              FOR THE DISTRICT OF OREGON

3    UNITED STATES OF AMERICA,          )
                                        )
4                   Plaintiff,          ) No. 05-60008-2-HO
                                        )
5      v.                               ) April 14, 2009
                                        )
6    PIROUZ SEDAGHATY, et al.,          ) Eugene, Oregon
                                        )
7                   Defendants.         )

8

9              TRANSCRIPT OF PROCEEDINGS

10        BEFORE THE HONORABLE MICHAEL R. HOGAN

11         UNITED STATES DISTRICT COURT JUDGE

12

13

14                     -:-

15

16

17

18

19

20

21

22

23            Deborah Wilhelm, CSR, RPR
                    Court Reporter
24               P.O. Box 1504
                Eugene, OR  97440
25               (541) 431-4113



```
 1                      APPEARANCES OF COUNSEL

 2

 3    FOR THE PLAINTIFF:      CHRISTOPHER L. CARDANI
                              United States Attorney's Office
 4                            405 E. 8th Avenue, Suite 2400
                              Eugene, OR  97401
 5                            (541) 465-6771
                              chris.cardani@usdoj.gov
 6
                              CHARLES F. GORDER, JR.
 7                            United States Attorney's Office
                              1000 S.W. Third Avenue, Suite 600
 8                            Portland, OR  97204-2902
                              (503) 727-1021
 9

10    FOR THE DEFENDANT:      LAWRENCE H. MATASAR
                              Lawrence Matasar, P.C.
11                            621 S.W. Morrison Street
                              Suite 1025
12                            Portland, OR  97205
                              (503) 222-9830
13                            larry@pdxlaw.com

14                            STEVEN T. WAX
                              Federal Public Defender
15                            101 S.W. Main Street, Suite 1700
                              Portland, OR  97204
16                            (503) 326-2123
                              steve_wax@fd.org
17

18    Also present:          Dave Carroll
                              Colleen Anderson
19                            Pirouz Sedaghaty
                              Summer Rife
20

21

22

23

24

25
```

```
 1              (Tuesday, April 14, 2009; 1:44 p.m.)
 2         (The following proceedings were had in chambers.)
 3                    P R O C E E D I N G S
 4         THE COURT:  Well, are we ready to give this
 5  case a real trial date now?
 6         MR. CARDANI:  We hope so.
 7         THE COURT:  Okay.  And have you talked about
 8  that?
 9         MR. CARDANI:  Yes, we have.
10         MR. MATASAR:  We have.
11         MR. WAX:  We have.
12         THE COURT:  I'm not shocked.
13         MR. MATASAR:  We met for about an hour in the
14  prosecutor's office this morning.
15         THE COURT:  It's good to have good lawyers.
16  What do you hope to do then?
17         MR. MATASAR:  We can't say that we agree.
18         THE COURT:  I get to veto.
19         MR. MATASAR:  Steve has the notes.  Why don't
20  you redo our discussion.
21         MR. WAX:  We thought --
22         THE COURT:  Yes.
23         MR. WAX:  -- that we would propose that this
24  Friday we would file a pleading with you that will seek
25  clarification and some expansion on your ruling on the
```

1   classified information.

2           THE COURT:  Okay.

3           MR. WAX:  We, with respect to the classified

4   information, also need a ruling from you on the piece

5   that relates to our ability to communicate, Larry and

6   me, and the two of us with Mr. Sedaghaty about the

7   document that we had provided.

8           We think that after resolution of the issues

9   related to classified material that we would need --

10  figure -- 60 days and then file substantive motion

11  challenging the search.

12          And when we were talking with the government,

13  they had been suggesting maybe June, which would be more

14  or less the same time frame for that, assuming that

15  resolution on the classified issues takes place

16  relatively quickly.

17          From that point, we had slightly different

18  views on trial date.  We're in agreement, I think, that

19  we need -- we both need to have a pretty clear sense of

20  what the trial would look like farther in advance of the

21  trial than is normally the case.

22          We're both anticipating some potentially pretty

23  complex evidentiary issues that relate to admissibility.

24  There might be some *Daubert* hearings with respect to an

25  expert or experts the government might present.

1          There are likely to be issues related to

2     witnesses from overseas, issues related to the

3     admissibility of some of the evidence that the

4     government might want to present.  They gave us some new

5     discovery this morning that includes some things that

6     come from Russian FSB, the successor to the KGB.

