KARIN J. IMMERGUT, OSB #96314
United States Attorney
District of Oregon
CHRISTOPHER L. CARDANI
Assistant United States Attorney
405 East Eighth Avenue, Suite 2400
Eugene, Oregon 97401
(541) 465-6771
chris.cardani@usdoj.gov
CHARLES F. GORDER, JR., OSB# 912874
Assistant United states Attorney
1000 SW Third Avenue, Suite 600
Portland, Oregon 97204
(503) 727-1117
charles.gorder@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  05-CR-60008-HO |
| | ) | |
| v. | ) | |
| | ) | GOVERNMENT'S RESPONSE |
| | ) | TO DEFENDANT'S MOTION |
| PIROUZ SEDAGHATY, | ) | TO SUPPRESS (CR 181) AND |
| | ) | TO COMPEL (CR 182) |
| Defendant. | ) | |


## I.  Introduction

The United States of America, through its undersigned counsel, herein responds

to:

• Defendant's Motion to Suppress Evidence Seized Pursuant to Search Warrant

   (CR181); and

• Defendant's Motion to Compel Government to Cease All Searches of Computers

   and Electronic Media Seized on February 18, 2004 (CR 182).

Defendant has filed these two motions, and an accompanying memorandum in support (CR 183), in an attempt to have evidence suppressed at trial. For reasons set forth below, this Court should deny both motions.

## II. Factual Background

On February 13, 2004 Colleen Anderson, a Special Agent with the Internal Revenue Service's Criminal Investigation Division (SA Anderson), submitted a thirty-four page affidavit in support of an application to search the premises at 3800 S. Highway 99, Ashland, Oregon. Finding there was probable cause to believe that crimes were committed, and that evidence of those crimes might be within the premises, United States Magistrate Judge John Cooney approved the application and issued a search warrant.

On February 18, 2004, agents served the search warrant and seized evidence, primarily nine computers and assorted computer media. Other items were taken after defendant's son, Jonah Sedaghaty, provided written consent to agents in the presence of his lawyer.

Through his present motions, defendant Pirouz Sedaghaty argues that agents violated his Fourth Amendment rights in several respects and that all of the seized evidence should be suppressed at trial. In this response, the government counters each of defendant's arguments, although in an order different than he presents them in his memorandum.

## A. The Probable Cause Statement

Judge Cooney found that SA Anderson's affidavit established probable cause to

believe that two officers of the Al-Haramain Islamic Foundation, Inc. (AHIF) in the
United States, Pirouz Sedaghaty (a/k/a Pete Seda) and Soliman Al-But'he, violated the
law by filing a false return with the IRS and by failing to acknowledge the transportation
of $130,000 out of the United States.

The search warrant affidavit establishes that AHIF was at the time one of Saudi
Arabia's largest Non-Governmental Organizations, with offices throughout the world.  Its
stated mission was to provide charitable services and Islamic education.  Defendant
Sedaghaty established a U.S. presence for AHIF when in 1997 he filed registration
documents with the Oregon Secretary of State.  The headquarters were in Ashland,
Oregon.  ¶9.[1]

On behalf of AHIF, Sedaghaty purchased the property subject to the search
warrant with $190,000 in funds brought to him from Saudi Arabia by co-defendant Al-
But'he.  Sedaghaty lived in this residence, and also used it as a prayer house and to
conduct the operations of AHIF.  ¶¶11-13.

In 1999, Sedaghaty formally incorporated AHIF in Oregon and, along with others
like Aqeel Abdul-Aziz Al-'Aqeel (Al-Aqeel) and Al-But'he in Saudi Arabia, Sedaghaty
became a Director of the corporation.  ¶¶14-15.  He also filed an application with the
IRS for AHIF to become a tax-exempt organization, meaning that, if granted, AHIF did
not have to pay income taxes for any of the donations it received, so long as it acted in
accordance with the rules governing such organizations.  ¶17.

---

[1]Paragraph citations are to SA Anderson's search warrant affidavit, which is
attached as "Exhibit 1" to the memorandum offered by defendant in support of his
motion to suppress.  (CR 183).

One of those regulations is that any tax-exempt public charity receiving more than $100,000 in gross receipts must file with the IRS a Form 990, *Return of Organization Exempt from Income Tax*.  ¶50.  These returns are subject to audit by the IRS.  If the IRS determines that an organization is not operating consistently with its tax exempt purpose, including by filing a false Form 990, then such coveted status may be revoked and the organization's revenues are then subject to taxation.  ¶¶51, 65.

The El Fiki Donation

The affidavit centers on a $150,000 donation made by an Egyptian named Dr. Mahmoud Talaat El-Fiki (El-Fiki) to AHIF in February 2000.  The donation was made by El-Fiki "in order to participate in your nobel support to our muslim brothers in Chychnia." ¶20.  The General Manager of AHIF in Saudi Arabia was Al-'Aqeel.  Al-'Aqeel was also the President of AHIF in Oregon.  ¶¶10 & 17.  Al-'Aqeel responded to El-Fiki, thanking him for his donation and assuring him "of our commitment to continue every possible effort to help ending the Chechnyan crisis."  ¶21.

The manner in which the $150,000 was structured is detailed in the affidavit.  On February 24, 2000, El-Fiki wire transferred the funds (less a $15 bank fee) from an account in London he had with the Bank of Kuwait to a Bank of America account in Ashland, Oregon.  ¶19.  The Oregon account was in the name of the AHIF.  The only two individuals allowed to access this account were defendant Sedaghaty and his co-defendant Al-But'he.  ¶30.

On March 7, 2000, defendant Al-But'he flew from Saudi Arabia to Oregon.  ¶29. On March 10, 2000 Al-But'he, Defendant Sedaghaty, and Defendant Sedaghaty's son,

Jonah, went to the Bank of America in Ashland.  Al-But'he accessed $130,000 of the El-Fiki donation by purchasing 130 $1,000 American Express Traveler's Checks.  The next day, defendant Sedaghaty returned to the bank and accessed the remaining El-Fiki funds by purchasing a $21,000 cashier's check made payable to Al-But'he.  On the front of a copy of this check someone wrote "Donations for Chichania refugees."  ¶30-33.

Records later obtained from AHIF show that Sedaghaty and Al-But'he signed an agreement on March 11, 2000 stating that Sedaghaty was turning over the funds to Al-But'he for the "Brothers and Sisters in Chechnya," and that Sedaghaty (also known as Abu Yunus) was relieved of all responsibilities for the money.  ¶34.  A second similar agreement was signed, supposedly on the same day, which contained much of the same information, but with a slightly different amount listed as having been transferred. ¶35.

