FILED '09 JUL 22 16:48 USDC-ORE

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF OREGON

 3    UNITED STATES OF AMERICA,         )
                                        )
 4                   Plaintiff,         )  No. 05-60008-2-HO
                                        )
 5        v.                            )  July 13, 2009
                                        )
 6    PIROUZ SEDAGHATY, et al.,         )  Eugene, Oregon
                                        )
 7                   Defendants.        )

 8

 9              TRANSCRIPT OF PROCEEDINGS

10        BEFORE THE HONORABLE MICHAEL R. HOGAN

11        UNITED STATES DISTRICT COURT JUDGE

12

13                       -:-

14

15

16

17

18

19

20

21

22

23           Deborah Wilhelm, CSR, RPR
                  Court Reporter
24                P.O. Box 1504
             Eugene, OR  97440
25                (541) 431-4113
```

```
 1                  APPEARANCES OF COUNSEL

 2

 3    FOR THE PLAINTIFF:    CHRISTOPHER L. CARDANI
                            United States Attorney's Office
 4                          405 E. 8th Avenue
                            Suite 2400
 5                          Eugene, OR  97401
                            (541) 465-6771
 6                          chris.cardani@usdoj.gov

 7                          CHARLES F. GORDER, JR.
                            United States Attorney's Office
 8                          1000 S.W. Third Avenue
                            Suite 600
 9                          Portland, OR  97204-2902
                            (503) 727-1021
10

11    FOR THE DEFENDANT:    LAWRENCE H. MATASAR
                            Lawrence Matasar, P.C.
12                          621 S.W. Morrison Street
                            Suite 1025
13                          Portland, OR  97205
                            (503) 222-9830
14                          larry@pdxlaw.com

15                          STEVEN T. WAX
                            Federal Public Defender
16                          101 S.W. Main Street
                            Suite 1700
17                          Portland, OR  97204
                            (503) 326-2123
18                          steve_wax@fd.org

19

20

21

22

23

24

25
```

INDEX OF EXAMINATIONS

| FOR THE PLAINTIFF: | Direct | Cross | ReD | ReX |
|---|---|---|---|---|
| Colleen Anderson | 17 | 21 | 67 | 77 |
| | -- | -- | 83 | 84 |

| FOR THE DEFENDANT: | Direct | Cross | ReD | ReX |
|---|---|---|---|---|
| David A. Carroll | 85 | -- | -- | -- |

```
 1              (Monday, July 13, 2009; 9:55 a.m.)

 2                  P R O C E E D I N G S

 3          THE CLERK:  Now is the time set for the matter

 4  of the United States of America versus Pirouz Sedaghaty,

 5  Case No. 05-60008, time set for oral argument on motion

 6  No. 181 to suppress.

 7          THE COURT:  Thank you, Ms. Weller.  Good

 8  morning, everyone.  I am very familiar with your

 9  briefing.  I had a few days off last week, and didn't

10  take a novel so I read your stuff several times.  I

11  appreciate you not repeating it.  I could refer you to

12  the page number, probably, in your brief.

13          I will tell you in advance that while I'm -- I

14  assume Agent Anderson is present, Mr. Cardani?

15          MR. CARDANI:  Yes, Your Honor.

16          THE COURT:  And I am willing to accept her

17  affidavit as her direct testimony and make her available

18  for cross-examination.

19          I don't think the pleadings thus far justify a

20  Franks hearing.  All of us are very familiar with the

21  standards to justify a Franks hearing.  And all of

22  the -- the law is not complicated on most of these

23  issues.

24          I was thinking -- Mr. Wax, what does your bar

25  number start with, what two numbers?
```

1          MR. WAX:  My Oregon number is 85.

2          THE COURT:  And the earlier number?

3          MR. WAX:  76.

4          THE COURT:  Mine is 71.  But I was thinking

5   when I was looking -- I looked at *Leon* again.  I

6   remember when that case came out, and so do you,

7   Mr. Matasar, you remember.  Were either of you

8   practicing then?

9          MR. GORDER:  I was, Your Honor.

10          THE COURT:  Yeah.  All right.  So we all know

11   the cases.  I used to hear a lot more motions to

12   suppress as a magistrate judge, but I've had plenty of

13   them.

14          So that's kind of the way I see the case right

15   now.  And if you have some preliminary matters, fine.

16   If you folks for the government want to ask Ms. Anderson

17   a few questions, go ahead, but I'd rather you not repeat

18   the affidavit, quite frankly.  I am very familiar with

19   it.  And I will accept that as the direct testimony.

20   She should be available for cross-examination, however,

21   and then any follow-up you want to do.  Okay?

22          Do you have anything preliminarily?

23          MR. WAX:  Yes, we do, Your Honor.

24          THE COURT:  All right.

25          MR. WAX:  First, I'd like to hand up to the

1  court an exhibit that came into being in the public

2  sphere on Friday.  I marked it with an SH-1 as

3  Suppression Hearing Exhibit Number 1.  Gave a copy of it

4  earlier to Mr. Gorder.  That unclassified version of a

5  report by the five inspectors general or five of the

6  intelligence agencies has additional information

7  regarding the existence of what they are now calling the

8  PSP.  What had previously been called the TSP, Terrorist

9  Surveillance Program, they are now calling it the

10  President's Surveillance Program.

11       Of particular interest, I believe, to the

12  proceedings today are the references on pages 18 and 19

13  to the manner in which the Department of Justice and

14  then it would appear as though the United States

15  Attorneys' Offices have been kept in the dark with

16  respect to their ability to comply with their discovery

17  obligations.  And I would ask you to take a look at

18  that.

19       THE COURT:  Paragraph D?

20       MR. WAX:  It's pages 18 and 19 --

21       THE COURT:  You are talking about discovery?

22       MR. WAX:  -- discovery issues.

23       THE COURT:  The discovery issues, fine.

24       MR. WAX:  And there are references there to the

25  manner in which the Department of Justice was in part

1    kept in the dark and unable to fulfill some of its

2    discovery obligations, I think is relevant.

3         THE COURT:  Mr. Baker.

4         Go ahead.

5         MR. WAX:  So we have that.

6         A second preliminary matter also involves

7    discovery of matters that we believe we need in order to

8    effectively cross-examine this morning.

9         In the discovery order that you issued just a

10   week or so ago, we do not see a ruling on item Number 45

11   in the supplemental discovery motion that we filed on

12   March 17th that was referenced again in the pleading

13   that we filed on November 6th that listed the discovery

14   matters that we believe were in dispute.  Those are the

15   forensic reports related to the computer searches.

16        In addressing the issues with Ms. Anderson

17   about the searches of the computers, the protocol, how

18   they proceeded, what came first, we believe that we need

19   to have those.

20        Another discovery matter emerges from the

21   affidavit or declaration that Ms. Anderson prepared that

22   was provided as an attachment or exhibit to the

23   government's response to our motion to suppress.  In

24   paragraph 12, she references a search warrant protocol.

25   It would appear as though that is a written protocol.

1    We do not have it.  We believe that we need to have it

2    before we can effectively cross-examine.

3            At paragraph 21 of her affidavit, she

4    references another protocol that was designed for the

5    searches of the computers.  Again, we believe we need to

6    have that in order to effectively cross-examine.

7            Would you like me to stop there?  I have a

8    couple of other preliminary matters that do not involve

9    discovery or --

10           THE COURT:  I'd like you to go through your

11   list.  Go ahead.

12           MR. WAX:  Okay.  The cross-examination that we

13   would anticipate of Ms. Anderson would cover several

14   aspects of the motion to suppress, including the genesis

15   of the warrant.

16           In the declaration that she filed, she says she

17   did not have awareness of certain aspects related to

18   classified or unlawful classified activities.  We

19   pointed out, we believe, that there is an inconsistency,

20   as we see it, between what she says and what was said by

21   Director Szubin in the OFAC civil litigation.

22           In questioning about that, we just want to, you

23   know, make the court aware that we would anticipate that

24   that could stray into classified areas.  So it's not

25   something I think that we would be able to go into in

1    this proceeding today.

2            THE COURT:   No.   You can ask her what she knew,

3    but you can't go into classified material today.

4            MR. WAX:   So that's one area in which we think

5    that we will probably need to come back for another

6    proceeding that would be classified.

7            With respect to the *Franks* issue, I understood

8    what, you know, you indicated your preliminary, you

9    know, view of *Franks* is.   Again, we believe that there

10   is need for questioning about classified material in

11   order to present what we understand the law requires us

12   to present in order to get a full-blown hearing.   That,

13   I think, is something that this new exhibit that we

14   handed up today helps to fulfill.

15           THE COURT:   And you don't need me to go through

16   the standards on *Franks* hearings?

17           MR. WAX:   Understood.

18           THE COURT:   Yeah.

19           MR. WAX:   We filed last week a notice -- a

20   formal notice under CIPA with respect to the use of

21   classified material.   And, again, we believe that that

22   would be something that the court would need to take up

23   before we would be able to go forward with certain

24   aspects of the questioning that we think needs to take

25   place with respect to this motion to suppress.

1          May I have one moment, please?

2          THE COURT:  Uh-huh.

3          (Discussion held off the record between Mr. Wax

4    and Mr. Matasar.)

5          MR. WAX:  In terms of the CIPA filing, Your

6    Honor, we're just wondering how the court will want to

7    proceed on that, and how the court views that relating

8    to the types of production and inquiry that we believe

9    is appropriate and authorized in the *Franks* aspect of

10   the hearing as well as the *Murray* prior illegality

11   aspect of the hearing.

12         THE COURT:  All right.  I am not going to sort

13   of make preliminary remarks about that.  In your reply

14   filed late Friday afternoon, you speculated -- well,

15   speculated might be -- have a tone to it.  You stated

16   that the decision making appeared to involve a person

17   other than Ms. Anderson.  And I don't know what the

18   facts are in that regard, but we will not go into

19   classified material today.

20         I specifically told our court security officer

21   she didn't have to be here today.  And I'm going to

22   consult with her on what other judges have done before I

23   have any hearing that involves that.

24         On a couple of other matters, was the search

25   warrant protocol or protocols concerning that in the

1  computers written or oral?

2        MR. CARDANI:  Judge, I -- two protocols were

3  mentioned.  The first one were a dialogue between Agent

4  Anderson and myself leading up to the warrant.  I gave

5  her written instructions.  She summarized them.

6  Almost -- repeated them almost verbatim in her present

7  statement.  Whether she has them available or not, I

8  don't know, but they are virtually -- I think the

9  testimony will be that they are virtually verbatim to

10  the e-mail dialogue I had with her and phone

11  instructions.

12        THE COURT:  Okay.

13        MR. CARDANI:  On the second one, on the search

14  term protocol, she does have a list of many search terms

15  that were provided, and we do have that available.  But

16  we've not been asked to provide it, but we could make

17  copies right now if the court wants them and give them

18  to the defense.

19        THE COURT:  All right.  Why don't we do that.

20  And we'll take a short recess.

21        And, David, I want to talk to you.

22        (Recess:  10:08 until 10:11 a.m.)

23        THE COURT:  Whenever you are ready, Counsel.

24        MR. CARDANI:  Judge, those copies are being

25  prepared for the first item I talked about.  If I might

1  just make a few statements before we call our witness.

2       THE COURT:  Yes, you can go ahead.

3       MR. CARDANI:  As I see it, this is, to a large

4  extent, a garden variety challenge of a search warrant

5  that the court has seen many times.  And the briefing

6  sets forth all of the legal standards.  And I know the

7  court is familiar with that.

8       One issue that I didn't raise in our brief that

9  I did want to raise here because I don't want to be

10 foreclosed from arguing it down the line if we need to

11 is that of standing.

12      Mr. Sedaghaty was out of the country at the

13 time of this warrant.  And while he lived at this -- at

14 the residence that we searched before he left, and while

15 he was a corporate officer of al-Haramain before he

16 left, and when it was searched, the *SDI* case that came

17 out of the Ninth Circuit last month contains an

18 interesting discussion about whether a corporate officer

19 retains a sufficient privacy interest in a corporate

20 property.  And so I raise the issue as a potential legal

21 bar to challenging the warrant.

22      Frankly, I don't think it's a strong argument,

23 but I do want the record to reflect that we are raising

24 standing as an issue based on the *SDI* case.

25      THE COURT:  All right.

