KENT S. ROBINSON, OSB #09625
Acting United States Attorney
District of Oregon
**CHRISTOPHER L. CARDANI**
Assistant United States Attorney
701 High Street
Eugene, OR 97401
Email:  chris.cardani@usdoj.gov
Telephone:  (541) 465-6771
**CHARLES F. GORDER, JR.**, OSB #912874
Assistant United States Attorney
1000 S.W. Third Ave., Suite 600
Portland, OR  97204
Email:  charles.gorder@usdoj.gov
Telephone:  (503) 727-1000
   Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA | CR 05-60008-02-HO |
| v. | **GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO COMPEL THE GOVERNMENT TO UTILIZE THE MUTUAL LEGAL ASSISTANCE TREATY ON BEHALF OF MR. SEDAGHATY AND/OR TO ISSUE LETTERS ROGATORY** |
| PIROUZ SEDAGHATY, | |
| Defendant. | |

**I. STATEMENT OF FACTS**

As alleged in the indictment, in the year 2000 the Al-Haramain organization which was

headquartered in Saudi Arabia, and whose U.S. branch (Al-Haramain USA) was then operated

by defendant, Pirouz Sedaghaty, in Ashland, Oregon, was involved in encouraging donations to support the so-called "mujahideen" fighting Russian forces in Chechnya.  In February 2000, an Egyptian donor identified as Mahmoud Talaat Hasan El-Fiki, who was seeking to support "our Muslim brothers" in Chechnya, wire transferred U.S. $150,000 from a bank account in London to a Bank of America account held by Al-Haramain USA in Ashland.

On March 7, 2000, defendant Soliman Al-Buthe arrived in the United States from Riyadh, Saudi Arabia.  On March 9, 2000, Al-Buthe flew to Ashland to retrieve the funds.  Defendants Sedaghaty and Al-Buthe went to the Bank of America and obtained 130 American Express Travelers checks in $1,000 denominations and a $21,000 cashier's check made out to Al-Buthe.  On March 12, 2000, Al-Buthe departed the United States, carrying the travelers checks.  When he left, Al-Buthe did not file a Currency and Monetary Instrument Report (CMIR), acknowledging he was leaving the country with more than $10,000 in currency as required by law.  The travelers checks and the cashier's check were later cashed at a bank in Saudi Arabia.  In October 2001, defendant Sedaghaty filed Al-Haramain USA's tax return for the year 2000 which covered up this transaction by falsely reporting that these funds were used to purchase a prayer house in Missouri, or returned to their original donor.  Evidence obtained in this investigation shows that Al-Haramain USA, Sedaghaty and Al-Buthe intended on using this money to support the mujahideen fighting the Russian government in Chechnya.

In January 2005, Mahmoud El-Fiki was interviewed in Egypt by an officer of the Egyptian security service.  Investigative agents in this case from the FBI and IRS had previously met with the Egyptian officer to discuss their investigation and to suggest questions for El-Fiki.  The U.S. agents were allowed to observe the interview via closed circuit television, but they

Page 2 -     GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO
             COMPEL

were not allowed to meet with El-Fiki or to question him directly. During this interview, El-Fiki claimed that he thought his $150,000 donation was for widows, orphans, and refugees in Chechnya, although he never spoke to anyone at Al-Haramain about the donation. An FBI "302" report of interview (contained in defendant's Exhibit "B" to his Motion to Compel, CR 238-3) was prepared describing the Egyptian interview of El-Fiki. This report was provided to the defense when the first batch of discovery was delivered to counsel in December 2007.

Now, almost two years later, defendant asks this Court to order the government to utilize the Mutual Legal Assistance Treaty in Criminal Matters between the Government of the United States and the Government of the Arab Republic of Egypt (hereinafter the "U.S./Egypt MLAT"), signed in Cairo on May 3, 1998, and entered into force on November 29, 2001 (a copy of which is attached to this response as Exhibit 1), to obtain evidence located in Egypt on behalf of the defense. CR 238, at 2. Without articulating exactly what testimony he expects to elicit, defendant seeks the presence at trial of three witnesses: Mr. Mahmoud El-Fiki, Mr. Sharif El-Fiki, and Mr. Mohammed Salat.[1]

Courts have consistently held that MLATs are not available for use by criminal defendants. Indeed, providing criminal defendants access to the U.S./Egypt MLAT would be contrary to the express terms and negotiated intent of the MLAT, and a judicial order to that effect would encroach on the prerogative of the executive branch to make treaty requests. Nor does the inability of a defendant to use the MLAT process violate the Sixth Amendment.

