| 106TH CONGRESS<br>*2d Session* | SENATE | TREATY DOC.<br>106–19 |
|---|---|---|

## TREATY WITH EGYPT ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS

---

# MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

TREATY BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE ARAB REPUBLIC OF EGYPT ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS, SIGNED AT CAIRO ON MAY 3, 1998 AND A RELATED EXCHANGE OF DIPLOMATIC NOTES



FEBRUARY 2, 2000.—Treaty was read the first time, and together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

---

U.S. GOVERNMENT PRINTING OFFICE

79–118                    WASHINGTON : 2000

# LETTER OF TRANSMITTAL

————————

THE WHITE HOUSE, *February 2, 2000.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Treaty Between the Government of the United States of America and the Government of the Arab Republic of Egypt on Mutual Legal Assistance in Criminal Matters, signed at Cairo on May 3, 1998. I transmit also a related exchange of diplomatic notes for the information of the Senate. The report of the Department of State with respect to the Treaty is enclosed.

The Treaty is one of a series of modern mutual legal assistance treaties being negotiated by the United States in order to counter criminal activities more effectively. The Treaty should be an effective tool to assist in the prosecution of a wide variety of crimes, including terrorism and drug-trafficking offenses. The Treaty is self-executing.

The Treaty provides for a broad range of cooperation in criminal matters. Mutual assistance available under the Treaty includes taking the testimony or statements of persons; providing documents, records and items of evidence; locating or identifying persons or items; serving documents; transferring persons in custody for testimony or other purposes; executing requests for searches and seizures; assisting in proceedings related to immobilization and forfeiture of assets, restitution, and collection fines; and any other form of assistance not prohibited by the laws of the Requested State.

I recommend that the Senate give early and favorable consideration to the Treaty and give its advice and consent to ratification.

WILLIAM J. CLINTON.

(III)

# LETTER OF SUBMITTAL

———————

DEPARTMENT OF STATE,
*Washington, November 23, 1999.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Treaty Between the Government of the United States of America and the Government of the Arab Republic of Egypt on Mutual Legal Assistance in Criminal Matters (the "Treaty"), signed at Cairo on May 3, 1998. I recommend that the Treaty be transmitted to the Senate for its advice and consent to ratification. Accompanying the Treaty is a related exchange of diplomatic notes. I recommend that these notes be transmitted for the information of the Senate.

The Treaty covers mutual legal assistance in criminal matters. In recent years, similar bilateral treaties have entered into force with a number of countries. This Treaty contains many provisions similar to those in the other treaties and all of the essential provisions sought by the United States. It will enhance our ability to investigate and prosecute a variety of offenses, including terrorism and drug-trafficking offenses of particular interest to the U.S. law enforcement community with respect to Egypt. The Treaty is designed to be self-executing and will not require new legislation.

Article 1(2) sets forth a non-exclusive list of the major types of assistance to be provided under the Treaty, including taking the testimony or statements of persons; providing documents, records and items of evidence; locating or identifying persons or items; serving documents; transferring persons in custody for testimony or other purposes; executing requests for searches and seizures; assisting in proceedings related to immobilization and forfeiture of assets, restitution, and collection of fines; and any other form of assistance not prohibited by the laws of the Requested State. The scope of the Treaty includes not only criminal offenses, but also proceedings related to criminal matters, which may be civil or administrative in nature.

Article 1(3) states that assistance shall be provided in connection with any conduct that is the subject of an investigation, prosecution, or proceeding under the laws of the Requesting State.

Article 1(4) states explicitly that the Treaty is not intended to create rights of private parties to obtain, suppress, or exclude any evidence, or to impede the execution of a request.

Article 2 provides for the establishment of Central Authorities and defines Central Authorities for purposes of the Treaty. For the United States, the Central Authority is the Attorney General or a person designated by the Attorney General. For Egypt, the Central

(V)

VI

Authority is the Minister of Justice or a person designated by the Minister of Justice.

The article also provides that the Central Authorities shall communicate directly with one another for the purposes of the Treaty.

Article 3(1) sets forth the circumstances under which a Requested State's Central Authority may deny assistance under the Treaty. A request may be denied if: (i) it relates to an offense under military law that would not be an offense under ordinary criminal law, (ii) its execution would prejudice the security or similar essential interests of the Requested State, or (iii) it is not made in conformity with the Treaty. In a diplomatic note dated April 22, 1998, the United States restated the understanding of the negotiating delegations that the "security or similar essential interests" provision in Article 3(1) provided an adequate basis upon which to deny assistance requests in cases the United States would consider political offenses. A reply note from Egypt acknowledges the Parties' understanding on this issue.

Before denying assistance, the Central Authority of the Requested State is required under Article 3(2) to consult with its counterpart in the Requesting State to consider whether assistance can be given subject to such conditions as the Central Authority of the Requested State deems necessary. If the Requesting State accepts assistance subject to such conditions, it is required to comply with the conditions. If the Central Authority of the Requested State denies assistance, it is required under Article 3(3) to inform the Central Authority of the Requesting State of the reasons for the denial.

