# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**PIROUZ SEDAGHATY,**<br><br>**Defendant.** | **CR 05-60008 HO**<br><br>**REQUEST BY THE UNITED STATES DISTRICT COURT OF OREGON FOR INTERNATIONAL JUDICIAL ASSISTANCE (LETTER ROGATORY) FROM THE KINGDOM OF SAUDI ARABIA** |

TO THE APPROPRIATE AUTHORITIES OF THE KINGDOM OF SAUDI ARABIA (hereinafter "Saudi Arabia"):

The United States District Court for the District of Oregon presents its compliments to the judicial authorities in Saudi Arabia and has the honor to request the assistance of the appropriate authorities in Saudi Arabia in connection with the prosecution of Pirouz Sedaghaty, who is charged in the District Court of Oregon with two offenses, each of which refer to Mr. Sedaghaty's involvement with money that was deposited with the Al Haramain charity in the Kingdom of Saudi Arabia, whose records are in the possession of the government of the Kingdom of Saudi Arabia.

I.    **Background**

A grand jury sitting in the District of Oregon returned an indictment on February 17, 2005, charging Mr. Sedaghaty with two offenses.  Specifically, Mr. Sedaghaty is charged with the following offenses against the United States.

Conspiracy to Defraud the United States Government in violation of Title 18, United States Code, Section 371.

False Return by Tax Exempt Organization in violation of Title 26, United States Code, Section 7206(1) and title 18, United States Code, Section 2.

Each of these are serious offenses under United States law.

The indictment alleges that in February 2000, an individual in Egypt (Mr. El Fiki) donated $150,000 to Al-Haramain as zakat to be sent to Chechnya.  These funds were initially wire transferred by Mr. El Fiki to an Al Haramain bank account in Oregon, converted into travelers checks and a cashier's check, and taken out of the United States by Mr. Sedaghaty's co-defendant, Mr. Soliman Al Buthe.  The indictment also alleges that Mr. Sedaghaty and Mr. Al Buthe intended that the funds be delivered to the Chechen mujahideen, and that they engaged in a conspiracy to prevent the United States Government from learning of the transaction by failing to fill out paperwork, as required by law, acknowledging the funds were leaving the United States, and by filing a false tax return with the Internal Revenue Service which falsified how the donated funds were distributed by Al Haramain Islamic Foundation, Inc.

In connection with this trial the Court requests that the government of Saudi Arabia provide:

**Page 2 REQUEST BY THE UNITED STATES DISTRICT COURT OF OREGON FOR INTERNATIONAL JUDICIAL ASSISTANCE (LETTER ROGATORY) FROM THE KINGDOM OF SAUDI ARABIA**

1.      Certification of authenticity of  the enclosed copies of the following documents (a) Al Haramain Islamic Foundation voucher # 263867; (b)Al Haramain Islamic Foundation voucher # 262740; (c) a summary report from Al Haramain charity Foundation to Soliman Al Buthe regarding the deposits made by Soliman Al Buthe;  and (d) an Al Haramain Islamic Foundation affidavit regarding the monies deposited by Soliman Al Buthe.

2.      In the alternative to #1 above, an authenticated, certified copy of the original following documents as possessed by the government of Saudi Arabia  (a) Al Haramain Islamic Foundation voucher # 263867; (b)Al Haramain Islamic Foundation voucher # 262740; (c) a summary report from Al Haramain charity Foundation to Soliman Al Buthe regarding the deposits made by Soliman Al Buthe;  and (d) an Al Haramain Islamic Foundation  affidavit regarding the monies deposited by Soliman Al Buthe.

3.      In addition, an authenticated, certified copy of the entries of voucher numbers 263867 and 262740 in the log referenced in the summary report from Al Haramain charity Foundation to Soliman Al Buthe regarding the deposits made by Soliman Al Buthe.

4.      In addition, Mr. Sedaghaty requests that the government of Saudi Arabia direct Mr. Sami 'Abd Al 'Aziz Al-Sanad to travel to Eugene, Oregon for the trial in June 2010.  The government of the Kingdom of Saudi Arabia is aware of Mr. Al-Sanad's location.   The travel expenses of these witnesses will be paid by the United States government.

