```
                IN THE UNITED STATES DISTRICT COURT

                     FOR THE DISTRICT OF OREGON

                            EUGENE DIVISION

UNITED STATES OF AMERICA,       )    Cr. No. 05-60008-HO
                                )
            Plaintiff,          )    ORDER
                                )
       v.                       )
                                )
PIROUZ SEDAGHATY, et al.,       )
                                )
            Defendants.         )
_____)
```

On May 3, 1998, the United States and the Arab Republic of Egypt signed a Mutual Legal Assistance Treaty (MLAT) which entered into force on November 29, 2001. Defendant seeks a court order requiring the government to use the MLAT process and its resources to assist him in securing necessary witnesses and documents overseas. Alternatively, defendant seeks issuance of a letter rogatory to the Arab Republic of Egypt to obtain the presence of

witnesses at trial or to take depositions of the witnesses in their home country or elsewhere.

Defendant sets out the following background:

Mr. Sedaghaty is named in the first two counts of a three count Indictment. The essence of the charges against him is that he conspired with Soliman Al Buthe to hide the fact Mr. Al Buthe took money from the United States to Saudi Arabia in order to give it to Chechen mujahadeen and falsified his tax return to cover up that transaction. During the pretrial process, the government has advised that two government counsel traveled to the Russian Federation with government law enforcement agents as part of their investigation in this case and obtained documents from Russian Federation officials. The government has also advised that it intends to offer at trial documents obtained from the Russian Federation and present a witness from the Russian Federal Security Bureau. The discovery provided by the government appears to reveal that it used the MLAT (002850 GOV) and Letter Rogatory (002288 GOV) process in order to obtain documents and witnesses from the Russian Federation.

In addition, the discovery contains an FBI 302 report of an interview conducted with Mr. Mahmoud Talaat Hassan El Fiki (the donor of the money in question) in Egypt.... It is not clear, however, what process was used by the government to obtain the cooperation of the Egyptian government. The interview report makes clear, however, that the Egyptian government was cooperating. Indeed, its agents conducted the interview. The discovery and tentative witness and exhibit lists also contain reference to an Al Haramain Islamic Foundation, Inc. custodian of records and documents produced in Saudi Arabia. With respect to these documents, the discovery does not reveal what process the government has, or intends to use, to obtain these documents and witnesses.

From the discovery produced by the government and through his own investigation, Mr. Sedaghaty has developed exculpatory information in Egypt. This exculpatory information is in the form of both witnesses and documents. The essence of the information Mr. Sedaghaty has reviewed and seeks to obtain as competent evidence for trial purposes involves testimony that the donation from Mr. El Fiki was intended for humanitarian purposes,

> he engaged in due diligence before making the donation, the choice to wire the donation to the United States was benign and entirely Mr. El Fiki's, and that he sought and was provided confirmation about receipt and use of his donation. Other witnesses in Egypt have information that Mr. Sedaghaty objected to the activities of certain people who worked at the Al Haramain offices and that the disagreement led to the departure of several of those individuals from Al Haramain. Review of the government's case reveals that much of its evidence with respect to the alleged agreement and alleged willfulness of Mr. Sedaghaty's actions rests on hearsay, inference, assumption, and innuendo. While such evidence should be weak, and we believe is entire lacking in substance, the reality of this case is that the nature of the charges and our client's ethnicity and religion place him at an extreme disadvantage. In these circumstances, it is critical that all of the resources of the Court and the government be made available to Mr. Sedaghaty to produce direct eyewitness testimony and exhibits that directly refute the government's allegations.
>
> The specific individuals and documents of which Mr. Sedaghaty is currently aware and for which he invokes the authority of the Court and seeks its assistance in Egypt are:
> 1. Mr. Mahmoud Talaat Hassan El Fiki.
> 2. Mr. Sharif El Fiki, Mr. El Fiki's son.
> 3. Mr. Mohammed Salat, Mr. El Fiki's employee.

The government adds additional facts regarding the interview of El-Fiki:

> In January 2005, Mahmoud El-Fiki was interviewed in Egypt by an officer of the Egyptian security service. Investigative agents in this case from the FBI and IRS had previously met with the Egyptian officer to discuss their investigation and to suggest questions for El-Fiki. The U.S. agents were allowed to observe the interview via closed circuit television, but they were not allowed to meet with El-Fiki or to question him directly. During this interview, El-Fiki claimed that he thought his $150,000 donation was for widows, orphans, and refugees in Chechnya, although he never spoke to anyone at Al-Haramain about the donation. An FBI "302" report of interview ... was prepared describing the Egyptian interview of El-Fiki. This report was provided to the

defense when the first batch of discovery was delivered to counsel in December 2007.

