KENT S. ROBINSON, OSB #09625
Acting United States Attorney
District of Oregon
**CHRISTOPHER L. CARDANI**
Assistant United States Attorney
405 East 8th Avenue, Suite 2400
Eugene, OR 97401
chris.cardani@usdoj.gov
Telephone:  (541) 465-6771
**CHARLES F. GORDER, JR.**, OSB #91287
charles.gorder@usdoj.gov
**RYAN W. BOUNDS**, OSB #00012
ryan.bounds@usdoj.gov
Assistant United States Attorneys
1000 S.W. Third Ave., Suite 600
Portland, OR  97204
Telephone:  (503) 727-1000
        Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CR 05-60008-02-HO** |
| **v.** | |
| **PIROUZ SEDAGHATY,** | **MEMORANDUM IN SUPPORT OF** |
| | **THE MOTION OF THE UNITED** |
| **Defendant.** | **STATES TO COMPEL COMPLIANCE** |
| | **WITH JULY 17, 2009, SUBPOENA** |
| **In re AL RAJHI BANK SUBPOENA** | **ISSUED PURSUANT TO 31 U.S.C.** |
| | **§ 5318(k)** |
| **AL RAJHI BANKING &** | |
| **INVESTMENT CORP,** | |
| **Real party in interest** | |
| **Respondent.** | |

The United States of America, by and through Kent S. Robinson, Acting United States Attorney for the District of Oregon, by Assistant United States Attorneys Charles F. Gorder, Jr., Christopher L. Cardani and Ryan W. Bounds, files this motion to compel Al Rajhi Banking & Investment Corporation ("the Bank") to comply with a lawfully issued administrative subpoena served on the Bank on July 27, 2009.  The Bank does not challenge service of the subpoena through its registered agent but refuses to comply and, citing various grounds, seeks to quash the subpoena through an ancillary proceeding that the Bank initiated in the United States District Court for the District of Columbia on January 19, 2010.  For the reasons set forth below, this Court should order the Bank to comply with the subpoena.

## I.    Factual Overview

Defendant Pirouz Sedaghaty awaits trial before this Court on charges of conspiring to defraud the United States and filing a false return with the Internal Revenue Service ("IRS") on behalf of the Al-Haramain Islamic Foundation ("AHIF").

### A.    *The Charged Conduct*

AHIF, a non-governmental organization headquartered in Riyadh, Saudi Arabia, first established a presence in the United States in 1997.[1]  In October 1997, AHIF designated Soliman Hamd Al-But'he, through a power of attorney, as its lawful representative in the United States.  At approximately the same time, he and defendant Sedaghaty registered AHIF as an assumed business name with the Oregon Secretary of State with a principal place of business in the United States in Ashland, Oregon.

---

[1]     AHIF's publicly stated purpose was to distribute Islamic aid and educational material, but the Saudi government dissolved the organization in 2004.

**PAGE 2 -     MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

Defendant Sedaghaty later established AHIF in 1999 as a corporation in the State of Oregon, thus becoming the Al-Haramain Islamic Foundation, Inc.  The organization's articles of incorporation indicated that the corporation was organized as a public benefit corporation, established exclusively for religious, humanitarian, educational, and charitable purposes.

AHIF bank records and other documents show that an individual in Egypt donated US$150,000 to Al-Haramain by means of an AHIF bank account in Oregon as "zakat" in order "to participate in your nobel [sic] support to our muslim brothers in Chychnia."  In March 2000, Al-But'he flew from Riyadh, Saudi Arabia, to Oregon, where he  went with defendant Sedaghaty to an Ashland, Oregon, branch of Bank of America and withdrew the US$150,000 in the form of 130 US$1,000 American Express traveler's checks and one US$21,000 cashier's check.

Al-But'he then took all of those checks to Riyadh, Saudi Arabia, without disclosing that he was departing the United States with the US$130,000 in traveler's checks, in violation of 31 U.S.C. §§ 5316(a)(1)(A), 5322.  Al-But'he deposited the Bank of America cashier's check at the Bank in account number 140608010109206 and apparently cashed the traveler's checks at the same time. Defendant Sedaghaty later filed a return with the IRS, mischaracterizing Al-Haramain's use of the donated funds.  Specifically, defendant Sedaghaty falsely reported on Al-Haramain's 2000 return that US$130,000 of the funds in question were used to purchase a mosque in Springfield, Missouri, and that the remaining sum of US$21,000 was returned to the donor.

Al-Haramain in both Saudi Arabia and Oregon strongly supported the cause of mujahideen fighters in Chechnya in the years 1999 and 2000.  The foregoing activities demonstrate that defendant Sedaghaty conspired with Al-But'he to defraud the United States by covertly removing the funds from the United States, failing to declare the funds, and filing a false 2000 return on behalf

**PAGE 3 -    MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

of Al- Haramain in order to hide the fact that the organization intended to distribute the funds to the Chechen mujahideen in contravention of U.S. law.[2]

A grand jury in the District of Oregon indicted defendant Sedaghaty, as well as Soliman Hamd Al-But'he and AHIF, on February 17, 2005. Defendant Sedaghaty was arrested on August 15, 2007. The trial date in this matter was initially set for April 16, 2008, but has been continued several times and is now set for June 7, 2010.[3]

B.    *The Subpoena*

On July 17, 2009, the undersigned Acting United States Attorney for the District of Oregon, Kent S. Robinson, served an administrative subpoena on the Bank, which maintains no offices in the United States,[4] pursuant to 31 U.S.C. § 5318(k)(3)(A)(I), which provides:

> The Secretary of the Treasury or the Attorney General may issue a summons or subpoena to any foreign bank that maintains a correspondent account in the United States and request records related to such correspondent account, including records maintained

---

[2]    In September 2004, the U.S. Treasury Department, Office of Foreign Assets Control, designated the Oregon branch of the Al-Haramain Islamic Foundation and Al-But'he personally as "Specially Designated Global Terrorists." The United Nations has also issued a designation of Al-Haramain.

[3]    The United States has since dismissed the charges against AHIF; Al-But'he is a fugitive.

