```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF OREGON

 3    UNITED STATES OF AMERICA,        )
                                       )
 4                    Plaintiff,       ) No. 05-60008-2-HO
                                       )
 5      v.                             ) January 19, 2010
                                       )
 6    PIROUZ SEDAGHATY, et al.,        ) Eugene, Oregon
                                       )
 7                    Defendants.      )

 8


 9                TRANSCRIPT OF ORAL ARGUMENT

10           BEFORE THE HONORABLE MICHAEL R. HOGAN

11              UNITED STATES DISTRICT COURT JUDGE

12

13

14                          -:-

15

16

17

18

19

20

21

22

23              Deborah Wilhelm, CSR, RPR
                      Court Reporter
24                    P.O. Box 1504
                 Eugene, OR  97440
25                    (541) 431-4113
```

<pre>
 1                    APPEARANCES OF COUNSEL

 2

 3    FOR THE PLAINTIFF:     CHRISTOPHER L. CARDANI
                            United States Attorney's Office
 4                          405 E. 8th Avenue, Suite 2400
                            Eugene, OR  97401
 5                          (541) 465-6771
                            chris.cardani@usdoj.gov
 6

 7    FOR THE DEFENDANT:     LAWRENCE H. MATASAR
                            Lawrence Matasar, P.C.
 8                          621 S.W. Morrison Street
                            Suite 1025
 9                          Portland, OR  97205
                            (503) 222-9830
10                          larry@pdxlaw.com

11                          STEVEN T. WAX
                            Federal Public Defender
12                          101 S.W. Main Street, Suite 1700
                            Portland, OR  97204
13                          (503) 326-2123
                            steve_wax@fd.org

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

```
 1              (Tuesday, January 19, 2010; 11:22 a.m.)

 2                    P R O C E E D I N G S

 3         THE CLERK:  This is the time set for Criminal

 4  05-60008-2, United States of America versus Pirouz

 5  Sedaghaty, hearing on defendant's motion to compel the

 6  government to utilize the Mutual Legal Assistance Treaty

 7  on behalf of Mr. Sedaghaty and/or to issue letters

 8  rogatory.

 9         THE COURT:  Give me just a second, Counsel.

10  Counsel, I am familiar with your papers.  This morning,

11  I also received another motion to compel the government

12  to utilize the Mutual Legal Assistance Treaty on behalf

13  of the defendant concerning Saudi Arabia.  And so I

14  think I'd like to -- if you comments, I'd rather have

15  comments on both of them today.  There is similar

16  issues.  And if there is a difference, talk about that

17  for me, please.  If you have something more to say on

18  this, fine.

19         MR. WAX:  We were surprised, Your Honor, to see

20  the government arguing that what we're seeking is not

21  exculpatory.

22         What we need from Saudi Arabia and Egypt goes

23  directly to the very core of this case.

24         THE COURT:  Let me ask with regard to Egypt,

25  Mr. El-Fiki --
```

```
 1              MR. WAX:  Yes.

 2              THE COURT:  -- what defense would his statement

 3    make -- let's say he -- say I gave the money, the term

 4    I'd probably use is God, I gave the money for charity

 5    purposes, and what defense does that make to the

 6    elements of the crimes charged here, the tax charge and

 7    the money charge?

 8              MR. WAX:  We anticipate that the government

 9    will be arguing that the fact that Mr. El-Fiki wired

10    money to Ashland, Oregon, from an account in London,

11    when he is based in Egypt, is suspicious and part of the

12    overall plan of al-Haramain, whether al-Haramain Ashland

13    or al-Haramain Saudi, to do something inappropriate with

14    the money.

15              We just received this morning a report from the

16    person the government calls an expert, Evan Kohlmann,

17    and while I did not have time to digest it, what he has

18    written about with respect to the way in which

19    al-Haramain conducted its business, and this is

20    primarily al-Haramain Saudi, suggests to me even more

21    clearly than it did when we filed the pleading that the

22    way in which the money was routed will be a part of the

23    government's case with respect to the element of

24    willfulness.

25              Mr. El-Fiki's statement, as reflected in the
```

1    FBI 302 report that was provided to us, explains that

2    there was nothing inappropriate, nefarious,

3    conspiratorial, or anything bad in any way about the

4    fact that he sent the money here.  And it explains what

5    the -- I'll call it advertisement, solicitation, you

6    know, for donations was what it said, and the choice

7    that it gave to donors to send money either to the U.S.

