DWIGHT C. HOLTON, OSB #09054
United States Attorney
District of Oregon
**CHRISTOPHER L. CARDANI**
Assistant United States Attorney
405 East 8th Avenue, Suite 2400
Eugene, OR 97401
chris.cardani@usdoj.gov
Telephone:  (541) 465-6771
**CHARLES F. GORDER, JR.**, OSB #91287
Assistant United States Attorney
1000 S.W. Third Ave., Suite 600
Portland, OR  97204
charles.gorder@usdoj.gov
Telephone:  (503) 727-1000
        Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CR 05-60008-02-HO** |
| **v.** | **GOVERNMENT'S RESPONSE TO REVISED SECOND MOTION TO COMPEL THE GOVERNMENT TO UTILIZE ITS DIPLOMATIC RESOURCES ON BEHALF OF MR. SEDAGHATY AND/OR TO ISSUE LETTERS ROGATORY** |
| **PIROUZ SEDAGHATY,** | |
| **Defendant.** | |

I.    **Statement of Facts**

As alleged in the indictment, in the year 2000 the Al-Haramain organization which was headquartered in Saudi Arabia, and whose U.S. branch (Al-Haramain USA) was then operated by defendant, Pirouz Sedaghaty, in Ashland, Oregon, was involved in encouraging donations to support the so-called "mujahideen" fighting Russian forces in Chechnya.  In February 2000, an Egyptian donor identified as Mahmoud Talaat Hasan El-Fiki, who was seeking to support "our Muslim brothers" in Chechnya, wire transferred U.S. $150,000 from a bank account in London to a Bank of America account held by Al-Haramain USA in Ashland.

On March 7, 2000, defendant Soliman Al-Buthe arrived in the United States from Riyadh, Saudi Arabia.  On March 9, 2000, Al-Buthe flew to Ashland to retrieve the funds.  Defendants Sedaghaty and Al-Buthe went to the Bank of America and obtained 130 American Express Travelers checks in $1,000 denominations and a $21,000 cashier's check made out to Al-Buthe.  On March 12, 2000, Al-Buthe departed the United States, carrying the travelers checks.  When he left, Al-Buthe did not file a Currency and Monetary Instrument Report (CMIR), acknowledging he was leaving the country with more than $10,000 in currency as required by law.  The travelers checks and the cashier's check were later cashed at a bank in Saudi Arabia.  In October 2001, defendant Sedaghaty filed Al-Haramain USA's tax return for the year 2000 which covered up this transaction by falsely reporting that these funds were used to purchase a prayer house in Missouri, or returned to their original donor.  Evidence obtained in this investigation shows that Al-Haramain USA, Sedaghaty and Al-Buthe intended on using this money to support the mujahideen fighting the Russian government in Chechnya.

/ / /

**Page 2  -**    **GOVERNMENT'S RESPONSE TO REVISED SECOND MOTION TO COMPEL**

On January 15, 2010, defendant, seeking to obtain certain evidence he believes to be located in the Kingdom of Saudi Arabia, filed a motion seeking to compel the United States to "utilize the Mutual Legal Assistance Treaty ("MLAT") on behalf of Mr. Sedaghaty and/or to issue letters rogatory." (CR 247 at 1.) Subsequently, upon being informed by counsel for the government that there was no such treaty with the Kingdom of Saudi Arabia, defendant revised his request and now asks this Court to compel the government to "utilize all diplomatic resources at its disposal on behalf of Mr. Sedaghaty and/or to issue Letters Rogatory." (CR 251 at 2.) Defendant, therefore, requests that – in the absence of an MLAT – he be allowed to harness the United States government's foreign affairs apparatus. Since the courts lack authority to compel the Executive Branch to undertake any action in the realm of foreign affairs and diplomatic relations, defendant's request must be denied.

Alternatively, as with defendant's previous motion regarding Egypt, there is little basis for the issuance of various letters rogatory in this matter. The defendant seeks evidentiary certifications of certain documents which he baldly asserts are in the possession of the Saudi government. Even assuming his assertion were correct, those documents on their face lack any legitimacy so they are neither exculpatory nor particularly probative of any relevant issue. The government therefore objects to any letter rogatory which would seek to "certify" such documents without a live witness subject to cross-examination by government counsel. With regard to the purported defense witness Al-Sanad, the government does not object to a letter rogatory which would invite him to testify at the trial in June 2010 or seeks to ascertain his willingness to be deposed.

