DWIGHT C. HOLTON, OSB #09054
United States Attorney
District of Oregon
**CHRISTOPHER L. CARDANI**
Assistant United States Attorney
405 East 8th Avenue, Suite 2400
Eugene, OR 97401
chris.cardani@usdoj.gov
Telephone: (541) 465-6771
**CHARLES F. GORDER, JR.**, OSB #91287
charles.gorder@usdoj.gov
**RYAN W. BOUNDS**, OSB #00012
ryan.bounds@usdoj.gov
Assistant United States Attorneys
1000 S.W. Third Ave., Suite 600
Portland, OR 97204
Telephone: (503) 727-1000
        Attorneys for United States of America

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | CR 05-60008-02-HO |
| v. | |
| **PIROUZ SEDAGHATY,** | REPLY IN SUPPORT OF THE MOTION OF THE UNITED STATES |
| **Defendant.** | TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA |
| **In re AL RAJHI BANK SUBPOENA** | ISSUED PURSUANT TO 31 U.S.C. § 5318(k) |
| **AL RAJHI BANKING & INVESTMENT CORP,** **Real party in interest** | |
| **Respondent.** | |

The United States of America, by and through Dwight C. Holton, United States Attorney for the District of Oregon, by Assistant United States Attorneys Charles F. Gorder, Jr., Christopher L. Cardani and Ryan W. Bounds, files this reply to the memorandum filed by Al Rajhi Banking & Investment Corporation ("the Bank") in opposition to the Motion of the United States To Compel Compliance with the July 17, 2009, Subpoena Issued Pursuant to 31 U.S.C. § 5318(k).  The Bank's memorandum in opposition raises the same arguments interposed by the Bank in the ancillary proceeding in the District of Columbia, but those arguments — already unavailing — are only further undermined by the current posture of these proceedings.  This Court should affirm the validity of the subpoena and order the Bank's compliance.[1]

## I.      The Bank's Facial Challenge to § 5318(k) Is Wholly Unwarranted.

This proceeding is solely to determine whether the government may invoke the enforcement authority of this Court to compel compliance with the subpoena issued to the Bank under § 5318(k). Nevertheless, the Bank's principal contention in opposition remains its claim that the statute unconstitutionally fails to "reserv[e] ultimate enforcement authority to the courts." (Resp't's Opp'n at 8.)  Even if this claim were a colorable one elsewhere, it is obviously misplaced here.  Simply put,

---

[1] The Bank asks this Court to "refrain from deciding" the instant motion until the District Court for the District of Columbia rules on the government's motion to transfer, dismiss, or stay the ancillary proceeding initiated by the Bank in that court in order to avoid "inconsistent judgments in two separate jurisdictions." (Al Rajhi Banking & Investment Corp.'s Opposition to United States' Motion To Compel Compliance with PATRIOT Act Subpoena [hereinafter "Resp't's Opp'n"] at 29.)  The United States does not oppose this request.

Although the Bank emphasizes that the ancillary proceeding in the District of Columbia was "first[ ]filed" and suggests that the government was dilatory in filing the instant motion to compel "nearly two weeks" after the initiation of the ancillary proceeding (Resp't's Opp'n at 2), a motion to enforce the subpoena would have been premature before the January 29, 2010, date set for the Bank's voluntary compliance.

**PAGE 2 -      REPLY IN SUPPORT OF THE MOTION OF THE UNITED STATES TO
               COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

the Bank urges the invalidation of § 5318(k) in the course of the very judicial review that the Bank faults the statute for failing to provide. This Court should decline the Bank's invitation to strike down a federal statute based only on an alleged infirmity that has never manifested itself. *See, e.g.*, *United States v. Raines*, 362 U.S. 17, 22 (1960) ("The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined.").

In any event, the Bank's claim itself is meritless for the reasons previously laid out in the government's initial memorandum. The Bank's entire argument rests on "the long-standing limits placed on government searches under the Fourth Amendment" (Resp't's Opp'n at 13), but the Supreme Court explicitly rejected the contention that the Fourth Amendment limits searches and seizures of the property of foreign nationals on foreign soil in *United States v. Verdugo-Urquidez*, 494 U.S. 259, 275 (1990).

