```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF OREGON

 3   UNITED STATES OF AMERICA,        )
                                      )
 4                  Plaintiff,        ) No. 05-60008-2-HO
                                      )
 5      v.                            ) February 16, 2010
                                      )
 6   PIROUZ SEDAGHATY, et al.,        ) Eugene, Oregon
                                      )
 7                  Defendants.       )

 8


 9              TRANSCRIPT OF ORAL ARGUMENT

10          BEFORE THE HONORABLE MICHAEL R. HOGAN

11            UNITED STATES DISTRICT COURT JUDGE

12

13

14                       -:-

15

16

17

18

19

20

21

22

23           Deborah Wilhelm, CSR, RPR
                   Court Reporter
24                P.O. Box 1504
               Eugene, OR  97440
25                (541) 431-4113
```

```
 1                       APPEARANCES OF COUNSEL

 2

 3    FOR THE PLAINTIFF:       CHRISTOPHER L. CARDANI
                               United States Attorney's Office
 4                             405 E. 8th Avenue, Suite 2400
                               Eugene, OR  97401
 5                             (541) 465-6771
                               chris.cardani@usdoj.gov
 6
                               CHARLES F. GORDER, JR.
 7                             United States Attorney's Office
                               1000 S.W. Third Avenue, Suite 600
 8                             Portland, OR  97204-2902
                               (503) 727-1021
 9

10    FOR THE DEFENDANT:       STEVEN T. WAX
                               Federal Public Defender
11                             101 S.W. Main Street, Suite 1700
                               Portland, OR  97204
12                             (503) 326-2123
                               steve_wax@fd.org
13

14    FOR AL RAJHI BANK:       BOAZ I. GREEN
                               MIA HAVEL
15                             Dewey & LeBoeuf
                               1101 New York Avenue, NW
16                             Washington, DC  20005-4213
                               (202) 346-8000
17                             bigreen@dl.com

18                             KEVIN W. BONS
                               Beckley Law Firm
19                             1257 High Street
                               Suite 2
20                             Eugene, OR  97440
                               (541) 683-0888
21                             kbons@beckley-law.com

22

23

24

25
```

```
 1              (Tuesday, February 16, 2010; 11:54 a.m.)
 2                       P R O C E E D I N G S
 3              THE CLERK:  Now is the time set for the matter
 4    of United States of America versus Pirouz Sedaghaty,
 5    Case No. 05-60008, time set for oral argument on motion
 6    247 to compel, motion 251 to compel, and motion 253 to
 7    compel.
 8              Mr. Cardani, at counsel table you have
 9    Mr. Gorder with you and also you have Ms. Anderson; is
10    that correct?
11              MR. CARDANI:  Yes.
12              THE CLERK:  Thank you.
13              And, Mr. Bons, you are appearing on behalf of
14    the bank?
15              MR. BONS:  I am, Your Honor.
16              THE CLERK:  And I have Bruce (sic) Green at
17    counsel table with you, as well as -- may I have your
18    name?
19              MS. HAVEL:  Mia Havel, M-I-A, H-A-V-E-L.
20              MR. BONS:  I just want to make sure I didn't
21    misunderstand you, Boaz Green for the bank also, Boaz.
22              THE CLERK:  Yes.
23              THE COURT:  Mr. Wax, we'll take your motion
24    first.  Let me just -- of course I'm familiar with the
25    subject matter from the previous motion and so on.  And
```

```
 1    the fact is, of course, that there is no Mutual Legal
 2    Assistance Treaty with Saudi Arabia, so that's kind of a
 3    moot question.  And I'm considering a limited issuance
 4    of letters rogatory, but not one that will impact the
 5    trial schedule, just so that you know.  So at least you
 6    know what to dissuade me of, if you can use a rifle
 7    instead of a shotgun.  All right.  If you have some more
 8    about this, great.
 9            MR. WAX:  On Friday we filed a motion for
10    reconsideration of the Egyptian request.  And this
11    morning we were able to obtain a declaration from the
12    Attorney Boss who was the attorney in the El Hindi
13    matter.  That should have been filed electronically
14    around 8:00 or 8:30 this morning.  I think that informs
15    that portion of your decision in the Egyptian matter and
16    should inform your decision in the Saudi matter with
17    respect to the dispute that apparently exists between
18    the United States and Mr. Sedaghaty about the
19    utilization of the MLAT procedure by the government for
20    defense counsel in other cases.
21            When we argued previously, the government had
22    represented to the court that they did not believe that
23    it had occurred.  In your opinion you indicated in a
24    footnote that you did not believe that it had been
25    utilized.  Mr. Boss's declaration, as we see it, makes
```

1    clear that the government did proceed with the MLAT.

2    And the absence of any evidence in that case was the

3    result of the receiving country's failure to respond

4    rather than the United States government's unwillingness

5    to utilize the process.

6              On Friday, we also sent the government a letter

7    and attachments that included a number of other

8    documents that we're interested in obtaining from Saudi

9    Arabia.  We suggested to them that it might make more

10   sense to deal with the Saudi documents with a

11   conversation between us first.

