IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Cr. No. 05-60008-HO |
| | ) | |
| Plaintiff, | ) | ORDER |
| | ) | |
| v. | ) | |
| | ) | |
| PIROUZ SEDAGHATY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

The United States moves to compel Al Rajhi Banking and
Investment Corporation to comply with an administrative subpoena
served on the bank on July 17, 2009. The Bank's motion to quash
the subpoena in an ancillary district court proceeding filed in
Washington D.C. precipitated this motion. It raises the same issue
as the motion before this court.

This case involves allegations of filing a false tax return
and failure to report money leaving the country. On March 9, 2000,

co-defendant Soliman Al-Buthe flew to Ashland, Oregon to retrieve funds donated by Egyptian Citizen Mahmoud Talaat Hassan El Fiki. Defendants Pirouz Sedaghaty and Al-Buthe went to the Bank of America in Ashland and obtained 130 American Express Travelers checks in $1,000 denominations and a $21,000 cashier's check made out to Al-Buthe. On March 12, 2000, Al-Buthe departed the United States, for Riyadh, Saudi Arabia carrying the travelers checks. When he left, Al-Buthe did not file a Currency and Monetary Instrument Report acknowledging he was leaving the country with more than $10,000 in currency. The travelers checks and the cashier's check were later cashed at the Al Rajhi bank in Saudi Arabia. In October 2001, defendant Sedaghaty filed Al-Haramain USA's tax return for the year 2000 which allegedly covered up this transaction by falsely reporting that these funds were used to purchase a prayer house in Missouri, or returned to their original donor.

The why of the alleged crimes allegedly involves using the money to support the mujahideen fighting the Russian government in Chechnya. Al-Haramain contends the money was intended to be used to distribute Islamic aid and educational material.

The United States Attorney for the District of Oregon served an administrative subpoena on the Al Rajhi bank pursuant to 31 U.S.C. § 5318(k)(3)(A)(I) which provides

> The Secretary of the Treasury or the Attorney General may issue a summons or subpoena to any foreign bank that

maintains a correspondent account in the United States and request records related to such correspondent account, including records maintained outside of the United States relating to the deposit of funds into the foreign bank.

The Al Rajhi bank conducts operations in the United States through correspondent accounts allowing it to make and receive payments directly through banks in the United States. The subpoena demanded production of authenticated copies of certified bank records belonging to Al-Buthe including "[r]ecords pertaining to the cashing of 130 $1,000 American Express Traveler's checks by Soliman Al-But'he in March of 2000 at Al Rajhi Bank" as well as "[r]ecords pertaining to the deposit and any subsequent disposition of a Bank of America cashier's check, check number 1001040568, issued to Soliman Al-But'he on March 11, 2000, for $21,000."

## A.   Venue

As noted above, the Al Rajhi Bank filed a motion to quash in the United States District Court for the District of Columbia in case number 10-mc-55-ESH. In its response to the government's motion, the bank requests that this court refrain from deciding the motion before this court until the D.C. court decides whether to change venue. Judge Ellen Huvelle ordered the motion to quash in Washington, D.C. stayed pending a determination of the same matter before this court, in an order dated February 9, 2010. Accordingly, the issue shall be decided by this court.

The Bank also argues that the authorizing statute creates an unconstitutional self-enforcing subpoena, that the subpoena may not be used to gather evidence for a criminal trial, and that the scope of the demand exceeds the scope of the authorizing statute. In addition, the Bank argues that even if the subpoena is otherwise enforceable, enforcement may be denied when compliance would force it to violate foreign law.

