# Exhibit 5



FROM THE OFFICE OF PUBLIC AFFAIRS

August 1, 2002
PO-3315

## Testimony of
## Kenneth W. Dam
## Deputy Secretary, Department of the Treasury
## before the
## Senate Committee on Banking, Housing, and Urban Affairs
## Subcommittee on International Trade and Finance
## August 1, 2002

Chairman Bayh and distinguished members of the Senate Subcommittee on International Trade and Finance, thank you for inviting me to testify about the misuse of charities by terrorist organizations to raise and move money. This is an important and complex issue. I applaud the Subcommittee for focusing on it. And I appreciate the leadership you have provided, Mr. Chairman, on this and related issues.

The financial front of the war on terror is a particularly important issue for the Treasury Department. Secretary O'Neill is the Administration's principal spokesman for the financial front of the war. As his Deputy, I chair a high-level interagency committee that sets strategic priorities for the financial front. Our General Counsel, David Aufhauser, chairs the National Security Council's interagency policy coordination committee on terrorist finance. Our Under Secretary for Enforcement, Jimmy Gurulé, leads our enforcement bureaus including the United States Customs Service, the United States Secret Service, and FinCEN, as well as our Office of Foreign Assets Control as they fight terrorist financing. Our Under Secretary for International Affairs, John Taylor, works to build and maintain the international coalition against terrorist finances. Our Under Secretary for Domestic Finance, Peter Fisher, also works to help implement the USA PATRIOT Act, and to help protect our nation's critical financial infrastructure. And, of course, we have many, many employees who are working hard and, in some cases, putting their lives at risk to fight the financing of terror.

Our first actions after the tragedy of September 11 were to identify known terrorists and terrorist entities, freeze their assets in the US, and work with our allies to extend those freezes world wide. As you know, we have obtained significant results in this effort, blocking over $112 million dollars globally and forging a coalition of support that includes all but a handful of countries.

Since these first actions, our fight against the financing of terror has expanded to the abuse of charities. As Secretary O'Neill has said, few actions are more reprehensible than diverting money intended for charity and using it to support hatred and cruelty. Such abuse corrupts the sanctity of charitable giving, diverts funds and resources from those in need, betrays the trust and goodwill of donors, and is a danger to us all.

We are addressing this problem at several levels. We are stopping the flow of funds by freezing the assets of charities that are supporting terrorist groups as well as aggressively investigating suspected abuses of charities. We also work with countries around the world to help raise standards of oversight and accountability for charities. In this work we are guided always by two principles: (1) preventing the abuse of charities for terrorist purposes; and (2) preserving the important role that charities play throughout the world.

Before I detail these efforts and address the specific topics raised in your invitation letter, allow me to update you briefly on the efforts the Treasury Department has taken, in cooperation with our sister agencies and departments, to combat terrorist financing.

*Achievements in Financial Aspects of U.S. Anti-Terrorism Initiatives*

As you know, our priority is to prevent terrorist attacks by disrupting terrorist finances. As the President has said, we seek to "starve the terrorists of funding."

I just noted that, since September 11th, the United States and other countries have frozen more than $112 million in terrorist-related assets. More importantly, we have cut the flow of terrorist money through funding pipelines, as in the case of Al-Barakaat's worldwide network which was channeling as much as $15 to $20 million to al Qaida a year. Where warranted, we have also unblocked funds. For example, $350 million in Afghan government assets that had been protectively frozen in connection with the Taliban sanctions, mostly before September 11, have now been returned to the legitimate Afghanistan government.

We have received strong international cooperation in this effort. All but a handful of countries and jurisdictions have pledged support for our efforts, over 160 countries have blocking orders in force, hundreds of accounts worth more than $70 million have been blocked abroad, and foreign law enforcement have acted swiftly to shut down terrorist financing networks. The United States has often led these efforts, but there have also been important independent and shared initiatives. On March 11, 2002, the United States and Saudi Arabia jointly designated two branches of a charity, and on April 19, 2002, the G7 jointly designated nine individuals and one entity. These efforts have been bolstered by actions from the European Union which has issued three lists of designated terrorists and terrorist groups for blocking.

