# Exhibit 6


# Testimony of
# Gary M. Bald, Acting Assistant Director
# Counterterrorism Division, FBI

## "Coordination of the United States' Efforts to Combat Money Laundering and Terrorist Financing"

### Before the Senate Caucus on International Narcotics Control
### March 4, 2004

Good morning Mr. Chairman and members of the United States Senate Caucus on International Narcotics Control. On behalf of the Federal Bureau of Investigation (FBI), I would like to express my gratitude to you for affording us the opportunity to participate in this forum and to provide comments on the FBI's achievements, together with our partners in the war on terror, in the effort to identify, dismantle and disrupt sources of terrorist financing and money laundering. I also appreciate the opportunity to highlight our efforts with regard to interagency cooperation in the battle against terrorist financing.

The fight against terrorist financing is a major front in our war on terror. We recognize that terrorists, their networks and support structures require funding in some form to exist and operate. Whether the funding and financial support is minimal or substantial, it often leaves a financial trail that can be traced, tracked, and exploited for proactive and reactive purposes. Being able to identify and track financial transactions and links after a terrorist act has occurred or a terrorist activity has been identified is important, but the key lies in exploiting financial information to identify previously unknown terrorist cells, recognizing potential terrorist activity or planning, and predicting and preventing potential terrorist acts. To this end, the FBI has bolstered its ability to effectively combat terrorism through the formation of the Terrorist Financing Operations Section (TFOS).

TFOS was created in April, 2002 to combine the FBI's traditional expertise in conducting complex criminal financial investigations with advanced technologies and the critical legislative tools provided through the USA PATRIOT Act. TFOS has built upon these established mechanisms by developing cooperation and coordination among law enforcement and intelligence agencies, both domestic and foreign, to form the preeminent terrorist financing investigative operation. In the past several months, TFOS has demonstrated its capabilities by conducting near real-time financial tracking of a terrorist cell and providing specific and identifiable information to a foreign intelligence agency, which resulted in the prevention of six, potential deadly terrorist attacks.

The TFOS mission includes: conducting full financial analysis of terrorist suspects and their financial support structures in the US and abroad; coordinating joint participation, liaison, and outreach efforts to exploit financial resources of private, government, and foreign entities; utilizing FBI and Legal Attaché expertise and relationships to fully develop financial information from foreign law enforcement and private agencies, including the deployment of TFOS personnel abroad to locations such as Iraq; working jointly with the intelligence community to fully exploit intelligence information to further terrorist investigations; working jointly with prosecutors and with the law enforcement and regulatory communities; developing predictive models and conducting data analysis to facilitate the identification of previously unknown or "sleeper" terrorist suspects; and providing the financial component to classified counterterrorism investigations in support of the FBI's counterterrorism responsibilities.

Achievements towards the identification, dismantlement and disruption of sources of terrorist financing:

Before addressing some specific, investigative accomplishments in the fight against terrorist financing since 9/11/01, it is important to mention our progress in broad areas. For instance, international awareness and cooperation on the problem of terrorist financing has reached unparalleled levels. Outreach with, and cooperation from, the

private sector has been outstanding and continues to develop--particularly the level of two-way interaction between law enforcement and the private sector. The resulting ability of FBI to access and obtain information in a timely fashion has significantly enhanced the FBI's ability to identify, investigate, and resolve immediate threat situations involving potential terrorist activity. Moreover, the ability to conduct near real-time monitoring of specifically identified financial activity has been invaluable not only to investigations ongoing in the US, but to foreign law enforcement and intelligence agencies in related investigations.

As an example of our successful liaison and outreach efforts, extensive training and support of international investigations by TFOS has resulted in Agent visits, exchanges and training programs involving countries in Europe, Southeast Asia, the Middle East, Africa and South America. In support of specific high profile joint terrorist financial investigative matters, a number of countries and agencies, including the United Kingdom, Switzerland, Canada and Europol, have detailed investigators to TFOS on a temporary duty basis.

TFOS has engaged in extensive coordination with authorities of numerous foreign governments in terrorist financing matters, leading to joint investigative efforts throughout the world. These joint investigations have successfully targeted the financing of several overseas Al-Qa'ida cells. Furthermore, through the assistance of relationships established with the central banks of several strategic countries, successful disruptions of Al-Qa'ida financing have been accomplished in countries such as the UAE, Pakistan, Afghanistan, Philippines and Indonesia.

