# EXHIBIT L

Case 6:05-cv-60008-AA Document 311-3  Filed 02/31/10  Page 2 of 10
Case 9:07-cv-00109-VRW Document 99-3  Filed 07/09/09  Page 3 of 53

Federal Bureau of Investigation - Congressional Testimony                    Page 1 of 9



Home | Site Map

**Contact Us**
- Your Local FBI Office
- Overseas Offices
- Submit a Crime Tip
- Report Internet Crime
- More Contacts

**Learn About Us**
- Quick Facts
- What We Investigate
- Natl. Security Branch
- Information Technology
- Fingerprints & Training
- Laboratory Services
- Reports & Publications
- History
- More About Us

**Get Our News**
- Press Room
- E-mail Updates
- News Feeds

**Be Crime Smart**
- Wanted by the FBI
- More Protections

**Use Our Resources**
- For Law Enforcement
- For Communities
- For Researchers
- More Services

Visit Our Kids' Page

Apply for a Job

## Congressional Testimony

**Testimony of John S. Pistole, Assistant Director, Counterterrorism Division, FBI**
**Before the Senate Committee on Banking, Housing and Urban Affairs**
**September 25, 2003**
**"Identifying, Tracking and Dismantling the Financial Structure of Terrorist Organizations"**

Good Morning Chairman Shelby, Senator Sarbanes, and other distinguished members of the committee. On behalf of the FBI, I would like to thank you for this opportunity to address the FBI's role in ensuring greater integrity of our country's financial institutions with respect to terrorist financing. I will discuss the FBI's efforts in identifying, tracking and dismantling the financial structure supporting terrorist groups to include forward thinking proactive and predictive capabilities. I will speak about our evolving liaison, sharing and outreach relationships with the financial community as well as with foreign governments and their respective financial and regulatory institutions (to include Saudi Arabia). I will conclude with some recent terrorist financing successes and the challenges we as well as private industry still face in following the money and obtaining and analyzing financial records, especially in emerging threat situations.

### FBI CHANGE IN FOCUS

As Director Mueller stated during his June 18, 2003 testimony before the House of Representatives Committee on Appropriations it is critical that the FBI transform it's "intelligence effort from tactical to strategic..if the FBI is to be successful in preventing terrorism and more proactive in countering foreign intelligence adversaries and disrupting and dismantling significant criminal activity."

Following the events of September 11, 2001 (9/11), the FBI changed it's focus making counterterrorism it's highest priority and redirecting resources accordingly. The emphasis was placed on intelligence with prevention as our primary goal. Counter terrorism investigations have become intelligence driven. Criminal investigation into these matters is considered a tool to achieve disruption, dismantlement and prevention.

### FORMATION OF TFOS

Prior to the events of 9/11, the FBI had no mechanism to provide a comprehensive, centralized, focused and pro-active approach to terrorist financial matters. While the FBI examined financial records at the time of previous terrorist attacks, as part of the investigation into each of the attacks, the events of 9/11 identified a critical need for a more comprehensive, centralized approach to financial matters. The Terrorist Financing Operations Section (TFOS) of the FBI's Counterterrorism Division was formed, immediately after 9/11, in response to this critical need. The mission of the TFOS has since evolved into a broader strategy

Top Story
Recent Stories
National Press R(
Top Local News
Local News by O
Congressional Testimony
- 2008
- 2007
- 2006
- 2005
- 2004
- 2003
- 2002
- 2001

Major Executive

Radio
- FBI This Week
- Gotcha

Contacts
- FBI Headquar
- FBI Local Offi(
- FBI Overseas

Backgrounders
- FBI Priorities
- FBI History
- Reports & Pul
- FOIA and Rea Room

056

Case 6:05-cv-60008-AAWD Document 311-3 Filed 02/31/10 Page 3 of 10
Case 9:07-cv-00109-VRW Document 99-3 Filed 07/09/09 Page 6 of 53

Federal Bureau of Investigation - Congressional Testimony                          Page 2 of 9

to identify, investigate, prosecute, disrupt and dismantle incrementally, all terrorist related financial and fund-raising activities.

