# Exhibit 8



FROM THE OFFICE OF PUBLIC AFFAIRS

June 16, 2004
JS-1729

**Testimony of R. Richard Newcomb, Director
Office of Foreign Assets Control
U.S. Department of the Treasury
Before the House Financial Services Subcommittee on Oversight
and Investigations**

Introduction

Madame Chairman, members of the Committee, thank you for the opportunity to testify on the Office of Foreign Assets Control's efforts to combat terrorist support networks which forms an important part of the Treasury Department and our government's national security mission. It's a pleasure to be here, as we discuss Treasury's new office and its role in these areas. Please allow me to begin with an overview of our overall mission and conclude with our strategies for addressing the threat of international terrorism.

II. OFAC's Core Mission

The primary mission of the Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury is to administer and enforce economic sanctions against targeted foreign countries, and groups and individuals, including terrorists and terrorist organizations and narcotic traffickers, which pose a threat to the national security, foreign policy or economy of the United States. OFAC acts under general Presidential wartime and national emergency powers, as well as specific legislation, to prohibit transactions and freeze (or "block") assets subject to U.S. jurisdiction. Economic sanctions are intended to deprive the target of the use of its assets and deny the target access to the U.S. financial system and the benefits of trade, transactions and services involving U.S. markets. These same authorities have also been used to protect assets within U.S. jurisdiction of countries subject to foreign occupation and to further important U.S. nonproliferation goals.

OFAC currently administers and enforces 27 economic sanctions programs pursuant to Presidential and Congressional mandates. These programs are a crucial element in preserving and advancing the foreign policy and national security objectives of the United States, and are usually taken in conjunction with diplomatic, law enforcement and occasionally military action.

OFAC's historical mission has been the administration of sanctions against target governments that engage in policies inimical to U.S. foreign policy and security interests, including regional destabilization, severe human rights abuses, and repression of democracy. Recent programs in the Western Balkans, Zimbabwe, Sudan, and other regions reflect that focus. Since 1995, the Executive Branch has increasingly used its statutory blocking powers to target international terrorist groups and narcotics traffickers.

Many "country-based" sanctions programs are part of the U.S. government's response to the threat posed by international terrorism. The Secretary of State has designated seven countries -- Cuba, North Korea, Iran, Libya, Iraq, Sudan and Syria - as supporting international terrorism. Three of these countries are subject to comprehensive economic sanctions: Cuba, Iran, and Sudan (1997). Comprehensive sanctions have been imposed in the past against Libya, Iraq, and

North Korea. In addition, effective May 12, 2004, the President issued a new E.O. prohibiting specific types of transactions and exportations and importations to and from Syria due to its continued support for terrorism, its occupation of Lebanon, its pursuit of weapons of mass destruction and missile programs and its undermining of the United States and international efforts to stabilize and reconstruct Iraq.

OFAC also administers a growing number of "list-based" programs, targeting members of government regimes and other individuals and groups whose activities are inimical to U.S. national security and foreign policy interests. In addition to OFAC's terrorism and narcotics trafficking programs, these include sanctions against persons destabilizing the Western Balkans and against the regimes in Burma and Zimbabwe. OFAC also administers programs pertaining to non-proliferation, including the protection of assets relating to the disposition of Russian uranium, and to trade in rough diamonds.

### III. Administration and Transparency

#### Organization

OFAC has grown over the past eighteen years from an office with ten employees administering a handful of programs to a major operation of 144 employees administering 27 programs. A large percentage of OFAC's professional staff have had prior professional experience in various areas of the law, finance, banking, law enforcement, and intelligence. To accomplish its objectives, OFAC relies on good cooperative working relationships with other Treasury components, federal agencies, particularly State and Commerce, law enforcement agencies, the intelligence community, domestic and international financial institutions, the business community and foreign governments.

OFAC is an organization which blends regulatory, national security, law enforcement, and intelligence into a single entity with many mandates but a single focus: effectively implementing economic sanctions programs against foreign adversaries when imposed by the President or the Congress. In order to carry out OFAC's mission, the organization is divided into ten divisions, with offices in Miami, Mexico City and Bogotá and soon to open this summer an office in Bahrain. OFAC's operations are also supported by attorneys in the Office of Chief Counsel (Foreign Assets Control). Two divisions are primarily devoted to the narcotics and terrorism programs, while others, primarily the Licensing, Compliance and Civil Penalties Divisions, are geared toward interaction with the public. It is these latter Divisions that primarily serve as OFAC's liaison with the public and figure prominently in promoting the transparency of OFAC's operations. Finally, OFAC's Enforcement Division provides crucial liaison with the law enforcement community.

Licensing Division

OFAC's licensing authority serves to "fine tune" or carve out exceptions to the broad prohibitions imposed under sanctions programs, ensuring that those transactions consistent with U.S. policy are permitted, either by general or specific license. For example, working closely with the Department of State, the Licensing Division played a critical role in issuing specific licenses to facilitate humanitarian relief activity by U.S. non-governmental organizations in the wake of the Bam earthquake in Iran. The primary focus of OFAC Licensing involves the country-based programs, primarily Cuba and Iran. Major areas of activity include issuing advisory opinions interpreting the regulations; processing license applications for exports of agricultural products, medicine and medical devices to Iran and Sudan pursuant to the Trade Sanctions Reform and Export Enhancement Act of 2000; license applications pertaining to travel and activities involving Cuba; applications to unblock funds transfers blocked by U.S. financial institutions; and the preparation of numerous legal Notices continuing statutory authority for OFAC's programs and semiannual reports to the Congress on their administration. Licensing activity involving the list-based programs centers primarily on the authorization of payment for legal services provided to blocked persons. OFAC's Miami Office, which coordinates Cuba travel licensing, compliance and enforcement matters, also reports primarily to the Licensing Division.

The Licensing Division reviews, analyzes and responds to more than 25,000 requests per year for specific licenses covering a broad range of trade, financial and travel-related transactions, including those related to the exportation and importation of goods and services and the provision of humanitarian and banking and financial services. It also provides written and oral guidance to the public and private sectors on the application of OFAC's regulatory programs to specific facts and circumstances. Redacted versions of interpretive rulings prepared by the Licensing Division are published on OFAC's website. During FY 2003, the Licensing Division made substantial progress in reducing the overall response time to incoming correspondence, primarily through a net increase of staff of 11 FTEs and conversion to an Oracle database and the use of that database for effective case management. The Licensing Division is also currently implementing a new integrated voice response system to more efficiently handle the large volume of calls it receives from the public.

