Exhibit 2

# FEDERAL BUREAU OF INVESTIGATION

# HEARING

BEFORE THE

## COMMITTEE ON THE JUDICIARY
## HOUSE OF REPRESENTATIVES

### ONE HUNDRED TENTH CONGRESS

FIRST SESSION

———

JULY 26, 2007

———

## Serial No. 110–86

———

Printed for the use of the Committee on the Judiciary



Available via the World Wide Web: http://judiciary.house.gov

———

U.S. GOVERNMENT PRINTING OFFICE

37–010 PDF   WASHINGTON : 2007

———

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

## COMMITTEE ON THE JUDICIARY

JOHN CONYERS, JR., Michigan, *Chairman*

HOWARD L. BERMAN, California
RICK BOUCHER, Virginia
JERROLD NADLER, New York
ROBERT C. "BOBBY" SCOTT, Virginia
MELVIN L. WATT, North Carolina
ZOE LOFGREN, California
SHEILA JACKSON LEE, Texas
MAXINE WATERS, California
WILLIAM D. DELAHUNT, Massachusetts
ROBERT WEXLER, Florida
LINDA T. SANCHEZ, California
STEVE COHEN, Tennessee
HANK JOHNSON, Georgia
BETTY SUTTON, Ohio
LUIS V. GUTIERREZ, Illinois
BRAD SHERMAN, California
TAMMY BALDWIN, Wisconsin
ANTHONY D. WEINER, New York
ADAM B. SCHIFF, California
ARTUR DAVIS, Alabama
DEBBIE WASSERMAN SCHULTZ, Florida
KEITH ELLISON, Minnesota

LAMAR SMITH, Texas
F. JAMES SENSENBRENNER, JR.,
  Wisconsin
HOWARD COBLE, North Carolina
ELTON GALLEGLY, California
BOB GOODLATTE, Virginia
STEVE CHABOT, Ohio
DANIEL E. LUNGREN, California
CHRIS CANNON, Utah
RIC KELLER, Florida
DARRELL ISSA, California
MIKE PENCE, Indiana
J. RANDY FORBES, Virginia
STEVE KING, Iowa
TOM FEENEY, Florida
TRENT FRANKS, Arizona
LOUIE GOHMERT, Texas
JIM JORDAN, Ohio

PERRY APELBAUM, *Staff Director and Chief Counsel*
JOSEPH GIBSON, *Minority Chief Counsel*

(II)

# C O N T E N T S

_____

JULY 26, 2007

Page

## OPENING STATEMENTS

The Honorable John Conyers, Jr., a Representative in Congress from the
State of Michigan, and Chairman, Committee on the Judiciary .................... 1
The Honorable Lamar Smith, a Representative in Congress from the State
of Texas, and Ranking Member, Committee on the Judiciary ......................... 2

## WITNESSES

The Honorable Robert S. Mueller, III, Director, Federal Bureau of Investiga-
tion
    Oral Testimony ................................................................................................. 3
    Prepared Statement ......................................................................................... 7

## APPENDIX

### Material Submitted for the Hearing Record

Prepared Statement of the Honorable Sheila Jackson Lee, a Representative
in Congress from the State of Texas, and Member, Committee on the
Judiciary ............................................................................................................ 62
Prepared Statement of the Honorable Betty Sutton, a Representative in Con-
gress from the State of Ohio, and Member, Committee on the Judiciary ....... 73
Post-Hearing Questions posed by the Honorable John Conyers, Jr., and the
Honorable Luis V. Guiterrez to the Honorable Robert S. Mueller, III, Direc-
tor, Federal Bureau of Investigation ................................................................ 74
Letter from Richard C. Powers, Assistant Director, Office of Congressional
Affairs, U.S. Department of Justice, Federal Bureau of Investigation, dated
November 13, 2007 ............................................................................................ 84
Letter from Richard C. Powers, Assistant Director, Office of Congressional
Affairs, U.S. Department of Justice, Federal Bureau of Investigation, dated
December 19, 2007 ............................................................................................ 85

Case 6:05-cv-00008-AA Document 310-21 Filed 03/31/10 Page 5 of 25
Case 9:07-cv-00109-VRW Document 49-1 Filed 09/30/08 Page 6 of 25

36

I am not certain about our intersection with the group at the University of North Texas, and I would have to get back to you on that. Quite clearly, the developments we have had in DNA over the last number of years have transformed in some sense the criminal justice system—giving us positive identifications of individuals, whether it be persons who were subsequently successfully prosecuted, but also missing persons.

As the use of DNA grows, we are short of resources, we are backlogged. And whether it be for the missing persons database or to more effectively and efficiently process requests for DNA examinations, it is something where we are going to need substantial resources in the future. My belief is the Federal system we have that integrates the State systems is working overall very well.

Mr. CHABOT. Thank you very much.

I think my time has expired, Mr. Chairman. Thank you.

Mr. CONYERS. Thank you.

I would be pleased to recognize the indefatigable gentlelady from Houston, Texas, Sheila Jackson Lee.

Ms. JACKSON LEE. Welcome to Mr. Mueller.

Thank you very much, Mr. Chairman. Let me thank you for creating a very important—or expanding on the very important role of this Committee, and that is oversight.

And we welcome you, Mr. Mueller. I know that we have visited before and you have missed some times. We hope you are well. Thank you for that.

I have three questions. My time is very, very short. And I think in the spirit of oversight, we have some very, very important questions to focus on that address a line of questioning that we have addressed over the past couple of weeks.

It is March 10 when General Ashcroft was in the hospital and you got a call from Jim Comey, concerned about a meeting that Mr. Gonzales was going to have with the chief of staff of the White House.

And it seems as if you would dispatch your FBI detail so that Mr. Comey would not be evicted from the room with General Ashcroft. And I might say that all of us were wishing him well at that time—certainly expressed our concern.

But he was going there, General Gonzales, to talk about the TSP, warrantless wiretapping. And it is a concern, so that we can get the record straight about what happened. And Mr. Comey was—as he arrived, he expressed a number of concerns about what this meeting was going to be about.

So my question to you, first of all, did you ever speak with either Mr. Gonzales or Mr. Card while they were at the hospital?

Mr. MUELLER. No, ma'am.

Ms. JACKSON LEE. And if you did not do that, did any of your agents speak to those individuals?

Mr. MUELLER. I don't believe so. I arrived at the hospital after Mr. Gonzales and Mr. Card had left.

Ms. JACKSON LEE. The discussion—and I don't know if you did arrive—did you have an opportunity to talk to General Ashcroft or did he discuss what was discussed in the meeting with Attorney General Gonzales and the chief of staff?

37

Mr. MUELLER. I did have a brief discussion with Attorney General Ashcroft.

Ms. JACKSON LEE. Pardon? I am sorry?

