Exhibit 15

PANEL ONE OF A HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: FISA FOR THE 21ST CENTURY CHAIRED BY: SENATOR ARLEN SPECTER (R-PA) WITNESSES: GENERAL MICHAEL HAYDEN, DIRECTOR, CENTRAL INTELLIGENCE AGENCY; LT. GENERAL KEITH ALEXANDER, DIRECTOR, NATIONAL SECURITY AGENCY; AND STEVEN BRADBURY, ACTING ASSISTANT ATTORNEY GENERAL, OFFICE OF LEGAL COUNSEL, DEPARTMENT OF JUSTICE LOCATION: 226 DIRKSEN SENATE OFFICE BUILDING, WASHINGTON, D.C. TIME: 9:00 A.M. EDT DATE: WEDNESDAY, JULY 26, 2006

---

SEN. SPECTER:  (Sounds gavel.)  Good morning, ladies and gentlemen. The Judiciary Committee will now proceed with our hearing on the proposed legislation which would submit the surveillance program for constitutional review to the Foreign Intelligence Surveillance Court.

Wiretapping has been going on in the United States involving U.S. citizens some four and a half years without having the traditional   judicial approval.  Since it was publicly disclosed in mid-December, the Judiciary Committee has held five hearings and has considered a variety of proposed bills, leading to the legislation which we have before us today, which has been meticulously negotiated and has the agreement of the president to refer the surveillance program to the FISA Court, if the legislation is approved.  There may be modifications, subject to the agreement of the president.

The Foreign Intelligence Surveillance Court is well-suited to handle this review because of its expertise in the field and because of its secrecy, with insistence by the White House that there not be public disclosures.

Moving to the substance of the bill, I first want to take up two items where critics do not face reality on these two major points. First, there is a contention that the bill is defective because it does not retain the Foreign Intelligence Surveillance Court as the exclusive place to determine wiretapping. The reality is that since the president has put his program into effect, the Foreign Intelligence Surveillance Act, administered by the Foreign Intelligence Surveillance Court, is in fact not the exclusive remedy. The president claims that he has inherent Article II power to conduct wiretapping aside from the court.

Three appellate courts appear to agree with that, but it depends upon what the program is.  The constitutional requirements are that there has to be a balancing of the value to security contrasted with the incursion into privacy, and that can only be determined by judicial review.  And in a context where the president is demonstrably unwilling to have the program subjected to public view, it would have to be determined by the FISA Court if it is to be ruled on constitutionally at all.

The second point where the critics are objecting, which I submit does not face the reality, is the contention that the proposed legislation expands the Article II power of the president of the United States.  A statute cannot do that.  The constitution is supreme.  If the president has the constitutional authority under Article II, that supersedes the statute, and a new statute may not add or diminish the president's constitutional power.

The legislation has received a considerable amount of commentary, a considerable amount of critical commentary, and candidly, I welcome the dialogue because I am personally convinced that when the legislation is fully understood and we -- faced with the reality of this surveillance going on, unchecked.

1

constitutionally in the absence of any better way to do it -- when this legislation is fully understood with those factors, there will be acceptance.

The commentary today in one of the major papers says that the legislation adds a provision, quote, "Nothing in this act shall be construed to limit the constitutional authority of the president to collect intelligence with respect to foreign powers and agents of foreign powers." Well, this bill doesn't add that. That provision is in the current Foreign Intelligence Surveillance Act. And it is there because it deals with embassies, foreign embassies, foreign residences of people of the United States representing foreign governments, and there has never been a requirement that there would have to be court approval to have wiretapping in that situation.

The commentary today says that the bill explicitly acknowledges an alternative source of power. Well, the bill doesn't. Article II power is what it is.

Now, I would have preferred to have had some other provisions, candidly. I would liked to have had the program mandatory so that the president would have to submit it to the FISA Court. But I could understand the president's refusal to do that in light of his being  unwilling to bind future presidents and make an institutional change in what powers the president has.

My goal is to solve the current problem. The president has made a firm commitment to me, later confirmed by his White House personnel publicly, a firm commitment -- may the record show that Mr. Steven Bradbury, who negotiated for the president, is nodding in the affirmative -- made a firm commitment to submit the program to the FISA Court.

Now, I would like to have a mandate, but this president is not going to give a mandate and yield to that kind of legislative authority. And even if the statute did provide a mandate, if a future president challenges it under Article II powers, Article II powers are what they are, and the statute could not bind a future president.

It really seems to boil down to me in many quarters that if the president agrees with it, there must be something wrong with it. There is a widespread sense that there is something amiss with presidential agreement. Well, this legislation was negotiated in a way that I have characterized as fierce, and when we come to Mr. Steven Bradbury, the acting assistant attorney general for the Office of Legal Counsel, we'll get into some of the details on that.

In light of the president's commitment, I think it is fair to say that this legislation is a breakthrough. Today's commentary refers to other bills which are pending; some by members of the Intelligence Committee who know the details of the program. Well, none of the bills does what this bill does. None of the bills reaches judicial review of the program.

We've had two recent decisions by United States District Courts. Last week, the chief judge of the District Court in San Francisco, Judge Walker, made a determination that a suit, Hepting versus AT&T, would go forward, but a close reading of that 72-page opinion shows it goes forward under very limited ways. And Judge Walker has put so many hurdles on state secrets that it is highly doubtful that that case will last much longer. Yesterday, a federal judge in

2

Chicago, Terkel versus AT&T, dismissed the case on grounds of state secrets. And when you read those cases, the obstacles are enormous.

If there is a sense to modify the provision in the legislation which gives exclusive jurisdiction to a FISA Court, that can be done. We wouldn't have the president's commitment, but the president talked about making modifications subject to his approval.

There are a number of changes which modernize the FISA Court, which we'll get into. I've talked longer than I customarily do, but I've done so because of the complexity of this issue and what, at least I think, is the lack of understanding of the legislation and its applicability.

We started a little early today because the prime minister of Iraq is scheduled to address a joint session at 11, and we may lose members by that time, and we also have a vote scheduled at 10:00. I'm pleased now to yield to the distinguished ranking member, Senator Leahy.

SEN. PATRICK LEAHY (D-VT): Well, I have -- thank you, Mr. Chairman. Thank you for convening this hearing, especially glad to welcome General Hayden, his first appearance before this committee since he assumed his new duties. I spoke with the general yesterday and told him how pleased I was to see the level of professionalism that he has brought to the agency and the appointments he's been -- made.

"Independence" and "competence" were the two watchwords that led me to believe that he'd serve well as the director of the CIA, and I said so at the time I voted for his confirmation. And again, we need some straight talk today in navigating this very difficult issue.

There are two sets of issues relating to the Foreign Intelligence Surveillance Act that are now before this committee. First, what is the extent of the administration's warrantless wiretapping in violation of FISA? And how should we in Congress react?

After seven months and four hearings, we remain largely in the dark about what the administration is doing and continues to do, because the administration has stonewalled this committee's bipartisan efforts at oversight.

But the answer is clear. We must demand and we must ensure that this administration and the next administration, which will follow in two and a half years, actually follows the law.

Does the FISA law itself need to be revised? It's been amended six times, at this administration's request, in the five years since 9/11. But even though we've done that six times at the administration's request, they now say it needs modernization. And that modernization is the focus of today's hearing. The Democratic members of this committee asked for such a hearing, and I compliment the chairman in having it.

But the issues of compliance and modernization are completely separate issues. Whether or not FISA needed fine-tuning is a legitimate consideration, but FISA's possible imperfections provide no excuse for the administration's flouting of existing law.

3.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

By the same token, the Bush-Cheney administration's outrageous disregard for existing law does not mean that we in Congress should shrink -- shirk our responsibility to improve the law if there's need to. So I'm ready to consider Section 9 on its merits, but I have serious grounds for skepticism.

If Section 9 revisions are, as claimed, needed to bring FISA up to date with 21st technology, why haven't we heard about them before now? I said we've amended it five times at the administration's request. In July 2002, former General -- Attorney General Ashcroft testified that the 2001 Patriot Act had modernized our surveillance tools to keep pace with technological changes. And in March of this year, in the reauthorization of the Patriot Act, we made all the amendments to FISA that the administration requested. In fact, the president then took credit for updating the law.

So if FISA as amended is too quaint to meet the challenge of the 21st century, then the Bush-Cheney administration owes the Congress and the American people an explanation of why they didn't speak up before now.

Now, to the extent I've been able to figure out the highly complex language of Section 9, it seems to me to permit vast new amounts of warrantless surveillance to telephone calls involving American citizens. It would appear to authorize unrestricted, unregulated government surveillance of American citizens talking to relatives, colleagues, trading partners overseas, without any showing that that's necessary to protect our national security.

But to the extent that the administration's witnesses can explain to us today, in practical and concrete terms, why these make sense, I'll listen. So I have some questions about it.

But let me turn to the rest of the bill. It's been called a compromise. Well, this Vermonter does not believe that we should ever compromise on requiring the executive to submit to the rule of law, no matter who is president.

And I'm sad to say that I see bill less as a compromise and more as a concession. It would abandon our oversight role, confine oversight to a single judge, on a secret court, whose decision on the one program the Bush-Cheney administration has agreed to submit for review is appealable only by the Bush-Cheney administration.

And even that oversight would not be required by the bill itself.

I know the chairman got the best deal he could. The president, the vice president, their legions, can be hard-headed rather than flexible bargainers. I make these observations respectfully, but also to express my reluctance to compromise FISA and the minimal protections, the minimal protections it provides for Americans. Section 8 would repeal FISA's exclusivity provision and affirmatively embrace the president's claim of sweeping inherent authority. The result is to make FISA optional. The president can use it or not use it, at his option.

So it's astounding that we're considering this proposal. FISA was never intended to give presidents choices; it was enacted to prevent abuses of executive power and protect Americans' liberties by prohibiting the government from spying on its citizens without court approval. The Bush-Cheney administration has chosen to simply ignore it. And I am wondering now if we are

4

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

going to reward its flouting of the law by saying, in effect, "Oh, please excuse us for passing that law; we didn't mean to; we didn't expect you to follow it; we'll never do that again." That's like arresting a burglar with three bags of cash and saying, "Well, leave one bag here and we'll all be okay with that."

Defenders of the bill have argued that Section 8 is meaningless because the president has whatever constitutional authority the Constitution says and Congress cannot limit that authority through legislation. If the best we can say on behalf of proposed legislation is it's a waste of ink, then we shouldn't be enacting it. But I don't believe that.

When it goes to the secret FISA Court, the administration will adhere to the position that Section 8 is meaningless, and the administration is insisting on that for a reason. The Supreme Court recently explained in its Hamdan decision, the constitutional scope of presidential power depends on the legislation Congress has enacted, even in times of war. The Constitution grants Congress the express power to set rules for the military and express power to make all laws which shall be necessary and proper for carrying into execution all the powers vested by the Constitution in the federal government, including those of the president. In the absence of congressional action, the president may well have some measure of unilateral authority. That is what the president's -- the administration always cites -- (suggests ?). But once Congress acts, as it did in FISA, the president's no longer free to do whatever he wants to do. As the court said in Hamdan, whether or not the president has independent power absent congressional authorization, Congress, of course, may place limitation on those powers. That was the whole point of FISA, to limit the president's power to spy on ordinary Americans by making FISA the sole means by which foreign intelligence wiretaps may be conducted in the United States.

