# EXHIBIT W

# HEARING OF THE SENATE SELECT COMMITTEE ON INTELLIGENCE
## PROPOSED FISA MODERNIZATION LEGISLATION

WITNESSES:

MR. MIKE McCONNELL, DIRECTOR OF NATIONAL INTELLIGENCE;

LTG KEITH ALEXANDER, DIRECTOR, NATIONAL SECURITY AGENCY;

MR. KENNETH WAINSTEIN, ASSISTANT ATTORNEY GENERAL FOR NATIONAL SECURITY, DEPARTMENT OF JUSTICE;

MR. BENJAMIN POWELL, GENERAL COUNSEL, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE;

MR. VITO POTENZA, GENERAL COUNSEL, NATIONAL SECURITY AGENCY

CHAIRED BY: SENATOR JOHN D. ROCKEFELLER IV (D-WV)

LOCATION: 106 DIRKSEN SENATE OFFICE BUILDING, WASHINGTON, D.C.

TIME: 2:30 P.M. EDT
DATE: TUESDAY, MAY 1, 2007

SEN. ROCKEFELLER: This hearing has begun, and I welcome all of our testifiers. And other members of the committee will be coming in. I know some of the caucuses just broke up.

The Select Committee on Intelligence meets today in open session, something we don't ought to do, to consider whether the scope and application regarding the Surveillance Act needs to changed to reflect the evolving needs for the timely collection of foreign intelligence. An extraordinarily complicated subject, this is. At the committee's request, the administration has undertaken a comprehensive review of the Foreign Intelligence Surveillance Act, commonly referred to as FISA. Out of this review, the administration proposed -- it believes would modernize the laws governing the way in which we gather foreign intelligence with the use of electronic surveillance.

Consideration of the administration's proposal and alternatives will be rooted in the Intelligence Committee's 30-year experience with our nation's long and delicate effort to strike that elusive right balance between effective intelligence collection for our national security and the constitutional rights and privacy interests of Americans.

The Intelligence Committee's existence came out of the work of the Church Committee and others in the mid-'70s to bring to light abuses in the electronic surveillance of Americans. One of the committee's first tasks was to work with the Senate Judiciary Committee and with the Ford and Carter administrations from 1976 to 1978 to enact the Foreign Intelligence Surveillance Act. As we take a fresh look at the current law, we will again be working with our colleagues in the Senate Judiciary Committee.

FISA involves both the judicial process on the one hand and the collection of intelligence. Our committee's contribution to this process

1

MR. MIKE McCONNELL: Good afternoon, Chairman Rockefeller, Vice Chairman Bond, members of the committee. Thank you for inviting us to come today to engage with the Congress on legislation that will modernize the Foreign Intelligence Surveillance Act, as you mentioned, FISA -- I'll refer to it as FISA from this point on -- which was passed in 1978.

In response to your guidance from last year on the need to revise FISA, the administration has worked for over the past year, with many of you and your staff experts, to craft the proposed legislative draft. It will help our intelligence professionals, if passed, protect the nation by preventing terrorist acts inside the United States. Since 1978, FISA has served as the foundation to conduct electronic surveillance of foreign powers or agents of foreign powers inside the United States. We are here today to share with you the criticality -- critical important role that FISA plays in protecting the nation's security, and how I believe the proposed legislation will improve that role, while continuing to protect the civil and the privacy rights of all Americans.

The proposed legislation to amend FISA has four key characteristics. First, it makes the statute technology-neutral. It seeks to bring FISA up to date with the changes in communications technology that have taken place since 1978. Second, it seeks to restore FISA to its original focus on protecting the privacy interests of persons inside the United States. Third, it enhances the government's authority to secure assistance by private entities, which is vital for the intelligence community to be successful. And fourth, it makes changes that will streamline FISA administrative processes so that the intelligence community can use FISA as a tool to gather foreign intelligence information more quickly and more effectively.

The four critical questions, four critical questions that we must address in collection against foreign powers or agents of foreign powers are the following. First, who is the target of the communications? Second, where is the target located? Third, how do we intercept the communications? And fourth, where do we intercept the communications? <u>Where we intercept the communications has become a very important part of the determination that must be considered in updating FISA.</u>

As the committee is aware, I've spent the majority of my professional life in or serving the intelligence community. In that capacity, I've been both a collector of information and a consumer of intelligence information. I had the honor of serving as the director of the National Security Agency from 1992 to 1996. In that position, I was fully aware of how FISA serves a critical function enabling the collection of foreign intelligence information.

