# EXHIBIT X

HEARING OF THE HOUSE SELECT INTELLIGENCE COMMITTEE
(Embedded image moved to file: pic21722.gif)SUBJECT: THE FOREIGN INTELLIGENCE SURVEILLANCE ACT
(Embedded image moved to file: pic23958.gif)CHAIRED BY: REP. SILVESTRE REYES (D-TX)
(Embedded image moved to file: pic18429.gif)WITNESSES: DIRECTOR OF NATIONAL INTELLIGENCE MIKE MCCONNELL; KENNETH WAINSTEIN, ASSISTANT ATTORNEY GENERAL
IN THE DEPARTMENT OF JUSTICE'S NATIONAL SECURITY DIVISION

1300 LONGWORTH HOUSE OFFICE BUILDING, WASHINGTON, D.C.
9:14 A.M. EDT, THURSDAY, SEPTEMBER 20, 2007

Copyright ©2007 by Federal News Service, Inc., Suite 500, 1000 Vermont Avenue, NW, Washington, DC, 20005, USA. Federal News Service, Inc. is a private firm not affiliated with the federal government. No portion of this transcript may be copied, sold or retransmitted without the written authority of Federal News Service, Inc. Copyright is not claimed as to any part of the original work prepared by a United States government officer or employee as a part of that person's official duties. For information on subscribing to the FNS Internet Service, please email to jack@fednews.com or call 1-800-211-4020.

REP. REYES: (Sounds gavel.) The committee will please come to order. Today the committee will receive testimony from the director of national intelligence, Admiral Michael McConnell, and the assistant attorney general for national security, Mr. Kenneth Wainstein, who is -- who we're waiting on now -- concerning the Foreign Intelligence Surveillance Act, and the recently enacted legislation that expanded the administration's surveillance powers; the Protect America Act, or as commonly referred to, the PAA.

10/3/2007

116

Case 6:05-cv-60903-AAR WDocument 311-31 Filed 03/31/10 Page 3 of 6
Case 3:07-cv-00109-VRW Document 99-41 Filed 7/05/09 Page 3 of 38

Page 8 of 88

REP. REYES: I want to thank my colleague from California for clarifying the fact that we may be spying on our soldiers.

With that, Director McConnell, you are recognized for your opening statement.

ADM. MCCONNELL: Thank you, Senator, ranking member Hoekstra, members of the committee, a pleasure to appear before you today.

I appreciate the opportunity to discuss the Protect America Act -- I will refer to it as PAA -- and the need for lasting modernization of the Foreign Intelligence Surveillance Act of course we'll refer to as the FISA.

I'm pleased to be joined today by Assistant Attorney General Ken Wainstein of the Department of Justice national security division.

It is my belief that the first responsibility of intelligence is to achieve understanding and to provide warning. AS the head of the nation's intelligence community, it is not only my desire but in fact my duty to encourage changes to policies and procedures, and where needed, legislation to improve our ability to provide warning of terrorist or other attacks to the country.

On taking up this post it became clear to me that our foreign intelligence capabilities were being degraded. I learned that collection using authorities provided by FISA continued to be instrumental in protecting the nation, but due to changes in technology, the law was actually preventing us from collecting foreign intelligence.

I learned that members of Congress in both chambers, and on both sides of the aisle had in fact proposed legislation to modernize FISA, and this was accomplished in 2006. In fact a bill was passed in the House in 2006.

And so the dialog on FISA has been ongoing for some time. This has been a constructive dialog, and I hope it continues in the furtherance of serving the nation to protect our citizens.

None of us want a repeat of the 9/11 attacks, although al Qaeda has stated their intention to conduct another such attack.

117

10/3/2007

Case 6:07-cv-60009-AA Document 311-31 Filed 03/31/10 Page 4 of 6
Case 9:07-cv-00109-VRW Document 99-41 Filed 03/05/09 Page 4 of 38

Page 10 of 88

When the law was passed in '78 almost all local calls in the United States were on a wire, and almost all international calls were in the air, known as wireless. Therefore FISA was written in 1978 to distinguish between collection on wire and collection out of the air.

Today the situation is completely reversed. Most international communications are on a wire, fiber optic cable, and local calls are in the air. FISA was originally -- FISA also originally placed a premium on the location of the collection. There was the cause of our problem, on a wire, in the United States, equal a warrant requirement even if it was against a foreign person located overseas.

Because of these changes in technology communications intended to be excluded from FISA in 1978 were in fact frequently included in 2007. This had real consequences. It meant the community in a significant number of cases was required to demonstrate probable cause to a court to collect communications of a foreign intelligence target located overseas. And that's very important, and I would emphasize it. Probable cause level of justification to collect against a foreign target located overseas.

Because of this, the old FISA's requirements prevented the intelligence community from collecting important intelligence information on current threats.

In a debate over the summer, and since, I've heard individuals both inside the government and outside assert that the threats to our nation do not justify this authority. Indeed, I've been accused of exaggerating the threat that the nation faces. Allow me to attempt to dispel that notion.

