**STEVEN T. WAX**
   Federal Public Defender
**STEPHEN R. SADY**
   Chief Deputy Defender
Steven Jacobson
Bryan E. Lessley ▲
Nancy Bergeson
Christopher J. Schatz
Ellen C. Pitcher
Craig Weinerman ▲
Mark Bennett Weintraub ▲
Gerald M. Needham
Thomas J. Hester
Ruben L. Iñiguez
Anthony D. Bornstein
Lisa Hay
Tonia L. Moro +

**FEDERAL PUBLIC DEFENDER**
**DISTRICT OF OREGON**

101 SW Main Street, Suite 1700
Portland OR 97204
503-326-2123 / Fax 503-326-5524

Branch Offices:

151 W. 7th, Suite 510    15 Newtown Street
Eugene, OR 97401    Medford, OR 97501
541-465-6937    541-776-3630
Fax 541-465-6975    Fax 541-776-3624

Susan Russell
Patrick Ehlers
Francesca Freccero
C. Renée Manes
Amy Baggio
Nell Brown
Kristina Hellman
Harold DuCloux III
Alison M. Clark
Brian Butler+
Thomas E. Price
Lynn Deffebach ★
Michelle Sweet ★

▲ Eugene Office
+ Medford Office
★ Research/Writing Attorney

April 2, 2010

Honorable Michael R. Hogan
United States District Court
405 East Eighth Avenue, Room 5700
Eugene, OR 97401

    Re:   *United States v. Sedaghaty, et al.*
            CR No. 05-60008 HO

Dear Judge Hogan:

    Pursuant to your direction at the hearing on April 1, 2010, following are the reasons why we believe Richard Smith is a necessary witness to complete the record on the Motion to Suppress.

    The Motion to Suppress alleges that the search was unlawful and the evidence must be excluded for a number of reasons. Mr. Smith's testimony is directly relevant to that aspect of the motion that seeks suppression of the fruits of the searches of the computers on the grounds that they exceeded the scope of the warrant, both in time and subject matter. The details are set out in the attachment to this letter.

    The necessity of Agent Smith's testimony arises from the fact that the government employed two different kinds of searches, at different times, using at least two different search platforms, and two separate search methodologies. Agent Smith's was performed in 2004, prior to any indictment. Agent Christiansen's was performed after the defendant's initial appearance. Agent Anderson, the only person who has testified about the computer searches, is not a forensic expert and her testimony is, in part, inconsistent with Agent Smith's report.

April 2, 2010
Page 2

The unlawful scope of the search of the computers was addressed in Agent Anderson's testimony on July 13, 2009. Testimony on that subject is found at pages 42-61, 73-77, 78-79, and 84. Analysis of her testimony is attached. In addition to that testimony, the Court has her declaration of December 11, 2009, and her testimony on April 1, 2010. In that testimony, she referred to her grand jury appearance in 2005 and seizing a number of photos and sending them on for determination of their contents. SH April 1, 2010, 31-32.

In the declaration, Agent Anderson stated that the review she engaged in with Agent Smith consisted of search terms "and also reviewing tens of thousand of file fragments through hexadecimal viewing." ¶ 7. Later in the declaration, she described keyword searches and hexadecimal viewing, offering an opinion on hexadecimal viewing and then stating, "this is why a more general search is required under the circumstances." ¶ 10.

Attached to the pleading of October 15, Mr. Sedaghaty submitted as a defense exhibit the reports of Computer Forensic Agent Richard Smith, dated July 31, 2009, and Computer Forensic Agent Jeremy Christiansen, dated August 4, 2009. In Smith's report, and discussed in the October pleading, Agent Smith described conducting "partition salvages in April" and working with Agent Anderson on April 15, 21, and May 6, 2004. His report described "reviewing individually the tens of thousands of salvaged files." He stated, "much of this review was conducted using hexadecimal viewing, which involves paging through thousands of pages of computer language to find fragments of files." Nowhere in his report did Agent Smith state that any search term lists existed, were provided to him, or that he used search terms.

