**Steven T. Wax, OSB No. 85012**
**Federal Public Defender**
**101 SW Main Street, Suite 1700**
**Portland, OR  97204**
**Tel: (503) 326-2123**
**Fax: (503) 326-5524**
**Email: steve_wax@fd.org**

**Lawrence Matasar, OSB No. 74209**
**621 SW Morrison Street, Suite #1025**
**Portland, OR 97205**
**Tel: (503) 222-9830**
**Email: larry@pdxlaw.com**

**Attorneys for Defendant**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CR 05-60008** |
| **Plaintiff,** | |
| **v.** | **DEFENDANT'S MOTION FOR AN EVIDENTIARY *DAUBERT* HEARING** |
| **PIROUZ SEDAGHATY,** | |
| **Defendant.** | |

## Introduction

Defendant, Pirouz Sedaghaty, by and through counsel, Federal Public Defender

Steven T. Wax, and Lawrence Matasar, hereby moves the Court pursuant to Rule 702

Federal Rules of Evidence to conduct an evidentiary *Daubert* hearing requiring the presence of Mr. Evan Kohlmann for examination by counsel and the Court in aid of the Court's gatekeeping duty to determine: (1) Mr. Kohlmann's qualifications to testify as a government expert witness; and, (2) the scope and admissibility of his proposed testimony.    The *Daubert* hearing is scheduled for May 10, 2010.  Mr. Kohlmann has been identified on the government's witness list as:

> An expert on the conflict in Chechnya.  He will provide background on the conflict, the role of the *mujahideen* in the conflict, and the funding of the *mujahideen* in Chechnya by the Al-Haramain Islamic Foundation.  He will also introduce material promoted by the Al-Haramain Islamic Foundation on its website, and identify some of the items found on defendant Sedaghaty's computers.

Govt. Amended Witness List, Doc. 293.

Mr. Kohlmann submitted a 29 page, single-spaced, heavily footnoted expert report in this case.  The report is a repository of information derived from secondary and tertiary sources, nothing based on the witness's first-hand experience.  Much of the report is gratuitously inflammatory, generously seasoned with references to bin Laden, Moussaoui, 9/11, and horrifying acts of brutality.  Little if any of the report has anything to do with the issues and parties in this case or can be considered to be within the bounds of helpful  "background."

The Kohlmann report appears to be largely boilerplate, a template this witness has used time and again in other cases.  Moreover, those other cases are critically different from this case.  Most of Mr. Kohlmann's other cases involved charges of direct participation in acts of terrorism, such as assassinations, kidnappings, hostage taking, and intentional efforts to harm American soldiers, citizens, or interests.  As such, Mr.

Kohlmann's testimony in those cases concerning the structure, goals, and acts of terrorists or terrorist groups might be seen as closer to the heart of the charged offenses. This is not one of those cases.

This is primarily a tax case. Any "terrorism" dimension to this case is subsidiary relating to the motive for or willfulness aspect, not the essence, of the pending charges. The words of Judge Kravitz in ruling on *Daubert* objections to Mr. Kohlmann's testimony in another case have real meaning here: "Nor should the Government use Mr. Kohlmann to turn this trial of a single alleged disclosure of classified information into an extended trial that is instead focused on al Qaeda, Bosnia or Chechnya." Feb. 20, 2008 Ruling and Order, *United States v. Abu-Jihaad*, Crim. No. 3:07-CR-57 (D. CN 2008).

**Rules Bearing On The Court's "Gatekeeping" Role**

In the exercise of its "gatekeeping" role, the Court must assess the qualifications of the witness to testify about particular subjects as an expert, as well as the reliability and relevance of the proposed testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). That assessment applies both to the substance of the expert's testimony and the methodology by which the expert arrived at his findings and opinions. *Id.* at 592-93. Thus, before an expert can be presented to the jury, the Court needs to determine whether the substance of the expert's testimony is relevant and the methodology by which he reaches his conclusions is reliable under Rule 702 Federal Rules of Evidence. The Court must decide if the expert's testimony is "based upon sufficient facts or data" and is the "product of reliable principles and methods," and

whether the witness "has applied the principles and methods reliably to the facts of the case." *Id.*

Essentially, then, the Court's gatekeeping role is intended to assure that expert testimony conforms to the rules of admissibility set out in the Federal Rules of Evidence. Several Rules bear on this function.

