**Steven T. Wax, OSB No. 85012**
**Federal Public Defender**
**101 SW Main Street, Suite 1700**
**Portland, OR  97204**
**Tel: (503) 326-2123**
**Fax: (503) 326-5524**
**Email: steve_wax@fd.org**

**Lawrence Matasar, OSB No. 74209**
**621 SW Morrison Street, Suite #1025**
**Portland, OR 97205**
**Tel: (503) 222-9830**
**Email: larry@pdxlaw.com**

**Attorneys for Defendant**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CR 05-60008 HO** |
| **Plaintiff,** | **MEMORANDUM IN SUPPORT OF VOIR DIRE MOTIONS** |
| **v.** | |
| **PIROUZ SEDAGHATY,** | |
| **Defendant.** | |

# TABLE OF CONTENTS

**PAGE**

I.    The Right to a Fair Trial and a Fair and Impartial Jury
      Requires Thorough Voir Dire. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

      A.    Trials Involving Issues Of Terrorism Are Different And Require
            Special Commitment To Thorough And Fair Jury Selection. . . . . . . . . . .  8

II.   The Court Should Allow the Attorneys To Ask Voir Dire Questions
      of the Jurors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

III.  The Court Should Question the Prospective Jurors With Open
      Ended Questions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

IV.   The Voir Dire In This Case Should Be Conducted Individually And
      Out Of The Presence Of The Other Prospective Jurors. . . . . . . . . . . . . . . . .  27

V.    Questionnaire. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

VI.   The Defense Should Be Granted 5 Additional Peremptory Challenges. . . . . . .  30

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

# TABLE OF AUTHORITIES

**PAGE**

*Azimi v. Jordan's Meats, Inc.*,
    456 F.3d 228 (1st Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*Batson v. Kentucky*,
    476 U.S. 79 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 23

*Berryhill v. Zant*,
    858 F.2d 633 (11th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 19

*Bursten v. United States*,
    395 F.2d 976 (5th Cir. 1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*Calley v. Callaway*,
    519 F.2d 184 (5th Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*Coleman v. Kemp*,
    778 F.2d 1487 (11th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*Duncan v. Louisiana*,
    391 U.S. 145 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 4

*Irvin v. Dowd*,
    366 U.S. 717 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 26

*Isaacs v. Kemp*,
    778 F.2d 1482 (11th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*J.E.B. v. Alabama*,
    511 U.S. 127 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

*Jordan v. Lippman*,
    763 F.2d 1265 (11th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*King v. Lynaugh*,
    850 F.2d 1055 (5th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

*McClesky v. Kemp*,
    481 U.S. 279 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

*Morford v. United States*,
   339 U.S. 258. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Mu'Min v. Virginia*,
   500 U.S. 415 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Murphy v. Florida*,
   421 U.S. 794 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Nebraska Press Ass 'n v. Stewart*,
   427 U.S. 539 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Offutt v. United States*,
   348 U.S. 11 (1954). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Pruett v. Norris*,
   153 F.3d 579 (8th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Quercia v. United States*,
   289 U.S. 466 (1933). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Ristaino v. Ross*,
   424 U.S. 589. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Rosales-Lopez v. United States*,
   451 U.S. 182 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 28

*Sheppard v. Maxwell*,
   384 U.S. 333 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Silverthorne v. United States*,
   400 F.2d 627 (9th Cir. 1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10, 27

*Swain v. Alabama*,
   380 U.S. 202 (1964), *overruled on other grounds by*. . . . . . . . . . . . . . . . . . . 2

*Taylor v. Louisiana*,
   419 U.S. 522 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

*Turner v. Murray*,
   476 U.S. 28 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Baldwin*,
   607 F.2d 1295 (9th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*United States v. Borders*,
    270 F.3d 1180 (8th Cir.2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

*United States v. Davis*,
    583 F.2d 190 (5th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*United States v. Dellinger*,
    472 F.2d 340 (7th Cir. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*United States v. Ford*,
    824 F.2d 1430 (5th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

*United States v. Gonzalez*,
    214 F.3d 1109 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

*United States v. Haldeman*,
    559 F.2d 31 (D.C. Cir. 1976), *cert denied*, 431 U.S. 933 (1977). . . . . . . . . . . .  26

*United States v. Harris*,
    542 F.2d 1283 (7th Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

*United States v. Hashimoto*,
    878 F.2d 1126 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

*United States v. Hawkins*,
    658 F.2d 279 (5th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

*United States v. Hearst*,
    466 F. Supp. 1068 (ND Cal. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

*United States v. Johnson*,
    584 F.2d 148 (6th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

*United States v. Ledee*,
    549 F.2d 990 (5th Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21, 22

*United States v. McVeigh*,
    918 F. Supp. 1467 (W.D. Okla. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . .  7, 8, 11

*United States v. McVeigh*,
    955 F. Supp. 1281 (D. Colo. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

*United States v. Nelson*,
    277 F.3d 164 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

*United States v. Noone*,
   913 F.2d 20 (1st Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Patterson*,
   648 F.2d 625 (9th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Ricketts*,
   146 F.3d 492 (7th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Robinson*,
   475 F.2d 376 (D.C. Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Rossbach*,
   701 F.2d 713 (8th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Rucker*,
   557 F.2d 1046 (4th Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6

*United States v. Sarkisian*,
   197 F.3d 966 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Springfield*,
   829 F.2d 860 (9th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Whitt*,
   718 F.2d 1494 (CA10 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Wansley v. Slayton*,
   487 F.2d 90 (4th Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Wells v. Murray*,
   831 F.2d 468 (4th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**STATE CASES**

*State v. Williams*,
   550 A.2d 1172 (NJ 1988).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Stevens v. State*,
   770 N.E.2d 739 (Ind. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Defendant Pirouz Sedaghaty, through his attorneys, Steven T. Wax and Lawrence Matasar, has filed four motions related to the voir dire in this case. This memorandum is filed in support of those motions and discusses the legal bases for Mr. Sedaghaty's request.

## I.    The Right to a Fair Trial and a Fair and Impartial Jury Requires Thorough Voir Dire

Trial by jury lies at the very core of our democratic institutions. It is the process through which we permit the state to impose penalties upon us as individual citizens when we are alleged to have violated one of society's penal norms. It is a right to which legal scholars and jurists repeatedly pay homage. *See, e.g., Duncan v. Louisiana,* 391 U.S. 145, 151-56 (1968). As articulated in the Fifth Circuit:

> [J]ury selection is [not] a preliminary and essentially ministerial act. At the least it is an essential instrument to the delivery of a defendant's constitutionally secured right to a jury trial rooted in the commands of due process, if not the trial guarantees of the sixth amendment and section 2 of article III themselves.

*United States v. Ford*, 824 F.2d 1430, 1435 (5th Cir. 1987).

The right to trial by jury is given content by such noble phrases as the requirement of an "impartial"jury (Sixth Amendment to the United States Constitution); a right to a jury which has not prejudged an issue (*Taylor v. Louisiana*, 419 U.S. 522, 530 (1975)); a right to a jury which will decide a case based solely on the law and facts addressed in court (*Irvin v. Dowd*, 366 U.S. 717, 722-723 (1961)). One of the avenues we have chosen to ensure selection of a fair jury is to build a system of juror challenges into our justice system.

