```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF OREGON

 3   UNITED STATES OF AMERICA,        )
                                      )
 4               Plaintiff,           ) No. 05-60008-2-HO
                                      )
 5     v.                             ) Monday, May 10, 2010
                                      )
 6   PIROUZ SEDAGHATY, et al.,        ) Eugene, Oregon
                                      )
 7               Defendants.          )

 8

 9            TRANSCRIPT OF EVIDENTIARY HEARING

10         BEFORE THE HONORABLE MICHAEL R. HOGAN

11          UNITED STATES DISTRICT COURT JUDGE

12

13                      -:-

14

15

16

17

18

19

20

21

22

23            Deborah Wilhelm, CSR, RPR
                   Court Reporter
24              P.O. Box 1504
              Eugene, OR  97440
25              (541) 431-4113
```

```
 1                      APPEARANCES OF COUNSEL

 2

 3    FOR THE PLAINTIFF:     CHRISTOPHER L. CARDANI
                             United States Attorney's Office
 4                           405 E. 8th Avenue, Suite 2400
                             Eugene, OR  97401
 5                           (541) 465-6771
                             chris.cardani@usdoj.gov
 6
                             CHARLES F. GORDER, JR.
 7                           United States Attorney's Office
                             1000 S.W. Third Avenue, Suite 600
 8                           Portland, OR  97204-2902
                             (503) 727-1021
 9
      FOR THE DEFENDANT:     STEVEN T. WAX
10                           BERNARD J. CASEY
                             MICHELLE SWEET
11                           Federal Public Defender
                             101 S.W. Main Street, Suite 1700
12                           Portland, OR  97204
                             (503) 326-2123
13                           steve_wax@fd.org

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    INDEX OF EXAMINATIONS

2    FOR THE PLAINTIFF:      Direct    Cross     ReD     ReX

3    Evan F. Kohlman          8        36        --      --

4


5


6    FOR THE DEFENDANT:     Direct    Cross     ReD     ReX

7    Walter Patrick Lang     91       128        --      --

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                 (Monday, May 10, 2010; 9:20 a.m.)
 2                      P R O C E E D I N G S
 3            THE CLERK:  Now is the time set for the matter
 4    of the United States of America versus Pirouz Sedaghaty,
 5    05-60008, time set for evidentiary hearing and hearing
 6    on pending motions.
 7            THE COURT:  Counsel, I'd like to take your
 8    experts first on the Daubert question.  Or I have a
 9    couple of friends in Louisiana who say "Daw-bear," but
10    we'll say "Daw-bert," I guess, since we're in Oregon.
11            On your direct of each other's witness, you may
12    have one hour.  Mr. Wax.
13            MR. WAX:  May I introduce to you, Your Honor,
14    the two people who are with me?
15            THE COURT:  Of course.
16            MR. WAX:  This is Bernie Casey, who is retired
17    from Reed Smith in Washington.  We met during the
18    Guantanamo litigation.  Bernie was managing partner
19    there.  They moved to San Francisco to open a branch,
20    and moved to Portland a couple of years ago, and has
21    been volunteering some time to help with this case given
22    Mr. Matasar's inability to be here, and the help that
23    he's provided on the Daubert issues, I asked him to come
24    down.  And hopefully it's okay with you that he sit at
25    counsel table.
```

1          THE COURT:  Welcome to Eugene.

2          MR. CASEY:  Thank you, Your Honor.  Good

3    morning.  Pleased to be here.

4          MR. WAX:  And to his right is Michelle Sweet,

5    whose name you will have seen on some of the pleadings.

6    She's a research and writing attorney in the office who

7    has provided some assistance on the evidentiary motions.

8          MS. SWEET:  Good morning, Your Honor.

9          THE COURT:  You are a prolific writer.  Okay.

10          MR. CARDANI:  Good morning, Judge.  I'd like to

11    introduce Mr. Gorder, Ms. Anderson, and Mr. Carroll.

12          THE COURT:  Thank you.

13          MR. CARDANI:  Mr. Kohlmann is here from New

14    York.  He's one of our experts subject to the "Daw-bear"

15    motion.  We have him here.  The defense, I understand,

16    has their expert Mr. Lang.  And I don't know how the

17    court wishes to proceed.  But I think those are the two

18    witnesses.

19          THE COURT:  You have a choice of who goes

20    first.

21          MR. WAX:  I think the -- Mr. Kohlmann should go

22    first, Your Honor.

23          THE COURT:  All right.  That's fine.

24          MR. CARDANI:  Mr. Gorder will be handling the

25    proceedings.

```
 1           MR. GORDER:  We'd be happy to do that, Your
 2    Honor.
 3           MR. WAX:  If we're doing introductions of
 4    everyone, Colonel Patrick Lang is present.  And at some
 5    point I anticipate he will be called as well.
 6           THE COURT:  Fine.
 7           MR. WAX:  And we would have no objection to
 8    Mr. Kohlmann being here through Colonel Lang's testimony
 9    if the government doesn't object to Colonel Lang being
10    here through Mr. Kohlmann's testimony.
11           MR. GORDER:  We do not, Your Honor.
12           THE COURT:  Thank you.
13           MR. GORDER:  Your Honor, before I call
14    Mr. Kohlmann, I know you've given us guidance of no more
15    than an hour on direct, but I was just wondering if
16    there was any other guidance that you could give us.  We
17    have briefed Mr. Kohlmann's qualifications.  He's
18    qualified, you know, in 15 different federal trials and
19    a number of places around the world.  He's here to
20    testify about his qualifications.
21           THE COURT:  You don't need to do that.  If you
22    have a CV you want to submit beyond what I have, you
23    can, but other than that, no.
24           MR. GORDER:  Your Honor, we do have -- and I
25    submitted as Government's Exhibit 1 today -- his expert
```

1    report in this case, which was provided to the court

2    last week, I believe.

3              THE COURT:  Yes.

4              MR. GORDER:  And we have submitted his résumé.

5    It's attached to the motion -- or our response to the

6    defendant's evidentiary motion, which is Document 344 in

7    the court record.

8              THE COURT:  Thank you.  I will take the expert

9    report as part of the direct.

10             MR. GORDER:  Thank you.  Your Honor, we would

11   then call Mr. Kohlmann.

12             THE CLERK:  Mr. Kohlmann, please raise your

13   right hand.

14             (The witness was sworn.)

15             THE CLERK:  Thank you.  If you would please

16   step forward.  Please watch your step.  We have some

17   wires here.

18             THE WITNESS:  Thank you very much.

19             THE CLERK:  Your microphones are right along

20   here.  They are built in.

21             THE WITNESS:  Thank you very much.  Thank you,

22   Your Honor.

23             THE CLERK:  Sir, would you please state your

24   full name, spelling your last name.

25             THE WITNESS:  Yes.  My name is Evan F.

1    Kohlmann, K-O-H-L-M-A-N-N.

2              THE CLERK:  Thank you.

3                        DIRECT EXAMINATION

4    BY MR. GORDER:

5       Q.    Mr. Kohlmann, could you tell the court what you

6    do for a living.

7       A.    I'm an international terrorism consultant.

8              MR. GORDER:  And, Your Honor, I want to just

9    briefly run through --

10             THE COURT:  You may.

11             MR. GORDER:  -- his qualifications.  And

12   then --

13             THE COURT:  It's your hour.

14             MR. GORDER:  Okay.  Thank you.

15   BY MR. GORDER:

16      Q.    Mr. Kohlmann, could you tell us how you first

17   got interested in the subject of international

18   terrorism?

19      A.    When I was an undergraduate student at the

20   Edmund A. Walsh School of Foreign Service at Georgetown

21   University in the late 1990s, I began an advanced study

22   of particularly countries in which there were

23   contemporary conflicts going on in the Muslim world.

24             One of the countries in particular that I was

25   focused in on was Afghanistan, particularly examining

```
 1   the Soviet/Afghan war of the 1980s, and the impact that
 2   that war had in terms of generating a new kind of
 3   transnational movement, a transnational movement that
 4   became known as the Arab Afghans.
 5          The Arab Afghans were mujahideen fighters, holy
 6   warriors who came to Afghanistan from other countries
 7   during the 1980s to fight against the Soviets.  However,
 8   a core of them stayed behind to continue fighting in
 9   Afghanistan, and then expanded to other countries,
10   including Bosnia-Herzegovina, Chechnya, the Philippines,
11   Somalia, and trying to trace the trajectories of these
12   individuals, their histories, their financing, their
13   communications, but, again, the idea of studying
14   transnational conflict and transnational jihadi
15   movements.
16   Q.    Now, did you earn any awards at Georgetown in
17   this area?
18   A.    Yes.  I was -- first of all, I was given the
19   opportunity to write an undergraduate honors thesis at
20   Georgetown University at the School of Foreign Service
21   in international politics.  A select number of students
22   each year are given the opportunity to write a longer
23   thesis paper.  I applied to write the thesis.  I was
24   granted the opportunity.  And my thesis was eventually
25   approved.  My thesis was on the subject of the legacy of
```

Kohlmann - D                                    10

1    the Arab Afghans.

2              I also graduated with honors in international

3    politics.  I graduated magna cum laude.  I think that's

4    it.

5        Q.    Now, while you were at Georgetown, did you

6    learn anything about how scholars, academics,

7    researchers conduct appropriate studies?

8        A.    Yes.  In order to write my honors thesis, there

9    was a year long process.  The first half of the year was

10   just learning the proper research methods for social

11   science research, for graduate level social science

12   research.  The primary focus was in the area of

13   comparative analysis, which is the essential tool of

14   social scientists, which is to take various different

15   sources, to assess their credibility, their

16   authenticity, and then to juxtapose them against each

17   other to try to come up with a common narrative or

18   shared narrative, an accepted narrative, based upon

19   different sources that are deemed to be credible.

20             Now, a part of that is learning what is

21   acceptable research.  So the ideas of primary,

22   secondary, and tertiary sources.

23       Q.    Can you define that for us.

24       A.    Sure, of course.  A primary source would be if

25   you actually went out and you particularly observed

1    something happening live, if you speak to someone

2    directly, that's a primary source.

3            A secondary source would be -- at least in the

4    terms of the research that I conduct -- would be if you

5    obtained a video recording or an audio recording or

6    communiqué, an authenticated communiqué, from a group.

7    It's not as good as being in that place, but in many

8    times when you are dealing with international terrorist

9    organizations or extremist groups, it's not always

10   feasible to get direct primary sources.  However,

11   secondary sources, particularly when they are video

12   recordings, audio recordings, authenticated documents

13   can be tremendously useful.

14           And then there are also tertiary sources.

15   Generally speaking, I don't rely on tertiary sources,

16   but I do use them in order to help educate my research.

17   A tertiary source would be a magazine article, would be

18   newspaper articles, would be the work of other academics

19   and scholars.  It's not something that I would want to

20   base my own research off of, but in order to understand

21   what other people are saying and how other people view

22   these events and the other kind of research that's being

23   developed by other scholars, it's important to also

24   focus on the tertiary, at least for background purposes.

25       Q.    Now, did you win any awards from the Center for

Kohlmann - D                                              12

1    Muslim-Christian Understanding?

2        A.    Yes.  At Georgetown University in the School of

3    Foreign Service, there is no direct minor program or

4    alternative degree program.  Instead of getting a

5    secondary degree, what they offer is known as

6    certificates.  And there are four programs, or at least

7    when I was there, there were four programs in which you

8    could get a certificate.

9            One of the programs was a program in Islam and

10   Muslim-Christian understanding, which was run by the

11   Center, the Prince Alwaleed bin Talal -- Alwaleed is

12   A-L-W-A-L-E-E-D, bin, B-I-N, Talal, T-A-L-A-L --

13   Center for Muslim-Christian Understanding at Georgetown

14   University.

15           In the Center, I studied under my mentor,

16   Dr. John Voll, whom I'm still in contact with.  I ended

17   up writing a -- what's known as a capstone thesis in

18   order to achieve a degree in Islam and Muslim-Christian

19   understanding.  My capstone thesis was on the subject of

20   religious and political modernization in early twentieth

21   century Afghanistan.

22           And, of course, I then achieved a degree, a

23   second degree in Islam and Muslim-Christian

24   understanding.

25       Q.    Now, after you graduated from Georgetown, did

1   you get any other degrees?

2      A.    Yes.  Subsequent to my degree at Georgetown or

3   my degrees at Georgetown, I achieved a JD or a juris

4   doctorate from the University of Pennsylvania Law School

5   in Philadelphia, Pennsylvania.

6      Q.    Have you practiced law since you graduated?

7      A.    No, I have not.

8      Q.    Okay.  Still on the international terrorism

9   arena?

10     A.    Yes.  The focus of my studies at the University

11  of Pennsylvania was not on corporate law or being a

12  lawyer.  The focus was on international security and

13  security law.  I also took classes separately in the

14  school -- the graduate school of arts and sciences at

15  the University of Pennsylvania in Afghanistan and

16  Islamism, democracy and terrorism.  In other words, the

17  focus of my study was national security studies,

18  terrorism, and the laws that govern over these areas.

19     Q.    Did you begin working at some point for a think

20  tank called The Investigative Project?

21     A.    Yes.

22     Q.    What is that and what did you do for them?

23     A.    The Investigative Project is a counter-

24  terrorism think tank and watchdog group that was started

25  in 1995 by a former CNN journalist.  I began working

Kohlmann - D                          14

1   there in 1998 as an intern.  I began when I was at

2   Georgetown.  I had a tremendous interest obviously in

3   these areas.  I wanted to do original research.  This

4   think tank gave me that opportunity.  By the time I left

5   there, I was a senior analyst or senior investigator.  I

6   worked there from approximately 1998 until December of

7   2003.

8       Q.    And what did you do for The Investigative

9   Project?

10      A.    As part of my responsibilities at The

11  Investigative Project, I was tasked with discovering,

12  researching, analyzing the communications, financing,

13  recruitment strategies, propaganda, and other aspects of

14  prominent international terrorist organizations.

15            My primary focus was on al-Qaeda and al-Qaeda-

16  like groups.  However, another major focus of mine was

17  actual regional conflicts in which Arab Afghan fighters

18  had been involved, particularly in places like

19  Bosnia-Herzegovina and the Caucasus.

20      Q.    And when you say the Caucasus, where is that?

21      A.    Chechnya.  For instance, in 19 -- in -- excuse

22  me, in early 2000 as part of my duties at The

23  Investigative Project, I identified a video recording

24  that had been produced by mujahideen in the Caucasus

25  known as Russian Hell in the Year 2000.

Kohlmann - D                              15

1           So I acquired this video recording.  I brought

2      it into The Investigative Project.  I analyzed it.  I

3      broke it down into pieces.  I identified the players.

4      And I provided that information to other people at the

5      think tank, and then that information is then given on

6      to academics, policy makers, and others with an interest

7      or responsibility in this field.

8      Q.    With regard to -- you mentioned primary

9      sources.  Have you ever had the opportunity to interview

10     someone that most of us would consider a terrorist?

11     A.    Yes.  I've interviewed several individuals who

12     have been convicted of terrorist offenses in the United

13     Kingdom and the United States.  I've interviewed

14     individuals who have been on frontline battlefields,

15     namely in Bosnia-Herzegovina, the Caucasus and

16     elsewhere.  I've -- yeah, I mean, I've interviewed a

17     number -- and we continue to do so.

18          As much as possible I try to conduct these

19     interviews personally.  Sometimes we have to do it

20     through intermediaries.

21     Q.    And when you say "intermediaries," how would

22     that work?

23     A.    Well, for instance, if we want to interview

24     someone from the Pakistani Taliban, it's exceptionally

25     difficult for me to try to get into Waziristan and meet

1    someone directly from the Pakistani Taliban.  But we can

2    get stringers, people that work for us to go there, feed

3    them questions.  They can go and ask the questions that

4    we want asked, video record the interview, and bring

5    back the video for us.

6         But as frequently as possible, I try to conduct

7    these interviews personally.

8    Q.    Do you -- well, what languages do you speak?

9    A.    I speak English, French, and some broken

10   Arabic.

11   Q.    So if the person doesn't speak English or

12   French, how do you conduct these interviews?

13   A.    Either in broken Arabic or through a

14   translator.  I have my -- I have a research assistant

15   who is a Jordanian national -- or, actually, he's about

16   to become a U.S. national, but he's originally from

17   Jordan, and he's a native Arabic speaker.  We also

18   employ people in my company who speak -- who are native

19   speakers of Urdu, Pashto, Turkish, and we also have

20   another individual who's a secondary speaker of Russian.

21   Q.    Now, where do you do most of your research?

22   Where does most of your research come from?

23   A.    We do a combination of materials.  A lot of the

24   research that we get we try to get directly from the

25   organizations themselves.  In other words, one of the

```
 1    reasons that we began doing this work was we felt that a
 2    lot of the empirical research that was being conducted
 3    on these organizations was being obtained through
 4    non-authentic sources.  And we felt that there was a
 5    tremendous amount of information that could be obtained
 6    directly from the organizations, in other words,
 7    directly from terrorist organizations, mujahideen
 8    organizations, extremist organizations.  The point is is
 9    that these folks were putting out a lot of material,
10    video recordings, audio recordings, communiqués,
11    magazines.  And this original material offered a
12    tremendous perspective inside these groups.  And offered
13    quite a bit of information that maybe these groups
14    didn't realize that they were giving out for free, but
15    which was very educational for those of us outside of
16    the conflict zones, outside of Chechnya, outside of
17    Afghanistan.
18            This material comes through different ways.
19    Some of the material we obtained through clearinghouses
20    in Europe and Pakistan and elsewhere.  For instance, I
21    just described this video recording Russian Hell in the
22    year 2000 from the Caucasus.  I obtained this by
23    contacting a jihadi clearinghouse based in the United
24    Kingdom.  I ordered it on CD.  And they mailed it
25    literally in the mail to us.
```

1          Other cases, I've gone to locations in the UK

2     and I've purchased things directly.  Very frequently

3     nowadays, because of the fact of law enforcement

4     crackdown on individuals that are trying to purvey

5     propaganda put out by terrorist organizations,

6     frequently we go to the Internet.  The Internet has

7     become the new venue for these groups to release their

8     material.

9          And what's also interesting is that these

10    groups are also releasing archival material, in other

11    words they're not just releasing material relevant to

12    what's going on today, but they're also releasing

13    material that has to do with conflicts that took place

14    10, 20 years ago.  And this is the first time we're

15    actually seeing this video footage, these audio

16    recordings, these communiqués, these magazines.  And

17    they are tremendously helpful, obviously, to educate

18    yourself.

19    Q.    How do you keep track of all this stuff?

20    A.    Well, we maintain a database, a formal

21    database, which contains at this point several billion

22    documents.  It is organized in a system where everything

23    is organized by region, by group, by year.  We have a

24    specific dating format so every file will be saved,

25    saved digitally where immediately by looking at the file

Kohlmann - D                                          19

```
 1    name, I can tell you the date it was saved, the source
 2    where it was -- where it comes from, the rough content.
 3    If it comes from a discussion forum, even the unique
 4    thread number assigned to that message.  All that
 5    material is then organized and is archived.
 6              And we have software known as ISYS, I-S-Y-S,
 7    and another software package known as dtSearch, along
 8    with a Mac Spotlight server, which enable us to do what
 9    are known as Boolean searches through this material.  A
10    Boolean search would be a LexisNexis style search,
11    "and," "if," "or," "nor."  So we can literally run
12    searches through the content of what we have.  So if
13    we're looking for a name, a phone number, an address, a
14    bank account number, we can get that level of
15    specificity.
16        Q.    Now, you might want to spell Boolean for the
17    court reporter.
18        A.    Excuse me, Boolean, B-O-O-L-E-A-N.
19        Q.    Now, what do you generally do with this
20    material that you gather?
21        A.    We do a number of different things.  We --
22    first of all, I work for NBC News.  I work as an analyst
23    for NBC News.  So one of the things we do is we develop
24    stories for media.  We develop investigative news pieces
25    which examine international terrorist organizations,
```

1    their recruitment, their financing, their

2    communications.

3          I also take that material and I produce

4    scholarly papers with it.  Currently I'm finishing work

5    on a paper for a journal known as *African Security* on --

6    in fact, the title of the paper is the "Sacralization of

7    the Somali Conflict," which is based upon the research

8    and what we've developed.  And I'm writing it in

9    conjunction with a graduate -- or actually at this point

10   a professor of Harvard University and another professor

11   from the United Kingdom.

12         We also take this material and we provide it to

13   government agencies.  We work with both the U.S.

14   government, we work with the -- the government of the

15   United Kingdom.  We work with Australian Federal Police.

16   The PET, the Danish police intelligence service.  We've

17   worked with law enforcement and governments around the

18   world.  We also work with the United Nations.  We work

19   with governments in the Middle East in order to, number

20   one, help provide the raw data that helps educate people

21   about what these groups are doing.

