# Item #1

CR 05-60008-HO
Declaration

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

02- 601                                      Subpoena E-03-376

**TO:**    Al Haramain Foundation
3800 S. Highway 99
Ashland OR 97520

**SUBPOENA TO TESTIFY
BEFORE GRAND JURY**

SUBPOENA FOR:
( ) PERSON        ( ) DOCUMENT(S) OR OBJECT(S)

YOU ARE HEREBY COMMANDED to appear and testify before the Grand Jury of the United States District Court at the place, date, and specified below.

| | |
|---|---|
| **Place:** Federal Building<br>211 East Seventh Avenue<br>Eugene, OR 97401 | **Courtroom:** |
| | **Date and Time:** 07/16/03; 9:00 a.m. |

YOU ARE ALSO COMMANDED to bring with you the following document(s) and/or object(s):

Please see Attachment A incorporated herein by reference.
The dates covered by this subpoena are from January 1, 1997 through the present date.

**(Please see the disclosure statement on the reverse side of this subpoena.)**

«« SEE Additional Information/Requirements Listed on the Reverse Side »»
This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| | |
|---|---|
| U.S. MAGISTRATE JUDGE OR CLERK OF COURT<br>**DONALD M. CINNAMOND, Clerk of Court**<br>(BY) DEPUTY CLERK: | DATE:<br>06/19/03 |

ATTORNEY'S NAME, ADDRESS AND TELEPHONE NUMBER:
Christopher L. Cardani          Requesting Agent:
701 High Street                Special Agent Colleen Anderson
Eugene OR 97401                Internal Revenue Service-CID
Phone: 541-465-6771            Phone: 541-776-4342

This subpoena is issued upon application of the:

☐ Defendant   ☑ U.S. Attorney

*Revised 7/12/93*                          *U.S.D.C. for Oregon -- Grand Jury Subpoena*

ATTACHMENT TO SUBPOENA ISSUED TO: Al Haramain Foundation

FOR THE YEARS: 1997 - 2003

All corporate records and books of account relative to the financial transactions of the Al Haramain Foundation.

To include but not limited to:

ALL CORPORATE BOOKKEEPING RECORDS and other financial records including General Ledger, General Journals, all Subsidiary Ledgers and Journals, Gross Receipts and income records, Cash Receipts and Disbursement records and/or Journals, sales and Purchase records and/or Journals, Accounts Receivable and Payable Ledgers and records, Bad Debt records, Cost of Goods Sold records, Loan Receivable and Payable Ledgers, Voucher Register and all sales and expense invoices including all invoices documenting expenses paid by cash (currency ) or bank check (cashier or teller checks) and retained copies of any bank checks (cashier or teller checks.)

Records reflecting the receipt of funds from individuals and/or entities, including records reflecting the nature or classification of the funds received from the individuals and/or entities.

Records reflecting the allocation of funds to  individuals and/or entities, including records reflecting the final disposition of the funds by the individuals and/or entities. Records reflecting the nature or classification of funds allocated to individuals and/or entities.

Inventory records establishing beginning and ending inventories including inventory sheets, work-papers, and valuation records.  Records and work-papers reflecting the purchase, basis and depreciable life of assets.  Records and work-papers of sales of corporate assets such records disclosing the dates of purchase and sale, cost and sales price, records establishing or adjusting asset basis.

Corporate Minute Book, Stock Register or other records reflecting ownership of corporate stock.  All financial statements, bookkeeper's and/or accountant's workpapers used in the preparation of corporate records or tax returns.  Retained copies of all federal and state income, payroll and excise tax returns.

SAVINGS ACCOUNT RECORDS:  Including passbooks or bank statements, records reflecting dates and amounts of deposits, withdrawals, interest, debit and credit memos, deposit slips, records reflecting the identity of checks deposited, withdrawal slips, and records disclosing the disposition of withdrawals, Forms 1099, debit and credit memos. Records of any certificates of deposit, money market certificates, U.S. Treasury Notes or Bills purchased.

CHECKING ACCOUNT RECORDS:  Including bank statements, deposit slips, records revealing the identity of checks drawn on the account, checks deposited, all debit and credit memos, and Forms 1099 issued.

ESCROW AND LOAN RECORDS:  Including escrow files, applications, financial statements, loan collateral, credit and background investigations required, loan agreements, notes or mortgages, settlement sheets, contracts, retained copies of checks issued for loans, repayment records, including records revealing the date, amount and method of repayment (cash or check), checks used to repay loans and a record disclosing the total amount of discount or interest paid annually, records of any liens, loans correspondence files and internal memoranda relative to these loans.

RECORD FORMAT:  In addition to hard copies, records are requested in the form of magnetic media.  Data may be provided in 3 1/2 inch diskette.

# Item #2

CR 05-60008-HO
Declaration

# LAWRENCE MATASAR, P.C.

ATTORNEY AT LAW
621 S.W. MORRISON STREET, SUITE 1025
PORTLAND, OREGON 97205



TELEPHONE: 503-222-9830
FAX: 503-274-8575
EMAIL: larry@pdxlaw.com

July 11, 2003

VIA MAIL AND FAX

FAX:  1-541-465-6840

Christopher L. Cardani
Assistant United States Attorney
701 High Street
Eugene, OR  97401

        RE:    Al Haramain Islamic Foundation, Inc.

Dear Mr. Cardani:

        Pursuant to our telephone conversations, I am writing to inform you that I represent Al Haramain Islamic Foundation, Inc. and Perouz Sedaghaty with regard to a current IRS – CID investigation, including a subpoena dated June 19, 2003 requiring the production of documents on July 16, 2003.

        We have agreed that, on or before July 16, 2003, I will copy and send to your office approximately 250 pages of documents that I have been provided.  We have also agreed that we will discuss further compliance with the subpoena when you return from vacation in early August.

        Thank you for your consideration and courtesy in this matter.

        Yours truly,

        LAWRENCE MATASAR

LM/bg
cc:    Al Haramain Islamic Foundation, Inc.
       Perouz Sedaghaty

# Item #3

CR 05-60008-HO
Declaration

# LAWRENCE MATASAR, P.C.
### ATTORNEY AT LAW
621 S.W. MORRISON STREET, SUITE 1025
PORTLAND, OREGON 97205

TELEPHONE: 503-222-9830
FAX: 503-274-8575
EMAIL: larry@pdxlaw.com



July 15, 2003

Christopher L. Cardani
Assistant United States Attorney
701 High Street
Eugene, OR 97401

     RE:   Al Haramain Islamic Foundation, Inc.

Dear Mr. Cardani:

     Enclosed is a copy of the documents we discussed in the above matter.

Yours truly,

LAWRENCE MATASAR

LM/smw
Enclosure
cc:   Al Haramain Foundation
      Perouz Sedaghaty

# Item #4

CR 05-60008-HO
Declaration

**Re: Al Haramain Foundation financial records**

<u>**Financial details provided:  00001-00456**</u>

-Check dated 12/31/97 for $187,126.35, which appears to be for the purchase of the Ashland prayer house.

<u>1999</u>
-Monthly billing report that includes deposit and expenditure details

-Profit and Loss statement

-Balance Sheet

<u>2000</u>
-Profit and Loss statement

-Balance Sheet

<u>2001</u>
-Check detail which includes check expenditures

-Profit and Loss statement

-Balance Sheet

<u>**Missing Items:**</u>

-Escrow records pertaining to the purchase of the Ashland, OR prayer house
-Financial records indicating the actual donor(s) of the funds used to purchase the Ashland, OR prayer house

<u>1999</u>
-List of employees, sub contractors, and their functions
-List of individual donors associated with contribution income and how to reach these individuals for confirmation (address, phone number)
-Backup documentation pertaining to funds received from donors, including donation receipts
-Backup documentation showing funds used for charitable purposes including funds distributed to other charitable organizations, assistance of refugees, and funds sent to Kosovo, Chechnia, and Albania

## 2000

-List of employees, sub contractors, and their functions

-Reports that include deposit and expenditure details

-List of individual donors associated with contribution income and how to reach these individuals for confirmation (address, phone number)

-Backup documentation pertaining to funds received from donors, including donation receipts

-Backup documentation showing funds used for charitable purposes, including funds distributed to other charitable organizations, assistance of refugees, and funds sent to Kosovo, Chechnia, and Albania

-Escrow records pertaining to the purchase of the Springfield, MO prayer house

-Financial records indicating the actual donor(s) of the funds used to purchase the Springfield, MO prayer house

## 2001

-List of employees, sub contractors, and their functions

-Report that includes all deposit and expenditure details

-List of individual donors associated with contribution income and how to reach these individuals for confirmation (address, phone number)

-Backup documentation pertaining to funds received from donors, including donation receipts

-Backup documentation showing funds used for charitable purposes including funds distributed to other charitable organizations, assistance of refugees, and funds sent to Kosovo, Chechnia, and Albania

## Additional information:

-Who is currently in control of the organization? (directors, etc)

-Who is the religious leader who performs prayers?

