```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF OREGON

 3   UNITED STATES OF AMERICA,        )
                                      )
 4                   Plaintiff,       ) No. 05-60008-2-HO
                                      )
 5     v.                             ) July 27, 2010
                                      )
 6   PIROUZ SEDAGHATY, et al.,        ) Eugene, Oregon
                                      )
 7                   Defendants.      )

 8


 9              TRANSCRIPT OF ORAL ARGUMENT

10         BEFORE THE HONORABLE MICHAEL R. HOGAN

11           UNITED STATES DISTRICT COURT JUDGE

12

13

14                        -:-

15

16

17

18

19

20

21

22

23              Deborah Wilhelm, CSR, RPR
                     Court Reporter
24                   P.O. Box 1504
                 Eugene, OR  97440
25                  (541) 431-4113
```

```
1                      APPEARANCES OF COUNSEL

2

3    FOR THE PLAINTIFF:     CHRISTOPHER L. CARDANI
                            United States Attorney's Office
4                           405 E. 8th Avenue, Suite 2400
                            Eugene, OR  97401
5                           (541) 465-6771
                            chris.cardani@usdoj.gov
6
                            CHARLES F. GORDER, JR.
7                           United States Attorney's Office
                            1000 S.W. Third Avenue, Suite 600
8                           Portland, OR  97204-2902
                            (503) 727-1021
9

10   FOR THE DEFENDANT:     LAWRENCE H. MATASAR
                            Lawrence Matasar, P.C.
11                          621 S.W. Morrison Street
                            Suite 1025
12                          Portland, OR  97205
                            (503) 222-9830
13                          larry@pdxlaw.com

14                          STEVEN T. WAX
                            Federal Public Defender
15                          101 S.W. Main Street, Suite 1700
                            Portland, OR  97204
16                          (503) 326-2123
                            steve_wax@fd.org
17

18

19

20

21

22

23

24

25
```

```
 1              (Tuesday, July 27, 2010; 3:23 p.m.)
 2                  P R O C E E D I N G S
 3              THE CLERK:  Case No. 05-60008, United States of
 4   America versus Pirouz Sedaghaty, oral argument on motion
 5   in limine.
 6              THE COURT:  Thank you.  All right.  Counsel,
 7   I'm familiar with your papers.  What else do you have on
 8   this?
 9              MR. MATASAR:  Do you want me to -- well, do you
10   want me to discuss the additional facts?
11              Your Honor, Mr. Cardani and I and Mr. Wax, and
12   actually most of the people here, including the agents,
13   not our client, met this morning to iron out some of the
14   facts.  And I think one of the things we've agreed to is
15   that the documents in the record, the AHIF series
16   numbers 1, 2, 4, 5, 6, and 7, are all documents that
17   contain a number from 20,001 -- a Bate stamp number from
18   20,001 to 20,140.  And that these documents, it turns
19   out, I have some visual aids, but I think they are
20   satisfied, it turns out that these documents were
21   provided to me by Washington lawyers on September 29,
22   2003.
23              So these documents were not present in Ashland
24   during the time of the events in the indictment.  The
25   documents were responsive to the subpoena, so that's why
```

1    they were provided.  The subpoena and the subsequent

2    communications between the government and me indicating

3    what documents they want, so that's why they were

4    provided.  There was no source requested or given at

5    that time.

6            Since then, of course, Ms. Anderson has gone

7    into the location of those documents at the time, but I

8    think we have shown both by the documents in my file and

9    also the lawyers who sent them to me have confirmed that

10   the documents were sent on September 26, 2003.  They

11   have copies of the documents without the Bate stamp.

12   Our copies are in -- rubber banded around the envelope

13   that they were sent in.  So I think we can all agree

14   that those documents were in the 20,000 series, and any

15   others that may come in before the court from 20,001 to

16   20,140 were not in Ashland at the time of the events of

17   the indictment.  Is that --

18            THE COURT:  So you have got 1 through 7,

19   omitting 3?

20            MR. MATASAR:  Yes, correct.  That was the

21   easier way to say it than I said it.

22            THE COURT:  I just want to make sure I got it

23   right.

24            MR. CARDANI:  Judge, by way of background, so

25   this has been a running discussion.

1          MR. WAX:  Yes, Your Honor, Exhibit Number 9 is

2     also in that series.  It, however, has been the subject

3     of a prior discussion between the parties, and agreement

4     with respect to its admissibility, along with a number

5     of other documents that related to communications

6     between Dr. El-Fiki and al-Haramain.

7          MR. CARDANI:  Okay.

8          MR. WAX:  So that's why we're not raising any

9     issues with respect to that one, even though it's in

10    that series.

11         MR. CARDANI:  So, Judge, just by way of

12    background, we served a subpoena on the corporate

13    offices of al-Haramain way back in '03 in the infancy of

14    this investigation.  Mr. Matasar assumed the

15    representation of Mr. Sedaghaty as well as al-Haramain,

16    and assumed responsibility for gathering and producing

17    corporate documents, which we're entitled to under the

18    subpoena.

19         We got one batch from Mr. Matasar that was very

20    limited.  That led to a series of discussions.

21    Mr. Matasar then went back and ended up producing a

22    second and yet a third batch of documents that

23    collectively were al-Haramain documents.

24         Special Agent Anderson spoke with Mr. Matasar.

25    And it's her recollection that he said at the time that

1    these documents all came from the Oregon offices, and

2    thus all of the AHIF documents, as we're calling them,

3    we can put in the offices of al-Haramain Oregon.

