DWIGHT C. HOLTON, OSB #09054
United States Attorney
District of Oregon
CHRISTOPHER L. CARDANI
Assistant United States Attorney
405 East Eighth Avenue, Suite 2400
Eugene, Oregon 97401
(541) 465-6771
chris.cardani@usdoj.gov
CHARLES F. GORDER, JR., OSB# 912874
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, Oregon 97204
(503) 727-1117
charles.gorder@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  CR 05-60008-HO |
| | ) | |
| v. | ) | GOVERNMENT'S TRIAL |
| | ) | MEMORANDUM |
| | ) | |
| PIROUZ SEDAGHATY, | ) | |
| a/k/a Pete Seda, Perouz Seda Ghaty | ) | |
| and Abu Yunus | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, through its undersigned counsel, herein submits

the following memorandum, addressing matters relating to the trial scheduled to

commence on Monday, August 30, 2010.

**Factual Background**

Through the extensive pretrial litigation that has occurred to date, this Court is

1 - Government's Trial Memorandum

well aware of the factual background.  In brief, during the late 1990s and early 2000, the Al-Haramain Islamic Foundation (AHIF) was one of Saudi Arabia's largest Non-Governmental Organizations, with offices throughout the world.  Its stated mission was to provide charitable services and Islamic education.

Defendant Pirouz Sedaghaty, who is known by many of the witnesses as Pete Seda or Abu Yunus, is an Iranian born national who has been in the United States for many years.  He is a naturalized U.S. citizen and was a resident of Ashland, Oregon during the events of this case.  Defendant Sedaghaty established a U.S. presence for AHIF when in 1997 he filed registration documents with the Oregon Secretary of State.

In 1999 defendant Sedaghaty formally incorporated the Al-Haramain Islamic Foundation, Inc. in Oregon.  Sedaghaty was the only U.S.-based Director of this organization; the three other Directors were all citizens and residents of the Kingdom of Saudi Arabia, and employees of AHIF in that country.  One of these individuals is Soliman Al-But'he, who is a co-defendant in the present case.  Al-But'he often traveled from Saudi Arabia to Oregon to assist defendant Sedaghaty conduct the U.S. operations of AHIF.  Sedaghaty and Al-But'he together maintained a bank account at the Bank of America in Ashland, Oregon, into which funds used to operate AHIF-USA were received and spent.

One of the other U.S. Al-Haramain Directors was Ageel Al-Ageel, also known as Aqeel Abdul-Aziz Al-'Aqeel.  Al-A'qeel was both the General Manager of Al-Haramain's worldwide head offices in Riyadh, Saudi Arabia, and the President of AHIF-USA in Oregon.  AHIF-Saudi Arabia provided most of the funding that was necessary for Sedaghaty to operate AHIF's interests in the United States.

2 - Government's Trial Memorandum

On behalf of AHIF, Sedaghaty purchased property in Ashland, Oregon with $190,000 in funds brought to him from Saudi Arabia by co-defendant Al-But'he. Sedaghaty lived in this residence, and also used it as a prayer house and to conduct the U.S. operations of AHIF.

Sedaghaty later filed an application with the Internal Revenue Service for AHIF to become a tax-exempt organization, meaning that, if granted, AHIF would not have to pay income taxes for any of the donations it received, so long as it acted in accordance with regulations governing such organizations and did not violate the law or act in a manner inconsistent with its tax exempt purpose. One of the regulations pertinent to the trial is that any tax-exempt public charity receiving more than $100,000 in annual gross receipts must file with the IRS a Form 990, *Return of Organization Exempt from Income Tax*. These returns are subject to audit or other sanctions by a unit within the IRS known as Tax Exempt and Government Entities. If IRS-TEGE determines that an organization is not operating consistently with its tax exempt purpose, including by filing a false Form 990, then such coveted status may be revoked and the organization's revenues would be subjected to taxation or other sanctions. Forms 990 are also public documents available over the internet; they are used by potential donors to determine whether to give funds to a particular organization.

Defendant Sedaghaty was the only AHIF Director physically present in the United States. AHIF-Saudi Arabia provided almost all the revenue to operate the Oregon branch. Various individuals worked for AHIF in Oregon, but defendant Sedaghaty was clearly the boss. He was responsible for giving the orders, signing the checks, and reporting back to AHIF officials in Saudi Arabia. He would check in at least once per

3 - Government's Trial Memorandum

day to make sure things were operating as he and AHIF-Saudi Arabia wanted. Defendant Sedaghaty reported most often to co-defendant Soliman Al-But'he, but he also dealt with other Al Haramain officials such as Abdul Aziz Al-Shoumar (a Riyadh accountant for AHIF), Abdul Qadir Abdul Khaliq, and Ahmed Ezzat.  Monthly reports were sent back to AHIF in Saudi Arabia to account for the spending of AHIF's funds.

