**Steven T. Wax, OSB No. 85012**
**Federal Public Defender**
**101 SW Main Street, Suite 1700**
**Portland, OR  97204**
**Tel: (503) 326-2123**
**Fax: (503) 326-5524**
**Email: steve_wax@fd.org**

**Lawrence Matasar, OSB No. 74209**
**621 SW Morrison Street, Suite #1025**
**Portland, OR 97205**
**Tel: (503) 222-9830**
**Email: larry@pdxlaw.com**

**Attorneys for Defendant**

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CR 05-60008** |
| **Plaintiff,** | |
| **v.** | **DEFENDANT'S TRIAL MEMORANDUM** |
| **PIROUZ SEDAGHATY,** | |
| **Defendant.** | |

### The Charges

The government has charged Mr. Sedaghaty in two counts.  Count 1

charges that he conspired with Soliman Al Buthe, and others known and

unknown, to defraud the United States by obstructing the lawful functions of the Internal Revenue Service (IRS) and the former United States Customs Service by deceitful or dishonest means in violation of Section 371 of Title 18 of the United States Code.  The essence of the conspiracy charge is that beginning in late 1999 and ending in October 2001, Mr. Sedaghaty and Mr. Al Buthe conspired to prevent the United States government from learning of a particular transaction – that an Egyptian donor, Dr. El Fiki, wired $150,000 to Al-Haramain Ashland, that the funds were converted into travelers checks and a cashier's check, and were then taken out of the United States by Mr. Al Buthe, intending that the funds be delivered to Chechen mujahideen.

The indictment alleges that they did this by agreeing to impede, impair, obstruct, and defeat the former United States Customs Service in the collection of information concerning the transportation of currency and monetary instruments leaving the United States when Mr. Al Buthe left the United States and failed to complete a customs form regarding the travelers checks and cashiers check, purchased at Bank of America, and that Mr. Sedaghaty would defeat the IRS in the collection of information concerning financial transactions of tax exempt organizations by falsifying information on the Al-Haramain Ashland year 2000 tax return.  The falsification includes overvaluing a prayer house Al-Haramain purchased in Springfield, Missouri by $83,250 listing it at $461,541.74, rather than the actual purchase price of the $378,291.74.

Count 2 incorporates the substantive tax aspect of the conspiracy count, charging that Mr. Sedaghaty filed a false tax return in violation of 26 U.S.C. § 7206(1).  The specific allegation is that Mr. Sedaghaty made and signed a tax return for the year 2000 that he knew contained false information, understating income and donations on lines 1 and 22, and overstating the value of the prayer house in Springfield, Missouri, on line 57a.   The under- and over-reporting alleged all involves the $150,000 donation from Dr. El Fiki, as reflected in the Court's ruling on Mr. Sedaghaty's Second Motion For A Bill Of Particulars.  CR 276.  Thus, this count requires the government to prove several facts specific to tax law:

(1)     that lines 1 and 22 of the 2000 Form 990 were understated and line 57a was overstated;

(2)     that the alleged misstatements were material, that is, that the mistakes on line 1, 22, and 57a had a natural tendency to affect the IRS's ultimate determination of Al-Haramain's tax exempt status; and

(3)     that Mr. Sedaghaty is responsible for the mistakes because he willfully provided the incorrect information to Mr. Wilcox, in order to hide the fact that he intended the money from Dr. El Fiki to go to Chechen mujahideen.

The language that Mr. Sedaghaty believes the Court will be required to use in the jury instructions is set out in the proposed jury instructions filed herewith.

### The Denial

Mr. Sedaghaty denies the charges in their entirety.

## The Government's Case

Presentation of the government's case, and of Mr. Sedaghaty's response, will have two major and distinct components. One will focus on the tax aspects of the case: were lines 1 and 22 understated and was line 57a overstated and, if so, were these errors material to the functions of the return and the responsibilities of the IRS; and if so, did Mr. Sedaghaty act willfully. A secondary question will be whether Mr. Sedaghaty and Mr. Al Buthe knew that the law required a report if monetary instruments in excess of $10,000 were taken out of the country.

