# EXHIBIT A

Steven T. Wax, OSB No. 85012
Federal Public Defender
101 SW Main Street, Suite 1700
Portland, OR 97204
Tel: (503) 326-2123
Fax: (503) 326-5524
Email: steve_wax@fd.org

Lawrence Matasar, OSB No. 74209
621 SW Morrison Street, Suite #1025
Portland, OR 97205
Tel: (503) 222-9830
Email: larry@pdxlaw.com

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 05-60008 HO |
| Plaintiff, | |
| v. | DECLARATION OF FEDERAL PUBLIC DEFENDER INVESTIGATOR JAMES STRUPP |
| PIROUZ SEDAGHATY, | |
| Defendant. | |

I, Jim Strupp, declare:

1.    I am an Investigator employed by the Federal Public Defender for the

District of Oregon. As part of my duties, I was assigned to conduct investigation

in the above captioned case for Steven T. Wax, along with Federal Public Defender Chief Investigator William Teesdale.  This Declaration is made in support of Defendant's Motion for a Continuance, or in the Alternative, a Motion  to Allow Witness Testimony Via Two-way Video Conferencing.

2.    Specifically, I was requested by Mr. Wax to locate and, if possible, interview Muhammad Sui. I understood Mr. Sui to be an individual who may or may not be living overseas, and who may have relevant information about this case.  Mr. Teesdale was also given the same request, and in preparation of this declaration I spoke with him about his efforts in that regard.

3.    I have been trying to locate Mr. Sui intermittently for approximately 16 months. I have used multiple public and proprietary sources to research possible locations for him, possible relatives, and possible associates through which I might make contact.

4.    Mr. Teesdale has told me that in April, 2009, he made a request of co-defendant's counsel to inquire of several individuals in Saudi Arabia whether current contact information existed for Mr. Sui. Mr. Teesdale also consulted the online public records reseller Accurint, of which this office is a subscriber, for possible leads for locating Mr. Sui. Mr. Teesdale was advised that a number of individuals in Saudi Arabia made efforts to locate Mr. Sui.  These efforts did not bear any fruit, and did not result in any viable contact with Mr. Sui.

5.    I also consulted Accurint on several occasions, attempting to develop

Page 2   **DECLARATION OF FEDERAL PUBLIC DEFENDER INVESTIGATOR JAMES STRUPP**

leads for Mr. Sui. Accurint is a proprietary public records reseller, which aggregates and cross-references public record references for particular individuals, based on search criteria (such as name, date of birth, possible address, etc.) supplied by the user. I was able to conclusively identify Mr. Sui's personal identifiers within Accurint. Using searches derived from this information and subsequent search results, I was able to establish possible leads to relatives and other associated individuals.

6.    In February, 2010, I made several contacts based on these leads, and inquired about other records concerning Mr. Sui's possible whereabouts. These records included New York property records, New York City Taxi and Limousine Commission records, tax assessor records, New York State court records, California business records, California and New York public phonebook information and Internet white pages listings. None of the information produced led me to Mr. Sui.  I also consulted other public records, which allowed me to conclusively identify a brother of Mr. Sui, who had been residing in the United States as a graduate student. I did not know whether that brother was still currently in the United States. Consulting university directories, academic publications, patent records, academic websites, and other sources, I attempted to locate his brother. Eventually, I did develop what I believe to be several e-mail addresses for the brother, at least two of which I consider to be current and valid.

7.      In May, 2010, I contacted a possibly related individual in New York State by telephone, as well as a possibly related individual in Texas by telephone. Neither of those individuals was cooperative with me in providing current contact information for Mr. Sui.  In June, 2010 I also developed a possible method of contacting Muhammad Sui through an online service. On June 2, I sent a request for contact to Mr. Sui through the service, without any response from him.

8.      In June, 2010 I sent several e-mail messages to Mr. Sui's brother's e-mail addresses, as well as to two of his known colleagues - one in California and one in Saudi Arabia. I also attempted phone contact with one of the colleagues. None of these attempts resulted in further contact from any recipient, or information about Mr. Sui's whereabouts.

