1               IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF OREGON

3   UNITED STATES OF AMERICA,        )
                                     )
4                   Plaintiff,       ) No. 05-60008-2-HO
                                     )
5     v.                             ) August 26, 2010
                                     )
6   PIROUZ SEDAGHATY, et al.,        ) Eugene, Oregon
                                     )
7                   Defendants.      )

8


9          TRANSCRIPT OF PRETRIAL PROCEEDINGS

10       BEFORE THE HONORABLE MICHAEL R. HOGAN

11         UNITED STATES DISTRICT COURT JUDGE

12

13

14                      -:-

15

16

17

18

19

20

21

22

23            Deborah Wilhelm, CSR, RPR
                   Court Reporter
24               P.O. Box 1504
               Eugene, OR  97440
25               (541) 431-4113

```
 1                      APPEARANCES OF COUNSEL

 2

 3    FOR THE PLAINTIFF:     CHRISTOPHER L. CARDANI
                             United States Attorney's Office
 4                           405 E. 8th Avenue, Suite 2400
                             Eugene, OR  97401
 5                           (541) 465-6771
                             chris.cardani@usdoj.gov
 6
                             CHARLES F. GORDER, JR.
 7                           United States Attorney's Office
                             1000 S.W. Third Avenue, Suite 600
 8                           Portland, OR  97204-2902
                             (503) 727-1021
 9

10    FOR THE DEFENDANT:     LAWRENCE H. MATASAR
                             Lawrence Matasar, P.C.
11                           621 S.W. Morrison Street
                             Suite 1025
12                           Portland, OR  97205
                             (503) 222-9830
13                           larry@pdxlaw.com

14                           STEVEN T. WAX
                             MICHELLE SWEET
15                           Federal Public Defender
                             101 S.W. Main Street, Suite 1700
16                           Portland, OR  97204
                             (503) 326-2123
17                           steve_wax@fd.org

18

19    Also present:          Agent Anderson
                             Agent Carroll
20

21

22

23

24

25
```

```
 1              (Thursday, August 26, 2010; 8:07 a.m.)

 2                    P R O C E E D I N G S

 3         MR. MATASAR:  Good morning, Your Honor.

 4         MR. WAX:  Good morning.

 5         THE COURT:  All right.  Just one preliminary

 6    comment.  At least the -- on the defendant's exhibits,

 7    they've seemed to come in, the list at least, in

 8    somewhat piecemeal fashion rather than an amended list

 9    each time.  And I have not gone through the work of

10    trying to go through and determine which of the exhibits

11    I've already received, and which the government has no

12    objection to that I expect to receive.  And do either of

13    you folks have someone doing that, doing that sort of

14    detailed bookkeeping on the exhibits?  I don't need a

15    report on it now but --

16         MR. CARDANI:  Judge, excuse me.

17         THE COURT:  I've just got to decide how to use

18    the resources that I have or whether someone else is

19    going to perform that function before trial or at least

20    early in trial.

21         MR. CARDANI:  Judge, we have had the same

22    challenge.  And Special Agent Anderson has been very

23    good at creating a spreadsheet where she's got all of

24    the exhibits listed out with categories, as I'm reading

25    them on the screen, not admitted --
```

1          MS. ANDERSON:  This is the new one.  No

2     objection, objection basis, and this one.

3          MR. CARDANI:  Last week the court asked us to

4     submit kind of a one -- in one submission something just

5     like that, whether we had objections or not, or no

6     objections to the exhibits.  We did that.

7          THE COURT:  That's the document entitled

8     Government's Response to Defendant's Proposed Trial

9     Exhibits?  Yes.

10          MR. CARDANI:  It has a big one of these

11     attached to it?

12          THE COURT:  Yes.

13          MR. CARDANI:  So that's what we've done to try

14     to keep track of what's going on here.  That's the

15     latest, greatest from our standpoint.  In addition to

16     that --

17          MS. ANDERSON:  And we can actually provide the

18     court this document in electronic format so you guys can

19     use it any way you want to and change it and use it for

20     your purposes.

21          THE COURT:  Thank you.  And have you had

22     someone go through this to see if it's inclusive of

23     whether it lists all of your exhibits?

24          MR. WAX:  Yes, it listed all the exhibits

25     through a couple of the supplemental submissions, so

1    there are a few exhibits that we added after that was

2    prepared, I believe.

3            THE COURT:  Does Agent Anderson know about

4    those?  I'm just trying to get a paper to work off of

5    here.

6            MS. ANDERSON:  I think, Your Honor, that they

7    were filed after we submitted this, so if I can get a

8    copy of the new ones, I can add them and then e-mail

9    them to you.

10            MR. WAX:  The government has copies of all

11    them.  I didn't send them directly to the agent but the

12    government has them all.

13            THE COURT:  I'm sure they do, but what I'm

14    trying do get is a list right now.

15            MR. WAX:  Right, I understand.

16            THE COURT:  I want to help our court staff out

17    in that regard if I can, to make sure we're all in

18    agreement.

19            Okay.  Well, there are a number of specific

20    matters on the calendar today.  One has to do with the

21    defendant's fourth motion in limine, Document Number

22    402.  It seeks exclusion of government exhibits SW-1 and

23    EK-7.  I have written material on these exhibits.  Do

24    you have anything further?

25            MR. GORDER:  Your Honor, we're prepared to

1    submit the matter.  I just want to emphasize that what

2    we've done with the exhibits -- you know, there is three

3    videotapes, but two exhibits, is we have tried to come

4    up with a representative sample.  I don't know if the

5    court has had an opportunity to actually review the

6    videos, but we think they are important.  The two found

7    at Mr. Sedaghaty's home obviously reflect on what was

8    going on at the residence.

9         The third, the one that's called Kavkaz or

10   Caucasus Institute video is simply an aid for our expert

11   witness to provide the jury with some understanding of

12   what the situation in Chechnya was like.

13        THE COURT:  All right.  Any response?

14        MR. WAX:  The summary, as we see it, Your

15   Honor, is in essence irrelevant to the decision you have

16   to make.  And we've articulated why we believe they are

17   irrelevant and also inflammatory.

18        We've provided information from Professor

19   Keskin, who is of Turkish origin, who has offered his

20   insights as to the materials, one of which is derived in

21   large part from Turkish television.

22        THE COURT:  All right.  I haven't watched them

23   yet.  I've been working on other things.  But I will

24   before trial starts and I'll give you rulings.

25        I am ready to rule on EK-7.  I'll allow the

1    witness to use that and receive it as demonstrative

2    exhibit only.  It won't go to the jury.

3            Then there are some 404(b) issues.  One has to

4    do with Exhibit Number BOA-6.  And this is -- well, you

5    know what it is.  The one that has "Power Mac" written

6    on it, the check with "Power Mac."  I ruled on it

7    before.  I've been asked to reconsider that.  Is there

8    anything further about that?

9            MR. CARDANI:  No, Your Honor.

10           MR. WAX:  No.  Thank you.

11           THE COURT:  I am going to reverse myself on

12   that exhibit and exclude it.  The -- it's the -- at

13   least for the government's direct case.  It could become

14   admissible on cross depending on what the evidence is at

15   trial.

16           Now, then there is the matter of the alleged

17   collection of funds for Chechnyan mujahideen during

18   Hajj.  And any further comment about that?

19           MR. GORDER:  Your Honor, again, we think this

20   is critical state of mind, and motive, opportunity

21   evidence.  The witness is going to basically -- just to

22   give you a flavor of what she would testify about this,

23   is that she went on the Hajj with a group sponsored by

24   al-Haramain, that they were required to deposit, when

25   they entered Saudi Arabia, $200 to reimburse the Saudi

 1    government for transportation purposes or whatever

 2    during the Hajj.  Because their travel was arranged and

 3    picked up by the al-Haramain organization, they were not

 4    required to rely on the Saudi government for anything,

 5    so when they left, the Saudi government returned the

 6    money to them.  And at that point, Mr. Sedaghaty asked

 7    them to donate the money to the Chechen mujahideen.

 8         THE COURT:  All right.  Anything further?

 9         MR. WAX:  Yes, Judge.  That -- those facts are

10    contested.  We do not believe that that occurred.  And

11    the jury would then be required to hear testimony on

12    this collateral issue from a number of witnesses.  So

13    that is one of the primary points we made, and I want to

14    emphasize this morning.

15         THE COURT:  I'm going to admit that evidence on

16    motive, opportunity, intent, knowledge, and absence of

17    mistake.

18         The defendant revisits the issues concerning

19    the Al Rajhi -- is that how you say the name of the

20    bank?  Al Rajhi Bank records?  All right.  Anything

21    further on that?  The records will be allowed.

22         Then the defendant has some input about

23    peremptory challenges, objecting to the blind method the

24    government uses, blind strike method, I think that's

25    what the defendant calls it.  I've never used the term

1    before, but I don't take any pejorative from that.

2    Anything more on that?  All right.  I'll use my normal

3    method.  My intention is to allow up to 15 or 20 minutes

4    of -- to explore something that I've already asked

5    about, if I haven't covered it.  But I intend for any

6    questions by counsel to be true follow-up, and I'll

7    interrupt you if it's not.

8            There is some comment about defense

9    Exhibit 730.  And is there a summary that provides just

10   what Al-Sanad said?

11           MR. GORDER:  Yes, Your Honor.  If you look at

12   Exhibit 730 proffered by the defense several months ago,

13   so it's in the record, it's a copy of a letter I sent

14   them summarizing Sanad's statements.  It's an

15   unclassified summary, you know, we're in an open

16   session, but just to remind the court, it's one that you

17   approved in one of our CIPA filings 18 months ago.

18           THE COURT:  Thank you.  I want to look at that

19   again.  So, Mr. Baker, remind me, would you, please.

20           MR. WAX:  Your Honor, in focusing on it in the

21   trial preparation, we identified the issues that we

22   included in the pleading.  And we do not believe that it

23   is solely a statement of what was said by Mr. Sanad.  As

24   we read it, it appears to be a compilation of

25   information from different sources.  It also includes

1    what appears to us to be editorial type comments by the

2    drafter.

3            THE COURT:  I read your materials.

4            MR. WAX:  Thank you.

5            THE COURT:  And I understand your argument.

6    All right.

7            MR. GORDER:  Your Honor, if I could just follow

8    up on that, our position -- we told the defense if they

9    wanted to introduce that summary, we would stipulate to

10   it.  But we think it's either all or nothing.  You can't

11   pick and choose.

12           THE COURT:  Okay.  The defendant has filed a

13   motion for a continuance.  Is there anything on that?

14           MR. WAX:  Yes, regrettably the computer

15   apparently did not pass through the declaration from Jim

16   Strupp and the witness statement.  We had provided a

17   witness statement to the government independently, but

18   you do not have -- if I understand correctly -- the

19   declaration that was attached.

20           We understand, as we have all been preparing

21   and, you know, for trial, that, you know, we're ready to

22   go as of next week.  What is set out in Mr. Strupp's

23   declaration and summarized briefly in the pleading is

24   the fact that we have been looking for Mr. Sui for the

25   better part of our involvement in the case.  And as

1    Mr. Strupp explains in his declaration, we did not

2    locate him until last week.  And when we located him, we

3    located him in China.

4         Mr. Strupp explains in his declaration that he

5    was able to make contact with Mr. Sui, and has had a

6    number of telephone conversations with him.

7         THE COURT:  Is he in Hong Kong?

8         MR. WAX:  No, he's in Guangzhou, just across

9    from Hong Kong.  And what we -- we filed a motion in the

10   alternative for the continuance or to be able to take

11   his testimony via a video hookup.

12        In his declaration, Mr. Strupp explains that he

13   has been in contact with the State Department and the

14   State Department consulates in Guangzhou and in Hong

15   Kong.  He explains further that under the Chinese law

16   and the treatise with the U.S., the steps that would be

17   required to serve him with a subpoena or to take his

18   testimony even by video in mainland China in Guangzhou

19   is three or four months.

20        We've been advised that if he goes to Hong

21   Kong, then there are different rules, and that we would

22   be able to accomplish that to fit the current schedule.

23        And I apologize that the material did not get

24   through in the filing.  We called the office as soon as

25   we learned that.  And hopefully it's in the system now

1    and available to the court.

2            But that's the essence of the portion of the

3    declaration that covers the efforts that we have made

4    that sets out the due diligence, the failures, and the

5    stroke of luck that finally got us to him.

6            The witness statement explains the centrality

7    of his testimony, and it's apparent on its face.  The

8    government is offering as AHIF exhibits the two

9    documents signed by Mr. Sedaghaty and Mr. Al-But'he.

10   And it's their theory that these are fabrications and

11   have no relation to reality.

12           The witness statement that we've provided says

13   Mr. Sui confirms that he is one of the signers on the

14   AHIF document.  It is his signature.  He was present in

15   Ashland.  He traveled with Mr. al-But'he.  And he

16   explains the efforts that were made to calculate -- how

17   they calculated the 186 and $188,000 figures.  And he

18   also explains that he traveled with Mr. al-But'he when

19   he left the country, and that there were no signs that

20   were visible to him, no forms given out with respect to

21   the CMIR reporting issue.

22           So his testimony is right at the core of the

23   case.  It is absolutely essential.  It addresses the

24   critical aspects that the government has put forward.

25   And there is no other witness who will be able to

1  address either of those issues.  No one else was with

2  Mr. al-But'he when he traveled, to our knowledge.  And

3  he is an eyewitness to the signing.

