1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF OREGON

3    UNITED STATES OF AMERICA,        )
                                      )
4                    Plaintiff,       ) No. 05-60008-2-HO
                                      )
5       v.                            ) August 31, 2010
                                      )
6    PIROUZ SEDAGHATY, et al.,        ) Eugene, Oregon
                                      )
7                    Defendants.      )

8

9        PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS

10       BEFORE THE HONORABLE MICHAEL R. HOGAN

11    UNITED STATES DISTRICT COURT JUDGE, AND A JURY

12         DAY 2 A.M. SESSION - PAGES 1 - 122

13

14                     -:-

15

16

17

18

19

20

21

22

23            Deborah Wilhelm, CSR, RPR
                     Court Reporter
24              P.O. Box 1504
              Eugene, OR  97440
25              (541) 431-4113

<pre>
 1                    APPEARANCES OF COUNSEL

 2

 3   FOR THE PLAINTIFF:    CHRISTOPHER L. CARDANI
                          United States Attorney's Office
 4                        405 E. 8th Avenue, Suite 2400
                          Eugene, OR  97401
 5                        (541) 465-6771
                          chris.cardani@usdoj.gov
 6
                          CHARLES F. GORDER, JR.
 7                        United States Attorney's Office
                          1000 S.W. Third Avenue, Suite 600
 8                        Portland, OR  97204-2902
                          (503) 727-1021
 9

10   FOR THE DEFENDANT:   LAWRENCE H. MATASAR
                          Lawrence Matasar, P.C.
11                        621 S.W. Morrison Street
                          Suite 1025
12                        Portland, OR  97205
                          (503) 222-9830
13                        larry@pdxlaw.com

14                        STEVEN T. WAX
                          BERNARD J. CASEY
15                        MICHELLE SWEET
                          Federal Public Defender
16                        101 S.W. Main Street, Suite 1700
                          Portland, OR  97204
17                        (503) 326-2123
                          steve_wax@fd.org
18

19

20

21

22

23

24

25
</pre>

```
1                    INDEX OF EXAMINATIONS

2      FOR THE PLAINTIFF:     Direct    Cross     ReD      ReX

3      Linda Czemerys          5        15        28       32

4      Jeremy Christianson     34       70        90       94

5      Evan Kohlmann          100      (P.M. session)

6         (See p.m. session by Ms. Bonds)
```

 1       (Tuesday, August 31, 2010; 9:06 a.m.  Jury absent.)

 2                    P R O C E E D I N G S

 3           THE COURT:  Be seated, please.  Please seat the

 4    jury.

 5           MR. WAX:  Your Honor, we do have the Sui matter

 6    pending.  And in terms of the logistics of that, we

 7    would hope to be able to take that up sometime this

 8    morning.

 9           THE COURT:  To take which up?

10           MR. WAX:  The matter of the witness Sui in

11    China.

12           THE COURT:  And what else?  Is that it?

13           MR. WAX:  That was the issue that I mentioned.

14    I'm sorry, Your Honor, we also still have pending before

15    Mr. Kohlmann, the SW-1 and the EK exhibits, the videos,

16    and their translation issues.

17           THE COURT:  Okay.

18           (Jury enters the courtroom at 9:08 a.m.)

19           THE COURT:  Good morning, Jurors.

20           Call your first witness, please.

21           MR. CARDANI:  Thank you, Your Honor.  The

22    government calls Linda Czemerys.

23           THE CLERK:  Please step forward to the center

24    of the courtroom.  Please raise your right hand.

25           (The witness was sworn.)

1          THE CLERK:  Please take the witness stand and

2    please watch your step.  Your microphones are the two

3    buttons along here, so if you would watch your paperwork

4    along here.

5          THE WITNESS:  Okay.

6          THE CLERK:  There is water here.  Let me get

7    you a glass.

8          THE WITNESS:  There is some here.

9          THE CLERK:  Thank you.  Would you please state

10   your name for the record, spelling your last name.

11         THE WITNESS:  Linda Czemerys, C-Z-E-M-E-R-Y-S.

12                     DIRECT EXAMINATION

13   BY MR. CARDANI:

14      Q.    Good morning.

15      A.    Good morning.

16      Q.    What is your occupation?

17      A.    Right now I am a supervisory special agent for

18   the Boise, Idaho, office.

19      Q.    Of what?

20      A.    Of the -- I'm sorry -- IRS Criminal Division.

21      Q.    Okay.  Internal Revenue Service's Criminal

22   Investigation Division.  And you are a supervisor in

23   Boise?

24      A.    That's correct.

25      Q.    Okay.  How long have you been with the IRS?

1      A.    I've been with the IRS for 26 years.

2      Q.    Were you working on the morning of February 18,

3  2004?

4      A.    Yes, I was.

5      Q.    And what did you do that morning?

6      A.    That morning, we executed a search warrant in

7  Ashland, Oregon.  One of my responsibilities at that

8  warrant was the seizing officer.

9      Q.    What's the address of the building?

10      A.    3800 South Highway 99, Ashland, Oregon.

11      Q.    Prior to executing the search warrant, did you

12  have an opportunity to review and discuss what items

13  were relevant to the search warrant?

14      A.    Yes.

15      Q.    Were there a number of agents that participated

16  in this warrant?

17      A.    Yes, there was approximately 17 agents.

18      Q.    Is that custom in a search warrant of -- for

19  IRS of a business?

20      A.    Yes.

21      Q.    What time of day was the warrant served?

22      A.    The warrant was served at 7:55 a.m. that

23  morning.

24      Q.    All right.  You said that your role was what,

25  seizing?

1       A.      I was the seizing officer.

2       Q.      All right.  What does a seizing officer do?

3       A.      What the seizing officer does is make sure that

4   the evidence that is being seized at the site is

5   seizable per Attachment B part of the affidavit with a

6   list of items to be seized.  So I make sure that when

7   the agents find something, they leave it there in place,

8   I look at it, they photograph it, they bring it up to

9   the table, it's logged in, and then it's bagged.  What

10  we call bagged and tagged, and then put in a box.

11      Q.      Are you the case agent in this investigation?

12      A.      No, I am not.

13      Q.      Who is the case agent?

14      A.      Special Agent Colleen Anderson.

15      Q.      Was she present at the warrant as well?

16      A.      Yes, she was.

17      Q.      And was she there to be able to consult with

18  concerning items within the scope of the warrant?

19      A.      Yes, she was.

20      Q.      I'd like to show the witness SW-66, please.

21  Agent Czemerys, can you identify the picture in SW-66?

22      A.      Yes.  That is the residence where we executed

23  the search warrant.  That photo is also attached to the

24  affidavit.

25      Q.      Can you describe the premises.

1      A.      The premises was a single level house with a

2   basement underneath.  And it's approximately over

3   4000 square feet, on some acreage.

4      Q.      And I'd like to next show you SW-64, a picture

5   of that same building in the upper left-hand corner.

6      A.      Yes.

7      Q.      Have you had an opportunity prior to coming

8   into court to examine SW-64 to determine whether it's a

9   fair depiction roughly of the internal premises of the

10  al-Haramain building?

11     A.      Yes, I have.

12     Q.      Is it?

13     A.      Yes, it is.

14     Q.      Let's go to the second page first.  This was a

15  multistory building.

16     A.      Correct.

17     Q.      Is this the upper level?  Can you describe

18  generally the premises of the upper level.

19     A.      Yes.  As you walk in the front door, there was

20  a living room, quite a large living room, on the

21  right-hand side.  Left-hand side was an open room that

22  appeared to be the prayer room.  There was the kitchen

23  attached to the living room.  And as you went further

24  down to the kitchen area, there was an office with

25  several smaller rooms off on the right-hand side there.

1    And on the left-hand side, there were several bedrooms

2    and a bathroom.

3        Q.    All right.  Now, there is references to -- if

4    we go to the living room, we see Seda 1 and 2 computer

5    tower bar code.  Can you explain that reference?

6        A.    That is where a computer was found in the

7    living room on the floor.  Within that computer, there

8    were two hard drives within the computer tower.

9        Q.    All right.  Why does it say Seda 1 and 2 on

10   that?

11       A.    That is the names that the computer forensic

12   person gave to the two hard drives that were found in

13   that computer.

14       Q.    Okay.  And you mentioned earlier about

15   taking -- customary to take pictures and try to document

16   where evidence was before it's seized.

17       A.    Yes.

18       Q.    All right.  To the best of your knowledge, does

19   Exhibit 64 fairly depict the location of various

20   computers that were taken pursuant to the warrant?

21       A.    Yes, it does.

22       Q.    So room A, if we can go into room A for a

23   minute on that same diagram, you see a number of other

24   computer, electronic types of evidence that were taken?

25       A.    Yes.

1      Q.     We'll come back to upstairs in a few minutes.

2   But could we go downstairs now.   Okay.   Please describe

3   the downstairs of this building.

4      A.     Well, there was a downstairs living area, and

5   then to the front of that was an office, and then you

6   could go to -- through the office you could go to a

7   bedroom on the left.   And then there was a bedroom on

8   the right, but you have to enter through another door.

9   And through that office, you could also enter out the

10  back onto the back porch there.   And then to the left,

11  there was a kitchen area, and then also it led out into

12  the garage.

13     Q.     Okay.   So if we could focus on room X for a

14  minute.   Once again, there are references to computers

15  6, and then 8 and 9, and 10, do you see that?

16     A.     Yes.

17     Q.     All right.   We have a picture of this room, I

18  think, later on in this exhibit, the last page of SW-64.

19  Does this -- are these pictures of room X?

20     A.     Yes, they are.

21     Q.     Taken the day of the warrant?

22     A.     Correct.

23     Q.     Okay.   And we see some computers there?

24     A.     Yes.

25     Q.     Okay.   Okay.   If we go back to the lower level

1    and blow up room X again, please.  All right.  So,

2    again, those references to the computer in the upper --

3    Seda 8 and 9 was a Hewlett-Packard Pavilion computer.

4    And there are numbers associated with that.  Is that

5    internal record keeping for IRS purposes?

6        A.    Yes.  Normally they try to write down the

7    serial numbers on the computers so they are easily

8    matched to that unit.

9        Q.    Again, to the best of your knowledge, does the

10   location of Seda 8 and 9, and the one down below it,

11   Seda 6, fairly depict where in room X these computer

12   hard drives were found?

13       A.    Yes, it does.

14       Q.    If we go back to -- there we go.  Now, Agent

15   Czemerys, was there anybody present physically when you

16   and the other agents served the search warrant?

17       A.    Yes.  When we were getting ready to make entry,

18   Jonah Sedaghaty was present.  He came out.  And also

19   present was his girlfriend.

20       Q.    Did they appear to live there?

21       A.    Yes, on the bottom floor, yes.

22       Q.    And at the time the warrant was served, was

23   there anybody else present?

24       A.    No, there was not.

25       Q.    Was the defendant Pirouz Sedaghaty there?

Czemerys - D by Mr. Cardani                              12

1    A.    No, he was not there.

2    Q.    What's the procedure in terms of seizing

3 computers when there is a large amount of information on

4 them?

5    A.    Well, when computers are found at the site,

6 we -- we always have a computer forensic person who is a

7 special agent who is special trained to take possession

8 of the computers.  So when we find one, we call them

9 down.  They look at it.  They kind of do a -- look at it

10 to see if there is -- whether they need to image it

11 right there on site, if they have the time to do that,

12 or if we just need to take it and then image it at our

13 office because it's going to take too long.

14         And at this site, finding as many as we did,

15 there was no way that they could be imaged on-site.  So

16 he came down, he takes down all the serial information

17 off the computers, we photograph it in place, and then

18 he takes possession of those computers.

19    Q.    This was Rick Smith?

20    A.    That's correct.

21    Q.    And what's his role within IRS?

22    A.    Rick Smith is a special agent with the IRS, but

23 he's our computer specialist, computer forensic person

24 who examines -- who images the hard drives, and then

25 examines and takes out the information.

1      Q.    To the best of your knowledge, were the

2   computers referenced in here taken by IRS pursuant to

3   the warrant, copies made, mirror copies made, and the

4   originals returned to the owner of the premises?

5      A.    That's correct.

6      Q.    Now, if we go back to the diagram of the

7   upstairs, you have -- do you have a file in front of

8   you, an Exhibit SW-1?

9      A.    I don't have those in front of me.

10     Q.    All right.  I'd ask that the clerk get SW-1.

11  And before you move on, when you said there were two

12  people present, did you identify who they were?

13     A.    Yes.

14     Q.    All right.  Who were they?

15     A.    It was Jonah Sedaghaty.

16     Q.    Who do you understand him to be?

17     A.    The son of the defendant.

18     Q.    Okay.

19     A.    And his girlfriend Christina Kaiser --

20  Stephanie, excuse me, Stephanie Kaiser.

21     Q.    SW-1, do you see that in front of you?

22     A.    Yes.

23     Q.    What is it?

24     A.    It is two videotapes.

25     Q.    Okay.  Were those taken pursuant to the search

Czemerys - D by Mr. Cardani                    14

1    warrant?

2        A.    Yes, they were.

3        Q.    Where were they found?

4        A.    They were found in the living room on some

5    metal shelving.

6        Q.    Okay.  And in conjunction here, if you point to

7    your screen, if you could just touch the screen and

8    roughly show us where those videotapes were found.

9        A.    Okay.  Can we make it a little bigger?  There

10   we go.  They were found right over here in this area.

11       Q.    Was there a TV near there?

12       A.    No.  The TV is over by the fireplace area.

13   The -- there was a metal shelving, and then there were

14   sliding glass doors that went out onto the deck.

15       Q.    There are two videotapes in SW-1?

16       A.    Yes.

17       Q.    Did you find other videotapes in that same

18   vicinity?

19       A.    Yes.  There were several videotapes in that --

20   on that shelving area.

21       Q.    About how many?

22       A.    I would say there is approximately 25 to 30

23   videotapes in that area.

24       Q.    All right.  Could you take a look at SW-2 on

25   the screen.

 1      A.      (Witness complies.)

 2      Q.      Can you identify that?

 3      A.      That is photographs that were found at the

 4 scene that were taken.

 5      Q.      All right.  And SW-3?

 6      A.      Same, photographs that were taken at the

 7 warrant site.

 8      Q.      And SW -- does that look familiar as the -- do

 9 you know if that is a picture taken inside the premises

10 or not?

11      A.      Yes.  They are inside the kitchen at the search

12 warrant site.

13      Q.      Okay.  And those weren't the day of the

14 warrant, those were just photos found during the

15 warrant?

16      A.      Correct.

17      Q.      Likewise SW-4?

18      A.      Yes, photos found at the search warrant site.

19              MR. CARDANI:  That's all I have.  Thank you.

20              THE COURT:  Cross.

21                      CROSS-EXAMINATION

22 BY MR. WAX:

23      Q.      Good morning.

24      A.      Good morning.

25      Q.      Tell me, please, the pronunciation of your

 1    name.

 2        A.      Czemerys.

 3        Q.      So, Agent Czemerys, this search was conducted

 4    in 2004, correct?

 5        A.      That's correct.

 6        Q.      The issues in this indictment involve activity,

 7    as you understand it, in and around the year 2000 in

 8    part, do you understand that to be true?

 9        A.      I understand that the -- it was an issue with

10    regards to a 2000 tax return.

11        Q.      Okay.  In the year 2000, do you know where

12    Mr. Seda was living?

13        A.      I don't have that knowledge, no.

14        Q.      Okay.  Are you aware that he was at that point

15    living at Valley View Road, and that this home and

16    prayer house that you searched was not in use at that

17    time?

18        A.      I'm not aware of that, no.

19        Q.      Do you know where the computers that were

20    seized were located or if they were even present in

21    their existing configuration in 1999 or 2000?

22        A.      I don't have that knowledge, no.

23        Q.      In looking at the diagrams that you were just

24    shown, I believe that they depicted kitchens on both

25    floors of the building?

