1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF OREGON

3    UNITED STATES OF AMERICA,        )
                                       )
4                      Plaintiff,      ) No. 05-60008-2-HO
                                       )
5      v.                              ) September 1, 2010
                                       )
6    PIROUZ SEDAGHATY, et al.,         ) Eugene, Oregon
                                       )
7                      Defendants.     )

8

9            PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS

10          BEFORE THE HONORABLE MICHAEL R. HOGAN

11      UNITED STATES DISTRICT COURT JUDGE, AND A JURY

12          DAY 3 A.M. SESSION - PAGES 1 - 113

13

14                          -:-

15

16

17

18

19

20

21

22

23            Deborah Wilhelm, CSR, RPR
                   Court Reporter
24                P.O. Box 1504
               Eugene, OR  97440
25                (541) 431-4113

```
 1                      APPEARANCES OF COUNSEL

 2

 3   FOR THE PLAINTIFF:     CHRISTOPHER L. CARDANI
                            United States Attorney's Office
 4                          405 E. 8th Avenue, Suite 2400
                            Eugene, OR  97401
 5                          (541) 465-6771
                            chris.cardani@usdoj.gov
 6
                            CHARLES F. GORDER, JR.
 7                          United States Attorney's Office
                            1000 S.W. Third Avenue, Suite 600
 8                          Portland, OR  97204-2902
                            (503) 727-1021
 9

10   FOR THE DEFENDANT:     LAWRENCE H. MATASAR
                            Lawrence Matasar, P.C.
11                          621 S.W. Morrison Street
                            Suite 1025
12                          Portland, OR  97205
                            (503) 222-9830
13                          larry@pdxlaw.com

14                          STEVEN T. WAX
                            BERNARD J. CASEY
15                          MICHELLE SWEET
                            Federal Public Defender
16                          101 S.W. Main Street, Suite 1700
                            Portland, OR  97204
17                          (503) 326-2123
                            steve_wax@fd.org

18

19

20

21

22

23

24

25
```

1                    INDEX OF EXAMINATIONS

2     FOR THE PLAINTIFF:          Direct   Cross    ReD      ReX

3     Daveed Gartenstein-Ross       13      62      109      --

4     (See p.m. session)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Wednesday, September 1, 2010; 9:12 a.m.  Jury absent.)

2                    P R O C E E D I N G S

3           THE COURT:  Thank you.  Be seated, please.

4           Mr. Cardani, I've been told that you are aware

5    of a situation where a witness and a juror made contact.

6           MR. GORDER:  Yes, Your Honor.  I can address

7    that.

8           THE COURT:  Okay.  Thank you.

9           MR. GORDER:  Last night after Barbara Cabral

10   left the courtroom and she was down in our office

11   getting paperwork put together, she informed us that as

12   she got off the stand last night, so this is as she

13   finished her testimony and walked by the jury box, one

14   of the jurors, and I believe it's Juror Number 1,

15   Ms. West, she described her as the lady with red hair.

16          THE COURT:  That's certainly true.

17          MR. GORDER:  Yes, and a hairdresser would know.

18   Anyway, said -- whispered to her something like "good

19   job."  And that was it.  I think Ms. Cabral --

20          THE COURT:  So she may or may not know her?

21          MR. GORDER:  Well, she doesn't know her.

22          THE COURT:  She doesn't know her?

23          MR. GORDER:  She doesn't know her.  It's just a

24   comment "good job."  And just as we were coming to the

25   courtroom this morning, Ms. Cooke tells me she passed a

```
 1   couple of jurors in the hallway, and one of them said to
 2   her, "you're doing a good job keeping the equipment
 3   running smoothly" or words to that effect.  So I just
 4   wanted to bring that to the court and party's attention.
 5   And I don't know that further action needs to be taken,
 6   but I think the jurors need to be told once again that
 7   we're not being rude if we don't talk to them.
 8            THE COURT:  Yeah.  Mr. Wax.
 9            MR. WAX:  Your Honor, we would move for the
10   removal of Juror Number 1.  Unfortunately, experienced a
11   similar situation in a case I tried a couple of years
12   ago, and we briefed the issue.  It was in front of Judge
13   Mosman.  One of the jurors approached the government
14   witness and initiated contact.  The law, as I understand
15   it, is clear that any such contact is presumptively
16   prejudicial.
17            THE COURT:  You'll have to give me some law on
18   that.  I don't know it.
19            MR. WAX:  Caliendo, C-A-L-I-E-N-D-O, versus
20   Warden.  It's at 365 F3d 691 at pages 696 and 698.  It's
21   a Ninth Circuit case from 2004.  And it seems to me that
22   for the juror to make that comment evinces a number of
23   potential things.  First --
24            THE COURT:  You'd have to speculate as to what
25   that is at this point, though.
```

```
 1          MR. WAX:  Well, as I said, a number of
 2   potential things, Your Honor.
 3          THE COURT:  All right.
 4          MR. WAX:  I don't think an inquiry is needed.
 5   I just think that the contact is in and of itself
 6   presumptively prejudicial.  To say "good job" to a
 7   government witness in the courtroom seems to me to be
 8   violating this court's directive to them.  It
 9   potentially evinces a pro-prosecution bias.  And even
10   without that, the fact of her initiating the contact
11   seems to me means that she needs to be removed.
12          THE COURT:  Okay.  I'll look at the case.  So
13   I'll take the motion under advisement.
14          MR. WAX:  All right.  Well, we would like, if
15   possible, to have this resolved before any additional
16   testimony is taken, Your Honor.
17          THE COURT:  We're not going to do that.
18          MR. WAX:  We would also request further inquiry
19   of Ms. Cooke, which jurors talked to her, and when.
20          While the comment, you know, is, you know,
21   potentially innocuous, you know, we have, you know,
22   passed jurors in the hallway and have not had
23   communication initiated with us.  And, again, it seems
24   to me that it is evincing a bias, and that an inquiry is
25   required.
```

1          THE COURT:  Mr. Gorder.

2          MR. GORDER:  Your Honor, I'm not familiar with

3    the case, you know, that Mr. Wax has cited.  It might

4    make sense to have some kind of inquiry with Ms. West at

5    some point --

6          THE COURT:  I agree.

7          MR. GORDER:  -- but perhaps you should read it.

8    And if you want to hear from Ms. Cooke directly on the

9    issue, she's here.

10         MR. WAX:  Your Honor, if you are going to do an

11   inquiry, I think that it would be -- first, we don't

12   believe it's necessary.  Second, if you are going to do

13   one, I believe it would be necessary to determine

14   whether there has been any communication among any of

15   the other jurors, and any discussions among them, if

16   she's passed on her comment to anyone else, you know,

17   boy, that witness did a good job, that that would also

18   be violating the court's instructions at the outset of

19   the case.

20         It may also be that the juror sitting next to

21   her heard it.  I think that this is a very serious

22   situation and could potentially lead to a motion for a

23   mistrial, which is why I think an inquiry at this point

24   is in order.

25         THE COURT:  Pull the case, please, David.

```
 1               What else do you have?
 2               MR. GORDER:  Your Honor, just a housekeeping
 3    matter.  Yesterday we resolved a dispute about a
 4    paragraph in one of the -- in the transcript for the
 5    video EK-7.  We agreed to just delete a couple of
 6    sentences from the transcript.  So I have a new and
 7    improved EK-7A to substitute for the one that the clerk
 8    has at this point.
 9               As I understand it, you admitted -- you've
10    allowed this testimony as an aid to the jury.  This
11    transcript is not going to go to the jury anyway, but
12    for the record, it should be substituted.
13               THE COURT:  Mr. Wax.
14               MR. WAX:  It's agreeable, Your Honor.
15               THE COURT:  All right.  It's received.  We'll
16    receive it.  We'll withdraw EK-7 and --
17               MR. GORDER:  7A.
18               THE COURT:  -- EK-7A.  Do you have a different
19    7A?
20               MR. GORDER:  Yeah, I --
21               THE COURT:  Well, to keep our record straight,
22    let's call it 7A1.  You've got to put another mark on
23    it.
24               MR. GORDER:  Okay.
25               MR. MATASAR:  Your Honor, I wanted to address,
```

1    if I could, the technical issues --

2         THE COURT:  You may.  It's received,

3    Mr. Gorder.  Go ahead.

4         MR. MATASAR:  The technical issues that you

5    mentioned.  I just wanted the court to know that before

6    we came, in the weeks before and in the very week before

7    the trial, we talked with a technical person about

8    having some sort of communication system amongst the

9    team so we wouldn't need, perhaps, to be passing notes

10   back and forth.

11        So the communication was okayed by the tech

12   person, and we thought was appropriate for the court,

13   that we could send -- rather than pass yellow papers and

14   interrupt each other back and forth, that we would be

15   able to use that system.

16        It may be that other people in the courtroom,

17   maybe the press or others who are sitting with our

18   people and making a lot more keyboard noise and notes

19   than we were, but I just want the court to know that we

20   got the okay to do that, and we thought it was a way to

21   reduce interruption.

22        THE COURT:  That's fine.  That's not your

23   fault.

24        MR. MATASAR:  I have another matter, but I'll

25   wait until you are done reading the case, Your Honor.

```
1              THE COURT:  All right.

2              (Pause in the proceedings.)

3              THE COURT:  The case is not as bright line,

4    Mr. Wax, as you suggest.  But I don't want to take a

5    chance with the trial either, because it's a case where

6    a witness -- a police officer was talking for 20 minutes

7    in the hallway with three jurors.  And probably what

8    happened here, there was pretty aggressive questioning

9    of a private citizen that some may have felt

10   uncomfortable about, and apparently this juror did, so,

11   you know, I think probably it's nothing, but I don't

12   want to take a chance and have to do this again.  So I'm

13   going to grant the motion, the juror is dismissed.

14             When you bring the jury in, apologize to the

15   juror that I can't be out there and talk to her, and

16   that we're very sorry that we've had to take this

17   action.  All right?

18             THE CLERK:  Juror Number 1?

19             THE COURT:  What else do you have, Mr. Matasar?

20             MR. MATASAR:  Your Honor --

21             THE COURT:  Don't do that in front of the other

22   jurors.

23             MR. MATASAR:  It may be that this occurred as I

24   was leaving and the court stayed on the bench, but I

25   understand that you indicated that you had ruled that my
```

```
 1    opening about the unemployment tax --

 2              THE COURT:  Yes.

 3              MR. MATASAR:  -- opened the door about --

 4              THE COURT:  Yes.

 5              MR. MATASAR:  Last I heard, you were

 6    considering it.

 7              THE COURT:  I wasn't straight, and then I ruled

 8    yesterday.

 9              MR. MATASAR:  Okay.  Well, I wasn't here, so

10    let me just -- if I could have 30 seconds to indicate

11    that my argument was that the accountant was not

12    communicating with his client and reading the material

13    from the IRS about the federal unemployment tax, which

14    is really completely different from the issue that is

15    raised by the check, which is not paying federal

16    withholding tax, kind of under-the-table payment.  We

17    would just have the court stick with your previous

18    ruling that people do that.  If you look at 403, the

19    prejudicial effect and the probative value is

20    outweighed.

21              THE COURT:  Yeah.  I've done my best to jog on

22    both sides here to narrow the focus, and without much

23    success, frankly.  And I think that it's pulled into

24    being more probative than prejudicial at this point.

25    All right.  Anything else?
```

```
1          MR. WAX:  Your Honor, will you admonish the
2    jurors?  I think the government --
3          THE COURT:  Of course I will.
4          MR. WAX:  -- requested that -- thank you.
5          And will you advise them of the reason why this
6    juror has been excused?
7          THE COURT:  No.  All right.  Seat the jury,
8    please.
9          You know, if you want to do this -- if you want
10   to pull Ms. West aside, maybe take her up to chambers
11   and then Jill bring the other jurors in, so there is no
12   embarrassment in front of the others.
13          (Jury enters the courtroom at 9:30 a.m.)
14          THE COURT:  Good morning, Jurors.  I'm more
15   sorry than you know about having to hold you back in the
16   jury room.
17          I need to remind you of one comment I made
18   earlier.  I told you that you can't talk to anybody else
19   about the case until it's time to deliberate.  And you
20   should keep an open mind yourselves until then.  But
21   that's -- this includes people who are witnesses or
22   attorneys or people that work for attorneys.  If you
23   want to say hello to me, that's fine, because we run
24   into each other in the hallway.  But we have to be very
25   careful about this.  And if they don't speak to you,
```

 1   it's not because they are rude.  It can seem impolite.

 2   If you don't speak to them, it won't be because you're

 3   rude.  It's just sort of whether or not to do it.  So

 4   I'd ask you to be very careful of that.  Okay?  Thank

 5   you.

 6          Call your next witness.

 7          MR. GORDER:  Your Honor, we would call Daveed

 8   Gartenstein-Ross.

 9          THE COURT:  Thank you.

10          (The witness was sworn.)

11          THE CLERK:  Please step forward and watch your

12   step.

13          THE WITNESS:  Thanks.

14          THE CLERK:  Please state your name, then spell

15   your name for the record.

16          THE WITNESS:  Daveed Gartenstein-Ross,

17   D-A-V-E-E-D, last name G-A-R-T-E-N-S-T-E-I-N, hyphen,

18   R-O-S-S.

19                    DIRECT EXAMINATION

20   BY MR. GORDER:

21     Q.    Sir, could you tell the jury where you reside

22   and what you do for a living.

23     A.    I reside in Washington, D.C. where I work for a

24   think tank, The Foundation For Defense of Democracies,

25   where I primarily research counterterrorism issues.

1    Q.    Now, you are not being paid today as an expert

2    witness or appearing as an expert witness?

3    A.    That's correct, I am not.

4    Q.    You are here pursuant to a subpoena?

5    A.    That's correct.

6    Q.    Could you tell us a little bit about your

7    background before -- I guess starting with where you

8    grew up and where you went to college.

9    A.    I grew up in Ashland, Oregon, graduating from

10   Ashland High School in 1994.  And then went to college

11   at Wake Forest University in Winston-Salem, North

12   Carolina, graduating in December of 1998.

13   Q.    Were you raised in any particular religious

14   faith?

15   A.    My parents are Jewish ethnically, but they

16   practiced a syncretistic kind of religion; that is, they

17   combined different religious views.  We had a statute of

18   Buddha in the backyard, pictures of Jesus and the like.

19   Q.    Now, at some point while you were in college,

20   did you convert to the Muslim faith?

21   A.    I did.  In December of -- or in the fall of

22   1997.

23   Q.    And at some point, did you begin to understand

24   that there were other Muslims in the Ashland area?

