IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     ) No. 05-60008-2-HO
                               )
        v.                     ) September 1, 2010
                               )
PIROUZ SEDAGHATY, et. al.,     ) Eugene, Oregon
                               )
                Defendants.    )

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL R. HOGAN

UNITED STATES DISTRICT COURT JUDGE

-:-

Jan R. Duiven, CSR, FCRR
Court Reporter
C&C Court Reporting
172 East 8th Avenue
Eugene, Oregon 97401
(541) 485-0111

```
                        APPEARANCES BY COUNSEL


FOR THE PLAINTIFF:          CHRISTOPHER L. CARDANI
                            United States Attorney's Office
                            405 E. 8th Avenue, Suite 2400
                            Eugene, OR 97401
                            (541) 465-6771
                            chris.cardani@usdoj.gov


                            CHARLES F. GORDER, JR.
                            United States Attorney's Office
                            1000 S.W. Third Avenue, Suite 600
                            Portland, OR 97204-2902
                            (503) 727-1021



FOR THE DEFENDANT:          LAWRENCE H. MATASAR
                            Lawrence Matasar, P.C.
                            621 S.W. Morrison Street
                            Suite 1025
                            Portland, OR 97205
                            (503) 222-9830
                            larry@pdxlaw.com

                            STEVEN T. WAX
                            MICHELLE SWEET
                            Federal Public Defender
                            101 S.W. Main Street, Suite 1700
                            Portland, OR 97204
                            (503) 326-2123
                            steve_wax@fd.org

Also present:              Agent Anderson
                            Agent Carroll
```

1

**INDEX TO WITNESSES**

2

3   **FOR THE
    PLAINTIFF:**                    **Direct**   **Cross**   **Redirect**   **Recross**

4

5   Debra Ingram                     115          141          144          145

6   Kevin Tyrrell                    146          163

7   Raajideen Kanan                  168          177

8   Thomas Wilcox                    180          237

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              EUGENE, OREGON; WEDNESDAY, SEPTEMBER 1, 2010; 1:16 P.M.

 2                                  -o0o-

 3

 4                          (Jury present.)

 5              THE COURT:  Thank you.  Please be seated.  Please call

 6    your next witness.

 7              MR. CARDANI:  Government calls Debra Ingram.

 8              THE COURT:  Thank you.

 9              THE CLERK:  Please raise your right hand (the clerk.)

10                      (The witness was sworn.)

11              THE CLERK:  Please step forward.

12              Please state your full name then spell your name for

13    the record.

14              THE WITNESS:  Debra Ingram, D-E-B-R-A, I-N-G-R-A-M.
```

**DIRECT EXAMINATION**

```
16    BY MR. CARDANI:

17        Q.   Good afternoon, Ms. Ingram.  Could you

18    tell the jury what you do for a living?

19        A.   I am the manager of Bank of America out of Ashland,

20    Oregon.

21        Q.   All right.  And there's a microphone down

22    below you built into the shelf that's in front of

23    you.

24        A.   Okay.

25        Q.   If you could just make sure you maybe
```

D. Ingram - D

1   face forward a little bit to me so that the

2   microphone can pick you up.

3       A.   Okay.

4       Q.   Okay.  Can you hear me okay?

5       A.   Yes.

6       Q.   All right.  You're currently the branch

7   manager of Bank of America?

8       A.   Correct.

9       Q.   Yes.  In what city?

10      A.   Ashland.

11      Q.   How long have you been in banking?

12      A.   1975.

13      Q.   What are your -- in general, your current

14  responsibilities?

15      A.   I manage a branch of ten associates.

16      Q.   In the year 2000, about ten years ago,

17  were you doing the same thing?

18      A.   Correct.

19      Q.   Do you know the defendant, Pirouz

20  Sedaghaty, also known as Pete Seda?

21      A.   Yes, I do.

22      Q.   How do you know him?

23      A.   Through a banking relationship with the branch.

24      Q.   A customer?

25      A.   Correct.

1    Q.    Down in Ashland?

2    A.    Correct.

3    Q.    You're familiar with a series of

4    exhibits, are you, that start with the letter BOA

5    in the government's exhibits?

6    A.    Yes, I am.

7    Q.    Bank of America?

8    A.    Correct.

9    Q.    Okay.  And I know have you them or you've

10   been shown them, but we're going to try to bring

11   them up electronically and work with you on a few

12   of them.  And there's a screen in front of you and

13   you can use your fingers if you want to highlight

14   something during your testimony.

15   A.    Okay.

16   Q.    Okay.  All right.  I'd like to start off

17   with BOA-1.  In general, what is this?

18   A.    That is a Bank of America legal signature card for

19   the business al-Haramain Foundation.

20   Q.    Signature card for a bank account or --

21   A.    Correct.  For a checking account.

22   Q.    Okay.  All right.  And do you recognize

23   the signatures there towards the top?

24   A.    Yes, I do.

25   Q.    Okay.  Who is that?

D. Ingram - D

```
 1        A.    Pete Seda.
 2        Q.    All right.  And there's a reference to a
 3   business down below?
 4        A.    Al-Haramain Foundation.
 5        Q.    And the -- back to the top, is there --
 6   oh.  I think it was the next page, the account
 7   number?
 8        A.    Correct.  The account number is there.  It's down a
 9   little further.
10        Q.    All right.  There's a series of accounts
11   here starting with the 11561?
12        A.    Correct.
13        Q.    All right.  Is that one of the
14   al-Haramain accounts that was maintained out of
15   Ashland at Bank of America?
16        A.    Correct.
17        Q.    And if we could go back up there, there
18   was another signature.
19        A.    Soliman Al-But'he.
20        Q.    Soliman.  Okay.  Would it be a fair
21   statement that these are the only two individuals
22   that had access to that account at the Bank of
23   America?
24        A.    That's correct.
25        Q.    Their name has to be on one of these
```

119

D. Ingram - D

1    cards to access the account?

2        A.    That's correct.

3        Q.    Before we leave this, we see

4    Mr. Al-But'he.  There's a Saudi Arabian passport

5    listed down below?

6        A.    Correct.

7        Q.    Do those signatures have to be done in

8    the bank?

9        A.    Yes.

10       Q.    Why is that?

11       A.    So that we can identify that the person signing the

12   signature card is also the person that's in front of us.

13       Q.    Okay.  All right.  With respect to that

14   11561 account -- we can next go to BOA-2 please.

15   Do you recognize this?

16       A.    This is a Bank of America statement for one month on

17   the business al-Haramain Foundation.

18       Q.    Okay.  And we see -- we know the account

19   number in the right hand corner there?

20       A.    Correct.

21       Q.    Okay.  And what's represented in bank

22   statements?

23       A.    Deposits, credits, checks written, automatic

24   withdrawals, automatic deposits.

25       Q.    Okay.  And it's mailed -- this was mailed

1    to an Ashland address?

2         A.    Correct.

3         Q.    And do you know if that was a post office

4    box for al-Haramain?

5         A.    Yes, it was.

6         Q.    Could we go to the next page?  Now, I

7    want to refer you to the block here that has lines

8    underneath the transactions.  Do you see that?  111

9    and 114?

10         A.    Yes.

11         Q.    All right.  I just want to establish do

12    you know who put those lines on there, and in this

13    exhibit and through a series of the other exhibits?

14         A.    It -- by Bank of America.  It was explained to me

15    that it was our person that answered the subpoena and gathered

16    all the information, highlighted anything 500 and above.

17         Q.    Okay.  So it's not necessarily anything

18    of significance other than $500 or more?

19         A.    Correct.

20         Q.    Okay.  Could we go to BOA-3.  And is this

21    a statement for that same -- that same account?

22         A.    Correct.

23         Q.    All right.  For the time period?

24         A.    February 1st through February 29th, 2000.

25         Q.    Could we go to page two.  And could you

1    highlight the deposit right here, the wire?

2              Ms. Ingram, are you familiar with

3    generally the history of this account over time?

4    And what I'm referring to here is the how active it

5    was in terms of how much deposit, whether something

6    was a big transaction or a small one?

7         A.   Well, now that I've seen records, yes.  I would say

8    I'm familiar with the account and the activity.

9         Q.   Okay.  All right.  And in this account,

10   there was -- what is represented on February 24th?

11        A.   An incoming wire from Mahmoud El-Fiki for $149,985

12   came into the al-Haramain Foundation account.

13        Q.   Now, that's a rather odd figure.  Do you

14   know why?

15        A.   A lot of times what happens is on the other end they

16   take the wire fee.

17        Q.   So if this was a $15 wire, that would

18   have been $150,000 being wired?

19        A.   That's correct.

20        Q.   Again, with respect to the history of

21   this trans -- this account, was this a significant

22   deposit?

23        A.   It was a significant deposit.  Correct.

24        Q.   BOA-4 please.  Going onto the next month,

25   this is a statement for the next month but the same

1    account?

2        A.   Correct.

3        Q.   Okay.  If we could go down to the debit

4    section, there's -- if we could highlight this

5    block right there.  All right.

6             Under the notation of checks paid for

7    this amount, we see two of them.  One on

8    March 10th, check number 9456.  Do you see that?

9        A.   Yes.

10       Q.   For $131,300?

11       A.   Correct.

12       Q.   And then down below, debit -- another

13   check debit March 13th, check 9624, for $21,000?

14       A.   Correct.

15       Q.   All right.  You were working at the bank

16   at this time?

17       A.   Yes, I was.

18       Q.   And you were familiar with Mr. Sedaghaty?

19       A.   Correct.

20       Q.   Could you tell the jury -- are you

21   familiar with a conversation that you had with him

22   that led up to these two transactions?

23       A.   Yes.

24       Q.   Okay.  Please tell the jury what you

25   recall.

1      A.    I remember that Pete Seda gave the branch a call and

2    asked for a 4:30 appointment with me.  And that he wanted to

3    discuss some business.  And he came into the banking center

4    and talked to me about the options for purchasing traveler's

5    checks.  And I asked him his denomination, the denomination he

6    wanted, our banking center does not handle that volume.  So I

7    gave him suggestions which was go to other banking centers

8    because sometimes they have more on hand than we do, a

9    cashier's check or a wire.  And he said, no, he wanted to make

10    the purchase.

11          So then I brought my operations officer into the

12    conversation.  She said they could be special ordered.

13      Q.    The purchase of what?  Did you say what

14    he wanted to purchase?

15      A.    Traveler's checks.

16      Q.    Okay.  What kind of traveler's checks?

17      A.    American Express.

18      Q.    Did you mention the amount?

19      A.    I told him what we had in our vault.

20      Q.    Okay.  And is it traditional that you

21    have over a hundred thousand dollars in American

22    Express traveler's checks at that time?

23      A.    No.  My banking center's very small.  I wouldn't

24    have had probably no more than ten thousand at that time.

25      Q.    So during this first contact, did I hear

```
 1    you right, you suggested other financial

 2    instruments?

 3         A.   Absolutely.

 4         Q.   Cashier's check?

 5         A.   Uh-huh, correct.

 6         Q.   All right.  And how much would a

 7    cashier's check have cost?

 8         A.   Again, back for 2000, I would have said it would

 9    have been under ten dollars.

10         Q.   And Mr. Sedaghaty said no to that?

11         A.   Correct.

12         Q.   And he wanted what?

13         A.   He wanted to purchase thousand dollar traveler's

14    checks in the denomination of $130,000.

15         Q.   You've already said your branch doesn't

16    keep that kind of money on hand.  Is there a

17    procedure that the bank has where you can acquire

18    that kind of money in American Express traveler's

19    checks?

20         A.   We could special order the traveler's checks.

21         Q.   Do you know if that was one in this case?

22         A.   Yes, it was.

23         Q.   Okay.  Could I show the witness AMX-2?

24    What is this?

25         A.   That's the order of the incoming traveler's checks
```

1    being delivered to the banking center.

2          Q.    All right.  And I see a date of

3    March 7th, 2000.

4          A.    Correct.

5          Q.    That would have been the shipping date?

6          A.    Correct.

7          Q.    Or the order date; do you know which?

8          A.    I don't know which.  I'm sorry.

9          Q.    All right.  And we see down below it

10   though United (Sic) express 130 quantity?

11         A.    Correct.

12         Q.    Thousand dollar denominations.  And we

13   see some serial numbers, 240 through -- ending

14   (sic) in 240 through 369?

15         A.    That's correct.

16         Q.    And then at the bottom totaling $130,000?

17         A.    Correct.

18         Q.    Okay.  And those came to your branch?

19         A.    Yes, they did.

20         Q.    Then if we could push the exhibit over

21   just a little bit more.  Is that your signature

22   there?

23         A.    Yes, it is.

24         Q.    And is that indicating that you, as a

25   branch manager, were receiving 130,000 in

1    traveler's checks?

2        A.    What it's telling us is that in dual custody, two of

3    us put those in the vault.  So, yes, we did receive those.

4        Q.    All right.  And that was because of

5    Mr. Sedaghaty's request?

6        A.    Correct.

7        Q.    Now, if you wanted to order -- is there

8    some magic to the 130,000 figure?  If you wanted --

9    if he had asked you for 150,000, could you have

10   done that?

11       A.    Yes.

12       Q.    So it was his request to limit it to

13   130,000?

14       A.    Correct.

15       Q.    So there at the bank March 9th, did Mr.

16   Sedaghaty retrieve these traveler's checks?

17       A.    I don't believe it was on March 9th, no.

18       Q.    Okay.  Was it the next day, March 10th?

19       A.    There is a debit -- if I could see the debit then I

20   would be able to help you with the date because that is the

21   date he did pick them up, the date we debited the account.

22       Q.    Sure.  Well, first of all, could we go to

23   AMX-1?  All right.  There's a folder in -- being

24   handed up to you.  Could you take a look at that

25   those, Ms. Ingram?

1      A.    Okay.

2      Q.    All right.  What are those?

3      A.    Those are the original traveler's checks that were

4  purchased at the branch.

5      Q.    All right.  And some of them are depicted

6  on the screen here but those are the actual ones.

7  Those serial numbers in the upper right hand corner

8  correspond to the receipt?

9      A.    Yes.

10     Q.    Okay.  If I could show the witness BOA-7.

11 Is this what you were looking for on getting a date

12 as to when Mr. Seda --

13     A.    Correct.  So then on 3-10, the traveler's checks

14 were picked up.

15     Q.    Now, do you remember this transaction?

16     A.    Yes, I do.

17     Q.    Okay.  Could you please tell the jury

18 what you remember about this transaction?

19     A.    I received a phone call asking if the traveler's

20 checks were here and we said, yes, they were delivered.  And

21 we made another appointment for 4:30.  And Pete Seda and

22 Soliman came into the banking center.  We took them out of the

23 vault.  And then we explained that they have to be signed in

24 front of us.  So Soliman at that time signed each traveler's

25 check in front of us.  And we made the debit from the business

1    account to pay for them.

2        Q.    All right.  You said Soliman Al-But'he.

3    There's a chart in the back of the jury there.  Do

4    you recognize -- in the upper right hand corner

5    there's a picture of an individual.  Do you know if

6    that's him or not?

7        A.    I took a passport picture and I documented the

8    passport picture.  To me, that -- that looks like him but I'm

9    not going to say a hundred percent because I've only met him

10   once or twice.

11       Q.    Okay.  But the individual who you thought

12   was Soliman Al-But'he at the bank, what was he

13   wearing?

14       A.    He had on his authentic wear.  So it was like a robe

15   and a covering.

16       Q.    And he was with Mr. Sedaghaty?

17       A.    Correct.

18       Q.    And you saw him sign these things 130

19   times?

20       A.    Yes, I did.

21       Q.    And was Mr. Sedaghaty there as well?

22       A.    Yes.

23       Q.    I showed you that check a minute ago.

24   Before we get back into it, is there -- is there a

25   fee to the customer for -- the handling fee for the

1    American Express traveler's checks?

2        A.   Yes, there is.

3        Q.   What percent is the fee?

4        A.   In 2000, it was a one percent fee of whatever you

5    ordered.

6        Q.   Okay.  So one percent of 130,000?

7        A.   Uh-huh.

8        Q.   $1,300?

9        A.   Correct.

10        Q.   So let's go back to BOA-7.  Is this a

11    check off of that account?

12        A.   Yes, it is.  11561.

13        Q.   Now, it doesn't have -- is this a counter

14    check?

15        A.   Yes.

16        Q.   Okay.  What -- how is this check created

17    and why?

18        A.   We have them at the banking center.  If they don't

19    have their own checkbook with them, we can do a counter check

20    and debit the account.

21        Q.   Okay.  So that represents the payment or

22    -- this debited that account, that 11561 account --

23        A.   That's correct.

24        Q.   -- that Mr. El-Fiki's wire went into the

25    previous month?

1      A.   Correct.

2      Q.   And so 130,000 of Mr. El-Fiki's wire is

3  now coming out by this check?

4      A.   Correct.

5      Q.   So there was still about roughly $20,000

6  of that wire still remaining in the account?

7      A.   That's correct.

8      Q.   I'd like to show you BOA-8 please.  Do

9  you see the date on that check, March 11th?

10     A.   Yes.

11     Q.   All right.  Do you know the circumstances

12 that led up to this -- this check being issued?

13     A.   Well, I wasn't present for this.  But after seeing

14 documentation, I know where the check went.

15     Q.   Okay.  And the person that dealt with

16 this transaction was who?  Is there another bank

17 employee that dealt with Mr. Seda at this time?

18     A.   Helen Moore [phonetic spelling] signed the cashier's

19 check.  Correct.

20     Q.   Okay.  Is Helen Moore -- was Helen Moore

21 a long-term employee of the bank?

22     A.   Yes.

23     Q.   And is she -- where is she today?

24     A.   She's passed away.

25     Q.   But being familiar with banking

1    procedures and looking back -- if we could go back

2    to BOA-4 for a moment.  We see a transaction that

3    actually hit the account March 13th, check number

4    9624, debited on the account for $21,000?

5         A.   That's correct.

6         Q.   Okay.  So it's -- it's the check that we

7    just went -- we just looked at, BOA-8 again, that

8    was used to debit the rest of Mr. El-Fiki's

9    account?

10        A.   Al-Haramain --

11        Q.   I'm sorry?

12        A.   -- Foundation's Account?

13        Q.   Al-Haramain, the account for the El-Fiki

14   wire?

15        A.   That's correct.

16        Q.   All right.  And do you recognize the

17   defendant's signature in the bottom right hand

18   corner?

19        A.   Yes, I do.

20        Q.   And there's some handwriting:  Bank of

21   America, $21,000, in the bottom left hand corner.

22   See that notation?

23        A.   Yes, I do.

24        Q.   For --

25        A.   Soliman.

 1      Q.    Soliman.  If we could go to BOA-9.  What

 2    is this?

 3      A.    This would be a copy of the cashier's check that was

 4    purchased for 21,000.

 5      Q.    All right.  So that $21,000 check issued

 6    to the bank was used to purchase this cashier's

 7    check?

 8      A.    Correct.

 9      Q.    All right.  And it's issued to Soliman

10    Al-But'he?

11      A.    Correct.

12      Q.    And from the al-Haramain Foundation as

13    purchaser?

14      A.    That's correct.

15      Q.    On March 11th?

16      A.    Correct.

17      Q.    And on the back of that check -- all

18    right.  If we could go to the top of that.  Do you

19    recognize the signature at the top as being

20    consistent with Mr. Al-But'he's signature on the

21    signature card?

22      A.    Yes, I do.

23      Q.    And there's some language on the bottom

24    there.  Do you speak Arabic?

25      A.    No, I don't.

1          MR. CARDANI:  Okay.  Neither do I.  We'll get into that

2     in a minute.

3          Okay.  BOA-9-A please.  And could we go to the -- third

4     page?  This has been stipulated as a correct English translation,

5     judge, that -- the Arabic translates:  To be deposited to our

6     account, 10920/6 at the Al-Hijaz street branch on the back of

7     that -- Bank of America check.

8          Q.   (By Mr. Cardani)  Now, Ms. Ingram, at the

9     time of this transaction back in March 2000, how

10    much would it have cost Mr. Sedaghaty to wire

11    transfer this money, 130,000, 150,000, whatever it

12    was, from Oregon to let's say Saudi Arabia?

13         A.   Well, our fees have changed so it's hard for me to

14    remember back in 2000.  But I would have said it would have

15    been $15 and under for a wire transfer.  It's $45 today.

16         Q.   Okay.  And was that one of the -- you

17    said you offered him a cashier's check.  Did you

18    also talk about the possibility of a wire transfer?

19         A.   I remember that, yes.  I gave him options.

20         Q.   Excuse me?

21         A.   Yes.  I gave him options.

22         Q.   He said no?

23         A.   Correct.

24         Q.   I'd like to show you next BOA-19.  All

25    right.  What's this?

1      A.   This is our wire transfer form that we fill out and

2    have the client sign to wire transfer.

3      Q.   So if somebody wants to transfer money

4    internationally, this is the type of form that

5    would be filled out internally by the Bank of

6    America to do it?

7      A.   Correct.

8      Q.   This form is in receipt of an actual wire

9    transfer?

10      A.   Correct.

11      Q.   You're familiar with this document?

12      A.   Yes.

13      Q.   Okay.  And if I could point out a few

14    things.  The individual who signed here on behalf

15    of this international wire is who?

16      A.   Pete Seda.

17      Q.   And that was done when?

18      A.   January 16th, 2001.

19      Q.   And up here where it says:  ID number,

20    Pete's ODL.  What does that mean?

21      A.   That his Oregon driver's license was presented.

22      Q.   And then down below where it says the

23    amount?

24      A.   It was a $5,000 wire.

25      Q.   And two lines down, the individuals

D. Ingram - D

```
 1   involved in this transaction?
 2        A.   Actually, that's the account title.
 3        Q.   Okay.  So Mr. Seda was on this account?
 4        A.   Correct.
 5        Q.   And it's going to?
 6        A.   Can we go down a little further?  It looks like the
 7   bank of Al-Rajhi.
 8        Q.   Oh, yeah.  And where is the bank
 9   Al-Rajhi, do you know?
10        A.   Saudi Arabia it says.
11        Q.   Okay.  If you'd go to the very bottom of
12   this transaction.  All right.  Your signature and
13   Ms. Moore's signatures being involved in this?
14        A.   Correct.  What happens is one has to put the wire
15   on, the second one has to approve the wire.
16        Q.   So is it fair to say then that Mr. Seda
17   was involved in a transaction where funds were
18   transferred internationally from Oregon to Riyadh,
19   Saudi Arabia, in January of 2001?
20        A.   Absolutely.
21        Q.   Through this wire?  And about how much
22   did this cost?
23        A.   15.
24        Q.   BOA-20 please.  Without going into all of
25   the details, is this another international wire
```

1    that Mr. Seda was involved in?

2        A.    Yes.

3        Q.    In June of 2001?

4        A.    Correct.

5        Q.    And how much is being wired here?

6        A.    $1,050.

7        Q.    Okay.  And if we could scroll down a

8    little bit.  Where's Mr. Seda sending money by this

9    international wire?

10       A.    The bank of Al-Rajhi to Saudi Arabia.

11       Q.    And that was a completed transaction?

12       A.    Correct.

13       Q.    Are you familiar with other -- without

14   getting into all the details, are you familiar with

15   other wire transfers, either domestically or

16   internationally, that Mr. Seda was also involved in

17   as a customer of your bank?

18       A.    Yes.

19       Q.    Bear with me for a moment.  If we could

20   go to BOA-5.  I'd like to get to a bank statement

21   of June 1st through June 30th of 2000.  So if you

22   could scroll ahead a little bit.  Okay.

23            Ms. Ingram, this is still the account

24   records for that al-Haramain account, that 11561?

25       A.    That's correct.

D. Ingram - D

1          Q.    Okay.  In June of 2000 -- could we go

2    down to here on June 21st -- was $295,000

3    transferred into this account?

4          A.    It was deposited into that account.

5          Q.    Okay.  Do you know where -- from where?

6          A.    I believe we have an exhibit on where it came from.

7          Q.    Okay.  BOA-12 please.  Are we familiar --

8    are you familiar for preparation of your testimony

9    here another al-Haramain account in the midwest

10   somewhere?

11         A.    That's correct.

12         Q.    Okay.  And it's a different account

13   number in the right hand corner there.  It ends in

14   6549?

15         A.    That's correct.

16         Q.    And we have a statement here May of 2000.

17   But it's in the name of al-Haramain Islamic

18   Foundation, Soliman Al-But'he, but listing that

19   same Ashland address?

20         A.    Yes.

21         Q.    And then the right hand side:  Customer

22   service, Wichita, Kansas?

23         A.    Correct.

24         Q.    On May -- if you could scroll down a

25   little bit.  On May 18th, did funds get deposited

1    to that account?

2        A.   295,000.  Yes.

3        Q.   And then if we could go to the next

4    statement of June 1st in that same exhibit.  All

5    right.  And do we see on the right side here amount

6    of withdrawals and debits?

7        A.   Two hundred --

8        Q.   I'm sorry.  From that same -- it's

9    June 2000, so that's the same Missouri -- Kansas

10   account.  What happened to that money?

11       A.   The 295,000?

12       Q.   Yeah.

13       A.   Came to the Oregon al-Haramain Foundation account.

14       Q.   All right.  So there was a Kansas account

15   in May, got a pile of money that was there for

16   about a month, and then it came out as being a

17   transfer from Kansas to Oregon; is that right?

18       A.   I'm not sure if it was a transfer.  I'm sorry.

19       Q.   Oh, okay.  Or a check?

20       A.   I think it was a check.

21       Q.   Okay.

22       A.   The way it got deposited in Oregon it looks like it

23   was an actual check.

24       Q.   Okay.  All right.  And that was picked up

25   again in the al-Haramain account here, that 11561?

```
 1        A.   That's correct.

 2        Q.   All right.  So that's in June of 2000.

 3   Can I show you BOA-10?  Are you familiar with this

 4   check off of that -- the al-Haramain account here

 5   in Oregon?

 6        A.   Yes.

 7        Q.   And what is this?

 8        A.   He wanted to purchase a cashier's check for

 9   $318,291.47 to First Escrow, Incorporated.

10        Q.   Who's he?

11        A.   Pete Seda.

12        Q.   Okay.  And was that cashier's check

13   issued?

14        A.   Yes.

15        Q.   BOA-17 please.  So this is a cashier's

16   check on that same account in the amount of

17   $318,291.74, June 23rd, 2000, issued to First

18   Escrow, Inc.?

19        A.   That's correct.

20        Q.   And that's the defendant's signature

21   there?

22        A.   Correct.

23        Q.   Okay.  The funds to make this good came

24   from that Kansas transaction?

