1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF OREGON

3   UNITED STATES OF AMERICA,          )
                                        )
4                    Plaintiff,         ) No. 05-60008-2-HO
                                        )
5      v.                               ) September 2, 2010
                                        )
6   PIROUZ SEDAGHATY, et al.,           ) Eugene, Oregon
                                        )
7                    Defendants.        )

8

9         PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS

10        BEFORE THE HONORABLE MICHAEL R. HOGAN

11   UNITED STATES DISTRICT COURT JUDGE, AND A JURY

12        DAY 4 A.M. SESSION - PAGES 1 - 128

13

14                       -:-

15

16

17

18

19

20

21

22

23            Deborah Wilhelm, CSR, RPR
                   Court Reporter
24               P.O. Box 1504
               Eugene, OR  97440
25                (541) 431-4113

```
1                    APPEARANCES OF COUNSEL

2

3    FOR THE PLAINTIFF:    CHRISTOPHER L. CARDANI
                           United States Attorney's Office
4                          405 E. 8th Avenue, Suite 2400
                           Eugene, OR  97401
5                          (541) 465-6771
                           chris.cardani@usdoj.gov
6
                           CHARLES F. GORDER, JR.
7                          United States Attorney's Office
                           1000 S.W. Third Avenue, Suite 600
8                          Portland, OR  97204-2902
                           (503) 727-1021
9

10   FOR THE DEFENDANT:    LAWRENCE H. MATASAR
                           Lawrence Matasar, P.C.
11                         621 S.W. Morrison Street
                           Suite 1025
12                         Portland, OR  97205
                           (503) 222-9830
13                         larry@pdxlaw.com

14                         STEVEN T. WAX
                           BERNARD J. CASEY
15                         MICHELLE SWEET
                           Federal Public Defender
16                         101 S.W. Main Street, Suite 1700
                           Portland, OR  97204
17                         (503) 326-2123
                           steve_wax@fd.org
18

19

20

21

22

23

24

25
```

1                           <u>INDEX OF EXAMINATIONS</u>

2       <u>FOR THE PLAINTIFF:</u>      <u>Direct</u>   <u>Cross</u>      <u>ReD</u>       <u>ReX</u>

3       Thomas Wilcox    (See Day 3)      4    79, 100     97

4       Gregory Wooten           102      (See p.m. session)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     (Thursday, September 2, 2010; 8:35 a.m.  Jury absent.)

2                P R O C E E D I N G S

3          THE COURT:  We have a juror that's having some

4     issues with diabetes and hasn't been feeling great, and

5     so we're watching that.  If we take a break at some

6     time, that's what that's about.  Okay?

7          MR. MATASAR:  Your Honor, I understand you have

8     a conference call at 9 o'clock.

9          THE COURT:  I do.  They promised at 9:00, but

10    time will tell.  It's taken me probably two months to

11    settle that case, and $13-and-a-half million, but it's

12    there now.  That's why I had my phone, unfortunately, in

13    here yesterday afternoon.  I was baby-sitting lawyers.

14         We'll have jury instructions probably by

15    tomorrow, maybe today, so you'll have them for the

16    weekend.

17         (Jury enters the courtroom at 8:39 a.m.)

18         THE COURT:  Good morning, Jury.

19         THE JURY:  Good morning.

20         THE COURT:  Go ahead, Mr. Matasar.

21         MR. MATASAR:  Thank you, Your Honor.

22              CROSS-EXAMINATION (continuing)

23    BY MR. MATASAR:

24    Q.    Mr. Wilcox, one of the things you said

25    yesterday was that when Pete Seda told you in September

1    about the Springfield property, you were stunned because

2    you had always envisioned until then that all

3    al-Haramain was was him and his friends in the Rogue

4    Valley.

5        A.    That's correct, right.

6        Q.    Isn't it true, Mr. Wilcox, that you had a

7    discussion with Chris Helmer -- I'm going to ask that

8    the witness be given 43079.  And you can look in your

9    file and find that, if you would like.  43079.  Didn't

10   you have a discussion with her about a $400,000

11   building?

12       A.    Well, let me read this.  Yeah, that's what it

13   says in my memo here, right.

14       Q.    Right.  But do you remember now that you talked

15   to her about a building that they bought in Springfield?

16       A.    No, I do not.  I remember this conversation and

17   she was -- what I took away from this conversation was

18   that she was concerned about the large sum of money

19   coming from the al-Haramain Saudi Arabia organization.

20       Q.    But it's not your memory that that conversation

21   had anything to do with the Springfield building?

22       A.    I don't think -- well, I can't remember, to

23   tell you the truth.  I don't know.

24       Q.    Can I have the clerk give you 43081.

25   Mr. Wilcox, does this refresh your recollection that on

1    Thursday, February 1st, same time, that you had a

2    discussion on a telephone call with Ms. Helmer about a

3    property in Springfield?

4        A.    Can I have a minute to read it?

5        Q.    Oh, sure, I'm sorry.

6        A.    Well, if I did have this conversation, it -- it

7    either didn't stay with me or didn't register with me,

8    because I can't remember when I spoke to Mr. Seda about

9    the 131,000.

10            I think I said yesterday I was guessing it was

11    in September.  But when I -- when he said that 131,000

12    was for the Springfield building, that was the first

13    time that I was aware of it or that it registered with

14    me.

15            This e-mail here is from her to Mr. -- says the

16    organization.  And I eventually got a copy of this

17    because Mr. Seda gave me this when he was disagreeing

18    with the bill that they sent him.  And she was sending

19    some documents to justify their bill.

20        Q.    Didn't you know that they had a building in

21    Springfield in February of 2001?

22        A.    I don't think -- no, I'm convinced I did not.

23        Q.    Not until -- let me show you 43664.  And if we

24    could expand the top part.  Doesn't your file contain a

25    fax that a man named Mr. Eberle was hired by

1    al-Haramain?

2        A.    Yes.  This is out of our payroll file.  And I

3    don't necessarily -- at that time we had a payroll clerk

4    that was excellent, and so the only time I got involved

5    in payroll issues was just to review the quarter end

6    return.  She may have gotten this and put this in the

7    file.  And I really didn't -- well, as I said, I -- my

8    memory might not be good on when these events occurred,

9    but I remember when Mr. Seda and I had a discussion

10   about the $131,000 check, that's when, it seems to me,

11   that that's when I remembered that was the first time I

12   had heard about the Springfield building.

13       Q.    Mr. Wilcox, I'm going to show you 43697.

14   Doesn't that reflect a check to a man named Eberle in

15   Springfield?

16       A.    Yes, sir, it does.

17       Q.    And there is an address at the bottom there?

18       A.    Yes, I see the address.

19       Q.    And this reflects a check written in May.  And

20   isn't that address, 2151 East Division Street, the

21   prayer house in Springfield?

22       A.    I don't know what the address is in

23   Springfield.

24       Q.    Okay.  Susan, can I ask you to show RDK-1, page

25   15.  Mr. Wilcox, you say that Ms. Anderson showed you

1    the escrow statement.

2        A.    Yes, sir.

3        Q.    And, Susan, if you could show the address up

4    there, about where it says property location.

5        A.    Okay, yes, I see it.

6        Q.    Okay.  So you hand wrote -- and let's go back

7    to 43697.  Isn't that your writing --

8        A.    Yes --

9        Q.    -- Mr. Wilcox?

10       A.    -- that's my handwriting.

11       Q.    Your handwriting on the document from May of

12   2001?

13       A.    That's correct, right.

14       Q.    And let me show you a few more, 43656.  If you

15   can expand the bottom.  That's Mr. Eberle?

16       A.    Yes, it is, right, that's correct.

17       Q.    All right.  So now you are saying you have no

18   doubt but that you knew that they had an operation in

19   Springfield in February, March, May of 2001.  The only

20   thing you are questioning is maybe you had this

21   conversation with Mr. Seda, which you said yesterday you

22   were sure was in September, you may have had that

23   conversation sooner?

24       A.    It may have been, yes.  I -- unfortunately, I

25   can't pinpoint a date as to when we had that

1    conversation.

2        Q.    Could it have been in February of 2001?

3        A.    I would doubt it, because the information that

4    he sent to me for the '99 and 2000 year, he sent over, I

5    believe it was, May 16th of '01.

6        Q.    So it couldn't -- you are saying the

7    conversation with Mr. Seda couldn't have been before

8    May 16th of '01?

9        A.    That's correct, it --

10       Q.    All right.  But even if it was then, you

11   clearly knew about the Springfield property in February

12   and in early May when you hand wrote on the Eberle

13   check?

14       A.    I may have known about it, but if you are

15   asking me to go back in my memory, what I remember is

16   that when we went over the $131,000 check, that to me

17   seemed like the first time that we spoke about the

18   Springfield building.

19       Q.    Yesterday -- and your memory yesterday was that

20   conversation was in September but now your memory is

21   different, you don't know?

22       A.    No, I think I said yesterday I'm guessing it

23   was September 19th or 20th based on the billing records.

24       Q.    All right.  So you were guessing then.

25   Yesterday you said your analysis showed that

1    al-Haramain's accounting was woefully inadequate.

2    That's the term that you used, correct?

3        A.    That's what I put in that letter to IRS, yes.

4        Q.    And that was also based on your analysis?  I

5    mean, you saw the deposits weren't entered right, there

6    were all sorts of problems?

7        A.    That's correct, right.

8        Q.    And they hired you to fix it, did they not?

9        A.    Yes, to stay on top of it, you are correct,

10   right.

11       Q.    And that's why you did this extraordinary

12   engagement letter, right?

13       A.    Yeah, we did the engagement letter, yes.

14       Q.    The extraordinary engagement letter because

15   they wanted you to fix it?

16       A.    Right.

17       Q.    And you also said yesterday that the typical

18   nonprofit is on a really tight budget, and so with a

19   typical nonprofit, you may be trying to cut as many --

20   not really cut corners, but try to get the very cheapest

21   approach for your services; is that right?

22       A.    Yeah.  What we try to do is get the people at

23   the nonprofit to do the detail work.  Normally with most

24   nonprofits on their boards or they'll have volunteers

25   that have some sort of bookkeeping or accounting

1    background, and they'll do that for the nonprofit.

2        Q.    But this was not -- to put it mildly -- a

3    typical nonprofit, was it?

4        A.    Yes, sir, you are right.

5        Q.    They were getting hundreds of thousands of

6    dollars coming in?

7        A.    Right.

8        Q.    Okay.  So they weren't in any need to cut

9    corners, they wanted you to fix their accounting and do

10   it right?

11       A.    Uh-huh.

12       Q.    Yes?

13       A.    Yes, yes, sir.

14       Q.    All right.  And let me show you 43539.  Can you

15   expand the top.  This is in June 6th of 2001 when you

16   were doing the work.  At that point Pete Seda is asking

17   you to make him a monthly account and he wants a better

18   response time, right?

19       A.    That's correct.

20       Q.    And he was willing to pay for that, right?

21       A.    Yes, he always paid his bills timely.

22       Q.    Correct.  And he was asking you for this

23   increased scrutiny to look and work hard on June 6,

24   2001, right when you were working on the taxes?

25       A.    Right.

1     Q.     Correct?  The 2000 return, in fact, at issue in

2   this case was due on May 15th?

3     A.     That's correct, right.

4     Q.     Yesterday, from time to time, you'd say "Pete

5   sent you this" or "Pete faxed you that" or "Pete did

6   this."  But really your communications at al-Haramain

7   were not with Pete Seda but they were with the

8   bookkeepers, were they not?

9     A.     Generally the conversations with the

10  bookkeepers were when they called me.  Generally when I

11  called al-Haramain, usually I spoke with Mr. Seda.

12    Q.     But as far as faxing things to you or entering

13  things in QuickBooks, that sort of stuff, Pete Seda

14  never did any of that?

15    A.     As far as I know, he did not.

16    Q.     Correct.  In fact, you said you never saw him

17  or knew of him to do anything like that?

18    A.     Yeah, I don't think he did any of that.

19    Q.     All right.  Yesterday you said you got an

20  extension for the 2000 tax year, correct?

21    A.     Right, yeah.

22    Q.     Is that in your file anywhere?

23    A.     Yes, it is.

24    Q.     If you could look for the extension for the

25  2000, Form 990 in your --

1      A.     No, I do not have that.  I extended the 1120.

2      Q.     Well, there wasn't an 1120 even in '99, was

3   there?

4      A.     No, sir.

5      Q.     And there wasn't going to be an 1120 in 2000?

6      A.     No, there wasn't.

7      Q.     Just for the jury, a Form 1120 is a corporate

8   tax return that a for-profit corporation files?

9      A.     That's correct.

10     Q.     Correct?

11     A.     Yes, sir.

12     Q.     A 990 is a not-for-profit corporation?

13     A.     That's correct, right.

14     Q.     All right.  So there is no extension that you

15   got from the IRS for al-Haramain's 990 that was due on

16   May 15, 2000?

17     A.     That's correct.

18     Q.     And they imposed a large penalty on you,

19   correct?

20     A.     Yes, they did.

21     Q.     And the penalty was imposed starting from

22   May 15th, right, the due date?  They did not impose --

23   they did not recognize any extension that you filed?

24     A.     That's correct.

25     Q.     So when you said you got an extension --

 1      A.      We had an extension until September 15th for

 2   the organization, but, unfortunately, it was filed on

 3   the wrong form.

 4      Q.      You filed it on the wrong form?

 5      A.      Yes, I did.

 6      Q.      Was that Mr. Seda's fault that you used the

 7   wrong form?

 8      A.      No, that was my fault.

 9      Q.      That was your fault.  Yesterday you testified

10   about a check that -- if I could ask that it be put on

11   from the government's exhibits BOA-6.  You testified

12   that during one of the meetings with Pete Seda that you

13   had when you were going through the documents and

14   questions about the 1998 return, you asked him about

15   this check.

16      A.      Yes.

17      Q.      Okay.  And you further testified yesterday, did

18   you not, that what he told you about this check caused

19   errors in both payroll taxes and fixed assets?

20      A.      Well, if this check was for the purchase of a

21   computer, as he told me, then the entry was accurate.

22   If, instead, this check was for payroll, then it was

23   inaccurate.  Then the coding was inaccurate based on the

24   information that he gave me.

25      Q.      Okay.  So you are saying that you had this

1    conversation with Pete Seda, he told you it was a

2    computer, because of that, you put it on fixed assets,

3    and, therefore, the return is wrong; is that what you

4    are saying?

5        A.    I put it on fixed assets, yeah.

6        Q.    Now, Mr. Wilcox, you first mentioned this

7    conversation only six years after you had started

8    talking to Colleen Anderson; is that right?  You first

9    started talking to her in 2003 and you didn't mention

10   this to her until 2009?

11       A.    That's correct.

12       Q.    Okay.  And this is the same conversation you

13   had with her where you had to admit to her that you had

14   told her things that were simply not true; is that

15   right?

16       A.    I don't know what you are talking about.  I'm

17   sorry.

18       Q.    Well, she came to see you in 2009, right?

19       A.    Yeah, we had a number of meetings over the

20   years.

21       Q.    Yeah.  Well, before this meeting in 2009 where

22   you looked at the audit trail, you had told her that

23   al-Haramain coded all of the checks on the Springfield

24   building schedule, had you not?

25       A.    Yes, that's right.

Wilcox - X by Mr. Matasar                              16

1    Q.    You told her that many times.  And you told her

2    that many times that they printed the schedule and gave

3    it to you, correct?

4    A.    That's correct, right.

5    Q.    And in this conversation it was the very first

6    time that you told her that what you had said before was

7    incorrect?

8    A.    Yeah.  When she showed me the audit trail and I

9    compared the e-mail on May 14th, '01, from Mr. Seda to

10   the printout -- the e-mail of QuickBooks that I sent

11   back to him in January of '02, and I did the

12   comparisons, then I noticed it.  The previous times that

13   I had met with Agent Anderson, I was going from memory.

14   And I didn't have any records available.

15          In some of those cases, I didn't have my files

16   available because they were taken away from me for a

17   period of time.

18   Q.    I take it it was a difficult situation for you

19   to tell an IRS-CID agent that you had been telling her

20   false information for six years?

21   A.    Yes.

22   Q.    She was not pleased about the situation, I take

23   it?

24   A.    I don't know.  I didn't -- I never really

25   noticed her reaction.  She seems to stay pretty level

1    all the time.

2        Q.    But you were quite tense about it?

3        A.    Well, I wasn't happy about it, but --

4        Q.    Okay.  And that's the conversation that you

5    gave her the information about the check with the --

6        A.    Yes.

7        Q.    -- 2006 -- okay.  That's the first time you had

8    mentioned it.  Now -- and by the way, you told her you'd

9    read a newspaper article, and that's what triggered your

10   memory, right?

