IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,       )
                                )
                Plaintiff,      ) No. 05-60008-2-HO
                                )
        v.                      ) September 2, 2010, P.M. Session
                                )
PIROUZ SEDAGHATY, et. al.,       ) Eugene, Oregon
                                )
                Defendants.     )

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL R. HOGAN

UNITED STATES DISTRICT COURT JUDGE

-:-

Jan R. Duiven, CSR, FCRR
Court Reporter
C&C Court Reporting
172 East 8th Avenue
Eugene, Oregon 97401
(541) 485-0111

APPEARANCES BY COUNSEL


FOR THE PLAINTIFF:          CHRISTOPHER L. CARDANI
                           United States Attorney's Office
                           405 E. 8th Avenue, Suite 2400
                           Eugene, OR 97401
                           (541) 465-6771
                           chris.cardani@usdoj.gov


                           CHARLES F. GORDER, JR.
                           United States Attorney's Office
                           1000 S.W. Third Avenue, Suite 600
                           Portland, OR 97204-2902
                           (503) 727-1021



FOR THE DEFENDANT:         LAWRENCE H. MATASAR
                           Lawrence Matasar, P.C.
                           621 S.W. Morrison Street
                           Suite 1025
                           Portland, OR 97205
                           (503) 222-9830
                           larry@pdxlaw.com

                           STEVEN T. WAX
                           MICHELLE SWEET
                           Federal Public Defender
                           101 S.W. Main Street, Suite 1700
                           Portland, OR 97204
                           (503) 326-2123
                           steve_wax@fd.org

Also present:              Agent Anderson
                           Agent Carroll

1          **INDEX TO WITNESSES**

2

3     **FOR THE**
      **PLAINTIFF:**                    **Direct**   **Cross**   **Redirect**
4

5     Christopher Wooten            130        148       169

6     Colleen Anderson             175        238

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              EUGENE, OREGON; THURSDAY, SEPTEMBER 2, 2010; 1:14 P.M.

2                                  -o0o-

3

4              THE COURT:  Okay.  Go ahead.

5              MR. CARDANI:  Thank you.

6              **DIRECT EXAMINATION OF GREGORY WOOTEN** (continued)

7    BY MR. CARDANI:

8         Q.   So you send your request for information

9    out to the exempt organization, you tailor it

10   toward the profession, if you received information

11   that one of these organizations had fairly

12   significant overseas distributions, distribution

13   that was not reported on the 990, would that shape

14   the information that you requested from the

15   organization before the official audit?

16        A.   If -- so you're asking me if an organization -- if I

17   had a referral indicating that an organization had made

18   overseas distributions and not reported that on the form 990,

19   would I ask questions about that?

20        Q.   Yes.

21        A.   Yes.  Absolutely.  As part or the preaudit analysis

22   in that case, I would review the form 990 and see if in fact

23   there were these overseas distributions that were in the

24   referral on the 990, and possibly just somebody was absolutely

25   wrong.  If I did not see them on the 990, I'd ask the

1    question.

2        Q.    Okay.  And you've mentioned about this

3    expenditure responsibility.  Would you expect in a

4    situation like this that the exempt organization

5    would have to provide the type of documentation you

6    talked about as part of this receipt and

7    expenditure responsibility?

8        A.    Yes.  The questions that I would ask of the

9    organization in this initial contact letter would say:  Did

10   you expend funds overseas?  And, if so, why were these not

11   reported on the 990 and how did you expend these funds?

12       Q.    Now, could this result in an interview

13   with the exempt -- the head of the person that

14   signed the 990?

15       A.    Yes, it could.

16       Q.    Okay.  So --

17       A.    Usually did.

18       Q.    I'm sorry?

19       A.    I was going to say usually, in the situation where

20   we have an examination of a 990, we would do an interview of

21   the officer of the organization.  We'd also go out and tour

22   the organization's facilities.

23       Q.    All right.  So let's just get right down

24   to it.  Let's say that this audit process is

25   completed and you find that an exempt organization

C. Wooten - D

1    has done something -- something wrong.  Are there a

2    range of sanctions available to EO with respect to

3    how to deal with it?

4         A.   Yes.   There's a very broad range of sanctions that

5    would be available to exempt organizations.

6         Q.   Start with the most -- like hand-slapping

7    minimum and then work your way up.

8         A.   Sure.  Okay.  The first and definitely the most

9    minimal of sanctions would be what we would call an advisory

10   letter.  In that case, if there was something incorrect on the

11   return, and it was something that was wrong but we deemed it

12   to be a very minor, potentially nonrecurring item, we would

13   simply send the organization a letter that indicated our

14   examination was complete and we've had no changes to their

15   exempt status, however, we do note that there were certain

16   deficiencies in the organization's reporting activities.

17        We would then describe that deficiency and say that

18   the occurrence of that deficiency could result in --

19   potentially excised tax up to revocation of the organization's

20   tax-exempt status.

21        Q.   So you'd fine the organization?

22        A.   I'm sorry?

23        Q.   Can you fine the organization?

24        A.   Can we fine the organization?

25        Q.   Yeah.

1    A.    We can fine organizations if we find that their

2    990s, for example, are grossly insufficient.  Grossly

3    misstated.  There are also excised taxes that we can impose

4    which are a little bit different than a fine.  Excised taxes

5    can potentially be imposed on organizations.  There are

6    officers --

7    Q.    Okay.  And you can propose actual

8    revocation of the exempt organization status?

9    A.    That's correct.  That is another potential.  If we

10   find that the activity is a significant nonexempt activity, we

11   can propose revocation.  If we propose revocation of the

12   organization after the appeal process, the organization would

13   then have to file an 1120, a corporate income tax return, and

14   pay tax as a normal corporation.

15   Q.    All right.  And getting up a little bit,

16   civil fraud, if you find that there's actually

17   fraud involved, you can start with the civil side?

18   A.    That's -- that's correct.  We can also make a

19   referral to -- to fraud on these cases if we find that there

20   are significant activities and we find evidence that they are

21   -- that the activities are intentional.  We can make referral

22   to the fraud side and they can have us pursue civil fraud or

23   they could potentially pursue criminal fraud.

24   Q.    Now, can a 501(c)(3) organization

25   distribute money overseas?

C. Wooten - D

1        A.    Yes.   A 501(c)(3) can distribute funds overseas as

2    long as they exercise the expenditure responsibility that

3    we're talking about.

4        Q.    And it has to be consistent with their

5    reason they're an exempt organization?

6        A.    Absolutely.   It needs to be consistent with their

7    501(c)(3) stated purposes or section 501(c)(3) code.

8        Q.    Okay.   And are overseas transactions

9    monitored a little bit more -- scrutinized a little

10    bit more significantly by EO?

11        A.    An overseas transaction would be scrutinized a

12    little bit more by EO simply because, as I mentioned earlier,

13    we have situations where within the U.S., we have the banking

14    system, the banking regulations, currency reporting

15    requirements, many different controls where funds leave the

16    U.S.  Many of those controls leave with the money.

17        Q.    All right.

18        A.    There -- therefore, we have to scrutinize the

19    transaction a little bit more.

20        Q.    And especially if they were cash or

21    traveler's checks for the reasons you mentioned?

22        A.    Yes.  If it was cash, more so.

23        Q.    And would this include funds being sent

24    over with the intent that they make their way into

25    a war zone?

1      A.   Yes, it would.

2      Q.   Now, if a -- if an exempt organization,

3  Mr. Wooten, sends money overseas for the purposes

4  of true humanitarian relief to refugees, let's say,

5  and they don't report that in the form 990 for that

6  year, does your shop care about that?

7      A.   If the organization made any type of distribution

8  and did not report it on the 990, it would be something

9  significant that we would want to have corrected if we were

10 doing an examination.

11      In your example, if the organization were to

12 distribute those funds for true humanitarian purposes, that

13 would possibly be a situation where we'd just be giving the

14 organization an advisory letter, though it may be that they

15 just did not understand the method for reporting something

16 like that.

17      Q.   But you'd want to know about it?

18      A.   Absolutely, yes.

19      Q.   Okay.  And its absence on a 990, would

20 that be significant to the IRS if it was -- if the

21 transaction occurred but it was not reported at

22 all?

23      A.   Yes, it would.

24      Q.   Okay.  Even if it was just for true

25 humanitarian purposes?

1    A.    It would still be a misstatement on the 990 that we

2    would be concerned with, yes.

3    Q.    What would your concern be?

4    A.    Well, if -- even if these funds ultimately were

5    decided to have gone to a true humanitarian purposes, it -- it

6    demonstrates that the organization may not have proper

7    controls in place to control their funds or to track their --

8    do their books or to track their expenditures.  Therefore,

9    this would be a situation where we would potentially advise

10   the organization that you need to track these things, you need

11   to report those to us, or you could have an effect on your

12   exempt status.

13         If this were --

14   Q.    Okay.  I'm sorry.

15   A.    I was going to say if this were a significant dollar

16   amount, and we advised the organization of that, and they did

17   it again, that might be one of the situations where there

18   could be a civil penalty imposed upon the organization, for

19   example, for failing or -- for filing a false 990 return.

20   Q.    Okay.  What if it was sent with the

21   intention on funding insurgents for acts of

22   violence overseas?

23   A.    If these funds were being -- if we did an

24   examination and found that these funds were being used to fund

25   insurgents, then that would likely be something that would be

1    considered contrary to 501(c)(3) purposes and lead to a

2    proposal of revocation of exempt status of the organization.

3         Q.   Can a 501(c)(3) send money to people to

4    commit acts of violence?

5         A.   If a 501(c)(3) were sending money to people to

6    commit acts of violence, then that would be contrary to public

7    policy of a 501(c)(3), contrary to the terms defined in

8    section 501(c)(3), charitable, educational, scientific,

9    literary, prevention of cruelty to children and animals, and

10    therefore that would not be consistent with their exempt

11    purpose.

12         Q.   Okay.  I'd like to show you IRS-1.  And

13    if we could go to the face page.  Mr. Wooten, did

14    you ever -- did TEG ever audit this al-Haramain

15    2000 form 990?

16         A.   No.  Exempt Organizations never audited this 990,

17    although I have seen this 990 before, yes.

18         Q.   Okay.  Why didn't you audit it?

19         A.   We did not -- exempt organizations did not audit

20    this because when exempt organizations became involved in a

21    review of this, this case was already under criminal

22    investigation.

23         Q.   And so is it policy -- what's the policy

24    within EO?

25         A.   Well, it's not actually a policy within EO.  As --

1    it's a legal ruling that we cannot pursue a civil matter at

2    the same time a criminal matter is being pursued in the same

3    activity.  Therefore, as long as this case is being pursued

4    criminally, we could not have done civil examination.

5             And the reverse of that is if we do a civil

6    examination, and we find something that we feel needs to be

7    referred for criminal review, then we have to stop our civil

8    examination.

9        Q.   Okay.  I forgot to ask you about

10   something.  Before we get to the 990 --

11       A.   Sure.

12       Q.   -- you mentioned this expenditure

13   responsibility that you'd be looking for during an

14   audit.  If you received information that a charity

15   had sent money overseas and requested

16   documentation -- I'm going to show you an exhibit

17   that's been marked as AHIF-2.  And if we could

18   expand that a little bit.  Could you read that to

19   yourself?

20       A.   Oh, sure.  (Witness reads.)  I'm familiar with this

21   document.  I've reviewed this document before.

22       Q.   All right.  If the EO -- if the exempt

23   organization said that they distributed money that

24   was not listed on its 990, and you requested

25   documentation, would this fit the bill?

1    A.   This would not -- this would not meet the

2    requirements of expenditure responsibility.  As I see it, this

3    document is only a document where the exempt organization is

4    transferring funds over to an individual, and although there

5    is a general statement about, "It's for the brothers and

6    sisters," it, first of all, does not indicate what the funds

7    are being used for.  And there aren't -- there is no

8    supporting documentation whatsoever that these funds are being

9    used for a charitable purpose.

10    Q.   Well, if we could scroll down to the

11    bottom.  There's a -- isn't that your support right

12    there?

13    A.   All it says here is:  "I deposit the amount in" -- I

14    believe it says -- "al-Haramain head office for Chechnyan

15    refugees."  That is simply a statement.  That is not

16    supporting documentation.

17    Q.   Okay.  All right.  And if I could show

18    you AHIF-3.  Now, you're familiar with this one

19    too, Mr. Wooten?

20    A.   Yes.  I'm familiar with this document.

21    Q.   Okay.  You know that it has different

22    amounts in the line here, 188 as opposed to 186?

23    A.   Yes.  I previously reviewed this document and I -- I

24    understand that this is a document to -- relating to the same

25    transaction as the previous document.

1    Q.    And if we could do a side-by-side of

2    AHIF-2 and AHIF-3, if you did an audit of an

3    organization and asked them to report -- to provide

4    their expenditure responsibility, and give you the

5    receipts justifying their claim that money went

6    overseas for humanitarian relief, and you were

7    given not one but both of these reporting the same

8    transaction, how would you react in an audit

9    situation?

10    A.    I would be even more concerned simply because we

11    have two documents here for these same dollar amounts.

12    Obviously, one of these is incorrect and it draws both of them

13    into question.

14    Q.    Now, you mentioned potential fraud.    If

15    you saw things like this during an audit, might

16    this trigger a referral for fraud?

17    A.    Yes.    This may lead to a -- excuse me, a referral

18    for fraud simply because we have multiple documents that are

19    purporting to document the same transaction which obviously

20    are incorrect.

21    Q.    Now, if we could go back, I'm sorry, to

22    IRS-1 now.    And if an organization provides true

23    humanitarian relief to refugees overseas, that

24    would be reported in the -- in a part of the 990;

25    is that right?

 1       A.   That's correct.

 2       Q.   Okay.  Let's go to the bottom of page

 3   two, and up here it's a statement of program

 4   service accomplishments.  And is this where you'd

 5   expect to see it?

 6       A.   This is one of the places on the 990 where you would

 7   expect to see that, yes.

 8       Q.   And you see down on C, it says:

 9   "Humanitarian aid.  The foundation receives

10   requests for aid and makes donations to some of

11   them," and a figure there of 24,000 and change?

12       A.   Uh-huh.

13       Q.   If information came to your attention

14   that -- that the organization was claiming that it

15   distributed far more than that, over a hundred

16   thousand dollars, rather than 24, and this came to

17   your attention, would that be of some concern?

18       A.   Yes, it would.

19       Q.   Why?

20       A.   Because the amounts are not reported on the 990

21   return.  And if the -- if the funds actually did go somewhere,

22   the 990 returns have checks and balances on them.  Therefore,

23   that would be an indication that a significant portion of the

24   990 may be incorrect.

25       Q.   So your concern would be one of

1    concealment?

2        A.    That -- that is correct.  That some of the -- that

3    this transaction may be reported somewhere -- somewhere other

4    than where it should be on the 990 return.

5        Q.    Even if the distribution was consistent

6    with its charitable purposes?

7        A.    It would still be an indication that something was

8    incorrect on the 990 return, yes.

9        Q.    And line 22, at the top of that page,

10   grants and allocations.  Is this another area where

11   distributions overseas would be picked up on a

12   return?

13       A.    Yes.

14       Q.    And then if we could go towards the end

15   of the return, schedule A.  Is a schedule A part --

16   another one of the forms that go on an 990?

17       A.    Yes, it is.  For this particular organization, the

18   organization was required to file a schedule A.

19       Q.    Okay.  And then -- okay.  And so this is

20   the schedule A for al-Haramain in its 2000 form

21   990.

22           I'd like you to go to -- direct you to

23   page six.  And if we could expand 51.  Okay.  What

24   is it -- it's information regarding transfers to

25   and transactions and relationships with

1    noncharitable EOs.  Okay.  Does this have to do

2    with what you were talking before in the

3    record-keeping thing -- of the letter that we

4    talked about that when you give money to a

5    nonexempt organization, you really have to do a

6    better job of keeping records?

7        A.    Yes.  This -- this is specifically asking the

8    organization if they gave funds to a non501(c)(3)

9    organization, and, if so, in what form funds were given to a

10   non501(c)(3) organization.  Yes.  This relates to the

11   expenditure responsibility requirements of organizations we

12   discussed earlier.

13       Q.    All right.  And in this form, the

14   defendant said -- when asked about transfers from

15   the reporting organization to a noncharitable

16   exempt organization of cash or other assets, line

17   51, you see "no" checked off both times there?

18       A.    That's correct.  I see "no" checked off both times.

19       Q.    Do you know if al-Haramain in Saudi

20   Arabia is a 501(c)(3) organization here in the

21   United States?

22       A.    Based upon my research, I did not find that

23   al-Haramain was a United States 501(c)(3) public charity or

24   501(c)(3) charity at all.

25       Q.    Now, if al-Haramain had distributed money

1    overseas for any purpose whatsoever, humanitarian

2    aid or to armed fighters, would you expect it to be

3    reported among other places here?

4         A.   I would expect it to be reported here if it were not

5    distributed to another 501(c)(3) organization, yes.

6         Q.   And elsewhere in the return.  You've

7    talked about that.  And if it was not reported at

8    all, whether for humanitarian aid or for fighters,

9    the IRS would care about that?

10        A.   That is -- that is an item that should have been on

11   the 990 return that was not reported on the 990 return.  So,

12   yes, that would be an incorrect 990 and we would care about

13   that, yes.

14        Q.   Can a -- can you amend one of these

15   things if you make a mistake?

16        A.   Can you amend a 990?  Yes.  You can amend a 990.

17   You can amend the attached schedule A.  You can amend it more

18   than once if you need to.

19        Q.   Oh, was -- I'm sorry.  Was al-Haramain in

20   Saudi Arabia a 501(c)(3) in the year 2000?

21        A.   No, they were not.

22        Q.   Now, you can file -- like we can as

23   individuals, you can amend a return if you find

24   that you made a mistake?

25        A.   That's correct.

1      Q.    And does that occasionally happen?

2      A.    Yes.  We -- we receive amended 990s quite often

3   within exempt organizations.

4      Q.    To the best of your knowledge, did this

5   organization, al-Haramain here in the United

6   States, ever file an amended return for the year

7   2000?

8      A.    No, they did not.

9      Q.    Now, you've audited quite a few of these

10  returns.  You've already said that.  In your

11  experience, has the IRS revoked tax-exempt status

12  for 501(c)(3)s based on false information provided

13  in 990s?

14     A.    Yes.  The IRS has revoked organizations for false

15  information on 990s.

16     Q.    And have you imposed sanctions less than

17  full revocation in similar situations?

18     A.    We have imposed sanctions less than full revocation

19  as well, yes.

20     Q.    And are you aware of situations where

21  there was revocations for organizations like this

22  distributing money overseas, but were found to be

23  in a manner contrary to public policy?

24     A.    There have been revocations for those purposes, yes.

25           MR. CARDANI:  If I may have a moment.

1                    (Counsel confer.)

2        Q.    (By Mr. Cardani)  Mr. Wilcox (sic), if we

3    could go back to the return, page one.  Assume

4    hypothetically that an organization received

5    $150,000 in a charitable donation, and reported it,

6    and the money went to overseas --

7        A.    Okay.

8        Q.    -- and the organization reported it in a

9    manner, including in line one that said that some

10   of the money was actually returned to the original

11   donor when it was not.  Would that be a problem to

12   the IRS?

13       A.    You're asking me if it would be a problem if there

14   were a reporting that funds went back to the original donor?

15       Q.    Yes.  And it did not.

16       A.    Yes.  It would be a problem.

17       Q.    And is $21,0000 what you would consider a

18   large or out-of-the-ordinary transaction?

19       A.    $21,000, yes.  That would be a significant -- that

20   would be a significant transaction, especially for an

21   organization that brings in, in this example, $561,000 in

22   direct public support.

23       Q.    Okay.  If we could go to page three, line

24   57.  Now, this seemed -- I'm going to describe this

25   as a more mundane part of the return, but land,

1    buildings, and equipment basis, and so on and so

2    forth.  Is that typically one of the hot areas in

3    auditing these type of returns?

4         A.   Land, buildings, and equipment is usually a fairly

5    static area within a return.  So, no, it's not really a hot

6    area if you want to call it that.

