1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF OREGON

3    UNITED STATES OF AMERICA,          )
                                         )
4                    Plaintiff,          ) No. 05-60008-2-HO
                                         )
5      v.                                ) September 3, 2010
                                         )
6    PIROUZ SEDAGHATY, et al.,           ) Eugene, Oregon
                                         )
7                    Defendants.         )

8


9             TRANSCRIPT OF TRIAL PROCEEDINGS

10        BEFORE THE HONORABLE MICHAEL R. HOGAN

11     UNITED STATES DISTRICT COURT JUDGE, AND A JURY

12               DAY 5 - PAGES 1 - 166

13

14                      -:-

15

16

17

18

19

20

21

22

23            Deborah Wilhelm, CSR, RPR
                    Court Reporter
24                 P.O. Box 1504
                Eugene, OR  97440
25                 (541) 431-4113

```
 1                      APPEARANCES OF COUNSEL

 2

 3    FOR THE PLAINTIFF:    CHRISTOPHER L. CARDANI
                            United States Attorney's Office
 4                          405 E. 8th Avenue, Suite 2400
                            Eugene, OR  97401
 5                          (541) 465-6771
                            chris.cardani@usdoj.gov
 6
                            CHARLES F. GORDER, JR.
 7                          United States Attorney's Office
                            1000 S.W. Third Avenue, Suite 600
 8                          Portland, OR  97204-2902
                            (503) 727-1021
 9

10    FOR THE DEFENDANT:    LAWRENCE H. MATASAR
                            Lawrence Matasar, P.C.
11                          621 S.W. Morrison Street
                            Suite 1025
12                          Portland, OR  97205
                            (503) 222-9830
13                          larry@pdxlaw.com

14                          STEVEN T. WAX
                            BERNARD J. CASEY
15                          MICHELLE SWEET
                            Federal Public Defender
16                          101 S.W. Main Street, Suite 1700
                            Portland, OR  97204
17                          (503) 326-2123
                            steve_wax@fd.org
18

19

20

21

22

23

24

25
```

3

```
1                    INDEX OF EXAMINATIONS

2    FOR THE PLAINTIFF:      Direct   Cross     ReD      ReX

3    Colleen Anderson  (See Day 4)      9       17       25

4

5    FOR THE DEFENDANT:      Direct   Cross     ReD      ReX

6    David Zaslow               26       42       50      --

7    Walter Patrick Lang        53      109      126      --

8    Nabil Taha                130      143      --       --

9    Bill Gabriel              146      153      --       --

10   Caren Caldwell            154      160      161      --

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        (Friday, September 3, 2010; 8:54 a.m.  Jury absent.)

 2                    P R O C E E D I N G S

 3            THE COURT:  Thank you.  Be seated, please.

 4            MR. CARDANI:  Good morning, Judge.

 5            THE COURT:  Go ahead.

 6            MR. MATASAR:  Your Honor, I wanted to raise a

 7   matter, an important matter, concerning the

 8   hypotheticals that were asked of the witness,

 9   Mr. Wooten, from the IRS.  My hypothetical was based on

10   the facts --

11            THE COURT:  I'll take this up later.  Let's

12   seat the jury.

13            MR. MATASAR:  No.  It has to do with

14   Ms. Anderson's testimony, Your Honor.

15            THE COURT:  Be quick about it, then.

16            MR. MATASAR:  Pardon me?

17            THE COURT:  Be quick about it.

18            MR. MATASAR:  Okay.  Mr. Cardani indicated in

19   his hypothetical, "Assume there's a wealthy Egyptian

20   individual who wants to donate money to the Chechnyan

21   mujahideen to support a fight in Chechnya," and assuming

22   further that he wants to send money to the U.S. rather

23   than Saudi Arabia to conceal the transaction from the

24   Egyptian government.  There is a 302 that we offered

25   that indicates the secret police in Egypt did a detailed
```

1    investigation of this man.  He checked with his boss,

2    with his main employee to determine that this was a

3    proper place to send money for widows and orphans.  I

4    think Mr. Cardani's intentional mischaracterization

5    should get either some sort of admonishment -- what I

6    would suggest here is the court simply say to the jury,

7    hypotheticals must be based on facts.  Two, that

8    Mr. Cardani's wasn't.  And, three, that you have

9    admitted, to cure this error, Defendant's Exhibit 678,

10   which is the El-Fiki 302.

11        That's my request.  And since Ms. Anderson was

12   present during the interview of Mr. El-Fiki, and she

13   well knows all of this information, that's why we feel

14   we have to bring it up now.

15        THE COURT:  Mr. Cardani.

16        MR. CARDANI:  Judge, I didn't bring this up in

17   direct.  It was in response, over my objection, that the

18   defense was allowed to use a hypothetical.  Clearly --

19        MR. MATASAR:  Excuse me, that's not correct.

20   It was your suggestion that I offer a hypothetical,

21   Mr. Cardani.

22        MR. CARDANI:  When we moved into the

23   hypothetical, it was clearly trying to base the facts of

24   the case, in my opinion, into this very lengthy question

25   to do in a hypothetical what he couldn't do directly.

1          I thought it was a fair response.  I had a good

2    faith basis to ask about the issue about the Egyptian

3    government.  We have adverse information on Mahmoud

4    El-Fiki having ties to an organization called the Muslim

5    Brotherhood.  So it was no more than that.

6          I have no objection for you telling the jury

7    that a hypothetical is not based on facts.  If that's --

8    if that's how you want to do this or in instructions or

9    now.

10          I have one other matter to raise as well.

11          THE COURT:  All right.  Go ahead.

12          MR. CARDANI:  It's my understanding we have a

13    number of character witnesses being called by the

14    defense this morning.  My understanding of the rules of

15    character witnesses are that you are allowed to

16    generally probe their knowledge base of the defendant,

17    how they know him and what circumstances and the like,

18    but not get into a very detailed exploration of this

19    particular event or this particle article or this

20    particular book, but as general foundation for the

21    ultimate fact about the reputation or things of the

22    like.

23          So just a little concerned about how much

24    detail they are going to be allowed to get in direct in

25    terms of laying a foundation for the reputation

```
 1   testimony.
 2           THE COURT:  There is a rule on it.  We'll
 3   follow the rule.
 4           MR. WAX:  Your Honor, we are not calling these
 5   people as character or reputation witnesses.  We are
 6   calling them to testify to their communications with
 7   Mr. Seda about the issues that the government has
 8   interjected through its calling of Mr. Gartenstein-Ross
 9   and through the inferences they are asking the jury to
10   draw from the communications that are present on the
11   computers.
12           THE COURT:  With regard to the matter raised by
13   Mr. Matasar, I will include an instruction about
14   hypotheticals.
15           Seat the jury, please.
16           MR. MATASAR:  But what -- okay.  Could we at
17   least question Ms. Anderson about this matter?
18           THE COURT:  No.
19           MR. MATASAR:  I think the hypotheticals are
20   simply vague.  The jury won't know that the hypothetical
21   wasn't based on real facts.  Mr. Cardani is -- he says
22   there is some information that they have, which we never
23   had.  All the information we had is that this
24   hypothetical was not based on facts.  If you give them
25   an instruction that hypotheticals must be based on facts
```

1  without more, they'll think that what -- that will

2  really give further support to the mischaracterization

3  of what is in the FBI 302 that we were provided, Exhibit

4  678.

5          THE COURT:  Thank you, Mr. Matasar.  I'm not

6  deciding this.  The jury is.  However, I think you both

7  took some liberties in hypotheticals.

8          MR. MATASAR:  Well, I read mine, Your Honor,

9  last night and it seemed to be based on all admissible

10  evidence --

11          THE COURT:  My opinion on that --

12          MR. MATASAR:  -- admitted evidence.

13          THE COURT:  -- doesn't matter, but it does help

14  inform my decision.

15          Please seat the jury.

16          MR. WAX:  Can we have a ruling on Exhibits 704

17  and 705, Your Honor?  May I inquire further of the

18  witness further on those?

19          THE COURT:  Yes.

20          Ms. Anderson, go ahead and take the stand.

21          THE WITNESS:  Thank you.

22          (Jury enters the courtroom at 9:06 a.m.)

23          THE COURT:  Good morning, Jurors.

24          Go ahead.

25          MR. WAX:  Thank you, Your Honor.

```
 1              CROSS-EXAMINATION (Continuing)
 2   BY MR. WAX:
 3     Q.    Good morning, Ms. Anderson.
 4     A.    Good morning.
 5     Q.    I'm going to try to move this along a little
 6   bit.  We were going through a number of the items from
 7   the computer yesterday, and I'd like to ask, we dropped
 8   off in early January, were there a series more e-mails
 9   that you saw in January and February that were sent by
10   or received by Mr. Seda?
11     A.    I'm not sure exactly the time period, but I did
12   see other e-mails that pertained to charities that maybe
13   function in the Chechnya area, if that's what you are
14   asking.
15     Q.    Thank you.  I'd like to turn now to some
16   e-mails from the end of February, and these will not be
17   shown to the jury at this time, Your Honor.  These are
18   marked for identification.
19            THE COURT:  Thank you.
20   BY MR. WAX:
21     Q.    If we could put up, please, 697A.  Do you
22   recall seeing this?
23     A.    Can I have a second, please?  If I didn't see
24   this specific one, I did see something like that, yeah.
25     Q.    Thank you.  697B, please.
```

1      A.      I believe I've seen that one.

2      Q.      Thank you.  698A, please.

3              THE COURT:  Did you say A?

4              MR. WAX:  Yes, Your Honor.

5              THE WITNESS:  I'm sorry, Mr. Wax, was I

6      supposed to comment on whether or not I saw this?

7      BY MR. WAX:

8      Q.      Yes.  The question is whether or not you've

9      seen this -- you saw this.

10     A.      Yes.  In fact, this particular e-mail

11     specifically I recall because I attempted to contact the

12     Catherine Granel that is mentioned in the letter.

13     Q.      Thank you.  698C, please.

14     A.      Yes.  Again, this is the same Catherine Granel

15     that I attempted to contact.

16     Q.      And 698D as in David?

17     A.      Yes, again, this is similar to the other.

18             MR. WAX:  Your Honor, I would offer at this

19     time 697A and B, 698A, C and D.

20             THE COURT:  Counsel.

21             MR. CARDANI:  Objection, self-serving hearsay.

22             THE COURT:  Excuse me?

23             MR. CARDANI:  Objection, self-serving hearsay.

24             THE COURT:  All right.  Members of the jury, a

25     very short lesson on the law, okay?  You -- everyone has

1    heard the term hearsay before.  And hearsay is something

2    basically that someone said or wrote that's offered for

3    the truth of it.  And so I'm going to admit these

4    exhibits but not for their truth.  You may not look at

5    them for their truth, only the fact that this has been

6    sent, and anything that may reveal about other issues,

7    but not for the truth of what is said in them.  Do you

8    understand?  Okay.  Good.  They are received.

9          MR. WAX:  Thank you.

10   BY MR. WAX:

11   Q.    If you could please look at 701 now.

12   A.    I'm not sure that I saw this -- well, in fact,

13   I don't believe I saw this one.  It says info to Harith.

14   I have no idea who that is.

15   Q.    You don't recall having seen this one?

16   A.    Not this particular one.  I am familiar with

17   Islam Relief.  I interviewed one of their

18   representatives at Islamic Relief, an Anwar Khan, and

19   spoke to him about whether or not he had any contact

20   with the defendant.  But I'm not familiar with this

21   particular, no.

22   Q.    We'll move on then.  You testified in your

23   direct examination that you selected, because you

24   thought they were in the relevant time and otherwise

25   important to you, SW-31, which is a March 22 e-mail;

1    SW-32, an April 12 e-mail; and these are e-mails

2    received at the computers; and SW-33, a May 28 e-mail --

3    excuse me.  32 -- I was mistaken on that.  31 and 33

4    were received from the Sheeshaan e-mail list.  And 32

5    was an e-mail sent by Mr. Seda, I believe, or at least

6    by someone at P, correct?  You testified that you had

7    selected those because you believed the relevant time

8    frame, et cetera?

9        A.    Relevant time frame and relevant content, yes.

10       Q.    I would now like to direct your attention,

11   please, to Exhibit 805A, and ask whether or not you

12   recall having seen that?

13       A.    I'm sorry, can you blow it up a little bit for

14   me, please.  Thank you.  I can't say for certainty that

15   I have seen this, because I don't specifically see any

16   of the types of words that I would have put in my search

17   terms.

18            As I explained yesterday, I put relevant words

19   in search terms like Chechnya, the defendant's name, the

20   codefendant's name, the accountant or bookkeeper's name,

21   things of that nature.  And I'm not sure that I see

22   Chechnya in here, so I'm not sure that I've seen this.

23       Q.    If you didn't see it, then I've understood it's

24   because the search terms that you chose might not have

25   appeared in here.  Do you --

1      A.    That's correct.

2      Q.    Do you understand, however, that this e-mail

3   was provided to the government by the defense for

4   comparison purposes by Mr. Christianson to ensure that

5   it was, in fact, found on the computers?

6      A.    That is correct.  Any of the ones that you have

7   provided to the government, Mr. Christianson verified

8   were in the computers.

9      Q.    805B, please.  Well, just the date of this is

10  April 19, seven days after the date of SW-32?

11     A.    That's correct.

12     Q.    Thank you.  805B, please.

13     A.    This looks familiar, yes.

14     Q.    And 806, if you would look at that, please.

15  And the first question about 806, if you look in the

16  lower right-hand corner, with reference to the number on

17  it, not the defense identification number, is that an

18  indication that you had a hard copy of this that was

19  obtained through the subpoena process?

20     A.    I believe so.  I believe that number at the

21  bottom indicates that it may have been within the first

22  batch of records that I received from the al-Haramain

23  Islamic Foundation's attorneys when I issued a subpoena.

24          MR. WAX:  Your Honor, I would offer 805B and

25  806.

Anderson - X by Mr. Wax                                    14

1              MR. CARDANI:  Judge, if it's received with

2      those limitations that you just instructed the jury,

3      then we do not have any objections.

4              THE COURT:  Yes.  They are received, but not

5      for their truth.

6              MR. WAX:  Thank you.

7      BY MR. WAX:

8         Q.    If we could turn now to 810.  The numbering on

9      the bottom of this one, does that indicate that this was

10     also received during this subpoena process?

11        A.    Actually, can you blow that up?  I believe

12     that's your numbering system, not previously from the

13     subpoena.  FPDU (sic) indicates that's your numbering

14     system.

15        Q.    No, that is the joint numbering system.  If you

16     recall, the government and defense jointly agreed to use

17     FPDUS for scanning in documents.

18        A.    Okay.  But that number doesn't indicate that it

19     came within the batch of records for the subpoena.

20             MR. WAX:  May I have a moment, please, Your

21     Honor.

22             THE COURT:  Yes.

23             (Discussion held off the record.)

24             MR. WAX:  I'll move on to another one, Your

25     Honor.

 1  BY MR. WAX:

 2      Q.    I'd like to ask you with respect to your direct

 3  examination testimony, you pulled out and included

 4  SW-36, an e-mail sent on September 18th of 2000.

 5      A.    Yes.

 6      Q.    SW-37, an e-mail received on September 20th of

 7  2000.

 8      A.    Yes, from Sheeshaan, yes.

 9      Q.    And SW-38, an e-mail sent on October 18 of

10  2000?

11      A.    I'm not actually sure that we discussed SW-38

12  in my direct but I am familiar with the e-mail.

13      Q.    It is an exhibit that the government has

14  offered and it has been received in evidence?

15      A.    Yes, that's correct.

16      Q.    And those exhibits were selected, at least in

17  part, all of them with your participation?

18      A.    Yes, they were.

19      Q.    And then SW-39, please, is that another e-mail

20  sent on October 18, 2000?

21      A.    Yes.  That's an e-mail from the defendant to

22  the Saudi accountant and/or bookkeeper.

23      Q.    All right.  I'd like to direct your attention

24  now, please, to Exhibit 910 that's been marked for

25  identification, and tell us whether or not you recall

1   having seen this?

2       A.   I'm sorry, could you blow that up for me,

3   please?  Thank you.  Yes.  I believe I did see this one

4   because it is signed AU, which is how the defendant

5   signs a lot of his e-mails.

6       Q.   Would you please then look at -- and the date

7   on that is October 9th --

8       A.   I'm --

9       Q.   -- of 2000?

10      A.   I'm sorry, it's not before me.

11      Q.   I'm sorry.  Take a look again, please.

12      A.   October 9th, yes.

13      Q.   Then if you could please look at Exhibit 911

14  for identification.

15      A.   I'm sorry, can you blow that up for me, please.

16  I'm not sure that I have seen this one.

17      Q.   Would you look, please -- if you could show her

18  the next page of it.  If you could look at that, please.

19  This is an attachment to the 911, for identification.

20      A.   The breakdown section looks familiar, but I'm

21  not sure that I have seen this within the same context

22  of this e-mail.

23      Q.   But, again, with respect to 911, these were

24  provided to the government -- I mean, after you provided

25  us with the hard drives, we provided you these documents

1   that we intended to offer, and Mr. Christianson had the

2   opportunity to review and ensure that they were on the

3   computer?

4      A.    That's correct, Mr. Christianson did review and

5   make sure that these were on the computer.

6          MR. WAX:  Thank you.  Your Honor, I would offer

7   910 and 911 under the same circumstances.

8          MR. CARDANI:  Same response, Your Honor.

9          THE COURT:  They are received, but not for

10  their truth.

11         MR. WAX:  Thank you, Your Honor.  I have no

12  further questions.

13         THE COURT:  Redirect.

14                  REDIRECT EXAMINATION

15  BY MR. CARDANI:

16     Q.    Agent Anderson, Mr. Wax yesterday and today

17  asked you a number of questions about some additional

18  e-mails that concern contacts in the computers with

19  Mr. Sedaghaty's operation and aid groups; is that right?

20     A.    And eGroups, yeah.

21     Q.    I'm sorry, aid groups.

22     A.    Oh, aid groups, yes.

23     Q.    And one of them was the -- can we bring up

24  Defense 682, please.  Thank you.  If we go to -- if we

25  could highlight maybe the upper half.  Thank you.  Are

1    you familiar with this group, Islamic Relief?

2        A.    Yes.

3              MR. WAX:  Your Honor, I'm wondering if these

4    should now be shown to the jury, if these have been

5    received.

6              THE COURT:  Fine.

7              MR. CARDANI:  Yes.  Please.  Thank you,

8    Mr. Wax.

9    BY MR. CARDANI:

10       Q.    So are you familiar with Islamic Relief?

11       A.    I am.

12       Q.    Before we get to -- do you see the address

13   here, put your finger where you see the contact

14   information.

15       A.    Yes, right here.

16       Q.    Okay.  During your investigation, did you find

17   this particular e-mail?

18       A.    Yes, I have seen this e-mail because, again, it

19   has Chechnya in it, which was one of my search terms.

20       Q.    Did you attempt to do any follow-up work based

21   on this and other Islamic Relief items?

22       A.    I did.

23       Q.    What did you do or, I'm sorry, why?

24       A.    Why?  First of all, it's talking about

25   Chechnya, which to me was a relevant term.  And it's

Anderson - ReD by Mr. Cardani                    19

1    talking about refugees and some type of aid to refugees.

2    So I contacted the group in southern California.  And I

3    spoke with a Mr. Anwar Khan to try and determine whether

4    or not he was in any way familiar with the defendant,

5    or -- and/or if he received any funds from the defendant

6    or the defendant's organization.

7         Q.    And what did he tell you about his --

8              MR. WAX:  Your Honor, I object.  That would be

9    hearsay, and we are intending on bringing in Mr. Khan,

10   so the jury can hear from him directly.

11             THE COURT:  Sustained.

12             MR. CARDANI:  Okay.

13   BY MR. CARDANI:

14        Q.    Without getting -- without getting into the

15   details of what he said, you contacted -- did you call

16   this phone number that was on the e-mail?

17        A.    I'm not sure if it was this phone number or

18   another phone number that I received.  But prior to

19   making the contact, I went to the bank records to try to

20   determine if any actual donations were made and there

21   were not.

22        Q.    All right.  Before we get to the money, though,

23   you reached out -- you spoke to somebody at this

24   organization?

25        A.    Yes, Anwar Khan.

1    Q.    And without getting into the details, did you

2    write a report based on that contact?

3    A.    I did.  I believe I interviewed him on

4    November 2, 2004.

5    Q.    And you -- we provided that report to the

6    defense long ago?

7    A.    I did, yes.

8    Q.    Now, the money, did you examine the bank

9    records, the al-Haramain U.S. bank records, to determine

10   whether any funds were provided by al-Haramain to the

11   Islamic Relief organization in California?

12   A.    I did.

13   Q.    And the result?

14   A.    I could not find any funds that were

15   transferred or in any way given to this organization.

16   Q.    Now, there has been a reference to another

17   account, The Arborist account that Mr. Sedaghaty had at

18   the Bank of America, did you take a look at that as

19   well?

20   A.    Yes.  I reviewed that and I didn't see any

21   funds going to this organization either.

22   Q.    How about for wires, did you look for any wire

23   transfers?

24   A.    Yes.  I reviewed several wire transfers, some

25   of which have been shown, and I didn't see any wire

1   transfers.

2       Q.    Defense 683, please.  If we could show that to

3   the jury as well.

4       A.    Thank you.

5       Q.    Now, halfway down, this does involve Chechnya,

6   so you were keen on this?

7       A.    Yes.  And it's December 30, 1999, time frame,

8   and it's talking about Chechnya, and I believe there was

9   a little bit of correspondence between the defendant and

10  the codefendant regarding it.  And although I didn't see

11  any funds going to this organization, I attempted to

12  find the organization on the Internet and couldn't find

13  anything regarding it.  Went to Web archive and things

14  like it to try to find it, but it's my understanding

15  that a lot of these aid organizations no longer exist.

16      Q.    Why did you try to get the contact information

17  for this organization?

18      A.    Again, there -- it's obviously in the e-mails,

19  there is some discussion about it, I thought, well,

20  let's -- I wanted to find out whether or not the

21  defendant had made any contact with this organization.

22  Looked in the bank records, there were no funds going to

23  it, so.

24      Q.    683B as in boy, if we could have that brought

25  up.  Same thing here?

