1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF OREGON

3    UNITED STATES OF AMERICA,          )
                                        )
4                   Plaintiff,          ) No. 05-60008-2-HO
                                        )
5       v.                              ) September 7, 2010
                                        )
6    PIROUZ SEDAGHATY, et al.,          ) Eugene, Oregon
                                        )
7                   Defendants.         )

8


9         PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS

10         BEFORE THE HONORABLE MICHAEL R. HOGAN

11      UNITED STATES DISTRICT COURT JUDGE, AND A JURY

12           DAY 6 A.M. SESSION - PAGES 1 - 119

13


14                        -:-

15

16

17

18

19

20

21

22

23              Deborah Wilhelm, CSR, RPR
                      Court Reporter
24                    P.O. Box 1504
                  Eugene, OR  97440
25                    (541) 431-4113

```
 1                          APPEARANCES OF COUNSEL

 2

 3     FOR THE PLAINTIFF:      CHRISTOPHER L. CARDANI
                               United States Attorney's Office
 4                             405 E. 8th Avenue, Suite 2400
                               Eugene, OR  97401
 5                             (541) 465-6771
                               chris.cardani@usdoj.gov
 6
                               CHARLES F. GORDER, JR.
 7                             United States Attorney's Office
                               1000 S.W. Third Avenue, Suite 600
 8                             Portland, OR  97204-2902
                               (503) 727-1021
 9

10     FOR THE DEFENDANT:      LAWRENCE H. MATASAR
                               Lawrence Matasar, P.C.
11                             621 S.W. Morrison Street
                               Suite 1025
12                             Portland, OR  97205
                               (503) 222-9830
13                             larry@pdxlaw.com

14                             STEVEN T. WAX
                               BERNARD J. CASEY
15                             MICHELLE SWEET
                               Federal Public Defender
16                             101 S.W. Main Street, Suite 1700
                               Portland, OR  97204
17                             (503) 326-2123
                               steve_wax@fd.org
18

19

20

21

22

23

24

25
```

1                       INDEX OF EXAMINATIONS

2     FOR THE DEFENDANT:      Direct    Cross      ReD      ReX

3     Marcus Owens               9        31        78       84

4     Joseph Boyer              85        86        --       --

5     David Rodgers             89     (See p.m. session)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        (Tuesday, September 7, 2010; 9:10 a.m.  Jury absent.)

 2            (Mr. Casey is absent from the courtroom.)

 3                   P R O C E E D I N G S

 4        THE COURT:  Seat the jury.

 5        MR. CARDANI:  Judge, we have three matters that

 6   we think we should take up before the jury comes in.

 7        THE COURT:  All right.

 8        MR. CARDANI:  The first one, we would like

 9   authorization from the court to have the defendant's

10   passports, presently in the custody of Pretrial Services

11   in Portland --

12        THE COURT:  I've heard that.  Is there any

13   objection to that?

14        MR. WAX:  I'm not sure what the request is.

15        MR. CARDANI:  The request would be that the

16   passports that are currently in the custody of Pretrial

17   Services in Portland be released to the FBI for use in

18   Mr. Seda's cross-examination.

19        THE COURT:  Granted.

20        MR. CARDANI:  Second, Mr. Owens is the first

21   witness for the defense today, and there is another one

22   named Mr. Long coming shortly after that.  If I

23   understand correctly, both of these individuals will

24   use, as the basis of their testimony, that they relied

25   on the Saudi receipts that you have excluded from
```

1    evidence.  If they do that, we would like to test their

2    credibility on cross-examination by asking them if they

3    were aware that this organization was a

4    specially-designated global terrorist organization by

5    the U.N., certain offices shut down, Saudi government

6    shut them down, and it would be offered to impeach them.

7         This has been -- the court has ruled that this

8    is not an area for our case in chief.  We followed that,

9    but we think this will be door opening.

10        MR. MATASAR:  I can just speak with regard to

11   Mr. Owens.  While I'd like to engage Mr. Cardani on the

12   issue, Mr. Owens is not going to rely on the receipts.

13   So I don't think we need to engage in that issue.

14        As far as Mr. Long, I'll let Mr. Wax address

15   that.

16        MR. WAX:  Dr. Long --

17        MR. MATASAR:  Dr. Long.

18        MR. WAX:  Dr. Long has seen the receipts and

19   Dr. Long believes that the receipts are relevant to the

20   question of what happened to the money.  And that the

21   presence of the number -- of the account number 9889

22   that matches up with the list of the Al Rajhi accounts

23   is a relevant fact.  And I do not see how that should in

24   any way open up the area or question of the designation

25   of the organization.

1          THE COURT:  The door was opened in Colonel

2  Lang's testimony.  You may do so.

3          MR. CARDANI:  And, finally, the last matter is

4  the defense has notified us about a brand new expert

5  over the weekend.  I think we were told about it on

6  Friday.  I'm sorry, Sunday.  Some expert out of Portland

7  to talk about memory, and the reliability of memory

8  vis-à-vis Mr. Wilcox.  We've gotten a one-paragraph

9  summary.  We've gotten no reports.  No *Daubert* ability

10 to test anything.  So at this point, we object on

11 timing, our ability to prepare his cross-examination,

12 and more fundamentally, we don't see it -- we see it not

13 relevant to anything, and invading the province of the

14 jury on credibility findings.

15         MR. WAX:  Dr. Daniel Reisberg is a professor at

16 Reed College.  He's testified numerous times in both

17 state and federal courts.  His area of study is memory.

18 He, after reviewing the testimony from Mr. Wilcox, and

19 seeing that he shifted his testimony with respect to the

20 $2060 check based on things that he saw and that he

21 shifted his testimony about the date of the meeting that

22 he alleges occurred September 25 to September 24, I

23 called Dr. Reisberg, and I did so because I'm familiar

24 with his body of research, and we have used him in cases

25 in Portland.  I immediately let the government know that

1    I had done so.  I did so at that late date because it
2    seemed to me that Wilcox's testimony made this issue
3    relevant.
4          The essence of his testimony will be that
5    studies of memory show that people conform their memory
6    to what they believe to be the facts, and that
7    conformance of memory to what they believe to be the
8    facts with things that are shown to them is not
9    reliable.
10          He will also say that that is an unconscious
11   matter, that the people are not aware of it.  I think
12   that the description of how memory works is an area that
13   is within the heartland of what expert witnesses can and
14   should be permitted to testify about.  I do not believe
15   that it is something that is within the knowledge of a
16   lay jury.  And that is what I would intend to call him
17   to ask about.  I anticipate that his testimony would be
18   short.
19          In terms of any logistical matters that would
20   relate to his testimony, he -- his teaching, he would be
21   available to testify this afternoon by phone or video
22   hookup if we could get him to the courthouse in
23   Portland, and we could arrange that at 3:00.  He would
24   be able to drive down to Eugene tomorrow morning.  He
25   has class at 12:00 or 1:00.  So we'd need to try to get

1    him on and off first thing.

2         In discussion with the government, we think

3    that it is reasonable likelihood that the defense case

4    will conclude today.  So if that occurred tomorrow

5    morning, it would be part of the core of the defense

6    case.

7         THE COURT:  Camus also wrote about the subject,

8    but you have to identify experts early, and this is not

9    soon enough.  I'm not going to permit that, a new expert

10   at this time.

11        Please seat the jury.

12        MR. MATASAR:  Your Honor, we don't have to take

13   it up right now, but at some point I want to address --

14   we filed a short memo about Mr. Cardani's hypothetical,

15   and we can take that up --

16        THE COURT:  About his what?

17        MR. MATASAR:  Hypothetical question.  We can

18   talk about it next time.

19        (Jury enters the courtroom at 9:17 a.m.)

20        THE COURT:  Members of the jury, I hope you had

21   a good, long weekend.  I'll tell you more about this

22   later (indicating).

23        Call your next witness, please.

24        MR. MATASAR:  We call Marcus Owens.

25        THE CLERK:  Please raise your right hand.

Owens - D by Mr. Matasar                                    9

```
 1              (The witness was sworn.)

 2              THE CLERK:  Please step around.  Please have a

 3    seat.  You'll be speaking into the microphone.  There is

 4    water.

 5              Please state your full name, and spell your

 6    name for the record.

 7              THE WITNESS:  My name is Marcus Sherman Owens,

 8    spelled M-A-R-C-U-S, S-H-E-R-M-A-N, and O-W-E-N-S.

 9                         DIRECT EXAMINATION

10    BY MR. MATASAR:

11       Q.     Do we need the microphone closer to the witness

12    or turn it up?

13              Mr. Owens, how are you employed?

14       A.     I'm a lawyer with the Washington, D.C. law firm

15    of Caplin & Drysdale.

16       Q.     When did you become a member of that firm?

17       A.     I became a member of that firm in early 2000.

18       Q.     What was your position before becoming a member

19    of Caplin & Drysdale?

