1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF OREGON

3

4    UNITED STATES OF AMERICA,    )

5              Plaintiff,         ) No. 05-60008-2-HO

6       v.                        ) September 7, 2010

7    PIROUZ SEDAGHATY, et al.,    ) Eugene, Oregon

8              Defendants.        )

9

10              TRANSCRIPT OF TRIAL PROCEEDINGS

11         BEFORE THE HONORABLE MICHAEL R. HOGAN,

12     UNITED STATES DISTRICT COURT JUDGE, AND A JURY

13         DAY 6, P.M. SESSION - PAGES 120 - 274

14

15                       -:-

16

17

18

19

20

21              Deborah M. Bonds, CSR-RPR
                     Court Reporter
22                 CC Court Reporting
                  172 East 8th Avenue
23              Eugene, Oregon 97401
                    541/485-0111
24

25

```
 1                    APPEARANCES OF COUNSEL

 2
    FOR THE PLAINTIFF:    CHRISTOPHER L. CARDANI
 3                        United States Attorney's Office
                          405 E. 8th Avenue, Suite 2400
 4                        Eugene, OR 97401
                          541/465-6771
 5                        Chris.cardani@usdoj.gov

 6                        CHARLES F. GORDER, JR.
                          United States Attorney's Office
 7                        1000 S.W. Third Avenue, Suite 600
                          Portland, OR 97204-2902
 8                        503/727-1021

 9  FOR THE DEFENDANT:    LAWRENCE H. MATASAR
                          Lawrence Matasar, P.C.
10                        621 S.W. Morrison Street
                          Suite 1025
11                        Portland, OR 97205
                          503/222-9830
12                        Larry@pdxlaw.com

13                        STEVEN T. WAX
                          BERNARD CASEY
14                        MICHELLE SWEET
                          Federal Public Defender
15                        101 S.W. Main Street, Suite 1700
                          Portland, OR 97204
16                        503/326-2123
                          Steve_wax@fd.org
17
    Also Present:         Agent Anderson
18                        Agent Carroll
                          Pirouz Sedaghaty
19

20

21

22

23

24

25
```

INDEX TO WITNESSES

FOR THE

| DEFENDANT: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| David Rodgers | 123 | 131 | 145 | -- |
| Anwar Ahmad Khan | 147 | 152 | 169 | -- |
| Jeffrey A. Cone | 170 | 208 | 224 | -- |
| David Long | 228 | 258 | -- | -- |

```
 1              TUESDAY, SEPTEMBER 7, 2010; 1:04 P.M.

 2                           -O0O-

 3                    (Jury present.)

 4              THE COURT:  Well, jurors, I went to

 5   The Duck Club.  We're still ahead.  The Beavers are

 6   going to do great.

 7              (Mr. Cardani entered.)

 8              MR. CARDANI:  Excuse me, Judge.

 9              THE COURT:  That's okay.

10              Go ahead.  You may continue.

11              DIRECT EXAMINATION (Continued)

12   BY MR. CASEY:

13       Q.    Mr. Rodgers, when we left off, you were

14   talking about being in Saudi Arabia and having

15   meetings from time to time with people from

16   al-Haramain.  In any of those meetings at any time

17   was it ever suggested by anyone that al-Haramain,

18   either in Saudi Arabia or in the United States

19   provide any funding or assistance to Islamic

20   militants, including mujahideen, and in particular,

21   mujahideen in Chechnya?

22       A.    No.  I never heard of such a thing.

23       Q.    Now, you talked previously or you

24   mentioned previously that when the Qur'an Foundation

25   in al-Haramain in the United States was distributing
```

1    literature to prisons, you were doing so at the

2    request of prison officials and chaplains.

3              Do you remember that, sir?

4        A.    Yes.

5        Q.    You have before you certain documents.

6    These documents have not yet been admitted into

7    evidence, so I would ask you not to comment on their

8    contents, but I would ask you to look at them,

9    generally.  They are documents Exhibits 1054 through

10   1063.

11       A.    Yes.

12       Q.    Just take a few minutes and thumb -- or

13   take as long as you need just to briefly go through

14   those.

15       A.    Yeah.  I get the gist of it.  You want me

16   to go through each one of them?

17       Q.    Just thumb through them just so you get

18   through the end in the interest of completeness.

19       A.    Okay.  Yeah.

20       Q.    Okay.  Just generally, without discussing

21   their contents, tell us what they are.

22       A.    These are a sample of some of the letters

23   that we would receive requesting Qur'ans and Islamic

24   material.

25              MR. CASEY:  Your Honor, I move their

1    admission for publication to the jury.

2              MR. GORDER:  Your Honor, I don't think

3    I've had a chance to see these.  Maybe I'm wrong.

4              THE COURT:  I'll rule later.

5              MR. CASEY:  I'm sorry, Your Honor?

6              THE COURT:  I'll rule later.

7              MR. CASEY:  We're coming near to the

8    conclusion of his testimony, Your Honor, so --

9              THE COURT:  There's no need to read

10   them during the testimony.

11             MR. CASEY:  All right, sir.  I'd ask

12   Ms. Wells to put on the screen certain documents

13   that have been admitted, and namely, Exhibits 607,

14   608, 609, 610, 611 and 613, beginning with 607,

15   please.

16   BY MR. CASEY:

17        Q.   All right.  Mr. Rodgers, what is that

18   picture that we're looking at now, Exhibit 607?

19        A.   That's a trip to the Redwoods.  I'm

20   standing on the left with a white cap on and Pete's

21   standing on the right.  Soliman al-But'he.  Those

22   are my two little boys with their Oregon duck shirts

23   on, orange and yellow and green there.

24        Q.   Which -- can you put a marker on the

25   person who is Mr. al-But'he?

```
1        A.    A marker?

2        Q.    Yes.  Oh, can you touch the screen and

3   then just --

4        A.    Yes.

5        Q.    -- Mr. al-But'he.

6        A.    This here is Soliman al-But'he

7   (indicating).

8        Q.    All right.  608, please.  Who is in that

9   picture, sir?

10       A.    Starting on the left is Pete, and that's

11  Rob Brown and next is -- I believe that's John Dunn

12  and myself with the cowboy hat on, on the right,

13  planting trees for the Forest Service.

14       Q.    When was that, do you know, roughly?

15       A.    I don't know.  We did a lot of jobs like

16  that.

17       Q.    All right.  Is that typical of the kind of

18  jobs you'd be doing?

19       A.    Yeah.  When we worked reforestation jobs,

20  yeah.

21       Q.    609, where was that and who is in that

22  picture?

23       A.    I can't really tell where it was at, but I

24  know who is there.  I think this was in Pete's

25  house.  This is -- you know, in those early days
```

1    when I lived in Sprague River we had a group of

2    friends, you know.  And as I said, we used to

3    discuss, you know, Islam -- and some of us became

4    Muslims, some of us didn't.  But we were always good

5    friends from high school, and we used to get

6    together, and you know, have, you know, little

7    meetings and, you know, friendly get-togethers.

8           And that's a picture of myself and Pete

9    and Rob Brown, John Dunn.  And the guys in the front

10   are Rob Robinson and Bob Wongen (phonetic).  They're

11   old high school friends and people we used to ride

12   horses and travel on pack trips with.  They're good

13   friends from high school.

14        Q.    Okay.  Can you point out Pete?

15        A.    Pete, yeah, he's right there (indicating).

16        Q.    And who is the woman next to him, do you

17   know?

18        A.    I believe that's his mother.

19        Q.    Okay.  Next exhibit, 610, please.  What do

20   you see there?

21        A.    This is the camel standing in front of the

22   Islamic Center in Ashland.

23        Q.    And as Mr. Cardani might say, I have a

24   very important question.  What's the name of that

25   camel?

1    A.    Actually I named him mandub, which means

2    ambassador in Arabic.

3    Q.    That's the prayer house, basically?

4    A.    That's the prayer house in Ashland, yes.

5    Q.    Okay.  Next exhibit, 611.  What do you see

6    there, sir?

7    A.    This is a tent we had set up outside of

8    our Islamic Center there for cultural events

9    inviting people to come and hear talks about Islam

10   and Arabian culture and this type of thing.

11   Q.    And who all would you invite to attend?

12   A.    Oh, the general public.  We had kind of a

13   program called Arabian Knights, and we'd invite the

14   general public to come over and hear about, you

15   know, the basics of Islam and Muslim culture and try

16   to, you know, build that understanding and such.

17   Q.    In 613, what do we see here?

18   A.    This is a picture of me and the king of

19   Saudi Arabia.  I'm receiving an award -- a gift, I

20   should say.  He had a horse that was very difficult

21   at the starting gate, and I specialize in gate

22   training horses -- race horses before the -- so they

23   load in the starting gate.

24         I trained his horse to load in the

25   starting gate.  The day of the big cup in Saudi

1    Arabia, I personally loaded the horse in the gate,

2    and the horse wanted to race.  And he invited us all

3    over to give us a gift.  And in that box was a

4    really nice watch, a Bvlgari watch.

5        Q.    Okay.  So, Mr. Rodgers, you've known

6    Mr. Seda for quite a few years.

7        A.    Yeah.

8        Q.    Is there anything -- is there anything

9    about Mr. Seda that has ever given you the sense

10   that he has a side to him other than what he has

11   shown to you, a secret side, a dark side, a side

12   that would be supportive of Islamic militant

13   activity?

14       A.    I've known Pete for many, many years, and

15   we've done all kinds of things together.  And I

16   probably -- I can honestly say I'm probably, you

17   know, his -- one of his best friends in the world.

18   And he knows me and I know him very well.  And he's

19   been very open with me and very, you know, confiding

20   in everything we've done.

21            And there's nothing secret about him, he's

22   very open and honest.  He's a very frank person.  I

23   mean it's like what you see is what you get with

24   Pete.  He's just out there.  He's not false or

25   pretentious whatsoever.  And there's no secret side

1   to him whatsoever.  I've never -- you know, he's a

2   very honest, kind person.

3        Q.    Have you ever heard him say anything or do

4   anything to lead you to believe that he was somehow

5   supporting mujahideen activities anywhere in the

6   world?

7        A.    Absolutely not.  And I've heard the

8   contrary constantly from him.  He always said that

9   "These things are political.  Let's just do our job

10  and try to represent the basics of our faith here."

11        It was a huge job to do in this country to

12  try to just do the basics.  We had nothing to do

13  with what was going on overseas and didn't even

14  really know the truth of what was going on in other

15  countries and conflicts.

16        I worked with the guys on -- like you've

17  seen on some of the pictures in the mountains on

18  jobs, and I never even seen the guy get in a fight,

19  never, with the guy.  He was absolutely not a

20  violent person.  I never seen him even come close to

21  getting in an actual physical fight with anyone.

22  Nothing like this.  Not even close.

23             MR. CASEY:  Thank you, Mr. Rodgers.

24             THE WITNESS:  May I step down?

25             MR. CASEY:  No, no.  There's more to

```
 1    come.
 2                    CROSS-EXAMINATION
 3    BY MR. GORDER:
 4         Q.    My name's Charles Gorder.
 5         A.    Yes.
 6         Q.    And I represent the United States, so I
 7    get a chance to ask you a few questions.
 8         A.    Yes, sir.
 9         Q.    Now, at the time that you were living in
10    Sprague River, that was back in the early 1980s?
11         A.    Yes.  Early 1980s.
12         Q.    Okay.  About when did you move back to
13    Ashland?
14         A.    I lived in Sprague River for a few years,
15    about four years.  I think I spent four winters out
16    there.  And then, like I said, I had to actually get
17    a real job and try to pay off this land and -- so I
18    moved.  It was about four years, sir.
19         Q.    Okay.  So maybe the middle 1980s?
20         A.    Yeah.  Something like that, sir.
21         Q.    Okay.  And you indicated that while you
22    were out there, the defendant gave you a Qur'an.  Is
23    that correct?
24         A.    Yes.
25         Q.    It wasn't the Noble Qur'an with the Call
```

1    to Jihad appendix?

2        A.    No, it wasn't.

3        Q.    You became familiar with that one later

4    on?

5        A.    Yes.

6        Q.    Okay.  When you moved back to Ashland, how

7    did you support yourself?

8        A.    Well, my parents actually lived -- was

9    living in Ashland, and at the time my father was

10   alive and my mother was living there too, and I did

11   odd jobs.  You know, I tried to train horses and, as

12   I said, I worked for -- you know, we did forest

13   service contracting and worked on ranches, this type

14   of thing.

15       Q.    Okay.  Did you work for the defendant?

16       A.    I worked for him?  Yeah.  He was a

17   contractor in Forest Service contracts, yeah.

18       Q.    And then how about when he started his

19   arborist business?  Did you work for him there?

20       A.    I don't remember ever working for him at

21   that point when he was an arborist.  I pretty much

22   had established myself on ranches and was heading

23   for being a horse trainer, trying to get out of that

24   tree business myself.

25       Q.    Did you work for him for the Al-Haramain

1    Foundation in Ashland?

2        A.    Yes.

3        Q.    Were you paid?

4        A.    I was paid, yes.

5        Q.    And were you paid in cash?

6        A.    I think it was cash.  I -- yeah.

7    Sometimes cash, yeah.

8        Q.    Under the table, as they say?

9        A.    Probably.

10       Q.    When did you leave Ashland to go to Saudi

11   Arabia the first time?

12       A.    When did I leave Ashland.  I've been

13   living in Saudi Arabia -- it was about 11 years ago

14   -- yeah, so I left --

15       Q.    So 1999?

16       A.    Roughly, yeah.

17       Q.    And you've lived there ever since?

18       A.    I did come back, you know, for a period of

19   time, but roughly, I've lived there almost ten years

20   straight, yeah.

21       Q.    So you weren't there when -- you weren't

22   in Ashland when the Chechnyan War kind of exploded

23   again in late 1999?

24       A.    No.  I was probably in Saudi Arabia, yeah.

25       Q.    Do you remember some speakers when you

1    were in Ashland, for example, Sheikh Hassan?

2        A.    Yes.

3        Q.    He was kind of radical?

4        A.    Radical?  Conservative.

5        Q.    Did you ever hear him say that Muslims

6    shouldn't live in the United States?

7        A.    I don't remember him saying that

8    personally, no.

9        Q.    How about a fellow named Abdul Qaadir?

10    Did you meet him?

11        A.    Adbul Qaadir, yeah.

12        Q.    We can -- we've got a couple of pictures.

13    Is this Abdul Qaadir?

14        A.    That's Abdul Qaadir that I know, yeah.

15        Q.    Okay.  And by the way, this is

16    Mr. Al-But'he?

17        A.    Yes, sir.

18        Q.    Okay.  Where did you meet Abdul Qaadir?

19        A.    I believe I first met him in Saudi Arabia.

20    He was working for the al-Haramain.

21        Q.    And did you get his emails about Chechnya?

22        A.    Not personally, but yeah, we received at

23    the office, you know, in Ashland all kinds of

24    emails.  But about Chechnya?  I don't remember

25    specifically about Chechnya.  We were constantly in

1    communication.

2        Q.    Okay.  You left Ashland in 1999 -- is that

3    correct?  -- and went to Saudi Arabia?

4        A.    Yes.  Roughly, it was about that date.

5        Q.    While you were in Saudi Arabia, did you

6    receive emails from Mr. Abdul Qaadir as part of the

7    Sheeshaan email group?

8        A.    I don't remember that specifically.  I --

9    I did receive emails from him probably.  We

10   continued to stay in communication, so yeah.

11       Q.    Okay.  What did he do for al-Haramain?

12       A.    You know, his English and his Arabic was

13   really good so he worked kind of in this translation

14   and communicating between the American-speaking

15   world or the English-speaking world and the Arabic

16   type of things.

17       Q.    But you don't remember getting a whole

18   bunch of emails about Chechnya from him as part of

19   the Sheeshaan group?

20       A.    No, not at all.

21       Q.    How about -- we've heard of another

22   gentleman a little bit, an Abdulaziz Al-Shoumar.

23   And I may be butchering the pronunciation.  Do you

24   know him?

25       A.    Yes.  I knew him, yes.

1    Q.    Where did you meet him?

2    A.    Same.  In Saudi Arabia.

3    Q.    Was he one of al-Haramain's accountants?

4    A.    I don't know what his position was exactly

5    in al-Haramain, yeah, but I knew him from there.

6    Q.    Okay.  Did you have meetings with him?

7    A.    Yeah.  He also was an English speaker and

8    had something to do with the English-speaking group,

9    yeah.

10    Q.    Okay.  But beyond speaking English, what

11    was his role?

12    A.    I don't really know what exactly his role

13    was, honestly.

14    Q.    Did you ever participate in al-Haramain's

15    Asia committee?

16    A.    Al-Haramain's what committee?

17    Q.    Asia committee?

18    A.    Asia committee.  Not that I know of.

19    Q.    Did you ever participate in a committee

20    that decided how to distribute money to Chechnya?

21    A.    No, not that specifically, no.  Any

22    meetings that we had were generally about how we're

23    going to run the Ashland office, and the day-to-day

24    how we're going to issue the books and how things

25    are going, this type of thing.

1    Q.    Okay.  Let's talk about the books a little

2    bit.  You mentioned the Noble Qur'an with the Call

3    to Jihad?

4    A.    Yes.

5    Q.    And you indicated that at some point you

6    talked them out of that?

7    A.    We tried to tell them that we didn't like

8    the translation that they were sending us, you know,

9    yeah.

10    Q.    But did they do anything about it?

11    A.    Eventually they did.  They -- eventually

12    they came out with another one that was like

13    revised.

14    Q.    And when was that?

15    A.    Oh, it probably took them a couple years

16    to do.

17    Q.    Was it after 9/11?

18    A.    I don't remember the date.  I don't

19    remember exactly when they came out with it.

20    Q.    Now, do you recall being interviewed by

21    William Teesdale, one of the investigators for the

22    lawyers for Mr. Seda?

23    A.    Do I remember being interviewed?

24    Q.    Right.  By a Willaim Teesdale?

25    A.    Yes.

1    Q.    Okay.  August 26, 2009?

2    A.    I think that was -- I don't remember

3  exactly the day, but yes.

4    Q.    Okay.  Here in Eugene.

5    A.    Yes.

6    Q.    You were back visiting.

7    A.    Yes, sir.

8    Q.    He met with you.

9    A.    Yeah.

10    Q.    Do you remember telling him that you wrote

11  letters to the al-Haramain organization complaining

12  about the Noble Qur'an, but they would not listen?

13    A.    Yeah.  I mean we wrote many letters to

14  them that they never responded to, you know, and --

15    Q.    And you kept distributing the Noble

16  Qur'an?

17    A.    We kept distributing the Noble Qur'an,

18  yeah.  We had an overwhelming request for Qur'ans

19  that we couldn't fill and -- you know, even though

20  we may -- didn't agree with all of it, we didn't

21  have a resource to drop the whole program.

22    Q.    How about this book, the Islamic

23  Guidelines?

24    A.    Yeah.

25    Q.    Do you remember that one?

1    A.    Roughly, yeah.

2    Q.    You'd send it to prisoners?

3    A.    I don't remember if that was sent to

4 prisoners specifically.  It perhaps was part of a

5 package of -- that was for converts.

6    Q.    Okay.

7    A.    Yeah.

8    Q.    Got some pretty nasty things to say about

9 Jewish people?

10    A.    I don't really remember what it exactly --

11 what it -- exactly the whole contents of the book,

12 no.

