1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF OREGON

3    UNITED STATES OF AMERICA,          )
                                        )
4                   Plaintiff,          ) No. 05-60008-2-HO
                                        )
5       v.                              ) September 8, 2010
                                        )
6    PIROUZ SEDAGHATY, et al.,          ) Eugene, Oregon
                                        )
7                   Defendants.         )

8

9         PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS

10         BEFORE THE HONORABLE MICHAEL R. HOGAN

11     UNITED STATES DISTRICT COURT JUDGE, AND A JURY

12       DAY 7, REBUTTAL ARGUMENT BY MR. CARDANI

13                  PAGES 1 -45

14

15                     -:-

16

17

18

19

20

21

22

23           Deborah Wilhelm, CSR, RPR
                  Court Reporter
24              P.O. Box 1504
             Eugene, OR  97440
25              (541) 431-4113

```
1                        APPEARANCES OF COUNSEL

2

3     FOR THE PLAINTIFF:      CHRISTOPHER L. CARDANI
                              United States Attorney's Office
4                             405 E. 8th Avenue, Suite 2400
                              Eugene, OR  97401
5                             (541) 465-6771
                              chris.cardani@usdoj.gov
6
                              CHARLES F. GORDER, JR.
7                             United States Attorney's Office
                              1000 S.W. Third Avenue, Suite 600
8                             Portland, OR  97204-2902
                              (503) 727-1021
9

10    FOR THE DEFENDANT:      LAWRENCE H. MATASAR
                              Lawrence Matasar, P.C.
11                            621 S.W. Morrison Street
                              Suite 1025
12                            Portland, OR  97205
                              (503) 222-9830
13                            larry@pdxlaw.com

14                            STEVEN T. WAX
                              BERNARD J. CASEY
15                            MICHELLE SWEET
                              Federal Public Defender
16                            101 S.W. Main Street, Suite 1700
                              Portland, OR  97204
17                            (503) 326-2123
                              steve_wax@fd.org
18

19

20

21

22

23

24

25
```

1          (Wednesday, September 8, 2010; 2:50 p.m.)

2              P R O C E E D I N G S

3          (Proceedings were had which were not ordered

4    transcribed, or have been transcribed and are bound

5    separately.)

6          THE COURT:  Members of the jury, we'll take a

7    five-minute health break, and then we have one more

8    short argument.

9          (Recess:  2:50 until 2:58 p.m.)

10         THE COURT:  We'll go back on the record.

11         Members of the jury, Mr. Cardani, under the

12   law, is entitled to rebuttal argument.  This is that

13   argument.  Go ahead.

14         MR. CARDANI:  Thank you, Your Honor.  Members

15   of the jury, bear with me for about 15 or 20 minutes,

16   and then the case will finally be yours.  So one more

17   lawyer gets to talk.

18         A few points about Mr. Wax's closing argument.

19   We listened to him for over two hours.  Unless I didn't

20   hear it correctly, he covered an awful lot of the case,

21   but I didn't hear him mention the Noble Qur'an.

22         The Noble Qur'an is the defendant, after he

23   started working for al-Haramain, sending to U.S. prisons

24   around this country, in the thousands, 10 to 15,000

25   prisoners, violent people serving time, getting junk

1  like this from al-Haramain saying jihad is an obligation

2  for Muslims.  Talk about people prone to suggestion.

3  Prisoners.

4         Mr. Wax talks for two hours and you don't hear

5  anything about that.  Nor do you hear anything about

6  this.  You've memorized some of this book, members of

7  the jury.  *Islamic Guidelines For Individual and Social*

8  *Reform*.  This was a special book at al-Haramain.  Not

9  everybody got this.  The only people who got this, and

10  you heard it from the witnesses, were the ones who

11  passed the test.

12         You had to be not only a believer, but you had

13  to pass a test.  Daveed Gartenstein-Ross, it's one of

14  his responsibilities, to put this book -- I'm sorry --

15  interviews into the prisons by the thousands.

16         The defense witness yesterday told you that as

17  well, Mr. Rodgers.  And back they came into al-Haramain.

18  It was a huge project sponsored by al-Haramain Saudi

19  Arabia with their Wahhabi, violent jihad propaganda.

20  They get a foothold in the United States.  Pete Seda

21  becomes their man.  And out goes this hateful, crazy

22  jihad stuff into prisons.

23         But not everybody got this.  Why didn't

24  everybody get this?  Because you can't talk openly about

25  this kind of stuff because you may get in trouble.  So

1   you got to be quiet about it.

2           And, yes, members of the jury, there are two

3   sides to Pete Seda.  The side that when the cameras are

4   on, when the lights are bright, is the smiling, peaceful

5   face of Islam in southern Oregon, and wherever else he

6   can market it.  But turn those lights off, turn the

7   cameras off, and get down into room X at 3800, and

8   that's where it really starts happening, because it is

9   there that he is serving the bidding of his sponsors

10  al-Haramain in Saudi Arabia, the ones that are funding

11  his ability to exist as an Islamic charity in the United

12  States.

13          Two hours we heard from Mr. Wax and nothing

14  about this stuff.  Why is that?  Why doesn't he talk

15  about the fact that we have Mr. Seda doing direct fund-

16  raising for the mujahideen?  Daveed Gartenstein-Ross and

17  others were asked to help sponsor, at Mr. Seda's behalf,

18  a mujahideen fighter to go to Kosovo.  Gartenstein-Ross

19  throws money in the hat.  And off goes a wire transfer

20  of some sort to Albania.

21          Barbara Cabral tells you she went to the Hajj

22  with Mr. Sedaghaty, big international flight, a big

23  pilgrimage, sponsored by who?  al-Haramain.

24          On the way out of the country, Mr. Seda says

25  let's give our money to the mujahideen.  No mention of

1    that from Mr. Wax.  Why is that?

2           The Springfield building, I didn't hear much

3    about that at all.  Mr. Seda was in the middle of the

4    purchase of the Springfield building.  As Mr. Gorder

5    told you this morning, it was one of the two big events

6    in the year 2000.  He knew exactly how much that

7    building cost.  He approved the deal.

8           If you look in those files, the Mr. Kanan

9    files, Pete approved the deal.  He made the decision.

10   He's working with al-But'he.  He's working with

11   al-Haramain.  And the money comes over and he buys it.

12   He knows all about it.  Why is that important?  And why

13   didn't they talk about it?

14           Because Pete Seda knows exactly to the dime,

15   members of the jury, how much that building cost.

16   $375,000.  He knew how much that they needed to close

17   the deal, 318,000 and change.  He gets the money.  He

18   sends the cashier's check off.  And the deal is closed.

