1                   IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF OREGON

3      UNITED STATES OF AMERICA,          )
                                          )
4                       Plaintiff,        ) No. 05-60008-2-HO
                                          )
5        v.                               ) September 8, 2010
                                          )
6      PIROUZ SEDAGHATY, et al.,          ) Eugene, Oregon
                                          )
7                       Defendants.       )

8

9                   TRANSCRIPT OF TRIAL PROCEEDINGS

10              BEFORE THE HONORABLE MICHAEL R. HOGAN

11          UNITED STATES DISTRICT COURT JUDGE, AND A JURY

12                     DAY 7 - PAGES 1 - 194

13

14                             -:-

15

16

17

18

19

20

21

22

23              Deborah Wilhelm, CSR, RPR
                     Court Reporter
24                   P.O. Box 1504
                Eugene, OR  97440
25                   (541) 431-4113

```
1                    APPEARANCES OF COUNSEL

2

3    FOR THE PLAINTIFF:    CHRISTOPHER L. CARDANI
                           United States Attorney's Office
4                          405 E. 8th Avenue, Suite 2400
                           Eugene, OR  97401
5                          (541) 465-6771
                           chris.cardani@usdoj.gov
6
                           CHARLES F. GORDER, JR.
7                          United States Attorney's Office
                           1000 S.W. Third Avenue, Suite 600
8                          Portland, OR  97204-2902
                           (503) 727-1021
9

10   FOR THE DEFENDANT:    LAWRENCE H. MATASAR
                           Lawrence Matasar, P.C.
11                         621 S.W. Morrison Street
                           Suite 1025
12                         Portland, OR  97205
                           (503) 222-9830
13                         larry@pdxlaw.com

14                         STEVEN T. WAX
                           BERNARD J. CASEY
15                         MICHELLE SWEET
                           Federal Public Defender
16                         101 S.W. Main Street, Suite 1700
                           Portland, OR  97204
17                         (503) 326-2123
                           steve_wax@fd.org
18

19

20

21

22

23

24

25
```

```
 1                    INDEX OF EXAMINATIONS

 2    FOR THE DEFENDANT:    Direct   Cross    ReD      ReX

 3    Patricia Florin        19      22      --       --

 4

 5

 6                       GENERAL INDEX

 7                                              Page

 8    In Chambers Hearing                         4

 9    Jury Instructions                          31

10    Closing Argument by Mr. Gorder             48

11    Closing Argument by Mr. Wax                82

12    Rebuttal Argument by Mr. Cardani          152

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                  (Wednesday, September 8, 2010; 7:55 a.m.)

2                  (The following proceedings were had in chambers

3      outside the presence of the jury.)

4                  (Defendant is present.)

5                  (Colleen Anderson is present.)

6                         P R O C E E D I N G S

7                  THE COURT:  On Exhibits 634, 637, and 641, this

8      says the government stipulates as to foundation.  Do you

9      object to the exhibits?

10                 MR. CARDANI:  Can you give us a minute to catch

11     up, Judge.

12                 THE COURT:  Yes.

13                 MR. CARDANI:  We've been working hard.

14                 THE COURT:  I am sure I slept more than you

15     folks last night, and it wasn't much.  Here, it doesn't

16     say there is agreement.  It says you stipulate to

17     foundation, so I don't know what that means.

18                 MR. GORDER:  Well, the problem is when we first

19     went over these, they didn't have the e-mail that these

20     things were attached to, but they do now, so we have no

21     objection.

22                 THE COURT:  Okay.  Those three are received.

23                 755.7, this is the one you've added the page

24     to?

25                 MS. SWEET:  Yes, we resubmitted the front page.
```

1              THE COURT:  It's received.

2              MS. SWEET:  Thank you.

3              THE COURT:  990.

4              MR. WAX:  Sorry, Judge, thank you.

5              MR. CARDANI:  There is actually an Exhibit 990?

6              THE COURT:  "Islam Is."

7              MR. CARDANI:  It's unfortunate, we heard that.

8              THE COURT:  Yes, there is Exhibit 990.

9              MR. CARDANI:  This is just rank, self-serving

10   hearsay.  And if the defendant is not testifying, how is

11   it that this is --

12             MR. WAX:  It's a book.  You've introduced

13   several books.  And this is another book that they sent

14   out.

15             MS. SWEET:  And several witnesses have

16   testified about seeing it.

17             THE COURT:  I'm familiar with it.  It's not

18   received.

19             755.9 through 755.12, I don't have my exhibits

20   with me so you have to tell me, please.

21             MR. WAX:  E-mail from Wilcox to Seda, the

22   attached QuickBooks file, another e-mail from Seda to

23   Shoumar with the attached QuickBooks file.

24             MR. CARDANI:  We'll stipulate to those.

25             THE COURT:  Those are received.

1          1238, excerpt of Wilcox's working papers

2    presented.  What page is that, Mr. Matasar?

3          MR. MATASAR:  Wasn't that admitted?

4          MS. SWEET:  Those were the pages you referred

5    to on cross.

6          MR. MATASAR:  Oh, yeah, yeah, yeah.  I think we

7    agreed that those would come in.

8          MR. CARDANI:  We don't object.

9          THE COURT:  It's received.

10         1238-A through E, Wilcox working papers used in

11   Jeff Cone's testimony.

12         MR. CARDANI:  No objection.

13         THE COURT:  Received.

14         1064, demonstrative exhibits, that's received

15   but only for demonstrative purposes.  It will not go to

16   the jury.

17         MR. MATASAR:  And 1065, I think, was

18   admitted -- was received yesterday.

19         MS. SWEET:  Yeah, this was filed before

20   yesterday.

21         MR. MATASAR:  No, I understand.

22         MR. WAX:  1065 is received.

23         THE COURT:  It's been received.

24         MS. SWEET:  It has been received.

25         THE COURT:  1016.

1          MR. WAX:  That is another check, I think, in

2    the -- another one of the checks from the bank records.

3    It's similar to 1004 to 1015.

4          MR. CARDANI:  No objection.

5          THE COURT:  Received.

6          1054 through 1063 are these letters to

7    al-Haramain from various clergy.

8          MS. SWEET:  And David Rodgers reviewed those

9    yesterday.

10          (Discussion held off the record.)

11          MR. GORDER:  The problem I have with these,

12    Your Honor, is Mr. Rodgers indicated that he left in

13    August of 1999, I think all of these are dated after

14    that.  So he couldn't really authenticate them.

15          THE COURT:  Anything else?

16          MR. WAX:  Both he and Gartenstein-Ross said

17    that they are -- I mean, Gartenstein-Ross recalled the

18    chaplain letters, and Mr. Rodgers said these are similar

19    to letters that he recalled.

20          THE COURT:  They clearly got letters from

21    chaplains, but these letters are not received.

22          Exhibit 680, Kosovo refugee families in San

23    Diego.

24          MR. WAX:  680 and 680A are more of the

25    documents from al-Haramain.

```
 1              THE COURT:  Well, one of them is Kosovo and one

 2   of them is Albania.

 3              MR. GORDER:  680, Your Honor, nobody has

 4   identified it, as, you know, what it is.  I would point

 5   out that one of the recipients of this e-mail is Anwar

 6   Al-Aulaqi, the notorious guy in Yemen who is, you know,

 7   subject of, you know, a lot of commentary in the press

 8   these days, but I mean there has been no testimony about

 9   this.

10              THE COURT:  680A?

11              MR. WAX:  680 is denied?

12              THE COURT:  I haven't ruled yet.  I want to go

13   over the other.

14              MR. WAX:  680 is what?

15              THE COURT:  They are similar.

16              MR. WAX:  Well, 680A is -- well, it's from

17   Abdul Qaadir.  And Gartenstein-Ross testified about the

18   work in Kosovo through Albania.  The government put in

19   the VOA record of the wire transfer from the arborist to

20   Albania and this is just --

21              MR. GORDER:  We have no objection to this.

22              THE COURT:  680 is not received.  680A is

23   received.

24              704 through 707C are not received.

25              755.8, QuickBooks audit report emulation.
```

```
1              MR. MATASAR:  That was, I think, received
2    yesterday.
3              MR. CARDANI:  And if not, received.
4              THE COURT:  Okay.
5              MR. WAX:  Which one was that, I'm sorry?
6              MR. MATASAR:  755.8.
7              THE COURT:  So, Deb, both lawyers say it's
8    received, so I'll follow along.
9              MR. CARDANI:  I'm sorry, Judge.
10             THE COURT:  I'll follow right along there.
11             Exhibits 1002A and B, video compilations.
12             MR. GORDER:  Your Honor, there has been no
13   testimony about that.
14             THE COURT:  That isn't received.  All right.
15             Now, 1201.
16             MR. WAX:  This is the series that was shown to
17   Gartenstein-Ross that relate to his work, his time
18   there, et cetera.  I think he either identified them
19   or --
20             THE COURT:  What is it about?
21             MR. WAX:  It's an e-mail regarding relief
22   monies that went out or a request for relief from the
23   western Somalia group.
24             THE COURT:  Somalia.  And 1201A is Kosovo,
25   right?
```

1          MR. WAX:  Right.  And that's what he said came

2    in on April 2nd.  That's got the fax stamp on it from

3    April 2nd.

4          1201B was his timesheet, which had an entry on

5    it that he mailed the Kosovo check on that date.

6          1201E is another flier that had come in about

7    Kosovo relief.

8          And 1201F is the check that is his handwriting

9    for Kosovo.

10          THE COURT:  Okay.  1201 is not received.

11          1201A, B, E, and F are received.  1210 -- not

12    for their truth, however.

13          1210?

14          MS. SWEET:  Daveed agreed that he had seen that

15    e-mail.  It was an e-mail between he and Mr. al-But'he.

16          THE COURT:  What did it say?  I've looked at

17    them all, but there are many books on my desk right now,

18    full of paper.

19          MR. GORDER:  I can't remember what this one is

20    about either.

21          THE COURT:  I can't imagine anyone is going to

22    argue we didn't have enough paper.

23          MS. SWEET:  This is about Soliman coming to

24    Daveed in New York.

25          THE COURT:  Oh, yes, that's received.

```
 1            1216.

 2            MR. WAX:  1215, I think.

 3            THE COURT:  1215.

 4            1210 is received, Madam Reporter.

 5            MR. MATASAR:  UMA Women's Society one.

 6            MR. WAX:  Yeah, another request for assistance.

 7            THE COURT:  That is not received.

 8            1216.

 9            MR. WAX:  This is more about the trip --

10            MS. SWEET:  Yes.

11            MR. WAX:  The al-But'he visit to New York.

12            THE COURT:  It's received.

13            Exhibits withdrawn, 676, 677, and 679.  They

14  are withdrawn.

15            MR. WAX:  Wait.  Where are we?

16            MS. SWEET:  This is if the receipts could not

17  come in.  Did you want to switch those?

18            MR. WAX:  I'm trying to remember what they are.

19  Hang on a second.

20            MR. MATASAR:  What are the numbers?

21            THE COURT:  676, 677, 679.

22            MR. MATASAR:  I have them.

23            MR. WAX:  Yeah, yeah, we withdraw those.

24            MR. MATASAR:  Yeah.

25            THE COURT:  Okay.  Then you want to raise again
```

1    DGR-1A and 2A.  What are those?

2            MR. GORDER:  Your Honor, there was no testimony

3    about DGR-1A, so we haven't offered that.

4            DGR-2A was some additional pages from the

5    *Islamic Guidelines* that I questioned the rabbi about,

6    and we'd ask that that be admitted.

7            THE COURT:  1A is not received.

8            MR. WAX:  And 2A is just so highly inflammatory

9    and prejudicial.  The jury has heard it.  And I don't

10   see any need to give them this language.

11           MS. SWEET:  And they already have one set

12   from -- one excerpt.

13           MR. CARDANI:  But several defense witnesses

14   talked at length about how he would never be involved

15   with things like this, they'd be surprised.

16           THE COURT:  2A is received.

17           Do you have any exhibit questions?

18           MR. GORDER:  Yes, Your Honor.  There are a few

19   exhibits from the defense that there has been no

20   testimony about, which seemed to me should be withdrawn

21   at this point.

22           1024 is the picture of trees.

23           1025A --

24           THE COURT:  It's withdrawn.

25           MR. WAX:  Wait, let me make sure I get my list

1    here.

2            THE COURT:  Now you're going to remind me of *My*

3    *Cousin Vinny* again.

4            MR. CARDANI:  Exactly.

5            MR. GORDER:  There was no --

6            MR. WAX:  Yeah, we will withdraw --

7            MR. GORDER:  -- cross-examination that good.

8            MR. WAX:  -- 1024.  We withdraw 1025A.  We

9    withdraw 1025B.

10            MR. GORDER:  Then 1027, if I recall, was some

11   receipts that a witness Jamal was going to testify

12   about.  He's -- those should be withdrawn.

13            MS. ANDERSON:  And there is a video.

14            MR. GORDER:  And there is some kind of video

15   that he had, 1028.

16            MR. WAX:  1028 was under advisement, so I don't

17   think I have to withdraw that.

18            I will not withdraw 1027.  We will await the

19   court's ruling.

20            MR. GORDER:  Well, you need to withdraw it

21   because you have received it earlier.

22            THE COURT:  That's fine.  You can have that.

23   1027, withdrawn.

24            MR. CARDANI:  Colleen, what else have you got?

25   She's been great in tracking all this stuff, which has

```
 1    been a very daunting task.

 2              THE COURT:  It's good to have an accountant

 3    around.  Off the record.

 4              (Discussion held off the record.)

 5              THE COURT:  Okay.  Let's go back on.

 6              MR. WAX:  801 was under advisement.

 7              MR. GORDER:  So I just want to confirm that's

 8    not in evidence.

 9              THE COURT:  What is it?

10              MR. WAX:  An e-mail from Pete to Raya saying no

11    mujahideen, please.

12              THE COURT:  Okay.  Do you have it there?

13              MR. GORDER:  Yes.

14              MR. CARDANI:  She was going to testify.  They

15    brought her over.

16              MR. GORDER:  She was going to testify.  We know

17    she entered the country last week sometime, but --

18              MR. WAX:  Big Brother was watching.

19              MR. GORDER:  Exactly.

20              MR. MATASAR:  What was on her computer?

21              MR. GORDER:  That, I don't know.

22              THE COURT:  It's not received.

23              MR. MATASAR:  You don't have high enough

24    clearance.

25              MR. CARDANI:  Stipulations, have we got to file
```

```
 1   one now?
 2          MS. SWEET:  I think -- I mean, we e-mailed back
 3   and forth, and I think we're okay.
 4          MR. CARDANI:  I lost track.  Colleen, is this a
 5   good-to-go thing on everything?
 6          MR. WAX:  The last time I saw it, we still had
 7   to add one paragraph, but that was three days ago.
 8          MS. SWEET:  It was about the living -- where he
 9   was.
10          MR. WAX:  So that's in there now?
11          MS. SWEET:  I believe so.
12          MR. CARDANI:  I'll sign this.
13          MR. WAX:  Judge, while we are on the record,
14   there was -- you had indicated earlier that the closing
15   argument needs to be limited, if I understood you
16   correctly.  And that I'm not going to be able to argue
17   that -- I mean, not just that Agent Anderson but that
18   the government did not make the effort to subpoena
19   the -- any other Al Rajhi records.  And if I understood
20   correctly, I need to object to that.
21          THE COURT:  That's fine.  That is my ruling.
22   And I understand you need to object to it, believe me,
23   and I'll make the record.  But it won't be in the public
24   record.
25          MR. WAX:  Okay.  Well, I would request that,
```

1    because I have a security clearance, if there are issues

2    that you have received from the government of a

3    classified nature that impact on that ruling, that I be

4    permitted to, you know, participate in a discussion

5    about that so that we can make an appropriate argument

6    to you.

7            I mean, I certainly understand that there are

8    certain hoops that the government needs to jump through

9    in terms of using a subpoena power.

10           I -- as you're aware, we have consulted with

11   two former exceedingly high level officials in the U.S.

12   government, and we have discussed with them the methods

13   available to the government for obtaining information,

14   for obtaining classified information, and, you know, the

15   processes.  As you heard yesterday, one of them is a

16   State Department official, former.

17           And we are unaware of anything that could have

18   conceivably limited the government's effort to use the

19   subpoena power.

20           If there is an official in the United States

21   government who said we're not going to sign off on you

22   issuing a subpoena for Al Rajhi, that fact, it seems to

23   me, cannot be classified.  And if there is an official

24   in the government who said that, the government is one

25   entity, and the jury has a right to know that.

1           If they are attempting to protect some

2     relationship with Saudi Arabia, and that motivates their

3     decision, you know, the jury doesn't need to know that

4     necessarily, if there is something classified in that,

5     but the fact that these prosecutors, representatives of

6     the U.S. government, didn't do something that is clearly

7     within their lawful authority, I mean, that's key to the

8     case.  And there is testimony from Agent Anderson.

9     There is testimony from Colonel Lang.

10          The jury has heard that this 9889 bank account

11    exists.  And from both Agent Anderson and Colonel Lang,

12    they've heard that it is relevant to this case.

13          THE COURT:  Thank you.  We're in recess right

14    now.

15          MR. CARDANI:  Judge, could I put on the record

16    that we've met for the last hour on jury instructions?

17          THE COURT:  Yes.

18          MR. CARDANI:  And had a detailed discussion on

19    that subject.

20          THE COURT:  You may -- or you have.  Now we're

21    in recess.

22          (Recess:  8:18 until 8:34 a.m.)

23          (The following proceedings were continued in

24    chambers.)

25          THE COURT:  Sorry to haul you back up.  We're

```
1   going back on the record.  Go ahead.
2           MR. GORDER:  Your Honor, I've talked it over
3   with Mr. Cardani, we are willing to allow Mr. Wax to
4   argue that the government should have subpoenaed the
5   other bank account records.  We hope he doesn't make it
6   personal.  And we will respond based on the evidence.
7           THE COURT:  All right.
8           MR. WAX:  Thank you.
9           THE COURT:  You are welcome, everybody.
10          (Recess:  8:35 until 9:24 a.m.)
11          (The following proceedings were held in open
12  court.)
13          THE COURT:  Please seat the jury.
14          MR. GORDER:  Your Honor, Mr. Cardani will be
15  here momentarily.  He's in the restroom.
16          THE COURT:  All right.  I'm sorry, I should
17  have looked up.
18          (Jury enters the courtroom at 9:25 a.m.
19  Mr. Cardani is present.)
20          THE COURT:  Good morning, jury.  We have one
21  more witness this morning.  Go ahead and call the
22  witness.
23          MR. WAX:  Patricia Florin, please.  Please
24  raise your right hand.
25          (The witness was sworn.)
```

 1            THE CLERK:  Please have a seat.  These are the

 2   microphones here.  There is water if you would like

 3   some.

 4            THE WITNESS:  Okay.

 5            THE CLERK:  Please state your name and then

 6   spell your name for the record.

 7            THE WITNESS:  Patricia Florin, P-A-T-R-I-C-I-A,

 8   Florin, F-L-O-R-I-N.

 9                    DIRECT EXAMINATION

10   BY MR. WAX:

11      Q.    Good morning, Ms. Florin.  Could you tell the

12   members of the jury, please, generally where you reside.

13      A.    I reside in a rural community in southern

14   Oregon.

15      Q.    Near Ashland?

16      A.    Yes.

17      Q.    Did you live in Ashland a while back?

18      A.    I did.  I lived there from 1983 until 2004.

19      Q.    In the 1990s and early 2000s, were you running

20   a business?

21      A.    I was.

22      Q.    What business was that?

23      A.    It was Florins Flying Fingers Secretarial.

24      Q.    And as Florins Flying Fingers Secretarial, did

25   you have the opportunity to do some work for my client,

1    Pete Seda?

2        A.    I did.

3        Q.    And can you tell the members of the jury,

4    please, for roughly how many years you performed work

5    for him?

6        A.    Sporadically for nine years.  From 1995 until

7    the final thing I did for Pete, I think, was in 2004.

8        Q.    Can you tell the members of the jury, please,

9    generally the nature of the work that you did as Florins

10   Flying Fingers, and what you did generally for Pete

11   Seda.

12       A.    It began as work for his arborist business,

13   billings, proposals.  I then did work for the Qur'an

14   Foundation, community outreach letters.  And then for

15   the al-Haramain Foundation, community outreach letters,

16   and public relations letters, things like that.

17       Q.    Did you act solely as a typist or did you also

18   from time to time offer either editorial or substantive

19   thoughts?

20       A.    I did offer editorial thoughts to Pete.  It was

21   often an exchange that went on.  He had something he

22   wanted to say, and we worked on finding the words he

23   needed to say it.

24       Q.    I'd like to direct your attention, please, to

25   February of 2000.  And ask whether you recall working on

1    any documents related to Chechnya?

2        A.    I did.

3        Q.    Okay.  If we could please show the witness and

4    the jury 698D, which is in evidence.  Ms. Florin, if you

5    could please look at this e-mail and tell us whether or

6    not you recognize it?

7        A.    I do.

8        Q.    And does it, in the text portion, reflect the

9    text of a letter on which you assisted in the typing?

10       A.    Yes, it's substantially the same, yes.

11       Q.    Just a couple more questions, Ms. Florin, if I

12   may ask in terms of religion, are you a Muslim?

13       A.    No, I am not.

14       Q.    Have you ever practiced as a Muslim?

15       A.    No, I have not.

16       Q.    Do you know another person from Ashland named

17   Marla Cates?

18       A.    I do.

19       Q.    Okay.  And are you familiar per chance with her

20   religion?

21       A.    No.

22       Q.    Do you know if she's a Muslim?

23       A.    I don't believe so.

24             MR. WAX:  Thank you.  I have no further

25   questions.

1           THE COURT:  Cross.

2                      CROSS-EXAMINATION

3    BY MR. CARDANI:

4       Q.    Ms. Florin, my name is Chris Cardani.  We met

5    briefly, I think, yesterday or the day before.  A few

6    areas to talk to you about.

7              So you've known Mr. Sedaghaty for quite a long

8    time, nine years working for him?

9       A.    Yes.

10      Q.    All right.  Spent a fair amount of time with

11   him or talking to him?

12      A.    I'm not sure what you mean by "fair," but when

13   there was a project, we could sometimes spend an hour or

14   two on the phone.

15      Q.    And do you feel you got to know him a little

16   bit over the years?

17      A.    A little, yes, yes.

18      Q.    Now, have you described him as having -- you

19   having profound differences with him in the concept of

20   the views on Islam?

21      A.    Yes.

22      Q.    And that was because he was far more, what?

23   Fundamental?  Conservative?

24      A.    No.

25      Q.    Okay.  Why don't you explain the profound

1    differences.

2       A.    The -- well, that could take all morning, and

3    I'm sure we don't want to do that.  But my religious

4    views are outside of the parameters of most of the

5    population around here, so that is where a lot of our

6    differences came in.

7       Q.    Okay.  What about the views of women, did that

8    bother you?

9            MR. WAX:  Your Honor, I object.  We did not

10   go --

11           THE COURT:  Sustained.

12           MR. WAX:  Thank you.

13   BY MR. CARDANI:

14      Q.    Now, did you -- you realized at some point that

15   the defendant began an affiliation with al-Haramain?

16      A.    Yes.

17      Q.    Have you described Mr. Seda's personality as

18   having changed after he began his affiliation with

19   al-Haramain?

20           MR. WAX:  Your Honor, we didn't go into

21   anything of this nature.

22           THE COURT:  Overruled.

23           THE WITNESS:  Could you repeat the question,

24   please?

25   BY MR. CARDANI:

1        Q.     Yes.   Have you stated that Mr. Sedaghaty's

2    disposition changed after he began his affiliation with

3    al-Haramain?

4        A.     His disposition?   No.   His intensity, perhaps,

5    because he was excited about all the things that he was

6    going to be able to do.

7        Q.     And part of that was driven by the fact that he

8    had access to money from Saudi Arabia; is that right?

9        A.     I can only assume.

10       Q.     Now, is it true that you've never been to

11   Mr. Sedaghaty's residence on Valley View Drive?

12       A.     That's true.

13       Q.     And then after he moved to the al-Haramain

14   building on 3800, you were never there either -- you

15   were never there either as well?

16       A.     That's correct.

17       Q.     And based -- Mr. Wax -- Mr. Wax asked you about

18   your being with Mr. Sedaghaty, doing work for him over a

19   nine-year period of time.   Were you aware that he was

20   distributing literature to prisoner inmates around the

21   United States?

22       A.     He told me they were distributing Qur'ans to

23   prisons.

24       Q.     Did he ever show you that literature?

25       A.     No.

 1     Q.    And have you described Mr. Sedaghaty as being

 2   an individual who is street-wise and able to

 3   compartmentalize his activities?

 4     A.    I don't recall ever describing him that way,

 5   no.

 6     Q.    Do you remember talking to Dave Carroll, the

 7   FBI agent, a couple months ago?

 8     A.    I do.

 9     Q.    You didn't tell him that Pete was kind of

10   street-wise and able to segment --

11     A.    I thought Mr. Carroll told me that.

12     Q.    Did you agree with that?

13     A.    A lot of that conversation, I sat and listened.

14   I probably shrugged.

15     Q.    Probably what?

16     A.    Did this (indicating).

17     Q.    Okay.  All right.  And, finally, is it true

18   that during your affiliation with Mr. Sedaghaty, he

19   never mentioned to you that he got $150,000 for

20   Chechnya, distribution to Chechnya?

21     A.    No, he did not.

22           MR. CARDANI:  That's all I have.

23           MR. WAX:  Nothing further.  Thank you.

24           THE COURT:  You may step down.  Thank you.  Any

25   other evidence?

```
 1              MR. WAX:  No, Your Honor.  At this time the
 2    defense would rest.
 3              THE COURT:  All right.
 4              MR. CARDANI:  As does the government.
 5              THE COURT:  All right.  Fine.  Members of the
 6    jury, you get a quick recess.  The Mr. Baker, who you
 7    have seen sitting over there, is making a few last-
 8    minute changes to the jury instructions.  And as soon as
 9    they are ready, we'll bring you back in for
10    instructions.  Okay?  Still too early to talk about the
11    case.
12              (Jury exits the courtroom at 9:35 a.m.)
13              THE COURT:  Mr. Cardani.
14              MR. CARDANI:  Judge, I have an exhibit I'd like
15    to offer.  It is Joint Exhibit Number 1.  It's a
16    stipulation of the parties, been signed by both parties,
17    and I would offer it at this time.
18              MR. MATASAR:  No objection, Your Honor.  I
19    signed it.
20              THE COURT:  Received.  Anything else?
21              All right.  Since we have a few minutes,
22    apparently, Mr. Wax, if you had mid-trial motions, I'm
23    happy to hear them at this time.
24              MR. WAX:  Yes, Your Honor.  I would move for a
25    judgment of acquittal at this time at the close of the
```

1    government's case.  And I would renew that objection at

2    the close of the defense case, and the close of all the

3    evidence.

4            THE COURT:  Thank you.  Any argument?

5            MR. CARDANI:  Only if the court has questions.

6            THE COURT:  Thank you.  The motions are denied.

7            What else do we need to clean up, gentlemen?

8            MR. WAX:  I believe, Your Honor, that in the

9    written submission, we noted our requests and objections

10   to the instructions.  Will it be necessary for us to

11   renew those after you read them or have we covered --

12           THE COURT:  Here is what we'll do:  I got my

13   little script written out here, and we'll do it.  We

14   have had extensive discussions on jury instructions in

15   chambers already.  The government has filed a written

16   submission, in fact, more than one with their comments

17   on the draft instructions.  Some of the matters there

18   have been addressed to their satisfaction, others

19   perhaps not.

20           After I send the jury out, I will give you both

21   the opportunity to make any additional -- or take any

22   additional exceptions to the instructions you like.

