EUGENE, OREGON; MONDAY, AUGUST 30, 2010; 2:13 P.M.

***EXCERPT***


(Jury not present.)

THE COURT:  Thank you.  One matter, counsel, before we get going.  I'm asking her name -- it was said to me but I don't remember right now.  Too many things.  At the break, one of our jurors's son -- 18-year old son's father, and ex-husband, just died.  That juror wants to be able to be with her son and I'd like to know -- we'll get the name here in a second, but I'd like to know whether you have an objection to that.

MR. CARDANI:  Of course not.

MR. WAX:  No.

THE COURT:  Jan, I looked down and saw the recording machine and I --

THE REPORTER:  I'm here, your Honor.

THE COURT:  I've walked in with no reporter before.

The juror is Tresha O'Connor and she is excused.  And please give her my best wishes and condolences.

Now, we have another juror who believed his car was towed this morning --

MR. CARDANI:  We've all been there.

THE COURT:  -- from the Diamond lot.  I doubt it would have been towed that quickly.  And so we're investigating.  I'll think that if it needs fixing, I recently settled a very large

Opening Statement for the Plaintiff

case involving Diamond Parking.  It's been to the Supreme Court
twice and here and there, and Judge Jones finally called me and
said:  Get me some relief.  Which I did.  And so I do have the
top lawyer's name and he takes my calls.  We'll help the juror
out if that's really what happened.  Okay.  And I don't know the
juror number.

        MR. CARDANI:  Judge, I assume it's okay if we can stay
seated when the jury is called.

        THE COURT:  Yes.  We don't stand up for the jury going
in and out in my courtroom.  You may keep your seats.

                    (Jury present.)

        THE COURT:  Mr. Cardani, you may proceed.

        MR. CARDANI:  May it please the Court, counsel,
cocounsel.

        I've been introduced but, once again, my name is Chris
Cardani and I'm with the U.S. Attorney's Office here in Eugene.
I'm the federal prosecutor, one of two, trying this case.  You've
met Mr. Gorder by way of introduction.  Special Agent Anderson.
But one of the most important people here is Susan Cooke from our
office.  She runs the technical aspect of this case.  And with
technology in this court, you're going to see a lot of exhibits
and things over video screens and things that I don't begin to
understand.  She runs all of that.  So she'll be doing that and
helping me in opening statement.

        It's my pleasure to present to you the government's

Opening Statement for the Plaintiff

opening statement to tell you what I think that you're going to see during the next several days here as you sit as a juror.

As Judge Hogan told you earlier, there are two charges in the indictment.  One alleges that the defendant, Pirouz Sedaghaty, who you'll hear referred to as Pete Seda or Abu Yunus, filed a false tax return.  And also the allegation in the second count is that he conspired, came to an agreement with individuals, to smuggle over $100,000 out of the United States in a manner designed to conceal that from government agencies.  Those are the two counts.  We'll talk about them more later.

But two counts both relate to a charity that the defendant created and operated in the time period that's relevant to this case, the year 2000, in southern Oregon in the town of Ashland.  The name of the charity was called al-Haramain Islamic Foundation.  Al-Haramain will be mentioned several times throughout this case.

That charity you will hear was a branch, a United States branch, of a much larger organization based in the country of Saudi Arabia at this time period.  So you had the headquarters in Saudi Arabia and the defendant created U.S. headquarters and ran it in 2000 and otherwise.

You will hear that in the United States, charitable organizations can seek permission from the IRS to become a tax-exempt organization.  It's a big deal.  What that means is we have corporations like Intel and other corporations, when they

get money, they have to pay corporate taxes, sizable corporate
taxes.  In the United States, you'll hear from witnesses, we want
to promote true acts of charity and so we allow charities to
register with the IRA as tax-exempt organizations.  If allowed,
it means all of their donations are received in a nontaxable form
so taxes don't have to be paid to the IRS, the federal
government.

Similarly, if you're one of these organizations, it's
called a 501-C-3 organization, people that donate to your charity
can deduct those donations on their tax returns if this is a
tax-exempt organization.

But you'll also hear, members of the jury, that if you
are allowed to proceed like this by the IRS, you also have to
prove that you're doing true charitable work.  True charitable
works will be explained to you.  But one of the things you can't
do as a public charity in the United States is fund acts of
violence.

The way the IRS determines what the charities are doing
throughout the country is there's a form.  IRS has lots of forms,
we all know that.  But the one that you're going to hear a lot
about is a 990.  Because a 990 is filed every year by a charity.
If they receive a certain amount of money, they have to file a
form with the IRS that explains the money they got in and then
what they did with it, how they -- how they disposed of it.

IRS gets these things and they take a look at them and

Opening Statement for the Plaintiff

they determine based on the information whether the charity is

acting consistent with its tax-exempt purpose.  If they learn

that a charity is funding acts of violence, they can do all kinds

of things, sanction them, penalties, audits, and even revoke them

as a tax-exempt organization.  But the point is it's the way they

find out about things like this is looking at the form 990 which

the organizations have to volunteer every year.

This case involves a donation made to al-Haramain in

the amount of $150,000 in the year 2000, and it was from an

overseas source.  We're going to show you that in considerable

detail.  The money was wired to a bank account here in Oregon at

the defendant's U.S. headquarters of al-Haramain.  And it was

later, we will show you, smuggled out of the country in the form

of mostly cash, American Express traveler's checks.

And it was intended to make its way into an area of the

world called Chechnya which at the time was going -- going

through a war with Russia.  It was a very violent conflict going

on in Chechnya at the time these funds were destined for a war

zone.

So both of the charges relate to this transaction.  The

indictment alleges that Mr. Seda, on behalf of the al-Haramain

organization, filed this form 990, the tax form, and conspired

with others to secretly smuggle this money out of the country

without the government, the U.S. government, being able to find

out about it.

What the indictment does not include, and I want to get this out right now based on some questioning and back and forth we had this morning, is there are not terrorism charges in this indictment.  The government is not accusing Mr. Sedaghaty for being a terrorist.  Right.  No terrorism charges.  Tax count and a conspiracy count.  There will be lots of evidence related to the whole atmosphere of violent events overseas but there are no terrorism charges.

So the case is simple in one sense.  You're called here to determine whether the defendant filed a false tax return omitting mention of what he did with this $150,000 or lying about it in that form 990 and whether he came to an agreement with other individuals to smuggle this money out of the country for nefarious purposes.

