**Steven T. Wax, OSB No. 85012**
**Federal Public Defender**
**101 SW Main Street, Suite 1700**
**Portland, OR  97204**
**Tel: (503) 326-2123**
**Fax: (503) 326-5524**
**Email: steve_wax@fd.org**

**Lawrence Matasar, OSB No. 74209**
**621 SW Morrison Street, Suite #1025**
**Portland, OR 97205**
**Tel: (503) 222-9830**
**Email: larry@pdxlaw.com**

**Attorneys for Defendant**


## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION


**UNITED STATES OF AMERICA,**          **CR 05-60008**

                          **Plaintiff,**

                                        **MOTION FOR NEW TRIAL**

          **v.**

**PIROUZ SEDAGHATY,**

                          **Defendant.**

**TABLE OF CONTENTS**

**PAGE**

I.    MOTION FOR A NEW TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    A.    The Government Presented A Distorted Picture Of
         Mr. Seda's Beliefs, And He Was Not Permitted To
         Present The Jury A Complete Picture. . . . . . . . . . . . . . . . . . . . .  3

    B.    Distortion Of The Record Regarding The Money. . . . . . . . . . . . .  9

         1.    The Receipts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

         2.    Colonel Lang's Testimony. . . . . . . . . . . . . . . . . . . . . . . . . 13

         3.    The Rulings On Exhibits 704 and 705 and on
            Colonel Lang Denied Mr. Seda His Right To
            Present A Defense Under The Fifth And
            Sixth Amendments. . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

         4.    The Continuance And The Witness Sui. . . . . . . . . . . . . . 15

    C.    Appeals To Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

         1.    Guilt By Association. . . . . . . . . . . . . . . . . . . . . . . . . . . 16

         2.    Anti-Islamic Statements And Actions. . . . . . . . . . . . . . . 19

    D.    Distortion Of The Record Through The Rule 404(b) Rulings. . . . . 22

         1.    The Gartenstein-Ross Check. . . . . . . . . . . . . . . . . . . . . 22

         2.    The Jewelry Sale. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

         3.    The Hajj And Kosovo Testimony. . . . . . . . . . . . . . . . . . . 24

    E.    Prosecution Distortion Of The Evidence. . . . . . . . . . . . . . . . . . . 24

1.    The Government Inserted Highly Prejudicial
Facts That Were Not Part Of The Evidence
Before The Jury Or Ever Provided To The Defense. . . . . . 25

2.    The Government Made Misstatements Of The
Facts Directly Related To Mr. Wilcox's Allegedly
Coding Checks Into QuickBooks Based On
Information Provided By Al Haramain. . . . . . . . . . . . . . . 28

F.    Voir Dire And Jury Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

1.    Juror Prejudice Demonstrated During Voir Dire. . . . . . . . 28

2.    Juror Prejudice Demonstrated During The Trial. . . . . . . . 30

3.    Improper Influence On Jurors On The Day
Of Deliberations And Verdict. . . . . . . . . . . . . . . . . . . . . . . 32

G.    The Court's Failure To Allow For A Public Trial
And For Mr. Sedaghaty To Be Present. . . . . . . . . . . . . . . . . . . . 33

H.    The Court Held Unnecessary Ex Parte Sessions With
The Government Attorneys And Their Case Agents. . . . . . . . . . 34

I.    The Court Erred When It Ordered The Defense To Not
Discuss The Evidence That The Defense Placed In The
Secure Facility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

J.    The Indictment Was Based On Speculation And False
Statements Of Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

II.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

# TABLE OF AUTHORITIES

## FEDERAL CASES                                    PAGE

*Caliendo v. Warden of Cal. Men's Colony,*
    365 F.3d 691 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Crane v. Kentucky,*
    476 U.S. 683 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Holmes v.  South Carolina,*
    547 U.S. 319 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Kennedy v. Lockyer,*
    379 F.3d 1041 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Kyles v. Whitley,*
    514 U.S. 419 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Marshall v. United States,*
    360 U.S. 310 (1959). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Mattox v. United States,*
    146 U.S. 140 (1892). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Parles v. Runnels,*
    505 F.3d 922 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

*Rosales-Lopez v. United States,*
    451 U.S. 182 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Sandoval v. Calderon,*
    241 F.3d 765 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Skilling v. United States,*
    130 S. Ct. 2896 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Turner v. Louisiana,*
    379 U.S. 466 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Cabrera,*
    222 F.3d 590 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Hobos,*
    573 F.2d 1111 (9th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Ivester,*
    316 F.3d 955 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Kerr,*
    981 F.2d 1050 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Knobbier,*
    574 F.3d 1065 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*United States v. Leon-Reyes,*
    177 F.3d 816 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*United States v. Necoechea,*
    986 F.2d 1273 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Scarbrough,*
    470 F.2d 166 (9th Cir. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Shwayder,*
    312 F.3d 1109 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Stephens,*
    73 F.2d 695 (9th Cir. 1934). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Waters,*
    2010 WL. 3565259. . . . . . . . . . . . . . . . . . . . . . 1, 2, 3, 4, 7, 8, 9, 17, 18

*Viereck v. United States,*
    318 U.S. 236 (1943). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Wardius v. Oregon,*
    412 U.S. 470 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## FEDERAL STATUTES

Fed. R. Crim P. 33. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Defendant, Pirouz Sedaghaty, through his attorneys, Steven T. Wax and Lawrence Matasar, respectfully moves this Court pursuant to Fed. R. Crim P. 33 for a new trial.

## I.     MOTION FOR A NEW TRIAL[1]

Through pre-trial motions related to evidentiary matters and voir dire, Mr. Seda expressed serious concerns about his ability to receive a fair trial. He continued to express concerns about the fairness of the trial as evidentiary issues were revisited or arose during the course of the trial. In this motion, he asks this Court to review key evidentiary rulings in light of a very recent Ninth Circuit case, decided on September 15, 2010, that addressed issues strikingly similar to those present in the instant case. *United States v. Waters*, No. 08-30222, 2010 WL 3565259 (9th Cir. Sept. 15, 2010). He also urges the Court to take a step back from the proceedings and individual rulings that have been made and consider the cumulative impact of the manner in which the case proceeded, particularly: 1) the cumulative prejudicial impact of the government focus on Islam, terrorism, and anti-Semitism in a case that is charged as essentially a tax case, 2) the rulings with respect to proffered exhibits 704(A)

---

[1] Counsel for the defense requested that the classified transcripts of the closed sessions that defense counsel was present for be made available as soon as possible in order to draft any post-trial pleadings. The Court Security Officer has indicated that the transcripts are in the process of being made available in order for the defense to review and, if necessary, supplement this pleading. The defense respectfully requests that the Court permit a supplementary pleading, if necessary, soon after the transcripts are made available.

and (B) and 705(A) and (B), and 3) the government's arguments regarding theft of $21,000 by Mr. Al Buthe.

"[T]he combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair." *Parles v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007). Thus, though "individual errors looked at separately may not rise to the level of reversible error, their cumulative effect may nevertheless be so prejudicial as to require reversal." *United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir. 1993).

