# Exhibit A

Steven T. Wax, OSB No. 85012
Federal Public Defender
101 SW Main Street, Suite 1700
Portland, OR 97204
Tel: (503) 326-2123
Fax: (503) 326-5524
Email: steve_wax@fd.org

Lawrence Matasar, OSB No. 74209
621 SW Morrison Street, Suite #1025
Portland, OR 97205
Tel: (503) 222-9830
Email: larry@pdxlaw.com

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. 05-60008-HO |
| Plaintiff, | |
| v. | DECLARATION OF COLONEL W. PATRICK LANG, RETIRED |
| PIROUZ SEDAGHATY, | |
| Defendant. | |

I, W. Patrick Lang, declare:

1. My name is Walter Patrick Lang, Jr. I am a retired colonel of Military Intelligence of the United States Army and of the Senior Executive Service (civilian) of the Defense Intelligence Agency (DIA) where I was head of all matters concerning the Middle East, South Asia, and Counter-terrorism for seven years.

Page 1    DECLARATION OF COLONEL W. PATRICK LANG, RETIRED

I was later head of all HUMINT operations for the DIA world-wide for two years. I was a specialist in Middle Eastern and Islamic affairs for the U.S. government for over twenty years.

2. While I held the positions described above, I had security clearance for Top Secret SCI material and about fifty compartments of classified material above Top Secret SCI. (This description is not classified.) In other words, I had access to all classified and unclassified material available to DIA. I now hold a "collateral" Secret federal clearance. This clearance level was restored to me six years ago by the U.S. government at their convenience because the government wanted me to do numerous consulting jobs dealing with national security that required such access.

3. During my Army career I was repeatedly schooled in various courses at the Military Intelligence school with regard to the proper procedures and law regarding the handling and use of classified information. At one point during my Army career, I was the commander of a detachment of the United States Army Special Security Group (USASSG). The detachment was located in Izmir, Turkey, at the NATO headquarters there. In that capacity I was responsible for the communication, administration, and regulation of clearance access to Top Secret SCI material for all the U.S. generals and senior staff serving in the NATO headquarters in Turkey. I was also responsible for investigation of any violations

of security by such people who had access to such information. I was the custodian of all such information in those headquarters.

4. As the head of Middle East, South Asian, and Counter-Terrorism affairs in DIA, I was the classifying authority for all materials up to the level of Top Secret, Special Compartmented Information (SCI). In that function I, either personally or through supervision, classified and, as appropriate, de-classified, thousands of classified documents.

5. In the course of expert witness consultation for the Federal Public Defender for the District of Oregon (FPD), I was given access to classified and un-classified information (including government and defense exhibits) available to the defense in the Pete Seda (aka Pirouz Sedaghaty) case. Access to the classified information was given at a Court Security Facility in the Washington, D.C., area or at the U.S. Attorney's office in Portland, Oregon. None of the material shown to me was classified above "collateral" Secret. After reading the material, I wrote a number of reports or declarations for the FPD office, one of which was classified.

6. The classified report I prepared was done entirely within the secure facility, was properly classified, marked appropriately, and submitted to the Court Security Officer for security review. Any other report that might contain classified information was filed appropriately with the Court Security Officer, who then presented the document for classification review by the appropriate agency or agencies.

7. In no way did I violate the spirit or the letter of any law, regulation, or directive concerning the security of the documents that I read or the documents that I prepared.

8. In the course of the summer, Judge Hogan ruled that I could appear as a qualified expert witness in the trial but that I could not testify with regard to any classified matter. In my opinion, that restriction limited the usefulness of the testimony that I could give because an understanding of the classified and unclassified information was important to my opinion regarding this case and, in particular, to issues regarding the admissibility of Defense Exhibits 704A and B and 705A and B.

9. Because of my long governmental and business experience with Saudi, Arab, and Islamic culture and ways of doing things, it is quite possible for me to make valid inferences from collections of documents with regard to the processes underway in governmental, charitable, and commercial transactions.

