DWIGHT C. HOLTON, OSB # 09054
United States Attorney
District of Oregon
**CHRISTOPHER L. CARDANI**
Assistant United States Attorney
405 East 8th Avenue, Suite 2400
Eugene, OR 97401
Email: chris.cardani@usdoj.gov
Telephone: (541) 465-6771
**CHARLES F. GORDER, JR.**, OSB #912874
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, Oregon 97204
Email: charles.gorder@usdoj.gov
Telephone: (503) 727-1000
Facsimile: (503) 727-1117
  Attorneys for the United States


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 05-CR-60008-HO |
| | ) | |
| v. | ) | GOVERNMENT'S RESPONSE |
| | ) | TO DEFENDANT'S MOTION |
| PIROUZ SEDAGHATY, | ) | FOR NEW TRIAL |
| | ) | |
| Defendant. | ) | |

The United States of America, through its undersigned counsel, herein responds

to defendant's Motion for New Trial (CR 477).  For reasons stated below, the motion

should be denied.

## I.  The Law

Fed. R. Crim. P. 33 governs motions for a new trial.  The Rule states:

(a) **Defendant's Motion.**  Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires....

## II.  Argument

The response below is presented in a manner structurally consistent with defendant's motion.

## A.  The Jury Was Not Presented with a Distorted View of the Defendant

Citing the recent case of United States v. Waters, No. 08-30222, 2010 WL 3565259 (9th Cir. Sept. 15, 2010) defendant first alleges that the jury received a one-sided and distorted view of the defendant, thus depriving him of a fair trial.  Specifically, defendant argues that the admission of the government's computer e-mail exhibits, the literature he sent to prisoners, and two videos of the Russian-Chechen war presented an unbalanced and unfair portrayal.

The Court recognized prior to trial that the key issue for the jury was the element of willfulness; whether the prosecution could establish that defendant intentionally violated a known legal duty by conspiring to conceal an attempt to fund the Chechen mujahideen with funds donated by El-Fiki and by falsifying a Form 990 which falsely reported the transaction.  To establish this challenging burden, the prosecution relied on exhibits and other evidence which reflected defendant's state of mind, such as the electronic information concerning the Chechen mujahideen discovered in the deleted portions of his computers,[1] his supervision of the distribution of Al-Haramain literature

---

[1]In his motion for a new trial, defendant complains that there was insufficient evidence that he viewed or read the e-mails in his own computers.  This claim ignores the fact that defendant personally responded to, commented on, or forwarded some of the Sheeshan and other related information to others, showing that he did view them, and did read them.  (See e.g., government exhibit SW-11, SW-18, SW-24, SW-36).

condoning acts of violence, videos found in his residence depicting the Chechen war, and witnesses who testified that he directly engaged in fund-raising for the mujahideen.[2] It should be noted that the government carefully culled the vast amount of mujahideen-related information found in defendant's computers.  That culling process was largely done based on the period of time in which defendant Sedaghaty's state of mind was most pertinent; between January 2000, just before the El-Fiki donation was received, and October 2001, when defendant signed the false tax return.  (9/2/10 TR at 183).[3]

The core of the defense was that defendant Sedaghaty was a man of peace, condemned acts of violence, and would never intentionally fund the mujahideen.  To the contrary, the defendant had no motivation to conceal anything from the IRS and thus did not intentionally falsify any information on his Form 990.  To promote this defense, defendant was permitted to call several witnesses who testified in detail that defendant was a peaceful man and would not engage in the type of conduct reflected in the government's exhibits and in the testimony of government witnesses.  Numerous exhibits from the same computer hard drives used by the government in its case-in-

---

[2]Defendant reads the Waters decision too broadly.  The case does not hold that evidence of literature associated with a defendant is never relevant in a criminal case.  Rather, such evidence should be reviewed carefully and with a "skeptical eye," to ensure that it is relevant to an issue.  Waters, slip op. at 14115, citing United States v. Curtain, 489 F.3d 935, 950 & 956 (9th Cir. 2007) (en banc) (noting literature may be relevant to defendant's intent).  The issue in question in Waters was not intent or defendant's state of mind; rather, the sole question was whether defendant was present during an arson.  Thus, the inflammatory literature in Waters was far less pertinent than it was to issues relevant in the present trial.

[3]Attached as Exhibit 1 hereto is a Declaration from Special Agent Anderson, which further describes the process of limiting the amount of information from defendant's computers in the government's case.

chief were offered and received from the defense which reflected this type of "man of peace" proposition.  For example, the defense introduced several e-mails, authored by defendant or the fugitive co-defendant Al-But'he, which reflected an alleged desire to provide humanitarian aid to those in need, including in Chechnya.  (See, e.g., defense exhibits 683, 683a, 683b, 683c, 683d, 686, 686a, 687a, 687b, 687d, 688a, 689, 697a).  Also, the Court allowed into evidence CNN articles in defendant's computers concerning the humanitarian crisis in Chechnya.  (Defense exhibits 692a-692g)  The jury heard about and viewed exhibits offered by the defense demonstrating that defendant or others working with him attempted to contact aid organizations to determine whether they could transfer the El-Fiki donation in to Chechnya for refugees.   (Defense exhibits 698a, 698c, 698d, 699b, 700).  The defense accomplished all of this without calling the defendant as a witness.

While it is true that this Court excluded other exhibits offered by the defense for lack of foundation or other type of evidentiary shortcoming, the defense was nevertheless allowed to present a robust case of its own in an attempt to counter the government's evidence.  The Court balanced its discretion with the rules of evidence in a manner which allowed the defense to promote its theory that defendant did not intend to fund the Chechen mujahideen.  See United States v. Perkins, 937 F.2d 1397, 1401 (9th Cir. 1991) ("The right to present a defense is clearly fundamental, but ... ' the accused ... must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'")

quoting <u>Chamber v. Mississippi</u>, 410 U.S. 284, 302 (1973).[4]

## B.  The Court Followed the Rules of Evidence Regarding the Trail of Money in the Case

1. <u>The Receipts</u>

The defendant complains that the record was "distorted" concerning the money involved in the case.  The gravamen of his complaint is that the Court did not allow the admission into evidence defendant's Exhibits 704(a) - 705(b), the so-called Al Haramain "receipts," in the absence of a proper authenticating witness who could establish a recognized exception (presumably as a business record) to overcome the obvious hearsay problems of these exhibits standing alone.   Counsel cites no case, and we are not aware of any, which holds that the hearsay rule is suspended and purported business records must be introduced into evidence just because a defendant offers them.  Rather, the Court is expected to follow the Federal Rules of Evidence, and its decisions in that regard will not be reversed absence an abuse of discretion. <u>United States v. Cherer</u>, 513 F.3d 1150, 1157 (9th Cir. 2008);  <u>United States v. Tank</u>, 200 F.3d 627, 630 (9th Cir. 2000).  Here, the Court properly excluded the proffered exhibits.

The exhibits, which asserted that Al Haramain in Saudi Arabia had received a total of 703,514 Saudi Riyals from Al Haramain in the United States, were clearly hearsay if offered to prove the truth of that matter.  Fed. R. Evid. 801(c).  Notably lacking in defendant's motion for a new trial, and specifically at pages 9-15 of that motion, is any citation to the hearsay exception which would have allowed the court to

---

[4]Had defendant testified, it is likely that some of the excluded material would have been received.

admit this evidence.  See Chambers v. Mississippi, 410 U.S. 284, 302 (1973) (noting that both the prosecution and defense must comply with established rules of evidence, including hearsay objections); Moses v. Payne, 555 F.3d 742, 757 (9th Cir. 2009) (noting defendant's right to present evidence not unlimited, but instead is subject to reasonable and procedural evidentiary rules); see also United States v. Redlightning, CA 09-30122, slip op. at 17550 (9th Cir. Oct. 25, 2010) (district court did not abuse discretion in refusing to admit preferred testimony that was neither competent nor reliable).

Indeed, despite the three-year gap between the time of defendant's arraignment and his actual trial, the defendant did not proffer, and still has yet to proffer, any appropriate testifying witness who could establish that these exhibits were actual business records of the Saudi Arabian-based Al Haramain Islamic Foundation under Fed. R. Evid. 803(6).  That exception to the hearsay rule requires that the various elements of the business records exception be established by a "custodian or other qualified witness" and further conditions their admission upon the trustworthiness of the source of the records as well as the "method or circumstances of preparation" of the records.  Not only did no custodial witness appear, but on their face, the legitimacy of the "receipts" was more than questionable.

