**Steven T. Wax, OSB No. 85012**
**Federal Public Defender**
**101 SW Main Street, Suite 1700**
**Portland, OR  97204**
**Tel: (503) 326-2123**
**Fax: (503) 326-5524**
**Email: steve_wax@fd.org**

**Lawrence Matasar, OSB No. 74209**
**621 SW Morrison Street, Suite #1025**
**Portland, OR 97205**
**Tel: (503) 222-9830**
**Email: larry@pdxlaw.com**

**Attorneys for Defendant**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CR 05-60008** |
| Plaintiff, | |
| v. | **REPLY TO GOVERNMENT'S RESPONSE TO MOTION FOR NEW TRIAL** |
| **PIROUZ SEDAGHATY,** | |
| Defendant. | |

Defendant Pirouz Sedaghaty, through his attorneys, Steven T. Wax and Lawrence Matasar, hereby replies to the government's response to his Motion For New Trial.  There are six issues that warrant a reply. [1]

**1.     The Receipts Were Admissible Without Regard To A Hearsay Exception.**

First, the government is incorrect that Mr. Sedaghaty needed to rely on a hearsay exception to allow the introduction of the receipts.  Gov't Resp. at 5. Rather, the receipts were offered as a contrary fact to the government's assertion that it had thoroughly investigated the money trail in this case.  The jury was allowed to believe that, while the government, by its own admission, only had a circumstantial case, the case was supported by a lengthy and intensive investigation into the money.  The fact that the government chose to ignore evidence in its possession that was contrary to its circumstantial position and question the authenticity because it came from the co-defendant's counsel does not assist the government.  The government received a great deal of information from co-defendant's counsel, much of which must have been deemed reliable.

The receipts and the government's possession of the receipts were proof of the government's unwillingness to follow up on information received that

_____

[1]  As to all the issues raised in the motion for a new trial, motion for an acquittal and the government's responses, Mr. Sedaghaty relies on his original filings.

**Page 2          REPLY TO GOVERNMENT'S RESPONSE TO MOTION FOR NEW TRIAL**

contained relevant information simply because it did not support their circumstantial theory of the case. The government was perfectly willing to investigate many pieces of evidence in this case only to later allege that the evidence, coupled with their investigation, supported the theory that the evidence was proof of a lie. Mr. Sedaghaty was entitled to have the jury understand the direct relationship between the numbers on the piece of evidence the government did not pursue and the contracts it alleged were fabrications. The government opened the door to this inquiry, and the Court failed to allow the defendant to fully pursue that line of questioning before the jury.

The government also attempts to suggest that the receipts, even if admitted at trial, would not have been exculpatory to Mr. Sedaghaty. Gov't Resp. at 8. That could not be further from the truth. The government repeatedly alleged that the monies were given to Soliman Al Buthe, who then distributed it in Chechnya, potentially to the Mujahideen, but kept $21,000 for his own use. The receipts established that Mr. Al Buthe did not pocket any money. Second, the government alleged that the contracts for $186,000 and $188,000 were fraudulent. Proof that Mr. Al Buthe deposited roughly the amount of the receipts was strong evidence that the contracts were legitimate. Third, the government argued that the money trail ended at Mr. Al Buthe's bank account. The receipts established that was not true.

From review of the record, it is not clear if the Court was provided any information about the receipts that was not provided to the defense.  If anything was provided, please advise counsel and provide it to counsel.

>    **2.    Viewed Under An Objective Standard, Throwing The Qur'an Requires A New Trial.**

Second, notwithstanding the government's agreement that Mr. Cardani tossed the Noble Qu'ran down on the table in front of the jury during his rebuttal closing argument, the government now requests that this Court make specific findings regarding this incident.  While the government portrays the rebuttal closing argument as an "invited response" (Resp. at 14),  the transcript reflects that it was not.  *See* Def. Motion for New Trial at 19-21.

It is ironic that the government argues on the one hand that its rebuttal arguments regarding the Qur'an was an "invited response" while, at the same time, the closing argument began with the assertion that the jury should focus on the fact that defense counsel never mentioned the Noble Qur'an in his closing.   September 8, 2010, TR at 152.  The juxtaposition of its argument in closing with its assertion in its pleading significantly undermines the force of its invited response suggestion.

