DWIGHT C. HOLTON, OSB# 09054
United States Attorney
District of Oregon
CHRISTOPHER L. CARDANI
Assistant United States Attorney
405 East Eighth Avenue, Suite 2400
Eugene, Oregon 97401
(541) 465-6771
chris.cardani@usdoj.gov
CHARLES F. GORDER, JR., OSB# 912874
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, Oregon 97204
(503) 727-1117
charles.gorder@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  05-CR-60008-HO |
| | ) | |
| v. | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| PIROUZ SEDAGHATY, | ) | |
| | ) | **Sentencing 11/23/2010 at 8:00 am** |
| Defendant. | ) | |

        The United States of America, through its undersigned counsel, herein submits

the following memorandum, addressing sentencing issues pertaining to defendant

Sedaghaty.

1 - GOVERNMENT'S SENTENCING MEMORANDUM

**Introduction**

Defendant Sedaghaty was convicted at trial on two counts: Conspiracy and Tax Fraud. Both offenses involve defendant Sedaghaty's attempt to covertly fund mujahideen fighters in Chechnya and to conceal that illicit funding from the United States Government. A presentence report has been prepared for the Court, recommending a sentence of 96 months. The defendant challenges the sentencing calculations and apparently will be seeking a sentence of probation. In this memorandum, the government discusses the offense conduct, sentencing guidelines, 18 USC §3553a, and the government's sentencing recommendation. Since there will be witnesses at the sentencing hearing, the government will also preview some of the expected testimony in this memorandum.

**Offense Conduct**

From presiding over the trial, and the extensive pretrial litigation, this Court is well aware of the conduct which forms the basis of defendant's convictions. Offense conduct will be presented herein only when necessary to explain the justification for sentencing enhancements.

**The Sentencing Guidelines**

The sentencing guidelines are correctly calculated in the presentence report.

1. Base Offense Level

The 2000 edition of the United States Sentencing Guidelines was used for the presentence report, as it provides the set of Guidelines most favorable to the defendant.

2. Tax Loss

2 - GOVERNMENT'S SENTENCING MEMORANDUM

To assess the tax loss for purposes of the Sentencing Guidelines the IRS has calculated the amount defendant would have owed in taxes had he properly reported the distribution of the $151,000 in the year 2000. That tax loss is $80,980, exclusive of penalties and interest, and is explained below.

Certain assumptions, based on the evidence and convictions, drive the tax loss calculations:

• Since Al-Haramain (U.S.) was a tax exempt organization under IRC §501(c)(3), it is obligated to prove its receipts went to exempt charitable purposes;

• §501(c)(3) organizations may not fund acts of violence;

• Al-Haramain's (U.S.) corporate charter states that it opposes terrorism;

• El-Fiki stated that his $150,000 donation was for "widows and orphans," and was wire transferred into Al-Haramain's (U.S.) account in Oregon. Defendant Sedaghaty and co-defendant Al-But'he were the only people authorized to access the funds in that account;

• Defendant Sedaghaty made unsuccessful attempts to distribute the funds to Chechnya, including through a different organization he controlled called the Quran Foundation;

• Defendants Sedaghaty, Al-But'he and others conspired to covertly smuggle $130,000 of the El-Fiki funds out of the U.S. to the Chechen mujahideen;

• Al-But'he channeled most of the El-Fiki funds to a representative of Abu Umar, who at that time was one of the leaders of the Mujahideen in Chechnya, working directly with Ibn Khattab, Commander of the Mujahideen in Chechnya. At the time of our transaction, Abu Umar was the *de facto* head of the Kavkaz Institute,

3 - GOVERNMENT'S SENTENCING MEMORANDUM

which was a training camp for the Chechen Mujahideen;

- Defendant Sedaghaty used the remaining El-Fiki funds to purchase a $21,000 cashier's check for Al-But'he, which Al-But'he deposited into his personal bank account in Saudi Arabia; and

- Defendant Sedaghaty falsely reported on the Al-Haramain Form 990 that $130,000 of the El-Fiki funds were used as part of the purchase price for a building in Missouri, and that the remaining $21,000 was returned to the donor.

