**Steven T. Wax, OSB No. 85012**
**Federal Public Defender**
**101 SW Main Street, Suite 1700**
**Portland, OR  97204**
**Tel: (503) 326-2123**
**Fax: (503) 326-5524**
**Email: steve_wax@fd.org**

**Lawrence Matasar, OSB No. 74209**
**621 SW Morrison Street, Suite #1025**
**Portland, OR 97205**
**Tel: (503) 222-9830**
**Email: larry@pdxlaw.com**

**Attorneys for Defendant**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CR 05-60008 HO** |
| **Plaintiff,** | |
| **v.** | **DEFENDANT'S SENTENCING MEMORANDUM** |
| **PIROUZ SEDAGHATY,** | |
| **Defendant.** | |

## TABLE OF CONTENTS

**PAGE**

I.    THE NEW TRIAL MOTION SHOULD BE HEARD FIRST. . . . . . . . . . . .  5

II.   MR. SEDAGHATY IS ENTITLED TO DISCOVERY FOR
      THE SENTENCING HEARING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

III.  THE PRESENTENCE REPORT GENERALLY VIOLATED
      FED. R. CRIM. P. 32.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

IV.   THE APPLICABLE STANDARD OF PROOF IS AT LEAST
      CLEAR AND CONVINCING EVIDENCE ON THE LOSS
      AND TERRORISM ENHANCEMENTS. . . . . . . . . . . . . . . . . . . . . . . . . 10

V.    THE COURT MAY ONLY SENTENCE ON RELIABLE EVIDENCE. . . . . . 12

VI.   FOUR ADVISORY GUIDELINE CALCULATIONS IN THE PSR ARE
      INCORRECT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      A.   There Is No Tax Loss.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      B.   There Was No Sophisticated Concealment. . . . . . . . . . . . . . . . 16

      C.   There Was No Obstruction Of Justice. . . . . . . . . . . . . . . . . . . . 18

      D.   The "Terrorism Enhancement" Is Not Supported In Law
           Or Fact By The Charges And Findings In This Case Or
           By The "Relevant Conduct" Provision Of Sentencing
           Guidelines (§ 1B1.3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

           1.   Judicial Estoppel Prevents The Government From
                Arguing That The Terrorism Enhancement Applies
                To Mr. Sedaghaty's Case. . . . . . . . . . . . . . . . . . . . . . . . . 22

           2.   There Is No Basis In Law For The Terrorism
                Enhancement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

                a.   There is no Statutory Basis for the Terrorism
                     Enhancement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

i

b.    § 2339C And 2339B Do Not Apply. . . . . . . . . . . . 30

3.    The Court Is Not In A Position To Make A Judgment On The Nature Of The War In Chechnya. . . . . . . . . . . . 32

4.    The Government Neither Argued Nor Attempted To Prove That The Offenses Of Conviction "Involved" Or Were "Intended To Promote" A Federal Crime Of Terrorism. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

5.    The Terrorism Enhancement Cannot Be Justified On The Basis Of The "Relevant Conduct" Provision Of The Sentencing Guidelines  (§ 1b1.3.). . . . . . . . . . . . . 35

6.    The Presentence Report Relies on Unfounded Speculation Attenuated From Mr. Sedaghaty. . . . . . . . . . 36

7.    Crediting The Verdict, The Government's Evidence Shows Mr. Sedaghaty Solely Sought To Fund A War. . . . . 38

8.    Precedent Is Against The Government. . . . . . . . . . . . . . . . 38

VII.   MR. IGNATCHENKO SHOULD NOT BE PERMITTED TO TESTIFY AT MR. SEDAGHATY'S SENTENCING. . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

A.    Ignatchenko's Proposed Testimony Is Irrelevant, It Involves New, Uncharged, Untried Offenses, Is Based On Multiple Levels Of Hearsay, Is Inherently Unreliable And Extraordinarily Prejudicial And Is, Therefore, Precluded Under The Fifth And Sixth Amendments To The Constitution And Under Federal Rules Of Evidence 401, 403 And 802.. . . . . . 41

1.    The Government Cannot Establish Through Mr. Ignatchenko Or Otherwise That The El Fiki Money Was Diverted To Chechen Mujahideen. . . . . . . . . . 43

2.    Mr. Ignatchenko's Testimony Should Be Precluded On The Basis Of Irrelevance, Excessive Prejudice, Inherent Unreliability And Hearsay Grounds. . . . . . . . . . 44

VIII.  SPECIFIC OBJECTIONS TO PRESENTENCE REPORT. . . . . . . . . . . . 46

ii

IX.    A SENTENCE OF TIME SERVED WOULD SATISFY ALL OF THE
       SENTENCING FACTORS.................................... 51

CONCLUSION. ............................................. 59

## TABLE OF AUTHORITIES

**PAGE**

*Gall v. United States,*
    552 U.S. 38 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Holmes v. South Carolina,*
    547 U.S. 319 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Kimbrough v. United States,*
    552 U.S. 85 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Kiyemba v. Obama,*
    561 F.3d 509 (D.C. Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Kuhn v. United States,*
    518 U.S. 81 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Miller v. Florida,*
    482 U.S. 423 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Munaf v. Geren,*
    533 U.S. 674 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*New Hampshire v. Maine,*
    532 U.S. 742 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 27

*Russell v. Rolfs,*
    893 F.2d 1033 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Arnaout,*
    282 F. Supp. 2d 838 (N.D. Ill. 2003). . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Arnaout,*
    431 F.3d 994 (7th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Booker,*
    543 U.S. 220 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Carty,*
    520 F.3d 984 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Garro,*
    517 F.3d 1163 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Gonzalez,*
    492 F.3d 1031 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Jordan,*
    256 F.3d 922 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11

*United States v. Marin-Cuevas,*
    147 F.3d 889 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Mubayyid,*
    567 F. Supp. 2d 223 (D. Mass. 2008). . . . . . . . . . . . . . . . . . . . . . . .  4

*United States v. Rosacker,*
    314  F.3d 422 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Schnell,*
    982 F.2d 216 (7th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Seacott,*
    15 F.3d 1380 ( 7th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Showalter,*
    569 F.3d 1150 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . 14, 18

*United States v. Sifuentez,*
    30 F.3d 1047 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

*United States v. Smith,*
    574 F.3d 521 (8th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Staten,*
    466 F.3d 708 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 13

*United States v. Thurston,*
    2007 WL. 1500176 (D. OR. May 21, 2007). . . . . . . . . . . . . . . . . . 27, 30

*United States v. Treadwell*,
    593 F.3d 990 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Weston*,
    448 F.2d 626 (9th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Whaley v. Belleque*,
    520 F.3d 997 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 27

*Williams v. New York*,
    337 U.S. 241 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**FEDERAL STATUTES**

18 U.S.C. § 1962(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

18 U.S.C. § 2332b(g)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

18 U.S.C. § 2339A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 28, 30

18 U.S.C. § 2339B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 30, 31, 32

18 U.S.C. § 2339C . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

18 U.S.C. § 956 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29, 30, 32

Fed. R. Crim. P. 32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 15

Defendant Pirouz Sedaghaty, through counsel, Lawrence Matasar and Federal Public Defender Steven T. Wax, hereby submits this memorandum in support of sentencing.  The Court will be required to make a significant number of specific decisions regarding sentencing.  These include:

1.      Motions for a New Trial and for Judgment of Acquittal;

2.      Sentencing discovery issues;

3.      objections to the presentence report generally;

4.      the standard of proof;

5.      the reliability of evidence;

6.      guideline factors including:

   a.      offense level and tax loss;

   b.      sophistication and concealment enhancement;

   c.      terrorism enhancement;

   d.      enhancement for obstruction of justice;

7.      paragraph by paragraph objections to the presentence report; and

8.      the determination of a fair and just sentence.

**Introductory Statement**

Aside from the evidentiary issues and issues of statutory and Guidelines construction discussed below, we urge the Court to look at this case from a broader vantage point.  The challenges and dangers presented by the threat of global terrorism cannot be understated. But we ask the Court to consider

**DEFENDANT'S SENTENCING MEMORANDUM**

where this case, and where Mr. Sedaghaty, fit into the galaxy of those fears and concerns.

In characterizing this case as a "tax case," we are not blind to the presence of a Chechnya connection – the alleged support for the Chechen military struggle with Russia.  We realize, of course, the fact that Mr. Sedaghaty was not charged with providing such support does not remove the specter of that element from the Court's universe of sentencing considerations after the jury's verdict.  But its significance now for sentencing purposes needs to be assessed from a perspective that we feel, frankly, was lost or distorted in the government's presentation at trial, even more so in the sentencing portions, and is lost in the Presentence Report (PSR).

At trial, Chechnya was supposed to be a back-door issue,  relevant only as to knowledge and intent on the tax counts.  Instead, Chechnya became synonymous with "terror."  And "terror" – Muslim terror – became the driving force of the trial.  Mr. Kohlmann, a young but well-traveled "terrorism" witness submitted a prolix report detailing one horrific act of terror after another, not about Mr. Sedaghaty but about professional terrorists and assassins having no connection with him. The report was often boiler-plate, lifted from other Kohlmann cases involving charges of genuine  terrorism actually committed by the defendants in those cases – actions such as plots to bomb American monuments, American soldiers, sailors and politicians, acts of hostage taking,

**Page 2   DEFENDANT'S SENTENCING MEMORANDUM**

kidnappings, mayhem and murder.   His testimony was reined in to some extent, but its undeniable, if tacit, purpose was to link Mr. Sedaghaty to violent actions and professional terrorists he knew nothing about.  Notwithstanding a lip-service denial that this was a terror case, the tones and specter of terror coursed through the government's opening and closing including an insulting reference to and dramatic throwing of the Noble Quran.

The Court's sentencing deliberations should be insulated from this toxicity.  The Presentence Report, arguments about the terrorism enhancement, and Mr. Ignatchenko's proposed testimony will continue the free-floating association of this defendant with actions he knew nothing about. Mr. Sedaghaty was a small-time player in a huge, world-wide organization most of whose activities for over half a decade have been perfectly legitimate and admirable. Mr. Ignatchenko's testimony might implicate some people in that organization with distributing funds to Chechens, as he might well confirm that many people and nations, western nations, did the same.  But Mr. Ignatchenko cannot implicate Mr. Sedaghaty with passing funds to the Chechens.  His testimony should not be permitted to perpetuate suggestions and inferences to the contrary.

