# EXHIBIT  1



**U.S. Department of Justice**

*Karin J. Immergut*
*United States Attorney*
*District of Oregon*
*1000 SW Third Avenue, Suite 600*   *(503) 727-1000*
*Portland, OR 97204-2902*    *Fax: (503) 727-1117*
*E-Mail: Charles.Gorder@usdoj.gov*

RECEIVED MAR 2 0 2009

March 25, 2009

RECEIVED MAR 2 6 2009

Steven T. Wax
Federal Public Defender
101 SW Main Street, Suite 1700
Portland, OR 97204

     Re:    United States v. Sedaghaty
            CR 05-60008-HO

Dear Mr. Wax:

Pursuant to Judge Hogan's orders of March 18, 2009, filed on March 20, 2009 (Docket # 160), this letter will inform you of the following unclassified summary of certain classified documents responsive to your discovery requests:

> The U.S. Government obtained information that Sami 'Abd Al 'Aziz Al-Sanad worked during 2000 and 2001 for the Al-Haramain organization and was responsible for providing currency supplied by Al-Haramain, including the currency obtained by codefendant Soliman Al-Buthe from Al-Haramain USA, to a representative of Muhammad Al-Sayf, aka Abu 'Umar, to be smuggled into Chechnya. Al-Sanad has claimed that the monies he provided to Al-Sayf's representative were destined for needy Chechen families.

                Very truly yours,

                KARIN J. IMMERGUT
                United States Attorney

                CHARLES F. GORDER, JR.
                Assistant United States Attorney
                Anti-Terrorism Coordinator
                District of Oregon

cc:    Lawrence Matasar, Esq.
       AUSA Chris Cardani



DEFENDANT'S
EXHIBIT
730

# EXHIBIT  2



Caplin & Drysdale, Chartered
One Thomas Circle, NW, Suite 1100
Washington, DC 20005
202-862-5000  202-429-3301 Fax
www.caplindrysdale.com

202-862-5020 Direct
mso@capdale.com

November 15, 2010

Mr. Steven T. Wax
Federal Public Defender
101 S.W. Main Street
Suite 1700
Portland, OR 97204

**RE:** **The Government's Proposed Application of 26 U.S.C. § 4958 to Assert a Tax Loss in *United States v. Pirouz Sedaghaty* (No. CR-05-60008-HO)**

Dear Mr. Wax,

I have reviewed the October 8, 2010 IRS Form 4549-A ("Income Tax Discrepancy Adjustments") and accompanying narrative setting forth the basis for the Government's claimed tax loss of $80,980, plus penalties and interest of $104,003.48, in the above-captioned case. The Government's proposed adjustments arise from its conclusion that the misreporting of a $151,000 donation allegedly made to the al-Haramain Islamic Foundation ("al-Haramain-USA")—a United States public charity—and subsequently transferred overseas in the form of (a) $130,000 in travelers' checks and (b) a $21,000 cashier's check, caused two "excess benefit transactions" within the meaning of section 4958 of the Internal Revenue Code.[1]

This letter provides my opinion that the excise tax on excess benefit transactions is inapplicable to the facts and circumstances of the underlying offense for which Mr. Sedaghaty was convicted and, accordingly, does not provide a basis for the Government to assert a monetary loss against Mr. Sedaghaty in this case. After discussing the Government's position at trial and during sentencing in Part I of this letter, Part II describes the purpose and mechanics of the "intermediate sanctions" excise tax on "excess benefit transactions" imposed by section 4958. Part III addresses the alleged reporting errors upon which Mr. Sedaghaty's conviction was based, and explains why these errors—individually and cumulatively—do not provide evidence of an

---

[1] Unless otherwise stated, all "section" references are to the Internal Revenue Code of 1986, as amended (the "Code") and all regulatory references are to the Treasury Regulations in effect under the Code in (the "Regulations" or "Treas. Reg.") in 2000, when the alleged transactions occurred.

Caplin & Drysdale
C H A R T E R E D

-2-

excess benefit transaction. Part IV discusses the factual circumstances underlying the offenses for which Mr. Sedaghaty was convicted and explains why they, too, could not give rise to an excess benefit transaction. Finally, Part V concludes that the tax loss suffered by the Government as a result of Mr. Sedaghaty's involvement in the alleged misreporting is at most $2,100 and, more likely, zero.

The opinions in this letter are based on my knowledge of the federal tax laws applicable to tax-exempt organizations, gained during 35 years of practice in this area; my experience serving for 25 years in the Exempt Organizations Division of the Internal Revenue Service—including ten years as Director of the Division during the period when section 4958 was enacted. In preparing this opinion, I have reviewed and relied on the trial and sentencing materials and other documents cited herein, as well relevant guidance including, but not limited to, the Code and Regulations, judicial decisions, and official IRS publications including, but not limited to, revenue rulings, general counsel memoranda, private letter rulings, and the Internal Revenue Manual.

## I.    The Government's Evolving View of the Underlying Transaction.

The Government's position regarding the mechanics of the underlying transaction—and, more significantly, its beneficiaries—appears to have shifted during the course of the prosecution and subsequent sentencing phase of this case.

### A.    *Position at Trial: "Diversion" of $151,000 in Charitable Funds to Soliman Al-Buthe and, Ultimately, Chechnan Mujahideen.*

In its indictment and at trial, the Government alleged that al-Haramain-USA's Saudi Arabian affiliate ("Al-Haramain-Riyadh") issued a call for donations to support the mujahideen in Chechnya.[2] In response, an Egyptian named Mahmoud El-Feki "decided to wire [a] $150,000 [contribution] to al-Haramain-USA for Chechnya."[3] Once received by al-Haramin-USA, this contribution (the "El-Feki contribution") was converted to $130,000 in travelers' checks and a $21,000 cashier's check payable to Soliman Al-Buthe, an officer of both al-Haramain-USA and al-Haramain-Riyadh. Contending that "Mr. Sedaghaty, on behalf of the al-Haramain[-USA] organization, conspired with [Mr. Al-Buthe and] others to secretly smuggle this money out of the country without the government, the U.S. government, being able to find out about it,"[4] the Government alleged that Mr. Al-Buthe "transported [the funds] out of the United States," cashed

---

[2] *See, e.g.*, Transcript of Government's Opening Statement at 11 ("So al-Haramain, we will show you, is promoting the cause of the mujahideen in Chechnya. Now, that word, mujahideen and jihad, will be explained to you later on. But they were interested in raising money for Chechnya, al-Haramain was.").

[3] *Id.* at 12.

[4] Transcript of Government's Opening Statement at 6; *id.* at 43 (same).

the travelers' checks at Al Rajhi Banking and Investment in Saudi Arabia and deposited the cashier's check into Mr. Al-Buthe's account at the same bank.[5]

Ultimately, according to the Government, the $130,000 in cashed travelers' checks was used "to help fund acts of violence in the mujahideen in Chechnya."[6] Indeed, the Sentencing Recommendation makes it clear that "**the basis for the application of the terrorism enhancement, under Guideline § 3A.1.4,** is the financial assistance Mr. Sedaghaty and Mr. Al-Buthe provided to the mujahideen in Chechnya in 2000, on behalf of [al-Haramain-USA], to intentionally and knowingly support terrorist activities."[7]

Thus, at trial and in its Sentencing Recommendation the Government describes a transaction wherein: (a) with Mr. Sedaghaty's assistance, $150,000 in charitable funds belonging to al-Haramain-USA was transferred to Mr. Al-Buthe; (b) Mr. Al-Buthe secretly transported the funds overseas; (c) Mr. Al-Buthe deposited a cashier's check representing $21,000 of the diverted funds in his personal bank account; and (d) Mr. Al-Buthe funneled $130,000 of the diverted funds to the mujahideen in Chechnya, to fund acts of violence. In its opening statement at trial, the Government explained that it was offering evidence of "this whole Chechnya, jihad, mujahideen stuff . . . to show [the jury] that the defendant had a motive to conceal his transaction from the government" by misreporting the El-Feki contribution on al-Haramain-USA's IRS Form 990—the crime for which Mr. Sedaghaty was convicted.[8] Echoing this analysis, the draft Sentencing Recommendation plainly states:

> The basis for Counts 1 and 2 is a conspiracy between Mr. Al-Buthe and Mr. Sedaghaty to defraud the United States Internal Revenue Service (IRS), by smuggling a $150,000 donation [al-Haramain-USA] received from an Egyptian citizen to fund a terrorism organization named Chechen Mujahideen in Chechnya.[9]"

**B.**    ***Position in the Form 4549-A: Diversion of $150,000 in Charitable Funds Conferred an Excess Benefit on Mr. Sedaghaty, in Violation of Section 4958.***

In the Form 4549-A, the Government asserts a different position regarding the underlying transaction. Instead of alleging that the $150,000 El-Feki contribution was diverted to Mr. Al-Buthe for his benefit or for the benefit of the mujahideen in Chechnya—the position taken at

---

[5] *See* Government's Submission of Redacted Indictment in *United States v. Sedaghaty*, No. CR 05-60008-HO, § II, ¶¶ J–M, O. In fact, Count 3 of the Indictment charges Mr. Al-Buthe with failure to file a Report of International Transportation of Currency or Monetary Instruments, in violation of 31 U.S.C. § 5316(a)(1)(A), when he "knowingly transported . . . $130,000 in travelers checks from Oregon to New York to Saudi Arabia."

[6] *See* Transcript of Government's Opening Statement at 27.

[7] Draft Sentencing Recommendation at 7, ¶ 22 (emphasis in original).

[8] Transcript of Government's Opening Statement at 27.

[9] Draft Sentencing Recommendation at 3, ¶ 9.



-4-

trial—the Government argues that Mr. Sedaghaty personally "misappropriated" $151,000 in charitable funds belonging to al-Haramain-USA, and this "caused" an excess benefit transaction.[10] Based on this new theory, the Government asserts that:

- $21,000 in "embezzled funds" and $130,000 in "funds intended for distribution" constitute personal income to Mr. Sedaghaty, requiring a $151,000 income adjustment to his 2000 Form 1040 and subjecting him to an additional $33,230 in personal income tax;

- Mr. Sedaghaty received an inappropriate economic benefit—or "excess benefit"—from al-Haramain-USA, valued at $151,000, and is liable for the 25 percent excise tax ($47,750) imposed by section 4958 on any director, officers, or other "disqualified person" of a charity who benefits from an "excess benefit transaction" with the charity; and

- Mr. Sedaghaty is also liable for a $10,000 excise tax imposed on any officer, director or other "organization manager" who knowingly participates in an excess benefit transaction.

Thus, the Government's allegation that it suffered a **"criminal tax loss of $89,980"**[11] is premised on its conclusion that Mr. Sedaghaty received $151,000 from al-Haramain and that this diversion of charitable funds constitutes an excess benefit transaction between Mr. Sedaghaty and al-Haramain-USA. This conclusion is incorrect as a matter of law. As I explain in the analysis that follows, the evidence produced at trial—and, indeed, the Government's arguments at trial, which necessarily formed the basis of the jury's decision to convict—clearly demonstrate that there was no "excess benefit transaction" involving Mr. Sedaghaty and al-Haramain-USA within the meaning of section 4958 of the Code.

## II.    "Intermediate Sanctions" Under Section 4958.

To ensure that individuals do not take advantage of the charities they control, federal tax law requires close scrutiny of any transactions, contracts, or compensation arrangements involving a charity and its officers, directors, or other "insiders." Sometimes, these arrangements are so egregious that they clearly violate the requirement of section 501(c)(3) that the "no part of the [organization's] net earnings . . . inures to the benefit of any private shareholder or individual." In such cases, the IRS may revoke the organization's exemption, typically retroactive to the year in which the acts occurred.

Indeed, until 1996, revocation was the sole enforcement tool available to the IRS when it discovered that a person had abused a public charity by using his influence to extract unwarranted benefits for himself or his family.[12] Revocation often provided an imperfect remedy for such abuses because it was either disproportionate to the underlying offense or it punished the wrong

---

[10] *See* narrative explanation of tax loss accompanying the Government's Form 4549-A.

[11] Draft Sentencing Recommendation at 7, ¶ 24 (emphasis in original).

[12] *See Taxpayer Bill of Rights 2*, H.R. Rep. 104-506, 104th Cong., 2d Sess., at 54 (March 28, 1996).

Caplin & Drysdale
C H A R T E R E D

-5-

party—that is, it threatened the existence of the public charity and its ability to perform needed services for its community while allowing those who had abused the charity to retain the benefits of their misconduct.[13]

The absence of any sanctions short of revocation for public charity violations of the private inurement and private benefit rules created serious enforcement problems for the IRS.[14] To address this gap in the tax law, Congress enacted section 4958 of the Code, which imposes "intermediate sanctions" as an alternative to the harsh penalty of revocation for enforcing the prohibition against private inurement. Under section 4958, insiders (referred to in the statute as "disqualified persons") who personally profit from "excess benefit transactions" bear the cost of tiered penalty excise taxes. Additionally, managers of the organization—*i.e.*, its officers and directors—who knowingly and willfully approve excess benefit transactions, may also incur financial penalties. However, the charity itself is not liable for an excise tax under this regime.

A.    *"Excess Benefit" Transactions.*

An "excess benefit transaction" is any transaction in which an "economic benefit" is provided directly or indirectly to or for the use of any disqualified person, and the value of the economic benefit provided exceeds the value of the consideration (including the performance of services) received by the charity in exchange.[15] Examples of excess benefit transactions that trigger intermediate sanctions penalty taxes would include:

- the charity's purchase of property from a disqualified person for more than the property's fair market value;

- the charity's sale of property to a disqualified person for less than the property's fair market value;

- the charity's payment of more than market rate to an independent contractor for services; and

- the charity's payment of more than "reasonable"[16] compensation, including gratuitous transfers, to a disqualified person.

---

[13] *See Federal Tax Laws Applicable to the Activities of Tax-Exempt Charitable Organizations*: Hearings Before the Subcomm. on Oversight of the House Comm. on Ways & Means, 103rd Cong. (1993) (statement of Margaret Richardson, Commissioner of Internal Revenue) (discussing the need for intermediate sanctions, short of revocation, for violations of the prohibition against inurement in section 501(c)(3)).

[14] *See id.*

[15] *See* Treas. Reg. § 53.4958-4(a)(1).

[16] The Regulations under section 4958 define "reasonable compensation" as the "amount that would ordinarily be paid for like services (whether taxable or tax-exempt) by like enterprise under like circumstances." Treas. Reg. § 53.4958-4(b)(1)(ii); *see also* Treas. Reg § 1.162-7 (b)(3) (same).

Caplin&Drysdale
C H A R T E R E D                                          -6-

The Regulations provide that an excess benefit may be provided directly by the applicable tax-exempt organization, or indirectly through (a) an entity "controlled" (more than 50-percent owned) by the applicable tax-exempt organization, such as a taxable subsidiary, or (b) an intermediary where there is an agreement or understanding that the intermediary will provide economic benefits to or for the use of the disqualified person, or the intermediary provides benefits to a disqualified person without any business or exempt purpose in doing so.[17]

### B.    Parties to an Excess Benefit Transaction.

As the foregoing description suggests, the intermediate sanctions regime applies only to transactions between "applicable tax-exempt organizations" and "disqualified persons." An "applicable tax-exempt organization" is an organization that:

- is currently described in section 501(c)(3) or 501(c)(4) of the Code and exempt from federal tax under section 501(a) of the Code, without regard to the excess benefit transaction,[18] or

- was described in these provisions at any time during the five-year period ending on the date of the transaction.[19]

For purposes of section 4958, an organization will be treated as described in section 501(c)(3) and exempt under section 501(a) only if the IRS is permitted to treat the organization as such under the rules of section 508.[20] Section 508 applies only to organizations that:

- have received a written determination from the IRS that they are described in section 501(c)(3);[21]

- are churches, integrated auxiliaries of churches, or conventions or associations of churches;[22] or

- are not private foundations and have annual gross receipts that are normally less than $5,000.[23]

---

[17] Treas. Reg. § 53.4958-4(a)(2)(iii).