7          So there are a host of trial type evidentiary

8     issues that are likely to consume a fair amount of time

9     and also whose resolution we think is important to help

10    us in knowing what the landscape of the trial is like.

11         Our sense, that meaning the defense, Larry and

12    I, are suggesting that a realistic trial date is next

13    winter.  That if we deal with the suppression issues

14    over the summer, if we can have, perhaps, a real, you

15    know, heart-to-heart status conference first part of

16    September where we can then, you know, get a clear

17    picture from the government in terms of experts and

18    witnesses and define those issues, have some substantial

19    evidentiary hearings maybe the first or second, you

20    know, week in November, then we can have a trial

21    February-ish.  That's what we would propose.

22         The government, at least this morning, was more

23    interested in a trial sooner than that.

24         MR. CARDANI:  Do you want to speak for us?

25         MR. GORDER:  Certainly.  Your Honor, we agreed

1  with Mr. Wax that we thought that trying to get the
2  substantive motions filed, briefed, and heard before the
3  summer ends would be a good idea.  And we were thinking
4  that they could file motions in early June.  We would
5  ask for three or four weeks to respond, and try to get
6  the hearing in July sometime before Mr. Cardani takes
7  off for Italy.
8          And we just thought that a trial date in the
9  fall sometime, mid-October to mid-November, somewhere in
10 that time frame, would be appropriate to get the case
11 moving.
12         We all realize that the defendant came back to
13 the country in August of 2007.  So the case has been
14 pending for over a year and a half now.  And we're just
15 trying to force ourselves forward.
16         THE COURT:  Right.  I'm hopeful that both sides
17 in this matter will be willing to show their hand to --
18 for trial to the extent that we don't have to interrupt
19 the trial with hearings.
20         MR. MATASAR:  And, Your Honor, that's one of
21 the issues here that has always been apparent is that
22 this is not an open file case like the others, so we
23 don't know their witnesses, and that's the exact concern
24 we have.
25         THE COURT:  I have concern for you, too.

1           MR. MATASAR:  Well, that's great.  We

2    appreciate that, Your Honor.  And so that's why we have

3    this different time frame.

4           We don't know -- when we hear for the first

5    time today about a secret Russian agent who listened in

6    to a phone call in 2000 and then destroyed the tapes,

7    and, you know -- or the tapes were destroyed, that is an

8    issue in itself.

9           One of their experts, so-called terrorism

10   expert, we saw him in the release issue hearings, we

11   probably want -- or we do -- or we will want to have a

12   *Daubert* hearing on him.  He doesn't speak Arabic.

13   There's a lot of -- he doesn't have a Ph.D.

14           So these are real substantive, meaty issues

15   that we'll have once we know who their witnesses are.

16   If we get their witnesses at the last minute, you are

17   right, that's our concern.  So we join you in that.

18           THE COURT:  And I will tell you that if we have

19   a *Daubert* hearing, it's not going to come during the

20   trial.  Everything is going to happen in advance.

21           MR. WAX:  I think, Judge, all of us are hopeful

22   that we can deal with a lot of that sort of stuff and

23   evidentiary issues and chains of custody and

24   admissibility and coconspirator issues, you know,

25   several months in front of the trial is what seems to us

1   to make the most sense.  I mean, normally we do that

2   stuff, you know, a week or two weeks before the trial.

3        But, for example, if the government is going to

4   be permitted to bring to the courtroom live a Russian

5   FSB agent to testify, which at least we understood this

6   morning is something that they are seriously

7   considering, that raises a host of issues about our need

8   to try, in whatever way we can, to do some investigation

9   in Russia.  It raises another set of discovery type

10  issues.

11       You know, we were also talking about, you know,

12  the potential for other witnesses from the Middle East

13  the government may want to call or we may want to call.

14  And to get witnesses here from overseas, and from some

15  of the less than democratic countries from which some of

16  them may be coming, that's not going to happen

17  overnight.

18       So that's why we're thinking, you know, try to

19  deal with the more standard, if it is standard,

20  suppression type issue over the summer, and then get

21  us -- you know, defining what the scope of the trial is

22  so that we can have motions, which we're thinking, you

23  know, we could be in court for a week on motions to

24  suppress -- you know, motions in limine.

25       THE COURT:  What do they do in there without

1    me?  We'll open the door.