Al-But'he returned to Saudi Arabia on March 12, 2000.  ¶36.  Federal law requires anyone transporting into or out of the United States currency in any form (including traveler's checks), in an amount exceeding $10,000, to submit a Currency and Monetary Instrument Report (CMIR).  ¶¶37-38, 43.  These forms are used by government agencies to track funds coming into and going out of the United States. ¶37.

Al-But'he did not file a CMIR when he left the United States on March 12, 2000. ¶41.  Al-But'he did, however, file CMIRs on nine separate occasions from 1991 through 2001, showing he transported $777,845 into the United States.  Some of these funds consisted of traveler's checks.  ¶42.  The face of a CMIR clearly states that such forms

must be filed by anyone leaving or entering the United States with more than $10,000. Al-But'he is proficient in reading and writing the English language.  ¶43-44.

Upon returning to Saudi Arabia, Al-But'he cashed the 130 $1,000 traveler's checks on approximately March 25, 2000 at a bank in Riyadh, Saudi Arabia.  ¶45.  He also deposited the $21,000 cashier's check into what appears to be a personal account at that same bank.  ¶46.

At the end of the year, defendant Sedaghaty had to account for the receipt and disposition of the El-Fiki donation in the AHIF Form 990 to be filed with the IRS.  The search warrant affidavit establishes that the $150,000 was mis-characterized in the 2000 Form 990 signed and submitted to the IRS by defendant Sedaghaty.  Beginning at paragraph 48, the affidavit chronicles how this occurred.  In essence, defendant Sedaghaty hired an accountant named Wilcox (hereinafter, Wilcox) in Medford, Oregon to prepare the Form 990 for AHIF.  ¶49.  Wilcox prepared the Form 990 based on information provided to him by Sedaghaty.  ¶58.  Sedaghaty gave Wilcox computerized accounting records which falsely depicted the El-Fiki funds as part of the money used by Sedaghaty to purchase a prayer house in Springfield, Missouri.  ¶¶60-61.  The false information provided by Sedaghaty also indicated that some of the El-Fiki funds were returned to him.  ¶61.

Sedaghaty never told Wilcox that the El-Fiki funds were sent to Chechnya, nor did Sedaghaty ever provide Wilcox with copies of bank records or the receipts Sedaghaty and Al-But'he signed for these funds.  ¶59.  Had Sedaghaty provided Wilcox with these records, he would have prepared the Form 990 differently.  After Agent

Anderson showed Wilcox these records, Wilcox acknowledged that the Form 990 he prepared for Sedaghaty contained false information.  ¶62.

To help establish that defendants Sedaghaty and Al-But'he committed the violations either knowingly or willfully, rather than by mistake, SA Anderson spent some time in her affidavit explaining the connection between the El-Fiki funds and Chechnya. Information provided by an international terrorism consultant explained that Chechnya is a North Caucasus province which has been engaged in a long Muslim-led guerilla resistance against Russian occupation.  By 1995 this struggle drew the attention of several well known Arab mujahideen commanders.  These commanders were trying to defend the Muslim world against infidel aggression by leading a "jihad."  It was reported that the Chechnyan mujahideen had received substantial funding from Islamic charities and Non-Governmental Organizations.  ¶22.

The search warrant affidavit includes reports published in newspapers and weekly periodicals, chronicling how the conflict in Chechnya went from a resistance movement to an attempt to create an Islamic state, with hundreds of Arab radicals traveling to fight the Russians in Chechnya.  One report alleged that Saudi charities such as AHIF were providing arms or cash to jihadists in areas around the world, and that AHIF was suspected of providing $1 million for the purchase of heavy weapons from the Taliban to be used by rebels in Chechnya.  ¶23-24.   A Russian Federal Security Service internal memo, obtained by and reported on by the *Washington Post*, stated that Al-'Aqeel told Arab commanders in Chechnya that AHIF had $50 million available for the mujahideen, a report denied by Al-'Aqeel.  ¶27.

According to a *Wall Street Journal* article, Al-'Aqeel, the General Manager of AHIF in Saudi Arabia and the President of AHIF in Ashland, Oregon, was removed from his position by the government of Saudi Arabia.  ¶26.

Consistent with these reported allegations is information provided by SA Anderson in paragraph 25 of her search warrant affidavit.  In 2002 and 2004, the United States Department of Treasury, Office of Foreign Asset Control (OFAC), used its regulatory powers to designate several AHIF offices as supporters of international terrorism, based in part on a belief that AHIF was funding mujahideen fighters.  As a result of these designations, United States persons were prohibited from engaging in transactions with AHIF offices in Bosnia, Somalia, Indonesia, Kenya, Tanzania and Pakistan.  These designations were joined by the United Nations, which imposed a travel ban, an arms embargo, and an asset freeze on designated AHIF offices.  ¶25.

SA Anderson informed Judge Cooney that an examination of AHIF's website www.alharamain.org showed that the organization strongly supported the cause of the mujahideen fighters in Chechnya both before and after El-Fiki made his donation to AHIF.  Information on that website provided readers with updates on battles between Russian forces and the mujahideen in Chechnya.  ¶28.

SA Anderson in her search warrant affidavit provided the statutory language and elements of the violations at issue.  ¶¶39-40, 52-53.  One of the elements of the tax violation requires the government to prove that any allegedly false information in a tax return was done willfully, rather than by mistake or through ignorance.  Willfulness

requires a high level of proof of criminal intent.[2]

In summarizing the evidence she had set forth in her affidavit, Agent Anderson opined that there was probable cause to believe that defendants Sedaghaty and Al-But'he conspired to defraud the government by failing to file a CMIR reporting the transportation of the El-Fiki money out of the United States, and by filing a materially false Form 990 with the IRS.  ¶63.

After establishing probable cause to believe that crimes were committed, SA Anderson then sought to establish probable cause that evidence of those crimes would be found at AHIF's facility at 3800 S. Highway 99, Ashland, Oregon (the location subject to the search warrant).

Defendant Sedaghaty left the United States in February 2003 during the criminal investigation.  Despite his absence, AHIF still appeared to be operating.  Defendant Sedaghaty's son Jonah was residing on the premises, mail was being delivered to AHIF's post office box, and the utility and telephone bills were being paid.  Banking activity, while limited, was still being conducted by AHIF in the United States.  ¶¶66-67. The accountant Wilcox told Agent Anderson that when he was last there in January 2003 the original records, including computerized accounting records and backup

---

[2]Wilfulness is an element in all criminal tax cases.  *United States v. Bishop,* 291 F.3d 1100, 1106 (9th Cir.2002).  "Willfulness ... requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Id.* The burden is on the government to negate the defendant's claim that he had a good faith belief that he was not violating the law. *Id.*  The Ninth Circuit has noted that direct proof of wilfulness is "rarely available," but may be inferred from the available circumstantial evidence.  United States v. Dearing, 504 F.3d 897, 901 (9th Cir. 2007).

documentation, were located at AHIF's facility at 3800 S. Highway 99, Ashland, Oregon.
Wilcox described the layout of the building, and probable location of relevant computers
and records.  ¶56.  Although AHIF had provided business records in response to a
grand jury subpoena, some records were missing.  ¶¶68-71.