```
 1                 MR. CARDANI:  The other argument --
 2                 THE COURT:  You made your strong and your weak
 3       arguments here.
 4                 MR. CARDANI:  Yeah.  I think we present a lot
 5       of strong arguments in our brief, Your Honor.
 6                 THE COURT:  Okay.
 7                 MR. CARDANI:  The court knows that the burden
 8       is on the defense on every one of the issues --
 9                 THE COURT:  Except consent.
10                 MR. CARDANI:  -- save one, except consent.  The
11       court knows that we bear the burden on that.  We will
12       call Special Agent Anderson on the issue of consent.
13                 We don't want this to become a free-for-all on
14       the other issues because the burden is on them.  The
15       court has already found, I believe, that there is
16       insufficient grounds to have a Franks hearing, so I
17       don't want this to raise -- this to become the
18       equivalent of a Franks hearing with Colleen Anderson on
19       the stand.
20                 And in that vein, if this case has an appellate
21       future, I would hope that the court would be somewhat
22       willing to explain its rulings.  The court has had so
23       much experience on this issue --
24                 THE COURT:  This is one I'll be issuing
25       something in writing, and no question about that.
```

1          Some of the -- a number of the arguments raised
2    by the defendant, in logic we call them negative
3    pregnants.  We say something either exists or it doesn't
4    so other things must exist or not.  And that's not the
5    kind of argument that gets you a *Franks* hearing,
6    frankly -- frankly.

7          MR. CARDANI:  All right.  The witness has been
8    instructed, Your Honor, that if any question reasonably
9    asks for a response involving classified information to
10   not answer it.  It's not that she's trying to be
11   recalcitrant, but for obvious reasons, we can't have
12   classified information shared in this setting right now.

13         Judge, I'm providing Mr. Matasar and Mr. Wax
14   with a copy of a document called Search Terms.  I think
15   during Colleen Anderson's testimony, we'll hear more
16   about it.  The court can be provided a copy of it.  But
17   these are -- I'll just give it to the witness.

18         In terms of the other protocol, talking at the
19   break, the e-mails that I sent to her and exchanged with
20   her are work product of the government.  But to the
21   extent that she relied upon them, the protocol -- in her
22   present statement, she reveals the protocol almost
23   verbatim, and I think that that's sufficient in terms of
24   discovery.  So we would ask not to have to disclose
25   internal work product e-mails between us and Special

1    Agent Anderson.  There is nothing --

2          THE COURT:  Provide it to the court for in

3    camera review, please.

4          MR. CARDANI:  Okay.  And I think that's it at

5    this point.  The only evidence we'll be offering is

6    Special Agent Anderson on consent and to adopt her

7    affidavit.

8          THE COURT:  Thank you.  One other item first,

9    Mr. Wax was correct.  We omitted a ruling on item Number

10   45 in the discovery motion referred to; and that,

11   frankly, was because there wasn't a lot of discussion by

12   either side about it and we assumed it was worked out,

13   taken care of.

14         Now, if -- I don't really want to dig back into

15   that paper at this moment, but I want to be able to go

16   ahead with the proceeding, too.

17         MR. CARDANI:  I don't have the discovery ruling

18   and I don't have the request.

19         THE COURT:  We skipped it.

20         MR. CARDANI:  What is the request?

21         THE COURT:  For forensic reports concerning

22   computer searches.

23         MR. CARDANI:  All right.  There is an expert

24   report being prepared for -- to cover most of that by an

25   expert who's likely to testify at trial.  I think that's

1   going to cover -- that will cover all of this, so I'm
2   not aware --
3          THE COURT:  When do you expect that to be
4   ready?
5          MR. CARDANI:  A couple of weeks.
6          THE COURT:  All right.  Thank you.  You'll
7   provide that?
8          MR. CARDANI:  Yes.
9          THE COURT:  Yeah, okay.  Thank you.  Call your
10  witness.
11         MR. CARDANI:  Yes.  The government calls
12  Special Agent Colleen Anderson.
13         THE CLERK:  Agent Anderson, if I could have you
14  please step forward to the center of the courtroom.
15  Thank you.  Please raise your right hand.
16         (The witness was sworn.)
17         THE CLERK:  Please take the witness stand.
18         THE WITNESS:  Good morning.
19         THE COURT:  Good morning.
20         THE CLERK:  Agent, if I could please have you
21  state your full name for the record, spelling your last
22  name.
23         THE WITNESS:  Sure.  It's Colleen Anderson,
24  A-N-D-E-R-S-O-N.
25         THE CLERK:  Thank you.

Anderson - D

1          MR. CARDANI: May I proceed?

2          THE COURT: Yes, please.

3                    DIRECT EXAMINATION

4    BY MR. CARDANI:

5      Q.    You are employed by the IRS?

6      A.    Yes, I am.

7      Q.    You're a special agent working criminal cases?

8      A.    Yes.

9      Q.    And you are also an accountant by training?

10     A.    Yes.

11     Q.    You are one of the case agents in the case

12   before the court right now?

13     A.    Yes, I am.

14     Q.    You were the affiant that presented an

15   affidavit in support of a search warrant application

16   before Judge Cooney many years ago?

17     A.    Yes.

18     Q.    The defense, as you know, has filed a motion to

19   suppress evidence coming out of that search.  Have you

20   reviewed their response -- I mean, I'm sorry, the motion

21   and its supporting memorandum?

22     A.    Yes, I have.

23     Q.    Did you assist the government in preparing a

24   response, and more specifically, did you prepare a

25   statement that you captioned In re:  Document 183,

1    United States versus Pirouz Sedaghaty?

2        A.    Yes, I did.

3        Q.    And for the record, that's an attachment.   I

4    believe it's Number 1 to CR 192, the government's

5    response.

6            You personally prepared that statement?

7        A.    I did.

8        Q.    To the best of your knowledge as you sit here

9    today, does the statement contain accurate information?

10       A.    Yes, it does.

11       Q.    Do you adopt it as your testimony for today?

12       A.    I do.

13       Q.    Did you also -- one of the issues that you

14   addressed is that of consent.   The statement indicates

15   that Jonah Sedaghaty, the defendant's son, signed two

16   consent forms in your presence during the warrant; is

17   that accurate?

18       A.    Yes, that's correct.

19       Q.    And these are attached -- copies of them are

20   attached to defense memorandum, which is CR 183.   And

21   the first one is Exhibit Number 3.   Have you looked at

22   those recently?

23       A.    Yes, I have.

24       Q.    One is a consent to search.   And it contains

25   purported signatures of Dave Carroll and Colleen

```
 1   Anderson.   Are you aware of those signatures?
 2       A.      I am.
 3       Q.      Is that your signature on the lower left-hand
 4   corner?   I can show it to you if you want.
 5       A.      Exhibit 3?
 6       Q.      Yes.
 7       A.      And, excuse me, is this the consent for search?
 8       Q.      Yes.
 9       A.      Yes, that's my signature.
10       Q.      That references the search of two green
11   trailers located at 3800 South Highway 99?
12       A.      Yes, it does.
13       Q.      Whose signature is on the right side?
14       A.      That would be the signature of Jonah Sedaghaty.
15       Q.      How do you know that?
16       A.      Because I was present when he signed it.
17       Q.      And was that -- was an attorney named David
18   Berger, was he present when this was signed?
19       A.      Yes, he was.
20       Q.      So that covered the green trailers.   After the
21   search, there was another consent.   And this is Exhibit
22   Number 6 to the same document, CR 183.   Do you have that
23   in front of you?
24       A.      Yes, I do.
25       Q.      Is that your signature on the lower left-hand
```

1    corner along with Dave Carroll's?

2    A.    Yes, it is.

3    Q.    And whose signature is on the right side?

4    A.    That would be of Jonah Sedaghaty.

5    Q.    And how do you know that?

6    A.    Because I was present when he signed it.

7    Q.    Was his attorney present when he signed it?

8    A.    Yes, he was.

9    Q.    Does this cover the consent to take items that

10   is attached in Exhibit 7 to that document, did you

11   prepare an inventory which chronicled all of the items

12   that were taken through the consent part of the search?

13   A.    Yes.  The IRS took an inventory of all the

14   items and printed it out, which was provided to

15   Mr. Sedaghaty.

16   Q.    Then attached to your present statement is a

17   court resolution.  This is an attachment to CR 192.  On

18   the back end of your statement, there is one-page

19   corporate resolution.  Do you have that in front of you?

20   A.    I do.

21   Q.    What is that?

22   A.    That is a corporate resolution -- my

23   understanding it's a corporate resolution in which Jonah

24   Sedaghaty was added as a board member to al-Haramain

25   Islamic Foundation.

1    Q.    How did you receive this?

2    A.    I received this from Attorney David Berger.

3    Q.    It's dated January 29, 2003.  The warrant

4    was -- when was the warrant served?

5    A.    February 2004.

6    Q.    And in paragraph 1 it says Jonah Smith

7    Sedaghaty, a resident of Ashland, Oregon, U.S.A., is

8    elected as a director of al-Haramain Islamic Foundation.

9    A.    Yes.

10   Q.    And it contains the purported signatures of

11   Soliman al-Buthe and Perouz Sedit Ghaty and Jonah.

12        And then the second page to that is a

13   resignation of Jonah, a little bit after the search?

14   A.    Yeah, approximately two days after the search.

15   Q.    How did you get that?

16   A.    That was also provided by Attorney David

17   Berger.

18        MR. CARDANI:  Judge, I have no other questions

19   at this time.

20        THE COURT:  Cross.

21                   CROSS-EXAMINATION

22   BY MR. WAX:

23   Q.    Ms. Anderson, could you start, please, by

24   telling us how many law enforcement officers were

25   present for the search.

Anderson - X                                    22

1          A.     I don't have that in front of me.   There was

2     probably -- if you want me to estimate.

3          Q.     Tell us as much as you can, please.

4          A.     Approximately 12 to 15.

5          Q.     How many different agencies were presented?

6          A.     IRS Criminal Investigation.   There was the

7     Federal Bureau of Investigation.   Immigration and

8     Customs Enforcement.   And we did have a Jackson County

9     Sheriff's Office detective there.

10         Q.     Was there a pre-search meeting among the 12 to

11    15 agents?

12         A.     Yes, that's standard.

13         Q.     Where did that take place?

14                THE CLERK:   I apologize for interrupting.   Your

15    microphone doesn't seem to be picking up.

16                (Brief pause.)

17                MR. WAX:   Judge, should we proceed?

18                THE COURT:   Yes, please.

19    BY MR. WAX:

20         Q.     Where did that meeting take place?

21         A.     I believe that took place at the Ashland Police

22    Department.

23         Q.     How many of the 12 to 15 officers and agents

24    were present?

25         A.     I believe most of them, most of them.   I'm not

1    sure if the sheriff's office detective was there or not.

2    I can't be certain of that.  But all of the IRS people

3    were there.  All of the FBI people, that I recall, that

4    were at the warrant.  Immigration was there.

5        Q.    Did you provide the members of the search team

6    anything in writing?

7        A.    Yes.  I provided them a copy of the items to be

8    seized, which they reviewed.  And then after that, I

9    provided them with copies, each and every one of them,

10   of the affidavit for search warrant.  And I sat there

11   and watched them review the affidavit.

12       Q.    When you say a copy of the items to be seized,

13   are you referring to the Attachment B to the warrant or

14   are you referring to some other document?

15       A.    No, Attachment B to the warrant.

16       Q.    Do you recall any discussions about the scope

17   of the search that was authorized under Attachment A or

18   under Attachment B?

19       A.    Yes.  The discussion was basically myself

20   talking to the agents, and telling them that if there

21   were any questions pertaining to the scope of the

22   warrant or items that need to be seized, that they

23   should first bring it to our senior officer.  And that

24   if she had any questions, she would then bring it to me.

25   And I was then to be shown all items that were marked as

1   potentially to be seized.

2       Q.    Who was the seizing officer?

3       A.    Special Agent Linda Czemerys.

4       Q.    We have been provided -- if I am recalling

5   correctly -- one report in discovery with respect to

6   this search, and that was from you.

7       A.    That's correct.

8       Q.    Have you seen any reports prepared by any of

9   the other 12 to 15 law enforcement officers who

10  participated?

11      A.    No, I don't believe so.

12      Q.    Do you recall ever seeing any notes taken by

13  any of the other participants?

14      A.    I recall that we had a general practice that we

15  had an agent that sketched out the building layout.   I

16  don't know if you'd consider that notes.

17      Q.    Who would that have been?

18      A.    I'd have to refer back to the search warrant.

19  I don't --

20      Q.    Can you do that quickly?

21      A.    I don't have those items with me.

22            MR. WAX:   All right.   Is that something we can

23  have an agreement that the government will provide us

24  later on this week?

25            MR. CARDANI:   Sure.

1          MR. WAX:   Thank you.

2    BY MR. WAX:

3      Q.    Have you seen any other notes that were taken

4    by any other law enforcement people?

5      A.    No.

6      Q.    Was there discussion about safety issues and

7    how you would actually enter the property?

8      A.    Yes, there was.

9      Q.    What plan did you formulate?

10     A.    The plan that was formulated was that the entry

11   team would knock and announce.   And at that point, they

12   would not have their guns drawn.   Once any individuals

13   inside were identified and asked to exit the residence,

14   then we would perform the search as we normally do.

15     Q.    When you arrived, can you describe for the

16   court, please, who went where.   Give us a general

17   description of the layout of the property, how one

18   accesses it from the public highways, start there,

19   please.

20     A.    Okay.   As far as what I saw, I was one of the

21   entry cars, as far as what I saw, we came up the

22   driveway, and up and around to what would be considered

23   the main level.   And at that point in time, the entry

24   team stopped short and went, I believe, downstairs to

25   enter the building, because I believe Jonah Sedaghaty

1    had actually came out of the residence at the time that

2    the cars were driving up to the premises.

3        Q.    Had come out of the building in this downstairs

4    area you are describing or had come out of the building

5    in the upper area where you were located?

6        A.    I did not personally see Mr. Sedaghaty exit the

7    residence, but from talking to one of the team leaders,

8    I understand that he came down from below, which would

9    be, my understanding, the personal part of the

10   residence.

11       Q.    Who would have been down there among the law

12   enforcement officers?

13       A.    The entry team.

14       Q.    What are the names of the people?

15       A.    The agent leading the entry would be Special

16   Agent Todd Anderson.  And I believe that Special Agent

17   Linda Czemerys was another person on the entry.  And

18   potentially Special Agent Brandy McKibben, but other

19   than that, I'd have to go back and check.

20       Q.    To your knowledge, were all of the law

21   enforcement officers that day armed?

22       A.    Except for one.  I believe there might have

23   been an FBI analyst present that wasn't armed.

24       Q.    An FBI analyst of computers?

25       A.    I'm not sure what her position was exactly.

```
 1    She, I believe, was an FBI analyst.  Whatever they asked

 2    them to do.