---

[1] Defendant also indicates that he seeks assistance in "securing . . . documents overseas." CR 238, at 2. Defendant, however, never specifies what documents he seeks nor how they are relevant to this matter. Defendant's description of the anticipated testimony of the named witnesses is equally vague. *Id.* at 4.

**Page 3 -    GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO COMPEL**

Therefore, the defendant's motion to compel the government to use the MLAT process, with or without "walled-off" government counsel assisting the defense, should be denied.

Alternatively, defendant asks that this Court issue letters rogatory to the courts of the Arab Republic of Egypt requesting that the named individuals be made present at the trial of this matter or that they be deposed "in their home country or elsewhere." *Id.*  Importantly, defendant also concedes in his motion that each of these individuals is either unwilling to cooperate with the defense or unable to be found – factors which counsel against conducting the requested depositions and which call into question the basis for believing any of the named individuals might have testimony helpful to his case. *Id.* at 12.  Thus, it appears that the defendant has not met the standard of exceptional circumstances required by Rule 15 of the Federal Rules of Criminal Procedure which would justify a deposition of foreign witnesses.  However, if the Court should issue such letters rogatory, it should do so with the understanding that the letters rogatory may not be acted upon by the courts in Egypt in time before the scheduled June 7, 2010, trial date.  In light of the fact that the defendant has waited two years to make this motion, the lack of a timely response by Egypt should not delay the trial of this matter.

## II.    THE FUNCTION OF MLATS AND THE ROLE OF THE EXECUTIVE

The United States is a party to bilateral MLATs with over 50 foreign jurisdictions.  Each MLAT is designed to facilitate the law enforcement efforts of the two treaty partners.  *See, e.g.*, Preamble to the U.S./Egypt MLAT, which states as follows:

> The Government of the United States of America and the Government of the Arab Republic of Egypt (hereinafter "the Contracting Parties"); [d]esiring to improve the effectiveness of law enforcement authorities of both countries in the investigation, prosecution and prevention of crime through cooperation and

      mutual assistance in law enforcement matters; [h]ave agreed as follows [to the Treaty] . . . .

Exhibit 1.

      In the United States, the implementation and operation of MLATs is the responsibility of the Executive Branch, normally referred to as a "Central Authority."  The Central Authority for the United States is always the Attorney General or designated officials of the U.S. Department of Justice.  The Attorney General has delegated the Central Authority function to Department of Justice officials of the Criminal Division and, in particular, to Criminal Division officials in the Office of International Affairs (OIA).  28 C.F.R. 0.64-1 [ORDER 918-80, 45 FR 79758 (1980), as amended by ORDER 1274-88, 53 FR 21997 (1988); ORDER 1906-94, 59 FR 41242 (1994)].  As a result, OIA – a part of the executive branch department entrusted with the responsibility for prosecuting all federal criminal offenses – serves as the Central Authority for the United States and administers the MLATs.

      As the Central Authority for the United States, OIA has complete discretion to make (or to not make) MLAT requests.  OIA can and does decline to make requests that fail to meet the treaty standards or that have the potential to negatively impact other cases or other foreign policy considerations.  OIA shares this responsibility with neither the judiciary nor the legislature.

      Moreover, as the Central Authority for the United States, OIA also works directly with foreign counterparts, primarily prosecutors in treaty partners' respective justice ministries, to promote the effective use of MLATs and to effect execution of the requests it makes pursuant thereto.  These functions are within the area assigned exclusively to the executive branch of the federal government:  administration of foreign affairs.  *See United States v. Belmont*, 301 U.S.