Article 4 prescribes the form and content of requests under the Treaty, specifying in detail the information required in each request. The Article permits requests to be made in other forms in urgent situations but requires written confirmation within ten days unless the Central Authority of the Requested State agrees otherwise. Unless otherwise agreed, the request must be in the language of the Requested State.

Article 5 requires the Central Authority of the Requested State to execute the request promptly or, where appropriate, to transmit it to the authority having jurisdiction to do so. It provides that the competent authorities of the Requested State must do everything in their power to execute a request, and that the courts of the Requested State shall have authority to issue orders necessary to execute the request. The Central Authority of the Requested State is required to make all necessary arrangements for and meet the costs of representation of the Requesting State in any proceedings arising out of a request for assistance.

Under Article 5(3), requests are to be executed in accordance with the laws of the Requested State except to the extent that the Treaty provides otherwise. However, the method of execution specified in the request is to be followed except insofar as it is prohibited by the laws of the Requested State. Under Article 5(4), if the Central Authority of the Requested State determines that execution of the request would interfere with an ongoing criminal investigation, prosecution, or proceeding in that State, it may postpone execution or, after consulting with the Central Authority of the Requesting State, impose conditions on execution. If the Requesting

VII

State accepts assistance subject to such conditions, it shall comply with them.

Article 5(5) further requires the Requested State, if so requested, to use its best efforts to keep confidential a request and its contents, and to inform the Requesting State's Central Authority if the request cannot be executed without breaching such confidentiality. This provides the Requesting State an opportunity to decide whether to pursue the request or to withdraw it in order to maintain confidentiality.

Article 5(6) additionally requires the Requested State's Central Authority to respond to reasonable inquiries by the Requesting State's Central Authority regarding the status of the execution of a request; to report promptly to the Requesting State's Central Authority the outcome of its execution; and, if execution of the request is denied, delayed or postponed, to inform the Requesting State's Central Authority of the reasons for the denial, delay or postponement.

Article 6 apportions between the two States the costs incurred in executing a request. It provides that the Requested State shall pay all costs, except for the following items to be paid by the Requesting State: fees of expert witnesses, costs of translation, interpretation, and transcription, and the allowances and expenses related to travel of persons pursuant to Articles 10 and 11.

Article 7 requires the Requesting State to comply with any request by the Central Authority of the Requested State that information of evidence obtained under the Treaty not be used for any investigation, prosecution, or proceeding other than that described in the request without its prior consent. Further, if the Requested State's Central Authority asks that information or evidence furnished be kept confidential or be used in accordance with specified conditions, and the Requesting State accepts the information subject to such conditions, the Requesting State must use its best efforts to comply with the conditions. Nothing in the article prevents the use or disclosure of information to the extent that there is an obligation to do so under the constitution of the Requested State in a criminal prosecution. The Requesting State is obliged to notify the Requested State in advance of any such proposed use or disclosure. Once information is made public in the Requesting State in accordance with the provisions of the article, no further limitations on use apply.

Article 8(1) provides that a person in the Requested State from whom testimony or evidence is requested pursuant to the Treaty shall be compelled, if necessary, to appear and testify or produce items, including documents, records, and other articles of evidence. The article requires the Central Authority of the Requested State, upon request, to furnish information in advance about the date and place of the taking of testimony or evidence pursuant to this Article.

Article 8(3) further requires the Requested State to permit the presence of persons specified in the request, except when the presence of such persons would be prohibited under the laws of the Requested State, and to permit them to question directly or indirectly the person giving the testimony or evidence. The Egyptian negotiating delegation confirmed that Egyptian law authorized the pres-

VIII

ence of the defendant during the taking of testimony and that Egyptian authorities would permit a U.S. prosecutor or other official to be present during the taking of such evidence or testimony in Egypt when such official could provide information relevant to the execution of the request. In the event that a person whose testimony or evidence is being taken asserts a claim of immunity, incapacity or privilege under the laws of the Requesting State, Article 8(4) provides that the testimony or evidence shall be taken and the claim made known to the Central Authority of the Requesting State for resolution by its authorities.

Finally, in order to ensure admissibility in evidence in the Requesting State, Article 8(5) provides a mechanism, through the use of Forms A and B append to the Treaty, for authenticating evidence that is produced pursuant to or that is the subject of testimony taken in the Requested State (or certifying its absence or nonexistence).

Article 9 requires that the Requested State provide the Requesting State with copies of publicly available records in the possession of government departments and agencies in the Requested State. The Requested State may further provide copies of records or information in the possession of a government department or agency in that State, but not publicly available, to the extent and under the same conditions as it would provide them to its own law enforcement or judicial authorities. The Requested State has the discretion to deny such requests entirely or in part. Article 9 also provides that no further authentication shall be necessary for admissibility into evidence in the Requesting State of official records where the official in charge of maintaining them authenticates the records through the use of form C appended to the Treaty. In like manner, the absence or nonexistence of such records is, upon request, to be certified by the use of Form D, which shall be admissible in evidence in the Requesting State.