5.      In the alternative to #4 above, the Court requests the government of the Kingdom of Saudi Arabia make Mr. Al-Sanad available to be deposed by defense counsel and the government lawyers in this case.   The Court requests that the arrangements for these depositions be made directly with Steven T. Wax, whose U.S. phone number is 503-326-2123.  Mr. Wax can also be contacted at Steve_Wax@fd.org.

The United States District Court for the District of Oregon assures the judicial authorities of the Kingdom of Saudi Arabia that the courts of the United States are authorized by statute, 18 U.S.C. § 1781, et seq, to assist foreign tribunals in the execution of similar requests.

## III.   TIME CONSTRAINTS

The Court further advises the judicial authorities in Kingdom of Saudi Arabia that this

request for international judicial assistance should be considered time sensitive and requests the appropriate authorities to promptly consider it.

_____

Honorable Michael R. Hogan
United States District Court

# EXHIBIT B

UNCLASSIFIED

[handwritten] BB
[handwritten] JE



Office of the Prosecutor General
of the Russian Federation

ulitsa Bolshaya Dmitrovka, 15a
Moscow, Russia, GSP-3, 125993

05/26/2009  № 82/1-1261-08
To №      182-22165

United States Department of Justice

To the Director of the Office of International Affairs

Ms. Mary Ellen Warlow

1301 New York Avenue, N.W.
Washington, DC 20005

Dear Ms. Director:

     The Office of the Prosecutor General of the Russian Federation affirms its respect for the United States Department of Justice and, in accordance with the Treaty between the Russian Federation and the United States for Mutual Legal Assistance in Criminal Matters, of 06/17/199, is sending materials obtained during the fulfillment of a request for legal assistance related to the investigation of a criminal case concerning officials of the Al Haramain Islamic Foundation.

     At the same time we are informing you that, pursuant to information received from the Directorate of the FSB of Russia for the Republic of Ingushetia, in March 2000, personnel from that directorate conducted operational measures related to the Saudi Red Crescent Society (hereinafter "SRCS"), which was a constituent component of the Saudi Joint Relief Committee for Kosovo and Chechnya

     As a result, it was determined that officials of the SRCS—Abdulla Al-Harsi (DOB 12/28/1968, subject of the Kingdom of Saudi Arabia, head of the representation of this organization in Ingushetia), Akhmed Feysal Kaid Ali (DOB 01/12/1974, citizen of Yemen, officer of the representation), Al Dzhukhani Abdulla (subject of the Kingdom of Saudi Arabia, manager of the representation's warehouse), Khabbula Mokhammed Talaat (DOB 04/13/1970, citizen of Syria, administrator of the representation)—under cover of providing aid to displaced persons from Chechnya, provided ideological, material, and financial aid to representatives of radical Islam, acting under the banner-cry of secession of the Caucasian republics from Russia and the creation of an independent Islamic state. The above-mentioned individuals undertook attempts to gather information about the [handwritten] 182-22165 Al Haramain Islamic Foundation [end handwriting]

AK № 072955 | Office of the Prosecutor General
of the Russian Federation

UNCLASSIFIED

– 3 –

2850

2850 GOV

UNCLASSIFIED

actions of federal agencies in the Northern Caucasus, simultaneously counteracting efforts by the federal center to return displaced persons to their places of residence.

In April 2000, the President of the Republic of Ingushetia, R. Aushev, gave a directive to the Ministry of Internal Affairs of the Ingushetia Republic and to the Directorate of the FSB of Russia for the Republic of Ingushetia to conduct a joint examination of the activities of the SRCS. As a result, it was discovered that the actions of officials of the given organization included violations of Articles 2, 18, and 47 of the Russian Federation Law "On Social Associations" and the Regulations for the Stay of Foreign Citizens on the Territory of Russia. As a result of the aforementioned, the SRCS representation on the territory of Ingushetia was shut down.