In this case, the government alleges that:

On March 9, 2000, Al-Buthe flew to Ashland to retrieve the funds. Defendants Sedaghaty and Al-Buthe went to the Bank of America and obtained 130 American Express Travelers checks in $1,000 denominations and a $21,000 cashier's check made out to Al-Buthe. On March 12, 2000, Al-Buthe departed the United States, carrying the travelers checks. When he left, Al-Buthe did not file a Currency and Monetary Instrument Report, acknowledging he was leaving the country with more than $10,000 in currency as required by law. The travelers checks and the cashier's check were later cashed at a bank in Saudi Arabia. In October 2001, defendant Sedaghaty filed Al-Haramain USA's tax return for the year 2000 which covered up this transaction by falsely reporting that these funds were used to purchase a prayer house in Missouri, or returned to their original donor. However, evidence obtained in the investigation may show that Al-Haramain USA, Sedaghaty and Al-Buthe intended on using the money to support the mujahideen fighting the Russian government in Chechnya.

Defendant argues that the government should be compelled to utilize the MLAT with the Arab Republic of Egypt to facilitate witness appearances, or that the court should issues letters rogatory to secure court testimony.

A.   MLAT

Defendant argues that because the government has utilized the MLAT process, due process requires that a similar process be made available to defendant.  Defendant further argues that if the process is not made available, then the evidence obtained by the government through such means must be excluded.  Defendant cites the Sixth Amendment to the United States Constitution for such a novel proposition.  Defendant also cites Ninth Circuit cases in which government refusals to grant immunity to defense witnesses who would directly contradict government witnesses who were granted immunity, could constitute prosecutorial misconduct.  See, e.g., United States v. Westerdahl, 945 F.2d 1083, 1086-87 (9th Cir. 1991); United States v. Straub, 538 F.3d 1147, 1156-65 (9th Cir. 2008).[1]

Defendant maintains that the witnesses it seeks through the MLAT process will provide directly contradictory testimony to government witnesses, i.e., that El-Fiki, El-Fiki's son and an El-Fiki employee will establish that there is nothing sinister about the donation, the manner in which it was made, and the routing of it to the United States.[2]

---

[1] The theory is that the government cannot utilize its exclusive process (such as granting immunity or utilizing an MLAT) in such a manner so as to distort the fact-finding process.  Defendant also maintains that the government has utilized the MLAT process in the past to assist defendants in other cases.  However, there appears to be no cases in which the government has actually followed through in utilizing an MLAT in such a manner.

[2] The court is not convinced that such evidence contradicts the assertion that defendant and Al Buthe routed the donation to the mujahideen or that falsified tax documents were filed.  Such

Page 5

Defendant also argues that if the court orders the government to utilize the MLAT, then it should also order an attorney and investigator within the United States government to act on Mr. Sedaghaty's behalf in a manner in which they are "walled off" from the attorneys and investigators directly involved in this prosecution.

In the United States, the implementation and operation of MLATs is the responsibility of the Executive Branch. The Attorney General has delegated the Central Authority function to Criminal Division officials in the Office of International Affairs (OIA). As a result, OIA serves as the Central Authority for the United States and administers the MLATs. As the Central Authority for the United States, OIA has complete discretion to make MLAT requests. OIA can and does decline to make requests that fail to meet the treaty standards or that have the potential to negatively impact other cases or other foreign policy considerations. OIA shares this responsibility with neither the judiciary nor the legislature.

Private persons are not parties to or intended beneficiaries of MLATs. Indeed, most MLATs (including the U.S./Egypt MLAT at issue here) explicitly exclude private persons from using them. <u>See, e.g.</u>, U.S./Egypt MLAT, which specifies that:

> This Treaty is intended solely for mutual legal assistance between the Contracting Parties [defined as the Governments of the United States and the Arab

---

evidence certainly does not contradict the failure to report the money leaving the country.

Republic of Egypt]. The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress or exclude any evidence or to impede the execution of a request.