[4]    *See* February 1, 2010, Declaration of AUSA Christopher L. Cardani [hereinafter "Cardani Decl."], Ex. C (Memorandum of Points and Authorities in Support of Petitioner's Motion To Quash USA Patriot Act Subpoena [hereinafter "Resp't's Mem."]) at 2-3.
The Bank conducts operations in the United States through so-called "correspondent accounts," which permit a foreign financial institution to make and receive payments directly through banks in the United States. *See* 31 U.S.C. § 5318A(e)(1)(B).

**PAGE 4 -    MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

outside the United States relating to the deposit of funds into the foreign bank.[5]

The subpoena demanded the production of a variety of "[a]uthenticated copies of certified bank records[] belonging to Soliman Al-But'he," including "[r]ecords pertaining to the cashing of 130 $1,000 American Express Traveler's checks by Soliman Al-But'he in March of 2000 at Al Rajhi Bank" as well as "[r]ecords pertaining to the deposit and any subsequent disposition of a Bank of America cashier's check, check number 1001040568, issued to Soliman Al-But'he on March 11, 2000, for $21,000." (Cardani Decl. Ex. B.)

The Acting United States Attorney sought the records in part to establish in defendant Sedaghaty's trial the actual disposition of the US$150,000 that AHIF received from the Egyptian donor after Al-But'he returned to Saudi Arabia. (Cardani Decl. ¶ 2; Resp't's Mem. at 19 ("[I]t is obvious that the government seeks to use its administrative subpoena power to collect evidence for trial.").) The initial return date on the subpoena was thus set for August 28, 2009. In light of ongoing negotiations with the Bank over the voluntary production of the documents at issue and the continuance of the trial date in this matter, the U.S. Attorney's Office agreed to defer the return date until January 29, 2010. (Cardani Decl. ¶¶ 4, 6.)

C.    *The Bank's Motion To Quash*

The Bank, however, failed to produce any responsive documents by the deferred return date. Instead, the Bank initiated a new proceeding in the United States District Court for the District of

---

[5]    By Delegation Order Number 2860-2007, the Attorney General on January 18, 2007, delegated "to the Assistant Attorney General [of the Criminal Division] and to the United States Attorneys, subject to the approval of the Criminal Division pursuant to § 9-13.525 of the United States Attorneys' Manual, the authority . . . to issue" subpoenas under this provision. (Cardani Decl. Ex. A.)

**PAGE 5 -     MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

Columbia on January 19, 2010, for the sole purpose of moving to quash the subpoena.  (Cardani Decl. ¶ 7; Resp't's Mem. at 9 (refusing to waive personal jurisdiction in the United States).) Although the Bank conducts no operations in the District of Columbia and maintains no correspondent relationships with any other bank chartered there, the Bank contends that its motion to quash the subpoena is properly heard in the District of Columbia because the Attorney General is named as a respondent in the Bank's pleading.  (Resp't's Mem. at 3 n.1, 10.)

II.     **This Court Should Enforce the Subpoena Directed to the Bank.**

The United States seeks an order from this Court compelling the Bank's compliance with the subpoena, which was duly served on the Bank in furtherance of a criminal prosecution pending before this Court. *See, e.g.*, *Vanguard Int'l Mfg. Corp. v. United States*, 588 F. Supp. 1289, (S.D.N.Y. 1984) (issuing order enforcing administrative subpoena for overseas bank records of foreign corporation in connection with investigation of U.S. taxpayer); *Garpeg Ltd. v. United States*, 583 F. Supp. 789 (S.D.N.Y. 1984) (same).

A.      *The Subpoena Clearly Satisfies the Standard for Judicial Enforcement.*

The Supreme Court set forth the standard for judicial enforcement of administrative subpoenas more than half a century ago in *United States v. Morton Salt Co.*, 338 U.S. 632 (1950). In that case, the Court affirmed the constitutional validity of administrative subpoenas and held that a demand for documents by a government agency (there the Federal Trade Commission) is presumptively lawful if "the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant."  *Id.* at 652.  The Court has continued to apply a deferential standard in reviewing administrative subpoenas and analogous investigative tools since *Morton Salt*.  *See, e.g.*, *United States v. Stuart*, 489 U.S. 353, 360 (1989) (noting that the

**PAGE 6 -**      **MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

IRS is "entitled to an enforcement order" if it has demonstrated that the summons in question was issued for a "legitimate purpose" and is "relevant to the purpose" and that the "administrative steps required by the Code have been followed").

Accordingly, the Ninth Circuit has repeatedly emphasized that "[t]he scope of [its] inquiry in an agency subpoena is narrow." *FDIC v. Garner*, 126 F.3d 1138, 1142 (9th Cir. 1997) (quoting *NLRB v. North Bay Plumbing, Inc.*, 102 F.3d 1005, 1007 (9th Cir.1996)). A court must ask: "(1) whether Congress has granted the authority to investigate; (2) whether procedural requirements have been followed; and (3) whether the evidence is relevant and material to the investigation." *EEOC v. Children's Hosp. Med. Ctr. of N. Cal.*, 719 F.2d 1426, 1428 (9th Cir. 1983) (en banc). "If the agency establishes these factors, the subpoena should be enforced unless the party being investigated proves the inquiry is unreasonable because it is overbroad or unduly burdensome." *Id.*

The subpoena directed to the Bank easily satisfies the three criteria identified by the Supreme Court in *Morton Salt* and since repeatedly echoed by the Ninth Circuit. There can be no question that "Congress has granted the authority" to the Department of Justice and thereby to the Acting United States Attorney for the District of Oregon "to investigate" suspected acts of fraud and terrorism-related money-laundering. *Id.*; *see* 18 U.S.C. § 1956(a)(2) (establishing offense of laundering of monetary instruments). Nor is there any claim that the undersigned Acting United States Attorney failed to follow any "procedural requirements" in issuing the administrative subpoena or that the documents sought are insufficiently "relevant and material" to the investigation of the suspected offenses. *Id.* Indeed, the Bank faults the subpoena for being *too* "relevant and material," *id.*, protesting that it is "carefully tailored to obtain evidence to prove facts alleged in the indictment" of defendant Sedaghaty. (Resp't's Mem. at 20.)