8    or to Saudi.

9         THE COURT:  What information do you have that

10    makes you believe that Mr. El-Fiki would be a witness,

11    that he would testify?

12         MR. WAX:  He provided a full and detailed

13    statement to the Egyptian authorities at the request of

14    the United States government that was participated in by

15    the United States government, we're confident, in

16    multiple ways.  We know that they were permitted to

17    listen to and view the interrogation.  We're confident

18    that they communicated with the Egyptian authority,

19    Secret Police, whoever it was who actually conducted the

20    interview in terms of explaining the area that they

21    wanted covered.

22         THE COURT:  What do I do with the language in a

23    case like *Westerdahl* that appears to limit relief like

24    this to a case in which there is prosecutorial

25    misconduct?

1          MR. WAX:  Well, I don't believe, Your Honor,

2    that that is what *Westerdahl* says, nor any of the other

3    cases.  My reading of *Westerdahl* from the outset and --

4          THE COURT:  It uses the words "where the fact-

5    finding process is intentionally distorted by

6    prosecutorial misconduct, and the defendant is thereby

7    denied a fair trial."

8          MR. WAX:  Well, there are other portions in the

9    opinion, Your Honor, which do not require a finding of

10   misconduct.

11         What I believe the Ninth Circuit said there and

12   in the subsequent cases is that when the government uses

13   its processes for the gathering of information on its

14   behalf, and refuses to do so for the defendant, that is

15   the intentional distortion of the fact-finding process

16   that the Ninth Circuit discussed.  Nothing more than

17   that need be shown.

18         We don't need to show any bad faith on the part

19   of the government.  We don't need to show anything other

20   than they have this authority, the executive authority

21   to grant immunity in *Westerdahl*, the executive authority

22   to use the MLAT process in a case of this nature.

23         When they use it on their own behalf, when they

24   are requested to use on it on behalf of the defense,

25   with the type of showing that was made in *Westerdahl* and

1    the type of showing that's made here of the relevance

2    and exculpatory nature of the evidence, and they refuse,

3    that's enough.  *Westerdahl* says -- and the cases that

4    have followed it -- say that's enough.  They may not do

5    that.

6          And if they refuse, then the court can either

7    preclude the testimony that they have obtained or

8    dismiss the case.  We don't need to show anything more,

9    as I read those cases.

10         THE COURT:  The cases also talk about timing,

11   and we've got a June trial date.  This case is over four

12   years old.  Why does this come now?

13         MR. WAX:  Well, Your Honor, as we explained

14   earlier on in the case, we made significant efforts to

15   locate Mr. El-Fiki, we were unsuccessful.  It took us

16   quite a while to finally get in contact with him and to

17   make the effort to speak with him.  That process was

18   finished -- I don't recall the exact date, perhaps

19   several months before we filed the pleading.  We

20   exhausted our efforts to obtain this information on our

21   own.

22         With respect to the information that we're

23   seeking in Saudi Arabia, as the court is aware, we have

24   been going through -- I don't recall -- 40,000 -- I

25   mean, many, many, many tens of thousands of e-mails,

1    once we eventually received the discovery and were able

2    to convert it into a usable format, and then spend the

3    time going through and finding the relevant documents.

4            THE COURT:  But El-Fiki's name is not a new

5    one.

6            MR. WAX:  No.  With respect to El-Fiki, we made

7    efforts which took us quite a while to try to obtain the

8    information on our own.  I don't believe that we were

9    late in any way.  And with respect to the use of this

10   MLAT process, our understanding is that goes far more

11   rapidly than the letter rogatory process.  And it seems

12   to us that with respect --

13           THE COURT:  And what do I do with the language

14   that says under these treatises that's for the

15   signatory's use, not to be used in this situation?  I

16   don't know that it has the negative, but it's for the

17   signatory's use.  The cases talk about that, at least.

18           MR. WAX:  Yes, Your Honor.  And what we're

19   requesting is your directing the government to utilize

20   the process on behalf of the defense.

21           We find it very disturbing that the government

22   did not even respond to the information that we first

23   provided to them informally when we sought their

24   assistance on an informal basis before we filed this

25   pleading.  We were told by the government prosecutors in

1    this case that they could not, under any circumstances,

2    utilize the MLAT process on our behalf.