/ / /

**Page 3  -      GOVERNMENT'S RESPONSE TO REVISED SECOND MOTION TO
               COMPEL**

If, however, the Court should issue any letters rogatory to the Kingdom of Saudi Arabia, it should do so only with the understanding that the letters rogatory may not be acted upon by the courts in Saudi Arabia before the scheduled June 7, 2010, trial date.  In light of the fact that the defendant has waited a significant length of time before making this motion, the lack of a timely response by the Kingdom should not serve to further delay the trial of this matter – a trial that has already been delayed five times over the course of the past two years.[1]

## II.    Defendant Cannot Compel the United States to Use its Diplomatic Resources on his Behalf.

On January 26, 2010, this Court issued an order denying defendant's previous request to compel the government to use an MLAT on his behalf.  In that order, this Court expressly found that a private defendant had no such right.  In noting that such matters are the province of the Executive Branch, this Court held, "[i]t is the [Department of Justice's Office of International Affairs] who has complete discretion to make (or not to make) MLAT requests and so many more considerations go into making such requests beyond any given criminal case including diplomatic relations."  (CR 252 at 9.)  This rationale applies *a fortiori* to defendant's present attempt to compel the United States to use its "diplomatic resources" on his behalf.

Article II of the United States Constitution grants the power to conduct foreign relations to the Executive Branch.  U.S. Const. art. II, § 2, cl. 1-3.  Based on this constitutional allocation of power, the Supreme Court has described the President of the United States as possessing "plenary and exclusive power" in the international arena and "as the sole organ of the federal

---

[1]  One government witness who had critical testimony to provide concerning defendant Sedaghaty's intent to assist the mujahideen in Chechnya has already died since the initial arraignment in this matter.

Page 4  -       GOVERNMENT'S RESPONSE TO REVISED SECOND MOTION TO
                COMPEL

government in the field of international relations . . . ." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936).  As such, the Court has made it abundantly clear that, "[t]he conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative – 'the political' – Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision[.]"  *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 766 (1972) *citing Oetjen v. Central Leather Co.*, 246 U.S. 297, 302 (1918) (emphasis added).  It is axiomatic, however, that "presidential action in the field of foreign affairs is committed to presidential discretion by law," *Jensen v. Nat'l Marine Fisheries Serv.*, 512 F.2d 1189, 1191 (9th Cir. 1975), and that courts lack authority to compel the Executive Branch to undertake any action in the realm of foreign affairs and diplomatic relations.  *Baker v. Carr*, 369 U.S. 186, 211 (1962).

On that score, the use of diplomatic resources is inextricably linked to foreign affairs and is, therefore, clearly a matter within the exclusive province of the Executive Branch.  The Supreme Court has noted that, "[u]nlike the courts, 'diplomatic and executive channels are, by definition, designed to exchange, negotiate, and reconcile the problems which accompany the realization of national interests within the sphere of international association.'"  *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for Southern Dist. of Iowa*, 482 U.S. 522, 552 (1987) *citing Laker Airways, Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 955 (1984).  As such, in asking this Court to compel the government to use its diplomatic resources on his behalf, defendant – in essence – asks this Court to commandeer the foreign relations apparatus of the United States so that it can be used as defendant wishes.  This would constitute an obvious intrusion by the judiciary into matters "wholly confided by our Constitution to the

**Page 5  -      GOVERNMENT'S RESPONSE TO REVISED SECOND MOTION TO
                  COMPEL**

political departments of the government," *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948), and would violate an important constitutional principle which has been ratified by over a century of federal jurisprudence. Accordingly, insofar as defendant seeks to compel the United States to use its diplomatic resources on his behalf, his motion must necessarily fail.

**III.    There Is No Basis To Seek Certification of the Documents Proffered by Defendant.**

Defendant alternatively requests that this Court issue a letter rogatory to the Kingdom of Saudi Arabia in order to certify certain documents. As this Court has previously noted, district courts have inherent authority to issue letters rogatory in both civil and criminal cases. *See United States v. Staples*, 256 F.2d 290, 292 (9th Cir. 1958) (noting that all federal courts have "inherent power to issue Letters Rogatory").

**A.    The Documentary Evidence**

Defendant seeks a letter rogatory in order to obtain certified copies of certain receipts and other documents purportedly produced by the parent Al-Haramain Islamic Foundation in Saudi Arabia – documents which defendant asserts are in the possession of the government of the Kingdom of Saudi Arabia. (CR 247 at 4.) He provides no evidence, however, to back up this assertion. Until he does so, his motion should be denied. The Al-Haramain Islamic Foundation has been designated by the U.S. Treasury's Office of Foreign Assets Control ("OFAC") as a Specially Designated Global Terrorist. The organization was officially dissolved by the Kingdom of Saudi Arabia for similar reasons in June 2004.