The Bank's efforts to distinguish away *Verdugo-Urquidez* as an inapplicable and "limited holding" are wholly without merit. First, the Bank argues that the putative search in this case "rests on the Bank's presence in the United States in the form of its domestic correspondent relationships" and that this "presence" establishes "domestic ties" that trigger the Fourth Amendment. (Resp't's Opp'n at 13-14.) The defendant in *Verdugo-Urquidez*, however, had at least as strong a claim to "presence" and "domestic ties" as the Bank does. There, the DEA undertook a search of the defendant's Mexican residences while the defendant was held in the United States specifically because the defendant was suspected of being "one of the leaders of a large and violent organization in Mexico that smuggle[d] narcotics into the United States." *Verdugo-Urquidez*, 494 U.S. at 262. If the defendant's physical presence in and large-scale operations involving importation of goods

**PAGE 3 -     REPLY IN SUPPORT OF THE MOTION OF THE UNITED STATES TO
                COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

into the United States did not trigger application of the Fourth Amendment in *Verdugo-Urquidez*, there is no basis for the Bank's contention that its remotely maintained "correspondent relationships" with four domestic banks should do so here.

The Bank also contends that the nature of the government's activities somehow triggers the Fourth Amendment. Specifically, the Bank cites the issuance of the subpoena within the United States and the demand that the records be produced to the government in the United States. (Resp't's Opp'n at 14.) It is plain from the facts of *Verdugo-Urquidez* itself, however, that neither the place where the search is initiated nor the destination of the records when they are recovered will bring a foreign search of a foreign person within the Fourth Amendment's purview. As the Court in that case explained, the search of the defendant's Mexican residences was initiated by "a DEA agent assigned to the Calexico DEA office" — that is, an agent based in California — and the evidence recovered in the search was to be introduced in a federal trial in the Southern District of California. 494 U.S. at 262-63. Notwithstanding these facts, the Fourth Amendment did not apply to the foreign search in *Verdugo-Urquidez*. For the same reason, it does not apply to the government's demand for the foreign bank's overseas records in this case.

The Bank finally attempts to distinguish *Verdugo-Urquidez* by noting that the Mexican authorities acquiesced in the searches in that case, whereas "the government has not obtained [the Saudi authorities'] consent to obtain the documents" at issue here. (Resp't's Opp'n at 14.) The Bank cites nothing in *Verdugo-Urquidez* or any other authority for the novel proposition that the scope of constitutional protections depends on a foreign sovereign's concurrence, and the government is aware of no such authority. Indeed, an essential aspect of the *Verdugo-Urquidez* Court's reasoning was that the Fourth Amendment could *not* impose constitutional niceties on the

PAGE 4 -   REPLY IN SUPPORT OF THE MOTION OF THE UNITED STATES TO
            COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA

political branches' pursuit of the interests of the United States in relation to the interests of foreign governments:

> For better or for worse, we live in a world of nation-states in which our Government must be able to "functio[n] effectively in the company of sovereign nations." *Perez v. Brownell*, 356 U.S. 44, 57 (1958). . . . Situations threatening to important American interests may arise half-way around the globe, situations which in the view of the political branches of our Government require an American response with armed force. If there are to be restrictions on searches and seizures which occur incident to such American action, they must be imposed by the political branches . . . .

*Verdugo-Urquidez*, 494 U.S. at 275. To read *Verdugo-Urquidez* as contemplating Fourth Amendment limits on overseas actions only when a foreign sovereign *disagrees* with the position of the United States would be, quite simply, to turn the reasoning of that case on its head.

In the final analysis, the Bank offers no credible basis for claiming that the Fourth Amendment has any application to the overseas records of a foreign national held by a foreign bank. There is none. *See In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 157, 170 (2d Cir. 2008) (rejecting application of Fourth Amendment's warrant requirement to overseas searches of *U.S. citizens*); *United States v. Aikins*, 946 F.2d 608, 613 (9th Cir. 1990) ("The Fourth Amendment does not apply to a search of aliens conducted in foreign territory."). The Bank's Fourth Amendment claim, if this Court addresses it at all, should be flatly rejected.