12             We certainly would be happy for the court, if

13   you are inclined, to issue the letter rogatory with

14   respect to the documents we had identified or with

15   respect to our request for the interview of Sami

16   Al-Sanad.  I do want to make you aware that there are

17   other documents, we hope to have a discussion with the

18   government about them.

19             We also have been looking at the procedures in

20   18 U.S.C. 3491 et seq., which call for utilization of

21   U.S. consular officials in order to deal with the

22   authentication aspects of documents.  So that's what we

23   have to say about those issues today.

24             THE COURT:  Yes.

25             MR. GORDER:  Your Honor, Charles Gorder for the

1    United States.  First, turning to the matter involving

2    your previous order regarding Egypt.  As you know,

3    Mr. Wax's filing was late Friday afternoon, and over the

4    three-day weekend, we have not had a chance to confirm

5    or find out exactly what the facts are with regard to

6    this question of whether an MLAT was ever sent to Egypt

7    in the El Hindi case.

8         The people we have talked to this morning don't

9    believe that there was, but there is one person that we

10   were unable -- or they were unable to find before we

11   came to court.  And so what we would ask is the time to

12   properly respond to that issue.

13        With regard to the defendant's motion for a

14   letter rogatory to Saudi Arabia, I don't want to repeat

15   everything that is in our briefing, but we do not

16   believe that there is a sufficient basis to have a

17   letter rogatory for any of the four documents that

18   Mr. Wax proffered in his motion.

19        We really question both the relevance and, to

20   some extent, the authenticity of several of those

21   documents.

22        THE COURT:  I may agree with that, but here is,

23   I think, the way to do this is for Mr. Wax to send us

24   both what he would like the letter to say, let him do

25   the drafting, in other words, while we deal with the

1  bank robber cases and so on; then you respond on a form

2  you think is appropriate.  I'd just like it to happen

3  quickly, because we do have a June trial date here.  And

4  I have my jaw pretty much set on that.  Okay?

5          MR. GORDER:  Okay.  With regard to Mr. Sanad,

6  as we indicated, we don't have any objection to an

7  invitation for him to come testify, but we think that

8  just the limited letter rogatory, at best, would be

9  sufficient to find out if he's willing to provide any

10  kind of statement.

11          And as the court -- you are familiar, I assume,

12  with the briefing in the matter involving the bank, I

13  seriously doubt we'll get a response.

14          THE COURT:  In 37 years, one I haven't had yet

15  so it's always nice to get something new.

16          And how much time do you want to respond on the

17  previous order on the matter that Mr. Wax talked about?

18          MR. GORDER:  A week, Your Honor, would be fine.

19          THE COURT:  That's fine.  Okay.  Well, great.

20  So why don't you a submit a form of letter rogatory that

21  you'd like me to sign.

22          MR. WAX:  I believe that we had done that, Your

23  Honor, as an attachment to the motion.

24          THE COURT:  If you did, I didn't read it.  But

25  if we have it, great.

```
 1          MR. WAX:  I will double check that, but I
 2   believe that we included as Exhibit A to the pleading
 3   the actual letter rogatory itself in the form that we
 4   understood would be appropriate.
 5          THE COURT:  All right.  So I'd like your
 6   response in a week on that also.
 7          MR. GORDER:  Very well.
 8          THE COURT:  Let's go to the bank matter.
 9          MR. WAX:  Your Honor, when you are done with
10   the bank, there are a couple of other brief issues that
11   I hope we can return to.
12          MR. GORDER:  Your Honor, Charles Gorder again
13   for the United States.  Since we filed our reply brief
14   last week, we learned that Judge Huvelle in the District
15   of Columbia has granted the government's motion to stay
16   the proceeding that the bank filed in the District of
17   Columbia.  That actually occurred last Tuesday.  Because
18   of the snow issues in D.C., we didn't find out about it
19   until Friday afternoon.
20          THE COURT:  I received the language on that.
21   It was a clean punt.
22          MR. GORDER:  Right, the ball is in your court.
23          THE COURT:  I understand, I understand exactly
24   what she did.  They have a great lunch room there for
25   the judges, by the way.  And I'll point it out to her
```

1    next time I'm there.

2          MR. GORDER:  Thank you, Your Honor.  Your

3    Honor, this is a matter of first impression, so I would

4    like to spend a little time talking about the history of

5    5318(k) of Title 31.  It was added as part of Title III

6    of the PATRIOT Act that was passed shortly after 9/11.

7    And Congress was very specific in its findings and its

8    purpose in passing this statute.  It specifically found

9    in Section 302 of the PATRIOT Act -- and I'm

10   paraphrasing -- that jurisdictions outside the United

11   States provide essential tools to disguise the

12   ownership, movement of criminal funds used to commit,

13   among other things, terrorism.  And that correspondent

14   banking facilities are susceptible to the manipulation

15   that would permit the laundering of those kinds of

16   funds.

17         And the purpose of the actual title was to

18   increase the strength of U.S. measures to prevent,

19   detect, and, I emphasize, prosecute the financing of

20   terrorism.  So we submit the Congress knew exactly what

21   it was doing when it passed this statute.

22         It set up a regime where the Department of

23   Justice could issue an administrative subpoena, and

24   require all banks that have a U.S. presence through the

25   correspondent banks to have a registered agent in the

1    United States to accept service of the subpoena.  And it

2    expected that bank -- foreign banks would be in the

3    dilemma that Al Rajhi claims that they are in today when

4    it passed this statute.