Before addressing issues raised by the Al Rajhi Bank, the general standard for enforcement of agency subpoenas should be noted. The Supreme Court set forth the standard for judicial enforcement of administrative subpoenas in United States v. Morton Salt Co., 338 U.S. 632 (1950). The Court stated that an agency's investigation is lawful if "the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." Id. at 652. The Ninth Circuit has stated that "[t]he scope of our inquiry in an agency subpoena is narrow." NLRB v. North Bay Plumbing, Inc., 102 F.3d 1005, 1007 (9th Cir. 1996); see also EEOC v. Children's Hosp. Med. Ctr. of N. Cal., 719 F.2d 1426, 1428 (9th Cir. 1983) (en banc). Generally, a court must ask "(1) whether Congress has granted the authority to investigate; (2) whether procedural requirements have been followed; and (3) whether the evidence is relevant and material to the investigation." Children's Hosp. Med. Ctr. of N. Cal., 719 F.2d at 1428. An affidavit from a government official is

sufficient to establish a prima facie showing that these requirements have been met.  See United States v. Stuart, 489 U.S. 353 (1989).  Finally, "[i]f the agency establishes these factors, the subpoena should be enforced unless the party being investigated proves the inquiry is unreasonable because it is overbroad or unduly burdensome."  Children's Hosp. Med. Ctr. of N. Cal., 719 F.2d at 1428.

Here, Congress granted authority to the Department of Justice, including the United States Attorney for the District of Oregon, to investigate suspected acts of fraud and money-laundering.  See 18 U.S.C. § 1956(a)(2).  The documents sought are relevant to the prosecution of this underlying case.  However, the subpoena in this case has the added wrinkle of seeking information from a foreign entity and thus the novel issues raised by the Al Rajhi Bank need to be considered.

The Al Rajhi Bank asserts that section 5318(k) grants "unprecedented" powers to demand foreign bank records at the pain of "severe sanctions" that puts the bank in the untenable position of having to choose between violating the laws of its own country, at the risk of imprisonment and fines, and the permanent loss of its United States correspondent accounts that are essential to its business.  The bank notes that the Saudi Arabian Monetary Authority (SAMA) informed it that it was prohibited from complying with the subpoena and would risk criminal prosecution in Saudi Arabia if it

complied.  SAMA informed the bank that the proper form for the United States to request the documents was through a letter rogatory and that SAMA would not allow the bank to comply with a request made through an administrative subpoena.[1]

B.  Constitutionality of Section 5318(k)

    1.  Opportunity for Judicial Review

Section 5318(k)'s grant of authority to demand foreign bank records is one of the new expanded tools that Congress gave the Executive Branch to investigate and disrupt transnational money laundering networks in the International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, which Congress enacted as Title III of the USA PATRIOT Act of 2001, Pub. L. 107-56, 115 Stat. 272 (2001).  In addition to authorizing the service of administrative subpoenas on foreign banks, section 5318(k) requires banks and other "covered financial institutions" in the United States to "terminate any correspondent relationship with a foreign bank not later than 10 business days after receipt of written notice . . . that the foreign bank has failed" either "to comply with a . . . subpoena" issued under this provision or "to initiate proceedings in a United States court contesting such . . . subpoena." 31 U.S.C. § 5318(k)(3)(C)(I).  Failure to terminate a

---

[1]The government did apparently attempt to obtain the documents through a request to the government of Saudi Arabia pursuant to the International Convention for the Suppression of Financing and Terrorism.  That attempt has not yielded any results.

correspondent relationship pursuant to this provision would subject a "covered financial institution" in the United States to "a civil penalty of up to $10,000 per day." 31 U.S.C. § 5318(k)(3)(C)(ii).

The Al Rajhi Bank argues that section 5318(k) grants enforcement power to executive authorities without reservation of ultimate enforcement authority to the courts in violation of due process. The Bank further notes that simply failing to bring a motion to quash does not cure due process deficiencies if the agency can then enforce the subpoena and impose sanctions without a court order.

The Bank contends that section 5318(k), by its plain language, allows the Treasury to order domestic banks to close a foreign bank's correspondent accounts, as a sanction for failing to comply with a subpoena, without first obtaining judicial review of the subpoena's enforceability. The bank's argument in this regard is significant on this issue of first impression. The court is concerned with the lack of an explicit procedure in the statute, via judicial oversight, initiated by the agency seeking enforcement through termination of correspondent accounts. However, the court need not reach the issue of the constitutionality of the enforcement procedures of section 5318(k) because foreign banks have no constitutional interest in their correspondence relationships with U.S. banks or in the privacy of the overseas records.