In addition to these efforts, we work with countries daily to get more information about their efforts and to ensure that the cooperation is as deep as it is broad. We are also providing technical assistance to a number of countries to help them develop the legal and enforcement infrastructure they need to find and freeze terrorist assets.

We have also had success pursuing international cooperation through multilateral forums including the U.N., the G7, the G20, the Financial Action Task Force (FATF), the Egmont Group, and the international financial institutions to combat terrorist financing on a global scale. In particular, Treasury continues to play a strong leadership role in FATF, a 31-member organization dedicated to the international fight against money laundering. As this Committee knows, in late October 2001, the United States hosted an Extraordinary FATF Plenary session, at which FATF established eight Special Recommendations on Terrorist Financing, including a recommendation regarding the need to regulate non-profit organizations. These recommendations quickly became the international standard on how countries can ensure that their financial regimes are not being abused by terrorist financiers.

Our law enforcement efforts also have proven fruitful. Treasury's Operation Green Quest, a multi-agency terrorist financing task force, was established in October 2001 to identify, disrupt, and dismantle terrorist financing networks by bringing together the financial expertise from Treasury and other branches of the government. Through their investigations, Operation Green Quest agents have been targeting a wide variety of systems that may be used by terrorists to raise and move funds. These systems include illegal enterprises, as well as legitimate enterprises, and charity/relief organizations (in which donations may be diverted to terrorist groups). Green Quest's work, in cooperation with the Department of Justice, has led to 38 arrests, 26 indictments, the seizure of approximately $6.8 million domestically, and seizures of over $16 million in outbound currency at the borders, including more than $7 million in bulk cash being smuggled illegally to Middle Eastern destinations. Recently, Customs, United States Secret Service, and FBI agents apprehended and subsequently indicted Jordanian-

born Omar Shishani in Detroit for smuggling $12 million in forged cashier's checks into the United States. The detention and arrest of Shishani is highly significant as it resulted from the Customs Service's cross-indexing of various databases, including information obtained by the U.S. military in Afghanistan. That information was entered into Custom's "watch list," which, when cross-checked against inbound flight manifests, identified Shishani. In addition, Green Quest agents, along with the FBI and other government agencies, have traveled abroad to follow leads and examine documents.

We are confident that our efforts are having real-world effects. What I can tell you in open session is that we believe that al Qaida and other terrorist organizations are suffering financially as a result of our actions. We also believe that potential donors are being more cautious about giving money to organizations where they fear that the money might wind up in the hands of terrorists. In addition, greater regulatory scrutiny in financial systems around the world is further marginalizing those who would support terrorist groups and activities. This deterrent effect, though perhaps not quantifiable, is an essential effect of our efforts.

At the same time, I must tell you that we have much to do. Although we believe we have had a considerable impact on al Qaida's finances, we also believe that al Qaida's financial needs are greatly reduced. They no longer bear the expenses of supporting the Taliban government or of running training camps, for example. We have no reason to believe that al Qaida does not have the financing it needs to conduct at least a substantial number of additional attacks. In short, a great deal remains to be done.

The Misuse of Charities and Non-Profit Organizations

Your invitation letter requested my thoughts about the scope of the problem of terrorist abuse of charities and non-profits. Unfortunately, this is not an issue on which precise measurement is possible. We do know that the mechanism of charitable giving – *i.e.*, the collection of resources from willing donors and its redistribution to persons in need – has been used to provide a cover for the financing of terror and that it has been a significant source of funds. In certain instances the charity itself was a mere sham that existed simply to funnel money to terrorists. However, the abuse often occurred without the knowledge of donors, or even of some members of the management and staff of the charity itself. Allow me to provide some examples.

Examples of Abuse of Charities by Terrorist Groups

*Example 1: Afghan Support Committee (ASC)*

On January 9, 2002, the United States designated the Afghan Support Committee (ASC), a purported charity, as an al Qaida supporting entity. The ASC operated by soliciting donations from local charities in Arab countries, in addition to fundraising efforts conducted at its headquarters in Jalalabad, Afghanistan, and subsequently in Pakistan. The ASC falsely asserted that the funds collected were destined for widows and orphans. In fact, the financial chief of the ASC served as the head of organized fundraising for Osama bin Laden. Rather than providing support for widows and orphans, funds collected by the ASC were turned over to al Qaida operatives. With our blocking action on January 9, 2002, we publicly identified the scheme being used by ASC and disrupted this flow of funds to al Qaida.