As part of this effort, TFOS has developed a specific terrorist financing and money laundering crimes curriculum for international training that includes topics such as: acquiring and handling evidence in document intensive financial investigations, major case management techniques, forensic examination tools, and methods of terrorist financing. At the request of the US Department of State, TFOS and the Internal Revenue Service have provided this curriculum to ten countries in just the past year, and are scheduled to provide it to approximately 38 countries overall, identified by the National Security Council as needing law enforcement training on conducting terrorist financing investigations.

Needless to say, access to foreign banking records is often critical to effectively following terrorist money. Through these training and outreach initiatives, TFOS has been able to obtain direct access to records provided by foreign central banks in numerous countries. In return, TFOS has also been able to assist these and other countries with the reciprocal sharing of terrorism related financial information.

TFOS has cultivated and maintains a contact database of private industry and government sources and persons who can provide financial data, including near real-time monitoring of financial transactions. Many of these contacts can be reached or accessed on a 24 hour/7 days a week basis, allowing TFOS to respond rapidly to critical incidents.

Through these contacts, with appropriate legal process, and pursuant to FBI investigative guidelines, TFOS has access to data and information from a variety of entities including: Banking Institutions, the Credit/Debit Card Sector, Money Services Businesses, the Securities/Brokerages Sector, Insurance Companies, Travel Agencies, Internet Service Providers, the Telecommunications Industry, Law Enforcement, State/Federal Regulatory Agencies, Public and Open Source Data Providers, the Intelligence Community, and International Law Enforcement and Intelligence Contacts. Access to this type of information is governed by the Right to Financial Privacy Act, Fair Credit Reporting Act, and other applicable statutes. The timeliness and accessibility of the data from these sources is contingent on a variety of factors, including whether the acquisition of the information requires legal process, the search capabilities of the data provider, and the size and depth of the data request. Nevertheless, as I've noted, the ability to access and obtain this type of information in a time sensitive and urgent manner has significantly enhanced the FBI's ability to identify, investigate and resolve immediate

threat situations involving potential terrorist activity.

**INTERAGENCY COOPERATION**
Organizational changes have taken place within the Executive Branch with respect to the investigation of terrorism financing, including the execution of a Memorandum of Agreement (MOA) between the Department of Justice (DOJ) and the Department of Homeland Security (DHS) concerning terrorist financing investigations. The MOA addressed the importance of waging a seamless, coordinated law enforcement campaign against terrorist sources of financing. Signed by Attorney General Ashcroft and Homeland Security Secretary Ridge on May 13, 2003, it designates the FBI as the lead terrorist financing investigations and operations agency, and enables DHS to focus its law enforcement activities on protecting the integrity of US financial systems. To this end, DHS implemented "Operation Cornerstone", led by Immigration and Customs Enforcement (ICE), to identify vulnerabilities in financial systems through which criminals launder their illicit proceeds, bring them to justice and work to eliminate financial infrastructure vulnerabilities. Former US Customs Service "Operation Green Quest" criminal cases having no nexus to terrorism were converted to "Operation Cornerstone", while those cases having a nexus to terrorism were transitioned to the appropriate FBI Joint Terrorism Task Force (JTTF) where participating ICE Task Force members continue to play significant roles. Ongoing and future "Operation Cornerstone" investigations that develop links to terrorism will be referred to the FBI through TFOS. ICE and TFOS are coordinating investigative initiatives that will enable ICE to identify financial systemic vulnerabilities, and which will enable TFOS to identify ties to terrorism and terrorist financing. In addition, there is a liaison from ICE assigned to TFOS, and investigators from ICE are assigned to the JTTFs. The FBI has reciprocated by assigning an FBI Agent Unit Chief to the ICE offices in Washington, D.C.

In the various 84 JTTFs throughout the United States, ICE and FBI Agents are working side by side on numerous joint investigations. The exact number of ICE and FBI Agents varies from city to city and depends largely upon the workload at each JTTF. The JTTF does not only include ICE and FBI Agents, but representatives from State and Local law enforcement agencies, and other federal agencies such as the Internal Revenue Service, Department of Defense, Department of the Treasury, Central Intelligence Agency, Postal Inspection and the Environmental Protection Agency. Every Agency has an open-ended invitation to participate in the JTTF, and FBI Special Agents In Charge are particularly encouraged to promote interagency cooperation through the JTTFs.