Identifying, tracking and dismantling the financial structure supporting terrorist groups is critical to successfully dismantling the organizations and preventing future terrorist attacks. As is the case in most investigations, locating and "following the money" plays a critical role in identifying those involved in the criminal activity, establishing links among them, and developing evidence of their involvement in the activity.

Terrorists, their networks and support structures, require funding in some form to exist and operate. Whether the funding and financial support is minimal or substantial, it usually leaves a financial trail that can be traced, tracked, and exploited for pro-active and reactive purposes. Being able to identify and track financial transactions and links after a terrorist act has occurred or terrorist activity has been identified, represents only a small portion of the mission; the key lies in exploiting financial information in efforts to identify previously unknown terrorist cells, recognize potential terrorist activity/planning, and predict and prevent potential terrorist acts.

In forming the TFOS, the FBI built upon its traditional expertise in conducting complex criminal financial investigations and long established relationships with the financial services communities in the United States and abroad. Integrating these skills and resources with the Counterterrorism Division, allows the FBI to bring its full assets to bear in the financial war on terrorism.

The TFOS is both an operational and coordinating entity with pro-active and reactive responsibilities. As a coordinating entity, the TFOS is responsible for ensuring that a unified approach is pursued in investigating terrorist financing networks. The TFOS achieves this directive by: 1) coordinating the financial aspects of FBI Field Office and Legat terrorism investigations; 2) establishing overall initiatives, policy and guidance on terrorist financing matters; 3) participating in the National Security Council's Policy Coordinating Committee (PCC) on Terrorist Financing; 4) coordinating national liaison with the financial services sector; 5) cooperating in and coordinating criminal terrorist financing investigations with the Department of Justice; and 6) providing support and training to Field Offices to include the designated Terrorism Financing Coordinator (TFC).

It is critical that the financial aspects of terrorism investigations be adequately addressed and that a concerted, coordinated effort is made to investigate terrorist finance issues by experienced financial investigators. Rarely will a terrorist financing investigation be confined to the territory of one field office, rather they normally span not only multiple field office jurisdictions, but the globe; i.e., these types of investigations will frequently be linked to investigations and/or issues in other jurisdictions and other countries. It is imperative that these investigative efforts be effectively coordinated, placed into perspective with other counterterrorism efforts, prioritized in accordance with national and global strategies, and addressed in concert rather than in a disjointed, inefficient manner. Prior to the establishment of the TFOS, there did not exist within the FBI a mechanism to ensure appropriate focus on terrorist finance issues and provide the necessary expertise and overall coordination to comprehensively address these matters.

So how far have we come in the war on terrorist financing since 9/11? There currently exists a much better understanding of terrorist financing

057

Case 6:05-cv-60008-AA Document 311-3 Filed 02/31/10 Page 4 of 10
Case 3:07-cv-00109-VRW Document 55-3 Filed 07/09/09 Page 7 of 53

Federal Bureau of Investigation - Congressional Testimony

Page 3 of 9

methods. More sophisticated and effective processes and mechanisms to address and target terrorist financing continue to develop and evolve. Pro-active approaches are increasingly being utilized. The awareness around the world on the part of law enforcement, government agencies, regulators and policy makers, and the private sector of terrorist financing methods, suspicious financial activity and vulnerabilities is much higher since 9/11. International cooperation has reached unparalleled levels. Outreach with, and cooperation from, the private sector has been outstanding and continues to develop, particularly the level of two-way interaction between law enforcement and the private sector. The ability to access and obtain this type of information in a timely fashion has significantly enhanced the FBI's ability to identify, investigate, and resolve immediate threat situations involving potential terrorist activity. However, we still face significant challenges in obtaining and analyzing financially related records in a timely fashion, especially in emerging threat situations, which I will discuss later in my testimony. The ability to conduct near real-time monitoring of specifically identified financial activity has been invaluable to not only investigations ongoing in the US, but to foreign law enforcement and intelligence agencies in related investigations. This illustrates another example of not only more pro-active measures but also of increased cooperation and coordination with the international community.