Compliance Division

OFAC Compliance adds a unique dimension to the war against terrorists and against other sanctions targets. Working with the regulatory community and with industry groups, it expeditiously formats and makes information public through appropriate channels in appropriate formats to assure that assets are blocked and the ability to carry out transactions through U.S. parties is terminated. It is always aware that "time is of the essence" and, if a new enemy were to appear tomorrow, OFAC is confident that it would be able to implement a new sanctions program within 24 hours even in a crisis environment. Our Compliance team is "in the trenches," so to speak, and provides a unique service through its toll-free telephone "hotline" giving real-time guidance on in-process transactions. As a result of its efforts every major bank, every major broker-dealer, and more and more industry professionals use software to scan and interdict transactions involving sanctions targets. OFAC's hotline averages 1,000 calls per week with at least $1 million and sometimes as much as $35 million in appropriately interdicted items each week. Recently, for example, OFAC worked with a US bank to block a wire transfer for close to $100,000 originating from a suspect and going to an organization associated with a Specially Designated Global Terrorist organization which we had named.

OFAC uses multiple formats and multiple platforms to get information out on its targets and - its programs - including on our website which now has over 1,000 documents, over a million hits per month, and over 15,000 email subscribers--so that banks, broker-dealers, and others can stop transactions in mid-stream.

OFAC's Compliance Division also runs more than 100 training sessions per year around the country and follows up with cases based on regulatory audits and blocked and rejected items which have resulted in 4,250 administrative subpoenas, 3,500 warning letters, and hundreds and hundreds of referrals for Enforcement or Civil Penalties action over the past five years.

Its positioning within the Treasury Department provides OFAC's Compliance with an invaluable capability to dialogue with and oversee industry groups as diverse as banking and securities, exporters and importers, travel service providers, insurers, and even credit bureaus and retailers.

Civil Penalties Division

OFAC's Civil Penalties Division acts as the civil enforcement arm of OFAC by imposing civil penalties for violations of OFAC programs. Penalties range from $11,000 to $1.075 million. Since 1993, the Division has collected nearly $30 million in civil penalties for sanctions violations and has processed more than 8,000 matters.

The Division reviews evidence and determines the appropriate final OFAC penalty action -- either a settlement, a penalty imposition, or the decision not to impose a penalty. It also grants requests for an agency hearing before an administrative law judge (ALJ) in cases under the Trading With the Enemy Act (TWEA). Four ALJs

have contracted with OFAC to hear such cases. In addition to ALJ hearings and the administrative civil penalty process, OFAC's Civil Penalties Division resolves civil enforcement cases in conjunction with criminal prosecutions by the Justice Department. OFAC also enters into global settlements of violations in forfeiture actions brought by the U.S. Customs and Border Protection (CBP) and works closely with CBP's Office of Regulations and Rulings and the Fines, Penalties and Forfeitures Offices nation wide.

The Civil Penalties Division publishes information on completed settlements and penalty impositions on OFAC's Penalties Disclosure Website. Providing additional transparency, as recommended by the Judicial Review Commission, OFAC has published in the Federal Register its Enforcement Guidelines with Penalty Mitigation Guidelines.

Enforcement Division

OFAC Enforcement concentrates on providing advice and assistance concerning criminal investigations and investigates civil violations of OFAC's regulations and statutes.

- Criminal investigations. OFAC Enforcement officers provide expert advice and assistance to Assistant United States Attorneys and criminal investigators from the FBI, Bureau of Immigration and Customs Enforcement (ICE) and the Department of Commerce's Office of Export Enforcement (OEE) in the investigation of suspected criminal violations of OFAC programs. The FBI has primary investigative authority for terrorism cases, while ICE conducts most investigations dealing with trade-related transactions. OFAC's long-standing and close relationship with ICE, and its predecessor office the US Customs Office of Investigation, has continued after the transfer of Customs to the Department of Homeland Security ("DHS"). This relationship works very well. ICE has field offices nationwide, covering all ports of entry, and agents assigned as attaches for overseas investigative coverage. ICE agents, along with inspectors from the CBP at DHS, have seizure authority at U.S. ports and they are the front line of OFAC's efforts to interdict unlicensed goods being exported to, or imported from, sanctioned countries or persons. Since 1995, there have been approximately 68 cases that resulted in criminal enforcement action for TWEA and the International Emergency Economic Powers Act ("IEEPA") violations.

- Civil Investigations. The Enforcement Division conducts civil investigations as a result of voluntary disclosures, informant information, internal research by OFAC staff, and referrals from ICE and other agencies. The Division currently has more than 2600 civil cases opened. These cases range from complex export, reexport and other trade transactions, to violations of OFAC Cuba travel restrictions. Most such cases result in an internal referral to the Civil Penalties Division for the possible imposition of civil penalties.

- Domestic Blocking Actions. OFAC officers serve blocking notices and work to ensure the blocking of assets of entities in the United States that are designated under the Foreign Terrorist, Narcotics and country programs. These actions are accomplished with the assistance of special agents from the FBI and ICE as needed.

- Law Enforcement Outreach Training. OFAC provides sanctions

enforcement training to ICE agents and CBP inspectors on a monthly basis through in-service training courses at the Federal Law Enforcement Training Center and at field offices and ports nation-wide. We have also provided training presentations to agents and analysts at FBI Headquarters and at the FBI Academy at Quantico, VA.

### Transparency and Outreach

In January 2001, the Judicial Review Commission on Foreign Asset Control submitted its final report to the Congress, making several recommendations with respect to OFAC. While some were specific to the Foreign Narcotics Kingpin Designation Act and OFAC's designation authority generally, others pertained to the "'transparency" of OFAC's operations and decision making standards in order to facilitate greater understanding of, and compliance with, the sanctions laws [OFAC] administers." In response to the Commission's report, OFAC and the three Divisions described above have taken several measures to enhance the transparency of OFAC's operations. Central to this initiative is the use of OFAC's website, administered by the Compliance Division, which currently contains more than 1,000 documents, including 96 program brochures, guidelines and general licenses, 12 industry brochures, and over 200 legal documents. Website usage statistics indicate in excess of 1.3 million hits per month. OFAC also publishes reports, speeches, and Congressional testimony on its website. Included among the reports are quarterly reports to the Congress on the administration of the licensing regime pertaining to the exportation of agricultural products, medicine and medical devices to Iran, Sudan, and, until recently, Libya. OFAC's Terrorist Assets Reports for 2001 through 2003 are also available.

Interpretive rulings in redacted format prepared by the Licensing Division are published on the website, extending the benefit of what had previously been private guidance. OFAC has also published 95 questions of general applicability frequently asked by the public about OFAC and its programs.