Mr. MUELLER. I did have a brief discussion with Attorney General Ashcroft after I arrived.

Ms. JACKSON LEE. And did he indicate the details of the conversation?

Mr. MUELLER. I prefer not to get into conversations that I had with the Attorney General. At the time I—again, he was entitled to expect that our conversations——

Ms. JACKSON LEE. And I respect that. Could I just say, did you have an understanding that the discussion was on TSP?

Mr. MUELLER. I had an understanding the discussion was on an NSA program, yes.

Ms. JACKSON LEE. I guess we use TSP; we use warrantless wiretapping. So would I be comfortable in saying that those were the items that were part of the discussion?

Mr. MUELLER. The discussion was on a national—an NSA program that has been much discussed, yes.

Ms. JACKSON LEE. Well, I appreciate that.

And do you then later remember what might have occurred? We know that there was a meeting back at the White House that night. Again, all of us were interested. It was raising debate in the United States Congress. Do you remember what happened at the meeting at the White House that night?

Mr. MUELLER. I was not present at the White House that night.

Ms. JACKSON LEE. And would you have any recollection, or asked for recollection through staff, whether TSP was discussed?

Mr. MUELLER. Well, I was not present at the meeting that Mr. Comey testified to having later that night at the White House. I do believe it related to a national security program—or a national NSA program, I should say.

Ms. JACKSON LEE. And let me just be clear, because I am saying this to you. Is it your understanding that General Gonzales was at the hospital and visited then-former General Ashcroft along with the chief of staff, Andy Card? Is it your understanding that they did have a meeting?

Mr. MUELLER. Yes.

Ms. JACKSON LEE. And so as we listen to General Gonzales's testimony, I believe under oath, regarding that, his statement, if I might just indicate that, in a question posed to him—and if it was about the TSP you are dissembling to this Committee—now, was it about TSP or not, the discussion on the 10th?

I think this says the 8th; I think the transcript is incorrect. This was a question posed by Senator Schumer.

The answer was, the disagreement on the 10th was "about other intelligence activities." The question, specifically, was, was it about TSP or not? And the answer was "about other intelligence activities."

It appears, from our discussion here today, that the discussion was certainly more focused than what General Gonzales has offered to the United States—in your recollection?

Mr. MUELLER. I am sorry. Is that a question, ma'am?

Ms. JACKSON LEE. Yes, it is.

38

Mr. MUELLER. I really can't comment on what Judge Gonzales was thinking or saying. I can tell you what I understood at the time.

Ms. JACKSON LEE. I think we appreciate your recollection. And I will just follow up—just to finish, Mr. Chairman, if I may—to say that, General, I had a series of questions about hate crimes and about that watch list.

I would only say to you, on the watch list, there are many people hurting, as my colleague said, while others may be going free.

I would like to get a report back on the watch list, because I will speak for the Texas Medical Center. And researchers and scientists are on that list—and it is very destructive—among others.

My last point is, Mr. Chairman, is that we like your priorities on terrorism, but, if I may just show this, we have no action on hate crimes and racial violence. That is where you are in the investigation of those.

And so I would appreciate a quick answer or a letter back on why we are so low. And I would welcome the letter, if the Chairman does not indulge me at this point.

Mr. MUELLER. Well, if I may comment on that last point, the addressing of hate crimes, the addressing of civil rights abuse is our number-two priority. But I would look at that figure in terms of what it represents in actual investigations we have undertaken.

Because, for a substantial period of time, we would open cases to report that which has happened in a particular community, as opposed to a thorough investigation.

And I will absolutely get back to you. But I do not believe that those statistics reflect what we have done in terms of hate crimes of civil rights abuses.

Ms. JACKSON LEE. I thank you very much.

Mr. Chairman, I want to pursue in the Committee——

Mr. CONYERS. The gentlelady's time——

Ms. JACKSON LEE [continuing]. The conflicting testimony of General Gonzales.

Mr. CONYERS [continuing]. Has expired.

Ms. JACKSON LEE. Thank you very much. I yield back.

Mr. CONYERS. I would like to recommend that there will be questions coming to the Director from Members, that he will be able to respond to.

I am pleased now to recognize Dan Lungren, the distinguished gentleman from California.

Mr. LUNGREN. Thank you very much, Mr. Chairman.

Mr. Mueller, let me try and go back to the FISA warrants, versus the NSLs, just so we make sure that the record is correct. Because you said you can get more in FISA warrants than you can get in NSL, leading to the suggestion that you don't need NSLs because you have FISA warrants.

But as I understand your testimony, you use the NSLs in some ways in preparation to be able to get a FISA warrant, because the NSLs gives you non-content material. And you may not have the basis to go after the more extensive information, absent that which you would get through the NSL.

Is that correct?

Mr. MUELLER. Correct.

44

We have a task force, MS-13 task force, with a number of partici-
pants from various agencies that address this across not only the
different State borders within the United States but
transnationally. Approximately a year ago, there were some 600
MS-13 individuals who were arrested not only in the United States,
but in El Salvador and Guatemala, Mexico, I think it may have
been Dominican Republic, Honduras in a coordinated takedown.

With a gang such as this that crosses borders, it is a function of
globalization, a different type of globalization which requires us to
work cooperatively and build allegiances and alliances with our
counterparts overseas, if we are to effectively address what I would
call a scourge of gang activity.

As I mentioned—I would finish by saying that we have been
somewhat successful recently in a joint task force operating out of
Los Angeles to address violent crime with MS-13 and the 18 street
gangs there.

Mr. FORBES. And if I could follow up on that—and I know you
did have that success. You mentioned it earlier. How important are
the joint task force capabilities to be able to pull down the gang
networks that you are seeing, especially the national connectivity
that we are beginning to see with MS-13?

Mr. MUELLER. My belief is task forces are tremendously impor-
tant. And that it is tremendously important that State and local law
enforcement authorities be funded to support task forces.

The funding constraints on State and local law enforcement have
been somewhat substantial over the last years. We ask them to
participate in joint terrorism task forces, to join with us in address-
ing the threat of terrorism. They ask us to participate with them
to address what is most on their mind, which often is violent crime
and, quite often, violent crime at the hands of gangs.

And the funding for both us, as well as State and local law en-
forcement, to address this must be provided, if we are to make a
dent in violent crime activity, violent gang activity in the United
States.

Mr. FORBES. And the last question—you may, if you don't have
this statistic with you, just get back to us with it. Do you have any
idea about the percentage of members of, let us say MS-13, because
that is in the news lately, might be here illegally?

Mr. MUELLER. I do not. I would have to get back to you. But it
is fairly—well, I would really have to get back to you on that. I
don't want to——

Mr. FORBES. We have had testimony that it could be between 60
percent and 80 percent. But if you could just see what your statis-
tics and get back.