Waiving FISA's exclusivity provision would not be meaningless; it would completely gut FISA. It would give the president a blank check to carry out warrantless wiretapping whenever he chooses or whenever the next president chooses. I could not in good conscience acquiesce in such a sweeping signing away of Americans' liberties in any circumstances, and I'm certainly not going to do it at the behest of an administration that has continuously broken the law.

Thank you, Mr. Chairman. I'll put my full statement in the record.

SEN. SPECTER: Thank you, Senator Leahy.

Would any other members like to make an opening statement? (No response.)

Then we'll turn to our first witness, the distinguished director of the Central Intelligence Agency, General Michael Hayden. General Hayden comes to this position with a very distinguished record. He received his bachelor's degree from Duquesne University, 1967, master's also from Duquesne, in modern American history. We have not only an intelligence officer but a renaissance man with us here today. Since, of course, worked in the Armed Forces Staff College, the Air War College, Defense Intelligence School. He's had ranking positions, which we'll include in the record. He's had many awards, honors, which we will include in the record, and one we will note specifically is that he's a Pennsylvanian from Pittsburgh.

That is too important just to be included in the record.

5

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MR. HAYDEN: Thank you, Senator.

SEN. SPECTER: We're honored, General Hayden, that you would testify before this committee on your first occasion since becoming director of the Central Intelligence Agency, and we look forward to your testimony.

MR. HAYDEN: Well, thank you, Mr. Chairman, Senator Leahy. Thanks for the opportunity to speak before your committee today.

The work that you and we have before us is truly important. How do we best balance our security and our liberty and continue the pursuit of valuable foreign intelligence?

Let me congratulate the committee for taking on the task of examining and, more appropriate, amending the Foreign Intelligence Surveillance Act.

This task of balancing security and liberty is one that those of us in the intelligence community take very seriously, and, frankly, it's one to which we turn our attention every day.

If I can be permitted one anecdote -- within days of the 9/11 attacks, I actually addressed the NSA workforce -- at the time, I was the director of that agency. It was a short video. I was talking to an empty room, but the video was beamed to our workforce throughout Fort Meade and globally, and most of what I said was what you would normally expect at a moment like that. I tried to inspire, our work was important, the nation was relying on us. I tried to comfort, look on the bright side -- a quarter billion Americans wish they had your job today. And I ended the talk by trying to give some perspective. I said all free peoples have had to balance the demands of liberty with the demands of security, and historically, we Americans had planted our flag well down that spectrum towards liberty. And so I ended my talk by simply saying here was our challenge. "We at NSA, we're going to keep America free," I said, "by making Americans feel safe again."

Now, that was not an easy challenge. The Joint Inquiry Commission, which I think most of you know was comprised of the House and Senate Intelligence Committees, would later summarize our shortcomings in the months and years leading up to the September 11th attacks. The commission -- sometimes harshly -- criticized our ability to link things happening in the United States with things that were happening elsewhere.

Let me just quote from some of the JIC -- the Joint Inquiry Commission's systemic findings, and here I'm quoting: "NSA's cautious approach to any collection of intelligence relating to activities in the United States" -- and again, I'm quoting -- "there were also gaps in NSA's coverage of foreign communications and FBI's coverage of domestic communications." And again, NSA did not want to be perceived as targeting individuals in the United States.

And finally -- and here, the commission was talking about one-end U.S. conversations; by that, I mean conversations in which one of the communicants was in the United States of America -- the commission said there was insufficient focus on what many would have thought was among the most critically important kinds of terrorist-related communications, at least in terms of protecting the homeland.

6

UNCLASSIFIED//FOR OFFICIAL USE ONLY

Now, for NSA, the challenge is very acute. NSA intercepts communications, and it does so for only one purpose -- to protect America, to protect the lives, the liberties and the well-being of the citizens of the United States from those who would do us harm. And by the late 1990s, that had become increasingly difficult. The explosion of modern communications in terms of volume, variety and velocity threatened to overwhelm as an agency.

The September 11th attacks exposed an even more critical and fundamental fault line. The laws of the United States do and should distinguish between the information space that is America and the rest of the planet. The laws of the United States do and should distinguish between the information space that is America and the rest of the planet. But modern telecommunications do not so cleanly respect that geographic distinction. All of us exist on a unitary, integrated, global telecommunications grid in which geography is an increasingly irrelevant factor.

What does place mean when one is traversing the Internet? There are no Area Codes on the World Wide Web.

And if modern telecommunications muted the distinctions of geography, our enemy seemed to want to end the distinction altogether. After all, he killed 3,000 of our countrymen from within the homeland. In terms of both technology and the character of our enemy, "in America" and "of America" were no longer synonymous.

I testified about this challenge in open session to the House Intel Committee in April of 2000. At the time, I used a metaphor, an example, and I created some looks of disbelief when I said that if Osama bin Laden crossed the bridge from Niagara Falls, Ontario, to Niagara Falls, New York, there were provisions of U.S. law that would kick in and offer him some protections and would actually affect how NSA could not cover him.

Now, at the time, that was just a stark hypothetical. Seventeen months later, after the attacks, that was the reality we were facing.

The legal regime under which NSA was operating, the Foreign Intelligence Surveillance Act, had been crafted to protect American liberty and American security. But the revolution in telecommunications technology has extended the actual impact of the FISA regime far beyond what Congress could ever have anticipated in 1978. And frankly, I don't think anyone can make the claim that the FISA statute was designed to deal with a 9/11 or to deal with a lethal enemy who likely already had armed combatants inside the United States.

Because of the wording of the statute, the government looks to four factors in assessing whether or not a court order is required before NSA can lawfully intercept communication. And again, you won't find these articulated as such in the statute, but the impact of the statute is that we look to four things so that we can decide whether or not a court order is needed before NSA does what it does routinely. And those factors are: Who's the target? Where is the target? How do we intercept the communication? And where do we intercept the communication?

And frankly, Mr. Chairman, the bill before the committee today effectively re-examines the relevance of each of those factors and examines the criteria we now want to use going forward to use each of them.

7

Let me just talk about each of them for a moment. Who is the target? The FISA regime from 1978 onward focused on specific court orders against individual targets, individually justified and individually documented. That was well suited to a stable foreign entity on which we wanted to focus, for extended periods of time, for foreign intelligence purposes. It is not as well suited to provide the agility to detect and prevent attacks against the homeland.

Looked at another way, FISA's careful individualized processes exact little cost when our goal is long-term surveillance and exhaustive intelligence coverage against a known and recognizable agent of a foreign power. The costs are different when our objective is to detect and prevent attacks. The costs are different when we are in hot pursuit of communications entering or leaving the United States involving someone we believe to be associated with al Qaeda.

Now, in this regard, extending the period for emergency FISA to seven days and allowing the attorney general to delegate his authority to grant emergency orders is very welcome, and I believe very appropriate. So, first of all, who is the target?

Secondly, where is the target? As I said earlier, geography is becoming less relevant. In the age of the Internet and a global communications grid that routes communications by the cheapest available band width available each nanosecond, should our statutes presume that all communications that touch America be equally protected?

As the chairman noted earlier this week, we do not limit our liberties by exempting from FISA's jurisdiction communications between two persons overseas that happen to get routed through U.S. facilities. Frankly, I think our limited resources should focus on protecting U.S. persons, not those entities who might get covered as a result of technological changes that have extended the impact and then the protection of FISA far beyond what its drafters could ever have intended.

I know that Senator DeWine, among others, has been concerned about the allocation of these resources and FISA backlogs. And frankly, now, as director of CIA, who must provide the predicate for FISA orders, I share his concerns in allocating resources and hope the legislation will help us properly focus resources on protecting the legitimate privacy rights of U.S. persons.

Now, beyond who and where is the target, there's the question of how do we intercept the communication. For reasons that seemed sound at the time of enactment, the current statute under which we operate makes a distinction between collection on a wire and collection out of the air.

Now, when the law was passed, almost all local calls were on a wire and almost all long-haul communications were in the air. Now, in an age of cell phones and fiber optic cables, that is totally reversed, with powerful and unintended consequences for how NSA can lawfully acquire a signal.

Legislators in 1978 should not have been expected to predict the future of global telecommunications, and neither should you. My view is that the statute we develop should be technology-neutral.

And then, finally, beyond how do we intercept the communication, there's the question of where. Where do we intercept it? A single

8

communication can transit the world even if the communicants are only a few miles apart. That happens routinely. And in that transit, NSA may have multiple opportunities to intercept it as it moves and as it changes medias.

As long as a communication is otherwise lawfully targeted, I believe we should be indifferent to where the intercept is achieved. Signals intelligence is a difficult art and science, particularly in today's telecommunications universe. Intercept of a particular communication, one that would help protect the homeland, for example, is always probabilistic. It is never deterministic. No coverage is guaranteed. We simply need to be able to use all the technology tools we have.

In that light, as I said earlier, there are no communications more important to the safety of the homeland than those affiliated with al Qaeda, with one end of the communication in the United States. And so why should our laws make it more difficult to target the al Qaeda communications that are most important to us, those entering or leaving this country?

Because of the nature of global telecommunications, we are playing with a tremendous home-field advantage, and we need to exploit that edge. We also need to protect that edge, and we need to protect those who provide it to us.

The proposed legislative language that requires compulsory compliance from carriers is a very important step in this regard. After 9/11, patriotic Americans from all walks of life assisted us, the intelligence community, in ensuring that we would not have another attack on our soil. Even prior to 9/11, we received critical assistance across the intelligence community from private entities.

As director of NSA, as deputy DNI, now as director of CIA, I understand that government cannot do everything. At times we need assistance from outside government.

Whatever legal differences and debates may occur about separations of power, Article II and other critical and very important issues, those people who help to protect America should not suffer as a part of this debate. I would urge the committee to recognize the importance of those efforts to these Americans and provide appropriate protections.

One final and very important point. Many of the steps contained in the proposed legislation will address the issue raised by the Congressional Joint Inquiry Commission -- back again -- one-end U.S. conversations, communications that that commission characterized as, again quoting, "among the most critically important kinds of terrorist-related communications." That means my friend here, General Alexander and his agency, NSA, will bump up against information to, from or about U.S. persons. Let me stress that NSA already routinely deals with this challenge and knows how to handle it while protecting U.S. privacy.

I was very happy to note that the draft bill contains quite a bit of language about minimization and minimization procedures. Minimization is the process that NSA uses to protect U.S. privacy, to protect U.S. identities. The same rules of minimization that NSA now uses globally, rules that are approved by the attorney general and thoroughly briefed to Congress, will be used under any activities that are authorized by the pending legislation.