In my first 10 weeks on the job as the new director of National Intelligence, I immediately can see the results of FISA-authorized collection activity. The threats faced by our nation, as I have previously testified to this committee, are very complex and there are very many. I cannot overstate how instrumental FISA has been in helping the intelligence community protect the nation from terrorist attacks since September 11th, 2001.

Some of the specifics that support my testimony, as has been mentioned, cannot be discussed in open session. This is because certain information about our capabilities could cause us to lose the capability if known to the terrorists. I look forward to elaborating further on aspects of the issues in a closed session that is scheduled to follow.

I can, however, make the following summary-level comment about the current FISA legislation. Since the law was drafted in a period preceding today's global information technology transformation and does not address today's global systems in today's terms, the intelligence community is significantly burdened in capturing overseas communications of foreign terrorists planning to conduct attacks inside the United States.

Let me repeat that for emphasis. We are significantly burdened in capturing overseas communications of foreign terrorists planning to conduct attacks inside the United States. We must make the requested changes to protect our citizens and the nation. In today's threat environment, the FISA legislation is not agile enough to handle the community's and the country's intelligence needs. Enacted nearly 30 years ago, it has not kept pace with 21st century developments in communications technology. As a result, FISA frequently requires judicial authorization to collect the communications of non-U.S. -- that is, foreign -- persons located outside the United States.

Let me repeat again for emphasis. As a result, today's FISA requires judicial authorization to collect communications of non-U.S. persons -- i.e., foreigners -- located outside the United States. This clogs the FISA process with matters that have little to do with protecting civil liberties or privacy of persons in the United States. Modernizing FISA would greatly improve that process and relieve the massive amounts of analytic resources currently being used to craft FISA applications.

FISA was enacted before cell phones, before e-mail and before the internet was a tool used by hundreds of millions of people worldwide every day.

There are two kinds of communications. It's important to just recapture the fact, two kinds of communications: wire and wireless. It's either on a wire -- could be a copper wire, a fiber wire -- it's on a wire or it's wireless, meaning it's transmitted through the atmosphere.

When the law was passed in 1978, almost all local calls were on a wire. Almost all local calls, meaning in the United States, were on a wire, and almost all long-haul communications were in the air, were known as wireless communications. Therefore, FISA in 1978 was written to distinguish between collection on a wire and collection out of the air or against wireless.

Now in the age of modern communications today, the situation is completely reversed. It's completely reversed. Most long-haul communications -- think overseas -- are on a wire -- think fiberoptic pipe. And local calls are in the air. Think of using your cell phone for mobile communications.

Communications technology has evolved in ways that have had unforeseen consequences under FISA, passed in 1978. Technological changes have brought within FISA's scope communications that we believe the 1978 Congress did not intend to be covered. In short, communications currently fall under FISA that were originally excluded from the act. And that is foreign-to-foreign communications by parties located overseas.

The solution is to make FISA technology-neutral. Just as the Congress in 1978 could not anticipate today's technology, we cannot know what technology may bring in the next thirty years. Our job is to make the country as safe as possible by providing the highest quality intelligence available. There is no reason to tie the nation's security to a snapshot of outdated technology.

Additionally, FISA places a premium on the location of the collection. Legislators in 1978 could not have been expected to predict an integrated global communications grid that makes geography an increasingly irrelevant factor. Today, a single communication can transit the world even if the two people communicating are only located a few miles apart. And yet simply because our law has not kept pace with technology, communications intended to be excluded from FISA are in fact included. There is no real consequence -- this has real consequence on the intelligence community working to protect the nation.

Today intelligence agencies may apply, with the approval of the attorney general and the certification of other high level officials, for court orders to collect foreign intelligence information under FISA. Under the existing FISA statute, the intelligence community is often required to make a showing of probable cause.

Frequently, although not always, that person's communications are with another foreign person overseas. In such cases, the statutory requirement is to obtain a court order, based on a showing of probable cause, that slows, and in some cases prevents altogether, the government's effort to conduct surveillance of communications it believes are significant to national security, such as a terrorist coordinating attacks against the nation located overseas.

This is a point worth emphasizing, because I think many Americans would be surprised at what the current law requires. To state the case plainly: when seeking to monitor foreign persons suspected of involvement in terrorist activity who are physically located in foreign countries, the intelligence community is required under today's FISA to obtain a court order to conduct surveillance. We find ourselves in a position, because of the language in the 1978 FISA statute, simply -- we have not kept pace with the revolution in communications technology that allows the flexibility we need.

As stated earlier, this committee and the American people should know that the information we are seeking is foreign intelligence information. Specifically, this includes information relating to the capabilities, intentions and activities of foreign powers or agents of foreign powers, including information on international terrorist activities. FISA was intended to permit the surveillance of foreign intelligence targets while providing appropriate protection through court supervision to U.S. citizens and other persons located inside the United States.