The threats that we face are real, and they are serious. In July of this year we released the National Intelligence Estimate, we refer to it as the NIE, on the terrorist threat to the homeland. The NIE is the community's most authoritative written judgment on a particular subject. It is coordinated among all 16 agencies of the community.

The key judgments from this NIE are posted on a website, and I would encourage all to review the full details.

In short the NIE's assessments stated the following. The U.S. homeland will face a persistent and evolving terrorist threat over the next three years. That's the period of the estimate. The main threats come from Islamic terrorist groups and cells, and most especially al Qaeda.

118

10/3/2007

Case 6:05-cv-60008-AA Document 311-31 Filed 03/31/10 Page 5 of 6
Case 3:07-cv-00109-VRW Document 99-41 Filed 07/05/09 Page 25 of 38

Page 12 of 88

values. There are three key areas that continue to need attention. For reasons that I've outlined today, it's critical that the FISA's definition of electronic surveillance be amended permanently so that it does not cover foreign intelligence targets reasonably believed to be located outside the United States. Second, I call on Congress to act swiftly to provide retroactive liability protection to the private sector. It is important to keep in mind that the intelligence community often needs the assistance of the private sector to protect the nation. We simply cannot go alone. We must provide protection to the private sector so that they can assist the community in protecting the nation while adhering to their own corporate fiduciary duties. Thirdly, in April 2007 in the bill that we submitted to Congress, we asked for a number of streamlined provisions that would make processing FISA applications more effective and efficient. These changes would substantially improve the FISA process without affecting the important substantive requirements of the law. Finally, we understand and fully support the requirement for the community to obtain a court order or a warrant any time the target for foreign surveillance is located inside the United States. That was true in 1978 when the law was originally passed. It is true today with the update that became law last month.

Mr. Chairman, that completes my remarks. I'd be happy to answer your questions.

REP. REYES: Thank you, Admiral.

With that, we recognize Mr. Wainstein for his opening statement.

MR. WAINSTEIN: Chairman Reyes, Ranking Member Hoekstra and members of the committee, good morning and thank you very much for this opportunity to testify before you again concerning FISA modernization. I'm proud to be here to represent the Department of Justice, and I'm happy to discuss this important issue with you.

The Protect America Act is an important law that has allowed the intelligence community to close intelligence gaps caused by FISA's outdated provisions, and it has already made a difference, it has already made our nation safer. In my statement this afternoon, I'll briefly explain why I believe Congress should make the Protect America Act permanent and also enact other important reforms to the FISA statute. But before I do that, I would like to thank this committee for having me in closed session last week.

And in particular, I'd like to thank you, Chairman Reyes, for proposing that we send you a letter laying out our position on some of the concerns that you and other members of the committee had with certain parts

119

10/3/2007

Case 6:05-cv-60008-AAW Document 311-21 Filed 03/31/10 Page 6 of 6
Case 3:07-cv-00109-VRW Document 99-41 Filed 07/05/09 Page 6 of 38

Page 13 of 88

of the Protect America Act, concerns that certain language might permit the government to conduct intelligence activities well beyond those that Congress contemplated when it passed the statute. As the committee is aware, we drafted and sent you that letter last Friday, and it laid out why it is that we don't think those concerns will become a reality in practice. I appreciated the opportunity to engage in that dialogue with you and your colleagues, Chairman Reyes, and I look forward to continuing it here today. I believe that this process will help to reassure Congress and the American people that the act you passed in August is a measured and sound approach to a critically important issue facing our nation.

Let me turn briefly now to why I believe the act should be made permanent. As I explained in my prior testimony, in 1978, Congress designed a judicial review process that applied primarily to surveillance activities within the United States where privacy interests are the most pronounced and not to overseas surveillance against foreign targets where (cognoscible ?) privacy interests are minimal or nonexistent. They did this very much intentionally as they were working against a constitutional backdrop articulated in case law and in legislation that did not extend 4th Amendment protections to foreigners overseas and that left the conduct of foreign intelligence surveillance against foreigners overseas within the ambit and authority of the executive branch.

With this historical backdrop in mind, Congress created a dichotomy in the statute, a dichotomy between domestic surveillance that is governed by FISA, and is therefore subject to FISA court review and approval, and overseas surveillance against foreign targets that is not. Congress established this dichotomy by distinguishing between wire communications which included most of the local and domestic traffic in 1978 and which were largely brought within the scope of the statute and radio communications which included most of the transoceanic traffic of the time and were largely left outside the scope of the statute.

As a result of the revolutions in telecommunications technology over the last 29 years, much of the international communications traffic is now conducted over fiber optic cables which qualify as wire communications under the statute. As a result, many of the surveillances directed at persons overseas which were not intended to fall within FISA became subject to FISA requiring us to seek court authorization before initiating surveillance and effectively conferring quasi-constitutional protections on terrorist suspects overseas. This process impaired our surveillance efforts and diverted resources that were better spent protecting the privacy interests of Americans here in America.

As the committee is aware, the administration had submitted to Congress a comprehensive proposal in April that would remedy this problem and provide a number of other refinements and important changes to the FISA

120

10/3/2007