The information from Agent Smith, as reflected in his report, is, at this point, different from the testimony of Agent Anderson because he does not refer to the use of search terms.

Review of the record reveals several things. First, Agent Anderson's recollection is not clear about when either of the search term lists was created. Second, Agent Anderson has acknowledged that material was seized and sent on for further review by a non-governmental terrorism consultant when she did not know whether it was related to Chechnya (we note again that search for items related to this term is outside the scope of the warrant signed by Judge Cooney). Third, Agent Smith's report describing hexadecimal viewing is a description of general rummaging through the computers which was not restricted in scope. Fourth, Agent Anderson's declaration of December 11, 2009, adds content to the searches she conducted with Agent Smith – use of general search terms – that are not in his report. Fifth, Agent Anderson's testimony and declaration contain admissions that at least some review of the computers occurred in 2004, without search terms, and produced material that led to items the government seeks to use, and to further searches.

April 2, 2010
Page 3

On this record, we respectfully submit that the Court should revisit (1) its decision of April 1, 2010, to limit Mr. Sedaghaty's cross-examination of Agent Anderson with respect to her declaration of December 11, 2009, and (2) require the production of Agent Smith for questioning about:

- the search process in 2004.

- the general searches he conducted in 2004.

- the extent and fruits of those searches.

- his interactions with Agent Anderson.

- the method and manner of conducting a hexadecimal search.

- the initial instructions to you in reviewing the hard drives, once they had been put in a forensic format?

- What is involved in salvaging partitions, and is file content reviewed in the process?

- What is mapping data, and what is involved in viewing computer file or directory information in that process?

- In evaluating each hard drive, were directories or file lists created so that the agent could review the contents of the entire visible directory system?

- Who was involved in the initial review of the hard drives designated Seda 6, finished on March 11, and how did you select an entry files to copy to CD to mail to agent Anderson? What criteria, if any, was supplied to you for your initial review of any of the hard drives examined?

- What were the first recovered images? When were they recovered? What did you do with them?

- What was involved in the initial review of hard drives seda 10 and 4, and how did you determine whether there was anything of evidentiary value?

- What are partition carves, and how do they assist in locating evidence that may have been erased or unintentionally corrupted? Is this a manual or automatic process? Does require opening files in order to confirm contents?

April 2, 2010
Page 4

- How were image files recovered, previewed, and determined to be relevant? How many image files were recovered? Were they all viewed? What are the other images that did not depict military activity contain?

- What was the forensic platform that you established for agent Anderson to review, and what were the capabilities of the software set up for her? Did it allow recovery and viewing of files according to searches only, or through multiple means?

- What is hexadecimal viewing, and why does it involve individually paging through computer language? How long did it take? What did you see and how did you record it on the way?

- Were the computer forensics platforms set up for the FBI in Bend and Agent Anderson, separately, the same platform or different? How did each operate? Were there any limitations on viewing contents of hard drives inherent in the platforms? Who was the FBI review platform set up for - which agent(s)? Were the reviewers of those platforms looking at whole hard drive images, or culled out selection of files? If the latter, how were the files culled?

- How were evidence files that were deemed relevant segregated from non-relevant materials?

- Were you provided lists of search terms?

- If so, do you have copies of them?

- If so, how many lists?

- When were the lists provided?

- What searches did you conduct other than with any lists?

- Did any list change during the course of your work? with additions? deletions?

- What were the products of the searches conducted without lists?

- What did you give to Agent Anderson from those searches?

- Did you provide her any cd's?

April 2, 2010
Page 5

- Do you have copies of those cd's?

If Agent Smith's answers are consistent with his report, we believe that they will even more firmly establish that general searches were conducted, and that they produced material that was used in the searching investigation and from which material was provided to Agent Anderson.

Agent Anderson would need to be recalled for cross-examination on her account of these issues as set out in her declaration. Agent Christiansen would need to be called about his work in 2008, his computer search methodology, his interactions with Agent Anderson, directions he received from her in the form of lists of search terms, and any interactions with Agent Smith.