The first rule of admissibility for any and all evidence is that it must be relevant to the issues at bar, meaning that it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401. As we develop below, based on his report, it is difficult to see what light Mr. Kohlmann's proposed testimony will shed on the probability of whether Mr. Sedaghaty intended to conceal material facts from the IRS -- the central issue at bar. Examination of the witness at the *Daubert* hearing is necessary to determine what if any aspect of his testimony is relevant to Mr. Sedaghaty's case.

Rule 403 also applies to the *Daubert* analysis:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

None of Mr. Kohlmann's many references to the violent history of jihad, which is his singular theme, is relevant. Even if some of it were relevant, its inevitable and intended impact is to sow prejudice and confusion. Counsel need an opportunity to examine Mr. Kohlmann to develop whether any aspect of this testimony is relevant and, if so, whether its probative value is outweighed by its explosive content.

Rule 702 sets out the basic elements of admissibility for expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Based on Mr. Kohlmann's report, none of his proposed testimony would be scientific or technical in nature. The report is lifted from sources that appear to be widely available to anyone with access to newspapers and a computer. As a threshold matter, then, during the *Daubert* hearing counsel for defendant need to examine the nature of Mr. Kohlmann's sources to assist the Court in determining whether his testimony may fairly be characterized as "specialized knowledge." More fundamentally, because the report ranges far beyond anything remotely connected with this case, counsel need an opportunity to examine Mr. Kohlmann so the Court might determine whether and how his testimony could assist the jury, whether he followed reliable principles and methods and, of particular importance, whether he *applied* them "reliably to the facts of the case."

Finally, Rule 703 contemplates that the trial court will have fully considered all aspects of the expert witness's proposed testimony *before* the witness is presented to the jury.

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert, at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the

opinion or inference unless the court determines that their probative value
in assisting the jury to evaluate the expert's opinion substantially
outweighs their prejudicial effect.

All of Mr. Kohlmann's proposed testimony is hearsay. But for the special

accommodations accorded to experts none of his testimony would be admissible.

Under the Rules, expert witness accommodations are not granted without a detailed

pre-screening of the proposed testimony. ("Presumably, this relaxation of the usual

requirement of firsthand knowledge . . . is premised on an assumption that the expert's

opinion will have a reliable basis in the knowledge and experience of his discipline.")

*Daubert* at  592.

Rule 703 makes it clear that the trial court needs to  determine in advance

whether hearsay sources are "of a type reasonably relied upon by experts in the field"

and that they are in fact necessary predicates for relevant opinions or inferences

contained in the witness's testimony.  The report does not make clear what opinions, if

any, Mr. Kohlmann intends to offer.  Without further examination of the witness,

therefore, it is not possible to ascertain (1) his opinions, (2) how much of his hearsay

testimony, if any, is a necessary predicate for his opinions, and (3) whether such

hearsay is "of a type reasonably relied upon by experts in the particular field."

Moreover, much of the Kohlmann report is calculated to inflame the passions of

jurors, particularly American jurors.  There are no words or images more terrifying today

in the United States  than those relating to terrorism.  In a case that does not involve

charges of participating in or providing material support for terrorism, the probative

value of testimony about the homicidal individuals and blood-curdling activities

associated with terrorist organizations is dubious at best, whereas its potential for

confusion and unfair prejudice is unbounded.  Examination of the witness at the

*Daubert* hearing is needed to give the Court time to make the "probative/prejudice"

calculation under Rules 403 and 703 *before* the testimony is presented to the jury.