Our legislatures and courts have long recognized that we should not rely on any randomly selected group of citizens to judge a case.  As set forth by the Supreme Court, "Voir dire examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges."  *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991).  Moreover, the right to challenges for cause and peremptory challenges is firmly embedded in our federal system and that of each of the 50 states. *See Swain v. Alabama*, 380 U.S. 202, 214-217 (1964), *overruled on other grounds by Batson v. Kentucky*, 476 U.S. 79 (1986).  The use of challenges, moreover, has a long history under the English common law from well before the Revolution.  *Id.* at 212-213.

Challenges enable counsel to deal with the fact that all people walk into a criminal courtroom with opinions and biases based on a lifetime of experience and that some cannot overcome these and fairly judge a case.  A right to challenge prospective jurors is, however, worthless unless the challenges have meaning.  Challenges can only have meaning if the attorneys have information which enables them to discern differences among prospective jurors.  As stated in *United States v. Harris*, 542 F.2d 1283, 1295 (7th Cir. 1976): "The defendants must be permitted sufficient inquiry into the backgrounds and attitudes of prospective jurors to enable them to exercise intelligently their peremptory challenges."  *See also United States v. Noone*, 913 F.2d 20, 32 (1st Cir. 1990); *United States v. Hashimoto*, 878 F.2d 1126, 1133 (9th Cir. 1989); *Berryhill v. Zant*, 858 F.2d 633, 641 (11th Cir. 1988) (concurring opinion); *United States v. Baldwin*, 607 F.2d 1295, 1297-98 (9th Cir. 1979); *United States v. Rucker*, 557 F.2d 1046, 1048 (4th Cir. 1977).

The Supreme Court has divided its analysis of juror impartiality into cases of "actual bias" and "presumed" or "implied" bias.  *See Murphy v. Florida*, 421 U.S. 794, 798 (1975).

> (1) **"Actual bias"** has been defined as "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality."  *United States v. Nelson*, 277 F.3d 164, 202 (2d Cir. 2002).  "Actual bias" has been described as "bias in fact."  *United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000).  Typically, where the court suspects a juror's "actual bias," the juror has admitted to some factor or "state of mind" giving rise to that suspicion.  *Id.* at 1112.

> (2) **"Presumed bias"** involves an inquiry "'whether an average person in the position of the juror in controversy would be prejudiced.' . . . [P]rejudice is to be presumed 'where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances."  *Id.*  (internal citations omitted).   "Presumed bias" "presents a mixed question of law and fact."  *Id.*  Cases of "presumed bias" tend to be rare, and "[o]nly in extreme circumstances may prejudice to a defendant's right to a fair trial be presumed from the existence of the pretrial publicity itself."  *Wells v. Murray*, 831 F.2d 468, 472 (4th Cir. 1987).  Still, "[i]n other, less extreme situations, when external events such as pretrial publicity raise strong possibility of jury bias, the court has a duty to determine whether the accused may have a fair trial.  Inquiry into jury bias typically entails an evaluation of 'the pre-trial publicity complained of and its impact, if any, on the jury, as developed through adequate *voir dire* examination of the jurors.'"  *Id.*, quoting *Wansley v. Slayton*, 487 F.2d 90, 92-93 (4th Cir. 1973).  "Because the implied bias standard is essentially an objective one, a court will, where the objective facts require a determination of such bias, hold that juror must be recused even where the juror affirmatively asserts (or even believes) that he or she can and will be impartial."  *Gonzalez* at 1113.

*Voir dire* in pre-trial publicity cases may involve both "actual" and "presumed" bias, and the presiding judge should explore the extent to which either type of bias might be present.  *See Pruett v. Norris*, 153 F.3d 579, 584-87 (8th Cir. 1998).

Ferreting out potential juror bias demands searching inquiry.  Only vigorous and thorough voir dire will determine the existence of racial, ethnic or religious bias or

whether attitudes towards punishment, the criminal justice system, law enforcement agents, or other issues will prevent a fair verdict.  *See, e.g., McClesky v. Kemp*, 481 U.S. 279, 309 n.30 (1987) (need to question about racial prejudice); *Baldwin*,  607 F.2d at 1297  (need to question about prejudice and attitude toward government agents).  However, while the right to exercise challenges and the concomitant right to do so with sufficient information for intelligent choice are firmly established, the manner in which the questioning should be conducted is not.

Notwithstanding the resounding phrases found in such cases as *Taylor* and *Duncan*, the mechanisms which give meaning to our jury system are under attack.  This includes a strong tendency to reduce the time spent in jury selection.  These efforts take the form of undue haste in completing the process, cursory examination, or elimination of the attorney's role as examiner.  *See, e.g., United States v. Johnson*, 584 F.2d 148, 155-56 (6th Cir. 1978).  Moreover, efforts to reduce the time spent in jury selection are usually supported by purely administrative concerns.  *See* Judge Nancy Gertner & Judith Mizner, The Law of Juries 3-60 & n.186 (1997).  They may also be supported by the belief that voir dire accomplishes little, or by the desire to eliminate a procedure which can help ensure fairer fact resolution for defendants.

Whatever the reason for the efforts to curtail voir dire, there is a substantial cost in reduction in fairness.  All too often the tools used in the courtroom are inadequate to perform the difficult task which must be done to ensure impartiality and avoid prejudgment or bias.  Examination of the realities of our system is helpful in determining what form of questioning is most likely to provide the type of forum contemplated by our Constitution and case law.  It is only with a clear understanding of the nature of the

work to be performed and the relative merits of the tools available that sound decisions regarding voir dire in this case can be made.

The attitudes held by prospective jurors are not necessarily what one would hope to find.  For example, the presumption of innocence, which underlies our system and of which we solemnly speak in the courtroom, is in peril.  Opinion polls and sociological research show that it exists only skin deep, if at all, in many prospective jurors.  *See, e.g.,* Edmond Constantini & Joel King, *The Partial Juror: Correlates and Causes of Prejudgment*, 15 Law & Soc. Rev. 9 (1981); NATIONAL JURY PROJECT, JURY WORK: SYSTEMATIC TECHNIQUES 35 (1978).  Moreover, common sense tells us that, for example, when a member of the Federal Bureau of Investigation has made an arrest, most people will believe there must be something to it.  When an agent's judgment is ratified by a grand jury and the United States Attorney, a reasonable person might be expected to say, "Presume he is innocent? Who are you kidding?!"  See also Cathy Johnson & Craig Haney, *Felony Voir Dire, an exploratory study of its content and effect*, 18 Law and Human Behavior 487-506 (1994) (finding jurors do not believe in the presumption of innocence).  That many jurors do not actually presume innocence is borne out by empirical research. *See J. King, "The Partial Juror," supra*; T. Sonnito & E. Arnold, *Report on Jury and Jurors*, 5 Trial Diplomacy Journal 1 (1983).