22         We also participate in the counter-

23   radicalization programs.  Recently I was over in Amman,

24   Jordan, at a conference speaking with representatives

25   from the Saudi Interior Ministry and the Jordanian royal

Kohlmann - D                                                    21

1    family about how -- the best strategies for counter-

2    radicalization given what's going on in the world today.

3        Q.    Now, you mentioned publishing a paper.

4    Approximately how many papers have you published?

5        A.    Quite a few.  I mean, I try to publish at least

6    one to two scholarly papers per year.  And then in

7    addition to that, I also publish various other different

8    articles.

9            This past February, I published a piece in the

10   West Point Counterterrorism Center Sentinel Journal on

11   the subject of a particular Web site which is being

12   using for recruitment by the Pakistani Taliban and other

13   organizations.

14           So it's a variety.  Sometimes we submit op-eds

15   for major newspapers.  But we try to do -- you know, we

16   try to hit different kinds of sources, but there is

17   numerous papers each year, yeah.

18       Q.    Now, have you written any books on -- you know,

19   on this general subject?

20       A.    Yes.  In 2004, I published my first book, which

21   was *Al-Qaida's Jihad in Europe:  The Afghan-Bosnian*

22   *Network*, which was published by Berg/Oxford Press in the

23   United Kingdom.

24       Q.    And could you explain to the court what kind of

25   review or editing process you had to go through to

1    publish the book.

2        A.    Sure.  Oxford as an academic publisher.  It

3    publishes mostly university style books.  So in order --

4    first of all, because of the fact that it's a British

5    publisher, so it's subject to British libel law, and

6    it's an academic publisher, I had to go through the

7    formal process of peer review.

8             Now, the -- that process is not -- was not in

9    my control.  In other words, what the publisher did was

10   the publisher identified a group of academics or

11   scholars that it trusted, and it sent them out this --

12   sent them out my draft blind.  In other words, I didn't

13   know who they were.  I didn't know what they were

14   reviewing.  And they were asked to review my draft.  Go

15   through it and assess whether or not it met the

16   credentials for academic scholarship, and whether or not

17   it was something worthy of publication.

18            Obviously, if my peer reviewers had come back

19   and said that it wasn't worthy of publication, it

20   wouldn't have been published.  But in addition to that,

21   because of the fact that the book was published in the

22   United Kingdom and is subject to British libel law, it

23   was also subject to an extremely high standard.  In

24   other words, every single fact that I put in the book

25   was rigorously checked, not just by my peer reviewers,

Kohlmann - D                                          23

1    but by a libel attorney hired by my publisher.

2        Q.    Have you gotten any feedback on the book since

3    it was published?

4        A.    Yes.  I mean it's -- it was -- has been

5    recommended by people such as Richard Clarke, the former

6    White House counterterrorism czar.  It's used as a

7    course text in universities such as Harvard, Johns

8    Hopkins, all over the place.  Australia, the United

9    Kingdom, all over the place.  It's one of the very few

10   books that deals with a particular period of time that

11   the Arab Afghans were engaged.  And while that period

12   may not be so interesting for media or for public

13   consumption, in academic circles and in university

14   circles it's very relevant for a lot of the scholars.

15       Q.    I take it it didn't make the *New York Times*

16   best-seller list?

17       A.    Yeah, again, it's not -- it's certainly not a

18   book for public consumption.  It's very in-depth.  It's

19   very detailed.  I mean I have an entire chapter just on

20   the use of charitable organizations to fund conflicts.

21   It's not the kind of thing that most people would find

22   as bedtime reading.  But it is something, again, for

23   scholars and for people that are engaged in very

24   detailed research that are looking for facts, it goes

25   into great fact.  And eventually it was actually

Kohlmann - D                                            24

 1   republished by the George Marshall Center in several

 2   different languages.

 3       Q.    Now, with regard to the -- I guess the

 4   scholarly journals that you say you try to publish once

 5   or twice a year, what kind of peer review do your

 6   articles go through in those instances?

 7       A.    Sure.  Well, there is formal and there is

 8   informal peer review.  I -- anything I publish, anything

 9   I write, one of the first things I'll do is submit it to

10   a whole host of different people who I know and I

11   respect and who have in-depth and lengthy knowledge in

12   this.  People such as Bruce Riedel, one of the guys that

13   was in charge of the Barack Obama administration review

14   of Afghanistan policy, et cetera, et cetera.  I pass

15   them to a large variety of different people.  And I try

16   to get feedback initially.

17           Then after that, when I submit it to the

18   journal, the paper is then reviewed by editors of the

19   journal, and they decide whether or not it fits their

20   standards for publication.

21           I've never had a piece rejected, so I'm

22   assuming that so far they've been on target.

23       Q.    Now, did you start a company or a business

24   called globalterrorist.com?

25       A.    Global Terror Alert, yes.  That was the former

Kohlmann - D                                25

```
 1    name of my business until recently.  I've expanded now
 2    with other partners to Flashpoint Global Partners.
 3        Q.    And generally what kind of a business has that
 4    been?
 5        A.    Global Terror Alert was essentially designed as
 6    a clearinghouse for international terrorism.  In other
 7    words, it was a place for scholars, academics, policy
 8    makers, journalists, students to come and actually get
 9    an eye into the raw data that underlies the world of
10    terrorism and terrorist organizations.
11             One of the issues that I had when I was
12    researching my thesis, was it was exceptionally
13    difficult for me to find good sources.  It took a lot of
14    digging.  And I thought it would be good for others to
15    be able to provide that information out there, so that
16    others when they are pursuing these same lines as I was,
17    they would be able to see kind of the authenticated
18    credible information coming out from these groups, so
19    there would be less confusion about the facts.
20             Also, obviously, it was, you know, partially a
21    pro bono venture, but, obviously, part of it was for
22    profit.  As part of Global Terror Alert, that was the
23    venue through which I did consulting work for the U.S.
24    Justice Department, for the FBI, and for other
25    organizations.
```

Kohlmann - D                               26

1    Q.    Now, you've also done work for an organization
2  called the 9/11 Finding Answers Foundation?
3    A.    That's correct, the NEFA Foundation, yes.
4    Q.    And just generally what is that?
5    A.    Sure.   NEFA was started after the September
6  11th terrorist attack in order to help promote nonprofit
7  counterterrorism research.   It's -- again, it's a
8  nonprofit organization.   The idea behind the group is
9  very similar to what The Investigative Project was
10  about, a nonprofit counterterrorism research, a
11  counterterrorism watchdog.   I've worked for them as an
12  investigator and as a contributor since, I think, 2005,
13  I think 2005.   And I continue to work for them, again as
14  an investigator, as a contributor.
15    Q.    Now, you have testified as an expert witness
16  for the United States in a number of criminal trials; is
17  that correct?
18    A.    That's correct, yes.
19    Q.    And in those cases, have you prepared an expert
20  report, so to speak?
21    A.    In all but I think two of them, yes.
22    Q.    And you've prepared one in this case; is that
23  right?
24    A.    That's correct, yes.
25    Q.    Could you tell the court what kind of process

Kohlmann - D                              27

1    you go through in preparing an expert report, including

2    in this case?

3        A.    Well, the first thing I would do is determine

4    what the expert report is supposed to be about.  What is

5    the general subject that I've been asked to write about.

6    Then I would go back, number one, and go into the

7    section of my database that deals with material from

8    that particular issue.  And I start going through piece

9    by piece attempting to match up material that I

10   recognize or I remember or I recall, that matches up and

11   helps address the issue that I've been asked to write a

12   report about.

13           Additionally, I then run searches through my

14   database, because I can't possibly remember billions of

15   documents off the top of my head, so I run Boolean

16   searches.  So I search for key words.  I search for

17   things.  And I see whether or not there is anything I

18   don't recall personally, but I did save, and I have

19   copies of in the database, that would be relevant to

20   this.

21           I also then conduct other searches.  Perhaps I

22   haven't saved the correct material.  Perhaps I haven't

23   saved the relevant material.  Perhaps that material is

24   available on the Internet.  Perhaps that material is

25   available via LexisNexis.  Perhaps that material is

Kohlmann - D                                      28

1    available via the Foreign Broadcast Information Service,

2    which is a U.S. government agency which republishes

3    foreign media in English.  Maybe there is a source

4    available in a foreign country.

5           The point is then to try to go out and see

6    whether or not there are any additional sources which

7    can help educate this question which I don't already

8    have in my database.

9           At that point I take these various different

10   sources, and I conduct, again, comparative analysis.  I

11   attempt to determine among these sources which are the

12   most credible, which offer the greatest degree of

13   insight and information to the question I've been asked

14   to write about, and I write a report based on that.

15   Obviously footnoted with all the sources listed.

16          And because of the fact that I deal solely in

17   open source information, in other words, information

18   that is not obtained through intelligence agencies,

19   information that is not obtained through, you know,

20   subterfuge, the information I have is open.  It's

21   public.  I can provide my sources, not just the

22   footnotes, but I can provide copies of my sources.

23      Q.    And I take it you did that in this case?

24      A.    That's correct, yes.

25      Q.    Now, without getting into the substance of your

1    testimony, could you explain to the court what your

2    background is in the conflict in Chechnya that would

3    allow you to provide the jury with some specialized

4    knowledge in that area?

5        A.    The conflict in the Caucasus has been one of

6    the primary focuses of my research since I began this,

7    began this endeavor.  When I wrote my honors thesis at

8    Georgetown University in 2001, I did a comparative

9    analysis of four different regions where Arab Afghan

10   fighters had gone to and had participated in battles and

11   what the impact had been.

12          One of those regions, one of the four regions I

13   chose was Chechnya, was the Caucasus.  The reason that I

14   was very interested in this, and the reason why I chose

15   this was because I had developed an incredible amount of

16   information, incredible amount of original sources which

17   helped educate as to what was going in the Caucasus, the

18   hierarchy of the foreign fighters, the identity of the

19   foreign fighters, their communication, their financing.

20          The critical aspects that everyone wanted

21   answers about, and it happened that this particular

22   conflict we were developing excellent sources with the

23   answers to those questions.  In fact, initially my

24   intention had been to follow up my book on Bosnia with a

25   book about Chechnya and about the Arab Afghans in the

1    Caucasus.  Unfortunately, not too many publishers are

2    interested in publishing books about Chechnya.  But

3    that's the nature of my interest and my expertise.

4        Q.    Now, how about in the subject matter of the

5    role of Islamic charities in financing what some of us

6    would call terrorist activity?

7        A.    Sure.  That has also been a major focus of my

8    studies ever since I began this endeavor.  First of all,

9    one of the chapters of my book is exclusively about the

10   role of the Islamic charitable organizations in funding

11   jihad or funding mujahideen groups.  It's an entire

12   chapter of my book.

13        I've also coauthored testimony, Congressional

14   testimony, on the use of charitable -- Islamic

15   charitable organizations in the Arabian Gulf to finance

16   international terrorist organizations.  I've written

17   numerous papers about this.  I just -- I submitted a

18   paper -- there is a paper that I published in -- with

19   the Danish Institute of International Studies about two

20   years ago which has been cited in the U.S. Treasury

21   Department guidelines for charitable organizations in

22   terms of avoiding terror finance issues.

23        So I publish fairly regularly on this issue.  I

24   conduct original research.  At this very moment we're

25   actually engaged in a project which is attempting to

1    identify bank account numbers and other financial

2    instruments which are being used at the very moment by

3    terrorist organizations to receive financing to finance

4    operations.

5        Q.    What about your background in studying

6    particular Web sites used in connection with terrorist

7    activity?

8        A.    Yeah.  Maybe it's no surprise given my age, but

9    one of the areas where I've focused in on quite a bit is

10   the use of Web sites and the Internet to disseminate

11   information by terrorist organizations.  In some ways

12   you could say that I have a bit of a niche in this area.

13   And I have conducted investigations of Web sites that

14   have been hosted by terrorist organizations, or been

15   promoting terrorist organizations since 1997.

16           I've written numerous papers, numerous academic

17   papers about this subject.  I have published -- in the

18   last two years, I've published papers on this subject in

19   the Annals of the American Academy of Social and

20   Political Sciences, in the West Point Counterterrorism

21   Center Sentinel Journal, and various other different

22   venues.

23           I've testified about this area in many, many

24   different courts.  And, obviously, it's a major, major

25   focus of what I do.

Kohlmann - D                                              32

1             I attempt to save copies of the Web sites.  I

2    attempt to authenticate where the material is coming

3    from.  I attempt to meet the people who are running the

4    Web sites.  But, yeah, that's -- again, it's -- because

5    of the fact increasingly that terrorist organizations

6    are taking to the Internet as their primary mechanism to

7    disseminate propaganda, in open source information, it's

8    becoming ever increasingly a more important aspect of

9    this.

10   Q.     Would that include the Web sites Azzam.com and

11   Qoqaz.net?

12   A.     Yes.  Between the years of approximately 1998

13   and 2002, I visited the Web sites of Azzam Publications

14   and Qoqaz.net on not just a daily basis but actually

15   multiple times a day, particularly during the point in

16   which the conflict in the Caucasus and Chechnya had

17   reached its peak in late 1999 and early 2000.

18           At that point in time, really one of the best

19   places to get updates on jihad action or what the

20   mujahideen were up to in the Caucasus was from Qoqaz.net

21   and Azzam Publications.  They were publishing material

22   almost everyday.  It was -- if you were interested in

23   jihad, if you were interested in mujahideen, this is

24   where you went to, period.

25   Q.     When you say "jihad," what do you mean by that?

1    A.    Well, jihad is an Arabic word which means holy

2    struggle.  It can be a spiritual struggle.  It can mean

3    an internal struggle.  However, in the contemporary

4    context because of events that have taken place in the

5    last 10, 15 years, increasingly jihad has become

6    associated with a particular meaning, which is the

7    meaning -- the violent meaning.  In other words, holy

8    struggle as in violent struggle, physical struggle, not

9    internal struggle.

10         There are some who still refer to jihad when

11   talking about internal struggle, but it's becoming less

12   and less used because of the fact that it has this

13   immediate connotation when you say it, not just in the

14   West but also in the Muslim world as well.

15   Q.    Now, have you also done a lot of research in

16   terrorist financing?

17   A.    Yeah.  Again, not just with Islamic charitable

18   organizations but many different mechanisms for

19   terrorist financing; everything from basic money

20   laundering, the use of Hawala networks, the use of

21   Western Union, et cetera, et cetera.  But, yeah, I mean,

22   Islamic charitable networks have been a large part of

23   investigating terror financing.  But it is part of it,

24   there is other aspects as well.

25   Q.    Now, with reference to al-Haramain, have you

Kohlmann - D                                    34

 1   done any work studying that organization from Saudi

 2   Arabia?

 3        A.    Yes, I have.

 4        Q.    Could you just briefly tell us what kind of

 5   research you've done in that area.

 6        A.    al-Haramain has been a large focus of my

 7   studies of Islamic charitable organizations in the

 8   Arabian Peninsula, particularly vis-à-vis al-Haramain's

 9   activities in Bosnia-Herzegovina and in the Caucasus.

10             I have worked directly -- I was -- I was hired

11   to work directly with the office of a high

12   representative in Bosnia-Herzegovina, among other

13   things, to work, in terms of researching, developing

14   information about al-Haramain and associated Islamic

15   charities, their activities in the local regions,

16   reviewing original documents produced by the security

17   service of the army of Bosnia-Herzegovina, the Muslim

18   army of Bosnia-Herzegovina, regarding the activities of

19   al-Haramain, their support of mujahideen, et cetera.

20   And expanding that from Bosnia-Herzegovina to the

21   Caucasus later on.  Because once the conflict in the --

22   once the conflict in Bosnia-Herzegovina ended,

23   al-Haramain's activities then briefly moved to Albany

24   and then to the Caucasus.  So tracing the patterns of

25   their behavior.

```
 1              But, again, al-Haramain was part of my book.
 2    It's part of my -- the Congressional testimony I
 3    coauthored.  It's a very frequent subject of material
 4    that I've written about.  I've written numerous articles
 5    about al-Haramain, and I've conducted a tremendous
 6    amount of research on al-Haramain's activities on the
 7    ground in Bosnia-Herzegovina.
 8              MR. GORDER:  Can I have a moment, Your Honor?
 9              THE COURT:  Yes.
10              (Discussion held off the record between
11    co-counsel.)
12              MR. GORDER:  Your Honor, as far as
13    Mr. Kohlmann's qualifications, we're prepared to submit
14    him as an expert.  If you want to hear further about the
15    specific testimony that he would offer during the trial,
16    I don't know if you want to rerun the trial, but those
17    are the areas that he is going to be speaking of.
18              THE COURT:  I don't want to rerun the trial.
19              MR. GORDER:  Very well.  Then we would tender
20    him as an expert.
21              THE COURT:  Thank you.  Who is taking the
22    cross?
23              MR. WAX:  Thank you, Judge.  Good morning,
24    Mr. Kohlmann.
25              THE WITNESS:  Good morning.
```

Kohlmann - X                                    36

```
 1              THE COURT:  Mr. Wax, up to one hour.

 2              MR. WAX:  I'll do my best.

 3              THE COURT:  I'll help you.

 4                         CROSS-EXAMINATION

 5   BY MR. WAX:

 6      Q.    You've been through this drill a number of

 7   times, have you not?

 8      A.    That's correct, yes.

 9      Q.    I would like to start by asking you to tell us

10   if you have read the indictment in this case?

11      A.    If I have read the indictment, it's been a

12   while.  I assume I probably have read it at some point

13   or another, yeah.

14      Q.    Do you recall what the charges in this case

15   are?

16      A.    I -- you know, frankly, I don't.  I don't

17   generally study the legal documents or I try to avoid

18   studying legal documents in cases in which I'm involved

19   with because I don't perceive it to be advantageous

20   towards my testimony.

21      Q.    Do you have any sense, then, of what the issues

22   are that the jury is going to be required to consider

23   under the indictment in this case?

24      A.    I have a basic sense.  But, again, I try to

25   avoid studying those issues because they're not relevant
```

```
 1    to my testimony and I seek to avoid prejudicing my
 2    testimony.
 3         Q.    Your judgment is that the issues in this case
 4    are not relevant to your testimony?
 5         A.    No, I --
 6               MR. GORDER:  Objection, Your Honor.
 7               THE COURT:  Sustained.
 8               THE WITNESS:  My response --
 9               THE COURT:  No.  That's all right.  Ask another
10    question.
11               THE WITNESS:  Excuse me, Your Honor.
12    BY MR. WAX:
13         Q.    What material were you given to review here?
14         A.    Well, I was given a substantial amount of
15    material to review.  I was given material -- computer
16    exhibits that were I understand to have been recovered
17    off of computers seized from the defendants in this
18    case.  I was given documents which were provided by the
19    government of Russia.  I was provided -- I think that's
20    almost everything.
21         Q.    How many computer exhibits were you provided?
22         A.    Off the top of my head, I'm not sure.  I could
23    give you a list if you like.  I have everything saved in
24    my database.
25         Q.    Do you have that list with you here today?
```

1    A.    No, I don't.

2    Q.    Do you recall whether it was the roughly 8 or

3  10 or so that are referenced in your report or were

4  there more than that?

5    A.    I believe that -- those were the ones that I

6  was given.  Although there may have been several --

7  there may have been other computer exhibits that I was

8  given that simply weren't relevant to my expert report

9  in the sense that they were either redundant or they

10  didn't have any direct bearing on what I was writing

11  about.  But, again, I -- if you would like, I'm sure I

12  could provide you with copies of everything that was

13  provided to me.

14    Q.    Do you recall how many pages of material from

15  the Russian FSB you were provided?

16    A.    Not very many.  I think approximately five or

17  six pages.

18    Q.    Were you provided a copy of Colonel Lang's

19  report on the FSB?

20    A.    I was provided a copy of a report by Colonel

21  Lang but I have not read it yet.  But I don't know if it

22  was a report on the FSB or not.  It was a report by

23  Colonel Lang.

24    Q.    With respect to your qualifications, I want to

25  ask you just a few questions.  You said, if I understood

1  you correctly, that in law school your focus was on

2  security law and international security.

3      A.    Roughly, yes, exactly.  Terrorism,

4  international security, national security law.

5      Q.    Okay.  Do you recall having offered such

6  testimony in a prior proceeding and having the attorney

7  go through with you your actual law school transcript?

8      A.    Yeah, I believe I did so in the *Muntasser* case

9  up in Boston.

10     Q.    And do you recall as you sit here today either

11 from that examination or from your recollection of your

12 law school degree precisely what courses you took in law

13 school?