-Who has control over the prayer house? (keys, locked gate, etc.)

-Who is David Jalajel and why is he receiving funds from the organization?

-At what point will I be able to speak with the two women who input the records? (Laleh & Summer)

-What was the charitable purpose behind the loan(s) to Midway Networks?

-Does the Al Haramain Foundation in Riyadh, SA control the funds for the US based organization?  If so, produce documentation reflecting that the organization retains necessary backup documentation reflecting contribution income and donations to other charitable organizations.

# Item #5

CR 05-60008-HO
Declaration

# LAWRENCE MATASAR, P.C.

ATTORNEY AT LAW
621 S.W. MORRISON STREET, SUITE 1025
PORTLAND, OREGON 97205

TELEPHONE: 503-222-9830
FAX: 503-274-8575
EMAIL: larry@pdxlaw.com



RECEIVED
SEP 1 2 2003
U.S. ATTORNEY
EUGENE, OR

September 10, 2003

Christopher L. Cardani
Assistant United States Attorney
United States Courthouse
701 High Street
Eugene, OR 97401

     RE:   Al Haramain Islamic Foundation, Inc.

Dear Mr. Cardani:

Following our meeting a few weeks ago, I have taken several steps toward providing the government with additional documents pursuant to your subpoena. I have spoken to Mr. Ghaty, reviewed numerous documents, met with Mr. Ghaty's previous attorneys in Ashland, and met with Mr. Ghaty's accountant in Medford.

My client has asked me to inform you that he intends to fully cooperate with the government's subpoena. However, I have so far been unable to review the numerous "backup" documents that you have requested. Therefore, I suggest that you and I meet to discuss this matter in approximately 30 days, by which time I expect to have obtained and reviewed the documents you have requested, or if not, to have taken substantial additional steps toward this goal.

Yours truly,

LAWRENCE MATASAR

LM/smw
cc:   Al Haramain Foundation
     Perouz Seda Ghaty

# Item #6

CR 05-60008-HO
Declaration

**Re: Al Haramain Foundation financial records**

**Financial details provided:  20001-20140**

-1998 Monthly billing report signed by Albuthe & Seda

<u>1999</u>

-Deposit for Refugees summary

-Office expenses for 1999

-Mailing expenses for 1999 & Jan. 2000

-Some deposits for 1999 (? Listed)

-Partial deposit listing for Refugees

<u>2000</u>

-Copies of three donated checks, (1) $50,000 ISNA, (2) $4,000 ISNA, (3) $196.75 from ?

-List of checks used to purchase Springfield prayer house; copy of B of A cashier's check for $318,291.74 & copy of B of A cashiers check to Kanan Law Firm for $10,000 used for purchase

-Sales agreement & closing statement for purchase of Springfield prayer house

-Agreement between Soliman & Abu Yunus for $186,644.70 dated 3/11/00; money deposited to head office for Chechnya relief funds.

-Copy of $21,000 BofA cashiers check to Soliman Albuthe dated 3/11/00 with notation Donations for Chichania Refugees.

-Letter of thanks from Aqueel to Mahmoud T. Al-Fiki for $150,000 to Chechnyan crisis.

-Partial deposit listing for Refugees (Jan& Feb?)

-Summary reports for Jan. Feb. April & May of 2000

-Statement of accts. For July 2000

-Some deposits for 2000 (?listed)

<u>2001</u>

-Profit and Loss statement from Jan.-April 24, 2001

-Register for ICSM 1/01-4/01

-Register for Al Haramain, sorted by amts. Deposits & checks.

**Missing Items:**

-Financial records indicating the actual donor(s) of the funds used to purchase the Ashland, OR prayer house

1999
-List of employees, sub contractors, and their functions
-List of individual donors associated with contribution income and how to reach these individuals for confirmation (address, phone number)
-Backup documentation pertaining to funds received from donors, including donation receipts
-Backup documentation showing funds used for charitable purposes including funds distributed to other charitable organizations, assistance of refugees, and funds sent to Kosovo, Chechnia, and Albania

2000
-List of employees, sub contractors, and their functions
-Reports that include deposit and expenditure details
-List of individual donors associated with contribution income and how to reach these individuals for confirmation (address, phone number)
-Backup documentation pertaining to funds received from donors, including donation receipts
-Backup documentation showing funds used for charitable purposes, including funds distributed to other charitable organizations, assistance of refugees, and funds sent to Kosovo, Chechnia, and Albania

2001
-List of employees, sub contractors, and their functions
-Report that includes all deposit and expenditure details
-List of individual donors associated with contribution income and how to reach these individuals for confirmation (address, phone number)
-Backup documentation pertaining to funds received from donors, including donation receipts
-Backup documentation showing funds used for charitable purposes including funds distributed to other charitable organizations, assistance of refugees, and funds sent to Kosovo, Chechnia, and Albania

**Additional information:**

-Who is currently in control of the organization? (directors, etc)

-Who is the religious leader who performs prayers?

-Who has control over the prayer house? (keys, locked gate, etc.)

-Who is David Jalajel and why is he receiving funds from the organization?

-At what point will I be able to speak with the two women who input the records? (Laleh & Summer)

-What was the charitable purpose behind the loan(s) to Midway Networks?

-Does the Al Haramain Foundation in Riyadh, SA control the funds for the US based organization?  If so, produce documentation reflecting that the organization retains necessary backup documentation reflecting contribution income and donations to other charitable organizations.

# Item #7

CR 05-60008-HO
Declaration

# LAWRENCE  MATASAR, P.C.

**ATTORNEY AT LAW**
621 S.W. MORRISON STREET,  SUITE 1025
PORTLAND, OREGON 97205

RECEIVED

OCT 3 0 2003

U.S. ATTORNEY
EUGENE, OR

TELEPHONE: 503-222-9830
FAX: 503-274-8575
EMAIL: larry@pdxlaw.com

October 27, 2003

Colleen Anderson
960 Ellendale, Suite A
Medford, OR 97504

    RE:    Al Haramain Investigation

Dear Ms. Anderson:

I have enclosed documents for your review, Bates numbers 300001 - 301522.

Yours truly,

LAWRENCE MATASAR

LM/smw
Enclosures
cc:    Pete Seda
       Christopher Cardani

# Item #8

CR 05-60008-HO
Declaration

# LAWRENCE MATASAR, P.C.
ATTORNEY AT LAW
621 S.W. MORRISON STREET, SUITE 1025
PORTLAND, OREGON 97205



TELEPHONE: 503-222-9830
FAX: 503-274-8575
EMAIL: larry@pdxlaw.com

February 26, 2004

Christopher L. Cardani
Assistant United States Attorney
United States Courthouse
701 High Street
Eugene, OR 97401

Dear Mr. Cardani:

I am writing to confirm that I represent Perouz Seda Ghaty regarding your investigation. I do not represent Al Haramain (USA), Al Haramain (Saudi Arabia), nor Soliman Albuthe.

I will suggest that Al Haramain (USA), Al Haramain (Saudi Arabia), and Mr. Albuthe obtain separate counsel on this matter, and I will suggest that their lawyers write you a letter of representation.

Thank you for your consideration.