4         Mr. Matasar has recently resurrected his memory

5    by looking at his files, by spending some time with his

6    secretary and also speaking with, as I understand it, an

7    al-Haramain attorney from the East Coast who's

8    represented al-Haramain on other matters.  And that some

9    of these documents, the ones just described, 1, 2, 4, 5,

10   6, 7, and 9, now appear -- we just learned about this

11   yesterday -- not having emanated -- were not collected

12   from the Ashland offices.  Whether they were there at

13   one time or not, who knows.  But Mr. Matasar got these

14   from the D.C. attorney, and gave those to Special Agent

15   Anderson in what I understand is the second batch, which

16   they Bate stamped as the 20,000 series.

17        Then there were still documents that were

18   missing or we should have gotten, we had further

19   discussions.  And Mr. Matasar then controlled a third

20   production of documents that covered the remaining AHIF

21   exhibits, 3, 8, 10, 11, and 12, as I understand it,

22   which they are saying did come from the Ashland offices

23   of al-Haramain.

24        Now, we met with Mr. Matasar this morning.  He

25   discussed this and we trust him.  We take him at his

1  word on this.  I think for purposes of this trial, we

2  need to come up with appropriate language that

3  memorializes this, so that we can -- we're able to

4  produce Special Agent Anderson on the stand during

5  trial, and she can say, I got AHIF 1 through 12 from

6  Larry Matasar or a representative of the defendant,

7  however we want to put it.  We think that's enough in

8  terms of authentication of the documents to get the

9  conversation going towards admissibility and move on.

10      If we want to give the jury some more clarity

11  on this, I suppose we can.  But this provides new light,

12  recent light, on the origins of these documents.  But

13  the bottom line is these were all documents that were

14  given to us in response to that one subpoena, yet over

15  three dates.

16      So I think for purposes of our motion, we are

17  really in kind of a similar posture, these are all

18  documents provided in response to the subpoena, so I

19  think that given the fact that where we got them from,

20  the question then becomes are there rules of evidence

21  that should make them admissible?

22      We are unable, because of how we got these

23  documents, to produce custodians of records to say that

24  these were business records of al-Haramain.  We can't do

25  that.  We don't know the source of these documents.  But

1    I think from our brief, there are other rules of

2    evidence, for example, the two receipts, AHIF 2 and AHIF

3    3, which the defendant signed, which the codefendant

4    al-But'he signed.  Clearly admissions of a party

5    opponent.  So I think these are authenticated, given to

6    us by counsel, and as long as we have enough evidence to

7    make a minimal showing that the defendant was likely to

8    have signed those, and we do, we have known signatures

9    of the defendant, and a comparison of these documents,

10    and those of al-But'he, we'll show that there is reason

11    to believe that they both signed those -- that AHIF 2

12    and AHIF 3, render them inadmissible (sic) on those

13    basis alone.

14          And we have a series of other -- I've explained

15    them in my brief, but there are other reasons why a lot

16    of these other documents are admissible because they are

17    not hearsay at all.  We're not offering them for the

18    truth of the matter asserted.  And for that matter,

19    Exhibits 2 and 3, we're not offering for the truth, we

20    think that they are fabrications.  We're offering them

21    to show that they are not true.  And we found cases

22    indicating that when you are offering something to show

23    a falsity, not for the truth, that they are outside --

24    that they are not hearsay.

25          So we're prepared to go through them one by

1  one, but the new information, if I've stated it

2  correctly, I think just provides the court with a little

3  bit more of an understanding, and us a little bit more

4  of an understanding as to how these documents came into

5  our possession.  But the bottom line is they were all

6  produced to us as responsive documents to that subpoena

7  back in 2003.

8          THE COURT:  All right.  Why don't you just go

9  through and summarize your position on each of these one

10  by one then.  Now, on this one, what I have here is that

11  the defendant would agree to the admission of Number 1

12  if the government stipulates that the handwriting is of

13  Soliman al-But'he.

14          MR. WAX:  That is no longer correct, Your

15  Honor.  These new facts put Exhibit Number 1 in a

16  different light, and I will be articulating that when

17  Mr. Cardani is done.

18          I've also put together a one paragraph pleading

19  just to complete the record on that, which we can file

20  later on today or tomorrow morning.

21          THE COURT:  All right.  Mr. Cardani.

22          MR. CARDANI:  So --

23          THE COURT:  I won't rely on my notes here,

24  because, apparently, too many things have changed.

25          MR. CARDANI:  Yeah, I know.  It's hard to

1   respond on the fly to something that's changed so

2   quickly, but the writing -- this cashier's check comes

3   in under another exhibit all by itself.

4           The only additional material is that

5   handwritten notation "donations for Chichania refugees."

6   We're not offering that for the truth of the matter

7   asserted.  In fact, once again, we're offering that as

8   part of attempted coverup.  That this was not a donation

9   for Chechnyan refugees, that this was given to us in

10  response to a subpoena where I think that there was an

11  understanding by people involved in this transaction

12  that we were kind of onto them, and that this was an

13  attempt to throw people off, and make this appear to be

14  something that it was not.  So we're not offering that

15  comment for the truth of the matter asserted.

16          We don't know for certainty who wrote this.  It

17  probably was al-But'he, we don't know, and we couldn't

18  stipulate to that.  But I don't think we need to get

19  there because this was given to us by the defense again

20  in response to that subpoena and we're not offering it

21  for its truth.