The atmosphere inside AHIF in Oregon was one of extremist religious practice, tinged with anti-Semitism.  Women and men were kept strictly separated and persons were criticized if they did not dress and act in what was viewed as the appropriate way. Various visiting extremist speakers expressed their views on such subjects as killing Muslims who converted to another religion and whether Muslims should live in a non-Muslim land such as the United States.  The organization distributed (including to thousands of prisoners throughout the United States) a version of the Koran containing an Appendix entitled "The Call to Jihad (Holy Fighting in Allah's Cause) in the Koran" which glorified violent jihad "with weapons," identified as "tanks, missiles, artillery, aeroplanes (air force) ships (navy), etc. and the training of soldiers in these weapons," and urged the "kill[ing] of those who disbelieve in Allah."  A more "peaceful" version of the Koran was distributed to others.  AHIF-Oregon also distributed a book entitled "Islamic Guidelines for Individual and Social Reform" which glorified violent jihad.  For example, this book identified as a religious obligation the duty to "expel the Jews [from Palestine] by money or physical fighting."  Occasionally, fund-raisers were conducted to support jihads in various parts of the world.  On one occasion, defendant Sedaghaty arranged for a number of people from Southern Oregon to go on the Haj (a pilgrimage to Mecca) and while in Saudi Arabia Sedaghaty collected money from the travelers to

4 - Government's Trial Memorandum

send to fighters in Chechnya.

<u>The Armed Conflict in Chechnya</u>

Shortly after the dissolution of the Soviet Union, independence movements

began to operate in the Caucasus region of Southern Russia, particularly in the area of

the Russian Republic of Chechnya.  The independence movement in Chechnya

originally had elements of both nationalism and links to religious extremists.  Armed

conflict eventually broke out between the Russian government and Chechens in 1994-

95, resulting in the first "Chechen war."  Beginning in 1995, a group of foreign fighters

led by Saudi citizen Ibn ul-Khattab, arrived in Chechnya and formed what became the

Islamic Army of the Caucasus or the foreign "mujahideen" (holy warriors) in Chechnya,

in order to fight in a "jihad."  The conflict took on far more religious overtones after 1995.


During a lull in the fighting during the second half of the 1990s, Khattab set up a

permanent base in Chechnya to train future insurgents in Islamic education and military

tactics.  This base was called the "Kavkaz Institute" and both Chechens and foreigners

looking to participate in the jihad went through the Kavkaz Institute.  Another Saudi

citizen, Abu Umar al Say'f, was a supervisor at the Kavkaz Institute.  In order to fund

their activities, Khattab and his associates turned to Islamic charities to obtain funds,

and used the bourgeoning internet to publicize their cause.  Interviews with mujahideen

leaders and propaganda videos were distributed through websites, including

Azzam.com, the preeminent English language Islamic terrorist website, and qoqaz.net,

a site set up by Azzam.com specifically to publicize the mujahideen viewpoint

concerning Chechnya.

5 - Government's Trial Memorandum

In 1999, the conflict in Chechnya flared up again when Khattab led the foreign mujahideen to invade the neighboring Russian Republic of Dagestan. The Russians responded by escalating the conflict in the region and the situation for the mujahideen became somewhat desperate. In November 1999, an interview with Khattab was posted on the internet in the "Jihad in Chechnya" section of Azzam.com. In the interview, Khattab was asked "Do you need support? What support do you need?" The website reported Khattab's response:

> The Chechen Republic has been surrounded from all sides. However, the Russian Army is prepared to sell everything for a price. As for previous affairs of the Muslims, one would always find Islamic charities and organisations present. I am sorry to say that there is not a SINGLE Islamic charity or organisation active inside Chechnya at present. Only the Red Cross is present in the Chechen towns and cities. Therefore, we advise the Muslims and the Muslim countries to take a sincere stand with the Mujahideen in the land of the Caucasus.

Al Haramain responded to the call. It posted on its website religious edicts known as "fatwas" from Islamic authorities stating that it was an obligation of all Muslims to "supply weapons and material support" to the Chechen mujahideen and to support them financially. An Al Haramain employee named Abdul Qadir Abdul Khaliq began to distribute information about the fighting in Chechnya and the mujahideen via e-mail to interested readers in a group referred to as the "Sheeshan" group.[1] Most of the material distributed came from the Qoqaz.net or Azzam.com websites and included such

---

[1] "Sheeshan" refers to Chechnya in Arabic. Many of the search warrant exhibits at trial are "Sheeshan Group" e-mails that were sent to defendant Sedaghaty and others to inform them on the current activities of the mujahideen in Chechnya and their need for money.

subjects as "How can I train myself for jihad?," the "Islamic Ruling on the Permissibility of Martyrdom Operations," and biographies of various so-called "martyrs" in the cause of the Chechen mujahideen.  Defendant Sedagahty regularly received the Sheeshan group e-mails in Oregon, including the Khattab interview, and many of them discovered within in his computers will be introduced into evidence at the trial.