The government's exhibit and witness lists and the discovery suggest that it will attempt to prove the accounting aspects of its case primarily through the man who prepared the year 2000 tax return, Tom Wilcox, IRS Agent Colleen Anderson, and an IRS agent testifying as an expert, Gregory Wooten, and use of the tax returns, bank records, and records of the closing statement for the purchase of the prayer house in Springfield.

It appears that the government will attempt to prove the CMIR reporting aspect of its case primarily through exhibits that show that Mr. Al Buthe reported money on multiple occasions when he entered the country, but there is no record that he completed a form when he left in March 2000.

It appears that the government will attempt to prove that Mr. Sedaghaty and Mr. Al Buthe entered a conspiracy and intended to send money to Chechen

mujahideen primarily by circumstantial evidence.  The government open source research expert, Evan Kohlmann, will testify that there is a belief that Islamic charities were helping fund mujahideen in Chechnya and a belief that Al-Haramain Saudi was engaged in those efforts.

Mr. Sedaghaty will not contest that there was a great deal of concern in the world about the Russian brutality.  Nor does he expect Mr. Kohlmann to deny that Al Haramain Saudi Arabia engaged in a great deal of legitimate humanitarian work.

Some people, including some people in Al Haramain, said things that were openly supportive of the mujahideen in Chechnya.  Some of these comments were made on group email lists, or list-serves, that went to the Al Haramain computers and on a  Al Haramain Saudi Arabia web site.  The government will introduce some of these documents, and it is expected that Mr. Kohlmann will testify about some of those.

The government will attempt to link Mr. Sedaghaty to the efforts described by Mr. Kohlmann primarily through the fact of his relationship with Al Haramain Saudi Arabia, the list-serve emails, and web sites with comments supportive of the mujahideen found on computers in Al Haramain Ashland, some actions of his former wife, and testimony that, at one point, Mr. Sedaghaty allegedly asked for contributions to fund a freelance mujahideen in Kosovo.  They will describe the routing of the money donated by Dr. El Fiki, the

purchase of travelers checks and a cashiers check, look at Mr. Al Buthe's bank records, and then ask the jury to draw an inference from those facts that Mr. Sedaghaty intended to fund the mujahideen with Dr. El Fiki's money.

Many of the exhibits the government will utilize in its case derive from a search warrant executed at Al-Haramain Ashland in February 2004. Many of those were recovered from computers taken during the search. Many others were produced in response to a subpoena served on Al Haramain Ashland in June 2003. Still others have been obtained from banks, government files, and accountant Tom Wilcox.

### Pre-Trial Rulings And Potential Trial Evidentiary Issues

The Court has ruled on challenges to many of the exhibits and has upheld the legality of the search. It has denied Mr. Sedaghaty's motions for access to classified material and his requests to utilize classified material during the case. At this point, we do not anticipate any further motions challenging these issues.

The Court has ruled on two challenges under *Daubert*, denying the challenges but indicating some limitations on the testimony of the experts. At this point, we do not anticipate any further issues with those experts.

The Court has ruled on both defense and government challenges on evidentiary grounds to numerous exhibits, granting some but denying most

challenges by both parties.  At this point, one issue that may remain open is how many exhibits are pre-admitted and may be utilized in opening statement.

In Section E of the Order of August 11, 2010 (CR 407), the Court states that it views Mr. Sedaghaty's challenge to hearsay and guilt-by-association as going more to the weight of the evidence than its admissibility.  In this vein, Mr. Sedaghaty anticipates that this case will present a very strong case for a motion for judgment of acquittal under Fed. R. Crim. P. 29 at the close of the government's case as a result of the circumstantial nature of the government's case and the major deficiencies he describes below.  In addition, because of the circumstantial nature of the government's case, the defense will be particularly vigilant in its objections to questions by the government of any witness, particularly Agent Anderson or Mr. Kohlmann, that could allow the government to provide the jury with something other than admissible evidence.

In Section M of the Order of August 11, 2010, the Court noted that it will need to rule on the admissibility of various statements that the government may offer at trial under the co-conspirator exception to the hearsay rules.  Mr. Sedaghaty remains concerned about this issue, particularly in light of the Court's statement in Section E9 on pages 15-16 that Mr. Abdul Qaadir-Abdul-Khaaliq is a co-conspirator.  Mr. Sedaghaty has no recall that the government or grand jury made any such finding or that the Court has been presented with

any evidence that Mr. Abdul Qaadir participated in any way with the donation from Dr. El Fiki.