9.      In early August, 2010, I again inquired of co-defendant's counsel whether he had any possible contact information for Mr. Sui. On August 16, 2010 I received two overseas telephone numbers and a possible e-mail address for Mr. Sui, from co-defendant's counsel. That same day, I called Mr. Sui at the phone numbers, and did speak with him.  He is currently located in Guangzhou, China. I asked him several questions concerning the areas in this case about which he may have information, and completed a phone interview with him. He told me that he is a U.S. Citizen with a valid U.S. Passport. He resides in Guangzhou, China, which is about two hours travel time from Hong Kong. A summary of that interview is attached to Defendant's Motion for a Continuance, or in the

Alternative, a Motion to Allow Witness Testimony Via Two-way Video Conferencing as Exhibit B.  Subsequent to the interview of August 16, I transmitted a copy of an agreement also depicted in Government's Trial Exhibit AHIF-3, which appears to bear Mr. Sui's signature.  The copy I transmitted was not received from the Government through discovery in this case, and as such, is not subject to the Court's Protective Order concerning discovery.  The copy of the document I transmitted to Mr. Sui is attached to Defendant's Motion for a Continuance, or in the Alternative, a Motion  to Allow Witness Testimony Via Two-way Video Conferencing as Exhibit C.

10.    I have had several phone conversations with Mr. Sui since August 16, attempting to secure his appearance at trial in this court. He has indicated that he is unwilling and unable to voluntarily travel to the United States from China to attend Mr. Sedaghaty's trial as a witness. He has said that travel to the United States on short notice would severely jeopardize his current business interests in China. He has also told me that he is a Muslim and has religious concerns about traveling during the holy month of Ramadan, and on the days of Eid to attend trial.

11.    I most recently spoke with Mr. Sui over the phone on August 23.  In response to my question, he said that he would be willing to accept voluntary service of a subpoena in order to provide testimony to this court through live two-way video conference link at the U.S. Consulate General in Hong Kong.

12.    I do not believe that I can currently serve Mr. Sui with a valid criminal subpoena in this case. Service of subpoena on witness in a foreign country is governed by 28 U.S.C. §1783, which states, in part, "Service of subpoena... shall be effected in accordance with the provisions of the federal Rules of Civil Procedure relating to service of process on a person in a foreign country." Federal Rule of Civil Procedure 4(f) states:

----------------

(f)    Serving an Individual in a Foreign Country.

Unless federal law provides otherwise, an individual - other than a minor, an incompetent person, or a person whose waiver has been filed - may be served at a place not within any judicial district of the United States:

(1)    by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;

(2)    if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:

(A)    as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;

(B)    as the foreign authority directs in response to a letter rogatory or letter of request; or

(C)    unless prohibited by the foreign country's law, by:

       (i)     delivering a copy of the summons and of the complaint to the individual personally; or

      (ii)    using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or

    (3)    by other means not prohibited by international agreement, as the court orders.

------------------

13.    I have learned that China is a party to the Hague Convention on Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters, as is the United States. I have also learned that valid service of legal process in China can only be accomplished under the terms of the Hague Convention, through the Chinese Central authority, which is the Department of Judicial Assistance and Foreign Affairs, Ministry of Justice, People's Republic of China. I further learned that the Department of Judicial Assistance and Foreign Affairs in China advises litigants that service of process usually takes 3 to 4 months.

14.    I further learned through United States State Department published information that service of subpoena by mail in China is prohibited for compulsory process. Additionally, according to the State Department the compulsion of testimony and documents within China pursuant to the Hague convention, letters rogatory, and other requests are typically unsuccessful and

can require up to one year.

15.    If valid service of the United States criminal subpoena were possible prior to the conclusion of trial in this case, it is not clear to me what viable enforcement options would be available should the witness declined to comply with the subpoena. I have learned that the United States and China are party to a Mutual Legal Assistance Agreement.   However, actual cooperation between judicial authorities in the two nations is often only successful on a case-by-case basis. See the United States, China, and Extradition: Ready for the next Step?, MacCormack, Anne, 446 Legislation & Public Policy, [Vol. 12:445, 2009].