4          MR. GORDER:  Your Honor, we start off with, we

5  definitely oppose a continuance.

6          THE COURT:  It's denied.

7          MR. GORDER:  And so the real question --

8          THE COURT:  I just said that by itself to allow

9  a point of incredulity.

10          MR. GORDER:  Okay.  Let me --

11          MR. WAX:  We understand our obligation to our

12  client.  I --

13          THE COURT:  That's fine.  I understand -- I get

14  that.

15          MR. GORDER:  Let me just set the record

16  straight here.  These receipts we received from the

17  al-Haramain organization from Mr. Matasar I believe in

18  2003 in response to a grand jury subpoena.  So I mean

19  these receipts have been sitting around for seven years.

20  It's not like these are -- this is a new piece of

21  evidence.  And it came from them.  So -- and there is

22  another person on the receipt.  We don't know why they

23  haven't tracked that person down, a signatory also.

24          I've read the witness statement that they've

25  provided.  There is relevant testimony.  I won't try to

1    contradict that.  How critical it is, I'm not sure.  And

2    the witness, as I understand from reading the report,

3    says he doesn't know what the purpose of the money was.

4    And I don't see anything in there about how they got to

5    the figure and that sort of thing.  So he doesn't have

6    tremendous insight into what Mr. Seda and Mr. al-But'he

7    were up to.

8            But the point that we want to emphasize is he's

9    a U.S. citizen.  He can be subpoenaed and come to court

10   and testify.  Under Title 28, the court can authorize

11   the issuance of a subpoena to be served in a foreign

12   country.  We have no objection to that.  We had the

13   court do the same for a potential witness in Egypt for

14   us a number of months ago.

15           THE COURT:  Is he a U.S. citizen?

16           MR. GORDER:  He is a U.S. citizen.

17           THE COURT:  I'm just asking the defense counsel

18   that.

19           MR. WAX:  He is, Your Honor.  And we have

20   explored the potential of a subpoena.

21           THE COURT:  Does he have a passport?

22           MR. WAX:  I do not know the answer.  I assume

23   he does otherwise --

24           THE COURT:  How could he be there, right?

25           MR. WAX:  Right.  But what Mr. Strupp's

 1    declaration explains is, what we have learned from the

 2    State Department about the steps that need to be gone

 3    through, and the -- as we have heard it from them, the

 4    impossibility of getting him here through the subpoena

 5    process in anything less than three to four months,

 6    that's the rub with the subpoena.  It just can't be done

 7    because of the Chinese law, the Chinese/U.S.

 8    requirements.  We would love to have him here.  That's

 9    why -- you know, obligation to the client, the first

10    request has to be, continue the case.

11         THE COURT:  You are saying it takes three or

12    four months to subpoena someone from Hong Kong?

13         MR. WAX:  He is not in Hong Kong.  He is in

14    Guangzhou.  He is in mainland China.

15         THE COURT:  But you intend for him to go to

16    Hong Kong.

17         MR. WAX:  We can probably get him to Hong Kong

18    for the video testimony.  But in terms of a subpoena to

19    use any compulsory process, we've been advised it's a

20    minimum three- to four-month process.

21         THE COURT:  If you can get him to Hong Kong,

22    why can't you get him here?  I've had lots of Chinese

23    witnesses before.

24         MR. WAX:  I cannot subpoena him to get here,

25    Your Honor.  He will voluntarily go to Hong Kong in

 1    order to provide the testimony.  In order to get him

 2    here, we would have to get a subpoena, and we cannot

 3    subpoena him, as we've had it explained to us through

 4    the State Department in anything less than three to

 5    four months.

 6              THE COURT:  That seems a little circular,

 7    frankly, but I need to look at the paper that was filed.

 8    Do you have anything more?

 9              MR. GORDER:  Your Honor, just our experience

10    with these video depositions from overseas is not good.

11    There is nothing to really impress the witness with the

12    oath.  And should this person perjure himself, we are

13    not going to be able to extradite him from China and

14    prosecute him.  And it -- I'm not sure there is this

15    impediment.  I don't know what conversations Mr. Wax has

16    had with the State Department.

17              When we got this yesterday, I communicated with

18    our Office of International Affairs.  The response I got

19    back was they thought under The Hague Convention there

20    was no impediment to serving the subpoena.  And they

21    would check with the State Department, and I just

22    haven't gotten a further response.

23              It seems to me they could fax a subpoena to the

24    consulate in Guangzhou and have Mr. Sui come there and

25    get served.  And I don't think there is any impediment

1    to him coming to the United States.  We are at least a

2    week away from the defense case.

3          THE COURT:  Have you checked to see if there is

4    a warrant out for him or anything like that?

5          MR. GORDER:  There is no warrant as far as I

6    know.  He may have a few issues but there is no warrant.

7          THE COURT:  All right.  We all have issues.  I

8    need to read the statement.  I haven't yet.

9          MR. WAX:  The one additional comment that I'd

10   like to make, Your Honor, is that it is difficult to

11   hear the government in this case saying that they have a

12   problem with video testimony.  In our paper we cite one

13   case of many in which the very same Department of

14   Justice has repeatedly stood up in court and said --

15         THE COURT:  You are -- you are -- I've been at

16   this 37 years, Mr. Wax.  We had people speaking five

17   languages in the General Paktipatt trial from all over

18   the world in all kinds of ways.  Let's go on to

19   something else.

20         That's all I have on the motions.  I have some

21   other thoughts.  What other matters do you folks have?

22         MR. WAX:  Well, in terms of the motions, I

23   guess it's not clear to us with respect to the exhibits

24   that we had proffered, our understanding from your

25   ruling of August 11 was that you were denying the

1    government's motion in limine which had been filed

2    previously.  What we perceive their filing on the 20th

3    to be, a request for reconsideration.  And does your

4    ruling of the 11th stand or are we now dealing with

5    the --

6         THE COURT:  There are many exhibits on the list

7    which I've reviewed for this hearing which are not

8    admissible.  All of these news reports, for example,

9    that sort of thing, and there are many that need

10   authentication.  And I don't know what that may be.  I

11   can't really rule on those until we get there.

12        There are a number that appear to be the purest

13   form of hearsay.  Those won't be admissible.  I could go

14   through each of them right now.  Those that the

15   government has no objection to, I'm ready to receive.

16   As far as that goes, I'll probably just do that by

17   minute order.  So, you know, if you want to go through

18   them one by one, we can.

19        MR. CARDANI:  Judge, if I might be heard on

20   that.  That would be helpful for opening statement,

21   because neither side wants to be showing the jury

22   exhibits which have not been received or be in the

23   position of having to object to the other side doing

24   that.  So giving a hard look at opening statements and

25   anticipating the defense opening, if they are bringing

1    stuff up that we have objected to as hearsay, we've got

2    to object to that.  So it would be helpful if the

3    court -- and we are prepared to go over -- we filed this

4    here, which serves as the basis for the objections, but

5    we're prepared to defend our objections today if the

6    court wants and also to get some guidance.

7           In the court's order of a couple of weeks ago

8    addressing the motions in limine, the court said things

9    like, you denied their motion in limine on certain

10   exhibits, but the next step of the government's evidence

11   on this as admitted wasn't there, and we just need --

12   just to make sure that we're solid -- an understanding

13   of those exhibits that actually should be received and

14   usable for opening.

15          THE COURT:  I want to do that last.  What else

16   do we have?

17          MR. CARDANI:  I have a number of things on my

18   agenda.  If I could pass this up to the court through

19   the courtesy of the clerk.  I've given this to the

20   defense.  This is a chart of a very pared down version

21   of a chart that we would like the jury to be able to

22   see, especially during the government's case in chief,

23   which identifies some of the players here with nothing

24   overly inflammatory in terms of their description.  But

25   the court knows from looking at the exhibits, stuff is

1    confusing.  And I think this would be helpful.  It is

2    not being offered as an exhibit, only as a demonstrative

3    aid to the jury.

4            MR. WAX:  We strenuously object, Your Honor.

5    It is highly prejudicial.  Khattab is completely

6    irrelevant.  There will be testimony about him, over

7    objection.  To put his photograph in front of the jury

8    at the outset injects a person into this case who has

9    zero bearing on it.

10           To put in a picture of a shadow, you know, the

11   Al Shoumar, you know, the suggestion of this shadowy

12   figure back in Saudi Arabia, again highly inflammatory

13   and prejudicial.

14           Mr. Abdul Qaadir will be testifying.

15           There will be photographs of Mr. al-But'he.

16   The government has one.  And at some point they can

17   introduce it.  We have a photograph of Mr. al-But'he.

18           Mr. Sedaghaty is present in the courtroom.  We

19   think this is just completely out of bounds.

20           MR. CARDANI:  I have nothing more to add.

21           THE COURT:  All right.  The -- what I'm going

22   to have you do, if you want to use this even for

23   demonstrative is to remove the descriptives below the

24   bottom three images.  Next?

25           MR. CARDANI:  Next, jury instructions.  It's

premature, but Mr. -- counsel has submitted a number of jury instructions which we have some serious consternation about as requiring us to prove too much. So we need to be heard on that, but if it's going to make its way into the defense's opening, then we really need to be heard on that earlier than usual.

Mischaracterization on the materiality requirements of the government.  The government has submitted the law in its proposed jury instructions on materiality.

The elements of the tax offense, whether the government has to prove that Mr. Sedaghaty actually knew this line, this line, this line was false, we disagree with that.

We disagree with their request that you instruct the jury that we have to prove both of the objects of the conspiracy to find him guilty.  That's, I believe, wrong.

We can be heard about this during trial as things go, but, again, I'm worried about opening statements.

THE COURT:  Just generally, I had to look to see if we had draft instructions yet.  We don't.  But I will as closely as possible follow the Ninth Circuit's form instructions.  And Judge Brown has committee

1   meetings all the time on that, and things tend to stand

2   up when they go down there.  So that's what I'll do.

3   And we will have -- I'll get you draft instructions

4   early in the trial.  And then we will meet at a --

5   sometime in the evening during the trial to go over

6   them.  All right?

7        MR. CARDANI:  Yes.  Judge, on that, with

8   respect to the Ninth Circuit's instructions, the court

9   flagged a while back some instructions coming out of the

10  Ninth Circuit in draft form.  The Ninth Circuit is about

11  to issue new instructions, new model instructions, a

12  couple that bear directly on some of the charges here.

13  I've reviewed those at length.  And some of those

14  instructions need to be reworked a little bit as they

15  apply here.

16        In our material, with the requested jury

17  instructions, I explained what that is.  But when the

18  court does look at that draft instruction, I think it

19  needs to give us an opportunity to better explain that.

20        THE COURT:  We will take a close look at it.  I

21  haven't, frankly, looked at that.  I want to get us off

22  to a start then.  And I want to know what the elements

23  are and then we'll go.

24        MR. CARDANI:  Of course.  Judge, the next issue

25  are stipulations.  The parties have made some strides,

1  some progress in stipulations.  That's good, for both

2  sides.  We appreciate that, and that will cut down the

3  number of witnesses on the government's side to probably

4  no more than a dozen in the case in chief.  So we are

5  making some progress in trying to streamline the trial.

6          An odd issue, we talked a while back about

7  placement, where each side sits during trial, and I want

8  to revisit that because we've given some thought and

9  discussion on that.  I think it's a bad idea to have the

10  defendant so close to the jury in this case.  And we

11  talked about this beforehand, about where everybody

12  sits, and it seems kind of silly, but I prefer not to

13  have the defendant on top of me, with all of my papers,

14  not close to the jury.  So we were in the courtroom

15  yesterday, and we would be proposing that we sit here,

16  and having our ALS computer specialist Ms. Cooke right

17  here.  She can work her magic from here.  And then we

18  can sit accordingly.  And there'd be plenty of room for

19  the defense to command both sides of the table.  And if

20  the defendant wants to face the jury, he can be on the

21  wraparound here.  So, again, just propose that as an

22  idea to the court.

23          THE COURT:  Do you wish to be heard on that?

24          MR. WAX:  We had gone over this in July, and

25  think that the agreement then should stand.

1                THE COURT:  I'll let you know.

2                MR. WAX:  Excuse me, Judge, can you let us

3       know, please, before Sunday?  We've arranged with the

4       marshal to get into the courtroom Sunday afternoon to

5       hook computers up.

6                THE COURT:  I will.

7                MR. WAX:  Thank you.

8                MR. CARDANI:  There are a couple of things that

9       the defense is proposing to get into that should be

10      brought up and discussed now so that we avoid issues at

11      trial having to have the jury excused.

12               As I understand Mr.  -- the defendant is

13      seeking to call FBI witnesses Dave Carroll and Joe Boyer

14      to talk about interviews that they had with

15      Mr. Sedaghaty or conversations they had with him in the

16      early stages of this case and post 9/11.

17               It raises some potentially provocative issues,

18      because if the point is that -- that they are trying to

19      make is that the defendant has been cooperative with law

20      enforcement, and why would he talk to the FBI if he was

21      trying to hide something, as the government suggests, it

22      opens the door to what's a fair response to that?