1      A.      Correct.

2      Q.      There are bedrooms on both floors of the

3  building?

4      A.      Correct.

5      Q.      You've indicated that the time that you

6  conducted the search, it was apparent to you that at

7  least one, if not both, of Mr. Seda's sons were residing

8  there?

9      A.      When we executed the warrant, Jonah Seda was

10 there with his girlfriend.

11     Q.      In looking around the place, I've got a teenage

12 son, and I don't know what your background is, but did

13 it appear as though some of the area was in the type of

14 disarray that one might find with late teenage boys or

15 early 20-year-old boys living someplace?

16     A.      Yes, it was messy.

17     Q.      In part, sort of teenagey messy?

18     A.      Could be teenagey messy, yes.

19     Q.      Okay.  With respect to the few photographs that

20 you indicated were taken during the search, if I recall

21 correctly, during the course of the search, you found or

22 observed many hundreds of photographs that you did not

23 take; is that correct?

24     A.      Well, they took a whole box of photographs,

25 from my recollection, that was down in the downstairs

1    office.

2        Q.    Okay.  But in terms of that box -- whole box of

3    photographs that was taken, do you recall that many of

4    them were family type photographs?

5        A.    I don't recall.

6        Q.    Do you recall that some of them depicted

7    activities in and around Ashland, Oregon?

8        A.    I don't recall because I did not go through

9    them.

10       Q.    All right.  Do you recall that some of them

11   showed Mr. Seda engaged in his business as an arborist?

12       A.    I don't recall that.

13       Q.    Do you recall that some of them showed Mr. Seda

14   engaged in Fourth of July activities in the city of

15   Ashland?

16       A.    I don't recall.

17       Q.    But there is no question that there were many,

18   many, many photographs that were there and the few that

19   you have just identified are a very small section or

20   subset of a large collection of photos; is that correct?

21       A.    That's correct.

22       Q.    Now, with respect to the items that you

23   observed in the house, in looking through the notes or

24   reports that were made, I thought I saw that you had

25   observed a rather lengthy list of book -- books, do you

1    recall that?  Did you check your notes -- well, first of

2    all, do you recall that?

3        A.    Like a handwritten list?

4        Q.    No, no, a typed inventory type list, many, many

5    pages of books.

6        A.    I don't recall that.

7        Q.    Would it help you to look through your notes to

8    see -- or the notes of the search to see if it was

9    reported that there was a typewritten list of books that

10   was observed?

11       A.    Was it something that we seized or it was

12   something --

13       Q.    No, it was something that you left.

14       A.    Yeah.  Can I look real quick?

15       Q.    Yes, please.

16       A.    I see on my list of photos that were taken that

17   there was -- there is two items here.  Books, then it

18   says sample of books, and then there is another one

19   sample of books.

20       Q.    All right.  Do you recall there being many,

21   many books in the premises?

22       A.    There were several books, yes.

23       Q.    Well, it was more than several, wasn't it?

24   Perhaps thousands?

25       A.    I don't remember there being thousands, but I

1    just don't have that recollection.

2        Q.    Do you recall there being books on shelves?

3        A.    Yes.

4        Q.    Do you recall there being books in boxes?

5        A.    Yes.

6        Q.    Do you recall there being many different books

7    around?

8        A.    Yes.

9        Q.    Did you look through all those books?

10        A.    No.

11        Q.    Do you -- did you seize all those books?

12        A.    No.

13        Q.    In fact, you seized very few books, is that not

14    correct?

15        A.    That's correct.

16        Q.    Do you recall that of the many books that were

17    there, some had nothing to do with Islam?

18        A.    I don't have that knowledge, but it could

19    probably be true.

20        Q.    Do you recall that of the many books that were

21    there that did involve Islam, many were of a very

22    moderate nature?

23        A.    I don't know that.  I didn't read them.

24        Q.    Do you recall that there were any number of

25    Qur'ans in the premises?

1      A.     I don't know.

2      Q.     Do you recall that of the many Qur'ans that

3   were there, some had the call to jihad that Mr. Cardani

4   mentioned in his opening statement and many did not?

5      A.     I don't recall that.

6      Q.     Did you look through all of the Qur'ans that

7   were there?

8      A.     I did not, no.

9      Q.     Did you look through and see if there were, in

10  addition to the Noble Qur'an, the one that Mr. Cardani

11  mentioned, there were other Qur'ans?

12     A.     I don't recall.

13     Q.     I don't know what your faith is, and pardon me

14  if this question is not one that relates, but are you

15  familiar with various versions of the Christian Bible,

16  that there are a number of versions of the Christian

17  Bible?

18     A.     Yes, I'm familiar with that.

19     Q.     And are you aware that there are a number of

20  versions of the Holy Qur'an?

21     A.     That, I don't know.  I don't have particular

22  knowledge of that.

23     Q.     In the course of the search, you have indicated

24  you did not make any effort to inventory the many, many

25  books that were present?

1      A.    No.  Correct.

2      Q.    You did not make an effort to determine how

3   many of those books might have had a call to jihad in

4   them and how many did not?

5      A.    No.

6      Q.    You did not make an effort to determine how

7   many of those books had nothing to do with religion?

8      A.    No.

9      Q.    How many of those books were of a completely

10  moderate mainstream description of Islam?

11     A.    No.

12     Q.    How many of those books describe a Westernized

13  view of how Muslims might or might not live in America?

14          MR. CARDANI:  Judge, I object at this point,

15  she doesn't know.

16          THE COURT:  Go on to the next, please.

17          MR. WAX:  Thank you.

18  BY MR. WAX:

19     Q.    With respect to the videotapes, you have

20  identified these two tapes in front of you.  I believe

21  that you indicated that your recollection is there were

22  perhaps 25 or 30 tapes on the metal shelves that you

23  described; is that correct?

24     A.    Correct, that's correct.

25     Q.    Do you recall that in another place in the

1    building in what might have -- be described as a prayer

2    room, there was a set of wooden bookshelves, perhaps an

3    entertainment center, do you recall that?

4        A.    I do recall there being an entertainment

5    center, and there was a TV there, and next to the TV,

6    there were also several videos in that area.

7        Q.    Do you recall there being another 25 or 30

8    videos in that area?

9        A.    Yeah, I think there were probably a few less in

10   that area, but, yes, there were probably 20 to 25 videos

11   in that area.

12       Q.    Do you recall that in the search, you also

13   located another, perhaps, 350 videos in two -- I'm not

14   sure exactly how to describe them.  And they sort of

15   look like storage units, but -- well, first of all, do

16   you recall there being several green metal structures

17   that you also searched?

18       A.    Yes.  There were two what we called trailers

19   out in the back that were green that were also searched.

20       Q.    And do you recall that one of them looked like

21   it might have been set up as an office with a desk in

22   it?

23       A.    I don't recall that there is a desk in it,

24   but --

25              MR. WAX:  May I have a moment, please, Your

1    Honor?

2              THE COURT:  Yes.

3              (Discussion held off the record.)

4         MR. WAX:  Your Honor, I'm not sure how you want

5    to handle this.  We have marked one of the photographs

6    that I would like to show the witness.

7              THE COURT:  The clerk will assist you.

8         MR. WAX:  I have it electronically.  I'm not

9    sure that I have it in hard copy.  So if we can show it

10   just to the witness, please.

11             THE COURT:  Has it been received?

12        MR. WAX:  It has not.  I was not aware that I

13   would need to show it to refresh her recollection, which

14   is what I would need to do right now.  I have a hard

15   copy, I believe, that I can show to the witness if that

16   would be easier at this point.

17             THE COURT:  Yes.  Please give it a number.

18        MR. WAX:  We have this marked for

19   identification as Exhibit 1034.

20             THE COURT:  Thank you.

21   BY MR. WAX:

22        Q.   Do you have 1034 in front of you now?

23        A.   Yes, I do.

24        Q.   Is that one of the photographs that was taken

25   during the course of the search provided to the

 1   government, which the government then provided to us?

 2       A.    Yes.

 3            MR. WAX:   I would offer that exhibit, Your

 4   Honor.

 5            MR. CARDANI:   Can we identify what it is?

 6   Where it was taken from?  Just in aid of objection, I'm

 7   not going to object to this, I just want to know where

 8   it was taken from.

 9            THE COURT:   Do you know where it was taken

10   from?

11            THE WITNESS:   Yes.  It appears to be one of the

12   trailers.  I have all the photos here, to see if I have

13   the exact same one, if that's okay.

14            MR. CARDANI:   One of the trailers, no

15   objection.

16            THE COURT:   It's received.

17   BY MR. WAX:

18       Q.    Do you also recall in the trailers there being

19   perhaps another 350 videotapes?

20       A.    Yes.  We took several boxes of videotapes out

21   of the trailer.

22       Q.    Did you go through those videotapes?

23       A.    I did not go through them.

24       Q.    Do you know whether some of them are copies of

25   news stories from CNN?

1      A.      I don't have that knowledge, no.

2      Q.      Do you know whether some of them are copies of

3    new stories from the History Channel?

4      A.      I do not know.  I didn't look at them.

5      Q.      You didn't look at them at all?

6      A.      No.

7      Q.      Do you recall that among the items that you

8    saw, there was a box -- there were several boxes that

9    had a label on them called "Pete's cloth" or "Pete's

10   tapes" or things of that nature?

11     A.      I do recall there were several boxes that said

12   "Pete's clothes," I thought.

13     Q.      Do you recall a box that said "Pete's tapes"?

14     A.      As I recall when I looked through my photos,

15   the majority of the boxes said "tapes" on them.  Whether

16   they said "Pete's tapes" on them, I don't recollect

17   that.

18             MR. WAX:  Your Honor, could we show the witness

19   an item we've had marked as Exhibit 1047 for

20   identification.

21             THE COURT:  Yes.

22   BY MR. WAX:

23     Q.      Do you have 1047 in front of you?

24     A.      Yes, I do.

25     Q.      Do you recall boxes of that nature being

1    observed, having the photograph taken, or seeing the

2    photograph?

3         A.    Yes, I do.

4         Q.    Does that refresh your recollection that there

5    was a box that was identified as "Pete's" something and

6    then the word "tapes" on it?

7         A.    Yes, I do.

8         Q.    All right.  With respect to the house and the

9    living arrangements in the house, do you have any

10   knowledge of the number of people who might have lived

11   there, whether on a prolonged basis or a temporary

12   basis, from the time that Mr. Seda first moved in until

13   the time of the search?

14        A.    No, I do not.

15        Q.    Do you have any knowledge of the number of

16   people who might have brought books or tapes or other

17   literature into the premises?

18        A.    No, I do not.

19        Q.    Do you know -- have any idea how many people or

20   which people would have access to or used what computers

21   at what different times?

22        A.    No, I do not.

23             MR. WAX:  Thank you.  I have no further

24   questions.

25             THE COURT:  Redirect.

```
 1                    REDIRECT EXAMINATION
 2   BY MR. CARDANI:
 3       Q.    Mr. Wax asked you about whether you were aware
 4   of all this other material that was in the building.
 5   Were you part of the actual searching team looking for
 6   items pursuant to the warrant?
 7       A.    No.
 8       Q.    What was your role?
 9       A.    My role was a seizing officer, to make sure
10   whatever the searching team found fit into the items to
11   be seized, and then to take possession of it.
12       Q.    I'm sorry?
13       A.    And then to take possession of it and get it
14   logged in.
15       Q.    So others are out there, looking for items,
16   they bring them to you, you compare it to the warrant,
17   right?
18       A.    That's correct, that's correct.
19       Q.    And Special Agent Anderson is there for
20   guidance as well?
21       A.    Yes.
22       Q.    And the mindset is, is this within the scope of
23   the warrant?
24       A.    That's correct.
25       Q.    Okay.  Now, Mr. Wax asked you about green
```

1    trailers.  So how many trailers were on the premises, if

2    you know?

3       A.    There were two trailers on the back of the

4    premises.

5       Q.    All right.  And if we could bring up SW-66.  Do

6    you know the acreage of the property, roughly?

7       A.    Roughly, as I recall, I thought it was at least

8    on a couple of acres.

9       Q.    Okay.  Now, where, in connection with this

10   picture, were the trailers, can you point?

11      A.    Well, you can't -- they are kind of behind the

12   house.  If you go around the right corner, they are

13   right back there.

14      Q.    Okay.  And how far were they from the house,

15   roughly?

16      A.    Roughly, I'm really not good with measurements,

17   but like -- they were like from me to that white board,

18   so they were very close to the residence.

19      Q.    Are you aware of other items that were found in

20   the green trailers?

21      A.    Yes, I am.

22      Q.    Are you aware of whether there were firearms in

23   the green trailers?

24      A.    Yes, there were.

25      Q.    Do you know about how many firearms were in the

1    green trailers?

2       A.    We found approximately ten firearms.

3             MR. WAX:  Your Honor, I object on grounds of

4    relevance, and it's beyond the scope of anything that

5    was asked.

6             THE COURT:  Mr. Cardani.

7             MR. CARDANI:  I think it's directly related to

8    the cross-examination talking about the nature of

9    Pete's -- the defendant's --

10            THE COURT:  Overruled.  Go ahead.

11   BY MR. CARDANI:

12      Q.    Are you aware of the number and type of

13   firearms that were found in the green trailers?

14      A.    There were ten firearms found in the green

15   trailers.

16      Q.    Did they include a 9-millimeter semiautomatic

17   pistol, Glock?

18      A.    Yes.

19      Q.    With fully loaded magazines?

20      A.    Yes.

21      Q.    Did it include another 9-millimeter

22   semiautomatic pistol?

23      A.    Yes.

24      Q.    With three pre-band fully loaded magazines?

25      A.    Yes.

1    Q.    And two more of those same weapons?

2    A.    Yes.

3    Q.    .44 Magnum revolver?

4    A.    Correct.

5    Q.    .22 semiautomatic pistol?

6    A.    Yes.

7    Q.    Ruger P89, two fully loaded magazines?

8    A.    Yes.

9    Q.    12-gauge shotgun?

10   A.    Yes.

11   Q.    Ruger .22 carbine?

12   A.    Yes.

13   Q.    With a scope?

14   A.    Yes.

15   Q.    And another .22 carbine?

16   A.    Yes.

17   Q.    Now, were those taken?

18   A.    No, they were not.

19   Q.    Why not?

20   A.    They were not within the scope of the items to

21   be seized.

22   Q.    But documents -- the weapons were inventoried,

23   nevertheless?

24   A.    They were inventoried and photographed,

25   correct.  I shouldn't really say inventoried.  We wrote

1    down the weapons and the serial numbers, but we did not

2    seize them.

3            MR. CARDANI:  That's all I have.

4                      RECROSS-EXAMINATION

5    BY MR. WAX:

6        Q.    Are you aware that all those weapons were

7    lawfully possessed?

8        A.    I did not have direct knowledge of that, but I

9    believe we had somebody from ATF run their serial

10   numbers.

11       Q.    And you learned that they were all lawfully

12   possessed?

13       A.    Correct.

14       Q.    So it wasn't just that they were not within the

15   scope of the warrant, there was nothing illegal about

16   them, the handguns or the long guns, correct?

17       A.    I believe that's correct.

18       Q.    You also don't have any personal knowledge

19   about whether or not they were all owned by Mr. Seda?

20       A.    I do not know that, no.

21       Q.    And you've indicated that Mr. Seda was not

22   present at the time of the search?

23       A.    That's correct.

24            MR. WAX:  Thank you.

25            MR. CARDANI:  No further.

1           THE COURT:  You may step down.  Call your next

2      witness, please.

3           MR. CARDANI:  Jeremy Christianson.

4           MR. WAX:  Your Honor, I don't believe I offered

5      the second exhibit.  I would do so now.

6           MR. CARDANI:  No objection.

7           THE COURT:  Received, 1047.  Thank you.

8           MR. WAX:  Could we show both of those to the

9      jury?  I'm not sure if they were shown to the jury

10     during the testimony.