25   A.    I did.

1    Q.    Can you explain how that happened.

2    A.    In December of 1997, I went back to Ashland.

3  And we looked in -- I was with a friend of mine who was

4  also a Muslim, who helped to lead me to Islam in the

5  first place.  And we looked in the local newspaper and

6  found that there were actually Friday services, Jummah

7  prayers, with the local foundation called the Qur'an

8  Foundation.

9    Q.    And what's a Jummah prayer?

10   A.    Jummah prayer is the Friday afternoon

11 congregational prayers within Islam.

12   Q.    Now, you indicated you saw something in the

13 paper about it.  Did you take any action in response to

14 that?

15   A.    Yes.  My friend and I ended up attending the

16 Friday afternoon prayers.

17   Q.    And where was that?

18   A.    It was at -- in the back of Seda's house on

19 Crowson Road in Ashland.

20   Q.    Now, when you say "Seda," who are you referring

21 to?

22   A.    I'm referring to the defendant (indicating).

23   Q.    Was that the first time you met the defendant?

24   A.    Yes, to the best of my knowledge.

25   Q.    Okay.  Did you -- what kind of interaction did

1    you have with him at that point?

2        A.    Not a whole lot during that particular visit.

3        Q.    Did you learn that he sometimes used a

4    different name?

5        A.    Yes.  During that visit, I learned that he used

6    the name Pirouz Sedaghaty sometimes, and also he used

7    the name Abu Yunus Sedaghaty.

8        Q.    Now, were you still in college at this point in

9    time?

10       A.    I was.

11       Q.    So was this like the winter break?

12       A.    Yes, it was.

13       Q.    Okay.  You went back to college?

14       A.    I did, yeah.

15       Q.    Okay.  What was your next interaction with

16   Mr. Seda?

17       A.    It was in the summer break of 1998.  I returned

18   again for congregational prayers and found that it had

19   been moved from the previous location, Crowson Road,

20   which was in his residence, to a new location on the

21   south end of town, which was a much larger building with

22   fairly expansive property that was now the main house of

23   prayer.

24       Q.    And was that on Highway 99?

25       A.    It was.

1    Q.    Now, at some point, did you hear any sermons or

2    whatever the Islamic equivalent would be involving

3    someone named Hassan Zabady?

4    A.    Yes.  Hassan Zabady gave the first sermon or

5    Khutbah in Arabic that I heard.  He delivered it in

6    December of 1997, the first time I visited the

7    foundation.

8    Q.    Okay.  So this was still at the Crowson Road --

9    A.    That's correct.

10    Q.    What do you recall from that sermon?

11    A.    It was a rather extreme sermon.  He argued that

12    Muslims would become corrupt in their faith living in

13    the West; and that we had to leave Western countries or

14    else they would corrupt our morals.

15        My friend, who accompanied me, who I mentioned

16    before, actually spent some time after the sermon

17    discussing or disputing some of Hassan Zabady's points

18    with him.  I recall that at the end of the exchange,

19    Zabady pointed angrily at the surrounding area, and

20    said, just look at all these homosexuals here, it's

21    going to corrupt us.

22    Q.    Now, was he living in the United States?

23    A.    Yes, in northern California.

24    Q.    What -- did you observe any interaction between

25    the defendant and Hassan Zabady?

 1      A.    Yes.  Both at the time and also over time.

 2  When I went back to work there the following year,

 3  Hassan Zabady was not a frequent but an occasional

 4  visitor.

 5      Q.    And how was he treated?

 6      A.    He was treated as a guest of honor.  He was

 7  viewed as a man with great knowledge of the faith.  Seda

 8  would address him with the honorific of Sheikh.  He

 9  would give sermons when he'd come, not always, but if he

10  wanted to give the sermon, he would.

11      Q.    Now, you indicated that when you came back in

12  the summer, there was this new place on Highway 99.  Can

13  we see Exhibit SW-66.  Do you recognize that?

14      A.    I do.

15      Q.    And what is it?

16      A.    That is the place where I went for prayer in

17  the summer of 1998.  It's the U.S. offices of the

18  al-Haramain Foundation where I ended up working for

19  about -- for the better part of a year.

20      Q.    Now, when you first got back and you heard --

21  you learned about this new location on Highway 99, did

22  you have a discussion with Mr. Seda about why the move?

23      A.    Yes.  Mr. Seda informed me that they had gotten

24  money from a Saudi Arabian charity, which had allowed

25  them to get this new building; and that, you know, with

1    the Saudi backing, he had big plans for this

2    organization.

3        Q.    And what was the name of the Saudi charity?

4        A.    The al-Haramain Islamic Foundation.

5        Q.    Had you ever heard of it at the time?

6        A.    I had not.

7        Q.    Now, you indicated that at some point you

8    started working for al-Haramain.  How did that come

9    about?

10       A.    Mr. Seda, after the sermon I went back for in

11   the summer of 1998, gave me a tour of the premises, and

12   he said that they were looking to hire people and

13   encouraged me to apply for a job, which I did, and was

14   subsequently hired.

15       Q.    When did you first start working there?

16       A.    In December of 1998, so a year after my first

17   visit to the Qur'an Foundation.

18       Q.    Now, were you still in college or what was the

19   situation?

20       A.    No, I had just graduated.

21       Q.    In December of 1998?

22       A.    Correct.

23       Q.    You had come home to Ashland after graduating?

24       A.    Yeah, that's correct.

25       Q.    Now, can you tell us what were your job

 1   responsibilities, how were you working there, that sort

 2   of thing?

 3        A.    I had a number of responsibilities.  I would

 4   conduct relations with the local press.  I would be

 5   involved in the distribution of literature.  I would --

 6   I ultimately took over the responsibility, although this

 7   wasn't originally something I was assigned to, of filing

 8   monthly reports with the head office in Saudi Arabia

 9   basically indicating what we were due on a month-to-

10   month basis to justify them continuing to fund the

11   operation.  And also entered some of the financial data.

12   There were other special projects that would come up

13   from time to time on Mr. Seda's discretion.

14        Q.    Could we see SW-64.  Now, have you seen this

15   exhibit before --

16        A.    Yes.

17        Q.    -- sir?  Appears to be a diagram of the house

18   on Highway 99?

19        A.    That's correct.

20        Q.    Okay.  The first page here depicts the lower

21   level.  Did you spend much time on the lower level of

22   the house?

23        A.    I did not.

24        Q.    Okay.  And why was that?

25        A.    Because the congregation practiced strict

1    gender segregation.  And there would often be families

2    downstairs, which meant that I couldn't go downstairs or

3    else I would end up mixing with women.  Sometimes I

4    would go downstairs, but in general that was an area

5    which -- sometimes it would be families.  And certainly

6    during religious events or during congregational

7    prayers, that was where the women would pray.  They

8    would have an amp which connected to the microphone for

9    the person giving the sermon, but there was no mixing of

10   men and women.

11       Q.    Now, if we could go to the second page.  And

12   this depicts the upper level; is that correct?

13       A.    That's correct.

14       Q.    And could you point out for the jury -- and if

15   you actually touch the screen, it will appear for us.

16   Where did you work while you were working?

17       A.    I worked right here (indicating).

18       Q.    Okay.  And was that basically a 9:00 to 5:00

19   job?

20       A.    It was.

21       Q.    Five days a week?

22       A.    Yes.

23       Q.    Okay.  Now, we've blown it up a little bit.

24   This is the office, room A.  Where did you do your work?

25       A.    This was my computer (indicating).

1      Q.    Okay.  The one that's labelled Seda 7?

2      A.    Correct.

3      Q.    Okay.  Was Mr. Seda living at this location

4   while you were working there?

5      A.    Not while I was there.

6      Q.    How long did you actually work for al-Haramain?

7      A.    From December of 1998 until August of 1999.

8      Q.    So approximately eight or nine months?

9      A.    Correct.

10     Q.    Now, there is a couple of other computers

11  depicted in this office.  Were they there at the time?

12     A.    They were.

13     Q.    They were?

14     A.    Yes.  I mean, not necessarily -- not the

15  computers that are listed here.  You have a laptop

16  listed.  They were all desktops at the time, but there

17  were two other computers in the office when I was there.

18     Q.    Now, were there other employees working for

19  al-Haramain?

20     A.    Yes.

21     Q.    And who were they?

22     A.    David Hafer and Rob Brown.

23     Q.    And what was Mr. Hafer's duties with the

24  foundation?

25     A.    He took care of the building and the grounds,

 1  including caring for the livestock that was kept on the

 2  premises.  He also handled distribution of literature

 3  and some other tasks.

 4      Q.    Okay.  Was he living at the premises?

 5      A.    He was.

 6      Q.    And Mr. Brown, you mentioned, what was his

 7  responsibilities?

 8      A.    He was supposed to take care of, amongst other

 9  things, the monthly reports and the financial, keeping

10  tabs on our expenses from, you know, month to month, but

11  ultimately I had to take those over because he had

12  trouble performing those duties.

13      Q.    Now, was -- what was Mr. Seda's role while you

14  were working there?

15      A.    Mr. Seda was the man in charge.  He was the

16  conduit between the Saudi Arabian head office and the

17  branch office in Ashland, Oregon.  He would give

18  instructions on a daily basis.  We would talk usually in

19  the morning, sometimes at another time during the day,

20  and he would relay what he wanted to get done that day

21  in terms of overall projects and other responsibilities.

22      Q.    In terms of the finances, who was in charge?

23      A.    Well, I'm not sure what you mean by that

24  question.

25      Q.    Okay.  Who signed the checks?

1     A.     That kept us running?  You mean -- there is two

2  answers to that.  One is that Saudi Arabia ultimately

3  signed the checks that kept us running from month to

4  month.  But the second -- for the employees, Mr. Seda

5  was the person who would sign the checks in order to --

6  you know, he would be the one who paid our salary.  He

7  was the one who had the ability to hire or fire us.

8     Q.     Now, did you help keep the books and that sort

9  of thing?

10     A.     I did.

11     Q.     Would you explain how you did that.

12     A.     There would be expenses, including routine

13  expenses such as electric bills, phone bills and the

14  like, and a few other expenses, I would enter them into

15  Microsoft Key Access database.

16     Q.     And in terms of the money coming in, where did

17  it come from?

18     A.     Almost 100 percent came from the office in

19  Saudi Arabia.

20     Q.     That was the al-Haramain office?

21     A.     Correct.

22     Q.     Now, how were you paid?

23     A.     I was paid with two checks.  Mr. Seda intended

24  to pay me under the table.  Ultimately, I ended up

25  reporting the money on taxes at the end of the year.

 1     Q.    Can we see BOA-6, please.

 2 Mr. Gartenstein-Ross, do you recognize this particular

 3 check?

 4     A.    I do.

 5     Q.    It's drawn on -- appears to be drawn on an

 6 al-Haramain account?

 7     A.    That's correct.

 8     Q.    It's dated in January 1998?

 9     A.    Correct.  Yes, I recognize the check.

10     Q.    Okay.  And what is it?

11     A.    That is the first salary check that I was paid.

12     Q.    For $2060?

13     A.    Yes.

14     Q.    Now, down at the bottom it says "Power Mac."

15 What is that?

16     A.    That is what Mr. Seda wrote on the check.  It

17 was his intention, as I said, to pay me under the table.

18     Q.    What does that mean to you?

19     A.    That it was -- you were off the books, not to

20 be reported to the IRS.  We actually had a fairly

21 lengthy discussion about this.

22     Q.    Okay.  By the way, it says 1998 on the check,

23 in January, but you were working there in '99, right?

24     A.    1998 is not the correct date.  That would be an

25 error of writing.  This was January 25th of 1999 when

1    the check was written.

2       Q.     Now, you say you had an extensive discussion

3    about the check.  Could you tell us what that discussion

4    was?

5       A.     Well, this was my first job after college.  And

6    I didn't really know how to deal with this, but he had

7    this long discussion, I'm going to put "Power Mac" on

8    the check; you be prepared to testify that this was for

9    a computer.  And I didn't really know how to respond to

10   that.  I didn't want to be paid under the table, but,

11   you know, it was a job that I had to have at that point.

12      Q.     You didn't sell him a "Power Mac"?

13      A.     I did not, no.

14      Q.     Or any other computer?

15      A.     No.  This was my employment check.

16      Q.     You indicated that there was some discussion

17   about testifying?

18      A.     Yeah, he meant it if we were ever prosecuted

19   for it.

20      Q.     And what did he say in that regard?

21      A.     He said "would you be prepared to take the

22   stand and say that this was for a computer?"

23      Q.     And what did you say?

24      A.     I said "yes."

25      Q.     Did you at some point change your mind on that?

1    A.    Well, yeah, I mean, I had changed my mind -- at

2  the time I wasn't sure how to handle it, but I decided

3  that what I was going to do was at the end of the year

4  just report it as income anyway, and not really deal

5  with the issue of how he wanted to pay with me -- pay

6  me.  And, ultimately, you know, at the end of the year

7  when it came time to file taxes, I talked to Mr. Seda

8  and told him I was going to report the income.

9    Q.    And what did he say at that point?

10    A.    He said that was fine.

11    Q.    Now, you indicated that another part of your

12  duties was to write reports or that sort of thing?

13    A.    Yes.

14    Q.    What was that all about?

15    A.    The reports were for the head office in Saudi

16  Arabia.  They were informing the office what we were

17  doing on a month-to-month basis, our accomplishments,

18  you know, what projects we wanted to undertake.  They

19  would often include requests for money, or money that

20  was spent, or money that we wanted to get for additional

21  projects.

22    Q.    Now, did Mr. Seda review your reports before

23  they were sent to Saudi Arabia?

24    A.    Yes, he did.

25    Q.    Okay.  And how was his English reading and

1   writing abilities?

2      A.    His reading ability was fine.  He would read

3   things, including e-mails, including reports.  His

4   writing ability wasn't great.  You know, it would

5   often -- he would be able to communicate but there would

6   often be spelling errors or grammatical errors or the

7   wrong word used in certain circumstances.

8      Q.    Now, how would he edit your reports?

9      A.    Usually he would look over it to make sure

10  that, for one thing, we were doing a good enough sales

11  job for the Saudi Arabian office, that we weren't

12  putting anything in there that would offend them

13  Islamically.

14         Second, he would often edit the language to

15  make sure that the language came across as more

16  religious, inserting phrases like Inshallah, which means

17  God willing, or Alhamdulillah, which means all praises

18  due to God.

19     Q.    Now, can you give us an example of what you

20  indicated was more positively?

21     A.    I'm sorry, I didn't hear you.

22     Q.    Could you give us an example of something he

23  changed to report to Saudi Arabia?

24     A.    Well, when I first got there, one of the first

25  things we did was we had a presentation to a high school

 1    class about Islam.  And, you know, constant with their

 2    belief in gender segregation, the men and women were on

 3    different sides the room.  But the head office

 4    apparently got some photographs of this, and were

 5    offended that the men -- the boys and the girls in this

 6    class were in the same room to begin with.  And so on

 7    that particular report, we very much de-emphasized the

 8    presentation, because they believed that having boys and

 9    girls in the same room was Islamically incorrect.