25        A.   It came from the Kansas transaction into the Oregon
```

1    transaction --

2        Q.    Yes.

3        A.    Okay.  Yes.

4        Q.    BOA-14 please.  Did Mr. Sedaghaty have

5    other accounts at Bank of America?

6        A.    Yes.

7        Q.    One of them in the name of the Arborist?

8        A.    That's correct.

9        Q.    Is this the signature card from the

10   Arborist?

11       A.    Yes, it is.

12       Q.    Mr. Seda here -- looks like he's the only

13   signatory on that account?

14       A.    That's correct.

15       Q.    BOA-15.  On page two of that, was there

16   an international wire issued off that account on

17   April 15th?

18       A.    Yes.

19       Q.    In the amount of 2,000 plus a $30 fee?

20       A.    Correct.

21       Q.    And BOA-16.  What is this?

22       A.    That would be a copy of the wire.

23       Q.    So Mr. Sedaghaty wired $2,000 to where?

24       A.    To the banco (sic) in Albania.

25             MR. CARDANI:  That's all I have.  Thank you.

1          THE COURT:  Cross.

2                    **CROSS-EXAMINATION**

3    BY MR. MATASAR:

4          Q.   Ms. Ingram, you indicated you're familiar

5    with the Wichita account?

6          A.   Correct.

7          Q.   If you could look at BOA-12.  And can't

8    you tell from that account that the deposit into

9    that account was traveler's checks?

10         A.   From the counter credit?

11         Q.   Do you know if -- if the deposit into

12   that account was traveler's checks?

13         A.   I believe there's documentation that shows that it's

14   traveler's checks.  Correct.

15         Q.   So $295,000 in traveler's checks were

16   deposited by Mr. Al-But'he on that day?

17         A.   Can we highlight it?  295,000.  Correct.

18         Q.   Okay.

19         A.   On May 18th.

20         Q.   And isn't it true that in your bank,

21   Soliman Al-But'he would often bring in large

22   amounts of traveler's checks into the Bank of

23   America in Ashland?

24         A.   I have no knowledge of that.

25         Q.   When they came on their appointment,

1    Mr. Al-But'he and Mr. Seda came through the front

2    door.  They made an appointment ahead of time.

3    They were all right out in the open; is that right?

4        A.   Correct.

5        Q.   And Mr. Al-But'he gave you his passport

6    number?

7        A.   Showed me his passport.

8        Q.   Okay.  And they could have taken out cash

9    if they wanted could they not?

10       A.   I wouldn't have had that much cash.

11       Q.   I understand.  But they could have

12   arranged to have that much cash from your bank,

13   could they not, if they had planned for that?

14       A.   I don't believe so.  I'm a very small banking

15   center.  So it would have had to go way above me to try to get

16   cash.  And for the safety of my associates, we couldn't have

17   counted out cash.

18       Q.   But they could have gone somewhere else

19   to get the cash certainly?  There was no credit

20   reason or any -- any problem with their account

21   that wouldn't let them get cash?

22       A.   Correct.

23       Q.   Now, you -- you talked to IRS Special

24   Agent Colleen Anderson about this case did you not?

25       A.   Correct.

1    Q.    And you talked to her twice -- at least

2  two times.   The first time was in 2003; does that

3  sound about right?

4    A.    Correct.

5    Q.    And the second time was in 2005?

6    A.    Correct.

7    Q.    So by the time you had talked to her the

8  second time, you had two years of knowing that this

9  was an important issue to the Internal Revenue

10  Service?

11    A.    Uh-huh.

12    Q.    And didn't you tell her when you talked

13  to her in July that the bank had thousand dollar

14  denominations available on the day that they came

15  in and that the bank did not have to order any?

16    A.    The day that they came in together they'd already

17  been ordered.  So, yes, they were there --

18    Q.    I see.

19    A.    -- in our vault.  Ordered by them.

20    Q.    So did you tell her you had previously

21  ordered them?

22    A.    I don't recall.

23    Q.    And when they got the traveler's checks

24  didn't they say they wanted more traveler's checks?

25    A.    I don't remember them asking for more traveler's

1    checks.

2        Q.   Didn't you tell Ms. Anderson at the same

3    time you told her -- that you didn't have to order

4    any?  That they wanted more?

5        A.   No.  I don't remember that.

6        Q.   And you didn't refer them to another

7    banking center?

8        A.   The first time that Pete came in?  Absolutely.  I

9    referred him to another banking center.

10       Q.   But I'm talking about the time that they

11   came in for the 4:30 appointment to purchase the

12   traveler's checks and your bank closed at 5:00.  At

13   that time didn't you tell them that they wanted --

14   didn't you tell Ms. Anderson that they wanted more

15   traveler's checks?

16       A.   No.  From my recollection, they were ordered, they

17   were delivered the amount that they wanted.  There was no

18   discussion of any of the dollar amount.

19           MR. MATASAR:  Okay.  That's all I have.

20           THE WITNESS:  Okay.  Thank you.

21           MR. CARDANI:  Just very briefly.

22                     **REDIRECT EXAMINATION**

23   BY MR. CARDANI:

24       Q.   If a customer had come in and gotten that

25   kind of cash, cash cash (sic), would the bank

1    require it to be filled -- require to be -- fill

2    out any form reporting that transaction to the

3    Department of Treasury?

4        A.   Yes, they would.

5        Q.   What's that form?

6        A.   Currency Transaction Report.

7        Q.   CTR?

8        A.   Correct.

9        Q.   And what do you have to do there?

10        A.   We have to send it in.  And it's --

11        Q.   Okay.

12        A.   It's identified and the reason why they want it and

13    the type of business.  They have to be a client.

14        Q.   And when do you have to file CTRs?

15        A.   Within 24 hours of the transaction.

16        Q.   And is there a certain limit of cash

17    where it triggers the filing requirement?

18        A.   Not supposed to say.  It's 10,000 or above.

19        MR. CARDANI:  Okay.  You just said.  All right.  That's

20    all I have.

21        MR. MATASAR:  Just one question.

22                   **RECROSS-EXAMINATION**

23    BY MR. MATASAR:

24        Q.   Aren't there sometimes certain rules that

25    are required for cash equivalents as well, like

1    cashier's checks, that sort of -- traveler's

2    checks, that sort of thing?  Are there also

3    reporting requirements?

4        A.   If they bring 3,000 or more in to purchase a

5    cashier's check, yes, we also do a transaction.  And it has to

6    be cash.  If they bought 3,000 or more cash in.

7        Q.   But not traveler's checks?

8        A.   No.

9             MR. MATASAR:  Not -- cashier's checks?  Okay.  Thank

10   you.

11            THE COURT:  Thank you.  You may step down.  The witness

12   is excused.  Call your next witness please.

13            MR. CARDANI:  Kevin Tyrrell.

14            THE CLERK:  Please raise your right hand.

15                      (The witness was sworn)

16            THE CLERK:  Please have a seat.  Please state your name

17   then spell your name for the record.

18            THE WITNESS:  My name is Kevin Tyrrell, T-Y-R-R-E-L-L.

19                          **DIRECT EXAMINATION**

20   BY MR. CARDANI:

21       Q.   Good afternoon, Mr. Tyrrell.

22       A.   Good afternoon.

23       Q.   What's your occupation?

24       A.   I currently serve as a special agent with U.S.

25   Immigration and Customs Enforcement, Homeland Security

 1    Investigations.  I'm a supervisor and special agent right now.

 2        Q.   Where is that?

 3        A.   I work out of our headquarters division at

 4    Washington, D.C. in the illicit finance and proceeds of crime

 5    unit.

 6        Q.   And if you could speak into the

 7    microphone a little bit.

 8        A.   Sure.

 9        Q.   A little bit closer so we can all hear

10    you.

11             Okay.  So you work for what we know as

12    ICE?

13        A.   ICE.  That's correct.

14        Q.   Okay.  There was a merger at some point

15    where ICE came into being?  There was a merger of

16    some sort; is that right?

17        A.   That's correct.  After the creation of the

18    Department of Homeland Security U.S. Customs Service, the

19    investigative arm of U.S. Customs Service and the

20    investigative arm of U.S. Immigration and Naturalization

21    Service was merged together to form ICE.

22        Q.   So customs service and border patrol were

23    part of what became ICE?

24        A.   That's correct.

25        Q.   Are you familiar with another government

1   -- uh, FinCEN?

2       A.   Yes.  In my capacity at headquarters right now as a

3   section chief or supervisor special agent, I supervise our

4   liaison to FinCEN.  FinCEN is the Financial Crimes Enforcement

5   Network.

6       Q.   What does FinCEN do?

7       A.   Well, FinCEN is our financial intelligence unit of

8   the United States.  And what their mission is is to -- is to

9   basically enhance the security of the United States.  They --

10  they do so by deterring and detecting criminal activity and by

11  promoting transparency in the U.S. financial system and also

12  the international financial systems.

13      Q.   All right.  So you're focusing on money

14  and money trails?

15      A.   That's correct.

16      Q.   Are you familiar -- the government's got

17  lots of acronyms -- but CMIR?

18      A.   Yeah.  The CMIR is an acronym for what's known as

19  the report of international transportation of currency or

20  monetary instruments.

21      Q.   Is there a form that people fill out

22  that's -- that Department of Treasury used to put

23  out now?  Well, let me just show you ICE FinCEN-3.

24  Okay.  What's this?

25      A.    This is -- this is the Currency and Monetary

1    Instrument Reporter, CMIR.  This is actually the -- this is

2    the old form which used to be known as Customs form 4790.

3    Since the merger between Immigration and Customs, FinCEN has

4    now taken over the responsibility of analyzing the data from

5    these forms.

6          Customs and Border Protection, which is the uniform

7    division of the Department of Homeland Security, are the ones

8    that still collect the information at the ports of entry.  But

9    FinCEN now analyzes the data from those forms and it's now

10   known as FinCEN form 105.

11   Q.   So is this one of the forms that

12   financial intelligence agencies and law enforcement

13   agencies in the United States uses to track cash

14   and the cash-like instruments in and out of the

15   country?

16   A.   Yes, it is.

17   Q.   Under what circumstances does a form like

18   this have to be filed?

19   A.   This form has to be filled out any time someone's

20   departing or entering the United States with more than $10,000

21   in currency or a monetary instrument.

22   Q.   And what's -- and currency is just cash

23   cash (sic)?

24   A.   Currency would be U.S. -- U.S. currency or foreign

25   currency.

K. Tyrrell - D

1          Q.   And monetary instruments -- other types

2     of monetary instruments that must be covered --

3     reported in one of these CMIRs?

4          A.   There's several different things that fall under

5     different -- fall under the definition of monetary instrument.

6     Traveler's checks are one of them.  Endorsed checks, cashier's

7     checks.

8          Q.   Okay.  And why -- why are things like

9     traveler's checks, American Express traveler's

10    checks, covered by the form?

11         A.   Well, traveler's checks are covered by the form

12    because they're treated the same as cash in most places and

13    they're very difficult to trace.  So that's -- traveler's

14    checks in any form are actually treated as a monetary

15    instrument on this form.

16         Q.   You said they're difficult to trace.

17    How's that?

18         A.   Well, once they're -- once they're issued to

19    somebody, somebody can come in and buy them with cash and they

20    can turn them over to anybody.  And at that point they're --

21    they're -- and once they're used to make a purchase or -- or

22    somebody deposits them or whatever, it's very difficult to

23    determine where they were deposited or used.

24         Q.   Okay.  Are cashier's checks covered by

25    CMIRs?

1      A.   Yes, they are.

2      Q.   Under what circumstance?

3      A.   Cashier's checks, if they are -- if they have been

4  endorsed by the person that is -- where the check is coming

5  from, in other words, if it's their account that they drew the

6  money from, and then they -- once they endorse the back of it,

7  that makes it -- it's a monetary instrument.  Because it can

8  be negotiated without anybody signing it again.

9      Q.   Okay.  So if I'm returning from overseas,

10  and I've got more than $10,000 in cash or

11  traveler's checks, I have to file one of these?

12      A.   Yes.  That's correct.

13      Q.   And what about for leaving?

14      A.   Yes.  When you're departing the U.S., you have to

15  file a Currency of Monetary Instrument Report as well.

16      Q.   Where would I get one of these forms?

17      A.   When you're departing any U.S. Customs and Border

18  Protection officer or CBP officer at the port of entry or

19  international airport can provide you with one of these forms.

20      Q.   Both ways, in and out?

21      A.   In and out.  That's correct.

22      Q.   Where do the forms go after they're

23  filled out?

24      A.   Currently they're actually -- CBP, in some ports,

25  they're able to digitally scan them and send them to a

1    contractor that they have that enters them into a database.

2    But prior to the merger, they were all sent to the U.S.

3    Customs Service Office of Investigations.

4         They would take the original copy of the form and

5    mail it to the Washington National Records Center where they

6    were filed.  So between 1990 and 2003, we can go back and

7    retrieve the original copy of any form, any CMIRs that were

8    filed.  Now we can get a digital copy of them.

9         Q.   And is this available to multiple law

10   enforcement agencies in the United States?

11        A.   Yes, it is.

12        Q.   And intelligence agencies?

13        A.   That's correct.

14        Q.   FinCEN.  All right.  Are you familiar

15   with this form here that's up on the screen, ICE

16   FinCEN-3?  Is this the form as it existed in the

17   month of March 2000?

18        A.   Yes, it is.

19        Q.   I'd like to go over some of the lines

20   here.  You covered a lot of this stuff.  But right

21   here I'd like to highlight that.  So it's this --

22   one same form that has to be filled out for anybody

23   departing from or entering the United States?

24        A.   That's correct.

25        Q.   And then line number 11.  And then down

K. Tyrrell - D

1    below it.  So exported or import?

2        A.   That's correct.

3        Q.   All right.  So if you're leaving the

4    country, you put departed from and then arrive

5    from.  So whoever's transporting the traveler's

6    checks would fill this here?

7        A.   Yes, they would.

8        Q.   And then if they're coming into the

9    United States, it would be over here?

10       A.   That's correct.  Under the imported section.

11       Q.   Okay.  If we could scroll down to like

12   part three.  So is part three where you identify

13   the type of monetary instruments you're

14   transporting?

15       A.   Yes, it is.

16       Q.   So if it was cash, it would be currency

17   and the value in U.S. dollars?

18       A.   That's correct.

19       Q.   And if it was traveler's checks, would

20   that be under "other instruments"?

21       A.   That's where you would put a traveler's check, yes.

22       Q.   There's a reference on the right side

23   that there are instructions -- there are a series

24   of instructions on the other side to this CMIR?

25       A.   Yes.

1      Q.   Is it -- I won't go over them all but

2  does it include instructions that traveler's checks

3  must be reported on these?

4      A.   Yes, it does.

5      Q.   Okay.  And are these forms signed under

6  penalties of perjury?

7      A.   Yes, they are.

8      Q.   All right.  Are you familiar with an I-94

9  in your government service?

10     A.   Yes, I am.

11     Q.   What's an I-94?  If we could go to ICE

12  CBP-1.  If we could go to the next one -- well,

13  there is a certification here for travel by Soliman

14  Al-But'he.  It references an I-94 admission and

15  some CMIRs filed.  Are you familiar with that?

16     A.   Yes.

17     Q.   Okay.  If we could go to page two of

18  that.  All right.  Is this a summary of travel by

19  Mr. Al-But'he on a particular day?

20     A.   Yes, it is.

21     Q.   Okay.  We see Soliman Al-But'he here?

22     A.   That's correct.

23     Q.   Saudi Arabia.  And are these type of

24  records kept through passports indicating when

25  travelers come and leave?

1      A.   Yes, they are.

2      Q.   All right.  So Mr. Al-But'he arrived in

3  the United States on this trip on March 7th of

4  2000?

5      A.   That's correct.

6      Q.   And listed a U.S. address of Ashland,

7  Oregon?

8      A.   That's correct.

9      Q.   He was admitted into the United States?

10     A.   He was.

11     Q.   And then the departure information just

12  below this, five-day trip?

13     A.   That's correct.  He departed on March 12th, 2000.

14     Q.   And the port of departure?

15     A.   He departed out of John F. Kennedy International

16  Airport in New York.

17     Q.   Okay.  And so that would have been when

18  he actually left the United States?

19     A.   That's correct.

20     Q.   Okay.  And flight number?

21     A.   Flight number was 38 on Saudi Arabian Airlines.

22     MR. CARDANI:  ICE FinCEN-1 please.  Judge, if I could

23  just read this into the record.  This is a document that's been

24  received.  It's a certification from the U.S. Department of

25  Homeland Security regarding Soliman Al-But'he al-Haramain

1    Foundation.

2            "Although there is evidence of foreign travel by

3    Mr. Al-But'he on March 7th, 2000, and on March 12th, 2000, search

4    of our database revealed no CMIRs filed by Mr. Al-But'he for the

5    month of March 2000."

6            And that's issued by the unit chief from Financial

7    Investigations Division of -- of ICE on December 3rd of 2003.

8        Q.   (By Mr. Cardani)  Who files an I-94 for

9    entry and departure information?

10       A.   An I-94 is issued by Customs and Border Protection

11   when somebody enters the country.  Basically it admits them

12   into a country.  It's a document which admits them into the

13   country.

14       Q.   Is it based on passport information or

15   what?

16       A.   It's based on passport information or if they carry

17   like a -- a card that they're able to cross the border with.

18       Q.   All right.  So passport records or

19   whatever show Mr. Al-But'he came in and left after

20   five days?

21       A.   That's correct.

22       Q.   Now, at our request did you review a

23   number of documents, ICE FinCEN-2 series, that are

24   CMIRs filed by Mr. Al-But'he on prior occasions?

25       A.   Yes, I did.

1          Q.   And if we could go to ICE FinCEN-4.

2     Okay.  What is this, agent?

3          A.   This is a summary of the CMIRs that we found that

4     had been filed by Mr. Al-But'he.

5          Q.   Okay.  A combination of electronic and

6     also hand information, the forms?

7          A.   That's correct, yes.

8          Q.   Okay.  So what does this depict?

9          A.   This depicts the total number of CMIRs that they

10    found for Mr. Al-But'he which was nine CMIRs.  It gives the

11    CMIR number which -- that's the number that we're able to go

12    into the Washington National Records Center to retrieve the

13    record.  It shows the date that the CMIR was filed by

14    Mr. Al-But'he.  It shows the amount of currency that he

15    claimed on that particular date.  And then it shows the

16    certified copy is the -- whether we were able to find the

17    actual record of the Washington National Center -- Washington

18    National Records Center.

19         Q.   So before these went electronic they were

20    done -- literally physical form maintained?

21         A.   They -- they were maintained physically but they

22    were also entered electronically off of a copy at that time.

23         Q.   Okay.  So when it has a certified copy of

24    a FinCEN that means what?

25         A.   That's a certified copy of the original document

1    that was filed.

2        Q.   Okay.  And the TECS II reference?

3        A.   TECS II reference would be a CMIR that wasn't able

4    to be found within the Washington National Records Center.

5        Q.   But the record reflected that it had been

6    filed by Mr. Al-But'he?

7        A.   That's correct, yes.

8        Q.   Okay.  And since then have we found that

9    -- you brought one of these with you didn't you?

10       A.   Yes.  Line item number six.  We were able to

11   retrieve that record after 2003 when they did the search.

12           MR. CARDANI:  Okay.  Judge, we'll be submitting that

13   later.  It's downstairs.  I forgot to bring it up.  But we'll be

14   submitting that replacement there.

15       Q.   (By Mr. Cardani)  Okay.  Let's take a

16   look at ICE FinCEN-2-A.  Oh, that summary reported

17   three quarters of a million dollars being

18   transported by Mr. Al-But'he?

19       A.   That's correct, yes.

20       Q.   In either cash or traveler's checks?

21       A.   Or some type of monetary instrument, yes.

22       Q.   Okay.  All right.  So is this a completed

23   CMIR?

24       A.   Yes, this is.

25       Q.   For Soliman Al-But'he listing an Ashland,

1    Oregon address?

2        A.    That's correct.

3        Q.    Okay.  And once again we see that

4    language up at the top for individuals departing

5    from or entering United States?

6        A.    That's correct.

7        Q.    And then down below there's a report of

8    transportation of traveler's checks in the amount

9    of 141,600?

10        A.    That's correct, yes.

11        Q.    And then on the bottom Mr. Al-But'he

12    signs that October '97?

13        A.    That's correct.

14        Q.    Can we go to 2-E?  That same series.

15    Another one filed by Mr. Al-But'he, another CMIR?

16        A.    Yes, this is.

17        Q.    Okay.  And if we could scroll down below,

18    see what's reported here.  TC.  Are those -- is

19    that traveler's checks?

20        A.    Yes, it is.  Traveler's checks in the amount of

21    $75,000.

22        Q.    And that would have been the -- what's

23    the month and date on that one?

24        A.    That would have been June of 1999.

25        Q.    All right.  Agent, a few other questions.

1    Are these forms, these CMIR forms, available

2    online?

3         A.   Yes, they are.

4         Q.   All right.  And the Internet's come a

5    long way now.  But do you know if they were

6    similarly available online in March of 2000?

7         A.   I -- I did a check on what's called Web Archive and

8    I was able to find that form from March 2nd, 2000.  It was --

9    it was an archive of the U.S. Customs Service website in March

10   of 2000 where the form was available online --

11        Q.   And --

12        A.   The customs form 4790 at that time.

13        Q.   Pardon me.

14        A.   That's all right.

15        Q.   And are people also able to get these at

16   customs offices at international airports?

17        A.   Yes, they are.

18        Q.   Okay.  So where would you go?

19        A.   At any international airport there's a U.S. Customs

20   Service, now CBP office, within the secure terminal of the

21   international departure area and arrival area where they can

22   retrieve that form for you.

23        Q.   And at JFK, was there a customs office in

24   the international -- international departure wing

25   of the -- wing of the terminal?

1      A.   Yes.

2           MR. CARDANI:  Excuse me for a moment.

3                     (Counsel confer.)

4      Q.   (By Mr. Cardani)  The ones you've

5  reviewed for Mr. Al-But'he that we just talked

6  about, are those for -- all for transportation of

7  cash or traveler's checks coming into the United

8  States?

9      A.   Yes.  Those are all CMIRs where he was entering the

10  United States and declaring these -- the currency or

11  traveler's checks.

12     Q.   And were any found where he had reported

13  taking money out of the United States?

14     A.   No.  We did not find any -- anything where he

15  reported money departing the United States.

16     Q.   In doing some homework coming into court

17  today, did you attempt to determine whether CMIRs

18  were filed by anybody leaving the United States in

19  March of 2000 from JFK airport?

20          MR. WAX:  Objection, your Honor.

21          THE COURT:  Overruled.

22          THE WITNESS:  Yes, I was.

23     Q.   (By Mr. Cardani)  And what was the result

24  of that?

25     A.   What I found was out of JFK Airport in March of

1    2000, there were approximately 431 CMIRs total filed.  And of

2    those 431, approximately 73 of them were filed on outbound

3    flights.

4         Q.   And do you know about how much was

5    reported?

6         A.   The -- of the 73, it was approximately $6.8 million

7    that was declared.

8         Q.   Going out?

9         A.   Going out, yes.

10        Q.   Of JFK in March of 2000?

11        A.   That's correct.

12        Q.   And do you know if any of those were

13   people going to Riyadh, Saudi Arabia?

14        A.   I know that some of them were going to Saudi Arabia.

15   I'm not sure if Riyadh was the city but I know some of them

16   were headed to Saudi Arabia.

17        Q.   But no indication it was Mr. Al-But'he

18   filing -- had filed any of these?

19        A.   No.  We didn't find any evidence that he had filed

20   them.

21             MR. CARDANI:  That's all I have.  Thank you.

22             THE COURT:  Cross.

23             MR. WAX:  Thank you, your Honor.

24   ///                                    ///

25   ///                                    ///

1               **CROSS-EXAMINATION**

2       BY MR. WAX:

3           Q.    Agent Tyrrell, let's start where you left

4       off.  Do you know how many passengers flew out of

5       JFK internationally in March of 2000?

6           A.    No, I don't.

7           Q.    Do you have any idea how many passengers

8       flew out and -- and had more than $10,000 and

9       didn't report it?

10          A.    No, I do not.

11          Q.    Help me out a little bit here.  You've

12      said, I think, that if a person is flying out of

13      JFK or some other airport, and one knows one can go

14      to a customs office to pick up a form -- did I hear

15      you correctly?

16          A.    No.  I just said there are customs officers within

17      the international departure areas of all airports in the U.S.

18          Q.    All right.  I have traveled out of the

19      country many times, including through JFK.  Help me

20      out.  Should I have seen a sign somewhere that is

21      right by an airport terminal or the counter or

22      anything?

23          A.    Every airport is different.  There might be some

24      signs in some airports and in other airports, no.

25          Q.    Okay.  And you don't have any charts or

1   diagrams or photos of any signs at JFK?

2       A.   I don't have any, no.

3       Q.   Okay.  Coming into the country, I've been

4   given forms on an airplane.  Do you understand that

5   that's a standard practice when you're flying in?

6       A.   Well, actually you're giving -- you're given a form

7   on the airplane for the customs declaration.  And on that form

8   it tells you that you have to declare your currency.  And you

9   have to actually get the CMIR when you arrive at the airport.

10      Q.   All right.  I don't recall seeing such

11  forms handed out to people leaving the country?

12      A.   No.  We don't hand out customs declarations when

13  people are leaving because you only have to declare stuff when

14  you're entering the country when it comes to goods and

15  merchandise.

16      Q.   Would you agree with me that there is a

17  potential for confusion among the traveling public

18  about whether or not you need to declare something

19  when you're leaving the country?

20      A.   I would agree with you, yes.

21      Q.   Okay.  Are you familiar with the General

22  Accounting Office?

23      A.   Yes.

24      Q.   Can you tell us what you understand it to

25  be?

1    A.    The General Accounting Office just is a -- is an

2    agency that makes sure that other federal agencies are

3    actually doing what they need to be doing and fulfilling their

4    responsibilities as an agency.

5    Q.    Are you familiar with the report

6    published by the General Accounting Office in

7    September of 2009?

8    A.    No, I'm not.

9    Q.    GAO-09-883, a report involving U.S.-Saudi

10    counterterrorism efforts?

11    A.    No, I'm not familiar with that.

12    Q.    Then I take it you haven't seen the

13    footnote on page 37 which discusses reporting

14    requirements from the U.S.?  And says:  "After

15    having discussed the requirement for reporting in

16    and out of Saudi Arabia, by comparison, each

17    individual arriving in the United States is

18    required to declare monetary instruments such as

19    cash, traveler's checks, or money orders valued at

20    $10,000 or more"?

21         MR. CARDANI:  Excuse me.  Did the witness say he's

22    familiar with this report?

23         THE WITNESS:  I am not familiar with the report.

24         MR. CARDANI:  Then I'd object.

25         THE COURT:  Sustained.

1        Q.    (By Mr. Wax)  Sir, in terms of the CMIR

2   forms that you have discussed, I'd like you please

3   to -- well, we could probably just do this with the

4   FinCEN-4 if we could put that up.

5             In looking through it, am I reading

6   correctly that on June 22, 1999, Mr. Al-But'he

7   filed a report for bringing $80,000 into the

8   country?

9        A.    That's correct, yes.

10       Q.    Okay.  And I guess we do need to go back

11  to the form to figure out where he came from.  So

12  that would be 2-D I believe.  And does that form

13  tell us where Mr. Al-But'he came from on that

14  occasion?

15       A.    Yes, it does.

16       Q.    And where did he come from?

17       A.    Riyadh which is in Saudi Arabia.

18       Q.    All right.  And then on -- going back to

19  FinCEN-4, I'm reading I think that on June 26th,

20  just four days later, there's another form filed

21  showing $75,000 report of him coming into the

22  country?

23       A.    That's correct, yes.

24       Q.    Okay.  Then if we go back to FinCEN-2-E

25  would that tell us where he came from on that

1    occasion?

2        A.    Yes, it does.  It says Toronto, Canada.

3        Q.    And does it tell us where he was going on

4    that occasion?

5        A.    Nashville.

6        Q.    Okay.  And so if we go back to 2-D, is

7    that telling us that on the 22nd, Mr. Al-But'he

8    came from Riyadh and landed at Washington, D.C.?

9        A.    Yes, it does.

10        Q.    And then it appears as though four days

11    later, he had apparently gone to Canada, to

12    Toronto, and reentered the United States, and once

13    again, reported a substantial quantity of

14    traveler's checks?

15        A.    That's correct, yes.

16        Q.    Okay.  And I take it by the absence of a

17    form between those two dates that there was no form

18    found showing that he reported perhaps the very

19    same traveler's checks when he left the country?

20        A.    No.  There was no form found.

21            MR. WAX:  Thank you very much, sir.

22            THE COURT:  Thank you.  You may step down.  Your next

23    witness please.

24            MR. CARDANI:  Your Honor, may I have a moment to confer

25    with some of our staff?

```
 1              THE COURT:  Yes.

 2                        (Counsel confer.)

 3              MR. WAX:  Your Honor, may I take a --

 4              THE COURT:  Yes.

 5              MR. CARDANI:  Judge, could I consult with Ms. Weller

 6   for a moment?

 7              THE COURT:  Yes.  I'm all yeses.  Just keep moving

 8   around calling witnesses and I'm fine.

 9              MR. CARDANI:  The government calls Mr. Kanan.

10              THE COURT:  Thank you.

11              THE CLERK:  Please stop and be sworn.  Please raise

12   your right hand.

13                        (The witness was sworn.)

14              THE CLERK:  Please have a seat.

15              This is the microphone you'll be speaking into.  If you

16   could please state your name and spell it for the record.

17              THE WITNESS:  Raajideen Kanan.  R-A-A-J-I-D-E-E-N,

18   K-A-N-A-N.

19              THE CLERK:  Thank you.  Pouring a glass of water here

20   for you.

21              MR. CARDANI:  Good afternoon.

22              THE WITNESS:  Thank you.

23                        DIRECT EXAMINATION

24   BY MR. CARDANI:

25       Q.   Good afternoon, Mr. Kanan.
```

1        A.    Good afternoon.

2        Q.    Are you okay?

3        A.    Yes.

4        Q.    All right.  Tell us where you're from?

5        A.    Joplin, Missouri.

6        Q.    Okay.  And was there a time that you were

7    a practicing attorney in Missouri?

8        A.    Yes, sir.  Yeah.

9        Q.    Okay.  And going back to the year 2000,

10   were you a practicing attorney in Missouri?

11       A.    Yes, sir.

12       Q.    And did real estate transactions and

13   criminal defense comprise most of your work at the

14   time?

15       A.    Yes, sir.

16       Q.    And did you do a lot of real estate

17   closings, a lot of real estate transactions during

18   your time as a lawyer?

19       A.    Yes, sir.

20       Q.    Did you help close -- acting as attorney,

21   closing on a property at 2151 East Division,

22   Springfield, Missouri?

23       A.    Yes, sir.

24       Q.    And at our request, did you provide files

25   that covered your work in that transaction?

1          A.   Yes, sir.

2          Q.   You've been shown exhibits which have

3     been received as RDK.  And are those your initials?

4     RDK are your initials?

5          A.   Yes, sir.

6          Q.   RKD-1 and RDK-2.  Now we're going to show

7     those electronically.  There's a screen to your

8     right.  All right.  If we could show RDK-1.  And do

9     you recognize this as a letter from your -- your

10    law offices?

11         A.   Yes, sir.

12         Q.   Sent August 9, 2000, to Pete Seda --

13         A.   Yes, sir.

14         Q.   Al-Haramain Islamic Foundation?

15         A.   Yes, sir.

16         Q.   To an address in Ashland, Oregon?

17         A.   Yes, sir.

18         Q.   And it was regarding this particular

19    piece of property?

20         A.   Yes, sir.

21         Q.   And down below, you -- the letter says:

22    "Dear Client Foundation"?

23         A.   Yes, sir.

24         Q.   And enclosed a series of documents.  And

25    are you familiar with those type of documents?

 1    A.   Oh, yes, sir.  That's a standard post-closing

 2 package.

 3    Q.   Did -- and then who's -- at the bottom of

 4 this there's a reference to a Lola Shaw, paralegal?

 5    A.   Yes.  She worked for me several years.

 6    Q.   Page two of this item is a Fed Ex slip.

 7 Does this --

 8    A.   Yes, sir.

 9    Q.    -- show that --

10    A.   Yes, sir.

11    Q.   -- it came within your file as indicating

12 that this was sent to Mr. Seda?

13    A.   Yes, sir.

14    Q.   And then are you familiar with the

15 documents -- prior to coming into court, you

16 flipped through these things and looked these

17 documents over to refresh your memory that they are

18 what they are?

19    A.   Yes, sir.

20    Q.   Okay.  There's one of them -- I need a

21 little help here from Ms. Cooke.  A settlement

22 statement.  While she's getting that -- all right.

23 Can you identify what a settlement statement is,

24 sir?

25    A.   Excuse me?

 1       Q.   What's a settlement statement?

 2       A.   A settlement is where all the numbers -- all the

 3   money amounts are listed, purchase price, any and all charges,

 4   credits, debits, whatever needs to be put on there so that

 5   it's all finalized.  A settlement statement is -- it's called

 6   a HUD-1.  A REG-Z document that's mandatory at all real estate

 7   closings in the United States.  And you have to use it.

 8       Q.   And if we could go -- and that's for this

 9   property.  And if we could go to the very borrow --

10   bottom of that, and there's a figure at the bottom

11   that's due from the borrower?

12       A.   Yes, sir.

13       Q.   All right.  $318,291.74?

14       A.   Yes, sir.

15       Q.   All right.  If we could leave that

16   exhibit and bring up another one, BOA-17, a check

17   we got from the Bank of America.  If we could

18   enlarge that.  Do you know who First Escrow is?

19       A.   Yes.  They're the title company that prepares all

20   these closing documents and takes care of the money and gets

21   every document filed at the local courthouse when it's done.

22       Q.   Did you deal with al-Haramain in Oregon

23   on this transaction to get the funds to close on

24   this property, sir?

25       A.   Yes, sir.

1          Q.    And does this appear to be the cashier's

2     check that was sent by Oregon signed by Mr. Seda to

3     close on this transaction?

4          A.    It sure looks like it, yes.  I mean -- yeah.

5          Q.    Now -- okay.  All right.  If you could

6     look back up at me for a moment now.  RDK-2 is a

7     series of documents including some handwritten

8     notes?

9          A.    Yes, sir.

10         Q.    And you're familiar with those?  You've

11    seen those prior to -- prior to coming into court

12    today?

13         A.    Yes, sir.

14         Q.    Did there come a point in time when you

15    had to talk to people in Oregon to close this deal?

16         A.    Uh, yeah.  It -- it was a little difficult I think

17    for -- there was a little bit of organization problem I think

18    with them.  You know, the title company did the work,

19    everything was going fine.  But it seems like I had to chase

20    them to get the money so they could send it to the title

21    company.

22         Q.    All right.  When you have conversations

23    with people in a real estate transaction and things

24    of the like, do you occasionally write out notes or

25    does your staff write notes that are in the file

R. Kanan - D

1    that you rely on to find out who's saying what in a

2    transaction?

3        A.   Well, my -- it -- it was required during the times

4    that I practiced myself, and I directed any staff to always

5    make notes about telephone conferences or meetings and to

6    place those in a file.

7        Q.   All right.  If we could bring up one of

8    those notes that's been received into evidence from

9    your files, sir.  The top one, if we could stick

10   with that.  Whose handwriting is that, sir?

11       A.   It looks like my paralegal's, Lola Shaw.

12       Q.   All right.  And was it the practice once

13   again for -- did she get involved in taking calls

14   and making notes to the file?

15       A.   Yes.  And that's how she was trained.  Always make

16   notes about phone calls or meetings and leave them in the

17   file.

18       Q.   Okay.  And would that be done -- would a

19   note be -- like this be kept at or near the time

20   that the call was made or the conversation

21   occurred?

22       A.   Oh, yes.  It's always -- it's always contemporaneous

23   because, you know, you forget things so you always got to make

24   a note when it happens.

25       Q.   So what is Ms. Shaw saying here?

```
 1        A.   "6-21-2000.  Oregon office.  Pete okayed everything

 2   for Springfield deal and he is sending the money."

 3            Do you want me to read further down?  I can't read

 4   -- it's down too far on the screen.

 5        Q.   No.  That's okay, sir.  If we could move

 6   a little -- I'm sorry.  Page four of that.  I'm

 7   going to show you another note though.  Do you

 8   recognize the handwriting in this one?  It's up

 9   top.

10        A.   Yes, sir.

11        Q.   Who's that?

12        A.   That's -- that's my paralegal -- that's my secretary

13   -- that's Lola's Shaw's writing.

14        Q.   Okay.  And what is being said here, sir?

15   What's being reflected in this?

16        A.   "6-21-2000."  "TC" means telephone call or telephone

17   conference from Pete.  "Funds will not be transferred until

18   Wednesday or Thursday of next week.  Have First Escrow call

19   RDK," which is me, "when the money arrives."

20        Q.   All right.  And then up a little bit is

21   another log note in that file.  Do you recognize

22   the writing there?

23        A.   That looks like my writing.  That's pretty bad.

24        Q.   Okay.  What's being reflected there, sir?

25        A.   "TC," again, telephone call, "6-21-2000."  And then:
```

"Pete called me and hopefully money will be Fed Exed to First Escrow."

Q.   Okay.  And then the very first page of that, is that also your bad handwriting?

A.   That's my writing.

Q.   All right.  What's going on there?

A.   "6-26-2000" -- that's -- "Suliman (sic) or Soliman," I don't know, "and Pete telephone called me after closing. Okay.  Five to six weeks to get documents."  And that's referring to the closing -- the post-closing package.

You know, it takes a while to get things filed and get everything back from the courthouse and the title company to issue their final title policy.  So, you know, within five or six weeks it was all sent to me and then I prepared that post-closing package with everything and sent it to the client.

Q.   Okay.  And that's what we referred to earlier, that August 9th letter that you sent to Pete Seda out here in Oregon?

A.   Yes, sir.  That has all the documents and everything listed.

Q.   Okay.  Just one other matter.  On page two of RDK-2, there appears to be a copy of a business card.  Is that in your file?

A.   Yeah.  Everything you have just came out of my file.

```
 1        Q.   I understand.  So this says:  Al-Haramain

 2   Islamic Foundation?

 3        A.   Yes, sir.

 4        Q.   And is the card a Soliman Al-But'he as

 5   the Internet committee chairman?

 6        A.   Yes, sir.

 7        Q.   And then there's a note there, Pete Seda,

 8   with -- with a number out here in Oregon?

 9        A.   Yes, sir.

10        Q.   Whose handwriting is that?

11        A.   Well, it's pretty bad.  It might be mine.

12             MR. CARDANI:  Mr. Kanan, that's all I have for you.

13   Thank you.

14             THE COURT:  Cross.
```

**CROSS-EXAMINATION**

```
16   BY MR. MATASAR:

17        Q.   Mr. Kanan, the building purchased was a

18   prayer house was it not?

19        A.   Yes, sir.

20        Q.   And that was for the Islamic community in

21   Springfield?

22        A.   Yes, sir.

23        Q.   And your father was involved in the

24   community; is that right?

25        A.   Yeah.  In those days he was.
```

1    Q.   And that's how you got involved in this

2    transaction?

3    A.   Well, you know, I think so.  I think my dad asked

4    me.  I don't speak Arabic.  I don't know.  But I think my dad

5    asked me and of course -- you know, my dad asked me to help

6    him so --

7    Q.   And you also got paid for this

8    transaction too; right?

9    A.   Yeah.  Probably not near enough now that I think

10   about it.

11   Q.   All right.  It was $3,750; does that

12   sound about right?

13   A.   Yeah.  Yes, sir.

14   Q.   Probably not worth coming here though

15   today though; right?

16   A.   It's tough.

17   Q.   You never met Pete Seda; is that right?

18   A.   You know, I -- I don't recall meeting -- meeting

19   him.  I've tried to remember but I don't recall meeting --

20   Q.   Okay.  And you've gotten no -- no notes

21   in your records or no memory of ever talking to him

22   after you sent the escrow papers in that closing

23   letter; is that correct?

24   A.   Yeah.  I think the only time I talked to him was to

25   get them to send the money.

 1        Q.   Okay.  But then once -- once you sent the

 2    closing papers, and you get it to be looked at,

 3    there was never any further discussions with him?

 4        A.   Well, you know, counselor, usually after a deal is

 5    done people don't want to come back.

 6             MR. MATASAR:  Right.  And -- that's all.  Thank you,

 7    sir.

 8             THE WITNESS:  Thank you.

 9             MR. MATASAR:  Sorry to trouble you.

10             THE COURT:  You may step down.

11             THE WITNESS:  Thank you, your Honor.

12             THE COURT:  Jurors, do you need a health break?  We'll

13    take one.

14             MR. CARDANI:  This witness may be excused, your Honor?

15             THE COURT:  Yes.

16                     (A short recess was held.)

17             THE COURT:  Please be seated.  Please seat the jury.

18                        (Jury present.)

19             MR. CARDANI:  May I call my next witness, your Honor?

20             THE COURT:  Please.

21             MR. CARDANI:  Tom Wilcox.

22             THE CLERK:  Please raise your right hand.

23                     (The witness was sworn)

24             THE CLERK:  Please have a seat.  This is the microphone

25    you'll be speaking into.

1          THE WITNESS:  Okay.

2          THE CLERK:  Please state your name and spell your name

3   for the record.

4          THE WITNESS:  Thomas James Wilcox, W-I-L-C-O-X.

5                       **DIRECT EXAMINATION**

6   BY MR. CARDANI:

7      Q.   Good afternoon, Mr. Wilcox.

8      A.   Good afternoon.

9      Q.   I think the first question that we all

10  have is what's in the suitcase?

11     A.   My files.

12     Q.   Okay.  You're an accountant, sir?

13     A.   Yes, I am.

14     Q.   All right.  Where are you an accountant?

15     A.   Medford, Oregon.

16     Q.   How long have you been an accountant?

17     A.   Graduated with a degree in accounting in 1974.  So

18  since then.

19     Q.   Could you briefly summarize your

20  experience as an accountant?

21     A.   From 1974 to 1979, I worked in Phoenix, Arizona, at

22  the Internal Revenue Service as a revenue agent.  Then I took

23  a job in Michigan with a national firm called Seidman &

24  Seidman, and I was there from 1980 through 1984, as a tax

25  supervisor.

1              Then the next two years, from '84 to '86, I took a

2    job with a regional CPA firm just outside of Madison,

3    Wisconsin, to head up their tax department.

4              In 1986, we moved to California where I'm originally

5    from and I worked for a local firm for a couple years.  And

6    then in 1989, I started my own practice in Danville,

7    California.  And then moved it up to Medford in 1992.

8         Q.   And you've been there since?

9         A.   Yes, sir.

10        Q.   How big a firm is your practice right

11   now?

12        A.   It's me.  And I have a couple assistants.

13        Q.   And back in the year 2000, was it just

14   you?

15        A.   It was myself and one other assistant.

16        Q.   But as an accountant?  Were you the only

17   accountant?

18        A.   I'm the only accountant.

19        Q.   Now, is part of your practice -- have you

20   been involved in doing tax work for tax-exempt

21   organizations?

22        A.   Yes.  The firm I was with in Michigan, Seidman &

23   Seidman, was the largest firm in the state.  We had 90

24   professionals on staff, 30 in the tax department.  I was a tax

25   supervisor.

1          The first year I was there, the -- one of the tax

2   partners put together a nonprofit team.  It consisted of him,

3   myself, and three staff people.

4          The firm processed about 5,000 tax returns and

5   somewhere around 30 or so nonprofit returns.  Since myself and

6   the staff people were new, he took us through a training

7   session where basically he said:  Since you know how to

8   prepare corporate and business returns, you know how to

9   prepare nonprofits.  And then he went through the nuances

10  between corporate tax law and nonprofit tax law.

11         And so the three staff people would prepare the

12  returns.  I would do the detail review.  And then the returns

13  would go to him for signature and out the door.

14  Q.    Throughout your career as an accountant,

15  have you continued to do work for what you call

16  nonprofits?

17  A.    Yes.  In the regional firm in Wisconsin, we did a

18  handful of them.  And the same -- the local firm I worked

19  with.  And once I started my practice in Medford, I -- I've

20  had about five or six nonprofits annually that I prepare tax

21  returns for.

22  Q.    Compared to how many returns overall?

23  A.    I do about 400 total.

24  Q.    So of the -- it's a fairly small

25  percentage of your practice?

1       A.    Yes, it is.  Right.

2       Q.    What's -- explain to us what the

3  difference is between a nonprofit company and a

4  for-profit company vis-a-vis tax returns?

5       A.    Okay.  A for-profit company is going to have income,

6  expenses.  If there's a net income, they're going to pay some

7  income tax.  In the nonprofit arena, if you have income and

8  expenses -- and if there's net revenues left over, they

9  generally do not pay income taxes on that.  There are

10 circumstances where they can pay some tax on it but the

11 nonprofits I have dealt with always are able to avoid that

12 situation.

13      Q.    So is it a pretty big deal for a business

14 to have nonprofit status?  I'm sorry.  Tax-exempt

15 status?

16      A.    Well, it's generally up to the founders of the

17 organization.  They'll decide that they want -- they want this

18 to be a public charity or some form of charity where they're

19 advancing a public good.  And so then they -- they make the

20 application with Internal Revenue Service.  Internal Revenue

21 Service goes through their application.  And then based on

22 questions and answers that IRS has, they're awarded usually a

23 determination letter which says that you're qualified to

24 operate as a tax exempt as long as you follow the rules that

25 we set out.  And they usually list the rules that pertain to

1    that particular tax-exempt organization.

2        Q.   So, once again, for business, it's a

3    strong financial incentive to earn that status with

4    the IRS?

5        A.   Yes, it would be if that's -- if that's the intent

6    of the organization.

7        Q.   Now, do you know the defendant Pirouz

8    Sedaghaty?

9        A.   Yes, sir, I do.

10       Q.   And how do you know him as?  By name.

11       A.   Pete Seda.

12       Q.   Did you come to represent him at some

13   point in time?

14       A.   Yes.

15       Q.   As an accountant?

16       A.   Yes.  In December of 1999, a lawyer in town referred

17   Mr. Seda to me and I met with him.  And he said there was an

18   organization in Ashland called al-Haramain Foundation.  And

19   they were interested in seeking tax-exempt status with

20   Internal Revenue Service.  They needed the form 1023 prepared.

21   And he engaged me to prepare that form with his assistance.

22       Q.   Did you meet with Mr. Seda?

23       A.   Yes, sir, I did.

24       Q.   All right.  And you said 12 -- December

25   of 1999?

1      A.   Yes.

2      Q.   When you first came to represent him?

3      A.   That's correct.

4      Q.   Okay.  Is it customary in your practice

5   to do what's called an engagement letter?

6      A.   Yes.  Especially with a new client.  They're not

7   required for the type of engagement he had, but when there's a

8   new client, you want to avoid any misunderstanding in what

9   they're paying for and what services you're going to be

10  rendering.

11        So you start with a proposal letter that gives the

12  client an idea as to what work I'll perform, what the fees

13  will approximately be.  And if he's fine with that, as he was

14  in this case, he told me to go ahead and prepare the

15  engagement letter and then he signed the engagement letter.

16     Q.   I'd like to show you what's been received

17  as Defense Exhibit 749-B, as in boy.  There will a

18  screen on your right side in a minute.  And,

19  Mr. Wilcox, it's interactive so you can put your

20  fingers on it if you want to refer to a certain

21  section so we can all see.

22     A.   Okay.

23     Q.   But if I can have 749-B.

24                    (Counsel confer.)

25     Q.   (By Mr. Cardani)  Okay.  Mr. Wilcox, can

1    you see that document that I placed on the screen?

2         A.    Yes, I see it.

3         Q.    All right.  That's 749-B.  Is this one --

4    is this your -- what is this?

5         A.    This is the proposal letter where I've detailed

6    various services that I can offer.

7         Q.    All right.  So over here, this is a

8    letter that you issued at the end of 1999?

9         A.    Yes.  I e-mailed it to Mr. Seda.

10        Q.    Okay.  All right.  "As a follow up to our

11   recent conversation, I am submitting some

12   information that you may find helpful --" oh, did

13   he say that he represented any kind of business

14   organization?

15        A.    Al-Haramain Foundation.

16        Q.    All right.  And so he wanted you to do

17   the 1023s and --

18        A.    Yeah.  He wanted the 1023 done for al-Haramain

19   Foundation.  Right.

20        Q.    Okay.  So this is based -- you would have

21   had a meeting with him and this is the letter that

22   would have been generated after that meeting?

23        A.    That's correct.  Right.

24        Q.    Paragraph one:  "Preparation of form 1023

25   and four to apply for status as a nonprofit

1    foundation, including an initial meeting of two

2    hours.  I would estimate that the preparation of

3    the application would take an additional two hours.

4    At my billing -- hourly billing rate of $75, the

5    fee for this service would be $300."  Is that what

6    you were charging at the time?

7         A.   That's correct.  Right.

8         Q.   Number two:  "Review of accounting

9    system.  This is done initially to ensure the

10   accuracy and reliability of the system.  It is done

11   in connection with the preparation of the income

12   tax returns to keep my time as efficient as

13   possible.  My hourly billing rate for this service

14   is $50 and this will normally take one to three

15   hours.  Therefore the maximum fee would be $150."

16        Tell us what you're saying here?  To

17   minimize the -- the amount of your time, what are

18   you meaning by that?

19        A.   What you try to do with every client, and especially

20   a nonprofit because their budgets are very tight, and you try

21   to push down as much as possible to the client level so that

22   they're doing the data entry, they're entering the checks, the

23   deposits.  And if they've got someone -- someone onsite who

24   can do the bank reconciliations, that's ideal also.

25        That enables them to do the work so when the work

1  comes to the accountant, the bill that they pay, they get more

2  bang for their buck by the accountant just working on the

3  professional end of it rather than the bookkeeping and

4  administrative end of it.

5      Q.   All right.  Is that especially true for

6  nonprofits and tax exempts?

7      A.   Yes.  Especially because, as I said, their budgets

8  are usually very tight.

9      Q.   Okay.  And so far you've talked about a

10  couple of brief meetings to do the 1023 for $300.

11  Review of an accounting system.

12          And then paragraph three:  "Preparation

13  of income tax returns.  It normally takes about

14  three to four hours to prepare nonprofit tax

15  returns.  Therefore the maximum would be $300 per

16  year."

17          Now, I thought a nonprofit doesn't file

18  an income tax return?

19      A.   Okay.  It's actually called an information return.

20  But if you say information return to most clients, they don't

21  understand what you're talking about.  When you identify it as

22  a tax return then they understand what you're talking about.

23  So that's just done for -- basically communication purposes so

24  they understand what's going on here.

25      Q.   All right.  And then you reference some