11       A.    Yeah, there was a magazine article that had

12   written that -- that talked about this with

13   Mr. Gartenstein.  And when he mentioned kind of the

14   situation where there was a check written from -- by him

15   from al-Haramain and he said it was really for payroll

16   services, but -- in the article it mentioned that this

17   Mr. Gartenstein said that Mr. Seda wanted --

18       Q.    You don't have to recite the article.

19       A.    Okay.

20             MR. CARDANI:  Excuse me, Judge, this is

21   directly relevant to the --

22             THE COURT:  You may answer the question.

23             THE WITNESS:  So in the article it said that

24   Mr. Gartenstein said that Mr. Seda told him he didn't

25   like paying payroll taxes, so he told him that he would

1    issue this check to you as -- he would -- al-Haramain

2    would issue the check to Mr. Gartenstein as if it was a

3    computer -- purchase of a computer.

4         And when I read that article, it immediately

5    triggered in my mind the meeting that I had many years

6    before with Mr. Seda about that check.

7    BY MR. MATASAR:

8    Q.    So this supposed conversation you had with

9    Mr. Seda, if you had it -- or you had it and it caused

10   you to put the computer in the fixed assets category?

11   A.    Yes, sir.

12   Q.    Okay.  Let me ask you to look at 43057.  Expand

13   the whole first page.  This is a fixed asset schedule

14   for '98, right?

15   A.    Yes, sir, it is.

16   Q.    The computer is not in there, is it,

17   Mr. Wilcox?

18   A.    No, it's not.

19   Q.    So you've testified, have you not, that the

20   conversation with Mr. Seda -- if you had the

21   conversation with Mr. Seda, it caused you to put the

22   computer into fixed assets?

23   A.    Yes.  And obviously by that schedule I was

24   incorrect.

25   Q.    So there was no conversation with Mr. Seda?

1      A.      There was a conversation with Mr. Seda about

2   that check.

3      Q.      Didn't you say that the conversation with

4   Mr. Sedaghaty about that check caused you to put the

5   check into the fixed assets category in 1998?

6      A.      I was pretty certain I put it there, but,

7   obviously, I didn't.

8      Q.      But you remember this conversation six years

9   later because of a newspaper article you read?

10     A.      It was a magazine article.

11     Q.      I'm sorry, magazine article.  You talked to

12   Colleen Anderson many times about this case, as you

13   said.  Didn't one of the things you tell her was that

14   every time you talked to Pete Seda about a specific

15   item, you had a hard copy in your file?

16     A.      I don't know if that's -- I don't remember

17   that.

18     Q.      Is that your recollection, that when you talked

19   to him about something, you'd have a hard copy in your

20   file?

21     A.      We sometimes -- we would try to most of the

22   time.  I don't know if it happened every single time.

23     Q.      There is no hard copy of this check in your

24   file, is there, Mr. Wilcox?

25     A.      I don't think so.

1     Q.     No.  And your review and correction of the

2   al-Haramain data that they input, wasn't just something

3   that you did at the very beginning when you started on

4   the case, it was something that you did throughout your

5   work with them?  That was what you were hired to do, to

6   continue to monitor?

7     A.     Yes, sir.

8     Q.     Continue to analyze?

9     A.     Yes.

10    Q.     And despite your efforts and their willingness

11  to pay you, they continued to have problems?

12    A.     Yes, they did.

13    Q.     And you told Ms. Anderson that they don't keep

14  the best records; is that fair to say?

15    A.     That's correct.

16    Q.     And from time to time there were control

17  problems with their record keeping system?

18    A.     Okay.  Yeah, that sounds familiar, yes.

19    Q.     Okay.  And I think you've indicated before, he

20  gave you specific instructions that the taxes be right

21  and the taxes be clean?

22    A.     Yes, sir, he did.

23    Q.     Now, Mr. Wilcox, even in circumstances where a

24  client doesn't tell you to keep the taxes clean, that's

25  really your job, right?

Wilcox - X by Mr. Matasar                            21

1     A.     Yes, it is.

2     Q.     Okay.  And you have a duty to the public and

3  the government as well as to your client?

4     A.     Yes, sir.

5     Q.     That's, in effect, the P in CPA, certified

6  public accountant, that's an important part of your

7  professional responsibility?

8     A.     Yes, sir.

9     Q.     And so this requires you to obtain appropriate

10 data to prepare the tax returns, does it not?

11    A.     Yes, it does.

12    Q.     And when you see inconsistencies, where you see

13 issues that raise your concerns, you are required by

14 ethical principles to get additional information, are

15 you not?

16    A.     Yes, I am.

17    Q.     Make reasonable inquiries?

18    A.     Yes, sir.

19    Q.     And it's also true that the Treasury Department

20 of the United States has regulations requiring you to

21 use due diligence in the preparation of materials?

22    A.     Yes, sir.

23    Q.     And if you do not, you could be suspended,

24 disbarred, not just by the Oregon Board of Accountants,

25 but also by the Internal Revenue Service and the

1    Treasury Department?

2        A.    That's correct.

3        Q.    And you already had a problem with the Oregon

4    CPA board, did you not?  You had a short, I think,

5    letter of admonition for filing your -- or filing your

6    license late, something like that?

7        A.    Yes, I had a letter of concern from them.

8        Q.    Now, Mr. Wilcox, you indicated that Mr. Seda

9    got a -- I think you called it a provisional ruling or

10   advance ruling?

11       A.    Advance ruling.

12       Q.    Okay.  And what that means is he is certain,

13   100 percent certain, even if he hadn't been certain

14   already, but based on the fact that he got an advanced

15   ruling, that he was 100 percent certain that the IRS was

16   going to scrutinize this tax returns in five years?

17       A.    That's correct.

18       Q.    Is that fair to say?  Okay.  So he knew that

19   was coming for sure.

20            Now, you say you're experienced in nonprofits.

21   So -- and we briefly discussed your proposal letter in

22   which you said you were -- worked for a large national

23   firm where one of your specialties was nonprofits; is

24   that correct?

25       A.    Yes, that's correct.

1      Q.      Right?

2      A.      Yes.

3      Q.      And when a -- when the IRS determines an

4   organization is tax exempt, they send you a letter

5   telling you so, right?

6      A.      That is correct.

7      Q.      Let me show you 43075.  And this essentially

8   says, dear applicant, congratulations, you're tax

9   exempt?

10     A.      Yes, this is the advance ruling letter.

11     Q.      Okay.  And doesn't the second page of that give

12  you further information about other taxes that you don't

13  have to pay, federal unemployment tax act cases, federal

14  unemployment tax act?

15     A.      Yes, it does.

16     Q.      Okay.  Now, Mr. Wilcox, shortly after you got

17  that letter, I'll show you 42671, you told al-Haramain

18  to pay federal unemployment tax?

19     A.      Yes, I did.

20     Q.      And they didn't need to pay that tax, did they?

21     A.      They did not.

22     Q.      And so let me show you 43660.  After you

23  paid -- well, first of all, you told Pete Seda to pay

24  the federal unemployment tax and he did it, right?

25     A.      That's correct.

Wilcox - X by Mr. Matasar                          24

1    Q.    He followed your wishes, you did something that

2    was incorrect, and he doesn't know, he just signs the

3    paper?

4    A.    That's correct.

5    Q.    And that's pretty much how it went?

6    A.    Yes, sir.

7    Q.    All right.  So after he paid it, there was a

8    refund check that -- or a refund letter that was sent

9    back to al-Haramain, correct?

10   A.    That's right.

11   Q.    Saying you are not required to file this form.

12   And then they faxed that to you, did they not?  Look at

13   the top left of this document.

14   A.    Yes, that's from al-Haramain's office, right.

15   Q.    So didn't you then -- even though you got that,

16   didn't you -- and I'll show you 43634 -- didn't you tell

17   them again to pay federal unemployment tax?

18   A.    Yes, sir.

19   Q.    And that was wrong as well?

20   A.    That's correct, it was.

21   Q.    And you got a refund for that, 42650, they got

22   a refund?

23   A.    Yes, sir.

24   Q.    And then in 43624 you told them yet again to

25   pay federal unemployment tax?

1      A.      This filing instruction tells me to sign and

2    mail the return.

3      Q.      Okay.  Is that -- how about 43628?

4      A.      Yes, that's correct, right.

5      Q.      And what you are telling the IRS there is that,

6    yes, there may be an overpayment, but you want it to be

7    applied to the next return, which means you are going to

8    file yet another unemployment tax return you don't need

9    to file?

10     A.      Yes, sir.

11     Q.      Okay.  And you kept doing that throughout the

12   time with --

13     A.      Yes, I did.

14     Q.      Okay.  And that was -- none of that was

15   Mr. Seda's fault?

16     A.      No, wasn't.  That was my fault.

17     Q.      Mr. Wilcox, I'm going to show you some other

18   documents about your preparation of the '98/'99 returns.

19            Isn't it fair to say that one of the basic

20   bedrock principles of accounting is the year end of year

21   one numbers have to be the identical number as the year

22   beginning of the next year?

23     A.      Yes, it would be.

24     Q.      Okay.  So let me show you 43008.  And that

25   shows cash at the end of tax year 1998 as $13,294?

Wilcox - X by Mr. Matasar                              26

1       A.    That's correct.

2       Q.    And if you look at 42900, that shows, at the

3    beginning of the next year, 11,994.  Maybe we can put

4    them both on the page at the same time.  So here you

5    see, Mr. Wilcox, that the end of one year has a

6    completely different number than the beginning of the

7    next year, correct?

8       A.    That's correct, right.

9       Q.    And this bedrock principle you didn't follow?

10      A.    No, I obviously didn't.

11      Q.    And was this Mr. Seda's fault?

12      A.    No, it was not.

13      Q.    Did you have a conversation with him about

14   this?

15      A.    No, sir.

16      Q.    He didn't cause you to do this?

17      A.    (Shaking head).

18      Q.    Let me show you 43008.  That shows $15,000 at

19   the end of the tax year '98 for other current

20   liabilities.

21      A.    Yes, sir.

22      Q.    And how about 42900, that's the next year.

23   That's where the current liabilities should be, isn't

24   it?

25      A.    That's where it should be.

1    Q.    And the 15,000 disappeared?

2    A.    That's correct.

3    Q.    That's not Mr. Seda's fault, is it?

4    A.    No, it's not.

5    Q.    Let me just show you another one.  Would you be

6    surprised to hear that there are numerous errors like

7    this throughout your work, year end, year beginning?

8    A.    The '98 information I got from Mr. Seda, I

9    tried to reconcile as closely as possible.  And going

10   from '98 and 99, yeah, there were some gaps.  And all I

11   can tell you is I didn't get it nailed down perfectly.

12   I didn't get it nailed down properly, actually.

13   Q.    Mr. Wilcox, there is no -- are you suggesting

14   that there can be an explanation -- there can possibly

15   be a reason why the year end cash in one year would be

16   different than the year beginning cash the next year

17   based on what somebody tells you?

18   A.    No.  As long as I had the bank statements, I

19   should be able to go from one year to the other.

20   Q.    What do the bank statements have to do with it?

21   Isn't it simply looking at the previous year return and

22   plugging that number in to the beginning of the next

23   year?

24   A.    That's -- yeah, that's generally how it's going

25   to work.  What the bank statements do is they reconcile

 1    the year end so that you -- the ending balance then

 2    becomes the beginning balance of the next year, and it

 3    flows.

 4            THE COURT:  We're going to take a short break

 5    at this time.

 6            (Recess:  9:13 until 9:28 a.m.)

 7            MR. CARDANI:  Judge, it's my understanding

 8    based on your ruling yesterday that we'd be given some

 9    time to prepare for redirect.

10            THE COURT:  Yes.

11            (Jury enters the courtroom at 9:29 a.m.)

12            THE COURT:  Thank you for your patience.  Go

13    ahead.

14            MR. MATASAR:  Your Honor, I understand that due

15    to a minor technical error, none of the documents on

16    this screen were shown to the jury.  I'm not going to

17    show them right now.  We'll take that up later, but

18    there is one I would like to show.

19            THE COURT:  Is it a document which has been

20    received?

21            MR. MATASAR:  Yes.  It's part of the FPDUS

22    documents.

23            THE COURT:  You may.

24    BY MR. MATASAR:

25      Q.    Mr. Wilcox, I'm just showing you on the screen

1    something that was shown to you before.  This is the --

2    on the top, is it not, the 1998 tax return that shows

3    the cash at the end of the year as 13,294, and at the

4    bottom of the screen, it's the 1999 tax return that

5    shows the cash at the beginning of the year with a

6    different number?

7        A.    That's correct, right.

8        Q.    Okay.  Mr. Wilcox, you prepared the Form 1023;

9    is that correct?

10       A.    Yes, sir.

11       Q.    And what is the Form 1023?  I'll show you page

12   2 of it which is 43194.  Why don't you tell the jury

13   what a Form 1023 is.

14       A.    It's an application for an organization to be

15   classified as tax exempt -- under the tax exempt status

16   rules of IRS.

17       Q.    So in this case when you filled it in, your

18   very first sentence that you hand wrote or that you

19   typed in on number one is the most significant activity

20   is the publication of Islamic books; is that right?

21       A.    Yes.  Mr. Seda gave me this information so I

22   put it on the form.

23       Q.    Okay.  And originally you applied to be a

24   church; is that right?

25       A.    Yes, sir.

1      Q.     And you have to provide a Schedule A for

2   churches when you do that.  And that's 43202.  At the

3   top of that, you explained to the IRS that the

4   foundation was formed to provide a book distribution

5   system, correct?

6      A.     Yes, sir.

7      Q.     And, again, at page 43196, top section, it says

8   there is an inventory of the spiritual books.  By the

9   way, you were at the prayer house several times, you saw

10  there is lots of books there?

11     A.     Yes.  Not at this point in time --

12     Q.     Not at this point?

13     A.     Yes, but, yes, sir.

14     Q.     Over the years you've been to the prayer house

15  and saw lots of books?

16     A.     I -- when I was at the prayer house, I would

17  typically go straight downstairs to where the two women

18  were working that I was to assist with the QuickBooks.

19  So that's really about the only place that I saw.

20            I know one time Mr. Seda took me down the hall

21  to introduce me to someone, and I noticed there was --

22  looked like a library with a bunch of books.

23     Q.     But you knew that what they were doing was

24  distributing books?

25     A.     Yes, sir.

1    Q.    And you got a specific response from the IRS to

2    your application.  I think you testified yesterday that

3    there was some back and forth?

4    A.    Yes, sir.

5    Q.    Right?  And you got a letter which is 43158.

6    And they are asking for some questions and some

7    information.  And you responded in 43156, I guess.  Yes.

8    Look at number five there.  You say -- you talk about

9    the publications and the books and that sort of thing.

10   A.    Yes, sir.

11   Q.    And later you got another letter, 43129, from

12   Jennifer Nicolin, the woman you discussed yesterday.

13   That's a letter September 6th.  And if you look at the

14   second page of the letter, that's 43130, number three

15   there, it says the IRS is essentially telling you that

16   because books is so important, that it's probably better

17   not to be a church, but that they are going to give a

18   different kind of 501(c)(3) status, right?

19   A.    That's correct.

20   Q.    Now, Mr. Wilcox, in your Form 1023 that you

21   prepared, 43201, you listed an inventory for books,

22   right?

23   A.    Yes.  This was an estimate provided to me by

24   Mr. Seda.

25   Q.    Okay.  And I just want to show you a little bit

1    more information in the tax returns.  Let me show you

2    42897.  You see the highlighted numbers that you put in

3    the tax return there for postage.  They had $17,000

4    worth of postage that year?

5         A.    Yes, sir.

6         Q.    And in the next year, 42319, the year 2000,

7    there was $19,000 for postage?

8         A.    Yes, sir, that's right.

9         Q.    And, Mr. Wilcox, in the '99 return, 42900, you

10   had no inventory for books, zero?

11        A.    Yeah, that's correct.  Normally what would

12   happen when they publish their books, they would ship

13   them out pretty promptly.  And so if there was an

14   inventory, it might have just been a few hundred to a

15   thousand dollars or something.  It was such an

16   insignificant amount, that we never bothered to

17   inventory that.  We just ran everything through the cost

18   of the publications and their postage expense.

19        Q.    Didn't the Saudi branch send them thousands of

20   books?

21        A.    I'm sorry?

22        Q.    Do you know that they got their books from

23   Saudi Arabia?

24        A.    No, I didn't.

25        Q.    You didn't talk to them about how to account

Wilcox - X by Mr. Matasar                         33

1    for all the books that they were dealing with?

2        A.    No.  When the cost -- if there was any costs

3    involved, then we just expensed it.  We didn't bother

4    setting it up in inventory because the idea was to keep

5    the inventory as minimal as possible.  That they would

6    get books in, ship them out, and that sort -- that's the

7    process.  So in a case like that, there is really no

8    need to do inventory.