7         Q.   All right.  If you've received

8    information that an organization had received over

9    a hundred thousand dollars in a donation, but had

10   not reported it in the 990 as an overseas

11   distribution, but rather had reported it at least

12   in part as having gone into land, buildings, and

13   equipment like this, might this line then become a

14   very important part of an audit?

15        A.   What you're describing would be a significant issue.

16   Then it would then be an organization that's essentially

17   hiding a transaction, yes.

18        Q.   Okay.  Even in this line 57?

19        A.   Yes.  You could -- you could hide it -- if you were

20   going to hide a transaction, the most logical place to do it

21   would be in an innocuous place on the tax return, someplace

22   that would receive less review by the IRS if you're asking me

23   that.

24        Q.   Do you occasionally see that in your

25   audits?

1   A.   Occasionally, yes.

2        MR. CARDANI:  Thank you, Mr. Wooten.

3        THE COURT:  Cross.

4                    **CROSS-EXAMINATION**

5   BY MR. MATASAR:

6   Q.   Mr. Wooten, I want to -- I wanted to

7   start just with something Mr. Cardani asked you.

8   Can I show you AHIF-2 and -3?

9        It was your testimony that the fact that

10  there are multiple documents with different numbers

11  would cause the IRS, would cause you, to initiate a

12  criminal fraud investigation; is that your

13  testimony?

14  A.   No.  I did not say it would initiate a criminal

15  fraud investigation, but it would be an area of concern for

16  us.  And the fact that there are two documents here with --

17  that are purporting to document the same transaction with

18  different numbers and different signatures would be area -- an

19  area of concern.

20  Q.   Didn't you use the term "fraud

21  investigation" with regard to this or just concern?

22  A.   I -- I believe what I -- I may have said that it

23  would lead to the possibility of a referral.

24  Q.   Okay.  Now, doesn't it matter to you how

25  the IRS got the documents?  For example, don't

1    businesses have multiple documents, draft

2    documents, all the time?  Isn't it a common

3    practice in both a charity and a regular business

4    to create a series of different documents as

5    they're working on a transaction?

6        A.    That's true.  Normally, if there are draft

7    documents, the draft documents would be unsigned documents.

8    But there may be several --

9        Q.    But they might be --

10       A.    -- several draft versions, yes.

11       Q.    And if a business gets a subpoena and

12   keeps all of their copies of everything, and their

13   attorney is asked to give all relevant documents,

14   they very well might provide documents that

15   apparently are inconsistent.  But that still would

16   be in something that would be provided.  And it

17   doesn't -- I mean, how is something like that if

18   the documents come pursuant to a subpoena and

19   provided by counsel, how would that possibly cause

20   the IRS to look into a fraud investigation?

21       A.    We're not talking about automatics here.  We're not

22   talking about these two documents would be handed to me as an

23   IRS examiner and I would immediately say:  Fraud.

24            However, this would lead me to the consideration of

25   fraud.  One of the batches of fraud is multiple documents for

1    example.

2        Q.    How many audits have you done?

3        A.    If you're looking for an exact number, I couldn't

4    give you the exact number.  Certainly hundreds of audits that

5    I've done myself and supervised several hundred more.

6        Q.    How many audits have you done to

7    organizations that provide grants to foreign

8    entities?

9        A.    If I had to -- very difficult to come up with a

10   number because many organizations provide some grants to

11   foreign entities as part of their activities.  Probably in the

12   neighborhood of, say, 50 -- 50 organizations to a 100

13   organizations.

14       Q.    You've said that organizations under

15   501(c)(3) must be operated exclusively for

16   charitable purposes?

17       A.    Section 501(c)(3) states that organizations must be

18   organized and operated exclusively for exempt purposes.

19   That's correct.

20       Q.    Aren't there Treasury rules under that

21   provision of the code that provide that the

22   organizations must be operated primarily for

23   charitable purposes?

24       A.    That is true.  There is a de minimus standard that

25   has been set so that an organization would not, for example,

```
 1    be revoked because they had a bookkeeper that stole $500 from

 2    the organization and the organization brings in a hundred

 3    thousand dollars per year.

 4              If there were -- if there were an absolute standard,

 5    then the organization could potentially be revoked for doing

 6    something like that.  So it's -- some sort of de minimus

 7    standard had to be set.

 8         Q.   So the rule is de minimus, the word is

 9    not primarily.  That's a mistake of mine that -- is

10    there a Treasury rule that says "primarily"?

11         A.   There is.  The interpretation is -- is if it's more

12    than de minimus it can still lead to revocation.

13         Q.   You mentioned the term "expenditure

14    responsibility"?

15         A.   Yes.

16         Q.   This is a term provided in section 4945

17    of the Internal Revenue Code?

18         A.   I believe that is one of the places that it states

19    it.

20         Q.   Isn't it true that that term is used for

21    private foundations not public charities?  The term

22    "expenditure responsibility"?

23         A.   Yes.  But expend -- the term is also used

24    generically with all examinations basically to have an

25    organization show that it's met the record-keeping
```

C. Wooten - X

1    requirements under 6033.

2         Q.    I understand.  But the term in the code

3    is -- it specifically applies -- the technical term

4    applies to private foundations.  You're saying a

5    more general description of your working use of the

6    word is what you're talking about, not the

7    technical version in the code?

8         A.    Yes.

9         Q.    What's -- you've indicated that the

10   penalties for charities can go all the way up from

11   a written advisory to a criminal prosecution?

12        A.    That's correct.

13        Q.    What's the penalty for filing -- or

14   what's the typical result for filing an incomplete

15   or inaccurate form 990?

16        A.    There is no typical penalty.  It all depends on what

17   the situation is with the -- with the transaction that led to

18   the inaccurate filing of the 990.  For example, the IRS

19   Service Center routinely sends out notices of incorrect

20   returns to organizations.  Quite often those penalties are

21   abated when an organization sends in an explanation where, on

22   an examination, we -- we have proposed all the way up through

23   criminal penalties.

24        Q.    Isn't there an Internal Revenue manual

25   that provides for certain closing letters to be

1    issued in certain circumstances?

2         A.    I believe there is, yes.

3         Q.    And doesn't that provide that -- fail --

4    that -- I'm sorry.  That filing an incomplete or

5    inaccurate form 990, the suggested result is a no

6    change with written advisory letters?  That that's

7    what the rules say is appropriate in that

8    circumstance?

9         A.    That is a -- that is a situation where it is -- in a

10   limited context, an organization fail -- fails to file the

11   correct 990, for example.  They do something like -- indicate

12   an incorrect taxpayer identification number.  That's probably

13   the most common error.  Don't properly file the return,

14   improperly complete a schedule, a fairly minor item on the

15   return.

16        Q.    Are there written rules indicating where

17   a more serious punishment should be imposed for

18   filing an incomplete -- filing an incomplete or

19   inaccurate form 990?

20        A.    Are there written rules?

21        Q.    Yes.

22        A.    I don't believe -- if you're looking for a chart

23   that says:  If this is the violation, then this.  If that is a

24   violation, then that.  No, I don't believe it.

25        Q.    It's just up to the IRS?  If you're

```
 1   saying it's really bad, then something really bad
 2   happens?
 3       A.   Certainly if -- the more significant the violation,
 4   the more significant the penalty.  Yes.
 5       Q.   Now, have you studied the actual e-mail
 6   chain between Mr. El-Fiki and al-Haramain?
 7       A.   No, I have not.
 8       Q.   You are aware -- let me show you 669.
 9   Can you read that?  You've never seen that
10   document?
11       A.   I do not believe so.  Let me --
12       Q.   Why don't I give you a moment to read it.
13       A.   Thank you.  (Witness reads.)  All right.
14       Q.   Okay.  So you see that -- if you look at
15   paragraph one, he's transferring money from his
16   account in London and he asks them if they have an
17   account in London; right?
18       A.   That's correct.
19       Q.   Okay.  Let me show you 670.  And let's
20   first enlarge the second paragraph:  Concerning.
21           Okay.  "Concerning to your inquiry -- or
22   inquire about our bank account in London, sorry,
23   brother, we don't have one there.  Although we have
24   account for Chechnya relief fund and if you wish
25   you could make it with this."
```

1          And if you go down to the bottom further

2     down -- yeah.  Further.  "Our account -- they have

3     an account in U.S.A."  Okay?

4          A.   Okay.

5          Q.   And all the way down to the bottom.  That

6     -- okay.  No.  Sorry, further up.  That's Jazak

7     Allah Khair, the signer, is an al-Haramain official

8     in Riyadh.  I'll ask you to just assume that that

9     is the case.

10                     (Reporter inquiry.)

11          MR. MATASAR:  I'll spell it for you here if we can get

12     further down.  It's J-A-Z-A-K, next word A-L-L-A-H, K-H-A-I-R.

13     Al-Haramain Foundation.

14          Q.   (By Mr. Matasar)  And if we can look at

15     671.  And if we can go to:  "In regard to our

16     previous correspondence."

17          And Mr. El-Fiki is telling al-Haramain

18     Saudi:  "In regard to our previous correspondence,

19     I have the pleasure of informing you that I have

20     already asked my bank in London to make a

21     transaction to your U.S.A. account;" okay?

22          A.   Okay.

23          Q.   So in that -- do you get from this e-mail

24     chain that you just looked at that Mr. El-Fiki was

25     intending to give your -- the money to the Saudi

 1   organization?  He asked them if they had an account

 2   in London, and they said:  No, we have an account

 3   in the U.S., and he sends it to the U.S. account?

 4            MR. CARDANI:  Judge, I object.  Excuse me.  I object to

 5   him characterizing Mr. El-Fiki's intent.  How can we know that?

 6            THE COURT:  Sustained.

 7            MR. MATASAR:  I'm just asking about the words on the --

 8   on the e-mail, your Honor.  I don't mean to inject any --

 9   anything more than that.

10   Q.   (By Mr. Matasar)  I'm just asking you to

11   consider the words on the e-mail chain.  Does it

12   not appear to you that the money from the donor was

13   intended to go to al-Haramain Riyadh?

14            MR. CARDANI:  I object to that as well.

15            THE COURT:  Sustained.

16   Q.   (By Mr. Matasar)  You're aware -- well,

17   isn't it true that the -- there must be a decision

18   made somehow, somewhere by the IRS as to where a

19   donation is given, okay?  Who has to put it on

20   their return; correct?

21            There are circumstances -- for example,

22   United Way.  United Way is a charity that funnels

23   money to all sorts of different charities.

24   Somebody might give money to United Way and then it

25   goes from United Way to the American Cancer

1    Society, whatever.  There are rules that have to do

2    with when an organization has to report money as a

3    contribution to that organization; correct?

4        A.   That's correct.

5        Q.   And you're familiar with the charges in

6    this case are you not?

7        A.   Yes.

8        Q.   And you know the indictment specifically

9    says:  In February 2000, an individual in Egypt

10   donated $150,000 to al-Haramain Riyadh; correct?

11   You've seen that in the indictment?  That's in

12   the --

13            MR. CARDANI:  Judge, excuse me.  The charging

14   document's not relevant to this witness's testimony.

15            THE COURT:  Sustained.

16       Q.   (By Mr. Matasar)  It was your testimony,

17   was it not, that -- with -- let me ask this.  Are

18   you aware that an Egyptian gave $150,000?  That

19   that's part of this case?

20       A.   Yes.

21       Q.   Okay.  And do you have an opinion as to

22   whether that $150,000 should have gone on line one

23   of the form 990 in the year 2000?

24            MR. CARDANI:  I object.  Without more facts, how is he

25   to know?

1          MR. MATASAR:  I can't -- I tried to give him the facts,

2     your Honor, but I -- I would like to give him the e-mail chain.

3     Those are the only facts we know.

4          MR. CARDANI:  If he wants to ask a hypothetical, I

5     guess I have no objection to that.

6          MR. MATASAR:  Okay.  I'll try that.

7     Q.   (By Mr. Matasar)  Assume -- assuming a

8     wealthy Egyptian wants to give money as Zakat to

9     widows and orphans in Chechnya, and assuming this

10    wealthy Egyptian contacts people in Saudi Arabia at

11    an organization called al-Haramain.  They have an

12    office in Riyadh.  And assuming this wealthy

13    Egyptian writes to them and says:  I hear about

14    this work you're doing with the Saudi committee and

15    I want to give as Zakat -- you know what Zakat is?

16    A.   Yes.

17    Q.   I want to give as Zakat some money to

18    you.  I have an account in London and I want to

19    give money, if you have one, to your account in

20    London.

21          And further assume that the wealthy

22    Egyptian is told by the Riyadh organization that:

23    We don't have an account in London.  If you want a

24    western bank, we have an account in United States

25    or you can send it to our account in Saudi Arabia.

1          Assuming further that the wealthy

2    Egyptian then sends the money to the account in the

3    United States.  Assume further that all the

4    transactions, all the e-mails, are between the

5    Egyptian and the Saudi branch.  Assume that there

6    is nothing in the e-mails that indicates that there

7    is any branch or office, anything in the United

8    States other than a bank account, okay?

9          And so given all those assumptions -- and

10   the money is sent to the account in the United

11   States.  And it turns out that there is an

12   organization unknown to the donor.

13         And my question to you is does the United

14   States organization put that money as a donation to

15   itself on line one of its tax return?

16   A.   I'm sorry.  You just said there was no U.S.

17   organization.

18   Q.   No.  I'm saying the donor does not know

19   there's a U.S. organization.  The donor in the

20   hypothetical -- I'm giving you the hypothetical.

21   The donor is told there's an account in the United

22   States, okay?  He's not told there's an

23   organization in the U.S.  He's looking for an

24   account in London, he's told there's an account in

25   the United States.  So he sends it to the account

1    in the United States.  That's what's in the donor's

2    head.

3          And my question to you is if there's --

4    if unknown to the donor, there's an actual

5    organization in the United States, does the

6    organization in the United States have to put that

7    -- under Internal Revenue rules, have to put that

8    $150,000 that they got under that hypothetical as a

9    contribution on line one of their form 990?

10   A.   I would expect that, no, they would not put that as

11   a contribution on line one of their 990 and would return it to

12   the donor as some sort of erroneous transfer.

13   Q.   Or could they not return it to the Saudi

14   organization where the donor actually intended it

15   to go?  If they did that, would that be

16   appropriate?  Isn't there typically in the Internal

17   Revenue Code pass-throughs or intermediaries?

18   Isn't this -- aren't those common terms that are

19   used in situations where money goes from one

20   organization to another to another?

21   A.   Well, what you're describing is not a pass-through

22   or an intermediary, it's just an error.  That these funds came

23   into -- the account of an organization in the United States

24   and was never intended to come into that.

25          So if the organization in the U.S. did anything with

1    those funds, they would simply correct the error.  So this

2    would not have anything to do with a pass-through.

3        Q.   Okay.  Well, correcting the error, could

4    it not, couldn't it include sending the money where

5    the donor intended it to go?  Wouldn't that be one

6    way that an organization might think -- it might

7    not be the perfect way for you, but wouldn't that

8    be one way that a legitimate organization might

9    correct the error, by sending it where the money

10   was intended to go?

11       A.   Certainly there would be the possibility of

12   transferring the funds, wire transferring them right back

13   where they came from or wire transferring them to the ultimate

14   recipient, yes.

15       Q.   Does the Internal Revenue Code require

16   that they be done by wire transfer?

17       A.   No.  But that would be the most efficient way to do

18   it and that was the way the funds came in.

19       Q.   Of course it would be the most efficient

20   way.  I'm asking you is it required by the Internal

21   Revenue Code?

22       A.   No.

23       Q.   It's required that an organization that

24   files a 990 file a schedule at line 22 for line 22,

25   is it not?

```
1        A.   A description of the activities?

2        Q.   The grants and donations?

3        A.   Oh, I'm sorry.  Yes.

4        Q.   Grants -- line 22?

5        A.   Yes.

6        Q.   Okay.  Are you with me?  Do you want us

7   to show you the return or --

8        A.   Um, no.

9        Q.   All right.  There's a requirement that a

10  schedule be filed?

11       A.   Yes.

12       Q.   And is that a yes?

13       A.   Yes.

14       Q.   And is it -- have you checked to see

15  whether schedules were filed in this case; do you

16  know?

17       A.   I believe this organization did file a schedule,

18  yes.  Referring to the schedule B.

19       Q.   Pardon?

20       A.   Are you referring to the schedule B of this

21  organization?

22       Q.   I'm referring to -- well, let's put IRS-1

23  on the screen.  And line 22 -- I think it's page

24  two.  See it says:  "Grants and allocations,

25  attached schedule"?
```

1      A.    Yes.

2      Q.    Was a schedule attached, do you know?

3      A.    I believe the schedule was attached.

4      Q.    A schedule of grants and allocations?

5      A.    I believe it was attached.  It's been a while since

6   I looked at it, but I don't remember there being a schedule

7   missing.

8      Q.    Is it common that there are errors in

9   form 990s?

10     A.    There are often errors in form 990s, yes.

11     Q.    And it's a form that's regularly being

12  changed and tweaked and improved upon; isn't that

13  correct?  Is that fair to say?

14     A.    The form 990 is often being changed.  There was --

15  there was a large revision of the form recently.  The basic

16  information on the 990, similar to the schedule you're showing

17  me here, has remained essentially the same for several years.

18     Q.    By the way, is it a serious error not to

19  file a schedule with line 22?

20     A.    It is a -- it is an error that can lead to

21  incomplete return penalties just as if an organization did not

22  properly complete their 990.

23     Q.    Do you have any statistics of how many --

24     A.    No.

25     Q.    -- organizations --

1      A.   No.  As an examiner, I don't -- I don't review or

2   maintain statistics of that sort.

3      Q.   Right.  But you must read the numerous

4   IRS publications.  You're a manager.

5           By the way, what are -- what office are

6   you in charge of?

7      A.   Seattle.  The Seattle office.

8      Q.   And that covers what part of the country?

9      A.   Washington, Oregon, Idaho, Alaska, and Hawaii.

10     Q.   But you're not familiar with the

11  percentage, for example, of 990s that are filed

12  without a schedule for line 22?

13     A.   I -- I have done some -- some basic research into

14  percentage of errors on 990s, but as a group manager, I -- I

15  don't really use those statistics.

16     Q.   It's a pretty huge number though, isn't

17  it, for errors on form 990?

18     A.   It's a large -- there are --- there are a large

19  number of errors on forms 990.  That's true.  The most common

20  errors on form 990 have to do with by far individuals not

21  signing tax returns, and individuals, for example, including

22  incorrect taxpayer identification numbers, things that we

23  would consider very minor errors, yes.

24     Q.   In the year 2000, were there any rules in

25  the Internal Revenue Code that prohibited aid to

1    Chechnya?

2        A.    In the Internal Revenue Code?  No.  The Internal

3    Revenue Code doesn't have specific rules.

4        Q.    And how about anywhere in the IRS rules

5    or regulations that prohibited aid to Chechnya in

6    the year 2000?

7        A.    Not that I am aware of.

8        Q.    Was there anything in the Internal

9    Revenue Code, IRS rules or regulations that would

10   have prohibited aid to the mujahideen in Chechnya

11   in the year 2000?

12       A.    I don't believe there was anything specific in the

13   IRS rules or regulations that stated that, no.

14       Q.    Isn't it true, Mr. Wooten, that at the

15   time of this return, October 16th, 2001, there was

16   no requirement as far as real specificity on lines

17   -- describing where grants went on line 22?

18       A.    Describing where grants --

19       Q.    Yeah.

20       A.    When you say where grants went --

21       Q.    Where the money went?

22       A.    As in a specific country, as in a specific --

23       Q.    Just --

24       A.    -- individual?

25       Q.    General purposes.  Couldn't you say

1    something as simple as nursing services?  Couldn't

2    you say something as similar -- simple as

3    fellowships?  Just a really broad description and

4    that would spec -- would satisfy line 22?

5        A.   I believe the instructions for the 990 for that

6    period asked for a little bit more detail than that.

7        Q.   Okay.  Let me show you then the -- I

8    guess we'll give this our next number.  I'll just

9    show it to the witness.  Can you first describe

10   that document?

11       A.   This is the instructions for the 2000 form 990 and

12   990-EZ.

13       Q.   Okay.  In what year?

14       A.   In 2000.

15       Q.   Could you read the second paragraph on

16   the attached schedule -- section on page 21 which

17   talks about classifying activities?