1    A.    Yes.  It's the same organization.  The

2    aidorg@ole.com.

3    Q.    Okay.  And I'm not going to go into

4    individually every one of the ones that Mr. Wax just

5    introduced, but could you tell the jury just in general

6    your methodology in the investigation when you saw

7    things in the computer that reference contacts with

8    other organizations, what did you do?

9    A.    Okay.  Well, specifically in the computer if it

10   in any way looked like there -- it was within my time

11   frame and had to do with Chechnya, then I would attempt

12   to find the organization or look for a contact or

13   something of that sort.

14         Some of them, like, for instance, that just

15   referenced the U.N., I had no idea how to get ahold of a

16   proper section to talk to somebody in the U.N.

17         However, there was some e-mail that went back

18   and forth between Mr. Sedaghaty and

19   Mr. Gartenstein-Ross, I believe that you have seen, that

20   pertained to, I guess, the Russian Embassy where there

21   was some discussion on how to basically cleanup an

22   e-mail that Mr. Sedaghaty, the defendant, wanted to send

23   to the Russian Embassy.

24         I did attempt to actually call the Russian

25   Embassy.  However, I don't speak Russian and the person

 1   who answered that line spoke absolutely no English, so I

 2   couldn't even confirm that it was the right section.

 3        Q.    But with respect to the money now, you said --

 4   you testified yesterday that your primary job was to

 5   follow the money?

 6        A.    Yes, that's correct.

 7        Q.    In your examination of the al-Haramain bank

 8   records, was there a lot of money coming in to the

 9   Ashland-based organization by way of just general

10   donations?

11        A.    No, no.  Most of the donations from my analysis

12   came in from the parent organization, Saudi Arabia, and

13   the El-Fiki donation was a large donation.  That, in

14   combination, you know, with the Canadian funds that

15   never left the account, those comprised, you know, the

16   two largest donations that I saw other than what comes

17   from Saudi Arabia.

18        Q.    For what time period?

19        A.    My analysis, my spreadsheet, as I like to call

20   it, was from '99, 2000, 2001, time period.

21        Q.    So there wasn't a lot of money to distribute

22   from the Ashland-based organization?

23        A.    On -- like I said, some of the funds that came

24   from Saudi Arabia were somewhat significant.  And on

25   occasion, the Ashland organization would make donations

1   to, say, like, I think there was an Almadina Islamic

2   School.  I contacted them.  And I believe that they had

3   some funds going to a western Somalia relief agency, and

4   I contacted them also.

5        Q.    So did you generally try to reach out to

6   anybody that you could that appeared to have received

7   money from the bank account?

8        A.    Yes.  If it had to do with possibly some kind

9   of relief work or charity donation of that sort.

10  Obviously, I didn't contact grocery stores or anything

11  that didn't have to do with what I was looking for.

12       Q.    And also attempted to talk to people of the

13  same -- in the same categories?

14       A.    Yes.

15            MR. CARDANI:  That's all I have.  Thank you.

16            MR. WAX:  Your Honor, I forgot to ask about one

17  of the exhibits.

18            THE COURT:  Go ahead.  It's all right.

19            MR. WAX:  Excuse me?

20            THE COURT:  Go ahead.

21            MR. WAX:  Thank you.

22            If we could please show, this is for

23  identification, not to the jury, 697.

24

25

```
 1                    RECROSS-EXAMINATION
 2   BY MR. WAX:
 3      Q.    Do you recall having seen this one?
 4      A.    I believe so.  The name sounds familiar.  I'm
 5   just not sure that I've seen the content.
 6      Q.    Again, it was provided to Mr. Christianson for
 7   his review?
 8      A.    Yes, it was.
 9            MR. WAX:  I would offer it, Your Honor, under
10   the same conditions.
11            MR. CARDANI:  I have the same response, Your
12   Honor.
13            THE COURT:  I'll receive it, but not for its
14   truth.
15            MR. WAX:  Thank you.  I have nothing else.
16            THE COURT:  You may step down.
17            THE WITNESS:  Thank you.
18            MR. CARDANI:  Judge, subject to meeting with
19   the defense counsel and the court, cleaning up some of
20   the exhibits, and to get stipulations all taken care of,
21   at this point the government rests its case.
22            THE COURT:  Thank you.  I'll reserve the
23   defendant's motions.
24            Call your first witness, please.
25            MR. WAX:  Thank you.
```

Zaslow - D by Mr. Casey                    26

```
 1                 THE CLERK:  Please raise your right hand.

 2                 (The witness was sworn.)

 3                 THE CLERK:  Please step around back.  Please

 4     have a seat.

 5                 THE WITNESS:  Thank you.

 6                 THE CLERK:  If you'll speak into the microphone

 7     here.  And there is water here if you need to.

 8                 THE WITNESS:  Thank you.  I appreciate it.

 9                 THE CLERK:  Please state your name and spell it

10     for the record.

11                 THE WITNESS:  David Zaslow, Z, as in zebra,

12     A-S-L-O-W.

13                           DIRECT EXAMINATION

14     BY MR. CASEY:

15         Q.    Mr. Zaslow, tell us where you live, please.

16         A.    I live in Ashland, Oregon.

17         Q.    And what is your occupation?

18         A.    I'm a rabbi.

19         Q.    And that means that you are a member of the

20     Judaic faith?

21         A.    Yes.  I'm Jewish and a congregational rabbi.

22         Q.    Do you know Pete Seda?

23         A.    Yes, I do.

24         Q.    Is he here today?

25         A.    Yes, he is.
```

Zaslow - D by Mr. Casey                              27

1      Q.    Can you point him out?

2      A.    Yes.  Right over there.

3      Q.    Tell us a little bit about your background,

4   where were you born, and when did you come to Oregon.

5      A.    I grew up in New York City, in 1947, and I

6   moved to Ashland, Oregon, to finish my undergraduate

7   work and do my graduate work in 1970.

8      Q.    Okay.  So you have been here for 40 years?

9      A.    Yes.

10      Q.    In the Ashland area?

11      A.    All in Ashland, yes.

12      Q.    Okay.  And you graduated from Southern Oregon

13   University; is that right?

14      A.    Yeah, well, at the time it was called Southern

15   Oregon College.  And I got my master's degree there in

16   '72 or '73.

17      Q.    What did you major in?

18      A.    Creative writing and education.

19      Q.    When did you begin your study of theology to

20   become a rabbi?

21      A.    I was a little older.  It was like a second

22   life career.  I started studying when I was 40 years

23   old, and ordained when I was 47.  In 1995, I was

24   ordained.

25      Q.    Okay.  And you are now associated with a

1   synagogue in Ashland?

2       A.     Yes.

3       Q.     Is there a name for that community?

4       A.     Yes.  It's called Havurah Shir Hadash or for

5   short we call it Havurah Synagogue.

6       Q.     And can you spell that, please.

7       A.     Yes.  H-A-V-U-R-A-H, Havurah Synagogue.

8       Q.     How large a synagogue is that, sir?

9       A.     We're a 150 family -- 150 members, some

10  singles, some -- many families, congregation.

11      Q.     Okay.  Is the community -- strike that.  Are

12  you interested in what is commonly described as the

13  ecumenical movement?

14      A.     Yes.  The movement that I belong to is called

15  Jewish Renewal.  And it's extremely ecumenical.  One of

16  our goals is to really help bridge differences between

17  Judaism, Christianity, and Islam, in particular, but

18  also Native Americans, Hindus, Buddhists, so very

19  involved in the ecumenical movement.

20      Q.     And have you been active in the Ashland

21  community with respect to that ecumenical movement?

22      A.     Yes.  Ashland is a small city.  It's a small

23  university, 5000 students in a small town.  But as much

24  ecumenism as possible.  I look for opportunities to work

25  with brothers and sisters in different religious

Zaslow - D by Mr. Casey                                    29

1    communities.

2       Q.    Now, is it fair to say that there are political

3    dimensions to issues concerning Judaism, Israel, and so

4    on, and if you could elaborate on that?

5       A.    Absolutely.  There are differences, there are

6    political dimensions to my work with Christians,

7    certainly with Muslims.  And there is always political

8    issues when it regards a country like Israel where there

9    is so much political controversy.

10      Q.    In general within that frame of reference do

11   you have views on these issues?

12      A.    Yes, I do.  I'm a very active member of AIPAC.

13   I'm a strong Zionist in support of --

14      Q.    What is AIPAC?

15      A.    AIPAC is the American Israel Political Action

16   Committee.  It's what we call the lobby group that

17   lobbies on behalf of Israel in the United States.

18      Q.    And so when you say you are -- I think you

19   mentioned the term Zionist, what does that mean?

20      A.    Well, Zionism basically is the -- you know, the

21   right for Israel to be a nation like many other nations

22   after the end of the Colonial period.  So Zionism was

23   the national movement for aspiration for Jewish people

24   to return to their ancient homeland.

25      Q.    And have you been active in discussions along

Zaslow - D by Mr. Casey                                30

1    those lines?

2        A.    I always am.  I'm always interested in people

3    who challenge Israel or who support Israel, and to do

4    dialogue with mostly Christians and Muslims, certainly.

5        Q.    Is it fair to say that within the context of

6    those discussions, you have come across extremists on

7    perhaps both sides of the issues?

8        A.    Absolutely.  Judaism is a small religion,

9    13 million people.  And since, of course, since I moved

10   to Ashland 40 years ago, there have always been, for

11   example, Christians, who are my friends, who believe

12   that I should convert to Christianity.  And there's

13   certainly been -- I've talked to Muslims who have views

14   that very much differ from my own views about Israel and

15   other political issues.

16       Q.    Have you ever had occasion to meet with

17   somebody who you would regard as an extremist on the --

18   say the Palestinian or Muslim side of that debate?

19       A.    Yes.  In 1988, I had the privilege of being

20   with a Jewish group that went to Israel and actually

21   went to Gaza and met with the head of a terrorist

22   organization called Hamas, Ahmad Yasin, who was the

23   spiritual leader of that organization.  And a delegation

24   of Jewish leaders met with him and we were trying to

25   dialogue -- I don't think I can't say convince him -- to

Zaslow - D by Mr. Casey                                    31

1    stop terrorism, but we were trying to dialogue and

2    understand what makes someone so angry that they would

3    commit acts of violence.

4        Q.    So you have met face to face with somebody that

5    you would regard as an extremist on the Palestinian or

6    Muslim side --

7        A.    Absolutely.

8        Q.    -- on the issue --

9        A.    I've met with Palestinian -- in particular

10   Palestinian extremists, Islamic extremists, that are --

11   that advocate violence.

12       Q.    And in that context, you've had specific

13   discussions about these tinderbox issues?

14       A.    Absolutely.  The right for Israel to exist, for

15   example, which is a very core value of the United

16   States, certainly of mine, is -- I'm very sensitive to

17   it.

18       Q.    Is it fair for me to understand that as a rabbi

19   you have frequent occasion to counsel people within your

20   congregation?

21       A.    Of course, yes.

22       Q.    So you've had a lot of human experience as

23   well?

24       A.    A lot of what, sir?

25       Q.    Experience with the human conditions as --

1    A.    Oh, human experience, yes.  Yeah, part of the

2  work of a rabbi is to be a spiritual counselor.

3    Q.    Now, how is it that you came to know Pete Seda?

4    A.    Ashland is a small city, and in the -- when I

5  started studying around -- I started studying to be a

6  rabbi in 1988, 1989.  And around that period of time,

7  Pete started coming to our synagogue.  The previous

8  rabbi who started the community that I'm now the rabbi

9  of, Pete would come around and wanted just to learn

10  about Judaism and the Jewish people.  And would come,

11  actually, to worship service, to our Shabbat, our

12  Saturday services.

13    Q.    Was Pete fairly well known in the Ashland

14  community?

15    A.    He was.  He was really a highly respected

16  arborist and his work with trees is well known, and --

17    Q.    Any other context?

18    A.    Being in a small town around that period of

19  time, there was certainly political issues, you know,

20  where Pete could come out on behalf of peace, on behalf

21  of goodwill between people.

22    Q.    Can you give us some examples of that?

23    A.    Whenever --

24          MR. GORDER:  Objection.  Your Honor?

25  Objection.

1          MR. CASEY:  Hold on.

2          MR. GORDER:  I think under 405, specific

3    instances of --

4          THE COURT:  He can talk about the general

5    reputation, Counsel.

6    BY MR. CASEY:

7      Q.    Sir, did you have occasion to visit the prayer

8    house that Pete Seda was associated with?

9      A.    Do you mean the mosque that was the tent in

10   Ashland?

11     Q.    The mosque.

12     A.    Yes.  Sure.  Absolutely.  Yeah, it was very

13   famous in town.

14     Q.    Under what occasions -- under what

15   circumstances?

16     A.    Well, both as a colleague, I might say to Pete,

17   we'd go to the mosque or go to his house and have a cup

18   of tea and just talk about political issues, things we

19   disagreed or agreed about.

20          But certainly I remember one Sunday morning, we

21   have a Hebrew school, and we brought our kids.  He had a

22   camel, and it was sort of a -- kind of a famous mosque

23   because it was a tent and he had a camel there.  And so

24   we brought our kids there to learn about Islam.  And he

25   had a guest speaker, I can't remember the fellow's name,

Zaslow - D by Mr. Casey                                    34

1    who talked about Islam to our kids so they would learn

2    and have a direct experience with another religion

3    rather than just reading about it in a book.

4        Q.    Have you had occasion personally to speak with

5    Pete about his views of the Islamic religion?

6        A.    Many times.  We talked about our differences,

7    our commonalties.  The differences between Judaism and

8    Islam, what we had in common.  I remember one time,

9    there was a tree in my backyard that broke.  And one

10   tree fell down.  He came to my yard as an arborist.  And

11   he said this is like the Jewish and Muslim people.

12   We're really one tree and it shouldn't have broken.  So

13   we would talk anecdotally on a personal level like that.

14       Q.    And where would he fit on the spectrum, say,

15   from conservative to liberal or whatever?

16       A.    Well, you know, there's different ways of

17   looking at it.  In other words, on a theological level,

18   I believe, it may be a wrong characterization, but Pete

19   is probably more what we call orthodox or more

20   conservative on his spiritual practice than I am.  I'm

21   more in the middle.  So -- I'm not using this term

22   politically.  But I would be more liberal in terms of my

23   practice and he would be more conservative in terms of

24   his religious practice.

25              On a political level, I always felt we were

1  very similar.  We believed in the rights of all people

2  to have their own land, and for Israel to exist, and for

3  people to live in harmony together.  So I would say

4  we're both kind of -- I don't know what to call it --

5  centrists or kind of balanced political positions.  I

6  never thought of him as a democrat or conservative or

7  one way or the other.

8       Q.    Was he personally engaged in the interfaith

9  community in Ashland?

10      A.    Yes, I think he was --

11      Q.    What does that mean, if you would --

12      A.    I would say in a small city in the size of

13  Ashland, approximately 20,000 people, Pete -- you know,

14  sometimes we represent more than we want to do.  I'm one

15  of the go-to people when people have questions about

16  Judaism.  He certainly was the go-to person when people

17  had questions about Islam.

18            So -- and any kind of event that would occur, a

19  negative event, a terrorist attack, or whether it was a

20  positive thing like some kind of peace ideal of people

21  coming together, Pete was the go-to person.

22            So he was often in the newspapers, you know,

23  representing a moderate, balanced, healthy American

24  positions about how people should live pluralistically.

25      Q.    Was he respectful with respect to other

Zaslow - D by Mr. Casey                                    36

1    people's religions and political persuasions?

2        A.    Absolutely.  I would say more than respectful.

3    I would say he was ecumenical in the sense of pluralism

4    and really promoting the pluralistic ideal of the United

5    States or what I believe in as well.

6        Q.    Did you and Pete ever have occasion to speak

7    about the ongoing Israeli-Palestinian conflict?

8        A.    Many times.

9        Q.    And?

10       A.    I would say, for example, that's one of -- to

11   me as a rabbi, it's where the rubber hits the road in my

12   relationship with Muslims, where do you stand on Israel?

13   Can you accept a two-state solution?

14           MR. GORDER:  Your Honor, I think we're getting

15   beyond --

16           THE COURT:  Sustained.

17   BY MR. CASEY:

18       Q.    Did you ever have occasion to see Pete or be

19   with Pete when he was attending and participating in a

20   discussion with the Israeli Consul General?

21       A.    Yes.  In my synagogue we hosted the Consul

22   General of Israel on several occasions.  And he had the

23   privilege of sitting and having lunch with the Consul

24   General of Israel after 9/11, maybe it was 2002, the

25   Consul General from the San Francisco office.

1      Q.    What was the subject of discussion?

2            MR. GORDER:  I'm going to object, Your Honor.

3            THE COURT:  Sustained.

4  BY MR. CASEY:

5      Q.    Do you know if Pete's -- any efforts by Pete to

6  engage in acts of charity?

7      A.    Yes.  From what I understand, he was -- I mean,

8  he was definitely charitable in local affairs where

9  people had need.  Not only -- professionally he often

10 donated his services as an arborist, you know, to

11 various groups if they needed it, or if an individual --

12 if an individual was poor but needed work.  And,

13 certainly, I know as a Muslim, we shared -- Judaism,

14 sadaka, and Islam charity are core parts of our

15 religious traditions.  So I know he was involved in

16 charitable giving.

17     Q.    Are you familiar with any efforts on his

18 part -- on Pete's part to deliver aid to victims of the

19 Palestinian conflict?

20           MR. GORDER:  Objection, Your Honor.

21           THE COURT:  Sustained.

22 BY MR. CASEY:

23     Q.    Are you aware of any efforts by Pete to deliver

24 aid to anyone?

25     A.    In -- after --

Zaslow - D by Mr. Casey                    38

1              MR. GORDER:  Objection, Your Honor.

2              THE COURT:  Overruled.

3              THE WITNESS:  After 9/11, Pete came to me with

4    a wild idea, which was to deliver aid to the

5    Palestinians.  He wanted to go to Israel and buy goods

6    and rent trucks and have Jewish drivers driving to the

7    West Bank.  And he -- it was a pretty wild idea.  And

8    that's when he went to Israel, he was going to try to do

9    that.  And he spoke with the Consul General, in fact,

10   about doing that, and publicly stated that he wanted to

11   deliver this large amount of money to do charitable aid

12   in Israel with Palestinians bringing people together.

13             It was a pretty wild idea because there was an

14   intifada, there was a war going on.  So at that time,

15   even the Consul General says I don't know if he can get

16   away with this.  But he definitely said to me in public

17   that he really wanted to do this big charitable aid with

18   a lot of money.

19   Q.    Are you familiar with a piece of literature

20   known as "Islam Is"?

21   A.    I am, yes.

22   Q.    What is it?

23             MR. GORDER:  Objection, Your Honor.

24             THE COURT:  Sustained.

25   BY MR. CASEY:

Zaslow - D by Mr. Casey                                39

 1    Q.    Are you familiar with any efforts by Pete to

 2  produce literature that discusses his views of the

 3  Islamic faith?

 4    A.    Yes.

 5          MR. GORDER:  Objection.

 6          THE COURT:  Counsel, I sustained the objection.

 7          MR. CASEY:  Thank you, Your Honor.

 8  BY MR. CASEY:

 9    Q.    Have you -- I think you testified that you had

10  occasion to visit the mosque in Ashland?

11    A.    Yes.

12    Q.    And you called it a tent --

13    A.    Yes.

14    Q.    -- right?  And has Pete ever had occasion to

15  visit your synagogue?

16    A.    Yes, many times.  In 2001, we built a new

17  sanctuary.  And we had a minister, a Native American,

18  Hindu speaker, and he was representing Islam, and gave

19  blessings to our synagogue in a very -- kind of a large

20  dedication ceremony.

21    Q.    And did you specifically invite him there for

22  that purpose?

23    A.    Specifically invited Pete, of all people, in

24  his ecumenical efforts and outreach efforts, because

25  he's known in a small town as being the person who would

Zaslow - D by Mr. Casey                                40

1    do outreach to people of other faiths, to bring people

2    together.

3        Q.    Have you ever seen or heard Pete do or say

4    anything that would suggest he was involved in or

5    supported a militant view of Islam?

6        A.    I would say the exact opposite.  Over my

7    experience in being as sensitive as I can be, because I

8    am very much supportive of our government's policy

9    against terrorism from George W. Bush to President

10   Obama, the very opposite, that I feel I have good

11   antennae for somebody who supports real peace and

12   ecumenism.

13           Maybe I didn't answer that.  So the answer is

14   no, I never heard him say anything that would support

15   any kind militarism in any way whatsoever, but the very

16   opposite, supporting peace, supporting Israel, people

17   living together well.

18       Q.    You have come to learn, have you not, that the

19   association with which Pete was affiliated, the Qur'an

20   Foundation, distributed Qur'ans to prisons?

21       A.    Yes.

22       Q.    And you have come to learn that some of those

23   Qur'ans have attached to it an appendix or a -- and

24   maybe another attachment that had some anti-Semitic

25   excerpts in it?

1     A.     Yes, absolutely.

2     Q.     And having come to learn that, does that

3  suggest to you or change your view concerning whether

4  Pete was inclined to support either anti-Semitic or

5  terrorist or violent groups?

6     A.     It wouldn't change my mind at all, because I

7  knew there was a lot of material coming out of Saudi

8  Arabia that had anti-Zionist, anti-Israel, comments

9  about America that appalled me, or that I very much

10  disagree with on a political level, but you have to

11  judge things by individuals.

12         The individual Pete Seda that I knew and

13  experienced as a coworker in Ashland for my period of

14  time working with him over ten years suggested the very

15  opposite, that this man did not support anything like

16  what I would call terrorism or anti-Semitism or

17  anti-American sentiment.

18         So even though there might have been literature

19  there, and there was literature that I disagreed with

20  theologically, Pete and I would have good discussions

21  about differences between Islam and Judaism.  We

22  disagreed theologically.  But I felt they were healthy

23  debates and healthy disagreements as opposed to me

24  thinking that he was negative about ecumenism or peace

25  or America.

1          MR. CASEY:  Thank you, Rabbi.  I have nothing

2   further.

3                    CROSS-EXAMINATION

4   BY MR. GORDER:

5      Q.    Good morning, Rabbi.

6      A.    Good morning.

7      Q.    Did you ever meet Pete's wife, Sofia?

8      A.    Yes, I did.  I believe that this is the -- his

9   wife that I knew, I think I did, yes.