20       A.     My position immediately before becoming a

21    member was as director of the Exempt Organizations

22    Division of the U.S. Internal Revenue Service.

23       Q.     What were your duties as the director of the

24    Exempt Division?

25       A.     My duties included supervising the employees of
```

Owens - D by Mr. Matasar                          10

1   the division, which was approximately 100, 120 people.

2   It included serving as the ultimate decision-maker, if

3   you will, for matters involving tax exempt

4   organizations, administration of tax laws applicable to

5   the tax exempt organizations.

6        Q.    How long did you serve in that position?

7        A.    I was director for ten years, from 1990 until

8   2000.

9        Q.    And what -- how long had you worked at the IRS

10  before becoming director?

11       A.    I had worked at the IRS for 15 years before

12  becoming director.

13       Q.    What did you do in the years previous to

14  becoming a director?

15       A.    I held a series of positions all in the Exempt

16  Organizations Division, beginning with the position of

17  tax law specialist, which is the classification for an

18  attorney not employed within the Office of Chief Counsel

19  of the IRS.  I then became technical advisor to the

20  division director.  And then just before becoming

21  division director, I was the -- what is known as the

22  executive assistant, which is functionally the deputy

23  division director for the division.

24       Q.    So that's -- if I counted right -- about

25  25 years working for the Internal Revenue Service?

1       A.      Correct.

2       Q.      In your work there, have you reviewed cases of

3   tax exempt organizations?

4       A.      Yes.

5       Q.      In what context would you do that?

6       A.      In two primary contexts.  The first is the

7   Exempt Organizations Division serves as the final

8   administrative appeal within the Internal Revenue

9   Service for cases that have -- considered to be

10  significant, have precedential value.  More routine

11  cases go to IRS Appeals Division.  So in the context of

12  working on the final rulings on cases moving through the

13  IRS, I would be involved in particular cases.

14          And then the Exempt Organizations Division at

15  that time had a program known as a post-review program

16  in which the case work of the various field offices in

17  the exempt organizations function was reviewed for

18  accuracy and consistency.  And I conducted many of those

19  reviews in my years there.

20      Q.      So you have reviewed, I take it, many, many tax

21  exempt organizations?

22      A.      Yes.

23      Q.      Hundreds, is that fair to say?  More?

24      A.      More like thousands.

25      Q.      Did you also work on developing IRS rules and

 1   maybe changing the tax forms?

 2      A.    Yes.  The division had responsibility for

 3   maintaining the Internal Revenue manual, which is the

 4   list of instructions to revenue agents on how to operate

 5   or administer the tax code.  The division also developed

 6   revenue rulings and revenue procedures, which are

 7   guidance documents for both the IRS and for taxpayers.

 8           Also participated in the drafting of

 9   regulations, and from time to time interacted with

10   Congress on legislation moving through Congress.

11      Q.    And have you reviewed audits, that is to say

12   audits or investigations that other people have done of

13   tax exempt organizations?

14      A.    Yes.

15      Q.    And you trained the auditors; is that fair to

16   say as well?

17      A.    That's right.  One of the functions of the

18   Exempt Organizations Division was to conduct a periodic

19   continuing professional education training for revenue

20   agents specializing in tax exempt organizations.

21           The division produced a volume each year known

22   as a continuing professional education text, in essence,

23   a summary of legal developments during the year that

24   formed the core of the training each year.  And the

25   training occurred in sessions held around the country.

 1    I, or a team of attorneys who worked for me, would make

 2    those presentations each year.

 3        Q.    And the defense has retained you as an expert

 4    to assist Mr. Seda on this case?

 5        A.    That's correct.

 6        Q.    Are you charging us?

 7        A.    Yes, I am.

 8        Q.    How much are you charging us per hour?

 9        A.    $300 an hour.

10        Q.    Is that your regular rate?

11        A.    No, it is not.

12        Q.    What would your regular rate be?

13        A.    $595 an hour.

14        Q.    And this rate is okay with your partners, this

15    reduced rate?

16        A.    Yes, it is.

17        Q.    Could you tell the jury why it is that some

18    organizations are exempt from tax?

19        A.    Well, Congress enacted a series of provisions

20    in the Internal Revenue Code, in fact, 29 different

21    provisions.  Each one describes a particular kind of

22    organization whose income is exempt from federal tax.

23    And one of those is Section 501(c)(3), which involves

24    charities, what we commonly know as a charity.  Other

25    sections involve other kinds of organizations.  And

Owens - D by Mr. Matasar                                14

1    Congress made a policy decision that if each of those

2    organizations was doing something useful, was

3    sufficiently distinct from an ordinary commercial

4    business activity, that is a taxpayer, that they

5    deserved to be tax exempt.

6            There are other aspects to each category of tax

7    exemption that make for differences between the various

8    categories.  The primary difference is that

9    contributions to charities are deductible as

10   contributions on an individual's Form 1040, whereas

11   contributions to other kinds of tax exempts like trade

12   associations or labor unions are not deductible as

13   charitable contributions.

14   Q.    Mr. Owens, a charity can give aid to the poor,

15   orphans and refugees?

16   A.    Correct.

17   Q.    And they could give aid to assist wounded

18   soldiers, fighters, and other combatants?

19   A.    Correct.

20   Q.    Including food and blankets, for example?

21   A.    To wounded combatants, correct.

22   Q.    What is the history of this sort of aid?

23         (Mr. Casey enters the courtroom.)

24   A.    Well, the history is actually quite extensive.

25   You can find the earliest indications that assisting the

1    wounded would be an appropriate charitable activity.  In

2    the preamble to the statute of charitable uses, which

3    was passed by English Parliament in 1501 and serves as

4    sort of the bedrock document for the development of the

5    law of charity both in the United Kingdom and in the

6    United States, and, in fact, that preamble served as the

7    model that the Treasury Department used in 1959 when it

8    wrote regulations defining what is a charity for the

9    Internal Revenue Code.

10           So even 500 years ago, there are indications

11   that that would be a charitable activity.  Subsequent to

12   that, during the American Civil War, Betsy -- rather --

13        Q.    Clara Barton?

14        A.    Clara Barton, yes, Clara Barton established the

15   American Red Cross, and made a point of taking care of

16   the wounded on both sides in the American Civil War.

17           At the same time, you had the Geneva

18   Conventions developed.  The first one was developed in

19   1863.  Subsequent conventions, taken together, show that

20   caring for the wounded, those who are both wounded

21   because they were combatants and those wounded as an

22   unfortunate byproduct of the war, was deemed to be an

23   appropriate activity, and given special sanction under

24   international law.

25           And, in fact, it's echoed in the organizing

Owens - D by Mr. Matasar                              16

1    documents of the American Red Cross today.

2        Q.    Hospitals were rebuilt with charitable funds in

3    Hanoi during the Vietnam War?

4        A.    Yes.  In fact, there are a series of articles

5    in the *New York Times* from 1975 describing how U.S.

6    charities attempted to collect money, in fact, did

7    collect money, to rebuild the Bach Mai Hospital in Hanoi

8    which was destroyed by the U.S. Air Force during the

9    Vietnam War.  The charities collected money.  One of

10   them applied for tax exemption.  And the articles

11   described how the IRS initially tried to revoke the tax

12   exempt status, but ultimately relented, and allowed it

13   to continue so --

14       Q.    Can --

15       A.    Sorry.  So even though in current times, there

16   are examples of taking care of the wounded or providing

17   ways for the wounded to be cared for that have been

18   deemed to be charitable.

19       Q.    And as recently as the last year or two, the

20   Red Cross was giving money to the Taliban; is that

21   correct?

22       A.    That has been reported in the media, yes.

23       Q.    To be clear, it would not be a charitable

24   purpose for the Red Cross or anyone to buy guns or bombs

25   for the Taliban?

1      A.      That is correct.

2      Q.      Mr. Owens, are you familiar with Form 990?

3      A.      Yes, I am.

4      Q.      Maybe we can show the first page of IRS-1,

5  Susan.  Can you do that, Ms. Cooke?  What kind of

6  organizations file Form 990?

7      A.      Organizations that are exempt from federal

8  income tax.  It is the general reporting form that is

9  used by charities and by other types of tax exempt

10 organizations and by political organizations.

11     Q.      So a pretty wide variety, a small charity, and

12 a big charity like United Way would all file this form?

13     A.      As would colleges, universities, hospitals,

14 labor unions, trade associations, and political parties.

15     Q.      The United Auto Workers would file this form.

16 It's just a wide group of people?

17     A.      Correct, correct.

18     Q.      By the way, do churches file Form 990?

19     A.      Churches do not file Form 990.

20     Q.      So if an organization, al-Haramain United

21 States, had a congregation that met regularly for

22 collective worship, could they have pressed their claim

23 with the IRS and have been declared a church?

24     A.      Yes.

25     Q.      And that's even though they distributed books?

1     A.    Correct.

2     Q.    And if the IRS had declared al-Haramain U.S.A.

3  a church, they wouldn't have had to file a 990 at all?

4     A.    They would not have had to file a 990, that is

5  correct.

6     Q.    Is there a history of errors on the 990,

7  mistakes being made by organizations that file it?

8     A.    Yes.

9     Q.    And what kind of errors, if you can just give a

10  short description of some of the errors that studies

11  have shown appear regularly on a 990.

12     A.    Just about every error one can conceive of,

13  from failing to sign the return through leaving off

14  required schedules, including Schedule A, which is a

15  very significant schedule.  And that continues even

16  today with a new form, missing schedules, incomplete

17  answers to questions are relatively common.

18     Q.    So the form that was filed in the year 2000 has

19  been improved upon for -- by the time we're filing the

20  2010 form?

21     A.    I'll say it's certainly been made more

22  complicated.

23     Q.    I see.  Was there a line 22 schedule filed with

24  this IRS-1?  Are you aware of that?

25     A.    I've looked at that Form 990, the 2000 Form

1   990, and there was no schedule relating to line 22.

2       Q.    Are there errors commonly seen on Schedule A,

3   question 51?  If Ms. Cooke could show page 13 of this

4   form.  You are familiar with that provision?

5       A.    Yes, I am.

6       Q.    Number 51.  If there were a payment of $150,000

7   from al-Haramain United States to al-Haramain Riyadh,

8   would that appear on this Schedule A, line 51?

9       A.    No, it would not.

10      Q.    It would not.  Why not?

11      A.    Because the instructions explicitly state that

12  the only organizations with whom financial relationships

13  should be reported are those that are exempt under other

14  sections of 501(c) and 501(c)(3) or political

15  organizations described in Section 527.

16           In other words, organizations like al-Haramain

17  Riyadh or al-Haramain Saudi, which are not exempt under

18  any section of 501(c)(3) would not be reported here.

19  And that is explicit in two places in the instructions,

20  and it's clear in the legislative history of Section

21  6033, which is the section that mandates the Form 990.

22      Q.    Mr. Owens, you were able to review Agent

23  Wooten's testimony in this case in a transcript?

24      A.    Yes, I was.

25      Q.    What was your rank at the IRS compared to his?

1    A.    I was the highest level IRS official with sole

2  responsibility for tax exempt organizations.   I was

3  three steps below the Commissioner of the Internal

4  Revenue.

5          Mr. Wooten was a revenue agent in the field,

6  later a revenue agent supervisor.

7    Q.    As a revenue agent supervisor, would that

8  position report directly to you, or are there other

9  levels in between the two of you?

10   A.    At the time it would not have reported to me.

11 There would have been many levels -- actually his

12 structure reported to district directors to regional

13 commissioners.   It was a different supervisory

14 structure.

15   Q.    Are you familiar with the instructions for Form

16 990 at the time, year 2000?

17   A.    Yes, I am.

18   Q.    Do you know if they give a suggested amount of

19 time to complete a Form 990?

20   A.    Yes, they do.

21   Q.    About how long?

22   A.    Well, they divide the Form 990 and the time

23 required into time devoted to collecting information, to

24 record keeping, time devoted to reviewing the law, time

25 devoted to preparing the return, and time devoted to

 1  copying and mailing the return.  And the time devoted to

 2  actually preparing the return itself, the Form 990 is

 3  probably about 22 hours, as I recall.  The time to

 4  prepare Schedule A, which is a critical schedule, was

 5  another 10 hours or so.

 6     Q.    And those will cover a gigantic variety of

 7  organizations?

 8     A.    That's right.  It's a rough average, so some

 9  would be more, others would be less.

10     Q.    And I asked you to review numerous documents in

11  this case; is that accurate?

12     A.    Correct.

13     Q.    Have you reviewed -- I'll just show you briefly

14  some e-mails which are Exhibit 669.  Just show you that

15  to refresh your recollection.  And then I'll let you

16  look at that for a second.  And then 670 and that's 671.

17  You are familiar with those?

18     A.    Yes, I am.

19     Q.    Are these the types of documents that the IRS

20  would use in making a determination as to al-Haramain

21  Ashland should have accounted for that $150,000 donation

22  on their tax return?

23     A.    Correct.

24     Q.    Okay.  Isn't an IRS auditor or reviewer

25  restricted to the information known to the accountant at

Owens - D by Mr. Matasar                          22

 1    the time the return was prepared?

 2        A.    No.  In fact, the contrary is the case.  They

 3    should be -- they should collect additional information.

 4    They should collect information that was not available

 5    to the accountant, if they become aware of it.

 6        Q.    Similarly, the IRS auditor or reviewer, is not

 7    restricted to the information known by the taxpayer or

 8    organization at the time?

 9        A.    That is correct.

10        Q.    Are the facts that we discussed in the e-mail,

11    and such, sufficient for you to make a determination as

12    to whether the $150,000 from Mr. El-Fiki should appear

13    on line 1 or line 22 of the al-Haramain Form 990 for the

14    year 2000?

15        A.    Yes, they are sufficient.

16        Q.    Okay.  Should the $150,000 have been on line 1

17    or line 22?

18            MR. CARDANI:  Excuse me, I object.  How is he

19    to know the intent of Mr. El-Fiki?

20            MR. MATASAR:  That's not the issue.  The issue

21    is -- the intent of Mr. El-Fiki is so far no where

22    relevant in the matter.

23            THE COURT:  Just a moment.  You can ask the

24    question.

25            MR. MATASAR:  Okay.

 1   BY MR. MATASAR:

 2       Q.    Should the $150,000 have been on either line 1

 3   or line 22?

 4       A.    No, it should not.

 5       Q.    And why is that?  Please tell the jury why they

 6   should not have been on line 1 or line 22.

 7       A.    That is because there is a core question in

 8   determining whether a transfer of money constitutes

 9   income or whether it constitutes something else.  And

10   that core question relates to whether the recipient of

11   the income has the ability to control that income or is

12   his relationship that of an agent where his ability to

13   use the money is restricted to the terms of the agency

14   agreement, form of contract, if you will.

15            It's essentially the same analysis that, for

16   example, when you make a deposit in your savings account

17   at a bank, that money does not belong to the bank even

18   though the bank has it.  The bank holds it for you,

19   awaiting your decision as to how to spend the money.

20   It's that same analysis.

21       Q.    Are there provisions in the Code or rulings or

22   memos within the IRS that supports your analysis that it

23   should not be on lines 1 or 22?

24       A.    Yes.

25       Q.    Can you briefly describe some of the authority.

1      A.     Well, the first authority of which I'm aware is

2    something called Office Decision 119 issued in 1919 by

3    the Internal Revenue Service.  And it involves a

4    member -- a religious leader of a congregation who was a

5    member of a religious order who received funds from the

6    congregation to be distributed up -- farther up the

7    church hierarchy.  And the ruling says that the monies

8    that are received, that are required to be transmitted

9    on to the parent organization, are not income to the

10   individual religious leader because they are -- he is

11   acting as the agent, not as the principal in that

12   relationship.

13          That principle has been carried through in a

14   series of revenue rulings which are official statements

15   of the IRS about interpretation of tax law.  It's

16   appeared in some court decisions, one involving the 7Up

17   company, not involving a charity, but the same principle

18   applies.

19          So it has been part of the tax law since the

20   beginning of the federal income tax.  1919 was an early,

21   very early time, up through the current.

22     Q.     Okay.  So, Mr. Owens, I want to ask you a

23   question about the reporting times.  Now, a 990 is filed

24   at the end of the tax year, December 31st, right, for --

25   for most organizations, including this one?

1    A.    It is due to be filed on the 15th day of the

2    fifth month after the close of the tax year.  Most

3    organizations have a calendar year tax year.  So Form

4    990 for the year 2000, for example, for a calendar year

5    taxpayer would be due May 15, 2001.

6    Q.    And what I want to differentiate now is the

7    question of in certain circumstances whether it should

8    appear somewhere else on the return other than line 1 or

9    line 22.  And let me give you an example.

10         Let's say that this organization had a tax

11   reporting date, it had a special tax year that ended

12   February 29th of 2000.  So you saw the money came into

13   their account before that, on February 25th; it went out

14   of their account on March 9th or 10th.  So let's just

15   assume that the tax year was ending February 29th when

16   that money was in that account.  In that case, would

17   that $150,000 shown up -- should it have shown up on the

18   tax return somewhere?

19   A.    Assuming it was received as an agent, yes.

20   Q.    Okay.  And where would it -- would it be on

21   line 1 or line 22?

22   A.    No, it would not.

23   Q.    Where would it be?

24   A.    The money -- the funds would show up as an

25   asset of the organization either as cash or as an other

 1    asset, there are two different lines for reporting that

 2    sort of thing, with a corresponding liability,

 3    offsetting liability.

 4         Q.    But let's be clear, that if the money went out

 5    in the same tax year, it wouldn't -- it needn't be on

 6    the return at all anywhere, not line 1, line 22, not as

 7    an asset, nowhere on the return?

 8         A.    It should not be on the return under those

 9    circumstances.

10         Q.    According to the information that you have

11    reviewed that we discussed, did al-Haramain U.S.A. have

12    a duty to send this $150,000 to al-Haramain Saudi

13    Arabia?

14         A.    Yes, it did.

15         Q.    Okay.  And explain to the jury why that is.

16         A.    That's because the funds were received from the

17    donor pursuant to an agreement with al-Haramain Saudi in

18    the form -- in essence a contractual agreement that

19    the -- there would be a transfer of funds to be used for

20    particular purposes.  And the arrangement constituted a

21    duty.  And al-Haramain Ashland, al-Haramain U.S., as the

22    agent for receiving those funds, was required under the

23    terms of this contract, if you will, to transmit them to

24    al-Haramain Saudi.

25         Q.    If -- Mr. Owens, once this $150,000 got to

1    al-Haramain U.S.A., and after they got it, they

2    explored, but didn't spend, but they explored various

3    ways of complying with the wishes of the donor, would

4    that change your analysis as far as whether it belongs

5    on line 1 or 22?

6        A.    No, it would not.

7        Q.    How about if al-Haramain U.S.A. got some sort

8    of instruction from al-Haramain Saudi Arabia to direct

9    the money to a particular recipient, and then they did

10   it, this is just an assumption, if they had done that,

11   would it go on line 1 or line 22?

12       A.    If they did transmit the money, it would not go

13   on line 1 or line 22.

14       Q.    Even if they did.  Okay.

15       A.    In fact, the reference I cited, Office Decision

16   119 from 1919, actually contains a line on which it says

17   that if the donor of the funds to the religious leader

18   instructs the religious leader to retain the money and

19   not pay it up to the parent church, it still is not

20   income to the religious leader.  So even in the earliest

21   precedent, there was an ability to adjust the

22   instructions.

23       Q.    Mr. Owens, if al-Haramain Riyadh gave

24   al-Haramain Ashland thousands of books at zero cost, and

25   al-Haramain U.S. distributed those, should the value of