13    Q.    Okay.  Can we have EGR 2-A, and this is

14 not in evidence so -- go to that next page.  If you

15 could take a look at No. 3 on page 108 there.

16         Does that refresh your recollection?

17    A.    Generally, what's -- yeah.  What about it?

18    Q.    You were sending that to prisoners -- or

19 converts, as you said?

20    A.    This book, yeah.  We were sending this

21 book to some people, converts.  I don't think we

22 were sending it directly to prisoners.  Most prisons

23 have a problem with a hard copy book, and they

24 wouldn't accept hard copy books.  We generally

25 didn't send hard copy -- hard covers into prisons.

```
1    They wouldn't accept it.
2        Q.    Would it surprise you if a thousand of
3    these were distributed to prisoners?
4        A.    I don't know.
5        Q.    After you left in 1999 the prisoner
6    project continued as far as you know, didn't it?
7        A.    Oh, yeah.
8        Q.    Now, could we have Defense 602B.
9            Now, you've told us about this particular
10   statement that you signed along with the defendant
11   and Soliman al-But'he.
12       A.    Yes.
13       Q.    Okay.  When was that signed?
14       A.    When was it signed?  I don't really
15   recall.
16       Q.    Was it about the time al-Haramain took
17   over?
18       A.    Probably, yeah.  Roughly about this time.
19            MR. CASEY:  Your Honor, I object to
20   the term "took over."
21            THE COURT:  Overruled.
22   BY MR. CASEY:
23       Q.    About the time that al-Haramain became
24   part of the operation in Ashland.
25       A.    I would be guessing, but roughly, yeah.
```

1          Q.    Okay.  Now, did al-Haramain revoke this

2    agreement at some point?

3          A.    Revoke it?

4          Q.    Right.

5          A.    No.  I don't -- I see Soliman al-But'he's

6    signature on it.  He was director of the office

7    there.

8          Q.    Well, do you remember telling Mr. Teesdale

9    that you sent a mission statement to the Kingdom of

10   Saudi Arabia saying that you would have nothing to

11   do with terrorism or politics, but they would not

12   agree to it?

13         A.    Like I said, we sent many requests and

14   things like this paper to them that never came back.

15   No comment.  Just gone.

16         Q.    Did you say "Rodgers said the statement

17   was about Islam being nonviolent, but the Saudi's

18   would not agree"?

19         A.    Excuse me?

20         Q.    Mr. Rodgers said, "The statement was about

21   Islam being nonviolent, but the Saudis would not

22   agree."

23                   MR. CASEY:  Request to show the

24   witness a copy of the statement.

25                   THE COURT:  That's fine.

```
 1              (Document shown to Counsel and witness.)
 2              MR. CASEY:  Thank you.
 3  BY MR. GORDER:
 4      Q.    So do you remember saying that?
 5      A.    Not specifically but --
 6      Q.    Well, did you send a mission statement to
 7  the Saudis and they would not agree to it on this
 8  subject?
 9      A.    Well, we sent this mission statement that
10  is on the screen here, and I didn't know anything
11  about it, whether it came back or not or got signed
12  or not, but I see here that it is signed.
13      Q.    But you said the Saudis would not agree?
14      A.    To my knowledge, they never sent -- you
15  know, I was just a worker in the office.  I didn't
16  know that they ever agreed or didn't agree, but I
17  never heard anything back from them.  But I see here
18  that it's signed.
19      Q.    So you were just a worker in the office?
20      A.    Uh-huh.
21      Q.    The defendant was the person who dealt
22  with the people in Riyadh?
23      A.    Yeah, mostly.
24      Q.    When the Qur'an Foundation was first
25  going, it was operating on a shoestring budget.  Is
```

1    that correct?

2        A.    Yes.

3        Q.    And when al-Haramain got involved, all of

4    a sudden there was a lot more money?

5        A.    There was a lot more books and supplies,

6    yes.

7        Q.    Noble Qur'ans?

8        A.    Qur'ans, books of all kinds.

9        Q.    Islamic Guidelines?

10       A.    Some of -- that was probably part of their

11   books, yeah.

12       Q.    And you accepted those and sent them out.

13       A.    Yeah.

14       Q.    Because they were the people with the

15   money.

16       A.    Yeah.  Well, we were trying to provide

17   books to thousands of requests and -- which we

18   didn't have resources to fill, and they were willing

19   to fill these requests, so yes, we didn't have an

20   alternative but to send the books that we got.

21       Q.    You said that when you met the al-Haramain

22   people in Saudi Arabia, you never discussed funding

23   for the mujahideen.  Is that correct?

24       A.    Yeah.  Never -- never discussed anything

25   like that.

1       Q.    Did you ever take a look at the

2  al-Haramain website?

3       A.    A couple times, yeah, maybe.

4       Q.    Did you ever read any fatwas about funding

5  the mujahideen?

6       A.    Don't remember.  Perhaps I did.

7       Q.    Well, if you did, then that would have

8  been something about al-Haramain funding the

9  mujahideen, wouldn't it?

10       A.    Excuse me?

11       Q.    If you read something on their website --

12       A.    Yes.

13       Q.    -- about funding the mujahideen, then it

14  would not be correct that al-Haramain had nothing to

15  do with it.  Is that right?

16       A.    I'm not sure about the question.  What are

17  you asking exactly?

18       Q.    I'm asking, did you ever notice anything

19  on their website about funding the mujahideen?

20       A.    Not to my recollection.  I don't remember

21  reading anything specific.

22       Q.    Okay.  The defendant had a wife named

23  Safiyah?

24       A.    Yeah.

25       Q.    Do you remember her?

1        A.    I mean, yeah, I didn't know her personally
2   too much, but yeah.
3        Q.    Did you understand that she spoke Russian?
4        A.    I think she was from Russia, yeah.
5        Q.    Were you aware that she was translating
6   for the Chechnyan mujahideen website?
7        A.    No, never heard of it.
8        Q.    Would it surprise you if that was
9   happening in the Al-Haramain --
10                MR. CASEY:  Objection --
11   BY MR. GORDER:
12        Q.    -- office in Ashland?
13                MR. CASEY:  Relevance, your Honor.
14                THE COURT:  Overruled.
15        A.    Would it surprise me?
16   BY MR. GORDER:
17        Q.    Yes.
18        A.    Yeah.
19                MR. GORDER:  Nothing further, Your
20   Honor.
21                MR. CASEY:  Quickly, Your Honor.
22   Mr. Gorder, may I see a copy of the Islamic
23   Guidelines?
24                     REDIRECT EXAMINATION
25   BY MR. CASEY:

1     Q.    This is the Islamic Guidelines, is it not?

2   Do you recognize the book?

3     A.    Yeah.  I've seen it, yeah.

4     Q.    It's a hardcover book?

5     A.    Yeah.

6     Q.    And is it not a fact that most prisons or

7   all prisons, to your knowledge, will not accept

8   hardcover books?

9     A.    Yeah.  It was their policy that we didn't

10  send these to prisoners -- hard copy books, Qur'ans

11  or whatever, hard copy books.  It was against the

12  rules, for security.

13              MR. CASEY:  Nothing further, Your

14  Honor.

15              THE COURT:  You may step down.

16              THE WITNESS:  Thank you.

17              THE COURT:  Next witness, please.

18              MR. WAX:  Call Anwar Khan.

19              (The witness was sworn.)

20              THE CLERK:  Please have a seat.

21  Please speak into the microphone here and there's

22  water if you would like some.

23              Please state your full name and then

24  spell your name for the record.

25              THE WITNESS:  My name is Anwar Ahmad

1    Khan, A-N-W-A-R, first name; Ahmad, A-H-M-A-D,

2    second name; Khan, K-H-A-N, last name.

3                        DIRECT EXAMINATION

4    BY MR. WAX:

5        Q.    Mr. Khan, could you tell the members of

6    the jury, please, where you're employed.

7        A.    I'm employed with the Islamic Relief

8    U.S.A, and I'm based out of Plano, Texas.

9        Q.    Were you working for the same organization

10   in the years 1999 and 2000?

11       A.    Yes.

12       Q.    And where were you based at that time?

13       A.    Burbank, California.

14       Q.    Could you tell the members of the jury,

15   please, whether you are a standalone organization

16   here in the United States or part of a larger group?

17       A.    We are an independent U.S. organization,

18   Islamic Relief U.S.A, but we have agreements with

19   other Islam Reliefs in other countries, such as U.K.

20   and Pakistan that we have -- and we work with them.

21       Q.    Is the U.K. organization in any way a

22   parent of the others?

23       A.    It's not of the U.S.A.

24       Q.    Excuse me.  It is not of the U.S.A?

25       A.    Yeah.

1    Q.    Okay.  Is it of any of the other branches

2    elsewhere in the world?

3    A.    It may be with some of the other offices.

4    Q.    Okay.  You don't know specifically?

5    A.    No.

6    Q.    Can you tell us, please, roughly what

7    volume of dollars comes through your organization in

8    a given year?

9    A.    Last year it was over $130 million in

10   donations, of which about 35 million was cash and

11   over 100 million was pharmaceuticals and other

12   in-kind donations.

13   Q.    Have you personally come back recently

14   from a place in the world where there has been some

15   terrible devastation?

16   A.    I just came back from Pakistan about a

17   week and a half ago, and I was in Haiti earlier this

18   year.

19   Q.    Okay.  I would like, sir, to ask one more

20   general question.  And if you could tell the members

21   of the jury, please, generally what the nature of

22   the work is that your organization does today, and

23   then whether that's any different than the nature of

24   the work the organization did in 1999 and 2000.

25   A.    We do humanitarian work and that's

1    involved in education, nutrition, vaccinations.  And

2    the difference between now and maybe 1999, 2000, is

3    we're doing a lot more work in America.  So we do

4    feeding the homeless programs in different parts of

5    America.  We're supporting free clinics in South

6    Central Los Angeles, and we're doing a lot more

7    humanitarian work in the U.S. than we did before.

8         Q.    In 1999 and 2000, was your organization

9    involved at all in humanitarian work with refugees

10   of the Chechnyan Russian War?

11        A.    Yes, we were.

12        Q.    Could you tell the members of the jury,

13   please, a little bit about the work that you were

14   doing in that region in that time frame?

15        A.    Yes.  Islamic Relief was in the Caucasus

16   that suffered in the Russian area from the '90s.

17   There was a war in '94/'95.  We had an Islamic

18   Relief office in Chechnya, and we were distributing

19   humanitarian supplies.  This was done with the

20   permission of the Russian government at the time.

21   There was a war going on between some Chechnyan

22   factions and the Russian government.

23             Then the war began again in '99, and we

24   already had some offices there.  We in America were

25   supporting the camps that the Chechens were forced

1   to flee their homes from the fighting.  They went to

2   Ingushetia, which is a Russian state next to

3   Chechnya.  We were supporting camps with food,

4   water, and those kinds of supplies.

5       Q.    Did you personally make any trips to

6   Ingushetia to any of the camps that you were

7   supplying?

8       A.    Yeah.  In 2000 I went to Ingushetia to see

9   the work that we were doing, the water that we were

10  distributing, the food parcels, as well.

11      Q.    In that same time frame, did your

12  organization put out any list serves on computers or

13  on the internet -- any information about the

14  situation in Chechnya and any of the work that your

15  organization was doing?

16      A.    Yes, we did.  This is important.  People

17  need to know where their money is going, what we're

18  doing with their money, and what the situation was

19  over there.

20      Q.    Did you actually put out a series of

21  bulletins on the IR website to a ListServe 7, 8, 9,

22  10, et cetera, describing the work and situation in

23  Chechnya?

24      A.    Yes, we did.

25      Q.    I'd like to ask, sir, whether in late

1    February or perhaps early March of 2000, you

2    received any communication from an organization in

3    Oregon inquiring about relief in Chechnya?

4        A.    I believe sometime in 2000 I received a

5    phone call from somebody from Oregon.

6        Q.    And what do you recall about the content

7    of that phone call?

8        A.    The person said that he had a lot of money

9    that he would be willing to give us.  That's why it

10    was given to me.  I'm in charge of fund-raising in

11    Islamic Relief U.S.A, so if donors want to give

12    money and they're interested in donating, they're

13    sent to me, so it came to me.  I spoke to him, and

14    he said that he was willing to give us money, but he

15    wanted to send a representative from his

16    organization to Chechnya with us and to select a

17    program over there to do.

18            And I explained to him that we couldn't do

19    that.  We didn't know who he was.  We didn't want to

20    work with organization -- volunteers that we didn't

21    know to send him over there, that may have been

22    liability issue for us and cause problems for us

23    over there.

24        Q.    Okay.  And do you recall the phone number

25    of your organization back in February and March of

1    2000?

2        A.    The Burbank, California, number was

3    818/238-9520 at that time.

4        Q.    818/238-9520?

5        A.    (No audible response.)

6            MR. WAX:  Thank you, sir.  I have no

7    further questions.

8            THE COURT:  Cross.

9                CROSS EXAMINATION

10    BY MR. CARDANI:

11        Q.    Mr. Khan, we met briefly a few moments

12    ago.  I just have some questions here.  When this

13    individual -- you don't know who it was that called

14    you?  You just think it was somebody from Oregon?

15        A.    Yeah.  I knew it was from Oregon.  I

16    assumed it was from some of the mosques in Oregon

17    that supported us.  That's what --

18        Q.    Not al-Haramain, but a different --

19        A.    Yeah.  It wasn't al-Haramain, no.  I never

20    worked with al-Haramain.  I know that there was a

21    mosque here in Portland, Oregon, that had donated

22    money, and I thought it may have been them, but it

23    wasn't.  He explained to me he wasn't with the

24    mosque.

25        Q.    All right.  And if I just get this

1    correctly, this individual said he had a lot of

2    money that he wanted to distribute, to work with

3    your organization in distributing in Chechnya.

4        A.    Yes.

5        Q.    And you -- he put a limitation on it that

6    he wanted to send someone from the organization to

7    go with you?

8        A.    Yeah.  To pick the humanitarian project,

9    yeah.

10       Q.    And you said that you couldn't allow that.

11       A.    No.

12       Q.    Didn't you also say that you'd be happy to

13   accept a donation of this money and make the proper

14   distributions through your organizations and give

15   him a detailed report?

16       A.    Yeah.

17       Q.    Yes?  She's got to get all this down.

18       A.    Yes.

19       Q.    All right.  What do you remember about

20   telling this person about that?

21       A.    Just what you said.  That would be a

22   general thing, that when people give us money,

23   especially large amounts, we know they want reports

24   and that we're willing to report on what we're doing

25   over there.

1    Q.    Did you ever hear -- did the person say,

2    Okay.  I'll send you some money, and go ahead and do

3    it?

4    A.    No.

5    Q.    To the best of your knowledge, did this

6    person send you any money?

7    A.    No.

8    Q.    To the best of your knowledge, did

9    al-Haramain in Oregon ever send your organization

10    any money for distribution in Chechnya?

11    A.    No, not to the best of my knowledge.

12    Q.    Now, you mentioned that you worked with

13    permission of the Russian government.  So your

14    organization is a very large charitable relief

15    organization?

16    A.    Yes.

17    Q.    And so it works -- in Ingushetia and in

18    the Chechnyan region back in 2000, you had the

19    express permission of the Russian government?

20    A.    Yes.  Without them -- it's the same.  We

21    have the permission in the U.S.  We're a nonprofit

22    501(c)3.  Unless we have permission of the

23    governments, we can't work over there.

24    Q.    And is one of the -- you said you went

25    over there in 2000, I think, to one of these camps.

1    Is it dangerous?

2        A.    Yes.

3        Q.    And did you have to have a number of

4    Russian bodyguards when you went over to these

5    camps?

6        A.    I didn't want bodyguards, but they didn't

7    give me a choice.

8        Q.    Okay.  So were they Russian?

9        A.    Yes, they were.

10        Q.    And how many were with you?

11        A.    The first time I went in 2000, oh, a

12    handful.

13        Q.    A handful, okay.  Are you aware that

14    al-Haramain had some activity over there, as well,

15    during this time?

16        A.    No.

17        Q.    You didn't know about any kind of things

18    in Ingushetia with al-Haramain?

19        A.    No, I didn't.

20        Q.    Okay.  Now, when you receive funds for

21    distribution overseas, what are the recordkeeping

22    requirements or procedures that your organization

23    goes through?

24        A.    I'm a fund-raiser so I can only talk in

25    general terms.

1    Q.    Okay.  If you could speak -- there's a

2    microphone in front of you there.  If you could just

3    speak up a little into the microphone.

4    A.    I'm a fund-raiser.  I can talk in general

5    terms.  I know that when we raise funds from people,

6    often we designate what the funds are going to.  For

7    example, Pakistan floods.

8         So we would tell them 20 million people

9    have been affected.  Many children are about to die

10   from hunger over there right now.  So we would raise

11   money and we would say it's going to Pakistan

12   floods.

13        Then it would go to accountants.  First it

14   would be entered in our donations.  Now we're based

15   out of Virginia -- an office in Virgina.  They enter

16   it over there.  Then accountants would make sure

17   that we honor the wishes of the donors, and a board

18   would have to give approval for the money to be

19   sent, and legal counsel would be involved, as well,

20   so we have CPAs, legal counsel, involved to make

21   sure that the money is sent by the regulations of

22   the U.S. government, and it gets to the people who

23   need it over there.

24   Q.    And then once it gets over there, what

25   about the recordkeeping requirements to ensure that

1    the money gets to the proper people?

2       A.    Yeah.  We have to report that, and we do

3    several audits of certain countries every year.  So

4    we -- when we send the money, they tell us, yes,

5    we've received the money.  And then we get a report

6    from them, how the money was done.  That's the

7    basic.  But oftentimes, we do more than that.  We do

8    audits, as well.

9       Q.    Why do you do audits as well, sir?

10      A.    It's a requirement that we were told --

11   we're based out of California, even now, and the

12   attorney general of California, we submit reports of

13   where our money has been spent every year.

14      Q.    And the idea there is just to make sure

15   you do everything reasonably that you can, to make

16   sure that the money ends up with the people that

17   really need it?

18      A.    Yes.

19      Q.    And the funds that you fund-raise here in

20   the United States for these overseas distributions,

21   are those reported in which you understand is a Form

22   990 by Islamic Relief?

23      A.    I know in the Form 990 we declare how much

24   we've raised.  Because I'm not intricately involved

25   with that, I don't know much more than that about

1    it.  But I do know that we do report to the attorney

2    general in California where the money was sent.

3         Q.    Okay.  And also on the Form 990 with the

4    Internal Revenue Service?

5                   MR. WAX:  Your Honor, I'd object.  He

6    said he doesn't deal with it.

7         A.    Well, I don't deal with the IRS, so the

8    990, I don't know about -- I know that has the total

9    amount for sure and a percent of administration is

10   on there.  I don't know about the individual

11   projects, if they're on there.

12   BY MR. CARDANI:

13        Q.    Okay.  But if somebody just jumped on your

14   website, IRW.org, is that your --

15        A.    It's now called IslamicReliefUSA.org.

16        Q.    Okay.  If someone just jumped on there

17   today, wouldn't they immediately see your Form 990

18   that you filed with the IRS?

19        A.    I'm not sure.  I know there's a percentage

20   of administration on there.

21        Q.    Okay.  Have you been to your website

22   recently?

23        A.    No, not recently.  Sorry.  I've been

24   traveling for quite some time.