19           Why is that important?  Because when the

20   accountant Wilcox comes and asks him about the purpose

21   of some of these funds, rather than just be forthcoming

22   and say, here are the records that I have in my

23   possession from Mr. Kanan, which he had, he withheld

24   those records from his own accountant, not telling him

25   what he knew about the transaction.

1          Why is that important?  Because Mr. Seda told

2     Mr. Wilcox, you know this very well by now, that that

3     check for one-hundred and thirty-one three, that is so

4     important in this trial, went into the Springfield

5     building.

6          Why is that?  Because Mr. Seda had a motive, a

7     motive to conceal the truth about the transaction.

8          Now, what you did hear from Mr. Wax quite a bit

9     in two hours is what I'm going to call the blame game.

10    Mr. Seda has been indicted.  Mr. Seda is here before

11    you.  His conduct, his activities are before you.

12         Now, we've heard the defense spend all kinds of

13    time, Mr. Wax talks about, well, Barbara Cabral, she's a

14    liar, can't rely on her; Daveed Gartenstein-Ross, liar,

15    can't rely on him; Colleen Anderson didn't do her job

16    right, only got one account in Saudi Arabia, deficient

17    investigation.  Mr. Gorder misrepresents a bunch of

18    stuff this morning to you, so Mr. Wax says,

19    respectfully.  And, oh, yes, Mr. Wilcox.  And Mr. Owens,

20    who they hired nine years after the fact to try to

21    justify the fact that an Islamic charity in the United

22    States, attempting to fund $150,000 in an overseas

23    transaction, for whatever purpose, for blankets, for

24    food, for bombs, concealed it on its 990.

25         I ask you this, members of the jury, if

1  everything was on the up-and-up to Mr. Seda and his

2  organization, why not broadcast to the world what a

3  wonderful thing he did in getting $150,000 moved into a

4  war zone for humanitarian relief?  Didn't do that.

5  Nobody knew, not many people.  A few insiders knew the

6  real truth.  But nobody could know the truth because he

7  had a motive to conceal because Islamic charities can't

8  be doing this kind of stuff.

9        If you are sending money overseas, you know

10  there is a way do it, you heard that from Mr. Khan.  The

11  annual report of the Islamic Relief Organization is in

12  evidence.  Take a look at it.  It's impressive.  This

13  group raises $100 million a year for legitimate refugee

14  relief, people in need, flood victims, war zones,

15  displaced -- true displaced refugees and children.

16        We have vehicles around the globe, members of

17  the jury, we love to give charities charitable dollars

18  to fund these organizations.  Khan's organization does

19  it the right way.  And you heard what he said.  You

20  know, look at the report.  They collect money in.  They

21  keep all kinds of records.  Records have to be kept.

22        Why are records so important?  Because this

23  kind of stuff once it's out there, it can disappear into

24  the Never Never Land of terrorism.  This is how wars are

25  fought.  The mujahideen are not sponsored by countries.

1      It's not like Russia who pays its soldiers with

2   rubles, government money.  It's not like the American

3   Army being paid with dollars.  The mujahideen are

4   freelance fighters that go around the global to promote

5   their terrible version of a religion that has very

6   peaceful elements of it, but their version of hatred, of

7   killing people that don't believe in their religion,

8   they have all these crazy views about women.  This is

9   how they do their stuff.  Cash.  And once cash is

10  released into the mainstream, it's gone.

11      So let me talk a little bit about the defense.

12  In the two hours that Mr. Wax was speaking, I counted

13  about an hour devoted to the testimony of one man.  Tom

14  Wilcox.  What do we know about Tom Wilcox?  One-

15  accountant firm down in Medford.  Wasn't a battery of

16  accountants.  Lots of help.  I think there was one

17  accountant and one assistant throughout the entire time.

18  Four-hundred clients or so during that time.  It's not

19  like al-Haramain was the only client.  He has got a lot

20  of stuff going on.

21      What else do we know?  That Mr. Seda contacted

22  him at the end of 1999, the very end of 1999.  And the

23  paperwork is finalized in early 2000.  The agreement

24  between Mr. Seda and Mr. Wilcox envisioned that

25  Mr. Wilcox would spend a handful of hours in doing the

1   forms, 990 and the 1023, because, for small charities in

2   the United States, that's the norm.  It's pretty easy.

3   If you are doing things on the up-and-up and the

4   paperwork is prepared by the client, it's pretty easy

5   stuff.  Mr. Wilcox had done several of these things

6   throughout his long accounting career.  So the

7   expectation was a few hours.

8          It's not what it turned out to be because the

9   paperwork was in no way, shape, or form, normal.  And

10  Mr. Seda and his organization was late in getting

11  information to Mr. Wilcox.  And the information that

12  came in, as we know now, was problematic.

13         We also know that by the time Mr. Seda got

14  around to dealing with Mr. Wilcox, the 1998 return was

15  already late.  The 1999 return was due in a few months.

16  And our 2000 return, October of 2001.

17         My point is they're already under the gun.  He

18  comes into the accountant late.  There's a lot of flurry

19  of paperwork that needs to be done.  Some requests for

20  information.  Mr. Wilcox has got 400 clients he's

21  dealing with.  It's the end of the year.  1040s have to

22  be done.  He's under the gun.

23         Now, again, one hour of testimony -- of closing

24  argument spent on the testimony of one man.  The Tom-

25  Wilcox-is-a-liar defense, it's a big one here.  Trying

1   to get your eye off of the ball of Pete Seda and his

2   actions talking about the other people and displacing

3   blame.  Tom Wilcox is a liar.

4        Now, we know that the defense got everything.

5   Mr. Wilcox had a suitcase of material.  Three binders,

6   1,000, 5,000, 10,000, whatever the number of pages were,

7   it was a lot; computer discs full of reams of other

8   material.  This was supposed to be a few hours.  It

9   turned into much more than that.  Lots of paper was

10  generated.  The defense gets all of it.  The QuickBooks.

11  The audit trails.  The billing records.  Enough to make

12  your eyes glaze over.  All of this stuff, the billing

13  records, the returns, everything is given to the

14  defense.

15       They pour over it.  They hire expert after

16  expert after expert, hundreds and hundreds and hundreds

17  of hours, a multiplying factor of probably 10 or 20 over

18  what Mr. Wilcox did in the entire time he worked for

19  Mr. al-Haramain, I suggest to you.  Pouring over his

20  work.  Why?  To try to make him be a liar when it came

21  time for his testimony to you.

22       So how did they do that?  Mr. Wilcox agreed to

23  sit down with the defense, as he did with the

24  government.  You heard Mr. Matasar, Mr. Wax had a

25  lengthy meeting with Mr. Wilcox.  Does that sound like a

1    liar?  Does that sound like someone who has something

2    that he's trying to hide?