23   That's after they go out.

24           And then after that, we will -- our clerks will

25   get the exhibits together to go to the jury room.  I

```
 1    invite you to look over their shoulders.  They are going
 2    to do the best they can, but if you want -- if you are
 3    concerned about it, please look over their shoulders.
 4            I'll tell the jury after -- I won't read the
 5    verdict form until after argument.  And at that point,
 6    I'll swear the bailiff, and excuse the alternates.  And
 7    any objection to that process so far?
 8            MR. CARDANI:  When you dismiss the alternates,
 9    Judge, we would ask that you request they not discuss
10    the case in --
11            THE COURT:  Of course.
12            MR. CARDANI:  -- case their service is further
13    needed.
14            THE COURT:  Of course.  And then after that,
15    after the jury goes out, we'll take the exceptions if
16    you have any additional ones.  But you can have anything
17    you filed in writing thus far.
18            MR. CARDANI:  We submitted a verdict form and
19    we both agree on it now.
20            THE COURT:  I have it.  So that's great.  So
21    we'll just be in recess for a few minutes.
22            I've asked Mr. Baker to bring the instructions
23    down.  Each of us will have a chance to quickly read it.
24    If you have something that's significant, we'll address
25    that if we need to.  All right?
```

1          MR. GORDER:  Your Honor, I'm going to want to

2    have the same setup that we used for the opening

3    statements.  Should we do that now before you read the

4    instructions?

5          THE COURT:  Yeah, as long as it doesn't put

6    anything between me and the jury.

7          MR. GORDER:  Were you able to see the jury with

8    that screen over there?

9          THE COURT:  Yes, but maybe turn -- you can plug

10   it in, but maybe turn it sideways so they can see.  I'm

11   going to read the instructions through.  I'm going to

12   give them each a written copy.  And they will take that

13   with them to the jury room.

14         MR. WAX:  Judge, will you give them a

15   five-minute stretch break between Mr. Gorder and my

16   starting?

17         THE COURT:  Yes.  And for you to move things

18   around if you need to.

19         MR. WAX:  Thank you.

20         THE COURT:  Absolutely.

21         (Recess:  9:39 until 9:48 a.m.  Jury absent.)

22         THE COURT:  We'll go on the record.

23   Mr. Cardani, you said something.

24         MR. CARDANI:  I have two substantive comments,

25   Judge.  First, I'd just like to note my objections

1    that -- I realize the court is giving the new pattern

2    instruction on the conspiracy to defraud, but I think

3    this makes us prove too much based on the *Caldwell* case.

4    I understand the court's consideration on that.

5            THE COURT:  Thank you.

6            MR. CARDANI:  The second is, the court has now

7    added the defendant's theory of defense.  We would just

8    like, on page 17, when you say "second," if you could

9    put "the defense maintains," and the same with the third

10   paragraph, just so it's clear that this is continuing to

11   comment on the defense theory of the case and are not

12   the court's reflections.

13           THE COURT:  Where are you suggesting that be

14   added?

15           MR. CARDANI:  Page 17 at the top after the word

16   "second," the defense -- I would add the words "the

17   defense maintains," and also again after the word

18   "third," three lines down, "the defense maintains."

19           THE COURT:  Mr. Wax.

20           MR. WAX:  We think that the way you wrote it is

21   fine.

22           THE COURT:  Add the notes, please.  We'll go

23   off the record.

24           (Recess:  9:49 until 10:06 a.m.)

25           THE COURT:  The court is in session.  Please

 1    seat the jury.

 2              (Jury enters the courtroom at 10:08 a.m.)

 3              THE COURT:  Members of the jury, I'm going to

 4    step down here because this screen is in the way, and I

 5    want to be able to see you for this, okay?

 6              What you hold in your hands are the court's

 7    instructions on the law.  And those are your own

 8    personal copies.  I'm giving them to you now, but you

 9    have to agree to not read ahead of me this first time

10    through.  After that, you can do with them what you'd

11    like, okay?

12              Members of the jury, now that you have heard

13    all the evidence, it is my duty to instruct you on the

14    law which applies to this case.

15              It is your duty to weigh all the evidence

16    received in the case, and in that process, to decide the

17    facts.  It is also your duty to apply the law as I give

18    it to you to those facts, whether you agree with it or

19    not.  You must decide the case solely on the evidence

20    and the law, and must not be influenced by any personal

21    likes or dislikes, opinions, prejudices, or sympathy.

22              You must follow all of these instructions and

23    not single out some and ignore others.  They are all

24    important.  Please do not read into these instructions

25    or into anything I may have said or done any suggestion

1    as to what verdict you should return.  That is a matter

2    entirely up to you.

3           The indictment in this case charges the

4    defendant with conspiring to defraud the United States

5    and filing a false tax return.  The indictment is not

6    evidence.  The defendant has pleaded not guilty to the

7    charges.  The defendant is presumed to be innocent

8    unless and until the government proves every element of

9    a charge beyond a reasonable doubt.

10          Proof beyond a reasonable doubt is proof that

11   leaves you firmly convinced that the defendant is

12   guilty.  It is not required that the government prove

13   guilt beyond all possible doubt, but the burden is

14   always on the government to prove guilt beyond a

15   reasonable doubt.

16          A reasonable doubt is a doubt based upon reason

17   and common sense and is not based purely on speculation.

18   It may arise from a careful and impartial consideration

19   of all the evidence, or from lack of evidence.

20          If, after a careful and impartial consideration

21   of all the evidence, you are not convinced beyond a

22   reasonable doubt that the defendant is guilty, it is

23   your duty to find the defendant not guilty.  On the

24   other hand, if, after a careful and impartial

25   consideration of all the evidence, you are convinced

 1   beyond a reasonable doubt that the defendant is guilty,

 2   it is your duty to find the defendant guilty.

 3          You are here only to determine whether the

 4   defendant is guilty or not guilty of the charges in the

 5   indictment.  The indictment -- I'm sorry, the defendant

 6   is not on trial for any conduct or offense not charged

 7   in the indictment.

 8          A separate crime is charged against the

 9   defendant in each count.  You must decide each count

10   separately.  Your verdict on one count should not

11   control your verdict on any other count.

12          At the beginning of the trial, I described the

13   charge of failure to file a report of international

14   transportation of currency or monetary instruments.

15          For reasons that do not concern you, count 3 of

16   the indictment as it relates to codefendant Soliman

17   al-But'he individually is not before you.  Do not

18   speculate about why codefendant Soliman al-But'he is not

19   part of this trial.

20          The defendant is on trial only for the charges

21   of conspiracy to defraud the United States and filing a

22   false tax return.  You may consider the evidence only as

23   it relates to those counts.

24          The evidence you are to consider in deciding

25   the facts consists of the sworn testimony of the

1   witnesses, the exhibits received in evidence, and any

2   facts to which the parties have agreed.

3        The parties have agreed to certain facts that

4   have been stated to you.  And you should therefore treat

5   these facts as having been proved.

6        In reaching your verdict, you may consider only

7   the testimony and exhibits received in evidence.  The

8   following things are not evidence and you may not

9   consider them in deciding what the facts are:

10       First, questions, including hypothetical

11  questions, statements, objections, and arguments by the

12  lawyers are not evidence.  The lawyers are not

13  witnesses.  Although you must consider a lawyer's

14  question to understand the answers of a witness, the

15  lawyer's questions are not evidence.  Similarly, what

16  the lawyers have said in their opening statements, will

17  say in their closing arguments and at other times is

18  intended to help you interpret the evidence, but it is

19  not evidence.  If the facts as you remember them differ

20  from the way the lawyers state them, your memory

21  controls.

22       Second, any testimony that I've excluded,

23  stricken, or instructed you to disregard is not

24  evidence.  In addition, some evidence was received only

25  for a limited purpose; and where I've instructed you to

consider certain evidence in a limited way, you must do so.

Third, anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is indirect evidence, that is, the proof of one or more facts from which you could find another fact.

You are to consider both direct and circumstantial evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give any evidence. In deciding the facts, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account: The witness's opportunity and ability to see, or hear, or know the things testified to;

The witness's memory;

1           The witness's manner while testifying;

2           The witness's interest in the outcome of the

3     case;

4           The witness's bias or prejudice;

5           Whether other evidence contradicted the

6     witness's testimony;

7           The reasonableness of the witness's testimony

8     in light of all the evidence; and

9           Any other factors that bear on believability.

10          If a witness knowingly testifies falsely

11    concerning any important or material matter, you may

12    distrust the testimony of such an individual concerning

13    other matters.  You may reject all of the testimony of

14    that witness or give it such weight or credibility as

15    you may think it deserves.

16          The weight of the evidence as to a fact does

17    not necessarily depend on the number of witnesses who

18    testify.  What is important is how believable the

19    witnesses were, and how much weight you think their

20    testimony deserves.

21          You have heard evidence that the defendant

22    committed other acts not charged here.  You may consider

23    this evidence only for its bearing, if any, on the

24    question of the defendant's intent, motive, opportunity,

25    preparation, plan, knowledge, identity, absence of

1    mistake, absence of accident, and for no other purpose.

2    You may not consider this evidence as evidence of guilt

3    of the crime for which the defendant is now on trial.

4           You have heard testimony that the defendant

5    made a statement.  It is for you to decide whether the

6    defendant made the statement; or, if so, how much weight

7    to give to it.  In making those decisions, you should

8    consider all the evidence about the statement, including

9    the circumstances under which the defendant may have

10   made it.

11          The testimony of a law enforcement officer is

12   to be treated by you in the same manner as that of any

13   other witnesses.  All witnesses who appeared in court

14   swore to tell the truth.  Law enforcement officers,

15   including FBI or IRS officers, did no more and no less.

16          You have heard testimony from persons who,

17   because of education or experience, were permitted to

18   state their opinions and the reasons for their opinions.

19          Such opinion testimony should be judged like

20   any other testimony.  You may accept it or reject it,

21   and give it as much weight as you think it deserves,

22   considering the witness's education and experience, the

23   reasons given for the opinion, and all the other

24   evidence in the case.

25          A defendant in a criminal case has a

1    constitutional right not to testify.  No presumption of

2    guilt may be raised, and no inference of any kind may be

3    drawn, from the fact that the defendant did not testify.

4           During the trial, certain charts and summaries

5    were shown to you in order to help explain the evidence

6    in the case.  These charts and summaries were not

7    admitted in evidence and will not go into the jury room

8    with you.  They are not themselves evidence or proof of

9    any facts.  If they do not correctly reflect the facts

10   or figures shown by the evidence in the case, you should

11   disregard them and determine the facts from the

12   underlying evidence.

13          Certain charts and summaries have been admitted

14   in evidence.  Charts and summaries are only as good as

15   the underlying supporting material.  You should,

16   therefore, give them only such weight as you think the

17   underlying material deserves.

18          The defendant is charged in count 1 of the

19   indictment with conspiring to defraud the United States

20   by obstructing the lawful functions of the former United

21   States Customs Service and the Internal Revenue Service

22   by deceitful or dishonest means, as alleged in the

23   indictment, in violation of Section 371 of Title 18 of

24   the United States Code.  In order for the defendant to

25   be found guilty of that charge, the government must

1   prove each of the following elements beyond a reasonable

2   doubt:

3          First, beginning in or about late 1999 and

4   ending in or about October of 2001, there was an

5   agreement between two or more persons to defraud the

6   United States by obstructing the lawful functions of the

7   former United States Customs Service or the Internal

8   Revenue Service by deceitful or dishonest means as

9   charge in the indictment;

10         Second, the defendant became a member of the

11  conspiracy knowing of at least one of its objects and

12  intending to help accomplish it; and

13         Third, one of the members of the conspiracy

14  performed at least one overt act in or after late 1999

15  for the purpose of carrying out the conspiracy, with all

16  of you agreeing on a particular overt act that you find

17  was committed.

18         An agreement to defraud is an agreement to

19  deceive or to cheat, but one who acts on an honest and

20  good faith misunderstanding as to the requirements of

21  the law does not act with an intent to defraud simply

22  because his understanding of the law is wrong or even

23  irrational.  Nevertheless, merely disagreeing with the

24  law does not constitute a good faith misunderstanding of

25  the law because all persons have a duty to obey the law

1  whether or not they agree with it.

2        A conspiracy is a kind of criminal partnership,

3  an agreement of two or more persons to commit one or

4  more crimes.  The crime of conspiracy is the agreement

5  to do something unlawful; it does not matter whether the

6  crime agreed upon was committed.

7        For a conspiracy to have existed, it is not

8  necessary that the conspirators made a formal agreement

9  or that they agreed on every detail of the conspiracy.

10  It is not enough, however, that they simply met,

11  discussed matters of common interest, acted in similar

12  ways, or perhaps helped one another.  You must find that

13  there was a plan to commit at least one of the crimes

14  alleged in the indictment as an object of the conspiracy

15  with all of you agreeing as to the particular crime

16  which the conspirators agreed to commit.

17        One becomes a member of a conspiracy by

18  willfully participating in the unlawful plan with the

19  intent to advance or further some object or purpose of

20  the conspiracy, even though the person does not have

21  full knowledge of all the details of the conspiracy.

22  Furthermore, one who willfully joins an existing

23  conspiracy is as responsible for it as the originators.

24  On the other hand, one who has no knowledge of a

25  conspiracy, but happens to act in a way which furthers

1   some object or purpose of the conspiracy, does not

2   thereby become a conspirator.  Similarly, a person does

3   not become a conspirator merely by associating with one

4   or more persons who are conspirators, nor merely by

5   knowing that a conspiracy exists.

6          An overt act does not itself have to be

7   unlawful.  A lawful act may be an element of a

8   conspiracy if it was done for the purpose of carrying

9   out the conspiracy.  The government is not required to

10  prove that the defendant personally did one of the overt

11  acts.

12         One of the lawful functions of the Internal

13  Revenue Service is to collect information concerning

14  financial transactions of tax exempt organizations.

15         One of the lawful functions of the Department

16  of Homeland Security, Immigration and Customs

17  Enforcement and Border Protection, formerly the United

18  States Customs Service, is to collect information

19  concerning the transportation of currency and monetary

20  instruments leaving and entering the United States.

21         Federal law requires that anyone who transports

22  more than $10,000 in monetary instruments into or out of

23  the United States must file a report with the Secretary

24  of Treasury.

25         Traveler's checks, in any form, are monetary

1    instruments.

2              As noted above, the indictment charges the

3    defendant with conspiracy to obstruct the lawful

4    functions of the former United States Customs Service in

5    addition to the lawful functions of the Internal Revenue

6    Service.  Accordingly, the government must prove, either

7    an agreement to file a false tax return or to fail to

8    report exporting monetary instruments.

9              A person is guilty of the crime of failure to

10   report exporting monetary instruments if the government

11   proves the following elements beyond a reasonable doubt:

12             First, the person knowingly transported more

13   than $10,000 in traveler's checks from a place in the

14   United States to or through a place outside the United

15   States;

16             Second, the person knew that a report of the

17   amount transported was required to be filed with the

18   Secretary of Treasury; and

19             Third, the person willfully failed to file such

20   report.

21             A person acts willfully for purposes of failure

22   to file -- I'm sorry -- failure to report exporting

23   monetary instruments when he or she has knowledge of the

24   reporting requirement and a purpose to disobey the law

25   requiring reporting.

1       The defendant is charged in count 2 of the

2   indictment with filing a false tax return in violation

3   of Section 7206(1) of Title 6 (sic) of the United States

4   Code.  In order for the defendant to be found guilty of

5   that charge, the government must prove each of the

6   following elements beyond a reasonable doubt:

7       First, the defendant made and -- I'm sorry,

8   I'll start over.  First, the defendant made and signed a

9   tax return for the year 2000 that he knew contained

10  false or incorrect information, as alleged in the

11  indictment, as to a material matter;

12      Second, the return contained a written

13  declaration that it was being signed subject to the

14  penalties of perjury; and

15      Third, in filing the false tax return, the

16  defendant acted willfully.

17      A matter is material if it had a natural

18  tendency to influence, or was capable of influencing,

19  the decisions or activities of the Internal Revenue

20  Service.

21      In order to prove that the defendant acted

22  willfully, the government must prove beyond a reasonable

23  doubt that the defendant knew federal tax law imposed a

24  duty on him, and the defendant intentionally or

25  voluntarily violated that duty.

1            A defendant who acts on a good faith

2    misunderstanding as to the requirements of the law does

3    not act willfully even if his understanding of the law

4    is wrong or unreasonable.  Nevertheless, merely

5    disagreeing with the law does not constitute a good

6    faith misunderstanding of the law because all persons

7    have a duty to obey the law whether or not they agree

8    with it.  Thus, in order to prove that the defendant

9    acted willfully, the government must prove beyond a

10   reasonable doubt that the defendant did not have a good

11   faith belief that he was complying with the law.

12           A person who willfully causes an act to be done

13   by another which if directly performed by him would be

14   an offense, is guilty of such offense.  In other words,

15   a person is guilty of an offense if he used an innocent

16   pawn to cause an act to be done which, if performed by

17   him, would be unlawful.

18           An act is done knowingly if the defendant is

19   aware of the act and does not act through ignorance,

20   mistake, or accident.  You may consider evidence of the

21   defendant's words, acts, or omissions, along with all

22   the other evidence, in deciding whether the defendant

23   acted knowingly.

24           The defendant's theory of defense is:

25           First, the government has not proved beyond a

1   reasonable doubt that the tax return contains any

2   material errors.  Neither line 1, contributions, nor

3   line 22, grants and allocations, is understated because

4   the El-Fiki donation need not have been included on the

5   tax return.  This is because Dr. El-Fiki donated the

6   $150,000 as Zakat to al-Haramain Riyadh, and not to

7   al-Haramain Ashland.  While line 51a (sic), value of

8   buildings, is overstated, the mistake was made by

9   Mr. Wilcox without defendant's knowledge --

10              MR. MATASAR:  I think there is an "and" there.

11              THE COURT:  Yeah, that's right.  There should

12   have been an "and" there.  "And is not material."  Thank

13   you, Counsel.

14              Second, the defendant maintains, even if the

15   tax return contained material errors, the errors are not

16   willful because they were made by Mr. Wilcox without the

17   defendant's knowledge of the material error.

18              Third, the defendant -- defense maintains, the

19   government has not proven beyond a reasonable doubt that

20   the defendant and Mr. al-But'he had an agreement to

21   defraud the United States in order to hide the

22   disposition of Dr. El-Fiki's donation.

23              When you begin your deliberations, elect one

24   member of the jury as your presiding juror who will

25   preside over the deliberations and speak for you here in

1   court.  You will then discuss the case with your fellow

2   jurors to reach agreement if you can do so.  Your

3   verdict, whether guilty or not guilty, must be

4   unanimous.

5          Each of you must decide the case for yourself,

6   but you should do so only after you have considered all

7   the evidence, discussed it fully with the other jurors,

8   and listened to the views of your fellow jurors.

9          Do not be afraid to change your opinion if the

10  discussion persuades you that you should.  But do not

11  come to a decision simply because other jurors think it

12  is right.

13         It is important that you attempt to reach a

14  unanimous verdict but, of course, only if each of you

15  can do so after having made your own conscientious

16  decision.  Do not change an honest belief about the

17  weight and effect of the evidence simply to reach a

18  verdict.

19         Because you must base your verdict only on the

20  evidence received in the case and on these instructions,

21  I remind you that you must not be exposed to any other

22  information about the case or to the issues it involves.

23  Except for discussing the case with your fellow jurors

24  during your deliberations:

25         Do not communicate with anyone in any way and

1   do not let anyone else communicate with you in any way

2   about the merits of the case or anything to do with it.

3   This includes discussing the case in person, in writing,

4   by phone or electronic means, via e-mail, text

5   messaging, or any Internet chat room, blog, Web site, or

6   other feature.  This applies to communicating with your

7   family members, your employer, the media or press, and

8   the people involved in the trial.  If you are asked or

9   approached in any way about your jury service or

10  anything about the case, you must respond that you have

11  been ordered not to discuss the matter and to report the

12  contact to the court.

13          Do not read, watch, or listen to any news or

14  media accounts or commentary about the case or anything

15  to do with it; do not do any research, such as

16  consulting dictionaries, searching the Internet, or

17  using other reference materials; and do not make any

18  investigation or in any other way try to learn about the

19  case on your own.

20          Some of you have taken notes during the trial.

21  Whether or not you took notes, you should rely on your

22  memory of what was said.  Notes are only to assist your

23  memory.  You should not be overly influenced by the

24  notes or those of your fellow jurors.

25          The punishment provided by law for these crimes

1    is for the court to decide.  You may not consider

2    punishment in deciding whether the government has proved

3    its case against the defendant beyond a reasonable

4    doubt.

5            A verdict form has been prepared for you.

6    After you have reached unanimous agreement on a verdict,

7    your presiding juror should complete the verdict form

8    according to your deliberations, sign and date it, and

9    advise the clerk that you are ready to return to the

10   courtroom.

11           Well, thank you.

12           We'll have the summation by the government at

13   this time.  Mr. Gorder.

14           MR. GORDER:  May it please the court, ladies

15   and gentlemen of the jury, counsel, good morning.

16           You just heard the judge instruct you about the

17   government's burden of proving this case beyond a

18   reasonable doubt.  And that's a burden that we willingly

19   accept in our system of justice.

20           I want to talk to you today about why the

21   evidence in this case shows that the defendant is guilty

22   beyond a reasonable doubt.

23           Let me give you a couple of tips about how to

24   deliberate that I think will be helpful to you during

25   your deliberations.  First, as the judge mentioned in

1    discussing reasonable doubt, there is the concept of

2    common sense.

3            No one expects you to abandon your common sense

4    when you go into the jury room.  Look at the evidence in

5    light of the way you understand how people behave.  Talk

6    is cheap.  So what I suggest that you do is look at what

7    the evidence shows that the defendant did, not what he

8    said, and follow the money in this case.

9            Second, the judge mentioned that you should

10   discuss the evidence with your fellow jurors before

11   deciding the case, and that's very important.  Don't

12   just walk in and say "let's take a vote."  It's harder

13   to listen to your fellow jurors when you do that.

14   First, go over the evidence in the case.

15           Now, Mr. Cardani when he spoke to you when the

16   trial started said that the evidence would be something

17   like a jigsaw puzzle.  And it certainly came in fast and

18   furious.  We've been here for a week and a half now, but

19   it did come in pretty quickly.  And so what I want to do

20   is go through the significant evidence in the case.  And

21   I'll try to remember to give you the exhibit numbers.

22   You'll have the exhibits back in the jury room that will

23   help you reflect on the evidence.

24           The evidence shows that there were two sides to

25   the defendant.  At al-Haramain they had a religious test

Closing Argument by Mr. Gorder                                    50

 1   that people would take.  And the non-Muslims got the

 2   smiling guy with a camel in the Fourth of July parade.

 3   But certain Muslims passed the test, and they got the

 4   Qur'an with the special Call to Jihad.  They got the

 5   anti-Semitic junk that was distributed by al-Haramain.

 6   And the mujahideen got aid.

 7          Conspiracy is simply an agreement -- it doesn't

 8   have to be down in writing -- just an informal agreement

 9   between people to violate the law.  It's kind of like a

10   plan.  And in this case, the plan was based on this

11   supposition:  The IRS and the Custom Service wouldn't

12   pass the defendant's test, wouldn't pass al-Haramain's

13   test, so the IRS would get a tax return that concealed

14   the funds destined for Chechnya.  And the Customs

15   Service would get no report when those funds left the

16   country.

17          Now, different people played different roles.

18   This fella Mr. al-But'he, he was the man that came over

19   here to get the money.  And he was the one that was

20   going to take it out of the country without reporting

21   it.

22          The defendant's role was to hide that from the

23   authorities in the United States.

24          There was another person, Mr. Al-Shoumar.  He

25   was the accountant for al-Haramain in Saudi Arabia.  His

 1    role was to stay on top of things and make sure that the

 2    concealment happened.

 3            Mr. Abdul Qaadir's role was to send out the

 4    Sheeshaan information to get people fired up about

 5    providing aid to the mujahideen.

 6            And it was a plan that was based on lies and

 7    concealment and dishonesty and deceit.

 8            Now, I want to talk to you, first of all, about

 9    what the evidence shows about al-Haramain and the United

10    States.  It was run by the defendant.  And I have a

11    question?  Was this a charity?  There was one person in

12    charge.  All the witnesses agreed to that.  That was the

13    defendant.

14            They had the prisoner books, the prisoner

15    program, and if you passed the test, you would get the

16    Noble Qur'an.  And you will recall some of the

17    information that was in that, that special appendix that

18    wasn't really part of the Qur'an, it was the edition

19    inserted "Praise is to Allah who has ordained al-Jihad,

20    the holy fighting in Allah's cause, with the heart, with

21    the hand, weapons, and with the tongue."

22            Mr. Gartenstein-Ross told you 15,000 of those

23    Noble Qur'ans were given -- sent out to prisoners around

24    the country.

25            There was the *Islamic Guidelines* with terrible

1   stuff about Jewish people.  "The type of jihad that's an

2   individual duty becomes a must when the enemy of Muslims

3   enters their land like the Jews who settled in

4   Palestine.  Every Muslim will be guilty unless he expels

5   the Jews by money or physical fighting."  This was a

6   charity?

7           They raised money for the fighters in Kosovo.

8   You heard Mr. Gartenstein talk about that and how he

9   contributed while he was working there.

10          When they went on the Hajj, the pilgrimage to

11  Mecca, Barbara Cabral who testified before you was told

12  that when she got her money back from the Saudi

13  government because they were so well taken care of by

14  al-Haramain, that the defendant went to her and said,

15  can we get that money for the mujahideen in Chechnya?

16          Jewelry sales, or we usually call them garage

17  sales, for the mujahideen were held at the defendant's

18  building in Ashland.  This is a charity?

19          The defendant's wife Sofia translated for the

20  Qoqaz Web site, the official Web site of the Islamic

21  Army of the Caucasus.  And she translated for their

22  Russian language Web site.

23          And if we could have SW-61, you can see some of

24  those translations.  So there was a little program, if

25  you know -- if you work for or know someone who works in

 1    a reputable aid organization, inform them that the

 2    mujahideen are in urgent need of doctors, medical

 3    personnel, and medical supplies.

 4            You heard from Mr. Kohlmann that the Qoqaz Web

 5    site was the official propaganda Web site of Ibn

 6    Khattab's group, the foreign mujahideen in Chechnya.

 7            SW-17, please.  You can see from the computers

 8    in Ashland a communication directly to the Qoqaz Web

 9    site, and instructions, Dear sister, the following

10    things should be done in order of priority, and tells

11    how to -- what should be done on the Russian Web site.

12    Keep up the good work, Sister.

13            And SW-29.  Don't think the defendant wasn't

14    aware of what his wife was doing.  This particular

15    e-mail from his arborist business to somebody, "we are

16    working on Russian Web site.  And I would like to ask

17    you if it is okay if we will use your map of Chechnya

18    and declaimer on our Russian Web site."  On our Russian

19    Web site.

20            And then SW-26, you recall Mr. Kohlmann

21    authenticated this as an official communiqué from Ibn

22    Khattab and Shamil Basayev, the leaders of the

23    mujahideen in Chechnya, thanking Sister Ptichka for

24    working on the Russian Web site.  That e-mail address

25    that they were using was Ptichka@hotmail.com.

1          I suggest to you, the defendant was -- felt

2     pretty good that day when he saw that.

3          Mr. Rodgers, who testified yesterday, claimed

4     that he would be surprised if this happened.  But you

5     know it did.  This is a charity?

6          Fund raising videos in the room where the women

7     prayed.  One produced by the American Islamic Group

8     founded by a famous guy who fought with the mujahideen

9     in Bosnia and Chechnya, according to Mr. Kohlmann.  You

10    recall those videos.  One had the little kids with the

11    AK47 shouting "Allah Akbar."  Specifically made videos

12    to raise money for the mujahideen.

13         And when the non-Muslims were not around the

14    tent, there was radical stuff going on.  "Leave the land

15    of the devils."  "The Talmud is the Jews' plan to ruin

16    the world."  And the defendant saying, "speak up so the

17    sisters can hear you."  "People who leave Islam should

18    be killed."  This is a charity?

19         When Mr. Gartenstein answered an inquiry about

20    Islam one day in an e-mail, he was reprimanded by the

21    defendant.

22         MR. WAX:  Your Honor, I object.

23         THE COURT:  Overruled.

24         MR. GORDER:  We have sheikhs in Saudi Arabia

25    who can handle those kinds of questions.