But as you will hear from Judge Hogan, who will instruct you on the law at the end of the case, one of the things that the government has to prove is this concept of willfulness.  He'll instruct you on what that means but I think he'll tell you basically that we have to prove that the defendant intentionally violated the law.  That when he did these things, when he filed the tax return, it was not a mistake that he falsified this transaction.  That he did so deliberately and he knew what he was doing.  And he wanted to violate -- that he knew he was violating the law.  And that when he conspired, he was also acting intentional.  He knew what he was up to.

And that's really what this trial is all about, proving what was going on in the mind of the defendant when this -- when this was done.

Now, let me now explain what the government expects to show you during the next several days.  A little bit of background on al-Haramain.  As I told you, al-Haramain is based in Saudi Arabia.  Huge organization.  Offices throughout the world at one point in time.  And in the late '90s, the defendant formed a local version here.  It was the first foothold of al-Haramain in the United States and it was headquartered right in our state down in Ashland.  And the defendant was the president of it.  Close connections between the al-Haramain parent organization in Saudi Arabia and here in Oregon.

The first slide I'd like to show you if our technology's working correctly is one of the various forms.  This is called a 1023 application for recognition of exemption under the Internal Revenue Code.  What's important to this is that this is the document where Mr. Seda formed the al-Haramain Islamic Foundation, U.S. headquarters, here in the United States.  He is listed as the contact providing an Oregon address.  1998 is the date of incorporation, and a website address listed www.al-Haramain.org.

You'll hear a little bit about that site.  That was the site that Saudi Arabia was promoting information and the defendant was part of that website as well.  He signed this

acknowledging he was seeking tax-exempt status with the IRS.

Now, that's not the basis of the tax count.  That's just to get this tax-exempt status that I talked about a minute ago.

The IRS, after some back and forth with Mr. Seda, allowed him to act as a tax-exempt organization.  Mr. Seda formed a bank account at the Bank of America in Ashland with one of the guys in Saudi Arabia, the treasurer of the local operation.  And we have a chart here that we'll refer to during the government's case-in-chief.  You're going to hear a lot of names.

MR. MATASAR:  Your Honor, may I be permitted to go over here?

THE COURT:  Of course.

MR. CARDANI:  You're going to hear about a lot of names that may be foreign to you.  But here we have the defendant Pirouz Sedaghaty, aka Pete Seda, Abu Yunus.  He's over there.

And then this is the guy that had the bank account we'll show you, Soliman Al-But'he.  You'll hear him referred to as "Brother Soliman" quite a bit.  He's a codefendant in this case but his fate is not before you as part of your jury service.  We'll get to these fellows in a little while.

Mr. Seda and Mr. Al-But'he formed a bank account in the United States.  So they're the only two people that can control access, get access to the funds coming into al-Haramain's bank account in the United States during our time.

Opening Statement for the Plaintiff

You will hear that the funding for the operation of the U.S. branch, Mr. Seda depended on funding from Saudi Arabia, they were his lifeline to run the al-Haramain Islamic Foundation in Ashland. Very few private donations came in, it was mostly al-Haramain's money.

Okay. So the tax charge involves a form 990. And I'm just going to show it to you briefly. Here it is. This is the basis of the tax count in the indictment. Return of organization exempt from income tax for the year 2000, form 990, by al-Haramain Islamic Foundation, Inc., care of Tom Wilcox, CPA. He's the guy who prepared this working with the defendant. We'll present his testimony later in the trial and it contains an awful lot of material. We'll dig into it as the government's case comes in.

But Mr. Seda signed this under penalties of perjury -- that's his signature, we'll prove it -- October of 2001, as the secretary of this organization. And he filed this with the IRS and they -- this was the document that forms the basis of the tax count before you.

The accountant that prepared this return, members of the jury -- and the IRS will tell you that this is a false tax return. And it's false because it disguised where this $150,000 that I'll get into in a moment actually went. It reported it as income but in reporting where it went, there was some lies. And that's why we're here today. We'll show you those lies.

Now, what is it about this particular transaction that brings us here today?  To understand this donation is going to require you to travel around the world.  Obviously not literally, but you're going to travel around the world in terms of learning about the movement of money throughout the world.  And Ms. Cooke has put together a slide presentation here where we have a world map that should be helpful to you to understand the nature of this $150,000 transaction.

So al-Haramain, we will show you, is promoting the cause of the mujahideen in Chechnya.  Now, that word, mujahideen and jihad, will be explained to you later on.  But they were interested in raising money for Chechnya, al-Haramain was.

And so here we have Ashland, Oregon.  And this is where the defendant ran al-Haramain found in southern Oregon.  And we have a picture here.  This is where the defendant later lived and ran al-Haramain.

So this was a sign that used to be here:  Al-Haramain Foundation U.S.A.  And that's the al-Haramain banner at Saudi Arabia.  This is a place you'll be hearing a lot about in southern Oregon.  So that was the local version.  And there was a lot of places around Saudi Arabia, and more specifically in the city of Riyadh.

Now, I mentioned Chechnya.  There was a conflict going on in late '99 and 2000.  It was a very active war zone.  And its location is defined on the map there.  But Chechnya is north of

Opening Statement for the Plaintiff

Saudi Arabia and south of Russia, and the fight was between
Russian forces and separatists and mujahideen.  There's Chechnya.
Grozny is the capital city.

        So I told you that we'll show you that they were
raising money for Chechnya and somebody answered the call that
was in Cairo, Egypt.  And Cairo, Egypt is over here to the west
of Saudi Arabia.  You're going to hear this gentleman's name.
His name is Mahmoud El-Fiki, F-I-K-I.  He's an Egyptian and he
contacted al-Haramain and said:  I want to donate $150,000 for
Chechnya.  How do I do it?

        He was told that the headquarters' operation which
controls all of the disposition of money had a bank account.  And
he was told how he could get the money from Egypt to Saudi
Arabia.  But he also -- al-Haramain also told him that he could
send it to the U.S. headquarters in Oregon if he wished.  And the
banking coordinates of that bank account was also given.

        This fellow, El-Fiki, decided to send it to Oregon.
And to make things even a little bit more global, his bank
account wasn't in Egypt, it was in London, England.  So where is
London, England on the map?  Right here.  He's got a bank account
there.