Review of the cumulative impact of the manner in which this case proceeded must now take place under the teaching of *United States v. Waters*, 2010 WL 3565259. In *Waters*, the Circuit ordered a new trial after review of a proceeding that bears a striking resemblance to much of Mr. Seda's trial. The decision's focus on the need for a new trial based on the unduly prejudicial manner in which the government relied on writings of others – writings that may have been in the defendant's possession with no proof that she had read them or passed them on and writings espousing violence – is directly on point. Addressing writings the government introduced, the Circuit stated:

> Their repugnant and self-absorbed embrace of destruction is likely to have swayed jurors' emotions, leading them to convict Waters not because of the facts before them but because she represented a threat to their own values.

*Waters*, 2010 WL 3565259 *9.  The same occurred here, as explain below in

Section A.

Another close similarity between *Waters* and this case is that in both

cases, the defendant proffered a contrary view of the defendant's beliefs but the

trial court rejected the proffer.  There, as here, while the jury saw some

documents and heard from some witnesses, critical evidence was excluded.

> The district court's ruling allowed the government to rely on 'other
> acts' evidence to establish that Waters identified with ELF's goals
> and tactics while prohibiting Waters from rebutting that evidence
> with evidence that demonstrated her commitment to values she
> claimed to hold.  These rulings, in combination, assured that the
> jury would be provided with a one-sided picture of Waters.  The
> jury saw her connected to violent anarchist propaganda that it may
> have had a visceral reaction to, while it was prevented from viewing
> evidence that would paint a contrasting picture of Waters as a
> person.

*Waters*, 2010 WL 3565259 *10.

Following are specific actions by the government and rulings by the

Court that rendered Mr. Seda's trial fundamentally unfair and that require a

new trial.

### A.    The Government Presented A Distorted Picture Of Mr. Seda's Beliefs, And He Was Not Permitted To Present The Jury A Complete Picture.

Throughout the trial, the government sought to portray Mr. Seda as

espousing extreme and violent views of Islam and of being anti-Semitic. They

called two witnesses who offered testimony on this subject – Bobbie Cabral and

Daveed Gartenstein-Ross.  Neither, however, went as far as the government

apparently hoped.  For example, the government sought to portray Mr. Seda as changing after Al Haramain came to Ashland, but when they asked Ms. Cabral, she said, "not really."  Tr. 275 (August 31, 2010).  As for Gartenstein-Ross, the government dramatically asked about genital mutilation – an inflammatory subject that had no place in the trial – eliciting that Gartenstein-Ross was reprimanded for objecting to it.  Tr. 45-46 (September 1, 2010).  Later, however, Gartenstein-Ross acknowledged that the reprimand came from David Hafer, not Mr. Seda, and that when Mr. Seda learned about the issue, Mr. Seda was "conciliatory."  Tr. 46 (September 1, 2010).  As a result, the core of the government's evidence on this point was from exhibits.

The exhibits took primarily three forms – numerous emails received on the Al Haramain computers; literature sent by Al Haramain to prisons, particularly The Noble Qur'an with the jihad appendix and the Islamic Guidelines; and two videos seized from the Al Haramain premises.  The holding of *Waters* on these issues is directly on point with respect to the material on the computers, with five exceptions that were entirely innocent: There was no evidence that anyone read, as opposed to merely opened, the items on the computer.  There was no evidence that Mr. Seda, as opposed to any of the many other people at Al Haramain, read the items.  Equally as important, and in stark contradiction to the holding in *Waters*, the jury was prevented from seeing far more relevant items on the computers – the wealth of material

written by Mr. Seda.  And, the jury was prevented from seeing documentary evidence that the concern over Chechnya expressed in many of the emails was similar to concerns expressed in the mainstream media, by the United States government, the United Nations, and candidates of high offices.  *Compare, e.g.,* SW-8, SW-14, SW-16, SW-28, SW-33, SW-37, AND SW-65 *with* excluded defense exhibits 628-633, 635, 639-640, 642-650, and 652-654.

Turning to the prison project literature, throughout the trial, the government offered evidence and argued that Al Haramain Ashland sent highly inflammatory and anti-Semitic literature regarding Islam to prisoners – the Islamic Guidelines and The Noble Qur'an with the jihad appendix.  The government continually described this project as one that was promoted and pushed by Al Haramain Ashland and that the purpose was to send Islamic materials to incite the prisoners.  Passages from the appendix and Islamic Guidelines were read or shown to at least five witnesses.

The purpose of the literature and a scoring system was contested by the witnesses.  Through Gartenstein-Ross, the government attempted to show that more radical literature was sent to some prisoners.  Tr. 29-40 (September 1, 2010).  Mr. Rodgers, however, said that the scoring was intended to send literature based on a prisoner's knowledge and to weed out duplicate requests.  Tr. 106-08 (September 7, 2010).

The government relied on its view of the prisoner project as part of its case on willfulness. Particularly, in light of the disagreement between the witnesses and government reliance on documents, it was fundamentally unfair to prevent Mr. Seda from showing a complete picture of the prison project or his own views on Islam and violence.

The use of the prisoner project unfairly skewed the trial in several respects. First, the prejudicial import of the government's argument outweighed any probative value. Second, if admissible, it was critical for the jury to understand that the literature was screened by the prisons and sought by the prisons.

Daveed Gartenstein-Ross and David Rodgers, both of whom had worked with Al Haramain Ashland on the prisoner project, agreed that in addition to the prisoners specifically requesting the materials, and the care with which Al Haramain took to make sure the right materials were sent to the prisoners, Chaplains from the various prisons would also request the literature. It was also uncontested that not only is material coming in and out of the prisons monitored, but Chaplains at the prisons specifically work to provide religious material to the persons at the prisons that they serve.

Despite the acknowledgment by Mr. Gartenstein-Ross and Mr. Rodgers, the Court ruled that the proposed exhibits of several letters from prison Chaplains requesting Islamic literature could not be received. Mr. Rodgers had

reviewed these exhibits.  The Court agreed that "[Al Haramain] clearly got letters from chaplains" but refused to receive the letters as evidence.  Tr. at 7 (September 8, 2010).  Thus, the jury received only the government's one-sided view of the prison program and had no idea that the prisons actually welcomed this literature.

In addition, the Court refused to permit Mr. Seda to introduce his own book on Islam – *Islam Is* – and other writings opposing violence.  *See, e.g.*, rejected exhibits 809, 811, 812, 812(A), 815, 815(A), 820(B), 820(C), 822, 825, 833, 833(A), 834, 835, 835(A), 836(B), 838, and 839.  *Islam Is* explained Mr. Seda's peaceful views of Islam.  Several defense witnesses testified that they had reviewed *Islam Is* and edited it.  There was sufficient foundation for the admission.  It was highly relevant, particularly due to the rulings that allowed the government to present highly inflammatory books and videos.  The exclusion of this material is in clear contradiction to *Waters*, 2010 WL 3565259 at *10 (holding that the district court abused its discretion when it excluded peaceful video produced by defendant).