10. After leaving the U.S. Government in 1994, I worked as a business executive in a large, Arab-owned (Lebanese) group of companies that manufactured building materials in 15 factories all over the Middle East and the United States. My duties with this firm included business development, government relations, and contract negotiation. I did this for five years before becoming a consultant to the same group of companies. As part of my work, I interacted more or less continuously with business and governmental circles

Case 6:05-cr-60008-AA   Document 477-1   Filed 09/23/10   Page 6 of 19

throughout the Arab World. I spent a great deal of time dealing with Saudi business clients or prospects and Saudi governmental offices involved in infrastructure projects. This was known to Judge Hogan. Because of this experience and expertise, it would have been possible for me to make judgments useful to the defense if I had been allowed to make reference to the classified materials that I had properly read.

11. On the 3rd of September, I testified at Mr. Seda's trial in Eugene, Oregon, before Judge Hogan and a jury. Before the trial, I was summoned to a meeting with the Court Security Officer. This meeting was attended by Mr. William Teesdale, FPD Chief Investigator. During the meeting, I reviewed a redacted (unclassified) version of the classified declaration that I had signed at the court secure facility. I was then admonished by the Court Security Officer to remember that I was not allowed to say anything classified or refer to anything classified in my testimony. I asked him a couple of clarifying questions, and in response he explained to me that I have a life-long obligation to protect the government's secrets. Since I had not done, said, or written anything that in any way compromised the security of the government's documents or secrets, I found that to be surprising.

12. During my testimony, I was very careful not to overstep these restrictions and said nothing that revealed classified information. Nevertheless, at one point in my testimony, the Court stopped the proceedings and excused the

jury. After a twenty-minute closed hearing that I did not attend, Judge Hogan resumed the trial and admonished me "against basing your answers on information you learned when you were with DIA." By ordering me not to base anything I might testify to on my experience working at DIA, Judge Hogan, in my opinion, improperly prevented me from discussing relevant unclassified information that I learned while employed by that agency. For example, I was appointed head of all Middle East affairs for the DIA to teach the agencies' analysts about the Middle East. This involved providing unclassified information to analysts regarding the Middle East. This was among my major duties for seven years. The classification procedures with which I am fully familiar and the classification procedures which I was responsible for implementing do not render information classified as broadly as the Courts' order. That order precluded me from testifying about a wealth of unclassified facts relevant to this case. It was simply inconsistent with the law.

13.    After the Court issued its order, I started to explain, "I have a great deal of knowledge, and there is only a fairly small amount of it that's specifically the result of my employment at DIA." The Court then admonished me, "We understand saluting uniforms around here." When Mr. Seda's lawyer then objected that the Court's ruling was not "consistent with the obligations the Colonel has," the Court told me "in this particular forum, I'm in charge."

14. Coming after the admonitions of the Court Security Officer, Judge Hogan's admonition was not only an incorrect statement of my security obligations, but also had a chilling effect on my testimony because I was required to limit what I said to ensure my compliance with the order.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct; that the statements heretofore set forth are based on my own knowledge, except where otherwise indicated, and as to those statements I believe them to be true; and that this declaration was executed on September 21, 2010.

_____
Colonel Walter Patrick Lang

# Exhibit B

Steven T. Wax, OSB No. 85012
Federal Public Defender
101 SW Main Street, Suite 1700
Portland, OR 97204
Tel: (503) 326-2123
Fax: (503) 326-5524
Email: steve_wax@fd.org

Lawrence Matasar, OSB No. 74209
621 SW Morrison Street, Suite #1025
Portland, OR 97205
Tel: (503) 222-9830
Email: larry@pdxlaw.com

**Attorneys for Defendant**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 05-60008 HO |
| Plaintiff, | |
| v. | DECLARATION OF FEDERAL PUBLIC DEFENDER INVESTIGATOR JAMES STRUPP |
| PIROUZ SEDAGHATY, | |
| Defendant. | |

I, James Strupp, declare:

1)   I am an investigator employed with the Federal Public Defender for the

Page 1   DECLARATION OF FEDERAL PUBLIC DEFENDER INVESTIGATOR JAMES STRUPP

District of Oregon. I have been assigned to work on the above-captioned case.

2)      I make this declaration in support of Defendant's Motion For Judgment Of Acquittal, Or In The Alternative For A New Trial.