To begin with, the Al Haramain Islamic Foundation, its head director, Aqil Aqil, and the co-defendant Soliman Al-Buthe involved in the transaction which was the subject of the indictment have all been designated by the U.S. Treasury's Office of Foreign Assets Control ("OFAC") as Specially Designated Global Terrorists.  Aqil Aqil and Al-Buthe have been similarly designated by the United Nations as individuals

associated with Al Qaida.  The Saudi organization was officially dissolved by the Kingdom of Saudi Arabia for similar reasons in June 2004.  Given this background, any purported business record of this organization was inherently untrustworthy and further bolstered the need for an authenticating witness.

Exhibits 704(a) - 705(b), the purported Al-Haramain receipts, were first provided to current counsel for the government by Thomas Nelson, counsel for the fugitive co-defendant Al-Buthe, in January 2005 after the nature of the government's investigation became public and after Al Haramain was shut down in Saudi Arabia.

Exhibits 704(a) and (b) purport to indicate that Al Haramain received 224,000 Saudi Riyals from co-defendant Al-Buthe (approximately $59,733 in U.S. dollars at the applicable exchange rate) on 3/14/00.  Yet an Al-Rajhi bank record (Gov't Exhibit ALR-1, p.2) shows that Al-Buthe cashed the US$130,000 in American Express checks on that same date, but for 486,850 riyals, not 224,000 riyals; quite a discrepancy!  And the second receipt, (Proposed Defense Exhibits 705(a) and (b)), dated 3/28/2000, allegedly document the receipt of an additional 479,514 Saudi Riyals (approximately $127,870) from Al-Buthe on behalf of Al Haramain USA, for a total "contribution" from Ashland of approximately US$187,854, much more than the $151,000 which Al-Buthe carried out of the United States in March 2000.

Given this significant discrepancy, the government has questioned and continues to question the authenticity of these two purported "receipts," and we objected to their admission without the opportunity for thorough cross-examination of an actual custodian or other qualified witness.  The simple fact is that these receipts purportedly came from a foreign organization associated with numerous terrorist events, and they only surfaced

after the investigation in this case became public.  These receipts, supposedly to document funds received from Al-Haramain USA, were not found at Al Haramain USA's premises when it was searched in February 2004, or in the Al Haramain computers seized during that search.  It was not an abuse of discretion for the Court to exclude them absent an appropriate witness to overcome the government's hearsay objections.

Even further, the defendant has still failed to establish that the admission of these documents would have been helpful to the defense.  The documents vaguely state that Al-Haramain in Saudi Arabia received money from Al Haramain USA through the fugitive co-defendant Al-Buthe "for the Muslims of the Chechens" (Exhibit 704(b)) and "for the Chechen Moslems."  Exhibit 705(b).  There is nothing particularly exculpatory about those references.  They certainly do not negate the allegation that the defendant, Al-Buthe, and Al-Haramain intended the money to go to the mujahideen fighting in Chechnya and thus needed to conceal from the US government the actual destination of the funds.  The alleged "receipts" do not state where the money went thereafter, nor do they even purport to earmark the funds for actual humanitarian assistance.  As such – even if admitted into evidence – the receipts would not have demonstrated that the money was actually intended for or spent on any truly charitable cause.   They, therefore, would not have exculpated defendant and were not paramount to defendant receiving a fair trial.

2.  Lang's Testimony

The defendant's nonsensical complaint that his expert witness Lang was intimidated by the Court and thus unable to authenticate these receipts suffers from a complete lack of logic.  Lang, who had not served in Saudi Arabia since the 1980s, had

no basis to supply the knowledge necessary to authenticate purported business records of Al Haramain, an organization which did not even exist when Lang was stationed in that country and for which he had never worked.  Whatever his expertise, it did not extend to the operations of Saudi-based Islamic charities in the 21st Century.

Even if he had such expertise, however, his expertise could not be used to introduce otherwise inadmissible evidence before the jury.  Although he may have used the exhibits in part to form his opinion, Rule 703 of the Federal Rules of Evidence provides as follows:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. *Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.*

(Emphasis added).  Given the questions concerning the authenticity of the purported receipts and their lack of relevance in this matter, the admission of the receipts were not necessary for the jury to evaluate Lang's opinions.

3. <u>Proposed Witness Sui</u>

The defendant also complains about his witness Sui, who allegedly could have testified concerning the circumstances surrounding the signing of Government Exhibit AHIF 3, an alleged "agreement" between defendant Sedaghaty and co-defendant Al-

Buthe, relieving defendant Sedaghaty of all responsibility for $188,465.00 supposedly collected for the "Brothers and Sisters" in Chechnya. This "agreement" was not found during the execution of the search warrant in Ashland, either as a hard copy at the premises or in the Al Haramain USA computers. Rather, it was provided by defendant's attorney after a grand jury subpoena was served on Al Haramain USA.

Despite the conclusory statement contained in the defense investigator's declaration (Exhibit B, ¶ 10) that he could not get Mr. Sui served with a subpoena in time, there is nothing to indicate that the defense could not have availed itself in a timely fashion of the procedure contained in 28 U.S.C. § 1783, which authorizes the overseas service of a subpoena on a US citizen such as Mr. Sui. By their own admission, the defense had direct contact with Sui several weeks before the defense case began and there is no reason they could not have had a subpoena issued by the Court and served during that time. Nor has the defense explained what efforts, if any, it went to in the past three years to locate and secure testimony from the other person who signed AHIF 3 as a "witness."

It should be noted that the Court *did* grant the defense motion to take Sui's testimony by video conference upon the representation that Sui was willing to cooperate in such a procedure. At no time during the trial did the defense inform the Court that Sui had reneged on this agreement and ask for a brief delay while he was served with a subpoena and traveled to the United States. Thus, any complaint that Sui did not appear was waived.

Finally, the defense has not established that Sui's proposed testimony was

potentially helpful to the defense concerning the creation of Exhibit AHIF 3.  From the

witness statement submitted to the Court in connection with the motion to take video

conference testimony, all Sui could say about the matter was he witnessed the signing

of the "agreement." (CR 430, pp. 13-15).  All he recalled was that the document

memorialized the transfer of donations to the Al Haramain Foundation in Saudi Arabia.

He did "not recall what the money was to be spent on" and although he recalled seeing

some travelers checks he was not aware of any cashier's check involved in the

transaction.  His testimony would not have deflected the incriminating nature of the so-

called "agreement," which was that it purported to document a monetary amount

transferred to Saudi Arabia which was substantially different ($188,465) than the actual

amount transferred ($151,000), and which was also different from the amount on the

duplicate "agreement" contained in Exhibit AHIF 2 ($186,644.70), leading to the

inevitable conclusion that both Exhibits AHIF 2 and 3 were phony.

## C.  The Prosecution Did Not Attempt to Appeal to Juror Prejudices Perceived by Defendant

Defendant asserts that the government attempted to convict him based on guilt

by association.  The government responds as follows:

### 1.  Demonstrative Aid

The government presented a demonstrative chart which showed the faces and

names of four other individuals whose names were repeatedly at issue during the trial.

The Court deleted some descriptive information but allowed the jury to view the chart as

a demonstrative exhibit.  A copy of the demonstrative aid is attached hereto as Exhibit

B.  Given the numerous names and individuals of various players in the conspiracy and the possibility of juror confusion, allowing the use of this chart was clearly appropriate. Lies v. Farrell Lines, Inc., 641 F.2d 765, 773 n. 9 (9th Cir.1981) (admission of demonstrative evidence well within discretion of trial judge).  The chart was only used during the evidentiary and argument stages of the trial; it was not received as an exhibit and did not go to the jury during deliberations.  The Court's instructions properly advised the jury of the limited nature of this type of evidence.

2.  Witness Evan Kohlmann

Defendant briefly mentions the testimony of expert Evan Kohlmann as being unfair given he did not link defendant Sedaghaty to the subject matter of his testimony. Yet, this Court conducted a Daubert hearing before the trial and issued a well-based ruling (CR 407) holding that Kohlmann's testimony was appropriate.