Second, and more importantly, there is no manner in which the government's actually labeling the Qur'an as "the defendant" can have been a response to anything counsel said.  It certainly cannot be considered a

"measured response."[2]  Gov't Resp. At 14.  Calling the Noble Qur'an "the defendant" underscores the effect of the argument's appeal to prejudice and shifting of the jury's focus from Mr. Sedaghaty and his actions to religion.

The government incorrectly characterizes the record when it states in its pleading that the prosecutor commented on "the appendix[3] to the Noble Quran entitled *A Call to Jihad.*"  Gov't Resp. at 13.  The objectionable prosecutor's argument regarding the Noble Qur'an was made without a single reference to the appendix in the Noble Qur'an.  Mr. Cardani referenced the Noble Qur'an one time as "the defendant" and, at another point in the closing, tossed the Noble Qur'an down on the table in front of the jury with force.  This was not a response that was "invited" by the defense.  The effect of these statements and actions was to appeal to racial, ethnic, and religious prejudice and violated Mr. Sedaghaty's Fifth Amendment right to a fair trial.  This is particularly true in light of the fact that the media was full of anti-Islamic sentiment at that time.

---

[2]  Indeed, if this was a "measured response," thereby a thoughtful and calculated response, then the actions of the prosecutor are of even greater concern.

[3]  The government further mischaracterizes the facts when it states that Al Haramain distributed the version of the Quran which had been altered by Al Haramain through the assertion of an appendix titled *The Call to Jihad.*  Gov't Resp. At 17.  There is no evidence that Al Haramain altered the Quran to include this appendix.  In fact, Mr. Sedaghaty and Mr. Al Buthe worked to remove the appendix from the Noble Quran that was being provided to Al Haramain.  *See* Ex.. A (Mr. Nelson's declaration) and Ex. B (Ms. Pisani's declaration).

In its response to the government's request that the Court make certain findings, Mr. Sedaghaty makes several points.  First, the pleading conflates a potential action involving the prosecutor, "given the professional import of claims of misconduct . . ." with the issue before this Court that relates to Mr. Sedaghaty and the Motion for a New Trial.  We do not seek consideration of, and do not believe it is appropriate for the Court to consider, any matters other than the legal issues presented by Mr. Sedaghaty's motion with respect to this trial.

Next, the government's request for findings asks this Court to engage in a determination of the subjective state of mind of the prosecutor when the comments were made.  Mr. Sedaghaty made no references to the prosecutor's subjective state of mind in his motion.  Nor does he believe that the prosecutor's state of mind is something on which this Court needs to, or should, make a finding with respect to the pending motion.

The question in a motion of this nature is not whether the prosecutor had a bad motive, or was even aware that his comments could or did appeal to prejudice, but, rather, the objective question of whether they might have been viewed that way by the jury.  As stated in *Bains v. Cambra*, 204 F.3d 964 (9th Cir. 2000), the question is whether a statement may have had a particular effect.  There the court noted that the challenged evidence permitted several inferences to be drawn, some of which were permissible and others

impermissible. *Id.* at 975. The question regarding the prosecutorial argument was if it was inflammatory, whether it "**might** have had the effect of motivating the jury" to draw an impermissible inference. *Id.* (emphasis added).

It is critical to note that the inquiry on an issue of this nature is probabilistic. In *United States v. Nobari*, 574 F.3d 1065 (9th Cir. 2009), the court reiterated that the test is whether the comments "**may** have encouraged the jury" to act on prejudice. 574 F.3d at 1075. (emphasis added). In the context of the entire trial, with its repeated references to Islam, jihad, the Noble Qur'an, and in the context of the issues related to the jury, the danger that the effect of the prosecutor's statements was impermissible is great.

While Mr. Sedaghaty does not believe that the Court should make the subjective findings requested by the government, in the event the Court is inclined to make any findings, he believes it is important for the Court to understand the full impact of the prosecutor's comments. Thus, he provides with respect to what occurred, affidavits of two witnesses who were present in the courtroom during Mr. Cardani's rebuttal closing argument. Exs. A and B. Each of the witnesses reports what he or she saw, as well as expressing their reaction.