Since defendant Sedaghaty used the El-Fiki donation in a manner inconsistent with the charter of Al-Haramain (U.S.), contrary to Al-Haramain's (U.S.) tax exempt status, but in furtherance of his personal agenda and purposes, tax law requires the misappropriated funds be taxed to him. The IRS has prepared a Form 4549-A for defendant Sedaghaty. (Attached hereto as Sentencing Exhibit 1). This Form uses the information he did report in his Form 1040, and adds additional taxes based on the conduct and assumptions described above. The diverted $151,000 is treated as income to defendant on his personal Form 1040. This results in an additional tax due and owing of $33,230 (Line 9). There being no evidence that the funds were originally treated or intended to be compensation to defendant Sedaghaty, the misappropriated funds constitute an excess benefit, resulting in an "excess benefit tax" of $47,750 assessed against him. (Line 10). See 26 U.S.C. §4958(a)(1). These two taxes total $80,980, which does not include penalties and interest.[1]

USSG §2T1.1 states that the offense level is the level corresponding to the tax

---

[1]USSG §2T1.1, App'n Note 1 states that penalties and interest are not part of the tax loss under the Sentencing Guidelines.

4 - GOVERNMENT'S SENTENCING MEMORANDUM

loss.  Under USSG §2T4.1, a tax loss of between $70,000 and $120,000 yields an

offense level of 14.  The base offense level for defendant Sedaghaty is thus 14.

Witnesses will be available at the sentencing hearing to explain the tax

calculations.

3.  Sophisticated Means

USSG §2T1(b)(2) states:

"If the offense involved sophisticated concealment, increase by 2 levels."

Application Note 4 to USSG §2T1.1 describes the meaning of sophisticated

concealment:

> For purposes of subsection (b)(2), "sophisticated concealment" means especially
> complex or especially intricate offense conduct in which deliberate steps are
> taken to make the offense, or its extent, difficult to detect.  Conduct such as
> hiding assets or transactions, or both, through the use of fictitious entities,
> corporate shells, or offshore bank accounts ordinarily indicates sophisticated
> means.

The evidence supports this two level sentencing enhancement.  Defendant

Sedaghaty and his cohorts engaged in a conspiracy to move $150,000 from England to

Oregon to Saudi Arabia and into Chechnya.  The following conduct evidences

sophisticated concealment:

• reducing most of the El-Fiki funds to hard-to-trace travelers checks;

• failing to file a CMIR when departing the United States;

• using an offshore bank account in Saudi Arabia to cash the traveler's checks and

the cashier's check;

• smuggling cash into Chechnya;

• concealing the entire overseas transaction by reporting to CPA Wilcox that the

5 - GOVERNMENT'S SENTENCING MEMORANDUM

funds were used to buy a building in United States or returned to the donor; and

• causing the CPA to prepare the Form 990, misrepresenting the overseas

transaction as an innocuous building purchase in Missouri.

Finally, the Court is aware of how difficult it was to obtain the overseas bank

records.  This added a level of complexity not found in ordinary financial crimes.

As reflected in ¶33 of the PSR, a two point enhancement is appropriate.

4. <u>Obstruction</u>

USSG §3C1.1 provides:

If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or
impede, the administration of justice during the course of the investigation,
prosecution or sentencing of the instant offense of conviction, and (B) the
obstructive conduct related to (i) the defendant's offense of conviction and any
relevant conduct; or (ii) a closely related offense, increase the offense level by 2
levels.

Application Note 4 to this Guideline states in pertinent part:

The following is a non-exhaustive list of examples of the types of conduct to
which this adjustment applies: ... (c) producing or attempting to produce a false,
altered, or counterfeit document or record during an official investigation or
judicial proceeding.

The government need not prove that the conduct actually obstructed justice, as

an attempt to do so will also satisfy this enhancement.  <u>United States v. Hernandez-</u>

<u>Ramirez</u>, 254 F.3d 841, 844 (9th Cir. 2001).

<u>False Receipts Provided During the Investigation</u>

During the investigation, a grand jury subpoena was served on the U.S. branch

of the Al-Haramain Islamic Foundation.  Specifically, records were requested which

reflected the movement of funds to Chechnya.[2]  In response, attorneys for Al-Haramain eventually provided the case agent two receipts which supposedly covered the movement of the El-Fiki funds.  Those receipts are false.  While the Court has heard a great deal of information on these false receipts, the following justifies a two point enhancement for obstruction under USSG §3C1.1.