We believe this thoughtful passage from an opinion of the District Court of Massachusetts, though specifically relating to a trial on the merits, has resonance for purposes of sentencing in the instant case.  That case involved

charges that the defendants solicited and used tax exempt funds to support

jihadist activities.  The court said:

> A further point should be emphasized. The struggle against
> religious and political extremism in general, and terrorism in
> particular, is likely to be the principal challenge facing this nation,
> and the rest of the world, for many years to come. At its core, that
> struggle is to protect and defend the most basic values of our
> society-indeed, of civilization itself. The difficulty and magnitude of
> that conflict can hardly be understated. But it is nonetheless
> important to bear in mind the proper place of the trial court in the
> American constitutional system. The role of this court, at least in
> this context, is necessarily narrow. It is not to help-or, for that
> matter, to hinder-American foreign policy. It is not to help or
> hinder American law enforcement priorities. It is not to make
> broad 'statements,' send 'messages,' or bestow symbolic 'victories'
> or 'defeats.' Instead, the role of the court is to make a relatively
> narrow and focused inquiry: whether the evidence presented at the
> trial, taken in the light most favorable to the government, was
> sufficient to support a conviction as to each defendant and as to
> each count. And it is to examine that evidence with a cold eye, not
> with inflamed passion-and without regard to any greater cause
> that this case may be deemed to represent, no matter how worthy
> that cause may be.

*United States v. Mubayyid,* 567 F.Supp.2d 223, 227 (D. Mass. 2008).

In considering the issues in this sentencing, it is also critical to keep in

mind the distinction between what was known and what was reasonable to

believe before, as contrasted with, after September 11, 2001.  What may have

appeared reasonable in terms of association in 1997 - 2001, is materially

different than it is today.

The jury has spoken and, for the purposes of sentencing, we accept that

fact.  The jury did not, however, address or answer any of the sentencing

**Page 4**   **DEFENDANT'S SENTENCING MEMORANDUM**

issues that must be resolved.  The verdict answered the question of

responsibility for the mistake on the tax return and Mr. Sedaghaty's purpose to

get money to the mujahideen.  The verdict did not, however, say whether that

was for humanitarian or weapons purposes, or what happened to the money.

Nor did it resolve the advisory guidelines questions addressed below.  We are

confident that this Court will dispassionately address those issues and

separate fact from opinion, evidence from speculation, the quality of the

Oregonians who have spoken for Mr. Sedaghaty, and the value of his life.

## I.    **THE NEW TRIAL MOTION SHOULD BE HEARD FIRST**.

At the outset, Mr. Sedaghaty objects to the manner in which this

proceeding is being handled.  On September 23, 2010, he filed an extensive

and substantial Motion For New Trial.  CR 477.  That motion was accompanied

by a Motion For Judgment Of Acquittal.  The government's response to the

Motion For New Trial raised factual questions.  Mr. Sedaghaty believes that the

new trial motion should be resolved first and that its resolution should obviate

the need for a sentencing proceeding.

## II.   **MR. SEDAGHATY IS ENTITLED TO DISCOVERY FOR THE SENTENCING HEARING.**

Prior to proceeding with any evidence or argument regarding sentencing,

Mr. Sedaghaty believes that the Court should resolve two outstanding matters

regarding discovery: information necessary for resolution of a challenge to the

admissibility of testimony from Russian FSB Agent Ignatchenko (section VII)

**Page 5**   **DEFENDANT'S SENTENCING MEMORANDUM**

and information necessary for his cross-examination in the event the Court permits him to testify.  The specific requests for discovery related to Ignatchenko are set out in the Motion for Discovery filed on November 15, 2010.  CR 494.

In addition, the final version of the Presentence Report requires revisiting of the requests for discovery previously made regarding the unclassified summary of classified evidence contained in the document provided by the government in discovery labeled "Defendant's Proposed Exhibit 730" (attached hereto as Exhibit 1).  Just before and during the trial, Mr. Sedaghaty renewed his earlier requests for discovery of exculpatory information as it relates to proposed Exhibit 730.  CR 420 at 8-9; Tr. August 26, 2010 at 9.  He pointed out that the last sentence of the document was exculpatory.  He further pointed out, however, that it was apparent that the document was a compilation of other documents and that it included editorial comments and words.

Because the presentence writer is now relying on a portion of Exhibit 730 (PSR ¶ 21a), and ignoring the exculpatory content of the last sentence, Mr. Sedaghaty believes it is necessary for the Court to revisit the order regarding disclosure of classified information as it relates to this document and provide Mr. Sedaghaty with the full measure of exculpatory information that was provided by Mr. Al Sanad.  Failure to provide him the tools necessary to

**Page 6**   **DEFENDANT'S SENTENCING MEMORANDUM**

combat the unsubstantiated opinions contained in the PSR that ignore the words of Mr. Al Sanad deprives Mr. Sedaghaty a fair sentencing under the Fifth Amendment and of his Sixth Amendment rights to compulsory process and to present a defense.  *See Holmes v. South Carolina*, 547 U.S. 319, 331 (2006) (affirming the defendant's right to "have a meaningful opportunity to present a complete defense.") (internal quotation marks omitted).  It also precludes complete cross-examination of Mr. Ignatchenko in violation of the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fifth Amendment.

## III.   THE PRESENTENCE REPORT GENERALLY VIOLATED FED. R. CRIM. P. 32.

The PSR advocates for the maximum sentence permitted under the law. Mr. Sedaghaty believes that it does so based on assumptions and opinions that are not factually based.  In the addendum to the report, the presentence writer states that all information in the report is derived from discovery, from case agent reports, or was obtained from the case agent (PSR Addendum pp. 3-4). Mr. Sedaghaty has combed the discovery for facts, as opposed to opinions and assumptions, to support a number of the statements to which specific objection is made below.  While he can find opinion and understands that certain statements made in the PSR are the view of one or more of the case agents or prosecutors, he is unable to find substantiating facts.  As a result, the report was not prepared in conformance with Fed. R. Crim. P. 32.

**Page 7    DEFENDANT'S SENTENCING MEMORANDUM**

A second problem with the PSR is reflected in the statement contained on page 4 of the addendum that there is no limit on the information the Court may receive in imposing sentence.  While a variation of that statement appears in the statute and guideline, it is not the law.  As the Ninth Circuit has repeatedly held, a sentence can only be based on reliable and accurate information.  *See, e.g., United States v. Jordan,* 256 F.3d 922, 931 (9th Cir. 2001).  To the extent that the presentence writer has prepared the report based on the belief that a sentence may be based on unsubstantiated hearsay, inference or innuendo, the value of the report is significantly undermined, and it is in violation of Fed. R. Crim. P. 32.

A third major problem with the report is its failure to comply, in other respects, with Fed. R. Crim. P. 32(d)(1)(B).  Under that section of the rule, the Probation Office has a duty to "calculate the defendant's offense level."  The handling of the tax loss issue in this case is illustrative of this Rule 32 violation.  The probation officer has been advised by the Internal Revenue Service that it believes there is a tax loss.  She has been advised by the defense that our expert, the former head of the Charitable Tax Section of the Internal Revenue Service, believes that the opinion of the government is incorrect.  This is not a fact-based issue.  It is, rather, a legal issue.

The probation officer, in ¶24, states the position of the Internal Revenue Service, acknowledges that the question is "complex and that the government

will be providing a calculation to the Court," but she goes on to recommend the

enhancement.  Based on the information in the report, it is entirely

inappropriate for the presentence writer to state that there is a tax loss and to

state that the advisory guideline calculation should begin at offense level 14.

Accepting the opinion of the government without being able to confirm it and

on a legal issue is, moreover, suggestive of a more general bias in the approach

to the report, a bias reflected in the acceptance of the opinions of government

agents as discussed below.[1]

In *United States v. Sifuentez*, 30 F.3d 1047, 1049-50 (9th Cir. 1994), the

Ninth Circuit addressed the question of the proper role of a presentence writer

in preparing a report.  There the court noted limits on the Probation Office, the

importance of analysis, and the impropriety of excessive or impermissible

--------

[1]While the defense appreciates that the PSR writer has made changes to the draft PSR, the seriousness of the errors contained in the first draft PSR sent to counsel reveals a profound misunderstanding of this case which was continued into the final  PSR. For example, the original draft contained an incorrect maximum sentence, misstated the names and nature of defense counsel, and contained the following inexplicable statements: "Mr. Sedaghaty was acquitted of Count 3 charging Failure to File Report of International Transportation of Currency or Monetary Instruments" (draft PSR ¶ 4); "Mr. Sedaghaty was acquitted of Count 3 which alleged Mr. Al-Buthe and Mr. Sedaghaty knowingly failed to report the transportation of more than $10,000 from the United States to Saudi Arabia" (draft PSR ¶ 10); and, "Although the government proved Mr. Sedaghaty and Mr. Al-Buthe conspired to transport $130,000 of the donation from Ashland to Saudi Arabia, they could not prove beyond a reasonable doubt Mr. Sedaghaty or Mr. Al-Buthe knowingly and willfully failed to file a report of the transportation."  (draft PSR ¶ 10).

**Page 9    DEFENDANT'S SENTENCING MEMORANDUM**

advocacy or argument.  While the report in this case does not contain

inflammatory rhetoric or argument, its uncritical acceptance of opinion is

equally at odds with the rule and the right to due process in sentencing.

## IV.   THE APPLICABLE STANDARD OF PROOF IS AT LEAST CLEAR AND CONVINCING EVIDENCE ON THE LOSS AND TERRORISM ENHANCEMENTS.

> Although a preponderance of evidence standard is ordinarily applied to establish facts used in sentencing, when the combined effect of contested enhancements would have "an extremely disproportionate effect on the sentence imposed," we apply a balancing test to determine whether the higher "clear and convincing" standard of proof should apply.

*United States v. Garro*, 517 F.3d 1163, 1168 (9th Cir. 2008) (internal citations

omitted).  In *Garro*, the court ultimately concluded that because the

enhancements were based on conduct charged in the indictment and to which

the defendant pled guilty, a preponderance of the evidence standard was

appropriate.  *Id.* at 1169.  The facts in *United States v. Staten*, 466 F.3d 708,

717- 20 (9th Cir. 2006), were different and illustrates applicability of the clear

and convincing standard.

In *Staten*, the defendant pled guilty to conspiracy to manufacture

methamphetamine.  The PSR recommended a fifteen-level advisory guideline

increase for a substantial risk of harm to human life or the environment under

U.S.S.G. § 2D1.1(b)(5)(B).  *Id.* at 711.  In reversing the district court's decision

and remanding for resentencing, the Ninth Circuit noted that the court erred in

applying a preponderance of the evidence standard when the increase was

Page 10  **DEFENDANT'S SENTENCING MEMORANDUM**

more than four levels and more than doubled the defendant's advisory

guideline range.  466 F.3d 708, 717-20 (9th Cir. 2006).  *See also United States*

*v. Gonzalez*, 492 F.3d 1031, 1040 (9th Cir. 2007) (proof by clear and convincing

evidence required because 9-level increase had an "extremely disproportionate

effect" on the sentence relative to the offense of conviction); *United States v.*

*Jordan*, 256 F.3d 922, 929 (9th Cir. 2001) (holding that heightened standard

should have been applied when the sentence was more than doubled); *see also*

*id.* at 934 (O'Scannlain, J., concurring) ("Since [*United States v. Hopper*, 177

F.3d 824 (9th Cir. 1999)], we appear to have consistently held that when the

enhancement is greater than four levels and more than doubles the applicable

sentencing range, then the enhancements must be proved under the 'clear and

convincing' standard of proof." (collecting cases)).