[18] Because the excess benefit transaction would constitute inurement in violation of the requirements of section 501(c)(3) and section 501(c)(4), if taken into account, it would necessarily affect whether the organization was described in section 501(c)(3) or 501(c)(4).

[19] Section 4958(e); Treas. Reg. § 53.4958-2(a)(1).

[20] *See* Treas. Reg. § 53.4958-2(a)(3).

[21] Section 508(a)(1).

[22] Section 508(c)(1)(A). The definition of the term "church" is a term of art and includes all houses of worship, regardless of their religious affiliation.

[23] Section 508(c)(1)(B).



-7-

Thus, for example, when the financial transfers at issue occurred in 2000, al-Haramain-USA would have been considered an applicable tax-exempt organization for purposes of section 4958. However, al-Haramain-Riyadh would not have been considered an applicable tax-exempt organization because the IRS never recognized its exempt status and it was not exempt by operation of U.S. law.

For purposes of the section 4958 penalty tax regime, a "disqualified person" is any person who was in a position to exercise "substantial influence" over the affairs of the applicable tax-exempt organization at any time during the five-year period ending on the date of the transaction.[24]  Certain persons are deemed *per se* "disqualified persons" by virtue of their official powers or responsibilities or the interests they hold.  Thus, for example, voting members of an organization's governing body (*e.g.*, officers and directors like Messrs. Sedaghaty and Al-Buthe) are considered *per se* disqualified persons, as are the persons functioning as the charity's chief executive officer, chief operating officer or chief financial officer.[25]  Others are "disqualified persons" by virtue of a familial relationship to a disqualified person (*e.g.*, a spouse, parent, child or sibling).[26]  For other cases, whether a person has the requisite potential to exercise substantial influence is determined using a facts and circumstances analysis.[27]  For purposes of section 4958, the term "disqualified person" also includes any entity that is more than "35 percent controlled" by a disqualified person.[28]

### C.     *Enforcement: Penalty Taxes and Required Disclosure to the IRS.*

The penalties imposed under section 4958 can be substantial.  Any disqualified person is liable for a tax of 25 percent of the excess benefit he receives from each excess benefit transaction.[29]  If more than one disqualified person benefits from a particular transaction, all such persons are jointly and severally liable for the tax.[30]

In addition to the tax imposed on disqualified persons, section 4958 may also penalize managers of the organization—*e.g.*, its officers, directors, and trustees.  Specifically, if the IRS concludes that there has been an excess benefit transaction between an applicable tax-exempt organization and a disqualified person, organizational managers who participated in the transaction knowingly, willfully and without reasonable cause may be held jointly and severally

---

[24] Section 4958(f)(1)(A); Treas. Reg. § 53.4958-3(a).

[25] Treas. Reg. § 53.4958-3(c).

[26] Treas. Reg. § 53.4958-3(b)(1).

[27] Treas. Reg. § 53.4958-3(e).

[28] *See* section 4958(f)(3).

[29] Section 4958(a)(1); Treas. Reg. § 53.4958-1(c)(1).

[30] Section 4958(d)(1); Treas. Reg. § 53.4958-1(c)(1).

Caplin&Drysdale
C H A R T E R E D

-8-

liable for a tax of 10 percent of the excess benefit.[31] In 2000, this "managers' tax" was subject to a cap of $10,000 per transaction.[32]

Charities must also disclose excess benefit transactions and the disqualified person(s) involved on their annual information returns (IRS Form 990). In 2000, this disclosure was made on Part VI, line 89b, which asks:

> Did the organization engage in any section 4958 excess benefit transaction during the year or did it become aware of an excess benefit transaction from a prior year? If 'Yes,' attach a statement explaining each transaction.

On its 2000 IRS Form 990, al-Haramain-USA responded "No" to this question. Count 2 of the Government's case ("False Return By Exempt Organization") alleges that al-Haramain-USA's 2000 information return contained several material errors. However, the Government did not challenge the accuracy of the organization's response on line 89b in its indictment or, to my knowledge, at trial. Furthermore, the sentencing materials I have reviewed do not challenge this specific response either.

## III.    None of the Alleged Reporting Errors That Formed the Basis of Mr. Sedaghaty's Conviction Constitutes Evidence of an Excess Benefit Transaction.

At trial, the jury convicted Mr. Sedaghaty of Counts 1 and 2 of a three-count indictment. Count 2 charges Mr. Sedaghaty with subscribing to an IRS Form 990, under penalties of perjury, that he believed was not true and correct as to every material matter, in violation of section 7601(1) of the Code. Specifically, the Government alleges that al-Haramain-USA's 2000 Form 990 contained three "material" errors:

- it understated "contributions, grants, and similar amounts received" by failing to report the El-Feki contribution on line 1;

- it understated "grants and allocations" paid by failing to report the $130,000 and $21,000 transfers of the El-Feki contribution on line 22; and

- it overstated the basis of a building in Springfield, Missouri on line 57a.

Because there were no specific findings from the jury as to the nature of the underlying transaction and on the question of the materiality of the 990 items, I can only speculate as to the basis for the jury's decision to convict Mr. Sedaghaty of Count 2—*i.e.*, whether it concluded that al-Haramain-USA's 2000 Form 990 contained one, two, or three misstated items. Even if, however, the jury ultimately determined that the contribution and subsequent distribution of the El-Feki contribution were properly reportable on lines 1 and 22 and that the alleged misstatement

---

[31] Section 4958(a)(2), (d)(1)-(2); Treas. Reg. § 53.4958-1(d).

[32] Section 4958(d)(2) of the Code as in effect prior to August 17, 2006.

-9-

on Line 57(a) was material, these errors would not result in—and, as a matter of law, are wholly unrelated to—any tax imposed by section 4958.

Section 4958 does not operate as an additional sanction when charitable assets are diverted to noncharitable purposes—for example, if funds contributed to al-Haramain-USA had used to purchase weapons or fund acts of violence. Rather, the sole remedy for the noncharitable use of charitable funds is revocation of the charity's exempt status. Nor does section 4958 operate as an additional sanction for misreporting items on a Form 990 generally. Penalties for such inaccurate returns are found in section 6652 of the Code and are "paid by the exempt organization," not its officers or directors.[33] Further, a prerequisite for the application of section 4958 is that a disqualified person *personally receive* an inappropriate financial benefit as a result of a transaction, such that the earnings of the organization inure to the benefit of an insider. In the absence of any such benefit—which is precisely the case with regard to [each] alleged misreported item—section 4958 is, quite simply, facially inapplicable.

### A.   *The Reporting on Line 1 of al-Haramain-USA's Form 990 Does Not Provide Evidence of an Excess Benefit Transaction.*

Line 1 of the Form 990, for instance, calls for the organization to report the contributions that it received during the year in question. The mere receipt of a contribution by a charity cannot constitute an excess benefit transaction taxable by section 4958 because, by definition, the value of a contribution flows to the charity, rather than to a disqualified person. I do not see any credible argument that Mr. Sedaghaty or any other disqualified person received a financial benefit as a result of Mr. El-Feki's contribution to al-Haramain-USA—the funds were transferred from Mr. El-Feki directly to the charity's bank account.

### B.   *The Reporting on Line 22 of al-Haramain-USA's Form 990 Does Not Provide Evidence of an Excess Benefit Transaction.*

Likewise, section 4958 is inapplicable to any error that may have occurred on Line 22 of al-Haramain-USA's Form 990. The Government's position at trial was that Mr. Al-Buthe took control of the funds from al-Haramain-USA and personally carried those funds to Saudi Arabia in contravention of U.S. law. Specifically, the Government asserted that at least $130,000 went to al-Haramain-Riyadh to benefit the mujahideen in Chechnya. Until the sentencing phase of this case, the Government never alleged that these funds personally benefited Mr. Sedaghaty or any other disqualified person in any way. Thus, with respect to these funds, there is simply no legal basis to conclude that the failure to include this transfer on Line 22 is evidence of an excess benefit transaction.

While the disposition of the remaining $21,000 is unclear, the Government's case at trial never alleged that this money benefited Mr. Sedaghaty. Even if Mr. Al Buthe embezzled that

---

[33] *See* section 6652(c).