2            MR. MATASAR:  Physically we'll open the door.

3    We can get you there physically there listening to

4    something else.  I'll be --

5            THE COURT:  I'll be surprised if that happens.

6    Okay.

7            MR. CARDANI:  Judge, we don't have any trouble

8    with sharing witnesses much sooner than later in this

9    case.  We realize they've got some work to do.

10           THE COURT:  Yeah.  Let's say that we get

11   suppression motions by mid-June, all right?  And

12   whatever the issues are, suppression motions are really

13   not time-consuming for a court to decide one way or the

14   other.  It sort of becomes clear during the hearing.

15           So when would you be willing to tip your hand

16   enough to give these folks something to respond to by

17   way of trial motions?

18           MR. CARDANI:  Trial --

19           THE COURT:  Not --

20           MR. CARDANI:  You mean like witness lists?

21           THE COURT:  Witness lists, expert lists,

22   exhibit lists, that sort of thing.

23           MR. CARDANI:  You know, I think that they can

24   predict 90 percent of our witnesses right now.  It's not

25   a big mystery as to who the majority of our witnesses

1    are going to be.  I wouldn't want to be locked into, you

2    know, a set witness list.

3            THE COURT:  Well, we want it to be inclusive,

4    in other words.  And I would want you to think about

5    whether -- what your position is going to be on that.

6            You know that I require witness lists and you

7    know that I do it even though the Ninth Circuit says I

8    can't enforce it, but it makes trials go better, so I'm

9    going to continue to do it.  You can't expect me to

10   follow the Ninth Circuit on that.

11           MR. CARDANI:  Judge, along those lines, you say

12   you don't like surprises, this trial, we will tip our

13   hand, we will tell them who we are calling well in

14   advance.  They can do their work.

15           Depending on who they may call may raise the

16   possibility of rebuttal witnesses --

17           THE COURT:  Yeah.

18           MR. CARDANI:  -- that are overseas witnesses.

19           THE COURT:  Sure.

20           MR. CARDANI:  And so to the extent that we can

21   have them tipping their hand as well as to who these

22   people may be, that's going to help shape the trial and

23   prevent delay.

24           And there really is a substantial likelihood of

25   that happening depending on who they call.

1        THE COURT:  Are you going to give us your

2   witnesses?

3        MR. MATASAR:  No.  We were talking about other

4   scheduling matters.

5        MR. WAX:  Well, in terms of experts, Judge, we

6   will, you know, provide the government with what we've

7   got.

8        THE COURT:  Off the record.

9        (Discussion held off the record.)

10        THE COURT:  Go ahead.

11        MR. WAX:  I'm sorry, I forget where we are.

12        THE COURT:  Are you going to tell us enough of

13   your witnesses and experts so that they can respond?  I

14   don't want to pull a jury in and send them home for two

15   weeks.

16        MR. WAX:  That won't happen.  You know, I

17   appreciate Chris's response, we'll give them the stuff

18   in plenty of time in advance.  What -- I give the same

19   answer.  You know, in terms of experts, you know, we all

20   know that there are accounting issues in the case.  And

21   at some point, we will have, you know, identified and

22   firmed up accountants.  And we will, you know, provide

23   sufficiently in advance of trial, you know, who our

24   accounting experts are, and the essence of their

25   testimony is required under Rule 16.  We're not going to

1   play games about that.

2           In terms of, you know, potential -- whatever we

3   call them, you know, terrorism witnesses, at this point,

4   we don't know if we're going to be bringing in any

5   terrorism type witnesses.  We're going to have to know

6   that sooner rather than later.  But when we get from the

7   government, as we did today, a, you know, set of reports

8   which open up an entirely, you know, new area of the

9   case, to a certain extent, we go back to, you know,

10  square one in terms of our assessment of what we need to

11  do.

12          You know, there are some fact witnesses who are

13  in, you know, the Middle East, who are potentially

14  desirable by either side.  And, you know, we touched on

15  that briefly in our conference this morning.

16          At this point I don't know if the government

17  knows who it's planning on calling and neither do we.

18  And what we do will depend in part on what they do.

19  They have the ability to, you know, work the government

20  to get people in from overseas far more easily than we

21  do.

22          THE COURT:  Please tell us who your accounting

23  type people and that sort of people are in time so we

24  don't have to interrupt the trial.

25          MR. WAX:  Don't worry about that, Judge.  That

1  will happen.  Absolutely.