Relying on her experience as a financial crimes investigator and accountant, SA
Anderson reviewed the categories of evidence typically associated with tax and money
laundering crimes.  This included financial and business records, which were often
stored in computers.  ¶¶72-81.  Agent Anderson stated that to effectively investigate
these types of crimes, it is necessary to examine most of a business' records for the tax
year at issue, including income, expenses, asset purchases, and communications with
accountants and other corporate officers.  ¶73.  Records which may appear innocuous
at first glance may later be revealed as highly relevant to a tax or money laundering
crime.  ¶74.

Agent Anderson further stated that individuals committing tax crimes sometimes
attempt to destroy evidence by deleting information in computers, but that this type of
information may be retrievable by a trained computer forensic expert.  ¶75.  Agent
Anderson described the type of computer evidence which she believed may be needed
to seize and analyze as part of the search warrant, and that the process of retrieving
computer data can be time consuming and cumbersome.  ¶¶76-81.

Agent Anderson wrote that an effective computer analysis could not always be
done on site during a search warrant.  ¶76-81.  Accordingly, in the conclusion section of
her affidavit, she requested authorization to seize all computers and related equipment

for analysis.

Judge Cooney granted the application and issued the search warrant on February 13, 2004. (CR 183, Exhibit 1). A list of the items to be seized under the warrant was appended as "Attachment B." (CR 183, Exhibit 1). Attachment B instructed agents that if the computers found at the premises could not practically be searched on site, then they could remove them from the premises for a forensic evaluation. If so, agents were allowed to analyze all of the contents of the computers to determine whether data fell within the scope of the warrant. If relevant computer data was found not to be within the items to be seized, it would be returned within a reasonable period of time, not to exceed sixty days.

Exhibit B and SA Anderson's affidavit were expressly incorporated into the search warrant.

## B. Search Warrant Preparation

Agents met beforehand to plan the execution of the search warrant. A detailed search warrant protocol was established to cover how the warrant would be executed.[3] Significantly for purposes of this motion, agents and officers participating in the warrant read the list of the items to be seized, as well as the 34-page affidavit used to obtain the warrant. *Anderson Statement at ¶¶11-12*. Agents were instructed how to determine whether items fell within the scope of the warrant, and to contact SA Anderson if they

---

[3]To assist this court in addressing defendant's arguments in the present motions, SA Anderson has prepared a statement, attached hereto as "Exhibit 1." References to that statement will be denoted below as "Anderson Statement," followed by supporting paragraph numbers.

had questions as to whether items were covered by the warrant.

Provisions were made on how to deal with attorney-client communications which might be encountered during a review of the evidence.  The agents had the ability to communicate with the prosecutor during the search process.  *Id.*

## C.  Search Warrant Execution

The warrant was executed on February 18, 2004.  It was done in a manner consistent with the search protocol.  Jonah Sedaghaty was present, and was given a copy of the search warrant and list of items to be seized, as well as the affidavit used to obtained the warrant.  *Id. at ¶13.*  He asked that he be allowed to call his attorney.  This was done, and an attorney named David Berger, who represented Sedaghaty and AHIF, was permitted to observe the execution of the search warrant.  He was also provided a copy of the warrant and affidavit, which he reviewed.  *Id. at ¶*14.

Relying on the protocol established prior to the warrant, SA Anderson determined whether items found in the premises fell within the scope of Judge Cooney's warrant.  She refused to seize some items after concluding they were outside the warrant, and consulted with the Assistant United States Attorney who was supervising the case to seek legal guidance during the warrant.  *Id.* at ¶17.

The only items seized pursuant to the search warrant were nine computers and related media and equipment.  *Id.* at ¶19.

## D.  Consent Obtained From Jonah Sedaghaty

It was learned during the warrant execution that Jonah Sedaghaty had become a Director for AHIF.  *Id.* at ¶16.  With his attorney present, Jonah Sedaghaty was asked to

consider signing a consent, allowing agents to search storage trailers on the premises.
This consent form advised Jonah Sedaghaty that he did not have to provide consent,
that incriminating items taken through by consent could be used in court, and that he
could refuse the agent's request, and require them to obtain another search warrant.
Jonah Sedaghaty signed the consent.  *Id.* at ¶17.

Later, Jonah Sedaghaty signed another consent form, in his attorney's presence,
allowing agents to take items found within the storage containers, as well as other items
found inside the house that had not been seized under the search warrant.  Agents
prepared a written inventory of the items seized under the warrant and the items taken
via consent and gave a copy of those inventories to attorney Berger.  *Id.* at ¶¶17-18.

**E.  Search of Computers and Related Computer Media**

Since the nine computers could not realistically be searched or imaged on site,
agents seized them, as permitted by the warrant.  Images, or copies, of the contents of
those computers were made and SA Anderson returned the nine computers to attorney
Berger within sixty days after the execution of the search warrant.  *Id.* at ¶19.

IRS computer experts analyzed the computer data.  They discovered that
operating systems had been reformatted and that data files had been deleted.  This
delayed the case agents' ability to search through the computer data.  *Id.* at ¶20.

Eventually, the computer data was able to be reviewed.  Relying on the warrant
and her incorporated affidavit, SA Anderson devised a list of terms to be used to search
the computer data.  The chosen terms were ones which bore a logical connection to the
affidavit, including "Al-Haramain," "Pete Seda," "Refugees," and pertinent e-mail

addresses.  *Id.* at ¶21.

Provisions were made to avoid review of attorney-client communications which may have been within the computer data.  *Id.* at ¶27.

During the search of the computer data, SA Anderson learned that images of child pornography were found on a floppy disk taken from AHIF's U.S. headquarters.  SA Anderson sought legal advice and an agent sought and obtained a search warrant from Magistrate Judge Coffin to further search the floppy disk.  *Id.* at ¶22.

A review of the computer data yielded evidence relating to the tax and money laundering crimes, to include evidence supporting the elements of willfulness and intent to deceive.  Among this pertinent evidence are personal and private e-mails between Sedaghaty, Al-But'he and other AHIF figures, information relating to mujahideen requests for financial support, interviews with mujahideen commanders, photographs of dead mujahideen, news articles, web pages, and internal AHIF organizational documents.  *Id.* at ¶¶24-27.  To find this material , a great deal of the computer data had to be reviewed.