 3        Q.    What type of analyst would be present at a

 4    search of that nature?

 5        A.    I don't know how to answer your question.  I'm

 6    not familiar with what this particular analyst's

 7    function was.

 8        Q.    If the person was not a computer analyst, what

 9    other types of analysts would be present at a search of

10    this nature?

11        A.    Well, FBI analysts have many different

12    functions.  I believe this one could possibly have been

13    one that input records, for instance.  I've dealt with

14    those type of analysts that input bank records, they

15    organize records.

16        Q.    What was this analyst's name?

17        A.    I don't recall.

18        Q.    Do you have that written down somewhere?

19        A.    I believe so.

20              MR. WAX:  Can we get agreement we can get that

21    from the government later?

22              MR. CARDANI:  Yes.

23              MR. WAX:  Thank you.

24    BY MR. WAX:

25        Q.    Did you observe the interaction that took place
```

Anderson - X

1   between the members of this entry team and Jonah

2   Sedaghaty?

3       A.      The initial interaction?  No.

4       Q.      That's correct.

5       A.      No.  My understanding was, from talking to,

6   again, the team leader of the entry, Special Agent Todd

7   Anderson, that when he came out, he was advised to come

8   see me, which I was on the upper level, so that I could

9   show him the search warrant and the affidavit and

10  explain what was going on.

11      Q.      Did Mr. Sedaghaty come to see you?

12      A.      Yes, he did.

13      Q.      Was he accompanied by any law enforcement

14  officers?

15      A.      I don't recall.  I don't recall.

16      Q.      Were you armed that day?

17      A.      Yes, I was.

18      Q.      Were you wearing any sort of protective gear,

19  bullet proof vests, anything of that nature?

20      A.      Yes, that's required.

21      Q.      Were all of the other agents and law

22  enforcement people similarly dressed?

23      A.      Yes, they were.

24      Q.      Were there any firearms present other than

25  handguns?

1    A.    I don't recall any other.

2    Q.    Shotguns, rifles, assault weapons, anything of

3    that nature?

4    A.    I don't recall any other weapons.

5    Q.    The team came up the driveway.  You drove up

6    the driveway.  Did any other people enter the premises

7    through any other route?

8    A.    No, no, just the entry team enters first.

9    Q.    Did any other cars go onto the property where

10   the residence and prayer house are located via any route

11   other than the driveway that you took?

12   A.    No.

13   Q.    Were there any helicopters in use?

14   A.    No.

15   Q.    When you had your first interaction with

16   Mr. Sedaghaty, what, if anything, took place?

17   A.    Mr. Sedaghaty came to talk to me, and I

18   informed him that we had a search warrant for the

19   premises.  I read him the search warrant and showed him

20   the items to be seized.  I asked him if he would like to

21   review the affidavit in which he said yes.

22         So once the residence was cleared by the team,

23   then I escorted Mr. Sedaghaty back into the residence,

24   and we picked an area that happened to be, I believe,

25   the prayer room, formerly known as the prayer room, and

1    that's where Mr. Sedaghaty and I had our discussions.

2        Q.    Do you know if any law enforcement personnel

3    had taken him into the premises prior to his having his

4    first interaction with you?

5        A.    I'm sorry, I don't understand the question.

6        Q.    Prior to your first interaction with

7    Mr. Sedaghaty, do you know whether any other law

8    enforcement personnel had taken him into the building?

9        A.    No, I'm not aware of that, no.  I have no

10   knowledge of that occurring.

11       Q.    Did you take him into the building and direct

12   him in any way while doing so?

13       A.    Did I take him into the building?  Are you

14   saying after the entry team did I take him into the

15   building?

16       Q.    Before, during, or after.

17       A.    Okay.  Yes.  After the entry team had made

18   their walk-through to secure the site, I informed

19   Mr. Sedaghaty that the search warrant was occurring,

20   and, again, went over the affidavit and everything with

21   him.  And I said that if he would like to stay on the

22   premises, that we could do so.  And I would pick a room,

23   which we did, the prayer room.  And he would be free to

24   review the affidavit, which he did.

25       Q.    Was he also told that he had the option of

1    leaving and not being present during the search?

2    A.    Yes.

3            MR. WAX:    Excuse me one moment, please, Your

4    Honor.

5            (Discussion held off the record between Mr. Wax

6    and Mr. Matasar.)

7    BY MR. WAX:

8    Q.    Do you know where Mr. Sedaghaty was when the

9    entry team, as you are calling it, did its walk-through?

10   A.    My understanding from talking to the team

11   leader was that Mr. Sedaghaty was downstairs in the

12   personal area with a girlfriend.  And that when we came

13   up the driveway, he came out the door, but the

14   girlfriend remained inside.

15   Q.    Do you know whether he was taken back into the

16   residence by the entry team and moved through the

17   residence by them as they did what you are calling a

18   walk-through?

19   A.    I don't recall that.  I can't say I recall

20   that.

21   Q.    In the discussion we had with the court before

22   the testimony began, we referenced the protocol that you

23   described in paragraph 12 of the declaration that you

24   signed on July 6th.  I'd like to ask you, please, about

25   that protocol.  Tell us as much as you remember about

1   the instructions that you were given with respect to the

2   geographic scope of the warrant.

3        A.   I don't believe the protocol talks about the --

4   let's see here.  Are you referring to a certain item?

5   I'm trying to figure out what you are referring to.

6             THE COURT:  I think he's talking about a

7   certain place.

8   BY MR. WAX:

9        Q.   The geography.  When you went to the address,

10  what did you expect to find in terms of buildings?

11       A.   I believe I expected to find the residence and

12  what looked like a couple of trailers on the property.

13       Q.   You were aware prior to going to the scene that

14  there were trailers on the property?

15       A.   I believe so.  I'm not sure if I knew there

16  were two trailers, but I did see something, obviously,

17  to the side of the residence, there were trees and

18  whatnot.  I'm not sure if I was aware of two of them,

19  but there did appear to be some form of building there,

20  yeah.

21       Q.   Had you been to that location prior to the date

22  of the search in February of 2004?

23       A.   Yes.  Prior to the search warrant, I had issued

24  a subpoena on al-Haramain Islamic Foundation, I'm not

25  sure how much earlier than that, but it would have been

1    probably June of 2003, maybe.  Approximately the summer

2    of 2003.

3         Q.    Do you recall having seen trailers on the

4    premises at that time?

5         A.    I don't recall seeing trailers on the premises

6    at that time.

7         Q.    Are you aware that FBI Agent Carroll had been

8    to that location prior to the date of the search?

9         A.    Yes.

10        Q.    Had you discussed with him his observations?

11        A.    Yes.

12        Q.    Are you aware that he had been there on more

13   than one occasion?

14        A.    I'm aware of the one occasion.  I'm not -- I'm

15   not sure that I'm aware of how many times he'd been at

16   the residence, but I was aware of the fact that he had

17   been at the residence at least once.

18        Q.    Did you discuss with him the affidavit that you

19   prepared in support of the search warrant?

20        A.    Did I discuss --

21        Q.    Yes.  Prior to the filing of the search warrant

22   application, did you discuss the affidavit that you were

23   in the process of preparing or were going to prepare

24   with the FBI Agent Carroll?

25        A.    Yes.

1    Q.    Did you discuss with him the warrant itself and

2    what you would include in Attachment A?

3    A.    Yes.

4    Q.    At any time in those conversations, do you

5    recall discussion about gee, what's there?  A building?

6    A garage?  An outbuilding?  Trailers?

7    A.    I believe there was a discussion.  I don't

8    specifically recall talking about the trailers, but I do

9    recall being advised that there was some form of a tent

10   up there.

11   Q.    Did you discuss what you should include in

12   Attachment A, the physical locations on the real

13   property that could be searched?

14   A.    I discussed that with AUSA Christopher Cardani.

15   I don't recall specifically discussing that with Special

16   Agent Carroll.

17   Q.    Did you discuss with Mr. Cardani the potential

18   that there would be or the fact that there were trailers

19   present on the property?

20   A.    I believe we did discuss that.

21   Q.    Was a decision made not to include the trailers

22   within the scope of Attachment A to the warrant?

23   A.    I believe so, because the attachment to the

24   warrant talks about just the residence.

25   Q.    What can you tell us about the discussion with

1    respect to noninclusion of the trailers?

2       A.    I don't recall that discussion.

3       Q.    Was that covered in any way in the written

4    material that Mr. Cardani provided to you?

5       A.    Yes, it was covered in the search warrant

6    protocol, specifically Item C in my affidavit, page 5,

7    where it says the authority to search only covers the

8    residence.  No trailers or outbuildings may be searched

9    unless there is consent provided by the occupant.

10      Q.    What can you tell us about the reason why you

11   were not of the view that there was probable cause to

12   search the trailers?

13            MR. CARDANI:  Judge, I'm going to object to --

14            THE COURT:  Sustained.  The legal standard

15   thrown in, Mr. Wax.

16   BY MR. WAX:

17      Q.    In terms of the types of items that were

18   included within Attachment B, did you receive anything

19   in writing from Mr. Cardani about that?

20      A.    Well, I would say that Item D in the search

21   warrant protocol, page 5, reflects the items to be

22   seized in the sense that it says that I will be a

23   seizure screener, if that's what you are asking.

24      Q.    What guidance did you have in writing, if any,

25   with respect to the items that could legitimately be

1    seized under the warrant?

2        A.    The guidance that I had pertaining to what

3    could be seized under the warrant is Attachment B itself

4    in the affidavit.

5        Q.    Was there anything further than that provided

6    to you in writing by Mr. Cardani?

7        A.    Just the search warrant protocol, which says

8    that if I had questions whether an item falls within the

9    scope of the warrant that I should contact him.

10       Q.    During the course of execution of the warrant,

11   you determined that there were items within the trailers

12   that you wanted to seize, correct?

13       A.    Yes.  After we received consent to search the

14   trailers from Mr. Sedaghaty, there were items in there

15   that we would like -- we asked permission through

16   consent to take, yes.

17       Q.    Were the trailers entered prior to the signing

18   of the consent by Jonah Sedaghaty?

19       A.    No.

20       Q.    Were the trailers opened prior to the signing

21   of the consent by Jonah Sedaghaty?

22       A.    I don't believe so.

23       Q.    Two consents were signed, correct?

24       A.    That's correct.

25       Q.    Your understanding of the first consent is that

1   it authorized what?

2       A.    The first consent was requested so that we may

3   look in the trailers, search the trailers, that was the

4   purpose of the first consent.

5       Q.    So the first consent was to open the door of

6   the trailers and go in?

7       A.    That's correct.

8       Q.    The second consent was obtained for what

9   distinct purpose?

10      A.    The second consent was obtained so that we

11  requested the right to take items that we thought might

12  be pertinent from the trailers and also the residence

13  that may fall outside the scope of the warrant.

14      Q.    With respect to items from either the trailers

15  or -- let me start again.  With respect to items that

16  were located in the house, you are indicating to us that

17  there were some that were observed that you believed

18  were outside the scope of the warrant?