**Page 5  -     GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO
                COMPEL**

324, 330 (1937); *United States v. Curtis-Wright Corp.*, 299 U.S. 304, 319 (1936); *First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 765-68 (1972).

### III. NO DEFENDANT CAN UTILIZE AN MLAT IN ORDER TO OBTAIN EVIDENCE.

Private persons are neither parties to – nor the intended beneficiaries of – MLATs. In fact, most MLATs (including the U.S./Egypt MLAT at issue here) explicitly exclude private persons – such as a criminal defendant – from using them. *See, e.g.*, U.S./Egypt MLAT, which specifies that:

> This Treaty is intended solely for mutual legal assistance between the Contracting Parties [defined as the Governments of the United States and the Arab Republic of Egypt]. *The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress or exclude any evidence or to impede the execution of a request*.

Exhibit 1, U.S./Egypt MLAT, Article 1(4) (emphasis added).

"Where the language of the treaty is clear and unambiguous, as with any exercise in statutory construction, [the court's] analysis ends there and [the court applies] the words of the treaty as written." *In re Commissioner's Subpoenas*, 325 F.3d at 1294 (11th Cir. 2003). *See also United States v. Davis*, 767 F.2d 1025, 1029-30 (2d Cir. 1985) (finding that because "the clear and unambiguous language" of a treaty did "not . . . confer judicially enforceable rights on individuals" the defendant "[had] no standing to move to exclude or suppress the Swiss bank records on the basis of a purported violation of [the Treaty]"). The same result obtains where a defendant moves the court for an order to obtain evidence pursuant to an MLAT and the MLAT contains a provision similar to the U.S./Egypt MLAT Article 1(4), *supra*.

///

Page 6 -    GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO COMPEL

Further, the Executive branch's official interpretation of the Treaty further supports the position that defendants have no right of access to the U.S./Egypt MLAT. "The Technical Analysis, constituting the executive branch's official interpretation of the Treaty, is entitled to much deference by this Court." *In re Commissioner's Subpoenas*, 325 F.3d at 1299 (11th Cir. 2003). The Executive's position on the meaning of the U.S./Egypt MLAT is reflected in the Letter of Submittal from the President to the Senate and the accompanying Technical Analysis, which were adopted by the Committee on Foreign Relations in Executive Report 106-24, submitted to the Senate recommending advice and consent to a number of treaties, including the U.S./Egypt MLAT. The Executive Report provides as follows, in pertinent part:

> [Article 1] [p]aragraph 4 contains a standard provision in U.S. mutual legal assistance treaties, which states that the Treaty is intended solely for government-to-government mutual legal assistance. The Treaty is not intended to provide to private persons a means of evidence gathering . . . . Private litigants in the United States may obtain evidence from Egypt by letters rogatory, an avenue of international assistance which this Treaty leaves undisturbed . . . .

*S. Rep. No. 106-24*, at 33 (2000).

Courts interpreting similar provisions in MLATs have held that criminal defendants cannot use MLATs themselves, *United Kingdom v. United States*, 238 F.3d 1312, 1317 (11th Cir. 2001), nor can a court order the government to make an MLAT request on behalf of a criminal defendant. *United States v. Jefferson*, 594 F. Supp. 2d 655, 674 (E.D. Va. 2009); *United States v. Rosen,* 240 F.R.D. 204, 213-214 (E.D. Va. 2007). The Eleventh Circuit, in reviewing an MLAT between the United Kingdom and the United States that contained the very same language found in the U.S./Egypt MLAT at Article 1(4), held that:

> A key feature of the [Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and

**Page 7 -    GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO COMPEL**

> Northern Ireland on Mutual Legal Assistance in Criminal Matters, 1994 WL 855115, entered into force December 2, 1996] is the requirement that a request for assistance be made, not directly to the courts, but rather between the "Central Authorities," which the treaty defines as the Secretary of State of the Home Department (for the United Kingdom), and the Attorney General (for the United States), or their designees. MLAT, art. 2,¶ 2. *There is no provision for private parties, such as individual criminal defendants in the English (or American) courts, to request the production of information*. *See* MLAT, art. 1, ¶ 3 ("The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence . . . .")