Article 10(1) provides a mechanism for the Requesting State to invite the voluntary appearance in its territory of a person located in the Requested State. The Requesting State shall indicate the extent to which the expenses will be paid. Article 10(2) provides that the Central Authority of the Requesting State has discretion to determine that a person appearing in the Requesting State pursuant to this Article shall not be subject to service of process, or be detained or subjected to any restriction of personal liberty by reason of any acts or convictions that preceded the person's departure from the Requested State. Under Article 10(3), any safe conduct provided for by this article ceases seven days after the Central Authority of the Requesting State has notified the person appearing in the Requesting State that their presence is no longer required, and the person being free to leave has not left, or having left, has voluntarily returned. The Central Authority may extend this safe conduct period for up to fifteen days if it determines that there is good cause to do so.

Article 11 provides that a person who is in the custody of a Contracting Party and whose presence is requested in the State of the other Contracting Party for purposes of assistance under the Treaty, shall be transferred to that State if the person consents and the Central Authorities of both States agree. Under this article, for ex-

IX

ample, a witness incarcerated in the Requested State could be transferred to the Requesting State to have his deposition taken in the presence of the defendant or a defendant in the Requesting State could be transferred to attend a witness deposition in the Requested State.

Article 11(2) further establishes both the express authority and the obligation of the receiving State to maintain the person transferred in custody unless otherwise authorized by the Sending States. The return of the person transferred is subject to terms and conditions agreed to by the Central Authorities, and the Sending State is not required to initiate extradition proceedings for return of the person transferred. The person transferred receives credit for service of the sentence imposed in the Sending State for time served in the custody of the Receiving State.

Article 12 requires the Requested State to use its best efforts to ascertain the location or identity of persons or items in the Requested State specified in a request.

Article 13 obligates the Requested State to use its best efforts to effect service of any document relating, in whole or in part, to a request under the Treaty. A request for the service of a document requiring a person to appear in the Requesting State must be transmitted a reasonable time before the scheduled appearance. Proof of service is to be provided in the manner specified in the request.

Article 14 obligates the Requested State to execute requests for search, seizure, and delivery of any item to the Requesting State if the request includes the information justifying such action under the laws of the Requested State. It provides that, upon request by the Central Authority of the Requesting State, every official who has custody of a seized item is required to certify, through the use of Form E appended to the Treaty, the identity of the item, the continuity of the item's custody and any changes in its condition. No further certification is required and the certificate is admissible in evidence in the Requesting State. Article 14(3) further provides that the Central Authority of the Requested State may impose upon the Requesting State terms and conditions deemed necessary to protect third-party interests in items to be transferred.

Article 15 requires the Requesting State's Central Authority, upon request of its counterpart in the Requested State, to return documents, records or other articles of evidence obtained in the execution of a request under the Treaty as soon as possible.

Article 16(1) provides that, if the Central Authority of one Contracting Party becomes aware of proceeds or instrumentalities of offenses that are located in the other Contracting Party and may be forfeitable or otherwise subject to seizure under the laws of that Party, it may so inform the Central Authority of that other Party. If the Party receiving such information has jurisdiction, it may present this information to its authorities for a determination whether any action is appropriate. The Central Authority of the Contracting Party receiving such information is required to inform the Central Authority of the Contracting Party that provided the information of the action taken.

Article 16(2) also obligates the Contracting Parties to assist each other to the extent permitted by their respective laws in pro-

X

ceedings relating to forfeiture of proceeds and instrumentalities of offenses, restitution to victims of crime, and collection of fines imposed as sentences in criminal prosecutions. Under Article 16(3), the Contracting Party having custody over proceeds or instrumentalities of offenses is required to dispose of them in accordance with its laws. Either Contracting Party may share all or part of such forfeited assets, or the proceeds of their sale, with the other Contracting party, to the extent not prohibited by the transferring Contracting Party's laws and upon such terms as it deems appropriate.

Article 17 states that assistance and procedures provided in the Treaty shall not prevent either Contracting Party from granting assistance to the other Contracting Party through the provisions of other applicable international agreements or through the provisions of its national laws. The Contracting Parties may also provide assistance pursuant to any bilateral arrangement, agreement or practice that may be applicable.

Article 18 provides that the Central Authorities shall consult, at times mutually agreed, to promote the most effective use of the Treaty, and may agree upon such practical measures as may be necessary to facilitate the Treaty's implementation.

Article 19 provides that the Treaty and its Appendices, which are integral parts of the Treaty, are subject to ratification. Article 19(3) provides that the Treaty applies to requests presented after the date of its entry into force, whether the relevant acts or omission occurred prior to or after that date. Article 19 further provides that either Contracting Party may terminate the Treaty by written notice to the other Contracting Party, termination to take effect six months following the date of notification.

A technical Analysis explaining in detail the provisions of the Treaty is being prepared by the United States negotiating delegation, consisting of representatives from the Departments of Justice and State, and will be transmitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in favoring approval of this Treaty by the Senate as soon as possible.

Respectfully submitted,

STROBE TALBOTT.