In addition, according to information at the disposal of the Directorate of the FSB of Russia for the Republic of Ingushetia, in 2002, on the territory of the Republic of Azerbaijan, law-enforcement officers detained representatives of the Al Haramain Islamic Foundation, subjects of the Kingdom of Saudi Arabia—Al Modikhish Akhmad Aliya, born in 1974, and Al-Dzhadani Taufik, born in 1972—who were suspected of subversive activity. According to the information obtained, the materials seized from them pointed to a connection between Al-Dzhadani Taufik and leaders of illegal, armed units, Khattab, Abu Touba and Arbi Barayev. In June 2002, Azerbaijani authorities made the decision to deport the detainees to the Kingdom of Saudi Arabia.

No documentary information in any format related to the facts of the illegal activities of representatives of the indicated foundation remains at the FSB's disposal. As was reported earlier, operational materials were destroyed according to established procedure as retention dates expired.



Enclosure: 14 pages

Acting Head of the Directorate                [Seal of the Office of the Prosecutor General
of Legal Assistance                                      of the Russian Federation]
of the Chief Directorate of                                     [signature]
International Legal Cooperation                      S. M. Gribinyuchenko

Executed by Yusifov, N. R., tel. 692-8380

UNCLASSIFIED

2851 GOV

File Number:
Date:            01/26/2009

**Witness Interview Report**

Moscow                                                   December 3, 2008

Interview started at 10:30
Interview ended at 13:00

Based on the Letters Rogatory received from the US Department of Justice, Deputy Chief of the 3rd Department of Russian FSB Investigative Division, Lieutenant Colonel of Justice V.V. Romanovskiy conducted an interview of a witness at 1/3 Bolshaya Lubyanka St., Room # 207, Moscow, in accordance with Articles 189 and 190 of Russian Federation Criminal Procedural Code. [The information about the witness is as follows:]

1. Last, first, patronymic name: IGNATCHENKO, Sergey Nikolayevich

2. Date of birth: September 02, 1961

3. Place of birth: Moscow

4. Place of residency and registration: 2 Bolshaya Lubyanka, apt.# 326, Moscow; phone:

5. Citizenship: Russian Federation

6. Education: college degree

7. Marital Status: married

8. Employer or Educational Institution: Russian Federal Security Service [FSB] employee phone:

9. Military service status: draft eligible

10. Previous convictions: none

11. Passport or other identification document: identity attested

12. Other information about the witness: none.

Witness ___[Illegible signature]____
                    (signature)

[Illegible signature]

Prior to the interview I was explained my rights and responsibilities as a witness according to Russian Federation Criminal Procedural Code, Article 56, part 4:

# EXHIBIT C

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription  02/14/2005

        (U) On 1/31/05, Mahmoud Talaat Hasan El Fiki, date of
birth, 5/9/32, was interviewed at the Nasr City, Egypt offices by
SSIS Major Muhammad. El Fiki was interviewed at a remote location
in the facility and was observed from a conference room via closed
circuit television. Internal Revenue Service-Criminal
Investigations(IRS-CI) SA Colleen Anderson and FBI Cairo ALAT Nael
Sabha were also present in the conference room observing the
interview, as was SSIS Major Ahmed Maher who acted as translator
during the interview. El Fiki was previously interviewed by the
SSIS pursuant to receiving questions via EC from Portland FBI.  On
1/30/05, a meeting was held at SSIS' downtown offices to discuss
the specific questions that would be posed to El Fiki by SSIS
investigators.

        (U) During the aforementioned meeting, the SSIS advised
they conducted extensive investigation into El Fiki's finances.
They advised El Fiki has donated upwards of approximately 35
million Egyptian Pounds(converted to U.S. dollars using conversion
rate of 5.87 Egyptian pounds to the dollar, is equivalent to
approximately $5.9 million), during his lifetime to various
charitable causes throughout Egypt. He has been primarily involved
in the construction of, and the purchase of equipment for hospitals
in Egypt. He prefers to use his money to build facilities or to
purchase specific equipment as opposed to donating cash.