Defendant contends there are no cases on point, at least in which the principles of Westerdahl are discussed. Courts considering the issue have declined to compel the government to use an MLAT to obtain evidence for the defense.[3] See, e.g., United States v. Jefferson, 594 F. Supp. 2d 655, 674 (E.D. Va. 2009) (emphasis added):

> By its plain terms, the U.S.-Nigeria MLA Treaty limits assistance to the "Contracting Parties," which it defines as the "Government of the United States of America and the Government of the Federal Republic of Nigeria." The treaty additionally expressly provides that only the two governments, and not private parties, can make use of its provisions: "This Treaty is intended solely for mutual legal assistance between the Parties. The provisions of this Treaty shall not give rise to a right on the part of any private party to obtain, suppress, or exclude any evidence, or to impede the execution of a request." As a result, courts have consistently held that MLA Treaties with such clauses "**create[] no rights in individual defendants to force the government to request evidence under the MLA treaty procedures**." It is thus clear that defendant, as a private party, is not entitled to use the MLA Treaty process himself or force the government to use the treaty on his behalf.

Moreover, the Jefferson court also noted that foreclosing the use of an MLAT for a defendant's benefit did not violate the Sixth

---

[3] There is an unpublished decision in United States v. Sindona in New York in which the court ordered the Department of Justice to make a US-Switzerland MLAT request to obtain records from Swiss banks. Even assuming this was a power the court had, that particular MLAT did not contain the language explicitly stating that it provides no rights for private citizens to compel testimony.

Page 7

Amendment right to compulsory process, noting that "[t]he compulsory process right is circumscribed . . . by the ability of the district court to obtain the presence of a witness through service of process" and that the process power of the district court does not extend to foreign nationals abroad.  Id. at 674. The court found that the right to compulsory process extends only to forms of process a court can issue of its own power and "not to forms of process that require the cooperation of the Executive Branch or foreign courts." Id. at 674-675.

Another court has noted, "[i]t is thus not unfair to allow the Government to use the MLAT procedure any more than it is unfair to allow the Federal Bureau of Investigation agents to interview witnesses in this country." United States v. Blech, 208 F.R.D. 65, 69 (S.D.N.Y. 2002).  A defendant's inability to use an MLAT does not violate a defendant's constitutional rights. Id.; see also Jefferson 594 F. Supp. 2d at 674-675.

In Westerdahl, the Ninth Circuit found that

> A criminal defendant is not entitled to compel the government to grant immunity to a witness. United States v. Shirley, 884 F.2d 1130, 1133 (9th Cir.1989). We have recognized an exception to this rule in cases where the fact-finding process is **intentionally distorted by prosecutorial misconduct**, and the defendant is thereby denied a fair trial. United States v. Lord, 711 F.2d 887, 892 (9th Cir. 1983).
>
> In order to make out a claim for prosecutorial misconduct, a defendant must show that the evidence sought from the nonimmunized witness was relevant and that the government distorted the judicial fact-finding process by denying immunity to the potential witness. ...

>    If a defendant makes an "unrebutted prima facie showing
>    of prosecutorial misconduct that could have prevented a
>    defense witness from giving relevant testimony," we will
>    remand the case to the district court to determine at an
>    evidentiary hearing whether the government intentionally
>    distorted the fact-finding process.

Westerdahl, 945 F.2d at 1086 (emphasis added).[4]

There is no comparable exception articulated in an MLAT context.  It is the OIA who has complete discretion to make (or to not make) MLAT requests and so many more considerations go into making such requests beyond any given criminal case including diplomatic relations.  The court declines to extend the exception developed in the immunity context to an MLAT context, particularly where the government may have national security and sensitive

---

[4]The Westerdahl court further noted:
Decisions on prosecutorial misconduct have focused on whether the government or its agents took affirmative actions to prevent defense witnesses from testifying. Jeffers, 832 F.2d at 479 (prosecutor did not make threat to defense witness which caused him to invoke fifth amendment or immunize government witnesses to distort factual picture); United States v. Paris, 827 F.2d 395, 401 (9th Cir. 1987) (evidence did not "support the proposition that the government intentionally caused DePalm to invoke his Fifth Amendment privilege"); United States v. Patterson, 819 F.2d 1495, 1506 (9th Cir. 1987) (defense failed to show that "prosecution created defense witness unavailability"); United States v. Touw, 769 F.2d 571, 573 (9th Cir. 1985) (prosecutor did not threaten or mislead defense witness by stating to judge that "there will be a complaint waiting for him at the door of the courtroom" if witness testified as planned); Lord, 711 F.2d at 891 (prosecutor told witness that whether he would be prosecuted "depended on his testimony"); United States v. Garner, 663 F.2d 834, 839-40 (9th Cir. 1981), cert. denied, 456 U.S. 905, 102 S.Ct. 1750, 72 L.Ed.2d 161 (1982) (no due process violation where defendant does not prove that exculpatory evidence was suppressed by government). However, misconduct is not confined solely to situations in which the government affirmatively induces a witness not to testify in favor of a defendant.
Westerdahl, 945 F.2d at 1086-87.