**PAGE 7 -    MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

In sum, because the subpoena "is within the authority of the [Department of Justice], the demand is not too indefinite and the information sought is reasonably relevant," *Morton Salt*, 338 U.S. at 652, this Court should order the Bank to comply with the subpoena.

B.       *This Court Is in the Best Position To Assess the Validity of the Subpoena.*

Two threshold considerations militate strongly for this Court's assessing the validity of the subpoena in the first instance rather than deferring to the outcome of the ancillary proceeding initiated by the Bank in the District of Columbia.

First, the subpoena was issued by the Acting United States Attorney for this District in furtherance of an investigation into criminal conduct that occurred within this District. That conduct included most conspicuously the conspirators' suspicious withdrawal of the $150,000 donation at issue in readily negotiable monetary instruments and the filing of a fraudulent return for AHIF — an Oregon corporation — with the Internal Revenue Service.

Second, the Oregon-based investigation has been the source of extensive litigation before this Court. The litigation has involved extensive motions relating to the pending trial of defendant Sedaghaty, numerous discovery motions, and a number of motions filed under seal pursuant to the Classified Information Procedures Act ("CIPA").[6]  (Cardani Decl. ¶ 8.)  This Court's familiarity with the full scope of this litigation is particularly relevant in light of the Bank's suggestion that serving the subpoena on the Bank was an effort to sidestep any adverse ruling that this Court might

---

[6]       Numerous motions are currently pending before this Court, including Defendant's Motions To Suppress and To Compel Issuance of Letters Rogatory To Obtain Evidence in the Kingdom of Saudi Arabia. (Cardani Decl. ¶ 8.)

**PAGE 8 -      MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

issue on defendant Sedaghaty's suppression motion. (Resp't's Mem. at 7 ("As mentioned above, the Subpoena was issued four days after the suppression hearing . . . .").)

In sum, this Court is uniquely familiar with the procedural context of the subpoena and the relevance of the documents that the government seeks thereby. These considerations make this Court the most logical forum for reviewing — and enforcing — the subpoena. *Cf. NLRB v. Cooper Tire & Rubber Co.*, 438 F.3d 1198, 1200-01 (D.C. Cir. 2006) (noting that numerous statutes conferring administrative subpoena authority on federal agencies specify that applications to enforce such subpoenas shall be made "within the jurisdiction [in] which the inquiry is carried on" and holding that courts look to, inter alia, "the place where the subpoenas were issued[ and] the place where the [agency] determined that unlawful actions had occurred").

The Bank, in contrast, can point to no basis for initiating its ancillary proceeding in the District of Columbia, other than the Bank's improvidently naming the Attorney General and Secretary of the Treasury as "defendants." (Resp't's Mem. at 9-10.) Such artifice should not deter this Court from properly passing on the validity of the subpoena. *Cf. Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004) (holding that the District Court for the Southern District of New York did not have jurisdiction over a habeas petition filed by petitioner in military custody in South Carolina, despite petitioner's naming Secretary of Defense — over whom the district court did have jurisdiction — because the habeas statute requires naming the custodian with "day-to-day control" over the petitioner in order to serve "the important purpose of preventing forum shopping"). This is

**PAGE 9 -     MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

particularly true where, as here, the parties explicitly agree that the issues raised are intrinsically and inextricably intertwined with the ongoing criminal proceedings before this Court.[7]

III.    **The Bank's Arguments Against the Enforceability of the Subpoena Are Groundless.**

The Bank contends that the subpoena is invalid on three grounds. The Bank claims first that the statute authorizing the issuance of the subpoena is unconstitutional, because it "allows the government to circumvent judicial review of the enforceability of a subpoena." (Resp't's Mem. at 14-17.) The Bank argues next that the subpoena is defective even by the terms of the authorizing statute, because it is broader in scope than the statute itself permits and demands documents for an "improper purpose," to wit, their introduction as evidence in a criminal trial. (Resp't's Mem. at 17-20.) Finally, the Bank insists that the subpoena impermissibly demands that the Bank violate Saudi law. (Resp't's Mem. at 20-24.) These contentions are meritless.

A.    *The Statute Does Not Unconstitutionally Circumvent Judicial Review of Subpoenas.*

The Acting United States Attorney for the District of Oregon issued the subpoena pursuant to the statutory authority conferred by § 5318(k), which authorizes the issuance of a "subpoena to any foreign bank that maintains a correspondent account in the United States" for "records related

---

[7]    That the Bank's ancillary proceeding raises the same issues is of no moment, as the District Court for the District of Columbia may dismiss the Bank's action for affirmative relief on the ground that the Bank will have a full opportunity to air its objections to the subpoena before this Court on the instant motion to compel. *See, e.g.*, *Reisman v. Caplin*, 375 U.S. 440, 450 (1964) (affirming district court dismissal of separate suit for relief from IRS subpoenas on the ground that plaintiff-petitioners could air their objections by intervening before the IRS commissioner or in district court on Commissioner's motion to enforce the subpoenas).

The United States expects to file a motion in the district court in the ancillary proceeding in the District of Columbia, requesting that the court there dismiss the ancillary proceeding or abstain from ruling on the Bank's Motion To Quash pending this Court's review of the subpoena in the context of this enforcement proceeding.

to such correspondent account, including records maintained outside the United States relating to the deposit of funds into the foreign bank." 31 U.S.C. § 5318(k)(3)(A)(i).  The authority to demand foreign bank records by administrative subpoena was one of many new or expanded tools that Congress gave the Executive Branch to investigate and to disrupt transnational money laundering networks in the International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, which Congress enacted as Title III of the USA PATRIOT Act of 2001, Pub. L. 107-56, 115 Stat. 272 (2001).  In passing the law, Congress specifically found that "money laundering . . . [is] critical to the financing of global terrorism and the provision of funds for terrorist attacks."  *Id.* § 302(a)(2), 115 Stat. at 296.