3           We obtained information, which we attached to

4    our pleading as an exhibit, that that is just simply not

5    the case.  We provided to the court and to the

6    government a pleading in which the government

7    prosecutors did what is not being done in this case and

8    that is agree, under the direction of the court as

9    reflected in the pleadings in that case, to utilize the

10   MLAT process through what was called the walled off

11   investigators and prosecutors.

12          That's what we're asking the court to direct

13   the government to do here.  And if it refuses to do so,

14   then under *Westerdahl*, this court has the authority to

15   either refuse to permit the government to introduce the

16   evidence it has obtained through the MLAT and rogatory

17   process, or the next step is to dismiss the indictment.

18          So the cases which say that the MLAT is not

19   available to the defense, we're not challenging those.

20   But what we're pointing out is that in none of those

21   cases was the court presented with the argument that we

22   presented here based on the Ninth Circuit's holdings in

23   *Westerdahl* and the cases that have followed it in the

24   intervening 20 years.

25          Under the *Westerdahl* analysis, we don't utilize

```
 1    the MLAT process ourselves.  The government does it for
 2    us.  The government designates an investigator outside
 3    of the prosecution team, the government designates a
 4    prosecutor outside of the prosecutor team.  Those
 5    investigators and prosecutors are walled off from the
 6    process --
 7              THE COURT:  I understand the process.
 8              MR. WAX:  Okay.  That's what we're requesting.
 9    That's what Westerdahl says is required when you have
10    the purely executive decision for immunity, which we see
11    as parallel and indistinguishable from the purely
12    executive authority here under the MLAT.
13              They've obtained information.  They are not
14    cooperating.  We say direct them to, or preclude their
15    use of the evidence.
16              THE COURT:  Mr. Cardani, what about this
17    argument that this is exculpatory on the willfulness
18    element?
19              MR. CARDANI:  Does the court wish to hear a
20    little bit about -- any responses to counsel's comments
21    about use in other cases?
22              THE COURT:  I'm going to let you both exhaust
23    yourself.  But I'm just trying to get to my question,
24    but if you have something more, that's fine.
25              MR. CARDANI:  Okay.  Well, I'll go right to the
```

1   court's question then.

2          Regarding the exculpatory nature of

3   Mr. El-Fiki's conduct, it's true that his conduct is the

4   central aspect of the -- forms one of the building

5   blocks of the indictment.  It is his money that we're

6   talking about in the indictment, that is true.  So his

7   conduct, his statements, are certainly relevant from an

8   evidentiary standpoint.  And if he were an American

9   citizen or if he were here, he'd probably end up on both

10  of our witness lists.  But that's a different analysis

11  from do we need to use extraordinary powers of the court

12  to secure testimony because it's exculpatory?

13         And the -- our response talks about it's one

14  thing to say that Mr. El-Fiki had no intent to fund

15  fighters, mujahideen, with his donation.  But it's also

16  clear from that statement that he's never met our

17  defendant, Mr. Sedaghaty, nor has he met the

18  co-defendant, Mr. Al-Buthe, nor have there been any

19  conversations or communications that we're aware of

20  between them.

21         So it's one thing to say Mr. El-Fiki had a

22  certain intent, but that intent is not exculpatory

23  vis-à-vis this defendant.  And, of course, Mr. El-Fiki

24  could never comment on this defendant's intent and

25  knowledge, prohibited by the rules of evidence.

 1              So that's the point we made in our response

 2      that it's certainly relevant but it doesn't rise to the

 3      level of being exculpatory in our view.

 4              THE COURT:  All right.  And is the question

 5      closer with Mr. Al-Sanad from Saudi Arabia?

 6              MR. CARDANI:  Yes.

 7              THE COURT:  All right.  Is there more you would

 8      like to say about that?

 9              MR. CARDANI:  About Mr. Sanad?

10              THE COURT:  Yes.

11              MR. CARDANI:  Well, the first thing I'd like to

12      say about that request is we got it Friday afternoon and

13      we have not --

14              THE COURT:  I just got it this morning.  So if

15      you want more time to respond, that's fine.

16              MR. CARDANI:  We do want more time to respond.

17      But --

18              THE COURT:  Then don't bother with it.  When

19      you respond, I will also want to know whether or not

20      they really need certified copies of these documents

21      that apparently you both have.