The defendant seeks letters rogatory to certify: (1) two Al-Haramain "receipts" allegedly dated in March 2000 at the time that the underlying transaction actually occurred, (CR 247-3,

**Page 6  -    GOVERNMENT'S RESPONSE TO REVISED SECOND MOTION TO COMPEL**

Ex. D at 2-5); (2) a letter dated in April 2004 from one Khalid Bin-'Ubayd al-Zahiri, (CR 247-3,

Ex. D at 6-7); and (3) an affidavit dated May 2004 from one Khalid Bin Obaid Azzabri (CR 247-

3, Ex. D at 9-10). The Court can take judicial notice that both the letter and affidavit are dated in

April and May 2004, months after the criminal search warrant was executed in this case and

when the affidavit in support of the search warrant was publicly available. Thus, these latter

documents appear to have been produced in contemplation of this and other litigation involving

Al-Haramain. Moreover, none of these documents are exculpatory or particularly helpful to

defendant's case.

### 1.     The Purported Al-Haramain "Receipts"

The purported Al-Haramain receipts were provided to current counsel for the government

by Thomas Nelson, counsel for the fugitive codefendant Al-Buthe, in January 2005. A review of

the defendant's own translation of these purported receipts (CR 247-3 at 3, 5) reveals that the

documents vaguely state that Al-Haramain in Saudi Arabia received money from Al-Haramain

USA through the fugitive codefendant Al-Buthe "for the Muslims of the Chechens" and "for the

Chechen Moslems." *Id*. There is nothing particularly exculpatory about those references. They

certainly do not negate the allegation that the defendant, Al-Buthe, and Al-Haramain intended

the money to go to the so-called mujahideen fighting in Chechnya. The alleged "receipts" do not

state where the money went thereafter, nor do they even purport to earmark the funds for actual

humanitarian assistance. *Id.* They do not demonstrate final receipt or the final destination of the

funds. As such – even if admitted into evidence – the vouchers do not demonstrate that the

money was actually intended for any charitable cause. Likewise, none of the documents would

serve to establish that the funds in question were used for a prayer house in Missouri or returned

**Page 7  -     GOVERNMENT'S RESPONSE TO REVISED SECOND MOTION TO
                COMPEL**

to their original donor as reflected on the Al-Haramain USA tax return.  They, therefore, do not

serve to exculpate defendant and are not paramount to defendant receiving a fair trial.

Defendant's request for a letter rogatory to obtain certified copies of the purported "receipts"

should, accordingly, be denied.  *See United States v. Rosen*, 240 F.R.D. 204, 215 (E.D. Va.

2007).

       Even if the Court were to entertain issuing a letter rogatory concerning these documents,

the government would object to any procedure in which these "receipts" were certified by an

official of the Kingdom of Saudi Arabia, which defendant now asserts possesses the documents,

rather than someone who was familiar with the day-to-day operations of Al-Haramain at the

time.  Furthermore, the government objects to any procedure certifying these "receipts" as

admissible evidence without providing the government with the opportunity to cross-examine

the person who certifies the documents in order to question their foundation for admission into

evidence.   Federal Rule of Evidence 803(6) prohibits the introduction of any business record

when "the source of information or the method or circumstances of preparation indicate lack of

trustworthiness."  The Al-Haramain receipts suffer from just such a lack.

       The 3/14/2000 "receipt" (CR 247-3 at 4-5) purports to indicate that Al-Haramain

received 224,000 Saudi Riyals from Al-Buthe (approximately US$59,813 at the applicable

exchange rate) on that date.  Yet an Al-Rahji bank record also provided by Al-Buthe's counsel

purports to show that Al-Buthe cashed the US$130,000 in American Express checks on that

same date, but for 486,650 riyals, not 224,000 riyals, quite a discrepancy!  And the second

receipt, dated 3/28/2000 (CR 247-3, Ex. D at 2-3), allegedly documents the receipt of an

additional 479,514 Saudi Riyals (approximately US$128,041) from Al-Buthe on behalf of Al-

**Page 8  -    GOVERNMENT'S RESPONSE TO REVISED SECOND MOTION TO
COMPEL**

Haramain USA, for a total "contribution" from Ashland of approximately US$187,854, much more than the $151,000 which Al-Buthe carried out of the United States in March 2000.