**II.**   **The Bank Cites No Authority Whatever for the Proposition that the Justice Department's Administrative Subpoenas May Not Be Used To Gather Evidence for Trial.**

The Bank acknowledges that numerous cases from a variety of jurisdictions have rejected challenges to the Justice Department's authority to gather evidence against a defendant through administrative subpoenas after the defendant is indicted for the offense under investigation. (Resp't's

Opp'n at 14.)  The Bank also acknowledges that the Ninth Circuit itself has recently affirmed that a federal agency may — despite a lack of explicit statutory authorization — gather evidence against a defendant through an administrative subpoena even after litigation involving the very subject of the investigation has commenced.  (Resp't's Opp'n at 18 (contending that *EEOC v. Federal Express Corp.*, 558 F.3d 842 (9th Cir. 2009), upheld post-trial subpoena authority "because of the unique, multi-step process established by Title VII").)  Nevertheless, the Bank, citing *Resolution Trust Corp. v. Grant Thornton*, 41 F.3d 1539 (D.D.C. 1994), insists that there is an immutable rule against the use of administrative subpoenas for purposes other than pretrial investigation absent explicit statutory language to the contrary.  (Resp't's Opp'n at 18 (dismissing "legislative history" in support of broad authority to gather records through § 5318(k) and emphasizing that "nothing in the language of [that provision] extends the subpoena power beyond the 'traditional scope of investigative authority'").)

The Bank is quite simply incorrect in asserting that there is a presumption against the enforcement of the Justice Department's administrative subpoenas when they are issued after an indictment is filed.  To the contrary, the Ninth Circuit has made clear that administrative subpoenas *must be enforced* unless agency authority is "plainly lacking."  *Federal Express*, 558 F.3d at 851 n.3 ("We believe that it is well-established that an administrative subpoena is to be enforced unless agency authority is plainly lacking." (emphasis added).).  The Justice Department's authority to issue subpoenas post-indictment is far from "plainly lacking" here.  Indeed, Congress enacted the subpoena authority in § 5318(k) in 2001 — long *after* the Justice Department's authority to issue post-indictment administrative subpoenas in drug and healthcare fraud cases had been expressly affirmed by at least two circuits and remained unchallenged in the others.  *See, e.g.*, *United States*

PAGE 6 -     REPLY IN SUPPORT OF THE MOTION OF THE UNITED STATES TO
             COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA

*v. Phibbs*, 999 F.2d 1053, 1077 (6th Cir. 1993); *United States v. Harrington*, 761 F.2d 1482, 1485 (11th Cir. 1985).  The courts must "assume that Congress is aware of existing law when it passes legislation."  *Atlantic Sounding Co., Inc. v. Townsend*, __ U.S. __, 129 S. Ct. 2561, 2577 (2009) (quoting *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990)).  Moreover, Congress was explicit about its intention to confer powers in excess of preexisting authorities, which had proven "outmoded and inadequate . . . in cases in which money laundering involve[d] foreign persons, foreign banks, or foreign countries."  *See* International Money Laundering Abatement and Antiterrorist Financing Act of 2001, Pub. L. 107-56 § 302(a)(8), 115 Stat. 297 (2001).  Although the Bank dismisses this express statement of Congress's intent as mere  "legislative history" (Resp't's Opp'n at 18), it was enacted by Congress and signed by the President as section 302 of the statute itself.[2]

The Bank's continued reliance on *Grant Thornton* as establishing a contrary rule is simply unconvincing — particularly in light of the fact that the district court in that case was considering a subpoena that was issued for a different purpose by a different agency under a different statute.

### III.  Enforcement of the Subpoena Is in the Overall Interests of the United States.

Contrary to Congress's express statutory requirement that foreign banks either comply with a valid demand for bank records under § 5318(k) or accept the potential loss of their correspondent relationships with covered institutions in the United States, and notwithstanding Congress's express

---

[2]     If Congress were inclined to limit the Justice Department's issuance of administrative subpoenas after an indictment is filed, Congress could have enacted such a limit.  The fact that it did not is itself evidence that no such limit exists.  *Cf. United States v. Stuart*, 489 U.S. 353, 363 (1989) (rejecting inference that statutory bar on IRS administrative summonses after a criminal referral is triggered by criminal investigations in foreign jurisdictions, noting "[w]e . . . see no reason to think that § 7602(c) means more than it says.").

**PAGE 7 -    REPLY IN SUPPORT OF THE MOTION OF THE UNITED STATES TO
              COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

disapproval of "'offshore' banking and related facilities [that are] designed to provide anonymity," Pub. L. 107-56 § 302(a)(4), 115 Stat. at 296, the Bank insists that this Court should effectively permit the Bank to defy the subpoena here and maintain its correspondent relationships out of deference to Saudi bank secrecy laws.  In doing so, the Bank asserts that the balance of factors enumerated in § 442(1)(c) of the Restatement (Third) of Foreign Relations Law of the United States compels that result.  The Bank is simply incorrect.