5            Let me give you just also a little background

6    concerning the government's attempts to not use this

7    process.  This is the kind of process that we only use

8    when we do not receive the kinds of cooperation in law

9    enforcement matters that we would expect from our

10   international partners and nations.

11           In July of 2008, the government made, through

12   the Department of Justice, a formal request to the

13   Kingdom of Saudi Arabia for exactly what we're asking

14   for in this administrative subpoena.  It was grounded in

15   the U.N. convention, International Convention for the

16   Suppression of the Financing of Terrorism and also the

17   principle of reciprocity, which is obligatory on nations

18   in the world.

19           And in our judgment and in the judgment of the

20   people at the Department of Justice who do this for a

21   living, because it was obligatory on the Kingdom of

22   Saudi Arabia, we had a much better chance of getting

23   these records rather than going through the letter

24   rogatory process, which is totally discretionary on the

25   court that ultimately receives the letter rogatory.

1        That formal request was presented to the

2    Kingdom in September of 2008 by the Department of State.

3    And we have received absolutely no response, which is

4    why the Justice Department authorized the U.S. Attorney

5    in the District of Oregon to issue this subpoena last

6    summer in July of 2009.

7        So the record should be clear that this was not

8    a casual decision on the part of either Mr. Cardani or

9    myself.  That this was -- we tried what we thought were

10    the best alternatives to what we call a noncooperative

11    option in a case like this.  And we were just simply

12    unsuccessful.

13        The bank has four arguments to resist

14    enforcement of this subpoena.  I'd like to address, I

15    think, in the order of seriousness of their arguments,

16    and it seems to me, at least, that their most serious

17    argument is that they are in this dilemma of being

18    forced to either violate U.S. law or violate Saudi law.

19        The real dilemma that they find themselves in

20    is to effectively lobby their government to comply with

21    its international obligations or risk losing its

22    corresponding bank privileges in the United States.  And

23    the bank's own exhibits, I think, show you that the

24    conundrum of violating Saudi law or violating U.S. law

25    is a false dichotomy.

1          In Exhibit C in their motion that they filed in

2    D.C., which is incorporated by reference in their

3    response in this court, they set out Section 2.63 of the

4    Saudi anti money laundering rules, which specifically

5    provide for exceptions in cases like this.  And I quote,

6    in accordance with Articles 22 and 23 of the Saudi anti

7    money laundering law which allow cooperating with

8    international governmental authorities for cases

9    involving money laundering and terrorist financing, any

10   sharing of information with a foreign party whether with

11   another bank or a foreign governmental authority should

12   not be done without the prior approval and coordination

13   with the Saudi Monetary Agency.

14          And Article 22 of their money laundering

15   statute says an exception to the confidentiality

16   provisions that normally apply -- as an exception,

17   excuse me, disclosed information by financial

18   institutions could be shared with concerned foreign

19   authorities that are connected with the Kingdom through

20   valid agreements or conventions or on the basis of

21   reciprocity according to defined legal procedures.

22          Now, the bank, at least in their papers today,

23   have shown that they made no effort to talk to the Saudi

24   Monetary Authority about those international obligations

25   and asking for an exception.  So we question, really,

1    whether the bank actually faces the dilemma that they

2    pose.

3            But the case law, Your Honor, is clear.  Even

4    if there is such a dilemma, the United States' interests

5    in enforcing its own laws outweighs foreign bank secrecy

6    law.

7            The leading case in this area throughout the

8    country is the Eleventh Circuit's decision in the *Bank*

9    *of Nova Scotia* case.  There, a grand jury subpoena was

10   served on a domestic bank for records located in the

11   Cayman Islands.  Just like here the bank resisted,

12   suggested that maybe you should try a letter rogatory,

13   and asked for permission from a local court in the

14   Cayman Islands to disclose the records, which was

15   refused.

16           The court -- the Eleventh Circuit rejected the

17   letter rogatory alternative, just as we did because we

18   thought that we had a better way.  And the court

19   rejected the dilemma, and said the bank would simply

20   have to choose between two sovereigns, and choose where

21   it decides to do business.

22           Now, there are numerous cases that have

23   followed that principle, the *Bank of Nova Scotia*

24   principle, and it's cited in their briefs -- or in our

25   briefs.

1              Against all this case law, the bank cites to

2    the *In Re Sealed Case* in the D.C. Circuit where a court

3    refused to enforce a grand jury subpoena that was served

4    on a bank that was owned by a foreign country for

5    records of a branch located in a second foreign country.

6    The case is unusual in the fact that it doesn't tell us

7    what countries they are, Country X and Country Y.

8              But that case is distinguishable in several

9    ways from the situation we have here.  First, the bank

10   in that case was owned by the foreign country, which I

11   think makes the conflict or the dilemma appear more

12   stark.  And the government conceded in that case that it

13   would be a crime in the foreign country, and we don't.

14   We believe that the Saudi government can authorize this

15   very quickly if they just complied with the

16   international obligations that they have agreed to in

17   the U.N. convention.