<u>2. Constitutionally Protected Interest</u>

The government contends that even if section 5318(k) permitted the government to compel the termination of a foreign bank's correspondent relationships without judicial review of the administrative subpoena, enactment of such an enforcement mechanism would be within Congress's power to regulate commerce with foreign nations.

The Supreme Court in <u>Buttfield v. Stranahan</u>, 192 U.S. 470, 493 (1904) stated:

> As a result of the complete power of Congress over foreign commerce, it necessarily follows that no individual has a vested right to trade with foreign nations which is so broad in character as to limit and restrict the power of Congress to determine what articles of merchandise may be imported into this country and the terms upon which a right to import may be exercised. This being true, it results that a statute which restrains the introduction of particular goods into the United States from considerations of public policy does not violate the due process clause of the Constitution.

In <u>United States v. Verdugo-Urquidez</u>, 494 U.S. 259 (1990) the Court held that the Fourth Amendment does not apply to searches and seizures by United States agents of property owned by foreign nationals located in a foreign country. "There is ... no indication that the Fourth Amendment was understood by contemporaries of the Framers to apply to activities of the United States directed against aliens in foreign territory." <u>Id</u>. at 267. However, aliens do receive constitutional protections when they have come within the territory of the United States and have

developed substantial connections with this country. <u>See, e.g.,</u>
<u>Plyler v. Doe</u>, 457 U.S. 202, 212 (1982) (The provisions of the
Fourteenth Amendment "are universal in their application, to all
persons within the territorial jurisdiction"); <u>Kwong Hai Chew v.</u>
<u>Colding</u>, 344 U.S. 590, 596, n. 5 (1953) ("The Bill of Rights is a
futile authority for the alien seeking admission for the first time
to these shores. But once an alien lawfully enters and resides in
this country he becomes invested with the rights guaranteed by the
Constitution to all people within our borders").

With respect to foreign policy,

> [a]pplication of the Fourth Amendment to those
> circumstances could significantly disrupt the ability of
> the political branches to respond to foreign situations
> involving our national interest.

<u>Verdugo-Urquidez</u>, 494 U.S. at 274. Application of the
constitutional protections argued by the Al Rajhi Bank would
certainly disrupt the ability of the government to combat financing
of international terrorism outside of the borders of this country.

The Bank contends that constitutional protections are afforded
in this context because the access to foreign bank records under
section 5318(k) rests on the Bank's presence in the United States
in the form of correspondent relationships and the subpoena seeks
a return of documents in the United States. This argument would be
stronger if the bank had a more physical presence in the United
States such as a branch office. However, foreign, remotely
maintained correspondent relationships are no more worthy of

constitutional protections than a foreign corporation seeking to sell a product in the United States banned by domestic policy. Cf. Buttfield, 192 U.S. 470 (due process of law is not denied in forbidding importation of inferior tea already delivered to United States). Imposing a fine on a domestic bank for maintaining a correspondent account which, in effect, sanctions a foreign bank for failing to produce documents related to investigation of financing of terrorism does not involve issues of constitutionality any more than denying clearance papers for a foreign vessel while fines related to regulation of foreign commerce remain unpaid. See Oceanic Navigation Co., Ltd. v. Stranahan, 214 U.S. 320 (1909) (Congress could empower the Secretary of Commerce and Labor to enforce, without invoking the judicial power, the penalty imposed by Act March 3, 1903, c. 1012, § 9, 32 Stat. 1215, for bringing into the United States an alien afflicted with a loathsome or dangerous contagious disease).

The court finds that even if judicial oversight of the administrative subpoena is not permitted on the face of the statute in question, there can be no due process or Fourth Amendment violation in compelling compliance with the subpoena through the enforcement actions of fining domestic banks that fail to terminate correspondent accounts with a foreign bank.