*Example 2: Revival of Islamic Heritage Society (RIHS)*

Also on January 9, 2002, we designated the Pakistani and Afghan offices of the Revival of Islamic Heritage Society (RIHS). The RIHS is an example of an entity whose charitable intentions were subverted by terrorist financiers. The RIHS was a Kuwaiti-based charity with offices in Pakistan and Afghanistan. The Peshawar, Pakistan office director for RIHS also served as the ASC manager in Peshawar. The RIHS Peshawar office defrauded donors to fund terrorism. In order to obtain additional funds from the Kuwait RIHS headquarters, the RIHS Peshawar office padded the number of orphans it claimed to care for by providing names of orphans

that did not exist or who had died. Funds sent for the purpose of caring for the non-existent or dead orphans were instead diverted to al Qaida terrorists. In this instance, we do not currently have evidence that this financing was done with the knowledge of RIHS headquarters in Kuwait.

Example 3: Al-Haramain Islamic Foundation

On March 11, 2002, the United States and Saudi Arabia jointly designated the Somali and Bosnian offices of the Saudi-based Al-Haramain organization. Al-Haramain is a Saudi Arabian-based charity with offices in many countries. Prior to designation, we compiled evidence showing clear links demonstrating that the Somali and Bosnian branch offices were supporting al Qaida. For example, we uncovered a history of ties between Al-Haramain Somalia and al-Qaida, the designated organization Al-Itihaad al-Islamiya (AIAI), and other associated entities and individuals. Over the past few years, Al-Haramain Somalia has provided a means of funneling money to AIAI by disguising funds allegedly intended to be used for orphanage projects or the construction of Islamic schools and mosques. The organization has also employed AIAI members. Al-Haramain Somalia has continued to provide financial support to AIAI even after AIAI was designated as a terrorist organization by the United States and the United Nations. In late-December 2001, Al-Haramain was facilitating the travel of AIAI members in Somalia to Saudi Arabia. The joint action by the United States and Saudi Arabia exposed these operations.

Preserving and Safeguarding Charities and Charitable Giving

As I stated earlier, our goal is to guard charities against abuse without chilling legitimate charitable works. Our strategic approach, as set forth in the recently published 2002 National Money Laundering Strategy, involves domestic and international efforts to ensure that there is proper oversight of charitable activities as well as transparency in the administration and functioning of the charities. It also involves greater coordination with the private sector to develop partnerships that include mechanisms for self-policing by the charitable and non-governmental organization sectors.

*Domestic Front*

Here at home, we are working to stem the flow of funds to terrorists through all channels. As mentioned above, we have issued blocking orders against charities and branches of charities providing support to terrorists. The three examples I cited previously all represent such blocking actions. In addition, we have blocked the assets of several other charities or groups that claimed to be providing charitable services. For example, on December 4, 2001, we blocked the assets of the Holy Land Foundation for Relief and Development, which describes itself as the largest Islamic charity in the United States. It operates as a U.S. fundraising arm of the Palestinian terrorist organization Hamas. We have also designated as terrorist supporters the Makhtab al-Khimamat/Al Kifah, a clearinghouse for Islamic charities financed directly by Usama bin Ladin and party to the 1993 World Trade Center attack; the Al Rashid Trust; the Wafa Humanitarian Organization; and the Rabita trust -- all Pakistan based al Qaida financier organizations; and the Ummah Tameer E-Nau, a Pakistani NGO which provided nuclear, biological and chemical weapons expertise to al Qaida.

In addition, we have blocked the assets of the Global Relief Foundation and the Benevolence International Foundation, under the provisions of the USA PATRIOT Act to assist the ongoing investigation of alleged links to terrorism.