Information sharing is critical to all of our efforts. The intelligence community, including the FBI, produces and obtains tremendous amounts of classified intelligence information. While much of the information can be of significant value in terrorist finance investigations, the value will not be realized or maximized absent the ability to filter the information, analyze it, and disseminate it in an appropriate manner to those who can make the best use of the information. Toward this end, TFOS participates in joint endeavors with the Treasury Department, the Department of Justice, and the Department of Homeland Security involving potential terrorist related financial transactions. TFOS also has personnel detailed to the CIA's Counter Terrorism Center, and personnel from there work directly with TFOS on financial intelligence matters.

In addition, the National Security Council (NSC) formalized the Policy Coordinating Committee (PCC) on Terrorist Financing at the end of 2001. The NSC chairs the PCC, which generally meets at least once a month to coordinate the United States government's campaign against terrorist financing. The meeting generally focuses on ensuring that all relevant components of the federal government are acting in a coordinated and effective manner to combat terrorist financing.

The Departments of State, the Treasury, Homeland Security and Justice also participate in an interagency Terrorist Financing Working Group, chaired by the State Department, to coordinate government efforts to identify, prioritize, assess, and assist those countries whose financial systems are vulnerable to terrorist exploitation. Groups of experts, including DOJ money laundering prosecutors, interagency law enforcement and regulatory members, have provided extensive on-the-ground assessments of such

countries' vulnerabilities in an effort to develop and provide targeted training and technical assistance to those countries identified as most vulnerable.

**EXAMPLES OF INVESTIGATIONS**
In addition to these developments, the FBI, working in coordination with other entities of the US government, has participated in the following successes pertaining to terrorist financing:

- The FBI conducted a detailed financial investigation/analysis of the 19 hijackers and their support network, following the September 11th attacks. This investigation initially identified the Al Qa'ida funding sources of the 19 hijackers in the UAE and Germany. The financial investigation also provided the first links between Ramzi Binalshibh and the 9/11/01 terrorist attacks. A continuing investigation, in coordination with the PENTTBOMB Team, has traced the origin of the funding of September 11th back to financial accounts in Pakistan, where high-ranking and well-known Al Qa'ida operatives played a major role in moving the money forward, eventually into the hands of the hijackers located in the US. As part of the 9/11/01 financial investigation, thousands of individuals and organizations were investigated in the US and abroad to determine whether they played any part in supporting the hijackers or the operation. Although the vast majority of these individuals and organizations were cleared of culpability, this process of elimination resulted in numerous other quality terrorism investigations being initiated, as well as criminal charges against hundreds of individuals for fraud and other criminal activity.

- In 2001, an FBI Joint Terrorism Task Force in Charlotte, North Carolina, utilized racketeering statutes to obtain criminal convictions and, thus, disrupt and dismantle a Hizballah procurement and fundraising cell. Twenty-four individuals were arrested for crimes including immigration fraud, visa fraud, cigarette smuggling, interstate transportation of stolen property, fraud, bank fraud, bribery, money laundering, racketeering, and providing material support to a designated terrorist organization, with the final conviction delivered in 2003. Sentences imposed range up to more than 150 years.

- In 2002, the FBI coordinated with the Treasury Department's Office of Foreign Asset Control (OFAC) to justify the blocking of Holy Land Foundation for Relief and Development (HLF) assets and the closing of its US offices, shutting down Hamas' largest fund-raising entity in the US. The HLF had been linked to the funding of Hamas terrorist activities, and in 2000, raised $13 million.

- In October 2002, the FBI and other US government agencies assisted German authorities in identifying and taking legal action against Hamas in Germany. Through the efforts of the FBI, including TFOS, exchanges with Germany led to the closure of the Al Aqsa Foundation in Germany, a suspected Hamas fundraising organization.

- In December 2002, a federal grand jury in Dallas returned an indictment against a senior leader of Hamas, Mousa Abu Marzouk, for conspiring to violate US laws that prohibit dealing in terrorist funds. Also charged and arrested by the FBI were Ghassan Elashi, the chairman of the Holy Land Foundation for Relief and Development, a charitable organization designated as a terrorist organization by the US Treasury Department's Office of Foreign Asset Control because of its fundraising activities on behalf of Hamas. Elashi and four of his brothers, all of whom are employees of the Richardson, Texas-based InfoCom Corporation, were charged with selling computers and computer parts to Libya and Syria, both designated state sponsors of terrorism. The indictment alleged that the Elashi brothers disguised capital investment from Marzouk, a specially designated terrorist for his admitted leadership role with Hamas, for their telecommunications company, InfoCom. The indictment and subsequent arrests have disrupted a US based business, which was conducting its activities with a known Hamas leader and state sponsors of terrorism.