### LIAISON AND OUTREACH

Extensive training and support of international investigations by the TFOS has led to Agent visits/exchanges and training programs involving a variety of countries from Europe, Asia, the Middle East, South America, and Africa. In support of specific high profile joint terrorist financial investigative matters, a number of countries and agencies, including the United Kingdom, Switzerland, Canada, Germany and Europol, have detailed investigators to the TFOS on a TDY basis. The TFOS has engaged in extensive coordination with authorities of numerous foreign governments in terrorist financing matters, leading to joint investigative efforts throughout the world. These joint investigations have successfully targeted the financing of several overseas Al Qaeda cells, including cells located in Indonesia, Malaysia, Singapore, Spain, and Italy. We have also disrupted Al Qaeda financing in the UAE, Pakistan, Afghanistan, and Indonesia with the assistance of relationships established with authorities in those and other countries.

The TFOS has developed a specific terrorist financing/money laundering crimes curriculum for international training which includes topics such as: acquiring and handling evidence in document intensive financial investigations, major case management techniques, forensic examination tools, and methods of terrorist financing. At the request of the U.S. Department of State, the TFOS has led an interagency team to provide this curriculum to a number of countries (and is scheduled to provide to approximately 38 countries) identified as needing law enforcement training on conducting terrorist financing investigations.

Through these training and outreach initiatives the TFOS has been able to build relationships with foreign counterparts that improves the FBI's ability to obtain access to financial records held by foreign financial institutions.

The TFOS has cultivated and maintains a contact database of private industry and government sources/persons who can provide financial data, including near real-time monitoring of financial transactions. Many of

058

Case 6:05-cv-60008-AA WD Document 311-3 Filed 02/31/10 Page 5 of 10
Case 9:07-cv-00109-VRW Document 99-3 Filed 07/09/09 Page 8 of 53

Federal Bureau of Investigation - Congressional Testimony

Page 4 of 9

these contacts can be reached or accessed on 24 hour/7 days a week emergency basis allowing the TFOS to respond rapidly to critical incidents. In all cases, TFOS follows applicable legal procedures in obtaining access to financial data.

Through these contacts and with legal process <u>the TFOS has access to data and information from a variety of entities including:</u> Banking, Credit/Debit Card Sector, Money Services Businesses, Securities/Brokerages Sector, Insurance, Travel, Internet Service Providers, Telecommunications Industry, Law Enforcement, State/Federal Regulatory Agencies, Public and Open Source Data Providers, <u>the Intelligence Community,</u> and International Law Enforcement and Intelligence Contacts. The timeliness and accessibility of the data is contingent on a variety of factors including whether the acquisition of the information requires legal process, the search capabilities of the data provider, and the size and depth of the data request. The ability to access and obtain this type of information in a time sensitive and urgent manner has significantly enhanced the FBI's ability to identify, investigate and resolve immediate threat situations involving potential terrorist activity. For example, the ability to conduct near real-time monitoring of specifically identified financial activity has been invaluable to not only investigations ongoing in the US, but to foreign law enforcement and intelligence agencies in related investigations.

Being able to identify and track financial transactions and links after a terrorist act has occurred or terrorist activity has been identified represents only a small portion of the mission. The key lies in exploiting financial information in efforts to identify previously unknown terrorist cells, recognize potential terrorist activity/planning, and predict and prevent potential terrorist acts. Prior to 9/11, there was not enough emphasis placed on addressing the mechanisms and systems associated with terrorist financing and disrupting them before they could be utilized to further terrorist activities.

## PROACTIVE TFOS PROJECTS

The TFOS has a responsibility to be not only REACTIVE but PROACTIVE as well, to think strategically about potential threats and future case development. As a result, the TFOS, together with the Counterterrorism Section (CTS), Criminal Division of the Department of Justice (DOJ), have begun a number of pro-active initiatives to identify potential terrorists and terrorist related financing activities.