Publication of various OFAC guidelines is also an important component of the transparency initiative. Along with the Enforcement Guidelines, OFAC has issued comprehensive application guidelines pertaining to the authorization of travel transactions involving Cuba. These guidelines were instrumental in reducing a backlog of license applications in this category from more than four hundred cases to fewer than one hundred, with a current average processing time per application of fewer than nine days. OFAC also issues a circular setting forth the regulatory program governing travel, carrier and funds forwarding services provided in the context of the Cuba embargo.

Responding to one of the Judicial Review Commission's recommendations, OFAC, wherever possible, has issued its regulations in the Federal Register as interim final rules allowing for public comments.

Finally, there are listings on the website for more than 100 sanctions workshops in the near future. These workshops provide a significant outreach to the financial and other communities OFAC regulates, further promoting transparency of agency operations.

### IV. OFAC's Designation Programs

Designations constitute the identification of foreign adversaries and the networks of companies, other entities, and individuals that are associated with them; as a result of a person's designation pursuant to an Executive orders ("EO") or statute, U.S. persons are prohibited from conducting transactions, providing services, and having other dealings with them. Generically, those who are placed on OFAC's public list are referred to as "Specially Designated Nationals" or "SDNs." Typically, SDNs are the instrumentalities and representatives that help sustain a sanctioned foreign government or adversary and commonly include the financial and commercial enterprises, front companies, leaders, agents, and middlemen of the sanctions target. In the terrorism programs, they are known as SDGTs, SDTs and FTOs; in the narcotics programs they are SDNTs for the Colombian cartels and Tier I and

Tier II SDNTKs under the Kingpin Act. In the country programs, they are SDNs.

OFAC's International Programs Division and Foreign Terrorist Programs Division are the offices which research and identify these targets for designation.

**Legal Authorities**

International Emergency Economic Powers Act

In January 1995, the President first used his IEEPA authority to deal explicitly with the threat to U.S. foreign policy and national security posed by terrorism, declaring a national emergency with respect to terrorists who threaten to disrupt the Middle East Peace Process. This action, implemented through Executive Order 12947, expanded the use of economic sanctions as a tool of U.S. foreign policy to target groups and individuals, as well as foreign governments. During the late 1990s, IEEPA authorities were used to issue additional Executive Orders imposing sanctions on al Qaida and Usama bin Ladin and entities or individuals that are owned or controlled by, act for or on behalf of, or that provide material or financial support to al Qaida or Usama bin Ladin.

Following this model, in October 1995, the President announced the concept of using EO 12947 as a model for targeting significant foreign narcotics traffickers centered in Colombia, i.e., the Colombian drug trafficking cartels. That IEEPA program, implemented in EO 12978 with the identification by the President of four Cali Cartel drug kingpins, has expanded into a key tool in the fight against the Colombian cartels. As of today, 14 Colombian drug kingpins, 381 entities, and 561 other individuals associated with the Cali, North Valle, and North Coast drug cartels have been designated as Specially Designated Narcotics Traffickers ("SDNTs") under EO 12978.

Authorities in Response to September 11th.

The President harnessed the IEEPA powers and authorities -- as well as his authority under the United Nations Participation Act -- in response to the terrorist attacks of September 11. On September 23, 2001, President Bush issued Executive Order 13224, "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism" declaring that the grave acts of terrorism and the threats of terrorism committed by foreign terrorists posed an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States. EO 13224, as amended, authorizes the Secretaries of the Treasury and State, in consultation with the Department of Justice and the Department of Homeland Security, to implement the President's authority to combat terrorists, terrorist organizations and terrorist support networks systemically and strategically.

This order prohibits U.S. persons from transacting or dealing with individuals and entities owned or controlled by, acting for or on behalf of, assisting or supporting, or otherwise associated with, persons listed in the Executive Order. Those designated and listed under the Executive Order are known as "Specially Designated Global Terrorists" (SDGTs). Violations of the EO with respect to SDGTs are subject to civil penalties; and if the violation is willful, persons may be criminally charged. The Executive Order also blocks "all property and interests in property of [designated persons] that are in the United States or that hereafter come within the United States, or that hereafter come within the possession or control of United States persons[.]"

To date, the U.S. has designated 375 individuals and entities as SDGTs pursuant to EO 13224. More than 270 of these entities are associated with either al Qaida or the Taliban which provides the basis to propose these names to the UN 1267 Sanctions Committee for inclusion on its consolidated list of individuals and entities the assets of which UN member states are obligated to freeze in accordance with relevant United Nations Security Resolutions (UNSCRs) including resolutions 1267 and, most recently, 1526. The United States has worked diligently with the UN Security Council to adopt resolutions reflecting the goals of our domestic executive

orders and obligating UN member states to freeze terrorism related assets.

Rolling FTOs into SDGTs Makes War on Terrorist Infrastructure Global

On November 2, 2001, the U.S. took an additional significant step when the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, utilized the new authorities in EO 13224 to designate 22 Foreign Terrorist Organizations (FTOs) as Specially Designated Global Terrorists (SDGTs). This action expanded the War on Terrorism beyond al Qaida and the Taliban and associated individuals and entities to include Hamas, Hizballah, the FARC, the Real IRA and others. This action created a truly global war on terrorism and terrorist financing and demonstrated the USG's commitment to continue and expand its efforts against all terrorist groups posing a threat to the United States, its citizens, its interests, and its allies. Currently, there are 37 FTOs which are also designated as SDGTs.

Foreign Narcotics Kingpin Designation Act

Building on the successes of the Colombian narcotics traffickers program, in December 1999 Congress enacted the Foreign Narcotics Kingpin Designation Act (Kingpin Act), originally introduced by Senators Coverdell and Feinstein and modeled on IEEPA and OFAC's Columbia SDNT program. It provides a statutory framework for the imposition of sanctions against foreign drug kingpins and their organizations on a worldwide scale. Like its terrorism and narcotics Executive Order-based predecessors, the Kingpin Act is directed against individuals or entities and their support infrastructure, not against the countries in which they are imbedded. Since the first list of kingpins was issued, 48 foreign drug kingpins, 14 derivative companies, and 52 derivative individuals have been designated. These totals are in addition to the 14 Colombian Principal Individuals that have been designated as Colombian Specially Designated Narcotics Traffickers [SDNTs] pursuant to E.O. 12978.

Antiterrorism and Effective Death Penalty Act

In 1996, Congress passed the Antiterrorism and Effective Death Penalty Act ("AEDPA"). AEDPA makes it a criminal offense to: (1) engage in a financial transaction with the government of a country designated as supporting international terrorism; or (2) provide material support or resources to a designated Foreign Terrorist Organization (FTO).