Mr. MUELLER. Will do.

Mr. FORBES. Thank you, Mr. Director.

And, Mr. Chairman, I yield back.

Mr. CONYERS. Thank you very much, Mr. Forbes.

The Chair is pleased to recognize the gentleman from Tennessee,
Mr. Steve Cohen.

Mr. COHEN. Thank you, Mr. Chairman.

I know we have gone over, two or three times, this fact that Gen-
eral Ashcroft was in the hospital. But I am curious. Mr. Comey

said that he called you, and you called your agents and said that
Mr. Comey was not to be removed from the room.

Why did you feel that there might be an attempt to remove him
from the room?

Mr. MUELLER. It was based on my conversation with Mr. Comey,
in which he indicated he had a concern that he would not be par-
ticipating in discussions in which he felt he should be participating
as the Acting Attorney General.

Mr. COHEN. And were there FBI agents at the room protecting
General Ashcroft?

Mr. MUELLER. Yes. He had a detail of FBI agents throughout his
tenure.

Mr. COHEN. All right. And so, he was concerned that Mr. Card
and Mr. Gonzales, or Judge Gonzales, were not going to include
him in the conversation. Is that correct?

Mr. MUELLER. All I can tell you is what I learned from him.

Mr. COHEN. So he believed that.

Mr. MUELLER. Yes.

Mr. COHEN. Why did you rush there?

Mr. MUELLER. He requested that I be there to determine what
went on. You would have to ask Mr. Comey why he had me there.
I did go at his request. He was the Attorney General at the time.

Mr. COHEN. So you went there, and when you were there, he said
at one point that you had a brief and memorable conversation—a
brief, memorable exchange with the Attorney General. How memo-
rable was that?

Mr. MUELLER. I had a conversation with him. I couldn't recite to
you word for word what that conversation was. I do remember him
being there.

Mr. COHEN. Just a memorable conversation——

Mr. MUELLER. It was a conversation, yes.

Mr. COHEN. What was the gist of it, sir?

Mr. MUELLER. I guess it covered very generally what had hap-
pened the moments before.

Mr. COHEN. And what had happened the moments before?

Mr. MUELLER. Well, again, I resist getting into the conversations,
the specifics of conversations I had, because I do think the Attorney
General then, the Attorney General now, and others are entitled to
keep those conversations between themselves.

Mr. COHEN. They may be entitled to, but are you entitled to?

And he is no longer the Attorney General, so at this point, he is
not the Attorney General. I am asking you to tell us what the con-
versation was. I don't think there is a privilege.

Mr. MUELLER. Excuse me just 1 second.

Mr. COHEN. Sidebar.

Mr. MUELLER. The discussion was that there had been a prior
discussion about an NSA program and that the Attorney General
deferred to Mr. Comey as the person to make whatever decision
was to be made.

Mr. COHEN. He had confidence in Mr. Comey, I take it.

Mr. MUELLER. Yes.

Mr. COHEN. Okay. At some point or another, I think you told
maybe Mr. Watt that you felt that there were problems with some
of the operations there, the wiretaps.

46

Mr. MUELLER. At a point in time, in conversations with Mr. Comey, I had understood that the Department of Justice had some concerns about the legality of an NSA program. That affected the FBI in the sense that we received pieces of information from the NSA.

My purpose was to determine that whatever we did as the Bureau in handling that was done according to the directive and the appropriate directive of the Department of Justice.

So my concern was to assure that whatever activity we undertook as a result of the information we received was done appropriately and legally. At some point in time, he expressed concern about the legality of it.

Mr. COHEN. And because of that concern, at some point did you express to Mr. Watt, I believe that was correct, earlier, that you considered resignation?

Mr. MUELLER. I don't believe I expressed that. I did not dispute what Mr. Comey had said. But, again, in this area, I would say that I should not get into the conversations I had with individuals.

Mr. COHEN. Well, this wouldn't be a conversation. I go back to Mr. Comey's testimony to the Senate—was about resignations. And Mr. Schumer asked, "Was one of those people that might have resigned the Director?" And he said, "I believe so. You would have to ask him, but I believe so."

So I am not asking you about a conversation with Mr. Comey, I am asking you, was he correct? Or better yet, just were you that person?

Mr. MUELLER. I was that person to whom he refers, yes.

Mr. COHEN. And were you considering resigning? You don't have to relay the conversation, this is just your own mind——

Mr. MUELLER. Understand why I cannot say that I do not dispute what Mr. Comey says, because Mr. Comey says ask Mr. Mueller. I will tell you that I don't believe that it is appropriate of me to get into conversations that I have had with principals on that issue.

Mr. COHEN. And I don't want a conversation. I want what is in your psyche. Did you consider it yourself? That is not a conversation, that is a state of mind.

Mr. MUELLER. Well, to the extent that I followed through on the state of mind, then it is a conversation. Again, I would resist getting into that conversation.

Mr. COHEN. My time is almost up. If I could have 30 more seconds, Mr. Chairman? And I would just like to ask this.

You made a comment about some task forces doing a great job in reducing crime in New York and Los Angeles. I am from Memphis. We have a serious crime problem there. Is there any plan to have any task forces there, street task forces, or additional personnel to help us with our crime problem?

Mr. MUELLER. I am quite confident we have at least one, if not more, safe streets task forces in Tennessee, in particularly in Memphis. And I will get back to you on that.

Mr. COHEN. No matter how many it is, I want one more. [Laughter.]

54

Mr. MUELLER. I would have to go look, but I do not believe that to be the case at all.

Mr. GOHMERT. All right, thank you.

And I do appreciate the Chairman's flexibility.

And, Mr. Mueller, I do thank you for coming up here and visiting with you. I think this helps us to have a better relationship. Thank you.

Mr. MUELLER. Thank you, sir.

Mr. CONYERS. The Chair recognizes yet another prosecutor, the gentleman from Alabama, Mr. Artur Davis.

Mr. DAVIS. Thank you, Chairman Conyers.

Mr. Mueller, I didn't know that my friend from Texas was going to be the first witness to beat you up today. That is news to those of us on this side.

Let me, in the time that I have, go back to something that we have obviously talked about a lot today, and it is the circumstances around the March 10 visit from the Attorney General to then-White House counsel Gonzales' office to Mr. Ashcroft, then the Attorney General.

And I will preface it by saying that I know you feel that we have plowed over this ground a lot today. We are doing it for an obvious reason. There have been serious questions raised about whether the current Attorney General was candid and truthful in his testimony at the United States Senate. And I know that you, if you had an opinion of that, would not venture it to us.

But it is important and we have some obligation to try to elucidate facts around as much as we can. So in that spirit, let me try to fill in some of gaps that some of my colleagues may have left today.