9

Let me close by saying that we have a great opportunity here. We can meet the original intent of the FISA Act to protect our liberty and our security by making the legislation relevant to both the technologies and the enemies we face.

Thank you very much. And I know my colleagues have opening statements, but after them I'd be very happy to take questions.

SEN. SPECTER: Thank you very much, General Hayden.

We now turn to General Alexander, who is now the director of the National Security Agency. His bachelor's degree is from West Point, master of science in business administration from Boston University, master's degree in physics from the Naval Postgraduate School, another master's degree in national security strategy; has had a distinguished array of assignments and awards, and they will all be made a part of the record.

We appreciate your service, General Alexander. We appreciate your coming in today. And the floor is yours.

GEN. ALEXANDER: Thank you, Mr. Chairman. Good morning, Mr. Chairman, Senator Leahy and members of the committee.

Sir, I have submitted a formal statement for the record. I'll provide a brief summary of that statement at this time.

SEN. SPECTER: Your full statement will be made a part of the record.

GEN. ALEXANDER: Thank you, sir.

I am pleased to be here today to provide testimony in support of the National Security Surveillance Act of 2006, which would amend the Foreign Intelligence Surveillance Act of 1978. The changes proposed in the bill are, I believe, intended to recapture the original congressional intent of the statute, ensuring the rights of the American people, our original congressional intent, and providing for our nation's security.

As General Hayden indicated in his remarks, this is an important conversation not only for the intelligence community, that will be called on to abide by the statute, but for all the American people.

Advances in technology have had some unanticipated consequences in how the National Security Agency carries out its duties. While some of the specifics that support my testimony and support passage of this bill cannot be discussed in open session, and while I would be happy to elaborate at any time, sir, the full content of that, let me succinctly say that communications technologies has evolved in the 28 years since the bill was established in 1978 into (days ?), as General Hayden says, that were unforeseen by the folks who built that bill.

The stunning technological changes in the communications environment that we have witnessed since the enactment of FISA have brought within the scope of the statute communications that we believe the 1978 Congress did not intend to be covered.

10

UNCLASSIFIED//FOR OFFICIAL USE ONLY

A tremendous communications infrastructure has emerged in the United States. And both our own citizens and foreign persons outside the country use its awesome capabilities. The drafters of the FISA did not and could not have expected to anticipate this. The result, though, as General Hayden's testimony suggested, is that the U.S. government is often required by the terms of the statute to obtain a court order to conduct surveillance of a target of a foreign individual operating overseas but using that infrastructure.

We believe the United States should be able to acquire communications of foreign intelligence targets overseas without a court order and that it ought not to matter whether we do so from the United States or elsewhere or how a particular communication makes its way from point A to point B.

But because of the way the statute defines electronic surveillance, we frequently fail to make the most of one of the greatest advantages we have over our foreign adversaries -- ready access to their communications present on a vast communications infrastructure located in our own nation.

We believe that the FISA of the future must contain a few critical provisions if the government is to be successful in gathering intelligence about its adversaries.

First, the statute needs to be technology-neutral. Determinations about whether a court order is required should be based on considerations about the target of the surveillance rather than the particular means of communication or the location from which the surveillance is being conducted.

Second, we must retain a means to compel communications companies to provide properly authorized assistance to the government, and we must insulate those companies from liability when they do so.

Third, the statute's definition of "agent of a foreign power" should be sufficiently broad to include visitors to the United States who may possess foreign intelligence information, even though they are not working on behalf of any foreign government. The Senate bill that we are looking at would effect the required changes.

In closing, let me again express my thanks to the entire committee for taking up this difficult but crucial issue -- balancing the security of this country and the civil liberties of our people. And thank you for allowing those of us who will implement that balance the opportunity to participate in this hearing.

SEN. SPECTER: Thank you very much, General Alexander.

We now turn to Steven Bradbury, acting assistant attorney general, Office of Legal Counsel. He had been the principal deputy assistant attorney general of the same department. Bachelor's degree from Stanford. A law degree from Michigan, magna cum laude. Has had a distinguished career in the private practice and was a law clerk to Judge Buckley of the D.C. Court of Appeals.

At the outset, Mr. Bradbury, I want to publicly acknowledge your legal abilities and your courtesies in working through the drafting of the legislation which we are considering today, jointly with Michael    O'Neill, the chief counsel and staff director of the Judiciary Committee. We're pleased to have you here today, and we look forward to your testimony.

11

MR. BRADBURY: Thank you, Mr. Chairman. It's been a pleasure to work with you and Mr. O'Neill. And it's a pleasure to be back before the committee today.

Mr. Chairman, Senator Leahy, Senator Kennedy, members of the committee, foreign intelligence surveillance is a critical tool in our common effort to prevent another catastrophic attack on the United States. The enemies we face operate in obscurity through secret cells that communicate globally while plotting to carry out surprise attacks from within our communities.

We all recognize the fundamental challenge the war on terror presents to a free society: to detect and prevent the next 9/11, while steadfastly safeguarding the liberties we cherish. Maintaining the constitutional balance between security and liberty must be the pole star in any legislative effort to reframe the FISA statute.

The past 28 years since the enactment of FISA have seen perhaps the greatest transformation in modes of communication in the history of the world. Innovations in communications technology have fundamentally transformed how our enemies communicate and, therefore, how they plot and plan their next attacks. It is more than a little ironic that al Qaeda is so expert in exploiting the communications tools of the Internet Age to advance extremist goals of intolerance and tyranny that are more suited to the 12th century than the 21st.

Meanwhile, the United States confronts the threat of al Qaeda with a legal regime geared more toward traditional case-by-case investigations. The limitations of the traditional FISA process and the acute need to establish an early warning system to detect and prevent further al Qaeda attacks in the wake of 9/11 led the president to authorize the terrorist surveillance program.

As he has described, that program, which has been the subject of prior hearings before this committee, involves the NSA's monitoring of international communications into and out of the United States where there are reasonable grounds to believe that at least one party to the communication is a member or agent of al Qaeda or an affiliated terrorist organization.

This committee is currently considering several pieces of legislation addressing FISA and the terrorist surveillance program. I want to thank the chairman again for his leadership on these issues and for his hard work in crafting a comprehensive approach that will help us fight terrorists more effectively and gather critical foreign intelligence more efficiently.

I also wish to thank Senator DeWine, who has also introduced a bill cosponsored by Senator Graham, which represents a very positive approach to the issues presented by the terrorist surveillance program.

The administration urges the committee to approve both of these bills promptly and we look forward to working with the Congress as a whole as this legislation moves ahead. And with the intel committees, in particular, where technical changes can be appropriately discussed to ensure that FISA, as amended, will provide the nation with the tools it needs to confront our adversaries.

Fundamentally, Chairman Specter's legislation recognizes that in times of national emergency and armed conflict involving and an exigent terrorist

12

UNCLASSIFIED//FOR OFFICIAL USE ONLY

threat, the president may need to act with agility and dispatch to protect the country by putting in place a program of surveillance targeted at the terrorists and designed to detect and prevent the next attack.

At the same time, however, Chairman Specter's legislation will provide an important new role for the judicial branch in the review of such presidential programs. In addition to oversight by the intelligence committees of the Congress, his bill would add a new title to FISA, under which the FISA Court, subject to certain requirements, would have jurisdiction to issue an order approving a program of terrorist surveillance authorized by the president. This legislation would create for the first time an innovative procedure whereby the attorney general will be able to bring such a surveillance program promptly to the FISA Court for a judicial determination that it is constitutional and reasonable in compliance with the requirements of the Fourth Amendment.

The FISA Court would also be authorized to review the particulars of the program and the minimization procedures in place to help ensure that the surveillance is focused on the terrorist threat and that information collected about U.S. persons is properly minimized. The availability of these procedures, and the ability of the FISA Court to issue an order approving a program of electronic surveillance, will strongly encourage presidents in the future to bring such programs under judicial supervision.

As Chairman Specter has announced, in response to this proposal and the other positive innovations contained in the chairman's bill, the president has pledged to the chairman that he will submit his terrorist surveillance program to the FISA Court for approval if the chairman's legislation were enacted in its current form or with further amendments sought by the administration.

Chairman Specter's legislation would also protect sensitive national security programs from the risk of disclosure and uneven treatment in the various district courts where litigation may be brought. Under his bill, the United States, acting through the attorney general, could require that litigation matters putting in issue the legality of alleged communications intelligence activities of the United States, be transferred to the FISA court of review, subject to the preservation of all litigation privileges. The court of review would have jurisdiction to make authoritative rulings as to standing and legality under procedures that would ensure protection of sensitive national security information and promote uniformity in the law.

In addition to the innovations I have described, Chairman Specter's legislation includes several important reforms to update FISA for the 21st century. These changes are designed to account for the fundamental changes in technology that have occurred since FISA's enactment in 1978 and to make FISA more effective and more useful in addressing the foreign intelligence needs of the United States and protecting the nation from the unique threats of international terrorism.

Mr. Chairman, thank you for the opportunity to appear today to discuss this important issue. We look forward to working with Congress on this critical matter. And today we urge the committee to give speedy approval to the bills introduced by Chairman Specter and Senator DeWine. Thank you.

SEN. SPECTER: Thank you very much, Mr. Bradbury.

13

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

After consultation with Senator Leahy, we're going to set rounds of seven minutes for members and we'll proceed to that now.

General Alexander, there would be much more comfort by everyone, including myself, if we could have individualized warrants so that the FISA Court would function as it does now: an application is made, there's a showing of what the government contends is probably cause and there's an individualized determination on granting the warrant.

Now it has been reported that the program in operation is so massive that that cannot be accommodated. If any of this requires going into closed session, gentlemen, we're prepared to do that. But to the extent you can comment publicly, I think there is great merit in it so that there is an understanding of the program to a maximum extent consistent with national security.

So my question to you, General Alexander: Would it be possible with additional resources to structure a program, to get what information you have, are getting here, on an individualized basis?

MR. ALEXANDER: Sir, let me answer that this way -- and I would ask Steve to make sure I say it exactly correct -- but as General Hayden, Steve and I have laid out for you, if you take away the foreign portion of that, where the (true ?) bill asks us to get a warrant on a U.S. person in the United States, if you take out foreign, overseas, other targets that we're talking about, which your bill does do, you're now back to a manageable level. And getting a court order for everyone in the United States is doable and one that we think should be done in that regard. And it's in the statute.

So the real issue is, intermixed into the domestic is the foreign. Your bill separates that and makes it manageable.

SEN. SPECTER: Let me focus the question more pointedly in light of what you just said.

Is it possible to have individualized warrants where your focus is on a foreign speaker, but your invasion, necessarily, involves a citizen in the United States? Would it be practical to have individualized warrants and still carry out the program which you have now?

MR. ALEXANDER: There is the technology part of the thing that we each discussed briefly, which would --

MS.    :  (Off mike.)