Debates concerning the extent of the president's constitutional powers were heated in the mid-'70s, as indeed they are today. We believe that the judgment of the Congress at that time was that the FISA regime of court supervision was focused on situations where Fourth Amendment interests of persons in the United States were implicated. Nothing -- and I would repeat -- nothing in the proposed legislation changes this basic premise in the law.

9

112

complete understanding of how the statute has been interpreted and how it's being currently used. I don't know how you legislate that way. MR. WAINSTEIN: Well, I understand, but obviously, every time they issue an order, that is -- that can be an interpretation of how the FISA statute is -- interpretation of the FISA statute. And as you know from the numbers that we issue, we have a couple thousand FISAs a year. So that would be quite a few documents.

SEN. FEINGOLD: This is an important matter. If that's the number of items we need to look at, that's the number we will look at.

Thank you, Mr. Chairman.

SEN. ROCKEFELLER: Thank you, Senator Feingold.

Senator Nelson.

SEN. BILL NELSON (D-FL): Mr. Chairman, most of my questions I'm going to save for the closed session, but I would like to ascertain the administration's state of mind with regard to the current law. In the case where there is a foreign national in a foreign land calling into the United States, if you do not know the recipient's nationality and therefore it is possible it is a U.S. citizen, do you have to, in your interpretation of the current law, go and get a FISA order?

MR. McCONNELL: No, sir, not if it -- if the target is in a foreign country and our objective is to collect against the foreign target, and they call into the United States, currently it would not require a FISA. And let me double-check that. I may be -- I'm dated.

LTG ALEXANDER: <u>If it's collected in the United States, it would require a FISA if we do not know who the end is to, or under the program it would have to be collected.</u> If it were known, both ends foreign, known a priori, which is hard to do in this case, you would not. If it was collected overseas, you would not.

SEN. BILL NELSON: Let's go back to your second -- General, your second answer.

LTG ALEXANDER: If you know both ends -- where the call is going to go to before he makes the call, then you know that both ends were foreign; if you knew that ahead of time, you would not need a warrant.

SEN. NELSON: If you knew that.

LTG ALEXANDER: If you knew that.

SEN. NELSON: If you did not know that the recipient of the call in the U.S. is foreign, then you would have to have a FISA order.

LTG ALEXANDER: If you collected it in the United States. If you collected it overseas, you would not.

SEN. NELSON: Well, since in digital communications, if these things -- little packets of information are going all over the globe, you might be collecting it outside the United States, you might be collecting it inside the United States.

22

113

MR. McCONNELL: And Senator, that's our dilemma. In the time in 1978 when it was passed, almost everything in the United States was wire, and it was called electronic surveillance. Everything external in the United States was in the air, and it was called communications intelligence.

So what changed is now things in the United States are in the air, and things outside are on wire. That's the --

SEN. NELSON: I understand that, but -- now, I got two different answers to the same question from you, Mr. Director, and from you, General.

MR. McCONNELL: It depends on where the target is and where you collect it. That's why you heard different answers.

SEN. NELSON: So if you're collecting the information in the United States --

MR. McCONNELL: It requires a FISA.

SEN. NELSON: Okay. Under the current law, the president is allowed 72 hours in which he can go ahead and collect information and, after the fact, go back and get the FISA order.

Why was that suspended before in the collection of information?

LTG ALEXANDER: Sir, I think that would best be answered in closed session to give you exactly the correct answer, and I think I can do that.

SEN. NELSON: And -- well, then, you can acknowledge here that is -- it was in fact suspended.

SEN. ROCKEFELLER: I would hope that that would be -- we would leave this where it is.

SEN. NELSON: All right. I'll just stop there.

SEN. ROCKEFELLER: Thank you, Senator Nelson.

Senator Feinstein.

SEN. DIANNE FEINSTEIN (D-CA): Thank you very much, Mr. Chairman. The administration's proposal, Admiral, doesn't address the authority that the president and attorney general have claimed in conducting electronic surveillance outside of FISA. While the FISA Court issued a ruling that authorized the surveillance ongoing under the so-called TSP, Terrorist Surveillance Program, the White House has never acknowledged that it needs court approval. In fact, the president, under this reasoning, could restart the TSP tomorrow without court supervision if he so desired.

Now, Senator Specter and I have introduced legislation which very clearly establishes that FISA is the exclusive authority for conducting intelligence in the United States.

Here's the question: Does the administration still believe that it has the inherent authority to conduct electronic surveillance of the type done under the TSP without a warrant?