If, however, the Court is prepared to accept and credit Agent Smith's report as an accurate description of unguided searching and Agent Anderson's admission that such searches were conducted and produced fruits that were used later, we would not need further testimony.

Thank you for your consideration.

Sincerely,

Steven T. Wax
Federal Public Defender

STW/sls
cc: Lawrence Matasar
    AUSA Charles Gorder
    AUSA Chris Cardani
O:\Client\Wax\Sedaghaty, Pirouz, 2007-1124\corres\hogan.15.wpd

## ATTACHMENT TO LETTER DATED APRIL 2, 2010

The computer aspect of the motion is set out in the initial Memorandum in Support of Motion to Suppress Evidence at pages 12 through 21 (CR 183). Additional argument was provided in the Reply to Government's Response to Defendant's Motion to Suppress (CR 196) at pages 2-5.

After the decision in *United States v. Comprehensive Drug Testing Inc.*, 579 F.3d 989 (9th Cir. 2009) (*en banc*), further argument was provided in the Supplement to Defendant's Motion to Suppress. We note that the scope of the computer search aspect of the Motion to Suppress was not initially based on, and does not need, *CDT* in order for Mr. Sedaghaty to prevail. The issue was next addressed in a Supplemental Memorandum in Support of Motion to Suppress (CR 230) filed on October 15, 2009, after Mr. Sedaghaty had had an opportunity to review the reports of the government's computer forensic experts, Richard Smith and Jeremy Christiansen, reports that were apparently prepared after the hearing on the Motion to Suppress.

The issue was next addressed in defendant's Reply to Government's Response to Defendant's [First] Supplement to Motion to Suppress, CR 234, a pleading that addressed the government's arguments with respect to retroactivity. The same issue is addressed in Mr. Sedaghaty's reply to government letter of March 19, 2010, regarding *CDT* and Motion to Suppress, CR 302.

Of particular relevance to the computer aspect of the Motion to Suppress is the following testimony of Agent Anderson:

> Question: Looking at the complete exhibit then, Agent Anderson, we have one page labeled search terms without numbers, and then three pages DT search terms that go 1 - 73. Were they created at different times?
>
> Answer: Yes, they were.
>
> Question: Please tell us which was created first.
>
> Answer: No, I don't recall which one came before the other one.
>
> Question: Who created the first one, search terms?
>
> Answer: I did.
>
> Question: When?
>
> Answer: After I received access to all of the data that needed to be

1

retrieved.

SH 44-45. Agent Anderson then went on to state that she created the first list on her own and she believes the second after consulting with AUSA Cardani and Special Agent Carroll. SH 45-46. She then stated:

> Answer: No, I believe what I stated was that I'm not sure if this was done in conjunction with the data being shipped to me or if I had done it after having access to it.

SH 46.

> Agent Anderson then returned to the subject:

> Answer: What I stated was that I was not sure if the search terms were created prior to receiving the data or after receiving the data from my CIS. However, I do believe the search terms were created during the time period that my CIS was processing the information and sent it to me.

SH 52. At that point, it is not clear whether she is referring to Richard Smith in 2004 or Jeremy Christiansen in 2008. When she continued on the next page, it appears as though she is referring to Mr. Christiansen in 2008 because she refers to an IRS specialist in Washington, D.C. and the DT search program. SH 53. On page 54, she continued discussing the processing in Washington and the DT search term list. SH 54.

Later in her testimony, Agent Anderson described the search of the computers as a "evolving" process.

> Answer: Yes, it was evolving. Like I said, I'd use one of the search terms, some information would come up, I would learn about something I hadn't known before but was obviously relevant to the tax charges, and would use new search terms to pull up the newly relevant information.

SH 74. On pages 77-82, Agent Anderson acknowledged that the search warrant authorized the search for specified names and organizations and that her search included names and organizations that were not listed in the warrant.