Mr. Kohlmann was required to testify in pre-trial hearings in other U.S. district

courts, or in a deposition, for the purpose of creating a record on which counsel could

examine and the court could determine his qualifications and the relevance and

reliability of his proffered testimony.  *See, e.g.: United States v. Abu Jihaad* (D. CN)

Crim. No. 3:07-CR-57 (MRK)*; United States v. Ahmed* (N.D. GA) 1:06-CR-147-WSD-

GGB*; United States v. Al-Hussayen* (D. ID) CR-03-048-C-EJL*; United States v. Amawi*

(N.D. OH) 3:06-CR-719; *United States v. Aref* (N.D.N.Y.) 4-CR-402; *United States v*

*Paracha (S.D.N.Y.) No. 03-CR 1197(SHS); United States v. Mubayyid* (D. MA)  Cr. No.

05-40026-FDS.  A review of those records reveals facts and insights that are relevant to

this motion.  First, as noted above, the nature of the charges and issues in those and

other cases in which Mr. Kohlmann testified is quite different from those in this case.

*See, e.g.:*

- *Abu Jihaad ka Paul R. Hall*  (D. Conn. 2008) (Hall was a US Navy man
accused of providing classified information to persons affiliated with
Azzam Publications, which operated jihadist websites and recruited for
mujahideen and promoted jihadist activities.  The classified information
concerned operational movements of his ship and Battle Group in the
Persian Gulf, including when it was scheduled to pass through the Straits
of Hormuz, and describing its vulnerability to attack.)

- *Ahmed* (ND GA 2009) *(*casing and videotaping monuments and other
sites in Washington, DC, as targets and sending the videos to known
terrorists, who stored and distributed multiple videos of violent jihad;
discussions with other known terrorists of plans to participate in violent
jihad including attacking a U.S. Air Force base in the state of Georgia;
participating in paramilitary training; traveling to Pakistan and Bangladesh

for attendance at a madrassa, further training and eventual participation in fighting with Lashkar-e-Taiba in Kashmir and elsewhere)

- *Amawi* (ND Ohio 2008)  (conspiracy to kill US soldiers in Iraq; recruitment of persons to join jihad in Iraq; providing material support; downloading website materials for use in training jihadists, including use of IEDs, suicide vests; conduct firearms training; travel to Jordan to deliver laptop to mujahideen; and a threat to kill or maim the President of the United States.)

- *Aref* (N.D.N.Y.) (conspiracy to facilitate purchase of surface to air missile to be given to terrorists in New York City.)

- *Paracha* (SD NY)  (Paracha posed as a person he knew to be an Al-Qaeda operative to obtain immigration documents that would assist the Al-Qaeda operative in getting entry to the U.S.,  accepting $200,000 of Al-Qaeda funds to invest in his business. The gravamen of this case is, thus, directly tied to the defendant's personal association with specific Al-Qaeda operatives, and his participation in actions that clearly, not remotely or potentially, imperiled Americans that are consistent with the Al-Qaeda goals and activities about which Mr. Kohlmann testified.)

- *Benkahla I and II*" (ED Va and 4th Cir.)  (willfully supplying services to the Taliban, using a firearm in furtherance of that purpose, and participation in a jihadist training camp run by Lashkar-e-Tiba ("LeT.") in Afghanistan, traveling in the company of someone later convicted of conspiracy to assassinate the President of the United States)

- *Mubayyid* and *Muntaseer* (D MA 2007)   (Although the core charges relate to tax fraud, the Mubayyid/Muntaseer case involves a series of overt acts that make it a genuine "terrorism" case unlike the instant case.  For example, the defendants in the Mubayyid/Muntaseer case had been operating the Boston office of Al-Kifah that was connected to the 1993 World Trade Center bombing.  In the aftermath of that bombing, they established another not-for-profit organization called "Care" which, in fact, appeared to be an alter-ego of Al-Kifah that was engaged in the same kind of pro-jihad activities as Al-Kifah.  Also, the defendants in that case committed multiple acts of dishonesty on several tax forms and in multiple interviews with several government agencies.  More fundamentally, the defendants in the Mubayyid/Muntaseer case were attempting to conceal their personal participation in establishing a pro jihad organization in Boston that directly published, as opposed to just having on their computers, pro-jihad literature, including the English version of "Join the Caravan" written by Abdullah Azzam, a notorious anti-U.S. militant, and directly soliciting and expending funds for the mujahideen.)