It is also borne out by anecdotal experience.  When asked if they believe the police and prosecution's judgment, many prospective jurors respond in the affirmative.  When asked how they would vote at the outset of a case, many jurors respond that they cannot vote.  Only a few understand that in the absence of proof, the presumption of innocence would require an acquittal.  Many jurors want to "hear both sides."  Even

after hearing a court's charge, jurors repeatedly report that they held it against an accused because he did not testify.

It is also clear that jurors are not open in their responses.  Studies have repeatedly shown that many jurors conceal information.  Sometimes this is unintentional; at other times it is a product of fear of speaking up or intimidation by the courtroom setting; at other times jurors are deliberately deceptive.  *See* Dale W. Broeder, *Voir Dire Examinations: An Empirical Study*, 38 S. CAL. L. REV. 503, 528 (1965) (stating jurors often answer untruthfully when questioned about biases) (cited with approval in *Groppi v. Wisconsin*, 400 U.S. 505, 510 (1971); Alfred Friendly and Ronald L. Goldfarb, CRIME AND PUBLICITY 103 (1967); R. Babcock, *Voir Dire: Preserving "Its Wonderful Power"*, 27 STAN. L. REV., 545, 554 (1975).

Our courts have recognized the impact of peer and situational pressure in the voir dire setting.  They have held that we cannot trust jurors  self-assessment of their attitudes: "But whether a juror can render a verdict based solely on evidence adduced in the courtroom should not be adjudged on the juror's own assessment of self-righteousness without something more . . . the psychological impact requiring such a declaration [of fairness] before one's fellows is often its father."  *Silverthorne v. United States,* 400 F.2d 627, 639 (9th Cir. 1968) (internal quotations omitted).

The cases also reflect many instances in which jurors have not truthfully or openly responded to questions put by the court.  For example, in *United States v. Patterson,* 648 F.2d 625, 629-30 (9th Cir. 1981), the defendant was tried and acquitted on one case but brought to trial again the very next day.  Approximately half of the prospective jurors were aware of the first trial. Yet when the court requested a show of

hands if anyone knew any of the defendants or knew anything of the case, no hands were raised.  *See, e.g., United States v. Rucker,* 557 F.2d 1046, 1047 (4th Cir. 1977) (jurors who had responded affirmatively on juror questionnaires remained silent when asked the same question in court).

The cases and studies of juror behavior are consistent with our general understanding of human behavior.  Most people attempt to adapt to new situations by showing what they perceive to be appropriate behavior.  P. Broom and P. Selznick, *Sociology: A Text With Adapted Readings*, 107-108 (1963). Most people seek approval in their dealings in groups.  H. Hart, The Science of Social Relations, 42-53 (1927).  In responding to attitudinal questions, people are likely to adhere to the majority or accepted view if it is known to them.  S. E. Asch, "Effects of Group Pressure Upon the Modification and Distortion of Judgments," Social Processes and Structures, 227 (1970).  Thus, we should be wary of such things as denial of anti-Muslim feelings when jurors are asked directly if they have any negative feelings about Muslim people, or general statements that one can presume innocence, or be fair, or have no impressions about guilt.  In all criminal cases the dynamics of human behavior make the voir dire process a difficult one for determining biases and ensuring selection of a fair jury.  In *United States v. McVeigh*, 918 F. Supp. 1467 (W.D. Okla. 1996), a case that involved domestic terrorism and resulted in a change of venue, Judge Matsch asserted:

> Extensive publicity before trial does not, in itself, preclude fairness.  In many respects media exposure presents problems not qualitatively different from that experienced in earlier times in small communities where gossip and jurors' personal acquaintances with lawyers, witnesses, and even the accused were not uncommon.  Properly motivated and carefully instructed jurors can and have exercised the discipline to disregard that kind of prior awareness.  Trust in their ability to do so

diminishes when the prior exposure is such that it evokes strong emotional responses or such an identification with those directly affected by the conduct at issue that the jurors feel a personal stake in the outcome.  That is also true when there is such identification with a community point of view that jurors feel a sense of obligation to reach a result which will find general acceptance in the relevant audience.

*Id*. at 1473.

The sources of jurors' knowledge, information, and attitudes may come from preexisting dispositions, from mass media, and from other persons in the juror's social environment through means of gossip and rumor. In ordinary cases the gossip and rumor may be inconsequential or absent, but in high profile cases members of the community discuss the events and make normative statements about their meaning and about the proper outcome of the trial.  Judge Matsch recognized these sociological facts in reaching his conclusion in *McVeigh* that the whole citizenry of the state of Oklahoma had become victims. *United States v. McVeigh*, 955 F. Supp. 1281 (D. Colo. 1997); *United States v. McVeigh,* 918 F. Supp. 1467 (W.D. Okla. 1996).

**A.    Trials Involving Issues Of Terrorism Are Different And Require Special Commitment To Thorough And Fair Jury Selection.**

An argument has been made that in a post 9/11 world, all Americans are victims. Only a thorough voir dire by counsel, familiar with the issues and the pervasive publicity surrounding this matter, which it is anticipated will only increase during the trial, will elicit from those jurors, some who may consider themselves "victims," their views, biases and inclinations which should excuse them from jury service.  A far more searching inquiry than the norm is necessary to ensure justice and the appearance of justice, *see, Offutt* v. *United States,* 348 U.S. 11, 14 (1954) ("justice must satisfy the appearance of justice"), and the public perception that the proceeding is a trial and not an inquisition.

In the case before the Court, the facts and issues present unusually difficult problems.  The need for particularly searching voir dire when society's prejudices and fears are reinforced in the media or emotional issues are present is apparent.

The requirement of careful adherence to procedure in a criminal trial has special force in a case such as this, involving allegations of funding Chechen fighters by a Muslim man of Middle Eastern birth and the pervasive and intense publicity surrounding this problem in post-September 11 America.  The unfortunate reality is that since September 11, 2001, the American public has been bombarded in the media on an almost daily basis by accounts of terrorist acts, alleged terrorist acts, the disruption of alleged terrorist cells, and questions about the best way to secure this nation.  One of the key issues in the presidential election in 2008 was the difference, or alleged difference, in approach to national security between the Democratic and Republican candidates.  Since the election, the former Vice President has been repeatedly seen and heard on and in the media challenging the Obama Administration's positions on national security.

We have, more recently, been subjected in this country to intense media regarding such local terrorist acts as the Ft. Hood psychiatrist shootings, the underwear bomber, and most recently, the attempt to blow up a car bomb by a naturalized citizen of Pakistani descent in Times Square, New York.

In addition to the constant barrage of media, all people who travel on airplanes are reminded every time we fly about the "terror threat level" by colored barometers in airports and by the airport search process.