14     A.    You mean every single last one?  No, I'm sorry,

15 I don't recall.  It's been -- I graduated from law

16 school about six years ago.  But I can tell you some of

17 the titles of the classes I took.  Diplomacy in

18 terrorism, Afghanistan and Islamism.  There are several

19 others, but I can't remember the course titles.

20     Q.    Let me see if this refreshes your recollection.

21 In your first year in law school do you recall taking

22 the standard first year course of civil procedure,

23 contracts, torts, property, and legal writing?

24     A.    Yes.

25     Q.    And in the second semester, constitutional law,

1    criminal law, legal writing, American legal history, and

2    administrative law?

3         A.    Correct, yes.

4         Q.    Are there any other courses that you took

5    during your first year in law school?

6         A.    No.  The first year is fairly standard, I

7    believe.

8         Q.    In your second year, do you recall having taken

9    professional responsibility, evidence for trial lawyers,

10   federal income tax, constitutional criminal procedure,

11   terrorism and democracy in the first semester?

12        A.    That's correct, yes.

13        Q.    So that's one course so far related to the

14   subject matter?

15        A.    Constitutional criminal law had direct bearing

16   on terrorism law.

17        Q.    Was it not the standard constitutional criminal

18   law course taught at Penn?

19        A.    I don't know what the standard

20   constitutional -- each constitutional criminal law

21   course is different depending on the professor that's

22   teaching it.  There is modification -- I mean, it's

23   not -- I don't think there's a standard course.

24              I certainly know there were other people who

25   took that course that didn't go through the exact same

Kohlmann - X                                                    41

1    text that I did.  But I don't -- again, there was --

2    when I say I took classes on national security on

3    international terrorism and security, I'm also referring

4    to elements of criminal law.  To understand about

5    international terrorism, you have to understand the

6    basis for constitutional criminal law and basic criminal

7    law.

8       Q.    Sir, I've taught constitutional criminal law

9    many times.  Mr. Gorder teaches a course in national

10   security law.  I'm aware of his curriculum and mine.

11   Let us focus on the course you took in constitutional

12   criminal law.  Did you deal with the traditional Fourth,

13   Fifth and Sixth Amendment issues of search and seizure,

14   confessions, right to counsel, and things of that

15   nature?

16      A.    Yeah.

17      Q.    It did not have any particular focus on

18   national security matters as a major component of the

19   course?

20      A.    I'd have to review my course notes.  Again,

21   it's been about five years since I graduated from law

22   school.

23      Q.    Second semester, do you recall taking

24   copyright, corporations, evidence for trial lawyers, law

25   and the holocaust, and topics in defamation?

1      A.      Yes.

2      Q.      Anything else that you took in the second year

3   of law school that I haven't mentioned?

4      A.      No, that's my complete transcript.

5      Q.      And then in the third year, do you recall

6   taking a course in death penalty and habeas corpus,

7   trial advocacy?

8      A.      Yes.

9      Q.      International human rights, an advanced

10  criminal law course, and a cyber crime seminar?

11     A.      That's correct, yes.

12     Q.      And then the last semester, a course in

13  Afghanistan and Islamism, free speech, trial advocacy,

14  First Amendment, and an independent study course?

15     A.      That's correct, yes.

16     Q.      And, again, in the third year, as with the

17  first two, I have read accurately all the courses that

18  you took?

19     A.      Oh, yes.

20     Q.      Okay.  Now, with respect to your undergraduate

21  degree, I thought I heard you say that you received a

22  second degree from Georgetown?

23     A.      Georgetown doesn't -- you can't get a minor

24  degree or a secondary degree within the School of

25  Foreign Service.  The option that's given is you can get

a certificate.  And the certificate program is what they
describe as the equivalent of a minor or a dual degree.
It's not exactly -- it doesn't exist anywhere outside of
Georgetown essentially.  But I actually have a second
degree.  I was given a second degree from that program.

Q.    Have you not said repeatedly in the past that
you received a certificate rather than a degree?

A.    It's a certificate program, but it's a degree.
You are misunderstanding what I was saying.  What I was
saying is that it's a certificate program but they gave
me a degree.  It's a degree.

Q.    How many courses did you take in Islam and
Muslim-Christian understanding, sir?

A.    In order to achieve the degree, you have to
take two years of course work.  So the first set of
course work is an intensive year in Islamic history.  So
it's a full year-long course starting from start to
finish on Islamic history.

Q.    How many credit hours, sir, in that year?

A.    I don't know.  That's credit hours, I have no
idea.  But, again, let me just finish.  The second year
is then the first part of the year I took course work in
Islamic modernism under Dr. John Voll.  And then the
second part of the year was writing my capstone thesis,
with Dr. John Voll.

1    Q.    Did you take any other courses during the

2    second year that were not part of the Islam and Muslim-

3    Christian understanding curriculum?

4    A.    I am sorry, I don't understand your question.

5    You mean did I take any other courses that were outside

6    of CMCU?

7    Q.    You were an undergrad at Georgetown, correct?

8    A.    That's correct, yes.

9    Q.    Four-year program, correct?

10   A.    That's correct, yes.

11   Q.    And you graduated with a BA, a BS?  What did

12   you get?

13   A.    Again, it's Georgetown, so it's a BSFS.  It's a

14   bachelor of science in foreign service.

15   Q.    All right.  And you -- Georgetown has a number

16   of undergraduate colleges?

17   A.    That's correct, yes.

18   Q.    And you were in which undergraduate college?

19   A.    I was in the Edmund A. Walsh School of Foreign

20   Service.  Excuse me, I'm sorry.  The Edmund A. Walsh

21   School of Foreign Service.

22   Q.    Does Georgetown have another undergraduate

23   school that relates more specifically to the Middle

24   East?

25   A.    No.  There are -- within the School of Foreign

1    Service, there is the Center for Contemporary Arab

2    Studies, and there is the Center for Muslim-Christian

3    Understanding.  But those are both within the School of

4    Foreign Service.  I mean, I -- I -- in order to achieve

5    my degree at BSFS, I took lots of classes at CCS, in the

6    Center for Contemporary Arab Studies.  In fact, I worked

7    as an undergraduate research assistant for Dr. Mamoun

8    Fandy, F-A-N-D-Y, who was a professor at CCS.

9        Q.    All right.  Now, Mr. Kohlmann, when you started

10   your interest in terrorism matters, you were an

11   undergraduate?

12       A.    That's correct, yes.

13       Q.    You were born in what year, sir?

14       A.    I was born in 1978.

15       Q.    You started Georgetown what year?

16       A.    In 1997.

17       Q.    Okay.  Did you work between high school and

18   college?

19       A.    Yes, but not in a field substantively related

20   to this, no.  I mean, I graduated from high school in

21   1997, I immediately went straight to college.

22       Q.    Okay.  So you did not take a year off, travel

23   the world, or do work in some other location?

24       A.    No, no, no.  I went straight to college.

25       Q.    And did you go straight through Georgetown in

Kohlmann - X                                        46

 1  four years?

 2      A.      That's correct, I did.

 3      Q.      All right.  You began working as an intern, you

 4  said, in The Investigative Project?

 5      A.      That's correct, yes.

 6      Q.      You did that on a volunteer or a paid basis?

 7      A.      No, no, a paid basis.

 8      Q.      You then graduated from Georgetown, which is

 9  located in Washington, D.C.?

10      A.      That's correct.

11      Q.      And went to law school at Penn located in

12  Philadelphia?

13      A.      That's correct, yes.

14      Q.      Did you continue to work for The Investigative

15  Project while at Penn?

16      A.      Yes.  What I did was that I managed to schedule

17  my classes so that they took place on Monday, Tuesday,

18  Wednesday, and then on Wednesday afternoon, I would go

19  down to D.C., and I would spend the next three or

20  four days down in D.C.  So I would divide half my week

21  being in Philadelphia and half my week be in D.C.

22      Q.      Now, I was curious when I was reading your

23  testimony from one of the other cases to see that you

24  said in an affidavit that was filed in 2004 that you had

25  spent the previous seven years engaged in research, and

1    also giving frequent briefings.  Did I read that

2    testimony correctly?

3        A.    Briefings to who?

4        Q.    Well, what the testimony -- transcript -- or,

5    excuse me, the affidavit described academic, law

6    enforcement, intelligence agencies, Department of

7    Justice --

8        A.    That's correct.

9        Q.    -- FBI, the National Security Council --

10       A.    That's correct, yes.

11       Q.    -- that is part of the Department of Homeland

12   Security?

13       A.    Yeah, that's correct.

14       Q.    So in 2004, when you signed this affidavit and

15   described seven years of frequent briefings, you were

16   25, 26 years old?

17       A.    That's correct, yep.

18       Q.    And you had not at any point been out of an

19   academic setting full-time in the work force?

20       A.    Well, that's a matter of debate.  I was working

21   part-time at The Investigative Project, but it was

22   closer to full-time.

23       Q.    Can you tell me, please, when the first

24   briefing that you gave to the FBI was?

25       A.    I could not tell you off the top of my head.  I

1    have no idea.

2        Q.    Can you tell us the subject matter?

3        A.    I have absolutely no idea, I'm sorry.

4        Q.    Are you -- but is it -- did you then and are

5    you telling us today that when you were an undergraduate

6    at Georgetown you were actually in a position in which

7    you were giving briefings to the Federal Bureau of

8    Investigation?

9        A.    Yeah.  In January of 2000 when I was a

10    sophomore or junior -- I was a junior at Georgetown

11    University, I actually went to the White House, and I

12    gave a briefing directly to White House counterterrorism

13    czar Richard Clarke, and not on one occasion, but on

14    three different occasions.

15        Q.    And what was the subject matter?

16        A.    On terror finance, on recruitment, on

17    communications networks, and other aspects of al-Qaeda.

18        Q.    How long did the first briefing take?

19        A.    I don't know.  Probably about four hours.

20        Q.    Four hours you alone with --

21        A.    No, no, it was me and a team of people, but I

22    was --

23        Q.    I see.

24        A.    -- I was one of two people leading the

25    briefing.

1    Q.    Who were the other people who were present?

2    A.    Steve Emerson, the director of The

3    Investigative Project; Rita Katz, who was one of the

4    other people who was leading the brief -- or was the

5    other person who was leading the briefing alongside of

6    me; and another lady who I would prefer not to name her,

7    Your Honor, just because she currently works for the New

8    York Police Department Intelligence Unit.

9          THE COURT:  You don't need to.

10   BY MR. WAX:

11   Q.    So is it more accurate to say then, sir, that

12   while you were a student, that you attended briefings

13   that were set up by The Investigative Project leaders?

14   A.    No, no, that would not be accurate.

15   Q.    Did you personally set up this briefing with

16   the White House?

17   A.    One of the ones -- not the first one, but the

18   subsequent ones myself and Rita Katz, who were the ones

19   who were leading the briefing, were the ones who

20   contacted Mr. Clarke and his assistants and set up the

21   subsequent briefings.

22   Q.    And Ms. Katz is how old?

23   A.    I don't know her age.

24   Q.    Is she substantially older than you are?

25   A.    I would say so, yes.

Kohlmann - X                                          50

1    Q.    Are you telling us that neither she nor

2    Mr. Emerson was taking the lead on setting up these

3    briefings?

4    A.    Initially.  But afterwards, once I got to know

5    these individuals, it was pretty much me running the

6    briefings.

7          As far as the FBI, which is what you asked

8    about initially, almost all the briefings that I

9    conducted with the FBI, it was me running the briefing.

10   The reason being is that I was the one doing the

11   substantive research.  So when someone from -- in a

12   government agency or an academic or others were coming

13   in looking for information, I was the one they wanted to

14   speak to because I was the one who had developed the

15   research, myself and Rita and one or two other people.

16   But when I say I was directing briefings, I don't mean I

17   was attending briefings, I mean I was giving the

18   briefing.

19   Q.    How much are you getting paid for your

20   testimony in this case?

21   A.    In this case I'm getting paid at a rate of $300

22   per hour.

23   Q.    Roughly how much money have you earned from the

24   United States government as a consultant in the last six

25   years, let's say since you graduated from law school?

1    A.    I have absolutely no idea.

2    Q.    Are we talking tens of thousands, hundreds of

3  thousands?  Give us a ballpark, please.

4    A.    In the last six years?

5    Q.    Yes, sir.

6    A.    From all government agencies?

7    Q.    Yes, sir.

8    A.    Just the U.S. government?

9    Q.    Yes, sir.

10    A.    Probably between 1 and $200,000.  Actually --

11  maybe a little bit more.  Over six years, I don't really

12  know.  I don't check my tax returns like that.  But it

13  would be in the probably hundreds of thousands of

14  dollars.

15    Q.    Hundreds of thousands?

16    A.    Over six years, yeah.

17    Q.    All right.  Now, you mentioned that you are

18  working for the NEFA Foundation?

19    A.    Yeah, I work as a contributor on behalf of

20  NEFA, that's correct.

21    Q.    When did you start doing work for NEFA?

22    A.    I began doing work for NEFA in 2005.

23    Q.    Were you ever engaged on any full-time or

24  relatively full-time basis with them?

25    A.    I work as a contributor.  I mean, I run my own

1    consulting business, and I consult for clients, and they

2    were one of the clients that I was consulting with.  So

3    I serve as a contributor, as an investigator, but I

4    don't -- I work full-time for myself.

5         Q.    How much time did you spend doing work for NEFA

6    in 2005?

7         A.    In 2005?

8         Q.    Yes, sir.

9         A.    On a weekly basis?  Maybe -- I don't know.

10   Maybe -- maybe five hours a week, ten hours a week.

11        Q.    2006?

12        A.    Probably about ten hours a week.

13        Q.    2007?

14        A.    Probably about 15 hours a week.

15        Q.    2008?

16        A.    Probably about 20 hours a week.

17        Q.    2009?

18        A.    Fifteen.

19        Q.    And 2010, this year?

20        A.    Ten.

21        Q.    Ten hours a week.  And what is the origin of

22   NEFA?  Do you know who set it up?

23        A.    Well, it was -- I mean, I didn't found the

24   organization.  I don't know who the contributors are.  I

25   know that the organization was created among other ways

 1   by a legal judgment in which there was a legal judgment

 2   in which money was given to the organization as part of

 3   a penalty, but other than that, no.

 4       Q.    Did the Motley Rice law firm have anything to

 5   do with the establishment of NEFA?

 6       A.    As far as I know, nothing.

 7       Q.    Do you know who David Draper is?

 8       A.    Yes, I do, yes.

 9       Q.    What do you know about him and his relationship

10   to NEFA?

11       A.    He is the director of strategic operations of

12   NEFA.

13       Q.    What, if any, involvement does NEFA have with

14   the 9/11 lawsuits that have been pending now for quite

15   some time?

16       A.    Zero, none.

17       Q.    What, if any, contribution does NEFA make to

18   the 9/11 legal team?

19       A.    Zero, none.

20       Q.    Is there any consulting relationship between

21   NEFA and the 9/11 team?

22       A.    No, there is no contact whatsoever.  There is

23   no contact whatsoever between NEFA and as far as I know

24   any attorneys involved in any legislation with regards

25   to victims of terrorism.

1    Q.    I want to shift gears a little bit now,

2  Mr. Kohlmann, and ask you a question or two about your

3  book.  You mentioned several times, if I heard you

4  correctly, that you have an entire chapter in the book

5  devoted to the funding of terrorism.  Did I hear that

6  correctly?

7    A.    Islamic charitable organizations, that's

8  correct, yes.

9    Q.    And in your book, is there any reference to

10  al-Haramain?

11    A.    I believe there is, yes.

12    Q.    Are you sure, sir?

13    A.    I'm pretty positive about that, but I'd have to

14  take a look at my book to be sure.

15    Q.    How many footnotes do you have in the book?

16    A.    A couple hundred.

17    Q.    Eight-hundred some odd?

18    A.    A couple hundred.  It's a lot.  It -- you

19  should know that the -- yeah, I mean, it's a couple

20  hundred.

21    Q.    Do you have a copy of the book with you?

22    A.    No.

23    Q.    Would you be surprised if the count is more

24  than just a couple hundred?

25    A.    It could be a thousand.  I have no idea.

```
 1   Again, it's -- it was an academic book.  It's a
 2   scholarly book.  Almost every single sentence has a
 3   footnote attached to it.  The book itself is about 2,
 4   300 pages long.  Given that length, I would say -- to
 5   say it's a thousand footnotes, I wouldn't be surprised,
 6   sure.
 7        Q.    And your recollection is that you do reference
 8   al-Haramain in it?  Are you sure of that?
 9        A.    I'm pretty sure, but I'd have to double-check
10   to be 100 percent sure.  It was in my initial draft.
11   There's a possibility it may have gotten cut out at some
12   point because of the fact that it wasn't a focus of my
13   book, but I'm -- I know it was in my initial draft.  And
14   I am pretty sure it was in the final copy that was
15   published.
16        Q.    But in any event, it was not the focus of the
17   book?
18        A.    The focus of the book was on the conflict in
19   Bosnia-Herzegovina and foreign fighters in the conflict
20   in Bosnia-Herzegovina.
21        Q.    And the funding of fighters?
22        A.    Well, let me finish.  There is various
23   different aspects of that which I studied.  I studied
24   the history.  I studied their communications, their
25   leadership, their financing.  So that's why I had one
```

1    chapter about the financing issue.  I had one chapter

2    about their activities post-conflict.  It's -- again,

3    each chapter deals with a different aspect of what was

4    going on there.

5        Q.    We'll go back and check the book, sir, and

6    introduce it as an exhibit if we think it's appropriate.

7              In terms of what you described as the types of

8    sources that you look at, I did understand you correctly

9    to say that you speak broken Arabic.

10       A.    Yeah.  In order to study Islam, you have to,

11   first of all, memorize quite a great deal of Arabic

12   vocabulary because of the fact that the religion is

13   predicated and came from the Arabian Peninsula.  Many of

14   the essential terms are Arabic words.

15             In addition to that because of the fact that I

16   listen and watch to -- a great deal of material that

17   comes from the Middle East that is often in Arabic, and

18   because I sit next to someone who is a native Arabic

19   speaker, you end up picking up Arabic after a while.

20       Q.    But it's broken?  You don't hold yourself out

21   as being fluent in Arabic?

22       A.    No, not in the least bit.  My understanding of

23   Arabic is based on oral.  It's not based on written.  I

24   can read characters and stuff, but it's mostly based on

25   oral.

1    Q.    All right.  When you are looking at Web sites,

2    for example, that are written in Arabic, you need

3    someone to translate that for you?

4    A.    Well, it depends what you mean.  I engage in

5    what's known as information triage.  In other words, my

6    basic knowledge of Arabic is enough for me to be able to

7    look at a document and identify whether or not that

8    document is relevant to the work I'm doing.

9          If I determine that it's relevant and

10   potentially has information that is relevant and useful

11   to what I'm doing, I then take that document, I hand it

12   off to my research assistant, who takes it and

13   translates it.  I wouldn't rely on my own knowledge of

14   Arabic, because, frankly, it would -- when it comes to

15   these materials, using anyone who's not a native Arabic

16   speaker is a waste of time.  You need --

17   Q.    Excuse me.  The research assistant works full-

18   time?

19   A.    Yeah, full-time.

20   Q.    The research assistant is a bilingual person?

21   A.    He's a native Jordanian, yeah.

22   Q.    The research assistant has been with -- this

23   one has been with you for how long?

24   A.    Last two years.

25   Q.    Prior to that, did you have someone else who

Kohlmann - X                          58

1  was sitting beside you reading the Arabic as needed?

2     A.    Either sitting beside me or someone that was in

3  the same city as I was in that I could call and have

4  come to meet me.

5     Q.    You've described, sir, if I heard correctly,

6  that there are a number of different types of research

7  that one can do in terms of sources; primary, secondary,

8  tertiary?

9     A.    That's correct, yes.

10    Q.    And in terms of primary sources, did I

11 understand you correctly to say that that would mean

12 going out and conducting interviews yourself?

13    A.    Yeah, for instance, or directly observing an

14 event.

15    Q.    Can you just answer yes or no, sir.

16    A.    But it's not just that.  It's also directly

17 observing an event.

18    Q.    You have, if I understand correctly, conducted

19 some primary research; is that correct?

20    A.    That's correct, yes.

21    Q.    You have interviewed, you said, a number of

22 people who have been convicted of terrorism offenses in

23 this country?

24    A.    In this country, the United Kingdom, and I've

25 also interviewed people who have not been convicted of

Kohlmann - X                                                        59

1    offenses but have been on the front lines.

2         Q.    How many people have you spoken with in this

3    country who have been convicted of terrorism offenses?