Yours truly,

LAWRENCE MATASAR

LM/smw
cc: Perouz Seda Ghaty

# Item #9 - AHIF-1

CR 05-60008-HO
Declaration

**Bank of America**

VOID AFTER 90 DAYS

24-7030/0230    1001040568

Cashier's Check

AL-HARAMAIN FOUNDATION
PURCHASER

PAY  ***** TWENTY ONE THOUSAND AND 00/100

DATE 09/11/200_

$ 21,000.00

/// SOLIMAN ALBUTHE///

To
The
Order
Of

TWO SIGNATURES REQUIRED FOR AMOUNTS OVER $250,000.

AUTHORIZED SIGNATURE

Donation for Chichania Refugees

⑈"100 1040568"⑈ ⑆3 230 703 80⑆: 2840 1⑈⑈840 23"⑈

GOVERNMENT
EXHIBIT

AHIF - 1
05-CR-60008-FFO

# Item #9 - AHIF - 2

CR 05-60008-HO
Declaration

Bismillah
May prayers and peace be upon the Messenger Muhammad

This is an agreement bet Soliman and Abu Yunus.  This agreement states, that Abu Yunus is turning all monies and responsibilities that were collected for the Brothers and Sisters in Chechnya over to Brother Soliman.  Soliman states that he has received monies in the amount of $ _186644.70,_ and he also fully relieves Abu Yunus of all responsibilites to the money.

X _____

X _____

Date: 4th of Thul Hijjah, 1420

_March, 11, 2000_

Witness #1: _____

Witness #2: _____

_I deposit the Amanet in Alharamain hed office for Chechanya Refugees._

20033

GOVERNMENT
EXHIBIT

AHIF - 2
05-CR-60008-HO

# Item #9 - AHIF - 3

CR 05-60008-HO
Declaration

Bismillah
May prayers and peace be upon the Messenger Muhammad

This is an agreement bet Soliman and Abu Yunus. This agreement states, that Abu Yunus is turning all monies and responsibilities that were collected for the Brothers and Sisters in Chechnya over to Brother Soliman. Soliman states that he has received monies in the amount of $ 188465.⁰⁰, and he also fully relieves Abu Yunus of all responsibilites to the money.

X _____

X _____

Date: 4ᵗʰ of Thul Hijjah, 1420

Witness #1: _____

Witness #2: _____



GOVERNMENT
EXHIBIT
AHIF - 3
05-CR-60008-HO

AHQ87
300644

# Item #9 - AHIF - 4

CR 05-60008-HO
Declaration

IRCHASE PRICE $ 375,000 USD.

.ID BY:

| NAME | AMOUNT | REMARKS |
|---|---|---|
| 1. ALHARAMAIN FOUNDTAION | $ 275,000 USD. | |
| 2. MR. MOHAMMAD QADDAS | $ 20,000 | Board Member, Springfield, MO |
| 3. MR. WALEED ALHATWANI | $ 25,300 | Board Member, Springfield, MO |
| 4. MR. SAMEER ALHADRAMI | $ 50,000 | Board Member, Springfield, MO |
| 5. MR. KAANAN | $ 10,000 | Board Member, Springfield, MO |
| COMMUNITY FUND RAISING: | $ 105,350 USD | |
| ALHARAMAIN FOUNDTAION: | $ 275,000 | |
| TOTAL: | $ 380,300 USD | |

20005



GOVERNMENT
EXHIBIT

HIF - 4
05-CR-60008-HO
006  000-783 0399

Item #9 - AHIF - 5

CR 05-60008-HO
Declaration

## AGREEMENT OF SALE AND PURCHASE

THIS AGREEMENT, made this _____ day of _____, 2000, by and between Municipal Financial Group, Inc., a _____ corporation (hereinafter collectively referred to as "Seller"), and Al Haramain Foundation, a _____ foundation, (hereinafter referred to as "Purchaser").

WHEREAS, Seller is the fee simple owner of certain improved, real property located in Greene County, Missouri; and

WHEREAS, Purchaser desires to purchase, and Seller is willing to sell said property upon the terms and conditions set out hereinafter.

NOW, THEREFORE, in consideration of the premises and for good and sufficient consideration passing from each of the parties hereto to the other, the receipt whereof is hereby acknowledged by each party, and in consideration of the mutual promises contained herein to be performed by the parties hereto, and each party intending to be legally bound hereby, it is agreed as follows:

### SECTION 1
### SALE AND PURCHASE OF PROPERTY

1.01.    Agreement to Sell and Convey.  Seller hereby agrees to sell and convey to Purchaser, and Purchaser hereby agrees to purchase from Seller, subject to the terms and conditions hereinafter set forth, all that certain parcel of unimproved land, lying and being situated in the City of Springfield, County of Greene, State of Missouri, being more particularly described as follows:

See EXHIBIT "A"  attached hereto and incorporated herein

together with the following:

(a)    All and singular, the rights and appurtenances pertaining thereto, including any right, title, and interest of Seller in and to adjacent streets, roads, alleys, accesses, and rights-of-way.

(b)    Such other rights, interests, and properties as may be specified in this Agreement to be sold, transferred, assigned, or conveyed by Seller to Purchaser.

(c)    All site plans, surveys, soil and substrata studies, architectural renderings, plans and specifications, engineering plans and studies, and other plans, diagrams, or studies of any kind, if any, in Seller's possession which relate to the Property.

The parcel of land legally described in Exhibit "A" and depicted on the drawing in Exhibit A-1, attached hereto and incorporated herein, together with the improvements, rights, interests, and other properties described above, are collectively called the "Property".

1.02.    Purchase Price.  The Purchase Price for the Property (the "Purchase Price") to be paid for the Property shall be the sum of  Three Hundred Seventy Five Thousand ,DOLLARS ($375,000.00 ).  The Purchase Price shall be payable as follows:

1.03.    Escrow Deposit - Cash Deposit.  In order to secure the performance of Purchaser under the terms and provisions of this Agreement, Purchaser will deliver, to KANAN LAW OFFICE,  2914 E. 32nd Street, Suite 111, Joplin, MO 64804 Attention:  Lola L. Shaw, Paralegal, (the temporary escrow check holder), the following earnest money deposit and KANAN LAW OFFICE may endorse said check over to any qualified Title Company to hold as escrow holder (the "Escrow Deposit"):

(a)    At the complete execution of this Agreement, Purchaser shall deposit the amount of Ten Thousand  Dollars ($10,000.00) in the form of cashier's or certified check, to be held and disbursed by the Title Company in accordance with the terms and provisions of this Agreement, and such funds shall be applicable to the Purchase Price.  In the event Purchaser shall fail to consummate the transaction contemplated in this Agreement for any reason, except for either default  of Seller or the failure any of the conditions to Purchaser's obligations to be satisfied, the Title Company shall deliver $5,000.00 of the Escrow Deposit to Seller, and it shall be and become the Property of Seller, such sum being agreed upon as liquidated damages for the failure of Purchaser to perform the duties, liabilities, and obligations imposed upon it by the terms and provisions of this Agreement for the purchase of the subject Property;  and

(b) A cashier's or certified check or wire transfer in the amount of Three Hundred Sixty Five Thousand DOLLARS ($365,000.00 ) for the remaining balance due to be paid at the time of closing.

GOVERNMENT EXHIBIT

AHIF - 5
605-CR-60008-HO

SECTION 2
SURVEY AND TITLE COMMITMENT; PERMITTED EXCEPTIONS AND CONTINGENCIES

2.01.    Preliminary Title Report.  Within ten days after the contract has been fully executed by both parties, Seller shall cause the Title Insurance Company to issue and deliver to Purchaser, at Seller's expense, a current ALTA 1970 Form B (amended 10/17/70) Commitment for an extended coverage owner's policy of title insurance (the "Title Commitment"), accompanied by a copy of all recorded documents affecting the subject Property and which will constitute encumbrances against the Property at the Closing.  Purchaser shall give Seller written notice within fifteen days after Purchaser's receipt of the Title Commitment that the conditions of title as set forth in such Title Commitment is or is not satisfactory, and in the event Purchaser states that the condition of title is not satisfactory, Seller shall, at its sole cost and expense, promptly undertake to eliminate or modify all such unacceptable matters to the reasonable satisfaction of Purchaser.  Seller agrees to use its best efforts to satisfy said objections promptly.  In the event Seller is unable to satisfy said objections as to the Property within fifteen days after receipt of those objections, Purchaser then has the option to rescind the agreement or waive the objections, at its option, and (a) accept title subject to the objections raised by Purchaser, without any adjustment in the Purchase Price, in which event, said objections shall be deemed to be waived for all purposes, or (b) rescind this Agreement, whereupon the Escrow Deposit shall be returned to Purchaser by the Title Company, and this Agreement shall be of no further force and effect.