22          THE COURT:  Number 2.

23          MR. CARDANI:  Not offered for the truth.  But

24  in any event, it's signed by Defendant Sedaghaty.  It's

25  an admission.  It's signed by Soliman al-But'he.  It's a

1    coconspirator statement.

2            THE COURT:  Do you have evidence on whether

3    these are their signatures?

4            MR. CARDANI:  Yes, yes.  We have -- we have

5    American Express Travelers Checks signed by al-But'he in

6    front of a bank witness that we'll be presenting at

7    trial.  And a side-by-side comparison will show that

8    there is reason to believe that that distinctive

9    signature is that of that known signature of al-But'he.

10           The writing in the bottom of AHIF 2 we're not

11   offering for the truth.  I cite a case, the *Black* case,

12   that's helpful in analyzing this as well on Exhibits 2

13   and 3.

14           So if I can move on to 3.

15           THE COURT:  Yes.

16           MR. CARDANI:  Yes.  That is the same verbiage

17   as AHIF 2, as I'm calling it, the words themselves

18   appear to be representing the same transaction.  But

19   there are differences.  And there are differences that

20   are very important to us.  And we want to show them to

21   the jury, because to us this appears as though Defendant

22   Sedaghaty and al-But'he kind of blew it when they tried

23   to make it look like this transaction was something

24   other than what we think it is.  And they signed two

25   different versions of this, putting in different amounts

1    of money.  They signed these things in different order.

2    One has witnesses that are purported to have seen this.

3    We don't know who they are as we talk now.  And then one

4    has the additional language about depositing the

5    amounts.

6          We think this is very good evidence, again, of

7    admissions by a party opponent because the defendant

8    signed this, and we'll show known signatures of the

9    defendant as well to allow you or the jury an ability to

10    conclude that the defendant did sign these documents.

11          THE COURT:  Number 4.

12          MR. CARDANI:  This is the most problematic of

13    our exhibits of the AHIF series.  This -- until the new

14    information about where this thing came from, this is

15    one of the documents that we learned yesterday came from

16    the D.C. lawyers, and we don't know if it was ever in

17    the Ashland offices.

18          But this is a summary of the funds used to buy

19    the mosque in Missouri, which is a very important part

20    of the case because it was that purchase that was

21    mischaracterized by the defendant in a tax return filed

22    by the IRS.  This shows the purchase price of $375,000

23    and also the people that donated money into this.

24          I say this is the most problematic for us

25    because we don't have the defendant signing this.  And

1    it -- if it was never in Oregon or at least the time it

2    was produced, if we can't put this in the Oregon

3    offices, it makes it a lot more difficult to offer this

4    as reflective of the defendant's intent.

5            But, again, I need some more time to think

6    about this.  I just heard about this last night because

7    we thought it was in the Ashland offices.

8            THE COURT:  5.

9            MR. CARDANI:  Number 5, Number 6, and Number 7

10   are all very routine real estate records that reflect

11   the purchase, again, of the Missouri building.  These

12   are almost duplicative of documents that we'll be

13   calling a lawyer from the Midwest who represented the

14   defendant and al-Haramain in the purchase of the

15   Missouri mosque.  He will say I sent the closing

16   documents and the documents related to the purchase of

17   the Missouri building to Mr. Sedaghaty in Ashland,

18   Oregon.  We have the mailing.  We have it as an exhibit.

19   It contains a lot of these same type of documents.

20           THE COURT:  Can he authenticate these

21   documents?

22           MR. CARDANI:  We can authenticate -- well,

23   until last night, I had these coming out of the Oregon

24   office.  And, obviously, that's going to be impacted as

25   well.  But what I wrote in my brief about this was that

1    because of where these were found or where these were
2    collected from and given to us, the offices of
3    al-Haramain, shows that it's within the defendant's
4    knowledge.  I can no longer say that.  But I'd like some
5    time to think about it, so I'd ask the court to reserve
6    ultimate rulings on this because I don't know if I have
7    other ways to authenticate these.
8              THE COURT:  Number 8.
9              MR. CARDANI:  Number 8, the defense agrees came
10   out of the Ashland offices.  And these directly relate
11   to the El-Fiki transaction, so I don't know if the
12   defense has any objections to this one.
13             THE COURT:  On 8 and 9, I show there are no
14   objections.
15             MR. WAX:  That's correct.
16             THE COURT:  Thank you.
17             MR. CARDANI:  So if I can move on to 10, 11,
18   and 12, the defense agrees that these came from the
19   Ashland office of al-Haramain.  And these are very
20   important intent documents, because these show a
21   knowledge of the treatment of the $150,000 that came in
22   from this Mr. El-Fiki.  They were in the defendant's
23   computer.  There are some notations on them that some
24   money, page 2 of Exhibit 10, we have a reference to
25   $318,000 and change.  That was a check that was made to

1   First Escrow for the purchase of the Masjid.  This is

2   the check used to buy the Missouri mosque.  And

3   indicates that the defendant was aware of the funds that

4   were necessary to buy that.  And that, again, was the

5   transaction that was mischaracterized in the tax return.

6           We want to be able to argue from documents like

7   this and the two next ones that the defendant was well

8   aware of the Missouri details.

9           THE COURT:  Were all three of these off the

10  computers, including 11?

11          MR. CARDANI:  If I can just have a moment.

12          AGENT ANDERSON:  Yes, all three of these were

13  found as attachments.