On January 22, 2000, defendant Sedagahty cut and pasted a portion of the interview with Khattab complaining about the lack of support of the Chechen mujahideen by Islamic charities, as quoted above, and e-mailed it to his Al Haramain superior, co-defendant Al-But'he, with the subject heading "What support?"

The El Fiki Donation

The indictment centers on a $150,000 donation made to AHIF in February 2000 by an Egyptian named Dr. Mahmoud Talaat El-Fiki (El-Fiki).  The donation was made by El-Fiki "in order to participate in your nobel support to our muslim brothers in Chychnia." Al-'Aqeel, (the General Manager of AHIF in Saudi Arabia, and the President of AHIF-USA), responded to El-Fiki, thanking him for his donation and assuring him "of our commitment to continue every possible effort to help ending [sic] the Chechnyan crisis." Demonstrating the strong ties between AHIF-Saudi Arabia and AHIF-US, Al-'Aqeel instructed El-Fiki that he could deliver his donation to AHIF by sending the funds to AHIF's bank account in Saudi Arabia or in the United States.

On February 24, 2000, El-Fiki wire transferred the funds (less a $15 bank fee) from an account in London, England to an AHIF account at the Bank of America in Ashland, Oregon.  The only two individuals allowed to access this account were defendant Sedaghaty and co-defendant Al-But'he.

7 - Government's Trial Memorandum

On March 7, 2000, defendant Al-But'he flew from Saudi Arabia to Oregon to retrieve the El-Fiki money.  On March 10, 2000 Al-But'he and defendant Sedaghaty went to the Bank of America in Ashland.  Al-But'he and Sedaghaty withdrew $130,000 of the El-Fiki donation by purchasing 130 $1,000 American Express Traveler's Checks, costing AHIF a $1,300 transaction fee.  The next day, defendant Sedaghaty returned to the bank and withdrew the remaining El-Fiki funds by purchasing a $21,000 cashier's check made personally payable to Al-But'he.

Al-But'he Smuggles the El-Fiki Money Out of the United States

Al-But'he returned to Saudi Arabia on March 12, 2000.  United States law requires anyone transporting into or out of the United States monetary instruments (including traveler's checks), in an amount exceeding $10,000, to submit a Currency and Monetary Instrument Report (CMIR) reporting the details of the transaction.  These forms are available to government agencies to track funds coming into and going out of the United States.  A deliberate failure to file a CMIR is a crime.

Al-But'he did not file a CMIR when he left the United States on March 12, 2000.  Al-But'he did, however, file CMIRs on nine separate occasions from 1991 through 2001, showing he transported $777,845 into the United States.  Some of these funds consisted of traveler's checks.  The face of a CMIR clearly states that such forms must be filed by anyone leaving or entering the United States with more than $10,000.  Al-But'he is proficient in reading and writing the English language.

Upon returning to Saudi Arabia, Al-But'he cashed the 130 $1,000 traveler's checks at the Al-Rajhi Bank in Riyadh, Saudi Arabia.  He deposited the $21,000 cashier's check into a personal account he had at that same bank.

8 - Government's Trial Memorandum

<u>Most of the El-Fiki Funds Were Smuggled into Chechnya</u>

An Al-Haramain employee named Sami 'Abd Al 'Aziz Al-Sanad took the currency transported from AHIF-USA by Soliman Al-But'he to a representative of Abu 'Umar, to be smuggled into Chechnya for the self-described purpose of assisting needy Chechen families.

Records later obtained from AHIF via grand jury subpoena show that Sedaghaty and Al-But'he supposedly signed an agreement on March 11, 2000, stating that Sedaghaty was turning over funds to Al-But'he for the "Brothers and Sisters in Chechnya," and that Sedaghaty (also known as Abu Yunus) was relieved of all responsibilities for the money.  A second similar agreement was signed, supposedly on the same day, which contained much of the same information, but with a slightly different amount listed as having been transferred.  It is unknown whether these documents were created on the dates listed, or whether they are backdated fabrications.