We note that the government trial memorandum states its intent to offer evidence that money was smuggled into Chechnya.  We will be objecting to any such evidence.

The Court's Order of August 11, also notes that rulings are still outstanding on the defense challenges to AHIF 5-7, SW 1, and EK7.

Mr. Sedaghaty will file by August 24 a set of proposed voir dire questions and a motion relating to the manner in which peremptory challenges are made.

To the extent other evidentiary issues arise during the trial, and as the Court considers the jury instructions and how to conduct the voir dire, we believe that the statement of the case set out below is helpful.

### The Scope of the Trial

The large volume of documents has been carefully analyzed by the parties.  From more than 23,000 recovered emails, numerous QuickBooks files, and the trove of paper documents obtained by subpoena, many hundreds were found that are relevant to the issues in the case.  Because the government's case is largely circumstantial and the defense is in the position of attempting to, in essence, prove a negative or disprove a chimera, both parties are utilizing more documents than might otherwise be the case.  In addition, in order to rebut the inferences that the government will be asking the jury to draw from

circumstantial facts that he believes are taken out of context and are not indicative of Mr. Sedaghaty's views or intention, it may be necessary for the defense to call several witnesses.

The issues related to the intended use of the donations are seen by both parties as requiring explanation from experts so that the jury can understand why people were concerned about Chechnya, a little about the war there, and how it was funded.

The accounting issues in the case are, to a certain extent, a "he said, he said" situation.  Because Mr. Sedaghaty believes that Mr. Wilcox is unlikely to be candid with the jury, it will be necessary to utilize the extensive record of his prior communications with the government and working papers to demonstrate his unreliability and lack of credibility.  In addition, his testimony raises a number of issues that require discussion by accounting and tax experts.

### Fundamental Failings In The Government's Case

It is critical to keep in mind that the government will offer no proof that the money that Soliman Al Buthe traveled with on March 11, 2000, in fact went to the mujahideen in Chechnya, or offer any direct evidence of any conspiracy.  It is also critical to keep in mind what the government has not even attempted to gather.

The government's case is based on several fundamental mistakes and

assumptions.  Many will be revealed through cross-examination of the

government's witnesses.  Some will emerge through defense witnesses.

At its core, the government's case was based on its belief that Mr.

Sedaghaty prepared what is called the "Springfield Building Schedule," the

form found in Mr. Wilcox's working files valuing the Springfield prayer house at

$461,541.74 that was then transferred to the fixed assets schedule (line 57A)

on the year 2000 tax return.  That was one of the pillars of the government's

presentation to the grand jury where Colleen Anderson testified that Mr. Wilcox

"said that they had their own accounting program within the prayer house and

that they would print these out and give them to him for preparation of tax

returns."  And it is at the core of the indictment in paragraph O of the manner

and means.

In August 2009, six years after he was first interviewed and only after he

was confronted with a computer-generated audit trail demonstrating that his

previous statements were false, Mr. Wilcox finally told IRS Agent Anderson that

he actually entered <u>all</u> the data that went onto the schedule and that he

printed it himself.

We anticipate that cross-examination of Mr. Wilcox will reveal that he

has made a number of false statements.  We anticipate he will admit some of

his misstatements.  Some will be revealed through comparison of his words

with the objective data that is in the computer record.

**Page 10 -       DEFENDANT'S TRIAL MEMORANDUM**

In addition, cross-examination will show that Mr. Wilcox is not reliable. While he held himself out as an expert in charitable tax accounting, his work was replete with fundamental mistakes, including mistakes he made after Al Haramain Ashland provided accurate information he had requested. The cross-examination and experts will reveal that Mr. Wilcox ignored generally accepted accounting principles and failed to gather essential documents.

Pete Sedaghaty relied on Mr. Wilcox. He had no reason to doubt that this former IRS agent would do for him what he had promised in his introductory letter and retainer agreement. Mr. Wilcox failed Mr. Sedaghaty in a number of ways, including by the mistakes and assumptions he made in preparing the Springfield Building Schedule.