16.    I have also learned that the United States and China are not signatories to an extradition treaty.

17.    On August 22 and again on 23rd, 2010, I consulted separately with two consular officers at the United States Consulates General in Guangzhou, China, and Hong Kong & Macau. Both consular officers told me that live video conference equipment is available at their facilities. The consular officer in Guangzhou said that there may be prohibitions upon taking sworn depositions for use in a foreign court by a foreign consular officer, within Chinese territory. At my request, she is consulting her legal advisers at the State Department in Washington DC to clarify whether the prohibition on taking sworn depositions would apply to providing live video feed testimony to this court. She also stated that these legal prohibitions may not apply in Hong Kong, which enjoys a separate

legal framework than mainland China. She is also seeking this clarification about this, at my request.

18.    The consular officer in Hong Kong said that they can provide a consular officer to preside over live video feed testimony to this court, from a location in Hong Kong, whether private or at consular facilities. A U.S. consular officer would administer the oath to the witness, and swear any court reporters or other personnel attending the testimony in Hong Kong if needed, and certify the proceedings to this court. The consular officer indicated that, generally, there are security concerns that may prohibit them from taking the testimony at the Consulate's facility, but the consular services are available to be performed at private locations in Hong Kong. The consular officer I spoke with is consulting with her superiors to see whether two way video link facilities would be available at the Consulate's office, if a private location were not suitable. In either case, the Consulate can provide staff to properly oversee the taking of the video testimony for this court.

19.    In connection Muhammad Sui's possible travel to the U.S. and appearance as a live witness in this court, the U.S. Marshals initiated a check of the National Crime and Information Center (NCIC), based on personal identifying information I supplied to them, including date of birth and Social Security number. It was reported to me that Mr. Sui does not show any criminal history, wants, or warrants in the NCIC system.

20.    Based on the foregoing, I believe that there are no viable means to secure Muhammad Sui's testimony through the issuance of a properly served subpoena in this case, and that he is effectively unavailable as a compulsory witness. Further, I believe that his sworn testimony could be secured in live fashion for this court, through two-way videoconference means during trial.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of knowledge and belief, and that this declaration was executed on August 25, 2010, at Portland, Oregon.

_James Strupp_

James Strupp

# EXHIBIT B

# INVESTIGATION MEMORANDUM

Case: U.S. v. Sedaghaty; CR 05-60008-HO
Attorney: Steven T. Wax
Invest: Jim Strupp
Witness: Muhamed Sui

Date: August 16, 2010

On August 16, 2001, I spoke with Muhamed Sui telephone number listed above. In summary, he related the following:

Mr. Sui lives in Guangzhou in Guangdong Province, China. He has lived there for about 8 years. He is a businessman there.

He traveled from Saudi Arabia to the United States, and back again, with Soliman Al Buthe in March, 2000.They traveled from Saudi Arabia by air, and landed at John F. Kennedy Airport in New York. They transferred to a domestic flight in Newark, New Jersey, and continued on to Portland, stopping in Tennessee along the way.

The purpose of his trip was to do some sightseeing and make new friends. He also knew of Pete Seda and his family through Soliman prior to the trip and part of his purpose was to meet Mr. Seda.

Mr. Sui was born in Saudi Arabia. He is a US citizen and holds a valid US passport. He was naturalized as a US citizen, in approximately 1996, in New York City where he lived at the time.

He understood Solomon Al Buthe's trip was to conduct business as a part of the Al Haramain Foundation, Saudi Arabia, with Pete Seda, whose organization was part of Al Haramain, located in Oregon.

He recalled funds being transferred from Pete to Solomon. He signed an agreement memorializing this transfer, as a witness to Pete and Soliman. He understood that the money referred to in the agreement were collected donations for the foundation in Saudi Arabia and the transmission of money to Solomon was for that purpose. The agreement was for the collection and the receipt of collection of those monies. He does not recall what the money was to be spent on. Mr. Sui was also read a copy of the agreement that he made verbatim. He has also been provided a copy and verified his signature.