23      Because that's not the whole picture.

24               And the whole picture is when we did finally

25      learn about the Chechnyan transaction, and Special Agent

1    Anderson was on the case, she sent a letter, which I

2    have here, in November of '03 to Mr. Matasar -- to

3    Mr. Sedaghaty in care of his lawyer.  I am paraphrasing.

4    I'm investigating criminal violations of Internal

5    Revenue laws, including the Form 990 for the year 2000,

6    which is one of the charges here.  In connection with my

7    investigation, I would like to ask you questions

8    regarding the filing of the forms you filed on behalf of

9    al-Haramain.  If you are willing to be interviewed,

10   please contact me at the above address or phone number

11   so I may schedule an appointment.  And that was sent out

12   and received.

13          In response to that, Mr. Matasar essentially

14   said, you are not going to be able to interview

15   Mr. Sedaghaty.  So we were deprived of that opportunity

16   to ask him the questions we wanted.  We, of course, are

17   not going to bring this up in our case in chief.

18          But if they bring in these witnesses and in any

19   way, shape, or form, in opening statement, or through

20   the witnesses try to make this point, then the cases

21   suggest that there may be a door opening here, that we

22   get a fair response to lay the whole picture out.

23          THE COURT:  What are your intentions?

24          MR. WAX:  Our intentions are to ask Agent Boyer

25   about the one conversation he had with Mr. Sedaghaty in

 1  September of 2001 in the very month when the tax return

 2  was being prepared, and to elicit from him the portion

 3  of the conversation that involved the Springfield

 4  property and the value of the Springfield property.

 5          With respect to Agent Carroll, I do not recall

 6  at this moment how many times they spoke between

 7  September 16, 17, whatever the first day was, and

 8  October 16th, the day on which Mr. Seda signed and sent

 9  in the tax return.  Could have been seven or eight.  And

10  we believe that that is directly relevant to the

11  suggestion that he was engaged in a conspiracy.  This is

12  the alleged culmination of the conspiracy and

13  Mr. Sedaghaty's openness with Mr. Carroll at that time

14  bears directly on his state of mind.

15          Subsequent to the signing of the return from

16  the end of October through into 2002, there were a

17  number of other communications between Mr. Seda and

18  Mr. Carroll that we would intend to bring out to show

19  that he was, you know, continuing to initiate some

20  conversations with Mr. Carroll, responding to

21  communications from Mr. Carroll, and that they discussed

22  a number of things, including Mr. Seda's safety,

23  including safety of his family, including theft from one

24  of his bank accounts.  He signed a consent for the

25  government to have access to bank accounts in October of

1   2001.  And that, we think, is all relevant and does not

2   in any way open the door to actions that occurred well

3   over a year later after counsel came into the case.

4          THE COURT:  All right.  Well, cut a wide swath.

5   Don't invite that then.  Cut a wide swath around what

6   Mr. Cardani is talking about or you could invite that

7   response.  All right.

8          MR. CARDANI:  Another exhibit, the defense has

9   identified 699-B, as in boy, as a proposed exhibit, and

10  with reference to the defense's letter to Enaam Arnaout,

11  who was head of an organization, an Islamic charity

12  called BIF, Benevolence International Foundation, in

13  Chicago.  This was when the money was in Ashland but

14  before it left the United States.

15         Mr. Sedaghaty sent several letters or at least

16  in the computers appears to have sent several letters to

17  other organizations that were involved in moving money

18  and other items into Chechnya.  Obviously the point here

19  is that he's looking to get other aid organizations

20  involved, defeating the intent aspect of the

21  government's case.

22         The court should be advised that Mr. Arnaout

23  was later indicted and pled guilty in Chicago to

24  defrauding his donors.  And I believe -- I'd have to get

25  the details on this, but I believe it was for providing

1    support to the mujahideen in Chechnya.  In other words,

2    misdirecting the money away from donative purposes and

3    providing material support in some form of fraud to the

4    donors.  So that raises the possibility of does the

5    government get to respond if this exhibit comes in under

6    a discussion about Mr. Arnaout, the fact that he later

7    said -- supported the mujahideen.  It's obviously a

8    sensitive issue.  And I wanted to flag it for the court.

9         MR. WAX:  Judge, what you will see, what the

10   jury will hear, is that starting in late December of

11   '99, even before Dr. El-Fiki's donation had materialized

12   in any way in Saudi Arabia and long before Mr. Seda had

13   any awareness of it, he was making efforts to gather

14   money and to try to take a caravan of humanitarian aid

15   into Chechnya.

16        THE COURT:  On that document, how are you going

17   to get around hearsay, if you intend to offer it?

18        MR. WAX:  Well, I am very troubled by that

19   question, Your Honor.

20        THE COURT:  Okay.  What is your answer?

21        MR. WAX:  Well, from -- in what the government

22   alleges is the period of the formation of the

23   conspiracy, they are arguing that the statements by

24   Mr. Seda -- in fact the statements by Abdul Qaadir that

25   Mr. Seda may never have received or may never have read

1    are admissible.  And if we understand correctly, Your

2    Honor has ruled that those are admissible,

3    notwithstanding our objections on a number of grounds,

4    including hearsay.

5         In that time frame, the computer records show a

6    continuous stream of effort by Mr. Seda with

7    Mr. al-But'he, with Mr. Arnaout, with Anwar Khan, with

8    Doctors Without Borders to get money to Chechnya.  That

9    is, as we see it, directly relevant on the core issue of

10   the case.  It is not hearsay.  It is the state of mind,

11   whether or not offered for the truth.  You've indicated

12   with --

13        THE COURT:  That's your answer.  Been waiting

14   for it.  It is not offered for the truth, right?

15        MR. WAX:  Yes.  We're offering to show that

16   those items are on the computer and to argue that that

17   is his state of mind and --

18        THE COURT:  Okay.

19        MR. WAX:  -- it is a mirror image of the entire

20   government's case with respect to material.  And here is

21   why I pointed out, you know, your words, the goose and

22   gander theory here.  I mean, I don't see how you can

23   allow them to put in Abdul Qaadir ListServ things, which

24   he may never even have seen, and then say that items

25   that he wrote --

1          THE COURT:  Well, I just asked the question.

2          MR. WAX:  I'm sorry, Your Honor.

3          MR. CARDANI:  Judge, there are a number of

4    things in the computer that are probably coming in for

5    contrary state of mind, letters to OFAC, and letters to

6    senators, and things of the like.  You know, some of

7    that we understand is part of the whole flavor of the

8    case, but to go -- we're really worried about

9    self-serving hearsay and our inability to cross-examine

10   witnesses.  We don't have to cross-examine a senator or

11   OFAC or anything like that, so we've been trying to work

12   with them in coming to reasonable agreements that some

13   of this stuff is fair game.  But when you are talking

14   about a convicted felon, who in Chechnya, that's

15   somebody we want to talk to if they are going to get

16   into it, or at least raise the issue that this fella had

17   some problems with the government moving support into

18   Chechnya.  So that's part of the wheat and chaff that

19   we're trying to deal with on this.

20          And in looking at a lot of the stuff that

21   they're trying to get in, our admissions, and we're

22   allowed to get it into the Federal Rules of Evidence,

23   properly authenticated, it doesn't necessarily

24   automatically work both ways.  The court knows that.

25   And so for some of these more sensitive ones, we just

1    want a witness.

2         The next issue Mr. Gorder is to address

3    involving a new defense expert.

4         MR. GORDER:  Yes, Your Honor, last week we

5    received a résumé of a Dr. David Long, who apparently

6    the defense intends to call, and just this week received

7    a report from him.  We didn't have an opportunity to

8    file a *Daubert* motion about this.  But I think that -- I

9    mean, the short version, Mr. Long is proffered as an

10   expert on Saudi Arabia.  And at least according to his

11   report, he's going to opine on the legitimacy of

12   Mr. El-Fiki's intent in donating this money and the

13   legitimacy of how al-Haramain handled the money.  And

14   that it could have not been diverted to the mujahideen.

15   And I don't think that is proper expert testimony in

16   this case.

17        So we wanted to flag that for the court that

18   before Dr. Long testifies or before his testimony is

19   referred to in opening statement, we want an opportunity

20   to have some kind of a hearing outside the presence of

21   the jury as to the proper scope of his testimony.

22        THE COURT:  Do I have the statement?  Do I have

23   the witness statement, the report?

24        MR. WAX:  I don't believe so, Your Honor.  We

25   can get that to you today.  He was on our list and

1    disclosed to the government in May.  We did not have the

2    report in hand.  But we let the government know about

3    him.  And I believe we sent the CV to the government

4    months ago as well.

5            THE COURT:  Has Mr. Gorder accurately reported

6    your intent with regard to him?

7            MR. WAX:  Yes, he is accurately reporting what

8    is in the report that we received last week.

9            THE COURT:  I'm leaving the office at noon for

10   a charity event in Eastern Oregon.  I need to get it.

11   Okay?

12           MR. WAX:  (Nodding head.)

13           THE COURT:  Thank you.

14           MR. CARDANI:  Scheduling, Judge, we are

15   prepared to work as long and as hard as the court

16   does -- intends to hold court.

17           For scheduling, we start Monday morning with

18   jury selection.  I anticipate, having been here before,

19   that we'll get a jury and go right into openings on

20   Monday.

21           THE COURT:  Yes.

22           MR. CARDANI:  If we're lucky, maybe even a

23   witness.  We'll be ready for a witness, if we get that.

24           We anticipate moving through our case in chief,

25   and assuming reasonable cross-examination, being done

1    Friday.  So is the court's intention now that we will

2    reconvene the following Tuesday?

3            THE COURT:  Yes.  I am -- the only thing that

4    puzzles me is how you are going to make 12 witnesses

5    last that long.

6            MR. CARDANI:  Well, I'd ask a little reprieve

7    from the court.  We've condensed the number of witnesses

8    and working hard, there is a little bit of testimony

9    that other witnesses are going to have to pick up on the

10   slack.  So please indulge us.  We've got you down to

11   about 12.  We'll try to be concise.  And I'm just saying

12   I think we're going to be done on Friday, perhaps early

13   Friday, and we've notified Mr. Wax of this, and they

14   need to have witnesses here, but I think we'll be doing

15   okay.

16           THE COURT:  All right.  Well, we'll see how we

17   do.  Usually we move a little quicker, Mr. Cardani, as

18   you know.

19           MR. CARDANI:  I'm well aware of that, Judge,

20   yes.  We are going to use a PowerPoint presentation

21   during opening.  We were in here working with the

22   logistics with the court yesterday.  We talked about

23   using this screen and a podium.

24           THE COURT:  You may.

25           MR. CARDANI:  And we -- again, we would like

```
 1    some help from the court in telling us, just to make
 2    sure that our exhibits have been received so that I can
 3    show them to the jury during opening.
 4            THE COURT:  All right.
 5            MR. CARDANI:  We have an amended exhibit list
 6    and a few exhibits for the court and counsel.  The Al
 7    Rajhi Bank records have been given to everybody in
 8    unison.  We have gone through them and excerpted just
 9    the ones that are pertinent to this case and taking off
10    all the correspondence and such.  Those are ALR-1 and
11    ALR-1A, and we'll tender those to the court and counsel
12    here.  The SW-69 and ALR-2 and 2A, more Al Rajhi Bank
13    records.  So I will give those to the court now.  We'll
14    file this electronically after this hearing as well.
15            Judge, I have a couple of other matters, if I
16    might.
17            THE COURT:  Go ahead.
18            MR. CARDANI:  Witness exclusion, we talked
19    about invoking the rule.  We are going to need Special
20    Agent Anderson, who is going to be a witness, we're
21    going to need her present for the case.
22            I understand that Mr. Wax intends on having
23    some investigators, Mr. Teesdale and Mr. Strupp, as the
24    same.  And we don't object to having them throughout the
25    trial as necessary witnesses.
```

1          However, they've identified a few other people

2     that they want to have present in the courtroom for some

3     of the government's witnesses, who, as I understand,

4     will then testify in the defendant's case, and use as

5     part of their background watching the testimony of

6     certain government witnesses.  And I'd just like to

7     know -- we've had some discussions with Mr. Wax about

8     this, there are an awful lot of experts on the list, and

9     I don't know what his intentions are in terms of how

10    many of them he plans on trying to have excluded from

11    the witness exclusion rule and present in the courtroom

12    before they testify.

13         MR. MATASAR:  I can do this, Your Honor.  We

14    have -- just as Mr. Cardani is aware -- a tax case, the

15    government will typically have a tax expert report when

16    the defense puts on their case.  Similarly, we would

17    like to have the expert witnesses either present in the

18    courtroom or be able to read transcripts.  The people

19    are Marcus Owens, the D.C. lawyer who was head of the

20    IRS charitable tax division; a woman named Cathy

21    Matthews, who is an expert accountant; and also perhaps

22    an auditor named Jeff Cone.

23         They are experts.  The general rule 615(3),

24    which provides for exclusion of witnesses, allows the

25    court to exempt it for experts.  The cases seem to say

```
1    it certainly makes sense to have an expert present when
2    their testimony is going to be based on what the other
3    side says.  So we'd simply ask the court's permission
4    under 615(3) to allow those three accounting experts
5    either to be present in the courtroom, or if logistics
6    makes that impossible, to be able to read a transcript
7    or be briefed about what the government witnesses say
8    about the accounting.
9              THE COURT:  Mr. Cardani.
10             MR. CARDANI:  The court does have discretion,
11   and Mr. Matasar sent me some cases.  The problem with it
12   is is it's one thing to say they're physically present
13   and then present testimony.  But if the testimony then
14   gets into a direct critique of our witness's testimony,
15   I think that's going beyond --
16             THE COURT:  I'll just interrupt.  You can have
17   them present.  I don't allow witnesses to comment on
18   other witness's testimony --
19             MR. MATASAR:  Sure.
20             THE COURT:  -- on any subject.
21             MR. MATASAR:  Sure.
22             MR. GORDER:  Your Honor, just to make clear,
23   although he's a defense witness, I think there is no
24   objection to Agent Carroll being in the courtroom.
25             MR. WAX:  There is not.
```

1          THE COURT:  All right.  You haven't lost your

2    sense of humor yet.  It could happen.