11          THE COURT:  I want to put this witness on the

12     stand now.  You can do that later.  Go ahead.

13          MR. WAX:  Thank you.

14          THE CLERK:  Sir, please step forward and raise

15     your right hand.

16          (The witness was sworn.)

17          THE CLERK:  Thank you.  Please step forward.

18     Please watch your step.  There is a couple of steps

19     there.  Your microphones are the buttons under here, so

20     if you would watch your paperwork.

21          Sir, would you please state your full name for

22     the record, spelling your last name.

23          THE WITNESS:  Jeremy William Christianson,

24     C-H-R-I-S-T-I-A-N-S-O-N.

25

1                     DIRECT EXAMINATION

2    BY MR. CARDANI:

3        Q.     Good morning, Mr. Christianson.

4        A.     Good morning.

5        Q.     What do you do for a living?

6        A.     I am a computer forensic manager for the United

7    States Commodities Futures Trading Commission.

8        Q.     Where is that?

9        A.     That's based out of Washington, D.C.

10       Q.     Is that where you live?

11       A.     That is where I live.

12       Q.     How long have you been doing that?

13       A.     I've been doing that for a little over a year

14   now at that particular agency.

15       Q.     What are your duties?

16       A.     My duties are I manage operations for the

17   Commission's Computer Forensics Division.

18       Q.     What does the Computer Forensics Division do?

19       A.     The Computer Forensics Division is responsible

20   for the collection and preservation and analysis of

21   electronic evidence in relation to our cases.

22       Q.     And you've been there about a year?

23       A.     I've been there about a year, yes.

24       Q.     How about before that?

25       A.     Before that, I worked for the Internal Revenue

 1   Service Criminal Investigation Division.

 2        Q.    In what capacity?

 3        A.    I was a senior investigative analyst and

 4   computer forensic examiner.

 5        Q.    All right.  And what were your specific duties

 6   in that capacity?

 7        A.    My specific duties were to provide support to

 8   the field agents in matters with digital evidence that

 9   they seized in cases.

10        Q.    What do you mean by field agents?

11        A.    Computer investigative specialists, which are

12   special agents that specialize in computer forensics and

13   search and seizures.

14        Q.    Okay.  Do you -- before that, what did you do?

15        A.    Before that I worked for the Air Force Office

16   of Special Investigations, and I was a computer forensic

17   examiner there as well.

18        Q.    How long?

19        A.    For a couple of years.

20        Q.    Excuse me?

21        A.    For several years.

22        Q.    Okay.  All right.  Now, before we get into the

23   substance of your testimony, can you explain the

24   relationship between you, when you were with the IRS,

25   with you -- were you in Washington, D.C. working?

Christianson - D by Mr. Cardani                          36

 1      A.      Yes, I was based out of Washington, D.C.

 2      Q.      All right.  What was the relationship between

 3  you and the field agents vis-à-vis examining computers?

 4      A.      My relationship with them was to provide

 5  support primarily when they would encounter technical

 6  challenges of data that they seized.  And I would assist

 7  them with the analysis and recovery of data.

 8      Q.      Have you had training in computer forensics?

 9      A.      Yes, I have.  I have -- over the past eight

10  years, I've accumulated more than a thousand hours of

11  training in computer forensics.

12      Q.      More than 1000?

13      A.      Yes.

14      Q.      Have you provided training to others in the

15  same subjects?

16      A.      Yes.  I taught at the Federal Law Enforcement

17  Training Center, and also taught to our local community,

18  state and local law enforcement as well.

19      Q.      Are you certified in this activity?

20      A.      There really isn't a certification that I have

21  to teach.  It's just a part of the job that I have.

22      Q.      What about certified as an examiner?

23      A.      I am certified as an examiner.  I have several

24  certifications.  One of which is a certified computer

25  examiner through the International Society of Forensic

 1    Computer Examiners.  And also I'm an EnCase certified

 2    examiner, again, which is the software that we use to

 3    conduct our analysis.

 4       Q.    Now, at some point in time when you were with

 5    the -- still with the Internal Revenue Service, did you

 6    get involved in an attempt to analyze the contents of

 7    certain hard drives seized from 3800 South Highway 99,

 8    Ashland, Oregon?

 9       A.    Yes.

10       Q.    Do you know when that was?

11       A.    It was approximately January of 2008.

12       Q.    2008?

13       A.    That's correct.

14       Q.    Okay.  And do you know how many hard drives you

15    were asked to help examine?

16       A.    It was requested that I analyze five hard

17    drives.

18            MR. CARDANI:  If I may have a moment.

19            (Discussion held off the record.)

20            MR. CARDANI:  Judge, I'd like to just read a

21    stipulation at this point with the consent of Mr. Wax.

22            THE COURT:  Go ahead.

23            MR. CARDANI:  The parties stipulate that in

24    February of 2004, the United States government obtained

25    eight computer hard drives from the premises of

1    al-Haramain Ashland in Ashland, Oregon.  The government

2    made mirror images of those hard drives and provided

3    them to its computer expert, Richard Smith.

4            Mr. Smith subsequently provided the hard drives

5    to government's computer expert, Jeremy Christianson.

6    The government's exhibits in the SW series were derived

7    from those computers.

8            THE COURT:  Mr. Wax, do you so stipulate?

9            MR. WAX:  Yes, Your Honor.

10           THE COURT:  Members of the jury, that means you

11   are to accept that as facts in the case.  Go ahead.

12   BY MR. CARDANI:

13   Q.    What does -- the term "mirror" showed up in

14   that stipulation in terms of the hard drive.  Can you

15   explain that?

16   A.    Yes.  A mirror copy of a hard drive is simply

17   an exact copy of a hard drive that we can authenticate

18   as being an exact copy.

19   Q.    So what you were given came from Oregon were

20   exact copies of basically the guts, the hard drives of

21   the computers?

22   A.    Yes.

23   Q.    To the best of your knowledge, were those same

24   copies provided to the defense?

25   A.    Yes.

Christianson - D by Mr. Cardani                    39

1    Q.    If we could bring up SW-64, please.  If we

2 could go to room X.  Now, are you familiar with the

3 monikers there, Seda 8, 9, 6 and 10?

4    A.    Yes.

5    Q.    And, Mr. Christianson, were those among the

6 hard drives that you attempted to analyze?

7    A.    Yes.

8    Q.    Did you say there were five that you analyzed?

9    A.    Five.

10    Q.    Do they include all of these?

11    A.    They do include all of these.

12    Q.    And a couple of others from the upstairs

13 office?

14    A.    Yes, Seda number 7.

15    Q.    Now, before attempting to do your work as a

16 computer forensic expert with IRS, did you talk to

17 anybody about what you were needed to do?

18    A.    I spoke with Special Agent Anderson and Special

19 Agent Rick Smith, who was the seizing agent for the

20 digital evidence.  He preserved it.  And she requested

21 that I conduct a recovery for documents, financial data

22 files like QuickBooks and e-mail.

23    Q.    Did that help shape the nature of your work

24 after that?

25    A.    It did, yes.

Christianson - D by Mr. Cardani                    40

1      Q.     Were there any specific requests about any

2   problems they were having in the field accessing the

3   contents of the hard drives?

4      A.     One of the problems that they had was that

5   they, utilizing the software that they were using, they

6   were unable to identify things like e-mail.

7      Q.     More specifically about the e-mail that they

8   were having trouble locating particular e-mails or what?

9      A.     They were having trouble locating -- I believe

10  it was any e-mail at all.

11     Q.     Okay.  And so did you then conduct an

12  examination of the computer hard drives?

13     A.     I did.

14     Q.     How long do you typically spend in analyzing

15  the contents of a hard drive?

16     A.     It's hard to put in an exact time of how long I

17  actually spend.  Each case is unique.  But usually data

18  is readily accessible in -- at least in my experience

19  with the cases that I've worked on.  And it usually

20  doesn't take a long time for turnaround.  I'd say a

21  couple of weeks to conduct a preliminary examination.

22     Q.     And in your four years with IRS, do you have a

23  rough estimate of how many computer hard drives you were

24  engaged in analyzing?

25     A.     It was a lot.

Christianson - D by Mr. Cardani                    41

1      Q.     Over 100?

2      A.     Not over 100.

3      Q.     Less than 100?

4      A.     Less than 100 but very close.

5      Q.     Now, were you able to access eventually the

6   information contained in some of the computers?

7      A.     Yes, I was.

8      Q.     Did it take much work?

9      A.     It took a tremendous amount of work.

10     Q.     Please, what do you mean by a "tremendous

11  amount of work"?

12     A.     It took a lot of time, so that the data

13  recovery techniques that I employed to recover the data

14  were very manual, very time intensive.

15     Q.     Why?

16     A.     Because of the state of the data.  The data

17  that I recovered existed in what I call residual areas

18  of the hard drive.  It wasn't accessible by a user of

19  the computer.

20     Q.     Can you break that down a little bit, it's not

21  accessible to a user?

22     A.     Sure.  If I'm a user of a computer, and I'm

23  sitting in front of it, and I turn the power on, and

24  Windows comes up, for example, the files and folders

25  that I see, that's easily accessible data.

 1          When you delete a file, the file is not visible

 2   to you anymore, but it's still on the hard drive until

 3   it's overwritten.

 4          So those areas of the hard drive that the user

 5   cannot see or access, there could still be residual data

 6   there.

 7      Q.   Can be?

 8      A.   Can be.

 9      Q.   All right.  What does that mean?  How do you

10   know if it's still there or not?

11      A.   It's still there until it's overwritten by new

12   data, by new files.

13      Q.   How long did you work on these computers?  You

14   said you got them in January of 2008.

15      A.   Again, it's very hard to quantify in hours how

16   many -- how much time I spent, but it took me several

17   months, at least upfront, to recover a lot of this data.

18      Q.   And were you working primarily on this?

19      A.   I was working primarily on this, yes.

20      Q.   For months?

21      A.   For months.

22      Q.   In terms of your comparison with your other

23   work, was this routine?

24          MR. WAX:  Objection, Your Honor.

25          MR. CARDANI:  For the amount of time.

1          THE COURT:  Did you say "was it routine"?

2          MR. CARDANI:  Yes, in comparison to the amount

3    of time compared to working on other projects.

4          THE COURT:  The objection is overruled.

5          THE WITNESS:  It was -- to spend as much time

6    as I did simply relates to the volume of information

7    that I was able to identify and recover.  So I spent

8    more time than usual, yes.

9    BY MR. CARDANI:

10     Q.    Have you ever worked on a project as large as

11   this before?

12     A.    This was one of the largest I've worked on.

13     Q.    Now, were you able to recover all of the

14   information from the contents of these hard drives?

15     A.    Can you define "all"?

16     Q.    Well, specifically you said when something is

17   deleted, it goes into this unallocated space?

18     A.    Yes.

19     Q.    And did you spend a lot of time forensically

20   sifting through the unallocated space?

21     A.    Yes, I did.

22     Q.    Now, did you find anything in the unallocated

23   space that led you to conclude that there were other

24   things there that were gone, that had been overwritten?

25     A.    In particular, we used e-mail, for example, the

1   method that I employed to -- very manual method to

2   recover some of the e-mail, it was incomplete with the

3   recovery, so I had to employ some tools to actually --

4   for example, Microsoft Outlook e-mail, I was actually

5   able to recover an entire mailbox associated to that

6   program.  And I use an analogy -- and, again, this is an

7   oversimplified analogy -- to a mailbox out in front of a

8   house that has letters inside.

9          I wasn't only able to recover one of those

10  letters, I was able to recover the entire mailbox.  And

11  that process, because of the volume of e-mail, took a

12  very substantial amount of time to recover, and to

13  repair.  And that tells me that it was probably deleted

14  at some point in time, which I couldn't determine, and I

15  had to run some repair tools to recover most of the

16  e-mail.

17  Q.   We're going to get into the e-mails, but just

18  to be clear, you just used an analogy about a missing

19  mailbox, so when somebody turns on a computer, and looks

20  for e-mails as a file, Outlook or something like that,

21  that you would ordinarily look for an e-mail?

22  A.   Yes.  Microsoft Outlook stores its e-mail in a

23  single file.  It's called a personal storage folder.

24  And that single is just like a mailbox.  All of your

25  e-mail is inside that one file.  And I was able to

Christianson - D by Mr. Cardani                    45

1    recover that one file, actually, on several hard drives.

2       Q.    From the deleted parts of the computer?

3       A.    From the unallocated, nonuser accessible areas

4    of the hard drive.

5       Q.    So when you turn on a computer, it would be,

6    like, apparent to the user, was there any e-mail system

7    apparent?

8       A.    There wasn't -- Microsoft Outlook was not

9    apparent on the computers.  If I were the one to sit

10   down and turn it on, Microsoft Outlook was not there.

11      Q.    Okay.  So the whole mailbox was actually

12   missing?

13      A.    Yes.

14      Q.    But you were able to use tools to get into the

15   deleted portions and find some e-mail?

16      A.    Yes.

17      Q.    You mentioned the word "repair."  What does

18   that mean?

19      A.    Again, if you are using Microsoft Outlook as

20   your e-mail program, and something happens to your

21   mailbox, it gets corrupted and you can't open it,

22   Microsoft has a tool that is specifically made to help

23   repair that for you so that you can save your e-mail.

24      Q.    Now, what was your goal in terms of -- were you

25   working with Special Agent Anderson quite a bit on this

Christianson - D by Mr. Cardani                    46

1    project?

2        A.    Yes, I was.

3        Q.    Did you talk to her on the phone quite a bit?

4        A.    I did quite a bit, yes.

5        Q.    All right.  What was your goal in rebuilding

6    these computers, especially the deleted aspects of them?

7        A.    My role primarily was to simply be the

8    technician, to identify and recover the types of data

9    that Special Agent Anderson identified upfront, and to

10   reconstruct that into a user accessible form so that she

11   could review and search the data.

12       Q.    And how?  How could you search the data then?

13       A.    Through different types of software that we

14   have that allows you to search a large volume of

15   information, files.

16       Q.    Were you ultimately successful?

17       A.    I believe so.

18       Q.    Okay.  But not entirely because there were --

19   there was material that was entirely overwritten, or do

20   you know?

21       A.    It's hard to determine, but there was a lot of

22   deleted data on the computers.

23       Q.    Did you find any e-mails that were like strings

24   of text but then just stopped so they are partially --

25       A.    There were several, for example, Web pages that

1    used to be on the computer at one point in time and

2    accessible to a user.  You could definitely see that

3    there were blocks of text for files and stuff of that

4    type that were not complete.

5        Q.    Meaning they were gone?

6        A.    Meaning that the likely scenario is that they

7    were partially overwritten.

8        Q.    And if they are partially overwritten, is there

9    any way at that point for you to recover them?

10       A.    No.

11       Q.    Gone forever?

12       A.    Gone forever.

13       Q.    Okay.  Now, in preparation for your testimony

14   today, were you asked to prepare a summary of certain SW

15   series, search warrant series, of exhibits that came out

16   of these computers?

17       A.    Yes.

18       Q.    And is that what's been identified as JC-4?

19       A.    Yes.

20       Q.    Did you help prepare this?

21       A.    Working with Special Agent Anderson, I did help

22   prepare this.

23       Q.    So to the best of your knowledge, does the

24   information depicted in here accurately show the nature

25   of the material in the report?

1        A.      Yes.

2        Q.      Before we bring it up -- okay.  If we could

3    bring up the first page of JC-4.  This is titled Summary

4    Report, Search Warrant Series Deleted Items Recovered

5    From Seized Al-Haramain Computers.  All right.  Now that

6    word "deleted" does that mean -- does that mean that

7    this is in the unallocated space, not in the apparent

8    portion of the computers?