10        Q.    Now, did you have any duties with regard to

11    prisoners in the United States?

12        A.    I did.

13        Q.    And could you explain what that was?

14        A.    I would grade different forms that were sent in

15    by prisoners.  They had a standard form to assess the

16    prisoners' Islamic knowledge, which --

17        Q.    How would you -- I mean, how was it that you

18    were trying to assess prisoners?

19        A.    I'm sorry, I didn't actually do the grading of

20    the forms, but I would look at the forms and the scores,

21    somebody else had graded them.  They'd be graded

22    according to things like who is Allah?  Who is Jesus?

23    What are the tenets in Sunan al-Fitra?

24        Q.    You might want to slow down and spell that for

25    the court reporter.

1      A.      Well, the last one's not particularly relevant

2  here, Sunan al-Fitra is S-U-N-A-N, A-L, hyphen,

3  F-I-T-R-A, which is different aspects of the Sunnah or

4  Muhammad's example that Muslims were supposed to

5  incorporate into the way that they looked.  So the point

6  with that one is it's a fairly complex question.

7           There were other questions -- there were ten

8  questions overall, ranging from the basic to the more

9  advanced on this form.

10     Q.      How was it that prisoners got this form?

11     A.      That's a good question.  I think that it was

12 through relationships with the chaplains, and then word

13 of mouth.  Often prisoners would write to us requesting

14 literature and then we would send them the form back in

15 order to asses their Islamic knowledge.  Then the

16 literature that they received would be based upon how

17 well they did on the form.

18     Q.      So it was kind of like a test to see what your

19 faith was?

20     A.      Yeah, both what your faith is and also how

21 advanced your knowledge of the faith is.

22     Q.      And was that a big part of your duties?

23     A.      It wasn't an enormous part, but it was

24 something that I would spend time on every week and

25 usually everyday.

1    Q.    And you said somebody else evaluated the

2    questionnaires?

3    A.    Yes.

4    Q.    And who was that, if you know?

5    A.    I don't know.  The questionnaires were

6    evaluated by other people.

7    Q.    Okay.  And there was some ultimate grade that

8    came out of it?

9    A.    Yes.  The minimum grade for someone to be a

10   Muslim was a three out of ten.  That's if they answered

11   questions like -- right -- such as who is Allah?  Who is

12   Muhammad?  Who is Jesus?  And, you know, if they got

13   that three, then there are certain books that would be

14   sent to them as a result.

15   Q.    And what books were those?

16   A.    Well, one of them was the al-Halali and Khan

17   translation of the Qur'an, which was a Saudi translation

18   of the Qur'an.  Also, the Brief Illustrated Guide to

19   Understanding Islam.  If they got a higher score, they'd

20   be sent more advanced materials such as Muhammad bin

21   Jamil Zino's Islamic Guidelines for Individual and

22   Social Reform.

23   Q.    Now, was there a book called the Noble Qur'an?

24   A.    That's correct, yes.  That's the translation of

25   the Qur'an I referred to previously.

 1   Q.    Okay.  And who was -- you said what version was

 2   that?

 3   A.    That was a translation that came out of Saudi

 4   Arabia.  I would describe it as being a Wahhabi

 5   translation of the Qur'an.

 6   Q.    Okay.  Now, before we get into that, you

 7   mentioned some name that went with it, and I think the

 8   court reporter would love for you to spell that for her.

 9   A.    Absolutely.  Muhammad bin Jamil Zino.  And it's

10   M-U-H-A-M-M-A-D, B-I-N, J-A-M-I-L, Z-I-N-O.

11   Q.    Now, can we see DGR-1, please.  Do you

12   recognize at least the first page of this exhibit?

13   A.    Yes.  That is the Noble Qur'an.

14   Q.    And if you could take a look at that, can you

15   explain to the jury what we're looking at here?

16   A.    This is the back cover of the Noble Qur'an.  It

17   has both al-Haramain's address in Saudi Arabia, and also

18   it has the address of the Ashland, Oregon, branch below

19   it.

20   Q.    Okay.  And the next page, please.  Now, if you

21   could blow this up.  Was this part of the Noble Qur'an

22   that you were referring to?

23   A.    Yes, it was.

24   Q.    Okay.  This was a particular appendix?

25   A.    Yes.  This appendix is the Call to Jihad.  I

1   should explain is that because Arabic reads from right

2   to left, including in books, the first page is on the

3   right-hand side as opposed to the left-hand side.  But

4   this was an appendix which was in all of the versions of

5   the Qur'an that were there while I was there, which is

6   about the duty of jihad, or as it defines it, holy

7   fighting.  And it makes the case that there is an

8   eternal obligation to wage war on that which is not

9   Muslim.

10      Q.    Now, was this actually part of the Qur'an, to

11  your knowledge?

12      A.    No, it's not actually part of the Qur'an.  The

13  Qur'an is -- you know, really when Muslims talk about

14  the Qur'an, they're talking about the Arabic text.  And

15  there were a number of insertions that weren't part of

16  the Arabic text that were featured in this Qur'an.  All

17  the appendices, those actually aren't part of the

18  Qur'an.  They are part of the book overall.  They are

19  meant to describe aspects of the faith, similarly, for

20  example, the very first surah or chapter, there is --

21  you know, there is these verses at the end, which in

22  Arabic translate as, you know, lead us to the straight

23  path, not the path of those who earned your anger or

24  those who went astray.  And, you know, in this

25  translation, in the English, there are insertions that

1    aren't part of the Arabic.  So it says not the path of

2    those who earned your anger and it inserts, such as the

3    Jews; nor of those who went astray, such as the

4    Christians.

5            So there is different kinds of explanatory

6    verses that are meant to guide the reader's direction in

7    a particular way.

8        Q.    Now, taking a look at this Call to Jihad, just

9    the first opening lines, it indicates praises to Allah

10   who was ordained, al-jihad, the holy fighting in Allah's

11   cause?

12       A.    Yes.

13       Q.    With the heart, with a hand, weapons,

14   et cetera?

15       A.    Yes.

16       Q.    With a tongue?

17       A.    Yes.

18       Q.    And you would send this out to prisoners in the

19   United States?

20       A.    That's correct.

21       Q.    During the time you were there, approximately

22   how many of these were sent out?

23       A.    It's hard to say how many were sent during the

24   time I was there, but by the time I left, there had

25   been -- you know, judging from what I had seen in the

1    databases that we kept, there were probably about 15,000

2    copies that had been sent out.

3        Q.    15,000?

4        A.    Best I could tell, yes.

5        Q.    And what kind of score did you have to earn on

6    the prisoner questionnaire to get this version?

7        A.    A three, meaning that if you were considered

8    Muslim, you would receive this Qur'an.

9        Q.    Okay.  If we could move to page 1236.  1236.

10   And this is another part of the Call to Jihad that's in

11   this appendix?

12       A.    Yes.

13       Q.    And it indicates that Muslims were ordered to

14   take all precautions against the enemies of Allah and

15   get ready against them with all they can of power,

16   because that is the first step for jihad; is that

17   correct?

18       A.    That's correct.

19       Q.    To get ready for jihad includes various kinds

20   of preparations and weapons, tanks, missiles, artillery,

21   aeroplanes, air force, ships, navy, et cetera; is that

22   correct?

23       A.    That's correct.

24       Q.    And the training of soldiers in these weapons?

25       A.    Yes.

1    Q.    Now, who was the author of this Call to Jihad?

2    A.    Muhammad bin Humaid, last name H-U-M-A-I-D, who

3    had previously been a Saudi Arabian chief justice but

4    who got into trouble with the Saudi government because

5    he was too extreme for them.

6    Q.    Now, when you were working at al-Haramain, did

7    you read this Noble Qur'an that you were sending to the

8    prisoners?

9    A.    I did.

10   Q.    Did you read Call to Jihad?

11   A.    Ultimately I did; not right away, though.

12   Q.    And what was your reaction to the Call to

13   Jihad?

14   A.    Well, during my time at al-Haramain, I began to

15   adopt a much more conservative and ultimately somewhat

16   extreme understanding of the faith.  This was what, you

17   know, the various books that we distributed taught.

18   This was what I'd be lectured to about -- by others

19   there, including Sheikhs who we brought in from outside.

20        So initially it was something that made me

21   uncomfortable, but I felt that if it was correct, this

22   was a religious obligation, that it was something that I

23   had to desire in my heart.

24   Q.    Did you -- let me ask you this:  Did you send

25   this particular book to non-Muslims?

1      A.     In general, when non-Muslims received the

2    Qur'an, they would receive a different translation, one

3    that was less extreme.

4      Q.     And what one was that?

5      A.     There were two, one of them was the Yusuf Ali

6    translation which --

7      Q.     You might want to spell that.

8      A.     Y-U-S-U-F, and last name A-L-I.  That was one

9    translation.

10          The other one was Marmaduke Pickthall,

11   M-A-R-M-A-D-U-K-E, P-I-C-K-T-H-A-L-L.  Those would be

12   the two translations that when we had things like, you

13   know, open sessions where we would teach non-Muslims

14   about Islam, those would be the Qur'ans in general that

15   would be given to non-Muslims, not the Noble Qur'an.

16     Q.     When you say they were more moderate, what do

17   you mean by that?

18     A.     Well, for example, in the first surah that I

19   referred to before where it talks about how Jews earned

20   Allah's wrath and Christians went astray, it didn't say

21   that in there, it didn't add the Jews and Christians.

22   It just said you guide us to the straight path, the path

23   of those who earned your grace, not the path of those

24   who earned your anger or went astray.  Likewise, it

25   didn't contain the different footnotes within this

1  Qur'an that advocate jihad.  It did not contain the Call

2  to Jihad appendix that you had previously discussed.

3      Q.    Now, did you ever discuss with Mr. Seda which

4  kind of Qur'an to give to various people?

5      A.    Yes, on one occasion, I recall.

6      Q.    And what was that?

7      A.    We had our cultural tent where non-Muslims

8  would visit and would be taught about Islam.  There was

9  one woman who was kind of oohing and aahing, she

10  obviously was -- she liked what we were saying.  And

11  when I was going to get her a Qur'an, Mr. Seda specified

12  that I should get her, I believe, the Yusuf Ali

13  translation of the Qur'an, not the Noble Qur'an.

14      Q.    So the more moderate one?

15      A.    Correct.

16      Q.    Can we see to DGR-2.  Do you recognize that

17  particular exhibit, Mr. Gartenstein-Ross?

18      A.    Yes, I do.  It's the book I referred to earlier

19  by Muhammad bin Jamil Zino.

20      Q.    And who would this book be sent to?

21      A.    Well, for the prisoner program, it would be

22  sent to prisoners who scored higher and who had a more

23  advanced Islamic knowledge.

24      Q.    So you had to do better than a three to get

25  this?

1     A.     In general, yes.

2     Q.     How many of these books were sent out while you

3  were there?

4     A.     Well, again, I don't know precisely, but in my

5  estimation, by the time I had left, there had been a

6  thousand sent out overall.  Not all of them during the

7  time I was there, but during the time that they were

8  operative.

9     Q.     Now, if we could move, there is -- the next

10 page -- well, back to -- these books would also have a

11 notation that they were distributed by the al-Haramain

12 Foundation?

13    A.     That's correct.  This was a sticker put into

14 the book or a stamp, I believe.  The others were

15 actually printed on the Noble Qur'an's back cover.

16    Q.     Does this appear to be a copy of the book?

17    A.     It is.

18    Q.     If we could take a look at page 130, there is a

19 reference to "jihad is obligatory on every Muslim in two

20 ways:  By spending one's wealth or offering oneself for

21 fighting in the cause of Allah."

22    A.     That's correct.

23    Q.     And then "jihad as an individual duty"?

24    A.     That's correct.

25    Q.     "This type of jihad becomes a must when the

1    enemy of the Muslims enters their land, like the Jews

2    who settled in Palestine."

3        A.    Correct.

4        Q.    "Every Muslim will be guilty unless he expels

5    the Jews by money or physical fighting."

6        A.    Yes.

7        Q.    And on the next page, 133, the "jihad against

8    the disbelievers, communists and the aggressors from the

9    Jewish-Christian nations can be either by spending on

10   jihad or by participating in it in person."

11       A.    Correct.

12       Q.    "The Prophet said perform jihad against

13   polytheists by wealth, body, and tongue."

14       A.    Yes.

15       Q.    So you would send that out to prisoners?

16       A.    Yes.

17       Q.    But not to non-Muslims?

18       A.    What did you say?

19       Q.    But not to non-Muslims?

20       A.    No, not at all.

21       Q.    Now, did you learn who the main point of

22   contact in Riyadh was for the parent organization

23   al-Haramain?

24       A.    It was Soliman al-But'he.  Do you need it?

25             THE REPORTER:  No.

 1   BY MR. GORDER:

 2      Q.    How did you learn that?

 3      A.    Because this was the person who we would have

 4   e-mail contact with.  Mr. Seda would have occasional

 5   telephone contact with Mr. al-But'he.  And he would be

 6   the one who we would need to speak to after we'd send

 7   out the reports.  Additionally the reports that we'd

 8   send, the monthly reports that I referred to earlier,

 9   would be e-mailed directly to Mr. al-But'he.

10      Q.    Now, did you -- did you ever meet Soliman

11   al-But'he?

12      A.    I did not.

13      Q.    Did you ever participate or overhear any phone

14   conversations with him?

15      A.    I did.

16      Q.    How would that come about?

17      A.    Often Pete -- often Mr. Seda would have the

18   speaker phone on when I was in the office when he was

19   speaking to Mr. al-But'he.  He would do that in order to

20   either have me present so I could take notes or I could

21   be cognizant of whatever action items would come out of

22   these telephone calls.

23      Q.    So you were kind of taking down a list of

24   things to do, that sort of thing?

25      A.    That's correct.

1    Q.    How was -- would you describe Mr. al-But'he's

2  English ability?

3    A.    Mr. al-But'he's English ability was fine.  He

4  would sometimes use incorrect words, but he could read

5  English, he could write English, and he could speak in

6  English.

7    Q.    And you know about the reading and writing from

8  the e-mails?

9    A.    Yes.

10    Q.    Did you ever overhear a phone conversation

11  between Mr. Seda and Mr. al-But'he about a television

12  program on PBS?

13    A.    Yes, I did.

14    Q.    And do you recall the circumstances of that?

15    A.    Yes.  On August 7th of 1998, al-Qaeda

16  terrorists struck two U.S. embassies in Africa, in Kenya

17  and Tanzania.  They were struck simultaneously.

18         Subsequently there was a PBS show, Frontline,

19  which said that an Islamic charity had been involved in

20  these attacks.  And it flashed al-Haramain's logo twice

21  during the discussion of how an Islamic charity had been

22  involved.