```
 1    work in maybe '98 and 1999.  But this is already
 2    the end of 1999, you're almost -- you're one day
 3    away from the year 2000?
 4         A.   That's correct.  Right.
 5         Q.   But this is when he first came to you?
 6         A.   That's correct.  Right.
 7         Q.   All right.  I'd like to move on and show
 8    you 750.  All right.  So is this what you call a
 9    proposal letter?
10         A.   No.  This is the engagement letter.  We just looked
11    at the proposal letter.
12         Q.   Okay.  So take us through this.  What are
13    you saying here?
14         A.   Okay.  I'm telling him that I'm going to prepare the
15    forms 1023 from information that he provides me with.  Number
16    two, I will analyze and review your accounting system to
17    ensure its accuracy and reliability.  I shall discuss with you
18    any areas of concern that come to my attention.  And then from
19    the information he provides, I'll prepare the '98-'99 returns
20    with IRS.
21              And then I always have a caveat here that I want the
22    client to understand that my engagement cannot be relied upon
23    to disclose errors, irregularities or illegal acts, including
24    fraud or deletations (sic) that may exist.  However, if I come
25    across any material areas like that I'm going to inform him.
```

1       Q.    Okay.

2       A.    And then -- and then just the fee for my services.

3   That's it.

4       Q.    Okay.  And all right.  And then at the

5   bottom, you recognize the defense -- the signature

6   of the defendant on the bottom as approving this?

7       A.    Yeah.  That's Mr. Seda.  Right.  That's his

8   signature.

9       Q.    Okay.  So at this point in time -- at

10  this point Mr. Seda is your client?

11      A.    Correct.  Right.

12      Q.    And about how many clients did you have

13  at this time?

14      A.    Oh, back then I would guess probably somewhere in

15  the low 300 range.

16      Q.    And, again, you were the only accountant

17  there?

18      A.    Yes.

19      Q.    All right.  So you mentioned that you

20  were going to prepare a 1023.  And is that the

21  application that you used to get tax-exempt status?

22      A.    Yes, it is.

23      Q.    And did you prepare that for him?

24      A.    Yes.  I met with him -- a lot of the questions on

25  the 1023 have to be answered -- you have to sit down with a

 1    client and get the answers to them because some of it might be

 2    accounting work that he'll give you, that sort of thing.  But

 3    a lot of the questions you just have to go over the names of

 4    directors and it's -- that's just -- that's just the process.

 5    You're going to have to meet with him and go over it.

 6            So, yeah, I met with him.  We went over it.  He

 7    provided me with some information.  And we prepared it that

 8    way.

 9    Q.    And is that typical in accounting

10    practice that -- to do returns and file information

11    with taxing authorities that you work with the

12    client to get the information?

13    A.    Oh, certainly.  That's -- that's the only way you

14    can get the information is to get it from the client.

15    Q.    And is there a relationship that

16    establishes over time that's based on trust?

17    A.    Yes.  As far as the engagement letter goes, that's

18    the only one that I ever asked him to sign.  After that, it

19    was just done verbally.  He would ask me to -- to do something

20    and I'd agree to do it, get the workup done, I billed it, and

21    he paid it, and the process just goes along like that.

22    Q.    All right.  I'd like to show you IRS-3.

23    And if we could go to the second page of that

24    exhibit.  All right.  Is this -- if we could go to

25    the very bottom of that first.  Sorry.

1              So is this the 1023 you prepared --

2     prepared for Mr. Seda?

3          A.   Yes, it is.

4          Q.   Now, it's dated 12-31-99?

5          A.   Yes.

6          Q.   And that first proposal letter was dated

7     the day before?

8          A.   Right.

9          Q.   So this happened very quickly?

10         A.   I -- actually what had happened, we met probably a

11    few days -- actually a few days before that proposal letter

12    went out.  And we went through -- he had called me on the

13    phone and told me what he wanted to accomplish for

14    al-Haramain.  He wanted to get tax-exempt status filed.  So I

15    had a bunch of the forms from the 1023 prepared and we

16    actually spent a couple hours going through it at that first

17    meeting even before he received the proposal letter, even

18    before the engagement letter.

19         Q.   And is that typical in registering a

20    nonprofit with IRS to spend that kind of time, two

21    to three hours, with a client so that you can do

22    the 1023?

23         A.   Yeah.  And the 1023s I've done in the past, I

24    usually need at least two hours to go through all the

25    questions with them.

1      Q.   All right.  And do you audit books or

2   gather records or anything like that in support or

3   the 1023 or are you taking the client's word here?

4      A.   Okay.  Whatever information the client gives us,

5   gives me, at that -- I put that on the 1023.  There's no need

6   to do the audit -- any audit at this point.  I was never

7   engaged in doing an audit for Mr. Seda.

8      Q.   Okay.  And when I mean -- not necessarily

9   audit, I know that's a formal accounting word, but

10  just like request a bunch of backup documentation?

11     A.   No.  You wouldn't need that for the 1023 because you

12  either get the accounting or he'll give you estimates, and

13  you're allowed to file the 1023 with projections or estimates.

14     Q.   And that's what you did here?

15     A.   That's correct.  Right.

16     Q.   All right.  Let's go to the top of that.

17  Let's go over some of the information.

18          So application for recognition of

19  exemption under 501(c)(3).  What's that?

20     A.   That's a section out of the Internal Revenue Code

21  that is one of the governing chapters for tax-exempt

22  organizations.

23     Q.   All right.  And so this is a form that

24  you filled out for al-Haramain Islamic Foundation,

25  Inc.?

1    A.    Right.

2    Q.    And the main contact was Pete Seda.  The

3    website address, 1-E, where'd you get that from?

4    A.    Mr. Seda gave that to me.

5    Q.    As the website address of his foundation?

6    A.    Yes, sir.

7    Q.    Then go down a little bit, number eight.

8    Is the organization required to file form 990?  And

9    you checked yes.

10    A.    Yes, I did.

11    Q.    And under what circumstances does -- does

12    an organization like Mr. Seda's have to file these

13    990s?

14    A.    Well, if it's a church, it doesn't have to file a

15    990.  If it gets to 501(c)(3) as a nonchurch public charity,

16    then it has to file a 990 if it's over 25,000.

17         What I normally do on this, they wanted to try to

18    qualify as a church but just in case they didn't, that's why I

19    checked the box yes.

20    Q.    Okay.  All right.  And paragraph four on

21    -- if we could go a couple more pages in.  Okay.

22    And the registered officers and directors included,

23    this Aqeel al Aqeel, Mansour al-Kadi, Soliman

24    Al-But'he, and Mr. Sedaghaty; right?

25    A.    That's correct.  Right.  He gave me those names and

195

T. Wilcox - D

1    addresses.

2        Q.   Okay.  Now, there's a bunch of figures

3    towards the end of it about revenues and expenses

4    and things like that.  And there's all these

5    figures entered in.  Here they are right here.

6    Thank you.  All right.

7            So you've only met your client a few days

8    earlier.  You spent, you say, a couple of hours

9    talking to him?

10       A.   Yes, sir.

11       Q.   Okay.  And is that the sum total of the

12   work you did to prepare this?

13       A.   I'm sorry.  Sum total of what?

14       Q.   Is that the sum total of your efforts in

15   getting information to prepare the return?  In

16   other words, where did these figures come from?

17       A.   Oh, okay.  Yeah.  He gave these to me.

18       Q.   And if we could just scroll down, there's

19   a number of other figures.  But Mr. Seda gave you

20   these?

21       A.   Yes.  Yeah.  He had an accounting done for the '98

22   and '99, and so we got some of it off of there.  And then on

23   some of it, like the line 15 entry there, those -- the one for

24   '98, the 5,000, that was an estimate on his part.  The rent,

25   line 20, the rent, 4,600, that was an estimate on his part

1    also.

2         Q.    Okay.   And then if we could go further

3    ahead to page 12.   Oh, thanks.

4              Down at the bottom here, number 16 talks

5    about all members of the foundation are volunteers.

6    No one receives any form of compensation.   No

7    official pastor or minister?

8         A.    Uh-huh.

9         Q.    So, again, for Mr. Sedaghaty --

10        A.    Yes.   Mr. Seda -- well, when I went through the

11   question that's what he told -- that was the answer he gave

12   me.

13        Q.    All right.   So let's -- so this is

14   prepared by you, Mr. Seda signs it, and off it goes

15   to the IRS?

16        A.    That's correct.   Right.

17        Q.    Did you later get a letter from the IRS

18   approving al-Haramain as a tax-exempt organization?

19        A.    Yes.   And -- we finally did on December 7th, 2000.

20   It was an advanced ruling where they -- they recognized it as

21   a 501(c)(3) public charity but not a church.

22        Q.    Okay.   What does that mean?

23        A.    Well, for a public charity -- the designation that

24   IRS gave them was that they -- there's a 33 percent test that

25   they were going to have to pass.   And what it means is that at

T. Wilcox - D

 1    least a third or more of its donations must come from

 2    individuals or governmental units.

 3        Q.   Okay.  So the bottom line is the IRS

 4    determined or -- was not deemed a church, it was

 5    deemed as a something else --

 6        A.   A public charity, right.

 7        Q.   A public charity.  But they were tax

 8    exempt?

 9        A.   That's correct.  Right.

10        Q.   And then -- okay.  So that's what you're

11    looking for?

12        A.   That's right.  Yes.

13        Q.   Okay.  So did this -- there was some back

14    and forth with the IRS that ultimately led to this

15    initial ruling?

16        A.   Uh-huh.

17        Q.   Yes?

18        A.   Yeah.  What you do when you submit a 1023 is -- what

19    I do, I go down the IRS procedural checklist.  And I go

20    through and I check off everything on there that IRS says to

21    attach to the 1023.  That gets mailed in.  Then the next step

22    is you'll get a letter from IRS saying they've received it,

23    and within six months someone will contact them if they have

24    more questions.

25              And so then Jennifer Nickelen [phonetic spelling],

1  an agent with the IRS's Portland office, initially contacted

2  Mr. Seda's organization on March 24th of 2000.

3      Q.   Okay.  So --

4      A.   Requesting additional information.

5      Q.   All right.  But there was some back and

6  forth with the IRS but ultimately a letter was

7  issued and I'd like to show you IRS-4.  And could

8  we go to the first page of that document?  And is

9  this the ruling from the IRS?

10     A.   Yes.  This is the advanced ruling.  Right.

11     Q.   Okay.  So it was received al-Haramain,

12  care of Thomas Wilcox, Medford?

13     A.   Yeah.  This -- during the process, Agent Nickelen

14  wanted -- so that she could talk to me about them, Mr. Seda

15  had to sign a tax power of attorney for me to represent them.

16  So this is my power of attorney copy.  A copy of this advance

17  ruling also goes to the taxpayer at the Ashland address.

18     Q.   Okay.  And so there's a reference here to

19  the advance ruling period beginning February of

20  '99?

21     A.   Right.

22     Q.   And an advance ruling period ends

23  December of '03.  What does that mean?  What's that

24  four-year period for?

25     A.   Okay.  It means that during this advance ruling

1    period, if people make donations to the charity, there will be

2    tax deductible.  However, eventually IRS will come along,

3    they'll do an audit, and after the advance ruling period, if

4    they determine that they haven't met the public charity test,

5    IRS can then reclassify the organization as a private

6    foundation.

7         Q.   Okay.  So this is sort of like a

8    probationary period, would that be a fair --

9         A.   That's a good way to describe it.

10         Q.   Okay.  And so donors now so -- so if you

11    were to give money to Mr. Seda's organization at

12    this time, with this advance ruling, you could

13    deduct that on your own tax return?

14         A.   That's correct.  Right.

15         Q.   Okay.  So there's a benefit to the donor

16    and then the organization itself that pays no taxes

17    on it as income?

18         A.   That's correct.  Right.

19         Q.   All right.  So the IRS says that they've

20    determined that you are exempt, speaking to

21    al-Haramain, from federal income tax, and then down

22    below:  "Because you are a newly created

23    organization, we are not now making a determination

24    of your status under the code, however, you can

25    reasonably expect to be a publicly-supported

1    organization described in the code."

2         If we go to the next page, at the very

3    bottom, there's a reference to requiring the form

4    990 there.  So this is that informational return

5    you talked about earlier?

6         A.   That's correct.  Right.

7         Q.   Okay.  So they don't pay like an income

8    tax return like most businesses do, they file this

9    990?

10        A.   That's correct.  Right.  Yeah.

11        Q.   And that's just giving IRS what through

12   that 990?

13        A.   Okay.  On the 990, they'll report the assets and

14   liabilities of the organization and they'll also show the

15   income sources that they've had plus the expenses against it.

16        Q.   Okay.  So by an informational return,

17   who's that information provided to?  When a 1040 is

18   filed by an individual taxpayers it's a very

19   private document; right?  You can't go on the

20   Internet and get everybody's 1040?

21        A.   Right.  Yeah.

22        Q.   Is this different?

23        A.   Yes, it is.  The 990 is a public document.

24        Q.   Okay.  So the next page of this ruling

25   here:  "You are required to make --" down here.

T. Wilcox - D

1    "You are required to make your annual information

2    return, form 990, available for public inspection

3    for three years after the letter date."

4            So it was in anticipation here that any

5    information that goes on the 990 would be available

6    to anybody?

7       A.   Yeah.  It's -- it's available to anybody.  They have

8    to make it available.

9       Q.   Okay.  And at the bottom it talks about

10   some record keeping.  "This determination is based

11   on evidence that your funds are dedicated for the

12   purposes listed in the code.  To assure your

13   continued exemption, you should keep records to

14   show that funds are spent only for those purposes.

15   If you distribute funds to other organizations,

16   your records should show whether they are exempt

17   under 501(c)(3)."  What does that mean?

18      A.   All they're doing here is they're just saying that

19   if there's -- if you're making donations to another public

20   charity, you just have to document -- there's got to be a

21   paper trail from your organization to the other organization.

22      Q.   If -- okay.  And do those paperwork

23   requirements last if you're giving from one tax

24   exempt to another as opposed to a tax exempt to

25   something else?

1        A.    I'm sorry.  I lost your question please.

2        Q.    Well, let me state it this way.  There's

3   another line here that runs over to the next page.

4   It says: "In cases where the recipient

5   organization is not exempt under 501(c)(3) --"

6   that's -- so whoever's getting money?

7        A.    Uh-huh.

8        Q.    "You must have evidence that the funds

9   will remain dedicated to the required purposes and

10  that the recipient will use the funds for those

11  purposes."  All right.  So what's that -- what's

12  going on there?

13       A.    Okay.  He's saying that when it -- if it goes to

14  another organization, and they're not exempt under 501(c)(3),

15  then you're going to have to come up with some records to

16  prove that the money that got spent out there was for the

17  public charity purposes for which IRS approved this advance

18  ruling.

19       Q.    So would a check be good enough for a

20  record like this?

21       A.    No.  A check is just -- you really need something

22  beyond the check.  IRS usually requires a cancelled check and

23  then a receipt or an invoice or some sort of vendor

24  documentation.

25       Q.    Okay.  So the record keeping is more

```
 1    important if you're giving to another organization
 2    that's not tax exempt under the code?
 3         A.    Exactly.
 4         Q.    Like overseas distributions, things like
 5    that?
 6         A.    Yes.  Anything like that, the organization would
 7    have to prove how the money was spent so that the IRS can
 8    determine whether it was spent for the tax-exempt purpose
 9    under which the advanced ruling was issued.
10         Q.    Now, did you have any discussions with
11    your client about these record keeping
12    requirements?
13         A.    Yeah.  What was refreshing about the first meeting I
14    had with Mr. Seda is that he -- he emphasized the need that he
15    wanted clean and accurate records.  And he felt that -- well,
16    his comments were that because he was Muslim, he said the U.S.
17    government assumes we're all bin Laden followers.  And I know
18    my phone's been tapped for the last ten years.  And so it's
19    not a question of if we're ever audited by IRS, it's a
20    question of when we'll be audited.
21              So I knew based on that that this would be a good
22    client to work with because he had -- he had the right
23    attitude towards taxes.  And so I went into cancelled checks,
24    vendor invoices, documentation outside -- outside of the --
25    outside of the checks, to prove an expenditure.
```

1      Q.   So -- all right.  You said that was

2  refreshing that he was sensitive to these record

3  keeping requirements or what?

4      A.   Well, it was refreshing that he came forth and said:

5  I want records that are clean and accurate.  So that's --

6  that's a good person to work with.

7      Q.   Okay.  And did that help you cement a

8  level of trust in the accuracy of information that

9  he would be reporting to you orally?

10      A.   Oh, definitely.  Yeah.

11      Q.   All right.  So let's -- moving ahead a

12  little bit to the years '99 and 2000, did you work

13  towards moving to prepare these 990 returns for

14  al-Haramain in Oregon for the years '99 and 2000?

15      A.   Yes.  Yes, I did.

16      Q.   Where did you get your information from

17  to do the 990s?

18      A.   I got it from Mr. Seda.  Let's see.  Let me -- give

19  me a minute here please.  Yeah.  For the '99 return, he did

20  not get that information to me until May 16th of 2001.

21      Q.   Is that late?

22      A.   Yes.  I had warned him that the '99 return would be

23  due May 15th of 2000.  And so each time I'd warn him about it,

24  he said he was working on it.  But, you know, he never sent me

25  anything.

1           So finally in -- on May 16th of -- oh, yeah.

2    May 16th of '01, he gets the '99 information to me with some

3    of the 2000 information.  So then I went through the --

4    through the '99 information.  And on May 30th, I had some

5    questions for him.  He answered my questions.  And we had the

6    return completed by June 14th ready for him to sign and submit

7    to IRS.

8           Q.    But it was late?

9           A.    Yes, it was over a year late.

10          Q.    Okay.  Well, but -- all right.  But he

11   didn't even come to you until the end of '99?

12          A.    That's right.  He came to me in December of '99.

13          Q.    Okay.  And so you've talked about some --

14   you said you warned him.  Was this -- did this

15   become a repeated occurrence or a pattern where you

16   were -- he was dilatory in getting you records?

17          A.    Yeah.  It was because when -- what I first did is I

18   went through his '98 records and he gave me some printouts.

19   When I compared those printouts to the bank statements, they

20   didn't match.  Only a small portion matched.  So I could see

21   that the accounting was woefully inadequate.

22          And so I -- I pointed out that we've got to get this

23   cleaned up.  That he needed to make sure that the bank

24   statement and the information he has on his printouts matched

25   with the bank statement.  And I think he tried that process,

1    but then eventually he gave all the checks and deposits to me

2    and we entered it on a computer accounting system that we had

3    at the office.  And that's how I got the '98 out.

4            Then -- then I recommended that he buy a program

5    called QuickBooks to input the '99 and 2000 information.  So

6    that's -- that's what he did.  And that was the information he

7    got to me.  Let's see.

8        Q.   So did that --

9        A.   Okay.

10       Q.   That's a long process.  You just said a

11   lot.  Did that whole thing take a lot of time in

12   terms of reviewing his accounting records and then

13   getting this QuickBooks thing purchased?

14       A.   Yeah, it did.  It took a while.

15       Q.   Now, your initial engagement letter

16   talked about estimating a three- to four-hour

17   process to prepare these 990s.  Was that the case

18   here?

19       A.   No.  That -- that's in the preparation of the 990.

20   The problem that he had was that he didn't have any of the

21   accounting done.  For us to get involved in the accounting --

22   for me to get involved in the accounting work was going to

23   cause -- cause additional fees and additional time.  And

24   that's pretty much what happened.

25       Q.   Okay.  Did the QuickBooks end up getting

 1    up and running at al-Haramain?

 2         A.   Yes, it did.

 3         Q.   All right.  And tell us -- did you

 4    actually visit the al-Haramain building and train

 5    anybody in how to use QuickBooks?

 6         A.   Yes.  I trained -- there were two women out there.

 7    One was named Laleh and the other was named Summer, and I

 8    trained them on how to make -- how to record checks, how to

 9    record deposits.  And I did train them on bank reconciliations

10    but they -- they never -- they would enter the deposits and

11    checks.  But they never did the bank reconciliations

12    themselves.

13         Q.   So you did visit the house though?

14         A.   Oh, yes.  I was there probably four or five times.

15         Q.   Okay.  Was that 3800 Highway 99 in

16    Ashland?

17         A.   Exactly.

18         Q.   Okay.  We've prepared a diagram.  It's

19    SW-64 of this.  And were there times -- during the

20    times that you went to visit the al-Haramain

21    building to help them with their accounting and tax

22    preparation, what office -- would you go upstairs

23    or downstairs?

24         A.   You would enter the house from upstairs and then you

25    would walk downstairs into where their office and computers

```
 1    were at.
 2         Q.   Okay.  And so what -- is it room X here?
 3    I'm going to blow up a room here.  Downstairs
 4    office room X.  Is that where you went?
 5         A.   Yes.  Yes, sir.  Went in here.  Right.
 6         Q.   So the few -- how many times do you think
 7    you were here?
 8         A.   Four times I would say probably.
 9         Q.   So when you were there -- when you were
10    there, was Mr. Seda there?
11         A.   Yes.  He was usually there every time that I was
12    there.
13         Q.   Okay.  And you mentioned two women, Laleh
14    and Summer?
15         A.   Yes.  That's right.
16         Q.   And were they there as well?
17         A.   Yeah.  Because two of the meetings were specifically
18    with them to show them how to do the QuickBooks work.
19         Q.   Okay.  So is it a fair statement to say,
20    as far as you knew, this is where al-Haramain was
21    run from?
22         A.   That's correct.  Right.
23         Q.   Financially?
24         A.   Okay.
25         Q.   Now, during the times you saw Mr. Seda
```

T. Wilcox - D

1    there was he on any particular computer in this

2    downstairs office?

3        A.    Yeah.  He was over at the one on the right hand side

4    here.

5        Q.    Okay.

6        A.    The other computer was the one that they had loaded

7    the QuickBooks on and that's where I worked with the two

8    women.

9        Q.    Okay.  I'm sorry.  Which was one was

10   that?  Which one was that?

11       A.    This is the one that you have here, Seda-Ten, that

12   one is where the QuickBooks program was leaded on.  And I

13   worked with the two women on -- and teaching -- training them

14   on the QuickBooks on that computer.

15       Q.    Seda-Ten.  What about Seda-Eight and

16   Nine, why is that marked?

17       A.    Because I saw Mr. Seda working over there on that

18   one.

19       Q.    Okay.  On more than one occasion?

20       A.    Uh, at least once.  Maybe twice.

21       Q.    All right.  And then there's one in the

22   back there, Seda-Six, ever see anybody on that?

23       A.    No.

24       Q.    All right.  Now, so you worked with them

25   in helping them implementing this QuickBooks and

T. Wilcox - D

1    bookkeeping system.  Was it a little bit easier to

2    do your work as an accountant to prepare the

3    returns in the future?

4         A.   Yes.  Because once all that data input is done then

5    all they required of me was the bank reconciliation.  Then I

6    would make the accounting adjustments.  And from that we would

7    prepare the tax return for them.

8         Q.   All right.  We've talked about the 1999

9    one but I want to move into the year 2000.  Did you

10   also prepare a 990 for that year?  And I refer you

11   to IRS --

12        A.   Yes, I did.

13        Q.   -- 3.  Okay.  If we could go to the

14   first page of that.  I'm sorry, IRS-1.  Okay.  Is

15   this it?

16        A.   Yes.  That looks like it.

17        Q.   You prepared this for Mr. Seda?

18        A.   Right.  Yes.

19        Q.   Now, prior to filling this one out, once

20   again, how did it get -- how did you get the

21   information that led to the preparation of this

22   return, sir?

23        A.   Okay.  He e-mailed me a QuickBooks disc on May 14th

24   of '01 that contained a lot of the 2000 information.

25             Now, in June -- on June 14th of '01, the '99 return

1   was completed.  Okay?  So now we're moving to the 2000.  And

2   Mr. Seda and I had a conversation and I pointed out to him

3   that he could reduce my fee if he -- if he -- if he could get

4   the bank reconciliations done at his level or done by someone

5   who would charge less than I would.

6           And so at that time he asked for the name of a

7   bookkeeper.  I gave him a name.  And so then I contacted the

8   bookkeeper.  She said she'd take on the engagement.  And then

9   -- with conversations I had with Mr. Seda and Mrs. Bean

10  [phonetic spelling], the bookkeeper, they had made connections

11  but they were having problems meshing their schedules.  She

12  couldn't make it when he was available and back and forth.

13          So then I left it in their hands.  Then in September

14  of '01, I -- I hadn't heard back from either one of them.  So

15  I called Mr. Seda and he said:  I haven't seen her at all.

16  She's never come down here.  So I called Mrs. Bean and she

17  told me quite -- you know, she apologized and said that she

18  wasn't able to take on the work.  That she was just too

19  swamped.

20          So at that point I talked to Mr. Seda.  That we've

21  got to get this thing going on the 2000 return.  And so he

22  then told me to do the work.

23          So I -- so with the QuickBooks information that I

24  had from -- that he sent to me on May 14th of '01, then I

25  would go through and if there were entries missing.  I would

1    input them.  I'd ask Mr. Seda:  What was this expense for?

2    Where did this deposit come from?  Those type of questions.

3    And then he would tell me and I would code it accordingly into

4    the program.

5        Q.   Now, was there some time urgency here?

6    Was this return late?

7        A.   Yeah.  This return was late.  It was -- we had an

8    extension good through September 15th.  But by the time he got

9    back to me it was -- some of the answers were past

10   September 15th.  And so from about September 16th to

11   October 2nd, that's the time frame it took to complete

12   everything.

13       Q.   All right.  And so you got your

14   information primarily from two sources, the

15   QuickBooks and then Mr. Seda?

16       A.   That's correct.  Right.

17       Q.   Did this include bank statements

18   themselves like from the Bank of America?

19       A.   Yeah.  In May he had faxed over the bank statements.

20       Q.   Can I show you --

21       A.   I needed the bank records to do the bank

22   reconciliations.

23       Q.   Okay.  Could you go -- let's go to BOA-3

24   please.  This has been identified as an al-Haramain

25   bank record for February of 2000.  And on page two

 1    of that document, there's a wire transfer on

 2    February 24th from this Mahmoud El-Fiki for almost

 3    $150,000; do you see that?

 4         A.   That's right.

 5         Q.   And did you have records like this

 6    available to you running into the preparation of

 7    the 2000 return?

 8         A.   Well, what I -- what I told him to do was go through

 9    the deposits for the year and make a list and identify the

10    deposits that were donations or -- or if a deposit was from a

11    source other than a donation to identify it.  So he put a work

12    paper together for me on that.

13         Q.   Okay.  And going to the return itself, I

14    don't know the page number but it's the IRS-1

15    towards the end, there's a form here that lists the

16    contributors to al-Haramain for that year.  Here we

17    go.  And, number two, you did indeed pick up the

18    contributor, the El-Fiki one, 149,985?

19         A.   That's correct.  On that work paper that Mr. Seda

20    gave me, he identified that as a donation from this man.

21         Q.   Okay.  All right.  And the so that was

22    reported to the IRS, as far as you know, properly?

23         A.   Yes.  That's right.  Yes, sir.

24         Q.   Now, I want to show you TW-1 please.  All

25    right.  Just identify this thing in general.

1    A.    Okay.  Here's how the process works.  After all the

2   checks and deposits have been entered, then I print out a

3   profit and loss.  Okay?  On the profit and loss it's going to

4   list some income, it's going to list a bunch of expenses, and

5   I go through and I circle the items that I want to examine in

6   detail.

7        This expense here is called reimbursed expenses.

8   And -- let's see here.  I'm pretty certain that the

9   al-Haramain people -- probably the two -- one of the two women

10  had made all these entries.  And it was under reimbursed

11  expenses.  It's really an account that's kind of just a

12  temporary holding account.  And as an accountant, you go

13  through and you need to clean it out and find out, okay, where

14  -- what expense category do these expenses belong in?

15    Q.    Okay.  So this is one of those QuickBook

16  (sic) reports that you told him to get and get up

17  and running to help you do the returns?

18    A.    That's correct.  Right.

19    Q.    Okay.  So this is a report from that

20  QuickBooks program, and there's a reference in the

21  middle to a $21,000 check on March 11th, 2000:

22  Bank of America, Soliman, $21,000?

23    A.    Right.

24    Q.    Now, before getting into any

25  conversations that you had with anybody about that,

 1    you mentioned clean up or something like that.

 2    Break it down for us on this reimbursed expenses.

 3    Is this -- is this a problem as an accountant

 4    running into a return?

 5         A.    Well, no.  All it is -- it's really just a temporary

 6    holding account.  And so now my job was to find out, okay,

 7    we've got five checks here.  What was the purpose behind the

 8    checks and what expense category do they need to be coded to?

 9         Q.    Okay.  And is $21,000 reimbursed expense

10    a fairly significant --

11         A.    Yes.  When I -- yes.  It was -- it's obviously

12    significant.  It's the majority of the account.

13         Q.    Okay.  But the size of it too?

14         A.    Yes.  Right.

15         Q.    All right.  So there are some handwritten

16    notes on there.  Whose are those?

17         A.    Those are mine.  That's the journal entry I'm

18    making.

19         Q.    Okay.  And I want to get back to that in

20    a minute.  But did you actually -- referring to

21    TW-4, did you actually get a copy of this

22    particular check?

23         A.    Yes.  Mr. Seda faxed this over to me.  And you can

24    see in the upper left there, May 16th was when he faxed it to

25    me.

1    Q.    All right.  And is it A-3 on the bottom

2    right?  What's that for?

3    A.    That's a work paper cross-reference.  Okay?  A-3 is

4    the bank reconciliation.  Three is the third month.  So it's a

5    bank reconciliation from March.

6    Q.    Okay.

7    A.    And since he had sent this to me, it was part of my

8    work papers.  And I just cross-referenced this to the -- that

9    bank reconciliation.

10    Q.    And the bottom left hand part of that

11    check it says:  For Soliman?

12    A.    Yes.  Right.

13    Q.    Okay.  All right.  If we could go back to

14    that last one then.  TW-1.  Okay.  So there's some

15    coding here and it says minus 21 and then minus

16    five?

17    A.    Uh-huh.

18    Q.    And then minus 26.  Okay.  You made --

19    who made the entry taking that -- making that minus

20    $21,000 or noting that as minus $21,000?

21    A.    Al-Haramain made that entry.

22    Q.    Okay.  Did you have discussion with

23    anybody about this particular check and why it was

24    in this account?

25    A.    Yeah.  I asked Mr. Seda what -- what the $21,000 was

1    for and he told me that this Soliman had made a donation to

2    the organization and then they refunded this -- they paid him

3    back this amount.

4              MR. MATASAR:  I'm sorry.  I didn't hear what he said.

5    He paid it back --

6              THE WITNESS:  Yeah.

7              MR. MATASAR:  To who?  I just didn't hear the words.

8              THE WITNESS:  Okay.  That the organization --

9    al-Haramain paid the 21,000 back to this Soliman.

10        Q.   (By Mr. Cardani)  Okay.  And who told you

11   that?

12        A.   Mr. Seda did.

13        Q.   How is it you remember that?

14        A.   Because on September 24th, I had a meeting with

15   Mr. Seda where I went over some work papers that I had.  I

16   needed answers to them to finish up the QuickBooks accounting

17   so that we could prepare the tax return.

18        Q.   Okay.  And that was filed the next month

19   in October?

20        A.   Yes.  On October 2nd, we finished it.

21        Q.   Okay.  You know about this meeting

22   because -- well, how do you remember that?  That's

23   a long time ago.

24        A.   I have billing records that -- the billing records

25   helped and then there's also an audit trail printout that

1    Agent Anderson showed me, and I could tell from the audit

2    trail when various -- items happened.

3            And I -- I can walk you through the time frame as to

4    what I went over with him, and after answering these

5    questions, how they got into the QuickBooks.

6    Q.    Okay.  We won't get into all the details

7    right now with the other things.  But is it fair to

8    say you talked to him?  You had specific questions

9    about several items?

10    A.    That's correct.

11    Q.    Okay.  Including this particular check?

12    A.    That's correct.

13    Q.    All right.  And he told you this was

14    refunded to Soliman?

15    A.    Right.  Yeah.

16    Q.    Any doubt in your mind about that

17    conversation, sir?

18    A.    Oh, no.  No.  No.

19    Q.    Let's go to -- back to -- I'm sorry --

20    these handwritten notes now.  So based on the

21    conversation, did you also talk to him about the

22    $5,000 where the --

23    A.    Yes.

24    Q.    Okay.  There's a number next to that.

25    All right.  What -- what can you tell us about

1    that?

2        A.    Okay.    Mr. Seda told me that the 5,000 was a check

3    written back to the Arborist because that also was a donation

4    that he had made and he was getting paid back for.

5        Q.    Okay.    So 21 plus five is 26?

6        A.    26,000.    Right.

7        Q.    And then the other one.    So then now what

8    is -- go down here to this number two, contribution

9    income, whose handwriting is that?

10       A.    That's mine.

11       Q.    Okay.    What are you saying there?

12       A.    Okay.    I'm making a journal entry here.    We're going

13   to subtract 26,000 out of the contribution as income that was

14   originally coded by the al-Haramain people in the QuickBooks

15   accounting.

16       Q.    And did that -- did that figure affect

17   the actual return?

18       A.    Well, yes.    Because that would reduce the amount

19   that was reported on page one of the 990.

20       Q.    Okay.    If we could go back to page one of

21   the 990.    Exhibit IRS-1.    So in line 1-A it talks

22   about contributions, gifts, grants?

23       A.    Uh-huh.

24       Q.    Public support, there's a figure of

25   $561,640; is that right?

1    A.    Right.  That's correct.  Right.

2    Q.    Did you put that in there?

3    A.    Yes.

4    Q.    Okay.  And if we could juxtapose the TW-3

5    please.  I forgot to ask about this.  So if we can

6    go down to the bottom of TW-3.  This is a

7    calculation of all the contribution income for that

8    year?

9    A.    Yes, it is.  And if you'll notice right there, the

10   one $26,000 entry, that's from that other work paper that we

11   were looking at.

12   Q.    All right.  So that other one where you

13   put the 26,000 which included this supposed

14   Al-But'he refund, made its way into this report,

15   and so you backed out a total of 26,000 for a final

16   figure of almost $562,000?

17   A.    That's correct.  Right.

18   Q.    Okay.  And then back to the return, that

19   migrates right into line 1-A of the return itself?

20   A.    That's correct.

21   Q.    Okay.  Mr. Wilcox, if that $21,000 was

22   not returned to the donor, but kept by this fellow

23   Soliman, is this line accurate?

24   A.    I'm sorry.  Say that again?

25   Q.    If this really was not a refund like

```
 1   Mr. Seda told you?

 2        A.   Oh.  Well, yeah.  If it's -- if it's not a refund of

 3   contributions income, then it's got to be coded somewhere else

 4   which means that the line one contribution as income is

 5   incorrect.

 6        Q.   And it's understated by?

 7        A.   By at least $21,000.

 8        Q.   Okay.  If we could go to BOA-4, and this

 9   is the Bank of America records for March of 2000.

10   And do you see a reference to a check paid, 9456,

11   down here for one thousand -- $131,300?

12        A.   Yes.  That's right.

13        Q.   Now, was there a problem with this check,

14   sir?

15        A.   I can't remember if it was in the original

16   accounting or not but I had --

17        Q.   Let's go --

18        A.   -- a question about it.

19        Q.   Okay.  Go to TW-5.  This is from your

20   papers.  We see that A-3 reference on the right?

21        A.   Right.  That's the bank reconciliation for March.

22        Q.   Okay.  So that's this check.  And it

23   appears in your file.  And what was the problem

24   concerning this check, sir?