9        Q.    How about when you get books donated from

10   another organization, isn't that an in-kind contribution

11   that must be reflected on the tax return?

12       A.    No.  If it's -- you are saying if it's donated

13   from another organization?

14       Q.    If al-Haramain Saudi Arabia gave them thousands

15   and thousands of books to distribute to people in the

16   United States or elsewhere, wouldn't that fact that they

17   were being given these books and then paying tens of

18   thousands of dollars for postage to send them out,

19   wouldn't first the donation or the incoming books to

20   al-Haramain U.S.A. be reflected on the tax return

21   somewhere?

22       A.    No.  Because they came to them at zero cost.

23       Q.    There is no in-kind contribution rule that if

24   you get something that you don't pay for, that it has to

25   be considered in a tax return?

Wilcox - X by Mr. Matasar                              34

 1     A.    Not in a case like this.

 2     Q.    Okay.  And the same thing with sending it out,

 3  that's not a grant or donation?

 4     A.    No.  When it goes out, it -- you have a

 5  shipping charge and so then that's your expense right

 6  there.

 7     Q.    All right.  So let's just use one example.

 8  Somebody gives you 100 books worth $20 each, $200, that

 9  200 doesn't go on line one, contribution, and when you

10  send it out, it doesn't go on line 22, grants or

11  allocation; that's your testimony?

12     A.    Yes, that's my testimony, that's right.

13     Q.    Okay.  Mr. Wilcox, you prepared the Form 990

14  that's the heart of this case, right?

15     A.    Yes, sir.

16     Q.    In your file, that's 43218.  It's also IRS-1,

17  but I think you'll be more familiar with your file.

18     A.    Okay.

19     Q.    43220 is the page on that return that lists --

20  that has line 57a, right?

21     A.    That's correct, right.

22     Q.    And that's your number?  I mean, that is the

23  number you put in there for land, buildings and

24  equipment?

25     A.    Right, correct.

1      Q.     Wrong number.  I'm sorry, I may have the wrong

2   number, but line 57a on that return has the number that

3   you put in.  My dyslexic speech.

4           Now, Mr. Wilcox, you also prepared Form 1120,

5   did you not?

6      A.     Yes, that's right.

7      Q.     And on that form, that's the corporate tax

8   return because they hadn't been given tax exempt status

9   yet.  So for 1998, you prepared a different number

10  return but it's pretty similar in most ways, right?

11     A.     Yes, you could say that.

12     Q.     That's 43005.

13     A.     Yes, sir, that's it.

14     Q.     So, Mr. Wilcox, on that return, on 43008, there

15  is a line 10a, and that is the place where you put

16  buildings, correct?

17     A.     Buildings and fixed assets, that's right.

18          MR. CARDANI:  Excuse me, I'm sorry, excuse me,

19  Counsel, for clarification we're talking about 1998 tax

20  return?

21          MR. MATASAR:  Correct, correct.

22          MR. CARDANI:  Okay.  Thank you.

23  BY MR. MATASAR:

24     Q.     And, Mr. Wilcox, that line essentially is

25  equivalent to the line 57a that's at issue in this case

1    on the 990, right?

2        A.    That's correct.

3        Q.    So the -- both of them are supposed to reflect

4    the value of buildings owned by the organization at the

5    end of that year, correct?

6        A.    Yes.

7        Q.    Okay.  And on this return, Mr. Wilcox, if you

8    look at 43005, you see a line for taxes, right?

9        A.    That's right.

10       Q.    And you submitted a schedule to go with that

11   43012, that $3,010, and you said --

12       A.    Right.

13       Q.    -- that they paid $3,010 in property taxes?

14       A.    That's correct, right.

15       Q.    Okay.  Now, in your opinion as a CPA, isn't

16   that a huge amount of property taxes for a $10,000 worth

17   of fixed assets?

18       A.    No, that 3000 was on the building.

19       Q.    Okay.  But the building was not on the return?

20       A.    Yes.  That was a tax decision I made and

21   discussed with Mr. Seda.  And if you want, I can go

22   through that conversation.

23       Q.    Please do.  Is there a discretion?  Can

24   somebody say not to put a building on a tax return if

25   they owned the building?

Wilcox - X by Mr. Matasar                          37

1      A.    Now, I felt there was justification for it.  So

2    what you are -- as I discussed with Mr. Seda, here is

3    how it works.  You are dealing with two sets of tax laws

4    here, a corporation income tax and tax exempt tax law.

5    Now, in a corporation, if there is a building put into a

6    corporation return, if eventually you sell the building,

7    there is a gotcha way that IRS can tax the proceeds of

8    that building two times, once at the corporate level,

9    then when the proceeds are distributed to the

10   shareholders, it could be taxed at a shareholder level.

11         So for proper tax planning in the corporation

12   income tax area, you try to keep buildings out of the

13   corporation.  Okay?

14         Now, on the tax exempt tax laws, if you sell --

15   have a building, where you sell it, you generally don't

16   have that problem because the proceeds are reinvested,

17   you buy another building, and it's used within the tax

18   exempt purpose, and you are fine.

19         What I didn't want happening is that I don't

20   want to show the building on the '98 return, and then

21   later on al-Haramain goes to sell the building, IRS

22   comes waltzing in flashing a copy of the '98 return, and

23   say, look, you put a building in a corporation return,

24   you just sold the building, we got you.  And so they

25   could be potentially looking at huge tax liabilities.

1          So I told Mr. Seda, here is how we'll sell this

2   to IRS.  We're going to start on the '99 tax exempt

3   return.  That's where the building and its depreciation

4   will start.  And here is the reason why we do this and

5   we leave it off the '98:  It was al-Haramain's intention

6   from the get-go to be a nonprofit -- to be a tax exempt

7   organization.  And so we've got facts and circumstances

8   that say that '98, we filed the corporation return, but

9   it was only because administratively we never got the

10  1023 started.

11         And I told Mr. Seda I was confident that I

12  could sell that argument to IRS if the building was ever

13  sold and we ever came up to that situation.  That's why

14  the building is not on the '98 tax return.

15  Q.     So the idea was to keep from the IRS the

16  information that you owned the building?

17  A.     No, sir, it wasn't to keep that at all.

18  Q.     What was the idea then?  I'm not sure what you

19  are saying.

20  A.     The idea was for tax planning purpose to avoid

21  a potential tax on the sale of that building because we

22  put the building on the corporation tax return, and so

23  using a facts and circumstances argument that IRS will

24  accept, we started the depreciation, we started -- we

25  showed the building on the '99 nonprofit return, 990.

 1      Q.    And do you have anything in your file that

 2   reflects this conversation with Mr. Seda?

 3      A.    No.

 4      Q.    And do you have anything in your file that

 5   reflects your -- or any rulings or Revenue Code numbers

 6   you could give me that indicate that if a corporation

 7   owns a building, they cannot put it on the tax return?

 8      A.    No, probably not.

 9      Q.    And, really, probably the -- it does matter

10   that much to the IRS anyway, does it?  Is that sort of

11   what you are saying the value -- what the -- if they put

12   the value of the building on the return?

13      A.    I'm sorry, I didn't understand the question.

14      Q.    I guess the question is:  In your view is it

15   material to the IRS that the value of a building is

16   properly reflected on the return?

17           MR. CARDANI:  Excuse me, object, Judge, as to

18   materiality on IRS's concern.

19           THE COURT:  Sustained.

20   BY MR. MATASAR:

21      Q.    In any event, Mr. Wilcox, this whole idea for

22   your plan was your idea, not Mr. Seda's plan?

23      A.    Yes, it was.

24      Q.    Mr. Wilcox, you prepared the Form 990 for the

25   year 1999; is that correct?

1    A.    Yes, sir.

2    Q.    And on that form at 42 -- I may have the wrong

3    number here.  I think it's 42897.  That's a statement of

4    functional expenses.  You indicate legal fees?

5    A.    Yes, sir.

6    Q.    Okay.  Now, in the -- in your preparation for

7    legal fees to prepare the return, you printed out a

8    profit and loss schedule on June 13, 2001, did you not?

9    That's -- let me show you --

10   A.    I don't --

11   Q.    -- 42919.

12   A.    Yes, you are right.

13   Q.    And it may take a few steps, but I wanted to

14   ask you about legal fees on that return.  Before you

15   printed that out, at 6:13 -- I'm sorry, at 2:36, do you

16   see the top left corner there?

17   A.    Yes.

18   Q.    I'm going to show you 42918, and if you look at

19   the top left there, that was 1:41 on 6/12, so that was

20   the day before?

21   A.    Yes.

22   Q.    Okay.  So the day before you were at 51,000,

23   you were at 73,000; is that correct?

24   A.    That's correct, right.

25   Q.    And that's professional fees?

1     A.     That's right.

2     Q.     Professional fees is a category in QuickBooks,

3  right?

4     A.     Well, yes, it is.  You can set it up on any

5  software program professionally, yes.

6     Q.     But what your job was, in effect, was to figure

7  out how to get the professional fees item in QuickBooks

8  into a legal fees item which is a line item on the tax

9  return?

10    A.     That's correct, right.

11    Q.     So the IRS wants to know about legal fees.  But

12  for one reason or another, the QuickBooks program just

13  has professional fees.  So maybe accounting fees would

14  go somewhere else and you gotta take those out,

15  et cetera, right?

16    A.     That's correct, right.

17    Q.     Okay.  So you had this -- let me show you

18  42923, okay, that's a list from QuickBooks of all the

19  professional fees, correct?

20    A.     Yes, at this point, it is, that's correct.

21    Q.     Everything that they -- they coded those?

22    A.     Yes, the '99 entries were input by al-Haramain,

23  correct.

24    Q.     Okay.  And you see that one of them is a

25  $50,000 check to a firm called -- or Akin Gump, looks

1    like a law firm, and it's $50,000?

2        A.    Yes.

3        Q.    And you make notes in your work papers, if we

4    can look at the bottom of that, you make notes in your

5    work papers to help you figure out what these entries

6    are, correct?

7        A.    Right.

8        Q.    And you put a number two next to the 50,000 and

9    then you wrote something, right?

10       A.    Yes, right.

11       Q.    Okay.  And that's because Pete Seda told you

12   that they paid $50,000 to a lawyer because they were

13   suing Frontline for something that they said that they

14   thought was not true?

15       A.    Yes, that's correct.

16       Q.    Okay.  And isn't it true, Mr. Wilcox, that when

17   people pay a law firm a retainer, that that money

18   doesn't belong to the law firm when it's paid, correct?

19       A.    Well, yeah, as I understand -- yeah, the money

20   is there until the services are rendered.

21       Q.    Correct.  So it's really the client's money

22   until the law firm uses it, right?

23       A.    Yes, that's right.

24       Q.    So it really technically wouldn't be $50,000

25   for legal fees until they start billing, correct?

1      A.    That's correct, right.

2      Q.    Now, I want to ask you, though, about the 120,

3  $1020 that you have that make the total of 5120.  Okay.

4  Do you see that?  We could go back to the schedule on

5  the return.  Do you have a number for that one?  42897.

6  Okay.  We've talked about the 50,000.  I want to ask you

7  about the other $1,020, which you determined was legal

8  fees, right?

9      A.    Yes, sir.

10     Q.    Okay.  In order to get to that number, you used

11  a piece of ledger paper, right?  Let me show you 42924.

12  Okay.  And what you did with that was -- and I won't

13  show it here, but you looked at that long, long list of

14  professional fees, and you listed a bunch of them as

15  either Ashland building or educational film.  And what

16  you did was you took them out of that $73,000?

17     A.    That's correct, yes.

18     Q.    And so as you did that, and I think Ms. Wells

19  has a way to show that -- which ones of these were part

20  of the other return of these, correct?  This is the

21  $73,000.  And if we can show which ones were on your

22  ledger paper, do you see those?  Those are all the ones

23  that were on the ledger paper.  And if you want, you can

24  check, if we can put them side by side.  Yeah.  Okay.

25            All the ones that are in yellow that -- you can

1   look next to them, the 2700, the 528, the 2760, each one

2   of those are in the column that adds up to 73,460.  Do

3   you see those, Mr. Wilcox?

4       A.    Yes, I see those.

5       Q.    The purple ones, the building and et cetera.

6   So what we're going to do is we're going to take them

7   out and show you the number of 51,020.  Those are the

8   ones that are remaining, if we can make those bigger.

9           So the sum total of those columns, if you can

10  take a quick look, Mr. Wilcox, if look at the 93,135, if

11  you can just eyeball that.

12      A.    I'm sorry, where are you at here?  Oh, on --

13  okay.  42923?

14      Q.    Yeah, the one that's on the screen.

15      A.    Okay.

16      Q.    If you can eyeball that, that looks like a

17  correct total?

18      A.    The correct total for what?

19      Q.    For the numbers in that column that were

20  remaining -- you got to 51,020 on the tax return for

21  legal fees, correct?

22      A.    Okay, yes, okay, I see, yeah, yeah, yeah, I do.

23      Q.    So these are the numbers that got you to the

24  51,020, right?

25              MR. CARDANI:  Judge --

1           THE WITNESS:  Yes, I think so.

2           MR. CARDANI:  Can I ask a question?  That

3     51,000 that we see on the bottom right-hand corner, who

4     put that there?

5           MR. MATASAR:  That is a visual aid for

6     demonstrative purposes.  That was not on there.  I'm

7     asking Mr. Wilcox if that's a correct total.

8           MR. CARDANI:  Thank you.

9           THE COURT:  That's not in evidence, right?

10          MR. MATASAR:  No, correct.

11          THE WITNESS:  Yeah, yes, that looks like it's

12    correct.

13    BY MR. MATASAR:

14       Q.   So, Mr. Wilcox, out of those numbers -- and

15    maybe we can look at the whole 42973 so you can see

16    the -- so just starting with the name, memo, and amount.

17    So, Mr. Wilcox, the $93, it says videotapes?

18       A.   Uh-huh.

19       Q.   How did you come to the conclusion that that

20    was legal fees?

21       A.   Generally on this -- well, I don't remember

22    exactly.  But generally on this schedule, this was the

23    type of schedule I'd sit down, meet with Mr. Seda, and

24    we'd go through and we'd -- and he'd indicate what they

25    were for.

1      Q.     So is it your testimony that for the $50 one,

2   the fourth one down, that Mr. Seda told you that horse

3   shoeing was a legal fee?

4      A.     I don't remember.

5      Q.     Do you know what farrier services are, the $110

6   further down?

7      A.     That's definitely for a horse or maybe it was

8   for their camel.

9      Q.     And did he tell you that was a legal fee?

10     A.     I doubt if he told it to me.

11     Q.     But you put it down there?

12     A.     Right, yeah.

13     Q.     Now, Mr. Wilcox, I wanted to ask you a further

14   question about these -- this $50,000 in legal fees.  One

15   of the things that -- let me show you a bank statement.

16   They faxed their banks statements to you from time to

17   time?

18     A.     Yes, they did.

19     Q.     42379.  And if you look at the top left, you

20   got it from them May 16, 2001?

21     A.     Yes, sir.

22     Q.     And one of the things on there is, if you look

23   on 7/5, a deposit of $18,634.78.

24     A.     Uh-huh.

25     Q.     And I assume right now you can't, off the top

Wilcox - X by Mr. Matasar                                      47

1   of your head, say what that's for?

2       A.    No, sir, I can't.

3       Q.    And I think you testified yesterday that one of

4   the things you would do is you would ask al-Haramain to

5   fax you information from time to time to help you figure

6   out what went where?

7       A.    That's correct.

8       Q.    Okay.  And let me show you 42352.  This is the

9   kind of fax that you would get from them, correct?

10      A.    Yes, sir.

11      Q.    And do you see what's highlighted there?

12      A.    Refund check from Mark McDougal, attorney.

13      Q.    Right.  And do you remember them telling you

14  that they were successful in their lawsuit, it look less

15  time, so they got a refund from their lawyer?

16      A.    I don't remember that.

17      Q.    But clearly it says refund check?

18      A.    Yes, sir, it does.

19      Q.    Okay.  And so if you go back to 42379, you see

20  that that 18,634.78 was part of the deposit for that

21  month, correct?

22      A.    Yes, it was.

23      Q.    If you look to the right, the total deposit for

24  that month was 18,747, right?

25      A.    Right.

1      Q.    And isn't it true that a lawyer funding a

2   retainer is not making a contribution to the

3   organization?

4      A.    That's right, he's not.

5      Q.    Right?  So that money should not go as a

6   contribution, should it?

7      A.    It should not.

8      Q.    Okay.  Do you know what he did with that?  Can

9   I show him --

10     A.    No.

11     Q.    Is 755 -- I would like to not publish this,

12  because I'm not sure if it's in.  Can we show 755.7,

13  page 49.  Do you see that, Mr. Wilcox?