18       A.   Page 21?

19       Q.   Page 21, far right column, the heading is

20   called:  Attached schedule.  And the second

21   paragraph as far as how to classify activities.

22   The sentence starts:  "On the schedule."

23       A.   You said the far right column?  Sorry.

24       Q.   Yes.

25       A.   "On the schedule, classify activities in more detail

1    than in such broad terms as charitable, educational, religious

2    or scientific, for example, identified payments for nursing

3    services, laboratory construction or fellowships."

4        Q.    So would you take it from that, that that

5    sort of identification is sufficient?

6        A.    This is asking not to use broad classifications but

7    to provide details is the way I interpret this.

8        Q.    Well, don't you interpret it that you

9    shouldn't use broad terms as charitable,

10   educational, religious or scientific, instead you

11   should use terms -- you should identify payments

12   for things like nursing services, laboratory

13   construction or fellowships.  Would you agree that

14   those latter three terms are more specific than

15   charitable, educational or religious?

16       A.    Yes.  There are a couple of examples that are a

17   little more specific than charitable, educational or

18   religious.

19       Q.    Well, I'm sure Mr. Cardani's going to ask

20   you.  Where are those examples?

21       A.    I'm sorry?

22       Q.    You said there were examples on here that

23   said -- that are more specific than nursing

24   services, laboratory--

25       A.    No, no.  I'm saying that those terms are a little

1    more specific than the general --

2         Q.    Okay.  All right.

3         A.    -- classifications.

4         Q.    Okay.  You're familiar with IRS

5    announcements, are you not?

6         A.    I have access to IRS announcements, yes.

7         Q.    And isn't it fair to say that after 9/11,

8    there was a need to make -- there was -- not a

9    need, but there was an effort made by the IRS to

10   require charities to be more specific?

11        A.    That was, I believe -- if you're asking what I think

12   you're asking, I believe that was part of the effort to

13   redesign the 990 form.

14        Q.    All right.  Well, let me just show you

15   another document here.  I'm sorry.

16        A.    (Witness reads.)

17        Q.    And look at page three on foreign grants.

18   And at this time there was very little specificity

19   required; is that correct?

20        A.    Referring to the document that you just handed me?

21        Q.    Well, let me ask -- ask you particular

22   things.  It says in the second paragraph -- it

23   talks about the form 990, the second paragraph in

24   foreign grants, does it not?  And it talks about

25   the schedule for line twenty -- it talks about line

C. Wooten - RD

1   22 which it doesn't seem to change, and line 23

2   which is grants to an individual.

3           And doesn't it say the attached schedule

4   for this line does not identify individual

5   recipients, instead payments are identified by

6   class of activity, e.g., clothing for disaster

7   victims.  Foreign grants are not identified

8   separately on this attachment.

9           So at that time you could file an

10  appropriate 990, could you not, that would not have

11  to be any more specific than saying aid to

12  refugees, clothing for disaster victims, that sort

13  of thing?

14      A.   It would be a return that would have been accepted

15  by the service center, yes.

16      Q.   Correct.

17           MR. MATASAR:  Thank you.  No further questions.

18           MR. CARDANI:  May I, judge?

19                    **REDIRECT EXAMINATION**

20  BY MR. CARDANI:

21      Q.   Mr. Wooten, let's just start with that

22  last part first.  Keep that document in front of

23  you.

24      A.   Okay.

25      Q.   This is an announcement given to you by

170
C. Wooten - RD

1    Mr. Matasar of some potential changes in the 990.

2    And referring to that same page -- are you still

3    with that foreign grants?

4         A.   Yes.

5         Q.   You're with me?

6         A.   Yes.

7         Q.   Okay.  And he referred you to paragraph

8    two with respect to changes on the form 990 and

9    line 22?

10        A.   Okay.

11        Q.   We didn't cover paragraph one.  Could you

12   read paragraph one out loud please?

13        A.   It says:  "Since the events of September 11th, 2001,

14   concern has been expressed that purportedly charitable

15   organizations may be transferring funds outside of the United

16   States to organizations or individuals suspected of supporting

17   terrorist activities."

18        Q.   Okay.  And is that part of the reason

19   this form was modified?

20        A.   Was that part of the reason that the 990 was

21   modified?

22        Q.   Yes.

23        A.   I'm sure that it was something that was on the table

24   along with several other items, but there's been a -- a

25   revision to the 990 in the works for several years.

1        Q.    Well, go down to paragraph three then.

2        A.    Uh-huh.

3        Q.    "We would like comments addressing what

4   further steps, if any, the service should take to

5   more effectively identify on form 990 transactions

6   that present the risk of the diversion of

7   charitable funds, including the following.  Should

8   domestic charities conducting foreign activities be

9   required to provide more specific information about

10  the flow of funds involved in these activities or

11  about the recipient of these funds as one example?"

12  Is that there?

13       A.    Yes.

14       Q.    If you could put that down for a minute.

15  Now, Mr. Matasar gave you a fairly long

16  hypothetical and let me just give you another

17  hypothetical.  Okay?

18            Assume there's a wealthy Egyptian

19  individual who wants to donate money to the

20  Chechnyan mujahideen to support a fight in

21  Chechnya, and knows that there's an operation in

22  Saudi Arabia, and there's an office in Ashland,

23  Oregon, and decides to send the money from an

24  account that he has overseas to the United States

25  rather than to Saudi Arabia to conceal the

1    transaction from the Egyptian government.

2          Assume that the money gets sent to the

3    Oregon account and it doesn't automatically just

4    get wired right back to the Saudi Arabian account.

5          You talked about a mistake.  Is that what

6    you'd expect if it was a mistake, you'd send it

7    right back or to the organization?

8       A.   Yes.

9       Q.   But instead the money stays in the United

10   States for about three weeks during which time your

11   exempt organization head, the head of the 501(c)(3)

12   in the United States, takes -- attempts to use that

13   money and to do things with it on his own but

14   fails.

15         And then a representative from an

16   organization overseas who is involved as well, the

17   parent organization, spends thousands of dollars

18   flying across to the United States, and goes to the

19   bank and retrieves this same money in the form of

20   traveler's checks paying an additional $1,300 of

21   the local charity's money, the 501(c)(3)'s money.

22   Okay?

23      A.   Uh-huh.

24      Q.   And also gets the rest of the money in

25   the form of a cashier's check, not in the amount of

1    $20,000 but $21,000.  So an additional $1,000 of

2    the local charity, the 501(c)(3)'s charity?

3                MR. MATASAR:  Objection, your Honor, I think this is

4    argument not a hypothetical question.

5                THE COURT:  It's similar to your hypothetical.  Go

6    ahead.

7                MR. MATASAR:  Mine was based on --

8                THE COURT:  Counsel, overruled.

9                MR. MATASAR:  Sorry.

10    Q.    (By Mr. Cardani)  And further assume that

11    the 21,000 included 20,000 of the donation but also

12    an additional $1,000 kicker from the 501(c)(3).

13    Okay?  And all of that money is then taken out of

14    the United States without control forms being filed

15    to report the transaction of the -- the

16    transportation of the cash out of the United

17    States.  And then it makes its way to Saudi Arabia

18    and ends up being involved -- reduced to cash.

19                Would you expect that transaction to show

20    up on the local 990?

21    A.    In your example, it sounds like the local

22    organization exercised some control over the funds as if it

23    was in fact their funds.  So then in that circumstance, I

24    would expect that to show up on the 990.

25                But beyond that, obviously as an auditor, I would

1    have some problems with several aspects of that transaction.

2        Q.   And are you familiar with the concept of

3    money laundering?

4        A.   Yes, I am.

5        Q.   Do you ever run across any organization

6    in your work that engages in attempts to launder

7    money outside the United States?

8        A.   I've run into organizations that have -- immediately

9    I can think of laundering money within the United States and,

10   yeah, I do know of at least one case I can think of

11   immediately outside the United States.

12       Q.   All right.  And does that cause your

13   organization some concerns if, during an audit, you

14   find that charitable organizations involved money

15   laundering?

16       A.   Yes.  Definitely.

17       Q.   Might that refer -- end up in a criminal

18   referral?

19       A.   Absolutely.

20            MR. CARDANI:  That's all I have.

21            THE COURT:  Anything further?

22            MR. MATASAR:  Nothing further.

23            THE COURT:  You may step down.  Thank you.

24            THE WITNESS:  Thank you.

25            THE COURT:  Let's go ahead and take a few minute break,

```
 1    jurors.
 2                        (Jury exits courtroom.)
 3                    (A short recess was held)
 4            THE COURT:  Thank you.  Be seated.
 5                        (Jury present.)
 6            THE COURT:  Your next witness.
 7            MR. CARDANI:  Judge, the government's final witness,
 8    we'd call Colleen Anderson.
 9            THE CLERK:  Please raise your right hand.
10                        (The witness was sworn.)
11            THE COURT:  Please have a seat.
12            THE WITNESS:  Thank you.
13            THE CLERK:  Please state your full name then spell your
14    name for the record.
15            THE WITNESS:  Colleen M. Anderson.  C-O-L-L-E-E-N,
16    A-N-D-E-R-S-O-N.
17                        DIRECT EXAMINATION
18    BY MR. CARDANI:
19        Q.   You're a special agent with the Internal
20    Revenue Service?
21        A.   I am.
22        Q.   Criminal investigator?
23        A.   Criminal Investigation Division, yes.
24        Q.   All right.  How long have you been a
25    criminal investigator with the IRS?
```

1        A.    It will be 15 years in December.

2        Q.    Tell us a little bit about your education

3    before you joined the IRS.

4        A.    I have an accounting degree from Chico State

5    University.

6        Q.    And then you went right to the IRS?

7        A.    Well, actually, after the -- after I obtained my

8    bachelor's degree in accounting, then I did, hm, approximately

9    nine months as an auditor from the district attorney's office

10   in northern California for the Child Support Enforcement

11   Division.

12       Q.    Then you joined the IRS?

13       A.    Then I did, yes.

14       Q.    Okay.  And you've been here throughout

15   the trial as what we call the case agent?

16       A.    Yes.

17       Q.    You're familiar with much of the evidence

18   that's been accumulated in this case?

19       A.    I am.

20       Q.    Taking you back to 2004, Agent Anderson,

21   were you present at the search warrant of 3800 in

22   Ashland?

23       A.    Yes, I was.

24       Q.    The al-Haramain building?

25       A.    Yes.

1    Q.    And did you have some involvement in the

2  evidence as it was being seized, especially with

3  the computers?

4    A.    Yes, I did.  If there were any questions regarding

5  any particular piece of evidence that the seizing officer

6  wanted to ask me about then Linda Czemerys, the special agent

7  that was the seizing officer, would ask and confer with me on

8  whether or not I thought it was appropriate to seize.

9    Q.    Is it fair to say that the main aspect,

10  the main part of the search warrant seizure,

11  involved computer hard drives from that location?

12    A.    Yes.  As far as the number of items that were

13  seized, by far the greatest quantity came from the seizure of

14  the hard drives or the computers themselves, yes.

15    Q.    Now, did you have a local computer guy?

16  They call them CISs?

17    A.    Yes.  We had a local computer forensics guy come out

18  from Bend to help us take the computers and then he took them

19  back to his location to image the drives.

20    Q.    All right.  And that was done by -- who

21  is this individual?

22    A.    I'm sorry.  That would be Special Agent Richard

23  Smith.

24    Q.    All right.  Did you work with Mr. Smith

25  then in attempting to analyze the contents of the

1    computer that were found at 3800?

2         A.    Yes.  Once a computer specialist gets the computers

3    and they image the drives, then they do their processes.  I'm

4    not a computer person so I don't know exactly what they do.

5    But once they process them, they attempt to make the

6    information available to the agents to review to look for

7    items within the scope of the warrant.

8         Q.    You worked with Agent Smith to do this

9    over time?

10        A.    Yes.  I attempted to work with Agent Smith to do

11   this over time.  It became apparent pretty quickly in the

12   process that there were some issues with the drives.  We

13   weren't getting the amount and types of information that I

14   would expect from that many computers.  Yes.

15        Q.    So did that cause you to reach out to

16   somebody else or a different unit within IRS to get

17   some help digging into the computers?

18        A.    Yes.  I had asked Special Agent Smith basically who

19   he went to to ask his more technical questions, and since it

20   appeared that we were having a hard time getting the

21   information that I thought should be on the drive -- for

22   instance, e-mail.  I found it very hard to believe that Agent

23   Smith wasn't able to retrieve some e-mail off these computers

24   because, you know, e-mail is on most computers these days.

25             So I asked him who he goes to to ask his questions

1    to and he referred me to Jeremy Christianson.  And I reached

2    out to him for some help with the computers.

3        Q.    And so over -- did you -- were the drives

4    sent to then Mr. Christianson?

5        A.    Yes.  I asked Agent Smith to send the drives, the

6    relevant drives, to Agent Christianson to process and analyze.

7        Q.    And did you work with him over a period

8    of time?  Was this a lengthy process?

9        A.    Yes.  It was quite a lengthy process.  Once

10   Mr. Christianson got the computer drives and he processed them

11   and he would let me know what was there, I told him directly

12   that I expect that there should be some e-mail in the system.

13   And he then went out and did his technical work to find the

14   mailboxes, the e-mail mailboxes that were missing, and my

15   understanding is he did what he needed to do to recover them,

16   repair them, and then get them into a process that I could

17   then review.

18       Q.    Okay.  So his goal was more like a

19   technician to reconstruct, wherever he could, the

20   items that you were looking for?

21       A.    Yes.

22       Q.    And was that at least partially

23   successful?

24       A.    Yes.  I believe it was partially successful.  He

25   retrieved --

1          MR. WAX:  Your Honor, I'm going to object.  We heard

2     from Mr. Christianson.

3          MR. CARDANI:  Just by way of background.  We didn't get

4     it all.

5          THE COURT:  I'll let her answer this question.  Go

6     ahead.

7          THE WITNESS:  Yes.  I believe that it was successful in

8     that he retrieved one major mailbox that we did not have prior to

9     that.  And he was able to repair it and get it into a format that

10    I could -- I could search.

11         Q.    (By Mr. Cardani)  All right.  And so did

12    he then take his work and send it out to you in a

13    way that you could then continue your

14    investigation?

15         A.    Yes.  What he did for me is basically he took the

16    information from the drives that he was able to obtain and

17    repair and basically fix.  He put them on a laptop for me and

18    installed a program that allowed me to search the drives based

19    on specific search terms that I felt were relevant that we'd

20    put in.  And I'd put the search term in, and then certain

21    documents would pop up with those search terms in it, and I'd

22    review them.

23         Q.    And if you found something particularly

24    pertinent, would Agent Christian -- Christianson be

25    able to help you identify forensically which drives

1  those came from and the history behind certain

2  e-mails?

3       A.   Yes.  In fact, when I would find a document, I felt

4  that it was very important to bring it to Mr. Christianson's

5  attention because, again, he's a computer specialist and I

6  relied on his computer knowledge to help me figure out, okay,

7  if I found this particular e-mail, is there more e-mails

8  within that e-mail chain?  And where was this found, which

9  drive, and that type of thing.

10      Q.   Was this a long process?

11      A.   It was a very long process, yes.

12      Q.   Months?

13      A.   Years.

14      Q.   Years.  Okay.  Now, you mentioned search

15  terms.  So when you got the product from Agent

16  Anderson -- Agent Christianson, you used search

17  terms to try to find things that were in the

18  computers that may be pertinent to your

19  investigation?

20      A.   Yes, I did.

21      Q.   Give us some examples of those type of

22  search terms that you used.

23      A.   Okay.  I felt the relevant search terms to use to

24  search the computers were search terms like:  Chechnya, the

25  defendant's name, both his last name, his Muslim name,

1    Yunus -- you know, Abu Yunus, things like that.  AU, refugees,

2    Soliman, money, mujahideen, terms like that.

3        Q.   Did you end up retrieving a large amount

4    of information that was responsive to some of your

5    search terms?

6        A.   Yes.  There was large volumes of information that I

7    had to comb through with these search terms.  And, again, just

8    because I would use one search term, there's various different

9    ways to spell Chechnya and things like that.  So those search

10   terms would then evolve into variations and that kind of

11   thing.  So it just kept growing and growing and growing, and

12   it took quite a substantial amount of time.

13       Q.   Okay.  So, incidentally, these computer

14   hard drives that you worked off of getting this

15   information are the same ones -- exact copies of

16   those were provided to the defense long ago; is

17   that right?

18       A.   Yes.  That's correct.

19       Q.   Now, there's been a reference to lots of

20   exhibits, in here and several of them start with

21   the letters SW.  Why is that?

22       A.   Let's see.  The SW exhibits, at least the ones I

23   have on JC-4, those are the various items that I collected

24   from my searches off the computers.  So there are other SW

25   documents, however, the ones that came from the computers I

1    collected and put on JC-4.

2        Q.    Working with Agent Christianson as -- in

3    terms of finding out where they came from and all

4    of that?

5        A.    Yes.   That's correct.

6        Q.    Now, we've selected -- I'm sorry.   There

7    have been several search warrant-related computer

8    exhibits that we're going to get into now.   Have

9    you attempted, in preparing for your testimony

10    today, to kind of put those -- put them into some

11    rough chronological format to walk through your

12    testimony leading up to the El-Fiki money being

13    transferred to Ashland?

14        A.    Yes.   And I should probably clarify.   The items on

15    JC-4, the ones that I'm referring to to testify today, these

16    are a small portion of the total e-mails that I reviewed.

17    What I did is I tried to take a sampling of different types of

18    things like e-mails, word documents, web pages that

19    Mr. Christianson was able to pull up which showed Internet

20    activity.   And what I did was I took what I thought were

21    relevant documents and e-mails and web pages from the time

22    period of about January 2000, through when the El-Fiki money

23    came up, to about the time of the filing of the 2000 tax

24    return.

25        Q.    Okay.   So you tried to stick relatively

1    within parameters to help refine the amount of

2    information that we were putting before the jury?

3        A.    Yes.

4        Q.    Okay.  But is it true that these SW

5    computer exhibits represent a fraction of the

6    overall amount of information that were found in

7    the al-Haramain computers?

8        A.    Oh, absolutely.  As far as some of -- like, for

9    instance, the Sheeshaan e-mails that have been shown, there

10   were hundreds and hundreds of those.  And I had to -- I

11   basically combed through those and picked what I hoped to be

12   representation samples of what was there.  So --

13       Q.    Okay.  So let's start with SW-5 and go

14   back to the screens.  SW-5 is the first one that I

15   want you to look at.  And you can use your touch

16   screen if you want but walk the jury through SW-5.

17       A.    Okay.  I'm sorry.  I might get away from the mike.

18   Let me know.

19            This is an e-mail from Abdul Qaadir Abdul Khaliq to

20   q@qf.org and it's an ad for Chechnyan relief.

21       Q.    Now, stop there for a second.  Is that

22   the fellow who's depicted in the bottom right hand

23   of the chart before the jury?

24       A.    Yes, it is.  The bottom right hand is Abdul Qaadir

25   Abdul Khaliq.

1    Q.    And is he the one who's been identified

2  as the author or at least the sender of these

3  Sheeshaan e-mails involving the Chechnyan

4  mujahideen?

5    A.    Yes.  Mr. Abdul Qaadir Abdul Khaliq is the author of

6  the Sheeshaan e-mails and he is -- he calls himself the online

7  news editor for the al-Haramain online website also.

8    Q.    Now, the ones we're getting into right

9  now, do these have the Sheeshaan -- is it your

10 understanding -- did the Sheeshaan e-mail group

11 exist at this point or were these before it?

12   A.    I believe this is before the Sheeshaan e-mails began

13 going out.

14   Q.    Okay.  So what do we see depicted in this

15 January 4th e-mail from Mr. Abdul Qaadir?  Oh, is

16 it true that most of these came out of Seda-Eight?

17   A.    Yes.

18   Q.    Okay.

19   A.    Yes, it is.

20   Q.    And to never -- if the jury wants to

21 verify that, they have the Exhibit JC-4?

22   A.    Yes.  On the Exhibit JC-4, I am looking at the first

23 item which is SW-5 which is the e-mail that we were just

24 discussing.