10     Q.    Spoke Russian?

11     A.    I -- you know something, I'm not certain,

12  Because part of the time -- she was a Jewish woman who

13  came out of the operation Exodus where our community

14  was -- raised a lot of money to bring Russian Jews both

15  to Israel and to the United States.  So I'm not sure if

16  she was from Azerbaijan or from Russia, but I knew she

17  was from that region, and I'm sorry for my ignorance on

18  it.

19     Q.    Wouldn't surprise you if she spoke Russian --

20     A.    It would not surprise me --

21     Q.    -- coming from that region --

22     A.    -- if she spoke Russian, no.  I thought she was

23  from Azerbaijan and so I'm sorry, I don't know the

24  linguistic differences.

25     Q.    Have you heard of the Islamic Army of the

Zaslow - X by Mr. Gorder                                43

1    Caucasus?

2        A.    If you mean the Chechen rebels -- what they

3    call --

4        Q.    Chechen foreign mujahideen.

5        A.    Yes.

6        Q.    Would it surprise you that Sofia was

7    translating Russian -- or English into Russian for their

8    official Web site?

9        A.    Yes, it would surprise me, yeah.

10       Q.    You didn't know that?

11       A.    No, I didn't know that.  I do know that

12   historically -- because I'm also a friend of I believe

13   one of your witnesses, Daveed Gartenstein-Ross, that the

14   Chechen rebels of the early '90s were a different group

15   than the Chechnyans of the early 2000s, and that there

16   was a legitimate freedom fighting aspect to the rebels

17   in the '90s but then they shifted to Islamic extremism.

18       Q.    If this was a translation in the year 2000,

19   would that disturb you?

20       A.    Well, it depends.  Translation of what?  So be

21   very specific.  In other words, if she's translating

22   something from -- you know, passages of the Qur'an into

23   Russian or -- no, it wouldn't disturb me.  It would

24   depend what she's translating.

25       Q.    How about propaganda from the Chechen

1    mujahideen?

2        A.    Well, again, if you mean by propaganda anything

3    anti-Israel, or anti-American, or anti-peace, or

4    anti-pluralism, and anti-plural, yeah, that would

5    disturb me.

6              But if she's just translating passages from

7    Dostoevsky or from Walt Whitman, you know, people do

8    things and they work for employers and it's not

9    necessarily all bad, even if they work for an employee

10   that you and I would agree is not a good employer.

11       Q.    In any case you didn't know anything about it?

12       A.    No, I knew nothing about it.

13       Q.    Did you ever go to the Friday services at the

14   mosque after al-Haramain got involved with it?

15       A.    No, I didn't, no.

16       Q.    Did Mr. Seda ever introduce you to Ahmed Ezzat?

17       A.    Not that I remember, no.

18       Q.    An official from al-Haramain in Saudi Arabia?

19       A.    I don't recall.

20       Q.    Rabbi, what's the -- can you give us a one

21   paragraph description of the Talmud?

22       A.    The Talmud is what we would call the

23   interpretative commentary of the Bible.  So we're not

24   literalists in Judaism.  We take the Bible and then we

25   have commentary on the Bible, and then we have

1   commentary on the commentary, and commentary on the

2   commentary, so we like to comment.  So the Talmud is a

3   collection of comments on our comments.

4       Q.    Now, have you heard that anyone preached at the

5   mosque that the Talmud was the Jews' plan to ruin the

6   world?

7       A.    Never heard that.  It would disturb me.  It

8   disturbs me to hear you ask that question.  It's a

9   horrible thing to say, but I didn't know that was

10  preached there.

11      Q.    Have you heard that Mr. Seda asked the speaker

12  to speak up so the sisters could hear him?

13            MR. CASEY:  Your Honor, I object.  This is --

14            THE COURT:  Sustained.

15            THE WITNESS:  I would have to say that I --

16            MR. GORDER:  Excuse me, the question was

17  sustained.

18            THE WITNESS:  Pardon me.  I understand.  Sorry.

19  Sorry, Your Honor.

20            THE COURT:  That's all right.

21  BY MR. GORDER:

22      Q.    Does your synagogue -- and forgive me, I'm not

23  going to try to pronounce the name --

24      A.    Havurah.

25      Q.    Does it have a Web site?

1      A.     Yes.

2      Q.     And I take it that it's fair to say that the

3   folks in your temple are generally pro-Israeli?

4      A.     Yeah, absolutely, yes.

5      Q.     Do you have any prayers on your Web site asking

6   Israeli sold -- or God to direct the shots of Israeli

7   soldiers?

8             MR. CASEY:  Your Honor, I object.  We're not

9   talking --

10             THE COURT:  No, no, no speeches.  Sustained.

11             MR. CASEY:  I understand.  Thank you.

12  BY MR. GORDER:

13     Q.     You were familiar with Mr. Seda's prisoner

14  project?

15     A.     Moderately familiar.

16     Q.     You talked a little bit --

17     A.     Yeah.

18     Q.     -- about the Qur'an with the call to jihad that

19  went to prisoners in the United States?

20     A.     Oh, you mean the additions of the Qur'an that

21  had anti-Semitic or anti-Israeli, yes, I've heard about

22  those, yes.

23     Q.     How about this book, *Islam Guidelines*?

24     A.     Never saw it.

25     Q.     Never saw it.  Mr. Seda never showed it you?

Zaslow - X by Mr. Gorder                           47

1      A.    What Pete showed me was a small booklet, he

2   asked me to check it out, to see what I felt about it

3   where you have statements about Christianity and Judaism

4   in it called "Islam Is."  And I had the chance of

5   editing it because I was very disturbed by some of the

6   comments about Judaism in it.  And I really felt he was

7   being sensitive to me in moderating some of the language

8   that I felt would be offensive to Jewish readers.

9      Q.    So you didn't see this book?

10     A.    Never saw that book.

11           MR. GORDER:  Your Honor, could we have DGR-2A

12   brought up, not in front of the jury.

13   BY MR. GORDER:

14     Q.    Did you know, Rabbi, that this book was sent to

15   about a thousand prisoners in the United States?

16     A.    No, I did not.

17     Q.    *Islamic Guidelines*?

18     A.    No.

19     Q.    I'd like to direct your attention to a

20   particular part on page 35.  Do you see that?

21     A.    Yes, I do.

22     Q.    "Whoever apostatizes from Islam should be

23   killed"?

24     A.    Yes.

25     Q.    "Assisting the Jews, the Christians, or the

1  Communists against Muslims"?

2      A.     Yes, I see it.

3      Q.     Does that disturb you?

4      A.     Yeah.  That's disgusting.  It's horrible.

5  Horrible commentary, and terrible theology, and bad

6  interpretation.

7      Q.     Does that affect your opinion of Mr. Seda?

8      A.     It doesn't, because if Mr. Seda said that, if

9  Pete had said that, over a period of time or had written

10 it, yes, it would affect my opinion of him.  The fact

11 that it was in a piece of literature that he might have

12 distributed, I would have as a friend challenged him,

13 how could you distribute that kind of literature?

14         But it doesn't mean a good person can't

15 distribute bad literature or that has bad comments in

16 it.  So I would have debated that with Pete, but it

17 doesn't affect my opinion of him, because my opinion is

18 based upon what I saw over a decade period of time in

19 his public declarations.

20         And I think I've got the sensitivity to know

21 when someone's being duplicitous.  I could be wrong.  I

22 certainly could be wrong.

23     Q.     Okay.  Let's take a look at page 108.  "Teach

24 your children the love of justice and revenge from the

25 unjust like the Jews and tyrants"?

1      A.      Terrible, yeah.

2              MR. CASEY:  Your Honor, I object to him reading

3      from this.  I don't believe this document --

4              THE COURT:  Overruled.

5              MR. CASEY:  -- is in evidence.

6      BY MR. GORDER:

7      Q.      How about page 167, "the last hour will not

8      appear unless the Muslims fight the Jews and kill them"?

9      A.      Obviously, it's racist, it's anti-Semitic, it's

10     bigoted.  I have no idea whether Pete could have known

11     that it's in there or not, I have to say that.  I'd be

12     disappointed to know if he knew that specifically was in

13     there.  And I can't believe personally -- I could be

14     wrong, as I said -- that he would have distributed that

15     knowing that's in there because of -- like I said, all

16     I'm here to do is to testify as a character witness to

17     what I've seen and observed over a decade long period of

18     time in his ecumenism.

19             Why would he come to a synagogue?  Why would he

20     sit with the Consul General of Israel?  Why would he

21     declare publicly for the two-state solution?  Why would

22     he declare, publicly sit with a Zionist like me, and

23     publicly declare of the right of Israel to exist, and to

24     believe this kind of racist nonsense?

25     Q.      But in the ten years that you knew him, you

1  never talked to him about this book?

2     A.    I have never seen that book and never talked to

3  him about it.

4          MR. GORDER:  No further questions, Your Honor.

5          MR. CASEY:  Just quickly, Your Honor.

6                      REDIRECT EXAMINATION

7  BY MR. CASEY:

8     Q.    I assume as an ordained rabbi you've had

9  occasion to read the Bible from time to time?

10    A.    Yes, occasionally.

11    Q.    Old Testament and New Testament?

12    A.    We don't call it that, but, yes, we call it the

13  Bible.

14    Q.    And are you familiar, sir, might there be any

15  excerpts that one could take from the Bible, both Old

16  and New Testaments, that had a violent calling to it,

17  that had a terroristic quality to it, that discussed

18  murder, mayhem, rapes, burnings for apostates,

19  et cetera?  Are there many such references in the Bible,

20  sir?

21    A.    There are.  If you are a literalist, if you

22  take things -- that's what the Talmud is all about is

23  trying to do interpretation on literalism.  So there are

24  literalistic passages about wars in the context of

25  3000 years ago that you read about today in the Jewish

Zaslow - ReD by Mr. Casey                              51

1    scriptures or in the Christian scriptures, they're very

2    disturbing, and that's what interpretation is about all.

3        Q.    And I assume in the performance of your duties,

4    you've had occasion to perhaps distribute the Bible or

5    to make it available to members of your congregation?

6        A.    Absolutely, yes.

7        Q.    And before you did that, did you take the pains

8    to delete every such reference from the Bible before you

9    discussed the Bible or made it available to or

10   distributed to your congregation?

11       A.    Well, I want to be honest with you, there's a

12   big difference between the Bible and the commentary.

13   Any Bible that would have a commentary, I would never

14   distribute a Bible with commentary that would be bigoted

15   against anybody.

16             The Bible itself has passages that are

17   controversial.  The Qur'an has passages that are

18   controversial.  The New Testament is -- it's the

19   commentary we're speaking about.

20       Q.    Well, I'm speaking about the Bible itself.

21       A.    Right.

22       Q.    Not the commentary.

23       A.    Right.

24       Q.    There are, as I understand it, and correct me

25   if I'm wrong, many references in the Bible to violence,

1   et cetera?

2      A.     Yes.

3      Q.     Right?

4      A.     There are, in a literalist level.

5      Q.     And before you distributed the Bible to your

6   congregation, or discussed the Bible, or made it

7   available to your congregation, did you take the pains

8   to go through and extricate, to delete, any such

9   reference from the Bible?

10     A.     No, of course not.  That's the whole purpose of

11  discussion and dialogue within my community.

12             MR. CASEY:  I have nothing further, Your Honor.

13             MR. GORDER:  Nothing further.  Move the

14  admission of DGR-2A.

15             MR. WAX:  We would object, Your Honor.

16             THE COURT:  I'll take it up later.

17             The next witness, please.

18             THE WITNESS:  Thank you.

19             MR. WAX:  Call Colonel Patrick Lang.

20             MR. CASEY:  Your Honor, may this witness be

21  excused?

22             THE COURT:  Yes.

23             THE CLERK:  Please raise your rate hand.

24             (The witness was sworn.)

25             THE CLERK:  Please have a seat.  Please speak

1    into the microphone here.  And there is water if you

2    would like.

3            Please state your name and spell your name for

4    the record.

5            THE WITNESS:  Walter Patrick Lang, Jr.

6                    DIRECT EXAMINATION

7    BY MR. WAX:

8    Q.    Good morning.  You are a retired colonel from

9    the United States Army?

10   A.    Yes, I am.

11   Q.    Colonel Lang, could you please start by telling

12   the members of the jury a little bit about your

13   background.  Why don't we start with where are you

14   currently residing?

15   A.    I reside in Alexandria, Virginia, about ten

16   miles from Washington, D.C.

17   Q.    Could you tell us, please, your educational

18   background, where did you go to college?  Let's start

19   there.

20   A.    I graduated from the Virginia Military

21   Institute in 1962 with a BA in English.  And from the

22   University of Utah, 14 years later, with a master of

23   arts degree in Middle East studies and Arab literature.

24   Q.    Can you tell us, please, a little bit more

25   about your -- about the master's degree, and what you

1    learned and what, if any, proficiency you developed in

2    Arabic?

3        A.    Well, I was sent there by the United States

4    Army.  I had volunteered after the Vietnam War for an

5    Army specialty program for officers for various parts of

6    the world.  And I tried to be a Chinese specialist, but

7    there weren't any vacancies that year, so they made me a

8    specialist in the Arab world because I had a very high

9    ability to learn foreign languages by test.

10            And so they tent me to language school, and

11    then to the University of Utah where they had a -- quite

12    a strong Middle East study center.  And I prepared there

13    for -- at the Army's direction -- for a career in which

14    I would serve in various parts of the Arab world as

15    military attaché, or, dare I say, an intelligence

16    officer or a high level staff officer in Washington or

17    some major headquarters, or commander of a unit deployed

18    in the Middle East.

19        Q.    Did you become fluent in Arabic?

20        A.    Yes, I did.  At the -- at the language school

21    in Monterey, California, Defense Language School, at the

22    end of the year, I was tested, and I got a perfect score

23    in Arabic, written, spoken Arabic.

24            And unbeknownst to me, when I was at Utah where

25    I was brought into the Phi Kappa Phi, which is an

Lang - D by Mr. Wax                        55

1   international honors society, my -- the fact that I also

2   had a transcript that was a 4.0 out of 4, attracted the

3   attention of the United States Military Academy, which

4   caused me to be ordered to West Point as -- to be the

5   professor of the Arabic language in the Middle East

6   studies.  I started the program there.

7       Q.    And what year was that, sir?

8       A.    It was the year of the tall ship, so it was

9   1976.

10      Q.    When you say you started the program, could you

11  tell the members of the jury, please, what program it is

12  that you started.

13      A.    Well, the -- at West Point, there is a great

14  deal of core curriculum in the four-year program for

15  cadets to become army officers and receive a bachelor's

16  degree, and they are required to take at least two years

17  of some foreign language.  There is seven or eight

18  offered.  So they added this one to the curriculum.

19           And so I had a lot of students who wanted to

20  take Arabic.  Some of them took two years of it.  Some

21  of them concentrated in it, took seven or eight courses,

22  some of them in spoken Arabic, some in written Arabic,

23  Arab literature, how to read newspapers, all that kind

24  of business.

25      Q.    Did you receive any awards for your teaching?

Lang - D by Mr. Wax                                56

 1     A.     Yeah.  I was twice selected as the best
 2   classroom teacher of the year for the -- all of the
 3   military academy at West Point.  And I was elected a
 4   member of the faculty senate.  And I was asked to stay
 5   permanently, but decided that I hadn't joined the Army
 6   to be a school teacher, so I moved on.
 7     Q.     Let's go back now, if we could, please, sir, to
 8   the beginning of your career.  You graduated from
 9   college from VMI in 1962.  Did you go from the
10   institution to the U.S. military?
11     A.     The day I graduated, yeah, I was sworn in as a
12   lieutenant in the Army the day I graduated from VMI, and
13   I went immediately on active duty as an officer of the
14   infantry, served there for several years in an infantry
15   battalion.
16           And then I was asked if I would transfer to
17   Special Forces to the Green Berets, once again because
18   of my language ability, I think.  And I did that.  And
19   so I went to language school.
20           And I was in South America chasing the Cubans
21   and their Marxist Indian friends around the mountains
22   for several years.  And then came back to the States and
23   went to -- while I was there, I changed my arm of
24   service to military intelligence.  So I went through
25   several schools, and then went to Vietnam for the first

Lang - D by Mr. Wax                                    57

1    time.

2        Q.    When you say you changed your focus or -- I'm

3    not quite sure of the phrase you used, but --

4        A.    My arm of service.

5        Q.    -- your military --

6        A.    My arm of service.

7        Q.    Arm of service, thank you, sir.  If you could

8    slow down just a tad, perhaps, and keep your voice up,

9    I'm having a little difficulty hearing some of it.

10           Did your career, then, from that point in the

11   mid '60s on involve intelligence work?

12       A.    All the rest of my time in the Army and then in

13   the Civil Service as a member of the senior executive

14   service thereafter, yes.

15       Q.    Can you tell us, please, sir, did you serve in

16   Vietnam?

17       A.    Two one-year tours.

18       Q.    And in what capacity were you serving?  And

19   just generally, what, if any, aspect involved

20   intelligence work?

21       A.    Well, it was all involving intelligence work.

22   I commanded a military intelligence detachment on the

23   border with Cambodia north of Saigon for a year.  I had

24   little teams in five or six surrounded locations.  We

25   were servicing the needs of the Army in the field in an

Lang - D by Mr. Wax                                      58

1    operational business there.  That's the first year.

2            Then after I came back to the States and went

3    back a couple years later, after I had been to Germany

4    and Turkey, I went to -- I went back and I was in a

5    strategic level ground reconnaissance organization

6    called the Studies and Observation Group, and -- for the

7    second year I was there.

8    Q.    Can you tell us, please, what the phrase

9    strategic level ground reconnaissance means in lay

10   terms.

11   A.    Well, we did ground reconnaissance in Laos and

12   Cambodia against the enemy's lines of communication.

13   Q.    After completing your duty in Vietnam, I

14   believe you told us that you had a number of other

15   postings, then to Utah, to West Point.  So if we could

16   now get to the point when you said you turned down the

17   offer of a permanent position at the military academy,

18   what was your posting?  What did you get into?

19   A.    Well, I left there, and I went to be the

20   Defense and Army attaché in the U.S. Embassy in North

21   Yemen in the southwestern corner of the Arabian

22   Peninsula.  There were then two Yemens.  Now there's one

23   Yemen.

24           And that was a very interesting job.  I was the

25   principal military staff officer in the Embassy.  And

1    I -- there was a big war going on in the country against

2    communist guerrillas led from South Yemen.  And I stayed

3    there for a couple of years and covered that, reporting

4    on that, and it was a very interesting job.

5              Then I came back to the States --

6    Q.    Well, before coming back to the States, as the

7    attaché in the embassy, doing intelligence work,

8    without, of course, going into anything classified, can

9    you give us a general idea of the types of work you did

10   and interactions with Yemenis or Saudis and exposure to

11   the culture of the Arabian Peninsula.

12   A.    Well, because I spoke Arabic quite well, in

13   fact, I was -- I spent a lot of time representing the

14   ambassador in interacting with the various circles of

15   the Yemen government, business circles in the country,

16   tribal leaders, I spent a good deal of time going to

17   Islamic mosques to talk to the imams there to understand

18   their point of view with regard to what was going on in

19   the country, and I studied a great deal about Islamic

20   religion and culture anyway in graduate school, and I

21   continued to study that all the time I was there.  It

22   was a very active situation, indeed, because there was

23   so much to do.

24             And hardly anybody in the country could speak

25   any English.  They all either spoke Arabic or Russian

Lang - D by Mr. Wax                                      60

 1   because there was a large Russian presence in the

 2   country.

 3       Q.      After the posting in Yemen, you started to say

 4   that you returned to the States.  What was your posting

 5   when you came back?

 6       A.      Well, I was put -- at the Defense Intelligence

 7   Agency, I was made the administrator and staff chief for

 8   all of the military attaché stations in the Middle East

 9   and north Africa.  I was responsible for their

10   recruitment, their training, their logistics, making

11   sure they were doing the right things.  I did that --

12   there were about 12 or 13 of those.  It kept me busy.

13   And then I -- then I was selected to go overseas again

14   to be Defense attaché in another country, this time

15   Saudi Arabia.

16       Q.      Before describing your experience in Saudi

17   Arabia itself, what can you tell us about the Defense

18   Intelligence Agency, what it is, and/or what it was?

19       A.      Well, it's much the same thing today that it

20   was then.  This -- there are several large national

21   agencies in the intelligence community of the United

22   States.  There is the Central Intelligence Agency.

23   There is the Defense Intelligence Agency, which is a --

24   the equivalent organization within the Department of

25   Defense.  There is -- the State Department has a large

Lang - D by Mr. Wax                              61

1   organization.  There is a National Security Agency.  And

2   then each of the military services has intelligence

3   functions as well.

4          And it's the same today except it's a lot

5   larger because of the war against terror.  There has

6   been a lot more money, and so there has been expansion,

7   and that's what it does, it collects information, it

8   analyzes the information, produces reports, participates

9   in the planning for contingency operations overseas or

10  active operations overseas by the Armed Forces, and

11  participates in the national debate as to what the

12  United States government thinks is the truth about

13  various major issues that become codified, if you want

14  to call it, of national intelligence estimates.  And

15  those become the ground truth for the United States on

16  major issues of being.  And that's what DIA is.

17     Q.    Into Saudi Arabia, then.  Your role there was

18  similar to the role you had in Yemen or was it

19  different?

20     A.    Well, it was similar, but it's a much bigger

21  place.  The embassy was about ten times as big.  I had

22  an airplane.  I had about 8 or 10 officers and a lot of

23  people working for me.

24          And the -- Saudi Arabia was the major ally of

25  the United States in the Middle East, so I as -- I had

Lang - D by Mr. Wax                        62

1  the rank of counselor of embassy for military affairs in

2  the diplomatic service, so I had to interact all the

3  time with various parts of the Saudi government, the

4  diplomatic parts, the military parts, all kinds of

5  different parts of the government.

6          And, once again, because my Arabic was really

7  pretty good, I was often taken along to help people

8  along who had to talk to somebody who couldn't speak

9  English very well.  And some that I -- you know, it was

10 a major -- it was a big job and I did it.