1   those books appear on the tax return as some sort of

2   contribution?

3       A.    Yes.  The fair market value should have

4   appeared as a contribution, an in-kind contribution.

5       Q.    And the fact that al-Haramain U.S. got them at

6   zero cost or didn't have to pay for them, but they were

7   donated, would that affect whether or not it belonged on

8   line 1?

9       A.    No.

10      Q.    And if al-Haramain Ashland distributed these

11  books throughout the United States, should that have

12  appeared on line 22 of the return?

13      A.    The distribution of the books and the fair

14  market value of those books distributed should have

15  appeared on line 22.

16      Q.    Just putting them down on Form 990 as a

17  shipping charge, that's not sufficient?

18      A.    Well, that would only be sufficient if the

19  books had no market value.

20      Q.    You are familiar with line 57a on the tax

21  return, Form 990?

22      A.    Yes, I am.

23      Q.    Does an organization have to report the value

24  of a building it owns on line 57a of Form 990?

25      A.    Yes.

1      Q.    And could we show that, Ms. Cooke.  I'm

2   guessing page 3 or 4.  I'm not exactly sure.  That's the

3   line on the return where it would go; is that correct?

4      A.    Correct.

5      Q.    Thank you, Ms. Cooke.  And what goes on that

6   line?  Is it just the basis -- you said the basis of the

7   asset.  Is that what needs to go on that line?

8      A.    Well, the line asks for the basis.  It asks for

9   the depreciation.  It asks for basically the value of

10   what might be deducted from the value.

11      Q.    Does the Form 990 at any place provide for the

12   mode of purchase or the cash flow that led to the

13   purchase of any building that goes on line 57a?

14      A.    It doesn't specifically ask for that

15   information.

16      Q.    What is the IRS's purpose in asking for the

17   value of buildings on line 57a of Form 990?

18      A.    Well, the IRS wants to know the value of the

19   assets the organization has, the nature of the assets.

20   A building would be one kind of asset.

21      Q.    Is the particular amount important to the IRS?

22      A.    The specific amount is not important.  What

23   would be important would be whether amounts were out of

24   proportion with the other assets and activities of the

25   organization.

Owens - D by Mr. Matasar                          30

1      Q.     And you can tell that if there was a large

2   difference, a $10 million difference, something like

3   that?

4      A.     Correct.  A building worth $10 million for an

5   organization that didn't appear to have activities that

6   would involve a building of that size would suggest that

7   perhaps something else was going on.

8      Q.     And would an $80,000 error on a 300 or a

9   $400,000 building, approximately, would that be

10  important to the IRS?

11     A.     That's -- would be trivial.

12     Q.     Just one more series of questions, Mr. Owens.

13  How common is it for 501(c)(3) status to be revoked?

14     A.     It is rare.

15     Q.     Are you familiar with the statistics?

16     A.     Generally familiar, yes.

17     Q.     About how rare?

18     A.     I believe for the year 2000, 27 to 29

19  organizations, 501(c)(3) organizations, lost their tax

20  exempt status out of a filing population of

21  approximately 240,000, not taken into account probably

22  several hundred thousand churches that do not have to

23  file a return.

24     Q.     And if your status is revoked, can you reapply?

25     A.     Yes.

1    Q.    How long is the waiting period, if any?

2    A.    There is no particular waiting period unless

3 the revocation was because of political campaign

4 activity, in which case there would be a year of taxable

5 status.

6         MR. MATASAR:  Thank you, Mr. Owens.  I have no

7 further questions.

8         THE COURT:  Cross.

9                    CROSS-EXAMINATION

10 BY MR. CARDANI:

11   Q.    Good morning, Mr. Owens.

12   A.    Good morning.

13   Q.    My name is Chris Cardani and I work for the

14 U.S. Attorney's Office.  And I just have some questions

15 for you on cross-examination.

16         First, you've given a discount to the defense?

17   A.    My rate has been reduced, yes.

18   Q.    Okay.  So you originally -- you usually charge

19 $600 an hour?

20   A.    $595, yes.

21   Q.    Thank you.  And you are charging $300 an hour

22 for your work in this case?

23   A.    Correct.

24   Q.    And how many -- does that include the

25 testimony, is it the same rate for testimony?

1     A.    Correct.

2     Q.    And how many hours have you worked on this

3  case, sir?

4     A.    I don't recall off the top of my head, but I've

5  worked a few.  I would say probably on the order of

6  maybe 40 hours total.  I have associates whose time is

7  also billed at the same reduced rate.

8     Q.    And were there associates in this case or just

9  you?

10     A.    Yes.

11     Q.    Which one?

12     A.    Excuse me?

13     Q.    Were there associates involved?

14     A.    Yes.

15     Q.    And do you know how many hours they worked on

16  this?

17     A.    I don't have the total figures in my head, but

18  my guess is probably something on the order of 40 to

19  50 hours.

20     Q.    Total associate time?

21     A.    That would be my best guess at this point, yes.

22     Q.    And what about paralegals and other

23  administrative expenses, would that go on top of this or

24  is that included in the rates?

25     A.    There were none of those personnel involved.

Owens - X by Mr. Cardani                          33

1      Q.    Now, your experience, you talked about you

2    putting 25 years with the Service?

3      A.    Correct.

4      Q.    And that ended in the year 2000?

5      A.    Correct.

6      Q.    When you went to work at Caplin & Drysdale?

7      A.    Correct.

8      Q.    Is it safe to say that your 25 years with the

9    IRS was all spent at headquarters?

10     A.    Correct.

11     Q.    In Washington, D.C.?

12     A.    Correct.

13     Q.    And as a lawyer?

14     A.    Correct.

15     Q.    So you went right from law school to the IRS?

16     A.    That's right.

17     Q.    Now, you talked about doing some supervising of

18   auditors, if I heard that correctly.  But have you been

19   personally involved in rolling up your sleeves and

20   auditing 990s?

21     A.    Could you describe what you mean by that?

22     Q.    Have you -- well, you know what an auditor

23   does, like a Greg Wooten before he became a supervisor?

24     A.    Yes, I do.

25     Q.    All right.  Have you served in that same

1    capacity with the IRS?

2        A.    I have traveled out to field offices where I've

3    had meetings with revenue agents who were developing the

4    questions that they would ask organizations.  I've gone

5    through those questions with the revenue agents, helped

6    refine them, helped decide which lines of inquiry to

7    explore, so I have not been out on-site, but I have been

8    in the process of deciding what questions to ask, how to

9    ask them, and assessing the information received.

10       Q.    But no personal field experience in a complete

11   audit from start to finish?

12       A.    That is correct.

13       Q.    Now, I want to understand this notion of agency

14   and how -- if I understand your testimony, you are

15   saying that if a local 501(c)(3) charity acts, in

16   essence, as an agent or a conduit for another

17   organization, then the transactions don't have to be

18   reported on 990; is that a fair statement?

19       A.    It depends on the time of the transaction.

20       Q.    The time.  What do you mean by the time?

21       A.    The timing of the transaction, in other words,

22   as I testified, if the receipt of those funds, receipt

23   as an agent and the disbursement as an agent occurs

24   within the same fiscal year, it isn't reported on the

25   Form 990.  It is tracked on the books and records of the

1    organization, but not reported on Form 990.

2            If, however, that transaction -- the agency

3    relationship spans more than a year, then there would be

4    an entry on the Form 990.

5    Q.    Now, you are making certain assumptions,

6    though, if -- let's stick with it -- if it's within the

7    same year.  You're making certain assumptions on agency,

8    and the term earmark has come up.  Is that a familiar

9    term to you?

10   A.    Yes, it is.

11   Q.    Is this what you are talking about on the

12   conditions you're assuming that the local charity

13   doesn't have to report this agency transaction?

14   A.    Earmarking is a somewhat diminished form of

15   identifying a particular use of an amount of money.  It

16   doesn't necessarily suggest an agency relationship.  An

17   agency relationship is where there is no discretion on

18   the part of the agent to vary the funds.

19           Earmarking could be a designation for a

20   particular category of use leaving the recipient with

21   the discretion to select among different uses.

22   Q.    But the non-reportability is what I'm focusing

23   on about your testimony.  To make it non-reportable, a

24   local 501(c)(3) really has no choice in the matter, they

25   are kind of a conduit for the transaction; is that a

1    fair statement?

2        A.    Yes.

3        Q.    And so the local charity, 501(c)(3), gets the

4    money, and they really have no choice but to serve as a

5    vehicle to get it overseas?

6        A.    They are bound by the terms of the contractual

7    agreement that sets up the agency relationship.

8        Q.    So it's really not the local charity's money,

9    it's the foreign entity's money, correct?

10       A.    Correct.

11       Q.    And so the local guy, local charity, really has

12   no control over the movement of the money?

13       A.    The local charity would have control in the

14   sense that they would be charged with maintaining the

15   funds until being transmitted.

16       Q.    Sure.

17       A.    But they would not have the discretion to vary

18   what to do with those funds.

19       Q.    Sure.  And your analogy was a bank, we deposit

20   money in our bank, and the bank can't just go out and

21   try to spend our money, we set the restrictions on it?

22       A.    Correct.

23       Q.    It's our money?

24       A.    Correct.

25       Q.    Now, you know -- you've studied a lot of the

1    documents in this case.  And you know the particulars of

2    what we call our transaction, the 150 that came in from

3    this Egyptian guy, and then what happened after that; is

4    that right?

5        A.    Yes, that's right.

6        Q.    So you know that when the money came in, it was

7    $150,000 less a $15 wire transfer fee?

8        A.    Correct.

9        Q.    So in a true conduit situation, wouldn't the

10   most efficient way for the local 501(c)(3), if it was a

11   true conduit, just spend another 15 bucks and kick the

12   money over to Saudi Arabia?

13           MR. MATASAR:  Objection, beyond the scope as

14   far as --

15           THE COURT:  Overruled.

16           MR. MATASAR:  -- this witness.

17           THE WITNESS:  Could you repeat the question,

18   please.

19   BY MR. CARDANI:

20       Q.    Yeah.  So you know that it costs $15 to get the

21   money from London to the United States, right?

22       A.    Correct.

23       Q.    Now, if it's a true conduit, so if this agency

24   relationship exists, then wouldn't you expect that the

25   most efficient way to achieve these intentions is to

1    spend another $15 and quickly wire it right back to

2    Saudi Arabia?

3        A.    That may not be the most efficient way.

4    Certainly nothing about the conduit relationship

5    requires any particular transmission.  In fact, for

6    foreign transmissions, the current Form 990, which has

7    an expanded reporting, specifically asks the question

8    about the means of communication of the funds, whether

9    it's wire transfer, check, cash, what have you.  So the

10   IRS would expect to see any form of transmission.  There

11   would be no particular form required.

12       Q.    It wouldn't be required, but it would -- if

13   you're trying to protect the -- what you say are the

14   intentions of the donor to preserve the principal and

15   get it to its intended purpose, act as this conduit as

16   you say, then wouldn't you want to do it as cheaply as

17   possible?

18       A.    The best way to do it is the way the owner of

19   the money wants it done, which in this case would be

20   al-Haramain Saudi, yes, that's -- that would be pursuant

21   to the agreement.

22       Q.    But you know -- I'm sorry, you know that you

23   can wire transfer money from Oregon to Saudi Arabia for

24   15, 20 bucks, correct?

25       A.    I would assume that's the amount, yes.

1      Q.     And there is nothing difficult about that, you

2    just go to the bank and say this is what I want to do?

3      A.     Correct.

4      Q.     And you know that didn't happen here?

5      A.     Correct.

6      Q.     And you know further that one of the Saudi

7    Arabian members of al-Haramain, this Mr. al-But'he,

8    proceeded to fly halfway across the world to come get

9    the money, right?

10     A.     Yes.

11     Q.     And that's not a cheap proposition?

12     A.     I would assume it isn't.

13     Q.     Several thousand dollars for a plane ticket.

14     A.     I've never priced them, but I would assume

15   something on that order.

16     Q.     Okay.  And you know this Mr. al-But'he was an

17   officer of the local charity here, too?  Did you know

18   there was a common membership on both Saudi Arabia and

19   the United States board membership?

20     A.     I understand he was a director.  I'm not sure

21   whether he was an officer or not.

22     Q.     All right.  I'll show you some documents later

23   on.  So you know that this Mr. al-But'he flew into the

24   United States, and he and Mr. Sedaghaty, the defendant,

25   went to a bank to retrieve this money, correct?

1      A.     That's my understanding.

2      Q.     And you know that before this happened, that

3   the head of the 501(c)(3), Mr. Sedaghaty, preordered

4   130,000 in American Express traveler's checks, right?

5      A.     I understand traveler's checks were ordered,

6   yes.

7      Q.     Now, you know that if you are acting as a

8   conduit and you didn't wire transfer the money for $15,

9   if you are really truly acting according to what you

10   think the intention of the donor is, to get the 150,000

11   to Saudi Arabia, then you would want to get $150,000 in

12   traveler's checks, not 130,000, right?

13          MR. MATASAR:  Objection, Your Honor, beyond the

14   scope and argumentative.

15          THE COURT:  Overruled.

16          THE WITNESS:  I think the question is whether

17   the owner of the funds, how they -- that owner wanted

18   the transmission to occur.

19   BY MR. CARDANI:

20      Q.     Do you know anything in this case that

21   Mr. El-Fiki said I want you to get 130,000 in traveler's

22   checks, not 150,000?

23      A.     I don't recall seeing anything like that.

24      Q.     All right.  And you've seen nothing where this

25   Mr. El-Fiki instructed Saudi Arabia or the United States

1   as to how to break down the transaction to get the

2   $150,000 to Chechnya, right?

3       A.    That's because Mr. El-Fiki would not have been

4   the one to have made those decisions.  The money would

5   belong to al-Haramain Saudi.  al-Haramain Saudi would

6   have been the one to make the decision about how to

7   transmit it.

8       Q.    No.  But I thought you said you'd want to

9   comply, as best as possible, with the intentions of the

10  donor in effectuating the transaction.  Did I hear that

11  wrong?

12      A.    No.  The intention of the donor is to give it

13  to al-Haramain Saudi.  al-Haramain Saudi, as I

14  indicated, is the owner of assets at that point.

15      Q.    So if the donor wanted $150,000 to go into

16  Chechnya, then al-Haramain had an obligation to do its

17  best job in preserving as much of that principal as it

18  could to achieve the intended purposes, right?

19      A.    Which al-Haramain are you referring to?

20      Q.    Both.

21      A.    al-Haramain Saudi would have had ownership over

22  the funds, and my recollection of the terms of the

23  arrangement with Mr. El-Fiki, gave al-Haramain Saudi the

24  ability to decide who and how the funds would be

25  distributed.  So al-Haramain Saudi had discretion,

1    whereas al-Haramain U.S. did not have discretion.  So

2    al-Haramain U.S. would have been charged with carrying

3    through and transmitting the money back to al-Haramain

4    Saudi.

5        Q.    Okay.  So getting back to the transaction, sir,

6    you know 130,000 in American Express was preordered by

7    Mr. Sedaghaty, right --

8        A.    Yes.

9        Q.    -- from the bank?

10       A.    Yes.

11       Q.    And did you know that there was a 1 percent fee

12   for that which cost $1,300 to al-Haramain local, the

13   501(c)(3)?

14       A.    I'm aware there is a fee for traveler's checks,

15   yes.

16       Q.    Okay.  And assume for purposes of this, that it

17   was $1,300 just to get it broken down like this, okay?

18       A.    I'll assume that.

19       Q.    So do you think Mr. El-Fiki would be happy

20   about that, that $1,300 of his donation was coming off

21   the top to do it in this kind of strange way?

22            MR. MATASAR:  Objection.

23            THE COURT:  Sustained.

24   BY MR. CARDANI:

25       Q.    Now, you also know that there was $20,000 in

1   addition to this, so you get the 130 that went in

2   traveler's checks, right?

3       A.    Correct.

4       Q.    And then there is another 20,000.  Do you know

5   where that $20,000 went?

6       A.    My understanding is it was retained by

7   Mr. Soliman al-But'he.

8       Q.    Well, more specifically, you know -- did you

9   see the documents where Mr. Sedaghaty issued a check for

10  the purchase of a cashier's check for Mr. al-But'he?

11      A.    Yes.

12      Q.    And you know that Mr. al-But'he and

13  Mr. Sedaghaty were the only two people that controlled

14  the money in that bank account, they were the only two

15  signatories; is that right?

16      A.    That's correct.

17      Q.    So the $21,000 cashier's check is given to an

18  officer of the local 501(c)(3), Mr. al-But'he?

19      A.    Correct.

20      Q.    So if you've got the 150, and that's broken

21  up -- that's supposed to go to Chechnya -- and you've

22  got 130 in traveler's checks, and now you've got 21,000

23  being issued, there is a little bit more than 150, isn't

24  there?  An extra grand, isn't there?

25      A.    Roughly, yes.

Owens - X by Mr. Cardani                    44

1    Q.    And do you know that Mr. al-But'he deposited

2   that cashier's check into his own personal bank account

3   in Saudi Arabia when he got home?

4    A.    I believe I've seen information to that effect

5   in the file, yes.

6    Q.    So if the local 501(c)(3), sir, spent $1,300 to

7   get the traveler's checks as the fee, and an extra $1000

8   on top of the 20,000, so it's $2,300 of the local

9   501(c)(3)'s money was spent to do this strange --

10  this -- excuse me -- this transaction in this manner,

11  wouldn't that be important to report how the 501(c)(3)

12  is using its own money, separate from what you consider

13  this conduit money, it's using its own money to help get

14  this transaction going, doesn't that --

15         MR. MATASAR:  Objection, Your Honor, there is

16  no indication whose money --

17         THE COURT:  Okay.

18         MR. MATASAR:  I'm sorry, assumes facts not in

19  evidence, I guess is what I should say.

20         THE COURT:  Sustained.

21  BY MR. CARDANI:

22   Q.    Okay.  If the local charity --

23         MR. MATASAR:  The objection was sustained.

24  BY MR. CARDANI:

25   Q.    Let me restate the question.  If the local

1   charity used its own money to help the transaction go

2   this way, isn't that important for 990 purposes,

3   reporting purposes?

4       A.    If the local charity expended funds for a

5   particular action, that would be reported as an expense

6   on the Form 990.

7       Q.    Okay.  So if the local charity used some of its

8   own money, separate from this 150 of Mr. El-Fiki's, then

9   that's a reportable transaction on the 990, right?

10      A.    Correct.

11      Q.    And you know that wasn't done here, right?

12      A.    I don't know that.

13      Q.    Well, you've spent quite a bit of time

14  reviewing the 990?

15      A.    Yes.  But there were a number of expenses

16  listed on the Form 990.  I don't know what was included

17  behind each of those expenses.

18      Q.    Okay.  Now, a slightly different subject.  When

19  you grant the stamp of approval for a business to act

20  tax exempt, there are obligations imposed on that

21  organization with respect to record keeping; is that

22  right?

23      A.    I'm not sure I understand your question,

24  because a business is almost by definition not qualified

25  to be tax exempt as a charity.

1        Q.     Well, you know what a determination letter, of

2    course, is, right?

3        A.     Yes, I do.

4        Q.     So when the IRS reviews an application, a 1023,

5    and after all the back and forth says, okay, you are now

6    tax exempt, there is a determination letter that's

7    issued?

8        A.     Correct.

9        Q.     And you've seen the determination letter in

10   this case, have you not?

11       A.     Correct.

12       Q.     I'd like to bring up -- incidentally, the tax

13   exempt status of al-Haramain as granted by IRS was not

14   as a church, was it?

15       A.     That's correct, it was not.

16       Q.     It was a public charity, right?

17       A.     Correct.

18       Q.     And so once granted, there was a requirement

19   that al-Haramain file 990s for any year that its

20   receipts exceeded $25,000; is that right?

21       A.     Correct.

22       Q.     Now, if we could go to IRS-4, and off to your

23   right, sir, if you could look on the screen.  This is

24   the determination letter issued by the IRS in this case.

25   Now, at the bottom of page 3, it talks about record

1  keeping requirements, does it not?

2      A.    Yes, it does.

3      Q.    And it's cut off here, but if you need a better

4  copy of this that explains the whole thing, I'll make

5  arrangements for you.  But "to assure your continued

6  exemption," the letter says, "you should keep records to

7  show the funds are only spent for those purposes;" is

8  that right?

9      A.    Correct.

10     Q.    And it talks about how when you give to another

11 tax exempt organization, there's certain types of record

12 keeping, but if we spill over to the next page, page 4,

13 if the recipient organization is not exempt under