25        Q.    I understand, sir.  But if someone was

1    interested in donating to the Pakistan flood

2    situation --

3         A.    I know often people go -- the 990 is

4    available online, and I know people do check out our

5    990.

6         Q.    Now, you put out some literature Mr. Wax

7    referred to.  Could we bring up -- I think it's

8    Defense 686B, as in boy.

9         A.    Yes.

10        Q.    Okay.  Do you recognize that as some

11   literature put out by Islamic Relief back in early

12   2000?

13        A.    Yes.

14        Q.    And that concerned the situation in

15   Chechnya and Ingushetia?

16        A.    No.  This is just a Merry Christmas.

17        Q.    Oh, okay.  Let's go to the next page.

18        A.    Holiday is called Eid and Mubarak means

19   greetings, so it's just --

20        Q.    Okay.  All right.  How about -- let me

21   take another chance, 682.  Okay.  Does this --

22        A.    Yes.

23        Q.    -- refer to a holiday or is this something

24   else?

25        A.    No.  This is referring to the work that we

1    were doing in the refugee camps in Ingushetia.

2        Q.    Okay.  So it says here December '99,

3    Islamic Relief, and it involves refugee camps in

4    Ingushetia.  And you were operating such camps --

5    your organization was operating such camps?

6        A.    Our Russian office was.  We were working

7    in those camps.  I think they were actually

8    operating some of them by the U.N., and we were

9    working with the U.N. in those camps.

10        Q.    So if someone called you during this time

11    period and said, I have $200,000 for -- to support

12    the camps there, would you have taken that money?

13        A.    To support our work over there?

14        Q.    Yes, sir.

15        A.    Yes.

16        Q.    And then send it over here to the

17    Ingushetia camps and operated in a manner consistent

18    with your testimony today?

19        A.    Yeah.

20        Q.    Now, I want to show you something that's

21    been marked AK2.  It's not in evidence.  I just want

22    to see if you can identify it.  Your group is a huge

23    organization, sir.  Did you say that it raised $130

24    million last year?

25        A.    Yes.  Over that, yes.

1      Q.    And going back in time roughly to -- it's

2    been tens of millions of dollars the last ten years

3    -- is that a fair statement? -- that you've raised?

4      A.    Our organization?

5      Q.    Yes, sir.

6      A.    No.  A lot more than that.

7      Q.    Okay.  60, 70, $80 million a year?

8      A.    No.  I think 130 million last year.  Maybe

9    70 the year before that.  50 the year before that,

10    30 the year before that.  But in 2001, we were

11    probably on about -- 2000, 2001, we were probably

12    about 6 million.

13      Q.    And your organization puts out annual

14    reports telling people where their money is going.

15    Is that correct?

16      A.    Yes.

17      Q.    All right.  I want to show you something

18    that I've marked AK-2.  And if I could have the

19    witness shown this.

20              MR. WAX:  May we have a copy, Chris?

21              MR. CARDANI:  I've got one other copy

22    and it's floating around.

23              (Pictures shown to witness.)

24    BY MR. CARDANI:

25      Q.    Mr. Khan, do you recognize that as the

1    Islamic Relief U.S.A 2002 annual report?

2        A.    Yes.

3        Q.    And this was put out by Islamic Relief to

4    people worldwide to show the many activities that

5    your organization was doing around the world to help

6    refugees.

7        A.    It was produced for the American market,

8    yeah.

9        Q.    Okay.  And is it true that this 2002

10   report involves some work that you're doing in

11   Chechnya?

12       A.    It should do -- yes, it does.

13               MR. CARDANI:  Offer AK-2.

14               MR. WAX:  Objection on relevance

15   grounds, Your Honor.

16               THE COURT:  Received.

17   BY MR. CARDANI:

18       Q.    Now, AK-2, if we could show that to the

19   jury, is that the face page of this pamphlet?

20       A.    Yes.

21       Q.    If you could go one page -- there's a

22   table of contents and that lists areas of the world

23   that you do in your work, Palestine, Afghanistan,

24   and then Chechnya and Ingushetia.

25       A.    Those are some of the places, yeah.

1    Q.    If we could go two more pages up, and

2    there's a reference here to emergency relief

3    projects --

4    A.    Yes.

5    Q.    -- including Afghanistan, Chechnya, Congo,

6    and the Palestine, total beneficiaries over 700,000.

7    Is that dollars or people?

8    A.    People.

9    Q.    That you've helped?

10    A.    Yes.  In that year alone.

11    Q.    And then down below, Ramadan projects?

12    A.    Yes.

13    Q.    Several areas of the world, conflict

14    zones, but includes Chechnya where you've helped

15    over half a million beneficiaries?

16    A.    Yes.

17    Q.    And down below, could you describe what

18    these projects are.  I don't know how to say them or

19    what they are.

20    A.    Oh, Qurbani projects is meat distribution.

21    Q.    What?

22    A.    Meat.  Meat distribution.  We believe in

23    the Qur'an that the profit Abraham was willing to

24    sacrifice his son for God, and instead of giving his

25    son, he instead sacrificed an animal, so that's

1    still practiced in the Muslim law.  And we encourage

2    to donate at least one-third of that to charity, but

3    in America we're encouraging the Muslims here to

4    donate 100 percent to charity.

5              So often this is a source of protein that

6    children get in refugee camps.  In many parts of the

7    world it's the only time they're going to eat meat

8    the whole year.

9    Q.    And is this saying that you helped feed 1

10   million people in these areas of the world during

11   this time?

12   A.    Yes.

13   Q.    And then off to the left, health and

14   nutrition projects --

15   A.    This was actually demarked for Islamic

16   Relief Worldwide.  That was the whole family of

17   Islamic Relief.

18   Q.    Yeah?

19   A.    Not just what we did in the U.S.A.

20   Q.    Understand.  And that involved Chechnya?

21   A.    Yes.

22   Q.    And then health and nutrition projects

23   involves Chechnya where you helped 234,000 people?

24   A.    Yes.

25   Q.    If we go three more pages up, and I see

1    that Chechnya is a -- is featured as a country focus

2    here.

3         A.    Yes.

4         Q.    And without reading the whole thing, it

5    talks about the -- in October 1999 hostilities

6    erupted anew in Chechnya and thousands of Chechens

7    were forced to flee across the border into

8    Ingushetia and IRW was one of the first aid agencies

9    to respond to the needs of the displaced Chechens.

10   Is that right?

11        A.    Yes.

12        Q.    It talks about your activities that you

13   were doing down here, but this break-out section on

14   Chechnya, it talks about you directly helping

15   101,000 refugees that were involved in that

16   conflict.

17        A.    That is all of the Islamic Relief

18   together, and our contribution from the U.S. was

19   $646,000.

20        Q.    Okay.  That's off to the right, yeah.  We

21   could block all that up.

22             So total Islamic Relief, U.S.A.

23   allocations, projects in Chechnya, over $600,000.

24        A.    Yes.

25        Q.    And if we could go a little bit up top

1    now, this picture here says it's a Chechen boy

2    receiving a food pack in a Sputnik refugee camp in

3    Ingushetia?

4        A.    Yes.

5        Q.    And the box that he's holding right there,

6    is that the type of work that your organization was

7    doing in Ingushetia?

8        A.    Yes.

9        Q.    Distributing food boxes and kits?

10       A.    Yes.

11       Q.    And down below what's this 18-wheeler

12   here?

13       A.    This is one of the lorries that was

14   carrying the food parcels.  We at this time had an

15   agreement with the U.N. World Food Program.  We were

16   partnering with them, and we were feeding, as you

17   can see, over 100,000 people we were helping at that

18   time.  So we needed a fleet -- convoy of trucks to

19   distribute the aid.

20       Q.    And if we could go further towards the

21   end, there's a management report.  Why is this

22   report put out?

23       A.    Where is it?

24       Q.    This annual report, this whole book.  Why

25   does IRW even distribute this?

1        A.     Oh, we did this to inform our donors and

2    to inform the general public.  It's extremely

3    important that people know where their money is

4    going, so every year we produce an annual report,

5    which has a financial breakdown in the end, but it

6    also mentions the projects and gives people a flavor

7    of the work that we do.

8        Q.     And you mentioned earlier that it's

9    important to keep good records to show that you're

10   really doing what you say with the money that you

11   raise?

12       A.     Yes.

13       Q.     And here we see a management report

14   talking about revenue in 2000 of over $5 million.

15   Do you see that on the -- look on the screen, sir,

16   to your right.

17       A.     Yes, yes.

18       Q.     Okay.  And then scrolling it down, there's

19   some pie charts here, and it gets into pretty good

20   details about the breakdown of where the money is

21   actually going.

22       A.     Yes.

23       Q.     And the last page I want to talk to you

24   about is the next one.  Do you have your annual

25   statements and your records officially audited?

1    A.    Yes.

2    Q.    And that requires you to spend a lot of

3  money hiring CPAs to dig into the books to make sure

4  that you did what you said you were going to?

5    A.    Yes.

6    Q.    And is this a statement of the auditors at

7  the end saying that they're satisfied after this

8  detailed review that you have accomplished your

9  mission?

10    A.    Yes.

11    Q.    Now, how would the auditors and

12  accountants know that you're doing the things that

13  you say you are with the money?

14    A.    That's not my area.  I'm a fund-raiser.

15  You'd have to ask the lawyers and our accountants.

16    Q.    Okay.  And I think that's the point, sir,

17  is that you have a series of lawyers and accountants

18  that your organization works with to help make sure

19  that you're getting it just right with the IRS, for

20  example?

21    A.    Yeah.  We have our in-house lawyers, we

22  have our in-house accountants, and then when we do

23  the audit, it's done by outside accountants, and we

24  also have other lawyers, as well.

25           MR. CARDANI:  Mr. Khan, that's all I

1    have for you.  Thank you.

2                    THE COURT:  Redirect?

3                    MR. WAX:  Yes.  Thank you, Your Honor.

4                     REDIRECT EXAMINATION

5    BY MR. WAX:

6        Q.    Mr. Khan, just a couple more questions.

7    You're clearly part of a very large charitable

8    organization.

9        A.    Yes.

10       Q.    Have you experienced differences in the

11   quality of recordkeeping between large organizations

12   such as yours and others that operate on a much

13   smaller scale?

14       A.    Yes.

15       Q.    Al-Haramain Saudi Arabia, there's been

16   testimony in this case that the al-Haramain Saudi

17   Arabia charity operated in 40 or 50 countries, and

18   worldwide had a budget of some 60 or $70 million.

19            Did you look for a similar report in Saudi

20   Arabia published by al-Haramain reporting on its

21   activities in its home country?

22       A.    No.

23                    MR. WAX:  Thank you.  I have no

24   further questions.

25                    THE COURT:  Thank you.  You may step

```
 1    down.  Thank you, sir.  You're excused.
 2                    Your next witness, please.
 3                    MR. MATASAR:  Jeff Cone.
 4                    (The witness was sworn.)
 5                    THE CLERK:  Please have a seat.
 6    Please speak into the microphone.  There's water
 7    here if you're thirsty.
 8                    Please state your name, then spell
 9    your name for the record.
10                    THE WITNESS:  My name is Jeffrey A.
11    Cone, J-E-F-F-R-E-Y, A, C-O-N-E.
12                        DIRECT EXAMINATION
13    BY MR. MATASAR:
14        Q.    Mr. Cone, what do you do professionally?
15        A.    I'm a CPA, been one since 1979.  Then I
16    joined International Accounting Firms and was with
17    them for ten years.  And then in 1992, I formed --
18    yes.  In 1992 I formed my own company and moved up
19    here and have been doing litigation consulting.
20        Q.    Okay. Anything else you do?  You work
21    with computer programming and such?
22        A.    Yes.  I'm a forensic accountant focusing
23    on forensic investigations of both accounting and
24    data, and I've been doing that mostly since nineteen
25    -- actually, I started doing that in 1998, and I've
```

1    been doing that ever since.

2        Q.    And when you say a forensic accountant, do

3    you have tools that you use or do you --

4        A.    Yes.

5        Q.    -- created that assist you in your

6    forensic accounting?

7        A.    Yes.  I've developed various software

8    tools that do assist me with the accounting -- with

9    doing forensic investigations.  And we'll talk about

10   one of those later.

11       Q.    And how do you spend most of your time,

12   say, in a year?  What percentages doing what?

13       A.    Probably 50 to 60 percent, I would guess,

14   would be forensic accounting, that investigation

15   area.  And the rest of it, you know, is some

16   administrative obviously.  And then also I do just

17   regular software development for clients that needed

18   to and --

19       Q.    And you work on civil and criminal

20   matters --

21       A.    Yes, I do.

22       Q.    -- in your forensic line --

23       A.    Uh-huh.

24       Q.    What did we ask you to do on this case?

25       A.    You asked me, first of all, to identify

1   out of a collection of files that were provided to

2   me by the public defender's office.  A collection of

3   what I'd call the relevant QuickBooks files, first

4   of all.  Then I was asked to retrieve both the data,

5   you know, that the user had entered, and the

6   metadata that the computer system or QuickBooks

7   creates about data inside the data.  Okay.

8           Then I was also asked to analyze the

9   QuickBooks files, and then to analyze the accounting

10  -- the other accounting information in al-Haramain's

11  work papers -- I mean al-Haramain's accounting

12  information -- and then to review Mr. Wilcox's work

13  papers.

14      Q.    So during the course of the work on this

15  matter, were you given various QuickBooks files?

16      A.    Yes, I was.

17      Q.    Okay.  And what -- you were given distinct

18  files.  What were the ones that you were given?

19      A.    Well, I was given a whole number of files,

20  but what I did find is three distinct QuickBooks

21  files that related to this particular case.  And

22  they are the -- there is -- the first one was one

23  dated -- I call it the May 14th, 2001, file.

24          And this is a file Mr. Seda emailed to

25  Mr. Wilcox, and he also emailed this one to

1    Mr. Shoumar on June 12, 2001.  This is -- that's

2    consistent with the work that al-Haramain had done

3    in terms of entering checks and two deposits.

4        Q.    And the second file was what?

5        A.    Was one dated June 13th, 2001, where

6    Mr. Wilcox provided a floppy disk to Mr. Seda.

7        Q.    And the third file?

8        A.    Was a -- it was a file that the activity

9    ended on October 2nd, 2001, but it was emailed by

10   Mr. Wilcox to Mr. Seda on January 7th, 2002.

11       Q.    And that was the primary file that you

12   used for most of the -- for all of the work you're

13   going to testify about?

14       A.    Virtually all the work really came from

15   that last file.

16       Q.    And you're also an auditor, you say.  So

17   you looked at Mr. Wilcox's work papers?

18              MR. CARDANI:  I'm sorry.  I missed the

19   date on that, the transmission of the third one.

20              THE WITNESS:  Was -- I believe it was

21   January 7th, 2002.

22              MR. CARDANI:  And that was from

23   Mr. Wilcox to Mr. Seda?

24              THE WITNESS:  Yes.  From Mr. Wilcox to

25   Mr. Seda with the last activity as of October 2nd,

1    2001, so there's about a three-month gap there.

2    BY MR. MATASAR:

3        Q.    Okay.  And so you're saying it was

4    transmitted in January of 2002, but the last work

5    was done in October of 2001.

6        A.    Yes.

7        Q.    And that's the primary file you used.

8        A.    That is the primary file.  Turned out to

9    be, yes.

10       Q.    So how did you identify -- you just

11   mentioned the last date of activity --

12       A.    Yes.

13       Q.    -- in this QuickBooks file.  How did you

14   identify that?

15       A.    Identified that using what is called

16   metadata.  You know, QuickBooks keeps inside of it

17   or tracks inside of it the date and time a record

18   was both created and it was last modified.

19            And so using some of the software tools I

20   developed, I was able to retrieve all that data out

21   of the QuickBooks files, do a sort, see what the

22   last date was.

23       Q.    Tell the jury a little bit -- I mean if

24   you put information in a program, let's say you're

25   typing a letter, and you write, "Dear John" or

1    you're doing a spreadsheet, and you add one, two,

2    three, four, five.  That's the data that the user

3    enters into a computer program.  Right?

4          A.    That is correct, yes.  You also --

5          Q.    What's the difference --

6          A.    I'm sorry.  Go ahead.

7          Q.    What's the difference between that data

8    and metadata?

9          A.    Okay.  So metadata is data about data.

10   Okay.  So start -- I think a good example would be

11   you have quick -- you're doing a little Word file

12   and you type in a letter to your mom.  And you type

13   it in, and you start typing it.  Well, as Word

14   creates the file, it's creating information about

15   that, what you're doing.  It's keeping track of the

16   moment you created it.  It's keeping track of who

17   the author is.  It's keeping track of how many words

18   you've typed.  It keeps track of what the last date

19   it was printed, things like that.  There's a wealth

20   of information.  Some of it you can see, some of it

21   you don't -- the program doesn't let you see because

22   you don't really need to see it often.

23         Q.    Okay.  So sometimes users themselves can

24   see the metadata.

25         A.    Yes.

1    Q.    And can they edit it?

2    A.    Sometimes they can.  For example, in Word,

3    there's a way to enter a description of the document

4    that's not printed as part of the document, but it's

5    something that you can put in there to remember why

6    you wrote the document.  If you wanted to.  It's not

7    very often used, I don't think, but it's there if

8    you want to edit it.

9    Q.    And some metadata cannot be changed by the

10   user.

11   A.    Yes.  That's right.  The time created, no

12   matter how much you might want to change that in a

13   Word file, you can't change it.

14   Q.    And what about in QuickBooks --

15   A.    It's the same --

16   Q.    Could you change the time a document was

17   created?

18   A.    Well, you can't change it.  I think you

19   meant the time that a record was created.

20   Q.    A record was created.

21         So QuickBooks -- so Word creates that time

22   created for the whole file.  In QuickBooks each

23   accounting record is -- has its own unique creation

24   date and modified date.

25   A.    (No audible response.)

```
1        Q.    Okay.

2        A.    And no, it can't be changed.  I want to

3   make sure at that point.

4        Q.    Okay.  So I'm going to show an exhibit

5   that's been admitted, 755.7.

6        A.    All right.

7              MR. MATASAR:  Well, this exhibit, do

8   we have a substituted version?

9              (Indistinct speaker.)

10             MR. MATASAR:  The substituted version

11  is in.

12             (A discussion was had off the record.)

13             MR. MATASAR:  All right.  Your Honor,

14  why don't we not publish it to the jury yet, and

15  let's see if I can see the first page of 755.7.

16             THE COURT:  Members of the jury, that

17  word "published" just means show it to you.

18             MR. MATASAR:  Sorry.

19             THE COURT:  It's all right.  It's not

20  complicated.  Only lawyers.

21             MR. MATASAR:  Okay, Your Honor, this

22  has been admitted.  This is the substituted version

23  so we can show it to the jury now.

24             THE COURT:  Thank you.

25             MR. CARDANI:  Publish it to the jury.
```

BY MR. MATASAR:

Q.    So you see that on your screen, Mr. Cone?

A.    Yes, I do.

Q.    Could you identify what this document is?

A.    Yes.  This is the audit trail from -- that
was provided to me by the public defender's office,
which I believe -- I understand that it got --
received from the government, that is of -- that
matches up with the October 2nd, 2001, QuickBooks
file.  And I believe it was printed from that file
because I printed the schedule from that same file
that looked exactly like this.