3         He is what he is, members of jury.  Is he the

4    world's best accountant?  I submit to you negative.

5    He's a small Medford-based CPA with 400 clients.  He

6    gets a contact from a charity.  He does charity work

7    before.  He says it's going to be a few hours a year.

8    He agrees to do it.

9         Turns over all of the records to the defense

10   and out it goes.  So they pour over the records.  And

11   they bring in a full-blown support team.  With

12   QuickBooks people to look at every nook and cranny

13   there, Mr. Cone; accountants; and Mr. Owens, the big

14   lawyer from Washington D.C.  Dig into everything.  And,

15   I submit to you, find a reason to blame other people, to

16   get your eye off of the ball, the defendant, Pete Seda's

17   actions.

18        So that work is done.  Hundreds and hundreds

19   and hundreds of hours.  And do they find mistakes?  Yes,

20   they do.  But use your common sense once again, members

21   of the jury.  Does any accountant get everything right?

22   Everything?  Every detail?  Does anybody in life get

23   everything right?  We all make mistakes.  Even if we're

24   trying to do our best, even if someone is paying us lots

25   of money to do work for them, we make mistakes.  Does it

1   make us liars when we take the stand?  No.  He made

2   mistakes.

3          We're not here to defend those mistakes.  He

4   made mistakes.  He told you he made mistakes.  And, yes,

5   on the QuickBooks thing, did he initially tell Colleen

6   Anderson that al-Haramain provided him with the

7   QuickBooks schedule and this building account already

8   done?  Yes.  But when shown the records, which he didn't

9   have access to at the time, several years after this all

10  went down, yes, his memory was refreshed.  Yes, I was

11  the one who coded this and put those checks in there.

12  Based on what?  Conversations with my client.

13         Is that so normal -- I mean, abnormal, members

14  of the jury?  Does he have a motivation to conceal, to

15  lie about these things?  Is it not normal that when you

16  do something and you are mistaken, and we have all done

17  that, and then later shown something else that refreshes

18  our memory, perhaps by our spouse, yes, I made a

19  mistake.  Okay.

20         Wilcox took the stand, members of the jury, and

21  he told you he made a mistake.  It's not like he's

22  trying to hide anything.  In all of his glory, Wilcox

23  got up and said, yes, I made some mistakes.

24         But I submit to you, members of the jury, that

25  on the issues most important to this case, he was

1    telling the truth.

2            Mr. Cone, their expert, spent 300 hours or

3    whatever it is.  CPA.  When I asked him, you saw this

4    check come in, you got the May 14th version of the

5    QuickBooks, comes in, we all agree on that.  We all

6    agree that the $131,000 check is not coded properly from

7    al-Haramain.  It's missing.  That's a huge check.  It's

8    a small charity.  That's gotta stick out like a sore

9    thumb.  It would to Mr. Cone.  And it did to Mr. Wilcox.

10   So what did he do?  He contacted the client.  Because

11   who knows best about the true inner workings of the

12   transaction other than the client?

13           Now, sure, you want to rely on information, you

14   want to see computer records, you want to see hard

15   copies and all, but it wasn't there in the additional

16   version -- the original version of the QuickBooks.  So

17   he had to ask the question.  To who?  Mr. Seda, his

18   client.

19           Now, did that occur during a phone call on

20   March 3, 2000?  Did that occur in an e-mail on June 21,

21   2001?  Did that occur when they saw each other at the

22   grocery store on May 17, 2001?  Who knows.  But what

23   Mr. Wilcox told you is, I talked to Pete.  Why?  Because

24   the 131 had not been taken care of in the books and

25   records properly, and I had to account for it to do my

1    job in preparing the 2001 return -- 2000 return, excuse

2    me.

3            Now, the billing records of Mr. Wilcox are in

4    evidence.  They show that the billing records occurred

5    for activity Mr. Wilcox did May 30th, June 13th, June

6    14th, September 19th, September 20th, 24th, 25th,

7    October 1st, October 2nd.  This was all billings by

8    Mr. Wilcox to Mr. Sedaghaty for work that he was doing

9    on the run-up to the 2000 return.  Our return.

10           So you've got all of these contacts that are

11   being billed.  And then they try to nitpick.  Well,

12   which one of these involved phone calls?  Which one of

13   these involved substantive work?  Which QuickBooks

14   schedule was in play for this?  Members of the jury,

15   this is nine years ago.  To test someone's memory like

16   that, how can any of us be expected to remember with

17   that kind of intricate detail what we did nine years

18   ago, let alone one year ago or even one month ago?

19           Mr. Wilcox took the stand and told you that he

20   talked to Pete Seda.  And what did Pete Seda say about

21   the check that's very important here, this one-

22   thirty-one three?  Funds used for the Springfield

23   building.

24           Now, we all agree there was no Springfield

25   building account in these QuickBooks things, so one had

1   to be done.  Mr. Wilcox created this and put the check

2   and others into the Springfield account based on

3   conversations with the defendant.

4          This money went to the Springfield building

5   purchase.  He creates this thing.  And it adds up to

6   $461,000, I believe.  And then Mr. Wilcox told you, I

7   showed this to my client, Mr. Seda.

8          Now, keep in mind, Mr. Seda, the defendant,

9   knows we paid $375,000 for this building.  Yet he has

10  shown a building schedule that says $460,000.  Tilt.

11  Doesn't work.  Add math.  Note to self.  Talk to

12  accountant.  Tell him something is wrong.  Didn't

13  happen.

14         I believe Mr. Wilcox, in response to my

15  question, I said, did you stick this under his nose?

16  Did he actually see this?  Yes.  We talked about it.  I

17  remember the conversations.  I can't tell you if it was

18  on this date or this date or this date.  We talked about

19  it.  Here are your billing records.  Yes, it could have

20  been this date, could have been that date, I don't know.

21         Was he lying to you when he told you that,

22  members of the jury?  Did he pull this out of whole

23  cloth?  What's his motivation to lie to you?  Is he

24  running an Islamic charity -- charities that are under

25  intense scrutiny for throwing this kind of stuff around

1   the world to fund mujahideen fighters?  No.  He's a solo

2   practitioner in Medford, Oregon, trying to make ends

3   meet with 400 other clients.

4          Now, the $21,000, likewise, it comes in and it

5   is reported.  It's reported in this thing called a

6   reimbursed expense.  A big red flag for accountants like

7   Mr. Cone acknowledged yesterday.  You gotta deal with

8   that.  So it comes in looking like it -- it's just

9   sticking out, $21,000.  We know that was our cashier's

10  check for al-But'he, that was funds used to buy

11  al-But'he.