1           With this evidence, ladies and gentlemen, you

2     can only conclude that there was something rotten on the

3     inside of al-Haramain in Ashland, Oregon.

4           Let me turn to Saudi Arabia because you can

5     only conclude there, there was something rotten even on

6     the outside of al-Haramain.  We saw some things from

7     al-Haramain's Web site, which if you look at IRS-3,

8     which was the application that Mr. Seda filed to get his

9     tax exempt status here in the United States, was his

10    official Web site address, al-Haramain.org.

11          Let's take a look at EK-1 from the Web site.

12    "The latest news about the jihad in Chechnya."  An

13    update on the fighting.  How many Russians were killed.

14    Not about the plight of the refugees.  This is a

15    charity?

16          EK-4A, this is the fatwa from one of those

17    sheikhs in Saudi Arabia that the defendant told

18    Mr. Gartenstein-Ross about.  This fatwa is found or was

19    found on the relief for Chechnya section of the Web

20    site.  And what does it tell you?  "It is obligatory

21    upon Muslims to pray for their brothers in order to

22    achieve victory."  Second, "supply them with weapons and

23    material support."  And third, "support them

24    financially."

25          Now, the defendant's experts tried to make a

1   big deal about fatwas, saying, you know, you don't have

2   to follow them.  It's not a requirement unless you

3   follow that particular cleric.  Here is where your

4   common sense comes into play.  You don't put something

5   up on your Web site unless you want people to follow it.

6   This is what al-Haramain in Saudi Arabia was telling the

7   world.  This is a charity?

8           Then we had Mr. Abdul Qaadir, the guy down on

9   the lower right.  He has his Sheeshaan Web site -- or

10  not Web site, e-mail list, sorry.  Sheeshaan means

11  Chechnya in Arabic, we heard.  It's an e-mail group.

12  And he made sure the defendant got this fatwa.

13          SW-30.  You will be able to take a look at this

14  in the jury room.  This is an almost identical

15  translation of Mr. Jibreen's or Sheikh Jibreen's fatwa

16  delivered March 8, 2000, right at the time Soliman

17  al-But'he was flying to the United States to pick up the

18  money.

19          And this Sheeshaan ListServ or e-mail group or

20  whatever you want to call it that Abdul Qaadir was

21  distributing, an employee of al-Haramain, had crazy

22  stuff -- really crazy stuff.  SW-27.  "How can I train

23  myself for jihad?" sent February 29th, to, among others

24  the computers in Ashland.  And we're not talking about

25  some peaceful kind of jihad that you struggle with

1    inside yourself.

2            Military training, physical training, martial

3    arts, firearms training.  This was a charity?

4            Let's talk a little bit about Chechnya.  What

5    did you learn about Chechnya?  Now, Mr. Cardani told you

6    we're not taking sides in that conflict.  It was brutal,

7    brutal on both sides.  If there is anything you can take

8    from that, it's how blessed we are to live in this

9    country where we're more likely to be killed in an auto

10   accident than in the crossfire of a war.  But what did

11   we learn?

12           Well, we learned that Ibn Khattab was the

13   leader of the foreign mujahideen, the Islamic Army of

14   the Caucasus.  And they had a training center called a

15   Kavkaz or the Caucasus Institute.

16           You saw Mr. Kohlmann's video that he had

17   obtained from the Internet put out by the Islamic Army

18   of the Caucasus about that training center.  It was a

19   boot camp for soldiers.

20           SW-48.  And in the defendant's computers, a

21   picture of the front of the camp.

22           EK-6A.  Back to al-Haramain in Saudi Arabia's

23   Web site.  They bragged about supporting the Caucasus

24   Institute.  You learned -- and I mentioned this a little

25   bit earlier -- that the foreign mujahideen and Chechnya

 1   had the Qoqaz Web site for propaganda purposes, and how

 2   Mr. Abdul Qaadir would just copy things from their Web

 3   site and send it out to the Sheeshaan group.  And you

 4   learned that in the second half of 1999, there had been

 5   kind of a truce in Chechnya, when the conflict flared up

 6   again when Khattab led a group to invade a neighboring

 7   republic, Dagestan.  The Russians responded and things

 8   got desperate.

 9          SW-56.  November 1999.  Again, Mr. Kohlmann

10   authenticated this as an official interview of Ibn

11   Khattab.  And question 6 is very important in this case.

12   "Do you need any support," Mr. Khattab?  "What support

13   in particular do you need?"  Answer, "the Chechen

14   Republic has been surrounded from all sides.  However,

15   the Russian Army is prepared to sell everything for a

16   price.  As for previous affairs of the Muslims, one

17   would always find Islamic charities and organizations

18   present.  I am sorry to say that there is not a single

19   Islamic charity or organization active inside Chechnya

20   at present."  November 1999.

21          Well, al-Haramain came to the rescue.  SW-6,

22   page 2, put on their Web site, Chechnya relief fund.

23   You can send your money to the Bank of America in

24   Ashland or to Al Rajhi Bank in Saudi Arabia.

25          Now, back to that question and answer from Ibn

1   Khattab.  What did you hear?  Well, we had a computer

2   forensic's expert -- if we could have JC-4, page 1,

3   okay, here we go.  And you'll have this in evidence.  He

4   went through all of the government exhibits that were

5   found in the computers.  All of them deleted, by the

6   way.  Don't know exactly by whom, but it made it very

7   difficult to find this.  He was able to do it.  So he

8   found that that question 6 and the answer had been

9   converted by someone into another document, a Word

10  document.  And that's what SW-52 is.  If we could go to

11  that.  So, again, same thing, different form.

12          Then what happened?  Now, this is at the time,

13  this is according to Mr. Christianson, the computer guy,

14  and you'll see that on his chart, this document was

15  created January 22, 2000.  This is while Mr. El-Fiki,

16  the Egyptian guy, is still in the process of considering

17  whether he'll send money to al-Haramain.  SW-11, an

18  e-mail from the defendant.  P, you heard that was his

19  e-mail address.  To al-But'he.  With a title "What

20  support?"  He sends to Mr. al-But'he the plea of Ibn

21  Khattab for Islamic charities to support the mujahideen.

22  This is a smoking gun.

23          Now, it's circumstantial evidence.  You can't

24  look into anyone's head to know what they were thinking.

25  You can't expect that people close enough to the

Closing Argument by Mr. Gorder                          60

1    defendant to know what he was up to, know his secrets,

2    would come in and tell us about that.

3            Now, Mr. Rodgers was here.  He was probably

4    somebody close enough, but he had gone to Saudi Arabia

5    by this time.

6            This, by the way, was a pretty good example of

7    an overt act of the conspiracy.  An overt act doesn't

8    have to be illegal in itself.  This e-mail from the

9    defendant to al-But'he, "what support?" are we giving to

10   Ibn Khattab?

11           Let me shift a little bit and talk about the

12   actual transaction.  And there are plenty of other

13   additional overt acts in this.  SW-22.  The Egyptian

14   gentleman, El-Fiki, decides to make a donation.  And

15   this is an e-mail that the defendant got that shows the

16   money is going to come from Mahmoud Talaat El-Fiki on

17   February 24, 2000.

18           You see at the very top -- you'll be able to

19   see in evidence -- this e-mail was sent from al-Haramain

20   to the defendant.  Alerting him, the money is coming.

21           Then SW-23, this is what I call the "be careful

22   e-mail."  Al-But'he, the guy in Riyadh, sends the

23   defendant a newspaper article talking about how the

24   government is trying to track down terrorists and the

25   problems they are having in dealing with money diverted

1   to terrorism for improper purposes.  And highlighted in

2   red, presumably by Mr. al-But'he, but by somebody, not

3   in the article, is "U.S. officials also said they have

4   discovered through the massive probe that a significant

5   number of Islamic terrorists are concealing their

6   activities and sources of funds by using charitable

7   organizations as fronts.  As many of these charities do

8   substantial community service work, investigating them

9   is not easy and can subject the FBI or foreign law

10  enforcement authorities to allegations of targeting

11  religious or ethnic group, sources said."

12          Now, why was this highlighted and sent to

13  Mr. Seda?  It was a message from his co-conspirator,

14  Mr. al-But'he, be careful.  Conceal the money that's

15  coming.

16          Well, then, BOA-3, and this is on page 2, this

17  is from the Bank of America statement for the bank in

18  Ashland, a wire transfer comes in for $149,985 from

19  Mr. El-Fiki.  That's the $150,000 minus a simple $15

20  wire fee.

21          AMX-2.  You heard the testimony of Debra

22  Ingram, the lady from the Bank of America, the defendant

23  called her up and ordered $130,000 in American Express

24  traveler's checks.  You'll have those in evidence.  Not

25  150 or 149, but 130.

 1          Common sense tells you there was some

 2   discussion, perhaps over the phone, between

 3   Mr. al-But'he and the defendant saying give me the 130,

 4   not the 150.

 5          March 7, 2000, the checks are shipped to the

 6   bank and they receive them on March 9th.  They didn't

 7   have those kind of checks sitting around the bank.

 8          Now, Debra Ingram, the banker, tried to talk

 9   the defendant out of doing this.  She said, you know, I

10   can get you a cashier's check for ten bucks, or you can

11   wire the money anywhere for 15.  These traveler's checks

12   are going to cost you $1300.  Nope.  That's the way we

13   want to do it.  We're going to pay the $1300 traveler's

14   check fee.  And there is going to be an airfare for

15   Mr. al-But'he to come from Saudi Arabia to get them.  I

16   don't know how much exactly that was, but it's probably

17   a couple thousand dollars, for a five-day trip.

18          And Mr. al-But'he arrives on March 7th.  If you

19   look at ICE CBP-1, this is the printout of his entry and

20   departure from the United States.  He arrived on March 7

21   in New York City, and he left on March 12th.  He was

22   there five days to pick up the money.

23          The next day -- or excuse me, on March 10th,

24   the day after the checks arrive, BOA-7, please, the

25   defendant and Mr. al-But'he go to the bank.

1    Mr. al-But'he signs this check for $131,300.  He was one

2    of the two signers on the account, along with the

3    defendant.  And you heard the testimony of Debra Ingram,

4    the defendant, al-But'he are there, and al-But'he has to

5    sit there and sign these things 130 times.

6            The next day -- and this is BOA-8 and 9 -- the

7    defendant comes back, writes another check for $21,000

8    to the bank, and gets a cashier's check made payable,

9    not al-Haramain, but to Soliman al-But'he for $21,000.

10            Then ICE FinCEN-1, al-But'he leaves the

11    country, March 12th.  Here is the CMIR form, which says

12    it's for individuals departing from or entering the

13    United States.  And you can see the chart that we have

14    for Mr. al-But'he.  Had filed nine of these at various

15    times in his career.  He didn't file one that day when

16    he was taking Mr. El-Fiki's money out of the country.

17            Now, you also heard the testimony that 73

18    people that month in March of 2000 left the country from

19    JFK International Airport and did fill these forms out

20    for over $6 million, but not Mr. al-But'he.

21            The defendant, he's traveled internationally,

22    too.  He's aware of these rules.  Went to the Hajj in

23    Saudi Arabia.  You heard he -- from the rabbi that he

24    went to Israel.  And he's from a part of the world where

25    the defendant's own experts tell you they like to carry

1    cash.

2            Then what happens?  Well, Mr. al-But'he goes

3    back to Saudi Arabia, and he cashes the checks.  And

4    this ALR-1A.  You see he cashed the 130,000 American

5    Express traveler's checks, and he got 486,850 Saudi

6    riyals in cash.  And that's gone.  Trail dries up.

7            Now, he also takes that cashier's check made

8    payable to him for $21,000 -- and this is on ALR-1A, the

9    translation for pages 4 and 5.  And it's a little faint,

10   but you'll be able to see it in the jury room.  Here is

11   the $21,000 Bank of America traveler's check.  Here is

12   the rate between Saudi riyals and the dollar.  And it

13   turns into 78,729 riyals.  And the credit is April 8th

14   of 2000.

15           Next exhibit, please.  And here is the deposit

16   into Mr. al-But'he's personal bank account at the bank

17   for the 78,729 riyals, April 8.

18           And then as Agent Anderson explained -- if we

19   could have the next exhibit -- you can see that the

20   money in his account was spent over the next period.

21   There's nothing that indicates it's going to Chechnya.

22   Nothing that indicates it's going to the Saudi Joint

23   Relief Committee.  Nothing that indicates that it's

24   going to al-Haramain.  Looks like it's spent for normal

25   personal expenses.

1          Now, somebody might call that $21,000 a

2    commission that Mr. al-But'he extracted for his trip to

3    the United States.  Some people might call it a

4    kickback.  But what I don't call it is Zakat that is

5    very strictly controlled and treated as sacred in Saudi

6    Arabia.

7          This is where your common sense comes into play

8    again.  Why -- this whole series of events, the guy

9    flying over, the $1300 traveler's checks fee, when all

10   they needed to do was wire transfer the money to Saudi

11   Arabia for 15 bucks, why do something that weird?  Well,

12   people do things weird when they are trying to conceal

13   what they are up to.  That's where your common sense

14   comes into play.

15         Now, let's switch to Springfield and the

16   purchase of the mosque, Springfield, Missouri.  Here's

17   one of the interesting things about this case, there

18   were two significant financial transactions in 2000 that

19   al-Haramain U.S.A. engaged in.  One was this El-Fiki

20   deal and the other was the purchase of the mosque in

21   Springfield, Missouri.  And both of those events are

22   misrepresented on the tax return.  What happened?

23         al-Haramain decided to buy another mosque in

24   Springfield, Missouri.  They hired Mr. Kanan, the lawyer

25   you heard from.  And if we could see RDK-2, page 4, it

 1    took a while, but on June 21st, he has his -- his

 2    secretary has a telephone call from Pete.  "The funds

 3    will not be transferred until Wednesday or Thursday of

 4    next week."  So who's in the middle of this transaction?

 5    The defendant.

 6            Then BOA-10 to 17.  On the 23rd, two days

 7    later, the defendant goes to the bank, he signs a check

 8    for $318,000 and change.  And it's turned into a

 9    cashier's check to First Escrow in Springfield,

10    Missouri.

11            RDK-2, this is on page 6, there is another

12    note, "telephone call from Pete in Oregon, he Fed Exed

13    money to First Escrow for a June 24 delivery."  So the

14    defendant, again, right in the middle of this

15    transaction.

16            RDK-2, page 1, on June 26th, phone call to

17    Soliman and Pete, after closing, it's okay, five to

18    six weeks to get the documents.

19            And then when you take a look at RDK-1 in the

20    exhibits, these are the documents that Mr. Kanan sent.

21    And they have the purchase price for the mosque,

22    $375,000.  And they reflected the $318,000 cashier's

23    check that the defendant sent.

24            Defendant told the FBI even on September 15,

25    2010, right while the return was being prepared, that

1   they had a mosque in Springfield.  And he said it was

2   purchased for about 300 to 325.  Just framing this check

3   pretty well, the $318,000.  So he knew what was going on

4   with that mosque.  He knew the costs.  And he knew where

5   the money came from.

6          Let's talk about the tax return.  This is

7   IRS-1.  Now, I want to spend a little time talking about

8   line 1a, that's one of the lines that is alleged to be

9   false, direct public support, $561,640.  Line 22,

10  24,534.

11         The statement of program services, which is on

12  another page, and you will see there, there is nothing

13  about Chechnya or relief for Chechnya or anything of the

14  kind.

15         The listed officers, which includes both

16  Mr. al-But'he, the treasurer, and the defendant as

17  secretary.  And line 57a.

18         Now, let's talk about line -- oh, okay, sorry,

19  little bit more.  Later on, Schedule A, question 2,

20  during the year has the organization either directly or

21  indirectly engaged in any of the following acts with any

22  of its, among other things, directors and officers.

23         D, payment of compensation or reimbursement of

24  expenses if more than $1,000, and the box is checked no.

25  Doesn't reflect the $21,000 that went to Mr. al-But'he.

1          And it's signed on October 16th under penalty

2     of perjury by the defendant.

3          Now, let's go through this just a little bit

4     more.  You've heard that on line 1 the $561,640 figure

5     does not include the $21,000 check.  Because Mr. Wilcox

6     was told it was returned to Mr. Soliman, the donor.

7          Line 22, the $22,534, allegedly the total of

8     distributions that year, does not have the $130,000, at

9     least, of Mr. El-Fiki's money that left the country.

10         The statement of program services, no reference

11    to Chechnya.  The biggest thing, aside from purchasing

12    the mosque that the charity did that year, it's not on

13    there.

14         Line 57a, this is another one where the

15    defendant is charged with a false statement.  685,643 is

16    the value of the property.  That includes the

17    Springfield mosque.  And it includes the $131,300 that

18    were used to buy the traveler's checks that were not

19    used to buy the mosque.  And then the Schedule 2A, the

20    list of officers.  Al-But'he got zero, apparently.

21         Now, let me talk a little bit about Mr. Wilcox.

22    You heard the judge instruct you that if you use an

23    innocent pawn to do an act which would be unlawful if

24    you did it, you can be found guilty.  And that's the

25    theory here.  That by telling Mr. Wilcox false

1    information, it got onto the return that he prepared,

2    and the defendant signed it under perjury, and he's

3    guilty.

4           Now, we'll concede that Mr. Wilcox is not the

5    best accountant in the world.  But his initial

6    engagement only envisioned that he'd be working on this

7    case for a few hours to do the 990 returns.  And it

8    turned out to be a heck of a lot more.

9           Now, how many hours did the defendant's experts

10   here who testified pour over Mr. Wilcox's file?  Well,

11   we heard yesterday that Mr. Cone spent 300 hours before

12   he even came to court at $150 an hour.  And there was

13   some other accountant working on it.  And they went

14   through and nitpicked it pretty good.

15          They found a $50 horse shoeing fee that was

16   listed as attorney's fees.  Now, unless the attorney was

17   Mr. Ed, that wasn't appropriate.  But Mr. Sedaghaty is

18   not charged with lying about his attorney's fees.

19          Mr. Wilcox admitted he made some mistakes.  He

20   admitted them to you and he didn't deny them.  It's your

21   job to decide if he was honest about two things, because

22   there is two things that are critical about Mr. Wilcox's

23   testimony.

24          One, what was he told about the purpose of the

25   $21,000 check that went to Mr. al-But'he?  Was he told

Closing Argument by Mr. Gorder                                    70

1    that it was a distribution to Chechnya or not?  And what

2    was he told about the purpose of the $131,000 check that

3    was used to buy the traveler's checks?  It's not

4    important when he was told or where he was told or

5    whether it was on the phone or in his office.  The real

6    question is who told him that?  Did the defendant tell

7    him that?

8            And in considering that, remember what you

9    heard from both sides, a CPA has to rely on what his

10   client tells him.

11           TW-1, this is from Mr. Wilcox's file.  He's

12   always been consistent that when he saw this $21,000

13   check in an inappropriate account, that he questioned

14   the defendant, and was told it was returned to the

15   donor, and that's why he took it out of the list of

16   contributions.  Always been consistent about that.

17           TW-2, this is his work papers that he produced

18   for the Springfield building.  And he's always been

19   consistent that he was told this $131,300 check went

20   into the Springfield mosque purchase.  That's the

21   critical evidence.

22           Now, whether it came from the QuickBooks file

23   received from the defendant or from a phone conversation

24   means fairly little.  He was never told about buying any

25   traveler's checks.  That might have helped him.  The

 1    defendant refused to give him the escrow statement that

 2    he asked for.  And you heard the defendant's own

 3    accountant, Mr. Cone, say he would have asked for it

 4    too.  Because then he would have seen that these numbers

 5    just didn't add up when the thing only cost 375,000,

 6    could have started asking questions.

 7              In considering this, remember that the

 8    defendant never mentioned Chechnya to Mr. Wilcox.  And

 9    remember that the defendant lied to Mr. Wilcox before

10    about BOA-6.

11              Now, you remember Daveed Gartenstein-Ross, this

12    was his first paycheck for $2060.  And it's

13    inappropriately dated.  It says January 25, 1998.  But

14    Mr. Gartenstein told you he worked there in January of

15    1999.  He started in December of '98, and he ran through

16    August of '99.  You know, I'm sure you've done it, I've

17    done it, early in the year, you sometimes forget that

18    it's now 1999, and you write down 1998.  So this was a

19    1999 check.

20              The defendant told Mr. Wilcox that this was for

21    the purchase of a computer.  And he told Mr. Gartenstein

22    this is how we're going to keep your salary off the

23    books so you don't have to pay taxes.  You might have to

24    testify someday you really sold me a computer.  Paid

25    Mr. Rodgers under the table also.  But it was a 1999

1    check.

2           Now, while he was testifying, Mr. Wilcox was

3    confronted on the stand, you didn't put this computer

4    purchase in your 1998 records, did you?  And Mr. Wilcox

5    got a little befuddled and said, no, I didn't put it in

6    1998 records.  But it was, as you saw, right in the

7    middle of the 1999 reports.  And they had an accountant

8    who went through these things for 300 hours, and it was

9    right where it should be.

10          Now, Mr. Wilcox may have been a little nervous

11   on the stand.  He may have been befuddled a little bit

12   at this point.  But don't you be befuddled in the jury

13   room.  And if it's all Wilcox's fault, why do we have

14   AHIF-2 and 3, these receipts from al-Haramain for

15   186,000 or 188,000, but not for 131,000 or 150,000?  By

16   the way, these receipts are not in the computers at

17   Ashland.

18          Who had a motive to conceal this transaction?

19   Wilcox or the defendant?  Mr. Wilcox didn't have the

20   conversation with al-But'he about the bombings of our

21   embassies in Africa and the allegation that al-Haramain

22   was somehow involved in that.  Mr. Wilcox wasn't told,

23   well, we can't be -- we can't be responsible for what

24   our volunteers might do.  That was the defendant back at

25   the time that Mr. Gartenstein-Ross worked there, and he

1    knew there was something wrong with al-Haramain.

2            Now, what's the defense?  Well, Mr. Wilcox made

3    me do it.  I've talked enough about that.  So let me

4    move on.  We had two supposed experts on Saudi Arabia

5    and the Arab world.  Now, maybe they spent a lot of time

6    over there, but they both have been out of government

7    since the early 1990s.  And they are hardly experts on

8    Islamic charities in the year 2000 and the problems with

9    diversions.  And they contradicted each other.

10           First we had Dr. Long, yesterday, Zakat has got

11   to be used for humanitarian aid.  It's like magic in

12   Saudi Arabia because it's part of the religion and it's

13   part of the culture, and the Saudi Joint Relief

14   Committee would have been all over it.  Well, ladies and

15   gentlemen, common sense, you know, people in Saudi

16   Arabia are human beings, too.  They are not perfect.

17   You know the Ten Commandments, thou shall not steal, but

18   you've heard of pastors who have run off with the church

19   funds.  Catholic Church priests are supposed to be

20   celebrate.  You've heard of child abuse.  Thou shall not

21   commit adultery.  Doesn't mean a rabbi at some point

22   might run off with someone's wife.  But you know also

23   that al-Haramain thought differently about Zakat.

24           And as from EK-5A, this was another one of the

25   fatwas, this is on their Web site.  And it says "giving

 1   Sadaqah and Zakat to the Muslims in the Land of the

 2   Caucasus, specifically in Chechnya, is permissible.  The

 3   Zakat would be given to the mujahideen and the poor,

 4   while Sadaqah is of a wider scope."

 5          And Dr. Long said he wouldn't change his

 6   opinion even if he learned that Osama bin Laden's best

 7   friend was the person in charge of the Saudi Joint

 8   Relief Committee, as Mr. Kohlmann told you.  I think you

 9   can discount his analysis of what happens in Saudi

10   Arabia.

11          Then we had Mr. Lang, he was the opposite.

12   Once the money leaves the country, it's impossible to

13   control it.  And perhaps the most incredulous testimony

14   in this entire trial, "the mujahideen have to eat, too.

15   When you deal with a Muslim rebel organization," he

16   said, "all life is a seamless garment."  In other words,

17   once it gets to the mujahideen, weapons, food, whatever.

18          Then we have Mr. Owens, he testified yesterday.

19   He was the former head of the tax exempt folks at the

20   IRS.  He's a lawyer, not an accountant.  And he works --

21   he's worked in Washington, D.C. all his life.  He never

22   actually even did an audit of a tax return for a

23   charity.  But he comes in here to convince you that the

24   auditors wouldn't care about the falsities in

25   al-Haramain's tax return.

1          Now, this is a little like calling the

2   Secretary of Defense to testify about the best way to

3   feed the sailors on an aircraft carrier.  I'd rather

4   hear from somebody who worked in the ship's galley as to

5   how it's really done, somebody like Mr. Wooten who you

6   heard from earlier.

7          Right out of the box, Mr. Owens goes, hey, that

8   150,000, that shouldn't be on the return because it's

9   a -- really belonged to al-Haramain Saudi Arabia, and

10  al-Haramain U.S.A. was just a conduit.  But then he went

11  quickly downhill as far as the defense goes.  He talked

12  about, well, there is an agreement between al-Haramain

13  U.S.A. and the conduit -- and al-Haramain Saudi Arabia,

14  excuse me.  Well, where is that agreement?  We never saw

15  it.

16         Look at what the defendant did.  Exhibit 69-B

17  (sic).  This is a defense exhibit.  This is a letter --

18  I believe it's in early March.  It's to Brother Enaam.

19  And it says "we have a contribution of $200,000.  And I

20  want to buy some food."  Now, does that sound like he's

21  just a conduit?  He's got nothing to do with this?

22  Where should I originally purchase these materials?

23  That's what the defendant was saying.  And just -- here

24  is that guy again, Jazak Allah Khair.

25         698D, this is another -- this is the one we

1   just heard about from Patricia Florin that she typed up.

2   "My organization is prepared to aid the people of

3   Chechnya with a sizable humanitarian donation.  We also

4   require that one of our representatives travel to

5   Ingushetiya."  This was sent by the defendant to

6   Patricia Florin to type up.  So the defendant was acting

7   like it was money he could spend.

8        And Mr. Khan, the guy we heard from yesterday

9   that ran Islamic Relief, now, he showed you how it's

10   supposed to be done.  He gets a call from somebody from

11   al-Haramain Oregon, we've got $200,000, he takes the

12   call, but we gotta have our guys go.  We gotta go.  He

13   says, no, we don't do it that way.  And he never heard

14   back from them.

15        The only agreement we have is AHIF-2 and 3

16   again.  And Mr. Owens told you that these things are so

17   phony looking that it would raise more questions with

18   his auditors, not less.

19        Now, Mr. Wooten, a guy who's actually gone out

20   into the field and done this work, told you that what he

21   would be looking for is evidence that the local

22   organization exercised some control over the fund.

23   Evidence like those exhibits I just showed you where "we

24   have the money," "I want to purchase," and the funds

25   would have to be reported on the return.

1          Then we had Mr. Owens' speeches, "990s are

2   important documents.  You must be forthcoming."  Even a

3   small problem that's identified on a return can lead to

4   bigger things that need to be investigated, under the

5   rock, I think is what he said, or perhaps could lead to

6   something like a Kavkaz boot camp in Chechnya.

7          We need to have more scrutiny in foreign

8   contributions or foreign transactions, money leaving

9   from the United States overseas, he said that was

10  important.  He said one of the IRS's jobs was to detect

11  money laundering.  And how would you detect it if it was

12  going through a 501(c)(3) organization if it's not on

13  the return?  He tried to minimize the inflated value of

14  the mosque in Springfield, Missouri, by saying, well,

15  it's just kind of a trivial deal.  But on

16  cross-examination he admitted, well, if you are

17  concealing overseas transactions in the value of a

18  building, that would be important.

19         And he said whether a foreign transaction was

20  to buy bombs or to buy blankets, it should be reported

21  on the Form 990, which it was not in this case.

22         And most importantly, he testified, if you go

23  ahead and choose to report something, even if you don't

24  have to, you can't lie about it.

25         So when he left the stand, you knew that his

 1    auditors would expect the $150,000 to be reflected on

 2    that return accurately.  The only conduit in this case

 3    was the conduit to the mujahideen in Chechnya.

 4          Finally, we had some witnesses that said that

 5    the defendant was a nice guy.  He was a man of peace.