        And on February 24th, the year 2000, we will show you
that he decided to wire transfer $150,000 to al-Haramain for
Chechnya.  And he did that by first sending the money from
London, England to Ashland, Oregon.  He paid $15 to do this.  So

$150,000 reduced by 15 bucks, that's what it cost at the time to do an international transfer where this bank here, based on El-Fiki's instruction goes, "click," and $150,000 moves electronically to here.  A paper trail is created now on the records of this bank and this bank that this fellow, El-Fiki, wired money into -- into Oregon.  As I said, February 24th, 2000, is when that occurred.

Mr. Seda is the head of this operation.  And there were very few employees.  It's not a large concern, it's just a handful of employees.  Mr. Seda, Mr. Sedaghaty, is the boss. Makes all the decisions, controls the money, pays the employees.

After a couple of attempts to contact other organizations involved in Chechnya which failed, within a very quick period of time, we are going to show you that the seeds of the conspiracy began.  What I mean by that is this money is intended for Chechnya and al-Haramain headquarters is here.  To get the money to headquarters, all Mr. Sedaghaty would have to do is to spend about $15, $20 and do a wire transfer from Oregon to Saudi Arabia.  They have a very modern banking system and it would require the same type of banker to just go, "click," and a paper trail would be created moving a one -- little less than $150,000 into Saudi Arabia.  That wasn't done.

What was done?  A bizarre financial instruction -- financial transaction then occurred between this fellow -- the money guy from al-Haramain, Mr. Al-But'he, and the defendant.

You will hear evidence that within about two weeks of the money being sent, Mr. Sedaghaty called his banker in Ashland and said: I want $130,000 in American Express traveler's checks for a transaction that just came in. I want to reduce that to $130,000 in traveler's checks. The banker, who will testify to you, told him: We don't have that kind of stuff around here, the traveler's checks. It's too much. This is a local branch. We don't have that. Why don't you just take a cashier's check? He said: No. I want American -- 130. Not $150,000 but $130,000 in American Express traveler's checks.

They told him it would take a couple of days to get those kind of traveler's checks. And for those of you who aren't familiar with traveler's checks, they were -- they're just like money but they're a little bit more secure because you sign them once when you get them and then you sign them twice to get -- to get the money. So they're a little bit safer than cash but essentially they're cash and they're very hard to trace. When you're trying to find out where they were actually disposed of, it can be very difficult. We did it in this case and you'll hear evidence from a government agent that they were finally able to trace this but it is very difficult.

So Mr. Sedaghaty orders the $130,000 and it takes a couple of days. But now what happens, once again, Mr. Al-But'he, the money guy in Saudi Arabia, after Mr. Sedaghaty had ordered the traveler -- these traveler's checks, he jumps on an airplane

Opening Statement for the Plaintiff

and he flies halfway around the world.  He flies from Riyadh
Saudi Arabia, and his port of entry is New York.  This is him.
He flies to New York as a port of entry, makes a quick stop in
Tennessee, and then makes his way into Oregon.  And he arrives on
March 9th of 2000.  So that's within about two weeks of when the
money was first sent.  He is there.  And he is there to act with
Mr. Sedaghaty to get this money.

        You'll see that the very next day, these two
individuals go to the bank and they ask for these traveler's
checks and they get them.  And as I told you, these things are
like money.  They're very hard to trace.  The IRS will tell you
that.  But here they are.  Mr. Al-But'he, Mr. Sedaghaty, the two
-- the only two account holders on the al-Haramain bank account
go in and they get these.

        These are in $1,000 denominations and there are 130 of
them here.  And to get them, Mr. Al-But'he had to sit there in
front of the bank, Mr. Sedaghaty, and sign his name 130 names --
times on this.  And when we introduce these things to you at the
bank, we'll -- we'll pass them around and show them to you.  130
of them.

        Now, there's a copy of one of them showing you the
signature.  To do this, American Express charges some money, one
percent.  So one percent of $130,000 is $1,300.  So it cost
al-Haramain $1,300 to do the transaction this way.  Once again,
it would have cost about $20 to internationally wire this from

Mr. Sedaghaty to al-Haramain instead of doing it this way but they decided to spend $1,300 of Mr. El-Fiki's money to get the money in this format.

Okay.  The bank filled out this check, al-Haramain Foundation, and it came off an account number which we'll show you is al-Haramain's account.  And so the debit to the account was a total of $130,000 plus $1,300.  $131,300 debited that account.  Most of Mr. El-Fiki's money is now in the form of these traveler's checks.  Mr. Al-But'he signs them once and gets them in the presence of Mr. Sedaghaty.  That happened on March 9th.

Now, you may be asking, what happened to the other $20,000?  The very next day, Mr. Sedaghaty goes back to the same bank, his bank, and asks that the remaining El-Fiki money -- and, by the way, there was hardly any money in the account before this, so we're talking about this money.  The rest of Mr. El-Fiki's money is now retrieved in the form of a cashier's check made out to Soliman Al-But'he.

What happened is this is the defendant, Mr. Sedaghaty, filling out a check to Bank of America for $21,000 off of the al-Haramain account, March 11th, 2000, for Soliman.  And Mr. Sedaghaty signs this.

This led to a cashier's check being issued by the bank and there it is.  It's in evidence.  $21,000 cashier's check, March 11th, 2000, from al-Haramain, Soliman Al-But'he, and a banker signs it.  So now Mr. Sedaghaty, Mr. Al-But'he, have

successfully withdrawn all of Mr. El-Fiki's money in traveler's checks and the cashier's check.

Mr. Al-But'he then leaves the country the very next day.  So it would appear that this trip was almost singular in purpose.  Flying halfway across the world shortly after the money gets here, flies to Oregon, quick trip to the bank over a two-day period, and then he -- the very next day flies out at great expense to al-Haramain.

Now, he's returning home and we have a plane that takes him back from Ashland, Oregon to New York.  And before we bring him back to Saudi Arabia, I've got to go over something else because it's part of what the allegations in the indictment include is this conspiracy to deprive the government of information related to what happened to this money.

You'll hear evidence that there's this law that requires anybody coming into the United States or leaving the United States with more than ten thousand dollars in cash or the cash equivalent, and you'll hear evidence that these are cash equivalent so these have to be listed.  We'll show you that Al-But'he knew this, they have to be filled -- a form has to be filled out.  It's the CMIR.  It's got a big, long, official name but basically it's another government form.  But it has a purpose.