Finally, the government introduced two videos that had been taken from the Al Haramain building several years after the time period of the alleged charges in the indictment, and nearly a year after Mr. Seda left the United States.  *See* SW-1.  There is nothing to establish any relevant connection between the overly prejudicial videos and Mr. Seda.  These videos were part of a

large collection of videos – nearly 400 – found during the search of Al Haramain.  *See* Def. Ex. 1002.  There was no testimony they were ever viewed by anyone, let alone Mr. Seda.  They involved the first Chechen war in 1995 and depicted, inter alia, soldiers training and Chechen nationalists.  The government argued, with no evidence, that they were fund raising tools.  Tr. 54 (September 8, 2010).  While he was permitted to introduce a written summary of the approximately 400 videos, Mr. Seda was not permitted to offer summary videos, rejected defense exhibits 1002(A) and 1002(B).

The facts here are strikingly similar to *Waters*.  The jury was permitted to see highly inflammatory material that Mr. Seda did not write and may not have read or seen.  The jury was prevented from seeing material he did write and say.  As said in *Waters*, "[A] defendant's choice of reading material will rarely have a particularly significant probative value.  Thus, attempts to use such evidence against a defendant must be viewed and reviewed with a careful and skeptical eye."  *Waters*, 2010 WL 3565259 *8.  There was a high danger that the government's exhibits' "repugnant and self-absorbed embrace of destruction is likely to have swayed jurors' emotions, leading them to convict [the defendant] not because of the facts before them but because she represented a threat to their own values."  *Waters*, 2010 WL 3565259 *10.

The jury was provided with a one-sided picture of Mr. Seda.  "The jury saw [him] connected to violent [ ] propaganda that it may have had a visceral

reaction to, while it was prevented from viewing evidence that would paint a contrasting picture of [Seda] as a person." *Waters*, 2010 WL 3565259 *10 (holding that the district court abused its discretion when it excluded peaceful video produced by defendant).  A new trial is required.

**B.    Distortion Of The Record Regarding The Money.**

**1.    The Receipts.**

One of the primary government themes through the trial was "follow the money."  But, the government presented the jury with a grossly distorted and incomplete picture of the money trail.  It argued that the trail stopped with the traveler's checks being cashed by Mr. Al Buthe and the cashier's check being deposited in his account.  Tr. 43-44, 71-72, 187-88 (September 7, 2010); Tr. 64-65 (September 8, 2010, closings).   It argued that Mr. Al Buthe may have stolen the $21,000 and taken it as a "kickback."  Tr. 64-65 (September 8, 2010).  Those arguments were made with the government having been in possession of receipts[2] for more than five years that provided a bank account number into which the full amount of the money described in the contract between Mr. Seda and Mr. Al Buthe was deposited.  Tr. 244-45, 276 (September 2, 2010); *see also* CR 262 at 7.

The government's primary IRS case agent confirmed, after reviewing receipts at trial, that she had seen the receipts years before.  Yet the

---

[2]  Proposed Def. Exs. 704(A)-705(B).

government failed to subpoena the proper account records, refused to use its
resources to allow the defense to seek the bank records, and the Court refused
to order the government to do so.  CR 247, 257, 327; Tr. 245-47, 272-77
(September 2, 2010).

On January 15 and 21, 2010, the defense requested the Court to issue a
Letter Rogatory to the government of Saudi Arabia requesting certification of
authenticity of several documents, including the receipts that are at issue here,
Proposed Def. Exs. 704(A) and 705(A), and the Al Haramain log documenting
the deposit of the funds referenced in the receipt, proposed Def. Ex. 706(A).  CR
247 and 251.  Mr. Sedaghaty also requested a Letter Rogatory to secure the
testimony of Mr. Al Sanad, either his presence at trial or through a deposition
in a foreign country.  In addition, Mr. Sedaghaty requested that the Court order
the government to utilize its vast diplomatic resources to secure the requested
documents.  CR 247 and 251.

In response, the government objected, arguing that "those documents on
their face lack any legitimacy so they are neither exculpatory nor particularly
probative of any relevant issue."  CR 262 at 3.  The government confirmed that
counsel for the government received these documents in January 2005.  CR
262 at 7.  Though the government considered the documents unreliable, it did
agree that the documents stated that Al-Haramain in Saudi Arabia received
money from Al-Haramain USA through Mr. Al Buthe for Chechen Muslims.  CR

262 at 7.  Despite this, the government concluded that there is nothing particularly exculpatory about those references.  CR 262 at 3.

In contrast to its objection to documentation that goes to the heart of the issues in this case, the government did not object to a Letter Rogatory inviting Mr. Al Sanad to testify or be deposed.  CR 262 at 3.  The government asserted that Mr. Al Sanad's testimony might have some limited relevance in assisting the trier of fact to trace the money from Oregon to Saudi Arabia and onward to Chechnya.  CR 262 at 12.  The government raised concerns that the Letter Rogatory process may be slow because, at the time, the Kingdom of Saudi Arabia had not responded to U.S. diplomatic requests to obtain bank documents for use at the trial.  CR 262 at 13.

On  April 16, 2010, the Court issued a minute order granting a Letter Rogatory for the testimony of Mr. Al Sanad, but did not do so for the documents referenced in the pleadings and above.  CR 327.  The government was ultimately able to receive bank records from Saudi Arabia through subpoena and introduced those bank records at trial.  CR 405.  On August 20, 2010, Mr. Sedaghaty objected to the use of those bank records, arguing that Mr. Sedaghaty had requested the government's assistance in obtaining bank records from Saudi Arabia, the specific bank records that were referenced on the receipts (CR 420 at 5) and that the government had refused to do so.  The

Court did not directly rule on this objection, other than to allow the

government to introduce the bank records at trial.

The fundamental unfairness was apparent. The Court should have

allowed the receipts to be presented to the jury. This could have been done

with an appropriate limiting instruction. The Court's refusal to admit defense

exhibits 704(A)-705(B), in contrast to the inaccurate portrayal of the

investigation in this case, rendered the trial fundamentally unfair, and a new

trial is required. *See Wardius v. Oregon*, 412 U.S. 470, 472, 476-77 (1973).

During trial, Mr. Seda was repeatedly prevented from showing the

receipts to his witnesses or the jury. Tr. 244-45, 272-77 (September 2, 2010);

Tr. 108-09 (September 3, 2010); Tr. 187-89, 227-28, 272 (September 7, 2010).

As a result, the jury was left with a completely distorted picture. The

government took full advantage of this distorted picture in closing.