3)      As part of my duties in this case, I was assigned to locate, interview, and if possible, arrange for the testimony of a witness named Mohammed Sui. In the weeks before trial, I did locate Mr. Sui and speak with him.  In the days before trial, and after the beginning of trial, I arranged for Mr. Sui's voluntary testimony by video conference from Hong Kong.  My efforts in those regards have been detailed by me in two declarations filed with this court: Declaration of Federal Public Defender Investigator Jim Strupp (Filed as Exhibit A to *Defendant's Motion to Continue / Reset Or In The Alternative, A Motion To Allow Witness Testimony Via Two-Way Video Conferencing)* (#429, 8/25/2010 and #430, 8/26/2010 ); and Supplemental Declaration Of Federal Public Defender James Strupp regarding *Motion to Continue / Reset Or In The Alternative, A Motion To Allow Witness Testimony Via Two-Way Video Conferencing* (#437, 8/29/2010).  Those declarations are incorporated here by reference.

4)      In the course of those preparations, on 8/22/2010, I had spoken with U.S. Consular Officer Katherine E. Farrell, of the U.S. Consulate General,

Page 2    DECLARATION OF FEDERAL PUBLIC DEFENDER INVESTIGATOR JAMES STRUPP

Guangzhou, China, about the possibility of taking Mr. Sui's testimony there. On 8/25/2010, Ms. Farrell related that her office could not oversee taking testimony from Guangzhou, as she had been told by her attorney advisor in Washington D.C. that the taking of testimony on mainland Chinese soil is forbidden by the Chinese government.

5) On day 2 of the trial, 8/31/2010, I learned that this Court allowed, by order, the taking of Mr. Sui's live testimony by video conference from Hong Kong.

6) By day 3 of trial, 9/1/2010 I arranged with a private video conference service in Hong Kong, with the U.S. Consulate General in Hong Kong, and with this Court's Technology Specialist to conduct the testimony on the beginning of court on Wednesday, 9/8/2010. I had also scheduled a live video conference test session in the courtroom for after close of court on 9/2/2010.

7) In the morning of 9/2/2010, I received initial communication from Mr. Sui that he might not be willing to attend the video testimony session in Hong Kong. In a subsequent phone call with him on the same day, he confirmed that he was not presently willing to travel to Hong Kong to provide testimony on 9/8/2010.

Page 3   DECLARATION OF FEDERAL PUBLIC DEFENDER INVESTIGATOR JAMES STRUPP

8)      On the evening of 9/2/2010 the Court's Technology Specialist successfully conducted a live test of the video interface between the trial courtroom and the Hong Kong-based video service provider's facility, in my presence.

9)      On 9/5/2010, I again spoke with Mr. Sui by telephone. He confirmed with finality that he was presently still in Guangzhou, China, and that he was no longer willing to travel voluntarily to Hong Kong to provide the video testimony. His appearance as a witness was subsequently withdrawn by counsel to Mr. Sedaghaty.

10)     For reasons set forth in the two prior declarations to this court referenced above, at the point at which Mr. Sui advised me that he would not voluntarily appear I had no further means to compel his testimony from Guangzhou, China, or effect valid service of a subpoena on him in the time frame allowed for the trial. This was due to the prohibition on taking testimony in mainland China, the legal means required to effect valid service of a subpoena on mainland China, (see 28 U.S.C. §1783), and the trial schedule of the court. I believe it would have taken at least 3-4 months to effect Mr. Sui's compulsory appearance at this trial.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of knowledge and belief, and that this declaration was executed on September 21, 2010, at Portland, Oregon.

_____

James Strupp

# Exhibit C

Thursday, September 9, 2010

# Newsline

■ News ■ Money ■ Sports ■ Life



### 'True Blood' star has no time to vamp

■ Movies next for Ryan Kwanten, who plays sweet but dim hero of HBO series, 3D

*By Dan MacMedan, USA TODAY*



### From Long Island to Broadway

■ Musical star Patti LuPone writes of love and triumphs in 'A Memoir', 4D

*By Todd Plitt, USA TODAY*



### Morgan to replace Larry King

■ Veteran British newsman and 'Talent' judge Piers Morgan starts in January, 6D

*By Frazer Harrison, Getty Images*

### BP: Perfect mix of mishaps caused spill
Report by the oil giant cites porous cement, failed safety valves and poor decisions by workers. 3A.