3.  Closing Argument

Defendant next highlights portions of the government's closing arguments in support of his "guilt by association" argument.

a.  Reference to Usama Bin Laden

The defendant complains about a single reference to Usama Bin Laden during the two hours of the government's two closing arguments, a reference to which he did not object.  The reference was more than fair argument.  The defendant, not the government, introduced the first reference to the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC") in his opening statement.  Two defense experts, Patrick Lang and David Long, identified the SJRC as a Saudi governmental institution

which allegedly regulated the distribution of funds from Islamic charities such as Al Haramain which were based in Saudi Arabia.  Supposedly, the SJRC and Saudi culture guaranteed that funds distributed by Al Haramain as zakat would not be diverted to the Chechen mujahideen.

The government's expert witness noted that the first person placed in charge of the SJRC was Wail Jalaidan, who was described as "an old friend" of Usama Bin Laden. Indeed, in an Al Jazeera interview Bin Laden said that he, Jalaidan, and Abdullah Azzam had all been in "one boat together" in the early days in Afghanistan.  Jalaidan remained in charge of the SJRC until approximately 2002 when he was subject to criminal sanctions and had his bank accounts frozen for his alleged role in financing paramilitary organizations.  (8/31/10 TR at 168-69).

b.  Comments Made in Rebuttal Argument

Defendant also complains about the government's closing rebuttal argument. Specifically, he singles out two brief passages in which the prosecutor commented on the traveler's checks defendant Sedaghaty and Al-But'he purchased at a bank in Ashland, and the appendix to the Noble Quran entitled *A Call to Jihad, (Holy Fighting in Allah's Cause)*.

Prosecutors, like defense counsel, are entitled to urge the jury to draw fair inferences from the evidence, and on rebuttal, the prosecution is entitled to defend its case by addressing specific attacks raised in the defense's closing argument.  While defendant draws this Court's attention to the line of cases that stand for the well-settled propositions that the government cannot seek a conviction by inflaming the passions of

the jury or by inviting the jury to decide the case based on racial or ethnic prejudice,

there is another well-settled principle that applies to closing arguments: the invited

response doctrine recognized in United States v. Young, 470 U.S. 1, 8-12 (1985); see

also United States v. Lopez-Alvarez, 970 F.2d 583, 598 (9th Cir. 1992) (holding that

prosecutors' remarks were an acceptable response to defense allegations that the

prosecution had intimidated, coached, and bribed witnesses);  United States v.

Williams, 990 F.2d 507, 510 (9th Cir. 1993) ("Where the defendant opens the door to an

argument it is 'fair advocacy' for the prosecution to enter.") (internal citations omitted).

And while the government must not use improper methods calculated to produce a

conviction based upon anything other than the proof at trial, defense counsel is subject

to the same restriction in closing and it is improper for a defense attorney to urge a jury

not to convict a defendant for broad, societal reasons.  Young, 470 U.S. at 8.  In our

case, the government's closing rebuttal argument was both proper because it simply

highlighted evidence and testimony for the jury that supported the elements of the

crimes charges, and it was an entirely proper and measured response to inflammatory

and objectionable remarks made by defense counsel during his closing argument.

    i.  The 130 Traveler's Checks Purchased by Defendant Sedaghaty Were
    Evidence of an Intent to Conceal the Ultimate Destination of Those Funds

        a.  The Government's Closing Argument was Based Upon Testimony from
        Evan Kohlmann

The government's expert witness on international terrorism, Evan Kohlmann,

testified that mujahideen fighters sometimes rely on funds received by Islamic charities

as *zakat* for true humanitarian assistance, which are improperly diverted instead to

support fighters.  He testified that there are no banks in war zones like Chechnya and

that cash is often hand-carried in increments of $100,000-$500,000 to support the

fighters.  The government's evidence showed that Al-But'he flew to the United States

and accompanied defendant Sedaghaty to the bank, where they together converted

most of the El-Fiki donation into 130 traveler's checks in $1,000 denominations.  Al-

But'he then returned to Saudi Arabia and promptly cashed the traveler's checks.  The

government argued that this was direct evidence of a conspiracy between Al-But'he and

defendant Sedaghaty to conceal the financial movement of the funds out of the United

States, in order to better hide their attempt to fund the mujahideen with El-Fiki's money.

　　　b.  <u>Defendant Attacked the Government's Theory in Closing</u>

　　　In his closing argument, defense counsel responded by stating that the use of

cash is common in Saudi Arabia.  He also sought to belittle the government's

conspiracy theory by stating to the jury:

> Now, conspiracy.  Picture this.  Soliman al-But'he, in full Arab regalia, a robe, in
> Ashland, Oregon, a headdress in Ashland, Oregon, goes into Pete Seda's bank,
> interacting with the teller  –  excuse me, the manager, Debra Ingram, with whom
> Pete Seda has done business with for years, sitting there and painfully signing
> out $130,000 – you know, one-hundred-and-thirty $1,000 traveler's checks.
> Conspiracy?  You want to tell the world your doing something a little bit odd?  Go
> to Ashland, dress like a Saudi, have a darker skin, have a bigger nose, and sign
> 130 traveler's checks in a thousand dollar denominations.  Hello?  There is
> absolutely nothing that the government has shown you of any conspiracy,
> coverup, hiding of anything.

(9/8/10 TR at p. 136).

/ / /

　　　c.  <u>The Government Responded to the Defense Attack</u>

In *rebuttal*, the government responded to defense counsel's closing remarks:

Why are records so important?  Because this kind of stuff once it's out there, it can disappear into the Never Never Land of terrorism.  This is how wars are fought.  The mujahideen are not sponsored by countries.  It's not like Russia who pays its soldiers with rubles, government money. It's not like the American Army being paid with dollars.  The mujahideen are freelance fighters that go around the global to promote their terrible version of a religion that has very peaceful elements of it, but their version of hatred, of killing people that don't believe in their religion, they have all these crazy views about women.  This is how they fund their stuff.  Cash.  And once cash is released into the mainstream, it's gone.

(9/8/10 TR at 157-58).

Considering Kohlmann's testimony as to how charities divert donated funds to support mujahideen fighters in Chechnya, and the evidence of defendant Sedaghaty and Al-But'he's conversion of the El-Fiki funds into cash, the prosecutor's response to defense counsel's remarks in closing were proper.  The comments were meant to reflect that the $130,000 in traveler's checks were designed to fund the mujahideen in Chechnya in a manner consistent with Kohlmann's testimony.  Prosecutors are entitled to strike "hard blows" based upon fair inferences from the evidence.  <u>United States v. Sullivan</u>, 522 F.3d 967, 982 (9th Cir. 2008).  It is proper for a prosecutor to respond directly to defense attacks made in closing arguments.  That is what happened here.  There was no error, let alone any plain error.[5]

ii.  <u>Islamic Literature Calling for Violent Jihad</u>

Defendant next challenges as improper remarks made in rebuttal about literature distributed by Al-Haramain in the United States.  As the Supreme Court's decision in

---

[5]It should be noted that there were no objections to the comments now complained of by the defendant.

Young instructs, the prosecutor's remarks must be viewed in context, with an examination of defense counsel's closing.  Young, 470 U.S. at 12.

Daveed Gartenstein-Ross testified that he was employed by Al-Haramain in Ashland, Oregon and that defendant Sedaghaty was the boss.  One of Gartenstein-Ross' responsibilities was to distribute Islamic literature to prisoners.  In deciding what type of literature to send out, prisoners were asked to first fill out a questionnaire to assess their knowledge of Islam.  A prisoner's level of knowledge, assessed on a point system used by Al-Haramain, dictated the type of material which would be sent to them by the "charity."  If a prisoner scored low on this form, Al-Haramain would send them benign background information on Islam.  Prisoners who proved to have a more detailed understanding of Islam, however, were sent much more strident literature.  Gartenstein-Ross identified two books of this sort.  First, trial exhibit DGR-2 is an excerpt of a book entitled *Islamic Guidelines for Individual and Social Reform*.  This book informed prisoners that violent jihad was obligatory on Muslims, either through directly participating in it by fighting or by providing money to support fighting.  Al-Haramain distributed about a thousand of these books to prisoners throughout the United States.[6]

The other book was called the *Noble Quran.*  Al-Haramain distributed versions of the Quran which had been altered by Al-Haramain through the insertion of an appendix titled *The Call to Jihad (Holy Fighting in Allah's Cause) in the Quran*.  This appendix,

_____

[6]The entire book was not exhibited.  Rather, DGR-2 consists of four pages; the cover, the inside of the cover which identified Al-Haramain as the book's distributor, and two pages of the book itself.

only sent to Muslim prisoners who scored high enough on the Al-Haramain assessment

questionnaire, promoted acts of violence in the name of Islam.  For example:

> ...[t]o get ready (for Jihad) includes various kinds of preparations and weapons
> [tanks, missiles, artillery, aeroplanes, (air force), ships, (navy), etc., and the
> training of the soldiers in these weapons]....