The prosecutor threw the Qur'an twice, at two distinct points in the argument. The first time it was thrown was immediately after the prosecutor referred to it as "junk." After he threw it down, he picked up the Islamic

Guidelines For Individual And Social Reform.  The set-up in the courtroom was that the podium from which the prosecutor was speaking was situated approximately 4 to 5 feet from the table.  The prosecutor was standing behind the podium when the book was thrown onto the middle of the table that was directly in front of the jury.  Regardless of the prosecutor's views, his actions with the Qur'an did disparage Islam.  And specifically at that time, as acknowledged by the government, major media outlets were covering stories about the burning of the Quran.  Gov't Resp. at 40.  Mr. Sedaghaty agrees that the prosecutor's tone was "forceful" (Gov't Resp. at 24);  the effect of this forceful statement was to improperly inflame the passions and emotions of the jury regardless of his intent.

There was nothing about the government references and these actions that was intended to address the issue of Mr. Sedaghaty's state of mind.

### 3. The Government's Tax Hypothetical Requires A New Trial.

The third issue warranting a response is the government statements that its hypothetical was "fairly based in large part on the other evidence before the jury." Gov't Resp. At 34.  This is untrue.  *See* Defendant's Motion for New Trial at 25-28.

### 4. Mr. Sedaghaty Did Not "Open The Door" On The FUTA Issue.

Fourth, the government mischaracterizes the basis upon which the Court ruled that the defense opened the door to the admission of the Gartenstein-

Ross check. As explained in the Def. Motion for New Trial at 22, the Court ruled that because defense counsel referenced federal unemployment taxes (FUTA) in the opening statement, the issue of paying employees under the table should come in. The defense disagrees that the reference was related to the 404(b) evidence in such a way that a door was opened.

Now, however, the government is claiming that because, in general, the defense claimed that the accountant made the mistakes at issue in this case, that the Gartenstein-Ross check became more probative than prejudicial. The defense's position was not new to the Court or to the government. The Court was well aware that was the position of the defense when the Court ruled that the check should be kept out of evidence. It was the defense's reference to FUTA in the opening statement that caused the Court to change his ruling and allow the admission of the check. It is that specific ruling that the defense takes issue with now.

### 5.    Mr. Wilcox Did Not Code The Gartenstein-Ross Check.

Fifth, as to the coding of this Gartenstein-Ross check, contrary to the government's argument, it was imperative that the jury understand clearly that Wilcox did *not* code that check. If Wilcox did not code the check, then his story about relying on a conversation with Mr. Sedaghaty and incorrectly coding the check, a conversation that he did not remember until a magazine article referencing the check was published many years later, cannot be believed.

From that, the defense sought to argue that it follows that he could not be believed regarding the conversation he allegedly had with Mr. Sedaghaty regarding the purchase of the Springfield building.  The clarity of when Mr. Wilcox did or did not code specific transactions goes directly to reasonable doubt.

### 6.    Mr. Sedaghaty Continues To Be Prejudiced By The May 18, 2008, Order.

Finally, when addressing Mr. Sedaghaty's claims regarding the May 18, 2008, Order, the government alludes to the possibility that the Court has reviewed the classified document that was placed in the secure facility when it argued that the "Court can now judge for itself whether the 'sealed document' was discoverable, or material, or otherwise relevant and helpful to that defense presented at trial[4] or  more generally to defendant." Gov't Resp. at 44.   The defense has received no such notice of this viewing.  Mr. Sedaghaty requests that the Court provide notice to the defendant if the Court has viewed the

---

[4]  The government fails to recognize the import of the access to the document as related to the motion to suppress.

document in question and when that viewing occurred.

Respectfully submitted on November 8, 2010.

/s/ Steven T. Wax
Steven T. Wax
Federal Public Defender

/s/ Lawrence H. Matasar
Lawrence H. Matasar

Michelle Sweet
Assisting on the Motion