The receipts cover the same purported transaction, have identical form language, and are dated the same day, yet:

• contain references to different amounts of money ($186,644.70 vs. $188,465.00);

• are signed by Sedaghaty and Al-But'he, but in reverse order in the two receipts;

• one is supposedly witnessed by two individuals, but the other is not;

• contrary to the amounts listed in the receipts, and as Special Agent Anderson testified, Al-Haramain (U.S.) did not transfer more than $151,000 to Al-But'he during the relevant time period;

• contrary to the statement on one of the "receipts," Al-But'he did not deposit the funds into the Al-Haramain (Riyadh) account.  Rather, he cashed the 130 $1,000 American Express Traveler's Checks and deposited the $21,000 cashier's check into his own personal bank account in Saudi Arabia;

• neither of the receipts were found in the Al-Haramain (U.S.) computers or during

_____

[2]Background concerning the subpoena, the request for financial records relating to Chechnya, and the provision of two false receipts purporting to cover the movement of the El-Fiki funds by defendant Sedaghaty and co-defendant Al-But'he, may be found in the trial testimony of Special Agent Anderson (9/2/10 TR at 232-37) and in a pretrial in limine motion to admit the false receipts - AHIF-2 and AHIF-3 - as evidence.  (CR 397 at 1-10).  The subpoena and the two false receipts are attached as exhibits to the in limine motion.  (CR 397).

the search of Al-Haramain's U.S. headquarters in Oregon; and

•    the government specifically requested by subpoena financial documents relating to funds sent to Chechnya.  Defendant Sedaghaty was in Saudi Arabia at the time.  Documents were tuned over to the government by Al-Haramain representatives in the United States in September 2003, including one of the false receipts signed by defendant Sedaghaty.  These documents were originally provided by Al-Haramain in Saudi Arabia.  With the exception of a couple of brief trips to other countries in the Middle East, defendant Sedaghaty was in Saudi Arabia from February 2003 until September 2003, just prior to the time the false receipt was sent from Saudi Arabia to the United States for delivery to investigators.

This information, as well as other information and testimony before this Court, warrant the two level enhancement for obstruction, as recommended in ¶28 of the PSR, as defendant Sedaghaty was personally involved in attempting to obstruct the investigation by providing two receipts falsely describing the movement of the funds.

5.  The Terrorism Enhancement

The Sentencing Guidelines and Federal Law[3]

USSG, §3A1.4 reads:

(a) If the offense is a felony that involved, **or was intended to promote, a federal crime of terrorism**, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

(b) In each such case, the defendant's criminal history category from Chapter

---

[3]The following quotes the pertinent law from the 2000 edition of the Sentencing Guidelines, which was the Manual in effect when the instant offenses occurred.

Four (Criminal History and Criminal Livelihood) shall be Category VI.  (emphasis added)

Application Note One of this Guideline states that the term "Federal crime of terrorism" is defined at 18 U.S.C. §2332b(g).  By engaging in the conduct that led to his convictions, defendant Sedaghaty intended to promote two of the listed federal crimes of terrorism; 18 U.S.C. §2339A (providing material support (money)), knowing or intending that it was to be used in preparation for a violation of 18 U.S.C. §956), and 18 U.S.C. §956 (relating to a conspiracy to injure property of a foreign government).

"Federal crime of terrorism" under 18 U.S.C. §2332b(g)(5) means an offense that–

(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and

(B) is a violation of–

(i) ... section 956 (relating to conspiracy to injure property of a foreign government)...[or] 2339A (relating to providing material support to terrorists)....

18 U.S.C. §956 reads:

(a)(1)  Whoever, within the jurisdiction of the United States, conspires with one or more other persons, regardless of where such other person or persons are located, to commit at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be punished as provided in subsection 2.

(b) Whoever, within the jurisdiction of the United States, conspires with one or more persons, regardless of where such other person or persons are located, to damage or destroy specific property situated within a foreign country and belonging to a foreign government or to any political subdivision thereof with which the United States is at peace ... shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be imprisoned for not more than 25 years.

9 - GOVERNMENT'S SENTENCING MEMORANDUM

18 U.S.C. 2339A provides:

> Whoever, within the United States, provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of ... section 956 ... shall be fined under this title, imprisoned not more than 10 years, or both.

<u>The Cases</u>

To apply the USSG §3A1.4 enhancement, this Court need not find that defendant Sedaghaty personally committed a federal crime of terrorism, or even that a federal crime of terrorism was committed.  <u>See</u> <u>United States v. Awan</u>, 607 F.3d 306, 314-15 (2d Cir. 2010) (sentencing guidelines enhancement under §3A1.4 applicable without showing that defendant's conduct constitutes federal crime of terrorism; sufficient to show that defendant's crime of conviction intended to promote federal crime of terrorism).