Both the tax loss and terrorism enhancement fall within the "clear and

convincing" requirements of the clearly established law.  The loss calculation

increases the offense level eight levels and raises the top of the range eight-fold.

The terrorism enhancement raises the offense level by at least eighteen levels

and increases the guideline range fifty-fold.

Mr. Sedaghaty also asserts that any facts that support the sentencing

enhancements should be proven beyond a reasonable doubt.  While recognizing

that the courts have not yet adopted a beyond reasonable doubt standard, Mr.

Sedaghaty believes that standard is applicable in the circumstances of this

case with respect to the terrorism enhancement and preserves that issue for future review.  The core of the argument in support of a beyond a reasonable doubt standard is incorporated within the estoppel argument set out below and the gross deviation in approach to this case taken by the government in the pretrial phase and at trial, as contrasted with the approach taken at sentencing.  When the government, as it does here, charges essentially a new crime in sentencing, with such a significant increase in sentencing, *United States v. Booker*, 543 U.S. 220 (2005), application of the *"Booker"* fix violates the Fifth and Sixth Amendments.  Even if the *Booker* fix is applicable, the fact that we are now dealing essentially with a new crime means the reasonable doubt standard must be applied.

## V.    THE COURT MAY ONLY SENTENCE ON RELIABLE EVIDENCE.

In *Williams v. New York*, 337 U.S. 241 (1949), the Supreme Court stated that the courts have wide latitude in the types of evidence that they may consider in sentencing.  Subsequent to that statement, however, the courts held that a sentence must be based on "reliable" evidence.  *United States v. Weston*, 448 F.2d 626, 634 (9th Cir. 1971).  More recently, particularly in the context of United States sentencing guideline calculations, the courts have made clear that an item of evidence must be sufficiently reliable for sentencing purposes.  *United States v. Marin-Cuevas*, 147 F.3d 889, 895 (9th Cir. 1998).  Conclusory statements are not sufficient.  *See United States v. Rosacker*, 314

F.3d 422, 425-26 (9th Cir. 2002).

When an advisory guideline factor must be established by clear and convincing evidence, the reliability of evidence on which the government must rely, is heightened.  This is based on concerns that criminal defendants receive adequate due process.  "Where a severe sentencing enhancement is imposed on the basis of uncharged or acquitted conduct, due process may require clear and convincing evidence of that conduct."  *United States v. Treadwell*, 593 F.3d 990, 1000 (9th Cir. 2010).  The Ninth Circuit has continued to recognize that "where the enhancement represents the overwhelming proportion of the punishment imposed, a court cannot reflexively apply the truncated procedures that are perfectly adequate for all of the more mundane, familiar sentencing determinations."  *Staten*, 466 F.3d at 720 (internal quotation marks omitted), *see also, Treadwell*, 593 F.3d at 1000.  Rather, the district court must "ratchet up certain,  . . . of the procedural protections afforded a defendant at sentencing, so as more closely to resemble those afforded at trial, by applying the clear and convincing evidence standard."  *Staten*, 466 F.3d at 720 (internal quotation marks omitted).

Here, much of the evidence presented by the government, and relied upon by the presentence report writer, are the uncorroborated opinions of case agents, multiple layers of hearsay, and reports provided by questionable sources.  This information is not reliable as required by the Constitution, and

**Page 13 DEFENDANT'S SENTENCING MEMORANDUM**

the Court may not simply rely on the factual statements in the PSR.  *United States v. Showalter*, 569 F.3d 1150, 1160 (9th Cir. 2009); see also § 6A1.3 (a).

## VI.  FOUR ADVISORY GUIDELINE CALCULATIONS IN THE PSR ARE INCORRECT.

The PSR has assessed upward adjustments for four advisory guideline factors with which Mr. Sedaghaty takes issue: tax loss; sophisticated concealment; obstruction of justice; and terrorism.

### A.    There Is No Tax Loss.

The government has provided the defendant documents outlining a loss calculation of $80,980, aggregating three amounts it alleges would have been due to the government, but for the commission of the offense.  All  three amounts are derived from a characterization of the underlying  transaction as an "excess benefit transaction" involving the Al-Haramain  Islamic Foundation [or "a charitable organization"] and the defendant.  The PSR increases Mr. Sedaghaty's offense level by eight levels and recommends restitution due to its uncritical acceptance of the IRS view that there was a tax loss of $80,980.  PSR p. 8, ¶ 32; PSR Sentencing Recommendation, p. 3.

The criteria for an excess benefit transaction, and the taxes applicable  to such a transaction, are specifically defined in the Internal Revenue  Code and federal tax regulations.  Through the expert testimony of the  former head of the IRS Exempt Organizations Division, the defense will  establish that, based on an application of the facts alleged in the  indictment and testimony at trial

to the federal tax code, regulations, applicable IRS guidance, and case law, the excess benefit transaction concept is completely inapplicable. Exhibit 2. There is no tax loss in this case.

The PSR does not provide a basis for its position other than by declaring: "The Calculation of the tax loss by the Internal Revenue Service is complex and will be provided by the government at the time of sentencing," (PSR p. 8, ¶ 24) and "Information pertaining to the tax loss was obtained from the case agent. The government supports the amount of the tax loss." (PSR Addendum, p. 4.) As argued above, this recommendation as to tax loss and restitution, made without analysis or real calculation but merely based on unexplained faith in the government's position, violates both Fed. R. Crim. P. 32(d)(1)(B): "The presentence report must calculate the defendant's offense level and criminal history category," and Fed. R. Crim. P. 32(c)(1)(B): "If the law permits restitution, the probation officer must conduct an investigation and submit a report that contains sufficient information for the court to order restitution." These recommendations deserve no deference by this Court.

In any event, there was no tax loss to the government and no restitution should be ordered. The government's position, which is inconsistent with its approach at trial, is that somehow Dr. El Fiki's contribution should be deemed Mr. Sedaghaty's personal income and subject to the "excess benefit transaction" tax. This approach is unsupported by facts or law. Moreover,

**Page 15 DEFENDANT'S SENTENCING MEMORANDUM**

even if the IRS had retroactively revoked Al Haramain's status as a charity and declared it a taxable corporation as of the year 2000, Al Haramain would not have been required to pay corporate tax on Dr. El Fiki's contribution.

For his legal argument concerning tax loss and restitution, Mr. Sedaghaty relies upon and incorporates herein the attached letter from Marcus Owens, who served for ten years as the Director of the Exempt Organizations Division of the Internal Revenue Service.  Exhibit 2.

In addition, there is no loss as a matter of fact.  As argued elsewhere in this pleading, there is no clear and convincing evidence money went to a non-charitable purpose.  Humanitarian relief to mujahideen is lawful.  Nor is there clear and convincing proof Mr. Al Buthe receive any benefit.

### B.    There Was No Sophisticated Concealment.

In ¶33 of the PSR, the presentence writer urges a two-level enhancement pursuant to U.S.S.G. § 2T1.1(b)(2) for sophisticated concealment.  Contrary to the opinions offered in that paragraph, the facts show that the transactions in this case were not complex, intricate, or concealed.

This transaction was in no manner complex.  It was a straightforward purchase of travelers checks and a cashier's check in an open and above-board manner.  The money was then deposited with Al Haramain Saudi Arabia as reflected in the receipts, and then transferred to the Al Haramain bank account in Saudi Arabia.  With respect to difficulties Agent Anderson may have had in

obtaining some records, she acknowledged at trial this was her first case involving these issues. The record shows the banks involved had, and when requested, produced all relevant documents.

The suggestion that Mr. Sedaghaty and Mr. Al Buthe walking into the Bank of America branch in Ashland, dealing with Mr. Sedaghaty's banker with Mr. Al Buthe wearing his Saudi clothing, involved any effort to hide anything is absurd. On the Saudi end, again there was no concealment. Mr. Al Buthe used his own bank to cash the travelers checks and deposit the cashier's check.

Finally, there was no effort to conceal this transaction from the accountant. Mr. Wilcox was provided copies of both checks used to purchase the financial instruments, and copies of the charity's bank records containing the transaction. When Mr. Wilcox provided the IRS subpoenaed documents about the case, Mr. Sedaghaty paid for them, and was in touch with Mr. Wilcox. Contrary to obstruction or concealment, he directed Mr. Wilcox to be open in the investigation and directed his lawyers to be over compliant in producing subpoenaed AHIF records. In addition, the objective facts are that Mr. Sedaghaty discussed Chechnya with Mr. Wilcox. Mr. Wilcox eventually admitted that at trial. His records also show he was told about the purchase of a property for around $400,000 as early as February 2001.

Failure of the presentence writer to mention Mr. Wilcox's admissions that

he discussed Chechnya with Mr. Sedaghaty and that his records included a discussion of purchase of property for approximately $400,000 with one of Mr. Sedaghaty's attorneys as early as February 2001, is a further indication of the lack of objectivity in this report.

### C.    There Was No Obstruction Of Justice.

In ¶20, the presentence writer recommends a two-level increase for obstruction of justice pursuant to U.S.S.G. §3C1.1.  This recommendation is based entirely on unsubstantiated opinion.  While the final version of the PSR removed a statement of the case agent from the original draft regarding the date of creation of the documents the presentence writer believes supports the obstruction enhancement, it continues to rely on her unsubstantiated opinion. We do not doubt that Agent Anderson believes that the documents are fraudulent.  Her belief, however, is not evidence.  It cannot form the basis for an upward adjustment in the guideline calculation.  *See Showalter*, 569 F.3d at 1160 (when defendant raises objections to the PSR at sentencing, the government bears the burden of proof and the court may not simply rely on the factual statements in the PSR).

The handling of the obstruction enhancement in ¶20 is, regrettably, further indication of the lack of objectivity in the report.  Mr. Sedaghaty pointed out to the presentence writer that there is one affirmative piece of evidence on the question of the creation of the two contracts – the investigation

memorandum of one of the signers of the document, Mr. Sui.  Exhibit 3.

Notwithstanding that fact, the presentence writer ignores it entirely in her

discussion of the obstruction issue.

> **D.    The "Terrorism Enhancement" Is Not Supported In Law Or Fact By The Charges And Findings In This Case Or By The "Relevant Conduct" Provision Of Sentencing Guidelines (§ 1B1.3).**

This is a first-offender tax case.  Mr. Sedaghaty  was not charged with

providing material support for or otherwise financing terrorism, or concealing

material support, or attempting to provide material support, or anything having

to do with terrorism.   The government categorically conceded to the jury this is

not a terrorism case:

> What the indictment does not include, and I want to get this out right now based on some questioning and back and forth we had this morning, is there are not terrorism charges in this indictment. The government is not accusing Mr. Sedaghaty for being a terrorist.  Right.  No terrorism charges.