-10-

money and al-Haramain-Riyadh never received it, Mr. Al Buthe—not Mr. Sedaghaty—would be the beneficiary of such a transaction. As I understand its position, the Government is asserting that Mr. Sedaghaty, as a manager of al-Haramain-USA, approved the transaction and is liable for the "managers' tax" of 10% (*i.e.*, $2,100) on this transaction. I believe that the Government's interpretation suffers from three logical fallacies.

First, al-Haramain-USA never received these funds as income for tax purposes and, thus, they should not have been reported on Line 22. This point is explained in detail in Part IV below.

Second, the Government has not conclusively established that Mr. Al Buthe did not, in fact, expend this money for charitable purposes. I understand that the Government has presented evidence that the $21,000 was deposited in a bank account in his name. However, I also understand that there is some controversy whether those amounts remained in this account or were transferred to al-Haramain-Riyadh, presumably to advance the intended charitable purposes of the El-Feki contribution. Moreover, to my knowledge the Government has neither assessed the section 4958 excise tax against Mr. Al Buthe, nor initiated an examination under section 4958. A prerequisite for the imposition of the "managers' tax" is a determination that an excess benefit transaction occurred in the first place. In my considerable experience with section 4958 since the statute's enactment, I have never encountered a situation in which the IRS imposed the "managers' tax" liability without also penalizing the disqualified person who benefited from the transaction.[34]

Third, Mr. Sedaghaty does not appear to have knowingly, willfully and without reasonable cause approved this transaction. It is my understanding that the sole evidence advanced by the Government that Mr. Sedaghaty approved the transaction knowingly, willfully and without reasonable cause is the fact that he signed the check used to purchase the cashier's check. In my experience, merely signing a check is insufficient evidence for the Government to impose the "managers' tax" under section 4958. Instead, the Government must establish that the manager knew and intended for the funds to be transferred as part of an excess benefit transaction. Based on the evidence I have reviewed, the Government has not met this standard. The emails submitted at trial demonstrate that Mr. Sedaghaty was informed the he should arrange for the transfer of the funds to al-Haramain-Riyadh to benefit the "Muslim brothers."[35] To the best of my knowledge, the Government has not presented any evidence that Mr. Sedaghaty intended to do anything other than effectuate that transfer.

---

[34] The Internal Revenue Manual, section 7.27.30.1.7, makes it clear that assertion of the excess benefit excise tax is a prerequisite to the assertion of the organization manager tax.

[35] *See, e.g.*, Feb. 20, 2000 email from al-Haramain-Riyadh to Mr. Sedaghaty; *accord* March 11, 2000 Agreement between Messrs. Sedaghaty and al-Buhte, remitting the El-Feki donation.

Caplin & Drysdale
C H A R T E R E D

-11-

C.    *The Reporting on Line 57(a) of al-Haramain-USA's Form 990 Does Not Provide Evidence of an Excess Benefit Transaction.*

Similarly, an error on Line 57(a), relating to the basis of the charity's property, is in no way related to an excess benefit transaction in this case. The Government has alleged that al-Haramain-USA misreported the basis on a building it purchased in Springfield, Missouri. The allegation, however, is simply that al-Haramain-USA did not accurately report the purchase price of the building to the IRS. The organization did not purchase the building from Mr. Sedaghaty or from any other disqualified person, and no disqualified person received any economic benefit from this transaction. Again, there is simply no basis in law to apply section 4958 to a line 57a reporting error.

D.    *The Government Did Not Challenge al-Haramain-USA's Reporting on 89(b).*

Finally, as noted above, the IRS Form 990 specifically requests information regarding whether a charity has engaged in a transaction subject to section 4958 on Line 89(b). Because al-Haramain-USA did not believe that it engaged in such a transaction in 2000, it responded to this question in the negative. While the Government challenged the accuracy of al-Haramain-USA's responses to several questions on its 2000 Form 990, the Government did not challenge in its indictment or, to my knowledge, at trial, the organization's response on Line 89b.

E.    *No Possible Combination of Errors on Lines 1, 22 and 57(a) of al-Haramain-USA's Form 990 Could Cumulatively Result in an Excess Benefit Transaction*

Moreover, based on the facts presented at trial in this case, no aggregation of the errors on Lines 1, 22 and 57(a) would transform these errors into an excess benefit transaction—the facts in this case do not support the conclusion that any earnings of the organization inured to Mr. Sedaghaty or any other disqualified person. The particular reporting errors charged and convicted in this case are, simply put, completely unrelated to the excise taxes imposed by section 4958.

IV.    **There was No Excess Benefit Transaction in This Case.**

In the narrative accompanying its Form 4549-A, the Government contends that there were two excess benefit transactions involving the $151,000 El-Feki contribution.

- The first excess benefit transaction allegedly occurred when $130,000 of the El-Feki contribution was converted to travelers' checks by Mr. Al-Buthe, an officer of both al-Haramain-USA and al-Haramain-Riyadh, who, according to the Government, "transported [the funds] out of the United States," used the funds "to help fund acts of violence in the mujahideen in Chechnya."[36]

---

[36] *See* Transcript of the Government's Opening Statement at 27.

Caplin & Drysdale
C H A R T E R E D

-12-

- The second excess benefit transaction allegedly occurred when the balance of the El-Feki contribution ($21,000) was distributed to Mr. Al-Buthe in a cashier's check.[37]

There is a fundamental fallacy with the Government's assertions, however. As explained above, for an excess benefit transaction to occur, an "applicable tax-exempt organization"—*e.g.*, an organization recognized by the IRS as a section 501(c)(3) public charity—must provide an inappropriate economic benefit to a "disqualified person." In this case, there was no "applicable tax-exempt organization" involved in the alleged transactions. Nor has the Government established that any economic benefit was provided to a disqualified person of al-Haramain-USA.

A.  ***The Organization that Participated in the Transfers of the El-Feki Contribution al-Haramain- Riyadh—is not an "Applicable Tax-Exempt Organization."***

I have reviewed the e-mail exchanges surrounding the El-Feki contribution. Based on these exchanges, it is my opinion that, as the Government argued at trial, Mr. El Feki's $150,000 charitable contribution was made to al-Haramain-Riyadh—the Saudi organization—to support Muslims in Chechnya. The El-Feki contribution was not made to al-Haramain-USA and, significantly, al-Haramain-USA never took title to the donated funds.

1.  Circumstances Surrounding the El-Feki Contribution.

The record in this case reveals the following sequence of events involving the El-Feki contribution:

- al-Haramain-Riyadh solicited contributions for the mujahideen in Chechnya;

- Mr. El-Feki responded to these solicitations and emailed al-Haramain-Riyadh regarding a proposed donation "supporting our Muslim brothers in Chyshan"[38];

- al-Haramain-Riyadh responded to Mr. El-Feki's emails and advised that Mr. El-Feki could wire his contribution to one of al-Haramain-Riyadh's "account[s] for Chechnya relief fund": either its "account in Saudi Arabia" or its "account in [the] USA"[39];

- Mr. El-Feki notified al-Haramain-Riyadh of his decision to wire the donation "to your USA account . . . in order to participate in your nobel [sic.] support to our Muslim brothers in Chychnia"[40];

---

[37] *See* narrative explanation accompanying Form 4549-A; *accord* draft Sentencing Recommendation at 6, ¶ 18 (describing the cashier's check).

[38] Jan. 11, 200 email from Mr. El-Feki to al-Haramain-Riyadh.

[39] Jan. 18, 2000 email from Jazak Allah Khair, al-Haramain-Riyadh, to Mr. El-Feki.

[40] Feb. 20, 2000 email from Mr. El-Feki to al-Haramain Riyadh.