2       THE COURT:  All right.  Are you using outside

3  financial people or are you using people from the IRS?

4       MR. CARDANI:  IRS.

5       THE COURT:  Yeah.  Who are you using?

6       MR. CARDANI:  And also -- well, their

7  accountant -- their accountant is a fact witness.  He'll

8  be a witness.  We also have an IRS witness named Wooten.

9       MS. ANDERSON:  Yes, Greg Wooten, TEGE.

10       MR. CARDANI:  So those are the financial

11  experts.

12       MS. ANDERSON:  Yes, he's Tax Exempt.

13       MR. CARDANI:  Anybody -- and that's it, right?

14       MS. ANDERSON:  Uh-huh.

15       MR. CARDANI:  And then we have a terrorism

16  consultant expert, who they know very well.  He

17  testified in the detention hearing, Evan Kohlmann.  We

18  plan on using him as a witness.  No mystery there.  And

19  we have a computer expert that's an IRS guy, Jeremy.

20  They've talked to him.  We've shared information.  So

21  that's all right out there.

22       The only new wrinkle to any of this is the

23  stuff that we came back from Russian with, and that is

24  this Russian discovery, and the possibility of us being

25  able to get somebody from Russia here who may or may not

1   testify direct in the case in chief.  We just don't

2   know.  They've got that information now.  It's been

3   translated.  And they'll understand it.

4           But most of the issues are out there and self-

5   evident, and there are no secrets.  We don't have any

6   secret witnesses.  We don't have --

7           MR. MATASAR:  There are no secrets except

8   secrets, the classified secrets.

9           MR. GORDER:  We're not planning on introducing

10  the secrets.

11          MR. MATASAR:  Right.

12          MR. CARDANI:  Yeah.  So I think that in terms

13  of your preparation, absent the Russian stuff, that it

14  is what it is on the expert side.  And like I said,

15  we'll be willing to turn over witness lists sooner

16  rather than later.

17          What I'd like to avoid is us turning over a

18  witness list, getting nothing in return, and then having

19  a trial date dissolve, you know, and then that just, you

20  know, leads to problems.  So if we have a finite trial

21  date and then we can back it up from there and say

22  what's a reasonable time to give them anything?  And

23  they've got, by the way, a lot of our witness statements

24  already, a lot of the traditional Jencks Act material

25  has been turned over in seven batches of discovery.

1          But we'll agree to do that, turn it over well

2     in advance of trial, but we'd like to have some

3     predictability that we've got a hard trial date.

4          MR. WAX:  We don't disagree with that, Judge.

5          MR. MATASAR:  We don't disagree with that.  We

6     think, though, remember -- well, we -- if there is going

7     to be well in advance the *Daubert* hearing, and we're

8     going to have to investigate the Russian stuff, we've

9     been sort of waiting sort of anticipating we were going

10    to have more discovery in the classified part than we

11    ended up with, so we've been kind of waiting to do a lot

12    of the international investigation and such that we've

13    done.

14         So in our view, October is just too soon to

15    have a trial.  So we would much prefer the after

16    Christmas approach rather than the October approach

17    because there is so much international investigation to

18    do.

19         The accounting case we can try in June or July,

20    I would say July, at the end of July, but as evidence by

21    the -- as we said, Judge, the release hearing in this

22    case, you know, typically a release hearing takes

23    15 minutes.  This one had experts from -- on the

24    telephone, and took hours and hours and days, so it's

25    anticipated to be a big, difficult matter.  So that's

1   why I think October is too soon.

2          Plus, if we get the date we ask for now, it's

3   going to be pretty hard to ask for a continuance later

4   on.

5          THE COURT:  You can ask.

6          MR. WAX:  I mean, our goal would be not to

7   because if we're dealing with overseas witnesses and

8   we're dealing with the logistics of getting people into

9   the country, you know, if we have a firm date that we're

10  aiming for, and we all know that's when it's happening,

11  then we know when we've got to get the people here,

12  which may not be logistically possible in October which

13  is five months, six months.

14         MR. MATASAR:  One more thing, I'm sorry, Judge,

15  but we've had nothing but good relations with the

16  government in this case.  I would say that's fair to

17  say, the lawyer-to-lawyer discussions, just at the very

18  highest level.  But the burden on us -- for them to say,

19  okay, now it's time to get the case going, they

20  literally told us today they went into the Lubyanka

21  Prison in Moscow, the two of them, and got like the red

22  carpet treatment.  People were waving to them,

23  et cetera.  We won't get that.