### III.  Legal Arguments

### A.  Alleged Illegal Surveillance

Defendant alleges in his motion that "Al-Haramain and the co-defendant [Al-But'he] were subjected to illegal surveillance."  (CR 183 at 8).  The support offered by defendant consists of:  1) a citation to *In re: National Security Agency Telecommunications Records Litigation, 564 F. Supp. 2d 1109* (N.D. Ca. 2008);   2)  an allegation that there was close coordination between criminal investigators and other

14 - Government's Response to Defendant's Motion to Suppress (CR 181) and to Compel (CR 182)

government agencies investigating AHIF, such as OFAC; and 3) articles discussing an

alleged surveillance program conducted by the National Security Agency.[4]

From this information, defendant speculates that there is:

a strong likelihood that the criminal investigation of Mr. Sedaghaty and Al
Haramain USA in Oregon was tainted by the unlawful surveillance being
conducted by other branches of the United States Government. If the decision to
seek the warrant in the criminal investigation or earlier decisions to pursue the
criminal investigation were prompted by the illegal investigation, suppression is
warranted. (CR 183 at 10).

Defendant cites to *Murray v. United States*, 487 U.S. 533 (1988) in support of his

claim. In *Murray*, law enforcement officers illegally entered a warehouse containing

marijuana, and later obtained a search warrant for that warehouse and seized the

marijuana. In the affidavit used to obtain the warrant, no evidence from the earlier

illegal search was used. The issue before the Supreme Court was whether the illegal

search tainted the search warrant, rendering inadmissible any evidence found during

the search warrant.

The *Murray* Court ruled that the evidence would only be suppressed if the illegal

search prompted the decision to seek a search warrant or if information obtained during

the illegal search was presented to the judge who issued the search warrant and

affected his decision to do so. *Id.* at 542. If there was an "independent source" relied

upon and used to obtain the warrant, then suppression was not appropriate. *Id.* The

---

[4]In his memorandum, defendant renews his attempt to access a classified
document that his lawyers submitted to a Court Security Officer (CSO) in January 2008.
This Court has previously ruled that the document would remain with the CSO and that
defense counsel not be allowed to discuss its contents absent a subsequent ruling by
the Court. (CR 103). To date, this court has not altered that ruling and recently denied
a motion to modify the prohibition. (CR 191 at p. 15).

Court remanded so that the lower court could determine the answers to these questions.

1.  <u>There is no Evidence that the Search Warrant was Tainted by Illegal Surveillance</u>

Offering scant evidentiary support, defendant Sedaghaty contends that there was "illegal surveillance" pertaining to AHIF  and Al-But'he, presumably by the National Security Agency, and that this infected the search warrant at issue.

For the evidence seized during the search warrant to be suppressed, defendant must establish that the purportedly illegal surveillance prompted SA Anderson's decision to seek the warrant, or that she included information from illegal surveillance in her affidavit for the warrant.  *Murray*, 487 U.S. at 542.

2.  <u>The Affiant Had No Knowledge of Any Allegedly Illegal Surveillance Program; the Search Warrant Affidavit Cannot Be Tainted</u>

When she submitted her affidavit to Judge Cooney, SA Anderson had no knowledge of any allegedly illegal surveillance program described by the defense. *Anderson Statement at* ¶¶5-9.  Other than what has been reported in news accounts and in defendant's motions, SA Anderson has no knowledge of this alleged program, even to this day.  *Id.*[5]  Her affidavit is not tainted and she did not seek the search warrant based on illegally obtained evidence.  The warrant was based on independent sources of information.  *See United States v. Mulder*, 889 F.2d 239, 241 (9th Cir. 1989),

---

[5]It is worth noting that nothing in the materials cited by defendant suggest that he was personally recorded in any allegedly illegal surveillance program.  Rather, the documents discuss intercepts allegedly of co-defendant Al-But'he and a civil lawyer and lobbyist in Washington, D.C., concerning a lawsuit against AHIF resulting from the 9-11 terrorist attacks.

citing *Murray*, 487 U.S. at 542 n.3  ("[W]hat counts is whether the actual illegal search had any effect in producing the warrant, not whether some hypothetical illegal search would have aborted the warrant.").

Also, while it is true that SA Anderson consulted with OFAC on the logistics of the execution of the search warrant, she obtained no information from OFAC which was used in the search warrant affidavit.  *Anderson Statement at ¶8.*

Defendant's claim that the fruits of the search warrant should be suppressed as having been obtained as the result of illegal surveillance is without merit.

**B.**    **There Was Probable Cause To Issue The Warrant**

On page 26 of his memorandum, defendant alleges the search warrant was "wholly lacking in probable cause," and that the affidavit describes a mistake on a tax return.  The government disagrees.

The Fourth Amendment requires probable cause for a warrant to be issued, authorizing a search or seizure.  *U.S. Const. Amend. IV.*  Probable cause exists when "given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983).

The affidavit summarized above establishes probable cause to believe that the tax and money laundering offenses were committed.  Defendant criticizes the use of newspaper accounts in the probable cause statement.  Yet, those references were only a part of the probable cause statement.  Like the information provided by the international terrorism expert, and the included fact that several AHIF branches had

17 - Government's Response to Defendant's Motion to Suppress (CR 181) and to Compel (CR 182)

been previously designated as supporters of terrorism, the articles merely helped to establish that the falsities in the Form 990 were not done mistakenly.  Similarly, this information, collectively, helped establish that Al-But'he's failure to file a CMIR when departing the United States with the El-Fiki funds was intentional, and as part of a covert plan by him and Sedaghaty to fund the mujahideen.

Probable cause was established in the search warrant application.[6]

**C.**   **There Were No Material Misstatements or Omissions in the Affidavit**

Defendant Sedaghaty alleges that there were a series of material omissions and misstatements of facts which, if provided or corrected, would have affected Judge Cooney's decision to issue the search warrant.

If a defendant claims there is a false statement in the warrant affidavit that is necessary to the finding of probable cause, the defendant may request an evidentiary hearing, or "*Franks* hearing."  *United States v. Craighead*, 539 F.3d 1073, 1080 (9th Cir. 2008) (citing *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)).  To be entitled to a *Franks* hearing the defendant must make a "substantial preliminary showing" that a false statement was included in the warrant affidavit.  *Craighead*, 539 at 1080.  The affiant must have "knowingly and intentionally, or with reckless disregard for the truth" allowed the false statement into the affidavit.  *Id.*  Further, "a defendant must make specific allegations, allege a deliberate falsehood or reckless disregard for the truth, *and*

_____

[6]Defendant's attack on probable cause is limited to a claim that the affidavit did not sufficiently provide probable cause to believe a crime was committed.  He does not argue that there was a lack of probable cause to believe evidence of such crimes would be found on the premises at 3800 S. Highway 99, Ashland, Oregon.

accompany such a claim with a detailed offer of proof."  *Id.* (emphasis added) (holding defendant did not meet his burden for requesting a hearing because he "did not point to one specific statement in the affidavit that was false or misleading.").  Alternatively, the defendant may seek a hearing based on "deliberate or reckless omissions of facts that tend to mislead."  *Id.* at 1081 (citing *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985)).  "However, the omission rule does not require an affiant to provide general information about every possible theory, no matter how unlikely, that would controvert the affiant's good-faith belief that probable cause existed for the search."  *Craighead*, 539 at 1081.