19      A.    That's correct.

20      Q.    Those, if I am reading paragraph 17 correctly,

21  included videotapes depicting mujahideen battlefield

22  scenes?

23      A.    Which item are you referring to?

24      Q.    In paragraph 17 of the affidavit of July 6th.

25      A.    Yes.

1     Q.    Now, the paragraph goes on to say that you had

2    a discussion with Mr. Cardani.

3     A.    Uh-huh.

4     Q.    Correct?

5     A.    Yes.

6     Q.    Following that discussion, it says you denied

7    the agent's request to seize some of the material.

8     A.    That's correct.

9     Q.    The material that was denied, is that the

10   material that is listed in the pages of the return that

11   followed the second consent?

12    A.    The items that I denied originally were the

13   videotapes.  There were numerous, numerous videotapes of

14   what appeared to be military type videos of what looked

15   like the U.S. capabilities of the army, navy, whatnot.

16   Those particular items are what I recall questioning or

17   basically denying the request that those be a part of

18   the search warrant --

19    Q.    Okay.

20    A.    -- seizure.

21    Q.    Those included the videotapes depicting the

22   mujahideen battlefield scenes?

23    A.    No, with those I questioned whether or not

24   those fell within the scope, because during the warrant,

25   we tried to review those videos, those particular -- the

1  mujahideen videos.  And at the time I don't believe I

2  was certain whether or not those videos actually

3  pertained to Chechnya or not.  I had an agent there that

4  actually spoke Russian, so we were trying to get him to

5  see if he could pick up on what those tapes were about.

6      Q.    Did you discuss with Mr. Cardani the mujahideen

7  videos?

8      A.    I believe I did.

9      Q.    Do you have any notes of that conversation?

10     A.    No, I do not.

11     Q.    You took no notes during your conversation with

12 him about what it was he was authorizing or not

13 authorizing you to seize absent the consent?

14     A.    I don't recall taking notes during that

15 conversation.

16     Q.    Did you make any notes of those items that you

17 denied agents' requests to seize?

18     A.    No, I don't believe I took notes pertaining to

19 which items.

20     Q.    Are you able to give us today an accurate list

21 of the items that were denied?

22     A.    I can give you a list by memory of what I

23 denied.

24     Q.    Well --

25     A.    That would include the military videos.  There

1    were boxes and boxes of military videos from the U.S.

2    Army.  Let me think, I believe there was photographs,

3    lots and lots of photographs.

4       Q.    Of what?

5       A.    They looked like photographs of persons that

6    have come to the residence, a lot of tent photographs of

7    persons coming, that sort of thing.

8       Q.    What other items do you recall today having

9    denied?

10      A.    I believe there were some address books.

11      Q.    What else?

12      A.    I believe there was some Islamic materials.

13      Q.    The paragraph 17 references Noble Qur'ans.

14      A.    That's correct.

15      Q.    Did you deny the permission to seize those?

16      A.    Under the search warrant.

17      Q.    What else?

18      A.    Again, samples of literature would be some

19   Islamic materials.  Yes, the prisoner letters.  That's

20   all I can recall.

21      Q.    How many different agents brought you items

22   that you denied?

23      A.    I believe probably only two, which would be my

24   seizing officer and Special Agent Carroll.

25      Q.    And the seizing officer, again, is named?

1    A.    Special Agent Linda Czemerys.

2    Q.    How many different times did you speak with

3    Mr. Cardani about the issue of items being within or

4    without the warrant?

5    A.    Several times.  I don't recall the exact

6    number.

7    Q.    During the course of the search, numerous

8    computer or hard drives were seized, correct?

9    A.    That's correct.

10    Q.    Was any effort made to look at them on the

11    premises?

12    A.    Our computer information specialist that was

13    present, we only had one, and once he realized the

14    number of computers there, then the determination was

15    made that it wasn't feasible to image them on-site.

16    Q.    Who was the computer person present at the time

17    of the search?

18    A.    Special Agent Richard Smith.

19    Q.    That's an IRS agent?

20    A.    Yes, he is.

21    Q.    When you went to the location, did you have a

22    protocol in place for searching the computers?

23    A.    The protocol basically is, I believe, listed in

24    Item B, items to be seized, which, I believe, states

25    that if it's not feasible to image them on-site, that we

 1   would retain them up to 60 days, and then return them.

 2          MR. WAX:  Okay.  We were provided a list of

 3   search terms earlier this morning.  Is this in evidence

 4   or was this just provided to us?

 5          MR. CARDANI:  No, it's not.  But I'll stipulate

 6   to its admissibility, and tender to the court if that's

 7   what you would like.

 8          MR. WAX:  Yeah.  We'll label this SH-2 for the

 9   hearing, if we may, Your Honor.

10          THE COURT:  Fine, received.

11          MR. WAX:  Does the court have a copy?

12          THE COURT:  No.

13          MR. CARDANI:  We have an extra copy.

14          MR. WAX:  Thank you.

15   BY MR. WAX:

16     Q.    When was the list of search terms that is

17   reflected on Exhibit Number 2 created?

18     A.    Both lists were created after IRS personnel

19   were able to access a lot of the data that needed to be

20   recovered.

21     Q.    After accessing the data on the computers

22   themselves?

23     A.    After processing the data to make it available

24   for me to access, yes.

25     Q.    On the computers themselves, you are talking

1   about?

2       A.    No, on the images from the computers.

3       Q.    You are not talking about accessing hard copies

4   of pieces of paper; you are talking about accessing the

5   images of the hard drives of the computers themselves?

6       A.    Yes.

7       Q.    Okay.  Exhibit 2 has one page that has the

8   heading Search Terms.  And then it has another page that

9   says DT Search Terms that goes 1 through 29.  And then a

10  third page that picks up 61 to 73.  Should there be

11  another page?

12      A.    No, I believe that's the document.

13      Q.    What happened to numbers 20 -- or 30 through

14  60?

15          MR. CARDANI:  If I may, excuse me, Mr. Wax.

16  The copy did not pick up a page.  I can give him a copy

17  of the items 30 through 60 that didn't appear on it and

18  I'll ask that a copy be made of that.

19          MR. WAX:  Can we then substitute a complete one

20  later, Your Honor, for the partial one we just handed

21  up?

22          THE COURT:  Just for clarity --

23          THE WITNESS:  I have a complete one.

24          THE COURT:  For clarity of the record, it will

25  be Number 2-A.

1          MR. CARDANI:  May I approach the witness?

2          THE COURT:  Yes.

3          MR. CARDANI:  I don't know if the original one

4    has --

5          THE COURT:  This one included Hawaii that I

6    got, this one.

7          MR. WAX:  I think that's Hawali.

8          MR. CARDANI:  Judge, may I inquire?  The

9    exhibit itself, does it have a page with Number 30

10   through 60 on it?

11         THE COURT:  I don't know.  I passed it off

12   here.  Go ahead and take a look at it, Mr. Cardani.

13         MR. CARDANI:  It does not.

14         THE COURT:  I don't have that.  I just have two

15   pages.  What does DT mean?

16         THE WITNESS:  It's a DT search.  It's actually

17   a program that the forensic people use where you can put

18   in terms and then it looks for the data.

19         THE COURT:  Thank you.

20         MR. CARDANI:  For purposes of this testimony,

21   though, she has a complete copy of the search terms and

22   Mr. Wax does as well.

23         MR. WAX:  Thank you.

24   BY MR. WAX:

25     Q.    Looking at the complete exhibit then, Agent

1    Anderson, we have one page labeled Search Terms without

2    numbers, and then three pages DT Search Terms that go 1

3    through 73.  Were they created at different times?

4    A.    Yes, they were.

5    Q.    Please tell us which was created first.

6    A.    No, I don't recall which one came before the

7    other one.

8    Q.    Who created the first one, Search Terms?

9    A.    I did.

10   Q.    When?

11   A.    After I received access to all of the data that

12   needed to be retrieved.

13   Q.    Does that include after receiving access to the

14   images of the hard drives?

15   A.    I can't recall if I had received the data prior

16   to making these lists.  It may have been at the same

17   time that my computer specialist told me that the data

18   would be available and that he would be shipping it out

19   to me that I may have created these search terms.

20   Q.    What about the list DT Search Terms?

21   A.    Yes, the difference between the first list

22   Search Term and the DT Search Term is that the first

23   page is what I came up with originally on my own.  And

24   the DT Search Term, I believe was a list that was

25   prepared after consulting with AUSA Cardani and Special

1    Agent Carroll.

2        Q.    That was definitely after having had access to

3    the information that was on the imaged hard drives?

4        A.    No, I don't know that -- again, as I stated, I

5    don't know -- I don't recall if this was done prior to

6    the data actually being shipped to me.

7        Q.    I am confused.  I thought you had told us

8    earlier that you did not create the search terms until

9    after you had access to the information that was on the

10   imaged hard drives.

11       A.    No, I believe what I stated was that I'm not

12   sure if this was done in conjunction with the data being

13   shipped to me or if I had done it after having access to

14   it.

15       Q.    Is there a report that would clarify that issue

16   for us?

17       A.    I don't know.

18       Q.    Do you have any log notes that would tell you

19   when you created the list called Search Terms?

20       A.    I don't believe I have a log that says that.

21       Q.    Do you have a log note that would say when you

22   created the list called DT Search Terms?

23       A.    No.

24       Q.    Do you have any notes of any type that would

25   shed light on when you created these two separate lists?

1       A.      I don't know.  I'd have to review my notes.  I

2    don't know.

3            MR. WAX:  Can we have that done and then

4    perhaps we would need to resume the hearing, Your Honor.

5            MR. CARDANI:  Well --

6            THE COURT:  I'm not going to interrupt the

7    hearing for that.

8            MR. WAX:  I appreciate that.

9            MR. CARDANI:  I'm not sure what the pertinence

10   of getting the best memory of the witness on how the

11   image -- unless it's important to the court, I'm not

12   sure how relevant it is.

13           THE COURT:  What are you after?

14           MR. WAX:  Excuse me?

15           THE COURT:  What are you after?

16           MR. WAX:  May I answer the question out of her

17   presence, please, and out of Agent Carroll's presence?

18           THE COURT:  You may.  We'll just go back into

19   this little room here.

20           Sorry, Deb.

21           MR. WAX:  Thank you.

22           (An in camera discussion was held.  Page 48 is

23   sealed, under separate cover.)

24           ///

25           ///

1              (Proceedings continued in open court.)

2              MR. CARDANI:  Judge, can I proffer the court

3    SH-2-A, I guess, which is a complete listing of the

4    search terms we're talking about?

5              THE COURT:  Yes.  It will be received.

6              MR. WAX:  Thank you.

7    BY MR. WAX:

8    Q.    All right.  Agent Anderson, with respect to the

9    search of the computers, where did they physically go

10   after they left the premises where they were seized?

11   A.    They went to our Bend office where my CIS was

12   stationed.

13   Q.    Who conducted the first search of the

14   computers?

15   A.    Well, my CIS imaged them and processed them and

16   then began searching the computers.

17   Q.    And the CIS to whom you are referring is whom?

18   A.    Special Agent Richard Smith.

19   Q.    In Bend?

20   A.    Yes.

21   Q.    Were copies of the images sent to any other

22   locations for any other searches?

23   A.    Copies of the images were processed and

24   eventually sent to me once a great deal of work was done

25   to access the images so that I could do the DT search.