*United Kingdom v. United States*, 238 F.3d at 1317 (emphasis added).

In *United States v. Jefferson*, 594 F. Supp. 2d 655 (E.D. Va. 2009), the defendant attempted to compel the government to use an MLAT to obtain evidence for use in his defense.[2] The court in that case, however, held that the defendant could not force the government to use an MLAT in such a manner.

> By its plain terms, the U.S.-Nigeria MLA Treaty limits assistance to the "Contracting Parties," which it defines as the "Government of the United States of America and the Government of the Federal Republic of Nigeria." The treaty additionally expressly provides that only the two governments, and not private parties, can make use of its provisions: "This Treaty is intended solely for mutual legal assistance between the Parties. The provisions of this Treaty shall not give rise to a right on the part of any private party to obtain, suppress, or exclude any evidence, or to impede the execution of a request." As a result, courts have consistently held that MLA Treaties with such clauses "create[] no rights in individual defendants to force the government to request evidence under the MLA treaty procedures." *It is thus clear that defendant, as a private party, is not entitled to use the MLA Treaty process himself or force the government to use the treaty on his behalf*.

*Id.* at 674 (emphasis added).

/ / /

---

[2] In addition, as in this case, the defendant in *Jefferson* argued that the Sixth Amendment required the government to use the MLAT on his behalf to obtain certain depositions – an argument that, for the reasons addressed more fully below, also failed.

**Page 8 -      GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO COMPEL**

The facts of this case are analogous in that the relevant MLAT between the United States and Egypt expressly defines the "Contracting Parties" as "The Government of the United States of America and the Government of the Arab Republic of Egypt."  *See* Preamble to the U.S./Egypt MLAT.  Further, as in *Jefferson*, the MLAT between the U.S. and Egypt expressly provides that it is intended solely for mutual legal assistance between the "Contracting Parties" and that its provisions "shall not give rise to a right on the part of any private person to obtain . . . any evidence, or to impede the execution of a request."  *Id.,* Article 1(4).  Defendant, as a private party, is, therefore, not entitled to use the MLAT process and cannot force the government to use the treaty on his behalf.  *Id.; see also Rosen*, 240 F.R.D. 204, 214.  Insofar as defendant's motion to compel seeks such action, it must, therefore, be denied.

## IV.     THE SIXTH AMENDMENT RIGHT TO COMPULSORY PROCESS

Just as defendant has no treaty-based right to make use of an MLAT, there is, likewise, no constitutional right to utilize an MLAT.  An MLAT is merely a mechanism designed to facilitate the efforts of U.S. prosecutors in gathering evidence in a foreign jurisdiction.  As such, an MLAT is neutral with regard to a defendant's constitutional rights; it neither guarantees nor subverts them.

Defendant in this matter specifically predicates his motion for invoking the U.S./Egypt MLAT on his Sixth Amendment right to compulsory process.  The Sixth Amendment provides, in the compulsory process clause, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . ."  The constitutional right to compulsory process, however, is not a boundless right to subpoena

/ / /

**Page 9  -     GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO
                        COMPEL**

whatever evidence or witness a defendant desires.  As stated by the Supreme Court in *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867-68 (1982):

> [T]he Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses; it guarantees him "compulsory process for obtaining *witnesses in his favor*."  U.S. Const., Amdt. 6 (emphasis added in original).

A defendant's right to call a witness, the corollary to the right to compulsory process for obtaining witnesses, is also limited.  *See, e.g., United States v. Hurn*, 368 F.3d 1359, 1362-63 (11th Cir. 2004).  Moreover, a district court may limit the number of witnesses, restrict cumulative testimony, or require a showing of relevance before defense evidence or witnesses may be introduced.  *See, e.g., United States v. Merrill*, 746 F.2d 458, 465 (9th Cir. 1984); *United States v. Verkuilen*, 690 F.2d 648, 659 (7th Cir. 1982).