TREATY BETWEEN THE GOVERNMENT OF
THE UNITED STATES OF AMERICA
AND
THE GOVERNMENT OF THE ARAB REPUBLIC OF EGYPT
ON
MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS

(1)

2

## TABLE OF CONTENTS

Article 1 ........................................................................................................Scope of Assistance

Article 2 ........................................................................................................Central Authorities

Article 3 ........................................................................................... Limitations on Assistance

Article 4 ..................................................................................... Form and Contents of Requests

Article 5 ........................................................................................... Execution of Requests

Article 6 ..................................................................................................................Costs

Article 7 ........................................................................................................Limitations on Use

Article 8 ....................................................................Testimony or Evidence in the Requested State

Article 9 ........................................................................................... Records of Government Agencies

Article 10 ...........................................................................Testimony in the Requesting State

Article 11 ...........................................................................Transfer of Persons in Custody

Article 12 .................................................... Location or Identification of Persons or Items

Article 13 ...........................................................................................Service of Documents

Article 14 .......................................... ........................................... Search and Seizure

Article 15 ........................................................................................... Return of Items

Article 16 ...........................................Assistance in Seizure and Forfeiture Proceedings

Article 17 ...........................................................................Compatibility with Other Treaties

Article 18 ........................................................................................... Consultation

Article 19 ........................................... Ratification, Entry Into Force, and Termination


Appendix A .........................Form A:  Certificate of Authenticity of Business Records

Appendix B .........................Form B:  Certificate of Absence or Non-Existence of
                                        Business Records

Appendix C ......................... Form C:  Attestation of Authenticity of Foreign Public
                                        Records

Appendix D..........................Form D:  Attestation Regarding Absence or Non-Existence
                                        of Foreign Public Records

Appendix E...........................Form E:  Attestation With Respect to Seized Articles

3

The Government of the United States of America and the Government of the Arab Republic of Egypt (hereinafter "the Contracting Parties");

Desiring to improve the effectiveness of the law enforcement authorities of both countries in the investigation, prosecution, and prevention of crime through cooperation and mutual legal assistance in criminal matters;

Have agreed as follows:

4

**Article 1**

**Scope of Assistance**

1.      The Contracting Parties shall provide mutual assistance, in accordance with the provisions of this Treaty, in connection with the investigation, prosecution, and prevention of offenses, and in proceedings related to criminal matters.

2.      Assistance shall include:

(a)   taking the testimony or statements of persons;

(b)   providing documents, records, and items of evidence;

(c)   locating or identifying persons or items;

(d)   serving documents;

(e)   transferring persons in custody for testimony or other purposes;

(f)    executing requests for searches and seizures;

(g)    assisting in proceedings related to immobilization and forfeiture of assets; restitution; collection of fines; and

(h)   any other form of assistance not prohibited by the laws of the Requested State.

3.      Assistance shall be provided in connection with any conduct that is the subject of the investigation, prosecution, or proceeding under the laws of the Requesting State.

4.      This Treaty is intended solely for mutual legal assistance between the Contracting Parties.  The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request.

5

-2-

## Article 2
## Central Authorities

1.      Each Contracting Party shall designate a Central Authority to make and receive requests pursuant to this Treaty.

2.      For the United States of America, the Central Authority shall be the Attorney General or a person designated by the Attorney General.  For the Arab Republic of Egypt, the Central Authority shall be the Minister of Justice or a person designated by the Minister of Justice.

3. The Central Authorities shall communicate directly with one another for the purposes of this Treaty.

## Article 3
## Limitations on Assistance

1.      The Central Authority of the Requested State may deny assistance if:

    (a)     the request relates to an offense under military law that would not be an offense under ordinary criminal law;

    (b)     the execution of the request would prejudice the security or similar essential interests of the Requested State; or

    (c)     the request is not made in conformity with the Treaty.

2.      Before denying assistance pursuant to this Article, the Central Authority of the Requested State shall consult with the Central Authority of the Requesting State to consider whether assistance can be given subject to such conditions as it deems necessary. If the Requesting State accepts assistance subject to these conditions, it shall comply with the conditions.

6

-3-

3.    If the Central Authority of the Requested State denies assistance pursuant to this article, it shall inform the Central Authority of the Requesting State of the reasons for the denial.

### Article 4
### Form and Contents of Requests

1.    A request for assistance shall be in writing except that the Central Authority of the Requested State may accept a request in another form in urgent situations.  If the request is not in writing, it shall be confirmed in writing within ten days thereafter unless the Central Authority of the Requested State agrees otherwise.  The request shall be in the language of the Requested State unless otherwise agreed.

2.    The request shall include the following:

    (a)    the name of the authority conducting the investigation, prosecution, or proceeding to which the request relates;

    (b)    a description of the subject matter and nature of the investigation, prosecution, or proceeding, including the specific criminal offenses that relate to the matter;

    (c)    a description of the evidence, information, or other assistance sought; and

    (d)    a statement of the purpose for which the evidence, information, or other assistance is sought.