        (U) El Fiki has no interest in seeking publicity for his
philanthropy and deflects inquiries about his charitable works. He
has never had a hospital named after him. He typically directs
hospital administrators in charge of naming their facilities to use
the names of honored deceased individuals to name the buildings.
Earlier in his life El Fiki donated approximately 10% of his income
to Zakat. Investigation conducted by SSIS revealed that later in
life El Fiki donates approximately 80% of his income to charity.

        (U) El Fiki is an engineer who received a Ph.D in
Engineering from Sofia University in Sofia, Bulgaria. El Fiki owns
and operates the Cairo Construction Company(CCC). CCC was, and
continues to be a prominent builder of hospitals in Egypt. The
company has been involved numerous large building projects
throughout Egypt.

---

Investigation on   1/31/05        at  Nasr City, Egypt

File #  315N-PD-45427                    Date dictated  2/9/05

by    SA David A.   Carroll

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.  000041

000041 GOV

FD-302a (Rev. 10-6-95)

315N-PD-45427

Continuation of FD-302 of ___Mahmoud Talaat El Fiki_____ , On _1/31/05___ , Page ___2___

    (U) El Fiki maintains money in bank accounts in CIB, Egypt, as well as in various institutions in Cairo, Alexandria, Egypt, the Bank of Kuwait in London, England and the United Arab Emirates(UAE).

    (U) El Fiki advised he became aware of Al Haramain Islamic Foundation through his son, Sharif El Fiki. S. El Fiki attended the Hajj in Saudi Arabia in 2000. Upon S. El Fiki's return to Egypt he was carrying flyer's prepared by the Al Haramain Islamic Foundation soliciting donations for providing humanitarian aid to Chechnyan widows, orphans and refugees. El Fiki advised his son showed him the flyer when he came home from the Hajj. The flyer depicted various photos of conditions in Chechnya and included photos of women and children.

    (U) El Fiki checked with his contacts in Saudi Arabia to determine AHF's reputation. He also consulted with his friend and employee, Mohammed Salat, about AHF's reputation. Salat had contacts in Saudi Arabia and made inquiries about the foundation. Salat reported to El Fiki that the foundation had a good reputation for providing humanitarian aid and recommended making the contribution. El Fiki's other associates in Saudi Arabia also vouched for Al Haramain as being a reputable organization.

    (U) After seeing the flyer, consulting his associates and accessing AHF's website, El Fiki made the decision to donate $150,000 to the cause of supporting widows, orphans and refugees in Chechnya. After making the decision, he contacted AHF via email through their website, AlHaramain.Org., and advised the foundation of his desire to donate $150,000. El Fiki received a response via email indicating the foundation's appreciation for his financial support. In AHF's responding email, El Fiki was provided two bank accounts as an alternative for submission of the donation.

    (U) The first option was an AHF account at the Bank of America(BOA) in Ashland, Oregon. The second was an AHF account at Al Rajhi Banking & Investment Corporation in Riyadh, Saudi Arabia. Subsequent to the completion of El Fiki's interview, the SSIS investigators allowed the interviewing agents the opportunity to view El Fiki's email to AHF indicating his desire to donate to the widows, orphans and refugees in Chechnya. They also presented for display the AHF responding email thanking El Fiki for his support and directing him to wire the money to one of the two aforementioned accounts. The SSIS advised the FBI would be provided with copies of these documents at a later date.

000042 GOV

FD-302a (Rev. 10-6-95)

315N-PD-45427

Continuation of FD-302 of _____Mahmoud Talaat El Fiki_____ , On __1/31/05__ , Page ___3___

    (U) El Fiki advised he chose to send his donation to the
Bank of America account provided in AHF's response because the bank
was more well known and he had more confidence in the United States
banking system than the banks in Saudi Arabia. El Fiki contacted
the Bank of Kuwait in London, England and directed them to wire
transfer $150,000 to the aforementioned AHF account at the BOA in
Ashland, Oregon. In directing the Bank of Kuwait to wire the money,
El Fiki requested, and received a receipt, indicating the cost of
the transaction was $40.00. SSIS also presented this receipt for
review by writer and SA Anderson.