Page 9

intergovernmental relation issues to contend with. Taking a <u>Westerdahl</u> approach in this area would constitute one branch of government intruding too far into the exclusive province of another. This is especially true since the treaty itself specifically states that its provisions shall not give rise to a right on the part of any private person to suppress or exclude any evidence. Further, there is an additional means to obtain evidence that defendant can utilize, and that is a letter rogatory.

B. <u>Letters Rogatory</u>

Alternative to his MLAT motion, defendant seeks to use letters rogatory to secure the depositions of El-Fiki, his son and his employee. Defendant maintains that exceptional circumstances exist requiring that El-Fiki be deposed as he believes it would be highly exculpatory to central issues and there are no alternative witnesses.

The court has the inherent power to issue letters rogatory. <u>United States v. Staples</u>, 256 F.2d 290, 292 (9th Cir. 1958). Letters rogatory are the means by which a court in one country requests the court of another country to assist in the administration of justice by taking depositions. <u>United States v. Rosen</u>, 240 F.R.D. 204, 215 (E.D.Va. 2007). The decision to issue letters rogatory lies within a court's sound discretion. <u>See</u> <u>United States v. Mason</u>, 919 F.2d 139 (4th Cir. 1990). Letters rogatory

should be issued only where necessary and convenient. <u>Rosen</u>, 240 F.R.D. at 215.

Letters rogatory are a complicated, dilatory and expensive system. <u>Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for Southern Dist. of Iowa</u>, 482 U.S. 522, 531 (1987).

> [D]elay attends the letters rogatory process and counsels against issuance. ... [But] such delay would be justified if necessary to ensure a fundamentally fair trial for defendants....

Depositions in criminal proceedings, unlike their civil counterparts, are disfavored. <u>See</u> <u>United States v. Drogoul</u>, 1 F.3d 1546, 1551 (11th Cir. 1993). Specifically, depositions are permitted only "because of exceptional circumstances and in the interests of justice" for the purpose of "preserv[ing] testimony for trial." Fed.R.Crim.P. 15. Courts should grant depositions only "if it appears that (a) the prospective witness will be unable to attend or be prevented from attending the trial, (b) the prospective witness' testimony is material, and (c) the prospective witness' testimony is necessary to prevent a failure of justice." Fed.R.Crim.P. 15 Advisory Committee Note. In addition, the Ninth Circuit has considered whether the deponent would be available at the proposed location for deposition and would be willing to testify. <u>United States v. Olafson</u>, 213 F.3d 435, 442. The court should also consider whether the safety of United States officials would be compromised by going to the foreign location. <u>Id</u>. But if

these criteria are satisfied, the depositions should be ordered, assuming appropriate compulsory process is available.

As noted above, it does not appear the hoped for El-Fiki testimony that he intended the donation for legitimate charitable purposes and not to fund the Chechnyan mujahideen necessarily contradicts that defendant and Al Buthe routed it to the mujahideen or that tax documents were falsified.  The testimony certainly does not refute the failure to report the money leaving the country.  El-Fiki has previously stated in interviews with Egyptian officials that he never heard of Al-Buthe and he did not even mention Sedaghaty.  El Fiki also stated he had no idea how his money was actually spent or if it went to the Chechnyan mujahideen.

The circumstances do not justify ordering the deposition.  In addition, given the late stage of the proceedings, the likely delay in going to trial is not justified.  Defendant knew of the El-Fiki statements two years ago and has only now moved for issuance of letters rogatory.

## CONCLUSION

For the reasons stated above, defendant's motion to compel the government to utilize the mutual legal assistance treaty and/or to issue letters rogatory (#238) is denied.

DATED this __26th__ day of January, 2010.

                                                          s/ Michael R. Hogan
                                                          United States District Judge