In addition to authorizing the service of administrative subpoenas on foreign banks, § 5318(k) requires banks and other "covered financial institutions" in the United States to "terminate any correspondent relationship with a foreign bank not later than 10 business days after receipt of written notice . . . that the foreign bank has failed" either "to comply with a . . . subpoena" issued under this provision or "to initiate proceedings in a United States court contesting such . . . subpoena." 31 U.S.C. § 5318(k)(3)(C)(i).  Failure to terminate a correspondent relationship pursuant to this provision would subject a "covered financial institution" in the United States to "a civil penalty of up to $10,000 per day."  31 U.S.C. § 5318(k)(3)(C)(ii).

In arguing that § 5318(k) is unconstitutional, the Bank protests that the potential liability of banks in the United States for this civil penalty "impermissibly allows the government to circumvent judicial review of the enforceability of a subpoena and decide the issue itself." (Resp't's Mem. at 15.)  This is so, the Bank suggests, because recipients of these subpoenas would be forced either to comply with them or to suffer "the termination of [their] correspondent accounts in the United

**PAGE 11 -    MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

States." (Resp't's Mem. at 16.)  The Bank maintains that the statute thus violates a "constitutional requirement that a *judicial* determination of a subpoena's reasonableness be made prior to the imposition of any penalty for noncompliance."  (*Id.*)  This argument is factually and legally untenable.

1.    The Statute Plainly Contemplates Judicial Review Before
      Any Penalty May Be Imposed.

Although this is an issue of first impression, it is self-evident that the government must act through the courts — as with the instant motion to compel — in pursuing penalties against a foreign bank for failing to comply with an administrative subpoena issued under § 5318(k), because the statute does not authorize the government to take any direct action against the foreign bank whatsoever.  The only fine that § 5318(k) authorizes is one against "covered financial institutions" in the United States.[8]  The Bank focuses, therefore, on the prospect that such institutions might terminate their correspondent relationships with the noncompliant foreign bank at the government's behest.  The Bank then claims that the power to compel this deleterious result is unconstitutionally conferred on the Executive Branch, where it may be exercised without judicial oversight.  Contrary to the Bank's claim, however, the government cannot avoid judicial review of an administrative subpoena by forcing the termination of correspondent relationships under § 5318(k).

---

[8]    As a result, the Bank's protest that § 5318(k) violates the principle that government agencies must not "be invested with authority to compel obedience to [their] orders by a judgment of a fine or imprisonment" (Resp't's Mem. at 17 (quoting *ICC v. Brimson*, 154 U.S. 447, 486 (1894))) is wholly misplaced.

**PAGE 12 -    MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO
              COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

In at least two ways, subsection 5318(k) provides for courts to review the propriety of an administrative subpoena issued thereunder before the government may compel the termination of correspondent relationships with the recipient foreign bank. First, the statute *expressly provides* that the foreign bank may "initiate proceedings in a United States court" to contest the subpoena. 31 U.S.C. § 5318(k)(3)(C)(i)(II). Initiation of such proceedings forestalls any duty under that paragraph for U.S.-based "covered financial institutions" to terminate correspondent relationships with the foreign bank and permits the appropriate court to review the propriety of the subpoena at issue. At least until the court disposes of the challenge in the government's favor, there is simply no authority under § 5318(k) to seek the termination of the foreign bank's correspondent relationships in the United States or to take any other action against the foreign bank. *See* 31 U.S.C. § 5318(k)(3)(C)(i).[9]

Second, even where the foreign bank forgoes an affirmative challenge to the subpoena, the government must, as a practical matter, rely on judicial process to *compel* the termination of the bank's correspondent relationships with U.S.-based "covered financial institutions." To the extent that those institutions do not terminate their correspondent relationships with the foreign bank on their own volition, the government's only coercive authority under § 5318(k) is the exaction of the "civil penalty of up to $10,000 per day" under 31 U.S.C. § 5318(k)(3)(C)(ii). Recovery of that penalty would, as a practical matter, require a judicial proceeding. In opposing the government's collection efforts, a U.S.-based institution would have both the incentive and the opportunity to

---

[9]    The Bank enjoys the reprieve provided under this provision without regard to whether the specific court to which the Bank applies is the court that decides the enforceability of the subpoena in the first instance.

**PAGE 13 -    MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

challenge the administrative subpoena giving rise to its duty to terminate the correspondent relationship in question.  Such a defense would permit the court to pass on the propriety of the administrative subpoena before the government could "enforce" it even through this indirect measure.

> 2. **Foreign Banks Have No Constitutionally Protected Interest in Their Correspondent Relationships with U.S. Banks or in the Privacy of & Their Overseas Records.**

Even if the Bank were correct that § 5318(k) permitted the government to compel the termination of a foreign bank's correspondent relationships without judicial review of the administrative subpoena in question, enactment of such an enforcement mechanism would be well within Congress's expansive power "to regulate Commerce with foreign Nations."  U.S. Const. Art. I § 8.

As the Bank acknowledges, its contention that administrative subpoenas must be enforceable only through the courts is "grounded in the Fourth Amendment's guarantee against 'unreasonable searches and seizures.'" (Resp't's Mem. at 14.)  Administrative subpoenas issued under § 5318(k), however, may be directed only to a foreign entity — specifically "a foreign bank that maintains a correspondent account in the United States."  31 U.S.C. § 5318(k)(3)(A).  Because these subpoenas relate to regulation of foreign commerce, Congress's power to direct the means of their enforcement is at its apex, and, because the records at issue are under the control of a foreign entity outside of the United States, the broad Fourth Amendment protections interposed by the Bank are without precedent or support.