22              MR. CARDANI:  Well, I'd like to give the court

23      a preview of where I think we're going on a response to

24      this because --

25              THE COURT:  All right.

1           MR. CARDANI:  -- half of it I've got off the

2     top of my head.  Mr. Wax spends a great period of time

3     asking the court to order us to use the MLAT that we

4     have with Saudi Arabia to get all this evidence and

5     secure things.

6           The fact of the matter is we do not have an

7     MLAT with Saudi Arabia.  There is none.  So most of this

8     motion is mooted by the fact that we have not negotiated

9     a treaty with the Kingdom of Saudi Arabia to get this.

10    We do -- we'd have to default then to -- any kind of

11    evidence gathering process involved, the court would

12    have to default to rogatories.  And that's where I think

13    we need to have some discussion.

14          But I will say that we have used our own

15    processes internally to try to get background

16    information relating to these receipts that are

17    appended.  These are not new to us.  They're not new to

18    the defense.  Everybody has known about them for quite

19    some time.  We tried to track these things down and get

20    certified copies and to find out some of the background

21    behind them, and we have been unable to get anywhere in

22    Saudi Arabia ourselves.  So if the court ultimately

23    decides -- we'll answer this:  If the court decides to

24    consider rogatory, we should be under no false sense of

25    illusion that we're going to get anything from Saudi

 1   Arabia, certainly not timely or at all in terms of that.

 2          THE COURT:  It's up to them how they treat

 3   that --

 4          MR. CARDANI:  Yes.

 5          THE COURT:  -- then?

 6          MR. CARDANI:  Yes.  It's a discretionary

 7   procedure.  Rogatories, of course, go from the court

 8   through our State Department to a judge in Saudi Arabia.

 9          THE COURT:  Yes.

10          MR. CARDANI:  And we just kind of facilitate

11   that request.  But it is a discretionary request by

12   people in Saudi Arabia.

13          I don't know how the court wishes to go here,

14   but the *Westerdahl* argument --

15          THE COURT:  Well, I -- I think maybe I'll step

16   back now.  I tried to get to the points that are -- I

17   want to make sure I'm listening and not thinking about

18   the issues that I came up with when I was studying this

19   yesterday.  But, Mr. Wax, did you have more you wanted

20   to say about the initial motions, the ones on the

21   calendar today?

22          MR. WAX:  No, Your Honor, I think I've covered

23   it.

24          THE COURT:  Thank you.

25          MR. CARDANI:  The *Westerdahl* argument, Judge,

 1    to us it's more like apples and oranges.  In *Westerdahl*
 2    you're talking about immunity.  And that case, which is
 3    a fairly extraordinary case, and has not been
 4    implemented to any degree or frequency, fortunately,
 5    because it requires what the court just pointed out, a
 6    showing of, in essence, misconduct by the prosecution in
 7    implementing immunity to certain witnesses that say a
 8    certain set of facts but refusing to offer immunity when
 9    there may be another set of facts that may be directly
10    exculpatory.  And that is seen as abusive, unfair, due
11    process issues, constitutional issues.  And in that
12    limited circumstance, there may be -- it may be
13    necessary for a hearing to determine if the government
14    has committed misconduct.  A far cry from what we have
15    here.  We're not talking about immunity.  We're talking
16    about evidence gathering.

17          We have got nothing from our MLAT with Egypt.
18    So it's not like we even used our processes available to
19    get one side of the picture from Egypt through an MLAT
20    and there may be this whole other pile of information
21    that's exculpatory.  We haven't implemented that
22    procedure with respect to our Egyptian Mutual Legal
23    Assistance Treaty.

24          But more fundamentally, I'm not going to repeat
25    everything in the brief, but this is an executive branch

1  tool.  The court cases that are cited, especially the

2  cases out of the Eastern District of Virginia, are very

3  instructive, they're recent.  Judge Ellis and other

4  judges on that bench have an extensive background in

5  this.  And they've issued opinions that are reported in

6  the *Federal Supplement*.  And I'm not aware of any case

7  where the judge has ordered the government to use its

8  MLAT authority to get information.  And the courts are

9  very hesitant to do so, recognizing that the terms of

10  the MLATs are negotiated between the governments, do not

11  involve the courts, and it's an executive dialogue.

12       And the language in the MLAT at issue here,

13  Egypt, specifically prohibit it being used as an

14  evidence gathering device for private parties like the

15  defendant here.  The *Jefferson* and *Rosen* cases are the

16  ones that are very good in providing the background on

17  that.