Given this significant discrepancy, the government questions the authenticity of these two purported "receipts" and objects to any procedure authenticating them which does not provide for thorough cross-examination of their actual maker by government counsel.  The simple fact is that these receipts purportedly come from a foreign organization associated with numerous terrorist events, and they only surfaced after the investigation in this case became public.  These Al-Haramain receipts, supposedly to document funds received from Al-Haramain USA, were not found on Al-Haramain USA's premises when it was searched in February 2004 or in the computers seized during that search.  Thus, the request for a letter rogatory to the government of the Kingdom of Saudi Arabia to certify these receipts should be denied.

### 2.    The Letter and Affidavit

Similarly, the letter and affidavit from the two alleged Al- Haramain officials suffer from even worse evidentiary problems than do the purported receipts.  They do not even purport to be contemporary business records admissible under Federal Rule of Evidence 803(6).  They are dated more than four years after the transaction, and months after the execution of the search warrant and the public release of the search warrant affidavit.  They simply contain rank hearsay not subject to any recognized exception.  The April 27, 2004, letter from Al-Zahiri (CR 247-3, Ex. D at 6-7), vaguely asserts that the money received was "designated to the Chechens," and again is not exculpatory or particularly helpful to the defense in any way.

The affidavit from Azzabri (CR 247-3, Ex. D at 9-10) does contain a conclusory statement that the money was spent "in Humanitarian and relief work for Chechen refugees."

**Page 9  -    GOVERNMENT'S RESPONSE TO REVISED SECOND MOTION TO
                        COMPEL**

That affidavit, however, is not a business record, does not provide any detail about where the money went and how it got there, and does not provide any proof of final destination. Again, it is rank, inadmissible hearsay. The request for a letter rogatory to the government of the Kingdom of Saudi Arabia to certify these hearsay statements should be denied.

## IV.    The Testimony of Sami 'Abd Al 'Aziz Al-Sanad

In March 2009, the government provided the defense with the following information:

> The U.S. Government obtained information that Sami 'Abd Al 'Aziz Al-Sanad worked during 2000 and 2001 for the Al-Haramain organization and was responsible for providing currency supplied by Al-Haramain, including the currency obtained by codefendant Soliman Al-Buthe from Al-Haramain USA, to a representative of Muhammad Al-Sayf, aka Abu 'Umar, to be smuggled into Chechnya. Al-Sanad has claimed that the monies he provided to Al-Sayf's representative were destined for needy Chechen families.

(CR 247-4, Ex. E.) Now, ten months later and less than five months before the oft-rescheduled trial date, the defendant seeks the issuance of a letter rogatory to the Kingdom of Saudi Arabia seeking to invite Al-Sanad to testify at the June 2010 trial or alternatively seeking his deposition in Saudi Arabia.

It is well-settled that the decision to issue letters rogatory lies within a district court's sound discretion. *Leasco Data Processing Equip. Corp. v. Maxwell*, 63 F.R.D. 94 (S.D.N.Y. 1973). In general, when requested to help secure deposition testimony, a court should grant an application for letters rogatory when: (1) the party seeking a deposition has established exceptional circumstances justifying the taking of the deposition under Rule 15; and (2) the prospective witness will not appear at a deposition voluntarily. *See United States v. Rosen*, 240 F.R.D. at 215.

**Page 10  -    GOVERNMENT'S RESPONSE TO REVISED SECOND MOTION TO COMPEL**

As this Court noted in its order regarding the defendant's requested letters rogatory to Egypt, "[l]etters rogatory are a complicated, dilatory and expensive system." (CR 252 at 11, *citing Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for Southern Dist. of Iowa*, 482 U.S. 522, 531 (1987).) If the deposition requested is not paramount to receiving a fair trial, then the request should be denied. *See, e.g., Rosen*, 240 F.R.D. 204 at 215.

Rule 15(a) allows the district court broad discretion in deciding whether to order depositions in a criminal case and explicitly states that such depositions will be reserved for "exceptional circumstances [where] it is in the interest of justice that the testimony of a prospective witness . . . be taken and preserved for use at trial . . . ." Fed. R. Crim. P. 15(a); *see also United States v. Hernandez-Escarsega*, 886 F.2d 1560, 1569 (9th Cir. 1989) ("The facts of each case must be separately considered to determine whether the exceptional circumstances contemplated by Rule 15(a) exist . . . ."). In deciding whether to grant a Rule 15(a) motion, the district court must consider, among other factors, whether the deponent would be available at the proposed location for deposition and would be willing to testify. *See United States v. Olafson*, 213 F.3d 435, 442-443 (9th Cir. 2000), *citing United States v. Zuno-Arce*, 44 F.3d 1420, (9th Cir. 1995). The court should also consider whether the safety of United States officials would be compromised by going to the foreign location. *United States v. Omene*, 143 F.3d 1167, 1169-70 (9th Cir. 1998).