As the Ninth Circuit noted in *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468 (1992), the relevant factors are:

> [T]he importance to the investigation or litigation of the documents or other information requested; the degree of specificity of the request; whether the information originated in the United States; the availability of alternative means of securing the information; and the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

959 F.2d at 1475.  The Bank maintains that the first factor "clearly" weighs against enforcing the subpoena, because the "government already *has* evidence of the actual disposition of the funds" at issue.  (Resp't's Opp'n at 23 (citing January 28, 2010, Declaration of Colleen Anderson).)  This factor focuses on the importance of the documents for "litigation."  However, the American banking records described in Special Agent Anderson's declaration do not provide evidence concerning the deposit and/or full extent of the disposition of these U.S.-sourced funds.  As a result, the records at issue here are "directly relevant," *Richmark*, 959 F.2d at 1475, and this first factor weighs in favor of disclosure.

/ / /

/ / /

**PAGE 8 -    REPLY IN SUPPORT OF THE MOTION OF THE UNITED STATES TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

The Bank does not even suggest that the second factor weighs against disclosure (Resp't's Opp'n at 23), but the Bank is correct that the third factor does, insofar as the documents pertain to a bank account maintained in a foreign jurisdiction by foreign parties.

Contrary to the Bank's representation, the fourth factor — the availability of the records by other means — weighs heavily for disclosure rather than against it. The Bank asserts that the alternative means it proposes, to wit a letter rogatory, is "substantially equivalent" to the administrative subpoena here (Resp't's Opp'n at 24), but it is no such thing. Even the Bank acknowledges that the United States indicated more than *three months ago* that it had previously submitted a request for these records directly to the Saudi government (Resp't's Opp'n at 5), but that request has so far been fruitless. Moreover, the Bank's core assertion is that the Saudi government itself is precluding the Bank from disclosing the records at issue. In these circumstances, the claim that a letter rogatory would recover the documents as readily as the Bank's producing them in compliance with the subpoena is nothing short of fanciful. *Cf. In re Grand Jury 81-2*, 550 F. Supp. 24, 29 (W.D. Mich. 1982) (rejecting foreign bank's claim that letters rogatory were substantially equivalent to a grand jury subpoena due to "'unnecessary formalities, unacceptable delays, unresponsive channels of communication, and ineffective procedures for obtaining evidence in a form for timely use'"). Responding to a letter rogatory is completely discretionary on the part of a foreign court. In contrast, the previous request made by the U.S. — grounded on both the principle of reciprocity and an international convention to which both nations are parties — was not discretionary but was fruitless nevertheless.

The fifth factor plainly favors the Bank's production of the records. As already discussed in the initial memorandum of the United States, *both* governments with an interest in this matter, by

**PAGE 9 -    REPLY IN SUPPORT OF THE MOTION OF THE UNITED STATES TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**

becoming parties to the International Convention for the Suppression of the Financing of Terrorism, have adopted policies of favoring disclosure over bank secrecy in investigations of terrorist financing.[3] The Bank's protest that the Convention does not override domestic law (Resp't's Opp'n 25) is quite beside the point. The Convention establishes that both governments have "important interests," *Richmark*, 959 F.2d at 1475, in disclosure. It is precisely this interest that the United States seeks to vindicate.

**IV.     Conclusion**

For the foregoing reasons and those articulated in its initial memorandum, the United States moves this Court to order the Bank to produce the documents identified in the subpoena issued by the Acting United States Attorney on July 17, 2009.

Dated: February 12, 2010

Portland, Oregon

>                    Respectfully submitted,
>
>                    DWIGHT C. HOLTON
>                    United States Attorney
>
>                    *s/ Charles F. Gorder, Jr.*
>                    CHARLES F. GORDER, JR.
>                    CHRISTOPHER L. CARDANI
>                    RYAN W. BOUNDS
>                    Assistant United States Attorneys

---

[3] The Bank's suggestion that this case does not involve the investigation of terrorist financing as contemplated by the Convention because no charge of "financing terrorism" was included in the indictment (Resp't's Opp'n at 25 & note 3) is plainly unserious.

**PAGE 10 -     REPLY IN SUPPORT OF THE MOTION OF THE UNITED STATES TO COMPEL COMPLIANCE WITH JULY 17, 2009, SUBPOENA**