18             But, most importantly, Your Honor, the three-

19   judge panel in the *In re Sealed Case* conceded that

20   Congress could empower a court to issue contempt orders

21   in these cases, and it would be the court's duty to

22   enforce them.

23             And that's exactly what Congress did in this

24   case.  This statute is designed to go straight to this

25   dilemma because the fact that your corresponding bank

1  privileges may be cut off is to prevent the kind of

2  resistance that we see in just this case.

3          The last case I want to mention, other cases

4  that have dealt with the issue of the conflict between a

5  foreign bank secrecy law and the obligations in the

6  United States sometimes reference the restatement that

7  is quoted in the Ninth Circuit's *Richmark* case, and I

8  think that one is illustrative, too.

9          That case actually came out of this district,

10 it came from Judge Frye, where she enforced a discovery

11 order against a Chinese company that was owned by the

12 People's Republic of China seeking net worth information

13 in support of a civil judgment.  And there were claims

14 that providing that kind of information would violate

15 the law of the People's Republic of China.  And the

16 court looked at, you know, five different issues.  And I

17 think they all favor enforcement of the subpoena here.

18         One is the importance of the document sought.

19 And I won't belabor the point, but we obviously need, as

20 much as possible, to be able to trace the disposition of

21 the funds that came from Oregon in this case.

22         The burden of complying with the request, and

23 the bank doesn't even suggest that complying with a

24 subpoena to provide three months' records is any kind of

25 an economic practical burden.

1          Where the information is located, now the

2    information obviously is located in the Kingdom of Saudi

3    Arabia, but I point out that the reason that we're here

4    is because the owner of the account in Saudi Arabia came

5    to Oregon, collected $150,000, and took it back and

6    transacted these dollar transactions at the Al Rajhi

7    Bank, which is why we have issued the subpoena we have.

8          Whether there are alternatives, we've tried

9    them, and they just haven't worked.

10          But most importantly is what are the national

11    interests involved?  And here again, the prevention of

12    terrorism financing is clearly in the United States'

13    national interests.  And I'd suggest it's in the

14    interests of the Kingdom of Saudi Arabia also.  They

15    wouldn't have signed the convention if it weren't.  And,

16    in fact, Your Honor, they have actually shut down the

17    al-Haramain Foundation because of terrorism financing.

18    So I think our interests coincide in most ways.

19          Your Honor, I think the second issue the bank

20    raises is whether or not there is a constitutional

21    problem with the way Congress set up the enforcement of

22    the statute.  We've briefed that.  I don't want to

23    belabor the point.  We are here asking the court to rule

24    on the propriety of the subpoena and enforce it.  And

25    the statute sets up a way for a bank to get court

1  review, a motion to quash, which the bank did.  It's

2  here now.  And it seems to me that that is all the

3  Fourth Amendment requires of any administrative

4  subpoena, let alone one served on a foreign bank for

5  foreign bank records where there may be much less in the

6  way of Fourth Amendment protections.

7         The kind of view the court is supposed to make

8  at that point is very limited.  Did Congress grant

9  authority to investigate?  Have the procedural

10  requirements been met?  And whether the evidence is

11  relevant material to the investigation.  I don't think

12  the bank seriously challenges the first two categories.

13  They make a halfhearted attempt to challenge the third

14  that says despite the statute's plain wording, it can't

15  be used to obtain evidence post-indictment.

16         I would note first that there is no time

17  limitation or proceeding limitation in 5318(k), in the

18  statute.

19         Second, not only -- the statute gives not only

20  the Attorney General the power to issue this kind of

21  subpoena but also the Secretary of the Treasury.  And I

22  question -- I mean, the Secretary of the Treasury is not

23  in charge of indicting anyone.  So I question whether

24  there is any kind of limitation about indictment --

25  post-indictment even in the gloss of the statute.

1              But, finally, the Department of Justice doesn't

2       stop investigating once a case is indicted.  We can't

3       use grand jury subpoenas because the grand jury can't

4       act any further once a case is finally indicted.  But we

5       do continue to investigate.  We do witness interviews.

6       We will issue Rule 17(c) subpoenas or -- to gather

7       evidence.  And Congress was presumably aware that we

8       have constantly used DEA administrative subpoenas and

9       health care fraud administrative subpoenas post-

10      indictment to collect evidence.  Now, there are several

11      cases that have upheld our use of that.

12             Most importantly, the case of *U.S. versus

13      Phibbs*, a Sixth Circuit case from 1993 that upheld

14      exactly that.  The bank suggests that that was dicta in

15      that case, but I don't think that's right.  There, the

16      defendant challenged both the basis for the subpoena,

17      the lack of probable cause, and that's what the court

18      said there was no standing to address in the particular

19      case, but it went on to rule that the fact that the

20      subpoena was used post-indictment was not a problem.

21             And it's worth noting that the DEA

22      administrative subpoena and the health care fraud

23      administrative subpoena that are referred to in our

24      briefs both refer to the department issuing these in the

25      course of an investigation, and they've been upheld

1    post-indictment.