The Al Rajhi Bank next argues that the government may not use an administrative subpoena to gather evidence for trial.  The Bank primarily relies on <u>Resolution Trust Corp. v. Thornton</u>, 41 F.3d 1539 (D.C. Cir. 1994).  There, the court held, with respect to an administrative subpoena issued pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act, that the Act confers no power on Resolution Trust Corporation to subpoena information for purposes of ascertaining cost-effectiveness of litigation after the agency files suit against the subpoena recipient.  However, the court also provided the following discussion:

> we first must decide whether Grant Thornton's arguments
> are foreclosed ... by our recent decision in <u>Linde
> Thomson</u>.  In <u>Linde Thomson</u>, a law firm challenging
> enforcement of an RTC subpoena argued, inter alia, that
> the RTC's filing of a civil complaint terminated the
> agency's investigation into the existence of legal claims
> and the cost-effectiveness of filing suit, and,
> therefore, also mooted a subpoena issued in furtherance
> of that investigation....  We rejected that argument for
> two reasons. First, we referred to our conclusion,
> reached earlier in the opinion, that two of the
> subpoena's investigative purposes-determining whether the
> RTC should seek to avoid the transfer of interests or
> incurrence of obligations, and determining whether the
> RTC should seek to attach assets-remained viable even
> after civil proceedings began. [footnote omitted] <u>Id.</u> at
> 1517-18. Second, we found that "the statute authorizing
> RTC investigations [does not] contemplate the termination
> of investigative authority upon the commencement of civil
> proceedings." <u>Id</u>. at 1518. The RTC argues that here, as
> in Linde Thomson, the purpose that animated the subpoena
> when it issued in November 1992- i.e., determining the
> cost-effectiveness of contemplated litigation-continues
> to justify enforcement.  In the RTC's view, the fact that

suit subsequently has been filed is mere happenstance. We disagree.

We perceive an important difference between this case and Linde Thomson. Unlike the subpoena at issue in Linde Thomson, the only purpose served by the San Jacinto subpoena is the determination whether pursuing litigation would be cost-effective. While we recognized in Linde Thomson that the RTC continues to exercise investigative authority after the commencement of civil proceedings, we did so only after finding that two of the subpoena's purposes, both related to uncovering further wrongdoing by the subpoena recipient, remained viable after suit was filed. See Walde, 18 F.3d at 950 (characterizing Linde Thomson as enforcing subpoena after commencement of civil proceedings "because ongoing investigation might reveal information to underpin further charges"). The very fact that we relied on these continuing investigative purposes to affirm the district court's enforcement order strongly suggested that the purpose of ascertaining the cost-effectiveness of litigation could not sustain the subpoena after civil proceedings began. Thus, while our Linde Thomson decision **does establish that the commencement of civil proceedings fails to extinguish a subpoena supported by viable investigative purposes**, it does not establish that ascertaining the cost-effectiveness of suit is such a purpose....

Nor can we discern any grant of authority in the FIRREA to subpoena documents for this purpose.

Id. at 1545-46 (emphasis added).

The context of this case is quite different. While a criminal case has been initiated here, the subpoena is not directed to the target of the prosecution and the use of the subpoena does not run into the discovery roadblock present in Thornton. See id. at 1547 (The RTC's asserted power also conflicts with well-established limits on a litigant's ability to discover an adversary's financial and insurance information. The federal discovery rules generally prohibit a litigant from discovering an opponent's assets until

after a judgment against the opponent has been rendered.) Additionally, the subpoena at issue seeks documents for purposes noted under the statute in question. Congress intended to confer powers in excess of preexisting authorities which had proven outmoded and inadequate in cases in which money laundering involved foreign entities. See International Money Laundering Abatement and Antiterrorist Financing Act of 2001, Pub. L. 107-56 § 302(a)(8, 115 Stat. 297 (2001).