Another aspect of our domestic strategy is to work within the U.S. regulatory system to ensure that charities are transparent to the maximum extent practical. In the United States, the transparency of the charitable sector is a concern of both federal and state officials, as well as of private organizations representing donors and charitable organizations. As this committee well knows, the Internal Revenue Service is the primary federal agency with oversight responsibility for charities. The IRS's responsibilities have expanded as the tax law has changed to keep up with

the growth of the nonprofit sector, which now consists of more than 1.5 million tax-exempt organizations, including nearly 800,000 charities and 350,000 religiously-affiliated organizations that control $2 trillion in assets.

Under U.S. law, any person or group may establish an organization with charitable purposes, and the creators of the organization are free to choose any charitable endeavor they wish to pursue. If the organization applies to the IRS for recognition of tax-exempt status, and shows that it meets the requirements of Section 501(c)(3) of the Internal Revenue Code (IRC), it will be recognized exempt until it ceases to exist or until the IRS determines it no longer meets the requirements and revokes exempt status. A charity may have its Section 501(c)(3) application denied or its existing tax-exempt status revoked by the IRS if it does not comply with these standards. A "revocation" means that the organization becomes taxable and that donors will receive no tax benefits from contributions to the organization. Revocation may also cause the state in which the charity is organized to take action to ensure its assets are used for charitable purposes.

While its primary functions in this sphere are to recognize and regulate tax-exempt status and to implement those provisions of the tax code that derive from that status, the IRS also performs a crucial role in the development and dissemination of information about those charities that fall under its jurisdiction. Most IRC 501(c)(3) organizations (except for churches and certain small organizations) are required to file annual information returns showing the income, expenses, assets, and liabilities of the organization, as well as information about its programs. 501(c)(3) organizations must make their returns available to anyone who asks (except for the names of contributors) by publishing them in readily accessible electronic and hard-copy formats. The availability of information about charities' operations helps stimulate oversight by donors, the media, academia, and private organizations.

Also, State Attorneys General have statutory jurisdiction over the charitable assets of these organizations and over fundraising activities of charities. Oversight responsibilities and practices vary from state to state, but most states exercise regulatory oversight over all organizations that raise money in their state, excluding churches, synagogues, and mosques, regardless of where the charity is domiciled. State charities officials have formed a national-level organization, the National Association of State Charities Officials (NASCO - www.nasconet.org). Among other things, NASCO has promoted harmonization in registration requirements among the states, and has advanced a "Model Act Concerning the Solicitation of Funds for Charitable Purposes."

The United States also has private, non-profit organizations that work to safeguard our tradition of charitable giving. One such organization is Independent Sector, a coalition of more that 700 national organizations, foundations, and corporate philanthropy programs that collectively represent many thousands more organizations throughout the United States. Its many research activities include defining and addressing ways to improve accountability in the charitable sector. Other organizations focus on particular segments of the charitable sector. The Council on Foundations focuses on issues affecting private foundations. The Evangelical Council for Financial Accountability serves a major segment of the religious community as an accreditation organization that either grants or withholds membership based on an examination of the financial practices and accomplishments of charitable organizations that apply. It provides public disclosure of its more than 900 members' financial practices and accomplishments, including on its website, www.ecfa.org. ECFA is also the United States member of the International Committee for Fundraising Organizations (ICFO), an umbrella organization that links the accreditation organization of 10 countries (US, UK, Canada, Norway, Sweden, France, Germany, Switzerland, Austria, and the Netherlands).

Other organizations promoting transparency include the Philanthropic Research Institute, whose Guidestar organization maintains a database containing IRS filings and other financial information of over 200,000 charities. Any interested individual can access the information through its www.guidestar.org website. Another donor-information organization, the Better Business Bureau (BBB) Wise Giving Alliance, focuses on organizations that conduct broad-based fund-raising appeals. It collects

and distributes information about the programs, governance, fundraising practices, and finances of hundreds of nationally soliciting charitable organizations that are the subject of donor inquiries. It asks the selected organizations for information about their programs, governance, fund raising practices, and finances, and measures the results against general guidelines and standards it has developed for measuring organizational efficiency and effectiveness. It publishes the results, including whether the selected organization refused to supply information, on its website at www.give.org.

While we are continually assessing ways to attack terrorist finances, there is no current Treasury Department proposal under consideration to modify the federal tax code for the purpose of blocking terrorist finance through charities. However, we are working with state charities officials and the private sector watchdog agencies to widen their horizons from the pursuit of fraud to the fight against terrorist finance.