- In January 2003, the FBI, working in conjunction with German law enforcement, arrested Mohammed Al Hasan Al-Moayad, a Yemeni national, on charges of conspiring to provide

material support to Al Qa'ida and Hamas. Al-Moayad was a significant financial contributor to Al Qa'ida and Hamas, and boasted he had provided over $20 million dollars to Usama Bin Laden. Al-Moayad participated in several fund raising events at the Al Farouq Mosque in Brooklyn, NY. Al-Moayad was arrested during an undercover operation where he believed that he was to receive a large financial contribution, which he advised an FBI source would be used to support mujahideen fighters of Al Qa'ida and Hamas. Along with Al-Moayad, several of his associates in New York were arrested for violating banking reporting requirements by structuring over $300,000 in several bank accounts in the United States.

- Offices of the Benevolence International Foundation (BIF), a US based charity, were shut down and its assets and records blocked following an OFAC and FBI investigation which determined the charity was being used to funnel money to Al Qa'ida. In February 2003, Enaam Arnaout, the head of BIF, pleaded guilty to racketeering conspiracy, admitting he fraudulently obtained charitable donations in order to provide financial assistance to persons engaged in violent activities overseas.

- A criminal case against Sami Al Arian, the alleged US leader of the Palestinian Islamic Jihad (PIJ), and the World Islamic Studies Enterprise forced the closure of several front companies suspected of funneling money to support PIJ operations against Israel. In August 2002, the investigation led to the deportation of Mazen Al-Najjar, the brother-in-law of Sami Al Arian and a known PIJ member. In February of 2003, following a 50-count indictment for RICO and Material Support of Terrorism violations, the FBI arrested Al-Arian and three other US-based members of the PIJ, including Sameeh Hammoudeh, Hatim Naji Fariz, and Ghassan Ballout. The FBI also executed seven search warrants associated with this action.

- In February of 2004, the FBI executed search warrants on the Ashland, Oregon office of Al Haramain Islamic Foundation, Inc. (AHIF). AHIF is one of Saudi Arabia's largest non-governmental organizations (NGO) with offices located throughout the world. AHIF's stated mission is to provide charitable services and Islamic education around the world. Based upon AHIF's claim to be a public benefit corporation organized exclusively for religious, humanitarian, educational and charitable purposes, the IRS granted AHIF tax-exempt status. The warrants were executed to further the investigation of criminal violations of Currency and Monetary Instrument reporting requirements by AHIF principals and subscribing to a false informational tax form. The investigation specifically focuses on a series of transactions involving traveler's checks cashed out of country and the mischaracterization of funds received by AHIF.

- TFOS is assisting coalition forces in Iraq in efforts to identify, disrupt, and dismantle the financial infrastructure of terrorist groups that are, or are planning to, attack coalition forces.

- TFOS has provided operational support to FBI Field Divisions and JTTFs across the United States to enhance their intelligence/criminal investigations of individuals and groups associated with, or providing material support to, terrorist organizations and activities. This assistance is provided in the form of conducting intelligence/criminal financial investigations, financial analytical support, major case management, financial link analysis, and the deployment of teams of experts to develop investigative plans to analyze large volumes of documents and data. TFOS has provided this type of operational support in Al Qa'ida cases in Buffalo and Portland, as well as in the Richard Reid, John Walker Lindh, Al Haramain, PIJ, and Mohamed Al-Moayad cases, among many others. This type of operational support has also been provided to Divisions investigating non-governmental organizations (NGOs), such as the Holy Land Foundation for Relief and Development, Benevolence International Foundation and the Global Relief Foundation.

- Since 9/11, the U.S. Government has blocked $36.3 million in terrorist assets located domestically, while the international community has blocked over $136 million, for a total of over $172 million. The FBI has provided assistance to both its U.S. Government partners and the international community by showing the definitive links to known terrorist organizations.

- The Treasury and State Departments have issued blocking orders on the assets of more than 340 terrorists, terrorist organizations, and terrorist supporters, many of them identified by the FBI, effectively denying them access to the US financial system.

- Federal law enforcement officials, working with the FBI in the JTTFs, have arrested over 61 individuals, indicted 47 and convicted 14 in connection with terrorist financing investigations.