The overriding goal of these projects is to identify potential terrorists and terrorist related individuals/entities, mechanisms or schemes through the digital exploitation of data. To accomplish this, the TFOS seeks to 1) identify potential data sources; 2) create pathways and protocols to legally acquire and analyze the data; and 3) provide both reactive and proactive operational, predictive and educational support to investigators and prosecutors.

It is important to understand that these projects and similar initiatives by the TFOS seek only to more fully exploit information <u>already obtained</u> by the FBI in the course of it's investigations or through the acquisition of new data through the appropriate channels and legal process. The FBI does not seek access to personal or financial information outside these constraints.

059

## INFORMATION SHARING

Case 6:05-cv-60008-AA-WD Document 311-3 Filed 02/31/10 Page 6 of 10
Case 9:07-cv-00109-VR-WD Document 99-3 Filed 07/09/09 Page 5 of 53

Federal Bureau of Investigation - Congressional Testimony

Page 5 of 9

Information sharing is critical to all of our efforts. The intelligence community, including the FBI, produces and obtains tremendous amounts of classified intelligence information. While much of the information can be of significant value in terrorist finance investigations, the value will not be realized nor maximized absent the ability to filter the information, analyze it, and disseminate it in an appropriate manner to those who can make the best use of the information. Toward this end, the TFOS participates in joint endeavors involving the CIA, FBI, Treasury Department, Department of Justice, and the Department of Homeland Security involving potential terrorist related financial transactions, in addition to other joint participation between the TFOS and the intelligence agencies. The TFOS has personnel detailed to the CIA/CTC and personnel from there work directly with the TFOS on financial intelligence matters.

A Policy Coordinating Committee (PCC) on Terrorist Financing was formalized at the end of 2001. The PCC generally meets at least once a month to coordinate the United States government's campaign against terrorist financing. The meeting generally focus on ensuring that all relevant components of the federal government are acting in a coordinated and effective manner to combat terrorist financing.

## SAUDI ARABIA AND THE WAR ON TERRORISM

Following the 9/11 attacks, it became apparent that the role of Non-Governmental Organizations (NGOs) and charitable organizations, as a potential source of funding for terrorist groups, needed closer scrutiny. This included any role that may have involved Saudi Arabia or its citizens in the support of terrorism, both directly and indirectly, through the financial support of these charitable organizations.

The Kingdom of Saudi Arabia has taken important steps to deter global terrorism, and has redoubled its efforts following the deadly car bombings in the Kingdom on May 12, 2003. Prior to the May 12 bombings, Saudi Arabia put new laws and regulations in place for all charitable organizations, ensuring that they are audited to prevent the flow of funds to entities other than charity. Saudi Arabia has also strengthened its laws and regulations regarding money laundering. These efforts include new rules concerning the verification of customers' identities as well as restrictions on non-residents' ability to open accounts in the country. These measures are being reviewed this week by an international team of experts from the Financial Action Task Force.

In March 2002, Saudi Arabia and the U.S. Government jointly blocked the accounts of Bosnia and Somalia branches of Al-Haramain Islamic Foundation, and of Wa'el Hamza Julaidan, an associate of Usama bin Laden who provided financial and logistical support to Al Qaeda.

Since the May 12, 2003 bombings of the three western compounds in Riyadh, Saudi Arabia, cooperation with the Kingdom of Saudi Arabia has significantly improved. The FBI sent an investigative team to the Kingdom and worked with the law enforcement and intelligence services to conduct the appropriate post incident investigation and evidence collection. Cooperation with the Saudi Arabian government continues on this and other terrorism investigations. Saudi Arabia has contributed to the break up of a number of Al Qaeda cells, the arrests of key Al Qaeda leaders and the capture of Al Qaeda members in Saudi Arabia.