Thirty-seven FTOs are currently subject to OFAC-administered sanctions. These FTOs have been designated by the Secretary of State in consultation with the Secretary of the Treasury and the Attorney General. Under the AEDPA and OFAC's implementing regulations, U.S. financial institutions must maintain control over all funds in which an FTO has an interest and report the existence of such funds to OFAC. OFAC works with State and Justice on FTO designations, and with the financial community, the FBI, State, and other Federal agencies in implementing the prohibitions of the AEDPA.

Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001

The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the USA "PATRIOT Act"), passed in October 2001, amends IEEPA to provide critical means and authority to OFAC to counter terrorist financing and their support structures. The Act has enhanced OFAC's ability to implement sanctions and to coordinate with other agencies by clarifying OFAC's authorities to block assets of suspect entities prior to a formal designation in "aid of an investigation." This critical authority helps prevent the flight of assets and prevents the target from engaging in potential damaging behavior or transactions. In addition, the PATRIOT Act explicitly authorizes submission of classified information to a court, in camera and ex parte, upon a legal challenge to a designation. This new PATRIOT Act authority has greatly enhanced our ability to make and defend designations by making it absolutely clear that

OFAC may use classified information in making designations without turning the material over to an entity or individual that challenges its designation.

OFAC'S Counter Narcotics Program

**OFAC's Mission Against Foreign Drug Cartels**

One of the primary missions of OFAC/IPD officers is to investigate, through both "all-source" research and extensive field work with U.S. law enforcement agents and Assistant U.S. Attorneys, and compile the administrative record that serves as the OFAC case to designate significant foreign narcotics traffickers and their networks of front companies and individuals pursuant to the Specially Designated Narcotics Traffickers (SDNT) program pursuant to EO 12978 and the Foreign Narcotics Kingpin Designation Act ("Kingpin Act").

Interagency Coordination

In its capacity to administer and enforce economic sanctions against foreign narcotics traffickers, both traditional drug cartel and narco-terrorist targets, OFAC's International Programs Division (OFAC/IPD) works extensively with other U.S. agencies in the law enforcement and intelligence communities, as well as the President's Office of National Drug Control Policy. OFAC/IPD officers regularly are requested to train DEA's financial investigators on OFAC's authorities to designate and block foreign drug cartels' financial networks under EO 12978 and the Kingpin Act. In addition, OFAC/IPD officers have also provided presentations for various ICE, FBI, U.S. Attorney's offices, the Department of Justice, and the Department of Defense on OFAC narcotics and other sanctions programs and how they can work jointly with a U.S. criminal investigation. OFAC continues to expand its relationships with U.S. law enforcement, including ICE, DEA, FBI, IRS Criminal Investigation and U.S. Attorney's Offices, and with other agencies including the Department of State, Department of Defense, and Central Intelligence Agency. While some formal interagency coordination is established by executive order or legislation (the Kingpin Act), in the day-to-day execution of these programs, interagency cooperation is the result of experienced OFAC/IPD officers working closely with other U.S. criminal investigators. These working relationships have led to several successful sanctions designation actions over the past few years.

OFAC's Enforcement Division and its International Programs Division have distinct but complementary relationships with the federal law enforcement community. OFAC/IPD is focused on investigations and research leading to designations, whether worked independently or jointly with federal law enforcement agencies and task forces, U.S. Attorneys offices, or other USG agencies. In the programs that OFAC enforces against foreign narcotics trafficking cartels and drug kingpins, OFAC/IPD has been working with the Department of Justice and DEA since 1995, with a significant contingent of OFAC/IPD personnel cleared to work at DEA headquarters. Over the years those working relationships have substantially broadened, bringing OFAC to the point where OFAC/IPD officers, both in the field and at headquarters, including OFAC's Attaché Offices in Bogotá and Mexico City, regularly work with OCDETF task forces, multiple U.S. Attorneys' offices, DEA, ICE, IRS–CI and the FBI, on cases and broader operations of mutual interest. This integrated operating method not only provides OFAC/IPD with better background information and evidence for its targets, but also makes OFAC's expertise in the business and financial structuring by the cartels available as a resource to law enforcement and intelligence agencies. This appropriate close working relationship with law enforcement provides a successful conduit for the sharing of information between law enforcement agencies and OFAC/IPD.

Since September 11, 2001, OFAC has played an integral role in the terrorism-related investigations being conducted throughout the law enforcement community. To coordinate efforts and actions, OFAC has detailed a full time liaison to the FBI's Terrorist Financing Operations Section (TFOS) and a weekly liaison to the Terrorist Screening Center (TSC) and participates on their interagency enforcement teams. Information obtained through close interagency coordination has been crucial in "making the case" to designate particular targets domestically and internationally. Information developed by OFAC has also proven useful for investigations being

conducted by TFOS, TSC and other U.S. law enforcement agencies.

The Kingpin Act

Pursuant to section 804(a) of the Kingpin Act, the Secretaries of Treasury, State, and Defense, the Attorney General, and the Director of Central Intelligence must consult and provide the appropriate and necessary information to enable the President to submit a report to Congress no later than June 1 each year designating additional Kingpin Tier I targets. OFAC/IPD is responsible for coordinating the interagency process for the Kingpin Act.

On May 29, 2003, President Bush announced the names of 7 foreign persons that he determined were significant foreign narcotics traffickers, or kingpins, under the Kingpin Act. These new drug kingpins included 3 foreign groups -- a Colombian narco-terrorist guerrilla army (the Revolutionary Armed Forces of Colombia or "FARC"), a Colombian narco-terrorist paramilitary force (the United Self-Defense Forces or "AUC"), and a Burmese drug trafficking ethnic guerrilla army (United Wa State Army or "UWSA"). These were the first designations of narco-terrorist groups under the Kingpin Act. The FARC and the AUC had previously been named as Foreign Terrorist Organizations by the State Department and designated as Specially Designated Global Terrorists by OFAC pursuant to EO 13224.

On June 1, 2004, President Bush announced the names of 10 foreign persons that he determined were significant foreign narcotics traffickers, or kingpins, under the Kingpin Act. These new drug kingpins included 8 individuals involved in the Mexican, Jamaican, Peruvian, Indian, and Afghanistan drug trade and 2 Mexican groups -- the Arellano Felix Organization and the Carrillo Fuentes Organization. This action underscored the President's determination to do everything possible to pursue drug traffickers, undermine their operations, and end the suffering that trade in illicit drugs inflicts on Americans and other people around the world, as well as preventing drug traffickers from supporting terrorists. Concurrent with the President's Kingpin designations, OFAC blocked, in furtherance of investigation, the Peruvian airline company, Aero Continente, six other companies, and six other individuals connected to the newly named Kingpin, Fernando Zevallos.