What did you understand John Ashcroft's condition to be on March 10, 2004?

Mr. MUELLER. He had gone through a difficult operation and was being closely monitored in the hospital.

Mr. DAVIS. Had you been in touch with him in the interim between March 10 and his operation?

Mr. MUELLER. No. The operation preceding March 10?

Mr. DAVIS. Yes, that is right. That is right.

Mr. MUELLER. No, I had not. I had not.

Mr. DAVIS. Did you understand him to be in a condition to receive visitors on these serious matters?

Mr. MUELLER. I did not, no.

Mr. DAVIS. Had you felt anything was pressing enough for you to get in touch with him during that timeframe?

Mr. MUELLER. No.

Mr. DAVIS. Were you surprised when you received the phone call from Mr. Comey indicating that there was going to be this visit to Mr. Ashcroft by Mr. Gonzales and Mr. Card?

Mr. MUELLER. It was out of the ordinary.

Mr. DAVIS. And was one of the reasons it was out of the ordinary because you didn't understand Mr. Ashcroft to be in a condition to receive visitors on serious matters?

Mr. MUELLER. No. It was a request from Mr. Comey that was out of the ordinary.

Mr. DAVIS. What was out of the ordinary?

55

Mr. MUELLER. To be requested to come to the hospital at that particular time, early in the evening.

Mr. DAVIS. And I think you have testified, or there has been testimony from Mr. Comey, that he asked you to have a conversation with FBI agents and to instruct them not to remove him from the room. Is that essentially accurate testimony on Mr. Comey's part?

Mr. MUELLER. I have no dispute with Mr. Comey as in that regard. My own recollection is somewhat uninformed.

Mr. DAVIS. Well, that certainly strikes me as unusual. You are the FBI Director. A senior official calls you and says, "Make sure that I am not evicted from the room," and I am sure that must have struck you as being an unusual request, didn't it?

Mr. MUELLER. Yes.

Mr. DAVIS. Did you take notes and memorialize your conversation with Mr. Comey, at that point?

Mr. MUELLER. No, at that point, I did not.

Mr. DAVIS. At some point, did you memorialize your conversations regarding this visit with Mr. Comey?

Mr. MUELLER. I may have, yes.

Mr. DAVIS. Do you still have those notes?

Mr. MUELLER. Yes.

Mr. DAVIS. And are they available to the Committee if the Committee was to ask for them?

Mr. MUELLER. I would have to get back to you on that.

Mr. DAVIS. Can you think of a reason or a privilege that would prevent the Committee from receiving these notes?

Mr. MUELLER. Deliberative, but I would have to get back to you on that.

Mr. DAVIS. Well, but as we sit here, can you think of any privilege that would preclude the Committee?

Mr. MUELLER. Deliberative. Deliberative.

Mr. DAVIS. Okay. That is your answer.

Let me move forward. I think you have indicated that you did not encounter Mr. Gonzales or Mr. Card at the hospital. Is that right?

Mr. MUELLER. Correct.

Mr. DAVIS. But you did speak with Mr. Ashcroft after the conversation that he had with Mr. Card and Mr. Gonzales. Is that right?

Mr. MUELLER. I did.

Mr. DAVIS. Did you make any notes regarding your conversation with Mr. Ashcroft?

Mr. MUELLER. Yes.

Mr. DAVIS. And do you still have those notes in your possession?

Mr. MUELLER. Yes.

Mr. DAVIS. Can you think of any reason why those notes should not be disclosed to the Committee?

Mr. MUELLER. The same response that I gave before in response to your earlier question, deliberative.

Mr. DAVIS. Now—this is an important question—tell me why you decided to make notes of your conversation with Mr. Ashcroft?

Mr. MUELLER. It was out of the ordinary.

Mr. DAVIS. What was out of the ordinary, Mr. Mueller?

56

Mr. MUELLER. Being asked to go to the hospital and be present at that time.

Mr. DAVIS. Did you share those notes with anyone in the Administration?

Mr. MUELLER. No.

Mr. DAVIS. Who have you shared them with prior to today?

Mr. MUELLER. My counsel.

Mr. DAVIS. Counsel——

Mr. MUELLER. Office of General Counsel.

Mr. DAVIS. Okay. Is that the only individual, Office of General Counsel?

Mr. MUELLER. Yes. Well, there may have been persons in my immediate staff, but——

Mr. DAVIS. Have you made any other notes or memorandum regarding the March 10 visit that you have characterized as unusual?

Mr. MUELLER. No.

Mr. DAVIS. Do you know if any notes or memorandum were made regarding the visit itself? I understand you didn't make them as you weren't there, but regarding the visit by Mr. Card and Mr. Gonzales to Mr. Ashcroft, do you know if there was any notetaker present.

Mr. MUELLER. I do not know.

Mr. DAVIS. I am sorry. Did you finish your answer? I am sorry.

Mr. MUELLER. I was going to anticipate your next question is I have not seen any such notes.

Mr. DAVIS. Okay, and——

Mr. CONYERS. I hate to tell the gentleman this, but with two other Members and the vote on, we are now really——

Mr. DAVIS. If you would just indulge me 10 seconds, Mr. Chairman, I would ask the Committee to take note of Mr. Mueller's very candid statement to us that he does have notes regarding this very important conversation, and I would ask the Senate to certainly be aware of it.

And I would certainly ask this Committee and our colleagues in the Senate to make a formal inquiry to obtain those thanks

Thank you for being candid, Mr. Mueller.

Mr. CONYERS. Thank you very much.

The Chair recognizes the gentlelady from Florida, Debbie Wasserman Schultz.

Ms. WASSERMAN SCHULTZ. Thank you, Mr. Chairman.

Director Mueller, I am going to change the subject and ask some questions related to the Internet and the ICAC task forces.

As you know, the Internet has facilitated an explosion of child exploitation. And Department of Justice officials testified before the Energy and Commerce Committee in the last Congress that there are hundreds of thousands of individuals trafficking in child pornography in the United States.

Everyone that I have talked to—from Mark Lunsford in Florida who is Jessica Lunsford's father, Marc Klaas, Polly Klaas's father in California and a number of other parents who have formed the Surviving Parents Coalition, to the National Coalition to Protect Children—everyone tells me that this problem is only getting worse and not better.

ROBERT S. MUELLER, III
DIRECTOR
FEDERAL BUREAU OF INVESTIGATION
BEFORE THE
JUDICIARY COMMITTEE ON OVERSIGHT OF THE
UNITED STATES HOUSE OF REPRESENTATIVES
JULY 26, 2007

Good afternoon Chairman Conyers, Representative Smith, and members of the
Committee. I am pleased to be here today.