MR. ALEXANDER: Yes, ma'am.

This is the part that we each discussed briefly in that if overseas we're collecting, going after a foreign target, no matter who that person is talking to, we are authorized under executive order to collect that communications. That's the "where." If we collect it here and it happens to go to a U.S. person, we have to stop and get a court order. So the predominate number of our targets are foreign targets. And the question is, if we make every foreign application, because we're using the infrastructure in the United States, an application that we have to do here in the United States, you have

14

cut out the most important advantage that we have -- our communications infrastructure. That's it.

SEN. SPECTER: General Hayden, let me move to another question with you.

You said that there has been some help/assistance in not having another attack on our soil.

One of the key factors is, in evaluating the intrusion on privacy, how valuable is the information which is obtained? Can you amplify in open sessions whether information obtained has prevented another attack, or to what extent has that information been of significant value for national security in weighing the balancing act of invasion of privacy?

MR. HAYDEN: Yes, sir, Senator. In open session I'll have to speak in generalities, but I can see with great confidence in all three positions, CIA, DNI and particularly NSA, in broad terms the support we get from the broader community of America in all its shapes and forms has been absolutely invaluable in helping, in this case, NSA do its mission.

SEN. SPECTER: Can you say whether it has ever prevented another attack?

MR. HAYDEN: I can say that the program that we're talking about here, the terrorist surveillance program, has been used to disrupt and degrade enemy activity, to break up cells. Can I claim that, you know, there was a sniper on the roof with a (run ?) in the chamber and we intercepted at that point? No. But we've gotten information we would not otherwise have had and it has enabled us to disrupt, clear al Qaeda attempts to do harm inside the United States.

SEN. SPECTER: General Hayden, moving to another issue: When you have the information going to the FISA Court with its secrecy provisions, contrast that with going, say, to a district court, say, in San Francisco. With respect to the complexity of the issues, is the explanation of the nature of the program -- and I'm open to having other courts besides the FISA court. I'm not in concrete on that. In order to get the president's signature to a modified bill we have to have his agreement. But would we have the negotiations? We talked about changes to the bill. The president wants some improvements in the bill. They'd have to be negotiated to his satisfaction. And in wrestling with this issue of consolidation in the FISA Court, we have done so because we know that the FISA Court has a background in the program, has an understanding of the national security risks, knows the details of the program. And we're considering whether it ought to be in other courts. There's an advantage in having other judges and not necessarily having it in a secret court. We have to work through the question as to a public disclosure. When we had an opinion of the FISA appellate court, it was made public, and I think the decision with the FISA Court would reach the public one way or another. But contrast, if you will -- and my red light is not quite on yet -- contrast, if you will, we're taking the cases to a district court like San Francisco contrasted with the FISA Court.

MR. HAYDEN: Mr. Chairman, I'm personally delighted that these issues would be placed in front of a court that, number one, is most knowledgeable about this whole universe of activity and understands, I think in very clear terms, what NSA does as a matter of routine and understands the care with which

15

the agency guards privacy and can make an accurate assessment of the issue that is placed in front of the court. And I would then add that having it in front of a single court, I think actually helps the cause of justice so that there is a unitary national view as to what constitutes the correct balance, the correct line, as Steve has mentioned earlier, between security and liberty.

     SEN. SPECTER:  Senator Leahy.

     SEN. LEAHY:  Thank you, Mr. Chairman.

     General Alexander, in my opening statement I mentioned that FISA has been amended six times in the last five years. Now to my knowledge, the administration never in that time asked for any of the changes that are contained in Section 9 of the chairman's bill. To the contrary, the administration has repeatedly said that the 2001 Patriot Act updated, modernized FISA. So if Section 9's provisions were so essential, why didn't we hear about them before now? Why this sudden demand for an overhaul of FISA?

     MR. ALEXANDER:  Sir, I don't know the exact answer for why it was never brought forward, but I can tell you there was great concern about revealing to an adversary an advantage that we had by making public some of the things that we could do. That has happened in the press.

     SEN. LEAHY:  Well, let me follow that a little bit.

     MR. ALEXANDER:  Okay, sir.

     SEN. LEAHY:  I'm told that these -- this request originated at NSA. Is that correct?

     MR. ALEXANDER:  Yes, sir.

     SEN. LEAHY:  So, and I'll ask this of you, General Alexander and then General Hayden. Earlier this year the administration did not ask Congress to authorize the so-called terrorist surveillance program, according to what you started to say, because talking about it may tip off our enemy. You think our discussion today about possible amendments to FISA is doing that?    MR. ALEXANDER:  I don't believe the amendments that have gone in the past have gone to the extent that we're talking about in this change of this bill here. Specifically, we have never brought forward the specifics on the advantage that we have in our home communications Ã,Â-

     SEN. LEAHY:  Do you believe this discussion is tipping off our enemies in any way?

     MR. ALEXANDER:  We have to be concerned, sir. Clearly, we do not want to give any advantage to our adversaries. And so the hesitancy is not just my own ignorance on this but making sure that I don't say something --

     SEN. LEAHY:  General Hayden?

     MR. HAYDEN:  Yes, sir. When the program began, the terror surveillance program, we at NSA felt we had two lawful approaches in which to conduct our operations against al Qaeda.

16

One is outlined in the tradition FISA act, the one under the president's authorization. We were quite happy to use both authorities, and we did. And in discussions as to whether or not we should move what had been authorized by the president under both his constitutional authorities and the administration's reading of the AUMF, in the discussions of whether or not we should move that under the FISA act, it really was a compelling concern as to how much of this could be discussed in open session.

What's happened in the last seven months is much of this program has already been put out into the public domain. That inoculates some of the discussion we're having today against some of the downside. But Senator, there will be questions I am sure you will ask any of the three of us that we will not be able to answer in open session.

SEN. LEAHY: Oh, yeah.

Let me ask Mr. Bradbury: When he testified last week, Attorney General Gonzales agreed with Senator Specter that the language in his bill that repeals FISA's exclusivity provision and recognizes the president's inherent authority to collect foreign intelligence is essentially meaningless. To quote the attorney general, quote, "It does not change the status quo." If that's the case, I assume you'd have no objection to striking this language in the bill, if all it does is state the status quo?

MR. BRADBURY: Well --

SEN. LEAHY: Yes or no.

MR. BRADBURY: I'm not able to answer that yes or no, Senator. I will say this: In our approach to these issues, and I think it's reflected in the legal analysis presented in our paper back in January on this program, it's always been our approach to endeavor to avoid a constitutional clash between the branches. And we think that's the way a court would address these issues.

SEN. LEAHY: But the attorney general said -- do you agree with the attorney general when he says all this does is state the status quo?

MR. BRADBURY: Well, the status quo certainly is the case, Senator, that the president has authority under Article II -- SEN. LEAHY: Do you agree with the attorney general?

MR. BRADBURY: -- and the status quo is as the court of review --

SEN. LEAHY: (Inaudible.)

SEN. SPECTER: Let him finish his answer.

SEN. LEAHY: But he's not answering my question.

SEN. SPECTER: Well, let him answer.

SEN. LEAHY: Do you agree with the attorney general?

MR. BRADBURY: I agree that as the court of review, the FISA court of review has stated, that the FISA statute cannot take away the president's constitutional authority.

17

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SEN. LEAHY: Okay. So -- so I don't know whether you agree with the attorney general or not. I'll let you discuss it with him, whether you agree with him or not.

Suppose the government wants to monitor telephone conversations, e-mails coming into the United States from American soldiers serving in Iraq. Now, let's stipulate it does not apply, this is not being done -- this is for you, Mr. Bradbury -- is not being done for law enforcement purposes, so Title 3 doesn't apply. Now, under current law, if the government acquired these communications off wires in the United States, it would need a warrant. What about the new definition of electronic surveillance in the chairman's bill? Would the government still need a warrant to intercept communications from our men and women in Iraq to their family members back at home?

MR. BRADBURY: If you're talking about a communication which is international, and if you're not targeting a person in the United States to try to collect information about that person in the United States, it would not fall within the amended definition of electronic surveillance.

SEN. LEAHY: So you would not need a warrant to collect it? They're e-mailing to their parents, spouses, whatnot, back home. You wouldn't need a --

MR. BRADBURY: If you're attempting to collect information about persons in the United States, which you -- it depends --

SEN. LEAHY: No, no, no, no. I left out that -- I said, there is no law enforcement in it, it is simply --

MR. BRADBURY: Well, Senator, it doesn't have to be law enforcement. Any effort to collect information about persons in the United States would fall within the definition of electronic surveillance, if you're targeting those persons. So you really need to look at -- and that's, I think, the fundamental point that the generals have made, is what we believe the statute ought to focus on is who is it you're trying to collect information about and --

SEN. LEAHY: I made it very clear. I said do you have a soldier in Iraq -- let's make it even clearer. A soldier in Iraq is sending an e-mail to his wife. You're not looking for law enforcement, he's not suspected of doing any crime or anything else. Would you need a warrant to collect that e-mail, or could you just pick it up and put it into your government banks?

MR. BRADBURY: Well, I will say, Senator, that today, under existing law, if you are collecting that internationally flowing communication, anywhere else in the world you can do that without any court approval. That's done today, pursuant to executive order when it's done for national security purposes. Now, these agencies operate for national security purposes and not simply to eavesdrop on people's private conversations when there isn't any national security interest or foreign intelligence --

SEN. LEAHY: Would your message be then that somebody sending an e-mail to their spouse back home from Iraq, they'd probably better be pretty careful what they say, that it's going to be in government database somewhere? MR. BRADBURY: No, I wouldn't, because as I've tried to just indicate, all of the authorities of these agencies, when they're operating today, Senator, under executive order -- it's called Executive Order 12-333, which we've existed under

18

since the 1970s -- the only collection that these agencies can do under that executive order is for foreign intelligence purposes. That's quite apart from any statutory requirements under FISA. So there's no listening in, except for foreign intelligence purposes, and that's the fundamental point. It doesn't matter whose communication you're listening in to, or where it's collected. It has to be for foreign intelligence purposes.

SEN. LEAHY: Doesn't answer the question, but I'll go to my next --

SEN. SPECTER: The vote is under way. We're going to adjourn very briefly. Senator Cornyn and I are going to be very swift in moving over and back, and when we come back, we'll pick up with Senator Cornyn.

We stand in recess for just a few minutes. (Raps gavel.)

RECESS

SEN. SPECTER: The committee will resume.

Senator Cornyn.

SEN. JOHN CORNYN (R-TX): Thank you, Mr. Chairman.

And I want to express my gratitude to the witnesses for being here today to talk about this important subject. I would hope that we could all start from a basic premise, and that is that we should use all legal means available to us to collect information from our enemies that would help us fight and win the global war on terror.

I think that we would all agree with that. I'm confident you would. Sometimes I wonder, when I hear some of the public debate.

But I want to maybe start with you, Mr. Bradbury. You know, early on, when The New York Times broke the story about the terrorist surveillance program, there were allegations that there had been a violation of the law, that this is unlawful.