Second, the courts found it useful to hear Mr. Kohlmann's testimony for

purposes of tailoring his testimony to the facts and issues of the case. *See, e.g.:*

- *Amawi:* Initially, the district court excluded Kohlmann's testimony altogether because its limited probative value outweighed its potential for unfair prejudice.  That ruling was premised on several grounds: (1) the defendants were not connected to any of the jihadist individuals or organizations mentioned by Kohlmann; (2) the CDs and other computer materials Kohlmann wanted to testify about were widely available to the public on websites that were not controlled by terrorist organizations; (3) Kohlmann overstated the difficulty of getting access to the websites containing jihadist videos; (4) the nature of the video materials was self-evident and required no expert testimony.  Eventually, after the Government laid foundations through independent non-expert means, Kohlmann was allowed to testify to the limited issue of the use of the internet by jihadist organizations to distribute propaganda and to tie a video that the defendants were proven to have watched to a jihadist organization.  Even that testimony was accompanied by limiting instructions that there was no proof that the defendants sought out or ever contacted jihadist organizations or that the organizations ever sought out or contacted the defendants.  Further, the court specifically disallowed any mention of Zacharias Moussaoui.

- *Abu Jihaad*: The court imposed certain limitations on EK's testimony:  "Mr. Kohlmann may provide the historical context the Government seeks, but he may not testify directly about Mr. Abu-Jihaad or his motivations lest his testimony 'usurp[] the jury's function.' *Id*. at 54 (quotation marks omitted).  Thus, Mr. Kohlmann should not testify about why individuals like Mr. Abu-Jihaad would want to order jihadi videos from Azzam Publications or provide information to Azzam Publications.  Nor should the Government use Mr. Kohlmann to turn this trial of a single alleged disclosure of classified information into an extended trial that is instead focused on al Qaeda, Bosnia, or Chechnya." (emphasis added).  In addition, the court noted that defendants reserved their right to object to any facet of his testimony that lacks a proper foundation or that implicates Rule 403's concerns regarding unfair prejudice and confusion.

- *Benkahla II :* In the retrial of *Benkahla*, the trial judge excluded an inflammatory video ("Russian Hell") as well as specific testimony about the defendants.

- *Paracha*:  Mr. Kohlmann was not allowed to testify about specific acts of terrorism because prejudice outweighed probative value.

- *Mubayyid:*  The transcript of Mr. Kohlmann's testimony illustrates the proper use of the *Daubert* hearing to filter out irrelevant and unfairly prejudicial testimony.  The transcript of the hearing reveals the judge's struggle with what is or is not relevant, certain misgivings about Mr. Kohlmann's qualifications, his tendency to overstate and speculate and the need to control his testimony so that it is "measured, and not veering into sensational or speculative...."

**An Evidentiary *Daubert* Hearing Is Necessary To Examine The Relevance And Applicability of Mr. Kohlmann's Testimony To The Facts And Issues In This Case.**

A large part of the Court's gatekeeping responsibility under Rule 702 is to assure that the "expert testimony proffered in the case is sufficiently tied to the facts of the case and that it will aid the jury in resolving a factual dispute."  *Daubert* at 591.  Unless the testimony is "helpful" to the jury's fact-finding duties, it should not be admitted.  "Helpfulness" requires a valid "connection to the pertinent inquiry as a precondition to admissibility."  *Id.* at 591.