In *Nebraska Press Ass 'n v. Stewart*, 427 U.S. 539, 564 (1976), the Court suggested "searching questioning of prospective jurors" to locate prejudice generated by adverse publicity.  *See also id.* at 602 ("Particularly in cases of extensive publicity, defense counsel should be accorded more latitude in personally asking or tendering searching questions that might root out indications of bias, both to facilitate intelligent exercise of peremptory challenges and to help uncover factors that would dictate disqualification for cause.") (Brennan, J., *concurring).*  Reviewing courts have repeatedly found reversible error where the trial court relied solely upon the assessment by a venire person of his or her own preconceptions and biases in cases involving extensive pretrial publicity.  *See, e.g., Sheppard v. Maxwell,* 384 U.S. 333 (1966); *Coleman v. Kemp*, 778 F.2d 1487 (11th Cir. 1985); *Isaacs* v. *Kemp,* 778 F.2d 1482 (11th Cir. 1985); *Jordan v. Lippman,* 763 F.2d 1265, 1274-82 (11th Cir. 1985); *United States v. Davis,* 583 F.2d 190,197-98 (5th Cir. 1978).

Extensive pretrial publicity about the "global war on terrorism" thus presents a special need for permitting questioning by counsel at jury selection by use of a questionnaire, individualized sequestered voir dire, and increased peremptory challenges.  "Due process requires that the accused receive a trial by an impartial jury free from outside influences.  Given the pervasiveness of modem communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused."  *Nebraska Press Ass 'n v. Stewart*,427 U.S. at 553, quoting *Maxwell,* 384 U.S. at 362-63 (emphasis in *Stewart* ). "[W]hen pretrial publicity is great, the trial judge must exercise correspondingly great care in all aspects of the case relating to publicity

which might tend to defeat or impair the rights of an accused.  The judge must insure
that the voir dire examination of the jurors affords a fair determination that no prejudice
has been fostered."  *United States v. Dellinger*, 472 F.2d 340, 374-75 (7th Cir. 1972),
quoting *Silverthorne v. United States*, 400 F.2d 627, 637-38 (9th Cir. 1968).  *See also*
*Nebraska Press Ass'n,* 427 U.S. at 602 (suggesting some attorney-conducted voir dire
in cases of extensive publicity (Brennan, J., concurring*)); Calley v. Callaway*, 519 F.2d
184, 208-09 (5th Cir. 1975) *(en banc)* (approving "searching and sensitively conduct[ed]
voir dire," which included allowing the members' attitudes, perceptions, backgrounds,
and nature and extent of their exposure to pretrial publicity as a means of avoiding
effects of extensive publicity).

If a fair trial consistent with American standards of justice is to be attained for
people accused of crimes related to terrorism, more than routine remedial legal
procedures are needed.  In the Order which granted a Change of Venue Motion in the
Oklahoma City bombing case, Feb. 20, 1996, Judge Matsch wrote eloquently:

> The existence of such a prejudice is difficult to prove.  Indeed it may go
> unrecognized in those who are affected by it.  The prejudice that may
> deny a fair trial is not limited to a bias or discriminatory attitude.  It
> includes an impairment of the deliberative process of deductive reasoning
> from evidentiary facts resulting from an attribution to something not
> included in the evidence.  That something has its most powerful effect if it
> generates strong emotional responses and fits into a pattern of normative
> values.
>
> . . .
>
> The possible prejudicial impact of this type of publicity is not something
> measurable by any objective standards. . . . There is no laboratory
> experiment that can come close to duplicating the trial of criminal charges.
> There are so many variables involved that no two trials can be compared
> regardless of apparent similarities.  That is the very genius of the
> American jury trial.

*United States v. McVeigh*, 918 F. Supp. at 1472-73.

The problem confronting the Court here goes far beyond pervasive publicity. Here, there are numerous examples regarding society's fear and prejudice regarding Muslim persons.  In our post-9/11 society, persons of Middle-Eastern descent are subject to intense and virulent prejudice.  Even people who would condemn racial profiling in the context of African-Americans and other minorities often conclude that it is warranted in the case of Middle-Easterners.  Stephen J. Ellmann, *Racial Profiling and Terrorism*, 46 N.Y.L. Sch. L. Rev. 675 (2002-2003).

Between September 11, 2001 and February 2002, over 1700 "hate crime" incidents were recorded against Muslim individuals or organizations suggesting that some persons are inclined to hold all Muslims responsible for terrorism.  The INS required male visitors between the ages of sixteen and forty-five from the Muslim nations of Iran, Iraq, Libya, Syria, and Sudan to report to their offices by December 16, 2002, to be fingerprinted.  To what extent does such action create a public perception that all of these men are dangerous?  More importantly, how does the Court learn whether potential jurors agree with such perceptions?

Research studies have demonstrated the consistent vilification of people of Middle-Eastern descent in film.  Jack G. Shaheen, Reel Bad Arabs: How Hollywood Vilifies a People 1-2 (Olive Branch Press 2001).  "Representations of Middle-Easterners as barbaric terrorists, loathsome misogynists and religious lunatics continue to dominate the silver screen.  In part, such portrayals are tolerated because of negative public opinion towards the Middle East.  At the same time, these images not only reflect existing stereotypes, they also help to ossify and further perpetuate them."

John Tehranian, *The Last Minstrel Show? Racial Profiling, the War on Terrorism and the Mass Media*, 41 CONN. L. REV. 781, 798 (2009).

And, they fare no better in television.  "Negatively stereotyped Arabs have appeared on "Vegas," "Fantasy Island," "Bionic Woman," "The Six Million Dollar Man," "Police Woman," "McCloud," "Hawaii Five-O," "Cannon," "Columbo," "Medical Center," "Wonder Woman," "Trapper John, M.D.," "Charlie's Angels," and "Rockford Files"" to name a few. *Id.* at 26.  Nor is there a reprieve from the excessive stereotyping in literature.  "Arabs were prominently featured in thirty-three best-selling works of American fiction during the 1970s and 80s."  *Id*.  Only one depicted them in a favorable light.  *Id*.

Middle-Eastern stereotypes in entertainment are persistent, even after Hollywood has largely abandoned other offensive racial stereotypes, because of negative public opinion regarding the Middle East that is created and reinforced by fear-mongering news broadcasts.  Fox News in particular has excelled in perpetuating an "us against them" mentality.  A rare positive story about a Muslim standing against terrorism posted to the Fox News website on May 5, 2010, garnered the following comment:

> While I commend Mr. Mahdi for speaking out, I know most 'law abiding' muslims don't share his beliefs.  The vast majority of them are terrorists at heart and sympathize with the jihadists.  They will never admit it, however. They believe they can live here and not be a part of America . . . they have no interest in associating with us in any way, shape or form!  Also many of them are supporting terrorist organizations financially . . . that is a fact!  They cannot, and should not be trusted, and they all should be monitored very closely.

Michael Goodwin, *U.S. Muslims Finally Take The Right Stand*, foxnews.com (May 5, 2010) (ellipses appeared in original).[1]  Another commenter succinctly stated, "GO SOMEWHERE ELSE!!!!! MUSLUM. DRANK YOUR OIL FOR DINNER."  *Id.*  To be fair, not all comments were racist and fearful, but most of them were.  These comments are important because "[w]hile Internet discussion forums do not exactly constitute bastions of reasoned and erudite discourse, they do reveal popular perceptions and prejudices."  John Tehranian, *The Last Minstrel Show? Racial Profiling, the War on Terrorism and the Mass Media*, 41 CONN. L. REV. 781, 790-91 (2009).  "[T]he images of Middle-Easterners, as reflected in mainstream media, are not innocuous.  They play a role in animating public policy and contribute to the harsh realities that Middle-Eastern Americans must endure. . . ."  *Id.* at 816.