4         A.    At least two.  But there have been several

5    others, that I -- there is two that I can think of off

6    the top of my head, but there is a list of people who I

7    have spoken with who have end -- I mean, well,

8    actually -- well, at least two I can think of off the

9    top of my head.

10        Q.    How many people have you spoken with who have

11   been convicted of terrorism offenses in the United

12   Kingdom?

13        A.    Two.

14        Q.    Two more?

15        A.    Two more.

16        Q.    So we have a total of four?

17        A.    That's correct, yes.

18        Q.    In addition, you have spoken with a number of

19   other people you describe as people who have been

20   involved in one way or another in terrorist acts?

21        A.    That's correct, yes.

22        Q.    Roughly, how many?

23        A.    Well, terrorist acts is -- I wouldn't describe

24   it as that.  What I would say is that these are

25   individuals who have had direct knowledge and direct

1    role in either a mujahideen organization, a jihadi

2    movement, or something that is financing them.

3        Q.    How many, sir?

4        A.    How many?  Maybe two dozen.

5        Q.    All right.  Now, with respect to the indictment

6    in this case and the issues that the jury will be

7    considering, I'd like to ask you some very specific

8    questions.

9              Have you personally spoken with any of the

10   principal leaders of the al-Haramain organization as it

11   existed in the year 1999, 2000, or 2001?

12       A.    No.

13       Q.    Have you had the opportunity at any time to

14   speak with Aqeel Al-Aqeel?

15       A.    No, I have not.

16       Q.    Mansour al-Kadi?

17       A.    No, I have not.

18       Q.    Soliman al-But'he?

19       A.    No, I have not.

20       Q.    And no other people you have identified through

21   your research as principals of al-Haramain?

22       A.    That's correct.

23       Q.    Have you had the opportunity to speak with any

24   of the principals in the Saudi Joint Relief Committee

25   about its existence, functioning, et cetera?

1       A.      The Saudi High Committee for Relief, yes.

2       Q.      Well, we have documents that describe it as the

3   Saudi Joint Relief Committee.  Are you referring to

4   something you believe is a different entity?

5       A.      The SJRC began as the Saudi High Committee for

6   Relief in Bosnia.  I have directly spoken with one of

7   the principals involved with the SHR in Bosnia-

8   Herzegovina.

9       Q.      All right.  My question is not about the SHR in

10  Bosnia-Herzegovina, and the mid or late 1990s.  My

11  question is about the Saudi Joint Relief Committee that

12  was dealing with the Russian government and Chechnya.

13      A.      There is only one.  It operates in different

14  conflict zones.  I understand what you are saying.

15      Q.      I appreciate that.  My question is:  Have you

16  spoken with any of the principals who were involved with

17  the Saudi Joint Relief Committee and the Russian and

18  Chechnyan situation?

19      A.      You mean as per that conflict?  No.

20      Q.      No.  Thank you, sir.  Have you spoken with any

21  of the members of the Saudi royal family about their

22  involvement with the Saudi Joint Relief Committee?

23      A.      No, they haven't volunteered that information

24  to me.

25      Q.      Have you made an effort to speak with them?

 1      A.      Yes, but they won't speak with me.

 2      Q.      Have you spoken with any members of the Saudi

 3 government about the formation of the Saudi Joint Relief

 4 Committee and the relationship between the Saudi Joint

 5 Relief Committee and the al-Haramain organization in the

 6 years 1999 through 2001?

 7      A.      No, I have not.

 8      Q.      With respect to issues involving the financing

 9 of terror or of mujahideen, let me ask you a few

10 questions.  I noticed that in 2004, you spoke with FBI

11 Agent Carroll and he prepared a report about that

12 conversation.  Do you recall that?

13      A.      I recall speaking with -- I recall speaking

14 with him, but I don't think I saw the report about our

15 conversation.

16      Q.      Do you recall that you provided him at that

17 time a report that you had prepared that had some

18 discussion in it about al-Haramain and the bank accounts

19 that al-Haramain had?

20      A.      Yes.  I believe what I did was I provided him a

21 copy of a memorandum that I had written while I was

22 working at The Investigative Project.

23      Q.      All right.  And that would have had your Global

24 Terror Alert logo on it?

25      A.      I don't recall.

1      Q.    You don't recall at this point?

2      A.    I don't remember.

3      Q.    All right.  Do you recall that at that time you

4   were able to go onto an al-Haramain Web site and

5   identify roughly 13 bank accounts related to

6   al-Haramain?

7      A.    That's correct, yes.

8      Q.    And you gave that information to him?

9      A.    Among others, yeah, that's correct.

10     Q.    Now, in terms of attempting to determine what

11  happens with particular money, do I assume correctly

12  from the fact that you were looking at bank accounts

13  that you would consider them to be an interesting or

14  important source of information?

15     A.    They are interesting.  I mean, there is a

16  limited amount I can do with bank accounts because I

17  don't have the ability to issue subpoenas.  But when it

18  comes to tracking terror finance, one of the most

19  difficult things is finding bank account numbers.  So

20  when I do find bank account numbers, that's one thing

21  I -- you know, I save.  There is a limited amount I can

22  do with it but I do pass it on to others.

23     Q.    Would it be your expectation that the

24  government with the powers that are available to it

25  might have made efforts to or should have made efforts

1    to at least look at those bank account records?

2         MR. GORDER:  Your Honor, objection as to

3    relevance.  I'm not sure what this has to do with his

4    qualifications.

5         MR. WAX:  Primary, secondary, tertiary sources.

6         THE COURT:  You said would it have made sense

7    for the government to do this, I think that's probably

8    not too relevant to me.

9    BY MR. WAX:

10   Q.    Did you make an effort to obtain any records

11   from the bank accounts that you had identified sometime

12   prior to October of 2004 when you provided this

13   information to Agent Carroll?

14   A.    I have no way of doing that.  I have no way of

15   getting at bank account information.  That's private

16   information that's only available via subpoena or to the

17   governments or to the people who are the owners of the

18   bank accounts.  I could not get access to that

19   information.

20   Q.    I have read in some of your prior testimony

21   that you have -- you used the phrase gone undercover at

22   some point.  Did I read that correctly?

23   A.    That is correct, yeah.

24   Q.    And in terms of going undercover, did you make

25   any effort to go undercover with respect to the

1  al-Haramain organization?

2     A.    That's not what I meant by undercover.  That's

3  much different.  When I was talking about doing

4  undercover work, that was going in terms of extremist

5  organizations and meeting people and meeting their

6  leaders.  You can't go undercover to get bank account

7  information without engaging in illicit activities,

8  which I don't engage in.

9     Q.    Did you make any effort to go undercover in the

10 sense that you have just described it, is my question,

11 with respect to al-Haramain?

12    A.    Oh, I'm sorry, I thought you meant as per the

13 bank accounts.  You mean to go undercover in

14 al-Haramain?  No, I did not do that.

15    Q.    Okay.  Did you -- I read in one of the

16 transcripts that you at some point sent an e-mail to

17 some fellow, I'm not going to pronounce his name

18 properly, Irhaby?

19    A.    Irhaby 007.

20    Q.    Irhaby and that will be I-R-H-A --

21    A.    B-Y 007.

22    Q.    B-Y.  Thank you.  And you just put out an

23 e-mail and said, hey, Irhaby, I'm here.  I'm Evan

24 Kohlmann.  Let's have a chat.

25    A.    It's not quite that simple.  This is an

Kohlmann - X                                             66

 1    individual who knew who I was.  And he had put out a

 2    video recording of me on the Internet.  As a result, I

 3    wrote an e-mail back to him.  It was more me replying to

 4    him saying, obviously you know who I am and obviously I

 5    know who you are, so why don't -- rather than, you know,

 6    ducking around this, why don't you just talk directly to

 7    me.

 8        Q.    Did you make any such effort to communicate via

 9    e-mail with any member of the al-Haramain organization?

10        A.    Yeah.  I believe we tried sending e-mails to

11    al-Haramain at various different times.  We didn't get a

12    response back.

13        Q.    Do you recall specifically when you did that?

14        A.    No.  It would have been on probably more than

15    one occasion, but I can't recall.  I know that typically

16    speaking what we do is we try -- whenever we get e-mail

17    addresses or phone numbers, we attempt to contact them

18    and see what kind of information we can get.

19              Sometimes it's lucrative, sometimes it's not.

20    We contacted the head of BIF in Saudi Arabia,

21    Benevolence International Foundation.  And he responded.

22    But with regards to al-Haramain, I don't believe we got

23    a response.

24        Q.    Do you recall specifically what e-mail address

25    you used to attempt to communicate with al-Haramain?

1    A.   I have no idea.  This would -- I should

2    clarify.  This would have been between eight and ten

3    years ago, so I -- I know that we engaged in this kind

4    of activity, but I could not give you specific dates or

5    addresses or whatnot.  I just know that if we had gotten

6    back a response, I would probably remember more, but I

7    know we didn't get back a response.

8    Q.   All right.  With respect to some of the e-mails

9    that the government showed you, whatever relatively

10   small number it was, do you recall the Web sites or the

11   persons from whom those e-mails appeared to have been

12   sent?

13   A.   I believe PSQ.org, or I'm sorry, I don't

14   remember.  It's -- there was one like -- there was a

15   couple, I believe, with al-Haramain addresses and there

16   was one with a P.  Off the top of my head, I couldn't

17   give you someone's e-mail address.

18   Q.   Do you recall if there was anything from a

19   person named a Abdul Qaadir?

20   A.   Yes, excuse me, yes, there was.

21   Q.   Did you make any effort to contact Abdul

22   Qaadir?

23   A.   No, I did not.

24   Q.   Have you then not spoken with Abdul Qaadir?

25   A.   No, I have not.

1        Q.      In many --

2        A.      I should add I did run a search on his e-mail

3    address.    And I attempted to locate other messages that

4    he might have posted on the Internet, but I didn't

5    contact him directly.

6        Q.      Okay.

7        A.      I should also add that when I'm engaged in a

8    case, a criminal case, I don't engage in that kind of

9    activity.    I don't try to send subterfuge e-mails to

10   people or subterfuge phone calls because that would be

11   interfering with a criminal investigation.

12       Q.      Nor do you just send out an e-mail as you did

13   with Irhaby, hi, I'm Evan Kohlmann, I'd like to chat?

14       A.      Well, that's --

15       Q.      My question is -- let me rephrase the question.

16   In this case, you did not do that with respect to Abdul

17   Qaadir?

18       A.      No, I did not.

19       Q.      Okay.  Now, I notice in terms of, you know,

20   comparison of the work that you did in this case as

21   contrasted with some of the others, Bosnian case about

22   which you testified, if I understood correctly, you've

23   actually spent time in Bosnia?

24       A.      That's correct, yes.

25       Q.      And you have told us that you had the

 1    opportunity to speak with a number of people firsthand

 2    who were involved in some of the other cases in which

 3    you've testified?

 4        A.    That's correct, yes.

 5        Q.    All right.  Now, in terms of the second types

 6    of sources that you described, you mentioned audios and

 7    videos.  Have you had the opportunity to be given access

 8    to any classified information in this case?

 9        A.    Not that I'm aware of.  I --

10        Q.    Do you have a security clearance?

11        A.    No, I don't.

12        Q.    Have you ever held a security clearance?

13        A.    No, I have not.

14        Q.    So to your knowledge, the government has not

15    provided you any material obtained in a manner that it

16    would be classified?

17        A.    Not unless there has been some kind of special

18    dispensation given, but, no, that's -- I deal only in

19    open source information.  I deal only in open source

20    research.  If I'm writing an expert report, I'll take

21    documents from the government to help educate me in

22    terms of what they might be developing separately if it

23    matches with my open source research, but I don't deal

24    with classified sources.

25        Q.    Have you had the opportunity to hear any tape

1    recorded conversations involving my client, Mr. Seda?

2        A.    No.

3        Q.    Have you had the opportunity to hear any tape

4    recorded conversations involving Soliman al-But'he?

5        A.    No.

6        Q.    Aqeel Al-Aqeel?

7        A.    Nope.

8        Q.    Mansour al-Kadi?

9        A.    Nope.

10       Q.    Nobody?

11       A.    Again, I don't have a security clearance and I

12   wouldn't want to get into reviewing classified documents

13   without a security clearance.

14       Q.    All right.  And you have not had the

15   opportunity to hear any such material from any source?

16   You didn't find anything, for example, on one of the Web

17   sites that are -- that you referred to in your direct

18   examination -- clearinghouses?  You didn't come across

19   tape recorded conversations of any of those individuals

20   in any source such as that?

21       A.    Classified recorded conversations, no.

22       Q.    No.  Unclassified, or classified or

23   unclassified on a clearinghouse Web site put out by --

24       A.    Recorded conversations between whom?

25       Q.    Mr. Sedaghaty, Mr. al-But'he, Aqeel Al-Aqeel,

Kohlmann - X                                    71

 1   Mansour al-Kadi --

 2       A.    No.

 3       Q.    -- or any of the other principals of

 4   al-Haramain?

 5       A.    No.  I've reviewed documents that have their

 6   name on business cards, letters, and whatnot, but I

 7   haven't reviewed audio recordings, no.

 8       Q.    Have you seen any video recordings of any of

 9   those four individuals I just mentioned in communication

10   with each other?

11       A.    No, no, no.

12       Q.    Have you had the opportunity to see or hear any

13   video or audio recording involving Mr. Sedaghaty,

14   Mr. Aqeel, Mr. Al-But'he, discussing the -- a donation

15   by an Egyptian man named El-Fiki?

16       A.    No, I have not.

17       Q.    All right.  In terms of al-Haramain, in

18   referring to the report that you provided to Agent

19   Carroll back in 2004, please help me be sure I

20   understood correctly what you had said.  al-Haramain, if

21   I understand correctly, you described back then as only

22   a quasi private entity?

23       A.    Quasi private, yes, because of the fact that

24   with Islamic charitable organizations in the Arabian

25   Peninsula, particularly in Saudi Arabia, very frequently

Kohlmann - X                                72

1    there are links back to one element or another within

2    the government.  In other words, whether we're talking

3    about al-Haramain or the Muslim World League, or Jamiat

4    Ahya al-Turath -- J-A-M-I-A-T, A-H-Y-A, A-L, dash,

5    T-U-R-A-T-H -- these organizations very frequently have

6    links back to the governments, whether it's the Kuwaiti

7    government, the Saudi government, the government of the

8    UAE.

9        Q.    Let me keep the focus, please, on al-Haramain.

10   If I understood correctly, you described it as being

11   very closely controlled and supervised by members of the

12   Saudi government?

13       A.    Certain members of the Saudi royal family,

14   that's right.

15       Q.    Yes.  And the members of the Saudi royal family

16   would be people who would often be part of the Saudi

17   government itself?

18       A.    That's why I described it as quasi private.

19       Q.    Okay.  So I did understand that correctly?

20       A.    That's correct, yes.

21       Q.    You described, if I understood correctly, a

22   connection between Mr. Aqeel Al-Aqeel and a foundation

23   on which one of the Saudi princes, Abdul-Aziz Fahd bin

24   Abdul Aziz, if I understood correctly, was also a board

25   member?

1    A.    I believe so, but you are going to have to give

2   me the exact reference.

3    Q.    This was in your report that you provided to

4   Agent Carroll.

5    A.    Okay.  But you have to read me the exact

6   reference.  I'm not sure what you are referring to.

7    Q.    I'll get back to that.  Were you provided any

8   information by the government regarding humanitarian

9   activities in which Mr. Sedaghaty was involved here in

10  the United States?

11   A.    What kind of humanitarian -- I don't -- I mean,

12  I was provided with information about his activities

13  with al-Haramain, to the degree of the exhibits that

14  I've been provided, but I don't --

15   Q.    Were you provided any documentation of his

16  volunteer work in Ashland, Oregon?

17        MR. GORDER:  Your Honor, I'm going to object.

18  I think we're, again, getting beyond his qualifications.

19        THE COURT:  Yeah, sustained.

20        MR. WAX:  Your Honor, if I understand *Daubert*

21  correctly, part of the court's function here is not only

22  to assess the qualifications but also assess the

23  relevance of the proposed testimony, and the fit that

24  that proposed testimony has to the specific issues in

25  this case.  And I believe that this line of inquiry goes

1    to those aspects of *Daubert*.

2              THE COURT:  I disagree.

3              MR. WAX:  Thank you.

4    BY MR. WAX:

5       Q.    In looking through the report that you prepared

6    in this case, I saw many references in your footnotes to

7    material that came off of a number of Web sites, an

8    al-Haramain Web site, a Qoqaz Web site, a Kavkaz

9    Institute Web site, et cetera.

10      A.    That's correct, yes.

11      Q.    Okay.  And do I understand that it's your view

12   that many of these Web sites put out by organizations of

13   that nature include a fair amount of propaganda?

14      A.    That's correct, yes.

15      Q.    And do you agree that propaganda would often

16   include a fair amount of exaggeration?

17      A.    It may.  It can.  It depends on -- it really

18   depends on the given case.  It depends on who's saying

19   it and in what context they're saying it.  It's not --

20   propaganda is not universal.  It depends on the

21   organization, the intent of the organization.  It's a

22   specific inquiry.

23      Q.    Sure.  But as a general proposition in terms of

24   your view of the -- you said, I think, it is now

25   billions of documents that you have on your database --

1    A.    Sure.

2    Q.    -- is it not your observation that many do

3    include exaggerations in the propaganda that is put out

4    by the organizations?

5    A.    That's the purpose of doing the comparative

6    analysis is trying to cut out the puffery and try to

7    identify the underlying facts that are presented in

8    these -- what can be ascertained or what can be counted

9    on as reliable.

10    Q.    The question, sir, is:  Do you agree that there

11    is a fair amount of propaganda that includes

12    exaggeration in some of the material that you find on

13    the Web sites?  Not what you do with it, but you agree

14    that it's there?

15    A.    I could repeat my previous answer which is that

16    it depends on a given case.  There is a small -- a

17    degree of puffery in propaganda but it depends on a

18    given case.  You have to point me to a given example,

19    and I could tell you.

20         I mean, when it comes to a recording from Osama

21    bin Laden, frankly, there's a lot of puffery in that.

22    When it comes to something that's put out by a

23    charitable organization, it's not so much puffery.  It

24    depends who you're talking -- if it's a political leader

25    versus a charitable leader versus something, it depends

1    on what their perspective is, what their purpose in

2    releasing this -- the recording or the document is, who

3    they are.  It's contingent upon so many different

4    factors, you can't possibly generalize.

5        Q.    Let me switch to another aspect of this case if

6    I may.  If I have understood correctly the positions

7    that you have expressed in the past, the al-Haramain

8    charity operated in roughly how many countries?

9        A.    Many.  Something like 70 different countries,

10   many.

11       Q.    And it dealt with some -- in some years, in the

12   late '90s, early 2000s, 50, 60, $70 million a year?

13       A.    That sounds about right, yeah.

14       Q.    And do I also understand correctly that it was

15   your understanding that al-Haramain was engaged in a

16   significant amount of what one might call legitimate

17   charitable activity?

18       A.    My understanding is that at least half of their

19   activities were probably legitimate.

20       Q.    Thank you.  Now, switching focus to one other

21   subject, I want to be sure I understand this.  The study

22   that you have done of the Chechen/Russian wars took you

23   back actually to the 1800s and the expansion of the

24   czarist empire?

25       A.    That's correct, yes.

1    Q.    And the struggles in the Islamic Republics that

2  became the southern tier of the czar's land?

3    A.    That's correct, yes.

4    Q.    Through the Soviet era and the struggles

5  between the Soviet government and the populations in --

6  same region, the region that includes Chechnya?

7    A.    That's correct.

8    Q.    And then into the 1990s, after the fall of the

9  Soviet Union, and the Russian Federation's desire to

10  maintain control in some of those republics, while some

11  of the Islamic Republics became independent countries,

12  some, such as Chechnya, did not?

13    A.    Well, actually, Chechnya did become

14  independently briefly.

15    Q.    Very brief time.  And Russia was very unhappy?

16    A.    She was very unhappy, yes.

17    Q.    Okay.  And if I understand correctly, your

18  perception of what Russia was doing in Chechnya included

19  some pretty brutal and God awful actions against both

20  military and civilian populations?

21    A.    Yeah.  I mean, there is -- the way that I would

22  describe it is that there is a lot of brutality that

23  goes around the Caucasus, but the Russians have

24  certainly played a role in that, yes.

25    Q.    In one of the earlier cases in which you

 1    testified, I think you went around the horn with the

 2    lawyer about the total number of refugees who were

 3    created in Chechnya.  And there was a discussion of a

 4    State Department report.  Several hundred thousand

 5    refugees, at the least, you would agree with me?