2.02.    Current Survey.  On or before May 26, 2000, Seller shall order and cause to be completed and delivered a currently certified ALTA certified boundary line survey with legal descriptions as to the Property, Improvements, Easements and all other matters in such detail as shall be required by the Title Company to remove any and all title exceptions as to items that would be disclosed by the Survey.  In the event the Survey shows any encroachments of any improvement upon, from, or onto the Property, on or between any building setback line, a property line, or any easement, said encroachment or easement shall be deemed to be a title defect unless included as a Permitted Exception.

(a)    Purchaser shall pay for the survey at closing.  In the event Purchaser does not close upon the Property, Purchaser shall pay for the survey; and

(b)    The Seller and Purchaser shall initial the final survey to evidence   agreement.

2.03.    Permitted Exceptions.  The Property shall be conveyed to Purchaser subject to no liens, charges, encumbrances, exceptions or reservations of any kind or character other than the following exceptions (the "Permitted Exceptions"):

(a)    The easements, liens, exceptions, and other encumbrances shown on the Title Commitment, which are affirmatively approved by Purchaser within 30 days after receipt of the title commitment.  Purchaser's failure to approve in writing any exception shall be considered to be a disapproval of such exception.

2.04.    Additional Contingencies.  This Agreement shall also be contingent upon approval by Purchaser, in Purchaser's sole discretion, of:

(i) this Agreement; and

(ii) the Property described herein (site) and improvements; and

(iii) Purchaser determining that:

(a)    adequate sanitary sewer and storm sewer or other suitable drainage facilities, water, gas and electric utility services are available to the Property and functioning well; and

(b)    all such utilities are either available in the adjacent public right of way or supported by recorded easements; and

(iv) Purchaser having a study period of sixty (60) days after the effective date within which to make, at Purchaser's expense, such tests and site assessments as it deems advisable to determine if there is an environmental condition (defined below) involving hazardous materials on or emanating from the premises.  The cost of such initial assessment shall be paid by Purchaser.  If the tests and/or site assessments indicate that there is an environmental condition involving hazardous materials, Purchaser shall have the option to extend the study period an additional sixty (60) days.  If Purchaser discovers an environmental condition (at Purchaser's sole discretion) involving hazardous materials during the study period, Purchaser may elect to rescind this agreement and all earnest money shall be returned to Purchaser.  "Environmental condition" shall include conditions with respect to soil, subsurface, surface waters, ground waters, stream sediments, air, and other material existing at or emanating from the real estate, regardless of whether such

environmental condition is naturally occurring or results from activities of Sellers or their respective predecessors in interest or others.

SECTION 3
PROVISIONS WITH RESPECT TO CLOSING

3.01.      Closing Date.  The consummation of the transactions contemplated by this agreement shall tentatively take place in the offices of the Title Company on such date (the "Closing Date") as Purchaser and Seller shall subsequently determine in writing, but in no event later than July 21, 2000.

3.02.      Seller's Obligations at the Closing   At the closing of the Property, Seller shall do the following:

(a)   Authority to Transfer.  Deliver to the Title Company any affidavits or other documents required by the Title Company to: authorize the execution and delivery by Seller of this Agreement; and all other documents and instruments necessary or advisable to consummate the transaction contemplated hereby.  All such copies shall be in recordable form.

(b)   Title Insurance Policy.  Cause to be furnished and delivered to Purchaser at Purchasers costs, after all instruments are recorded and returned and all requirements of the commitment are met, an owner's title insurance policy issued by the Title Company, insuring good and marketable fee simple title as to the conveyed tract in Purchaser in a face amount equal to the Purchase Price and Improvements on the Property totaling $375,000.00, and containing no exceptions other than the Permitted Exceptions, and other exceptions, if any, which Purchaser may, in Purchaser's sole discretion, consent to in writing.  The said policy shall be accompanied by such endorsements as Purchaser may reasonable require.

(c)   Affidavit.  Execute and deliver to Purchaser a certificate certifying, as of the Closing Date, that there are no mechanic's liens or other liens against the Property which are not shown of record on Title Company's form.

(d)   Warranty Deed.  Execute and deliver to Purchaser a General Warranty Deed or other appropriate deed, conveying the Property free and clear of all encumbrances whatsoever, except as Purchaser shall have accepted.

3.03.      Purchaser's Obligations at Closing.  Subject to the terms, conditions, and provisions hereof, and contemporaneously with the performance by Seller of its obligations set forth above, Purchaser shall deliver to Seller or Title Company, the following:

(a)   A cashier's or certified check or wire transfer in the amount of Three Hundred Seventy Five Thousand DOLLARS ($375,000.00 ).

3.04.      Closing Costs:  Seller.  Seller shall pay the following costs and expenses in connection with the Closing:  (a)  the costs of the preparation of the commitment and Warranty Deed or other appropriate deed; and (b) one-half (1/2) of the Closing fee.

3.05.      Closing Costs:  Purchaser.  Purchaser shall pay the following costs and expenses in connection with the Closing:  (a)  the costs of the preparation and recording of any loan documents; (b)  the costs of recording the Warranty Deed or other appropriate deed; (c)  the costs of the preparation of the Survey; (d)  Purchaser's attorney's fees and costs, and (e)  the premiums payable for the Owner's policy of Title Insurance to be furnished to Purchaser,   and (f) one-half (1/2) of the Closing fee.

SECTION 4
AFFIRMATIVE COVENANTS

Purchaser and Seller hereby agree as follows:

4.01.      Inspection.  Purchaser and its agents and representatives shall be entitled to enter upon the Property for inspection, soil tests, examination, and planning prior to the Closing.

4.02.      Further Assistance.  Seller and Purchaser agree to perform such other acts, and to execute, acknowledge, and/or deliver subsequent to the Closing such other instruments, documents and other materials as Seller or Purchaser may reasonably request in order to effectuate the consummation of the transactions contemplated herein and to vest title to the Property in Purchaser.

4.03.      Payment of Taxes.  General real estate taxes for the current year shall be prorated as of the date of closing.  The portion of tax attributable to Purchaser shall be charged to Purchaser at the time of the closing, and Seller shall be responsible for paying all taxes at the time they become due and payable, and shall provide Purchaser with proof of such payment.

4.04    Indemnity by Seller and Purchaser.  Seller and Purchaser agree to indemnify and hold harmless each and the other from and against, and to reimburse each and the other with respect to any and all claims, demands, causes of action, loss, damage, liabilities, costs and expenses (including attorneys' fees and court costs) asserted against or incurred by one against the other by reason of or arising out of (a) the breach of any representations or warranty of each to the other set forth in this Agreement, (b) the failure of each or the other to perform any obligation required by this Agreement to be performed by one or the other.

SECTION 5
SELLER'S REPRESENTATIONS AND WARRANTIES

Seller hereby represents and warrants as of the date hereof and as of the Closing Date:

5.01.    Marketable Title.  Seller has good, marketable and insurable title to the Property, free and clear of all mortgages, liens, encumbrances, tenancies, security interest, covenants, conditions, restrictions, rights-of-way, easements, judgments and other matters affecting the title except the Permitted Exceptions.

5.02    Environmental.  The Seller warrants that to the best knowledge, information and belief of the Seller, no hazardous substance or hazardous waste has been disposed of or otherwise placed or left upon the subject Property, nor have any reports been filed by or with any authority having jurisdiction disclosing the presence of any hazardous substance or hazardous waste upon the subject Property.