14          MR. CARDANI:  Agent Anderson says these were

15  all found within the computer or attachments to

16  documents within the al-Haramain seized computers.

17          MR. MATASAR:  Not this version.

18          MR. WAX:  Not these.  These were hard copies.

19  These are not from the computer.

20          MR. MATASAR:  They may also be in the computer.

21          MR. WAX:  Well, but these documents are not.

22  These are not from the computer.

23          AGENT ANDERSON:  Yeah, that's correct, but the

24  same --

25          MR. CARDANI:  If I can have a moment.

```
 1              THE COURT:  Off the record.

 2              (Discussion held off the record.)

 3              MR. CARDANI:  So, Judge, if I can go back on

 4    the record.

 5              THE COURT:  You may.

 6              MR. CARDANI:  The verbiage, I'm told, were

 7    found in the computers.  There is some handwritten

 8    notations on 10 and 11 that were not found in the

 9    computers.  So what happened here was hard copies of

10    this information that came out of the al-Haramain

11    computers was collected by somebody in the Ashland

12    offices, there were hard copies laying around, and it

13    had handwritten notations on it.  They were collected,

14    ultimately given to Mr. Matasar, and provided to us from

15    the Oregon offices.

16              THE COURT:  Okay.  As far as -- are you

17    satisfied with the sort of -- that you can show the

18    foundation absent Mr. Matasar's testimony?  In other

19    words, that they came out of the office?

20              MR. WAX:  We don't contest that they came out

21    of the office.

22              THE COURT:  You agree to that?

23              MR. WAX:  Yes.

24              MR. MATASAR:  Yes.

25              MR. WAX:  Yes.  We have worked over the last
```

1    couple of months on agreeing that they were in the

2    office.  And as we have set out in our pleadings, we

3    don't think that gets them into evidence.  But we do not

4    contest their origin and how the government obtained

5    them.

6            THE COURT:  All right.  Mr. Wax?

7            MR. WAX:  The new facts with respect to the

8    Exhibits 1, 2, 4, 5, 6, and 7, we believe are most

9    significant to the bases on which the government has

10   offered them.

11           At the outset, we don't believe that the

12   government's indication that these are very important to

13   their case has any bearing on the application of the

14   rules of evidence.

15           Second, we pointed out in our pleadings that

16   the fact that they were provided by Mr. Matasar through

17   this subpoena process in no manner renders them

18   admissible.  All it does is get them into the

19   government's hand.  We don't contest that.  But you then

20   have to make the determinations on admissibility.

21           With respect to the specifics, Exhibit Number 1

22   and Exhibit Number 2 raise the same issue as we see it.

23   And that is that these documents contain handwriting

24   that the government cannot establish who, where, or when

25   it was put on the document.  To the extent that they are

1  offering them as statements of a conspirator,

2  coconspirator, they would have to establish that the

3  entire document, including the handwriting on it, was

4  made during the course of the conspiracy.

5          The indictment alleges that the conspiracy

6  ended in October of 2001.  What the parties have been

7  able to agree upon is that these documents were not in

8  Ashland available for provision by Mr. Matasar by

9  gathering up records there.  They came into his

10 possession in September of 2003.  There is, as a result,

11 a lack of proof that the handwriting was made during the

12 course of and in furtherance of the conspiracy.

13          It may be that the check itself, item number

14 one, is admissible without the handwriting on it.  The

15 government has other versions of this check, which I

16 believe they have marked as exhibits that have come from

17 either the Bank of America or through their search

18 warrant process, and we do not object to the

19 introduction of the check itself.  But with respect to

20 item number one, the "donations to Chichania refugees,"

21 the Arabic on it, particularly the English "donations

22 for Chichania refugees," they're lacking a necessary

23 factual predicate.

24          The same thing would be true with respect to

25 Exhibit Number 2.  The handwriting "I deposit the

1    amanet" could have been written by, if it is

2    Mr. al-But'he, in September of 2003, when he provided

3    this to whomever he provided it, a lawyer, it appears,

4    that ended up in another lawyer's hands that was then

5    provided to Mr. Matasar.  We do not know.

6           The government cannot establish that this is

7    made during the course of the conspiracy and in

8    furtherance of the conspiracy.

9           If Mr. al-But'he was acting to engage in the

10   coverup that Mr. Cardani describes in 2003, perhaps he

11   could be charged with a separate effort to obstruct

12   justice, but we see no basis for attributing this

13   comment to Mr. Sedaghaty and having it introduced in

14   evidence against him.

15          We have in our pleadings articulated other

16   objections to Exhibits 2 and 3, which I won't repeat.

17          I was pleased to hear Mr. Cardani indicate that

18   he views AHIF 4 as, in his perspective, the most

19   problematic of the government's proffered exhibits.  We

20   believe, however, that the reason that he articulates

21   for this being a problem is equally applicable to

22   Exhibits 1 and 2 with the handwritten notation on them.

23          There is no evidence that this was produced in

24   Ashland.  No evidence that Mr. Sedaghaty ever saw it.

25   No evidence that this was produced during the course of

 1    and furtherance of the alleged conspiracy.  And they

 2    must establish those facts prior to the court's being

 3    able to exercise its gatekeeping function, and find this

 4    was during the course of and in furtherance of a

 5    conspiracy, if they don't give you facts from which you

 6    can make that finding, we don't see that there is any

 7    basis for admissibility.