<u>AHIF's Form 990</u>

At the end of the year, defendant Sedaghaty had to account for the receipt and disposition of the El-Fiki donation in the AHIF Form 990.  The disposition of the $150,000 was incorrectly reported in the Form 990 signed and submitted to the IRS by defendant Sedaghaty.  It will be established at trial that defendant Sedaghaty hired an accountant named Wilcox in Medford, Oregon to prepare the Form 990 for AHIF. Wilcox prepared the Form 990 based on information provided to him by Sedaghaty. Sedaghaty lied to Wilcox by telling him that $130,000 of the El-Fiki funds were spent by AHIF-US to purchase a prayer house in Springfield, Missouri, and that the remaining

9 - Government's Trial Memorandum

funds from the El-Fiki transaction were returned to El-Fiki.

Sedaghaty never told Wilcox that all of the El-Fiki funds were taken out of the United States to Chechnya, to Saudi Arabia or to anywhere else outside the U.S. Nor did Sedaghaty ever provide Wilcox with any of the records showing the El-Fiki funds were taken out of the United States. Had Sedaghaty provided Wilcox with information of foreign transactions, he would have prepared the Form 990 differently. Wilcox will acknowledge at trial that if the El-Fiki funds were in fact taken out of the United States, then the Form 990 he prepared was false.[2]

**The Charges**

A three count indictment returned by the grand jury charged the Al-Haramain Islamic Foundation, Inc., in its corporate capacity, and Pirouz Sedaghaty and Soliman Al-But'he. Count One alleges that the three defendants engaged in a conspiracy to prevent the United States Government from learning about the transactions involving the El-Fiki funds by failing to acknowledge that Al-But'he left the United States with the funds and by filing a false Form 990 with the IRS.

Count Two charges AHIF and defendant Sedaghaty with filing a false tax return on behalf of AHIF-US, in that it falsely reported that the El-Fiki funds were used by AHIF to purchase a building in Missouri and returned to El-Fiki.

Count Three charges Al-But'he with failing to file a CMIR with the U.S. Government, acknowledging he was departing the country with more than $10,000.

---

[2]The government need not prove that the El-Fiki funds made their way into Chechnya. Rather, as discussed later in this trial memorandum, the government must prove that the Form 990 was materially false and that Sedaghaty knew it.

Since AHIF-US is presently a functionless shell corporation, the prosecution dismissed the charges against the corporation. Al-But'he, A Saudi citizen, is a fugitive and has refused to submit to the jurisdiction of the United States since he was indicted in 2005. Accordingly, the present trial will only directly involve defendant Sedaghaty, although Al-But'he and other AHIF officials' conduct is relevant to the charges.

The indictment has been redacted to remove AHIF as a formally charged defendant. Al-But'he remains a charged defendant; the jury should be instructed that his fate is not before them.

**Elements of the Offenses**

To convict defendant Sedaghaty of conspiracy, the government must prove:

Count One - Conspiracy

First, beginning in or about late 1999, through October 2001, there was an agreement between two or more persons to defraud the United States by impeding, impairing, obstructing or defeating the lawful functions of the IRS or the Department of Homeland Security (formerly known as the United States Customs Service), through deceitful or dishonest means;

Second, defendant Sedaghaty became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

Third, one of the members of the conspiracy performed at least one overt act during the conspiracy for the purpose of carrying it out.[3]

Count Two - Filing a False Tax Return

---

[3]Formal and more detailed proposed instructions with legal citations will be submitted by the government in a separate filing.

11 - Government's Trial Memorandum

To convict defendant Sedaghaty on Count Two, the government must prove:

First, defendant Sedaghaty made and signed a Form 990, Return of Organization Exempt from Income Tax for the year 2000, that he knew contained false information as to a material matter;[4]

Second, the return contained a written declaration that it was being signed subject to the penalties of perjury; and

Third, in filing the false return, defendant Sedaghaty acted willfully.

## Defense - Lack of Willfulness and Criminal Intent

It is anticipated that the main defense at trial will be that defendant Sedaghaty was a man of peace, had no intent to fund the *mujahideen* in Chechnya, and thus had no motive to conceal the disposition of the El Fiki funds. To the extent that the AHIF Form 990 was false, it was a mistake. The defense will assert that defendant Sedaghaty did not have the requisite mens rea - willfulness - necessary to convict.

Willfulness is an element in all criminal tax cases. *United States v. Bishop,* 291 F.3d 1100, 1106 (9th Cir. 2002). "Willfulness ... requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Id.* The burden is on the government to negate the defendant's claim that he had a good faith belief that he was not violating the law. *Id.* The Ninth Circuit has noted that direct proof of willfulness is "rarely

---

[4]Defendant Sedaghaty did not personally prepare the Form 990. Rather, the evidence will establish that he provided false information to his accountant who, relying on that false information, unwittingly prepared the Form 990 containing the inaccurate information. The government will request that the jury be instructed that defendant Sedaghaty may be convicted if he knowingly caused the false Form to be prepared. <u>See</u> 18 U.S.C. 2(b).

available," but may be inferred from the available circumstantial evidence.  United States v. Dearing, 504 F.3d 897, 901 (9th Cir. 2007).