A second fundamental mistake on the accounting aspect of the case will be revealed through the testimony of the tax experts. Marcus Owens will testify that he was the head of the Internal Revenue Service Charitable Tax Section up to 2000. It is his opinion that Dr. El Fiki's donation should not even have been reported on the tax return, both because it was earmarked for a particular purpose and because it was a donation to Al Haramain Saudi Arabia, not to Al Haramain Ashland, Mr. Owens will also testify that the precise value of a building owned by a non-profit organization is not material to any function of the IRS.

With respect to the aspect of the conspiracy count involving the CMIR violation, the law is clear that a reporting violation charge requires proof that the defendant knew of the reporting requirement.  *See United States v. Tatoyan*, 474 F.3d 1174, 1179 (9th Cir. 2007).  We anticipate that there will be no proof with respect to Mr. Sedaghaty or Mr. Al Buthe.

### The Defense Response to And Case On Willfulness And Intent

Turning to the non-accounting aspects of the case – what happened with Dr. El Fiki's money, or where did Mr. Sedaghaty intend it to go – there are a number of glaring deficiencies in the government's case: first, there is no proof that the money went to mujahideen in Chechnya; second, there is no proof of any conspiratorial agreement; third, everything that Mr. Sedaghaty and Mr. Al Buthe did was done openly, documented, and is entirely inconsistent with notions of a criminal conspiracy; fourth, the written record in the most relevant time frame – December 1999 to March 2000, is replete with Mr. Sedaghaty's concern for the plight of the Chechen refugees and his desire to get them humanitarian aid; and fifth, Mr. Sedaghaty's intent to provide humanitarian aid is consistent with his mind-set and long-time activities working for peace.

The defense anticipates it will be calling three experts on these issues: Col. Patrick Lang, former head of Human Intelligence for the Department of Defense.  He will expand on the testimony he offered at the *Daubert* hearing. Dr. David Long, former Deputy Director of Counter-Terrorism for the

Department of State, and Prof. Tugrul Keskin will also discuss the Chechen war and Saudi charities.

Col. Lang and Dr. Long, and to a lesser extent Prof. Keskin, will address the issues brought up by the testimony of Mr. Kohlmann with respect to the Russian/Chechen conflict.  This would include the effort for autonomy in Chechnya that was partially successful after the first Russian Chechen war that ended in 1995.   The Chechens wanted more independence, and in the late 1990's, war broke out again.  This time the Chechen people, the majority of whom are Muslim, were joined in their efforts by Muslims from other parts of the world.  The Russians fought back with a vengeance.  The brutality of their response brought condemnations from the United States, Europe, the United Nations, and numerous humanitarian organizations.  In 1999, 2000, and 2001, the Department of State included sections on the Chechen situation in its annual report on human rights conditions.  The Department of State reported that several hundred thousand people had been driven from their homes and were living in desperate conditions in refugee camps.  Grozny, the Chechen capital, was virtually leveled and looked like Berlin in April 1945.  For a time, the Russians cut off humanitarian aid.

The experts will also discuss the agreement between the Russian and Saudi governments that was reached in 1999 for provision of aid to the Chechen refugees.  They will explain the creation of what was called the Saudi

Joint Relief Committee and Al Haramain Saudi Arabia's role in it to get aid to the refugees in 1999 and 2000.  Col. Lang will review the exhibits the defense has marked from Saudi Arabia.  He will offer many of the opinions contained in his declarations, report, and *Daubert* hearing testimony.

Dr. Long will discuss Islamic and Saudi law, the relationship between the Saudi government and Saudi charities and the limitations on use of zakat.

Professor Keskin, a native of Turkey, will testify about Islamic law and the videos that include Turkish television footage.

Mr. Sedaghaty will present a number of documents from the Al Haramain Ashland computers and others that provide a context for the concern he expressed over the Russian/Chechen war.  The Court and jury will learn that the concern expressed by Mr. Sedaghaty mirrors that of the United States government and many humanitarian organizations, both Muslim and non-Muslim.  The Court will learn from documents recovered from the computers that, prior to his awareness of the donation from Dr. El Fiki, Mr. Sedaghaty was working very hard to get humanitarian aid to Chechnya.  While the money from Dr. El Fiki was in Ashland, Mr. Sedaghaty continued those efforts with that money in mind.