Mr. Sui is Muslim. To sign a form as a witness is to witness before Allah, he said.

Page 1  INVESTIGATION MEMORANDUM: Muhammad Sui  8/16/2010

He does not recall any discussion between Pete, Solomon, or anyone else that Al Haramain concerning this document relating to fighting, jihad, or mujahideen. He does not recall having any discussions with Pete Seda at any other time concerning any of these subjects, relating to any other matter.

On the way to Oregon, they met and were accompanied by Nabil Rajeh, who traveled with them to Oregon from Tennessee. He recalls him being in Oregon but he does not recall him signing the document, except upon being refreshed in his recollection about this fact.

He does not recall a discrepancy between two amounts on the agreement he signed. He recalls some calculations being done to arrive at the amount on the agreement. He recalls Solomon Al Buthe had a balance sheet or accounting sheet of some sort that he used to arrive at the figure placed in the agreement.

He recalls seeing travelers checks with Solomon Al Buthe in connection with the monies that were being collected and transmitted. He does not recall a cashiers check.

He recalls that the Islamic Society of North America (ISNA) had a big event fundraiser concerning raising money for Chechnya refugees around that time. He not recall whether ISNA donated funds to Al Haramain in Oregon.

Inbound to the United States, they landed at JFK airport. He does not recall meeting anyone in the city. He does not recall renting a car and driving to upstate New York.

He traveled back to Riyadh, Saudi Arabia with Solomon Al Buthe, through JFK to Riyadh. They traveled from JFK on Saudi Arabian Airlines. They did not encounter any Customs inspections on the way out. They were not personally presented with any Customs forms at their departure of JFK. He does not recall any signage, kiosks, or stands containing Customs forms that were presented to travelers in the airport.

He has traveled from JFK to Riyadh, Saudi Arabia approximately 20 times. The trip in March, 2000 was his most recent travel from the United States. He has never encountered Customs inspection, forms, kiosks, signage or any other Customs stations requiring customs forms on his outbound departure from JFK to Saudi Arabia. He recalls encountering Customs inspections every time he entered the United States at JFK and every other airport through which he entered the U.S.. He recalls that at the airline gate he had to deposit an I-94 immigration entry/exit form with the airline staff. It was common for other travelers Saudi Arabia that he knew to forget to deposit that form.

He not recall speaking with Soliman about any Customs forms on their travel back to Riyadh. He did not know specifically whether Soliman was hand carrying any travelers checks. There was no discussion whatsoever between the two of them regarding Customs or reporting currency.

**Page 2**        **INVESTIGATION MEMORANDUM: Muhammad Sui**        **8/16/2010**

In Oregon he recalls going to a bank with Soliman, but does not recall it associated with getting travelers checks and does not recall any details about the stop.  It occurred during a shopping trip.

Specifically, he does recall seeing travelers checks in connection with the amount that was signed for. He does not know whether it was $188,000. He does not recall seeing any cash in connection with this amount.  He does not recall whether the monies that were being memorialized in the agreement that he signed were monies for Zakat.

He has never known Pete Seda to espouse jihad, mijahadeen, or violent forms of Islam. He has known Solomon Al Buthe to be a supporter of the poor, needy, and the families of oppressed peoples. He has had no discussion about this case with Solomon or Pete prior to this phone call.

# EXHIBIT C

Bismillah
May prayers and peace be upon the Messenger Muhammad

This is an agreement bet Soliman and Abu Yunus.  This agreement states,
that Abu Yunus is turning all monies and responsibilities that were collected
for the Brothers and Sisters in Chechnya over to Brother Soliman.  Soliman
states that he has received monies in the amount of $ 188465.00 ,
and he also fully relieves Abu Yunus of all responsibilites to the money.

X_____

X_____

Date: 4th of Thul Hijjah, 1420

Witness #1:_____

Witness #2:_____

AHIF 000601

AHIF 000601

101829 B&W

EXHIBIT C