3          MR. MATASAR:  I don't think so in this case,

4    Your Honor.  There is too much of it here.  I hope it

5    doesn't go, even for Mr. Carroll.

6          MR. CARDANI:  Judge, my long list is just about

7    done.

8          THE COURT:  Yeah.

9          MR. CARDANI:  Susan Cooke is in the courtroom

10   from our Portland office.  You've seen her during prior

11   trials here.  She's very good with what she does with

12   this electronic stuff.  I would like her to meet with

13   the court representatives and talk about the logistics

14   of how we're presenting.

15         THE COURT:  Fine.

16         MR. CARDANI:  But other than just getting

17   guidance from the court on the admissibility of

18   exhibits, we have nothing else at this time.

19         THE COURT:  How about you fellas?

20         MR. WAX:  In terms of scheduling, based on the

21   conversation we had when we were last in court, we have

22   a number of witnesses we're bringing in for Friday, and

23   we will be prepared to commence testimony, assuming that

24   the government does rest on Friday, if that is still the

25   court's desire.

```
 1              THE COURT:  All right.

 2              MR. WAX:  The following week, as we've noted

 3    before, includes both Rosh Hashanah and Eid.  And in

 4    terms of the -- you know, counsel and the defendant,

 5    we're prepared to move forward in terms of, you know,

 6    when Eid actually falls and where the trial is at.  We

 7    would like the opportunity to bring to the court's

 8    attention if there is an obligation that Mr. Seda would

 9    like to fulfill on that particular day.

10              THE COURT:  That's fine, but not in front of

11    the jury.

12              MR. WAX:  Understood.

13              THE COURT:  Give me a schedule.

14              MR. WAX:  Yes, sir.  The other issue with

15    respect to that, Your Honor, would be in the jury

16    selection process.  We do not want to be in a position

17    in which we have jurors potentially, if there are any in

18    the venire, who are either Muslim or Jewish for whom the

19    holidays are a significant issue, to be excluded because

20    the trial is otherwise scheduled to go forward.  We

21    think that that could raise some issues with respect to

22    the fairness.  I don't know what the venire is likely to

23    look like, if that will become an issue, but I think it

24    is something that the court should address in your

25    questioning.  And depending on the response, I think we
```

```
1    might need to take up a scheduling issue if there are
2    any people who say, yes, I can serve but --
3              THE COURT:  I'm not going to use the
4    questions -- I read your voir dire this morning.  And
5    I'm not going to use the questions you have, but I'll
6    raise the issue, of course.
7              MR. WAX:  Thank you.  In terms of the trial
8    presentation, you've met Mr. Casey during the Daubert
9    hearing.  He's the lawyer from Reed Smith who has been
10   volunteering with the office.  He has continued to
11   volunteer with the office.  He will be here in court
12   part of the time.  I've worked out with the
13   Administrative Office that he can continue to work with
14   us on a volunteer basis and get the insurance coverage,
15   to the extent that there is any, that I have and that
16   the other lawyers in the office have.
17             We would like him to be able to be sworn in pro
18   hoc vice to this court and to handle the testimony of
19   Evan Kohlmann.  He had been working on that in the
20   spring, given the reasons why the trial was put over
21   from June.  And the additional work that I've taken on
22   in terms of the original split that Mr. Matasar and I
23   have had, he's been working on the Kohlmann piece.  He
24   is a highly skilled lawyer.  And hope that that would be
25   all right with the court.
```

1          THE COURT:  Any objection?

2          MR. GORDER:  As long as he's an active member

3    of the bar somewhere, no.

4          THE COURT:  Sure.

5          MR. WAX:  Thank you.  I just want to be sure I

6    understand correctly since our Susan Cooke equivalent,

7    Ms. Wells, who you met before is not here today.  In the

8    courtrooms in Portland, the ALS people at counsel table

9    are able to control the publication of exhibits to the

10   jury.  Our understanding is that here that is handled

11   exclusively --

12         THE COURT:  Yes.

13         MR. WAX:  -- by the court.

14         THE COURT:  Yes.

15         MR. WAX:  Okay.

16         THE COURT:  I've just been corrected.  So we'll

17   let you publish, but you make sure an exhibit is

18   received before you do it.

19         MR. WAX:  We just want to know what the options

20   are and what the government's intention is so that we're

21   all on the same page with us.

22         MR. CARDANI:  This is that very issue that I

23   thought that it would be helpful talking privately,

24   because she's had a lot of experience in Portland and

25   here that addresses that subject.  I don't know if

1  Ms. Cooke wants to speak.

2           THE COURT:  Well, all I want you to do is

3  instruct your folks to not just put it up because you've

4  referred to it.  You make sure it's received.  And

5  Christy will meet with you, and Jill will meet with you

6  folks.

7           MR. WAX:  Great.  Thank you.

8           THE COURT:  Thank you.  I don't have a button

9  up here.  Some judges do that, an override, I don't.

10  But we'll fix that.

11          MR. WAX:  Starting time Monday morning, Your

12  Honor?

13          THE COURT:  9 o'clock.

14          MR. WAX:  9 o'clock.

15          THE COURT:  We'll work generally 9:00 to 5:00.

16  We'll go over 5:00 sometimes.  It's my -- I do my dead

17  level best to keep the jury in the box during that time

18  with normal breaks.  I am very disinclined to take any

19  lengthy break during the trial except during noon hour

20  or before 9:00 or after 5:00.  So if you've got

21  something coming up, give me some advance notice because

22  I'm not going to let the jury sit and cool their heels.

23          MR. MATASAR:  Your Honor, will there be a break

24  between the government's opening and the defense

25  opening?  We had --

```
1              THE COURT:  I don't know.  It depends how the
2    time goes.  If you need to set something up, I'll sure
3    give you a break to do that.
4              MR. MATASAR:  Five minutes or something like
5    that.
6              THE COURT:  Of course, of course, yeah.
7              MR. WAX:  With respect to the use of the big
8    screen TV, when that is on, are the monitors off?
9              THE COURT:  No, I don't think so.
10             MR. WAX:  They remain on?
11             THE COURT:  They're all on, aren't they,
12   Christy?
13             THE CLERK:  I'm going to have to work with our
14   system and IT staff.  I believe we can turn the monitors
15   off, but I can't make you any guarantees on that.
16             MR. GORDER:  When we did the testing yesterday,
17   we tried both ways, and we decided that it would be best
18   to have the monitors on because in the back row, it may
19   be difficult for some of the jurors to read.
20             THE COURT:  Well, that's your choice.  You may
21   want to -- somebody may want to show the jury an exhibit
22   you don't want them to read too closely.
23             MR. MATASAR:  There is one other thing, Your
24   Honor, about the admitting exhibits.  One of the things
25   that we're going to do is cross-examine the accountant,
```

1    the government's witness.  And he has a lot of work

2    papers.  And one of the things I'm going to ask him is,

3    maybe what about this work paper?  What about that work

4    paper?  We didn't want to admit the hundreds and

5    hundreds and hundreds of pages of work papers as an

6    exhibit.  However, I think it might -- I don't think

7    there is any question that anything that's in his work

8    paper could be an exhibit.

9          So what I think we might be able to do to save

10   the time of asking each witness to identify each

11   specific -- asking the witness to identify each piece of

12   paper, that I think we should we able to, as I show it

13   to him, avoid that, and admit it at the end so that we

14   can just ask him, I'm showing you FPDUS-42315, do you

15   see that?  Did you write this here?  Did you write that

16   there?  As opposed to, I'm showing you a document.  Can

17   you tell me what that is?  It's 42315.  Yes.  Is that

18   your work paper?  Yes.  Is that something that you

19   consulted in preparing the tax returns here?  Yes.  Is

20   that something you consulted in looking at Government's

21   Exhibit IRS Number 1?  Yes.  Then I move for --

22          THE COURT:  What's the volume of this material?

23          MR. MATASAR:  The volume of his work papers,

24   I'm guessing, 800 pages.  One of them is -- I'm guessing

25   800 pages.  The number ones I'm going to ask him about,

1    maybe 30 or 40 or 50, something like that.

2         THE COURT:  Does the government have a position

3    on this?

4         MR. CARDANI:  I'm sorry, what is it that you

5    are asking to do?

6         THE COURT:  What he's asking is just to be able

7    to refer to the work papers without going through the

8    evidentiary rigamarole and then the ones he refers to,

9    we'll just receive at the end.

10        MR. MATASAR:  Yeah.

11        MR. CARDANI:  Yeah, and I think if -- if I'm

12   understanding this correctly, if you give us some

13   notice, Mr. Wilcox some notice about which ones so that

14   he has them at his fingertips, it is a large file.

15        MR. MATASAR:  I understand.  Mr. Cardani has

16   talked about this before.  And I have indicated that

17   much as I want to assist him, I don't want to give him

18   my cross-examination of his witness ahead of time.

19        MR. CARDANI:  I don't care.  If this is going

20   to go -- it could go very slowly is what I'm saying

21   because it is a large file, and he's going to want to

22   look in his file and see where it is.

23        MR. MATASAR:  Well, we have given him -- we

24   have given to Ms. Anderson the list of his file

25   correlated with the numbers that have been scanned in.

1    So he's aware of what things are where.  I don't think

2    that should be a problem.  We'll do the best we can.

3              THE COURT:  All right.  What I'm going to

4    require each side to do, you've probably been told this

5    by my staff, the witnesses that will be testifying that

6    half day, you give half day notice of the exhibits you

7    are going to refer to, including these work papers, and

8    that's so that we can have them available.

9              MR. MATASAR:  Okay.  Thank you.  Will we

10   know -- that's another matter.  I'm not sure how the

11   court or the government will do it.  Will they tell us

12   the order of their witnesses?

13             THE COURT:  They are going to give us that

14   list, it goes to you and me.

15             MR. MATASAR:  Okay.  Great.  So we'll know who

16   is going when.

17             MR. CARDANI:  Certainly the list of the

18   witnesses is not a problem, but the list of the exhibits

19   as well that we anticipate using?

20             THE COURT:  Yes.  Because I want to have them

21   ready to sit them all in a group on the witness stand

22   when the witness takes the stand.

23             MR. CARDANI:  Ours will all be electronic.  I

24   doubt that there will be hardly any, but we'll do our

25   best on that.

```
 1            MR. MATASAR:  And so if it's going to be -- you
 2   are mostly concerned about the paper, is what you are
 3   saying?
 4            THE COURT:  That's right.
 5            MR. MATASAR:  So any paper exhibits, we'll deal
 6   with that, I promise.
 7            THE COURT:  Yeah.  I don't want to have to dig
 8   for a paper exhibit while everybody is sitting in here.
 9   It's boring enough.
10            MR. WAX:  We have everything scanned in as
11   well, Your Honor.  And if the technology works, it will
12   be a virtual trial in that sense.
13            MR. MATASAR:  We do have backup.  As the court
14   made clear last time, if the technology breaks down, the
15   trial does not stop.
16            THE COURT:  That's true.  We had a break
17   before.
18            MR. MATASAR:  So we're ready for paper.
19            THE COURT:  All right.  Anything else besides
20   the exhibits?
21            MR. WAX:  No, I think that we're back to --
22            THE COURT:  Okay.  What I have in front of me
23   right now are -- well, do we have a minute order from
24   the last hearing about exhibits?  Did we do a minute
25   order to show that certain exhibits were received?
```

1   Mr. Cardani says I overruled objections, but didn't say

2   the exhibit was received.  I wonder if we have that sort

3   of record.

4         MR. CARDANI:  CR 407, if it helps, was the

5   court's ruling on that, page 13 through 16.  And you

6   also did some work in CR 404 on the AHIF exhibits, which

7   speak to the admissibility of some of the exhibits.

8         (Discussion held off the record.)

9         MR. WAX:  Your Honor, as you are looking at the

10   exhibits, in terms of the foundation and authentication

11   issues, keep in mind, please, that the government has

12   Mr. Gartenstein-Ross on its list and there are a number

13   of items that will be identifiable and admissible

14   through him.  We have Mr. --

15         THE COURT:  All you need to do is tell me who.

16   All right?  It could be someone on the government's

17   list, your list, I don't care about that.

18         MR. WAX:  Thank you.

19         (Discussion held off the record.)

20         THE COURT:  Counsel, we did have a record of

21   proceedings on July 27, but it was a limited number of

22   exhibits.  They were the AHIF exhibits that there were

23   objections to.

24         First, I -- just because it's in front of me

25   first, I have the defendant's -- I'm working off of the

1  government's response to the defendant's trial exhibits.

2  Do the defendants want to tell me what their

3  authentication and whether -- and how they are going to

4  get around hearsay on 601 through 603.

5          MR. WAX:  602, Patricia Florin typed it.  602,

6  602A are either prepared by Rob Brown or he will be able

7  to identify them as something that he -- they are very

8  similar to items that he prepared.  And 601, I believe

9  that either Mr. Brown or Mr. Rodgers will be able to

10  identify.