9        A.      That's correct.

10       Q.      All right.  Let's talk about the fields first.

11   We see the exhibit numbers for trial, so the first one

12   would be SW-5.  Do you see that on the first line?

13       A.      Yes.

14       Q.      And then next to it is a description?

15       A.      Yes.

16       Q.      E-mail with attachment from Abdul Qaadir dated

17   such-and-such.  Whose description is that?

18       A.      Special Agent Anderson.

19       Q.      And then the next column is the hard drive?

20       A.      That is the evidence item it came from.

21       Q.      I'm sorry?

22       A.      That's the evidence item that it came from,

23   yes.

24       Q.      Okay.  Were a lot of these from Seda 8?

25       A.      It appears that way, yes.

 1       Q.     From room X.  And then the "from," "to," and
 2   the "CC," is -- who put -- whose information is that?
 3       A.     Those are standard fields in an e-mail.  So
 4   when e-mails are sent and received, it's who it came
 5   from, who it went to.
 6       Q.     So that's from the e-mail itself, not from
 7   any --
 8       A.     Correct, that is --
 9       Q.     -- government -- I'm sorry?
10       A.     That is from the e-mail itself, yes.
11       Q.     And the subject line?
12       A.     That is from the e-mail.
13       Q.     And then the date of e-mail or document on the
14   right?
15       A.     That is also from the e-mail.
16       Q.     Did you -- were you asked to do, as best you
17   could, a chronological list of these search warrant
18   items?
19       A.     Yes.  Once the -- this spreadsheet was put
20   together, you could sort chronologically based on the
21   data.
22       Q.     Okay.  But this particular exhibit starts
23   January 4, 2000, then runs for several pages.  And
24   eventually we take you through September of '01.  So
25   where possible, chronologically?

Christianson - D by Mr. Cardani                    50

1    A.    Yes.

2    Q.    Now, are many of these items depicted recovered

3    e-mails?

4    A.    These are recovered e-mails from what we talked

5    about earlier of one of those mailbox files.

6    Q.    Okay.  But you -- there are other types of

7    information depicted on here as well?

8    A.    There is.  There are several Web pages and Word

9    documents.

10    Q.    We're having a little trouble hearing you.  If

11    you could move a little closer to the microphone.  It's

12    down there.

13    A.    Sure.

14          THE COURT:  The mikes are those little silver

15    buttons in front of you.

16          THE REPORTER:  You may slow down, too.  I think

17    that would help.

18    BY MR. CARDANI:

19    Q.    She slows me down a lot, too.  Now, one thing

20    before we get into some of these, were you asked to

21    determine whether it was possible that these e-mails

22    we're about to get into were spam?  Are you familiar

23    with spam?

24    A.    Yes, I am.

25    Q.    What's spam?

Christianson - D by Mr. Cardani                    51

 1    A.    Spam is, for lack of a better definition, junk

 2    mail, things that you don't want, or ads and other

 3    things.

 4    Q.    So you can just simply delete it without even

 5    opening it?

 6    A.    You could, yes.

 7    Q.    And where would it go on the computer if you

 8    did that?

 9    A.    If you were using, again, a program like

10    Microsoft Outlook, there's actually a recycle bin inside

11    Outlook, so it would simply be in the deleted folder.

12    Q.    Okay.  So were you asked to determine whether

13    these e-mails were of the spam nature?

14    A.    I was.

15    Q.    What was the result of your work?

16    A.    Basically what we determined that these -- the

17    location of each one of these e-mails, and most of them

18    were in the in box folder.  And I was asked to determine

19    whether they were read or unread.  And we determined

20    that all of these e-mails in this particular spreadsheet

21    were marked as read.

22    Q.    Okay.  So would that require somebody to

23    physically open it on a computer?

24    A.    Yes.

25    Q.    Okay.  Now, all of these were opened?

1     A.    Yes.

2     Q.    So, for example, if we could go to page 5 of

3   this.  And then the second line down there,

4   Mr. Christianson, SW-30, you say that that is -- or

5   stated that the e-mail to Sheeshaan group dated March 8,

6   2000, at such-and-such a time containing fatwa from

7   Jibreen, right?

8     A.    Yes.

9     Q.    Okay.  And then moving over in that field, you

10   are saying it's from Seda 8, deleted?

11     A.    Yes.

12     Q.    And then AQ@Yahoo with the address of the

13   sender?

14     A.    Yes.

15     Q.    And then to the Sheeshaan eGroups.  Now, are

16   you familiar with the -- if we can go back to the left

17   just a little bit.  Okay.  This Sheeshaan eGroups, are

18   you familiar with that based on this investigation?

19     A.    No.

20     Q.    All right.  Do you know what an eGroup is?

21     A.    I do.

22     Q.    What's an eGroup?

23     A.    An eGroup is simply a group of -- a

24   distribution list, if you will, for a particular topic

25   for a particular entity.

Christianson - D by Mr. Cardani                    53

1    Q.    Did you find a number of e-mails that were

2   associated with this Sheeshaan eGroups --

3    A.    Yes.

4    Q.    -- on the computer?

5    A.    Yes.

6    Q.    And then so if we could bring up the exhibit

7   itself, SW-30, please.  If we look at that first part up

8   top, is this an example of an e-mail that made its way

9   into the summary, SW-30?

10    A.    Yes.

11    Q.    Okay.  So there is the address up at the top,

12   and a date sent, date delivered.  And so you took this

13   information and worked with Agent Anderson and put this

14   into the JC-4 exhibit?

15    A.    Yes.

16    Q.    Okay.  Can we go to SW-51, please.  In addition

17   to e-mails, did you find other type of information

18   within the deleted section of the computers?

19    A.    Yes, several -- there were quite a bit of

20   documents and Web pages, for example.

21    Q.    What is this?

22    A.    This is a Web page.

23    Q.    Okay.  And what can I do to help the jihad and

24   mujahideen?  Now, this is SW-51.  And I see in the last

25   page of JC-4 -- we don't need to see it right now, keep

1    this up here for a second, but you put the date of the

2    e-mail or document not applicable in your summary, why

3    is that?

4        A.    When you recover files from unallocated space,

5    you lose all of that information, the dates, times, and

6    the source of where it existed, when it was accessible

7    by the user.

8        Q.    But the contents of this in the deleted section

9    of Seda 8, does this indicate that somebody actually

10   visited a Web site on this computer?

11       A.    It's logical to assume that, yes.  At one point

12   in time, this Web page existed and was accessible to the

13   user.

14       Q.    But then was deleted?

15       A.    Yes.

16       Q.    Okay.  I'm going to ask you about a few other

17   e-mails and ask you if you did some work forensically

18   that helps explain some of the e-mail traffic in this.

19   Could we start with SW-56, please.

20            Are you familiar, Mr. Christianson, with this

21   exhibit?

22       A.    Yes.

23       Q.    And did this come from Seda 8?

24       A.    Yes.

25       Q.    All right.  Profile commander of the foreign

1    mujahideen in the Caucasus.  And this is a multiple page

2    exhibit.  Could we go to page 6, please.  All right.

3    Could we expand this part right here (indicating).

4    Thank you.

5           Do you see that?  It's from this Khattab

6    interview, Mr. Christianson.  Do you need any support?

7    What support in particular do you need?

8        A.    Yes.

9        Q.    And then the answer, "The Chechen Republic has

10   been surrounded from all sides.  However, the Russian

11   Army is prepared to sell everything for a price.  As for

12   previous affairs of the Muslims, one would always find

13   Islamic charities and organizations present.  I'm sorry

14   to say there is not a single Islamic charity

15   organization active inside Chechnya at present.  Only

16   the Red Cross is present in Chechen towns and cities.

17   Therefore, we advise the Muslims in the Muslim countries

18   to take a sincere stand with the mujahideen in the land

19   of the Caucasus."  Do you see that?

20       A.    Yes.

21       Q.    Now, can we go to SW-52.  Does this -- this

22   came also from Seda 8, according to page 1 of your

23   summary?

24       A.    Yes.

25       Q.    And it's listed here as having been created on

1   January 22, 2000?

2       A.      Yes.

3       Q.      So tell us about that.  How -- what is this?

4       A.      This is a recovered Microsoft Word document.

5   And Microsoft Word when you create a new Microsoft Word

6   document stores internal dates and times.  And those

7   internal dates and times are reflective of when it was

8   created based on the time zone settings were for Windows

9   at the time it was created.

10      Q.      So this document, is that the entire document?

11      A.      That is the entire document.

12      Q.      Okay.  So someone singled off this particular

13  question and put it into a Word document?

14      A.      It would appear so.

15      Q.      And then if we could go -- are you familiar

16  with the term "cut and paste"?

17      A.      I am.

18      Q.      Can you go onto a Web site and highlight

19  material and save it to the Word document?

20      A.      You can, yes.

21      Q.      That would be a cut and paste?

22      A.      Yes.

23      Q.      Okay.  And the language here is identical to

24  that other one?

25      A.      It was identical, yes.

1    Q.    All right.  The next exhibit, SW-11, now this

2   is dated the same day.  You said in your summary that

3   the Word document was created on January 22nd --

4    A.    Yes.

5    Q.    -- on the computer.  This is a new exhibit,

6   SW-11, which is listed on page 2 of your summary as an

7   e-mail contained within Seda 6, from P@qf.org.  Do you

8   see that?

9    A.    Yes.

10    Q.    To al-But'he, right?

11    A.    Yes.

12    Q.    And then it says "what support"?

13    A.    Yes.

14    Q.    And that's the subject line?

15    A.    That is the subject line.

16    Q.    Typically in -- who would have typed "what

17   support"?  Would that have been from the sender of this

18   e-mail?

19    A.    That would have been from the sender, yes.

20    Q.    And this same question down below, the verbiage

21   is identical to the Khattab interview and the Word

22   document you just talked about?

23    A.    It is, yes.

24    Q.    Do you know if this was sent?

25    A.    It appears that it was sent, yes.

1    Q.    And then if we go to SW-36, please.  Okay.

2    Blowing up the first half of that one, SW-36,

3    Mr. Christianson, does this appear to be an e-mail from

4    looking at your -- this lists as coming from that same

5    computer, Seda 6 from room X?

6    A.    Yes.

7    Q.    Okay.  So the same computer listed on your

8    summary here on page 5, from the same sender, P@qf.org

9    to Sheeshaan owner at eGroups, dated September 18, 2000.

10   And down below is Red Commie in red?

11   A.    Yes.

12   Q.    Now, it's in red.  Do you know if that was in

13   its original form or whether someone from the government

14   made it red?

15   A.    No one from the government made it red.  At

16   least not from the recovery that I did.  It is in the

17   state that it was in when I recovered it.

18   Q.    Both in size and color?

19   A.    Both in size and color.

20   Q.    And then three lines down it says AU?

21   A.    Yes.

22   Q.    And are you familiar that the defendant's --

23   one of his names is Abu Yunus?

24   A.    Yes, Special Agent Anderson told me that was.

25   Q.    And down below it says The Arborist, Ashland,

1    Oregon, Pete Seda, urban forester, certified arborist?

2        A.    Yes.

3        Q.    So it's a contact with the issuer of Sheeshaan

4    eGroups?

5        A.    Yes.

6        Q.    If we could move on to SW-23.  If we could just

7    see who is sending this.  Was this also recovered from

8    the computers?

9        A.    Yes.

10       Q.    I'm looking at your summary, and you have it

11   from hard drive Seda 8 in the deleted section?

12       A.    Yes.

13       Q.    So this is just from soliman@albuthi.com dated

14   February 23rd of 2000 to Pete?

15       A.    Yes.

16       Q.    Regarding FBI witch hunt to target Islamic

17   charities?

18       A.    Yes.

19       Q.    I'd like to go to the second page of that and

20   if we could go down towards the bottom.  Do you see that

21   red paragraph?

22       A.    Yes.

23       Q.    Before getting into the contents of it, it's in

24   red.  And the same question from before.  Is -- did

25   someone put this in red in its original form in the

1    computers?

2        A.    It appears that way, yes.

3        Q.    Changed the color, but I'm saying you didn't do

4    it?

5        A.    I did not do it.

6        Q.    Okay.  And to the best of your knowledge, she

7    didn't do it?

8        A.    To the best of my knowledge, she did not do it

9    either.

10       Q.    All right.  So if you went in there today and

11   looked at this computer, you'd find this in red, this

12   section?

13       A.    I would find it exactly the same way, yes.

14       Q.    Okay.  U.S. officials also said they have

15   discovered through the massive probe that a significant

16   number of Islamic terrorists are concealing their

17   activities and sources of funds by using charitable

18   organizations as fronts.  Since many of these charities

19   do substantial community service work, investigating

20   them is not easy and can subject the FBI or foreign law

21   enforcement authorities to allegations of targeting

22   religious or ethnic groups, sources said.

23       A.    Yes.

24       Q.    Okay.  If we could go back to page 1 at the top

25   there.  This was sent by someone using the

 1    soliman@albuthi address to Pete, and it was found in

 2    this deleted section of Seda 8?

 3        A.    Yes.

 4        Q.    A few other things.  I'd like to go to SW-8,

 5    please.  Mr. Christianson, in addition to a lot of these

 6    e-mails, were there pictures and maps also found in

 7    deleted sections of these hard drives?

 8        A.    Yes.

 9        Q.    And does this one here, SW-8 that's before you,

10    from AQ@Yahoo, Friday, January 14th, news from the

11    mujahideen in Chechnya, news and photos, and then there

12    are attachments.  What do those refer to before we get

13    into them?

14        A.    Attachments are simply, in this particular

15    case, pictures that were sent with the e-mail.

16        Q.    And there is a thing at the end of these

17    addresses, JPG, like p4@JPG.  What does JPG mean?

18        A.    That is a particular type of picture file.

19        Q.    J-peg, is that how you guys say it?

20        A.    J-peg, yes.

21        Q.    That means the picture.  All right.  And this

22    is talking about a Russian plane shot down January 2000,

23    70 Russians killed, 4 vehicles destroyed?

24        A.    Yes.

25        Q.    And then pictures from operations, see

Christianson - D by Mr. Cardani                    62

1    attached.  All right.  If we could go on to the second

2    page of this.  And I want to go through some of these

3    pictures.  Are these the attachments that were on that

4    particular e-mail, Mr. Christianson?

5         A.    Yes.

6         Q.    All right.  We just scrolled through all of

7    those pictures.  And those were all the pictures that

8    were attached as these JPGs to the e-mail?

9         A.    Yes.

10        Q.    Did you find photos SW-45?  Was this found in

11   the deleted sections of these hard drives?

12        A.    Yes.

13        Q.    Do you know who these fellas are?

14        A.    I don't know specifically, but I was told they

15   were -- by Special Agent Anderson that these are

16   pictures of mujahideen fighters.

17        Q.    All right.  SW-44, that was in the computer?

18        A.    Yes.

19        Q.    46.  47.  Now, what is this?

20        A.    That is a picture.

21        Q.    Was it found attached to anything, if you know,

22   or randomly in the computers?

23        A.    That was not an attachment to an e-mail.  That

24   was found on the hard drive as a recovered picture.

25        Q.    It was just a JPG photo --

1      A.     Yes.

2      Q.     -- found on the computer.  Okay.  48.  Can you

3   enlarge that a little bit.  It's really hard to make out

4   on this, but do you have any idea what that sign says?

5      A.     I do not.

6      Q.     Okay.  We'll have another witness talk about

7   that later, but I just wanted to ask you that.  Okay.

8   49.  Just another JPG in the computer?

9      A.     Yes.

10      Q.     And 50, same type of thing?

11      A.     Yes.

12      Q.     All right.  SW-59, this is listed in your

13   summary as coming also from Seda 8, undated, but a JPG

14   photo of the map of a battle in Grozny?

15      A.     Yes.

16      Q.     And the next one, SW-60, also you say comes

17   from Seda 8 in the deleted section?