23         Mr. Seda wanted to talk to Mr. al-But'he about

24  this.  He was very upset by the PBS reporting.  And

25  during the course of the phone call, he said to

1    Mr. al-But'he, "This is wrong, isn't it?  You know,

2    al-Haramain had nothing to do with the East African

3    embassy bombings, correct?"

4           And Mr. al-But'he would not deny al-Haramain's

5    involvement.  Instead he just said, "oh, we have many

6    volunteers.  We don't know."

7    Q.    So he wouldn't answer the question directly?

8    A.    He would not deny al-Haramain's involvement.

9    Instead his response was that they had many volunteers,

10   which was basically to me sounded a lot like an alibi.

11   Q.    You mentioned e-mail.  Was there an e-mail

12   system at the office?

13   A.    There was.

14   Q.    And did you have a particular e-mail address

15   while you were working there?

16   A.    Yes.  My e-mail address was, I believe,

17   DGR@qf.org.

18   Q.    QF presumably for the Qur'an Foundation?

19   A.    Right, which was the predecessor of al-Haramain

20   in Ashland.

21   Q.    Was there an address Q@qf.org?

22   A.    Yes, that was the general e-mail address.

23   Q.    When you say general, what do you mean by that?

24   A.    That was the main address, kind of the

25   institutional e-mail address.  The other e-mail

1    addresses would be directed to individual people within

2    the organization.  But Q@qf.org was the main e-mail

3    address.  So if somebody e-mailed al-Haramain generally,

4    that's where it would go.

5         Q.    Okay.  How about P@qf.org?

6         A.    That was Mr. Sedaghaty's address.

7         Q.    Who had access to the Q@qf.org e-mails?

8         A.    We all had access to it, including Mr. Seda.

9         Q.    How about DH@qf.org?

10        A.    That was David Hafer.

11        Q.    R@qf?

12        A.    That was Rob Brown.

13        Q.    What about an e-mail address

14   Haramain@alharamain.org?

15        A.    That was the institutional e-mail address for

16   the Saudi office of al-Haramain, I believe.

17        Q.    So it was kind of the Saudi equivalent of

18   Q@qf.org?

19        A.    That's correct.

20        Q.    Did you ever discuss with Mr. Seda e-mails that

21   came in on the Q@qf.org?

22        A.    Yes, on a number of occasions.

23        Q.    Did you ever learn that he had seen an e-mail

24   from outside the office that had come into the office?

25        A.    Yes.  I mean, on one occasion he had seen an

1    e-mail on his home computer that I ended up deleting as

2    being irrelevant to us.

3        Q.    And how do you know he saw it?

4        A.    Because he talked to me about the e-mail.

5        Q.    So he had access to the e-mail from his home

6    also?

7        A.    He did.

8        Q.    Were you ever reprimanded by Mr. Seda about an

9    e-mail that you had sent out?

10       A.    Yes, on one occasion.

11       Q.    And can you -- did the reprimand include

12   suggesting that you should refer to e-mails --

13             MR. WAX:  Objection.

14       Q.    -- like that elsewhere?

15             THE COURT:  Just --

16             MR. WAX:  That was leading, Your Honor.

17             THE COURT:  Yeah.  Thank you.

18             MR. GORDER:  I'll rephrase the question.

19   BY MR. GORDER:

20       Q.    Can you explain just generally what the

21   reprimand was about?

22       A.    Yes.  A non-Muslim had sent an e-mail asking

23   about female genital mutilation and whether it was an

24   Islamic practice.  I replied with an e-mail saying that

25   it was not Islamic.  And I was reprimanded for this on

1    the basis that I should have consulted with a set of

2    scholars that we had in Saudi Arabia who would love to

3    answer questions like that.

4        Q.    Who reprimanded you?

5        A.    It was done -- my understanding was that it

6    was -- it came through Pete.

7            MR. WAX:  Objection, Your Honor.  I'm going to

8    ask that this be stricken.

9            THE COURT:  Sustained.

10           MR. WAX:  I'm going to ask that the answer --

11           THE COURT:  Sustained.

12           MR. WAX:  Thank you.

13   BY MR. GORDER:

14       Q.    Did you discuss that with Mr. Seda?

15       A.    I did not.  I discussed it with Mr. Hafer.

16       Q.    Okay.  Now, during the period of time that you

17   were there, did some of the folks associated with --

18       A.    Actually, I'm sorry, let me go back to that.

19   There were two separate things.  There was the reprimand

20   which came from Mr. Hafer.  Then on a second occasion, I

21   did discuss this with Mr. Seda.  He was conciliatory

22   towards it, but Mr. Seda introduced the idea that we

23   have scholars in Saudi Arabia who love to answer this

24   kind of thing.  So I did discuss the e-mail with

25   Mr. Seda.

1    Q.    Okay.  And what does "scholars" mean to you?

2    A.    It means people who are trained in Islamic law

3    who can provide religious rulings on matters that won't

4    necessarily be clear to people with less training.

5    Q.    People like you?

6    A.    Correct.

7    Q.    Now, was there a period of time while you were

8    working there where a number of the local attendees or

9    persons associated with al-Haramain went on the Hajj?

10   A.    Yes.

11   Q.    And can you just briefly explain to the jury

12   what the Hajj is?

13   A.    The Hajj is a duty of Muslims when -- it's

14   considered one of the five pillars of Islam, and that is

15   to take a pilgrimage to Mecca once during the believer's

16   lifetime.

17   Q.    And do you recall when the Hajj trip was that

18   year?

19   A.    It fell into March with a bit of overlap with

20   another month.  I think it was -- I think it might have

21   run March to April or else it was just March.

22   Q.    And this was 1999?

23   A.    That's correct.

24   Q.    Did you attend the Hajj?

25   A.    I did not.

1    Q.    So you stayed behind and ran the office?

2    A.    I did.

3    Q.    Okay.  When Mr. Seda returned from the Hajj,

4    did you have any discussion with him about donating some

5    money?

6    A.    Yes, I did.

7    Q.    And what was that about?

8    A.    Well, this was around the time that there was a

9    humanitarian crisis flaring up over Kosovo.  Ultimately

10   the U.S. intervened militarily.  But after Mr. Seda

11   returned, following one sermon, he stood up and

12   addressed the congregation and said what's going on in

13   Kosovo is terrible.  The Serbs are slaughtering Muslims,

14   raping women.  And I know a couple of brothers who want

15   to go and fight the Serbs.  And he asked for donations

16   from the congregation.

17   Q.    Where did this conversation take place?

18   A.    It took place in the main prayer room.

19   Q.    How many people were around?

20   A.    Approximately, I would say, a dozen.

21   Q.    Did you donate money?

22   A.    I did.

23   Q.    If we could see BOA-16.  Have you seen this

24   exhibit before?

25   A.    I have.

1     Q.     And it's wire funds transferred to Albany?

2     A.     That's correct.

3     Q.     Dated April 15th, '99?

4     A.     Yes.

5     Q.     Does that date ring a bell with you as to the

6     time frame that this Kosovo donation was done?

7     A.     Yes.  It was shortly after the request.

8     Q.     How much money did you donate?

9     A.     $5.

10    Q.     Did -- while you were working at al-Haramain,

11    did you have visitors from the al-Haramain office?

12    A.     Yes, we did.

13    Q.     And who were they?

14    A.     We had a few visitors.  The major ones were

15    Abdul Qaadir Abdul-Khaaliq, who is a convert to Islam;

16    and Ahmed Ezzat.  They also were accompanied by a film

17    maker who was going to make an Islamic educational film.

18    Q.     If we could have SW-4, please.  And do you

19    recognize that photograph?

20    A.     Yes.  That's Abdul Qaadir Abdul-Khaaliq.

21           Do you need me to spell that for you?

22           THE REPORTER:  No.

23    BY MR. GORDER:

24    Q.     He's up on this chart that's over by the jury

25    box --

1       A.      Yes.

2       Q.      -- in the lower right-hand corner?

3       A.      That's correct, that's him.

4       Q.      Was he an employee of al-Haramain?

5       A.      That was my understanding, yes.

6       Q.      What was Mr. Seda's reaction to this gentleman

7   coming?

8       A.      He thought very highly of Mr. Abdul Khaaliq.

9   You know, his view in advance of the visit, his

10  explanation to me was this guy is amazing.  He knows

11  Islam really well.  He's going to come and show us how

12  to practice real Islam.

13      Q.      And did you eventually learn what his e-mail

14  was?

15      A.      Yes, I did.

16      Q.      Okay.  And --

17      A.      AQ@Yahoo.com.  He also had a second e-mail

18  address, which was AQDCKSA@Yahoo.com.

19      Q.      If we could see SW-26.  And just this is the

20  second e-mail address that you were talking about?

21      A.      That's correct, yes.

22      Q.      Now, what did Mr. Abdul Qaadir do while he was

23  in Ashland?

24      A.      He gave -- he taught some classes.  I believe

25  that he gave sermons or Khutbahs as well.  And, you

 1   know, basically taught about Islam in a variety of ways.

 2      Q.     And how would you describe his version of

 3   Islam?

 4      A.     I would describe it as harsh.

 5             MR. WAX:  Your Honor, I'm going to object.  I

 6   think we need a foundation here.

 7             THE COURT:  Sustained.

 8             MR. WAX:  Thank you.

 9             THE WITNESS:  I had several conversations with

10   him about how he understood Islam.  On one occasion he

11   talked about how, in his view, people who left the faith

12   should be killed because it's tantamount to treason.

13   From that, I would describe his understanding of Islam

14   to be rather harsh.

15             Second, he subsequently sent me a large number

16   of e-mails about the fighting in Chechnya, which were,

17   to me, rather shocking, dealing with the mujahideen

18   there and the Russians in Chechnya.

19             That's another thing that I would -- from which

20   I would draw the conclusion that he had a rather harsh

21   understanding.

22   BY MR. GORDER:

23      Q.     Can we go back to SW-26.

24      A.     Yes.

25      Q.     And if you could blow up the beginning there.

 1  This is an e-mail from Mr. Abdul Qaadir?

 2      A.    Yes.

 3      Q.    To the Sheeshaan group?

 4      A.    Yes.

 5      Q.    What was that, if you know?

 6      A.    That's a group that he established dealing with

 7  the news about the Chechen mujahideen.  He subscribed --

 8  he put several of us on his e-mail list, including

 9  myself.

10      Q.    So you received the Sheeshaan group e-mails?

11      A.    I did.

12      Q.    Are those the ones that you referred to as

13  somewhat fairly shocking?

14      A.    Yes.

15      Q.    If we could go to SW-2.  Do you recognize

16  people in this particular picture?

17      A.    I do.

18      Q.    And if you could point them out for the jury.

19      A.    Yes.  This is David Hafer.  This is me.  And

20  this is Ahmed Ezzat.

21      Q.    Who was Ahmed Ezzat?

22      A.    He was a Sheikh who I believe also worked for

23  al-Haramain.  He was originally from Egypt but moved to

24  Saudi Arabia.

25      Q.    Did -- were you present when he gave a sermon

1   or a speech at the al-Haramain building?

2       A.      I was.

3       Q.      Okay.  Was there a particular one about a

4   reference to the Talmud?

5       A.      There was.  It was not during the main speech,

6   rather it was after a speech that he had given where one

7   of the other Muslims asked me about the Talmud.

8       Q.      And what is the Talmud?

9       A.      The Talmud is the understanding -- Jewish

10  understanding of religious law.  And the question I was

11  asked by someone else --

12          MR. WAX:  Your Honor, I'm going to object.

13          THE COURT:  Overruled.

14          THE WITNESS:  The question I was asked by

15  someone else is what is the Talmud.  Ahmed Ezzat

16  answered the question rather than me.  He said that the

17  Talmud is the Jews' plan to ruin everything.

18  BY MR. GORDER:

19      Q.      Was Mr. Seda present during this?

20      A.      Mr. Seda was present.

21      Q.      Did he have any reaction to this comment?

22      A.      Yeah.  Mr. Ahmed Ezzat extrapolated upon this

23  for some time, including talking about how soccer was a

24  Jewish plot because it's meant to make men show the skin

25  above their knees, which is impermissible under Islamic

1    law.  Mr. Seda was very -- he was complimentary towards

2    it.  He said, "wow, brother, this is amazing information

3    you have.  You need to share this with the sisters,"

4    that is the women downstairs who could hear via the amp

5    downstairs.  So he handed Mr. Ezzat the microphone so

6    that he could repeat his description of the Talmud.

7        Q.    Did Mr. Seda ever say anything to you about how

8    he viewed either Mr. Abdul Qaadir or Mr. Ezzat?

9        A.    He had a positive impression of both of them.

10   He -- as I said before, he was very laudatory about

11   Mr. Abdul Khaaliq's understanding of Islam.  And he also

12   treated Mr. Ezzat as a respected religious teacher.

13       Q.    Now, you indicated that you left al-Haramain.

14   Let me ask you this before we go there:  During these

15   times where -- well, I'll withdraw that.  You indicated

16   you left in August of 1999?

17       A.    That's correct.

18       Q.    And what was the reason that you left

19   al-Haramain?

20       A.    To go to law school.

21       Q.    And where did you go to law school?

22       A.    New York University.

23       Q.    Now, did something happen with regard to

24   Chechnya about the time you left?

25       A.    Yes.  Around the time I was leaving, a group of

 1   Chechen mujahideen or holy warriors invaded a

 2   neighboring republic, Dagestan, with the intention of

 3   setting up an Islamic government in Dagestan.  They were

 4   repulsed.  There was then a series of apartment bombings

 5   in Russia.  And Russia ended up invading Chechnya.

 6       Q.    Did you have any contact with Mr. Seda after

 7   you went to law school about the situation in Chechnya?

 8       A.    I did, yes.

 9       Q.    And how were those contacts done, since you

10   weren't in the same city?

11       A.    Both by phone and also by e-mail.

12       Q.    Would you describe the contacts in general?

13       A.    Well, Mr. Seda was obviously very upset by the

14   Russian prosecution of the war.  He was also upset about

15   things that he considered as being negative or libelous

16   said about the mujahideen.  For example, he was just

17   very upset by one report in which it was claimed that

18   the mujahideen were using chemical weapons against the

19   Russians.  And he said to me that he could prove that

20   that was not the case.

21       Q.    As far as you know, that wasn't true?

22       A.    That the mujahideen were using chemical

23   weapons?  I don't know one way or the other.  As far as

24   I know, it's not true.

25       Q.    And was this the time where this Sheeshaan

 1   group got set up, this e-mail group?

 2      A.    Yes, it was around the same time.

 3            MR. GORDER:  Your Honor, if we could see --

 4   this will be a defendant's exhibit, 687.  And perhaps if

 5   you could just blow up the e-mails so it's a little

 6   easier for the jury to read.