25        A.   Well, as you can see, there's -- there's no payee
```

T. Wilcox - D

1    listed.  So I didn't know who it was to and what it was for so

2    I had to ask him a question.

3         Q.   Now, you mentioned that when you talked

4    to Mr. Sedaghaty about the $21,000 matter that we

5    just talked about, you talked to him about other

6    things.  Was this one of them?

7         A.   Yeah.  But not at the same time.

8         Q.   Oh, okay.

9         A.   Okay.

10        Q.   Do you remember a separate conversation

11   with him about the disposition of these funds?

12        A.   Yes.  When I asked him what this was about, he said

13   that they had bought ) an -- al-Haramain had bought a mosque

14   in Springfield, Missouri, and that this was part of the

15   proceeds for the cost of that mosque.

16        Q.   All right.  Mr. Seda told you that?

17        A.   Mr. Seda said that, yes.

18        Q.   And did you believe him?

19        A.   Yeah.  Of course.  He was my client.  And so I knew

20   when I had some question he'd tell me the truth.

21        Q.   Now, had you ever heard about a purchase

22   like this?  You had been representing him now for a

23   little bit of time.  Did you know about this

24   purchase prior to this conversation?

25        A.   No.  This was the first I heard about Springfield.

1    I was -- actually I was kind of stunned because I had always

2    envisioned al-Haramain was Mr. Seda and his friends in the

3    Rogue Valley have this mosque.  And now when he tells me that,

4    you know, we bought a mosque in Springfield, Missouri.  I was

5    impressed that, okay, this is more than just Mr. Seda, with

6    the Rogue Valley and his friends.  This is -- this is going

7    across the country.

8        Q.   Okay.  With respect to this -- this

9    building purchase now, would that be potentially

10   important to you, the details of this purchase, in

11   filling out the 2000 990?

12       A.   Yeah.  Any building is going to be a substantial

13   asset.  So it was -- it was definitely important to nail down

14   the cost of the Springfield building.

15       Q.   Okay.  And so did you ask Mr. Sedaghaty,

16   your client, for any records concerning the closing

17   of this building?

18       A.   Yes.  I asked him for the closing escrow statement.

19       Q.   Okay.  What's a closing escrow statement?

20       A.   That will come from the title company when title

21   passes to a buyer and it will indicate what they've paid for

22   the building.  And then any -- it will also show any mortgage

23   or note payable against that building.

24       Q.   So it's picked up in a couple of spots in

25   the 990 as an asset of the nonprofit?

1      A.    Yes.  It's on the 990.

2      Q.    Okay.  And as well, if there was any note

3  or interest, that would be picked up somewhere?

4      A.    Yes, it would be.  Right.

5      Q.    Okay.  Now, when you requested the escrow

6  statement for this new building that you just

7  learned that Mr. Seda said this check went to

8  purchase, what was his response?

9      A.    He asked why I needed it.  I said:  Well, if there's

10  a mortgage on the building, then I've got to record -- I've

11  got to record the assets so -- on the liabilities side of it.

12  And he said:  Well, in our religion, we don't pay out interest

13  expense.  And if we ever loan money to people, we don't demand

14  interest income.

15          So I said:  In other words, this is a cash -- you

16  paid cash for the building?  He says:  That's right.  And so

17  at that point I dropped the question for the request of the

18  escrow statement.

19      Q.    Did he ever provide you with the escrow

20  statement?

21      A.    No, sir.

22      Q.    Okay.  As you look back now, would that

23  have been helpful in preparing the return?

24      A.    Yes, it would have been.

25      Q.    Now, I want to go to -- so you knew about

T. Wilcox - D

1    this building but you didn't know the details.  Did

2    you have to do some work to determine the purchase

3    price of the building and the details?

4        A.    Well, when there were checks that I had questions

5    about, Mr. Seda would tell me which checks applied to the

6    Springfield building.  And I also told him he'd need to

7    identify to me any -- any other costs besides this one.  And

8    then there was a big check for 318,000 that was coded to

9    Springfield building.  Then there were three smaller checks of

10   a few thousand apiece.

11       Q.    Okay.  So let's go to TW-2.  All right.

12   This -- does this writing on the bottom right

13   indicate that this was part of your file?

14       A.    Yes.  That's the -- that's the work paper

15   cross-reference.

16       Q.    Okay.  Is this a QuickBooks report as

17   well?

18       A.    Yes, it is.

19       Q.    Okay.  What does this report?

20       A.    When I found out where these checks belonged, I

21   coded them to the Springfield building account and I printed

22   this out.  And I wanted this print out to have Mr. Seda

23   confirm that we had all the costs in the Springfield building.

24       Q.    Okay.  Now, so you had specific

25   conversation with Mr. Sedaghaty about the cost of

1    this building?

2         A.    That's correct.  Right.

3         Q.    All right.  Now, he told you that that

4    check for 131,300 that we just talked about went

5    into this building?

6         A.    Yes, sir.

7         Q.    So you listed that?

8         A.    Uh-huh.

9         Q.    Up here?

10        A.    Yes.  The first one.  Right.  Yeah.  That's the one.

11        Q.    Okay.  Now -- oh.  Who created this

12   report?

13        A.    I did.

14        Q.    Okay.  And I thought you said that the

15   QuickBooks program was supposed to be done by them?

16        A.    Yeah.  When -- okay.  They did most of it.  Okay?

17   So a lot of entries were in there.  And I'd have to look at

18   the audit trail to see if they -- well, eventually what

19   happened, I coded this to the Springfield building account

20   because the question came up:  What's this check for?  There's

21   no payee.  And then so to get it into the QuickBooks, I put

22   the name al-Haramain there and --

23        Q.    Referenced that check 9456?

24        A.    Right.  Yeah.  And then as -- as I questioned

25   Mr. Seda, then he came up with these other checks, the 318,000

1    one, and then there was this 10,000 one, and then one for

2    1,950 that he said would also -- were also part of the cost of

3    the Springfield building.

4        Q.   Okay.  Now, when you were first

5    interviewed by IRS about this report, did you

6    indicate that al-Haramain had prepared this report

7    initially?

8        A.   Yeah.  When I was interviewed, it had been several

9    years since this had happened.  And our normal procedure, I

10   said with the nonprofit especially, is to push everything down

11   to their level so that they'll do all -- all of this kind of

12   work to save on the fee that we have to charge them.

13           And so I went off of my -- my best -- my normal

14   procedure.  That's the normal procedure.  I didn't know that I

15   had input these until Agent Anderson showed me the audit trail

16   printouts.

17       Q.   Can you say what's an audit trail?

18   Talking about like an IRS audit trail?

19       A.   No.  It's generated by QuickBooks.  It's in the

20   QuickBooks program.  And it will -- it will detail the date

21   and the time that you make any specific entry.

22           And so Agent Anderson had given me a -- she had a

23   QuickBooks file that Mr. Seda had e-mailed to me on May 14th

24   -- on April -- excuse me.  May 14th, '01.  And I compared that

25   with the QuickBooks file that I e-mailed back to Mr. Seda on

1    January 7th of '02.  And that way I was able to find out which

2    entries I had made.

3        Q.   So that refreshed your memory as to who

4    actually prepared this QuickBooks schedule?

5        A.   Yes, it did.

6        Q.   And who did it?

7        A.   I prepared this schedule.

8        Q.   Okay.  And -- now, this total Springfield

9    building down here, was there a -- it was news to

10   you, you say, that they had even bought this

11   building?

12       A.   Yes.  Yeah.  It was -- yeah.  It was the first I

13   heard about it.

14       Q.   Okay.  So you created this program within

15   QuickBooks and put these checks that Mr. Seda told

16   you were used to buy in here?

17       A.   That's correct.  Right.

18       Q.   All right.  Did that affect -- did that

19   affect the return?

20       A.   Yes.  Because this now gets classified -- well, this

21   gets added to the other fixed assets, and it will go on line

22   57-A of the -- of the 990.

23       Q.   Okay.  Before we get there, I'd like to

24   go to the IRS one.  And towards the back of it,

25   there's this thing called a book depreciation

1    report.  What's a book depreciation report while

2    she's looking for that?

3        A.   That's just -- it was just a depreciation entry to

4    be made on -- based on the client's fixed asset schedule.  So

5    whatever -- whatever buildings and equipment are in there,

6    then -- yeah.  That's what this is here.

7        Q.   Okay.  So on the very bottom of this book

8    depreciation report -- and this is a part of the

9    return filed with the IRS?

10       A.   Yes.  This was the depreciation schedule attached to

11   the tax return for 2000.

12       Q.   Okay.  And so there's a listing of a

13   Springfield building and talks about the cost of

14   being $461,542; right?

15       A.   That's correct.  Right.

16       Q.   And did that figure come from that prior

17   exhibit we just looked at, the TW-2 exhibit?

18       A.   Yes, it did.  Right.

19       Q.   Okay.  So that figure made its way down

20   to the depreciation report on the return; right?

21       A.   Yes.  It made it to the line item or the fixed --

22   where the total asset -- the fixed assets were listed.

23       Q.   Okay.  And it included that $131,300

24   -- --

25       A.   Yes, it did.

1      Q.   -- supposedly going to the building?

2           All right.  Now, getting back to the

3   return, IRS-1, page two of the return, if that

4   $131,300 did not go into the Springfield building

5   in reality, sir, but went out of al-Haramain as an

6   overseas distribution, is this return correct?

7      A.   No.  It's inaccurate.  Because it means the fixed

8   assets are way overstated.

9      Q.   Okay.  Let's go to line 22 please.  Is

10  line -- would line 22 -- if the information your

11  client gave to you was false, would line 22 have

12  been affected?

13     A.   If the 131,000 was really a distribution for grants

14  and allocations, it needs to go on that line.

15     Q.   Okay.  So there's an understatement

16  there?

17     A.   Yeah.  Yeah.  If the 131 -- if the 131,000 went for

18  grants and allocations then this line is way understated.

19     Q.   Okay.  Or -- all right.  Or if it was

20  given to Al-But'he as an allocation, it would be

21  understated by 150,000?

22     A.   I'm sorry.  You lost me there.

23     Q.   If the -- never mind.

24          How about line 57?  Okay.  You've looked

25  at this prior to coming into court today, sir?

1    A.    Yes.  Yes, sir.

2    Q.    All right.  The line 57, land, building

3  and equipment, there's a report of $685,000?

4    A.    That's right.

5    Q.    We've gone over your work as to what you

6  did to include not only the Springfield building

7  but the other ones?

8    A.    Uh-huh.

9    Q.    Same question there.  If what Mr. Seda

10  told you about that 131 check was false, would this

11  line have been affected as well?

12    A.    Yes.  And it means that this line is overstated.

13    Q.    Okay.  And if we go back to page two, the

14  statement of -- page two of IRS-1 please.  And if

15  we could just bring it up and go down a little bit.

16  Okay.

17          Now, there's a portion of the return on

18  page two of the return, this is the form 990 for

19  the year 2000, it talks about down here:  Statement

20  of program service accomplishments.  Do you see

21  that?

22    A.    Right.  Yes.

23    Q.    Okay.  Is there where a tax exempt lists

24  what it's done with its money to promote its public

25  --

1     A.   That's correct.  Right.

2     Q.   To promote its public charitable

3  purposes?

4     A.   Yeah.  Yeah.  This is in here.

5     Q.   Do you prepare this?

6     A.   Yes, I did.

7     Q.   Based on the information given to you by

8  your client?

9     A.   Yes.

10     Q.   Okay.  Do you see the word Chechnya on

11  here?

12     A.   No.  It's not on here.

13     Q.   During the two-plus years, you

14  represented Mr. Sedaghaty for about how long?

15     A.   Let's see.  Started in December '99, and -- I

16  believe the first part of 2003 when I completed the 2002

17  return was the last -- was the last piece of work I did for

18  him.

19     Q.   All right.  During the time that you were

20  working with him about how many meetings did you

21  have with him by phone or by face?  And you can

22  just ballpark it.

23     A.   Okay.  There are a lot.  I would say over the course

24  of a year, phone calls or -- or personal meetings, might be as

25  many as 20 to 25.

1      Q.   A year?

2      A.   Yeah.  So -- well, toward the -- it seemed like --

3   I'd have to look at my files, but toward the end of 2002, a

4   lot of my contact was strictly by e-mail to him.  But I would

5   say for 2000, 2001, and for most of 2002, and -- we had a

6   number of meetings or phone calls.  I would guess, you know,

7   25-- 20 to 25 a year.  Quite a few.

8      Q.   Okay.  During all of these collective

9   meetings by telephone, face to face, by e-mail, did

10  Mr. Sedaghaty ever mention a region of the world

11  called Chechnya to you?

12     A.   No, sir.

13     Q.   When was the first time you heard the

14  subject of Chechnya associated with this case?

15     A.   When I met with Agent Anderson, she mentioned that

16  some money went to Chechnya.

17     Q.   Could we go to AHIF-12?  Mr. Wilcox, this

18  is a document that's been received as having been

19  provided pursuant to a subpoena by the al-Haramain

20  Foundation.  Did you know during the years that you

21  were representing Mr. Seda and al-Haramain, did you

22  know that there was an accountant in Riyadh, Saudi

23  Arabia that was working on -- with Mr. Seda on the

24  details of some of the same transactions that you

25  were looking into?

1      A.   No, sir.

2      Q.   He never told you that?

3      A.   No, sir.

4      Q.   Page two of that document is a monthly

5  summary report from March 2000.  And do you see

6  down here at the bottom:  To Brother Soliman,

7  21,000, and to Brother Soliman over here, 131,300

8  are not included in the total balance.  Do you see

9  that?

10     A.   Yes, I see that.

11     Q.   And approved by the Ashland office

12  manager.  Were you ever given this report?

13     A.   No, I wasn't.

14     Q.   Might it have affected your work or

15  inquiries with Mr. Seda if you had been given this?

16     A.   Yeah.  Because I would have noticed the 131,300.  It

17  would have popped right out as -- that -- I'd want to find out

18  are you sure that's part of the cost of the Springfield

19  building?

20     Q.   Okay.  And if we could go to BOA-6,

21  please.  Sir, are you familiar with this check?

22     A.   Yes.

23     Q.   How so?

24     A.   One of the meetings I had with Mr. Seda -- it was

25  one of these meetings where we were going through a number of

1    documents and questions I had in the preparation of the '98

2    return.  And I saw this question -- I saw this check made out

3    to this man.  I asked him what it was for.  And he told me it

4    was for a computer.

5         Q.   Okay.  Speak into the microphone a little

6    bit, Mr. Wilcox.  I'm having trouble.  Mr. -- you

7    spoke to Mr. Sedaghaty about this particular check?

8         A.   Yes.  I asked him what this check was for and he

9    told me that they had bought a computer from this man.

10        Q.   Okay.  If this really had nothing to do

11   with the purchase of a computer, but actually was a

12   payment for salary to this fellow, Mr. Ross, would

13   that have been important to you?

14        A.   Yes.  Because it means that the payroll tax is wrong

15   and the fixed asset schedule is wrong.

16        Q.   So a tax exempt does pay payroll taxes?

17        A.   Yes, they do.

18        Q.   Just not income taxes?

19        A.   That's correct.  Right.

20        Q.   Did you believe him when he told you this

21   was a payment for a computer?

22        A.   Yes.  Yeah.  Of course.  He's -- like I said, he was

23   a refreshing client to work with from the get-go because he

24   said he wanted the records clean and accurate.  And so I knew

25   I was getting honest replies from him.

```
 1        Q.   Could we show the witness AHIF-2 please?

 2             Mr. Wilcox, you've been shown -- in

 3    preparation for your testimony today, you've been

 4    shown this document?

 5        A.   I believe this was one of the documents that either

 6    you or Agent Anderson showed me.

 7        Q.   Okay.  It refers to a Chech -- the

 8    transaction in Chechnya in supposedly March of

 9    2000?

10        A.   Yes, I see it.

11        Q.   And at the bottom it's saying:  I deposit

12    the amount in al-Haramain head office for Chechnya

13    refugees; do you see that?

14        A.   Yes, I do.

15        Q.   Was this ever supplied to you by your

16    client, Mr. Sedaghaty?

17        A.   No, sir, it wasn't.

18        Q.   Would that have affected the return had

19    he done so?

20        A.   Well, yeah.  Because I'd want to know what this was

21    about.  Because it looks like it goes in the humanitarian aid

22    area.

23             MR. CARDANI:  Okay.  That's all I have, judge.  Thank

24    you.

25             THE COURT:  Cross.
```

**CROSS-EXAMINATION**

BY MR. MATASAR:

Q.   Mr. Wilcox, was there just one meeting --
you were talking about a meeting with Mr. Seda
where you coded.  Can you look at TW-2?  Can you
put TW-2 on there for him?

You talked about a meeting you had with
Mr. Seda.  Was that one meeting when you talked
about all these items on here?

A.   Yeah.  On -- let's see.  Okay.  On the Springfield
building account, I had spoken with him previously about --
about these -- these expenses, the 131 and the 318 in
particular.

Q.   When?

A.   Prior to this meeting.  I'd have to -- I guess I'd
have to check -- I'd have to look at my files and try to
figure that out.

Q.   Do you think you could figure that out?

A.   Yeah.  I'll try to.

Q.   Which documents are you looking at to try
to figure it out?

A.   I'm going to start with my billing record.  I've got
-- it's 42451.

So looking at this, I would have asked him about
these two entries probably between September 19th and

1  September 20th of that year.

2      Q.   And let me show you -- can we put on

3  42451?  This is your piece of paper that Colleen

4  Anderson brought to you at the same time she

5  brought you the audit trail; is that right?

6          MR. CARDANI:  Excuse me.  Has this been received?  If

7  we could have an exhibit reference.

8          MR. MATASAR:  Well, I thought what we had agreed to was

9  we could refer during Mr. Wilcox's cross to any of his work

10 papers simply by the FPD-U.S. number.

11         MR. CARDANI:  I have no objection to him refreshing his

12 memory to this.

13         MR. MATASAR:  Well, maybe we'll take it up at the break

14 but that was my understanding.

15                        (Counsel confer.)

16     Q.   (By Mr. Matasar)  Mr. Wilcox, we won't

17 show it to the jury.  Can you identify 42451?

18     A.   Yes.  It's -- it's a work paper in my billing file.

19 And it's how I track time on the time that I spent to prepare

20 the '99 and 2000 returns for al-Haramain.

21     Q.   And that's something that you used to

22 prepare the taxes?

23     A.   Not this -- not this billing.  This is just to --

24 this is for me to bill to the client.

25     Q.   And it's something that you used to

1    prepare your testimony for today?

2        A.    Yes.   I refreshed it so that I could remember when I

3    -- when I met with Mr. Seda.

4        Q.    And was this the document that

5    Ms. Anderson brought to you when she met with you

6    and brought you the audit trail as well?

7        A.    I don't really remember this.  I just -- I know that

8    when I went through -- when I was prepping for my testimony, I

9    went through my billing file and I noticed this was in here.

10   I don't remember if she brought it with the audit trail

11   documents or not.

12           MR. CARDANI:  And I have no objection for this being

13   received if you're offering it.

14           MR. MATASAR:  Okay.  Again, I think we'll take it up

15   with the Court at a break.  My understanding was all -- and maybe

16   I need to --

17           THE COURT:  Let's do it later.

18           MR. MATASAR:  Okay.  Fine.

19           THE COURT:  You'll just bore the jury.

20           MR. MATASAR:  We'll have enough of that for the next

21   period of time, your Honor.

22       Q.    (By Mr. Matasar)  So, Mr. Wilcox, you're

23   looking at this piece of paper and that's helping

24   you remember when you looked at the items on TW-2

25   when you talked to them -- to Mr. Seda about them?

T. Wilcox - X

1          A.    I'm sorry.  What's TW-2?

2          Q.    Can you show him TW-2 please?  I think we

3    can give a name to that one.  Okay.  Could we --

4    could we agree that instead of calling it TW-2

5    we'll call it the Springfield Building Schedule?

6          A.    Sounds good to me.

7          Q.    Okay.  And you'll know what that is?

8          A.    Yes, sir.

9          Q.    All right.  So there's four items on

10   there?

11         A.    Yes, sir.

12         Q.    Okay.  When did you talk to Mr. Seda

13   about the first item on the schedule?

14         A.    Probably September 19th or September 20th.

15         Q.    And what about the second?

16         A.    It would be my guess that all four items -- see,

17   what I did -- I had the question about the 131 and then the

18   318 and Mr. Seda told me they were for the Springfield

19   building account.  And then I said:  Are there any other costs

20   that are involved?  And that's when he informed me about the

21   $10,000 check and the $1,950 check.

22         Q.    Okay.  And --

23         A.    So most likely to answer your question, I probably

24   talked to him about it on April -- either September 19th or

25   September 20th.

1      Q.   And this would have been the first time
2  -- well, let me call your attention back to the
3  item that we had up there, the 42451.
4      A.   Oh, okay.  Uh-huh.
5      Q.   Okay.  So all items that had to do with
6  Springfield were discussed on the 19th or the 20th?
7      A.   Probably, yes.
8      Q.   And is that the same meeting that you
9  first heard of the fact that there was a
10  Springfield building?
11      A.   Yeah.  The -- when -- when the 131 came up, that's
12  when I -- that's when I first knew about the Springfield
13  building.
14      Q.   And that was September 19th?
15      A.   That's my guess.
16      Q.   Okay.  Did -- did you have any idea that
17  there was -- so you testified that you had no idea
18  that there was any relationship at all between
19  al-Haramain and Springfield until you heard of
20  this; is that right?
21      A.   Well, I didn't know about a Springfield building
22  account until Mr. Seda told me about it.
23      Q.   I understand.  But was there anything
24  else having to do with Springfield, Missouri?  I
25  mean, I thought you said --

1    A.    That was it.  Just -- there was a building out

2  there.

3         MR. MATASAR:  All right.  Well, let me ask you about a

4  document in your records which is 43664.  And I think we'll -- I

5  guess give you a piece of paper.

6         Your Honor, what I'd like to do is show it to the

7  witness and not the jury.

8         THE COURT:  The clerk will assist you.

9         MR. MATASAR:  I'd like -- if I can just do them all at

10  once.  I would -- let me get a list of documents, your Honor, and

11  then she can take this up.  I'll give them all to my staff and

12  we'll get them all here.

13        I'll take up another matter, your Honor, while they're

14  collecting the documents and then we'll approach the Court when

15  we have time.

16    Q.    (By Mr. Matasar)  Mr. Wilcox, your

17  proposal letter was December 30th, 1999?

18    A.    Correct.  Right.

19    Q.    And I think you addressed this before but

20  you have a large file in this case; correct?

21    A.    Yes.  Right.

22    Q.    And at one point the government and the

23  defense jointly took your file and had it scanned;

24  is that right?

25    A.    That's right.

1    Q.   And you were asked to look at the numbers

2    on that file.  Each piece of paper on that file has

3    a unique number; is that right?

4    A.   It does.  Right.

5    Q.   And FP -- and it starts FPD-U.S.?

6    A.   That's right.

7    Q.   And then 40,000 something?

8    A.   Uh-huh.

9    Q.   And so you've had a chance to review your

10   file, both the paper version and the FPD-U.S.

11   numbers, and you're confident, are you not, that

12   the FPD-U.S. numbers are all proper reflections of

13   documents -- pieces of paper that were actually in

14   your file; is that right?

15   A.   Yes, I am.

16   Q.   And you know sort of where they are?

17   Like I'll just make up a number, FPD-U.S, you know,

18   43653 might be the 2000 501(c)(3) file?  You'll be

19   able to maneuver by giving you those numbers --

20   A.   Yeah.  Yeah.  Because Agent Anderson gave me an

21   index.

22   Q.   Okay.  And we provided that to her and

23   we're just trying to make it smooth.

24        Now, in your engagement letter, you say

25   you're going to ensure the accuracy and reliability

1    of the accounting system?

2        A.    Right.

3        Q.    And is that your typical engagement

4    letter?

5        A.    No.  In his case, he want -- he was adamant about

6    records being clean and accurate.  And so that's why I put it

7    in there.  Because he wanted me to review the accounting that

8    he had already done and see if there were any shortcomings in

9    it.

10        Q.    Okay.  And that's beyond what you

11    typically do?

12        A.    Yes, sir.

13        Q.    Okay.  And he also told you some things

14    about how he works did he not?  Didn't he tell you

15    that he believes in delegation and he wanted you to

16    make sure the bookkeepers were doing it right?

17        A.    I don't know if he used the word delegation but, you

18    know -- he told me to work with the two women to make sure the

19    entries were proper.

20        Q.    He told you he didn't do a detailed

21    review of the books themselves.  That he expected

22    you to do that job?

23        A.    Well, we'd have to define what a "detailed review"

24    is.  The -- the way it works is that the client inputs the

25    data, and then when I get it, if a bank reconciliation hasn't

```
 1    been done, I do the bank reconciliation.  Then at that point
 2    QuickBooks has now generated a profit and loss.  I print out
 3    the profit and loss and I'll go through the expenses there.
 4    And I'll want to analyze anything that looks unusual or that
 5    might just raise a question in my head.  And that's -- that's
 6    -- and then we go into the detail that way.
 7         Q.   Well, let me ask it this way.  You've
 8    talked to Colleen Anderson many times have you not?
 9         A.   Yes, sir.
10         Q.   And sometimes there were other agents
11    with her, Gregory Wooten?  Remember he was there
12    once?
13         A.   Yes.
14         Q.   And didn't you flatly tell them that Pete
15    Seda told you he believes in delegation?
16         A.   I don't remember.  I'm sorry.
17         Q.   Didn't you also tell them that he told
18    you he doesn't do a detailed review and he expects
19    you to review what the bookkeepers are doing?  You
20    didn't tell them that?
21         A.   I may have said that, yes.
22         Q.   So the first thing you did though when
23    you got this account was you looked at the
24    bookkeeping system.  You did the review that he
25    asked you to do?
```

1        A.    Yes, sir.

2        Q.    Okay.  And that took about five of your

3    hours; does that sound about right?

4        A.    Yeah.  It might have, yeah.

5        Q.    Okay.  And you saw numerous errors.

6    There were lots of problems?

7        A.    Right.

8        Q.    Okay.  There were deposits clearing the

9    bank but not on the general ledger, but he didn't

10   list the deposits?

11       A.    That's right.

12       Q.    Just lots and lots of problems.  And in

13   fact you didn't fix the books like they asked you

14   to did you?  Did they make a lot of changes based

15   on your comments?

16       A.    Yeah.  I told him he needed to get those -- those

17   corrected.  And then the process was that eventually he gave

18   me the '98 deposits and checks and he said:  Why don't you do

19   it to make sure that we've got it right?

20       Q.    Okay.  So that was the '98.  But didn't

21   you later -- didn't you tell us just this afternoon

22   that after that they were entering the deposits and

23   the checks and all you were doing was the

24   reconciliation?

25       A.    In '99, they entered -- yeah.  Everything.  And they

1   made most of the entries for 2000.

2       Q.   Okay.

3       A.   For those years.

4       Q.   When you say most of the entries, you're

5   saying deposits and checks?

6       A.   Yes.  I believe so.

7       Q.   Mr. Wilcox, when you were working on

8   their books in September of 2001, on that sheet

9   that we just looked at, isn't it true you entered

10  every single deposit for the entire year of 2000?

11  You entered the deposits?

12      A.   I may have if they weren't on that original

13  QuickBooks.  I'd have to look at the audit trail.  But you may

14  be right.

15      Q.   Okay.  So -- and you may be wrong when

16  you -- when you just said they entered the deposits

17  and the checks, it may be that really you did?

18      A.   Well, yeah.  Then -- in that case they must have

19  entered the majority of the checks.

20      Q.   They entered the majority of the checks

21  then what about the deposits?

22      A.   Okay.  Let me check here.  Let me take a look.  Yes.

23  It appears that I entered all the deposits looking at the

24  audit trail.

25      Q.   All right.  And you told us that they

 1   were getting their bookkeeping straight and better

 2   but that's not really true is it?  It was just as

 3   -- pretty much inadequate was it not?

 4       A.   Well --

 5       Q.   Even as late as January 2002 it was

 6   inadequate?

 7       A.   The '99 work was pretty much complete.  Okay?  The

 8   2000, it was still -- as you can see from the audit trail,

 9   there was some checks that were still missing from time to

10   time.

11           MR. MATASAR:  Your Honor, I would like to show the

12   witness a document that is -- I do not have a piece of paper

13   because of a ruling which I thought we had.  I just misunderstood

14   and maybe I can present this to the Court.  But what I'd like to

15   do is show the witness some documents and not publish them to the

16   jury.

17           THE COURT:  Show them to Mr. Cardani first.

18           MR. MATASAR:  Can we show him 43433?

19       Q.   (By Mr. Matasar)  Mr. Wilcox, what I'd

20   like to do is show you -- I'm not sure what the

21   electronic situation is here.  Do you see 43433 in

22   front of you there?

23       A.   Yes.  I see it.

24           MR. MATASAR:  All right.  Your Honor, I think -- I

25   think what we'll do here is just move to introduce his file.  I

1    think it's all something that he consulted and that way we'll be

2    able to move a lot smoother.  It's a lot of papers for the jury

3    but I think it's all admissible.  It's something he relied on for

4    his work.  And otherwise we'll have to identify each -- each

5    piece of paper.

6            So we'll move to introduce the whole file.

7            MR. CARDANI:  Can I discuss it with Mr. Matasar before

8    taking a position?

9                        (Counsel confer.)

10   Q.   (By Mr. Matasar)  Mr. Wilcox, didn't you

11   write a letter to the IRS on January 3rd, 2002?

12   A.   Yes.  This is it here.

13   Q.   And didn't -- didn't you indicate at that

14   point that their bookkeeping was inadequate?

15   A.   Yes.  We did for the letter.

16   Q.   Okay.  And, by the way, you also told the

17   letter (sic) a story about the bookkeeper -- about

18   a bookkeeper being hired and being unable to

19   complete the engagement, and didn't form -- inform

20   the organization, and then that they immediately

21   engaged another bookkeeper.  You told the IRS all

22   that but that wasn't true was it?

23   A.   Yes, it was.  That was the bookkeeper that I

24   recommended to Mr. Seda.  And this is being -- it was -- who

25   they never made connections with.  And then the second

```
 1    bookkeeper would basically be me.  Then they -- that they then
 2    used us to get the bookkeeping completed.
 3         Q.   Oh, I see.  So when you wrote the letter
 4    to the IRS and said:  Unfortunately, this
 5    bookkeeper was unable to complete the engagement
 6    and did not inform the organization of this until
 7    September 2001, for that --
 8         A.   That's Mrs. Bean I was referring to.
 9         Q.   She never even started the engagement
10    though did she?
11         A.   That's right.  She never even started it.
12         Q.   All right.  And so when you said the
13    organization engaged her, that wasn't correct?
14         A.   Well, they made connections but -- yeah.  It just --
15    it just never got off the ground.  I -- what I had -- I told
16    Mr. Seda about her and I called her, if she'd like the
17    engagement, and she told me that she had made connections with
18    Mr. Seda.  So that's why I used the phrase:  The organization
19    engaged her.
20         Q.   But they didn't -- you know what an
21    engagement is, do you not?  You have an engagement
22    letter yourself?
23         A.   That's correct.  Right.
24         Q.   The organization did not engage her?
25         A.   Okay.  Maybe I was embellishing but that's -- that's
```

1    the way I saw it.  That there was an agreement there that the

2    work was going to get done, but because of scheduling

3    difficulties, the two of them just never got together.

4        Q.   So it's your testimony there was an

5    agreement that the work was going get done?  Really

6    all they did was call her and see if she was

7    available and she said she wasn't.  Isn't that what

8    really happened?

9        A.   No.  When they -- Mrs. Bean said to me that he had

10   -- she had been in contact with Mr. Seda and they were going

11   to try to arrange a meeting so that she could go down and

12   start to do the work.  But that meeting never took place.

13       Q.   Okay.  But you told the IRS that the

14   organization engaged her.  And then you told the

15   IRS that al-Haramain immediately engaged another

16   bookkeeper who completed the job.  And you're

17   saying that's you?

18       A.   Right.

19       Q.   But then you say -- I'll read the whole

20   sentence:  "They immediately engaged another

21   bookkeeper who completed the job and got the

22   information to me as quickly as possible for

23   immediate filing."

24            So you gave it to yourself; is that what

25   you're telling the IRS?

```
 1        A.    Yes.  That's what I was telling them.

 2              THE COURT:  Have you finished with that document,

 3   counsel?

 4              MR. MATASAR:  Yes.

 5              THE COURT:  All right.  Members of the jury, I'm going

 6   to let you go early today.  But you get to come in early in the

 7   morning.

 8              JURORS:  Oh.

 9              THE COURT:  We're going to start at 8:30 tomorrow.  And

10   I have to take a little break at 9:00 to put a significant matter

11   on the record in another civil case.  These people will be in

12   other cities across the country but something that I've worked on

13   a few months.  And it's just sort of a little thing that everyone

14   comes in and says yes with a court reporter sitting there.  So

15   we're going to do that tomorrow at 9:00 when they call me.  So

16   I'll see you at 8:30, all right?

17              Now, remember, we're not -- we're going to just walk

18   right past everybody in the courtroom and not talk to them.  And

19   I know you're not rude.  I know you pretty well now.  You've been

20   here for a couple of days.

21              And don't talk about the case to anyone at this point.

22   All right?  Thank you.

23                         (Jury exits courtroom.)

24              THE COURT:  And I understand there's some that want to

25   spend the night and that's fine.
```

1          MR. CARDANI:  Judge, if I might bring up one --

2          THE COURT:  I have something too.  So that's fine.

3          MR. CARDANI:  You're more important.

4          THE COURT:  Yes.  I'm just answering someone who wants

5     -- just tell them -- tell me they'd like five more tickets to the

6     game on Saturday.

7          MR. MATASAR:  Only five?  And today's Wednesday.  Only

8     five?

9          THE COURT:  I'm asked to pull rabbits out of the hat.

10    So disregard that.  Okay.

11         MR. CARDANI:  I have one because I'll be working on

12    Saturday if you're looking for a volunteer.

13         Judge, a couple of things.  First, there's some kind of

14    annoying buzzing every once in a while.  I don't know if the

15    Court's hearing it but the mike seem to be picking up a buzzing

16    like somebody's getting an e-mail on their Blackberry.  We have

17    frisked ourselves and we have no equipment.

18         THE COURT:  You noticed it just this afternoon haven't

19    you?  It's my Blackberry.  I've been working.

20         MR. CARDANI:  No objection.

21         Judge, after the cross-examination of this witness is

22    done, we have two more witnesses.

23         THE COURT:  Yes.

24         MR. CARDANI:  And depending on the length of cross, we

25    anticipate on resting sometime tomorrow.

```
 1                THE COURT:  Sure.  Thank you.

 2                You may step down now, sir.

 3                Who is your witnesses, Ms. Anderson and --

 4                MR. CARDANI:  Greg Wooten from the IRS.

 5                MR. MATASAR:  We're ready for them.  Let me just read

 6      the part that I thought resolved this.  We talk all about --

 7                THE COURT:  I remember.  You don't have to read it.

 8                MR. MATASAR:  Okay.

 9                THE COURT:  What's the issue?  That's what I want to

10      know.

11                MR. MATASAR:  The issue --

12                MR. CARDANI:  The issue --

13                MR. MATASAR:  The issue is I would like to, rather than

14      identify specifically each document as I'm going through it,

15      which is like five questions for maybe 70 documents, simply to

16      show him something that's part of his work papers, publish it to

17      the jury and to him at the same time, and then at the end of it,

18      after -- without going through the evidentiary rigamarole as you

19      described it, and then at the end of the testimony, say:  We move

20      to admit the documents that were shown to Mr. Wilcox.  That saves

21      us three, 400 questions which I don't think -- I don't think are

22      necessary.