14     A.    Yes.

15     Q.    That's part of what Colleen Anderson brought

16  for you -- brought to you?

17     A.    Yeah.  This is from the audit trail.

18     Q.    Yeah.  She brought it to you, you looked at it.

19  Does that refresh your recollection whether you put this

20  refund from the lawyer as a contribution into

21  QuickBooks?

22     A.    Yes, I did put it as contribution income.

23     Q.    And that was incorrect?

24     A.    Yes, it was.

25     Q.    Was that Mr. Seda's fault?

1        A.      No, sir, it was my fault.

2        Q.      You testified yesterday, Mr. Wilcox, about the

3    $21,000 that Soliman al-But'he had made -- or a check --

4    $21,000 check and they sent it back to him; is that

5    right?

6        A.      That's right, yes.

7        Q.      You said you asked him what it was for, and he

8    said it went to Soliman -- came from him and went back,

9    or went back to Soliman, correct?

10       A.      Yes, that's right.

11       Q.      And you had talked about this $21,000 from time

12   to time with Mr. -- I'm sorry -- with Colleen Anderson

13   and also Mr. Charlton?

14       A.      I'm sorry, Mr. Who?

15       Q.      Wasn't there sometimes another IRS agent

16   present when Colleen Anderson was meeting with you?

17       A.      There was on one occasion someone from the

18   Seattle office.  I think he was an expert in tax exempt.

19       Q.      Yes.  His name might have been Kurt Charlton,

20   does that name ring a bell?  If you don't know his name,

21   that's fine.

22       A.      No, it's Greg -- that name doesn't ring a bell.

23       Q.      Now, when you were talking to them, you spoke

24   about a lot more than the $21,000 check, right?

25       A.      Yes.

Wilcox - X by Mr. Matasar                    50

1     Q.    And you told them, for example, that there was

2   $614,000 that was booked as a -- contributions for the

3   year?

4     A.    That's right.

5     Q.    And you also told them big dollars went to

6   Soliman al-But'he, right?

7     A.    I probably did, yes.

8     Q.    And so one thing, by the way, when you talked

9   about Soliman al-But'he, he was in your mind al-Haramain

10  Saudi Arabia, correct?  You didn't really differentiate

11  between him and al-Haramain Saudi Arabia?

12    A.    No.  I just knew that Mr. Seda mentioned the

13  name a lot.  I didn't know what the connection was.  I

14  just figured he was an individual with the al-Haramain

15  Foundation.

16    Q.    Right.  But in your books when you said there

17  was a contribution, you listed the contributions as from

18  Soliman al-But'he.  You didn't say contributions from

19  al-Haramain Saudi Arabia?

20    A.    That's correct, right.

21    Q.    Okay.  And you knew there was an al-Haramain

22  Saudi Arabia?

23    A.    Yes, I did.

24    Q.    So saying big dollars went to Soliman is not

25  any different than saying big dollars went to

1    al-Haramain Saudi, same sort of idea?

2        A.    Okay.  I guess I'd agree with that.

3        Q.    Okay.  And so isn't it true that Pete Seda told

4    you that not just the $21,000 but the $131,000, those

5    big dollars went to Soliman al-But'he?

6        A.    No.  When I asked him about the $131,000,

7    that's when he told me it was part of the Springfield

8    building.

9        Q.    So when you say big dollars were going to

10   al-Haramain Saudi Arabia, what number would you say is

11   big dollars?

12       A.    That 21,000.

13       Q.    That's out of 614, big dollars means just 21?

14       A.    I don't remember saying "big dollars," but if

15   that's what I told Agent Anderson, then yeah.

16       Q.    At one point yesterday, Mr. Cardani asked you

17   if the entire $151,000 were given back to Mr. al-But'he,

18   would that have had an effect on line 22?

19       A.    On the 2000 return?

20       Q.    Right.  Do you remember that question?

21       A.    Yes, I think I do.

22       Q.    Okay.

23       A.    Yes, if that money -- line 22 is the grants and

24   allocations line.  If that money was misclassified in

25   some area and it belonged here, then line 22 would be

1    incorrect.

2        Q.    Okay.  So if the entire 150 were given back to

3    Mr. al-But'he, you'd have some concerns?

4        A.    Yes, sir.

5        Q.    Okay.  So let me ask a question, hypothetical

6    question, Mr. Wilcox.  You know there was $150,000 given

7    by Mr. El-Fiki to al-Haramain, right?

8        A.    Yes, sir.

9        Q.    If he intended that money to go to al-Haramain

10   Saudi Arabia in the first place, not to al-Haramain

11   United States, okay?

12       A.    Uh-huh.

13       Q.    Assume that that's the case.

14       A.    Okay.

15       Q.    If that were true, isn't it true also that that

16   money need not be reflected on line 1 or on line 22?

17       A.    Yeah, that would be correct because it would be

18   a wash transaction.

19       Q.    Right.  You could back it out, and you've

20   backed out other transactions in the past.  Mr. Wilcox,

21   I'd like to ask you about what we've called the

22   Springfield building schedule.  If -- I think it's a

23   government exhibit.  Can you pull it up without the

24   number?  I'll get you the number in a second.  Do you

25   have a number?

1              While we're looking for that, Mr. Wilcox, the

2    first time you met with Colleen Anderson was the day she

3    brought you a subpoena; is that right?

4        A.    Yes, sir.

5        Q.    And on that day -- so the first time you met

6    with Colleen Anderson was the day she brought you a

7    subpoena, right?

8        A.    Yes, sir.

9        Q.    That was June 12, 2003?

10       A.    Yes.

11       Q.    Okay.  And you really weren't prepared to talk

12   to her that day very much, right?  You were kind of

13   surprised?

14       A.    Yes, I was completely surprised.

15       Q.    She asked you a few questions about the

16   returns, a bit about the mosque purchases, that sort of

17   thing?

18       A.    Yeah, that sounds familiar.

19       Q.    And didn't you tell her at that time you may

20   have gotten copies of the escrow purchases -- or of the

21   escrow statements for both mosque purchases?

22       A.    I don't know if I did.

23       Q.    You don't remember telling her one way or the

24   other?

25       A.    No, I can't remember.

 1    Q.    You made arrangements with her to interview you

 2  in detail a second time?

 3    A.    That's right.

 4    Q.    So she came again to see you five days later,

 5  you knew she was coming, right?

 6    A.    That's right.

 7    Q.    She brought another agent?

 8    A.    Yes.

 9    Q.    And one of the things they were most concerned

10  about, were they not, was the Springfield building

11  schedule?  Could you show it to the witness.  This piece

12  of paper.

13    A.    Well, at that meeting with Agent Anderson, and

14  I believe that was the -- the other agent was the tax

15  exempt specialist out of Seattle.  It was about a

16  four-and-a-half hour meeting, and -- yeah, we might have

17  gone over this, but I can't tell you in detail.  It

18  covered quite a bit that night.

19    Q.    Well, didn't you tell them at the time that the

20  organization coded the checks?

21    A.    Yes, I probably said that.

22    Q.    And didn't you tell them that they gave you

23  this piece of paper?

24    A.    Yes, I did.

25    Q.    And by saying that the organization coded the

1    checks, what you are saying is the organization told you

2    in this document what the checks were for?

3        A.    Yes, yes, sir.

4        Q.    And didn't in this meeting, this June 2003

5    meeting, didn't Colleen Anderson and Greg Wooten

6    specifically ask you about conversations between you and

7    Mr. Seda about this?

8        A.    Yes, I'm pretty certain.

9        Q.    And you didn't tell them anything about it, did

10   you?  No conversations?

11       A.    I'm sorry?

12       Q.    Did you tell them anything about conversations

13   you had with Mr. Seda about any of these numbers?

14       A.    If we discussed it at that meeting, I would

15   have pointed -- well, I don't know if I did at that

16   meeting or not, but these -- I had conversations with

17   Mr. Seda because that's how I knew to code these amounts

18   here into the Springfield building account.

19       Q.    You are saying that now, right?  You are saying

20   now -- just now you said you had conversations with

21   Mr. Seda and that's how you knew how to code these

22   numbers, right?

23       A.    That's correct, right.

24       Q.    But seven years ago, you didn't tell that to

25   Colleen Anderson, you didn't say you had conversations

1   with Mr. Seda so you could code them, you said he coded

2   them?

3        A.   Well, yeah, I made that statement.  For

4   instance, on most of the QuickBooks input for '99 and

5   2000 after the two women had been trained on the input,

6   they would input those into the computers.  So,

7   indirectly, they've done the coding that way.  And,

8   yeah, there was certain accounts where I would have to

9   make adjustments or I would have to ask questions that I

10  would end up coding those amounts in.  So it wasn't all

11  done by them or all done by me.  It was that sort of

12  process.

13       Q.   Again, you are telling us that now, but then

14  you simply told them, when they showed you this piece of

15  paper, that they coded it and they gave you the piece of

16  paper?

17       A.   Yeah, that's what I assumed at that time.

18       Q.   And you talked to them again in November 2003,

19  maybe five months later?

20       A.   I'll assume you are correct, yeah.

21       Q.   Okay.  And at that time they showed you the

22  escrow statement, did they not?

23       A.   Yes, I believe -- I know eventually I was shown

24  the Springfield escrow statement, correct.

25       Q.   And you knew that the value of the building on

 1    the escrow statement was 381, right?

 2        A.    Yeah, when I looked at the escrow statement,

 3    yes.

 4        Q.    Okay.  And you have here 461?

 5        A.    That's correct.

 6        Q.    So Colleen Anderson asked you how the numbers

 7    are wrong, right?  Why is it wrong?

 8        A.    Right.

 9        Q.    You -- she, in effect, told you the tax return

10    you prepared was inaccurate?

11        A.    That's correct, right.

12        Q.    And, again, you told her there that you got the

13    value wrong when you prepared the return because

14    Mr. Seda coded the checks and they gave you the

15    Springfield building numbers?

16        A.    That's probably what -- yes, that's what I did

17    say, yeah, you are right.

18        Q.    And you signed that on a written statement to

19    that effect?

20        A.    Yes.

21        Q.    That you calculated the value by using this

22    piece of paper that they gave you?

23        A.    That's correct, right.

24        Q.    And you spoke with Colleen Anderson on the

25    phone from time to time?

1    A.    Yes, sir.

2    Q.    And at one point she asked you if you had a

3 lawyer?

4    A.    I don't remember that.

5    Q.    You don't remember telling her on February that

6 you were not represented by a lawyer at that time?

7    A.    No, I don't -- I never really used a lawyer too

8 often.

9    Q.    I'm asking about this matter.  Maybe you don't

10 use one too often.  I'm asking if, when she came to talk

11 to you about this case, if you told her you didn't have

12 a lawyer?

13    A.    Oh, okay.  I consulted with Mike Guy who was a

14 lawyer in town who actually was the lawyer that referred

15 Mr. Seda to me.  And I did have some questions about my

16 exposure, my liability, in meeting with IRS and

17 questions along that line.

18    Q.    So you met with me and Mr. Wax and Mr. Strupp

19 in May of 2009, right?

20    A.    Yes, sir.

21    Q.    That was eight years after this thing was

22 printed?

23    A.    Yes, sir.

24    Q.    And at that time you told us -- and, by the

25 way, Colleen Anderson was present at that meeting,

Wilcox - X by Mr. Matasar                    59

1    right?

2        A.    That's correct.

3        Q.    You asked that she be present.  We said no

4    problem.  And so we all spoke together in -- was it your

5    office or was it the IRS office?

6        A.    Her office.

7        Q.    And you told us again, did you not, that

8    al-Haramain coded all the checks, and that you didn't

9    enter anything yourself into QuickBooks?

10       A.    Yes, I did tell you that.

11       Q.    In fact, you told us you didn't enter any

12   financial transactions at all into QuickBooks, that

13   al-Haramain did them all, all you did was some bank

14   reconciliation?

15       A.    Yeah.  What I was going through -- well, I was

16   doing it by memory.  That's the process that we have in

17   place for our clients is where -- for them to do all the

18   detail entry.  And then after we get the QuickBooks file

19   from them, after they reconcile the bank statement, then

20   we take it from there.  And I do the -- whatever

21   adjusting to entries need to be made.  So that's the

22   normal process.  And I was quoting to you my normal

23   process from memory.

24       Q.    So it's fair to say your memory is not very

25   good?

1    A.    Yeah, I was wrong in this case.

2    Q.    And it's also fair to say that you don't take

3    very good notes; is that accurate?

4    A.    Well, yeah, I wish I would have taken better

5    notes, you are right.

6    Q.    You told that to the agent at one point that

7    you don't take good notes; do you remember telling them

8    that?

9    A.    No.  What I meant was I wish I would have kept

10   the notes that I had taken.  Sometimes you make a

11   notation, you get the answer you need, you make the

12   adjustment into QuickBooks, and then you don't need the

13   note anymore because the question has been answered.  So

14   during this process, I wish I would have kept those

15   notes.

16   Q.    So apart from this, you entered many, many

17   transactions yourself, right?

18   A.    Yes, sir.

19   Q.    Probably hundreds, deposits, all sorts of

20   stuff?

21   A.    Yeah.  I don't know if it's hundreds but you

22   may be right.

23   Q.    All right.  So it went from zero to hundreds?

24   A.    Correct.

25   Q.    And in this audit trail that you looked at, it

1    proved to you that you were incorrect on these

2    documents?

3        A.    That's right, yeah.

4        Q.    Did -- when you had this meeting with Colleen

5    Anderson, did she tell you it could be a crime to give a

6    false statement to a government agent?

7        A.    No, sir.

8        Q.    Do you know this?

9        A.    I do now.

10       Q.    And at that time when you saw Colleen

11   Anderson -- you do now meaning you now just because I

12   told you or from some other way?

13       A.    Well, yeah, I guess I've known it, but I

14   didn't -- I certainly did not intentionally give a wrong

15   answer.

16       Q.    When you talked with Ms. Anderson on that last

17   time, after she showed you the audit trail which made it

18   clear to you that you had given false information

19   before, you told her a different story which is that you

20   coded all these, right?

21       A.    Yeah.  I went through the -- there was an

22   e-mail on -- it was May 14th of '01, where Mr. Seda

23   e-mailed to me the QuickBooks file.  So those were the

24   entries that they had made.  And then Ms. Anderson

25   showed me a -- that was an audit trail -- there was an

1   audit trail printout of that May 14th, '01, data.

2       Q.     Right.

3       A.     Then there was an e-mail on January 7th of '02

4   where I e-mailed the QuickBooks file back to Mr. Seda so

5   he could restore it on his computer, and I compared the

6   two, and I saw the entries that they had made and the

7   additional ones because of the time coding on the audit

8   trail, I could see that those are the ones that I had

9   made in my office.

10      Q.     Okay.  And so she brought you some documents

11  which caused you to completely change your memory,

12  completely change -- right -- changed your memory of

13  what happened?

14      A.     Yes, sir.

15      Q.     Do you have a memory of what happened or are

16  you just reciting what's in the papers?

17      A.     Now, about what?  About this stuff here?

18      Q.     About any of this stuff.  You've said for six

19  years that you didn't code this, and now you see on a

20  piece of paper that looks like it says you coded it.  Do

21  you have a memory or are you just reading what the paper

22  says?

23      A.     No.  I remember the questions that I had to ask

24  to get the answers to these, I remember those.

25      Q.     You told Colleen Anderson you met with Pete

Wilcox - X by Mr. Matasar                          63

1   Seda on September 25th.

2        A.    Okay.  That's incorrect.  I met with him on --

3   just a minute, please.

4        Q.    Mr. Wilcox, while you are doing that, let me

5   show you 42451.

6        A.    Yeah, I met with him on September 24th at 1

7   o'clock.

8        Q.    Didn't Ms. Anderson bring you this piece of

9   paper?

10       A.    No.  This was in my billing file.

11       Q.    But she brought you the audit trail.  Didn't

12  she bring you some billing records, too?

13       A.    I don't know if she did.  I don't remember

14  that.  I just remember the audit trail.

15       Q.    Well, when you met with her, you picked

16  September 25th as the date.  Or are you saying you

17  didn't tell her the 25th?

18       A.    No, I was incorrect.

19       Q.    Why did you tell her the 25th?

20       A.    I probably looked at this -- Mr. Seda normally

21  came in mid to late afternoon, and I saw the 3:00 to

22  4:30 and assumed that that's when he came in.  But after

23  I saw the audit trail and some of the entries, I realize

24  he came in at 1 o'clock on the 24th.

25       Q.    So I'm looking at Ms. Anderson's report, which

Wilcox - X by Mr. Matasar                          64

1    indicates that she brought you an al-Haramain 2000

2    timesheet.  Are you saying that -- is there a different

3    document in your file that could be referred to as an

4    al-Haramain 2000 timesheet that's not this?  Do you have

5    a different one?