25   Q.    Okay.  And it's up on the screen, but

 1    that's a -- in the right-hand side there, that's

 2    the chronological fashion that we've put these

 3    things together.  So they can have some help if

 4    they want to look at these and see where they came

 5    from.  But we see that most of these came out of

 6    Seda-Eight, the whole first page and then -- on and

 7    on --

 8        A.    Yes.  This is correct.

 9        Q.    -- with a few exceptions?  Okay.  So

10    getting back to SW-5, we have Mr. Abdul Qaadir

11    doing what here?

12        A.    He's sending the Chechnyan Relief Fund document to

13    q@qf.org which is an e-mail address associated with the

14    defendant.

15        Q.    Okay.  And let's look at that -- that

16    attachment.  Is it your understanding this was

17    promoted on the al-Haramain website later?

18        A.    Yes, it was.

19        Q.    Okay.  And there's a reference both to

20    the Riyadh version of al-Haramain at the top?

21        A.    Yes.

22        Q.    And then it talks about the Chechnyan

23    relief fund, you see that?

24        A.    Yes.

25        Q.    And then down below there's a reference

1    to what?

2        A.   There's a reference to the al-Haramain Educational

3    Center in Ashland.  They give the e-mail address, and the fact

4    that it's in Ashland, Oregon, some phone numbers, and that

5    kind of information.

6        Q.   Okay.  And so this went over al-Haramain

7    -- it was published on al-Haramain.org later on?

8        A.   Yes.

9        Q.   Okay.  And then if a contributor or a

10   donor wanted to give money to support this, they

11   could send their money to al-Haramain either here

12   in Oregon or to al-Haramain at the al-Rajhi Bank in

13   Saudi Arabia?

14       A.   Yes.

15       Q.   Okay.  If we could move on to SW-6.

16   Dated the same day, Tuesday, January 4th, what is

17   this?

18       A.   This is an e-mail from Soliman Al-But'he to the

19   Ashland al-Haramain office with a CC to the defendant at

20   p@qf.org.

21       Q.   Okay.  And is the attached the ad for

22   Chechnyan relief fund -- you've seen that.  Is it

23   the same one that we've seen -- that we saw on the

24   previous exhibit?

25       A.   Yes.

1    Q.   So the defendant's receiving this from

2    two different sources now then on the same day?

3    A.   Yes, he is.

4    Q.   And this one's from Mr. Al-But'he?

5    A.   Yes.

6    Q.   Okay.  SW-7.  All right.  The next day.

7    What do we have here?

8    A.   This is an e-mail from, again, Abdul Qaadir to

9    undisclosed recipient list.  And the subject is:  Editor's

10   word 32.  Do you want me to describe the e-mail?

11   Q.   No.  What's the -- what's the import of

12   this?  What's the -- is there a reference to the

13   al-Haramain online newsletter here?

14   A.   Yes.  Mr. Abdul Qaadir Abdul Khaliq calls himself

15   the online news editor for the al-Haramain website, and he is

16   stating that there is a new article coming out in the new --

17   in the new issue.  And this is going to wet your whistle

18   basically as to what you're going to see in that issue.

19   Q.   And a reference to the al-Haramain.org

20   website?

21   A.   Yes.

22   Q.   Okay.  If we could go to page two of

23   that.  And down towards the bottom, this went out

24   -- this was actually published on the al-Haramain

25   website?

1        A.    Yes, it was.

2        Q.    Okay.  And we see -- talking about down

3   here:  "Aid our mujahideen brothers in Chechnya.

4   Unify their rows.  Gather them on word of truth.

5   Oh, Allah.  Aim their firing and strengthen their

6   determination," and so on and so forth.  You

7   recognize that?

8        A.    Yes, I do.

9        Q.    Okay.  All right.  In the paragraph up

10  above, we don't need to read it, but it talks in

11  similar fashion; is that right?

12       A.    Yes.  Yes, it does.

13            MR. WAX:  Your Honor, excuse me.  I'm going to object

14  to this line of testimony.  The government went through all of

15  these with Mr. Christianson and I think that this is repetitive.

16            MR. CARDANI:  I'll try to go through it pretty quick on

17  the ones that we've covered, Judge, but I think putting them in

18  this fashion helps prove a different point.

19            THE COURT:  All right.  Just be quick about it.

20       Q.    (By Mr. Cardani)  SW-8.  All right.

21  Eight days later, what happened here?

22       A.    This -- this is an e-mail, again from Abdul Qaadir,

23  to undisclosed recipient.  And it is news from the mujahideen.

24  And then with this is attached photos of Russians killed and

25  -- looks like other military type information.

 1      Q.   Okay.  And there are coming out from

 2   Abdul Qaadir into the al-Haramain computers now.

 3   We've seen this before, but there are a series of

 4   pictures depicting acts of war; is that right?

 5      A.   Yes.

 6      Q.   Now, this came about a week after those

 7   Chechen relief fund e-mails came out?

 8      A.   Yes.  Yes, they did.  About a week after that but

 9   yet still before the El-Fiki money comes.

10      Q.   Okay.  SW-10.  Why did you -- this is one

11   I don't think the jury has heard about.  Thursday,

12   January 20th, 2000, from Abdul Qaadir.  Why is this

13   significant, Agent Anderson?

14           MR. WAX:  Excuse me, your Honor.  I'm going to object

15   to why it's significant.  I believe the witness can testify to

16   the content but not offer any opinion.

17           THE COURT:  Sustained.

18           MR. WAX:  Thank you.

19      Q.   (By Mr. Cardani)  Okay.  Please tell us

20   why you selected this one?

21           MR. WAX:  Again, objection, your Honor.

22           THE COURT:  Overruled.

23           THE WITNESS:  Okay.  I selected this particular e-mail

24   because this is what appears -- this basically states that this

25   is the start of an e-group.  And he's telling the persons that

1    he's e-mailing that if you do not want to receive this particular

2    e-mail group or e-listing, all you have to do is send him back an

3    e-mail saying:  Please remove me from the e-group.

4        Q.    (By Mr. Cardani)  And that last line

5    there:  Darned?

6        A.    Oh.  "Darned if I want to be accused of spamming and

7    annoying people," yes.

8        Q.    Okay.  And it goes on:  "As you know, I

9    regularly send out reports about the Chechen

10   mujahideen and occasionally forward other articles

11   of interest, however, if you do not want to receive

12   these mailings, I will not force them on you."

13       A.    Yes.

14       Q.    SW-11.  Okay.  January 22nd, the jury's

15   heard a lot about this.  We won't go into it.  But

16   is this "what support" e-mail involving -- well,

17   what is this?  Why did you select this?

18       A.    This is the "what support" e-mail that

19   Mr. Christianson had talked about.  I picked this one because,

20   one, it's within my time period that I -- that I had specified

21   as being important.  It's about a month before the funds

22   actually came in.  A month before the funds from Mr. El-Fiki

23   comes in.  And there were several different items on the

24   computer that had the same information, including this e-mail.

25   There was also a Word document.  And I believe there was a Web

192

C. Anderson - D

1   page also.

2       Q.   Before we leave this one, what about the

3   from section of this?

4       A.   Yes.  It is from p@qf.org to Al-But'he, and p@qf.org

5   is an e-mail address associated with the defendant.

6       Q.   And the subject line of "what support"

7   would have come from the sender?

8       A.   Yes.  It would have.

9       Q.   SW-12, two days later.  Why this one?

10      A.   Again, it's within my time frame, and I believe that

11  there is some discussion -- yes, there is.  There's some

12  discussion in this e-mail regarding how to send donations to

13  the Muslims in Chechnya.  So I felt that was relevant.

14      Q.   And then if we could go to the second

15  page of that, question three down below.  Is that

16  part of what you're referring to here?

17      A.   Yes.

18      Q.   And then the next page under D?

19      A.   Yes.  "By collecting as much money as possible from

20  friends, families, relatives, and contacts, and mosque centers

21  everywhere."  Yeah.

22      Q.   Okay.  And E?

23      A.   Yes.  Specifically this talks about if you know

24  anybody from reputable aid organizations to inform them about

25  the mujahideen needing help and doctors.

1      Q.   SW-13, the same day?

2      A.   Yes, it is.

3      Q.   Okay.  And why did you select this one?

4      A.   Let's see.

5           MR. WAX:  Your Honor, I'm going to ask for a continuing

6      objection to the "why did you select" question.

7           THE COURT:  You may have it.

8           MR. WAX:  Thank you.

9           THE WITNESS:  Okay.  I believe -- I'm going to double

10     check this.  I believe this may be the first e-mail from the

11     Sheeshaan group.  Let me check something.  Yes.  I believe it's

12     the -- one of the first e-mails anyway from the Sheeshaan group.

13     Q.   (By Mr. Cardani)  Okay.  And, again, from

14     Seda-Eight:  "I have created this e-mail group to

15     more easily facilitate getting a much-read and

16     sought after e-mails that bring information from

17     the Chechen mujahideen website to all those who

18     have requested it."

19     A.   Yes.  So this is, again, I believe the first

20     Sheeshaan e-group.  So now you can get an idea of what the

21     e-group is going to be talking about.

22     Q.   If we could scroll down just a little bit

23     before we leave this one.  Down here.  "To post a

24     message, send it to Sheeshaan@egroups.com.  And

25     then to unsubscribe, send a blank message."

1      A.    Yes.  Again, I believe in most of the Sheeshaan, if

2    not all of them, they give you the option of unsubscribing.

3      Q.    SW-14, again, the same date,

4    January 24th.  The jury has seen this quite a bit.

5    I won't spend much time on it.  But can you

6    identify this one?

7      A.    Yes.  This is a -- I believe it's another interview

8    with Ibn-ul-Khattab who is the foreign mujahideen leader in

9    Chechnya.  And if we could go down further --

10     Q.    Go down to question four on page two.

11   I'm not sure if you want to talk about something

12   else.

13     A.    Yes.  This is what interests me here is they're --

14   they're asking for funding and that sort of thing.  So this is

15   why I picked this one.

16     Q.    And they talk about down here:  "Most of

17   our weapons are either captured or purchased from

18   the Russian military"?

19     A.    Yes.

20     Q.    "And defeated army is willing to sell all

21   of Russia for money."  And you were focusing on the

22   recruitment of money in e-mails like this?

23     A.    Yes, I was.

24     Q.    SW-16, moving ahead to February 5th.

25   And, again, when was the El-Fiki money actually

1    received here in Oregon?

2        A.   February 24th.

3        Q.   So 19 days before that did this come into

4    the al-Haramain computers?

5        A.   Yes, it did.

6        Q.   And what is it?

7        A.   It is another Sheeshaan e-mail.  Looks like a photo

8    library of different photos.  Yeah.  Basically it's --

9        Q.   It talks about being the first of a

10   series of four mailings that are a sample of photos

11   from website.  And be forewarned, not for faint

12   hearted.  And then did there -- was there a number

13   of photos attached to this e-mail?

14       A.   Yes.  Yes, there were.  And I believe that we only

15   -- I only exhibited this particular one but reviewed the other

16   four.

17       Q.   Okay.  And is this representative of

18   those others and many others found in the

19   computers?

20       A.   Yes.

21       Q.   And some of the pictures that we're about

22   to show are fairly graphic, but are these also

23   representative of the ones you chose to put in

24   here?

25       A.   Yes.

C. Anderson - D

1        Q.    Okay.  If you could scroll through them.

2            And -- okay.  If we could go back to page

3    three.  And they talk about -- there's some

4    commentary here on the right side.  "Dead Russian

5    special forces who bombed innocent civilians"?

6        A.    Yes.

7        Q.    And then down below --

8            MR. WAX:  Judge, I'm going to object.  This has nothing

9    to do with my client.  There's been testimony about this war.

10    This is unduly prejudicial.

11            THE COURT:  Thank you.  Overruled.

12        Q.    (By Mr. Cardani)  And then the commentary

13    on this one here:  "Russian special force humbled

14    by the mujahideen."

15        A.    Yes.

16        Q.    All right.  And then, once again, this

17    was found in the computers from Ashland, Oregon?

18        A.    Yes, it was.

19        Q.    In the deleted sections of Seda-Eight?

20        A.    Yes.

21        Q.    Moving on to SW-55, this isn't the same

22    format so tell us what this is?

23        A.    Oh, yes.  This is a Web page from azzam.com, jihad

24    Chechnya site, and it's requesting Russian translators.

25        Q.    And there's a reference to other sites

1    that have been brought up here, qoqaz.net?

2        A.    Right.    When I saw web pages like this, it became

3    apparent that qoqaz had different web sites for different

4    languages.    And I think I saw, you know, Russian, French --

5    there might have even been Spanish, that kind of thing in

6    there.

7        Q.    If you could scroll down a little bit.

8    Somewhere in there I have in my notes that there

9    was talk about the site going down.    Do you see

10   that?    Do you see that there?

11       A.    Ah, yes.    At the top of what's been isolated here.

12       Q.    Do you see that announcement?

13       A.    Announcement.    Okay.

14       Q.    February 20th of 2000?

15       A.    Yes.    It's stating that there are attempts being

16   made to shut down the site.    And if it's shut down, basically

17   just keep checking back.

18       Q.    All right.    Moving on to SW-20.    Okay.

19   What is this?

20       A.    Oh, sorry.    Oh, yes.    This is an e-mail from the

21   defendant at the Arborist.com to azzam2000@e-mail.com which is

22   the e-mail address associated with Azzam Publications.

23       Q.    What about that e-mail up top, the e-mail

24   address?

25       A.    Yes.    That -- that e-mail address is associated with

1    the defendant at the Arborist business.

2        Q.   Oh, I'm sorry.  Sorry about that.  Okay.

3    So going to that Azzam site?

4        A.   Yes.  And then at the bottom of it I noted that it

5    is basically signed AU which is -- stands for Abu Yunus.

6        Q.   Okay.  SW-18.  All right.  We have

7    another -- okay.  What do we have here?

8        A.   Again, I tried to do a representational sample, so

9    this is another e-mail back to Azzam Publications.  But

10   instead of the previous e-mail, it was an e-mail address used

11   by the defendant from his Arborist account.  This is one from

12   p@fq.org which is the associated with the defendant at the

13   Qur'an Foundation address.

14       Q.   Okay.  And then moving into the actual

15   El-Fiki transaction, SW-22?

16       A.   Okay.  Yes.  This is an e-mail from p@fq.org which

17   is associated with the defendant to Haramain@al-Haramain.org

18   which is the e-mail address for the Saudi-based organization,

19   and it is a confirmation -- or they're seeking confirmation of

20   whether or not the El-Fiki funds had come.

21       Q.   And --

22       A.   Yes?

23       Q.   If we could go to the bottom and I guess

24   work up so we can -- directing your attention to

25   the paragraph that's highlighted here.  Mr. El-Fiki

1    is the sender of this first e-mail?

2        A.    Yes.    It looks like Mr. El-Fiki is the sender of the

3    first e-mail and he is looking -- or he is stating that he has

4    asked his bank in London to make a transaction to the U.S.

5    account for al-Haramain using details that were provided

6    earlier to him.

7        Q.    "Use Zakat in order to participate in

8    your noble support to our Muslim brothers in

9    Chechnya"?

10       A.    Yes.

11       Q.    And then giving banking coordinations or

12   the transaction details -- I'm sorry.    Is that

13   right?

14       A.    Yes.    He's asking for some type of receipt or

15   confirmation.    An e-mail, yeah.    Looks like he's asking for

16   confirmation --

17       Q.    Okay.

18       A.    -- of the receipt.

19       Q.    Okay.    Scroll -- I'm sorry.    If we could

20   scroll up a little bit on that and then take the --

21   the first one here.    What's this one right here?

22   It says:    From al-Haramain to Pete?

23       A.    Yes.    This is, again, an e-mail from the Saudi

24   organization in Riyadh to the defendant regarding this

25   transaction.    It's signed:    Soliman.    And he's asking the

1    defendant to check for the funds transfer basically and let

2    him know.

3        Q.    Okay.  And then up top, the last one,

4    where the defendant responds or somebody using

5    p@qf.org responds saying what?

6        A.    He's asking do you know the donor and that he wanted

7    to advertise in Islamic Horizon, which I understand is a

8    magazine for dawah work for refugee relief fund.

9        Q.    Can we go to AHIF-8 please?  Taking you

10   briefly out of the search warrant series, but do

11   you recognize this same e-mail traffic but

12   something a bit more to it on February 21st, the

13   top?

14       A.    Yes.  Then an e-mail is sent back from the Saudi

15   organization to P, which I believe is p@qf.org, regarding:

16   No, I don't.  Did you receive the money?

17       Q.    Okay.  February 21st?

18       A.    Yes.

19       Q.    All right.  SW-23.  The top here,

20   Al-But'he to Pete, one day before the money arrives

21   in Oregon?

22       A.    Yes.  The date was significant because, again, it's

23   one day before the money arrives.  And then the e-mail is

24   discussing charities and how Islamic charities are being

25   affected by scrutiny by the government -- government.

C. Anderson - D

1    Q.   Now, there's been some testimony

2    forensically that this -- this paragraph had been

3    highlighted in -- by the sender named Al-But'he.

4    "U.S. officials also said they had discovered

5    through the massive probe that a significant number

6    of Islamic terrorists are --"

7             THE COURT:  Slower please.

8             MR. CARDANI:  I'm sorry.

9    Q.   (By Mr. Cardani)  "-- are concealing

10   their activities and sources of funds by using

11   charitable organizations as fronts.  Since many of

12   these charities do substantial community service

13   work, investigating them is not easy and can

14   subject the FBI or foreign law enforcement

15   authorities to allegations of targeting religious

16   or ethnic groups, sources said."  That's one day

17   before the El-Fiki money came?

18   A.   Correct.

19   Q.   And we know -- I'm not going to run

20   through all the bank records but -- unless we need

21   to -- the bank received the El-Fiki donation here

22   in Oregon on February 24th?

23   A.   Correct.

24   Q.   By way of a wire transfer?

25   A.   Yes.  By way of a wire transfer from Mr. El-Fiki's

1    London account.

2    　　　Q.　So is the money here -- SW-24 please.

3    This is one day after the money was -- had arrived?

4    　　　A.　Yes.　It's the day after the money has arrived, and

5    this is an e-mail from the defendant from his Arborist account

6    to ferhad@aneiva.com.　This individual was Ferhad Erdogon who

7    is an acquaintance of the defendant's.

8    　　　Q.　Okay.　Okay.　There's a reference to that

9    Gogaz (sic) site?

10    　　　A.　Qoqaz, yes.

11    　　　Q.　All right.　And then down below this is

12    -- if we could scroll down a little bit, the title

13    of this?

14    　　　A.　Yes.　It's a biography of a Turkish mujahideen

15    martyred in Chechnya.

16    　　　Q.　SW-27.　Okay.　February -- go ahead.

17    What's significant about this?

18    　　　A.　Yeah.　I -- I chose this one, again, because we are

19    within the time period.　The funds have come in from

20    Mr. El-Fiki but the funds have not been distributed yet.　And

21    this is a -- a sample of a Sheeshaan e-mail that came in

22    during that time period talking about how somebody can train

23    themselves for jihad.

24    　　　Q.　All right.　SW-28.　When did

25    Mr. Al-But'he go to the bank with Mr. Seda to get

1    this money?

2        A.    I believe it was March 10th.

3        Q.    All right.  What happened -- why'd you

4    select this one?

5        A.    This -- this one is one day before the traveler's

6    checks are ordered by the bank from American Express.  And --

7        Q.    Subject line?

8        A.    Yeah.  The subject line is:  "About 13 mujahideen

9    annihilating Russian convoys."

10       Q.    SW-30.  Okay.  This is from -- why'd you

11   select this one?

12       A.    Again, we're in that really critical time period now

13   where the traveler's checks have been ordered.  This is the

14   day before they actually get to the bank and the funds are

15   picked up.  And it is a fatwa by Ibn Jibreen.  And because it

16   is a fatwa, it -- and what it talks about below, I felt that

17   it was significant.

18       Q.    Now, stepping aside from these for a

19   moment, going into the Bank of America records,

20   have you examined the Bank of America records that

21   have been exhibited in this case?

22       A.    Yes, I have.

23       Q.    And with respect to the bank account

24   where the El-Fiki money was received, you've

25   analyzed the contents of that account?

1        A.    Yes, I have.

2        Q.    Did you confirm the wire transfer that

3   came into that account on February 24th?