11         I also was the representative person for

12 several of the small countries in the Persian Gulf,

13 although I wasn't a resident there.  Sometimes you don't

14 have enough people to have a resident diplomat in every

15 one of these place.  So I did that for another three

16 years.

17 Q.    You learned --

18 A.    While I was there, I was promoted to full

19 colonel.

20 Q.    Thank you, sir.  In your years there, did you

21 come to learn more about Saudi culture, the religion of

22 Islam as it's practiced in Saudi Arabia?  Let's just

23 start with those two.

24 A.    Yes.  I mean, I understood that I was supposed

25 to be a career specialist in understanding what the

Lang - D by Mr. Wax                                          63

1    Arabs were about.  That was my job in the Army at that
2    point.  And just as the people who were specialists in
3    the Soviet Union were supposed to understand what the
4    Russians and all these other people were about.  So I
5    made it my business to spend a lot of time with the
6    Saudis and people in the -- particularly in the
7    religious establishment, because Saudi Arabia is really
8    a theocracy.  It's a theocracy which is more or less the
9    property of a particular family or maybe two families.
10   And in order to understand how they function, the way
11   they behave, and what their internal rules are, you have
12   to spend a great deal of time with them.  My job
13   required me to do that anyway.  So I did that.  I
14   spent -- I was busy a lot over there.
15      Q.    And you were interacting on a regular, if not
16   daily, basis with various members of the Saudi
17   government?
18      A.    Oh, yes, everyday.
19      Q.    The Saudi intelligence establishment?
20      A.    Yes, both military and civil.
21      Q.    And with Saudi businessmen?
22      A.    All the time.  There are a great many really
23   large business establishments in Saudi Arabia.  Often
24   they have large numbers of foreign ex-patriot experts to
25   help them with things that they can't handle themselves,

Lang - D by Mr. Wax                                64

1    like accounting, business law, business development,

2    technical processes.  These people are useful to me so I

3    could understand what was going on in the economy.

4        Q.    You came back in the mid '90s.  Was there any

5    placement back in a learning college setting?

6        A.    Well, me?

7        Q.    Yes.  You.

8        A.    I was very lucky in that I was selected to be a

9    student at the U.S. Army War College in Carlisle,

10   Pennsylvania.  This is an extremely competitive

11   selection.  And you don't apply for it.  They pick you

12   or they don't.  Same things for a promotion.  And I went

13   there for a year, and continued to -- when I wasn't

14   doing core curriculum things there, I continued to work

15   on my skills and knowledge with regard to Middle East

16   and Islam, and Arab politics, things like that.

17       Q.    The U.S. Army War College is what, sir?  Can

18   you just briefly tell us what it is?

19       A.    Well, it is the senior most service school for

20   a career U.S. Army officer.  The selection rate is 2

21   percent of all those who are eligible.  And it's a year

22   long course.  And it is a required thing to be qualified

23   to be promoted to brigadier general if you are going to

24   be promoted to brigadier general, which I was not.

25            So I spent a year there.  And at the end of

Lang - D by Mr. Wax                          65

 1   that year, I was -- I got a very nice phone call -- oh,

 2   while I was there, I was selected to command a brigade

 3   in the military intelligence business, but then I was

 4   told that I was too highly skilled a specialist to be

 5   allowed to do that, so I would have to do something

 6   else.  And then I got a nice phone call from the

 7   director of the Defense Intelligence Agency, which he

 8   offered me a very good job.  He --

 9        Q.    What was the --

10        A.    -- asked (answer not heard).

11              THE REPORTER:  I'm sorry, what was the end?

12              THE WITNESS:  The director of the Defense

13   Intelligence Agency called me up and asked me to take a

14   particular job.

15              THE REPORTER:  Not that.

16              THE WITNESS:  Is that what you need?

17   BY MR. WAX:

18        Q.    Colonel, I'm going to ask you to slow down a

19   little bit again, please.  The court reporter --

20        A.    I'm sorry.  I'm not aware that I'm speaking

21   fast.

22        Q.    Some of the rest of us are, so.

23        A.    Well, what was the job?

24        Q.    Yes, please.

25        A.    The job title was to be the Defense

Lang - D by Mr. Wax                                    66

1    Intelligence officer for the Middle East and South Asia.

2    And in this capacity, I would be the direct principal

3    assistant to the director of the Defense Intelligence

4    Agency, a lieutenant general, responsible for all the

5    work that the agency did with regard to the Middle East

6    and South Asia.  I held that job for seven years.

7        Q.    Holding that job for seven years means that you

8    served under a number of different Secretaries of

9    Defense or Chiefs of Staff?  Can you tell us, please, a

10   little bit about the hierarchy and what it means that

11   you were there for that period of time?

12       A.    Well, I guess I -- first I should say that two

13   years after I started this, I decided I wanted to retire

14   from the Army.  And when I said that, the director of

15   DIA asked me if I would stay on as a member of the

16   Senior Executive Service as a civilian.

17       Q.    What's that, Senior Executive Service within

18   the Army or --

19       A.    No, that was in the Department of Defense.

20       Q.    Department of Defense.  Help us out.

21       A.    These are civil servants or the equivalence of

22   generals.  So he asked me if I would stay on in that

23   job, same job, if they would give me the job on that

24   basis.  So I said, yes, I would.  It seemed like a good

25   thing to me.

Lang - D by Mr. Wax                    67

1            As to your other question, the Defense

2    Intelligence Agency works directly for the Secretary of

3    Defense, and the Chairman of the Joint Chiefs of Staff.

4    And I've worked for -- directly in support of a number

5    of them.  I don't particularly want to bring up all

6    their names.

7        Q.    That's fine.  But you survived for seven years

8    as the Reagan administration became the Bush

9    administration and various --

10       A.    Yeah.

11       Q.    -- Secretaries of Defense came and went?

12       A.    Yeah.  I never was particularly concerned with

13   who was president, to tell you the truth, because I'm

14   not political, and I'm just not interested in that kind

15   of thing.

16       Q.    Now, can you please give the members of the

17   jury some idea of what your responsibilities were in

18   that capacity.  And I think of particular relevance here

19   would be, you know, access to data, analyzing data,

20   making judgments about people, and advising people --

21       A.    Well, I was responsible for the content of

22   everything that the Defense Intelligence Agency did in

23   terms of briefings to high level people, participation

24   in planning, papers produced, participation in forming

25   national intelligence estimates, all of that kind of

Lang - D by Mr. Wax                                    68

1    business.  So everything that the agency had access to

2    from all the rest of the intelligence community, the

3    State Department, plus liber research, you know, from

4    some very skilled people, and it was my job to referee

5    all that and see to it that what was produced was

6    acceptable and coherent, which was interesting because I

7    had never been an analyst before.  I was always a field

8    soldier in either Special Forces or field intelligence.

9    But they wanted me to do it, so I did it for seven

10   years, first in the military and then civilian.

11       Q.    So before you became the head there in '85,

12   when you've described being a field officer, in that

13   capacity, you were gathering data?

14       A.    Yeah, that's right.  I mean, it's not -- you

15   know, if -- you are supposed to have -- in work like

16   that, you're supposed to have a pleasing personality,

17   you know, and if you talk to enough people, and you

18   encourage them to be helpful to the United States,

19   oftentimes they are.  And I did a lot of that and was

20   pretty good at it.

21       Q.    Would you also gather information that you

22   would pass on to other people, analysts --

23       A.    Oh, yeah.

24       Q.    -- who then incorporated into reports,

25   et cetera?

Lang - D by Mr. Wax                                    69

1      A.    Oh, yeah.  When you do that in the field, you

2   don't do it for your own amusement.  So, you know, you

3   write reports, and they are transmitted electronically,

4   and become part of the lifeblood of the information

5   stream of the intelligence community, as we're talking

6   about it.  We go to all agencies so that they are

7   integrated as part of what they do.

8          There is a kind of myth that has been

9   perpetrated that the intelligence agencies don't share

10  information.  That's really not true except for about 5

11  percent of what everybody has.  Everybody has a few

12  things they would consider to be the crown jewels, but,

13  in fact, most information is shared, and there is a vast

14  amount of it, vast amount.

15     Q.    Then from '85 to '92 rather than being a

16  primary gatherer, you were on the receiving end, and

17  engaged in the analysis and different type of report

18  preparation?

19     A.    Yeah.  And it was up to me to make sure the

20  Secretary of Defense and the Chairman were satisfied

21  with what they were getting from us in terms of their

22  requirements for knowledge.

23     Q.    And did you have personal interactions with the

24  Chairman of the Joint Chiefs of Staff and with the

25  Secretary of Defense on a regular basis?

Lang - D by Mr. Wax                                  70

1        A.     Every week, and two or three times.

2        Q.     In that capacity, for that seven-year period,

3    did you personally brief either President Reagan or

4    President Bush?

5        A.     I briefed President Reagan about three times, I

6    think; and President George H.W. Bush repeatedly during

7    the Desert Storm period leading up to the first Gulf

8    War.  I went to the Oval Office a number of times with

9    several other people from around the community to have

10   group discussions with him about what the Iraqis were

11   doing, what they were likely to do, things like that.

12       Q.     You left that position -- excuse me, before you

13   left that position, were you given a rank of some sort?

14       A.     Yeah, at the end of the first Gulf War, I was

15   given the president -- Presidential Rank of

16   Distinguished Executive presented to me by President

17   George H.W. Bush himself.  This is -- it's an in-person

18   rank award in the civil service, given to 1 percent of

19   those who might -- people in the senior executive

20   service, it was on the basis of my work with regard to

21   the first Gulf War.

22       Q.     Now, you mentioned, I believe, that among the

23   types of information that you would receive as the

24   Defense Intelligence officer in that period, you used

25   the word "research."

1      A.     Yes.

2      Q.     Now, you had the opportunity to read a report

3   prepared by Evan Kohlmann?

4      A.     No, I didn't.  I read his report -- testimony

5   before the Senate in July.

6      Q.     Did you also have the opportunity to hear him

7   testify in a hearing in this court back in May?

8      A.     I did.

9      Q.     Okay.  And you have, then, some familiarity

10  with the type of work that he does?

11     A.     Yes, I do.

12     Q.     Okay.  And how would that type of work relate

13  to the type of work that you did; and particularly, the

14  reference to a report that you made?

15             MR. GORDER:  Objection.

16             THE COURT:  Sustained.

17  BY MR. WAX:

18     Q.     What do you mean by "research" in terms of the

19  type of information on which you relied?

20     A.     Well, the intelligence community is analysts

21  who are like research scholars in a university, really,

22  but with high security clearances.  They do exactly what

23  scholars do.  They pull together all available

24  information, both from unclassified and classified

25  sources, and combine that with current reporting, which

1    is usually classified, from the field in order to form a

2    synthesis that becomes a basis of their collective

3    judgment as to the truth or falsity of any particular

4    thing.

5        Q.    In '92, you left that position and you went to

6    another one in the government?

7        A.    Yes.  Also within the Defense Intelligence

8    Agency.  I became the first director of the Defense

9    HUMINT Service.

10       Q.    What is that?  HUMINT, H-U-M-I-N-T?

11       A.    Yeah, that's all capitals, that's an acronym

12   for human intelligence.  This denotes the collection of

13   information using human beings as sources.

14       Q.    Since you've mentioned that word, can you

15   explain to the members of the jury, please, whether

16   there are other acronyms used in the intelligence

17   business that describe other sources of information?

18       A.    Yes.  These are sort of like disciplines in the

19   academic world.  There is Signals Intelligence --

20            MR. GORDER:  Your Honor, I'm going to object to

21   the relevance.

22            THE COURT:  Counsel.

23            MR. WAX:  It's going to be relevant to where

24   his testimony goes, Your Honor.

25            THE COURT:  Overruled.

1            THE WITNESS:  There is Signals Intelligence,

2    which obviously has to do with the collection of

3    signals.

4            There is IMINT, which has to do with imagery,

5    usually aerial imagery of things on the ground.

6            There is MASINT, which is the measurement of

7    the characteristics of various objects.

8            There are a number of things like that.  And

9    they are all kind of specialties within the business of

10   collecting information.

11   BY MR. WAX:

12   Q.    I want to digress for one moment before we pick

13   up with your activities after you left government

14   service on a full-time basis, and ask whether or not you

15   have published any books or articles?

16   A.    Well, I've published a great many articles in a

17   variety of publications since I left government.  Since

18   when I was in government, like every intelligence

19   person, I was forbidden to publish things in any sort of

20   journals, academic or otherwise.

21           After I had cooled off for a while after having

22   left the government service, I wrote -- I've written a

23   number of things on the Middle East, on Arab politics,

24   on military affairs, on Special Operations, since I was

25   a Green Beret officer, and on counterinsurgency, many

Lang - D by Mr. Wax                                74

 1    different articles.

 2            And I have written three books.  One was a

 3    social studies textbook on the history of the human

 4    intelligence discipline in -- as a form of art.  And

 5    I've written two novels that are amusingly sort of

 6    autobiographical about what I learned in life, but which

 7    are set in the American Civil War.  And I'm working on a

 8    third, fitfully.

 9       Q.    In terms of the articles, to try to speed this

10    up, let me just read from your résumé a few of the

11    titles that seem to be potentially relevant here.  An

12    article "Drinking the KoolAid," "Middle East Policy" for

13    the Middle East Policy Council in 2004?

14       A.    Yes.

15       Q.    "Wahhabism and Jihad" in *America*, March of

16    2003?

17       A.    Yes.

18       Q.    "Speaking Truth to Power," *America* also in

19    2003?

20       A.    Yes.

21       Q.    In terms of symposia in which you have

22    participated and/or presented papers, "Al-Qaeda 2.0:

23    Transnational Terrorism after 9/11" for the "New America

24    Foundation," 2004?

25       A.    Yes.

Lang - D by Mr. Wax                                75

```
 1       Q.     "Government Secrecy and National Security" in
 2  the New York University Institute of Law Security, 2007?
 3       A.     Yes.
 4       Q.     The "Annual Symposium on the Middle East,"
 5  featured speaker on Saudi Arabia at the U.S. Army War
 6  College, March 2008?
 7       A.     Yes.
 8       Q.     "Counterinsurgency:  America's Strategic
 9  Burden?" a panel at The Center on Law and Security at
10  New York University, 2009?
11       A.     Yes.
12       Q.     Did you also participate in or consult for a
13  workshop on "Terrorism - 2025" at the Johns Hopkins
14  University in January of this year?
15       A.     Yeah.  That was a government symposium run by
16  the director of National Intelligence.
17       Q.     All right.  Let's go back, then, to 1994,
18  please, if you would.  You left government service at
19  that time?
20       A.     I did.
21       Q.     Did you take up another occupation?
22       A.     Yes.  I had been in government service for
23  32 years, and I thought I should do something new.  And
24  so I floated my résumé to people I knew in the Middle
25  East who had money and jobs.  And I received several job
```

Lang - D by Mr. Wax                                    76

1   offers.  And I took the one that had the best job and

2   the most money attached to it.

3          And I worked full-time for five years for a

4   company owned by one man, a Lebanese man, who makes

5   building materials in 15 or 16 different places in the

6   Middle East and in the United States.  Actually, I

7   opened the factories in the United States.

8          And then after 2000, I decided I wanted to be a

9   consultant for this fella.  So I took that up.  And I

10  was also a member of his board.  And I started

11  consulting again for the United States government at

12  their request for the intelligence community, Department

13  of Defense, things like that.

14  Q.    We will get back to that in a moment, but let

15  me ask you, sir, during the course of your work with the

16  Lebanese business, did you spend a great deal of time in

17  the Middle East?

18  A.    Yes.  That -- my job consisted -- I was the

19  head of a subsidiary involved -- of his -- involved in

20  business development, government relations, contract

21  negotiations, things like that.  And so I had to travel

22  around everywhere that we had prospective business or

23  existing business.  And it was every country in the

24  Middle East and north Africa except Algeria -- and --

25  and -- I think it -- and South Yemen, I never went

Lang - D by Mr. Wax                                          77

1    there.  I've never been there.

2       Q.    Did you also do work for the Lebanese fellow

3    for a charity, for a foundation that he had?

4       A.    Yes.  The issue arises of Zakat in this whole

5    business here, which is one of the five pillars of

6    Islam.  This man -- Zakat is normally something like

7    2-and-a-half percent of someone's gross income if they

8    are Muslim.  And so he -- for him that was a lot of

9    money.  And he wanted to do something useful for it that

10   might advance his political prospects in Lebanon as

11   well, so I organized a family foundation for him that

12   did charitable work in Lebanon, and vocational training,

13   micro-credit lending for women's businesses.

14           And then in the States, we sponsored the work

15   of a number of think tanks at Harvard and the Council on

16   Foreign Relations that were advocating the peace

17   process, in particular Henry Siegman's Middle East

18   project.

19      Q.    You've indicated, I believe, that you left his

20   employment on a full-time basis around the year 2000.

21   So let's talk about the last ten years.  You indicated

22   that you were asked to go back to assisting our

23   government in a consultive capacity?

24      A.    Yes.

25      Q.    And have you continued to do that for the past

Lang - D by Mr. Wax                        78

1    ten years?

2        A.    Yeah, right up until now.  As a matter of fact,

3    I have a couple of scheduled things to participate in

4    the next few months.  And in the course of that, my

5    security clearance, which lapsed when I left government,

6    was restored because it was necessary for the

7    government's needs.

8        Q.    With respect to security clearance, when you

9    were working for the government, you held a security

10   clearance?

11       A.    Oh, yes.

12       Q.    And do I understand correctly that there are

13   various levels of security clearances?

14       A.    An almost infinite number of levels.  You want

15   to know mine?  It was top secret --

16             MR. GORDER:  Objection, Your Honor.

17             THE COURT:  No.

18             THE WITNESS:  Sir?

19             THE COURT:  No.

20   BY MR. WAX:

21       Q.    Did you have access to a great deal of

22   information?

23       A.    Yes.

24       Q.    Thank you.  And you once again have a security

25   clearance from our government?

 1     A.     I do.

 2            MR. GORDER:   Objection, Your Honor.  I'm not

 3     sure what the relevance is.

 4            THE COURT:   The objection is sustained.  It's

 5     not relevant.

 6     BY MR. WAX:

 7     Q.     The consulting that you have been doing for the

 8     government for the past ten years, up to and including

 9     the present, has that continued to involve matters

10     related to the Middle East?

11     A.     Exclusively, really.  Involving the future

12     plans of the government, and analysis of major issues

13     before the -- the government for understanding, things

14     like that.

15     Q.     In addition to working for the United States

16     government, have you also taken on a few consulting

17     tasks for people in out -- in other capacities such as

18     this one?

19     A.     Well, I think of this as a service to the

20     government in that it's service to the courts, but, yes,

21     I have done some expert witness testimony in a number of

22     cases for -- both for Federal Public Defenders and for

23     private law firms doing pro bono work.

24     Q.     And in terms of the people who approach you to

25     see whether or not you can help in their cases, do you

Lang - D by Mr. Wax                                    80

```
 1    have, you know, any process that you go through before
 2    you decide whether to agree to assist?
 3              MR. GORDER:  Objection, Your Honor.
 4              THE COURT:  Sustained.
 5    BY MR. WAX:
 6       Q.    Do you take all the work that comes to you,
 7    sir?
 8       A.    No.
 9              MR. GORDER:  Objection.
10              THE COURT:  Overruled.
11              THE WITNESS:  The answer was no.
12    BY MR. WAX:
13       Q.    We contacted you some time ago and asked
14    whether or not you would assist in this case?
15       A.    Yes.
16       Q.    And did you do any preliminary investigation
17    before agreeing to do so?
18              MR. GORDER:  Objection, Your Honor.
19              THE COURT:  Sustained.
20    BY MR. WAX:
21       Q.    You did agree to assist us?
22       A.    Yes.
23       Q.    And we are paying you?
24       A.    Yes, you are.
25       Q.    Are we paying you the fee that you can command
```

Lang - D by Mr. Wax                                    81

1    in the private market or something else?

2       A.    This is -- this is much less than I command in

3    the private market.

4       Q.    All right.  Let's turn now, sir, to some of the

5    work that you have done in preparation for your

6    testimony today.  Did you have an opportunity to review

7    the indictment in this case?

8       A.    Yes.

9       Q.    Were you provided a full set of the government

10   exhibits?

11      A.    All that you had that you provided me.

12      Q.    If we had them all, you got them all?

13      A.    I presume so.

14      Q.    Did we provide you documents that we had marked

15   as potential exhibits for this case?

16      A.    Yes.

17      Q.    Were you provided, without specifying here,

18   additional materials related to this investigation,

19   things that were not necessarily marked as exhibits?

20      A.    Yes, I think I was, yes.

21      Q.    Okay.  And in terms of the assessments that I'm

22   about to get into, are they based on review of the

23   materials that you were provided and the extensive

24   background that you have described?

25      A.    Yeah, I think I view whatever material you show

1    me in the light of my life experience and work

2    experience, yeah.

3        Q.    I'd like, sir, to turn to a couple of terms

4    that I'd like to try to clarify at the outset, a couple

5    of terms that have been used in this case, and please

6    tell us what your understanding of them is.

7            The term "mujahideen" has been used.  The term

8    "terrorism" has been used.  And I believe there may be

9    one other term that you are going to throw into the mix

10   in your testimony.

11           So what does "mujahideen" mean?  What does

12   "terrorist" mean?  And what is a "resistance fighter" in

13   your mind?

14       A.    Well, mujahid is an Arabic word which means a

15   fighter for the faith.  And it is generally applied by

16   Muslims in any situation to someone who fights for the

17   faith in a situation in which they think the faith and

18   their religious identity is threatened.  It can cover a

19   wide variety of types of fights and types of people.

20       Q.    There's a broad spectrum of people who would

21   fall under the term "mujahideen"?

22       A.    Yeah, especially in the minds of the Muslims,

23   because they tend to assign this kind of virtuous status

24   to anybody who they think is struggling on their behalf

25   in protection of their religious identity.

Lang - D by Mr. Wax                                          83

1    Q.    And that could include people who are not

2  picking up arms?

3    A.    Yeah, it could, actually, because jihad is a

4  somewhat ambiguous term, this struggle for the faith.