14 501(c)(3), you must have evidence that the funds will

15 remain dedicated -- we just had an electronic burp,

16 Judge.

17         THE COURT:  None of my machines are working

18 today.

19         MR. CARDANI:  I can go back to old school, if

20 you want.

21         THE COURT:  Let's do it the old-fashioned way.

22         MR. MATASAR:  Does the court reporter need the

23 electricity?  You're okay.  Your machine is working?

24         THE REPORTER:  Yes.

25         MR. CARDANI:  Am I free to go ahead?

1            THE COURT:  Yes, just speak up.

2    BY MR. CARDANI:

3        Q.     All right.  Mr. Owens, I have a letter here.

4    And if you -- I better speak quickly while it's up here

5    before it disappears.  Do you see that, Mr. Owens?

6        A.     Yes, I do.

7        Q.     I'm going to speak up, because it doesn't look

8    like we have mikes.  But if -- what this determination

9    letter is saying to al-Haramain is, if you are

10   distributing money to another organization that is not

11   tax exempt, there are even greater record-keeping

12   requirements; is that right?

13       A.     Yes, that's correct.

14       Q.     And that said a minute ago, okay -- it says

15   "you must have evidence that the funds will remain

16   dedicated to the required purposes, and that the

17   recipient will use the funds for those purposes."  Are

18   you familiar with that language?

19       A.     Yes, I am.

20       Q.     Okay.  So what we're saying here, and the

21   reality of this is, what we want to know is if you're

22   sending money to a non-501(c)(3), you gotta keep really

23   good records, right?

24       A.     Yes.

25       Q.     And the reason is because TEGE, your old shop,

1   EO, Exempt Organizations, is on the front lines of

2   monitoring charities to determine whether they're

3   spending their money consistent with public policy,

4   correct?

5       A.    Consistent with the Internal Revenue Code.

6       Q.    Sure.  But if somebody applies as a public

7   charity, as a religious charity, for example, like here,

8   it's IRS's job, your old shop's job, to monitor the

9   charities to make sure they are doing what they say they

10  are doing, correct?

11      A.    Correct.

12      Q.    And the primary vehicle that you use to do

13  that, that IRS uses to do that, is this Form 990 that

14  we've heard so much about, right?

15      A.    Correct.

16      Q.    And with respect to foreign distributions, the

17  IRS is particularly concerned about record-keeping

18  requirements being maintained by local charities, fair

19  statement?

20      A.    Fair statement.

21      Q.    And what you would want -- what you would

22  expect to make sure that it's doing what it's supposed

23  to do, before sending money overseas, is it a fair

24  statement that you would expect as IRS the local

25  organization to do a little bit of an investigation to

Owens - X by Mr. Cardani                              50

1    make sure that the funds are going for their intended

2    purposes?

3        A.    Correct, I would.

4        Q.    We would call that due diligence, would we not?

5        A.    Yes.

6        Q.    And you'd expect the charity -- the local

7    charity to make some investigation or determination in

8    advance of sending the money as to who would get it,

9    what would be done with the money; is that right?

10       A.    That's generally what you would expect to see,

11   yes.

12       Q.    And then you would expect the local charity

13   here to do some sort of tracking or record keeping or

14   reporting back to the actual use made of the money,

15   right?

16       A.    Unless an exception applied.

17       Q.    But in general that's -- the IRS's expectations

18   with respect to foreign money, that there be

19   record-keeping --

20       A.    The IRS has published guidance in Revenue

21   Procedure 92-94, which is described in the Form 990

22   instructions, that sets out something called an

23   equivalency determination where as part of that due

24   diligence process on the front end, the U.S. charity

25   collects information, including an affidavit from the

 1   foreign organization, that would allow the U.S. charity

 2   to make a good-faith determination that the foreign

 3   entity was equivalent of a U.S. charity for purposes of

 4   transmitting money, then the U.S. charity does not have

 5   to have the back-end tracking that you described.

 6           The back-end tracking is only required where no

 7   equivalence determination is done on the front end.

 8       Q.    Now, it looks like we got a mike.  You've

 9   testified in other cases like this around the country,

10   have you not?

11       A.    I have testified in court on -- this is my

12   fourth occasion.

13       Q.    All right.  And one of them included a case in

14   Boston?

15       A.    Correct.

16       Q.    And during that trial, I have a copy of the

17   transcript if you want to see it, but weren't you asked,

18   if a domestic charity sends money --

19           MR. MATASAR:  May we see a transcript,

20   Mr. Cardani?  Do you have one for us?

21           MR. CARDANI:  Uh-huh.  (Document tendered).

22   BY MR. CARDANI:

23       Q.    Repeat the question.  You were asked:  "If a

24   domestic charity sends money overseas for its charitable

25   purposes, what are the requirements of the IRS with

1    regard to due diligence in ensuring that the money is

2    spent for charitable purposes?"

3            Do you remember that question?

4    A.    Yes, I do.

5    Q.    Was your answer:  "The IRS would expect the

6    charity to make some investigation or determination in

7    advance of sending the money as to who would receive the

8    money and what would be done with the money."

9            Did you say that?

10   A.    That's my recollection.

11   Q.    And did you go on to say:  "And they would

12   expect some sort of tracking or record keeping or

13   reporting back as to the actual use made of the money"?

14   Did you say that?

15   A.    I believe that's what I said.

16   Q.    Now, with respect to that type of record

17   keeping -- do we have use of our machines?  Could we

18   bring up AHIF-2.  Is this among the documents, sir, that

19   you looked at prior to your testimony today?

20   A.    Yes, it is.

21   Q.    And you know there is another one very much

22   like it, AHIF-3.  Did you also look at that one?

23   A.    Yes, I did.

24   Q.    Are these the type of investigative efforts and

25   record keeping that you referred to in your Boston

1    testimony that would be sufficient to the IRS?

2        A.    No.

3        Q.    Why not?

4        A.    Because these records are not records relating

5    to an U.S. organization's funds being transmitted

6    overseas.  These records actually appear to be, to me,

7    just, in essence, a receipt for accepting money, moving

8    it from one party to the other.  They really don't

9    describe the end use of the funds, so that they are more

10   of an intermediary documentation of where the funds are.

11       Q.    So would you go so far as to say that they are

12   basically irrelevant to the record keeping -- whether

13   the record -- maintaining these record-keeping

14   requirements?

15       A.    They are relevant only insofar as they show who

16   had the money at one particular point in time.

17       Q.    All right.  I want you to assume something for

18   me for this next set of questions.  If the IRS had

19   audited al-Haramain and asked them to produce records

20   relating to this Chechnya transaction, and they gave

21   you -- they gave IRS two receipts, these two receipts,

22   think IRS would have any problems with these things?

23       A.    I think the IRS would wonder what they are.

24   They are -- they simply show a transmission of money.

25   They don't show anything much beyond that.  So they seem

1    to naturally -- would have led a revenue agent to ask

2    more questions.  They are simply documents that are, as

3    I said, intermediaries in the transmission.

4        Q.    Thank you.  And you would expect a Revenue

5    agent to ask more questions if the tax exempt

6    organization said this receipt reports the transmission

7    of 150,000 that you are asking about so here you go, and

8    you saw not one but two of these, and they have

9    different amounts, different signatures, that would

10   raise some red flags, would it not?

11       A.    It certainly would trigger questions.  Whether

12   it would be red flags or not would depend on the other

13   facts surrounding these particular documents.

14       Q.    And if you did that additional investigation or

15   as one of your subordinates in the field, like

16   Mr. Wooten, did this additional investigation and found

17   out that those figures are incorrect, that $188,000

18   never left the local charity's account, in other words,

19   that this is false information, would that cause IRS

20   some concern?

21       A.    It certainly would be grounds to ask for an

22   explanation.

23       Q.    Now, you are familiar with fraud during an

24   audit occasionally when you select a 501(c)(3)

25   organization for an audit and an audit occurs, if the

1    exempt organization provides false evidence to the IRS,

2    that's a big problem, is it not?

3        A.    Knowing/willful provision of false information

4    is a big problem, yes.

5        Q.    And in addition to things like disbanding or

6    revoking the charity, there are other options available

7    for sanctions to IRS, are there not?

8        A.    Yes.

9        Q.    Fines?

10       A.    Penalties, yes.

11       Q.    Letter of reprimand, if it's not that big a

12   deal?

13       A.    Those are called no change with advisory

14   letters, but that's essentially what it is, a warning.

15       Q.    Okay.  But if you -- excuse me.

16       A.    A warning.

17       Q.    But if you ratchet it up a little bit and you

18   determine that there is actual fraud during the audit

19   process by providing false evidence, could you have

20   civil fraud sanctions?

21       A.    You could.

22       Q.    And could you not refer it to the criminal

23   house of IRS?

24       A.    Correct.

25       Q.    And that would probably happen, would it not,

1    if you are auditing a tax exempt and they provided false

2    information to you?

3        A.    Well, the decision to make the referral is

4    based on that sort of finding, but there is also a

5    requirement that there be a threshold amount of tax due,

6    that there be some tax effect.  And that's laid out in a

7    recent report that the Treasury Inspector General for

8    tax administration released on Exempt Organizations'

9    criminal cases back on July 2nd, I think, of this year.

10   And that report by the Inspector General outlines in a

11   couple of paragraphs his process and makes it clear that

12   there is a threshold, in other words, not every act in

13   which there is some sort of understatement of tax is

14   going to necessarily be accepted for criminal

15   investigation, that there are threshold and requirements

16   and that --

17       Q.    Okay.

18       A.    -- and that Exempt Organizations' criminal

19   cases are handled under special procedures, that is the

20   decisions to accept or to proceed are made by higher

21   officials than would be the case in a normal income tax

22   investigation.

23       Q.    Mr. Owens, you know that those thresholds can

24   be waived when you find that an exempt organization is

25   committing fraud during the audit process, do you not?

1     A.     Correct.  I was speaking in terms of the

2    general procedures.  Of course there are always special

3    cases.

4     Q.     Now, in addition -- we talked about TEGE being

5    the front line for policing charities, right?  That's

6    the main mission of TEGE to -- not police, but monitor

7    charities.

8     A.     To administer the tax laws applicable to tax

9    exempt organizations.  It's much broader than just

10   charities.

11    Q.     And you know that there are other laws on the

12   radar screen -- during your 25 years with the IRS, you

13   know that there are several other laws that come into

14   play if you find that a tax exempt organization is

15   engaged in fraudulent activity, right?

16    A.     There could very well be, yes.

17    Q.     And one of the biggies is the crime of money

18   laundering; is that right?

19    A.     Correct.

20    Q.     And isn't money laundering when an organization

21   takes money of questionable origin, and essentially

22   attempts to put it into a bank account, and masquerade

23   it, create a paper trail to make it look as though it's

24   legitimate money; is that your understanding of money

25   laundering?

1       A.      That's my general understanding, yes.

2       Q.      And so if IRS gets wind -- let's say that there

3    is a tip from the public that one of your 501(c)(3)

4    organizations is engaged in money laundering, that would

5    be pretty significant to you in achieving your mission;

6    is that right?

7       A.      That would be an issue that would need to be

8    investigated, in my view.

9       Q.      And you can refer that to other components of

10   the federal government if you've got some questions,

11   FBI?

12      A.      No, you can't, because of Section 6103, the

13   privacy rule in the Internal Revenue Code precludes the

14   sharing of taxpayer information with other government

15   agencies, unless they are grand juries or things of that

16   nature and duly authorized.  But the Exempt

17   Organizations Division did not have the authority, and,

18   in fact, it would have been sanctioned, the individuals

19   would have been terminated, if they had disclosed tax-

20   payer information to other government agencies.

21      Q.      Okay.  I'm not talking about that.  I'm talking

22   about when you decide that there may be criminal

23   activity, when you're doing an audit or looking at the

24   activities of a tax exempt organization, or you receive

25   information from the public that the charity may be

Owens - X by Mr. Cardani                              59

1   involved in criminal activity, there are ways, are there

2   not, to get that information to the agencies that would

3   investigate that?

4       A.    That would not have been my function, so I'm

5   not positive of the precise steps.  All I know is there

6   is a privacy rule in the Internal Revenue Code that

7   severely limits the coordination with other government

8   agencies.

9       Q.    But you've got criminal investigation as part

10  of the umbrella of IRS?  Surely you can get information

11  to them of this sort?

12      A.    You make an official referral, yes.

13      Q.    Okay.  And then controls are put on so the

14  audits are discontinued.  But once the referral is made

15  to criminal, then IRS can continue to look into that,

16  right?

17      A.    Excuse me, I'm not sure I understood it.

18      Q.    You're saying that there are penalties and

19  restrictions on the use of taxpayer information in

20  sharing that, this 6103?

21      A.    With other agencies, yes.

22      Q.    Okay.  But doesn't apply to the criminal side

23  of IRS, you can give them information like this, right?

24      A.    That's right.  It's part of the same agency.

25      Q.    Okay.  And then once IRS CI is involved,

1    Criminal Investigation, they have the ability to invite

2    in other agencies, like the FBI, as long as certain

3    requirements, paperwork is filled out with the courts on

4    information sharing of taxpayer information, right?

5        A.    I believe that's the case, yes.

6        Q.    So I want to give you a hypothetical.  You

7    talked about this agency relationship and whether the

8    transaction needs to be reported to the IRS.  I want to

9    give you a hypothetical that has nothing to do with the

10   facts of this case, but I want to ask you about it,

11   okay?

12       A.    Okay.

13       Q.    Assume that information came to you that one of

14   the charities received drug money, cash, from a drug

15   dealer, and they put it in the 501(c)(3)'s bank account,

16   and then transferred it out of the country, and they did

17   this to hide the fact that it was drug money, okay?

18       A.    I understand your hypothetical so far, yes.

19       Q.    And that information came to you, IRS, that

20   would be of concern, would it not?

21       A.    Yes, it would.

22       Q.    And what would your expectations be with

23   respect to the 501(c)(3) in a situation like that,

24   record keeping, reporting, would you expect the

25   501(c)(3) to come clean and to tell the IRS about it?

1    A.    Would I expect that to happen?

2    Q.    Yes.

3    A.    Well, I would hope that it would happen.  If,

4    indeed, it's a criminal conspiracy, I would not expect

5    it to happen.

6    Q.    You mean isn't the point that one of the big

7    things about charities is you want them to be

8    transparent in their activities; is that a fair

9    statement?

10   A.    I'm not sure what "transparent" means, but I

11   think in the common parlance, yes.

12   Q.    Okay.  990s are publicly available, are they

13   not?

14   A.    Correct.

15   Q.    They go out to the world, so they're -- you can

16   go onto the computer right now and pull up a charity's

17   990?

18   A.    Correct.

19   Q.    And the reason for that is that you want these

20   organizations to be forthcoming, that's what I mean by

21   transparent in their financial activities, right?

22   A.    Well, the reason for that is the charities are

23   required to make copies of their Form 990 available to

24   the public to anyone who asks, that's the reason.

25   Q.    And -- well, one of the reasons for that is so

1    donors can decide whether a particular charity is one

2    that they would want to give their money to, right?

3         A.    That is the supposition that the IRS provides

4    on the Form 990 instructions, yes.

5         Q.    Okay.  So if a charity is engaged in sending

6    money overseas to fund the mujahideen, whether it's for

7    blankets or bombs, you'd expect the 501(c)(3)

8    organization to tell donors about that, wouldn't you?

9         A.    I would expect the questions on a Form 990 that

10   deal with grant making to be responded in a complete and

11   candid way, which would include information about the

12   dissemination of the funds, the geographic region of the

13   world, the recipient organization.  Current Form 990

14   asks for the means of transmission of funds, that sort

15   of information.

16        Q.    Well, haven't you -- when you were still with

17   the IRS, you gave a few speeches in your career?

18        A.    I gave a few, yes.

19        Q.    I'm looking at something that's reported by a

20   group called Quality 990, Improve IRS Form 990

21   Reporting.  Are you familiar with that organization?

22        A.    I think it's an activity, not a separate

23   organization.  At least that's my recollection.  It's

24   been a while since that was extant.

25        Q.    Okay.  I want to see if you remember a speech

 1    you gave way back in 1999.  And I have got some

 2    information here if you want to see it.

 3        A.    I may need to see it.

 4        Q.    Okay.  You want to see it now or you want me to

 5    ask about it?

 6        A.    Why don't you ask me about it and I may recall,

 7    but I give a lot of speeches a year, so.

 8        Q.    All right.  Let me see if this is the type of

 9    speech you would have given back then.  The title of

10    this is IRS Warns Nonprofits to Complete Form 990

11    Accurately.  "In a recent speech, Marcus S. Owens, IRS

12    Exempt Organizations Division Director, said it is

13    important that tax exempt organizations fill out their

14    Form 990 information returns completely and accurately."

15    Does that sound like something you'd say?

16        A.    It certainly does.

17        Q.    All right.  "Owens said that the visibility" --

18              MR. MATASAR:  I'm going to object, Your Honor.

19    This is reading a press release.  This is not the

20    speech.

21              MR. CARDANI:  It's not a -- it's a report of

22    what he said.  And if he didn't say, he can say it.

23              THE COURT:  Yeah.  You can use it to refresh

24    his recollection.

25    BY MR. CARDANI:

Owens - X by Mr. Cardani                          64

1    Q.    Do you want to see it?

2    A.    So far it sounds like something I would have

3    said.

4    Q.    Okay.  You just -- I've got a copy of it here.

5    If you want to see, just let me know.

6          Going on, "Owens said that the visibility of

7    the form will increase with widespread use of the

8    Internet and efforts of the IRS to put all Forms 990 on

9    a CD ROM.  As a result, organizations that put vague and

10   general information on their returns could provide

11   fodder to their critics, competitors, and investigative

12   reports, he warned.  These forms are important documents

13   to a number of donors, researchers and watchdog

14   agencies."

15         Does that sound like something you would have

16   said when you were still with IRS?

17   A.    Certainly does.

18   Q.    And what's going on there, once again, you want

19   this transparency, if you want to be tax exempt, you

20   gotta tell people, including donors and the IRS, what

21   you are doing with your money; fair statement?

22   A.    I said I was looking for accuracy.  I said the

23   rest of the world may be looking for transparency.

24   Q.    I'm sorry, did you --

25   A.    I said I would be -- I said in the speech, as I

1   recall, and as you read, that I was looking for

2   accuracy, and that donors and others, users of the form,

3   might be looking for transparency.

4        Q.    Now, have you also said in the past that in

5   those cases where false statements are made

6   deliberately, and we're talking about a 990, the IRS

7   will often pursue the broader investigation because

8   there is probably a heck of a lot more under the rock;

9   did you say that?

10       A.    I could very well have said that.  I've

11  certainly said things like it.  I don't remember the

12  "under the rock" quote, but it sounds like a good one.

13       Q.    Okay.  And I've got that article, too, if you

14  want to take a look at it.  That was in a *Roanoke Times*

15  just this year, June of 2010.  Do you remember talking

16  about a Navy veterans' investigation?

17       A.    Oh, yes, yes, I do.  I recall that.

18       Q.    Okay.  Now, wasn't the issue there that there

19  was an allegation that an organization that was

20  supposedly raising money for Navy veterans, a 501(c)(3),

21  was actually distributing some of its money for improper

22  purposes?

23       A.    That's my recollection, yes.

24       Q.    It was only a few thousand bucks, right?

25       A.    I don't remember the exact amounts.  I do