Q.    Okay.  So let me maybe blow up the top
left part --

A.    Yes.

Q.    -- and ask if you if there's any metadata
on this report.

A.    Yes.  The metadata on this report -- I can
touch this.  Right?

Q.    Yes.

A.    It's right there (indicating).

Q.    And what does that show?

A.    It tells us that this -- that record was
entered or last modified on April 22nd, 2001, at
18:44:38, which is, of course, military time for six

1    o'clock, or 6:44.

2         Q.    Now, does that 6:44 reflect the time the

3    transaction was entered or last modified at the

4    place where it was entered or at the place where it

5    was printed?

6         A.    It's interesting.  It's at the place it

7    was printed.

8         Q.    Okay.  So if, for example, this document

9    was -- this record -- is that what you would call

10   it?

11        A.    We'd call it this record, right.

12        Q.    9/4/01?

13        A.    Right.

14        Q.    So if this record was entered in Oregon at

15   15:44:38 --

16        A.    Yes.

17        Q.    -- and printed in, say, Washington or New

18   York even years later -- even years later, it would

19   say 18:44?

20        A.    That's correct.

21        Q.    And have you -- are you sure of this?  How

22   do you know that this is the case with this

23   particular document?

24        A.    I printed out this exact same schedule on

25   my computer in Oregon and the exact same record

1    shows up exactly three hours different.  I mean down

2    to the second, 44:38.  So I became very convinced of

3    that, yeah.

4         Q.    All right.  So, Mr. Cone, from this

5    report, can you tell when the transaction, this,

6    say, 9/4/01 was first entered into QuickBooks?

7         A.    No, you really can't.

8         Q.    What does that 18:44:38 tell you?

9         A.    That tells me that the last moment, down

10   to the second, of when somebody actually last

11   changed it.  Now, if they've never changed it, it

12   would be the same as creation, but I can't tell it

13   from this.

14        Q.    Does the QuickBooks program provide a way

15   -- the program itself -- provide a way to see the

16   date that a document -- a record was first entered?

17        A.    No, it does not.

18        Q.    However, it stores that information, the

19   date it was first entered?

20        A.    That is correct.

21        Q.    And how does it store it?

22        A.    Stores it as a field just like it stores

23   the last modified date.  So if you look at the --

24   when I use the -- shall I go into the tool --

25        Q.    No, no.  Just first let me ask you.  It

1    stores it.

2        A.    Yes.

3        Q.    And it's a kind of metadata that you were

4    talking about?

5        A.    Yes.   Exactly.   It's a metadata field,

6    yes.

7        Q.    So it's somewhere inside the program, but

8    the user using QuickBooks can't cull it out.

9        A.    Yes.   That is correct.

10       Q.    Okay.   So how is it that you can go deeper

11   into the QuickBooks program to see this information?

12       A.    Yes.   There's -- the manufacturers of

13   QuickBooks also have produced or allowed or

14   distribute, let's call it, a product called an SDK

15   or software developer kit, that allows programmers

16   to interact with QuickBooks, retrieve data, actually

17   update, you know, pieces of information that are

18   allowed.

19            But what I did is I got my hands on this

20   QuickBooks software developer kit and figured out

21   how to program it so that I could then ask

22   QuickBooks to send me all the information inside a

23   QuickBooks file that I needed.   And when I did that,

24   I was able to retrieve both the time created and the

25   time last modified, as well as other metadata about

1    -- you know, the data and metadata that was in for

2    each record.

3         Q.    So let me first ask, this SDK that you

4    mentioned, software developers kit, is that a common

5    thing used for -- throughout the computer industry?

6         A.    Yes.

7         Q.    So there might be one for Excel, there

8    might be one for Word, there might be one for iTunes

9    or whatever --

10        A.    I wouldn't say --

11        Q.    iPhone --

12        A.    The various programs can -- a programmers

13    -- a program -- the manufacturers of the program can

14    decide to distribute it, you know, and sometimes use

15    that term, sometimes don't, but --

16        Q.    And sometimes they sell it?

17        A.    Sometimes it's sold, yes.

18        Q.    And did you develop your own program to --

19    with the SDK --

20        A.    Yes.

21        Q.    -- the software developers kit to get at

22    this information inside -- deep inside QuickBooks?

23        A.    Yes, I did.

24        Q.    Okay.  What did you call your program?

25        A.    I called my program QuickBooks viewer.

1    Q.    Okay.  And do you market that?

2    A.    No, I don't.

3    Q.    Maybe someday or not --

4    A.    Someday.

5    Q.    So what does it do, the QuickBooks viewer?

6    A.    The QuickBooks viewer basically goes

7    through and it goes through all the objects that the

8    SDK allows or publishes, let's call it, that you can

9    access, and I just draw every piece of information I

10   can out of QuickBooks just so that I have a tool

11   that I can now forensically look at the information

12   inside of QuickBooks and present it in a way that

13   would be useful to investigators in forensic

14   environments.

15   Q.    And you processed with the QuickBooks

16   viewer the files that we've talked about earlier.

17   A.    Yes.

18   Q.    Okay.  And using this viewer, are you able

19   to create a report that would look just like the

20   audit trail, except add some of the additional

21   fields that are in the metadata?

22   A.    Yes.

23   Q.    Okay.  Now, I'd first like to show to the

24   Court and counsel 755.8.

25                Now, Mr. Cone, you've compared this to the

1    755.7?

2         A.    Yes.  The --

3         Q.    The audit trail.

4         A.    Yes, I have.

5         Q.    Okay.  And is it your opinion that this is

6    the same as that -- same data except it also

7    includes a column for the time the transaction was

8    created?

9         A.    Yes.  It's -- well, it's identical for

10   that except for two things.  One, I added the last

11   modified date --

12        Q.    Which is already -- isn't that already in

13   it?

14        A.    Yeah.  The created date and the time

15   modified date as two separate fields.

16        Q.    Okay.

17        A.    I also added a unique -- or the

18   transaction number, which QuickBooks assigns to each

19   transaction that is entered, which by default is not

20   included on the audit report, but it's something

21   that you can get to from within the QuickBooks

22   software.

23             I did notice one other slight change, and

24   the original audit trail does have a status field --

25   I believe it's called a status field -- that I have

1    not included on mine because it doesn't add any

2    meaningful information.

3        Q.    Well, let me ask you about the transaction

4    number.  Every time you do something in QuickBooks,

5    the program assigns a sequential transaction number.

6    Is that correct?

7        A.    That is correct.

8        Q.    And you can't change that.

9        A.    Nope.

10        Q.    Okay.  So if you put in, let's say,

11    Transaction No. 523, and it's a check for $200 to

12    John Smith, and that's given that transaction

13    number, when you want to wipe that off QuickBooks --

14        A.    Uh-huh.

15        Q.    -- you can't do that.  That transaction

16    number stays there.

17        A.    Right.  If you want -- you could delete

18    that transaction --

19        Q.    Right.

20        A.    -- but then -- the next transaction you

21    would add, it would put the next number in, I

22    believe.

23        Q.    So there would be a --

24        A.    There'd be a gap.

25        Q.    -- missing number.

1    A.    Yes.

2            MR. MATASAR:  Okay.  Your Honor, I'd

3    move for the admission of 755.8.

4            MR. CARDANI:  We're having trouble

5    finding our copy of that.  Can we get a copy of that

6    and take a look at it?

7            (A discussion was had off the record.)

8            THE COURT:  Members of the jury, I

9    think we'll take a short break.  All right.

10           (Jury absent.)

11           THE COURT:  I'm sorry to interrupt,

12   Counsel.  We're losing the jury.

13           MR. MATASAR:  I lost the flip on this

14   case, Your Honor, and that's how it's going to go.

15   I'm sorry.  No gore and guts for me.  What can I

16   say?

17           THE COURT:  I'd get to your stuff you

18   want to say.  You make your own decision.

19           MR. CARDANI:  We do have one matter to

20   talk about before the next witness.  Is Mr. Long

21   next?

22           MR. WAX:  Yes.  Long is next.

23           MR. CARDANI:  Okay.  I think

24   Mr. Gorder wants to be heard.

25           MR. GORDER:  Your Honor, just before

1    we started after the lunch break, Mr. Wax indicated

2    that if -- that he does intend to have Long talk

3    about these Saudi receipts that are not in evidence.

4    And, you know, we intend, you know, to question him

5    about the credibility in light of the designations

6    of al-Haramain.  And he suggested he's going to nail

7    a lot of facts about the evidence, so I wanted to

8    bring that to the Court's attention now rather than

9    in the middle of cross-examination.

10                THE COURT:  Mr. Wax?

11                MR. WAX:  If I heard you correctly,

12   Your Honor, you indicated that you believed that the

13   door had been opened to the government going into

14   the designation through Colonel Lang's testimony.

15                In light of that, it seemed to me that

16   I have -- well, I object to that ruling that I have

17   no choice, particularly because Mr. Cardani spent so

18   much time with Mr. Owens insinuating that there was

19   a theft of $21,000 orchestrated by Mr. Seda and

20   Mr. al-But'he, and to argue that the $21,000 was

21   diverted into Mr. al-But'he's personal account when

22   the government is fully aware that Mr. al-But'he

23   received a receipt from the al-Haramain organization

24   on March 14 and March 28th for $187,000, and that

25   receipt has Account No. 9889 for the Al Rajhi Bank

1    and they didn't bother to get it is entirely

2    inappropriate.

3            That having been done and having been

4    permitted, I don't see that we have any choice but

5    to be permitted to go into the existence of these

6    receipts in detail.  The fact of the designation, it

7    seems to me, Your Honor, is completely irrelevant to

8    that issue.  Moreover, the designation has been

9    challenged and the designation is not final.

10            The designation case is on appeal in

11   the 9th Circuit, and I don't believe that it would

12   be appropriate to inform the jury about the

13   designation.  Then we have to inform the jury that

14   the designation has been appealed and it's not

15   final.

16            Moreover, the challenge to the

17   designation has been proceeding without the lawyers

18   for al-Haramain having the opportunity to review

19   classified material.  And what we believe we would

20   be able to do far more effectively than they is to

21   present the case as to why that designation is

22   inappropriate.

23            Finally, the designation of

24   al-Haramain that took place and the designation of

25   Mr. al-But'he was specifically done without a

1    designation of my client, the person at issue here.

2              So for all those reasons, we do not

3    believe that the government should be permitted to

4    do it.  We believe that they have required us to go

5    forward with this evidence to come back with an

6    inference they are asking the jury to draw that is

7    contrary to facts that are in their possession and

8    contrary to facts that they could have obtained, but

9    chose not to.  That's the issue.

10             THE COURT:  All right.  I think we're

11   going to be forced to have a secured little session,

12   so we'll do that in a few minutes.

13             (A recess was taken.)

14             (Closed session was held.)

15             MR. MATASAR:  Your Honor, now that

16   Mr. Cardani's seen 755.8, we would move for its

17   admission.

18             MR. CARDANI:  No objection.

19             THE COURT:  Received.

20             MR. MATASAR:  Why don't you just show

21   that to the jury again.

22   BY MR. MATASAR:

23     Q.   So, Mr. Cone, you see this is the audit

24   trail emulation that you prepared.  It's got that

25   created date and the transaction date.  Could you

1    just mark those on the screen or maybe circle them

2    over there on the left.

3        A.    There is the created date and last

4    modified is right next to it.

5        Q.    And right to the left of your red line is

6    the transaction number.

7        A.    Correct.  Right there (indicating).

8        Q.    Now, Mr. Cone, using the metadata in the

9    QuickBooks files, have you also been able to

10   identify the periods of data entry activity?

11       A.    Yes, I have.

12       Q.    And about -- so that means the times that

13   people that were entering into QuickBooks?

14       A.    Yes.

15       Q.    Okay.  Have you prepared a demonstrative

16   exhibit showing these periods on a simple timeline?

17       A.    Yes, I have.

18       Q.    Okay.  Let me show the Court and counsel

19   1064.  And that's a timeline showing the time that

20   data was entered in QuickBooks?

21       A.    Yes, it is.

22            MR. MATASAR:  Okay.  Move for

23   demonstrative purposes that 1064 be admitted.

24            MR. CARDANI:  With those restrictions,

25   no objections.

1          THE COURT:  Received.

2    BY MR. MATASAR:

3        Q.    So, Mr. Cone, could you just describe this

4    chart?

5        A.    Sure.  You can see there on March 30th the

6    QuickBooks file was started.  Now, I want to make

7    clear, the QuickBooks file we're talking about is

8    different versions of the very same file.  It's not

9    brand-new files each time.  So they started the file

10   on March 30th, but didn't do really anything about

11   it.  They just created one account, not really even

12   any transactional data.

13          Finally on 4/16 -- between 4/16 and May

14   14th, al-Haramain recorded 516 checks and two 2000

15   year deposits.

16       Q.    Okay.  And then nothing much happened

17   until May 30th?

18       A.    That's correct.  When -- and May 14th we

19   know is also the date that it was emailed by

20   Mr. Seda to Mr. Wilcox.

21       Q.    Okay.  So Mr. Wilcox then entered data on

22   5/30 through 6/13, which is on the bottom?

23       A.    That's correct.  And he entered 25

24   reconciling items which comprised 66 bank items, and

25   there were also six other entries.

1    Q.    And then September 19th to October 2nd?

2    A.    Right.  Nothing was done on the file

3  between -- until then.  And then on September 19th,

4  he then does the year 2000 work for that tax return

5  making those types of entries.

6    Q.    So, Mr. Cone, you showed us the audit

7  trail you prepared, 755.8.

8    A.    Uh-huh.

9    Q.    Could the QuickBooks viewer produce all

10  the reports, just like QuickBooks does, just pick

11  and choose things that you think are most important

12  to help you understand the file?

13    A.    Yes.  I could, yes.

14    Q.    And so did you make one of the Springfield

15  building schedule?

16    A.    Yes, I did.

17    Q.    Okay.  Could you show -- I believe this is

18  -- well, let me just not publish it to the jury.

19  This is 1065.

20          Okay.  So these are the items coded to

21  Springfield building?

22    A.    Yes.

23    Q.    Okay.  From your file and your QuickBooks

24  viewer.

25    A.    Yeah.  As printed by my QuickBooks viewer.

1    This is the same information as in QuickBooks, yes.

2              MR. MATASAR:  So I'll move for the

3    admission of 1065.

4              MR. CARDANI:  If I may have a moment.

5              (A discussion was had off the record.)

6              MR. CARDANI:  Thank you.  No

7    objection.

8              MR. MATASAR:  Show it to the jury

9    then?

10             THE COURT:  What was the number again?

11             MR. MATASAR:  Defense 1065.

12             THE COURT:  Thank you.  It's received.

13   BY MR. MATASAR:

14        Q.    So what I'd like to show you also is on

15   the same screen an exhibit that we have a number of

16   42345 but it's really TW-2, Springfield building

17   schedule, and I'd like to show those on the screen

18   at the same time.

19        A.    All right.

20        Q.    So while we're doing that, Mr. Cone, can

21   you describe the difference between your emulation

22   version of the schedule, which is on the top

23   there --

24        A.    Right.

25        Q.    -- 1065 and the Springfield building

1    schedule on the bottom?

2        A.    The main differences are I've added this

3    -- I blocked it out -- the transaction number, the

4    time created, and the time modified.  I just wanted

5    to make sure it's clear.  When I have a little arrow

6    by the time modified, that means it's identical to

7    the time created, which then means that record was

8    never edited.

9        Q.    Okay.  And so there's an extra item, is

10   there not, in your schedule?

11       A.    Yes.  I have added the -- what -- on my

12   schedule, as it also appears in QuickBooks, the 9/15

13   $4,000 entry to Islamic Center Springfield.

14       Q.    So can you describe how QuickBooks itself

15   -- look at 42345, Mr. Wilcox's, working papers.

16       A.    Yes.

17       Q.    Got a time there.  How was that created by

18   Mr. Wilcox?

19       A.    So Mr. Wilcox would have created this by

20   going into the QuickBooks program and picking out

21   the report generator, and then specifying that he

22   wanted all of the transactions for the Springfield

23   account, the Springfield building -- you can see

24   that right there, okay -- and that were through or

25   as of -- on or before December 31st, 2000.

```
 1        Q.    So --

 2        A.    The date of this report here.  Go ahead.

 3        Q.    So why is the $4,000 that's on yours not

 4   on Mr. Wilcox's?

 5        A.    There's two reasons.  Well, actually --

 6   the reason is, is because at the time that

 7   Mr. Wilcox printed this schedule -- see right here,

 8   I'm blotting it out unfortunately -- this check was

 9   actually -- had been recorded as being in the wrong

10   year.  It had been recorded in 2001.  And I think we

11   have an exhibit to show that --

12              MR. MATASAR:  Which is 1238-E, which

13   is also 755 -- just show it to the witness.  And if

14   you can enlarge the top part of it.

15   BY MR. MATASAR:

16        Q.    Okay.  This comes from Mr. Wilcox's

17   working papers.  Right?

18        A.    Yes, it does.

19              MR. MATASAR:  Well, I move it in for

20   it's admission, Your Honor.  I think it will help

21   the jury understand this.  I don't think we need any

22   further authentication.

23              MR. CARDANI:  Yeah.  I don't object to

24   that.

25              THE COURT:  Received.
```

BY MR. MATASAR:

Q.    Mr. Cone, do you see a $4,000 check there?

A.    Yes.  See it right here.

Q.    And do you see anything unusual about that check?

A.    Well, you can see that it's circled in red, which I believe Mr. Wilcox did.  And it's -- you can see the date is 9/15/2001.  So when Mr. Wilcox printed the schedule out, as of -- I think it's ten o'clock -- something like ten o'clock -- at that moment inside QuickBooks, that check was dated 9/15/2001, so it was excluded from the Springfield schedule that he had printed out.

Q.    Because he was printing out -- he was doing the 2000 tax return.  Right?

A.    Yes.

Q.    So he wanted to know everything that had to do with the year 2000?

A.    That's correct.

Q.    And he had mistakenly coded this as 2001, so when he told it to print it out on 42345, we could show that if --

A.    TW-2.

Q.    Right.  It didn't include it?

A.    That's correct.

1      Q.     So at the time this was printed out by

2  Mr. Wilcox, he had really already coded it?

3      A.     That's correct.  If we could go back to

4  the -- to my emulation.

5      Q.     Now, could you determine if you looked

6  at -- hold on a second.

7              Can you determine when the $4,000 was

8  first coded?

9      A.     Yeah.  If we could go back to my emulation

10  of the Springfield report.

11      Q.     Yeah.  Okay.

12      A.     Show that again.

13      Q.     Why don't we look at 755.7.  This is

14  yours, okay.

15      A.     If you go ahead and highlight the top

16  part, you see on that 4,000 on the -- maybe

17  highlight the fourth row down -- can you do that?

18              And then you can clearly see that the time

19  created is on 9/20/2001, four days before he printed

20  the Springfield schedule.  And that he modified it

21  at 9/24 at 14:06.  Now, we have to be careful with

22  that time.  That 14:06 is what is known as Pacific

23  standard time, and it gets confusing because the SDK

24  retrieves the data in standard time even though

25  daylight time is effective, the QuickBook reports

1    are all reflecting daylight time.  This is standard

2    time, so you have to mentally convert it.

3        Q.    Okay.  So let me show you -- so we know

4    Wilcox coded it on the 20th.

5        A.    Yes.

6        Q.    Let me show you the audit trail that he

7    looked at.

8        A.    Yes.

9        Q.    That's 755.7, page 48.  We know he coded

10   it on the 20th.