12         Did Mr. Wilcox get the right information to

13  Mr. Seda when he asked him about this one?  No.  Didn't

14  mention the Chechnya transaction.  And by the way, if

15  Mr. Seda had truly acted in his mind on the up-and-up

16  properly, he would be telling the world, including Tom

17  Wilcox, look what I did, I fed refugees.  I took care of

18  the needy.  I, Pete Seda, got $150,000 from an Egyptian

19  guy, and I got it into a war torn area with my fellow

20  Muslims in need, and I did good.

21         And, Mr. Wilcox, I told you before, I think I'm

22  under scrutiny by the IRS, by the government, I think

23  I'm going to be audited, keep my books and records

24  clean.  If that was his mindset, why not tell Mr. Wilcox

25  all about this?  It was a huge deal in his life at that

1   time, this money thing.  He never told Wilcox about the

2   Chechnya transaction.

3           This return, members of the jury, IRS-1 is the

4   subject of the tax count.  It's long.  I've looked at it

5   quite a few times.  The word Chechnya is nowhere in

6   here.

7           So if things are on the up-and-up, Mr. Seda,

8   tell your accountant about it.  Tell the world about it.

9   And this 990, by the way, does go to the world.  Can't

10  do that.  Why?  Because he knows he's up to no good.  We

11  caught him in a transaction involving an Islamic charity

12  that can't do what he was trying to do, and we caught

13  him.  Took a lot of work.  Took a lot of effort, record

14  requests, but we caught him, and that's why we're here

15  today.

16          Now, Mr. Wilcox, again, testifies.  And they

17  have all the information.  They've done all of the run-

18  up and the investigation on him.  And they put him -- we

19  put him on the stand.  He told you, in essence, what I

20  just told you.  And then he goes on cross-examination.

21  A full court press.  To do what?  To try to make him

22  appear as a liar to divert your attention and blame it

23  on the accountant rather than the client who has given

24  the accountant bad information.

25          You cannot expect an accountant to file an

1    accurate return if you are providing inaccurate

2    information to your return preparer.  It's as simple as

3    that.

4            He did make mistakes.  A $4,000 mistake, the 1

5    percent error mistake, a few other things that the

6    defense talked to you about, Mr. Wax repeated.  I submit

7    to you that with all of the time and attention that they

8    flyspecked his work, his caseload of work, things like

9    that are going to happen, and they did.  He told you

10   about it.  He didn't run from them.  He admitted it.

11   Yeah, that was my mistake.  That's not on Pete.  That's

12   not Pete's fault.

13           Does that sound like a liar to you?  I made

14   this mistake here.  I made this mistake here.  That's

15   not on Pete.  Yep, you're right.

16           He even admitted a mistake that he didn't make.

17   The defense thinks they get this big deal with that

18   $2,000 Gartenstein check.  Why is that so important?  It

19   seems like a little thing.  But sometimes little things

20   mean big things.  Daveed Gartenstein-Ross told you that

21   the defendant gave him a check for $2,060.  It was for

22   salary.  It wasn't for a computer.  But that's what

23   Mr. Seda wrote on the computer -- on the check.  Mac,

24   purchase of a Mac or something like that.  It was in

25   1999.  And we know the check was dated by Mr. Seda

1   wrong.  It was a '99 check.  And the defense has this

2   thing.  And Mr. Gartenstein-Ross tells us that it was a

3   salary check, not a -- I'm sorry, it was a payroll check

4   improperly listed as a computer purchase that never

5   happened.  And that Mr. Sedaghaty was just trying to

6   avoid payroll taxes.  It's a little thing about intent.

7          What's he thinking about when he's dealing with

8   the IRS?  Is this someone who is trying to be clean?

9   Keep the books clean?  IRS is going to scrutinize me?

10  No.  It's an anti-IRS sentiment.

11         So he doesn't want to pay payroll taxes.  He

12  lies on the check.  And Gartenstein-Ross tells you about

13  it.

14         Now, why do I bring it up here?  Because Wilcox

15  is hit with this check.  They think they gotta big

16  gotcha.  Well, if you thought this thing was a computer

17  purchase, why is not in the 1998 information?  Which we

18  know they've poured over with a fine-tooth comb.  And it

19  wasn't in the '98 stuff.  So Wilcox eats it.  I guess I

20  made a mistake.

21         But then on redirect, we show him the 1999

22  records, and there it is.  He did rely on his client's

23  information when he said, what's this check for?  And

24  Pete told him it was for a computer purchase, and he

25  makes an appropriate entry in the 1999 records.  And

 1    he's shown that.  So he even admitted a mistake that he

 2    didn't make.

 3           Does that sound like -- to you like someone

 4    who's trying to lie and pull one over on you?  No.

 5           But on the big transactions, folks, keep the

 6    eye on -- keep your eye on the ball, please.  The

 7    Springfield building purchase, when Mr. Wilcox learned

 8    about it, he wanted supporting records.  Never given to

 9    him.  And yet he -- Mr. Seda had them.  Concealment.

10           And on the 131 and the 21 that Wilcox found

11    out, the big checks he's got to deal with, talk to his

12    client, concealment and lies at this point.  Concealment

13    and lies from your client are inevitably going to end up

14    in a false return.  The return is false in the many ways

15    that we told you.

16           Lines 1, 22, and 57, you've got it committed to

17    memory by now, are false.  Line 1 is false because the

18    $121,000 was backed out of contribution income by Wilcox

19    because of the lie by Mr. Seda to him about it being

20    refunded to the donor.  That was what the client said.

21    That's how it was treated.  Line 1 is false.

22           22 and 57 has to do with the money going out

23    because the client tells the accountant that it's money

24    that went into the building.  The accountant takes the

25    information, puts it in, and it ends up affecting

1    falsely lines 22 and 57.

2         Now, when you deliberate on this return, those

3    are the three lines in the indictment.  And you have to

4    agree that a particular line on the return is false to

5    convict him beyond a reasonable doubt.  But that's not

6    all you have.

7         You can look at the whole return.  And there

8    are other parts of that return that are false.  And if

9    there are other parts of the return that are false, it

10   makes more sense that the other -- that the lines that

11   are charged are false as well.

12        Chechnya should have been bull horned in that

13   return, because there's a section that talks about

14   humanitarian relief, statement of functions.  And there

15   is a $24,000 entry that has nothing to do with Chechnya.

16   And this is where the money should have gone if

17   everything as on the up-and-up.  There would be no

18   motivation to conceal and lie.

19        The $21,000 that went to al-But'he, he's an

20   officer of the corporation, whatever that payment was

21   for, if it went to the officer, it should have been

22   reported.  It was not.  Another falsity in the return.