 6    And let me just talk about one of those.  This is

 7    Exhibit 602B, Mr. Rodgers testified about this

 8    yesterday.  This was the mission statement that they put

 9    together when al-Haramain took over the Qur'an

10    Foundation.  "We mutually agree to never support or

11    approve any statements or acts of terrorism."  That's

12    kind of an unusual thing to put in your mission

13    statement.  This is before 9/11.  And it's very similar

14    to some of the disclaimers you saw from the Qoqaz and

15    Azzam Web sites that were putting all the propaganda for

16    the mujahideen, like how to train for jihad, but, of

17    course, that's for information purposes only, and we're

18    not encouraging anybody to actually go.

19          Let me talk about one last thing.  And he

20    didn't get a lot attention during the witnesses, but

21    that's Mr. Abdulaziz Al-Shoumar.  I suggest to you he's

22    another conspirator in this case.  Now, he was the

23    accountant or bookkeeper from Riyadh.  He comes into the

24    picture SW-21.  Again, an e-mail in the defendant's

25    computers.  February 19, 2000.  "Dear brothers, Abo

1    Yonos" -- that's Abu Yunus, the defendant, and Bilal,

2    somebody else -- "two months back I was given the

3    responsibility to handle the U.S.A. Dawah group

4    activities.  It is a heavy burden on my shoulders.  And

5    I ask Allah to help all stand firm in carrying out the

6    responsibilities."  So then he says, "Brother Abo Yonos,

7    please use the Quicken software to record all the

8    transactions starting with February 2000.  The software

9    will save a lot of effort and organize all the financial

10   aspects.  In addition, it will give you multi reports."

11   So he's a numbers guy.

12          Now, this is just -- remember, this is just at

13   the time that El-Fiki is getting ready to send his money

14   to the United States, February 19, 2000.  All of a

15   sudden Mr. Shoumar is on the scene.  Wilcox never knew

16   about it.

17          It's kind of unusual.  Your CPA here in Oregon

18   doesn't know about the accountant in Riyadh.

19          SW-32, this is a report -- this is part of an

20   e-mail that was sent by the defendant to Mr. Al-Shoumar.

21   And on page 4, he has the monthly summary report for

22   March of 2000.  This is when the $150,000 was taken out

23   of the bank in traveler's checks and a cashier's check.

24   He's got the expenses for the month and that sort of

25   thing.  And then down here at the bottom, to Brother

1    Soliman, 21,000, to Brother Soliman, 131,300 are not

2    included for the total balance.  Nothing about Chechnya.

3    Nothing about Chechnya refugees.

4            If you are trying to hide something, you might

5    not want to put it in an e-mail.  Though it's Brother

6    Soliman.

7            Then SW-43.  Now, this is a very long exhibit.

8    You'll have it in the jury room.  You have to kind of

9    start from the bottom and work your way up.  And this

10   is -- there is an attachment to the e-mail, an Excel

11   spreadsheet, not a QuickBooks file like Mr. Wilcox got.

12   This is a different one.  An Excel spreadsheet.  And

13   about page 20 of that spreadsheet you see, again, the

14   131,300 and the $21,000, and it says Soliman's check.

15           Now -- and this, again, never given to

16   Mr. Wilcox.  Then SW-43, page 2, again, like I say, you

17   need to kind of read this from the bottom up.  On

18   August 29, 2001, Mr. Shoumar e-mails the defendant, and

19   he sends a copy to al-But'he.  Brother Abu Yunus, the

20   highlighted items require more clarification.  He goes

21   through and he asks a bunch of questions about different

22   expenses.  And then he has a special footnote.  "Brother

23   Soliman, I would appreciate that you send all the

24   amounts that has nothing to do with the Foundation

25   business to another account.  Adding this amount to the

1   deposits and expense sheets in the al-Haramain account

2   would give us the wrong view about the actual situation.

3   So he's saying, you know, get these things off the

4   books.  That's because Shoumar knows this is no

5   humanitarian deal.  We've got to conceal it.

6           And then the very beginning of the e-mail, and

7   this comes -- well, this -- before we get to the

8   beginning, just before -- Saturday, September 8th, Al-

9   Shoumar sends another one to the defendant saying,

10  "Brother, I am still waiting for your reply."  So he's

11  not getting the information that he wants.  Okay.  And

12  then the next slide.  And this is the very top of the

13  e-mail.  Again, this is Abdulaziz Shoumar to Mr. Abu

14  Yunus, the defendant, with a copy to al-But'he,

15  Saturday, September 29, 2001.  Now, this is after 9/11.

16  "I have tried during the past two years to" -- says may,

17  but probably means my -- "best limited ability to

18  organize the work and make sure that we get work

19  together to be precise as much as we can to avoid any

20  possible trails from anybody."  And he chides him again.

21  "You record some expenses that does not belong to

22  al-Haramain, such as the Soliman mobile expenses."  Get

23  al-But'he's things off the books, please, to avoid any

24  possible trails.  That's another smoking gun, ladies and

25  gentlemen.  Al-Shoumar was another conspirator.  Avoid

1    any possible trails.

2           Three weeks later, the defendant signed the

3    return.  And on that return, there were no trails

4    because he had told Mr. Wilcox false information.  He

5    took al-Haramain Saudi Arabia's money.  People noticed a

6    change when al-Haramain came in.  And talk was cheap,

7    but look at what he did, not what he said, and follow

8    the money.  If you do, you'll return guilty verdicts.

9    Thank you.

10          THE COURT:  Members of the jury, I've bought

11   you lunch today.  It should be in your room.  I think

12   what we'll do is take a break until 12:30 and then

13   continue the arguments.  Okay.  Still too early to talk

14   about the case.  Thank you.

15          (Lunch recess:  11:41 until 12:34 p.m.)

16          THE COURT:  Be seated.  Mr. Wax, go ahead.

17          MR. WAX:  Thank you, Your Honor.

18   Mr. Sedaghaty, his family, defense team, the government,

19   ladies and gentlemen of the jury, I'd like to start by

20   thanking you for your attention during the course of

21   this trial.  It has, I'm sure, not been easy at times,

22   as exhibits have been flying in, and some without any

23   explanation.

24          It's my hope this afternoon to provide you a

25   framework that you might consider during your

1     deliberations.  And in doing so, I hope to take some of

2     the exhibits that have come in and spend a little time

3     with them.

4            What you'll find when you get back into the

5     jury room and start looking at the exhibits is that the

6     sequence in which you'll find them in the manila folders

7     that the court clerk will provide to you isn't

8     necessarily chronological, and isn't necessarily a

9     grouping that makes sense because of the way in which

10    the lawyers have to put things together.  It may be that

11    you'll want to take the exhibits and mix and match them,

12    put them into clusters.

13           And during the course of this statement to you,

14    I'm going to, from time to time, be suggesting some

15    clusters that I think make some sense and might help you

16    make some sense out of what has been presented.

17           Another preface that I want to start with is

18    this:  I stand before you this afternoon with some fear,

19    some fear in my heart.  I stand before you holding some

20    fear for my client, for Pete Seda.  And I stand before

21    you holding some fear for this great country of ours.

22           We know that throughout the 1980s and 1990s,

23    there were a number of terrorist events that affected

24    our nation, that affected our military serving overseas

25    in the Middle East.  And, of course, we all remember the

Closing Argument by Mr. Wax                          84

1    events of September 11, 2001.  And those events had a

2    profound impact on our nation.

3            They had an impact, I think, on all of us as

4    individuals, and I'm sure in many different ways, but

5    part of that impact, the impact that causes me to have

6    some fear and to want to put this out to you at this

7    time, is that those events, it seems to me, have caused

8    us as a nation at times to react with anger, at times,

9    perhaps, to react out of fear, and at times, perhaps, to

10   react without paying sufficient care to the actions of

11   individual human beings as opposed to a collective them.

12           During the selection process, we heard from a

13   number of the prospective jurors that they had some

14   strong feelings, some strong negative feelings about

15   Islam.  You were all selected to serve on this jury

16   because each one of you in that process told us all that

17   you believed that you would be able to sit here and

18   judge this case on its facts, to judge the facts that

19   the government has presented against the individual

20   human being for whom I and the rest of the team are

21   responsible, Pete Seda, the man on trial here.

22           And we are confident that each of you will

23   remember the oath that you took when you were selected

24   as jurors to do just that.

25           Now, I've tried to break down the different

1    subject areas that I'm going to talk about into six

2    general categories.  And I know everyone says go in with

3    three, threes are the way to go, six is too many.  I

4    tried.  There just seem to be a little bit too much.  So

5    the six categories that I'm going to talk to you about

6    generally are this:  I'm going to start with a little

7    bit of a reference to what are the charges?  What must

8    the government prove here in this case?

9          I'm then going to turn to talk about how the

10   case began.  And I think that there are a number of very

11   significant things that you've heard about that that

12   bear on what I submit to you is the utter failure of the

13   proof in this case.

14         The third category that I'm going to talk about

15   is Mr. Wilcox.  Mr. Wilcox is absolutely essential to

16   the government's case.  And I'm going to talk to you

17   about why he is just plainly and simply not an

18   individual on whom you can reasonably rely in making a

19   decision that is going to have a profound impact on one

20   of your fellow citizens.

21         The fourth area is going to be to take a look

22   at the documents, the SW documents, the defense

23   documents, and to show you, to weave and knit those

24   together into these coherent patterns so that you can

25   see what we submit to you is the truth, both of the

1  absence of evidence of guilt and, indeed, although we

2  have no burden, the innocence of Pete Seda.

3          Fifth, I'm going to talk to you at a number of

4  times, not as a separate category, about why the

5  government's theory, and I submit to you all that you

6  have heard is in essence a theory, speculation,

7  assumption, why it makes no sense.

8          And then, finally, I'm going to talk to you

9  about Pete Seda the man, what you have learned about him

10 and about -- to borrow from Mr. Gorder's words -- his

11 actions, and how those actions are entirely inconsistent

12 with anything other than a verdict of not guilty.

13         What are the charges?  Well, the charges are a

14 conspiracy to defraud the United States.  As you read

15 the indictment, which you'll have with you, you'll see

16 that there is a section called the purpose of the

17 conspiracy and a section called the object of the

18 conspiracy.

19         In essence, what the government has charged is

20 that Mr. Seda and Mr. al-But'he and perhaps others made

21 an agreement to defraud the United States government, an

22 agreement to defraud the government by diverting money

23 from this philanthropist, Dr. El-Fiki, diverting it from

24 its humanitarian purpose, and sending it -- or at least

25 attempting to send it to Chechen mujahideen, and then to

1   hide it from the government by not reporting it on

2   income taxes and by burying it into the Springfield

3   building schedule, and by not reporting the money when

4   it left the country.

5          It's important to keep the focus on those

6   charges because the government asked some of the

7   witnesses about bad reporting, about due diligence, and

8   pointed out other mistakes that Mr. Wilcox made on the

9   return.  Those are not the charges in this case.  And we

10  hope that you will keep your eye on that.

11         How did this begin?  What has the evidence

12  shown you in this case?  September 11 of 2001, the Trade

13  Towers came down.  Four days later supervisory FBI Agent

14  Joe Boyer from the Portland office in Ashland, Oregon,

15  having a conversation with Pete Seda, with Pete Seda the

16  most prominent and public Muslim in southern Oregon and

17  northern California.

18         And in that conversation, September 15 of 2001,

19  the very week in which Mr. Wilcox, as I will get to you,

20  wants you to believe that Mr. Seda lied to him about

21  this Springfield property.  Pete Seda told FBI Agent

22  Boyer about 300 to $325,000 having been used by

23  al-Haramain to purchase a prayer house in Springfield,

24  Missouri.  He told the FBI agent the truth.

25         And at that moment very moment, ladies and

1    gentlemen, I submit this to you:  You should have a

2    reasonable doubt about the theory that the government is

3    asking you to accept with an absence of evidence.  How

4    on earth can there be a conspiracy that makes any sense

5    at all when the man is telling the government in the

6    form of the FBI supervisory agent about the property and

7    giving him the correct number on the check that he knew

8    about, on the check that he, Pete Seda, knew about?

9    Reasonable doubt right there.

10            It just makes no sense to tell the truth to the

11   FBI and then a week later to be said, oh, I'm lying to

12   my accountant.

13            You know that the FBI started serving subpoenas

14   and you know that Agent Anderson came into this case

15   several months later.  And what you've learned is that

16   over the course of the next two years, the government

17   served scores of subpoenas, phone records, bank records,

18   property records, personal records, business records,

19   the fine-tooth comb of the United States government with

20   all of its might and all of its investigative resources

21   trained on Pete Seda, the arborist, and the al-Haramain

22   Foundation of Ashland, Oregon.

23            After two years, perhaps curious about some

24   things, and I would ask this:  If the United States

25   government subpoenaed each and every one of the records

1    of each of every one of us in this courtroom, I imagine

2    that it would find some things that it would be curious

3    about.  And if we have accountants, that it might want

4    to check with our accountants about it.  And that's

5    precisely what Agent Anderson did.  Agent Anderson is

6    dogged.  Agent Anderson is an intelligent person.  But

7    Agent Anderson told you five years in the IRS at that

8    time, I believe, if I've done the math correctly, it's

9    the first case that she had ever encountered from

10   Medford, Oregon, where she had been stationed, involving

11   traveler's checks, tracing of this nature, involving

12   anything overseas, involving anything that might be

13   suggestive of an international mujahideen issue.  This

14   is big.  And she is taking it seriously, as we all want

15   our law enforcement people to do.  But something

16   happened.

17           When she went to talk to Tom Wilcox in June of

18   2003, what you learned is that Tom Wilcox lied to Agent

19   Anderson.  There is no polite way for me to describe

20   what happened.  Tom Wilcox told you that he was a little

21   worried about maybe some liability for himself, and he

22   spoke with a lawyer.  I don't recall if it was 2003 or

23   2004, but early on, he spoke with a lawyer about his own

24   potential liability.

25           Recall back, what is happening in June of 2003?

1   He knows that he has done work for an Islamic charity.

2   He is aware of very strong anti-Muslim feelings in this

3   country of ours from September 11th.  And he knows, of

4   course, that that has been all over the media because

5   the invasion of Iraq took place in March of 2003.  And I

6   regret to say it, you saw him, and you will make your

7   own judgment, but I don't think that Tom Wilcox had the

8   courage, had the innate humanity, if you will, to

9   acknowledge what had happened.

10        Agent Anderson was told by Tom Wilcox they,

11  al-Haramain, coded the items on the Springfield building

12  schedule.  Agent Anderson was told al-Haramain printed

13  the Springfield building schedule.  Agent Anderson was

14  told nothing about any story that you have now heard

15  about conversations with Pete Seda.  It did not occur in

16  June of 2003 or, as you learned, when the agent went

17  back to him in November of 2003.

18        Go forward another year.  You know that in

19  2004, the government agents were speaking with Evan

20  Kohlmann, at that time three years out of Georgetown.

21  Now, Georgetown may be a fine university in Washington,

22  D.C., but I would ask all of you to reflect upon your

23  experiences in what may well be comparable colleges and

24  universities here in Oregon or elsewhere.  This man is

25  three years out of college and he is doing Internet

1    research.  And he has a theory that he discusses with

2    Agent Anderson.

3           He has a theory about which he had written in

4    his senior thesis, and that was a theory about this

5    mysterious entity that he calls the Arab Afghans.  But

6    Evan Kohlmann in 2004, explaining that theory, knows

7    nothing, as he knows nothing when he testifies in this

8    courtroom six years later, about Pete Seda.  He knows

9    nothing about any actions taken by the al-Haramain

10   Ashland organization in Saudi Arabia or, if any, in

11   Chechnya.  And he knows nothing about the donation by

12   the doctor, philanthropist, Mahmoud El-Fiki, where it

13   went, what happened to it.  And I submit to you he knows

14   precious little about the operation of any Saudi

15   charities other than what any one of us could read

16   online.

17          A terrible, terrible, terrible thing happens.

18   What happens is that Agent Anderson, armed with this

19   information, armed with this misinformation, goes into

20   the grand jury and tells the grand jury, as you heard

21   her testify, what, four years later, she learned to be a

22   lie.  She didn't know that.  But Tom Wilcox did.

23   Because this indictment was based on a lie.  This

24   indictment was based on Tom Wilcox's having told Agent

25   Anderson I received this Springfield building schedule,

1   this piece of paper that you've seen on the computer any

2   number of times, al-Haramain people coded all this data,

3   they printed it out, they handed me the piece of paper.

4           And the grand jurors, perhaps reasonably, said,

5   well, all right, you know, the standard we have to deal

6   with is a lot less than in a trial, they return an

7   indictment.  The indictment will be there with you, and

8   you'll be able to read how in February of 2000

9   al-Haramain Riyadh is the charge.  The government has

10  recognized until they needed to change their theory to

11  fit the testimony that has come out, but this donation

12  is to al-Haramain Riyadh, was contacted by an individual

13  in Egypt seeking to donate $150,000 as Zakat.  We'll get

14  back to that.

15          Paragraph O, in or about September of 2001,

16  defendant Pirouz Sedaghaty provided a financial summary

17  to his accountant -- defendant Pirouz Sedaghaty provided

18  a financial summary to his accountant detailing the

19  funds used to purchase the building in Springfield.

20          And the other mistake that's made, the

21  accounting is allegedly false because Sedaghaty

22  represented to the accountant that the $21,000 cashier's

23  check to Soliman al-But'he were funds returned to the

24  original donor, that is Dr. El-Fiki.  The testimony in

25  this courtroom is to the contrary.  The money was all

1    taken out by Soliman al-But'he.  That's how this case

2    begins, ladies and gentlemen.  This case begins based on

3    a mistake, based on a lie.

4           What happens?  What happens with Tom Wilcox?

5    What happens with Pete Seda?  Larry Matasar and I get

6    into the case.  We hire Jeff Cone.  We hire a number of

7    people.  We have the staff in the Federal Defender

8    Office looking at this material.  And there is no

9    question that some of this accounting stuff takes a

10   while to understand, especially for guys like me who

11   ain't accountants.

12          Jeff Cone, Jeff Cone is a person with both CPA

13   training and significant computer skills.  Jeff Cone

14   gets into the metadata.  And that metadata tells us that

15   Tom Wilcox entered, coded, these Springfield items, and

16   Tom Wilcox printed the Springfield items.  The metadata

17   tells us with absolute 100 percent certainty, to the

18   extent that there is anything certain in this great

19   world of ours, that what Tom Wilcox had said in 2003 was

20   untrue.  For six years, he had stuck by this lie, this

21   story.

22          The interview in May of 2009 that took place

23   with Mr. Matasar and one of my investigators and me,

24   took place in Agent Anderson's office.  She heard, and

25   I'm sure it was quite clear to her that she knew and

1   understood from our questioning what we understood.  She

2   went back to Mr. Wilcox, you've learned, in August.  And

3   when she went back to him in August, she went back with

4   two things.  She showed him the audit trail.

5        And I hope you recall the difference that Jeff

6   Cone told you about between the audit trail that's

7   available to any QuickBooks user and the Jeff Cone

8   produced view, the QuickBooks viewer as he called it,

9   that pulls out more of the metadata, because when Agent

10  Anderson went, she went with the audit trail.

11       Wilcox looks at it.  And Wilcox goes, oh, gosh,

12  you know, appears as though you got me.  I -- appears as

13  though that, you know, this coding, looks like I did it.

14  Coding looks like I did it.  Yeah, looks like I printed

15  it.  And for the first time, Mr. Wilcox tells this story

16  about conversations with Pete Seda.  Oh, well, gee, I

17  must have talked to Pete, and he told me this stuff, and

18  then I had a meeting with him.  I had a meeting with him

19  on September 25.

20       Now, please note this date, because it is

21  highly significant.  Mr. Gorder said to you, well, wait

22  a minute, you know, geez, was it by phone, what day is

23  it?  Well, you know, it doesn't matter.

24       Ladies and gentlemen, it does matter.  It

25  matters because it helps you decide, I submit, whether

1    or not you are going to rely on anything that Tom Wilcox

2    said to you.

3           Here is why:  Think about memory.  Our mind, I

4    don't know if you -- any of you have ever studied it.

5    How does memory get created?  How does memory shift?

6    What happens?  Wilcox is confronted with something he

7    believes to be a fact, an audit trail, a timesheet.  He

8    believes that those are facts.  So he conforms his

9    memory to what it is that Agent Anderson shows him.

10   She's not doing anything improper.  But Tom Wilcox,

11   whether unconsciously or consciously, conforms his

12   memory to the facts as he understands them to be from

13   the documents that Agent Anderson shows him.

14          But you now know that you cannot rely, and I

15   would submit, on anything that Mr. Wilcox said.  You

16   know that for several, absolutely critical, and

17   irrefutable reasons.  While he told Agent Anderson based

18   on that timesheet that the meeting with Mr. Seda that he

19   alleges takes place, that I submit to you he made up,

20   occurred on September 25, he is subsequently before his

21   testimony in this courtroom, shown and looks more

22   carefully at the audit trail, and he sees an entry at

23   1:06 p.m. on September 24.  Remember that testimony?

24   1:06 p.m. on September 24.  So when he comes into this

25   courtroom, he has shifted his memory again.  He has

1   conformed his memory again, an entirely new story to fit

2   what he now believes to be the facts.

3          Well, you know, I looked at this.  Well, I know

4   I told Agent Anderson September 25, but, folks, it had

5   to be September 24.  And I know -- I know it was at

6   1:00 p.m.  He was specific.  And I regret that I have to

7   say this is a specific manufactured memory because of

8   the 1:06 p.m. entry on the audit trail.  It's in

9   evidence.  Look it up, please.

10          But what Mr. Wilcox didn't know, because I

11  submit these conversations never took place, and I

12  submit to you there is absolutely nothing that you can

13  rely on from these conversations, is that the metadata

14  that Jeff Cone has extracted from the audit trail shows

15  that Tom Wilcox entered one of the items that's on this

16  Springfield building schedule, the $4,000 check, he

17  entered it on September 20th.  Please put the audit

18  trail next to the Jeff Cone QuickBooks viewer, and you

19  will see how Tom Wilcox is shifting his story,

20  conforming it to whatever is put in front of him.

21          And I ask you, ladies and gentlemen, would you

22  take an action in an important matter, an important

23  matter involving the future of one of your fellow

24  citizens, based on that type of testimony?  Can you rely

25  on that in any way?  He, I regret to say, consciously or

 1  unconsciously, lied to the government and he lied to

 2  you.

 3          You had the misfortune to see a weak human

 4  being, a weak human being who lied to you, who was

 5  making things up in this courtroom, and I want to give

 6  you one other example of that, because, again, it is the

 7  metadata that establishes the way in which he is making

 8  things up to protect himself because he can't own up to

 9  what he's done.  And that has to do with this $2060

10  check, which is BOA-6.

11          Remember his testimony, please.  He tells you

12  that he read an article in *Readers Digest*, about 2009,

13  written by Daveed Gartenstein-Ross, and when he read

14  this article in 2009, he recalled, oh, yeah, right, nine

15  years ago or eight years ago, I had a conversation with

16  Pete Seda.  Yeah, okay, maybe, something can trigger a

17  memory.  Something can also create a memory.  Any

18  student of psychology and human memory will tell you

19  that.  How can you know whether or not this is something

20  to rely on?

21          Here is how:  He gave you a story made up on

22  the spot.  He looks at the check.  And it has the year

23  1998 on it.  That's wrong.  There's not a dispute about

24  that.  But what it is utterly significant about the fact

25  is that Mr. Wilcox makes up a story based on what he's

 1   presented.  "I coded that check into the fixed assets

 2   account."  He recalls coding it into the fixed asset

 3   account.  He is shown the fixed asset account.  And he

 4   says, "it's not there."  Okay.  He didn't say generally,

 5   as Mr. Gorder said, well, you know, I entered it.  No.

 6            It is significant to look at the detail because

 7   he's making this up.  He didn't say "property."  He

 8   didn't say the "record."  "Fixed assets."  And he looks

 9   and it's not there.  And what does he say?  "Well, you

10   know, that was my memory.  I guess I didn't do it."  And

11   Mr. Matasar says, "well, Mr. Wilcox, you never had any

12   conversation with Pete Seda?"  "No, I had a conversation

13   with Pete Seda, that's why I coded it."  Wait a minute,

14   it's not there.  He doesn't get shaken from the fact

15   that he coded it.  Okay.  And then Mr. Matasar shows

16   him -- Ms. Wells, I think it's 755.7 at page 45.  I hope

17   my notes are right here.  All right.  I have the wrong

18   number.  Or can you help me out, Ms. Wells, the date

19   on -- here we go.  Can you highlight, there we go.  All

20   right.

21            So what you find out is Mr. Wilcox never coded

22   this check at all.  Look at this.  You heard,

23   undisputed, all of the data entry done in April and May

24   of 2001 is done at the al-Haramain office.  All of the

25   coding by Mr. Wilcox takes place from September 19 to

1    September 25, or perhaps October 2nd.  And look at the

2    date on this.  This check is coded on May 8th.  This

3    check is coded by al-Haramain.  Mr. Wilcox made up a

4    story.  Mr. Wilcox made up a story to conform to some

5    facts as he perhaps thought they were, consciously or

6    unconsciously, and it's just not true.

7              And, again, I say to you, think about it, think

8    about the future of a fellow human being.  Think about

9    the man who testified here.  Think about the reliability

10   or lack of reliability of the story that he tells, well,

11   all right, maybe I didn't code it, maybe I didn't do it,

12   but Pete Seda told me to.  And I respectfully submit to

13   you, that is not something on which you can rely.  And

14   there it was.

15             The horribly, horribly unfortunate thing here

16   is that Mr. Wilcox's memory, what he tells you, is

17   entirely inconsistent with reality in a number of other

18   significant respects.  Please bear with me here.

19   Because it's not easy to be talking in such a negative

20   way about another person.  But this is my client's life

21   that I'm dealing with, and I need to talk some more

22   about Mr. Wilcox.

23             He lied to you, to you here in this courtroom,

24   at least six times, consciously, subconsciously, I don't

25   know.  And the mistakes that he told, the misstatements

1    that he made, are on the core issues in this case.

2           First, Chechnya, Mr. Wilcox, when did you first

3    hear of -- excuse me -- Springfield.  Ah, start with

4    Springfield.  Mr. Wilcox, when did you first hear about

5    Springfield?  When I was doing the taxes in September of

6    2001.  Remember that testimony, please.  And what's his

7    words in terms of whether or not you can rely on this --

8    this isn't an idle memory -- I was stunned.  I was

9    stunned to hear about that.  It's not true.

10          Ms. Wells, can you put up 43079.  This is a

11   document from Tom Wilcox's file.  This is a note he

12   typed about a conversation he had with an attorney Chris

13   Helmer of Miller Nash, an attorney working for Pete

14   Seda.  And he talks about -- mentions some donations for

15   an individual, 2 percent excise tax may be subject to

16   because they built a building of about $400,000.  Okay.

17   He knows about a building of $400,000.  Here is his

18   note.  Okay.  Next, let's take a look, please, at 43079.

19   Is that -- we're there.  Whoops.  43697.  As I said,

20   there are lots of exhibits.  And you've got to put them

21   in sequence to understand the significance.

22          He is doing payroll for a fellow named Eberle,

23   Deya ud-Deen Eberle, in Springfield, Missouri.  He knows

24   that there is al-Haramain activity in Springfield,

25   Missouri.

1           And let's go then, please, to 43656.  Another

2    form that he has proposed for Mr. Eberle.  If you can

3    come down to Springfield lower down on the page.  And

4    he's mailing it to Springfield.

5           I submit to you, ladies and gentlemen, that Tom

6    Wilcox knew in the spring of 2001 about the Springfield

7    property.  He knew that the value was approximately

8    $400,000.  He discussed it with Pete Seda's attorneys at

9    Miller Nash.  And he prepared papers with a Springfield

10   address, the very address when you compare, not on this

11   one, but on the other one, compare the address with the

12   address on the closing statement of the Springfield,

13   Missouri.

14          Next, Chechnya.  Chechnya.  "I never heard

15   about anything with relationship to Chechnya from Pete

16   Seda until I heard about it from the United States

17   government years later."  Wow, "I don't know about

18   Springfield, my hands are clean.  I don't know about

19   Chechnya, my hands are clean," but it's not true.

20          Mr. Matasar showed him 43386, please.  This is

21   a letter from Chris Helmer, the Miller Nash lawyer.