The purpose is is that when money is being brought into the United States or out, for whatever purpose, either legitimate

or something nefarious, people have to tell the government in the form.  And those forms are important to law enforcement because if they want to look into transactions, they look at forms like this which has a lot of good information about the nature of the transaction.

You will hear evidence, members of the jury, that Mr. Al-But'he knew all about these forms because he filled them out lots of times.  When he has taken trips, he's the money guy from Saudi Arabia.  When he's bringing traveler's checks and cash into the United States on several occasions, both before and after our transaction, he filled out these forms.  And we'll show them to you.

But when he left the United States in March with these traveler's checks, he didn't file the form.  And that form very clearly says that it has to be filled out by anybody entering the United States with this kind of money or departing.  Concealment.

Mr. Al-But'he, on March 12th, is now in New York.  So he's got the money March 11th.  March 12th, he goes through the time zone and he flies back to Saudi Arabia and we will put him on the ground on March 12th of 2000.  So he left on the -- I believe the 7th, five days later he's back.  Halfway around the world in five days and back.

Now, we will show you through the testimony of Special Agent Anderson later on that in attempting to trace the disposition of this money, the cashier's check and these

traveler's checks, she engaged in a very intensive effort to find out what Mr. Al-But'he did with this money. And, members of the jury, we're all familiar with movies and TV which depict investigations and prosecutions. When they need evidence, they just simply pick up the phone and call halfway around the world and, boom, evidence comes in and there it is for you on TV. In the real life, it don't work like that.

You will hear evidence that tracing financial transactions, especially overseas outside the United States, is exceedingly difficult. In trying to find the disposition of things like these, the traveler's checks, is very difficult. Because unless somebody indicates where they were cashed -- and we will show you Mr. Al-But'he made a mistake here and left a little bit of a paper trial because he cashed them very quickly when he got home.

And we'll show you the international banking records were eventually, through much effort, but eventually were retrieved. And what they show is that Mr. Al-But'he took these things into his bank, Al Rajhi Investment, and he signed them, again, 130 times the second one, meaning I want to cash these.

So he goes to his bank. He's alone. Mr. Sedaghaty is still here in Oregon. And he cashes them. For cash cash (sic). I think the currency in Saudi Arabia may be rials, but he gets like cash cash (sic).

The investigators will tell you that as hard as it is

Opening Statement for the Plaintiff

to trace these, once you have actual cash, cash cash (sic), you can't trace it. You don't know where it goes. Concealment of the trails, members of the jury, is what we're going to show you this was all about.

Now, the cashier's check, that $21,000 cashier's check that Mr. Al-But'he had, what did he do with that? We will show you, again through obtaining his bank account records -- very hard to do but eventually it was done -- we'll show you Mr. Al-But'he's bank records and we will show you that he took that $21,000 of El-Fiki's money and he stuck it into his own personal bank account and started spending it. Think of a commission. Think of a money fee for all of this. So that is the El-Fiki money.

This is one of the receipts that we'll show you from Al Rajhi showing that Mr. Al-But'he went into his bank with $130,000 of traveler's checks. These serial numbers correspond to those. And we'll show you that the IRS was able to fortunately get these and show you that he cashed these very quickly in Saudi Arabia as I said.

Now, when listening to this testimony, members of the jury, I'd ask that you consider the fact of how much money was spent on this transaction. Whatever the costs were to fly halfway around the world for Mr. Al-But'he, the cost of getting the traveler's checks, the $1,300 bucks, and flying back, is a lot of money. When the alternative is Mr. Al-But'he could pick

Opening Statement for the Plaintiff

up the phone and say:  Hey, Mr. Seda.  Hey.  That's the money

that we need over here from El-Fiki.  El-Fiki sent it to you.

But wire it over here for 20 bucks and we'll take care of --

we'll take care of the money.  It didn't happen that way because

of the paper trail.

Now, this was a very significant transaction for

Mr. Sedaghaty in the year 2000.  We will show you hardly any

other money, as I said earlier, came into his bank account that

wasn't from al-Haramain.  Okay?  It was like winning the lottery.

He got a tremendous amount of money.  And this sticks out in his

mind because it's a very big, significant, six-figure

transaction.

And why that's important is because we're going to show

you that when the tax return was later figured -- later filed,

the question for you is going to be:  Was this just a mistake

that these funds were -- said something else, the disposition of

these funds was mischaracterized in this return?  Was it a

mistake or was there some type of more sinister intent?

We'll show you that this was a very big transaction.

And if everything was on the up and up, it should have been a

very simple transaction in that government form 990, the tax

return, was the basis for the count, it should have been just

been $150,000 in and then $150,000 out and here's where it went.

And the IRS would then be able to do its work and decide whether

this was a tax-exempt charitable purpose or not.

Opening Statement for the Plaintiff

But you'll see that in this return, members of the jury, Chechnya -- Saudi Arabia transaction with this money is not even mentioned.  It's disguised for something entirely different and I'll get to that later on in the opening statement.

Now, the accountant -- oh, before I move on, you'll hear from a government witness who is an expert on what the mujahideen around the world are doing.  And he will tell you -- Mr. Kohlmann is his name.  Evan Kohlmann.  He will tell you that Islamic fighters, and these are fighters that are promoting their version of a religion -- and let me just step back for a minute and talk to you about that.

This trial is not about the religion of Islam.  This case will involve religious aspects to it to tell you what the defendant's mindset was when he engaged in these transactions because we will show you that al-Haramain subscribed to a very strident form of Islam that promoted acts of violence in the name of religion, jihad, violent jihad, aggressive "kill people" jihad.

So we're not taking on Islam in this case, members of the jury, we're explaining the defendant's mindset, al-Haramain's mindset that led to these transactions.

Now, this government expert will tell you that here's Chechnya up here.  And he'll tell you that in active war zones, which this was at the time, there are no active banks.  You can't just wire money in.  You can't go cashier -- cash a cashier's

check.  You need cash.  If you're trying to help the fighters,
whether it's for food, medicine, there are orphans of dead
mujahideen or to directly fund the mujahideen themselves with
weaponry, they need cash.  And so the expert will tell you that
the way things are done is money is broken down to small piles of
cash and is smuggled from areas all around Chechnya.  It was at
the time, 2000, through the mountains of Azerbaijan, and there
were smuggling roots where people would bring in cash.