> Then what happens? Well, Mr. al-Buthe goes back to Saudi
> Arabia, and he cashes the checks. And this ALRA. You see he
> cashed the 130,000 American Express traveler's checks, and he
> got 486,850 Saudi rivals in cash. *And that's gone. Trail dries up.*
>
> Now, he also takes that cashier's check made payable to him for
> $21,000 – and this is on ALRA, the translation for pages 4 and 5.
> And it's a little faint, but you'll be able to see it in the jury room.
> Here is the $21,000 Bank of America traveler's check. Here is the
> rate between Saudi rivals and the dollar. And it turns into 78,729
> rivals. And the credit is April 8th of 2000. Next exhibit, please.
> And here is the deposit into Mr. al-Buthe's personal bank account
> at the bank for the 78,729 rivals, April 8.
>
> And then as Agent Anderson explained – if we could have the ext
> exhibit – you can see that the money in his account was spent over

the next period.  There's nothing that indicates it's going to Chechnya.  Nothing that indicates it's going to the Saudi Joint Relief Committee.  *Nothing that indicates that it's going to al-Haramain.*  Looks like it's spent for normal personal expenses.

Gorder closing, Tr. 64 (September 8, 2010) (emphasis added).  The defense had evidence that the government chose to ignore and that the Court refused to allow the jury to see; indeed, to ignore the receipts was the only way the government could present its distorted, inaccurate, and speculative theory.  A new trial is required.

### 2.    Colonel Lang's Testimony.

One of the key defense witnesses at trial was Col. Patrick Lang, a retired colonel of Military Intelligence of the United States Army and of the Senior Executive Service (civilian) of the Defense Intelligence Agency (DIA) where he was head of all matters concerning the Middle East, South Asia, and Counter-terrorism for seven years.  During the course of Col. Lang's testimony, the Court stopped the proceedings and then proceeded to severely limit the defense expert's testimony.  Tr. 95-97 (September 3, 2010).   The colonel was prepared to testify in detail about rejected exhibits 704(A) and 705(A) and 706 through 729.

As reflected in the declaration from Col. Lang, the Court's ruling was contrary to the applicable law on classified information.  Ex. A.  The ruling both chilled the Colonel's testimony and severely impeded the defense efforts to present the truth to the jury.

3.    **The Rulings On Exhibits 704 and 705 and on
Colonel Lang Denied Mr. Seda His Right To Present
A Defense Under The Fifth And Sixth Amendments.**

The rulings described above prevented the defense from presenting

evidence contradictory to the government's evidence, as well as a theory of

defense.  This violated the Fifth and Sixth Amendments.  "The Constitution

guarantees criminal defendants a meaningful opportunity to present a

complete defense."  *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)

(citations and quotations omitted).  *See Crane v. Kentucky*, 476 U.S. 683, 690

(1986).  The limitation in attacking the government investigation violated Mr.

Seda's due process rights. "[A]ttack[ing] the reliability of [an] investigation" is

an important defense tactic.  *See Kyles v. Whitley*, 514 U.S. 419, 446 (1995).

In this case, the government took great pains to explain to the jury the

extent of their investigation.  In response, the defense attempted to present

evidence of the lack of investigation by producing receipts, which contained the

Al Haramain Chechen relief bank account number, regarding the funds at

issue in the trial.  The Court prevented the defense from presenting this

defense or evidence at trial.  Tr. 244-45, 272-77 (September 2, 2010); Tr. 108-

09 (September 3, 2010); Tr. 187-89, 227-28, 272 (September 7, 2010).  This

rendered the trial fundamentally unfair, and a new trial is required.

### 4.    The Continuance And The Witness Sui.

As described in the affidavits of Investigator Strupp, the defense was finally able to locate and contact a key witness, Muhammad Sui, one of the signers of the agreement between Mr. Seda and Mr. Al-buthe (AHIR 2 and 3), barely two weeks before the trial.  CR 429, 430, 437.  The witness was not willing to come voluntarily to the United States to testify.  As a United States citizen, he was subject to subpoena.  As reflected in Mr. Strupp's declaration, it was, however, impossible to obtain a subpoena in time for the August 30 trial date.  The Court summarily denied Mr. Seda's request for a continuance but did allow video testimony.  Tr. 13 (pretrial hearing, August 26, 2010).

Mr. Seda made significant efforts to convince Mr. Sui to testify voluntarily by video.  Ex. B.  In the end, Mr. Sui refused.  Ex. B.  Given the importance of AHIF 2 and 3 to the government's presentation, his absence was fatal to the defense.  The Court's refusal to grant a continuance so that Mr. Sui could be present violated the compulsory process clause and rendered the trial fundamentally unfair.  *United States v. Hobos*, 573 F.2d 1111, 1114 (9th Cir. 1978) ("when a continuance is sought to obtain witnesses, the accused must show who they are, what their testimony will be, that the testimony will be competent and relevant, that the witnesses can probably be obtained if the continuance is granted, and due diligence has been used to obtain their attendance on the day set for trial") (citations omitted).

### C.    Appeals To Prejudice.

#### 1.    Guilt By Association.

The government used, throughout the trial, a photo montage that was on a large posterboard. The government claimed it was "demonstrative purposes" and used it at every opportunity to demonstrate the government's approach of guilt by association.  The persons depicted by photograph were Mr. Seda; an inflammatory photo of Soliman Al Buthe, the co-defendant; a non-photo silhouette of Mr. Al Shoumar; Abdul Quadir; and Commander Ul-Khattab, leader of the Chechen mujahideen.  There are many references to this photo montage, particularly during opening and closing.  *See, e.g.*, Tr. 8-9, 25, 29, 32 (Gov't Opening, August 30, 2010); 50-51, 56 (September 8, 2010).The government could not have relied on guilt by association any more than they did in this trial.  *See Kennedy v. Lockyer*, 379 F.3d 1041, 1055-56 (9th Cir. 2004) (evidence of gang membership cannot be introduced to prove intent or culpability; such evidence creates the impermissible and prejudicial risk of "guilt by association," as well as the risk that the jury will equate gang membership with the charged crimes).  Any jury instructions provided did not cure the prejudice that was caused by the photo montage.

The photo montage was the most visual act of guilt by association, but the testimony was replete with it.  Indeed, the entire testimony of Evan Kohlmann was designed to invite a conviction because, as a general

proposition, Islamic charities were believed to have funded terrorism and mujahideen.  This testimony was offered with no link to Mr. Seda or Al Haramain Ashland.

The closing argument contains another clear example of the improper appeal to prejudice.  Since September 11, 2001, the biggest bogeyman for the United States has been Osama Bin Laden.  Mr. Seda abhors Bin Laden and his perversion of Islam, but the jury was not permitted to read Mr. Seda's writings on this subject.  *See e.g.* Exs. 810(B), 813(A), 836(B), 836(C), 839, 840, 840(A), 840(B), and 840(C).  *Compare Waters*, *supra*.  The government was, however, permitted to inject the bogeyman into the trial through testimony that the man the Saudi government placed as head of the Saudi's Joint Relief Committee was an "old friend"[3] of Bin Laden's and had fought with him in Afghanistan at a time when the United States was funding the anti-Soviet mujahideen.  TR. 169-71 (August 31, 2010).

This appeal to emotion and prejudice and a call to find Mr. Seda guilty based on the former friendship with no proof of any communication between him and Mr. Seda or any knowledge about him by Mr. Seda requires a new trial.