### Rash of fires sweeps through Detroit
Eighty-five structure fires combust in the Motor City, causing officials to ask suburbs for help. 3A.

### ■ Money: Small hospitals struggle
Independent medical centers are less able to win loans, stay afloat in the struggling economy. 1B.

### ■ Sports: Padres manager exhales
Bud Black of the San Diego baseball franchise says first win was a relief after 10-loss streak. 1C.

### ■ Life: Long-distance relationships rise
Ease of flying, an economy affecting people's mobility have made love across the miles common. 7D.



■ Living well. Staying healthy. Love and family, too. See *Your Life* in a whole new way.
■ Today, could your romance survive long distance? 7D

**USA TODAY Snapshots®**

Top countries where illegal



**Brett Favre:** 18th season.
*Getty Images*

# Vikings-Saints kick off tonight

■ NFL Bonus Section, 1E
■ 10 things that are guaranteed this season, 1C

**NBC 8:30 p.m., ET**



*By Jasmine Luoma for USA TODAY*

**"Not convinced that backing down is the right thing":** Pastor Terry Jones talks about plans for a Quran burning, including backlash from the community, while in his office Wednesday.

# Plan to burn Qurans ignites debate on rights

## For many, a lesson in the cost of free speech

*By Larry Copeland and Rick Hampson*
USA TODAY

GAINESVILLE, Fla. — The Constitution won't let you yell "fire" in a crowded theater if there isn't one. It won't let you utter "fighting words" with impunity. But scholars agree it will let a pistol-packing minister of a tiny fundamentalist church outrage countless Muslims by burning the Quran, a book he says he hasn't read.

Florida preacher Terry Jones prepared for a bonfire of the Qurans on Saturday — the ninth anniversary of the 9/11 terror attacks — despite protests from the White House, the Vatican, the U.S. commander in Afghanistan, fellow Christian evangelicals and veterans' groups.

"As of right now," Jones said Wednesday, "we are not convinced that backing down is the right thing."

In an interview with USA TODAY he said he had not been contacted by the White House, State Department or Pentagon. If he were, he said, "that would cause us to definitely think it over. That's what we're doing now. I don't think a call from them is something we would ignore."

**Cover story**

Jones' plans for "International Burn a Koran Day" at his Dove World Outreach Center provoked a warning this week from Gen. David Petraeus that U.S. troops in the field could be endangered.

"We're concerned with troops and mission-

*Please see COVER STORY next page ▶*

# China may relax one-child rule

More kids needed to work

# Exhibit D

Steven T. Wax, OSB No. 85012
Federal Public Defender
101 SW Main Street, Suite 1700
Portland, OR  97204
Tel: (503) 326-2123
Fax: (503) 326-5524
Email: steve_wax@fd.org

Lawrence Matasar, OSB No. 74209
621 SW Morrison Street, Suite #1025
Portland, OR 97205
Tel: (503) 222-9830
Email: larry@pdxlaw.com

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 05-60008-HO |
| Plaintiff, | |
| v. | DECLARATION OF MICHELLE SWEET |
| PIROUZ SEDAGHATY, | |
| Defendant. | |

I, Michelle Sweet, declare that the following statements are true to the best of my knowledge, information, and belief:

1. I am a Research and Writing Attorney for the Federal Public Defender's Office in Portland, Oregon.

Page 1    DECLARATION OF MICHELLE SWEET

2.  As part of the defense team, during the trial, I stayed at the Sleep Inn on Broadway, Eugene, Oregon, around the corner from the Federal District Courthouse.

3.  Each morning, a copy of the USA Today would be placed on each of the tables in the lobby of the Sleep Inn.

4.  On September 9, 2010, the front page of the USA Today featured a story about the pastor who wanted to burn the Qu'rans.

5.  On the morning of September 9, 2010, some time between 7:30 a.m. and 8:15 a.m., I went downstairs and saw Juror number 5 (as indicated on August 30, 2010) having breakfast and reading a newspaper.

6.  I did not speak to him or make eye-contact.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated this ___ day of September, 2010.

_____
Michelle Sweet

Page 2   DECLARATION OF MICHELLE SWEET