(Gov't exhibit DGR-1 at p. 1236).

Under the leadership of defendant Sedaghaty, Al-Haramain (U.S.) distributed

approximately fifteen thousand copies of *The Call to Jihad (Holy Fighting in Allah's*

*Cause) in the Quran* into United States prisons.[7]

Defendant Sedaghaty was aware of the different versions of the Quran available

for distribution by Al-Haramain.  Gartenstein-Ross recalled an incident where a woman

who knew little about Islam visited Al-Haramain in Oregon.  Defendant Sedaghaty

instructed Gartenstein-Ross to provide her a Quran, but one without the more strident

*Call to Jihad* appendix.

The materials which advocated violence were specifically endorsed by Al-

Haramain, both in Saudi Arabia and in the United States.  Stickers were placed on the

covers of the books listing the Al-Haramain Islamic Foundation as the distributor, along

with the foundation's address and contact information in Oregon and in Saudi Arabia.

a.  Evidence Promoting Acts of Violence were Relevant to Willfulness and Intent to

Conceal

---

[7]Once again, the only exhibit offered by the prosecution at trial, DGR-1, was the
*Call to Jihad* appendix.  The government did not offer the entire Noble Quran, but had
the book containing the appendix identified by witnesses.

Well before trial, the prosecution offered these materials as reflective of

defendant's state of mind, which was so critical to the case.  In a pretrial ruling, this

Court ruled:

> DGR-1 and DGR-2
>
> These exhibits (appendix to the Qu'ran and Islamic Guidelines espousing Jihad) were allegedly distributed by Al-Haramain in Ashland.  The exhibits are admissible to show state of mind.

(CR 407 at 17).

The prosecution treated these exhibits consistent with this ruling.  In opening

statement the prosecutor advised the jury that the main issue at trial was the element of

wilfulness; whether defendant acted intentionally in filing a false tax return on behalf of

Al-Haramain, which entirely concealed the Chechnya transaction:

> And that's really what this trial is all about, proving what was going on in the mind of the defendant when this – when this was done.

(8/30/10 TR at 7).

Later, the prosecutor stated in opening:

> [t]hy why in this case, members of the jury gets us into this whole Chechnya, jihad, mujahideen stuff.  Because we are offering that to show you that the defendant had a motive to conceal his transaction from the government.  Why? Because tax-exempt charities in the United States cannot get involved in funding acts of violence.  You could be done.  You could be audited.  All kinds of bad things could happen.  The defendant knew that and had a motive to conceal.

Id. at 27.

Specifically addressing the extremist literature distributed by Al-Haramain to

prisoners, the prosecutor referenced in opening statement witness Gartenstein-Ross

and the two exhibits:

Government's Response to Defendant's Motion for New Trial - Page 19

...prisoners are told by al-Haramain, defendant Sedaghaty's operation, fighting in the cause of Allah, jihad is obligatory on every Muslim in one of two ways: By spending one's wealth or offering oneself for fighting in the cause of Allah. All right. Again, what's going on in the defendant's mind as all these things are going out to prisoners throughout the country, this stuff is going out and his stamp of approval by Al-Haramain starting with headquarters and right here.

Id. at 39.

After the evidence was completed, which included Gartenstein-Ross' testimony about Al-Haramain's distribution of the strident material to prisoners, the government presented its closing argument, making the point that the distribution of material advocating violent jihad was inconsistent with a charity.

In his closing, defense counsel spent over two hours reviewing various aspects of the case. He repeatedly accused a government witness of lying, id. at 99, and suggested that government counsel was selective in presenting its summation ("Question 6, what Mr. Gorder did not show you, you need to look at, please."). Id. at 118. Counsel argued that Sedaghaty was a "...man of peace, has been a bridge builder, has been espousing a moderate and ecumenical view of Islam." Id. at 144.

Personalizing the matter, defense counsel also told the jury during closing:

"I stand before you this afternoon with some fear, some fear in my heart. I stand before you holding some fear for my client, for Pete Seda. And I stand before you holding some fear for this great country of ours." Id. at 83.

Despite this lengthy and passionate closing, defense counsel never mentioned defendant's distribution of extremist literature. In rebuttal, the prosecution reminded the jury of this omission:

A few points about Mr. Wax's closing argument. We listened to him for over two hours. Unless I didn't hear it correctly, he covered an awful lot of the case, but I

didn't hear him mention the Noble Qur'an. The Noble Koran is the defendant, after he started working for al-Haramain, sending to U.S. prisons around this country, in the thousands, 10 to 15,000 prisoners, violent people serving time, getting junk like this from al-Haramain stating jihad is an obligation for Muslims. Talk about people prone to suggestion. Prisoners. Mr. Wax talks for two hours and you don't hear anything about that. Nor do you hear anything about this. You've memorized some of this book, members of the jury. Islamic Guidelines For Individual and Social Reform. This was a special book at al-Haramain. Not everybody got this. The only people who got this, and you heard it from the witnesses, were the ones who passed the test.

Id. at 152-53.[8]

During this part of the rebuttal argument, the prosecutor waved and "tossed down" the Noble Qur'an, with its violent appendix *A Call to Jihad (Holy Fighting in Allah's Cause) in the Qur'an.* Later in the rebuttal argument, the prosecutor asked rhetorically why the defense omitted mention of some of the government's evidence on defendant's state of mind, including the prisoner literature and defendant's act of personally engaging in fund-raising activities for the mujahideen:

Why is that? Because Mr. Seda had a motive, a motive to conceal the truth about this transaction.

Id. at 156.

Later, in reviewing the elements of the tax crime, the prosecutor highlighted the most difficult aspect of the case; proving that defendant acted with the requisite wilfulness in filing a false tax return:

And then number four, willfulness. And that is what a lot of this trial has been about. And I told you at the beginning of this trial that that's where the action is at for you. This notion of willfulness. Because we have to prove not only that he

---

[8]The defense did not object to the prosecutor's rebuttal comments now challenged in the present motion. See United States v. Kerr, 981 F.2d 1050, 1052 (9th Cir. 1992) (arguments not objected to reviewed for plain error).

signed a false return under the penalties of perjury that contain materially false information, but we have to show you that he had – that he did these things willfully.  Basically, that he knew he had an obligation to file the return and was deliberate in – in doing this falsely, this false return.  So how did we do that during this trial?  And I suggest to you that Mr. Wax has done a very passionate job in trying to keep you from focusing on this.  But I have to do it because this is part of the motivation that Mr. Sedaghaty had to file this false tax return....

The willfulness is represented by those e-mails, the fatwas, the prisoner books, the fact that he's raising money at about the same time for the Kosovo mujahideen, the – after the Hajj with Cabral, direct fund-raising, direct requests by Mr. Sedaghaty himself, doing the work, our web site, using that Ptichka, his wife....

Id. at 182-83; 185.

In the present motion defendant criticizes the prosecutor's comments and conduct as designed to improperly inflame the passions and prejudices of the jury. They were not.  Viewed in their proper context, it is clear that the prosecutor's comments and conduct in the rebuttal were intended to address the defendant's state of mind, the element of wilfulness, and to rebut comments made by the defense in closing. When defense counsel told the jury that defendant was a "man of peace," and that counsel had "fear in [his] heart" for defendant Sedaghaty and "this great country of ours," in relation to the government's case - it was the defendant, not the prosecution, that attempted to remove the case from the courtroom, and untether the jury from the evidence and witnesses.  Defense counsel's plea to the jury to allay the fears "in his heart" for the "man of peace" justified the government's rebuttal argument that instead, the jury should focus on the evidence and testimony that supported a different inference - that of the defendant as an individual driven to covertly practice what his organization instructed others to do;  provide financial support to the mujahideen as a perceived

religious obligation.  Defendant acted willfully when he subscribed to the false return because of his own desire to act consistently with the literature distributed to the prisoners in the *Call to Jihad* appendix.  No fair reading of the government's argument or actions during its closing rebuttal could be construed as a condemnation of Islam. Quite the opposite.  The government only condemned the *Call to Jihad* appendix that advocated violence or the financing of violence.