<u>Awan</u> is highly pertinent to the present case.  There, in an opinion issued this past Summer, the Second Circuit did a thorough review of the terrorism enhancement and the cases interpreting the language of USSG §3A1.4.  Focusing on the words "intended to promote" contained within the Guideline, the Second Circuit wrote:

> The "intended to promote" prong applies where the defendant's offense is intended to encourage, further, or bring about a federal crime of terrorism, even though defendant's own crime of conviction or relevant conduct may not include a federal crime of terrorism.  And this has an important implication: To qualify as a federal crime of terrorism that may serve as a predicate for a §3A1.4 enhancement, an offense must be listed in 18 U.S.C. §2332b(g)(5)(B) and, in addition, it must be an offense that ... is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," as provided bu 18 U.S.C. §2332b(g)(5)(A).  Under the "intended to promote" prong, however, so long as the defendant's offense was intended to encourage, further or bring about a federal crime of terrorism as statutorily defined, the defendant himself does not have to commit an offense listed in §2332b(g)(5)(B).

10 - GOVERNMENT'S SENTENCING MEMORANDUM

Id. at 314 (citations omitted).

The Second Circuit's interpretation of the "intended to promote" prong of USSG

§3A1.4 is not unique.  In fact, it is consistent with every circuit which has considered the

issue.  See United States v. Arnaout, 431 F.3d 994, 1001 (7th Cir. 2005) (terrorism

enhancement applicable where court finds that the intent or purpose of defendant's

substantive offense of conviction was to promote a federal crime of terrorism; defendant

need not be convicted of federal crime of terrorism);  United States v. Mandhai, 375

F.3d 1243, 1247-48 (11th Cir. 2004) (same); United States v. Graham, 275 F.3d 490,

516-17 (6th Cir. 2001) (same).[4]

The terrorism enhancement is applicable in our case if the Court finds that, in

committing the crimes of conviction - namely, conspiring to conceal from the United

States the movement of the El-Fiki funds outside of the United States, and filing a false

tax return on behalf of Al-Haramain (US) - defendant Sedaghaty:

• intended to promote a violation of Title 18, United States Code, Section 956: or

• intended to promote a violation of Title 18, United States Code, Section 2339A;

  AND

• that such offense was calculated to influence or affect the conduct of the Russian

  government by intimidation or coercion, or to retaliate against Russia for its

  conduct.

_____

[4]The Ninth Circuit has generally addressed the terrorism enhancement, see, e.g.,
United States v. Tankersley, 537 F.3d 1100, 1112-13  (9th Cir. 2008), but has not
directly considered the specific question above.  In addition, Chief Judge Aiken issued
an unpublished memorandum in United States v. Thurston, 2007 WL 1500176 (D. Or.,
May 21, 2007), holding that the terrorism enhancement is applicable where the offense
of conviction was intended to promote a "federal crime of terrorism."

11 - GOVERNMENT'S SENTENCING MEMORANDUM

If so found, then USSG §3A1.4 applies and escalates the offense level to a minimum of 32.[5]

The Facts Supporting the Terrorism Enhancement

Expert witness Evan Kohlmann testified at trial that in 1999 armed conflict broke out between the Chechen Mujahideen and the Russian government in the Caucusus region.[6]  Mujahideen Commander Ibn Khattab and roughly one-thousand of his fighters launched aggressive guerrilla operations against Russian forces.  Russia responded with its own aggressive tactics.

The mujahideen also resorted to acts of terrorism against the Russian populace. The mujahideen and their sympathizers were responsible for attacks on apartment buildings in Moscow, as well as attacks on a theatre, subway systems, and an elementary school, resulting in the deaths of many civilians.  These attacks continue through the present day.  On October 19, 2010, suicidal Islamic insurgents stormed the parliament building in Chechnya, exploding themselves and others in an attempt to destabilize Chechnya.  See

http://news.yahoo.com/s/ap/20101019/ap_on_re_eu/eu_russia_caucasus_violence

--------

[5]The Ninth Circuit has held that "when a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction, due process requires that the government prove the facts underlying the enhancement by clear and convincing evidence." United States v. Jordan, 256 F.3d 922, 926 (9th Cir. 2001).  Since the terrorism enhancement substantially elevates the offense level, this Court should make its sentencing findings based on the clear and convincing standard.

[6]Kohlmann also prepared a detailed report prior to trial, provided to the Court and the defense, which chronicles the support provided by Al-Haramain to the mujahideen in Chechnya.  The information contained herein is largely derived from Kohlmann's trial testimony and his expert report, which is attached hereto as Sentencing Exhibit 2.

There can be no doubt that the mujahideen's conduct has been "calculated to influence or affect the conduct of the Russian government by intimidation or coercion, or to retaliate against Russia for its conduct."