Government Opening Statement, 08/30/2010.

Government counsel reiterated this point during closing argument.  He

told the jury that its case was not hinged to any findings that Mr. Sedaghaty

intended that the money be used to support terrorism.  He stressed to the jury

that Mr. Sedaghaty could be convicted of the tax fraud charges regardless of

whether he intended the donation to support humanitarian causes or to assist

the mujahideen in  combat operations:

[M]embers of the jury, don't get lost in this blankets versus bomb

**Page 19  DEFENDANT'S SENTENCING MEMORANDUM**

quagmire.  When you get back there and say, you know, maybe he
had an intent to food -- give food to people, blankets to people, or
maybe he really did try to buy arms, the point of this is, if you are
doing things like this as a charity, the IRS's antennae go way up,
as they should be, when you're dealing with cash especially.  And if
you're going to take the position and say, I did good things with
this, I gave this money to refugees, blankets, food, medicine, okay,
but tell us about it.  That's what you need to do as an exempt
organization.

Government closing at 178-79.

As an initial matter, although the government now seeks to punish Mr.

Sedaghaty for providing "material support" for terrorists under § 2339A, it did

not charge him with that offense and, as noted, conceded that this was not a

terrorism case. In that respect, the government's posture at trial reflects the

cornerstone principle requiring a meaningful connection between the defendant

and the crime, and bespeaks a sense of proportion that the government now

threatens to jettison for sentencing purposes.

Accepting all arguments and inferences in their worst light, the

disconnect between Mr. Sedaghaty and the Chechen war is immense,

immeasurably so.  Mr. Sedaghaty was not a "player" in the Chechen war, a

conflict that has been raging  for centuries, concerning which he had zero

influence or control.  He was a small figure in a world-wide organization with

massive resources and thousands of employees in 70 countries around the

world whose charitable activities were well-recognized.  He facilitated the

transfer of the El Fiki money from the United States to Saudi Arabia and lost

**Page 20 DEFENDANT'S SENTENCING MEMORANDUM**

any control over it after that.

But accepting the worst inferences as true, despite the vacuum of proof, if some of that money eventually went to Chechen mujahideen it was a drop in the bucket when compared with the vast amounts of monetary and other support being provided to the Chechen cause from sources all over the world, including from the United States and other western governments. The lines between Chechen insurgents and mujahideen, between war and terror, between humanitarian and military aid, were then, as now, fluid and blurry. The attempt by the government now, with the assistance of the Russian FSB, an "aggrieved party" with much skin in the game, to link the El Fiki donation with despicable acts of terror in Moscow perpetrated by unknown persons having nothing to do with this Defendant should be summarily rejected.

The government may not simply rely on videotapes or "common knowledge" that some Chechens at some time committed acts of terror.  Even if there were evidence tracing the El Fiki money to Chechnya – which there is not (see below for further discussion) – it is improper to link this specific donation to actions of unidentified terrorists that may have occurred many years before or after the fact.  The government did not, and could not, make that argument at trial on the basis of the evidence.  It is the rough equivalent of arguing that aid provided by the United States government and other allied western nations to the cause of Chechen or Afghan nationalism is blood-stained by the

excessive actions of some people enlisted in the cause.  Similarly, America's invasion of Afghanistan after 9/11 would never be seen as an act of terrorism, or the "promotion" of terrorism, notwithstanding our country's alignment in this war with Northern Alliance, tribal warlords and Pakistani militias, all of whom have had well-documented involvement in acts of terror.

        **1.**    ***Judicial Estoppel Prevents The Government From Arguing That The Terrorism Enhancement Applies To Mr. Sedaghaty's Case.***

Both the PSR and government are urging the Court to impose the terrorism enhancement under U.S.S.G. § 3A1.4.  Mr. Sedaghaty opposes the enhancement, believing that it is inapplicable as a matter of fact and law.  In addition, the manner in which the government has handled this case precludes it from seeking the terrorism enhancement as a matter of estoppel.  Specifically, the government should be estopped from arguing two facts at sentencing that contradict its earlier position: (1) that the El Fiki donation could be traced to terrorist activity; and (2) that the Chechen combatants were terrorists.

Judicial estoppel is an equitable doctrine that prevents a party from "playing fast and loose with the courts" by reversing its position "in order to suit its current objective."  *Whaley v. Belleque*, 520 F.3d 997, 1002 (9th Cir. 2008); *see also New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001).  Often known as the doctrine of preclusion of inconsistent positions, judicial estoppel

"precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Whaley*, 520 F.3d at 1002 (*quoting Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600 (9th Cir. 1996)).  The doctrine is "most commonly applied to bar a party from making a factual assertion in a legal proceeding which directly contradicts an earlier assertion made in the same proceeding or a prior one." *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990).

At trial, the government claimed that the El Fiki money could not be traced once Mr. Al Buthe had cashed the 130 traveler's checks.  For example, government counsel argued to the jury in closing that: "You see [Mr. Al-Buthe] cashed the 130,000 American Express traveler's checks, and he got 486,850 Saudi riyals in cash. And that's gone. Trail dries up."  Gorder Close at 64.  The government took the same position throughout the pre-trial phase as well as in repeated interactions with defense counsel.  Not only was the government adamant that the money could not be traced once cashed, it actively fought introduction of defense exhibits offered to show the further flow of the donated funds, *see* Def. Exhibit[2] 704, 705, and failed to subpoena the Al Haramain Saudi bank account where the defense argued the money had gone.

_____

[2]Attached as Exhibit 8.  A Defense Exhibit List is attached.  All of the Exhibits listed have been provided to the Court and to the government prior to and during trial.  The list indicates by "*" exhibits that may not have been admitted at trial.  Following the filing of this memorandum, those identified exhibits will be provided to this Court and to the government on a CD.

**Page 23  DEFENDANT'S SENTENCING MEMORANDUM**

Additionally, the prosecution recognized the distinction between fighting mujahideen and terrorists and that it did not take sides in the conflict.  During opening statements, the government flatly stated that "[t]he government is not accusing Mr. Sedaghaty for being a terrorist."  (Opening at 6).  The logic of that position was obvious given the numerous defense exhibits showing the U.S. government's support for Chechnya in 1999 and 2000.  *See, e.g.*, Def. Exhibit 628, 629, 631, 633, 634, 1002(B).  Any possible inference that Mr. Sedaghaty was supporting the Chechen fighters who were terrorists during those years was quickly extinguished when the prosecution stated in both opening and closing that the government would not take a position with respect to favoring either side in the conflict:

> [T]his case does not involve us taking a side with either side. We're not here to take sides.  We're not here to defend Russia's actions or the mujahideen's actions.  We're not here to judge that.

Opening at 28.

> [W]e're not taking sides in that conflict. It was brutal, brutal on both sides. If there is anything you can take from that, it's how blessed we are to live in this country where we're more likely to be killed in an auto accident than in the crossfire of a war.

Gorder Close at 57.  While the prosecutors remained neutral about the war, official reports on the war from 1999-2001 show that the United States regularly condemned Russian aggression in Chechnya.  Def. Exhibit 647, 648, 649.

Moreover, whatever might have occurred years later involving actual

Page 24 **DEFENDANT'S SENTENCING MEMORANDUM**

terrorist acts against civilians, what Mr. Sedaghaty was aware of as reflected in the government exhibits from the websites, was a war. It was not acts of terror against civilian populations. This is seen in the government's exhibits. *See, e.g.*, SW-8, SW-16, SW-28.

Indeed, even the evidence the government claimed reflected Mr. Sedaghaty's mental state—the Sheeshan emails—shows an understanding at the time that the Chechen fighters were engaged in traditional warfare and not terrorist attacks. The emails, largely copied verbatim from the Qoqaz website, describe such military operations as attacks on enemy armor columns, the shooting down of a Russian military plane, and other offenses against "Russian Forces." SW-28. Moreover, the Sheeshan emails specifically refuted any claim that the Chechen fighters were engaged in terrorism. *See, e.g.*, January 27, 2000 Sheeshan email (explicitly denying Chechen involvement in the 1999 Moscow apartment bombings). Exhibit 4.

In fact, many of the Sheeshan emails that were sent to Mr. Sedaghaty at the time of the El Fiki donation strongly condemned actions that would be considered terroristic in nature. For example, a February 15, 2000, Sheeshan email decried the "rampage"and "atrocities" committed by the "Russian Forces," including "indiscriminate killing of men, women and children" and the use of "weapons of mass-destruction" against a "defenseless civilian population." Exhibit 4. Similarly, a Sheeshan email sent three days later again vilified

**Page 25 DEFENDANT'S SENTENCING MEMORANDUM**

"targeting civilians" and "indiscriminate killing."  Exhibit 4.  Given that the

government relied heavily on the Sheeshan emails at trial to establish Mr.

Sedaghaty's intent, it cannot now legitimately claim that Mr. Sedaghaty's

understanding of the conflict was different than what he would have learned

from those documents.

　　　　The theory for the terrorism enhancement advanced in the PSR, is set

out in ¶26.  That paragraph opines that Russia's presence in Chechnya was

"lawful," that the Chechens were "retaliating" against the Russians, and that

the actions of the Chechen fighters were criminal when it calls them an

"offense."  All of those positions are contrary to the positions asserted by the

government before and during trial as reflected in the statements above.

　　　　Now, however, as evidenced in the PSR, the government seeks to argue

the reverse of its trial positions.  First, the government apparently will claim

that the "Chechen mujahideen received the AHIF [El Fiki] donation on or after

March 25, 2000."  PSR at 7.  Second, the government now claims that at the

pertinent time, the Chechen mujahideen were a terrorist organization.  PSR at

3.

　　　　While these positions are untenable for the numerous factual and legal

reasons set forth below, they should be precluded at the outset as an equitable

matter.  The doctrine of judicial estoppel seeks "to protect the integrity of the

judicial process by prohibiting parties from deliberately changing positions

**Page 26 DEFENDANT'S SENTENCING MEMORANDUM**

according to the exigencies of the moment." *United States v. Smith*, 574 F.3d

521, 527 (8th Cir. 2009) (*quoting New Hampshire*, 532 U.S. at 750). The

government now seeks to change its factual position to gain an advantage at

sentencing. This Court should exercise its discretion and estop the

government from "playing fast and loose with the courts." *See Whaley*, 520

F.3d at 1002.

> **2.    There Is No Basis In Law For The Terrorism Enhancement.**

Application of the terrorism enhancement requires proof that the offense

of conviction "involved, or was intended to promote, a federal crime of

terrorism." 3A1.4 of the U.S. Sentencing Guidelines. The government must

identify which enumerated "federal crime of terrorism" the defendant intended

to promote. *United States v. Thurston*, 2007 WL 1500176 *6 (D. OR. May 21,

2007).