Caplin&Drysdale
C H A R T E R E D

-13-

- al-Haramain-Riyadh notified al-Haramain-USA that the El-Feki contribution would be wired into the latter's bank account, and asked al-Haramain-USA to notify it when the funds arrived[41];

- al-Haramain-Riyadh sent Mr. El-Feki a letter, on its corporate letterhead, acknowledging his contribution and assuring him of the organization's "commitment to continue ever effort to help ending the Chechnyan crisis"[42]; and

Three conclusions necessarily flow from this evidence. First, Mr. El-Feki intended to make a donation to al-Haramain-Riyadh and believed he was transferring the funds to a U.S. account owned by al-Haramain-Riyadh. Second, both al-Haramain-Riyadh and al-Haramain-USA understood that al-Haramain-Riyadh was the intended recipient of the El-Feki contribution, and al-Haramain-USA's role was to facilitate the transfer of funds from Mr. El-Feki to al-Haramain-Riyadh. Third, al-Haramain-USA was not empowered to exercise independent control over the El-Feki contribution. Given these circumstances, it is my view that the El-Feki contribution was made to al-Haramain-Riyadh, not al-Haramain-USA.

       2.    The El-Feki Contribution Constituted Income to al-Haramain-Riyadh, Not al-Haramain-USA.

As you are aware, U.S. taxpayers, including individuals like Mr. Sedaghaty and charities like al-Haramain-USA, are required to report their annual gross income to the IRS. "Gross income" is defined broadly to include "all income from whatever source derived."[43] Under general principles of U.S. tax law, an income item is only received by a taxpayer (and, thus, included in gross income) if the taxpayer has *unfettered use* of that money. By contrast, "[a]mounts received by a taxpayer burdened with the obligation to expend them for a specific, limited purpose are *excluded* from gross income if the taxpayer earmarks these funds and administers them as an agent, conduit or trustee."[44] As the IRS has explained:

> if the taxpayer has only ministerial powers over the disposition of the funds, the funds will be excludible from its gross income. On the other hand, if . . . . the use of the funds is subject to the taxpayer's discretion, the funds must be included in the taxpayer's gross income."[45]

---

[41] Feb. 20, 2000 email from al-Haramain-Riyadh to Mr. Sedaghaty.

[42] Feb. 21, 2000 Letter from Aqeel Abdul-Aziz Al-'Aqeel, General Manager of al-Haramain's "Head Office-Riyadh" to Mr. El-Feki.

[43] Section 61(a).

[44] Gen. Couns. Mem. 33885 (July 22, 1968).

[45] Gen. Couns. Mem. 37203 (July 28,1977) (citing Rev. Rul. 74-321, 1974-2 C.B. 16; Rev. Rul. 74-319, 1974-2 C.B. 15, and Rev. Rul. 56-152, 1956-1 C.B. 56).

Caplin & Drysdale
C H A R T E R E D

-14-

In other words, for an item to constitute "income," the taxpayer must do more than take possession of earmarked funds and follow instructions concerning their disposition. The taxpayer must exercise affirmative control over the funds and have discretion to decide how they are used. The IRS and courts have applied this principle in a variety of circumstances.[46] Of particular relevance, the IRS has ruled that charitable contributions received by one organization, but earmarked for another, were not includable in the recipient's gross income when it paid the gross amount received to the other organization.[47]

### 3.  Al-Haramain-USA Did Not Participate in Either Transfer of Funds From the El-Feki Contribution.

Based on the record and legal principles described above, I do not believe that the El-Feki contribution was made to al-Haramain-USA. Rather, the evidence demonstrates that the contribution was made to al-Haramain-Riyadh, and the funds constituted income to that organization. Because the El-Feki contribution was made to al-Haramain-Riyadh, the funds comprising the $130,000 in traveler's checks and the $21,000 cashier's check were, necessarily, transferred to Mr. Al-Buthe and, ultimately, to individuals or organizations in Checnhya, from al-Haramain-Riyadh, not al-Haramain-USA.

In 2000 when the transfers occurred, al-Haramain-Riyadh was not recognized by the IRS as a section 501(c)(3) public charity and, therefore, was not an "applicable tax-exempt organization" for purposes of section 4958. Because the organization involved in the transfers was not an "applicable tax-exempt organization, section 4958 *cannot apply* to these transactions. Thus, there were no "excess benefit transactions" involving the funds contributed by Mr. El-Feki and the Government's assertion of a tax loss based on section 4958 is unfounded in this case.

### B.  *The Government has not Established that the Transfer of $130,000 in Travelers' Checks, or the Transfer of the $21,000 Cashier's Check, Conferred an Economic Benefit on a Disqualified Person.*

Even if the El-Feki contribution properly belonged to al-Haramain-USA—which is not the case—neither the transfer of the $130,000 in travelers' checks, nor the transfer of the $21,000 cashier's check, conferred an "economic benefit" on a "disqualified person" of the organization. Accordingly, the transfers cannot constitute "excess benefit transactions" within the meaning of section 4958.

---

[46] *See, e.g.*, Seven-Up Co. v. Commissioner, 14 T.C. 965 (1950), *acq.* 1950-2 C.B. 4 (amounts received by the Seven-Up Company from its customer-bottlers, pursuant to an agreement that the funds would be used solely in a national advertising campaign, did not constitute gross income to the company because it was a conduit for those funds which were specifically earmarked for a limited purpose); General Counsel Memorandum 34825 (Mar. 30, 1972) (amounts received by a clergyman from his congregants, as agent for his church, which were not used for his personal living expenses but rather paid over to the church, were not includable in the clergyman's gross income).

[47] Revenue Ruling 58-276, 1958-1 C.B. 73.

Caplin & Drysdale
C H A R T E R E D

-15-

1.   The $130,000 in Travelers' Checks Were Not Transferred to
     Disqualified Persons of al-Haramain-USA.

It is abundantly clear that the conversion to travelers' checks and subsequent transfer of
$130,000 of the El-Feki contribution did not constitute an excess benefit transaction.  In its
indictment, at trial, and in its draft Sentencing Recommendation, the Government has not wavered
from its position that these funds were provided to the mujahideen in Chechnya—and not to
disqualified persons of al-Haramain-USA.[48]  Indeed, the Government emphasizes in its draft
Sentencing Recommendation that this diversion of these funds "to the mujahideen in Chechnya in
2000, on behalf of [al-Haramain-USA]" provides "[t]he basis for the application of the
terrorism enhancement under Guideline § 3A.1.4" in this case.[49]  For the Government to
contend now that the same funds enriched a disqualified person of the organization would
undercut its entire theory of the case.

2.   The Government has not Established that the Transfer of the $21,000
     Cashier's Check Conferred an Economic Benefit on Mr. Al-Buthe.

If the El-Feki contribution had belonged to al-Haramain-USA—which, again, is not the
case—then the transfer of the $21,000 cashier's check to Mr. Al-Buthe, a disqualified person of
the organization, would pose a closer question.  However, based on the information I have
reviewed, it is my view that the Government has not conclusively established that Mr. Al Buthe
retained these funds for his personal benefit.  The evidence on this point appears to be mixed, at
best.  On one hand, I understand that the Government presented evidence that the $21,000
cashier's check was deposited in a bank account in Mr. Al-Buhte's name.  On the other hand, I
understand that the Government has not presented evidence that Mr. al-Buhte used these funds for
his own personal purposes.  I further understand that credible financial records from al-Haramain-
Riyadh suggest that the $21,000 was promptly transferred to the organization, presumably to
advance the donor's intended purpose.

Finally, I note that that the Government took the position at trial and in its draft Sentencing
Recommendation that the entire $150,000 El-Feki contribution—which necessarily includes the
$21,000 converted to a cashier's check—was used "to fund a terrorism organization named
Chechen Mujahideen in Chechnya.[50]"  And, while the Government has long been aware of this

---

[48] *See, e.g.*, Transcript of Government's Opening Statement at 6, 27–28, 35; Draft d Recommendation at
3, ¶ 9; *id* at 5–6, ¶¶ 17-18; *id.* at 7, ¶ 22–23; *id.* at 8, ¶ 26.

[49] Draft Sentencing Recommendation at 7, ¶ 22 (emphasis in original); *see also id.* at 8, ¶ 26 ("As
previously noted, Mr. Sedaghaty and Mr. Al-Buthe smuggled $150,000 to the mujahideen in Chechnya in
an effort to help finance terrorist activities").