24         For us to investigate this stuff is just orders

25  of magnitude more difficult.  So it just takes a while

1   for us to do it.  And I think October, again, is just

2   unrealistic.  We have good investigators.

3        THE COURT:  I was locked in that courthouse

4   elevator in Moscow.

5        MR. MATASAR:  Very nice.  Well, maybe they look

6   at prosecutors different, but they got the red carpet

7   treatment.  They didn't get locked in the elevator.

8   They got high fives and waves.

9        THE COURT:  Their recordkeeping is kind of

10  fascinating.

11       MR. MATASAR:  Not that fascinating if they

12  destroyed these tapes.

13       MR. GORDER:  Well, they indicated that it's in

14  the ordinary course of business, after five years.

15       MR. MATASAR:  Oh, really?

16       MR. WAX:  I see.  That's the old Soviet

17  ordinary course of business, destroy the tapes.

18       THE COURT:  One of the fascinating things,

19  actually, about their system, because when you are there

20  to -- I was there supposedly to teach judges how to do

21  jury trials.  And they have to -- not to say too much,

22  they were quite careful to point out to me that the

23  first jury trials in Russia were under Alexander I.

24  There was a hiatus in there.  But -- and when I started

25  talking about getting things to trial, they said our law

1    requires that the case be tried in 60 days, but that

2    means 60 days from when the file is sent from these file

3    rooms to a chambers.  And I looked at some files.

4    They'd been smoldering there for a long, long time.  I

5    couldn't read them, but I could read numbers.  All

6    right.  It was fascinating, really.

7         Okay.  Just a second here.  How long do you

8    anticipate for the trial itself?

9         MR. CARDANI:  Up to two weeks is what our best

10   estimate is right now without knowing what kind of

11   defense to expect.

12        THE COURT:  All right.  I want to try the case

13   in November if we can get there.  Let me just try these

14   dates on.  I know it's not exactly what you folks have

15   asked for.

16        Actually, Lea, would you make double

17   photocopies of this, so they don't try to write it down

18   here.  We can just walk through it.  And we'll just

19   relax for a second.

20        (Discussion held off the record.)

21        THE COURT:  All right.  We'll go back on the

22   record.  You see, I've suggested suppression motions be

23   filed by the 12th of June; that the hearings on those

24   motions be the 13th of July; and that witness list and

25   expert lists on the 10th of August; the trial motion

1   hearings on September 1st.

2          MR. WAX:  Is that filed or to be in court?

3          THE COURT:  That's to be -- well, I'm sorry, I

4   misspoke.  That is just the motions to be filed on the

5   1st, and the hearing on 9/22.  Yeah, you can see what I

6   did, I followed the hearings twice.  And then October

7   13th, proposed jury instructions, voir dire, and

8   miscellaneous other trial motions, if there is some

9   little motions in limine or things like that, procedural

10  things.

11         MR. WAX:  Independent of what we were saying

12  before, on September 22nd, I'm supposed to be in Alaska.

13  We've got a trip, be leaving around the 20th, and coming

14  back around October 3rd is what we have set.  So if it's

15  possible to accommodate that, Kathleen has always wanted

16  to go to Alaska, and we've finally booked it.

17         THE COURT:  All right.  That's the -- tell me

18  that again.  That's the 20th --

19         MR. WAX:  Leaving around the 20th.

20         MR. CARDANI:  While he's looking for that,

21  there will be in limine hearings on this that could

22  consume some time, so is that built into this?  I see

23  filings date for the 13th of October.

24         MR. WAX:  Or were you thinking of the in limine

25  type motions for the September 1 round?  Is that what

1    you're thinking?

2         THE COURT:  No.  The motions you can file, I

3    want you to file early.  But in a case like this, there

4    will be some little miscellaneous things later.

5         Why don't we have -- we'll move that pretrial

6    conference into November when Steve gets back.  Let's

7    say the 9th of November.  And on that date, we'll hear

8    other motions, later filed motions.

9         MR. CARDANI:  In limine type of motions?

10        THE COURT:  Yeah.

11        MR. CARDANI:  Okay.

12        THE COURT:  And preserve -- on -- Lea, preserve

13   a couple of days for each of those more -- when I say

14   motion hearings, I realize we have calendars on some of

15   those Tuesdays, and so on.  We'll adjust.