Nowhere in his memorandum does defendant request a *Franks* hearing, but starting on page 27 of his memorandum in support of the motion to suppress, he nevertheless points out specific parts of the affidavit which contain information he says reflects misstatements and omissions.  Each is reviewed below:

Paragraphs 11 and 16

Fairly read, the affidavit does not imply that defendants Sedaghaty and Al-But'he engaged in improper conduct by using traveler's checks.  Rather, this information is factual to show the proof supporting AHIF's purchase of properties in Missouri and Oregon.

Paragraph 18

Examined in its entirety, the affidavit establishes that the world-wide organization known as the Al-Haramain Islamic Foundation was based in Saudi Arabia, and had offices throughout the world.  (CR 183 at Exhibit 1, ¶9).  One of those branches was in

the United States, and was headquartered in Oregon.  ¶9.  Yet, despite these structural

differences, there is a strong connection between the two organizations.  This is

reflected in the affidavit where it is established that the General Manager of AHIF in

Saudi Arabia (Al-Aqeel) was also the President of AHIF in the United States.  Similarly,

co-defendant Al-But'he was the treasurer of AHIF in Oregon, and shuttled money back

and forth from Saudi Arabia on behalf of AHIF in Saudi Arabia.  ¶¶15, 17, 18, 42.  The

affidavit accurately explained how the organizations were structured and did not mislead

Judge Cooney.

Defendant's complaint about failing to state when the investigation commenced

is meaningless, as it is not pertinent to a finding of probable cause.

Paragraphs 22-24

Differences in the geopolitical views of the conflict in Chechnya was not

important to the probable cause statement.  Rather, this information was offered

because, to protect their tax exempt status as a religious organization, organizations

like AHIF must be honest with the IRS in the Form 990, and accurately report all

disbursements of charitable donations.  The affidavit proved that the 2000 Form 990

falsely characterized the funds sent to Chechnya.  The challenged information helps

disprove that it was a mistake.

Paragraph 47

The agent's reasoned opinion that the warrant may reveal other problematic

financial transactions by AHIF was not necessary to a probable cause finding.

Regardless, agents did in fact discover from a review of other evidence that defendant

Sedaghaty sent funds from Oregon to another area in the world where mujahideen were engaged in fighting.

Paragraph 55

While it is true that Wilcox initially stated to the IRS that he thought Sedaghaty was honest in his record keeping, he said this prior to being shown the various falsities in the 2000 Form 990.  Thus, the omitted statement is less significant than it may appear.  Also, the affidavit does report that Wilcox stated that Sedaghaty made the potentially exculpatory statement to him that the AHIF books had to be "right and clean." ¶55.

Paragraph 60

The affidavit does indicate that Wilcox was more than a mere tax preparer for AHIF.  In paragraph 56, the affidavit states that Wilcox went to AHIF and personally trained two women on how to use the Quickbooks program.  To the extent this information is relevant, it connotes a more active role by Wilcox.  Omitting Wilcox's brief status as a former IRS employee in the 1970s was not material to the probable cause finding.

Paragraph 66

It is not relevant how SA Anderson learned that Jonah Sedaghaty was residing at the AHIF property prior to the warrant.

Paragraphs 70-71

During the numerous interviews with the FBI before he left the United States, defendant Sedaghaty never discussed the $150,000 transaction at issue in this case.

21 - Government's Response to Defendant's Motion to Suppress (CR 181) and to Compel (CR 182)

The agent was unaware of the Chechnya transaction at the time of these interviews, which only came to light *after* Sedaghaty left the United States.  The information now raised by the defense is not pertinent to the probable cause finding.

Peaceful Activities of Defendant Sedaghaty

Much of the information about defendant's benevolent activities was learned after the warrant was executed.  This information was largely derived from information contained in the seized computers.  SA Anderson was not reckless in omitting this information from her affidavit.  Moreover, evidence that defendant may have engaged in peaceful acts over time does not alter the probable cause finding in the affidavit.

Sedaghaty's E-mail Account

When Sedaghaty departed the United States in February 2003, he told the FBI he would be overseas for only a few months.  In fact, he stayed outside of the United States for two and a half years, knowing for part of this time that he had been indicted and that there was an arrest warrant pending.  Omitting that he arranged for potential e-mail communication with the FBI before he left did not affect the probable cause finding.

Defendant Has Failed to Establish Grounds for a *Franks* Hearing

Defendant has fallen far short of meeting his burden of establishing that there were intentional or reckless falsities or omissions of material facts in the affidavit.  While not requested by the defense, he has failed to make the requisite showing to require an evidentiary hearing under *Franks*.

**D.    Agents Did Not Exceed the Scope of the Search Warrant In Seizing and Searching Material On Computers and Electronic Media**

22 - Government's Response to Defendant's Motion to Suppress (CR 181) and to Compel (CR 182)

Defendant asserts that agents exceeded the scope of the search warrant by seizing AHIF's computers and analyzing their contents beyond the permissible scope of the warrant.  He is incorrect.  As demonstrated below, agents at all times acted in a reasonable manner consistent with the search warrant and the law.

It will be established below that:

• The warrant permitted the seizure of all computers and related computer media;

• The warrant authorized the search of all of the contents of the computers and computer media;

• The search warrant affidavit was properly incorporated into the warrant;

• Agents used the warrant and affidavit to limit the scope of the search of the computer data; and

• The search of the computers and computer data was done with search terms reasonably related to the warrant.

<u>All of the AHIF Computers Could be Seized and All Contents Examined</u>

Defendant does not appear to challenge the agents' conduct or authority in seizing the nine computers.  Nor could he.  Attachment B of the search warrant expressly addressed computers.  It stated that if the computers could not be practically searched on site, then agents were permitted to temporarily seize the computers and related paraphernalia, to be forensically reviewed by trained personnel.  In so doing, the warrant allowed computer personnel to "examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized...."  (CR 183, Exhibit 1, Attachment

23 - Government's Response to Defendant's Motion to Suppress (CR 181) and to Compel (CR 182)

B).  The attachment also permitted agents to search for deleted material to determine whether such information contained relevant information.