```
 1     Q.    Were copies of the images provided to the FBI?
 2     A.    The -- Special Agent Carroll was provided
 3   copies of a couple of the drives.
 4     Q.    Which ones?
 5     A.    I don't recall.
 6     Q.    Is there a record of that somewhere?
 7     A.    I'm assuming he probably has a record of that.
 8     Q.    Do you have a record of which drives you gave
 9   to him?
10     A.    I don't know.  I'd have to look.
11     Q.    All right.  When would the drives have been
12   given to him?
13     A.    Copies or images of the drives?
14     Q.    Yes.
15     A.    Well, obviously after the search warrant; and
16   other than that, I can't speculate.
17     Q.    In 2004?
18     A.    I don't know.
19     Q.    Is that the type of thing that will be
20   described in the forensic report that Mr. Cardani
21   indicated is in the process of preparation?
22     A.    I don't -- I don't know.
23     Q.    Were copies of the drives sent to Washington,
24   D.C.?
25     A.    No -- well, yes, they were, because I have a
```

1    computer specialist in Washington, D.C. for the IRS.

2        Q.    When were the copies sent to that person?

3        A.    Copies -- I don't know.  I'd have to check.

4        Q.    Who is that person?

5        A.    That person would be Jeremy Christianson.

6        Q.    Were copies of the drives provided to any

7    people as far as you know other than Mr. Christianson,

8    Mr. Smith, and Agent Carroll?

9            MR. CARDANI:  Judge, before she answers, I'm

10   going to object to the line of questioning.  What's

11   important is the evidence we're trying to put in trial.

12   How it came into being, how we pulled it out of the

13   computers, and she is the witness that directed that

14   from beginning to end.  If other copies were made, given

15   to other people that didn't result in any kind of

16   tendering of exhibits for trial, I don't see how it's

17   relevant to this hearing.

18           THE COURT:  Can you connect it?

19           MR. WAX:  Yes, Your Honor.  We do not know at

20   this point from this witness the origin of these search

21   terms, whether they were derived or created by her at

22   any particular time and --

23           THE COURT:  Why don't you ask her about that.

24           MR. WAX:  -- who reviewed the information.

25           THE COURT:  Ask her about that.

1   BY MR. WAX:

2     Q.    If I understood you correctly earlier, you've

3   told us that you do not recall, as you sit here today,

4   when the list of search terms was created; is that

5   correct?

6     A.    What I stated was that I was not sure if the

7   search terms were created prior to receiving the data or

8   after receiving the data from my CIS.  However, I do

9   believe the search terms were created during the time

10  period that my CIS was processing the information and

11  sent it to me.

12    Q.    When the CIS was processing the information,

13  were copies of the hard drives also at that point in

14  Washington, D.C.?

15          MR. CARDANI:  Objection, relevance.

16          MR. WAX:  It's directly relevant, Your Honor.

17  If there was something done there that led to --

18          THE COURT:  Let me ask this:  Where did -- did

19  you get any information from Washington, D.C. to help

20  you put together this list?

21          THE WITNESS:  Of search terms?

22          THE COURT:  Yes.

23          THE WITNESS:  No.

24          THE COURT:  The objection is sustained.

25  BY MR. WAX:

1    Q.    What is ILook?

2    A.    ILook is an IRS program for reviewing computer

3    data.

4    Q.    What program was Mr. Smith using in Bend?

5    A.    Well, I'm not a computer expert, but I'll give

6    you my understanding.  My understanding is that

7    originally Mr. Smith was using something called SaveBack

8    in order to image the drives and process them.  And

9    ILook, is my understanding, is an IRS proprietary type

10   of program.  And I believe Special Agent Smith started

11   using one of the earlier versions of ILook.

12         However, because we were having problems with

13   retrieving some of the deleted data, the drives were

14   reformatted, there is a lot of things that had happened

15   to the drives, that the images were eventually sent to

16   my IRS specialist in Washington, D.C. who is an ILook

17   program manager, so he is very familiar with the

18   program.  And that is when he was able to retrieve most

19   of the pertinent data.

20   Q.    That retrieval information was provided to you?

21   A.    That retrieval information was processed, put

22   into a laptop with the DT search function on it, and

23   these DT search terms were used to review the data.

24   Q.    In Bend or in Washington?

25   A.    What occurred in Bend or Washington?

1       Q.      The review of the material with the DT search

2    terms.

3       A.      In Medford, Oregon.

4       Q.      In Medford?

5       A.      Uh-huh.

6       Q.      When the programmer did whatever he did in

7    Washington, were you provided with any information that

8    led to inclusion of any of the items in the list of DT

9    search terms?

10      A.      Well, the process of using -- if you are

11   familiar with the program DT Search, it's a rolling

12   process.  Basically you put in a search term and data

13   comes up.  Correct?  So then you review the data.  And

14   within that data, if it's pertinent, you find other

15   possible relevant search terms that's used.  This DT

16   Search Term list is not all inclusive.

17      Q.      If I understand what you just said, you are

18   telling us that something was done in Washington, some

19   terms are rolled forward, they were then used which led

20   to the creation of other terms?

21      A.      I'm not sure what you just said, but let me

22   state this:  In Washington, he processed the

23   information, put it on a laptop, shipped it to me in

24   Medford.  I had created, around that time period, the DT

25   search terms.  Once I started searching the computer

 1   based on my DT search terms, data was retrieved that led

 2   me to other potential search terms that were relevant to

 3   the warrant.

 4       Q.     Prior to your doing that, am I understanding

 5   correctly that other persons, perhaps Mr. Smith, perhaps

 6   Mr. Christianson, had looked at the data that was on the

 7   hard drives?

 8       A.     Mr. Christianson, yes, had looked at some of

 9   the data on the hard drives because prior to him

10   shipping me the laptop with the data on it, I had asked

11   him to run some search terms for me.

12       Q.     Based on what list?

13       A.     Based on the list that you have as the exhibit.

14       Q.     Based on the list called Search Terms or based

15   on the list called DT Search Terms?

16       A.     They would include probably both of them.

17       Q.     Do you have any notes anywhere that would

18   answer the question as to what actual terms he had to

19   work from, Christianson?

20       A.     I believe he has a list of those and I believe

21   that he will be putting those in his report.

22       Q.     Did I understand you correctly to say that

23   there are other terms that have been employed that go

24   beyond --

25       A.     Yes.

1    Q.    -- those contained in Exhibit 2-A?

2    A.    Yes.

3    Q.    Do you have those in writing anywhere?

4    A.    I do not believe I have those in writing.  The

5    ones that I asked Mr. Christianson to run, I believe he

6    has those and will have those in his report.

7    Q.    If I'm reading your July 6th affidavit

8    correctly, you are telling us in paragraph 17 that

9    videotapes depicting mujahideen were outside the scope

10   of the warrant?

11        MR. CARDANI:  Judge, that calls for a legal

12   conclusion.

13        THE COURT:  Sustained.

14   BY MR. WAX:

15   Q.    Let me try again.  I see the word mujahideen in

16   paragraph 17 of your affidavit.  I see the word

17   mujahideen in paragraph 21 of your affidavit.  In

18   paragraph 17, aren't you telling us that you viewed

19   videotapes -- you viewed videotapes of mujahideen as

20   being outside the scope of the warrant?

21        I'm asking the question, not Mr. Cardani.  Can

22   you answer that question?

23        THE COURT:  Come on, Mr. Wax, that wasn't

24   called for.  I know you have a job to do here, but we're

25   not going to do that.

1          He's asking your opinion.  Did you see it was

2     outside?  That's not a legal opinion.

3          THE WITNESS:  Yes.  At the time I wasn't sure

4     if it fell within the scope or not.  And I believe

5     that's what I stated prior to that.  I wasn't sure

6     whether it fell within the scope or not.  I couldn't

7     tell from the very poorly -- poor quality of the videos

8     exactly what I was seeing.

9          Again, I had an agent there that just happened

10    to speak Russian.  We were trying to make sense out of

11    the video.  But we're in the middle of a search, so I

12    didn't have time to go through the entire video.

13    BY MR. WAX:

14    Q.    With respect to the search terms that are

15    contained in the DT list, for example, where did the

16    term Number 24, Hawali, come from?  Why is that included

17    in the list?

18    A.    Hawali?

19    Q.    Yes.

20    A.    I believe Mr. Hawali is the sheikh from Saudi

21    Arabia that was one of the mentors for Osama bin Laden.

22    Q.    Did that name appear anywhere in anything that

23    you had seen with respect to Mr. Sedaghaty?

24    A.    With respect to Mr. Sedaghaty?

25    Q.    And the tax charges at issue in this case.

1      A.      No.   The name pertained to, again, Osama bin

2    Laden.

3      Q.      Safar, where did that name or word come from?

4      A.      Can you tell me what line that is?

5      Q.      Number 25.

6      A.      I believe Safar is the first name of another

7    sheikh named Qussaibi who, again, was another clerk that

8    Osama bin Laden utilized.

9      Q.      Had you seen any information related to Safar

10   with reference to Mr. Sedaghaty prior to the search in

11   February of 2004?

12     A.      No.

13     Q.      Have you seen any information with respect to

14   Safar -- excuse me.  Had either Mr. Christianson or

15   Mr. Smith or any other person who had looked at the

16   computers given you any information about Safar prior to

17   the computer searches that were conducted after February

18   of 2004?

19     A.      Prior to --

20     Q.      After.

21     A.      Okay.  I'm not sure I'm understanding your

22   question.  Prior to the computer searches or are you

23   saying after?

24     Q.      Let me try again.  The name Safar, had that

25   come to your attention from any of the material, written