A defendant bears the burden of showing that the evidence, production of which the defendant seeks to compel, is material and favorable to the defense.  As the Supreme Court held in *Valenzuela-Bernal*, 458 U.S. at 867, 872-73, where a defendant had no access to testimony because the government deported the witness, the defendant, to establish a Sixth Amendment violation, "must make at least some plausible showing of how [the] testimony would have been both material and favorable to his defense."  Even then, the Court, citing *Washington v. Texas*, 388 U.S. 14 (1967), suggested that the government must act arbitrarily to deprive the defendant of "testimony [that] would have been *relevant* and *material*, and . . . *vital* to the defense."

Where a defendant meets his burden re material and favorable evidence, his right to compulsory process is further limited by a court's subpoena power (*i.e*., a witness within the territorial boundaries of the United States pursuant to FED. R. CRIM. P. 17(e)(1) or a U.S. national

or resident in a foreign country pursuant to FED. R. CRIM. P. 17(e)(2) and 28 U.S.C. § 1783). *See, e.g., United States v. Moussaoui*, 382 F.3d 453, 463 (4th Cir. 2004); *United States v. Korogodsky*, 4 F. Supp.2d 262, 268 (S.D.N.Y. 1998); *United States v. Ismaili*, 828 F.2d 153, 159 n.2 (3d Cir. 1987).

An MLAT does not expand a U.S. court's subpoena power outside the territory of the United States. Instead, an MLAT obligates a treaty partner, where a request from the United States meets the criteria of the MLAT, to use procedures available to the treaty partner, including compulsory measures, to execute the U.S. request. *See, e.g.*, U.S./Egypt MLAT at Article 8(1), Exhibit 1, which states that:

> A person in the Requested State from whom testimony or evidence is requested pursuant to this Treaty shall be compelled, if necessary, under the laws of the Requested State to appear and or produce items, including documents, records, and articles of evidence.

To invoke an MLAT, first, the U.S. Central Authority designated by the MLAT makes a request that it believes complies with the requirements of the treaty. *See, e.g.*, U.S./Egypt MLAT, Article 2(2), ("Central Authority" means, for the United States of America, "the Attorney General or a person designated by the Attorney General"); Article 2(3) ("The Central Authorities shall communicate directly with one another for the purposes of this Treaty."). Second, the treaty partner independently assesses the request to confirm that it qualifies for assistance within the parameters of the treaty. *See, e.g.*, U.S./Egypt MLAT, Article 3(1), which states that: ("The Central Authority of the Requested State may deny assistance if: . . . the request is not made in conformity with the Treaty."). Thus, if a treaty partner views a request not to be in conformity with the MLAT, it may decline to execute it.

**Page 11  -    GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO
                COMPEL**

In sum, an MLAT does not provide the "compulsory process" contemplated by the Sixth Amendment, and its availability as a potential foreign evidence gathering tool to a U.S. prosecutor, but not to a U.S. defendant, does not constitute a deprivation of a defendant's Sixth Amendment right.

In *United States v. Jefferson* the district court found that foreclosing the use of an MLAT for a defendant's benefit did not violate the Sixth Amendment right to compulsory process, noting that "[t]he compulsory process right is circumscribed . . . by the ability of the district court to obtain the presence of a witness through service of process" and that the process power of the district court does not extend to foreign nationals abroad. *Jefferson*, 594 F. Supp. 2d at 674, *citing Moussaoui,* 382 F.3d at 463-464. The court found that the right to compulsory process extends only to forms of process a court can issue of its own power and "not to forms of process that require the cooperation of the Executive Branch or foreign courts." *Id.* at 674-675.

Accordingly, a defendant's constitutional right to compulsory process is not implicated by a court's refusal to order the Executive Branch to invoke an MLAT in favor of a defendant. *Id.* To the contrary, a defendant's inability to utilize the MLAT process is proper and even an expected function of the MLAT's role as a government-specific mechanism. As one court has noted, "It is thus not unfair to allow the Government to use the MLAT procedure any more than it is unfair to allow the Federal Bureau of Investigation agents to interview witnesses in this country." *United States v. Blech*, 208 F.R.D. 65, 69 (S.D.N.Y. 2002). A defendant's inability to use an MLAT simply does not violate – or even implicate – a defendant's constitutional rights in any manner. *Id.*; *see also Jefferson* at 674-675. As such, any argument by defendant for use of an MLAT on his behalf must necessarily fail.