3.    To the extent necessary and possible, a request shall also include:

    (a)    information on the identity and location of any person from whom evidence is sought;

    (b)    information on the identity and location of a person to be served, that person's relationship to the investigation, prosecution, or proceedings, and the manner in which service is to be made;

7

-4-

(c)  information on the identity and whereabouts of persons or items to be located;

(d)  a precise description of the place or person to be searched and of the items to be seized;

(e)  a description of the manner in which any testimony or statement is to be taken and recorded;

(f)  a description of the testimony or statement sought, which may include a list of questions to be asked of a witness;

(g)  a description of any particular procedure to be followed in executing the request;

(h)  information as to the allowances and expenses to which a person asked to appear in the Requesting State will be entitled; and

(i)  any other information that may be brought to the attention of the Requested State to facilitate its execution of the request.

### Article 5
### Execution of Requests

1.  The Central Authority of the Requested State shall promptly execute the request or, when appropriate, shall transmit it to the authority having jurisdiction to do so. The competent authorities of the Requested State shall do everything in their power to execute the request. The Courts of the Requested State shall have authority to issue orders necessary to execute the request.

2.  The Central Authority of the Requested State shall make all necessary arrangements for and meet the costs of the representation in the Requested State of the Requesting State in any proceedings arising out of a request for assistance.

8

-5-

3.      Requests shall be executed in accordance with the laws of the Requested State except to the extent that this Treaty provides otherwise.  However, the method of execution specified in the request shall be followed except insofar as it is prohibited by the laws of the Requested State.

4.      If the Central Authority of the Requested State determines that execution of a request would interfere with an ongoing criminal investigation, prosecution, or proceeding in that State, it may postpone execution, or make execution subject to conditions determined necessary after consultations with the Central Authority of the Requesting State.  If the Requesting State accepts the assistance subject to the conditions, it shall comply with the conditions.

5.      The Requested State shall use its best efforts to keep confidential a request and its contents if such confidentiality is requested by the Central Authority of the Requesting State.  If the request cannot be executed without breaching such confidentiality, the Central Authority of the Requested State shall so inform the Central Authority of the Requesting State, which shall then determine whether the request should nevertheless be executed.

6.      The Central Authority of the Requested State shall respond to reasonable requests by the Central Authority of the Requesting State on progress toward execution of the request.

7.      The Central Authority of the Requested State shall promptly inform the Central Authority of the Requesting State of the outcome of the execution of the request.  If the execution of the request is denied, delayed, or postponed, the Central Authority of the Requested State shall inform the Central Authority of the Requesting State of the reasons for the denial, delay, or postponement.

9

-6-

### Article 6
### Costs

The Requested State shall pay all costs relating to the execution of the request, except for the fees of expert witnesses, the costs of translation, interpretation, and transcription, and the allowances and expenses related to travel of persons pursuant to Articles 10 and 11, which shall be paid by the Requesting State.

### Article 7
### Limitations on Use

1.      The Central Authority of the Requested State may request that the Requesting State not use any information or evidence obtained under this Treaty in any investigation, prosecution, or proceeding other than that described in the request without the prior consent of the Central Authority of the Requested State.  In cases where consent is provided, the Requesting State shall comply with the conditions specified by the Requested State.

2.      The Central Authority of the Requested State may request that information or evidence furnished under this Treaty be kept confidential or be used only subject to terms and conditions it may specify.  If the Requesting State accepts the information or evidence subject to such conditions, the Requesting State shall use its best efforts to comply with the conditions.

3.      Nothing in this Article shall preclude the use or disclosure of information to the extent that there is an obligation to do so under the Constitution of the Requesting State in a criminal prosecution.  The Requesting State shall notify the Requested State in advance of any such proposed use or disclosure.

10

-7-

4.      Information or evidence that has been made public in the Requesting State in a manner consistent with paragraphs 1 or 2 may thereafter be used for any purpose.

### Article 8
### Testimony or Evidence in the Requested State

1.      A person in the Requested State from whom testimony or evidence is requested pursuant to this Treaty shall be compelled, if necessary, under the laws of the Requested State to appear and testify or produce items, including documents, records, and articles of evidence.

2.      Upon request, the Central Authority of the Requested State shall furnish information in advance about the date and place of the taking of the testimony or evidence pursuant to this Article.

3.      The Requested State shall permit the presence of such persons as specified in the request during the execution of the request, except when the presence of such persons would be prohibited under the laws of the Requested State, and shall allow such persons to pose questions directly or indirectly to the person giving the testimony or evidence.

4.      If the person referred to in paragraph 1 asserts a claim of immunity, incapacity, or privilege under the laws of the Requesting State, the testimony or evidence shall nonetheless be taken and the claim made known to the Central Authority of the Requesting State for resolution by the authorities of that State.

5.      Evidence produced in the Requested State pursuant to this Article or that has been the subject of testimony taken under this Article may be authenticated by attestation, including in the case of business records, in the manner indicated in Form A appended to this Treaty.  The absence or nonexistence of such records may, upon request, be certified through the use of Form B appended to this Treaty.  Records authenticated by Form A, or Form B certifying the absence or nonexistence of such records, shall be admissible in evidence in the Requesting State.