    (U) El Fiki advised the donation was for Zakat to support
widows and orphans. After making the donation, a month passed and
El Fiki had not received an acknowledgment from AHF indicating the
foundation received the money. El Fiki was unaware that $21,000 of
the $150,000 he donated to AHF ended up in Soliman Albuthe's
personal bank account. El Fiki did not know Albuthe and had never
heard of him. This disturbed El Fiki and he therefore sent another
email requesting acknowledgment of the donation. In response to El
Fiki's inquiry about the delay in AHF's acknowledging his donation,
the foundation sent him an email directing him to contact Salat. El
Fiki was told Salat had the receipt for the donation.

    (U) El Fiki advised he never had any telephonic contact
with anyone at AHF, nor has ever spoken with anyone employed by the
foundation. AHF did not return any of the money to him and
questioned the interrogator as to why would they return money to
him. El Fiki had no idea how his donation was actually spent. He
advised he had no method or means to determine how the money was
specifically spent. El Fiki was unaware if the money was spent on
Chechnyan mujahedin. He reiterated that he would have no way of
knowing how the money was actually spent.

    (U) SSIS personnel indicated El Fiki provided the
following time line of events regarding his contact with AHF.

    January 11, 2000 - El Fiki's first contact with AHF via
email through their website.

    Approximately within a week's time of 1/11/00, AHF
responded providing the two choices of bank accounts available to
receive donations.

000043 GOV

FD-302a (Rev. 10-6-95)

315N-PD-45427

Continuation of FD-302 of _____Mahmoud Talaat El Fiki_____, On _1/31/05_ , Page __4__

     Approximately within a week after receipt of response from AHF, El Fiki directs his bank to wire the money to the BOA in Ashland, Oregon.

     February 20, 2000 - El Fiki's follows up with an email to AHF inquiring as to why he has not received acknowledgment of his donation.

     March 23, 2000 - El Fiki resends his email asking for a receipt for his donation.

     Thereafter, El Fiki received a letter from his bank confirming the transfer.

     El Fiki subsequently received an AHF receipt through Salat indicating the cash was received by the foundation.

     El Fiki's last contact with AHF was the March 23, 2000 email seeking confirmation and acknowledgment that his donation was received.

     (U) El Fiki described another charity he provided money to during the period 1997-2000. The organization employed approximately 250 people. El Fiki's accountant told him his contributions to this charity were being wasted on unnecessary employees and not properly spending the money on children as promised. The information provided by his accountant caused him to more closely scrutinize to whom he provided financial support. This information also showed him how difficult it is to monitor funds donated to any organization. El Fiki ultimately stopped giving to his particular charity because it was abusing his trust and donations.

     (U) El Fiki advised he donated $150,000.00 in three separate installments of $50,000.00 each to the Islamic Center of Southern California(ICSC), located at 434 South Vermont Ave, Los Angeles, California. These funds were also sent to an account maintained at the Bank of America. These donations occurred in February and April, 1995. This money went towards establishing a new school at the facility. The school was known as "The Straight Path." El Fiki's connection to the ICSC was through his association with Dr. Hassan Hatout. El Fiki knew Hatout from their time together in Kuwait. Hatout is a gynecologist practicing in Los Angeles. El Fiki last donated money to the ICSC in 1996. El Fiki

000044 GOV

FD-302a (Rev. 10-6-95)

315N-PD-45427

Continuation of FD-302 of ___Mahmoud Talaat El Fiki___ , On _1/31/05_ , Page ___5___

remains in contact with Hatout and described meeting him once a
year in Kuwait.

      (U) El Fiki donated money to an Islamic Center in Cairo
that is run by Dr. Abdul Gafar(phonetic). El Fiki recalled an
Egyptian student named Mohammad Turki that solicited him for
donations for a mosque in the United States. Turki called in
approximately mid-2001 after the events of 9/11/01. Turki's father
worked with El Fiki in Kuwait. El Fiki had doubts about what the
money would be used for and declined to donate. He has never heard
from Turki since that time.

000045 GOV