**PAGE 14 -    MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

It is well and long established that "[t]he power to regulate commerce with foreign nations is expressly conferred upon Congress, and, being an enumerated power, is complete in itself . . . ." *Buttfield v. Stranahan*, 192 U.S. 470, 493 (1904). As a result, "no individual has a vested right to trade with foreign nations which is so broad in character as to limit and restrict the power of Congress to determine what articles of merchandise may be imported into this country *and the terms upon which a right to import may be exercised*." *Id.* at 494 (emphasis added). The Supreme Court has thus repeatedly held that Congress may authorize the Executive Branch to enforce laws restricting foreign commerce by administrative action alone. *See, e.g.*, *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 329, 336-40 (1908) (rejecting challenge to customs agents' extrajudicial exaction of monetary fines by withholding clearance for steamships seeking to depart for foreign ports); *accord Lloyd Sabaudo Societa Anonima Per Azioni v. Elting*, 287 U.S. 329, 335 (1932) (reaffirming *Oceanic Steam* but acknowledging that "the action of the Secretary is . . . subject to some judicial review"). The Bank cites no authority for the proposition that Congress lacks the analogous power both to dictate the terms by which "correspondent relationships" with "foreign banks" may be conducted and to determine the means by which those terms will be enforced. The government is aware of none.

Moreover, it is clear that the Fourth Amendment imposes no constraint whatever on the scope of the searches and seizures that Congress may authorize with respect to foreign persons on foreign soil. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 274-75 (1990) (holding that the "Fourth Amendment has no application" to search of residences belonging to Mexican national on Mexican soil). As a result, to the extent that courts have suggested that administrative subpoenas may not be self-enforcing without impermissibly exposing their recipients to "constructive searches"

**PAGE 15 -    MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

in contravention of the Fourth Amendment's warrant requirement (Resp't Mem. at 14 (citing *United States v. Sturm, Ruger & Co.*, 84 F.3d 1 (1st Cir. 1996))), those cases simply have no bearing on the constitutionality of § 5318(k).

As the Supreme Court made clear in *Morton Salt*, the constitutional restraints on the scope of administrative subpoenas directed even to U.S. citizens on U.S. soil are modest: "It is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." 338 U.S. at 369.  This  remains true today. *See, e.g.*, *EEOC v. Karuk Tribe Housing Auth.*, 260 F.3d 1071, 1076 (9th Cir. 2001) ("[C]ourts must enforce administrative subpoenas unless the evidence sought . . . is plainly incompetent or irrelevant to any lawful purpose of the agency." (internal quotation marks and brackets omitted)); *RTC v. Grant Thornton*, 41 F.3d 1539, 1548 (D.C. Cir. 1994) ("[T]he Fourth Amendment generally presents little obstacle to the enforcement of administrative subpoenas." (citing *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 208 (1946))).  However modest those constitutional limits may be, they are slighter still with respect to foreign banks on foreign soil.  As a result, the Bank's contention that § 5318(k) is unconstitutional simply because administrative subpoenas issued thereunder are effectively compulsory is wholly unpersuasive.

B.    *The Subpoena Is Plainly Authorized by the Statute.*

The Bank also claims that the subpoena is defective even by the terms of § 5318(k) itself, but the Bank is incorrect.  The Bank alleges two infirmities: first, that the subpoena fails to make clear how the documents at issue relate to the Bank's correspondent accounts in the United States, and, second, that the subpoena seeks those documents for trial as opposed to pure investigation. Neither of these facts is inconsistent with the terms and purpose of § 5318(k).

**PAGE 16 -    MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

1.    The Scope of the Demand Is Well Within the Limits of the
Authorizing Statute.

The Bank's principal contention is that the subpoena fails to limit its scope to "records related to [a] correspondent account," as required by the statute, because the subpoena "makes no reference to any of the Bank's correspondent accounts." (Resp't's Mem. at 17-18.) This objection amounts to little more than a stylistic quibble. The United States does not purport to seek documents unrelated to the Bank's correspondent accounts in the United States, and the Bank does not meaningfully assert otherwise.

In the subpoena, the government sought:

Account records for account number 140608010109206 for the time period of February, March, and April of 2000, to include:

(1) Copies of signature cards and customer applications;

(2) Copies of bank statements, ledger cards, or records reflecting dates and amounts of deposits and withdrawals;

(3) Copies of debit and credit memos;

(4) Copies of deposit slips and checks deposited (including the backs of the checks);

(5) Copies of withdrawal slips and teller records showing the withdrawal of currency, including records reflecting the type of currency received (U.S. dollars or Saudi Riyals);

(6) Copies of checks issued for withdrawals (including the backs of the checks);

(7) Copies of all records reflecting the cashing of traveler's checks, including teller records, receipts indicating the number of cashier's checks cashed, the denominations of the cashier's checks cashed, and the type of currency received (U.S. dollars or Saudi Riyals);

(8) Records reflecting the customer exchange rate of U.S. dollars to Saudi Riyals on March 13, 2000, March 14, 2000, March 27, 2000, and March 28, 2000;

**PAGE 17 -    MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO
COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

(9) Records pertaining to the cashing of 130 US$1,000 American Express Traveler's checks by Soliman Al-But'he in March of 2000 at Al Rajhi Bank, to include the date and time of the transaction, the amount of the transaction, and type of currency received by Al-But'he (U.S. dollars or Saudi Riyals); and

(10) Records pertaining to the deposit and any subsequent disposition of a Bank of America cashier's check, check number 1001040568, issued to Soliman Al-But'he on March 11, 2000, for US$21,000.

(Cardani Decl. Ex. B.)  The list of responsive documents makes clear that the government seeks records directly relating to Soliman Al-But'he's negotiation of the financial instruments at the center of this very investigation — specifically the expressly identified cashier's check and 130 traveler's checks — by and through the Bank.  Although the requests for Al-But'he's account records were not explicitly limited to the negotiation of those specific financial instruments, the three-month time frame of February 2000 to April 2000 effectively narrowed the responsive records to those that were "reasonably relevant," *Morton Salt*, 338 U.S. at 369, to tracing the disposition of the funds at issue.

Moreover, because the financial instruments in question were issued in U.S. dollars by U.S. banks, the negotiation of those instruments inevitably "related to" the Bank's "correspondent account[s] in the United States."  31 U.S.C. § 5318(k)(3)(A)(i).  The Bank neither suggests otherwise, nor could it plausibly do so:

On March 14, 2000, Al-But'he went to an Al-Rajhi Banking and Investment Corp (Al-Rajhi Bank) branch in Saudi Arabia and appears to have cashed the AMEX traveler's checks for currency.  For reimbursement, bank records show Al-Rajhi Bank sent the AMEX traveler's checks to one of its US correspondent banks, Chase Manhattan (now JP Morgan Chase) in the US.