18       Now, with respect to what Mr. Wax says about

19  the government does this anyways, we checked into the

20  facts of the Ohio case, which *El Hindi*, I think, is the

21  case, and he attached a letter where there was some

22  indication that the government was going to use its MLAT

23  authority for the defense.  I don't have chapter and

24  verse, but I talked to the people that were somewhat

25  involved in this back in Washington.

1          The government's office that deals with

2    interfacing between foreign governments and our

3    government and the State Department is under the

4    Department of Justice called Office of International

5    Affairs, OIA.  And they break down to particular

6    regions.  And I spoke with the people that deal with

7    this part of the world.  They are very aware of this.

8    And what they said in that case, *El Hindi*, is that

9    although this paperwork was executed by the U.S.

10   Attorney's Office and components of the department, no

11   one ever consulted the central authority, OIA, about

12   this.  Once they heard about this, they vetoed it.  They

13   said this is not what is done.  It is outside of

14   protocol and it never happened.

15          If the court wishes a statement or testimony to

16   support that, we would be happy to provide it but it was

17   never done.  And it shouldn't be done here.

18          The other comments I have are with respect to

19   the alternative request and that's for the letters

20   rogatory.  Can I address that now?

21          THE COURT:  Yes.

22          MR. CARDANI:  On the letters rogatory, as I

23   read it, they want the court to issue letters rogatory

24   to Egypt to get the Egyptian courts to help secure the

25   presence of witnesses here.  These are not American

citizens.  These are Egyptian citizens, outside the
compulsory process of the United States government and
this court.  So it would require some direct involvement
by the Egyptian courts.  And from what I read, they have
been unable to gain the cooperation of Mr. El-Fiki.
There is no indication that he would voluntarily jump on
a plane, come here, and testify.  So that's kind of a
huge issue in terms of just issuing letters of rogatory
asking Egypt to help secure that.

He also -- the defendant also asked for letter
rogatory assistance to do a Rule 15 deposition in Egypt,
I presume of Mr. El-Fiki and the other two.  The same
cases I cited earlier, the *Jefferson* case out of the
Eastern District of Virginia, very instructive.  After
acknowledging that MLATs are not appropriate tools for
the defense discovery, did indicate that letters
rogatory can be helpful to secure witness testimony, but
only where it is shown that the witness will agree to
testify at a foreign deposition and provide material
information.

In that case, the judge did not issue a
full-blown letter of rogatory but did issue a letter
rogatory to the foreign government essentially asking
would these people testify at a deposition willingly.
And I think that if that's done here, foreign law needs

1   to be considered.  I don't know what Egyptian law

2   provides someone in Mr. El-Fiki or the other two's

3   situation, what type of rights they have under Egyptian

4   law, but that would have to be delved into, I think.

5   But the judge in that case, *Jefferson*, did issue a

6   limited rogatory with a 60-day status check, not asking

7   the court to secure the depositions but, in essence,

8   asking whether they'd be willing to testify at a foreign

9   deposition.

10          One big thing that we're very concerned about

11  that has been touched upon by the court and that's the

12  timing of all of this.  And on the Egyptian side of the

13  house, this all involves testimony involving Mr. El-Fiki

14  and records concerning his transaction.  We issued a

15  subpoena to al-Haramain in the summer of 2003.

16  Mr. Matasar was counsel at the time, and he responded by

17  giving us records roughly in the fall of 2003, which

18  included some of this very material, the El-Fiki

19  material, the transactional information, perhaps some of

20  the e-mails that they're pulling out of the computers

21  now.  Some of those came over in hard copy to us from

22  them way back in 2003.  It's no mystery what this case

23  is all about and who Mr. El-Fiki is.

24          Moving forward, once Mr. Sedaghaty was indicted

25  and eventually came back to the United States in 2007,

1    the very first batch of discovery we provided in

2    December of 2007 included all of the -- the relevant

3    El-Fiki material, and also these computer hard drives

4    were turned over.  So for two years now -- for more than

5    two years, but through discovery purposes for over two

6    years, this material has sat in the defendant's

7    possession.  It is only now, two years later, that we're

8    getting these requests to go talk to El-Fiki, or to the

9    MLAT authority, or to get records certified, it's very

10   late in the game.  And the court knows that we've gone

11   to great lengths to secure a June 2010 trial date.  The

12   court took two weeks on its calendar, set a series of

13   preceding motions, a number of dominos have to fall, a

14   lot of hearings, a lot of witnesses to come here, that's

15   all been set up, and we're in that process now of

16   heading towards trial.