Although the government has no objection to the issuance of an invitation to Al-Sanad for him to come to testify, the defense concedes that it has had no contact with Al-Sanad and does not know whether he is willing to testify. Those circumstances do not bode well for making him available either for trial or for a timely Rule 15 deposition.

**Page 11  -    GOVERNMENT'S RESPONSE TO REVISED SECOND MOTION TO COMPEL**

In determining whether to order the taking of his deposition, the Court must also consider the need for such testimony. Although Al-Sanad's testimony might have some limited relevance in this case in assisting the trier of fact to trace the money taken from Oregon to Saudi Arabia onward to Chechnya, it is by no means critical to the issue of defendant Sedaghaty's specific intent. While Al-Sanad has claimed that he believed the money he provided to the smuggler was destined for "needy Chechen families," such a statement has little relevance to the defendant's own knowledge or state of mind. In fact, given defendant's admitted lack of contact with Al-Sanad (CR 247 at 12), there is absolutely no way to impute Al-Sanad's subjective belief to defendant. And it certainly does not explain why the defendant would falsely declare on the tax return that the funds went to Missouri rather than Chechnya, or explain the failure to declare the funds as they left the United States. As such, the deposition requested is not paramount to receiving a fair trial. *See, e.g., Rosen*, 240 F.R.D. 204 at 215.

Should the Court decide to issue letters rogatory, the government respectfully requests that it craft the request for judicial assistance similar to that crafted by the court in *United States v. Jefferson*, 594 F. Supp. 2d 655 (E.D. Va. 2009), so that a letter rogatory would first issue requesting the appropriate Saudi judicial authority to examine Al-Sanad by written interrogatories regarding his willingness to waive his Fifth Amendment rights and answer questions fully in a later deposition. That initial letter should also inquire as to whether, at defendant's expense, Al-Sanad would be willing to come to the United States and testify at defendant's trial. Sixty days would then be allotted to complete this process, after which defendant's request for depositions would be examined in light of the response received, if any.

/ / /

Page 12  -    GOVERNMENT'S RESPONSE TO REVISED SECOND MOTION TO
               COMPEL

If no response is received, the available information would not warrant authorizing Rule 15 depositions and defendant's request would then be denied.  *Id.* at 675-676.

If the Court should, however, decide to issue such a letter rogatory, or any other process to the Kingdom of Saudi Arabia, then it should be done under the condition that the trial now scheduled for June 7, 2010, will not be delayed due to the potential failure of the Saudi courts to respond quickly to this Court's request.  The government's previous experience with Saudi Arabia in this regard is certainly not an exception to the general rule that the letters rogatory process can be very time consuming.  As the Court is aware from related litigation in this very case, the Kingdom of Saudi Arabia has not responded to U.S. diplomatic requests (grounded in an international treaty to which both the United States and Saudi Arabia are parties) to obtain bank documents for use at the upcoming trial (CR-255 at 3).

Although the Justice Department will use its good offices to have any letter rogatory issued by this Court expeditiously delivered after the defense obtains an Arabic translation of the document, it is very probable that there will be no response from Saudi Arabia between now and June 2010.  In light of the repeated delays in this case which have left it lingering on the federal docket for over two years, coupled with the fact that the defense could have made this motion almost a year ago but instead waited until now to seek this evidence, there is no reason to further delay the upcoming trial if such letters rogatory are not acted upon in a timely fashion.

V.    **Conclusion**

For the reasons given above, the defendant's motion to compel the government to use its diplomatic resources for the benefit of defendant should be denied.  The defense motion for the issuance of letters rogatory to certify exhibits should also be denied.  The defense motion for a

**Page 13  -    GOVERNMENT'S RESPONSE TO REVISED SECOND MOTION TO COMPEL**

letter rogatory to depose Al-Sanad should only be granted, if at all, for the limited purpose of inviting Al-Sanad to come to the United States to testify or to ascertain his willingness to testify or be deposed in this case.

Dated this 9th day of February 2010.

DWIGHT C. HOLTON
United States Attorney


/s/ *Charles F. Gorder, Jr.*
CHARLES F. GORDER, JR.
Assistant United States Attorney


/s/ *Christopher L. Cardani*
CHRISTOPHER L. CARDANI
Assistant United States Attorney


**OF COUNSEL:**
Dan E. Stigall
Trial Attorney
U.S. Department of Justice
Office of International Affairs