2          Now, opposed to all this, the bank cites the

3    *Resolution Trust Company* case versus *Grant Thornton*,

4    again in the D.C. Circuit.  Totally different statute, a

5    different agency, and a different purpose for the

6    administrative subpoena.  That was an extremely broad

7    mandate that the RTC had, which was to issue

8    administrative subpoenas, quote, for the purpose of

9    carrying out any power, authority, or duty, and was not

10   as narrowly drawn as this particular administrative

11   subpoena statute is.  And it was issued solely to

12   discover the financial net worth of a party after a suit

13   was filed.

14         Now, the case is distinguishable not just

15   because of its -- the fact that it's a different statute

16   and a different agency, the D.C. Circuit read into it a

17   statute of limitations, so to speak, analogizing it to a

18   grand jury subpoena.

19         My view -- and I guess it's only my view -- but

20   with all due respect to the D.C. Circuit, I don't think

21   the grand jury analogy was apt because, again, after

22   indictment, a grand jury can't do anything.  The RTC

23   could still pursue its lawsuit.  But the other thing

24   that they suggested was it was a way to get around

25   limits on discovery regarding net worth before judgment.

1        So here Congress has specifically given us this

2    method, and we can't use a trial subpoena, Your Honor.

3    We can't use a Rule 17(c) subpoena in this case to

4    obtain these records.  So we're not getting around

5    anything.

6        Finally, Your Honor, the bank challenges the

7    scope of the subpoena.  This is a very traditional way

8    to -- we're getting some simple bank records, and I

9    frankly don't think that there is anything wrong with

10   that.

11       Unless the court has any questions, we would

12   ask you to issue an order finding that the subpoena was

13   duly authorized and issued under the statute.  It's

14   relevant to the issues in this case.  Denying the bank's

15   motion to quash.  And ordering the bank to comply within

16   10 days.

17       THE COURT:  All right.  Let me ask just a

18   clarifying question, I want to make sure specifically

19   what you are asking me to do.  Do you draw any

20   distinction between the government seeking to impose a

21   5318(k) sanction and actual compliance with the subpoena

22   to produce the documents, in other words?

23       MR. GORDER:  Correct.

24       THE COURT:  All right.  You are seeking both of

25   those things or just the first?

1              MR. GORDER:  No, we are just seeking your order

2     that the bank has to comply, and denying their motion to

3     quash.  I mean, ultimately it will be up to the Attorney

4     General and the Secretary of the Treasury whether to cut

5     off the corresponding bank privileges.

6              THE COURT:  Thank you.  All right.  Is it

7     Mr. Green?

8              MR. GREEN:  Yes, it is, Your Honor.

9              THE COURT:  How did you get the Internet

10    address "bigreen"?

11             MR. GREEN:  I have my parents to thank for

12    that.

13             THE COURT:  Okay.

14             MR. GREEN:  The initial matter I want to

15    address is the fact that the bank is not a party to this

16    case.  There is not -- there are no allegations of

17    wrongdoing by the bank.  The case has been pending for

18    almost five years.  And the records requested are almost

19    ten years old.  The bank doesn't wish to delay the

20    trial.  And it's not trying to deprive the government of

21    the records.  It's trying to avoid violating Saudi law

22    in Saudi Arabia and subjecting itself there to criminal

23    prosecution, including imprisonment and fines.

24             The bank is the third largest bank in Saudi

25    Arabia.  It has one of the largest net worths of

1    domestic branches there.  It's publicly traded.  It is

2    followed by analysts at the Standards & Poor (sic).

3           For the bank to be prosecuted in its home

4    country of violating explicit instructions by its

5    regulator not to comply with the request as stated would

6    be a tremendous impact -- would have a tremendous impact

7    on the bank's business and on its reputation.  In the

8    same way, the dilemma of having to lose its

9    correspondent accounts in the United States due to

10   government action would foreclose many lines of

11   businesses that depend on those correspondent accounts

12   and services the bank will no longer be able to provide

13   its customers.  And would also cause tremendous

14   reputational harm to the bank.  And that could have

15   spillover that we've seen with actions under 5318A,

16   which the government has threatened using against the

17   bank, could also lead to closure of correspondent

18   accounts in other countries as well.

19          The bank has tried very hard since receiving

20   the subpoena to find a way to comply with the subpoena.

21   It immediately requested authorization by its regulator

22   as required under Section 2.63 that the government has

23   quoted here.  It requires preapproval and cooperation of

24   SAMA.  And SAMA, Saudi Arabian Monetary Authority,

25   refused to provide the bank with the authorization to

1    provide the records, and stated very explicitly in its

2    letter to the bank that the bank would be subject to

3    criminal prosecution if it did so.

4           The declaration by the head of the bank's legal

5    department that we submitted here states that this is

6    not an empty threat, and the bank is seriously concerned

7    about those possibilities.

8           So in that sense, the dilemma is a clear

9    dilemma.  While the government has used the treaty for

10   suppression of terrorism financing, that's not a treaty

11   that is necessarily relevant in this case.  We don't

12   know what the Saudi government's handling of that treaty

13   has been.  The bank is privately owned.  And it's not

14   connected in any way to the Saudi government.  But the

15   reading -- the plain reading of that treaty and the

16   government looked at the allegations and accounts in

17   this indictment, they don't clearly involve financing

18   terrorism.  And, therefore, Saudi Arabia could

19   reasonably have determined that this was not the

20   appropriate mechanism to request these documents.