The Ninth Circuit has stated that administrative subpoenas may issue even after an agency grants a right to sue to the charging party. See E.E.O.C. v. Federal Express Corp., 558 F.2d 842, 851 (9th Cir. 2009) ("The Fifth Circuit concluded that "in a case where the charging party has requested and received a right to sue notice and is engaged in a civil action that is based upon the conduct alleged in the charge filed with the EEOC, that charge no longer provides a basis for EEOC investigation.... we cannot agree."). The Federal Express court further stated that "We believe that it is well-established that an administrative subpoena is to be enforced unless agency authority is plainly lacking," id. at 851, n. 3, and that "nothing in § 706(f)(1) of Title VII indicates that the EEOC's investigatory powers over a charge cease when the charging party files a private action." Id. at 853.

Similarly, there is nothing in the subpoena authority granted by Congress in section 5318(k) to indicate that the Justice

Department may not issue subpoenas post-indictment.  A criminal
investigation need not cease upon the filing of an indictment.

C.    Scope of the Authorizing Statute

    The Al Rajhi Bank next contends that the scope of the demand
exceeds the limits of the authorizing statute because it does not
relate to correspondent accounts.  The Subpoena seeks:

> Account records for account number 140608010109206 for
> the time period of February, March, and April of 2000, to
> include:
>
> (1) Copies of signature cards and customer applications;
>
> (2) Copies of bank statements, ledger cards, or records
> reflecting dates and amounts of deposits and withdrawals;
>
> (3) Copies of debit and credit memos;
>
> (4) Copies of deposit slips and checks deposited
> (including the backs of the checks);
>
> (5) Copies of withdrawal slips and teller records showing
> the withdrawal of currency, including records reflecting
> the type of currency received (U.S. dollars or Saudi
> Riyals);
>
> (6) Copies of checks issued for withdrawals (including
> the backs of the checks);
>
> (7) Copies of all records reflecting the cashing of
> traveler's checks, including teller records, receipts
> indicating the number of cashier's checks cashed, the
> denominations of the cashier's checks cashed, and the
> type of currency received (U.S. dollars or Saudi Riyals);
>
> (8) Records reflecting the customer exchange rate of U.S.
> dollars to Saudi Riyals on March 13, 2000, March 14,
> 2000, March 27, 2000, and March 28, 2000;
>
> (9) Records pertaining to the cashing of 130 US $1,000
> American Express Traveler's checks by Soliman Al-But'he

in March of 2000 at Al Rajhi Bank, to include the date and time of the transaction, the amount of the transaction, and type of currency received by Al-But'he (U.S. dollars or Saudi Riyals); and

(10) Records pertaining to the deposit and any subsequent disposition of a Bank of America cashier's check, check number 1001040568, issued to Soliman Al-But'he on March 11, 2000, for US $21,000.

The government asserts that the requests are related to Al-Buthe's negotiation of the financial instruments at the center of this investigation, i.e., the cashier's checks and traveler's checks identified in the indictment. The government contends that the financial instruments in question were issued in U.S. dollars by U.S. banks and that the negotiation of those instruments inevitably related to correspondent accounts in the United States. The Bank disagrees contending that the records relate to a personal account of Al-Buthe in Saudi Arabia. The requests shall be limited to those directly related to the cashier's check and 130 travelers checks issued by U.S. banks and thus to requests 7, 8, 9, and 10 and requests 2-6 to the extent any documents relate to the cashier's check and traveler's checks or otherwise to correspondent accounts with United States Banks.


D.   Conflict with Foreign Law

The Bank also asserts that the subpoena should be quashed because compliance would require it to violate the laws of the Kingdom of Saudi Arabia.