*International Efforts*

As on all issues related to terrorist financing, our efforts to prevent the abuse of charities by terrorists can only be successful if we have international cooperation and support. As I have stated before, we cannot bomb foreign bank accounts. We need the cooperation of foreign governments to investigate and block them. The blocking actions we have taken to date were not isolated U.S. actions, as seen in the March 11, 2002, joint designation with Saudi Arabia. Each of the blocking actions we have taken to combat the abuse of charities – with the exception of the freezes in aid of US-based investigations – has been backed and echoed by our allies. I am very proud of the work that has gone into building the international coalition against financial terrorism, and would like to take this opportunity to give credit to the other agencies of the US government – including the State Department, the intelligence community, the FBI and the Department of Justice – that have helped us keep that coalition in place.

Moreover, we are working with other countries to strengthen their own internal charitable regulation regimes so that they can feel confident that their charitable communities are not being abused. We have pursued these discussions both bilaterally and multilaterally, in the Middle East, South East Asia, and Europe, as well as in the G7 and G8 processes and especially through the Financial Action Task Force (FATF). Secretary O'Neill has raised this issue directly with his counterparts on his visits to the Persian Gulf and Europe. Other countries, especially those whose cultures incorporate, encourage, and require charitable giving, are as concerned as we are that the good deeds of well-intentioned donors should not be hijacked by terrorists.

They are making progress, as even a cursory review of foreign press reports indicates. For example, on March 21, the Saudi press reported that the Saudi government had issued a regulatory decision requiring charitable societies to submit to the Saudi Foreign Ministry the details of projects they intend to finance abroad. Also in March, the Pakistani press reported on the Pakistan Center for Philanthropy, an independent, non-profit organization dedicated to improving philanthropic regulation. According to these reports, the Pakistani government asked the center to develop recommendations for a new law governing charities, NGO's, and other civil society organizations. In May, the Azerbaijani press reported that the government had submitted to parliament a new law further regulating the funding of charities and other NGO's. And in June, the Egyptian press reported that a draft law expanding government oversight of non-governmental and charitable organizations was submitted to parliament.

There is not a single correct approach to ensuring appropriate transparency and oversight of charitable organizations. Different countries attempt to do so using a variety of approaches. In some, independent charity commissions have an oversight role. In other countries, government ministries are directly involved. Moreover, in many jurisdictions, the focus of oversight has been combating fraud rather than terrorist financing. Many of the same regimes and mechanisms, however, can assist in the fight against terrorist finance as well.

We are attempting, bilaterally and multilaterally, to ensure that all jurisdictions treat

the regulation of charitable institutions with the seriousness it deserves. As I mentioned earlier, one of the eight special counter-terrorism recommendations adopted at the October 2001 plenary session of FATF specifically called on member countries to ensure that charities and other NGOs should not be abused for the furtherance of terror, and the United States is taking the lead within FATF to develop specific best practices to ensure transparency, accountability, and enforcement of regulations over charities.

Additional Authority to Prevent the Misuse of Charities

Mr. Chairman, your invitation letter inquires whether the Administration needs additional authorities to prevent the abuse of charities. As you know, on December 20, 2001, Congress passed the "Victims of Terrorism Tax Relief Act of 2001" in which there were revisions of some elements of the tax code. An important change in the tax-related laws involved the expansion of the availability of tax returns and return information under Section 6103 for purposes of investigating terrorist incidents, threats, or activities, and for analyzing intelligence concerning terrorist incidents, threats, or activities. The ability to access and consolidate all relevant financial information in order to uncover terrorist networks and support cells is crucial to our overall efforts. In this context, it is important to our efforts to ensure that charities are not being abused by terrorist groups and supporters.

Though we are exploring ways to make our efforts more efficient and effective, we do not see a particularized need at this time to ask this Committee and Congress for additional authority. We look forward to working with you when we identify necessary changes to make our efforts most effective.

Conclusion

Mr. Chairman, this concludes my formal testimony. I would be pleased to answer any questions that you, or members of the Committee, may have regarding the Administration's goals and policies regarding the abuse of charities by terrorist organizations as well as other issues related to terrorist financing.