- US Government agencies, to include the FBI's TFOS, deployed trainers and advisers on missions to countries around the world to assist with the drafting of legislation to combat terrorist financing, strengthen bank supervision in identifying suspicious transactions, and address other financial crimes and corruption. Since 9/11/01, over 80 countries have introduced new terrorist-related legislation and approximately 84 countries established Financial Investigation Units.

As previously noted, TFOS has conducted near real-time financial tracking of a terrorist cell and provided specific and identifiable information to a foreign intelligence agency, which resulted in the prevention of six, potential deadly terrorist attacks.
It should be noted that the above examples do not include the many classified intelligence successes that have directly contributed to the prevention or disruption of terrorist activities.

The use of information technology to better identify and isolate suspicious transactions related to terrorist financing:

The FBI has a responsibility to be not only reactive but proactive, and to think strategically about potential threats and future case development. Accordingly, TFOS, together with the Counter-Terrorism Section, Criminal Division of the Department of Justice, has begun a number of proactive initiatives to identify potential terrorists and terrorist related financing activities.

The overriding goal of these projects is to proactively identify potential terrorists and terrorist related individuals, entities, mechanisms or schemes through the digital exploitation of data. To accomplish this, TFOS seeks to 1) identify potential electronic data sources within domestic and foreign government and private industry providers; 2) create pathways and protocols to legally acquire and analyze the data; and 3) provide both reactive and proactive operational, predictive and educational support to investigators and prosecutors.
Utilizing the latest computer technology available, the Counterterrorism Division serves as a proactive, financial intelligence investigative management and support team. TFOS generates leads for other FBI components and proposes and conducts proactive financial intelligence initiatives and projects. TFOS works closely with other operational units and document exploitation initiatives to ensure financial intelligence is being fully exploited and disseminated.

TFOS has conducted an extensive review of data mining software and link analysis tools currently utilized by other governmental and private industries for consideration of use by the FBI. TFOS also participates in the FBI's SCOPE Intelligence Data Warehouse (IDW) User Management Group and has been involved in the development and planning for future enhancements to the IDW. TFOS's Proactive Exploitation Group (PEG) has created an interactive, computer playbook generator that can assist investigators in determining data sources to be queried, based upon the quantity and quality of their investigative data.

TFOS has initiated several projects to integrate data from its internal financial database, open/public source data and FBI and other government data sources onto a central query platform. Through this process, and in concert with contract vendors working for the SCOPE IDW Project, TFOS has developed a process whereby it can batch query multiple databases. This has the potential to save the FBI hundreds, if not thousands, of hours of data input and query time on each occasion it is utilized. Furthermore, it facilitates rapid acquisition and sharing of information with other agencies. Through the

Case 6:05-cv-00008-AA Document 11-6 Filed 03/31/10 Page 8 of 9
Case 3:07-cv-00109-RW Document 49-2 Filed 09/30/08 Page 170 of 296
Statement of Gary M. Bald 03/04/04 re Coordination of the United States' Efforts to Com... Page 7 of 9

sophisticated tools being utilized, and the matching protocols developed, TFOS can ensure each query is properly conducted and done to a best practices query standard.

Recently, TFOS utilized the batch process it developed to exploit over three thousand identifiers. The batch process accomplished in hours what would have taken TFOS personnel and FBI Field Offices over 4,300 man-hours to conduct. Furthermore, because TFOS conducted the queries in batch form, and has global access to all of the search results, previously unidentified links, patterns and associates among the data can now be extracted. Absent the batch process, this would have been extremely difficult, if not impossible, to accomplish.

TFOS has initiated a variety of proactive data mining projects to identify potential terrorists and terrorist financing. The projects were conceived in 2002 and now, with the advent of certain software tools and data access, are either being implemented or will begin shortly.

An example of this is the Terrorist Risk Assessment Model (TRAM), which seeks to identify potential terrorist and terrorism financing activity through the use of targeted, predictive pattern recognition algorithms. The project entails the compilation of past and current known data regarding individual and group terrorist activity, methodologies, demographics, financial patterns, etc., to form a predictive pattern recognition program.

It is important to understand that these projects and similar initiatives by TFOS seek only to more fully exploit information already obtained by the FBI in the course of its investigations or through the appropriate legal process, and where there is an articulated law enforcement need. TFOS does not seek access to personal or financial information outside these constraints.