060

The Saudi and U.S. Governments have recently agreed to focus

Case 6:05-cv-60003-AA WDocument 311-3 Filed 02/31/10 Page 7 of 10
Case 9:07-cv-00109-VRW Document 99-3 Filed 07/09/09 Page 20 of 53

increased investigative attention on identifying and eliminating sources of terrorist funding within the Kingdom and around the world. The FBI and our counterparts in the Saudi Ministry of Interior have established a joint terrorism financing task force.

## THE USA PATRIOT ACT AND OTHER LEGISLATION

Our efforts to combat terrorism have been greatly aided by the provisions of the PATRIOT Act. The success in preventing another catastrophic attack on the U.S. homeland would have been much more difficult, if not impossible, without the Act. It has already proved extraordinarily beneficial in the war on terrorism, and our opportunities to use it will only increase. Most importantly, the PATRIOT Act has produced greater collection and sharing of information within the law enforcement and intelligence communities.

Title III of the Act, also known as the International Money Laundering Anti-Terrorist Financing Act of 2001, has armed us with a number of new weapons in our efforts to identify and track the financial structure supporting terrorist groups. Past terrorist financing methods have included the use of informal systems for transferring value in a manner that is difficult to detect and trace. The effectiveness of such methods should be significantly eroded by the Act, which establishes stricter rules for correspondent bank accounts, requires securities brokers and dealers to file SARs, and certain money services to register with FinCEN and file SARS for a wider range of financial transactions.

There are other provisions of the Act that have considerably aided our efforts to address the terrorist threat including: strengthening the government's position in defending suits brought by those who provide material support; and the power to seize money subject to forfeiture in a foreign bank account by authorizing the seizure of a foreign bank's funds held in a U.S. correspondent account.

The FBI has utilized the legislative tools provided in the USA PATRIOT Act to further its terrorist financing investigations. Some examples of how the TFOS has used the provisions in the USA PATRIOT Act to obtain foreign bank account information by issuing subpoenas on those foreign bank's U.S. correspondent bank and to corroborate financial data obtained through criminal investigative techniques with intelligence sources. All of these techniques have significantly assisted ongoing terrorism investigations and would not have been possible, but for the enactment of the USA PATRIOT Act.

It is important for the Committee and the American people to know that the FBI is using the PATRIOT Act authorities in a responsible manner. We are making every effort to effectively balance our obligation to protect civil liberties with our obligation to protect Americans from terrorism.

## TERRORIST FINANCING SUCCESSES

The FBI has achieved several recent and notable successes. These are the direct result of our ongoing efforts to cultivate more meaningful and productive international relationships, and increase emphasis on sharing relevant financial information domestically between law enforcement, government agencies, and private financial institutions. In concert with other U.S. Government agencies, the FBI has deployed advisers and trainers on numerous missions around the world to assist countries in the

061

Case 6:05-cv-60003-AA Document 311-3 Filed 02/31/10 Page 8 of 10
Case 3:07-cv-00109-VRW Document 99-3 Filed 07/09/09 Page 8 of 53

Federal Bureau of Investigation - Congressional Testimony

Page 7 of 9

crafting of legislation to combat terrorist financing, further strengthen financial oversight controls, and encourage closer scrutiny of suspicious financial transactions.

On four separate occasions, the FBI has received financial information from a foreign government directly related to the funding of a pending terrorist attack. On these occasions the FBI was able to provide near real-time tracking of the funds and provide the foreign government with specific and identifiable information regarding the parties involved in the financial transactions - more explicitly the exact location and time the transactions occurred. Based on this critical information, the foreign government was able to locate members of terrorist cells and prevent them from executing their intended terrorist attacks.

In January 2003, German law enforcement authorities that had been working closely with the FBI arrested Mohammed Al Hassan Al-Moayad, a Yemeni national, on charges of conspiring to provide material support to Al Qaeda and Hamas. Al-Moayad was a significant financial contributor to Al Qaeda and Hamas and boasted that he provided over $20 million dollars to Usama bin Laden. Al-Moayad had participated in several fund-raising events at the Al-Farouq Mosque in Brooklyn, New York. Al-Moayad has been arrested and is awaiting extradition to New York from Germany.