OFAC prepares and designates "Tier II" narco-terrorist leaders under the Kingpin Act. On February 19, 2004, OFAC/IPD took action against leaders and key figures of two narco-terrorist organizations in Colombia, the FARC and the AUC. Nineteen leaders of the FARC and eighteen key figures of the AUC plus three AUC front companies were added to OFAC's list of "Tier II" individuals and entities designated under the Kingpin Act. These Kingpin Tier II designations reinforce the reality that the FARC and the AUC are not simply terrorist/guerrilla organizations fighting to achieve political agendas within Colombia. They are part and parcel of the narcotics production and export threat to the United States, as well as Europe and other countries of Latin America.

Specially Designated Narcotics Traffickers

Since the inception of the Colombia program in 1995 under Executive Order 12978, OFAC/IPD officers have identified 956 businesses and individuals as Specially Designated Narcotics Traffickers ("SDNTs") consisting of fourteen leaders of Colombia's Cali, North Valle, and North Coast drug cartels.

- North Valle Cartel links to the AUC. In October 2002, OFAC coordinated the designation of a Colombian cartel kingpin with the FBI. A joint investigation by OFAC/IPD and the FBI Miami field office led to the SDNT action against Colombia's North Valle cartel leader, Diego Leon Montoya Sanchez and a network of front companies and individuals in Colombia in conjunction with an FBI criminal asset forfeiture action in South Florida. Diego Leon Montoya Sanchez is closely associated with the AUC, a Colombian narco-terrorist organization.

- Continued Actions against the Cali Cartel. Since 2002, OFAC/IPD has worked jointly with the U.S. Attorney's Office for Middle District of Florida and Operation PANAMA EXPRESS, a multi-agency drug task force based in Tampa, Florida. A two-year investigation by OFAC/IPD officers in conjunction with the PANAMA EXPRESS task force led to the March 2003 SDNT action against two new Cali Cartel leaders, Joaquin Mario Valencia Trujillo and Guillermo Valencia Trujillo, and their financial network of 56 front companies and individuals. Joaquin Mario Valencia Trujillo is indicted in the Middle District of Florida and was recently extradited to the U.S. from Colombia.

In 2003, OFAC/IPD investigations focused on Cali cartel leaders, Miguel and Gilberto Rodriguez Orejuela. In February 2003, OFAC/IPD designated 137 companies and individuals comprising a complex financial network in Colombia and Spain controlled by Miguel and Gilberto Rodriguez Orejuela. This action exposed and isolated a parallel network of Cali cartel front companies established to evade OFAC sanctions. In March 2003, OFAC/IPD officers targeted a Colombian money exchange business and a prominent Colombian stock brokerage firm, which facilitated the Cali cartel network's financial transactions. In October 2003, OFAC/IPD designated 134 new front companies and individuals including a network of pharmaceutical companies extending from Colombia to Costa Rica, Ecuador, Panama, Peru, and Venezuela, with ties to financial companies in the Bahamas, the British Virgin Islands and Spain. These SDNT actions were the result of a three-year investigation by OFAC/IPD officers and the OFAC Attaché – Bogota.

These actions under the SDNT and Kingpin Act programs reflect the increasing cooperation, coordination and integration among the U.S. counter-narcotics agencies in the battle against international narcotics trafficking and narco-terrorism. On March 3, 2004, the U.S. Attorney for the Southern District of New York issued a joint statement with the DEA New York field office and the OFAC Director announcing the indictment of two of Colombia's most important drug kingpins, Gilberto Rodriguez Orejuela and Miguel Angel Rodriguez Orejuela, leaders of the notorious Cali Cartel, under Operation DYNASTY, a joint investigation involving the U.S. Attorney's Office for the Southern District of New York, DEA, OFAC, and Colombian authorities. Both Cali cartel leaders were designated under EO 12978 as Colombian cartel leaders in October 1995. The indictment charges the Rodriguez Orejuela brothers with money laundering conspiracy based largely upon the predicate offense of violating the IEEPA as a result of the drug kingpins' efforts to defeat OFAC's designations of many of their companies as SDNTs.

## OFAC's Counter-Terrorism Program

Foundations of Terrorist Financing and Support

The threat of terrorist support networks and financing is real, and it has been OFAC's mission to help identify and disrupt those networks.

There is much we know about how radical terrorist networks were established and still thrive. OFAC's research has disclosed the overall framework of the support structures that underpin the most prominent Islamic extremist movements throughout the world. "Deep pocket" donors in the Middle East provide money either to terrorist groups directly, or indirectly through trusted intermediaries and non-governmental organizations (NGOs), including charities. These NGOs can, in turn, use the money to provide funding and logistical services directly to terrorist groups, including transportation, cover employment, and travel documentation. They also provide support indirectly by using the funds for public works projects -- wells, social centers, and clinics -- to reach disaffected populations susceptible to radicalizing influences. These projects also often include extremist religious schools, which serve as fertile recruiting grounds for new members of terrorist groups.

The terrorist networks are well-entrenched and self-sustaining, though vulnerable to

U.S., allied and international efforts. Looking forward, please allow me to explain how we have arrived at this view and present the strategy, being implemented in coordination with other components of the Treasury Department and other Federal agencies including the Departments of Defense, State, Justice, Homeland Security, the FBI, IRS Criminal Investigation, the intelligence community and other agencies, to choke off the key nodes in the transnational terrorist support infrastructure.

Research and Evidentiary Preparation

The primary mission of officers within OFAC's Foreign Terrorist Programs Division is to compile the administrative record or "evidentiary" material that serves as the factual basis underlying a decision by OFAC to designate a specific person pursuant to EO 13224 or other counter-terrorism sanctions authorities that triggers a blocking of assets and a prohibition on US persons from dealing with the designated party. OFAC officers conduct "all-source" research that exploits a variety of classified and unclassified information sources in order to determine how the activities or relationships of a specific target meet the criteria of the EO. As the implementing and administrating agency for EO 13224 and other related programs, OFAC coordinates and works with other US agencies to identify, investigate and develop potential targets for designation or other appropriate USG actions. Officers use their considerable expertise to evaluate available information in the critical process of constructing a legally sufficient evidentiary record.

More broadly, OFAC officers compile research on multiple targets to build a comprehensive schematic of the structure of particular terrorist network. They then employ a "key nodes" methodology to identify these high value targets within them that serve critical functions. OFAC believes that by eliminating these key nodes or high value targets the network would be disabled because without them the network would not receive sustaining services such as recruitment; training; logistical, material, financial, or technological support; and leadership. OFAC selects specific targets to recommend for designation based on the potential to cripple or otherwise dramatically impair the operations of the overall network by economically isolating these nodes. Economic sanctions are most effective against key nodes such as donors; financiers (fundraisers, financial institutions, and other commercial enterprises); leaders; charities; and facilitators such as logisticians. OFAC already has targeted key nodes in terrorist networks in several areas of the world including groups in Southeast Asia and various parts of Africa. OFAC is currently engaged in new research on groups in the Middle East, including Iraq, and the Caucasus.