When I was sworn-in as the sixth Director of the FBI nearly six years ago, I was
keenly aware of the need to address a number of management and administrative
challenges facing the Bureau. However, the terrorist attacks of September 11, 2001,
coupled with the emerging terrorist and criminal threats brought on by globalization and
advances in technology, required far more changes than we anticipated. Indeed, we in
the FBI have undergone unprecedented transformation in recent years. Today, the FBI is
a stronger organization, combining greater intelligence and national security capabilities
with a longstanding commitment to protecting the American people from both crime and
terrorism, while upholding the Constitution and protecting civil liberties.

Today, I want to give you a brief sense of the FBI's current priorities, the changes
we have made to meet our mission, and some of the challenges we are facing.

**Changes in Structure and in the Way We Do Business**

After the September 11th attacks on America, the FBI's priorities shifted
dramatically. Our top priority became the prevention of another terrorist attack. Today,
our top three priorities – counterterrorism, counterintelligence, and cyber security – are
national security-related.

To that end, we have made a number of changes in the Bureau, both in structure
and in the way we do business. We stood up the National Security Branch, which
oversees our counterterrorism, counterintelligence, and intelligence operations. We
consolidated our chemical, biological, radiological, and nuclear threat resources into the
Weapons of Mass Destruction Directorate.

We have doubled the number of intelligence analysts on board, from 1,023 in
September 2001 to more than 2,100 today. We have tripled the number of linguists. We
set up Field Intelligence Groups, or FIGS, in each of our 56 field offices. These FIGS
combine the expertise of agents, analysts, translators, and surveillance specialists. We
integrated our intelligence program with other agencies under the Director of National
Intelligence, with appropriate protections for privacy and civil liberties.

We have tripled the number of Joint Terrorism Task Forces (JTTFs) across the
country, from 33 to more than 100. These task forces combine the resources of the FBI,
the intelligence community, the military, and state and local police officers. These JTTFs

have been essential in breaking up terrorist plots across the country, from Portland, Lackawanna, Torrance, and Chicago, to the recent Fort Dix and JFK plots.

In short, we have improved our national security capabilities across the board. Today, intelligence is woven throughout every program and every operation. Much of our progress has been the result of expertise gained over the past 99 years of our existence, in the criminal arena with organized crime, and in counterintelligence, through the development of sources and expertise in interview and surveillance techniques. Our experience has allowed us to build enhanced capabilities on an already strong foundation.

**The FBI's Criminal Programs**

To meet our national security mission, the FBI had to shift personnel and resources, but this has not affected our commitment to our significant criminal responsibilities. While Americans justifiably worry about terrorism, crime also touches the lives of millions of people. Today in the FBI, we have roughly a 50/50 split in resources between national security and criminal programs. To make the best use of these resources, we will continue to focus on those areas where we bring something unique to the table and to target those criminal threats against which we will have the most substantial and lasting impact.

In recent years, we have moved away from traditional drug cases and smaller white collar crimes that can be handled by other law enforcement agencies, but we have dedicated more agents and more resources to public corruption, violent crime, civil rights, transnational organized crime, corporate fraud, and crimes against children. We remain ready and willing to help keep our communities safe.

Public Corruption

Public Corruption is among the agency's top priorities and is the number one priority of the Criminal Investigative Division. Public corruption strikes at the heart of government. It erodes public confidence, and undermines the strength of our democracy. Investigating public corruption is an FBI commitment as old as the Bureau itself. Indeed, it is a mission for which the FBI is singularly situated; we have the skills necessary to conduct undercover operations and the ability to perform electronic surveillance.

Today, there are 640 Special Agents dedicated to more than 2,400 pending investigations. The number of pending cases has increased by 49 percent since 2001. The number of agents working such cases has increased by 42 percent. The Department of Justice's conviction rate is high, as is the overall number of corruption convictions. In the past two years alone, the Department has convicted over 1,500 federal, state, and local officials. The Department also has recovered more than $69 million in fines and more than $356 million in restitution.

The Public Corruption Program also targets governmental fraud and corrupt practices. For example, the International Contract Corruption Initiative addresses the systemic, long-term multi-billion dollar contract corruption and procurement fraud crime problem in the Middle East, principally in Iraq, Kuwait, and Afghanistan.

2

The Hurricane Fraud Initiative addresses contract and procurement fraud in the Gulf Coast region of the United States in the aftermath of hurricanes Katrina and Rita. The Campaign Finance and Ballot Fraud Initiative addresses campaign finance violations, with a particular emphasis on the upcoming 2008 primaries and national elections.

### Violent Crime

National crime rates remain near historic lows, thanks in large part to the courageous efforts of local, state and federal law enforcement agencies, and several major metropolitan areas continue to report decreases in the number of violent crimes in their communities. Nevertheless, it must be acknowledged that the FBI's 2005 Uniform Crime Report (UCR) and the 2006 preliminary UCR did signal a slight increase in the aggregate number of violent crimes in America. These data do not reveal a nationwide trend; instead, they show local increases in some violent crimes in certain communities.

Despite the continuation of historically low crime rates, the Department of Justice and the FBI take seriously any increase in crime, and here, too, we strive to maximize our resources through partnerships and task forces. We are currently operating 188 Safe Streets Task Forces. Forty-three of these task forces are dedicated to violent crime; 10 are dedicated to major theft. In addition, there are 16 Safe Trails Task Forces that cover crimes committed in Indian Country such as homicide, rape, child sexual assault, and narcotics trafficking. Task forces dedicated to violent crime alone conducted investigations resulting in more than 700 convictions in Fiscal Year 2006.

We also participate in state and local fusion centers across the country. More than 250 Special Agents, analysts, and linguists work side-by-side with their state and local counterparts, collecting intelligence, analyzing criminal trends, and sharing that information up and down the line, from federal and state officials to the officer on the street.

We are also working together to combat crimes against children. The Innocence Lost National Initiative works to identify and disrupt child prostitution rings. To date, the program has been expanded to 29 cities, with 23 dedicated task forces and working groups. Since its inception, more than 300 children have been recovered and/or identified, and 204 child predators have been convicted in federal or state court.

To address the pervasive problem of child abductions, the FBI created the Child Abduction Rapid Deployment (CARD) teams. There are currently 10 teams regionally dispersed to enable the rapid deployment of experienced Crimes Against Children investigators. These agents provide investigative, technical, and resource assistance to state and local law enforcement during the most critical time period after a child is abducted. Since April 2006, the CARD teams have been deployed 23 times. Eleven victims have been recovered alive and all but two investigations have been resolved.

### Violent Gang Activity

We also face significant challenges from violent gangs. They are a nationwide plague that is no longer limited to our largest cities.

3

Since 2001, for example, our violent gang caseload has more than doubled. Currently, we have more than 2,800 pending investigations into gangs and gang-related activities. The number of agents working such cases has increased by 70 percent.