But as the chairman pointed out, my recollection is there have been at least three courts that have expressly acknowledged the president's inherent power under the Constitution to collect foreign intelligence during a time of war. Is my recollection correct?

MR. BRADBURY: That's correct, Senator. The 4th Circuit, the 2nd Circuit, other circuits -- in fact, more than three -- and then, of course, the FISA Court of Review acknowledged that.

SEN. CORNYN: Well, that was going to be my next point, that the very court that Congress created to oversee the decisions of the Foreign Intelligence Surveillance Court, the FISA Court of Review, has acknowledged in a written opinion the president's inherent authority under Article II to conduct this, in essence, battlefield intelligence-gathering. Isn't that right?

MR. BRADBURY: That's correct, Senator.

SEN. CORNYN: Are you aware of any court that has held the Terrorist Surveillance Program to be unlawful?

19

MR. BRADBURY: No, Senator. No court has reached that issue. SEN.
CORNYN: So the only courts that have spoken to it have held that this is a
lawful exercise of the president's authority under the Constitution.

MR. BRADBURY: The only decisions from courts are that the president
generally has authority, under Article II, to protect the country through
foreign intelligence surveillance.

SEN. CORNYN: Well, I would hope that because -- I agree with your
assessment; that's certainly my understanding. And I would hope that those who
would try to scare people or make allegations of rampant sort of unlawful or
rogue conduct would bring their rhetoric down a little bit, because, in fact,
the only decisions we do have from courts indicate that the president does have
that authority under appropriate circumstances.

I want to also ask, General Hayden and General Alexander, there was
some statement made early on in the hearing today that the capability that the
NSA has been using, that the United States government has been using to
intercept international communications between al Qaeda operatives and folks
here in the United States who may be their allies, that this is somehow
unchecked authority.

But I just want to ask a little bit about that. It's my recollection
that this program is reviewed every 45 days internally within the NSA and the
administration. It's my recollection that it's been briefed to the FISA Court
judges, if not all of them, at least the chief judge, and maybe some others; if
you can help me there.

It's also been briefed since the inception to leaders, on a bicameral
and a bipartisan basis, the leaders of the House and the Senate, as well as the
chairman and ranking members of both the House and Senate Intelligence
Committees. Did I summarize that correctly?

MR. HAYDEN: Yes, sir. That's correct, Senator.

SEN. CORNYN: Well, to me, that seems like it comes in some
conflict with the idea that this authority is unchecked. And that's my
conclusion. You don't have to agree or disagree.

And one reason I support Senator Specter's bill is because it does
acknowledge this authority, but it creates a way to try to accommodate the
legitimate concerns that members of Congress have and to make sure that Congress
is a full partner in the process of striking the balance that, General Hayden,
you talked about between privacy concerns and our ability to collect
intelligence by all lawful means.

Mr. Bradbury, I wonder, though, if you could tell me, do you view this
bill to be a substantial change from the status quo? There was some question
about that. Or is it a ratification, more or less, by Congress that the
president has that authority and then create other procedures that are
essentially consistent with what's already happening now?

MR. BRADBURY: Well, of course, Senator, as the chairman made clear in
his opening remarks, the status quo today is that the president has exercised
his authority, both under the Constitution and his view of the authorization for

20

UNCLASSIFIED//FOR OFFICIAL USE ONLY

the use of force, and has established the Terrorist Surveillance Program, independent of FISA, in an effort to try to detect communications that may be leading to another attack on the country.

And so this legislation would make -- would recognize that existing fact, but it would make a very substantial change in FISA today by adding a new title that would give the court jurisdiction to review such a program on a program-wide basis.

And that is an important new tool that any president would have going forward. And it's because of that innovative new tool that would really allow for efficient judicial review of such a program in wartime that the president would take the program then to the court for its review.

So I applaud, again, the chairman for the legislation and for that effort, because I do think that's very important -- would be a very important change in the current statutes.

SEN. CORNYN: Well, thank you very much for that clarification. And I think you're certainly correct. I know, General Alexander,     there was some question about whether the NSA was intercepting Internet communications between a soldier in Iraq and their family members at home. You're a soldier, are you not, sir?

MR. ALEXANDER: Yes, sir.

SEN. CORNYN: And you certainly, I know, have an interest in not undermining the privacy rights of an American citizen serving his country and defending freedom in Iraq. Do you -- are you spending your time targeting American citizens, soldiers in Iraq, just in your spare time?

MR. ALEXANDER: No, sir, we aren't, nor would we. If we do, we have procedures through the attorney general overseas, if it's against a U.S. person, or a court order here in the United States. And both of those would be followed.

I will tell you, I would be more concerned about other nations looking at our soldiers, which they do, than terrorists. And so the fact that we can do it, others can do it too. And so the greatest concern is the operational security that goes along with soldier communications, which they in Iraq know very well. And as you know, sir, from the soldiers there, they treat OPSEC like it's very important to their own survival.

MR. HAYDEN: Senator, if I can just emphasize a point that General Alexander brought up, the procedures in place today, which will not be affected by the act before the committee, is that in order to target a protected person, a U.S. person -- and that definition goes beyond just citizens of the United States -- in order to target a protected person overseas now requires, well, now General Alexander to make a case to the attorney general that this is for foreign intelligence purposes and that the target of the activity is the agent of a foreign power. And that would not be changed by the legislation.

MR. BRADBURY: I'm sorry, just to emphasize that triply, what I mentioned before in response to the question from Senator Leahy is that there are authorities today under executive order to do foreign intelligence surveillance. But those authorities, if you're talking about targeting the

21

communications of a U.S. person, like a U.S. soldier in Iraq, require both that it be for a foreign intelligence purpose and that the attorney general expressly approve it. And that's under existing executive order. That would remain unchanged by this legislation.

SEN. SPECTER: Thank you, Senator Cornyn.

Senator Kennedy.

SEN. KENNEDY: Thank you very much.

And I want to thank the panel, thank them for their service to the country -- impressive backgrounds and experience and commitment. I was here when we did the FISA legislation; at that time, in '76, President Ford and Attorney General Levi. And they worked very closely with the Judiciary Committee, the president and the attorney general, and we worked out the FISA.

It was enormously complex and complicated at that time, and the range of intelligence challenges are like an echo that I hear this morning. Everyone understood that there was cutting edge; it was new information, dangerous time. And we were able to work out legislation that only had one vote in opposition to it in the United States Senate, and it has worked.

Obviously there are suggestions and recommendations that can be made, but it worked and it had the confidence of the American people and the confidence of the Congress about the protections of rights and liberties, and also in getting information.

All of us are in the same boat in terms of al Qaeda and the dangers that are before this country, but as you have all eloquently stated, the balance between the security and also the liberties that we have to deal with. And that is what many of us had hoped, that we would be able to work with an administration -- would work with us.

We can handle the sensitive and secret information and establish a process that I think would have given the American people the confidence that all of us were working together, Republican and Democrat, the president and the Congress, bipartisan way, to really get at the core dangers that we face in protecting liberties. And that is what I think continues the challenge. And the fact that we are still working on this is just enormously important.

But that's the departure point, and it still continues to be frustration that we were unable to get to that point and don't have all of the information that we should have in order to legislate. The American Bar Association points out the challenges that we're continuing to face under the circumstances.

I'm interested, in the time that I have, if you can just tell us -- and we're very conscious of the fact that there's sensitive information on this -- but can you tell us now the extent that this is actually affecting the Americans, Americans here at home? What are we talking about, to the extent that they are included in this program?

MR. HAYDEN: Senator, I'll start --

SEN. KENNEDY: Okay.

22

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MR. HAYDEN: -- since I was there when the program began. I mean this very sincerely -- nothing more important to the people conducting this program than the privacy of Americans.

SEN. KENNEDY: Good.

MR. HAYDEN: We understand nothing more important in the conduct of this program than the privacy of Americans.

After the story broke in The New York Times, I went out to talk to the NSA work force that is involved in this, and it struck me that on the walls of the office in which this activity is conducted, there was a large poster that said, "What constitutes a U.S. person?" And the four different approaches by which one could gain the protection    of a U.S. person were spelled out there, even in the bowels of the office that is responsible for this program.

It is done very carefully. It is very targeted. There is a probable-cause standard before any communication is intercepted that one or both communicants is, again, through a probable-cause standard, associated with al Qaeda. So I know the sensitivities, Senator. NSA is a powerful and a secretive organization. Those are the two things our political culture distrusts the most. But this is done with great care.

SEN. KENNEDY: Well, I understand that. And the standard, then, is the probable-cause standard. Is that correct?

MR. HAYDEN: That's correct.

SEN. KENNEDY: All right. But the question was to the extent the number of Americans that are included in this. Can you tell us, or is that -- what is the extent? What is the range?

MR. HAYDEN: We have briefed the precise numbers to all members and some numbers of staff to both Intelligence Committees, Senator.

SEN. KENNEDY: But even in the range -- if you can't, you can't. But, I mean, are we talking about 20,000? Are we talking 2 million? Can you -- you can't do it in that --

MR. HAYDEN: I'm not able to.

SEN. KENNEDY: All right. Can you tell us whether any of these are continuing surveillance; that is, that they go on for not only just a conversation but whether they are continuing, whether there are Americans that are subject to continuing -- this was an issue when we passed the FISA. Attorney General Levy spoke about this issue and question in terms of the legality of it. And this is an area that obviously is of concern. Can you tell us?

MR. ALEXANDER: Sir, if I can give you two things here in open session. The overwhelming focus in our collection is against the foreign entities, by a tremendous margin. And everyone who has read into that is amazed when they see that, first and foremost, predominantly foreign.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

There are U.S. parts to that. And I can't go into the details of the lengths of that, but it is all focused on the al Qaeda and it's predominantly -- go ahead, sir.

MR. HAYDEN: I'd just offer a point to make it very clear. The president has said the communication we believe to be affiliated with al Qaeda, associated with al Qaeda, one end of which is in the United States, and we believe at least one end we have a probable-cause standard is al Qaeda. As General Alexander points out, overwhelmingly the end we believe to be affiliated with al Qaeda is a foreign end.

SEN. KENNEDY: All right. And so just about the question about it continuing and ongoing versus a conversation, the extent of that, General Keith -- Alexander?

MR. ALEXANDER: Sir, I'm not sure I understand.

SEN. KENNEDY: One thing is whether you're listening to a conversation; the other is whether you have the wiretap that is continuing 24 hours a day.

MR. ALEXANDER: Right. Sir, we go through a very deliberate process to listen in on any conversation, just because of the sheer resources, whether it is in this program or any other program.

And so as we started out, we know it's one end foreign -- you cannot physically listen to millions of phone calls, nor would we.

SEN. KENNEDY: Okay.

MR. ALEXANDER: We are going to focus it down onto the most important ones, and we have ways and methods to do that that I would -- that we could -- should not discuss here.