The vast portion of Mr. Kohlmann's report is a boilerplate recitation of allegedly historical jihadist events and allegedly biographical information about jihadist leaders having no connection whatsoever with Mr. Sedaghaty or the charges in the indictment.  Section II of the report beginning on page 4 concerns "The Islamic Army of the Caucasus."  This section might fairly be characterized as a mini biography of a Saudi national called Ibn-ul-Khattab. It goes on for several single-spaced pages describing Mr. Khattab and his exploits in Chechnya.  Kohlmann quotes from sources he considers to be "enemy propaganda" portraying Khattab as a formidable, rather romantic figure in the annals of jihadism – "the lion cub was transformed into an outstanding fighter and one of the bravest and most adroit leaders among the Mujahideen" and so forth. On page 15, he talks about a propaganda video called "Russian Hell in the Year 2000" that

depicts the "execution of wounded Russian prisoners by Khattab himself."  On page 16, he quotes Khattab as saying, "There's no difference between the American Army and the Russian Army.  They seized our territory, and the Muslims have the right to seek such a solution."

Most of the story about Khattab concerns events that pre-date Al-Haramain's entry into the United States.  *None* of it is in any way connected to Mr. Sedaghaty. Counsel need to explore with Mr. Kohlmann in what possible manner this kind of testimony will assist the jurors in their fact-finding duties in this case.

On page 7 of his report, and again on page 25 using identical words, Mr. Kohlmann refers to Zacharias Moussaoui who, he reminds us, "pled guilty to conspiring to kill Americans as part of the September 11, 2001 suicide hijackings."  Page 8 of his report shows a picture of a dead man, a Saudi Arabian killed while fighting in Dagestan. On page 9 of his report, Mr. Kohlmann, again referring to videos that he considers "enemy propaganda," talks about "fatwahs" and intentions to inflict great damage on American military forces in Iraq.  On page 12, he talks about Gulbuddin Hekmatayar, a "notorious Afghan mujahideen commander" the defendant does not know, who might be associated with another person that the defendant does not know, and has had no contact with. On page 14, Mr. Kohlmann discusses an insurgent operation against the Russians involving "1,600 innocent hostage at a hospital" and "129 civilians" killed.  On page 15, he talks about "bloody close encounters," "roadside bombings," "suicide attacks," "Black Widows (female operatives disguised as civilians)," "campaign of bombings," "smashing the Russian positions".  On page 16, he mentions  "suicide unit",

hostage taking, killing "nearly 115 hostages," "exacting maximum damage," "stormed an elementary school", "320 innocent people killed," the "Belan massacre."

Without question, this testimony is not calculated to help the jurors, but to incite them. Mr. Kohlmann's report does not even try to connect up his scary tales with the defendant in this case or with the issues at bar.  He cannot do so.   Liberal references to notorious leaders of jihadist warfare, suicide bombings, hijackings, 1,600 innocent hostages, the execution of wounded prisoners, conspiracies to kill Americans and the like, seamlessly punctuated with references to Al-Haramain, can only be calculated to inflame and confuse the jury into finding what the facts simply do not support. The government cannot fairly or convincingly tie Mr. Sedaghaty to the pro-jihadist actions and sympathies of others. It should not be allowed to do so by sowing confusion and prejudice through the testimony of Mr. Kohlmann.

Mr. Kohlmann should, therefore, be made available as a witness so that counsel may make a record from which the Court can determine whether, or which part of,  Mr. Kohlmann's testimony has any probative value and, to the extent it might, whether its potential for confusing or misleading the jury, or inflaming the jury's passions, outweighs its probative value.

**An Evidentiary *Daubert* Hearing Is Necessary To Examine The Reliability Of Mr. Kohlmann's Sources.**

Mr. Kohlmann's highly detailed report contains 120 noted sources.  Kohlmann himself considers fifty-nine of these notations to be based in enemy propaganda. Specifically, thirty-seven of his source notations refer to materials and websites owned and operated by Azzam Publications, an organization that Kohlmann calls "the

undisputed top mujahideen propaganda site on the Internet."  (p. 23, GOV 3059.);
twenty-one are from "The Sword of Islam: Khattab," a video that Kohlmann calls
"mujahideen propaganda."  (p.5, GOV 3041.  One (note 66) is from a source that
Kohlmann says is "a Saudi dissident group aligned with Usama Bin Laden."  (p. 17,
GOV 3053.)  Some of Kohlmann's other sources are either selectively biased or of
dubious reliability.  For example, twelve are from prosecutorial exhibits or proffers of
evidence, six are from Russian FSB reports, and several are from other organizations
that are sympathetic to the international propagation of Islam.