A 2009 Gallup poll revealed that 43% of Americans "admit to feeling at least 'a little' prejudice toward Muslims."  *Religious Perceptions in America with an In-Depth Analysis of U.S. Attitudes Toward Muslims and Islam*, Gallup Center for Muslim Studies, 2009.  By contrast, only 15% say the same about Jews.  *Id.*  When the respondents were asked for their opinion of Islam, 31% responded "not favorable at all," and 22% responded "not too favorable" for a combined 53% of Americans who have an unfavorable impression of the Islamic faith.  *Id.*  The Gallup poll posits that one of the reasons for the overwhelming bias against Islam is biased news reporting.  According to

---

[1] Available at http://www.foxnews.com/opinion/2010/05/05michael-goodwin-times-square-bombing-muslim-pakistan/#discussion-form[5/5/2010 10:48:16 AM].  Last accessed May 5, 2010.

Media Tenor, a research firm that analyzes media coverage, "two-thirds of the television coverage about Islam associates Muslims with extremism." *Id.* at 9.

A 2008 hate crimes survey by Human Rights First states that hate crimes against Muslims and people who appear to be of Middle Eastern descent remain at historically high levels.[2]  Concurring with the survey, "a report by the American-Arab Anti-Discrimination Committee (ADC) documented incidents of violence between 2004 and 2007 against Arab Americans of all faiths, including death threats, vandalism, and at least one murder." *Id.*

Anti-Muslim bias exists in Oregon as well.  The *Register-Guard* of Eugene reported that racist and crude emails circulated for more than a year among the city of Springfield's Maintenance Division employees.  Susan Palmer, *City Faces Outrage Over E-mails*, REG. GUARD, May 4, 2010, at A7.  The e-mails ridiculed Muslims among other ethnic groups.  Mia Tuan, *Guest Viewpoint: Let's Hope Springfield Uses E-mail Scandal to Educate*, REG. GUARD, May 5, 2010, at A9.

These prejudices are deeply held.  Extensive voir dire through the mechanisms proposed in Mr. Sedaghaty's motions is needed to probe the extent of the jurors' prejudices and their ability to be impartial in a criminal case is critical in these situations. In *Turner v. Murray*, 476 U.S. 28 (1986), the court was confronted with an issue regarding the adequacy of voir dire in a case in which racial passions and prejudices were present.  The court noted the importance of probing juror biases in these areas. *Id*.

---

[2] Available at http://www.humanrightsfirst.org/discrimination/reports.aspx?s=muslims&p=antimuslim

For example, in the case of *Azimi v. Jordan's Meats, Inc.*, 456 F.3d 228, 231 (1st Cir. 2006), a federal jury found that Mr. Azimi, a Muslim immigrant from Afghanistan, had suffered years of vicious racial invective and physical abuse at his workplace.  His co-workers taunted him with racialist epithets, linked him, by blood, to Osama bin Laden and Saddam Hussein, and left him profane notes about his faith.  They assaulted him, forcing pork into his mouth and pockets as they denounced his religion.  After he filed a complaint, and shortly after 9/11, he was fired.  *Azimi*, 456 F.3d at 232-33, 246.  The jury agreed that he had suffered discrimination, yet they found that the unlawful harassment had not caused him "to be damaged by emotional distress, pain, suffering, emotional anguish, loss of enjoyment of life[,] and/or inconvenience."  *Azimi*, 456 F.3d at 233.  Mr. Azimi did not receive any monetary damages.  *Id.*  And, on appeal, the verdict was affirmed.  *Azimi*, 456 F.3d at 232.

The jurors negation of any damage Mr. Azimi suffered is reflected in the information collected about the negative views Americans admit to having towards people of the Muslim faith.  Sonia CHopra, Ph.D., Anti-Arab and Anti-Muslim Sentiment Amongst Potential Jurors: Underlying Psychological Constructs And Tools For Identification, NATIONAL JURY PROJECT (2008) (summarizing Gallup poll revealing the bias and prejudice against individuals who are or are perceived to be, Arab, Middle Eastern or Muslim).[3]  When analyzing how these bias and prejudices may impact a potential jury pool, Ms. Chopra noted that there are important tools to help identify biased and prejudiced jurors.  *Id.* at 6.  For example, in addition to soliciting potential

---

[3]Available at http://www.njp.com./articles/AntiArabSentiment.pdf

jurors' attitudes and perceptions about Muslim and/or Arab individuals, potential jurors would need to be queried about their self-categorization as an American, perceived threats of terrorism, and whether they know someone of the Muslim faith. *Id.* at 7. As Ms. Chopra's article clarifies, the prejudices and bias that people hold against Muslims are vast, and the effort that the Court and the attorneys must make to draw these prejudices out is equally great. *Id.*

There have been a number of terrorism prosecutions across this country in the last ten years involving men who practice Islam and are originally from a Middle Eastern country. Anecdotal evidence derived from communications with attorneys who have handled a number of those cases reveals how difficult it is to secure a fair and impartial jury. The evidence of the deeply held antipathy to Muslim men from the Middle East accused of terrorist acts has been born out in many of those cases.

## II. The Court Should Allow the Attorneys To Ask Voir Dire Questions of the Jurors

This case involves allegations of a Muslim man's efforts to hide the transfer of funds to the Chechen mujahideen. The potential for prejudice against a person accused of such a crime is extreme.

This Court is constitutionally required to inquire into potential jurors' racial prejudices if "ethnic or racial issues are inextricably intertwined with conduct of the trial, or if the circumstances in the case suggest a significant likelihood that racial prejudice might infect the defendant's trial." *United States v. Borders*, 270 F.3d 1180, 1182 (8th Cir.2001)*; see also Rosales-Lopez*, 451 U.S. at 190. Even where a particular case

does not meet the constitutional standard for inquiry into racial or ethnic bias, the

Supreme Court reiterated in *Rosales-Lopez* that, in the federal court system:

> [W]e have indicated that under our supervisory authority over the federal
> courts, we would require that questions directed to the discovery of racial
> prejudice be asked in certain circumstances in which such an inquiry is
> not constitutionally mandated.

*Rosales-Lopez*, 451 U.S. at 190, citing *Ristaino v. Ross*, 424 U.S. 589, 597, n.9

(1976). The same standard should apply to prejudice on religious and ethnic grounds.