 6        A.    Yeah, Russians, Muslims.  I mean, the capital

 7    of Chechnya, Grozny, was leveled to the ground.  So

 8    anyone who lived there, regardless of where they were

 9    from or who they were, had to leave.

10        Q.    Okay.  And the brutalities and atrocities were

11    perpetrated, among others, by the Russians?

12        A.    They were perpetrated all around, but I think

13    the answer is that the Russians had the greatest degree

14    of military force, so frequently the worst brutality was

15    associated with them.

16        Q.    All right.  In terms of what was happening in

17    Chechnya in the mid and late 1990s and on into 2000, if

18    I understand you correctly, the Russians were actually

19    obstructing efforts that people were making to provide

20    humanitarian aid to some of the -- the population in

21    Chechnya?

22        A.    They were obstructing certain efforts to

23    provide humanitarian aid, yes.  Not all, but certain

24    efforts, yes.

25        Q.    Correct.  And there were some, you know,

1    humanitarian organizations that were attempting to do

2    some business in Chechnya.  And as you are indicating,

3    the Russians accepted some and not others?

4        A.    What happened wasn't -- in the beginning I

5    think the Russians viewed most of this as benevolent or

6    at least as harmless.  But by 1999, the Russians had

7    decided that some of the activities that these

8    organizations were engaged in went beyond just providing

9    food and medicine, in fact, that they were providing

10   money to combatants.  And at that point, a number of

11   organizations began to be scrutinized by the Russian

12   government.  Several of them were prevented from getting

13   involved in the conflict, or else they were -- they

14   became adversaries of the Russian government.

15       Q.    And you are aware that in late 1999 in an

16   effort to address some of those concerns, the Russian

17   Federation and the government of Saudi Arabia actually

18   entered an agreement?

19       A.    That's correct.

20       Q.    Signed an agreement, and through that

21   agreement, among other things, the Saudi Joint Relief

22   Committee was authorized to operate in Chechnya and to

23   provide aid?

24       A.    I believe so, that's correct, yeah.

25       Q.    Now, I want to -- should have done this at the

Kohlmann - X                                                    80

1    beginning -- to ask you a definitional question.  You

2    described yourself, if I heard you at the outset, as an

3    international terrorism consultant.

4        A.    That's correct.

5        Q.    I'd like to talk to you for a minute, please,

6    about the definition of that term.

7        A.    Sure.

8        Q.    Let me ask you this way, if I can:  Would you

9    please define the word "terrorism" as you are using it

10   in that phrase?

11       A.    Well, I think it's more of a title than

12   anything else.  If you want to know exactly the area

13   that I study, I study transnational jihadi movements.

14             Now, terrorism can be -- can take many

15   different forms, but in this case I'm referring to

16   non-state actors who are engaging in violence, either

17   directed against civilians, directed against

18   noncombatants, or directed against, you know, even

19   soldiers who are not in an active combat zone, or

20   individuals who are financing that activity, individuals

21   who are participating in logistical support for that

22   activity.  In other words, it refers to, generally

23   speaking, organizations that have either been named as

24   the SGDTs, specially designated global terrorists; as

25   foreign terrorist organizations, FTOs, under the U.S.

1    State Department definition; or else have been involved

2    with individual -- or who are directly partnered with

3    individuals who are SGDTs or FTOs.

4        Q.    All right.  So let's go back, if we can please,

5    just to Chechnya.

6        A.    Sure.

7        Q.    From the perspective of the Chechen people in

8    the years 1994, 1995, they were engaged in a war of

9    liberation, resisting Russian domination?

10       A.    I wouldn't want to speak on behalf of the

11   Chechen people, but I think it's fair to say that there

12   was a war of liberation or a war of independence that

13   took place.  That was initially led in 1991 by Dzhokhar

14   Dudayev -- D-Z-O-K-H-A-R, D-U-D-A-Y-E-V -- who began a

15   nationalist movement to try to create an independent

16   state.  Yeah.

17       Q.    If I may try to focus the discussion here.

18   The -- we had a war in Chechnya between those Chechens

19   who wanted freedom and the Russians who didn't want it?

20       A.    There's not one war that took place in the

21   Caucasus.  There was multiple wars that took place

22   between the years of 1991 and today.  There is --

23       Q.    I appreciate that.  I'm sorry.  I should have

24   restated the introduction to the question, '94, '95.

25       A.    In 1994 and in 1995, the conflict was mostly at

Kohlmann - X                                                      82

1   that point a nationalist struggle.

2       Q.    Okay.  Now --

3       A.    It began shifting in 1995.

4       Q.    Okay.  I'm not asking you that question.  Let's

5   just stay with me, please.  If I understood you

6   correctly, you would distinguish between a war of

7   liberation, or perhaps, from the Russian perspective, a

8   secessionist or civil war movement, from the acts of

9   terror that are committed against, I think you said,

10  civilian populations or non -- soldiers who are not in

11  combat?

12      A.    Well, I studied both.  I studied --

13      Q.    I'm not asking you what you studied.  I'm just

14  asking in terms of the definition.  Do you distinguish

15  between an act of terror committed by a person against a

16  civilian -- start there -- and a person fighting for the

17  liberation of his country against what he perceives to

18  be an oppressive neighbor?  Do you make that

19  distinction?

20      A.    These are all subjected to individual

21  definitions.  But the latter group, I would generally

22  refer to as insurgents; whereas the former group, I

23  would generally refer to as extremists or terrorists.

24  However, it's so factually -- you can't just say someone

25  killing civilians, is that the terrorist; someone that's

Kohlmann - X                                                    83

```
 1   not -- doesn't fit that definition, is not.  It's
 2   factually dependent.
 3          It's not factually dependent on whether or not
 4   you're Chechen or not.  It's just -- it's dependent upon
 5   the conditions that are involved.
 6   Q.    All right.  Let me ask it this way, if I can:
 7   During the American Revolution the French king supported
 8   the colonies in their effort to break away from England.
 9          MR. GORDER:  Your Honor, I think we're getting
10   a little far afield.
11          MR. WAX:  Well, I'm having a hard time getting
12   an opinion --
13          THE COURT:  You have four minutes.  You can use
14   it the way you'd like.
15          MR. WAX:  Your Honor, I am going to urge you
16   quite strenuously to let me have more than four minutes.
17   I mean, this is --
18          THE COURT:  Thank you.  You're asking questions
19   about the French in the American Revolution.  I know
20   something about that, but I don't see that as being
21   helpful.
22          MR. WAX:  Well, I'm not getting a straight
23   answer to what I thought was a pretty simple question.
24          THE COURT:  Well, you have the court's limits.
25   BY MR. WAX:
```

1    Q.    Mr. Kohlmann, if I understood correctly from

2    the report that you -- or the information you provided

3    to the FBI in 2004, you stated that the al-Haramain

4    Ashland -- excuse me -- the al-Haramain English language

5    Web site was run by or out of Ashland, Oregon.

6    A.    Yes.  I believe that was determined through

7    looking up Internet domain records.

8    Q.    Do you have specific information that you can

9    provide us about that?  Which domain records did you

10   look up?  What were the IP addresses?  And what did you

11   find?

12   A.    I'd have to look back in my records to give you

13   a specific answer, but I believe what the answer is is

14   that I read -- and again --

15   Q.    Do you recall today -- I'm not asking you what

16   you believe.  Do you recall today what information you

17   looked at?

18   A.    Not definitively.  I would have to review back

19   and look in my notes.  Again, I don't want to waste

20   time, but I believe the answer is I ran a WHOIS search

21   on the domain name alharamain.org.  And I returned back

22   with the address here in Ashland.

23          I also believe that the Ashland address was

24   actually listed on the Web site at a certain location.

25   Q.    But you don't recall that specifically?

1    A.    You are asking me a very detailed factual

2    answer.

3    Q.    Yes, I am.

4    A.    I'd have to go back and look at my notes.

5    Q.    Did you speak with Mr. Sedaghaty and ask him

6    that question?

7    A.    No, I did not.

8    Q.    Mr. al-But'he?

9    A.    No, I did not.

10   Q.    Anybody else?

11   A.    Nope.

12   Q.    Did you have access to the computers that the

13   government seized from the al-Haramain building in

14   Ashland and have the opportunity to see whether they

15   contained any software or other information suggesting

16   that they were used for that purpose?

17   A.    No.  In this particular case, I wasn't hired to

18   do a forensic analysis of any hard drives.

19   Q.    The answer then is no?

20   A.    Again, I wasn't hired to do a forensic

21   analysis.

22   Q.    Is the answer no?

23   A.    I wasn't hired to do a forensic analysis.  The

24   answer is no.

25   Q.    Thank you.  In the report that you prepared in

1    this case, if I understood correctly, you stated that

2    you learned that certain people in certain charities

3    were skimming funds that were intended for refugee type

4    relief and using it for other purposes?

5        A.    That's correct, yes.

6        Q.    Can you please tell me what information you can

7    provide, with specifics, about any such activity with

8    respect to al-Haramain?

9        A.    Yeah.  I have records -- original records from

10   the army -- the Muslim army of Bosnia-Herzegovina, the

11   security service.

12       Q.    With respect to al-Haramain and Chechnya, sir,

13   I'm not asking about Bosnia, I'm sorry if I wasn't clear

14   on the question.  What specific information, if any, do

15   you have regarding the skimming of funds from

16   al-Haramain in Chechnya?

17       A.    Are you including the documents that I was

18   provided in this case by the government or no?

19       Q.    And by that you would be referring to the FSB

20   documents?

21       A.    I believe so, yes, that would be one, yes.

22       Q.    All right.  Other than that?

23       A.    I'd have to look back, but I mean there has

24   been a significant amount of documentation of this.  Are

25   you talking about primary, secondary, or tertiary

1   sources?

2       Q.      Start with primary.

3       A.      Primary, I don't think so.  But secondary and

4   tertiary, I believe that there are sources, but I

5   could -- I could get them for you, but I can't recount

6   them off the top of my head.

7       Q.      You told us previously that you have had no

8   audio or video communications with anyone related to

9   al-Haramain and Chechnya.  So would that not eliminate

10  secondary sources on this question?

11      A.      Well, secondary -- you're talking about things

12  with al-Haramain, but I could have also gotten video

13  recordings which show a camp in the Caucasus, which I

14  know to be the camp of Ibn ul-Khattab.  And I happen to

15  know that that is being funded by al-Haramain.

16      Q.      Tell me, please, the source of the information

17  which causes you to say you know it is funded by

18  al-Haramain.  What is the source of your information?

19      A.      I'd have to get the exact footnote, but I

20  believe it's a sworn document in federal court.  I

21  believe it's the Northern District of Illinois.  I'd

22  have to double-check on that.  It's -- what it is --

23      Q.      Which case are you referring to?

24      A.      I believe it's the Enaam Arnaout case.

25      Q.      And what do you recall about this alleged sworn

1  document?

2       A.    I'd have to check back and see.  I'd have to

3  check back.  I mean, you're asking me about very, very

4  specific exhibits that I was not prepared to answer

5  questions here.  If you want me to dig this stuff up,

6  I'd be happy to do it.

7             MR. WAX:  May I have a moment, please, Your

8  Honor?

9             THE COURT:  Yes.

10            (Discussion held off the record between

11  co-counsel.)

12            MR. WAX:  Your Honor, the other areas that I

13  believe that I should be permitted to go into are the

14  ones that relate to what we understand to be the other

15  aspects of the court's role as a gatekeeper at a *Daubert*

16  hearing.

17            We believe that Mr. Kohlmann's report is

18  replete with exaggerations, irrelevancies, and highly

19  prejudicial information that should not have any

20  presence in this courtroom in front of the jury.

21            And what I believe that I should be entitled to

22  do is to go through the report with him on a paragraph-

23  by-paragraph basis and to explore the extent to which

24  the material that's contained in this report, which we

25  take to be what the government is intending to elicit

```
 1    from him in front of the jury, is just completely
 2    irrelevant to the issues in this case.  That's where I
 3    am at in terms of the questioning and what -- kind of
 4    what I request permission to pursue.
 5              THE COURT:  Thank you.  I gave you the limits.
 6    I've allowed you to go beyond them.  You used some of
 7    the time for material that, frankly, has really almost
 8    nothing to do with what this is about.  And so those
 9    were my limits.  And I'm going to stick with them.
10    We're in recess.
11              (Recess:  11:05 until 11:16 a.m.)
12              THE COURT:  Go ahead and be seated, please.
13              Yeah, in light of the last argument, I do want
14    to remind counsel that, of course, the expert report is
15    not coming into evidence.  And there are some matters in
16    there that won't be allowed.  There is some that will.
17    But that's true of the material I've seen on Colonel
18    Lang.  But this is about qualifications, methodology,
19    whether someone has the right background and that sort
20    of thing.
21              All right.  Do you want to call your witness,
22    Mr. Wax.
23              MR. WAX:  Yes, Your Honor.  Colonel Patrick
24    Lang.
25              THE COURT:  Thank you.
```

 1           MR. WAX:  And, Judge, we have a copy of his

 2    résumé that's been revised, I'd hand that up.

 3           THE COURT:  Thank you.  Counsel, with regard to

 4    schedule, I'm taking our midday break at 11:30, and it

 5    will go until a few minutes after 1:00, so it will be a

 6    nice, generous break today, more than you can count on

 7    with me.  Go ahead.  Raise your right hand, please.

 8           (The witness was sworn.)

 9           THE CLERK:  If you would please take the

10    witness stand.  Please watch, we have some cords strung

11    out here.

12           MR. WAX:  Your Honor, before the testimony with

13    Colonel Lang begins, I do anticipate that it will

14    involve reference to classified material.  And in

15    discussing with him his ability to discuss his

16    background and qualifications, he expresses some concern

17    that some of what he will be describing to the court,

18    you know, may involve some classified matters that would

19    require us to have the courtroom appropriately cleared.

20           THE COURT:  All right.  Please stay away from

21    that for the next ten minutes.  And then during the

22    break -- we have to do some things, like bring another

23    disc down for the court reporter and so on.  We can take

24    the other after our midday break.

25           MR. WAX:  Thank you.

 1              THE WITNESS:  Good morning, Your Honor.

 2              THE CLERK:  Colonel, your microphones are

 3    located here.  There's water for you.  So if you could

 4    keep your papers away from the microphone.

 5              If I could have you please state your full name

 6    for the record, spelling your last name for the court

 7    reporter.

 8              THE WITNESS:  Walter Patrick Lang, Jr.  The

 9    last name is spelled L-A-N-G.

10              THE CLERK:  Thank you.

11              THE COURT:  As far as I'm concerned, you don't

12    need to go into the CV.  You can, if you'd like, of

13    course, but it's just a time matter.

14              MR. WAX:  I appreciate that, Your Honor.  We

15    will attempt to bring out those aspects that we think

16    are most important.

17                         DIRECT EXAMINATION

18    BY MR. WAX:

19    Q.    Colonel Lang, could you tell the court, please,

20    very briefly about your educational experience.

21    A.    Well, I graduated from the Virginia Military

22    Institute in 1962, and the University -- with a BA

23    degree -- and from the University of Utah with an MA in

24    Middle East studies in 1976.  And I am a graduate of the

25    Armed Forces Staff College, the Army Command and General

Lang - D                                                      92

1    Staff College, and the U.S. Army War College.

2        Q.    Now, Colonel Lang, would you tell the court

3    please when you first entered the service of the United

4    States military?

5        A.    On the 10th of June 1962, I was commissioned in

6    the regular Army as an infantry officer.

7        Q.    And did you at some point relatively early on

8    in your career start dealing with matters related to

9    intelligence?

10       A.    Yes.  After a few years in the infantry, I went

11   into the Special Forces, the Green Berets.  And then

12   after a year or two, took command of an operational

13   detachment.  I was brought into the staff intelligence

14   work of the 8th Special Forces Group, and I did that for

15   the rest of my career until 1988 when I retired from the

16   Army, except for three years that I taught Arabic as the

17   professor of Arabic at West Point.

18       Q.    Now, would you please tell the court a little

19   bit about some of your early experiences in the 1960s

20   and '70s in Vietnam, to the extent that you can here in

21   this setting, involving intelligence matters.

22       A.    I -- in 1968 and '69, I commanded a clandestine

23   operations detachment in 3 Corps, that's north of the

24   Saigon border.  And I cannot discuss that in great

25   detail in an unclassified setting.  And then I had

Lang - D                                                    93

1    several other tours of duty in which I was a clandestine

2    operations officer in various parts of the world.  Often

3    conducted operations against the KGB, the GRU, against

4    foreign guerrilla movements of various of kinds, in

5    conjunction with the CIA.

6           I have two awards from the CIA given for

7    recruitments of Warsaw Pact personnel.  And after I

8    retired from the Army, I continued in intelligence work

9    as a member of the Defense Intelligence Senior Executive

10   Service.

11   Q.    Let me focus for the next few moments on some

12   more details about your educational background.  You

13   mentioned getting a master's degree at -- in Utah.  Was

14   that while you were an active member of the Armed

15   Services?

16   A.    Yes.  I had completed the Arabic language

17   school at Monterey, California, with the Defense

18   Language Institute, and got a perfect score on the

19   achievement test.  So they decided they were going to

20   send me next to graduate school in Middle East studies.

21   And I was supposed to have gone to the American

22   University in Beirut, but a civil war broke out.  And so

23   they diverted me to Utah where I took a degree which

24   concentrated on modern Arab literature, on the social

25   anthropology in the Middle East, and the history of the

1   politics of the Middle East.  And I had a grade point

2   average at the end of 4.0 of 4.

3       Q.    And you've indicated that that master's program

4   took place after completion of the Army's or the Armed

5   Services Arabic Language School in Monterey, California?

6       A.    That's correct.  I forgot to say that I was

7   also admitted to the International Honor Society of Phi

8   Kappa Phi at Utah.

9       Q.    All right.  So you were back then in the 1970s

10  and are you still today fully fluent in Arabic?

11      A.    Yes, I am, in fact.  After this I -- in

12  addition to teaching Arabic at the college level, I, in

13  fact, worked for many years in the Middle East.  And

14  in -- sometimes in situations in which there were no

15  English speakers really.  So I've had a great deal of

16  practice.

17      Q.    All right.  Now, in addition to your study of

18  Arabic as a language, you are indicating that your

19  education in this master's program included study of

20  politics, anthropology, social anthropology.  If you

21  could expand on that a little bit, please, sir.

22      A.    Well, I've always had the conviction in the

23  intelligence business that the knowledge of mankind and

24  the doings of mankind is more significant than the

25  rigors of political science as a discipline.  So I

Lang - D                                              95

 1  tended to concentrate on anthropology as a record of the

 2  behavior of human groups, especially in the Middle

 3  Eastern context, and the history of politics in the

 4  Middle East as the actual record of what occurred

 5  probably as a result of those intermixtures.

 6          I also did quite a lot of developmental

 7  economics focused on the Middle East at Utah.

 8  Q.    Now, in 1976, did you find yourself at West

 9  Point?

10  A.    I did.  I was -- I unexpectedly received a

11  phone call one day that told me that I was summoned to

12  go up and create program in the Arabic language and

13  Middle East studies at the Military Academy at West

14  Point.

15  Q.    So you were the founder and creator of a

16  program which is still ongoing today?

17  A.    Yes, that's right.  I created the program

18  curriculum and taught the courses for the first three

19  years until I departed for another assignment.  While I

20  was there, I was a member of the faculty senate,

21  elected.  And I was twice selected as the best classroom

22  instructor of the year at the Academy.

23  Q.    Now, when you left West Point, what was your

24  next assignment or posting?

25  A.    Well, I had this interesting Hobson's choice

Lang - D                                                96

 1    there.  They asked me to stay on permanently, and I
 2    couldn't imagine anything I wanted to do less, and so I
 3    decided to accept the Army's offer to become the Defense
 4    and Army attaché of the Republic of Yemen.  That was
 5    then North Yemen.  Since then the two countries, north
 6    and south, have combined.  I did that for two-and-a-half
 7    years.
 8        Q.    And when you were the attaché at that posting,
 9    did you live in Yemen?
10        A.    Oh, yes, I lived in San'a, the capital of Yemen
11    with my wife.
12        Q.    Can you explain for the court, please, in
13    general terms, what your responsibilities as the attaché
14    were?
15        A.    Well, I worked for both the ambassador, and,
16    therefore, was a kind of pseudo State Department
17    employee, and I also worked for the director of the
18    Defense Intelligence Agency as his representative.  I
19    was a consular of embassy in the State Department sense
20    for military affairs.  And at the same time, I was
21    collecting all over the country on an overt basis
22    information about the Soviet and Chinese military
23    missions in the country, which were very large.  I did
24    spend a lot of time with the Soviets because of that.
25    And there was a large civil war going on in the

Lang - D                                                97

1    southeast part of the country against the National

2    Democratic Front, which was also backed by the Soviets,

3    so I spent a lot of time on the Soviet dealings there

4    and talking to prisoners taken by the Yemeni Army who

5    had been trained by the Soviets, things like that.