5.03    Condemnation.  Seller has no knowledge of any pending or prospective condemnation effecting the property or access thereto.

5.04    Conflicts.  The execution, delivery and performance of this Contract does not conflict with any instruments or agreements to which Seller is a party, or any judgment, decree, writ, order, rule or regulation to which Seller is subject.

5.05    Seller Knowledge.  Seller has no knowledge of

(i) any violations of any applicable law, ordinance, rule, regulation or order against or affecting the Property, or any litigation or other proceeding pertaining thereto including, without limitation, environmental laws, ordinances, rules, regulations and orders; and

(ii) any existing, presently pending, or threatened actions, suits or proceedings affecting the Property; or

(iii) any pending but uncertified, unsatisfied, unconfirmed or unrecorded special assessment which, when certified, ratified or confirmed would result in a lien of the Property.

5.06    No Utility Agreements.  Seller has not made any special agreements with the utility company which supplies the electrical current or gas for the Property, or any electrical or other equipment or facilities furnished except concerning the usual charges for consumption of electrical current and gas.

5.07    Leases.  There are no leases or other rights of occupancy for the Property and the property is vacant.

5.08    Further Agreements.  Seller shall not further encumber the Property by entering into easement agreements, restrictive covenants, or other matters.

SECTION 6
CONDITIONS TO CLOSING

6.01.    Conditions to Purchaser's Obligations.  The obligations of Purchaser hereunder to consummate the purchase is subject to the satisfaction, as of the Closing, of each of the following conditions, in addition to any conditions above stated, which conditions may be waived, in whole or in part, in writing, by Purchaser at or prior to the Closing.  In the event of the failure of any condition, the Title Company, shall immediately refund all Escrow Deposits to Purchaser,  and thereafter, this Agreement shall be null and void, and neither party shall have any further rights or obligations hereunder.

6.02.    Compliance.  Purchaser and Seller shall have performed, observed, and complied with all of the covenants, agreements, and conditions required by this Agreement to be performed, observed, and complied with by it prior to or as of the Closing.

20011

SECTION 7

PROVISION WITH RESPECT TO FAILURE
OF TITLE, DEFAULT, AND SECURITY DEPOSIT

7.01.    Failure of Title.  If Seller shall be unable to convey title to the Property or any portion thereof on the Closing Date in accordance with the provisions of this Agreement, (a) Seller shall, on or prior to the Closing Date, give notice of such inability (and the nature thereof) to Purchaser, and (b) Purchaser may either accept such title as Seller can convey, without abatement of the Purchase Price, or terminate this Agreement, in which event the Escrow Deposit shall be forthwith returned to Purchaser. . . .

7.02.    Default by Seller.  In the event that Seller should fail to consummate the transactions contemplated herein for any reason, except Purchaser's default or the failure of any of the conditions to Seller's obligations set forth herein to be satisfied as required herein, Purchaser may enforce specific performance of this Agreement and in such action shall have the right to recover damages suffered by Purchaser by reason of the delay in the acquisitions of the Property, and in which event the Escrow Deposit shall be forthwith returned to Purchaser (even though an action for specific performance has been commenced). No delay or omission in the exercise of any right or remedy accruing to Purchaser upon any breach by Seller under this Agreement shall impair such right or remedy or be construed as a waiver of any such breach theretofore or thereafter occurring. The waiver by Purchaser of any condition or of any subsequent breach of the same or any other term, covenants, or conditions herein contained shall not be deemed to be a waiver of any other condition or of any subsequent breach of the same or any other term, covenant, or condition herein contained.  All rights, powers, options, or remedies afforded to Purchaser either hereunder or by law shall be cumulative and not alternative, and the exercise of one right, power, option, or remedy shall not bar other rights, powers, options, or remedies allowed herein or by law.

7.03.    Default by Purchaser.  In the event Purchaser should fail to consummate the transaction contemplated herein for any reason, except default by Seller or should any of the conditions to Purchaser's obligations not be satisfied, Seller shall be entitled to $5,000.00 of the Escrow Deposit as liquidated damages and shall be and become the property of Seller, such sum being agreed upon as liquidated damages for the failure of Purchaser to perform the duties, liabilities, and obligations imposed upon it by the terms and provisions of this Agreement and because of the difficulty, inconvenience, and uncertainty of ascertaining actual damages, no other damages, rights, or remedies shall in any case be collectible, enforceable, or available to Seller other than as provided in this paragraph, and Seller agrees to accept and take $5,000.00 of the Escrow Deposit as its total damages and relief hereunder in such event.  No delay or omission in the exercise of any right or remedy accruing to Seller upon any breach by Purchaser under this Agreement shall impair such right or remedy or be construed as a waiver of any such breach.

7.04.    Attorney's Fees, Etc.  Should either party employ an attorney or attorneys to enforce any of the provisions hereof or to protect its interest in any matter arising under this Agreement or to recover damages for the breach of this Agreement, the losing party in any final judgment agrees to pay the prevailing party all reasonable costs, charges, and expenses, including attorney's fees, expended or incurred by it in connection therewith.

SECTION 8
BROKERAGE COMMISSIONS

8.01.    Brokerage Commissions.  Seller represents to the Purchaser, that Heyle Realtors & Counseling Services acts on behalf of Seller, and Seller is responsible for all brokerage commissions in connection with this transaction.

SECTION 9
GENERAL AGREEMENTS

9.01.    Risk of Loss.  All risk of loss or damage to the Property prior to Closing, including, but not limited to, loss by fire, windstorm, or other casualty, shall rest with Seller.  If, prior to the Closing, the Property is damaged as a result of fire or other casualty, Purchaser shall have the option to:

(a)    Accept title to the Property without any abatement of the Purchase Price whatsoever, and any insurance proceeds payable to the Seller or its successors or assigns shall be paid over to Purchaser at closing; or

(b)    Cancel this Agreement, in which event neither party shall have any further liability or obligation to the other hereunder and the Escrow Deposit shall be forthwith returned to Purchaser by the Title Company.

Said option shall be exercised by Purchaser by delivering to Seller written notice of such exercise on or before the tenth (10th) day following the date on which Purchaser received notice that such fire or other casualty has occurred, but in no event later than the Date of Closing. In the event Purchaser shall fail to exercise said option within the ten (10) day period, then Purchaser shall be deemed to have elected the alternative set forth in subparagraph 9.01(a) above.

9.02.    Assignability.  Subject to the terms of this Agreement, Purchaser and Seller shall not assign this Agreement.

9.03.    Notices.  Any notice to be given or to be served upon any party hereto in connection with this Agreement must be in writing and shall be given by certified or registered mail and shall be deemed to have been given and received when a certified or registered letter containing such notice, properly addressed, with postage prepaid, is deposited in the United States mails.  Such notice shall be given the parties hereto at the following addresses:

SELLER:                                      PURCHASER:
Kirk A. Heyle                                R. D. Kanan
Heyle Realtors & Counseling Services         KANAN LAW OFFICE
309 South National Avenue                    2914 East 32nd Street
Springfield, MO  65802-3420                  Suite 111
                                             Joplin, MO  64804

Any party hereto may at any time, by giving five (5) days written notice to the other party hereto, designate any other address in substitution of any of the foregoing addresses to which such notice shall be given and other parties to whom copies of all notices hereunder shall be sent.

9.04.    Binding Effect.  This Agreement shall be binding upon and shall insure to the benefit of the parties hereto and their successors and assigns.

9.05.    Time of Essence.  Time is of the essence of this Agreement.

9.06.    Law.  This entire Agreement shall be construed and interpreted under the laws of the State of Missouri.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement of Sale and Purchase on the day and year hereinbefore written.

SELLERS: Municipal Financial Group, Inc.