 8           The same issue, Judge, exists with respect to

 9    Exhibits 5 through 7.  And, again, Mr. Cardani, you

10    know, has noted that he perceives a potential problem,

11    and we think that he is absolutely right.  The

12    government proffered 5 through 7 because they believed

13    that they could show that Mr. Sedaghaty had had those

14    exhibits in his possession.

15           THE COURT:  I don't need more on those just

16    now.

17           MR. WAX:  Thank you.

18           We've indicated no objection to 8 and 9.

19           With respect to 10 through 12, while they are

20    found in the property in Ashland, as we've articulated

21    in our pleading, that doesn't render them admissible.

22    The government has no proof who prepared them, why they

23    were prepared, or when.  There is no proof that they

24    were prepared as in the ordinary course of business.

25    And when they engaged in the sidebar and dialogue with

1    respect to there being multiple copies of these

2    documents, these in hard copy with handwriting on them,

3    other copies on the computer, there is no proof whose

4    handwriting this is, why it's put there, is it part of a

5    conspiracy, is it not part of a conspiracy, et cetera.

6             So we believe that for the reasons we have

7    articulated, plus these, they should be ruled

8    inadmissible.

9             THE COURT:  Thank you.  My rulings are as

10   follows:  On these AHIF Exhibits 1 through 12, Number 1

11   is received, but the handwriting is not received for its

12   truth.

13            Numbers 2 and 3 are received, but not for their

14   truth.

15            Number 4 is not received on this record.

16            Number 5, 6, and 7 I'll take under advisement.

17   I don't believe that sufficient authentication has been

18   provided.

19            Numbers 8 and 9 are received.

20            And Numbers 10, 11, and 12 are received, but

21   not for the truth of what is written on them --

22   handwriting that's on them.

23            All right.  There is another motion before the

24   court and that is the defendant's motion for a bill of

25   particulars.  Do you wish to be heard further on that?

1          MR. WAX:  I'm sorry, Your Honor, I did not hear

2    which motion you were referring to.

3          THE COURT:  A motion for a bill of particulars,

4    Number 374.

5          MR. WAX:  Your Honor, we have filed more than

6    one motion for a bill of particulars.  I regret that I

7    don't have that one with me.  Which one is this?

8          THE COURT:  All right.  I can pull it out.

9    Frankly, it's the one where you don't cite any Ninth

10   Circuit cases, I know that.

11         MR. WAX:  If your clerk has it handy, if I

12   could take a quick look.

13         THE COURT:  I know you filed lots of motions.

14         (Discussion held off the record.)

15         THE COURT:  Yeah.  This is the one where you

16   want to have all the coconspirator statements

17   identified.

18         MR. WAX:  Yes.  Oh, thank you.  We've

19   articulated there what we believe is a fundamental

20   unfairness with the way in which the case is currently

21   proceeding.

22         The government announced in one pleading

23   Mr. Al Shoumar as a coconspirator.  There is no

24   evidentiary basis for that.  And before any statement

25   can be admitted as a coconspirator statement, we believe

1    the government needs to make a showing, you have an

2    obligation to rule.  In terms of calling witnesses, for

3    all we know at this point, we may call a witness the

4    government decides is a coconspirator, and we should not

5    be put in the position in which we might call a witness,

6    find that the government declares that person a

7    coconspirator, and then in the court's instructions at

8    the end of the case if you give a coconspirator

9    statement instruction, find ourselves saddled with, you

10    know, having called a person who they view in one way,

11    we view in a different way without having had an

12    advanced ruling from the court about just who or what it

13    is that we're dealing with.

14              THE COURT:  All right.  Any -- do you wish to

15    be heard on that?

16              MR. CARDANI:  No.

17              THE COURT:  The motion is denied.  That can

18    happen at trial.

19              Now, what I have tried to do through Mr. Baker

20    here, is marshal all of the remaining issues and

21    exhibits that need rulings.  And it's my commitment to

22    try to -- no later than mid-week next week -- have out

23    something that resolves everything that's before me, so

24    you don't have to guess.  All right?

25              MR. CARDANI:  Yes.  I have a few other

1    matters --

2            THE COURT:  Good.

3            MR. CARDANI:  -- if the court has completed --

4            THE COURT:  Sure.

5            MR. CARDANI:  We, as the court knows from some

6    litigation involving the Al Rajhi Bank, we have now been

7    provided with a total of two batches of records from the

8    Al Rajhi Bank.  We are going to offer portions of them

9    at trial under a provision of law 18 U.S.C. Section

10   3505, which allows us to get foreign business records

11   properly certified into evidence without calling the

12   foundational witnesses.

13           Mr. Wax and Mr. Matasar have been provided

14   copies of this earlier today.  And I'd like to serve it

15   on the court now as well, but this is our notice that

16   we're required to provide the court and to the defense

17   of our intent to rely on this section of law to get

18   records in at trial without calling the witnesses.  So

19   if I could tender that to the court right now.

20           And we will be addressing this subject as well

21   in our trial brief going over this provision of law and

22   cite the court some Ninth Circuit cases of recent

23   vintage where this procedure has been followed.