Once again, the government is not required to prove in this trial that the El-Fiki funds were actually delivered into Chechnya, for the mujahideen, or for any other purpose.  Rather, the government must prove that defendant Sedaghaty signed and submitted to the IRS a Form 990 that he knew contained material falsehoods.

The Court knows from pretrial litigation that much of the proof of willfulness and criminal intent was obtained from the deleted portions of computers seized during the search warrant from AHIF-US in Oregon.  This computer evidence -  including the Sheeshan e-mails, interviews with battlefield commanders seeking funding, and the religious edicts obligating Muslims to fund the *mujahideen* - will establish that AHIF promoted the needs of the *mujahideen* fighters in Chechnya, and that defendant Sedaghaty was interested in covertly providing support to the fighters.  To establish willfulness and criminal intent, the government will present evidence of AHIF's role in funding the *mujahideen* in Chechnya.  It will also be established that one of defendant Sedaghaty's wives, while working out of an AHIF office in Ashland, Oregon, assisted in translating pro-mujahideen propaganda on websites devoted to the subject.

Another manner in which the government will establish willfulness and criminal intent is through proof of defendant Sedaghaty and Al-But'he's various attempts to conceal the true disposition of the El-Fiki funds from outsiders, including the AHIF-US accountant in Oregon.

13 - Government's Trial Memorandum

**Defense - Materiality**

It is anticipated that the defense will also seek to establish that the falsities in the AHIF Form 990 were not material to the IRS.  Through cross examination of government witnesses, and through their own witnesses, the defense will contend that the type of falsities alleged in this case are not material.

To be material, the government need not prove that the falsities actually influenced or were relied upon by the IRS.  Rather, a matter is material if it had a natural tendency to influence, or was capable of influencing, the ability of the IRS to audit or verify the accuracy of the Form 990, *Return of Organization Exempt from Income Tax*. See Ninth Circuit Model Criminal Instruction 9.37;  United States v. Peterson, 538 F.3d 1064, 1071 (9th Cir. 2008) (district courts should instruct on materiality "tracking the language" of United States v. Gaudin, 515 U.S. 506, 509 (1995)); United States v. Serv. Deli Inc., 151 F.3d 938, 941 (9th Cir. 1998); see also United States v. Matsumaru, 244 F.3d 1092, 1101 (9th Cir. 2001).

An IRS witness who specializes in the area of tax exempt organizations who will testify that the alleged falsities in our case were material to the IRS.

**Miscellaneous Trial Matters**

**Classified Information**

The government does not intend to offer any classified evidence at trial.

**OFAC and United Nations Designations**

In 2002 and 2004, the United States Department of Treasury, Office of Foreign Asset Control (OFAC), designated several AHIF offices across the world, including

AHIF-US, as supporters of international terrorism.  Three of the four AHIF-US Directors - defendant Soliman Al-But'he (Treasurer), al-Aqeel (President), and Mansour Al-Kadi (Vice President) - were all designated as Specially Designated Global Terrorists by OFAC, but defendant Sedaghaty was not.  Similar designations were made by the United Nations Security Council, which imposed a travel ban, an arms embargo, and an asset freeze on designated AHIF offices, including AHIF-USA.  In an order issued by the Court on August 11, 2010 on numerous pretrial matters (hereafter CR 407), the Court excluded reference to these designations. (CR 407 at p. 18).

**Defendant Sedaghaty's Fugitive Status**

Defendant Sedaghaty departed the United States in February 2003 during the criminal investigation of his activities and those of AHIF.  The grand jury returned the indictment in February 2005.  While he was overseas at the time, Sedaghaty was informed of the indictment and that there was a warrant pending for his arrest. Sedaghaty refused to return to the United States for two and a half years and voluntarily surrendered himself to U.S. law enforcement in August 2007.

The prosecution will not seek to elicit proof of defendant Sedaghaty's fugitive status in its case-in-chief unless fairly responding to matters raised by the defense. (CR 407 at 11-12, 17).

**Evidence of Plural Marriage**

The government will not affirmatively introduce defendant's religious practice of polygamy against him at trial.  The Court has ruled that evidence of marriage to a particular person can be introduced to establish bias of a defense witness or on the issue of control of the computers.  (CR 407 at p. 17).