In addition to the experts and documents, Mr. Sedaghaty may call a number of witnesses who worked for Al Haramain in Ashland and in Al Haramain Saudi Arabia.  These witnesses would describe how Mr. Sedaghaty

opened his home as a center for prayer for the local Muslim community and, in 1989, set up what he called the Qu'ran Foundation, an organization that was active both in Southern Oregon and nationally, explaining Islam and providing literature to interested people.  Mr. Sedaghaty funded the Qu'ran Foundation out of his own pocket.  These witnesses would also describe the humanitarian work of Al Haramain Ashland and Al Haramain Saudi Arabia and how Mr. Sedaghaty became involved with Al Haramain Saudi Arabia.

Mr. Sedaghaty may call a number of witnesses who were regular attendees at the Prayer House in Ashland who will describe its operations, Mr. Sedaghaty's moderation and tolerance in religion, and may provide a counter-point to two of the government witnesses, Daveed Gartenstein-Ross and Barbara Cabral.

Finally, Mr. Sedaghaty may call a number of witnesses who will describe his activities as a peace partner in Ashland.  These would include a Rabbi, Minister, and professor.

The defense witnesses would also describe how Mr. Sedaghaty did well in The Arborist business and became a well known public figure in Southern Oregon throughout the 1990's as a result of his ecumenical, interfaith, peace-oriented, and public work as a spokesperson for moderate Islamic views in Southern Oregon.  He was also known in the community for his work as an arborist, consultant to local governments on issues related to trees, and as a

founding member of State of Oregon Urban Forestry Board.  Mr. Sedaghaty was highly visible and often written about in the media, as open in his civic and religious life as he was in his dealings with relief for Chechnya.

Through cross-examination of government witnesses, defense witnesses and the documents, the Court will learn that the plight of the Chechen populace and brutality of the Russians brought condemnation and expressions of concern not only from U.S. and world leaders, but also from the Muslim community.  Al Haramain Saudi Arabia, which had been active in the region for years, sent out appeals for aid for the refugees and provided updates on the fighting.  Many of the reports were sent through list serves to which Mr. Sedaghaty, or others in Al Haramain Ashland, subscribed.  Some of the reports of both the devastation and the heroics of the Chechen fighters are quite similar to those published by such mainstream entities as Time Magazine and CNN.

As the situation worsened in Chechnya, Mr. Sedaghaty's concern about the plight of the Chechen refugees increased.  He read whatever reports he could find about the situation, on list-serves, the Al Haramain website, and in the main stream media.  And Mr. Sedaghaty decided to act: to try to raise money for and deliver it to the needy refugees in Chechnya.

Al Haramain Ashland had been gathering small donations for Chechen humanitarian aid during 1999.  As the news reports of the horrible condition

there increased late in 1999, Mr. Sedaghaty stepped up his efforts.  From December 30 through March 7, he and his staff worked actively to try to solicit funds for refugee relief and then find a way to get it there.  As noted above, the Al Haramain Ashland computers are replete with those efforts.  He communicated with Soliman al Buthe seeking to energize Al Haramain Saudi Arabia.  He communicated with his former employee, Daveed Gartenstein-Ross, who joined in the efforts and tried to help Mr. Sedaghaty obtain a visa from the Russian government.  He contacted other humanitarian organizations, both Muslim and non-Muslim.

Al Haramain Ashland received one significant donation, approximately $36,000 from the Islamic Society of North America, based in Toronto, Canada.

The Court will see how Mr. Sedaghaty's efforts paralleled those of Al Haramain Saudi Arabia, which was also soliciting donations for Chechen refugees in 1999-2000.  Through the government's case and additional exhibits introduced by the defense, the Court will see that in January, a wealthy Egyptian Philanthropist, Dr. Mahmoud Talaat El Fiki, who was aware of Al Haramain Saudi Arabia's work with the SJRC, responded to an announcement placed by Al Haramain Saudi Arabia.  Prior to making his donation, he confirmed that his donation, or zakat, would be used to aid the poor, orphans, and refugees in Chechnya.