11          THE COURT:  602B and C, and 603.

12          MR. WAX:  Again, Rob Brown and Dave Rodgers for

13  602B and C.  And 603, I believe, Mr. Rodgers as well.

14          THE COURT:  What does 603 say?

15          MR. WAX:  It's a statement -- general statement

16  of purpose.  It goes on for a page or so.

17          THE COURT:  We'll look for it here.

18          MR. WAX:  The Qur'an Foundation is a nonprofit

19  foundation.

20          THE COURT:  I have it here.  That's all right.

21  Who was it to?  It says to whom it may concern.  Is that

22  me?

23          MR. WAX:  Entire world.

24          THE COURT:  Did Mr. Brown write it?

25          MR. WAX:  No, he did not draft it.

1          THE COURT:  Do you know who wrote it?

2          MR. WAX:  Well, Mr. Sedaghaty certainly is one

3    of the primary authors.  Mr. Rodgers and Mr. Brown were

4    both working there at the time.  And you have their

5    signatures -- or Mr. Rodgers' signature, at least, is on

6    either 602B or 602C.

7          THE COURT:  601 and the 602 exhibits are

8    received but not for their truth.

9          603 is not received.

10         606, 607, 608, 609, 610, 611, 612, 613, 614,

11   614A are received.

12         Now, do you have anything to say about 628

13   through 633?

14         MR. WAX:  Your Honor, it actually would go 628

15   through 642 are really all of apiece.  The government's

16   position is -- and we anticipate that there will be

17   testimony from Mr. Gartenstein-Ross that Mr. Seda's

18   views are outside the mainstream, that what he is

19   looking at in terms of Chechnya, his view on that, is

20   extreme, and these articles are intended to demonstrate

21   that his views with respect to Chechnya were right in

22   the mainstream of thought at the time.

23         MR. GORDER:  Your Honor, our objection to these

24   documents, and it's a long series of them, they are

25   basically newspaper articles or other documents authored

```
 1   by other people.  They are not in the al-Haramain
 2   computers.  There is no evidence that Mr. Sedaghaty ever
 3   saw them.  And they just contain inadmissible hearsay.
 4            THE COURT:  Well, that's true on many of them,
 5   but there are a couple of them where it says they were
 6   in the computers, 634, 637, 641.  I did -- I've read
 7   this list of four this morning, so.
 8            MR. GORDER:  Correct, Your Honor.  And those,
 9   what has happened is it's part of a thing in the
10   computer but not the complete thing.
11            THE COURT:  All right.
12            MR. GORDER:  For example, it might be Mr. Seda
13   mailing the things to somebody but --
14            THE COURT:  Okay.
15            MR. GORDER:  So if it comes in, we want the
16   whole thing to come in.
17            THE COURT:  Exhibits 630 through 641 are not
18   received.  Those which are in the computers, if you want
19   to do a sub exhibit under that number with the entire
20   document, I'll reconsider it on those.
21            MR. WAX:  Do I assume correctly, however, that
22   I will be able to question both Mr. Kohlmann and Colonel
23   Lang about the issue?  And the government is saying --
24            THE COURT:  About the issue, but not about what
25   some reporter said about it.
```

```
 1              MR. WAX:  Thank you.

 2              THE COURT:  I've met a few reporters.  So have

 3    you.  Okay.

 4              MR. MATASAR:  I think we can all agree on that,

 5    Your Honor.

 6              THE COURT:  Now, 642 through 665 any comment

 7    about those?

 8              MR. WAX:  Yeah.  The United Nations Resolution,

 9    April of 2000, it's in the very same time frame.  We

10    believe that it is critical for the jury to have

11    testimony that is an independent, objective view of the

12    fact of what was happening in Chechnya.  Perhaps the

13    State Department report, the U.N. report, and the GAO

14    report, and, again, it's something that both

15    Mr. Kohlmann and Colonel Lang will be testifying about.

16              THE COURT:  Well, experts can rely on things

17    that are not themselves admissible, as we all know.

18    This sounds more like that sort of thing to me, doesn't

19    it?

20              MR. WAX:  Well, Judge, yes, but the government

21    is apparently going to be able to present things that

22    Mr. Kohlmann has pulled off the Internet about the

23    Kavkaz Institute which have no bearing on Mr. Seda.  He

24    never saw it, et cetera, et cetera.  And I think that

25    there -- it should be handled in an equal way.
```

1    Either --

2              THE COURT:  Getting ready to quote me again?

3              MR. WAX:  I love to do that, Your Honor.

4              THE COURT:  But that doesn't make this blanket

5    admission appropriate.  If you have a witness that

6    actually relied on some of these things, then so be it.

7    They've got to do that for that to happen.

8              At this time 642 through 665 are not received.

9              The following exhibits are received:  668, 669,

10   670, 671, 672, 673, 673A, 673B, 674, 676, 677.

11             Now, 678, this is the 302 of the El-Fiki

12   interview.  Do you wish to be heard on that?

13             MR. CARDANI:  We've argued it previously, Your

14   Honor.  It is prepared by the government, taken by the

15   government.  We have both attempted to get Mr. El-Fiki

16   here.  I don't believe there is any argument about the

17   content.  And we believe the jury should be able to hear

18   as much as it can about what Dr. El-Fiki was doing and

19   what he had to say.

20             THE COURT:  678 is not received.  679 is

21   received.  680 --

22             MR. WAX:  Mr. Abdul Qaadir prepared 680A and

23   680 is on the same subject.

24             THE COURT:  My book has a number 680 through

25   684 and there is nothing here.  It says reserved, the

1    page says reserved.

2              MR. WAX:  The court should have received the

3    updated notebooks last week.

4              THE COURT:  This particular version has some of

5    these.  The updated books are still missing some

6    documents.  I don't know if you have -- who is doing

7    that for you.  You may want to have somebody go through

8    them.

9              (Discussion held off the record.)

10             MR. WAX:  Do you have them in the book in front

11   of you now, Your Honor?

12             THE COURT:  I have some of them at least.  Let

13   me see.

14             MR. CARDANI:  Judge, I'm told that there have

15   not been rulings on things that you've already gone

16   past, 602.

17             MS. ANDERSON:  A, B, and C.

18             MR. CARDANI:  A, B, and C.

19             THE COURT:  I said those were received but not

20   for their truth.

21             MR. CARDANI:  Okay.  And was 628 and 29, were

22   there rulings?  We're updating our spreadsheet as we go.

23             THE COURT:  Thank you.  They were not received.

24             MR. CARDANI:  641 was not received as I

25   understand it.  Not received?

1          THE COURT:  641 was not received.

2          MR. CARDANI:  Okay.  Thank you.

3          THE COURT:  What is your foundation for 680?

4          MR. WAX:  It's recovered from the Ashland

5     building, is the foundation that I have at this time.  I

6     do not know at this moment whether Mr. Abdul Qaadir will

7     be able to testify to that.

8          THE COURT:  The government's note says not in

9     computers.

10          MR. WAX:  It is one of the series of documents

11     that were found in hard copy in the -- or were turned

12     over in response to the subpoena, so they were at the

13     al-Haramain building and provided to the government from

14     there.

15          MR. WAX:  Excuse me, Your Honor, Mr. Anwar

16     Khan, I believe, will be the person authenticating this.

17     The -- one of our witnesses is from the Islamic Center

18     of San Diego.  I believe that this is prepared by

19     Mr. Kahn's organization.

20          THE COURT:  What is he going to testify about?

21          MR. WAX:  He was contacted by Mr. Seda.  He's

22     going to testify about his trip to Chechnya, his

23     observations there, his communication with al-Haramain

24     Ashland about Chechnya.  And he will also testify about

25     the works of his organization with respect to Kosovo,

1   the humanitarian work.  As you recall, the government is

2   offering a $2,000 check written on the Arborist account

3   that was sent to Kosovo in either April or May of 1999,

4   same time frame as 680 and 680A.  The government's

5   theory is this is for mujahideen.  And we have the proof

6   through Mr. Kahn about the humanitarian work.  And

7   Mr. Abdul Qaadir about the humanitarian work

8   specifically about al-Haramain.

9          THE COURT:  Who is going to authenticate 681?

10  Actually, there is no objection.

11          682, what's the source of that?

12          MR. WAX:  682, Mr. Kahn's organization.  The

13  series -- the IRW, Islamic Reliefs, are items that are

14  sent out on a ListServ by Mr. Kahn.  The government's

15  position is that Mr. Sedaghaty should be found culpable

16  in part because he receives information through the

17  Sheeshaan ListServ.  There were a whole host of

18  ListServs to which he subscribed.  All of these e-mails

19  from Islamic Relief are coming in in the critical time

20  frame when, under the government's theory, the

21  conspiracy was organized, and they go directly to his

22  state of mind at that time in the exact same way, under

23  the government's theory, that the Sheeshaan e-mails do.

24          MR. GORDER:  Your Honor, with regard to the

25  ones we're looking at right now, 680 and, I guess, on

1    680A, I ask that you reserve on that.  I think we want

2    to talk to Mr. Kahn before these exhibits are admitted.

3            THE COURT:  681 is received.

4            For the other documents in 680 through 684,

5    they may very well be admissible, not for their truth,

6    but I'm going to wait for the witness, so they are under

7    advisement.

8            685 and 685A are received.

9            686, with regard to 686 through 686C, are those

10   the complete computer files?

11           MR. WAX:  To my knowledge, they are, Your

12   Honor, I mean, in the sense of this is what was

13   recovered.

14           THE COURT:  Yes.  But it's not an attachment?

15   They aren't just like an attachment of another e-mail

16   message or something like that?  In other words, I think

17   the government is right that if you are going to put it

18   in, you have to put the whole thing in.

19           MR. WAX:  My understanding is this is the

20   entire document for these.

21           MR. GORDER:  I think for these four, Your

22   Honor, that's correct.

23           THE COURT:  All right.  Thank you.  Those

24   exhibits are received, but not for the truth.

25           687 and 687A are received.  687B, 687C, 687D

1    are received.

2            MR. GORDER:  Your Honor, 688 is completely

3    irrelevant to this case.  We're not going to get into, I

4    hope, whether the government is doing bad things to

5    Muslims and that sort of thing.  It's just -- secret

6    evidence in U.S. courts.  I mean, it's totally

7    irrelevant.

8            MR. WAX:  The reason, Your Honor, why we

9    disagree is that in terms of the government's theory of

10   a conspiracy to defraud the United States, the fact that

11   Mr. Seda and Mr. al-But'he were aware that there was at

12   least a belief that the government was looking

13   exceedingly carefully --

14           THE COURT:  Yeah.  Where was 688A, where did it

15   come from?  What was the source of it?

16           MR. WAX:  688A?

17           THE COURT:  Yes.

18           MR. WAX:  That's one of the recovered e-mails

19   from the computer.

20           THE COURT:  It doesn't -- in these others, the

21   government says it was in the computer.  Do you agree

22   that it was in the computer?

23           MS. ANDERSON:  Let me see.

24           (Discussion held off the record.)

25           MR. GORDER:  We think it is, Your Honor.

1              THE COURT:  All right.

2              MR. GORDER:  A lot of exhibits here.  It's hard

3    to keep track of them.

4              THE COURT:  Is that true of 689 and 689A also?

5              MR. WAX:  689 is one where we've had separate

6    discussions of stipulation because it went to a

7    government official.  We've been talking with the

8    government about the lack of need to bring in officials

9    from the United States government, Israeli government,

10   and this is another one that we've been talking about.

11             THE COURT:  All right.  688 is not received.

12             689, 689A and 690 are received, but not for

13   their truth.

14             The following exhibits are received:  690, 691,

15   691A.

16             MR. WAX:  Excuse me, Your Honor, when you said

17   received but not for the truth --

18             THE COURT:  Yes.

19             MR. WAX:  -- that would be 688A, 689, and 689A?

20             THE COURT:  Yes.

21             MR. WAX:  Thank you.

22             THE COURT:  And the other, 690 and '91 and '91A

23   are received.

24             MR. WAX:  Thank you.

25             THE COURT:  Did 692A and 692B come from the

1    computers?

2              MR. WAX:  Yes, Your Honor.

3              MR. CARDANI:  Judge, if I may have a moment.

4              THE COURT:  Yeah, I'm interested in really all

5    of those through --

6              MR. WAX:  The photographs --

7              THE COURT:  -- 694F.

8              MR. WAX:  Your Honor, the photographs

9    themselves I do not believe were on the computer.  The

10   link to the photographs is on the computer.

11             (Discussion held off the record.)

12             MR. CARDANI:  Judge, Special Agent Anderson can

13   summarize this if the court wants the background on

14   this.  It might be helpful.

15             THE COURT:  Yes.

16             MS. ANDERSON:  Your Honor, my understanding of

17   this e-mail is that a link was actually e-mailed, but

18   all the exhibits to that, the 692B, C and all that

19   stuff, that wasn't actually on the computer.  What it

20   appears the defense has done is gone to this link and

21   pulled up a bunch of stuff off of this Web site and put

22   it in as exhibits selectively.  Like, if you look at the

23   subject matter, it talks about rape victims, but if you

24   look at the attachments, I don't believe there is

25   anything about rape victims.  It goes into other stuff

1   like Grozny, and, yeah, pretty much the attack on

2   Grozny, and then, you know, children needing food and

3   things like that.