18      A.     Yes.

19      Q.     Titled Mujahideen Tactical Movements Out of

20   Grozny?

21      A.     Yes.

22      Q.     And the bottom, mujahideen movement?

23      A.     Yes.

24      Q.     All right.  I'd like to move on to a slightly

25   different subject now.  SW-17, please.  Okay.  At the

1    top it says Hotmail, Ptichka1@hotmail.com.  Do you see

2    that?

3        A.    Yes.

4        Q.    So this is on page 2 of your summary, also from

5    the same hard drive, Seda 8, as -- it says here,

6    original sent February 6, 2000.  So can you describe

7    what this is?

8        A.    This is a -- looks like an e-mail message from

9    someone with Ptichka1@hotmail.com composing a message

10   using Web based e-mail, Hotmail.

11       Q.    And when you do e-mails like this, it's just

12   reflected in the computer like this?

13       A.    The behavior of Internet Explorer, which is the

14   Web browser that was used to generate this, was to store

15   remnants of that particular Web mail on the computer.

16       Q.    Okay.  And this is to -- regarding the "to"

17   line here, Qoqaznet@yahoo.co.uk?

18       A.    Yes.

19       Q.    And regarding translations?

20       A.    Yes.

21       Q.    And then down below, if we could highlight the

22   snap -- you've said -- you used the word snapshot

23   before?

24       A.    I did not say snapshot.

25       Q.    Oh.

1      A.    But essentially that's what this is.

2      Q.    Okay.  Well, I don't know what I mean by

3   snapshot.  Tell me what this is.

4      A.    This is just an -- this is the original portion

5   as if I was replying to an e-mail, so the original

6   e-mail thread would be part of that.

7      Q.    Okay.  And -- okay.  So if we go -- this is

8   from Qoqaz Web site to Ptichka at Hotmail.  And, again,

9   this is coming from Ptichka1 stuff is in the Seda 8?

10     A.    Yes.

11     Q.    Regarding translation, February 2000, talking

12  about -- down here, dear sister, the work seems to be

13  going on well?

14     A.    Yes.

15     Q.    Okay.  So does it appear that somebody was

16  using this computer to do translations for Qoqaz?

17           MR. WAX:  Objection.

18           MR. CARDANI:  Well --

19           MR. WAX:  I don't know how this witness can

20  answer that.

21           THE COURT:  Yeah.  Go on.

22  BY MR. CARDANI:

23     Q.    But the subject is "translations"?

24     A.    The subject is translations, yes.

25     Q.    All right.  And it's going in the -- if we

1   could go back to the exhibit, up top, this is someone

2   communicating with Qoqaznet about translations?

3       A.    Yes.

4       Q.    Okay.  All right.  And it was found in the

5   computers in Ashland, Oregon?

6       A.    It was, yes.

7       Q.    From someone using this Ptichka address?

8       A.    Yes.

9       Q.    Now, can we go to SW-61, please.  All right.

10  What's this?

11      A.    This is a recovered Web page for a Web site The

12  PROMT's Online Translator, and this was also again a

13  recovered Web page.

14      Q.    All right.  And in the microphone, a little

15  louder, I'm having trouble.

16      A.    This is a recovered Web page for this, what

17  appears to be an online translation service.

18      Q.    Okay.  Are you familiar with online

19  translations services?

20      A.    Vaguely.

21      Q.    Okay.  Do you know if there are services

22  available online where you can put information in to get

23  help translating into various language?

24      A.    I do know there are some, yes.

25      Q.    So we see here the English part of it, "wait

Christianson - D by Mr. Cardani                    67

1    until we post the details of the aid organization able

2    to collect these donations and then send your money to

3    them.  We do not accept or collect donations ourselves

4    as we are only a news outlet."  And then talks about the

5    mujahideen down below.  "Urgent need of doctors, medical

6    personnel, and medical supplies."

7         A.    Yes.

8         Q.    Do you see that?  And then right below that, it

9    says English-Russian translation?

10        A.    Yes.

11        Q.    And then down below -- do you speak Russian?

12        A.    I do not.

13        Q.    Okay.  Have you ever seen Russian before?

14        A.    I have seen Russian before.

15        Q.    Does this appear to be Russian?

16        A.    It appears that way.

17        Q.    Okay.  Could we go to the overall page and then

18   highlight down below, too.  More of translation stuff?

19        A.    Yes.

20        Q.    Did you find a number of these types of things

21   in the computer?

22        A.    I did.

23        Q.    Seda 8?

24        A.    Seda 8, yes.

25        Q.    All right.  Now, I'd like to move to a

1    different subject, Mr. Christianson.  Later on you said

2    that your job was to put this in a searchable format for

3    Agent Anderson?

4       A.    Yes.

5       Q.    Were you able to search, too?

6       A.    I was able to search, too, if she requested it,

7    yes.

8       Q.    And can I show you AHIF-2.  If we could blow up

9    that first paragraph.  This references an agreement

10   between Soliman and Abu Yunus about turning all monies

11   and responsibilities collected for the brothers and

12   sisters of Chechnya to Brother Soliman.  And then

13   Soliman states he has received monies in the amount of

14   such-and-such and fully relieves Abu Yunus of all

15   responsibilities for the monies.

16      A.    Yes.

17      Q.    Were you asked to do a text search to determine

18   if these were in any of the computers?

19      A.    Yes.

20      Q.    And what were the results of that search?

21      A.    I did not find this in any of the computer

22   evidence that I searched.

23      Q.    Okay.  That references $186,000, do you see

24   that?

25      A.    Yes.

Christianson - D by Mr. Cardani                69

1     Q.    And if you could go a little bit lower, okay.

2   Do you see the signatures there, two signatures up here

3   (indicating), that and that?

4     A.    Yes.

5     Q.    Okay.  Hold that thought.  And let's go to

6   AHIF-3, okay.  Now, you've seen this before?

7     A.    Yes.

8     Q.    Okay.  The same language in whatever this is,

9   but the same text?

10    A.    Yes.

11    Q.    And the signatures are in -- references

12   188,000, not 186,000?

13    A.    Yes.

14    Q.    And then the signatures here are reversed?

15    A.    Yes.

16    Q.    Okay.  So this would have been the same -- did

17   you search the computers for this one as well?

18    A.    Yes.

19    Q.    Did you find them at all?

20    A.    No.

21         MR. CARDANI:  Thank you, Mr. Christianson.  I

22   have no other question for you.

23         THE COURT:  Cross.

24         MR. WAX:  May I proceed, Your Honor?

25         THE COURT:  Please.

                      CROSS-EXAMINATION

BY MR. WAX:

    Q.    Is it Mr. Christianson or Agent Christianson?

    A.    Mr. Christianson.

    Q.    Good morning.  And thank you.
Mr. Christianson, I'd like to ask you a few questions
about the items recovered, and then go into some of the
computerese, and ask you a few questions about that.

          Let me start with what was recovered at the end
of the day.  Do you have any count of the total number
of e-mails that you recovered?

    A.    I don't have that in front of me.  I don't
recall how many total e-mails there were.

    Q.    Would something in the order of 20 to 25,000
sound like the right ballpark?

    A.    That sounds like the right ballpark.

    Q.    Did you also look for, I think you said,
financial records?

    A.    Yes.

    Q.    Okay.  Did you recover any files from the
QuickBooks program?

    A.    I did, yes.

    Q.    Do you recall roughly how many either complete
or fragments of QuickBooks files you were able to
recover?

1      A.    If I recall correctly, it was approximately at

2   least 20 to 30.

3      Q.    Do you recall there being more than that,

4   perhaps as many as 300 either complete files or

5   fragments of files?

6      A.    If we include fragments, I don't know if the

7   number was quite that high, but that sounds right.

8      Q.    Now, in terms of the recovery process,

9   Mr. Cardani asked you whether you were aware that the

10  defense was provided mirror copies of the hard drives

11  that we believe are identical to the mirrors that you

12  were working with, and I think you said you were aware

13  of that.

14     A.    Yes.

15     Q.    Okay.  In terms of the recovery process, is

16  there, in the way in which different forensic examiners

17  approach their work, a likelihood that you could have

18  recovered something perhaps that the forensic people

19  working with us did not?

20     A.    It's possible, yes.

21     Q.    And vice versa, that they might have recovered

22  some things that you did not?

23     A.    Yes, that's possible, too.

24     Q.    In terms of the specific items that are in this

25  JC-4 exhibit, 50 some items, that is clearly an

Christianson - X by Mr. Wax                    72

1   exceedingly small percentage of the total number of

2   e-mails recovered?

3       A.    Yes.

4       Q.    Far less than 1 percent?

5       A.    Yes.

6       Q.    In terms of the items recovered, I believe that

7   you had put up on the screen, or Mr. Cardani had put up

8   on the screen, one document that had been copied into

9   Microsoft Word?

10      A.    That was one of them, yes.

11      Q.    Do you recall that there were many Microsoft

12  Word documents that you observed?

13      A.    There were many, yes.

14      Q.    The items that were put up on the screen

15  included a number of items from ListServs?

16      A.    Yes.

17      Q.    And I believe that you were shown ListServs

18  with an AQ initial, Sheeshaan group?

19      A.    Yes.

20      Q.    And AQ, by the way, that is the initials of a

21  man named Abdul Qaadir, are you aware of that?

22      A.    That's what I'm told, yes.

23      Q.    All right.  Do you recall that in terms of

24  ListServs, there were scores of ListServs found on the

25  computers?

1      A.    Yes, there was.

2      Q.    Okay.  And do you recall that of those scores

3  of ListServs, some had absolutely nothing to do with

4  religion, Islam or Chechnya?

5      A.    Yes.

6      Q.    Peace activist work from Ashland, Oregon?

7      A.    That sounds right.

8      Q.    Urban forestry work?

9      A.    Yes.

10      Q.    *New York Times*?

11      A.    Yes.

12      Q.    The Ashland Patriots?

13      A.    I'm not familiar with that one.

14      Q.    Canadian urban forestry conference?

15      A.    I'm not familiar with that one either.

16      Q.    Do you recall -- did you ever do a count of the

17  number of ListServs from whom items were sent that were

18  found on the computers?

19      A.    I did not do a count.

20      Q.    Would something in the order of 50 sound like a

21  reasonable approximation of what you saw?

22      A.    Based on the contents that Special Agent

23  Anderson asked me to review, that's possible.

24      Q.    Okay.  The government asked you to put together

25  this exhibit, JC-4; is that correct?

1      A.      Yes.

2      Q.      And did I understand correctly that the primary

3  direction for putting that together came from Agent

4  Anderson?

5      A.      That's correct.

6      Q.      Did you make any effort to, you know, look at

7  the total number of e-mails sent in the time period from

8  the end of December 1999 through the beginning of March

9  of 2000?

10     A.      I did not.

11     Q.      We just went through a number of ListServ

12 e-mails from Mr. Abdul Qaadir.

13     A.      Yes.

14     Q.      Do you recall that there were at least a half a

15 dozen e-mails from an organization called Islamic

16 Relief?

17     A.      I believe I recall that, yes.

18     Q.      Do you recall that there was a series of

19 photographs that was from *Time*, *Time* magazine Web site

20 from mid February of 2000?

21     A.      As far as the photographs, I'm not sure I

22 recall seeing photographs.

23     Q.      Could we please show the witness Exhibit

24 Number 692 and then 692A through G.  692A, please.  Do

25 you recall the recovery of this e-mail on --

Christianson - X by Mr. Wax                          75

1     A.     Yes, I do.

2     Q.     All right.  And do you see that this has a --

3 from Q to Sunnah?

4     A.     Yes.

5     Q.     Do you recognize Sunnah as one of the

6 ListServs?

7     A.     I'm not sure if that was a ListServ.

8     Q.     Okay.  But there is no question that this would

9 have been one of the recovered e-mails?

10    A.     There is no question.

11    Q.     The subject line on this, do you recall

12 documented cases of 26,500 rape victims?

13    A.     Yes.

14    Q.     And then the salutation Salam, and LOOOOK in

15 capital letters?

16    A.     Yes.

17    Q.     Then down below that, a path to a computer Web

18 page of some sort?

19    A.     Yes.

20    Q.     And you recall -- do you recall that -- and

21 this is all, obviously, part of this e-mail?

22    A.     That is all part of this e-mail, yes.

23    Q.     If we could go to, please, 692B.  Do you recall

24 seeing this recovered photo essay from the computer?

25    A.     I didn't until I got to review this exhibit

1    prior to the trial.  I didn't recall actually seeing

2    that in the hard drive, but I did validate that it was.

3          MR. CARDANI:  I would just like to establish

4    that this was not in the computer.

5          THE WITNESS:  The e-mail was in the computer.

6    BY MR. WAX:

7    Q.    The e-mail was in the computer?

8    A.    Yes.

9    Q.    With the path?

10   A.    With the path, yes.

11   Q.    All right.  And you validated the path through

12   your work?

13   A.    I didn't validate the path, just the e-mail

14   itself.

15   Q.    All right.  Thank you.  I'll move on.  Did

16   you -- do you recall a series of e-mails from

17   Mr. Sedaghaty to Mr. al-But'he during January, February,

18   and March of 2000?

19   A.    Specifically, no.

20   Q.    Were you asked by Agent Anderson to put

21   together a chart of all communications between

22   Mr. Sedaghaty and Mr. al-But'he in January, February,

23   and March of 2000?

24   A.    To put together a chart of all communications,

25   no.

1    Q.    Similar to JC-4.

2    A.    I was not asked to do that, no.

3    Q.    Do you recall from your review roughly 50

4    e-mails in that period between Mr. Sedaghaty,

5    Mr. al-But'he, Mr. Sedaghaty, and a number of other

6    people regarding the humanitarian crisis in Chechnya?

7    A.    Again, I don't recall those.  My role was

8    simply to provide the data in a reviewable form for

9    Special Agent Anderson, and she identified these JC-4

10   exhibits.

11   Q.    All right.  So if you were not asked to put it

12   in JC-4 by Agent Anderson, you would not necessarily

13   have focused on it?

14   A.    Not necessarily.

15   Q.    We were provided, as you understand it, the

16   same mirror hard drives that you were working from?

17   A.    Yes.

18   Q.    Were you provided copies of the exhibits that

19   we had marked for identification some time ago so that

20   you could do a check to see whether the items that were

21   identified from the computer were consistent with your

22   work?

23   A.    Yes.

24   Q.    Okay.  And did you find that all of the items

25   that we had identified from the computer were, according

1   to your work, actually on the computer?

2      A.    Yes.

3      Q.    I'd like to ask you a few questions now,

4   please, about some of the computer processes.  And

5   please bear with me if I don't use the precise

6   terminology and correct me as needed.

7      A.    Okay.

8      Q.    If I understood you correctly, the files that

9   are -- excuse me, the exhibits that are included in this

10  SW series were what you called recovered from

11  unallocated space?

12     A.    That's correct.

13     Q.    All right.  Now, in terms of the terms

14  allocated and unallocated space, perhaps it would help

15  if you could provide a little bit more background on

16  them.

17          Are there a number of ways in which items on a

18  computer can be -- I'm not sure if the phrase is

19  transferred to or can be found in unallocated space or

20  get to unallocated space?  What would be the correct

21  phrase?  Transfer to?  Get to?  Help me out.

22     A.    No, that's correct.  There are a number of ways

23  that data could ultimately reside in unallocated space.

24     Q.    For example, if I have an e-mail on my

25  computer, I'm going through my regular e-mail list, I

Christianson - X by Mr. Wax                         79

1   look at something, and I hit the delete button for that

2   one e-mail, what happens to it?

3       A.    Depending on the type of e-mail that you are

4   using, again I'll go back to the example of Microsoft

5   Outlook, it simply goes to a deleted items folder inside

6   the e-mail box.

7       Q.    Now, my IT people at the office tell me that

8   I'm terrible, my e-mail grows too big, and that there is

9   a function for emptying the mailbox, and all I need to

10  do is program it and it can happen automatically in the

11  normal course?