 7   BY MR. GORDER:

 8      Q.    Sir, do you recognize this particular e-mail?

 9      A.    I do.

10      Q.    And was this your e-mail address at NYU?

11      A.    It was, yes.

12      Q.    Okay.  And it's dated January 17, 2000?

13      A.    Yes.

14      Q.    And it's sent to P?

15      A.    Yes.

16      Q.    Was that -- who was that?

17      A.    Who was what?

18      Q.    Who is P?

19      A.    That is Mr. Seda.

20      Q.    You sent this e-mail?

21      A.    Yes.

22      Q.    And you indicate that you are "looking forward

23   to working with you" on the Grozny project?

24      A.    Yes.

25      Q.    What was that?

1     A.    Mr. Seda had a recurring idea of establishing,

2  you know, on aid caravan that would go into a conflict

3  zone.  Previously this idea had surfaced with respect to

4  the crisis in Kosovo, where they would be delivering

5  humanitarian supplies, and that would send a signal that

6  the war had to end.

7           He indicated that he had another such project

8  that he wanted to undertake with respect to Grozny,

9  sending a caravan of aid into Grozny to send a signal

10 both about the humanitarian conditions and also that the

11 war had to end.

12    Q.    And you said there was a similar project with

13 regard to Kosovo?

14    A.    Well, it was a similar idea.  It never really

15 got off the ground.  He e-mailed the Serbian ambassador

16 to a Serbian representative several times, but

17 ultimately it was something which did not happen.

18    Q.    Okay.  Could we still see the exhibit, just

19 to -- 687.  You also requested some Noble Qur'ans?

20    A.    That's correct.

21    Q.    What was that all about?

22    A.    This was during -- this was during Ramadan that

23 year.  And I was part of a law school student

24 association called the Middle Eastern Law Student

25 Association.  We were holding an Iftar dinner, which is

1    the dinner that breaks the Ramadan fast.  And we wanted

2    to get a number of Qur'ans to distribute to students at

3    the event.

4        Q.    And there is a phrase at the very end, forgive

5    my pronunciation, Jazak Allah Khair.  What does that

6    mean?

7        A.    Jazak Allah Khair means may Allah shower you

8    with goodness or award you with goodness.

9        Q.    In Arabic?

10       A.    In Arabic, yes.

11       Q.    Okay.  If we could go to 687A.  And if you

12   could just blow that up a little so we could read it.

13   This is an e-mail from P to you; is that correct?

14       A.    Yes.  It's forwarding an e-mail that he had

15   sent to Mr. al-But'he in Saudi Arabia.

16       Q.    Okay.  And, again, it talks about the convoy

17   proposal?

18       A.    Yes, it does.

19       Q.    Okay.  If we could go to 687B.  What was your

20   reaction to the convoy proposal?

21       A.    At first I thought it was a very noble idea

22   when he first approached me about it.  One that was

23   unlikely to happen given that, you know, the Russians

24   don't want the war to end, so they wouldn't want a

25   convoy to occur that would be sending a signal that the

1    war had to end.  They were prosecuting it at the time.

2    But it struck me as a noble idea.

3              Eventually I received an e-mail from him that

4    made me think that it wasn't a proposal that he was --

5    that gave me some fixed feelings about the proposal when

6    he sent me a request to the Russian ambassador which was

7    extremely derogatory to him.

8    Q.    Okay.  In this particular e-mail, did you -- if

9    you could just blow up the first couple of paragraphs.

10   Did you do some research about how to contact the

11   Russian Federation?

12   A.    Yes, I did.

13   Q.    What was that all about?

14   A.    Well, Pete wanted to -- Mr. Seda wanted my

15   help.  And in part, he had just sent me, you know, more

16   Qur'ans than I requested.  I believe he sent me 200

17   Qur'ans for the Iftar event.  So I felt it would be good

18   to reciprocate by helping him with some research that he

19   needed.

20   Q.    And so you sent him the phone numbers of the

21   Russian people at the U.N.?

22   A.    Yes, that's correct.

23   Q.    Okay.  Now, if we could see 687C.  If you could

24   just blow up the e-mail a little bit.  Do you recall

25   receiving an e-mail from Mr. Seda along this line?

1    A.    Yes.  This was the e-mail that included an

2  attachment, which made me quite a bit more skeptical of

3  the project.

4    Q.    And why was that?

5    A.    Because the attachment on two occasions talked

6  about either kissing the Russian ambassador's filthy ass

7  or kissing and bribing his filthy ass.

8    Q.    If we could go to the next page.  And if you

9  could just blow up the first paragraph.  Is this the

10  letter you referred to?

11    A.    Yes, Dear Ambassador Bonehead.

12    Q.    What was your reaction when you received this

13  letter?

14    A.    Well, two things.  Number one, it made me think

15  that, you know, there was Russian animus as much as

16  there was concern for the people in Chechnya.  And,

17  second, it made me think that this was something that

18  wasn't, you know, likely to ever advance as a proposal.

19    Q.    Did there come a point in time where Mr. Seda

20  asked you to go to JFK Airport?

21    A.    Yes.

22    Q.    And what was that all about?

23    A.    He wanted me to meet Mr. al-But'he when

24  Mr. al-But'he was coming into the country, to present

25  him with flowers and make him feel like a welcomed

 1  guest.

 2       Q.    And how did that request come to you?

 3       A.    Through the phone.  He called me to ask me to

 4  do that.

 5       Q.    Do you recall approximately when that was?

 6       A.    I believe it was early -- I believe it was

 7  March of 2000.

 8       Q.    And he wanted you to go where?

 9       A.    He wanted me to go to the JFK Airport to meet

10  Mr. al-But'he who was flying in from Saudi Arabia.

11       Q.    And present him with flowers?

12       A.    Yes.

13       Q.    Did you do that?

14       A.    I did not.

15       Q.    Why was that?

16       A.    Because getting to the JFK Airport from where I

17  lived was a $35 cab trip, so it's $70 both ways.  And,

18  also, I wasn't sure at that time that I wanted to see

19  Mr. al-But'he.

20            As I said, you know, I adopted a very strict

21  interpretation of the faith during my time there.  And,

22  you know, at this point, I was really -- that was waning

23  a bit.  I was grappling with the way that I felt

24  theologically, religiously after having adopting some

25  views that were extreme because I felt that they were

1    the right thing with God.

2            One thing that I had done, I used to have a

3    full beard when I was at al-Haramain, which was, you

4    know, explained to me as a religious obligation.  I'd

5    shaved that down to a goatee.  Among other things, I

6    didn't want to have Soliman -- Mr. al-But'he lecture me

7    or look down upon me for having improper facial hair.

8            MR. GORDER:  No further questions, Your Honor.

9            THE COURT:  Cross.

10           MR. WAX:  Thank you, Your Honor.

11                        CROSS-EXAMINATION

12   BY MR. WAX:

13       Q.    Good morning, sir.

14       A.    Good morning.

15       Q.    I'd like to start pretty much where Mr. Gorder

16   was leaving off.

17       A.    Okay.

18       Q.    And ask you some things about some of these

19   central issues here in the indictment.

20       A.    Okay.

21       Q.    Did I understand correctly that in the winter

22   of 2000 you were in communication with Mr. Seda about

23   his desire to try to get a caravan of humanitarian

24   relief to Chechnya?

25       A.    Yes.

1    Q.    Did I also understand correctly that, as you

2  understood it, that was a recurring idea of his?

3    A.    Yes.

4    Q.    You mentioned the peace caravan to Kosovo.

5    A.    Yes.

6    Q.    That occurred while you were working at

7  al-Haramain?

8    A.    Yes, his idea for it occurred.  The caravan

9  itself did not occur.

10   Q.    I understand.  But the notion of it occurred

11 while you were working?

12   A.    Yes, that is correct.

13   Q.    You participated in some efforts to try to make

14 that become a realty?

15   A.    Yes.  There was some communication with the

16 Serbian ambassador.

17   Q.    I think you mentioned in direct examination

18 some -- was it e-mail or was it letters or --

19   A.    With the Serbian ambassador?

20   Q.    Yes.

21   A.    That was conducted, I believe, via e-mail and

22 via the phone.  Mr. Seda was the main point of contact.

23 I was providing assistance on that.

24   Q.    Was there also a letter written with respect to

25 that effort?

 1    A.    Yes, yes, there was.  I believe that the letter

 2  was sent as an e-mail attachment, but I don't know for

 3  sure, or it was faxed.

 4    Q.    Did you work on that letter, sir?

 5    A.    I believe that I helped to draft it, yes.

 6    Q.    All right.  You've already told us that

 7  Mr. Seda's written English is not the best?

 8    A.    That's correct.

 9    Q.    While you were working there, one of the things

10  that you would do from time to time was to write things

11  in a more proper English?

12    A.    That's correct.

13    Q.    You did that with respect to the letter that

14  was attempting to get permission to run a convey to --

15  into Kosovo?

16    A.    Yes, I believe so.

17    Q.    All right.

18    A.    To be honest, whether I edited or not, my

19  memory is a little bit vague, but it sounds familiar.

20         MR. WAX:  If I may have a moment, please, Your

21  Honor.

22  BY MR. WAX:

23    Q.    You described for Mr. Gorder some of the e-mail

24  exchanges that you had with Mr. Seda in January.  And he

25  showed you the language in the e-mail that Mr. Seda had

1   sent to you that had some rather harsher words in it,

2   correct?

3       A.    Yes.

4       Q.    Now, when Mr. Seda sent that to you, it was

5   with a request that you refine that letter and turn it

6   into a proper form that would be appropriate to send to

7   a diplomatic entity?

8       A.    It said it would need some of your editing

9   work.  I mean, this was not a matter of a letter that

10  had a few words misspelled or a few grammatical errors.

11  It was one that began Dear Ambassador Bonehead and then

12  talked about kissing or bribing your filthy ass.

13      Q.    I understand that, sir.  Mr. Seda's request to

14  you was to turn that into a letter requesting permission

15  to run the convoy, and for you to turn it into proper

16  diplomatic language; is that correct?

17      A.    That wasn't clear to me.  His e-mail to me says

18  at the top, "it needs some of your editing work."  But

19  when I looked at the letter, it seemed so far off that

20  it didn't seem like the kind of thing I could work with

21  to edit.

22      Q.    Did you not, in fact, edit and draft a letter

23  that was sent out on January 24th?

24      A.    I have no recollection of that.

25      Q.    Could we please show the witness Exhibit 689.

1      A.    I don't -- I have no recollection of editing

2  this.  He had other people working for him at the time.

3  I would guess that there is -- that somebody else had

4  edited this.  If I had edited it, there surely would be

5  an e-mail that I had sent to Pete with -- to Mr. Seda

6  with the edited version.

7      Q.    Did you have an opportunity to compare some of

8  the text that was in the e-mail that Mr. Seda sent you

9  with the text of this letter to see if, leaving aside

10  some of the anger at the situation, the core of the

11  request is essentially the same?

12      A.    I believe this is my first time seeing this

13  letter, so, no, I have not had a chance to do that.

14      Q.    And you don't recall having worked on it after

15  receiving the e-mail?

16      A.    I do not, no.

17      Q.    Thank you.  Now, do you recall with respect to

18  efforts in which you assisted with Kosovo that there

19  were refugees who were being brought into the United

20  States and given asylum or a least a refuge in our

21  country on the East Coast?

22      A.    Yes.

23      Q.    Do you recall Mr. Seda being concerned about

24  the flight of those refugees?

25      A.    Yes.

1    Q.    Did you assist him in putting together a trip

2    to New Jersey where he was going to provide some

3    assistance, at least in the form of some literature, and

4    to do some fact finding about what else was needed?

5    A.    Yes.

6    Q.    He did go to New Jersey as you understand it?

7    A.    He did, yes.

8    Q.    And you helped put that together?

9    A.    Yes, I assisted him.

10    Q.    All right.  Now, I'd like to take you through

11    some more of the e-mails in the winter than Mr. Gorder

12    showed you, and I'm going to -- we'll repeat a couple of

13    them, and then we'll move on to some you have not yet

14    been shown, I believe.

15        If we could start, please, with Exhibit 687A.

16    You've indicated that you recall having received this,

17    that would have been on or about January 17th that you

18    received it?

19    A.    Yes.

20    Q.    And you received it with the attachment below,

21    correct?

22    A.    With the forwarded e-mail, yes.

23    Q.    Yes.  And what you see here is that on

24    January 1, Mr. Seda was writing to Mr. al-But'he

25    expressing concern about the conditions in Chechnya?

1      A.    Yes.

2      Q.    And what he was asking for support on from

3  Mr. al-But'he from al-Haramain Saudi was the idea of the

4  convey?

5      A.    Yes.

6      Q.    And his primary goal, his hope would be to get

7  permission to do that from the United Nations?

8      A.    It says with U.N. support.  I believe that --

9  I'm not sure who would have to approve it, whether it

10 would be the Russians or the U.N.

11     Q.    Whichever, he was -- his goal was to do this

12 through some official channels?

13     A.    Yes, that's what the e-mail says.

14     Q.    All right.  If we could put up 687B, please.

15 Do you recall that in addition to just sending this on

16 to you, what he was doing was soliciting your

17 assistance?

18     A.    Yes.

19     Q.    And in this e-mail, which is an attachment

20 that -- to an e-mail that he sent to B, and you've told

21 us that that was Bilal?

22     A.    I haven't said that, but my understanding is

23 that it was Bilal, yes.

24     Q.    I'm sorry.  So Bilal was another employee.  Did

25 he come after you left?

1    A.    He came after me.  I've never met him.

2    Q.    But you are aware that he was hired?

3    A.    That's correct.

4    Q.    Are you aware that his responsibilities

5    included many of the tasks that you had previously been

6    performing?

7    A.    I'm not aware of that, but I have no reason to

8    doubt it.

9    Q.    Okay.  So in this e-mail which Mr. Seda

10   forwarded to Bilal on February 21st, it includes your

11   response to him --

12   A.    Yes.

13   Q.    -- as of January 17 expressing your view, this

14   is a beautiful idea?

15   A.    Correct.

16   Q.    And offering to do all you can to help with the

17   humanitarian effort?

18   A.    Correct.

19   Q.    In here, you provide information about the

20   Russian Federation, phone numbers, fax numbers,

21   et cetera?

22   A.    Yes.

23   Q.    In 687, please, and it's difficult to tell

24   perhaps the times, because on some of these e-mails,

25   they show East Coast times and some West Coast times.

1  This is the one in which you refer to the Grozny project

2  and express your -- in fact, you are looking forward to

3  working with him on it?

4      A.    Yes.

5      Q.    And, in fact, you did?

6      A.    I provided him with contact info, et cetera, I

7  did some research for him, yes.