23                THE COURT:  You don't have to give a speech about it.

24                MR. MATASAR:  Yeah.  No.  Sorry.

25                THE COURT:  What's yours?
```

1          MR. CARDANI:  The rest of the story was that they were

2   giving us a half-day notice based on your ruling.

3          THE COURT:  Yes.

4          MR. CARDANI:  And we haven't been given a half-day

5   ruling.  We're not trying to stall the process.  Authenticity is

6   not a problem, judge.  But if it's totally an irrelevant

7   document, we want to be able to object because there's not been a

8   wholesale receipt of his entire file that's been deemed

9   admissible.

10          THE COURT:  Do you have a list of the documents you

11   want to use?

12          MR. MATASAR:  But then we said I thought that was for

13   paper documents not -- my memory was that was for paper documents

14   not electronic documents.  We can give them a list of a lot of

15   documents.

16          MR. CARDANI:  We'll work with you right away and get

17   everything taken care of for tomorrow as soon as we get the list.

18          MR. MATASAR:  The problem --

19          MR. WAX:  Your Honor, my recall is very clear that we

20   also said that with respect to the documents that we were going

21   to use solely for cross, and we would not know that necessarily

22   until the witness had finished in direct, we would be able to --

23   if we were dealing with paper, give them to the clerk and the

24   government would not get them.  And it was our understanding that

25   that was the ruling of the Court.

1          THE COURT:  Okay.  What I'm going to do is allow you to

2     pull documents out and use them, but I want you to give a list of

3     those documents so that we don't waste a bunch of time tomorrow.

4     Give a list of the documents to the government.

5          MR. MATASAR:  I understand your ruling, your Honor.  I

6     will just say that I think it will unduly affect the ability to

7     effectively cross-examine a witness.  I don't think we should be

8     required to provide the government, the night before the

9     cross-examination of a critical witness, a blueprint to our

10    cross-examination.  I don't think it will be effective

11    confrontation of a witness if they are able to prepare the

12    witness.

13         THE COURT:  Well you tell me how to do this so we don't

14    waste half a day?  So they have a chance to respond to you.

15    There's that buzzing again.

16         MR. CARDANI:  I still have no objection.

17         MR. MATASAR:  If -- one thing we can do, your Honor, is

18    give it to the lawyers and not the witness.

19         THE COURT:  That's fine.  I'm happy with that.

20         MR. CARDANI:  Okay.  Just so I don't run afoul of any

21    ruling, he obviously -- we need to be able to meet with him

22    tonight to prepare cross-examination.  So how do we not -- I

23    mean, regardless of what they do, judge, this is very ordinary

24    trial preparation here.  We would be meeting with our witness

25    overnight to talk about cross-examination.  And it would no doubt

 1    involve an examination of his work file.  So, you know, if they

 2    want to protect their ability to cross-examine, how do I not

 3    violate any of these rules if I'm given this list?

 4         MR. MATASAR:  We could give them -- as Mr. Casey did

 5    with Mr. Kohlmann, we can give them the piece -- we can do it all

 6    with paper and we can give them the paper as we're showing it to

 7    the witness.  That's one thing -- one way we can do it.

 8         MR. CARDANI:  I have no objection to say that anything

 9    in his file they can give him to review.  And if they want to put

10    a list together so that he can make sure it's there, that's --

11    that's fine.

12         But what I'm -- I'm worried about are things going back

13    to the jury, judge, that are -- that are not admissible.  There's

14    some things in that file that go back to '98 which we probably

15    are going to be objecting to.

16         MR. MATASAR:  I think -- I talked in my opening about

17    things in '98.  Maybe that's one thing we can resolve.  If the

18    witness prepared the -- was hired -- if the witness was hired in

19    January of 2000 -- is that correct?

20         MR. CARDANI:  December '99.

21         MR. MATASAR:  December '99, January 3rd, 2000, so

22    nothing is in his file that is before January of 2000.  There's

23    some documents that have '99, '98 on them, but they weren't

24    prepared by this witness until 2000.  His work papers, I believe,

25    are all after January 2000 and all should be relevant.

1          I know I'm making too long of a speech but I don't

2     think we have to give the prosecution a list of our

3     cross-examination ahead of time.

4          MR. WAX:  And, judge, I'm also quite surprised to hear

5     that Mr. Cardani thinks that it would be appropriate for him to

6     discuss the cross-examination --

7          THE COURT:  Thank you for wasting time now.  That's

8     fine.  But we don't need a speech about that.

9          MR. WAX:  Well --

10         THE COURT:  I've been around a while too.

11         MR. MATASAR:  So we can admit all the records or we can

12    show him paper as we show it to the witness but -- I don't think

13    we can give him our cross-examination the day before.

14         THE COURT:  Here's what we're going to do.  You can

15    refer to documents.  But if you want more time to prepare for

16    redirect, I'm going to give it to you.  Because there's a pile of

17    paper here.  And I'll just work out the schedule and make it

18    work.

19         MR. CARDANI:  Fine.

20         THE COURT:  Frankly I'm not going to interrupt the

21    jury's work to take motions at that point anyway.  I'm going to

22    reserve all the defense motions and keep the jury working with

23    witnesses tomorrow.  So if we have to bring the witness back,

24    we'll bring him back.

25         MR. CARDANI:  Now, I'm not hearing the judge -- Court

1    telling me that I can't talk to the witness overnight am I?

2              THE COURT:  No.  You can talk to the witness tonight.

3              MR. CARDANI:  Okay.  All right.

4              THE COURT:  Of course you can.  But if -- if, you know,

5    there's -- as I told them, 800 papers and documents.

6              MR. MATASAR:  No.  I'm only going to talk about 50 or

7    60 --

8              THE COURT:  No, no.  In the file.  Didn't he say --

9              MR. MATASAR:  That's a number I'm guessing.

10             THE COURT:  Are there more?

11             MR. CARDANI:  It's a suitcase full.

12             THE COURT:  Well, you're going to have a chance to do

13   redirect if you want it.  In an informed way.  And if you pull up

14   the documents, put them up to the jury, and then do your cross.

15   All right?

16             MR. MATASAR:  Great.  Great.  Thank you, your Honor.

17             THE COURT:  I think your surprise stuff is usually not

18   that effective anyway but I'm going to give you a chance at it.

19             Now, next.  Next, the lock on our safe upstairs is

20   broken.  And we got it open one last time with the help of

21   professional company.  So a new lock is being drilled out.  The

22   door is being drilled out.  A new lock is being expedited in.

23             I have ordered that the papers be gathered and placed

24   in a marshal -- in Marshall Barr's office in a safe like that

25   one.  There are alarms there and so on but that's where the