6        A.    No.  This was -- I thought this was -- no.

7    This is in my billing file.  If she brought that, I

8    don't remember.

9        Q.    All right.  Okay.  So you picked the 25th, but

10   now -- now, by the way, you had days to review the audit

11   trail before she came to see you on that day, right?

12       A.    I don't know if I did or not.

13       Q.    Clearly you have no independent memory apart

14   from looking at the pieces of paper when you met with

15   Mr. Seda, right?  You were going just by what's on the

16   audit trail?

17       A.    Yes, that's correct, right.

18       Q.    Now, if you look at this piece of paper, it

19   doesn't say "meeting" on it, does it?

20       A.    No, it doesn't.

21       Q.    Let me show you 42473.  This is another

22   timesheet that you have, right?

23       A.    That's correct, right.

24       Q.    And don't you typically inform a client or

25   inform yourself when you have a meeting with a client?

Wilcox - X by Mr. Matasar                              65

1       A.      What do you mean by "inform"?

2       Q.      Well, I mean, isn't it important for you to

3  keep records to bill your clients?

4       A.      Yes, yes.

5       Q.      And isn't it part of your job to bill your

6  clients, sort of a good client relations to tell them

7  what kind of work you are doing for them?

8       A.      Yes, that's in the bills, right.

9       Q.      Yes.  And don't you, when you meet with a

10  client, both indicate it to yourself, as you do here,

11  and also tell the client about it?

12      A.      Yes.  It depends on the circumstances.  If the

13  meeting is say a special meeting that lasts 10, 15,

14  30 minutes or longer, then in the -- when we send out

15  the bill, yeah, I'll indicate the meeting.

16              If it's a case where he comes in, goes through

17  a few documents to answer my questions, and then leaves,

18  and he was only there 5 or 10 minutes or something, I

19  never detail that out.  Because I needed the questions

20  to complete the tax returns.  So I just bill all that

21  out with the return for the tax bill, for the tax return

22  bill.

23      Q.      Mr. Wilcox, aren't there countless occasions --

24  let me show you some of your other bills.  First of all,

25  sometimes you bill more for meetings.  Don't you bill

1    $80 an hour at that time instead of something less for a

2    meeting?

3        A.    Yeah, typically, right.

4        Q.    So it's in your interests to say there is a

5    meeting?

6        A.    Well, yeah, if the meeting was -- like I say,

7    if it was a lengthy meeting, 15 minutes or more, then I

8    bill that out separately.

9        Q.    All right.  Look at 42443.  Here it shows, I

10   think, you bill $80 for meetings and $40 for other

11   things?

12       A.    Yeah.  The billing rate is $80.  And you can

13   see on number 89 -- yeah.

14       Q.    All right.

15       A.    That entry, there is a conference there.  And

16   then we -- a letter was drafted.  And then on

17   October 30th, there was a conference there, and we

18   discussed a bunch of other stuff.

19       Q.    42416, that's a bill to al-Haramain which

20   indicates a meeting with the IRS, right?

21       A.    Right, yes, sir.

22       Q.    That was your meeting with Colleen Anderson?

23       A.    Yes, sir.

24       Q.    429 -- I'm sorry, 42419, conference with

25   client.  You tell your client that you had a meeting

1    with him, right?

2        A.    Yes, I did.

3        Q.    42420, conference with client, right?

4        A.    Right, yep.

5        Q.    Lists a whole bunch of things you did there,

6    only added up for a total of $176, so it probably was a

7    pretty short conference with the client, wasn't it,

8    Mr. Wilcox?

9        A.    Most likely.  This type of work, the payroll

10   work, that gets billed out at lower rates than other

11   work.

12       Q.    42433, conference with clients, right?

13       A.    That's correct, right.

14       Q.    How about 42463 --

15             MR. CARDANI:  Judge, I'm going to object.  This

16   is 2002 now.  I think we've covered the time period.

17             THE COURT:  Sustained.

18             MR. MATASAR:  Pardon me, Your Honor?

19             THE COURT:  Sustained.

20   BY MR. MATASAR:

21       Q.    42463, this is an August 17, 2000, bill,

22   meetings with Pete?

23       A.    Yes, I see it.

24       Q.    42415 -- no, I'm sorry, 42470 is the number,

25   I'm sorry, that's my bad.  42470.

Wilcox - X by Mr. Matasar                             68

1      A.     Yes, I see it.

2      Q.     Now, Mr. Wilcox, you were saying that you only

3   put down important meetings?

4      A.     I'm sorry, I only put down what?

5      Q.     Is that your testimony, you only put important

6   meetings with your client?

7      A.     No.  If I would meet with a client for

8   typically it's 15 minutes or more, then usually I'll put

9   it in the bill.

10      Q.     Okay.  Now, didn't you also put telephone calls

11   on your bills when you had a telephone call with a

12   client?

13      A.     Yes, once again, if they are lengthy ones.

14      Q.     And there -- I won't go through them now, but

15   isn't it a fact that there are countless -- not

16   countless -- 10, 15 indications on bills that you made

17   to Pete Seda where you billed for telephone calls?

18      A.     Yes, that sounds familiar.

19      Q.     And the bill 42448 that you sent to Pete Seda

20   for the period during September 2001 says nothing about

21   any sort of meeting with Pete Seda?

22      A.     That's correct.

23      Q.     This wasn't a document that Colleen Anderson

24   brought for you to review, was it?

25      A.     No, I don't think so.  I don't know.

1    Q.    You didn't look at your entire billing file

2    with her?

3    A.    Well, yeah, eventually I'm sure she's seen the

4    entire billing file.  I've gone through it, too.

5    Q.    You went through it looking -- you went through

6    that in the audit trail looking to find a date when you

7    could have meet with Pete Seda to talk about the

8    Springfield building schedule, right?

9    A.    Yes.  At that meeting, all I want -- I knew the

10   entries that were on the Springfield building account

11   that he had given me.  I just wanted to confirm and make

12   sure that we had them all in there.

13   Q.    Now, the purpose of this meeting you told

14   Colleen Anderson was to verify that two documents were

15   correct.  Didn't you tell her that at this supposed

16   meeting, you showed Pete Seda two documents that he

17   verified?

18   A.    Yeah.  There were -- usually in a meeting like

19   that, there would be a couple of printouts of schedules

20   that I wanted him to review and tell me what this should

21   be coded to.  I needed to get an explanation of certain

22   checks that were written.

23   Q.    And the two schedules that you asked him to

24   verify, according to your conversation with

25   Ms. Anderson, were the Springfield building schedule

1  that we talked about, and another one, the reimbursed

2  expenses schedule that we'll talk about in a minute?

3      A.    Yes, those -- well, there were actually three

4  at that meeting.  There was a third schedule at that

5  meeting.

6      Q.    Did you tell Ms. Anderson three or two?

7      A.    I probably told her two.

8      Q.    What was the third one?

9      A.    A third one was an account called loan.  Let me

10 see here.  It's 42353.

11     Q.    Let me find that document, Mr. Wilcox.  What is

12 it called?

13     A.    42353 is the number I have.

14     Q.    May I approach -- well, if you give me a

15 second, I'll find it.  42353.  So what time of day was

16 that meeting?

17     A.    1 o'clock.

18     Q.    Okay.  And that's what you are saying now after

19 looking at the --

20     A.    After looking --

21     Q.    -- audit trail.

22     A.    -- at the audit trail and the entries that I

23 made in relation to this 42353 and the 42350, the

24 reimbursed expenses.

25     Q.    So, Mr. Wilcox, by the time you went to see --

1    well, on September 25th, isn't it fair to say that the

2    Springfield building schedule that we've been showing

3    you with the 461, that was incorrect, right?  That has a

4    bad number on it?

5        A.   Yeah.  At that 1 o'clock meeting with Mr. Seda,

6    I had a question about a $4,000 check and -- not the

7    check, a bank debit that went out of their bank account.

8    And I needed to know what it was for.  And he told me it

9    was remodels on the Springfield building account, which

10   changed that 461 to 465.

11       Q.   Is that the first you ever noticed that $4,000?

12       A.   I believe so, yes.

13       Q.   Isn't it true, Mr. Wilcox, that that $4,000 had

14   been coded months before?

15       A.   When I looked at the audit trail, I have it as

16   being entered on September 24th at 1:06.

17       Q.   Mr. Wilcox, do you recall coding that $4,000 in

18   September of -- September 20th and just putting the

19   wrong year on it?  You don't remember anything about

20   that $4,000?

21       A.   No, I don't remember that.

22       Q.   You don't, I'm sorry?

23       A.   No, I thought I answered no.  I don't remember.

24       Q.   Mr. Wilcox, look at the Springfield building

25   schedule again.  All right.  Okay.  Let's go back.

1   Mr. Wilcox, I have a piece of paper.  Could you look at

2   42373?

3        A.    Okay.

4        Q.    Doesn't that show a $4,000 check?

5        A.    Yes, it does.

6        Q.    Okay.  9/15/2001?

7        A.    Right.

8        Q.    So that had already been coded?

9        A.    Yeah, it would appear to be.

10       Q.    All right.  So, again, you have no independent

11   memory, you are just reciting what you see on the audit

12   trail?

13       A.    Well, I remember asking Mr. Seda about the

14   4000, and him telling me that it was --

15       Q.    Right.  You remember now.  But the first time

16   you ever remembered it was six years or eight years

17   after it happened and after you --

18       A.    No.  I believe it was in my November 18th, '03,

19   statement that, you know, there was a $4,000 difference,

20   and that $4,000 was for remodeling.

21       Q.    If you look at the Springfield building

22   schedule, it appears that the closing was near June 23,

23   2000, right?

24       A.    Yes.

25       Q.    Isn't that typical?  And the $131,000 check is

Wilcox - X by Mr. Matasar                          73

1    three months before then?

2        A.    That's right.

3        Q.    That's not a typical earnest money number, is

4    it?

5        A.    No, it is not.

6        Q.    It's kind of an unusual set of numbers for a

7    building, is it not here?

8        A.    I would say, yes.

9        Q.    And don't you have a duty when you see

10   inconsistent numbers like this to obtain additional

11   documentation?

12       A.    Well, in this -- yeah, you are probably right.

13   I relied on Mr. Seda's answers.

14       Q.    And you looked at the check for 131,300, did

15   you not, at 42402?

16       A.    I probably did.

17       Q.    That's a pretty unusual looking check, isn't

18   it?

19       A.    It certainly is.

20       Q.    And didn't that call your attention and cause

21   you -- by the way, this check was written 3/10 of 2000,

22   and you are not talking to Mr. Seda, according to your

23   story now, until September of 2001?

24            MR. CARDANI:  Judge, I object.

25            MR. MATASAR:  Over a year and a half later.

1          MR. CARDANI:  Excuse me.  I object to the

2     argumentative nature of the question.

3          THE COURT:  Sustained.

4          MR. MATASAR:  Sorry, Your Honor.

5     BY MR. MATASAR:

6     Q.    So you have this unusual check, you are talking

7     about it a year and a half later, and don't you agree

8     that this check along -- even in addition to the other

9     material would cause you to seek more information?

10    A.    Well, I asked him a question about the check.

11    He told me it was for the Springfield building account,

12    and I coded it accordingly.

13    Q.    Can you look at the Springfield building

14    schedule again.  Do you know what Dar Ul-Islam Dawah is?

15    A.    I have no idea.

16    Q.    Did you talk to Mr. Seda about that?

17    A.    Yes.  The only way I got any of these numbers

18    into the Springfield building account was based on

19    answers he gave me where he told me this was for the

20    Springfield building.

21    Q.    You have no memory of what it was for or no

22    notes?

23    A.    No.

24    Q.    You have indicated that given that there were

25    inconsistencies, you probably should have sought more

1    information.

2            Isn't it correct that the CPA standards

3    regarding preparation of a tax return that says that --

4    say that a member may rely on good faith on information

5    furnished by the taxpayer.  However, the member should

6    not ignore the implications of information furnished and

7    should make reasonable inquiries if the information

8    furnished appears to be inconsistent?

9        A.    Yes, sir, that's right.

10       Q.    So you should have gotten the

11   Springfield escrow statement, should you not?

12       A.    Well, no -- well, yeah, I asked Mr. Seda for

13   it.

14       Q.    You asked him but then he simply said we didn't

15   get a loan and you didn't pursue it any further?

16       A.    That's correct.

17       Q.    Correct?  That's as far as it went?

18       A.    That's correct.

19       Q.    You didn't press him?

20       A.    That's right, I didn't.

21       Q.    As far as he knows -- I mean, there is no

22   indication that you pressed him at all.  Okay.

23           Now, isn't it true that when you first applied

24   for 501(c)(3) status, there was this back and forth with

25   the IRS?

Wilcox - X by Mr. Matasar                          76

1    A.    Yes, that's right.

2    Q.    And didn't the IRS ask you to obtain the escrow

3    statement for the Ashland building and didn't you obtain

4    it?

5    A.    Yes.

6    Q.    So -- and Pete Seda knew that?

7    A.    Uh-huh.  Oh, yes, sir.

8    Q.    Correct?  He knew that as part of an audit, the

9    IRS could request that the escrow statement be obtained?

10   A.    Yes, sir.

11   Q.    You've indicated that Pete Seda reviews the tax

12   returns, right?  In this case you sent it to him a few

13   weeks before it got filed?

14   A.    Which tax return?

15   Q.    Let me show you 42338.

16   A.    Okay.  Yes.  These are our filing instructions.

17   Q.    The date of that is October 2nd?

18   A.    Yes, sir.

19   Q.    And I think if we look at IRS-1 page 7, it --

20   does that have the signature date?  Yeah.  Pete Seda

21   signed it on the 16th.  You finished it on the 2nd.  It

22   looks like then you mailed it to him on the 2nd, and he

23   had two weeks before he signed it?

24   A.    That's correct, right.

25   Q.    Mr. Wilcox, isn't it true that if there are

1    internal inconsistencies in a return, the IRS is much

2    more likely to look at it carefully or audit it?

3         A.    Probably.

4         Q.    And isn't it true that on this return there

5    were really only two parts that talk about the value of

6    a building?  Okay.  Let me show you what they are.

7    First, of course, is line 57a, okay, on page 4 of the

8    exhibit.  I think we can --

9              THE COURT:  Counsel, how much more do you have?

10             MR. MATASAR:  Probably ten minutes at the most.

11             THE COURT:  We're going to take a break.

12             (Recess:  10:46 until 11:06 a.m.)

13             THE COURT:  Go ahead.

14   BY MR. MATASAR:

15        Q.    Mr. Wilcox, where we last were was I said there

16   are two places on the return that list values for

17   buildings, correct?  And I'm showing you there IRS-1,

18   page 4, which is line 57a.

19        A.    Yes, sir.

20        Q.    The key line in the return.  And that has a

21   number 685,643.

22        A.    That's correct.

23        Q.    And the other place on the return that lists

24   fixed assets is the depreciation schedule, which is page

25   17.  And you see the total for all assets there up

1   there?

2       A.      Yes, sir.  It's $4,000 off.

3       Q.      So you made this error, correct?

4       A.      Yes, sir, I printed off that --

5       Q.      This is an error, right?  This should not be

6   that way?

7       A.      That's correct.  They should reconcile.

8       Q.      You made that error.  You were rushing to get

9   this done, is that right, the tax return?

10      A.      I was getting the return prepared.  I don't

11  know if I was rushing, but I was getting it done.  And,

12  yes, I printed out this before -- yeah, I made the

13  error, okay.

14      Q.      You made the error.  And my point is it's a

15  pretty simple error to see.  Anybody looking at this

16  return that was really concerned about the value of

17  fixed assets on this tax return, anybody would have been

18  able to see it?  You don't have to be a sophisticated

19  accountant, right?

20      A.      Correct.

21      Q.      Correct.  And Pete Seda had two weeks to review

22  this return, right, from October 2nd to October 16th?

23      A.      Yes, that's when he came back into the office

24  with the returns, and he signed them there.

25      Q.      And Pete Seda never mentioned this error to

1    you, did he?

2        A.    No, sir.

3        Q.    He just accepted the return that you gave him

4    and he signed it?

5        A.    Yes, sir.

6        Q.    Even with this obvious error about fixed assets

7    and the value of buildings?

8        A.    That's correct.

9              MR. MATASAR:  No further questions.

10             THE COURT:  Do you want to do your redirect now

11   or later?

12             MR. CARDANI:  I'm prepared, Judge.

13             THE COURT:  Okay.

14             MR. CARDANI:  Thank you.

15                       REDIRECT EXAMINATION

16   BY MR. CARDANI:

17       Q.    Mr. Wilcox, if we could have Defense 749B

18   brought up, please.  All right.  Mr. Wilcox?