4        A.    Yes.

5        Q.    And then it went out in March?

6   March 10th and 11th?

7        A.    March 10th, the 131,300 went out, and March 11th,

8   the 21,000 went out.  Yes.

9        Q.    Okay.  Prior to the El-Fiki money being

10  received in that account, was there much money in

11  it?

12       A.    There was a relatively low balance.  And the reason

13  I look for that is if there's a low balance in an account, and

14  let's just say there's two, three thousand dollars in an

15  account, then you get a significant deposit into that account

16  and then you have some type of expenditure of a significant

17  amount.

18            Well, the expenditure is based on that large

19  deposit.  So the funds -- that expenditure is basically using

20  the funds that were previously deposited, the large deposit.

21       Q.    Okay.  So did you do that examination

22  with respect to the traveler's checks that were

23  purchased and the cashier's check that were (sic)

24  purchased out of that account?

25       A.    Yes.  I basically did a small analysis, looked at

1    the account, and determined that neither the American Express

2    checks or the 21,000 could have been purchased without the

3    deposit of the El-Fiki funds.

4        Q.   So ICE-CBP-1.  Next page of that one.

5    Does this confirm Mr. Al-But'he's trip into the

6    United States on March 7th?

7        A.   Yes, it does.  It shows that Mr. Al-But'he arrived

8    in the United States on March 7th.  And then he again departed

9    on March 12th.

10        Q.   Okay.  And AMX-2.  Okay.  This shows that

11    up here on March 7th.  Why is that date

12    significant?

13        A.   March 7, 2000, is the date that the traveler's

14    checks are actually shipped from American Express to Bank of

15    America.

16        Q.   Now, are those serial numbers consistent

17    with the serial numbers on the actual traveler's

18    checks that you were later able to find?

19        A.   Yes, they are.

20        Q.   BOA-7, the check used to purchase the

21    traveler's checks?

22        A.   Yes.  This check was used to purchase the $131,000

23    American Express traveler's checks.

24        Q.   And then BOA-8?

25        A.   Yes.  This is the check that was used to purchase

1    the -- a cashier's check in the name of Soliman Al-But'he.

2        Q.   And BOA-9?

3        A.   That is the traveler -- or that is the cashier's

4    check.

5        Q.   Okay.  Is it your testimony that both of

6    these transactions cleared the account based on the

7    El-Fiki deposit, in other words, it was that money

8    that was necessary to make these things work?

9        A.   Yes, it was.

10       Q.   ICE-FinCEN-1.  Mr. Al-But'he's now

11   leaving the country and filed no CMIRs?

12       A.   Yes.  Once I determined that a significant amount of

13   money had left the United States, I had asked an immigration

14   and customs enforcement officer to check to see if a CMIR or

15   currency monetary instrument report was filed by

16   Mr. Al-But'he.

17       Q.   And it wasn't?

18       A.   And, no, there was no CMIR filed on this occasion.

19       Q.   Okay.  Special Agent Anderson, in your

20   experience, talking about traveler's checks for a

21   moment, are traveler's checks -- you've done a lot

22   of financial investigations?

23       A.   Throughout my 15 years, I've done -- yeah, various

24   types of financial investigations.  I do investigations

25   regarding tax evasion and money laundering, and within that

1    realm, you get various different types including, you know,

2    drug-related cases and things like that.  Yes.

3        Q.    Are you familiar with the concept in

4    financial investigations of follow the money trail?

5        A.    Yes.  That's what I do.

6        Q.    Okay.  And so how do you do that?

7        A.    Basically what you do when you're trying to follow

8    money is, you know, you start with bank records or any type of

9    records that will give you a base point.  And in this

10    instance, we've got at this point -- we've been shown --

11    you've got 131,300 going out to buy American Express

12    traveler's checks and a $21,000 cashier's check.

13            Now, if you're dealing with regular checks, those

14    come back to the bank.  And if you're lucky and the bank

15    hasn't lost them, then you can review the back of those items

16    and take a look to see possibly, you know, where those items

17    were deposited and then track them from there into somebody's

18    account.

19            Unfortunately, with American Express traveler's

20    checks, that same process of trying to identify where they go

21    is much more difficult.  American Express does not keep the

22    information as to where their traveler's checks are actually

23    cashed.  Their system has American Express traveler's checks

24    -- where they were purchased.  Basically where American

25    Express sent the items to, Bank of America.

1          So in the process of trying to find these particular

2     items, I had to contact American Express to find out, you

3     know, do you store this type of information.  I was told, no,

4     they did not.  And then my discussions with that organization,

5     with American Express, led to how can I track these funds if

6     you don't show the disposition of your own checks.

7          And in that conversation, I found that one of the

8     individuals with American Express was lucky enough to actually

9     obtain the original American Express traveler's checks in this

10    transaction that I could then utilize to try and track the

11    funds based on the stamps showing the process -- where the

12    checks were -- the traveler's checks were processed.

13         Q.   Okay.  So we know from the case that

14    we've already introduced the original American

15    Express traveler's checks that were purchased by

16    the defendant and Mr. Al-But'he here in Oregon?

17         A.   Yes.

18         Q.   All right.  And so you say you were lucky

19    enough to actually get them.  Can we go to AMX-1,

20    please, and look at the back side of these checks?

21    And I'd like you to tell the jury, did this help

22    you in your investigation?

23         A.   Yes.  This is -- unfortunately, it's a poor-scanned

24    copy of my -- of the backs of the traveler's checks.  May I

25    touch the screen?

C. Anderson - D

1       Q.    Sure.

2       A.    Okay.  If you can see up here, right up here, it's

3   very light, but it says:  Al-Rajhi Banking and Investment.

4   And from that, I was able to tell that the traveler's checks

5   had been processed by Al-Rajhi Banking Investment and that

6   they used chase Manhattan as their correspondent U.S. account

7   to process them.

8       Q.    Okay.  So if you look at the original

9   checks, can you make that out?

10      A.    Yeah.  The original checks are much clearer, yes.

11      Q.    Okay.  And so AMX -- AMX-3.  What's that?

12      A.    That -- that appears to be a bank stamp from

13  Al-Rajhi Banking Investment.

14      Q.    All right.  Now, I'd like you to step

15  back for a minute, sort of turn -- go -- blacken

16  the screens for a moment if I might and ask you

17  something.

18            Did you attempt -- I'm sorry.  Could we

19  go back to AMX-3?  I missed something.  Did you get

20  these things translated?  There's some Arabic on

21  this stuff.

22      A.    Yes.  I had to get -- I had to get them translated

23  to find out what the stamps said, yes.

24      Q.    Okay.  And did you find out that -- well,

25  what did you find out in the translations?

1       A.    Can you show me -- yeah.  In the translations,

2  again, we saw that it was Al-Rajhi Banking and Investment.

3  That was actually in English so that, you know, I could make

4  it out myself.  And then with the translations, I was able to

5  tell that the traveler's checks were actually cashed at the

6  Al-Hijaz street branch for Al-Rajhi Banking Investment.

7       Q.    Okay.  And then what about the BOA-9-A?

8  If we could go to the back side of that.  Is there

9  some -- you were able to get this from the bank --

10  Bank of America here in the United States?

11       A.    Yes, I was.

12       Q.    Okay.  And there's some Arabic.  Did you

13  get the Arabic translated?

14       A.    Yes, I did.

15       Q.    All right.  If we could go to the next

16  page.  And it translates into --

17       A.    To be deposited to our account number and then it

18  gives me 10920-6.  Again, the Al-Hijaz street branch.

19       Q.    Now, did you, Agent Anderson, attempt to

20  trace further the proceeds of the American Express

21  traveler's checks and the Bank of America cashier's

22  check that went to this -- went overseas?

23       A.    Yes, I did.  Once I determined that the funds had

24  gone to Al-Rajhi Banking Investment in Saudi Arabia, I

25  employed, at first, diplomatic means to try and get these bank

```
 1    records showing the actual deposits or what happened to these
 2    items in Saudi Arabia.  And after that didn't work, I ended up
 3    issuing a subpoena to the Al-Rajhi Banking Investment bank.
 4         Q.   Okay.  How long -- you said diplomatic --
 5    I missed that last part.  You said diplomatic
 6    measures and then what?
 7         A.   And then after that didn't work, I ended up issuing
 8    a subpoena or requesting a subpoena from the U.S. Attorney's
 9    Office to request those bank records from Al-Rajhi Banking
10    Investment in Saudi Arabia.
11         Q.   Had you ever issued a subpoena attempting
12    to get international bank records before?
13         A.   No, I had not.
14         Q.   Was it an easy process?
15         A.   No, it was not.
16         Q.   Okay.  Was it ultimately somewhat
17    successful?
18         A.   Yes, it was.
19         Q.   Okay.  You mentioned diplomatic.  Were
20    there -- how long did this process take?
21         A.   Couple years.
22         Q.   Was there some push back from the bank?
23              MR. WAX:  Objection, relevance.
24              THE COURT:  I didn't hear the question.  I'm sorry.
25              MR. CARDANI:  The question was:  Was there push back
```

 1    from the bank?

 2            THE COURT:  Overruled.

 3        Q.   (By Mr. Cardani)  Was there push back

 4    from the bank?

 5        A.   Oh, I'm sorry.  Yes, there was.

 6        Q.   And did that result in some -- a lot of

 7    legal back-and-forth as well?

 8        A.   Yes.  There was -- again, there was some legal back

 9    and forth on whether or not they were going to comply with the

10    subpoena and, ultimately, they did.

11        Q.   Okay.  I'd like to go to what's been

12    marked as ALR-1-A.  Is this a certification of the

13    Al-Rajhi bank records that ultimately made their

14    way over from Saudi Arabia?

15        A.   Yes.  This is the certification that came with the

16    first batch of Al-Rajhi records that came over.  My records

17    consisted of basically two batches that they supplied.

18        Q.   All right.  If we could go to -- the

19    third page of that.  Okay.  What's -- what is that?

20        A.   This is -- this is a bank receipt from Al-Rajhi

21    Banking Investment showing that -- showing the $131,000

22    traveler's checks, American Express traveler's checks.  And,

23    again, you can see the serial numbers are reflective of the

24    serial numbers that were on the preorder slip from American

25    Express.  That these particular checks were cashed -- if you

1    can go down further -- they were actually cashed for what

2    appears to be Saudi rials.  486,850 Saudi rials.

3        Q.    SR refers to Saudi rials?

4        A.    Yes.

5        Q.    Is that the currency in Saudi Arabia?

6        A.    Yes, it is.

7        Q.    Now, there's a bunch of letters on this.

8    If we could get a snapshot of this and to the

9    right.  You see some letters like FGH and things

10   like that?

11       A.    Yes.  The letters correspond to translations that I

12   had done so that I could understand, you know, everything

13   that's on the document.  So these items were translated.

14       Q.    Okay.  So in these records for the jury,

15   we have the receipt without these letters but then

16   the translated version with letters that have been

17   added by the translators to associate the English?

18       A.    Yes.  To help me understand basically what -- what

19   was on every line and understand what was in Arabic that I

20   didn't know.

21       Q.    Okay.  And so if we could go to the next

22   page.  Now, so you're saying the bottom right here

23   is the translation of that same receipt?

24       A.    Yes.  And what this helped me with was if you look

25   at item F, it shows that the person that cashed these

1    traveler's checks was Soliman Hamd Al-But'he or Al-But'he.

2        Q.    And how about C, the date of the

3    transaction?

4        A.    Yes.  The date was March 14th, 2000.  And that was

5    significant to me because my records show, again, that

6    Mr. Al-But'he flew out of JFK on March 12th, arrived in Saudi

7    Arabia on March 13th, and then it appears here that these

8    traveler's checks were cashed on March 14th.

9        Q.    Now, anything more on the Al-Rajhi

10    records with respect to the traveler's checks?

11        A.    No.  I think that's --

12        Q.    All right.  Did you also successfully

13    obtain bank records from the Al-Rajhi bank

14    concerning the disposition of the cashier's check,

15    $21,000 cashier's check?

16        A.    Yes, I did.

17        Q.    So let's start with the statement.

18            Oh, I'm sorry.  This is from the same

19    Exhibit ALR-1-A.  Page -- all right.  Are these

20    part of the Al-Rajhi records concerning the

21    cashier's check?

22        A.    Yes, they are.  And -- may I explain?

23        Q.    Yeah.

24        A.    Okay.  As you can see -- I'll try not to mess it up.

25    If you can see here, it shows a credit into the account of

1    Mr. Soliman Al-But'he.  78,729 reflects the 21,000 in Saudi

2    rials.  I believe that the conversion rate is 3.749.  And it

3    shows it as a deposit.  And here, it shows a date of

4    April 8th.

5         Q.   Where do you see April 8th?

6         A.   Right here.

7         Q.   Oh, okay.  All right.  So this is the

8    statement of account for the account of Soliman

9    Al-But'he in Saudi Arabia?

10        A.   Yes.

11        Q.   And what you're saying here is this shows

12   that on April 8th he deposited our cashier's check

13   into this account and was credited with 78,000

14   rials?

15        A.   Yes.  And I should probably explain that.  The

16   deposit actually didn't occur on 4-8.  With a cashier's check

17   of this type, any time you try and process an instrument like

18   that overseas, in general, it takes about, you know, 15 to

19   20 days in order for it to process.  Because the process is

20   that the cashier's check goes to the foreign bank, Al-Rajhi

21   Banking investment.  They then have to go to their U.S.

22   correspondent account to then go back to the issuer of the

23   check to get payment.  And a lot of banks will not credit your

24   account until they have received payment.

25             So that's why you see such a time period reflected

 1    from the time he was back in Saudi Arabia to the credit into

 2    his account.

 3        Q.   Okay.  And so were you able to -- what's

 4    the next page?  Next page?  Okay.  What's this?  If

 5    you hit the lower corner, I think you'll be able to

 6    clear those red lines.

 7        A.   Oh, I see it.  Sorry.  Oh.  Hm.  I don't think it's

 8    working.  Oh, there it goes.

 9        Q.   Okay.  What do we have here?

10        A.   Okay.  This is -- this is also a deposit record for

11    the bank.  A lot of it's in Arabic, but what I can read

12    without the translation is the 21,000.  It's a Bank of America

13    cashier's check.  And I'm afraid the rest is in Arabic.

14        Q.   Okay.  Can we have the translation on the

15    next page?  Okay.  So what does the translation

16    tell you?

17        A.   The translation tells me that the account was

18    credited on April 8th of 2000.  Again, the Al-Hijaz road (sic)

19    branch for the account of Soliman Hamd Al-But'he.  The rate

20    was 3.749.  I guess I got that right.  Okay.  And his account

21    number is 10920 as we saw earlier.

22        Q.   Okay.  Did you get more Al-Rajhi records

23    that showed how Mr. Al-But'he used this money once

24    it hit his account?

25        A.   Yes.  I got somewhat limited records, but after the

```
 1   April 8th credit on the account, I received bank statements
 2   for that April 8th, and this -- once this was credited to his
 3   account, he had other ins and outs.  But basically it appeared
 4   that it stayed in the account and it's starting to dwindle
 5   down basically.
 6       Q.   Spent --
 7            THE COURT:  How much more do you have, counsel?  Looks
 8   like more than one page.  I think we'll take a break now.
 9            MR. WAX:  Your Honor, can we have a moment with you
10   after the jury goes out?
11            THE COURT:  Yes.  I have another something too.
12            Members of the jury, I've decided to find a way to get
13   you out of here somewhat earlier tomorrow.  Some of you, I know,
14   have plans that aren't here local.  And mine are at Autzen
15   Stadium so it's really easy for me.  But you probably have other
16   things that you're going to do with the holiday weekend.  And so
17   I don't know exactly what time it will be, but I'm going to try
18   and plan accordingly.  All right?  Thank you.
19                         (Jury exits courtroom.)
20            THE COURT:  9:00 tomorrow.
21            MR. WAX:  And are they coming back tonight or are you
22   excusing the jury now?
23            THE COURT:  Actually, I misread the clock.  I think
24   I'll give you ten minutes since you're standing up.
25            You may step down.
```

1           The testimony hasn't been scintillating today and I

2   guess I thought it was 5:00.  All right.

3           If you have something now, that's fine.  I'm going to

4   -- we're going to have a session with those lawyers with security

5   clearance after court today.

6           MR. WAX:  Okay.  Our question, your Honor, has to do

7   with scheduling.

8           THE COURT:  Yes.

9           MR. WAX:  We scrambled and we got some witnesses up

10  here today, and at least one says that it would be exceedingly

11  difficult to stay overnight.  So --

12          THE COURT:  Who is that and what is their testimony

13  about?

14          MR. WAX:  That's Rabbi Zaslow.

15          THE COURT:  All right.  I assume that the testimony

16  will be short?

17          MR. WAX:  Maybe a half hour.

18          THE COURT:  All right.  Well, and how much longer do

19  you think you have with this summary witness?

20          MR. CARDANI:  I have three subjects.  I would say

21  probably 15 to 20 minutes.

22          THE COURT:  And what do you anticipate for cross?

23          MR. WAX:  I'm wondering if it might make more sense if

24  you're agreeable to take the rabbi this evening and then do the

25  cross tomorrow because I do not imagine -- if Mr. Cardani goes

    1    another, you know, past 4:30, I'm certainly not going to be done
    2    by 5:00.
    3            THE COURT:  Well, I'll take -- I'm going to see how it
    4    goes, frankly.  I'm not going to keep the jury real late tonight.
    5    It's been a brutal day for a juror or a judge sitting here, and
    6    that's just the truth.  I'll find another day for him to come
    7    back if we have to, but we'll take our short break right now.
    8            MR. WAX:  Judge, in terms of next week, my best guess
    9    would be that we may finish Tuesday.  You know, certainly
   10    Wednesday at the latest and then sometime during the day.  So I
   11    don't anticipate that we're going to have a time crunch.
   12            THE COURT:  All right.  I told my staff that we would
   13    be instructing on Wednesday.  Never done this before.  But --
   14            MR. MATASAR:  Worst case.
   15                    (A short recess was held.)
   16                        (Jury present.)
   17            THE COURT:  We're waiting for one more.  We've got
   18    enough here though.  I'm going to -- you know what I do most days
   19    is judicial mediation.  I do a lot of that.  So I'm going to make
   20    an offer to you.  We actually don't decide things in a courtroom
   21    by majority vote.  I get to decide in here.
   22            But I'm just looking at our schedule.  I've been
   23    talking to the lawyers during the break.  I'd like to finish this
   24    witness, and then we only have one more short witness, and that
   25    could take us until 6:00.  But if you're willing to hang in there

1    with me that long today, then I'll recess midday tomorrow.  Can

2    you go along with that with me?  All right.  That'd be wonderful.

3    That's what we'll do then.  Thank you.

4              Okay.  What we're going to do, counsel, then is -- just

5    a moment.

6                   (A discussion was held off the record.)

7              THE COURT:  That's fine.  Had to do with a phone call,

8    counsel.  We're going to finish this witness and take care of the

9    witness and we're shooting for 6:00 to get out of here.  All

10   right.  So let's not waste any time.

11             MR. CARDANI:  Okay.  May I proceed, your Honor?

12             THE COURT:  Yes.  Please do.

13             **DIRECT EXAMINATION OF COLLEEN ANDERSON** (continued)

14   BY MR. CARDANI:

15        Q.   Special Agent Anderson, ALR-2, the last

16   Al-Rajhi bank record that I want you to look at.

17   Are you familiar with this document coming out of

18   Saudi Arabia?

19        A.   Yes, I am.

20        Q.   Okay.  I'd like to go to page one of the

21   actual document.  In the upper right-hand corner,

22   identify what we're looking at here.

23        A.   Yes.  This is basically a bank statement from

24   Al-Rajhi Banking Investment for the account of Soliman

25   Al-But'he.

1    Q.   All right.  And then if you could go to

2    -- if you could go to page three of that document.

3    All right.  Page three of the same account, if we

4    could scroll down.  Were you able -- for the

5    benefit of these records, were you able to show

6    that this was -- that the cashier's check of

7    Mr. Al-But'he was deposited into his account?

8    A.   Yes.  The cashier's check that we discussed, the

9    21,000 which converts to 78,729 in Saudi rials, was deposited

10   into Mr. Al-But'he's personal account on 4-8.

11   Q.   Okay.  And there are translations -- and,

12   well, if we could go a little bit further and then

13   go on to the next page.  Were his -- his account

14   was then credited with this transaction?