5  And as you know, I'm sure people know here, it can be an

6  internal struggle just as well.  So someone who is

7  struggling in order to maintain a virtuous life, in

8  fact, who would -- might often be thought of by other

9  Muslims as a mujahid.

10          And what were the other terms?

11   Q.    Terrorist and resistance type fighter.

12   A.    Well, terrorism is usually thought of, in my

13 understanding working in the government, is -- as a

14 violence applied against civilian populations in pursuit

15 of a political aim.

16   Q.    As opposed to fighting against an army or a

17 state entity?

18   A.    Yeah, that's right.  To use the word terrorist

19 against -- to describe people who are fighting an armed

20 force in the field is seldom done, really, except maybe

21 for political reasons.

22          And resistance fighter, that's pretty clear, is

23 somebody in a local population who is resisting a

24 foreign aggressor.

25   Q.    You mentioned a little bit about Islam.  We've

 1    had a fair amount of testimony.  But I'd like to,

 2    please, get your perspective on a couple of aspects of

 3    Islam as they may relate to this case.  Saudi Arabia?

 4        A.    Yes.

 5        Q.    You've spent enough time there and studied it

 6    enough to have an understanding of the place of religion

 7    in Saudi society?

 8        A.    Oh, yes, I think that's quite clear, yeah.

 9        Q.    Would you please tell us your understanding.

10        A.    Saudi Arabia is a theocratic state,

11    essentially, which is --

12        Q.    Meaning what, sorry?

13        A.    Well, the religion essentially forms the

14    background and framework of government, and in fact of

15    all aspects of life.  And the only tolerated form of

16    religio-politico thought in Saudi Arabia is the Wahhabi

17    sect of Islam.

18              And this is a form of Islam in which it is

19    believed that the relationship between men and God is

20    not particularly warm.  God is the law giver and man is

21    the law obeyer.  And everything is about law very

22    strictly.  And it is -- and life is -- consists of

23    figuring out what the proper application of law is so

24    that man can obey God.  This idea of things dominates

25    all of Saudi life.

Lang - D by Mr. Wax                                    85

1          And as the name Saudi Arabia applies, this
2    country is, in fact, for all intents and purposes, the
3    property of the Al-Saud family.  It was created by them.
4    They continue to rule it.  They have got most of the
5    money.  And they have an allied family, the Al-Shaikh
6    family, with whom they have been intermarried since the
7    eighteenth century, since the first famous member of
8    that family was the founder of the Wahhabi sect.  And
9    their alliance with them, provides legitimacy to the
10   Saudi government.
11   Q.    The alliance between the Saud family and the
12   Al-Shaikh family, you are indicating, provides some
13   legitimacy to the Sauds because of the imprimatur of the
14   religious people?
15   A.    Yes, because Islam, in its form, does not
16   really recognize secular government, because it believes
17   in the unity of all aspects of man's life, as God they
18   believe is completely unified.
19          So the various parts of life should not be
20   separated, in their view.  To do that is an impious,
21   irreligious thing to do.  So they don't tend to have the
22   ability to have a completely secular government, when
23   you are as purely Islamic as the Saudis are, because
24   what would be authority for that since the religious
25   life is the only thing that really matters?

Lang - D by Mr. Wax                                          86

 1          So the favor showed to them by the Al-Shaikh

 2     family tends to give the Saudi family a de facto secular

 3     rule and legitimacy.

 4      Q.     Okay, Islam generally, is it a very diverse

 5     religion?

 6      A.     Yes.  This is something that's very important

 7     is that there is no one Islam.  The Muslims want --

 8     typically want to believe that Islam is unified because,

 9     again, because God is one, and, therefore, God's rule

10     should be unified.  But, in fact, Islam is a headless

11     religion.  It's a religion of laymen, which has no

12     hierarchy, there are no bishops, there are no priests.

13          So -- and the view of what Islam is is formed

14     by religious consensus among groups of Muslims in

15     varying size.  Anything from the 7 or 8 million people

16     in Saudi Arabia, who are only allowed to have one

17     understanding, down to little groups of people who may

18     have peculiar understandings of what Islam is.  Al-Qaeda

19     or Al-Qaida is a good example in that most Muslims would

20     say they are not really Muslims because they don't

21     accept their view of Islam.

22          But for the guys -- the people in al-Qaeda,

23     Al-Qaida, that it is valid, and they were willing to

24     kill you for it.

25          So on this basis, because it's formed on the

1    basis of consensus, there are many, many, many, many,

2    many, many different, in reality, forms of Islam, as

3    many as there are groups of Muslims who agree with each

4    other.

5        Q.    And some --

6        A.    They don't like that definition, by the way.

7        Q.    And some of the groups would, perhaps, be

8    extreme, as you've said, with respect to al-Qaeda,

9    others could be on the opposite end of the spectrum in

10   terms of conservative versus less conservative practice

11   or interpretation?

12       A.    Well, the great cleavage in my opinion -- my

13   opinion -- is between those Muslims who believe that

14   Islam is all about law and those Muslims who believe

15   that Islam is about what is inside you and your warmth

16   of feeling about your relationship to God and other

17   people.  Those are called Sufis.  And this is a great

18   split.  And there is -- it's an unbridgeable split.  So

19   they -- and then there are endless variations on these

20   themes as -- in different groups.

21            But it's a great error, in my opinion, to think

22   that Islam is one, or that somehow they are all the same

23   thing, or that there is a chain of command outside one

24   of these groups.  It's just not true.

25       Q.    Let me switch, please, we've had a fair amount

Lang - D by Mr. Wax                                        88

1   of testimony about the Russian-Chechen conflict.  I
2   believe that there are a couple of points that you could
3   add.  So take it that we've heard a lot testimony up to
4   now.
5           I'd like to ask you, please, in terms of the
6   structure of the Soviet Union, were there different
7   types of republics in the Soviet Union?  And what type
8   was Chechnya?
9           MR. GORDER:  Objection, Your Honor, beyond his
10  expertise.
11          MR. WAX:  I do not believe so.
12          THE COURT:  Well, I'll listen to your answer
13  and --
14          THE WITNESS:  Well, the Chechen autonomous
15  Russian republic, along with the other little republics
16  in the north Caucasus that are legally part of the
17  Russian Federation, which was part of Soviet Union,
18  these little countries were all seized by the Russian
19  czar, emperor, in the nineteenth century, even though
20  they weren't populated by Russians.  They were populated
21  by Muslims of various kind of Turkish stock.  And they
22  have resisted absorption into Russia ever since,
23  culturally, politically, every other way.
24          Although there are quislings, you know, there
25  are collaborationists among them as well, but the great

Lang - D by Mr. Wax                          89

1    majority of people have resisted Russification and

2    Christianization, actually, ever since.  And it's

3    ongoing to today.

4            THE COURT:  We're going to take a break at this

5    time.

6            MR. WAX:  Thank you.

7            (Recess:  10:54 until 11:05 a.m.  Jury absent.)

8            THE COURT:  Counsel, I took the bench before

9    the jury just to comment that it appeared there was some

10   witnesses in the courtroom, so just -- you take care of

11   that, please.

12           Seat the jury, please.

13           (Jury enters the courtroom at 11:06 a.m.)

14           THE COURT:  You may proceed.

15           MR. WAX:  Thank you, Your Honor.

16   BY MR. WAX:

17   Q.   Colonel Lang, when we broke, I think we were

18   talking a little bit about Chechnya.  Can you tell the

19   members of the jury, please, under the Soviet Union what

20   was a Union republic and what was a Russian republic, if

21   those phrases mean anything?

22   A.   Well, Lenin decided for some reason

23   satisfactory to himself that those parts of the Russian

24   Empire that were exterior and faced on the outside world

25   that were primarily inhabited by non-Russians would be

Lang - D by Mr. Wax                                90

1   considered to be Union republics.  They would be

2   federated with the Federation, the Russian Federation;

3   whereas those similar non-Russian ethnic political

4   identities like Chechnya, Circassia, Dagestan,

5   et cetera, that were inside and didn't have an external

6   border would be considered part of the Russian

7   Federation.  That was -- it seems to have been an

8   arbitrary decision on his part.

9       Q.    And after the breakup of the Soviet Union, was

10  there a distinction that the Russian Federation made

11  based on those Soviet determinations that played a role

12  in what became the Russian-Chechen wars?

13      A.    Well, the dissolution of the Soviet Union left

14  all the Union republics on the outside as independent

15  countries.  Whereas, those parts that Lenin had

16  classified as subdivisions of the Russian Federation,

17  the Russians insisted they would keep them, but that was

18  quite resented by these people who thought they were

19  every bit as alien to Russia as the other ones.

20      Q.    That included the Chechens?

21      A.    Absolutely.

22      Q.    Now, in terms of the Russian-Chechen situation,

23  I think the jury has heard that there were two main

24  periods of warfare.  I'd like to direct your attention

25  to the warfare in '99 and 2000.  And if you could tell

1    us, please, the perception of that conflict in the world

2    in that period.

3              MR. GORDER:  Objection, Your Honor.

4              THE COURT:  Sustained.

5    BY MR. WAX:

6       Q.    Was there concern about what Russia was doing

7    with respect to Chechnya?

8              MR. GORDER:  Objection.

9              MR. WAX:  I'm sorry, I didn't hear a ruling.

10             THE COURT:  You did not hear one.  The

11   objection is sustained.

12   BY MR. WAX:

13      Q.    Did you have concern?

14             MR. GORDER:  Same objection.

15             MR. WAX:  Your Honor, the government --

16             THE COURT:  Overruled.

17             MR. WAX:  Thank you.

18   BY MR. WAX:

19      Q.    Did you have concern?

20      A.    Yes, because I thought that an agreement had

21   been made in which Chechnya would be given a very large

22   measure of autonomy, and then the Russian army proceeded

23   to suppress the degree of autonomy that they thought had

24   been achieved, and I thought that was probably a foolish

25   thing to do.

1      Q.    And do you have an understanding of whether

2    there were other people who shared that perspective?

3           MR. GORDER:  Objection.

4           THE COURT:  The objection is sustained.

5    BY MR. WAX:

6      Q.    Have you -- were you aware or have you become

7    aware that Muslim people were concerned about the

8    situation in Chechnya?

9      A.    Speaking from my own experience as someone who

10   has circulated widely in and among Muslim peoples for

11   the last 30 years, and in that period of time I was in

12   business traveling throughout the Islamic world where

13   people talked about this a lot, it seemed to me that, in

14   my own experience, the Muslims I knew were very upset

15   about Russia's actions in Chechnya.

16     Q.    Was -- did you experience any interactions with

17   non-Muslims in that same period about the Russian-

18   Chechen situation, your personal experience?

19          MR. GORDER:  Objection.

20          THE COURT:  Overruled.

21          THE WITNESS:  Well, yes, I knew a lot of people

22   in Washington and New York in the foreign policy

23   community --

24          THE COURT:  No, you can -- don't go into that.

25          THE WITNESS:  All right.

1    BY MR. WAX:

2        Q.    Without referencing the people, tell us,

3    please, about your experience.

4              MR. GORDER:  Objection, Your Honor.

5              THE COURT:  The objection is overruled.

6              THE WITNESS:  People generally thought that the

7    Russian action was unjustifiable and excessive in that

8    period.

9    BY MR. WAX:

10       Q.    Thank you, sir.  Now, there was some testimony

11   about an incident in August of 1999 in Moscow, and my

12   question is whether or not you have any knowledge of --

13   belief about the actual perpetrators of that bombing.

14             MR. GORDER:  Objection, Your Honor.

15             THE COURT:  Sustained.

16             MR. WAX:  It's something that came from the

17   government's witness, Your Honor.

18             THE COURT:  You have my ruling.

19             THE WITNESS:  Am I to answer the question?

20             THE COURT:  No.

21   BY MR. WAX:

22       Q.    All right.  Let's go back to Saudi Arabia, sir,

23   and let me ask you a few more questions about that.  I'd

24   like to ask you, please, what you have learned in your

25   career about the role of the Saudi government with

 1    respect to charities.

 2        A.    The Saudi government, because it is of fairly

 3    shaky legitimacy in Islamic terms except in the way I

 4    described, seeks to maintain a very tight control over

 5    all things involving funding, external funding, internal

 6    organizations of various kinds, meetings.  And is -- it

 7    generally tends to supervise very closely anything they

 8    think might get out of hand and cause them trouble in

 9    the world generally.  And they are very, very tough

10    about this.

11        Q.    Are you familiar with an organization called

12    al-Haramain?

13        A.    Of course.

14        Q.    And what, if anything, can you tell the jurors

15    about your understanding of what al-Haramain was in the

16    year 1999, 2000?

17        A.    My understanding is that this was a Saudi

18    religious charity, which by its charter and by the

19    character of its board of supervisors, was empowered to

20    distribute Zakat from foreign donors, largely, that

21    these are alms, which is a religious duty in Islam,

22    given by people as a tithing, you know, to groups of

23    people who were, in fact, the deprived, the widows and

24    orphans, the wounded, people fasting during Ramadan,

25    things like that.  And I'll stop there.

1     Q.    Do you know anything about the governing

2  structure of al-Haramain?

3     A.    Yes.  I mean it was --

4           MR. GORDER:  Objection.  Can we have a further

5  foundation?

6           MR. WAX:  He has explained his extensive

7  experience in the Middle East.

8           THE COURT:  Just a moment.  Members of the

9  jury, I'm going to excuse you to the jury room for a few

10 minutes.

11          (Jury exits the courtroom at 11:15 a.m.)

12          THE COURT:  I will see counsel in the jury room

13 on the fourth floor.

14          (A closed session was held.)

15          (Jury absent from the courtroom.  11:36 a.m.)

16          THE COURT:  Colonel Lang, when did your

17 security clearances lapse?

18          THE WITNESS:  Beg your pardon?

19          THE COURT:  When did your security clearances

20 lapse?

21          THE WITNESS:  Well, when I left DIA -- when I

22 resigned from DIA, I was debriefed from all my accesses,

23 and then my clearance was restored about six years ago.

24          THE COURT:  When did you leave DIA?

25          THE WITNESS:  In the fall of 1994.

Lang - D by Mr. Wax                                96

1          THE COURT:  All right.  And you know that with

2    those clearances, and you had a very high level of

3    security clearance, but you know that you signed an

4    agreement to protect those things for the rest of your

5    life, that information.  And I don't have to remind you

6    of that, but it's true.  We're both in that same boat.

7    And I just caution you against basing your answers on

8    information you learned when you were with DIA.

9          THE WITNESS:  Your Honor, I am -- have a great

10   deal of knowledge, and there is only a fairly small

11   amount of it that's specifically the result of my

12   employment at DIA.

13         THE COURT:  Well, did you understand what I

14   said?

15         THE WITNESS:  I did.

16         THE COURT:  All right.  We understand saluting

17   uniforms around here, don't we?

18         THE WITNESS:  Yes, we do.

19         THE COURT:  All right.  Fine.  Seat the jury.

20         MR. WAX:  Your Honor, I'd like the record to

21   reflect an objection to the court's ruling.

22         THE COURT:  It was not a ruling -- well, I

23   guess it was.  It was an admonition.  It was a reminder

24   of what he has agreed to.

25         MR. WAX:  Well, I believe -- I am objecting to

1    the breadth of the court's admonition.  I do not believe

2    that it is consistent with the obligation that the

3    colonel has.  And I want the record to reflect that,

4    please.

5            THE COURT:  Well, nevertheless, Colonel, you

6    understand that in this particular forum, I'm in charge.

7            THE WITNESS:  Yes, I do.  You are in charge.

8            THE COURT:  Go ahead.  Seat the jury, please.

9            (Jury enters the courtroom at 11:39 a.m.)

10           THE COURT:  Go ahead.

11           MR. WAX:  Thank you.

12   BY MR. WAX:

13      Q.    Colonel, I'd like to ask you about al-Haramain

14   and your understanding of the operation of al-Haramain

15   in 1999, 2000, to the extent that you are able to

16   testify about that.

17      A.    Based on the unclassified documents that you

18   have shown me, I would say -- and my knowledge of the

19   function of the Saudi government within their society, I

20   would say that al-Haramain was under tight control by

21   the Saudi government in its operations, and it was

22   closely supervised both within al-Haramain and by

23   supervising committee made up of senior ministers and

24   princes of the royal house.

25      Q.    In terms of the relationship between

1    al-Haramain and the committee that you just referred to

2    and the Saudi government, what, if anything, can you

3    tell us in this sort of setting about the membership of

4    Saudi officials on the committee?  And, specifically,

5    which committee are you referring to?

6        A.    I have a hard time remembering these initials.

7        Q.    SJRC?

8        A.    All right.  Well, first of all, among the

9    unclassified documents you showed me, one was a royal

10   decree from the king himself, which -- and another from

11   the prime minister of Saudi Arabia, who is now the king,

12   creating this SJRC committee for the specific purpose of

13   oversight over a number of charities, most -- religious

14   charities.

15            And they -- the members of the oversight

16   committee were named in both cases.  And there is the

17   Minister of the Interior, who was a police minister; the

18   Minister of Foreign Affairs; the Minister of Religious

19   Affairs; the Chief of the External Intelligence Service,

20   and several other people.  Those are the ones who are

21   the most striking.  And a man who was the -- a doctor

22   who was the head of the Saudi Red Crescent, their

23   version of the Red Cross.  And those functions were

24   reproduced at both these levels.  And the directives and

25   the charters for these committee and for al-Haramain

1    specified that, in fact, that the -- these charities,

2    including al-Haramain --

3              MR. GORDER:  Your Honor, I'm going to object

4    to -- he's basically reading from documents that are

5    hearsay.

6              THE COURT:  Yes.

7              MR. WAX:  I don't believe he has anything in

8    front of him to be reading from.

9              THE WITNESS:  No.

10              THE COURT:  Well, you can go ahead.  You can go

11    ahead.  It's just -- if you find that it was merely

12    repeating what's in a document, that is hearsay, you can

13    consider it, but not for the truth of it.  Go ahead.

14              THE WITNESS:  Well, these appear to be

15    government documents to me.  And they specify that --

16    and in the charter of these organizations, that they

17    should restrict their activities to the administration

18    of donations from pious Muslims for alms giving.

19    BY MR. WAX:

20    Q.    And in terms of your understanding from

21    unclassified sources of the way in which the Saudi

22    government, Saudi charities operate, is what you have

23    just described consistent with your general unclassified

24    understanding?

25    A.    Yeah.  I think one of the things you have to

Lang - D by Mr. Wax                                    100

1    understand about the senior members of the Saudi

2    government is that, in my opinion and experience of

3    them, they are not really hypocrites.  They actually

4    believe in the tenets of their religion.  And a duty to

5    administer alms provided -- donated by pious Muslims for

6    the needy, would be taken seriously by them.  And I find

7    it very difficult that they would do anything else, to

8    believe they would do anything else.

9        Q.    All right.  So in terms of a suggestion that

10   funds that were donated for Zakat with a specific

11   designation of assisting orphans or other refugees in

12   the Chechen conflict, how would something like that be

13   treated under the Saudi governmental and governmental

14   charity structure?

15           MR. GORDER:  Objection, Your Honor.

16           MR. WAX:  It's exactly what --

17           THE COURT:  The question is overruled.

18           MR. WAX:  Thank you.

19           THE WITNESS:  Actually, I don't understand the

20   question, so.

21   BY MR. WAX:

22       Q.    Someone gives Zakat, you said that the people

23   are not hypocrites?

24       A.    Yes.

25       Q.    And the Zakat has a designation, give us the --

1      A.      As to purpose?

2      Q.      As to purpose.

3      A.      Yeah.

4      Q.      And how would the Saudi government regulating a

5  charity that received such a donation operate?

6      A.      They would seek to ensure that the funds went

7  to that purpose.

8      Q.      All right.  Now, in terms of funding of

9  fighters --

10     A.      Yes.

11     Q.      -- and how the Saudi government would operate

12  and what it would permit, what can you tell us, sir?

13     A.      If there were a matter of state policy to

14  support Chechen rebels against the Russians, the Saudi

15  government has the apparatus within itself to do that,

16  and infinite resources, without resorting to diverting

17  money from a religious charity, fairly small amounts of

18  money, too.

19     Q.      So in the real world, as you have experienced

20  it, and as you can describe it through unclassified

21  information, how would it work if the Saudi government

22  wanted to allow funding of mujahideen in Chechnya?

23             MR. GORDER:  Objection, Your Honor.

24             THE COURT:  Overruled.

25             THE WITNESS:  The government would do it

1    itself.  It has the internal organs to do that.  And it

2    has the funds.  They would have no need to do it using

3    funds provided to these charities.

4    BY MR. WAX:

5       Q.    Now, in terms of the relationship between the

6    people in what we generally call the Mideast region, is

7    there a difference ethnically between Arabs and

8    Persians?

9       A.    Of course.  The --

10      Q.    Help us out, please.

11      A.    The Persians are an Indo-European people who

12   speak a language that is related to various European

13   languages, but has a lot of Arabic loan words in it.

14   The Arabs are a Semitic people who speak a strictly

15   Semitic language that doesn't have a lot of loan words

16   in it.

17      Q.    Is there also, beyond the linguistic, are there

18   some religious differences between the Persian stock

19   primarily in Iran and the Arabs in Saudi Arabia?

20      A.    Most Persians are Twelver Shia and the Saudi

21   Arabians have some Twelver Shia in their eastern

22   province near the Persian Gulf, but the vast majority of

23   them are Sunni Muslims of the Wahhabi sect.  And those

24   two things don't mix very well.  The Wahhabis only

25   barely tolerate the Shia as fellow Muslims.

1       Q.    And as a general proposition in terms of the

2  degree of trust that a Wahhabist in Saudi Arabia would

3  give to a person who is of Persian extraction and

4  practicing a very different form of religion, how would

5  that affect the degree of trust that would be given?

6             MR. GORDER:  Objection, Your Honor.

7             THE COURT:  Overruled.

8             THE WITNESS:  He would not be a trusted person.

9  He might be tolerated, might be used as a useful

10 instrument, but would not be a trusted person.

11 BY MR. WAX:

12      Q.    And in terms of not being a trusted person, if

13 a Wahhabist Saudi were going to be engaging in

14 activities that were going contrary to the views of what

15 some might view as legality, would they let a Persian,

16 non-Wahhabist know about it?

17      A.    It seems very unlikely to me in my opinion,

18 yeah.