Owens - X by Mr. Cardani                          66

 1   recall there were allegations of high living and
 2   excessive compensation, but I don't remember the actual
 3   dollar amounts.
 4        Q.    But what you were saying about under the rock,
 5   correct me if I'm wrong, but what you're saying is if an
 6   organization was doing something improper, even though
 7   it's just -- with just a little bit of its money, the
 8   IRS wants to take a look at it from a broader
 9   perspective because there may be a heck of a lot more
10   going on as an indicator by that diversion; is that what
11   you meant?
12        A.    That's roughly what I meant, yes.
13        Q.    And you also said that "knowingly making a
14   false statement on a tax form submitted to the
15   government is a criminal offense," right?
16        A.    I may very well have said that.
17        Q.    Well, and it is?
18        A.    It is.  It's a true fact.
19        Q.    Okay.  990s are filed under penalties of
20   perjury?
21        A.    Correct.
22        Q.    And just to get something straight, regardless
23   of whether this agency thing that you're talking about
24   occurred, if a tax exempt organization makes the
25   decision to report the transaction anyways, they can't

1   lie about it in a 990, can they?

2       A.    They have to report in a true and complete way.

3       Q.    Okay.  So even if a -- some passthrough or

4   earmark or agency thing occurs, like technically looking

5   back on it ten years later, you are saying, well, maybe

6   they didn't have to report that, well, if, in fact, they

7   did, they can't lie about it on a 990, can they?

8       A.    If they reported it on a Form 990, it should

9   have been accurately -- it should have been what they

10  believed to be accurate at that time.

11      Q.    So regardless of a ten-year-later decision on

12  whether it's supposed to be reported or not, the fact of

13  the matter is if it's on the 990 as filed by the exempt

14  organization, they have to be proper in their reporting

15  with the IRS, right?

16      A.    They have to be as -- they have to be as proper

17  as they can be.  And by that I mean that they have to

18  make a concerned effort to report accurately.

19      Q.    Now, we've been -- there's been some discussion

20  about a change in 990; are you aware of that?

21      A.    I'm aware of that, yes.

22      Q.    What year was that?

23      A.    Well, the 990 changes each year.  The most

24  dramatic change occurred between 2007 and 2008.

25      Q.    Okay.  But wasn't there some proposed changes

1    in 2002 as well?

2         A.    There were proposed changes each year, yes.

3         Q.    Okay.  And Mr. Matasar brought this up with a

4    prior witness, but one of the reasons that the 990 was

5    proposed to be changed was because of this issue of

6    foreign grants, money being sent overseas; are you aware

7    of that?

8         A.    Yes, I'm aware of that announcement, yes.

9         Q.    And that the announcement said that since the

10   events of September 11, 2001, concern has been expressed

11   that purportedly charitable organizations may be

12   transferring funds outside the United States to

13   organizations or individuals suspected of supporting

14   terrorist activities, right?

15        A.    That's what I understand the announcement said,

16   yes.

17        Q.    And you know our filing here was in October of

18   2001?

19        A.    Correct.

20        Q.    And you know that under this foreign grant

21   section, one of the hot button issues was line 22?

22        A.    The foreign grant section of the announcement?

23        Q.    Yes.

24        A.    Yes.

25        Q.    And they wanted public comment -- IRS did -- on

 1    addressing what further steps, if any --

 2              MR. MATASAR:  Objection, Your Honor.  This is

 3    argument.  It's not really asking a question to the

 4    witness.

 5              THE COURT:  I didn't hear the question.

 6    BY MR. CARDANI:

 7       Q.    Did the IRS ask for comment regarding changes

 8    of the form to help the Service to determine how to take

 9    more effectively, and identify on Forms 990,

10    transactions that present a risk of a diversion in

11    charitable funds?

12              THE COURT:  Overruled.

13              THE WITNESS:  That was the essence of the

14    announcement.  It asked for suggestions on changes to

15    the Form 990.

16    BY MR. CARDANI:

17       Q.    Because of a concern about so-called charities

18    diverting money for terrorist activity?

19       A.    That is what the announcement said, yes.

20       Q.    And the IRS was thinking about making a few

21    changes to make sure they did as good a job as they

22    could in determining whether that was happening?

23       A.    Correct.

24       Q.    Now, could we go to IRS-3, page 3, please.

25    This is one of the forms, Mr. Owens, that you reviewed

1    prior to testifying today?

2        A.    Correct.

3        Q.    And do we see -- in number 4, do we see Soliman

4    al-But'he listed as an officer, director, or trustee of

5    al-Haramain here in the United States?

6        A.    Yes, he is.

7        Q.    Okay.  And this is a 1023 so --

8        A.    Correct.

9        Q.    All right.  Now, if we could pull up BOA-8.

10   You've seen this check, too?

11       A.    Yes, I have.

12       Q.    You know it came out of the al-Haramain bank

13   account here in Oregon?

14       A.    That's my understanding, yes.

15       Q.    And it was made payable to the Bank of America

16   for a cashier's check.  And it's signed by

17   Mr. Sedaghaty.  Are you aware of that?

18       A.    Yes, I am.

19       Q.    And in the notations section, it says for

20   Soliman?

21       A.    Yes, it does.

22       Q.    And you know -- you've seen other records that

23   this led to a cashier's check, came out of the El-Fiki

24   money, al-But'he takes it home, reports nothing to

25   customs on the way out about any of this money, and then

1   he deposited this cashier's check into his own personal

2   account, you know that, right?

3       A.      That's my understanding of events, yes.

4       Q.      Now, if a local 501(c)(3) makes a payment to

5   its officers, doesn't that have to get reported on the

6   990?

7       A.      It depends on the nature of the payment.

8       Q.      Okay.  If we could go to IRS-1, line 25.  Line

9   25 asks about compensation of officers, does it not?

10      A.      Yes, it does.

11      Q.      If this payment, this $21,000, was a payment to

12  an officer for compensation, wouldn't you expect it to

13  be here?

14      A.      If it was payment for compensation, I would

15  expect it to be reported there, yes.

16      Q.      And Schedule A, you mentioned that -- if I

17  heard your testimony correctly -- Schedule A is a very

18  important schedule on a 990?

19      A.      Correct.

20      Q.      If we could go to page 2, questions 2d, as in

21  David, and 2e, during the year has the organization --

22  up top here -- either directly or indirectly engaged in

23  any of the following acts with any of its trustees,

24  directors, officers, so on and so forth, with an

25  individual -- with -- or with any taxable organization

1    with which any such person is affiliated as an officer,

2    director, and so on; and then d says payment of

3    compensation or reimbursement of expenses if more than

4    1,000, and the answer is no, right?

5        A.    That is correct.

6        Q.    And if this was a payment to Mr. al-But'he for

7    compensation or payment or reimbursement of expenses,

8    then you would expect it to be reported here, would you

9    not?

10       A.    If it was a payment by the organization filing

11   a Form 990, yes.

12       Q.    And likewise, e there, was a transfer of any

13   part of its income or assets to an officer, it goes here

14   as well, right?

15       A.    Correct.

16       Q.    And it wasn't done here.  Now, you mentioned

17   line 57 of the building accounts, and if I could

18   summarize your testimony, you said in here it would be

19   kind of an immaterial error; did I get that right?

20       A.    I used the word "trivial."

21       Q.    Trivial.  Okay.  Let me give you a

22   hypothetical.  If an organization -- a 501(c)(3)

23   organization gets a six figure distribution, and

24   information came to you that the tax exempt engaged in

25   an attempt to coverup a foreign distribution by making

1    it appear as though the bulk of the money went into the

2    purchase of a building on line 57, if that information

3    came to you, you'd care about line 57, wouldn't you?

4        A.    I'd care about all aspects of the transaction.

5        Q.    I'm sorry?

6        A.    I said I would care about all aspects.  Part of

7    the transaction that would be most, I think, of interest

8    to the IRS, would be the part where you describe there

9    being an effort to disguise the funds.  The purchase of

10   a building is an ordinary transaction that thousands of

11   charities enter into all the time.

12       Q.    And what I'm saying is, in and of itself, line

13   57 might not that be a -- be of big a deal, but if it

14   was part of an attempt to disguise a foreign transaction

15   as though it went into a building, then that line 57 may

16   be a very important part of an IRS inquiry, fair

17   statement?

18       A.    Well, except line 57 asks for the value of the

19   property, the basis, it doesn't ask for transactional

20   information about it.

21       Q.    No.  But if you learned that the organization

22   had increased the basis of a building, in other words,

23   they made it look like they spent more money to buy the

24   building than they really did, and this was an effort to

25   masquerade a foreign transaction, line 57 would be very

1    important at that point?

2        A.    Line 57 is where that inflated basis figure

3    would show, yes.

4        Q.    And it would be an important part of an IRS

5    inquiry if those facts were true?

6        A.    Correct.

7        Q.    A couple of other areas, Mr. Owens, and then

8    I'll be done.  You know that the word Chechnya is

9    mentioned nowhere in the 990 that's so important in this

10   case, right?

11       A.    I don't recall seeing it, no.

12       Q.    And if an organization is intentionally keeping

13   evidence or information about a foreign transaction off

14   its the 990, you would want to know about that, IRS,

15   right?

16       A.    The foreign transactions of all kinds are what

17   are reported basically on the Form 990.

18       Q.    But if they are not, what I'm saying is if one

19   occurred and it didn't appear anywhere on the 990, that

20   would be significant to the IRS?

21       A.    If it was the kind of transaction that should

22   be reported and it was not, it would be significant,

23   yes.

24       Q.    And it would be significant potentially to

25   donors thinking about whether they want to give money to

1    an organization or not, right?

2       A.    It might, it might.

3       Q.    Not to be facetious, but is the Chechen

4    mujahideen a 501(c)(3) organization?

5       A.    Not to my knowledge.

6       Q.    Okay.  And is al-Haramain Saudi Arabia a

7    501(c)(3) organization?

8       A.    Not to my knowledge.

9       Q.    Have you gone on record, sir, as recently as

10   2009 as taking the position that IRS Exempt

11   Organizations is not being given enough money to do its

12   job in monitoring charities?

13      A.    I've been pretty consistent with that, not just

14   in 2009.

15      Q.    Yes.  You've written quite a bit about this?

16      A.    Yes.

17      Q.    Okay.  And haven't you also said that the IRS

18   can't do enough audits to catch problem charities?

19      A.    That certainly sounds like something I said,

20   yes.

21      Q.    And there is a disconnect between IRS's

22   national and local offices?

23      A.    Also sounds like something I would have said.

24      Q.    Now, you said in your testimony with

25   Mr. Matasar that revocations of charities are -- did you

1    say exceedingly rare or something like that?

2        A.    Yes, I did.

3        Q.    But lesser forms of activity by the IRS are far

4    more common, are they not?

5        A.    You mean lesser forms of action that has some

6    adverse aspect to it?

7        Q.    Yes.

8        A.    Yes.

9        Q.    Audits?

10       A.    Well, audits occur at the rate of probably

11   between 1500 and 2000 or so audits a year.  That's not

12   itself a sanction, other than the costs you have to

13   incur to pay lawyers to represent you.

14       Q.    All right.  But what I'm getting at is, while

15   revocations may be rare, there are all kinds of lesser

16   sanctions that are far more regularly imposed by the IRS

17   on exempt organizations; is that right?

18       A.    There are certainly a wide variety of

19   sanctions.  How common they are being applied is

20   difficult to learn from the IRS's databases, but I would

21   say it's more common.  How much more common, I can't

22   say.

23       Q.    Okay.  And you know that there has been a

24   problem in this country with charities diverting money

25   to fund acts of violence, right?

Owens - X by Mr. Cardani                                    77

1      A.     That's certainly what the Department of Justice

2   and the Treasury Department have been saying.   However,

3   I don't recall that there has been much provided in the

4   way of specific detail about that.

5      Q.     Well --

6      A.     In other words, how many.

7      Q.     Okay.   But it was so -- it was of such moment

8   to the IRS, that they had proposed changing the 990

9   because of that very issue, right?

10      A.     They certainly proposed it, yes.

11      Q.     And it was changed?

12      A.     It was eventually changed, yes.

13      Q.     And to help determine whether charities are

14   diverting money that they claim are going for

15   humanitarian purposes but are truly going to fund

16   mujahideen for things like weaponry and all, the IRS

17   would want to know about that -- let me back up.   If a

18   501(c)(3) is sending money overseas for any purpose, and

19   the IRS learns that it's not reported in a 990, we've

20   already agreed that that would be significant to the IRS

21   to want to know more about that?

22      A.     U.S. charity sending its money overseas, yes.

23      Q.     And whether it's for buying blankets for

24   refugees, or buying blankets for fighters, or for buying

25   bullets for fighters, you would want to know about that,

Owens - ReD by Mr. Matasar                         78

1   correct?

2       A.    The IRS would want to know about it, yes.

3       Q.    And the primary way the IRS gets its

4   information from charities as to what it's doing is

5   through the 990, right?

6       A.    Correct.

7       Q.    And so if the organization decides not to

8   report its distribution overseas, never say anything

9   about it, then how would the IRS even know about it?

10      A.    If it's not reported, the IRS would not know

11  about it unless information came from some other source.

12      Q.    And if it did, you'd audit that organization?

13      A.    It certainly would be a factor in deciding

14  whether to do an audit.  The audit decision would depend

15  on a number of other factors as well.

16            MR. CARDANI:  If I may have a moment.

17            (Discussion held off the record.)

18            MR. CARDANI:  Mr. Owens, that's all I have.

19  Thank you, sir.

20            THE COURT:  Redirect.

21                      REDIRECT EXAMINATION

22  BY MR. MATASAR:

23      Q.    Mr. Owens, Mr. Cardani asked you about an audit

24  of al-Haramain U.S.  Was there an audit in this case?

25      A.    I understand there was no audit conducted, no

1    civil audit.

2        Q.    Indeed, there can't be an audit when there's a

3    criminal case going on?

4        A.    It's extremely rare to have that happen, yes.

5        Q.    Are you aware of any evidence that those two

6    receipts that are AHIF-2 and 3 were provided to the IRS

7    in any sort of audit?

8        A.    I'm not aware of that, no.

9        Q.    Mr. Cardani asked you about money laundering.

10   You've read the indictment in this case?

11       A.    Yes, I did.

12       Q.    Was there a charge of money laundering?

13       A.    I did not see one.

14       Q.    In fact, what does the indictment allege about

15   the El-Fiki donation to al-Haramain Saudi Arabia, if you

16   recall?

17       A.    I don't recall specifically what the indictment

18   alleged about that particular donation.

19       Q.    Do you recall that it said that the money went

20   from El-Fiki as Zakat to al-Haramain Riyadh?

21       A.    I certainly saw references like that, yes.

22       Q.    Now, the IRS would want to know a lot of things

23   in a sort of a big brother or a universal world where

24   the government knows everything, but the answers it

25   requires to specific questions are limited; is that fair

Owens - ReD by Mr. Matasar                              80

1    to say?  It only asks that the organization provide

2    certain answers?

3        A.    That's correct.

4        Q.    You've testified that al-Haramain U.S.A. was

5    obligated to send the money to al-Haramain Saudi Arabia,

6    this $150,000?

7        A.    Yes.

8        Q.    Now, this due diligence that Mr. Cardani was

9    asking you about concerning the use of money received,

10   does it apply in this case, given the e-mails that you

11   saw in which all the contact was with Saudi Arabia by

12   Mr. El-Fiki, and the language about the accounts, is

13   there a due diligence requirement or need it just be

14   sent to the parent or the Saudi Arabian organization?

15       A.    The due diligence requirement doesn't apply,

16   because the funds involved were not the funds of

17   al-Haramain U.S.A.  They were funds that they had

18   received as an agent for the third party.  So the due

19   diligence only applies when the U.S. charity is

20   distributing its own money.

21       Q.    Are you aware that al-Haramain Saudi Arabia has

22   a lot of money?

23       A.    I'm aware in a very general sense, yes.

24       Q.    Well, you know they gave hundreds and hundreds

25   of thousands of dollars to al-Haramain United States or

1    Ashland?

2        A.     Yes, I'm aware of that.

3        Q.     And do you know whether or not they

4    instructed -- whether or not al-Haramain Saudi Arabia

5    instructed Soliman al-But'he to use traveler's checks in

6    carrying the money back to al-Haramain Saudi Arabia?

7        A.     I don't recall seeing that, no.

8        Q.     Do you know whether or not there is a Saudi

9    custom whereby personal and business funds of

10   individuals are routinely temporarily commingled into

11   the same bank account?

12       A.     I'm not familiar with Saudi customs on

13   financial matters.

14       Q.     Do you know that Soliman al-But'he later paid

15   this money that he at first put in his bank account to

16   al-Haramain Saudi Arabia?

17              MR. CARDANI:   Judge, that misleads the facts.

18              MR. MATASAR:   Do you know whether or not --

19   I'll withdraw it.

20   BY MR. MATASAR:

21       Q.     Do you know whether or not Soliman al-But'he

22   paid this money after he put it in his account to

23   al-Haramain Saudi Arabia?

24       A.     No, I don't.  I don't know.

25       Q.     Do you know whether or not the $21,000 was

1    compensation to Soliman al-But'he in any fashion?

2        A.    I do not.

3        Q.    Mr. Cardani asked you what you knew about

4    Mr. El-Fiki's donation, right?

5        A.    Yes.

6        Q.    Did you review an FBI report about the

7    donation?

8            MR. CARDANI:  Objection, Your Honor, hearsay.

9            THE COURT:  Well, the question whether he

10   reviewed it is not.  Overruled.

11   BY MR. MATASAR:

12       Q.    Okay.  And did the report by the FBI also

13   contain an extensive analysis by the Egyptians of

14   Mr. El-Fiki's finances?

15       A.    Yes, it did.

16       Q.    Was there any indication whatsoever in the

17   report that you read that Mr. El-Fiki's -- that the

18   money Mr. El-Fiki donated was of questionable origin?

19       A.    None whatsoever.

20            (Discussion held off the record between

21   Mr. Matasar and Mr. Wax.)

22            MR. MATASAR:  Thank you, Mr. Owens.

23            MR. CARDANI:  I have nothing else, Judge.

24            THE COURT:  You may step down.  We'll take a

25   short break.

1              (Jury exits the courtroom 10:53 a.m.)

2              THE COURT:  Counsel, I have another matter

3    scheduled during the break.

4              (Recess:  10:53 until 11:12 a.m.  Jury absent.)

5              MR. MATASAR:  Your Honor, I forgot to ask

6    Mr. Owens a question.  It was a redirect question, and

7    I'd ask the court's indulgence to let me ask him that

8    question.

9              THE COURT:  You may.  It's a question?

10             MR. MATASAR:  It's actually A and B.  It's 1A

11   and 1B.

12             THE COURT:  You get credit for admitting that

13   upfront.

14             MR. MATASAR:  Thank you.  Once in my life, I

15   said only one question, and I actually did, and the

16   court was like waiting for more.

17             THE COURT:  Go ahead and take the stand.

18             (Jury enters the courtroom at 11:14 a.m.)

19             THE COURT:  Jurors, just a couple more

20   questions for Mr. Owens.

21   BY MR. MATASAR:

22     Q.    Mr. Owens, Mr. Cardani asked you many

23   hypothetical questions during your cross-examination

24   that were not based on this case about the need to

25   report certain matters to the IRS.

1      A.    Correct.

2      Q.    In this case, in this case, were such reporting

3  requirements applicable given this donation?

4            MR. CARDANI:  Excuse me, how does he know that?

5            THE COURT:  Yeah.  Is that an objection?

6            MR. CARDANI:  I'm sorry.  I object.

7            THE COURT:  It's sustained.

8  BY MR. MATASAR:

9      Q.    From what you know about the case, from what

10  you've read in the e-mails and other materials, were

11  those questions applicable to this case?

12     A.    They were not.

13            MR. MATASAR:  Thank you.

14                      RECROSS-EXAMINATION

15  BY MR. CARDANI:

16     Q.    Just one question.  No matter what, can you lie

17  to the IRS in a Form 990 under penalties of perjury?

18     A.    You cannot.

19            MR. CARDANI:  Thank you.

20            THE COURT:  You may step down.  Your next

21  witness, please.

22            MR. WAX:  We would call Agent Boyer.

23            MR. MATASAR:  The witness is excused, Your

24  Honor?  Your Honor, may the witness be excused?

25            THE COURT:  Yes.

Boyer - D by Mr. Wax                                    85