11       A.    Yes.

12       Q.    But what I want to ask you is -- let's

13   look at this.  And maybe highlight the second line.

14   Okay.  If somebody were looking at the audit trail

15   and they didn't know anything about metadata and

16   they were trying to figure out when they coded the

17   $4,000 item, might they have picked -- and they

18   didn't know, as I said, anything about metadata --

19   they might have chosen 9/24/2001 as the time they

20   first coded that item?

21       A.    Yes.  That is a distinct possibility

22   because the label on that column also says

23   Entered/Last Modified.  And as we talked about,

24   somebody looking at it wouldn't necessarily know

25   whether they had made any modifications.

1    Q.    Correct.  So somebody who didn't know as

2    much as you know about QuickBooks and were asked

3    when they first coded it, they'd pick this time?

4    A.    Yes.

5    Q.    But that would be wrong because we know it

6    was coded and entered on 9/20.

7    A.    That is correct.

8    Q.    Now, you've also mentioned that you

9    prepared a schedule -- let's show the witness

10   755.13.  What is this document?  Can you identify

11   what this is?

12   A.    This is another report I printed for my

13   QuickBooks viewer.  It is a listing of all the

14   activity where Mr. Wilcox created a record from

15   September 19th through September 24th, 2001.

16            MR. MATASAR:  Okay.  I'll move for the

17   admission of 755.13.

18            MR. CARDANI:  If we could take a look

19   at it.  We have it.  I just want to look at it.

20            (A discussion was had off the record.)

21            MR. CARDANI:  No objection.

22            THE COURT:  Received.

23   BY MR. MATASAR:

24   Q.    This essentially shows Mr. Wilcox's work

25   flow, what he's doing every few seconds, every few

1    minutes?

2        A.    Yes.

3        Q.    Within QuickBooks.  It doesn't show he's

4    -- it just shows QuickBooks.

5        A.    Just shows QuickBooks.

6        Q.    Okay.  In general, what can you tell us

7    about his schedule as he's working?

8        A.    If you -- first of all, if you look down

9    the transaction dates, you can see the transaction

10   dates are fairly chronological.  He starts on 1/28

11   and then -- 1/28, then 1/28, 1/31, and then there's

12   -- starts in February and then March and the

13   impression certainly is that he was just going

14   through the bank reconciliations entering all the

15   activity that al-Haramain had not entered for the

16   2000 time frame.

17       Q.    Okay.  So those are the dates that he

18   entered from the transaction.

19       A.    Right.

20       Q.    The time that he is actually doing this

21   would be the first column.  Is that correct?

22       A.    Yes, the first column.  So, for example,

23   what I've done here -- I will chart here, and I'll

24   just read it off to you is -- I took a look at the

25   time frames between each entry.  If you start with

1    the February 29th entry, which is the fourth one

2    down, which is labeled 558 --

3         Q.    Sorry.  That would be Transaction No. 558?

4         A.    Yes.

5         Q.    Okay.  Maybe we can start there and then

6    the jury can follow down there and read while you're

7    doing this.

8         A.    Well, the next record down, he's entered

9    -- he saved -- this is the moment that he presses

10   save.  You know, when you're working with data, you

11   usually have to press save --- and that's the case

12   with QuickBooks.

13             So the next one down he created in four

14   minutes and two seconds later.  Okay.  If you do the

15   math, I think it works out.  560, the next one down

16   is created 40 seconds after the prior one.  The next

17   one, which is now the first record in March, so if

18   you're thinking about his work flow, he would have

19   -- Okay, I'm done with February.  Maybe put it on

20   the QuickBooks reconciliation like we say.  Then he

21   would have then started March and so then he does

22   the next one.  Okay.

23             Well, 562 is done two minutes and 11

24   seconds later, so that is the $5,200 deposit there.

25   563 is done two minutes and 35 seconds after that,

1    and then the last entry for March is done four

2    minutes and two seconds after that.  So my

3    impression is that, you know, he's just going

4    through these pretty rapidly.

5         Q.    And transaction No. 563 is also the first

6    item shown in the Springfield building schedule, is

7    it not, the --

8         A.    Yes.

9         Q.    -- $131,000 check?

10        A.    It is.  In fact, we also note from another

11   report that he created -- as part of entering this,

12   he created the Islamic -- the fixed asset account,

13   that he actually had to go through the little --

14   there's a few minor steps you have to go to, to

15   enter a new account as you're recording things in

16   QuickBooks.  And he actually -- he took a few more

17   extra seconds to do that.

18        Q.    And so what can you tell from looking at

19   this, as far as the dates in particular, about the

20   entry of information about the Springfield building

21   $131,000?

22        A.    Well, we specifically know that he did

23   create it on September 19th.  We know it was never

24   edited, so that tells us that he had to know

25   everything about this before he entered it.  He had

1    to know that it had -- dealt with the Springfield

2    account.  He had to come to the conclusion it was --

3    who the payee is, and things like that so --

4        Q.    So I just want to show you a few more

5    here.  At the very bottom there, 567?

6        A.    Yes.

7        Q.    That's on the Springfield building

8    schedule?

9        A.    That is true.

10        Q.    And then on the top of page 2, it's

11    Transaction No. 574?

12        A.    Yes.

13        Q.    Or in the middle, I guess, of page 2.

14        A.    Yes.  Something flipped on my screen here.

15        Q.    Do you see the 574?

16        A.    574, yes.  The 318,000, right.

17        Q.    Then there's 582 on page 3.

18        A.    Yes.  That's the $4,000.

19        Q.    Okay.  Then also 587, lower on page 3.

20        A.    Right.

21        Q.    Now, were all four of these items coded in

22    sequence?

23        A.    Obviously, not.

24        Q.    Okay.  Were all Springfield building items

25    coded on the same day?

1        A.     No, they weren't.

2        Q.     Did you see a faxed copy of the $131,300

3    check in Mr. Wilcox's work papers?

4        A.     Yes, I did.

5        Q.     Show the witness 1238-B.

6        A.     Yes, I saw that.

7              MR. MATASAR:  Mr. Cardani, we're going

8    to move eventually for the admission of all the

9    checks.  If that's agreeable, we'll just do it now.

10   Witness, Mr. Cardani we're going to move for

11   admission of all the checks, if that's agreeable

12   we'll do it now.

13             MR. CARDANI:  Which checks?

14             MR. MATASAR:  The 131, the 21, and the

15   318.  So we'll publish to the jury, then, and

16   formally move, Your Honor, for the entry of 1238-B.

17             THE COURT:  Received.

18   BY MR. MATASAR:

19       Q.     You indicated, did you not, Mr. Cone, that

20   you viewed the work papers of Mr. Wilcox?

21       A.     Yes.

22       Q.     And was this in there?

23       A.     Yes, it was.

24       Q.     Can you tell the date and time this check

25   was faxed?

 1          A.    Yes.   We can see in the upper left-hand

 2    corner right here, that it was faxed on 5/16/2001 at

 3    2:08.

 4          Q.    Okay.   And I'd like to show you 1238-A.

 5    And to the jury, too.

 6                    MR. CARDANI:   We don't object.

 7                    MR. MATASAR:   We'll move for its

 8    admission, 1238-A, Your Honor.

 9                    MR. CARDANI:   No objection.

10                    THE COURT:   Received.

11    BY MR. MATASAR:

12          Q.    So, Mr. Cone, you said the last check was

13    faxed at 2:08 p.m. on 5/16/2001.   So we're going to

14    look now at -- okay.   So the 131 was faxed on

15    5/16/2001 at 2:08.   Is that the same time as the

16    $21,000?

17          A.    Yes.   They were both faxed --

18          Q.    The exact same time?

19          A.    Yes.

20                    MR. MATASAR:   And let's look at

21    1238-D, and we'll move for its admission.

22                    MR. CARDANI:   No objection.

23                    THE COURT:   Received.

24    BY MR. MATASAR:

25          Q.    And when was that faxed?

1          A.    That was faxed at 2:23, a little bit later

2     in the day.

3          Q.    So going back to the $131,000 check, did

4     you see -- if we could put it up there, 1238-B.

5               And we've seen the audit trail and others.

6     Did you see any documentation or any information in

7     Mr. Wilcox's work papers that supported the fact of

8     him coding this check to the Springfield building

9     account?

10         A.    No.    There was nothing in his work papers

11    at all that supported that decision on his part.

12               MR. MATASAR:  Hold on a second, Your

13    Honor.

14               (A discussion was had off the record.)

15               MR. MATASAR:  Let's just show you

16    1238-C.  It's another check.  And move for it to be

17    admitted.

18               THE COURT:  Received.

19    BY MR. MATASAR:

20         Q.    Sorry.  I neglected this.  This is the

21    fourth check.  Is this the fourth check on the

22    Springfield building schedule?

23         A.    Yeah.  These are the four checks that were

24    included.  Mr. Wilcox actually had check copies in

25    his files.

1              MR. MATASAR:  Move for admission of

2    this one.

3              MR. CARDANI:  No objection.

4              THE COURT:  Received.

5    BY MR. MATASAR:

6         Q.    So two were faxed at 2:08?

7         A.    Yes.

8         Q.    The 131 and the 21.

9         A.    That's correct.

10        Q.    Two were faxed at 2:23, the 10, and the

11   318.

12        A.    That's correct.

13        Q.    And there's no information that you could

14   find anywhere in the work papers that would explain

15   why 131 went to Springfield?

16        A.    No, there's not.

17             MR. MATASAR:  That's all I have.

18             THE COURT:  Cross?

19                  CROSS-EXAMINATION

20   BY MR. CARDANI:

21        Q.    Mr. Cone, I gave you a couple of exhibits

22   and asked you over the break to compare them with

23   the QuickBooks.  Were you able to verify that they

24   came from the QuickBooks?

25        A.    No, I couldn't.

1    Q.    You question whether these reports came

2    out of the QuickBooks stuff?  You said you've looked

3    at all the QuickBooks stuff.

4    A.    Yes.

5    Q.    Okay.  Do you have any doubt that the two

6    exhibits that I showed you came from the QuickBooks?

7    A.    They appear to be QuickBooks files, but I

8    could not verify.  I believe you mentioned that they

9    -- or asked if they came from a specific file dated

10   May 14th -- the May 14th file, and for me to, you

11   know, certify that they absolutely did come from

12   that, I would have to take them, prepare -- print

13   out the same report, look at it, see if I got the

14   same results from my file.

15   Q.    Okay.  We're going to show you -- if we

16   could pass this up.  I'm not offering it at this

17   time, but this is the report of --

18           Now, Mr. Cone, you started the testimony

19   off by saying you looked at three files, the May

20   14th file, a June file, and an October file.  Right?

21   A.    Yes.

22   Q.    Okay.  You spent an awful lot of time

23   doing your magic on this stuff.  Right?

24   A.    I'm not sure what you mean by a lot of

25   time, but yes, I've spent some time on them.

1      Q.    Well, let's talk about that first, then.

2    What -- how much -- how many hours have you put into

3    this project?

4      A.    I have a little over 300 hours prior to

5    kind of the final push for trial.

6      Q.    Okay.  So 300 plus the time to trial prep?

7      A.    Yes.

8      Q.    Okay.

9      A.    Roughly.

10     Q.    All right.  And you're getting paid for

11   this, of course.  What are you charging?

12     A.    150 an hour.

13     Q.    Okay.  So you've been paid -- I'm not

14   going to pretend to do math on this.  300 hours

15   times 150.  You spent that kind of time working on

16   this.  And, in essence, you're reviewing the back

17   and forth on the QuickBooks?

18     A.    I'm doing a lot of work.  Not all of it is

19   being presented here, I guess.

20     Q.    Okay.  And you're a CPA?

21     A.    Yes.

22     Q.    All right.  And Ms. Matthews has assisted

23   the defense, as well.

24     A.    I believe that is true, yes.  I did not

25   participate in any meetings, you know, with her.

1        Q.    Okay.  But you've seen her in court here?

2        A.    I met her for the first time when we got

3    to court here on Thursday.

4        Q.    And your understanding is that she's a

5    CPA, as well.

6        A.    Yes.  That is my understanding.

7        Q.    And she spent an awful lot of time looking

8    into the books and records and the Wilcox --

9              MR. MATASAR:  Objection, Your Honor.

10   I don't think it's an appropriate question to ask --

11             MR. CARDANI:  Okay.  I'll withdraw.

12   BY MR. CARDANI:

13       Q.    All right.  So now, I only want to ask you

14   about some limited stuff here, but I need you to

15   verify, if you can, that the reports that I'm going

16   to show you now came from the May 14th QuickBooks.

17   Now, that's the one that everybody agrees

18   al-Haramain gave to Tom Wilcox.

19       A.    The May 14th file was the one given by

20   Mr. Seda to Mr. Wilcox, correct.

21       Q.    Okay.  So now we've got the report that's

22   been passed up to you, and I want to show you -- it

23   hasn't been received yet, so if we could show him

24   TW-8.

25             Now, this is the thing I showed you a

1    couple hours ago.

2        A.    Uh-huh, yes.

3        Q.    All right.  Can you see that -- can you

4    just verify for me that this comes right out of that

5    May 14th report?  This is just a subset or a

6    contributions section of that May 14th report?

7        A.    You're talking about this report that you

8    just passed up?

9        Q.    Uh-huh.

10       A.    How would you expect me to do that?

11       Q.    Oh, it's on a yellow tab.

12       A.    Which one?  We have three yellow tabs

13   here.  Do you want me to just check each one?

14               MR. CARDANI:  Judge, may I approach

15   the witness?

16               THE COURT:  Yes.

17               MR. MATASAR:  Do you have a copy of

18   this for us?

19       A.    Okay.  Here's the problem we have here,

20   okay.  If I can say this.  The problem we have is --

21               MR. MATASAR:  Excuse me, Your Honor.

22   I'm not sure what the witness is looking at.

23               THE COURT:  Yeah.  Let's show

24   Mr. Matasar.

25               (A discussion was had off the record.)

1          MR. CARDANI:  Judge, this is nothing

2    but a section out of that same report.

3          THE COURT:  Go ahead.

4    A.    The problem is, you know, the

5    authentication of this report.  I'm not trying to be

6    difficult, but for me to say that this -- you know,

7    that there's nothing on here -- there's no way that

8    QuickBooks -- let's start over again.

9          You know, when QuickBooks prints a report,

10   it doesn't say here's the file and here's the date

11   of that report and anything like that on here.  So

12   looking at this report, I can't tell -- I know it

13   was printed on 12/23 at nine -- excuse me -- on

14   September 5th at 12:33 p.m., but I don't know what

15   file it came from --

16   BY MR. CARDANI:

17   Q.    Mr. Cone --

18   A.    -- other than your representation of it.

19   Yes.  Go ahead.  I'm sorry.

20   Q.    Mr. Cone, I'm not asking you about when it

21   was reported or when it was edited.  All I'm asking

22   you is the information depicted in there, the

23   checks, to whom they went to and the amounts, is

24   right out of the May 14th report.

25   A.    I couldn't tell you that without --

1      Q.    Compare the information.  It's the same

2   thing.

3      A.    But this report is from -- the same

4   problem.

5             MR. CARDANI:  Okay.  Can we have a

6   stipulation that TW-8 came out of the May 14th

7   report?

8             MR. MATASAR:  We don't have a May 14th

9   report and --

10            MR. CARDANI:  May I approach the

11  witness to get that, Your Honor?

12            THE COURT:  Yes.

13            (A discussion was had off the record.)

14            MR. MATASAR:  Your Honor, Ms. Anderson

15  has indicated that they have printed out the May

16  14th QuickBooks file onto paper, and that this paper

17  reflects that.  And we -- for purposes of right now

18  today, we can check later to see if that's true, but

19  for purposes -- as long as we can object later, it's

20  okay to continue questioning the witness, if he

21  assumes that this is printed from the May 14th

22  QuickBooks file.

23            THE WITNESS:  All right.

24            MR. CARDANI:  Okay.  Great.  Offer

25  TW-8 at this time.

```
1                    THE COURT:  Any objections?

2                    MR. MATASAR:  Nothing than what I've

3    said already, Your Honor.

4                    THE COURT:  It's received.

5    BY MR. CARDANI:

6         Q.    Okay.  So we're now back on TW-8.

7         A.    Great.

8         Q.    Now, you recognize this as the

9    contributions report from the May 14 QuickBooks

10   report -- and this is the one that al-Haramain gave

11   to Wilcox.  Correct?

12        A.    The May 14th report is the one that went

13   to Wilcox, yes.  You're making -- yes.  I'll just --

14        Q.    So someone from al-Haramain had input a

15   bunch of checks and they're depicted on this report.

16   Before Wilcox gets it, this information comes to

17   him.

18        A.    Okay.  Yeah, I would agree with that

19   statement.

20        Q.    All right.  And so if we could go to the

21   bottom, we see some of our 1999 transactions.  I'll

22   get back to those later.

23        A.    Uh-huh.

24        Q.    But the 2000 ones, Shop'n Cart, al-But'he,

25   Western Somalian Relief, so on and so forth.
```

1    A.    Yes.

2    Q.    So that came to Mr. Wilcox on May 16th,

3    but can we agree that the check for 131,300 -- and

4    can we show him TW-5.

5          And this check that we've heard so much

6    about, can we agree that that was not in the report

7    given to Wilcox on May 14th?

8    A.    Yes.  I would agree with that.

9    Q.    Okay.  It wasn't coded anywhere in the

10   QuickBooks as given by al-Haramain to Mr. Wilcox,

11   was it?

12   A.    No.

13   Q.    Now, as a CPA yourself and seeing a check

14   of this size, you would want to know what it was

15   for.  Right?

16   A.    Yes, I would.

17   Q.    And wouldn't one of the things that you'd

18   do is -- to find out the answer to that is maybe

19   talk to your client and ask him?

20   A.    I would typically -- yes, I would -- if I

21   was in Mr. Wilcox's shoes, that is what I would have

22   done.

23   Q.    And if the client says, "It went into a

24   Springfield building."

25   A.    Yes.

1     Q.     Then you have to account for that on a

2  Springfield building report.  Right?

3     A.     Yes, but you would want some more

4  supporting documentation probably for that type of

5  -- that size of number.

6     Q.     Yeah.  You'd want like, say, a closing

7  statement or an escrow file?

8     A.     You'd want to have something, yes.

9     Q.     You'd want to ask your client for that.

10    A.     Yes, you would.

11    Q.     So TW-2, here's the building report.

12    A.     Right.

13    Q.     So Mr. Wilcox coded this check, the

14  131,300, in this building report, the Springfield

15  building, which is a report he prepared.

16    A.     Right.  Mr. Wilcox prepared, right.

17    Q.     Okay.  So in it goes as the funds used to

18  buy -- part of the funds used to buy the Springfield

19  building.

20    A.     Yes.

21    Q.     And then this figure, this 461,541 is used

22  to prepare the 990.  It's on the actual attachment

23  as part -- as the funds used to buy the Springfield

24  building.  Right?

25    A.     I have not studied that very much, but I

1    believe that's true.

2         Q.    Okay.  We can show it to you if you want.

3         A.    I'm not going to argue that point.

4         Q.    Now, if we could go back to TW-8.  Do you

5    have a calculator?

6         A.    Not with me, no.

7         Q.    Do you have a piece of paper?

8         A.    I've got a piece of paper.

9         Q.    Okay.  Let's --

10        A.    Let me get a pen.

11        Q.    Let's test your math skills.  Okay.  Do

12   you see how this says 25,063.26?