23        The return was sent to the client,

24   Mr. Sedaghaty, and he signed it and off it goes.  But

25   the thing is, they say, you know, he don't -- Pete's not

1   a detail guy, and he may have just signed it, and off it

2   goes, well, okay, but here is the thing on that.  If you

3   know in your mind, as he did when he was dealing with

4   Wilcox, that he had concealed the truth from him about

5   the transaction overseas, then the return had to be

6   false in Mr. Sedaghaty's mind, because the correct

7   information was never given to him.  So when he signed

8   that return, okay, he might have not looked at line 1

9   and said, oh, my, that's false; 22, wow, that one's not

10  right, he knew the return was false, members of the

11  jury, because the essence of the most significant

12  transactions had been mischaracterized.  Springfield

13  transaction and the $150,000 that we have here.

14          Before I leave Wilcox, when we hire

15  accountants, we heard testimony that it is not an

16  adversarial relationship.  You're not hiring an

17  accountant to challenge you on the accuracy of your

18  information.  To the contrary, it's a trusting

19  relationship.

20          Now, there may be some verification

21  requirements on the accountant on occasion, but you

22  basically have to accept the client's statement, not

23  blindly.  You should do things like maybe ask for an

24  escrow file.  But you have to, at some point, accept

25  your client's word.  If you go after your client and

1    say, I don't think you are telling me the truth on this,

2    how long are you going to have that client?  Doesn't

3    work that way.

4           Mr. Wilcox made mistakes, but I submit to you

5    he was credible in eating those mistakes and telling you

6    the truth.

7           Mr. Owens, here is the next part of the blame

8    game.  Well, the return is not false, but if it's false,

9    it never should have been filed in the first place.

10    That's a clever lawyer thing.  It's a trick.  Don't fall

11    for it.  Nine years after this transaction, members of

12    the jury, they hired this guy that was the head of

13    Exempt Organizations, and, yes, he did some impressive

14    work with the IRS, 25 years of service.  He spends a

15    pile of time, associates spend a pile of time digging

16    through these issues, and they come up with something

17    that I submit to you is a smokescreen.  This should have

18    never been reported in the first place.  Well, why is

19    that, Mr. Owens?  Because it was a conduit, an agency

20    relationship.  Well, what's that?

21           Well, when a tax exempt organization here gets

22    money but it's not really theirs, they are just a

23    vehicle to send it on to somebody else, a conduit, and

24    there is an agreement for all of this, then it's not a

25    reportable transaction.  So this transaction, or at

1   least most of it, never should have been reported in the

2   first place, so Mr. Owens says.

3          Well, members of the jury, where is the

4   agreement?  Mr. Gorder asked you this morning, I'll ask

5   you again, we've heard from Mr. Wax, where is the

6   agreement that makes this that, makes this a boom-boom

7   thing, that Mr. Seda had no control?  You don't see it

8   because it didn't exist.

9          Mr. Sedaghaty, when he got this money, if it's

10  a true agency conduit, he should have spent $15, like

11  El-Fiki did, and say, okay, boys at al-Haramain, I got

12  the money.  All right, what should I do with it?  Okay,

13  send it to Saudi Arabia, all right, I'll go down to my

14  banker, Ms. Ingram, 15 bucks, send that money to -- wire

15  transfer to Saudi Arabia.  And we know he's done that

16  before.  They talk about cash being normal ways of

17  moving money and things of -- like that, attempting to

18  justify this screwy transaction that I'll get into in a

19  moment.

20         Members of the jury, you have two wire

21  transfers before you in the Bank of America records

22  where Mr. Sedaghaty himself wired money internationally

23  for, like, 10 or 20 bucks.  He knows how to do it.  And

24  that's the way it should have been done if this conduit

25  theory was real.  But that didn't happen.

1        The money stayed here in Oregon under the

2   control of Mr. Sedaghaty.  He's the only al-Haramain guy

3   here that's on the account.  And what happened at that

4   point?  The seeds of a conspiracy, a secret, clandestine

5   plan with Mr. al-But'he, Mr. Sedaghaty, Shoumar enters

6   the picture later on.  And what's the plan?  The plan

7   is, after Mr. Sedaghaty treats this money as his own and

8   makes a couple of unsuccessful attempts to contact other

9   organizations, including Mr. Khan, a legitimate

10  organization, if Mr. Sedaghaty had taken Mr. Khan up on

11  his solicitation, we're not going to take you into the

12  country in a war zone, al-Haramain, if that's who he was

13  talking to, he doesn't even know who he was talking to,

14  but he thinks maybe it was someone from Oregon, he

15  thought it was somebody in Portland.  But members of the

16  jury, if Mr. Sedaghaty had contacted this organization

17  and if this Mr. Khan convinced them to send the money,

18  as a lot of other people do, to the tune of 75,

19  $100 million a year, give it to us, we'll take it in, we

20  do proper record keeping requirements, we do our

21  responsibilities.  We're sponsored by the Russian

22  government in Ingushetiya, we'll do it the right way.

23  And in their pamphlet, they do.

24        Did Mr. Sedaghaty do that?  No, he didn't.  He

25  held on to the money, and he tried to direct it other

1    ways.  It destroyed this Owens' conduit theory.  If it

2    was really a conduit, that should have been kept off of

3    the books of the 501(c)(3), then it should have been

4    just simply wired away because Mr. Sedaghaty would have

5    no choice but to do otherwise.

6           And some of those contacts, incidentally, were

7    in the name of the Qur'an Foundation, not al-Haramain.

8    Why is that?  Why didn't he always deal with it as

9    al-Haramain?  And he had other people do it.  Perhaps

10   because al-Haramain was developing a pretty bad

11   international reputation as being a problem in the area

12   of terrorism, funding terrorism.

13          How do we know that?  The 9/11 report, there is

14   a whole chapter on terrorist financing.  How did these

15   things happen?  Terrorist financing.  Things cost money.

16   People need to live that plan on doing bad things.

17   People need to eat.  People need shelter.  People need

18   arms.  They need money.

19          So a big old study is done and al-Haramain is

20   chosen as one of the poster childs (sic), witnesses

21   identified that.  So when Mr. Sedaghaty is reaching out

22   to these organizations, perhaps he knows that

23   al-Haramain has some stain on it.

24          And remember that conversation that Daveed

25   Gartenstein-Ross told you about about east African

1   embassies blowing up?  Lots of people killed.

2   al-Haramain is associated with that on a TV program.

3   Mr. Sedaghaty talks to al-But'he saying, we didn't have

4   anything to do with that, did we?  You heard the

5   testimony, words to the effect, we have many people

6   working for us.  Wow, there's a denial for you.