22   Chris Helmer is talking about a number of things.

23   Mr. Seda, we'll get to all of his desires to be a

24   humanitarian organization.  And then further down the

25   page, "I explained to him some of the problems that you

1   have been having with Chechnya, Nigeria, and other

2   countries.  And he knew fully well what I was talking

3   about."  Chechnya.  This is a letter from the lawyer.

4   Spring.

5          Next please, 42651.  Now, this letter doesn't

6   get to him until November of 2001.  But that's not

7   significant.  Because his testimony was I never heard of

8   Chechnya until the government told me.  And here it is,

9   al-Haramain, "enclosed is a check for 2000.  This is a

10  disbursement from our Zakat account.  Please use it for

11  relief work in Afghanistan or Chechnya."  And Tom Wilcox

12  sat in that witness stand and Tom Wilcox said he never

13  heard of Chechnya.  He washed his hands of Chechnya.  He

14  washed his hands of Springfield.  And he knew about them

15  both.

16         Another lie, moving a little bit away from that

17  core issue, but I think that again if you reflect on his

18  testimony, you'll see how it shows his unreliability.

19  He was absolutely crystal clear, direct in

20  cross-examination, I had obtained an extension for the

21  2001 taxes until September 15th.  And then reflect on

22  Mr. Matasar's questioning of him.  "Mr. Wilcox, if you

23  could look for the extension for the 2004 Form 990 in

24  your --"  "Oh, oh, no, I don't have that.  I extended

25  the 1120."  What?  "Well, there wasn't an 1120 even in

1    '99, was there?

2            "Answer:  No, sir.

3            "And there wasn't going to be an 1120 in 2000?

4            "Oh, no, there wasn't.

5            "Well, just for jury, Form 1120 is the

6    corporate return for nonprofit -- for a for profit

7    corporation, that's correct.

8            "Yes, sir.

9            "990 is for a nonprofit.

10           "That's correct.

11           "There is no extension that you got from the

12   IRS for al-Haramain's 990 that was due on May 15th.

13           "That's correct."

14           Reflect on this, ladies and gentlemen.  He said

15   something that's not true.  He made up a story in front

16   of you.  Well, you know, gee, gosh, I filled it out on

17   the wrong form.  Reasonable doubt again right there.

18           He says at one point they entered all the

19   deposits.  Changes his testimony.  No, well, you know, I

20   entered the deposits.  He tells you about this IRS

21   letter of January 3, 2002.  Well, yeah, I probably

22   embellished, but, again, look at what he's doing in

23   terms of making things up, making things up.  The letter

24   is read to him.  It says, you know, try to retain one

25   bookkeeper, and then that didn't work out, they retained

 1    a second bookkeeper.  It's not true.  What does he make

 2    up for you?  I was the bookkeeper.  I was the

 3    bookkeeper.  Yeah, you know, I did the coding.  And so

 4    Mr. Matasar said to him somewhat sarcastically, well,

 5    what, you passed it on to yourself?  Yep.

 6            That's classic, ladies and gentlemen, of how a

 7    person who is struggling with the truth will shift and

 8    change and embellish.

 9            And think about what you heard from Mr. Gorder,

10    Mr. Gorder stood up in front of you and said he never

11    mentioned Chechnya.  He did.

12            Mr. Gorder stood up in front of you and talked

13    about the 1998, the BOA-6, the $2,060 check.  It's

14    relevant.

15            Mr. Gorder says Mr. Seda refused to give the

16    escrow statement to Mr. Wilcox.  Well, that's not true

17    either.  Mr. Wilcox asked for it.  Mr. Seda said why?

18    Mr. Wilcox gave him an answer.  Mr. Seda said, you know,

19    we don't have a loan.  And Mr. Wilcox said, one of the

20    few things that perhaps you can rely on, "I dropped it."

21            Ladies and gentlemen, I'm not going to take up

22    much of your time with the mistakes that Tom Wilcox

23    made.  They are legend.  When you look at the returns,

24    you will see his mistakes.  Mr. Gorder makes light of

25    the fact.  Well, yeah, you put horse shoeing into

1    professional fees.  All right.  It's not that

2    significant a dollar amount.  But I submit it's

3    indicative of the lack of care with which Tom Wilcox

4    regrettably approached his work.

5            But more significantly, we know about the

6    $18,000 return of the retainer from the law firm that

7    was retained in Washington, D.C. to deal with the

8    *Frontline* issue.  And what's significant about that,

9    ladies and gentlemen, is that on the 25th of May, in

10   response to some questions asked by Mr. Wilcox, he

11   received a faxed sheet of paper with the answers.  And,

12   unfortunately, my notes are failing me now here, and I

13   don't recall the number of that exhibit, but I invite

14   you to find it.  Apologize.  But you look at it, and you

15   see that he's told by al-Haramain $18,000 back from the

16   lawyer for the retainer.  Mr. Wilcox ignores the

17   information provided to him by his client and miscodes

18   that $18,000.  al-Haramain says A, Tom Wilcox does B.

19   Mistake.

20           You heard from Mr. Matasar in the opening and

21   he showed you a PowerPoint, and he's far better at these

22   gizmos than I am, and I'm not going to show it to you

23   again.  Remember the unemployment tax PowerPoint that

24   Mr. Matasar showed you, and he went through the

25   documents.  IRS says they don't have to pay the FUTA,

1   the unemployment tax.  Okay.  The document comes in, it

2   says, guys, here's your refund.  Wilcox, you don't have

3   to pay it.  Comes to al-Haramain, al-Haramain sends it

4   to its accountant, the accountant ignores what the IRS

5   said.  Next quarter, he has them pay it again.  Three

6   times, four times, I don't recall how many.

7            Now, mistakes, you can't blame Pete Seda.  And

8   Pete Seda isn't blaming Tom Wilcox.  What I'm saying to

9   you -- well, I guess maybe we are blaming Tom Wilcox,

10  because if he had not done this, we would not be here.

11  But how can you rely -- what do these mistakes tell you?

12  They tell you he is, for whatever reason, with whatever

13  pressure should have been on him, doing a slapdash job,

14  ignoring the statement from his client at the outset

15  it's not if I'm going to be audited, it's when.  It's

16  not if, it's when.

17           And not only that in terms of how you think

18  about, you know, a conspiracy, hide something from the

19  IRS, Mr. Seda knows from this Form 1023, and make note

20  of this, please, and go back to the language on that

21  form, which you've already seen that says you have an

22  advanced ruling to operate as a charity.  An advanced

23  ruling means Pete Seda knew every minute that he was

24  working as al-Haramain Ashland that the IRS was going to

25  thoroughly scrutinize his files.  He tells his

1    accountant, "I'm going to be audited because I'm

2    Muslim."  He then has a charity.  And the charity

3    documents say "you are going to be reviewed."  It makes

4    absolutely no sense that he would then try to pull the

5    wool over his accountant's eyes.

6           Probably feels good to see me turning a lot of

7    pages.  Mr. Gorder says "wait a minute, folks, you know,

8    it doesn't matter when this meeting took place or how it

9    took place or whatever.  You know, he said there was a

10   meeting.  But you know something, I've already talked to

11   you about the fax sheet, and what you learned in the

12   redirect of Mr. Wilcox by Mr. Cardani is that Tom Wilcox

13   knows how to write a letter.

14          42914, I think is one of them.  42914, please.

15   Tom Wilcox knows how to write a letter.  Tom Wilcox

16   knows how to say to his client, folks, I need some

17   information.  Tom Wilcox -- oh, hello, computer.  Tom

18   Wilcox -- I have paper.  Tom Wilcox says, 42914, please

19   look it up, "I need the following to complete the

20   return."  Mr. Cardani went through three or four of

21   these.

22          42592 is another one.  Thank you.  42352 is the

23   fax sheet.  Look at these.  And then ask yourself, this

24   is Wilcox's pattern.  You know this is what an

25   accountant is supposed to do.  And Mr. Wilcox knows how

 1  to do it.  You have something significant you are

 2  discussing with a client, you note it in your file, you

 3  send them a letter, you send them an e-mail, you get

 4  back information in written form.  And you know there is

 5  no note, no writing, no letter, no fax, no nothing, to

 6  substantiate this claim that there was a conversation.

 7  What happened here with Tom Wilcox?  I don't know.

 8          He's late.  He's already cost his client, as it

 9  turned out, I think it was about $8,000 in late fees.

10  Is he just a sloppy man?  Is he scared?  Shouldn't the

11  fear perhaps make him be even more careful?  I don't

12  know.  Is he moving too fast?  Maybe.

13          But you heard from Mr. Cone that there is

14  something that happened that may explain why Mr. Wilcox

15  made this mistake on his own.  You know that in May

16  there were two sets of checks faxed to him.  You recall

17  that there was a 131,000 and a 21,000 faxed at the same

18  time, two or two oh six, is at 1238-A and B perhaps.

19  Here is the 21,000.  So you it's the 1238 series, 1238-A

20  and B, and you don't need to show the other one.

21  Members of the jury, it's 1238-A, B, C, and D.  Please,

22  look at them.  And what you'll see is that the 21,000

23  and the $131,000 check are faxed at the same time.

24  Suggesting, perhaps, that the people at al-Haramain

25  working on them, viewing them as being related, money

1    that is part of the El-Fiki donation.

2           What you see is that the $10,000 and $318,000

3    checks are faxed at the same time.  Both of those checks

4    are related to the Springfield building schedule, to the

5    Springfield property.  Those checks have come into

6    Mr. Wilcox four months before.  He's in a hurry, as Jeff

7    Cone told you, from the metadata, he's just sitting

8    there plugging away, 40 seconds, 2 minutes, 2-and-a-half

9    minutes, he enters something, takes the next one, enters

10   it, and you can see through Jeff Cone's worksheets how

11   Tom Wilcox entered the checks:  January; next, February;

12   next, March; next.  And these checks have not come in to

13   al-Haramain, and they are not on the bank statements at

14   the same time.

15          The checks that he enters onto the Springfield

16   building schedule he is coding at different times.

17   Look, please, at Jeff Cone's work.  And you can see as

18   Jeff Cone explained how Wilcox was working.  The

19   significance here is he has not been given a package by

20   al-Haramain.  He has not been given a cluster of

21   anything by al-Haramain.  And he doesn't have it as a

22   package or a cluster.  But he's moving fast.  And he

23   says, all right, you know, this one's got Soliman's name

24   on it, this one has Soliman's -- no, this one has -- and

25   he just enters them.  I don't know.  I wasn't there.

1    But I submit this to you:  Whatever and why ever Tom

2    Wilcox did this, it was not as part of a conspiracy to

3    hide anything from the United States government.  There

4    was no conspiracy.  Pete Seda had no such intent.  He

5    had no need to do anything of that nature.

6              And if I can use one more thing with Wilcox and

7    the accounting, and actually this is probably more

8    Mr. Seda and the accounting, then I will leave this

9    horse flayed enough.

10             The government's theory has to be that in mid

11   September, at some point when this alleged conversation

12   takes place, Pete Seda's fertile brain is conspiring,

13   and Pete Seda is terribly and horribly upset about this

14   money to Chechnya.  And Pete Seda is doing everything he

15   possibly can to prevent the United States government

16   from learning about this.

17             Well, that's absurd, because if you want to

18   hide a donation, don't give the stuff to your

19   accountant.  Because if you have a competent one, as

20   Seda believes he does with the letters that have come

21   before, you don't leave it to the accountant, well,

22   Mr. Seda, what about this? to do it.  Do it yourself if

23   you're going to bury it.  That's absurd, on its face.

24             But the government's theory has to have

25   Mr. Seda with his fertile mind and this conspiratorial

1   mood in mid September.  If that's true, if that is true,

2   Ms. Wells, can you put up, please -- do you have IRS-1,

3   pages 4 and 17, where we have the two things together?

4   If that's true -- can you get to the 681 and 685, there

5   we go.  Here is the depreciation schedule on the tax

6   return.  This is the page with line 57a, the alleged

7   misstatement.  Well, guess what, folks, Tom Wilcox,

8   independent of anything that Pete Seda said, even he

9   admits this, made a mistake.

10        Tom Wilcox created an inconsistency in this

11  return, folks.  Tom Wilcox created an inconsistency that

12  you heard from -- I don't know whether it was one or two

13  or three of the experts who testified about it, but it

14  would certainly draw the attention of the IRS, if you

15  got an inconsistency, the IRS auditors, Mr. Wooten

16  types, they're going to catch it.  Look at this, 681,

17  685.  The government wants you to believe that Pete Seda

18  is conspiring to hide some transaction from the

19  government and bury it in his tax return.

20        And he had two full weeks, the government says,

21  to look at this tax return, go over it with a fine-tooth

22  comb.  Well, you can be sure if there was a conspiracy

23  to bury the El-Fiki donation in the Springfield

24  property, that this arch conspirator would see what

25  Wilcox, I believe it was he himself said, any idiot

1    looking at this would see it.  But this arch

2    conspirator, my client, this alleged arch conspirator,

3    supposedly going over this return with a fine-tooth comb

4    to hide it from the government, signs it, turns it in.

5          Mr. Gorder asked you to use your common sense.

6    I do, too.  I think this is real common sense, with no

7    disrespect meant.

8          There is no plan.  There is no hiding of

9    Springfield.  This makes absolutely no sense.  And it

10   makes no sense because it doesn't exist.

11         Next, throw Wilcox aside, I should probably

12   shut up and sit down, you've probably had enough, and

13   there is probably enough reasonable doubt in the case

14   right now, but I'm a lawyer.  And when we lawyers write

15   briefs, they're never brief.  And when we make closing

16   argument, they are never short enough.  I know.  I will

17   continue.  Please bear with me.  Because I think there

18   are some equally significant things to talk about in

19   terms of the weaknesses in the government's case beyond

20   this account.

21         What do the documents tell you about what was

22   going on in al-Haramain Ashland in December, January,

23   February, and March of 2000?  And here is where I am

24   going to ask you to please, again, play careful

25   attention -- pay, not play -- careful attention to how

1    these documents come together in a coherent pattern of

2    innocence.

3         Generally, you know from what you've heard in

4    this courtroom, if you didn't know it before, that in

5    1999, 2000, the centuries old Russian-Chechen war heated

6    up again.  You know from the testimony that you heard in

7    this courtroom that it was a brutal war.  You know from

8    the documents that you have seen from the Muslim

9    perspective, it was a genocide.  You know from Kohlmann,

10   from Colonel Lang, and from Dr. Long that there were

11   hundreds of thousands of refugees.  You also know that

12   from Anwar Khan, who traveled there personally.  It's a

13   given.

14        You know from Dr. Long that the Department of

15   State was sufficiently concerned about Chechnya to put

16   into its country human rights reports write-ups about

17   the Russian atrocities in Chechnya in that time frame.

18   This is an international catastrophe.  This is an

19   international catastrophe that motivated much of the

20   world.

21        Pete Seda, Mr. Cardani said in his opening,

22   that Pete Seda, my client, had an obsession with

23   Chechnya.  Pete Seda was unquestionably concerned about

24   Chechnya.  And Pete Seda's concern is a concern that you

25   heard was personally shared by Colonel Patrick Lang, the

1    former head of the Department of Defense Intelligence

2    Agency.

3           And you heard from Dr. David Long, the former

4    deputy director of counterterrorism for our Department

5    of State that it was our United States government's

6    policy to be concerned.

7           Pete Seda is in the mainstream.  You know from

8    exhibits -- I don't need to show these, Ms. Wells, but

9    please take a look at them, 692, the photograph series,

10   B through G, *Time Magazine* running photographs of the

11   destruction, the devastation, the refugees in Chechnya.

12          You know from exhibits -- I think they may have

13   been 634 and 641, CNN, hardly a bastion of radicalism,

14   lots of stories about the devastation in Chechnya.

15   Okay.  That's the context.

16          Now, to the Muslim world, when you look at the

17   e-mails from Azzam, the Sheeshaan ListServ what you see

18   is more invective, you see more anger, you see more

19   discussion about -- one of them, the headlines is 26,000

20   rapes.  You see more discussion about -- from Islamic

21   Relief -- children without heat.  To be sure, the

22   perspective of the Muslim world perhaps viewing the

23   victims of the Chechen atrocity as brothers or brothers

24   and sisters is more intense.

25          But I ask any of you of Irish extraction to

1    think about the Troubles in Ireland, and what you might

2    have seen on an Irish Web site as opposed to CNN, the

3    perspective.  Those of you who are Palestinian, those of

4    you who are Jewish, think about what you might see on

5    Web sites from your people talking about issues of

6    concern that get you more in the gut than to the broader

7    world where it's more of an abstraction.

8            Yes, to be sure there were people in the Muslim

9    world who were terribly upset.  And to be sure there

10   were many people in the Muslim world who wanted the

11   Chechens to win.  They wanted the Chechens to win

12   perhaps because they believe in freedom.  They wanted

13   the Chechens to win, perhaps, for Islamic reasons.  Or

14   they wanted the Chechens to win to stop the genocide and

15   the rapes.  It's a given.  You've seen the e-mails.  We

16   don't dispute them.

17           But what is the issue?  Let us drill into these

18   series of e-mails that the government trots in front of

19   you, oh, my God, they say, guilt by association.  I am

20   so offended at this photograph that's been here, whose

21   back is now turned, guilt by association.  That has no

22   place in an American courtroom.  That's what they are

23   asking you to do.

24           Pete Seda had e-mails on his computer from

25   ListServs, find him guilty.  Hold him responsible for

 1    them.  I wonder how many of us should worry about some

 2    e-mails that might be on our computers.  Or if the

 3    government went through us with a fine-tooth comb.  But

 4    let's dispassionately look at Pete Seda's activities

 5    with respect to these e-mails.

 6            What do you see in evidence?  Can we have

 7    SW-69, please.  SW-69, it's an e-mail from Q to AQ, from

 8    Pete to Abdul Qaadir, to the evil nemesis Abdul Qaadir

 9    who sends out all this stuff.  He's responding to a

10    Sheeshaan ListServ e-mail.  What does Pete Seda do?

11    Hey, look, www.pathfinder.com/time/daily/special/photo/

12    Grozny.  Pete Seda responds to AQ, forwarding a *Time*

13    *Magazine* e-mail.  That's one.

14            SW-18, please.  The evil Azzam Web site.

15    What's found on Pete Seda's computer?  What's found on

16    the al-Haramain computer?  SW-18.  Please, put these

17    together, SW-69, SW-18, to Azzam.  This e-mail forwards

18    CNN back to Azzam.  Yo, you radical dudes, you better

19    take a look at what's on CNN.  Not "go jihad," not "go

20    brother."

21            SW-20.  A third, SW-20, The Arborist, what does

22    he forward?  Yes, the subject line is Russia's fears

23    about terrorism are valid.  This is a CNN article, to

24    Azzam.  Hardly any indication of support for the

25    mujahideen.

1         SW-36.  The fourth, SW-36, Pete to Sheeshaan

2    responding to a listing of postings that other people

3    have placed, and he writes back, the e-mail has "call

4    me."  Four e-mails.

5         Please, go through all of the SW's.  Go through

6    every e-mail that the government submitted to you, and

7    take a look about what you can see in those e-mails, the

8    government's evidence, that informs you on this question

9    of intent or willfulness.  You'll find four.  Perhaps I

10   missed one, perhaps not.

11        And now to the fifth one.  The fifth one isn't

12   a response to these guys.  The fifth one is an e-mail

13   from Mr. Seda to Mr. al-But'he.  Mr. Gorder went through

14   this.  And as Mr. Gorder went through this, I'm sitting

15   there thinking "he's calling this the smoking gun?"  I'm

16   about to get up and tell you that this is an absolutely

17   critical piece of defense evidence that has been

18   submitted by the government.  And here is why:  Let's

19   start, please, with SW-56.

20        You were shown that there was an interview, a

21   full, 12-page interview with Ibn Khattab on the Web.

22   Okay.  Oh, Ibn Khattab, a man about whom there is no

23   evidence of any connection, knowledge, or anything

24   between Pete Seda and Ibn Khattab.  The government gives

25   you zero.  The suggestion that there is a relationship

 1    between Pete Seda and Ibn Khattab is offensive.

 2             Now, what is in here?  On page 6, question 6,

 3    Exhibit 52, please -- I'm sorry, you know, Ms. Wells, I

 4    went too fast there.  We need to get to page 6.  We need

 5    to get to the question 6 in this one.  Oh, I'm sorry.

 6    Thank you.

 7             Question 6, what Mr. Gorder did not show you,

 8    you need to look at, please.  Question 6, do you need

 9    any support?  What support?  Question 6 has two

10    paragraphs.  Please, study this when you are back in the

11    jury room on this exhibit.  Paragraph 1, "Chechen

12    Republic has been surrounded from all sides.  Russian

13    Army prepared to sell everything for a price.  Through

14    previous affairs, one would always find Islamic

15    charities and organizations present.  Sorry to say there

16    is not a single one active inside Chechnya at present.

17    Only the Red Cross is present in the Chechen towns and

18    cities.  Therefore, we advise the Muslims and the Muslim

19    countries to take a sincere stand with the mujahideen in

20    the land of the Caucasus."

21             What's the import of that paragraph, folks?  Is

22    the import of that paragraph, please, folks, the

23    Russians are devastating Chechnya.  There are no

24    humanitarian organizations.  Please help us with

25    humanitarian aid?

 1          Now, look at paragraph -- the next paragraph.

 2   The next paragraph goes on and moves away from

 3   humanitarian aid.  The Muslim and Arab world is in a --

 4          THE COURT:  A little slower, please.

 5          MR. WAX:  I'm sorry, Your Honor.  "Is under the

 6   grip and influence of the deceiving and lying Western

 7   media.  Stand by your mujahideen brothers.  Arab

 8   countries are not able to help the mujahideen due to the

 9   difficulties in finding out the reality of the

10   situation.  Now you know full well what is happening."

11          Stand by us.  Not a call to arms, but not

12   discussing humanitarian aid.  Okay.  Two paragraphs,

13   please, look at this when you are back there.

14          Now, if we go to 52.  52, this is the Word

15   document, right?  What do you see?  One paragraph or

16   two?  Just one.  Just the first one.  Just the

17   humanitarian aid one.

18          Now, please, SW-11.  It's only the first

19   paragraph that Pete Seda forwards on to Soliman

20   al-But'he, the humanitarian paragraph.

21          I ask you to please read every single paragraph

22   of that SW-56, all 12 pages, and you will find things

23   about fighting, you will find things about the

24   mujahideen, you will find many things.

25          Pete Seda, according to this e-mail introduced

1    by the government, distracted one, the only paragraph

2    related to humanitarian support.  And doesn't that tell

3    you what is in Pete Seda's mind on January 22 of 2000?

4    Humanitarian support.  Nothing else.

5           Let's put that in context now.  Let's look

6    closely at these other e-mails.  And I encourage you to

7    go through them with care.  Ms. Wells, I'll call out

8    numbers on occasion, but let me just roll for a minute.

9    We start with Exhibits 1004 to 1015.  1004 to 1015,

10   checks that come in in the fall.  Checks earmarked for

11   Chechen relief.

12          We then can pick up at Exhibit 683.  And I

13   would ask you to please pay careful attention when you

14   are deliberating to the sequence of exhibits that run

15   from 683 with all the A's and B's, up to 700-A through

16   G.  Please look at that series.  And what you will find

17   is a series of e-mails that discuss humanitarian

18   assistance.

19          Ms. Wells, if we could go back, please, 683-A,

20   I'm sorry, 683.  From P to al-But'he, December 30th.

21   He's forwarding the e-mail regarding the lorry in Spain.

22   Help the Muslims.  Human help for Chechnya.  That's what

23   you find in these e-mails.

24          If we can go, please, to 683-C.  Horrible

25   condition.  P to al-But'he, describing the horrible

1    condition.  The goal, a large truck convey of food and

2    medicine.  Goal is to enter and relieve Grozny,

3    et cetera.

4          Let's go back to 683-B, please.  683-B is from

5    al-But'he to P.  Now, the government pointed out what it

6    called its hide the ball, what was it?  The be careful

7    e-mail, Mr. Gorder said, of February.  Well, look not at

8    the be careful e-mail, which is Mr. Gorder's spin, look

9    at all these e-mails and see what Pete Seda is reading

10   from Mr. al-But'he.  This absolutely critical two,

11   two-and-a-half month period.  Please, read them all.

12   Humanitarian aid, horrible condition, what can we do?

13   Let's get some humanitarian aid here.  al-But'he, Seda,

14   Seda, al-But'he.  And Daveed Gartenstein-Ross who was

15   here, who testified, who testified about his involvement

16   in trying to help.

17         What do you see?  You see, if we could go,

18   please, to 689.  I'm not going to take you through all

19   of these.  But 689, Gartenstein-Ross talked to you about

20   the letter to the Russians.  The letter to the Russians

21   that Mr. Seda had said something, you know, Rasputin,

22   you know, and he's angry about Rasputin, but look,

23   please, carefully at the draft that starts out with kiss

24   your whatever, Rasputin.  Look at the text and compare

25   the text with this letter addressed to the Russians.

1            Now, conspiracy.  Anwar Khan said, you know,

2    I'm a big organization, whatever he is now, 130 million

3    bucks.  I'm Anwar Khan with a team of accountants, a

4    team of lawyers.  Anwar Khan gets permission from the

5    Russian government in 1999 to go to Chechnya.  What is

6    this letter doing?  It is seeking permission from the

7    Russian government.  Conspiracy?  No.  That's not a

8    conspiracy.  It's out in the open.  It's not hiding

9    anything.  Mr. Seda, putting himself out there, please,

10   let me do this legally.

11           Gartenstein-Ross told you, and

12   Gartenstein-Ross's e-mail show, a pattern, January,

13   February, March, let me help.  Beautiful Grozny project.

14   Well, he says Pete's a bit of a visionary or

15   unrealistic, maybe so.  But he's not conspiring.  You

16   don't engage in a secret agreement.  You don't engage in

17   what the government theorizes this way.  That's nuts.

18           All right.  You go through these, and I want to

19   just get to the end here, please look at them all.

20           You heard today from Patricia Florin.  Why on

21   earth did we call Patricia Florin?  We called Patricia

22   Florin because at the end of this sequence, the end of

23   this period, the end of the period where Mr. Seda is

24   trying to get some convey going, to try to get some

25   humanitarian aid to Chechnya, this alleged conspirator,

1    this person Mr. Gorder says is hiding everything, and

2    Mr. Cardani, understand, he gets to get up after me and

3    talk to you again, and I'm sure he'll have something to

4    say about this.  And I hope when he's talking, you'll be

5    thinking, hey, what would Wax say back to him?  What

6    would Matasar say back to him?

7            Conspiracy?  Hi, Patricia, I'm trying to find

8    an organization to help me get some humanitarian aid to

9    Chechnya.  Mr. Gorder kept saying that's a charity?

10   That's a charity?  Well, I don't want to parrot, that's

11   a conspiracy?  That's a conspiracy?  Come on.  Common

12   sense.

13           You are conspiring to get money to Chechnya

14   that you are not even going to bury into a tax return?

15   Call Patricia Florin, your typist of nine years, hey,

16   Patricia, would you please help me type this letter to

17   doctors of the world, international aid organization.

18           Hey, Marla Cates -- you have available to you

19   to look at e-mails from Marla Cates.  What you see is

20   try this organization, try that organization.

21           And then you have these 700-A through G series.

22   What you see is e-mails come in, check out this Web

23   site.  Can we have 700 -- what is it?  A, B, any one of

24   them will do.  700-A through G, World Food Program

25   delivers to Balkans.  These things are found -- first of

1    all, you can see printed out, February 29, check the

2    Cates e-mail dates, check the Florin e-mail dates.

3    These things are printed out.  These things appear, are

4    found, and turned over from the al-Haramain Ashland

5    office to the government in response to the subpoena.

6             It certainly appears -- this one is March 1,

7    the other was the 29th.  That someone in al-Haramain was

8    taking seriously the advice that was coming in from

9    people like Cates.