        Now, I told you before that there will be an accountant
that will testify and he will testify that he was charged with
doing this government form 990 at the end of 2000 or after that.
And he had access to the defendant's bank records so he clearly
saw the El-Fiki money coming in, the 150 grand.  He saw that.
There was a very clear trail to that.  But he had to figure out
-- and he reported it on the return.  But he had to also say to
the IRS where it went.

        So to do that he talked to his client.  He got almost
all of his information from his client, the defendant, Pete Seda.
And so he -- you'll hear evidence that he asked Mr. Seda:  Where
-- what happened with this money?  What is all about this?
Mr. Sedaghaty, members of the jury, never told the accountant
about this -- all of this transaction that I just told you about.
Instead he lied to his own accountant.  Why would he lie to his
own accountant?  To conceal the movement of the money.  More
about that later.

Opening Statement for the Plaintiff

But the accountant eventually got ahold of two checks. You've seen them both, the 131 and the 21 which is most of Mr. El-Fiki's money, and then a little bit -- a little bit more. And he saw those. And what happened was al-Haramain in Ashland sent those to the accountant and the accountant was in Medford, the next town over from Ashland. And he -- this led to a discussion between Mr. Sedaghaty and the accountant Wilcox: Hey, where did this money -- where did this money go? Mr. Sedaghaty told his own accountant that this money here, the $21,000, had been refunded to the donor. A lie.

Mr. Sedaghaty also told his accountant that this money here, this $131,300, was used as part of the proceedings to buy a building in Missouri. Now, there really was a building bought in Missouri but it wasn't with this money, the basis of lies that led to a false tax form.

Now, accountants can only do -- prepare returns as accurately as the information that is given to them. So if somebody -- people don't hire accountants to cross-examine them on their transactions. You will hear that an accountant's job is to basically accept the client's word for things with some reasonable documentation if there is some questions and then forms are filled out accordingly.

You will hear that the accountant took this information and what his defendant -- what his client said about it and prepared this form 990 accordingly. These lies led to lies in

Opening Statement for the Plaintiff

the form 990 and the defendant signed them under penalties of
perjury.  We'll get into the particular lines of tax return that
were false:  Lines one, 22, and 57.  You don't need to know all
the details but basically, in accountant talk, he's going to tell
you how if this money didn't go to a Missouri mosque or get
refunded to the donor, how the return was affected.  And we'll
show you that the return was false, and it was big-time false, in
that it never even mentioned Chechnya.

        Now, talking about accountants for a moment, you're
going to hear evidence that at the same time that the defendant
was paying an accountant in Medford to do this transaction,
al-Haramain in Saudi Arabia had an accountant.  And his name is
Al Shoumar.  And his -- don't have a picture of him for you but
his face is represented here.  He is the CPA equivalent in Saudi
Arabia.

        And he starts dealing with the defendant,
Mr. Sedaghaty, by e-mail.  And his job is to make sure they're
giving al-Haramain all the money to run its operation, to buy
books, and to do things on behalf of al-Haramain.  But they want
to know what they're getting for their money.  So they demand an
accounting of what are you doing with our money?  Normal.

        You'll see that there was a lot of e-mail traffic but
Mr. Sedaghaty was beholden to the parent organization in Saudi
Arabia to fund the operations and to explain what he was doing
with the money.

Opening Statement for the Plaintiff

Now, when this guy asks about the same money, the
$150,000, because he's seeing it come into the bank account too,
he has access to the statements, the defendant doesn't mention
anything about this money going to a Missouri building or
refunded to a donor.  So we got in e-mails, Mr. Sedaghaty giving
two accountants different information about the basis of the
transaction that brings us together today.  Concealment.

The accountant is given a little bit of information
about this transaction.  Mr. Sedaghaty tells his accountant when
he's very particular where all the other money is going.  But
when they talk about this, Mr. Sedaghaty, in e-mails, tells his
accountant this:  Went to Brother Soliman.  He knows what it's
for.  This 131, ask Brother Soliman.  Doesn't mention anything
about the specifics, he just sort of -- electronic wink and a nod
says:  Talk to him.  You don't want to write anything in an
e-mail too sharp because it may come back to you.  But the point
is different information going to two different accountants.
We'll show you that.

We'll also show that you when the Internal Revenue
Service and Special Agent Anderson got involved in the case,
after much digging through the records and a lot of forensic
accounting, they started smelling something about Chechnya.
Started learning about the little bit of possibility of money
going into Chechnya.  So you will hear that the investigation
issued a grand jury subpoena for books and records of

al-Haramain, and specifically got into asking records for the --
this stuff.

And so you will hear that in response to that subpoena,
we got batches of information sent to -- or the government got
different batches of information sent in over time, some from
al-Haramain and Saudi Arabia and some from al-Haramain in the
United States.  And we will show you that evidence when she
testifies, but we will show you that false information was given
about our transaction to the investigators.  Why would you do
that if you weren't trying to conceal something?

Now, a few minutes about the why.  Okay?  Why would
somebody be so secretive about a transaction?  Why would somebody
lie to their own accountant when they really want to be on the up
and up and tell that same accountant that they want to be clean
with the IRS because they think the government's looking at them?
Why would somebody, again, give bogus information to the IRS when
they start sniffing around for more specific information?

The why in this case, members of the jury, gets us into
this whole Chechnya, jihad, mujahideen stuff.  Because we are
offering that to show you that the defendant had a motive to
conceal his transaction from the government.  Why?  Because
tax-exempt charities in the United States cannot get involved in
funding acts of violence.  You could be done.  You could be
audited.  All kinds of bad things could happen.  The defendant
knew that and had a motive to conceal.

Opening Statement for the Plaintiff

Now, how are we going to show that the defendant intended on using his good efforts to help fund acts of violence in the mujahideen in Chechnya, that area of the world that we showed earlier?  We're going to show you, as I said, that al-Haramain subscribed to this radical form of their religion that promoted this notion of violent jihad.  They did it on their website, al-Haramain.org.  That's the one the defendant said was his website to the IRS or that he at least shared with al-Haramain in Saudi Arabia.

So we're going to show you a number of slides.  You can see them on your monitors or you can look up here.  But here's something that's coming out of al-Haramain.org in the late 1999 when the war was raging.  And this was a war, again, involving Russian forces and Chechen separatists and these mujahideen Islamic fighters.