---

[3]  This description escalated through trial.  On August 31, 2010, he was described as an "old friend" of Osama Bin Laden.  Tr. 169-71 (August 31, 2010).  On September 3, 2010, he was described as a "good friend," and then on September 8, 2010, he was described as a "best friend" of Osama Bin Laden.  Tr. 124 (September 3, 2010) and Tr. 74 (September 8, 2010).

**Page 17**      **MOTION FOR NEW TRIAL**

In his opening statement, Mr. Cardani stated there are no terrorism charges in this indictment:

> The government is not accusing Mr. Sedaghaty for being a terrorist.  Right.  Tax count and a conspiracy count.  There will be lots of evidence related to the whole atmosphere of violent events overseas but there are no terrorism charges.

Gov't Opening at 6.  That is not how the case was tried.  Notwithstanding the fact that support of the Chechen fighters and condemnation of Russian brutality was official United States policy in 1999-2000, that support of the fighters was lawful, and that the fighters were not terrorists, but were engaged in a war of national liberation, the government and its witnesses repeatedly spoke about terrorism.  *See*, *e.g.*, Tr. 60 (August 31, 2010); 104-06 (August 31, 2010); 109 (August 31, 2010); 111 (August 31, 2010); 113-114 (August 31, 2010); 171 (August 31, 2010); 264 (August 31, 2010); 42 (September 1, 2010); 170 (September 2, 2010); 201 (September 2, 2010); 68-69 (September 7, 2010); 258 (September 7, 2010); 261 (September 7, 2010); 268 (September 7, 2010). And in closing, the government references to terrorism amounted to an appeal to the jurors' fears about terrorism.

> Why are records so important?  Because this kind of stuff once it's out there, it can disappear into the Never Never Land of terrorism. This is how wars are fought.  The mujahideen are not sponsored by countries.

> It's not like Russia who pays its soldiers with rubles, government money.  It's not like the American Army being paid with dollars. The mujahideen are freelance fighters that go around the global to promote their terrible version of a religion that has very peaceful

> elements of it, but their version of hatred, of killing people that
> don't believe in their religion, they have all these crazy views about
> women.  This is how they do their stuff.  Cash.  And once cash is
> released into the mainstream, it's gone.

Cardani closing, Tr. 157-58 (September 8, 2010).

## 2.    Anti-Islamic Statements And Actions.

> This trial is not about the religion of Islam.  This case will
> involve religious aspects to it to tell you what the defendant's
> mindset was when he engaged in these transactions because we
> will show you that al-Haramain subscribed to a very strident form
> of Islam that promoted acts of violence in the name of religion,
> jihad, violent jihad, aggressive "kill people" jihad.

Gov't Opening, Tr. 22 (August 30, 2010).  While this was stated in the opening,

the focus of the trial did put Islam on trial.  This was seen most clearly in the

rebuttal closing.

The prosecutor started his rebuttal with the Noble Qur'an.  The

transcript shows the prosecutor saying, virtually at the outset, "The Noble

Qur'an is the defendant..." Cardani closing, Tr. 152 (September 8, 2010).   He

went on:

> after he started working for Al Haramain, sending to U.S. prisons around
> this country, in the thousands, 10 to 15,000 prisoners, violent people
> serving time, getting junk like this from Al Haramain saying jihad is an
> obligation for Muslims. Talk about people prone to suggestion. Prisoners.

Cardani closing, Tr. 152 (September 8, 2010).

During this argument, and again later during the closing (Cardani

closing, Tr. 187 (September 8, 2010)), the prosecutor was waiving the Qur'an

around and then tossed it down on the table directly in front of the jury.[4]

This portion of the argument falls directly within the holding of *Bains*.

There the Circuit noted that while most of the governments argument about

the Sikh religion was relevant,

> A not insignificant portion of the prosecutor's closing arguments,
> however, highlighted the relevant testimony in a way that went
> beyond merely providing evidence of motive and intent...and that
> invited the jury to give in to their prejudices and buy into the
> various stereotypes that the prosecutor was promoting.

*Bains*, 204 F.3d at 974.

Particularly in the climate about Islam that exists in this country today,

that is the type of statement that the courts have held appeals to prejudice and

emotion.  The Ninth Circuit has held that "appeals to racial, ethnic, or religious

prejudice during the court of a trial violate a defendant's Fifth Amendment

right to a fair trial."  *United States v. Knobbier*, 574 F.3d 1065,1073 (9th Cir.

2009), quoting *United States v. Cabrera*, 222 F.3d 590, 594 (9th Cir. 2000).

Specifically, clearly established federal law provides that such prosecutorial

conduct "violates a criminal defendant's due process and equal protection

---

[4]  The parties agree that during these portions of the argument, the
prosecutor was waiving, and then tossed down, the Noble Qur'an that had been
shown to witnesses during the trial.  This version contains the original Arabic
and an English translation of the Qur'an and contains as Appendix 3, the Call
to Jihad.

rights." *Bain v. Cambrai*, 204 F.3d 964, 974 (9th Cir. 2000). Here, the words were compounded by action.

Whatever an individual's views of the Qur'an, even one that contains the jihad appendix, it remains the holy book of one of the world's major religions. Moreover, The Noble Qur'an was the official Qur'an of the Kingdom of Saudi Arabia, one of the United States' closest allies in 2000. Whether consciously or not, throwing the holy book of Islam onto the table had the effect of allowing jurors to act based on emotion and also profoundly disrespected the defendant's religion.

The government's statements about the Noble Qur'an, anti-Semitism, and terrorism invited the jurors to give into their prejudices. *See Knobbier*, 574 F.3d at 1073; *Sandoval v. Calderon*, 241 F.3d 765, 776 (9th Cir. 2001); *United States v. Leon-Reyes*, 177 F.3d 816, 822 (9th Cir. 1999) ("Prosecutors may not make comments calculated to arouse the passions or prejudices of the jury."). *See also Viereck v. United States*, 318 U.S. 236, 247-48 (1943)

> A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem. The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear.

*Leon-Reyes*, 177 F. 3d at 822 (citations omitted).  The trial was tainted with

fear of Muslims, Islam, and terrorism.  A new trial is required.

### D.    Distortion Of The Record Through The Rule 404(b) Rulings.

#### 1.    The Gartenstein-Ross Check.

Pre-trial, the Court properly ruled that evidence of a check Mr. Seda had

written to Mr. Gartenstein-Ross for salary but had described it as for a

computer was inadmissible under a F.R.E. 403 and 404(b) analysis.

Completely unrelated to the manner in which the defendant paid

Mr. Gartenstein-Ross, in the defense's opening statement, counsel provided the

jury one of many examples of carelessness on the part of the accountant, the

accountant's preparation of several federal unemployment tax (FUTA) returns

for Al Haramain Ashland despite numerous letters from the IRS notifying him

that the organization was exempt from that tax.  The Court, sua sponte, ruled

that the defense had opened the door to the issue of paying employees under

the table and allowed the 404(b) evidence to be presented to the jury.