### Request for Findings by this Court

In the present motion, defendant accuses government counsel of making anti-Islamic statements and engaging in conduct that "profoundly disrespected the defendant's religion."  (Motion at 20-21).  This is inaccurate.  At no point in the trial did either attorney for the government say or imply anything disparaging or critical of Islam as a religion.  The critical remarks in defendant's motion most directly relate to rebuttal argument where the prosecutor "tossed down" a copy of the *Noble Qu'ran* which contained the *Call to Jihad* appendix distributed by Al-Haramain to prisoners.

Given the professional import of claims of misconduct by Assistant United States Attorneys, the government respectfully requests that this Court issue explicit factual findings regarding the rebuttal closing argument: 1) that the AUSA held up the *Noble Qu'ran*, as well as the *Islamic Guidelines for Individual and Social Reform*, to underscore that despite a lengthy closing argument, defense counsel had not addressed the evidence showing that Al-Haramain had distributed these materials into U.S. prisons;  2) that the AUSA tossed the books onto the adjacent counsel table next to the podium from where he was speaking;  3) that the AUSA neither said nor did

anything to disparage Islam; and 4) that the AUSA's tone was appropriately forceful and professional (and no more strident than defense counsel's tone or demeanor in his closing), and that the overall presentation was not designed to improperly inflame the passions and emotions of the jury.

Bains v. Cambra Not Applicable

Defendant's reliance on Bains v. Cambra, 204 F.3d 964, 974-75 (9th Cir. 2000) is misplaced.  (Motion at 20).  In that state habeas case, the prosecutor highlighted the defendant's status as a member of the Sikh religion "for the purpose of showing that all Sikh persons (and thus Bains by extension) are irresistibly predisposed to violence when a family member has been dishonored," and to argue that Sikh's "are completely unable to assimilate to and abide by the laws of the United States."  Id. at 974-75.  The government in this case, by sharp contrast, made no such sweeping condemnations of Islam or its followers.  Moreover, the government properly cabined its comments regarding defendant's motive to the willfulness element of the tax charge.  The government's rebuttal argument - never challenged until in the new trial motion - was entirely proper and responsive to defense counsel's remarks.

## D.  The Rule 404(b) Evidence Was Properly Admitted

Defendant next complains about the admission of evidence of three incidents involving the fund-raising for the mujahideen and the admission of the Gartenstein-Ross check (Gov't Exhibit BOA-6).  This evidence was developed primarily from the testimony of two witnesses, Barbara Cabral and Daveed Gartenstein-Ross.  The decision to admit such evidence was within the Court's discretion.  United States v. Hollis, 490 F.3d 1149,

1152-53 (9th Cir. 2007).  The Ninth Circuit has instructed:

> Rule 404(b) is a rule of inclusion - not exclusion - which references at least three categories of other "acts" encompassing the inner workings of the mind: motive, intent, and knowledge.  Once it has been established that the evidence offered serves one of those purposes, the relevant Advisory Committee Notes make it clear that the "only" conditions justifying exclusion of the evidence are those described in unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence.

United States v. Curtin, 489 F.3d 935, 944 (9th Cir. 2007) (en banc).  Here, these prior

similar acts admitted were clearly relevant to defendant Sedaghaty's state of mind,

which was the paramount issue throughout the hotly contested trial.

1. Mujahideen Fund-raising While On the Haj and During Jewelry Sales

Government witness Barbara Cabral testified about two incidents of fund-raising

for the Chechen mujahideen conducted by defendant Sedaghaty and his organization,

Al-Haramain USA.  One incident occurred in 1999 while the defendant and Mr. and Mrs.

Cabral went on the Haj pilgrimage to Mecca.  At the conclusion of the trip, defendant

Sedaghaty approached Mrs. Cabral and persuaded her to turn over to him the refunds

they had received from the Saudi government to "help send blankets and food and help

the mujahideen in Chechnya."  The other involved a rummage-type sale involving

jewelry conducted at the Al Haramain premises in Ashland sometime in 2000, which

raised $1,763 (Gov't Exhibit BC-1) and "all the funds were to go to the mujahideen in

Chechnya."

At no stage during the proceedings, including in his five voluminous motions in

limine filed prior to trial, in his trial brief, or during Mrs. Cabral's testimony itself did the

defendant object to the evidence concerning the jewelry sale.[9]  Accordingly, these

objections were waived.  United States v. Archdale, 229 F.3d 861, 864 (9th Cir. 2000)

(absent a definitive pre-trial ruling on the question, a defendant must

contemporaneously object to evidence at trial to preserve the issue).  The government's

intention to introduce 404(b) evidence was clearly set forth in the government's notice

filed within its trial brief (CR415, pp. 21-22).  Any complaint about the introduction of this

evidence was thus waived and cannot be entertained unless the admission of the

evidence was plain error.  See, e.g., United States v. Sine, 493 F.3d 1021, 1038 (9th Cir.

2007).

    In any event, the admission of testimony concerning both of these events was

clearly proper under Fed. R. Evid. 404(b) as relevant to "motive, opportunity, intent . . .

plan, knowledge [and] absence of mistake or accident."   As stated repeatedly, the main

issue for the jury was whether the defendant acted willfully in 2000 and 2001 to cover

up the true nature of the El Fiki transaction and his knowledge of the intended use of

that money by Al Haramain to fund the mujahideen in Chechnya.  The defendant, both

in his opening statement and during the trial, forcibly denied the accusation, arguing that

Sedaghaty was "a man of peace" who acted solely because of his concern for the plight

of innocent Muslim victims of the war in Chechnya.  Through his various witnesses and

exhibits he proffered that because of his good character he had no intention to fund the

_____

[9]The government also questions whether the defendant's objection to the Haj
testimony was also preserved.  The Court brought the issue up *sua sponte* at the
August 26, 2010 pretrial hearing, and all that defense counsel did was indicate that the
defense contested the facts and the jury would have to hear from a number of
witnesses on the subject.  He did not formally object to the admission of the evidence.

mujahideen, or any knowledge of such an intention, when he signed the Al Haramain

tax return and otherwise assisted Al-Buthe in the El Fiki transaction.  The fact that

defendant Sedaghaty shook down the Cabals to turn over their refunds to help the

mujahideen in Chechnya, and that fund-raising for the mujahideen in Chechnya

occurred at the Ashland office/mosque supervised and run by the defendant, was

clearly probative of the defendant's knowledge, intent, and motive in acting as he did.

Both Mrs. Cabral and Mr. Gartenstein-Ross testified that the defendant was in

charge of the Al Haramain organization in the United States and ran the operation at the

Ashland location.  The jury heard that his Russian-speaking wife Safiyah also

participated in the jewelry sale.  The defendant suggests that the admission of this fund-

raising evidence was somehow improper because these events were "legal and

private."  Counsel's asserted legality of such fund-raising is very questionable, at least

inside the United States (see 18 U.S.C. §956), but nothing in Fed. R. Evid. 404(b)

requires that a similar act be either illegal or public to qualify for admission.  United

States v. Curtin, 489 F.3d at 943 & n.3.  Rather, the question is whether the act was

sufficiently similar to be probative of a relevant issue and whether its probative value

outweighed its prejudicial effect.  Here, that was clearly the case.

The defendant also complains that the jewelry sale evidence should not have

been admitted because the Court did not admit defense exhibit 801, an email between

the defendant and Raya Shokatfard, an organizer of the "jewelry sale."  That exhibit,

however, contained self-serving hearsay and lacked an appropriate foundation since

neither the defendant nor Shokatfard testified to authenticate it.[10]   Fed. R. Evid. 404(b) does not condition the admission of similar act evidence upon an opponent's ability to lay a proper foundation to rebut that evidence.

2.  Fund-raising for Kosovo

        Similarly, Daveed Gartenstein-Ross testified that in 1999 defendant Sedaghaty solicited donations from Gartenstein-Ross and others for money to support "a couple of brothers who want to go and fight the Serbs" in Kosovo, another area of the world in which a conflict denominated partly in religious terms was occurring.  Gartenstein-Ross donated to the cause and shortly thereafter defendant Sedaghaty wire transferred $2,000 from his business account to an Al Haramain account in Tirane, Albania (Gov't Exhibits BOA14-16) which was close to the area of the Kosovo conflict.  Although the defendant objected to the introduction of the bank records corroborating this testimony in his motion in limine (CR 336, p. 25), he never formally objected to the introduction of Gartenstein-Ross' testimony on this subject.  Thus, again, the complaint he now raises was waived.  The fund-raising for the mujahideen in Kosovo was extremely probative of the defendant's knowledge, intent, and lack of mistake or accident and was directly relevant to the issue of his willfulness.  The testimony concerning this incident was short and to the point and did not become "a trial within a trial."