<u>Mujahideen Funding in Chechnya and Defendant's Attempt to Help</u>

Since they were not working directly for any particular country, the mujahideen in Chechnya needed funding to continue their jihad against Russia in late 1999. Kohlmann testified that the mujahideen took advantage of the newly developing technology of the Internet to promote its message and funding requests. This Court heard about websites and media outlets created to support the Chechen mujahideen, such as qoqaz.net, Azzam Publications, and the Sheeshan Group listserv, which distributed mujahideen propaganda through E-mails. This material was published in many languages, including English and Russian. A famous interview of Commander Khattab was published through the internet and found its way to defendant Sedaghaty in Oregon through an E-mail distribution. This Court knows from trial that defendant Sedagaty took a portion of this interview - one where Khattab implored Islamic charities to support his forces with money - and "cut and pasted" it into an E-mail to co-defendant Al-But'he, along with the added byline of "What Support?". (<u>See</u> SW-11). Fundraising videos for the Chechen mujahideen were found at defendant Sedaghaty's residence. Excerpts of these videos, Exhibit SW-1, were played for the jury.

Defendant Sedaghaty and one of his wives, who used the computer moniker "ptchika1@hotmail.com," helped Azzam Publications translate the Web-based material about the mujahideen into Russian. (SW-17 & 61). The jury viewed a note by Commander Khattab personally thanking defendant Sedaghaty's wife (Sister Ptichka)

13 - GOVERNMENT'S SENTENCING MEMORANDUM

and others for translating jihadi content into Russian for Azzam (SW-26).

This Court is well aware of defendant Sedaghaty's interest in the plight of the mujahideen in Chechnya. He was able to follow the day-to-day events through news accounts distributed by his friend and fellow co-conspirator Abdul Qaadir (the "AQ" Sheeshan E-mails). On behalf of Al-Haramain, AQ sent out battlefield updates and pro-mujahideen propaganda to interested followers, including defendant Sedaghaty. Some of the E-mails were requests that fellow Muslims do their part for the jihad by sending money to Commander Khattab. (See SW-12).

Religious edicts, known as fatwas, were sent to defendant Sedaghaty and found in his computers. These fatwas state that Muslims were obligated to provide money to support the mujahideen fighters in Chechnya. One of the fatwas was received by defendant Sedaghaty on March 8, 2000, just two days before defendants Sedaghaty and Al-But'he went to the Ashland, Oregon bank to retrieve the El-Fiki funds. (SW-30).

Kohlmann explained how funds were physically provided by Islamic charities to the mujahideen. He testified that funds donated as *zakat* by Muslims were sometimes diverted to support the mujahideen. Since there were no banks reliably operating in or near Chechnya, which at that point was a war zone, charities obtained cash and used money runners to smuggle funds into Chechnya in increments between $100,000-$500,000.

Also related to defendant Sedaghaty's desire to assist the mujahideen in Chechnya is a statement he made to Richard Cabral. Cabral was a long-term associate of the defendant. At one point, Cabral went to visit defendant Sedaghaty at his residence and observed Sedaghaty showing a pro-Chechen mujahideen video to

14 - GOVERNMENT'S SENTENCING MEMORANDUM

another associate.  During this viewing, defendant Sedaghaty stated that he wanted to

go to Chechnya and fight.  Mr. Cabral did not testify at trial because he died in 2008.

His witness statement is attached.  See Richard Cabral Interview Report at paragraph 8

(Sentencing Exhibit 5).

<u>Where Did Our Money Go</u>?

On March 18, 2009, this Court approved the distribution of an unclassified

summary of classified documents responsive to defendant's pretrial discovery requests.

That summary, provided to defense counsel well before trial, reveals:

> The U.S. Government obtained information that Sami 'Abd Al 'Aziz Al-Sanad
> worked during 2000 and 2001 for the Al-Haramain organization and was
> responsible for providing currency supplied by Al-Haramain, including the
> currency obtained by codefendant Soliman Al-Buthe from Al-Haramain USA, to a
> representative of Muhammad Al-Sayf, aka **Abu 'Umar**, to be smuggled into
> Chechnya.  Al-Sanad has claimed that the monies he provided to Al-Sayf's
> representatives were destined for needy Chechen families.

<u>See</u> Government Sentencing Exhibit 3 (emphasis added).[7]

Kohlmann provided background information about Abu 'Umar, both in his expert

report and at trial.  Kohlmann testified that once mujahideen Commander Khattab and

his fellow commanders and advisors first arrived in Chechnya, they established the

Kavkaz Institute.  The purpose of this camp was to teach a militant religious framework

in order to fight the Russians in Chechnya.  The Kavkaz Institute, also known as the

Caucusus Foundation, was a school to propagate radical Islam, including religious

instruction and combat training.  The jury and this Court observed the playing of

Government Exhibit EX-7, a demonstrative exhibit, which was a series of clips recorded

---

[7]Before trial, the defense sought to introduce this document as defense exhibit
#730.  They later withdrew it, so it was never before the jury.