> a.    There is no Statutory Basis for the Terrorism Enhancement.

The draft PSR (¶22) asserted the applicability of the terrorism

enhancement based on Mr. Sedaghaty's and Mr. Al Buthe's "knowingly

support[ing] terrorist activities, which actually occurred against Russia," citing

18 U.S.C. § 2339B  as the requisite statutory predicates. After receiving Mr.

Sedaghaty's explanation of the inapplicability of those sections, the PSR has

now shifted and articulates the terrorism enhancement as being applicable

under 18 U.S.C. § 2339A concerning "material support for terrorism."  In the addendum section of the report, the writer notes that our objection to ¶26 is now resolved.  That is not the case.  For the reasons set out below, as a matter of law, the terrorism enhancement is not applicable under any guideline or statutory provision.

Further, the application of 18 U.S.C. § 2339A is inappropriate here because  fighting a war does not violate 18 U.S.C. § 956.  Under the laws of war, for one soldier to kill another is not a crime.  William Winthrop, *Military Law And Precedents* at 782 (rev. 2d ed. 1920) (general rule that the operations of war on land can legally be carried on only through the recognized armies or soldiering of the state or duly enlisted or employed in its service).  As reflected in the news reports introduced by the government during the trial, during the winter of 2000, what was taking place in Chechnya was a war between Russian and Chechen forces.

The normal characteristics of terrorism do not apply here.  As noted above, during the relevant time period involved in this case (1999-2001), the Chechens were involved in a war of liberation with Russia, one in which the Chechen cause received diplomatic and other support from the United States and other western governments.  (See, *e.g.*, Def. Exs. 0628, 0629, 0630, 0631, 0632,0633, 0634, 0635, 0653.)  The two recent wars, in the 1990's and early 2000, were accompanied by the expected sequellae of struggle between two

**Page 28 DEFENDANT'S SENTENCING MEMORANDUM**

nations battling for control over the same territory – negotiations, peace treaties, development of independent governmental structures and advice, support and assistance from the international community. The Chechens also received military support from foreign allies, the "mujahideen," but, as government terrorism expert witness Evan Kohlmann admitted, it was either that or be obliterated by the much stronger Russian army. That is why, presumptively, government counsel explicitly told the jury that this was a war in which we do not take sides.

Indeed, as shown in numerous government exhibits, such as the Kavkaz video and the pictures seized from emails on Al Haramain Ashland's computers, the Chechen mujahideen were soldiers fighting in uniform against traditional military targets. EK-7, SW-8; *accord* Exhibit 4. As such, any acts committed against Russian forces, again the acts that are depicted in the government's exhibits, were privileged and not criminal.

In addition to the fact that 18 U.S.C. § 956 does not apply to legitimate acts of war, the statute also does not – by its terms – apply to the particulars of this case. Specifically, the presentence report writer's theory that the terrorism enhancement applies is based on a flawed application of § 956.

Section 956 criminalizes conspiracies to commit various acts, and requires that one of the conspirators is "within the jurisdiction of the United States." § 956(a)(1), (b). Importantly, the presentence report writer seeks to

**Page 29 DEFENDANT'S SENTENCING MEMORANDUM**

apply § 956 through § 2339A, the material support statute.  Thus, in order for the terrorism enhancement to apply, the government must prove that Mr. Sedaghaty provided material support "knowing or intending" that that support would be used "in preparation for, or in carrying out," a conspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country, with one of the conspirators being "within the jurisdiction of the United States." § 2339A; § 956.

The critical flaw in the presentence report writer's logic hinges on the jurisdictional element in § 956; simply put, the government cannot show that anyone within U.S. jurisdiction was a party to a § 956 conspiracy.  The government does not allege, nor has it produced any evidence, that Mr. Sedaghaty ever agreed, let alone met or communicated with, any individual who sought to violate the law.

b.      § 2339C And 2339B Do Not Apply.

Turning to the other potential statutes, § 2339C (financing of terrorism) was not extant in 2001 and, thus, cannot form the predicate for a terrorism enhancement under the Guidelines that apply to the offenses of conviction that occurred in October 2001.  *See Miller v. Florida,* 482 U.S. 423 (1987); *United States v. Seacott*, 15 F. 3d 1380, 1384-86 ( 7th Cir. 1994); *United States v. Schnell*, 982 F.2d 216, 218 (7th Cir. 1992); *Thurston,* 2007 WL 1500176. Moreover, § 2339C(a) would apply only if the alleged financing was used to

carry out (A) an act which constitutes an offense within the scope of a specified "treaty" or (B) an "act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act."

Accordingly, § 2339C(a) does not apply for five reasons : (1) because it was not extant in 2001, it violates *ex post facto* principles; (2) there is no evidence, or argument, that the offenses of conviction violated a specified treaty; (3) there is no evidence that the offenses of conviction were intended to "cause death or serious bodily injury to a civilian;" (4) there is no evidence that the offenses of conviction were intended to cause death or serious bodily injury to a civilian "not taking an active part in the hostilities of armed conflict;" and (5) there is no evidence that the purpose of the offenses of conviction were "to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act."

Nor does § 2339C(c) (Concealment) apply.  That subsection covers concealment of financing that violated either § 2339B or § 2339C(a).  For the reasons stated immediately above and immediately below, neither § 2339C(a) nor 2339B applies to this case.  Accordingly, § 2339C is not a valid predicate for the application of the terrorism enhancement.

**Page 31 DEFENDANT'S SENTENCING MEMORANDUM**

Section 2339B on its face does not apply because it requires proof of support to "foreign terrorist organizations," a term defined by statute to mean "an organization designated as a terrorist organization under section 219 of the Immigration and Nationality Act." § 2339B(g)(6). We are not aware of an "organization" called the "Chechen Mujahideen" but, even if there were such an organization, it was not "designated as a terrorist organization under section 219 of the Immigration and Nationality Act." Therefore, neither § 2339B nor § 2339C provides a proper basis for the application of the terrorism enhancement to this case.

### 3.    *The Court Is Not In A Position To Make A Judgment On The Nature Of The War In Chechnya.*

A fundamental principle of our system of government is that the Executive is responsible for diplomatic actions and decisions. *Munaf v. Geren*, 533 U.S. 674, 689 (2008) (courts traditionally are reluctant to intrude upon the authority of the Executive in military and national security affairs.) *See also, Kiyemba v. Obama*, 561 F.3d 509, 515 (D.C. Cir. 2009) ('[S]eparation of powers principle . . . preclude the courts from second-guessing the Executive's assessment of the likelihood a detainee will be tortured by a foreign sovereign").

Guided by that principle, this Court may not rule that what was occurring in Chechnya in 2000 was an "offense" within the meaning of 18 U.S.C. §§ 956 or 2339A. At that time, the Executive Branch made the judgment that what was occurring in Chechnya was a legitimate conflict

Page 32 **DEFENDANT'S SENTENCING MEMORANDUM**

between Chechnya and Russia.  The Chechen fighters were not considered "terrorists" by the Executive.  Def. Exhibit 629, 631, 633, 1002(B).  Indeed, the U.S. government was likely funding the Chechen fighters.  CR 495, Col. Lang Declaration at ¶¶31 and 33; see also CR 354.  This Court has no authority to take a contrary position at this time.

Moreover, the estoppel argument set out above precludes the Executive from now changing positions on that subject.

### 4. The Government Neither Argued Nor Attempted To Prove That The Offenses Of Conviction "Involved" Or Were "Intended To Promote" A Federal Crime Of Terrorism.

Application of the terrorism enhancement in this case improperly conflates two separate arguments: (1) the alleged diversion of funds to the Chechen mujahideen, and (2) the tax fraud.  Mr. Sedaghaty was not charged with diverting funds or providing support to or financing terrorism.  Mr. Sedaghaty was charged with tax fraud.  The government did not argue that the purpose of the tax fraud conspiracy "involved or was intended to promote" terrorism or to "affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  Rather, the government presented lengthy testimony (Wooten) to establish, and explicitly told the jury, that Mr. Sedaghaty's motive was to protect Al Haramain USA's tax exemption and to avoid exposing himself to tax sanctions and charges of civil and criminal fraud.  Government Opening, 08/30/2010, Tr. 27.

The government's articulation of the motive at trial, though disputed, makes theoretical sense.  Its argument now does not.  Cheating on taxes in October 2001 cannot logically be conflated with supporting a Chechen effort to intimidate or coerce the Russian government in March 2000.  The purpose and intention that may underlie a plan to cheat on tax returns in October 2001 might, as the government has previously argued, have been to avoid tax sanctions, but it could have nothing whatever to do with any effort to provide support for the Chechen actions against the Russians some 18 months earlier.  Support for the Chechens, if it ever took place, was long since over and done with.

In other words, any conceivable attempt to promote acts of terror or to influence or affect or retaliate against the Russians by coercion or intimidation would arguably have occurred with the alleged one-time provision of support in March 2000.  The tax fraud was perpetrated a year-and-a-half after the fact.  There is no evidence that Mr. Sedaghaty was in any way involved in any effort to assist Chechen mujahideen at that time.

Even if the tax fraud were intended to conceal the earlier support to the Chechens in March 2000, it cannot be seen as an effort 19 months later to promote a federal crime of terrorism or to influence or affect the Russians and certainly not by intimidation or coercion as required by § 3A1.4 and 18 U.S.C. § 2332b(g)(5)(A).  The government did not argue or offer any evidence that Mr.

Sedaghaty was continuing to support the mujahideen in October 2001 when he filed the tax returns.  Rather, his conduct at that time can only be explained, and was in fact explained by the government, as being motivated by a desire to avoid tax problems and other sanctions, not to promote terrorism.

### 5. The Terrorism Enhancement Cannot Be Justified On The Basis Of The "Relevant Conduct" Provision Of The Sentencing Guidelines  (§ 1b1.3.).

Section 1B1.3 of the Guidelines in relevant part permits the sentencing judge to consider not just the base offense but other acts "that occurred during the commission of the offense of conviction , in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." If the "offense of conviction" had been "providing material support" or "financing terrorism" in violation of federal statutes, then it might be argued that a tax fraud that was calculated to conceal that action would be "Relevant Conduct."  But this case is the reverse.  The "offense of conviction" here was the conspiracy to commit tax fraud and the filing of a tax return that the jury found occurred in October 2001.  Any actions that occurred a year and a half before the offense of conviction,  in March 2000 when the alleged diversion of funds took place, cannot be said to have occurred during, in preparation for or in avoiding detection for the offense of conviction.  Accordingly, those facts relating to the government's pursuit of the terrorism enhancement may not properly be considered "relevant conduct" within the Guidelines.