[50] Draft Sentencing Recommendation at 3, ¶ 9; *see also* Transcript of Government's Opening Statement at
6 (contending that the El-Feki contribution "was intended to make its way into an area of the world called
Chechnya which at the time was going – going through a war with Russia.  It was a very violent conflict
going on in Chechnya at the time these funds were destined for a war zone."); Indictment § II, ¶¶ C–K
(describing the El-Feki contribution and quoting correspondence regarding its use for Chechnya).

transfer, to my knowledge it has not assessed the section 4958 excise tax against Mr. Al Buthe or initiated an examination under section 4958. Given the thin evidence on this point, this is not entirely surprising. In my view it would be difficult for the IRS to conclude that the transfer of the $21,000 conferred an economic benefit on Mr. Al-Buhte in violation of section 4958.

**V.    The Government Tax Loss Calculations are Erroneous.**

Based on its claims that he participated in, approved, or otherwise "caused" an excess benefit transaction—assertions that, for the reasons set forth above, are generally problematic—the Government has assessed $80,980 in additional tax, plus $104,003.48 in penalties and interest, against Mr. Sedaghaty. The Government's loss calculation consists of the following:

- $37,750 in section 4958 excise taxes: $32,500 with respect to the $130,000 transfer and $5,250 with respect to the $21,000 transfer;

- $10,000 in section 4958 manager's tax with respect to the entire $151,000 that was transferred; and

- $33,230 in additional income tax resulting from a $151,000 adjustment to Mr. Sedaghaty's personal income.

The Government's loss calculation is inaccurate and vastly overstated. In my opinion, there was no excess benefit transaction in this case. Thus, the tax loss attributable to Mr. Sedaghaty, and the additional taxes assessed against him, should be zero.

### A.    The Government's Imposition of the Section 4958 Taxes is Improper.

As I explain in detail in Parts III and IV of this letter, the reporting errors charged at trial, the transfer of the $130,000 in travelers' checks, and the transfer of the $21,000 cashier's check, do not constitute excess benefit transactions between an applicable tax-exempt organization and a disqualified person. Accordingly, it is my view that the Government's assertion of section 4958 excise taxes and manager's taxes against Mr. Sedaghaty is erroneous.

I note, however, that if the court were to find that (a) the El-Feki contribution was made to al-Haramain-USA (and not, as I believe, to al-Haramain-Riyadh), and (b) Mr. Al-Buhte was personally enriched by the $21,000 cashier's check, there would be room to conclude that the transfer of the cashier's check to Mr. Al-Buhte constituted an excess benefit transaction.[51] Were this to occur, the maximum amount the Government could credibly assess against Mr. Sedaghaty would be $2,100—the manager's tax that would be imposed under section 4958. It is important to note, however that the manager's tax could only be imposed against Mr. Sedaghaty only after the Government first determined that Mr. Sedaghaty knowingly approved the transfer of these funds to Mr. Al-Buhte and then asserted the section 4958 excise tax against Mr. Al-Buhte.

---

[51] This stands in contrast to the $130,000 transfer that benefited men and women in Chechnya who, very clearly, were not disqualified persons of al-Haramain-USA.

Caplin&Drysdale
C H A R T E R E D

-17-

### B.    The Government's $151,000 Adjustment to Mr. Sedaghaty's Income is Improper.

The Government's attempt to recalculate the taxes owed on Mr. Sedaghaty's *personal* Form 1040 based on an alleged violation of section 4958 is inappropriate and inconsistent with the federal tax law.  Mr. Sedaghty did not receive any personal economic benefit from these transfers and, thus, realized no income.  Further, even if Mr. Al-Buthe embezzled the $21,000 cashier's check, as the Government contends, the Government has not presented any evidence that these funds were ever received as income by Mr. Sedaghaty.  Accordingly, Mr. Sedaghaty's *personal* income tax would be unaffected by these transactions.

### C.    The Alleged Errors on al-Haramain-USA's 2000 Form 990 Would Not Cause Any Additional Tax Loss to the Government.

Even though the alleged reporting errors on al-Haramain-USA's Form 990 involved tens-of-thousands of dollars, these errors, if true, would not create any additional tax loss for the Government.  This is not surprising.  In cases involving charitable organizations, the Government often loses no revenue, even in situations involving reporting errors, because the charity itself is not subject to tax on income related to its exempt function and income from charitable contributions.[52]  Thus, even if al-Haramain's Form 990 contained material errors, the organization's income and excise tax liability to the Federal Government would be unaffected by these errors.

In my experience this result is not uncommon.  Because tax-exempt organizations generally do not, by definition, pay tax on the items reflected on their Forms 990, errors on these forms generally do not result in any loss of revenue to the Government.  Indeed, even assuming that (a) the el-Feki contribution was made to al-Haramain-USA, (b) the Government had revoked al-Haramain-USA's tax-exempt status retroactive to 2000 (such that it would have been treated as a taxable corporation in the year of the El-Feki contribution), al-Haramain-USA would not have been subject to federal income tax on its contribution income.  Rather, the el-Feki contribution and other contributions would be treated as gifts to a taxable corporation and, as such, would not be subject to federal income tax under section 102 of the Code.[53]

## VI.    Conclusion.

Based on the facts and legal analysis set forth above, it is my opinion that the alleged facts and reporting errors forming the basis for Mr. Sedaghaty's conviction (taken individually or cumulatively) do not provide a legitimate basis for the Government's proposed application of section 4958 in this case.  Section 4958 does not operate as an additional sanction for

---

[52] Section 501(a).

[53] *See* section 102(a) ("Gross income does not include the value of property acquired by gift."); *Branch Ministries v. Rossotti*, 211 F.3d 137, 143 (D.C. Cir. 2000) (explaining that "revocation of the exemption does not convert bona fide donations into income taxable to [the former section 501(c)(3) organization]" and citing section 102(a) for this proposition).

Caplin & Drysdale
C H A R T E R E D

-18-

misreporting items on a Form 990. Rather, it penalizes "disqualified persons" who personally receive an improper economic benefit—such as excessive compensation or a below-market rate financial transaction—from a U.S. public charity. Had there been evidence showing that funds belonging to al-Haramain-USA been deposited in Mr. Sedaghaty's personal account or otherwise diverted to his personal use, section 4958 could be applicable. However, these are not the circumstances in this case. Here, the transactions alleged by the Government to be "excess benefit transactions" involved (a) the transfer of funds belonging to a foreign organization, al-Haramain-Riyadh—not an "applicable tax-exempt organization"; (b) to individuals and organizations in Chechnya—not "disqualified persons."

If the Government were to prevail on its argument that section 4958 is applicable to the errors charged and convicted in this case, this would, to the best of my knowledge, be an unprecedented use of section 4958. I am unaware of any court case, Federal Regulation, IRS authority, or other interpretation sanctioning the use of section 4958 in this regard. The purpose of section 4958 is not to penalize instances in which a charity misdirects funds for non-charitable purposes or misreports information on its Form 990. Rather, it is designed to enforce the prohibition against private inurement set forth in section 501(c)(3).[54] Because all of the elements of an excess benefit transaction are simply not present in this case, the court should reject the Government's proposed application of section 4958 in this case and its related proposed adjustments to Mr. Sedaghaty's income. Quite simply, there was likely zero tax loss attributable to Mr. Sedaghaty in this case, and the Court should reject any basis for sentencing premised on the amounts reflected on the Government's Form 4549-A.

Sincerely,

Marcus S. Owens

---

[54] *See Taxpayer Bill of Rights 2*, H.R. Rep. 104-506, 104th Cong., 2d Sess. (March 28, 1996), at 54 (explaining that new section 4958 "provides for intermediate sanctions that may be imposed when nonprofit organizations described in section 501(c)(3) or 501(c)(4) engage in transactions with certain insiders that result in private inurement."); Preamble to Proposed Regulations, *Failure by Certain Charitable Organizations To Meet Certain Qualification Requirements; Taxes on Excess Benefit Transactions*, 63 Fed. Reg. 41486, 41488 ("in practice, the excise taxes imposed by section 4958 will be the sole sanction imposed in those cases in which the excess benefit does not rise to a level where it calls into question whether, on the whole, the organization functions as a charitable or other tax-exempt organization.").