16        MR. WAX:  Judge, I'm sorry, I may have

17   misspoken.  The day I'm not here is September 22nd.

18        THE COURT:  Oh, okay.  That's not what I

19   understood.

20        MR. WAX:  Sorry.  I'm supposed to leave --

21   we're going to leave on the 20th, and then I'll be back

22   in the office Monday, October 5.  So it's the 22nd date

23   that's the -- that poses the problem for me.

24   October 26th was --

25        THE COURT:  The problem is that the government

1  needs a chance to respond if you file things like

2  *Daubert* motions and so on on the 1st.  And so -- well --

3       MR. WAX:  Can you push that 22nd date back to

4  the October 9th or 13th or something?

5       Our sense, Judge, is we're better -- if the

6  16th of November is the trial date, that we'd all be

7  better off if we can keep the October 26th date for any

8  last round of hearings, so that in the last two weeks or

9  so we all know more or less what's coming in.  If we

10  wait for the last round of hearings until the week

11  before the trial, I think it becomes more difficult for

12  both parties.

13       THE COURT:  Okay.  What about this:  If we move

14  the trial motion hearings to October 13, get the jury

15  instructions, voir dire, and other trial motions on the

16  30th of October, pretrial conference and remaining

17  motions on the 16th, and start the trial on the 30th.

18       MR. MATASAR:  Yeah, good.

19       THE COURT:  The first week we will not have --

20  well, is Thanksgiving --

21       MR. WAX:  Thanksgiving is the 26th.

22       THE CLERK:  Jurors are often gone.

23       THE COURT:  We can start it on the 30th.

24       MR. MATASAR:  Fine.

25       THE COURT:  And that first week's trial, the

schedule will go something like this:  We'll pick the
jury and have opening statements on Monday and Tuesday.
We'll start the evidence on Friday the 4th.  If any of
you want to know why, I'm happy to explain it.

MR. CARDANI:  I think we're about to hear it.

THE COURT:  The Beavers are here on the 3rd.
They are playing on a Thursday this year.  And I'll have
150 people here, so I'm going to take the day before to
get ready.

MR. WAX:  That's good, the jurors will
appreciate it.

THE COURT:  They'll like it, too.

MR. CARDANI:  Monday and Tuesday, jury
selection, opening.  Wednesday and Thursday, down.

THE COURT:  It won't take us two days to do
that, but we'll -- if there is some other little
pretrial things to clean up, we'll do that then.

MR. MATASAR:  That's great.

THE COURT:  And maybe I'll have ruled on the
exhibits by then, but if not, I'll do that before we
start taking any evidence --

MR. WAX:  I think --

THE COURT:  -- to the vast extent we can.

MR. WAX:  -- Judge, what would be useful, which
we've done in some other cases, and we'll try to get

1    together with the government and see what we can agree

2    on and get as much stuff pre-admitted as we can.

3              THE COURT:   I expect you to do that.   If some

4    need rulings, I'll probably try to make them in advance,

5    too.

6              MR. WAX:   So in terms of other stuff that we

7    had had on our list that we hoped to address today,

8    Judge, we have three motions pending on which we need

9    rulings.   The one is the communication between and among

10   the defense about the document.   And I don't know if you

11   want us to argue that at all right now but --

12             THE COURT:   No.

13             MR. WAX:   -- we need a ruling on that so we can

14   figure out what -- where to go with that.

15             In the nonclassified discovery motions, we

16   still disagree with the government about the scope of

17   their *Brady* obligation, what is *Brady* material.   And we

18   argued that previously about character type evidence, if

19   you want to call it that, although I think it goes

20   directly to the intent issues.   We just need a ruling on

21   that because we're in disagreement.

22             We had asked previously for a ruling on the

23   computer discovery issues.   It appears as though we have

24   that resolved.   We've had two meetings now with the

25   government expert and we're awaiting a report which we

1   understand will give us not the actual documents but

2   will give us a very direct guide.  So in terms of our

3   previous request for you to rule on the discovery of

4   computer issues, I don't think you need to attend to

5   that today.  It looks like we have that worked out.

6   Which means, I think, that we have two things on the

7   table on which we need rulings, as we see it.

8           THE COURT:  Do either of you want to be heard

9   further on that?

10          MR. CARDANI:  Well --

11          MR. GORDER:  Let me jump in, Your Honor, at

12  least on the issue about them communicating about this

13  sealed document.