The support for the authority to take and examine the contents of the computers was reasonably based on the affidavit of SA Anderson, wherein she discussed why she believed there would be pertinent information in the computers, and why it may be necessary to seize them and examine all of their contents to determine if there was relevant evidence.  Providing this type of evidentiary support in an affidavit seeking authority to seize and examine the contents of computers is consistent with current Ninth Circuit law.  *See United States v. Banks*, 556 F.3d 967, 973-74 (9th Cir. 2009) (affidavit adequately explained why necessary to seize computer for off site review); *United States v. Hay*, 231 F.3d 630, 637 (9th Cir. 2000)  (seizure of complete computer system for evidence of child pornography proper where affidavit explained why necessary and magistrate decided to approve the request);  *cf. United States v. Hill*, 459 F.3d 966, 975-76 (9th Cir. 2006) (wholesale seizure of computers pursuant to warrant overbroad due to lack of explanatory supporting affidavit to properly inform the magistrate);  *United States v. Adjani*, 452 F.3d 1140, 1145-46 (9th Cir. 2006) (warrant supported by probable cause because affidavit submitted to magistrate judge established fair probability that  evidence of crime would be found in computers).

**E.    The Analysis of the Contents of the AHIF Computers Was Not a General Search; It Was Reasonable Based On the Warrant**

The thrust of defendant's attack on the computer evidence is based on his belief that agents engaged in an impermissible general search of the computers once they

were able to be analyzed.  An understanding of how the computer data was actually analyzed refutes this position.

1.    The Affidavit Was Part of the Search Warrant

To help limit the breadth of a search in a white collar crime warrant, and to avoid allegations that agents engaged in an impermissible general search, affidavits used to obtain the warrant are often incorporated into the warrant and used by agents at the search as a limiting tool.  *See United States v. SDI Future Health, Inc.*, No. 07-10261, 2009 WL 1508763, at *9 (9th Cir. June 1, 2009).[7]  Such was done in the present case.

In setting forth what items could be seized under the search warrant, the warrant expressly incorporates "Attachment B," which is a list entitled "Items To Be Seized."  An examination of Attachment B reveals the following language:

> Evidence concerning the subscription to a false Form 990 Tax Return, in violation of Title 26, United States Code, Section 7206(1), **as described in the attached affidavit, for the year 2000, limited to the following: ...**"  (emphasis added). (CR 183, Exhibit 1, Attachment B).

The attachment then lists, as authorized items to be seized, various types of records typically associated with tax crimes: bank records, communications records (including electronic communications) and other financial records.

---

[7]In his memorandum offered in support of his motion to suppress, defendant relies on *United States v. Comprehensive Drug Testing, Inc.*, 513 F.3d 1085 (9th Cir. 2008).  Yet, the Ninth Circuit has withdrawn that opinion and agreed to rehear the case *en banc.  See United States v. Comprehensive Drug Testing, Inc.,* 545 F.3d 1106 (9th Cir. 2008) ("The three-judge panel opinion shall not be cited as precedent by or to any court of the Ninth Circuit.").

The recent case of *United States v. SDI Future Health, Inc.*, No. 07-10261, 2009 WL 1508763 (9th Cir. June 1, 2009) reflects current governing Ninth Circuit principles concerning the scope of a search warrant issued in a white collar case.

For the money laundering violation, the attachment again incorporates SA Anderson's affidavit and limits the search to items relating to the money laundering offense, with the relevant time period of October 1997 through February 2003.

SA Anderson's affidavit was thus expressly incorporated by reference into the warrant. It was also present at the search, and its contents were used to help agents decide what they could lawfully take. *See SDI Future Health*, 2009 WL 1508763 at *9-10. There can be no question that, consistent with Ninth Circuit law, the affidavit was part of the warrant.

2.    The Search Warrant and Affidavit Were Used to Constrain the Search of the Information In the Computers and Computer Media

Defendant complains that agents "seized and rifled through a tremendous amount of information from the computers and computer hard drives that is well beyond the scope of the warrant." (CR 183 at 18). This allegation is belied by the facts.

In reviewing the scope of the warrant, it must be kept in mind that, as explained in the affidavit and warrant, an effective investigation into tax and money laundering crimes required an examination of large categories of information. While the crimes alleged in the affidavit are specific and limited in time, the investigation into those crimes required an ability to inspect records which may at first appear innocuous but, when coupled with other information or evidence, takes on a more incriminating light. For example, e-mail communications between defendant Sedaghaty and AHIF employees in Saudi Arabia may appear benign. Yet, establishing a regular chain of communications between the United States and Saudi AHIF branches is likely to be an important and contested issue at trial.

26 - Government's Response to Defendant's Motion to Suppress (CR 181) and to Compel (CR 182)

While it is true that the computers contained large amounts of data, when the agents were able to actually review the computers, they engaged in a carefully crafted protocol to determine if there was relevant information. This was mainly done in two ways. First, the search warrant affidavit was used in limiting the scope of the search. For example, a written interview found in a computer with a mujahideen commander in Chechnya concerning his need for financial support from Islamic charities is within the scope of the warrant when the affidavit is consulted. Yet, information found in the computer relating to an unrelated topic may not be within the scope of the search. In this way, the affidavit was used as a limiting tool to narrow the breadth of the search.

Second, relying on the warrant (including the affidavit), SA Anderson came up with a list of terms to search the computers. These terms were logically related to the investigation, such as "Chechnya," "Sedaghaty," and even "Refugees." This search produced relevant evidence necessary for trial. *See Anderson Statement at* ¶21.

Agents were careful to respect the attorney-client privilege during their search, and established a protocol to avoid having the prosecutor or case agent review protected communications. *Id.* at ¶27.

Further proof that agents did not engage in a general search is reflected by their discovery of child pornography in AHIF's computers. When they saw the images they ceased reviewing that disk and applied for another search warrant. This demonstrates the reasonableness of the search, and reflects an awareness of the proper limits of the search warrant. *Id.* at ¶22.

3.    <u>Current Case Law On Scope of Computer Searches</u>

27 - Government's Response to Defendant's Motion to Suppress (CR 181) and to Compel (CR 182)

The Fourth Amendment requires particularity, whereby a search warrant should describe what the officer is authorized to search for and seize. *SDI Future Health, Inc.*, 2009 WL 1508763, at \*11 (9th Cir. June 1, 2009). "The description must be specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized . . . [but] the level of detail necessary in a warrant is related to the particular circumstances and the nature of the evidence sought." *Id.* (citations omitted). While particularity should be "sufficient to prevent a general, exploratory rummaging in a person's belongings, it need only be reasonably specific, rather than elaborately detailed." *United States v. Rude*, 88 F.3d 1538, 1551 (9th Cir. 1996).