```
 1    material, seized during the searches on February 13th?

 2        A.    No.

 3              THE COURT:    What was the number of the first

 4    name you used?

 5              MR. WAX:    Hawali, Number 24.

 6              THE COURT:    Thank you.

 7    BY MR. WAX:

 8        Q.    Had Safar --

 9              THE COURT:    I apologize.  I misread it before.

10    That shows what a quick review does.  You got me on that

11    one.

12    BY MR. WAX:

13        Q.    Had Safar appeared in anything that had been

14    viewed by Mr. Christianson or Mr. Smith?

15        A.    No, I don't believe so.

16        Q.    Number 50 in the list, Sami, why does that

17    appear here?

18        A.    Sami is the first name of Mr. al-Hussayen who

19    was the subject of an investigation out of Idaho in

20    which Mr. al-Buthe, who is the codefendant in this case,

21    had contacts with.

22        Q.    Was -- what about 49, Korni?

23        A.    Again, I believe that is a sheikh out of Saudi

24    Arabia that was associated with Osama bin Laden.

25        Q.    You believe or you know?
```

1    A.    I believe, that was my understanding.

2    Q.    Okay.  I'm assuming that as I go through the

3    affidavit, I have not missed either Sami or al-Hussayen

4    referenced anywhere in the affidavit that you filed in

5    support of the search warrant?

6    A.    I do not believe he's referenced in the

7    affidavit, no.

8    Q.    Nor is Korni?

9    A.    No, he's not.

10   Q.    In fact, most of these names are not referenced

11   anywhere in the affidavit that you filed in support of

12   the search warrant?

13   A.    Several of them are not.

14   Q.    Well, should we just go down the list or open

15   to page -- since I'm not -- let's just go back to the

16   beginning.  On the list, Number 20, Salman?

17   A.    Salman?

18   Q.    It's not in the affidavit, is it?

19   A.    That particular spelling, no, I don't believe.

20   Q.    21, Oadah?

21   A.    Oadah, no, that is not in the affidavit.

22   Q.    22?

23   A.    No.

24   Q.    24?

25   A.    No.

1    Q.    25?

2    A.    No.

3    Q.    26?

4    A.    No.

5    Q.    27?

6    A.    No.

7    Q.    28?

8    A.    Nope.

9    Q.    29?

10   A.    Nope.

11   Q.    Looking down from 30 through 60, are there any

12   in the list 30 through 60 that are included in the

13   affidavit filed in support of the search warrant?

14   A.    Yes.   Starting on Number 53, Aquil; 54, Aqueel;

15   55, Aqeel; 56, Mansour; 57, Al Kadi; 58, Kadi; 59, Al

16   Qadi; and 60, Qadi.

17   Q.    Are in the affidavit in support of the search

18   warrant?

19   A.    Yes, they are.

20   Q.    Could you help me out.  I'm not finding --

21   A.    It refers to --

22   Q.    -- the Kadi's?

23   A.    No problem.  First of all, Number 53 down,

24   Aquil, refers to Aqeel Aqeel --

25   Q.    I understand, 53, 54, and 55, Aquil.

1      A.    And 57 is Al Kadi, who is the vice president of

2   al-Haramain.

3      Q.    I see.  Thank you.  On page 17 -- or page 5.

4   Thank you.

5      A.    Uh-huh.

6      Q.    All right.

7            THE COURT:  Does anyone need a health break?

8            THE WITNESS:  I'm fine.  Thank you.

9            MR. CARDANI:  We're okay, Your Honor, thank you

10  for asking.

11           MR. WAX:  Fine.

12           THE COURT:  Okay.

13           MR. WAX:  Could I have a moment, please?

14           THE COURT:  Uh-huh.

15           (Discussion held off the record between Mr. Wax

16  and Mr. Matasar.)

17  BY MR. WAX:

18     Q.    Ms. Anderson, I'd like to take you back, if I

19  could, to the issues related to the inception of the

20  effort to obtain a search warrant.

21     A.    Okay.

22     Q.    Who participated in discussions about searching

23  the premises that were subject to the search at issue

24  here?

25     A.    Prior to the search warrant?

1    Q.    That's correct.

2    A.    AUSA Cardani and myself.  It's possible Special

3    Agent Carroll.  I can't recall, though.

4    Q.    Did you have any discussions within the IRS

5    with any of your supervisors about whether a search

6    should be undertaken or not?

7    A.    Whether the search warrant should be

8    undertaken?

9    Q.    Correct.

10    A.    Yes, the search warrant was reviewed by my IRS

11    supervisors.

12    Q.    Prior to its preparation, was there any

13    discussion about whether you should actually go forward

14    and seek a search warrant?

15    A.    I don't specifically recall a discussion on

16    whether or not we should go forward and seek the search

17    warrant.  I believe that once the decision was made that

18    we should, -- with AUSA Cardani and myself -- start

19    drafting a search warrant affidavit, that it was

20    approved.

21    Q.    By whom?

22    A.    It's generally reviewed by my first level

23    manager and our in-house counsel.  And I'm not sure if

24    the special agent in charge reviews it or not.

25    Q.    Okay.  Who was the in-house counsel?  Who is

1    the first level supervisor?

2              MR. CARDANI:  Object, relevance.

3              THE COURT:  What is the relevance, Counsel?

4              MR. WAX:  On the *Murray* issue, Your Honor.

5              THE COURT:  You can give the names.

6              MR. CARDANI:  Judge, may I be heard?

7              THE COURT:  Yes.

8              MR. CARDANI:  What was the ruling on the

9    objection?

10             THE COURT:  Overruled.

11             MR. CARDANI:  If I might, if he is getting

12   into -- the *Murray* issue has to do with the knowledge

13   of --

14             THE COURT:  I realize that, but I'm going to --

15   I'll require her to give the names.

16             MR. CARDANI:  Okay.  Very well.

17             THE WITNESS:  My direct supervisor --

18             THE COURT:  Or recklessness.

19             MR. CARDANI:  Burden, Your Honor.

20             THE COURT:  Okay.  Go ahead.

21             THE WITNESS:  My direct supervisor at the time

22   was SSA Linda Enders.  And counsel, I believe, was

23   Cassandra -- I can't remember her last name.

24   BY MR. WAX:

25        Q.    Where was she located?

1    A.    I believe she's located out of Seattle.

2  Actually, I'm sorry, I believe she's located in

3  Portland.

4    Q.    Let me then take you back three years to 2001,

5  the inception of the investigation.  Were you given

6  directions by anyone with respect to undertaking

7  investigation of Mr. Sedaghaty, al-Haramain, al-Buthe?

8    A.    Given directions in what sense?

9    Q.    By anyone in authority in the IRS about opening

10  an investigation of Mr. Sedaghaty, Mr. Al-Buthe, or

11  al-Haramain USA?

12    A.    Well, the process with the IRS is, I believe

13  the United States Attorney's Office requested that an

14  IRS agent be assigned to assist in reviewing the

15  financial materials in the investigation.  I believe my

16  first line supervisor, SSA Linda Enders, asked if I was

17  available to do so.

18    Q.    So your understanding is that the -- your

19  involvement came at the request of the United States

20  Attorney's Office here in Oregon?

21    A.    I believe so.

22    Q.    With respect to the involvement of the FBI,

23  when did you and the FBI begin your work together?

24    A.    We began our work together when I initiated my

25  investigation.

1      Q.      (Indicating.)

2      A.      When I initiated my investigation.

3      Q.      When was that?

4      A.      Early 2002.

5      Q.      Do you have any notes that would give you a

6   specific date?

7      A.      I believe that there is a request letter from

8   the U.S. Attorney's Office, that's generally how it

9   occurs, that requests my assistance.

10     Q.      Did you have any participation in the service

11  of subpoenas with respect to al-Haramain or

12  Mr. Sedaghaty in 2001?

13     A.      2001?  No.

14     Q.      So anything that took place prior to 2002 would

15  have been FBI or some other agency?

16     A.      It would have been FBI is my understanding,

17  yes.

18             MR. WAX:  Excuse me, please, Your Honor.

19             THE COURT:  Sure.

20             (Discussion held off the record between Mr. Wax

21  and Mr. Matasar.)

22             MR. WAX:  Thank you.  I have no further

23  questions.

24             THE COURT:  Thank you.

25             Redirect.

1                        REDIRECT EXAMINATION

2    BY MR. CARDANI:

3        Q.    Special Agent Anderson, let me just go back for

4    a few minutes of testimony to shore up some things that

5    you said on cross.  Are you a lawyer?

6        A.    No, I'm not.

7        Q.    So when you were asked questions by Mr. Wax

8    about whether something was within the scope of the

9    warrant, who did you consult with for -- for some help

10   on that?

11       A.    I consulted AUSA Christopher Cardani.

12       Q.    That would be me?

13       A.    Yes.

14       Q.    All right.  But before that, did you have a

15   copy of the warrant and the affidavit with you on the

16   site itself?

17       A.    Yes, I did.

18       Q.    Did you use your information that you knew

19   about, your legal permission to be there, the warrant

20   and the affidavit, to help make a decision on scope

21   issues?

22       A.    Yes, I did.

23       Q.    All right.  And did you make some of those

24   decisions yourself based on your understanding of the

25   case?

1      A.      Yes.

2      Q.      And then you also sought some legal counsel as

3  well?

4      A.      Yes.

5      Q.      And based on the legal counsel, you ended up

6  presenting a request for consent to Jonah Sedaghaty?

7      A.      Yes.

8      Q.      And that was done in the presence of his

9  lawyer, Mr. Berger?

10     A.      Yes.

11     Q.      And was it your understanding Mr. Berger

12  represented or at least purported to represent

13  al-Haramain to some extent as well?

14     A.      Yes.

15     Q.      He was given a copy of the warrant?

16     A.      He was given a copy of the warrant and the

17  affidavit.

18     Q.      And the list of the items to be seized?

19     A.      And a list of items to be seized, yes.

20     Q.      The videos, I just want to clarify something.

21  Were there a lot of videos found on the premises?

22     A.      There was a lot of videos on the premises.

23     Q.      What's a lot?

24     A.      Boxes of videos, boxes, yeah, just boxes.

25     Q.      Did you have time to put every one of them in

1   the TV and review them?

2      A.   No.

3      Q.   So is there a difference in your mind between

4   the videos found on the premises between ones depicting

5   mujahideen battles in Chechnya and this U.S. history --

6   U.S. Army videos that you mentioned, was there a

7   difference at the site in your mind between those two

8   categories?

9      A.   Yes, there was a difference.  The military

10  videos, I did not feel fell within the scope.  And I

11  questioned the -- what appears to be the mujahideen

12  videos.

13     Q.   Now, if you knew that some of those videos

14  contained battlefield scenes of mujahideen participating

15  in battles against Russian forces in Chechnya, would

16  that influence your decision on scope, whether something

17  was within the scope of the warrant on the site?

18     A.   Yes.

19     Q.   How so?

20     A.   Well, when I reviewed -- what I saw of the

21  video was nothing more than tanks and military equipment

22  that had -- appeared to have been blown up or something

23  of that nature, I don't recall specifically seeing

24  anything that completely identified them as being

25  Chechnyan mujahideen.

1    Q.    And if you did, would that have affected your

2    decision on scope?

3    A.    Chechnyan mujahideen?

4    Q.    Yes.

5    A.    Yes.

6    Q.    Why?

7    A.    Because it's part of the affidavit.

8    Q.    So you felt the affidavit was part of your

9    direction as to scope?

10    A.    Yes.

11    Q.    Mr. Wax asked you about the Noble Qur'an.    Are

12    you familiar with that version of the Qur'an?

13    A.    Yes.

14    Q.    And you found -- or agents found several copies

15    of those on-site?

16    A.    Yes.

17    Q.    Now, did you read the entire thing before

18    making decisions on whether those might be within the

19    scope or not?

20    A.    Did I read the entire Qur'an?

21    Q.    Yes.

22    A.    No.

23    Q.    If you knew on-site that there was an appendix

24    called A Call to Jihad, basically imploring people to go

25    fight for a jihad, would that have affected your

1    decision on scope on-site?

2       A.    Yes.

3       Q.    Why?

4       A.    Because jihad is mentioned in the affidavit.

5       Q.    And these videos that we're talking about

6    depicting mujahideen battlefield scenes and the Noble

7    Qur'ans, these were items that were covered by the

8    consent search?

9       A.    Yes, they were.

10      Q.    And there'll be a legal determination on

11   others, but you felt you could take them because of the

12   consent?

13      A.    That's correct.

14      Q.    Moving to the computers.  You touched upon

15   this, but was there some delay between the time when you

16   sent the imaged devices, first Rick Smith had them and

17   then Mr. Christianson in D.C., about how long, if you

18   recall, was it before you got a searchable product in

19   that computer?

20      A.    It was several years.  Again, the investigation

21   slowed down once Mr. Sedaghaty hadn't returned to the

22   United States.

23      Q.    Was also -- this several year delay, was part

24   of that the technical limitations or technical

25   difficulties encountered in searching these computers?

1    A.    Yes.  It's my understanding there was a

2    definite difference in the programs that were used early

3    on and the newer program that came out.

4    Q.    You mentioned that there was deleted material

5    on the computers?

6    A.    Yes.

7    Q.    Did that -- some of that stuff has been

8    resurrected in searchable form for you?

9    A.    Yes.  In fact, that's where a majority of the

10   relevant information came from.

11   Q.    So most of the usable -- relevant information

12   that we'll be seeking to use at trial came out of

13   information that had been deleted from the computers?

14   A.    Yes, I believe so.

15   Q.    And that through forensic analysis, agents were

16   able to resurrect and allow you to search?

17   A.    Correct.

18   Q.    So when we talk search terms here, that's my

19   next topic of questioning, it's mostly the deleted

20   material that someone had hit delete, delete, delete

21   before you got there in February of 2004, that was

22   resurrected, and it was to that that you applied the

23   search term analysis?

24   A.    Yes.  I am not a computer expert, but my

25   understanding is there was ways that files get deleted,

1    and my understanding is that a majority of the pertinent

2    information came from the deleted files.

3        Q.    So now, the last area I want to ask you about

4    are these search terms.  If the search terms weren't

5    mentioned verbatim in your affidavit, did you feel,

6    nevertheless, that some of these search terms that

7    Mr. Wax went over with you were reasonably related to

8    the investigation as depicted in your affidavit?

9        A.    Yes.

10       Q.    So this was during this period of time a

11   question of whether funding was used to promote acts of

12   terrorism; is that right?

13       A.    Correct.

14       Q.    So if you -- and the Chechnyan mujahideen

15   that's described in your affidavit, when you created

16   search terms like the ones mentioned by Mr. Wax, did you

17   feel, based on the information in the affidavit, that

18   those were within the reasonable context of the

19   investigation?

20       A.    Yes.

21       Q.    Did you use the affidavit and the information

22   contained or summarized there, in addition to your

23   larger investigation, in creating these search terms?

24       A.    Yes.

25       Q.    Was that an evolving process?

1      A.      Yes, it was evolving.   Like I said, I'd use one

2    of the search terms, some information would come up, I

3    would learn about something I hadn't known before but

4    was obviously relevant to the tax charges, and would use

5    new search terms to pull up the newly relevant

6    information.

7      Q.      Do you have any examples of that?

8      A.      Yes.   For instance, Qoqaz, which is mentioned

9    in the search warrant affidavit is a Web site in which

10   al-Haramain Islamic Foundation Web site had a link.

11            Qoqaz, I believe, was a part of the Azzam

12   Publications.   And on that Web site, it discussed in

13   detail the Chechnyan mujahideen, their battles, funding.

14   They had all kinds of information about interviews with

15   mujahideen commanders and things of that nature.

16            While using the Qoqaz search term, which was

17   relevant, there came up information pertaining to an

18   individual named -- that was later identified as

19   Radmilla Balobina, who it was my understanding was one

20   of Mr. Sedaghaty's wives at the time.   And while looking

21   through those materials, it appears that Radmilla -- she

22   went by -- what do I want to call it?   An e-mail name of

23   Ptichka, which is Russian for "little bird" is my

24   understanding.

25            In these Ptichka e-mails, it talked about

1    Qoqaz.   In fact, it talked about actually translating

2    some of the Qoqaz material into Russian for a Russian

3    Qoqaz Web site.   And so through that process, it became

4    obvious to me that Ptichka, also known as Radmilla, was

5    relevant to the investigation.

6        Q.    Now, we're all in a new world in terms of

7    computers and the amount of information that can be

8    stored on them, but I'd just like to ask you something.

9    Go back to the days -- you've been an investigator for

10   how long?

11       A.    Almost 14 years in December.

12       Q.    Going back to some of your earlier experiences,

13   have you participated in white collar search warrants in

14   which large amounts of paper material was on-site, file

15   cabinets and boxes and stuff?

16       A.    Yes.

17       Q.    In attempting to determine what was in the

18   proper context of the warrant or the affidavit, have you

19   ever had experiences where you start reviewing something

20   on-site and not think it was pertinent, put it aside,

21   and then learn something else during your search that

22   made some of that discarded material potentially

23   relevant and cause you to change your mind on scope?

24       A.    Yes.

25       Q.    Why is that?

1     A.    Why is that?  Well, as you are going through

2    the documents, and you find documents pertinent to the

3    warrant, you find information pertaining to the crime

4    that you didn't have before, and, therefore, the new

5    information becomes relevant.

6     Q.    And that's sort of like what happened to the

7    computers here?

8     A.    Yes.

9     Q.    So these search terms may have not been part of

10    an initial search, but as your understanding of the

11    contents of the computer became clearer, you came up

12    with new search terms?

13     A.    That's correct.

14     Q.    And did you also rely on other parts of the

15    investigation and talking to people that know a little

16    bit more about these subjects, did that also cause you

17    to create new search terms?

18     A.    Yes.

19     MR. CARDANI:  If I may have a moment, Your

20    Honor?

21     THE COURT:  Yes.

22     (Discussion held off the record between

23    Mr. Gorder and Mr. Cardani.)

24     MR. CARDANI:  That's all I have.  Thank you.

25     MR. WAX:  Your Honor, may I go into some of

1    these areas?

2                THE COURT:   Sure.

3                MR. WAX:   Thank you.

4                      RECROSS-EXAMINATION

5    BY MR. WAX:

6       Q.     Ms. Anderson, I'd like you to please take a

7    look at the Attachment B.  Do you have a copy in front

8    of you?

9       A.     I believe I do.

10      Q.     Okay.  Attachment B starts out by listing five

11   individuals the magistrate judge identified as being

12   associated with the violations, correct?

13      A.     Correct.

14      Q.     So giving authorization to obtain information

15   with respect to these five people that's in the warrant

16   itself, correct?

17      A.     Yes.  That's part of the authorization, yes.

18      Q.     Next, entities associated with the violations,

19   the word "al-Haramain" appears in each of the five in

20   different variations, correct?

21      A.     Correct.

22      Q.     But there are no other entities listed here

23   either, correct?

24      A.     Correct.

25      Q.     Now, evidence relating to the tax violations,

1    you've referenced the affidavit.

2        A.    Uh-huh.

3        Q.    I'd like you to read the last four words of

4    that paragraph that follow the reference to the

5    affidavit.

6        A.    I'm sorry, you lost me.  On what?

7        Q.    Paragraph that says "evidence relating to the

8    tax violation."

9        A.    Okay.

10       Q.    The first paragraph --

11       A.    Yes.

12       Q.    -- evidence concerning description.

13       A.    Uh-huh.

14       Q.    The last four words are what?

15       A.    "Limited to the following."

16       Q.    You clearly had this in front of you when you

17   conducted the search in February?

18       A.    Yes.

19       Q.    And this was still in effect when the computer

20   searches were conducted later, the computer searches

21   that are, in fact, still ongoing?

22       A.    Yes, that's correct.

23       Q.    So the limitation was put upon you by the

24   issuing court, correct?

25       A.    I believe so.

1    Q.    Now, that limitation then told you that you

2    could obtain records and communications?

3    A.    Uh-huh.

4    Q.    Including electronic records and communications

5    involving the individuals or entities above, correct?

6    A.    Correct.

7    Q.    And those individuals or entities do not

8    include people such as Sami al-Hussayen?

9    A.    I'm sorry, Mr. Wax, it says "including

10   electronic records and communications involving

11   individuals or entities above."

12   Q.    Right.

13   A.    I don't believe it says it excludes anything

14   else.

15   Q.    The affidavit on its face listed five

16   individuals, correct?

17   A.    Correct.

18   Q.    And it listed five entities?

19   A.    Correct.

20   Q.    And then this paragraph told you that you could

21   obtain records and communications involving the

22   individuals or entities above?

23   A.    Involving them, yes.

24   Q.    Okay.  And the next clause "individuals or

25   entities above pertaining to the preparation of an IRS

1   form," correct?

2       A.      Correct.

3       Q.      Do you see those words there?

4       A.      Yeah.

5       Q.      Now, for example, a communication between

6   Mr. Sedaghaty and Mr. Wilcox contained on a computer in

7   an e-mail, that would be a communication pertaining to

8   the preparation of the IRS form?

9       A.      Communication between Mr. Sedaghaty and

10  Mr. Wilcox --

11      Q.      Yes.

12      A.      -- one of the accountants, yes.

13      Q.      Yes.

14      A.      Yes.

15      Q.      A communication between Mr. Sedaghaty and an

16  accountant in Saudi Arabia, al-Haramain Saudi Arabia,

17  that would pertain to the preparation of the form?

18      A.      It would pertain to items that would go into

19  the preparation of the form, yes.

20      Q.      Okay.  With respect to the list of search

21  terms, I don't see, for example, the term QuickBooks in

22  your list of search terms.

23      A.      No, that's not on there.

24      Q.      I don't see the term Wilcox.  I see the name

25  Tom.  I don't see Wilcox.