**Page 12 -     GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO
                COMPEL**

## V.    THERE IS AN INSUFFICIENT BASIS FOR THE ISSUANCE OF LETTERS ROGATORY.

Alternatively, defendant requests that this Court issue letters rogatory. The issuance of letters rogatory represents "the means by which a court in one country requests the court of another country to assist in the administration of justice by taking depositions." *Rosen*, 240 F.R.D. at 215. District courts have inherent authority to issue letters rogatory in both civil and criminal cases. *See United States v. Staples*, 256 F.2d 290, 292 (9th Cir. 1958) (noting that all federal courts have "inherent power to issue Letters Rogatory"); *cf.* 28 U.S.C. § 1781(a)(2) (authorizing the Department of State to transmit letters rogatory issued by a United States tribunal).

It is well-settled that the decision to issue letters rogatory lies within a district court's sound discretion. *Leasco Data Processing Equip. Corp. v. Maxwell*, 63 F.R.D. 94 (S.D.N.Y. 1973). In general, when requested to help secure deposition testimony, a court should grant an application for letters rogatory when (1) the party seeking a deposition has established exceptional circumstances justifying the taking of the deposition under Rule 15; and (2) the prospective witness will not appear at a deposition voluntarily. *See Rosen*, 240 F.R.D. at 215. Another factor to be considered is the delay issuing the letters rogatory would cause. "[D]elay attends the rogatory process and counsels against issuance. The letters rogatory procedure has been described as 'complicated, dilatory and expensive.'" *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court*, 482 U.S. 522, 531 (1987). If the deposition requested is not paramount to receiving a fair trial, then the request should be denied. *See, e.g., Rosen*, 240 F.R.D. at 215.

**Page 13 -    GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO COMPEL**

Rule 15(a) allows the district court broad discretion in deciding whether to order depositions in a criminal case and explicitly states that such depositions will be reserved for "exceptional circumstances [where] it is in the interest of justice that the testimony of a prospective witness . . . be taken and preserved for use at trial . . . ." FED. R. CRIM. P. 15(a); *see also United States v. Hernandez-Escarsega*, 886 F.2d 1560, 1569 (9th Cir. 1989) ("The facts of each case must be separately considered to determine whether the exceptional circumstances contemplated by Rule 15(a) exist . . . ."). In deciding whether to grant a Rule 15(a) motion, the district court must consider, among other factors, whether the deponent would be available at the proposed location for deposition and would be willing to testify. *See United States v. Olafson*, 213 F.3d 435, 442-443 (9th Cir. 2000), *citing United States v. Zuno-Arce*, 44 F.3d 1420 (9th Cir. 1995).

In this case, defendant has not adequately established that exceptional circumstances exist to warrant deposing Mr. Mahmoud El-Fiki, Mr. Sharif El-Fiki, or Mr. Mohammed Salat. Other than a notably general description of the evidence, CR 238, at 4, defendant has not articulated with any degree of specificity what testimony he expects to elicit from these individuals, nor a basis upon which to believe that the individuals in question would actually testify as he avers. In fact, defendant concedes in his motion that all three of the requested witnesses are either unwilling to cooperate with the defense or cannot be found.[3] *Id.* at 12. This alone serves as a basis for denying defendant's request. *Olafson*, 213 F.3d at 442-443 (denial of

---

[3] "Mr. El Fiki has not . . . been willing to cooperate with Mr. Sedaghaty's investigators in their approach without the assistance of Egyptian authorities. Nor was his son. Mr. Sedaghaty was not able to locate Mr. Salat." CR 238, at 12.

**Page 14 -    GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO
                COMPEL**

request for deposition proper where there was no indication that either party was willing to provide testimony at a deposition).