11

-8-

### Article 9
### Records of Government Agencies

1.      The Requested State shall provide the Requesting State with copies of publicly available records, including documents or information in any form, in the possession of government departments and agencies in the Requested State.

2.      The Requested State may provide copies of any records, including documents or information, that are in the possession of a government department or agency in that State, but that are not publicly available, to the same extent and under the same conditions as such copies would be available to its own law enforcement or judicial authorities.  The Requested State may in its discretion deny a request pursuant to this paragraph entirely or in part.

3.      Records produced pursuant to this Article may be authenticated by the official responsible for maintaining them through the use of Form C appended to this Treaty.  The absence or nonexistence of such records may, upon request, be certified through the use of Form D appended to this Treaty.  No further authentication shall be necessary.  Records authenticated by Form C, or Form D certifying the absence or nonexistence of such records, shall be admissible in evidence in the Requesting State.

### Article 10
### Testimony in the Requesting State

1.      When the Requesting State requests the appearance of a person who is present in the Requested State, the Requested State shall invite the person to so appear.  The Requesting State shall indicate the extent to which the expenses will be paid.  The Central Authority of the Requested State shall promptly inform the Central Authority of the Requesting State of the response of the person.

12

-9-

2.    The Central Authority of the Requesting State may, in its discretion, determine that a person appearing in the Requesting State pursuant to this article shall not be subject to service of process, or be detained or subjected to any restriction of personal liberty, by reason of any acts or convictions that preceded his departure from the Requested State.

3.    The safe conduct provided for by this Article shall cease seven days after the Central Authority of the Requesting State has notified the Central Authority of the Requested State that the person's presence is no longer required, or when the person, having left the Requesting State, voluntarily returns.  The Central Authority of the Requesting State may, in its discretion, extend this period up to fifteen days if it determines that there is good cause to do so.

### Article 11
### Transfer of Persons in Custody

1.    A person in the custody of a Contracting Party, whose presence is requested in the State of the other Contracting Party for purposes of assistance under this Treaty, shall be transferred to that State if the person consents and if the Central Authorities of both States agree.

2.    For purposes of this Article:

(a)    the receiving State shall have the authority and the obligation to keep the person transferred in custody unless otherwise authorized by the sending State;

(b)    the receiving State shall return the person transferred to the custody of the sending State as soon as circumstances permit or as otherwise agreed by both Central Authorities;

13

-10-

(c)     the receiving State shall not require the sending State to initiate
        extradition or any other proceedings for the return of the person
        transferred; and

(d)     the person transferred shall receive credit for service of the sentence
        imposed in the sending State for time served in the custody of the
        receiving State.

### Article 12
### Location or Identification of Persons or Items

If the Requesting State seeks the location or identity of persons or items in the
Requested State, the Requested State shall use its best efforts to ascertain the location or
identity.

### Article 13
### Service of Documents

1.      The Requested State shall use its best efforts to effect service of any
document relating, in whole or in part, to any request for assistance made by the
Requesting State under the provisions of this Treaty.

2.      The Requesting State shall transmit any request for the service of a
document requiring the appearance of a person before an authority in the Requesting State
a reasonable time before the scheduled appearance.

3.      The Requested State shall return a proof of service to the Requesting State in
the manner specified in the request.

14

-11-

### Article 14
### Search and Seizure

1.    The Requested State shall execute a request for the search, seizure, and delivery of any item to the Requesting State if the request includes the information justifying such action under the laws of the Requested State.

2.    Upon request by the Central Authority of the Requesting State, every official in the Requested State who has had custody of a seized item shall certify, through the use of Form E appended to this Treaty, the identity of the item, the continuity of its custody, and any changes in its condition.  No further certification shall be required.  The certificates shall be admissible in evidence in the Requesting State.

3.    The Central Authority of the Requested State may require that the Requesting State agree to the terms and conditions deemed necessary to protect third Party interests in the item to be transferred.

### Article 15
### Return of Items

The Central Authority of the Requested State may require that the Central Authority of the Requesting State return any items, including documents, records, or articles of evidence furnished to it in execution of a request under this Treaty as soon as possible.

### Article 16
### Assistance in Seizure and Forfeiture Proceedings

1.    If the Central Authority of one Contracting Party becomes aware of proceeds or instrumentalities of offenses that are located in the other Contracting Party and may be

15

-12-

forfeitable or otherwise subject to seizure under the laws of that Contracting Party, it may so inform the Central Authority of the other Contracting Party. If the Contracting Party receiving such information has jurisdiction in this regard, it may present this information to its authorities for a determination whether any action is appropriate. These authorities shall issue their decision in accordance with the laws of their country. The Central Authority of the Contracting Party that received the information shall inform the Central Authority of the Contracting Party that provided the information of the action taken.

2.      The Contracting Parties shall assist each other to the extent permitted by their respective laws in proceedings relating to the forfeiture of the proceeds and instrumentalities of offenses, restitution to the victims of crime, and the collection of fines imposed as sentences in criminal prosecutions. This may include action to temporarily immobilize the proceeds or instrumentalities pending further proceedings.