Al-But'he appears to have deposited the $21,000 BOA cashier's check into an account at Al-Rajhi, most likely at the same time he cashed the traveler's checks. The account number is 140608010109206 and appears to be a personal account for Soliman Al-But'he.  Bank records show that Al-Rajhi Bank processed for payment the cashier's check through another US correspondent bank, US Bank.  In turn, bank

records show US Bank requested payment of the $21,000 from BOA on March 30, 2000.

(January 28, 2010, Declaration of Colleen Anderson ¶¶ 5-6.)  Although the subpoena did not expressly recite the relationship between the request and the Bank's correspondent accounts in the United States, nothing in the § 5318(k) or any authority cited by the Bank requires such an explicit recital.

In any event, the relationship between the documents identified by the subpoena and the Bank's correspondent accounts in the United States must have been plain to the Bank, which actually negotiated the financial instruments expressly referenced in the subpoena through those correspondent accounts.  The Bank's protest that "[t]here is nothing in the subpoena on which the *court* could base a finding that the requested records relate, in any way, to the Bank's correspondent accounts," (Resp't's Mem. at 17), is simply irrelevant to the statutory propriety of the subpoena. The Court had no occasion to assess the scope of the subpoena until the Bank resolved to resist it.

Because the subpoena seeks documents that are clearly within the scope of the statute, the Bank's argument must fail.  As the Ninth Circuit has previously observed, "[t]he scope of [the court's] inquiry in an agency subpoena is narrow." *Garner*, 126 F.3d at 1142.  This Court should decline the Bank's invitation to extend that inquiry into purely editorial questions of how a subpoena might have been differently drafted.

       2.      The Subpoena Was Issued for a Proper Purpose.

The Bank also asserts that the subpoena was invalid because § 5318(k) does not authorize the issuance of subpoenas "to gather evidence for trial." (Resp't's Mem. at 18.)  The Bank cites

**PAGE 19 -**      **MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

nothing in § 5318(k) or any other relevant authority to support this contention, however, and it cannot be seriously entertained in light of Congress's express purpose in enacting the statute.

The Bank cites only two cases in support of its categorical assertion that an administrative subpoena may not be used to gather evidence for trial, and neither of them is relevant to the scope of § 5318(k).  Indeed, both stand for the opposite proposition: The government's authority to demand documents to gather evidence for trial depends only upon Congress's intent to confer it.  The first case the Bank cites is the D.C. Circuit's decision in *RTC v. Grant Thornton*, 41 F.3d 1539 (D.C. Cir. 1994).  (Resp't's Mem. at 18.)  In that case, the court considered whether, pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), the RTC had "statutory authority to subpoena financial documents solely to ascertain the cost-effectiveness of pursuing litigation" even after the RTC had filed suit.  *Grant Thornton*, 41 F.3d at 1542.  The court held in the negative, rejecting the RTC's claim that its statutory authority to issue subpoenas in "furtherance of any  . . . duty under the statute," including that of "mak[ing] efficient use of funds obtained from the . . . Treasury" could be interpreted to confer such a novel authority.  *See* 41 F.3d at 1546.  The court held that it was "unreasonable to construe this general language to confer such an unprecedented power."  *Id.*  As this holding makes clear, *Grant Thornton* related to the proper interpretation of FIRREA — not to the Justice Department's authority under § 5318(k).

The Bank correctly points out that the *Grant Thornton* court adverted to the powers of the grand jury to exemplify "the traditional scope of investigative authority" while discussing the context of FIRREA's broad statutory language.  *Grant Thornton*, 41 F.3d at 1547.  The court went on for the same purpose, however, to discuss the  "well-established limits on a litigant's ability to discover an adversary's financial and insurance information."  *Id.*  The latter discussion would have

**PAGE 20 -    MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

been wholly irrelevant if, without regard to the language and purpose of the relevant statute, an administrative subpoena could never exceed the "traditional scope of investigative authority," as the Bank suggests.  Indeed, the court made plain that it offered no such sweeping holding by emphasizing that it was concerned only with "what motives may be imputed to the Congress that enacted the FIRREA."  *Grant Thornton*, 41 F.3d at 1548.

The Bank also cites the Third Circuit's decision in *In re Grand Jury Proceedings (Schofield)*, 486 F.2d 85, 91 (3d Cir. 1973), for the proposition that, "[i]f the court concludes that an administrative subpoena has been issued for the purposes of developing a criminal case, it will decline enforcement."  (Resp't's Mem. at 19.)  That dictum, however, rests solely on cases addressing the enforceability of administrative subpoenas in *tax cases*, where judicial gloss on the subpoena authority under the Internal Revenue Code and its explicit statutory bar on the use of such subpoenas to advance cases already referred for criminal prosecutions rightly control.  *See* 486 F.2d at 91 (citing *Donaldson v. United States*, 400 U.S. 517 (1971) ("We hold that under [26 U.S.C.] § 7602 an internal revenue summons may be issued in aid of an investigation if it is issued in good faith and prior to a recommendation for criminal prosecution."); 26 U.S.C. § 7602(d) ("No summons may be issued *under this title* . . . with respect to any person *if a Justice Department referral is in effect* with respect to such person." (emphases added)).