17          And so our comment is if the court wants to

18   consider some type of letter rogatory to try to get this

19   thing going, I would ask that the court be mindful of

20   the trial date and not let any kind of delay in the

21   rogatory process act as an impediment to moving towards

22   trial.

23          Judge Ellis recognized this in the *Jefferson*

24   case that the trial was, I think, fairly imminent.  And

25   the judge, as I said, said I'll issue a letter rogatory,

1    we'll have a status check in 60 days, but we're not

2    going to let this extend the trial.  And if there is no

3    response to it from the country requested, then we're

4    going to deny the request for a Rule 15 deposition and

5    move forward to trial.

6            I also would like to add that the State

7    Department -- even a letter of rogatory is a very

8    cumbersome process.  The courts have described this

9    process as extremely cumbersome, dilatory, expensive.

10   And the State Department, who does coordinate with the

11   foreign governments, we've asked them about Egypt's

12   track record.  Because it is a discretionary vehicle,

13   either through an MLAT or through a letter rogatory, and

14   I quoted a State Department comment that came back to me

15   for purposes of this hearing:  The United States has

16   enjoyed limited success in obtaining admissible evidence

17   in a timely manner from Egypt.  The U.S. government has

18   made few requests which are generally grounded on the

19   Mutual Legal Assistance Treaty, successes have been

20   infrequent.

21           So, again, no illusions here, if we go down the

22   road of foreign evidence gathering, we know from our own

23   work, and this is law enforcement to law enforcement,

24   that it is extremely difficult to work with foreign

25   governments to get cooperation.  We have to deal with

1   the logistics of translation, and then there has to be a

2   formal handoff from the State Department to the

3   equivalent of their State Department, going down to

4   their ministry of whatever department is involved in the

5   request, to their courts, consideration made, and then

6   back around.  So it's going to take an awful long time,

7   time that we really don't have right now if we want to

8   preserve this June trial date, which we want to do at

9   all costs.  I think that's all I have.

10          THE COURT:  Thank you.  Mr. Wax.

11          MR. WAX:  One second, please.

12          (Discussion held off the record between

13   co-counsel.)

14          MR. WAX:  Your Honor, to the extent that the

15   timing of our request is an issue for you, there are a

16   few additional comments that I would make.  If the

17   timing is not an issue for you, then I don't have

18   anything to add.

19          THE COURT:  I do think it's something I need to

20   consider.

21          MR. WAX:  All right.  Then let me say the

22   following:  You are aware that from the outset of the

23   commencement of the case in this court back in 2007,

24   late 2007, there has been an ongoing dispute about the

25   manner in which the government has handled the computer

 1    discovery.  We have been through that.  It's on the

 2    record.  But I think that that is critical to understand

 3    how long it took us to get into a position to understand

 4    what was relevant in terms of some of the financial

 5    documents, what we could attack in terms of some of the

 6    financial documents, and what we wanted to embrace in

 7    terms of some of these financial documents.

 8            Before we could understand that aspect of the

 9    case, it was our judgment that it would have been

10    incompetent as defense counsel, it would also have been

11    imprudent of me as the person responsible for money, to

12    send investigators off to Egypt and to Saudi Arabia to

13    try to gather information from Mr. El-Fiki and some of

14    these records that are in the motion that we filed on

15    Friday.  You just can't do that.  We couldn't do it

16    without understanding the case.

17            And we did not get to the point where we could

18    understand the case until the summer of 2009 because of

19    the exceedingly difficult problem we had in getting to

20    the electronic data.

21            THE COURT:  Have you had someone in Egypt?

22            MR. WAX:  Mr. Teesdale has been there, and

23    Mr. Teesdale has made the effort to contact Mr. El-Fiki

24    and this pleading is a result of his efforts and his

25    inability to obtain what we believe we need and what the

1  government was able to obtain through whatever contacts

2  it has with the Egypt Secret Police and the Egyptian

3  government that conducted the interrogation or interview

4  of Mr. El-Fiki at the behest of the United States

5  government.

6          In terms of timing, the government has

7  certainly provided us with a lot of material, but as you

8  also recall, they announced at the outset that this is

9  not an open discovery case.  We received another batch

10 of discovery this morning.  And we're appreciative of

11 that.