21          The bank has suggested many other options to

22   try to work with the Saudi regulator to obtain

23   permission to provide the records.  It asked the

24   government for additional details regarding the previous

25   requests.  And those requests by us to the government

1    were declined.

2            The bank also suggested that if the government

3    has copies of these records or some of the records which

4    may not be admissible at trial, the bank offered to see

5    whether it could certify those records rather than

6    provide its own records as a way to avoid being the one

7    providing the information.  That was another suggestion

8    that the bank provided that the government didn't take

9    us up on.

10           What the government has not done is issue a

11   letter rogatory in this case.  And the government has

12   known for almost four months that that is the process

13   that the bank's regulators have decided is the

14   appropriate mechanism.  The bank has offered to try to

15   get such a letter rogatory expedited so that it can get

16   the approval to provide the documents, but the

17   government has refused to do so.  And possibly this is a

18   strategic decision by the Office of International

19   Affairs regarding how to deal with the coverage of the

20   treaty, but it leaves the bank hostage to the U.S.

21   authorities being very stubborn on this specific issue.

22           While the government brings the issue of the

23   bank agreeing to be subject to this possible conflict

24   between Saudi Arabian law and U.S. law, the balancing

25   act required under restatement only comes into play if

1   the subpoena is enforceable, and we argue that the

2   subpoena is not enforceable.

3          To begin with, we have the issue of the Fourth

4   Amendment and a subpoena which is essentially self-

5   enforcing.  The fact that we are here today doesn't

6   negate the Fourth Amendment issue.  This is the classic

7   instance of a situation that is -- can be -- can evade

8   review but is subject to repetition because the only

9   option for a bank receiving a subpoena is to go ahead

10  and seek judicial review.  There is no way for the bank

11  to sit back and wait for the government to enforce the

12  subpoena, because that's not required under the statute,

13  which sets it apart from every other administrative

14  subpoena statute.

15         Additionally, under *Sherar v. Cullen*, the bank

16  should have that right to wait for the government to go

17  ahead and seek enforcement of the subpoena.  And it

18  having to go ahead and seek judicial protection doesn't

19  solve the constitutional issue here.

20         The government has tried to compare the search

21  here to the search in *United States versus*

22  *Verdugo-Urquidez*.  Those are very different situations.

23  The search here is not entirely in Saudi Arabia.  It was

24  issued based on the bank's connections to the United

25  States, the enforcement power is here in the United

```
 1   States, and it requires the bank to bring the documents
 2   to Medford, Oregon, which is -- I would say -- pretty
 3   much quintessential American.
 4            THE COURT:  Yeah, they have electricity there
 5   now.
 6            MR. GREEN:  So we hear back in D.C.  We barely
 7   have any there right now.
 8            The government has also said the fact that the
 9   defendant in Verdugo-Urquidez was in the United States,
10   Justice Rehnquist made it very clear that that wasn't an
11   issue there because he had been brought to the United
12   States against his will, and, therefore, hadn't
13   affirmatively brought himself to the United States and
14   sought the protection.  That's very different from a
15   bank that has been keeping correspondent accounts in the
16   United States for at least ten years, if not longer.
17            Even if the statute is constitutional, this is
18   clearly a misuse of administrative subpoena power.  It
19   is black letter law that grand jury subpoenas may not be
20   used to gather evidence for trial.  And there are many
21   cases that compare grand jury subpoenas to
22   administrative subpoenas starting with U.S. v. Morton
23   Salt which makes that comparison, and is one of the
24   seminal cases regarding enforcement of administrative
25   subpoenas.
```

1          And since the government has argued Congress

2    has deemed to be aware of the law regarding use of

3    administrative subpoena, Congress would also have been

4    aware of *RTC v. Grant Thornton* which makes it very clear

5    that administrative subpoenas cannot be used to gather

6    evidence for trial, and that doing so would upend

7    traditional notions of investigations.

8          The cases that the government has cited to

9    support its conclusions are not D.C. Circuit cases and

10   are not Ninth Circuit cases.  *U.S. v. Phibbs* is actually

11   a case that *RTC v. Grant Thornton* cited to support its

12   conclusion there.  I would submit that that means that

13   the holding in *U.S. v. Phibbs* is open to interpretation.

14         *U.S. v. Harrington* doesn't include a lot of

15   discussion, but it also doesn't cite ongoing

16   investigations.

17         And *U.S. v. Lazar*, which is the unpublished

18   case from '09 that the government cited setting out the

19   rule in the Sixth Circuit, also makes clear that that

20   rule is a departure from traditional notions of use of

21   administrative subpoenas.

22         Therefore, if Congress really wanted to provide

23   the Department of Justice and the Department of Treasury

24   to use these subpoenas in a way that is in opposition to

25   the established rules regarding administrative

1   subpoenas, it would have been explicit in that.

2   Administrative agencies are creatures of statute.  They

3   have the powers that are granted to them by statute.

4   And this statute does not explicitly grant the power to

5   use these subpoenas to gather evidence for trial.  They

6   are purely investigative.