The possibility of civil or criminal sanctions will not necessarily prevent enforcement of a subpoena. See Restatement (Second) of the Foreign Relations Law of the United States, § 39-40 (1965). When the laws of two jurisdictions conflict, the court must balance the interests, including the respective interests of the states involved and the hardship that would be imposed upon the person or entity subject to compliance. The Restatement (Third) of the Foreign Relations Law of the United States, section 442(1)(c) identifies relevant factors in deciding whether or not foreign statutes excuse noncompliance with discovery orders. These factors include:

> the importance to the investigation or litigation of the documents or other information requested; the degree of specificity of the request; whether the information originated in the United States; the availability of alternative means of securing the information; and the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

Richmark Corp. v. Timber Falling Consultants, 959 F.2d 1468, 1475 (9th Cir. 1992).

Courts have held that the United States' interest in law enforcement outweighs the interests of the foreign states in bank secrecy and the hardships imposed on the entity subject to compliance. See, e.g., United States v. Davis, 767 F.2d 1025 (2d Cir. 1985) (finding interest in enforcing criminal laws against fraud overcame Cayman Islands interest in bank secrecy); United

States v. First Nat'l City Bank, 396 F.2d 897 (2d Cir. 1968) (finding strong interest in grand jury investigation of antitrust violations); SEC v. Banca Della Svizzera Italiana, 92 F.R.D. 111 (S.D.N.Y. 1981) (compelling production in regulatory action to enjoin violations of federal securities laws). But see In re Sealed Case, 825 F.2d 494, 499 (D.C.Cir. 1987) (reversing contempt sanction against bank, stating "we should say it causes us considerable discomfort to think that a court of law should order a violation of law, particularly on the territory of the sovereign whose law is in question").

The Kingdom of Saudi Arabia and the United States are parties to the International Convention for the Suppression of Financing of Terrorism which obligates mutual assistance. See International Convention for Suppression of the Financing of Terrorism, G.A. Res. 109, Art. XII, § 1, U.N. GAOR, 54th Sess., U.N. Doc. A/RES/54/109 (Dec. 9, 1999). Although the bank, as a private entity, is not a party to the agreement, The Convention specifically bars parties from "refus[ing] a request for mutual legal assistance on the ground of bank secrecy." See id. Art. XII, § 2. However, under section 5 of article 12, mutual legal assistance is provided only in conformity with any treaties or other arrangement of legal assistance and in the absence of such treaties (as is the case here), assistance shall be in accordance with respective domestic laws.

Additionally, the sanctions the court would condone in this case are not directed at the bank, but only at domestic banks and their relationship with the foreign bank.  The court will not defer to Saudi law and require that the correspondent accounts remain open if the Al Rajhi Bank refuses compliance with the subpoena.

The records sought are directly relevant and the documents, as limited above, are identified with a high degree of specificity. The documents are located in Saudi Arabia and those who will produce the documents are subject to the laws of Saudi Arabia. While the records could conceivably be obtained via a letter rogatory, the government's previous request of the Saudi government appears to have been met with no viable response.  Thus, there is no other means of securing the information.  Although compliance with the subpoena ostensibly may violate Saudi law, the International Convention for the Suppression of Financing of Terrorism confirms that both countries have a strong interest in production.  Accordingly, the United States' interest in law enforcement in this case outweighs the interests of the Kingdom of Saudi Arabia in bank secrecy and the hardships imposed on the Al Rajhi Bank in complying with the subpoena.  The court grants the motion to the extent that the government may seek to impose the sanctions authorized under section 5318(k) unless the Al Rajhi Bank complies with the subpoena.

<u>CONCLUSION</u>

For the reasons stated above, the United States' motion to compel compliance with the July 17, 2009, subpoena issued pursuant to 31 U.S.C. § 5318(k) (#253) is granted to the extent that the government may seek to impose the sanctions authorized under section 5318(k) unless the Al Rajhi Bank complies with the subpoena as limited above. To the extent that the Al Rajhi Banking & Investment Corporation's motion to quash filed in Case Number 10-mc-55-ESH in the United States District Court for the District of Columbia is before this court, the motion is denied as moot.

DATED this   26th   day of February, 2010.


                              s/ Michael R. Hogan
                         United States District Judge