**National Money Laundering Strategy**
With respect to the 2003 National Money Laundering Strategy, the FBI concurs with the strategy's goals and objectives. The blocking of terrorist assets worldwide, establishing and promoting of international standards for adoption by other countries to safeguard their financial infrastructures from abuse and facilitating international information are several key objectives which must be achieved if law enforcement and regulatory agencies are to have any success in stemming the flow of illegal funds throughout the world. Within the FBI, the investigation of illicit money flows crosses all investigative program lines.

The number one priority of the FBI is prevention of terrorism. To prevent terrorist acts, all investigative and analytical tools of the U.S. Government must be strategically applied, in a cohesive manner, through the JTTFs.

Our efforts to combat terrorism have been greatly aided by the provisions of the PATRIOT Act and, pursuant to the 2003 National Money Laundering Strategy, the FBI is ensuring its vigorous and appropriate application. It has already proven extraordinarily beneficial in the war on terrorism. Most importantly, the PATRIOT Act has produced greater collection and sharing of information within the law enforcement and intelligence communities.

Title III of the Act, also known as the International Money Laundering Anti-Terrorist Financing Act of 2001, has armed us with a number of new weapons in our efforts to identify and track the financial structures supporting terrorist groups. Past terrorist financing methods have included the use of informal systems for transferring value in a manner that is difficult to detect and trace. The effectiveness of such methods should be significantly eroded by the Act, which establishes stricter rules for correspondent bank accounts, requires securities brokers and dealers to file Suspicious Activity Reports or SARS, and money transmitting businesses, which include any person who engages as a business in the transmission of money, to register with the Financial Crimes Enforcement Network (FinCEN) and file SARS.

There are other provisions of the Act that have considerably aided our efforts to address

the terrorist threat including: strengthening the existing ban on providing material support to terrorists and terrorist organizations; the authority to seize terrorist assets; and the power to seize money subject to forfeiture in a foreign bank account by authorizing the seizure of funds held in a US correspondent account.

The FBI has utilized the legislative tools provided in the USA PATRIOT Act to further its terrorist financing investigations. It is important for the Committee and the American people to know that we are using the PATRIOT Act authorities in a responsible manner. We are effectively balancing our obligation to protect Americans from terrorism with our obligation to protect their civil liberties.

Terrorism represents a global problem. The FBI is committed to its U.S. and international partnerships and to effectively sharing information to protect our nation from terrorism. To meet this goal, the FBI has formed the International Terrorism Financing Working Group (ITFWG), which includes law enforcement and intelligence agency representatives from the United Kingdom, Canada, Australia and New Zealand, and addresses the international aspect of terrorist financing investigations.

**Alternate Financing Mechanisms**
In its latest report assessing the use of alternate financing mechanisms by terrorists, GAO recommended that, "The Director of the FBI should systematically collect and analyze data concerning terrorists' use of alternative financing mechanisms". The FBI has already implemented some measures to address the GAO's recommendation, and plans to implement additional measures by April 30, 2004 which address concerns identified in the GAO report.

The FBI has established specifically defined intelligence requirements used to guide the Bureau's collection efforts within its Office of Intelligence. As a result, we developed specific intelligence requirements, which are tied to various known indicators of terrorist financing activity.

TFOS has developed statistical queries in the FBI's CT Annual Field Office Report (AFOR) pertaining to terrorist financing. Included in this reporting are responses to the tracking, locating, and monitoring of subjects of terrorism investigations through the identification of emerging trends pertaining to terrorist financing techniques, including alternative financing mechanisms discovered through other criminal investigations.

TFOS has established the Program Management and Coordination Unit (PMCU), which will be responsible for, among other things, tracking various funding mechanisms used by many different subjects in ongoing investigations - to include alternative financing mechanisms. The PMCU will be well positioned to identify emerging trends across the spectrum of terrorist financing.

Measures to collect and analyze data concerning terrorists' use of alternative financing mechanisms will greatly enhance our ability to recognize, respond to, and ultimately disrupt or dismantle terrorist organizations reliant upon them. Through the international partnerships that we have established, additional sources from which to obtain similar information regarding alternative financing mechanisms are of great mutual benefit. The FBI intends to maintain and encourage liaison and relationships with our law enforcement colleagues both in the United States and all over the world to ensure that new methods of terrorism financing, as well as current ones, are accurately tracked and monitored.

Again, I offer my gratitude and appreciation to you, Chairman Grassley, as well as the distinguished members of this Caucus, for dedicating your time and effort to this issue, and I would be happy to respond to any questions you may have.