In December 2002, a Federal grand jury in Dallas returned an indictment against a senior Hamas leader, Mousa Abu Marzouk, for conspiring to violate U.S. laws that prohibit dealing in terrorist funds. Also arrested and charged by the FBI were Ghassan Elashi, chairman of the Holy Land Foundation for Relief and Development (HLF). Elashi and four of his brothers, all of whom are employees of the Richardson, Texas, based InfoCom Corporation, were charged with selling computers and computer parts to Libya and Syria, both designated state sponsors of terrorism. The indictment alleged that the Elashi brothers disguised capital investment from Marzouk, a specially designated terrorist for his admitted leadership role with Hamas. The indictment and subsequent arrests have disrupted a U.S.-based business, which was conducting activities with a known Hamas leader, and international state sponsors of terrorism.

In support of other FBI Field Office cases, the TFOS provided intelligence and criminal financial investigative assistance through various mechanisms such as: a) financial analytical support; b) financial link analysis; c) field deployment of financial experts; and d) major case management support. This support aided investigators in a variety of cases such as:

- The FBI Joint Terrorism Task Force (JTTF) in Charlotte, N.C. utilized racketeering and terrorist financing statutes to disrupt, and then dismantle a Hizballah procurement and fund-raising network relying on interstate cigarette smuggling.
- The FBI, supported the Treasury's Office of Foreign Asset Control (OFAC), in blocking assets of U.S. offices for Holy Land Foundation for Relief and Development (HLF). This resulted in the closure of Hamas' largest fund-raising entity in the U.S. (The HLF has been linked to the funding of Hamas terrorist activities, and raised $13 million dollars of support in 2000).
- Joint FBI-OFAC cooperation shut down U.S. based offices of Benevolence International Foundation (BIF). Assets and records were blocked after it was determined that the charity was funneling money to Al Qaeda. In February 2003, Enaam Arnaout, the head

062

Case 6:05-cv-60008-AA Document 311-3 Filed 02/31/10 Page 2 of 10
Case 3:07-cv-00109-VRW Document 99-3 Filed 07/09/09 Page 2 of 53

Federal Bureau of Investigation - Congressional Testimony

Page 8 of 9

- of BIF, pled guilty to racketeering conspiracy and fraud charges.
- The FBI, with cooperation from the U.S. Intelligence Community and a foreign government, apprehended a principle money launderer of Usama bin Laden's, responsible for funneling approximately tens of millions of dollars through international accounts to Al Qaeda and the Taliban.
- In February 2003, the FBI arrested Sami Al Arian, the alleged leader of U.S.-based Palestinian Islamic Jihad (PIJ), and three other members of his organization. They also closed several front companies suspected of providing material support to PIJ members in operations against Israel.

## PARTICIPATION OF FINANCIAL INSTITUTIONS

Since the events of 9/11, private industry and particularly the financial services industry have made great efforts to assist law enforcement in the investigation of terrorism and terrorist financing related matters. Their corporate patriotism and desire to work more closely with government in protecting America is recognized and appreciated. They are literally on the "front lines" in the financial war on terrorism. Because it takes money to travel, communicate and carry out terrorist acts it is the bank teller, manager or broker that is more likely to interact with the next terrorist or terrorist financier, maybe even before law enforcement or the intelligence community does. For this reason, it is critical that the financial services industry receive the necessary training and awareness of the "Things to Look For" as it relates to terrorism and that they have a vehicle or mechanism to report their suspicions to the government in a timely and efficient manner. This is accomplished through the use and electronic filing of SARs. Conversely, the government needs to have a way to communicate these "Things to Look For" with the private sector as well as a mechanism to publish names of individuals, entities and/or organizations reasonably suspected of engaging in terrorist activity. Outreach and training combined with the utilization of USA PATRIOT ACT Section 314(a) facilitates the timely sharing of information between law enforcement and financial institutions. As mentioned earlier, the TFOS has sponsored and participated in a series of conferences and training forums with representatives from the financial services industry and regulators to educate them of the "Things To Look For" but more coordination and law enforcement outreach is needed.