A completed OFAC evidentiary record on a particular target is submitted first for legal review, then to the Executive Office of Terrorist Finance and Financial Crimes, where OFAC officers work with that office to prepare the package for the Policy Coordinating Committee (PCC). The PCC determines whether the USG should designate a particular entity or should pursue alternative legal or diplomatic strategies in order to achieve U.S. interests. As part of the PCC process, OFAC's designation proposal will usually be vetted by the consultative parties specified by the EO.

In addition to the evidentiary package, OFAC and other Treasury officers work with the interagency community to draft an unclassified Statement of the Case (SOC) which serves as the factual basis for the public announcement of a designation. The State Department uses it to pre-consult with countries which are directly impacted by a proposed US action and to urge them to designate at the same time as the USG. Upon a USG determination to designate, the SOC is used to notify host countries and the UN of an impending US action. It is also used to propose the inclusion of the target on the consolidated list of the UN 1267 Sanctions Committee of those individuals or entities associated with al Qaida or the Taliban.

UN and Bilaterally Proposed Designations

Whenever an individual or entity is proposed for inclusion on the UN 1267 consolidated list by another country through the UN or is proposed to the USG bilaterally, OFAC, and when appropriate the Department of State, is responsible for preparing the administrative record. In order to designate a target proposed to the UN by a Member State or by another government bilaterally to the USG, OFAC (or

when appropriate State) must develop an administrative record that would support a domestic designation under E.O. 13224 as described above. Quite often, due to a difference in legal authorities and the type of or lack of information provided by a proposing country, this process may require several discussions with the initiating party and often requires further coordination through the UN and with other countries in order to obtain sufficient information to meet domestic legal criteria.

Other Counter-terrorism Activities

OFAC's role in the counter-terrorism arena is not limited to preparing designations, although this often serves as a key component of its other activities. The transnational nature of terrorism support networks requires engagement with allies and routine information sharing. OFAC's direct engagement with allies on terrorism support infrastructure began with officials from Saudi Arabia, Kuwait and the UAE in June 1999. Information and understandings developed from this and other OFAC trips to the region significantly contributed to formulating some of the strategies employed today.

Direct Treasury and OFAC engagement with foreign allies' counterparts provides an opportunity for OFAC to gather information, apply pressure, request support, or offer assistance. In some cases, Treasury may seek joint action with an ally in an effort to disrupt or dismantle an organization. In other instances, OFAC may use the threat of designation to gain cooperation, forcing key nodes of financial support to choose between public exposure of their support for terrorist activity or their good reputation.

Of course, OFAC also collaborates extensively with other elements within the Treasury Department. In particular, I want to mention our excellent relationship with IRS Criminal Investigation. This relationship has been especially important and productive in carrying out the Treasury Department's authority under Executive Order 13315, which blocks the assets of Saddam Hussein and other senior officials of the former Iraqi regime. For many months now, OFAC has been coordinating almost daily with Washington-based IRS-CI agents to guide the efforts of IRS-CI agents on the ground in Iraq to identify the ill-gotten assets of Saddam and his cronies. OFAC's partnership with IRS-CI on this issue has developed important investigational leads that would have been impossible if our organizations had not been so closely synchronized.

Significant OFAC Designations Pursuant to EO 13224

The result of OFAC's research and coordination efforts over the past three years has been several significant designations of charities, terrorist financiers, and financial support networks.

OFAC Actions against Terrorist-Supporting Charities:

- Holy Land Foundation (HLF). OFAC/IPD worked closely with the FBI prior to 9/11 to designate this charity located in Richardson, Texas. HLF was a financial supporter of HAMAS, a terrorist group originally designated in January 1995 pursuant to Executive Order 12947. The FBI Dallas field office specifically sought OFAC's involvement in its investigation and an OFAC/IPD officer became part of the North Dallas Terrorism Task Force. As a result of this close coordination, on December 4, 2001, OFAC designated the Holy Land Foundation pursuant to EO 13224 and EO 12947. This designation was upheld in U.S. Federal district court, affirmed on appeal, and on March 1, 2004, the Supreme Court denied HLF's petition for certiorari in HLF's challenge to its designation. Additionally, Section 501(p) of the Internal Revenue Code was enacted as part of the Military Family Tax Relief Act of 2003 (P.L. 108-121), effective November 11, 2003. Section 501(p)(1) suspends the exemption from tax under section 501(a) of certain organizations, including those designated as a terrorist organization or foreign terrorist organization. Section 501(p), as a result, suspended HLF's

tax exempt status (effective on the date of enactment of this section or the designation, which ever is later in time). This suspension continues until all designations and identifications of the organization are rescinded under the law or Executive Order under which such designation or identification was made.

- Benevolence International Foundation (BIF) & Global Relief Foundation (GRF) Blocking in Aid of Investigation. On December 14, 2001, the Treasury blocked pending investigation (BPI) the property of both BIF and GRF, two Islamic charities in Chicago, Illinois and the first such action under EO 13224. After the December 2001 BPI action, OFAC continued to work with other components of the Treasury and the FBI, SFOR in the Balkans, the Department of Justice, and the intelligence community to obtain additional information which led to the designation of GRF on October 17, 2002 and BIF on November 18, 2002 pursuant to EO 13224. On February 25, 2003 the civil lawsuit filed by BIF against the U.S. was voluntarily dismissed with prejudice and without costs. On November 12, 2003, the Supreme Court denied certiorari in GRF's appeal of the denial of its motion for preliminary injunction. As a result of the OFAC designation, IRS suspended the tax-exempt status of both BIF and GRF.

- Al Haramain Foundation. Treasury has worked closely with other U.S. Government agencies and Government of Saudi Arabia in order to coordinate the bilateral designation of six branches of this prominent Saudi charitable organization. The Bosnian and Somali branches were designated on March 11, 2002, the Pakistani, Indonesian, Kenyan, and Tanzanian branches were designated on January 22, 2004 and, most recently, the Albanian, Afghani, Bangladeshi, Ethiopian and Netherlands branches, as well as Al Haramain's former leader Aqeel Abdulazia Al-Aqil, were designated on June 2, 2004.