We routinely work with our state and local partners to combat this pervasive threat. Of our 188 Safe Streets Task Forces, 135 are dedicated to identifying, prioritizing, and targeting violent gangs. We now have more than 600 agents serving on those task forces, along with more than 1,100 officers from state and local law enforcement. Last year, they convicted nearly 2,200 violent gang members.

In addition to our task force participation, we stood up the National Gang Intelligence Center (NGIC) in Washington, D.C. to support our law enforcement partners on the front lines. The NGIC shares information and analysis concerning the growth, migration, criminal activity, and association of gangs that pose a significant threat to communities across the United States. The NGIC is co-located with GangTECC, the National Gang Targeting, Enforcement and Coordination Center, which is the national, multi-agency anti-gang task force created by the Attorney General. The MS-13 National Gang Task Force supports FBI field office investigations of the MS-13 international gang, and coordinates investigations with other local, state, federal, and international criminal justice agencies.

In support of the President's strategy to combat criminal gangs from Central America and Mexico, the FBI has forged partnerships with anti-gang officials in El Salvador, Honduras, and Guatemala, among other countries. We are working with the U.S. Department of State and the Department of Homeland Security to support the FBI's Central American Fingerprint Exploitation (CAFE) initiative, which collects gang members' fingerprints in the above-referenced countries, allowing the United States to deny entry to the country even if they utilize aliases, and the new Transnational Anti-Gang (TAG) Center announced by the Attorney General in San Salvador in February.

<u>Civil Rights Program</u>

As you know, the FBI is charged with investigating civil rights violations. In recent years, we have expanded our Civil Rights Program beyond police brutality and hate crimes, to include the Civil Rights Cold Case Initiative and human trafficking issues. Since 2001, the number of pending civil rights cases has increased 19 percent, from 1,326 to 1,587.

In February of 2006, the FBI and the Department of Justice began to work with the NAACP, the Southern Poverty Law Center, and the National Urban League on the Civil Rights Cold Case Initiative. As part of this initiative, the FBI asked its 56 field offices to re-examine their unsolved civil rights cases, and to determine which cases could still be viable for prosecution. Since this initiative began, 95 referrals have been forwarded to 17 field offices. Each will need to be assessed for its investigative and legal viability, but for those cases in which we can move forward, we will.

4

We all know that many murders during the Civil Rights era were not fully investigated, were covered up, or were misidentified as accidental deaths or disappearances. Many trails ran cold, and many cases were effectively closed.

Yet the families and friends of these victims never lost hope, and breakthroughs in forensic analysis technology have affirmed that hope. In June of this year, for example, James Seale, a former member of the Ku Klux Klan, was convicted of the kidnapping and murder of Henry Dee and Charlie Moore back in 1964. In 2005, Edgar Ray Killen was convicted for his role in the deaths of three civil rights workers in Mississippi in 1964. And in 2003, Ernest Avants was convicted for the 1966 murder of Ben Chester White.

Through your support of these investigations, with the passage of the Emmett Till Unsolved Civil Rights Crime Act, we will have the resources we need to investigate and prosecute these crimes, and bring those responsible to justice.

<u>Transnational Organized Crime</u>

Transnational organized crime continues to evolve with advances in globalization and technology.

La Cosa Nostra is an organized crime enterprise with direct ties to the Sicilian Mafia and remains a major organized criminal threat to American society. Currently, we have nearly 600 pending Italian organized crime investigations. We are also actively investigating Eurasian, Albanian, Asian, and African organized criminal syndicates. Between 2001 and 2007, for example, pending Eurasian organized crime cases increased by 65 percent and an average of 160 individuals were indicted per year between 2002 and 2006.

We are working with partners around the world to identify, apprehend, and disrupt members of international criminal syndicates. For example, we are working with the Italian National Police to combat Sicilian Mafia activity in Italy and in the United States, in a partnership known as the Pantheon Project. The FBI has assigned personnel in Rome to work side-by-side with Italian National Police investigators, and the Italian National Police have assigned a representative to FBI Headquarters to work side-by-side with Agents in the Organized Crime Section.

The FBI-Hungarian National Police Organized Crime Task Force has been up and running for more than six years, working to dismantle organized crime groups, with FBI agents permanently stationed in Budapest to work with their Hungarian counterparts. The Albanian Organized Crime Task Force will commence operations this fall, with partial funding from the Department of Defense.

The FBI's Criminal Division has also assumed administrative and operational responsibility from the Office of International Operations for the Southeast European Cooperative Initiative (SECI), which is headquartered in Bucharest, Romania. SECI serves as a clearinghouse for information and intelligence for member and observer countries, and supports specialized task forces addressing transborder crimes including human trafficking, financial crimes, smuggling of goods and terrorism.

5

Recognizing the growing threat posed by transnational criminal enterprises throughout the world, the FBI, in conjunction with the Department of Justice, has begun an assessment of the world-wide organized crime threat. This collaborative effort between the United States, Great Britain, Canada, Australia, and New Zealand will enable us to focus resources internationally in order to neutralize those organized crime groups with the greatest impact and longest reach.

## Major White Collar Crime

The FBI routinely investigates large-scale financial crimes, including corporate, securities, commodities, mortgage and health care fraud. In recent years, the FBI has investigated company after company, including Enron, Enterasys, Comverse, HealthSouth, WorldCom, and Qwest, among many others. These names have been in the headlines for the past several years. Thousands of employees lost their jobs and their life savings; thousands of stockholders were defrauded. We have successfully investigated and helped put away many of the persons responsible for these crimes.

The number of agents investigating corporate and other securities, commodities, and investment fraud cases has increased 47 percent, from 177 in 2001 to more than 250 today. Today, we have more than 1,700 pending corporate, securities, commodities and investment fraud cases, which is an increase of 37 percent since 2001.

In 2006, the FBI investigated 490 corporate fraud cases, resulting in 176 informations and indictments, 133 convictions, $14 million in fines, and $62 million in seized assets. Significantly, the FBI has also secured $1.2 billion in court ordered restitution for the victims of these crimes.

We are also a member of the Corporate Fraud Task Force. FBI Special Agents work closely with investigators from the Securities & Exchange Commission, the IRS, the U.S. Postal Inspection Service, the Commodity Futures Trading Commission, and Treasury's Financial Crimes Enforcement Network, among others. Together, we target sophisticated, multi-layered fraud cases that injure the marketplace and threaten our economy. Since its inception, the Department has obtained 1,236 corporate fraud convictions, including the convictions of 214 chief executive officers and presidents, and 53 chief financial officers.