SEN. KENNEDY: All right. I'm going to run out of time here. But let me ask you: Has any of the information been -- that has been gathered to date in any of this been used in any legal proceedings here, in any courts or any trials to date?

MR. ALEXANDER: Senator, the process used is the process by which we use any foreign intelligence, and it is -- it moves outside of the intelligence community with all the appropriate caveats on it, in terms of how it can be used in judicial procedures.

SEN. KENNEDY: But can you tell us whether it has been or hasn't been -- been used?

MR.       :  I don't know.

MR.       :  I don't know.

MR. ALEXANDER: I don't know, Senator, because -- again, because we put the caveats on it --

MR.       : It's for lead and investigative --

MR. ALEXANDER: -- for lead and investigative purposes of what it says.

24

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SEN. KENNEDY: Time is up, Mr. Chairman. Thank you.

SEN. SPECTER: Thank you, Senator Kennedy.

Senator Feinstein.

SEN. DIANNE FEINSTEIN (D-CA): Thank you very much, Mr. Chairman, and thank you for the hearing.

I'd like to just say one thing, and that is, as a member of the Intelligence Committee, I have been briefed on the program. And I am strongly opposed to giving this president or any president the right to collect content, to collect content on United States persons without a warrant.

And today, for the first time, we heard General Alexander state that if the foreign-to-foreign switching is taken care of, that the program is easily accommodatable to an individual warrant for U.S. persons in content collection. Is that not correct, General?

MR. ALEXANDER: Not quite, ma'am. If I might just state in my words, that if the foreign selectors that we're going after, which -- some of those -- depends on where the target is -- and this goes back to the definition of electronic surveillance. And so it's not necessary -- if we're going after a terrorist in Country A, and he's talking to somebody in Country B, we're authorized to go after that.

If that same terrorist we're targeting happens to go into the United States, we're authorized to collect that overseas also and minimize the U.S. person's data.

The issue that I was describing is, now, under the current FISA, if I collect that in the United States, I have to get a warrant for it. So what you would have us do is -- overseas I could do it and minimize it. Today I lose the advantage of being able to do that in the United States. If that portion of the targeting -- in the definition of this electronic surveillance -- we believe that is adjusted in this proposal, that meets both of those, and that that would then allow us to --

SEN. FEINSTEIN: And both ends are foreign-to-foreign?

MR. ALEXANDER: Not necessarily. The target of the selector is foreign. And the question is, where are they calling? But we don't --

SEN. FEINSTEIN: Well, I know those numbers, too.

MR. ALEXANDER: Right.

SEN. FEINSTEIN: And I do not think that those numbers are necessarily prohibitive from a FISA warrant, nor do I believe that it would take that much time for a FISA warrant.

MR. ALEXANDER: But it would require us, ma'am -- if I might, it would require us to get a FISA on every foreign one in advance, because we don't know who they're calling until it's happened.

25

SEN. FEINSTEIN (?): Oh --

MR. BRADBURY: Senator, may I also just add a point, if I might?

SEN. FEINSTEIN: Certainly. MR. BRADBURY: In the chairman's legislation there would also be a number of other reforms to FISA which would greatly assist in the general ability to get FISAs, even for domestic targets. For example, the FISA application process would be streamlined. The amount of information required for an application would be reduced --

SEN. FEINSTEIN: That was in my bill, too.

MR. BRADBURY: -- yes, it was -- and that --

SEN. FEINSTEIN: I believe Senator Specter took it from my --

MR. BRADBURY: Absolutely. It's a good idea -- (laughter) -- and good ideas should be liberally --

SEN. FEINSTEIN: I just wanted to make that clear.

SEN. SPECTER: I had thought that was our bill, the Feinstein- Specter --

(Laughter.)

SEN. FEINSTEIN: (Laughs.) I'm delighted! Yes, it is our bill.

MR. BRADBURY: In addition -- and this may also be in your legislation, Madame Senator -- the emergency authorization period would be extended from three days to seven days. The ability to authorize it would be liberalized. And then, perhaps most importantly, if the reforms are made to the definition of what's covered to take out the international communications that are not really historically the primary focus of FISA, that, of course, by itself would free up a lot of resources in terms of the Office of Intelligence Policy and Review that makes the applications to FISA. So all of those combined would necessarily make it much easier to get quick approvals for those domestic targets of necessary intelligence surveillance.

MR. ALEXANDER (?): And that's why I tried to craft my opening comments about those four criteria. And very frequently, NSA is required to get FISAs not because of who is targeted, but because of one of those other three criteria. And what this legislation does is move the legal focus back to who are you targeting rather than these techniques or accidents of how you actually carry it out.

SEN. FEINSTEIN: Well, let me raise one other point. Senator Specter's new FISA bill also eliminates the 15-day window on surveillance following a declaration of war. And this could be interpreted to mean that after a declaration of war, the president has unlimited wiretap authority till the end of the war. And how long, under the new Specter version, would a president's authority last? Could it last for decades?

MR. BRADBURY: Well, Madame Senator, the president's authority to protect the country comes in large measure from his authority under Article II.

26

UNCLASSIFIED//FOR OFFICIAL USE ONLY

And, of course, with the terrorist surveillance program, that has been in place now since shortly after 9/11.

It is our view, as we tried to explain in --

SEN. FEINSTEIN: If you don't mind, let me just interrupt you.

MR. BRADBURY: Absolutely.

SEN. FEINSTEIN: Because it seems to me you are buying in -- the administration is buying in to a concept, and that's Senator Specter's bill. Therefore, you are tacitly confining your Article II authority within the confines of the Specter bill, as I understand it. So I am asking you the question, one of the amendments made is to delete this 15-day period, which, therefore, once deleted, also has an interpretation that it is without end.

MR. BRADBURY: Well, there would be no express provision that says in time of war that the limitations of FISA do not apply. The current provision says if there were a declaration of war, none of the requirements or limitations in FISA would apply at all for 15 days. Now, there's only been five declarations of war in the history of the country, and we haven't even come close to one since FISA was enacted in 1978.

It's our view of that provision today in the legislation that, in effect, it's a determination by Congress back in 1978, which was not a time of war, that in the event of armed conflict or a declaration of war, that the branches would come together and that there would be some accommodation made going forward in that -- during that wartime. It's not our view that it was a declaration by Congress that only 15 days of warrantless surveillance in wartime is all you need. I don't think that's what it was intended to mean. It was intended to give some leeway -- all the rules are off -- and then during that period, there would be some special accommodation made. It was really, in effect, a decision by Congress in the 1970s to punt the question of what would happen during an actual armed conflict.

SEN. FEINSTEIN: Mr. Chairman, would you allow me one other question?

SEN. SPECTER: Yes, proceed, Senator Feinstein.

SEN. FEINSTEIN: Yeah. Perhaps, Mr. Bradbury, you're the one to ask this question of. Is it your contention that the FISA Court is an Article III court?

MR. BRADBURY: The judges are Article III judges. And, yes, they're serving in a special capacity for purposes of approving these orders, but, yes, they are Article III --

SEN. FEINSTEIN: And to what do you attribute that? I mean, where is the justification for finding it in an Article III court?

MR. BRADBURY: They are appointed for life with their compensation fixed. It can't be reduced. They are Article III judges, and Congress, by statute, has given them a special assignment at the appointment of the chief justice, but that does not mean that they're not Article III judges. They act in their capacities as Article III judges, as does a court that approves, for example, a Title 3 warrant.

27

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SEN. FEINSTEIN:  Isn't there a magistrate serving as a FISA Court judge?

MR. BRADBURY:  I'm not aware of that.  There are 11 FISA Court judges. I believe -- don't hold me to this -- that they're all district judges appointed by the chief justice.

SEN. FEINSTEIN:  Well, I'm a little puzzled, Mr. Chairman, on this one point, because there is nothing in the FISA law that gives this court the ability to make programmatic approvals as opposed to grant warrants, individual warrants.  And how a court gives an advisory approval to a program and the constitutionality of such, I think, is questionable.

MR. BRADBURY:  Well, may I respond to that?

SEN. FEINSTEIN:  Yes, please.

MR. BRADBURY:  Interestingly enough, the FISA Court of Review, in the In re Sealed Case decision, addressed the question of whether a FISA order under the current statute is a warrant or not.  And the court actually concluded that, while it has a lot of characteristics of a warrant, the court did not need to conclude or decide that it was a warrant because foreign intelligence surveillance could be conducted before and after FISA, as long as it's reasonable under the Fourth Amendment, and that the FISA procedures would ensure that any court order approving surveillance would ensure that that surveillance was reasonable under the Fourth Amendment.  So there isn't -- it's not necessarily the case that a FISA order, even an individualized one, is a warrant for Fourth Amendment purposes.  And the Fourth Amendment does not require a warrant in all circumstances.  In special cases, there can be surveillance done, searches conducted without warrants -- as long as they are reasonable -- for example, in the area of foreign intelligence investigations and surveillance.

The -- but you are --

SEN. FEINSTEIN:  Are you making the argument that a FISA Court order for content collection is not a warrant?

MR. BRADBURY:  Well, the FISA Court of Review concluded that it did not need to decide that it was a warrant for it to be constitutional, so it does not have to be viewed as a warrant.

And I would say that you're right, that today FISA does not contain any procedure that would allow the FISA Court to give a program-wide order of approval to surveillance.  The new title that would be created by the chairman's bill would enable the court to do that and would give the court jurisdiction.

But in terms of Article III and whether there's a case or controversy, I don't see a difference between the program-wide order and the individualized order.  There would still be a case or controversy, it would be constitutional. The attorney general, as a result of that order, can get an order from the court that would compel cooperation to do what needs to be done to undertake the surveillance.  And just as with a Title 3 warrant today, where the government goes in ex parte to a district judge and gets approval for a Title 3 warrant, this is a similar construct, and it's similar to the FISA process today for FISA orders.

28

There is the hypothetical person on the other side of the case -- not hypothetical, but the people on the other side of the case are those people who would be under surveillance.

That's the same in a Title 3 context or under FISA today. I really think it would function like FISA today; it would just be a program- wide order.

SEN. FEINSTEIN: Well, you've been more than generous with your -- (inaudible) -- Mr. Chairman --

SEN. SPECTER: How much more time would you like, Senator -- how much more time would you like, Senator Feinstein?

SEN. FEINSTEIN: Well, you see, I think this is kind of the crux of the matter, and --

SEN. SPECTER: Senator Feinstein, proceed.

SEN. FEINSTEIN: If you just allow me for a minute. Essentially, there are no holds in your bill on a president's authority. Once there is this programmatic approval by the FISA Court, then individuals in this country can be wiretapped for content, and that wiretapping could go on forever. There is no duration. I would assume that others could be slipped into that program, perhaps even without review. And what worries me is that once for content -- metadata is something else -- but for content, once you go to a programmatic approval, it opens the pandora's box of all kinds of games that can be played with that, because there is no timely periodic review of everybody that -- whose content is being collected under that programmatic review; no decisions made as to how long that data can be maintained; when a decision can be made that the data should -- that the content collection should be cut off.