It is common knowledge that the Russian FSB is bitterly, some would say
brutally, engaged in the suppression of Islamic separatist organizations in Chechnya
and the Caucasus. It is also beyond question that propaganda machines for jihadist
movements will exaggerate and distort facts, events and personalities connected with
their sphere of interest.  Yet Mr.  Kohlmann uses these sources not simply to associate
the defendant with them, but as the very basis for his disquisitions about jihadist
warfare and the like. Examination of the witness is therefore necessary to establish a
basis for the Court to determine the reliability of a major portion of the sources used by
Mr. Kohlmann in preparing his pro-prosecution testimony in this case.

**An Evidentiary *Daubert* Hearing Is Necessary To Examine Mr. Kohlmann's
Qualifications To Testify As An Expert In This Case.**

Mr. Kohlmann's alleged expertise appears to be entirely derivative, not
experiential.  Except possibly for a handful of first-person interviews he claims to have
had with persons not connected with this case, his base of knowledge comes from
reading materials prepared by others – web sites, videos, journals, and the like – either

in school or in his consulting business, which appears to be mostly self-employment.  It does not appear that he can claim first-hand experience with the subject matters of intelligence, terrorism, and counter-terrorism, and with the strategies and policies surrounding same.

His report leaves many holes in, and raises many questions concerning, his qualifications that need to be explored at an evidentiary hearing.  For example:

- Does he have any military training or service of any kind, particularly in special forces, intelligence, or counter-insurgency that focus on terrorism organizations?

- Does he have any civilian intelligence service (CIA, FBI, DIA, NSA, Homeland Security)?

- Has he ever lived or worked for any substantial period in the Mideast or in a Muslim country?

- Has he ever been a journalist or foreign correspondent assigned to Mideast or terrorism stories?

- Has he ever pursued a graduate degree in Middle East studies, Islam, national security or terrorism?

- To what extent, if at all, does he speak Arabic, or Pashtu or Urdu?  What portion of his source material is written in those languages? Given the requirement that an expert is allowed to base his opinions on hearsay only if it is a type of hearsay that is "reasonably relied upon by experts in the particular field" (R. 703) it is necessary to inquire about the identity, location, qualifications and reliability of his translators.  Otherwise, the Court is handicapped in its ability to determine if that portion of Kohlmann's testimony satisfies this requirement of the Rules.

- Exactly what academics, policy makers, law enforcement officers has he worked for and what did he do for them?

- Has he ever been consulted by policy makers for advice outside the litigation context?

- Exactly what are, and what did he do for, the Investigative Project and NEFA?  Who are their officers, principals, owners and clients?

- •    Who are his clients in connection with Globalterror.com?

- •    Has he ever been told by a court that he tends to exaggerate in his testimony or that he needs to be reined in?

In short, Mr. Kohlmann's report is nothing more than a wide-ranging compilation of jihadist history based mostly on admitted propaganda having no connection with the defendant in this case or the issues at bar.  To the extent he has anything of relevance to add to the trial of Mr. Sedaghaty it is not apparent from the report.  Moreover, his qualifications to offer any relevant expert testimony appear thin at best.  Therefore, counsel need an opportunity to examine Mr. Kohlmann at the hearing on May 10 to probe his qualifications and to ascertain in what manner his testimony is based on reliable sources and will assist the jury in understanding the evidence or in determining disputed facts at issue in this case.

RESPECTFULLY SUBMITTED this 16th day of April, 2010.


/s/ Steven T. Wax
Steven T. Wax
Federal Public Defender

/s/ Lawrence Matasar
Lawrence Matasar


Bernard J. Casey
On the Memorandum