Since *Rosales-Lopez* was decided, a number of circuits, including the Ninth

Circuit, have analyzed, on a case by case basis, under what circumstances such

inquiries

should be made. In *United States v. Sarkisian*, 197 F.3d 966 (9th Cir. 1999), the Ninth

Circuit enumerated two such situations which would give rise to a required inquiry: 1)

where the defendant is accused of a violent crime and he and the victim are members

of different racial or ethnic groups; and 2) where "the external circumstances of the

case indicate a reasonable possibility that racial or ethnic prejudice will influence the

jury's evaluation of the evidence." *Sarkisian*, 197 F.3d at 979, quoting *Rosales-Lopez*,

451 U.S. at 192-193. Mr. Sedaghaty is charged, *inter alia*, with filing a false tax return

in order to hide the transfer of funds to Chechen fighters. This charge, while not

technically a terrorism charge, presents the specter of a threat of terrorism, particularly

due to the anticipated evidence involving an Islamic charity, the cultural differences

regarding the use of travelers checks, and the practices of the Islamic faith. These

same factors indicate that racial prejudice will influence the jury.

Rule 24(a) of the Federal Rules of Criminal Procedure gives this Court discretion to allow counsel to conduct voir dire.

> (a)  Examination.  (1) In General.  The court may examine prospective jurors or may permit the attorneys for the parties to do so. (2) Court examination. If the court examines the jurors, it must permit the attorneys for the parties to: (A) ask further questions that the court considers proper; or (B) submit further questions that the court may ask if it considers them proper.

Upon request, certain topics must be covered and certain questions must be asked by the Court.  In considering judicial economy, it is more efficient to permit counsel to simply ask questions rather than spend time approaching the bench to request follow up questions after a juror discloses information on certain critical topics.

Counsel does not seek to microscopically examine the jurors, nor is there a desire to unnecessarily prolong these proceedings.  Instead, counsel wants to ask a sufficient number of questions to each member of the venire to elicit any bias or prejudice and to intelligently exercise precious peremptory strikes.  Given the sensitive issues involved in this case, the pretrial publicity and the anticipated media coverage of the trial, attorney participation in voir dire will enable counsel to obtain the necessary information.

Mr. Sedaghaty respectfully submits that attorney voir dire is a more effective tool for eliciting information from prospective jurors than questioning by the court alone. The Court, as a function of its role, suffers from several inherent handicaps in eliciting complete information from the jury pool, including jurors perception of the court as an authority figure, status and distance from jurors, and the court's lack of familiarity with the case.

As examined in the CRIMINAL PRACTICE GUIDE:

Venire persons will frequently hide their true feelings and conceal their biases when asked about them publicly, particularly by the judge, who, robed and physically elevated, deferred to and addressed as "Your Honor," is the most powerful figure in the courtroom. Jurors will thus tend to conceal prejudice in order to avoid embarrassment and disapproval by the judge. The great social distance between venire persons and the judge places an undue burden on them in communicating their true feelings. As a result, venire persons will tend to agree with what they imagine the judge wants them to say.

"Judges usually do not realize that they are seen by jurors as both powerful and fair, and that this attitude on the part of jurors creates an expectation in their minds that they should say they can be fair and impartial, whether or not this is true. Jurors desire to be accepted and approved of by the judge. They want to say the right things to him." Bennett, *Psychological Methods of Jury Selection in the Typical Criminal Case*, 4 Criminal Defense 11, 13 (No. 2, April 1977).

CRIMINAL PRACTICE GUIDE, 4 No. 1 Crim. Prac. Guide 11 (January/February 2003).

As a neutral and detached participant, the trial judge cannot have the same interest in discerning bias as does an adversary. There is less personal stake. As a result, our basic understanding of human nature tells us that a neutral party will be less likely to hear suggestions of bias and less likely to follow up on them. Students of interviewing accept as a basic tenet that the bias or role of the interviewer affects what he hears or how he interprets responses. *See* R. GORDEN, INTERVIEWING: STRATEGY, TECHNIQUES AND TACTICS, 6 (1969).

The differing role of court and counsel may also affect the manner in which questions are phrased or interpreted. The court is perceived by the jurors as far more of an "authority figure" than counsel. This inhibits candid responses. *Berryhill. v. Zant,* 858 F.2d 633, 642 (11th Cir. 1988) (J. Clark concurring). For example, in *United States v. Hawkins*, 658 F.2d 279 (5th Cir. 1981), the court asked whether any prospective jurors had heard or read of the case on TV, radio, etc., which caused them to form an

opinion.  No hands were raised.  When defense counsel put a similar question concerning media exposure, 48 of 56 prospective jurors responded.  *Id.*  Anecdotal experience underscores the importance of phrasing and tone.  *See* JURY WORK, *supra*, at 40.

In an interview setting, the attitude of the questioner is important in eliciting information.  When the questioner empathizes with the interviewee, or gives some of himself, or takes other steps to reduce tension or ego threat, the flow of information is enhanced.  Gorden, *supra* at 196.  Such communication facilitating techniques are more readily engaged in by an attorney than by the court in most situations.  It is more likely that an attorney will reveal a personal experience to set a juror at ease than will the court.

Were a trial judge to attempt to relate more openly with prospective jurors, his distance from the jury behind an imposing physical barrier (the bench) would be an inhibitor.  The austere and symbolic black robe would also stymie the flow of communication.  Even in the absence of a robe or location on the bench, the judge's status is the most important impediment to securing a fair jury through judicial questioning.  As the authors of the National Jury Project have noted:

> Most people seek approval from and are predisposed to acquiesce to authority figures.  When asked to evaluate themselves, most people portray themselves in the best possible or most "socially desirable light" . . . these tendencies increase when the questioner is a person of substantially higher status and authority than the respondent.  This phenomenon is compounded by the fact that the judge is perceived as an impartial and benevolent authority.

JURY WORK, *supra*, at 37.  This observation is consistent with general work in the field.

*See* R. Kahn, *supra*, at 49.

The trial judge's status and role inherently inhibit communication in yet another way. While perceiving themselves as neutral, many judges, whether unintentionally or overtly, convey their views and desires to the jurors.  Note, *Judges' Non-Verbal Behavior in Jury Trials: A Threat to Judicial Impartiality*, 61 Vᴀ. L. Rᴇᴠ. 1266 (1975).  As stated by the Supreme Court, the influence of the trial judge on the jury "is necessarily and properly of great weight" and "his lightest word or intimation is received with deference, and may prove controlling."  *Quercia v. United States*, 289 U.S. 466, 470 (1933).  Indeed, jurors' "[high] sensitiv[ity]" to the court is a matter of judicial notice. *Bursten v. United States*, 395 F.2d 976, 983 (5th Cir. 1968).  This sensitivity limits jurors' willingness to openly express bias or concern with some of our basic rules of law. This is consistent with their desire to be liked and accepted.  When stating a position would cause a juror to disagree with what he perceives the court wants, the likelihood of a truthful response is less than if he were disagreeing with the less imposing attorney. Gorden, *supra*, at 146-152.

The trial judge suffers yet another disadvantage.  He does not know as much about the case as do the adversaries.  He is less familiar with the evidence and case theories than the parties.  As a result, he cannot know the nuances which will be important.  It is this knowledge which allows counsel to better probe in areas which can reveal attributes about a prospective juror which would appropriately lead to a challenge for cause or a peremptory challenge.  In *United States v. Ledee*, 549 F.2d 990 (5th Cir. 1977), the court quoted with approval Frates & Greer, *Jury Voir Dire: The Lawyer's Perspective*, 2 A.B.A. Lɪᴛɪɢᴀᴛɪᴏɴ Nᴏ. 2 (1976), on this subject:

> A judge cannot have the same grasp of the facts, the complexities and
> nuances as the trial attorneys entrusted with the preparation of the case.
> The court does not know the strength and weakness of each litigant's
> case. Justice requires that each lawyer be given an opportunity to ferret
> out possible bias and prejudice of which the juror himself may be unaware
> until certain facts are revealed.