6        Q.    In that capacity were you called upon to

7    analyze data, exercise judgment, and make

8    recommendations to people in the embassy, in the State

9    Department, in the Defense Department or elsewhere?

10       A.    Well, yes, throughout the U.S. government.  I

11   was the military representative in the country for all

12   things that had to do with intelligence, so I had to

13   judge what the extent was of the Soviet and Chinese

14   programs, how effective they were, how the guerrilla war

15   was going, advise the ambassador as to how much military

16   assistance he ought to recommend the United States

17   provide, to compete with the Soviets, for example.  And

18   I had to travel all the time back to Washington to talk

19   to the State Department and the Treasury and National

20   Security Council about these issues, yes.

21       Q.    Let's see if in the next minute or two we can

22   define a couple of terms.

23       A.    Yes.

24       Q.    You used the phrase -- I think it was the

25   phrase Defense Intelligence Agency.  Can you tell the

Lang - D                                          98

1    court, please, just what that is and how it fits into

2    the U.S. intelligence community.

3        A.    Well, there are several major elements of the

4    U.S. intelligence community, separate agencies that

5    belong to different departments of government.

6            The CIA, of course, is a standalone agency

7    which essentially serves the presidency, at that time

8    we're talking about.  The State Department has the

9    Bureau of Intelligence and Research.  The Defense

10   Department has the Defense Intelligence Agency.  And

11   each of the services have activities, as do some other

12   parts.  And these things act as a committee of the

13   whole, to a large extent, in coordinating what it is the

14   positions are that they take with regard to the -- what

15   the U.S. government accepts as truth.

16           They collect information for that purpose.

17   They can analyze it by comparative analysis, as I heard

18   described earlier.  And then produce documents which

19   become the truth of the United States government.

20       Q.    Now, in terms of the intelligence work that you

21   have done and that is done elsewhere in the United

22   States government, there are, if I understand correctly,

23   several different types of intelligence with names such

24   as HUMINT and SIGINT.  Can you explain please what some

25   of those different categories are.

 1      A.    These can really be described as disciplines in

 2   the collection world, which actually is divided into

 3   collection, analysis, dissemination.  And these are

 4   different kinds of collections.

 5            SIGINT is the collection of enemy or adversary

 6   signals, both the verbal or of a nonverbal nature.

 7            HUMINT is the use of humans in order to collect

 8   information, either openly or by use of secret methods.

 9            IMINT is the use of photography or other kinds

10   of imaging from overhead.

11            And MASINT is a little obscure even to me after

12   I've worked with it for many years.

13            MR. WAX:  Okay.

14            THE COURT:  This is a good time.  When you have

15   your lunch, say to yourself "I'm going to speak a tiny

16   bit slower."

17            (Lunch recess:  11:30 a.m. until 1:12 p.m.)

18            THE COURT:  Go ahead, Mr. Wax.

19            MR. WAX:  Thank you, Judge.

20   BY MR. WAX:

21      Q.    So, Colonel Lang, let us move forward with your

22   experience.  After your time in Yemen, did you continue

23   with any other type of studies at the War College?

24      A.    Well, before that, I went back to the states,

25   and for 8 or 10 months I was the person in charge of all

1  the attaché stations in the Middle East in the Defense

2  Intelligence Agency's headquarters in Washington.  In

3  other words, I ran these places for administration and

4  operations from Washington.

5      Q.    And what does that job entail in terms of

6  reviewing material, and analyzing it, making judgments,

7  giving directives to people in the field?

8      A.    Well, in addition to the logistical and

9  administrative matters, personnel, things like that, I

10  had to look at what they were producing in terms of

11  reporting, and then go around to the other parts of the

12  government that were interested in this, the State, CIA,

13  and Treasury, places like that, and see if it was

14  satisfactory, confer with them to get a kind of peer

15  rating for the products of our attaché offices in the

16  Middle East, and then retask them to have them do what

17  it is that they were supposed to be doing.

18      Q.    So you would gather information, make judgments

19  about what was best, worst, mediocre?

20      A.    Yes, judge it basically.

21      Q.    And then would you discuss your analysis with

22  other people who were doing work similar to yours within

23  the intelligence community?

24      A.    Well, first I would ask the analyst, the people

25  who do comparative analysis, and within the DIA, that's

1    the Defense Intelligence Agency, and then I would ask

2    the same questions out at all the other agencies to see

3    whether there was a sufficiency in what was being

4    reported, whether they thought it was any good, you

5    know.  And then retask people to get the -- to adjust

6    the product in the collection activity if necessary.

7        Q.    And retasking in English as opposed to a

8    military phrase would mean what, sir?  What do you mean

9    by "retasking"?

10       A.    Well, I'd send messages to the field and tell

11   them to stop doing this, start doing that, that kind of

12   thing.

13       Q.    Were you in the mid 1990s at some point in a

14   position in Saudi Arabia itself?

15       A.    Yes.  After I finished doing this for 10 months

16   or so, I went back to the Middle East to Saudi Arabia to

17   be the Defense and Army attaché, the job I had in Yemen

18   only on a bigger scale because this was a bigger stage,

19   bigger office, bigger embassy, bigger interests for the

20   United States.  And I was there for another

21   two-and-a-half years.

22            And while I was there, I was promoted to

23   colonel.  And I performed the same kind of duties there,

24   and with regard to collecting information, advising the

25   ambassador, conferring with all the other foreign

1    attachés in the Saudi capital so that we could sort of

2    support each other in the collection of information,

3    judge what was to be done.

4         And then I was -- then I was selected to attend

5    the Army War College in Carlisle, Pennsylvania, on my

6    return to the United States.

7    Q.    Let's just stay in Saudi Arabia for a moment.

8    Did your work there bring you in contact with members of

9    the Saudi royal family and the Saudi government?

10   A.    Oh, yes.  That was a very large part of what I

11   was doing.  In North Yemen, I had a lot of Russians,

12   Chinese, and guerrillas to fool around with.  In Saudi

13   Arabia, the principal target of our efforts was the

14   Saudi government itself, to find out what they were

15   doing, to influence their actions, that kind of thing.

16   So I spent a great deal of time in Riyadh, in the

17   Ministry of the Defense, and Aviation, in the Foreign

18   Ministry, or at the Justice Ministry sometimes because

19   of American prisoners who had to be dealt with.  And my

20   Arabic was really quite good.  And so -- actually it was

21   better, really, than the State Department people, almost

22   all of them in the embassy.

23        So I was often asked to go with the ambassador

24   or other senior dignitaries to visit senior people in

25   the Saudi government, provincial governors, ministers of

1    state, various royal princes.  And often I acted as

2    their interpreter because otherwise nothing would have

3    gotten done.  And visiting firemen as well.  I remember

4    an astronaut in particular that I took out to visit

5    people.

6              I was also acting in conjunction with the CIA

7    station there in the business of the clandestine

8    intelligence, and I really can't go any further than

9    that in an unclassified thing, but we had a very

10   satisfactory outcome with regard to that.

11      Q.    Okay.  Now, you said that you came back and

12   were at the War College.  Tell us about that, please.

13      A.    Well, the course is the senior most course for

14   Army officers and other people from other services, few

15   civilians who were sent there.  It's for lieutenant

16   colonels and colonels.  The selection rate is 2 percent

17   for those eligible in a given in year.  So it's selected

18   by national board.  It's not something you apply for.

19   And so it's a course on grand strategy, the management

20   of Defense Department resources, some advanced business

21   on international relations, subjects of that kind.  I

22   was there for a year.

23      Q.    And when you concluded with that, was there a

24   selection for promotion that you were told you weren't

25   going to take because something else was going to happen

Lang - D                                                                104

1   with you?

2       A.    It wasn't a promotion.  I was selected for

3   brigade command, which was something I was very happy

4   about, by an international board.  And then I was told

5   by the Department of the Army bureaucracy that I was not

6   going to take command because I was too valuable doing

7   what I was doing in the intelligence and the Middle East

8   business.  And that I could forget about that.  I was

9   going to stay as much as a specialist as I was.

10          And then I had a nice phone call from the

11  director of the Defense Intelligence Agency, Lieutenant

12  General James Williams, who asked me to take a very good

13  job in DIA headquarters.

14      Q.    And for the next seven years, give or take,

15  what did you do, sir?

16      A.    Well, the job -- and this is a job title rather

17  than its description was to be the defense intelligence

18  officer for the Middle East, South Asia in counter-

19  terrorism.

20          And in that job, I controlled everything that

21  DIA did with regard to those specific areas, the Middle

22  East, South Asia in counterterrorism, everything in

23  collection, in comparative analysis, in coordination

24  with all the other parts of government, and in

25  supporting our principal clients, who were the Joint

1    Chiefs of Staff.  And in my case, specifically the

2    Chairman, I was his personal liaison officer to the

3    intelligence community, and the Secretary of Defense,

4    first Caspar Weinberger, and then Frank Carlucci, and

5    then Cheney.  And I did that for seven years.

6            And in this job, my biggest position -- there

7    was a whole board of defense intelligence officers for

8    different subject matters, and we all worked directly

9    for the director of DIA, had no other superior.

10           And the principal job was to lead analysis in

11   the -- the strategic analysis of your field of endeavor,

12   and to make judgments between different lines of

13   analysis by a large number of analysts who are really

14   scholars, really, who have high security clearances.

15   And these people are very competent people.  And they

16   obviously will have differing opinions.

17           It was their job, the DIO, to decide amongst

18   them as to which lines of approach were correct, which

19   were not, and to help them develop those things, to

20   approve all the documents and briefings, sometimes to

21   give the documents and briefings.  And to be the

22   principal officer in Joint Chiefs of Staff planning for

23   that area of the world or that function and also for

24   being the principal officer for DIA participation in the

25   formation of national estimates, which are the -- in the

1    intelligence community sitting as a whole deciding what

2    it is that is the government's truth on a given subject,

3    like the Palestinians or something like that.

4        Q.    And when you said that that is a responsibility

5    of the DIO, that was you --

6        A.    That's me.

7        Q.    -- DIO?

8        A.    Yeah.  I had that job for seven years.  I was

9    surprised when I was given that job because I had never

10   really been an analyst before.  I had always been a

11   collector in clandestine operations, Special Forces

12   operator in the field, infantry officer, things like

13   that, and so I was surprised to do that.  But it worked

14   out very well.

15           If I hadn't been good at this and if my

16   products had not been appreciated by the Secretary of

17   Defense and Chairman of the Joint Chiefs, and all these

18   other very senior persons, I would have been gone very

19   quickly.

20       Q.    And as you indicated, you served at least three

21   different Secretaries of Defense?

22       A.    Yes.

23       Q.    You were continued on as they would take

24   office?

25       A.    Yeah, that's right.  And since I dealt with

 1    them almost everyday, they had plenty of opportunity to

 2    say if they didn't like it.  All it would have taken was

 3    one phone call to the director of DIA.  And -- but we

 4    went on quite nicely.

 5           And in that period of time, we had our

 6    undeclared war with Libya, and we had the Iran-Iraq war

 7    in which the United States played a major role.  Can't

 8    say too much more about that.  Then we had the First

 9    Gulf War.  And then I survived through all of that in

10    this function.

11    Q.    Now, during the course of your responsibilities

12    as the DIO, would you from time to time participate in

13    personal briefings of the President of the United

14    States?

15    A.    I did, in fact.  And when George H.W. Bush was

16    president, I briefed him half a dozen times in the time

17    of Desert Storm, the First Gulf War.  I had briefed

18    President Reagan several times before that.  And I never

19    got around to President Clinton.  I had moved on to

20    something else about that time.  But I did that quite

21    often.

22           I used to also brief foreign leaders a great

23    deal.  I briefed King Abdullah of Saudi Arabia several

24    times, and his predecessor, King Fahd.  I briefed Prince

25    Saud Faisal, the Foreign Minister of Saudi Arabia; Turki

1   Faisal, the former head of General Intelligence in --

2   you need some spellings?

3          THE REPORTER:  I'll get them.

4      A.    Yeah.  And I used to go over to Jordan and

5   brief His Majesty King Hussein and various officials

6   over there, other people around the Arab world.

7      Q.    And in your briefings, you would be providing

8   to these people, as well as the Secretaries of Defense

9   and the Chairman of the Joint Chiefs, your assessment on

10  a variety of matters related to terrorism, counter-

11  terrorism, and some of the more specific subjects that

12  you've already mentioned?

13     A.    Yes.  In addition to all the specific things on

14  the Middle East and all the things that were happening,

15  you know, there is always something happening in the

16  Middle East, you know, the counterterrorism thing, for

17  which we had a large analytic staff was a big subject

18  for me.  Altogether I was supervising the work of about

19  130 analysts in grades up to GS15, that's like a colonel

20  in the Army, you know.  And we did that all the time.

21         Counterterrorism was a big subject.  We had a

22  lot of activity in that time.  There was a lot of

23  activity with the Abu Nidal organization, and the

24  Popular Front for the Liberation of Palestine, and its

25  variant, the General Command; the PLO, the -- and

1  various organizations like that.  They were all the
2  focus of our attention all the time.
3      Q.    Sir, did you retire from active military
4  service during the period that you were serving as the
5  DIO?
6      A.    Yes.  I got a very good break.  I -- in 1988,
7  the director of DIA -- I found out I wasn't going to get
8  promoted in the Army because they didn't want to promote
9  anybody who was a specialist in the Middle East, so the
10 director of DIA asked me if I would stay on as a
11 civilian if he made this a job in the Defense
12 Intelligence Senior Executive Service.  And I said, yes,
13 I'll do that.  So they got permission from the Congress
14 for that.  And I signed out of one thing and into the
15 other the same day.
16     Q.    And in terms of the equivalency of the rank
17 that you held after you resigned, would that relate in
18 any way to a rank within the military?
19     A.    I was promoted several times in the Senior
20 Executive Service, and I ended up as an MP-4, which
21 is -- an EP-4, Executive Program 4, which is the
22 equivalent in the Armed Forces of a lieutenant general.
23     Q.    And were there any other honors or distinctions
24 that came your way in that period?
25     A.    Yes.  I was -- I was awarded the Presidential

1   Rank of Distinguished Executive, which is the highest

2   award you can -- the highest professional award you can

3   be given in the Civil Service of the United States.

4       Q.    And that was awarded by which president?

5       A.    President G.H.W. Bush.

6       Q.    Now, when you left the DI -- your service at

7   the DIO, you took up another position within the

8   government?

9       A.    Yeah.  After seven years, we had a new director

10  in DIA.  And he decided that a lot of people had been in

11  the same jobs too long, so he asked me if there was

12  another job I'd like.  So I said I'd like to go be the

13  director of Defense HUMINT Collection.  So they sent me

14  over there.  And I did that for two years.

15      Q.    What generally did that job entail?

16      A.    Well, it was really the kind of thing I really

17  like.  I was in charge of all the attachés, military

18  defense, naval and air attachés in the world, and

19  everything they did.

20            And also I was in charge of all the clandestine

21  assets of the Defense Department.  I had the chance to

22  reorganize them all into one service, the Defense HUMINT

23  Service.  And then I had a lot of little detachments

24  that -- bought foreign equipment for reverse engineering

25  and various other specialized jobs like that.

Lang - D                                            111

1    Altogether a couple thousand people.

2         Q.    Okay.  You left government service in 1994 --

3         A.    Yes.

4         Q.    -- and took a position in private industry?

5         A.    I did.  By that time I had had 32 years of

6    government service, and I thought I should do something

7    different.  So I floated by résumé around and I received

8    a number of offers.  And I took the one that looked the

9    most interesting and had the most money attached to it.

10   And I went to work as a corporate executive for a

11   Lebanese man who owned a large group of companies in the

12   Middle East that made construction materials,

13   principally pipe.

14        Q.    And you stayed in that position more or less

15   full-time for roughly seven years, was it?

16        A.    Well, I worked really full-time at that until

17   2000, yes.  And then I decided I would like to cut back,

18   so I became a member of his board of directors and a

19   consultant to the company doing business development,

20   government relations work, and contract negotiations in

21   the Middle East.  And they found it useful to have this

22   American go around and deal with situations which the

23   various Arab groups couldn't agree with each other.  And

24   so I did that until 2006.  And during that period --

25   then I stopped working with them.

1            During that period, I started developing a

2    private consultancy with the government, principally,

3    because I was no longer an employee of that company, so

4    I started working for the government again.

5    Q.    So in terms of the work with the corporation --

6    and this is FMS, Incorporated?

7    A.    Yeah, it's Future Pipe Group really is the name

8    of the group there.

9    Q.    Roughly how much of your time, if any, did you

10   spend in the Middle East from 1994 to roughly 2000,

11   2001?

12   A.    Well, when I first went to work for the

13   company, I went out and lived in Dubai for six months to

14   become -- there was a big factory there, so I wanted to

15   become familiar with the manufacturing process.  And so

16   I did that.  Then I came back to my home.  And I -- we

17   set up offices in Washington.  And I ran a subsidiary of

18   the company out of it for the same things, for business

19   document, government relations, and contract

20   negotiation.  And then eventually we started building

21   factories in the United States in the Gulf Region.

22   Q.    Did you continue to travel to the Gulf of the

23   Middle East up until 2000 when you stopped your

24   employment?

25   A.    I did.  I would go -- every two months or so, I

1    would go for a week or two out to the Gulf, to Saudi

2    Arabia, to everyplace out there, Egypt where we had

3    business.  And I did a lot of work in Saudi Arabia in

4    the Gulf because there is a big market there, and we had

5    several factories in the Gulf.  And I would -- spent a

6    lot of time cultivating sources among the people I

7    already knew in the Saudi government establishment; and

8    then new people, bankers, businessmen, lots of business

9    with fixing contracts, and watching how they did things,

10   and doing financing jobs for particular contracts with

11   their banks, things of that kind.

12        Q.    So in that roughly six, seven-year period, you

13   maintained the contacts that you had had with people who

14   were in government when you were working with the United

15   States government?

16        A.    And I built up a lot more.

17        Q.    More contacts?

18        A.    Yeah.

19        Q.    You also functioned directly as a business

20   executive in, as you've indicated, a number of the

21   Middle Eastern countries, including Saudi Arabia?

22        A.    Yeah, most particularly in Saudi Arabia, yeah.

23        Q.    And you became familiar with some of the Saudi

24   business practices through that personal experience?

25        A.    I used to watch them all the time.  Before I

1    went into business in the Middle East, I thought I knew

2    a lot about how Arabs functioned in business and

3    government and things like this.  And once I started

4    functioning in business as one of them, I found out I

5    had a lot more to learn.  So there were a lot of things

6    to learn in those six years.

7        Q.    Now, let me just ask a little bit about the

8    types of information that you would have access to and

9    be dealing with in your analysis.  And if we need to go

10   into a closed session or you need to stop your answers,

11   just keep your eye on that ball, please.

12           In terms of attempting to determine what was

13   going on in Saudi Arabia --

14       A.    Among other places.

15       Q.    Well, let me focus on Saudi Arabia for a

16   moment.  Did you develop an understanding through your

17   work with the government the way in which the Saudi

18   government functioned and the type of control it exerted

19   over institutions -- charitable institutions in Saudi

20   Arabia?

21       A.    Yes.  I mean --

22           MR. GORDER:  Your Honor --

23           THE COURT:  Just a moment.

24           MR. GORDER:  Your Honor, if I could object and

25   ask for some clarification as to where we're headed.

1    Mr. Lang has been proffered as an expert to testify at

2    the trial.  I fail to see the relevancy of U.S.

3    government collection efforts in Saudi Arabia to this

4    trial that we are going to try next month.  And whether

5    he's an expert on that or not, seems really beside the

6    point.

7            THE COURT:  Yeah.  I'll give my rulings on

8    those matters later.  As long as you stay away from

9    things that can't happen in open court, that's fine.

10   I'm going to let you do it.

11           MR. WAX:  Thank you.

12           THE WITNESS:  Well, yes, we were very

13   interested in how the Saudi society functioned, because

14   it's a major ally of the United States.  That's when I

15   was in government.  And so, in fact, we applied all of

16   the collection means of the U.S. government, used all

17   the experts, and all the analytic talent we had to build

18   up as comprehensive a picture as we could of how they

19   functioned.