Printed Name:    _____
Title:           _____
Date of Execution: _____

PURCHASER:  Al Haramain Foundation

X _____
Printed Name:    _____
Title:           _____
Date of Execution: _____

LIST OF EXHIBITS

EXHIBIT A        Legal Description
EXHIBIT A-1      Property Drawing
EXHIBIT A-2      Currently certified ALTA certified boundary line survey with legal descriptions as to the Property, Improvements, Easements and all other matters

2943

# Item #9 - AHIF - 6

CR 05-60008-HO
Declaration

A. Settlement Statement

**U.S. Department of Housing and Urban Development**

OMB No. 2502-0265

| B. Type of Loan | | | | |
|---|---|---|---|---|
| 1. ☐ FHA | 2. ☐ FmHA | 3. ☐ Conv. Unins | Fee Number 036003 | Loan Number | Mortgage Insurance Case Number |
| 4. ☐ VA | 5. ☐ Conv. Ins. | | | | |

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "p.o.c" were paid outside of closing; they are shown here for informational purposes and are not included in the totals.

D. NAME AND ADDRESS OF BORROWER: AL HARAMAIN ISLAMIC FOUNDATION
1257 SISKIYOU BOULEVARD, ASHLAND, OR

E. NAME AND ADDRESS OF SELLER: MUNICIPAL FINANCIAL GROUP, INC.
1132 LUTTRELL, BLUE SPRINGS, MO 64015

F. NAME AND ADDRESS OF LENDER:

G. PROPERTY LOCATION: 2151 E. DIVISION
SPRINGFIELD, MO 658803

H. SETTLEMENT AGENT: FIRST ESCROW, INC.
PLACE OF SETTLEMENT: 1342 E. PRIMROSE, STE B, SPRINGFIELD, MO 65804
TIN: 43-1209358

I. SETTLEMENT DATE: 06/23/2000    RESCISSION DATE:

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| 100. GROSS AMOUNT DUE FROM BORROWER: | | 400. GROSS AMOUNT DUE TO SELLER: | |
| 101. Contract Sales Price | $375,000.00 | 401. Contract Sales Price | $375,000.00 |
| 102. Personal Property | | 402. Personal property | |
| 103. Settlement charges to borrower (from line 1400) | $6,071.00 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| ADJUSTMENTS FOR ITEMS PAID BY SELLER IN ADVANCE: | | ADJUSTMENTS FOR ITEMS PAID BY SELLER IN ADVANCE: | |
| 106. City/town Taxes | | 406. City/town Taxes | |
| 107. County Taxes to | | 407. County Taxes to | |
| 108. Assessments to | | 408. Assessments to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. GROSS AMOUNT DUE FROM BORROWER: | $381,071.00 | 420. GROSS AMOUNT DUE TO SELLER: | $375,000.00 |
| 200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER: | | 500. REDUCTIONS IN AMOUNT DUE TO SELLER: | |
| 201. Deposit or earnest money | $60,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | $50,573.65 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| ADJUSTMENTS FOR ITEMS UNPAID BY SELLER: | | ADJUSTMENTS FOR ITEMS UNPAID BY SELLER: | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes 01/01/2000 to 06/23/2000. | $2,779.26 | 511. County taxes 01/01/2000 to 06/23/2000 | $2,779.26 |
| 212. Assessments to | | 512. Assessments to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. TOTAL PAID BY/FOR BORROWER: | $62,779.26 | 520. TOTAL REDUCTIONS IN AMOUNT DUE TO SELLER: | $53,752.91 |
| 300. CASH AT SETTLEMENT FROM/TO BORROWER: | | 600. CASH AT SETTLEMENT TO/FROM SELLER | |
| 301. Gross amount due from borrower (line 120) | $381,071.00 | 601. Gross amount due to seller (line 420) | $375,000.00 |
| 302. Less amount paid by/for borrower (line 220) | $62,779.26 | 602. Less reductions in amt. due seller (line 520) | $53,752.91 |
| 303. CASH (☒ FROM) (☐ TO) BORROWER: | $318,291.74 | 603. CASH (☐ FROM) (☒ TO) SELLER: | $321,247.09 |

HUD-1 (3-86) - RESPA, HB 4305.2

PAGE 1

GOVERNMENT EXHIBIT

AHIF - 6
05-CR-60008-HO

## SETTLEMENT CHARGES

| | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|
| **9. TOTAL SALES/BROKER'S COMMISSION** BASED ON PRICE $375,000.00 @ 6 % = $22,500.00 | | |
| DIVISION OF COMMISSION (LINE 700) AS FOLLOWS: | | |
| 1. $22,500.00 to | | |
| 2. to NEYLE REALTORS & COUNSELING SERVICES | | |
| 3. Commission paid at settlement | | $22,500.00 |
| 4. | | |
| **700. ITEMS PAYABLE IN CONNECTION WITH LOAN.** | | |
| 01. Loan origination fee % | | |
| 02. Loan discount % | | |
| 03. Appraisal fee to | | |
| 04. Credit report to | | |
| 05. Lender's inspection fee | | |
| 06. Mortgage insurance application fee to | | |
| 07. Assumption fee | | |
| 08. | | |
| 09. | | |
| 10. | | |
| **800. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE:** | | |
| 01. Interest from 06/23/2000 to 07/01/2000 @ /day | | |
| 02. Mortgage insurance premium for mos. to | | |
| 03. Hazard insurance premium for yrs. to | | |
| 04. Flood insurance premium for yrs. to | | |
| 05. | | |
| **1000. RESERVES DEPOSITED WITH LENDER:** | | |
| 1001. Hazard insurance months @ per month | | |
| 1002. Mortgage insurance months @ per month | | |
| 1003. City property taxes months @ per month | | |
| 1004. County property taxes months @ per month | | |
| 1005. Annual assessments months @ per month | | |
| 1006. Flood insurance months @ per month | | |
| 1007. months @ per month | | |
| 1008. months @ per month | | |
| 1009. Aggregate Accounting Escrow Adjustment | | |
| **1100. TITLE CHARGES:** | $135.00 | $135.00 |
| 1101. Settlement or closing fee to FIRST ESCROW, INC. | | $130.00 |
| 1102. Abstract or title search to FIRST ESCROW, INC. | | |
| 1103. Title examination to | | |
| 1104. Title insurance binder to | | |
| 1105. Document preparation to | | |
| 1106. Notary fees to | $3,750.00 | |
| 1107. Attorney's fees to KANAN LAW OFFICES | | |
| (includes above items Numbers: ) | | |
| 1108. Title insurance to FIRST ESCROW, INC. | | $875.00 |
| (includes above items Numbers: FE5209 ) | | |
| 1109. Lender's coverage | | |
| 1110. Owner's coverage $875.00 ( $375,000.00 ) | | |
| 1111. ESCROW FEE | | $200.00 |
| 1112. ESCROW FOR MECAIDICS LIEN RELEASE | | $66,000.00 |
| 1113. | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES:** | | |
| 1201. Recording fees: Deed $21.00 ; Mortgage ; Releases | $21.00 | |
| 1202. City/county tax/stamps: Deed ; Mortgage | | |
| 1203. State tax/stamps: Deed ; Mortgage | | |
| 1204. OVERNIGHT FEES | | $60.00 |
| 1205. | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES:** | | |
| 1301. Survey to JOHN GORDON & ASSOC. | $1,250.00 | |
| 1302. Pest inspection to | | |
| 1303. | | |
| 1304. WARD PLUMBING - PLUMBING | | $1,143.65 |
| 1305. WADE WATSON - CLEANUP | | $825.00 |
| 1306. ATLAS - EST ($1,900.00) P.O.C. | | |
| 1307. | | |
| **1400. TOTAL SETTLEMENT CHARGES** | $6,071.00 | $90,573.65 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Borrower: _WALEED ALHATLARI_          Date: _____   Seller or Agent: _L. B. PRIOR, SEN. VICE PRES._          Date: _____

Borrower: _mohamed al kadas_          Date: _____   Seller or Agent: _____          Date: _____

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

_____          Date: _____   Settlement Agent: _JERRY W. MATNEY_          Date: 6-26-2000

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

# Item #9 - AHIF - 7

CR 05-60008-HO
Declaration

# Warranty Deed by Corporation

KNOW ALL MEN BY THESE PRESENTS:

That    MUNICIPAL FINANCIAL GROUP, INC.

of the County of   Jackson              in the State of   Missouri              , a Corporation

organized and existing under the laws of the State of                          party of the first part, in consideration of