24           THE COURT:  All right.  Anything further?

25           MR. MATASAR:  Do you have some more?

```
 1              MR. CARDANI:  I do, but --
 2              MR. MATASAR:  Alternate, however you want to do
 3    it.
 4              MR. CARDANI:  Schedules, Judge, we had -- we
 5    thought we were going to be done with this trial right
 6    now, so we planned some pretty lock solid vacations.
 7              THE COURT:  Sure.
 8              MR. CARDANI:  I'd like to give the court and
 9    the clerk's office some dates that Mr. Gorder and I are
10    not going to be in the district, and absent an
11    emergency, not able to attend to this trial -- pretrial
12    issue.  I'm leaving next Tuesday, August 3rd, and I'll
13    be gone until August 18th.  And Mr. Gorder will be
14    gone --
15              MR. GORDER:  I'll be gone, Your Honor, from
16    August 2nd through the 12th.
17              THE COURT:  Wonderful.
18              MR. GORDER:  Although, I'll be outside of
19    Roseburg as part of that, so I will be in the district.
20              MR. CARDANI:  On the Umpqua River, great
21    Internet service.  So we'll be ready to go when we
22    return, but I just wanted to advise the court of that.
23              We're working on our trial brief and jury
24    instructions.  And we'd ask that we have some deadlines
25    set to give the court adequate time to take into
```

1      consideration both of those types of submissions.

2              THE COURT:  Have I given you trial brief

3      deadline or jury instruction deadlines?

4              MR. CARDANI:  Not since the trial was

5      continued.

6              THE COURT:  All right.  How long do you want,

7      Mr. Baker?

8              MR. BAKER:  As much time as possible.

9              THE COURT:  When can you have them?

10             MR. CARDANI:  If we file them -- would the 19th

11     of August be too late?

12             MR. BAKER:  That should be good.

13             MR. CARDANI:  Thursday, the 19th.

14             THE COURT:  It's a deal.  I'll help you take

15     the medicine if you'll prescribe it.

16             MR. CARDANI:  Okay.  We'll file our court --

17     file the trial brief and jury instructions by the 19th.

18     That's all I had on my list, Judge.  Thank you.

19             THE COURT:  Mr. Matasar.

20             MR. MATASAR:  Your Honor, we had two things.

21     One is that, as you heard during the time that we talked

22     about continuing the case, we've divided up the case

23     kind of informally or formally within our defense team,

24     but I've been doing a lot of the issues concerning the

25     accounting, Mr. Wilcox, Ms. Anderson, we have an expert

1   that I met with from D.C., a man formerly head of the

2   Tax Exempt Division of the Internal Revenue Service.

3   And I've been doing that.  Mr. Wax has been doing the

4   other parts of the case.  And we had thought that it

5   would be best for us both to be giving various -- giving

6   parts of the opening statement in the case, and perhaps

7   the closing.

8          I know from my experience in state court where

9   I have seen this occur, there is, in fact, even a rule

10  in Oregon Rule of Civil Procedure, which, of course, is

11  very far from binding on this court, but which says

12  something like no more than two people can take part in

13  the opening and closing.  So it's assumed that two can.

14         We think it would be most efficient for the

15  court and for the jury if we could do that, and yet I

16  know Your Honor may have some strong feelings about

17  that.  And we'd probably rather know now than just have

18  Mr. Wax start, and then say Mr. Matasar, and then you

19  say, wait a minute, we don't want that to occur.  In

20  fact, we had some discussions about whether to raise it,

21  but I think it's fairest for all of us if we could do

22  that, if we could get your idea of that.  We think it

23  would be more efficient and better, but we'd like to

24  know.

25         THE COURT:  One lawyer per opening, one per

```
 1   closing.  Anything else?
 2           MR. WAX:  Technology and logistics in the
 3   courtroom.  Which table do we sit at during the trial?
 4   We've been on this side in all the pretrial proceedings.
 5   Will we continue to be here, or do you shift sides when
 6   the jury comes?
 7           THE COURT:  I've never paid it a second
 8   thought.  I did have -- there was a criminal case where
 9   we almost had a fist fight between the lawyers.
10           MR. MATASAR:  I was involved in one of those in
11   Judge Brown's first jury trial, yes.
12           THE COURT:  Wonderful.  We had an assistant
13   whose initials are JK who had a temper that came out one
14   morning.
15           MR. WAX:  Would we assume, then, we'll just
16   continue in these positions?
17           THE COURT:  Does anyone object to that?
18           MR. CARDANI:  No.
19           THE COURT:  No.  That's fine.
20           MR. WAX:  In terms of support in the courtroom,
21   I believe both sides are going to have courtroom
22   technology people.
23           THE COURT:  Yes.
24           MR. WAX:  Ms. Wells, who's in the audience,
25   came down today just to plug things in, and we were
```

```
 1   looking in Courtroom 3.  We may want to try to use a

 2   local -- I don't know what it's called.  Internet

 3   wireless --

 4        MR. MATASAR:  We tried a device, Your Honor,

 5   which turns cell phone signals into a small Wi-Fi spot,

 6   but it works almost everywhere but not really in this

 7   courthouse very well.  So it's very slow.  So we're

 8   going to try to get maybe the staff to provide us with

 9   an Internet connection so we can communicate amongst

10   each other and also research, whatever may be

11   appropriate.

12        THE COURT:  There is an Internet connection in

13   the room.

14        MR. MATASAR:  And that would be available to

15   us?  That would be great.

16        THE COURT:  Well, that's an interesting

17   question, because our head IT guy is worried about

18   security in this building.

19        MR. MATASAR:  I can see why he would be.

20        THE COURT:  And I think he's a little --

21   probably overboard on that.  But he has his job and I

22   have mine.  Why don't you see what you can do first.

23   You know, those cell phone -- whatever they are called,

24   I don't use one, but I know I've had a lot of lawyers

25   use them up on the fifth floor.
```

```
 1          MR. MATASAR:  The Verizon one doesn't work
 2   here.  We can try another device.  Maybe an AT&T or a
 3   Sprint one.
 4          AGENT ANDERSON:  My AT&T wireless card works in
 5   the courthouse.
 6          MR. MATASAR:  Well, we'll see what we can do.
 7          MR. WAX:  But if that works, that would be
 8   okay?
 9          THE COURT:  Yeah.  In terms of technology
10   breaks, we don't break for the day.
11          MR. WAX:  But we are planning on having two
12   redundancies.
13          MR. MATASAR:  Two lawyers, two computers,
14   somebody goes down, we're good.
15          MR. WAX:  Another table where we could have --
16   our investigators would be coming, sitting, notebooks, a
17   place to have that sort of thing.
18          THE COURT:  What I would rather I think you
19   do -- are you going to need that kind of help?
20          MR. CARDANI:  We're going to have Susan Cooke
21   here for our ALS, running this.
22          THE COURT:  Yeah.
23          MR. CARDANI:  She'll be here.
24          THE COURT:  If you have tables like that, we
25   have extra chairs in here because of our Sunwest case,
```