15 - Government's Trial Memorandum

**Pretrial and Trial Publicity**

The media has reported on various matters related directly and indirectly to this case.  Media coverage is expected during the trial as well.  While standard instructions caution the jury to avoid such out-of-court publicity, the Court may wish to be more explicit and more frequently remind the jury of its obligation to only rely on evidence properly received in court.

**Demonstrative Evidence**

To assist the jury in better understanding the case, the prosecution intends to use a "Power Point" presentation during opening statement.  Additionally, there will be numerous individuals mentioned during trial, whose activities are relevant to the case. The prosecution will thus use a physical chart, with the names of some of the more prominent individuals, along with the available photographs.  The jury should be allowed to view this chart throughout the case to better comprehend the individuals involved in the activities before it.

The Power Point presentation and chart will not be offered as exhibits, but as demonstrative jury aids.

**Summary Evidence**

To assist the jury and save trial time, the government will present summary exhibits and testimony.

Proposed government exhibit JC-4 is a summary of pertinent deleted e-mails and other computer information retrieved by an expert in computer forensics.  This exhibit is a list of the retrieved electronic information chronologically sorted.  It identifies which of

16 - Government's Trial Memorandum

the ten hard drives from which the exhibits were found and lists the e-mail addresses that concern each exhibit.  This summary is admissible under FRE 1006.  See United States v. Shirley, 884 F.2d 1130, 1133 (9th Cir. 1989) (summary evidence admissible so long as underlying records admissible as well).

Proposed exhibit ICE FinCen-4 summarizes the prior CMIR filings by co-defendant Al-But'he, as discussed above.  The summaries and the information underlying the exhibits were provided to the defense; the summaries are admissible under FRE 1006.

**Agent Testimony**

It is anticipated that many exhibits will be received at trial without any initial explanation of their significance for the jury.  Categories of information like this include:

•       domestic AHIF bank records;

•       American Express Traveler's Checks;

•       international bank records from Al-Rajhi Bank;

•       deleted e-mails and other electronic information from the seized AHIF computers;

•       airline flight records and government entry records;

•       CMIR data; and

•       subpoenaed documents from AHIF.

The significance of many of these seemingly unrelated exhibits will be unclear to the jury as those exhibits are being introduced.  To assist the jury make sense of the exhibits, Special Agent Anderson will testify towards the end of the case-in-chief.  She will review with the jury the details of many of these exhibits in a chronological fashion, putting the various items of evidence into a comprehensible light.  The Ninth Circuit has

17 - Government's Trial Memorandum

recognized that such summary evidence "can help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of the multitude of witnesses."  United States v. Shirley, 884 F.2d 1130, 1133 (9th Cir. 1989), quoting United States v. Lemire, 720 F.2d 1327, 1348 (D.C.Cir. 1983).  See also United States v. Baker, 10 F.3d 1374, 1410-12 (9th Cir. 1993) (proper under FRE 611(a) to permit agent to testify in summary form as to value of drug evidence presented during trial, providing helpful clarity for jury).

**The Government's 404(b) Notice**

FRE 404(b) requires that, upon request from the defense, the prosecution shall provide reasonable notice of the general nature of any intent to use "other act" evidence, admissible to establish a defendant's knowledge, intent, lack of mistake, etc.

The government believes that some of the evidence described below is direct evidence of the charged crimes.  That is, the admissibility of such evidence is not dependent on Rule 404(b), as it is "inextricably intertwined" with the case.  In an abundance of caution, and mindful of the notice provisions of FRE 404(b), however, the government produces this information as its notice of evidence possibly admissible under Rule 404(b):

1. Defendant's Solicitation of Funds for Mujahideen Fighter in Kosovo

It is anticipated that one of the government's witnesses will testify that while he was an employee of AHIF-US, defendant Sedaghaty approached him and others requesting that they donate money to support "brothers" who wanted to travel to Kosovo to join and fight with the *mujahideen*.  This witness donated funds.  Financial records show that on April 15, 1999, defendant Sedaghaty used one of his businesses called

18 - Government's Trial Memorandum

"The Arborist" to wire transfer $2,000 to an Al-Haramain branch office then active in Tirane, Albania.  An expert witness will testify that, at this time, *mujahideen* fighters were active in an armed conflict in Kosovo and that the Albania office was the closest AHIF office to that conflict.  See government exhibits BOA 14, 15 & 16.  This Court recently ruled that exhibits related to this testimony are relevant to defendant's intent and knowledge.  (CR 407 at 14).