While he is an Egyptian, Dr. El Fiki's had much of his money in London and asked Al Haramain Saudi Arabia if they had an account in London to which he could transfer his gift. They did not, but Dr. El Fiki was given the option of using a Saudi bank or another western bank, the Bank of America in Ashland. He chose Ashland and wired approximately $150,000 in late February 2000. With the money from Dr. El Fiki and ISNA in hand, Mr. Sedaghaty stepped up his efforts to get it to Chechnya. But he was unsuccessful.

Then in early March he learned that Mr. Al Buthe was traveling to the United States. The decision was made for Mr. Al Buthe to carry the money back to Saudi Arabia and turn it over to Al Haramain Saudi Arabia for transmission to the Chechen refugees.

Mr. Sedaghaty and Mr. Al Buthe drafted an agreement regarding transfer of the money. The Court will learn how they arrived at the amounts reflected on the government's exhibits. While the agreement reflected the full amount of money Al Haramain Ashland had collected for the refugees, Mr. Al Buthe actually left with less, approximately $151,000, a combination of the donation from Dr. El Fiki, ISNA, and several smaller contributions. He was, however, obligated to deliver the full amount of zakat to Al Haramain Saudi Arabia.

Mr. Sedaghaty and Mr. Al Buthe went to the Bank of America branch together in Ashland to purchase travelers checks. They dealt with a manager

Mr. Sedaghaty had gotten to know over the years. They bought all the travelers checks available in $1000 denominations and took the rest in a cashier's check. There was nothing suspicious or surreptitious about their trip to the bank. Everything they obtained was in the open and fully traceable.

After his return to Saudi Arabia, Mr. Al Buthe fulfilled his obligation to Mr. Sedaghaty, Dr. El Fiki, ISNA, and the other donors. He deposited $187,000 with the Al Haramain office in Riyadh. When he left the United States, he did not declare the money. There will be no evidence that Mr. Sedaghaty or Mr. Al Buthe were aware of the reporting requirement or that the two men had ever discussed the issue.

The totality of the evidence will reveal the inconsistency between the government's theory and the clear record of Mr. Sedaghaty's life. It will reveal that Mr. Sedaghaty's intent with the donations for Chechnya is entirely consistent with similar ideas and efforts he made over the years for assisting refugees in Tajikistan, Afghanistan, and Kosovo. And his conduct here was consistent with a prolonged campaign Mr. Sedaghaty undertook in 2002 through the State Department, Office of Foreign Asset Control and Israeli government, to deliver money to Palestinians in the West Bank.

Mr. Sedaghaty's efforts to get aid to Chechen refugees is also entirely consistent with his life-long work as a spokesperson against extremism in

religion, terrorism, and as a partner for peace with religious, educational, and civil leaders in Southern Oregon.

Indeed, in the very same months – September and October 2001– when the government alleges that the conspiracy to defraud the government was culminated, Mr. Sedaghaty was meeting regularly with government officials, including Agent David Carroll of the F.B.I.  Over the next several years, he met regularly with Agent Carroll, sometimes at the agent's request, sometimes on his own initiative.  He spoke with him about terrorism, expressed his horror at the acts of September 11, offered to help deal with Osama Bin Laden in whatever way he could.  Less than two weeks after signing the tax return he contacted the Office of Foreign Asset Control to see if he could arrange delivery of aid through Iran.  He spoke out in the community.  He wrote to Al Haramain officials in Saudi, at great peril to himself, urging them to take a strong stand against Bin Laden and terrorism.

Again, this is all consistent with Mr. Sedaghaty's efforts as a partner for peace and shows what his intent was with the money donated for Chechnya – he wanted it to go for humanitarian purposes.

Mr. Sedaghaty believes that the evidence in this case will provide a compelling case for a judgment of Acquittal under Fed. R. Crim. P. 29.

Respectfully submitted this 18th day of August, 2010.


/s/ Steven T. Wax
Steven T. Wax
Federal Public Defender

/s/ Lawrence H. Matasar
Lawrence H. Matasar