4         MR. WAX:  Your Honor, what -- the reason there

5   is a reference to rape victims, this is a reply to an

6   e-mail.  It's just part of an e-mail chain where the

7   subject line did not get changed.  On 692A, you have the

8   link to this photo.

9         THE COURT:  Where is it?  I'm looking at that

10  and looking for the link.  Which page is it on?

11        MR. WAX:  692A, the very first page of the

12  e-mail, the top line from Q, you know, bracket, Q@bf.org

13  and then Salam LOOOOK, capitalized.

14        THE COURT:  I see it.

15        MR. WAX:  And then --

16        THE COURT:  I see it.

17        MR. WAX:  Thank you.

18        THE COURT:  So, again, what do we know about

19  whether these items through 694 came from the computers?

20        MR. WAX:  692 and 692A are on the computer.

21        THE COURT:  Yeah.  We talked about that

22  already.

23        MR. WAX:  I'm sorry.

24        THE COURT:  I said through 694F.

25        MR. WAX:  All the e-mails are on the computer,

1      Your Honor.

2           THE COURT:  These aren't all e-mails.  There

3      are some Web pages, Doctors Without Borders, if I'm

4      reading my French correctly.

5           MR. WAX:  Those two Web pages, I believe, are

6      not on the computer.  I'm double checking.  No, Your

7      Honor, the Doctors Without Border Web page, 694E and F,

8      are not on the computer.

9           There is an e-mail that we have added at the

10     end now that we've obtained where a witness Marla Cates

11     forwarded the U.N. -- no, I take that back.  We have

12     added a U.N. page that was actually found in hard copy

13     in the Ashland prayer house.  These two were not on the

14     computer.

15          THE COURT:  All right.  My rulings are as

16     follows:  693C is received.  Exhibits 692 through

17     694F -- I'm sorry, through 694D are received but not for

18     their truth.

19          And, of course, I already ruled that 693B was

20     received.

21          694E and 694F are not received.

22          695 and 696 are received.

23          MR. WAX:  Excuse me, Your Honor, let me catch

24     up to you.  E and F are out?

25          THE COURT:  Yes.

1           MR. WAX:  Thank you.

2           THE COURT:  Now, how much of this material from

3   697 through 699B were in the computers?

4           MR. WAX:  The 697, et cetera, are all either

5   from Mr. Seda's computer or some are from Patricia

6   Florin's computer.  You'll see a number of the exhibits

7   look the same.  And what we've done is to marry up items

8   that Ms. Florin found on her computer that she had

9   worked on with items that we found on Mr. Seda's

10  computers.

11          THE COURT:  What did she do?

12          MR. WAX:  Ms. Florin worked for Mr. Seda for

13  roughly nine years.  She was a Florin's Flying Fingers

14  Typing Service, and she would type.  Sometimes she would

15  edit.  There are a number of documents that have

16  commentary in them.  And she, as we perceived it,

17  fortunately for us, had a very extensive record saved on

18  her hard drives.

19          MR. GORDER:  Your Honor, I think we're getting

20  into some, you know -- to matters where -- if

21  Mr. Sedaghaty wants to get on the stand and testify as

22  to what he was doing, you know, he's going to be able to

23  do it.  But, you know, he can't testify through all of

24  these exhibits.  I mean, I'm looking at 698, this is a

25  letter to Catherine -- or a memorandum, unsigned, from

1  Catherine Granel from Bilal Abdul Kareem.  It seems to

2  me that there is just not an adequate foundation to

3  admit it.

4          THE COURT:  Okay.  Can you identify which ones

5  are on the Florin computer as compared to the

6  defendant's computer?

7          MR. WAX:  Yes, we can, Your Honor.

8          THE COURT:  Make that clarification for me,

9  please.

10          MR. WAX:  I need one moment, please.

11          THE COURT:  There are -- the government does

12  have some notes in that regard.  Do you agree with

13  those?

14          MR. WAX:  All of the exhibits that are from the

15  Florin computers, Your Honor, should have in the lower

16  left-hand corner, for example, 698E, it has a number and

17  the initials PF.  That was from her filing system.  And

18  it also appears as though, at least for some of them,

19  the government has noted Florin document in the chart

20  from which we're working.

21          So I believe the answer, Your Honor, would be

22  if there is no PF notation in the lower left, that is

23  either from the computer in al-Haramain or if it is like

24  698 and has an FPDUS number on it in the lower

25  right-hand corner, that would be a document that was

1    found in hard copy in the al-Haramain Ashland offices

2    and provided to the government through the subpoena

3    process in 2003.

4            THE COURT:  Tell me what Marla Cates' role was.

5            MR. WAX:  Marla Cates is a person that

6    Mr. Sedaghaty had contacted, had been working with, and

7    she will testify that he contacted her in February, and

8    asked for any assistance she could provide in locating

9    an organization through whom he could send humanitarian

10   supplies to Chechnya.  And the e-mails are e-mails that

11   she sent to him that contained Web links to the United

12   Nations Web site, to one other Web site.  I believe we

13   have two Marla Cates e-mails.  If I'm remembering

14   correctly, they are not in this series because we

15   obtained them later -- no, I take that back.  We did put

16   them in this series.  697 is a Marla Cates e-mail.  She

17   is a person who lives in or around Ashland and had

18   forwarded these Web sites to Mr. Seda.

19           And then we were able to locate what is an add

20   on, I believe, toward the end, hard copies of some of

21   the Web pages to which she had referred that were found

22   in the al-Haramain offices.

23           MR. GORDER:  Your Honor, just to kind of follow

24   up on the point I'm talking about, 697A is a perfect

25   example of just self-serving hearsay.  I mean, it's an

```
 1    e-mail of Pete's --

 2              THE COURT:  I've read it.  That's fine.

 3              MR. GORDER:  -- draft letter.

 4              MR. WAX:  And we submit, of course, it's

 5    directly relevant to his state of mind at the time --

 6    the critical moment in time.

 7              THE COURT:  I know the issues here.  Let me

 8    just read them.

 9              MR. MATASAR:  You can continue.  I'm going to

10    take a short break, if that's acceptable.

11              THE COURT:  Yes.  Go ahead.

12              (Brief pause.)

13              THE COURT:  Here is the next group.  Exhibit

14    697 is received.  697A is not received.  697B is

15    received.  698 is not received.  698A is not received.

16    698B is not received.  698C is not received.

17              MR. WAX:  Excuse me, Your Honor, 698A that has

18    the Granel e-mail address on the top, and that was

19    recovered from the computers.  That is not a Pat Florin

20    document.  The reason there is a date in the lower

21    left-hand corner on that, that is when the computer

22    recovery person provided it to us.  So that is from the

23    al-Haramain computer with the address line at the top

24    from the al-Haramain computer to Granel.  So that is an

25    al-Haramain document.  And we had provided the
```

1    government a report from the expert, Mr. Cox, explaining

2    his recovery process.

3           MR. CARDANI:  And then when we went to

4    follow-up with Catherine Granel, we couldn't find her,

5    locate her, interview her.

6           THE COURT:  It's not received.

7           All right.  698A through 698G are not received.

8           698H is received.

9           699 is received.

10          699A and B are received.

11          700 is received.  700 and 701A are not

12   received.

13          702 and 703 are reserved.

14          Now, 704 are the AHIF.

15          MR. WAX:  Your Honor, we had added subsequent

16   to that, and I'm not sure whether I have them in my --

17   in this envelope that I was to bring down today or

18   whether the office had gotten them to you last Friday.

19   There are additional exhibits, 700A, B, C, and -- 700

20   through 700F.

21          THE COURT:  They are in those file folders.

22   They are in several places.

23          MR. WAX:  Let me hand up if I could what is in

24   this envelope.  I'm not 100 percent sure what it is at

25   this point.

```
 1            MR. GORDER:  This is part of 700?  Okay.  We

 2    don't seem to have it.  I'm not saying you didn't get it

 3    to us, but --

 4            MR. WAX:  It would have come last week.

 5    Charles, let me see your copy.

 6            THE COURT:  Yeah.  This envelope doesn't have

 7    those numbers, but I have them in another pile here.

 8            (Discussion held off the record.)

 9            THE COURT:  These are basically a series of

10    press releases?

11            MR. WAX:  No, Your Honor.  The Marla Cates Web

12    site, Mr. Sedaghaty had apparently gone to it.  These

13    700A through F are pages that were found in al-Haramain

14    building.  You'll notice in the lower right-hand corner

15    over the FPDUS number there is an actual date of the

16    printing, February 29 on 700A, et cetera.  So these are

17    pages after the Marla Cates e-mail, al-Haramain went

18    onto the Web sites to which she had referred, and

19    printed out these pages.  These pages were provided to

20    the government in response to the subpoena in 2003.

21            THE COURT:  There is 700A through G, have you

22    seen them?  I'll hand you these.

23            MR. GORDER:  Yes, we have.  We've got them.

24            THE COURT:  All right.  They are received.  All

25    right.  Now --
```

1          MR. WAX:  Your Honor, with respect to the

2     receipts 704A and 705 were the receipts of the

3     translations, one of the disclosures we made last week

4     occurred after we located Dr. Jamal who is a Saudi

5     doctor working -- excuse me, studying at OHSU, and he

6     worked at al-Haramain in 2000 through 2003.  He provided

7     us copies of receipts that he had received from

8     al-Haramain when he had made donations.  Those are added

9     as 1029 or something, perhaps.  And his testimony will

10    include review of these two receipts, and say that these

11    are identical in form to receipts that he received.  And

12    we will be offering a receipt that he received to match

13    up with these two.

14         MR. GORDER:  Your Honor, if I can address this.

15    Starting with 704, and then there is a long series of

16    documents that purport to be basically business records

17    of the al-Haramain organization in Saudi Arabia, and/or

18    other kind of internal to Saudi Arabia documents, and we

19    vociferously object to introducing these documents

20    without a real authenticating witness that we can

21    cross-examine about them.

22         This is an organization that was shut down by

23    the Saudi government, has been designated as a special

24    designated global terrorist organization by the United

25    States, and also been designated by the U.N. in similar

process.  And we just think that any purported document

coming from them requires a real witness.  And I don't

think somebody who says I worked for them once can

authenticate those documents.  They have to be somebody

who was involved in the organization at the time with

these documents.

So we have real problems with them.  And we

think -- you know, we don't have Saudi Arabian people

that we can bring to court.  And they are just hearsay

at this point.

MR. WAX:  Your Honor is also aware that Colonel

Lang will be offering his testimony based in part on

these description of the SJRC, the relationship between

the SJRC and the Saudi government.  He is familiar with

Saudi governmental operations.  And the fact that

Dr. Jamal worked there and received receipts, it seems

to me, is highly significant.  And I think that these

receipts with his testimony should be viewed separately.

The other documents are, for the most part,

Saudi government documents, as Colonel Lang has and will

describe al-Haramain, and I believe Mr. Kohlmann says

this as well, al-Haramain was a quasi governmental

organization.  And many of these documents are signed by

the prince.  I think one of them is signed by the man

who is now the king, et cetera.

 1          THE COURT:  Exhibit 704A through 707C are taken

 2  under advisement.

 3          713, do you wish to be heard?

 4          MR. WAX:  We've made our points on these.  Your

 5  Honor, as I said, he's a government official.  This is a

 6  declaration by a government official, sworn under oath,

 7  et cetera.

 8          THE COURT:  Not received.

 9          MR. WAX:  That was a no?

10          THE COURT:  Yes.  No.  Not received.

11          What's the source of 714A?

12          MR. WAX:  I believe all of the documents, Your

13  Honor, from this point through 729 are derived from

14  sources in Saudi Arabia.

15          THE COURT:  Thank you.  How did you get them?

16          MR. WAX:  Excuse me?

17          THE COURT:  How did you get them?  Who gave

18  them to you?  What's the --

19          MR. WAX:  I believe that nearly all were

20  provided to the government by attorneys for al-Haramain

21  in 2004 or '5.  And whether that was Mr. Nelson or

22  Ms. Bernabei or a combination, I don't know.

23          Some of the documents were admitted as exhibits

24  or submitted, excuse me, to the OFAC in the designation

25  proceedings.  Other of the documents were submitted in

1    one or the other of the al-Haramain lawsuits.  All

2    derived, you know, from various people in Saudi Arabia.

3            MR. GORDER:  Your Honor, that's why we object.

4    I mean these documents --

5            THE COURT:  I understand.

6            David.

7            (Discussion held off the record.)

8            THE COURT:  Exhibits 714A through 729B are not

9    received for lack of foundation.

10           On 730, the government says that the objection

11   is to form.  Would you explain that, please.

12           MR. GORDER:  Yes, Your Honor.  It was just that

13   I didn't think it would be appropriate to submit to the

14   jury a letter with my signature saying I'm the anti-

15   terrorism coordinator.  This is a summary of classified

16   evidence.

17           But it's my understanding they've withdrawn --

18   we're prepared to stipulate to the summary in its

19   entirety if they want.  If they don't -- I mean, it's up

20   to them.

21           MR. WAX:  At this time, Your Honor, we would

22   not be offering it.  We've pointed out what we believe

23   needs to be done.

24           THE COURT:  That's fine.  Not received.

25           The following exhibits are received:  731.

1          732 through 747 are reserved.

2          748 through 754.43193 are received.

3          Up to 754.43219.

4          MR. WAX:  May I get Mr. Matasar back in to

5     speak to that one, Your Honor?