12      A.    Yes.

13      Q.    You are familiar with such things?

14      A.    I am familiar with such things.

15      Q.    What happens when the trash gets emptied

16  automatically in the normal course?

17      A.    Again, back to my example of Microsoft Outlook

18  program, much like a hard drive, the e-mail simply gets

19  deleted within the confines of that mailbox.  And you

20  can relate it to the same thing as data being stored on

21  the hard drive itself.  It actually has an allocated

22  space inside the actual PST file or the Outlook mailbox.

23      Q.    And then when you empty it, then what happens?

24      A.    When you empty it, that frees up space inside

25  your mailbox, and it can be recovered to an extent until

1    it's overwritten by new e-mail.

2        Q.    So in the normal course, the way in which a

3    person could have a computer set up, e-mails could go

4    into unallocated space?

5        A.    Sure, yes.

6        Q.    All right.  So there is nothing sinister about

7    the fact that something is in unallocated space in and

8    of itself?

9        A.    In and of itself, no.

10       Q.    Now, from time to time some of us are infected

11   by viruses on our computers.  And when that happens,

12   what do some viruses do?

13       A.    Well, viruses can do a great number of things.

14       Q.    Sure.  With respect to how things could end up

15   in unallocated space.

16       A.    Viruses can simply corrupt data, slow your

17   computer down, and, again, a number of other things.

18       Q.    All right.  So in terms of corruption of data,

19   a virus could render data unreadable when you turn on

20   your computer and log in?

21       A.    It's possible, yes.

22       Q.    And that material, which you couldn't access,

23   you might be able to retrieve with your EnCase tool or

24   some other tool from unallocated space?

25       A.    Yes.

Christianson - X by Mr. Wax                    81

1      Q.    All right.  So assume I'm infected by a virus,

2  assume I'm a teenage boy, and I think I know better than

3  the computer, and I want to try to fix it myself, or

4  assume I'm 62 years old and make the same mistake,

5  reformatting a computer, what does that mean?

6      A.    Reformatting a computer is, again, I'd like to

7  use an analogy.  If you want to -- if you go to the

8  store and buy a three-ring binder, and you want to store

9  notes.  You buy an empty three-ring binder, that's like

10 your hard drive.  Now, before you can actually write or

11 store notes inside that binder, you have to put paper

12 inside.  So you would put paper inside.  And that

13 essentially creates a partition in relative to -- in

14 relation to the hard drive, and you can start taking

15 notes.  Something is there for you to be able to store

16 notes with your writing.

17          So when you partition a hard drive, that's

18 simply saying you take something that's blank and you

19 can't write to it, now you partition and format the hard

20 drive so that you can put things like Windows and things

21 like that.

22     Q.    So if, for example, a computer is corrupted by

23 a virus, one of the things that a person might need to

24 do or could do in an effort to get the computer working

25 again, would be to reformat it?

1       A.      Yes.

2       Q.      In that process, would material that had

3  previously been on it before the reformatting now be in

4  unallocated space and potentially recoverable by a

5  person such as yourself?

6       A.      Yes.  If you reinstall Windows, the data that

7  existed on there before you reinstalled, would be

8  deleted.

9       Q.      All right.  Now, one of the things that, again,

10  my IT guys tell me to do is back up onto these little

11  memory sticks or onto discs.  A person might take an

12  e-mail file, delete it, and back it up on a disc?

13      A.      Yes.

14      Q.      You could do that with a legal brief, or

15  anything else you are working on, your poetry?

16      A.      You could, yes.

17      Q.      All right.  So that could be a reason why

18  something would not be retrievable other than through

19  your allocation -- excuse me -- recovery process?

20      A.      Yes.

21      Q.      All right.  Now, in terms of this word

22  "overwriting" that you've used, every now and then the

23  IT guys tell me to defrag my computer.  To defrag, what

24  does that mean, and what does that tell us about how

25  data is stored on computers that might be relevant to

1    this deletion/recovery process?  Defrag.

2       A.    To defrag means -- we'll take, for example,

3    Microsoft Windows, when it stores files on your hard

4    drive, sometimes the storage places on a hard drive are

5    in fragments, so that naturally can slow down accessing

6    the files.  Most of the time, transparent to you and I

7    as users.

8            If you use the defragment option for your hard

9    drive, it simply brings the pieces of a single file that

10   belong to each other and makes them contiguous on a hard

11   drive, and basically making it more efficient, cleaning

12   it up.

13      Q.    So, for example, if I were to type a brief, and

14   I am sitting there thinking I'm typing straight away,

15   inside the computer that brief could be in a whole bunch

16   of different places?

17      A.    It could be, yes.

18      Q.    And the defragging process, when the IT guys

19   tell me to do it, is going to put some of that stuff

20   back together?

21      A.    Yes.

22      Q.    So with respect, for example, to the QuickBooks

23   files and the fragments of QuickBooks files, you could

24   have a QuickBooks file, and while you're accessing it,

25   you might think it's all in one place, but on the

1    computer, it's really a whole mess of fragments?

2        A.    It's possible, yes.

3        Q.    All right.  So that, in terms of fragments, is

4    one way in which fragments just occur in the normal

5    course of the operation of a computer?

6        A.    Yes.

7        Q.    All right.  Now, with respect to this word

8    "overwriting," when something is deleted, so I have

9    typed something or I've got an e-mail and the computer

10   has it stored somewhere, I hit the delete button, the

11   item is actually still there, as you've described, that

12   you could get to through your recovery tools?

13       A.    Yes.

14       Q.    All right.  If I just, in the normal course,

15   type another brief or write another e-mail, the computer

16   could -- and not could, the computer does on its own

17   decide where to put this new item?

18       A.    Yes.

19       Q.    And it could very well, and does all the time

20   on everyone's computer, overwrite data?

21       A.    Yes.

22       Q.    So when you are talking about overwriting, you

23   are talking about a normal process that goes on with

24   normal computer use?

25       A.    It's possible, yes.

Christianson - X by Mr. Wax                    85

1      Q.    Okay.  Now, in some cases that we've dealt with

2   where because of the nature of the material, it actually

3   had to be put in a way that you just couldn't ever get

4   to it, classified material, you have to delete forever.

5   You can overwrite some of that with some programs that

6   overwrite, you know, 39 times or whatever the magic

7   number is, correct?

8      A.    Yes.

9      Q.    Now, in terms of the overwriting that you

10  observed here, you're talking about you type something,

11  you delete, you type something else, a fragment might be

12  there, the whole thing might be there, or it might have

13  been completely overwritten?

14     A.    Yes.

15     Q.    Okay.  Now, in terms of the work that you are

16  able to do, clearly you are not present when these

17  computers were being used?

18     A.    I was not.

19     Q.    So you do not know who was sitting at the

20  computer typing?

21     A.    No.

22     Q.    Reading?

23     A.    No.

24     Q.    Deleting?

25     A.    No.

1       Q.     For the most part, you do not know when an item

2    was read?

3       A.     No.

4       Q.     You can tell from an e-mail header when the

5    person perhaps sent it, correct?

6       A.     Correct.

7       Q.     But could have been read that day?

8       A.     It doesn't actually flag when it was read, just

9    the fact that, yes, it was read, or, no, it was not.

10      Q.     Okay.  Could have been that day?  That week?

11   That month?  That year?  That decade?

12      A.     Yes.

13      Q.     Now, with respect to the Web page question, I

14   think Mr. Cardani asked you about whether the -- some of

15   these Web pages were recovered from the unallocated

16   space.  And I am not sure if he used the word deleted,

17   but I think that that was at least the inference in the

18   question.  I want to ask you, please, about how

19   computers deal with Web pages.

20      A.     Can you be more specific?

21      Q.     I'll try.  When I go to WWW dot whatever, and a

22   Web page pops up, Time Essay, you know, Time.com, with

23   that Web line on it, okay?

24      A.     Okay.

25      Q.     The page image appears on my computer, correct?

1      A.    Correct.

2      Q.    Now, let's assume I don't hit save in any way,

3   okay?

4      A.    Okay.

5      Q.    Does the computer nonetheless retain an image

6   of that Web page that I visited?

7      A.    The natural behavior for a Web browser is yes.

8      Q.    Okay.  So I think I'm being sneaky, and I don't

9   want someone to know I visited a Web page, but you come

10   along, and it's right there anyway, correct?

11      A.    Correct.

12      Q.    All right.  Now, with respect, then, to the

13   fact that Web pages are in unallocated space, you have

14   no way to know if they were ever actually saved to the

15   computer?

16      A.    No.

17      Q.    If there was any intentional deletion?

18      A.    No.

19      Q.    Or whether a person read something on the

20   computer, as many of us do, closed it and moved on in

21   the normal course?

22      A.    Yes.

23      Q.    I'd like to ask you now, sir, a little bit

24   about what I think Mr. Cardani was starting with, the

25   length of time that it took you to do this recovery.  If

Christianson - X by Mr. Wax                         88

1    I heard correctly, you told us that this was the largest

2    or one of the largest cases in terms of the amount of

3    data on which you've worked?

4        A.    Yes.

5        Q.    Now, the volume of e-mail that you found and

6    had to deal with, 23 or 25,000 over a multiyear period,

7    there is nothing unusual about that, is there?

8        A.    There is nothing unusual about that.

9        Q.    All right.  Now, with respect to e-mail

10   recovery, help us out here, please.  Is that just in and

11   of itself, regardless of the computer, a time-consuming

12   process that will often need to be done manually?

13       A.    I found it to be a standard process that I run

14   and usually I find results.

15       Q.    What does "file carving" mean?

16       A.    "File carving" means, to put it simply, most

17   files have a unique file signature or fingerprint that

18   make it unique, at least from where a file can be

19   identified, and to carve for a file means to search for

20   that unique signature or fingerprint, and to identify

21   that there is the possibility that that file might be

22   there.

23       Q.    All right.  In terms of e-mails, how does

24   looking for e-mails and this concept of file carving

25   relate?

1     A.    Depending on the type of e-mail, file carving

2   is actually that technique that I actually used to

3   recover the Microsoft Outlook mailbox.

4     Q.    All right.  I thought I heard you use the word

5   manual in your direct testimony.  Did I?

6     A.    Yes.

7     Q.    All right.  Tell us, please, what your

8   reference to that word meant in terms of this process?

9     A.    Okay.  So it's actually a several part process.

10  So you can search through, use initial search for that

11  particular fingerprint, and then manually review the

12  data, what we would call like the physical level.

13        Logical data is what you see when you use your

14  computer everyday.  Forensically we look physically at

15  the file on the hard drive.  And the manual process is

16  to find out long or how big the file might actually be

17  to make sure that you can get accurate recovery.

18    Q.    That's in the normal course of this kind of

19  recovery process, whether it's these computers or other

20  computers?

21    A.    It is a normal course, yes.

22    Q.    And it is a very time-consuming process?

23    A.    It is very time-consuming.

24    Q.    And because of the large volume of data that

25  you were attempting to recover, it took you a lot of

1    time?

2        A.    It took me a lot of time, yes.

3            MR. WAX:  May I have a moment, please, Your

4    Honor?

5            THE COURT:  Yes.

6            (Discussion held off the record.)

7            MR. WAX:  Thank you, sir.  I have no further

8    questions.

9            THE COURT:  Redirect.

10           MR. CARDANI:  Thank you.

11                    REDIRECT EXAMINATION

12   BY MR. CARDANI:

13       Q.    Following up on some of counsel's questions,

14   Mr. Christianson, talking about the Sheeshaan things

15   about Chechnya and the mujahideen, do you remember him

16   asking you about that?

17       A.    Yes.

18       Q.    All right.  So you reviewed some on direct, and

19   we took out -- we went over a few of them.  And you know

20   that there are several more exhibited that we didn't go

21   over in your testimony?

22       A.    Yes.

23       Q.    Those are all -- there is a lot of other

24   Sheeshaan e-mails regarding Chechnya, correct?

25       A.    As I recall, yes.

1       Q.      Mujahideen?

2       A.      Yes.

3       Q.      And funding issues?

4       A.      Yes.

5       Q.      And are you aware that there were literally

6   hundreds and hundreds of these types of e-mails in the

7   deleted sections of these computers?

8       A.      I'm not sure of the exact number, but yes.

9       Q.      Many, many, many more than what's been

10  exhibited here?

11      A.      Yes.

12      Q.      Involving the same subject?

13      A.      Yes.

14      Q.      All right.  Now, your inventory, JC-4, starts

15  in January 4th of 2000 and goes right up through page 4,

16  March 8, 2000, into page 5 of a 7-page document.

17          My point is, are the ones in here, search

18  warrant exhibits that are listed on the Sheeshaan group

19  of Chechnya, mujahideen, and funding issues, are they

20  representative of a certain time period, January and

21  March?

22      A.      Yes.

23      Q.      But there are others, many, many others

24  regarding these same subjects that involve different

25  time periods?

Christianson - ReD by Mr. Cardani                    92

1       A.      There were others, yes.

2       Q.      You know that this trial involves the time

3   period that is very sensitive to that time period,

4   January to March of 2000?

5       A.      Yes.

6       Q.      Now, Mr. Wax asked you about viruses and

7   corruption of computers and things like that.  Are there

8   ways to preserve data before computers are worked on or

9   reformatted -- and when you are reformatting a computer,

10  you're jeopardizing the loss of tremendous amounts of

11  information?

12      A.      That's possible, yes.

13      Q.      Are there ways to prevent that from happening?

14      A.      Yes.  You can buy an external hard drive, or a

15  USB device, some kind of storage device, and back up the

16  data that you would like to save, and then reformat your

17  hard drive.

18      Q.      All right.  So if I've got this virus that he's

19  alluding to, and I think I've got serious problems and

20  somebody has to wipe them, then I buy one of these

21  external hard drives, download all of my important

22  information --

23      A.      Yes.

24      Q.      -- reformat the thing, and then migrate the

25  information back onto the computer?

1      A.      Yes, that's one way to do it.

2      Q.      All right.  And is that common in business when

3   computers are reformatted?

4      A.      Based on my experience, that's common.

5      Q.      Because you don't want to lose the data?

6      A.      Yes.

7      Q.      Now, Mr. Wax spent quite a bit of time talking

8   about the amount of time spent looking for these e-mails

9   and things like that.  I just want to get right back

10  into this one.  Explain the difference between looking

11  for deleted e-mails and the entire absence of the whole

12  mailbox system for the jury.

13     A.      Explain it again?

14     Q.      Yes.

15     A.      In this particular case, I go to the example of

16  the type of e-mail that I recovered.  Again, Microsoft

17  Outlook, if you want to delete an e-mail, it's

18  self-contained inside your personal storage folder,

19  which is a single file.  But in this particular case, I

20  recovered entire mailbox files.

21     Q.      Okay.  So the whole system of e-mails was gone,

22  the Outlook e-mail system was gone on these computers?

23     A.      That's correct.

24     Q.      Is that significant?

25     A.      That's fairly significant.

1    Q.    Was it that absence of the entire system that

2    made your work in part so time-consuming?

3    A.    Yes.

4    Q.    The search warrant e-mails that are listed in

5    your JC-4 were all opened by someone on the computer?

6    A.    They were opened, yes.

7         MR. CARDANI:  Excuse me one minute.

8         (Discussion held off the record.)

9         MR. CARDANI:  That's all I have.  Thank you.

10        MR. WAX:  A couple of questions, please, Your

11   Honor.

12                    RECROSS-EXAMINATION

13   BY MR. WAX:

14   Q.    Mr. Christianson, with respect to this question

15   about external hard drives, were you provided any backup

16   discs or hard drives to review?

17   A.    I was not.

18   Q.    Are you aware that there was a box found in the

19   search warrant that was labeled backup discs?