8      Q.    All right.  If we could then put up, please,

9  687D.  Do you recall that the day after the exchange

10 that you just looked at, his request of help from you

11 and your response, he forwarded you again the e-mail

12 that he had sent to Mr. al-But'he soliciting

13 Mr. al-But'he's help?

14     A.    I didn't recall that he had sent it twice but

15 clearly he did.

16     Q.    Thank you.  And do you recall -- you've

17 described the exchange of the Qur'ans, your request for

18 the Qur'ans, and Mr. Seda sending them.  Do you recall

19 perhaps two, two-and-a-half weeks after this initial

20 exchange, Exhibit 691, please, your asking Mr. Seda for

21 an update on what was happening in the Grozny project?

22     A.    Yes.

23     Q.    All right.  The bottom of that, February 4, if

24 there are any developments in the convoy to Grozny,

25 please let me know.  And Mr. Seda responded to you,

1    correct?  Do you recall receiving --

2        A.    Yes.

3        Q.    -- the response at the top of the page?  Him

4    telling you that, you know, the Russian interior

5    ministry is jerking him around, and he wanted some help,

6    see if we can lean on them somehow; do you recall that?

7        A.    Yes.

8        Q.    So he's clearly telling you, at least, that

9    he's trying to do something, and you saw the letter that

10   was sent on January 24th?

11       A.    Yes.  I had never seen that letter before but

12   I've seen it now.

13       Q.    Now, do you recall responding to Mr. Seda a

14   little bit later, and responding with an apology?  Take

15   a look at 695, please.  So, again, he's forwarding this

16   to Bilal on February 21.  But it has a response from you

17   on February 19 now.  Do you recall apologizing, you

18   haven't been able to call, you've been out of town, and

19   if you can still help, you are offering to still help,

20   that you'll give him a call?

21       A.    Yes.

22       Q.    You're taking the initiative through this

23   letter and offering to call him?

24       A.    Yes.

25       Q.    Do you recall that now?

 1      A.      Yes, I recalled it previously.

 2      Q.      Okay.  And do you recall that Mr. Seda then

 3   communicated with you again, he was somewhat frustrated

 4   that he was not able to go forward, and asked you for

 5   some help a few weeks later?

 6      A.      Are you talking about help with finding which

 7   Islamic charities were operating in the area?

 8      Q.      Do you recall him seeking assistance from you

 9   in that regard?

10      A.      I recall providing it.

11      Q.      Do you recall him seeking it?

12      A.      I don't recall the letter that he sent seeking

13   it.

14      Q.      Could we see Exhibit 700, please.  If you'd

15   take a look at this, please.

16      A.      Yeah, I recall sending that e-mail.

17      Q.      All right.  And no question that you were still

18   viewing this as something that you were going to try to

19   participate in, offering to help, and providing the

20   help, and this is now a month and a half nearly after

21   the January 18 e-mail with the rough language in it,

22   correct?

23      A.      Yeah, I was still providing him with

24   assistance.

25              MR. WAX:  All right.  Your Honor, would this be

1    a time for a break?  I probably have a significant

2    amount more to do.

3              THE COURT:  That's fine.  We'll take a break.

4              MR. WAX:  Thank you.

5              (Recess:  10:54 until 11:18 a.m.  Jury enters

6    the courtroom.)

7              THE COURT:  Just relax.  Apparently, I beat the

8    witness back here, so.

9              (Witness enters the courtroom.)

10             THE COURT:  Take your time.  You may continue,

11   Mr. Wax.

12             MR. WAX:  Thank you, Your Honor.

13   BY MR. WAX:

14     Q.    Mr. Gartenstein-Ross, if I could ask you please

15   to try to keep your voice up a little.  At times we were

16   having difficulty hearing you over here.

17     A.    Certainly.

18     Q.    Thank you.  You mentioned in direct examination

19   some of your understanding of Mr. Seda's views on a

20   number of topics.  And I'd like to ask you your

21   understanding of his views about terrorism and funding

22   terrorism and acts of violence generally.

23             You've heard him speak about those subjects,

24   haven't you?

25     A.    I have.

1      Q.      And you have an understanding about his views

2    being quite against terrorism?

3      A.      I do not.

4      Q.      Okay.  Do you recall that you have been

5    interviewed by the agents of the FBI on a number of

6    occasions?

7      A.      Yes, that's correct.

8      Q.      And do you recall on January 7, 2003, having,

9    at least as I understand it, the first interview with

10   them?

11     A.      That's correct.

12     Q.      Do I understand correctly that before going in

13   for that interview, you formulated a plan for yourself

14   about how to handle it?

15     A.      I -- the only plan I had was to tell the truth.

16     Q.      Yes.  Well, that is the plan that you had.  And

17   do you not recall actually writing about, formulating

18   this plan?

19     A.      Yes.  And I also -- I know -- I'll let you take

20   your questions where you are going.

21     Q.      Thank you, sir.  So when you went into the FBI

22   on that first occasion, it was your intent to tell the

23   truth, and you did tell the truth?

24     A.      I did.

25     Q.      All right.  And do you recall on January 7,

1   2003, telling the FBI, Mr. Seda hates terrorism and

2   believes it gives Islam a bad name?

3       A.    Yes.  That was prior, sir, to revelations about

4   where this money has been going.

5       Q.    Well, you don't know where this money has gone,

6   do you, sir?

7       A.    I don't know directly, no.

8       Q.    Have you been in Chechnya?

9             MR. GORDER:  Objection, Your Honor.

10            MR. WAX:  Well, I object, Your Honor, and ask

11  that that be stricken.

12            THE COURT:  It will not.  The objection is

13  sustained.

14  BY MR. WAX:

15      Q.    Have you been in Chechnya?

16      A.    No, I have not.

17      Q.    Have you been in the offices of al-Haramain in

18  Saudi Arabia?

19      A.    No.

20      Q.    Do you have any firsthand knowledge from

21  speaking with anyone in Chechnya about whether or not

22  the El-Fiki donation ever got there?

23      A.    No.

24      Q.    Do you have any firsthand knowledge from anyone

25  about whether the donation from Mr. El-Fiki was used for

1  humanitarian purposes?

2      A.    No.

3      Q.    Now, let's get back to the questions that I was

4  asking you, sir.  Do you recall seeing a fatwa put out

5  by Osama bin Laden that talked about killing Americans?

6      A.    Yes.

7      Q.    And do you recall that Mr. Seda saw that fatwa?

8      A.    Yes.

9      Q.    Do you recall speaking with him about that

10 fatwa?

11     A.    Yes.

12     Q.    And do you recall Mr. Seda being quite upset

13 about that?

14     A.    He said it was against Islam.

15     Q.    He said it was against the Islam that he knew

16 and he understood, correct, sir?

17     A.    That is correct.

18     Q.    You understand Islam to be a religion that has

19 a wide diversity of views, do you not?

20     A.    Yes, I do.

21     Q.    You understand that there is no central

22 authority in Islam?

23     A.    Within Sunni Islam, yes.

24     Q.    You understand that within Islam, people can

25 read fatwas and follow them if they believe in them, or

1    they can reject them if they are inconsistent with their

2    belief?

3        A.    Yes.

4        Q.    And what Mr. Seda said to you and you heard him

5    discuss it, was that the Osama bin Laden's use of

6    terrorism was not the Islam taught by the Prophet?

7        A.    Yes, that's correct.

8        Q.    Now, Mr. Gorder asked you about the Frontline

9    show.

10       A.    Yes.

11       Q.    And if I heard you correctly, you told

12   Mr. Gorder that Mr. Seda was upset when he saw that?

13       A.    That's correct.

14       Q.    Do I understand correctly that Mr. Seda was

15   upset at two things with respect to the Frontline

16   discussion of the bombings at the embassy?

17       A.    Are you going to enumerate those two things?

18       Q.    Do you recall Mr. Seda being upset at the fact

19   of the bombings themselves?

20       A.    No, I do not, because we never had a discussion

21   about that.  The bombings occurred in August of 1998

22   before I started working there.  When we had that

23   discussion with Mr. al-But'he, he was upset about

24   al-Haramain's alleged complicity.

25       Q.    Mr. Seda did not believe that al-Haramain would

1    be involved in anything like that, correct?

2        A.    Before the phone call, yes.  After the phone

3    call, it certainly raised doubts when Mr. al-But'he

4    would not deny al-Haramain's role.

5        Q.    And Mr. Seda's response to that, sir, was to

6    consider washing his hands of al-Haramain?

7        A.    That is correct.

8        Q.    Now, it turned out that he did not wash his

9    hands of al-Haramain, correct?

10       A.    That is correct, too.

11       Q.    But you describe, I think, that there were a

12   number of occasions when there was tension between

13   Mr. Seda's views at the al-Haramain Ashland branch, and

14   the views of the people at al-Haramain Saudi Arabia?

15       A.    Some tension, yes.

16       Q.    You described, I think, one thing involving the

17   mixing of boys and girls?

18       A.    Yes.

19       Q.    If I heard you correctly, you said it's your

20   recollection that when classes of boys and girls would

21   come to the tent, that the boys would be on one side and

22   the girls would be on the other?

23       A.    Correct.

24       Q.    Do you not recall that the boys and girls just

25   mingled together?

1    A.    You are talking about the class that came in

2   December of 1998?

3    Q.    Any number of classes --

4    A.    They were -- I didn't see any number of

5   classes.  There was one high school class that came.  It

6   was in December of 1998.  And they were segregated with

7   the boys on one side and the girls on the other.

8    Q.    You do not recall other classes coming?

9    A.    Other high school classes or classes -- no, I

10  do not.  I recall other non-Muslims showing up to the

11  tent but I don't recall any other classes coming.

12   Q.    Do you recall other non-Muslims coming in

13  groups to the tent?

14   A.    Yes.

15   Q.    Do you recall them being mixed gender?

16   A.    Yes.

17   Q.    And do you recall that the people would mingle,

18  men and women together?

19   A.    Yes.

20   Q.    And you told us that when Mr. Seda was

21  discussing with you the report that you had sent to

22  al-Haramain about this one incident that you recall,

23  that he asked you to tone down the description?

24   A.    That's correct.

25   Q.    It's your understanding, however, because you

1    observed it, I take it, that after, he continued to

2    allow groups of men and women to mingle together in the

3    tent?

4        A.    Of non-Muslims?  Yes.

5        Q.    I'd like to ask you about the -- another issue

6    with respect to the mixing of genders.  Do you recall an

7    interaction with a fellow named Sheikh Adly?

8        A.    Yes.

9        Q.    And do you recall a meeting that you and

10   Mr. Seda might have gone to together?

11       A.    We were with Mr. Adly together a number of

12   times.

13       Q.    Yes.  And do you recall an issue came up with

14   Sheikh Adly not wanting to be alone with a woman?

15       A.    Yes.

16       Q.    And do you recall that Mr. Seda complained

17   about that and spoke up about that?

18       A.    Well, he didn't speak up to Mr. Adly.  He spoke

19   up to me about that, and we solved the issue.

20       Q.    And when he spoke up, it was "I don't agree

21   with that"?

22       A.    Yeah.  He thought Mr. Adly had an overly rigid

23   interpretation.

24       Q.    Thank you.  Now, with respect to the views that

25   are expressed by some people, you've told us that Islam

1    is a large tent, if you will.  And that's true with

2    respect to views about jihad as well, is it not?

3         A.    Yes.

4         Q.    There are many people who believe that jihad

5    should be a personal journey or a personal struggle?

6         A.    Yes.

7         Q.    There are others who take a more harsh view or

8    a more aggressive view of jihad?

9         A.    Yes.

10        Q.    Do you recall that in discussions with people

11   at the al-Haramain building, there might have been some

12   people, I think you said, who expressed some views that,

13   well, offensive jihad or a warring struggle is okay?

14        A.    Yes.

15        Q.    Others did not?

16        A.    Correct.

17        Q.    And in those discussions, there was discussion

18   that even among those who thought that a warring jihad

19   was okay, there were people who said, look, if you are

20   going to do that, though, you cannot hurt civilians?

21        A.    I don't recall the specific discussions, but

22   certainly those views are out there within Islam.

23        Q.    And you don't recall them at the al-Haramain

24   building?

25        A.    Not off the top of my head.  If there is

 1   something specific you are referring to, I'm sure you

 2   can refresh my memory.

 3       Q.    Well, do you recall that another interview you

 4   had -- and I'm not sure exactly how this is written up,

 5   it says October 15th and 18th of 2004, a meeting with

 6   Colleen Anderson?

 7       A.    Yes.

 8       Q.    And do you recall telling Ms. Anderson or Agent

 9   Anderson, excuse me, on that occasion that some of the

10   members of AHIF were sympathetic to the mujahideen?

11       A.    Uh-huh.

12       Q.    Some are not, correct?

13       A.    When --

14       Q.    Some are and some are not?

15       A.    Which AHIF are you referring to?  Are you

16   referring to the Ashland congregation?  The Saudi Arabia

17   branch?  I'm just not sure what your question is.

18       Q.    From the notes it appears as though you were

19   discussing with Agent Anderson the views of people at --

20   while you were employed at AHIF in Ashland, some of the

21   members of AHIF -- I don't know, I guess, which AHIF you

22   were referring to.

23       A.    I understand the question.  I think I was

24   referring to the overall congregants.  And, yes, some

25   were sympathetic, some were not.

1    Q.    And with respect to those who were sympathetic,

2    do you recall, at least it's reflected in her notes,

3    persons at the prayer house did mention there were rules

4    for jihad and civilians should not be harmed?

5    A.    Yes.  The reason why your question threw me for

6    a little bit of a loop is because saying that civilians

7    shouldn't be harmed in jihad doesn't necessarily

8    constitute an endorsement of jihad, of militant

9    fighting.

10   Q.    I'd like to talk with you -- switch gears here

11   a little bit and ask you some questions about some of

12   your work at al-Haramain.

13   A.    Okay.

14   Q.    I first want to ask you whether or not I have

15   correctly read your description of some of the people

16   you met there, Mr. Brown, Mr. Rodgers, Mr. Hafer,

17   perhaps even Mr. Seda, Muslim rednecks; is that a phrase

18   you've used?

19   A.    Yes.  Not necessarily to describe those

20   specific individuals, but it was an interesting

21   congregation.  That was not said in a derogatory way.

22   Q.    There were people who were -- liked being out

23   in the woods?

24   A.    Yeah, absolutely.

25   Q.    Mr. Sedaghaty was an arborist?

 1      A.      Yes, absolutely.

 2      Q.      He worked in the forests, I guess, before he

 3   started his business.  Do you have any knowledge of

 4   that?

 5      A.      Yes.

 6      Q.      And you have knowledge of Rob Brown, Dave --

 7   well, Rob Brown and Dave Rodgers also having work in the

 8   woods?