```
 1   papers are right now.  Does anyone have any objection?
 2           I've informed our security officer of that and he'll be
 3   back in the morning and we'll have locksmiths and new locks and
 4   he's going put a new come -- Scooter will put a new combination
 5   and so on but that's what I've done today.
 6           MR. WAX:  No objection.
 7           THE COURT:  Any objection?
 8           MR. GORDER:  No objection, your Honor.
 9           THE COURT:  All right.  So if you need something in
10   there, we need to know right away so I can, you know, make
11   arrangements with the marshal to get it available.
12           MR. GORDER:  Not for us, your Honor.
13           THE COURT:  Okay.  Okay.  What else?
14           MR. WAX:  Scheduling.
15           THE COURT:  Uh-huh.
16           MR. WAX:  We were told by the government this morning
17   that they might finish tomorrow.  We had had a number of
18   witnesses lined up for Friday.  We are trying to get more in for
19   Friday but we had not been making any effort to get people here
20   for tomorrow.
21           THE COURT:  Well, it sounds like if I don't let Mr.
22   Matasar have a day to play with paper --
23           MR. MATASAR:  I don't think it will take a day, your
24   Honor, but it's important.
25           THE COURT:  Yeah.  That's fine.  It appears important.
```

1           MR. MATASAR:  If I can have the electronics it will be

2    laser sharp.

3           THE COURT:  It's just fascinating to juries to hear

4    about that.

5           MR. MATASAR:  They love paper.

6           THE COURT:  Okay.  For long before the trial started, I

7    assured you it was going to move faster than you thought.  And I

8    expect people to be ready to move on.  So do your very best.

9    You'll be glad you did.

10          MR. WAX:  We will try to have some people here tomorrow

11   afternoon.

12          THE COURT:  Thank you.

13          MR. MATASAR:  You also said it would be easier too than

14   we thought, your Honor.  You said not as complicated as you

15   thought we think it is.

16               (The proceedings recessed at 4:54 p.m.)

17

18

19

20

21

22

23

24

25

**C E R T I F I C A T E**

STATE OF OREGON        )
                       )
County of Lane         )


          I, JAN R. DUIVEN, Certified Shorthand Reporter of the

Circuit Court for the State of Oregon, in and for the County of

Lane, do hereby certify that the foregoing pages 114 to 261,

comprise a complete, true, and correct transcript, to the best of

my ability, of the proceedings held in the above-entitled matter

on WEDNESDAY, SEPTEMBER 1, 2010.


          Dated at Eugene, Oregon, this 1st day of September, 2010.



                    _____

                    JAN R. DUIVEN, CSR, FCRR

                    Certified Court Reporter

## $

**$1,050** [1] - 136:6
**$1,300** [1] - 129:8
**$1,950** [2] - 240:21
**$10,000** [5] - 149:20, 151:10, 163:8, 165:20, 240:21
**$130,000** [2] - 124:14, 125:16
**$131,300** [4] - 122:10, 221:11, 229:23, 230:4
**$149,985** [1] - 121:11
**$15** [2] - 121:17, 133:15
**$150** [1] - 187:15
**$150,000** [1] - 121:18, 213:3
**$2,000** [1] - 140:23
**$20,000** [1] - 130:5
**$21,000** [12] - 122:13, 131:4, 131:21, 132:5, 214:21, 214:22, 215:9, 216:20, 216:25, 220:21, 221:7, 222:4
**$26,000** [1] - 220:10
**$295,000** [2] - 137:2, 141:15
**$3,750** [1] - 178:11
**$30** [1] - 140:19
**$300** [3] - 187:5, 188:10, 188:15
**$318,291.47** [1] - 139:9
**$318,291.74** [2] - 139:17, 172:13
**$45** [1] - 133:15
**$461,542** [1] - 229:14
**$5,000** [2] - 134:24, 218:22
**$50** [1] - 187:14
**$500** [1] - 120:18
**$561,640** [1] - 219:25
**$562,000** [1] - 220:16
**$685,000** [1] - 231:3
**$75** [1] - 187:4
**$75,000** [2] - 159:21, 166:21
**$80,000** [1] - 166:7

## '

**'01** [6] - 205:2, 210:24, 210:25, 211:14, 211:24, 227:24
**'02** [1] - 228:1

**'03** [1] - 198:23
**'84** [1] - 181:1
**'86** [1] - 181:1
**'97** [1] - 159:12
**'98** [11] - 189:1, 195:21, 195:24, 205:18, 206:3, 235:1, 246:18, 246:20, 257:14, 257:17, 257:23
**'98-'99** [1] - 189:19
**'99** [19] - 195:22, 198:20, 204:12, 204:14, 204:19, 204:22, 205:2, 205:4, 205:11, 205:12, 206:5, 210:25, 232:15, 238:20, 246:25, 248:7, 257:20, 257:21, 257:23

## 0

**05-60008-2-HO** [1] - 112:5

## 1

**1** [3] - 112:6, 115:1, 262:13
**1,950** [1] - 227:2
**1-A** [2] - 219:21, 220:19
**1-E** [1] - 194:3
**10,000** [2] - 145:18, 227:1
**1000** [1] - 113:7
**101** [1] - 113:16
**1023** [16] - 184:20, 186:18, 186:24, 188:10, 189:15, 190:20, 190:25, 192:1, 192:15, 192:22, 193:3, 193:5, 193:11, 193:13, 197:18, 197:21
**1023s** [2] - 186:17, 192:23
**1025** [1] - 113:12
**1040** [2] - 200:17, 200:20
**105** [1] - 149:10
**10920/6** [1] - 133:6
**10th** [2] - 122:8, 126:18
**11** [1] - 152:25
**111** [1] - 120:8

**114** [2] - 120:9, 262:10
**115** [1] - 114:5
**11561** [6] - 118:11, 119:14, 129:12, 129:22, 136:24, 138:25
**11th** [3] - 130:9, 132:15, 214:21
**12** [2] - 184:24, 196:3
**12-31-99** [1] - 192:4
**12th** [2] - 155:13, 156:3
**130** [2] - 125:10, 128:18
**130,000** [6] - 125:25, 126:8, 126:13, 129:6, 130:2, 133:11
**131** [5] - 230:17, 231:10, 237:12, 240:17, 241:11
**131,000** [2] - 230:13, 230:17
**131,300** [3] - 226:4, 234:7, 234:16
**13th** [2] - 122:13, 131:3
**141** [1] - 114:5
**141,600** [1] - 159:9
**144** [1] - 114:5
**145** [1] - 114:5
**146** [1] - 114:6
**149,985** [1] - 213:18
**14th** [6] - 205:6, 210:23, 210:25, 211:24, 227:23, 227:24
**15** [2] - 135:23, 195:23
**150,000** [3] - 126:9, 133:11, 230:21
**15th** [4] - 140:17, 204:23, 212:8, 212:10
**16** [1] - 196:4
**163** [1] - 114:6
**168** [1] - 114:7
**16th** [6] - 134:18, 204:20, 205:1, 205:2, 212:10, 215:24
**1700** [1] - 113:16
**172** [1] - 112:24
**177** [1] - 114:7
**180** [1] - 114:8
**18th** [2] - 137:25, 141:19
**1974** [2] - 180:17, 180:21
**1975** [1] - 116:12
**1979** [1] - 180:21
**1980** [1] - 180:24

**1984** [1] - 180:24
**1986** [1] - 181:4
**1989** [1] - 181:6
**1990** [1] - 152:6
**1992** [1] - 181:7
**1999** [9] - 159:24, 166:6, 184:16, 184:25, 186:8, 189:1, 189:2, 210:8, 242:17
**19th** [5] - 237:25, 240:14, 240:24, 241:6, 241:14
**1:16** [1] - 115:1
**1st** [4] - 120:24, 136:21, 138:4, 262:15

## 2

**2,000** [1] - 140:19
**2-D** [2] - 166:12, 167:6
**2-E** [1] - 159:14
**20** [3] - 195:25, 232:25, 233:7
**2000** [61] - 116:16, 120:24, 124:8, 125:3, 129:4, 133:9, 133:14, 136:21, 137:1, 137:16, 138:9, 139:2, 139:17, 152:17, 155:4, 155:13, 156:3, 156:5, 160:6, 160:8, 160:10, 161:19, 162:1, 162:10, 163:5, 169:9, 170:12, 181:13, 189:3, 196:19, 198:2, 204:12, 204:14, 204:23, 205:3, 206:5, 210:9, 210:24, 211:1, 211:21, 212:25, 213:7, 214:21, 221:9, 223:11, 229:11, 231:19, 233:5, 234:5, 236:9, 238:20, 243:18, 247:1, 247:10, 248:8, 257:19, 257:21, 257:22, 257:24, 257:25
**2001** [7] - 134:18, 135:19, 136:3, 204:20, 233:5, 247:8, 250:7
**2002** [5] - 232:16, 233:3, 233:5, 248:5,

**249:11
**2003** [5] - 143:2, 152:6, 156:7, 158:11, 232:16
**2005** [1] - 143:5
**2009** [1] - 165:7
**2010** [4] - 112:6, 115:1, 262:13, 262:15
**20th** [4] - 238:1, 240:14, 240:25, 241:6
**21** [2] - 216:15, 219:5
**21,000** [3] - 132:4, 217:9, 234:7
**2151** [1] - 169:21
**21st** [1] - 137:2
**22** [4] - 166:6, 230:9, 230:10, 230:11
**222-9830** [1] - 113:13
**22nd** [1] - 167:7
**237** [1] - 114:8
**23rd** [2] - 139:17
**24** [1] - 145:15
**240** [2] - 125:13, 125:14
**2400** [1] - 113:3
**24th** [4] - 121:10, 198:2, 213:2, 217:14
**25** [3] - 232:25, 233:7
**25,000** [1] - 194:16
**26** [2] - 216:18, 219:5
**26,000** [4] - 219:6, 219:13, 220:13, 220:15
**261** [1] - 262:10
**26th** [1] - 166:19
**295,000** [3] - 138:2, 138:11, 141:17
**29th** [1] - 120:24
**2nd** [3] - 160:8, 212:11, 217:20

## 3

**3** [1] - 210:13
**3,000** [2] - 146:4, 146:6
**3-10** [1] - 127:13
**30** [2] - 181:24, 182:5
**300** [1] - 190:15
**30th** [3] - 136:21, 205:4, 242:17
**318** [2] - 237:12, 240:18
**318,000** [1] - 225:8, 226:25
**326-2123** [1] - 113:17
**33** [1] - 196:24

**369** [1] - 125:14
**37** [1] - 165:13
**38** [1] - 155:21
**3800** [1] - 207:15
**3rd** [3] - 156:7,
249:11, 257:21

## 4

**4,600** [1] - 195:25
**40,000** [1] - 243:7
**400** [2] - 182:23,
254:21
**405** [1] - 113:3
**42451** [4] - 237:23,
238:3, 238:17, 241:3
**431** [2] - 162:1, 162:2
**43433** [2] - 248:18,
248:21
**43653** [1] - 243:18
**43664** [1] - 242:4
**465-6771** [1] - 113:4
**4790** [2] - 149:2,
160:12
**485-0111** [1] - 112:25
**4:30** [3] - 123:2,
127:21, 144:11
**4:54** [1] - 261:16

## 5

**5,000** [3] - 182:4,
195:24, 219:2
**50** [1] - 259:6
**500** [1] - 120:16
**501(c)(3** [5] - 194:15,
196:21, 202:5,
202:14, 243:18
**501(c)(3)** [2] - 193:19,
201:17
**503** [3] - 113:8,
113:13, 113:17
**541** [2] - 112:25, 113:4
**57** [2] - 230:24, 231:2
**57-A** [1] - 228:22
**5:00** [1] - 144:12

## 6

**6-21-2000** [3] - 175:1,
175:16, 175:25
**6-26-2000** [1] - 176:7
**6.8** [1] - 162:6
**60** [1] - 259:7
**600** [1] - 113:7
**621** [1] - 113:11
**6549** [1] - 137:14

## 7

**70** [1] - 254:15
**727-1021** [1] - 113:8
**73** [2] - 162:2, 162:6
**749-B** [3] - 185:17,
185:23, 186:3
**750** [1] - 189:8
**7th** [5] - 125:3, 155:3,
156:3, 196:19, 228:1

## 8

**800** [1] - 259:5
**8:30** [2] - 252:9,
252:11
**8th** [2] - 112:24, 113:3

## 9

**9** [1] - 170:12
**90** [1] - 181:23
**9456** [3] - 122:8,
221:10, 226:23
**9624** [2] - 122:13,
131:4
**97204** [1] - 113:16
**97204-2902** [1] - 113:8
**97205** [1] - 113:12
**97401** [2] - 112:24,
113:4
**99** [1] - 207:15
**990** [20] - 194:8,
194:15, 194:16,
200:4, 200:9,
200:12, 200:13,
200:23, 201:2,
201:5, 204:13,
206:19, 210:10,
219:19, 219:21,
223:11, 223:25,
224:1, 228:22,
231:18
**990s** [3] - 194:13,
204:17, 206:17
**9:00** [2] - 252:10,
252:15
**9th** [3] - 126:15,
126:17, 176:18

## A

**A-3** [3] - 216:1, 216:3,
221:20
**ability** [3] - 256:6,
257:2, 262:12
**able** [18] - 126:20,

151:25, 156:17,
157:11, 157:16,
158:3, 158:10,
160:8, 160:15,
183:11, 211:18,
228:1, 243:19,
249:2, 255:7,
255:22, 256:11,
256:21
**above-entitled** [1] -
262:12
**absence** [1] - 167:16
**absolutely** [3] - 124:3,
135:20, 144:8
**access** [2] - 118:22,
119:1
**accomplish** [1] -
192:13
**accomplishments** [1]
- 231:20
**accordingly** [1] -
212:3
**account** [62] - 117:20,
117:21, 118:6,
118:8, 118:22,
119:1, 119:14,
119:18, 120:21,
121:3, 121:8, 121:9,
121:12, 121:21,
122:1, 126:21,
128:1, 129:11,
129:20, 129:22,
130:6, 131:3, 131:4,
131:9, 131:12,
131:13, 133:6,
135:2, 135:3,
136:23, 136:24,
137:3, 137:4, 137:9,
137:12, 138:1,
138:10, 138:13,
138:14, 138:25,
139:4, 139:16,
140:13, 140:16,
141:5, 141:8, 141:9,
141:12, 142:20,
151:5, 214:11,
214:12, 215:6,
215:12, 216:24,
225:21, 226:19,
237:11, 240:19,
241:22, 245:23
**accountant** [16] -
180:12, 180:14,
180:16, 180:20,
181:16, 181:17,
181:18, 182:14,
184:15, 188:1,
188:2, 190:16,
210:2, 214:12,
215:3, 233:22

**accounting** [25] -
164:22, 165:1,
165:6, 180:17,
187:8, 188:11,
189:16, 191:2,
191:9, 193:9,
193:12, 195:21,
205:21, 206:2,
206:12, 206:21,
206:22, 207:21,
210:6, 217:16,
219:15, 221:16,
244:1, 244:7
**accounts** [3] - 118:10,
118:14, 140:5
**accuracy** [4] - 187:10,
189:17, 204:8,
243:25
**accurate** [5] - 203:15,
204:5, 220:23,
235:24, 244:6
**acquire** [1] - 124:17
**acronym** [1] - 148:18
**acronyms** [1] - 148:17
**acting** [1] - 169:20
**active** [1] - 121:4
**activity** [2] - 121:8,
148:10
**acts** [1] - 189:23
**actual** [5] - 127:6,
134:8, 138:23,
157:17, 219:17
**adamant** [1] - 244:5
**added** [1] - 228:21
**additional** [4] - 187:3,
198:4, 206:23
**address** [8] - 120:1,
137:19, 155:6,
159:1, 170:16,
194:3, 194:5, 198:17
**addressed** [1] -
242:19
**addresses** [1] - 195:1
**adjustments** [1] -
210:6
**administrative** [1] -
188:4
**admissible** [3] -
249:3, 255:9, 257:13
**admission** [1] -
154:14
**admit** [2] - 254:20,
258:11
**admits** [2] - 156:11,
156:12
**admitted** [1] - 155:9
**advance** [7] - 198:16,
198:19, 198:22,
198:25, 199:3,
199:12, 202:17

**advanced** [3] - 196:20,
198:10, 203:9
**advancing** [1] -
183:19
**affect** [4] - 219:16,
228:18, 228:19,
256:6
**affected** [3] - 230:12,
231:11, 234:14,
236:18
**afoul** [1] - 256:20
**afternoon** [11] -
115:17, 146:21,
146:22, 168:21,
168:25, 169:1,
180:7, 180:8,
246:21, 253:18,
261:11
**agencies** [5] - 149:12,
149:13, 152:10,
152:12, 165:2
**agency** [2] - 165:2,
165:4
**agent** [10] - 142:24,
146:24, 147:1,
148:3, 157:2,
159:25, 163:3,
180:22, 198:1,
198:13
**Agent** [8] - 113:18,
113:19, 218:1,
227:15, 227:22,
233:15, 236:6,
243:20
**agents** [1] - 245:10
**ago** [3] - 116:16,
128:23, 217:23
**agree** [4] - 164:16,
164:20, 191:20,
240:4
**agreed** [1] - 238:8
**agreement** [2] - 251:1,
251:5
**ahead** [6] - 136:22,
142:2, 185:14,
196:3, 204:11, 258:3
**AHIF-12** [1] - 233:17
**AHIF-2** [1] - 236:1
**aid** [1] - 236:21
**airlines** [1] - 155:21
**airplane** [2] - 164:4,
164:7
**airport** [9] - 151:19,
155:16, 160:19,
161:19, 161:25,
163:13, 163:21,
163:23, 164:9
**airports** [4] - 160:16,
163:17, 163:24
**al** [52] - 112:7, 117:19,

118:4, 118:14, 119:17, 120:4, 121:12, 131:10, 131:13, 132:12, 136:24, 137:9, 137:17, 138:13, 138:25, 139:4, 155:25, 170:14, 172:22, 177:1, 184:18, 186:15, 186:18, 192:14, 193:24, 194:23, 196:18, 198:11, 199:21, 204:14, 207:1, 207:4, 207:20, 208:20, 212:24, 213:16, 214:9, 216:21, 217:9, 219:14, 222:13, 223:2, 226:22, 227:6, 230:5, 233:19, 233:21, 236:12, 238:20, 241:19, 251:15

**Al** [41] - 118:19, 119:4, 128:2, 128:12, 132:10, 132:20, 133:6, 135:7, 135:9, 136:10, 137:18, 141:16, 141:21, 142:1, 142:5, 154:14, 154:19, 154:21, 155:2, 155:25, 156:3, 156:4, 156:19, 156:24, 157:4, 157:10, 157:14, 158:6, 158:18, 158:25, 159:11, 159:15, 161:5, 162:17, 166:6, 166:13, 167:7, 177:4, 194:24, 220:14, 230:20

**Al-But'he** [36] - 118:19, 119:4, 128:2, 128:12, 132:10, 137:18, 141:16, 141:21, 142:1, 142:5, 154:14, 154:19, 154:21, 155:2, 155:25, 156:3, 156:4, 156:19, 156:24, 157:4, 157:10, 157:14, 158:6, 158:18, 158:25, 159:11, 159:15, 161:5, 162:17, 166:6,

166:13, 167:7, 177:4, 194:24, 220:14, 230:20

**Al-But'he's** [1] - 132:20

**al-Haramain** [49] - 117:19, 118:4, 118:14, 119:17, 120:4, 121:12, 131:10, 131:13, 132:12, 136:24, 137:9, 137:17, 138:13, 138:25, 139:4, 155:25, 170:14, 172:22, 177:1, 184:18, 186:15, 186:18, 192:14, 193:24, 196:18, 198:11, 199:21, 204:14, 207:1, 207:4, 207:20, 208:20, 212:24, 213:16, 214:9, 216:21, 217:9, 219:14, 222:13, 223:2, 226:22, 227:6, 230:5, 233:19, 233:21, 236:12, 238:20, 241:19, 251:15

**Al-Hijaz** [1] - 133:6
**al-Kadi** [1] - 194:23
**Al-Rajhi** [3] - 135:7, 135:9, 136:10
**alarms** [1] - 259:25
**Albania** [1] - 140:24
**allocation** [1] - 230:20
**allocations** [2] - 230:14, 230:18
**allow** [1] - 256:1
**allowed** [1] - 193:13
**almost** [3] - 189:2, 213:2, 220:16
**America** [17] - 115:19, 116:7, 117:7, 117:18, 118:15, 118:23, 119:16, 120:14, 131:21, 133:7, 134:6, 140:5, 141:23, 172:17, 212:18, 214:22, 221:9
**AMERICA** [1] - 112:4
**American** [5] - 123:17, 123:21, 124:18, 129:1, 150:9
**amount** [15] - 122:7, 123:18, 134:23, 138:5, 139:16,

140:19, 144:17, 144:18, 157:14, 159:8, 159:20, 187:17, 217:3, 219:18, 236:12
**amounts** [2] - 141:22, 172:3
**AMX-1** [1] - 126:23
**AMX-2** [1] - 124:23
**analyze** [2] - 189:16, 245:4
**analyzes** [1] - 149:9
**analyzing** [1] - 149:4
**Anderson** [14] - 113:18, 142:24, 144:2, 144:14, 218:1, 227:15, 227:22, 233:15, 236:6, 238:4, 239:5, 243:20, 245:8, 254:3
**annoying** [1] - 253:14
**annual** [1] - 201:1
**annually** [1] - 182:20
**answer** [2] - 196:11, 240:23
**answered** [3] - 120:15, 190:25, 205:5
**answering** [2] - 218:4, 253:4
**answers** [4] - 183:22, 191:1, 212:9, 217:16
**anticipate** [1] - 253:25
**anticipation** [1] - 201:4
**anyway** [2] - 258:21, 259:18
**apiece** [1] - 225:10
**apologized** [1] - 211:17
**appear** [1] - 173:1
**APPEARANCES** [1] - 113:1
**application** [5] - 183:20, 183:21, 187:3, 190:21, 193:18
**applied** [1] - 225:5
**apply** [1] - 186:25
**appointment** [5] - 123:2, 127:21, 141:25, 142:2, 144:11
**approach** [1] - 242:14
**appropriate** [1] - 258:5
**approve** [1] - 135:15
**approved** [2] - 202:17, 234:11
**approving** [2] - 190:6,

196:18
**April** [3] - 140:17, 227:24, 240:24
**Aqeel** [2] - 194:23
**Arabia** [11] - 133:12, 135:10, 135:19, 136:10, 154:23, 162:13, 162:14, 162:16, 165:16, 166:17, 233:23
**Arabian** [2] - 119:4, 155:21
**Arabic** [3] - 132:24, 133:5, 178:4
**Arborist** [3] - 140:7, 140:10, 219:3
**archive** [2] - 160:7, 160:9
**area** [3] - 160:21, 236:22
**areas** [3] - 163:17, 189:18, 189:25
**arena** [1] - 183:7
**Arizona** [1] - 180:21
**arm** [2] - 147:19, 147:20
**arrange** [1] - 251:11
**arranged** [1] - 142:12
**arrangements** [1] - 260:11
**arrival** [1] - 160:21
**arrive** [2] - 153:4, 164:9
**arrived** [1] - 155:2
**arrives** [1] - 175:19
**arriving** [1] - 165:17
**Ashland** [14] - 115:19, 116:10, 117:1, 118:15, 120:1, 137:19, 141:23, 155:6, 158:25, 170:16, 184:18, 198:17, 207:16, 234:11
**asset** [5] - 223:13, 223:25, 229:4, 229:22, 235:15
**assets** [5] - 200:13, 224:11, 228:21, 229:22, 230:8
**assist** [1] - 242:8
**assistance** [1] - 184:21
**assistant** [1] - 181:15
**assistants** [1] - 181:12
**associated** [1] - 233:14
**associates** [2] - 116:15, 142:16
**assumes** [1] - 203:17

**assure** [1] - 201:12
**assured** [1] - 261:7
**attach** [1] - 197:21
**attached** [1] - 229:10
**attempt** [1] - 161:17
**attention** [2] - 189:18, 241:2
**attitude** [1] - 203:23
**attorney** [5] - 169:7, 169:10, 169:20, 198:15, 198:16
**Attorney's** [2] - 113:3, 113:7
**audit** [18] - 193:1, 193:6, 193:7, 193:9, 199:3, 217:25, 218:1, 226:18, 227:15, 227:17, 227:18, 238:5, 239:6, 239:10, 247:13, 247:24, 248:8
**audited** [2] - 203:19, 203:20
**August** [2] - 170:12, 176:18
**authentic** [1] - 128:14
**authenticity** [1] - 255:5
**authorities** [1] - 191:11
**automatic** [2] - 119:23, 119:24
**available** [13] - 143:14, 152:9, 160:1, 160:6, 160:10, 201:2, 201:5, 201:7, 201:8, 211:12, 213:6, 251:7, 260:11
**Avenue** [3] - 112:24, 113:3, 113:7
**avoid** [2] - 183:11, 185:8
**awarded** [1] - 183:22

## B

**backed** [1] - 220:15
**backup** [1] - 193:10
**bad** [3] - 175:23, 176:4, 177:11
**balance** [1] - 234:8
**ballpark** [1] - 232:22
**banco** [1] - 140:24
**bang** [1] - 188:2
**bank** [43] - 117:20, 119:8, 119:21, 122:15, 124:17,

126:15, 128:12, 130:16, 130:21, 132:6, 135:7, 135:8, 136:10, 136:17, 136:20, 141:20, 142:12, 143:13, 143:15, 144:12, 144:25, 172:17, 187:24, 205:19, 205:23, 205:25, 207:9, 207:11, 210:5, 211:4, 212:17, 212:19, 212:21, 212:25, 216:4, 216:5, 216:9, 221:9, 221:21, 244:25, 245:1, 246:9
**Bank** [15] - 115:19, 116:7, 117:7, 117:18, 118:15, 118:22, 119:16, 120:14, 131:20, 133:7, 134:5, 140:5, 141:22, 212:18, 214:22
**banking** [13] - 116:11, 116:23, 123:3, 123:6, 123:7, 123:23, 125:1, 127:22, 129:18, 130:25, 142:14, 144:7, 144:9
**barr's** [1] - 259:24
**based** [12] - 156:14, 156:16, 183:21, 186:20, 191:16, 201:10, 203:21, 218:20, 229:4, 232:7, 246:14, 255:2
**bean** [4] - 211:9, 211:16, 250:8, 251:9
**bear** [1] - 136:19
**became** [1] - 147:23
**become** [1] - 205:15
**BEFORE** [1] - 112:13
**beginning** [1] - 198:19
**behalf** [1] - 134:14
**behind** [1] - 215:7
**believes** [2] - 244:15, 245:15
**belong** [1] - 214:14
**belonged** [1] - 225:20
**below** [12] - 115:22, 118:3, 119:5, 122:12, 125:9, 134:22, 153:1, 155:12, 159:7, 159:17, 170:21, 199:22
**benefit** [1] - 199:15

**best** [3] - 227:13, 261:8, 262:11
**better** [1] - 248:1
**between** [7] - 149:3, 152:6, 167:17, 182:10, 183:3, 237:25, 241:18
**beyond** [2] - 202:22, 244:10
**big** [4] - 121:6, 181:10, 183:13, 225:8
**bill** [2] - 188:1, 238:24
**billed** [1] - 191:20
**billing** [9] - 187:4, 187:13, 217:24, 237:22, 238:18, 238:23, 239:9
**bin** [1] - 203:17
**bit** [16] - 116:1, 125:21, 136:8, 136:22, 137:25, 147:7, 147:9, 163:11, 173:17, 175:20, 194:7, 204:12, 210:1, 222:23, 231:15, 235:6
**blackberry** [2] - 253:16, 253:19
**block** [2] - 120:7, 122:5
**blow** [1] - 208:3
**blueprint** [1] - 256:9
**BOA** [1] - 117:4
**BOA-1** [1] - 117:17
**BOA-10** [1] - 139:3
**BOA-12** [2] - 137:7, 141:7
**BOA-14** [1] - 140:4
**BOA-15** [1] - 140:15
**BOA-16** [1] - 140:21
**BOA-17** [2] - 139:15, 172:16
**BOA-19** [1] - 133:24
**BOA-2** [1] - 119:14
**BOA-20** [1] - 135:24
**BOA-3** [2] - 120:20, 212:23
**BOA-4** [3] - 121:24, 131:2, 221:8
**BOA-5** [1] - 136:20
**BOA-6** [1] - 234:20
**BOA-7** [2] - 127:10, 129:10
**BOA-8** [2] - 130:8, 131:7
**BOA-9** [1] - 132:1
**BOA-9-A** [1] - 133:3
**book** [3] - 228:25, 229:1, 229:7

**bookkeeper** [11] - 211:7, 211:8, 211:10, 249:17, 249:18, 249:21, 249:23, 250:1, 250:5, 251:16, 251:21
**bookkeepers** [2] - 244:16, 245:19
**bookkeeping** [6] - 188:3, 210:1, 245:24, 248:1, 249:14, 250:2
**books** [4] - 193:1, 244:21, 246:13, 247:8
**border** [5] - 147:22, 149:6, 151:17, 156:10, 156:17
**bore** [1] - 239:19
**borrow** [1] - 172:9
**borrower** [2] - 172:11
**bottom** [23] - 125:16, 131:17, 131:21, 132:23, 135:11, 159:11, 171:3, 172:10, 190:5, 190:6, 191:25, 196:4, 197:3, 200:3, 201:9, 216:1, 216:10, 220:6, 225:12, 229:7, 234:6, 236:11
**bought** [6] - 146:6, 222:13, 223:4, 228:10, 235:9
**box** [2] - 120:4, 194:19
**boy** [1] - 185:17
**branch** [9] - 116:6, 116:15, 116:23, 123:1, 124:15, 125:18, 125:25, 127:4, 133:6
**break** [5] - 179:12, 215:2, 238:13, 239:15, 252:10
**brief** [1] - 188:10
**briefly** [2] - 144:21, 180:19
**bring** [10] - 117:10, 141:21, 146:4, 158:13, 172:16, 174:7, 231:15, 253:1, 258:23, 258:24
**bringing** [1] - 166:7
**broken** [1] - 259:20
**brother** [2] - 234:6, 234:7
**brought** [7] - 123:11,

158:9, 238:4, 238:5, 239:5, 239:6, 239:10
**buck** [1] - 188:2
**budgets** [2] - 187:20, 188:7
**building** [37] - 177:17, 207:4, 207:21, 223:9, 223:12, 223:14, 223:17, 223:22, 223:23, 224:6, 224:10, 224:16, 225:1, 225:3, 225:6, 225:9, 225:21, 225:23, 226:1, 226:5, 226:19, 227:3, 228:9, 228:11, 229:13, 230:1, 230:4, 231:2, 231:6, 234:19, 237:11, 240:5, 240:19, 241:10, 241:13, 241:21, 242:1
**buildings** [1] - 229:5
**built** [1] - 115:22
**bunch** [5] - 192:15, 193:10, 195:2, 214:4, 256:3
**business** [11] - 117:19, 118:3, 119:17, 123:3, 127:25, 145:13, 176:24, 182:8, 183:13, 184:2, 186:13
**businesses** [1] - 200:8
**But'he** [36] - 118:19, 119:4, 128:2, 128:12, 132:10, 137:18, 141:16, 141:21, 142:1, 142:5, 154:14, 154:19, 154:21, 155:2, 155:25, 156:3, 156:4, 156:19, 156:24, 157:4, 157:10, 157:14, 158:6, 158:18, 158:25, 159:11, 159:15, 161:5, 162:17, 166:6, 166:13, 167:7, 177:4, 194:24, 220:14, 230:20
**But'he's** [1] - 132:20
**buy** [3] - 150:19, 206:4, 228:16
**buyer** [1] - 223:21

**buzzing** [3] - 253:14, 253:15, 256:15
**BY** [11] - 113:1, 115:16, 141:3, 144:23, 145:23, 146:20, 163:2, 168:24, 177:16, 180:6, 237:2

## C

**C&C** [1] - 112:23
**calculation** [1] - 220:7
**California** [2] - 181:4, 181:7
**Canada** [2] - 167:2, 167:11
**cancelled** [2] - 202:22, 203:23
**cannot** [1] - 189:22
**capacity** [1] - 148:2
**card** [8] - 117:18, 117:20, 119:12, 132:21, 140:9, 156:17, 176:24, 177:4
**Cardani** [9] - 133:8, 156:8, 158:15, 161:4, 161:23, 185:25, 217:10, 248:17, 258:5
**CARDANI** [49] - 113:2, 115:7, 115:16, 133:1, 140:25, 144:21, 144:23, 145:19, 146:13, 146:20, 155:22, 158:12, 161:2, 162:21, 165:21, 165:24, 167:24, 168:5, 168:9, 168:21, 168:24, 177:12, 179:14, 179:19, 179:21, 180:6, 236:23, 238:6, 238:11, 239:12, 249:7, 253:1, 253:3, 253:11, 253:20, 253:24, 254:4, 254:12, 255:1, 255:4, 255:16, 256:16, 256:20, 257:8, 257:20, 258:19, 258:25, 259:3, 259:11
**cards** [1] - 119:1
**care** [3] - 172:20, 198:12, 255:17
**career** [1] - 182:14

**Carroll** [1] - 113:19
**carry** [1] - 156:16
**case** [11] - 124:21,
142:24, 185:14,
194:18, 206:17,
233:14, 242:20,
244:5, 247:18,
252:11, 252:21
**cases** [1] - 202:4
**Casey** [1] - 257:4
**cash** [27] - 142:8,
142:10, 142:12,
142:16, 142:17,
142:19, 142:21,
144:25, 145:16,
145:25, 146:6,
149:13, 149:14,
149:22, 149:23,
150:12, 150:19,
151:10, 153:16,
158:20, 161:7,
165:19, 224:15,
224:16
**cash-like** [1] - 149:14
**cashier's** [17] - 123:9,
124:4, 124:7,
130:18, 132:3,
132:6, 133:17,
139:8, 139:12,
139:15, 146:1,
146:5, 146:9, 150:6,
150:24, 151:3, 173:1
**category** [2] - 214:14,
215:8
**caveat** [1] - 189:21
**CBP** [3] - 151:18,
151:24, 160:20
**CBP-1** [1] - 154:12
**cement** [1] - 204:7
**Center** [1] - 158:4
**center** [12] - 123:3,
123:6, 125:1,
127:22, 129:18,
142:15, 144:7,
144:9, 152:5,
157:12, 157:17,
157:18
**center's** [1] - 123:23
**centers** [1] - 123:7
**certain** [4] - 145:16,
145:24, 185:20,
214:8
**certainly** [2] - 142:19,
191:13
**certification** [2] -
154:13, 155:24
**Certified** [2] - 262:8,
262:19
**certified** [3] - 157:16,
157:23, 157:25

**certify** [1] - 262:10
**chairman** [1] - 177:5
**chance** [4] - 243:9,
256:14, 259:12,
259:18
**changed** [1] - 133:13
**changes** [1] - 246:14
**chapters** [1] - 193:21
**charge** [2] - 211:5,
227:12
**charges** [1] - 172:3
**charging** [1] - 187:6
**charitable** [1] - 232:2
**charity** [11] - 183:18,
194:15, 196:21,
196:23, 197:6,
197:7, 199:1, 199:4,
201:20, 202:17
**CHARLES** [1] - 113:6
**chart** [1] - 128:3
**charts** [1] - 163:25
**chase** [1] - 173:19
**Chech** [1] - 236:7
**Chechnya** [6] -
232:10, 233:11,
233:14, 233:16,
236:8, 236:12
**check** [67] - 122:8,
122:13, 123:9,
124:4, 124:7,
127:25, 128:23,
129:11, 129:14,
129:16, 129:19,
130:3, 130:9,
130:12, 130:14,
130:19, 131:3,
131:6, 132:3, 132:5,
132:7, 132:17,
133:7, 133:17,
138:19, 138:20,
138:23, 139:4,
139:8, 139:12,
139:16, 146:5,
151:4, 153:21,
160:7, 172:16,
173:2, 197:20,
202:19, 202:21,
202:22, 214:21,
215:22, 216:11,
216:23, 218:11,
219:2, 221:10,
221:13, 221:22,
221:24, 224:7,
225:8, 226:4,
226:20, 226:23,
231:10, 234:21,
235:2, 235:7, 235:8,
237:16, 240:21,
247:22
**checkbook** [1] -

129:19
**checked** [2] - 194:9,
194:19
**checking** [1] - 117:21
**checklist** [1] - 197:19
**checks** [74] - 119:23,
122:6, 123:5,
123:15, 123:16,
123:22, 124:14,
124:19, 124:20,
124:25, 126:1,
126:16, 127:3,
127:13, 127:20,
129:1, 141:9,
141:12, 141:14,
141:15, 141:22,
143:23, 143:24,
144:1, 144:12,
144:15, 146:1,
146:2, 146:7, 146:9,
150:6, 150:7, 150:9,
150:10, 150:11,
150:14, 150:24,
151:3, 151:11,
153:6, 153:19,
154:2, 158:20,
159:8, 159:19,
159:20, 161:7,
161:11, 165:19,
167:14, 167:19,
187:22, 203:23,
203:25, 206:1,
207:8, 207:11,
214:2, 215:7, 215:8,
225:4, 225:5, 225:9,
225:20, 226:25,
228:15, 246:18,
246:23, 247:5,
247:17, 247:19,
247:20, 248:9
**chief** [2] - 148:3, 156:6
**chris.cardani@
usdoj.gov** [1] - 113:5
**CHRISTOPHER** [1] -
113:2
**church** [4] - 194:14,
194:18, 196:21,
197:4
**circle** [1] - 214:5
**Circuit** [1] - 262:9
**circumstance** [1] -
151:2
**circumstances** [4] -
130:11, 149:17,
183:10, 194:11
**cities** [1] - 252:12
**city** [2] - 116:9, 162:15
**civil** [1] - 252:11
**claimed** [1] - 157:15
**classified** [1] - 228:20

**clean** [6] - 203:15,
204:5, 214:13,
215:1, 235:24, 244:6
**cleaned** [1] - 205:23
**clear** [1] - 255:19
**clearing** [1] - 246:8
**CLERK** [10] - 115:9,
115:11, 146:14,
146:16, 168:11,
168:14, 168:19,
179:22, 179:24,
180:2
**clerk** [3] - 115:9,
242:8, 255:23
**client** [27] - 134:2,
145:13, 170:22,
176:16, 185:6,
185:8, 185:12,
187:19, 187:21,
189:22, 190:10,
191:1, 191:12,
191:14, 192:21,
193:4, 195:7,
203:11, 203:22,
222:19, 223:16,
230:11, 232:8,
235:23, 236:16,
238:24, 244:24
**client's** [2] - 193:3,
229:4
**clients** [2] - 188:20,
190:12
**close** [4] - 169:20,
172:23, 173:3,
173:15
**closed** [1] - 144:12
**closer** [1] - 147:9
**closing** [12] - 169:21,
171:1, 172:20,
176:8, 176:10,
176:15, 178:22,
179:2, 223:16,
223:18, 223:19
**closings** [2] - 169:17,
172:7
**CMIR** [12] - 148:17,
148:18, 149:1,
153:24, 157:11,
157:13, 158:3,
158:23, 159:15,
160:1, 164:9, 166:1
**CMIRs** [12] - 150:3,
150:25, 152:7,
154:15, 156:4,
156:24, 157:3,
157:9, 157:10,
161:9, 161:17, 162:1
**code** [6] - 193:20,
199:24, 200:1,
201:12, 203:2, 212:3

**coded** [7] - 215:8,
219:14, 221:3,
225:8, 225:21,
226:19, 237:5
**coding** [1] - 216:15
**collect** [1] - 149:8
**collecting** [1] - 242:14
**collective** [1] - 233:8
**Colleen** [3] - 142:24,
238:3, 245:8
**combination** [2] -
157:5, 260:4
**coming** [11] - 130:3,
151:4, 153:8, 161:7,
161:16, 164:3,
166:21, 171:15,
173:11, 178:14,
230:25
**comments** [2] -
203:16, 246:15
**committee** [1] - 177:5
**communication** [1] -
188:23
**community** [2] -
177:20, 177:24
**company** [9] - 172:19,
173:18, 173:21,
176:12, 183:3,
183:4, 183:5,
223:20, 259:21
**compared** [3] -
182:22, 205:19,
227:24
**comparison** [1] -
165:16
**compensation** [1] -
196:6
**complete** [5] - 212:11,
248:7, 249:19,
250:5, 262:11
**completed** [8] -
136:11, 158:22,
205:6, 211:1,
232:16, 250:2,
251:16, 251:21
**complicated** [1] -
261:14
**comprise** [2] - 169:13,
262:11
**computer** [8] - 206:2,
209:1, 209:6,
209:14, 235:4,
235:9, 235:11,
235:21
**computers** [1] -
207:25
**concern** [1] - 189:18
**concerning** [2] -
221:24, 223:16
**confer** [6] - 161:3,

167:24, 168:2,
185:24, 238:15,
249:9
**conference** [1] -
175:17
**conferences** [1] -
174:5
**confident** [1] - 243:11
**confirm** [1] - 225:23
**confrontation** [1] -
256:11
**confusion** [1] - 164:17
**connection** [1] -
187:11
**connections** [4] -
211:10, 249:25,
250:14, 250:17
**consisted** [1] - 182:2
**consistent** [1] -
132:20
**consult** [1] - 168:5
**consulted** [1] - 249:1
**contact** [5] - 123:25,
194:2, 197:23,
233:4, 251:10
**contacted** [2] - 198:1,
211:7
**contained** [1] - 210:24
**contemporaneous** [1]
- 174:22
**continued** [2] -
182:15, 201:13
**contractor** [1] - 152:1
**contribution** [4] -
219:8, 219:13,
220:7, 221:4
**contributions** [2] -
219:22, 221:3
**contributor** [1] -
213:18
**contributors** [1] -
213:16
**conversation** [10] -
122:21, 123:12,
174:20, 186:11,
211:2, 218:17,
218:21, 222:10,
222:24, 225:25
**conversations** [3] -
173:22, 211:9,
232:4
**Cooke** [1] - 171:21
**copy** [13] - 132:3,
140:22, 152:4,
152:7, 152:8,
157:16, 157:22,
157:23, 157:25,
176:23, 198:16,
215:21
**corner** [6] - 119:19,

127:7, 128:4,
131:18, 131:21,
137:13
**corporate** [2] - 182:8,
182:10
**correct** [136] - 116:8,
116:18, 116:25,
117:2, 117:8,
117:21, 118:8,
118:12, 118:16,
118:24, 119:2,
119:6, 119:20,
120:2, 120:19,
120:22, 121:19,
121:23, 122:2,
122:11, 122:14,
122:19, 124:5,
124:11, 125:4,
125:6, 125:11,
125:15, 125:17,
126:6, 126:14,
127:13, 128:17,
129:9, 129:23,
130:1, 130:4, 130:7,
130:19, 131:5,
131:15, 132:8,
132:11, 132:14,
132:16, 133:4,
133:23, 134:7,
134:10, 135:4,
135:14, 136:4,
136:12, 136:25,
137:11, 137:15,
137:23, 139:1,
139:19, 139:22,
140:8, 140:14,
140:20, 141:6,
141:14, 141:17,
142:4, 142:22,
142:25, 143:4,
143:6, 145:8,
147:13, 147:17,
147:24, 148:15,
151:12, 151:21,
152:13, 152:24,
153:2, 153:10,
153:18, 154:22,
155:5, 155:8,
155:13, 155:19,
156:21, 157:7,
158:7, 158:19,
159:2, 159:6,
159:10, 159:13,
162:11, 166:9,
166:23, 167:15,
178:23, 185:3,
186:23, 187:7,
189:4, 189:6,
190:11, 193:15,
194:25, 196:16,
197:9, 199:14,

199:18, 200:6,
200:10, 208:22,
212:16, 213:19,
214:18, 218:10,
218:12, 220:1,
220:17, 220:20,
226:2, 228:17,
229:15, 230:6,
232:1, 235:19,
242:18, 242:20,
250:13, 250:23,
257:19, 262:11
**corrected** [1] - 246:17
**correctly** [2] - 163:15,
166:6
**correspond** [1] -
127:8
**cost** [9] - 124:7,
133:10, 135:22,
222:15, 223:14,
225:25, 227:2,
229:13, 234:18
**costs** [3] - 225:7,
225:23, 240:19
**COUNSEL** [1] - 113:1
**counsel** [6] - 161:3,
168:2, 185:24,
238:15, 249:9, 252:3
**counselor** [1] - 179:4
**counted** [1] - 142:17
**counter** [4] - 129:13,
129:19, 141:10,
163:21
**counterterrorism** [1] -
165:10
**country** [15] - 149:15,
153:4, 156:11,
156:12, 156:13,
163:19, 164:3,
164:11, 164:14,
164:19, 166:8,
166:22, 167:19,
223:7, 252:12
**County** [2] - 262:6,
262:9
**couple** [9] - 181:5,
181:12, 188:10,
192:16, 194:21,
195:8, 223:24,
252:20, 253:13
**course** [5] - 178:5,
222:19, 232:23,
235:22, 259:4
**COURT** [63] - 112:1,
112:14, 115:5,
115:8, 141:1,
146:11, 161:21,
162:22, 165:25,
167:22, 168:1,
168:4, 168:7,

168:10, 177:14,
179:10, 179:12,
179:15, 179:17,
179:20, 236:25,
242:8, 248:17,
252:2, 252:5, 252:9,
252:24, 253:2,
253:4, 253:9,
253:18, 253:23,
254:1, 254:7, 254:9,
254:23, 254:25,
255:3, 255:10,
256:1, 256:13,
256:19, 258:7,
258:10, 258:14,
258:20, 259:2,
259:4, 259:8,
259:10, 259:12,
259:17, 260:7,
260:9, 260:13,
260:15, 260:21,
260:25, 261:3,
261:6, 261:12
**court** [5] - 161:16,
171:15, 173:11,
230:25, 252:14
**Court** [9] - 112:23,
112:23, 239:15,
242:14, 248:14,
255:25, 258:25,
262:9, 262:19
**court's** [1] - 253:15
**courthouse** [2] -
172:21, 176:12
**courtroom** [2] -
252:18, 252:23
**covered** [6] - 150:2,
150:10, 150:11,
150:24, 152:20,
169:25
**covering** [1] - 128:15
**CPA** [1] - 181:2
**created** [4] - 129:16,
199:22, 226:11,
228:14
**creation** [1] - 147:17
**credit** [2] - 141:10,
142:19
**credits** [2] - 119:23,
172:4
**crime** [1] - 147:4
**crimes** [1] - 148:4
**criminal** [2] - 148:10,
169:13
**critical** [1] - 256:9
**cross** [22] - 141:1,
156:17, 162:22,
177:14, 216:3,
216:8, 225:15,

236:25, 238:9,
253:21, 253:24,
255:21, 256:7,
256:9, 256:10,
256:22, 256:25,
257:2, 258:3, 258:6,
258:13, 259:14
**Cross** [1] - 114:3
**CROSS** [4] - 141:2,
163:1, 177:15, 237:1
**cross-examination** [8]
- 253:21, 256:9,
256:10, 256:22,
256:25, 258:3,
258:6, 258:13
**CROSS-
EXAMINATION** [4] -
141:2, 163:1,
177:15, 237:1
**cross-examine** [2] -
256:7, 257:2
**cross-reference** [2] -
216:3, 225:15
**cross-referenced** [1] -
216:8
**CSR** [2] - 112:22,
262:18
**CTR** [1] - 145:7
**CTRs** [1] - 145:14
**currency** [13] - 145:6,
148:19, 148:25,
149:21, 149:22,
149:24, 149:25,
151:15, 153:16,
157:14, 161:10,
164:8
**current** [1] - 116:13
**custody** [1] - 126:2
**customary** [1] - 185:4
**customer** [5] - 116:24,
128:25, 136:17,
137:21, 144:24
**Customs** [1] - 151:17
**customs** [18] - 146:25,
147:18, 147:19,
147:22, 149:2,
149:3, 149:6, 152:3,
156:10, 160:9,
160:12, 160:16,
160:19, 160:23,
163:14, 163:16,
164:7, 164:12

**D**

**D.C** [2] - 147:4, 167:8
**dad** [3] - 178:3, 178:4,
178:5
**Danville** [1] - 181:6

**data** [5] - 149:4, 149:9, 187:22, 210:4, 244:25
**database** [2] - 152:1, 156:4
**date** [13] - 125:2, 125:5, 125:7, 126:20, 126:21, 127:11, 130:9, 157:13, 157:15, 159:23, 201:3, 227:20
**dated** [2] - 192:4, 192:6
**Dated** [1] - 262:15
**dates** [1] - 167:17
**days** [8] - 156:20, 166:20, 167:10, 177:25, 192:11, 195:7, 252:20
**deal** [5] - 172:22, 173:15, 175:2, 179:4, 183:13
**dealing** [1] - 255:23
**dealt** [3] - 130:15, 130:17, 183:11
**dear** [1] - 170:22
**debit** [8] - 122:3, 122:12, 122:13, 126:19, 127:25, 129:20, 131:8
**debited** [3] - 126:21, 129:22, 131:4
**debits** [2] - 138:6, 172:4
**DEBRA** [1] - 115:14
**Debra** [3] - 114:5, 115:7, 115:14
**December** [10] - 156:7, 184:16, 184:24, 196:19, 198:23, 205:12, 232:15, 242:17, 257:20, 257:21
**decide** [1] - 183:17
**declaration** [1] - 164:7
**declarations** [1] - 164:12
**declare** [4] - 164:8, 164:13, 164:18, 165:18
**declared** [1] - 162:7
**declaring** [1] - 161:10
**dedicated** [2] - 201:11, 202:9
**deduct** [1] - 199:13
**deductible** [1] - 199:2
**deemed** [3] - 197:4, 197:5, 255:8
**DEFENDANT** [1] -

113:10