19       A.    Yes.

20       Q.    Do you see 749B in front of you?

21       A.    Yes, sir.

22       Q.    This is, as we talked about yesterday, your

23   initial proposal letter and then it was followed by an

24   engagement letter; is that right?

25       A.    Yes, sir.

1    Q.    All right.  So when you had a discussion with

2  Mr. Sedaghaty about doing the 1023, you envisioned about

3  two hours worth of work, doing it for four hours total,

4  for about 300 bucks?

5    A.    That's correct, right.

6    Q.    Is that a normal -- based on your experience

7  working with charities and tax exempt, is that a normal

8  amount of work to prepare to do a 1023?

9    A.    Yes, that's about right.

10   Q.    Okay.  Then in the review of the accounting

11  system, number two, if we could bring that up, and

12  just -- if we could leave this up, please.  You were

13  envisioning, based on your initial conversations with

14  him, that the billing rate for review of accounting

15  system would be $50, normally takes one to three hours,

16  maximum fee $150; is that right?

17   A.    Correct, right.

18   Q.    All right.  Is that standard in working with

19  nonprofits?

20   A.    No.  Usually the review of the accounting

21  system, that was something that Mr. Seda had requested

22  because, as I said before, in most nonprofits you have

23  always got a volunteer, someone on the board who was

24  willing to do the bookkeeping or accounting, and they'll

25  handle it, and all you'll really be involved in,

1    usually, is the preparation of the 990.

2        Q.    And then paragraph 3, in preparing the 990, you

3    call them income tax returns, but you said yesterday

4    that would cover the nonprofit returns as well, normally

5    takes three to four hours to prepare the returns,

6    maximum would be $300 per year?

7        A.    That's correct, right.

8        Q.    Why did you write that in your proposal letter,

9    sir?

10       A.    That's the normal -- I've been doing 990s for a

11   lot of years and that's typically what they take me.

12       Q.    All right.  Did they take a little bit longer

13   in this case?

14       A.    Well, it did because of -- I had to get

15   involved in the accounting more than I normally do,

16   that's all.  And then that would be -- the additional

17   time was really not necessarily the preparation of the

18   return but going through the QuickBooks and meeting with

19   the client and getting answers to various questions.

20       Q.    If we could remove that from the screen.  Thank

21   you.  Now, Mr. Matasar asked about a penalty that was

22   imposed by the IRS for a late filing.

23       A.    Yes, sir.

24       Q.    You were brought in in January of 2000 to work

25   for Mr. Sedaghaty?

1      A.     Yeah, basically, right.

2      Q.     '98 return's already late?

3      A.     That's correct.

4      Q.     '99 return is due when?

5      A.     It would have been due May 15th of 2000.

6      Q.     Okay.  Late?

7      A.     No, in the early part of 2000 --

8      Q.     All right.  You've got four months to work with

9   him to get it done?

10     A.     Right, correct.

11     Q.     And the 2000 return is due the following year,

12   2001?

13     A.     That's correct, right.

14     Q.     Mr. Matasar asked you about the Board of

15   Accountancy or who is the state board in Oregon that

16   deals with accountants' licensing?

17     A.     Yes, State Board of Accountancy.

18     Q.     All right.  Tell us about the issue there.

19     A.     I was in a building on Crater Lake Avenue in

20   Medford.  It was in February of 1994.  And in the middle

21   of tax season, the building that I was in was burned

22   down.  And so I relocated to another building on

23   Riverside.

24            And so my license -- so from there, I thought I

25   had gotten all the forwarding addresses done, and this

1   and that.  And so my license eventually, I think,

2   expired in June of '95.

3          A few months after it expired, I was going

4   through my wallet, and I noticed that my card wasn't

5   current.  So I contacted the State Board of Accountancy,

6   and told them I'd like a replacement card.  And they

7   told me, no, your license has expired.  You've been

8   practicing without a license.

9          So an investigator came out to meet with me,

10  and we talked about the situation, the fire, the middle

11  of tax season, and this and that.  And he said -- he

12  said this calls for lenient action, so there will be no

13  reprimand but there will be a letter of concern that you

14  didn't give us your new address after the fire.

15  Q.    All right.  So in terms of the various degree

16  of sanction for a problem like that, where does that fit

17  in the whole paradigm?

18  A.    That's the lowest level.

19  Q.    And you brought this to their attention?

20  A.    Yes, sir, I did.

21  Q.    How long have you been an accountant?

22  A.    Since 1974.  I've been a CPA since 1979.

23  Q.    Practiced in California?

24  A.    Yes, sir.

25  Q.    Michigan?

1     A.    Yes, sir.

2     Q.    Wisconsin?

3     A.    Right.

4     Q.    And Oregon since '92?

5     A.    That's right.

6     Q.    How many -- have you ever been reprimanded by

7  the state boards in any of those places?

8     A.    No, this was the only one.

9     Q.    Okay.  What about the IRS?

10    A.    No sanctions there.

11    Q.    All right.  In your entire career?

12    A.    Yeah, that's it.

13    Q.    And so is it fair to say in terms of your

14 career, this is the only blemish, this one about your

15 licensing?

16    A.    That's correct.

17    Q.    And you brought that to their attention?

18    A.    Yes, sir.

19    Q.    Now, if we could bring up the building schedule

20 again that we've heard so much about.  All right.  Let

21 me -- when you initially met with the Internal Revenue

22 Service and discussed this with them, your information

23 was that you believed at the time that al-Haramain did

24 the input on this; is that correct?

25    A.    That's correct.

1      Q.      All right.  Now, with the benefit of time and

2    the audit trails from QuickBooks you know now that that

3    was incorrect?

4      A.      That's right.

5      Q.      All right.  And what -- if I'm hearing you

6    correctly, correct me if I am wrong, you are saying that

7    you created this building schedule but you did it based

8    on information provided to you by someone?

9      A.      Yeah.  It was provided to me -- the -- the

10   information was provided to me by Mr. Seda.  As I went

11   through some checks, I had some questions, and then when

12   I found out about his Springfield building, I just

13   wanted to find out all the costs that were involved.

14   And that's where I wound up getting these four items

15   here.  And then there was another $4,000 item that he

16   said also had to be charged to the Springfield building

17   account.

18     Q.      Do you remember those meetings?

19     A.      Yes.  I remember the meetings.

20     Q.      Even though it was nine years ago, you remember

21   the meetings?

22     A.      I remember the conversations, okay.  I can't

23   give you the specific date of the meetings, but --

24     Q.      Okay.  Mr. Matasar spent all kinds of time

25   going over your billing records, talking about May and

1  September and so on and so forth.  As you sit there on

2  the stand today, do you remember discussing the building

3  schedule and the checks that went into this report with

4  Mr. Seda?

5      A.    Yes.  At that meeting of September 24th, this

6  was one of the schedules we went over.  I wanted him to

7  confirm that -- I wanted him to confirm that, have we

8  missed anything?  Do you think this is the total cost of

9  the Springfield building?  And he looked at it and he

10  told me it was.

11      Q.    Okay.  So regardless of who prepared this

12  report, them or you, it was placed in front of

13  Mr. Seda's nose, you went over it with him, and he

14  verified the accuracy of this schedule?

15      A.    Yes, sir.

16      Q.    Now, when you are hired as someone's

17  accountant, Mr. Matasar asked you a series of questions

18  about you should have done this, you should have done

19  that, requesting records and so on and so forth.  Was it

20  your testimony that you did ask Mr. Seda for the

21  Springfield building -- the escrow records from the

22  closing of the Springfield building?

23      A.    Yes, I did ask him for that initially.

24      Q.    And he didn't provide it to you, did he?

25      A.    Well, no, he didn't, but -- I dropped the

 1   question after he explained, you know, his religious

 2   practice.

 3       Q.    You asked him for the records, he didn't give

 4   them to you?

 5       A.    That's a correct statement.

 6       Q.    During all of these meetings with him,

 7   telephone, e-mails, back and forth, so on and so on that

 8   Mr. Matasar spent so much time talking to you about

 9   today, how many of those conversations involved the

10   subject of Chechnya?

11       A.    Zero.

12       Q.    How many of those involved providing funding to

13   the mujahideen in Chechnya?

14            MR. MATASAR:  Objection, beyond the scope.

15            THE COURT:  Overruled.

16            THE WITNESS:  Could you repeat the question,

17   please?

18   BY MR. CARDANI:

19       Q.    Your conversations, series of conversations

20   Mr. Matasar went over with you, billing records, phone

21   calls, letters, so on and so forth, how many of those

22   interactions with your client, the defendant, involved

23   the subject of funding the mujahideen in Chechnya?

24       A.    None.

25       Q.    How many of your conversations involved

1    providing humanitarian relief to Chechnya?

2         A.    None.

3         Q.    Now, Mr. Matasar talked to you about -- oh,

4    before I get there, were there times that you were

5    having trouble getting information from Mr. Seda and

6    that resulted in problems preparing the return?

7         A.    Well, there would sometimes be delays.  I would

8    ask him for information, and it might be a period of

9    time before he could get back to me.  Sometimes he was

10   immediate and there were other times that it seemed to

11   take a while.

12        Q.    Could I get 42914 brought up.  Can we show that

13   to the witness and the jury.  And if we could highlight

14   it so we could read it a little bit better.  Sir, is

15   this from your file?

16        A.    Yes, sir.

17        Q.    And incidentally while we're on that, do you

18   have a suitcase in front of you?

19        A.    Yeah, I do.

20        Q.    Okay.  What's in the suitcase?

21        A.    These are the al-Haramain files.

22        Q.    And is this the file that you accumulated over

23   the period of time that you represented the defendant?

24        A.    Yes, sir.

25        Q.    Approximately how many thousands of pieces of

 1   paper are in those files?

 2       A.    There might be a ream of paper in each one of

 3   them, 500 --

 4       Q.    Why don't --

 5       A.    There might be a ream of paper in each one of

 6   them.  A ream is what, about 500 sheets?

 7       Q.    Suitcase, I saw you wheeling it in yesterday,

 8   it's about this big?

 9       A.    Yeah.  So there's three binders, so maybe there

10   is a thousand pages or more.

11       Q.    A lot?

12       A.    Yes, sir.

13       Q.    Ten thousand pages, perhaps?

14       A.    How many?

15            MR. MATASAR:  Objection.  The witness just said

16   1,000.

17            THE COURT:  Yeah, he said a thousand pages or

18   more, to be precise.

19   BY MR. CARDANI:

20       Q.    Judge, I hate to be dramatic.  Could you pick

21   up the suitcase?  Okay.  Put it in front of you.  All

22   right.  Now, all of the information that was in the

23   suitcase represents your work for al-Haramain?

24       A.    Yes, sir.

25       Q.    It's full of binders?

1      A.     Yes, sir, right.

2      Q.     Okay.  That's one of the binders right off to

3  the right?

4      A.     Yeah, there is one here.  There is one here.

5  And there is one on the floor.

6      Q.     So we're talking --

7      A.     Three binders.

8      Q.     All right.  Now, there is a document in front

9  of you, Defense 42914.  What is this, sir?  If you need

10 to go to the top, we can get it for you.

11     A.     Okay.  Yes, I see it.

12     Q.     What is it?

13     A.     I'm sorry, I didn't hear your question?

14     Q.     What is it?

15     A.     I had a series of questions that I needed help

16 with from Mr. Seda in completing the '99 return.  And

17 these are the questions that I had.

18     Q.     And you sent it to him?

19     A.     Yes, sir.

20     Q.     Because you had some questions requiring

21 follow-up from your client?

22     A.     That's correct, right.

23     Q.     Now, if we bring up 42592, if we could

24 highlight -- make it a little more readable, please.

25 The whole thing, please.  Okay.  Is this a letter that

1    you sent May 14, 2002, that's in your file?

2        A.    Yes, sir.

3        Q.    Is this another letter -- and if we could

4    highlight the verbiage.  There we go.  Thank you.  Are

5    you requesting information?

6        A.    Yeah, this is information pertinent to the 2001

7    tax return.

8        Q.    And that's May of 2002 that you are asking

9    questions, including Soliman deposits?

10       A.    Yes, sir.

11       Q.    All right.  You sent this to Mr. Seda?

12       A.    Yes, it was faxed to him on that date.

13       Q.    Okay.  If we could next go to Defense 42543.

14   What is this, sir?

15       A.    This is a fax from Mr. Seda to me answering the

16   questions of that previous page that you had up there.

17       Q.    You sent that in May 14th, and the response is

18   June 26th?

19       A.    That's correct.

20       Q.    Okay.  That's about six weeks?

21       A.    Yes, sir.

22       Q.    Quite a bit of time responding to your letter

23   and preparing the return; is that right?

24       A.    In this case, yes, you're right.

25       Q.    All right.  If we could have BOA-6 brought up,

1    please.  If we could highlight this.  You've seen quite

2    a bit of this check, sir?

3        A.    Yes, I have.

4        Q.    Mr. Matasar showed you this check.  And it's

5    dated January 25, 1998.  Do you see that?

6        A.    Yes.

7        Q.    And then Mr. Matasar asked you to look for the

8    records for 1998 to see where you input that.  And what

9    was your testimony?

10       A.    I thought I had put this in the fixed assets,

11   but after he showed me that schedule, it was obvious

12   that I did not.

13       Q.    For 1998?

14       A.    That's correct, right.

15       Q.    In your experience do people occasionally,

16   especially at the beginning of the year, write checks as

17   if it was the previous year?  Get the dates wrong?

18       A.    Yes, yeah, they may, right.

19       Q.    Have you ever done that?

20       A.    Yeah, I have.

21       Q.    I have.  All right.  January 25, 1998, if you

22   were to assume that that check was incorrectly dated by

23   Mr. Seda, and it was actually January of 1999, that

24   check should be recorded in the fixed assets for 1999;

25   is that right?

1       A.      Yes, sir, that's right.

2       Q.      Let's take a look, do you recognize this as

3   the --

4       A.      Yes, that's the audit trail.

5       Q.      All right.  This is a reliable document for

6   you?

7       A.      Yes, sir.

8       Q.      All right.  Let's go to right here.  All right.

9   Is this your fixed asset entries for the year 1999?

10      A.      Yes, it is, but it's been coded to office

11  supplies, not fixed assets?

12      Q.      Which is consistent with what you said before

13  during direct and then changed your mind when

14  Mr. Matasar said look through the 1998 schedule, this is

15  properly coded in 1999 records?

16          MR. MATASAR:  Objection, Your Honor.  It's a

17  compound question --

18          THE COURT:  Sustained.

19          MR. MATASAR:  -- and it misstates the evidence.

20          THE COURT:  Sustained.

21          Would you please take the suitcase down because

22  the court reporter is having a hard time seeing you.

23  Thank you.

24  BY MR. CARDANI:

25      Q.      Okay.  Based on this record for 1999, if that

1    check was really for 1999, not 1998, you properly

2    categorized it consistent with what the check said it

3    was as a fixed asset?

4         A.    No, I've categorized it as office supplies.

5         Q.    I'm sorry, buying a computer, buying equipment?

6         A.    That's correct.

7         Q.    Which is what the check said?

8         A.    Well, that's the answer that Mr. Seda gave me

9    that he -- that they bought a computer from this man.

10        Q.    You relied on his information?

11        A.    Yes, sir.

12        Q.    And put it here?

13        A.    Yes, sir.

14        Q.    Now, on that subject, when you are hired by a

15   client to represent them, especially a nonprofit, are

16   you paid to challenge them on the accuracy of what they

17   tell you?

18        A.    No.  You are just -- you do come in with the

19   spirit of healthy skepticism on things that look

20   unusual, but mainly what you are going to do is go

21   through and -- well, like in the case with them, just

22   make sure all the checks and deposits get in.  And that

23   they will do the majority of the coding.  You may do

24   some adjusting journal entries at the end of the year to

25   reclassify certain accounts, and so forth.

1    Q.    But my question is when you -- it's not an

2    adversarial relationship?

3    A.    No, sir.

4    Q.    So you trust your client unless given reason

5    otherwise?

6    A.    Yes, sir.

7    Q.    Fair statement?

8    A.    That's right.

9    Q.    And you trusted Mr. Sedaghaty?

10   A.    Yes, I did.

11   Q.    You trusted the accuracy of the statements he

12   made to you in response to the questions when you had

13   some questions about the financial records of

14   al-Haramain?

15   A.    Yes, I did.

16   Q.    Now, when you saw this *Reader's Digest*

17   article --

18   A.    Yes, sir.

19   Q.    -- it was about this very check?

20   A.    Yes, it was.

21   Q.    And did anything about that article cause you

22   to form a different -- have some concerns about the

23   veracity of the statements made to you several years

24   earlier by Mr. Sedaghaty?

25   A.    Well, yeah, when I read that --

1          MR. MATASAR:  Objection, Your Honor, beyond the

2    scope.