15   A.   Yes, it was.

16   Q.   And then if we could go to the next page.

17   What's depicted here on the next page in

18   Mr. Al-But'he's bank records?

19   A.   Basically you have some debits and credits going in

20   and out like any bank statement.  And then what it shows here

21   is that the funds remain in the account.  And up to the time

22   of the records that I have, it shows it remains in the account

23   and it's starting to be spent down.

24   Q.   All right.  And there are other records

25   as part of the ALR-2 series that are English

C. Anderson - D

1    translations which similarly have those -- those

2    letters and all of that; is that right?

3        A.   Yes.

4        Q.   Okay.  But they -- anything else you want

5    to add before we leave the Al-Rajhi records?

6        A.   Well, specifically when I got these bank statements,

7    what I was looking for was any type of movement of the funds

8    anywhere else other than his personal bank records, and I

9    could not find that.

10       Q.   Okay.  Turning to a different subject

11   here, if we could go to SW-17.  What's that?

12       A.   Yes.  This is a Hotmail e-mail from --

13       Q.   Look at the very top.

14       A.   Let me see.  Yes.  It's the ptichka1@hotmail and it

15   is to qoqaz.net.  And this particular e-mail was of interest

16   because the individual describing themselves as ptichka1, who

17   is using the computers at -- let me start again.

18           The individual that is ptichka@hotmail is using the

19   computers at al-Haramain Islamic Foundation in Ashland to

20   correspond with Qoqaz and they are discussing translations.

21   And if you can see down here, they reference her as -- oops,

22   if you can clear that.  It just moved up.  They reference here

23   as:  Dear sister.

24           And the -- it goes on to discuss this individual

25   doing translations for the website.

C. Anderson - D

1        Q.    Okay.  And then SW-29?

2        A.    Yes.  This document was important to me because the

3    previous document that we saw was captured by my computer

4    specialist showing that this individual, who calls herself

5    ptichka1@hotmail.com, she is shown here in the CC.  And the

6    defendant at the Arborist address, pete@thearborist.com is

7    e-mailing an individual at webmaster@ichkeriya.com, and the

8    subject matter of the e-mail is that:  "We are working on a

9    Russian website and I would like to ask you is it okay if we

10   use your map of Chechnya and disclaimer on our Russian

11   website.  Please reply ASAP."

12           So this particular e-mail stuck out to me because

13   the defendant right here cc'd ptichka regarding the e-mail

14   requesting use of this map for this Russian website that is

15   associated with qoqaz.com.

16       Q.    And he referred to it as:  "Our Russian

17   website"?

18       A.    Yes.  And in this it says:  "Our Russian website."

19       Q.    All right.  I'd like to turn to a new

20   subject here, SW-21.  All right.  Go ahead.

21       A.    Yes.  I picked this particular one because Mr. Al

22   Shoumar, who is -- yeah.  Right there.  This is one of the

23   series of e-mails that Mr. Al Shoumar sends to p@qf.org which

24   is an e-mail address associated with the defendant.  And in

25   this e-mail, he lays out the fact that he is responsible to

C. Anderson - D

1    handle the financials of the Ashland, Oregon branch.  And it's

2    basically an introductory -- introductory letter saying:  Here

3    I am.  I'm going to be -- you know, I'm responsible for the

4    financials here.  I'm going to be asking you for things and

5    that kind of thing.

6         Q.   Okay.  And down here, there's a reference

7    to brother Abu Yunus?

8         A.   Yes.

9         Q.   Oh, and a little bit lower.  Reference to

10   using Quicken software to record all transactions

11   starting in January 2000?

12        A.   Yes.  And that was somewhat surprising to me.  This

13   particular -- particular individual, Al Shoumar, who is an

14   accountant, seems to be wanting them to use Quicken software

15   versus the QuickBooks software that the U.S. accountant wanted

16   to use for the U.S. organization.

17        Q.   All right.  And it's -- al Shoumar is his

18   last name here?

19        A.   Yes.

20        Q.   All right.  His name is up there on the

21   chart?

22        A.   Yes.

23        Q.   Okay.  SW-43.  Does this also involve

24   this fellow Shoumar?

25        A.   Yes.  Again, it is another e-mail from Mr. Shoumar

C. Anderson - D

1   and this time it is to the defendant and the codefendant,

2   Soliman Al-But'he.

3       Q.   Okay.  And it references what?

4       A.   References some clarifications.  And it appears in

5   the e-mail that -- let me see -- that Mr. Shoumar is concerned

6   about financial issues --

7       Q.   Can we go to page three of that?

8       A.   Yeah.

9       Q.   All right.  That last paragraph?

10      A.   Yes.  This is -- this is part of the initial e-mail

11  chain.  What you're seeing here is actually this document has

12  got some back and forth going on.  And basically the bottom is

13  the first e-mail, and then they reply, and it kind of goes up

14  from here.  So this is the bottom of the e-mail.

15          And in this one, Al Shoumar cc's Soliman Al-But'he

16  and states that he would appreciate it if you'd send all the

17  amounts that has nothing to do with the foundation business to

18  another account.  Adding this amount to the deposits and

19  expenses in the al-Haramain account would give us the wrong

20  view about the actual situation.

21          So he's -- he's discussing a deposit that he feels

22  has nothing to do with foundation business into the

23  al-Haramain account.

24      Q.   And are there spreadsheets -- several

25  spreadsheets that are attached to this?

1      A.    Yes.  When I went through the spreadsheets, one of

2    the spreadsheets -- and it's a long spreadsheet so I didn't

3    want to show -- show everything, but at the bottom of one of

4    the spreadsheets, if you're familiar with Excel, for instance,

5    I don't know that that is what they used in this, but it looks

6    like an Excel-style format anyway, there is a section that

7    says:  Brother Soliman or like a column for Soliman.

8            And in that column, attached to this e-mail, is the

9    21,000 and the 131,300 that we're talking about in the

10   financial transaction.

11     Q.    Okay.  SW-53.  Okay.  What is this?

12     A.    This is one of -- and, again, there were a couple

13   different documents like this where the defendant was sending

14   basically financial summaries to the accountant in Riyadh,

15   Mr. Shoumar, and it basically details some of the incoming

16   expenses and things like that.

17     Q.    Okay.  Keep going down.  Did you find

18   this in Mr. Wilcox's records at all?

19     A.    No, I did not.

20     Q.    All right.  Is there a reference to our

21   transaction here in March 2000?

22     A.    Yes.  Right there.  Yeah.  The 131,300.  If you note

23   that there is no reference on the 131,300 as to why the

24   expenditure was made.  And then for the 21,000, the reference

25   is Bank of America for Soliman.

C. Anderson - D

1        Q.   SW-62.  It's the last Shoumar document

2    I'd like to show you.  But what is this?

3        A.   This is a summary by Mr. Shoumar to the defendant,

4    Abu Yunus, of the Internal Revenue Service letter.  And --

5    yep.  That's what it is.

6        Q.   Okay.  If you could scroll below.  Okay.

7    And is this -- and the following thing an account

8    -- an analysis of some of the information coming

9    out of the IRS about what they can and cannot do as

10   a tax-exempt organization?

11       A.   Yes.  Exactly.

12       Q.   And on the last page:  "Number one, keep

13   case histories and records for all monies

14   distributed with names, addresses, purposes of

15   payment, manner of selection, relationship if any

16   to any members, officers, trustees, donor, et

17   cetera, payment; number two, payment to other

18   organizations should be kept in special record

19   showing whether they are exempt under section

20   501(c)(3); and, three, if the organization

21   receiving funds from al-Haramain is tax exempted,

22   then you should make sure that the money paid is

23   used for the right -- required purpose only"?

24       A.   Yes.  I found this particular section very

25   interesting because, again, Al Shoumar is an accountant in

1    Saudi Arabia for al-Haramain in Saudi Arabia, and he is

2    keeping track of and trying to deal with the records in

3    Ashland.  And he is specifically stating here that you have to

4    keep these type of detailed records regarding distributions.

5          And this stuck out to me because I did not see this

6    type of detail for the Chechnyan transaction.

7    Q.   All right.  And, once again, this was

8    found in the defendant's computers?

9    A.   Yes.

10   Q.   And all the stuff that you've just been

11   talking about, with the exception of the Al-Rajhi

12   records, of course, were found in the Ashland

13   computers?

14   A.   Yes.

15   Q.   Now, if we could turn that off for a

16   minute.  As you did your investigation, did you

17   immediately stumble across in your financial

18   transaction the so-called Chechnya transaction?

19   A.   I'm sorry.  Which part?  The Chechnya --

20   Q.   You were involved in a financial

21   investigation in this case?

22   A.   Yes.

23   Q.   Did you immediately know about the

24   connection with a possible transfer of money to

25   Chechnya?

1       A.    No, I did not.

2       Q.    Did that take some time to kind of figure

3    out?

4       A.    Yes.  Yes, it did.  Basically when I got involved in

5    the investigation, I was reviewing the bank accounts.  My

6    normal procedure is to obtain bank accounts for whatever

7    individuals or organizations that I am reviewing.  And I have

8    them myself or have some assistant pretty much put a lot of

9    their bank activity into spreadsheets so that I can analyze

10   the ins and the outs and it makes it easier for me to

11   determine where the funds went.  Basically I can see the

12   deposits coming into my spreadsheet and then I can see the

13   allocations going out.

14          And when I did that, you could see some large

15   allocations going out.  And obviously the 131,300 and the

16   21,000 are significant, you know, distributions from a small

17   charity like this.  And I couldn't immediately see, you know,

18   where these distributions went.

19          So then I had to start from there on figuring out --

20   going back to Bank of America, getting the records they have,

21   trying to get the cashier's check, reviewing the back of the

22   cashier's check, see who processed it, request additional

23   information from them, you know.  And then, again, ultimately

24   it took me to the Al-Rajhi Bank in Saudi Arabia in order to

25   determine the final -- you know, the disposition position at

1    that point.

2        Q.   How long did this process take you?

3        A.   Year and a half.  Two years.

4        Q.   All right.  So at some point in time did

5    you learn about a possible connection with

6    al-Haramain in Oregon and Chechnya and the funding

7    in the -- of a possible transaction involving

8    Chechnya?

9        A.   Yes.  In the process of trying to track the

10   cashier's check and the traveler's checks, I requested the

11   U.S. attorney's office issue a subpoena to the corporation,

12   al-Haramain Islamic Foundation here in Ashland, the

13   corporation, to get the corporate books and records to help me

14   determine where these funds had gone basically.

15       Q.   All right.  And did those -- was that

16   subpoena given to you?

17       A.   Yes, it was.

18       Q.   And did you attempt to serve that?

19       A.   Yes.  I attempted to serve it on the defendant,

20   however, he was not available.  So I ended up serving the

21   subpoena on Laleh and Summer who were still at the foundation

22   and were -- were the bookkeepers basically.

23       Q.   Did -- is it your understanding that the

24   defendant was married to one of these two

25   individuals at the time?

1    A.   Yes.

2    Q.   And did you serve that subpoena?

3    A.   Yes.

4    Q.   Okay.  And so, over time, did you start

5    getting records -- did you get some records in

6    response to that subpoena?

7    A.   Yes.  Over a period of time, I believe I served the

8    subpoena -- I don't have the exact date for you, but I believe

9    I served the subpoena in June of 2003, and I got approximately

10   three batches of records from attorneys for the foundation

11   pursuant to the Springfield.

12   Q.   Okay.  What do you mean by batches, just

13   -- was that at one time or separate times?

14   A.   Separate times.  So basically I would get the first

15   batch and I was told that more were coming.  I'd get a second

16   batch and then finally a third batch.

17   Q.   But before those second and third come,

18   did you take any steps to refine the request

19   because you weren't getting certain records?

20   A.   Yes.  After the -- after I received the first batch,

21   it was a pretty small batch, and I didn't -- I didn't feel

22   that the types of records that --

23        MR. WAX:  Your Honor, I'm going to object.  This is

24   going to get into a whole collateral matter involving counsel, et

25   cetera.

1           MR. CARDANI:  No, it's not.

2           THE COURT:  Don't go there.

3           MR. CARDANI:  I won't go there.

4           THE COURT:  The objection's overruled.

5           THE WITNESS:  Okay.  After the first batch of records

6    and after reviewing them, I basically typed up a list of, you

7    know, what was there and basically what wasn't there.  What I

8    expected to get that was not received.

9           And so I put together a list of items that I wanted,

10   pursuant to the subpoena, so that we could give them back to the

11   foundation so they could supply those records.

12       Q.   (By Mr. Cardani)  So you met with lawyers

13   representing al-Haramain?

14       A.   Yes.

15       Q.   Okay.  And refined the request.  And did

16   you specifically ask for records relating to

17   Chechnya?

18       A.   Yes.  In my request, I asked for records I believe

19   for Kosovo, Albania, Chechnya, maybe other countries, yeah.

20       Q.   Okay.  And so you -- so you got batches.

21   So over three different times you got records in

22   response to these requests?

23       A.   Yes.

24       Q.   And did you examine all those?

25       A.   Yes.

1       Q.    Fairly large volume of information?

2       A.    Over the three batches.

3       Q.    Okay.  I'm just going to ask you about a

4    couple of them.  AHIF-2.  Okay.  Did you get that

5    in response -- did you get this in response to an

6    official -- excuse me one second.  Did you get

7    those in response to a federal grand jury subpoena

8    served on al-Haramain through an attorney of the

9    al-Haramain U.S. office?

10       A.    Yes, I did.  This particular document I got -- and

11    that would have been I believe batch two that I received it.

12    And this document came from Saudi Arabia.

13       Q.    And this was -- this was during the

14    criminal investigation that you got this?

15       A.    Yes.

16       Q.    All right.  And this document came from

17    Saudi Arabia?

18       A.    Yes.

19       Q.    From the al-Haramain offices?

20       A.    Yes.

21       Q.    Okay.  Now, in another batch, did you get

22    AHIF-3?

23       A.    Yes, I did.  And this -- I believe came in batch one

24    which came from the Ashland offices.

25       Q.    Okay.  So something very similar but from

```
1    a different al-Haramain source?
2         A.   Yes.
3         Q.   All right.  Okay.  So one came from Saudi
4    Arabia, one came from the United States?
5         A.   Yes.
6         Q.   But both came from lawyers here
7    representing al-Haramain?
8         A.   Yes, it did.
9         Q.   Now, AHIF -- if we could go back to
10   AHIF-2.  All right.  What can you tell us about
11   this?
12        A.   Well, as you can see, it appears to be a typed
13   written receipt that is an agreement between Soliman and Abu
14   Yunus stating that he's turning all monies and
15   responsibilities collected for the brothers and sisters in
16   Chechnya over to brother Soliman.  And that Soliman has
17   received $186,644.70 from the defendant and he fully relieves
18   the defendant of all responsibilities to the money.
19        Q.   Okay.  Now, this one came from Saudi
20   Arabia?
21        A.   Yes, it did.
22        Q.   All right.  And you see a date there,
23   March 11, 2000?
24        A.   Yes.
25        Q.   Do you know if this was actually signed
```

1    on that date or not?

2        A.    I have -- actually, I -- I don't know if it -- was

3    signed on this date.  In fact, at the bottom where it says:

4    "I deposit the amount in al-Haramain head office for Chechnyan

5    refugees" at the bottom.

6        Q.    Yes.

7        A.    That -- that couldn't be possible on that date

8    because Mr. Al-But'he hadn't left the country yet.

9        Q.    And is that what you understand to be his

10   signature at the bottom and on the top of this

11   thing?

12       A.    Yes.

13       Q.    Okay.  And this is a reference -- there's

14   a reference here to money being exchanged in the

15   amount of $186,644.  All right.

16       A.    Yes.  That -- another thing that caught my attention

17   on this particular receipt is the amount of money here.  The

18   El-Fiki transaction that we've been discussing is basically

19   131,000 plus the 21.  So you've got 130 actually in traveler's

20   checks and then the 21 which is 151,000.  And this receipt

21   purports that Mr. Al-But'he received $186,644.70 from

22   Mr. Sedaghaty, the defendant, and my review of the bank

23   records show that that's not possible.

24       Q.    How is that not possible?

25       A.    Mr. Sedaghaty -- because the only other funds in the

1    account at this time were deposits made from an organization

2    out of Canada, the Islamic Society of North America, and they

3    had deposited some Canadian funds which was like 50 some, you

4    know, thousand Canadian dollars or whatever that basically

5    translates into about $36,200 or something like that U.S.

6    dollars.  Those funds never left the al-Haramain U.S. account.

7    So they were never given to Mr. Al-But'he to take with him to

8    Saudi Arabia.

9         Q.   So could there have been other monies?

10        A.   No.  There were no other funds of that magnitude in

11   this account.

12        Q.   At this time period?

13        A.   At this time period yes.

14        Q.   All right.  AHIF-3.  What about -- what

15   about this one?

16        A.   Okay.  Again, it's -- it appears to be the same

17   typed written face here, but as you can see, the amounts

18   differ by a little bit.  I think the other one was 186, this

19   is 188.

20             And at this point -- on this one, there appears to

21   be two witnesses signing for it.  And, again, going back to

22   the bank records and my bank analysis, it wasn't possible for

23   Mr. Al-But'he to actually have those funds given to him by the

24   defendant out of the al-Haramain account because those $36,000

25   from the Canadian charity never left the al-Haramain account.

1      Q.   At this time period?

2      A.   At this time period, yeah.

3      Q.   Own.  And this one came from the U.S.?

4      A.   AHIF-3.  Yes.  This particular receipt came from the

5  Ashland office.

6      Q.   AHIF-1 is the last exhibit I'm going to

7  show you.  Almost done.  Okay?

8           Was this part of the materials given to

9  you in response to that subpoena for the records of

10  al-Haramain?

11     A.   Yes, it was.

12     Q.   And this is during the criminal

13  investigation?

14     A.   Yes.

15     Q.   Did that come from Saudi Arabia or the

16  United States?

17     A.   Yes.  This -- this one came from Saudi Arabia.  And

18  as you can see, this -- this is a copy of the cashier's check

19  that was given to Soliman Al-But'he that was then taken over

20  to Saudi Arabia and deposited into his personal bank account

21  and then spent down.

22           So, again, this caused me concern because it says

23  that it's donations for Chechnyan refugees but it was actually

24  deposited into his personal account.

25           MR. CARDANI:  Thank you.  That's all I have.

```
 1              THE COURT:  You may cross-examine.

 2              MR. WAX:  Thank you, your Honor.

 3                        CROSS-EXAMINATION

 4   BY MR. WAX:

 5         Q.   Agent Anderson, good afternoon.

 6         A.   Good afternoon.

 7         Q.   You first got into this case in January

 8   of 2002?

 9         A.   January or February of 2002, yes.

10         Q.   Okay.  When you got into it, the FBI had

11   some records that they turned over to you?

12         A.   Yes.  That's standard procedure.  When requested to

13   do an investigation, my -- they request me basically to take

14   over the financials and to look at them.

15         Q.   And you've become the case agent on the

16   case as you've described?

17         A.   Yes.  I'm a co-case agent.

18         Q.   Okay.  Now, you have told us, I think,

19   that this was the first case in which you've been

20   involved in which you made an effort to serve a

21   subpoena on an overseas bank?

22         A.   Yes, I believe so.

23         Q.   You were also describing the -- sounded

24   like the learning process you went through with

25   respect to the investigation of the traveler's
```

1    checks.  Was this is the first case in which you

2    had made that effort?

3         A.   To look into traveler's checks?

4         Q.   To trace them as you described today?

5         A.   Yes.

6         Q.   Thank you.  You got into this case about

7    four months after September 11th; correct?

8         A.   Yes.  Approximately.

9         Q.   All right.  September 11th was a major

10   turning point in the life of this country?

11        A.   I would agree with that, yes.

12        Q.   And in terms of the nature of the

13   activity of law enforcement, it also caused a

14   little change in that, did it not?

15        A.   Yeah.  Yes.  I would agree with that.

16        Q.   Have you been involved in any cases --

17   investigations before this involving any

18   allegations of activity involving mujahideen

19   overseas?