19      Q.    Thank you, sir.  I'd like to turn for a moment

20 then, please, to the little bit about the Saudi economy.

21 You've told us you had a great deal of experience living

22 and working there in the region.

23      A.    Well, first for the government and then as a

24 businessman.

25      Q.    Okay.  So I don't think we're going to run into

1    issues here.  Can you tell us, sir, as a general

2    proposition, are there differences between the way in

3    which the Saudi economy functions on a day-to-day basis

4    as contrasted with the American economy?

5        A.    Big businesses, really big businesses, function

6    much the same way, because of the heavy mixture of

7    foreign talent to help administer these businesses.

8    Smaller businesses that are run by local entrepreneurs

9    or people who are civil servants, or people -- or just

10   merely well-to-do tend to function on the basis of trust

11   a great deal more than here.  And people are pretty

12   sloppy about accounting.

13            There are no real taxes in Saudi Arabia except

14   for religious taxes.  And people are just not concerned

15   about everyday accounting measures the way we are.

16            Having had to negotiate contracts with these

17   people a lot, I found it quite frustrating at times.

18       Q.    In terms of cash, is there a difference in the

19   way in which cash is used in this country as contrasted

20   with Saudi Arabia?

21       A.    Americans don't tend to walk around with a lot

22   of cash or cash instruments and they do.  I mean, 10 or

23   $15,000 worth of walking-around money is nothing,

24   really, in -- for the people who are fairly well-to-do

25   in Saudi Arabia.  And they tend to do things that are --

Lang - D by Mr. Wax                                      105

1   for us -- seem rather bizarre like commingling funds,

2   official funds and other people's funds, government

3   funds, your funds.

4           And if you put the money -- government money in

5   your bank account and then you put it back in somewhere

6   else, nobody will say a word about this.  This is a

7   country in which they cut your hand off for stealing.

8   And that -- if you mess with that, this is a form of

9   theft.

10  Q.    And you have personally experienced this --

11  obviously not having your hand cut off --

12  A.    No.

13  Q.    -- but observing the way in which the economy

14  operates, '80s, '90s and beyond?

15  A.    Yes, certainly.  They see no reason to change

16  the way they do things.

17  Q.    In terms of traveler's checks, do you have any

18  experience, observations, of the way in which traveler's

19  checks are used in Saudi Arabia as contrasted with

20  traveler's checks in this country?

21  A.    No.  I have never seen a widespread use of

22  traveler's checks in Saudi Arabia.  People who carry

23  tend to carry around letters of credit or a lot of cash

24  in several currencies, or maybe a super-duper credit

25  card with purple, black, whatever, you know, something

1    like that.  But a large number of traveler's checks,

2    this is a peculiarity for me.

3        Q.    Okay.  In terms of the tracing of money and

4    what is involved in tracing money, what, if anything,

5    can you tell us about how one might go about that.

6            MR. GORDER:  Objection, Your Honor.  He has a

7    lack of foundation with his experience.

8            THE COURT:  Yeah, lay a foundation.

9    BY MR. WAX:

10       Q.    Sir, can you tell us whether or not you have

11   any experience dealing with efforts to trace money?

12       A.    Yes.

13       Q.    Okay.  Do I take it that I cannot ask you

14   anything in particular about that or can I?

15       A.    I think you cannot actually, but other than

16   that I have experience with that, yes.

17       Q.    All right.  What can you tell us then?

18       A.    Well, it's perfectly possible to trace bank

19   transfers.

20       Q.    All right.  And in terms of making an effort to

21   determine what happens with money, would it be important

22   to look at receipts if they are available?

23       A.    If the documents are available, certainly.

24       Q.    Okay.  And would it be important to make an

25   effort to determine if a receipt has a bank account

1    number on it, whether or not the money went from the way

2    in which that receipt indicated?

3        A.    It would certainly -- if there is an account

4    name and number on the receipt, I would think that would

5    be a help, yes.

6        Q.    And in terms of your experience of the way in

7    which things worked or should work, would that be

8    something that you believe would be important and that

9    you would want to do, if you were making such an effort?

10       A.    Yeah, I would.

11       Q.    Did you have an opportunity to review and

12   examine a number of -- or two specific receipts in this

13   case?

14       A.    Yes.

15       Q.    And did you examine them based on your

16   experience working with the economy in Saudi Arabia?

17               MR. GORDER:  Objection, Your Honor.

18               THE COURT:  The objection is overruled.

19               THE WITNESS:  They seemed to me to be typical

20   cashier's receipts for money received, the two you are

21   talking about, torn out of some kind of ledger book,

22   probably has a stub.  And I read them in both Arabic and

23   English.

24   BY MR. WAX:

25       Q.    And did you find markings on them that would

1    suggest that they are authentic or inauthentic?

2       A.    Well, the way things like this work in that

3    part of the world, the commercial legal tradition is

4    that of the Ottoman Turkish Empire, which was very

5    focused on things like seals, serial numbers on

6    documents, signatures, often stamped usually with a

7    government-issued stamp.  And these two documents all

8    have those markings on them.  And those things would --

9    those -- the presence of those indicia would make them

10   appear to be legal commercial documents.

11      Q.    And with your understanding of the legal and

12   commercial system in Saudi Arabia, what, if any,

13   penalty --

14      A.    It's not just Saudi Arabia, by the way, it's

15   all over that region.

16      Q.    Okay.  Focusing on Saudi Arabia, what, if any,

17   penalties would one -- well, I'll withdraw that

18   question.

19            Your Honor, I am going to renew the offer of

20   Exhibits 704 and 705 and ask that they be shown to

21   Colonel Lang.

22            MR. GORDER:  Your Honor, we'd object, lack of

23   foundation.

24            THE COURT:  All right.  Well, the exhibits are

25   not received.  I'll make the record later in another

1    setting.

2              MR. WAX:  Thank you.  If I could have a moment,

3    please, Your Honor.

4              THE COURT:  Yes.

5              (Discussion held off the record.)

6              MR. WAX:  Thank you, Your Honor.  Colonel Lang,

7    I'd like to ask you one more -- actually, I don't.

8              Thank you, Your Honor.  No further questions.

9              THE COURT:  Cross.

10             MR. GORDER:  Thank you.

11                        CROSS-EXAMINATION

12   BY MR. GORDER:

13      Q.    Can you tell us when was it you were in Yemen

14   as the attaché?

15      A.    About 25 years ago, 1980 to '82.  And I've been

16   back four times since for a week or so at a time each

17   time.

18      Q.    And then at some point you went to Saudi Arabia

19   as the attaché, if I understood your testimony?

20      A.    That's right.  Later in that same decade for

21   three years.

22      Q.    Okay.  And what years were those?

23      A.    Those were late '82, '83, and '84.  I hope I

24   get the dates right.  It's been a while.

25      Q.    Mid 1980s?

1    A.    Yeah.  And I've been back there any number of

2  times, too.

3    Q.    And then when were you at the Defense

4  Intelligence Agency?

5    A.    Well, I worked for the Defense Intelligence

6  Agency in one capacity or another from, let's see, 1979

7  until I retired from DIA in August -- fall of 1994.

8    Q.    You've been out of government since then?

9    A.    Except for the consulting we've been talking

10  about.

11    Q.    You indicated that you had written an article

12  called "Wahhabism and Jihad"?

13    A.    Yeah, that was about ten years ago, I think.

14    Q.    March 10, 2003?

15    A.    That's about right.

16    Q.    Okay.  Could you tell the jury, what is

17  Wahhabism?

18    A.    Wahhabism is an understanding of Sunni Islam

19  formed on the basis of the Hanbali law code as

20  interpreted by the learned person Ibn-al-Wahhab in the

21  eighteenth century.  And it tends to form its opinion of

22  law on the basis, not of all the different roots of the

23  law as the other Sunni schools of law do, but instead

24  only on scripture, on the Qur'an and on Hadith, which is

25  the tradition of the practice of the Prophet and of the

1    early Islamic community as understood by the Wahhabis.

2    They have their own -- different schools of Islam have

3    different codes of tradition.

4              And their judges in their jurisprudence, people

5    who are called fukaha, the singular is fakih, form

6    collections of jurisprudence based on case law derived

7    from the scripture only as understood by the Wahhabis.

8    And these things are used as -- for the basis of rulings

9    by Wahhabi judges called Qadis in Saudi Arabia, and also

10   Qatar as well where this is accepted.  And it is a

11   distinctive form of Sunni Islam, which tends to be quite

12   intolerant of other forms of Islam, like the Shia and

13   the Sufi Mystics who believe that God is love and that

14   religion is mostly about how you feel about God.

15   Q.    You testified that this Wahhabism is the

16   prevailing sect in Saudi Arabia; is that correct?

17   A.    It is the prevailing sect in Saudi Arabia.

18   Q.    And the government has to get along with it; is

19   that correct?

20   A.    Absolutely.  Because -- would you like an

21   embellishment of that?

22   Q.    No.

23   A.    Okay.

24   Q.    "Wahhabism demands unceasing death against

25   other less observant Muslims and non-Muslim

1  unbelievers;" is that right?

2      A.    Not necessarily.

3      Q.    Haven't you written that?

4      A.    No, I don't -- well, what are you referring to?

5      Q.    Your article, "Wahhabism and Jihad."

6      A.    I think that Wahhabism is closely tied to the

7  issue of whether or not some people can interpret the

8  scriptures and the traditions in such a way as to

9  believe that unending violent jihad is a necessary duty

10 for Muslims.

11     Q.    Did you write "Wahhabism cites the Qur'an's

12 description of war made against unbelievers in the first

13 centuries of Islam to justify, indeed to demand,

14 unceasing war to the death against other less observant

15 Muslims, and especially against non-Muslim unbelievers"?

16     A.    If I did write that, I think I was, in fact, in

17 error, because I think, in fact, that it is quite

18 possible for people who are of the Wahhabi sect to

19 interpret their own tradition in such a way that it does

20 not, in fact, require unending war against unbelievers.

21 If I made that mistake --

22     Q.    Well, would it help --

23     A.    -- I need --

24     Q.    -- to refresh your recollection to look at a

25 copy of the article?

1      A.    No.  I'll take your word for it.  I've not been

2   right in everything I ever wrote.

3      Q.    Okay.  So you take it back?

4      A.    That particular sentence?

5      Q.    Yes.

6      A.    Yes, I would take that back.

7      Q.    "This war against the infidels is the jihad, a

8   moral obligation of every true Muslim."

9      A.    You know, I think you're taking things out of

10   context a little.  In fact, what I was saying there --

11      Q.    Did you want to see --

12      A.    -- is Wahhabism, in fact, tends to --

13      Q.    -- the article?

14      A.    -- lead to a mentality in which it is easy to

15   interpret the scriptures in such a way as to think you

16   are required to act in that particular way.

17           And if you look at the underlying mentality of

18   the al-Qaeda terrorists, you will see that they are, in

19   fact, based on Wahhabism.

20           MR. GORDER:  Your Honor, could I ask the clerk

21   to give a copy of this to the witness?

22           THE COURT:  Yes.

23           MR. WAX:  May I have a copy, please?

24           MR. GORDER:  Yes.

25           MR. WAX:  Thank you.

1             THE WITNESS:  Thank you.

2    BY MR. GORDER:

3        Q.     Is that a copy of your article "Wahhabism and

4    Jihad"?

5        A.     Yes, it is.

6        Q.     It was in *America* magazine March 10, 2003?

7        A.     Certainly.

8        Q.     And if you turn to page 3.

9        A.     Okay.

10       Q.     In the first paragraph that actually begins on

11   that page, did you write "This war against the infidels

12   is the jihad, a moral obligation of every true Muslim"?

13       A.     We must not be on the same page.

14       Q.     Page 3.

15       A.     Oh, I see, "This war against the infidels is

16   the jihad, a moral obligation of every true Muslim."

17       Q.     So you did write that?

18       A.     Yeah, I did.

19       Q.     al-Haramain was a Wahhabi organization?

20       A.     Well, it existed in Saudi Arabia in the context

21   of Saudi society, so I think you would have to say yes.

22       Q.     Now, you've testified in the past that you are

23   not an expert on the Caucasus; is that correct?

24       A.     No, that's correct.  Well, I'm not in the kind

25   of detail that your man is.

 1     Q.    Not in the kind of detail that Mr. Kohlmann is?

 2     A.    That's correct.

 3     Q.    Are you familiar with the Kavkaz Institute?

 4     A.    I am familiar that there is something called a

 5  Kavkaz Institute.  There are many things that have been

 6  called the Qoqaz, Kavkaz, Caucasus, this or that.  It is

 7  not clear to me exactly what that was or where it

 8  existed in time, in fact, because it is variously

 9  described as a Web site, a publication, a training

10  center, it's not clear to me what it was.

11     Q.    Well, if we could have SW-48.

12     A.    Yeah, I see this picture.

13     Q.    This is one of the exhibits in this case.  You

14  indicated that you had reviewed the exhibits for the

15  government?

16     A.    I've seen this picture.

17     Q.    You recognize this as the Kavkaz Institute in

18  Chechnya?

19     A.    No.

20     Q.    Were you aware that al-Haramain claimed to

21  support the Kavkaz Institute?

22     A.    I am aware that al-Haramain said that it

23  provided funds for teachers and various things of that

24  kind at the Caucasus Institute, yes.

25     Q.    Do you know what they were teaching?

1      A.    I do not.  How could I know?

2      Q.    SW-8, please.  If we could go to some of the

3  pictures.  Now, sir, you testified that jihad can be an

4  internal struggle; is that correct?

5      A.    Yeah.

6      Q.    It can also be a violent struggle?

7      A.    Absolutely.

8      Q.    If we could scroll through the pictures.  Would

9  you agree that these pictures depict a violent struggle?

10     A.    They depict a war.  War is --

11     Q.    Not an internal struggle?

12     A.    I beg your pardon?

13     Q.    Not an internal struggle?

14     A.    Oh, I see what you mean.  This is war.

15     Q.    Do you know who -- well, actually let's go to

16  SW-45.  Do you recognize these gentlemen?

17     A.    I don't know them in the detail you do.  I

18  presume somebody is ul-Khattab and somebody is Shamil

19  Basayev or somebody like that.

20     Q.    You just don't know that much about the Chechen

21  mujahideen?

22     A.    Well, how is it relevant?

23     Q.    I'm asking whether you know anything about the

24  Chechen mujahideen?

25     A.    I know that -- I don't know a great deal about

1    their internal politics or how they were -- or what the

2    succession was or that kind of thing, no, I don't know

3    that.

4        Q.    You testified about fatwas.  What are fatwas

5    again?

6        A.    A fatwa is a religious opinion issued by a

7    religious scholar on a subject that has to do with a

8    point of law in Islam, which is defining as to what

9    Islam is.  There are as many fatwas, of course, as there

10   are people who could issue fatwas.

11       Q.    SW-30, please.  Have you reviewed this exhibit?

12       A.    I don't particularly remember this one, no.

13       Q.    You don't recognize this as the English

14   translation of a fatwa from the al-Haramain Web site?

15       A.    I am aware of the fact that there were

16   several -- several Muslim religious scholars who were

17   allowed to post things on the al-Haramain Web site,

18   which included admonitions to jihad, yes, I know that.

19   If this is one of them, okay.

20       Q.    Well, do you remember seeing this one?

21       A.    I don't remember this particular one, no, but

22   I've seen several of them, yes.

23       Q.    If we can scroll down just a little bit.  Next

24   page.  Could you take a look at this particular part of

25   the fatwa?

1      A.      Whose fatwa is this?

2      Q.      Somebody named Jibreen.

3      A.      Okay.

4      Q.      Were you aware that this was on the al-Haramain

5  Web site in the Chechnya relief section?

6      A.      I am aware that there were several similar

7  fatwas on the al-Haramain relief site.  I can give you a

8  reason why I think they were there.

9      Q.      Did you read this fatwa?

10     A.      Yeah, I did, insofar as it appeared amongst the

11 exhibits, yes.

12     Q.      And it says it's obligatory upon the Muslims to

13 supply them with weapons and real power?

14     A.      This is -- this -- a fatwa of this kind is a

15 religious opinion of one scholar.  Now, if al-Haramain,

16 which forms its basis of support in Saudi religion, as

17 all institution does, by a process of compromise and

18 consensus found it necessary to put that there, it's

19 certainly unfortunate, but I don't think it indicates

20 that it is more than a compromise effort to please some

21 senior cleric.

22     Q.      You indicated that the SJRC in your expert

23 opinion was tightly controlling what al-Haramain was

24 doing --

25     A.      Yes.

1     Q.      -- with its money; is that correct?

2     A.      I think it's inherent in the structure of the

3     thing.

4     Q.      So when the Web site indicated that it was

5     obligatory upon Muslims to supply the mujahideen in

6     Chechnya with weapons and real power and to strengthen

7     them with financial donations, is that what you consider

8     expert or strict control?

9     A.      I think that the fact that they let this be on

10    their Web site was a big mistake.

11    Q.      So they were not under control?

12    A.      No, I think they were under control, but if you

13    think the princes who are on this committee supervised

14    everything that was on the al-Haramain Web site and

15    never missed anything, I think that would be incorrect.

16    Q.      Now, if we could go to SW-68.  This is -- do

17    you recognize this particular document, sir?

18    A.      Well, you know, you show these things to me

19    like this, and I don't particularly recognize this

20    particular document, no.

21            Is this another fatwa that was on the

22    al-Haramain Web site?

23    Q.      Well, you testified that you reviewed all the

24    government exhibits.

25    A.      That doesn't mean I memorized them.

Lang - X by Mr. Gorder                                        120

 1      Q.      You don't recognize this one?

 2      A.      Well, it's obviously an exhortation to support

 3  people in Chechnya who are in revolt against the

 4  Russians.  What is the rest of it?

 5      Q.      Scroll down just a little bit.  Somebody is

 6  asking what is the ruling on giving charities and Zakat

 7  to Muslims in Chechnya.  Do you recognize that -- does

 8  that refresh your memory that you saw this exhibit?

 9      A.      Is this about my memory?  I don't understand.

10  I understand what this says.  And if you tell me it was

11  on the al-Haramain Web site, I'm quite willing to accept

12  that.  And what it says is that it is permissible to --

13  that Zakat could be used for the mujahideen fighting the

14  war, and the poor and charity.

15          The fact that -- the mujahideen have to eat,

16  too, you know, and so the fact that some of this might

17  have ended up in their hands to do that is -- I don't

18  think it means a great deal, because when you are

19  dealing with a Muslim rebel organization somewhere,

20  they, too, have the view in fact that all of life is a

21  seamless garment.

22          And like Hezbollah in Lebanon, Hezbollah

23  administers charities and government in southern Lebanon

24  for everyone.  And these people, when they are running a

25  piece of Chechnya, they also take care -- even though

1    they are fighting the Russians, they also take care of

2    feeding people, and the homeless, and sick, and things

3    like this.

4           So it's very difficult for somebody sending

5    money from Saudi Arabia to be sure of what the exact

6    purpose is that it will be put to at the other end.

7    Q.    It's very difficult?  I thought that the Saudi

8    government had strict control?

9    A.    Well, until the money goes overseas.  Once it

10   gets to a place like Chechnya, how are they going to

11   exert strict control?  We send a lot of money to

12   Afghanistan, can we exactly be determined as to how it's

13   used there?

14   Q.    We're not here to talk about Afghanistan, sir.

15   This particular fatwa was found in the defendant's

16   computers.  Are you aware of that?

17   A.    There are -- a great many things were found in

18   the defendant's computers, various messages sent to him,

19   things from overseas that were on distribution lists.  I

20   don't think the possession of messages in a library or

21   in an archive in your computer indicates anything other

22   than interest on your part in what's going on.  I have a

23   lot of things in my library, too.

24           MR. GORDER:  Your Honor, can we strike the

25   answer as nonresponsive?

1          MR. WAX:  It was directly responsive to the

2    question.

3          THE COURT:  We don't need argument now.  We'll

4    let the jury decide whether it was responsive.  Go to

5    the next question, please.

6    BY MR. GORDER:

7      Q.    In any event, this particular fatwa indicates

8    that Zakat in the land of the Caucasus, specifically

9    Chechnya, is permissible for the mujahideen?

10     A.    Yeah, but what purpose the mujahideen might put

11   it to is not specified in this document.

12     Q.    So you are telling us that when the Saudi

13   government was exercising strict control over

14   al-Haramain, that did not include preventing money from

15   going to the mujahideen as long as it was for food?

16     A.    Once funds arrive in a place like Chechnya in

17   an active war zone in the hands of a rebel group that

18   sees itself responsible for all aspects of life, I don't

19   think there is any way you can control exactly what use

20   it will be put to.

21     Q.    Exactly.  It could be used for bombs?

22     A.    I don't think there's any way you can know what

23   they will do.  But that doesn't mean, in fact, that the

24   al-Haramain charity intended for it to go to that at

25   all.

1      Q.     Ammunition?

2      A.     I'm not going to answer that question.  I said,

3  you don't know what kind of use they might put it to.

4      Q.     You have no idea once it leaves the country?

5      A.     That's right.  Once the funds go from Saudi

6  Arabia through some channel to Chechnya in the middle of

7  a war against the Russians, into the hands of some

8  fighting group that also exercises social

9  responsibility, you have no way of knowing what they are

10  going to do with it.

11      Q.     Once it's converted to cash, it can be used to

12  buy food; is that correct?

13      A.     Money can be used for anything, can't it?

14      Q.     I'm asking you a question, sir.  Could you

15  please answer it.

16      A.     What is the question?

17      Q.     Once aid is converted to cash, it can be used

18  to buy food?

19      A.     It could be used to buy anything, yes.  It

20  could be used to buy food.

21      Q.     Ammunition?

22      A.     Yes, of course.

23      Q.     Guns?

24      A.     Yes.

25      Q.     To pay trainers to train soldiers?

1    A.    Yes.

2    Q.    The widows and orphans of the mujahideen?

3    A.    Certainly.  They are poor and destitute as

4  well.

5    Q.    Now, are you familiar with someone named Wail

6  Jalaidan?

7    A.    I've heard the name.  I don't remember who that

8  is.