```
 1              THE CLERK:  Please raise your right hand.

 2              (The witness was sworn.)

 3              THE CLERK:  Please have a seat.  Please speak

 4   into the microphone here.  And there is water, if you

 5   would like some.

 6              Please state your full name and then spell it

 7   for the record.

 8              THE WITNESS:  Joseph J. Boyer, B-O-Y-E-R.

 9                     DIRECT EXAMINATION

10   BY MR. WAX:

11      Q.   Sir, could you tell the members of the jury,

12   please, how you are employed?

13      A.   I'm a supervisory special agent with the FBI.

14      Q.   In what city, sir?

15      A.   Portland.

16      Q.   And how long have you been with the FBI?

17      A.   A little over 28 years.

18      Q.   You were then working with them in September of

19   2001?

20      A.   Yes, sir.

21      Q.   Did you speak with my client, Mr. Seda, on

22   September 15 of 2001?

23      A.   Yes, I did.

24      Q.   Did he mention to you a property or prayer

25   house in Springfield, Missouri?
```

 1    A.    He did.

 2    Q.    What did he tell you about it?

 3    A.    He stated that the al-Haramain Foundation

 4  funded the purchase of the property in Springfield.

 5    Q.    Did he mention any dollar amounts that you

 6  recall?

 7    A.    I recall 300 to $325,000.

 8          MR. WAX:  Thank you.  I have no further

 9  questions.

10          THE COURT:  Cross.

11                      CROSS-EXAMINATION

12  BY MR. CARDANI:

13    Q.    Special Agent Boyer, during that same

14  conversation, did Mr. Sedaghaty mention the subject of

15  Chechnya at all?

16    A.    No, sir.

17    Q.    Did you know, coming into that interview,

18  anything about his involvement in a financial

19  transaction involving an area of the world called

20  Chechnya?

21    A.    No, I did not.

22    Q.    This interview occurred inside the premises of

23  the al-Haramain building in Ashland?

24    A.    Yes.

25    Q.    Upstairs or downstairs?

Boyer - X by Mr. Cardani                                    87

1     A.     Downstairs in the prayer room.

2     Q.     Could that be -- if we could bring up Exhibit

3  64, please.  Now, if we could go to the first page of

4  that.  This is the upstairs.  Do you see the house down

5  below.  Is that the house that you were in, Agent Boyer?

6     A.     Yes, sir.

7     Q.     And do you see a prayer room referred to as

8  room J in the upstairs?

9     A.     Yes, I do.

10    Q.     All right.  Is that what you are referring to

11 as where you interviewed -- you spoke to the defendant?

12    A.     Yes.

13    Q.     All right.  And did you go downstairs at all?

14    A.     No, we did not.

15    Q.     Is that because Mr. Seda allowed you to tour

16 the upper floor of the residence, foundation, but not

17 the lower level?

18    A.     That's what's stated in the interview report,

19 yes.

20    Q.     Now, did Mr. Sedaghaty give you a bunch of

21 information on the religion of Islam?

22    A.     Yes, he did.

23    Q.     And did you review that -- I know it's many

24 years ago -- but did you review that inventory before

25 coming into court today?

Boyer - X by Mr. Cardani                        88

```
 1      A.      Yes.

 2      Q.      I'm going to show you a couple of books.  I'll

 3   just hold them up.  Did any of them include this thing

 4   called the Noble Qur'an?

 5      A.      That's not listed in the interview report.

 6      Q.      And a book called Islamic Guidelines For

 7   Individual and Social Reform, was that amongst the

 8   literature that Mr. Sedaghaty gave you?

 9      A.      Not according to the documented record, no,

10   sir.

11              MR. CARDANI:  That's all I have.

12              MR. WAX:  No redirect, Your Honor.  Thank you.

13              THE COURT:  Thank you.  Your next witness,

14   please.

15              MR. CASEY:  Call David Rodgers.

16              THE CLERK:  Please raise your right hand.

17              (The witness was sworn.)

18              THE CLERK:  Please have a seat.

19              THE WITNESS:  Thank you.

20              THE CLERK:  Please speak into the microphone

21   here.  And there is water if you would like some.

22              THE WITNESS:  Thank you.

23              THE CLERK:  Please state your full name, then

24   spell your name for the record.

25              THE WITNESS:  My name is David Rodgers,
```

Rodgers - D by Mr. Casey                            89

```
 1   D-A-V-I-D, R-O-D-G-E-R-S.

 2                    DIRECT EXAMINATION

 3   BY MR. CASEY:

 4       Q.    David, as I understand, you were born in

 5   Eugene, Oregon; is that correct?

 6       A.    Yes.

 7       Q.    And where do you live now?

 8       A.    I am living in Riyadh, Saudi Arabia.

 9       Q.    Okay.  Are you married?

10       A.    Yes, I am.

11       Q.    Do you have a family?

12       A.    I do.  I have five children.

13       Q.    Okay.  Are they with you in Riyadh, Saudi

14   Arabia?

15       A.    They are, yes.

16       Q.    And you've known Pete Seda for a number of

17   years, right?

18       A.    For a very long time, yes.

19       Q.    Dating back to when?

20       A.    Oh, since my high school years, a long time

21   ago.