13        A.    Yes.

14        Q.    All right.  Now, I want to get back to

15   those 1999 checks.  The first five of those are from

16   1999.  Right?

17        A.    Okay.

18        Q.    Now, if your job is to find out what the

19   contributions -- as given by al-Haramain to

20   Mr. Wilcox for the year 2000, then, those '99

21   contributions have to be deducted.  Right?

22        A.    Right.

23        Q.    So could you add up the total of 1999

24   checks?

25        A.    I'd rather not try to do it just ad hoc

```
1    like that.  I'm sure you've done --

2         Q.    Do you have a piece of paper?

3         A.    Yes, I do.

4         Q.    Okay.  You can use it.  Do you have a pen?

5         A.    Yes, I do.

6         Q.    Okay.  Can you just, please, do that for

7    me.  Humor me.

8         A.    Okay.

9                   (Pause.)

10              I came up with, I believe, 529.31.

11        Q.    Okay.  That's the same as my calculator,

12   so congratulations, we agree.  All right.  Hold that

13   figure.

14        A.    Okay.

15        Q.    See this figure here, 25,063.26?

16        A.    Uh-huh.

17        Q.    All right.  Now, do just one more math for

18   me.  Subtract that number -- take 25,063.26 and back

19   out 529.31.

20                  (Pause.)

21        A.    I believe 24,533.85 probably would be

22   right.

23        Q.    Close.  Round it up now to the next

24   dollar.

25        A.    Oh, 24,534.
```

1        Q.    24,534.  Okay.  Hold that figure, 24,534.

2    Now, let's go to the return.  Can you go to IRS-1,

3    and if we could go to line 22.  And tell us what

4    figure Mr. Wilcox reported for the donations as

5    reported by his client al-Haramain on the Form 990

6    for contributions.

7        A.    We have our 24,534.

8        Q.    Okay.  Now, if the funds, that 131,300,

9    really went for foreign contribution for whatever

10   purpose, it should have gone here, shouldn't it?

11       A.    I don't think that's my job to opine on

12   that particular piece of information.

13       Q.    Well, but you're a CPA?

14       A.    I'm a CPA.  I'm not a tax accountant.

15   I've never specialized in taxes.  I specialize in

16   audit and forensic accounting work, so I'm not going

17   to sit here and -- I can't opine on whether that

18   amount should have actually appeared here.  And I

19   was here when Mr. Wooten was talking about what

20   should and should not go on tax forms, and I'm not

21   going to opine particularly on that.

22            I would say that if the 131 had been coded

23   correctly -- you know, as we now believe it should

24   have been -- it probably could have been on that

25   contribution schedule as an expense, unless it was

1    considered to be a complete pass-through or wash, in

2    which case maybe it shouldn't have shown up as P&L

3    or an expense, depending on the nature of the

4    transactions.

5        Q.    Now, you're just basing that on your

6    observation of the testimony in this trial, aren't

7    you?

8        A.    Yes.

9        Q.    Okay.  You don't know anything about that.

10       A.    I don't -- no.  I tried to preface my

11   comment that way.

12       Q.    All right.  Let's move on to the $21,000.

13   Okay.  TW-4.  Now, you know that this check was

14   coded by al-Haramain in the QuickBooks as a

15   reimbursed expense.

16       A.    Yes.

17       Q.    If I could show you -- I'm going to

18   represent that TW-9 -- which I have a copy here for

19   Mr. Matasar.

20            MR. MATASAR:  I have it.

21            MR. CARDANI:  It came out of the May

22   14 QuickBooks.  And with that understanding, I would

23   offer TW-9.

24            MR. MATASAR:  Same position, Your

25   Honor.

1              THE COURT:  It is received subject to

2    that.

3    BY MR. CARDANI:

4        Q.    Okay.  So I'm bringing it up on the

5    screen.

6        A.    Yeah, I see it.

7        Q.    All right.  Now, this is the list of

8    reimbursed expenses that Mr. Wilcox got from

9    al-Haramain.  In other words, al-Haramain did the

10   inputting, not Mr. Wilcox.

11       A.    Yes.

12       Q.    All right.  And you see the third line to

13   the bottom there --

14       A.    Yes.

15       Q.    -- the $21,000 is listed as a reimbursed

16   expense.

17       A.    Yes.

18       Q.    Now -- well, I was going to say, do you

19   know as a CPA that $21,000 is a lot of money for

20   reimbursed expense?

21       A.    It certainly would -- it certainly stands

22   out on this schedule as being a little unusual.

23       Q.    Okay.  And as a CPA, knowing that this is

24   a large amount that stands out, you've got to deal

25   with it, don't you?

1     A.    Yes.

2     Q.    And if your client didn't code it anywhere

3    else in the QuickBooks, you'd probably want to talk

4    to your client and ask him about it, wouldn't you?

5     A.    Yes, you would.

6     Q.    And if I could show TW-1.  Now, let's say

7    the client says it was refunded to the donor.  Then

8    as a CPA you'd want to back that out of reimbursed

9    expenses.  Right?

10     A.    That is correct.

11     Q.    And assume with me, that if that

12    information is received, both the 21,000 and also

13    you see where Mr. Wilcox did the $5,000 work here --

14     A.    Yes, uh-huh.

15           MR. MATASAR:  Your Honor, I'm going to

16    object.  Mr. Wilcox specifically did not say return

17    to the donor.  It's an improper hypothetical

18    question.  He said it went back to Mr. al-But'he.

19    No facts in the record at all.

20           MR. CARDANI:  Well, I'll restate the

21    question.

22    BY MR. CARDANI:

23     Q.    You see that Mr. Wilcox made some

24    adjustments here.

25     A.    Yes.

1    Q.    Okay.  And those two checks came down to

2    $26,000.

3    A.    Yes.  I see that.

4    Q.    So he backed those out of contribution --

5    income.  Right?

6    A.    That's what he did, yes.

7    Q.    Okay.  Let's go to TW-3.  So he makes --

8    going down to the bottom here.

9    A.    Uh-huh.

10    Q.    And you know that there was an adjustment

11    made reducing contributions by $26,000.

12    A.    Yes.

13    Q.    And you see that figure at the bottom,

14    561,639.53?

15    A.    Uh-huh.

16    Q.    Okay.  That's rounded up to, what,

17    561,640?

18    A.    Yes.  I think that would be the right

19    rounding.

20    Q.    All right.  Let's go to IRS-1, Form 990,

21    and let's look at line 1.  That's what Mr. Wilcox

22    listed for contributions for that year.  Right?

23    A.    That is correct.

24         MR. CARDANI:  I have nothing else.

25    Thank you.

1              THE COURT:  Mr. Matasar?

2                  REDIRECT EXAMINATION

3    BY MR. MATASAR:

4        Q.    Mr. Cone, you were asked if you were the

5    CPA and you got the $131,000 check.  First, let me

6    show the $131,000 check.  I'll give you the number

7    in a second.

8              Susan, can you cull it up?  Do you know

9    what it was?  It was TW -- I don't know the number.

10   I'm sorry.  1238-B, I think.  We can use our

11   version.

12             Now, first of all, Mr. Wilcox coded that

13   check?

14       A.    That is correct.

15       Q.    Okay.  It wasn't hidden in some schedule

16   before he got it.  This check was actually faxed to

17   him.

18       A.    Yes.  It was faxed to him almost four

19   months -- if I have my math right here still.

20       Q.    Okay.  And if you got that check --

21   Mr. Cardani asked you some questions, if you got a

22   check like that, what would you have done.

23       A.    Yes.

24       Q.    Why don't you tell the jury what you would

25   have done?

1      A.      First of all, I would have called up

2   Mr. Seda, I think in the first instance, and then

3   written notes, probably a large note, given the size

4   of this check, a large note at the bottom of it

5   exactly what Mr. Seda had told me about this check.

6   And I'd have asked him, "Well, why are we using a

7   counter check?"

8              This is a specific type of bank check.  I

9   don't know whether that's been testified to, but

10  this is not a preprinted al-Haramain check, so

11  there's big questions in my mind about that.  I'd

12  also be curious about why Mr. But'he -- I believe

13  that's Mr. But'he's signature -- why Mr. But'he

14  signed it.  There's just a lot of questions about

15  this check.  And no payee, that's another big flag

16  as to there's something very unusual about this.

17     Q.      And how long a conversation do you think

18  that might have taken?

19     A.      At least five, 10 minutes, I guess.

20     Q.      All right.  Not two minutes and 30 seconds

21  or whatever --

22     A.      No.  Definitely not two minutes and 30

23  seconds.

24     Q.      And what would your file have reflected?

25  Anything other than the note on the bottom of that

 1    fax?  Would you have other notes in the file perhaps

 2    of your conversation justifying this?

 3        A.    I think if I had a good copious note

 4    there, and then the cross-references from this check

 5    to wherever it ended up, so that somebody picking

 6    up, for example -- you know, if in fact it was a

 7    fixed asset, picking up the al-Haramain schedule,

 8    seeing the 131, seeing the cross-reference back to

 9    this check, okay, then it would be very clear from

10    anywhere in the work papers that you would go -- you

11    could figure out what was going on with it.  It

12    would be really clear.

13        Q.    We've seen some of those -- I don't know.

14    Do you remember the legal fee schedule --

15        A.    Yes.

16        Q.    -- where there was a circle at --

17        A.    Right.

18        Q.    -- from line and then that sort of thing?

19        A.    Yes.

20        Q.    So there are ways that you reflect

21    important transactions on the work papers.

22        A.    Right.  In the audit terminology, we say

23    footnotes.

24        Q.    Footnotes.

25        A.    You know, you tick mark something and then

1    we footnote it and describe what is going on with

2    that check so that there's no ambiguity down the

3    road as to what was going on.

4        Q.    And you typically do that at the time that

5    you learn the information.

6        A.    Absolutely.

7        Q.    So you'd have to have a conversation with

8    the client, and then you'd be mucking up all these

9    different kinds of papers.

10       A.    Yes.

11                  MR. MATASAR:  Okay.  Thank you.

12                  MR. CARDANI:  Nothing else.

13                  THE COURT:  You may step down.

14                  Call your next witness.

15                  MR. WAX:  Your Honor, the next witness

16   is Dr. Long.  And we need a ruling from the court on

17   the matters we discussed before we commenced.

18                  THE COURT:  All right.  On the record,

19   let's not have it just now.  I'm going to find that

20   there's not proper foundation established as a

21   custodian or supervisor under the Oregon rules, and

22   so do not expect to allow those several exhibits we

23   discussed earlier to come into evidence.  That's

24   part of the reason for my ruling.

25                  MR. WAX:  May he still comment on what

```
1    he has observed?
2                    THE COURT:  Not about those exhibits,
3    no.
4                    MR. WAX:  May I have a moment, please?
5                    THE COURT:  Yes, of course.
6                    Why don't you stand and stretch,
7    jurors.  I realize you work hard here.  I'm a farm
8    boy, so I don't watch the clock very well.
9                    MR. WAX:  Dr. David Long, Your Honor.
10                   THE COURT:  Thank you.
11                   (The witness was sworn.)
12                   THE CLERK:  Please have a seat.
13   Please speak into the microphone here.  Here's some
14   water if you'd like some.
15                   THE WITNESS:  Thank you.
16                   THE CLERK:  Please state your name and
17   then spell it for the record.
18                   THE WITNESS:  David Long.
19                   THE COURT:  Go ahead, Counsel.
20                        DIRECT EXAMINATION
21   BY MR. WAX:
22      Q.    All right.  Dr. Long, can we start,
23   please, by having you tell the jury a little bit
24   about your background and please start with your
25   educational background.
```

1    A.    I got a bachelor's degree in history from

2    Davidson College in North Carolina.  I got a

3    master's degree in political science from the

4    University of North Carolina in Chapel Hill.  I got

5    another master's degree with the Fletcher School of

6    Law and Diplomacy in Boston, which was at that time

7    under both Harvard University and Tufts University.

8    And I got a Ph.D. in international relations from

9    George Washington University in Washington D.C.

10    I have been a Middle East person -- I

11    won't say specialist -- from my academic days.  I

12    joined the Foreign Service in 1962.  I've served in

13    Sudan and Morocco, in Jordan and Saudi Arabia, and

14    of course, in Washington where I was, among other

15    things, the head of analysis for the Near East, and

16    where I was the deputy director of the Office of

17    Counterterrorism for regional terrorism back in the

18    1980s.

19    I've also had somewhat of a career as --

20    in academia.  I was the first director of the

21    Georgetown University Center for Contemporary Arab

22    Studies.  I was an acting head of the humanities

23    department while I was doing a tour at the United

24    States Coast Guard Academy in Connecticut.  And I

25    have taught in various -- at night at various

1    universities in Washington D.C. and I've also spent

2    a year teaching on a fellowship at the University of

3    Pennsylvania in Philadelphia.

4            And I have also done a considerable amount

5    of lecturing.  I've lectured in every State of the

6    Union, including this state.  I have lectured

7    overseas, in U.K., in Germany, in Italy, in Egypt,

8    in Saudi Arabia, in Jordan, in United Arab Emirates,

9    in Kuwait, in Iran back during the shah's reign, in

10   India, in Australia, and in Japan.  I think that's

11   about enough of that.

12       Q.    All right.  Let me put another question to

13   you.

14       A.    Okay.

15       Q.    Have you ever lived in Saudi Arabia?

16       A.    Yes, I have.

17       Q.    Okay.  When and for how long?

18       A.    I was assigned to Saudi Arabia in the

19   winter of 1966, but I spent -- I spent New Year's in

20   Beirut and got there in January 1967.  And I left

21   there in 1970 and came back to the United States.

22   But since then I have often, both on business and in

23   research and other things, been visiting there ever

24   since.  The last time I was in Saudi Arabia, I

25   guess, was in the winter of 2008.

1    Q.    Okay.  And during your time in the State

2  Department, looks like 31 years or so, did you hold

3  very high level security clearances?

4    A.    Yes, I did.  I held pretty much as high as

5  you can get in the State Department, but in addition

6  to that, I represented the State Department on the

7  Intelligence Community Staff, which is made up of

8  all agencies and departments in the U.S. government

9  that either collect, analyze, or use intelligence in

10  policymaking.  And at that one, I think I had over a

11  dozen security clearances from virtually every

12  intelligence operation in Washington D.C.

13    Q.    And during the course of your work for the

14  State Department, were you assigned from time to

15  time to do intelligence work?

16    A.    Well, when you say intelligence work, that

17  covers a lot of ground.  I was an analyst in the

18  Bureau of Intelligence and Research.  And I was the

19  head of analysis for the Near East for quite a

20  while.

21    Q.    Okay.  And you mentioned being in the

22  Office of Counterterrorism and the deputy director

23  in the State Department.  That was in the 1980s?

24    A.    That is correct.

25    Q.    And to the extent you can, please give us

1    a rough idea of your responsibilities in that

2    counterterrorism position.

3         A.    Well, we had a very small office back

4    then, and my superior was Ambassador Oakley.  And in

5    those days the State Department was considered the

6    lead agency for international terrorism in the

7    United States government.  And we had -- as it

8    turned out, we had a lot to do.  We actually had

9    more terrorism going on then than we do now, but it

10   was not, of course, as high profile as it is now.

11   So I did a lot of traveling.

12              One of the things that I had to do was

13   when there was a really bad crisis going on, I led a

14   lot of what we call emergency support teams, which

15   as the lead agency, the State Department had the

16   head of those teams.  And we had people from the CIA

17   and DIA and NSA and all over the place, depending on

18   the nature of the crisis, such as airplane

19   hijacking, such as -- older people here might

20   remember the Achille Lauro.  It was a ship that was

21   taken over by terrorists and things like that.

22              I also worked on the hill with -- on

23   terrorism matters and policy when asked by the

24   congress -- our office was asked to come up and give

25   them briefings on various things.  I also --

1    Q.    And that was part of your

2    responsibility --

3    A.    Yes.

4    Q.    -- to go up to the congress and brief the

5    congress people?

6    A.    And also to be in a lot of meetings at the

7    White House because there was a lot of terrorism

8    going on.

9    Q.    All right.  Now, you have retired from

10   government service in 1993.  Since then have you

11   continued to be employed in any way that uses the

12   expertise that you had developed during your 31

13   years with the government?

14   A.    Yes, I have.

15   Q.    Please tell the members of the jury a bit

16   about that.

17   A.    Well, I've done a lot of consulting.  I've

18   done a lot of lecturing.  I've written probably half

19   a dozen books since I retired.  I wrote a bunch

20   before I retired.  The latest books of which came

21   out two weeks ago, one on Saudi Arabia, and I am the

22   coeditor of probably one of the leading books on the

23   government and politics of the Middle East and North

24   Africa.  And the 6th edition came out also last

25   week.

1          I am also on a list of -- for an aviation

2   security consulting firm, particularly when it deals

3   with the Middle East, and have written for them a

4   number of threat analyses for master security plans,

5   places like Saudi Arabia and United Arab Emirates.

6      Q.    But just in terms of the currency of your

7   knowledge, if I understand correctly, the book The

8   Kingdom of Saudi Arabia, first edition 1997, that is

9   one that you have coauthored?

10     A.    No.  That I authored myself.  The second

11  edition came out last week.

12     Q.    And the second edition you coauthored?

13     A.    I coauthored it with a young scholar named

14  Sebastian Maisel, who basically helped me with the

15  research, which brought it up-to-date from my first

16  edition.

17     Q.    Right.  And the subject matter of The

18  Kingdom of Saudi Arabia in brief for the jurors,

19  please, is what?

20     A.    Well, it is a -- it's sort of like a

21  handbook, but it's not written in handbook language.

22  It's a little deeper than that.  And we discussed in

23  there the topology, the demography, the land and

24  people.  We discussed economics.  We discussed

25  petroleum.  We discussed Islam.

1             I earlier had written a book on the hajj,

2      and on involatol (phonetic) hajj, which is the

3      administration, how the Saudis put on a hajj.  They

4      had last year about three million people come to the

5      pilgrimage in Mecca.

6             We did a chapter on foreign affairs, their

7      foreign policies, and so we pretty much covered the

8      waterfront in this book.

9      Q.    Okay.  And the other book which has had a

10     new edition come out just recently, The Government

11     and Politics of the Middle East in North Africa,

12     does that include Saudi Arabia?

13     A.    Yes, it does.  And I used to always write

14     that book -- that chapter, the first edition came

15     out in 1980.  And I designated Dr. Maisel, who is my

16     coauthor in the latest book, to do that one, but I

17     had to edit one-third of that book including the

18     chapters on Saudi Arabia and Gulf states in Yemen,

19     and most of the Near East.

20     Q.    I noticed another book, Culture and

21     Customs of Saudi Arabia with a 2005 publication

22     date.

23     A.    Yes.  They've been after me for a couple

24     years to write that.  I am not a cultural

25     anthropologist, but after 9/11, I felt that if

1    you're going to understand what people do and why

2    they do it in Saudi Arabia, you have to know

3    something about Islam and you have to know something

4    about culture, and those are interactive.  And so I

5    wrote this book on the culture and customs of Saudi

6    Arabia in 1905 [sic] and it is still in print.

7        Q.    In 1905 or 2005?

8        A.    Sorry.  2005.  Beg your pardon.

9        Q.    Thank you, sir.

10       A.    Time flies.

11       Q.    All right.  I take it then -- let me start

12   this way.  My office contacted you some months ago

13   to ask whether or not you could be of any assistance

14   in helping us understand some of the transactions at

15   issue in this case.