7            Now, before I leave Mr. Owens, he told you he

8   runs a shop called Exempt Organizations, did when he was

9   with the IRS.  It's what Mr. Wooten does up in Seattle

10  on a day-to-day basis.  They care about how charities

11  get their money and spend their money.  They have to.

12  That's their job.  If you're going to be tax exempt, you

13  gotta do good things with your money.  And this Form 990

14  is the primary vehicle for us to know what you're doing.

15  And it's also the primary vehicle for what your donating

16  public, because this goes on the Internet, you gotta be

17  on the up-and-up.

18           Mr. Owens admitted that no matter what, this

19  conduit theory, agency theory, whatever, no matter what,

20  you can't lie to the IRS on a 990.  And if you do, it's

21  a very important thing when it's talking especially

22  about an overseas transaction involving 130, $150,000.

23  It's a big deal.

24           So what the defendant did through his deceptive

25  acts with Mr. Wilcox and engaging in this screwy

 1   transaction is he concealed information from the very

 2   organization that we here in the United States rely on

 3   to make sure that things like this don't happen

 4   (indicating) with tax exempt charities in the United

 5   States.

 6          Now, Mr. Owens, he's looking at a lot of

 7   organizations, he has to decide which ones to audit,

 8   which ones not.  Well, how do you get your information?

 9   Well, the 990.  We get -- they gotta tell us what money

10   comes in and where it's going.

11          Well, if you learn that an organization got 150

12   and masqueraded it into a building purchase, might that

13   get your attention?  Well, the form might not, in and of

14   itself, the line 57 thing, might not jump out at us, but

15   if the information came to us that it was a clever

16   design to bury it into a portion of the tax return, you

17   bet we'd be curious about it.  It would be an audit, and

18   probably a lot worse, if it came out that this was an

19   intentional act to masquerade and disguise $150,000

20   transaction.

21          In assessing that, members of the jury, don't

22   get lost in this blankets versus bomb quagmire.  When

23   you get back there and say, you know, maybe he had an

24   intent to food -- give food to people, blankets to

25   people, or maybe he really did try to buy arms, the

1   point of this is, if you are doing things like this as a

2   charity, the IRS's antennae go way up, as they should

3   be, when you're dealing with cash especially.  And if

4   you're going to take the position and say, I did good

5   things with this, I gave this money to refugees,

6   blankets, food, medicine, okay, but tell us about it.

7            That's what you need to do as an exempt

8   organization.  You know in that letter that went out to

9   Pete Seda saying you're tax exempt, it said keep good

10  records, and file 990s telling us what you're up to.

11  What did he do?  When the IRS comes in years later and

12  subpoenas records for this transaction when we started

13  realizing -- when she started realizing something was up

14  about this Chechnya deal, record requests went out to

15  the lawyers for al-Haramain, formal requests, subpoenas,

16  tell us about the Chechnyan transaction.  Records came

17  in over time.  Agent Anderson told you that some came

18  from Saudi Arabia sources, al-Haramain, and others came

19  from sources here in the United States, al-Haramain.

20  Different batches, different time, lots of records.  Why

21  is that such a big deal?  Because you know them by

22  reference now, AHIF-2 and AHIF-3.

23            When we caught them, when we started sniffing

24  around this transaction, did you see receipts saying,

25  refugees, here's the purchase of -- like Mr. Khan's

 1   operation, have detailed record keeping records to show

 2   if there is a question about them?  No.  We're not

 3   dealing with exempt organization people.  Now we're

 4   dealing with criminal investigators.

 5          What's going on in the defendant's mind now

 6   when the jig is up?  Two different receipts come in

 7   purporting to be -- for the -- representing the same

 8   transaction.  One says 188.  One says 186.  They are

 9   both bogus, members of the jury, false documents.

10   Signed differently.  One's witnessed.  One's not.  The

11   agreement language is the same.

12          And incidentally that language is not found in

13   the computers.  Who typed those?  I doubt it was

14   Ms. Florin who knew nothing about the transaction.  They

15   are created.

16          And they attempt to come up with a figure,

17   apparently $36,000 came from Canada.  This 150.  And if

18   you add it up, 186, yeah, that sounds good, put it in,

19   sign it.  Agent Anderson told you that $36,000 never

20   left the United States.  The numbers don't add up.

21   $186,000 didn't leave.

22          And what about this offset thing that Mr. Wax

23   is telling you about?  Obfuscation.  What kind of

24   business offsets money for things that apparently

25   happened?  Well, I gave you money before, so I owe --

 1    you gave me some money before, so I owe you some money.

 2    And even though I'm not going to send it overseas, I'm

 3    going to give you a receipt saying that you gave it --

 4    that I gave it to you.  Offset.  How about nonsense?

 5    The receipts are bogus.

 6            We've got two different receipts for the same

 7    transaction containing different information.  I

 8    don't -- I suggest to you, members of the jury, they

 9    didn't even realize they gave us two receipts.  But

10    Mr. al-But'he and Mr. Seda, you know from those

11    receipts, those are their signatures, they signed those

12    receipts on different occasions, because of the -- where

13    the signatures appear.  So they had to know they were

14    signing the same receipt twice.  And there were no other

15    big transactions, no other transactions like this.

16            Now, the charges.  The judge instructed you

17    this morning on the elements of the crimes that you need

18    to consider before you return verdicts of guilty.

19            Now, that's a formal word, elements of the

20    crime, but think about it like a recipe.  Certain

21    ingredients need to go into a recipe to make the product

22    a good one.  So think of the ingredients needed to go

23    into a verdict of guilty on the tax count.  What are

24    those ingredients, those elements that you need to find?

25            You need to find, one, that there was a false

1    return.  We've been over that over and over and over

2    again.  The guy who prepared the return said it was

3    false.  Wilcox.  He didn't know it at the time, based

4    the information on Mr. Sedaghaty's communications, but

5    they told you -- he told you in the various ways that

6    I've already gone over, that the return is false.  And

7    incidentally, no mention of Chechnya, so on and so

8    forth.  Check, false return.

9           Ingredient number two, signed under the

10   penalties of perjury.  The return is signed by

11   Mr. Sedaghaty.  And it is signed under penalties of

12   perjury.  Check.

13          Ingredient number three, that the false

14   information in the returns have to be material to the

15   IRS.  How is the IRS supposed to do its job in

16   monitoring charities if it's never told about a

17   transaction?  Bombs, blankets, medicine, not even told

18   that the money went overseas at all.  It's not in there.

19   It's absent.  The IRS is prevented from doing its job.

20   And if it had been told about the transaction, in

21   whatever form it occurred, they would have done

22   something about it, and it would have been capable of

23   influencing the decisions of the IRS.  Check,

24   materiality.