10            Now, one more thing about the SW series, if we

11   could, please, put up SW-61.  Again, Mr. Gorder pulls

12   this one out, and I'm thinking, well, all right, we got

13   a repeat on something.  The translation.  The

14   translation.  Can we highlight, please, the top just --

15   wait until we post the details of the aid organization

16   able to collect these donations.  Go through this.

17            Yes, there is talk about the mujahideen.  But

18   this translation work, the evidence that the government

19   gives you, is evidence discussing humanitarian aid.

20            Okay.  Is Ptichka doing this?  Is Ptichka the

21   same as Sofia, Mr. Seda's wife at the time?  Is the "we"

22   in the other e-mail, Mr. Seda?  Well, maybe, sure.  It

23   doesn't matter.  Because humanitarian aid.  Okay.

24            Now, at this point I need to say this:  We deny

25   and I am arguing to you that there was ever any intent

 1    or effort to provide any assistance to the mujahideen.

 2              Okay.  So don't take wrong what I'm about to

 3    say next, please.  You heard from Marcus Owens.  Marcus

 4    Owens sat in this witness stand, and Marcus Owens told

 5    you "I am the former head of the charitable tax section

 6    of the Internal Revenue Service."  No, he doesn't do the

 7    audits.  He writes the book.  Okay.  "I lecture, I tell

 8    people how to do it, I tell people what the law is."  It

 9    is the Marcus Owenses of the world who tell the

10    Mr. Wootens of the world what to look for.  They give

11    the direction to the auditors, what is legal and what is

12    not.

13              The fact that he's not done an audit is

14    irrelevant.  And Marcus Owens told you something

15    critically important.  Under the Internal Revenue Code

16    and under the purposes section of the charitable Form

17    1023, it is lawful, it is within the charitable purpose

18    of the charity to give humanitarian assistance to

19    fighters.  Didn't happen.  From Mr. Seda.  Ptichka, if

20    she's doing anything, is she doing it on her own?  Is

21    she doing it through al-Haramain?  Zero proof.  You

22    cannot use that to say, oh, guilty.

23              Humanitarian, Mr. Owens told you if Mr. Seda

24    has knowledge and participation in anything like that,

25    it is legal.  It does not violate the charitable

1    purposes.  Absolutely critical point.  Marcus Owens, the

2    man who was the person in charge of making this type of

3    decision in 2000, the very year in which this

4    transaction took place.  Okay.  Unrefuted, unrebutted

5    testimony.  That's the law, according to Owens, the man

6    who writes the book.

7            Now, the El-Fiki donation.  It's important to

8    focus on it for several reasons.  It's important to

9    focus on it because you know some things about it and

10   there are some things that you don't.  And what you do

11   know about it shows that the government has a theory

12   based on a total absence of fact.  What you heard from

13   Mr. Owens, he had the opportunity to review a report

14   prepared by or as a result of work done by the Egyptian

15   state security police.  Thoroughly reviewed, he said,

16   Dr. Mahmoud El-Fiki, the wealthy Egyptian

17   philanthropist.

18           There was absolutely nothing that Mr. Owens

19   observed that cast any doubt on the bona fides of

20   Dr. El-Fiki and of the humanitarian purpose of his

21   donation.

22           Oh, boy, Islam, Zakat, five pillars, et cetera.

23   Why is that relevant?  I was a little surprised to hear

24   Mr. Gorder making light of Colonel Lang and Dr. Long.

25   These are two men who have devoted their entire

Closing Argument by Mr. Wax                                127

1   professional careers to defending the United States

2   government against all enemies foreign and domestic.

3   They have held the highest security clearances of any

4   person in this land.

5          Colonel Lang, when he was working in the

6   Department of Defense in the late 1980s, was one of

7   those guys who would go into the bowels of the White

8   House and 7:30 in the morning, the President there with

9   his cup of coffee, hey, guys, did the world blow up

10  anywhere last night?  And Colonel Patrick Lang is one of

11  the ones -- and he's got an ego -- who would say, no,

12  President Reagan, the world is still there.  George H.W.

13  Bush, he said, he briefed him, I don't recall if he said

14  on a daily basis, but quite frequently during the Gulf

15  War.

16         Colonel Walter Patrick Lang continues to work

17  for and defend the United States of America from all

18  enemies, foreign and domestic, for our government,

19  today.  The suggestion that he is out-of-date, I

20  respectfully submit, is completely out of bounds.

21         Dr. David Long left the Department of State in

22  1993.  Dr. David Long was the man responsible for

23  counterterrorism activities in the Department of State

24  in the mid 1980s under President Reagan.  The top dog

25  for the Middle East.  Dr. David Long, he's an older guy,

 1   yes, but Dr. David Long has just updated his books on

 2   Saudi Arabia, come out this year.

 3           Both of these men come into this courtroom, I

 4   ask you, would either of those men risk his reputation?

 5   Would either of those men, who is still working for the

 6   United States government, come into this courtroom and

 7   talk to you for money?  I don't think either of those

 8   guys can be bought.  Yes.  We're paying them, but the

 9   suggestion that we bought their testimony, I think each

10   of them would find offensive.

11           They are patriots.  They are men still working

12   for this country, keeping us safe.  And both of them

13   came here on behalf of Pete Seda to testify and to tell

14   you what they have learned through two lifetimes of

15   experience in the Middle East.  Why?

16           Our cultures are different.  There is no

17   suggestion that all Saudis are perfect.  But what you

18   needed to understand to try to put the government's

19   fact-less theory in context is the reality of the Saudi

20   world.  And you heard from these two distinguished

21   patriots the following:

22           The Saudi government is awash in money.

23   Probably didn't need to hear that from them.  The Saudi

24   government may at times do things we don't like.  The

25   Saudi government may at times want to fund some

1    mujahideen.  Maybe even the Saudi government might want

2    to fund some terrorists.  But both of these men said

3    they would not allow a Zakat donation from an Egyptian

4    philanthropist running through the al-Haramain

5    organization to be used in that way.

6            Evan Kohlmann, 31 years old now, never had a

7    security clearance, never worked for the government,

8    never taught at a university, an Internet researcher,

9    tells you, you know, there are some reports out there

10   that there is some money that gets diverted from some

11   Middle Eastern charities.  Evan Kohlmann says that and

12   then Mr. Casey questions him.  And Mr. Casey says,

13   Mr. Kohlmann, let's look at your book, your seminal work

14   from 2004, based on your honors thesis, al-Haramain

15   isn't mentioned.  Mr. Kohlmann, let's look at your

16   testimony in 2003, al-Haramain isn't mentioned.

17   Mr. Kohlmann, let's look at your testimony to the

18   Danish, al-Haramain isn't mentioned.  Mr. Kohlmann,

19   let's look at your more recent activities, al-Haramain

20   isn't mentioned.

21           You heard nothing from Evan Kohlmann that in

22   any way undermines or detracts from what you heard from

23   the two patriots who came in and testified when called

24   by the defense.  It would never be permitted to happen

25   under Saudi society.  Those guys are experts.  They

 1    lived there.

 2            If you believe in the spy netherworld, they

 3    probably ran the world there for a while each of them in

 4    his own way.

 5            Dr. Long told you that he continues to maintain

 6    close contact with high current and former Saudi

 7    officials.  He told you he discussed the SJRC and

 8    al-Haramain with them.  Did he get tired at the end of

 9    day?  Yeah.  All right.  Whatever.  They told you the

10    truth, the reality of how things work.  That's why Zakat

11    is important.  That's why it is critical to look at what

12    is described, please, Ms. Cooke, SW-5.

13            Now, we don't know, because the government

14    hasn't offered any proof, whether the attached ad,

15    whether this is the advertisement that Dr. El-Fiki saw.

16    All we know from his e-mail that I'll get to in a

17    moment, his e-mail of January 11, is that he became

18    aware that there was a committee seeking relief.  But

19    this advertisement is all about humanitarian work.

20            Okay.  Now, we go to Exhibit, please,

21    Ms. Wells, 669.  This is the e-mail from El-Fiki to

22    Haramain, and this is Saudi al-Haramain.  The government

23    doesn't make any bones about that.  And he is talking

24    about Zakat, Zakat, Zakat.  And Dr. El-Fiki is a pretty,

25    you know, rigorous guy.  He doesn't take this lightly.

 1    You know, he may be sitting on millions, but 150,000

 2    bucks is still a little bit more than chump change to

 3    him, and he wants to be sure that this is handled

 4    properly.  So he says, what are you guys going to do for

 5    it?  In what disciplines are the account revenues going

 6    to be spent?  The syntax isn't the greatest, but what

 7    are you going to do with it?  And I need a receipt.  And

 8    Zakat.

 9          670, please.  Response to El-Fiki from Haramain

10    telling him, if we could highlight in the middle,

11    answering your question number 4.  Where did it go?

12    Here we go.  We will confirm -- we'll send you a receipt

13    after we receive your transaction.  And this is probably

14    the answer to number 5, you can look at these, put them

15    side by side, your Zakat should be sent to the poor, the

16    orphans and refugees.  This is what al-Haramain tells

17    El-Fiki.

18          671, please.  This e-mail 671, again, please,

19    study it, Zakat, Zakat, Zakat.

20          Okay.  There is an obligation here.  If El-Fiki

21    is a thief, if El-Fiki is a funder of mujahideen, Dr.

22    Mahmoud El-Fiki ain't going to send these e-mails, he's

23    not going to wire the money, he's not going to have the

24    wire transactions with his bank in London.  Want to give

25    money to the mujahideen?  You do it another way.

 1          If you are al-Haramain, and you want to divert

 2    funds to the mujahideen, and maybe they did at that

 3    time, you don't take this.  Why?  Long and Lang told

 4    you.  The Saudis take their religion seriously.  Now,

 5    there may be hypocrites there.  Sure.  There are

 6    hypocrites in every religion.  Mr. Gorder gave you some

 7    examples of the hypocritical theological people in this

 8    country.  But under the Saudi system, awash in oil

 9    money, you want to get money to Chechen mujahideen, you

10    don't do it this way.

11          And the United States government, which bears

12    the burden of proof in this case, offered you nothing in

13    rebuttal.  They offered you no response.  Evan Kohlmann

14    doesn't say a word about this.  What Evan Kohlmann says

15    is, I know that al-Haramain is a pretty big charity.

16    Maybe about the size of Islamic Relief.  And there are

17    reports that out of the 60, 70 bucks, al-Haramain may

18    have some diverted.  You cannot convict Pete Seda if

19    some other guys are doing some diversion when he and

20    Soliman al-But'he have not conspired.

21          And that, ladies and gentlemen, at its core is

22    what the United States is asking you to do in this

23    trial.  And we say please respectfully say no.

24          The SJRC, Osama bin Laden's best friend was put

25    in charge.  Okay.  Smear.  Where is the evidence?  Where

1    is the evidence from the United States government that

2    the SJRC activity in Chechnya ever had a diversion?

3            Patrick Lang, Colonel Lang, and Dr. Long told

4    you the members of the SJRC and the al-Haramain board

5    are the Saudi kings and princes, the minister of the

6    interior, the security minister.  They don't do it this

7    way.  And you have zero evidence.  That's what the judge

8    has told you you need to have.  That's the importance of

9    Zakat.

10           Couple more points about that and I'll move on

11   to the last section of my argument.  The indictment, I

12   read you the indictment at the outset because the

13   indictment itself alleges that Dr. El-Fiki sent this

14   Zakat to al-Haramain Riyadh.  Mr. Owens told you

15   explicitly about the relationship between al-Haramain

16   Saudi and al-Haramain Ashland.  Mr. Owens told you about

17   agency.  You are not lawyers.  He is.  The man who wrote

18   the book came in and said to you that this money, as

19   with any money that goes to one charity, when it goes to

20   a different charity, it does not need to appear on the

21   books of that charity.  It did not need to appear on the

22   books of al-Haramain in Ashland as long as the money did

23   not last -- you know, cross over a fiscal year.

24   Absolutely critical.

25           Line 1, didn't have to be there.  Line 22,

1    didn't have to be there.  Just not there.

2           Now, he was also asked, contrary, I would

3    respectfully submit, to what Mr. Gorder said, that the

4    fact that Pete Seda from this e-mail train, you look at

5    it, and you see activity taking place, Pete Seda is

6    interested in Chechen relief before he's aware of

7    El-Fiki.  Okay?  You'll see that.

8           El-Fiki comes in.  Pete Seda goes, wow, let me

9    try and see if I can do something with this larger pot

10   of money.  And Mr. Owens explicitly told you that the

11   fact that he did that does not change the legal

12   responsibility.

13          With all respect, Mr. Gorder, that was the

14   testimony from Mr. Owens.  And that is the unrefuted

15   evidence in this case.  Yes, Mr. Seda tried.  Yes.

16   Well, he has this money in hand.  He tries.  He fails.

17   And Mr. al-But'he takes it back to Saudi.

18          How does he take it back?  This traveler check

19   business, I can't explain that except by referring you

20   back to Dr. Long.  Dr. Long said to Mr. Gorder, well,

21   you might not do it that way, but that's Saudi.

22          You heard from both Long and Colonel Lang that

23   the Saudi economy is cash based.  You heard that the use

24   of monetary instruments is common.  Cash is doled out

25   hither, thither, and yon.  You heard that there weren't

1    even any banks in Saudi Arabia until sometime in the

2    late 1950s, and then they wouldn't even call it a bank.

3    Now, that's an indication of the strictness of some of

4    the religion there.

5            So Mr. al-But'he, you see from FinCEN-4,

6    please, has a pattern, multi year, of bringing in

7    substantial amounts of money in traveler's checks.

8    Okay.  Please look at all of the FinCEN documents

9    because they will show you that these are all -- almost

10   all -- traveler's checks.  It's how al-But'he does it.

11   Why?  We can't ask him.  You can't know.  But you see

12   this pattern.  And what you will see on the FinCEN

13   documents is every single one of these reports is for

14   entering the country.

15           Now, does he know that he needs to report

16   leaving the country?  I submit no.  You heard testimony

17   about it from the FinCEN person.  There are no signs,

18   there is no notice, there are no forms handed out.  Yes,

19   if you read the form carefully when you are sitting on

20   the airplane it says in and out.  What you know, though,

21   and I asked the fellow, if you look at June 22 and June

22   26, you know Soliman al-But'he came into the country

23   June 22, '99, with 80,000.  He went to Canada.  He came

24   back four days later.  He reported the traveler's checks

25   again.  I don't think that's a man who is trying to hide

 1    anything.  I think that's a man who understands his

 2    obligation to report as involving reporting coming in.

 3           Did it cost 1300 bucks?  Sure.  Does al-But'he

 4    usually get his traveler's checks for free at the Al

 5    Rajhi Bank?  Maybe.  Does Mr. al-But'he have the ability

 6    and perhaps the obligation to make up the 1300 bucks

 7    when he deposits the money in the proper account in

 8    Saudi Arabia?  Perhaps.  This is how they do it.

 9           Now, conspiracy.  Picture this.  Soliman

10    al-But'he, in full Arab regalia, a robe, in Ashland,

11    Oregon, a headdress in Ashland, Oregon, goes into Pete

12    Seda's bank, interacting with the teller -- excuse me,

13    the manager, Debra Ingram, with whom Pete Seda has done

14    business for years, sitting there and painfully signing

15    out 130,000 -- you know, one-hundred-and-thirty $1000

16    traveler's checks.  Conspiracy?  You want to tell the

17    world you're doing something a little bit odd?  Go to

18    Ashland, dress like a Saudi, have a darker skin, have a

19    bigger nose, and sign 130 traveler's checks in a

20    thousand dollar denominations.  Hello?  There is

21    absolutely nothing that the government has shown you of

22    any conspiracy, coverup, hiding of anything.

23           AHIF-2 and 3, don't need to show them, let me

24    just talk about them for a minute.  Mr. al-But'he and

25    Mr. Seda are looking at the monies that have come in.

1    And Mr. al-But'he and Mr. Seda have a number of things

2    to look at.  I invite you, please, to look at the checks

3    and add them up.  It's about $6200 in checks that came

4    in from November through January.  It's the 1004 through

5    1016 series.  Look at the ISNA check.  50,000 in the

6    bank, 36,000 once the Canadian discount is applied.

7            If you add up the amount of money for which

8    Mr. Seda was responsible for Chechnya, if you look at

9    the January 6th e-mails, and those January 6th e-mails

10   are -- we don't need to show them right now, because I'm

11   running out of time, please look them up, though, 686

12   and 686-A.  They are the e-mails that say please

13   deposit, you know, to our account, 3,000 and 940.  With

14   responses from al-But'he saying, yeah, I'll do my best.

15           What do you have here?  You have what the

16   accountants call a pass-through or an offset.  You have

17   the e-mail that is in evidence that, again, we don't

18   have to show it, but if you don't mind, make a note, 760

19   and 760-A, the March 6th e-mails and attachment

20   suggesting that Mr. al-But'he was going to bring in the

21   budget, the money for funding of al-Haramain for the

22   next six-month period.  And you'll see in some of the

23   exhibits, it's about 49,000 bucks that comes in from

24   time to time.  There are months with a zero amount in

25   and then you'll get a bunch of money in, and then you'll

1    get some more zeros.  What's going on here?

2         Well, what I submit is going on is that

3    Mr. Seda and Mr. al-But'he are sitting there and trying

4    to figure out, okay, you've got 150 from El-Fiki, you've

5    got 36,000 that's come in from ISNA, now there's 186.

6    Well, that's the number on AHIF-3, I believe it is.

7    You've gotten in about 6,000 bucks before.  You have

8    told us in the beginning of January that we should put

9    in 3940 into the account for Chechnya in Saudi.  How

10   much money are you responsible for, Mr. Seda?

11        And you can add this up any number of ways.

12   And I encourage you to do so, because what you'll see is

13   if you count the checks that have come in, and if you

14   take the offset from January, you are going to come up

15   186 or 188,000 every time.  2000 apart.  Yep.  Why are

16   there two documents?  One is from Saudi.  One is from

17   Ashland.  You know that from the first two witnesses who

18   testified.  And what you've got is a proper accounting.

19        Now, Mr. Gorder said and Mr. Cardani said in

20   the opening:  Follow the money, follow the money.  They

21   say that we follow the money, and the money trail

22   disappears at the Al Rajhi Bank account of Soliman

23   al-But'he.  And I respectfully submit to you that that

24   is not the case.  I respectfully submit to you that the

25   United States government had the ability, and you heard

 1    testimony from Agent Anderson and from Colonel Lang

 2    about what you should have been provided.  The

 3    suggestion is made that Mr. al-But'he put 21 grand in

 4    his pocket, awash in money in Saudi Arabia, this guy is

 5    in charge of this Saudi governmental department, I don't

 6    know that he needs to pocket 21 grand, working for a

 7    charity that's got 70 million bucks' budget at that

 8    time.

 9          But from the testimony of Agent Anderson and

10    the testimony of Colonel Lang, you know this:  Let's

11    look, please, at Exhibit 731.  This is the document that

12    was, at least a version of this, provided to the

13    government by Evan Kohlmann in 2004.  Bank account

14    numbers for the al-Haramain Foundation with the Al Rajhi

15    Banking and Investment Company.  You know from the Al

16    Rajhi records introduced by the government that they

17    subpoenaed the Al Rajhi Bank for one bank account,

18    Soliman al-But'he's.

19          You know from Colonel Lang and from Agent

20    Anderson, go to the next page, please, that the Al Rajhi

21    Bank and al-Haramain have set up a number of different

22    accounts, each with a different number, that relates to

23    different activities of the al-Haramain Foundation.  One

24    is 9889/5, the Asian Committee.  It's the committee that

25    deals with general charity, and Zakat, 'aqeeqah, oath

1    expiation, book printing, Dawah, sponsorship of

2    institutions, Qur'an memorization, clinics, sponsorships

3    of orphans and callers, Palestine and Chechnya.

4            You heard that there is a great deal of

5    relevance to this.  You heard that the money trail

6    could -- the money trail should have been followed here.

7    You want to know where the $187,000 for which Soliman

8    al-But'he was responsible went?  You need to look at

9    this account.

10           The judge has instructed you that a reasonable

11   doubt can arise from the evidence or the lack of

12   evidence.  The government does not have to prove, you

13   have heard, the money actually went to Chechnya.  They

14   just to prove the intent.  But their suggestion that

15   Soliman al-But'he pocketed 21 grand, which has nothing

16   to do with Chechnya, and I'm not sure how that even fits

17   in here, the answer, I submit to you, is here

18   (indicating).  They have the burden.  They have the

19   ability to subpoena documents from overseas.  They did.

20   They didn't do this.  Reasonable doubt there.

21           All right.  I'm going to wrap it up.  Doesn't

22   mean one minute, unfortunately, but I am near the end,

23   Your Honor.  I'm going to wrap it up in this way, the

24   last subject:  Pete Seda.  What have you heard?  What

25   have you seen?

1          Well, you have a number of exhibits that came

2     in through Daveed Gartenstein-Ross.  He told you that

3     Pete Seda had a, as far as he knew, a long time desire

4     to lead convoys.  Pete, perhaps, a little grandiose.

5     Perhaps wanting to be Anwar Khan.  Not quite ever

6     getting there.  He wants to be the guy who is doing it.

7          He has Gartenstein-Ross write letters to the

8     Serbs about the situation in Kosovo.  You'll see

9     exhibits about efforts, Tajikistan, 910, Exhibit 910,

10    please.  Afghanistan, Exhibit 911.  You heard from Rabbi

11    Zaslow that in the summer of 2002, Pete Seda took his

12    dream to do something like this overseas trying to do it

13    in Palestine, and turned away at the border.

14          This Chechnya stuff is entirely consistent with

15    that effort.  Could he have given the money to Anwar

16    Khan?  Yes.  Did Pete's ego perhaps prevent him from

17    doing that?  Perhaps.  But this is his dream.  You know

18    he went to New Jersey.  You know from Gartenstein-Ross

19    he took a trip there to help the Kosovo/Albanian

20    refugees there.  And you know he went to Palestine.

21          Pete Seda and al-Haramain and the accounting,

22    the government has introduced a bunch of records

23    relating to the accounting.  If you take out the AQ and

24    Sheeshaan e-mails from the SW series, you find a whole

25    series, and I encourage you to sort them out, put them

1    in a couple of piles.  This is this accounting pile.

2    This is the Sheeshaan pile.  And take a look through the

3    accounting e-mails in sequence.  And what do you see?

4    You see a normal relationship between Pete Seda and

5    al-Haramain.  You see a lot of frustration on behalf of

6    the head of the committee, Mr. Al-Shoumar because Pete

7    Seda's records, as Tom Wilcox told you, were a mess.

8    The accounting at al-Haramain was not the best, not

9    because there is any conspiracy, but because it was a

10   shoestring operation.

11           And when you look at the bank balances in the

12   BOA series of bank records, you will see they are often

13   down to 1,000 or less.  You will see evidence that Pete

14   has to loan al-Haramain money, al-Haramain Ashland, out

15   of his own pocket, because al-Haramain Saudi isn't

16   getting money in frequently enough.  And Al-Shoumar is

17   saying to him, come on, buddy, get with the program.  He

18   wants him to use Access -- no, he wanted him to use

19   Quicken.

20           Gartenstein-Ross said, well, I set up Access.

21   When I get there, it was a mess.  Well, you know that

22   Quicken wasn't used because you will see in this series

23   of e-mails the Excel spreadsheets.

24           Now, the government makes a big deal, well,

25   Mr. Wilcox never saw this.  Mr. Al-Shoumar never saw

 1   that.  Hold on, guys.  Let's get the temporal frame

 2   correct.  During the year 2000, when these monthly

 3   reports go from al-Haramain Ashland to Saudi, the

 4   al-Haramain office is using Excel.  Yes, they still have

 5   the Excel program up and running in 2001.  But Tom

 6   Wilcox says, guys, Excel don't work for tax purposes.

 7   Please use QuickBooks.  And they buy QuickBooks.  And

 8   they set it up, you know, March of 2001.

 9           There are no two book systems here.  There is

10   nothing being hidden from anybody.  There is one set of

11   accounting that al-Haramain Saudi requires, and Pete

12   Seda gives it to them.  He doesn't hide from them.

13   There is another set of accounting that Wilcox wants for

14   tax purposes.  No hiding.  No hiding.  Everything is out

15   in the open.

16           And Al-Shoumar is annoyed.  Now, maybe Al-

17   Shoumar understood what Mr. Owens understood, that the

18   al-But'he money, the money that he took out, the El-Fiki

19   donation, the Soliman checks, were actually not checks

20   that should have appeared on the al-Haramain Ashland

21   books.  Owens told you that.  Read this e-mail that

22   Mr. Gorder made such a big deal out of at the end of his

23   argument, the September 29 e-mail, no trail.

24           He is telling him, when you read the entire

25   e-mail, and the entire sequence of e-mails, guys, keep

1    the books straight.  Money that is yours, account for

2    it.  Money that should not be in your accounts, please

3    don't.  And it's entirely consistent with everything

4    that is out in the open that Pete Seda is doing.

5           Pete Seda, Pete Seda, what do you know?  I'm

6    going to start broadly.  Start in the world.  We'll

7    start out there.  We'll start with our patriots Long and

8    Lang, who have come in and put their reputations on the

9    line to come into this courtroom to testify on behalf of

10   Pete Seda and to explain to you what they can about

11   these charges.

12          Bring it in a little, the community at large.

13   You heard from the community at large that Pete Seda for

14   his entire lifetime in Ashland has been a public figure,

15   has been a man of peace, has been a bridge builder, has

16   been espousing a moderate and ecumenical view of Islam.

17          You heard Rabbi Zaslow tell you, you know, my

18   job, I kind of think I'm maybe a decent judge of

19   character.  Rabbi Zaslow told you exceedingly clearly, I

20   am a Zionist.  And if you know anything about Judaism,

21   if you know anything at all about the Israeli-

22   Palestinian situation, which causes so much tension

23   between Israel and the rest of the world, between Jews

24   and Muslims, what you know is that a Zionist is about a

25   fervent a Jew as you can find when it comes to the State

 1    of Israel.  Aliyah Israel, the Holy Land of the Jews.

 2    His view, that's our land.

 3            Rabbi Zaslow is a friend and associate, a

 4    partner for peace with Pete Seda.  Rabbi Zaslow, the

 5    Zionist, invites this alleged Wahhabist funder of

 6    mujahideen to the dedication of his new temple?

 7    Mr. Gorder said look at the actions.  Look at the

 8    actions.

 9            And Pete Seda?  Would any Wahhabist, would any

10    believer in extremism in Islam -- as Rabbi Zaslow said,

11    would a leader of Hamas or Hezbollah appear in a temple?

12    Oh, no, no way, no how.  Actions speaking louder than

13    words.

14            The community at large.  Pete Seda gives

15    charity in Ashland.  Pete Seda is there in the Fourth of

16    July parade driving his arborist truck.  He's -- someone

17    is riding the camel.  I guess he can't be doing both at

18    once.

19            Minister Caren Caldwell knows Pete, rented a

20    space to him in the '80s, before he was able to invite

21    people to his home, or probably he had a home to invite

22    people to.

23            Let's come from them to Patricia Florin, nine

24    years of working.  I thought it was pretty interesting

25    when she was asked this morning, well, did you tell

1   Agent Carroll this?  And she said, uh-uh, he said that

2   to me.  And I submit you saw a very genuine human being

3   here.

4            Let's come closer in.  Let's go into the tent,

5   if you will.  Into the tent, we brought you Bill

6   Gabriel, 20-some-year high school teacher in Ashland,

7   Oregon, kid -- responsible for kids in Ashland, brings

8   his kids up to the tent.  Interacts with Pete Seda.  I

9   don't think that he would be exposing his kids to a

10  fundamentalist Muslim.

11           The government says, well, wait a minute, you

12  know, there's this other side of Pete, so let's go into

13  the prayer house.  We brought you just a couple of

14  people because I think they are a good representative

15  sample.

16           Nabil Taha, Ph.D., civil engineer.  What type

17  of people pray in the prayer house?  Well, you have what

18  Daveed Gartenstein-Ross called some of the redneck

19  Muslims.  Pete, his friend David Rodgers, Rob Brown,

20  John Dunn, the boys who went out to Sprague River, lived

21  on the land, yeah, they hunt.  They have guns.  Pete

22  Seda has guns.  So what?  You heard Dave Rodgers.  I'm

23  an Oregonian.  I learned to shoot before I learned to

24  walk, or, you know, whatever it was that he said.