And I want to step back and tell you that this case does not involve us taking a side with either side.  We're not here to take sides.  We're not here to defend Russia's actions or the mujahideen's actions.  We're not here to judge that.  We're here to show you that what was going on in his mind when he filed this return.

Russia did a lot of bad things in this war, members of the jury.  Atrocities were committed, refugees were created, and the mujahideen did equally brutal things on their side.  That's a wash.  But anyway, they're sending out information about the

Opening Statement for the Plaintiff

latest news about the jihad in Chechnya. "Click here for latest updates from Chechnya and how to help them." We'll hear testimony on that's a link to a well known fundraising site for the mujahideen. And this is an Arabic date but I think it translates to October 1999 with the al-Haramain logo. This is going on electronically.

And when I go through these exhibits, a lot of these things made their way into the defendant's computers in the United States. And we're not talking spam, we're talking about things that were sent to his inbox, opened up, sometimes cut and pasted, and put into word documents. It's not just stuff that is thrown, you know, away into junk or discarded e-mail. They had a particular interest in this subject.

Another al-Haramain document. In February of 2000, al-Haramain puts out online information about jihad. February 2000, al-Haramain. What does it say about jihad? Jihad is a religious obligation in Islam. Its aim is to fight oppression and injustice. To remove obstacles to prevent the spread of Islam accomplished by either weakening or destroying the disbelieving prevalent political powers so that Muslims can prevent anyone from persecuting their brother Muslims wherever they may be.

Now, that's coming out of the Saudi Arabia al-Haramain.org site. So that's one way we'll show you a little bit about what was going on in defendant's mind during the very

Opening Statement for the Plaintiff

time period that's so important to this case, early 2000.

But we will show you even more specifically that this defendant had an obsession with the status and plight of what was going on in Chechnya involving fellow Muslims.  So we'll show you that in addition to that website material, there was an employee in Saudi Arabia named Abdul Qaadir, and we got him over here on the chart too, right here.  Abdul Qaadir.  He's also known as AQ in the e-mail traffic.  You'll see a lot of AQ.  He's an al-Haramain guy.  And he starts sending out information all over in the place like in IGLU or ListServ to people who may be interested.  It's a group e-mail going out to various people, including al-Haramain in Ashland, Oregon.

And what we're about to show you are documents that came out of the defendant's computers during a search warrant that was executed in, I believe, 2004 or 2003.

This is a diagram of the defendant's -- that same building we talked about right here.  And you'll hear from witnesses that when the search warrant was served in a downstairs area -- the defendant lived at the time of the search warrant in one of the bedrooms, but here downstairs, office room X we call it, there were several computers.

This was the defendant's office.  This is where the U.S. headquarters of al-Haramain was operated from, right in his office.  And we'll show you that a couple of other ladies worked in this -- in this office alongside of the defendant.

Opening Statement for the Plaintiff

But in computers that have been labeled here Seda Six, Seda Ten, Seda Eight and Nine, Seda Eight is the big one.  Seda Eight.  A computer expert will tell you that when these things were -- when they were able to actually get into the computers -- and that's a whole other story.  When he testifies, he's going to tell you that somebody had erased all of the information in the computers.  That when they went to look for the inbox there was none.  That it had been completely wiped clean.

And he had to use forensic tools and very sophisticated methods to actually try to reconstruct the e-mails because when you turn it on and start to look at it, there's nothing there.  But you will hear that when somebody tries to delete things, there are sometimes electronic footprints in a computer.  And with these tools, sometimes you can resurrect this and that was done in this case.  Took this guy a bazillion hours to do it but you'll hear how he was able to get into the computer and actually get some of the stuff out.  Not all of it.  Some of it was gone forever.  But some of it.

Okay.  So Seda Eight was examined as well as the others and we're going to show you a series of things now that was in this time period of late '99, early 2000, when the El-Fiki money was up for grabs.  What was going on in defendant's mind I ask as you review these.

All right.  This was an attachment to one of the e-mails in the defendant's computers that had been deleted and

it's a map of the mujahideen's tactical movements out of Grozny.
Grozny being the capital of Chechnya.  It shows mujahideen
movement.  It's a battlefield map.  But that was -- that was
attached to various e-mails issued by this fellow Abdul Qaadir.
And let's take a look at some of those.

Okay.  AQ, Abdul Qaadir, in January 2000 -- and,
remember, the El-Fiki money came in February of 2000.  But
El-Fiki was already in contact with al-Haramain about wanting to
send money.  There's an e-mail in the computer, and we're not
talking spam, this was opened up in the computer:  Frequently
Asked Questions About the Jihad in Chechnya.

And we've highlighted number three.  This is our work.
How Can We Help the Mujahideen in Chechnya?  Answer:  By
collecting as much money as possible from friends, families,
relatives, contacts, in mosques, centers, everywhere.  Leave this
money with trustworthy individuals in the community, and so on,
and so forth.  It will be there for you to review.

It goes on:  If you work for or know someone who works
in a reputable aid organization, inform them that the
mujahideen -- these are the fighters -- are in urgent need of
doctors, medical personnel, medical supplies.  Also in need of
thousands of medical combat kits containing basic dressings,
antibiotics, pain-killing injections, insertable tampons to
absorb blood from bullet wound injuries, and other items.

And it talks about how they need doctors and so on and

Opening Statement for the Plaintiff

so forth to make their way into Chechnya through aid
organizations and join the fighting units of Ibn Ul-Khattab.
Okay?  Another name.  Khattab.  He made the chart.

       Khattab's over here.  And you'll hear that at the time
of these events, this was the big cheese in Chechnya.  This was
the leader of the mujahideen.  The commander issuing all the
instructions for the Islamic fighters.  He was calling all the
shots.

       And you will hear that Khattab was telling those that
were interested in the subject:  We need money, we need money.
And you will hear from the government's expert that the main
source of funding for these guys, the mujahideen, in Chechnya was
through Islamic charities.  So-called charities.  And they needed
to send money to people like this so that they could buy weapons
and things of the like.  Medical supplies, food and all, to fund
the war in Chechnya.