The reference to federal unemployment taxes in the opening statement

was wholly unrelated to any issue regarding one example of Mr. Seda paying an

employee under the table.  *See* Tr. 11 (September 1, 2010).  This did not open

the door to the 404(b) evidence in this case.  *Compare United States v. Kerr*, 981

F.2d 1050, 1052 (9th Cir. 1992)  (defense counsel's remark during opening

statement that defendant possessed cocaine at time of arrest, opened the door

to testimony that defendant possessed a small amount of cocaine when he was arrested in 1990, after the time period of the charged conspiracy).

Nothing said in the opening statement put this transaction at issue. Its use by the government to argue a pattern of lying to Mr. Wilcox was fundamentally unfair. As mentioned above, that fundamental unfairness was compounded when the government's closing argument then misstated the accountant's ultimate admission that he never entered the check into QuickBooks based on conversations with Mr. Sedaghaty – a direct contradiction of his earlier testimony.

### 2.    The Jewelry Sale.

Use of testimony about a jewelry sale by Bobbie Cabral had no place in Mr. Seda's trial. She was permitted to testify that the "sisters" held a jewelry sale to raise money for blankets and food for Chechen mujahideen. Tr. 279-80 (August 31, 2010). There was no testimony linking Mr. Seda to that sale. It is difficult to conceive of a proper rationale for admission of the acts of others in this way.

The unfairness and prejudice was compounded when the Court excluded the one piece of evidence that did link Mr. Seda to the sale – proposed defense Exhibit 801, the April 1, 2000, email from Mr. Seda to Ms. Shokatfard stating that he would not allow Al Haramain to be involved in any such activity.

### 3.    The Hajj And Kosovo Testimony.

In addition to testimony about Chechnya, the Court permitted testimony about alleged solicitations by Mr. Seda for money for food and blankets for mujahideen in Kosovo and a separate appeal for Chechnya at the end of Hajj in 1999.  Both were collateral.  Neither of these alleged acts involved Al Haramain or any money that should have been accounted for on Al Haramain's tax return.  If the actions took place, they were legal and private.  Mr. Seda was put in the position of having to determine how much emphasis to place on them – expanding the trial by calling witnesses to refute the testimony or allowing it to stand rebutted only through cross-examination of the government witnesses.  Allowing expansion of the case in this way was fundamentally unfair.

The unfairness was particularly acute since the Court precluded Mr. Seda from introducing any of the long series of correspondence of his efforts to get humanitarian aid to the Palestinians or repeated statements against funding mujahideen or terrorism.  Proposed Def. Ex. 866-890.

### E.    Prosecution Distortion Of The Evidence.

Throughout the trial, the government distorted the evidence.

> ### 1.  The Government Inserted Highly Prejudicial Facts That Were Not Part Of The Evidence Before The Jury Or Ever Provided To The Defense.

"[W]e now hold that the use of guilt assuming hypotheticals undermines the presumption of innocence and thus violates a defendant's right to due process." *United States v. Shwayder*, 312 F.3d 1109, 1121 (9th Cir. 2002).  The government asked the following hypothetical question at Tr. 171, September 2, 2010, P.M. session:

> Assume there's a wealthy Egyptian individual who wants to donate money to the Chechnyan mujahideen[5] to support a fight in Chechnya,[6] and knows that there's an operation in Saudi Arabia, and there's an office in Ashland, Oregon,[7] and decides to send the money from an account that he has overseas to the United States rather than to Saudi Arabia to conceal the transaction from the Egyptian government.[8]

---

[5]  There is no evidence in the record that Dr. El Fiki wanted to donate money to Chechen mujahadeen.  The record reflects he had heard of a "Saudi Committee" and wanted to donate money as Zakat.  Exhibit 669.  Exhibit 678, not admitted at trial, explains that Dr. El Fiki acted in response to a request for "donations for providing humanitarian aid to Chechnyan widows, orphans and refugees."  Exhibit 678 further provides that before he made his donation, Dr. El Fiki was assured by contacts in Saudi Arabia and by a trusted employee that the foundation had a good reputation for providing humanitarian aid.

[6]  There is no evidence in the record that Dr. El Fiki wanted to support a fight in Chechnya.  *Supra.*

[7]  There is no evidence in the record that Dr. El Fiki knew of an "office" in Ashland, Oregon.  After he requested whether Al Haramain Riyadh had "an account" in London, he was told that they had "an account" in Ashland, Oregon, USA.  Ex.  670-671.

[8]  There is no evidence in the record that Dr. El Fiki intended to conceal the transaction from the Egyptian government.  To the contrary, the formidable Egyptian State Security Investigations Service (SSIS), a branch of the Interior Ministry, reported to the FBI that it "conducted extensive investigation into

Contrary to *Shwader*, the government's hypothetical improperly included

prejudicial facts that are not in evidence nor supported by any information that

may come into evidence.

While the government stated that the reason for including the statement,

"there's a wealthy Egyptian individual who wants to donate money to the

_____

Dr. El Fiki's finances."  Exhibit 678, p. 1. The SSIS made no allegation that
Dr. El Fiki tried to conceal the transaction from the Egyptian government, but
rather advised the FBI:

> El Fiki has donated upwards of approximately 35 million Egyptian
> Pounds (converted to **S.** dollars using conversion rate of 5.87
> Egyptian pounds to the dollar, is equivalent to approximately $5.9
> million), during his lifetime to various charitable causes
> throughout Egypt. He has been primarily involved in the
> construction of, and the purchase of equipment for hospitals in
> Egypt. He prefers to use his money to build facilities or to purchase
> specific equipment as opposed to donating cash.

> El Fiki has no interest in seeking publicity for his philanthropy and
> deflects inquiries about his charitable works. He has never had a
> hospital named after him. He typically directs hospital
> administrators in charge of naming their facilities to use the names
> of honored deceased individuals to name the buildings. Earlier in
> his life El Fiki donated approximately 10% of his income to Zakat.
> Investigation conducted by SSIS revealed that later in life El Fiki
> donates approximately 80% of his income to charity.

> El Fiki is an engineer who received a Ph.D. in Engineering from
> Sofia University in Sofia, Bulgaria. El Fiki owns and operates the
> Cairo Construction Company (CCC). CCC was, and continues to be
> a prominent builder of hospitals in Egypt. The company has been
> involved in numerous large building projects throughout Egypt. Ex
> 678.

Chechnyan mujahideen," was based on information that Dr. El Fiki is somehow associated with the Muslim Brotherhood, there has been nothing suggested throughout this case that would support that conclusion, nor would such a vague association, even if supported, justify the specific claims to the jury in the hypothetical question.

The hypothetical amounted to an assumption of guilt of a conspiracy, and thus undermined Mr. Sedaghaty's presumption of innocence.  This was improper.  Moreover, the government's use of a hypothetical that included facts that were not before the jury was improper.  *See United States v. Stephens*, 73 F.2d 695, 703 (9th Cir. 1934) ("If the hypothetical question properly presents the fact which the evidence tends to prove, and does not call upon the witness to reconcile conflicting evidence or pass upon the merits of the case, a wide range may be given by the court and a liberal allowance as to its form.").  *See also United States v. Scarbrough*, 470 F.2d 166, 168 (9th Cir. 1972) (upholding trial court's decision disallowing testimony that was given in response to a hypothetical question that assumed facts not in evidence).