3.  The Gartenstein-Ross Check

        The question concerning the admission of the testimony about the Gartenstein-

_____

        [10]  Ms. Shokatfard, who was on the defendant's witness list, was present at the Eugene Courthouse during the trial, see attached Declaration of Colleen Anderson, and could have authenticated her e-mail, but counsel apparently decided not to call her.

Ross check (Exhibit BOA-6) was litigated by the parties before trial and ruled upon before the evidence was admitted.  Gartenstein-Ross testified that it was his first salary check at Al-Haramain USA, that defendant Sedaghaty wrote on the check "Power Mac," and that defendant told him he would have to be prepared to testify that this check was in payment for the sale of a computer if it were ever challenged in court.  Similarly, the Al Haramain accountant Wilcox testified that when he questioned the defendant about the check he was told that the check was for the purchase of a computer.  The relevance of this testimony was two-fold:  it demonstrated the defendant's plan and preparation to lie to the IRS when it suited him, and his intent on doing so to his accountant in order to effectuate that purpose.

The Court carefully balanced the probative value against the prejudice of this evidence, initially ruling that the testimony was admissible under Rule 404(b), and then reversing itself just before trial and excluding the evidence.

At trial, the defense "opened the door" to this evidence as early as opening statement, which emphatically portrayed the defendant as an innocent man tripped up by an incompetent accountant.  In the course of the defense opening, the defendant was portrayed as not an "evil fundamentalist conspiring to cheat on his taxes."  The jury was told that the errors on the return were "based on mistakes by the accountant" and that the defendant had told accountant Wilcox to "Get it right" and "I don't do a detailed review of the books –  I expect you to do that."  "The plan was to trust Tom Wilcox with his work." and "Wilcox got almost every accounting matter wrong."  By shifting the blame for the incorrect entries on the tax return to the accountant Wilcox, the defense

directly put in issue the defendant's honesty in dealing with the IRS and his accountant,

claiming that:

> Tom Wilcox made the error, started this whole thing by
> blaming Pete Seda, saying it was all his fault.  It was not.
>
> We believe by the time we're done with this case the
> evidence will show that Pete Seda is not a criminal.  He's a
> good man.  He's a good American.

By opening the door to the defendant's intent in dealing with the IRS and his

accountant, the defense made it absolutely clear that the circumstances surrounding the

issuance of the Gartenstein-Ross check were more probative than prejudicial.  This

Court agreed and properly permitted the evidence.

4.  The Court Properly Instructed the Jury About The 404(b) Evidence

Finally, the Court properly instructed the jury about the limited use of this

evidence.  The jury was told that:

> You are here only to determine whether the defendant is
> guilty or not guilty of the charges in the indictment.  The
> indictment -- I'm sorry, the defendant is not on trial for any
> conduct or offense not charged in the indictment.

And it was further instructed:

> You have heard evidence that the defendant committed
> other acts not charged here.  You may consider this
> evidence only for its bearing, if any, on the question of the
> defendant's intent, motive, opportunity, preparation, plan,
> knowledge, identity, absence of mistake, absence of
> accident, and for no other purpose.  You may not consider
> this evidence as evidence of guilt of the crime for which the
> defendant is now on trial.

Juries are presumed to follow a trial court's instructions.  Richardson v. Marsh, 481 U.S.

200, 211 (1987); United States v. Gallenardo, 579 F.3d 1076, 1082 (9th Cir. 2009).

In sum, there are no grounds for a new trial based upon the admission of the

404(b) evidence.

**E.   There was No Distortion of the Evidence**

1.  Hypothetical Question

Citing United States v. Shwayder, 312 F.3d 1109, 1121 (9th Cir. 2002),

defendant complains that the prosecution improperly posed a guilt-assuming

hypothetical during the questioning of a witness.  The question deemed improper in

Shwayder concerned a guilt-assuming question about the defendant posed to a

*character* witness.  There, the Court ruled that it is improper for the government to cross

examine a character witness by asking questions that assume the defendant's guilt in

the very case being presently tried.  Such a question "can have only negligible probative

value as it bears on the central issue of guilt."  Id. at 1120.  Shwayder thus stands for

the proposition that it is improper for a prosecutor to cross examine a *character* witness

called by the defense and to have the witness assume the defendant's guilt on the

charges at issue during that same trial.  Such an assumption has a tendency to dilute

the presumption of innocence.

Unlike the situation in Shwayder, the hypothetical question in the present case

did not involve the cross examination of a character witness and in no way affected

defendant's presumption of innocence.  Rather, the question was posed to a

government witness during his *redirect* examination, and was asked only after the

defense invited the question by first posing its own hypothetical question.  Nothing in the government's hypothetical question asked the witness to assume defendant Sedaghaty's guilt.  <u>Shwayder</u> is not pertinent to this case.

In any event, the question at issue was must be examined in its proper context. One of the defenses raised at trial was that when El-Fiki made his $150,000 donation, he intended that the funds go to Al-Haramain headquarters in Saudi Arabia, rather than to the Al-Haramain office in the United States controlled by defendant Sedaghaty.  If so, the defense maintained through its former IRS witness Marcus Owens, defendant had no obligation to report the receipt and disposition of the funds in the Form 990 at issue in the indictment, and thus any false statements about the donation were not material.[11]

Although El-Fiki was not called as a witness by the government or the defense, the defense attempted to establish El-Fiki's intent through other means.  One of the ways in which the defense tried to establish this was through the cross examination of government witness Gregory Wooten, who is an IRS employee called by the prosecution to establish that the false statements in the Form 990 were material to the IRS.

On cross examination, the defense asked questions designed to have Wooten speculate as to El-Fiki's intent.  The government objected on the basis that the defense was improperly attempting to prove El-Fiki's intent through a collateral witness.  (9/2/10 TR at 154-58).  The court sustained objections.  (156-57).  The defense then attempted

---

[11]Materiality is an element of the tax crime charged in Count Two, as well as an object of the conspiracy charged in Count One.

to establish El-Fiki's intent through the use of a hypothetical question to Wooten.  (158-60).  This question required Wooten to assume that El-Fiki did not know there was a branch of Al-Haramain in the United States, and that the donation was for "orphans and widows." ("That's what's in the donor's head.") (158-60).  Wooten responded that, under the lengthy factual scenario in counsel's hypothetical question, if El-Fiki did not know of the U.S. branch of Al-Haramain, and merely sent the donation to what he thought was the U.S. account of a foreign charity as a "pass-through" or "mistake," then the transaction would not need to be reported on the Form 990 of the U.S. organization. (160).

The government countered by posing its own hypothetical on redirect.  The government's hypothetical had Wooten assume that El-Fiki *was* aware of the Al-Haramain branch in the United States, that he intended to fund fighters in Chechnya, and that he sent the funds to the United States to conceal the transaction from the Egyptian government.  The hypothetical question also had Wooten assume that defendant Sedaghaty exercised control over the donated funds.  Under this scenario, Wooten testified that he would expect the transaction to be reported on the Form 990. (173).

The government's hypothetical question was proper.  Exhibits received into evidence showed that Al-Haramain posted information on its global website soliciting funds for the "Chechnya Relief Fund."  Solicitations listed both the Al-Haramain Charitable Foundation in Saudi Arabia, as well as the Al-Haramain Educational Center in Ashland, Oregon.  (Government exhibit SW-5).  Bank accounts for both organizations

were listed.  Moreover, at about the same time of the El-Fiki donation, Al-Haramain's web page had a section entitled the "Chechnya Relief Fund," which provided battlefield updates pertaining to the mujahideen's war with Russian forces in Chechnya. (Government exhibit EK-1).  Potential donors were given instructions on this webpage as to how to provide assistance.  Other information on the Al-Haramain website included a *fatwa* instructing Muslims to provide financial support to the mujahideen in Chechnya. (Government exhibits EK-4, 4a, 5, 5a).

The defense was successful in asking witness Wooten to assume El-Fiki's intent in the form of a hypothetical question.  Once done, the government was entitled to suggest that El-Fiki's true intent may have different.  This response was invited by the defense and was fairly based on the evidence.[12]  While it is true that El-Fiki provided a statement to Egyptian law enforcement that served as the basis for the defense hypothetical, the government was permitted to counter with a different set of assumptions that was fairly based in large part on other evidence before the jury.