15 - GOVERNMENT'S SENTENCING MEMORANDUM

at the Kavkaz Institute as a fundraising tool for supporters of the mujahideen.  This video shows mujahideen soldiers being trained in the art of armed conflict, to include physical training, weapon training, and explosives training.  Footage of actual mujahideen combat operations, such as the downing of a helicopter and the destruction of a railroad bridge, are contained in this video.  Defendant Sedaghaty had a photograph of the Kavkaz Institute in his computers.  (Government Exhibit SW-38).  This photograph depicts camouflaged fighters marching in formation in front of the Kavkaz Institute.

Kohlmann identified Sheikh **Abu 'Umar** al-Saif as the supervisor of the Kavkaz camp.  Abu 'Umar came to Chechnya and, along with Commander Khattab, played a key leadership role for the Chechen mujahideen.  Abu 'Umar was especially critical in obtaining funding for mujahideen operations, and secured money from donors in the Middle East.  Abu 'Umar personally implored Muslims to make charitable donations to support the jihad in Chechnya.  In an online interview in January 2000 (the same month that El-Fiki made his donation to Al-Haramain) Abu 'Umar boasted that financial support from Muslims played an important role in the victories of the mujahideen, who had been lacking adequate supplies of food and medicine.

Abu 'Umar was thus a vital player during the time period important to the government's case, raising funds for Commander Khattab and the Chechen mujahideen, and supervising the Kavkaz Institute.  The unclassified summary set forth above connects the funds brought from Al-Haramain (U.S.) by co-defendant Al-But'he to Abu 'Umar and the Chechnen mujahideen.

Expected Testimony at the Sentencing Hearing From Russia Security Forces

16 - GOVERNMENT'S SENTENCING MEMORANDUM

At the sentencing hearing, the government intends to call Colonel Sergey Ignatchenko, an officer of the Federal Security Service of the Russian Federation (often referred to as the "Russian FSB"), to testify as a witness via video transmission relevant to issues of the application of the terrorism enhancement under the sentencing guidelines and the appropriate sentence in this case.  The fact that the witness will not be physically present in the courtroom does not make his testimony inadmissible since even hearsay is admissible at a sentencing hearing.  The Sixth Amendment right to confrontation does not apply at sentencing and thus does not prohibit such testimony. See, e.g., United States v. Paull, 551 F.3d 516, 528 (6th Cir.) (2009) (reliance on hearsay contained in letter appropriate at sentencing hearing), and cases cited therein. See also Peterson v. California, 604 F.3d 1166, 1170 (9th Cir. 2010) (hearsay testimony at preliminary hearing constitutional since right to confrontation "is primarily a trial right"); United States v. Littlesun, 444 F.3d 1196, 1199-1200 (9th Cir. 2006)  (Crawford, hearsay rule, and other evidentiary limitations inapplicable at sentencing, so long as accompanied by minimal indicia of reliability).  Here, Colonel Ignatchenko's testimony will be subject to cross-examination by defense counsel.

Colonel Ignatchenko was the FSB officer in charge of investigating the activities of the Al Haramain Islamic Foundation in Chechnya during the time period that defendant Sedaghaty and other Al Haramain representatives handled the $150,000 which was the subject of the trial.  He will testify about the material support provided by Al-Haramain to the Chechen mujahideen, including the purchase of weapons.  For example, he will testify that the Russian government intercepted a phone call in February 2000 (the same month in which El-Fiki wired his $150,000 to the Al-Haramain

17 - GOVERNMENT'S SENTENCING MEMORANDUM

account at the Bank of America in Oregon), which indicated that "Al Haramain had 50

million dollars designated specifically for the mujahidins."  Later in the year 2000, a

phone call was intercepted between Aqil Aqil, the head of Al-Haramain world-wide as

well as a director of the Oregon branch of Al-Haramain, and Mujahideen Commander

Khattab.  In this phone call, Aqil told Khattab:

> The cargo is ready to be shipped: RPGs[8] and rounds of
> ammunition for them, along with rounds for other systems;
> machine guns, Kalashnikov assault rifles, sniper rifles.  We
> purchased 1000 rounds of ammunition, AGS,[9] one PTUR
> "Fagot,"[10] 500 [bulletproof] vests."