Page 35 **DEFENDANT'S SENTENCING MEMORANDUM**

### 6.    *The Presentence Report Relies on Unfounded Speculation Attenuated From Mr. Sedaghaty.*

In recommending the terrorism enhancement, the PSR relies in substantial part on a letter sent by government counsel to Mr. Wax, counsel for the Defendant.  Exhibit 1, Proposed Exhibit 730.  ¶21a.  The letter informed Mr. Wax as follows:

> The U.S. Government obtained information that Sami 'Abd Al' Aziz Al-Sanad worked during 2000 and 2001 for the Al-Haramain organization and was responsible for providing currency supplied by Al-Haramain, including the currency obtained by codefendant Soliman Al-Buthe from Al-Haramain USA, to a representative of Muhammad Al-Sayf, aka Abu 'Umar, to be smuggled into Chechnya.  Al-Sanad has claimed that the monies he provided to Al-Sayf's representative were destined for needy Chechen families.

Exhibit 1.

This bare-bones recitation with no sources disclosed, and involving who knows how many layers of hearsay, was apparently accepted as fact on the mere "say-so" of government counsel.  But, even more significantly, the paragraph provides the only direct evidence before this Court on the use of the El Fiki money – that it was used for humanitarian purposes.  There is no basis before this Court, or in the PSR, on which a portion of the formerly classified statement of Al Sanad obtained by intelligence personnel can be ignored while other portions of the statement are accepted.

The PSR then proceeds to Evan Kohlmann's testimony, also based on multiple layers of other sources, that Umar worked for the mujahideen, ¶21b,

and then to a purported intercept from the Russian KGB involving, as it happens, the two top leaders of the Chechen Mujahideen and Al-Haramain Saudi Arabia concerning the delivery of supplies to the mujahideen.  This only explains a general pattern.  It does not contradict the specific information about the only money in any way related to Mr. Sedaghaty.

Where does Mr. Sedaghaty fit into this picture?  Apparently solely on the basis of the so-called "What Support?" e-mail he sent to Al Buthe forwarding a portion of a widely circulated request from Mr. Khattab for aid and assistance. *See* ¶ 22.  The e-mail in no manner suggests that Mr. Sedaghaty was recommending military or any other support for the mujahideen.  It only asked "What support?", nothing more.  The e-mail, if anything, reflects Mr. Sedaghaty's preference to limit any support that might be considered for humanitarian assistance to needy Chechens.  That is because Mr. Sedaghaty did not forward to Al Buthe the entire multi-page request from Khattab, only that portion that concerns requests for humanitarian assistance to Chechen victims, and only the first paragraph of the request, the paragraph dealing with humanitarian aid.  SW 11.

The inferences that the PSR draws for this string of speculation are directly at odds with what the government claimed at trial.  The government flatly admitted at trial that the El Fiki money could not be traced to Chechnya, that the trail "dries up" after it gets deposited in Saudi Arabia.  Gorder Close at

64.  As reflected in Section VI(D)(1) above, the government should be judicially

estopped from asserting positions for sentencing purposes that are at odds

with its position during the trial.

We realize the Court may consider hearsay for sentencing purposes but,

as discussed above, more substance is required than self-serving, conclusory

assertions that are suspect on their face, that contradict the government's

position at trial, that are unaccompanied by any factual back-up from any

primary source, and provide no real opportunity for the defense to challenge, in

order to justify the very significant enhancement of a sentence that would

otherwise be permissible under the Guidelines.

### 7. Crediting The Verdict, The Government's Evidence Shows Mr. Sedaghaty Solely Sought To Fund A War

As articulated above in Section VI(D)(1), the government's own evidence

taken from Mr. Sedaghaty's computers showed his knowledge of the situations

was that it was a war.  The websites touted success in military campaigns.

They spoke against civilian terror.  To the extent this evidence is germane on

the question of intent, as the government argued at trial, it shows Mr.

Sedaghaty's intent was **not** to support acts of terror.  There is no contrary

evidence because application of the enhancement requires proof of Mr.

Sedaghaty's intent, there is none to support the enhancement.

### 8. Precedent Is Against The Government.

To our knowledge, the only court  to consider the applicability of the

terrorism enhancement in a case involving the Chechen war in the late 1990's declined to apply the enhancement.  In *United States v. Arnaout*, 431 F.3d 994 (7th Cir. 2005), the Court of Appeals affirmed the district court's rejection of the terrorism enhancement's applicability to the conviction of a defendant, the head of a charitable organization, who admittedly diverted charitable contributions to the Chechen mujahideen specifically for use in fighting. Mr. Arnaout ran Benevolence International Foundation (BIF), a Saudi charity.  He was charged with fraud on donors for diverting to Bosnian and Chechen militants money that was given for humanitarian aid.  On February 10, 2003, Arnaout pled guilty, pursuant to a written plea  agreement, to conspiring to violate RICO in violation of 18 U.S.C. § 1962(d).  In the plea agreement, Arnaout acknowledged that beginning in May 1993, he was responsible for and directed BIF's operations in the United States.  Arnaout admitted that he and others agreed to conceal from donors, potential donors, and federal and state governments that a material portion of the donations received by BIF were being used to support soldiers overseas. The support he provided included boots, tents, uniforms, walkie-talkies, and an ambulance intended for ultimate use by fighters in Bosnia and Chechnya.  431 F.3d 998.

The district court found that, "The government has not established that the Bosnian and Chechen recipients of BIF aid were engaged in a federal crime of terrorism, nor that Arnaout intended the donated . . . [equipment] to be used

to promote a federal crime of terrorism." *United States v. Arnaout*, 282 F. Supp.

2d 838, 845 (N.D. Ill. 2003).  The Circuit court affirmed, finding "no clear error"

in that ruling:

> [T]he district court did find that the record did not establish by a preponderance of the evidence that Arnaout attempted, participated in, or conspired to commit any act of terrorism.  *The district court also found that the government had not established that the Bosnian and Chechen recipients of BIF aid were engaged in a federal crime of terrorism, or that Arnaout intended the donated boots, uniforms, blankets, tents, X-ray machine, ambulances, nylon or walkie talkies to be used to promote a federal crime of terrorism.*  We find all of the district court's findings on this issue consistent with the record, not clearly erroneous, and sufficient to support the district court's refusal to apply § 3A1.4.

(emphasis added).

Thus, Mr. Arnaout – unlike Mr. Sedaghaty – as admittedly involved in

diverting charitable funds to supply Chechen mujahideen with supplies having

obvious military utility in the same conflict as is involved in the instant case

and the trial and appellate courts found that none of his conduct was intended

to promote terrorism.

While the Court found that the terrorism enhancement under the

Guidelines is not applicable in Mr. Arnaout's case, it varied upward based on

many of the same facts.  In that respect, however, the *Arnaout* case is

materially distinguishable from Mr. Sedaghaty's.  Unlike Mr. Sedaghaty, Mr.

Arnaout was involved in a pattern of conduct with full knowledge and intent to

provide military support to mujihadeen.  By contrast, Mr. Sedaghaty was

accused of only one act involving sending money overseas.  Second, in contrast

to Mr. Arnaout, there is no evidence that Mr. Sedaghaty intended to provide

military support to mujahideen as approved to humanitarian support.  Again, if

the jury credited Bobby Cabral, the support was intended to be entirely

humanitarian.  Tr., August 31, 2010 at 279-80.  That is the only direct

evidence of Mr. Sedaghaty's intent.  Third, in contrast to Mr. Arnaout, the one

act of which Mr. Sedaghaty has been found guilty stands in stark contrast to

his decades-long positive, peaceful, and humanitarian involvement and the

continuing support he enjoys from prominent members of the Southern Oregon

community.  They continue to believe that he is not anti-Semitic or a person

who has any desire to fund violent activities.

## VII.  MR. IGNATCHENKO SHOULD NOT BE PERMITTED TO TESTIFY AT MR. SEDAGHATY'S SENTENCING.

### A.  Ignatchenko's Proposed Testimony Is Irrelevant, It Involves New, Uncharged, Untried Offenses, Is Based On Multiple Levels Of Hearsay, Is Inherently Unreliable And Extraordinarily Prejudicial And Is, Therefore, Precluded Under The Fifth And Sixth Amendments To The Constitution And Under Federal Rules Of Evidence 401, 403 And 802.

On October 25, 2010, undersigned counsel received notice from the

government of its intention to call Mr. Ignatchenko as a witness at the

sentencing proceeding for Mr. Sedaghaty scheduled for November 23, 2010.

His expected testimony is described by government counsel as including "some

of the matters contained in his interview report provided by the FSB to the

United States government" that was previously produced in discovery.

The FSB reports that were previously produced in discovery include a report of an FSB interview with Mr. Ignatchenko in which he refers to transcripts of purported telecommunications intercepts that purportedly implicate Al Haramain Saudi Arabia in the transfer of funds to Chechen mujahideen. Ignatchenko did not testify at trial and the reports on which his proposed testimony is based were not introduced. Apparently, the government seeks to introduce his testimony now in an effort to justify imposition of the "terrorism enhancement" under U.S.S.G. § 3A1.4. Ignatchenko's testimony cannot be justified on that ground.

First, the documents on which the proposed testimony is based do not trace the El Fiki money to Chechen mujahideen. The documents on which the proposed testimony is based do not mention Mr. Sedaghaty at all or suggest that Mr. Sedaghaty had any intention to deliver funds to the mujahideen, or that he had any knowledge of any plans or intentions of others to deliver the funds to the mujahideen.

Second, for multiple reasons developed above, the terrorism enhancement does not apply to the charges and findings in this case.

Third, Ignatchenko's proposed testimony is inherently unreliable.

**1.    *The Government Cannot Establish Through Mr. Ignatchenko Or Otherwise That The El Fiki Money Was Diverted To Chechen Mujahideen.***

The Ignatchenko testimony is offered to support the uncharged, untried allegation that the El Fiki donation actually was transferred into the hands of Chechen mujahideen. There is nothing in evidence or in the FSB documents that is the basis of Ignatchenko's proposed testimony to support that theory. Government counsel explicitly conceded that it could *not* trace the El Fiki donation to Chechen fighters:

> You see he cashed the 130,000 American Express traveler's checks, and he got 486,850 Saudi riyals in cash. And that's gone. Trail dries up.

Gorder Close at 64.

The basis of Mr. Ignatchenko's testimony consists of papers that were given to government counsel in this case by the Russian FSB in exchange for intelligence information provided by government counsel. The Russian FSB is a direct successor to the notorious Soviet secret police, the KGB, and has continued the KGB's deception and brutality.  The FSB materials were provided to us in pre-trial discovery. They were not introduced into evidence or otherwise referred to in trial and, therefore, nothing contained in them is included in any findings made by the jury.  More importantly for sentencing purposes, nothing in these documents establishes that the El Fiki donation was used to support Chechen mujahideen.