# EXHIBIT  3

Steven T. Wax, OSB No. 85012
Federal Public Defender
101 SW Main Street, Suite 1700
Portland, OR 97204
Tel: (503) 326-2123
Fax: (503) 326-5524
Email: steve_wax@fd.org

Lawrence Matasar, OSB No. 74209
621 SW Morrison Street, Suite #1025
Portland, OR 97205
Tel: (503) 222-9830
Email: larry@pdxlaw.com

Attorneys for Defendant

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 05-60008 HO |
| Plaintiff, | |
| v. | DECLARATION OF FEDERAL PUBLIC DEFENDER INVESTIGATOR JAMES STRUPP |
| PIROUZ SEDAGHATY, | |
| Defendant. | |

I, Jim Strupp, declare:

1.     I am an Investigator employed by the Federal Public Defender for the

District of Oregon. As part of my duties, I was assigned to conduct investigation

in the above captioned case for Steven T. Wax, along with Federal Public Defender Chief Investigator William Teesdale.  This Declaration is made in support of Defendant's Motion for a Continuance, or in the Alternative, a Motion to Allow Witness Testimony Via Two-way Video Conferencing.

2.    Specifically, I was requested by Mr. Wax to locate and, if possible, interview Muhammad Sui. I understood Mr. Sui to be an individual who may or may not be living overseas, and who may have relevant information about this case.  Mr. Teesdale was also given the same request, and in preparation of this declaration I spoke with him about his efforts in that regard.

3.    I have been trying to locate Mr. Sui intermittently for approximately 16 months. I have used multiple public and proprietary sources to research possible locations for him, possible relatives, and possible associates through which I might make contact.

4.    Mr. Teesdale has told me that in April, 2009, he made a request of co-defendant's counsel to inquire of several individuals in Saudi Arabia whether current contact information existed for Mr. Sui. Mr. Teesdale also consulted the online public records reseller Accurint, of which this office is a subscriber, for possible leads for locating Mr. Sui. Mr. Teesdale was advised that a number of individuals in Saudi Arabia made efforts to locate Mr. Sui.  These efforts did not bear any fruit, and did not result in any viable contact with Mr. Sui.

5.    I also consulted Accurint on several occasions, attempting to develop

leads for Mr. Sui. Accurint is a proprietary public records reseller, which aggregates and cross-references public record references for particular individuals, based on search criteria (such as name, date of birth, possible address, etc.) supplied by the user. I was able to conclusively identify Mr. Sui's personal identifiers within Accurint. Using searches derived from this information and subsequent search results, I was able to establish possible leads to relatives and other associated individuals.

6.    In February, 2010, I made several contacts based on these leads, and inquired about other records concerning Mr. Sui's possible whereabouts. These records included New York property records, New York City Taxi and Limousine Commission records, tax assessor records, New York State court records, California business records, California and New York public phonebook information and Internet white pages listings. None of the information produced led me to Mr. Sui. I also consulted other public records, which allowed me to conclusively identify a brother of Mr. Sui, who had been residing in the United States as a graduate student. I did not know whether that brother was still currently in the United States. Consulting university directories, academic publications, patent records, academic websites, and other sources, I attempted to locate his brother. Eventually, I did develop what I believe to be several e-mail addresses for the brother, at least two of which I consider to be current and valid.

7.    In May, 2010, I contacted a possibly related individual in New York State by telephone, as well as a possibly related individual in Texas by telephone. Neither of those individuals was cooperative with me in providing current contact information for Mr. Sui. In June, 2010 I also developed a possible method of contacting Muhammad Sui through an online service. On June 2, I sent a request for contact to Mr. Sui through the service, without any response from him.

8.    In June, 2010 I sent several e-mail messages to Mr. Sui's brother's e-mail addresses, as well as to two of his known colleagues - one in California and one in Saudi Arabia. I also attempted phone contact with one of the colleagues. None of these attempts resulted in further contact from any recipient, or information about Mr. Sui's whereabouts.

9.    In early August, 2010, I again inquired of co-defendant's counsel whether he had any possible contact information for Mr. Sui. On August 16, 2010 I received two overseas telephone numbers and a possible e-mail address for Mr. Sui, from co-defendant's counsel. That same day, I called Mr. Sui at the phone numbers, and did speak with him. He is currently located in Guangzhou, China. I asked him several questions concerning the areas in this case about which he may have information, and completed a phone interview with him. He told me that he is a U.S. Citizen with a valid U.S. Passport. He resides in Guangzhou, China, which is about two hours travel time from Hong Kong. A summary of that interview is attached to Defendant's Motion for a Continuance, or in the

Alternative, a Motion to Allow Witness Testimony Via Two-way Video Conferencing as Exhibit B.  Subsequent to the interview of August 16, I transmitted a copy of an agreement also depicted in Government's Trial Exhibit AHIF-3, which appears to bear Mr. Sui's signature.  The copy I transmitted was not received from the Government through discovery in this case, and as such, is not subject to the Court's Protective Order concerning discovery.  The copy of the document I transmitted to Mr. Sui is attached to Defendant's Motion for a Continuance, or in the Alternative, a Motion  to Allow Witness Testimony Via Two-way Video Conferencing as Exhibit C.

10.    I have had several phone conversations with Mr. Sui since August 16, attempting to secure his appearance at trial in this court. He has indicated that he is unwilling and unable to voluntarily travel to the United States from China to attend Mr. Sedaghaty's trial as a witness. He has said that travel to the United States on short notice would severely jeopardize his current business interests in China. He has also told me that he is a Muslim and has religious concerns about traveling during the holy month of Ramadan, and on the days of Eid to attend trial.

11.    I most recently spoke with Mr. Sui over the phone on August 23.  In response to my question, he said that he would be willing to accept voluntary service of a subpoena in order to provide testimony to this court through live two-way video conference link at the U.S. Consulate General in Hong Kong.

**Page 5    DECLARATION OF FEDERAL PUBLIC DEFENDER INVESTIGATOR JAMES STRUPP**

12.    I do not believe that I can currently serve Mr. Sui with a valid criminal subpoena in this case. Service of subpoena on witness in a foreign country is governed by 28 U.S.C. §1783, which states, in part, "Service of subpoena... shall be effected in accordance with the provisions of the federal Rules of Civil Procedure relating to service of process on a person in a foreign country." Federal Rule of Civil Procedure 4(f) states:

----------------

(f)    Serving an Individual in a Foreign Country.

Unless federal law provides otherwise, an individual - other than a minor, an incompetent person, or a person whose waiver has been filed - may be served at a place not within any judicial district of the United States:

(1)    by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;

(2)    if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:

(A)    as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;

(B)    as the foreign authority directs in response to a letter rogatory or letter of request; or

(C)    unless prohibited by the foreign country's law, by:

**Page 6    DECLARATION OF FEDERAL PUBLIC DEFENDER INVESTIGATOR JAMES STRUPP**

(i)    delivering a copy of the summons and of the complaint to the individual personally; or

(ii)    using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or

(3)    by other means not prohibited by international agreement, as the court orders.

------------------

13.    I have learned that China is a party to the Hague Convention on Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters, as is the United States. I have also learned that valid service of legal process in China can only be accomplished under the terms of the Hague Convention, through the Chinese Central authority, which is the Department of Judicial Assistance and Foreign Affairs, Ministry of Justice, People's Republic of China. I further learned that the Department of Judicial Assistance and Foreign Affairs in China advises litigants that service of process usually takes 3 to 4 months.

14.    I further learned through United States State Department published information that service of subpoena by mail in China is prohibited for compulsory process. Additionally, according to the State Department the compulsion of testimony and documents within China pursuant to the Hague convention, letters rogatory, and other requests are typically unsuccessful and

can require up to one year.

15.    If valid service of the United States criminal subpoena were possible prior to the conclusion of trial in this case, it is not clear to me what viable enforcement options would be available should the witness declined to comply with the subpoena. I have learned that the United States and China are party to a Mutual Legal Assistance Agreement.  However, actual cooperation between judicial authorities in the two nations is often only successful on a case-by-case basis. See the United States, China, and Extradition: Ready for the next Step?, MacCormack, Anne, 446 Legislation & Public Policy, [Vol. 12:445, 2009].