14          THE COURT:  Yes.

15          MR. GORDER:  As you know, Mr. Cardani and I are

16  not privy to it, so we are kind of shooting in the dark

17  here.  You've had an opportunity to review the

18  government's pleadings, and may be able to make some

19  decisions as to how relevant that would be.  If you feel

20  it's necessary, they can go through the court security

21  officer and arrange somehow -- they would probably have

22  to go to Washington, D.C. to discuss what they want to

23  discuss between themselves.

24          MR. CARDANI:  Or with the court.

25          MR. GORDER:  Or with the court.  If it's with

1    the court, I think we would ask that Mr. Sandoval be

2    allowed to participate.  And beyond that, Mr. Cardani

3    and I really can't take a position because we don't know

4    what you're talking about.

5         THE COURT:  When you filed the brief, did the

6    court security officer bring a computer out here?

7         MR. WAX:  Yes, yeah, we worked on that,

8    although I think at the end of the day, she believed

9    that we weren't putting anything class -- anything that

10   required that kind of treatment, and that we could have

11   actually just done it on our system.

12        THE COURT:  You want to go beyond that?

13        MR. WAX:  Well, what we've requested with

14   respect to the document in our communication is --

15        THE COURT:  We don't need any more on that.

16        Now, on other discovery, where are you?

17        MR. CARDANI:  Well, I think we're just fine.

18   The disagreement seems to be about if there are acts

19   of -- noncriminal acts, activity that's not criminal,

20   and I don't mean to belittle the request, but in us

21   screening everything that we've turned over, which has

22   been substantial, is every time that we have evidence of

23   Mr. Sedaghaty not involved in criminal activity is that

24   discoverable, we think not, under Rule 16, under *Brady*,

25   Jencks, *Giglio*, anything.  So I don't know what more --

1   is there anything else to the disagreement?

2         MR. MATASAR: I mean, we think it is. Not so

3   much helping an old lady across the street but a lot of

4   the things that we feel are in the government's file

5   cabinet, if you will, that they haven't turned over

6   include positive things, comments about the defendant,

7   comments by the defendant, which we believe would be

8   useful in preparing for trial, and maybe even

9   admissible.

10        MR. WAX: It goes directly to his intent.

11        MR. MATASAR: State of mind.

12        MR. WAX: State of mind, which is one of the

13   key elements in the indictment that, you know, he did

14   certain things with respect to the tax return for a

15   particular purpose. And we believe that evidence on

16   classified and unclassified that reflects on his intent

17   with respect to his activities to engage in peaceful,

18   charitable, and helpful things, as opposed to violent,

19   pro-mujahideen things, goes directly to an element the

20   government has alleged, and is therefore exculpatory.

21   And that's our disagreement.

22        THE COURT: Okay. That's fine. I understand

23   that. That's what I thought. But it's refreshed for

24   me. I'm going to give you a little minute order, order

25   in writing on these things.

1          MR. MATASAR:  We had written -- I think as far

2     as whether we can talk about the secret thing, we -- our

3     papers pretty much reflect our arguments, so we really

4     don't have to restate it here.  I think we have two

5     papers.

6          THE COURT:  I have them.

7          MR. MATASAR:  You have them, yeah, I know that,

8     so we're good.

9          THE COURT:  I agree.  Anything else?  I've got

10    bankers here from three banks -- four banks right now.

11         MR. MATASAR:  Great.  Throw them in jail, or at

12    least get them indicted.

13         THE COURT:  They feel like they are in jail

14    already.

15         MR. CARDANI:  Judge, will this schedule be

16    reduced to a minute order?

17         THE COURT:  You'll get a better copy than this.

18         (The proceedings were concluded at 2:26 p.m.)

19

20

21

22

23

24

25

1          CERTIFICATE

2          I, Deborah Wilhelm, Certified Shorthand Reporter

3    for the State of Oregon, do hereby certify that I was

4    present at and reported in machine shorthand the oral

5    proceedings had in the above-entitled matter.  I hereby

6    certify that the foregoing is a true and correct

7    transcript, to the best of my skill and ability, dated

8    this 30th day of June, 2009.

9

10

11

12                                    Deborah Wilhelm, RPR
13                                    Certified Shorthand Reporter
                                      Certificate No. 00-0363
14

15

16

17

18

19

20

21

22

23

24

25