"Whether a search exceeds the scope of a search warrant is [determined] through an objective assessment of the circumstances surrounding the issuance of the warrant, the contents of the search warrant, and the circumstances of the search." *United States v. Hitchcock*, 286 F.3d 1064, 1071 (9th Cir. 2002) (superseding amended opinion addresses other grounds in *United States v. Hitchcock*, 298 F.3d 1021 (9th Cir. Aug. 2, 2002)); s*ee also United States v. Hurd*, 499 F.3d 963, 966-69 (9th Cir. 2007) (applying the *Hitchcock* test for determining the valid scope of a warrant). Also, in examining this issue of scope, the number of files is not significant. *SDI Future Health, Inc.*, 2009 WL 1508763, at \*12. The search and seizure of large quantities of material is justified if the material is within the scope of the probable cause underlying the warrant." *Id.*

In searching through large amounts of material in any white collar crime search, agents will undoubtedly come across items which are not relevant. This is inevitable and has been recognized by the courts. As the Ninth Circuit stated in *Rude*:

> Any search for relevant documents is likely to retrieve *some* information that ultimately is beyond the core of evidentiary material produced at trial. An objective basis for distinguishing relevant documents from others is therefore necessary to ensure that the search is limited. Here, the specification of dates, individuals, and the NPI corporation, along with a reasonably precise delineation of the type of records sought, satisfied the specificity requirement.

88 F.3d at 1551.

It is undoubtedly true that with technological advances computer searches present new and sometimes difficult challenges to ensure law enforcement avoid general searches. This challenge was recently recognized by the Ninth Circuit in *United States v. Giberson*, 527 F.3d 882 (9th Cir. 2008). In addressing a defendant's argument that searches of computers present a great potential for the intermingling of relevant evidence and irrelevant and possibly personal and private material, the court wrote:

> [T]he fear that agents searching a computer may come across personal information cannot alone serve as the basis for excluding evidence of criminal acts. While officers ought to exercise caution when executing the search of a computer, just as they ought to when sifting through documents that may contain personal information, the potential intermingling of materials does not justify an exception or heightened procedural protections for computers beyond the Fourth Amendment's reasonableness requirement.

*Id.* at 888-89 (citations omitted). The standard is simply that "[i]f it is reasonable to believe that a computer contains items enumerated in the warrant, officers may search it." *Id.* at 888; *see also United States v. Adjani*, 452 F.3d at 1148-52 (containing extensive discussion concerning difficulty of searching computer

evidence, concluding that agents properly used warrant and incorporated affidavit to search and seize e-mails, which were within the scope of the warrant).

4.    The Government's Search Was Proper

To summarize, the search warrant expressly permitted the seizure of the computers and this authority was reasonably necessary as explained in the affidavit used to obtain the warrant.  Agents properly seized the computers and related media and equipment during the execution of the warrant.

Once seized, agents acted reasonably in forensically analyzing the contents of the computers and searching it for relevant evidence.  Proper measures were undertaken to avoid a general rummaging through the computers.   Given the nature of the evidence sought, agents were permitted to search through the computers for evidence that defendants acted knowingly and willfully in committing the crimes set forth in the search warrant.

Weighed against the backdrop of current computer search cases, it is clear that the agents' attempt to examine the computer data for evidence of the crimes was reasonable at every step.  They attempted to do their jobs by analyzing the contents of the computers lawfully in their possession, but in a manner that was mindful of limitations.  Those limitations were reflected by their use of search terms,[8] setting a protocol to avoid attorney-client communications,

_____

[8]While the use of search terms helped narrow the scope of the execution of our search, it is not necessarily required in computer searches.  *See United States v. Hill*, 459 F.3d at 977-78 (9th Cir 2006) ("we look favorably upon the inclusion of a search protocol; but its absence is not fatal.").  A generalized seizure of business documents may be justified if it is demonstrated that the government could not reasonably

and by obtaining another warrant when they discovered evidence of criminal activity unrelated to the search warrant issued by Judge Cooney.  For these reasons, this court should reject defendant's argument that the search of the computers was unconstitutional.

**F.**    **There Is No Time Limit to Search Lawfully Seized Evidence**

Defendant Sedaghaty complains in his memorandum about the length of time the government has taken to analyze the computer data.  He offers no legal support for the proposition that there is some type of arbitrary time limit within which legally seized evidence must be searched, and that the government has violated his Fourth Amendment rights in continuing to search through the evidence.

While suppression of evidence may be appropriate for evidence recovered outside the scope of the warrant, there is no basis for suppressing evidence properly seized because the government needs an extended period of time to identify relevant information.  Further, as stated above, employing search protocols to review the seized material maintains the specificity of the warrant and supports the reasonableness of the search (as opposed to a general rummaging).

Defendant's position on this issue would be better understood if the seized computers were still in the government's possession.  They are not.  As set forth

---

segregate documents on the basis of whether or not they were likely to evidence criminal activity.  *See United States v. Banks*, 556 F.3d 967, 973 (9th Cir. 2009).

31 - Government's Response to Defendant's Motion to Suppress (CR 181) and to Compel (CR 182)

above, the computers were returned to defendant's attorney within sixty days after the warrant was served.  The government is analyzing images of those computers.  Also, the government has provided defense counsel with copies of all of the imaged computer data.

Moreover, as reflected in SA Anderson's statement, defendant Sedaghaty's fugitive status played a role in the amount of time it has taken to comprehensively review the computer evidence.  He was indicted in February 2005, but did not return to the United States until August 2007.  *See Anderson Statement at ¶28.*

Under Fed. R. Crim. P. 41(g), defendants have the right to move for the return of property illegally seized, or to otherwise obtain their property back. However, as long as the government has a need to retain the property for evidentiary purposes the defendant has the "burden of proving both that the seizure was illegal and that he or she is entitled to lawful possession of the property."  *United States v. Harrell*, 530 F.3d 1051, 1057 (9th Cir. 2008). Otherwise, "[p]roperty seized for the purposes of a trial . . . should ordinarily be returned to the defendant once trial has concluded."  *United States v. Kaczynski*, 416 F.3d 971, 974 (9th Cir. 2005).

**G.**    **Agents Acted In Good Faith Reliance On the Search Warrant**

If the court concludes there was a defect in the warrant, suppression is not an appropriate remedy where agents acted in good faith in relying on an objectively reasonable warrant.  *SDI Future Health, Inc.*, 2009 WL 1508763, at

*14.  Unless this court finds the warrant "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," suppression is inappropriate.  *See United States v. Crews*, 502 F.3d 1130, 1136 (9th Cir. 2007) (for good faith exception to apply, officers must have relied on search warrant in objectively reasonable manner and affidavit must establish at least a "colorable argument for probable cause");  *United States v. Clark,* 31 F.3d 831, 835 (9th Cir.1994).