```
 1      A.      Wilcox would have been one of my search terms
 2   that would have evolved.  Tom is his first name.  And I
 3   believe from reviewing the records that Pete referred to
 4   him as Tom, so that came up more often than not.
 5      Q.      You knew prior to February --
 6              THE COURT:  You should refer to the defendant
 7   as the defendant, not by his first name.
 8              THE WITNESS:  Oh, right.
 9   BY MR. WAX:
10      Q.      You knew prior to the search that the
11   accountant's full name was Tom or Thomas Wilcox?
12      A.      Uh-huh.
13      Q.      You had seen documents with the name Wilcox on
14   them?
15      A.      I have seen documents with Wilcox on it, yes.
16      Q.      The next paragraph of the warrant itself
17   authorizes the search for and seizure of records
18   relating to, and then it lists a number of things,
19   correct?
20      A.      Yes.
21      Q.      And nowhere in that list does it mention, for
22   example, Sami al-Hussayen?
23      A.      No, it does not.
24      Q.      Same with the next paragraph, records relating
25   to credit card accounts, records and transactions
```

1    involving the year 2000?

2       A.    I'm sorry, was that a question?

3       Q.    That paragraph, again, makes no reference to

4    anyone or any entity other than those people and

5    entities listed in the warrant itself?

6       A.    Yes.

7       Q.    Correct?

8       A.    That's correct.

9       Q.    Turning to the bottom of the next page with

10   respect to computers --

11            THE COURT:  Counsel, I've read the affidavit.

12   This is mostly argument, isn't it?

13            MR. WAX:  Perhaps it is, Your Honor.  I think

14   that it directly refutes the suggestion that Mr. Cardani

15   was raising.

16            THE COURT:  Sure, I understand that.

17            MR. WAX:  Thank you.

18            THE COURT:  And I don't -- I don't question

19   your enthusiastic efforts.

20            MR. MATASAR:  We're good, we're good.

21            MR. WAX:  Thank you.

22            THE COURT:  Okay.

23            MR. WAX:  One more moment, please.

24            (Discussion held off the record between Mr. Wax

25   and Mr. Matasar.)

1          MR. WAX:  I have no further questions.

2          MR. CARDANI:  Just real brief follow-up.  I

3    think we're just about done.

4          THE COURT:  It's hard not to be last, isn't it?

5                    REDIRECT EXAMINATION

6    BY MR. CARDANI:

7      Q.   Are you familiar, as an IRS agent, with the

8    term "willfulness"?

9      A.   Yes, I am.

10     Q.   What is your understanding of the term

11   "willfulness"?

12     A.   Willfulness is an element of tax violation,

13   specifically Title 26:7206(1), filing a false return.

14     Q.   And is willfulness an element of the crime that

15   you described in your affidavit for Judge Cooney?

16         MR. WAX:  Judge, I'm going to object for the

17   same reason that you --

18         THE COURT:  Okay.  We'll apply the goose and

19   the gander rule.

20         MR. CARDANI:  Fair enough.  One last thing

21   then, this hasn't been asked.

22         MR. MATASAR:  Where's my evidence code?

23   BY MR. CARDANI:

24     Q.   Did you seek to obtain or any other agents

25   obtain another search warrant for the contents of these

1    computers or the computer media after you got the
2    material back?

3        A.    Yes, I did.  After reviewing disks and CDs with
4    Special Agent Richard Smith, it became apparent that
5    there was some form of child pornography on one of the
6    disks in which I noted that we needed to contact you
7    regarding this to find out what to do with it.

8        Q.    And what was done?

9        A.    After contacting you, a special agent from the
10   FBI went ahead and drafted an affidavit for search
11   warrant, got a search warrant for the contents on that
12   disk.

13            MR. CARDANI:  Okay.  That's all I have.

14            MR. WAX:  One question, please.

15                    RECROSS-EXAMINATION

16   BY MR. WAX:

17       Q.    If I understand the discovery correctly, it is
18   your belief that that disk was not related to my client;
19   is that correct?

20       A.    It's my understanding that disk was in the --
21   the disks that were taken from the al-Haramain search
22   warrant.  I don't know if it's related to your client or
23   not.

24       Q.    I thought I saw somewhere that the government
25   believed that it was not related to Mr. Sedaghaty.

1     A.     I don't recall seeing that.

2            MR. WAX:  Nothing further.

3            THE COURT:  All right.  Thank you.  You may

4     step down.

5            THE WITNESS: . Thank you.

6            MR. CARDANI:  Judge, we have no more witnesses

7     to present to the court on this, just argument, which

8     there is plenty of.

9            MR. WAX:  Your Honor, we would seek to call FBI

10    Agent Carroll with respect to the piece of the search

11    consent issue and to the *Murray* issue.

12           MR. CARDANI:  No objection as to the first two

13    categories.  The third may be somewhat problematic.

14           THE COURT:  All right.  Go ahead.

15           (The witness was sworn.)

16           THE CLERK:  Thank you.  Please take the witness

17    stand.  Agent, would you please state your full name for

18    the record, spelling your last name.

19           THE WITNESS:  Certainly.  David A. Carroll.

20    C-A-R-R-O-L-L.

21           THE CLERK:  Thank you.

22                      DIRECT EXAMINATION

23    BY MR. WAX:

24      Q.    Mr. Carroll, you've been employed with the FBI

25    for how long?

1      A.      Since 1987.

2      Q.      You are currently located where?

3      A.      In the Medford resident agency.

4      Q.      Were you present at the search of the premises

5  under discussion in this case in February of 2004?

6      A.      Yes, I was.

7      Q.      Can you describe, please, the role that you

8  played at the inception of the search.  And in

9  particular were you part of the entry team?

10     A.      Not the initial entry team, no.

11     Q.      Were you present and/or were you able to see

12  what took place between the agents who first encountered

13  Jonah Sedaghaty?

14     A.      I have a general recollection, yes.

15     Q.      Please give us that.

16     A.      If I recall correctly, Mr. Sedaghaty, Jonah,

17  had come out of the lower level of the building.  If --

18  as Ms. Anderson described for you, the driveway goes up

19  to the upper level, there is also a drive into the

20  garage area where Jonah came out of.

21             It's my recollection he was directed to go up

22  to speak with Ms. Anderson -- Mrs. Anderson.  And then

23  the initial entry team proceeded to go inside the house.

24     Q.      Did you see whether Mr. Sedaghaty was taken

25  into the house by the initial entry team?

Carroll - D

```
 1    A.    I don't recall that.

 2    Q.    Do you recall seeing him in the presence in a

 3   custodial way of agents at any time that day?

 4    A.    No.

 5    Q.    Did you actually see him move from the lower

 6   area up to the upper area where Agent Anderson was

 7   located?

 8    A.    No, no, I did not.

 9    Q.    Were you armed that day?

10    A.    Yes.

11    Q.    Did you have your firearm drawn at any point?

12    A.    No.

13    Q.    Did you see any agents with firearms drawn at

14   any point?

15    A.    I think the initial entry team may have had

16   their guns in their hands at the time they made entry.

17    Q.    Do you recall whether they had their guns in

18   their hands at the time they first encountered Jonah

19   Sedaghaty?

20    A.    I can't say.  I don't recall.

21    Q.    With respect to the computers in this case, if

22   I understood Agent Anderson correctly, she indicated

23   that you were provided copies of some of the mirrors of

24   some of the hard drives?