Furthermore, there is nothing in the record to suggest what these witnesses could testify about that would be particularly favorable to defendant Sedaghaty in this criminal case. All that the defendant has done to meet his burden of establishing exceptional circumstances is to submit the FBI 302 provided to counsel by the government two years ago concerning the interview of Mahmoud El-Fiki by the Egyptian authorities, an interview in which the government's agents were not allowed to participate directly. Assuming El-Fiki, when under oath and subject to cross-examination, would testify similarly to his previous statement to the Egyptians, his testimony would have at best minimal relevance. Apparently, he had no contact with anyone from Al-Haramain except by e-mail, and his statement does not even mention defendant Sedagahty; he specifically said he had never heard of codefendant Al-Buthe. We are aware of no evidence that defendant Sedagahty ever communicated with El-Fiki. At best, El-Fiki claims he thought his donation to "the brothers" in Chechnya was to go to widows, orphans, and refugees, but he states he "had no idea how his donation was actually spent," and was "unaware if the money was spent on the Chechnyan mujahedin." Defendant's Exhibit B, page 6 ("302," at 3), CR 238-3. It is difficult to understand how El-Fiki's state of mind is relevant evidence to defendant Sedagahty's state of mind when El-Fiki never talked to Sedaghaty or conversed with anyone else from Al-Haramain. And there is even less to suggest that the other two witnesses the defendant seeks to depose (El-Fiki's son and an employee) have anything to offer at all.

/ / /

/ / /

**Page 15  -     GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO
                 COMPEL**

Defendant has thus failed to establish exceptional circumstances justifying the taking of the requested depositions. Given defendant's concession that all of the requested individuals are either unwilling to cooperate or cannot be located, his request should be denied.

Alternatively, if the Court should decide to issue letters rogatory, it should be done under the condition that the potential failure of the Egyptian courts to respond quickly to the Court's request will not be grounds to continue the trial now scheduled for June 7, 2010. As noted earlier, as a general rule, the letters rogatory process can be a cumbersome and long-drawn out affair. The government's previous experience with Egypt in this regard certainly is not an exception to this general rule. In fact, the discretion to act upon letters rogatory (or not to do so) lies completely with first the Egyptian Foreign Ministry which would have to transmit the request to the appropriate court and second with the decisional authority of that Egyptian court. *See Pain v. United Technologies Corp.*, 637 F.2d 775, 789 (D.C. Cir. 1980) (noting, "Although the cooperation of the deponent is insured by local courts acting upon letters rogatory, execution of the letters in the first case rests upon principles of international comity, and is in that sense discretionary.")

Although the Justice Department will use its good offices to have any letter rogatory issued by this Court expeditiously delivered after the defense obtains an Arabic translation of the document, it is very probable that there will be no response from Egypt between now and June 2010.

In light of the fact that the defense has known about El-Fiki's statement for two years and could have made this motion at any time, and because there is no way of ensuring that Egypt will respond in a timely fashion if at all, there is no reason to delay the upcoming trial based upon the

**Page 16 -    GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO COMPEL**

issuance of letters rogatory. One of the government's primary witnesses has already died since the proceedings in this case really began after the defendant returned from his travels overseas. Further delay is unwarranted. The Court has wide discretion in determining whether to continue a trial in order to allow for additional time to conduct overseas depositions. *See, e.g., United States v. Croft*, 124 F.3d 1109, 1117-18 (9th Cir. 1997).

## VI.   CONCLUSION

For the reasons given above, the defendant's motion to compel the government to use an MLAT for the benefit of defendant and, alternatively, for the issuance of letters rogatory, should be denied.

Dated this 18th day of December 2009.

>                    KENT S. ROBINSON
>                    Acting United States Attorney
>
>
>                    /s/ *Charles F. Gorder, Jr.*
>                    CHARLES F. GORDER, JR.
>                    Assistant United States Attorney

**OF COUNSEL:**
Dan E. Stigall                              /s/ *Christopher L. Cardani*
Trial Attorney                              CHRISTOPHER L. CARDANI
U.S. Department of Justice                  Assistant United States Attorney
Office of International Affairs