3.      The Contracting Party that has custody over proceeds or instrumentalities of offenses shall dispose of them in accordance with its laws. Either Contracting Party may transfer all or part of such assets, or the proceeds of their sale, to the other Contracting Party, to the extent permitted by the transferring Contracting Party's laws and upon such terms as it deems appropriate.

## Article 17
## Compatibility with Other Treaties

Assistance and procedures set forth in this Treaty shall not prevent either of the Contracting Parties from granting assistance to the other Contracting Party through the provisions of other applicable international agreements, or through the provisions of its national laws. The Contracting Parties may also provide assistance pursuant to any bilateral arrangement, agreement, or practice that may be applicable.

16

-13-

### Article 18
### Consultation

The Central Authorities of the Contracting Parties shall consult, at times mutually agreed to by them, to promote the most effective use of this Treaty.  The Central Authorities may also agree on such practical measures as may be necessary to facilitate the implementation of this Treaty.

### Article 19
### Ratification, Entry Into Force, and Termination

1.    This Treaty and its Appendices, which are integral parts of the Treaty, shall be subject to ratification, and the instruments of ratification shall be exchanged as soon as possible.

2.    This Treaty shall enter into force upon the exchange of instruments of ratification.

3.    This Treaty shall apply to any request presented after the date of its entry into force whether the relevant acts or omissions occurred prior to or after that date.

4.    Either Contracting Party may terminate this Treaty by means of written notice to the other Contracting Party.  Termination shall take effect six months following the date of notification.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Treaty.

DONE at  Cairo this  third  day of  May, 1998, in duplicate, in the English and Arabic languages, both texts being equally authentic.

FOR THE GOVERNMENT OF             FOR THE GOVERNMENT OF
THE UNITED STATES OF AMERICA:      THE ARAB REPUBLIC OF EGYPT:

17

-14-

## FORM A

### CERTIFICATE OF AUTHENTICITY OF
### BUSINESS RECORDS

I, _____ (Name) _____, attest on penalty of

criminal punishment for false statement or false attestation that

I am employed by _____ (Name of Business from which documents are sought)

_____ and that my official title is _____.

I further state that each of the records attached hereto is the original or a duplicate of the

original records in the custody of _____ (Name of Business from which documents

are sought) _____.

I further state that:

- (A) such records were made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;

- (B) such records were kept in the course of a regularly conducted business activity;

- (C) the business activity made such records as a regular practice;

- (D) if such record is not the original, such record is a duplicate of the original.

_____        _____
        Signature                                                        Date


Sworn to or affirmed before me. _____ (Name) _____,

a _____ (notary public, judicial officer, etc.)_____ this

_____ day of _____ 19_____.

18

-15-

## FORM B

### CERTIFICATE OF ABSENCE OR NON-EXISTENCE OF
### BUSINESS RECORDS

I, _____(Name) _____, attest on penalty of criminal punishment for false statement or false attestation that

I am employed by _____ (Name of Business from which documents are sought) _____ and that my official title is _____.

As a result of my employment with the above-named business, I am familiar with the business records it maintains.  The business maintains business records that:

    (A)    are made, at or near the time of the occurrence of the matters set forth by (or from information transmitted by) a person with knowledge of those matters;

    (B)    are kept in the course of a regularly conducted business activity; and

    (C)    are made by the business as a regular practice.

    Among the records so maintained are records of individuals and entities that have accounts or otherwise transact business with the above-named business.  I have made or caused to be made a diligent search of those records.  No records have been found reflecting any business activity between the business and the following individuals and entities:_____.

If the business had maintained an account on behalf of or had participated in a transaction with any of the foregoing individuals or entities, its business records would reflect that fact.

_____    _____

       **Signature**               **Date**

Sworn to or affirmed before me, _____(Name)_____, a _____

this (notary public, judicial officer, etc.) _____ day of _____ 19_____.

19

-16-

**FORM  C**

**ATTESTATION OF AUTHENTICITY OF**

**FOREIGN PUBLIC RECORDS**

I, _____ (Name)_____, attest on penalty of criminal punishment for false

statement or attestation that my position with the Government of_____(Country) _____

is _____ (Official Title) _____   and that in that position I  am authorized by

the law of ____ (Country)_____ to attest that the documents attached and

described below, are true and accurate copies of original official records which

are recorded or filed in  _____(Name of Office or Agency) _____,

which is a government office or agency of _____ (Country)___ ____.


Description of Documents:

 

_____

(Signature)


_____

(Title)


_____

(Date)

20

- 17 -

FORM D

ATTESTATION REGARDING ABSENCE OR
NON-EXISTENCE OF FOREIGN PUBLIC RECORDS

I,_____, attest on penalty of

criminal punishment for false statement or attestation that
my position with the Government of_____(Country)
is _____ (official title) and that in that position I am
authorized by the laws of _____(Country) to make this
attestation.

I do hereby certify that I am the custodian of records of _____
(Name of Public Office or Agency), and that I have made a diligent
search of the said records for the _____ (Set Forth Description
of Records for Which a Search was Done), and that no such records are
found to exist therein.