Needless to say, neither § 5318(k) nor any other administrative subpoena authority conferred on the Justice Department incorporates such a bar.  To the contrary, numerous courts have expressly rejected the claim – heedlessly echoed by the Bank here – that the Justice Department may issue administrative subpoenas on third parties only before an indictment issues.  *See, e.g.*, *United States v. Phibbs*, 999 F.2d 1053, 1077 (6th Cir. 1993) ("However, unlike the grand jury system, [the DEA's

**PAGE 21 -    MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

administrative subpoena authority] may also be used to discover evidence *related to the charges in the original indictment*." (emphasis added)); *United States v. Harrington*, 761 F.2d 1482, 1485 (11th Cir. 1985) (affirming administrative subpoenas issued to third parties by the DEA "between the indictment and the trial in this case"); *United States v. Lazar*, 2006 WL 3761803, at *8-*9 (W.D. Tenn. Dec. 20, 2006) (unpublished) (upholding the Justice Department's use of administrative subpoenas for healthcare fraud investigations under 18 U.S.C. § 3486 "to obtain evidence related to charges in a pending indictment"); *United States v. Wachter*, 2006 WL 2460790, at *6-*7 (E.D. Mo. Aug. 23, 2006) (unpublished) (affirming issuance of healthcare subpoenas under § 3486 post-indictment); *United States v. Daniels*, 2000 WL 764951, at *4-*5 (D. Kan.) (unpublished) (same).

What is true of the Justice Department's administrative subpoena authority in the context of investigations for controlled substances violations and healthcare fraud is only more obviously true in the context of § 5318(k): the government's efforts to combat international money laundering and global terrorism. Indeed, Congress could not have been more explicit in its intent to confer expansive authority on the Departments of the Treasury and Justice to combat particularly grave offenses that had historically defied reliance on standard judicial process and traditional law enforcement mechanisms. *See* International Money Laundering Abatement and Antiterrorist Financing Act of 2001, Pub. L. 107-56 § 302, 115 Stat. 296 (finding that "transactions involving . . . offshore jurisdictions [offering facilities to provide anonymity] make it difficult for law enforcement officials and regulators to follow the trail of money earned by criminals, organized international criminal enterprises, and global terrorist organizations"); *id.* at 297 (finding that "United States anti-money laundering efforts are impeded by outmoded and inadequate statutory provisions that make investigations, prosecutions, and forfeitures more difficult, *particularly in cases in which money*

*laundering involves foreign persons, foreign banks, or foreign countries*" (emphasis added)).  In short, given Congress's express intent to the contrary and the total absence of any relevant supporting authority, the Bank's assertion that the government may not use administrative subpoenas to "gather evidence for trial" is entirely meritless.

       3.      The Government's Demand for Documents Relating to the Fraudulent Concealment of Funds by a Designated Terrorist Organization Cannot Be Nullified by a Foreign Government's Privacy Laws.

Finally, the Bank asserts that the subpoena is unenforceable because it would require the Bank to defy the direction of its Saudi regulator and because "[v]arious provisions of Saudi law" allegedly "prohibit the Bank from providing the information requested in the Subpoena."  (Resp't's Mem. at 20-22.)  This argument is unfounded.

 "When the laws of two jurisdictions conflict, the court must balance the interests, including the respective interests of the states involved and the hardship that would be imposed upon the person or entity subject to compliance." *In re Grand Jury Subpoena Dated Aug. 9, 2000*, 218 F. Supp. 2d 544, 554 (S.D.N.Y. 2002) (citing Restatement Third of Foreign Relations Law of the United States § 442(1)(c)).  In weighing these interests, "[c]ourts consistently hold that the United States interest in law enforcement outweighs the interests of the foreign states in bank secrecy and the hardships imposed on the entity subject to compliance." *Id.*; *see also, e.g.*, *United States v. Bank of Nova Scotia (In re Grand Jury Proceedings)* [hereinafter *Bank of Nova Scotia II*], 740 F.2d 817, 827-29 (11th Cir. 1984); *United States v. Bank of Nova Scotia (In re Grand Jury Proceedings)*, 691 F.2d 1384, 1389-91 (11th Cir. 1982); *United States v. Field (In re Grand Jury Proceedings)*, 532 F.2d 404, 407-10 (5th Cir. 1976); *United States v. First Nat'l City Bank (In re Grand Jury*

**PAGE 23 -**     **MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

*Subpoena)*, 396 F.2d 897, 902-05 (2d Cir. 1968); *S.E.C. v. Bana Dela Svizzera Italiana*, 92 F.R.D.

111 (S.D.N.Y. 1981) (enforcement of federal securities laws overrides Swiss bank secrecy laws).

The Eleventh Circuit squarely addressed and rejected the very argument that the Bank raises

here in *Bank of Nova Scotia II*.  In that case, prosecutors served a grand jury subpoena in connection

with a drug trafficking case on the Miami Branch of a foreign bank, seeking records located in the

Cayman Islands.  The bank disregarded the subpoena, claiming that compliance would require it to

violate Cayman bank secrecy laws.  740 F.2d at 826.  The court found, however, that the U.S.

Government's interest in detecting and prosecuting criminal activity outweighed the Cayman

Island's interest in preserving bank secrecy and holding that the bank secrecy laws "should not be

used as a blanket device to encourage or foster criminal activities."  *Id.* at 827.  Importantly, the

bank argued, just as Al Rajhi does here, that the U.S. court should defer to the application of the

foreign law on the grounds that the bank should not be put in the position of having to choose

between conflicting commands of foreign sovereigns.  *Id.* at 828.  Relying on the Fifth Circuit's

decision in *Field*, 532 F.2d at 410, the Court held that it "simply c[ould] not acquiesce in the

proposition that United States criminal investigations must be thwarted whenever there is a conflict

with the interest of other states."  *Id.*; *see also Field*, 532 F.2d at 410 ("In a world where commercial

transactions are international in scope, conflicts are inevitable.").

Similarly, in *In re Grand Jury 81-2*, 550 F. Supp. 24 (W.D. Mich. 1982), the district court

rejected a German bank's defiance of a grand jury subpoena on the ground that production of the

records sought was prohibited by German law and would expose the bank and its officers to the risk

of criminal and civil penalties.  The bank sought customers' consent to disclosure, but several of the

customers refused, including one German company that obtained an *ex parte* order from a German

**PAGE 24 -    MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO
COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

court prohibiting the bank from complying with the subpoenas.  The district court found that "the United States' interest in enforcing its criminal laws outweighs any countervailing interests or hardships asserted by the bank," 550 F. Supp. at 29, and thus rejected the bank's contention that the government should be constrained to use letters rogatory to obtain the documents at issue.  *Id.* ("The United States has chosen subpoenas as the preferred method of obtaining the records. . . . [T]hat method is both lawful and proper."); *cf. Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for the S. Dist. of Iowa*, 482 U.S. 522 (1987) (rejecting claim that Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters preempted means otherwise established under the Federal Rules of Civil Procedure to demand evidence located within the jurisdiction of another state-party to the Convention).