12         As I mentioned, my quick review of the report

13 from Evan Kohlmann, the person they call an expert

14 that's in here, that says things that heighten the

15 relevance and exculpatory aspect of the information

16 we're seeking.

17         This material also includes a document called

18 al-Haramain Islamic Foundation audit trail.  And the

19 date on it is May 1, 2008.  We're concerned if this

20 date, May 1, 2008, is something that was in the

21 government's possession now for roughly 20 months, why

22 we're just getting it today.  Among other things, it

23 contains information that directly contradicts some of

24 the written statements that we were previously provided

25 from the accountant Tom Wilcox about the core aspect of

1  this case as it relates to the purchase of a property in

2  Springfield and accounting.  May 1, 2008.  If Mr. Wilcox

3  printed it out and prepared it then, and the government

4  didn't have it, well, it's hard to understand that.  If

5  the government printed out that and they are just giving

6  it to us now, with the exculpatory information in it, it

7  seems to me that the government is not in a particularly

8  good position to be complaining about any delay on our

9  part as we have been trying to understand and to access

10  and then to understand what is in the voluminous

11  electronic records that are on the hard drives that were

12  recovered.

13         THE COURT:  Have you had that discussion with

14  Mr. Cardani?

15         MR. WAX:  No, I just looked at this -- I mean,

16  we were given it just before the court proceeding began.

17  We were looking at it for a moment outside at the table,

18  and I was just going back through it here in the

19  courtroom.

20         THE COURT:  All right.  Anything further?

21         MR. CARDANI:  Those came out of al-Haramain

22  hard drives, which were given to them a long time ago.

23  We can have discussions outside the court about the

24  dates and the ins and outs of it, but that's been in

25  their possession, at least in hard drive form, for quite

1    some time.

2         THE COURT:  All right.  I'll give you something

3    in writing, gentlemen.  Thank you.

4         MR. CARDANI:  Oh, Judge, one other matter.  Did

5    the court wish to address the need for a classified

6    hearing at the March -- our next hearing, and this is in

7    March, and it's to address some of the legal issues on

8    the motion to suppress?

9         THE COURT:  I have your written material.  I

10   think that's satisfactory.  I'm frankly waiting to hear

11   with more specificity exactly what we're going to be

12   talking about then, what material we're going to see.

13        MR. CARDANI:  All right.  In coming into that

14   hearing, we're not anticipating the need for any kind of

15   classified evidence unless the court orders otherwise,

16   and that would require logistical support from the court

17   security officer.

18        THE COURT:  Well, now, as you all know, this

19   case has gone on long enough we lost our wonderful court

20   security officer, and I've got to meet a new person.  I

21   guess she's -- Erin has already transferred to her job

22   in San Francisco.  And so what I'm going to do is

23   request, when it's on the schedule, that we get the new

24   one out so that we can get a -- some working

25   relationship there.  All right.  Thank you very much.

```
 1              MR. CARDANI:  Thank you, Judge.
 2              THE CLERK:  Court is in recess.
 3              MR. MATASAR:  Your Honor, can I just ask, when
 4    you said you were waiting for some more information, do
 5    you want us to make a further submission of the
 6    specific --
 7              THE COURT:  Something informal to tell me
 8    specifically where you are going.  You've given me
 9    principles -- legal principles and so on.  It's sort of
10    hard to apply those in the ether sphere.
11              MR. MATASAR:  That's fine, Your Honor.  And
12    might -- when you said the court security officer is
13    coming, would that be just a meeting with the court
14    or --
15              THE COURT:  Yes.
16              MR. MATASAR:  You wouldn't want us to do it
17    then, you'd want us to do it separately?
18              THE COURT:  I might make that in conjunction.
19              MR. MATASAR:  Thank you.
20              (The proceedings were concluded at 12:01 p.m.)
21
22
23
24
25
```

CERTIFICATE

1

2          I, Deborah Wilhelm, Certified Shorthand Reporter

3   for the State of Oregon, do hereby certify that I was

4   present at and reported in machine shorthand the oral

5   proceedings had in the above-entitled matter.  I hereby

6   certify that the foregoing is a true and correct

7   transcript, to the best of my skill and ability, dated

8   this 8th day of February, 2010.

9

10

11

12                              /s/ Deborah Wilhelm
                                Deborah Wilhelm, RPR
13                              Certified Shorthand Reporter
                                Certificate No. 00-0363
14

15

16

17

18

19

20

21

22

23

24

25