7        The government does not dispute that the

8   records are sought to gather evidence for trial.  And at

9   this stage in the proceeding, it would be difficult to

10  believe that there is any ongoing investigation of any

11  additional wrongdoing.  And the government may actually

12  use grand jury subpoenas in cases where there are

13  continuing investigations into ongoing or other

14  violations of the law that are not already in the

15  indictment.

16       Additionally, in terms of the scope of the

17  subpoena, the subpoena requests documents that all

18  relate to an individual's private account at the bank.

19  The statute -- the clear language of the statute speaks

20  to relating to the correspondent account, and to

21  request the universe of documents requested in this

22  subpoena reads the words "relating to" out of the

23  statute, and that's clearly an improper way to read the

24  statute.

25       If the statute is constitutional and this is a

proper use for an administrative subpoena and if this is
a subpoena that asks for the kinds of documents that are
requested, that are allowed under the statute, the
government -- the court still has to conduct a balancing
test under the restatement of foreign relations.  And we
submit that in this case, the balance of the interests
lies with quashing the subpoena rather than enforcing
it.

        The need for the documents is questionable
given the fact that the government, as stated in Special
Agent Anderson's declaration, already knows that the
funds made their way to Saudi Arabia, were deposited at
the bank, and that the bank had then worked with its
correspondent accounts to negotiate these instruments.

        The hardship on the bank if it complied with
the subpoena is clear.  It would be subject to criminal
prosecution.  And that is clearly a significant hardship
under all the cases reading this -- the restatement
balancing test.  And in terms of the balance of
interests, the government does speak broadly about its
ability to conduct investigations into money laundering
and financing of terrorism, but in this case it's about
seeking some additional evidence to prove a point that
we submit could already be proven with records that the
government already has or records they can easily get

1    from the U.S. banks.

2        The Saudi interest here is making sure that the

3    banks that it regulates don't work with international

4    powers without going through the bank's own regulators.

5    It would be very difficult for Saudi authorities to

6    regulate their own banks if these banks are subject to

7    demands from foreign authorities without involvement of

8    the local authorities.

9        Saudi Arabia has not refused these documents.

10    There are other options for the government to obtain the

11    documents.  We pointed out that a letter rogatory is

12    what the Saudis already themselves had asked for as

13    opposed to cases the government cites where the

14    recipient of the subpoena suggested without showing that

15    that was a method that would have worked.  And it's

16    unclear that enforcing the subpoena, if it led to

17    closure of the bank's correspondent accounts, would --

18    that, in fact, would foreclose the ability of the

19    government to obtain these documents.  And that is one

20    of the balancing issues that are brought up in *Richmark*.

21    And we believe here would militate to quash the subpoena

22    rather than enforce it.

23        THE COURT:  Thank you.  Mr. Gorder.

24        MR. GORDER:  Your Honor, just briefly.  I think

25    the issue is joined before you.

1          Just a couple of points I want to make.  I

2     can't accept that the Kingdom of Saudi Arabia would say

3     that this is not a terrorism case when they shut down

4     al-Haramain because of its terrorist connections.  It's

5     clearly what the case is about.

6          Second, I just don't read the *Sherar versus*

7     *Cullen* case that counsel cites to stand for the

8     proposition that providing the bank the option to file a

9     motion to quash somehow doesn't make this statute

10    constitutional.  I just don't read that in that case.

11         So we would request that you enforce the

12    subpoena.

13         Your Honor, as you know, this is a case of

14    first impression, I don't want to delay your decision,

15    but I do believe this is one that, you know, lawyers

16    throughout the country will want to read your reasoning.

17              MR. WAX:  Your Honor?

18              THE COURT:  You have an interest here, too,

19    Mr. Wax.

20              MR. WAX:  We do.

21              THE COURT:  Okay.  Go ahead.

22              MR. WAX:  Thank you.  We urge the court to view

23    this request by the government in the context of our

24    requests.  It's an unusual situation which both the

25    defense and the government are seeking records from

1  overseas.  And we urge you in looking at our Saudi

2  request, reconsidering our Egyptian request to do so in

3  the context of the government's request.

4         The second comment I would make is that the use

5  by the government and its citation to the International

6  Convention for the Suppression of the Financing of

7  Terrorism reinforces the point that we've attempted to

8  make about the power that the government has, and the

9  fact that it should not be permitted to use its powers,

10  although in this instance not so far successfully,

11  without balancing the playing field.

12         Third point, with respect to terrorism, in the

13  year 2000, when the money that the government alleges

14  went to Chechnya, the fight in Chechnya was not one

15  viewed by the world or by the United States of America

16  specifically as a terrorist action.  It was rather a war

17  of liberation or resistance to Russian aggression.  And

18  we've previously mentioned that the current vice

19  president --

20         THE COURT:  When were the school children

21  assassinated?

22         MR. WAX:  I don't recall the answer to that

23  question, Your Honor, but there is absolutely no

24  suggestion that we have seen in this case that the

25  government has any notion that the money which we assert

1    was used to buy, if you will, blankets and food for

2    widows and orphans was used for any specific terrorism

3    offense.  And the reality of the world's view of what

4    was happening in Chechnya in 2000 takes us outside of

5    any funding of terrorism.