## PRODUCTION OF FINANCIAL RECORDS IN ELECTRONIC FORMAT

One of the biggest challenges facing law enforcement when it comes to financial records analysis is the unavailability of financial records in electronic format. In the past, it was common for investigators to request and financial institutions to provide copies of financial records such as statements, copies of checks or deposit slips in hard-copy (i.e., paper) form. The delays inherent to their production and forwarding to law enforcement was complicated by the fact that the records were not readily accessible by the financial institution and because they are often in paper form they are not readily searchable or retrievable. This is especially true when time is of the essence during emerging threat situations where access to and analysis of the records is critical. Some financial institutions have made great strides in converting and storing their transactional and customer records in electronic format. The credit card industry is a good example of this. Many banks and institutions even allow their customers to view and download their account transactional data via the internet into financial management programs. However, others because of the nature of their business or the costs involved do not digitally store or are not

063

Case 3:05-cr-60008-AA Document 316-3 Filed 03/31/10 Page 10 of 10
Case 3:07-cv-00109-VRW Document 99-3 Filed 07/09/09 Page 23 of 53

Federal Bureau of Investigation - Congressional Testimony

Page 9 of 9

capable of producing records electronically.

Future law enforcement investigations would be significantly enhanced if financial institutions were to develop and adopt standards of best practices for the storage and production of financial records in electronic format. Countless hours and resources on the part of private industry and the government could be saved if these records were stored and produced in a format that eliminated the need for investigators to re-input or type the information back into financial analysis programs.

Currently when records are not available in a digital format, we utilize high-speed scanners to scan and copy the records. Text is thereby converted to Optical Character Recognition (OCR) searchable text. By "digitizing" the documents into scanned, searchable images they become immediately available to all with a need or interest in the records. Digitizing the records not only facilitates rapid dissemination of the documents but also provides for enhanced searching and analysis. Storage, retrieval and discovery production costs are also thereby reduced. Once the records are digital, then advanced searching tools may be applied against them to identify key information, patterns or trends.

However, as long as relevant records remain in paper form whether held by the financial institution or the government, investigators are impeded in their timely dissemination and analysis. This can have an impact on our preventative efforts.

In summary, the increased promotion of anti-terrorist financing training both domestically and internationally would go a long way towards furthering cooperation and raising awareness of patterns in terrorist financing. Efforts to interdict illegal money remitters which undermine our financial institutions and provide a potential avenue for illicit funds to be transferred should be pursued. Finally, the production of financial records in electronic format would facilitate not only sharing and analysis, but increase our ability to tactically respond to emerging threats.

## CONCLUSION

Terrorism is a global problem. The solution is grounded in what we have experienced since 9/11 - unprecedented international cooperation and coordination. The threat terrorism poses must always be considered imminent. In addition to considerable financial investigative expertise, addressing terrorism and the finances that support and propagate it requires the ability to both implement proactive and preventive approaches to disrupt and dismantle as well as the ability to conduct highly reactive immediate response financial investigations to address potential imminent threats. As stated herein and in conjunction with more and more of the international community and other aspects of the U.S. Government, the FBI has made considerable progress toward achieving and implementing these abilities.

Again, I offer my gratitude and appreciation to you, Chairman Shelby, Senator Sarbanes, and the distinguished members of the Committee, for dedicating your time and effort to this issue and I would be happy to respond to any questions you may have.

Accessibility | eRulemaking | Freedom of Information Act/Privacy | Legal Notices | Legal Policies and Disclaimers
Privacy Policy | USA.gov | White House
FBI.gov is an official site of the U.S. Federal Government, U.S. Department of Justice.

064