OFAC Actions against Terrorist Financial Networks:

- Al-Barakaat network. OFAC identified the Al-Barakaat Network as a major financial network providing material, financial, and logistical support to Usama Bin Laden, al Qaida, and other terrorist groups. On November 7, 2001, the President announced the designation of the Al-Barakaat Network pursuant to EO 13224. This action was taken in coordination with the predecessor to the Department of Homeland Security's ICE, the then Treasury Department's US Custom's Office of Investigation, which executed simultaneous search warrants at the time of designation. As a result of that action, Barakaat's cash flow was severely disrupted and the Emiratis closed down Barakaat's offices in their territory, froze its accounts, and placed several individuals under an informal house arrest. Since the designation, six Barakat-related individuals and entities were removed from the list upon demonstrating and ensursing that they were no longer engaging in the activities for which they were originally designated.

- Nada-Nasreddin / al Taqwa network. OFAC coordinated with U.S. law enforcement and intelligence community, and worked closely with its foreign partners in the Caribbean and Europe to target al Qaida supporters, Yousef Nada and Ahmed Idris Nasreddin. OFAC designated them and related companies in November 2001 and August 2002 pursuant to EO 13224, significantly disrupting another network.

- Wa'el Hamza Julaidan. OFAC identified Julaidan as a senior figure in the Saudi charitable community, who provided financial and other support, to several terrorist groups affiliated with al Qaida operating primarily in the Balkans. OFAC worked with other U.S. Government agencies and the Government of Saudi Arabia to coordinate a bilateral designation of Julaidan on September 6, 2002.

**OFAC's Key Node Strategy**

Over the past year and a half, OFAC has sought to take a more systematic approach to evaluating the activities of major terrorist organizations in various regions. This approach has focused on identifying "key nodes" discussed above, which when targeted and economically isolated can cripple a terrorist network's ability to function.

To implement this approach, OFAC staff has established collaborative relationships with several Department of Defense agencies and combatant commands in order to gain wider access to information critical to developing evidentiary records in support of designations. Working with DOD Commands and other DOD agencies provides OFAC and its DOD partners a force multiplier that brings together a variety of counterterrorism tools and resources. This will be an important model of inter-agency coordination as well as strategic vision for the Treasury Department as a whole, as we move toward greater integration and amplification of our intelligence and analysis functions in the Office of Intelligence and Analysis.

- Jemmah Islamiyah (JI) / Southeast Asia. In October 2002, OFAC began a joint project with the U.S. Pacific Command (USPACOM) and other DOD elements that identified terrorist support networks in Southeast Asia and selected key nodes, or priority targets, in these networks. The project's geographic scope included Indonesia, the Philippines, Malaysia and Singapore, and eight terrorist or Islamic extremist groups. The project focused special attention on the al Qaida-affiliated JI, the Abu Sayyaf Group (ASG), and the Moro Islamic Liberation Front (MILF), because of their relative importance in the region and threat to U.S. interests. The project identified the key leaders, fundraisers, businessmen, recruiters, companies, charities, mosques, and schools that were part of the JI support network. OFAC has sought to expand on this model through collaboration with other DOD agencies including the combatant commands. These efforts have included:

- The Horn of Africa. OFAC analysts have worked with DOD agencies, including analysts from the Office of Naval Intelligence (ONI), to fully identify the terrorism support infrastructure in the Horn of Africa. In this region, shipping and related drug smuggling activities appear to be strengthening the terrorism infrastructure. In coordination with our interagency partners, we were able to identify some of the key leaders, charities, and businesses that appear to be critical to the overall functioning of the network. In January 2003, the U.S. took joint action with the Government of Saudi Arabia against two of these key targets--the Kenya and Tanzania offices of the Saudi-based Al-Haramain Islamic Foundation.

- North Africa. In August 2003, I visited the U.S. European Command headquarters (USEUCOM) and met with the Chief of Staff, to begin a joint project including USEUCOM, OFAC officers, and other DOD elements to identify terrorist support networks in the North Africa region and key nodes

within this network. The geographic scope of this project includes Morocco, Algeria, Tunisia, Libya, Mauritania, and Mali, and nine terrorist or Islamic extremist groups and their support networks. At the inception of this project, the Director of USEUCOM's Intelligence Directorate indicated that this region posed the most serious threat in USEUCOM's area of responsibility and asked OFAC to devote available resources to the project. The recent Madrid bombings and the suspicion that North African terrorists may have been involved illustrates the reality of the threat these groups pose not only to the stability of the region but the interests of the U.S. and our allies.

- Caucasus. In January 2004, the USEUCOM Chief of Staff visited OFAC and was briefed on an OFAC initiative to identify terrorist groups and their support networks in another region of USEUCOM's area of responsibility. The Chief of Staff invited an OFAC analyst to USEUCOM's Joint Analysis Center in Molesworth, England, to work with a regional analyst there to further develop information on terrorist activity in the region. The outcome of the week-long visit was that it confirmed our preliminary analytical conclusions of terrorist activity and support. We are now in discussion with a DOD element, USEUCOM, and a U.S. Government agency to pursue a collaborative effort to refine our understanding and determine if the initiative justifies the commitment of limited resources for the ultimate exercise of OFAC sanctions or other appropriate U.S. Government authorities against priority targets we may identify.

- Additional Initiatives. In March of this year, OFAC was invited to brief the Headquarters North American Aerospace Defense Command (NORAD) and U.S. North Command (USNORTHCOM) Interagency Coordination Group (JIACG) on the subject of OFAC authorities under Executive Order 13224 and OFAC efforts against terrorism. In addition, the U.S. Southern Command (USSOUTHCOM) has also contacted my office and expressed an interest in an OFAC analyst detailed to the USSOUTHCOM JIACG. OFAC continues to explore collaborative opportunities with both of these commands.

These efforts have been so successful that, in December 2003, the Office of the Secretary of Defense requested the detail of six OFAC employees to the headquarters of six DOD combatant commands. As a result, we hope to detail OFAC analysts with the U.S. Central Command (USCENTCOM) and U.S. Special Operations Command (SOCOM) in the near future.

**OFAC Attaché Offices and Foreign Counterparts**

OFAC's ability to successfully pursue counter-narcotics and counter-terrorism missions has been greatly enhanced by assigning OFAC officers to attaché and liaison positions abroad with several US embassies and military commands

- **OFAC Bogotá office** coordinates OFAC sanctions programs in Colombia and conducts research on Colombian drug cartels and narco-terrorists. The OFAC Attaché and Assistant Attaché in Bogota serve as the liaison with U.S. Embassy elements and Colombian government agencies and have established solid relationships with the Colombian banking and private sectors. OFAC/IPD officers travel regularly to Colombia and have extensive knowledge of Colombian drug cartel finances.

- **OFAC Mexico City office** coordinates OFAC sanctions programs in

- Compliance is building a new Specially Designated Nationals database that will allow enterprise-wide access to declassified target information and permit analysts to directly link from a name on the SDN list to the underlying declassified evidentiary material for easy access.