Health care fraud significantly impacts the lives of all Americans. The National Health Care Anti-Fraud Association conservatively estimates that three to five percent of total health care expenses are fraudulent. The major issues are constantly changing and those involved in health care fraud are continually probing health care benefits programs for areas of potential fraud. Constant communication between the health care benefits programs, law enforcement agencies, state agencies and the public is the most effective means to respond to these changes. The FBI is an integral element of the joint Department of Justice and Department of Health and Human Services Health Care Fraud and Abuse Program and is actively involved in 32 Health Care Fraud Task Forces, as well as numerous working groups and joint investigations. During 2006, investigations

6

resulted in 599 indictments; 534 convictions and pre-trial diversions; $373 million in restitutions; and $1.6 billion in recoveries.

### Cyber Crime

Protecting the United States against cyber-based attacks and high-technology crimes is our third priority, ranking behind only counterterrorism and counterintelligence. With the ubiquitous nature of the Internet, cyber crime is an ever-evolving threat. Our foreign adversaries and competitors can remotely observe, target, acquire and exploit our information to their advantage, often without any physical presence in the United States. Terrorists recruit, train and plan attacks in the shadows of the Internet. Sexual predators prowl chat rooms for younger and younger victims. Spies sell intellectual property and state secrets to the highest bidder. Hackers who used to shut down servers around the world for bragging rights may be linked to criminal or terrorist organizations. In addition, many traditional crimes, from money laundering and fraud to identity theft and organized crime, have migrated online.

Five years ago, in 2002, we created the Cyber Division to handle all cyber-security crimes. Today, our highly-trained cyber agents and analysts investigate computer fraud, child exploitation, theft of intellectual property, and worldwide computer intrusions.

<u>Innocent Images National Initiative</u>

One of our most important cyber programs is the Innocent Images National Initiative (IINI). The IINI is an intelligence-driven, multi-agency investigative operation to combat the proliferation of Internet child pornography and exploitation. Unfortunately, there is no shortage of work in this arena. In the past 10 years, we have witnessed an exponential increase in our caseload, from just 113 cases in 1996 to more than 5,000 this year. In fact, online child pornography and exploitation investigations accounted for 37 percent of all investigations in the Cyber Division in Fiscal Year 2006. In total, more than 6,000 child predators have been convicted in FBI cases since 1996.

We have ongoing undercover operations across the country, with hundreds of agents who investigate cases with their state and local counterparts. On any given day, these investigators may pose as children to lure online predators into the open. They may pose as collectors who seek to share images through peer-to-peer networks. They may coordinate with the National Center for Missing and Exploited Children to identify children and adults featured in child pornography. Or they may train police officers to investigate cases in their own jurisdictions.

Our collaboration is not limited to the national level. Many producers and distributors of child pornography operate outside of our borders. Police officers from Britain, Australia, Belarus, Thailand, and the Philippines, among others, work with agents and analysts on the Innocent Images International Task Force in Calverton, Maryland. Since its inception, investigators from 19 countries have participated in the task force. Together, they have generated more than 3,000 leads that were sent to DOJ-

funded Internet Crimes Against Children Task Forces, FBI field offices, and our international law enforcement partners.

> ### Online Fraud, Cyber Espionage, and Computer Intrusions

We also investigate online fraud, identity theft, intellectual property violations, cyber espionage, and computer intrusions.

For example, an ongoing cyber crime initiative has identified more than one million potential victims of botnet cyber crime. The investigation, entitled "Operation Bot Roast," targets "botnets" – groups of compromised computers under the remote command and control of a hacker commonly known as a "bot-herder."

Most owners of these compromised computers are unwitting victims who have unintentionally allowed access and use of their computers to facilitate other crimes, including identity theft, denial of service attacks, phishing, click fraud, and the mass distribution of spam and spyware. Because of their widely distributed capabilities, botnets are a growing threat to national security, the national information infrastructure, and the economy.

The FBI is working with industry partners like the CERT Coordination Center at Carnegie Mellon University, Microsoft Corporation, and the Botnet Task Force to identify victim computer IP addresses and to notify those affected. To date, several suspects have been charged or arrested with computer fraud and abuse.

The FBI sponsors InfraGard, a cutting edge public and private alliance committed to information sharing and analysis to combine the knowledge base of a wide range of members. InfraGard is an association of businesses, academic institutions, state and local law enforcement agencies, and other participants dedicated to sharing information and intelligence to prevent hostile acts against the United States. InfraGard Chapters are geographically linked with FBI Field Office territories. Currently, there are over 20,000 individual Infraguard members, representing 240 Fortune 500 companies and all National Critical Infrastructure sectors.

Increasingly, cyber threats originate outside of the United States. Our information infrastructure is not ours alone – it can be accessed by anyone with a laptop and a modem. Our Cyber Action Teams travel around the world on a moment's notice to assist in computer intrusion cases, whether in government, military, or commercial systems. These teams gather vital intelligence that helps us identify the cyber crimes that are most dangerous to our national security and to our economy.

In 2005, for example, cyber teams comprising investigators and experts in malicious code and computer forensics worked closely with Microsoft Corporation and with law enforcement officials from Turkey and Morocco to find the criminals responsible for creating and spreading the "Mytob" and "Zotob" worms. We resolved this case within just weeks of the attack, in large part because of the intelligence we received from our international and private sector partners.

We are also uniquely positioned to investigate counterintelligence threats in the cyber arena. Although I am limited in what I can discuss in an open forum, the FBI is partnered in the National Cyber Investigative Joint Task Force with elements of the Intelligence Community to investigate and respond to counterintelligence cyber threats.

### International Scope and Operations

In today's "flat world," our role cannot be limited to the domestic front. Just as there are no borders for crime and terrorism, there can be no borders for justice and the rule of law.

To respond to this new threat landscape, the FBI must create new partnerships and solidify old friendships with our counterparts around the world. Twenty years ago, the idea of regularly communicating with our law enforcement and intelligence counterparts around the world was as foreign as the Internet or the mobile phone. Today, advances in technology, travel, and communication have broken down walls between countries, continents, and individuals.

To that end, we have strengthened our relationships with our international law enforcement partners; we have expanded our global reach. The FBI now has Legal Attaché offices – called Legats – in more than 70 cities around the world, providing coverage for more than 200 countries.

These Legats are the FBI's first responders on the global front, from assisting our British counterparts in the London bombings to finding the man responsible for the attempted assassination of President Bush in Tbilisi, Georgia. We train together; we work hand-in-hand on multinational task forces and investigations. We have assisted counterterrorism investigations from Saudi Arabia to Spain, and from Britain to Bali.

Together we are identifying people and groups that provide financial support to terrorists. We are collaborating closely with our counterparts in Russia, Eastern Europe, and Asia to combat global nuclear terrorism. We are working with the Italian National Police and the Hungarian National Police to investigate organized criminal syndicates that continue to immigrate to the United States. We are working with our foreign counterparts to cut off the proliferation of child pornography on the Internet. These international partnerships are vital to our collective security.