MR. BRADBURY: Senator, that's not the case. Under the chairman's bill, all of those things would be addressed by the court in its review. So, for example, strict requirements would be, before the court would be able to entertain such an application, it would have to be directed at the foreign terrorist threats. There would have to be a showing that it -- that you couldn't use traditional FISA process. There would have to be a showing that there's special need for agility and flexibility and that you cannot identify all of the targets in advance. Then, there would have to be special minimization procedures proposed and in place to protect any information about U.S. persons that might be caught up in the program.

Then, the court would review it for reasonableness under the Fourth Amendment. The Fourth Amendment is not an open-ended blank check. The Fourth Amendment would not allow things to go on permanently. It would not allow things to be general and not focused on the threat. All of those things would be taken into account and reviewed carefully by the court. It could only be approved for 90 days, and then, the court would review it. You'd have to come back in, and in reviewing it and reauthorizing it, the court is charged under the legislation to look at, "Well, what has the actual collection been? Has it been focused as the attorney general said it would be? Have the minimization procedures been followed?" All of those things would be subject to careful judicial review by the FISA Court.

29

SEN. FEINSTEIN: All right. Knowing the numbers of the foreign- to-foreign --

SEN. SPECTER: Senator Feinstein -- Senator Feinstein, you're up to eight minutes over, which is another round. Why don't you ask your last question.

SEN. FEINSTEIN: The last one. Knowing the numbers of the foreign-to-foreign, you're saying every one of them would be reviewed every 90 days?

MR. BRADBURY: Well, in the terrorist surveillance program of the president, we're talking about international communications in and out of the United States, and under the chairman's proposal for this new program-wide order, it would be focused on surveillance where the -- where you're talking about communications to or from persons in the United States. So the foreign-to-foreign would not be the subject of such a program-wide order. But communication surveillance where there's a U.S. -- there's somebody in the United States who's involved, could be and would be the subject of such a program, and the court would be free to ask, as the legislation makes clear, for any additional information the court desires to review that program and to take a look at very carefully and closely. So it would be up to the court in making a judgment as to the reasonableness of the program, the targeted nature of it, et cetera.

SEN. FEINSTEIN: Thank you. I appreciate it very much. Thank you.

MR. BRADBURY: Thank you, Senator.

SEN. SPECTER: Thank you. Thank you, Senator Feinstein.

General Alexander, coming back to the question which I asked initially and you've expanded upon, would it be impractical or impossible -- or even impossible to have individualized warrants under the current surveillance program?

You had responded in part that it would limit you when you were going after a foreign number, foreign caller, someone who initiated the call abroad, not knowing whether it was going to be to a domestic location or not. Would you expand upon that?

MR. ALEXANDER: Yes, sir. And I'll take from the testimony that we started out with, in that who and where are the key parts of this. Who is the target that we're going after? Is it a foreign terrorist in a country outside the United States? If the target is outside the country making a call, then we should use every means possible -- and I think everybody generally agrees with that -- to go after that communication. The issue is, if we conduct that in the United States and it happens to stop in the United States, in the United States we'd need a warrant; outside the United States we could do it under executive order. So we have a problem. And the issue then becomes do I get a court order for every foreign target that I have under the possibility that I could have collected it in the United States? That's what it does to us today. That is impractical. It would cause a tremendous burden on --

SEN. SPECTER: Now, specifically, what is impractical? When you start -- wait a minute.

30

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MR. ALEXANDER:  The volume.  The volume --

SEN. SPECTER:  Wait a minute.  Let me ask the question so we have the framework.

Is it impossible or impractical to get an individualized warrant when the caller is outside the United States, not knowing whether the recipient will be inside the United States?

MR. ALEXANDER:  Yes, sir, it would be impractical.  I'm not saying it would be impossible, but it would be impractical because we don't know what the foreign to U.S. number could possibly be.  Would the requirement be, hypothetically, if that foreign number called all foreign numbers, you'd say good to go.  But if they called U.S. number one -- FISA.  If he calls U.S. number two, I have to get a new FISA.  U.S. number three, a new FISA.  U.S. number four, a new FISA.  And what I'm ending up doing is submitting for calls that have been happening, and what we would do is saturate ---

SEN. SPECTER:  That's what you have to do, absent the surveillance program?  MR. ALEXANDER:  That's correct --

SEN. SPECTER:  But with the surveillance program, you don't have to do that.

Now, you say impractical, but not impossible.

MR. ALEXANDER:  Well, you would not be effective.  In my opinion, sir, from an operational perspective --

SEN. SPECTER:  Why not -- why not effective?

MR. ALEXANDER:  Because you would be so far behind the target, if you were in hot pursuit, with the numbers of applications that you would have to make and the times to make those, you could never catch up to the (target ?).

SEN. SPECTER:  So your conclusion is that to have individual warrants, it would not be practical or effective in what you're seeking to accomplish.

MR. ALEXANDER:  That's correct.

SEN. SPECTER:  General Hayden, I think it would useful if you supplemented your oral testimony in writing, amplifying so you have an opportunity to present a fuller picture.  We've had a pretty good dialogue here.

SEN. FEINSTEIN:  I might say particularly on --

SEN. SPECTER:  Now, are you on your time, Senator Feinstein?  Let me -- let me proceed, Senator Feinstein.  We'll come back to you after Senator Leahy, if the next vote doesn't come sooner.

Mr. Bradbury, Senator Feinstein said that there are no holds and no limitations on what the president can do under my bill.  But isn't it a fact that what the president can do under my bill is what the president is doing now, and that it is measured by whatever his Article II powers are?

MR. BRADBURY:  Well, that's certainly correct.

31

SEN. SPECTER: And isn't the determination as to whether he has Article II powers to do what he is doing now a balancing test so that on this date of the record, this committee, not knowing the details of the program, is not in the position to say that it is an exercise within Article II or it is beyond Article II? Is that true?

MR. BRADBURY: That -- that's true. And I would add that the limitation and the real balancing test comes into the Fourth Amendment, because whatever the president does is subject to the Fourth Amendment --

SEN. SPECTER: But we can't determine that unless we know what the program is. Or on the balancing test, reasonableness, as you said earlier, depends on the threat and depends upon the invasion of privacy.

MR. BRADBURY: That's correct.

SEN. SPECTER: And that requires a judicial determination.

MR. BRADBURY: Well, that's one very effective way to do it. And that's what your legislation would do. It would bring the court in to make that determination.

SEN. SPECTER: Is there any other way to obtain a judicial determination other than the FISA court, maintaining the secrecy that the president insists upon?

MR. BRADBURY: Well, I think that's a very good mechanism for doing that. Obviously, the 30 or so pieces of litigation around the country that have challenged various versions of what has been alleged in the media, we do not think those disparate matters in litigation in various district courts around the country is an -- is an effective or appropriate way for any of these determinations to be made.

SEN. SPECTER: Let me move to a series of questions with the minute I have left. Isn't it true as a practical matter, de facto, that the Foreign Intelligence Surveillance Act is not now the sole means of wiretapping in the United States, where you have one party in the United States and one party out of the United States?

MR. BRADBURY: That's correct. The president's program is outside of FISA. SEN. SPECTER: And isn't -- and isn't it -- isn't it so -- FAST is not the exclusive way. And isn't it also true that no statute, including the one I propose, can expand or contract the president's Article II powers?

MR. BRADBURY: Well, I would say that statutes can reasonably regulate exercises of the president's constitutional authority, but where we see a real issue -- and it's a very significant constitutional issue, and that's what the FISA Court of Review is talking about, is an effort to try to eliminate it or snuff it out. And that's where you get a real direct clash between the branches. And that's what we've always endeavored to avoid throughout this discussion. And I think your legislation recognizes that we all want to avoid that particular --

SEN. SPECTER: With Senator Leahy's acquiescence, I'm going to pursue this just a bit further. When you talk about reasonably regulated and you come

32

to Justice Jackson's famous concurrence in the steel seizure case, he said that when the president exercises his constitutional power plus a grant of authority from the Congress under Article I, then his power is at a maximum, because he has two powers: Article II and Article I.

MR. BRADBURY: That's correct. That's correct.

SEN. SPECTER: Where he exercises his Article II power alone, it is at the medium point. Where he faces a situation where Congress has denied him certain authority, as where FISA is in existence, then he relies solely on his Article II power. But isn't that Article II power whatever it is as determined by the balancing test on the invasion of privacy versus the national security interest involved?

MR. BRADBURY: That's right.

SEN. SPECTER: Final -- final question. This -- this provision in the bill has been cited repeatedly as a negative comment: "Nothing in this act shall be construed to limit the constitutional authority of the president to collect intelligence with respect to foreign powers and agents of foreign powers," close quote.

Now, the best illustration of that is a wiretap of a foreign embassy.

Isn't it true that that line was in the FISA Act of 1978?

MR. BRADBURY: It was. I believe, Mr. Chairman, it was amended to take it out at a later point, and this legislation would reinstate it in the bill. But I think the important point is that the FISA Court of Review in its decision says essentially just exactly that, and this is simply a recognition or affirmation of what the FISA Court of Review has said. You're -- in pointing to the embassy provision, you're exactly right; that that's an example where FISA today recognizes and allows for the executive branch to take action without a court order to undertake foreign intelligence surveillance. And that's an authority that exists today and that is recognized in the FISA statute.

SEN. SPECTER: So in totality, Article II power is what it is, and it can't be added to or subtracted by legislation since the Constitution supersedes legislation?

MR. BRADBURY: The legislation doesn't change Article II authority. It can add Congress's authority, as Justice Jackson indicated in his concurrence, or it can attempt to leave the Article II authority as it is, or it can attempt to take away from it whatever Congress -- whatever authority Congress would otherwise provide. And --

SEN. SPECTER: But Congress doesn't have any authority by statute to change the Constitution?

MR. BRADBURY: That is correct.

SEN. SPECTER: Including Article II?

MR. BRADBURY: That is correct.

SEN. SPECTER: Senator Leahy, you have at least 10 minutes or longer.

33

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SEN. LEAHY: Thank you.

Of course, we don't amend the statute by -- amend the Constitution by statute. But as Youngstown pointed out, there are many areas where the president's Article II powers are circumscribed by statute. Is that not correct? MR. BRADBURY: Yes, in the exercise of those authorities, but not where those authorities --

SEN. LEAHY: Thank you. I was glad to get a simple declaratory judgment -- (light laughter) -- a simple declaratory answer from someone from the Justice Department. It's been years! I compliment you, Mr. Bradbury. I compliment you. You'll probably get fired for doing that, but I compliment you for doing it.

But the language that Senator Specter quoted was -- that you never enacted; it was struck from the conference in 1978, as I recall -- but there are areas where we can -- the Congress, under Article I, can determine the actions of the president under Article II. And then, the president, of course, has -- in his oath of office, he says that he will faithfully execute the laws of the United States. Now, of course, if he doesn't like the laws, he can always veto them.