*Ledee*, 549 F.2d at 993 & n.4.  Again, this is consistent with our general understanding

of the interview process and the importance of an informed interviewer to the fact

gathering process.  Gorden, *supra*; Kahn, *supra*.

In a system of attorney-conducted voir dire, or one in which the attorneys have a

major role, the quality of information and challenges will be improved.  As this

memorandum demonstrates with empirical support for basic common sense, one form

of questioning is likely to be substantially more productive than another. With attorneys

participating and better informed, the net result should be a fairer jury.  Each side

should be better able to spot persons who are infected by a significant potential to bias

the proceedings.  With persons on the extremes more readily detected and excluded,

the result should be fairer fact resolution.

The Supreme Court's decision in *J.E.B. v. Alabama*, 511 U.S. 127 (1994), further

supports this argument.  In *J.E.B.*, the Court held:

> If conducted properly, *voir dire* can inform litigants about potential jurors,
> making reliance upon stereotypical and pejorative notions about a
> particular gender or race both unnecessary and unwise.  *Voir dire*
> provides a means of discovering actual or implied bias and a firmer basis
> upon which the parties may exercise their peremptory challenges
> intelligently, *see, e.g., Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 602
> . . . (1976) (Brennan, J., concurring in judgement) (*voir dire* "facilitate[s]
> intelligent exercise of peremptory challenges and [helps] uncover factors
> that would dictate disqualification for cause"); *United States v. Whitt,* 718
> F.2d 1494, 1497 (CA10 1983) ("Without an adequate foundation [laid by
> *voir dire*], counsel cannot exercise sensitive and intelligent peremptory
> challenges").

*J.E.B.*, 511 U.S. at 143-44 (brackets in original).  Because, as Justice O'Connor pointed

out in her concurring opinion in *J.E.B.*, litigants can not simply rely on their intuition in

exercising peremptory challenges, 511 U.S. at 149 (O'Connor, J., concurring), fairness

dictates that defense counsel be given an opportunity to voir dire the venire panel

individually to ensure that a fair and impartial jury is selected consistent with the

dictates of *Batson* and its progeny.

>       As noted in the D.C. Circuit:

> The defense must be given a full and fair opportunity to expose bias or
> prejudice on the part of veniremen.  *Morford v. United States*, 339 U.S.
> 258 . . .(1950).  The possibility of prejudice is real, and there is
> consequent need for a searching voir dire examination, in situations
> where, for example, the case carries racial overtones, or involves other
> matters concerning which the local community or the population at large is
> commonly known to harbor strong feelings that may stop short of
> presumptive bias in law yet significantly skew deliberations in fact . . .  Still
> other forms of bias and distorting influence have become evident, through
> experience with juries, and have come to be recognized as a proper
> subject for *voir dire*.  An example is the problem that jurors tend to attach
> disproportionate weight to the testimony of police officers.

*United States v. Robinson*, 475 F.2d 376, 380-381 (D.C. Cir. 1973).

>       Moreover, this Court's firm guidance can limit the abuses which have occurred

with attorney voir dire.  *See, e.g.*, *United States v. Ricketts*, 146 F.3d 492, 495 (7th Cir.

1998) (district judge conducted general voir dire of jury panel and then gave each

attorney thirty minutes to question the pool); Mark W. Bennett, District Judge, N.D.

Iowa, Voir Dire Instruction No. 11, "After Judge Bennett has completed his questions,

each side will be permitted to conduct up to one-half hour of jury voir dire.  A request for

additional time for attorney voir dire because of the complexity or unusual nature of a

case, or in multi-party cases, should be made at the final pretrial conference" (2008).[4]

Chief Judge Lay noted the trial court's discretion and control in supporting attorney

participation in voir dire in *United States v. Rossbach*, 701 F.2d 713, 717 & n.2 (8th Cir.

1983).  Thus, while some additional time will be spent in voir dire, it should not seriously

affect the flow of court business.

A number of judges have permitted attorneys to question prospective jurors

directly without any adverse results.  Hearings have been held on a number of bills in

Congress which would mandate attorney questioning in voir dire.  *See Gertner, supra*,

at 3-61 & n.187.  The overwhelming weight of the testimony has been that attorney

questioning is important in ensuring selection of fair jurors and that it can be permitted

at minimal cost to the system.  *See, e.g.,* Hearing before the Subcommittee on Courts

and Court Administration of the Committee on the Judiciary, United States Senate.

One Hundredth Congress First Session, July 16, 1987.  Counsel are in a position to

elicit from the potential jurors sufficient information to uncover any latent bias or

prejudices.  Counsel has an affirmative constitutional duty to render effective assistance

of counsel, which obligation can only be fulfilled if given the opportunity to participate in

the voir dire and then exercise cause and peremptory challenges in a *meaningful*

fashion.  The right of a defendant in a criminal case to have the prospective jurors

examined in person by her or his attorney is one of the most effective means of insuring

a fair and impartial jury.

---

[4]*available at* http://www.iand.uscourts.gov/e-
web/documents.nsf/0/DD11521E589A74B78625747F00655229/$File/MWB's+voir+dire
+instructions+as+of+07+07+08.pdf

**III.    The Court Should Question the Prospective Jurors With Open Ended Questions**

Mr. Sedaghaty does not seek to conduct the entire voir dire.  He is, rather, seeking to question the prospective jurors after the court has conducted the initial questioning.  Mr. Sedaghaty recognizes the importance of the Court's questioning to the jury selection process,  and urges the Court to conduct its questioning with open ended questions to the greatest extent possible.

Examination of juror bias requires probing and creative questions.  Often the most effective questions address problem areas by indirection so that the prospective jurors need not be forced to say things such as "I am prejudiced."  Instead, for example, information about racial attitudes should be obtained through questions about relations in the workplace, military service, or other areas.   Additional follow-up then helps uncover the truth.  Open ended questions are critical to this process.  *See, e.g.,* Mark R. Kosieradzki, *Voir Dire in the Age of Juror Bias,* 37 Trial 65, 69 (Oct. 2001) ("The best voir dire is one full of open-ended questions that encourage candor without telegraphing an answer."); V. Hale Starr & Mark McCormick, JURY SELECTION 286 (1985) (same).

It is important that the Court engage in voir dire that encourages learning on the part of the parties and the Court before instructing.  We ask that the Court never foreshadow what response might result in disqualification and never dictate to any juror any requirement that the juror must "follow the law", before fully developing any feelings, biases, opinions or prejudices that the person may hold. Any such inquiry or directives about "the law," before discovering the opinions or biases of a prospective juror, is counterproductive and serves only the prosecution's interests.