20           Among the various things would be how the

21   governmental entities and the royal family, who really

22   own Saudi Arabia, how they controlled all these

23   entities, like al-Haramain and the Saudi Joint Relief

24   Committee, things of that kind, because they were very

25   concerned with in fact maintaining absolute control so

Lang - D                                          116

1   that nothing went wrong in their relations with the

2   United States, for example.  Is that your question?

3   BY MR. WAX:

4       Q.    Yes.  So in terms of the work that you were

5   doing and the expertise that you developed, that

6   included, I take it, expertise in the relations of the

7   Saudi government with the various entities that existed

8   in Saudi Arabia?

9       A.    Yes.  As a major player in the American

10  intelligence community, we were not just interested in

11  military things, we were interested in a comprehensive

12  picture of all the aspects of Saudi society,

13  governmental, nongovernmental.  We wanted to know what

14  made them tick and exactly how they functioned.

15      Q.    In terms of your development of expertise with

16  respect to mujahideen and the funding of mujahideen, did

17  your work take you into those areas?

18      A.    Yes.  We were -- the United States government

19  has always had a certain problem in distinguishing

20  between mujahid groups who are in one sense can be

21  thought of as fighters for liberation in some contexts,

22  and terrorist groups in another sense who are often

23  extremist Islamic groups.  So we were very interested in

24  developing as big a database, often interacting with

25  civilian people's databases, as to exactly what the

1    layout was of all these groups and how they interacted.

2    And I was in charge of that in the Department of

3    Defense.  And I went to all of the meetings in the --

4    across the intelligence community in which these matters

5    were discussed and decided upon.

6        Q.    Let's look at the last 10 years or so of your

7    work since you began serving as a consultant.  If I

8    understood correctly, you said that you have continued

9    to work for the United States government but in a

10   consulting capacity?

11       A.    Yes.

12       Q.    Did I understand correctly?

13       A.    You understood correctly, yeah.

14       Q.    Could you please explain to us in as much

15   detail as you can the nature of your consulting work for

16   the government over the last 10 years or so.

17       A.    Well, I'm a well-known figure in the world of

18   military affairs and the Middle East and counter-

19   terrorism in the United States government, and amongst

20   contractor companies that support the government in

21   these endeavors.  So starting seven or eight years ago,

22   I began to get more and more offers to work for various

23   contracting companies or parts of the government itself

24   for short periods of time, three or four days, two

25   weeks, a month, something like this, in specific

```
 1   planning scenarios for the Middle East, in war gaming,

 2   both political and military, and in writing various

 3   things for them.

 4         For example, myself and several associates

 5   wrote a book on the Bedouin tribes of the Al-Anbar

 6   Governorate in Iraq for the Defense Intelligence Agency

 7   in 2006, which has become -- it's a classified document.

 8   The title is not.  But it's -- but it was -- it's been

 9   an important document in the war in Iraq.  And any

10   number of other projects like that.

11         I have several ongoing at the present time.

12   And I have a security clearance at present, which is

13   secret.  Before, I had a security clearance for a

14   special compartment of intelligence, and with a whole

15   lot of compartments in it.  And -- but at present it's

16   secret because my work has not required anything more.

17   Q.    Have you done work consulting for both the Bush

18   and Obama administrations in the twenty-first century, I

19   guess we're in?

20   A.    Oh, yes, to both.  It doesn't matter to me, of

21   course, which party is in power, but, yes, in fact --

22   Q.    Both have called you back and called on your

23   expertise?

24   A.    Yeah, the government has, yes.

25   Q.    Okay.  Now, in terms of writing, we have in
```

1    your CV a number of articles.  I just want to draw your

2    attention to a couple of them.  There is the book listed

3    *Intelligence:  The Human Factor* published in 2004?

4        A.    Uh-huh, that's correct.  That was cleared by

5    DIA.  And that is written on historical examples and it

6    is kind of primer in espionage.

7        Q.    *The Tribes of the Al-Anbar Governorate*

8    published in June of 2006?

9        A.    That's the one I just mentioned.

10       Q.    All right.  An article entitled "Drinking the

11   Kool-Aid, Middle East Policy," 2004, does that discuss

12   anything about goings-on in Saudi Arabia and/or funding

13   of --

14       A.    No.  This is -- this is about the intelligence

15   contest over -- and the run-up to the war in Iraq.

16       Q.    Okay.  "Wahhabism and Jihad" published 2003,

17   subject matter of that would be what?

18       A.    That would be specifically the role and

19   function of the Wahhabi, that brand of Islam within

20   Saudi society and the effect that it's had in sculpting

21   Saudi society over the last 100 years or so.

22       Q.    Another "Al-Qaeda and the Jihadis,"

23   September 2006, subject matter of that?

24       A.    Basically Islamic terrorism.

25       Q.    And "Islam:  Monotheistic but not Monolithic,"

Lang - D                                                          120

1    January 2007?

2        A.    Yes.  That's a -- I wrote that for the Catholic

3    people charities for the Middle East, they wanted an

4    encyclopedic view for their magazine, you know, the

5    various types of Islam, and the basic tenets.  So it's

6    a -- kind of a tour d'horizon.  T-O-U-R, D, apostrophe,

7    H-O-R-I-Z-O-N.

8        Q.    Have you, in addition to providing input to

9    members of the Executive Branch been called upon by

10   Congress to testify as an expert before any number of

11   Congressional committees?

12       A.    I haven't done that very much since I left the

13   government, but when I was in government, I testified 3

14   or 400 times before the Oversight Committees, the Armed

15   Forces Committees, the Appropriations Committees, the

16   Foreign Affairs Committees.  That was one of my major

17   jobs.

18       Q.    Since you left the government service and also

19   since you left the corporation, have you testified as an

20   expert witness in any federal courts?

21       A.    Yes, I have.  I testified in 2003, I think, in

22   a civil action in the District Court of the District of

23   Columbia before Judge Royce Lamberth in a case involving

24   a number of plaintiffs against the government of Iran

25   for material support of terrorism involving Meir

1    Kahane's murder.

2              And last week, I testified in another civil

3    action in the same court before another judge, whose

4    name I don't remember exactly.  And it was against the

5    government of Syria for material support of terrorism in

6    a couple of incidents that occurred back in the late

7    1980s.  And the victims were suing for damages against

8    Syria.

9              And there have been about six or seven other

10   cases involving a mass murder in the Dallas area by a

11   strange young man.  And a number of habeas court cases

12   involving Guantanamo people.

13   Q.    And in some of those habeas cases, while you

14   have not testified, have you provided declarations and

15   been accepted as an expert by the courts?

16   A.    All of them.

17   Q.    Okay.  Now I'd like to ask you specifically

18   about Chechnya for a moment.  And if you can tell us

19   whether or not during the course of your work for the

20   government and out of the government you've developed

21   any familiarity and expertise about Chechnya.

22   A.    Well, as a full-time government and Army

23   specialist in the Islamic countries, which is what I

24   was, and then the head of all that kind of business in

25   the Defense Intelligence Agency, the -- rather the

 1    states and areas marginal to the Arab Islamic world,

 2    like the states in the Caucasus, and Central Asia, way

 3    down in Africa, were always of great interest to me

 4    because they were part of the orbit of Islamic affairs,

 5    and my work intersected with that of my colleagues who

 6    were the DIOs for the Soviet Union, for example.  And so

 7    these areas were always the subject of great discussion,

 8    and with regard to all the papers that were written

 9    within DIA and the intelligence community.  And I

10    participated in all those discussions.

11           I don't claim to be an expert specifically in

12    the Caucasus, but this was always a matter of which I

13    took great care to inform myself.

14    Q.    During the course of your work, both within the

15    government and subsequently, have the opportunity to

16    work with or receive information from what is now the

17    FSB, Russian Security Service?

18    A.    Because I was a clandestine intelligence

19    officer for many years in different places, often the

20    targets were members of the KGB and then GRU and

21    officers of that kind.  And I had long experience in

22    dealing with them in the field.  And then in DIA

23    headquarters, they were the object of great concern to

24    us because of their activities in the kinds of areas you

25    are talking about.

1          And I find it very hard to believe -- this is

2    my opinion -- that the FSB is a great deal different

3    than the KGB.  And I would cite that incident that

4    occurred with regard to an American diplomat stationed

5    in Mexico who was honey trapped in Moscow by the FSB.

6    And it was widely written up in the newspapers, and this

7    is last year, I believe.

8    Q.    Have you had the opportunity in the last few

9    years to discuss with any of your colleagues, former

10   colleagues, what is going on currently with the FSB and

11   get any input from any of those people about their views

12   of the FSB?

13   A.    Because of my ongoing consulting business for

14   the government, and when I go to events for which I've

15   been hired by the government, there are colleagues there

16   who are old colleagues of mine, there are people who

17   currently work in the government who are very current in

18   these things, and I don't hear any great level of trust

19   expressed by them for the FSB and its veracity in

20   matters in which the interests of the Russian State

21   might conflict with the truth.

22   Q.    And the people with whom you are having these

23   conversations are the same type of people on whom you

24   would have relied in your work as the DIO, and then as

25   the director of HUMINT?

1      A.     Oh, yes.  Same level, same kind of people, same

2   agencies.

3      Q.     Now, in terms of this particular case, we

4   contacted you now quite some time ago, and you provided

5   two declarations that are not classified in any way, one

6   related to the FSB, the other related to the types of

7   information that should be available in this court.  And

8   you more recently provided a declaration that was

9   prepared in a classified setting, correct?

10     A.     Yes.

11     Q.     All right.  We provided you some materials in

12  order for you to provide some assistance, and let me see

13  if I can quickly review that.  Did we provide you a copy

14  of the indictment?

15     A.     Yes.

16     Q.     You read it and understood the nature of the

17  conspiracy and tax charges and the El-Fiki donation,

18  et cetera?

19     A.     Yes, very, I do.

20     Q.     Have we provided you a set of all of the

21  exhibits that the government has marked, at least those

22  up until, I guess, last Friday, I think we provided you

23  copies, did we not?

24     A.     Yes.

25     Q.     And did we, over the weekend, have the

Lang - D                                                              125

1   opportunity for you to look at some new exhibits that

2   the government marked toward the end of last week?

3       A.    Yes, at your offices here.

4       Q.    Did we also provide you with a full set of the

5   materials that we have marked as potential defense

6   exhibits?

7       A.    Yes.

8       Q.    Have we, in addition, provided you some other

9   reports, witness interviews, et cetera, prepared by the

10  FBI and the IRS related to the investigation which has

11  been conducted in this matter?

12      A.    Yes.

13      Q.    In terms of the understanding that you have of

14  the issues here, I'd like to ask you a couple of

15  questions.  In attempting to determine the -- let's

16  start with the money, what happened to the money that

17  was originally donated by Mr. El-Fiki, what would you --

18  I'm going to ask this one of several ways.  What would

19  you have done had you been in a position to be

20  attempting to determine that?  What, given your years of

21  experience with the government, would you have expected

22  the government to do in the effort to determine what

23  actually happened with the El-Fiki money?

24      A.    You mean once it got to Saudi Arabia?

25      Q.    Yes.

1      A.    A couple of things.  I would have, first of

2    all, gone and tuned up the collection apparatus of the

3    U.S. government, especially in a Signals Intelligence

4    area, to have them collecting against the kind of

5    information you wanted.

6            The transfer of funds in -- across

7    international banking boundaries and things of that kind

8    anyway are the kinds of transactions which are readily

9    accessible to the United States government.

10           The second thing I would have done is I would

11   have gone to Saudi Arabia, and I would have spoken

12   directly to the really responsible officials who sat on

13   the boards of these institutions, at al-Haramain and the

14   Saudi Joint Relief Committee, who are really -- a lot of

15   them are very senior people in the Saudi government and

16   royal family.  And I see no reason why they would have

17   thought it would not have been the right thing to do and

18   in their interest in order to describe what happened to

19   the money.  And I don't know whether or not that was

20   done, but I don't see any evidence of it having been.

21           MR. WAX:  Your Honor, I think the next

22   questions that I want to ask may need to be asked in a

23   less populated courtroom.

24           THE COURT:  All right.  How much more do you

25   have?

1          MR. WAX:  Maybe 20 minutes total.

2          THE COURT:  Yeah.  I'm not sure you have that

3    much time left but you have some time.  So let's --

4    that's fine.  We'll have a secure courtroom.  So those

5    who don't have the proper clearance, I need to ask you

6    to leave.

7          MR. WAX:  Your Honor, with respect to

8    Mr. Casey, he has a clearance through the Guantanamo

9    work.  He has not yet had a need-to-know order entered

10   in this case.  What is your pleasure with respect to

11   him?

12         THE COURT:  I'm sorry, Mr. Casey, but I don't

13   want to take any chances.

14         MR. CARDANI:  Judge, I'm sorry, can Evan

15   Kohlmann return back to New York?

16         THE COURT:  As far as I'm concerned, yes.  Do

17   you want him here this afternoon?

18         MR. WAX:  Unless the court intends to permit me

19   to ask more questions --

20         THE COURT:  I don't.

21         MR. WAX:  -- there wouldn't be any point in him

22   staying.  But if you do, I would love that opportunity.

23         THE COURT:  All right.  Thank you.  Okay.

24         (Further proceedings were held in a closed

25   session and are bound under separate cover or are not

```
 1   transcribed.)
 2             (Proceedings resume in open court at 2:25 p.m.)
 3             THE COURT:  Thank you.  I did want to tell
 4   counsel that I've scheduled time in the next few weeks
 5   to do another personal complete review of all the
 6   classified materials in the case.
 7             Are you finished with the witness?
 8             MR. WAX:  Yes, Your Honor.  And before
 9   Mr. Slade leaves, I have an envelope that I should
10   probably return to him.
11             THE COURT:  Thank you.  Let's give it to him
12   now.  That's great.
13             MR. WAX:  Thank you.
14             THE COURT:  Thank you, Mr. Wax.  All right.
15   Mr. Gorder.
16             MR. GORDER:  Thank you, Your Honor.
17                         CROSS-EXAMINATION
18   BY MR. GORDER:
19      Q.    Mr. Lang --
20      A.    Excuse me, sir, I'm a retired regular Army
21   officer with the grade of colonel.  I would appreciate
22   it if you would address me by my rank.
23      Q.    Very well.  Colonel Lang, you left Saudi Arabia
24   in 1985.
25             THE REPORTER:  Excuse me, is your microphone
```

1    on?

2              MR. GORDER:  Is that better?

3              THE REPORTER:  Thank you.

4    BY MR. GORDER:

5       Q.    You left Saudi Arabia in 1985?

6       A.    Yes, I believe that -- either '84 or '85.

7       Q.    And as far as while you were in government

8    service, you were not stationed there after that date;

9    is that correct?

10      A.    No.  But I've been there many times.  Would you

11   like me to say how?

12      Q.    No, that's fine.

13      A.    Okay.

14      Q.    You left government service in 1994; is that

15   correct?

16      A.    That is correct, July, something like that.

17      Q.    Now, the work you did for FMS, Incorporated,

18   you indicated that that was primarily a company that

19   sold pipe throughout the Middle East; is that correct?

20      A.    Yes.  I also set up and ran the owner's family

21   foundation, yeah.

22      Q.    What kind of piping are we talking about?

23      A.    We're talking about ferroconcrete pipe in

24   dimensions up to three meters, and various kinds of

25   fiberglass pipe in diameters up to five meters for

1    applications in the municipal water -- sewage and water

2    flowing business, in the petrochemical industry, in --

3    and in oil field operations.  We also have an

4    engineering company that did a complete lay-down of the

5    system for you, built all of the joints and phalanges

6    and things and all that.

7        Q.    Okay.  Now, in connection with that, you didn't

8    do any studies of Islamic charities; is that right?

9        A.    Not in that period of time, no.

10       Q.    So from 1994, you haven't studied that issue?

11       A.    No, that's not correct.  The Middle East is my

12   business and the Islamic world is my business.  And I

13   have continued to study and sought to improve myself in

14   this field for my whole life.

15       Q.    And what -- have you published anything in that

16   regard?

17       A.    Yeah.  Mr. Wax mentioned several articles that

18   I have published in places.  I will say, I mean, I'm not

19   a scholar, as Mr. Kohlmann is.  I'm a professional

20   intelligence officer.  And if the issue of peer review

21   arises, professional intelligence officers don't do peer

22   reviews in the same way that scholars do.  In fact, we

23   do it by a comparison of work amongst ourselves, amongst

24   colleagues, and across the community.

25       Q.    And the articles that you mentioned with

1   Mr. Wax, which ones of those deal with Islamic

2   charities?

3        A.    I don't think there are any that deal

4   specifically with Islamic charities, no.

5        Q.    Have you published anything about al-Haramain?

6        A.    No, I have not.

7        Q.    In the time that you worked for the government

8   through 1994, did you have any occasion to study the

9   activities of al-Haramain?

10       A.    Certainly.  Because they were part of the total

11  galaxy of activities that were suspected by the

12  government of the United States as being in support of

13  Islamic terrorist activities everywhere.  But once

14  again, you don't publish things for the general public

15  in the intelligence community.  You publish them for the

16  government.

17       Q.    When was al-Haramain started?

18       A.    I don't remember.

19       Q.    Have you published anything about Chechnya?

20       A.    No, I have not.

21       Q.    And after you left the government in 1994, did

22  you do any studying of the conflict in the Caucasus?

23       A.    Yes, I did.  I read many things about it, and I

24  have taken a continuing interest in the development of

25  the conflict there from the point in time of which the

1    leadership of the Chechen movement were either Sufis of

2    the Naqshbandi order or former Soviet military officers.

3    And gradually over the years they came to be replaced,

4    in large part, by Wahhabi agents and various kinds of

5    takfiri jihadis.  Yes, I've kept track.

6        Q.    Okay.  Who is Ibn Khattab?

7        A.    He's one of the leaders of the movement there.

8        Q.    And what is he doing today?

9        A.    Oh, I don't know.  If you are going to -- want

10   to ask me things at that level of detail, I'm not going

11   to be able to answer your questions.  But, in fact, the

12   issue here, as I understand it in this trial, is what

13   happened to the money once it got to Saudi Arabia and

14   where did it go?  Did it go to support a militant

15   jihadism in Chechnya?  Not what the order of battle is

16   of the Chechen guerrillas.

17       Q.    Okay.  I'm just trying to ascertain your

18   expertise in --

19       A.    I'm not -- that's fine.  I --

20       Q.    -- the Caucasus.

21       A.    Yeah.

22       Q.    During the time that you worked for the Defense

23   Intelligence Agency, did you work with the FBI in their

24   law enforcement function?

25       A.    No.  I generally worked with them in their --

1    when I did work with them, it was in their counter-

2    intelligence function, and that side of the Bureau.  And

3    they're not very easy to work with most of the time.

4       Q.    So you would not say you have an expertise in

5    how the FBI collects information inside the United

6    States?

7       A.    No, that's not true at all.  I've participated

8    in many discussions about this.  And I've now

9    participated in so many of these court cases that I have

10   read a great many of their reports.  And it's very easy

11   to see how they do this.

12          In this case in Dallas that was mentioned

13   involving Smadi who the FBI recruited to blow up an

14   office building, in fact, I reviewed all the videotapes

15   of the entire process of recruitment, training, and

16   execution of the pseudooperation, I've paid a lot of

17   attention to how they collect these -- collect things.

18   I think they do it very well.

19      Q.    You indicated that you testified in a couple of

20   cases in 2003 that would involve civil actions; is that

21   correct?

22      A.    And last week.

23      Q.    And last week.  What was the nature of your

24   testimony?  What was the subject matter?

25      A.    Well, in the case of the -- in both cases, it

```
 1    had to do largely with -- in addition to my general

 2    understanding from my supervisory role in the analysis

 3    of the actions of the Iranian and Syrian governments in

 4    support of terrorism at those times, in the case of the

 5    case against Syria, I was personally a participant in

 6    the day -- in this thing the day that it occurred in

 7    that I was called into the office of the Chairman of the

 8    Joint Chiefs of Staff, Admiral William Crowe, to

 9    translate for him the conversation he was having on the

10    telephone with the Egyptian officers on the airfield in

11    Malta where the aircraft was stormed by Egyptian

12    commandos, so I was actually a kind of witness to that.

13        Q.    And what was the time frame of that?

14        A.    That particular thing was the 23rd of

15    November 1988.

16        Q.    And the case involving Iran --

17        A.    You mean when was the occurrence?

18        Q.    Yes.

19        A.    I don't remember when Meir Kahane was murdered.

20    It was -- I just don't remember.  This was quite a while

21    ago now.

22        Q.    But before you left government service?

23        A.    Did it occur before I left government service?

24        Q.    Yes.

25        A.    I don't remember that, if it was or not.
```

1    Q.    And in the case last week, what was that about?

2    A.    I just told you.  It was about the hijacking by

3    the Abu Nidal group of an EgyptAir airliner en route

4    from Athens to Cairo and its diversion into Malta where

5    it sat on the ground for a while.  And the hijackers

6    killed several Americans or tried to -- they killed one

7    American and tried to kill two more.  And the Egyptians

8    brought in a lot of commando troops.  And after some

9    hours of procrastination, they decided to assault the

10   airplane and they killed 60 people.