TEN DOLLARS AND NO/1000————————————————————————— DOLLARS

to it paid by AL HARAMAIN ISLAMIC FOUNDATION, INC., A NOT FOR PROFIT CORPORATION
1257 SISKIYOU BOULEVARD, SUITE 212, ASHLAND OR  97520

of the County of                          and State of                          party

of the second part, the receipt whereof is hereby acknowledged, and by virtue and pursuance of a Resolution of the Board of

Directors of said party of the first part, does by these presents, Grant, Bargain, Sell, Convey and Confirm unto the said party

of the second part    its            heirs and assigns, the following described lots, tracts, or parcels of land, lying, being

and situate in the County of   GREENE              and State of  MISSOURI

to-wit:

ALL OF THE EAST 10 ACRES OF THE SOUTHEAST QUARTER (SE 1/4) OF THE SOUTHWEST
QUARTER (SW 1/4) EXCEPT THE NORTH 5 ACRES AND EXCEPT THE WEST 200 FEET OF
THE SOUTH 435 FEET, AND EXCEPT ANY PART THEREOF DEEDED, TAKEN OR USED FOR
ROAD OR HIGHWAY PURPOSES, ALL IN SECTION EIGHT (8), TOWNSHIP TWENTY-NINE (29),
RANGE TWENTY-ONE (21) IN GREENE COUNTY, MISSOURI. SUBJECT TO ALL EASEMENTS OF
RECORD AND ANY PART THEREOF BEING USED FOR ROADWAY PURPOSES.



TO HAVE AND TO HOLD the premises aforesaid, with all and singular the rights, privileges, appurtenances, and immunities
thereto belonging or in anywise appertaining unto the said part  y   of the second part, and unto   its     heirs and assigns, forever.
The said party of the first part hereby covenanting that it is lawfully seized of an indefeasible estate in fee in the premises herein
conveyed; that it has good right to convey the same; that the said premises are free and clear of any incumbrance done or suffered
by it or those under whom it claims; and that it will warrant and defend the title to the said premises unto the said party      of the
second part and unto   its          heirs and assigns forever, against the lawful claims and demands of all persons whom-
soever.  EXCEPT TAXES FOR THE YEAR 2000 AND THEREAFTER

IN WITNESS WHEREOF, the  MUNICIPAL FINANCIAL GROUP, INC.

the said party of the first part has caused these presents to be signed by its   Vice President        and

attested by its secretary, and corporate seal to be hereunto affixed, this the    19th   day of JUNE
A. D.  2000                          MUNICIPAL FINANCIAL GROUP, INC.

BY _____ (SEAL)
   _____ (SEAL)
   _____Secretary
   Richard A. Davis

-5209  Return to 1st Escrow    2151 E. Division

29011

GOVERNMENT
EXHIBIT

AHIF - 7
05-CR-60008-HO

# Item #9 - AHIF - 8

CR 05-60008-HO
Declaration

pseda

From:    Alharamain [haramain@alharamain.org]
Sent:    Monday, February 21, 2000 9:11 PM
To:      P
Subject: Re: Confirmation

No, I don't did you receive the money?

----- Original Message -----
From: P
To: Alharamain
Sent: Monday, February 21, 2000 10:54 Õ
Subject: RE: Confirmation

Salam

Do you know this brother?
I like to also advertise in Aljumah and Islamic Horizen For Dawa work and refugee relief fund InshaAllah.
Love you
Salam
AU

-----Original Message-----
From: Alharamain [mailto:haramain@alharamain.org]
Sent: Sunday, February 20, 2000 10:15 PM
To: Pete
Subject: Fw: Confirmation
Importance: High

Please AboYunns chick it and update me soon.
Jazak Allah hair
Soliman

----- Original Message -----
From: s-elfeki
To: haramain
Sent: Sunday, February 20, 2000 03:53 â
Subject: Confirmation

Dear Brothers

Al-Salamu Alaikom.
May Allah bless your efforts supporting our muslim brothers everywhere.

In regard to our previous correspondence, I have the pleasure informing you that I have already asked **my bank in London** to make a transaction to **your USA account**, using the details you provided in an earlier e-mail, as Zakat in order to participate in your nobel support to our muslim brothers in **Chychnia**, and here are the transaction details.

| | |
|---|---|
| **Donation made by** | Dr. Mahmoud Talaat El-Fiki |
| **From his account in** | Nation Bank of Kuwait (Intenational) Plc. - London |
| **To your account in** | Bank of America |
| **Transferred amount** | US$150,000 (A Hundred & Fifty Thousand US Dollars) |

300678

GOVERNMENT
EXHIBIT

AHIF - 8
05-CR-60008-HO

Value                  24/2/2000

What I am asking you to do, is to kindly:
1) Confirm that this amount would be used as ZAKAT
2) Inform me by e-mail as soon as you get the transaction
3) Send me a letter (original document from your establishment) confirming that the US$150,000 donation has been received as Zakat from Dr. Mahmoud Talaat El-Fiki.
Our mailing address is:
4 Ibn Kathir St. - Off Nile St.
Suez Canal Tower - 24/1
12311 Dokki
Giza - Cairo
Egypt

Please contact for any further details.
Your cooperation will be highly appreciated.
All the Best & Al-Salamu Alaikom Wa Rahmatu Allah.

300677

# Item #9 - AHIF - 9

CR 05-60008-HO
Declaration

بسم الله الرحمن الرحيم

**AL-HARAMAIN ISLAMIC FDN.**
Head Office - Riyadh
General Manager Office

مؤسسة الحرمين الخيرية

المكتب الرئيسي – الرياض

مكتب المدير العام

Ref. : ........................................

Date : ........................................

رقم : ........................................

التاريخ : 2001/2/21

Dear Brother Dr. Mahmoud T. Al-Fiki

As-Salaamu 'Alaikum Wa Rahmatullahi Wa Barakaatuhu,

On behalf of Al-Haramain Foundation management and staff, I would like to thank you for your generous donation of $150,000 (One hundred-fifty thousand dollars) as zakaat.

We appreciate your trust in Al-Haramain Islamic Foundation and assure you of our commitment to continue every possible effort to help ending the Chechnyan crisis.

We pray to Allah subhaanahu wa ta'aalaa to reward you and guide you to be amongst His devoted, pious servants.

'Aqeel Abdul-Aziz Al-'Aqeel
General Manager





GOVERNMENT
EXHIBIT

HIF - 9
05-CR-60008-HO—

20036

# Item #9 - AHIF - 10

CR 05-60008-HO
Declaration

As Salamu Alaikum
Explanation for the Items that was requested is as follows:

$300
$600
$846.64
$525
$182.64
$100
The above items were all for the accountant (Thomas Wilcox). He takes care of the taxes, IRS issues.

$397
The check was written to Br. Bilal that was working in the center, and it was for his airplane ticket. Later on it came out of his pay check.

$55
Membership for credit card for Alharamain.

$5000
It was written to Somalian Releif Agency for Sacrificing on Eid and distribute among the needy, per Br. Soliman.

$85
Membership for Costco, for Br. Aqeel and Br. Soliman which was refunded later to the account.

$1000
For shipping the books and other Items, also buying the things related to packaging.

$185.61
This Item was a part of the check written for credit card bill and was for the Alharamain's guests came to the center for work.

$2882.61
For Customs expenses for shipping books and other items from KSA.

$587.35
Refrigerator for down stairs of Alharamains building.

$399
$1425
Above items were paid for Br. Yusuf Estets and his family to come to Ashland and possible employment for Alharamain. First Item for Renting a car for them and second for Tickets to fly to Ashland and back.
$82.74
for the guests for center and the tent. It was combined expense.



GOVERNMENT
EXHIBIT

AHIF - 10
05-CR-60008-HO

300701

$50
$44.50
$32.50
$227.45
Above items were for 4th of July, for applying to enter the Parade, for renting the tables to put the
books on for Dawa, and buy some food for the brothers who helped.

*(handwritten: PERC) (VOLANTARY)*

$1000
Tax attorney Retainer, Miller and Nash Comp. They worked for Alharamain's tax questions,
problems,????????????????????????????