1    and it gets, you know, a cast of thousands.  So all

2    these chairs around the back, we can pull.  We can put

3    little tables on the sides over there, if we need to.  I

4    don't want any more up in the well, though, so --

5            MR. WAX:  In the back behind --

6            THE COURT:  That's right, on the side in the

7    back, yes.  There is room for them.

8            MR. WAX:  All right.  And, you know, we'll have

9    either a huge shopping type cart with notebooks.  And I

10   mean, we got --

11           THE COURT:  Sure.

12           MR. WAX:  And we had talked earlier with

13   Ms. Weller, I believe, about the possibility of having

14   an office or using the spare courtroom during the course

15   of the trial.  And we just want to be sure, if we can,

16   that we can have a place where we can do, you know, work

17   either early in the morning or at night, and not have to

18   be horsing things back and forth because both of us are

19   set up in Portland, and hope that we could have a

20   place -- Mr. Cardani and Mr. Gorder could certainly use

21   their office in this building.  And we hope that there

22   will be a place where we can set up shop as well.

23           THE COURT:  We'll find something for you.

24           MR. WAX:  Which would raise the issue of access

25   to the courthouse after hours for Mr. Matasar.  We're

1    not asking for it for our client.  But in Portland, my

2    key card for the courthouse will get me in 24 hours a

3    day.  And we hoped that we could arrange so that, you

4    know, the Federal Defender's staff and Mr. Matasar could

5    be using whatever space is set up for us.

6           THE COURT:  Somebody needs to take

7    responsibility.  What our marshal -- you know, I bring

8    in people for settlement conferences at off hours all

9    the time.  But I just can't have staff in and out, and

10   so on.  Someone is going to have to -- a couple of

11   people have to just be responsible for that.  And we'll

12   work it out with Mr. Barr.

13          MR. WAX:  Thank you.

14          MR. GORDER:  Your Honor, if I could just add

15   this, I don't know if the marshal --

16          THE COURT:  Ms. Weller, I wonder about the

17   conference room that's down out towards the entrance on

18   the side.  I don't know if that still has a key card on

19   that entrance or not.

20          MS. WELLER:  Your Honor, I can make

21   arrangements wherever you think would be appropriate.

22   Access to the building from the front has a key card

23   access, but the east side of the building does not have

24   a key card access.

25          THE COURT:  The other thing we might think

1    about, if it works for them, is Pretrial Services has

2    some empty offices.

3            MS. WELLER:  Yes.

4            THE COURT:  And that's very near a key card

5    entrance.  So let's inquire of them.  Because they are

6    set up as offices.

7            MS. WELLER:  Yes, Your Honor.  I'll check into

8    that.

9            THE COURT:  We only have two officers here, and

10    I built a big one.

11            MR. GORDER:  Your Honor, I was just going to

12    mention for Mr. Wax's benefit that the card that I have

13    that gets us into the courthouse in Portland, the

14    marshals programmed here so it works at the entrance.

15            THE COURT:  You can.  I will tell you, our

16    marshal's office is somewhat jealous of that

17    prerogative.  And so I'll probably have to speak to

18    them.  But that's why I'm going to have to say probably

19    that one of the two of you will be letting people in and

20    out of the building or something like that.

21            MR. WAX:  I'm more than happy to take

22    responsibility for it.

23            THE COURT:  Sure.

24            MR. CARDANI:  Speaking of technology, that

25    screen right there, can I utilize that for opening

1    statement?

2              THE COURT:  Yes.  It plugs into the floor over

3    here, sure.

4              MR. CARDANI:  All right.  We're going to be

5    offering a chart for use, you're going to hear a lot of

6    names and see a lot of faces.  We're going to have a

7    chart prepared.  We'll run it by counsel beforehand.

8    But we'd like this chart to be available as the case

9    goes, so that people -- jurors can associate individuals

10   and roles with faces.

11             THE COURT:  Let me see it before the morning of

12   trial.

13             MR. CARDANI:  Of course.  And we'll have a

14   PowerPoint or something for opening statement.

15             THE COURT:  Sure.

16             MR. CARDANI:  And lastly, the trial schedule,

17   we start bright and early Monday, August 30th.