    2.  Evidence Establishing that Sedaghaty Utilized International Bank Wires

Proposed government exhibits BOA-19 and BOA-20 show that in 2001 defendant Sedaghaty wire transferred funds from Bank of America in Ashland, Oregon to the Al-Rajhi Bank in Riyadh, Saudi Arabia, for the benefit of one of his acquaintances.  While not directly related to the funds at issue in the indictment, this evidence demonstrates that Sedaghaty was well-versed in the use of international wires, and knew how inexpensive they were as compared to the purchase of American Express Traveler's Cheques, which have a far more expensive 1% transaction fee.  In addition, it will be shown that international wire transfers are far more traceable by government officials than travelers checks.

    3.  Co-defendant Al-But'he's Submission of CMIRs to the U.S. Government

As mentioned above, one of the charged objects of the conspiracy alleges that defendant Sedaghaty and co-defendant Sedaghaty sought to conceal their attempt to smuggle the El-Fiki funds out of the United States for Chechnya by failing to fill out a Currency and Monetary Instrument Report, as Al-But'he was required to do when he left the United States with the funds.

Proposed government exhibit ICE FinCen-4 is a chart summarizing nine different

19 - Government's Trial Memorandum

occasions when co-defendant Soliman Al-But'he filed CMIRs reporting his transportation of monetary instruments into the United States.  The underlying CMIRs are contained in proposed government exhibits ICE FinCen-2a through 2i.  Through these collective exhibits, co-defendant Al-But'he volunteered to the U.S. Government that from October 1997 through April 2001 he transported a total of $777,845 USD into the United States.  Some of the reported funds were traveler's checks.  These CMIRs are pertinent to establishing the concealment aspect of the charged conspiracy.

    4.  <u>Defendant Sedaghaty's Lies to His Accountant</u>

Proposed government exhibit BOA-6 is a check from defendant Sedaghaty to Daveed Gartenstein-Ross, who at the time was an employee of AHIF-US.  Gartensteen-Ross will be a government witness at trial and will testify that defendant Sedaghaty gave him this $2,060 check as a salary payment, yet falsely wrote "Power Mac" in the notation section of the check.  Sedaghaty did this, in part, to assist this employee avoid paying income taxes to the IRS.  The Court has tentatively ruled that this evidence is admissible.  (CR 407 at 13).

When defendant Sedaghaty's accountant later asked him about this check, Sedaghaty lied and told him that the check was for the purchase of a computer, rather than a salary payment.  This affected AHIF's obligation to withhold taxes.

    5.  <u>AHIF-US Distributed Materials Urging Violent Jihad and Financial Assistance for the Chechen *Mujahideen*</u>

Gartensteen-Ross will further testify that one of his responsibilities as an Al-Haramain employee was to distribute Islamic literature to those seeking information, including prisoners.  Proposed exhibit DGR-1 is *The Noble Koran*, and contains an

20 - Government's Trial Memorandum

appendix titled "The Call to Jihad (Holy Fighting in Allah's Cause) in the Qur'an."  This appendix defends the use of using violent acts - jihad - to spread Islam.

DGR-2 is a book entitled "Islamic Guidelines." It too was delivered by Al-Haramain in Ashland, Oregon to others.  The pamphlet states that Jihad is obligatory and may be accomplished by personally engaging in jihad, or by funding others to engage in violent jihad.  The Court has ruled that Exhibits DGR-1 and DGR-2 are admissible to show the defendant's state of mind.  (CR 407 at 17).

6. Collection of Funds for Chechen Mujahideen During Haj and a Jewelry Sale

In the Spring of 1999, defendant Sedaghaty arranged for a number of people from the Southern Oregon Muslim community to go on the Haj (a pilgrimage to Mecca). The group's travel was hosted by AHIF and they met Soliman Al-But'he during their journey.  Before the group left Saudi Arabia, Sedaghaty collected money from the American travelers to send to the mujahideen (referred to as "freedom fighters") in Chechnya.  Sedaghaty apparently gave the money to co-defendant Al-But'he.  The evidence of this collection, involving defendants Sedaghaty and Al-But'he raising money for the mujahideen in Chechnya less than a year before the transaction which is the subject of the indictment, is admissible to establish motive, opportunity, intent, knowledge and absence of mistake.

Similarly, sometime in the summer/fall of 2000, women at the AHIF Oregon mosque conducted a jewelry sale to raise money for the mujahideen in Chechnya. According to an e-mail found in the Al Haramain computers (Proposed Government's Exhibit BC-1) approximately $1,763 was eventually raised and sent to Chechnya through an unknown method.  This evidence also is admissible to establish motive,

21 - Government's Trial Memorandum

opportunity, intent, knowledge and absence of mistake.

       7.  <u>Translation Services for Pro-*Mujahideen* Websites</u>

One of defendant Sedaghaty's wives translated pro-mujahideen propaganda from English into Russian for the radical website www.qoqaz.net.  She did this from the premises of AHIF-US in Ashland, Oregon.  This work is reflected in proposed government exhibits SW-17, SW-26, SW-29 and SW-61 and is probative on the issue of knowledge, intent and lack of mistake.