6          THE COURT:  Yes.

7          MR. WAX:  Excuse me, Your Honor.

8          (Brief pause.)

9          MR. MATASAR:  Your Honor, we just submitted all

10    the correspondence between the IRS and al-Haramain for

11    completeness.  Sorry.

12          THE COURT:  That's not received.

13          754.43220, it would probably get the same

14    ruling, but it's not in my book, so.

15          MR. CARDANI:  Yes, Judge, this is 2004 --

16          MR. MATASAR:  February 9, 2004.

17          THE COURT:  It's not received.  But I will tell

18    you, I haven't received it.  I'm not receiving it

19    because of the year.  If you want to look at it, give me

20    a copy of it.

21          MR. MATASAR:  Your Honor, I think we're okay.

22    We won't be complaining about that.

23          THE COURT:  Okay.  Well, that's good sport, and

24    that's fair to complain about what I do.

25          Now, 754.43238 through 755 -- so, no, I'm

1    sorry, yes, 755.6 are received.

2        The government says it does not have a 755.7.

3    And neither do I.

4        MR. WAX:  We do.

5        THE COURT:  Good.  I have a paper that says the

6    number and TBD.

7        MR. MATASAR:  Your Honor, this is the audit

8    trail, which is part of --

9        THE COURT:  I have it in a separate pile lying

10    over here.  The audit trail.  All right.  Does the

11    government have it now?

12        (Discussion held off the record.)

13        MR. MATASAR:  The government says there is some

14    extraneous writing on the top of the first page.  I

15    think we can agree to remove that.

16        THE COURT:  Mine says Tom to Pete.

17        MR. MATASAR:  Correct.

18        MS. ANDERSON:  In actuality this came from an

19    e-mail so it's not complete in and of itself.

20        MR. WAX:  I think, Your Honor, the notation is

21    something that happened within our office when we --

22    after we had printed it.

23        MR. CARDANI:  So we have no objection to this

24    if that editorial in the upper right is removed.

25        THE COURT:  Give us a clean page on the

 1    original exhibit.  And that exhibit, 755.7, is received.

 2          756.

 3          MR. WAX:  Your Honor, there is also a 755.8,

 4    financial statement transaction, QuickBooks audit

 5    report.

 6          THE COURT:  Yeah.  It's not in the government's

 7    list, but I find it in one of these separate file

 8    folders.  Any objection to that?

 9          MR. CARDANI:  If we can have a moment, Your

10    Honor.

11          THE COURT:  We'll take a short break.

12          (Recess:  10:30 until 10:37 a.m.)

13          THE COURT:  Exhibit 756.

14          MR. GORDER:  Your Honor, with regard to 755.8,

15    which was a long spreadsheet --

16          THE COURT:  Yes.

17          MR. GORDER:  -- we just got that late last week

18    and we need to analyze it, so we'd ask you to reserve on

19    that.

20          THE COURT:  That's fine.  It looks like it's

21    probably admissible to me, frankly, but I'll take it

22    under advisement so you have a chance to read it.

23          756.

24          MR. WAX:  Your Honor, are you waiting for us or

25    for the government?

1                THE COURT:  I'm waiting for the government.  I

2    would like to know what their objection is.

3                MR. GORDER:  Your Honor, this is just another

4    in a series of these e-mails.  If -- you know, if

5    Ms. Katkhouda comes, I guess she could authenticate it,

6    or I guess if the defendant testifies, he could.  But it

7    is in the computer.

8                THE COURT:  It's received, but not for its

9    truth.

10               The following exhibits are received:  759

11   through 761.

12               762 is received but not for its truth.

13               763 through 800 are reserved.

14               MR. GORDER:  Your Honor, this recipient, Raya

15   Shokatfard, I guess, she's on the defendant's witness

16   list, so if she's going to testify, maybe she can

17   authenticate this.

18               THE COURT:  What's the source of 802?

19               MR. WAX:  It was one of the documents found

20   that was in the al-Haramain prayer house that was

21   provided in response to the subpoena.

22               THE COURT:  This is off the record.

23               (Discussion held off the record.)

24               MR. GORDER:  Your Honor, I just want to, as you

25   are making your rulings, keep in mind now we're getting

1    into letters and things about subjects other than

2    Chechnya or Kosovo.  And, again, it's unsigned,

3    self-serving hearsay.

4         MR. WAX:  There are clearly distinctions among

5    these, Your Honor.  A few of them are directed from

6    Mr. Seda to al-Haramain Saudi to Sheikh Aqeel.

7         THE COURT:  Yes.  Can you point those out to

8    me?

9         MR. WAX:  Yes.  804C, 805B, 806 -- and clearly

10   801 is really not part of this series.  I mean, the 802

11   through 826 are the series of letters, some of which are

12   from Mr. -- the al-Haramain computer, some are from

13   Ms. Florin's computer.  801 is of apiece of many of the

14   e-mails that you've received already.

15        And, Your Honor, there are also a few in here

16   that are to or from, you know, some of the government

17   officials where, our understanding is, the government

18   will not be objecting, and we will be having some

19   stipulations.

20        THE COURT:  Is that true about 810?

21        MR. WAX:  Yes.  I believe it should be true

22   with respect to 810, 809, 810A.

23        THE COURT:  809 -- okay.

24        MR. GORDER:  So, for example, with 810, Your

25   Honor, we object to the introduction of the exhibit.  He

1    doesn't need to bring in Colin Powell to say that it got

2    to the State Department, if you overrule -- otherwise

3    overrule our objection, but we do object to the exhibit.

4              THE COURT:  All right.  Exhibits 828 through

5    853 are not received.

6              854 and 855 are taken under advisement.

7              856 through 909B are not received.

8              David, can you help me find the next group.

9              (Discussion held off the record.)

10              THE COURT:  Is there a 909C?

11              MR. WAX:  There is, Your Honor.  909C is

12    another letter to OFAC.

13              THE COURT:  Okay.  It's not in my book.  What

14    is it about?

15              MR. WAX:  He's seeking an application from OFAC

16    for a convoy through Iran to distribute food in

17    Afghanistan.

18              THE COURT:  That is not received.

19              MR. WAX:  Your Honor, we did not hear, I don't

20    think, a ruling on 801 through 826.

21              THE COURT:  All right.  801 is under

22    advisement.

23              802 is received, not for its truth.

24              803A is received.  803B is received.  803C is

25    received.

1          Now, all of these things that are written

2     material are hearsay, if you offer them for their truth.

3     I want to make it clear, I'm not going to allow you to

4     argue that these are in for the truth.  These are --

5     they are some of the records that are there, all right?

6          803D is received.  803E is received.  803F is

7     received.

8          804A is not received.  And the entire 804

9     series is not received.

10          MR. WAX:  Including the 804C, Your Honor,

11     because that is not to a community person?

12          THE COURT:  Yes, including that.

13          805 through 826 are not received.

14          MR. WAX:  Your Honor, just so that I've brought

15     it to your attention, 813 is in the very time frame when

16     the tax return is being prepared, and is six or

17     seven days before the government alleges there was a

18     meeting between Mr. Seda and Mr. Wilcox, and three days

19     after his meeting with Agent Boyer.

20          THE COURT:  I'll let you have 813.  It's

21     received.

22          MR. WAX:  Thank you.

23          THE COURT:  910 and 911 are not received.

24          925 is received.

25          Exhibits 926 through 1001 are not received.

1   Exhibit 1002 is received.

2           MR. WAX:  Judge, may I make a comment, please,

3   about 966 and 967?

4           THE COURT:  You may.

5           MR. WAX:  We anticipate that there will be

6   testimony from Mr. Gartenstein-Ross along the lines of

7   his book, to a certain extent, about the alleged radical

8   nature of activities in al-Haramain Ashland.  And among

9   the issues that will come up, these exhibits, 967 and

10  968, are relevant.

11          THE COURT:  Can that witness identify 968?

12          MR. WAX:  Excuse me, 966 and 967, I'm sorry,

13  the photograph in 966 and the photograph in 967 go

14  together, Your Honor.  Well, they don't go together but

15  they illustrate the same point.  With respect to the

16  nature of the activities at the prayer house and issues

17  that arose with respect to that.

18          THE COURT:  Can the witness identify 967?

19          MR. WAX:  I have not had the opportunity to

20  speak with him.  I do not know.  I am confident that he

21  will say he attended sessions similar to that, and he is

22  aware that similar sessions occurred while he was there

23  in 1999.  And the teacher, Bill Gabriel, will be able to

24  identify the photograph that is in 966.  If I understand

25  correctly, that was his class.  And if that was not his

1  class, I know that he has been there with his class, and

2  similar photographs either may or may not have been

3  taken.

4        THE COURT:  967, the ruling is changed to under

5  advisement.

6        On 966, if you can find the photograph or get a

7  copy of that, fine, but not the newspaper page.

8        MR. WAX:  Would we be able to cut the

9  photograph -- I don't know if we have the original

10 photograph, we can certainly excise it.

11        THE COURT:  Yes, yes.

12        MR. WAX:  Thank you.

13        THE COURT:  All right.  Now, 1002A and B, have

14 those been produced?

15        MR. GORDER:  Yes, we received those.  We first

16 saw them yesterday.  We may have gotten them on Tuesday,

17 Your Honor.

18        THE COURT:  I haven't seen them, so what are

19 they?

20        MR. GORDER:  1002A is a bunch of videos of Pete

21 Seda giving speeches or television interviews.  You

22 know, it's him testifying without taking the oath or

23 being subject to cross-examination.

24        THE COURT:  1002B.

25        MR. GORDER:  That's 1002A.

```
1              THE COURT:  Yes.

2              MR. GORDER:  1002B has some of Pete talking

3    about Chechnya, some of -- some CNN reports of Chechnya,

4    and a press conference that Madeleine Albright and I

5    think the Russian foreign minister are giving about

6    their meeting in the late 1990s.

7              THE COURT:  Do I have them?

8              MR. WAX:  You should, Your Honor.  They may

9    have been what was in the envelope that I brought down

10   today.  I'm advised that the court should have them and

11   hopefully --

12             THE COURT:  They are not.

13             MR. WAX:  -- you do.  They are not?

14             THE COURT:  Well, what do they look like?

15             MR. WAX:  CDs, DVDs.

16             THE COURT:  Nope.  I'll take them under

17   advisement.  You better give them to me so I can watch

18   them.

19             MR. WAX:  We will do that.  If I can explain

20   the origin, the government is introducing the two tapes

21   that are the subject of our objection because they are

22   old, et cetera.  Those two tapes were part of a

23   collection of roughly 400 tapes, CDs, et cetera, that

24   were seized by the government.  All of the content on

25   the two CDs is excerpts from tapes that were found on
```

1    the premises.

2              THE COURT:  I'll look at them when I get them.

3              1003 says to be created.

4              MR. WAX:  I don't anticipate there will be such

5    an exhibit.  It does not appear at this point as though

6    the Prisoner Project is going to be an issue in the

7    government's case.

8              THE COURT:  It's not received then.

9              The following exhibits are received:  1004,

10   1005, 1006, 1007, 1008, 1009, 1010, 1011, 1012, 1013,

11   1014, 1015.

12             Numbers 1016 through 1023 are reserved.

13             Okay.  Mr. Baker.  1024 is the next one we

14   need.  Any ideas?  Oh, here we go.  1024, this reminds

15   me of the movie that involved a place called the Sack of

16   Suds.  Are you familiar with that movie?

17             MR. GORDER:  No.

18             MR. CARDANI:  No.

19             THE COURT:  You are not?

20             MR. CARDANI:  No.

21             THE COURT:  Joe Pesci plays a defense lawyer in

22   this movie.  You need to go watch it.  And he says are

23   you saying you could see through all that shrubbery

24   through that dirty window over to the Sack of Suds?  And

25   you said these two youths got in that Plymouth.  Anyway,

1   you'll have to watch it yourself.  It's a great, great

2   movie.

3          MR. CARDANI:  Wrong movie.  My Cousin Vinny was

4   the name of it.

5          THE COURT:  My Cousin Vinny.

6          MR. CARDANI:  We have seen that one.

7          THE COURT:  Okay.

8          MR. WAX:  Well, there is a camera in the

9   bushes, Your Honor.

10          THE COURT:  There is a camera in the bushes,

11   all right.  That's fine.  That is received.

12          Then the -- says photograph of wire.  Is that

13   wire going to the camera?

14          MR. WAX:  That is wire left over.  That wire

15   photograph was taken by our investigator in Medford when

16   he went out to the site a year or so ago, and he found

17   wire.

18          THE COURT:  Is he going to testify?

19          MR. WAX:  That would be the plan, Your Honor.

20          THE COURT:  All right.

21          MR. GORDER:  Your Honor.

22          THE COURT:  Yeah.

23          MR. GORDER:  I really question the relevance of

24   this.  I mean, there is a camera in the bushes.

25          THE COURT:  Well, let's see what he can tie up.

1    But if he's going to testify, that's fine.

2            All right.  And then President Bush's picture,

3    why is that relevant?

4            MR. MATASAR:  Your Honor, in the release

5    hearing the way the case went -- and I expect it's going

6    to go the same here -- the government will show that a

7    lot of the material that was provided by al-Haramain was

8    incendiary, including this Noble Qur'an, one of their

9    elements of their case is they are giving away a Noble

10   Qur'an, this has a call to jihad in it, this is a bad

11   thing.  We will produce evidence that the Noble Qur'an

12   is the official version of the Qur'an of the Saudi

13   government.  And I think, therefore, it makes sense for

14   us also to be able to show the links between the Saudi

15   government and the United States government.  That's the

16   purpose of this.