20   A.    I was not aware of that.

21   Q.    And you weren't given that, obviously?

22   A.    I was not.

23   Q.    All right.  With respect to the deletion of or

24   the recovery of the entire mailbox, the reformatting

25   issue that we discussed and the problem of viruss or

1   reformatting, that could very well lead to the

2   elimination of an entire mailbox?

3       A.    That's possible, yes.

4       Q.    And that mailbox could very well have existed

5   on any of the backup media that were found but not

6   provided to you?

7       A.    That's possible, yes.

8             MR. WAX:  Thank you, sir.

9             MR. CARDANI:  Nothing else, Your Honor.

10            THE COURT:  Thank you.  You may step down.

11  We'll take a short break, Jurors.

12            MR. CARDANI:  May the witness be excused, Your

13  Honor?

14            THE COURT:  Excuse me?

15            MR. CARDANI:  May the witness be excused?

16            THE COURT:  Yes.

17            (Jury exits the courtroom at 11:09 a.m.)

18            THE COURT:  Which exhibits do you need a ruling

19  according to your records?

20            MR. WAX:  Excuse me, Your Honor?

21            THE COURT:  Which exhibits do you need a ruling

22  according to your records?

23            MR. WAX:  The SW-1, EK-7, and EK-7A.

24            MR. CARDANI:  Don't -- we have some confusion,

25  Your Honor.  EK-7 as having been admitted by the court.

```
 1            MR. WAX:  We thought that was for demonstrative

 2   purposes only.

 3            MR. GORDER:  That's my understanding, yes.

 4            MR. WAX:  And so 7A would be the one they want

 5   to show to the jury.

 6            MR. GORDER:  7A is the translation.

 7            THE COURT:  Yes.  I think it's just EK-7,

 8   Mr. Wax.  Well, didn't I already say about that that

 9   they could use it for demonstrative purposes?

10            MR. WAX:  Yes, but I think that EK-7A is a

11   translation that the government actually wants to

12   introduce into evidence and --

13            MR. GORDER:  No.  We simply want to play it

14   with the video, in other words, it would be subtitled,

15   not go to the jury.

16            MR. WAX:  Well, we object to that.  And there

17   is a translation dispute that we would need to talk with

18   the government about as well.

19            THE COURT:  Well, talk to them about it.  I'll

20   give you your rulings when we get back.  All right.

21            And SW-1 is received.

22            With regard to the Sui matter, you may call him

23   by video.

24            MR. WAX:  Thank you.

25            MR. CARDANI:  Judge, excuse me, Daveed
```

1    Gartenstein-Ross is coming up as a witness, not right

2    now, we've got a lengthy witness next.  But he's coming

3    up later on.  The BOA-6 issue, the 404(b), we would like

4    to be heard on that once again before his testimony.

5            THE COURT:  I don't want more argument on it on

6    the record.  Based on the defendant's opening, BOA-6 is

7    received.

8            MR. CARDANI:  Thank you.

9            (Recess:  11:12 until 11:31 a.m.)

10           THE COURT:  What I don't have is 7A, EK-7A.

11   Tell me the story on the translation.

12           MR. GORDER:  Your Honor, I think there is a

13   copy of EK-7A which we gave to the court staff.  EK-7 is

14   the video that Evan Kohlmann is going to show the jury.

15   And EK-7A is just the subtitles that will translate

16   what's on the screen.

17           THE COURT:  Who did the translation?

18           MR. GORDER:  FBI linguist, Arabic, Chechen, and

19   Turkish.

20           THE COURT:  Are you calling them?

21           MR. GORDER:  No, we are not.  I think we've

22   worked out the issue with the defense.  There was a lot

23   of confusion as to what clips should be translated.  And

24   you don't need to bother with that.  But I think they

25   were worried about something that's not in the video

1    that we're going to show.

2         THE COURT:  All right.  Thank you.  Okay.  I

3    see the translation.  Thank you.

4         We don't need to do an oath.  You are admitted.

5    Just give me an order, Mr. Wax.

6         MR. WAX:  Can we do that for Ms. Sweet as well?

7         THE COURT:  Yes, that's fine.

8         MR. WAX:  Thank you.

9         THE COURT:  Certainly for this case.  And I --

10   what I -- we always have a local lawyer because we need

11   someone who we can hold accountable if we decide to do

12   something.

13        MR. WAX:  I'm sitting right here.

14        THE COURT:  And we have one.

15        MR. MATASAR:  I'll be here.  You can come after

16   me.

17        THE COURT:  I'm not coming after you.  It'll be

18   him.  So you have your friend's well-being in your

19   hands.

20        What else is there now?

21        MR. GORDER:  Your Honor, our next witness is

22   Evan Kohlmann.  I expect to spend a couple of hours with

23   him on direct, so I was just curious as to the court's

24   plans for the lunch break.

25        THE COURT:  Want to get him started.  I found

1    it's better to do that.  You know, you folks still have

2    lots of energy.  You each examined the last witness

3    three times, and -- but you'll wear down as we keep

4    going.

5            MR. GORDER:  They're triple teaming us, Judge.

6            THE COURT:  Nothing was achieved in those last

7    two, by the way, in my opinion.  Let's seat the jury.

8            MR. CARDANI:  Mr. Wax and I felt much better

9    about it, though, Judge.

10           THE COURT:  I'm glad you enjoyed it.  You

11   enjoyed yourself more than the jurors did on that one.

12           (Jury enters the courtroom at 11:35 a.m.)

13           THE COURT:  Call your next witness, please.

14           MR. GORDER:  Your Honor, we would call Evan

15   Kohlmann.

16           THE COURT:  Thank you.

17           THE CLERK:  Sir, would you please step forward

18   to the center of the courtroom.  And please raise your

19   right hand.

20           (The witness was sworn.)

21           THE CLERK:  Thank you.  Please take the witness

22   stand.  Sir, your microphones are the round circles

23   right up here.

24           THE WITNESS:  Thank you.

25           THE CLERK:  Sir, please state your full name

 1    for the record, spelling your last name.

 2              THE WITNESS:  Yes.  Of course.  My full name is

 3    Evan F. Kohlmann, K-O-H-L-M-A-N-N.

 4              THE CLERK:  Thank you.

 5                       DIRECT EXAMINATION

 6    BY MR. GORDER:

 7       Q.    Good morning, Mr. Kohlmann.

 8       A.    Good morning.

 9       Q.    Welcome to Oregon.

10       A.    Thank you.

11       Q.    Could you tell the jury what you do for a

12    living.

13       A.    Yes, I work as an international terrorism

14    consultant.

15       Q.    And where is your offices?

16       A.    My primary office is located in New York, New

17    York.  However, my business, Flashpoint Global Partners,

18    has offices around the world including in Peshawar,

19    Pakistan.

20       Q.    Now, how did you get into this line of work?

21       A.    I started this line of study back when I was a

22    student at Georgetown University.  I was -- at

23    Georgetown, I was a student of the Edmund A. Walsh

24    School of Foreign Service.  And while there, I was

25    involved in two different programs at Georgetown.

 1              One program is known as the Center For

 2      Contemporary Arab Studies, the CCAS.  And the other is

 3      known as the Center for Muslim-Christian Understanding,

 4      or CMCU.

 5              At Georgetown I graduated with a degree in

 6      international politics, with a focus in international

 7      security studies.  I worked as a research assistant for

 8      Dr. Mamoun Fandy, M-A-M-O-U-N, F-A-N-D-Y.  And I also

 9      achieved a certificate from the Center for

10      Muslim-Christian Understanding in Islam and Muslim-

11      Christian Understanding.

12      Q.    Now, while you were at Georgetown, what was the

13      particular focus of your studies?

14      A.    The particular focus of my studies was on the

15      Arab Afghan movement.  The Arab Afghan movement is a

16      movement that began during the 1980s when foreign

17      fighters began traveling to Afghanistan in hopes of

18      participating in conflict against the occupying Soviet

19      forces.  Though the forces were primarily the holy

20      warriors, the mujahideen, were primarily Afghan and

21      Pakistani, there was a small contingent of foreign

22      fighters who came from around the world, including from

23      here in the United States, to participate in combat

24      against the Soviets in the name of Islam or the name of

25      the Islamic cause.

1    Q.    And they were referred to as the Arab Afghans?

2    A.    Yes.  The idea being is that the majority of

3    them came from Arabic origin or Arabic descent, so it

4    was a reference term referring to Arab fighters in

5    Afghanistan.

6    Q.    At Georgetown, did you have the opportunity to

7    study a region called Chechnya?

8    A.    Yes.  As a result of my studies at Georgetown,

9    I competed my studies at Georgetown, I should say, by

10   writing a senior honor's thesis.  My honor's thesis

11   title was actually The Legacy of the Arab Afghans, a

12   Case Study.

13        What I attempted to do at my thesis was look at

14   the initial creation of the Arab Afghan movement, and

15   then do a comparative study tracing how these fighters

16   had gone on from Afghanistan to other conflict zones,

17   and trying to understand the impact that those fighters

18   had had in those conflict zones, and why they had

19   achieved relative degrees of success or failure.

20        Of the four countries that I studied, aside

21   from Afghanistan, one of which was the Caucasus or

22   Chechnya.

23   Q.    When did you graduate from Georgetown?

24   A.    I graduated from Georgetown in the spring of

25   2001.

1    Q.    And what degree did you achieve there?

2    A.    My degree was in international politics with a

3    focus on international security studies.  And also, of

4    course, I got my certificate in Islam and Muslim-

5    Christian understanding.

6    Q.    Now, I understand after that you went to law

7    school?

8    A.    That's correct, yes.  I was working throughout

9    this time at a think tank based in Washington, D.C.

10   studying these groups.  Aside from my academic

11   credentials, I was also doing work in a think tank

12   studying these groups, mapping out their recruitment,

13   financing, and whatnot, and I continued to do that, but

14   at the same time I decided to continue my studies at the

15   University of Pennsylvania Law School.

16   Q.    And did you eventually graduate from law

17   school?

18   A.    I did, yes.

19   Q.    You decided to be an international terrorism

20   consultant, not a lawyer?

21   A.    Yes.  The focus of my studies even at law

22   school was primarily directed towards international

23   security studies, terrorism, and paramilitary

24   organizations, looking at the ways these organizations

25   work within international law, and the substantive

1    aspects.

2           While in law school, I took classes outside of

3    law school in the Graduate School of Arts and Sciences

4    at the University of Pennsylvania in such areas as

5    Afghanistan and Islamism.

6    Q.    Now, you mentioned working for a think tank in

7    Washington D.C.  Can you explain a little bit what your

8    duties were there?

9    A.    Yes.  I began -- the think tank is known as the

10   Investigative Project.  It was founded in 1995 as a

11   watchdog organization studying international terrorist

12   groups.  It was founded by a former CNN journalist.  I

13   began working there as an intern when I first started my

14   studies at Georgetown University, but because of the

15   fact that I stayed there for several years, my position

16   within the think tank accelerated to the point where

17   when I was in law school, even though I was a part-time

18   employee of the think tank, I was a senior analyst.

19   Q.    And what kind of things did you do there?

20   A.    The purpose of my research at the Investigative

21   Project was to study in depth the recruitment,

22   financing, propaganda, and communications of

23   international terrorist organizations, most

24   specifically, al-Qaeda and al-Qaeda affiliate groups,

25   and other permutations of the Arab Afghan movement.  In

 1   other words, I was studying both the terrorist

 2   organization al-Qaeda and other groups that had emerged

 3   from the Arab Afghan movement of the 1980s, groups

 4   including the Islamic Army of the Caucasus and Chechnya,

 5   the Libyan Islamic Fighting Group, the idea being that

 6   there was a panoply of different organizations.  And it

 7   was important for comparative study to understand how

 8   each of these organizations worked.  And studying the

 9   very, very specific aspects of these groups that few

10   others were paying attention to at the time.

11       Q.    How do you study these groups?

12       A.    Well, as taught to me at Georgetown University

13   there is a particular way of conducting proper social

14   science research on these groups.  I use a very basic

15   element of social science research, which is known as

16   comparative analysis.  In other words, you get as many

17   credible sources as possible about a particular

18   organization, an individual, an aspect of an

19   organization, and you compare and contrast them

20   attempting to determine what actually happened, what is

21   the accepted narrative of what happened here.

22           In order to obtain sources regarding

23   international terrorist groups, which tend to be shadowy

24   and difficult to contact, I relied on a variety of

25   different techniques.

1          There are primary sources where you actually go

2    out in the field and you speak to a representative of a

3    terrorist group, someone who is a spokesman of a

4    terrorist organization, or you witness events going on

5    in the field.

6          Q.    Have you done any of that?

7          A.    Yes, yes.  I've interviewed a number of

8    different individuals who have been subsequently

9    convicted or have been charged with international

10   terrorist offenses, people such as Sheikh Abu Hamza

11   al-Masri, A-B-U, H-A-M-Z-A, A-L, dash, M-A-S-R-I.

12   People such as Abdullah Anas, A-B-D-U-L-L-A-H, A-N-A-S.

13   Omar Bakri Mohammed, O-M-A-R, B-A-K-R-I,

14   M-O-H-A-M-M-E-D.  Saad al-Faqih, S-A-A-D, A-L,

15   F-A-Q-I-H.  I've interviewed a number of these

16   individuals whenever I have the opportunity.

17         Q.    Now, you mentioned there was some other sources

18   that you would look at besides primary sources.

19         A.    Yes.  As I explained, when it comes to

20   terrorists and paramilitary organizations, fairly

21   obviously it's sometimes difficult to get direct access

22   to the leaders of these groups or the spokesmen of these

23   groups, or to go to Afghanistan or Chechnya or Somalia

24   and view these events as they are going on, especially

25   if you're not from within the movement.

1           As a result, we also rely on secondary sources.

2    A secondary source would be a video recording produced

3    by one of these organizations, a magazine produced by

4    one of these organizations, an official communiqué

5    released by one of these organizations or one of their

6    spokesmen.  In other words, it's not quite as good as

7    being there and seeing the events live, but this is a

8    credible source.  This is, in other words, from the

9    horse's mouth.

10           In other words, if a leader of a group, the

11   Islamic Army of the Caucasus would release a video, we

12   would gain access to the video, we would translate the

13   material, and we would attempt to understand the

14   information in there how this fits into our greater

15   understanding, again, of the communications, propaganda,

16   financing, and recruitment of these organizations.

17           THE COURT:  Mr. Kohlmann, please try to slow

18   down a bit.

19           THE WITNESS:  I apologize, Your Honor.

20   BY MR. GORDER:

21   Q.    Speaking of foreign languages, do you speak

22   any?

23   A.    Yes.  I speak English and French fluently, and

24   I also speak some broken Arabic.

25   Q.    Okay.  English sometimes too fast.

Kohlmann - D by Mr. Gorder                              108

1      A.      Very frequently.

2      Q.      Okay.  And when you say broken Arabic, what do

3  you mean by that?

4      A.      Well, in order to study Islam, you have to

5  understand basic Arabic vocabulary.  However, I never

6  took Arabic as a formal language.  Instead, what we do

7  is we rely on native translators.  My research assistant

8  is a native Jordanian who is a native speaker of Arabic.

9  Our office in Peshawar, Pakistan, we have native

10  speakers of Urdu, of Pashto, of Dari.

11          We -- in the end, we decided that it was simply

12  better to have native speakers doing the translation

13  because of the fact that there are certain things as

14  foreign nationals or as a secondary speaker of the

15  language you don't necessarily catch, especially with

16  Arabic which tends to be colloquial, and has different

17  permutations across the Middle East.  In other words,

18  the Arabic spoken in Morocco is not necessarily going to

19  be the same as the Arabic spoken in Egypt or Saudi

20  Arabia, et cetera.  Rather than trying to learn each

21  dialect, it's much better to hire people who are native

22  speakers who can do the translation.

23      Q.      Now, are you affiliated with an organization

24  called NEFA?