 9      A.      Yes.

10      Q.      And some of them grew up in the Ashland area?

11      A.      Yes.

12      Q.      But some not in the city, I think you grew up

13   more in the -- more urban or suburban area?

14      A.      Yeah.

15      Q.      And some of these guys were from around some of

16   the hills and hollers?

17      A.      That's correct.

18      Q.      When you got there and started looking at, you

19   know, some of the work that you did, you told us that

20   eventually you started dealing with some of the

21   finances?

22      A.      Yes, eventually I started inputting expenses

23   into the database.

24      Q.      And what you found was a great deal of

25   disorganization?

1      A.     When I picked it up, yes.  I said when I picked

2   it up, it was disorganized because Mr. Brown had not

3   done that work for some time.  It wasn't -- it wasn't

4   that difficult to organize it.  It was just a matter of

5   going back and making sure it was in order.

6      Q.     You, as I understand it, have not only a

7   college degree but a law school degree?

8      A.     That's correct.

9      Q.     All right.  And have you ever taken any

10  accounting courses or business courses in law school?

11     A.     Yes.  I mean, I took a course on tax law.  I --

12  I took part of a course on accounting for lawyers before

13  deciding that it was too boring.

14     Q.     Well, I'm with you there, and that may be the

15  only place we're together, sir.  You instituted a

16  computer program, did you not?

17     A.     I didn't institute it.  They had a preexisting

18  program, Microsoft Key Access.

19     Q.     All right.  It hadn't really been used properly

20  or it hadn't been used much, had it?

21     A.     It had been used.  It's just that there were

22  several months in which -- there were a number of months

23  where data had not been entered, but there was already a

24  system in place when I picked up the program.  I did not

25  initiate its use.

1    Q.    All right.  Let me see if I have misunderstood

2    something here.  I want to refer you back, please, to

3    your notes of an interview on January 15 -- excuse me,

4    January 7, 2003, an indication that you said at that

5    time that you set up a program on the computer using

6    Microsoft Access.

7              MR. GORDER:  Your Honor --

8    A.    Those are not my words.

9              MR. GORDER:  Could the witness be allowed to

10   see what he's being asked about?

11             THE COURT:  Yes.

12             MR. WAX:  It's one sentence, Your Honor.

13             THE WITNESS:  It's okay.  I don't need to see

14   it.  I mean, the fact that the interview says I set it

15   up doesn't mean that those are the words that I said.

16   That's what was written in the interview.  I didn't set

17   up the program.  The program was there previously.

18   BY MR. WAX:

19   Q.    So you are telling --

20   A.    I did use the program.

21   Q.    But you're telling us that the agent who wrote

22   this down, as you recall it, wrote it down incorrectly?

23   A.    Well, I'm saying that the words "set up a

24   program," yes, technically, that's probably not the

25   exact right way to frame it, but when you are writing a

 1    witness affidavit that's several pages long, sometimes

 2    there will be a word or two that's astray.  I disagree

 3    with your interpretation of this affidavit.

 4        Q.    Do you recall that when you were trying to get

 5    into this bookkeeping that you found that there were

 6    some repetitive check numbers?

 7        A.    Yes.

 8        Q.    Some pretty basic mistakes, same check number

 9    appearing on multiple checks?

10        A.    Yes.

11        Q.    Now, in terms of what you described about

12    Mr. Seda's involvement in the running of the operation,

13    I want to get back to that for a moment.  Isn't it true

14    that he was rarely there at al-Haramain?

15        A.    He wasn't there 9:00 to 5:00.  He was

16    frequently in the office, but, you know, there would

17    be -- he wouldn't be there, you know, looking over the

18    work constantly.

19        Q.    Well, let me, if I may, read you another

20    sentence from this report of January 7th, written down,

21    Seda was rarely at the office as he had his day job.

22        A.    Right.  That's consistent with what I talked

23    about, that he wasn't there 9:00 to 5:00.  He would be

24    there for prayers almost everyday.  Bear in mind, the

25    prayers and the -- the prayers and -- the prayer room

1   and the office are in the same building.  So he would be

2   in the building frequently.  He was not a manager who

3   was in the office everyday.

4        Q.    Not a hands on manager?

5        A.    Well, he was -- I can't speak whether he's a

6   hands on manager or not.  You can be hands on without

7   being in the office everyday.  It depends on how

8   thoroughly you look at the work.  He looked at

9   everything that I put together before it was sent out to

10  the head office or anywhere else.

11       Q.    Let's go back to the language of the report.

12  As written down by the agent, it was Seda was rarely at

13  the office.  Are you indicating to us that that is

14  another inaccuracy?

15       A.    I am not --

16            MR. GORDER:  Your Honor, could the witness be

17  given a copy of the report?

18            THE COURT:  Yes.

19            MR. WAX:  The section bracketed in red.

20  (Document tendered).

21            THE WITNESS:  Okay.

22  BY MR. WAX:

23       Q.    Having reviewed that, does that refresh your

24  recollection that that is what you told the agent or are

25  you indicating that the agent perhaps didn't get it down

 1   precisely as you said it?

 2       A.    My recollection has not changed at all.  It's

 3   not inaccurate.  He was rarely at the office during

 4   office hours.  He was frequently at the building.  He

 5   would come there for prayers.  He would come there --

 6   and when he came for prayers, for example, usually

 7   coming for the maghrib prayers, which are around

 8   4 o'clock or 5 o'clock, he would often look over work.

 9            It is not inconsistent with what the agent

10   wrote down.  It's just an elaboration on it.  As you

11   know, affidavits such as that don't encompass every

12   single nuance and subtly.  You are over interpreting

13   that.

14       Q.    Thank you for the lecture.  I appreciate it.

15   Can we get back to the questioning?

16            MR. GORDER:  Objection, Your Honor.

17            THE COURT:  That's stricken.

18   BY MR. WAX:

19       Q.    With respect to the work of the al-Haramain

20   Foundation when you were there, you have talked to us

21   about some of the work in the reports.  You would

22   prepare reports that would describe the work that was

23   being done, correct?

24       A.    Yes.  That's correct.

25       Q.    And when you prepared those reports, did you

1  report with relative accuracy to Saudi Arabia?

2      A.    Yes.

3      Q.    Okay.  With respect to the e-mails --

4  Mr. Gorder asked you about some of the e-mail addresses,

5  and you've described some of those for us.  You've also

6  mentioned this person Abdul Qaadir?

7      A.    Yes.

8      Q.    He was an employee of al-Haramain in Saudi

9  Arabia?

10     A.    Correct.

11     Q.    And on one occasion he visited in Ashland?

12     A.    Yes, for a fairly extended stay, over a month,

13 I believe.

14     Q.    All right.  But there is no question he was an

15 al-Haramain Saudi employee?

16     A.    Correct.

17     Q.    I want to ask you a few questions, please,

18 about the prisoner program.  If I heard you correctly,

19 you said that all of the Qur'ans that were sent to

20 prisoners were the Noble Qur'an?

21     A.    That I know of.  During my time there, all the

22 Qur'ans that were sent to prisoners were the Noble

23 Qur'an, I believe.

24     Q.    Are you not aware and do you not recall that

25 some of the Yusuf Ali Qur'ans were sent to prisons?

1      A.    I don't recall that, no.  In any of the orders

2   that I placed for prisons, never once do I recall

3   sending out an Yusuf Ali translation.

4            MR. WAX:  Your Honor, would you like me to show

5   the witness the report or can I read the sentence to

6   him?

7            THE COURT:  The witness should have it, please.

8   BY MR. WAX:

9      Q.    If you'd look at the red bracketed area,

10  please, and see if that refreshes your recollection.

11     A.    Okay.

12     Q.    You've had an opportunity to read the report as

13  the agent wrote it down?

14     A.    Yeah.

15     Q.    Does that refresh your recollection about the

16  Yusuf Ali Qur'an also being sent out to prisons?

17     A.    Yes.  I'm sure that that's correct, but if it

18  was sent out, which, again, I have no reason to doubt,

19  having refreshed my memory on that --

20     Q.    Thank you, sir.

21     A.    -- it certainly wasn't the vast -- was the vast

22  minority of the time.

23     Q.    Now, with respect to the Qur'ans sent out to

24  prisons, do you recall that there was communication with

25  either chaplains or wardens in many of the prisons?

 1      A.      Yes.

 2      Q.      Do you recall that you would need to get

 3  permission to have the Qur'ans sent in?

 4      A.      It depends on the prison.  Some prisons, yes.

 5  Other prisons, no.

 6      Q.      All right.  But you are aware that certainly

 7  with some of the prisons there was a screening process?

 8      A.      Yes.

 9      Q.      And the Qur'ans that were sent in, whether the

10  Noble Qur'an or the Yusuf Ali Qur'an for those prisons,

11  would have been screened by the authorities?

12              MR. GORDER:  Objection, calls for speculation.

13              THE COURT:  Sustained.

14  BY MR. WAX:

15      Q.      Well, I believe that there was -- if he knows

16  there was communication with some of the institutions,

17  wasn't there, sir?

18      A.      I recall communication with one chaplain in

19  Oklahoma, I believe.

20      Q.      And were Qur'ans sent to that prison?

21      A.      I don't recall.

22      Q.      Do you recall that there was some disagreement

23  between al-Haramain Saudi Arabia and al-Haramain Ashland

24  about the prisoner program as a whole?

25      A.      Yes.

1      Q.    The al-Haramain Saudi people didn't really

2    believe in it?

3      A.    That's correct.

4      Q.    Yet Mr. Seda did and it continued?

5      A.    Yes.

6      Q.    In terms of the relief work by al-Haramain in

7    Ashland, do you recall from time to time letters coming

8    in or requests coming in in other written forms by

9    people seeking assistance from al-Haramain Ashland?

10     A.    Yes.

11     Q.    Do you recall inquiries with respect to

12   Somalia?

13     A.    No.

14           MR. WAX:  If we could show the witness

15   something marked for identification, Your Honor.  This

16   is not in evidence.  1201, please.

17           THE COURT:  Thank you.

18           THE WITNESS:  This arrived at a time that I was

19   not at al-Haramain.  Actually, it -- yeah, yeah, I was

20   not in the country at this point in time.

21           THE COURT:  Don't --

22           MR. WAX:  It's not to the jury, Your Honor.

23           THE COURT:  It's on my screen.

24           MS. WELLS:  It's on your screen, but this

25   screen is what the jury sees.

1        MR. WAX:  If you prefer, we can do it with the

2   paper copies.

3        THE COURT:  Yes.

4   BY MR. WAX:

5   Q.    Did I understand correctly when you were

6   testifying on direct examination that you were working

7   for al-Haramain from late '98 through August of '99?

8   A.    Right.  I was -- at this particular point in

9   time, I was in Britain, so I don't -- I mean, obviously,

10  this e-mail was sent.  It's something that I've never

11  seen before.

12  Q.    Do you have any recollection of any discussion

13  about aid for people in Somalia?

14  A.    I do not.

15  Q.    Do you have any recollection about any

16  discussion about aid in the form of goats?

17  A.    No, I do not.

18  Q.    Do you have any recollection about discussion

19  of aid requests for Kenya, humanitarian aid requests for

20  Kenya?

21  A.    I do not, no.

22  Q.    If we could please show the witness, just in

23  paper form, Exhibit 1215, marked for identification,

24  excuse me.

25        I recognize the date on this is after you had

1  left, but I'd ask you to take a look at it to see if it

2  refreshes your recollection about any communications of

3  a similar nature.

4      A.    No, it doesn't.  I mean, we got -- we got

5  requests like this frequently, but generally it just

6  wasn't something we would provide.

7      Q.    Okay.  But requests like that --

8      A.    Yeah.

9      Q.    -- I mean --

10     A.    I have not seen this request before, that's why

11 I couldn't recall it, but, yes, we would receive

12 requests like this.

13     Q.    Thank you.  All right.  With respect to the

14 literature that al-Haramain Ashland sent out, do I

15 understand correctly from reading some of the

16 information, that your view is that Mr. Seda is not the

17 most literate of individuals?

18     A.    I've said that before.  I think that that's

19 inaccurate.  I think he can read fine.  One thing that

20 I've done since I've previously had that opinion --

21     Q.    Excuse me, I'm asking you about facts, not any

22 research that you have done, sir.

23          Do you have an understanding -- did you have an

24 understanding at some time -- some time ago -- that

25 Mr. Seda probably had not read all the literature that

1   was sent out?

2       A.    Yes.

3       Q.    Now, I would like to ask you, sir, just a

4   little bit, in brief, about some of your religious

5   exploration.  You've described for us, I think, that

6   your parents were born to parents of the Jewish faith?

7       A.    That's correct.

8       Q.    You've described your upbringing was -- I

9   didn't understand the word you used.

10      A.    Syncretistic.

11      Q.    Syncretistic?

12      A.    Syncretistic.

13      Q.    A blend?  A mixture?

14      A.    A mixture.

15      Q.    Thank you.  You then converted to Islam?

16      A.    Yes.

17      Q.    The branch or sect, I'm not sure which word to

18  use, of Islam that you were practicing initially I think

19  you said was a Sufi oriented practice?

20      A.    Yes.

21      Q.    You then became somewhat more doctrinaire in

22  your theory?

23      A.    Yes, while working at al-Haramain.

24      Q.    And you have since left the Islamic faith?

25      A.    That's correct.

1     Q.    And have you adopted a new faith?

2     A.    I have.

3           MR. GORDER:  Objection, Your Honor.  I think

4     we're going beyond --

5           THE COURT:  Yeah, that's all right.  I'll allow

6     some of it, but let's try to stick to the issues here.

7           MR. WAX:  Well, may he answer that question or

8     not, Your Honor?

9           THE COURT:  Yes.

10          THE WITNESS:  Yes, Christianity.

11    BY MR. WAX:

12    Q.    Now, with respect to your time at al-Haramain,

13    if I have understood your writings correctly, when you

14    were first exploring Islam, there was something, I think

15    you've said, that was stirring inside yourself?

16    A.    Yes.  What I'm describing there is the zeal of

17    someone finding a new faith.

18    Q.    And you were looking for something for yourself

19    that would be relatively rigid?

20    A.    When I first embraced Islam?

21    Q.    No.  As you were moving through Islam, you were

22    looking for something --

23    A.    Well, no, I mean, rigidity was pretty much

24    thrust upon me.

25    Q.    Well, sir, do you recall saying about yourself

1    you did not want to be racked by doubt?

2       A.    That's correct.  I wanted theological

3    certainty.

4       Q.    Thank you.  Now, I'd like to ask you a question

5    or two about the testimony you gave about Soliman

6    al-But'he's visit to the United States in March of 2000.

7       A.    Yes.

8       Q.    Do you recall that the communication, there was

9    direct communication between you and Mr. al-But'he?

10      A.    Yes.  We spoke on the phone briefly while he

11   was in New York.