**defendant** [3] - 116:19, 184:7, 190:6
**defendant's** [2] - 131:17, 139:20
**Defendants** [1] - 112:8
**Defender** [1] - 113:15
**defense** [5] - 169:13, 185:17, 190:5, 242:23, 258:22
**define** [1] - 244:23
**definitely** [2] - 204:10, 223:13
**definition** [1] - 150:5
**degree** [1] - 180:17
**delegation** [3] - 244:15, 244:17, 245:15
**deletations** [1] - 189:24
**delivered** [3] - 125:1, 127:20, 144:17
**demand** [1] - 224:13
**denomination** [3] - 123:5, 124:14
**denominations** [2] - 125:12, 143:14
**departed** [3] - 153:4, 155:13, 155:15
**departing** [6] - 149:20, 151:14, 151:17, 152:23, 159:4, 161:15
**department** [4] - 145:3, 148:22, 181:3, 181:24
**Department** [3] - 147:18, 149:7, 155:24
**departure** [6] - 155:11, 155:14, 156:9, 160:21, 160:24, 163:17
**depict** [1] - 157:8
**depicted** [1] - 127:5
**depicts** [1] - 157:9
**deposit** [10] - 121:1, 121:5, 121:22, 121:23, 141:8, 141:11, 212:2, 213:10, 236:11, 247:10
**deposited** [6] - 133:5, 137:4, 137:25, 138:22, 141:16, 150:23
**deposits** [19] - 119:23, 119:24, 150:22, 187:23, 206:1,

207:9, 207:10, 213:9, 213:10, 214:2, 246:8, 246:10, 246:18, 246:22, 247:5, 247:11, 247:16, 247:21, 247:23
**depreciation** [6] - 228:25, 229:1, 229:3, 229:8, 229:10, 229:20
**describe** [1] - 199:9
**described** [2] - 200:1, 254:19
**designation** [1] - 196:23
**detail** [4] - 182:12, 214:6, 227:20, 245:6
**detailed** [4] - 186:5, 244:20, 244:23, 245:18
**details** [7] - 135:25, 136:14, 218:6, 223:10, 225:1, 225:3, 233:24
**detecting** [1] - 148:10
**determination** [3] - 183:23, 199:23, 201:10
**determine** [5] - 150:23, 161:17, 199:4, 203:8, 225:2
**determined** [2] - 197:4, 199:20
**deterring** [1] - 148:10
**diagram** [1] - 207:18
**diagrams** [1] - 164:1
**difference** [1] - 183:3
**different** [5] - 137:12, 150:4, 150:5, 163:23, 200:22
**difficult** [4] - 150:13, 150:16, 150:22, 173:16
**difficulties** [1] - 251:3
**digital** [1] - 152:8
**digitally** [1] - 151:25
**dilatory** [1] - 205:16
**DIRECT** [4] - 115:15, 146:19, 168:23, 180:5
**direct** [1] - 255:22
**Direct** [1] - 114:3
**directed** [1] - 174:4
**directors** [2] - 191:4, 194:22
**disc** [1] - 210:23
**disclose** [1] - 189:23
**discuss** [4] - 123:3, 189:17, 249:7, 258:6

**discussed** [3] - 165:15, 166:2, 241:6
**discusses** [1] - 165:13
**discussion** [2] - 144:18, 216:22
**discussions** [2] - 179:3, 203:10
**disposition** [1] - 222:11
**disregard** [1] - 253:10
**distribute** [1] - 201:15
**distribution** [2] - 230:6, 230:13
**distributions** [1] - 203:4
**DISTRICT** [3] - 112:1, 112:2, 112:14
**division** [4] - 147:3, 149:7, 156:7, 169:21
**document** [21] - 134:11, 155:23, 156:12, 157:25, 172:6, 172:21, 186:1, 198:8, 200:19, 200:23, 201:20, 213:1, 233:18, 234:4, 236:4, 239:4, 242:4, 248:12, 252:2, 254:14, 255:7
**documentation** [5] - 130:14, 141:13, 193:10, 202:24, 203:24
**documented** [1] - 128:7
**documents** [32] - 156:23, 170:24, 170:25, 171:15, 171:17, 172:20, 173:7, 176:9, 176:20, 235:1, 236:5, 237:20, 239:11, 242:10, 242:14, 243:13, 248:15, 254:15, 254:20, 255:10, 255:13, 255:14, 255:15, 255:20, 256:2, 256:3, 256:4, 257:23, 258:15, 259:5, 259:14
**dollar** [4] - 124:13, 125:12, 143:13, 144:18
**dollars** [4] - 123:21, 124:9, 153:17, 158:17
**domestically** [1] - 136:15

**discussed** see above... **donation** [4] - 213:11, 213:20, 217:1, 219:3
**donations** [4] - 197:1, 199:1, 201:19, 213:10
**done** [28] - 119:7, 126:10, 134:17, 157:20, 172:21, 174:18, 179:5, 186:18, 187:9, 187:10, 188:23, 191:19, 191:20, 192:23, 195:21, 206:21, 210:4, 211:4, 226:15, 231:24, 236:19, 244:8, 245:1, 251:2, 251:5, 253:22, 260:5
**donor** [2] - 199:15, 220:22
**donors** [1] - 199:10
**door** [3] - 142:2, 182:13, 259:22
**doubt** [2] - 218:16, 256:25
**down** [46] - 115:21, 117:1, 118:3, 118:8, 119:5, 122:3, 122:12, 125:9, 134:22, 134:25, 135:6, 136:7, 137:2, 137:24, 146:11, 152:25, 153:11, 159:7, 159:17, 167:22, 170:21, 175:3, 175:4, 179:10, 187:21, 190:25, 194:7, 195:18, 196:4, 197:19, 199:21, 200:25, 211:16, 215:2, 219:8, 220:6, 221:11, 223:13, 227:10, 228:9, 229:19, 231:15, 231:19, 234:6, 251:11, 254:2
**downstairs** [5] - 158:13, 207:23, 207:25, 208:3, 209:2
**drew** [1] - 151:5
**drilled** [2] - 259:21, 259:22
**driver's** [1] - 134:21
**dropped** [1] - 224:17
**dual** [1] - 126:2
**due** [2] - 172:11, 204:23
**DUIVEN** [2] - 262:8, 262:18

**Duiven** [1] - 112:22
**during** [13] - 117:14,
123:25, 169:17,
174:3, 198:13,
198:25, 207:19,
208:25, 232:13,
232:19, 233:8,
233:20, 238:9

### E

**e-mail** [3] - 233:4,
233:9, 253:16
**e-mailed** [4] - 186:9,
210:23, 227:23,
227:25
**early** [2] - 252:6
**earn** [1] - 184:3
**easier** [2] - 210:1,
261:13
**East** [1] - 112:24
**east** [1] - 169:21
**effective** [2] - 256:10,
259:18
**effectively** [1] - 256:7
**efficient** [1] - 187:12
**effort** [1] - 260:19
**efforts** [2] - 165:10,
195:14
**eight** [2] - 194:7,
209:15
**either** [6] - 136:15,
158:20, 193:12,
211:14, 236:5,
240:24
**El** [7] - 121:11, 129:24,
130:2, 131:8,
131:13, 213:2,
213:18
**El-Fiki** [4] - 121:11,
131:13, 213:2,
213:18
**El-Fiki's** [3] - 129:24,
130:2, 131:8
**electronic** [4] - 157:5,
157:19, 248:21,
255:14
**electronically** [3] -
117:11, 157:22,
170:7
**electronics** [1] - 261:1
**embellishing** [1] -
250:25
**emphasized** [1] -
203:14
**employee** [2] - 130:17,
130:21
**enables** [1] - 187:25
**enclosed** [1] - 170:24

**end** [12] - 121:15,
186:8, 188:3, 188:4,
189:2, 195:3,
205:11, 206:25,
213:15, 233:3,
254:17, 254:19
**ending** [1] - 125:13
**endorse** [1] - 151:6
**endorsed** [2] - 150:6,
151:4
**ends** [2] - 137:13,
198:22
**enforcement** [4] -
146:25, 148:4,
149:12, 152:10
**engage** [1] - 250:24
**engaged** [8] - 184:21,
193:7, 249:21,
250:13, 250:19,
251:14, 251:15,
251:20
**engagement** [18] -
185:5, 185:7,
185:15, 189:10,
189:22, 191:17,
192:18, 206:15,
211:8, 243:24,
244:3, 249:19,
250:5, 250:9,
250:17, 250:21
**English** [1] - 133:4
**enhance** [1] - 148:9
**enlarge** [1] - 172:18
**ensure** [3] - 187:9,
189:17, 243:25
**enter** [2] - 207:10,
207:24
**entered** [11] - 157:22,
195:5, 206:2, 214:2,
246:25, 247:9,
247:11, 247:16,
247:19, 247:20,
247:23
**entering** [7] - 149:20,
152:23, 159:5,
161:9, 164:14,
187:22, 246:22
**enters** [2] - 152:1,
156:11
**entire** [2] - 247:10,
255:8
**entitled** [1] - 262:12
**entries** [8] - 211:25,
214:10, 226:17,
228:2, 237:25,
244:19, 247:1, 247:4
**entry** [12] - 149:8,
151:18, 156:9,
187:22, 195:23,
215:17, 216:19,

216:21, 219:12,
220:10, 227:21,
229:3
**envisioned** [1] - 223:2
**equipment** [3] - 229:5,
231:3, 253:17
**equivalents** [1] -
145:25
**errors** [2] - 189:23,
246:5
**escrow** [1] - 139:9,
139:18, 172:18,
175:18, 176:2,
178:22, 223:18,
223:19, 224:5,
224:18, 224:19
**especially** [5] - 185:6,
187:19, 188:5,
188:7, 227:10
**establish** [1] - 120:11
**establishes** [1] -
191:16
**estate** [5] - 169:12,
169:16, 169:17,
172:6, 173:23
**estimate** [3] - 187:2,
195:24, 195:25
**estimates** [2] - 193:12,
193:13
**estimating** [1] -
206:16
**et** [1] - 112:7
**EUGENE** [1] - 115:1
**Eugene** [4] - 112:7,
112:24, 113:4,
262:15
**eventually** [4] - 199:2,
206:1, 226:18,
246:17
**evidence** [5] - 156:2,
162:19, 174:8,
201:11, 202:8
**evidentiary** [1] -
254:18
**ex** [1] - 171:6
**exactly** [2] - 203:3,
207:17
**examination** [9] -
253:21, 256:9,
256:10, 256:22,
256:25, 257:1,
258:3, 258:6, 258:13
**EXAMINATION** [10] -
115:15, 141:2,
144:22, 145:22,
146:19, 163:1,
168:23, 177:15,
180:5, 237:1
**examine** [3] - 214:5,
256:7, 257:2

**excuse** [6] - 133:20,
161:2, 165:21,
171:25, 227:24,
238:6
**excused** [2] - 146:12,
179:14
**exed** [1] - 176:1
**exempt** [20] - 181:20,
183:14, 183:24,
184:1, 184:19,
190:21, 192:14,
193:21, 196:18,
197:8, 199:20,
201:16, 201:24,
202:5, 202:14,
203:2, 203:8,
231:23, 235:16
**exemption** [2] -
193:19, 201:13
**exempts** [1] - 188:6
**exhibit** [10] - 120:13,
125:20, 137:6,
138:4, 172:16,
191:24, 219:21,
229:17, 238:7
**Exhibit** [1] - 185:17
**exhibits** [4] - 117:4,
117:5, 120:13, 170:2
**exist** [1] - 189:24
**existed** [1] - 152:16
**exits** [1] - 252:23
**expect** [2] - 199:25,
261:8
**expected** [1] - 244:21
**expects** [1] - 245:18
**expedited** [1] - 259:22
**expenditure** [1] -
203:25
**expense** [6] - 212:1,
214:7, 214:14,
215:8, 215:9, 224:13
**expenses** [11] - 183:6,
183:8, 195:3,
200:15, 214:4,
214:7, 214:11,
214:14, 215:2,
237:12, 245:3
**experience** [1] -
180:20
**explain** [1] - 183:2
**explained** [2] -
120:14, 127:23
**exported** [1] - 153:1
**Express** [5] - 123:17,
123:22, 124:18,
129:1, 150:9
**express** [1] - 125:10
**extension** [1] - 212:8

### F

**face** [4] - 116:1,
232:21, 233:9
**fact** [2] - 241:9, 246:13
**fair** [5] - 118:20,
135:16, 199:8,
208:19, 218:7
**fairly** [2] - 182:24,
215:10
**fall** [2] - 150:4, 150:5
**false** [2] - 230:11,
231:10
**familiar** [27] - 117:3,
121:2, 121:8,
122:18, 122:21,
130:25, 134:11,
136:13, 136:14,
137:7, 137:8, 139:3,
141:4, 147:25,
148:16, 152:14,
154:8, 154:15,
164:21, 165:5,
165:11, 165:22,
165:23, 170:25,
171:14, 173:10,
234:21
**far** [5] - 175:4, 188:9,
191:17, 208:20,
213:22
**fascinating** [1] - 261:3
**faster** [1] - 261:7
**father** [1] - 177:23
**faxed** [3] - 212:19,
215:23, 215:24
**FCRR** [2] - 112:22,
262:18
**February** [6] - 120:24,
121:10, 198:19,
212:25, 213:2
**fed** [2] - 171:6, 176:1
**federal** [2] - 165:2,
199:21
**Federal** [1] - 113:15
**fee** [11] - 121:16,
128:25, 129:3,
129:4, 140:19,
187:5, 187:15,
190:2, 211:3, 227:12
**fees** [3] - 133:13,
185:12, 206:23
**fellow** [2] - 220:22,
235:12
**felt** [1] - 203:15
**few** [10] - 117:11,
134:13, 159:25,
192:11, 195:7,
208:6, 225:10,
233:7, 252:13

**figure** [12] - 121:13, 126:8, 166:11, 172:10, 219:16, 219:24, 220:16, 229:16, 229:19, 237:17, 237:18, 237:21
**figures** [4] - 195:2, 195:5, 195:16, 195:19
**Fiki** [4] - 121:11, 131:13, 213:2, 213:18
**Fiki's** [3] - 129:24, 130:2, 131:8
**file** [40] - 145:14, 151:11, 151:15, 171:11, 173:25, 174:6, 174:14, 174:17, 175:21, 176:24, 176:25, 188:17, 191:10, 193:13, 194:8, 194:12, 194:14, 194:16, 200:8, 221:23, 225:13, 227:23, 227:25, 238:18, 239:9, 242:20, 242:23, 243:2, 243:10, 243:14, 243:18, 248:25, 249:6, 255:8, 257:1, 257:9, 257:14, 257:22, 259:8
**filed** [24] - 149:18, 152:6, 152:8, 154:15, 156:4, 156:24, 157:4, 157:13, 158:1, 158:6, 159:15, 161:18, 162:1, 162:2, 162:18, 162:19, 166:7, 166:20, 172:21, 176:11, 192:14, 200:18, 217:18, 229:9
**files** [6] - 156:8, 169:24, 174:9, 180:11, 233:3, 237:16
**filing** [3] - 145:17, 162:18, 251:23
**fill** [4] - 134:1, 145:1, 148:21, 153:6
**filled** [6] - 134:5, 145:1, 149:19, 151:23, 152:22, 193:24

**filling** [2] - 210:19, 223:11
**final** [2] - 176:13, 220:15
**finalized** [1] - 172:5
**finally** [2] - 196:19, 205:1
**finance** [1] - 147:4
**financial** [8] - 124:1, 148:4, 148:7, 148:11, 148:12, 149:12, 156:6, 184:3
**financially** [1] - 208:23
**FinCEN** [10] - 148:1, 148:4, 148:6, 148:7, 149:3, 149:9, 149:10, 152:14, 157:24
**FinCEN-1** [1] - 155:22
**FinCEN-2** [1] - 156:23
**FinCEN-2-A** [1] - 158:16
**FinCEN-2-E** [1] - 166:24
**FinCEN-3** [2] - 148:23, 152:16
**FinCEN-4** [3] - 157:1, 166:4, 166:19
**fine** [11] - 168:8, 173:19, 185:13, 239:18, 252:25, 253:2, 256:19, 257:11, 258:8, 258:19, 260:25
**fingers** [2] - 117:13, 185:20
**finish** [2] - 217:16, 260:17
**finished** [3] - 217:20, 252:2, 255:22
**firm** [9] - 180:23, 181:2, 181:5, 181:10, 181:22, 181:23, 182:4, 182:17, 182:18
**first** [34] - 123:25, 126:22, 139:9, 139:17, 143:2, 144:8, 172:18, 175:18, 176:1, 176:3, 180:9, 182:1, 185:2, 189:5, 191:25, 192:6, 192:16, 198:8, 203:13, 205:17, 210:14, 222:25, 226:10, 227:4, 228:12, 232:16, 233:13, 240:13, 241:1, 241:9,

241:12, 245:22, 248:17, 253:13
**five** [14] - 155:12, 156:20, 176:9, 176:13, 182:20, 207:14, 215:7, 216:16, 219:5, 246:2, 253:5, 253:7, 253:8, 254:15
**five-day** [1] - 155:12
**fix** [1] - 246:13
**fixed** [6] - 228:21, 229:4, 229:21, 229:22, 230:7, 235:15
**flatly** [1] - 245:14
**flew** [2] - 163:4, 163:8
**flight** [2] - 155:20, 155:21
**flights** [1] - 162:3
**flipped** [1] - 171:16
**flying** [2] - 163:12, 164:5
**focusing** [1] - 148:13
**folder** [1] - 126:23
**follow** [2] - 183:24, 186:10
**followers** [1] - 203:17
**footnote** [1] - 165:13
**FOR** [4] - 112:2, 113:2, 113:10, 114:3
**for-profit** [2] - 183:4, 183:5
**foregoing** [1] - 262:10
**foreign** [2] - 149:24, 156:2
**forget** [1] - 174:23
**forgot** [2] - 158:13, 220:5
**form** [47] - 134:1, 134:4, 134:8, 145:2, 145:5, 147:21, 148:21, 149:2, 149:10, 149:17, 149:19, 150:10, 150:11, 150:14, 150:15, 152:4, 152:7, 152:15, 152:16, 152:22, 157:20, 160:8, 160:10, 160:12, 160:22, 163:14, 164:6, 164:7, 166:11, 166:12, 166:20, 167:17, 167:20, 183:18, 184:20, 184:21, 186:24, 193:23, 194:8, 196:6, 200:3, 201:2, 213:15,

231:18, 249:19
**formal** [1] - 193:9
**forms** [15] - 149:5, 149:9, 149:11, 151:16, 151:19, 151:22, 154:5, 157:6, 160:1, 164:4, 164:11, 166:2, 189:15, 192:15
**forth** [4] - 197:14, 198:6, 204:4, 211:12
**forward** [2] - 115:11, 116:1
**foundation** [10] - 117:19, 118:4, 119:17, 121:12, 137:18, 170:22, 187:1, 194:5, 196:5, 199:6
**Foundation** [10] - 132:12, 138:13, 156:1, 170:14, 177:2, 184:18, 186:15, 186:19, 193:24, 233:20
**foundation's** [1] - 131:12
**founders** [1] - 183:16
**four** [12] - 166:20, 167:10, 175:6, 186:25, 188:14, 194:20, 198:24, 206:16, 207:14, 208:8, 240:9, 240:16
**four-hour** [1] - 206:16
**four-year** [1] - 198:24
**FP** [1] - 243:5
**FPD** [5] - 238:10, 243:5, 243:10, 243:12, 243:17
**FPD-U.S** [5] - 238:10, 243:5, 243:10, 243:12, 243:17
**frame** [2] - 212:11, 218:3
**frankly** [1] - 258:20
**fraud** [1] - 189:24
**Friday** [2] - 260:18, 260:19
**friends** [2] - 223:2, 223:6
**frisked** [1] - 253:17
**front** [7] - 115:22, 117:12, 119:12, 127:24, 127:25, 142:1, 248:22
**fulfilling** [1] - 165:3
**full** [2] - 115:12, 259:11
**funds** [11] - 135:17,

137:25, 139:23, 172:23, 175:17, 201:11, 201:14, 201:15, 202:8, 202:10, 222:11
**future** [1] - 210:3

**G**

**game** [1] - 253:6
**GAO-09-883** [1] - 165:9
**gather** [1] - 193:2
**gathered** [2] - 120:15, 259:23
**general** [7] - 116:13, 117:17, 164:21, 165:1, 165:6, 213:25, 246:9
**generally** [3] - 121:3, 183:9, 183:16
**generated** [3] - 186:22, 227:19, 245:2
**get-go** [1] - 235:23
**gifts** [1] - 219:22
**given** [9] - 164:4, 164:6, 227:22, 230:20, 232:7, 234:12, 234:15, 255:4, 257:3
**glad** [1] - 261:9
**glass** [1] - 168:19
**goods** [1] - 164:14
**GORDER** [3] - 113:6, 260:8, 260:12
**governing** [1] - 193:21
**government** [10] - 115:7, 147:25, 154:9, 168:9, 203:17, 242:22, 255:24, 256:4, 256:8, 260:16
**government's** [2] - 117:5, 148:16
**governmental** [1] - 197:2
**graduated** [1] - 180:17
**grants** [3] - 219:22, 230:13, 230:18
**great** [2] - 259:16
**Greg** [1] - 254:4
**Gregory** [1] - 245:11
**ground** [1] - 250:15
**guess** [7] - 166:10, 190:14, 233:6, 237:15, 240:16, 241:15, 242:5
**guessing** [1] - 259:9

# H

**half** [3] - 255:2, 255:4, 256:14
**half-day** [2] - 255:2, 255:4
**hand** [17] - 115:9, 119:19, 123:8, 124:16, 127:7, 128:4, 131:17, 131:21, 137:13, 137:21, 146:14, 157:6, 164:12, 168:12, 179:22, 209:3, 216:10
**handed** [2] - 126:24, 164:11
**handful** [1] - 182:18
**handle** [1] - 123:6
**handling** [1] - 128:25
**hands** [1] - 211:13
**handwriting** [6] - 131:20, 174:10, 175:8, 176:4, 177:10, 219:9
**handwritten** [3] - 173:7, 215:15, 218:20
**happy** [1] - 256:19
**Haramain** [49] - 117:19, 118:4, 118:14, 119:17, 120:4, 121:12, 131:10, 131:13, 132:12, 136:24, 137:9, 137:17, 138:13, 138:25, 139:4, 155:25, 170:14, 172:22, 177:1, 184:18, 186:15, 186:18, 192:14, 193:24, 196:18, 198:11, 199:21, 204:14, 207:1, 207:4, 207:20, 208:20, 212:24, 213:16, 214:9, 216:21, 217:9, 219:14, 222:13, 223:2, 226:22, 227:6, 230:5, 233:19, 233:21, 236:12, 238:20, 241:19, 251:15
**hard** [1] - 133:13
**hat** [1] - 253:9
**head** [3] - 181:3, 236:12, 245:5

**headed** [1] - 162:16
**headquarters** [2] - 147:3, 148:2
**health** [1] - 179:12
**hear** [8] - 116:4, 123:25, 147:9, 163:14, 217:4, 217:7, 258:4, 261:3
**heard** [7] - 211:14, 222:21, 222:25, 228:13, 233:13, 241:9, 241:19
**hearing** [2] - 253:15, 258:25
**held** [2] - 179:16, 262:12
**helen** [1] - 130:18
**Helen** [1] - 130:20
**help** [10] - 126:20, 163:11, 163:19, 169:20, 171:21, 178:5, 204:7, 207:21, 214:17, 259:20
**helped** [1] - 217:25
**helpful** [2] - 186:12, 224:23
**helping** [2] - 209:25, 239:23
**hereby** [1] - 262:10
**highlight** [5] - 117:13, 121:1, 122:4, 141:17, 152:21
**highlighted** [1] - 120:16
**Highway** [1] - 207:15
**Hijaz** [1] - 133:6
**hired** [3] - 249:18, 257:18
**history** [2] - 121:3, 121:20
**hit** [1] - 131:3
**HOGAN** [1] - 112:13
**holding** [2] - 214:12, 215:6
**homeland** [1] - 146:25
**Homeland** [3] - 147:18, 149:7, 155:25
**homework** [1] - 161:16
**honest** [1] - 235:25
**Honor** [21] - 161:20, 162:23, 167:24, 168:3, 179:11, 179:14, 179:19, 239:21, 242:6, 242:10, 242:13, 248:11, 248:24, 255:19, 256:5,

256:17, 259:16, 260:8, 260:12, 260:24, 261:14
**HONORABLE** [1] - 112:13
**hopefully** [1] - 176:1
**hour** [1] - 206:16
**hourly** [2] - 187:4, 187:13
**hours** [10] - 145:15, 187:2, 187:3, 187:15, 188:14, 192:16, 192:21, 192:24, 195:8, 246:3
**house** [3] - 177:18, 207:13, 207:24
**HUD-1** [1] - 172:6
**humanitarian** [1] - 236:21
**hundred** [3] - 123:21, 128:9, 138:7

# I

**I-94** [5] - 154:8, 154:11, 154:14, 156:8, 156:10
**I-N-G-R-A-M** [1] - 115:14
**ICE** [13] - 147:12, 147:13, 147:15, 147:21, 147:23, 148:23, 152:15, 154:11, 155:22, 156:7, 156:23, 157:1, 158:16
**ID** [1] - 134:19
**idea** [4] - 163:7, 185:12, 241:16, 241:17
**ideal** [1] - 187:24
**identified** [3] - 145:12, 212:24, 213:20
**identify** [11] - 119:11, 153:12, 171:23, 188:21, 213:9, 213:11, 213:25, 225:7, 238:17, 249:4, 254:14
**II** [2] - 158:2, 158:3
**illegal** [1] - 189:23
**illicit** [1] - 147:4
**immediate** [1] - 251:23
**immediately** [3] - 249:20, 251:15, 251:20
**immigration** [3] - 146:25, 147:20,

149:3
**implementing** [1] - 209:25
**import** [1] - 153:1
**important** [8] - 143:9, 203:1, 223:10, 223:13, 235:13, 253:3, 260:24, 260:25
**imported** [1] - 153:10
**impressed** [1] - 223:5
**IN** [1] - 112:1
**inaccurate** [1] - 230:7
**inadequate** [4] - 205:21, 248:3, 248:6, 249:14
**Inc** [2] - 139:18, 193:25
**incentive** [1] - 184:3
**include** [3] - 154:2, 212:17, 231:6
**included** [4] - 194:22, 220:13, 229:23, 234:8
**including** [5] - 163:19, 173:7, 187:1, 189:23, 218:11
**income** [20] - 183:5, 183:6, 183:7, 183:9, 187:11, 188:13, 188:18, 199:17, 199:21, 200:7, 200:15, 214:4, 219:9, 219:13, 220:7, 221:3, 221:4, 224:14, 235:18
**incoming** [2] - 121:11, 124:25
**incorporated** [1] - 139:9
**incorrect** [1] - 221:5
**indeed** [1] - 213:17
**index** [1] - 243:21
**INDEX** [1] - 114:1
**indicate** [4] - 223:21, 225:13, 227:6, 249:13
**indicated** [1] - 141:4
**indicating** [3] - 125:24, 154:24, 171:11
**indication** [1] - 162:17
**individual** [5] - 128:5, 128:11, 134:14, 165:17, 200:18
**individuals** [4] - 118:21, 134:25, 159:4, 197:2
**inform** [3] - 189:25, 249:19, 250:6

**information** [39] - 120:16, 149:8, 155:11, 156:9, 156:14, 156:16, 157:6, 186:12, 188:19, 188:20, 189:15, 189:19, 191:7, 191:10, 191:12, 191:14, 193:4, 193:17, 195:15, 198:4, 200:17, 201:1, 201:5, 204:8, 204:16, 204:20, 205:2, 205:3, 205:4, 205:24, 206:5, 206:6, 210:21, 210:24, 211:23, 212:14, 230:10, 232:7, 251:22
**informational** [2] - 200:4, 200:16
**informed** [3] - 240:20, 259:13, 260:2
**Ingram** [9] - 114:5, 115:7, 115:14, 115:17, 121:2, 126:25, 133:8, 136:23, 141:4
**initial** [3] - 187:1, 197:15, 206:15
**initials** [2] - 170:3, 170:4
**input** [4] - 206:5, 210:4, 212:1, 227:15
**inputs** [1] - 244:24
**inquiries** [1] - 234:15
**inspection** [1] - 201:2
**instead** [1] - 240:4
**instructions** [3] - 153:23, 153:24, 154:2
**instrument** [7] - 149:1, 149:21, 150:5, 150:15, 151:7, 151:15, 158:21
**instruments** [8] - 124:2, 148:20, 149:14, 150:1, 150:2, 153:13, 153:20, 165:18
**intelligence** [3] - 148:7, 149:12, 152:12
**intent** [1] - 184:5
**interactive** [1] - 185:19
**interest** [3] - 224:3, 224:12, 224:14

**interested** [1] - 184:19
**Internal** [5] - 143:9, 180:22, 183:20, 184:20
**internal** [1] - 193:20
**internally** [1] - 134:5
**international** [14] - 134:15, 135:25, 136:9, 140:16, 148:12, 148:19, 151:19, 155:15, 160:16, 160:19, 160:21, 160:24, 163:17
**internationally** [4] - 134:4, 135:18, 136:16, 163:5
**Internet** [2] - 177:5, 200:20
**Internet's** [1] - 160:4
**interrupt** [1] - 258:20
**interviewed** [2] - 227:5, 227:8
**introduce** [2] - 248:25, 249:6
**investigations** [3] - 147:1, 152:3, 156:7
**investigative** [2] - 147:19, 147:20
**invoice** [1] - 202:23
**invoices** [1] - 203:24
**involve** [1] - 257:1
**involved** [12] - 135:1, 135:13, 135:17, 136:1, 136:16, 174:13, 177:23, 178:1, 181:20, 206:21, 206:22, 240:20
**involving** [1] - 165:9
**irregularities** [1] - 189:23
**irrelevant** [1] - 255:6
**IRS** [37] - 142:23, 183:22, 184:4, 189:20, 192:20, 196:15, 196:17, 196:24, 197:3, 197:14, 197:19, 197:20, 197:22, 198:6, 198:9, 199:2, 199:5, 199:19, 200:11, 202:17, 202:22, 203:7, 203:19, 205:7, 210:11, 213:22, 227:5, 227:18, 228:24, 229:9, 249:11, 249:21, 250:4, 251:13,

251:15, 251:25, 254:4
**IRS's** [1] - 198:1
**IRS-1** [5] - 210:14, 213:14, 219:21, 230:3, 231:14
**IRS-3** [1] - 191:22
**IRS-4** [1] - 198:7
**Islamic** [5] - 137:17, 170:14, 177:2, 177:20, 193:24
**issue** [6] - 143:9, 176:13, 254:9, 254:11, 254:12, 254:13
**issued** [12] - 130:12, 132:5, 132:9, 139:13, 139:17, 140:16, 150:18, 156:6, 156:10, 186:8, 198:7, 203:9
**item** [5] - 158:10, 171:6, 229:21, 240:13, 241:3
**items** [8] - 214:5, 218:2, 218:9, 237:9, 239:24, 240:9, 240:16, 241:5
**itself** [3] - 199:16, 213:13, 220:19

## J

**James** [1] - 180:4
**JAN** [2] - 262:8, 262:18
**Jan** [1] - 112:22
**January** [9] - 134:18, 135:19, 228:1, 248:5, 249:11, 257:19, 257:21, 257:22, 257:25
**Jennifer** [1] - 197:25
**JFK** [8] - 160:23, 161:19, 161:25, 162:10, 163:5, 163:13, 163:19, 164:1
**job** [6] - 180:23, 181:2, 215:6, 244:22, 251:16, 251:21
**John** [1] - 155:15
**jointly** [1] - 242:23
**Joplin** [1] - 169:5
**journal** [2] - 215:17, 219:12
**JR** [1] - 113:6
**judge** [13] - 133:5, 155:22, 158:12,

168:5, 236:23, 253:1, 253:13, 253:21, 255:6, 256:23, 257:13, 258:4, 258:25
**JUDGE** [1] - 112:14
**July** [1] - 143:13
**June** [15] - 136:3, 136:21, 137:1, 137:2, 138:4, 138:9, 139:2, 139:17, 159:24, 166:6, 166:19, 205:6, 210:25
**juries** [1] - 261:3
**jurors** [1] - 179:12
**JURORS** [1] - 252:8
**Jury** [3] - 115:4, 179:18, 252:23
**jury** [16] - 115:18, 122:20, 122:24, 127:17, 128:3, 179:17, 238:17, 239:19, 242:7, 248:16, 249:2, 252:5, 254:17, 257:13, 258:22, 259:14
**jury's** [1] - 258:21
**juxtapose** [1] - 220:4

## K

**K-A-N-A-N** [1] - 168:18
**Kadi** [1] - 194:23
**Kanan** [6] - 114:7, 168:9, 168:17, 168:25, 177:12, 177:17
**Kansas** [6] - 137:22, 138:9, 138:14, 138:17, 139:24, 139:25
**keep** [5] - 124:16, 168:7, 187:12, 201:13, 258:22
**keeping** [4] - 201:10, 202:25, 203:11, 204:3
**Kennedy** [1] - 155:15
**kept** [3] - 154:24, 174:19, 220:22
**Kevin** [3] - 114:6, 146:13, 146:18
**kind** [10] - 123:16, 124:16, 124:18, 144:25, 186:13, 192:20, 214:11,

223:1, 227:11, 253:13
**knowing** [1] - 143:8
**knowledge** [1] - 141:24
**known** [4] - 116:20, 148:18, 149:2, 149:10
**knows** [1] - 163:13
**Kohlmann** [1] - 257:5

## L

**laden** [1] - 203:17
**Laleh** [2] - 207:7, 208:13
**land** [1] - 231:2
**landed** [1] - 167:8
**Lane** [2] - 262:6, 262:10
**language** [2] - 132:23, 159:4
**large** [2] - 141:21, 242:20
**largest** [1] - 181:23
**larry@pdxlaw.com** [1] - 113:13
**laser** [1] - 261:2
**last** [6] - 201:23, 203:18, 216:14, 232:17, 259:20
**late** [4] - 204:21, 205:8, 205:9, 212:6, 212:7, 248:5
**law** [5] - 149:12, 152:9, 170:10, 182:10
**LAWRENCE** [1] - 113:10
**Lawrence** [1] - 113:11
**lawyer** [2] - 169:18, 184:16
**lawyers** [1] - 256:18
**leaded** [1] - 209:12
**learned** [1] - 224:7
**least** [5] - 143:1, 192:24, 197:1, 209:20, 221:7
**leave** [4] - 119:3, 154:25, 172:15, 174:16
**leaving** [6] - 151:13, 153:3, 161:18, 164:11, 164:13, 164:19
**led** [4] - 122:22, 130:12, 197:14, 210:21
**ledger** [1] - 246:9

**left** [9] - 131:21, 155:18, 156:19, 163:3, 167:19, 183:8, 211:13, 215:24, 216:10
**legal** [1] - 117:18
**length** [1] - 253:24
**less** [1] - 211:5
**letter** [34] - 117:4, 170:9, 170:21, 176:18, 178:23, 183:23, 185:5, 185:11, 185:15, 186:5, 186:8, 186:21, 189:9, 189:10, 189:11, 191:17, 192:6, 192:11, 192:17, 192:18, 196:17, 197:22, 198:6, 201:3, 206:15, 242:17, 243:24, 244:4, 249:11, 249:15, 249:17, 250:3, 250:22
**level** [4] - 187:21, 204:8, 211:4, 227:11
**liabilities** [2] - 200:14, 224:11
**liaison** [1] - 148:4
**license** [1] - 134:21
**likely** [1] - 240:23
**limit** [2] - 126:12, 145:16
**line** [22] - 152:25, 158:10, 195:23, 195:25, 197:3, 202:3, 219:21, 220:19, 220:23, 221:4, 228:21, 229:21, 230:9, 230:10, 230:11, 230:14, 230:18, 230:24, 231:2, 231:11, 231:12
**lined** [1] - 260:18
**lines** [4] - 120:7, 120:12, 134:25, 152:19
**list** [14] - 183:25, 213:9, 214:4, 242:10, 246:10, 255:10, 255:14, 255:17, 256:2, 256:4, 257:3, 257:10, 258:2
**listed** [8] - 119:5, 155:6, 172:3, 176:21, 201:12, 222:1, 226:7, 229:22

**listing** [3] - 137:18, 158:25, 229:12
**lists** [2] - 213:15, 231:23
**literally** [1] - 157:20
**living** [1] - 115:18
**loaded** [1] - 209:6
**loan** [1] - 224:13
**local** [3] - 172:21, 181:5, 182:18
**lock** [3] - 259:19, 259:21, 259:22
**locks** [1] - 260:3
**locksmiths** [1] - 260:3
**log** [1] - 175:21
**Lola** [2] - 171:4, 174:11
**Lola's** [1] - 175:13
**long-term** [1] - 130:21
**look** [12] - 126:24, 141:7, 158:16, 173:6, 224:22, 226:17, 233:3, 237:5, 237:16, 243:1, 247:13, 247:22
**looked** [9] - 131:7, 171:16, 179:2, 189:10, 229:17, 230:24, 239:24, 245:23, 247:9
**looking** [12] - 127:11, 131:1, 166:5, 197:11, 220:11, 229:2, 233:25, 237:20, 237:24, 239:23, 247:23, 253:12
**looks** [10] - 128:8, 135:6, 138:22, 140:12, 173:4, 174:11, 175:23, 210:16, 236:21, 245:4
**loss** [4] - 214:3, 245:2, 245:3
**lost** [2] - 202:1, 230:22
**love** [1] - 261:5
**low** [1] - 190:15

## M

**Madison** [1] - 181:2
**magic** [1] - 126:8
**Mahmoud** [2] - 121:11, 213:2
**mail** [4] - 152:5, 233:4, 233:9, 253:16
**mailed** [7] - 119:25,

186:9, 197:21, 210:23, 227:23, 227:25
**Main** [1] - 113:16
**main** [1] - 194:2
**maintained** [3] - 118:14, 157:20, 157:21
**majority** [3] - 215:12, 247:19, 247:20
**man** [3] - 213:20, 235:3, 235:9
**manage** [1] - 116:15
**manager** [4] - 115:19, 116:7, 125:25, 234:12
**mandatory** [1] - 172:6
**maneuver** [1] - 243:19
**Mansour** [1] - 194:23
**March** [30] - 122:8, 122:13, 125:3, 126:15, 126:17, 126:18, 130:9, 131:3, 132:15, 133:9, 152:17, 155:3, 155:13, 156:3, 156:5, 160:6, 160:8, 160:9, 161:19, 161:25, 162:10, 163:5, 198:2, 214:21, 216:5, 221:9, 221:21, 234:5, 236:8
**marked** [1] - 209:16
**marshal** [2] - 259:24, 260:11
**marshall** [1] - 259:24
**matasar** [1] - 242:16
**MATASAR** [44] - 113:10, 141:3, 144:19, 145:21, 145:23, 146:9, 177:16, 179:6, 179:9, 217:4, 217:7, 237:2, 238:8, 238:13, 239:14, 239:18, 239:20, 242:3, 242:9, 248:11, 248:18, 248:24, 252:4, 253:7, 254:5, 254:8, 254:11, 254:13, 254:24, 255:12, 255:18, 256:5, 256:17, 257:4, 257:16, 257:21, 258:11, 259:6, 259:9, 259:16, 260:23, 261:1, 261:5, 261:13

**Matasar** [7] - 113:11, 238:16, 239:22, 248:19, 249:7, 249:10, 260:22
**match** [1] - 205:20
**matched** [2] - 205:20, 205:24
**material** [1] - 189:25
**matter** [5] - 176:22, 222:4, 242:13, 252:10, 262:12
**maximum** [2] - 187:15, 188:15
**mean** [8] - 134:20, 173:4, 193:8, 196:22, 198:23, 201:17, 241:25, 256:23
**meaning** [1] - 187:18
**means** [8] - 157:24, 175:16, 196:25, 198:25, 221:4, 230:7, 231:12, 235:14
**Medford** [4] - 180:15, 181:7, 182:19, 198:12
**meet** [3] - 184:22, 191:5, 256:21
**meeting** [19] - 178:18, 178:19, 186:21, 186:22, 187:1, 192:17, 203:13, 217:14, 217:21, 237:3, 237:4, 237:7, 237:8, 237:15, 241:8, 251:11, 251:12, 256:24
**meetings** [10] - 174:5, 174:16, 188:10, 208:17, 232:20, 232:24, 233:6, 233:9, 234:24, 234:25
**members** [2] - 196:5, 252:5
**memory** [5] - 171:17, 178:21, 228:3, 238:12, 255:13
**mention** [2] - 123:18, 233:10
**mentioned** [5] - 190:19, 208:13, 215:1, 222:3, 233:15
**merchandise** [1] - 164:15
**merged** [1] - 147:21
**merger** [4] - 147:14, 147:15, 149:3, 152:2
**meshing** [1] - 211:11

**met** [11] - 128:9, 178:17, 184:17, 190:24, 191:6, 192:10, 195:7, 199:4, 233:15, 239:3, 239:5
**MICHAEL** [1] - 112:13
**MICHELLE** [1] - 113:15
**Michigan** [2] - 180:23, 181:22
**microphone** [6] - 115:21, 116:2, 147:7, 168:15, 179:24, 235:5
**middle** [1] - 214:21
**midwest** [1] - 137:9
**might** [10] - 163:23, 177:11, 191:1, 232:24, 234:14, 243:18, 245:5, 246:4, 253:1, 260:17
**migrates** [1] - 220:19
**mike** [1] - 253:15
**million** [2] - 158:17, 162:6
**mind** [2] - 218:16, 230:23
**mine** [3] - 177:11, 215:17, 219:10
**minimize** [1] - 187:17
**minister** [1] - 196:7
**minus** [5] - 216:15, 216:18, 216:19, 216:20
**minute** [5] - 128:23, 133:2, 185:18, 204:19, 215:20
**missing** [2] - 211:25, 248:9
**mission** [1] - 148:8
**Missouri** [8] - 138:9, 169:5, 169:7, 169:10, 169:22, 222:14, 223:4, 241:24
**misunderstanding** [1] - 185:8
**misunderstood** [1] - 248:13
**moment** [6] - 131:2, 136:19, 161:2, 167:24, 168:6, 173:6
**monetary** [11] - 148:20, 149:21, 150:1, 150:2, 150:5, 150:14, 151:7, 151:15, 153:13, 158:21, 165:18
**Monetary** [1] - 148:25

**money** [27] - 124:16, 124:18, 133:11, 134:3, 136:8, 138:10, 138:15, 148:13, 148:14, 151:6, 161:13, 161:15, 165:19, 172:3, 172:20, 173:20, 175:2, 175:19, 176:1, 178:25, 199:11, 202:6, 202:16, 203:7, 224:13, 231:24, 233:16
**month** [10] - 119:16, 121:24, 121:25, 129:25, 138:16, 152:17, 156:5, 159:23, 216:4, 217:18
**monthly** [1] - 234:4
**months** [2] - 197:23, 252:13
**Moore** [3] - 130:18, 130:20
**Moore's** [1] - 135:13
**morning** [3] - 252:7, 260:3, 260:16
**Morrison** [1] - 113:11
**mortgage** [2] - 223:22, 224:10
**mosque** [4] - 222:13, 222:15, 223:3, 223:4
**most** [9] - 150:12, 169:13, 188:20, 200:8, 226:16, 233:5, 240:23, 247:1, 247:4
**motions** [2] - 258:21, 258:22
**move** [9] - 175:5, 189:7, 210:9, 248:25, 249:2, 249:6, 254:19, 261:7, 261:8
**moved** [2] - 181:4, 181:7
**moving** [4] - 168:7, 204:11, 204:13, 211:1
**MR** [105] - 115:7, 115:16, 133:1, 140:25, 141:3, 144:19, 144:21, 144:23, 145:19, 145:21, 145:23, 146:9, 146:13, 146:20, 155:22, 158:12, 161:2, 161:20, 162:21,

162:23, 163:2,
165:21, 165:24,
167:21, 167:24,
168:3, 168:5, 168:9,
168:21, 168:24,
177:12, 177:16,
179:6, 179:9,
179:14, 179:19,
179:21, 180:6,
217:4, 217:7,
236:23, 237:2,
238:6, 238:8,
238:11, 238:13,
239:12, 239:14,
239:18, 239:20,
242:3, 242:9,
248:11, 248:18,
248:24, 249:7,
252:4, 253:1, 253:3,
253:7, 253:11,
253:20, 253:24,
254:4, 254:5, 254:8,
254:11, 254:12,
254:13, 254:24,
255:1, 255:4,
255:12, 255:16,
255:18, 255:19,
256:5, 256:16,
256:17, 256:20,
257:4, 257:8,
257:16, 257:20,
257:21, 258:4,
258:9, 258:11,
258:19, 258:25,
259:3, 259:6, 259:9,
259:11, 259:16,
260:6, 260:8,
260:12, 260:14,
260:16, 260:23,
261:1, 261:5,
261:10, 261:13
**multiple** [1] - 152:9
**Muslim** [1] - 203:16
**must** [5] - 150:2,
154:3, 197:1, 202:8,
247:18

**N**

**nail** [1] - 223:13
**name** [16] - 115:12,
118:25, 137:17,
140:7, 146:16,
146:17, 146:18,
168:16, 180:2,
184:10, 211:6,
211:7, 226:22, 240:3
**named** [2] - 207:7
**names** [2] - 191:3,
194:25

**Nashville** [1] - 167:5
**national** [6] - 152:5,
157:12, 157:17,
157:18, 158:4,
180:23
**naturalization** [1] -
147:20
**near** [2] - 174:19,
178:9
**necessarily** [3] -
120:17, 193:8,
255:21
**necessary** [1] - 254:22
**need** [18] - 164:18,
165:3, 166:10,
171:20, 179:12,
192:24, 193:5,
193:11, 202:21,
203:14, 214:13,
215:8, 225:6,
239:16, 256:21,
258:8, 260:9, 260:10
**needed** [6] - 184:20,
205:23, 212:21,
217:16, 224:9,
246:16
**needs** [2] - 172:4,
230:14
**negotiated** [1] - 151:8
**net** [2] - 183:6, 183:8
**network** [1] - 148:5
**never** [15] - 178:17,
179:3, 193:6,
204:24, 207:10,
207:11, 211:16,
230:23, 234:2,
249:25, 250:9,
250:11, 250:15,
251:3, 251:12
**New** [1] - 155:16
**new** [9] - 182:6, 185:6,
185:8, 224:6,
259:21, 259:22,
260:3, 260:4
**newly** [1] - 199:22
**news** [1] - 228:9
**next** [24] - 115:6,
118:6, 119:14,
120:6, 121:24,
121:25, 126:18,
133:24, 138:3,
146:12, 154:12,
167:22, 175:18,
179:19, 181:1,
197:21, 200:2,
200:24, 202:3,
217:18, 218:24,
239:20, 259:19
**Nickelen** [2] - 197:25,
198:13

**night** [2] - 252:25,
256:8
**nine** [2] - 157:10,
209:16
**nonchurch** [1] -
194:15
**nonprofit** [13] - 182:2,
182:5, 182:10,
183:3, 183:7,
183:14, 186:25,
187:20, 188:14,
188:17, 192:20,
223:25, 227:10
**nonprofits** [5] - 182:9,
182:16, 182:20,
183:11, 188:6
**normal** [3] - 227:9,
227:13, 227:14
**normally** [3] - 187:14,
188:13, 194:17
**notation** [2] - 122:6,
131:22
**note** [7] - 174:19,
174:24, 175:7,
175:21, 177:7,
223:23, 224:2
**notes** [10] - 173:8,
173:24, 173:25,
174:5, 174:8,
174:14, 174:16,
178:20, 215:16,
218:20
**nothing** [2] - 235:10,
257:22
**notice** [2] - 220:9,
255:2
**noticed** [3] - 234:16,
239:9, 253:18
**noting** [1] - 216:20
**nuances** [1] - 182:9
**number** [33] - 118:7,
118:8, 119:19,
122:8, 131:3,
134:19, 137:13,
142:6, 152:25,
155:20, 155:21,
156:23, 157:9,
157:11, 158:10,
177:8, 187:8,
189:15, 194:7,
195:19, 196:4,
213:14, 213:17,
218:24, 219:8,
233:6, 234:25,
238:10, 243:3,
243:17, 259:9,
260:17
**numbers** [7] - 125:13,
127:7, 172:2, 243:1,
243:11, 243:12,

243:19
**numerous** [1] - 246:5

**O**

**object** [2] - 165:24,
255:7
**objecting** [1] - 257:15
**objection** [10] -
161:20, 238:11,
239:12, 253:20,
256:16, 257:8,
260:1, 260:6, 260:7,
260:8
**obviously** [2] -
215:11, 256:21
**occasion** [4] - 166:14,
167:1, 167:4, 209:19
**occasionally** [1] -
173:24
**occasions** [1] -
156:24
**occupation** [1] -
146:23
**occurred** [1] - 174:21
**occurrence** [1] -
205:15
**October** [4] - 159:12,
212:11, 217:19,
217:20
**odd** [1] - 121:13
**ODL** [1] - 134:20
**OF** [4] - 112:2, 112:4,
112:12, 262:5
**offer** [1] - 186:6
**offered** [1] - 133:17
**offering** [1] - 239:13
**Office** [2] - 113:3,
113:7
**office** [18] - 120:3,
152:3, 160:20,
160:23, 163:14,
164:22, 165:1,
165:6, 175:1, 198:1,
206:3, 207:22,
207:25, 208:4,
209:2, 234:11,
236:12, 259:24
**officer** [4] - 123:11,
151:18, 260:2
**officers** [2] - 163:16,
194:22
**offices** [2] - 160:16,
170:10
**official** [1] - 196:7
**often** [1] - 141:21
**okayed** [1] - 175:1
**old** [1] - 149:2
**once** [18] - 128:10,

150:18, 150:21,
151:6, 159:3,
167:12, 174:12,
179:1, 182:19,
184:2, 209:20,
210:4, 210:19,
242:10, 245:12,
253:14
**one** [91] - 118:13,
118:25, 119:16,
121:6, 122:7,
124:21, 129:4,
129:6, 133:16,
135:14, 135:15,
140:7, 145:21,
149:11, 150:3,
150:6, 151:11,
151:16, 151:19,
152:22, 154:12,
158:9, 159:15,
159:23, 163:13,
171:20, 172:16,
174:7, 174:9, 175:8,
176:22, 179:13,
181:15, 182:1,
186:3, 186:24,
187:14, 189:2,
191:18, 193:21,
195:23, 196:6,
201:23, 207:7,
209:3, 209:6, 209:9,
209:10, 209:11,
209:12, 209:18,
209:19, 209:21,
210:9, 210:19,
211:14, 213:18,
214:9, 214:15,
216:14, 219:7,
219:19, 219:20,
220:10, 220:12,
221:4, 221:11,
222:6, 225:7,
226:10, 227:1,
228:24, 234:24,
234:25, 236:5,
237:3, 237:8, 240:3,
242:22, 253:1,
253:11, 256:17,
257:7, 257:17,
259:20, 259:25
**ones** [4] - 127:6,
149:7, 161:4, 231:7
**online** [3] - 160:2,
160:6, 160:10
**onsite** [1] - 187:23
**open** [2] - 142:3,
259:20
**opening** [1] - 257:16
**operate** [1] - 183:24
**operations** [1] -

123:11