3          THE COURT:  Overruled.

4          MR. MATASAR:  It's calling for an opinion.

5          THE COURT:  You have my ruling.  Go ahead.

6          THE WITNESS:  I'm sorry.  Yeah, well, when I

7    read the article, and based on the comments made in the

8    article, it made me question whether he told me the

9    truth -- or, obviously, that he probably had not told me

10   the truth about that check.

11   BY MR. CARDANI:

12     Q.    Was that the first time you questioned his

13   veracity?

14     A.    Probably, yes.

15     Q.    Several years later?

16     A.    Yes, right.

17         MR. CARDANI:  Through the benefit of the clerk,

18   could I offer this as the next TW exhibit.  We'll be up

19   to 6.

20         MR. MATASAR:  No objection.

21         MR. CARDANI:  Thank you.  I've got to get it

22   stickered and take care of kind of the housekeeping but

23   I do offer it at this time, Judge, as TW --

24         THE CLERK:  6.

25         MR. CARDANI:  -- 6.

1          THE COURT:  CW-6 is received.

2          MR. CARDANI:  Judge, that's all I have.  Thank

3     you.

4          THE COURT:  Thank you.  Recross.

5          I said CW.  It's TW.  Thank you.

6                    RECROSS-EXAMINATION

7     BY MR. MATASAR:

8     Q.    Mr. Wilcox, I want to show you number 43886,

9     which should not go to the jury yet.  Could you read

10    that, Mr. Wilcox, especially the second half of the long

11    paragraph.  This is a letter in your file?

12    A.    Yes, sir, I see it.

13    Q.    And it refers to al-Haramain?

14    A.    Right, it does.

15    Q.    Wanting to give money to Chechnya?

16    A.    Yes, I see it.

17    Q.    And they don't want to give it to the United

18    Nations or some NGO, but they want to give it to

19    Chechnya?

20    A.    Right.

21    Q.    Just one more number, Your Honor.  By the way,

22    Mr. Wilcox, the date of that letter was February of

23    2001?

24    A.    Yes, it was.

25    Q.    Mr. Wilcox, look at 42651, not to the jury

1    also.  That's a document in your file?

2         A.     Yes, I see it, okay.

3         Q.     March 9, 2001?

4         A.     Right.

5         Q.     And doesn't that tell you that al-Haramain is

6    getting money for relief work in Afghanistan or

7    Chechnya?

8         A.     Yes, it does.

9         Q.     Mr. Wilcox, let me show you the audit trail,

10   the very last exhibit that the government introduced.

11   Now, you say that you put this -- you testified that

12   Mr. Seda told you to put this in to fixed assets,

13   this --

14        A.     Well, he said it was a computer.

15        Q.     So you coded it as a fixed asset based on your

16   conversation?

17        A.     It looks -- yeah.  It looks like I coded it

18   into office supplies.

19        Q.     Okay.  Mr. Wilcox, did you have a file on

20   May 18, 2001?

21        A.     A file of what?

22        Q.     The QuickBooks file.

23        A.     May 8, 2001?  According to what I was told by

24   Agent Anderson, there was a QuickBooks file from

25   Mr. Seda e-mailed to me on May 14th of 2001.

1      Q.     So if the coding was done on May 8th, you

2    didn't code it, did you?

3      A.     No, I wouldn't have.

4      Q.     Right.

5      A.     They would have coded it.

6      Q.     They would have coded it?

7      A.     That's right.

8      Q.     So there was no conversation with Mr. Seda that

9    caused you to code it and you didn't code it?

10     A.     Yeah, I remember the conversation with him.

11     Q.     Mr. Cardani showed you at the beginning of his

12   redirect, and I'm not going to show them again -- why

13   don't we do it.  42914, 42592, 42543, these are all

14   documents that indicate when you have important

15   questions to Mr. Seda, you write them down and keep them

16   in your file, do they not?

17     A.     That's right.

18            MR. MATASAR:  No further questions.

19            MR. CARDANI:  Briefly.  May I have the witness

20   shown this exhibit.  It is 42651.  No.  I'm sorry, the

21   witness, not the judge.

22            MR. MATASAR:  He gets to see it anyway.

23            THE COURT:  She's actually trained to show it

24   to me first, no matter what a lawyer says.

25            MR. MATASAR:  No objection.

                        REDIRECT EXAMINATION

1

2    BY MR. CARDANI:

3        Q.    All right.  Mr. Wooten (sic), do you see that?

4        A.    Yes, I do.

5        Q.    All right.  I want you to take a look at the

6    very top of that.

7        A.    Right.

8        Q.    That came from your files?

9        A.    Yeah, apparently it's in my file.

10       Q.    Yeah.  Look at the bottom right hand, I think

11   we've agreed that all of these documents with the FPD

12   reference came from your file.

13       A.    Right.  Okay.

14       Q.    Do you accept that for the purposes of this

15   question?

16       A.    Yes.

17       Q.    Mr. Matasar talked about a letter mentioning

18   Chechnya contributions and so on and so forth.  And I

19   think you stated that that letter is -- was part of your

20   file and dated March 9, 2001?

21       A.    Yes.

22       Q.    Okay.  Looking at that document, though, does

23   that refresh your recollection as to when you actually

24   received this document?

25       A.    No.  I don't know when I received this.

1     Q.    All right.  But what's the fax date on the top

2    of it?

3     A.    November 18th, '01.

4     Q.    Okay.  Is that maybe an indicator as to when it

5    was --

6     A.    Yeah, that's probably when he sent it over --

7    Mr. Seda sent it over.

8     Q.    All right.  If it was the date that -- that was

9    the day that he sent this letter, can we agree that

10   that's about a month after the form 2000 990 that's at

11   issue in this case was filed with the IRS?

12    A.    Let's see, I'm sorry would you repeat that

13   question.  I'm --

14    Q.    Well, the return -- the 2000 return, 990 is

15   logged in with the IRS in October of 2001?

16    A.    That's correct, right.

17    Q.    Okay.  That's before the date of this faxed

18   e-mail to you?

19    A.    That's correct, right.

20          MR. CARDANI:  That's all.

21          THE COURT:  Thank you.  You may step down.  The

22   witness is excused.  Call your next witness, please.

23          MR. CARDANI:  Greg Wooten.

24          THE CLERK:  Please raise your right hand.

25          (The witness was sworn.)

```
 1              THE CLERK:  Please have a seat.  This is the

 2    microphone that you'll be speaking into.

 3              Please state your name and spell your name for

 4    the record.

 5              THE WITNESS:  Gregory Wooten, G-R-E-G-O-R-Y,

 6    W-O-O-T-E-N.

 7                          DIRECT EXAMINATION

 8    BY MR. CARDANI:

 9        Q.    Good morning, Mr. Wooten.

10        A.    Good morning.

11        Q.    In what city do you live?

12        A.    I live in Renton, Washington.

13        Q.    And what do you do for a living?

14        A.    I am a supervisory Internal Revenue agent for

15    the Internal Revenue Service specializing in exempt

16    organizations.

17        Q.    Let's go -- before we get into what you do

18    there, let's go into a little bit about your background.

19        A.    Sure.

20        Q.    Do you have a college degree?

21        A.    Yes, I do.

22        Q.    In what?

23        A.    Accounting.

24        Q.    What year?

25        A.    I graduated from Central Washington University
```

1    in 1988.

2        Q.    What did you do after you graduated with your

3    accounting degree?

4        A.    After I graduated, I immediately went to work

5    for the Internal Revenue Service in the Exempt

6    Organizations Division.

7        Q.    So was that still in '98 -- I mean, '88?

8        A.    1988, yes.

9        Q.    And how long have you been with that unit?

10       A.    I have been with EPEO is the Employee Plans

11   Exempt Organization Division of the IRS, which

12   subsequently changed in a restructure to an organization

13   called the Tax Exempt Governmental Entities Division of

14   the IRS.  My entire working career after college from

15   1988 until current.

16       Q.    Okay.  So it's known today by an acronym as

17   TEGE?

18       A.    TEGE, Tax Exempt and Governmental Entities,

19   that's right.

20       Q.    Regardless of what it was called before or now,

21   what does TEGE do for IRS?

22       A.    TEGE is one of the operating divisions, it's

23   actually the smallest operating division of the IRS.

24   And what TEGE does is do determinations.  We determine

25   tax exempt status and examinations of organizations that

1    have some sort of tax preferred or tax exempt status.

2          There are several divisions within TEGE.  We

3    deal with retirement plans.  We deal with charities,

4    your typical 501(c)(3) charities, you might be familiar

5    with.  We also deal with tribal entities.  And we deal

6    with governmental agencies.

7          I work specifically with the exempt

8    organizations area of the IRS, which deals with tax

9    exempt organizations.

10   Q.    Okay.  So you've been doing this for roughly

11   22 years?

12   A.    I've been working within the TEGE or its

13   predecessor for about 22 years, that's correct.

14   Q.    Which office are you currently in?

15   A.    I am currently in the Seattle, Washington,

16   office.  And I mentioned that TEGE is a -- or exempt

17   organizations in my case is a little bit small, so the

18   Seattle office actually controls audits over the

19   Washington -- the states of Washington, Oregon, Idaho,

20   Alaska, and Hawaii.  We also do a little bit of

21   traveling around the rest of the U.S. occasionally as

22   well.

23   Q.    Okay.  Have you received much training in the

24   art of auditing tax exempt organizations?

25   A.    Certainly.  When I first came on board with

1    exempt organizations, we're talking about I received an

2    initial phase of training that dealt with the 1023, the

3    application process an organization has to go through

4    in order to receive that tax exempt status.

5           As a follow-up to that, I received examinations

6    training for the audit of the 990.  The 990 is a return

7    filed by organizations that have received that tax

8    exempt status.  Subsequently, we receive annual

9    refresher training, as well as as-needed training in

10   changes in tax law.

11   Q.    Have you also provided training to other IRS

12   employees on the same subject?

13   A.    Yes.  I've provided training to other IRS

14   employees as well as public seminars on how to become an

15   exempt organization, how to maintain your exempt

16   organization status, and what is happening within exempt

17   organizations at the time.

18   Q.    Okay.  Going back to the time period 1994

19   through about 2007, if I'm reading my notes correctly,

20   were you an auditor in TEGE?

21   A.    That is correct.  Prior to 1994, I worked in

22   the Employee Plans Section, the Pension Plan Audit

23   Section of the IRS.  Subsequent to that, in 1994, I

24   became an auditor, a revenue agent, that audited almost

25   exclusively 990 organizations within the exempt

1    organization function.

2        Q.    I've just been passed a note that you are

3    speaking a little bit quick for everybody.  Can you try

4    to slow down just a little bit.

5        A.    I'm sorry.

6        Q.    I'm usually getting those notes sent to me, so

7    I know how that goes.

8              Okay.  Is this your first time ever testifying

9    in court?

10       A.    Yes, it is.

11       Q.    There is some water to your left if you ever

12   need to --

13       A.    Thank you.

14       Q.    If you need some water, it's right there.

15             Okay.  So I've asked you, before coming into

16   court today, to come up with a ballpark for the jury to

17   tell us how many form 990s you personally audited in

18   your career with the IRS.

19       A.    And it certainly has been in the hundreds in my

20   career with the IRS.  And we sort of ballpark based upon

21   an average number of returns I audited per year while I

22   was doing this, and we came up with a little in excess

23   of 300.

24       Q.    And then since have you changed jobs and --

25   well, you got promoted in 2007?

1       A.      That's correct.  In 2007, I became a

2   supervisory Internal Revenue agent.  So what I now do is

3   I actually manage the group that does the audits of all

4   of the 990s filed in the area that I mentioned earlier.

5       Q.      And how many people are in the section?

6       A.      I have 11 revenue agents working for me as well

7   as my secretary.

8       Q.      The same question there, since 2007 you've been

9   kind of the boss over the same function?

10      A.      Yes, that's true.

11      Q.      And how many audits have been conducted of

12  exempt organizations under your leadership?

13      A.      Current and ongoing exams, it's actually hard

14  to come up with a number there have been so many, but

15  certainly in the range of 3 to 400.

16      Q.      All right.  What is a 501(c)(3) charity?

17      A.      501(c)(3) is a section of the Internal Revenue

18  Code.  It relates to the granting of tax exempt status,

19  our most favorable tax exempt status to an organization

20  as long as they meet certain requirements.  They have to

21  meet certain organizational and operational requirements

22  in order to be granted that status.

23              And effectively what the statute says is that

24  these organizations in order to be granted tax exempt

25  status must be operating -- organized and operated

1    exclusively for exempt purposes, and can -- the

2    organization's assets cannot inure to the benefit of an

3    individual or organization in a substantial amount.

4        Q.    That's a mouthful but --

5        A.    Yes.

6        Q.    -- is it fair to say basically that this is a

7    pretty coveted status if you are running a business and

8    sometimes you have to pay a lot of incomes taxes,

9    corporate taxes?

10        A.    Yes.

11        Q.    But if you achieve this goal of becoming a

12    501(c)(3), then you don't have to pay anymore income

13    taxes?

14        A.    In general that's true.  Without boring

15    everyone about something called unrelated business

16    income, a 501(c)(3) organization is an organization that

17    is effectively granted a tax free status by the

18    government because of them operating on exempt -- for

19    exempt purposes.  We only grant that status to certain

20    organizations, those being organizations that are

21    operated for charitable purposes, for educational

22    purposes, for promotion of national and international

23    sporting events, for the prevention of cruelty to

24    children, for the prevention of cruelty to animals.  So

25    we only grant that most favored status to organizations

Wooten - D by Mr. Cardani                              109

1    that exclusively -- is what the statute says -- operate

2    in a manner that promotes those purposes.

3        Q.    And the IRS has got lots of forms, but is it a

4    Form 1023 that one files to seek this status with the

5    IRS?

6        A.    A Form 1023 is the application that an

7    organization files to receive tax exempt status, that is

8    correct.  And that, as I mentioned before, when I

9    received training with the IRS, that was one of the

10   forms that I received training on how to process those

11   applications.

12       Q.    You are familiar with an application by the

13   al-Haramain Islamic Foundation in Oregon to become a tax

14   exempt organization?

15       A.    Yes, I did review that application.

16       Q.    And IRS-4 is an exhibit that's been received.

17   If we could go to the first substantive page.  Do you

18   recognize this, sir?

19       A.    Yes, I do.  What we're looking at is what we

20   generally call a determination letter, a favor

21   determination letter.  It is a letter that grants status

22   under Section 501(c)(3) as a charity to the al-Haramain

23   Foundation.  It appears to have been processed by an

24   employee that works out of the Portland office that used

25   to work for me.

1     Q.    Okay.  There is just a couple of points that

2     I'd like to cover with you on this.  If we could go to

3     page 2.  Before we get into the verbiage how, is

4     there -- is there a difference between -- when do you

5     have to file a 990 as a tax exempt organization?

6     A.    As it states in the document here, generally

7     organizations are required to file a 990 or some

8     derivative thereof if the organization is receiving more

9     than $25,000 in gross receipts annually.

10    Q.    Okay.  And the 1040s that individuals file for

11    income taxes, families and individuals --

12    A.    Yes.

13    Q.    -- are those available to the public?

14    A.    No, they are not.

15    Q.    How about a Form 990?

16    A.    With certain exceptions for donor information

17    and information that the service is deemed sensitive,

18    all of the 990 information is available to the public.

19    You can get onto the Web and pull up the 990 return for

20    any organization within the United States.

21    Q.    Why is that?

22    A.    Because these forms are there to -- one of

23    their purposes, as well as informing the government of

24    what the organization is doing, they are there to inform

25    the public of what an organization is doing, what this

1    organization's activities are.

2         Donors -- everyone out there has the

3    opportunity to make charitable contributions to

4    organizations.  Now, if you are trying to decide who you

5    would want to make a donation to, one of the things you

6    can do is you can take a look at that organization's 990

7    and see if the activities that are reported on that 990

8    are consistent with an organization you would like to

9    give money to.

10        The organizations therefore have it in their

11   best interest to report as accurately as possible what

12   they are doing on the Form 990 returns so that the

13   donors will take a look at it and say, yes, this is an

14   organization I would like to donate to based upon the

15   activities that are disclosed here.

16   Q.    So is it a fair statement to say that these

17   Forms 990 are -- kind of have a dual function to --

18   A.    Yes.

19   Q.    -- help the donors -- the donating public to

20   decide where to send their charitable contributions?

21   A.    Yes, that's correct.  That is one of the

22   functions of this form as well as it being a primary

23   form that I, as a revenue agent or now a supervisory

24   revenue agent, would review when an examination was

25   being done on one of these organizations.