20        A.   No.  This is my first.

21        Q.   And this was a pretty big event for you?

22   Pretty interesting for you to get into; correct?

23        A.   Yes.  It's an interesting case.

24        Q.   And it was also, as you saw it, a

25   significant one for you in Medford, Oregon.

```
 1    Unusual would it be?  Not in terms of your regular
 2    caseload?
 3         A.   At the beginning of this investigation?
 4         Q.   Yes.  That's what I'm asking.
 5         A.   Yes.  At the beginning of this investigation.
 6         Q.   Thank you.  I think you've told us that
 7    you cast a pretty wide net with subpoenas?
 8         A.   I don't believe I said that.
 9         Q.   You told us you served a lot of subpoenas
10    I think?
11         A.   I don't believe I said that either.
12         Q.   Well, then let me ask.  Did you serve a
13    lot of subpoenas in the course of your
14    investigation in this case?
15         A.   Yes.
16         Q.   Thank you.  You've also indicated that
17    the FBI had served some subpoenas before you got
18    in?
19         A.   Yes, they did.
20         Q.   You subpoenaed bank records?
21         A.   I subpoenaed additional bank records and then also
22    some new ones.  But basically, in the beginning, what I did
23    was I would follow up on missing items and things like that,
24    yes.
25         Q.   Bank records were subpoenaed either by
```

1    the IRS or the FBI during the course of this

2    investigation?

3         A.    Yes.

4         Q.    Escrow records were subpoenaed?

5         A.    Yes, they were.

6         Q.    Phone records?

7         A.    I believe so.

8         Q.    Tax records?

9         A.    Tax records aren't --

10         Q.    Well, you don't have to subpoena them.

11         A.    Yes.

12         Q.    You certainly obtained them?

13         A.    I obtained them, yes.

14         Q.    And did you subpoena all the bank records

15    that you could think of?

16         A.    Probably at that time, yes.

17         Q.    Okay.  You told us, I think, that part of

18    your job is to subpoena -- or is to follow the

19    money?

20         A.    Yes.

21         Q.    All right.  And part of your process in

22    following the money was to try to gather records

23    that would help you do that?

24         A.    Yes.

25         Q.    And if I heard you correctly, with

1    respect to that, you served one subpoena or

2    subpoena for one set of bank records in Saudi

3    Arabia?

4         A.   Yes.  I served one subpoena for the personal account

5    of Mr. Soliman Al-But'he.

6         Q.   For one bank account?

7         A.   Yes.

8         Q.   All right.  Now, I'd like to ask you what

9    you did not subpoena in terms of this effort of

10   yours, okay?

11        A.   Okay.

12        Q.   In the year 2004, the United States

13   government, whether it was you or the FBI, received

14   a list of approximately 13 bank accounts of the

15   al-Haramain Saudi Arabia organization; do you

16   recall that?

17        A.   I don't recall that.  The FBI may have received

18   that.  I don't recall that.

19        Q.   Let me show you an exhibit please.

20   Please show the witness Exhibit 731.

21             MR. CARDANI:  Is that in evidence?

22             MR. WAX:  Excuse me?

23             MR. CARDANI:  Is that in evidence?

24             MR. WAX:  Right now I'm just showing the witness.

25             MS. SWEET:  It is received.

1          MR. WAX:  It is received.

2          MS. SWEET:  It's been received.

3          MR. WAX:  Yes.  You can publish it to the jury.  It's

4    been received.

5          Q.    (By Mr. Wax)  Agent Anderson, would you

6    please take a look at Exhibit 731.  It's a two-page

7    document.  If you could go to the second page,

8    please.  Do you recall the United States government

9    receiving this document or a copy thereof in 2004?

10         A.    I can't say I recall it, but the document looks

11   familiar.

12         Q.    Take a look please at the -- account

13   number 9889/5.  Read us please what that says.

14         A.    "Al-Haramain --" I'm sorry.  It keeps moving.

15         Q.    Could you blow up that line?  Thank you.

16         A.    It says:  "Al-Haramain committee 9889/5 general

17   charities, Zakat --" do you want me to read the whole thing?

18         Q.    Yes, please.

19         A.    Okay.  "General charity, Zakat --" I'm not sure if

20   I'm saying this right, "Aqeeqah oath expiation, book printing,

21   dawah sponsorship of institutions, Qur'an memorization,

22   clinics, sponsorship of orphans and callers, Palestine,

23   Chechnya."

24         Q.    Chechnya; correct?

25         A.    Yes.

1      Q.   Now, you told us that you are co-agent?

2      A.   Yes.

3      Q.   Co-agent is Agent Carroll of the FBI?

4      A.   Yes.

5      Q.   You don't doubt that this was provided to

6  the government, whether it was you or Agent Carroll

7  by Evan Kohlmann, the fellow who was retained by

8  the government and testified in this case?

9      A.   That's likely.

10     Q.   Now, I'd like you to look at -- well,

11  first, let me ask you.  Just from this -- any time

12  between the year 2004, when the government received

13  this, and today, have you made an effort to

14  subpoena the Al-Rajhi bank for account number

15  9889/5?

16     A.   I did not make an effort to subpoena those accounts.

17     Q.   Thank you.  Now, please show, but not to

18  the jury, Exhibit 704 marked for identification.

19  Let's start with A please.  Now, Agent Anderson,

20  I'd like you to tell us whether you have seen this

21  item as long ago as the year 2005?

22     A.   I'm not sure of the year but, yes, I have seen this

23  item.

24     Q.   All right.  Let's go to the translation

25  please.  This is B?

1              MR. CARDANI:  Excuse me.  This is not in evidence,

2     judge.

3              MR. WAX:  And it's not going to the jury.

4              MR. CARDANI:  So how can she read out loud from it?

5     It's --

6              MR. WAX:  I'm asking -- I'm going now to the

7     translation please.  And I'm asking her to look at it.

8              MR. CARDANI:  She can look at it, but she has no

9     ability to authenticate it.

10             THE COURT:  Hang on.

11             THE WITNESS:  Okay.

12        Q.   (By Mr. Wax)  Now, I'd like you to look

13     at this, and without telling us at this point what

14     it is that you see --

15        A.   Right.

16        Q.   -- tell me -- tell us whether or not you

17     see anything that appears to you to be relevant to

18     the investigation in this case?

19        A.   Yes.  I've seen this document and there are parts of

20     it that would be relevant.

21             MR. WAX:  Yes.  Thank you.  Your Honor, I offer the

22     704-A and -B into evidence at this time.

23             MR. CARDANI:  I object on foundation.

24             MR. WAX:  She has told us, your Honor, that she made an

25     effort to trace this money.

 1              THE COURT:  Not before the jury.  Do I have those?

 2              MR. WAX:  You do, your Honor.

 3              THE COURT:  Okay.  I'll look at it.  Go on to another

 4    subject.

 5              What's your foundation for them?

 6              MR. WAX:  She has told us, your Honor, that she made

 7    every effort she could to trace the money.  And I am using this

 8    to show bias and an incomplete investigation.

 9              THE COURT:  No.  What is the --

10              MR. WAX:  She has had it and seen it and didn't act.

11              THE COURT:  She didn't say that she -- did you say

12    you've had it?

13              MR. CARDANI:  No.  Excuse me.

14              THE WITNESS:  I've seen the document, your Honor, but

15    the source wasn't what I considered credible.

16              MR. CARDANI:  Judge, there's authenticity grounds on

17    this and I'd like to be heard.

18              THE COURT:  I'll take this up outside the jury's

19    presence but not now.

20       Q.    (By Mr. Wax) There's no question that

21    you've only subpoenaed one bank account record from

22    Saudi Arabia?

23       A.    Yes.  I got authorization to subpoena one bank

24    account for the personal account of Mr. Al-But'he.

25       Q.    Let us turn please to the testimony that

1    -- about the $21,000.  You heard --

2        A.   Okay.

3        Q.   You heard Mr. Wilcox testify in court

4    today?

5        A.   I did.

6        Q.   And did you hear him describe the

7    transaction and what he did with respect to the

8    $21,000 and his understanding about that?

9        A.   Specifically what part?

10       Q.   I'll read from the transcript.  This is

11   page 216, counsel, about the 21,000.

12              "QUESTION:  Okay.  Did you have

13              discussion with anybody about this particular

14              check and why it was in this account?

15              "ANSWER:  Yeah.  I asked Mr. Seda

16              what -- what the 21,000 was for and he told

17              me that this Soliman had made a donation to

18              the organization and then they refunded this,

19              they paid him back this amount."

20           MR. CARDANI:  Judge, I object him from actually reading

21   from the transcript and asking her to comment on witnesses.

22           THE COURT:  You're reading it.  What's your question?

23           THE WITNESS:  I heard --

24       Q.   (By Mr. Wax)  You heard that testimony?

25       A.   I did.  Okay.

1      Q.   You have described this transaction in a

2  very different way, have you not?

3      A.   I don't believe I commented on the same issues that

4  you talked to Mr. Wilcox about.

5      Q.   Not in this proceeding yet.  But you've

6  described this transaction in the course of your

7  investigation, and, in particular, in seeking an

8  indictment from the grand jury; do you recall that?

9      A.   I've -- I recall discussing the $21,000 cashier's

10 check in various different -- in front of the grand jury, in

11 other hearings, and things like that, yes.

12     Q.   And do you recall telling the grand jury

13 not what Mr. Wilcox said, that this money was from

14 Soliman and went back to Soliman, but that this

15 money was given to Mr. Al-But'he to give back to

16 the original donor, back to Mr. El-Fiki?  Do you

17 recall that that was your testimony in the grand

18 jury?

19     A.   I don't recall that, but that is possible, yes.

20     Q.   Now, in terms of the testimony that you

21 have given here today, you referred to Mr. Al

22 Shoumar as an accountant?

23     A.   Yes.

24     Q.   Have you spoken with him?

25     A.   No, I have not.

1      Q.   Have you looked at a CV, a resume?

2      A.   No, I have not.

3      Q.   Do you know if he's an accountant from

4    any factual source?

5      A.   The reason I said that he was an accountant is

6    because I have reviewed many, many, many e-mails where he is

7    taking on the accounting responsibilities for the Ashland

8    branch.

9      Q.   He could be a bookkeeper?

10     A.   Bookkeepers don't generally direct people to give

11   them information like that.

12     Q.   He could be in a supervisory position

13   where he is authorized to direct people?

14     A.   He could be, yes.

15     Q.   He could have an accountant working for

16   him or under him offering him advice to pass on?

17     A.   Actually I did see an e-mail where he does have

18   someone who does assist him, yes.

19     Q.   Okay.  You're making an assumption that

20   he's an accountant without facts; is that not

21   correct?

22     A.   I would say that the e-mails provided me the facts

23   to make that assumption.

24     Q.   It is nonetheless an assumption on your

25   part; correct?

1          A.    Correct.

2          Q.    Now, did I hear you correctly in direct

3     examination say that neither the traveler's checks

4     nor the cashier's check that were purchased on

5     March 10th and 11 of 2000 could have been purchased

6     without the El-Fiki funds?  Did I hear you

7     correctly?

8          A.    I'm not sure if I stated that or not.  But

9     definitely the combination could not have been purchased

10    without the El-Fiki funds.

11         Q.    Okay.  Well, let me please direct you to

12    BOA -- BOA-3, please, Ms. Cooke.  You've told us

13    that you reviewed the bank records from the Bank of

14    America that were subpoenaed?

15         A.    Yes.

16         Q.    That would mean then that you reviewed

17    BOA-3, the account record for February of 2000?

18         A.    Yes.

19         Q.    And if you would please turn to page two,

20    the account balance on February 23rd.  Excuse me.

21    The account balance shown on February 18th is what?

22         A.    The account balance on February 18th is before the

23    adjustment of the Canadian funds.  So, in reality, that

24    balance isn't correct.

25         Q.    What is shown on the bank statement?

1      A.   I don't see a balance for February 18th on this bank

2   statement.

3      Q.   Daily account balance?

4      A.   Where are you at?  You'll have to show me.  Okay.

5      Q.   Do you see that, the account balance on

6   February 18th?

7      A.   Yes.

8      Q.   And it was what?

9      A.   $708.

10      Q.   All right.  And then on February 23rd it

11   was what?

12      A.   $37,047.30.

13      Q.   I believe you've told us that you are

14   aware that the Islamic Society of North America,

15   ISNA, made a donation that came through al-Haramain

16   Ashland in February of 2000; correct?

17      A.   Yes.  The donation was made right around that same

18   period of time.

19      Q.   Right.  So the 37,000 would reflect the

20   donation from ISNA?

21      A.   Yes, it would.

22      Q.   And you've seen paperwork related to that

23   beyond the check?  Have you seen anything else

24   related to that?

25      A.   Beyond the check?  I don't understand what you're

```
 1    asking.
 2         Q.   Beyond the deposit that was made.
 3         A.   Okay.
 4         Q.   Do you understand that that was a
 5    donation that was sent in by ISNA for al-Haramain
 6    Ashland to use for a refugee project?
 7         A.   Yes.
 8         Q.   For Chechen refugees?
 9         A.   Yes.
10         Q.   So on the 23rd, there's 37,000 in the
11    account, including this ISNA donation for Chechnyan
12    refugees?
13         A.   Yes.
14         Q.   The next day, February 24th, the El-Fiki
15    donation is credited?
16         A.   Yes.  That's correct.
17         Q.   And the account balance is then reflected
18    as 186,997?
19         A.   Yes.  That would be the combination of the two.
20         Q.   Now, let me just stop right there for a
21    moment.
22         A.   Okay.
23         Q.   And let us go back, please, to AHIF-2.
24    What is the total amount listed in there for the
25    brothers and sisters in Chechnya?
```

1      A.    186,644.70.

2      Q.    Pretty close to the 186,997 reflected in

3  the bank balance on February 24th?  Couple hundred

4  dollars off?

5      A.    Yeah.  Couple hundred bucks off.

6      Q.    Okay.  Can we go back to the bank

7  balance, please?  BOA-2, the second page.  Sorry.

8            So when you testified that neither could

9  have been purchased without the El-Fiki funds, that

10  is not accurate?

11      A.    If you'd like, I will correct myself.  The

12  combination could not have been purchased without the El-Fiki

13  funds.

14      Q.    Agent Anderson, the combination of the

15  $21,000 check and the $130,000 in traveler's checks

16  is $151,000?

17      A.    Correct.

18      Q.    Okay.  The combination could not have

19  been purchased?

20      A.    Correct.

21      Q.    But the total amount is not derived

22  solely from the El-Fiki funds; correct?

23      A.    Correct.  Some of the remaining balance had to come

24  in order to -- yeah.  Make up the difference.

25      Q.    Am I in the wrong -- it should have been

1  BOA-3.  I'm sorry.

2         Agent Anderson, in terms of the presentation that you

3  have made in this case and the work that you have been doing,

4  you've acknowledged at least one assumption so far.  Isn't it

5  true that during the course of your work you have made a number

6  of assumptions and done a fair amount of speculating?

7     A.   You'd have to define specifically what that would

8  be.

9     Q.   Well, how about actually using the word

10 "speculating" while testifying before the grand

11 jury?

12    A.   I don't -- you'll have to tell me what you're

13 talking about.

14    Q.   Do you recall that -- do you recall that

15 you did that?

16    A.   No, I do not recall that.

17    Q.   You're --

18         MR. CARDANI:  I'm sorry.  If you're going to ask her

19 about specific testimony, I'd ask that she have a copy of the

20 transcript.

21    Q.   (By Mr. Wax)  So you don't recall

22 speculation in the grand jury?

23    A.   No.  Do you want to show me a page?

24    Q.   Let's start, please, on page 70, question

25 on the bottom of page 70 through the top of page

1    71.

2                  "QUESTION:  Okay.  This is a copy of an

3            e-mail -- "

4        A.   I'm sorry.  I'm not there yet.  Where are you

5    please?

6        Q.   Bottom of page 70, line 23 is where the

7    question begins.

8        A.   Okay.

9        Q.   Okay.  "This is a copy of an e-mail, is

10   it not, from al-Haramain Riyadh with that same

11   e-mail address that we have talked about earlier?

12   Looks like the next day, 21st of 2000, to P.  Is

13   that -- what's your speculation there?  Who was

14   this to?

15                  "ANSWER:  Yes.  I believe the e-mail is

16           to Mr. Sedaghaty from al-Haramain Riyadh."

17           Do you recall that question and answer?

18       A.   Yes.  May I explain?

19       Q.   Do you recall the question and answer?

20       A.   Well, I don't recall it, but I see it before me.

21   But may I explain?

22           MR. CARDANI:  Judge, I ask that she be allowed to

23   explain the answer.

24           THE COURT:  Yeah.  Of course.

25           THE WITNESS:  Okay.  During my grand jury testimony

1    here, it's specifically talking about an e-mail.  And at this

2    time, I did not have the benefit of Mr. Christianson to do the

3    forensic analysis that was necessarily -- necessary to tell me

4    what drive it came from, which e-mail address it came from, that

5    kind of thing.

6        So at this point in time, I was still using Special

7    Agent Rick Smith and we hadn't had the breakthrough basically on

8    the computers yet.

9        Q.   (By Mr. Wax)  So if I just heard you

10   correctly, you did not have firm evidence and you

11   engaged in speculation?

12       A.   That is not what I said.

13       Q.   Let's turn, please, to page 83,

14   discussion about the traveler's checks and the

15   bank?

16       A.   Which part, please?

17       Q.   Starting around line eight.  Excuse me.

18   Line nine.

19       A.   Okay.

20       Q.   Some questions and answers about

21   traveler's checks.  And then you give a long answer

22   starting at line 18.

23       A.   Okay.  So are we dealing with question from nine or

24   am I going down to 18?  Because there's two different

25   questions.

```
 1      Q.   Let's just start on line 14.

 2      A.   Okay.

 3      Q.        "QUESTION:  Fairly significant

 4           amount.  Do you know if banks ordinarily

 5           have those kinds -- in a small town like

 6           Ashland ordinarily have that kind of

 7           traveler's checks on hand?

 8                "ANSWER:  Well, I spoke with a customer

 9           service manager who was in charge of

10           traveler's checks during that time and she

11           believes they did not carry $1,000 traveler's

12           checks on hand in a small branch like Ashland

13           and that these probably had to be special

14           ordered from American Express in advance.

15                "QUESTION:  Now, that was speculation on

16           his part?

17                "ANSWER:  On her part, yes."

18           Does that refresh your recollection about the

19      presentation of speculation to the grand jury?

20      A.   I am not sure what presentation of speculation

21      you're referring to.

22      Q.   Does the word "speculation" appear here

23      in the transcript in front of you?

24      A.   Yes.

25      Q.   Thank you.  Turn to page 88, please.
```

1    Line 13.

2              Do you recall being asked:  "Do you have

3    an explanation as to why there are two agreements?

4                   "ANSWER:  No.

5                   "QUESTION:  Do you have an explanation

6                   as to why there's a difference in the

7                   amounts?

8                   "ANSWER:  No.

9                   "QUESTION:  Do you have investigative

10                   speculation as to why there are two

11                   agreements and two different amounts?

12                   "ANSWER:  Yes."

13              Do you recall that question and answer?

14    A.   I see it before me, yes.

15    Q.   And do you recall then going on to offer

16    some speculation?

17    A.   I don't believe I offered speculation.  Basically I

18    offered what I knew at the time based on my analysis.

19    Q.   You said, at line 16 through 18, you did

20    not have an explanation; correct?

21    A.   Yes.

22    Q.   And then starting at line 23, in response

23    to the question whether or not you have

24    investigative speculation, you said:  Yes; correct?

25    A.   Yes.

1          THE COURT:  We're going to take a short break.  One of

2    you needs to make a phone call.  Just take the juror to the room,

3    all right?  The rest of you can stand and stretch.  So we're off

4    the record for a few moments.

5                    (A short recess was held.)

6          THE COURT:  All right.  We'll go back on record.

7    Mr. Wax, you may continue.

8          MR. WAX:  Thank you.

9          **CROSS-EXAMINATION OF COLLEEN ANDERSON** (continued)

10   BY MR. WAX:

11        Q.   Just one more question in this line,

12   Agent Anderson.  If you could turn to page 93,

13   please.  Discussion about the CMIR forms and some

14   comments by Mr. Al-But'he.