9    Q.    He was the person who was appointed by the

10 Kingdom of Saudi Arabia as the first director of the

11 SJRC.

12   A.    Ah, yes, I remember that now, okay.

13   Q.    A good friend of Osama bin Laden's?

14   A.    Well, I don't know that to be true.  I know

15 that has been asserted, but I don't know that to be

16 true.

17   Q.    That would be a curious appointment, if you

18 were exercising strict control?

19   A.    I don't know that to be true.

20   Q.    Well, you indicated that you read the Senate

21 testimony of Evan Kohlmann?

22   A.    I did.

23   Q.    And did you read what he had to say on that

24 subject?

25   A.    I don't know that Mr. Kohlmann is right about

1    this.  He's a good researcher, but how do I know he

2    reached correct conclusions?

3        Q.    Did you read about --

4             THE COURT:  Counsel, this goes both ways.  I

5    don't favor witnesses commenting on another witness's

6    testimony.

7             (Discussion held off the record.)

8    BY MR. GORDER:

9        Q.    Sir, you have previously written "It was very

10   difficult for the government of Saudi Arabia to prevent

11   the export of vast sums of private Saudi money;" is that

12   correct?

13       A.    When did I write that?

14       Q.    If you could take a look at page 4 of the same

15   article, "Wahhabism and Jihad," last paragraph on the

16   bottom of page 4.

17       A.    Yeah.  This has to do with the support of

18   Wahhabi missionary works abroad.

19       Q.    This is missionary work by a group that

20   believes in endless war?

21       A.    That isn't the only thing they believe in, sir.

22       Q.    But you did write that "It has been almost

23   impossible for the government to prevent the export of

24   vast sums of private Saudi money to support Wahhabi

25   missionary works abroad."

1    A.    I think that's certainly true, but that doesn't

2    have anything to do with al-Haramain.  That has to do

3    with the willingness of rich Saudis to send their money

4    abroad to support missionary activity.

5    Q.    You don't know if it has anything to do with

6    al-Haramain or not, do you?

7    A.    No, but neither do you.

8         MR. GORDER:  No further questions, Your Honor.

9         MR. WAX:  A few follow-ups, please.

10                   REDIRECT EXAMINATION

11   BY MR. WAX:

12   Q.    Colonel Lang, with respect to some of the

13   questions that Mr. Gorder was asking about items found

14   on the computers taken from al-Haramain, your response

15   to one of the questions included something to the effect

16   of -- if I heard you correctly, it doesn't mean that

17   al-Haramain charity, al-Haramain Saudi, intended the

18   money to go anywhere.

19         The fact that there is a fatwa issued and is

20   put on a Web site where there is reference to charitable

21   work, what, if anything, does the presence of that fatwa

22   mean about the intent of al-Haramain Saudi, as you

23   understand it?

24   A.    Well, I can only give you my opinion.

25   Q.    That's what we're seeking.

1     A.    Yeah.   The -- I think that seeking the support

2    of various senior clerics in the Wahhabi religious

3    scholarly establishment, they allowed several things to

4    be put on their Web site which were probably

5    inappropriate.   And the references to military support

6    here I think were a bad idea, but I don't think they are

7    definitive of what they were doing.

8     Q.    Now, with respect to my client, Pete Seda,

9    you've been shown these items by the government today

10   that were on the computer.   You've also had the

11   opportunity to see things written or said by Mr. Seda

12   himself.

13    A.    Yes.

14    Q.    In terms of your work in assessing people for

15   32 years for the United States government, which type of

16   information is more important?

17         MR. GORDER:   Objection, Your Honor, he can't

18   comment on --

19         THE COURT:   Sustained.

20   BY MR. WAX:

21    Q.    Did you observe e-mails that are in evidence in

22   this court to and from Mr. Seda, between Mr. Seda,

23   al-Haramain Ashland, to al-Haramain Saudi, discussing

24   charitable works?

25    A.    Oh, yes.

Lang - ReD by Mr. Wax                                     128

1      Q.      And in your judgment, is the presence of those

2   e-mails important?

3              MR. GORDER:  Objection, Your Honor.

4              THE COURT:  Yeah, this gets into the province

5   of the jury, Mr. Wax.

6              MR. WAX:  I believe that Agent Anderson was

7   permitted to testify that she selected certain items

8   because she believed they were important.

9              THE COURT:  Well, all right, that -- I'm

10  just -- he can answer this question, but --

11             MR. WAX:  Thank you.  I will stop after this

12  question.

13             THE COURT:  -- you know what I'm saying.

14             MR. WAX:  Yes, sir.

15             THE WITNESS:  Could you repeat the question?

16             THE COURT:  Do you think those e-mails about

17  charity are important?

18             THE WITNESS:  Yes, I do.

19             MR. WAX:  Thank you.

20             THE COURT:  Anything further?

21             MR. WAX:  No.  Thank you.

22             THE COURT:  Other?

23             MR. GORDER:  No, Your Honor.

24             THE COURT:  You may step down.  Thank you.

25             THE WITNESS:  Thank you, Your Honor.

1          THE COURT:  Counsel, I'm willing to keep the

2   jury here for a while longer.  We're not going to have a

3   lunch break.  I'm going to just let them go this

4   afternoon.  I know you had some other people, a couple

5   short ones you want to put on.

6          MR. WAX:  Yes, we could put on two more short

7   witnesses, Your Honor.

8          THE COURT:  Do you need a break before we do

9   that?  Let's go ahead and do that.  Some of you may be

10  driving to the coast or who knows.

11         MR. WAX:  Your Honor, may Colonel Lang remain

12  in the courtroom?

13         THE COURT:  Yes.

14         MR. CASEY:  Call Mr. Taha.

15         THE CLERK:  Please step forward.  Please raise

16  your right hand.

17         (The witness was sworn.)

18         THE CLERK:  Please step around, have a seat.

19         THE WITNESS:  Thank you.

20         THE CLERK:  Please speak into the microphone

21  here.  And there is water here if you need some.

22         Please state your name and then spell your name

23  for the record.

24         THE WITNESS:  My name is Nabil, that's N like

25  Nancy, A like Adam, B like Bob, I-L, Nabil.  Last name

Taha - D by Mr. Casey                                     130

1    is Taha, T-A-H-A.

2                        DIRECT EXAMINATION

3    BY MR. CASEY:

4        Q.    Mr. Taha, where do you live?

5        A.    I live in Klamath Falls, Oregon.

6        Q.    And how long have you lived there?

7        A.    Boy, that's -- I moved in 1993 -- 1997, so

8    that's how much?  That's quite a bit, 13 years.

9        Q.    I'm -- you're asking the wrong guy, but it

10   sounds about right.  Where were you born?

11       A.    I'm sorry, sir?

12       Q.    Where were you born, sir?

13       A.    I was born in Cairo, Egypt.

14       Q.    And how long did you live in Egypt?

15       A.    I lived until I think about 26 years old when I

16   came to the States to study at Kansas State University.

17       Q.    Okay.  And did you complete a degree at Kansas

18   State University?

19       A.    Yes, sir, I finish my master and my Ph.D. in

20   engineering.

21       Q.    So you have a Ph.D., that's a doctor of

22   philosophy, in what?

23       A.    Civil engineering.

24       Q.    Civil engineering.

25       A.    Yeah, structural, building like this one.

Taha - D by Mr. Casey                                   131

1    Q.    Okay.  And then when is it that you -- what did

2    you do after you got out of school with your Ph.D.?

3    A.    I work in Kansas City for a while.  Then OIT

4    had an opening for a teaching position, so I moved to

5    Klamath Falls to teach at Oregon Institute of

6    Technology.

7    Q.    Were you a professor there?

8    A.    I was associate professor there, yes.

9    Q.    In what?

10   A.    Civil engineering.

11   Q.    And how long were you in that position at

12   Oregon -- what is it, Oregon Institute of Technology?

13   A.    Yes.

14   Q.    All right.

15   A.    I stayed seven years there.

16   Q.    Seven years.  And then did you start a

17   business?

18   A.    I start a business the next year I was joined.

19   In 1998, I started engineering firm called Precision

20   Structural Engineering.  And in 2004, the business grew,

21   we made money, and I did the silly things and resigned.

22   And I'm sorry I resigned because of the recession now,

23   so.

24   Q.    You resigned from the faculty at the

25   university, is that it?

 1      A.      Yes, sir.

 2      Q.      To pursue your business interests 100 percent

 3  of the time?

 4      A.      Yes, sir.

 5      Q.      And the business is -- what is it, Precision

 6  Structural Engineering?

 7      A.      Yes, sir.

 8      Q.      What does it do?

 9      A.      We do blueprints to construct a building like

10  this one.  Columns, beams, foundation, the skeletal of

11  the business I do, so I'm responsible for the safety of

12  the building, so I -- that building sounds safe to me

13  (indicating).

14      Q.      In that respect, does your -- has your business

15  had occasion to design churches and synagogues?

16      A.      Oh, absolutely.  I've designed personally about

17  15, 20 churches.  I'm pleased to have the icing on the

18  cake was one synagogue because that is not things you

19  see all the time.  So I did, yes.  I did a lot of them.

20  We give special discounts to churches because it's a

21  place of worship.  That's great.

22      Q.      And you remain in that business today?

23      A.      Yes, sir.

24      Q.      All right.  You are a, as I understand it, a

25  Muslim; is that correct?

Taha - D by Mr. Casey                                           133

1        A.      That's true.

2        Q.      Okay.  And where would you fall on the spectrum

3    of the Muslim religion, do you know?

4        A.      I hope my dad is not here.  On the loose side,

5    kind of.  I am liberal, very liberal kind of.

6        Q.      So in 1997, I think that's when you moved to

7    Klamath Falls; is that right?

8        A.      Yes, sir.

9        Q.      Okay.  In 1997, did you have occasion to seek

10   out a place to practice your religion?

11       A.      Yes, sir, I did.  And I looked in the paper and

12   I found Pete, the first time we prayed in his own house,

13   there was no place for worship at the moment.

14       Q.      How did you find Pete's prayer house, as it

15   were?

16       A.      Just in the phone book, and there was -- in the

17   Yellow Pages, there was an ad for the mosque, yes.

18       Q.      And that's how you came to know Mr. Seda?

19       A.      Yes, sir.

20       Q.      Were you a regular attendee at the prayer

21   services at his place?

22       A.      I did attend quite a bit.

23       Q.      How frequently would you attend?

24       A.      Sometimes once a week.  Sometimes once a month,

25   because I had two jobs at the moment, the college and

Taha - D by Mr. Casey                                    134

1    the business, so once a week or once a month, that -- it

2    fall in between.

3        Q.    So as I understand it, there were regular

4    weekly prayer sessions; is that right?

5        A.    Each Friday, yes.

6        Q.    Each Friday?

7        A.    And then once a month, potluck, social.

8        Q.    Potluck.  Do you have a family?

9        A.    Yes, sir.  I have a wife and two daughters.

10       Q.    Tell us about your family.

11       A.    I have a wife and two daughters.

12       Q.    Did you take your wife and two daughters with

13   you to attend the prayer sessions?

14       A.    Yes, sir.  Especially the social event, we love

15   the food, we love the event, and definitely I want to

16   spend some time with my family there, yes.

17       Q.    So the prayer group in 1997, that was in Pete's

18   house or trailer or --

19       A.    Yes, trailer, yes.

20       Q.    There came a time when it moved to somewhere

21   else?

22       A.    Yes, sir.

23       Q.    Where was that?

24       A.    That was the place in Ashland, 19 blah blah

25   blah.  You probably have the address.

1      Q.      South Highway 99?

2      A.      Yes.

3      Q.      And is that where the tent was?

4      A.      The tent?

5      Q.      The tent, yes.

6      A.      Yes, there was a tent and there was a nice

7   camel.  My kids loved to play with the weird shaped

8   thing that they're not used to the camel, so yeah, they

9   enjoyed playing with that.

10      Q.      And sometime in 1999, as I understand it,

11   Pete's organization purchased a building at that

12   location?

13      A.      Yes, yes.

14      Q.      And did you do some professional work in that

15   connection?

16      A.      Yes.  There was some cracks and the basement

17   wall of the building was tilting and it was cracking.

18   And Pete did ask me to look at it since I'm structural

19   engineer, and I did.  And I did some drawings to fix the

20   basement wall, and also do potential expansion.  So,

21   yes, I did that.  That was a gift, by the way, he got it

22   for free.

23      Q.      Tell the ladies and gentlemen of the jury, if

24   you would, what happens typically at prayer session.

25      A.      Prayer session -- prayer session or not the

1  potluck?

2      Q.     The prayer session, yes.

3      A.     The prayer session, we just go and there was

4  somebody supposed to give a speech.  And we listen to

5  speech.  After the speech, usually we social, like any

6  church.  It's really normal, like anybody else.  You

7  listen to the speech.  Sometimes you agree.  Sometimes

8  you don't.  I'm on the liberal side, so sometimes I tell

9  them, okay, say whatever you want, I do whatever I want,

10  and we social, and then everybody go to work because

11  it's on Friday.

12     Q.     So do a variety of people give the speeches?

13     A.     Yes.

14     Q.     Okay.  Did Pete sometimes give a speech?

15     A.     Yes.

16     Q.     Anybody else that you can recall offhand?

17     A.     Probably if some of the witness outside -- I

18  mean, it's -- we don't fund -- too much fund, so

19  sometimes he's asking me, which I deny because of lack

20  of knowledge, but any member of the community usually

21  can give a speech.

22     Q.     Okay.

23     A.     It's a volunteer work.

24     Q.     There has been some testimony in this case that

25  at the prayer house there was a gender separation, men

Taha - D by Mr. Casey                              137

1    were in one place and women in the other place.  Do you

2    have a view on that?

3         A.    Yes.  It is a hot issue.  Some people would

4    like to separate sexes.  It's baloney, so whenever I

5    can, I just remove that screen, and join my wife and

6    kids.  I would like to spend some time with them.  So

7    there are some people who would like to separate it, but

8    I personally against it.

9              And to be honest with you, Pete let me do

10   whatever I want in many cases.  So even though some

11   people wanted separation, I don't believe in it.  And he

12   didn't mind.

13        Q.    Do you continue to attend prayer session?

14        A.    As much as I can.  And to be honest with you,

15   the longer I live in the States, the looser I am, so I

16   attend less now.

17        Q.    Where do you go now?

18        A.    We have a place in Phoenix.

19        Q.    And people who attend prayer sessions in

20   Phoenix, it's a mosque in Phoenix; is that right?

21        A.    That's true, yes, sir.

22        Q.    Are they the same core group of people as

23   attended at Pete's place?

24        A.    Yes.  Absolutely.  I was one of them, and there

25   are others.  But with exception, of course, some people

 1   move out and people move in.

 2        Q.    Right.  Did you ever hear anything or see

 3   anything or witness anything going on at the prayer

 4   house that struck you as being radical?

 5        A.    I would say conservative rather than radical.

 6   Radical is a strong word.  I mean, separation is one of

 7   them, which is -- doesn't make sense to me, you living

 8   in the States, for God's sake, we are mixed everywhere.

 9   So separation doesn't make sense to me.  So radical, no,

10   but conservative, some people tried, yes.

11        Q.    Did you ever hear a Sheikh Hassan speak?

12        A.    Yes, I did one time.  And I got him after the

13   prayer and I gave him a piece of my mind.

14        Q.    Why is that?

15        A.    I mean, very tight, go back where you belong,

16   in my opinion.  If you are living in the States, just

17   relax and enjoy life, and love it.  It's a good life

18   here.  So I did give him a piece of mind for being --

19   not radical, though -- but just conservative, like

20   separation and all these things.  Just loosen up,

21   Mister.

22        Q.    What about Pete Seda, was he -- did you ever

23   hear him saying anything which you would consider

24   radical or in support of radical Muslim causes or

25   anything?

Taha - D by Mr. Casey                                    139

1       A.      To be honest with you, I would report anybody

2    that does something.  I mean, listen, I love this

3    country, and, Pete, if he is bad boy, he won't be my

4    friend.  I'm just simple as that.

5       Q.      You're a businessman, right?

6       A.      I'm sorry?

7       Q.      You're a businessman?

8       A.      I'm a businessman.  I have business in town.

9    And I have my family in town.  And I love this country.

10   And if I see something bad, I will report it.  I'm

11   sorry, Pete, I will report on him if he was a bad boy.

12      Q.      Can you afford to be seen with or to associate

13   with anybody that's considered to be radical?

14      A.      I don't like them.  I just -- it's not me, to

15   be honest with you.  I --

16      Q.      Do you think it might have some impact on your

17   business?

18      A.      Oh, yes, yes, yes.

19      Q.      Do you know if Pete has ever been associated

20   with peace-making activities?

21      A.      To be honest with you, I'm proud of him in that

22   area.  He did show up on TV.  He was in tough spot.

23   Let's face it, Islam religion is not popular in the

24   States, but he has the guts and the nerve to show up on

25   TV and talk about it.  And I am proud of him for that,

1    because some few bad boys can make a really bad

2    reputation, but he had the guts and nerve to go on TV

3    and say, hey, we are guys -- typical guys.  We would

4    like to raise our families.  We are businessmen and

5    women, and we would like to live in peace with

6    everybody.  So I am proud of him that he did participate

7    in several of them.

8         Q.    Tell us about the tent.  There's a cultural

9    tent, is that right, at the mosque?

10        A.    Yeah, that is just an Arabian culture place

11   that you go and you have a coffee.  And I was there,

12   myself, and just have a good time.  It's just like

13   greenish environmental movement, if you would like to

14   say.  It's a tent.  It's not a building, it was all the

15   modern stuff.  So you just go back to nature and have a

16   cup of coffee in the nature, because this was in the

17   grassy area style, so.

18        Q.    Was the public invited to participate in events

19   at the tent?

20        A.    I am -- I was not sure if there is public, but

21   I was there sometimes, but I am unaware if any public

22   has been.

23        Q.    Do you know if Pete had a public profile, as it

24   were, in the city of Ashland?

25        A.    Yeah, the guy is famous, yes, he was.

1      Q.    Why is that?

2      A.    Because he wants to live in the community.

3 Pete was -- for the community, I would take him as

4 better than myself.  I am always in business, work

5 14 hours a day.  If you run your own business, one of

6 you guys, you know, take the trash out, answer the

7 phone, you do everything, deal with unhappy clients, and

8 all these things.  So my main real insight was in

9 business.  Pete, God bless his heart, he was in the

10 community.  He go to churches, give classes.  I know him

11 going to OSU, to the best of my knowledge, and also

12 spoke about religion.  So he was more involved with more

13 communicating with the community.

14     Q.    Did you ever have any political discussions

15 with him?

16           MR. GORDER:  Objection, Your Honor.

17           THE COURT:  Sustained.

18 BY MR. CASEY:

19     Q.    Did you ever talk about Chechnya?

20     A.    No.

21     Q.    Okay.  Were you ever -- are you aware of any

22 efforts on the part of Pete to solicit funds or support

23 for anything having to do with Chechnya?

24     A.    No.  Actually, I never was asked to give any

25 money to them -- to the mosque, the mosque, the place,

1    except when I would just drop something in the box for

2    utilities, like any worship place, it's living on

3    donations, so the answer is no.

4        Q.    Did you ever feel any pressure from the

5    community, from the Muslim community at Pete's place,

6    to -- I don't know -- become more conservative or more

7    radical or more whatever, more extreme or more

8    supportive of any radical Islamic causes?

9        A.    No.  Again, to be honest with you, if it does,

10   I would have left the group long time ago.  I'm --

11       Q.    No pressure to become a fundamentalist or

12   anything like that?

13       A.    Good luck with that.  It's not going to happen,

14   so.

15       Q.    So is it fair to say you know Pete pretty well?

16       A.    I do.

17       Q.    Okay.

18       A.    I do.

19       Q.    Have you ever seen anything about him or seen

20   him do anything or hear him say anything that would lead

21   you to believe that he had kind of a hidden or dark side

22   or some secret agenda to support violence or terror or

23   anything like that?

24       A.    To be honest with you, no way.  Again, as I

25   shared with you, if I knew, I would report them.  I have

 1    no mercy on that.  But, no, the answer is no, really,

 2    seriously.  I know him very well.  And we had several

 3    meetings when I was working on the building to fix it,

 4    so you have to talk to the owner.  If you are serving

 5    somebody to do repair for his work, for his building,

 6    you have to meet with them, you have to talk to them, so

 7    the answer is absolutely no.

 8              MR. CASEY:  Nothing further.

 9              THE COURT:  Cross.

10              MR. GORDER:  Thank you, Your Honor.

11                        CROSS-EXAMINATION

12    BY MR. GORDER:

13        Q.    Mr. Taha?

14        A.    Yes, sir.

15        Q.    How long does it take to get from Klamath Falls

16    to Ashland, about an hour and a half?

17        A.    An hour and a half, that's correct.

18        Q.    So you were able to get over once a month,

19    maybe once a week?

20        A.    That's right.  Depends on my time, yes.

21        Q.    Depends how busy you were?

22        A.    That's true.

23        Q.    On projects where you got paid, I assume?

24        A.    I'm sorry?

25        Q.    On projects where you got paid?

1      A.    That's right, because his project was for free,

2   so I hope I can collect now.

3      Q.    Okay.  This fella, Hassan Zabady, you indicated

4   that you got upset with him?

5      A.    Yes.

6      Q.    Did you hear him call the United States the

7   land of the devils?

8      A.    No.

9      Q.    You didn't know much about the finances of

10  al-Haramain in Ashland, did you?

11     A.    I'm aware of it, that they donated some money,

12  yes.

13     Q.    Okay.  You are aware they donated some money to

14  the mujahideen in Chechnya?

15     A.    No.  I'm aware that they donated money to buy

16  the place.

17     Q.    Okay.  Beyond that, you don't know how they

18  were spending the money and that sort of thing?

19     A.    Details, no.  But I would have heard, if they

20  did something, but, no, details, I was not really in

21  details about -- I think I was close enough to them to

22  know if they did.

23     Q.    Would it surprise you to find out that they

24  were raising money for the mujahideen in Kosovo?

25     A.    I'm unaware of that.

1           MR. CASEY:  Objection, Your Honor.  There is no

2      foundation for that.