22       Q.    Okay.  How old are you?

23       A.    I am 49 years old now.

24       Q.    Okay.  What is your occupation?

25       A.    I'm a professional horse trainer actually.
```

Rodgers - D by Mr. Casey                    90

 1    Q.    And is that what you do in Riyadh, Saudi
 2  Arabia?
 3    A.    Roughly.  I'm actually technically a marshal on
 4  the horse racing track, so I patrol the track and make
 5  sure that the people who are using the race track keep
 6  the rules.  And on race day, I run the escort services,
 7  called pony horses.  We escort the race horses to the
 8  starting gates.
 9    Q.    Have you had occasion over the years to train
10  police departments, for example, and other law
11  enforcement agencies with respect to the use of horses?
12    A.    In the United States or in Saudi Arabia?
13    Q.    Either, sir.
14    A.    I have attended a seminar and assisted a man
15  who was a specialist in police horse training, yeah.
16    Q.    Okay.  You went to high school, as I understand
17  it, in Ashland; is that correct?
18    A.    Ashland High School, yes.
19    Q.    So you moved to Ashland as a young boy?
20    A.    Yeah, seventh grade, I started.  I went through
21  junior high and high school in Ashland, Oregon.
22    Q.    Were you involved in sports?
23    A.    Yes, I was.  I was on the wrestling team and I
24  was also on the football team every year.
25    Q.    And what did you do after graduating from high

Rodgers - D by Mr. Casey                    91

1  school?

2     A.    After graduating from high school, I went on --

3  immediately after graduating from high school, I took --

4  went on a long pack trip.  I rode up the Pacific Crest

5  trail all summer, and just, you know, wanted to find out

6  what life was all about, and decided to ride up into the

7  mountains with my horse and traveled all summer.

8     Q.    Who did you go with?

9     A.    Some of the guys I went to high school with.

10 Pete was one of them, a good friend and such.  And he

11 was involved in the horse packing trip.  And Rob Brown

12 and John Dunn, and guys like this.

13    Q.    Did there come a time when you lived on a piece

14 of property in Sprague River?

15    A.    Yes, yes.

16    Q.    Where is that, sir?

17    A.    The Sprague River is kind of a little bit

18 northeast of Klamath Falls.  And, yeah, we wanted to

19 live out on the land.  You know, we loved nature, loved

20 horses, you know, loved the environment.  And I wanted

21 to live kind of a natural life out there.  And so we

22 decided, you know, we weren't ready to jump right into

23 college or careers, and so we went out and lived on the

24 land for a while to, you know, sort it out and enjoy

25 life.

Rodgers - D by Mr. Casey                              92

 1      Q.      Who was "we"?

 2      A.      Myself, and Pete was also there living with me,

 3  and Rob Brown.  And, again, you know, different people

 4  came and went from the land that we were living on out

 5  there.

 6      Q.      Fairly primitive circumstances?

 7      A.      Oh, yeah.  We wanted to keep it simple.  I

 8  lived in a cabin, a log -- or a wall tent, kind of a

 9  canvas cabin.  I guess you'd call it an elk hunting tent

10  type of thing at first.  Eventually I got trailers and,

11  you know.

12      Q.      How did you earn a living?

13      A.      You know, I worked on -- I worked for local

14  ranchers.  We -- you know, there was a lot of ranchers

15  out there that needed ranch hands and stuff like that.

16  And Pete was a good contractor with the Forest Service,

17  type -- reforestation type jobs, you know, so we worked

18  those type of jobs, too, seasonally.

19      Q.      Did you do any hunting?

20      A.      Yeah, yeah.  I loved hunting, yeah.

21      Q.      Is Pete a hunter as well?

22      A.      Yeah.

23      Q.      You all have weapons?

24      A.      Yeah.

25      Q.      What kind?

Rodgers - D by Mr. Casey                            93

1       A.      We had handguns and rifles and such, you know.

2   I'm an Oregonian, I mean, my dad was a Boy Scout leader,

3   and, you know, he taught me to shoot guns from an early

4   age, and loved the outdoors, and you know.

5       Q.      Was it fairly common out there in Sprague River

6   to have handguns and weapons?

7       A.      Oh, yes, real common, yeah.  Everybody has a

8   rifle in the back of their truck, you know.  It's like

9   very common and normal.

10          There is an Indian reservation out there.  And

11  they like to drink.  And they'd come around and, you

12  know, cause trouble sometimes.  And there is ranchers

13  and, you know, it was kind of the wild West a little bit

14  out there.

15      Q.      Are you a practicing Muslim, sir?

16      A.      I am.

17      Q.      Have you always been?

18      A.      Well, I haven't always been.  I became a Muslim

19  when I was living out there in Sprague River about 1982.

20      Q.      And how did that come about?

21      A.      Well, you know, we were searching different,

22  you know, belief systems in the world, basically.  And I

23  was reading the books of the -- I was raised a Catholic.

24  My parents were Catholic.  And so I knew something about

25  the Bible and Christianity and everything.  And I wanted

1    to know what the rest of the world's religions believed

2    in.  You know, so I read basically about what the

3    Buddhists belive in, the Hindus believe in, and

4    everything I could find.  American Indians religion.  I

5    mean, I just read everything.

6        Q.    Fair to say that at that time in your life you

7    were on kind of a spiritual journey or quest?

8        A.    Oh, definitely.  I would definitely consider

9    myself spiritual.  I was living out in the mountains,

10   and wanted to be close to nature, and God, and, you

11   know.  So eventually we were reading different books

12   and, you know, Pete had a copy of the Qur'an, and he

13   just offered it to us like, well, you're reading

14   everybody's book, go ahead and check this one out.  This

15   is the book of the Muslims.

16       Q.    Was he a practicing Muslim at that time?

17       A.    Not really, no.

18       Q.    Was he pushing Islam?

19       A.    He wasn't pushing Islam at all.  As a matter of

20   fact, he just gave us a copy of the Qur'an and said,

21   check it out, you know, just like everything else.  We

22   used to sit around the camp fire and discuss

23   philosophies and what everybody believed in and what we

24   liked and what we didn't like in this book or that book.

25   Islam --

Rodgers - D by Mr. Casey                          95

1    Q.    Excuse me, I didn't mean to interrupt.

2    A.    Islam just kind of grew on me.  I just took a

3 liking to its monotheistic message.  And I was kind of

4 looking for unity in religions.  And it's -- it states

5 that, you know, Moses, Jesus, Mohammed were all prophets

6 and all believed in the same God, and that appealed to

7 me.  So it just kind of -- I tended towards it and it

8 grew on me.

9    Q.    So you had lots of discussions?

10   A.    Oh, yeah, lots of discussion.

11   Q.    About philosophies and religions and so on?

12   A.    Yes, sir.

13   Q.    Were you into Native American religions at all?

14   A.    Oh, yeah.

15   Q.    And Pete, was he as well?

16   A.    Yeah.  We used to go into sweat lodges with the

17 Indians, you know, there were these Indian medicine men

18 and they would have -- Indians would have, you know,

19 like powwow kind of get-togethers, and we used to go

20 sweat with them, pray in their sweat lodge, and tried

21 everything, you know, all kinds of stuff.

22   Q.    How long were you guys out there?

23   A.    I lived out there for about four years.

24   Q.    How about Pete?

25   A.    Similar, come and go, about this time, three or

Rodgers - D by Mr. Casey                                96

1    four years.

2        Q.    Did there come a time when you thought you

3    needed to get a -- sort of a more regular source of

4    living?

5        A.    Yeah.  I mean, we were living on this piece of

6    land, and the man who owned it was being pretty lenient

7    with us and let us make some payments.  And eventually

8    after a few years, he said, hey, guys, why don't you

9    just buy this land from me.  If you're going to live

10   there, you gotta pay for it.  So financial reality set

11   in.  And I started looking for work under what I loved

12   doing, which was working with horses.  So I basically

13   went out and started getting jobs on horse ranches and

14   such.

15       Q.    Which ranches, can you think of any at the

16   moment?

17       A.    I worked in early times as a wrangler, which

18   is -- and a guide basically on a place called Scott

19   River Resort in northern California, and that was to

20   take people who wanted to rent horses and ride up in the

21   wilderness and be a guide for them.  And I worked on

22   another place in kind of the White City area, which is

23   near Medford, called the Diamond L Stables.  Same thing,

24   it was a rental horse place.  Eventually I got working

25   on quarter horse ranches.  I worked at C-2 Cattle

Rodgers - D by Mr. Casey                    97

1    Company which is in the White City area, as, you know,

2    first as an irrigator on the ranch, and then eventually

3    I worked as an assistant to the trainer.

4         Q.    So in these experiences, did you learn quite a

5    bit about horses and how to train houses and how to

6    break horses?

7         A.    Absolutely.  I learned tremendous amount, sure.

8    It was -- it'd become a profession for me then.

9         Q.    Okay.  And in addition to working on ranches

10   during this time in your life, did you have occasion to

11   work with Pete on his arborist type business?

12        A.    Yeah, I mean, he continued along the lines of

13   working with trees and Forest Service type jobs, so, you

14   know, sometimes in between these ranch jobs, or, you

15   know, whenever he had a contract I could work with him,

16   I worked with him on reforestation jobs, and cone

17   picking jobs, and different stuff like this.

18        Q.    So is it fair to say that you and Pete shared a

19   love of the outdoors and nature?

20        A.    Absolutely, yes.

21        Q.    So you are now living in Saudi Arabia?

22        A.    Yes, I am.

23        Q.    And why are you living there?  And first of

24   all, how long have you been living there?  And for

25   what -- why are you there?

Rodgers - D by Mr. Casey                              98

1       A.      I've been living there for about 11 years now.

2    And I first went there to study Arabic, because I wanted

3    to understand the religion that I was professing.  And I

4    wanted to learn the language.  And I wanted the

5    experience of going to another country and all.  And I

6    got the opportunity, so I went actually to initially

7    study Arabic.  And, you know, honestly I was a really

8    lousy student.  And their program was real difficult.

9    And it was fully in Arabic.  And it was kind of an

10   immersion program.  And I basically bombed out, and

11   wasn't very happy about it.

12           And my good friend, Pete, advised me real good

13   at one point, he said, just go back to what you are good

14   at, you know, and that's training horses.  So I started

15   looking at what the people in Saudi Arabia were doing

16   with horses and who has horses, and what's the business

17   like there.

18      Q.      Is that a big thing over there?

19      A.      They love their horses, that's for sure.  They

20   love their horses.  And the biggest business --

21      Q.      So what happened --

22      A.      -- there is basically horse racing,

23   thoroughbred racing, thoroughbred flat track racing.

24   And I showed some people what I could do.  I specialize

25   in kind of a special horse psychology type of training.

Rodgers - D by Mr. Casey                          99

1    And I showed some people what I could do.  And somebody

2    offered me, you know, a job and a contract, and said

3    I'll bring you over here, and your family, and you can

4    stay and work for me, teach my people and teach my

5    horses.

6        Q.    Before you moved over there for that purpose,

7    you were living in Ashland, right?

8        A.    Yes.

9        Q.    In the Ashland area?

10       A.    Yeah, after we basically moved off the land at

11   Sprague River, I moved back to Ashland, which I had went

12   to school, and my mother and father was there, and I

13   moved back to Ashland, yeah.

14       Q.    And did you become acquainted with a kind of

15   Muslim community in the Ashland area?

16       A.    Oh, yeah, definitely, you know.

17       Q.    How did that come about, sir?

18       A.    It was a long time before I knew any other

19   Muslims who considered themself a Muslim, besides the

20   group that I had basically lived with in Sprague River.

21   And a few of us had, you know, really inclined toward

22   Islam, considered ourselves Muslims eventually after

23   living out there and reading all the books, as I

24   mentioned.

25             And I didn't really know any other Muslims

 1   besides our group.  But one day Pete called me up and

 2   told me there is a group of Muslims in town, and they

 3   are inviting everybody to a dinner, you know, asking us

 4   to, you know, get together and have congregational

 5   prayers and such like that.  So I started meeting

 6   actually other Muslims, you know, outside our little

 7   community.

 8       Q.    Okay.  And did there come a time when Pete

 9   began to invite this group of other Muslims and yourself

10   to his house, as it were, or he was in a trailer, I

11   guess, at that time, right?

12       A.    Yeah.  You know, we didn't have a place to

13   pray, you know, our congregational prayer, and some of

14   the guys volunteered.  And Pete was one of them.  And

15   Abdi was another.  And we used to just meet in his

16   house, and, you know, pray in one of his rooms, you

17   know, our once a week congregational prayer.

18       Q.    At some point in time this group of people of

19   whom -- how many were there at that time, roughly?

20       A.    Just a handful, probably 10, 15 people.

21       Q.    Where do they come from?  Are they mostly from

22   Ashland or --

23       A.    Well, probably a majority of them were foreign

24   students going to Southern Oregon State University in

25   Ashland, majority of them.  There are just a few of us

Rodgers - D by Mr. Casey                           101

1    people who were local Muslims or converts.

2         Q.    Did there come a time when Pete and you got

3    together and decided to kind of form a more structured

4    approach to the prayer sessions?  Let me direct your

5    attention -- are you familiar with the Qur'an

6    Foundation?

7         A.    Yeah, certainly.

8         Q.    How did that come about?

9         A.    Yeah, I -- the earliest recollection I remember

10   was there was a time in Ashland where Pete called me up

11   one time and said, hey, there is somebody making a talk

12   at the college about Islam, and let's go listen to it.

13   So we went to this place.  It was -- I don't remember if

14   it was at the college or at another building.  But,

15   anyway, we went to this place, and the man stepped up to

16   the microphone and he said, I'm not a Muslim, but I'm

17   going to talk today about Islam.  And we were kind of

18   disappointed.  And we said, huh, we consider ourselves

19   Muslims.  We should be making that talk.  Maybe next

20   year we'll organize and try to represent our own

21   religion here.  There is nobody -- we're the local

22   Muslims living in town, and we wanted to represent the

23   religion ourselves.  So we started getting organized

24   like this, you know.  I think this is how it came about.

25        Q.    Okay.  Did you file papers?  Did you become a

Rodgers - D by Mr. Casey                    102

1    legal entity --

2        A.      Yeah, yeah.

3        Q.      -- by the name of the Qur'an Foundation?

4        A.      Of course, we wanted to be a legal nonprofit

5    organization, you know, in hopes that we would, you

6    know, grow and be able to be more, you know,

7    representation of our religion and such.

8        Q.      So essentially you and Pete founded this

9    organization?

10       A.      Yes.

11       Q.      Called the Qur'an Foundation?

12       A.      Yes.

13       Q.      Okay.  And what was the purpose of that

14   foundation?

15       A.      To be representatives of our religion.  I mean,

16   Islam was greatly misunderstood and absolutely poorly,

17   if not represented at all, in our region in southern

18   Oregon and northern California basically.  So we wanted

19   to be representing our own religion to try to build

20   bridges and understanding, you know, help the local

21   Muslim community and this type of thing.

22       Q.      What did you all do in that connection?

23       A.      What did we do?

24       Q.      What did you do to further that purpose?

25       A.      Oh, I mean, we -- like I said, we started

Rodgers - D by Mr. Casey                              103

 1   organizing to make talks, you know, anybody who wanted
 2   to hear about what the Islam was, we would, you know, go
 3   to -- you know, the college had that multicultural,
 4   multi-religious day where different faiths were allowed
 5   to, you know, step up and represent their faith, and
 6   tell basically the foundations of it, and this type of
 7   thing.
 8        Q.    Did you distribute literature?
 9        A.    Oh, yeah, we distributed literature.  You know,
10   we wanted people to know, you know, what we were
11   believing and such.
12        Q.    So what kind of literature did you distribute?
13        A.    Mostly, you know, I mean a lot of people who
14   have converted to Islam simply did so by reading the
15   Qur'an independently.  And we felt like, you know, this
16   was a good way to -- at least -- the Qur'an was not even
17   available in public places.  If you went to most
18   libraries back at that time, they didn't have one.  So
19   we decided to place them in public places where people
20   could get them if they wanted them.
21        Q.    Who purchased the Qur'ans?
22        A.    Pete was always really, you know, sincere and
23   diligent and generous about this thing.  And most of the
24   time, he reached into his own pocket and paid for these
25   things himself.

Rodgers - D by Mr. Casey                          104

1     Q.    Did you have occasion to distribute some of