16       A.    That is correct.

17       Q.    And I take it that you believed that your

18   familiarity with Saudi religion, government,

19   business, and charities is sufficient that you

20   believe that you would be -- it would be reasonable

21   for you to appear in court as an expert witness, and

22   that's why you're here.

23       A.    Yes.  I would add to that culture.

24       Q.    Culture.  Thank you, sir.  All right.  I

25   want to start just by asking you a very brief

1    question or two about the Russian Chechen War.

2    There's been a great deal of testimony about that.

3    My question to you, sir, is:  Does the State

4    Department prepare reports on a country-by-country

5    basis of human rights issues around the world?

6         A.    Yes.

7         Q.    Can you tell us a little bit about that.

8         A.    Human rights is, of course, a major United

9    States government concern for all around the world.

10   And regardless of what you're writing about or what

11   country you're writing about, all countries are

12   viewed from a point of view of human rights.  And

13   when there is a country that is in conflict, and

14   particularly, brutal conflict as was -- has happened

15   in Chechnya, then human rights becomes a very

16   serious subject in trying to -- discussing what is

17   the best policies to adopt in regard to that issue.

18        Q.    And are you familiar with human rights

19   reports by the Department of State, your former

20   employer, about Russia, and specifically, any

21   references to Chechnya for the years 1999 and 2000?

22        A.    Yes.  I have seen them.

23        Q.    And in a very brief form, can you tell us

24   whether or not they expressed concern about the

25   brutality of the Russian activity in Chechnya in

1    that time period?

2                  MR. GORDER:   Objection as to

3    relevance.

4                  THE COURT:   Overruled.   Very brief,

5    Doctor.

6    BY MR. WAX:

7        Q.    You may answer in brief, sir, about those

8    reports.

9        A.    It is my view that having seen these kinds

10   of reports from all over the world, when both I was

11   doing Near East and when I was doing the whole world

12   and anti-terrorism, that it did in the State

13   Department language express very much concern for

14   human rights because of the conflict.

15       Q.    And these reports are official documents

16   of the United States Department of State expressing

17   the official views of that branch of our government?

18       A.    That is true, and the United States State

19   Department is the lead agency for foreign policy.

20       Q.    Thank you, sir.   All right.   I'd like to

21   change the subject to one that we have also had some

22   discussion about, and that is Islam zakat and

23   fatwas.   And I'd like to get into this, not by

24   asking you for a detailed discussion because we've

25   already had that, but by asking Ms. Cooke to please

1    show you the Exhibit EK-4A.

2           Okay.  You've clearly had an opportunity

3    to see this fatwa before -- or this document before

4    coming into court today?

5      A.    Yes, I have.

6      Q.    Okay.  And you've had an opportunity to

7    read it and study it?

8      A.    Yes, I have.

9      Q.    All right.  In very brief form, sir --

10          And, Your Honor, I can speed this up if I

11   could do some leading, if that's permissible?

12              THE COURT:  Give it a try.

13              MR. WAX:  Thank you.

14   BY MR. WAX:

15     Q.    A fatwa is a statement by a person in

16   Islam that represents that person's views?

17     A.    That is correct.

18     Q.    Is a fatwa binding on all Muslims in any

19   way?

20     A.    Some are, some are not.  Depends on who

21   makes the fatwa and under what circumstances.  For

22   example, Saudi Arabia, the law -- what we would

23   consider constitutional law of Saudi Arabia is

24   Islamic law.  And the Islamic and the Saudi Ministry

25   of Justice is really a modernization of the Grand

1    Mufti and the Chief Qadi.

2        Q.    What's mufti and qadi?  Help us out.

3        A.    Okay.  I'm going to.  The -- a qadi is a

4    judge, so that means the head of the juridical

5    system judges.  The mufti is those who deals with --

6    the chief person who deals with fatwas.  And if

7    within the justice -- the ministry of justice, if

8    there is a fatwa, it can be binding.

9            But on the other hand, anyone who is

10    thought to be an expert on Islamic law and gives a

11    fatwa on his own or was asked to give a fatwa is not

12    necessarily binding.

13        Q.    Okay.  In terms of this exhibit EK-4A, the

14    name, I'm not going to try the pronunciation of

15    anything, other than the last six letters, Jibrin.

16    Are you familiar with the name of this individual?

17        A.    Yes.

18        Q.    Is he a mufti or -- I forgot the other

19    word you used -- whose fatwa would be binding as you

20    described?

21        A.    He is a religious scholar and is known in

22    the country, but this is still his own personal

23    finding.

24        Q.    Now, very briefly, we have had the term

25    "zakat" described as one of the pillars of Islam,

1   and that a zakat has certain restrictions and

2   creates certain obligations.  I'd like to ask you,

3   sir, whether this fatwa, Exhibit EK-4A, makes any

4   reference to zakat?

5       A.     In my opinion -- I can't see the whole

6   thing, whether it literally does or not, but it is

7   not about zakat.  It is about jihad.

8       Q.     In terms of any rights, obligations, or

9   limitations that this particular fatwa would have on

10  a donation that is described as zakat, would this

11  have any bearing on that?

12      A.     Not really.  Zakat is one of the five

13  pillars of Islam, which are the basic religious

14  rights and represent the basic religious theology of

15  Islam.  Zakat is the fourth pillar.  It's very

16  basic.  Jihad is not a pillar, and it is not binding

17  in the same way as zakat, which is obligated -- it

18  is the obligation of every Muslim, adult Muslim, to

19  give zakat according to their financial ability.  So

20  it's like a tithe.  And it -- and in that context,

21  it is not -- it is not a synonymous thing with

22  jihad, and jihad is not one of the five pillars of

23  the faith.

24      Q.     All right.  So this Jibrin fatwa is

25  dealing with a subject other than zakat?  If I can

1    shorten --

2         A.    Yes.

3         Q.    -- what you said.

4         A.    In my opinion, it is dealing with jihad.

5         Q.    If we could, please, show Dr. Long EK-5A.

6    You've had the opportunity to review this document

7    before coming to court today?

8         A.    Yes.  I've seen the document.

9         Q.    And this is represented to be a fatwa by a

10   fellow named Uthaymin?

11        A.    Uthaymin, yes.

12        Q.    And this particular document does refer to

13   zakat.

14        A.    Yes, it does.

15        Q.    Can you please tell the members of the

16   jury what this particular fatwa is saying about the

17   permissible uses of money for zakat, and I also see

18   that there's reference in here to sadaqah.  So help

19   the jurors please understand what this fatwa is

20   saying.

21        A.    Zakat, as I said before, is a pillar of

22   the faith, the fourth pillar.  It is obligatory for

23   all adult Muslims who are financially able to give a

24   portion of their disposable income every year for

25   humanitarian purposes.  Sadaqah, which is also

1  mentioned in the Qur'an, is charitable giving, but

2  it is not a pillar of the faith and it is broader

3  than zakat.

4            Zakat is really a religious rite, like

5  R-I-T-E, and it is considered -- the rite of zakat

6  refers to expressing -- and it's obligatory.

7  Expressing your love of God and your obedience of

8  God through giving each year for humanitarian

9  charity.

10      Q.    So zakat has a humanitarian component that

11  is required?

12      A.    That is correct.

13      Q.    All right.

14      A.    Sadaqah, on the other hand, does also have

15  humanitarian giving in it, but it is much broader

16  than zakat.

17      Q.    Okay.  Now, I'd like you to please look at

18  the first paragraph in the answer here, "Giving

19  sadaqah and zakat to the Muslims in the land of

20  Caucasus, specifically in Chechnya is permissible.

21  The zakat would be given to the mujahideen and the

22  poor, while sadaqah is of a wider scope."

23            Can you help the members of the jury

24  please to understand the reference to mujahideen

25  here, and what, if any, limitation on aid to the

1    mujahideen exists in the use of the word "zakat"?

2        A.    All right.  Mujahideen is a plural for

3    mujahid, and a mujahid is someone who is doing

4    jihad.  Jihad has a broad, broad sphere of meanings.

5    It is not just holy war.  It includes holy war, but

6    it is not just holy war.  So you can be a mujahideen

7    in many, many contexts.  Obviously, in Chechnya, the

8    context that they would use it would be they're at

9    war of independence, and they have made it an

10   Islamic war for independence and they called

11   themselves mujahideen.  All right?

12           Now, that said, however, there are a

13   number of things that you can do for them in sadaqah

14   that you cannot do for them in zakat because zakat

15   is only limited -- is limited only to humanitarian

16   giving, period.  So if there is humanitarian giving

17   that can be done for somebody who's a mujahideen, it

18   is still humanitarian.  And if it is not

19   humanitarian, it does not count as zakat.  It can be

20   sadaqah, but it cannot be zakat.

21       Q.    All right.  Dr. Long, I'd now like to turn

22   your attention to a few of the documents that we

23   have in this case that describe the donation made by

24   an Egyptian philanthropist, Dr. Mahmoud El-Fiki.

25           And, Ms. Wells, if you could please put up

1    for the jury first and the witness Exhibit 669.

2    You've had an opportunity to view this email before

3    coming into court today?

4        A.    Yes, sir.

5        Q.    And can you please tell the members of the

6    jury what, if any, portions of this email, which is

7    an email from Dr. El-Fiki to Haramain, date of

8    January 11th, what, if any, portions of this are

9    relevant to the question of the limitations on --

10   that would exist on the donation he made?

11             MR. GORDER:  Your Honor, I'm going to

12   object to any discussion of Mr. El-Fiki's intent.

13             MR. WAX:  I'm not asking for his

14   intent.  I'm asking for a description of this

15   document, Your Honor, and what it says.

16             THE COURT:  Yeah.  I'm going to let

17   him describe that, but you may not take that for the

18   truth of what's in the document.  Mr. El-Fiki is not

19   here for cross-examination, so it would be -- for

20   the truth of it would be hearsay.  I'm going to

21   allow him to describe it.

22             MR. WAX:  Thank you.

23   BY MR. WAX:

24       Q.    So, Dr. Long, taking a look at this

25   document, do you see the word "zakat" --

1    A.    Yes, I do.

2    Q.    -- in here.  Paragraph 3 -- well, let's

3  just start from the beginning.  Take us through it

4  because it appears in a number of places.  What does

5  this document say to you about limitations on the

6  use of the money that Dr. El-Fiki eventually

7  contributed?

8    A.    All right.  The first one says "I would

9  like to pay zakat."  Remember, it is an obligation

10 to pay zakat.  "Supporting Muslim brothers in

11 Chechnya."  This is what he's talking about,

12 Chechens.

13   Q.    Excuse me --

14   A.    "And would be transferring the money from

15 my account to London" and we'll go on with that.

16       No. 2 says, "If yes" -- and the answer was

17 yes -- "can you provide me with the account details"

18 -- which were done.  "Would it be possible for you

19 to send any receipt?"  And that is responded to,

20 also.

21       So what this person is asking for, he

22 wants to do a zakat.

23   Q.    And that's humanitarian?

24   A.    And that means humanitarian, and he wants

25 it to be done for people in need and poor for

1    humanitarian purposes only, in Chechnya because of

2    the conflict that was going on, which was a very,

3    very brutal war.

4        Q.    Doctor, I'd like to ask you a question,

5    please, about the use of the phrase "Muslim

6    brothers" in here, and what, if any, connotation or

7    denotation that has based on your familiarity with

8    and long experience in the Middle East with Arabic

9    and Saudi Arabia?

10       A.    Well, brothers in Arabic is ikhwan, and

11   ikhwan, or brothers, is commonly used in all sorts

12   of contexts.  It means the brethren.  It means, if

13   you were in the Southern United States, it would

14   mean y'all.

15            And so when he's talking about the

16   brethren or the brothers, he's talking about his

17   fellow men and women, the folks in Chechnya.  And

18   that -- that is the context that I read that you see

19   here when he says the Muslim brothers.

20       Q.    I'd like to direct your attention, please,

21   for a moment to the first paragraph.  There's a

22   reference to a Saudi committee and I'd ask whether

23   or not you are familiar with an entity that we've

24   had testimony about that was established by explicit

25   agreement of the Russian and Saudi governments in

1    1999, the Saudi Joint Relief Committee.

2        A.    Yes, I am.

3        Q.    And just in very brief form, because we've

4    had some testimony about this, what is your

5    understanding about the purpose of that committee?

6        A.    That committee was to see and to

7    coordinate, not just the Al-Haramain Foundation, but

8    a number of other Saudi charitable foundations and

9    organizations, such as the Saudi Red Crescent

10   Committee, which in Saudi Red Crescent is a Muslim

11   name for what we call the Saudi Red Cross.

12            So its job was to make sure that all of

13   these people were coordinated so that they could get

14   their donations and they're giving to the people who

15   needed it, not just zakat, but also sadaqah, which

16   had broader connotations than zakat, but any

17   charitable gift for the people of Chechnya who

18   needed it, and they needed it badly.  This committee

19   was trying to coordinate all those so they wouldn't

20   go all over the place and not get to where they were

21   supposed to go.

22       Q.    All right.  Thank you, Doctor.  I'd like

23   to now ask you to please take a look at Exhibit 670

24   -- if that could be shown to the witness and the

25   jury -- and this is an email dated January 18th from

1    al-Haramain to Dr. El-Fiki.  And if you could please

2    -- you've seen this before you came to court today?

3         A.    Yes, I have.

4         Q.    And could you please tell us what you see

5    in here that is relevant to the inquiries that

6    appeared in the Dr. El-Fiki email of January 11th

7    that you've just described.

8         A.    Well, I don't see it all here, but --

9         Q.    I think it's coming up on the screen now.

10        A.    Okay.  This was the al-Haramain

11   Foundation's response to the questions that were

12   given to them by Mr. El-Fiki who wanted to have the

13   zakat.  And basically, if you look -- if you see it,

14   they -- he is telling them in answer to the query

15   that they got it -- they can give him a receipt

16   saying that they got it to make sure that they did

17   get it and that it would be used for the purposes of

18   the poor and the needy and the refugees in Chechnya,

19   all of which can come under what can be done with a

20   zakat.

21             So he basically was saying that the

22   Al-Haramain Foundation was able to -- willing to

23   provide the funds -- the zakat funds that

24   Mr. El-Fiki wanted to give to where he wanted them

25   to go to for humanitarian purposes.

1          THE COURT:  Counsel, I overruled the

2    previous objection by the government, but the

3    witness is doing what he's really not allowed to do

4    here.  He can tell what the terms usually mean.  He

5    can't tell what Mr. El-Fiki's intention is.

6          MR. WAX:  All right.

7          THE WITNESS:  Let me change that if I

8    may, Your Honor, and say it is my opinion.

9          THE COURT:  There's not enough for you

10   to base an opinion on what his intention is.

11   Mr. Wax knows what I'm saying.

12   BY MR. WAX:

13   Q.    Dr. Long, I would ask you to look, please,

14   at Exhibit 676, and this is also in evidence, I

15   believe, so it could go to the jury.  You had an

16   opportunity to see this exhibit before coming to the

17   courtroom today?  I'm sorry about the placement of

18   the computer and the size there, but do you recall

19   this exhibit including an email chain -- Ms. Wells,

20   put it back up to --

21   A.    Yes.

22   Q.    There you go.  -- an email chain between

23   Dr. El-Fiki and al-Haramain?

24   A.    Yes.

25   Q.    All right.  And just please tell us what

1  the terms in this series of documents mean, going --

2  starting at the bottom, it appears to be an email

3  dated February 24th.  Do you see the reference --

4       A.    Yes, I do.

5       Q.    -- to the term "zakat" in that email --

6       A.    Yes.

7       Q.    -- which is from Dr. El-Fiki to

8  al-Haramain?

9       A.    Well --

10      Q.    I mean the first question is:  Do you see

11  the reference to the term "zakat"?

12      A.    I see the reference to zakat.

13      Q.    And this is a reference contained in the

14  email sent by El-Fiki.

15      A.    That is correct.

16      Q.    And you previously described for us what

17  zakat generally means, and I take it that that would

18  be the same understanding that you would have of the

19  term here, as well?

20      A.    That is correct.

21      Q.    All right.  And then further up in the

22  email, March 23 -- do you see the date, March 23?

23      A.    Yes.

24      Q.    Ms. Wells, if you could highlight that.

25            Do you see the reference to the term

1    "zakat" in that portion of the email as well?

2        A.    Yes, I do.

3        Q.    And again, in the context, your

4    understanding of the term is for humanitarian work?

5        A.    Yes, it is.  Not because I think it is.

6    It is because that in Islam are the parameters for

7    zakat.

8        Q.    All right.  So let me ask you this,

9    Dr. Long:  What would make any organization in Saudi

10   Arabia bound in any way by the restrictions on the

11   use of a zakat donation that you have described for

12   us?

13       A.    Well, I noted earlier that I used the term

14   "culture" and I used the term "Islam."  Islam is a

15   religion.  Culture is what folks in a -- that share

16   their values and norms socially agree about.  And in

17   this case, Saudi culture is overlaid with Islamic

18   values.  All right?

19            So in this case, what would be -- in my

20   personal opinion and in my professional opinion, it

21   would be very unlikely that a person would desecrate

22   one -- the fourth pillar of the faith by doing

23   anything with it that were not permissible within

24   the parameters of that -- in this case zakat.  And

25   it would be very unlikely that culturally -- not

1    just legally, but culturally -- that they would

2    desecrate something that they believe is a -- is a

3    basic obligation from God by sending it anywhere

4    that was not -- that was not permissible within the

5    parameters in Islamic law and in the Qur'an what

6    they can do with it.

7        Q.    Now, in terms of your understanding of the

8    Saudi government, Saudi culture, Saudi society,

9    Saudi politics, if the Saudis wanted to fund

10   mujahideen, would that be done through an Islamic

11   charity such as al-Haramain in this way with this

12   type of documentation?

13       A.    It would -- it could be done, but it is my

14   view that the Saudi government would not do it

15   through the al-Haramain.  They would do it in other

16   ways which they have to do it, which would be -- one

17   way would be sadaqah, which has a broader

18   connotation, but they -- I have been told by very

19   senior Saudi officials that the committee that we

20   had mentioned just earlier limited themselves to

21   doing it for -- to the things that they were -- that

22   they were looking at from all of these different

23   foundations, that it was for humanitarian --

24   basically for humanitarian need, and that is what

25   the zakat limits it to, and that is what the donor

1    of the zakat has to do.

2        Q.    I'd like, Ms. Cooke, if you could please

3    show Dr. Long FinCEN-4 for starters.  And this is in

4    evidence, so it would go to the jury, please.

5    Dr. Long, did you have an opportunity to take a look

6    at this exhibit prior to your testimony today?

7        A.    Yes, I did.

8        Q.    Okay.  And you're familiar with CMIR, what

9    is a CMIR?

10       A.    Yes.

11       Q.    We have all of the individual documents

12   from which this chart has been created.  I'm not

13   going to ask that you look at each of those

14   individually, but in looking at this, and you see a

15   pattern of a fellow named Soliman al-But'he bringing

16   cash instruments into the United States at least

17   nine times over a several-year period, and sometimes

18   in large quantities.

19       A.    Yes, I do.

20       Q.    Okay.  We have some in the other exhibits

21   that many of these were cash instruments or

22   travelers checks.  My question to you is this:

23   Based on your familiarity with the Saudi economy and

24   Saudi business, are you surprised to see that there

25   is a significant use of cash instruments in this

1    way?