25          And then number four, willfulness.  And that is

1   what a lot of this trial has been about.  And I told you

2   at the beginning of this trial that that's where the

3   action is at for you.  This notion of willfulness.

4   Because we have to prove not only that he signed a false

5   return under the penalties of perjury that contain

6   materially false information, but we have to show you

7   that he had -- that he did these things willfully.

8   Basically that he knew he had an obligation to file the

9   return and was deliberate in -- in doing this falsely,

10  this false return.

11          So how did we prove that during this trial?

12  And I suggest to you that Mr. Wax has done a very

13  passionate job in trying to keep you from focusing on

14  this.  But I have to do it because this is part of the

15  motivation that Mr. Sedaghaty had to file this false

16  return.

17          And, incidentally, this is also one of the

18  objects of the conspiracy.  There are two charges.  The

19  tax count in count 2, the conspiracy count in count 1.

20  And the conspiracy account -- count alleges that he

21  attempted to defraud the United States by depriving the

22  Customs Service of information related to the foreign

23  transportation of money, which I'll talk about, but also

24  to the Internal Revenue Service in doing their job in

25  monitoring tax exempt charities.

1          You only have to find one of those two objects

2    unanimously.  We're going to ask you to do it on the

3    verdict form.  We're going to ask you to find him guilty

4    of count 1.  And then there are two little checkmarks

5    underneath, did you find unanimously that he agreed to

6    defraud the Customs Service?  If so, check here for yes.

7    And the IRS.  We suggest that the evidence supports

8    checkmarks on both of those.

9          And here is why:  The tax motive.  Exempt

10   organizations cannot fund mujahideen.  Okay?  You

11   can't -- or acts of violence and things like that, and

12   we got into this thing about the Red Cross and Taliban

13   and things like that.  Tax exempt charities, Mr. Wooten

14   told you, cannot promote acts of violence.  If you are

15   buying food for the mujahideen, no.  Certainly not

16   armaments.

17         But in any event, tell us what you are doing

18   because if you think you are okay, if you think you are

19   in the proper zone, just tell us about it so we can do

20   our job.  Didn't go.  Why?  Because Mr. Sedaghaty did

21   have a motivation to conceal when he signed that return.

22   What is that?  This JC-4 exhibit lists all of these

23   Sheeshaan e-mails and all of the other things in the

24   computers roughly in chronological order.

25         I suggest to you that Mr. Gorder got it just

 1  right in telling you that during the time period in

 2  question, January to March 2000, Mr. Sedaghaty was

 3  fairly obsessed with the events in Chechnya from the

 4  lens -- from the lens of the propaganda machine known as

 5  al-Haramain, Qoqaz, Azzam, and these guys, like Khattab

 6  who are trying to blow people up in Chechnya, and asking

 7  people to help fund it, because they have no state

 8  sponsorship.  They need money.  And he says in his

 9  interviews, Islamic charities have always been the ones

10  that have stepped up in helping us, but they are gone

11  now.  So out goes the cry across the world to the fellow

12  believers that are following things like this and

13  getting things from Mr. Abdul Qaadir Khaliq to take you

14  guys down here in Saudi Arabia, another al-Haramain guy

15  sending out the propaganda stuff from Qoqaz and Azzam,

16  the most preeminent mujahideen Web sites in the globe at

17  the time.

18          MR. MATASAR:  Excuse me, Your Honor, I'm going

19  to object as not proper rebuttal argument.

20          THE COURT:  Overruled.  Please bring it to a

21  close, Mr. Cardani.

22          MR. CARDANI:  The willfulness is represented by

23  those e-mails, the fatwas, the prisoner books, the fact

24  that he's raising money at about the same time for the

25  Kosovo mujahideen, the -- after the Hajj with Cabral,

1   direct funding, direct requests by Mr. Sedaghaty

2   himself, doing the work, our Web site, using that

3   Ptichka, his wife.  You've got his wife down there in

4   Ashland, Oregon, downstairs, room X, probably, doing

5   translation services for the propaganda machine and

6   Mr. Khattab.

7        This gets so much attention that Khattab from

8   Chechnya thanks them.  And Mr. Sedaghaty, we did that

9   trail, calls it our Web site.  His wife is doing the

10  services on our Web site, and this big cheese in

11  Chechnya personally thanks him here in Ashland, Oregon.

12  As Mr. Gorder, said this is a charity.

13       A pattern of concealment and lies is also part

14  of defendant's willfulness.  In addition to all the lies

15  to Wilcox, not even a mention to Shoumar -- about this

16  fellow Shoumar.  He's doing a lot of the things, members

17  of the jury, that Mr. Wilcox is doing, trying to dig

18  into the details of the transaction.

19       And SW-43 is the only e-mail I'm going to

20  specifically read from before I sit down.  Mr. Wax tried

21  to deal with this.  I submit to you he didn't get it

22  right.  The date is September 29, 2001.  The

23  significance of the timing, 18 days after September

24  11th, think of the world atmosphere at that point.

25  Terrible, terrible act on our soil.  And there was a

1   question of whether radical Islamists were associated

2   with it or not.  That's the message around the world.

3   So 18 days after September 11th, Shoumar, who has looked

4   at all the books and records, and finds the Soliman

5   money, the 131 and the 21, our money, says I have

6   tried -- this is to Abu Yunus.  This is going directly

7   to the defendant here in Ashland and cc's al-But'he.

8   Talk about a conspiracy.  "I have tried during the past

9   two years to my best limited ability to organize the

10  work and make sure that we work together to be precise

11  as much as we can to avoid any possible trails from

12  anybody."

13          Ask yourselves, who are they trying to hide

14  trails from?  This is a deliberate effort to conceal

15  that we found in the deleted sections of the defendant's

16  computer.

17          Few more things.  The FBI, Agent Boyer goes

18  there four days after September 11th, yes, the

19  Springfield thing was mentioned.  The money was

20  mentioned to the FBI, not to the accountant.  But ask

21  Agent Boyer, did he give you some literature?  Yes, he

22  did.  Any of this kind of stuff?  No.  Noble Qur'an?

23  No.  Why?  Because the FBI, members of the jury, didn't

24  pass the test.  They got the good stuff.  They got the

25  smiling, peaceful side of Pete Seda, not the other side.

 1          That weird transaction, folks, has been talked

 2     about over and over and over, but I'm just going to say

 3     this about it:  If everything is on the up-and-up, wire

 4     the money to Saudi Arabia.  Don't -- Pete Seda

 5     preordered $130,000 in traveler's checks.  Not 150.