25  That's Oregon.  That's our state.  You have those guys.

1          You have students.  You have teachers.  You
2    have engineers.  You have a broad spectrum of the
3    Islamic community.  You have the big tent, if you will,
4    inside the prayer house.
5          Nabil Taha likes to pray with his wife and
6    daughters.  They come to Friday prayer together.  Some
7    of the other people in the prayer house believe in the
8    separation of the sexes.  Not Nabil, not Mr. Taha and
9    his family.  All right, the curtain is there, he's
10   respectful of that during the service.  And as soon as
11   it's over, he pulls it aside.  And what does Pete Seda,
12   the supposedly conservative Wahhabist say?  Nothing.
13   It's fine by Pete.
14         You are inside the prayer house, folks.  You
15   are inside the prayer house through the eyes of engineer
16   Ph.D. Nabil Taha.
17         Daveed Gartenstein-Ross, well, I objected at
18   one point in the argument because he said something
19   about he was chastised.  You recall, the chastisement
20   was not from Pete Seda.  The chastisement was from
21   someone else in the house.  And you recall, I hope, that
22   he said that when Pete spoke to him about it later,
23   which he did, his word was conciliatory.
24         Yeah, are there guys there who believe in a
25   more strict practice of Islam than Pete?  Yes.  Are

1   there guys there or women there who believe in a more

2   political practice of their religion?  Yes.  Are there

3   people who are less conservative?  More secular?  More

4   Americanized?  Yes.  So what?  There is no dark side.

5   This is not a cell of people who are terrorists.

6           Dave Rodgers.  I hope you saw Dave Rodgers as a

7   genuine human being.  I hope you saw Dave Rodgers as a

8   guy -- yes, he's a friend of Pete Seda's who came in and

9   told you from the heart about himself, about his

10  evolution as a human being, about his life with Pete.

11  He told you about the prayer house.  All right.

12          Sheikh Hassan shows up sometimes.  Some people

13  like it.  Some people don't.  Sheikh Hassan comes and

14  goes.  Abdi Guled leads the prayer.  David Rodgers leads

15  the prayer.  Pete Seda leads the prayer on occasion.  He

16  doesn't like to do it.  It's a big tent.  There are

17  Sunni.  There are Shia.  There are Sufi.  Islam you

18  learned, if you didn't already know, is a broad

19  religion.  And that prayer house in Ashland, Oregon, was

20  full of the diversity of Islam.

21          Pete Seda is the guy in charge.  Pete Seda is

22  respectful of the way in which all people who come there

23  want to practice.  Were there things that were said that

24  might have been offensive?  Yeah.

25          I don't think that Rabbi Zaslow would have hung

1  around with Pete Seda if Pete Seda was anti-Semitic.

2  And I don't think that if Pete Seda were anti-Semitic,

3  he would have hung around with Rabbi Zaslow.

4           Gartenstein-Ross and the Kosovo donation,

5  please look at the exhibits.  You have in evidence the

6  1200 series, the beginning of the 1200 series.  And what

7  you see is on April 2nd of 1999, there is a request for

8  aid faxed in.  Ms. Wells, I don't recall the number of

9  it.  Do you have it handy or not?  It's 1200 something.

10 Forget it.  You'll find it.  1200 something.  Request

11 for aid, has a fax line at the top.  It comes in on

12 April 2nd.  It comes in on the day that Gartenstein-Ross

13 writes the check, $100 check.

14          It comes in, Gartenstein-Ross says, well, maybe

15 I forged Pete's signature.  Oh, Pete couldn't have been

16 there.  Well, maybe it was mailed later after he got

17 back.  Read his timesheet.  Mailed Kosovo check.

18          Is he confabulating?  Was something said about

19 Kosovo?  You bet.  And you have the brochures, the

20 fliers, Kosovo aid, and you can match up the date, the

21 check, Pete's signature.  This isn't about mujahideen.

22          Why does he say that?  I don't know.  He has a

23 terrorism business.  Does it help him if he's been in a

24 terrorism house and to talk about it as a terroristic

25 place?  Not going to get much credibility if you're

1    describing the place you're living as a big tent in

2    Ashland, Oregon, full of people from the full range of

3    diversity of Islam.  I don't know.  But look at the

4    physical evidence.  Look at the physical evidence.

5            We've been in his house.  Bobbie Cabral was

6    asked, hey, did things change when al-Haramain came?

7    And the government expected, oh, yes, for the worse.

8    Well, no, no.  Was there any call for money to

9    mujahideen after the Hajj?  I submit not.  I don't think

10   that that is reliable.  Bottom line is it is contrary to

11   everything else you know about Pete Seda.

12           This is the man, and please look this up, this

13   is the man who writes an agreement against violence,

14   602-B, 1998.  He knows the first Trade Tower bombing

15   occurred in '93, Sheikh Rahman had been charged, was

16   probably in prison then in New York.  He knows about the

17   potential for violence.  And he writes a charter that

18   Dave Rodgers signs that says that ain't us.

19           Please take a look at Exhibit 805-B, April of

20   2000.  Pete Seda taking, what I submit, is probably a

21   pretty significant risk to himself writes to Sheikh

22   Aqeel, and you'll see the letter, and you can see the

23   call for fatwa against terrorism.  That's Pete Seda.

24           You put all this together, ladies and

25   gentlemen, you put together the physical evidence, you

1    put together the testimony, you put together the

2    testimony from the world, from the international

3    terrorism experts, the colonel and the doctor who

4    protect this country, you bring it into the community,

5    you bring it into the tent, you bring it into the house,

6    you put that with the physical evidence that the

7    government has taken from the house, you put it together

8    with the physical evidence that the government took from

9    the house that we presented, and I submit to you that

10   what you find is nothing on which you can base a verdict

11   of guilty of either count.

12          I submit that you find that the government is

13   presenting you inference, innuendo, conjecture,

14   speculation.  The government is presenting you a theory,

15   and that the reality of this evidence is evidence that

16   should cause you to say that the government has utterly

17   failed in presenting evidence sufficient for you to

18   return a verdict; that the evidence proves not only that

19   Mr. Seda is not guilty, but that the evidence has

20   established that he is a decent human being, a good

21   person who believes in peace, and did not conspire with

22   anyone, who acted openly at all times, and is innocent

23   of these charges.

24          I thank you for your time, for your attention,

25   for listening, for bearing with me.

 1            Thank you, Your Honor.

 2            THE COURT:  Members of the jury, we'll take a

 3    five-minute health break, and then we have one more

 4    short argument.

 5            (Recess:  2:50 until 2:58 p.m.)

 6            THE COURT:  We'll go back on the record.

 7            Members of the jury, Mr. Cardani, under the

 8    law, is entitled to rebuttal argument.  This is that

 9    argument.  Go ahead.

10            MR. CARDANI:  Thank you, Your Honor.  Members

11    of the jury, bear with me for about 15 or 20 minutes,

12    and then the case will finally be yours.  So one more

13    lawyer gets to talk.

14            A few points about Mr. Wax's closing argument.

15    We listened to him for over two hours.  Unless I didn't

16    hear it correctly, he covered an awful lot of the case,

17    but I didn't hear him mention the Noble Qur'an.

18            The Noble Qur'an is the defendant, after he

19    started working for al-Haramain, sending to U.S. prisons

20    around this country, in the thousands, 10 to 15,000

21    prisoners, violent people serving time, getting junk

22    like this from al-Haramain saying jihad is an obligation

23    for Muslims.  Talk about people prone to suggestion.

24    Prisoners.

25            Mr. Wax talks for two hours and you don't hear

1    anything about that.  Nor do you hear anything about

2    this.  You've memorized some of this book, members of

3    the jury.  *Islamic Guidelines For Individual and Social*

4    *Reform*.  This was a special book at al-Haramain.  Not

5    everybody got this.  The only people who got this, and

6    you heard it from the witnesses, were the ones who

7    passed the test.

8            You had to be not only a believer, but you had

9    to pass a test.  Daveed Gartenstein-Ross, it's one of

10   his responsibilities, to put this book -- I'm sorry --

11   interviews into the prisons by the thousands.

12           The defense witness yesterday told you that as

13   well, Mr. Rodgers.  And back they came into al-Haramain.

14   It was a huge project sponsored by al-Haramain Saudi

15   Arabia with their Wahhabi, violent jihad propaganda.

16   They get a foothold in the United States.  Pete Seda

17   becomes their man.  And out goes this hateful, crazy

18   jihad stuff into prisons.

19           But not everybody got this.  Why didn't

20   everybody get this?  Because you can't talk openly about

21   this kind of stuff because you may get in trouble.  So

22   you got to be quiet about it.

23           And, yes, members of the jury, there are two

24   sides to Pete Seda.  The side that when the cameras are

25   on, when the lights are bright, is the smiling, peaceful

 1    face of Islam in southern Oregon, and wherever else he

 2    can market it.  But turn those lights off, turn the

 3    cameras off, and get down into room X at 3800, and

 4    that's where it really starts happening, because it is

 5    there that he is serving the bidding of his sponsors

 6    al-Haramain in Saudi Arabia, the ones that are funding

 7    his ability to exist as an Islamic charity in the United

 8    States.

 9            Two hours we heard from Mr. Wax and nothing

10    about this stuff.  Why is that?  Why doesn't he talk

11    about the fact that we have Mr. Seda doing direct fund-

12    raising for the mujahideen?  Daveed Gartenstein-Ross and

13    others were asked to help sponsor, at Mr. Seda's behalf,

14    a mujahideen fighter to go to Kosovo.  Gartenstein-Ross

15    throws money in the hat.  And off goes a wire transfer

16    of some sort to Albania.

17            Barbara Cabral tells you she went to the Hajj

18    with Mr. Sedaghaty, big international flight, a big

19    pilgrimage, sponsored by who?  al-Haramain.

20            On the way out of the country, Mr. Seda says

21    let's give our money to the mujahideen.  No mention of

22    that from Mr. Wax.  Why is that?

23            The Springfield building, I didn't hear much

24    about that at all.  Mr. Seda was in the middle of the

25    purchase of the Springfield building.  As Mr. Gorder

1   told you this morning, it was one of the two big events

2   in the year 2000.  He knew exactly how much that

3   building cost.  He approved the deal.

4            If you look in those files, the Mr. Kanan

5   files, Pete approved the deal.  He made the decision.

6   He's working with al-But'he.  He's working with

7   al-Haramain.  And the money comes over and he buys it.

8   He knows all about it.  Why is that important?  And why

9   didn't they talk about it?

10            Because Pete Seda knows exactly to the dime,

11   members of the jury, how much that building cost.

12   $375,000.  He knew how much that they needed to close

13   the deal, 318,000 and change.  He gets the money.  He

14   sends the cashier's check off.  And the deal is closed.

15            Why is that important?  Because when the

16   accountant Wilcox comes and asks him about the purpose

17   of some of these funds, rather than just be forthcoming

18   and say, here are the records that I have in my

19   possession from Mr. Kanan, which he had, he withheld

20   those records from his own accountant, not telling him

21   what he knew about the transaction.

22            Why is that important?  Because Mr. Seda told

23   Mr. Wilcox, you know this very well by now, that that

24   check for one-hundred and thirty-one three, that is so

25   important in this trial, went into the Springfield

1    building.

2            Why is that?  Because Mr. Seda had a motive, a

3    motive to conceal the truth about the transaction.

4            Now, what you did hear from Mr. Wax quite a bit

5    in two hours is what I'm going to call the blame game.

6    Mr. Seda has been indicted.  Mr. Seda is here before

7    you.  His conduct, his activities are before you.

8            Now, we've heard the defense spend all kinds of

9    time, Mr. Wax talks about, well, Barbara Cabral, she's a

10   liar, can't rely on her; Daveed Gartenstein-Ross, liar,

11   can't rely on him; Colleen Anderson didn't do her job

12   right, only got one account in Saudi Arabia, deficient

13   investigation.  Mr. Gorder misrepresents a bunch of

14   stuff this morning to you, so Mr. Wax says,

15   respectfully.  And, oh, yes, Mr. Wilcox.  And Mr. Owens,

16   who they hired nine years after the fact to try to

17   justify the fact that an Islamic charity in the United

18   States, attempting to fund $150,000 in an overseas

19   transaction, for whatever purpose, for blankets, for

20   food, for bombs, concealed it on its 990.

21           I ask you this, members of the jury, if

22   everything was on the up-and-up to Mr. Seda and his

23   organization, why not broadcast to the world what a

24   wonderful thing he did in getting $150,000 moved into a

25   war zone for humanitarian relief?  Didn't do that.

 1   Nobody knew, not many people.  A few insiders knew the

 2   real truth.  But nobody could know the truth because he

 3   had a motive to conceal because Islamic charities can't

 4   be doing this kind of stuff.

 5        If you are sending money overseas, you know

 6   there is a way do it, you heard that from Mr. Khan.  The

 7   annual report of the Islamic Relief Organization is in

 8   evidence.  Take a look at it.  It's impressive.  This

 9   group raises $100 million a year for legitimate refugee

10   relief, people in need, flood victims, war zones,

11   displaced -- true displaced refugees and children.

12        We have vehicles around the globe, members of

13   the jury, we love to give charities charitable dollars

14   to fund these organizations.  Khan's organization does

15   it the right way.  And you heard what he said.  You

16   know, look at the report.  They collect money in.  They

17   keep all kinds of records.  Records have to be kept.

18        Why are records so important?  Because this

19   kind of stuff once it's out there, it can disappear into

20   the Never Never Land of terrorism.  This is how wars are

21   fought.  The mujahideen are not sponsored by countries.

22        It's not like Russia who pays its soldiers with

23   rubles, government money.  It's not like the American

24   Army being paid with dollars.  The mujahideen are

25   freelance fighters that go around the global to promote

1    their terrible version of a religion that has very

2    peaceful elements of it, but their version of hatred, of

3    killing people that don't believe in their religion,

4    they have all these crazy views about women.  This is

5    how they do their stuff.  Cash.  And once cash is

6    released into the mainstream, it's gone.

7         So let me talk a little bit about the defense.

8    In the two hours that Mr. Wax was speaking, I counted

9    about an hour devoted to the testimony of one man.  Tom

10   Wilcox.  What do we know about Tom Wilcox?  One-

11   accountant firm down in Medford.  Wasn't a battery of

12   accountants.  Lots of help.  I think there was one

13   accountant and one assistant throughout the entire time.

14   Four-hundred clients or so during that time.  It's not

15   like al-Haramain was the only client.  He has got a lot

16   of stuff going on.

17        What else do we know?  That Mr. Seda contacted

18   him at the end of 1999, the very end of 1999.  And the

19   paperwork is finalized in early 2000.  The agreement

20   between Mr. Seda and Mr. Wilcox envisioned that

21   Mr. Wilcox would spend a handful of hours in doing the

22   forms, 990 and the 1023, because, for small charities in

23   the United States, that's the norm.  It's pretty easy.

24   If you are doing things on the up-and-up and the

25   paperwork is prepared by the client, it's pretty easy

1    stuff.  Mr. Wilcox had done several of these things

2    throughout his long accounting career.  So the

3    expectation was a few hours.

4            It's not what it turned out to be because the

5    paperwork was in no way, shape, or form, normal.  And

6    Mr. Seda and his organization was late in getting

7    information to Mr. Wilcox.  And the information that

8    came in, as we know now, was problematic.

9            We also know that by the time Mr. Seda got

10   around to dealing with Mr. Wilcox, the 1998 return was

11   already late.  The 1999 return was due in a few months.

12   And our 2000 return, October of 2001.

13           My point is they're already under the gun.  He

14   comes into the accountant late.  There's a lot of flurry

15   of paperwork that needs to be done.  Some requests for

16   information.  Mr. Wilcox has got 400 clients he's

17   dealing with.  It's the end of the year.  1040s have to

18   be done.  He's under the gun.

19           Now, again, one hour of testimony -- of closing

20   argument spent on the testimony of one man.  The Tom-

21   Wilcox-is-a-liar defense, it's a big one here.  Trying

22   to get your eye off of the ball of Pete Seda and his

23   actions talking about the other people and displacing

24   blame.  Tom Wilcox is a liar.

25           Now, we know that the defense got everything.

 1   Mr. Wilcox had a suitcase of material.  Three binders,

 2   1,000, 5,000, 10,000, whatever the number of pages were,

 3   it was a lot; computer discs full of reams of other

 4   material.  This was supposed to be a few hours.  It

 5   turned into much more than that.  Lots of paper was

 6   generated.  The defense gets all of it.  The QuickBooks.

 7   The audit trails.  The billing records.  Enough to make

 8   your eyes glaze over.  All of this stuff, the billing

 9   records, the returns, everything is given to the

10   defense.

11         They pour over it.  They hire expert after

12   expert after expert, hundreds and hundreds and hundreds

13   of hours, a multiplying factor of probably 10 or 20 over

14   what Mr. Wilcox did in the entire time he worked for

15   Mr. al-Haramain, I suggest to you.  Pouring over his

16   work.  Why?  To try to make him be a liar when it came

17   time for his testimony to you.

18         So how did they do that?  Mr. Wilcox agreed to

19   sit down with the defense, as he did with the

20   government.  You heard Mr. Matasar, Mr. Wax had a

21   lengthy meeting with Mr. Wilcox.  Does that sound like a

22   liar?  Does that sound like someone who has something

23   that he's trying to hide?

24         He is what he is, members of jury.  Is he the

25   world's best accountant?  I submit to you negative.

1    He's a small Medford-based CPA with 400 clients.  He

2    gets a contact from a charity.  He does charity work

3    before.  He says it's going to be a few hours a year.

4    He agrees to do it.

5          Turns over all of the records to the defense

6    and out it goes.  So they pour over the records.  And

7    they bring in a full-blown support team.  With

8    QuickBooks people to look at every nook and cranny

9    there, Mr. Cone; accountants; and Mr. Owens, the big

10   lawyer from Washington D.C.  Dig into everything.  And,

11   I submit to you, find a reason to blame other people, to

12   get your eye off of the ball, the defendant, Pete Seda's

13   actions.

14         So that work is done.  Hundreds and hundreds

15   and hundreds of hours.  And do they find mistakes?  Yes,

16   they do.  But use your common sense once again, members

17   of the jury.  Does any accountant get everything right?

18   Everything?  Every detail?  Does anybody in life get

19   everything right?  We all make mistakes.  Even if we're

20   trying to do our best, even if someone is paying us lots

21   of money to do work for them, we make mistakes.  Does it

22   make us liars when we take the stand?  No.  He made

23   mistakes.

24         We're not here to defend those mistakes.  He

25   made mistakes.  He told you he made mistakes.  And, yes,

1    on the QuickBooks thing, did he initially tell Colleen

2    Anderson that al-Haramain provided him with the

3    QuickBooks schedule and this building account already

4    done?  Yes.  But when shown the records, which he didn't

5    have access to at the time, several years after this all

6    went down, yes, his memory was refreshed.  Yes, I was

7    the one who coded this and put those checks in there.

8    Based on what?  Conversations with my client.

9           Is that so normal -- I mean, abnormal, members

10   of the jury?  Does he have a motivation to conceal, to

11   lie about these things?  Is it not normal that when you

12   do something and you are mistaken, and we have all done

13   that, and then later shown something else that refreshes

14   our memory, perhaps by our spouse, yes, I made a

15   mistake.  Okay.

16          Wilcox took the stand, members of the jury, and

17   he told you he made a mistake.  It's not like he's

18   trying to hide anything.  In all of his glory, Wilcox

19   got up and said, yes, I made some mistakes.

20          But I submit to you, members of the jury, that

21   on the issues most important to this case, he was

22   telling the truth.

23          Mr. Cone, their expert, spent 300 hours or

24   whatever it is.  CPA.  When I asked him, you saw this

25   check come in, you got the May 14th version of the

 1   QuickBooks, comes in, we all agree on that.  We all

 2   agree that the $131,000 check is not coded properly from

 3   al-Haramain.  It's missing.  That's a huge check.  It's

 4   a small charity.  That's gotta stick out like a sore

 5   thumb.  It would to Mr. Cone.  And it did to Mr. Wilcox.

 6   So what did he do?  He contacted the client.  Because

 7   who knows best about the true inner workings of the

 8   transaction other than the client?

 9           Now, sure, you want to rely on information, you

10   want to see computer records, you want to see hard

11   copies and all, but it wasn't there in the additional

12   version -- the original version of the QuickBooks.  So

13   he had to ask the question.  To who?  Mr. Seda, his

14   client.

15           Now, did that occur during a phone call on

16   March 3, 2000?  Did that occur in an e-mail on June 21,

17   2001?  Did that occur when they saw each other at the

18   grocery store on May 17, 2001?  Who knows.  But what

19   Mr. Wilcox told you is, I talked to Pete.  Why?  Because

20   the 131 had not been taken care of in the books and

21   records properly, and I had to account for it to do my

22   job in preparing the 2001 return -- 2000 return, excuse

23   me.

24           Now, the billing records of Mr. Wilcox are in

25   evidence.  They show that the billing records occurred

1   for activity Mr. Wilcox did May 30th, June 13th, June

2   14th, September 19th, September 20th, 24th, 25th,

3   October 1st, October 2nd.  This was all billings by

4   Mr. Wilcox to Mr. Sedaghaty for work that he was doing

5   on the run-up to the 2000 return.  Our return.

6           So you've got all of these contacts that are

7   being billed.  And then they try to nitpick.  Well,

8   which one of these involved phone calls?  Which one of

9   these involved substantive work?  Which QuickBooks

10  schedule was in play for this?  Members of the jury,

11  this is nine years ago.  To test someone's memory like

12  that, how can any of us be expected to remember with

13  that kind of intricate detail what we did nine years

14  ago, let alone one year ago or even one month ago?

15          Mr. Wilcox took the stand and told you that he

16  talked to Pete Seda.  And what did Pete Seda say about

17  the check that's very important here, this one-

18  thirty-one three?  Funds used for the Springfield

19  building.

20          Now, we all agree there was no Springfield

21  building account in these QuickBooks things, so one had

22  to be done.  Mr. Wilcox created this and put the check

23  and others into the Springfield account based on

24  conversations with the defendant.

25          This money went to the Springfield building

1    purchase.  He creates this thing.  And it adds up to

2    $461,000, I believe.  And then Mr. Wilcox told you, I

3    showed this to my client, Mr. Seda.

4           Now, keep in mind, Mr. Seda, the defendant,

5    knows we paid $375,000 for this building.  Yet he has

6    shown a building schedule that says $460,000.  Tilt.

7    Doesn't work.  Add math.  Note to self.  Talk to

8    accountant.  Tell him something is wrong.  Didn't

9    happen.

10          I believe Mr. Wilcox, in response to my

11   question, I said, did you stick this under his nose?

12   Did he actually see this?  Yes.  We talked about it.  I

13   remember the conversations.  I can't tell you if it was

14   on this date or this date or this date.  We talked about

15   it.  Here are your billing records.  Yes, it could have

16   been this date, could have been that date, I don't know.

17          Was he lying to you when he told you that,

18   members of the jury?  Did he pull this out of whole

19   cloth?  What's his motivation to lie to you?  Is he

20   running an Islamic charity -- charities that are under

21   intense scrutiny for throwing this kind of stuff around

22   the world to fund mujahideen fighters?  No.  He's a solo

23   practitioner in Medford, Oregon, trying to make ends

24   meet with 400 other clients.

25          Now, the $21,000, likewise, it comes in and it

Rebuttal Argument by Mr. Cardani                    166

1  is reported.  It's reported in this thing called a

2  reimbursed expense.  A big red flag for accountants like

3  Mr. Cone acknowledged yesterday.  You gotta deal with

4  that.  So it comes in looking like it -- it's just

5  sticking out, $21,000.  We know that was our cashier's

6  check for al-But'he, that was funds used to buy

7  al-But'he.

8           Did Mr. Wilcox get the right information to

9  Mr. Seda when he asked him about this one?  No.  Didn't

10 mention the Chechnya transaction.  And by the way, if

11 Mr. Seda had truly acted in his mind on the up-and-up

12 properly, he would be telling the world, including Tom

13 Wilcox, look what I did, I fed refugees.  I took care of

14 the needy.  I, Pete Seda, got $150,000 from an Egyptian

15 guy, and I got it into a war torn area with my fellow

16 Muslims in need, and I did good.

17          And, Mr. Wilcox, I told you before, I think I'm

18 under scrutiny by the IRS, by the government, I think

19 I'm going to be audited, keep my books and records

20 clean.  If that was his mindset, why not tell Mr. Wilcox

21 all about this?  It was a huge deal in his life at that

22 time, this money thing.  He never told Wilcox about the

23 Chechnya transaction.

24          This return, members of the jury, IRS-1 is the

25 subject of the tax count.  It's long.  I've looked at it

 1   quite a few times.  The word Chechnya is nowhere in

 2   here.

 3           So if things are on the up-and-up, Mr. Seda,

 4   tell your accountant about it.  Tell the world about it.

 5   And this 990, by the way, does go to the world.  Can't

 6   do that.  Why?  Because he knows he's up to no good.  We

 7   caught him in a transaction involving an Islamic charity

 8   that can't do what he was trying to do, and we caught

 9   him.  Took a lot of work.  Took a lot of effort, record

10   requests, but we caught him, and that's why we're here

11   today.

12           Now, Mr. Wilcox, again, testifies.  And they

13   have all the information.  They've done all of the run-

14   up and the investigation on him.  And they put him -- we

15   put him on the stand.  He told you, in essence, what I

16   just told you.  And then he goes on cross-examination.

17   A full court press.  To do what?  To try to make him

18   appear as a liar to divert your attention and blame it

19   on the accountant rather than the client who has given

20   the accountant bad information.

21           You cannot expect an accountant to file an

22   accurate return if you are providing inaccurate

23   information to your return preparer.  It's as simple as

24   that.

25           He did make mistakes.  A $4,000 mistake, the 1

 1   percent error mistake, a few other things that the

 2   defense talked to you about, Mr. Wax repeated.  I submit

 3   to you that with all of the time and attention that they

 4   flyspecked his work, his caseload of work, things like

 5   that are going to happen, and they did.  He told you

 6   about it.  He didn't run from them.  He admitted it.

 7   Yeah, that was my mistake.  That's not on Pete.  That's

 8   not Pete's fault.

 9          Does that sound like a liar to you?  I made

10   this mistake here.  I made this mistake here.  That's

11   not on Pete.  Yep, you're right.

12          He even admitted a mistake that he didn't make.

13   The defense thinks they get this big deal with that

14   $2,000 Gartenstein check.  Why is that so important?  It

15   seems like a little thing.  But sometimes little things

16   mean big things.  Daveed Gartenstein-Ross told you that

17   the defendant gave him a check for $2,060.  It was for

18   salary.  It wasn't for a computer.  But that's what

19   Mr. Seda wrote on the computer -- on the check.  Mac,

20   purchase of a Mac or something like that.  It was in

21   1999.  And we know the check was dated by Mr. Seda

22   wrong.  It was a '99 check.  And the defense has this

23   thing.  And Mr. Gartenstein-Ross tells us that it was a

24   salary check, not a -- I'm sorry, it was a payroll check

25   improperly listed as a computer purchase that never

1    happened.  And that Mr. Sedaghaty was just trying to

2    avoid payroll taxes.  It's a little thing about intent.

3            What's he thinking about when he's dealing with

4    the IRS?  Is this someone who is trying to be clean?

5    Keep the books clean?  IRS is going to scrutinize me?

6    No.  It's an anti-IRS sentiment.

7            So he doesn't want to pay payroll taxes.  He

8    lies on the check.  And Gartenstein-Ross tells you about

9    it.

10           Now, why do I bring it up here?  Because Wilcox

11   is hit with this check.  They think they gotta big

12   gotcha.  Well, if you thought this thing was a computer

13   purchase, why is not in the 1998 information?  Which we

14   know they've poured over with a fine-tooth comb.  And it

15   wasn't in the '98 stuff.  So Wilcox eats it.  I guess I

16   made a mistake.