       Okay.  Moving on.  Another e-mail, February 15th, from
the same guy, AQ.  "Mujahideen Attack Russian Convoy."  Dear
brothers and sisters, do you know that it is the right of Muslims
in Chechnya to receive the moral, physical, and financial support
of all Muslims throughout the world?  Capital letters:  It is
obligatory upon every Muslim that he or she support the
mujahideen and the Muslims in Chechnya in any way they can,
quoting a copy of the Qur'an.  And then moving on:  No Muslim has
any excuse not to support the Muslims in Chechnya.

Opening Statement for the Plaintiff

Okay.  The next one.  This is a copy of some website information that was found on the computers in Ashland, Oregon, as part of this deleted material but resurrected by the IRS computer guy.  What's the subject here that people were reading about?  What can I do to help jihad and the mujahideen?  The answer:  Raise, collect, and donating money.

Jihad is being entirely funded by donations from individuals.  First and most important thing that Muslims can do in the west, like here, is to donate money and to raise it amongst their families, friends, and others.  All major scholars of the world today will agree the key cause to the mujahideen is one of the best forms of Zakat.  Zakat, the government expert will tell you, is a religious donation in that religion.  Alms given.

Couple of others.  January 14th, 2000, highly relevant time to the case.  Abdul Qaadir sends out more information that makes its way into the computers in Ashland, Oregon.  News from the mujahideen in Chechnya, talks about a Russian plane being shot down, a bunch of Russians killed and vehicles destroyed.

Now, I'm going to warn you.  We're going to see some photos here.  Some are a little graphic.  But they're acts of war.  These war attachments to this that were found in the defendant's -- once again, the computer.  So attached to this are pictures of some of the combat situations.  You're going to see just a few.  You see the mujahideen, Russians, armaments of

vehicles of war, people on the March.

You see explosions in trucks, blown-up trucks, and dead people involving what's going on in Chechnya.  Again, not taking sides, but this is what's going on and the defendant is very interested in this subject.

All right.  We are also going to show you that there's other e-mails in the computers, and I've shown enough of them to you right now, but this fellow Khattab gave interviews and those interviews were broadcast on mujahideen websites for propaganda purposes.  And you'll see that he gave a very famous interview in our time period and he was asked:  Commander Khattab, what is it that you need?  And I'm paraphrasing but the answer you'll see is going to be:  We need money.  To enter -- Russians are bearing down on us and we need money.  And the way we usually get money is from Islamic organizations, charities, and they're not here.

So he's broadcasting to the world that we need money. We need support.  This interview was sent to the defendant in Ashland, Oregon, into his computer.  And it wasn't just sent but you'll see that through some forensics, we're going to show you that a part of this interview -- that part about raising money for -- to arm the commander and his troops.

At the same time this El-Fiki was sending in money, you'll see that this guy was saying:  We need support, there was an e-mail sent from Ashland, Oregon, by the defendant from him to Saudi Arabia.  The money guy at al-Haramain cut and pasted this

part of the interview where he says:  We need money for Islamic charities.  We need support.  And in the byline, in the title line of this e-mail, from him to him, it says:  What support? What support?  As if to say:  What are we doing to help the cause?  Okay.  Head of al-Haramain in the United States to the money guy in Saudi Arabia at the same time the El-Fiki money is in play.

Now, we've got the al-Haramain stuff in their computers.  We've got the defendant's computers.  But we've also got some other stuff for you that we're going to show you during this trial.

One of the parts of Islamic religion and, again, we can get uncomfortable talking about religion but it's relevant to this case for the motivation of the defendant.  You'll see this thing called a fatwa, F-A-T-W-A.  A fatwa.  A fatwa, you will be told, is an edict by a high-ranking or a respected scholar in Islam.  And you will see that some of these people weighed in -- they were asked, these high-ranking scholars were asked:  Is it Islamic to fund the mujahideen in Chechnya?  And that led to the creation of fatwa.

What's the answer from these high-ranking people so, you know, we want to know.  Is it okay?  A fatwa was issued on the al-Haramain website in Arabic.  So in Saudi Arabia, there's an Arabic fatwa and the expert will tell you what it says and what it means and its import.  But it's basically to raise funds

Opening Statement for the Plaintiff

for the mujahideen.

In the defendant's computers there was an English translation and here it is.  It went out March 8th of 2000.  This is when Al-But'he's in town.  This is when the money is being retrieved in Oregon.  This thing comes out into defendant's computer March 8th, 2000, fatwa from Jabreen.  It'll be explained to you is part of this Sheeshaan group, and Sheeshaan I think means Chechnya in Arabic.  And this is what the Jabreen, a high-ranking cleric here, this scholar says, talking about Chechnya:  The state of the mujahideen and that which is obligatory upon the Muslims towards them.

So from these evidences, it is obligatory upon the Muslims to first supplicate for the brothers and sisters in that land for victory to overcome their enemies; second, supply them with weapons and real power which they are able to strife (sic) and kill their enemies on the battlefield; and, third, strengthen that with financial donations as they are in need, desperate need, of food, clothing, and all that which assists them in becoming strong and reduces the pain of striving and harm, treating anyone amongst them who has been struck with injury or was in pain jihad with money.

Now, turning away from the e-mails, members of the jury, and let's come back to Oregon for a moment.  We're going to present the testimony of an employee that used to work for the defendant.  Daveed Gartenstein-Ross is his name.  He's going to

Opening Statement for the Plaintiff

tell that you just before this transaction occurred he worked for the defendant in Ashland, Oregon, late 1999.  And he's going to tell you a little bit about the atmosphere and what it was like but he reported to the defendant, Mr. Seda, who was his boss.  And al-Haramain was the big boss and we'll explain the relationship between them.

But one of the -- one of the duties of U.S. headquarters of al-Haramain was to spread the word that al-Haramain was sending out a Saudi Arabia.  And they had a foothold in the United States and they needed to spread the message.

So al-Haramain Saudi Arabia sends in cartons and cases of books that -- some is innocuous but some of it is very violent, very strident.  And they sent it from Saudi Arabia to here to distribute in the United States through the defendant's U.S. headquarters here.  And that's where this fellow Ross comes in because he sent it out.  And where did he send it?  I'll show the material in a minute.  But this material was sent into U.S. prisons throughout the United States.  People serving time for all kinds of crimes and this was to get them information about the religion of Islam.

And so you'll hear that these things went out in the thousands, cases and cases put into U.S. prisons worldwide late 1999.  Let's take a look at them.

One is called the Noble Qur'an.  And we see here that

it's issued out of Riyadh, Saudi Arabia.  And there's that
website al-Haramain.org, and then a reference to the defendant's
mailing address in Ashland, Oregon, their phone number, using the
same website address down there.