By introducing prejudicial information to the jury that was not in the record, or even in discovery provided to the defense, the government violated Mr. Sedaghaty's right to due process of law.

The Court erred when it failed to: (1) strike the remarks or inform the jury that they are stricken from the record because they are not supported by

evidence, as requested by the defense; and (2) admit the defense requested Exhibit 678, the El Fiki FBI interview.  A new trial is required.

> **2.    The Government Made Misstatements Of The Facts Directly Related To Mr. Wilcox's Allegedly Coding Checks Into QuickBooks Based On Information Provided By Al Haramain.**

A critical issue in this case was whether Al Haramain told Mr. Wilcox to code a portion of the El Fiki donation into the Springfield building sale.  As a parallel example of Mr. Wilcox coding transactions based on conversations with Mr. Seda, the government relied on a sequence of events surrounding government Exhibit BOA-6, a check written to Daveed Gartenstein-Ross, with a notation on the memo line regarding a computer.  Despite the fact that Mr. Wilcox's testimony undeniably confirmed that he did not code that check, Tr. 99 (September 2, 2010), the government ignored the testimony of its own witness and instead argued to the jury that Mr. Wilcox did code that check as a result of a conversation with Mr. Sedaghaty.  Tr. 169 (September 8, 2010). This was not correct and requires a new trial.

> **F.    Voir Dire And Jury Issues.**

>> **1.    Juror Prejudice Demonstrated During Voir Dire.**

The Court properly recognized before trial that the case was of a "sensitive nature."  CR 407, p. 19.  Despite that recognition, the Court failed to allow a fair and thorough review of the jury pool.  This failure resulted in a tainted jury.  Although the defense requested a questionnaire in order to

examine the potential jurors' prejudices, the Court denied this motion.  Rather, the Court conducted a cursory review of the jurors and their prejudices, relying on approximately 15 questions, only one of which touched upon any issues regarding religion.

During the questioning of the prospective jurors, the presence in the jury pool of strong and emotional anti-Islamic sentiment became apparent.  The Court, however, did minimal questioning about these issues and cut counsel off at exactly 15 minutes of questioning after it had become apparent how strong some of the jurors' views were and how those views would preclude a fair assessment of the facts.  Tr. 104 (Voir Dire, Aug. 30, 2010).  Counsel was, thereby, prohibited from determining how many other jurors held similar views.

The Court's ruling on several challenges for cause ignored the prejudice that the prospective jurors had expressed, improperly leaving Mr. Seda to spend peremptory challenges on those jurors.  Tr. 108-09 (Voir Dire, August 30, 2010).  *See Rosales-Lopez v. United States*, 451 U.S. 182, 188-192 (1981) ("Only when there are more substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors in a particular case does the trial court's denial of a defendant's request to examine the jurors' ability to deal impartially with this subject amount to an unconstitutional abuse of discretion"); *Skilling v. United States*, 130 S. Ct. 2896, 2919-20 (2010).  Here,

there were several indications of significant prejudices against Mr. Sedaghaty. This was not adequately addressed in Voir Dire.

### 2.    Juror Prejudice Demonstrated During The Trial.

During the trial an unknown number of jurors expressed a pro-prosecution bias.  On the third day of trial, it was revealed that the government had become aware of three instances of potential juror misconduct.  The first involved Juror number 1 complimenting a government witness as the witness got off the stand.  Tr. 4 (September 1, 2010).  The other two instances involved jurors complimenting the work of the government's supervisory litigation support specialist, Susan Cooke.  Tr. 4-5 (September 1, 2010).  The defense moved for the Court to examine the jurors, and remove those jurors who had revealed bias for the government.  The Court failed to examine any of the jurors, nor did the Court require the government to identify the jurors who had complimented Ms. Cooke.

The Court, upon the defense's motion, did remove juror number 1 from the jury.  However, the Court declined to conduct any further review of the jurors who had complimented Ms. Cooke.  Counsel requested that the Court inquire into the matter.  Tr. 6 (September 1, 2010).  The Court did not do so. The Court should have requested that the government reveal which jurors complimented Ms. Cooke and conducted an examination as to jurors' bias.

The Sixth Amendment guarantees a defendant in a criminal case a fair and impartial jury. As a result, "private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Mattox v. United States*, 146 U.S. 140, 150 (1892). *See also Turner v. Louisiana*, 379 U.S. 466, 473-74 (1965) (finding denial of right to impartial jury where jurors had continuous and intimate contact with two key government witnesses).

The Ninth Circuit has stated that it and "other circuits have held that *Mattox* established a brightline rule: Any unauthorized communication between a juror and a witness or interested party is presumptively prejudicial, but the government may overcome the presumption by making a strong contrary showing." *Caliendo v. Warden of Cal. Men's Colony*, 365 F.3d 691, 696, 698 (9th Cir. 2004). In *Caliendo*, the Ninth Circuit noted a number of considerations for determining whether the government has carried its burden of overcoming the presumption of prejudice that arises from improper juror communications. These factors include whether an unauthorized communication between a juror and a third party concerned the case; the length and nature of the contact; the identity and role at trial of the partes involved; evidence of actual impact on the juror; and, the possibility of eliminating prejudice through a limiting instruction. *Caliendo*, 365 F.3d at 697-98. Unfortunately, because this Court

failed to conduct an examination of the unknown complimentary jurors; this communication is presumptively prejudicial.

In light of the prejudice shown during voir dire and in the comment of the juror who was excused, the fact of ingratiating comments made to the prosecution by jurors requires a new trial.

### 3.    Improper Influence On Jurors On The Day Of Deliberations And Verdict.

On Wednesday September 9, the jurors continued their deliberations. That morning, the newspaper USA Today ran a front page story with a photograph about burning Qur'ans.  Ex. C.  The hotel where Juror 5 spent the night (the same hotel as the defense team) placed the newspaper on all tables in the breakfast area.  The juror was observed sitting at one of the tables and reading the newspaper.  *See* Ex. D.  That same day, there was significant television coverage about burning the Qur'an.

This exposure likely prejudiced the juror and strengthened any fears the juror had regarding Muslims and the religion of Islam.  *See Marshall v. United States*, 360 U.S. 310, 312-13 (1959) (recognizing that exposure to prejudicial information is "almost certain to be as great when that evidence reaches the jury through news accounts as when it is a part of the prosecution's evidence").  Here, the government went out of its way to vilify the Qur'an throughout trial, and most particularly, during closing argument.  The closing argument was on September 8th, a mere three days before the anniversary of 9/11, and one day

before the article at issue appeared in the newspaper that Juror number 5 was

seen reading.  The same day the verdict was received.