Finally, this Court properly instructed the jury that questions asked by lawyers are not evidence:

> In reaching your verdict, you may consider only the testimony and exhibits received into evidence.  The following things are not evidence and you may not consider them in deciding what the facts are:
>
> First, questions, including hypothetical questions, statements, objections, and arguments by the lawyers are not evidence.  The lawyers are not witnesses. Although you must consider a lawyer's question to understand the answers of a witness, the lawyer's questions are not evidence.... (9/8/10 TR at 14).

---

[12]In overruling the defense objection to the government's hypothetical question, this court properly observed that it was similar to the defense's own hypothetical question of Wooten. (173).

2. Wilcox Coding of Check

At trial, government witness Gartensein-Ross testified that he worked for defendant Sedaghaty and Al-Haramain in Ashland.  Sedaghaty paid Gartenstein-Ross "under the table."  His first salary check was for $2,060.  Because Sedaghaty did not want to report the payroll distribution to the IRS, he wrote "Power Mac" on the bottom of the check, making it appear that Gartenstein-Ross had sold a computer to Al-Haramain.  (Government exhibit BOA-6).[13]  The date of the check was January 25, 1998, although it was mis-dated and was actually supposed to be January 25, 1999.  During a conversation concerning this check, defendant Sedaghaty told Gartenstein-Ross that he should be prepared to falsely testify about this by taking the stand and saying that the check was really for a computer. (9/1/10 TR at 24-26).

Government witness Wilcox - Sedaghaty's accountant - testified at trial that he had a conversation with defendant Sedaghaty about this check.  Sedaghaty falsely told Wilcox that the check was for the purchase of a computer from the individual listed on the check.  This lie caused Wilcox to categorize the check as an equipment purchase, rather than how it should have been; as payroll, which would have required Sedaghaty to pay payroll taxes on the funds. (9/1/10 TR at 234-35).

On cross examination, defense counsel attempted to impeach Wilcox by showing him Quikbooks records for 1998 that included no entries reflecting that this check was contained in the fixed assets category.  Upon reviewing these records, Wilcox acknowledged that he was wrong and that he did not enter the check in the fixed assets

_____

[13]This is the same check discussed above in the Rule 404(b) argument.

category, contrary to his testimony on direct.  (9/2/10 TR at 19).

On redirect, the prosecution showed Wilcox the *1999* Quikbooks printout for Al-Haramain (government exhibit TW-6) which showed that the $2,060 payroll check was improperly listed as "office supplies."  Upon reviewing this record, Wilcox testified that, in fact, he had categorized the check as office supplies based on false information provided to him by Sedaghaty.  This revealed that Wilcox's testimony during direct was actually true.  (9/2/10 TR at 94).

On recross, defense counsel sought to establish that Wilcox did not code the check.  (9/2/10 TR 99).  Wilcox said that if the coding was done on May 8th, then he, Wilcox, would not have been the one who coded the check.  Wilcox further stated that he specifically recalled a conversation with Sedaghaty about the check.

In the present motion, defendant asserts the prosecution incorrectly told the jury during summation that witness Wilcox coded the Gartenstein-Ross check.  While there was conflicting testimony at trial concerning who actually coded this particular check into the Quikbooks files, - *compare* 9/2/10 at p. 94 *with* p. 99 - the witness confirmed that the check in question was misclassified based on information provided by defendant Sedaghaty.

The point sought to be made during summation was that defendant Sedaghaty lied to Wilcox about the purpose of the check.  It was not particularly important who coded this check;  rather, that defendant Sedaghaty provided false information to his accountant, thus reflecting Sedaghaty's willingness to lie to the IRS and his own accountant concerning the proper methods of reporting monetary transactions.  This

point was made during summation. (9/8/10 TR at 168-70).

## F.  Voir Dire Procedures and Juror Issues

1.  The Court's Voir Dire Procedures Were Proper

Defendant asserts that this Court's voir dire procedures were inadequate and resulted in a "tainted jury."  This unfounded criticism is most directly related to the issue of religion.

During its voir dire, this Court asked each of the jurors to specifically provide information relating to their views on religion:

> Do you or anyone close to you have strong feelings regarding any type of religious practices or specific ethnicities?  In other words, some of you have your own faith.  And are you able to be a juror and evenhanded in evaluating the evidence and applying the law as I give it to you with regard to someone of another faith, or from another culture.  And if you have a problem one way or the other, or a strong preference for or aversion to those things, we need to know about that.

(8/30/10 TR at 14).

Many of the jurors responded that they were tolerant of other religions.  Others qualified their response that they were tolerant except for extremists, fanatics, or those who engage in violence in the name of religion.  This Court asked follow up questions where appropriate and excluded jurors *sua sponte* based on answers concerning religion. (87, 104).   The Court also conducted individual voir dire of some of the jurors who indicated they had been exposed to some media coverage of the case. (70).  The Court permitted defense counsel to ask his own follow up questions on individual jurors. Many of these questions related to religion. [96-104].

In the recent case of <u>Skilling v. United States</u>, 130 S. Ct. 2896, 2917-18 (2010), the Supreme Court noted that jury selection procedures are highly discretionary and particularly within the province of the trial judge. The jury selection procedures utilized by this Court amply assured defendant of a fair jury and provided him with sufficient information to exercise the elevated number of peremptory challenges this Court granted him (12 as opposed to 10).

2. <u>There was No Juror Prejudice Demonstrated During Trial</u>

Defendant next claims that "an unknown number of jurors expressed a pro-prosecution bias." (Motion at 30). He is wrong.

After government witness Barbara Cabral testified, and as she was departing the witness stand, one of the jurors whispered to her "good job," or words to that effect. (9/1/10 TR at 4). Government counsel brought the subject to the Court's attention. During this same exchange, government counsel also informed the Court that as one of the government's non-testifying technology assistants was coming into the courtroom, one of the jurors told her she was doing a good job running the equipment in the courtroom.

Citing <u>Caliendo v. Warden</u>, 365 F.3d 691 (9th Cir. 2004), defense counsel requested that the Court immediately remove the juror who made the comment to witness Cabal, and conduct further inquiry regarding the comment to the technology assistant. This Court reviewed the <u>Caliendo</u> case and, while opining that the type of juror contact in that case was far more problematic, nevertheless dismissed the juror out of an abundance of caution. The Court refrained from conducting additional inquiry on

the comment to the technology assistant.  The Court then called the jury back into the courtroom and reminded the remaining jurors to refrain from speaking to anyone about the case until it was time to deliberate. (9/1/10 TR at 4-14).

Again citing Caliendo, defendant now asserts that the Court's refusal to conduct additional inquiry on the comment to the technology assistant constitutes grounds for a new trial.  Caliendo, however, does not support defendant's argument.  In that case a critical government law enforcement officer-witness was overheard talking to three jurors outside the courtroom for approximately twenty minutes.  Noting that there is a judicially created bright-line presumption of prejudice concerning unauthorized communication between a juror and a witness or interested party, the Court also recognized that such a presumption is not triggered when the juror contact is *de minimis*.  Caliendo, 365 F.3d at 696.  Instead, where there is a *de minimis* juror contact, the defendant must show that the communication could have influenced the verdict before the burden shifts to the prosecution to rebut a presumption of prejudice.  The brief juror contact with the technology assistant in our case was more along the type of casual or inevitable contacts recognized as *de minimis* by the Caliendo Court.  The technology assistant was not a witness.  Her credibility was not an issue and there is nothing remotely close to suggest the juror's comment influenced the verdict.  A brief remark that she was doing a good job presenting the electronic evidence, absent more, was insufficient to trigger a presumption of prejudice.  This Court exercised proper discretion in dismissing the juror who made the comment to the testifying witness, while refraining from conducting an unnecessary inquiry concerning the juror comment to the

non-testifying technology assistant.  There was no error.

3.  Unproven Jury Exposure to an Irrelevant USA Today Article Does Not Require a
New Trial

Defendant next claims that there was juror misconduct pertaining to an article
appearing in *USA Today* during the trial.  The article and an affidavit from defense
counsel are attached to the new trial motion.  The article was about a pastor's plan to
burn copies of the Qu'ran.  The article was critical of the plan and noted *that* several
groups had condemned the idea.  The article had nothing to do with our trial.