Colonel Ignatchenko will also provide details concerning the Kavkaz Institute, the

mujahideen training camp described above, including the financial support of the camp

by Al-Haramain, and the training of the Chechen mujahideen to commit acts of

terrorism.  "Graduates" of the Institute were required to commit an act of terrorism upon

leaving the camp.  Ignatchenko will identify documents taken from students of the

Kavkaz Institute or from the computer of a Chechen mujahideen leader, including wiring

diagrams for bombs, Al-Haramain receipts reflecting funding for the camp, and a

"Martyrs and Orphans Form" which, among other things, was used to keep track of the

mujahideen's "role in the jihad" and their ultimate fate.[11]  Ignatchenko's testimony,

combined with Kohlmann's testimony and many of the trial exhibits, will be relevant to

---

[8] Rocket Propelled Grenades

[9] Automatic Grenade Launchers

[10] An anti-tank grenade launcher.

[11]Ignatchenko's report and related sentencing exhibits are attached hereto.  See
Ignatchenko Witness Report and Exhibits FSB 4 through FSB 11, Sentencing Exhibit 4.

establishing the foundational basis for the terrorism enhancement.

The Terrorism Enhancement Applies

The summary of the declassified report concerning the Al-Haramain money runner Sanad indicates that Al-But'he gave $130,000 of the El-Fiki money to a representative of "Abu 'Umar" to be smuggled into Chechnya. While Sanad said he thought the funds were for "needy Chechen families," the facts and circumstances strongly suggest otherwise. Abu 'Umar was operating the Kavkaz camp for the Chechen mujahideen and was providing logistical support to Commander Khattab. The El-Fiki funds were intended to assist the mujahideen's jihad against Russian soldiers by killing them and damaging and destroying property in Russia. Legally stated, the evidence establishes that, in committing the crimes for which he has been convicted, defendant Sedaghaty "intended to promote" violations of 18 U.S.C. §2339A and 18 U.S.C. §956. He conspired with Al-But'he and others to conceal the movement of the El-Fiki donation out of the United States, to be delivered to a representative of Abu 'Umar and his fellow mujahideen, including Commander Khattab, to support their efforts to fight Russia. These offenses were calculated to influence or affect the conduct of the Russian government by intimidation or coercion, or to retaliate against Russia for its conduct. If this Court agrees, then an enhancement under USSG §3A1.4 is warranted, as recommended in ¶26 of the PSR.

6.  Guideline Range

The enhancement under USSG §3A1.4 raises the offense level to a minimum of 32, with a mandatory criminal history category of VI. This yields a sentencing range of 210-262 months. The crimes of conviction, however, have a combined statutory

19 - GOVERNMENT'S SENTENCING MEMORANDUM

maximum of 96 months (60 months for the conspiracy count and 36 months for the tax fraud count). Pursuant to USSG § 5G1.1(a), where the guideline range exceeds the statutory maximum term, the statutory maximum becomes the guideline sentence. The force of the terrorism enhancement is thus substantially blunted by the statutory maximum. Accordingly, the maximum sentence this Court may impose on defendant Sedaghaty is 96 months.

## 18 U.S.C. §3553a Factors

Under present sentencing law, this Court must first determine the applicable Guidelines range. United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). The guidelines must "be calculated correctly," since the guideline range is the starting point and "initial benchmark." United States v. Ressam, 593 F.3d 1095, 1117 (9th Cir. 2010). Specific findings need to be made on the tax loss and the applicability of enhancements for terrorism, obstruction and sophisticated concealment.

Since the Guidelines are merely advisory, once the correct Guidelines range has been established, the Court must then make an individualized determination and permit the parties to make their arguments for the sentence they feel is appropriate, taking into consideration the factors within 18 U.S.C. §3553a. Ressam, 593 F.3d at 1117-18.

Defendant Sedaghaty has no criminal history. Prior to his departure from the United States in 2003, he served as a public and peaceful religious leader in Oregon. Many witnesses, including religious leaders of differing faiths, have testified and offered other support for him, characterizing him as a man of peace who disdained acts of terrorism. These views should neither be ignored nor rejected, but evaluated in view of his private and insidious side, exposed by the evidence in this case.

20 - GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Sedaghaty knowingly agreed to help co-defendant Al-But'he and other Al-Haramain officials running the "charity" launder a $150,000 donation through the United States to Saudi Arabia in an attempt to provide funding for the mujahideen in Chechnya.  The jury convicted him of conspiring to prevent the United States Government from learning of his actions and covering up the entire transaction by lying to his accountant, who unwittingly prepared an Al-Haramain tax return for defendant Sedaghaty, which made the transaction look like an innocuous purchase of a building in Missouri.