**Page 43 DEFENDANT'S SENTENCING MEMORANDUM**

In pertinent part, the FSB documents relate to alleged intercepts of purported communications purportedly involving an Al Haramain official in Saudi Arabia and one or more alleged Chechen mujahideen.  Aside from the myriad reasons these documents lack authenticity, they simply do not establish that the El Fiki money was ever delivered to any Chechens.  All the government knows is that this money was deposited in a Saudi Arabian bank account. It has no evidence of what, if anything, happened to this money after that. Further, and critically, the FSB documents never mention, explicitly or implicitly, the defendant, Mr. Sedaghaty, and shed no light whatever on his state of mind with respect to the disposition of these funds.

> **2.    *Mr. Ignatchenko's Testimony Should Be Precluded On The Basis Of Irrelevance, Excessive Prejudice, Inherent Unreliability And Hearsay Grounds.***

In proffering Mr. Ignatchenko, the government is seeking to impose on Mr. Sedaghaty the consequences of a crime of terrorism without shouldering the burden of proving the crime – and the government seeks to do this thorough a foreign witness, an agent of the Russian FSB, testifying in a foreign language by video.  The due process implications of this position are self-evident, but they are magnified greatly by the inherent unreliability of this witness's  testimony.  Consider:

- There are many layers of hearsay implicated in the proffered testimony. Ignatchenko apparently will talk about a purported transcript of a wire or radio intercept that purportedly occurred more than a decade ago somewhere between Russia and Saudi Arabia.  The actual intercept

**Page 44  DEFENDANT'S SENTENCING MEMORANDUM**

recording is missing.  Only a purported transcript exists. Can Ignatchenko testify first-hand that the conversations in the transcripts actually took place?  Who actually conducted the intercepts?  By what means?  When?  For what purpose?  Who can identify with certainty that the participants in the intercepted conversation, if there was such a conversation, are who the transcripts identify them to be, and on what basis can that be said?  Who recorded the purported transcript of the intercepts?  When, where and under what circumstances?  Who kept the transcripts for these many years and under what conditions and "in the regular course" --, the regular course of what or whom? Who has seen them over the years? In what manner and for what purpose have they been used over the years?

- Where is the actual recording of the intercept?  Ignatchenko apparently says the actual recording was destroyed under a five year record retention program. So there is not a shred of corroboration for this incendiary testimony. How does Ignatchenko know the recording was destroyed, when, by whom and why?   Is it even remotely possible that the Russian government would destroy such evidence because of a bureaucratic regulation even as its furious battles with the Chechens were intensifying ?  Why is it then that the Russians just happened to keep the paper record of the transcript?  Isn't the record retention policy even more relevant to paper records?

- Just how were these transcripts produced?  Certainly not in "the ordinary course."  They were produced by a Russian spy agency, renowned world-wide for its fabrications of evidence,  as part of a swap of intelligence with the prosecutors in this case who traveled to Russia to get evidence for this case.

- What is it exactly that the transcripts purport to establish?  One of the FSB  reports refers to the intercept of a fax from an unknown Chechen operative relaying to someone from Al Haramain Saudi Arabia the details of a secret imminent military operation.  Not a very likely occurrence.  The purported recording just happens to be between the top two figures in the respective organizations -- the "legendary" Commander Khattab from the Chechen side and Mr. Aqeel from Al Haramain Saudi Arabia. How convenient. Yet slavish obedience to the record retention policies destroyed the evidence?  Not likely.

Col. Lang has previously provided this Court with extensive information

**Page 45 DEFENDANT'S SENTENCING MEMORANDUM**

regarding the inherent unreliability of the FSB as an organization.  CR 235-2.
His report also explains that Ignatchenko's explanation for the unavailability of
the tape is not credible.  Given a choice between crediting the former head of
Human Intelligence for our Defense Department or a Russian FSB agent, the
choice is obvious.

## VIII.  SPECIFIC OBJECTIONS TO PRESENTENCE REPORT.

### A.    Custody.

The statements and the rationale that Mr. Sedaghaty used his personal
beliefs to promote extreme acts of intimidation to the end is of the paragraph
based on opinion, not fact.

### B.    Factors To Be Considered In Sentencing.

We object to all of the checked boxes.

### C.    Recommended Conditions.

We object to conditions 1 through 4, 6, 9, 12, and 13.

### D.    Restitution.

There is no restitution due because there was no loss.  *See* above.

Paragraph 7.  Reference to the Embassy bombing in Kenya has no
relationship to Mr. Sedaghaty and should be stricken from the report.

Paragraph 8.  There is a significant omission from this paragraph.  Mr.
Sedaghaty was not designated by OFAC or the United Nations.

Paragraph 9.  There is no "organization" known as the "Chechen

Mujihadeen." At the time, the Chechen fighters were fighting a war of liberation, not engaging in terrorist activities. There is no evidence of smuggling. The money was not "transported to finance a violent jihad."

Paragraph 12. We are aware of no reports stating that Aqeel Al Aqeel delegated Mr. Al Buthe to establish a presence for AHIF in the United States.

Paragraph 15. The changes made in this paragraph from the draft report do not address significant issues. As argued above, in 1999-2000, Chechnya was experiencing a war between armies. Certainly that is what Mr. Sedaghaty knew. The details of the war are set out above. It remains a nationalist conflict. There is no evidence that the mujahideen fighting against the Russians with Khattab were primarily foreigners.

Paragraph 16. Testimony at the trial about the Kavkaz Institute was that it had a much broader purpose than reflected in the PSR. The websites were not all associated with groups known for terrorist activities.

Paragraph 17. The paragraph includes an incorrect chronological sequence. Dr. El Fiki contacted Al Haramain in early January, not February. This paragraph continues to omit the facts related to Mr. El Fiki's well-known, nonviolent, philanthropic work as reflected in Exhibit C to the objection letter. Attached as Exhibit 5.

Paragraph 20. The statement "the case agent determined" has no place in a presentence report. There is no factual basis for this statement. Nor is

**Page 47 DEFENDANT'S SENTENCING MEMORANDUM**

there a factual basis for the statement that inclusion of the $36,000 "was an intentional effort" to conceal the instant offense and "fabricate false documentation." This paragraph is, moreover, incomplete because it fails to reference the one piece of documentary evidence regarding the agreements between Mr. Al Buthe and Mr. Sedaghaty, the investigation report of Mr. Sui (attached to the objection letter as Exhibit D, attached hereto as Exhibit 3.

Paragraph 21. We are unaware of any evidence that Mr. Al Buthe "deposited the traveler's check into an account."

Paragraph 21(a). This is one of the most problematic paragraphs in the PSR. In it, the writer refers to defense proposed Exhibit 730, the unclassified summary of classified information. Exhibit 1. As discussed above, the presentence writer appears to accept at face value the government's opinion regarding the evidence and does not give any credit to the one piece of affirmative evidence that exists in this case regarding the manner in which the funds were used in Chechnya – the statement of Sami Al Sanad that they were used for humanitarian purposes. It is difficult to understand how the government can have it both ways. The paragraph ends with several sentences describing what "they understood." There is no factual basis for such statements. It is again inference, innuendo, and assumption.

Paragraph 21(b). This paragraph continues with the discussion of Mr. Al Sanad, noting that his "claim" "contradicts" Mr. Umar's "well publicized role . .

."  While Mr. Umar may have had a publicized role, it was multifaceted.  When the only direct evidence is that the money was used for proper humanitarian purposes, there is no legitimate basis on which to conclude that there is clear and convincing evidence that the El Fiki donation was used for a military purpose based on the asserted generalized nature of Umar's actions.

Paragraph 22.  There is no evidence that the El Fiki money was used to "fund daily operations of the mujihadeen" or for "terrorist acts."  Again, the government took a contrary position and its evidence shows Mr. Sedaghaty's knowledge and intent had nothing to do with terrorism.  The discussion of the January 2000 email on the subject of "what support" omits the fact that Mr. Sedaghaty only sent one of the two paragraphs in response to the question.  It further omits the fact that the only question that Mr. Sedaghaty forwarded to Mr. Al Buthe was the one discussing humanitarian needs.  He did not forward any of the other paragraphs related to warfare.  The last sentence is again a conclusion without any evidentiary basis.

Paragraph 22(a).  This statement ignores Col. Lang's analysis of the lack of reliability in any information derived from the Russians.  CR 235-2.  In particular, it ignores the fact that Col. Lang says that it is exceedingly unlikely that the Russian FSB would have a systematic program for destroying tapes of the nature described.  It is disturbing that the word of this patriot and presidential advisor is ignored in favor of a foreign agent.  Col. Lang has

**Page 49 DEFENDANT'S SENTENCING MEMORANDUM**

previously provided this Court with extensive information regarding the inherent unreliability of the FSB as an organization.  CR 235-2.

Paragraph 22(b).  This paragraph again ignores the fact that what was taking place in Chechnya in 2000 was a war and that soldiers in a war are privileged in their killing.

Paragraph 23.  There is no proof that any agreement or scheme was devised at all, let alone "after the El Fiki donation was smuggled to the Chechen mujihadeen."  Again, this is inconsistent with the government's statement throughout that it has no evidence of what happened to the money after Mr. Al Buthe took it out of the United States.

Paragraph 24.  There is no tax loss.  See above.

Paragraph 25.  This paragraph removed the "tipped off" language from the draft report and replaced it with "as a result of the investigation."  There continues to be no evidence as to why Mr. Sedaghaty left the United States. This is, again, entirely speculative.

Paragraph 26.  We object.  *See* above.

Paragraph 27.  We object.  *See* above.

Paragraph 28.  We object.  *See* above.

Paragraph 32.  We object.  *See* above.

Paragraph 33.  We object.  *See* above.

Paragraph 35.  We object.  *See* above.

Paragraph 36.  We object.  *See* above.

Paragraph 37.  We object.  *See* above.

Paragraph 39.  We object.  *See* above.

Paragraph 42.  We object.  *See* above.

Paragraph 63.  We object.  *See* above.

Paragraph 67.  We object.  *See* above.

Paragraph 72.  We object.  *See* above.

## IX.    A SENTENCE OF TIME SERVED WOULD SATISFY ALL OF THE SENTENCING FACTORS.

Under 18 U.S.C. § 3553, the primary consideration in sentencing is the rule of parsimony. Section 3553(a)'s parsimony principle directs the Court to fashion "a sentence sufficient, but not greater than necessary" to meet the sentencing objectives set forth in 3553(a)(2).  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *Gall v. United States*, 552 U.S. 38 (2007).

The law is also clear that an individual should be judged on the totality of his life, not the least of his acts.  *See, e.g., United States v. Carty*, 520 F.3d 984, 991-93 (9th Cir. 2008); *Kuhn v. United States*, 518 U.S. 81, 112 (1996) ("it has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case is a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.").  Both the rule of parsimony and the importance of judging a man on the totality of his life

**DEFENDANT'S SENTENCING MEMORANDUM**

have their roots deep in the Judeo/Christian tradition.