16.    I have also learned that the United States and China are not signatories to an extradition treaty.

17.    On August 22 and again on 23rd, 2010, I consulted separately with two consular officers at the United States Consulates General in Guangzhou, China, and Hong Kong & Macau. Both consular officers told me that live video conference equipment is available at their facilities. The consular officer in Guangzhou said that there may be prohibitions upon taking sworn depositions for use in a foreign court by a foreign consular officer, within Chinese territory. At my request, she is consulting her legal advisers at the State Department in Washington DC to clarify whether the prohibition on taking sworn depositions would apply to providing live video feed testimony to this court. She also stated that these legal prohibitions may not apply in Hong Kong, which enjoys a separate

legal framework than mainland China.  She is also seeking this clarification about this, at my request.

18.    The consular officer in Hong Kong said that they can provide a consular officer to preside over live video feed testimony to this court, from a location in Hong Kong, whether private or at consular facilities. A U.S. consular officer would administer the oath to the witness, and swear any court reporters or other personnel attending the testimony in Hong Kong if needed, and certify the proceedings to this court. The consular officer indicated that, generally, there are security concerns that may prohibit them from taking the testimony at the Consulate's facility, but the consular services are available to be performed at private locations in Hong Kong.  The consular officer I spoke with is consulting with her superiors to see whether two way video link facilities would be available at the Consulate's office, if a private location were not suitable.  In either case, the Consulate can provide staff to properly oversee the taking of the video testimony for this court.

19.    In connection Muhammad Sui's possible travel to the U.S. and appearance as a live witness in this court, the U.S. Marshals initiated a check of the National Crime and Information Center (NCIC), based on personal identifying information I supplied to them, including date of birth and Social Security number.  It was reported to me that Mr. Sui does not show any criminal history, wants, or warrants in the NCIC system.

**Page 9    DECLARATION OF FEDERAL PUBLIC DEFENDER INVESTIGATOR JAMES STRUPP**

Case 6:05-cr-60008-AA    Document 498-1    Filed 11/18/10    Page 32 of 36
Case 6:05-cr-60008-HO    Document 430    Filed 08/26/10    Page 11 of 17    Page ID#:
3889

20.    Based on the foregoing, I believe that there are no viable means to secure Muhammad Sui's testimony through the issuance of a properly served subpoena in this case, and that he is effectively unavailable as a compulsory witness. Further, I believe that his sworn testimony could be secured in live fashion for this court, through two-way videoconference means during trial.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of knowledge and belief, and that this declaration was executed on August 25, 2010, at Portland, Oregon.

_James Strupp_

James Strupp

# INVESTIGATION MEMORANDUM

Case:       U.S. v. Sedaghaty; CR 05-60008-HO
Attorney:   Steven T. Wax
Invest:     Jim Strupp
Witness:    Muhamed Sui

Date:       August 16, 2010

---

On August 16, 2001, I spoke with Muhamed Sui telephone number listed above.  In summary, he related the following:

Mr. Sui lives in Guangzhou in Guangdong Province, China.  He has lived there for about 8 years. He is a businessman there.

He traveled from Saudi Arabia to the United States,  and back again, with Soliman Al Buthe in March, 2000.They traveled from Saudi Arabia by air, and landed at John F. Kennedy Airport in New York. They transferred to a domestic flight in Newark, New Jersey, and continued on to Portland, stopping in Tennessee along the way.

The purpose of his trip was to do some sightseeing and make new friends. He also knew of Pete Seda and his family through Soliman prior to the trip and part of his purpose was to meet Mr. Seda.

Mr. Sui was born in Saudi Arabia.  He is a US citizen and holds a valid US passport.  He was naturalized as a US citizen, in approximately 1996, in New York City where he lived at the time.

He understood Solomon Al Buthe's trip was to conduct business as a part of the Al Haramain Foundation, Saudi Arabia, with Pete Seda, whose organization was part of Al Haramain, located in Oregon.

He recalled funds being transferred from Pete to Solomon. He signed an agreement memorializing this transfer, as a witness to Pete and Soliman. He understood that the money referred to in the agreement were collected donations for the foundation in Saudi Arabia and the transmission of money to Solomon was for that purpose. The agreement was for the collection and the receipt of collection of those monies. He does not recall what the money was to be spent on. Mr. Sui was also read a copy of the agreement that he made verbatim.  He has also been provided a copy and verified his signature.

Mr. Sui is Muslim. To sign a form as a witness is to witness before Allah, he said.

**Page 1        INVESTIGATION MEMORANDUM: Muhammad Sui        8/16/2010**

He does not recall any discussion between Pete, Solomon, or anyone else that Al Haramain concerning this document relating to fighting, jihad, or mujahideen. He does not recall having any discussions with Pete Seda at any other time concerning any of these subjects, relating to any other matter.

On the way to Oregon, they met and were accompanied by Nabil Rajeh, who traveled with them to Oregon from Tennessee. He recalls him being in Oregon but he does not recall him signing the document, except upon being refreshed in his recollection about this fact.

He does not recall a discrepancy between two amounts on the agreement he signed. He recalls some calculations being done to arrive at the amount on the agreement. He recalls Solomon Al Buthe had a balance sheet or accounting sheet of some sort that he used to arrive at the figure placed in the agreement.

He recalls seeing travelers checks with Solomon Al Buthe in connection with the monies that were being collected and transmitted. He does not recall a cashiers check.

He recalls that the Islamic Society of North America (ISNA) had a big event fundraiser concerning raising money for Chechnya refugees around that time. He not recall whether ISNA donated funds to Al Haramain in Oregon.

Inbound to the United States, they landed at JFK airport. He does not recall meeting anyone in the city. He does not recall renting a car and driving to upstate New York.

He traveled back to Riyadh, Saudi Arabia with Solomon Al Buthe, through JFK to Riyadh. They traveled from JFK on Saudi Arabian Airlines. They did not encounter any Customs inspections on the way out. They were not personally presented with any Customs forms at their departure of JFK. He does not recall any signage, kiosks, or stands containing Customs forms that were presented to travelers in the airport.

He has traveled from JFK to Riyadh, Saudi Arabia approximately 20 times. The trip in March, 2000 was his most recent travel from the United States. He has never encountered Customs inspection, forms, kiosks, signage or any other Customs stations requiring customs forms on his outbound departure from JFK to Saudi Arabia. He recalls encountering Customs inspections every time he entered the United States at JFK and every other airport through which he entered the U.S.. He recalls that at the airline gate he had to deposit an I-94 immigration entry/exit form with the airline staff. It was common for other travelers Saudi Arabia that he knew to forget to deposit that form.

He not recall speaking with Soliman about any Customs forms on their travel back to Riyadh. He did not know specifically whether Soliman was hand carrying any travelers checks. There was no discussion whatsoever between the two of them regarding Customs or reporting currency.

**Page 2**         **INVESTIGATION MEMORANDUM: Muhammad Sui**         **8/16/2010**

In Oregon he recalls going to a bank with Soliman, but does not recall it associated with getting travelers checks and does not recall any details about the stop.  It occurred during a shopping trip.

Specifically, he does recall seeing travelers checks in connection with the amount that was signed for. He does not know whether it was $188,000. He does not recall seeing any cash in connection with this amount.  He does not recall whether the monies that were being memorialized in the agreement that he signed were monies for Zakat.

He has never known Pete Seda to espouse jihad, mijahadeen, or violent forms of Islam. He has known Solomon Al Buthe to be a supporter of the poor, needy, and the families of oppressed peoples. He has had no discussion about this case with Solomon or Pete prior to this phone call.

Bismillah

May prayers and peace be upon the Messenger Muhammad

This is an agreement bet Soliman and Abu Yunus.  This agreement states, that Abu Yunus is turning all monies and responsibilities that were collected for the Brothers and Sisters in Chechnya over to Brother Soliman.  Soliman states that he has received monies in the amount of $ 188465.00 and he also fully relieves Abu Yunus of all responsibilites to the money.

X _____

X _____

Date: 4th of Thul Hijjah, 1420

Witness #1: _____

Witness #2: _____

AHIF 000601

AHIF 000601

101829 B&W

EXHIBIT C