In the case before the court, agents relied on the warrant and affidavit in searching the premises, in seizing evidence, and in later searching that evidence. The warrant was extensively supported with information to believe that crimes were committed and evidence of those crimes would be found in the evidence seized, including the computers.  At the very least, there was a "colorable argument for probable cause."   Suppression is inappropriate.

**H.**     **Severance:  Partial Suppression Is the Remedy For Overbroad Searches**

If the scope of the search was exceeded, or the warrant was overbroad in some fashion, the Ninth Circuit endorses the doctrine of severance.  *SDI Future Health, Inc.*, 2009 WL 1508763, at *15-16.  Severance, or partial suppression, usually applies only to the evidence obtained in violation of the warrant.  *Hurd*, 499 F.3d at 966.  "Suppression is generally the proper remedy when the police

33 - Government's Response to Defendant's Motion to Suppress (CR 181) and to Compel (CR 182)

go beyond the scope of an authorized search warrant by searching places or
seizing evidence not included in the warrant." *Id.* Total suppression is reserved
for situations where a warrant lacks *any* particularity. *SDI Future Health, Inc.*,
2009 WL 1508763, at *15-16. "This extraordinary remedy should be used only
when the violations of the warrant's requirements are so extreme that the search
is essentially transformed into an impermissible general search." *United States
v. Chen*, 979 F.2d 714, 717 (9th Cir. 1992). If this Court finds any defects in the
scope of the warrant, then partial suppression is the remedy.

**I.      Jonah Sedaghaty Lawfully Consented To the Search of the Storage
         Containers and Allowed Agents To Take Items From the Property**

1.      The Present Law of Consent in the Ninth Circuit

        "[O]ne of the specifically established exceptions to the requirements of
both a warrant and probable cause is a search that is conducted pursuant to
consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Agents may
search without a warrant if an individual provides voluntary consent, and
evidence discovered during that search may be seized and admitted at trial. *Id.*
The government bears the burden of establishing that consent was voluntary,
which is to determined from the totality of the circumstances. *United States v.
Brown*, 563 F.3d 410, 415 (9th Cir. 2009).

        The Ninth Circuit relies on five factors to determine whether consent was
voluntary. *Id.* The factors are "guideposts" and "no one factor is determinative."
*Id.* The factors are:

34 - Government's Response to Defendant's Motion to Suppress (CR 181) and to
Compel (CR 182)

> (1) whether the consenting individual was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the consenting individual was notified that she had the right not to consent; and (5) whether the consenting individual had been told a search warrant could be obtained.

*Id.* (citing *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002)). The third factor is not relevant if the consenting individual was not in custody. *United States v. Patayan Soiano*, 361 F.3d 494, 504 (9th Cir. 2004). As to the fourth factor, "knowledge of the right to refuse consent is highly relevant in determining whether consent is valid." *Id.* In applying the fifth factor, it may weigh against the argument for voluntary consent if the consenting individual is informed of "the possibility of a search warrant in a threatening manner." *Id.* However, "when probable cause to justify a warrant exists, the weight of the fifth factor is significantly diminished." *Id.*

2.    Consent By a Third Party

A third party who possesses common authority over the place being searched may provide the voluntary consent necessary to allow a warrantless search. *United States v. Murphy*, 516 F.3d 1117, 1122 (9th Cir. 2008) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)). The Ninth Circuit has identified three factors to determine the validity of a third party's consent. *United States v. Rosi*, 27 F.3d 409, 413 n.2 (9th Cir. 1994). The first factor is "whether the third person has an equal right to access the premises searched . . . ." *Id.*; *see also Murphy*, 516 F.3d at 1122 (common authority "is established through mutual use of the property by persons generally having joint access or control for most purposes."); *but see Murphy*, 516 F.3d at 1122 (listing factors that indicate a lack of common authority including not contributing to rent or not possessing

35 - Government's Response to Defendant's Motion to Suppress (CR 181) and to Compel (CR 182)

a key).  The second and third factors only apply if the defendant was present at the time the third party consented.  *See Rosi*, 27 F.3d at 413 n.2.

3.     Jonah Sedaghaty Consented To the Search and Seizure

Jonah Sedaghaty was present during the search, and resided within the premises.  He was a Director for the AHIF in Oregon.  His father, defendant Pirouz Sedaghaty, was absent from the property, and, in fact, was absent from the United States.  During the search, Jonah Sedaghaty was provided a copy of the search warrant, a listing of the items to be seized, and a copy of the affidavit used to obtained the warrant.

Jonah Sedaghaty was allowed to stay on the property during the search and agents permitted him to call AHIF's lawyer, David Berger.  Berger showed up at the premises and was also given a copy of the search warrant documentation.

Agents asked Jonah Sedaghaty to consider allowing them to search two storage containers on the property.  He agreed in the presence of his lawyer.  A consent form signed by Jonah Sedaghaty stated he did not have to give consent and could make the agents get a warrant for them.  Jonah signed the consent.  Agents recovered some evidence they wished to take from the storage containers.

Agents also found some items from within the house that they wished to take. Unsure whether these items were covered by the search warrant, SA Anderson asked Jonah Sedaghaty to consider providing consent to take the items from the storage unit and the non-computer items from inside the house.  He agreed and signed a second consent in the presence of his lawyer.

36 - Government's Response to Defendant's Motion to Suppress (CR 181) and to Compel (CR 182)

Agents provided Jonah Sedaghaty and attorney Berger a listing of all items seized through the warrant, as well as those taken through the consent form.  Agents did not have their weapons drawn during the discussions with Jonah Sedaghaty and attorney Berger.

Based on the law of consent, applied to these facts, Jonah Sedaghaty had the authority to provide consent to search the storage containers and to allow agents to take items from inside the storage units and the residence.  *United States v. Rosi*, 27 F.3d at 413 n.2.  He provided this consent in a voluntary manner.  *United States v. Brown*, 563 F.3d at 415.

## IV.  Conclusion

As established above:

1. The search warrant was not prompted by illegal surveillance and there was no information in the affidavit generated from illegal surveillance;

2. There was probable cause to support the search warrant;

3. There were no material omissions or misstatements of facts in the affidavit used to obtain the warrant;

4. Agents acted in good faith in relying on the search warrant;

5. Agents did not conduct a general search of the computers, which is properly ongoing; and

6. Jonah Sedaghaty provided consent for the search of the storage units and the seizure of items at the premises.

For these reasons, defendant's motion to suppress (CR 181) and to cease and desist (CR 182) should be denied.

DATED this 6th day of July, 2009.

Respectfully submitted,

KARIN J. IMMERGUT
United States Attorney


*/s/ Christopher L. Cardani*
By: _____
CHRISTOPHER L. CARDANI
Assistant United States Attorney


*/s/ Charles F. Gorder, Jr.*
By: _____
CHARLES F. GORDER, JR.
Assistant United States Attorney