25    A.    Correct.
```

1     Q.     Do you recall how many and/or which ones?

2     A.     I want to say they were referred to as images,

3  Seda 6, 7 and 8, I believe.

4     Q.     Do you recall when you obtained them?

5     A.     No, I don't recall a specific time.

6     Q.     Do you have any notes or records that would

7  clarify that issue?

8     A.     No, I don't.

9     Q.     None?

10    A.     Maybe a receipt that I had -- had prepared upon

11 receiving them from Mrs. Anderson.  They weren't direct

12 evidence, so they were -- they were working copies, so

13 it wasn't as if I had to maintain a chain of custody on

14 them.

15    Q.     Could you check your records and let us know

16 after today whether you do have any receipt or other

17 records that would show when you obtained them?

18    A.     I can check.

19    Q.     Thank you.

20    A.     Uh-huh.  If you'll allow me to make a note.

21    Q.     Thank you.  What did you do with the copies of

22 the images that you received?

23    A.     I believe I forwarded them to what's referred

24 to as the RCFL, the NWRCFL.  I don't know if you're

25 familiar with that with the cases that you handle in

1    Portland.  But it's Northwest Computer Regional (sic)

2    Forensic Lab that the FBI is -- sponsors and operates

3    with other local and state law enforcement agencies.

4        Q.    Did you ask that anything be done with them?

5        A.    I asked that they be loaded onto a computer so

6    that I could review them.

7        Q.    Did that happen?

8        A.    Yes.

9        Q.    Did you conduct your review?

10       A.    Limited.

11       Q.    Do you know whether the copies were reviewed by

12   any other law enforcement personnel?

13       A.    I had a couple of analysts at one point in time

14   come down and review them, but it was a very temporary

15   thing.  It was kind of a catch-us-can basis, but that's

16   about it.

17       Q.    Do you know whether any other copies were made

18   and sent to any other location?

19       A.    Later, yes.

20       Q.    When did that occur?

21       A.    Most recently, copies of those hard drives were

22   provided to the Russian FSB.

23       Q.    Prior to that happening, were they reviewed by

24   any other entity or branch of the FBI in Oregon or

25   Washington or elsewhere in this country?

1     A.     You know, I've been thinking about it, and I

2  cannot remember if I had sent them back to our

3  headquarters to be reviewed by, you know, our

4  headquarters lab back there, I can't recall.

5     Q.     Would you have any notes or records that would

6  enable you to refresh your recollection on that?

7     A.     You know, I could check, but I don't -- I'll do

8  that as well.  I can't -- what I'm saying is I can't

9  specifically recall if I did that because I was working

10  in conjunction with the IRS and Mrs. Anderson, and I was

11  relying on searches that were being done through them as

12  well.

13     Q.     Your particular assignment within the FBI back

14  in 2001, was what?

15     A.     Give me a second.  I was working as a street

16  agent in the Medford resident agency, working everything

17  from bank robberies to fugitives to violent gangs to,

18  you know, you name it, a wide breadth of federal

19  violations.

20     Q.     Have you had any particular assignments with

21  respect to terrorism matters?

22     A.     Prior to this, no.

23     Q.     Prior to this, which "this"?

24     A.     This case.

25     Q.     Okay.  Have you had any assignments to any

1    terrorism task forces?

2        A.    Under -- this case relating to Mr. Sedaghaty

3    falls under the auspices of the Joint Terrorism Task

4    Force within the Portland Division of the FBI.

5        Q.    And are you a participant or member of that

6    group or unit?

7        A.    On a part-time basis, yes, because you have to

8    understand I still work other cases as well, outside of

9    the terrorism realm.

10       Q.    If I understood correctly, Agent Anderson said

11   that she became involved with investigation of

12   Mr. Sedaghaty and/or al-Haramain sometime in 2002.

13   We've seen subpoenas that were issued in 2001.

14             Were you involved in the investigation of

15   either Mr. Sedaghaty or al-Haramain in 2001?

16             MR. CARDANI:   Judge, I object to relevance.

17             THE COURT:   Sustained.

18             MR. WAX:   Again, Judge, I think this goes to

19   the *Murray* issue.

20             THE COURT:   I disagree.

21             MR. WAX:   Then I have no further questions,

22   Your Honor.

23             THE COURT:   Thank you.

24             MR. CARDANI:   No questions.

25             THE COURT:   You may step down.

1        MR. WAX:  Oh, excuse me, Judge --

2        THE COURT:  Are you going to ask about consent?

3        MR. WAX:  No, going back to the computers.

4        THE COURT:  All right.  Go ahead.

5   BY MR. WAX:

6        Q.   Did you participate in preparation of any lists

7   of search terms for any searches of the computers by

8   either FBI or IRS personnel?

9        A.   I recall contributing some names to that list.

10       Q.   Do you recall when that occurred?

11       A.   No.

12       Q.   Would there be any written record of that?

13       A.   Not that I'm aware of.

14       Q.   Do you recall whether it occurred before the

15  physical seizure of the computers during the execution

16  of the warrant or at some time later on?

17       A.   It would have been after the execution of the

18  warrant.

19       Q.   Do you recall whether it occurred before any

20  review had been made of the computers by any personnel

21  or only after an initial review?

22       A.   I couldn't specifically recall.

23       Q.   The names that you believe you contributed to

24  the search terms, do you recall what they were?

25       A.   The only one that comes to my mind specifically

1  relates to Timimi.

2      Q.   Where would that name have come from in terms

3  of your contribution of it to this case?

4      A.   I can't answer that question based on the fact

5  that it's related to material that can't be discussed in

6  this courtroom at this time.

7           MR. CARDANI:  Judge, we're into this area now

8  where I don't mind him answering any of this but he's

9  not allowed to because it involves classified

10  information.

11          THE COURT:  Okay.

12  BY MR. WAX:

13     Q.   Let me see if I can ask some questions that

14  don't go into that area.

15          If I recall correctly, I don't see the name

16  al-Timimi in the affidavit prepared by Agent Anderson.

17     A.   You have me at a loss, because I don't have the

18  affidavit in front of me, but I'll take your word for

19  it.

20     Q.   Do you recall if you had reviewed any of the

21  hard copies of items that were seized under this search

22  warrant and come across the name al-Timimi prior to your

23  providing that name as a search term?  I ask that

24  question again because -- well, do you recall that?

25     A.   No, I don't recall.

1          MR. WAX:  I have nothing that I could ask in
2     this forum then.
3          THE COURT:  Fine.  Mr. Cardani?
4          MR. CARDANI:  No questions.
5          THE COURT:  You may step down.
6          THE WITNESS:  Thank you.
7          THE COURT:  Counsel, do you wish to add
8     anything to your written arguments?
9          MR. CARDANI:  Judge, the burden is on me on
10     consent and I'm prepared to talk about that if the court
11     has any questions.  But the burden is on them on all
12     other matters, and I don't know who goes first on this.
13          THE COURT:  Do you have any additional argument
14     to your written contributions?
15          MR. WAX:  We believe, Judge, that before you
16     can rule on any of the aspects of the motion to
17     suppress, it would first be necessary to rule on the
18     CIPA issue and whether we're going to be able to get
19     into the classified material that we believe is relevant
20     to the *Murray* and *Franks* aspects of the case.
21          THE COURT:  I understand that to be your
22     position.  I, frankly, haven't decided that yet.  I'm
23     going to look at this again.  And this will take one of
24     two forms.  Either I'll decide that we ought to get some
25     clarity with regard to what we have already, then issue

1  an order, and allow you, if there are other information

2  developed or depending on my other rulings, to ask to

3  reconsider on certain issues; or I'll delay this.

4         There's a part of me, frankly -- I haven't done

5  this a couple of years like you all -- that says I ought

6  to decide what is fresh in my mind now rather than hold

7  on to it, but I just haven't decided this yet.

8         MR. WAX:  The other point, Judge, is that the

9  forensic report may well shed some light on some of the

10  issues that we're raising with respect to the scope of

11  the search, particularly the computer scope.

12         THE COURT:  Right.  And I understand that is

13  your position.  And I would have the same comments that

14  I just had.  All right.

15         MR. WAX:  Other than that, I think that the

16  reply that we were able to get in on Friday to the

17  government's response sets out the legal aspect of the

18  issue that we were discussing with Ms. Anderson on which

19  the goose-and-gander rule was invoked.  And --

20         THE COURT:  I did that in a Medford civil trial

21  one time.  This was a case in which there was a young

22  lawyer trying the case for the defendant and an older

23  lawyer sitting with him.  And he kept telling this young

24  lawyer to stand up and make a certain objection, which I

25  denied every time, and because that older lawyer just

1    before had been doing the same thing to the other side.

2         So finally the older lawyer said something to

3    the young man, and could I have a bench conference?

4    Sure.  They came on up.  And the older lawyer started

5    arguing, on what basis is this ruling -- you know, what

6    is the basis of the ruling?  I said, it's the goose-and-

7    gander rule.

8         This gave me a chance to use it a second time.

9    The other time was decades ago.  But I'll keep it in my

10   arsenal, if necessary.

11        MR. WAX:  We just urge you to read the four

12   corners of the warrant with care.

13        THE COURT:  Sure.

14        MR. WAX:  And we believe that it supports the

15   issues that we presented.  We don't have anything to

16   add.

17        THE COURT:  Thank you.

18        MR. CARDANI:  Judge, I'll be brief as well.  I

19   think this was a real, if I might, a textbook operation

20   on how to do a search warrant involving computers in a

21   day and age as technology has evolved.  There was no way

22   to search through these things on-site.

23        I think the best -- the toughest legal argument

24   that I tried to address in our response has to do with

25   once you have an awful lot of information in retrievable

1  form, how is it -- are there any limitations you can

2  have that are fair to be put on in your review of that

3  evidence?  And I can keep coming back to the paper days.

4  If an agent had a white collar warrant, and there is

5  boxes and boxes of material, it's the equivalent, in

6  this case, I think, of having the computers in a

7  searchable form.

8         I think it's a strong argument that every bit

9  of information on the computer can be reviewed by

10  qualified agents to determine if something is within the

11  scope of a search.  And it also can be a continuing one,

12  that the investigation can build during the search of

13  that, as it can be done on the site of a search in a

14  paper warrant.  One file may be thought of as irrelevant

15  but based on the investigation as it evolves during the

16  search, other things became fair game.  Other agents may

17  have some input.

18         And there is no rule that says we are under a

19  time limit on how long that review can take.  So I think

20  that that stuff can be done right up to the point of

21  trial.  And if fair -- if relevant material comes out of

22  those computers, whether the request is from me or from

23  Mr. Gorder or Ms. Anderson based on the state of the

24  investigation, I think it's all fair game.

25         And I think the cases support us.  The recent

1    cases that have come out of the courts -- the courts
2    have been grappling with this, the *Banks* case and the
3    other *Hay* case talk about the consent -- the computer
4    searches, and I think they all support that position.

5            It's a difficult one because we're talking
6    about just so much information now.  Everything is going
7    into computers, so the courts are struggling to keep up
8    with the technology.  But I think that they've come down
9    on the side of what's fair for the circumstances.  And I
10   think that the license that -- the permission that Agent
11   Anderson had was based on the warrant which allowed her
12   to seize all of the computers.  Judge Cooney allowed
13   that.  That's expressed.  And then the question becomes
14   incorporation.

15           The warrant -- the affidavit was extensive.
16   And it was incorporated.  It was incorporated -- you
17   know, in the application itself, it was incorporated
18   within the warrant itself.  It was present on-site.  It
19   was reviewed by the agents.  So under Ninth Circuit law,
20   I really don't think there is any question that that
21   affidavit was fairly part of the search warrant itself.
22   And it was used as a limiting device.  And you've heard
23   how that was done.

24           And the issue of willfulness is broad.  The
25   court is aware of that.  And so I think that really

1    allows agents to search -- some cases have indicated

2    through the entire business records of a business in a

3    tax crime to determine if the links can be made to show

4    certain things.  So it is fairly broad.

5          And I think that agents are allowed to go, as I

6    said, through a computer search every bit of information

7    to determine if there is relevance to the case.

8          To the extent that there is any problem with

9    that, the question is not total suppression.  The

10   question is partial suppression and also good faith

11   mixed in there.

12         If a particular item is offered by the

13   government at trial, and we'll be offering some of the

14   items coming out of the computers, there's no doubt

15   about that, if there is a particular problem in terms of

16   scope, I suspect some of those things can be dealt with

17   at trial, to the extent they need be.

18         I think the motion needs to be denied in its

19   entirety because there was probable cause, what was done

20   was fair, and the whole touchstone of the Fourth

21   Amendment is what is reasonable under the circumstances.

22         And what these agents did here in detailing the

23   probable cause and incorporating the affidavit, in

24   acting in good faith in every step of the way, and

25   seeking legal advice, I think the testimony was on more

1    than one occasion from the prosecutor who knew the most

2    about the case, shows that they were trying to be

3    reasonable.  They were trying to act within the

4    strictures of the Fourth Amendment, case law as given by

5    the prosecutor to the agents, by seeking another warrant

6    for child pornography, reasonable.  And also by -- we

7    didn't get into this, but in the papers, they described

8    trying to avoid attorney-client communications, which

9    these days can be found all over computers.

10            Search terms were done on there to try to

11   shield the agents working on this case from getting into

12   privileged material without review by what we call taint

13   reviewers, attorneys or agents.

14            THE COURT:  Who was your taint lawyer?

15            MR. CARDANI:  David Atkinson is part of that

16   taint analysis.  He's an AUSA up in Portland.

17            THE COURT:  Uh-huh.

18            MR. CARDANI:  So my point is that agents,

19   again, acted reasonable every step of the way.  And I

20   think a fair reading of the cases reflect that.  And I

21   would ask that the court deny the motion in every

22   respect.

23            And on the consent issue, Jonah Sedaghaty had

24   the legal ability to provide consent.  He was a

25   director.  He was the only one on the premises.  His

1    father, the defendant, was away.  The attorney on the

2    premises, able to review all of the materials, including

3    the affidavit itself.

4         Signing a consent form, I think this is a --

5    under the legal analysis of consent, that we've met our

6    burden by quite a bit on showing that there was a valid

7    consent to seize materials that may or may not have been

8    separate from the scope.  And I think that that is a

9    legal analysis.  Whether some of these things were or

10   were not part of the warrant is a legal conclusion.

11   That's not for the agent to determine as a matter of law

12   or as a matter of what she did.  She sought guidance

13   because she thought it might have been in the gray area,

14   I submit.

15        The cautious approach, the one taken here,

16   would be that may be a gray area, but if someone is

17   there that can provide the consent, in the presence of

18   their lawyer, ask them if they are willing to do so.

19   That was done here.  And it was obtained under consent.

20        So I think there is a fair argument that a lot

21   of the challenged materials do come within the scope

22   that sought guidance on and ended up getting consent, so

23   I don't want to rest upon consent for the admissibility

24   of this material at trial, but I think that that is

25   certainly a big part of it because it was obtained.

1          THE COURT:  One thing I'm going to look back at

2     because I remembered Ms. Anderson's affidavit a bit

3     differently than her testimony today, I'm not saying --

4     I may have just read it wrong or too quickly, but at any

5     rate, the young Mr. Sedaghaty's consent is one thing.  I

6     had made a little note that Mr. Berger had also

7     consented, but what I hear is that it was -- the consent

8     was given in his presence.  That's your position, right?

9          MR. CARDANI:  It's at least that.  Whether he

10    uttered the words "I consent too," I don't know the

11    answer to that.  Does the court wish to hear that

12    from --

13         THE COURT:  No, no.  But I only bring it up

14    because I had a little different -- you know, I read the

15    record, as I told you before, and that's the only tiny

16    little surprise that came up to me today, frankly.

17         Do you remember something about that, Mr. Wax?

18         MR. WAX:  No.  I was going to ask you if I

19    could make a comment about the scope issue.

20         THE COURT:  Sure.

21         MR. CARDANI:  That's all I have, Judge.

22         THE COURT:  You can.  You both have strong and

23    weak arguments.

24         Mr. Cardani, if you took the position that

25    permission to search the house was also permission to

1    search the green -- whatever they were -- trailers,

2    that's not one of your strong arguments.

3         And just like you had some that weren't so

4    strong either.  You can talk about it if you want.

5         MR. WAX:  Judge, in terms of the scope of the

6    search, I think that the government's focus on the

7    difficulty of searching computers is in this case in

8    part a red herring.

9         If we focus for a minute on paragraph 17 of

10   Ms. Anderson's July 6th declaration, she's recognizing

11   that within the house, they find these boxes of

12   videotapes, they find the prisoner letters.  And there

13   is question in her mind, a question in Mr. Cardani's

14   mind, is all that within?  Is some of that within or

15   some of that without the scope of the warrant?  That

16   seems to me to be highly significant, and should inform

17   the question about the computer searches because as I

18   see it, it's the same issue.

19        The government could very easily in its

20   Attachment B to the warrant have said records and

21   communications including blah-blah-blah, pertaining to

22   the preparation of an IRS form.  And note the language,

23   "pertaining to the preparation of."  They could have had

24   another paragraph that says, records and communications

25   relating to the reasons why this mistake were made.

1    Records and communications relating to the allegation

2    that --

3           THE COURT:  You may not use the word "mistake,"

4    but I understand your argument.

5           MR. WAX:  That the -- you know, money was

6    directed to, you know, fund Chechnyan mujahideen.

7           THE COURT:  Sure.

8           MR. WAX:  They just did not do that.

9           THE COURT:  I get your argument, Mr. Wax.  You

10   can continue if -- I don't want -- if you have something

11   more to say, go ahead, but I even got it before.

12          MR. CARDANI:  Judge, the green trailer issue,

13   just to be sure, I have never taken the position that

14   the green trailers were fair game for the warrant.  In

15   fact, to the contrary.  And that is contained in her new

16   affidavit.  She was instructed that they were outside.

17          THE COURT:  Sure.

18          MR. CARDANI:  When I say that there is some

19   things on the cusp, I'm talking about stuff coming out

20   of the house.

21          THE COURT:  Sure, okay.  All right.  I do want

22   to say this:  Thank you very much for your economy.  And

23   the briefs were marvelous on the issue here.  I usually

24   don't get that good of briefs.  And I enjoyed them.  And

25   because they were so well written, they made me read

1   them a couple of times.   That doesn't happen often.

2   Thank you.

3          MR. MATASAR:   Your Honor, there is one thing

4   before we go, and that is I think the CIPA rules imply

5   that the government gets some time to respond.   And I

6   don't know if you want to set an arbitrary 30 days or

7   some sort of time limit.   I don't know what they are

8   intending to do.   But given that the trial date seems to

9   be rapidly approaching, we want to make sure that there

10  is some sort of time limit for them to respond.   I don't

11  want to suggest that, or maybe they intend to do it

12  sooner.   I'm not sure.

13         THE COURT:   If you have something, that's fine.

14  I, frankly -- that's one of the latter things that came

15  to my attention.   I haven't carefully looked at all of

16  that.   I've got just an overt view of it.   If you have

17  something to say about whether you want to respond to

18  that, that's -- now is the time to do that.

19         MR. GORDER:   Your Honor, I'll take

20  Mr. Matasar's suggestion of 30 days.   I'm not sure we

21  will need to respond beyond what's already before you,

22  but something like this, we'll have to consult with main

23  justice about, so --

24         THE COURT:   Sure.

25         MR. GORDER:   -- 30 days will be fine.

1           THE COURT:  All right.  That's great.  If you
2   don't get enough clarity in my written materials, let me
3   know because I know you need your record in this case.
4           All right.  Thank you very much.
5           (The proceedings were concluded at 12:23 p.m.)

```
1                           CERTIFICATE

2           I, Deborah Wilhelm, Certified Shorthand Reporter

3    for the State of Oregon, do hereby certify that I was

4    present at and reported in machine shorthand the oral

5    proceedings had in the above-entitled matter.  I hereby

6    certify that the foregoing is a true and correct

7    transcript, to the best of my skill and ability, dated

8    this 22nd day of July, 2009.

9

10

11

12                                   Deborah Wilhelm, RPR
13                                   Certified Shorthand Reporter
                                     Certificate No. 00-0363
14

15

16

17

18

19

20

21

22

23

24

25
```