I further certify that the records for which a search was conducted set
forth matters which are required by the laws of the Government of
_____(Country) to be recorded or filed and reported, and
such matters regularly are recorded or filed and reported by
_____(Name of Public Agency or Office).


_____
(Signature)


(SEAL)


_____
(Date)

21

-18-

## FORM  E

### ATTESTATION WITH RESPECT
### TO SEIZED ARTICLES

I, _____ (Name)_____, attest on penalty of criminal punishment for false
statements or attestation that my position with the Government of ____ (Country) _____
is _____ (Official Title)_____ .  I received the articles listed below from _____
_____(Name of Person)_____ on _____(Date), at ____(Place)_____
in the following condition:


**Description of Article:**


**Changes in Condition while in my custody:**



**Official Seal**


_____
(Signature)

_____
(Title)

_____
(Date)

22

EMBASSY OF THE
UNITED STATES OF AMERICA

No. 430

The Embassy of the United States of America presents
its compliments to the Ministry of Foreign Affairs of the
Arab Republic of Egypt and has the honor to refer to the
proposed Treaty between the United States of America and the
Government of the Arab Republic of Egypt on Mutual Legal
Assistance in Criminal Matters (the "Treaty") which was
initialed on November 19, 1997, in Washington.

In connection with the Treaty, the Embassy notes that
during its negotiation the U.S. delegation agreed to delete
from Article 3(1) its proposal for the inclusion of an
express reference to a "political offense" exception among
the bases for denial of assistance in the Treaty.  In so
doing, the United States took into account the view of the
Egyptian delegation that the term "political offense" is not
used in Egyptian law and that Article 3(1)(b) of the Treaty
provided an adequate basis upon which to deny assistance
requests in cases the United States would consider

23

"political offenses."  Article 3(1)(b) permits each Party to

deny assistance if the execution of the request would

prejudice the "security or essential interests" of the

requested state.  The Embassy hereby confirms that it is the

view of the United States that Article 3(1)(b) is sufficient

to meet the concerns of the United States in this area, and

the United States will implement the Treaty accordingly.



Embassy of the United States of America

Cairo, April 22, 1998

24

**U.S. DEPARTMENT OF STATE**
**OFFICE OF LANGUAGE SERVICES**
**Translating Division**

LS No. JIP0619991897

SK

Arabic

Ministry of Foreign Affairs
Deputy Assistant Minister for Treaty Affairs

10/3/1998

Outgoing Number: 2274 + 1

The Ministry of Foreign Affairs of the Arab Republic of Egypt, the office of the Deputy Assistant Minister for International Treaty Affairs, extends its best regards to the Embassy of the United States of America in Cairo.  This is in reference to the memorandum from the esteemed Embassy, memorandum number 430, dated 3/31/1998, regarding Paragraph 1.b. of Article Three of the Mutual Legal Assistance Treaty on Criminal Matters, which was signed by both countries on 5/3/1998.  (A copy of the Embassy's memorandum, which is dated 4/22/1998, was sent to the Ministry of Justice of the Arab Republic of Egypt.)  The Ministry of Foreign Affairs of the Arab Republic of Egypt has the honor of attaching herewith a copy of a memorandum dealing with that issue.  The memorandum, memorandum number 193, dated 8/1/1998, was sent to us by the Ministry of Justice.

The Ministry of Foreign Affairs of the Arab Republic of Egypt, the office of the Deputy Assistant Minister for International Treaty Affairs, avails itself of this opportunity to extend to the esteemed Embassy its highest regard and appreciation.

[signature]
[illegible stamp]

To the Embassy of the United States of America in Cairo

25

**U.S. DEPARTMENT OF STATE**
**OFFICE OF LANGUAGE SERVICES**
**Translating Division**

LS No. JIP0619991897
**SK**
**Arabic**

Arab Republic of Egypt                                    205/1 General
**Ministry of Justice**                                    Attachments: _____
Bureau of Legislative Affairs                              Record Number: 193 / 8/1/98

Ambassador Ezzat Sa'd
Deputy Assistant  Minister for International Agreements Affairs

[Dear Ambassador Sa'd:]

This is in reference to letter number 430, dated 4/22/1998, from the Embassy of the United States of America in Cairo concerning the Mutual Legal Assistance Treaty [MLAT] in criminal matters between the government of the Arab Republic of Egypt and the United States of America.

We wish to inform you that the Egyptian side understands the reasons behind the deletion of the term, "political offenses," from the draft treaty.  Both sides had agreed to that deletion during the negotiations because the term, "political offenses," is not defined in the provisions of Egypt's criminal code.  Moreover, Paragraph 1.b. of Article Three makes reference to that term unnecessary.  Hence, both parties are entitled to deny requests for assistance if [such requests] have a bearing on the security or interests of the Requested State.

This is for your information.  We ask that you kindly notify the American party.

Respectfully yours,
[signature]
Counselor Dr. Essam Ahmad Muhammad
Chief, Department of Legislation

8/1/1998