Against this authority, the Bank cites one unsigned 1987 case for the sweeping proposition that the conflict with Saudi law should render the subpoena unenforceable.  (Resp't's Mem. at 20-22 (citing *In re Sealed Case* [hereinafter *Sealed Case*], 825 F.2d 494 (D.C. Cir. 1987) (per curiam).) Even that case, however, is of highly dubious relevance.  Not only was *Sealed Case* decided some fourteen years before the enactment of § 5318(k), but the D.C. Circuit did not even purport in that case to pronounce so generalized a theory as that on which the Bank relies.

At issue in *Sealed Case* was a district court's contempt order levying fines of $50,000 per day on a foreign bank specifically to enforce a requirement that the bank violate the criminal laws of a foreign jurisdiction.  *See Sealed Case*, 825 F.2d at 496.  The D.C. Circuit vacated the contempt order, emphasizing that it was primarily concerned that the "sanctions represent[ed] an attempt by an American court to compel a foreign person to violate the laws of a different foreign sovereign on that sovereign's own territory" where that person was "not merely a private foreign entity, but . . .

**PAGE 25 -**    **MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

*an entity owned by the government*" of yet another sovereign government.  825 F.2d at 498 (emphasis added).  Needless to say, the same facts are not in play in the enforcement of the subpoena here, as the Bank is "merely a private foreign entity."  (Resp't's Mem. at 2 ("A substantial portion of the Bank's stock is owned by the Al Rajhi family")).)  Moreover, the D.C. Circuit in *Sealed Case* explicitly disavowed any intention to establish a generally applicable rule, emphasizing that there was a division of authority on the question and that the court did "not . . . decide the general issue of whether a court may ever order action in violation of foreign laws."  *Id.*

Even if *Sealed Case* were binding authority in this circuit and could be read to establish a general rule for grand jury subpoenas, that case would have no bearing on the force of the § 5318(k) subpoena at issue here for at least three reasons.  First, both the Kingdom of Saudi Arabia and the United States are parties to the International Convention for the Suppression of the Financing of Terrorism, which obligates parties to "afford one another the greatest measure of assistance[,] . . . including assistance in obtaining evidence in their possession," in furtherance of investigations into offenses involving terrorist financing.  *See* International Convention for Suppression of the Financing of Terrorism, G.A. Res. 109, Art. XII, § 1, U.N. GAOR, 54th Sess., U.N. Doc. A/RES/54/109 (Dec. 9, 1999).[10]  The Convention specifically bars parties from "refus[ing] a request for mutual legal assistance on the ground of bank secrecy."  *See id.* Art. XII, § 2.  That the Saudi

---

[10]    The Convention defines such offenses to include the "provi[sion] or collect[ion] of] funds with the intention that they should be used . . . in order to carry out . . . act[s] intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act." International Convention for Suppression of the  Financing of Terrorism, G.A. Res. 109, Art. II, § 1, U.N. GAOR, 54th Sess., U.N. Doc. A/RES/54/109 (Dec. 9, 1999).  The defendants in this case were suspected of precisely such conduct.

**PAGE 26 -    MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

government has explicitly adopted, through the Convention, a public policy in favor of disclosure must alleviate any prudential concern arising from the alleged incompatibility between Saudi banking laws and the enforcement of the valid subpoena here.

Second, Congress enacted § 5318(k) in the wake of the 2001 terrorist attacks specifically to *overcome* the impediments posed by the laws of "jurisdictions outside of the United States that offer 'offshore' banking and related facilities designed to provide anonymity," Pub. L. 107-56, § 302(a)(4), 115 Stat. at 296, because the money laundering activities facilitated by such laws played a "critical" role in the "financing of global terrorism and the provision of funds for terrorist attacks," *id.* at § 302(a)(2). Denying the enforceability of subpoenas under § 5318(k) out of solicitousness for such laws would thus defy the explicit purpose of the statute.

Finally, since it is directed only to a foreign bank with domestic ties limited to correspondent relationships with "covered financial institutions" in the United States, the enforcement of the subpoena here does not implicate the same specter of direct "sanctions," *Sealed Case*, 825 F.2d at 498, compelling a violation of foreign law. The only jeopardy the Bank complains of is the loss of correspondent relationships with "covered financial institutions" in the United States, which is a business opportunity the Bank is free to forgo. *See Bank of Nova Scotia II*, 740 F.2d at 828 (rejecting argument that "it is unfair to require the Bank to be put in the position of having to choose between the conflicting commands of foreign sovereigns," noting that "such occasions will arise and a bank indeed will have to choose").

It bears emphasis in this context that permitting the Bank to shield its correspondent relationships with U.S. banks by recourse to foreign law would, in effect, limit the regulation of the Bank's operations *within the jurisdiction of the United States* pursuant to the very sort of privacy

**PAGE 27 -    MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

protections that Congress expressly decried in enacting this statute.  Such an outcome is self-evidently untenable.  In short, Saudi laws against disclosure in this context cannot prevent the operation of § 5318(k), and the subpoena issued thereunder is readily enforceable notwithstanding Saudi law.

**IV.    Conclusion**

For the foregoing reasons, the United States moves this Court to order the Bank to produce the documents described in the subpoena issued by the undersigned Acting United States Attorney on July 17, 2009.

Dated: February 1, 2010

Portland, Oregon

Respectfully submitted,

KENT S. ROBINSON
Acting United States Attorney

*s/ Charles F. Gorder, Jr.*
CHARLES F. GORDER, JR.
CHRISTOPHER L. CARDANI
RYAN W. BOUNDS
Assistant United States Attorneys

**PAGE 28 -    MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**