6            The country that wanted to be the country of

7    Chechnya, or perhaps was, was engaged in a war with the

8    Soviet Union that was the Second Chechen War.  Joe

9    Biden, Vice President, then Senate Foreign Relations

10   Committee; Madeleine Albright, former Secretary of

11   State, and other United States officials have described

12   the war in that way.

13           So I think that with respect to any terrorism

14   issue that exists between the United States and the

15   bank, this is outside of that purview.

16           The next point that I would make, to the extent

17   that you were concerned about the lateness of our

18   request for Mr. El-Fiki, what you heard from the

19   government is they proceeded in an informal way.  We

20   proceeded in an informal way.  They were stymied.  We

21   were stymied.  After they were stymied, they turned to

22   the court.  After we were stymied, we turned to the

23   court.  So I think that as you are considering the

24   timing of our actions, the context again, the playing

25   field should be even.

1        Next point, the government and the court, in

2   looking at the El-Fiki matter raised some questions

3   about the relevance of the El-Fiki information we were

4   seeking.  I would submit that there is a significant

5   question about the relevance of the information the

6   government is seeking.

7        If what we're seeking with respect to El-Fiki

8   is not relevant, then we fail to see how this is

9   relevant.

10        To the extent that Mr. Sedaghaty had any

11   control over the funds, his intent, his purpose was to

12   do something humanitarian.  If, after the money went to

13   Saudi Arabia, other people acting independently of him

14   did, as the government suggests, something different,

15   irrelevant to his state of mind and the charges in this

16   indictment.

17        So while we believe that El-Fiki is relevant,

18   based on what you've already said, it seems this is

19   equally as irrelevant or, perhaps, equally as relevant.

20        Finally, the bank suggests the government may

21   already have these records.  We believe the government

22   is already in possession of the records.  Whether or not

23   these United States Attorneys have them in their

24   possession may be a different question.  And I think

25   that that would require the court or behoove the court

1  to inquire further into those matters.  And that may

2  involve having classified sessions under the CIPA.

3  Thank you.

4            THE COURT:  What about the last suggestion?

5            MR. GORDER:  Excuse me, Your Honor?

6            THE COURT:  What about the last suggestion?

7            MR. GORDER:  Your Honor, if we had records that

8  we could --

9            THE COURT:  It's just one of the first times

10 that Mr. Wax has suggested I meet with the other side

11 alone.  I've known him a long time, too.

12           MR. GORDER:  Your Honor, we'd be happy to meet

13 with you alone, if that's what you desire.

14           If we had records that we could use in court at

15 the trial, we wouldn't have gone through this process.

16 But I'll leave to the court the decision of whether

17 Mr. Wax is supporting the government's motion or

18 opposing it because I'm not sure which.  I will just

19 say, the government tried a very formal diplomatic

20 request in the summer of 2008 that failed, so we haven't

21 been sitting around twiddling our thumbs.

22           THE COURT:  I know whose side you are on.

23 That's all right.

24           MR. WAX:  I would point out to you that I found

25 Mr. Gorder's phrasing very, very interesting.  If we had

1  records --

2          THE COURT:  I listened, Mr. Wax.

3          MR. WAX:  -- that we could use in court, you

4  know, that doesn't say he doesn't have the records.

5          THE COURT:  I listened.  That's all right.  I

6  don't have my hearing aids on, but I'd tell you to

7  repeat if I didn't hear.

8          MR. WAX:  Thank you.  Sorry.

9          THE COURT:  Okay.  You had a couple of other

10 things to raise.

11         MR. WAX:  Yes, briefly, Your Honor.  We have --

12 the court issued an order with respect to discovery that

13 included grand jury matters last week.  Mr. Matasar and

14 Mr. Cardani engaged in some discussion about the fact

15 that we don't yet have the grand jury testimony of

16 Ms. Anderson.  We believe that it is relevant to us now.

17 We believe that it may contain information that would be

18 instructive in the framing of a motion to dismiss, and

19 as well as trial preparation, and it was ordered more

20 than six months ago, and we'd request the court direct

21 the government to provide it to us forthwith.

22         You also still have pending before you two

23 motions for bills of particular.  As our trial

24 preparation work is heating up and as we're looking

25 forward to the mid-March date for provision of witness

1  and exhibit lists, it becomes more and more critical for

2  us to get rulings on those motions, and hope that you

3  can get to them in the near future.  That's it.  Thank

4  you.

5          THE COURT:  Okay.  Anything else?

6          MR. CARDANI:  No, Your Honor.

7          THE COURT:  Thank you all very much.

8          (The proceedings were concluded at 12:45 p.m.)

```
1                        CERTIFICATE
2          I, Deborah Wilhelm, Certified Shorthand Reporter
3    for the State of Oregon, do hereby certify that I was
4    present at and reported in machine shorthand the oral
5    proceedings had in the above-entitled matter.  I hereby
6    certify that the foregoing is a true and correct
7    transcript, to the best of my skill and ability, dated
8    this 17th day of February, 2010.
9
10
11
12
                              /s/ Deborah Wilhelm
13                            Deborah Wilhelm, RPR
                              Certified Shorthand Reporter
14                            Certificate No. 00-0363
15
16
17
18
19
20
21
22
23
24
25
```