- Compliance intends, in the near future, to make a new DataMart feature available on the OFAC website that will allow users of OFAC's Specially Designated Nationals list to more easily "shop" for information that is tailored to their specific compliance needs.

Licensing Division

- OFAC's Licensing Division plans to further increase the efficiency with which license applications and requests for interpretive rulings are processed, with a goal of no longer than a two-week turnaround for submissions, which do not require review and clearance outside the Division.

- Licensing intends to develop enhanced capabilities for scanning and e-mail connectivity to facilitate review and clearance of licensing submissions requiring interagency consultation, with the ultimate goal of developing a web-based system with interagency access to avoid the need to transmit material altogether.

- The Division also plans to develop and publish on OFAC's website "treatises" on the various categories of commercial and financial transactions subject to OFAC's jurisdiction. These treatises will discuss OFAC's licensing practices with regard to the application of OFAC's regulations to those transactions. Redacted versions of the Division's interpretive rulings will be appended to the relevant treatise, providing comprehensive guidance and promoting consistency and transparency with respect to subjects ranging from trade issues and financial instruments and services to ownership and control and acquisition and divestiture.

- Licensing will continue supporting OFAC's regulatory implementation function by participating in the preparation of draft regulations and promoting their timely clearance and publication.

Enforcement Division

- Enforcement will build on and improve upon OFAC's existing relationships with federal law enforcement agencies, principally the FBI, ICE, Customs and Border Protection, Commerce Office of Export Enforcement and Offices of the United States Attorney, to enhance the criminal enforcement of OFAC sanctions programs.

International Programs (Counter-Narcotics) Division

- · OFAC's continuing counter-narcotics designation program objectives are to identify, expose, isolate, and incapacitate the business and financial infrastructures and penetrations into the legitimate economy of foreign narcotics kingpins and drug cartels, as well as their agents and functionaries. OFAC will continue to develop its working relationships with federal law enforcement agencies, U.S. Attorneys' offices, intelligence community elements, military commands, and select foreign enforcement and counter-narcotics units on a global basis.

OFAC will continue to develop operational relationships in the field and at headquarters with Federal law enforcement agencies, U.S. Attorneys' offices, Intelligence Community elements, and military commands. This includes more personnel to work with OCDETFs and other operational task forces and more training of the other government components in OFAC narcotics designation programs.

OFAC also plans to increase its participation in narcotics fusion and targeting centers and related interagency programs.

Foreign Terrorism Programs Division

OFAC plans to continue to expand its efforts to impede the activities of terrorist organizations utilizing the key nodes methodology. This will be done in concert with the new Office of Intelligence Analysis (OIA), as the Treasury Department works to integrate its analytical work product with all components of Treasury and the intelligence community. The new OIA will work with OFAC to monitor all relevant intelligence which can be used to further OFAC's mission. OFAC, using this information as well as other sources and its own research, will continue to develop the structure of terrorist groups and their support networks and to identify and isolate key nodes within them that serve critical functions, building upon and continuing the work with the military commands.

- OFAC will seek to detail OFAC officers to six DOD combatant commands for periods of two years to exploit the unique DOD resources and abilities to identify terrorists, terrorist groups, and their support networks, including DOD analytic resources, data collection, and most importantly local knowledge.

IT Challenges

Improving OFAC's Information Technology capabilities remains one of the greatest challenges to enhancing OFAC's ability to pursue its mission. OFAC could enhance current analytical capabilities by utilizing more advanced and available information technologies and advanced communications capabilities. Communication and cooperation with participating unified military combatant commanders and civil agencies has shown great promise in sharing information resources to identify terrorist targets, non-state enemies that function within worldwide terrorist networks demands closer coordination by U.S. government agencies and military in the diplomatic, economic, intelligence, and law enforcement domains. To enhance its capabilities, OFAC is pursuing the following communication systems and technologies that would enable the coordination and integration that is critical for agencies, military forces, and coalition nations to effectively fight in this new war:

- **Database Application**. OFAC could improve its ability to share and store information with the development of an internal database application. This application would reside on the "classified" networks and allow OFAC analysts to store and analyze information. This information could be shared, as appropriate, through classified communication networks and provide participating partners (Intelligence Community, Military Commands, and

Law Enforcement Agencies) with substantive targeting information.

- **Enhanced electronic communication.** This includes the establishment of a multi-media infrastructure using the Defense Messaging System cable communications servers, web servers, secure email, and data servers using Public Key Infrastructure (PKI) and FORTEZZA national security information assurance for both the Joint Worldwide Intelligence Communication System (JWICS) and the Secret IP Router Network (SIPRNET) enclaves. Establishing connectivity to the DOD interoperability of secure voice and data during periods of heightened protection requiring rapid analytical reporting between military and civil agencies.

- **Establishment of a robust e-mail system and database infrastructure.** OFAC will establish a robust e-mail system and database infrastructure for the exchange of Sensitive But Unclassified (SBU) information with the U.S. and international partner law enforcement community. This infrastructure would take advantage of emerging technologies with respect to repudiation with digital signature, authentication, and PKI information assurance protections. The access of law enforcement databases (NLETS, TECS, etc) for the cross-analytical work required between intelligence and law enforcement sensitive data. This enhanced communications capability will allow OFAC to exploit "open to government" information sources.

- **Developing Secure Video Teleconferencing (SVTC) capabilities.** OFAC is in the process of developing and enhancing its SVTC capbilities on both the JWICS for intelligence and SIPRNet for sanitized information of a law enforcement nature. Completion of construction on OFAC's Secure Video Teleconferencing facility will allow officers in Washington to communicate and work more effectively on joint projects involving civil agencies and U.S. military and coalition forces. Ensuring the collaborative strategic planning of a host of entities in the conduct of counter-terrorism and counter-narcotic missions.

- **Better Communication Utilizing SIPRNET and ADNET Enclaves.** Both the International Programs Division (counter-narcotics) and the Foreign Terrorist Programs Division (counter-terrorism) will seek to improve their electronic communication with the law enforcement community by utilizing systems as SIPRNET and the Anti Drug Network (ADNET).

Increased OFAC Cooperation with Foreign Counterparts

- OFAC's trips to target areas and its discussions with its counterparts in other countries have afforded OFAC the opportunity to work with these partners and provide guidance on the sanction strategies it currently employs. In all these, and future efforts, Treasury, working in coordination with other U.S. government agencies including the State Department, will take advantage of OFAC contacts and work abroad to increase cooperative efforts and expand its interaction with other government counterparts in order to deal with common threats against the United States and our allies.

Madame Chairman, I would like to thank you and the Committee for the opportunity to speak on these issues. This concludes my remarks today. I will be happy to answer your questions.