### National Security Letters and the Office of Integrity and Compliance

In response to the Inspector General's report dated March 9, 2007, concerning the FBI's use of National Security Letters (NSLs), and an internal audit conducted by the FBI, the Bureau is in the process of implementing numerous reforms. These reforms will ensure that we comply fully with both the letter and the spirit of the authorities entrusted to us.

We are conducting audits to identify and rectify errors in our use of NSLs. We are streamlining the approval process to include review of all NSL requests by FBI attorneys. We are training agents and supervisors how and when to use NSLs.

9

With regard to the collection of data, investigators must request specific information and justify the need for such information before the NSL is sent. In addition, all evidence received from an NSL must be reviewed before it is included in the FBI's databases, to ensure that only the information requested is retained. Any irrelevant data will be isolated from other data and may be returned or destroyed. Further, the use of so-called "exigent letters" is no longer permitted. New guidelines provide a clear process to be followed in cases of emergency. The FBI has also worked closely with the privacy and civil liberties officers of the Department of Justice and the Office of the Director of National Intelligence to insure that policies for retention of information obtained through NSLs are appropriate to protect privacy and civil liberties.

As part of a significant national security oversight and compliance effort, we are working with the Department of Justice as it stands up a dedicated Oversight Section within the National Security Division. This section will be comprised of attorneys and staff members specifically dedicated to ensuring that the Department of Justice fulfills its national security oversight responsibilities, to include all aspects of the FBI's national security program and its use of national security tools. The Department will exercise this oversight through a regular process of conducting National Security Reviews of FBI field offices and Headquarters national security units. These reviews are not limited to areas where shortcomings have been identified; instead, they are intended to enhance compliance across the national security investigative spectrum.

Finally, within the FBI itself, we have proposed establishment of the Office of Integrity and Compliance (OIC), which will soon be submitted to Congress and the Office of Management and Budget for their concurrence. After the Inspector General's audit of the FBI's use of NSLs brought to our attention an unacceptably high rate of error, we took a hard look at the causes. While we had training for the use of NSLs in place, we had no built-in, effective way to track compliance with those requirements.

While many large corporations have compliance divisions, few, if any, government agencies have department-wide programs to internally monitor compliance. Given the complex nature of the FBI's mission, as well as the number of rules, guidelines, and laws to which we are subject, it is time to start such a program. In developing this proposal, we have welcomed the input of the Privacy and Civil Liberties Oversight Board, external privacy and civil liberties groups, as well as Congress.

The OIC will develop, implement, and oversee a program that ensures there are processes and programs in place that promote FBI compliance with both the letter and the spirit of all applicable laws, regulations, rules, and policies. Through this program, we will cultivate an environment committed to these principles and will assist FBI management at all levels to maintain a culture where ethics and compliance are paramount considerations in decision making. The OIC will be headed by an Assistant Director who will report directly to the FBI's Deputy Director, providing direct access to the top decision makers within the FBI. The OIC will not duplicate the work of the Inspections Division, but will identify areas of risk so that we can mitigate the risk.

These comprehensive oversight and compliance programs will ensure that national security investigations are conducted in a manner consistent with our laws, regulations, and policies, including those designed to protect the privacy interests and civil liberties of American citizens. The FBI will do all that it can to uphold our core value of integrity in order to maintain public trust and confidence.

### Information Technology

In recent years, we have made vast improvements to the FBI's outdated information technology systems. We have installed thousands of state-of-the-art computers and secure global networks. We have developed sophisticated databases and search engines, many of which we share with our federal, state, local and tribal counterparts.

We are also in the process of implementing Sentinel, our fully automated, web-based case management system. The Sentinel system, when completed, will help the FBI manage information beyond the case focus of existing systems, and will provide enhanced information sharing, search, and analysis capabilities. Sentinel also will facilitate information sharing with members of the law enforcement and intelligence communities.

In June, we implemented the first phase of Sentinel. Phase 1 provides a user-friendly, web-based interface to access information that is housed in the FBI's Automated Case Support (ACS) system. Information is pushed to users, and documents are made available through hyperlinks. Phase 1 features a Personal Workbox, which summarizes a user's cases and leads, putting more information at their fingertips. It also provides a Squad Workbox, which allows supervisors to better manage their resources and assign leads with the click of a mouse.

We are currently working with Lockheed Martin, the prime contractor, to plan the development and deployment of the next set of Sentinel capabilities. With Phase 1, we built the foundation for the entire enterprise. Phase 2 will add additional capabilities, such as electronic forms and electronic workflow, through which employees can send documents to supervisors for review, comment, and approval. Phase 2 is scheduled for incremental development and deployment, providing capabilities to users in a more timely fashion. The four-phase Sentinel project is scheduled to conclude in 2011, as originally planned.

### Future of the FBI

The FBI was created nearly 100 years ago to address crime crossing state boundaries. Today, we combat crime and terrorism that cross state boundaries and national borders with the click of a mouse. The world is smaller and more interconnected than it ever has been. Unfortunately, criminals and terrorists are also more interconnected. The threats we face are global in nature, and the technology is moving more quickly than we could have foreseen just 10 years ago.

11

To defeat these emerging threats, we must continue to expand our global reach. We must continue to share information with our federal, state, local, tribal, and international partners. We must continue to update our technology to keep pace with criminals and terrorists the world over. We must continue to work together to dismantle criminal enterprises and terrorist cells, to put away child predators and violent gang members, and to disrupt criminals and terrorists before they strike. Working together is not just the **best** option; it is the **only** option.

Today, we are building on our legacy and our capabilities as we focus on our top priority: preventing another terrorist attack. It is indeed a time of change in the FBI, but our values can never change. We must continue to protect the security of our nation while upholding the civil rights guaranteed by the Constitution to every citizen.

When I speak to Special Agents upon their graduation from the FBI Academy, I remind each one that it is not enough to prevent foreign countries from stealing our secrets – we must prevent that from happening while still upholding the rule of law. It is not enough to stop the terrorist – we must stop him while maintaining his civil liberties. It is not enough to catch the criminal – we must catch him while respecting his civil rights. The rule of law, civil liberties, civil rights – these are not our burdens; they are what make us Americans.

* * *

Mr. Chairman, I would like to conclude by thanking this Committee and you for your service and your support. Many of the accomplishments we have realized during the past six years are in part due to your efforts. From addressing the growing gang problem to creating additional Legal Attaché offices around the world, to compensating our personnel, and, most importantly, to protecting the American people from terrorist attack, you have supported our efforts and our budget requests.

On behalf of the men and women of the FBI, I look forward to working with you in the years to come as we continue to develop the capabilities we need to defeat the threats of the future.