But General Alexander, let's go back to the Terrorist Surveillance Program because we may have been discussing two things in your answers to the earlier questions.

Let's say that under this program you established probable cause; a particular individual you're monitoring is a terrorist and those individuals within the boundaries of the United States.

At that point, do you go to FISA for a warrant?

MR. ALEXANDER: Not necessarily, sir.

SEN. LEAHY: I know --

MR. ALEXANDER: Maybe. Maybe. It would definitely go to one of the other Intel agencies as soon as that is. Our objective would be -- NSA would not be -- would not proceed at that point. We would pass it to either the FBI --

SEN. LEAHY: You're going to continue -- you've got somebody in the United States.

You've established probable cause. And this is prescinding for the moment whether the original program is actually authorized under the law or not. But let us assume you've got probable cause that somebody in Middlesex, Vermont, is a terrorist. I know all the people in Middlesex. I don't think there are any --

MR. ALEXANDER: Wouldn't happen, sir.

SEN. LEAHY: But let's say you do. At that point, do you have to go to FISA for a warrant if you're going to continue monitoring that person, that individual?

34

MR. ALEXANDER:  Actually, the --

SEN. LEAHY:  Somebody have to go to FISA --

MR. ALEXANDER:  Somebody -- potentially, but not necessarily. And the question really gets us to where are we in the process of knowing that that is a terrorist.  If we know for sure that's a terrorist, it's gone to the FBI, the FBI would take that, probably to a FISA, and start their own procedures, with the lead in investigative information that we gave them.

Generally, you don't have a clear-cut case like that, sir.

SEN. LEAHY:  And I was trying to make it -- for an easier answer, to make it clear-cut.

Well, let's go to Section 9(k) of the chairman's bill.  This would exempt from criminal liability any FBI agent or intelligence officer who executes a physical search for foreign intelligence information if the search is authorized under the Constitution.  Apparently that's a reference to the president's claimed inherent authority as commander in chief.

Does this immunize anyone who conducts warrantless searches of American homes and offices without court orders under the say-so of the president?

MR.    :  Yeah, Steve, you want to answer that one?

MR. BRADBURY:  Well, I think, Senator, it simply conforms the law to what the law -- that FISA's trying to do -- SEN. LEAHY: No, no, no, no, no. Let's go back.  You were so good before answering the question right to begin with.  If -- does this immunize somebody who conducted a warrantless search of an American home or office under the say-so of the president?  I mean, that should be simple.

MR. BRADBURY:  Well, if intelligence officers have executed surveillance programs that have been duly authorized by the president, this would recognize that those intelligence officers who exercise those authorities should not be subject to criminal process.

SEN. LEAHY:  So -- and so it immunizes this --

MR. BRADBURY:  I would say, Senator, that that is the approach that FISA takes today.  The officers and agents of the U.S. who --

SEN. LEAHY:  This is different.  This is on 9(k) saying if they are authorized by the president -- the president, not FISA, but the president -- does that immunize them?

MR. BRADBURY:  Well, the legislation would recognize that there may be instances where there are programs authorized by the president. That's recognized in the legislation, and then there are procedures in place for judicial review.

SEN. LEAHY:  Okay.

35

UNCLASSIFIED//FOR OFFICIAL USE ONLY

MR. BRADBURY: There are also procedures for the attorney general in temporary circumstances to authorize surveillance without a court order. And so --

SEN. LEAHY: Well, has the president authorized warrantless physical searches outside of FISA?

MR. BRADBURY: I think that the only thing the president has talked about is the terrorist surveillance program. That's the program that is done today without a FISA order. And that's been the subject of the hearings before this committee. And I think it's an appropriate subject for the legislation that's been proposed.

SEN. LEAHY: Can you answer the question whether he's authorized such warrantless searches?

MR. BRADBURY: I'm not going to say he has.

SEN. LEAHY: I wanted to make sure you had a chance to respond on that specifically.

You know, I worry that what we're doing is trying to immunize a lot of activities, sort of like we had this great battle here, conducted on the pages of the press and all, on the question of torture. And then after wonderful signing ceremonies at the White House and everything else, the president said, "However, there will be areas where we don't have to apply that law," and thus agreed to immunize people.

I worry -- but it's not going into this question of immunization -- I'm not talking about the president's pardon ability, and we've seen that in Watergate and others, where the president has pardoned people afterward. But -- and Iran-contra and so on. I'm talking about blanket immunization.

Let me ask both General Alexander and General Hayden this. As I understand FISA, it's always allowed NSA to use a kind of vacuum cleaner approach to radio communications in the United States, sometimes referred to the NSA exemption. So in the chairman's bill, if you repeal Section 101(f)(2) of FISA, would that extend the NSA exemption to all electronic communications, both wire and radio?

(Off-mike conferral among witnesses.)

MR.    : Again, I think the straightforward answer, Senator, is yes, and just then one additional sentence of explanation is that it would allow NSA to target foreign entities.

And we've, in our discussions, I think have crossed some concepts here. In terms of targeting a foreigner for a foreign intelligence purpose, the chairman's bill would allow NSA to use all the tools that it has; it would not make a distinction between grabbing a signal out of the air or grabbing a signal some other way.

SEN. LEAHY: Yeah, I understand. So, for example, if you had -- this would allow you to seize, record, say, all the calls between the United States and India, just blanket.

36

MR. ALEXANDER (?):  You would -- you would -- no, it would not.

SEN. LEAHY:  I mean, I'm talking about under the -- if you repeal Section 101(f)(2).

MR. ALEXANDER (?):  No, no, not at all.  It would allow you to target a phone number in Central Asia, all right, and it would give you the same ability to cover that target that you now have, pulling that signal out of the air or collecting that signal overseas, it would allow you to use all the tools that we have at our disposal in order to get what we've already agreed is coverage of a legitimate foreign intelligence target.

SEN. LEAHY:  Do we do this kind of vacuum-cleaner surveillance of Americans now?

MR. ALEXANDER (?):  You're talking about intercepting the content or -- Senator, everything is done, it is targeted and for a foreign intelligence purpose.  No.

SEN. LEAHY:  If on these calls -- and I understand, without going into the specifics of the program, you've taken a huge number of calls not -- and e-mails, not specifically on a person.  Are those then stored for retrieval and analysis by NSA --

MR. ALEXANDER (?):  Sir -- Senator, your premise is incorrect.

SEN. LEAHY:  Okay.

MR. ALEXANDER (?):  Under the president's program, when NSA collects the content of a communication, it has already established a probable cause predicate that one or both communicants is associated with al Qaeda.  So we do not vacuum up the contents of communications, under the president's program, and then use some sort of magic after   the intercept to determine which of those we want to listen to, deal with or report on.

SEN. LEAHY:  What if something is picked up by mistake?  What happens to it?

MR. ALEXANDER (?):  There's a technical term called "inadvertent collection."  If NSA collects something inadvertently, standard procedures for the president's program are the standard procedures we have for all inadvertent collection -- it is destroyed.

SEN. LEAHY:  So it's not available to others throughout the government?

MR. ALEXANDER (?):  Only with one exception.  If the inadvertent collection contains evidence of a crime, policy and statute require us to report that.  Otherwise, it's destroyed.

SEN. LEAHY:  Okay.  Now, in addition to narrowing the definition of electronic surveillance, as I read Section 9, it would expand the so-called embassy exception, in Section 102 of FISA.  Am I correct on that, Mr. Bradbury?

MR. BRADBURY:  Yes, Senator.  I believe under this new provision, that provision would allow the attorney general to approve for a period targeted foreign intelligence surveillance that is directed solely at the communications

37

UNCLASSIFIED//FOR OFFICIAL USE ONLY

of foreign government operations or non- U.S. persons who are agents of a foreign government -- solely at those communications.

SEN. LEAHY: But if this was passed -- for example, you have a congressional staffer call the German embassy to plan a congressional trip to Berlin, that could be picked up?

MR. ALEXANDER (?): Senator, across the board, when NSA conducts surveillance against a legitimate foreign intelligence target and that target is in communication with an American, the American is not the target, the foreign entity is the target. We have well-established procedures to protect the privacy of the U.S. communicant.

SEN. LEAHY: Well, we have Section 9 of the chairman's bill expands the definition of agent of foreign power.

We expanded that definition a few years ago, the so-called lone-wolf amendment. It also changes the definition of attorney general from being restricted to "the attorney or deputy attorney general" to "any person or persons designated by the attorney general." Would that permit the attorney general to delegate to every FBI agent and intelligence officer in the country the authority to authorize emergency wiretaps of phone calls?

MR. BRADBURY: No, Senator. That's not the way the attorney general delegates his authority. So, for example --

SEN. LEAHY: But would he -- under this change of definition to now include any person or persons designated by the attorney general, I'm not saying whether he would do it, but would he have that power?

MR. BRADBURY: He would never do that. He would never do --

SEN. LEAHY: Would he have the power?!

MR. BRADBURY: Not under his current regulations.

SEN. LEAHY: This is like you buy a car that can go 125 miles an hour; you're going to say, "But of course, I'll never drive it over the speed limit," but you could go 125 miles an hour. If this says he can delegate it to anybody, does he have the power to delegate it to anyone?

MR. BRADBURY: He would delegate pursuant to his existing regulations on delegations, which are limited. And so in this case, for example, you'd be talking about the assistant attorney general for the National Security Division, in all likelihood.

SEN. LEAHY: But we have in the law now it's restricted to the attorney general or the deputy attorney general, as -- (inaudible) -- reference to that in Ruth Marcus's column this morning in the paper. But this would allow -- permit him to go way beyond that, does it not? I mean, just on the face of it, aside from what he might or might not do, on the face of it does it allow him to go way beyond that?

MR. BRADBURY: Well, Senator, let me say this. All authorities of the attorney general today under statute, unless they're expressly limited against delegation, are subject to delegation by the attorney general pursuant to his

38

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

existing regulations in the Department of Justice, and this would simply allow for that. But under those    regulations, authorities of the attorney general are not widely delegated to all individual FBI agents, for example. That is simply not done, and it wouldn't ·be done.

SEN. LEAHY: I had such hopes for you earlier when you actually answered a question yes or no.

But I'll submit the rest of my questions, Mr. Chairman. You know, this is highly technical. Between the House and Senate, I remember we had more than a dozen hearings when we considered reauthorization of the Patriot Act, and this bill goes way beyond the Patriot Act. So we will require more answers. And I appreciate the extra time.

SEN. SPECTER: Well, Senator Leahy, we're available for more hearings. We've only had five. We'll have as many as we need.

General Hayden, thank you for your testimony and thank you for your service. General Alexander, thank you for your testimony and for your service. Mr. Bradbury, thank you for your testimony and your service. It's good to have real professionals come before this committee and answer the questions.

MR. BRADBURY: Thank you, Mr. Chairman, and thank you, Senator Leahy.

END.

UNCLASSIFIED//FOR OFFICIAL USE ONLY