As the New Jersey Supreme Court put it:

> An important ingredient in the [capital voir dire] inquiry is the use of open-ended questions, which in our opinion are most likely to provide counsel and the court with insight into juror's opinions and biases. Once the trial court has elicited from each juror sufficient information concerning the person's predilections—which are much more likely to be expressed freely when the juror is not constrained by an instruction from the court on what kind of answer leads to automatic dismissal – then counsel's ability to formulate and argue for excusal for cause is enhanced. More importantly, the trial court will have a more complete record on which to apply the *Adams-Witt* standard in granting or denying excusals for cause. This enhanced record is imperative to preserve society's interest in a fair trial.

*State v. Williams*, 550 A.2d 1172, 1182 (NJ 1988) (emphasis added).

If the depth and strength of any feelings, biases, opinions or prejudices are not fully explored before the jury is instructed about legal obligations or requirements of the law, counsel and the Court are deprived of the true feelings of the person, on which counsel must rely to intelligently exercise his challenges, and on which the Court must rely if it is to reliably and fairly rule on the defense challenges. The purpose of voir dire is to flush out the juror's biases, not drive those biases deeper into that psychological cave where we all bury our private prejudices.

## IV.   The Voir Dire In This Case Should Be Conducted Individually And Out Of The Presence Of The Other Prospective Jurors

One of the most effective mechanisms for ensuring that voir dire generates meaningful information from prospective jurors is individual questioning out of the presence of other jurors. This practice is particularly important in a case such as that before the Court in which there are issues involving terrorism, Muslims, and Islamic charities. These issues are negatively reinforced on a daily basis by the media. Questioning will be necessary on a number of sensitive subjects.

The reasons why individual sequestered voir dire is more effective are self-evident.  Jurors are more likely to be honest if they are not required to volunteer potentially embarrassing information in front of their peers; answers to questions about pre-trial publicity will not poison the entire venire.  As the Court stated in *Irvin v. Dowd*,

> No doubt each juror was sincere when he said that he would be fair and impartial . . . but the psychological impact of requiring such a declaration before one's fellows is often its father.

366 U.S. at 728.  *See United States v. Haldeman*, 559 F.2d 31, 65 (D.C. Cir. 1976), *cert denied*, 431 U.S. 933 (1977).  The logic of asking questions about pre-trial publicity out of the presence of the venire has repeatedly been expressed.  For example, as noted in *King v. Lynaugh*, 850 F.2d 1055, 1068 (5th Cir. 1988):

> Following the logic of Supreme Court precedent, this court has held that when the record reveals a significant possibility that pretrial publicity prejudiced the venire the district court is obligated to conduct individual voir dire to assure impartiality.

*See Silverthorn v. United States*, *supra*.

The discussion in one of the many decisions involving the Patty Hearst kidnaping can serve as a model for this case.

> At defendant's request jurors were examined individually, in camera out of the presence of other veniremen . . . to insure complete candor . . . Defendant submitted a total of seven-five proposed questions, nearly all of which were accepted and propounded by the trial judge.  Over a period of several days, nearly sixty potential jurors were examined.  Each were queried, slowly and deliberately, as to regular reading habits, television and radio exposure, recollection of each of the dramatic events enumerated above, conversations with friends and family concerning the case, and a litany of other pertinent matters.  In some cases, jurors were asked in excess of one hundred separate questions.  Counsel were given the opportunity to pose, through the trial judge, additional questions.

*United States v. Hearst*, 466 F.Supp. 1068, 1076-77 (ND Cal. 1978), *judg. affirmed in part, vacated in part*, 638 F.2d 1190 (9th Cir. 1980), *cert denied*, 451 U.S. 938 (1981).

## V.    Questionnaire

The voir dire process in this case is likely to be difficult.  "Jury questionnaires are a useful tool employed by courts to facilitate and expedite sound jury selection." *Stevens v. State*, 770 N.E.2d 739, 751 (Ind. 2002).  "Questionnaires that are designed by attorneys and tailored to a specific case, unlike routine or standardized questionnaires that elicit standard juror background information, are uniformly praised." Marvin Zalman & Olga Tsoudis, *Plucking Weeds from the Garden: Lawyers Speak About Voir Dire*, 51 Wayne L. Rev. 163, 228 (2005).  Questionnaires allow a more focused voir dire, where attorneys have greater information about potential biases, and can exercise challenges more intelligently and efficiently.  William W. Schwarzer, *Reforming Jury Trials*, 132 Fed. Rules Decisions 575, 581 (1991); Carolyn S. Koch, *An Unbeatable Combination: Mock Trials and Written Questionnaires*, Champion 36 (Jan. 2009).  Questionnaires also "allows counsel to ask certain personal questions in a private way which would otherwise be embarrassing if the jurors had to answer them out loud in front of a full courtroom of people."  John F. Romano, *What are the Jury Issues in Your Products Case?  Planning Voir Dire Using Juror Questionnaires*, Ass'n Trial Lawyers of Am. Annual Conference Materials 191 (July 21, 2002).  "[M]ost importantly, the juror questionnaire serves the interest of justice by helping the parties choose the most fair and impartial jurors in a more precise way than through simple oral voir dire."  *Id.*

Mr. Sedaghaty will submit a proposed questionnaire on May 11, 2010.  This questionnaire would be administered by the Court.  Results would be made available to the Court and the parties sufficiently in advance of the oral questioning so that the in-court inquiries could be properly honed.

better.

## VI.    The Defense Should Be Granted 5 Additional Peremptory Challenges

The Court has discretion to grant additional peremptory challenges in cases involving sensitive subject matter and highly charged issues.  *See Rosales-Lopez v. United States*, 451 U.S. 182 (1981) (discussing broad discretion of trial court in voir dire process); *United States v. Springfield*, 829 F.2d 860, 864 (9th Cir. 1987) (in a single defendant case the court held that "the award of additional peremptories is not mandatory, but permissive, and rests in the trial court's sound discretion.").

The charges against Mr. Sedaghaty involve very sensitive cultural issues with regard to the Islamic religion and emotional issues involving alleged acts of terror.  The potential for bias among many potential jurors is great and may cause it to be particularly difficult to select a fair and impartial jury.  The highly charged atmosphere regarding such charges is likely to render the selection of a jury difficult.  Additional peremptory challenges can help render the selection process more fair.

### Conclusion

The procedures requested herein aim to ensure, as far as possible, that Mr. Sedaghaty will have a fair and impartial jury.  The only countervailing consideration which could weigh against his request is an administrative concern to save some time in the jury selection process.  In a case which has consumed several hours of the court's,

**Page 30    MEMORANDUM IN SUPPORT OF VOIR DIRE MOTIONS**

defendants', prosecutor's, and defense attorneys' lives already, and will consume

approximately two to three weeks, an addition of several hours to the proceedings is a

de minimis price to pay.  People facing lengthy prison terms should be permitted to

participate in the jury selection process and be provided a process which maximizes the

potential for obtaining fair jurors.

Respectfully submitted this 7th day of May, 2010.

/s/ Steven T. Wax
Steven T. Wax
Federal Public Defender

/s/ Lawrence Matasar
Lawrence Matasar