11   Q.    Maybe I misunderstood you.  I thought that was

12   a case that you testified in 2003?

13   A.    No.  That was -- the case in 2003 had to do

14   with the culpability of the Iranian government in

15   material support of the terrorists in New York who

16   murdered Meir Kahane and killed several other people who

17   happened to be on the scene.

18   Q.    Okay.  That murder occurred late '80s, early

19   '90s sometime?

20   A.    I really don't remember.  I wouldn't want to

21   mislead you.

22   Q.    Have you done any studies of pro-Chechen

23   material?

24   A.    Only in the materials that have been sent to me

25   by the defense that were found, I guess, in -- on the

1    scene somewhere.

2        Q.    But no others?

3        A.    No.  I'm not terribly interested in the

4    propaganda of Islamic militant groups.

5        Q.    Are you familiar with the Benevolence

6    International Foundation?

7        A.    The what?

8        Q.    Benevolence International Foundation.

9        A.    I'm sorry, I'm getting deaf, I guess.  I really

10   couldn't hear that.

11            THE COURT:  Benevolence International

12   Foundation.

13            THE WITNESS:  No, I am not familiar with them.

14   BY MR. GORDER:

15       Q.    The Global Relief Foundation?

16       A.    No.

17       Q.    Do you know who Enaam Arnaout is?

18       A.    What's the name?

19       Q.    Enaam Arnaout.  Now, I may be mispronouncing

20   that.

21       A.    No, I don't know who that is.  I do not know

22   who that is.

23       Q.    During your time up through 1994, did you work

24   with the IRS in their law enforcement function?

25       A.    No.

1              MR. GORDER:  Nothing further, Your Honor.

2              THE COURT:  Thank you.  Thank you, sir.  You

3    may step down.

4              THE WITNESS:  Thank you, Your Honor.

5              THE COURT:  Counsel, many of the other matters

6    before the court are motions that are typical in these

7    cases, and I have ideas about how they'll be decided

8    already.  If there is a particular one that you wish to

9    add more discussion today, you may.

10             The other thing is that I understand that

11   today, I didn't really have a long conversation on this,

12   but some of the government's exhibits are going to be

13   withdrawn or replaced.  So I'd like to make as clear a

14   record in that regard.

15             I have reviewed the objections that the parties

16   have made to exhibits, and I am ready to rule on those,

17   but I'm going to do so in the form of a minute order.

18   But if there are other -- I'd like to know what is the

19   state of the exhibits right now so that I can give you

20   rulings on most of the exhibits before trial.

21             And I will tell you, since I'm doing it before

22   trial, if there are some that there is a -- that's

23   indicated that someone is going to be called to provide

24   a foundation and there is not agreement on foundation,

25   and if that person is not called, then I can be asked to

```
 1   reconsider that ruling at the trial.  In other words, if
 2   you agree on foundation, no; but on the other hand, if
 3   there is not agreement and the foundation of a witness
 4   is not called by the party who's the proponent of the
 5   exhibit, then you can give a -- the other side can ask
 6   that I reconsider my ruling.  But I'm going to try to
 7   give you advanced rulings so your game plan can be quite
 8   organized before we start the trial because when we
 9   start, we're going to move right along.
10            So are there other matters that you want to
11   give me some argument on?
12            MR. CARDANI:  May I have a moment, Your Honor?
13            THE COURT:  Yes.
14            (Discussion held off the record.)
15            THE COURT:  Okay.  Actually, I hadn't seen
16   this, but I've been busy trying to listen to your other
17   thing.  Apparently, I do have a list provided that
18   certain exhibits are withdrawn by the government and
19   certain ones are added.  And have you informed defense
20   of which witnesses -- or which exhibits have been
21   withdrawn?
22            MR. CARDANI:  Yes, Your Honor.  That same list
23   was provided to Mr. Wax with a full set of changes.  And
24   by way of background, when we met -- we met in Portland
25   for the better part of a day, the defense and us.  A lot
```

1  of the government's exhibits contain surplusage at the

2  bottom.  You run something off the printer, it has some

3  extra stuff that we had to scrub.  So the bottom

4  category there, we had to do a lot of work.

5          THE COURT:  Where changes are made.

6          MR. CARDANI:  Pardon?

7          THE COURT:  Where it says changes made to

8  exhibits.

9          MR. CARDANI:  Yes, Your Honor, by and large

10  that's what that was done for.

11          Certain exhibits we've reconsidered and

12  withdrawn, as we've noted.  And others we have added.

13  We've provided those to the defense.  By and large these

14  are the ones that have been in their possession for

15  quite some time.  And so that list right there is

16  accurate through today.

17          There'll be a few exhibits along the way, we

18  anticipate minor changes along the way, we may have some

19  additions.  But this brings us up to speed.

20          The defense was provided with all this stuff.

21  We've updated the court's books.  Special Agent Anderson

22  did that today and updated the court's books.  So we

23  should all be on the same sheet with respect to this

24  list.

25          THE COURT:  Mr. Baker, I didn't try to remember

1    exhibit numbers and so on when I was reviewing this this

2    weekend.  Do you know whether -- well, Mr. Wax has -- do

3    you have objections to any of those that are under the

4    category "exhibits added"?  And have you given me those

5    objections?

6            MR. WAX:  I believe we got these on Friday,

7    Your Honor.  And I looked at them yesterday.  We will

8    have some objections.  We have not been able to put that

9    together.  We do have a number of other exhibits that

10   we've identified that up to now that we intend to offer.

11   I've just not had the time to get those into a

12   supplemental list and get copies to the government.

13   We'll try to get that done this week.

14           THE COURT:  All right.  Get me any objections

15   you have this week also, please.

16           MR. WAX:  Yes, we'll do so.

17           THE COURT:  All right.  Anything further?

18           MR. WAX:  Yes, Your Honor, a couple of things,

19   if we could, please.

20           THE COURT:  You may.

21           MR. WAX:  First is a ministerial type question.

22   As we read the court's minute order, we understood that

23   you wanted exhibits in folders.

24           THE COURT:  Yes.

25           MR. WAX:  And we provided you notebooks.  I did

 1   bring down a set of the exhibits.  We had previously

 2   marked each one divided out in a folder, which, if you

 3   would still like those, we would like to leave them with

 4   you today.

 5          THE COURT:  We try to do that with our -- sort

 6   of our record exhibits.  And then the reason they are

 7   useful for us -- the books can work too, but as you

 8   know -- well, if you don't, you will find out, that I

 9   want to know at least on a daily basis which exhibits

10   you intend to use with a witness so that when the

11   witness takes the stand, those exhibits can be in the

12   folders on the -- at the stand with them, and so we

13   don't waste time fumbling for exhibits.

14          MR. WAX:  We will leave those before we leave.

15          THE COURT:  Thank you.  That's what they are

16   for.  I think Ms. Mermis may have started that.  It

17   works pretty well, so.

18          MR. WAX:  Okay.  In terms of the exhibits that

19   we have marked, we noted in our pleading portion of the

20   exhibit list, that we distinguish between exhibits that

21   we are offering in something akin to a case in chief and

22   documents that we intend to use or may use with

23   government witnesses in cross.  And we want to be sure

24   that as you are thinking about what we have offered,

25   that you keep in mind that many of those may be used

1    solely for cross-examination purposes.

2        THE COURT:  There are some, but if you want to

3    use them, that's what they'll be used for.  But the

4    question I have is more basic:  Do you want me only to

5    give you rulings on exhibits that you intend to use in

6    your direct case -- direct defense?  I want -- I'll

7    review all of them, but there are a number like that,

8    and that aren't admissible unless on cross.  There are a

9    number of things that are appropriate for, perhaps,

10   refreshing recollection, that sort of thing, but they're

11   hearsay, for example.

12       MR. WAX:  I think, Judge, that if there are

13   some that you view as out of bounds for any purpose, it

14   would certainly help us to know that.

15       THE COURT:  I'll try to tell you, even if it's

16   not a ruling upfront.  There are a number of them, for

17   example, that are hearsay, and that's only -- you know,

18   you can only use that for certain limited purposes.

19       MR. WAX:  We understand.  And we also intend

20   and believe that the rule of evidence permit us to use

21   hearsay with experts.  And I hope you'll keep that in

22   mind as well in terms of some of the ones that are

23   hearsay.

24       THE COURT:  Within limits, though.  Years ago I

25   tried condemnation cases about scenic easements on the

1    Rogue River.  And the expert witnesses when asked -- and

2    the government's witness was a witness named Cap

3    Vandagrift from Medford, and when asked how he came up

4    with his opinion he said, I talked to other people on

5    the river and asked them how much the view was worth to

6    them on their property.

7              MR. WAX:  I don't think we're going there, Your

8    Honor.  I think where we're going is where the Ninth

9    Circuit just gave us some guidance in the *Stever* case in

10   terms of exhibits.

11             THE COURT:  I know you are.  I'm just having a

12   little fun.

13             MR. WAX:  Well, I hear you, but I want my

14   client to be sure that he understands where we're at

15   here.

16             We also have a couple of witnesses we've

17   identified as people we will be adding to a witness

18   list, and we'll get that information out as well.

19             We, in the pleading portion of the lists, also

20   pointed out that if we understand correctly what the

21   government has provided to us in the nature of witness

22   and exhibit lists is their direct case only.  And if,

23   indeed, that is what they've done and the court is going

24   to, you know, permit that what I would call limited

25   disclosure, I think that it is more than appropriate to

1  not hold us to provide material that is really crossing

2  their case.

3           I think that it would be best in this situation

4  if they provided us a full set of materials, because we

5  have provided far more than I think the government has

6  any right to under the law.  And I just want to

7  re-emphasize that.

8           THE COURT:  I even remember the case that your

9  office appealed my --

10          MR. WAX:  And won.

11          THE COURT:  -- requirement --

12          MR. WAX:  And won.

13          THE COURT:  And won.  I still require it,

14  though.  Look at me.

15          MR. WAX:  I know that.  And, look, I did not

16  object, Your Honor.  And that's what I'm saying, I think

17  we've done more than the law requires.

18          THE COURT:  I don't really care what the Ninth

19  Circuit says about that.

20          MR. WAX:  Well, we do, Judge.

21          THE COURT:  Well, then don't provide it.  But

22  as you know, it makes more sense to sometimes, whatever

23  they say.

24          MR. WAX:  So --

25          THE COURT:  Congratulations on your win,

```
1    sincerely so.

2            MR. WAX:  Thank you.

3            The difficult thing today, Judge, is

4    Mr. Matasar and the condition of his wife.

5            THE COURT:  Yes.  I know that.  Please take my

6    best to their family.

7            MR. WAX:  I will do that.  I'm not sure that we

8    can be able to try this case on June 7th.  He has not

9    worked now for a week.  Today, while his wife is home,

10   she is at physical and occupational therapists.  I mean,

11   there are a whole series of things that they're dealing

12   with in terms of her condition, and she cannot at this

13   point be left alone.  He doesn't know, I don't know when

14   he will be able to get back to full engagement in the

15   case.

16           And the reality of our situation is that in the

17   division of labor, you know, we're able to go forward

18   today because I've been focusing on the, you know,

19   non-accounting aspects of the case.  He's been focusing

20   on the accounting portion.  And meetings that were

21   scheduled last week and this week with two of our

22   accounting experts unfortunately had to be cancelled,

23   and we don't know when they will be rescheduled.  Given

24   the --

25           THE COURT:  We're going to hold the schedule
```

1    for right now.  We have a month left, and we'll follow

2    it.  A lot of work has been done.  And there is some

3    things we can't do anything about, of course.  And I

4    hope that whatever I do will be humane, along with

5    right.

6           MR. WAX:  Well, we hope so, too, Your Honor.

7    At this point I just want everyone to be aware that

8    while we are, to the extent we can, going forward for

9    June 7th, I am very concerned that it's just not going

10   to be possible for us.  And we will get back to you

11   perhaps toward the end of the week when the Matasars

12   have a clearer picture of the progress, you know, that's

13   made this week, and what the next couple of weeks look

14   like.

15          I am trying to remember what the next time we

16   are scheduled to be back in court dealing with any

17   pretrial matters is, if we have anything.  We have

18   nothing currently on?

19          THE CLERK:  (Indicating.)

20          MR. WAX:  Well, you know, we submitted a series

21   of voir dire motions on Friday.  We hope to get a

22   proposed questionnaire to you tomorrow.  And at the

23   latest, that will be on Wednesday.

24          We have attempted to put together a factual

25   argument as to why a questionnaire and a more than

```
 1   usually intensive voir dire is needed in this case.  We

 2   hope you look on that with some favor.  And if so, think

 3   that it would be important to have at least some phone

 4   discussions about that so that if you are going to

 5   permit a questionnaire, that can take place getting out

 6   to the venire and getting the information back in plenty

 7   of time for us to actually do something with the

 8   information.

 9            THE COURT:  I'll give you a ruling on those

10   motions long before trial.

11            MR. WAX:  And, you know, you've seen that we

12   have in addition to the big motions dealing with the

13   evidence, we filed a couple of supplementals, and --

14            THE COURT:  I read them this weekend.

15            MR. WAX:  -- we -- I don't want to say eagerly

16   await, but we await your rulings.

17            THE COURT:  You'll get them soon.  I have some

18   ideas about them already.

19            MR. WAX:  If I can have a moment with my

20   colleagues who are filling in for Mr. Matasar.

21            THE COURT:  You may.

22            MR. WAX:  See if they can channel him to me.

23            THE COURT:  Of course.  No one can channel

24   Larry Matasar.

25               (Discussion held off the record.)
```

1           MR. WAX:  We will, Judge, be filing another

2      motion in a day or two similar to that which we've been

3      filing with respect to some of the exhibits, and it will

4      be requesting that you hold a hearing in advance of the

5      trial on any statements that the government seeks to

6      offer as statements of coconspirators under the

7      coconspirator exception to the hearsay rule.  And you

8      have pending our renewed requests with respect to

9      coconspirators.

10           I think that what we have seen in the

11     government's recent pleadings puts that issue into

12     higher relief and makes it clear that we're all

13     operating at this point in the dark to a certain extent

14     about who or what the government views as the scope of

15     the conspiracy.  And we certainly shouldn't be put in a

16     position in which we might call a witness the government

17     views as a coconspirator and we don't have any idea

18     about that.

19           So that if there are people believed by the

20     government and identified by the grand jury as

21     unindicted coconspirators, I think we need to know that,

22     and I think you need to do that so that you can make

23     rulings in advance of trial as to whether or not the

24     coconspirator rules would apply and render any

25     statements that the government seeks to offer as

1   admissible.

2          THE COURT:  Well, we have two experienced

3   prosecutors.  They are aware of the rules in that

4   regard.

5          MR. GORDER:  Thank you, Your Honor.  We have a

6   couple of issues we wanted to bring up.  On my behalf,

7   I'm told -- I was told late last week that there is a

8   letter on the way to me from the Prosecuting General's

9   Office in Russia about the proposed testimony of the FSB

10  officer that we've listed as our witness.  And my

11  understanding is the Russians are putting some

12  conditions on his testimony.  But I haven't gotten the

13  letter, so -- and I'm actually -- I at least have a

14  tentative appointment at the Russian Embassy in

15  Washington later this week to discuss their conditions.

16         So I wanted to alert the court and counsel that

17  the FSB officer may not ultimately testify.  So I

18  wouldn't spend a lot of time worrying about his exhibits

19  right now.

20         If that situation changes, we'll let everyone

21  know.  But at least if I understand the letter

22  correctly, we probably would not be calling him as a

23  trial witness, so -- but I haven't seen it.  So that is

24  part of the nature of dealing with foreign governments.

25         THE COURT:  Among those facts that don't

 1    matter, the former head of the Prosecutors in Russia was

 2    at a seminar I was the resource person for on a boat

 3    down the Volga River, and the important thing is his

 4    name was Evgenii, so he shared the same name as our

 5    little community here.

 6              MR. GORDER:  I'm not sure whether my letter is

 7    coming from him or not, Your Honor.

 8              THE COURT:  It's not.  He's doing something

 9    else now.

10              MR. GORDER:  Okay.  And then Mr. Cardani had a

11    few items.

12              MR. CARDANI:  There are a couple of exhibits,

13    Judge, that we've notified counsel that are in the

14    process of being finalized.  The Jeremy Christian (sic)

15    report is just a report that we're going to offer as a

16    summary for the jury to show which hard drives each of

17    our exhibits came from, and then we'll depict that on a

18    floor plan of al-Haramain's Ashland setting.

19              THE COURT:  You'll show that to Mr. Wax?

20              MR. CARDANI:  Yes, we will, yes.  The Al Rajhi

21    Bank records, there has been a lot of back and forth on

22    that.  We're told out of Washington that there is a

23    possibility that we'll get those in a format for

24    publication to the jury.  I just want you -- we've put

25    it on our exhibit list.  We'll provide counsel with

1    immediate notification if we get those things.  But for

2    now, we'll put that on the exhibit list in hopes that

3    we're going to be able to get that.

4            The AHIF exhibits, the series of exhibits -- I

5    talked to you about this at our list hearing, we were

6    hopeful the last time we met that we were going to meet

7    with the defense and come to some stipulations on the

8    foundational aspects of the exhibits that we have that

9    start with the prefix AHIF, and there are about 12 of

10   them.

11           I thought we were making progress on that and I

12   held off filing a motion on that.  But I'm ready to --

13   I'm within a day or two of being able to file that

14   motion.  If we're not able to reach the stipulations

15   necessary, then we're going to need some rulings from

16   the court because on a couple of exhibits, we need some

17   more information.  And unless there is some agreements

18   from the defense, then the information -- for example,

19   where Mr. Matasar got certain of the documents that he

20   gave us in response to the subpoena.  He acted as a

21   vehicle in delivering those records.

22           THE COURT:  Let me just ask this:  You need to

23   take your counsel on whether you file a motion, but what

24   I'd like you and the defense to discuss, though, in

25   addition to that, whether I would rule that Mr. Matasar

1    would have to testify or not is whether that can happen

2    in a proceeding before we seat a jury, so that we can --

3    if we have to do it, do it in that way.

4         MR. CARDANI:  And I thought we were making some

5    progress on that, Judge, that would obviate any of this,

6    but we're just not there.  I'll have a conversation with

7    Mr. Wax about this, hopefully before the end of the day

8    to see if we can do that and not have -- they make a

9    point that Mr. Matasar is not a true custodian of

10   records in the business to set the proper foundation for

11   business records under 803(6).  That's well taken.  And

12   I understand that.

13        But if we are not relying on that, but we're

14   relying on the fact that it's an admission of

15   al-Haramain's, this is a document that came out of the

16   premises.  It is relevant -- highly relevant and came

17   from a highly reliable source, the jury is entitled to

18   know that information.  And the court is entitled to

19   know that information when ruling on the admissibility

20   of it.

21        Because we gave Mr. Matasar the professional

22   courtesy of not having to show up at the grand jury or

23   have a custodian, a true custodian appear, when those

24   records were given to us long ago, we are going to need

25   some more information on that.  And I'm hopeful that we

1  can do that agreeably, but we may not be.

2          THE COURT:  Okay.

3          MR. CARDANI:  The trial schedule, just -- the

4  court has heard this over and over again, but we are all

5  very sensitive to Mr. Matasar's personal situation, and

6  I think that goes without stating.  But we would be

7  remiss if we didn't do all we could to hold the line on

8  the trial date.  This case --

9          THE COURT:  You don't need to say any more

10  about that.  I'm going to do my very best to have the

11  trial as it's currently set.

12          MR. CARDANI:  That's all I have.

13          THE COURT:  Anything further?

14          MR. WAX:  No, thank you.

15          THE COURT:  Yes.  Gentlemen and ladies, thank

16  you very much.  We're in recess.

17          (The proceedings were concluded at 3:06 p.m.)

18

19

20

21

22

23

24

25

1                    CERTIFICATE

2          I, Deborah Wilhelm, Certified Shorthand Reporter

3     for the State of Oregon, do hereby certify that I was

4     present at and reported in machine shorthand the oral

5     proceedings had in the above-entitled matter.  I hereby

6     certify that the foregoing is a true and correct

7     transcript, to the best of my skill and ability, dated

8     this 14th day of May, 2010.

9

10

11

12

13                         /s/ Deborah Wilhelm
                         _____
14                       Deborah Wilhelm, RPR
                         Certified Shorthand Reporter
15                       Certificate No. 00-0363

16

17

18

19

20

21

22

23

24

25