*(handwritten circled: Solutons $)*

$21,000
$131,300
The first Items was written per Br. Soliman, and the 2nd check was signed by Br. Soliman. so he
knows the details of them.

$320
$540
The items above was for hey for the camel in the center.

$650
$440
Custom expenses for shipping of books and other items from KSA.

$2000
Was sent to springfield for their Iftar in Ramadhan per Br. Abdul Aziz AlShoumar.

$16,000
Was sent to Springfield per Br. AbdulAziz Alshoumar

$20,000
Was sent to AlMadina Islamic School, Per Br. Soliman

$318,291.74
Check was made to First Scrow Inc. ???????????????????????????????????????????

*(handwritten: For PERCHASE of MASSI)*

$5000
$10,000
Loan Repayment to Abu Yunus. The account didn't have funds in it, Abu Yunus put these
amounts in there and Alharamain paid him back.

$2,266.66
Check was written to Br. Abdul Qadir for work in summer camp in Ashland, OR. Year 2000
$600
Repairs, Cleaning and painting the Musallah.

300702

$4900
$100 [illegible handwriting]
Bank charges for stablishing Merchant account.

$1200
To Al Huda Islamic School, donation to a needy sister. Per Br. Soliman.

$134.96
For taxes.

$109.79
For shipment which was paid mistakenly out of account, was refunded in 2001.

$10,000
Was written to Islamic center of Springfield by Br. Soliman

$481.25
The corrected postage amount is $284.94

*[handwritten notation]* Shipping charges amount refunded in 2001

300703

# Item #9 - AHIF - 11

CR 05-60008-HO
Declaration

Brother Abu Yunus
Assalamu Alaikkum Warahmatullah.

Alhamdu Lillah I am in good health and seek the same for you from Allah.

Your message raised 2 questions on the center's accounts.

1.   Payments made during the current period for an event in the previous period.

Let us take some specific instances. All transactions for the year 1999 should be shown separately, because they belong to a period when brother Soliman was handling the affairs of the center.

Any cheque drawn during 1999, but realized in year 2000, belongs to 1999. These amounts should have been shown in 1999 when the cheque was drawn. You can **HIGHLIGHT** these payments on the bank statement for year 2000. This will enable us to reconcile the bank statement with your accounts.

Any cheque drawn during year 2000 for an event relating to year 1999. This amount should be informed to brother Soliman, so that he would know about it. The accounts for 1999 will be adjusted accordingly to give a true picture of 1999 activities. As for the money involved, we will either reimburse this amount separately if necessary or adjust the year 2000 accounts to eliminate the expense. Please advice immediately, if there are any payments due for 1999 activities.

2.   The miscellaneous expenses, you have raised are valid. We have discussed and have the following suggestions:

- **Repairs:**

    *Minor Repairs* are already provided for, in the budget under Utilities.
    *Major Repairs*, You should provide cost involved, and obtain prior approval. We will provide the funds when needed.
    As for the repairs for the accommodation, please provide the cost involved, the period involved, so that it may be presented to those interested here.
- The **IRS payment** expected to be minimal, and we are proceeding with the appeal to exempt us from Tax. However, until such time you can give us an estimate and when a payment is made, please show them under Utilities category.
- **Legal Fees:** When you have such expenses, please provide details and instances. We will arrange with you for such situation.
- Please provide a list of the county charges and Taxes we should pay every year. We estimate them to be minimal, and can be shown under Utilities too.
- What is the **accountant fee** you have indicated? What is the amount involved?
- **Donation of $1,200/-** , we will check-up with Brother Soliman.

3.   You have shown $5,000/- as merchant account in February 2000. Please provide details of these expenses, the nature of expenses etc.,



GOVERNMENT
EXHIBIT
AHIF - 11
05-CR-60008-HO

300452.

4. Whenever you have an expense not provided in the budget, please show them below the Total as you have shown in February Report. This will enable us to concentrate on these new expenses. Later, when we get your clarification, we will advise you where to show them.

5. Please fax the Bank Statements for the months ending Jan/Feb/Mar.2000.

Please answer all our questions so we can get the clear picture.

Please let me know if you have any question or clarification.

*Your brother in Islam*
*Abdulaziz. S Al-Shoumar*
*USA Dawah Group*

ROSE
BOYE
NURUNNEHR
AFROZE

300453

# Item #9 - AHIF - 12

CR 05-60008-HO
Declaration

# MONTHLY SUMMARY REPORT

February 2000

| CATEGORY | APPROVED AMOUNT $ | THIS MONTH EXPENSES | CUMULATIVE EXPENSES UP TO DATE | BALANCE |
|---|---|---|---|---|
| Salaries | 18,000 | 0 | 397 | 17603 |
| Utilities/Tax/Tel/Elect/Water | 7,200 | 1444.59 | 5117.81 | 2082.19 |
| Tent Project | 6,000 | | | 6000 |
| Public Relation/ Hospitality | 3,000 | 129.61 | 212.35 | 2787.65 |
| Post/Mail | 15,000 | 298.32 | 2705.20 | 12294.80 |
| TOTAL | 49,200 | 1872.52 | 8432.36 | 40767.64 |

Merchant Account $5000, Donation for sister $1200, is not included in Total Balance.

Approved By
Ashland Office Manager

GOVERNMENT EXHIBIT
AHIF - 12
05-CR-60008-HO
CANDELS 800.783.0300

300685

# MONTHLY SUMMARY REPORT
## March 2000

| CATEGORY | APPROVED AMOUNT $ | THIS MONTH EXPENSES | CUMULATIVE EXPENSES UP TO DATE | BALANCE |
|---|---|---|---|---|
| Salaries | 18,000 | 2024.20 | 2421.20 | 15578.80 |
| Utilities/Tax/Tel/Elect/Water | 7,200 | 5232.46 | 10350.27 | -3150.27 |
| Tent Project | 6,000 | 401.87 | 401.87 | 5598.13 |
| Public Relation/ Hospitality | 3,000 | 76 | 288.35 | 2711.65 |
| Post/Mail | 15,000 | 2532.39 | 5237.59 | 9762.41 |
| TOTAL | 49,200 | 10266.92 | 18699.28 | 30500.72 |

Western Somali Relief Agency $5000, To Brother Soliman $21000, To Brother Soliman $131300, are not included in the Total Balance.

Approved By
Ashland Office Manager

30062

# Item #10

CR 05-60008-HO
Declaration



Garage
(Rm W)

Bathroom
(Rm V)

Kitchen
(Rm U)

Under
Kitchen

stairs

ALHARAMAIN
Foundation  USA
Islamic Educational
Center of America

Bedroom
(Rm Y)

Computer E Tower 5002X
SN# QFK01E0008726
Seda 3

closet

Downstairs
Living Room
(Rm T)

Seda 10
ASUS Tower
Barcode 04B544

Downstairs
Office
(Rm X)

Seda 8 and 9
HP Pavilion 8370
SN# US835051159

fireplace

Seda 6
Computer tower
Barcode 044625

Porch
(Rm Z)

Bedroom
(Rm AA)

Deck

Deck

3800 S. Hwy 99
Ashland, OR
(Lower Level)



Kitchen (Rm Q)

Bathroom (Rm R)

Bedroom (Rm P)

Bedroom (Rm O)

Bedroom (Rm M)

Hallway (Rm N)

Bathroom (Rm L)

Deck

Deck

Prayer (Rm J)

Foyer (Rm K)

stairs

wood stove

closet space (Rm H)

Seda 1 and 2
Computer Tower
Barcode 046941

fireplace

Living Room (Rm I)

ALHARAMAIN Foundation USA

Deck

Kitchen (Rm G)

Laundry Room (Rm D)

Closet (Rm F)

Bathroom (Rm C)

Office closet (Rm B)

Seda 4
Compaq Contura
Laptop FCC ID:
CNT5M628

Pantry (Rm E)

Office (Rm A)

Seda 5
Macro Voice
Computer MAX100
Model #60427

Seda 7
IBM Aptiva Tower
SN#1S2140L6125DM623

3800 S. Hwy 99
Ashland, OR
(Upper Level)