18             THE COURT:  Yes.

19             MR. CARDANI:  And does the court anticipate a

20   full week that week?

21             THE COURT:  Yes.

22             MR. CARDANI:  And then the next Monday is Labor

23   Day.

24             THE COURT:  Yes.

25             MR. CARDANI:  Does the court have any intention

1    of holding court that day?

2              THE COURT:  I don't believe so.

3              MR. CARDANI:  Okay.  It helps for the

4    scheduling, and then we'll go the rest of that week.

5              THE COURT:  And then the trial will be over.

6              MR. CARDANI:  Thank you.

7              THE COURT:  You are welcome.

8              MR. WAX:  Judge, just in terms of trial

9    scheduling, Ramadan begins in August and runs through,

10   in all probability, Friday, the 10th.  Mr. Sedaghaty

11   will, in all probability, be fasting.  And, you know,

12   while he can accommodate and shift some of his prayer

13   times, we hope that you will be sensitive to that.  And

14   on Friday, the 10th, if that is the end of Ramadan,

15   there is a more important prayer for that day.  That is

16   also the week of Rosh Hashanah, and I just want to make

17   you aware of that.

18             THE COURT:  We'll get the directions of both

19   prayers then, right?

20             MR. WAX:  So --

21             THE COURT:  Which way is Mecca?  And which way

22   is Jerusalem?  They are sort of close from here.

23             MR. WAX:  We have a number of our witnesses,

24   just in terms of the logistics and with the Labor Day

25   weekend.  Should we anticipate having any people

 1    available on Friday the -- whatever it is, 3rd of
 2    September, or should we --
 3            THE COURT:  Yes.
 4            MR. WAX:  -- anticipate kicking off early on --
 5            THE COURT:  Yes.  I want a full week that first
 6    week.  And I -- I do not want to run out of witnesses.
 7    And I say we won't work on Labor Day, but, frankly, if
 8    we're not making good enough progress, we might, because
 9    this case will be tried in two weeks.
10            MR. MATASAR:  Will that be --
11            THE COURT:  We can choose a Saturday instead,
12    or something, too.  I work on Saturdays.
13            MR. CARDANI:  And Sundays, I've figured out.
14            MR. MATASAR:  Now that we do know the end date
15    of the trial, I think we're pretty sure on that, will
16    there be a time that the government's case will have an
17    end date similarly, or how do you do that, Your Honor?
18    I know that -- we'd just like to know how that will go.
19            MR. CARDANI:  Well, if this thing -- if they
20    are saying -- there is a possibility we'll conclude this
21    case before the first week is over.
22            THE COURT:  I expect that.
23            MR. MATASAR:  Great.
24            MR. CARDANI:  So depending on cross, so you
25    should have witnesses available.

```
1                 THE COURT:  I don't know if you've tried a case
2       in front of me, Mr. Matasar.  You'll have to remind me.
3                 MR. MATASAR:  I have not.
4                 THE COURT:  Mr. Cardani has.  We move along.
5                 MR. MATASAR:  I have heard.  I am told that you
6       do.
7                 THE COURT:  A wonderful courtroom deputy in
8       Portland, I tried a case of -- I don't know which judge
9       it belonged to, but one of them, and when we got to sort
10      of the end of the evidence, I said "what do you think of
11      the pace?"  She's a delightful person, but she says "I
12      didn't know it was a race."
13                MR. MATASAR:  Just with you telling that story
14      without being cowed or feeling bad about it says a lot.
15                THE COURT:  I feel just great.
16                MR. MATASAR:  Yeah, use it as a compliment.
17      That's great.  That's the point of that story to me.
18                THE COURT:  Helps you understand.
19                MR. MATASAR:  Yes.  It was clear that you were
20      not having any trouble deciding the one lawyer for
21      opening, one lawyer for closing issue.
22                THE COURT:  That's true.
23                MR. MATASAR:  Might there be some concerns that
24      you have that we could address or is it just not worth
25      even discussing?  That it's just a hard-and-fast rule
```

1    that this -- I mean, it may be when two lawyers -- when

2    I see two lawyers doing something, one says the same

3    thing as the other, or is there something we can maybe

4    adapt on, we could try to do that.

5            THE COURT:  You think the case is more

6    complicated than I do, I guess.  I think one lawyer is

7    enough.

8            MR. WAX:  For what it's worth, Colleen Scissors

9    and I split an argument in front of Judge Marsh some

10   time ago, and we didn't duplicate, we moved right along,

11   and a seamless transition.

12           THE COURT:  He is a lovely man and one of my

13   heros.

14           MR. MATASAR:  Okay.  Thank you, Judge.

15           THE COURT:  Anything else?

16           MR. MATASAR:  No.  Thank you.

17           (The proceedings were concluded at 4:15 p.m.)

18

19

20

21

22

23

24

25

```
 1                         CERTIFICATE

 2         I, Deborah Wilhelm, Certified Shorthand Reporter

 3   for the State of Oregon, do hereby certify that I was

 4   present at and reported in machine shorthand the oral

 5   proceedings had in the above-entitled matter.  I hereby

 6   certify that the foregoing is a true and correct

 7   transcript, to the best of my skill and ability, dated

 8   this 3rd day of August, 2010.

 9

10

11

12
                                /s/ Deborah Wilhelm
13                              _____
                                Deborah Wilhelm, RPR
14                              Certified Shorthand Reporter
                                Certificate No. 00-0363
15

16

17

18

19

20

21

22

23

24

25
```