**Al-Rajhi Bank Records of Co-defendant Al-But'he - Self Authenticating Foreign Records**

The United States Government received records through the Kingdom of Saudi Arabia.  Specifically, bank records were obtained concerning an account in the name of co-defendant Soliman Al-But'he at Al-Rajhi Banking and Investment Corporation. These records establish that after he returned from Oregon, Al-But'he: 1) cashed the 130 $1,000 American Express Traveler's Checks; and 2) deposited the $21,000 cashier's check into his personal account at Al-Rajhi Bank.  These records are directly relevant to the trial, as they show the disposition of the El-Fiki funds sent to defendant Sedaghaty.  Al-But'he's acts are in furtherance of the charged conspiracy.

The Al-Rajhi bank records were received with a Certificate of Authenticity of Business Records," which renders the records admissible at trial without the need to call a foreign witness from the Kingdom of Saudi Arabia or Al-Rajhi Bank.  Pursuant to 18 U.S.C. §3505(a), a foreign record of regularly conducted activity is not excluded by the hearsay rule if a foreign certification attests to the requirements set forth in 18 U.S.C. §3505(a)(1)(A)-(D).

22 - Government's Trial Memorandum

Section 3505(a) requires the foreign certification to attest that:

- the record was made at or near the time of the occurrence of the matters set forth by a person with knowledge of such matters;

- such record was kept in the ordinary course of a regularly conducted business activity;

- the business activity made such a record as a regular practice; and

- if such record is not an original, such record is a duplicate of the original, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

A proper certification serves to authenticate the records and obviates the necessity of calling a live witness to establish authenticity.  It also is sufficient to overcome hearsay objections.  See United States v. Jawara, 474 F.3d 565, 584 (9th Cir. 2007) (district court properly admitted foreign records over hearsay and authentication objections because records certified in compliance with 18 U.S.C. §3505).

In our case, competent officials from Al-Rajhi Bank (the General Manager for Retail Banking and the Chief Operating Officer) appeared before an official within the Ministry of Justice of the Kingdom of Saudi Arabia and swore or affirmed that the records provided were genuine business records of the bank.[5]  The certifications that were executed fully comply with the foundational requirements of 18 U.S.C. §3505, and thus the records are admissible at trial without the need for the prosecution to call a foreign witness.  Id.  (noting that Congress enacted §3505 to streamline the admission

---

[5]The Al-Rajhi Bank records and the foreign certification (in Arabic and English) have been provided to the defense.

of foreign bank records);  United States v. Hagege, 437 F.3d 943, 956-58 (9th Cir. 2006) (rejecting confrontation, authentication and hearsay challenges to foreign records received under 18 U.S.C. §3505).

**Voir Dire Procedures**

The Court has granted the parties additional peremptory challenges during voir dire (Defense 12 and Government 8).  This Court's traditional voir dire questions, supplemented by attorney-based pretrial recommendations for additional case-related questions, will ensure a fair and impartial jury.  If the Court conducts voir dire, Fed. R. Crim. P. 24(a)(2) requires the Court to ask additional juror questions proffered to the Court if they are deemed appropriate.

In motion CR 372 defendant Sedaghaty requested permission to conduct attorney voir dire.  In that motion he sought to extend the holding in United States v. Sarkisian, 197 F.3d 966, 978-80 (9th Cir. 1999), to support his request that counsel be permitted to ask prospective jurors about potential religious biases.  This Court recently denied that request without prejudice, but left open the possibility that "true follow-up" may be permitted once the Court completes its questioning of prospective jurors.  (CR 407 at 19-20).  The present case will involve Muslim beliefs and practices, and jurors should be asked about their ability to consider those beliefs and practices in an unbiased fashion.  The Court should inquire about potential religious biases and, consistent with its ruling, allow true follow-up on this delicate subject if it is deemed appropriate.[6]

_____

[6]The government will submit a list of potential questions for the Court to consider asking during the voir dire process.  Whether jurors can consider differing religious

24 - Government's Trial Memorandum

DATED this 19th day of August, 2010.

Respectfully submitted,

DWIGHT C. HOLTON
United States Attorney


*/s/ Christopher L.  Cardani*
By: _____
CHRISTOPHER L. CARDANI
Assistant United States Attorney


*/s/ Charles F.  Gorder, Jr.*
By: _____
CHARLES F. GORDER, JR.
Assistant United States Attorney

---

beliefs and practices in an unbiased manner will be covered in those suggested questions.

25 - Government's Trial Memorandum