17           THE COURT:  Very creative argument.  The

18   exhibit is not received.

19           MR. MATASAR:  Great photo, too.

20           THE COURT:  It's a great photo.  And it's the

21   same president who could read Mr. Putin's heart.  Are

22   you going to offer that, too?

23           MR. MATASAR:  No, we are not.

24           THE COURT:  All right.

25           MR. MATASAR:  That's the government's part of

1    the case.  They were closer to Mr. Putin's heart than we

2    were in this case.

3            MR. WAX:  And not on the spreadsheet, Your

4    Honor, there are a few more exhibits.  Hopefully, you

5    have them all in manila folders.

6            THE COURT:  1027.

7            MR. WAX:  Yes.  Those are the receipts provided

8    to us by Dr. Jamal.  And he will testify about them and

9    identify them at the trial.

10           THE COURT:  All right.  Any objection?

11           MR. GORDER:  We object on the grounds of

12   relevance, Your Honor.

13           THE COURT:  1027 are received.

14           Now, there is a disc in 1028.

15           MR. WAX:  That is the video that Dr. Jamal

16   provided.  He put on a conference in -- I forget which

17   year, I'm sorry, but it was a conference about the work

18   in Kosovo.  And it is a conference, as I said, he put it

19   on, and he provided that video to us.  It is, you know,

20   describing the work of al-Haramain, humanitarian work in

21   Kosovo, Albania in 1999.  The very same issue the

22   government is injecting through the $2,000 check.  They

23   say it went -- they say al-Haramain is doing dirty work,

24   and Dr. Jamal says I put on the conference, here is what

25   al-Haramain was, in fact, doing, and here is my proof.

```
 1          MR. GORDER:  Your Honor, the video is, I think,
 2   about 12 minutes long.  It's a -- appears to be a
 3   professionally produced thing, not just something --
 4          THE COURT:  I'll look at it.
 5          MR. GORDER:  It's all in Arabic.  I'll ask if
 6   there is a translation because I don't speak Arabic.
 7          MR. WAX:  Well, we have had Dr. Sbait working
 8   feverishly since we got it.  I don't have a transcript,
 9   but you can call Dr. Sbait and he can fill you in on
10   what we've got.
11          THE COURT:  Certainly without a translation it
12   won't be admissible, and I doubt that it's going to be,
13   but I'll look at it.
14          Okay.  Now, government's exhibits.
15          MR. WAX:  Your Honor, we have two more.  You
16   should have a 1029 and a 1030.  1029 is a list of the
17   documents --
18          THE COURT:  Those are what are in your
19   envelope.
20          MR. WAX:  Oh, good.  Something arrived.  That's
21   a list of documents prepared by Patricia Florin.  She
22   received documents on her computer and the documents
23   that we had marked as exhibits, and this is the
24   compilation of what she was able to say she had on her
25   computer in one form or another.
```

```
1              THE COURT:  On her computer?
2          MR. WAX:  Yes.  Remember, we have -- some of
3    the exhibits that we had marked were from her computer,
4    and this is a list of those items that were on the
5    al-Haramain computers or hard copy from al-Haramain that
6    she also had on her computer.
7              MR. GORDER:  Your Honor, I apologize if we've
8    got this one, I haven't seen it.
9              THE COURT:  Yeah.  Okay.
10             MR. GORDER:  And so I'd ask you to reserve.
11             THE COURT:  Under advisement.  You can look at
12   it.
13             MR. GORDER:  And what's 1030?
14             MR. WAX:  1030 is the Chase deposit ticket that
15   you had offered at one point and then withdrawn.
16             MR. GORDER:  No objection.
17             THE COURT:  Excuse me?
18             MR. GORDER:  1030, we don't object to.
19             THE COURT:  It's received.  All right.
20             Now, I have a document called government's
21   second amended exhibit list.  Is that your up-to-date
22   version?
23             MR. CARDANI:  The one I just proffered to
24   you -- to the court is the third amended exhibit list.
25             THE COURT:  This one was filed 5/7, so that's
```

1  probably not --

2          MR. CARDANI:  It's the one we just tendered to

3  the court earlier today.

4          THE COURT:  All right.  Thank you.  Let me find

5  it here.  Yes, I have it.  We just need a little more

6  paper.

7          Now, I made some rulings on July 27th on some

8  AHIF exhibits.  Have you filed any objections to these

9  other exhibits, Mr. Wax?

10          MR. WAX:  May I have a moment?

11          THE COURT:  You may.

12          (Discussion held off the record.)

13          MR. WAX:  Your Honor, I think that the

14  objection material that we have filed since the -- in

15  the last several months, relates to the bank records and

16  the reciprocity issue.  It relates to the -- some of the

17  404(b) material.  And we have an objection to the -- one

18  of the items that we were just handed this morning, the

19  photograph of al-Sayf.  I mean, I just -- I don't get

20  it, how that could possibly go to the jury.

21          THE COURT:  What is the number?

22          MR. WAX:  It is EK-9.  He can testify

23  apparently about al-Sayf but why on earth the

24  jury should see --

25          THE COURT:  EK-9?

1          MR. WAX:  Correct.  It's in the material they

2     provided this morning.

3          THE COURT:  All right.  Counsel, EK-9.

4          MR. GORDER:  Yes, Your Honor, in Mr. Kohlmann's

5     testimony when he's describing the leadership of the

6     mujahideen in Chechnya at this Caucasus Institute or

7     Kavkaz Institute, this is the guy that kind of ran the

8     camp.  And we'll have evidence that al-Haramain's Web

9     site publicized that they were supporting the camp.  And

10    additionally, with Exhibit 730, if we get back into

11    that, he's the person that's mentioned that money was to

12    be delivered to, so.

13         MR. WAX:  I don't see how that enables them to

14    present something to the jury that is so inflammatory.

15         THE COURT:  All right.  As I said earlier,

16    Exhibit SW-1 is under advisement.  I've ruled -- I've

17    made rulings on the other bank records and so on.  The

18    other exhibits are received on the government's third

19    amended exhibit list.

20         What else do we have this morning, fellas?

21         MR. WAX:  I don't believe, Your Honor, that you

22    had ruled on AHIF 5 through 7.  You had reserved on

23    those previously.

24         THE COURT:  You are right.  They aren't on the

25    list.  Do you still want to offer them or not?

1         MR. CARDANI:  Yes.  They are not on our exhibit

2    list?

3         THE COURT:  No.  You go from AHIF 3 to 8.

4         MR. CARDANI:  Yeah, we took them off just

5    because they hadn't been ruled in.  Yes.  These are

6    fairly innocuous documents, not offered for the truth,

7    but they are documents that were found in al-Haramain

8    showing that the defendant was aware of the details of

9    the Springfield building.  We do offer them.

10        THE COURT:  All right.  Mr. Baker.

11        MR. WAX:  Your Honor, I don't believe that -- I

12   believe the reason you reserved is that there was no

13   proof that they had come from al-Haramain Ashland.  And

14   in the absence of that proof, I think that the

15   government does not have a foundation.  There can be --

16        THE COURT:  Where were they obtained?

17        MR. WAX:  I believe those are part of what is

18   being called the batch two that had come from Saudi

19   Arabia.

20        MR. GORDER:  No, I don't think so.

21        MR. WAX:  Yeah, no, Ms. Anderson is agreeing.

22   I think that's where we were at in terms of their

23   origin.  They are from the al-Haramain Saudi office.

24        THE COURT:  I remember now.

25        MS. ANDERSON:  They are from the Saudi office.

1          MR. CARDANI:  We'll withdraw 5, 6, and 7, Your

2     Honor.

3          THE COURT:  Thank you.

4          MS. ANDERSON:  What about 4?

5          MR. CARDANI:  So just to be clear, the search

6     warrant series of exhibits, with the exception of 1, are

7     all received?

8          THE COURT:  Yes.

9          MR. WAX:  And what about EK-9, Your Honor, I'm

10    sorry, I didn't track your ruling on that photograph?

11         THE COURT:  It will be received.

12         (Discussion held off the record.)

13         MR. CARDANI:  Are you in the middle of

14    something, Judge, or can I talk?

15         THE COURT:  Yes, you can talk.

16         MR. CARDANI:  BOA-6 we would like to talk

17    about.  You initially ruled in August that BOA-6 was

18    proper 404(b) evidence, and this is the check for $2,060

19    to Daveed Gartenstein-Ross.  And it's listed as "Power

20    Mac."  And today I heard you had reconsidered that.

21         THE COURT:  Yes.

22         MR. CARDANI:  I'd like to just take one more

23    shot on that.  We -- this is part of a story, and we

24    thought it was admissible so we were all ready to go on

25    it.  This witness, if allowed to testify, will talk

1    about this check issued to him by the defendant.  It was

2    for salary.  They put down "Power Mac" as a computer

3    purchase, so the inference there you wouldn't have to

4    pay tax -- payroll taxes on it.

5           THE COURT:  Right.

6           MR. CARDANI:  We also have testimony from the

7    accountant, Wilcox, who will say that he asked the

8    defendant about this particular check, and he also

9    affirmed that this was for a computer purchase, his own

10   accountant.  So the lie, in our view, to the accountant

11   makes this particularly relevant 404(b) evidence.  And

12   we would ask once again that -- we thought you got it

13   right at the August order.

14          THE COURT:  I decided -- it's evidence of

15   cheating on taxes, and -- but I thought I finally --

16   well, as I thought about it, I decided it just tipped

17   over to the other side of the line.  So not on your

18   direct case.  I can think of lots of ways it can become

19   admissible depending on what various witnesses say.

20          MR. CARDANI:  You won.

21          MR. WAX:  I wasn't going to speak to that

22   issue.

23          MR. CARDANI:  All right.  So just to be clear,

24   other than the very few exhibits we've just talked

25   about, all the governments exhibits have been received?

```
 1              THE COURT:  Yes.

 2              MR. CARDANI:  Okay.  Okay.  Great.

 3              THE COURT:  Frankly, I expect that AS-1 (sic)

 4    to be received also if it's as you described it, but I

 5    need to see it first.

 6              MR. WAX:  The same is true with respect to the

 7    defense exhibits that you said received?

 8              THE COURT:  Yes.

 9              MR. WAX:  Now, with respect to those that you

10    did not accept, in the event that Mr. Seda testifies, I

11    assume that the hearsay and foundation issues will

12    evaporate.

13              THE COURT:  That's true for many of them.

14    However, there are a large number that I think are

15    really far afield.

16              MR. WAX:  I understand and appreciate that.

17              THE COURT:  You know.

18              MR. WAX:  I'm interested in the Chechnya,

19    Kosovo, those things.

20              THE COURT:  Yeah, I'm not -- Somalia, you know.

21              MR. WAX:  Well, their pattern of Kosovo and our

22    pattern of Palestine --

23              THE COURT:  Okay.  I don't think we're going to

24    have testimony about trucks rolling into Gaza.

25              MR. CARDANI:  Judge, we included a few new
```

1  exhibits this morning.

2          THE COURT:  Yes.

3          MR. CARDANI:  And I don't know if we need to

4  have discussions with Mr. Wax on these.

5          THE COURT:  I asked them if there were

6  objections.  I didn't hear any.  They are received.

7          MR. CARDANI:  With the exception of that

8  picture of Mr. --

9          MS. ANDERSON:  They were received.

10          MR. CARDANI:  Okay.  So they are all received.

11          (Discussion held off the record.)

12          THE COURT:  Nothing else?  All right.  Well,

13  it's a little tedious, but hopefully it saves us time

14  next week.

15          We are going to keep the pedal down, fellas,

16  when we start the trial, so it's going to be -- we'll

17  all be tired, and you'll be upset with me when it's over

18  and all that normal stuff, okay.

19          MR. WAX:  We're laying in large supplies of

20  yogurt at the motel.

21          THE COURT:  There is a chance I will recess

22  early on the Friday because I have about 100 people

23  coming to a tailgate party the next day.

24          MR. WAX:  In terms of our witnesses --

25          THE COURT:  I'll let you know.

1          MR. WAX:  Yeah.  We were planning on bringing

2     in an out-of-towner or two for Friday so.

3          THE COURT:  Let's see how we go.  I'm just

4     telling you in advance that I'm going to be watching.

5     Depends how we get this thing kicked off.  Sometimes it

6     takes a little while to get the pace.

7          MR. MATASAR:  We know it's a race, Your Honor.

8     We're embracing the analogy, because there are rules.

9     You know basically how long it's going to take.  There

10     are a lot of good things about the race analogy.

11          THE COURT:  That's right.

12          (The proceedings were concluded at 11:51 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATE

2          I, Deborah Wilhelm, Certified Shorthand Reporter

3     for the State of Oregon, do hereby certify that I was

4     present at and reported in machine shorthand the oral

5     proceedings had in the above-entitled matter.  I hereby

6     certify that the foregoing is a true and correct

7     transcript, to the best of my skill and ability, dated

8     this 27th day of August, 2010.

9

10

11

12                              /s/ Deborah Wilhelm

13                              _____
                                Deborah Wilhelm, RPR
14                              Certified Shorthand Reporter
                                Certificate No. 00-0363
15

16

17

18

19

20

21

22

23

24

25