25      A.      Yes.

1     Q.     And what do you do for them and what are they?

2     A.     NEFA -- the NEFA Foundation stands for 9/11

3  Finding Answers.  It's a nonprofit foundation here in

4  the United States which was created after the

5  September 11th terrorist attacks in order to sponsor

6  nonprofit research, again on the very same aspects of

7  paramilitary and terrorist organizations that I was

8  doing previously.  In other words, the communications,

9  the recruitment, the financing.  These are issues that

10 are beyond what you would read in the newspaper, but

11 we -- NEFA was founded because -- the idea was that

12 these areas are essential in order for academics, policy

13 makers, even ordinary citizens to be able to understand

14 these groups and the phenomena, it was important to

15 bring these aspects out, and to make them available

16 publicly.

17          So, for instance, the NEFA Web site maintains a

18 very large, open database of documents, videos, and

19 other material relating to international terrorist

20 groups, which are made freely available to the public

21 with the idea of educating the public and allowing the

22 public to make their own decisions about what is

23 significant, what is important, and how this fits in,

24 again, to the larger framework of world events.

25    Q.     Have you written any books on the subject?

Kohlmann - D by Mr. Gorder                          110

1      A.     Yes, I have.

2      Q.     And what was that?

3      A.     My book, *Al-Qaida's Jihad in Europe:  The*

4  *Afghan-Bosnian Network* was the flowering of my thesis.

5  In other words it was me taking my honor's thesis and

6  expanding it into a full length book, looking

7  specifically at the conflict in Bosnia-Herzegovina

8  between the 1990s and how that related to the Arab

9  Afghan movement begun in Afghanistan.  It was published

10 in London in 2004 by Oxford Press.

11     Q.     And did you cover the topic of Chechnya in the

12 book?

13     A.     Yes, I did.  The reason being is that, among

14 other reasons, a number of the individuals who fought

15 with the Arab Afghans in Bosnia-Herzegovina would later

16 go on and graduate, I guess you could say, and then go

17 on and fight with the Islamic Army of the Caucasus.  The

18 two conflicts kind of neatly arranged each other where

19 the Bosnian conflict ended in approximately November of

20 1995, and the major phase of the Chechen war, at least

21 the phase involving foreign fighters, began in

22 approximately 1996 and 1997.

23     Q.     Have you testified before Congress on subjects

24 like this?

25     A.     Yes I have.

1    Q.    Most recently, when was that?

2    A.    Most recently, about a month and a half ago, I

3  testified before the Senate Judiciary Committee, the

4  Subcommittee on Crime and Drugs, on the subject of the

5  role of a Saudi state sponsored charitable organizations

6  in financing paramilitary and terrorist organizations.

7    Q.    Now, how do you keep track of all this

8  information?

9    A.    In order to keep track of this information, we

10 maintain a very large electronic database.  The database

11 is approximately three terabytes, two to three terabytes

12 in size.  A terabyte is a thousand gigabytes.  And a

13 gigabyte is a thousand megabytes.

14        To give you some idea of how much data is

15 stored in there, you are talking about millions and

16 millions of pages literally.  Now, keep in mind some of

17 these files are video files, which are larger than a

18 text file.  But in reality, we have hundreds, if not

19 thousands, of video recordings obtained from around the

20 world, from the Internet, from elsewhere, from on the

21 ground, text documents, communiqués, magazines.  We

22 literally have every single communiqué released by any

23 major Arab Afghan faction in the last six or seven years

24 all neatly arranged in business records, so they're very

25 easily recallable.

1          We translate these materials, and then we put

2     them in electronic database for the purpose of then

3     searching.

4          We have electronic search tools that allow us

5     to run searches through this material, which are known

6     as Boolean searches.  It's B-O-O-L-E-A-N.  By Boolean,

7     Boolean is "and," "if," "or," "nor," in other words, we

8     can conduct very, very specific searches through this

9     material looking for very specific key words and

10    eliminating material that we know is not relevant.

11         And with these search tools, we're actually

12    able to conduct searches instantaneously and get

13    immediate answers about what is in the database that is

14    relevant to a particular search.

15         MR. CASEY:  Your Honor, if I may object to the

16    style of answering.  It's a narrative --

17         THE COURT:  Overruled.

18         MR. CASEY:  Thank you, Your Honor.

19    BY MR. GORDER:

20    Q.   Mr. Kohlmann, when you say "we," who are you

21    talking about?

22    A.   Well, my company, Flashpoint Global Partners, I

23    am one of the chief partners.  Then in addition to

24    myself, I have my research assistant, who is, again, a

25    Jordanian national, he speaks Arabic fluently.

 1          We also have others who work in the office who

 2    speak Russian and a variety of other languages.  Plus,

 3    of course, we have my other partners who are based in

 4    London and also in New York, and then we also have our

 5    office in Peshawar, Pakistan, which operates to collect

 6    local information from the field.

 7          For instance, we were among the first -- or as

 8    far as I know, the only individuals to get access to the

 9    martyrdom video of Faisal Shahzad, the individual who

10    attempted to detonate a bomb in Times Square several

11    months ago.  We were able to do that with our sources on

12    the ground in Pakistan.

13    Q.    Now, have you testified as an expert witness in

14    other courts?

15    A.    Yes, I have.

16    Q.    Could you explain to the jury just briefly

17    where.

18    A.    Sure.  I have testified in numerous cases in

19    the United States in U.S. Federal Court.  I believe the

20    current count is 17 or 18 different cases in U.S.

21    Federal Court.  I have testified twice on -- in U.S.

22    military tribunals in Guantanamo Bay.  Actually, make

23    that three times, excuse me.  And I have also testified

24    abroad in courts including the United Kingdom, Denmark,

25    Bosnia-Herzegovina, Australia, in various different

1    terrorism cases in those jurisdictions on behalf of

2    those governments.

3        Q.    And you've been retained as an expert witness

4    for the government in this case; is that correct?

5        A.    That is correct, yes.

6        Q.    And you are being paid $300 an hour?

7        A.    That's correct, yes.

8        Q.    I'd like you to turn to the subject of

9    Chechnya.  Could you tell the jury a little bit about

10   the background of the region, not extensively, but up

11   through about the point where the Soviet Union fell.

12       A.    Sure.  Chechnya is a small republic that is

13   considered to be inside of the Russian sphere of

14   influence.  It's a Muslim republic.  So in contrast to

15   the primarily Russian Orthodox religion that's spread

16   through most of Russia, Chechnya is Muslim.  And it has

17   a history of resistance against the Soviets and against

18   the Russians.

19            Beginning in approximately the 1930s, Stalin

20   and other Russian leaders made vigorous efforts to try

21   to make sure that Chechnya did not break off and

22   separate.  As a result, there were a series of

23   rebellions that took place in Chechnya almost every year

24   from the 1930s until 1950s where Chechen insurgents

25   would attempt to launch rebellions against Russian

1    forces.

2            Following about the 1950s or '60s, the Russians

3    more or less stamped out most of the resistance they

4    were facing there.  And Chechnya continued as part of

5    the USSR.  In 1991, the USSR fell apart, and Chechnya

6    declared its independence.

7            Chechnya at that point was led by a former

8    Russian Air Force officer named, Dudayev, Jokhar

9    Dudayev.

10   Q.    You better spell that for the court reporter.

11   A.    Sure.  It's spelled in a couple of different

12   ways, but you can spell it J-O-K-H-A-R, Dudayev,

13   D-U-D-A-Y-E-V.

14   Q.    And can we see Exhibit EK-8, please.  Do you

15   see that on the screen, Mr. Kohlmann?

16   A.    Yes, I can.

17   Q.    Okay.  Could you just explain for the jury

18   where Chechnya is located, and a little bit about it on

19   the map?

20   A.    Of course.  Chechnya, as you can see on this

21   map, is a landlocked territory.  It's squeezed between

22   Dagestan to the east, to the north; and Ingushetiya to

23   the west of Ossetia; and then you can see farther south

24   is Azerbaijan, Georgia, and Armenia.

25   Q.    If you actually touch the screen, I think --

Kohlmann - D by Mr. Gorder                           116

1    A.    Sure.  Of course.  No problem.  It's right

2 there.  Excuse me.

3         And you can see on the map at the right, you

4 can see the topography, it's also a fairly mountainous

5 place.  It's a fairly rugged territory.

6    Q.    So it's really in the southern part of what we

7 call Russia today?

8    A.    It is generally considered to be part of

9 Russia's southern Muslim frontier, yes.

10   Q.    And it's also in an area of the world that's

11 referred to as the Caucasus?

12   A.    That's correct.  This area right here that's

13 squeezed between the Caspian Sea and the Black Sea,

14 right here, is generally described as the Caucasus.

15   Q.    Now, after the USSR fell, you indicated that

16 this Soviet or Russian officer tried to lead

17 independence.  What happened?

18   A.    After Jokhar Dudayev declared independence and

19 attempted to form an autonomous republic, the Russians

20 decided that they couldn't allow that to happen.  They

21 decided that if that was going to happen, then other

22 republics would break away, and the entire former USSR

23 would fall apart.

24        As a result, the Russians invaded Chechnya with

25 military force once again in an effort to put down the

Kohlmann - D by Mr. Gorder                         117

1   rebellion.  However, after approximately three years of

2   fighting, some very intense fighting in which the

3   capital of Chechnya, Grozny, was leveled to the ground,

4   the Russians essentially decided that they weren't going

5   to win.  So they pulled a cease fire.  They decided to

6   agree to a cease fire, and they began withdrawing their

7   forces out of Chechnya, allowing Jokhar Dudayev and his

8   advisors to set up a semiautonomous republic.

9       Q.    Now, what was the nature of this rebellion in

10  the early 1990s?

11      A.    Well, Chechnya has a history, its legacy is a

12  Sufi Islam.  There's a long history started by a

13  historic figure named Imam Shamil, S-H-A-M-I-L, where

14  resistance to the Russians was organized along the lines

15  of Sufi Islam.  Sufi is a particular sectarian aspect of

16  Islamism.  It's generally fairly moderate, really.  And

17  the idea was to organize the Chechens into an army to

18  defend themselves and to establish their own independent

19  presence.

20          But it was -- I should say, though, as much as

21  it was organized along the lines of Sufi Islam, it was a

22  fairly nationalistic struggle, particularly up until

23  1995.  Islam played a role but it was more of a

24  spiritual role.  It wasn't a primary role.  The idea was

25  to establish a Chechen nationalistic republic with a

1    secular leadership.

2        Q.    Now, what happened after this cease fire took

3    place?

4        A.    After the cease fire took place, the Russians

5    began withdrawing their troops, and the conflict

6    attracted the attention of foreign extremists, of others

7    outside of Chechnya who saw the conflict going on there

8    and imagined that it could be restructured along the

9    lines of a more religious-oriented conflict; in other

10   words, abandoning the nationalist struggle and trying to

11   emphasize or push the Chechens into adopting a more

12   Islamic versus Christian struggle.

13       The primary progenitors of this strategy or

14   this idea were foreign extremists who had come from the

15   Arab Afghan movement, individuals who had traveled after

16   Afghanistan to a variety of different conflicts in

17   Central Asia with the idea of sponsoring jihad or holy

18   war against the Russians in places like Tajikistan,

19   Kyrgyzstan, Uzbekistan, and eventually Chechnya.

20       Q.    Now, was there a particular Arab person who

21   went into Chechnya and became the leader of that group?

22       A.    Yes.  In the spring of 1995, the first formal

23   delegation of Arab Afghan commanders arrived in

24   Chechnya, initially with the idea of just providing

25   Chechens with religious training, with military

1    training, giving them the expertise in order to fight

2    the Russians in their next encounter.

3          This delegation was led by a number of senior

4    Arab Afghan commanders, but the most senior, the most

5    famous, was a Saudi Arabian national whose real name is

6    Samir al-Suwailem, S-A-M-I-R, A-L, dash,

7    S-U-W-A-I-L-E-M, but Samir was better known by his

8    kunya -- kunya is K-U-N-Y-A, which is like a pseudonym,

9    combat pseudonym, and in Suwailem's case his combat

10   pseudonym was Ibn-ul-Khattab, I-B-N, U-L, dash,

11   K-H-A-T-T-A-B.

12   Q.    Can we have Exhibit SW-45.  And if you could

13   take a look at this particular picture, Mr. Kohlmann, do

14   you recognize the individuals in this picture?

15   A.    Yes, I do.

16   Q.    And if you could point them out for the jury,

17   who are they?

18   A.    Of course.  At the left right here, this here

19   is Samir al-Suwailem, otherwise known as Ibn ul-Khattab.

20         At the right, far right, right here, is one of

21   the other senior Arab Afghan commanders, a Saudi

22   national, who joined Ibn ul-Khattab in 1995 in Chechnya,

23   his kunya, his combat pseudonym, was Abu Walid

24   al-Ghamdi, G-H-A-M-D-I.

25         The person at the center here who was wearing

Kohlmann - D by Mr. Gorder                                    120

1    no hat and who is bald, this is Shamil Basayev,

2    S-H-A-M-I-L, B-A-S-A-Y-E-V.  Basayev is a native of the

3    Caucasus.  In contrast to the other two individuals on

4    here, he actually is from the Caucasus region.  However,

5    Basayev boasted that he had participated in training in

6    the late stages of the Arab Afghan war, and he had

7    adopted the philosophy of violent jihad, of violent

8    religious conflict against the Russians, in the same

9    style as Ibn ul-Khattab and Abu Walid al-Ghamdi.

10        Q.    Now, we've got a chart that the jury has seen,

11   and I don't even have broken Arabic, so I refer to him

12   as Ibn ul-Khattab.

13        A.    Yeah.

14        Q.    But what was his role in this group?

15        A.    Ibn ul-Khattab was famous because of his

16   exploits during the Soviet/Afghan war.  In the late

17   stages of the Soviet/Afghan in Afghanistan, he had

18   fought in a place that was known as Massada,

19   M-A-S-S-A-D-A, which was a mountaintop camp inside of

20   Afghanistan where himself and a number of other senior

21   Arab Afghan leaders, including Osama bin Laden, waged a

22   rather desperate Alamo-style struggle against Russian

23   paratroopers, Afghan Communist Army troops.  And they

24   had withstood a tremendous battery of bombs and missiles

25   and everything else.  Ibn ul-Khattab became famous

1   because of the fact that he was a legendary commander,

2   he had legendary military skills.  He was famed for his

3   courage in battle.  And as a result, he then decided

4   that he wanted to take these lessons, and, again, export

5   them elsewhere.

6          When he arrived in Chechnya, he immediately

7   became the head, the senior commander, the commander in

8   chief, of the foreign mujahideen in the Caucasus, which

9   eventually became known as the Islamic Army of the

10  Caucasus.

11         It was himself, along with Shamil Basayev, who

12  were the two most senior leaders of this movement.

13  After Ibn ul-Khattab's death, the other individual in

14  this photo, Abu Walid al-Ghamdi, took over in that

15  position.

16         THE COURT:  Is this a good time for a break?

17         MR. GORDER:  Yes, it is, Your Honor.

18         THE COURT:  Recess until 1 o'clock, Jurors.

19  Thank you.

20         (Lunch recess at 12:04 p.m.)

21         (Further proceedings were had by Reporter

22  Deborah Bonds, and are bound under separate cover.)

23

24

25

```
 1                        CERTIFICATE

 2        I, Deborah Wilhelm, Certified Shorthand Reporter

 3   for the State of Oregon, do hereby certify that I was

 4   present at and reported in machine shorthand the oral

 5   proceedings had in the above-entitled matter.  I hereby

 6   certify that the foregoing is a true and correct

 7   transcript, to the best of my skill and ability, dated

 8   this 1st day of September, 2010.

 9

10

11

12
                             /s/ Deborah Wilhelm
13                           _____
                             Deborah Wilhelm, RPR
14                           Certified Shorthand Reporter
                             Certificate No. 00-0363
15

16

17

18

19

20

21

22

23

24

25
```