12      Q.    Do you recall that there was direct

13   communication between you and Mr. al-But'he about your

14   meeting with him in New York?

15      A.    Yes.

16      Q.    In fact, Mr. al-But'he and you exchanged

17   e-mails about it?

18      A.    I don't recall exchanging e-mails but that may

19   well have happened.

20      Q.    Do you recall that the initiative for the

21   meeting with Mr. al-But'he actually came from an e-mail

22   that you received from him?

23      A.    As far as I know, the initiative came from a

24   discussion with Pete.  Pete had -- with -- Mr. Seda had

25   called me to ask me to meet with Mr. al-But'he.

1   Mr. al-But'he may have subsequently e-mailed me but the

2   initial impetus came from Mr. Seda.

3       Q.    You don't recall the -- an e-mail from

4   Mr. al-But'he telling you that he would like to meet

5   with you?

6       A.    I don't recall it.  I'm not saying it wasn't

7   sent, but I don't -- this was ten years ago.

8       Q.    Could we please show the witness what we have

9   marked as 1216.

10      A.    I've looked at it.

11      Q.    Does that refresh your recollection?

12      A.    Yes, it does.

13      Q.    Thank you, sir.  Now, I'd like to turn to this

14  supposed conversation or call for money for mujahideen

15  after the Hajj.

16      A.    Yes.

17      Q.    Okay.  You've told us that this occurred

18  sometime after the Hajj.

19      A.    Yes, after.

20      Q.    Can you pin it down any more specifically?

21      A.    I cannot.  I -- I've pinned it down to, I

22  believe, March or April of 1999, but it was after

23  Mr. Seda returned from the Hajj.

24      Q.    Do you recall discussion in that time frame at

25  the prayer house about the need for humanitarian relief

1    for the people in Kosovo?

2        A.    Yes.

3        Q.    Do you recall in that time frame giving

4    humanitarian relief for the people in Kosovo?

5        A.    No.  I recall sending money to -- we did send

6    money to an organization Justice For All.  We didn't

7    provide direct humanitarian assistance, but we did make

8    a donation.

9        Q.    A donation to an organization that was

10   soliciting for humanitarian relief?

11       A.    Yes.

12       Q.    And did you participate in that?

13       A.    Yes.

14       Q.    Did you actually write the check for it?

15       A.    I may well have, yes.

16       Q.    Well, let's see if we can pin this down, sir.

17   The -- you came back from the Hajj --

18       A.    I didn't go to the Hajj.

19       Q.    Excuse me, they came back from the Hajj, and we

20   have some time records here that I'd like to show you.

21   If we could please show the witness what we have marked

22   as 1201B?

23            THE REPORTER:  B or D?

24            MR. WAX:  B.

25            THE CLERK:  1201C?

1          MR. WAX:  B.

2          THE COURT:  B as in boy.

3          THE CLERK:  I show what looks like your records

4     at 1201C.

5          MR. WAX:  There should be two sets of time

6     records.

7          THE CLERK:  I don't have a 1201B as in boy

8     (documents tendered).

9     BY MR. WAX:

10       Q.    Would you take a look at that, please, sir, and

11    tell us whether or not you recognize it?

12       A.    Yes.

13       Q.    What do you recognize it to be?

14       A.    That this is my timesheet which I would submit.

15       Q.    Would you please put the two pages side by

16    side.  It appears as though that's how they would have

17    been laid out?

18       A.    That's correct.

19       Q.    And would you look on April 2nd, the Friday?

20       A.    Uh-huh.

21       Q.    Take a look at the entry there and see whether

22    or not that refreshes your recollection that discussion

23    about Kosovo would have taken place on Friday,

24    April 2nd?

25       A.    The Kosovo task -- there were more than one

1    occasion on which Kosovo discussions happened.  The

2    Kosovo task force is what I talked to you about before.

3    It was administered by an organization Justice for All.

4    This was something that occurred while -- I believe it

5    occurred while Mr. Seda was still on Hajj.  And that

6    this contribution was solicited by the individual giving

7    the Khutbah that Friday who was Abdi Guled.

8        Q.    So if you believed that the discussion that's

9    referred to -- well, is there a discussion referred to

10   in that timesheet?

11       A.    A discussion?  There is -- you are talking

12   about the April 2nd?

13       Q.    April 2nd.

14       A.    There is no discussion.  It says Jummah

15   prayers, no contribution to Kosovo task force.

16       Q.    All right.  And you are telling us that it's

17   your recollection that Mr. Seda was still on Hajj at the

18   time?

19       A.    I believe so, yes.

20       Q.    If we could please show the witness what's

21   marked for identification as 1201F.  Have you had a

22   chance to look at that?

23       A.    Yeah.

24       Q.    Is your handwriting on that item?

25       A.    Yes.

1    Q.    Is that a check for $100?

2    A.    Yes.

3    Q.    Dated?

4    A.    Dated April 2nd.

5    Q.    Signed by?

6    A.    It has a signature that is Pete's signature.

7 That is --

8    Q.    Do you recognize that as the signature you saw

9 many times while you worked there?

10    A.    Yes.  But often I would be asked to sign that

11 signature.

12    Q.    Are you telling us that this is your

13 handwriting?

14    A.    I don't know whose handwriting that is.  What I

15 am saying is that I know for sure that he was on Hajj at

16 this point because if you look at my entries, April 1st,

17 feed and play with animals; April 2nd, feed animals;

18 April 3rd and 4th, feed and play with animals, I was

19 doing this because they were on Hajj.  And the person

20 who would normally feed the animals, David Hafer, was

21 not there.  So because of the time entries, I'm quite

22 sure that he was still on Hajj, that my recollection is

23 accurate.

24    Q.    If we could please show the witness Exhibit

25 1201A for identification --

1    A.    And also one thing I would point out --

2    Q.    Mr. Gartenstein-Ross, there is another

3  question.

4         THE COURT:  He may explain his answer.

5         THE WITNESS:  One thing I would point out is

6  that Mr. Seda returned by April the 6th, so I would

7  submit that it's entirely possible that I wrote out the

8  check on April 2nd, and Mr. Seda finally signed it later

9  on.  That often happens with checks.

10 BY MR. WAX:

11   Q.    Now, before you look at 1201A, please keep --

12 get the timesheet back up in front of you.

13   A.    It's right here.

14   Q.    You went on vacation and were away from the

15 Ashland area for several weeks in April, were you not?

16   A.    Well, not for several weeks, but for nine days.

17   Q.    When did you leave?

18   A.    The 12th.

19   Q.    When did you come back?

20   A.    The 21st.

21   Q.    If you now please look at 1201A.  Do you recall

22 having seen this?

23   A.    I don't recall having seen this.  I don't have

24 any reason to believe that I didn't, but I don't recall

25 it.

1      Q.      Do you recall having seen an appeal for Kosovo

2   humanitarian relief like this while you were working in

3   Ashland in April of 1999?

4      A.      There were multiple appeals, yes.

5      Q.      Multiple humanitarian appeals, correct?

6      A.      Yes.

7      Q.      If you would take a look at that again, please,

8   and see whether or not there is any date or time

9   notation on it up at the top?

10     A.      April 2nd of 1999.

11     Q.      Thank you, sir.  If we could please show the

12  witness what is marked for identification as 1201E.

13  Have you had a chance to look at that?

14     A.      Yes.

15     Q.      Do you recall having seen that while you were

16  working at al-Haramain Ashland --

17     A.      Yes.

18     Q.      -- in the spring?

19     A.      This is precisely what we talked about before,

20  Kosovo task force, U.S.A., and I correctly identified it

21  as Justice For All.

22     Q.      And this is another one of the many appeals for

23  humanitarian relief that came into Ashland in that time

24  frame?

25     A.      Yes.

1    Q.    Now, after you came back from the trip that you

2    took in April, your involvement with Kosovo relief

3    continued, did it not?

4    A.    Well, it wasn't Kosovo relief.  It was for

5    Kosovar refugees.

6    Q.    Excuse me, your involvement with relief for the

7    Kosovo refugees continued?

8    A.    Yes.

9    Q.    Do you recall in May that you had communication

10   with Soliman al-But'he about another group that had

11   communicated with you that had relief and it was looking

12   for a way to get it to the refugees?

13   A.    Yes.

14   Q.    If we could please show the witness what we

15   have marked as Exhibit 1210 for identification.  Does

16   this appear to be an e-mail chain between you and

17   Soliman al-But'he?

18   A.    Yes.  I would like to take another second to

19   review it, if that's okay.

20   Q.    Please.

21   A.    Okay, yes.

22   Q.    Do you recall --

23   A.    Yes.

24   Q.    -- that you received some communication from a

25   group, Purdue University?

1      A.     Yes.

2      Q.     They had some money they wanted to give to

3   refugees?

4      A.     No.  They had food, clothing, and non-

5   prescription medication, not money.

6      Q.     Excuse me, not money, they actually had goods?

7      A.     Yes.

8      Q.     Thank you.  You communicated with

9   Mr. al-But'he?

10     A.     Yes.

11     Q.     Mr. al-But'he communicated back with you?

12     A.     Correct.

13     Q.     And he told you the address, the location to

14  give these people of an al-Haramain group in the region

15  that could get the supplies to the refugees?

16     A.     Yes.

17     Q.     Thank you, sir.  One last set of questions,

18  sir.  You know Evan Kohlmann?

19     A.     Yes.

20     Q.     You indicated at the outset, I believe, that

21  your job includes some consulting work on

22  counterterrorism?

23     A.     Yes.

24     Q.     You and Evan Kohlmann are in competition?

25            MR. GORDER:  Objection, Your Honor.  I don't

 1  see the relevance of this.

 2          THE COURT:  Overruled.

 3          THE WITNESS:  I am not sure if in competition

 4  would be the right way to phrase it, but we both work in

 5  the same field.

 6  BY MR. WAX:

 7     Q.    And you have had some disagreements, have you

 8  not?

 9          MR. GORDER:  Objection, Your Honor.

10          THE COURT:  Overruled.

11          THE WITNESS:  We have a bit of a personal

12  rivalry, I would frame it.

13  BY MR. WAX:

14     Q.    Well, personal rivalry includes your belief

15  that he has said things about you that are libelous?

16          MR. GORDER:  Objection, Your Honor.

17          THE COURT:  Overruled.

18          THE WITNESS:  I sent him an e-mail at one point

19  trying to get him to stop saying bad things about me.

20  Whether they are actually libelous, I think is -- I

21  don't -- I do not think that they are.  I was trying to

22  persuade him to tone down the rivalry.

23  BY MR. WAX:

24     Q.    Do you recall in May of 2009 speaking with

25  Agent David Carroll?

1       A.      Yes.

2       Q.      And if you would like to look at the report --

3       A.      No, I recall it.

4       Q.      Do you recall telling him at that time

5  describing Kohlmann's statements as libelous?

6       A.      Right.  I was in a somewhat agitated state.

7               MR. WAX:  Thank you, sir.  I have no further

8  questions.

9               THE COURT:  Redirect.

10                      REDIRECT EXAMINATION

11 BY MR. GORDER:

12      Q.      Mr. Gartenstein-Ross, just to go back to the

13 issue about the two brothers going to fight the Serbs --

14      A.      Yes.

15      Q.      -- when did that conversation with Mr. Seda

16 occur?

17      A.      Well, looking at this, now that the -- that

18 this has refreshed my memory, it had to have occurred on

19 April 9th.

20      Q.      Of 1999?

21      A.      Of 1999.

22      Q.      And you were clear as to what the purpose of

23 the money was for?

24      A.      Yes.  He said that two brothers -- not

25 necessarily that they were brothers in flesh, but

1    brothers in Islam, were going to go over to fight the

2    Serbs.  It was very clearly laid out.

3        Q.    And he asked you for a donation?

4        A.    He asked the people there for donations, yes.

5             MR. GORDER:  Nothing further, Your Honor.

6             THE COURT:  Thank you.  You may step down.

7    We'll take a recess until ten after 1:00.

8             THE CLERK:  This court is in recess.

9             (Jury exits the courtroom at 12:06 p.m.)

10            THE COURT:  Mr. Wax.

11            MR. WAX:  Your Honor, I would like to offer at

12   this time exhibits that were marked for identification,

13   1201, 1201A, 1201B, 1201E.

14            THE COURT:  What was that last one?

15            MR. WAX:  E.

16            THE COURT:  Okay.  I had that.  What was before

17   that?

18            MR. WAX:  I'm sorry, 1201, then A.

19            THE COURT:  Yes.

20            MR. WAX:  B, E, and F.

21            THE COURT:  Yeah.  B -- I'm just writing B

22   down, so that's what happened.  Thank you.

23            MR. WAX:  1210, 1215 and 1216.

24            THE COURT:  Any objection?

25            MR. GORDER:  Yes, Your Honor.  I think 1201A he

1    said he hadn't seen before.

2         THE COURT:  That's my recollection also.

3         MR. GORDER:  1210 -- or, excuse me, 1216, he

4    just said it refreshed his recollection he got an

5    e-mail.  He didn't say anything further.

6         1215, he didn't recall.

7         No objection on 1201F, or 1201E, or 1201B.

8         And 1210, he just said he got an e-mail.  He

9    didn't identify this particularly as an e-mail.

10         THE COURT:  And 1201?

11         MR. GORDER:  1201?  1201, he said he'd never

12    seen before.  He was on vacation or something.

13         MR. WAX:  Your Honor, I would also point out

14    that regardless of his identifying them, they are on the

15    computer on the relevant subject and the relevant time

16    frame as those that are on the computer.

17         THE COURT:  I'll give you rulings later on on

18    those.

19         MR. WAX:  Thank you.

20         MR. GORDER:  Some of these, Your Honor, are

21    not, as I understand it, on the computer.

22         MR. WAX:  That's true.  As I said, some are.

23         THE COURT:  Some are and some are not?

24         MR. WAX:  Yes, sir.  And it should be obvious,

25    I think, from the documents, but we can give you a list

1    when we come back in that --

2            THE COURT:  All right.  Thank you.  We're in

3    recess.

4            (Lunch recess at 12:09 p.m.)

5            (Further proceedings were had by Reporter Jan

6    Duiven and are bound under separate cover.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE

2         I, Deborah Wilhelm, Certified Shorthand Reporter

3    for the State of Oregon, do hereby certify that I was

4    present at and reported in machine shorthand the oral

5    proceedings had in the above-entitled matter.  I hereby

6    certify that the foregoing is a true and correct

7    transcript, to the best of my skill and ability, dated

8    this 1st day of September, 2010.

9

10

11

12
                              /s/ Deborah Wilhelm
13                            _____
                              Deborah Wilhelm, RPR
14                            Certified Shorthand Reporter
                              Certificate No. 00-0363
15

16

17

18

19

20

21

22

23

24

25