**opposed** [1] - 201:24
**options** [3] - 123:4,
133:19, 133:21
**OR** [4] - 113:4, 113:8,
113:12, 113:16
**orally** [1] - 204:9
**order** [6] - 124:20,
124:25, 125:7,
126:7, 143:15, 144:3
**ordered** [7] - 123:12,
129:5, 143:17,
143:19, 143:21,
144:16, 259:23
**orders** [1] - 165:19
**ordinary** [1] - 256:23
**OREGON** [3] - 112:2,
115:1, 262:5
**Oregon** [24] - 112:7,
112:24, 115:20,
133:12, 134:21,
135:18, 138:13,
138:17, 138:22,
139:5, 139:25,
155:7, 159:1,
170:16, 172:22,
173:2, 173:15,
175:1, 176:19,
177:8, 180:15,
204:14, 262:9,
262:15
**organization** [30] -
173:17, 183:17,
184:1, 184:6,
184:18, 186:14,
194:8, 194:12,
196:18, 198:2,
199:5, 199:11,
199:16, 199:23,
200:1, 200:14,
201:21, 202:5,
202:14, 203:1,
203:6, 217:2, 217:8,
249:20, 250:6,
250:13, 250:18,
250:24, 251:14
**organizations** [3] -
181:21, 193:22,
201:15
**original** [6] - 127:3,
152:4, 152:7,
157:25, 221:15,
247:12
**originally** [2] - 181:4,
219:14
**otherwise** [1] - 249:4
**ourselves** [1] - 253:17
**outbound** [1] - 162:2
**outside** [4] - 181:2,
203:24, 203:25

**overall** [1] - 182:22
**overnight** [2] - 256:25,
259:1
**overruled** [1] - 161:21
**overseas** [3] - 151:9,
203:4, 230:6
**overstated** [2] - 230:8,
231:12
**own** [3] - 129:19,
181:6, 199:13

---

**P**

**P.C** [1] - 113:11
**P.M** [1] - 115:1
**p.m** [1] - 261:16
**package** [3] - 171:2,
176:10, 176:15
**page** [27] - 118:6,
120:6, 120:25,
133:4, 140:15,
154:17, 165:13,
171:6, 175:6, 176:3,
176:22, 191:23,
196:3, 198:8, 200:2,
200:24, 202:3,
210:14, 212:25,
213:14, 219:19,
219:20, 230:3,
231:13, 231:14,
231:18, 234:4
**pages** [2] - 194:21,
262:10
**paid** [10] - 122:6,
178:7, 191:21,
217:2, 217:5, 217:9,
219:4, 221:10,
223:21, 224:16
**paper** [24] - 201:21,
213:12, 213:19,
216:3, 220:10,
225:14, 238:3,
238:18, 239:23,
242:5, 243:2,
243:10, 243:13,
248:12, 249:5,
255:13, 255:23,
257:6, 258:12,
258:17, 260:22,
261:5
**papers** [12] - 178:22,
179:2, 216:8,
217:15, 221:20,
238:10, 249:2,
254:16, 257:24,
259:5, 259:23, 260:1
**paperwork** [1] -
201:22
**paragraph** [1] -

186:24, 188:12,
194:20
**paralegal** [2] - 171:4,
175:12
**paralegal's** [1] -
174:11
**pardon** [1] - 160:13
**part** [16] - 147:23,
153:12, 181:19,
195:24, 195:25,
216:7, 216:10,
222:14, 225:13,
227:2, 229:8,
232:16, 234:18,
254:6, 254:16
**particular** [10] -
154:19, 157:15,
170:18, 184:1,
209:1, 215:22,
216:23, 218:11,
235:7, 237:13
**partners** [1] - 182:2
**pass** [1] - 196:25
**passed** [1] - 130:24
**passengers** [2] -
163:4, 163:7
**passes** [1] - 223:21
**passport** [8] - 119:4,
128:7, 128:8, 142:5,
142:7, 156:14,
156:16, 156:18
**passports** [1] - 154:24
**past** [3] - 192:23,
212:9, 252:18
**pastor** [1] - 196:7
**patrol** [1] - 147:22
**pattern** [1] - 205:15
**pay** [8] - 128:1, 183:6,
183:9, 183:10,
188:1, 200:7,
224:12, 235:16
**payable** [1] - 223:23
**payee** [2] - 221:25,
226:21
**paying** [1] - 185:9
**payment** [3] - 129:21,
235:12, 235:21
**payroll** [2] - 235:14,
235:16
**pays** [1] - 199:16
**penalties** [1] - 154:6
**people** [19] - 148:21,
160:15, 162:13,
164:11, 164:13,
173:15, 173:23,
179:5, 182:3, 182:6,
182:11, 199:1,
214:9, 219:14,
224:13, 252:11,
260:19, 261:8,

261:10
**per** [1] - 188:15
**percent** [5] - 128:9,
129:3, 129:4, 129:6,
196:24
**percentage** [1] -
182:25
**perform** [1] - 185:12
**perhaps** [1] - 167:18
**period** [8] - 120:23,
198:19, 198:22,
198:24, 199:1,
199:3, 199:8, 239:21
**perjury** [1] - 154:6
**person** [7] - 119:11,
119:12, 120:15,
130:15, 151:4,
163:12, 204:6
**personal** [1] - 232:24
**pertain** [1] - 183:25
**Pete** [18] - 116:20,
118:1, 123:1,
127:21, 134:16,
139:11, 144:8,
170:12, 175:1,
175:17, 176:1,
176:8, 176:19,
177:7, 178:17,
184:11, 194:2,
245:14
**Pete's** [1] - 134:20
**Phoenix** [1] - 180:21
**phone** [6] - 127:19,
174:16, 192:13,
232:21, 232:24,
233:6
**phone's** [1] - 203:18
**phonetic** [3] - 130:18,
197:25, 211:10
**photos** [1] - 164:1
**phrase** [1] - 250:18
**physical** [1] - 157:20
**physically** [1] - 157:21
**pick** [4] - 116:2,
126:21, 163:14,
213:17
**picked** [4] - 127:14,
138:24, 223:24,
224:3
**picking** [1] - 253:15
**picture** [3] - 128:5,
128:7, 128:8
**piece** [9] - 170:19,
232:17, 238:3,
239:23, 242:5,
243:2, 248:12,
249:5, 257:5
**pieces** [1] - 243:13
**pile** [2] - 138:15,
258:16

**Pirouz** [2] - 116:19,
184:7
**PIROUZ** [1] - 112:7
**place** [2] - 174:6,
251:12
**placed** [2] - 186:1,
259:23
**places** [1] - 150:12
**Plaintiff** [1] - 112:5
**PLAINTIFF** [2] - 113:2,
114:3
**planned** [1] - 142:13
**play** [1] - 260:22
**plus** [4] - 140:19,
200:15, 219:5,
232:13
**point** [15] - 134:13,
147:14, 150:20,
173:14, 184:13,
190:9, 190:10,
193:6, 211:20,
224:17, 242:22,
245:1, 249:14,
252:21, 258:21
**pointed** [2] - 205:22,
211:2
**policy** [1] - 176:13
**popped** [1] - 234:17
**port** [2] - 151:18,
155:14
**portion** [2] - 205:20,
231:17
**Portland** [4] - 113:8,
113:12, 113:16,
198:1
**ports** [2] - 149:8,
151:24
**position** [1] - 249:8
**possibility** [1] -
133:18
**possible** [3] - 187:13,
187:21, 251:22
**post** [4] - 120:3,
171:1, 176:10,
176:15
**post-closing** [3] -
171:1, 176:10,
176:15
**potential** [1] - 164:17
**potentially** [1] - 223:9
**pouring** [1] - 168:19
**power** [2] - 198:15,
198:16
**practice** [9] - 164:5,
174:12, 181:6,
181:10, 181:19,
182:19, 182:25,
185:4, 191:10
**practiced** [1] - 174:4
**practicing** [2] - 169:7,

169:10
**prayer** [1] - 177:18
**preparation** [12] -
137:8, 186:24,
187:2, 187:11,
188:12, 206:19,
207:22, 210:21,
213:6, 235:1, 236:3,
256:24
**prepare** [26] - 182:8,
182:9, 182:11,
182:20, 184:21,
185:14, 188:14,
189:14, 189:19,
190:20, 190:23,
195:12, 195:15,
204:13, 206:17,
210:2, 210:7,
210:10, 217:17,
232:5, 238:19,
238:22, 239:1,
256:11, 256:22,
258:15
**prepared** [14] -
176:14, 184:20,
191:7, 192:1, 192:2,
192:15, 196:14,
207:18, 210:17,
227:6, 228:4, 228:7,
257:18, 257:24
**prepares** [1] - 172:19
**preparing** [1] - 224:23
**prepping** [1] - 239:8
**present** [5] - 113:18,
115:4, 130:13,
179:18, 248:14
**presented** [1] - 134:21
**pretty** [8] - 175:23,
177:11, 183:13,
206:24, 214:8,
248:3, 248:7, 252:19
**previous** [1] - 129:25
**previously** [2] -
143:20, 237:11
**price** [2] - 172:3,
225:3
**primarily** [1] - 212:14
**print** [2] - 214:2,
225:22, 245:2
**printed** [1] - 225:21
**printout** [1] - 217:25
**printouts** [4] - 205:18,
205:19, 205:24,
227:16
**private** [2] - 199:5,
200:19
**probationary** [1] -
199:8
**problem** [8] - 142:20,
173:17, 206:20,

215:3, 221:13,
221:23, 255:6,
255:18
**problems** [3] - 211:11,
246:6, 246:12
**procedural** [1] -
197:19
**procedure** [4] -
124:17, 227:9,
227:14
**procedures** [1] - 131:1
**proceedings** [2] -
261:16, 262:12
**PROCEEDINGS** [1] -
112:12
**proceeds** [2] - 147:4,
222:15
**process** [9] - 191:4,
191:21, 198:13,
205:25, 206:10,
206:17, 214:1,
246:17, 255:5
**processed** [1] - 182:4
**professional** [2] -
188:3, 259:21
**professionals** [1] -
181:24
**profit** [6] - 183:4,
183:5, 214:3, 245:2,
245:3
**program** [8] - 206:4,
209:12, 212:4,
214:20, 226:15,
227:20, 228:14,
231:20
**projections** [1] -
193:13
**promote** [2] - 231:24,
232:2
**promoting** [1] -
148:11
**proper** [2] - 243:12,
244:19
**properly** [1] - 213:22
**property** [4] - 169:21,
170:19, 172:9,
172:24
**proposal** [8] - 185:11,
186:5, 189:9,
189:11, 192:6,
192:11, 192:17,
242:17
**prosecution** [1] -
258:2
**protect** [1] - 257:2
**protection** [3] - 149:6,
151:18, 156:10
**prove** [3] - 202:16,
203:7, 203:25
**provide** [4] - 151:19,

169:24, 224:19,
256:8
**provided** [4] - 191:7,
200:17, 233:19,
243:22
**provides** [2] - 189:15,
189:19
**Public** [1] - 113:15
**public** [16] - 164:17,
183:18, 183:19,
194:15, 196:21,
196:23, 197:6,
197:7, 199:4,
200:23, 201:2,
201:19, 202:17,
219:24, 231:24,
232:2
**publicly** [1] - 199:25
**publicly-supported**
[1] - 199:25
**publish** [2] - 248:15,
254:16
**published** [1] - 165:6
**pull** [3] - 253:9, 256:2,
259:13
**purchase** [17] -
123:10, 123:13,
123:14, 124:13,
132:6, 139:8,
144:11, 146:4,
150:21, 172:3,
222:21, 222:24,
223:9, 223:10,
224:8, 225:2, 235:11
**purchased** [4] - 127:4,
132:4, 177:17,
206:13
**purchaser** [1] - 132:13
**purchasing** [1] - 123:4
**purpose** [2] - 203:8,
215:7
**purposes** [7] - 188:23,
201:12, 201:14,
202:9, 202:11,
202:17, 232:3
**pursuant** [1] - 233:19
**push** [3] - 125:20,
187:21, 227:10
**put** [24] - 120:12,
126:3, 135:14,
148:22, 153:4,
153:21, 166:4,
172:4, 182:2,
185:19, 193:5,
213:11, 220:2,
220:13, 226:21,
228:15, 237:6,
238:2, 244:6,
252:10, 257:9,
259:14, 260:4

# Q

**qualified** [1] - 183:23
**qualify** [1] - 194:18
**quantity** [2] - 125:10,
167:13
**quarters** [1] - 158:17
**questioned** [1] -
226:24
**questions** [15] -
159:25, 183:22,
190:24, 191:3,
192:25, 197:24,
205:5, 212:2, 218:5,
218:8, 225:4, 235:1,
254:15, 254:21
**quickbook** [1] -
214:15
**QuickBooks** [27] -
206:5, 206:13,
206:25, 207:5,
208:18, 209:7,
209:12, 209:14,
209:25, 210:23,
211:23, 212:15,
214:20, 217:16,
218:5, 219:14,
225:16, 226:15,
226:21, 227:19,
227:20, 227:23,
227:25, 228:4,
228:15, 245:2,
247:13
**quickly** [2] - 192:9,
251:22
**quite** [3] - 211:17,
233:7, 258:4

# R

**RAAJIDEEN** [1] -
168:17
**Raajideen** [2] - 114:7,
168:17
**rabbits** [1] - 253:9
**raise** [5] - 115:9,
146:14, 168:11,
179:22, 245:5
**Rajhi** [3] - 135:7,
135:9, 136:10
**range** [1] - 190:15
**rate** [2] - 187:4, 187:13
**rather** [3] - 121:13,
188:3, 254:13
**RDK** [3] - 170:3,
170:4, 175:19
**RDK-1** [1] - 170:8
**RDK-2** [3] - 170:6,
173:6, 176:23

**read** [6] - 155:23,
175:3, 251:19,
254:5, 254:7
**reading** [2] - 166:5,
166:19
**ready** [3] - 205:6,
254:5, 261:8
**real** [5] - 169:12,
169:16, 169:17,
172:6, 173:23
**reality** [1] - 230:5
**really** [11] - 202:21,
214:11, 215:5,
220:25, 230:13,
235:10, 239:7,
247:17, 248:2,
251:5, 251:8
**reason** [2] - 142:20,
145:12
**reasonably** [1] -
199:25
**receipt** [4] - 127:8,
134:8, 202:23, 255:8
**receive** [1] - 126:3
**received** [11] - 127:19,
155:24, 170:3,
174:8, 185:16,
192:17, 197:22,
198:11, 233:18,
238:6, 239:13
**receives** [1] - 196:6
**receiving** [1] - 125:25
**recent** [1] - 186:11
**recess** [1] - 179:16
**recessed** [1] - 261:16
**recipient** [2] - 202:4,
202:10
**reclassify** [1] - 199:5
**recognition** [1] -
193:18
**recognize** [9] -
117:22, 119:15,
128:4, 131:16,
132:19, 170:9,
175:8, 175:21, 190:5
**recognized** [1] -
196:20
**recollection** [1] -
144:16
**recommended** [2] -
206:4, 249:24
**reconciliation** [8] -
210:5, 216:4, 216:5,
216:9, 221:21,
244:25, 245:1,
246:24
**reconciliations** [5] -
187:24, 207:9,
207:11, 211:4,
212:22

**record** [21] - 115:13, 146:17, 155:23, 157:13, 157:17, 158:5, 158:11, 168:16, 180:3, 201:10, 202:20, 202:25, 203:11, 204:2, 207:8, 207:9, 212:25, 224:10, 224:11, 237:22, 252:11

**records** [28] - 121:7, 136:24, 152:5, 154:24, 156:18, 157:12, 157:18, 158:4, 178:21, 193:2, 201:13, 201:16, 202:15, 203:15, 204:5, 205:16, 205:18, 206:12, 212:21, 213:5, 217:24, 221:9, 223:16, 235:24, 242:4, 244:6, 258:11

**RECROSS** [1] - 145:22

**Recross** [1] - 114:3

**RECROSS-EXAMINATION** [1] - 145:22

**redirect** [2] - 258:16, 259:13

**REDIRECT** [1] - 144:22

**Redirect** [1] - 114:3

**reduce** [2] - 211:3, 219:18

**reentered** [1] - 167:12

**refer** [6] - 120:7, 144:6, 185:20, 210:10, 238:9, 258:15

**reference** [14] - 118:2, 153:22, 158:2, 158:3, 171:4, 188:25, 198:18, 200:3, 214:20, 216:3, 221:10, 221:20, 225:15, 238:7

**referenced** [2] - 216:8, 226:23

**references** [1] - 154:14

**referred** [3] - 144:9, 176:17, 184:16

**referring** [4] - 121:4, 176:10, 215:20, 250:8

**refers** [1] - 236:7

**reflected** [3] - 158:5, 175:15, 175:24

**reflections** [1] - 243:12

**refresh** [1] - 171:17

**refreshed** [2] - 228:3, 239:2

**refreshing** [5] - 203:13, 204:2, 204:4, 235:23, 238:11

**refugees** [1] - 236:13

**refund** [3] - 220:14, 220:25, 221:2

**refunded** [2] - 217:2, 218:14

**REG** [1] - 172:6

**REG-Z** [1] - 172:6

**regarding** [2] - 155:25, 170:18

**regardless** [1] - 256:23

**region** [1] - 233:10

**regional** [2] - 181:2, 182:17

**registered** [1] - 194:22

**registering** [1] - 192:19

**reimbursed** [4] - 214:7, 214:10, 215:2, 215:9

**relationship** [3] - 116:23, 191:15, 241:18

**relevant** [1] - 257:25

**reliability** [3] - 187:10, 189:17, 243:25

**relied** [2] - 189:22, 249:3

**religion** [1] - 224:12

**rely** [1] - 174:1

**remain** [1] - 202:9

**remaining** [1] - 130:6

**remember** [20] - 123:1, 127:15, 127:18, 133:14, 133:19, 143:25, 144:5, 178:19, 217:13, 217:22, 221:15, 222:10, 239:2, 239:7, 239:10, 239:24, 245:11, 245:16, 252:17, 254:7

**rendering** [1] - 185:10

**rent** [2] - 195:24, 195:25

**repeated** [1] - 205:15

**replacement** [1] -

158:14

**replies** [1] - 235:25

**report** [25] - 145:6, 148:19, 159:7, 163:9, 165:5, 165:9, 165:22, 165:23, 166:7, 166:21, 200:13, 214:19, 220:14, 225:16, 225:19, 226:12, 227:5, 227:6, 229:1, 229:8, 229:20, 231:3, 234:5, 234:12

**Report** [1] - 151:15

**reported** [11] - 150:3, 154:3, 158:16, 159:18, 161:12, 161:15, 162:5, 167:13, 167:18, 213:22, 219:19

**Reporter** [3] - 112:23, 262:8, 262:19

**reporter** [2] - 149:1, 252:14

**reporting** [5] - 145:2, 146:3, 165:13, 165:15, 204:9

**Reporting** [1] - 112:23

**reports** [1] - 214:16

**represent** [3] - 184:12, 185:2, 198:15

**represented** [4] - 119:21, 121:10, 186:13, 232:14

**representing** [2] - 222:22, 233:21

**represents** [1] - 129:21

**request** [6] - 126:5, 126:12, 156:22, 169:24, 193:10, 224:17

**requested** [1] - 224:5

**requesting** [1] - 198:4

**require** [2] - 145:1

**required** [10] - 145:25, 165:18, 174:3, 185:7, 194:8, 200:25, 201:1, 202:9, 210:5, 256:8

**requirement** [2] - 145:17, 165:15

**requirements** [5] - 146:3, 165:14, 201:23, 203:12, 204:3

**requires** [1] - 202:22

**requiring** [1] - 200:3

**reserve** [1] - 258:22

**resolve** [1] - 257:17

**resolved** [1] - 254:6

**respect** [4] - 119:13, 121:20, 223:8, 255:20

**respond** [1] - 256:14

**response** [1] - 224:8

**responsibilities** [2] - 116:14, 165:4

**responsibility** [1] - 149:4

**rest** [2] - 131:8, 255:1

**resting** [1] - 253:25

**result** [1] - 161:23

**retrieve** [5] - 126:16, 152:7, 157:12, 158:11, 160:22

**return** [39] - 188:18, 188:19, 188:20, 188:22, 195:15, 199:13, 200:4, 200:8, 200:16, 201:2, 204:19, 204:22, 205:6, 210:7, 210:22, 210:25, 211:21, 212:6, 212:7, 213:7, 213:13, 215:4, 217:17, 219:17, 220:18, 220:19, 224:23, 228:19, 229:9, 229:11, 229:20, 230:3, 230:6, 231:17, 231:18, 232:17, 235:2, 236:18

**returned** [1] - 220:22

**returning** [1] - 151:9

**returns** [17] - 182:4, 182:5, 182:8, 182:12, 182:21, 182:22, 183:4, 187:12, 188:13, 188:15, 189:19, 191:10, 204:13, 210:3, 214:17, 238:20

**revealed** [1] - 156:4

**Revenue** [5] - 143:9, 180:22, 183:20, 184:20

**revenue** [2] - 180:22, 193:20

**revenues** [2] - 183:8, 195:3

**review** [13] - 156:22, 182:12, 187:8, 188:11, 189:16, 243:9, 244:7, 244:21, 244:23, 245:18, 245:19,

245:24, 257:9

**reviewed** [1] - 161:5

**reviewing** [1] - 206:12

**rigamarole** [1] - 254:18

**Riyadh** [6] - 135:18, 162:13, 162:15, 166:17, 167:8, 233:22

**RKD-1** [1] - 170:6

**robe** [1] - 128:14

**Rogue** [2] - 223:3, 223:6

**room** [3] - 208:2, 208:3, 208:4

**Ross** [1] - 235:12

**roughly** [1] - 130:5

**rude** [1] - 252:19

**rules** [4] - 145:24, 183:24, 183:25, 257:3

**ruling** [19] - 196:20, 197:15, 198:9, 198:10, 198:17, 198:19, 198:22, 198:25, 199:3, 199:12, 200:24, 202:18, 203:9, 248:13, 255:2, 255:5, 255:25, 256:5, 256:21

**run** [2] - 208:21, 256:20

**running** [4] - 207:1, 213:6, 214:17, 215:4

**runs** [1] - 202:3

---

## S

**S.W** [3] - 113:7, 113:11, 113:16

**safe** [2] - 259:19, 259:24

**safety** [1] - 142:16

**salary** [1] - 235:12

**Saturday** [2] - 253:6, 253:12

**Saudi** [13] - 119:4, 133:12, 135:10, 135:19, 136:10, 154:23, 155:21, 162:13, 162:14, 162:16, 165:16, 166:17, 233:22

**save** [1] - 227:12

**saves** [1] - 254:20

**saw** [18] - 128:18, 208:25, 209:17, 235:2, 246:5, 251:1

scan [1] - 151:25
scanned [1] - 242:23
schedule [8] - 228:4,
228:7, 229:4,
229:10, 235:15,
240:5, 240:13,
258:17
schedules [1] -
211:11
scheduling [2] -
251:2, 260:14
scooter [1] - 260:4
screen [7] - 117:12,
127:6, 152:15,
170:7, 175:4,
185:18, 186:1
scroll [6] - 136:7,
136:22, 137:24,
153:11, 159:17,
195:18
search [2] - 156:3,
158:11
seat [4] - 146:16,
168:14, 179:17,
179:24
seated [2] - 115:5,
179:17
second [6] - 135:15,
143:5, 143:8,
191:23, 240:15,
249:25
secretary [1] - 175:12
section [5] - 122:4,
148:3, 153:10,
185:21, 193:20
secure [1] - 160:20
security [3] - 146:25,
148:9, 260:2
Security [3] - 147:18,
149:7, 155:25
Seda [86] - 116:20,
118:1, 123:1,
127:12, 127:21,
130:17, 134:16,
135:3, 135:16,
136:1, 136:8,
136:16, 139:11,
140:12, 142:1,
170:12, 171:12,
173:2, 176:19,
177:7, 178:17,
184:11, 184:17,
184:22, 186:9,
190:7, 190:10,
192:2, 193:7, 194:2,
194:4, 195:19,
196:10, 196:14,
198:14, 203:14,
204:18, 208:10,
208:25, 209:11,

209:15, 209:17,
209:22, 210:17,
211:2, 211:9,
211:15, 211:20,
212:1, 212:15,
213:19, 215:23,
216:25, 217:12,
217:15, 219:2,
221:1, 222:16,
222:17, 223:2,
223:5, 224:7, 225:5,
225:22, 226:25,
227:23, 227:25,
228:15, 231:9,
233:21, 233:23,
234:15, 234:24,
237:4, 237:8, 239:3,
239:25, 240:12,
240:18, 241:22,
245:15, 249:24,
250:16, 250:18,
251:10
Seda's [3] - 194:12,
198:2, 199:11
Seda-eight [1] -
209:15
Seda-six [1] - 209:22
Seda-ten [2] - 209:11,
209:15
Sedaghaty [19] -
116:20, 122:18,
124:10, 126:16,
128:16, 128:21,
133:10, 140:4,
140:23, 184:8,
194:24, 196:9,
222:4, 223:15,
225:25, 232:14,
233:10, 235:7,
236:16
SEDAGHATY [1] -
112:7
Sedaghaty's [1] -
126:5
see [48] - 119:3,
119:18, 120:8,
122:7, 122:8, 125:2,
125:9, 125:13,
126:19, 130:9,
131:2, 131:22,
138:5, 143:18,
154:21, 159:3,
159:18, 185:21,
186:1, 186:2,
204:18, 205:20,
206:7, 209:22,
213:3, 214:8,
215:24, 221:10,
221:20, 221:25,
226:18, 231:20,

232:10, 232:15,
234:5, 234:8,
234:10, 236:10,
236:13, 237:10,
240:16, 244:8,
248:8, 248:21,
248:23, 250:3,
251:6, 252:16
seeing [2] - 130:13,
164:10
seeking [1] - 184:19
seem [1] - 253:15
Seidman [4] - 180:23,
180:24, 181:22,
181:23
send [4] - 145:10,
151:25, 173:20,
178:25
sending [2] - 136:8,
175:2
sensitive [1] - 204:2
sent [12] - 152:2,
170:12, 171:12,
173:2, 176:14,
176:15, 176:18,
178:22, 179:1,
204:24, 211:24,
216:7
sentence [1] - 251:20
separate [1] - 222:10
September [17] -
112:6, 165:7,
211:13, 212:8,
212:10, 217:14,
237:25, 238:1,
240:14, 240:24,
240:25, 241:14,
247:8, 250:7, 262:15
SEPTEMBER [2] -
115:1, 262:13
serial [2] - 125:13,
127:7
series [8] - 117:3,
118:10, 120:13,
153:23, 156:23,
159:14, 170:24,
173:7
serve [1] - 146:24
Service [6] - 143:10,
147:21, 180:22,
183:20, 183:21,
184:20
service [11] - 137:22,
147:18, 147:19,
147:22, 152:3,
154:9, 160:9,
160:20, 187:5,
187:13, 231:20
services [3] - 185:9,
186:6, 190:2

session [1] - 182:7
set [1] - 183:25
settlement [5] -
171:21, 171:23,
172:1, 172:2, 172:5
several [4] - 150:4,
171:5, 218:9, 227:8
shall [1] - 189:17
sharp [1] - 261:2
Shaw [3] - 171:4,
174:11, 174:25
Shaw's [1] - 175:13
sheet [1] - 247:8
shelf [1] - 115:22
shipping [1] - 125:5
short [1] - 179:16
shortcomings [1] -
244:8
Shorthand [1] - 262:8
show [35] - 124:23,
127:10, 130:8,
133:24, 139:3,
148:23, 156:19,
170:6, 170:8, 171:9,
175:7, 185:16,
189:7, 191:22,
198:7, 200:14,
201:14, 201:16,
208:18, 212:20,
213:24, 223:22,
236:1, 238:2,
238:17, 240:2,
242:6, 248:11,
248:15, 248:17,
248:18, 248:20,
254:16, 258:12
showed [5] - 128:23,
142:7, 218:1,
227:15, 236:6
showing [3] - 166:21,
167:18, 257:6
shown [5] - 117:10,
170:2, 236:2, 236:4,
254:20
shows [4] - 141:13,
157:13, 157:14,
157:15
sic [9] - 125:10,
125:14, 140:24,
144:25, 149:23,
176:7, 189:24,
214:16, 249:17
side [7] - 137:21,
138:5, 153:22,
153:24, 185:18,
209:3, 224:11
sign [6] - 128:18,
134:2, 163:20,
191:18, 198:15,
205:6

signatory [1] - 140:13
signature [15] -
117:18, 117:20,
118:18, 119:12,
125:21, 131:17,
132:19, 132:20,
132:21, 135:12,
139:20, 140:9,
182:13, 190:5, 190:8
signatures [3] -
117:23, 119:7,
135:13
signed [7] - 127:23,
127:24, 130:18,
134:14, 154:5,
173:2, 185:15
significance [1] -
120:18
significant [5] -
121:21, 121:23,
215:10, 215:12,
252:10
signing [1] - 119:11,
151:8
signs [4] - 159:12,
163:24, 164:1,
196:14
similarly [1] - 160:6
simply [2] - 238:10,
254:15
single [1] - 247:10
sit [1] - 190:25
sitting [1] - 252:14
situation [2] - 183:12,
248:21
six [6] - 158:10, 176:9,
176:14, 182:20,
197:23, 209:22
size [1] - 215:13
slip [1] - 171:6
small [5] - 121:6,
123:23, 142:14,
182:24, 205:20
smaller [1] - 225:9
smooth [1] - 243:23
smoother [1] - 249:2
solely [1] - 255:21
Soliman [26] - 118:19,
118:20, 127:22,
127:24, 128:2,
128:12, 131:25,
132:1, 132:9,
137:18, 141:21,
154:13, 154:21,
155:25, 158:25,
176:7, 177:4,
194:23, 214:22,
216:11, 217:1,
217:9, 218:14,
220:23, 234:6, 234:7

**someone** [5] - 187:23, 197:23, 211:4, 253:4
**sometime** [1] - 253:25
**sometimes** [3] - 123:8, 145:24, 245:10
**somewhere** [7] - 137:10, 142:18, 163:20, 182:5, 190:14, 221:3, 224:3
**soon** [1] - 255:17
**sorry** [19] - 125:8, 131:11, 138:8, 138:18, 175:6, 179:9, 183:14, 191:25, 195:13, 202:1, 209:9, 210:14, 217:4, 218:19, 220:24, 230:22, 240:1, 245:16, 254:24
**sort** [8] - 146:1, 146:2, 147:16, 191:2, 199:7, 202:23, 243:16, 252:13
**sound** [3] - 143:3, 178:12, 246:3
**sounds** [2] - 240:6, 260:21
**source** [1] - 213:11
**sources** [2] - 200:15, 212:14
**speaking** [3] - 168:15, 179:25, 199:20
**special** [6] - 123:12, 124:20, 142:23, 146:24, 147:1, 148:3
**specific** [3] - 218:8, 225:24, 227:21
**specifically** [2] - 208:17, 254:14
**speech** [3] - 254:23, 258:1, 258:8
**spell** [4] - 115:12, 146:17, 168:16, 180:2
**spelling** [3] - 130:18, 197:25, 211:10
**spend** [2] - 192:20, 252:25
**spent** [7] - 192:16, 195:8, 201:14, 202:16, 203:7, 203:8, 238:19
**spoken** [1] - 237:11
**spots** [1] - 223:24
**Springfield** [27] - 169:22, 175:2, 177:21, 222:14, 222:25, 223:4,

223:14, 225:6, 225:9, 225:21, 225:23, 226:19, 227:3, 228:8, 229:13, 230:4, 231:6, 234:18, 237:10, 240:5, 240:18, 241:6, 241:10, 241:12, 241:19, 241:21, 241:24
**staff** [8] - 167:25, 173:25, 174:4, 181:24, 182:3, 182:6, 182:11, 242:11
**stall** [1] - 255:5
**standard** [2] - 164:5, 171:1
**start** [7] - 117:4, 117:16, 163:3, 185:11, 237:22, 251:12, 252:9
**started** [6] - 181:6, 182:19, 232:15, 250:9, 250:11, 261:6
**starting** [1] - 118:11
**starts** [1] - 243:5
**state** [6] - 115:12, 146:16, 168:16, 180:2, 181:23, 202:2
**STATE** [1] - 262:5
**State** [1] - 262:9
**statement** [21] - 118:21, 119:16, 120:21, 121:25, 136:20, 137:16, 138:4, 171:22, 171:23, 172:1, 172:5, 205:24, 205:25, 208:19, 223:18, 223:19, 224:6, 224:18, 224:20, 231:14, 231:19
**statements** [4] - 119:22, 205:19, 212:17, 212:19
**STATES** [3] - 112:1, 112:4, 112:14
**States** [21] - 113:3, 113:7, 148:8, 148:9, 149:13, 149:20, 152:10, 152:23, 153:9, 155:3, 155:9, 155:18, 159:5, 161:8, 161:10, 161:13, 161:15, 161:18, 165:17, 167:12, 172:7

**status** [8] - 183:14, 183:15, 184:3, 184:19, 186:25, 190:21, 192:14, 199:24
**step** [6] - 115:11, 146:11, 167:22, 179:10, 197:21, 254:2
**steve_wax@fd.org** [1] - 113:17
**STEVEN** [1] - 113:14
**stick** [1] - 174:9
**still** [7] - 130:5, 130:6, 136:23, 149:8, 248:8, 248:9, 256:16
**stipulated** [1] - 133:4
**stop** [1] - 168:11
**story** [2] - 249:17, 255:1
**straight** [1] - 248:1
**street** [1] - 133:6
**Street** [2] - 113:11, 113:16
**strictly** [1] - 233:4
**strong** [1] - 184:3
**stuff** [3] - 152:20, 164:13, 259:17
**stunned** [1] - 223:1
**subject** [1] - 233:14
**submit** [2] - 197:18, 205:6
**submitting** [3] - 158:12, 158:14, 186:11
**subpoena** [2] - 120:15, 233:19
**substantial** [2] - 167:13, 223:12
**subtract** [1] - 219:13
**suggested** [1] - 124:1
**suggestions** [1] - 123:7
**suitcase** [2] - 180:10, 259:11
**Suite** [4] - 113:3, 113:7, 113:12, 113:16
**Suliman** [1] - 176:7
**sum** [3] - 195:11, 195:13, 195:14
**summarize** [1] - 180:19
**summary** [4] - 154:18, 157:3, 158:16, 234:5
**summer** [2] - 207:7, 208:14
**supervise** [1] - 148:3
**supervisor** [4] - 147:1, 148:3, 180:25,

181:25
**supplied** [1] - 236:15
**support** [2] - 193:2, 219:24
**supported** [1] - 199:25
**supposed** [3] - 145:18, 220:13, 226:15
**supposedly** [2] - 230:1, 236:8
**surprise** [1] - 259:17
**surprised** [1] - 258:4
**sustained** [1] - 165:25
**SW-64** [1] - 207:19
**swamped** [1] - 211:19
**SWEET** [1] - 113:15
**sworn** [5] - 115:10, 146:15, 168:11, 168:13, 179:23
**system** [9] - 148:11, 187:9, 187:10, 188:11, 189:16, 206:2, 210:1, 244:1, 245:24
**systems** [1] - 148:12

**T**

**T-Y-R-R-E-L-L** [1] - 146:18
**talks** [5] - 196:4, 201:9, 219:21, 229:13, 231:19
**tapped** [1] - 203:18
**tax** [45] - 180:24, 181:3, 181:20, 181:24, 182:1, 182:4, 182:10, 182:20, 183:4, 183:7, 183:10, 183:14, 183:24, 184:1, 184:19, 187:12, 188:6, 188:13, 188:14, 188:18, 188:22, 190:21, 192:14, 193:21, 196:18, 197:7, 198:15, 199:2, 199:13, 199:21, 200:8, 201:23, 201:24, 203:2, 203:8, 207:21, 210:7, 217:17, 229:11, 231:23, 235:14, 235:16
**tax-exempt** [9] - 181:20, 183:14,

181:25
**supplied** [1] - 236:15

184:1, 184:19, 190:21, 192:14, 193:21, 196:18, 203:8
**taxes** [6] - 183:9, 199:16, 203:23, 235:16, 235:18, 238:22
**taxing** [1] - 191:11
**taxpayer** [1] - 198:17
**taxpayers** [1] - 200:18
**TC** [3] - 159:18, 175:16, 175:25
**teaching** [1] - 209:13
**team** [1] - 182:2
**TECS** [2] - 158:2, 158:3
**telephone** [6] - 174:5, 175:16, 175:25, 176:8, 233:9
**temporary** [2] - 214:12, 215:5
**ten** [6] - 116:15, 116:16, 123:24, 124:9, 203:18, 209:15
**Ten** [1] - 209:11
**term** [1] - 130:21
**terminal** [3] - 160:20, 160:25, 163:21
**terms** [3] - 121:5, 166:1, 206:12
**test** [2] - 196:24, 199:4
**testified** [1] - 241:17
**testimony** [7] - 117:14, 137:8, 236:3, 239:1, 239:8, 251:4, 254:19
**THE** [90] - 112:1, 112:2, 112:13, 113:2, 113:10, 114:3, 115:5, 115:8, 115:9, 115:11, 115:14, 141:1, 144:20, 146:11, 146:14, 146:16, 146:18, 161:21, 161:22, 162:22, 165:23, 165:25, 167:22, 168:1, 168:4, 168:7, 168:10, 168:11, 168:14, 168:17, 168:19, 168:22, 177:14, 179:8, 179:10, 179:11, 179:12, 179:15, 179:17, 179:20, 179:22, 179:24, 180:1, 180:2, 180:4,

217:6, 217:8,
236:25, 239:17,
239:19, 242:8,
248:17, 252:2,
252:5, 252:9,
252:24, 253:2,
253:4, 253:9,
253:18, 253:23,
254:1, 254:7, 254:9,
254:23, 254:25,
255:3, 255:10,
256:1, 256:13,
256:19, 258:7,
258:10, 258:14,
258:20, 259:2,
259:4, 259:8,
259:10, 259:12,
259:17, 260:7,
260:9, 260:13,
260:15, 260:21,
260:25, 261:3,
261:6, 261:12
**themselves** [3] -
207:12, 212:18,
244:21
**therefore** [2] - 187:15,
188:15
**they've** [5] - 187:23,
197:22, 199:19,
200:15, 223:21
**thinks** [1] - 258:5
**Third** [1] - 113:7
**third** [3] - 133:3,
197:1, 216:4
**Thomas** [3] - 114:8,
180:4, 198:12
**thousand** [7] - 123:21,
123:24, 124:13,
125:12, 143:13,
221:11, 225:10
**three** [14] - 153:12,
158:17, 182:3,
182:11, 187:14,
188:12, 188:14,
192:21, 201:3,
206:16, 216:4,
225:9, 254:21
**throughout** [1] -
182:14
**Thursday** [1] - 175:18
**tickets** [1] - 253:5
**tight** [2] - 187:20,
188:8
**title** [8] - 135:2,
172:19, 173:18,
173:20, 176:12,
176:13, 223:20
**TO** [1] - 114:1
**today** [10] - 130:23,
133:15, 161:17,

173:12, 178:15,
230:25, 236:3,
239:1, 252:6, 260:5
**today's** [1] - 253:7
**together** [6] - 143:16,
147:21, 182:2,
213:12, 251:3,
257:10
**Tom** [1] - 179:21
**tomorrow** [9] - 252:9,
252:15, 253:25,
255:17, 256:3,
258:23, 260:17,
260:20, 261:10
**tonight** [2] - 256:22,
259:2
**took** [10] - 127:22,
128:7, 180:22,
181:1, 182:6,
206:14, 212:11,
242:23, 246:2,
251:12
**top** [8] - 117:23,
118:5, 132:18,
132:19, 159:4,
174:9, 175:9, 193:16
**Toronto** [2] - 167:2,
167:12
**total** [10] - 157:9,
162:1, 182:23,
195:11, 195:13,
195:14, 220:15,
228:8, 229:22, 234:8
**totaling** [1] - 125:16
**totally** [1] - 255:6
**tough** [1] - 178:16
**toward** [2] - 233:2,
233:3
**towards** [6] - 117:23,
195:3, 203:23,
204:13, 213:15,
228:24
**town** [1] - 184:16
**trace** [2] - 150:13,
150:16
**track** [2] - 149:13,
238:19
**traditional** [1] - 123:20
**trail** [13] - 201:21,
217:25, 218:2,
226:18, 227:15,
227:17, 227:18,
238:5, 239:6,
239:10, 247:13,
247:24, 248:8
**trails** [1] - 148:14
**train** [2] - 207:4, 207:9
**trained** [3] - 174:15,
207:6, 207:8
**training** [2] - 182:6,

209:13
**trans** [1] - 121:21
**transaction** [25] -
121:6, 127:15,
127:18, 130:16,
131:2, 133:9, 135:1,
135:12, 135:17,
136:11, 139:24,
139:25, 140:1,
145:2, 145:6,
145:15, 146:5,
169:25, 172:23,
173:3, 173:23,
174:2, 178:2, 178:8,
236:8
**transactions** [5] -
120:8, 122:22,
169:12, 169:17,
233:24
**transcript** [1] - 262:11
**TRANSCRIPT** [1] -
112:12
**transfer** [9] - 133:11,
133:15, 133:18,
134:1, 134:2, 134:3,
134:9, 138:17,
138:18, 213:1
**transferred** [2] -
135:18, 137:3,
175:17
**transfers** [1] - 136:15
**translates** [1] - 133:5
**translation** [1] - 133:4
**transparency** [1] -
148:11
**transportation** [3] -
148:19, 159:8, 161:6
**transported** [1] -
158:18
**transporting** [2] -
153:5, 153:14
**travel** [3] - 154:13,
154:18, 156:2
**traveled** [1] - 163:18
**traveler's** [46] - 123:4,
123:15, 123:16,
123:22, 124:13,
124:18, 124:20,
124:25, 126:1,
126:16, 127:3,
127:13, 127:19,
127:24, 129:1,
141:9, 141:12,
141:14, 141:15,
141:22, 143:23,
143:24, 143:25,
144:12, 144:15,
146:1, 146:7, 150:6,
150:9, 150:11,
150:13, 151:11,

153:5, 153:19,
153:21, 154:2,
158:20, 159:8,
159:19, 159:20,
161:7, 161:11,
165:19, 167:14,
167:19
**travelers** [1] - 154:25
**traveling** [1] - 164:17
**treasury** [2] - 145:3,
148:22
**treated** [2] - 150:12,
150:14
**trial** [2] - 256:24,
261:6
**tried** [2] - 178:19,
205:25
**triggers** [1] - 145:17
**trip** [2] - 155:3, 155:12
**trouble** [2] - 179:9,
235:6
**true** [6] - 141:20,
188:5, 247:9, 248:2,
249:22, 262:11
**trust** [2] - 191:16,
204:8
**truth** [1] - 222:20
**try** [10] - 117:10,
142:15, 187:19,
187:20, 194:17,
237:16, 237:19,
237:20, 251:11,
261:10
**trying** [3] - 243:23,
255:5, 260:18
**turn** [1] - 150:20
**TW-1** [2] - 213:24,
216:14
**TW-2** [8] - 225:11,
229:17, 237:5,
237:6, 239:24,
240:1, 240:2, 240:4
**TW-3** [2] - 220:4,
220:6
**TW-4** [1] - 215:21
**TW-5** [1] - 221:19
**twice** [3] - 128:10,
143:1, 209:20
**two** [42] - 118:21,
120:25, 122:7,
122:22, 126:2,
134:25, 138:7,
140:15, 143:2,
143:8, 154:17,
167:17, 171:6,
176:23, 181:1,
187:1, 187:3, 187:8,
189:16, 192:20,
192:24, 207:6,
208:13, 208:17,

209:7, 209:13,
212:14, 212:25,
213:17, 214:9,
219:8, 230:3,
231:13, 231:14,
231:18, 232:13,
234:4, 237:25,
244:18, 251:3,
253:22
**two-plus** [1] - 232:13
**type** [8] - 134:4,
145:13, 153:13,
154:23, 158:21,
170:25, 185:7, 212:2
**types** [1] - 150:1
**typical** [3] - 191:9,
192:19, 244:3
**typically** [1] - 244:11
**Tyrrell** [5] - 114:6,
146:13, 146:18,
146:21, 163:3

## U

**U.S** [23] - 146:24,
147:18, 147:19,
147:20, 148:11,
149:24, 151:14,
151:17, 152:2,
153:17, 155:6,
155:24, 160:9,
160:19, 163:17,
165:14, 203:16,
238:10, 243:5,
243:10, 243:12,
243:17
**U.S.-Saudi** [1] - 165:9
**ultimately** [2] -
197:14, 198:6
**unable** [2] - 249:18,
250:5
**under** [19] - 122:6,
124:9, 133:15,
149:17, 150:4,
150:5, 151:2,
153:10, 153:20,
154:5, 193:19,
194:11, 199:24,
201:17, 202:5,
202:14, 203:2,
203:9, 214:10
**underneath** [1] -
120:8
**understated** [3] -
221:6, 230:18,
230:21
**understatement** [1] -
230:15
**unduly** [1] - 256:6
**unfortunately** [1] -

250:4
**uniform** [1] - 149:6
**unique** [1] - 243:3
**unit** [3] - 147:5, 148:7, 156:6
**united** [1] - 125:10
**UNITED** [3] - 112:1, 112:4, 112:14
**United** [21] - 113:3, 113:7, 148:8, 148:9, 149:13, 149:20, 152:10, 152:23, 153:9, 155:3, 155:9, 155:18, 159:5, 161:7, 161:10, 161:13, 161:15, 161:18, 165:17, 167:12, 172:7
**units** [1] - 197:2
**unusual** [1] - 245:4
**up** [51] - 116:2, 117:11, 118:17, 122:22, 126:21, 126:24, 127:14, 130:12, 134:19, 138:24, 152:15, 158:13, 159:4, 163:14, 166:4, 172:16, 173:6, 174:7, 175:8, 175:20, 181:3, 181:7, 183:16, 186:10, 202:15, 205:23, 206:25, 207:1, 208:3, 213:17, 214:16, 215:1, 217:16, 223:24, 224:3, 226:9, 226:20, 226:25, 231:15, 238:13, 239:14, 241:3, 241:11, 242:11, 242:13, 243:17, 253:1, 253:15, 259:13, 259:14, 260:18
**upper** [3] - 127:7, 128:4, 215:24
**upstairs** [3] - 207:22, 207:24, 259:19
**urgency** [1] - 212:5
**uses** [1] - 149:13

## V

**Valley** [2] - 223:3, 223:6
**value** [1] - 153:17
**valued** [1] - 165:19

**various** [2] - 186:6, 218:2
**vault** [4] - 123:19, 126:3, 127:23, 143:19
**vendor** [2] - 202:23, 203:24
**verbally** [1] - 191:19
**version** [1] - 243:10
**violate** [1] - 257:3
**vis** [2] - 183:4
**vis-a-vis** [1] - 183:4
**visit** [3] - 207:4, 207:13, 207:20
**volume** [1] - 123:6
**volunteer** [1] - 253:12
**volunteers** [1] - 196:5

## W

**W-I-L-C-O-X** [1] - 180:4
**walk** [3] - 207:25, 218:3, 252:17
**wants** [2] - 134:3, 253:4
**warn** [1] - 204:23
**warned** [2] - 204:22, 205:14
**Washington** [7] - 147:4, 152:5, 157:12, 157:17, 158:4, 167:8
**waste** [2] - 256:3, 256:14
**wasting** [1] - 258:7
**water** [1] - 168:19
**Wax** [1] - 166:1
**WAX** [13] - 113:14, 161:20, 162:23, 163:2, 167:21, 168:3, 255:19, 258:4, 258:9, 260:6, 260:14, 260:16, 261:10
**ways** [1] - 151:20
**wear** [1] - 128:14
**wearing** [1] - 128:13
**web** [1] - 160:7
**website** [3] - 160:9, 194:3, 194:5
**Wednesday** [2] - 175:18, 253:7
**WEDNESDAY** [2] - 115:1, 262:13
**week** [1] - 175:18
**weeks** [2] - 176:9, 176:14
**weller** [1] - 168:5

**where'd** [1] - 194:3
**whoever's** [2] - 153:5, 202:6
**whole** [3] - 206:11, 249:6, 251:19
**wholesale** [1] - 255:8
**Wichita** [2] - 137:22, 141:5
**Wilcox** [19] - 114:8, 179:21, 180:4, 180:7, 185:19, 185:25, 198:12, 220:21, 233:17, 235:6, 236:2, 237:3, 238:16, 239:22, 242:16, 247:7, 248:19, 249:10, 254:20
**Wilcox's** [1] - 238:9
**wing** [2] - 160:24, 160:25
**wire** [26] - 121:1, 121:11, 121:16, 121:17, 123:9, 129:24, 130:2, 130:6, 131:14, 133:10, 133:15, 133:18, 134:1, 134:2, 134:8, 134:15, 134:24, 135:14, 135:15, 135:21, 135:25, 136:9, 136:15, 140:16, 140:22, 213:1
**wired** [3] - 121:18, 136:5, 140:23
**Wisconsin** [2] - 181:3, 182:17
**withdrawals** [2] - 119:24, 138:6
**witness** [33] - 115:6, 115:10, 124:23, 127:10, 146:11, 146:12, 146:15, 165:21, 167:23, 168:13, 179:14, 179:19, 179:23, 236:1, 242:7, 248:12, 248:15, 253:21, 255:22, 256:7, 256:9, 256:11, 256:12, 256:18, 256:24, 257:7, 257:18, 257:24, 258:12, 258:23, 259:1, 259:2
**WITNESS** [13] - 115:14, 144:20, 146:18, 161:22,

165:23, 168:17, 168:22, 179:8, 179:11, 180:1, 180:4, 217:6, 217:8
**witnesses** [5] - 168:8, 253:22, 254:3, 258:23, 260:18
**WITNESSES** [1] - 114:1
**woefully** [1] - 205:21
**women** [6] - 207:6, 208:13, 209:8, 209:13, 214:9, 244:18
**Wooten** [2] - 245:11, 254:4
**word** [4] - 193:3, 193:9, 232:10, 244:17
**words** [4] - 151:5, 195:16, 217:7, 224:15
**works** [3] - 214:1, 244:14, 244:24
**workup** [1] - 191:20
**world** [1] - 233:10
**worried** [1] - 257:12
**worth** [1] - 178:14
**write** [3] - 173:24, 173:25, 249:11
**writing** [5] - 175:13, 175:22, 175:23, 176:5, 225:12
**written** [2] - 119:23, 219:3
**wrote** [1] - 250:3

## Y

**year** [19] - 116:16, 169:9, 181:13, 182:1, 188:16, 189:3, 198:24, 205:9, 210:9, 210:10, 213:9, 213:16, 220:8, 231:19, 232:24, 233:1, 233:7, 238:1, 247:10
**years** [13] - 116:16, 143:8, 171:5, 181:1, 181:5, 201:3, 203:18, 204:12, 204:14, 227:9, 232:13, 233:20, 247:3
**yeses** [1] - 168:7
**York** [1] - 155:16
**yourself** [2] - 250:22,

251:24