 1     Q.    If we could go to page 3 of that letter.  And

 2  this information is repeated in this letter that's

 3  captured there, talking about the fact that -- this is

 4  the letter that went out al-Haramain, and does this

 5  capture this requirement to make these 990s available

 6  for public inspection?

 7     A.    Yes, it does.

 8     Q.    And are these available --

 9           THE COURT:  Excuse me, find a place for us to

10  break, please.

11           MR. CARDANI:  Right here, Judge, would be

12  great.

13           THE COURT:  Until 1 o'clock.  Thank you.

14           (Lunch recess:  11:56 until 1:07 p.m.)

15           THE COURT:  Go ahead.

16           MR. CARDANI:  Thank you, Your Honor.

17  BY MR. CARDANI:

18     Q.    Mr. Wooten, before we broke for lunch, we were

19  talking about an Exhibit IRS-4, which I think has been

20  referred to as a determination letter?

21     A.    That's correct.

22     Q.    Issued to al-Haramain allowing them to

23  become -- operate as a public charity?

24     A.    That's correct.

25     Q.    As a tax exempt organization?

Wooten - D by Mr. Cardani                                    113

1     A.     A 501(c)(3) organization, that's correct.

2     Q.     Okay.  If you could lean forward a little bit,

3  there's a microphone down --

4     A.     Yeah.

5     Q.     -- in front of you built into the board, but --

6  and speak slowly.  Okay.  I think that you established

7  that the organization has to file a 990 if receipts are

8  over a certain amount?

9     A.     That's correct.

10    Q.     How much is that?

11    A.     Usually it's $25,000 for the period that is at

12 issue here, the 2000 year.

13    Q.     Okay.  And those forms are made available to

14 the public as well as to the IRS?

15    A.     That's correct.

16    Q.     The last part of the letter that I want to talk

17 to you about starts on the bottom of page 3.  And the

18 last paragraph here, it's a little cut off, but could

19 you read it out loud, and we'll get it over to page 4,

20 and then -- is this a very common letter to you?  Do you

21 know the verbiage very well?

22    A.     Yes.

23    Q.     Okay.  Could you read that slowly to the jury

24 and add the words that are cut off at the end?

25    A.     "This determination letter is based on evidence

 1    that your funds are dedicated to the purposes listed in

 2    Section 501(c)(3) of the Code.  To assure your continued

 3    exemption, you should keep records to show that the

 4    funds are spent only for those purposes.  If you

 5    distribute funds to other organizations, your records

 6    should show whether they are exempt under Section

 7    501(c)(3).

 8        Q.    Okay.  Stop there for a minute and we'll get

 9    to that.  All right.  Can you explain to the jury what

10    that means, that you have to keep records and -- when

11    you make a distribution to another 501(c)(3), what that

12    means?

13        A.    Certainly.  All the tax exempt organizations

14    are required as a condition of their continued exempt

15    status to maintain records showing how they expended

16    their funds.

17            What this is saying is that in order to

18    continue to be exempt under Section 501(c)(3), your

19    organization should keep those records.  If the

20    organization distributes funds to other 501(c)(3)

21    organizations, then the organization must maintain

22    records to indicate that they did distribute those funds

23    to another 501(c)(3) organization.

24            What this section has to do with is what we

25    like to call -- it's an auditor's expenditure

1    responsibility.  It's kind of a multistep process.

2           There is a different record-keeping requirement

3    for an organization that distribute funds to another

4    501(c)(3) as compared to a non-501(c)(3) organization,

5    such as a non-charitable corporation, or an individual

6    or other non-charitable beneficiary.

7      Q.    Okay.  Let me stop you there.  Because I think

8    that's explained in the next one.

9      A.    Okay.

10     Q.    So the letter goes on to the next page, in

11   cases where the -- at very top here page 4 -- recipient

12   organization is not exempt --

13     A.    Yes.

14     Q.    Has the jury seen this?  Pardon me.  "In cases

15   where the recipient organization is not exempt under

16   Section 501(c)(3), you must have evidence that the funds

17   will remain dedicated to the required purposes, and that

18   the recipient will use the funds for those purposes."

19           What's going on there, Mr. Wooten?

20     A.    This is describing a situation where the

21   organization is distributing funds to something other

22   than another charitable organization.  What it is saying

23   in shorthand there is that the organization must

24   maintain records and be able to provide those records to

25   the IRS upon examination showing how they spent funds

1    for exempt purposes.  And if they provided those funds

2    to another individual say, just as an example, if I gave

3    $100,000 to you to expend for charitable purposes, I

4    could not just hand those funds to you saying expend

5    these funds for charitable purposes.  It is possible for

6    you to do that as my agent.  However, you would have to

7    provide me records that I could then provide to the IRS

8    showing that those funds ultimately did go to a

9    charitable beneficiary.

10       Q.    Okay.  And there is a difference, not to be too

11   fine a point, but if one tax exempt gives to another,

12   the record reporting requirements aren't as stringent as

13   opposed to if a tax exempt gives money to a nontax

14   exempt organization; is that a fair statement?

15       A.    That is correct.

16       Q.    Okay.  And the record-keeping requirements are

17   much more stringent because as the IRS want to --

18            MR. MATASAR:  Objection to leading questions,

19   Your Honor.

20            THE COURT:  Sustained.

21   BY MR. CARDANI:

22       Q.    Well, again, all right.  What explains this

23   difference?

24       A.    The difference is that if you distribute the

25   funds to a second charitable organization, second

1    501(c)(3) charitable organization, that organization

2    essentially takes over the charitable record-keeping

3    responsibilities.  Therefore, the only thing that

4    your -- the first charitable organization would have to

5    do is show cancelled checks, something along those

6    lines, that said funds went from their bank account to

7    the account of the second charitable organization.

8         In that case, the first charitable organization

9    is essentially relieved of its burden.  The second

10   charitable organization takes on that burden.

11        In a situation where there is no second

12   charitable organization, the last charitable

13   organization that is using those funds for some purpose

14   that they purport to be charitable, has to be able to

15   document who the end user of those funds are and how

16   they were used for charitable purposes.

17   Q.   Because if you're dealing with two tax exempts,

18   they are both within your umbrella so you could ask them

19   that information?

20   A.   That is correct.  They are both 501(c)(3)

21   charitable organizations, they are both subject to

22   examinations as charitable organizations.

23   Q.   But if you have a 501(c)(3) distributing money

24   to a nontax exempt organization, then the record-keeping

25   requirements are much more stringent on your tax exempt

1  organization?

2      A.    The record-keeping requirements continue on the

3  first tax exempt organization until the final

4  disposition of the funds, that's correct.

5      Q.    Now, does this -- these record-keeping

6  requirements, I think you call them expenditure

7  responsibilities, do these also include records with

8  respect to funds going overseas?

9      A.    Yes.

10     Q.    How so?

11     A.    Expenditure responsibility is still required,

12 regardless of whether funds are going to an organization

13 within the U.S. or outside of the U.S., the organization

14 that is distributing those funds still must document

15 that those funds are going to a charitable purpose.

16          When funds leave the U.S., as an auditor, I

17 would be more concerned with those funds simply because

18 the funds are leaving the U.S. and its regulatory

19 controls, so funds become a little bit more loose as

20 they get outside of the U.S.  And we still require an

21 organization to be able to provide us documentation as

22 to where those funds went, for example, which country

23 did they go to, but not just that, but who did you

24 distribute those funds to in a given country, how did

25 the recipient in that country distribute or use those

 1    funds themselves, and was that ultimately a charitable

 2    purpose.

 3        Q.    What about such expenditure responsibility for

 4    overseas transactions that involve cash or things like

 5    travelers checks?

 6        A.    Cash and travelers checks generally are more

 7    difficult to trace as they leave the country.

 8    Therefore, we, the IRS, are more concerned about funds

 9    traveling in those fungible forms.

10            If you are making a distribution overseas, the

11    most common thing is always to make a distribution via

12    wire transfer.  It costs a couple of dollars to make the

13    transfer.  It's an immediate transaction that goes from

14    one bank to another bank in the receiving country.

15            If the funds are going in some more liquid

16    form, say cash or travelers checks, the organization --

17    first of all, that would be unusual.  Second of all, the

18    organization would be required to provide substantial

19    documentation as to how those funds were used at the end

20    user.

21        Q.    If you know about it?

22        A.    Yes, if I knew about it.

23        Q.    Okay.  Can a tax exempt organization, a

24    501(c)(3), this is a phrase that I think you're familiar

25    provide with prohibited activities?

1     A.     Yes.

2     Q.     What's a prohibited activity with respect to a

3  501(c)(3)?

4     A.     A prohibited activity or we like to call it

5  inure.  In Section 501(c)(3) it describes inurement.

6  And that's basically funds going to an insider of the

7  organization or to an individual as a private benefit.

8  Also, you know, a prohibit -- it would just generally be

9  something outside the context of Section 501(c)(3),

10  funds used for any non-charitable purpose.

11     Q.     Okay.  So there are certain things that are

12  within 501(c)(3) as allowing you, the IRS, to say you

13  don't have to pay taxes?

14     A.     That's correct.

15     Q.     Okay.  But is the flip side that you have to

16  spend your money in a manner consistent with the

17  purposes that you were granted that tax exempt status?

18     A.     That's correct.  Section 501(c)(3) is the

19  section that defines what an organization that does not

20  have to pay federal income tax for charitable -- as a

21  charity is.

22     Q.     Now, in -- as part of TEGE's mission with IRS

23  to monitor 501(c)(3) organizations to make sure that

24  they are acting in a manner consistent with their

25  charted purpose?

Wooten - D by Mr. Cardani                              121

1        A.     That's correct.  The exempt organization

2   function within the TEGE division, which is the function

3   that I work for, that is our primary responsibility.  We

4   monitor organizations that are exempt under 501(c)(3) as

5   well as some other sections.  And the 990s, the primary

6   return they file, we have the primary audit

7   responsibility of those returns.

8        Q.     That was my next inquiry is this form, 990.  Is

9   that an important document in TEGE's mission to

10   determine if tax exempts are acting consistent with what

11   they are charted purposes are?

12       A.     Yes.  Within the exempt organization functions

13   that is the primary document that we look at when we're

14   doing an initial review of an exempt organization as to

15   their activities.

16       Q.     What kind of information is generally reported

17   in the 990?

18       A.     The 990 is kind of a broad brush return.  It's

19   not your typical say 1120 return that just lists the

20   incomes and assets of the organization, but that is one

21   of its purposes.

22            The income of the asset -- I'm -- excuse me.

23   The expenditures of the organization are listed on the

24   990.  The assets and liabilities of the organization are

25   listed on the 990.  There is a description of the

1   charitable purpose of the organization on the 990, as

2   well as its charitable activities.   There is a schedule

3   on there that breaks down how the organization spent its

4   funds.   There are also attached schedules that relate to

5   something we call private foundation status that ask a

6   series of questions about where the organization

7   received its funds.   There is a schedule that is

8   attached on how the organization distributed their

9   funds.   There are several questions -- there are several

10  questions that have been added over the years to the 990

11  that ask specific questions, such as does the

12  organization get into political, legislative activities,

13  some of the other things a 501(c)(3) organization say

14  cannot do or is restricted from doing.

15      Q.   Okay.  Now, as part of TEG -- are these 990s

16  filed under the penalty of perjury?

17      A.   Yes.  There is a signature line on the 990s

18  under penalty of perjury, that's correct.

19      Q.   Does -- you've mentioned the fact that you've

20  audited hundreds of these type of returns or supervised

21  hundreds more.

22      A.   Yes.

23      Q.   Can you explain the process of how 990s or tax

24  exempt organizations may be selected for audit by the

25  IRS?

1      A.    There are several reasons an organization may

2   be selected for audit by the IRS, a 990 that is, from

3   mundane to the very specific.  When I say mundane,

4   sometimes we just look at organizations on a random

5   basis to do a statistical sampling within an industry.

6   We have industries within exempt organizations.

7           Additionally, if there is a known problem, we

8   will sometimes look at that known problem within an

9   industry.  So if we know of a problem, for example, with

10  organizations that do credit counseling, we may have a

11  project on credit counseling organizations.

12          Also, it's quite common for us to receive

13  referrals from the general public where someone sends in

14  information saying an organization is doing this or

15  that.  And that we feel that this is a contradiction to

16  their exempt status and that you should examine that

17  organization.

18     Q.    All right.  It's that one that I want to focus

19  on for a minute, information coming in from outside

20  sources like the public.

21     A.    Yes.

22     Q.    If TEGE -- is there a better way to refer to it

23  or do I have to say TEGE?

24     A.    If you just want to say -- if you're speaking

25  of the division that I work for that audits 990s, just

Wooten - D by Mr. Cardani                                    124

1    call it EO, exempt organization.

2        Q.    EO.  All right.  If EO is given information

3    that one of the 501(c)(3)s is providing false

4    information on its 990, is that important to your shop?

5        A.    Yes, it is.  If an organization is providing

6    false information on its 990, then that would likely

7    lead to a referral for an examination.

8        Q.    An audit?

9        A.    Yes.

10       Q.    So once a return or an organization is selected

11   for audit, can you just describe the general process of

12   what an audit involves?

13       A.    All right.  Generally if an auditor, revenue

14   agent receives a return for an audit, the first thing

15   that they would do is take a look at the 990 filed by

16   the organization, in conjunction with the information

17   that generated the examination.  So we're talking, I

18   believe you said, in the context of a referral here.  So

19   if there were a referral that came in for an

20   examination, I, or the examiner, would review the

21   referral, and then review the 990 in conjunction with

22   the referral.

23            We'd look at the 990 to see if the items that

24   are reported in the referral document are reflected, or

25   in some cases not reflected on the 990 return.

 1              Additionally, we would do an analysis of that

 2       990 return for what we like to call LUQs, large,

 3       unusual, or questionable items.  These are just items

 4       that are out of the ordinary on the return, a large

 5       expenditure, an expenditure going someplace that you

 6       really wouldn't normally expect to see, or someplace

 7       that may cause you concern.

 8              We were discussing expenditures, going out of

 9       the country earlier in one of the previous questions.

10       An expenditure going out of the country may be

11       classified as a large, unusual, or questionable item.

12       It usually would be depending on the type of

13       organization we have.

14       Q.    So you do this background information or gather

15       information before reaching out to the exempt

16       organization?

17       A.    That is correct.  We call this our preaudit

18       analysis simply -- it's simply that, a pre-analysis of

19       all the information that we can pull up.  We look at the

20       referral.  We look at the 990.  We may also get on to an

21       organization's Web site, look at other public sources.

22       Some referrals, even though you made reference earlier

23       to them coming in from the public, the public in this

24       case also could include a local law enforcement agency.

25       And we could then potentially make contact with that law

Wooten - D by Mr. Cardani                    126

 1   enforcement agency, because sometimes they have more

 2   information to provide us after the referral came in.

 3       Q.    After this preaudit stuff is done, do you reach

 4   out to the --

 5       A.    Yes.

 6       Q.    -- tax exempt organization?

 7       A.    Once the preaudit examination -- preaudit

 8   analysis is done, then the examination really starts.

 9   Based upon the preaudit analysis, an appointment letter

10   is prepared.  It's sort of an introductory letter,

11   similar to a 1040 examination letter if any of you have

12   ever received it that says the IRS would like to

13   schedule an examination of your books and records.

14   Usually it will have a specific list of books and

15   records attached to it.  And it will tell the

16   organization to either contact us to schedule an

17   appointment, and -- either that or it will actually have

18   an appointment date already set on it and tell them that

19   we're planning on meeting with you on this given day.

20       Q.    So let's say that there was some type of

21   specific information that came your way about

22   misrepresentation in the 990, would your request to the

23   exempt organization for information be tailored towards

24   that?

25       A.    Yes, it would.  If we received a referral that

Wooten - D by Mr. Cardani

1  had specific information, our letter would be tailored

2  to that specific information.  So, for example, if it --

3  if the referral came in and said you spent $100,000 as a

4  down payment on your own house, we would ask the

5  organization, please provide us records as to your

6  expenditures for this period.  Did you expend any of

7  these funds on your own house?

8          THE COURT:  Excuse me just a moment, please.

9  We had some communication issues, and we need to get

10  another reporter.

11          (Further proceedings were had by Reporter Jan

12  Duiven, and are bound under separate cover.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE

2          I, Deborah Wilhelm, Certified Shorthand Reporter

3    for the State of Oregon, do hereby certify that I was

4    present at and reported in machine shorthand the oral

5    proceedings had in the above-entitled matter.  I hereby

6    certify that the foregoing is a true and correct

7    transcript, to the best of my skill and ability, dated

8    this 2nd day of September, 2010.

9

10

11

12
                              /s/ Deborah Wilhelm
13                            _____
                              Deborah Wilhelm, RPR
14                            Certified Shorthand Reporter
                              Certificate No. 00-0363
15

16

17

18

19

20

21

22

23

24

25