15        A.   I'm sorry.  Can you give me a line number please?

16        Q.   I'm getting to that.

17        A.   Okay.

18        Q.   Line 14, question follows:  "All right.

19   And based on your examination of the forms, do you

20   have investigative speculation as to whether that's

21   true or not, what he said to the Wall Street

22   Journal is true or not?

23              "ANSWER:  Well, my speculation --" do.

24   you recall that question and your use of the word "speculation"?

25        A.   Actually I do on this one.  And being that it's

 1    based on a newspaper article, it was speculation.

 2         Q.    Thank you.   In terms of the presentation

 3    in the grand jury, looking at page 102, do you

 4    recall describing to the grand jury in your

 5    testimony how the Springfield building schedule

 6    came into being?

 7         A.    Can you tell me what line number you're referring

 8    to?

 9         Q.    Well, first, do you have recollection of

10    testifying to the grand jury about how the

11    Springfield building schedule came into being?

12         A.    Yeah.   I -- it was several years ago in 2004, but I

13    have a general idea of how I testified, yes.

14         Q.    All right.   And do you recall that the

15    testimony that you gave was explicit that Mr. Seda

16    created the building schedule, printed it, and gave

17    it to Mr. Wilcox?

18         A.    Yes.   My testimony regarding the 21 in the grand

19    jury pertained to that part of it was based on conversations

20    with Tom Wilcox.

21         Q.    And you swore under oath and gave the

22    grand jury a description based on that information

23    as you had understood it from Mr. Wilcox?

24         A.    As I understood it from Mr. Wilcox at that time.

25         Q.    And he has now you heard told us that

 1    that was not how it happened?

 2         A.   That's correct.

 3         Q.   All right.  Now, Agent Anderson, you

 4    described a bit of the process of your review of

 5    the computers?

 6         A.   I'm sorry.  Are we done with the grand jury

 7    testimony?

 8         Q.   Yes.  Today, you've described for us a

 9    bit of the process of your review of the computers;

10    correct?

11         A.   Yes.  That's correct.

12         Q.   And if I heard you correctly, you said

13    that you focused on what you believed to be the

14    relevant time period:  January, February, March of

15    2000; correct?

16         A.   Correct.

17         Q.   And if I understood you correctly, you

18    made an effort to pull out what you considered to

19    be representative e-mails of the activity that was

20    going on in that time frame?

21         A.    I believe what I said was I made an effort to pull

22    out representational samples of the Sheeshaan e-mails during

23    that time, yes.

24         Q.   But the Sheeshaan e-mails were just one

25    small part of the e-mails that were found on the

1    computer, were they not?

2        A.    Yes.    There were lots of e-mails on the system

3    between the time period of maybe December of '99, all the way

4    through maybe February of '03.

5        Q.    Well, let's just focus on what you

6    considered to be the relevant time frame.

7        A.    Okay.

8        Q.    Did you make an effort to put in

9    chronological sequence the e-mails that reflect not

10   what someone is sending to al-Haramain, but the

11   e-mails emanating from al-Haramain?

12       A.    I reviewed those e-mails, but I did not put them

13   into a chronological order, no.

14       Q.    Did you make any effort to look at the

15   words uttered by my client in that relevant time

16   period as contrasted with the e-mails that were

17   sent out by people such as Abdul Qaadir or to the

18   Sheeshaan list?

19       A.    What specific e-mails are you referring to?

20       Q.    Well, I'm asking you did you make an

21   effort to analyze and put in chronological order

22   e-mails sent by Pete Seda in January, February, and

23   March of 2000?

24       A.    Well, I reviewed e-mails if they matched my search

25   terms.    Again, how I came up with the documents, because there

1    are thousands of e-mails, is that I would put specific search

2    terms in there and pull up those documents.  If it was

3    relevant in the sense of it hit one of my search terms, and it

4    was sent out by Mr. Sedaghaty, then, yes, I reviewed it.

5            Did I put those in chronological order and are they

6    on my spreadsheet?  No.

7        Q.   Did you consider it relevant if an e-mail

8    discussed humanitarian aid?

9        A.   Yes, I did.

10       Q.   Did you consider it relevant if an e-mail

11   discussed aid to refugees?

12       A.   Actually, let me correct my statement.  I felt that

13   it was relevant if it was during my time period, if it

14   pertained to Chechnya, and it discussed aid, yes.

15           MR. WAX:  Your Honor, I'm going to reoffer a number of

16   exhibits.  The first series are under advisement, 682, 683

17   through 683-D.

18           MR. CARDANI:  Can I have -- oh, excuse me.

19           THE COURT:  Any objection?

20           MR. CARDANI:  With the limitations that the Court put

21   earlier on the use of these things, no objection.

22           THE COURT:  They are received.

23     (Exhibit Nos. 682 & 683-A-683-D were received into evidence.)

24           MR. WAX:  Thank you.  Can we please show to the jury

25   then 682?

1           THE COURT:  The limitations are, counsel, these

2    generally are hearsay, but I'm going to let them in but not for

3    the truth of them.

4        Q.   (By Mr. Wax)  Agent Anderson, do you

5    recall seeing this e-mail on the computer?

6        A.   Yes, I do.

7        Q.   An e-mail from Islamic Relief

8    Organization describing the situation and plight of

9    the refugees, Chechen refugees, in Chechnya?

10       A.   Yes, I see those things.

11       Q.   Could we go to 683 please?  Do you recall

12   seeing this e-mail on computer?

13       A.   Yes, I do.

14       Q.   And this is an e-mail from Pete to

15   Al-But'he?

16       A.   Yes, it is.

17       Q.   And the date on it is December 30, 1999?

18       A.   Yes.

19       Q.   The subject:  Human help for Chechnya?

20       A.   Yes, that's the subject line.

21       Q.   And what is -- the text is:  Chechnya,

22   spelled incorrectly, check this out; correct?

23       A.   Yes.  That's correct.

24       Q.   And the e-mail, Mr. Seda is forwarding to

25   Mr. Al-But'he an e-mail that came in from something

1    called AIDORG; correct?

2        A.    Correct.

3        Q.    And describing having an -- "In Spain, a

4    lorry of 24 tons human help for Chechnya and need

5    aid to send it"?

6        A.    Yes.

7        Q.    And just so the record is clear on this,

8    I believe that we've had testimony that the first

9    reference to Mr. El-Fiki doesn't come up until

10   sometime in mid-January?

11       A.    The first reference in the e-mails?

12       Q.    Yes.  Any reference, any e-mail

13   communication between Mr. El-Fiki and al-Haramain

14   Saudi Arabia occurs sometime in mid-January?

15       A.    I believe so.  I can look it up if you like.

16       Q.    All right.  Several weeks after this?

17       A.    Yes.

18       Q.    Thank you.  683-A please.  Are you fluent

19   in Spanish per chance?

20       A.    No, I'm not.

21       Q.    Turn to the second page please.  It

22   appears to be an English translation describing an

23   association in Spain that wants to help people,

24   Palestine, Lebanon, and Chechnya.  "At present, we

25   have obtained human help, blankets, clothes --"

```
 1    looks like a typographical -- "for the Muslim

 2    people in Chechnya.  Whole things are ready.  We

 3    have a lorry, one driver, and a translator who can

 4    speak several Slavian languages and money for the

 5    travel"?

 6         A.   Yes.  That's correct.  May I ask a question?  Is

 7    this all a part of the same e-mail for AIDORG?

 8         Q.   You tell me, Ms. Anderson.  You reviewed

 9    the computer.

10              Do you recall that you told us, 683, the

11    e-mail --

12         A.   Yes.  Is this part of that e-mail?  That's what I'm

13    asking.

14         Q.   You tell me.  And these were all

15    presented to you for review by Mr. Christianson,

16    were they not?

17         A.   Yes, they were.  And I reviewed them.

18         Q.   Thank you.  Let's turn to 683-B please.

19    Do you recall seeing this e-mail?

20         A.   Yes, I do.

21         Q.   Mr. Al-But'he's response to Mr. Seda;

22    correct?

23         A.   Yes.

24         Q.   And he says:  "We are ready to take it

25    and disrupted --" probably a misuse of words -- "to
```

1    our office in Paco.  Just give us full details how

2    we can contact them"?

3        A.   That's correct.

4        Q.   Do you recall seeing this?

5        A.   I do.

6        Q.   Turn to 683-C please.  Another e-mail

7    from P to Al-But'he?

8        A.   Yes.

9        Q.   Dated January 1st?

10       A.   Yes.

11       Q.   Subject line:  Horrible condition?

12       A.   Uh-huh.

13       Q.   "My beloved brother Soliman, please give

14   your best support and effort in exploring in the

15   idea for me taking a large truck convoy of food and

16   medicine to Chechnya.  Goal is to enter and relieve

17   Grozny which, by that time, would be much worse and

18   horrible condition with U.N. support and evacuate

19   the wounded in Inshallah;" do you recall having

20   read this?

21       A.   Yes.  I read this.

22       Q.   "And then if unsuccessful in entering

23   Grozny after several exhaustive attempts, second

24   secret alternative is to take the convoy to relieve

25   the worst of the refugee camps in Inshallah and

1    evacuate the wounded in Inshallah.  Urgent.

2    Respond requested;" do you -- do you recall this

3    entire e-mail?

4         A.   I do.

5         Q.   If you could turn to 683-D please.  Do

6    you recall seeing this e-mail on the computer?

7         A.   Yes.  This is a reply back to the same e-mail.

8         Q.   And in this Mr. Al-But'he is responding

9    to Mr. Seda, January 2nd of 2000:  "My dear

10   brother, this is what we are doing since this war

11   start.  All what we need is to fund Jazak Allah

12   Khair Soliman;" do you recall this?

13        A.   I do.

14        Q.   Again, this is several weeks before

15   anything transpires or comes from Mr. El-Fiki?

16        A.   Correct.

17        Q.   And what Mr. Seda is being told here by

18   Mr. Al-But'he is that what al-Haramain Saudi is

19   doing is what Mr. Seda asked, providing supplies to

20   the refugees of the Chechen war; correct?

21        A.   That's what he states in here, yes.

22             MR. WAX:  Thank you.  684.  No, not 684.  The next one

23   would be 686.  And I believe, your Honor, that the next series

24   were all previously received.

25        Q.   (By Mr. Wax)  So 686.  Do you recall

 1    seeing 686 in the e-mail?  On computer -- excuse

 2    me.

 3        A.   Yeah.  I specifically remember this e-mail because

 4    -- may I explain?

 5        Q.   Well, first, do you recall seeing it?

 6        A.   Yes, I do.

 7        Q.   Let's identify it first please.  This is

 8    an e-mail from -- on the top, Mr. Al-But'he to

 9    Mr. Seda?

10        A.   Yes.

11        Q.   And if you look down it appears to be an

12    e-mail in which Mr. Al-But'he is responding to an

13    e-mail sent by Mr. Seda?

14        A.   Correct.

15        Q.   Okay.  So let's start with the bottom

16    one.

17        A.   Okay.

18        Q.   You see Mr. Seda, on January 6th, telling

19    Mr. Al-But'he that he was depositing 3,000 Zakat to

20    our account so you can distribute it to the Chechen

21    refugees as soon as possible.  Please e-mail me

22    back confirmation of this request.  Do you recall

23    that?

24        A.   Yes.  I specifically recall the depositing 3,000 to

25    our account.  Yes.

```
 1        Q.   Okay.  And the response from

 2   Mr. Al-But'he:  "I will do my best"?

 3        A.   Correct.

 4        Q.   Now, with respect to the bank records --

 5        A.   Uh-huh.

 6        Q.   -- do you recall reviewing the bank

 7   records for November, December, and January of 1999

 8   and 2000?

 9        A.   Yes.

10        Q.   And do you recall seeing a number of

11   checks having come in that were specifically

12   earmarked for Chechen relief?

13        A.   I did.  And I looked for this check and I could not

14   find it.

15        Q.   Well, did you look to see if there were a

16   series of checks and make any efforts at --

17        A.   I did.  Actually, I have a list of checks here.

18        Q.   All right.  Thank you.

19             MR. CARDANI:  Excuse me.  Wait.  I don't think she was

20   done explaining her answer.

21             MR. WAX:  Well, the question was whether she did and

22   she said yes.

23             THE COURT:  Did you have further explanation?

24             THE WITNESS:  Well, I believe Mr. Wax said I could

25   explain why this e-mail was important.
```

1          MR. WAX:  I didn't ask that question.

2          MR. CARDANI:  Judge, I'd ask that she be able to

3    explain the significance of that e-mail to give full context.

4          THE COURT:  Go ahead.

5          THE WITNESS:  Okay.  The reason I specifically remember

6    this e-mail is because when I saw this -- where they're

7    describing the 3,000 Zakat deposit to our account, I have the

8    al-Haramain main account.  And like you asked, I have reviewed

9    the '99 and 2000 bank records like I had told the jury before.

10         Basically what I do is I input the records into an

11   Excel spreadsheet, both the deposits and the outgoing.  And then

12   I went through and any checks that were definitively marked as

13   Chechnya, I went ahead and highlighted -- I like to color-code my

14   spreadsheets.  So I color-code so I can tell which ones actually

15   go to Chechnya.  And while doing that, I could not find this

16   $3,000 in the account.  And so it -- basically made me wonder if

17   I'm missing an account.

18      Q.    (By Mr. Wax) Agent Anderson, I'm going to

19   ask you again, in terms of bank records that you

20   sought --

21      A.    Yes.

22      Q.    You sought no bank records from

23   al-Haramain Saudi Arabia; correct?  You served no

24   subpoenas?  I will put it that way.  You served no

25   subpoenas on al-Haramain Saudi Arabia; correct.

1          MR. CARDANI:  Excuse me.  Judge, this is straying into

2     an area where I'm going to have some strong objections.

3          MR. WAX:  She's already testified that she's served no

4     subpoena --

5          THE COURT:  I don't want argument in front of jury.

6          MR. WAX:  Your Honor, our witness can come back

7     tomorrow morning.  He said he could stay overnight.  So if this

8     would be a convenient time to stop and we could perhaps take up

9     the evidentiary matters.

10          THE COURT:  Are there some others?

11          MR. WAX:  Well, there's the other one that I had asked

12     you to rule on earlier.

13          THE COURT:  There's others though that we're going to

14     need to take up?

15          MR. WAX:  Related to the same subject matters, yes.

16          THE COURT:  All right.  Members of the jury, I'll see

17     you at 9:00.

18                    (Jury exits courtroom.)

19          THE COURT:  All right.  With regard to -- are they out?

20     The jury is out?

21          With regard to the 704-A and -B, tell me when you saw

22     them and where they came from.

23          THE WITNESS:  I'm sorry?

24          THE COURT:  Do you know tell me when you saw 704-A and

25     -B and where they came from if you know?

1            THE WITNESS:  The first time I saw these, your Honor,

2       they came from the codefendant's -- I guess you'd call him civil

3       attorney in Saudi Arabia.  And he tried to present them to us as

4       being authentic records.

5            THE COURT:  All right.  Go ahead and have a seat.  You

6       can keep them there for the time being.

7            Any other questions on the issue of foundation?

8            MR. CARDANI:  Yes.  Yes, judge.  There's no -- there's

9       no witness to lay true authenticity and business records under

10      the Federal Rules of Evidence for these exhibits.

11           THE COURT:  Well, I haven't heard any yet but I just

12      want to know if you had more questions.

13           MR. CARDANI:  That's all --

14           MR. WAX:  I don't have any other questions, your Honor,

15      no.

16           THE COURT:  All right.  Do you have some argument on

17      it?

18           MR. WAX:  Yes, please.

19           THE COURT:  Okay.

20           MR. WAX:  As an investigator in a criminal case, it

21      seems to me it is incumbent on the government to investigate

22      potentially exculpatory evidence.  The witness was presented by

23      her expert with a list of Al-Rajhi bank account information.  She

24      was provided 13 bank account numbers, including 9889, the

25      Chechnya account.  She's then provided, by a person she

1    distrusts, receipts with that same bank account record on them.

2    And she doesn't make an effort to see whether that bank account

3    reflects the deposit of $187,000, virtually the same amount

4    reflected on the two receipts -- excuse me, the two contracts, if

5    you will, between Mr. Seda and Mr. Al-But'he.

6            And the jury has a right to know that.  She is

7    representing -- or the government is representing that this was a

8    fair and thorough investigation.  And we respectfully submit it

9    was not.

10           And when the witness says, "My job is to trace the

11   money," and she is provided records that say, "This is where the

12   money went," the jury has a right to know that she didn't look.

13   The bank records from the Al-Rajhi bank, the government went

14   through a whole deal.  The $21,000 was deposited, the $130,000,

15   the traveler's checks were cashed.  There's something I can't say

16   in the open court.  The $130,000 were cashed.  The jury has a

17   right to know that that $130,000, which was not cashed, was

18   available for deposit on the very same day -- excuse me,

19   deposited at al-Haramain on the very same day that the traveler's

20   checks were cashed.

21           The first of the two receipts from al-Haramain, 704 and

22   705, is written out on March 14th, the day the government has

23   told us the traveler's checks are cashed.  And I submit the jury

24   has a right to know that.

25           And whether they're offered for the truth or not as

```
 1    part --
 2              THE COURT:  Here's what I'm struggling with.  If you
 3    want to say that she didn't do a thorough job, that's one thing.
 4    But there's nothing -- there's nothing in the record that would
 5    compel me to allow this exhibit -- there's no foundation for it.
 6              MR. WAX:  The foundation is it's in her possession,
 7    your Honor.  And as an investigator, she has an obligation to
 8    pursue the lead when it is the lead that could go to the
 9    exculpatory evidence of the case.  And if the government turns a
10    blind eye to something in its possession, when its own expert has
11    given them something that matches it, that's relevant.
12              Tell them it's not for the truth of it, you know, I --
13    I appreciate that.  But the foundation is it's in her possession
14    and she didn't act when she has told the jury:  My job is to
15    trace the money.  And she didn't.
16              MR. GORDER:  Your Honor, if I could address -- there's
17    two problems here.  The first is these two exhibits were produced
18    by the codefendant's attorney in 2004, four years after the fact.
19    That is not a foundation for authenticity.
20              The Court is well aware that the codefendant is a
21    special-designated global terrorist and that this organization is
22    a special-designated global terrorist and has also been
23    designated by the United Nations and shut down by the Kingdom of
24    Saudi Arabia.
25              Now, to authenticate these records, it takes more than
```

1    a codefendant's attorney to hand something to the government.

2    And we would object to that.

3            I also think the insinuation that Ms. Anderson has been

4    sloppy or not done her job is inappropriate and I can't say

5    anything more than that in open session.

6            THE COURT:  All right.

7            MR. WAX:  Judge, they have offered the records that

8    came from the same lawyer.  The AHIF exhibits were produced from

9    Saudi Arabia through counsel.  And it seems to me that they

10   should be estopped from offering something from a lawyer and then

11   saying the same lawyer presents me something else and we're not

12   going to look at it.  That's not right.

13           THE COURT:  All right.  Let's go to this other matter.

14   The questions that was coming in.  Can we do that in open court

15   or do we need to do it in a closed session?

16           MR. CARDANI:  And is this -- are these the questions

17   get into the extent of her investigation?  Is the same issue that

18   Mr. Gorder just responded to?

19           THE COURT:  All right.

20           MR. CARDANI:  Judge, I'm sorry, if I could add one

21   thing.  It has already been established that she did not subpoena

22   these other accounts listed in that exhibit.  That's already been

23   established.  So I think that's -- that's all you need -- that's

24   as far as we need to go.

25           THE COURT:  All right.  We're going to be in recess

1    here.  We're going to go to a closed session.  And we're going to

2    do it in the jury room on the fourth floor.

3            MR. MATASAR:  Will the courtroom be open when we're

4    done, your Honor?

5            THE COURT:  Yes.

6            (The proceedings recessed at 5:48 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**C E R T I F I C A T E**

STATE OF OREGON      )
                     )
County of Lane       )


      I, JAN R. DUIVEN, Certified Shorthand Reporter for the State of Oregon, in and for the County of Lane, do hereby certify that the foregoing pages 129 to 278, comprise a complete, true, and correct transcript, to the best of my ability, of the proceedings held in the above-entitled matter on THURSDAY, SEPTEMBER 2, 2010.


      Dated at Eugene, Oregon, this 2nd day of September, 2010.


      _____

      JAN R. DUIVEN, CSR, FCRR

      Certified Court Reporter