3           THE COURT:  That's up to the jury.  Go ahead.

4           MR. GORDER:  No further questions, Your Honor.

5           THE COURT:  Anything further?

6           MR. CASEY:  Nothing further, Your Honor.

7           THE COURT:  Thank you.  You may step down.

8           THE WITNESS:  Thank you.

9           THE COURT:  Your next witness, please.

10          MR. CASEY:  Call Caren Caldwell, please.

11          MR. WAX:  Your Honor --

12          MR. CASEY:  Wait, wait, wait, bear with us for

13     a second, Your Honor.

14          THE COURT:  No, that's fine.

15          (Discussion held off the record.)

16          MR. CASEY:  Call Bill Gabriel, please.

17          THE CLERK:  Please step forward.  Please raise

18     your right hand.

19          (The witness was sworn.)

20          THE CLERK:  Please step around, have a seat.

21     This is your microphone.  And water here if you need it.

22          THE WITNESS:  Thank you.

23          THE CLERK:  Please state your name, and spell

24     your name for the record.

25          THE WITNESS:  Bill Gabriel.  B-I-L-L, Gabriel,

1    G-A-B-R-I-E-L.

2                    DIRECT EXAMINATION

3    BY MR. CASEY:

4        Q.    Where do you live?

5        A.    Ashland, Oregon.

6        Q.    How long have you been there?

7        A.    Since 1973.

8        Q.    What do you do for a living?

9        A.    I'm a high school teacher.

10       Q.    And how long have you been engaged in that

11   occupation?

12       A.    Twenty-four years as a high school teacher,

13   four years as a middle school teacher.

14       Q.    Where do you teach?

15       A.    Ashland High School.

16       Q.    What kind of courses do you teach?

17       A.    I teach ninth grade humanities, which is global

18   studies and English.  I teach advanced placement world

19   history, history through film, journalism, and the

20   school newspaper, *The Rogue News*.

21       Q.    Okay.  Do you know Pete Seda?

22       A.    I do.

23       Q.    He's here in the courtroom, is he not?

24       A.    Yes, he is.

25       Q.    Point him out?

1      A.      (Indicating).

2      Q.      Okay.  Is Pete -- was Pete -- strike the

3  question.  How long have you known Pete?

4      A.      Well, I knew Pete initially when I had Jonah,

5  his son, in my class, and -- through parent conferences.

6  And then I knew Pete as a -- in a relationship because

7  we used to take our class to the tent.

8      Q.      Okay.  So when did you first make his

9  acquaintance?

10      A.      Well, whenever -- Jonah was a freshman, which

11  maybe 15 years ago.

12      Q.      Okay.  Did Pete have an active profile in the

13  community?

14      A.      Yes, he did.

15      Q.      Do you want to elaborate on that a little bit?

16      A.      Well, he was the arborist, and -- so you'd

17  always see the arborist truck driving around.  He

18  actually lived up the street from where I lived.  And he

19  was also -- he had the tent.  And we would take our

20  students to the tent about -- I think three years in a

21  row, four years in a row.  It was the Qur'an Foundation,

22  that we would learn Islam -- about Islam.

23          We'd also take our kids to the Jewish temple

24  and also the minister would come in and talk about

25  Christianity.  And we also went to the Buddhist temple,

Gabriel - D by Mr. Casey                                    148

1    so it wasn't just Islam.

2           Also, Pete would be in the Fourth of July

3    parade with the camel.  And also on the public -- we

4    have a local television network in Ashland or in

5    southern Oregon, and so he would -- and along with -- I

6    believe it was Rabbi Sirinski would be on panels

7    discussing religions.

8    Q.     Pete would be with Rabbi Sirinski?

9    A.     I believe so, or Rabbi David Zaslow.

10   Q.     Zaslow, okay.  Tell us about the times that you

11   took your classes to the prayer center that Pete ran.

12   A.     Well, we'd -- we would go and -- we would

13   arrange it with Pete.  And Pete would -- we'd go as a

14   class.  And as a class, we would hop on a bus.  It was

15   only a few miles.

16   Q.     Like how many kids?

17   A.     Well, the biggest group was 60 kids.  That was

18   a combination of two classes.  Or you'd take --

19   actually, there was always about 60 kids.  And my

20   teaching buddy, Butch McBaine, who taught the English

21   side, and I taught the global studies side, we would

22   take them there.  And then we were studying the Middle

23   East -- I'd teach global studies according to regions.

24   And we were studying the Middle East at particular

25   times, so we were studying -- whatever region we were

1    studying, we'd study the religions.

2              And so when we're studying south Asia, we'd

3    study Buddhism and Hinduism.  And when we studied the

4    Middle East, we studied Judaism, Christianity, and

5    Islam.

6              So Pete and I got to talking, and Pete says,

7    I've got this Qur'an Foundation, and we discuss Islam.

8    I says, great, let's go.  So we'd go out.  And would --

9    kids would go there.  And we'd sit in a circle in this,

10   actually, beautiful tent, with nice carpeting, and the

11   kids would eat dates and drink water, and Pete would

12   talk about Islam.

13   Q.   What would he say?

14   A.    He'd talk about the principles of Islam.  Now,

15   in the class when we'd -- we'd always talk about, you

16   know, I mean, I would go over the five pillars of Islam,

17   and talk about the divine chain, and, you know, it's the

18   God of Abraham with Judaism and Christianity and Islam.

19             And he would talk about the five pillars.  And

20   what -- you know, what it was like to be on Hajj.  And

21   he discussed Ramadan.  And just a basic daily behavior

22   of Muslims.  And the kids would -- were really engaged,

23   I believe.

24   Q.    Okay.  Ask if you can show -- I believe, Your

25   Honor, these -- this series of exhibits has been -- at

1    least the three documents I'm going to be referring to

2    now have been admitted.  So Exhibit 910, please.  I'm

3    sorry 610.  Could you expand that.

4              Do you recognize that, Mr. Gabriel?

5    A.    The camel or the house?

6    Q.    Both.  Either or both.

7    A.    I do, I do.

8    Q.    They both belong to the al-Haramain center that

9    you attended?

10   A.    Yeah, we always knew it as the tent.

11   Q.    Okay.  611, please.  Is that the tent?

12   A.    That looks like the tent.

13   Q.    Okay.  612, please.  Same property.

14   A.    Yes.  The tent is behind the flowering tree.

15   Q.    Okay.  Now, without showing the next two to the

16   jury, since they have not yet been admitted, 966,

17   please.  Without commenting on what this is, do you

18   recognize it, sir?

19   A.    Yes, I do.

20             MR. CASEY:  Your Honor, I would ask that this

21   document be admitted.

22             THE COURT:  Received.

23             MR. CASEY:  Thank you.

24   BY MR. CASEY:

25   Q.    Can we show it to the jury, please.  What do

1    you see in that picture, sir?

2        A.    Those are my students from our classes, and

3    that were inside the tent.  And that's what we'd do,

4    we'd sit in a circle around that.  And Pete would be

5    on -- you know, in the middle, really, on one side.

6    We'd be in a circle, and there would be a discussion.

7        Q.    Boys and girls together?

8        A.    Boys and girls together.

9        Q.    Okay.  And the same thing, Ms. Wells, if you

10   would show -- not show this next exhibit not to the jury

11   first, please.  Show it to the witness.  This is 967,

12   which I understand, Your Honor, is under advisement.

13             MR. CARDANI:  No objection.

14             THE WITNESS:  Can I put my glasses on?

15             THE COURT:  It's received.

16   BY MR. CASEY:

17       Q.    Can you show it to the jury, please.

18       A.    Yeah.

19       Q.    What do you see in this exhibit, sir?

20       A.    That's another one of our classes.  I can see

21   my buddy, my teaching partner, Butch's head is right in

22   the foreground there, and I'm in the background, and

23   those are more students in the tent.

24       Q.    Do you see Pete there?

25       A.    I think I do.  It's -- yes.

1      Q.     Is that him standing in the background?

2      A.     Yes, standing, yes.

3      Q.     Just quickly go back to 966, please.  Do you

4   know when that picture was taken?  Was it before or

5   after 9/11?

6      A.     It was right after 9/11, yes.

7      Q.     Right after 9/11.  Did Pete have anything

8   particular to say about 9/11 at that?

9      A.     Yeah, he condemned it.  He condemned the acts.

10  He was upset about it.  And he said that Muslims would

11  not kill innocent people.  And he was very adamant about

12  that.  And it was just interesting, because we had just

13  taken a field trip to Crater Lake, and we didn't even

14  know 9/11 took place.  And our kids came down -- we were

15  up in the parking lot, and we heard about it through

16  people staring blindly into space and were in -- you

17  know, and they said -- they heard it on the radio.  And

18  we were in Crater Lake, of all places.  And then we came

19  back, and it was about a week -- I don't know the exact

20  date.  I know it was after -- fairly soon after 9/11.

21  And that's what we did.

22         MR. CASEY:  Nothing further.  Thank you,

23  Mr. Gabriel.

24         THE COURT:  Cross.

25

```
1                          CROSS-EXAMINATION
2      BY MR. CARDANI:
3          Q.    Mr. Gabriel?
4          A.    Hi.
5          Q.    Hi.   Just a few questions.   The meetings that
6      you had with your classroom when you went to the
7      property, was it confined to the tent or did you go
8      inside the house itself?
9          A.    We never went inside the house.
10         Q.    Did you have much exposure yourself to what was
11     going on inside the premises --
12         A.    No.
13         Q.    -- of al-Haramain?
14         A.    No.
15         Q.    So is it fair to say you're not aware of how
16     Mr. Sedaghaty ran the financial operations of
17     al-Haramain?
18         A.    That's -- I -- I don't know.
19         Q.    All right.   I just have one more question for
20     you.   But it's really important.   And you're a teacher
21     for a long time.
22         A.    Yeah.
23         Q.    What was the name of the camel?
24         A.    I don't know.
25               MR. CARDANI:   I have nothing else.
```

1           MR. CASEY:  I was about to object.

2           THE REPORTER:  Your Honor, I need him to spell

3    the other teacher's name that was with him.

4           THE COURT:  Yes.

5           THE WITNESS:  Butch McBaine, Butch or Robert,

6    M-C-B-A-I-N-E.

7           THE REPORTER:  Thank you.

8           THE COURT:  Anything further?  One more.

9           MR. CASEY:  Okay.  Call Caren Caldwell, please.

10          THE CLERK:  Please raise your right hand.

11          (The witness was sworn.)

12          THE CLERK:  Please step around back here.  And

13   have a seat.  Please speak into the microphone.  It's

14   this button here.  Water is here if you would like some.

15          THE WITNESS:  Okay.

16          THE CLERK:  Please state your name, then spell

17   your name for the record.

18          THE WITNESS:  Caren Caldwell.  C-A-R-E-N,

19   Caldwell, C-A-L-D-W-E-L-L.

20                       DIRECT EXAMINATION

21   BY MR. CASEY:

22     Q.    Ms. Caldwell, where do you live?

23     A.    Ashland, Oregon.

24     Q.    And for a substantial period of time, you were

25   a pastor of a congregational church there; is that

Caldwell - D by Mr. Casey                                   155

 1  correct?

 2      A.    Yes.

 3      Q.    And I believe that was almost 20 years, about

 4  19 years?

 5      A.    Nineteen years, exactly.

 6      Q.    And some time after that, you were an associate

 7  pastor at the United Methodist Church in Medford; is

 8  that correct?

 9      A.    Yes.

10      Q.    Okay.  So you are an ordained minister?

11      A.    Yes.

12      Q.    Okay.  And how did you come -- strike the

13  question.  Do you know Mr. Seda?

14      A.    Yes.

15      Q.    And how did you come to know him?

16      A.    I came to know him in the mid '80s soon after I

17  arrived in Ashland.  And he was a college student then,

18  and came to our church to ask to rent some space for a

19  Friday evening prayer group.

20      Q.    Did he, in fact, conduct Friday prayer services

21  at the church?

22      A.    Yes, uh-huh.

23      Q.    For how long a period of time?

24      A.    For about a year.

25      Q.    And did Pete have a profile in the community,

1    fairly high visibility profile?

2       A.    In later years, yes, yes, very familiar.

3       Q.    Can you elaborate on that?

4       A.    Well, he was familiar as the tree person.  He

5    used to drive a great big tree truck through town on the

6    Fourth of July, and that was his business.  And he was

7    also familiar in the peace community in Ashland.  We

8    had, you know, a number of events, interfaith events and

9    peace events, and he would be on panels or speaker or

10   offer some kind of, you know, offering in the services

11   and the panels.

12      Q.    Was he considered to be a part of the peace

13   community in Ashland?

14      A.    I think so.  Yeah, he was a regular on some of

15   the programs that featured, you know, interfaith

16   speakers.

17      Q.    Were you a member yourself?

18      A.    Yes, yes.

19      Q.    And so when you speak of the peace community

20   and the interfaith community, are they one and the same,

21   or are they different or what?

22      A.    Huge amounts of overlap, yes.

23      Q.    Overlap, yeah.  And Pete would be considered to

24   be part of both communities; is that what you are

25   saying?

1    A.    Oh, yes, yes, yeah.

2    Q.    Okay.  And what made him so?  What makes one a

3  member of those communities?

4    A.    Well, I suppose you just sort of like choose

5  your own community, don't you, what you are interested

6  in?

7    Q.    Did he participate in any particular

8  activities?

9    A.    He participated in interfaith services.  We

10  have Thanksgiving services every year that are inter-

11  faith in nature in Ashland.  We've had some, you know,

12  special services, particularly at the time of the

13  murders of two women, when the whole community kind of

14  turned out, out of concern.

15    Q.    Where was that and when was it, do you know,

16  offhand?

17    A.    The '90s, mid '90s.  It was a lesbian couple,

18  Roxanne and Michelle, who were members of the United

19  Methodist Church in Ashland.  They were murdered.  And

20  the community had service, sort of a vigil service,

21  before their bodies were found, and then a memorial

22  service afterwards.

23    Q.    Is it my understanding that representatives of

24  various religious faiths were asked to appear to speak?

25    A.    Yes, yes, that's correct.

1       Q.      And did you speak at it?

2       A.      I spoke at one of those events.  I can't

3  remember which one.  And Pete was at both of the events,

4  as I recall.

5       Q.      Okay.  Did Pete speak at that memorial service

6  for women?

7       A.      I think so.  I get the two services kind of

8  conflated in my mind.

9       Q.      Did you ever invite him to your church to

10  speak?

11       A.      On at least two occasions.  He came early on

12  after I first met him, and I asked him to do what we

13  call a mission moment in the Sunday service talking

14  about his faith.  And then a few years later, several

15  years later, I asked him to come again when our adults

16  were doing a study of world religions.  So he came for

17  two Sundays in a row to talk about Islam and share with

18  an hour-long class.

19       Q.      Without getting into the -- you know, the great

20  details, details of what he spoke about, could you

21  describe the gist of his presentations about the

22  religion of Islam?

23       A.      Oh, I think, you know, he started out with, you

24  know, sort of the basics, this is what people of the

25  Muslim faith believe, the five principles, or I don't

Caldwell - D by Mr. Casey                          159

1    always have the right lingo.  And then he had, you know,

2    a number of questions that people would ask, something

3    about, you know, well, what's women's role in Islam?

4    And he would just, you know, be glad to talk about any

5    of that.  How they thought about, you know, jihad, or

6    what a spiritual life -- a spiritual obligation was for

7    a Muslim.

8        Q.    Is it fair to say that the purpose of these

9    interfaith meetings would be to extend bridges to the

10   community at large?

11       A.    Yeah, that was like a mission that Pete

12   practiced in the community, as, you know, he was the

13   go-to person that whenever we wanted to have that kind

14   of an event to build bridges across, you know,

15   differences in the community, he was the one we went to

16   to talk about Islam.

17       Q.    Did he ever express to you or do anything to

18   impress you with his attitude about charity, for

19   example?

20       A.    Charity, he expressed, was one of the

21   obligations of a Muslim, so.

22       Q.    Did he ever do anything or say anything in

23   particular that would reflect on his commitment to

24   charity?

25       A.    Well, I remember him talking about taking a

1    trip to Israel.  He had some material contributions for

2    Palestinians, and he was trying to get them into the

3    country, but the Israelis barred him.

4        Q.    Did he ever do or say anything to you at any

5    time over the years suggesting that he had a -- sort of

6    a secret side or dark side or some sinister side that

7    would be supportive of violence or terror or even, you

8    know, like a militant expression of Islam?

9        A.    No.  I mean, that doesn't even fit his

10   personality.  As I witnessed that, he was just always

11   sort of very open and friendly, talkative, willing to

12   shoot the breeze, talk seriously about stuff, talk about

13   whatever was happening in the community.  I didn't see

14   any signs of any secretiveness at all.

15            MR. CASEY:  Thank you.  Nothing further.

16            THE COURT:  Cross.

17                       CROSS-EXAMINATION

18   BY MR. GORDER:

19       Q.    Were you aware of his prisoner project to send

20   Qur'ans to prisoners around the country?

21       A.    Not until I attended the first hearing about

22   three years ago.

23       Q.    So you were not aware back in the year 2000

24   that he was sending Qur'ans to prisoners with a call to

25   jihad appendix?

1      A.    I was not aware of his distribution of the

2  Qur'an to prisoners.

3      Q.    How about did he ever share with you this book,

4  *Islamic Guidelines For Individual and Social Reform*?

5      A.    He shared a Qur'an with me, which he gave me in

6  English, and he also had a booklet that he wrote about

7  the basics of Islam.

8      Q.    The Qur'an that he gave you did not have a call

9  to jihad in it?

10      A.    I don't think so.  I probably never read it

11  that closely.

12      Q.    Would it surprise you to learn that this book

13  has some fairly anti-Semitic things in it?

14      A.    I don't know what book that is.

15            MR. GORDER:  Nothing further.

16            THE COURT:  You may step down.

17            MR. CASEY:  May I, Your Honor, just follow up

18  briefly?

19            THE COURT:  Briefly.

20                      REDIRECT EXAMINATION

21  BY MR. CASEY:

22      Q.    In your capacity as a minister, I assume you've

23  had occasion to give lessons on -- to study, first of

24  all, and then to give lessons on the Bible?

25      A.    Completely.  Every year, every season of the

1   year.

2       Q.    So are you familiar in the Bible that there are

3   references in the Bible to acts of mayhem, murder, rape,

4   violence, describing God as a god of war, et cetera?

5       A.    I am.  There are quite a few of them.  I have

6   read the entire Bible, and I have studied and taught it

7   and had to answer for it.

8       Q.    And before you gave your lessons or your

9   sermons or made the Bible available to your congregants,

10  did you take the pains to excerpt and to delete every

11  such reference from the Bible?

12      A.    No.

13      Q.    Thank you.

14      A.    I just assumed everybody had the same Bible.

15  It is what it is.

16          MR. CASEY:  Thank you.  Nothing further.

17          THE COURT:  Thank you.

18          Members of the jury, we're going to be in

19  recess until 9 o'clock Monday morning.  Now, during the

20  weekend, there's no sense thinking about this case.  You

21  think about other things.  Maybe you've got some fun

22  planned or not, or maybe you have work planned for Labor

23  Day, it sort of seems like it might fit.  Whatever you

24  have planned, don't think about the case, and don't talk

25  to anyone about it.  Don't read anything about it.  And

 1    we're on a good pace here.  It's not going to take all

 2    of next week to finish this case.

 3          So I said Monday, didn't I?  Tuesday.  Tuesday

 4    at 9 o'clock.  Yes, judges make mistakes, too.  I'll

 5    give you my wife's number, if you want to point that

 6    out.

 7          And I want to tell you I really approve of most

 8    of your dress today, also.  My daughter would be very

 9    happy with Mr. Meeuwsen's attire since she -- when she

10    started attending Oregon State, for Christmas our son

11    gave her a gift.  He bought a Duck mascot and a Beaver

12    mascot and did surgery on them, and made them sort of

13    like Siamese twins, you know.  And she put it up there

14    in her room.  And she was in the dorm with all the

15    freshmen football players at Oregon State.  She typed a

16    few of their papers.  They probably needed a little bit

17    of study, but so do ours.  And at any rate, that was a

18    great matter of controversy in that dorm room.

19          We'll see you on Tuesday.

20          (Jury exits the courtroom at 1:08 p.m.)

21          THE COURT:  What do we have left, Mr. Wax?

22          MR. WAX:  I don't know.  We will --

23          THE COURT:  Your guess will be better than

24    mine.

25          MR. WAX:  We will be caucusing either this

1    afternoon or tomorrow, and we'll figure out how

2    extensive a case we'll proceed with.

3         My best guess, without consulting with anyone

4    else, is testimony should be done on Tuesday.

5         THE COURT:  Uh-huh.

6         MR. MATASAR:  Remember we're starting Tuesday.

7         MR. WAX:  I do recall that.  As I said, I

8    didn't consult with Mr. Matasar or Mr. Casey, so -- but

9    that's for whatever it's worth.

10        THE COURT:  Thank you.

11        MR. CARDANI:  If that's the case, Judge, we're

12   going to have to talk about instructions at some point.

13        THE COURT:  Yes.

14        MR. CARDANI:  I don't know if the court's

15   planned on that.  We got a draft copy of the

16   instructions yesterday.  We'll review those over the

17   weekend, but I was hoping to have a meaningful

18   opportunity to talk about instructions.

19        THE COURT:  You will have a meaningful

20   opportunity.

21        MR. MATASAR:  Where has he been all week?  I

22   don't know.

23        THE COURT:  To address the court.  We will not

24   submit it to majority vote, however.

25        I've only been reversed on instructions once,

1    and I did it to myself.  After the jury was out, I --

2    someone in my office showed me a pesky case.

3            MR. CARDANI:  I seem to know a little bit about

4    that since it was my case.

5            THE COURT:  Yes.  We did a do over.  All right.

6    Thank you.

7            (The proceedings were adjourned at 1:10 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATE

2          I, Deborah Wilhelm, Certified Shorthand Reporter

3     for the State of Oregon, do hereby certify that I was

4     present at and reported in machine shorthand the oral

5     proceedings had in the above-entitled matter.  I hereby

6     certify that the foregoing is a true and correct

7     transcript, to the best of my skill and ability, dated

8     this 5th day of September, 2010.

9

10

11

12

13                        /s/ Deborah Wilhelm
                          _____
14                        Deborah Wilhelm, RPR
                          Certified Shorthand Reporter
15                        Certificate No. 00-0363

16

17

18

19

20

21

22

23

24

25