2   this material, the Qur'ans, for example, to local

3   prisons?

4     A.    Yeah, certainly, yeah, we did.

5     Q.    So why are you doing this?  Why are you

6   distributing this literature?

7     A.    As I said, Islam was really poorly represented

8   and misunderstood, you know, in the whole -- our whole

9   region, and in the country in general in this country.

10  And we wanted to, you know, be able to represent it

11  properly.  And so we wanted to get the book out there,

12  the Qur'an itself, and let it speak for itself, and let

13  people read it if they wanted to read it.

14    Q.    Did you think it would have an impact on

15  prisoners, in particular?

16    A.    Well, certainly.  I mean, these are people who

17  are in jail, in trouble, you know, have problems in

18  their life and such, and --

19    Q.    What impact did it have on you, your

20  association with Islam and your conversion to Islam?

21    A.    I mean, it certainly made me a much better

22  person, a much more straight person.  I don't drink.  I

23  don't do drugs.  I don't, you know, do all kinds of

24  things that keep me on a straight, even keel, you know,

25  tending towards getting married and having a good family

Rodgers - D by Mr. Casey                          105

1    life and this type of thing.

2        Q.    Did it ever occur to you at any time or insofar

3    as you're personally aware, did it -- do you know if it

4    ever occurred to Pete that you were distributing the

5    Qur'an and other literature to prisoners to encourage

6    participation in jihad or militant activities?

7        A.    Not at all.  On the contrary.  We believe that

8    if you became a good Muslim and you would live an honest

9    and straight and law abiding life, basically, would be

10   able to help the reform of prisoners actually.

11       Q.    Now, I'm going to ask you more about this in

12   detail a little bit later, but there came a time when

13   the Qur'an Foundation -- strike that.  There came a time

14   when al-Haramain developed a United States office in

15   Ashland, correct?

16       A.    Yes, yes.

17       Q.    And Pete and you were associated with

18   al-Haramain in Ashland, correct?

19       A.    Yes.

20       Q.    Okay.  And al-Haramain was providing you with

21   books and literature and Qur'ans to distribute to the

22   public, to whomever was interested, including prisoners,

23   correct?

24       A.    Yes.

25       Q.    And am I correct in understanding that the

1    Qur'an that was initially provided by al-Haramain for

2    that purpose had an appendix attached to it called the

3    Call to Jihad?

4         A.    Yes, it did.

5         Q.    And did there come a time when the al-Haramain

6    U.S. folks were involved in getting a revision to that

7    first version of the Qur'an?

8         A.    Say that again.  I didn't quite understand.

9         Q.    Yes.  Did there come a time when another

10   version of the Qur'an was sent by al-Haramain for

11   distribution?

12        A.    Yeah.  I mean, eventually, you know, the Qur'an

13   that they were providing us with, you know, we didn't

14   feel was very appropriate in a lot of ways.  And they

15   eventually, you know, removed that appendix.  And I

16   forget what issue it was, but they changed it and gave

17   us another version of it basically.

18        Q.    Okay.  There was some testimony in this case

19   about a questionnaire that was associated with the

20   distribution of that literature.  Can you tell us about

21   that questionnaire, what you know about it?

22        A.    There was a -- say it again.  There was a what?

23        Q.    There was a questionnaire, are you familiar

24   with that?

25        A.    A questionnaire, yes.

Rodgers - D by Mr. Casey                    107

1      Q.    What was that all about?

2      A.    The questionnaire to the prisoners?

3      Q.    Yes, sir.

4      A.    Oh, yes.  Well, in our work with the prison

5  system, you know, these people are in prison, and

6  anything free that you can send them, they would take,

7  you know.  And sometimes they would take things just to

8  sell it for cigarettes.  So we didn't want to send them

9  multiple Qur'ans.  So we had a way of not only

10  understanding what we had sent them with a

11  questionnaire, but what was their level of understanding

12  to send them appropriate books.  Because, frankly, they

13  would lie to you sometimes, and say, yeah, I'm a Muslim,

14  and if you asked them in a questionnaire, you would see

15  he doesn't know the simplest things about Islam.  So

16  with a questionnaire, we could evaluate where is this

17  guy at, you know, and what had we sent him, if anything,

18  before.

19      Q.    Did you get many requests from prisoners or

20  from prison officials to send material -- this Islamic

21  material?

22      A.    Tremendous, overwhelming, overwhelming amount

23  of requests for --

24      Q.    What do you mean by "overwhelming"?

25      A.    I mean boxes full of letters, you know, saying

1    I'm in prison, this and that, here is my story, could

2    you please send me a Qur'an or could you send me any

3    other literature, this and that.  Or thank you very much

4    for sending me a Qur'an, can you send me more material.

5    You know, just a tremendous amount of --

6        Q.    Was it possible for the Qur'an Foundation to

7    keep up with the requests?

8        A.    Impossible.  There is no way -- we had so much

9    requests for Qur'ans and Islamic materials from the

10   prison system, that there is no way we could possibly do

11   it ourself.  We couldn't even afford our own mosque in

12   Ashland or prayer hall.

13       Q.    Now, there came a time when al-Haramain Saudi

14   Arabia became interested in what the Qur'an Foundation

15   was doing, and eventually they established an office in

16   Ashland, correct?

17       A.    Yes.

18       Q.    Tell us how that came about, please.

19       A.    Well, when I went to Saudi Arabia to study

20   Arabic, I had been working with, you know, representing

21   the faith to non-Muslims and doing that in America.

22   When I went over there, I looked into who's doing that

23   type of work there.  There is a lot of non-Muslim

24   workers there, too.  And I met some people who wanted an

25   English speaker to speak to people who didn't understand

Rodgers - D by Mr. Casey                                    109

1    Arabic and such, and also to introduce or represent

2    Islam to them.  So I got involved with some people over

3    there that were doing that.  And I actually met some of

4    the people from al-Haramain who were Islamic charitable

5    organizations providing books and literature, and all

6    kinds of orphanages.  And before probably I even asked

7    them if they could help us with the books in America,

8    they asked us would you like to distribute books in

9    America, Islamic books in America, Qur'ans and such.

10        Q.    Was Mr. al-But'he one of the people that you

11   met?

12        A.    Yeah, Soliman al-But'he.

13        Q.    Okay.  Did you speak to him specifically about

14   the distribution of Qur'ans here by the Qur'an

15   Foundation?

16        A.    Yeah, sure.

17        Q.    And was he the guy that suggested that they

18   might be able to help out?

19        A.    Yeah, he's the guy.

20        Q.    Then what happened after that?

21        A.    I put him in contact with Pete, who was in

22   America, and worked doing this work.  And let them

23   basically work out the details of how they could send

24   books, and what they were going to do and this type of

25   thing.

Rodgers - D by Mr. Casey                                    110

1     Q.    So who is this guy, al-But'he?

2     A.    Soliman al-But'he, he works as a municipality

3  officer.  He basically manages parks, trees, you know,

4  landscaping of the parks in Saudi Arabia.

5     Q.    So you guys hit it off, you had common

6  interests?

7     A.    Yeah, yeah, he was a very nice guy, spoke

8  English very well, you know, he was athletic, you know,

9  nice guy, we hit it off.

10    Q.    And then you put him in touch with Pete?

11    A.    Yes, I put him in touch with Pete to talk about

12 helping us out with the demand for Qur'ans and books in

13 America.

14    Q.    So at some point in time after that, there was

15 a formalized relationship that was established here in

16 the United States?

17    A.    Yes.

18    Q.    Right?

19    A.    That's right.

20          MR. CASEY:  Would you please put up

21 Exhibit 602A, please.  Your Honor, I believe 602A has

22 been received, so request permission to publish to the

23 jury?

24          THE COURT:  If it's been received, you may.

25 BY MR. CASEY:

Rodgers - D by Mr. Casey                                    111

1      Q.    Mr. Rodgers, do you recognize 602A?

2      A.    Yeah, I mean, generally, yeah, I see it.  There

3   you go, that's better.

4      Q.    It's a letter dated March 6, 1998?

5      A.    Yes.

6      Q.    Do you want to scroll down to the bottom.

7   Okay.  Basically what does this appear to you to be,

8   sir?

9      A.    This one here is a monthly report --

10     Q.    Yeah.

11     A.    -- from --

12     Q.    From al-Haramain?

13     A.    Activities, yeah.

14     Q.    Let's move on to 602B, please.  Also, it's been

15   received.  What is 602B, sir?

16     A.    Can you make it a little bigger?  Yeah, there

17   you go, sorry.

18     Q.    Appears to be a statement of purpose?

19     A.    Yeah, this is our statement of purpose, yeah.

20     Q.    The statement of purpose between?

21     A.    Basically a mission statement.

22     Q.    I'm sorry, sir, can you read the first line

23   under the heading?

24     A.    The first line under the heading, "Statement of

25   declaration between Qur'an Foundation and al-Haramain

Rodgers - D by Mr. Casey                            112

1   Foundation."

2       Q.    Okay.

3             THE COURT:  These are some of the exhibits,

4   members of the jury, that I received but not for their

5   truth.

6   BY MR. CASEY:

7       Q.    Would you read the paragraph beginning "we all

8   mutually stand"?

9       A.    Yes.  "We all mutually stand against terrorism

10  or ever engaging in any subversive activities against

11  any government, race, or gender."

12      Q.    The next paragraph?

13      A.    "We mutually agree to cooperate for the purpose

14  of Islamic education; to promote peace through

15  understanding of Islam."

16      Q.    And the next paragraph, sir?

17      A.    And "we mutually agree to never support or

18  approve of any statement or acts of terrorism.  Such is

19  totally against our beautiful religion of Islam."

20      Q.    And the next paragraph?

21      A.    "We shall not break any governmental laws or

22  cause any mischief on earth."

23      Q.    And the final paragraph?

24      A.    "We mutually agree to uphold the Qur'an and the

25  Sunnah of our kind, gentle, and loving Prophet.  Peace

Rodgers - D by Mr. Casey                              113

1    be upon him."

2        Q.    And there are some signatures on here.  Do you

3    recognize the first signature?

4        A.    The first signature is Pete's, and the second

5    one is mine.

6        Q.    And then on the right-hand column, there

7    appears to be -- there appear to be a couple of

8    signatures there.  Do you recognize those?

9        A.    Yeah.  Well, it's written there a Soliman

10   al-But'he.  I can't read his signature but, yeah.

11       Q.    So Soliman al-But'he is the person that we've

12   been referring to as al-But'he, correct?

13       A.    al-But'he, yeah, yeah.

14       Q.    And, indeed, are you -- is it your recollection

15   that these representations in this document correctly

16   and accurately reflect the commitment of your

17   organization to peaceful promulgation of Islam?

18       A.    Absolutely.  I mean, this was our mission

19   statement.  Me and Pete sat down together and, you know,

20   put this together, and wanted to be declared and signed,

21   you know, by everybody, that this is what we believe in,

22   this is what we're doing here.  We want to educate

23   people about Islam.  We're not a terrorist organization.

24   We don't want to break any laws.  This is what we're

25   trying to do here.  This is clearly a statement, you

 1    know, of what we believe in, basically, and what we're

 2    doing.  It's a mission statement.

 3        Q.    All right.  Can we remove that, please.

 4              For a time in your life were you living in what

 5    has come to be known as the prayer house that

 6    al-Haramain established in Ashland?

 7        A.    Yes.

 8        Q.    Okay.  And Pete Seda was an active participant

 9    in the al-Haramain organization at the prayer house,

10    correct?

11        A.    Correct.

12        Q.    And you actually lived in the prayer house for

13    a while?

14        A.    Uh-huh.

15        Q.    Okay.  Inside the house?

16        A.    Inside the house, yeah, downstairs.

17        Q.    You had access to upstairs and downstairs?

18        A.    Yeah.  Upstairs was, you know, the prayer room

19    basically and some offices, and then downstairs was a

20    small apartment, yeah.

21        Q.    And just generally tell us what you did there.

22    What were your functions and what role did you play?

23        A.    Yeah.  I -- I mean, I did everything from, you

24    know, clean up the place and have it ready for prayer,

25    to actually do, you know, the Friday -- what we would

1    call the Friday sermon, and actually lead prayers

2    sometimes.  We took turns with it, you know, different

3    people did it at different times.

4           I would help in packaging and mailing out the

5    Qur'ans.  There was a lot of work to be done there.  And

6    the office would be receiving these letters, and, you

7    know, evaluating them, and sending the person the right

8    books, and this type of thing, I did this type of thing.

9    Q.    So at the prayer sessions, did you have

10   occasion to lead the prayers from time to time?

11   A.    I did, actually, from time to time.  Yeah,

12   anybody could lead the prayers and sometimes I did.

13   Q.    Did you like to do that?

14   A.    I couldn't say I really liked to do that, but

15   it was -- somebody had to do it.  We had to take turns

16   at it.

17   Q.    Did Pete do it?

18   A.    Sometimes.  Not very often.  He didn't care to

19   really lead the prayer too much, but, yeah, sometimes he

20   did.

21   Q.    And I guess there were computers that were

22   located in the house?

23   A.    Computers in the office, yes.

24   Q.    Office computers?

25   A.    Okay.

1    Q.    You had access to some of the computers?

2    A.    Yeah.

3    Q.    And from time to time, there would be -- appear

4    on the computer some materials relating to Chechnya; is

5    that correct?

6    A.    Perhaps, yeah.  Nothing specifically I

7    remember, but, yeah, probably.

8    Q.    Was Chechnya a major topic of conversation

9    within the prayer group?

10   A.    Not Chechnya, per se.  I mean, being Muslims,

11   you know, we're concerned with what's going on around

12   the Muslim world.  And if there was, you know,

13   oppression or conflicts of wars or, you know, some sort

14   of turmoil going on, we would generally talk about what

15   we heard in the news and such, yeah.

16   Q.    What about political issues generally, were

17   they a major -- insofar as they would affect Muslims and

18   Islamic political issues, geopolitically around the

19   world, was that a major topic of concern or focus in the

20   prayer house?

21   A.    Not a major topic of concern.  I mean, we --

22   you know, as we said even in our mission statement,

23   we're really non-political.  We just wanted to represent

24   the basic tenets and basic foundations, teachings of our

25   religion, and we didn't really get very political about

1    stuff.

2        Q.    Okay.  Do you ever remember Pete making any

3    pitch on behalf of militant Islamic activity of any

4    kind?

5        A.    No.

6        Q.    Or the mujahideen?

7        A.    A pitch or -- no.

8        Q.    Or solicitation or assistance.

9        A.    Certainly not, no.  If Pete ever wanted to do

10   any sort of help outside of our own country and

11   community, he wanted to help orphans.  He had a real

12   love and passion in his heart to want to really help,

13   you know, those poor people who are basically at the

14   bottom, you know, of a conflict, who are kind of

15   innocent and had, you know, nothing to do or say about

16   it.  And if anything, I remember him talking to me about

17   wanting to help orphans.

18       Q.    During your stay in Saudi Arabia or your

19   residency in Saudi Arabia, you have had occasion, have

20   you not, from time to time to meet with al-Haramain

21   officials to discuss certain matters?

22       A.    Yes.

23       Q.    And generally what would be the topics of such

24   meetings?

25       A.    I mean, if they called me in to want to talk to

1  me -- they're a big, you know, Arabic, Saudi charity,

2  and, you know, if they wanted to know something about,

3  you know, what we were going to do in America, and how

4  we were going, you know, to distribute books or how is

5  the thing going there, and how can we help you and run

6  it smooth, it would be about this simple, operational

7  type of things.

8      Q.    Any recollection of them ever mentioning to you

9  any attempts to solicit funds or to provide assistance

10 to Islamic fighters or mujahideen?

11     A.    No, never.

12            THE COURT:  We'll be in recess until 1 o'clock.

13            (Lunch recess at 11:57 a.m.)

14            (Further proceedings were had by Reporter

15 Deborah Bonds, and are bound under separate cover.)

```
 1                         CERTIFICATE

 2         I, Deborah Wilhelm, Certified Shorthand Reporter

 3   for the State of Oregon, do hereby certify that I was

 4   present at and reported in machine shorthand the oral

 5   proceedings had in the above-entitled matter.  I hereby

 6   certify that the foregoing is a true and correct

 7   transcript, to the best of my skill and ability, dated

 8   this 7th day of September, 2010.

 9

10

11

12
                          /s/ Deborah Wilhelm
13                        _____
                          Deborah Wilhelm, RPR
14                        Certified Shorthand Reporter
                          Certificate No. 00-0363
15

16

17

18

19

20

21

22

23

24

25
```