2        A.    No, I'm not.

3        Q.    Can you tell the members of the jury,

4    please, why you're not surprised at this.  What have

5    you personally seen and experienced about the way in

6    which Saudi business people or private people

7    operate?

8        A.    Well, I would start with there's a

9    generation gap here.  Saudi Arabia's society,

10   cultural values are still -- have always been for

11   1400 years Islamic, but the underlying basis culture

12   has been as old as the Old Testament because that's

13   where it came from.  And that was -- it was very,

14   very isolated country up until the 20th Century.

15   The only foreigners that they regularly saw were the

16   pilgrims that went for Mecca, and they were all

17   Muslims.

18            There were no banks because they

19   considered banks to be using usury because that's

20   what people who loaned money did back 1400 years

21   ago, and so they said we don't want anybody charging

22   interest 1400 years ago.  So it was very, very

23   common that people would use cash.  It was usually

24   -- in olden times it was coins, silver and gold.

25   And that custom actually survived up until the

1    1950s.  Aramco, the big oil company in Saudi Arabia,

2    which was owned by Americans back then, had to fly

3    in something like three or four DC-4s, DC-6s full of

4    Maria Theresa silver dollars from Austria just to

5    pay the payroll because the people would not take

6    paper money or anything else.

7              And in the late 1950s an American went

8    over and started their Central Bank.  And they

9    didn't call it a bank because they didn't like the

10   name, and they called it the Saudi Arabia Monetary

11   Agency, and that's still what it is and that's still

12   what it's called to this day.  And he wanted to get

13   people to use paper money.  So he made these things

14   up and it said -- for the pilgrims, and it said

15   payor of -- this is -- to the payor on demand we

16   will give you ten riyals.  And what he was really

17   hoping was that they would get --

18              MR. GORDER:  Excuse me, Your Honor --

19        A.    -- so used to using --

20              MR. GORDER:  I think we're getting off

21   topic.

22              THE COURT:  Objection sustained.

23   BY MR. WAX:

24        Q.    Dr. Long, the bottom line is, that today

25   the use of cash, cash equivalents remains common in

1    Saudi Arabia as you understand it?

2         A.    Well, that's what I was just going to end

3    with, that to this day, people still routinely

4    prefer to use cash and to carry cash rather than to

5    transfer it electronically any other way.  And it

6    has happened to me personally, so I know about it,

7    and it is common.  And younger people, maybe under

8    25, might start using electronic stuff, but older

9    people still prefer to use cash to this day.

10        Q.    All right.  And one last question, sir.

11        A.    Yes.

12        Q.    If we could show the witness, please,

13   Exhibit 731, and I believe that's in evidence and

14   would go to the jury, as well.

15        A.    Yes.

16        Q.    And this has a second page on it.

17        A.    Yes.  I've seen it.

18        Q.    All right.  You've had an opportunity to

19   look at this, a list of bank account numbers for the

20   al-Haramain Saudi organization for bank accounts

21   that they held at the Al-Rajhi Bank in Saudi Arabia?

22        A.    Yes.

23        Q.    And you've had the opportunity to look at

24   the description for the Asian Committee, account

25   9889?

1    A.    Yes.

2    Q.    Okay.  If you were attempting to determine

3  what happened to the money with respect to Chechnya

4  and al-Haramain Saudi, is this an account that you

5  would want to look at?

6    A.    Absolutely.

7         MR. WAX:  No further questions.

8         THE COURT:  Cross?

9           CROSS-EXAMINATION

10 BY MR. GORDER:

11   Q.    Dr. Long, okay, are you telling us that

12 everybody is perfect in Saudi Arabia?

13   A.    No.

14   Q.    They don't always follow the rules?

15   A.    No, but they follow some more than they do

16 others.

17   Q.    You're aware, aren't you, that from your

18 work in terrorism that Islamic charities have

19 diverted zakat on terrorism?

20   A.    I am aware that they were accused of

21 giving money to terrorists, yes.

22   Q.    You told us that in your opinion, the

23 SJRC, the Saudi committee that we've been talking

24 about, would have prevented any diversion of zakat

25 for improper purposes.  Is that correct?

1     A.    To Chechnya, yes.

2     Q.    And that is based on your conversations

3  with Saudi officials?

4     A.    Yes.

5     Q.    So Saudi officials did not tell us -- or

6  tell you that there was anything wrong in Saudi

7  Arabia?

8     A.    What do you mean by anything wrong?

9     Q.    With the SJRC.

10     A.    I beg your pardon?

11     Q.    They didn't tell you there was anything

12  wrong in Saudi Arabia with the SJRC.

13     A.    No.

14     Q.    Did you discuss with them who the first

15  director of the SJRC was, 1999/2000?

16     A.    Yes.

17     Q.    And who was that?

18     A.    It was an allah shaykh.

19     Q.    It was who?

20     A.    It was an allah shaykh.

21     Q.    An allah shaykh.

22     A.    Yeah.

23     Q.    What is that?

24     A.    Oh, al-Haramain.  I'm sorry.  I

25  misunderstood you.  I thought you meant of the

1    committee.  Of al-Haramain?

2        Q.    No.  Of the SJRC.

3        A.    I don't remember.

4        Q.    Wasn't the initial chief director someone

5    named Wa'el Jalaidan?

6        A.    Yes.  Yes.  That's right.

7        Q.    Good friends of Osama bin Laden's?

8        A.    I don't know.

9        Q.    Did you discuss that with Saudi officials

10   that told you that SJRC was hunky-dory?

11       A.    I didn't see any reason to.

12       Q.    Did you know that he was removed by the

13   Saudi government in 2002?

14       A.    No, I didn't.

15       Q.    Did you know that he was a key founder

16   with Osama bin Laden of the mujahideen services

17   office?

18       A.    No, I did not.

19       Q.    The precursor to al-Qaeda?

20       A.    Yes.

21       Q.    Does that affect your opinion that the

22   SJRC would have been on the job in preventing

23   diversion of zakat?

24       A.    No.

25       Q.    In your study of -- well, you retired from

1    the State Department in 1993.  Is that correct?

2        A.    That's correct.

3        Q.    Did you -- you've continued to study

4    terrorism --

5        A.    Yes.

6        Q.    -- since that time?

7              Are you familiar with the 9/11

8    Commission's case study on al-Haramain?

9        A.    Yes.

10       Q.    You're familiar that they concluded --

11   well, let me ask you this.  The 9/11 Commission was

12   set up by the government to try to figure out what

13   went wrong with 9/11.

14       A.    Yes.

15       Q.    Issued a number of reports.

16       A.    Yes.

17       Q.    Had a large number of distinguished people

18   working for them?

19       A.    That's correct.

20       Q.    Perhaps some of them colleagues of yours

21   from your State Department days?

22       A.    Yes.

23       Q.    Think they did a good job?

24       A.    Overall, yes.

25       Q.    Now, are you aware that they indicated

1    that there was little regulation of charities in

2    Saudi Arabia before 9/11?

3        A.    I'm aware that there was little oversight

4    of day-to-day operations.

5        Q.    Well, if there was little oversight of

6    day-to-day operations, how can you be confident that

7    the SJRC could prevent the diversion of zakat?

8        A.    Because their job was to coordinate where

9    the money went to.

10       Q.    Didn't the commission in their study say

11   that the foreign operations of charities from Saudi

12   Arabia was not regulated at all until 2002?

13       A.    There was some regulation, but the job of

14   the committee was to coordinate where they went.

15       Q.    My question is:  Didn't the 9/11

16   Commission conclude that there was no regulation of

17   foreign operations of Islamic charities from Saudi

18   Arabia until 2002?

19       A.    There was no oversight in the whole

20   operation from donor to recipient until 2002.

21       Q.    If there was no way to control how it went

22   from donor to recipient, how could the SJRC be sure

23   that there was no diversion of zakat?

24       A.    Because zakat is different from any other

25   kind of donation or charitable giving in that it has

1    very strict parameters to it.  And it is those very

2    strict parameters to it which leads me to the

3    opinion that they would be carried out by

4    al-Haramain regardless of the other kinds of monies

5    they might get from other people for other things.

6         Q.    If they were perfect.

7                   MR. WAX:  Objection.  Argumentative,

8    Your Honor.

9                   THE COURT:  Overruled.

10   BY MR. GORDER:

11        Q.    Can you answer the question, please?

12        A.    Even if they were imperfect because it is

13   a very strong cultural mores in Saudi Arabia that

14   whatever you might be tempted to do or whatever you

15   would desire to do, even if you desired to do it

16   thinking that it is in the name of Islam, you do not

17   desecrate one of the four pillars of the faith

18   because you will be answerable to God.

19             And this is a very strong belief in --

20   throughout the country in the culture.  So that they

21   take, for example, swearing about -- in an affidavit

22   that it is true, they take that very, very seriously

23   and this is a very strong feeling throughout the

24   country.

25        Q.    If we could go to SW-68.  Now, did you

1    review this document that was found in the computers

2    at al-Haramain in United States before testifying?

3        A.    Could I see the rest of it?

4        Q.    Sure.

5            MR. WAX:  Isn't this the same as EK-5,

6    different version?

7            MR. GORDER:  Very similar.

8            MR. WAX:  Thank you, Mr. Gorder.

9        A.    I don't remember seeing that version, no.

10   BY MR. GORDER:

11       Q.    Okay.  Appears to be another translation

12   of Mr. Uthaymeen's -- or Shaykh Uthaymeen's fatwa?

13       A.    Uh-huh.

14       Q.    If we could highlight this part here.  It

15   indicates that zakat can be used for the mujahideen,

16   the Muslims fighting the war, in Chechnya?

17       A.    My take on that is because of the

18   parameters of what you can do with zakat, it does

19   not include using zakat for combat operations.  It

20   would be in this case more like Clara Barton, who

21   founded the Red Cross, starting off with field

22   hospitals for union troops in the Civil War and

23   actually took care of confederate troops at the same

24   time, and it was for humanitarian purposes.  And

25   that is what zakat has to be used for.

1    Q.    Of course it says for Muslims fighting the

2  war.  Correct?

3    A.    It says for mujahideen.  It doesn't say

4  it's helping them fight the war.

5    Q.    Now, if we could jump to EK-5A, you

6  previously testified that this was about jihad.

7    A.    Where is jihad in there?

8    Q.    Isn't this about the jihad in Chechnya?

9    A.    As I see it, it's about -- it says sadaqah

10  and zakat, and sadaqah can be used in a broader

11  context than zakat, and it could be used for jihad.

12    Q.    In fact, in your opinion, the way someone

13  in Saudi Arabia would fund war fighting efforts

14  would be through cash.  Is that correct?

15    A.    Yes.

16    Q.    Now, would zakat, in your opinion, be

17  treated as sacred?

18    A.    Treated as what?

19    Q.    Sacred.

20    A.    Sacred?  Yes.

21    Q.    There would be every effort to keep the

22  principal amount denoted for zakat intact?

23    A.    Not only that, but it would be incumbent

24  upon the donor to do this as a rite in showing his

25  love and obedience to God, just like any other

1    religious rite.  So it has a religious connotation

2    to it that sadaqah -- far beyond what sadaqah has.

3        Q.    So if someone donated some zakat, they

4    would want the entire amount to go for the donated

5    purpose.  Is that correct?

6        A.    Yes.

7        Q.    Keep the expenses of the transaction as

8    low as possible?

9        A.    Yes.

10        Q.    So if you were wire transferring money for

11    a $15 fee, that would probably be a good way to keep

12    the principal intact?

13        A.    They would be trying to get it any way

14    they could to a place where it's very hard to get

15    anything into.

16        Q.    Okay.  Well, if you were trying to get

17    some zakat from Oregon to Riyadh, and you had

18    $150,000, would a good way to do that be to wire

19    transfer the money for a $15 fee?

20        A.    It would be a good way for you to do it,

21    but that doesn't necessarily mean to a Saudi it

22    would be a good way to do it.

23        Q.    Well, if the organization had nine bank

24    accounts in Riyadh, that would probably be a good

25    way to do it?

1      A.      Yes.

2      Q.      Rather than get the money in travelers

3   checks?

4      A.      No.

5      Q.      Pay a $1,300 fee for them?

6      A.      No.

7      Q.      And just diminish the zakat?

8      A.      As I said earlier, carrying cash was a

9   very normal way of transferring money, and still is.

10     Q.      If the carrying of the cash costs $1,300?

11     A.      Yes.

12     Q.      How about --

13     A.      This is a very rich country.  They are

14  looking at how to get where it came from to where it

15  should go.

16     Q.      So they fly somebody over here, couple

17  thousand dollars in airfare?

18     A.      Back when I was living in Saudi Arabia,

19  the Department of Defense -- the Ministry of Defense

20  in Saudi Arabia owed the defense department -- I

21  don't know -- it was over a million dollars.  I

22  can't remember the exact amount.  And I was heading

23  back to Washington, and they asked me to carry a

24  check for that amount of money back to Washington.

25  And my bosses said since I'm going and since the

1    other way to do it would be put it through the

2    diplomatic pouch, which would take longer because it

3    came once a week, I did.

4         And for the Department of Defense that was

5    a very normal way to do things.  For Americans it

6    was not, and it burned a hole in my pocket and I was

7    scared to death.

8    Q.    But it was a check?

9    A.    It was a check.

10   Q.    Why did the Saudi government remove the

11   cash boxes -- the zakat boxes in the mosques in

12   2002/2003?

13   A.    Because all the heat they got from the

14   United States about giving money to terrorists,

15   which they saw as shaming the government and as a

16   betrayal of the United States's relationship with

17   them.

18   Q.    Dr. Long, I -- could we have exhibit 670,

19   please.  You recall testifying about this exhibit?

20   A.    No, I didn't.

21   Q.    Why don't you take a look at it.

22   A.    Oh, okay.  I'm sorry.

23   Q.    And if we could just scroll down a little

24   bit further.  Okay.  That's fine.

25   A.    Yes.

1     Q.    Now, I recall reading in your report about

2    this particular exhibit.  You indicated that

3    Mr. El-Fiki had received a response from Mr. Jazak

4    Khair from al-Haramain.

5    A.    Yes.

6    Q.    Have you ever talked to Mr. Khair?

7    A.    No.

8    Q.    Have you read any reports about Mr. Khair

9    and what he has to say?

10    A.    No.

11    Q.    You speak Arabic, don't you?

12    A.    I beg your pardon?

13    Q.    You speak Arabic?

14    A.    Yes.

15    Q.    Doesn't "Jazak Allah Khair" mean "May God

16    bless you"?

17    A.    That's barak Allah feek (phonetic).

18    Q.    What does it mean in Arabic?

19    A.    What, khair?

20    Q.    Jazak Allah Khair.  I can't pronounce it

21    right.

22    A.    It's just a saying about God giving you

23    blessings.

24    Q.    Okay.  So it's not a person.  It's a

25    blessing.

1      A.     Yes.

2      Q.     But in your report you say you received a

3    response from Mr. Jazak Allah Khair.

4      A.     Okay.

5              MR. GORDER:  No further questions,

6    Your Honor.

7              MR. WAX:  Your Honor, I have one

8    question, but I need to take it up with the court

9    because it relates to an earlier issue and something

10   that Mr. Gorder just went into.

11             THE COURT:  All right.  Are you going

12   to be calling other witnesses?

13             MR. WAX:  I have one other short

14   witness who has been waiting patiently all day who

15   would love to testify and be able to go home.

16             THE COURT:  Well, what we'll do is put

17   that witness on.  Members of the jury, let's go

18   ahead and finish the testimony.  Well, let me ask

19   this.

20             Are you going to have rebuttal

21   evidence?

22             MR. CARDANI:  At this point, no.

23             THE COURT:  All right.

24             MR. CARDANI:  And depending on what

25   this is --

```
 1                THE COURT:  All right.

 2                MR. WAX:  Your Honor, excuse me.  I'm

 3    not indicating that we're prepared to rest.  My

 4    indication is we have one more short witness today.

 5                THE COURT:  All right.  Do you have

 6    other witnesses?

 7                MR. WAX:  We will need to be

 8    consulting tonight.  I think you understand the

 9    issue.

10                THE COURT:  In that case we're going

11    to take a recess until 9:00 tomorrow morning.

12                Members of the jury, I'm pretty sure

13    we'll get the case to you tomorrow.  Okay?  We're

14    pretty much at the end of the evidence.  Very

15    shortly in the morning I'll be giving you your

16    instructions on the law and you'll hear the

17    argument.  Okay.  Thanks for your patience.

18                (Jury exited courtroom.)

19                THE COURT:  I assume you're referring

20    to a secured area -- is that correct? -- or are you

21    not?

22                MR. WAX:  I don't believe that there's

23    anything that I need to say in closed session, Your

24    Honor.

25                THE COURT:  Well, all right.  Go
```

1    ahead.

2                    MR. WAX:  Mr. Gorder asked about a

3    loss of $1,300, and I believe that once again by the

4    government suggesting to the jury that there has

5    been something done that diminishes the amount of

6    money that is available in Saudi Arabia, they are

7    making the Exhibits 704 and 705 critical to

8    rebuttal.

9                    THE COURT:  Okay.  I disagree.

10                   You may step down.

11                   Now, we probably should take some time

12   to just go over some of the remaining questions you

13   need a ruling on.  I sort of hate to do that to our

14   reporter tonight, and plus, I will tell you right

15   now, I'm in a lot of pain, so it's not in your best

16   interest for me to do it tonight.  I've looked at

17   the material, and we'll do it -- I think what we're

18   going to do is come in at seven in the morning.  All

19   right?  And we'll do that -- and we'll probably do

20   that in Chambers.

21                   How long do you request for your

22   summations?

23                   MR. GORDER:  Your Honor, I haven't

24   quite formed it out because I wasn't sure what --

25   certainly no more than 90 minutes.

```
 1                    THE COURT:  All right.
 2                    MR. WAX:  I was guessing up to two
 3    hours, Your Honor.
 4                    THE COURT:  90 minutes apiece.
 5    Anything further tonight?
 6                    MR. CARDANI:  So tomorrow we can talk
 7    about jury instructions, as well, Judge?
 8                    THE COURT:  Yes.  We can do that
 9    tomorrow morning at seven.
10                    MR. GORDER:  Your Honor, can I just
11    understand, is it your practice to do the jury
12    instructions before argument --
13                    THE COURT:  Yes.
14                    MR. GORDER:  -- or after?  Okay.
15    Thanks.
16                    MR. WAX:  So, Your Honor, we have one
17    short witness left, and then we need to consult with
18    our client tonight before determining --
19                    THE COURT:  I understand that.  I know
20    the code words.  We're in recess.
21                    (The proceedings were adjourned
22                     at 5:09 p.m.)
23
24
25
```

274

```
1   STATE OF OREGON      )
                          )   ss.
2   County of Lane       )

3

4        I, Deborah M. Bonds, CSR-RPR, a Certified

5   Shorthand Reporter for the State of Oregon, do

6   hereby certify that at the time and place set forth

7   in the caption I reported all testimony and other

8   oral proceedings in the foregoing matter; that the

9   foregoing transcript consisting of pages 120-273

10  contains a full, true and correct transcript of the

11  proceedings reported by me to the best of my ability

12  on said date.

13       IN WITNESS WHEREOF, I have set my hand and CSR

14  seal this 8th day of September 2010, in the City of

15  Eugene, County of Lane, State of Oregon.

16

17

18

19

20

21

22

23

24  Deborah M. Bonds, CSR-RPR

25  CSR No. 01-0374
```