 6     130.  Why is that?  Because there was a plan.  There was

 7     a conspiracy afoot to move some of this money overseas

 8     in a clandestine fashion at some risk.  There was a

 9     plan.  Mr. Seda ordered 130 for a reason.

10          And then the flight across the world.  The no

11     CMIR.  The fact that at least 73 other people knew about

12     the CMIR filing requirements leaving the country leads

13     one to suggest that people do understand what the form

14     says.  For everybody leaving the country or entering the

15     country, you gotta file this form.  He's filed it

16     before.  He should have done it then.  He didn't.  Why?

17     Because that was his part of the role of the conspiracy,

18     to conceal this from Customs.

19          So when they are at the bank in Ashland,

20     Oregon, doing it in this screwy way, there was a plan to

21     conceal this from various facets of the government,

22     including Customs, al-But'he's role, and the IRS, Seda's

23     role, Shoumar's role, al-But'he.

24          Mr. Wax takes issue with the records that

25     Colleen Anderson got from Saudi Arabia, the Al Rajhi

1    records.  And seems to suggest that if she was

2    successful in getting that one account, she was

3    negligent in not getting others.  Members of the jury,

4    you heard her testimony.  It took the better part of two

5    years for her to get those records.  And she described

6    it as diplomatic and legal back and forth.  Two years to

7    get those records.  It is not a walk in the park.

8    Extremely difficult.  As is tracing money.

9        Members of the jury, I'll leave you with this:

10   All the checkmarks are there for you.  The false return,

11   the perjury, the materiality, and the willfulness, the

12   motive, they are all there.  When you think about it,

13   all of the ingredients for the recipe of guilt for count

14   2 have been proven, and I ask you to do so.

15       When you get to the conspiracy count, it is

16   much of the same, all of that tax stuff, but in

17   addition, we have to show that there was a plan, a

18   conspiracy.  And conspiracies aren't written out.

19   That's not the way criminals act.  A secret plan to hide

20   this stuff, acting with all of these guys but to hide

21   it.  That has been proved, as has the other part of the

22   conspiracy to hide this from the government.

23       This conspiracy was one to deceive and to

24   cheat, which is part of the instructions that Judge

25   Hogan gave you this morning, that has been proven.

1          Members of the jury, you've been very patient.

2     There's been an awful lot of testimony.  And some very

3     good lawyering, I suggest to you, on both sides.  We

4     have a great system.

5          It is now in your hands to do your jobs in

6     sifting through the evidence and seeing if the

7     government met its burden of proof.  I suggest to you,

8     members of the jury, that we have.

9          If this was all on the up-and-up, if he didn't

10    have this desire to conceal this transaction, to do

11    something that charities can't do in the United States,

12    then he should have been very direct and told it to the

13    world, starting with that Form 990, and everybody else,

14    and not -- it would been -- instead, he concealed it

15    from everybody.  And we are here today because an awful

16    lot of good digging went into the investigation, and the

17    records have been produced to you showing that he should

18    be found guilty beyond a reasonable doubt to both count

19    2 and count 1.  Thank you.

20          THE COURT:  Ladies, would you try to pull the

21    screen back.

22          (Brief pause in the proceedings while equipment

23    is moved.)

24          THE COURT:  You've heard the argument and heard

25    the evidence.  And in my hand I have the verdict form.

1    And this verdict form has the caption, the name of the

2    case, we, the jury, and so on.  Then it says count 1,

3    conspiracy to defraud the United States, and there is a

4    place -- a line by "guilty" and a line by "not guilty."

5    You put your unanimous decision on whichever line it is.

6    If you mark "guilty," and I'm not suggesting you should

7    one way or the other, but if you do, then there are two

8    additional questions.  And there is a "yes" and a "no"

9    by each of them.  Just circle the one that's your

10   unanimous opinion again.  Every decision must be

11   unanimous.

12           And then on count 2, we have a false return by

13   a tax exempt organization.  There is a line with

14   "guilty" and "not guilty."

15           Now, when you get to the jury room, select your

16   presiding juror.  You can start your deliberations when

17   you receive the verdict form and the indictment and the

18   exhibits.  And they'll be in right away.

19           Before we do that, do you have the oath for the

20   bailiff, please.

21           (Ms. Wright and Ms. Weller were sworn as

22   bailiffs.)

23           THE COURT:  All right.  Thank you very much.

24           Well, at this time Ms. Palanuk and

25   Ms. Jespersen, you've been serving as our -- I'm sorry.

 1    I got that wrong.  Ms. Mecartea and Mr. Meeuwsen, you've

 2    been serving as our alternates.  So when you go to the

 3    jury room, you should get your things and leave.

 4         Now, what I'm going to ask you to do, however,

 5    is to not talk to others about your work until you've

 6    heard that there is a verdict here.  Sometimes we have

 7    to invite someone back to deliberations.  And that could

 8    happen to you, but if I don't see you again,

 9    Mr. Meeuwsen, good luck to the Beavers this year.

10         All right.  So the others can -- I told you I'd

11    tell you when it's time to start talking about the case,

12    the time has arrived.  So you may -- you are excused to

13    the jury room, and good luck in your deliberations.

14         (Jury exits the courtroom at 4:03 p.m.)

15         THE COURT:  Counsel, take your exceptions in

16    addition to those you have already done in writing, if

17    you have any?

18         MR. CARDANI:  No, Your Honor.

19         MR. WAX:  No, I think we've covered it in

20    writing, Your Honor.

21         MR. MATASAR:  And orally at the conference.

22         THE COURT:  Thank you very much.  Once in a

23    while, my bride tells me that maybe we shouldn't go to

24    that particular party because you don't have good

25    termination skills.  And I'm going to be happy to report

1    to her that at least two more fall in that category.

2              So that's great.  Thank you for your work.

3              You can look at the exhibits, if you want.

4    They've been put together already.  And we need a phone

5    number for a 15-minute call.  Okay.  Thank you.

6              (Court stood in recess, subject to call, from

7    4:03 until 8:45 p.m. when the jurors were released until

8    9:00 a.m. on Thursday, September 9, 2010.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATE

 2          I, Deborah Wilhelm, Certified Shorthand Reporter

 3    for the State of Oregon, do hereby certify that I was

 4    present at and reported in machine shorthand the oral

 5    proceedings had in the above-entitled matter.  I hereby

 6    certify that the foregoing is a true and correct

 7    transcript, to the best of my skill and ability, dated

 8    this 9th day of September, 2010.

 9

10

11

12
                            /s/ Deborah Wilhelm
13                          _____
                            Deborah Wilhelm, RPR
14                          Certified Shorthand Reporter
                            Certificate No. 00-0363
15

16

17

18

19

20

21

22

23

24

25
```