17           But then on redirect, we show him the 1999

18   records, and there it is.  He did rely on his client's

19   information when he said, what's this check for?  And

20   Pete told him it was for a computer purchase, and he

21   makes an appropriate entry in the 1999 records.  And

22   he's shown that.  So he even admitted a mistake that he

23   didn't make.

24           Does that sound like -- to you like someone

25   who's trying to lie and pull one over on you?  No.

1           But on the big transactions, folks, keep the

2    eye on -- keep your eye on the ball, please.  The

3    Springfield building purchase, when Mr. Wilcox learned

4    about it, he wanted supporting records.  Never given to

5    him.  And yet he -- Mr. Seda had them.  Concealment.

6           And on the 131 and the 21 that Wilcox found

7    out, the big checks he's got to deal with, talk to his

8    client, concealment and lies at this point.  Concealment

9    and lies from your client are inevitably going to end up

10   in a false return.  The return is false in the many ways

11   that we told you.

12          Lines 1, 22, and 57, you've got it committed to

13   memory by now, are false.  Line 1 is false because the

14   $121,000 was backed out of contribution income by Wilcox

15   because of the lie by Mr. Seda to him about it being

16   refunded to the donor.  That was what the client said.

17   That's how it was treated.  Line 1 is false.

18          22 and 57 has to do with the money going out

19   because the client tells the accountant that it's money

20   that went into the building.  The accountant takes the

21   information, puts it in, and it ends up affecting

22   falsely lines 22 and 57.

23          Now, when you deliberate on this return, those

24   are the three lines in the indictment.  And you have to

25   agree that a particular line on the return is false to

1   convict him beyond a reasonable doubt.  But that's not

2   all you have.

3          You can look at the whole return.  And there

4   are other parts of that return that are false.  And if

5   there are other parts of the return that are false, it

6   makes more sense that the other -- that the lines that

7   are charged are false as well.

8          Chechnya should have been bull horned in that

9   return, because there's a section that talks about

10  humanitarian relief, statement of functions.  And there

11  is a $24,000 entry that has nothing to do with Chechnya.

12  And this is where the money should have gone if

13  everything as on the up-and-up.  There would be no

14  motivation to conceal and lie.

15         The $21,000 that went to al-But'he, he's an

16  officer of the corporation, whatever that payment was

17  for, if it went to the officer, it should have been

18  reported.  It was not.  Another falsity in the return.

19         The return was sent to the client,

20  Mr. Sedaghaty, and he signed it and off it goes.  But

21  the thing is, they say, you know, he don't -- Pete's not

22  a detail guy, and he may have just signed it, and off it

23  goes, well, okay, but here is the thing on that.  If you

24  know in your mind, as he did when he was dealing with

25  Wilcox, that he had concealed the truth from him about

1    the transaction overseas, then the return had to be

2    false in Mr. Sedaghaty's mind, because the correct

3    information was never given to him.  So when he signed

4    that return, okay, he might have not looked at line 1

5    and said, oh, my, that's false; 22, wow, that one's not

6    right, he knew the return was false, members of the

7    jury, because the essence of the most significant

8    transactions had been mischaracterized.  Springfield

9    transaction and the $150,000 that we have here.

10          Before I leave Wilcox, when we hire

11   accountants, we heard testimony that it is not an

12   adversarial relationship.  You're not hiring an

13   accountant to challenge you on the accuracy of your

14   information.  To the contrary, it's a trusting

15   relationship.

16          Now, there may be some verification

17   requirements on the accountant on occasion, but you

18   basically have to accept the client's statement, not

19   blindly.  You should do things like maybe ask for an

20   escrow file.  But you have to, at some point, accept

21   your client's word.  If you go after your client and

22   say, I don't think you are telling me the truth on this,

23   how long are you going to have that client?  Doesn't

24   work that way.

25          Mr. Wilcox made mistakes, but I submit to you

 1    he was credible in eating those mistakes and telling you

 2    the truth.

 3            Mr. Owens, here is the next part of the blame

 4    game.  Well, the return is not false, but if it's false,

 5    it never should have been filed in the first place.

 6    That's a clever lawyer thing.  It's a trick.  Don't fall

 7    for it.  Nine years after this transaction, members of

 8    the jury, they hired this guy that was the head of

 9    Exempt Organizations, and, yes, he did some impressive

10    work with the IRS, 25 years of service.  He spends a

11    pile of time, associates spend a pile of time digging

12    through these issues, and they come up with something

13    that I submit to you is a smokescreen.  This should have

14    never been reported in the first place.  Well, why is

15    that, Mr. Owens?  Because it was a conduit, an agency

16    relationship.  Well, what's that?

17            Well, when a tax exempt organization here gets

18    money but it's not really theirs, they are just a

19    vehicle to send it on to somebody else, a conduit, and

20    there is an agreement for all of this, then it's not a

21    reportable transaction.  So this transaction, or at

22    least most of it, never should have been reported in the

23    first place, so Mr. Owens says.

24            Well, members of the jury, where is the

25    agreement?  Mr. Gorder asked you this morning, I'll ask

1   you again, we've heard from Mr. Wax, where is the

2   agreement that makes this that, makes this a boom-boom

3   thing, that Mr. Seda had no control?  You don't see it

4   because it didn't exist.

5          Mr. Sedaghaty, when he got this money, if it's

6   a true agency conduit, he should have spent $15, like

7   El-Fiki did, and say, okay, boys at al-Haramain, I got

8   the money.  All right, what should I do with it?  Okay,

9   send it to Saudi Arabia, all right, I'll go down to my

10  banker, Ms. Ingram, 15 bucks, send that money to -- wire

11  transfer to Saudi Arabia.  And we know he's done that

12  before.  They talk about cash being normal ways of

13  moving money and things of -- like that, attempting to

14  justify this screwy transaction that I'll get into in a

15  moment.

16         Members of the jury, you have two wire

17  transfers before you in the Bank of America records

18  where Mr. Sedaghaty himself wired money internationally

19  for, like, 10 or 20 bucks.  He knows how to do it.  And

20  that's the way it should have been done if this conduit

21  theory was real.  But that didn't happen.

22         The money stayed here in Oregon under the

23  control of Mr. Sedaghaty.  He's the only al-Haramain guy

24  here that's on the account.  And what happened at that

25  point?  The seeds of a conspiracy, a secret, clandestine

1   plan with Mr. al-But'he, Mr. Sedaghaty, Shoumar enters

2   the picture later on.  And what's the plan?  The plan

3   is, after Mr. Sedaghaty treats this money as his own and

4   makes a couple of unsuccessful attempts to contact other

5   organizations, including Mr. Khan, a legitimate

6   organization, if Mr. Sedaghaty had taken Mr. Khan up on

7   his solicitation, we're not going to take you into the

8   country in a war zone, al-Haramain, if that's who he was

9   talking to, he doesn't even know who he was talking to,

10  but he thinks maybe it was someone from Oregon, he

11  thought it was somebody in Portland.  But members of the

12  jury, if Mr. Sedaghaty had contacted this organization

13  and if this Mr. Khan convinced them to send the money,

14  as a lot of other people do, to the tune of 75,

15  $100 million a year, give it to us, we'll take it in, we

16  do proper record keeping requirements, we do our

17  responsibilities.  We're sponsored by the Russian

18  government in Ingushetiya, we'll do it the right way.

19  And in their pamphlet, they do.

20          Did Mr. Sedaghaty do that?  No, he didn't.  He

21  held on to the money, and he tried to direct it other

22  ways.  It destroyed this Owens' conduit theory.  If it

23  was really a conduit, that should have been kept off of

24  the books of the 501(c)(3), then it should have been

25  just simply wired away because Mr. Sedaghaty would have

1   no choice but to do otherwise.

2          And some of those contacts, incidentally, were

3   in the name of the Qur'an Foundation, not al-Haramain.

4   Why is that?  Why didn't he always deal with it as

5   al-Haramain?  And he had other people do it.  Perhaps

6   because al-Haramain was developing a pretty bad

7   international reputation as being a problem in the area

8   of terrorism, funding terrorism.

9          How do we know that?  The 9/11 report, there is

10  a whole chapter on terrorist financing.  How did these

11  things happen?  Terrorist financing.  Things cost money.

12  People need to live that plan on doing bad things.

13  People need to eat.  People need shelter.  People need

14  arms.  They need money.

15         So a big old study is done and al-Haramain is

16  chosen as one of the poster childs (sic), witnesses

17  identified that.  So when Mr. Sedaghaty is reaching out

18  to these organizations, perhaps he knows that

19  al-Haramain has some stain on it.

20         And remember that conversation that Daveed

21  Gartenstein-Ross told you about about east African

22  embassies blowing up?  Lots of people killed.

23  al-Haramain is associated with that on a TV program.

24  Mr. Sedaghaty talks to al-But'he saying, we didn't have

25  anything to do with that, did we?  You heard the

1    testimony, words to the effect, we have many people

2    working for us.  Wow, there's a denial for you.

3            Now, before I leave Mr. Owens, he told you he

4    runs a shop called Exempt Organizations, did when he was

5    with the IRS.  It's what Mr. Wooten does up in Seattle

6    on a day-to-day basis.  They care about how charities

7    get their money and spend their money.  They have to.

8    That's their job.  If you're going to be tax exempt, you

9    gotta do good things with your money.  And this Form 990

10   is the primary vehicle for us to know what you're doing.

11   And it's also the primary vehicle for what your donating

12   public, because this goes on the Internet, you gotta be

13   on the up-and-up.

14           Mr. Owens admitted that no matter what, this

15   conduit theory, agency theory, whatever, no matter what,

16   you can't lie to the IRS on a 990.  And if you do, it's

17   a very important thing when it's talking especially

18   about an overseas transaction involving 130, $150,000.

19   It's a big deal.

20           So what the defendant did through his deceptive

21   acts with Mr. Wilcox and engaging in this screwy

22   transaction is he concealed information from the very

23   organization that we here in the United States rely on

24   to make sure that things like this don't happen

25   (indicating) with tax exempt charities in the United

1   States.

2          Now, Mr. Owens, he's looking at a lot of

3   organizations, he has to decide which ones to audit,

4   which ones not.  Well, how do you get your information?

5   Well, the 990.  We get -- they gotta tell us what money

6   comes in and where it's going.

7          Well, if you learn that an organization got 150

8   and masqueraded it into a building purchase, might that

9   get your attention?  Well, the form might not, in and of

10  itself, the line 57 thing, might not jump out at us, but

11  if the information came to us that it was a clever

12  design to bury it into a portion of the tax return, you

13  bet we'd be curious about it.  It would be an audit, and

14  probably a lot worse, if it came out that this was an

15  intentional act to masquerade and disguise $150,000

16  transaction.

17         In assessing that, members of the jury, don't

18  get lost in this blankets versus bomb quagmire.  When

19  you get back there and say, you know, maybe he had an

20  intent to food -- give food to people, blankets to

21  people, or maybe he really did try to buy arms, the

22  point of this is, if you are doing things like this as a

23  charity, the IRS's antennae go way up, as they should

24  be, when you're dealing with cash especially.  And if

25  you're going to take the position and say, I did good

 1   things with this, I gave this money to refugees,

 2   blankets, food, medicine, okay, but tell us about it.

 3          That's what you need to do as an exempt

 4   organization.  You know in that letter that went out to

 5   Pete Seda saying you're tax exempt, it said keep good

 6   records, and file 990s telling us what you're up to.

 7   What did he do?  When the IRS comes in years later and

 8   subpoenas records for this transaction when we started

 9   realizing -- when she started realizing something was up

10   about this Chechnya deal, record requests went out to

11   the lawyers for al-Haramain, formal requests, subpoenas,

12   tell us about the Chechnyan transaction.  Records came

13   in over time.  Agent Anderson told you that some came

14   from Saudi Arabia sources, al-Haramain, and others came

15   from sources here in the United States, al-Haramain.

16   Different batches, different time, lots of records.  Why

17   is that such a big deal?  Because you know them by

18   reference now, AHIF-2 and AHIF-3.

19          When we caught them, when we started sniffing

20   around this transaction, did you see receipts saying,

21   refugees, here's the purchase of -- like Mr. Khan's

22   operation, have detailed record keeping records to show

23   if there is a question about them?  No.  We're not

24   dealing with exempt organization people.  Now we're

25   dealing with criminal investigators.

1          What's going on in the defendant's mind now

2   when the jig is up?  Two different receipts come in

3   purporting to be -- for the -- representing the same

4   transaction.  One says 188.  One says 186.  They are

5   both bogus, members of the jury, false documents.

6   Signed differently.  One's witnessed.  One's not.  The

7   agreement language is the same.

8          And incidentally that language is not found in

9   the computers.  Who typed those?  I doubt it was

10  Ms. Florin who knew nothing about the transaction.  They

11  are created.

12         And they attempt to come up with a figure,

13  apparently $36,000 came from Canada.  This 150.  And if

14  you add it up, 186, yeah, that sounds good, put it in,

15  sign it.  Agent Anderson told you that $36,000 never

16  left the United States.  The numbers don't add up.

17  $186,000 didn't leave.

18         And what about this offset thing that Mr. Wax

19  is telling you about?  Obfuscation.  What kind of

20  business offsets money for things that apparently

21  happened?  Well, I gave you money before, so I owe --

22  you gave me some money before, so I owe you some money.

23  And even though I'm not going to send it overseas, I'm

24  going to give you a receipt saying that you gave it --

25  that I gave it to you.  Offset.  How about nonsense?

1    The receipts are bogus.

2            We've got two different receipts for the same

3    transaction containing different information.  I

4    don't -- I suggest to you, members of the jury, they

5    didn't even realize they gave us two receipts.  But

6    Mr. al-But'he and Mr. Seda, you know from those

7    receipts, those are their signatures, they signed those

8    receipts on different occasions, because of the -- where

9    the signatures appear.  So they had to know they were

10   signing the same receipt twice.  And there were no other

11   big transactions, no other transactions like this.

12           Now, the charges.  The judge instructed you

13   this morning on the elements of the crimes that you need

14   to consider before you return verdicts of guilty.

15           Now, that's a formal word, elements of the

16   crime, but think about it like a recipe.  Certain

17   ingredients need to go into a recipe to make the product

18   a good one.  So think of the ingredients needed to go

19   into a verdict of guilty on the tax count.  What are

20   those ingredients, those elements that you need to find?

21           You need to find, one, that there was a false

22   return.  We've been over that over and over and over

23   again.  The guy who prepared the return said it was

24   false.  Wilcox.  He didn't know it at the time, based

25   the information on Mr. Sedaghaty's communications, but

1  they told you -- he told you in the various ways that

2  I've already gone over, that the return is false.  And

3  incidentally, no mention of Chechnya, so on and so

4  forth.  Check, false return.

5          Ingredient number two, signed under the

6  penalties of perjury.  The return is signed by

7  Mr. Sedaghaty.  And it is signed under penalties of

8  perjury.  Check.

9          Ingredient number three, that the false

10  information in the returns have to be material to the

11  IRS.  How is the IRS supposed to do its job in

12  monitoring charities if it's never told about a

13  transaction?  Bombs, blankets, medicine, not even told

14  that the money went overseas at all.  It's not in there.

15  It's absent.  The IRS is prevented from doing its job.

16  And if it had been told about the transaction, in

17  whatever form it occurred, they would have done

18  something about it, and it would have been capable of

19  influencing the decisions of the IRS.  Check,

20  materiality.

21          And then number four, willfulness.  And that is

22  what a lot of this trial has been about.  And I told you

23  at the beginning of this trial that that's where the

24  action is at for you.  This notion of willfulness.

25  Because we have to prove not only that he signed a false

 1  return under the penalties of perjury that contain

 2  materially false information, but we have to show you

 3  that he had -- that he did these things willfully.

 4  Basically that he knew he had an obligation to file the

 5  return and was deliberate in -- in doing this falsely,

 6  this false return.

 7          So how did we prove that during this trial?

 8  And I suggest to you that Mr. Wax has done a very

 9  passionate job in trying to keep you from focusing on

10  this.  But I have to do it because this is part of the

11  motivation that Mr. Sedaghaty had to file this false

12  return.

13          And, incidentally, this is also one of the

14  objects of the conspiracy.  There are two charges.  The

15  tax count in count 2, the conspiracy count in count 1.

16  And the conspiracy account -- count alleges that he

17  attempted to defraud the United States by depriving the

18  Customs Service of information related to the foreign

19  transportation of money, which I'll talk about, but also

20  to the Internal Revenue Service in doing their job in

21  monitoring tax exempt charities.

22          You only have to find one of those two objects

23  unanimously.  We're going to ask you to do it on the

24  verdict form.  We're going to ask you to find him guilty

25  of count 1.  And then there are two little checkmarks

 1   underneath, did you find unanimously that he agreed to

 2   defraud the Customs Service?  If so, check here for yes.

 3   And the IRS.  We suggest that the evidence supports

 4   checkmarks on both of those.

 5        And here is why:  The tax motive.  Exempt

 6   organizations cannot fund mujahideen.  Okay?  You

 7   can't -- or acts of violence and things like that, and

 8   we got into this thing about the Red Cross and Taliban

 9   and things like that.  Tax exempt charities, Mr. Wooten

10   told you, cannot promote acts of violence.  If you are

11   buying food for the mujahideen, no.  Certainly not

12   armaments.

13        But in any event, tell us what you are doing

14   because if you think you are okay, if you think you are

15   in the proper zone, just tell us about it so we can do

16   our job.  Didn't go.  Why?  Because Mr. Sedaghaty did

17   have a motivation to conceal when he signed that return.

18   What is that?  This JC-4 exhibit lists all of these

19   Sheeshaan e-mails and all of the other things in the

20   computers roughly in chronological order.

21        I suggest to you that Mr. Gorder got it just

22   right in telling you that during the time period in

23   question, January to March 2000, Mr. Sedaghaty was

24   fairly obsessed with the events in Chechnya from the

25   lens -- from the lens of the propaganda machine known as

1   al-Haramain, Qoqaz, Azzam, and these guys, like Khattab

2   who are trying to blow people up in Chechnya, and asking

3   people to help fund it, because they have no state

4   sponsorship.  They need money.  And he says in his

5   interviews, Islamic charities have always been the ones

6   that have stepped up in helping us, but they are gone

7   now.  So out goes the cry across the world to the fellow

8   believers that are following things like this and

9   getting things from Mr. Abdul Qaadir Khaliq to take you

10  guys down here in Saudi Arabia, another al-Haramain guy

11  sending out the propaganda stuff from Qoqaz and Azzam,

12  the most preeminent mujahideen Web sites in the globe at

13  the time.

14        MR. MATASAR:  Excuse me, Your Honor, I'm going

15  to object as not proper rebuttal argument.

16        THE COURT:  Overruled.  Please bring it to a

17  close, Mr. Cardani.

18        MR. CARDANI:  The willfulness is represented by

19  those e-mails, the fatwas, the prisoner books, the fact

20  that he's raising money at about the same time for the

21  Kosovo mujahideen, the -- after the Hajj with Cabral,

22  direct funding, direct requests by Mr. Sedaghaty

23  himself, doing the work, our Web site, using that

24  Ptichka, his wife.  You've got his wife down there in

25  Ashland, Oregon, downstairs, room X, probably, doing

1   translation services for the propaganda machine and

2   Mr. Khattab.

3          This gets so much attention that Khattab from

4   Chechnya thanks them.  And Mr. Sedaghaty, we did that

5   trail, calls it our Web site.  His wife is doing the

6   services on our Web site, and this big cheese in

7   Chechnya personally thanks him here in Ashland, Oregon.

8   As Mr. Gorder, said this is a charity.

9          A pattern of concealment and lies is also part

10  of defendant's willfulness.  In addition to all the lies

11  to Wilcox, not even a mention to Shoumar -- about this

12  fellow Shoumar.  He's doing a lot of the things, members

13  of the jury, that Mr. Wilcox is doing, trying to dig

14  into the details of the transaction.

15         And SW-43 is the only e-mail I'm going to

16  specifically read from before I sit down.  Mr. Wax tried

17  to deal with this.  I submit to you he didn't get it

18  right.  The date is September 29, 2001.  The

19  significance of the timing, 18 days after September

20  11th, think of the world atmosphere at that point.

21  Terrible, terrible act on our soil.  And there was a

22  question of whether radical Islamists were associated

23  with it or not.  That's the message around the world.

24  So 18 days after September 11th, Shoumar, who has looked

25  at all the books and records, and finds the Soliman

 1   money, the 131 and the 21, our money, says I have

 2   tried -- this is to Abu Yunus.  This is going directly

 3   to the defendant here in Ashland and cc's al-But'he.

 4   Talk about a conspiracy.  "I have tried during the past

 5   two years to my best limited ability to organize the

 6   work and make sure that we work together to be precise

 7   as much as we can to avoid any possible trails from

 8   anybody."

 9          Ask yourselves, who are they trying to hide

10   trails from?  This is a deliberate effort to conceal

11   that we found in the deleted sections of the defendant's

12   computer.

13          Few more things.  The FBI, Agent Boyer goes

14   there four days after September 11th, yes, the

15   Springfield thing was mentioned.  The money was

16   mentioned to the FBI, not to the accountant.  But ask

17   Agent Boyer, did he give you some literature?  Yes, he

18   did.  Any of this kind of stuff?  No.  Noble Qur'an?

19   No.  Why?  Because the FBI, members of the jury, didn't

20   pass the test.  They got the good stuff.  They got the

21   smiling, peaceful side of Pete Seda, not the other side.

22          That weird transaction, folks, has been talked

23   about over and over and over, but I'm just going to say

24   this about it:  If everything is on the up-and-up, wire

25   the money to Saudi Arabia.  Don't -- Pete Seda

1    preordered $130,000 in traveler's checks.  Not 150.

2    130.  Why is that?  Because there was a plan.  There was

3    a conspiracy afoot to move some of this money overseas

4    in a clandestine fashion at some risk.  There was a

5    plan.  Mr. Seda ordered 130 for a reason.

6           And then the flight across the world.  The no

7    CMIR.  The fact that at least 73 other people knew about

8    the CMIR filing requirements leaving the country leads

9    one to suggest that people do understand what the form

10   says.  For everybody leaving the country or entering the

11   country, you gotta file this form.  He's filed it

12   before.  He should have done it then.  He didn't.  Why?

13   Because that was his part of the role of the conspiracy,

14   to conceal this from Customs.

15          So when they are at the bank in Ashland,

16   Oregon, doing it in this screwy way, there was a plan to

17   conceal this from various facets of the government,

18   including Customs, al-But'he's role, and the IRS, Seda's

19   role, Shoumar's role, al-But'he.

20          Mr. Wax takes issue with the records that

21   Colleen Anderson got from Saudi Arabia, the Al Rajhi

22   records.  And seems to suggest that if she was

23   successful in getting that one account, she was

24   negligent in not getting others.  Members of the jury,

25   you heard her testimony.  It took the better part of two

1  years for her to get those records.  And she described

2  it as diplomatic and legal back and forth.  Two years to

3  get those records.  It is not a walk in the park.

4  Extremely difficult.  As is tracing money.

5        Members of the jury, I'll leave you with this:

6  All the checkmarks are there for you.  The false return,

7  the perjury, the materiality, and the willfulness, the

8  motive, they are all there.  When you think about it,

9  all of the ingredients for the recipe of guilt for count

10 2 have been proven, and I ask you to do so.

11       When you get to the conspiracy count, it is

12 much of the same, all of that tax stuff, but in

13 addition, we have to show that there was a plan, a

14 conspiracy.  And conspiracies aren't written out.

15 That's not the way criminals act.  A secret plan to hide

16 this stuff, acting with all of these guys but to hide

17 it.  That has been proved, as has the other part of the

18 conspiracy to hide this from the government.

19       This conspiracy was one to deceive and to

20 cheat, which is part of the instructions that Judge

21 Hogan gave you this morning, that has been proven.

22       Members of the jury, you've been very patient.

23 There's been an awful lot of testimony.  And some very

24 good lawyering, I suggest to you, on both sides.  We

25 have a great system.

 1          It is now in your hands to do your jobs in

 2    sifting through the evidence and seeing if the

 3    government met its burden of proof.  I suggest to you,

 4    members of the jury, that we have.

 5          If this was all on the up-and-up, if he didn't

 6    have this desire to conceal this transaction, to do

 7    something that charities can't do in the United States,

 8    then he should have been very direct and told it to the

 9    world, starting with that Form 990, and everybody else,

10    and not -- it would been -- instead, he concealed it

11    from everybody.  And we are here today because an awful

12    lot of good digging went into the investigation, and the

13    records have been produced to you showing that he should

14    be found guilty beyond a reasonable doubt to both count

15    2 and count 1.  Thank you.

16          THE COURT:  Ladies, would you try to pull the

17    screen back.

18          (Brief pause in the proceedings while equipment

19    is moved.)

20          THE COURT:  You've heard the argument and heard

21    the evidence.  And in my hand I have the verdict form.

22    And this verdict form has the caption, the name of the

23    case, we, the jury, and so on.  Then it says count 1,

24    conspiracy to defraud the United States, and there is a

25    place -- a line by "guilty" and a line by "not guilty."

1    You put your unanimous decision on whichever line it is.

2    If you mark "guilty," and I'm not suggesting you should

3    one way or the other, but if you do, then there are two

4    additional questions.  And there is a "yes" and a "no"

5    by each of them.  Just circle the one that's your

6    unanimous opinion again.  Every decision must be

7    unanimous.

8            And then on count 2, we have a false return by

9    a tax exempt organization.  There is a line with

10   "guilty" and "not guilty."

11           Now, when you get to the jury room, select your

12   presiding juror.  You can start your deliberations when

13   you receive the verdict form and the indictment and the

14   exhibits.  And they'll be in right away.

15           Before we do that, do you have the oath for the

16   bailiff, please.

17           (Ms. Wright and Ms. Weller were sworn as

18   bailiffs.)

19           THE COURT:  All right.  Thank you very much.

20           Well, at this time Ms. Palanuk and

21   Ms. Jespersen, you've been serving as our -- I'm sorry.

22   I got that wrong.  Ms. Mecartea and Mr. Meeuwsen, you've

23   been serving as our alternates.  So when you go to the

24   jury room, you should get your things and leave.

25           Now, what I'm going to ask you to do, however,

1    is to not talk to others about your work until you've

2    heard that there is a verdict here.  Sometimes we have

3    to invite someone back to deliberations.  And that could

4    happen to you, but if I don't see you again,

5    Mr. Meeuwsen, good luck to the Beavers this year.

6             All right.  So the others can -- I told you I'd

7    tell you when it's time to start talking about the case,

8    the time has arrived.  So you may -- you are excused to

9    the jury room, and good luck in your deliberations.

10            (Jury exits the courtroom at 4:03 p.m.)

11            THE COURT:  Counsel, take your exceptions in

12   addition to those you have already done in writing, if

13   you have any?

14            MR. CARDANI:  No, Your Honor.

15            MR. WAX:  No, I think we've covered it in

16   writing, Your Honor.

17            MR. MATASAR:  And orally at the conference.

18            THE COURT:  Thank you very much.  Once in a

19   while, my bride tells me that maybe we shouldn't go to

20   that particular party because you don't have good

21   termination skills.  And I'm going to be happy to report

22   to her that at least two more fall in that category.

23            So that's great.  Thank you for your work.

24            You can look at the exhibits, if you want.

25   They've been put together already.  And we need a phone

1    number for a 15-minute call.  Okay.  Thank you.

2            (Court stood in recess, subject to call, from

3    4:03 until 8:45 p.m. when the jurors were released until

4    9:00 a.m. on Thursday, September 9, 2010.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATE

2           I, Deborah Wilhelm, Certified Shorthand Reporter

3    for the State of Oregon, do hereby certify that I was

4    present at and reported in machine shorthand the oral

5    proceedings had in the above-entitled matter.  I hereby

6    certify that the foregoing is a true and correct

7    transcript, to the best of my skill and ability, dated

8    this 15th day of September, 2010.

9

10

11

12
                         /s/ Deborah Wilhelm
13                       _____
                         Deborah Wilhelm, RPR
14                       Certified Shorthand Reporter
                         Certificate No. 00-0363
15

16

17

18

19

20

21

22

23

24

25