          Now, this is a big book but there's an appendix on it
that you'll see and that appendix will be explained to you by the
expert but here it is.  It's in English going into prisons.  In
the name of Allah, the most gracious, merciful, the call to
jihad, holy fighting in Allah cause in the Qur'an.

          And it talks about how to do a jihad.  But it goes on
-- and I think we have another quote -- I'm sorry.  Could we back
up one?  One slide?  Praise to Allah who has ordained Al-jihad,
the holy fighting, in Allah's cause.  With the heart and weapons,
tongue, speeches will be called the jihad.  Or with money.

          But there's another book that went out in the
thousands.  There's another book that probably a thousand of
these went out to the prisons as well by the defendant's
operation here.  It was called the Islamic Guidelines for
Individual and Social Reform.  And, again, there's all the
information on al-Haramain.  This goes out.  But let's take a
look at a couple of passages here.

          Prisoners are told by al-Haramain, defendant
Sedaghaty's operation, fighting in the cause of Allah, jihad is
obligatory on every Muslim in two ways:  By spending one's wealth
or offering oneself for fighting in the cause of Allah.  All

right.  Again, what's going on in the defendant's mind as all
these things are going out to prisoners throughout the country,
this stuff is going out and his stamp of approval by al-Haramain
starting with headquarters and right here.

Jihad against disbelievers, communists, and the
aggressions from Jewish Christian nations can be either by
spending on jihad or by participating in it in person.  Perform
jihad against polytheists by wealth, body, and tongue.

All right.  Members of the jury, let me just spend a
few minutes now and talk to you about the structure of the
government's case because I'm almost done.  The structure of the
case is going to go like roughly like this.  We're first going to
show you that, again, unlike the movies where people just snap
their hands and these brilliant prosecutors have all this
evidence at the touch of their hand and as clear as day, this is
a circumstantial case.

In showing you his willfulness for the tax return and
the conspiracy is going to present it to you as if it was a
jigsaw puzzle.  You've all done jigsaw puzzles and we pick up a
piece and alone it means nothing.  You can't see what it shows.
But we're going to show you various pieces of puzzles coming in
through the trial.  We're going to show you bank records coming
in.  We're going to show you tax records coming in.  Real estate
records coming in.  And they may not tell a clear picture in and
of themselves, but by the end of the case, they will be put

together to you.

But those puzzles are going to start with law
enforcement witnesses bringing in all of this stuff, and we're
talking about a little bit about some of the e-mails, a computer
expert talking about how hard it was to get these things, and a
little bit about the traffic of these e-mails and how they were
actually opened and some were saved in the computer rather than
being spam or junk.

The expert will tell you all about the conflict in
Chechnya, how they needed money, and how they were funded
especially by Islamic charities often with cash, small amounts of
cash.

People that worked and went to al-Haramain to show you
the atmosphere of the operation.  The banker is going to bring in
pieces of the puzzle, bringing in -- talking about these
traveler's checks and things of the like that I talked about
earlier.

Somebody that was involved in buying the building in
Missouri and telling you that the defendant was in the middle of
that transaction, knew exactly how much it cost, diffusing what
he later or -- contrast to what he told the accountant.  I told
you that accountant will testify and tell you the defendant told
him A, B, and C about this transaction.  That the money that
Al-But'he brought back actually went into the building in
Missouri.  The false statements.  An IRS witness will tell you

that they really care about these things, and if they're being
omitted from these, it's not just a technicality, they care.

And Special Agent Anderson is going to come in towards
the end of the case and talk to you about some of the other
aspects, the foreign bank records and things of the like, and put
it in more of a chronological fashion.

Now, a little bit about the defense. We expect that by
the end of this trial, members of the jury, you're going to see
two very different sides to Pete Seda. And I call him Pete Seda
because that's how everybody else refers to him that knows him in
this world. Pirouz Sedaghaty is his real name. Pete Seda is how
he's known.

You will see that during this time period in southern
Oregon he was kind of a public person. He was out there a lot on
camera, in media, and parades and things like that promoting acts
of peace. Involved in legitimate charitable work. In fact he
even met with the FBI a number of times to talk to them about
what else they would want to know about what was going on. Keep
in mind the FBI knew nothing about the Chechnya transaction
during this time. But the point is is that you're going to hear
that he was involved in good acts, benevolent acts.

We're not here to judge those one way or another,
members of the jury. We're here to judge him on this transaction
back in 2000.

And what we're going to show you is that there was

Opening Statement for the Plaintiff

another side to the defendant Pete Seda, a dark side.  A side
that although when the cameras are turned off --

MR. MATASAR:  Your Honor, I believe this is too much
going into argument so I object.

THE COURT:  Move it to a close please.

MR. CARDANI:  We will show you that this defendant was
insistent on helping the cause of the mujahideen in answering the
call of Mr. Khattab.  We will show you that it -- this dark side
only emanated itself when it could be done covertly, secretly,
and without laying the paper trail.  And as long as those things
were done, we will show you that the defendant willingly aided
his efforts to do these things.

Members of the jury, at the end of the case, my
colleague, Mr. Gorder, is going to return before you and he is
going to do a closing argument and put together the various
pieces of this jigsaw puzzle.  I'm confident by that time there
will be a clear picture that this defendant willfully violated
the tax laws by filing a false return and conspired with
Mr. Al-But'he and others to smuggle money out of the country
without the government finding out about it.

And we will ask you to turn -- return verdicts of
guilty.  Thank you for your time.

THE COURT:  Members of the jury, we'll take a short
break now.  You're excused for a moment.

(Excerpt of proceedings concluded.)

# C E R T I F I C A T E

STATE OF OREGON      )
                     )
County of Lane       )


          I, JAN R. DUIVEN, Certified Shorthand Reporter of the

Circuit Court for the State of Oregon, in and for the County of

Lane, do hereby certify that the foregoing pages, 1 to 42,

comprise a true and correct **TRANSCRIPT EXCERPT**, to the best of my

ability, of the proceedings held in the above-entitled matter on

MONDAY, AUGUST 30, 2010.


          DATED AT EUGENE, OREGON, THIS 31ST DAY OF AUGUST, 2010.



          _____

          JAN R. DUIVEN, CSR, FCRR

          COURT REPORTER