Exposure of the jurors to this type of inflammatory anti-Islamic

sentiment on the day they resumed deliberations and issued a verdict requires

a new trial.  At the very least, a thorough inquiry regarding the prejudicial

influence of the media on Juror number 5 and all the jurors is required.

### G.    The Court's Failure To Allow For A Public Trial And For Mr. Sedaghaty To Be Present.

Prior to trial, the Court ruled that no classified evidence would be

presented to the jury.  CR 407 at 12.  Counsel were fully aware of their

obligations.  Notwithstanding that fact, several times during trial, the Court

requested counsel, and only counsel, to appear outside the presence of the

jury, without Mr. Seda and in closed session.[9]  The Court violated Mr. Seda's

---

[9]  According to information provided by the Court Security Officer, the following closed sessions were held during trial:

August 31, 2010 (4:14 p.m.) Closed hearing with Gorder, Cardani, Wax, Matasar, Scooter Slade, David Baker, Christy Weller.

September 2, 2010 (5:53 p.m.) Closed hearing with Gorder, Cardani, Matasar, Wax, William Teesdale, David Carroll, Colleen Anderson, Scooter Slade, David Baker, Christy Weller.

September 2, 2010 (6:05 p.m.) Closed hearing with Gorder, Cardani, David Carroll, Colleen Anderson, Scooter Slade, David Baker, Christy Weller.

September 2, 2010 (6:12 p.m.) Closed hearing with Gorder, Cardani, David Carroll, Colleen Anders, Scooter Slade, David Baker, Christy Weller.

Sixth Amendment and Rule 43 right to be present and a public trial.    The

reasons for trial to appear before the public are: (1) to ensure a fair trial, (2) to

remind the prosecutor and judge of their responsibility to the accused and the

importance of their functions, (3) to encourage witnesses to come forward, and

(4) to discourage perjury.  *United States v. Ivester*, 316 F.3d 955, 960 (9th Cir.

2003).  It is unclear why the Court held many of these sessions outside the

public forum without Mr. Seda present.  As to the sessions that defense

counsel was present, with one exception, no classified information was

discussed.

### H.    The Court Held Unnecessary Ex Parte Sessions With The Government Attorneys And Their Case Agents.

Several times during trial, as mentioned above, the Court held closed

sessions with the attorneys from both parties, as well as having the

government case agents present.[10]  The defendant was not present.  After each

---

September 3, 2010 (11:20 a.m.) Closed hearing with Gorder, Cardani, Wax, Matasar, Scooter Slade, Christy Weller, David Baker.

September 7, 2010 (2:50 p.m.) Closed hearing with Cardani, Gorder, David Carroll, Scooter Slade, David Baker.

September 7, 2010 (2:28 p.m.) Closed hearing with Gorder, Cardani, David Carrol, Wax, William Teesdale, Christy Weller, Scooter Slade, David Baker.

[10]  According to information provided by the Court Security Officer, the following closed sessions were held during trial:

August 31, 2010 (4:14 p.m.) Closed hearing with Gorder, Cardani,

of these sessions, counsel for the defense was excused and the Court

continued to meet with the government attorneys as well as the case agents.[11]

There was no notice served on the defense regarding the need for the

government to communicate with the Court ex parte, as required under

Classified Information Procedures Act (CIPA).  It remains unclear from the

record what prompted the closed sessions, and counsel is unaware of anything

said in the closed sessions for which he was present that would have

---

Wax, Matasar, Scooter Slade, David Baker, Christy Weller.

September 2, 2010 (5:53 p.m.) Closed hearing with Gorder, Cardani, Matasar, Wax, William Teesdale, David Carroll, Colleen Anderson, Scooter Slade, David Baker, Christy Weller.

September 2, 2010 (6:05 p.m.) Closed hearing with Gorder, Cardani, David Carroll, Colleen Anderson, Scooter Slade, David Baker, Christy Weller.

September 2, 2010 (6:12 p.m.) Closed hearing with Gorder, Cardani, David Carroll, Colleen Anders, Scooter Slade, David Baker, Christy Weller.

September 3, 2010 (11:20 a.m.) Closed hearing with Gorder, Cardani, Wax, Matasar, Scooter Slade, Christy Weller, David Baker.

September 7, 2010 (2:50 p.m.) Closed hearing with Cardani, Gorder, David Carroll, Scooter Slade, David Baker.

September 7, 2010 (2:28 p.m.) Closed hearing with Gorder, Cardani, David Carrol, Wax, William Teesdale, Christy Weller, Scooter Slade, David Baker.

[11]  In addition to the list provided by the Court Security Officer, the defense similarly objects to any other ex parte sessions.

necessitated the need for the government to meet with the Court in an ex parte

format, especially where defense counsel have proper security clearances.  It is

counsel's understanding that these ex parte sessions were held on the record.

The manner in which these sessions were held necessitates a new trial.

> **I.     The Court Erred When It Ordered The Defense To Not Discuss
> The Evidence That The Defense Placed In The Secure Facility.**

On May 18, 2008, the Court issued an order preventing counsel for the

defense from discussing or viewing the document that the defense placed in the

secure facility.  This Order prevented Mr. Sedaghaty from presenting a

complete defense.  He was prevented from filing necessary pre-trial motions,

from conducting investigation, and from presenting a complete defense theory

at trial.  This Order violated Mr. Sedaghaty's due process rights and

necessitates a new trial.

> **J.     The Indictment Was Based On Speculation And False
> Statements Of Fact.**

AUSA Chris Cardani and IRS Case Agent Colleen Anderson speculated

throughout their investigation and in their presentation to the grand jury in

this case.  At trial, Agent Anderson was questioned about a few specific

examples of the speculation in this case, specifically regarding recipients of e-

mails, practices of one of the banks at issue in the case, and the meaning of

two agreements that were provided to the government through the subpoena

process.  Tr. 254-60 (September 2, 2010).   In addition, Agent Anderson

admitted that she reported to the grand jury that Mr. Sedaghaty had printed and provided his accountant the Springfield Building schedule.  This was not the case.  Rather, Mr. Wilcox had entered that information and he printed the Springfield Building schedule.  Tr. 260-61 (September 2, 2010).  In addition, Agent Anderson agreed that she may have told the grand jury that the $21,000 was returned to the donor, Dr. El Fiki, rather than given to Mr. Al Buthe.  Tr. 248 (September 2, 2010).  Agent Anderson also told the grand jury that the $21,000 necessarily derived from the El Fiki donation.  She then admitted at trial the funds may have derived from a different source.  The government provided speculative and false information to the grand jury, and as a result, an indictment was returned.  After Mr. Cardani learned of the change in the critical facts, as presented to the grand jury, he did nothing to cure this misinformation.  Mr. Sedaghaty's due process rights have been violated.  A new trial is required.

II.    **Conclusion**

For all the reasons set forth herein, a new trial should be ordered.

Respectfully submitted on September 23, 2010.

/s/ Steven T. Wax
Steven T. Wax
Federal Public Defender

/s/ Lawrence H. Matasar
Lawrence H. Matasar

Michelle Sweet
Assisting on the Motion