According to defense counsel, copies of the newspaper were placed on tables at
the hotel where a juror and the defense team were residing during trial.  Counsel states
that during the morning of September 9th, she saw a juror reading a newspaper.  She
does not indicate if it was *USA Today*, or whether the juror was reading the article about
the Qu'rans.

From this, defendant speculates that this unproven exposure to an unrelated
matter "prejudiced the juror and strengthened any fears the juror may have had
regarding Muslims and the religion of Islam."  (Motion at 32).  This speculation is
unfounded and unwarranted.

It must be noted that defense counsel never brought their concerns to the Court's
attention at a time when the Court could have addressed the matter.  The jury
deliberated for much of the day of September 9th, and was called into the courtroom to
consider a question they had raised.  At no time did defense counsel bring the alleged
misconduct matter to the court's attention.  The first time the issue was raised was in

the present motion.

In any event, the Court instructed the jury before the trial commenced that they were required not to avoid anything about the case other than the evidence presented in court. The Court repeated this admonition during trial and instructed the jury to base its verdict only on the evidence. Defendant has failed to establish juror misconduct, and there are insufficient facts warranting recalling the jury to make further inquiry about the irrelevant newspaper article.

## G.  The Closed Conferences With Defense Counsel Did Not Prejudice the Defendant

The defendant seeks a new trial on the grounds that the Court conducted several closed sessions with defense and government counsel outside of the defendant's presence. Defense counsel knows that the reason the Court called for those sessions to be closed was the strong possibility that classified information would be discussed.[14] Obviously, neither the defendant, who does not possess a security clearance, nor the public at large, could participate in or listen to a discussion of classified information. To allow such participation would defeat the very purpose for which Congress passed the Classified Information Procedures Act, 18 U.S.C. App. III ("CIPA"). Defense counsel did not object at the time to the Court conducting these sessions outside the presence of the defendant or the public and, once again, this complaint was waived.

---

[14]  The Court has ordered the Court Security officer to conduct a classification review of the transcripts of the closed sessions (CR 481). To date, that review is not complete so the government cannot discuss the specific subject matters of the closed sessions in this unclassified response.

Even if these objections were not waived, however, the closed sessions were appropriate.  Although the First and Sixth Amendments generally require open proceedings and that a defendant be present at all critical stages of a criminal prosecution, see generally Waller v. Georgia, 467 U.S. 39 (1984), that right is not absolute and does not extend to each and every proceeding in a criminal trial.  United States v. Sherlock, 962 F.2d 1349, 1358 (9th Cir. 1992) (upholding the exclusion of defendants' family members while rape victim testified as "substantially justified" and "narrowly tailored").  In particular, a defendant's exclusion from a CIPA hearing where classified information will be discussed by the Court and counsel does not violate such rights, particularly when the discussion centers around legal and procedural issues for which a defendant would have little, if anything, to contribute.  See, e.g., In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 93, 128-30 (2nd Cir. 2008), *cert. denied*, 129 S.Ct. 2778 (2009).  Here, the short closed conferences, intended to discuss classified matters, served an important national security interest and were narrowly tailored to discuss only those issues.  The defendant cannot establish any prejudice from his exclusion because he would have had nothing substantive to offer on the subjects discussed and he did not have a necessary security clearance.

## H.  The *Ex Parte* Sessions Were Appropriate Under the Classified Information Procedures Act

The defendant also complains about the occurrence of several *ex parte* sessions between government counsel and the Court which the Court conducted during the trial. *Ex parte* proceedings are permissible when there is an "overriding necessity, such as

the need to act quickly or to keep sensitive information from the opposing party." United States v. Wills, 88 F.3d 704, 711 (9th Cir. 1996), quoting United States v. Thompson, 827 F.2d 1254, 1258 (9th Cir. 1987). The *ex parte* sessions during trial were called by the Court to discuss issues arising from previous CIPA filings by the government and were ancillary to those filings. CIPA Section 4, 18 U.S.C. App. 3, § 4, contemplates an *ex parte* procedure in connection with discovery matters involving classified information, the archetype of "sensitive information," and there was no error in conducting those sessions during the trial.

## I.  The Court's Order of May 16, 2008, Does Not Require a New Trial

The defendant has renewed his complaint concerning the Court's Order of May 16, 2008, prohibiting access to and discussion of the "sealed document" previously turned over by the defense to the custody of the court. Although undersigned counsel are not privy to the contents of the "sealed document," there does not appear to have been any material change in circumstances so as to warrant a new trial because of the Order of May 16, 2008.

The Court has now had the opportunity to hear the defense in this case. That defense can be fairly summarized as (1) an attempt to shift blame for the false entries on the tax return away from the defendant and onto the Al Haramain accountant Tom Wilcox and (2) evidence proffered that as a "man of peace" the defendant would not have acted wilfully to violate the law with regard to funds destined for Chechnya. In pretrial proceedings, the Court previously denied defendant's motion for a protective order under CIPA concerning the document noting that the "court ha[d] previously

denied discovery requests for access to the sealed document or discussion of its

contents."  (CR 276 at 2 & n.1).  The Court can now judge for itself whether the "sealed

document" was discoverable, or material, or otherwise relevant and helpful to that

defense presented at trial or more generally to defendant.  If not, the "sealed document"

and its contents were not at issue in this matter and there was no need for further

defense access to or discussion by counsel about the "sealed document."  The Court

should, in consultation with the Court Security Officer, reiterate its prior ruling in that

regard in this context.

## J.  The Grand Jury Procedures Used to Obtain the Indictment were Proper

As his final contention, defendant criticizes the grand jury procedures used to

obtain the indictment, and says speculation and a false statement of fact lead to the

indictment.  Despite having the grand jury transcript of Special Agent Anderson prior to

trial, defendant never raised this issue prior to trial.  Fed. R. Crim. P. 12(b)(3) requires

that motions alleging a defect in instituting the prosecution must be made prior to trial.

United States v. Anderson, 472 F.3d 662, 668 (9th Cir. 2006).

In any event, the Federal Rules of Evidence are not applicable in proceedings

before grand juries.  See Fed. R. Evid. 1101(d)(2).  Also, hearsay is permissible before

a grand jury.  Costello v. United States, 350 U.S. 359, 362 (1956); United States v.

Samango, 607 F.2d 877, 880-81 (9th Cir. 1979).  While it is true that Agent Anderson

was asked to speculate during her grand jury testimony, this was entirely proper.  To

prevent grand jurors from being misled into thinking she had first hand knowledge of a

subject, she was occasionally asked to offer investigative speculation as a preface to

testimony.  There is nothing impermissible about this and defendant offers no support to the contrary.

At trial, defense counsel cross examined Agent Anderson on this subject. (9/2/10 TR at 254-61).  She was asked about one specific part of her grand jury testimony concerning who prepared the Springfield building schedule.  Based on what witness Tom Wilcox had told her previously, Agent Anderson testified at grand jury that defendant Sedaghaty had created the schedule. (9/2/10 TR at 260).  Wilcox acknowledged at trial that he had previously told Agent Anderson that he believed defendant Sedaghaty had prepared the building schedule, but after being shown the actual Quikbook files, he subsequently recalled that he, Wilcox, was the one who actually created the schedule based on information provided to him by Sedaghaty.  The defense was aware of this new piece of information well before trial and the subject was thoroughly explored by the defense at trial.  In sum, Agent Anderson testified truthfully before the grand jury about her understanding of who prepared the building schedule. There is no basis for a new trial.[15]

### III.  Conclusion

Defendant was well-represented at trial.  His trial was fair and he was properly convicted.  He has identified no issue warranting a new trial.  For reasons stated, this

---

[15]To the extent defendant is now alleging prosecutorial misconduct before the grand jury, he did not do so prior to trial as required by Fed. R. Crim. P. 12(b)(3).  Also, a conviction following a jury trial generally indicates that any prosecutorial misconduct before the grand jury was harmless beyond a reasonable doubt.  See United States v. Mechanik, 475 U.S. 66, 72-73 (1986);  Costello v. United States, 350 U.S. 359, 363 (1956); People of Territory of Guam v. Muna, 999 F.2d 397, 399 (9th Cir. 1993).

Court should deny defendant's motion for a new trial.

DWIGHT C. HOLTON
United States Attorney
District of Oregon


*/s/ Christopher L. Cardani*
CHRISTOPHER L. CARDANI
Assistant United States Attorney


*/s/ Charles F. Gorder, Jr.*
CHARLES F. GORDER, JR.
Assistant United States Attorney