To this day, defendant Sedaghaty has refused to accept responsibility for his actions.  Rather, he departed the United States during the criminal investigation in February 2003, taking up residence in Saudi Arabia, the U.A.E., Syria and Iran.  He became a fugitive from justice when he was officially charged in February 2005.  He intentionally remained a fugitive until August 2007, when he negotiated his surrender to federal agents.  He was well-represented by extremely capable lawyers and was given a fair trial.  It is time for him to be held accountable for his crimes.  A within Guideline sentence of 96 months (as per USSG § 5G1.1(a)) is appropriate.[12]

### Funds Available to Defendant Should be Paid to the Government as Reimbursement for His Legal Representation

After defendant Sedaghaty returned to the United States and surrendered to federal agents in August 2007, he filled out a financial affidavit asserting he was indigent and therefore applied for court-appointed counsel.  (CR 26).  The government

---

[12]If the Court does not apply the terrorism enhancement, an upward variance is alternatively appropriate, since the defendant's criminal conduct was far outside the heartland of typical criminal tax cases.

is not privy to that affidavit.  Magistrate Judge Coffin granted the motion for court-appointed counsel and Attorney Matasar began representing defendant at the taxpayer's expense.  (CR 27, 35).  At some point in the proceeding, Attorney Matasar was joined by the Federal Defender's Office, who also began representing defendant Sedaghaty at taxpayer's expense.  Another financial affidavit was filed under seal.  (CR 48).

On November 1, 2007, a letter dated October 25, 2007 was docketed under seal. The government is not privy to this letter.  The letter, from Attorney Wax to the Court, apparently concerns funds and/or assets received by counsel on behalf of defendant Sedaghaty, who claimed he was indigent.  This Court issued a minute order on November 1, 2007 (CR 61):

> Defendant is ordered not to access, or disburse, or cause to be disbursed any funds in the trust accounts of any of the attorneys identified in Mr. Wax's letter to the court dated 25 October 2007.  The court requires that these sums and other assets identified in the financial affidavit attached to that letter be preserved and remain available for consideration of repayment of funds paid pursuant to the Criminal Justice Act for costs of representation in this case.

While initially detained, the Court released defendant Sedaghaty pretrial.  One of the release conditions was that he execute an appearance bond in the amount of $150,000.  The bond was partially secured by the posting of $58,981.00 received by the Clerk's Office on behalf of defendant Sedaghaty.  (CR 67).  The government is unaware of whether these funds are the same as those identified in the Court's previous order.

Under 18 U.S.C. §3006A(f):

> Whenever the ... court finds that funds are available for payment from or on behalf of a person furnished representation, it may authorize or direct that such funds be paid to the ... court for deposit in the Treasury as a reimbursement....

This Court should order funds posted by or on behalf of defendant, as well as the "other assets identified in the financial affidavit," be paid to the Treasury as reimbursement of funds spent by the taxpayers on his behalf.  To do so, the Court must first determine: 1) the rough amount of taxpayer funds expended on behalf of defendant; and 2) that he has the present ability to pay some of the expenses.  United States v. Danielson, 325 F.3d 1054, 1076-77 (9th Cir. 2003) (repayment under 3006A(f) must be based on defendant's current ability to repay; district court may order full or partial reimbursement of attorney fees upon finding that funds are available).  The $58,981 posted with the Court, as well as the other assets referred to by the Court in its order, appear to be sufficiently "presently available" to defendant under the reimbursement provision of 18 U.S.C. 3006A(f).

In the alternative, any such funds or assets available to defendant should be used to pay restitution.  The presentence report recommends that defendant Sedaghaty pay the Internal Revenue Service restitution in the amount of $80,980.

## Conclusion

For reasons stated, the government concurs with the recommendation in the presentence report that defendant Sedaghaty be sentenced to serve 96 months in prison.  Defendant Sedaghaty should continue to be detained as a flight risk and the Court should further order that funds and assets be transferred to the government as

///

///

///

///

23 - GOVERNMENT'S SENTENCING MEMORANDUM

reimbursement of legal fees or as restitution.

DATED this 17th day of November, 2010.

Respectfully submitted,

DWIGHT C. HOLTON
United States Attorney


*/s/ Christopher L.  Cardani*
By: _____
CHRISTOPHER L. CARDANI
Assistant United States Attorney


*/s/ Charles F.  Gorder, Jr.*
By: _____
CHARLES F. GORDER, JR.
Assistant United States Attorney

24 - GOVERNMENT'S SENTENCING MEMORANDUM