Guided by these principles, the six months time served is a reasonable sentencing satisfying all of the factors in 18 U.S.C. § 3553.

**EARLY LIFE AND FAMILY HISTORY**

Pete Sedaghaty grew up in a well-established family in Tehran. His grandparents were Muslim and ran a restaurant in Iran. His father rose through the army to become a Colonel under the Shah. After leaving the army in the mid to late 1960's, his father went into business, doing well for many years working for an American vegetable oil distribution company. Pete Sedaghaty's childhood was normal and happy.

He was not a scholar. In fact, he has dyslexia that has plagued his ability to study his entire life. He excelled, however, at activities involving hand/eye coordination, becoming a national motocross racing champion at age 17.

During the early 1970's, the family began to chafe under the rule of the Shah and Pete Sedaghaty's father arranged for the boys, one by one, to leave Iran. After the older boys settled in Oregon, Pete joined them in 1976. Pete's older brother, Bijan, had settled in Ashland. His brother, Bay, had settled in Eugene. His mother joined the boys several years later and ended up living with Pete in Ashland until she died in November 2002.

**Page 52 DEFENDANT'S SENTENCING MEMORANDUM**

**PETE SEDAGHATY'S LIFE IN ASHLAND**

Pete Sedaghaty's early years in the United States were described at trial by his good friend, David Rodgers (Tr. September 7, 2010 at 91-97), and by the Associate Minister at the Medford United Methodist Church, Rev. Caren Caldwell.

Rev. Caldwell testified:

> I came to know him in the mid '80s soon after I arrived in Ashland. And he was a college student then, and came to our church to ask to rent some space for a Friday evening prayer group.
>
> *    *    *
>
> [Pete Seda] was familiar as the tree person. He used to drive a great big tree truck through town on the Fourth of July, and that was his business. And he was also familiar in the peace community in Ashland. We had, you know, a number of events, interfaith events and peace events, and he would be on panels or speaker (sic) or offer some kind of, you know, offering in the services and the panels.
>
> *    *    *
>
> [Pete Seda] participated in interfaith services. We have Thanksgiving services every year that are inter-faith in nature in Ashland. We've had some, you know, special services, particularly at the time of the murders of two women, when the whole community kind of turned out, out of concern.

Tr. September 3, 2010 at 155-57.

Pete Sedaghaty took some classes at what was then Southern Oregon College and did a fair amount of exploring of lifestyles and spirituality. He was always a hard worker. As Mr. Rodgers described, he became a leader of a

group of men in the Ashland area who worked in the forests, eventually getting

contracts with the United States Forest Service, falling in love with the tree

business, learning civil culture and by the late 1980's, establishing his own

business, The Arborist.  *See e.g.*, TR, September 7, 2010 at 92.  *See* Def.

Exhibit 608, 609, 937, 946.

Early in his life, Pete Sedaghaty married and divorced a couple of times.

Then, in approximately 1981, Pete Sedaghaty had a significant relationship

with Dana Ann Smith, the mother of his two children, Jonah and Joseph.

They ultimately separated in the late 1980's.  Pete Sedaghaty fought for and

was granted custody of his two young sons.  At the end of 1993, Pete

Sedaghaty married Laleh Zahedi.  They divorced in 2000.  He has been married

to Summer Rife since 2005.

**PETE SEDAGHATY IS A COMMUNITY LEADER**

Pete Sedaghaty has been active in public life in Oregon almost since his

arrival.  When the Iran hostage crisis occurred in 1979, Pete Sedaghaty, as one

of the few Iranians in Southern Oregon and a person who has never been

afraid to speak out on the issues, took up the mantel of explaining what he

could about the situation and how wrong he believed the actions of the hostage

takers were.

As described by David Rodgers and Rev. Caldwell at the trial, Pete

Sedaghaty became the center of the small Islamic community in Southern

**Page 54 DEFENDANT'S SENTENCING MEMORANDUM**

Oregon, opening his home to worshipers of all varieties of Islam. *See e.g.*, TR, September 7, 2010 at 100-01.

A number of witnesses at trial explained that Islam is as diverse a religion as Christianity and Judaism in terms of the spectrum of practice from liberal reform to conservative fundamental. Pete Sedaghaty has always been a person who believes in openness and tolerance and from the outset opened his home to and accepted all varieties of practice of Islam. He helped the community by locating space to rent from Southern Oregon College and Minister Caren Caldwell. He later opened his home which became the center of worship in the 1990's and eventually obtained the funding from Al Haramain Saudi Arabia that led to the purchase and creation of the prayer house on Highway 99. *See* Def. Exhibit 612.

Pete Sedaghaty continued to be a spokesperson for moderate Islam throughout his time in Ashland. Whenever something involving Islam or the Middle East was in the news, Pete Sedaghaty was sought out for comment. Ashland Rabbi David Zaslow, an interfaith colleague of Pete Sedaghaty, expressed his general view of Pete Sedaghaty's work in the community in a letter to Judge Coffin that was introduced at the release hearing:

> From the time I was ordained until several years after September 11, 2001 Pete Seda was my peace partner in bringing a bit of hope to both the Jewish and Muslim communities of southern Oregon. He spoke passionately against violence, Islamic terrorism, and for reconciliation with the Jewish community. He took some personal risk not only to associate himself with the

**Page 55 DEFENDANT'S SENTENCING MEMORANDUM**

Jewish community here, but to proclaim a very positive, public
view about Israel.

Rabbi Zaslow also testified at trial:

I would say in a small city in the size of Ashland, approximately
20,000 people, Pete Seda . . . certainly was the go-to person when
people had questions about Islam.

So - - and any kind of event that would occur, a negative event, a
terrorist attack, or whether it was a positive thing like some kind of
peace ideal of people coming together, Pete Seda was the go-to
person.

So he was often in the newspapers, you know, representing a
moderate, balanced, healthy American positions about how people
should live pluralistically.

\*   \*   \*

[Pete Seda] was ecumenical in the sense of pluralism and really
promoting the pluralistic ideal of the United States or what I
believe in as well.

TR, September 3, 2010 at 35-36.

In addition to his public persona regarding Islam and the Middle East,

Pete Sedaghaty became a fixture in the Ashland community for involvement in

civic affairs, particularly when it involved trees or other environmental issues.

*See* Def. Exs. 925-929, 931.  He as there when the community needed him

doing good works.  *See e.g.*,  TR, September 3, 2010 at 37 (Rabbi Zaslow);

Exhibit 6. *See also,* Def. Exhibit 934, 936, 939.  In addition to those who

testified, many community members provided information regarding Mr.

Sedaghaty's good works and community involvement.  Investigation reports of

persons who did not testify are attached here as Exhibit 7.

One of the clips on a video that will be shown at the sentencing hearing shows Pete Sedaghaty driving one of his Arborist trucks around town when the city of Ashland lost its water supply in 1996.  At his own expense, he purchase a 600 gallon water tank and drove around town delivering thousands of gallons of water to people in need.  Another of the clips on the video is of Pete Sedaghaty helping clean up Ashland after a devastating storm.  Another is of Pete Sedaghaty volunteering his time working in the forests cleaning up.  Those actions are the measure of the man.

In addition to his direct volunteer and charitable work in the community, Pete Sedaghaty took his lighter side into such things as the annual Fourth of July Ashland parade.  His large Arborist truck became a fixture in the parade as did his camel, Mandub.  *See* Def. Exhibit 610, 968

As described by Rabbi Zaslow and Minister Caldwell, Pete Sedaghaty was also a prominent and outspoken person for tolerance and interfaith activity in the Ashland religious and peace communities.

Rev. Caldwell testified:

[She invited Pete Seda to speak at her church on] at least two occasions.  He came early on after I first met him, and I asked him to do what we call a mission moment in the Sunday service talking about his faith.  And then a few years later, several years later, I asked him to come again when our adults were doing a study of world religions.  So he came for two Sundays in a row to talk about Islam and share with an hour-long class.

**Page 57 DEFENDANT'S SENTENCING MEMORANDUM**

*   *   *

[Pete Seda shared] the basics, this is what people of the Muslim faith believe, the five principles, or I don't always have the right lingo.  And then he had, you know, a number of questions that people would ask, something about, you know, well, what's women's role in Islam?  And he would just, you know, be glad to talk about any of that.  How they though about, you know, jihad, or what a spiritual life - - a spiritual obligation was for a Muslim.

*   *   *

[Pete Seda] was the go-to person what whenever we wanted to have that kind of an event to build bridges across, you know, differences in the community, he was the one we went to to talk about Islam.

TR, September 3, 2010, at 158- 59.  *See* Def. Exs. 611, 956, 957(A), 967, 968, 970, 971, 976, 977, 978.

Rabbi Zaslow testified:

[He and Pete Seda would] go to the mosque or go to [Pete Seda's] house and have a cup of tea and just talk about political issues, things we disagreed or agreed about.

But certainly I remember one Sunday morning, we have a Hebrew school, and we brought our kids [to the tent].   He had a camel, and it was sort of a - - kind of a famous mosque because it was a tent and he had a camel there.  And so we brought our kids there to learn about Islam.  And he had a guest speaker, I can't remember the fellow's name, who talked about Islam to our kids so they would learn and have a direct experience with another religion rather than just reading about it in a book.

TR, September 3, 2010 at 33-34.

Rabbi Zaslow also testified about conversations that he had with Pete

Sedaghaty about their different religions.

We talked about our differences, our commonalities.  The

**Page 58 DEFENDANT'S SENTENCING MEMORANDUM**

> differences between Judaism and Islam, what we had in common.
> I remember one time, there was a tree in my backyard that broke.
> And one tree fell down. [Pete Seda] came to my yard as an arborist.
> And he said this is like the Jewish and Muslim people.  We're really
> one tree and it shouldn't have broken.  So we would talk
> anecdotally on a personal level like that.

TR, September 3, 2010 at 34.  While condemning the anti-Semitic literature of

Al Haramain, Rabbi Zaslow spoke eloquently of Pete Sedaghaty's tolerance.

## CONCLUSION

Pete Sedaghaty has been a respected community leader and a strong

force for peace and inter-faith harmony in Ashland since the 1990s.  Even at

his own personal peril, Mr. Sedaghaty has repeatedly spoken out against

terrorism and the forces of evil.  The events at issue here occurred in 2000 and

2001, when few people, not even leaders in the United States Senate and State

Department, appreciated the complex geopolitical factors relied upon by the

government at trial and at sentencing.  For the reasons stated herein, it is not

necessary under 18 U.S.C. § 3553(a) that this Court impose a prison sentence.

This Court should impose a sentence of six months, with credit for time served.

Respectfully submitted this 18th day of November, 2010.

/s/ Steven T. Wax
Steven T. Wax
Federal Public Defender

/s/ Lawrence H. Matasar
Lawrence H. Matasar

Bernard J. Casey
On the Memorandum

Page 59  **DEFENDANT'S SENTENCING MEMORANDUM**