1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF OREGON

3   UNITED STATES OF AMERICA,        )
                                     )
4                    Plaintiff,      ) No. 05-60008-2-HO
                                     )
5      v.                            ) November 23, 2010
                                     )
6   PIROUZ SEDAGHATY, et al.,        ) Eugene, Oregon
                                     )
7                    Defendants.     )

8

9          TRANSCRIPT OF SENTENCING PROCEEDINGS

10       BEFORE THE HONORABLE MICHAEL R. HOGAN

11        UNITED STATES DISTRICT COURT JUDGE

12

13                       -:-

14

15

16

17

18

19

20

21

22

23           Deborah Wilhelm, CSR, RPR
                   Court Reporter
24               P.O. Box 1504
             Eugene, OR  97440
25               (541) 431-4113

```
 1                    APPEARANCES OF COUNSEL

 2

 3    FOR THE PLAINTIFF:    CHRISTOPHER L. CARDANI
                            United States Attorney's Office
 4                          405 E. 8th Avenue, Suite 2400
                            Eugene, OR  97401
 5                          (541) 465-6771
                            chris.cardani@usdoj.gov
 6
                            CHARLES F. GORDER, JR.
 7                          United States Attorney's Office
                            1000 S.W. Third Avenue, Suite 600
 8                          Portland, OR  97204-2902
                            (503) 727-1021
 9

10    FOR THE DEFENDANT:    LAWRENCE H. MATASAR
                            Lawrence Matasar, P.C.
11                          621 S.W. Morrison Street
                            Suite 1025
12                          Portland, OR  97205
                            (503) 222-9830
13                          larry@pdxlaw.com

14                          STEVEN T. WAX
                            BERNARD J. CASEY
15                          MICHELLE SWEET
                            Federal Public Defender
16                          101 S.W. Main Street, Suite 1700
                            Portland, OR  97204
17                          (503) 326-2123
                            steve_wax@fd.org

18

19

20

21

22

23

24

25
```

```
1                    INDEX OF EXAMINATIONS

2     FOR THE PLAINTIFF:      Direct   Cross     ReD     ReX

3     Sergei Ignatchenko         20      40      --      --

4     Gregory Wooten             99     107      --      --

5

6     FOR THE DEFENDANT:      Direct   Cross     ReD     ReX

7     Marcus Owens              116     126      --      --

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Tuesday, November 23, 2010; 8:28 a.m.)

 2                      P R O C E E D I N G S

 3              THE CLERK:  This is the time set for Criminal

 4   Case 05-60008, United States of America versus Pirouz

 5   Sedaghaty, time set for sentencing.

 6              THE COURT:  Thank you.  Is our witness on the

 7   phone?

 8              (Discussion held off the record with the

 9   clerk.)

10              MR. CARDANI:  Good morning, Judge.

11              THE COURT:  Good morning.

12              MR. CARDANI:  I don't know what the present

13   status is of our attempt to hook up with Moscow, but

14   people in Moscow are ready to go.  Once that hookup is

15   made, we're prepared to call Sergei Ignatchenko from

16   Moscow.  Until that hookup is made, we're also prepared

17   to go forward with posttrial motions.  And if we can't

18   make that hookup right now, perhaps it would be good

19   to --

20              THE COURT:  I'm told we don't have the video

21   hookup with Moscow yet.

22              MR. CARDANI:  We do not?

23              THE COURT:  Do not.

24              MR. CARDANI:  Okay.  What I have on my list of

25   items to get through today is the Moscow testimony.  We
```

1    have one other witness who is on his way into the

2    courtroom from the IRS to support the tax loss figures.

3    Those are the only two witnesses we anticipate at this

4    point calling today.  We do have posttrial motions to

5    get through, and obviously assorted sentencing issues,

6    and repayment of legal fees.

7         Does the court wish to go to the posttrial

8    motions?

9         THE COURT:  Yes.

10         MR. CARDANI:  Mister -- the defense has filed a

11    motion for judgment of acquittal and a motion for a new

12    trial.  Most of the government's response is in the

13    papers, and we don't have a response unless the court

14    has questions.

15         The motion for judgment of acquittal raises a

16    legal issue, and that was whether the donation that came

17    over from Egypt through London was earmarked to be

18    reported on the Form 990.  The government's motion is

19    that there were lengthy facts before the jury to entitle

20    them to reject that defense and convict him on the tax

21    count.  We don't have any other argument or anything

22    else on that unless the court has any questions on the

23    motion for judgment of acquittal.

24         On the motion for the new trial, there are, by

25    my count, 20 issues raised on the motion for new trial.

1    We'll stand on our briefing on all of them except one

2    issue, and that has to do with the rebuttal argument,

3    and whether there was improprieties committed by

4    government counsel in rebuttal argument.

5            Mr. Gorder is going to handle that for the

6    government, and we'll ask the court to make findings on

7    that matter.  And we're prepared to address all of the

8    other issues as well.  And -- excuse me.  And I think

9    that's all we have for the motions.

10           THE COURT:  Thank you.  Mr. Gorder.

11           MR. GORDER:  Yes, Your Honor.  On the issue of

12   the rebuttal argument, we feel very strongly about that.

13   Your Honor, you'll recall that one of the exhibits we

14   introduced during the trial was SW-23.  It was an e-mail

15   from the codefendant al-But'he to the defendant

16   Sedaghaty on February 23, 2000, right about the time

17   that the Egyptian El-Fiki was sending his money to

18   Ashland.

19           Al-But'he e-mailed to Mr. Sedaghaty a

20   *Washington Post* article about government investigation

21   of terrorism.  And apparently Mr. al-But'he highlighted,

22   somebody did, in red a paragraph in that article, which

23   I will paraphrase that "Islamic terrorists are

24   concealing the sources of their funds by using

25   charitable groups as fronts.  Investigating those kinds

1   of charities is not easy and it can subject the

2   government to allegations of targeting religious or

3   ethnic groups."

4          Sadly, ten years later, that paragraph is still

5   true.  We can't have a trial apparently where a

6   prosecutor can point out the obvious, pointing to

7   exhibits introduced into evidence is sending out a call

8   to violent jihad and anti-Semitic literature to violent

9   prisoners to rebut a claim that a defendant is a man of

10  peace and a spokesman for tolerance, without that

11  prosecutor being accused of making an appeal to

12  prejudice or the jury, who it appears in this case

13  conscientiously deliberated for over two days, being

14  accused of having rendered a verdict based on prejudice.

15         And what are these allegations based on?

16  Really nothing.  Claims that certain people in the

17  audience were offended by Mr. Cardani's argument.  If

18  that was a standard for what was a fair trial in this

19  country, few convictions could stand scrutiny.  Because

20  it's way too easy to claim that a lawyer is appealing to

21  prejudice rather than commenting on the evidence and

22  responding to his adversary's comments.

23         You know, there were some other people who were

24  in the audience who might have said that when a defense

25  attorney said "I have fear in my heart for my country"

1    that he was appealing to prejudice, or when it was said

2    that after 9/11 the nation reacted with anger, he was

3    trying to inflame the jury.  "I'm offended" by a

4    demonstrative chart used during the trial.  "My expert

5    witnesses are two distinguished patriots."  Imagine if

6    the government said that.  Or that al-But'he walked

7    around Ashland dressed like a Saudi, having a darker

8    skin and a bigger nose.  It's way too easy to claim that

9    somebody's prejudiced.  And, again, it's not what

10   somebody in the audience might have said or thought.

11   What's really important in this case, Your Honor, is

12   what you saw and observed during the trial, because

13   we're going to ask you to make findings in that regard,

14   and what you observed about Mr. Cardani's closing

15   argument and rebuttal argument and what you observed in

16   the way of the jury's reactions.

17           The *Bains* and *Knobbier* cases cited by the

18   defense are really off point because they involve the

19   explicit use by a prosecutor of racial or religious

20   stereotypes, like "expect violence from all Sikhs in

21   this situation."  And the defense doesn't claim that

22   that's what happened.  Their only real claim is that

23   Mr. Cardani threw the Qur'an around the courtroom.  And

24   that's just not true.  You were here.  And I think that

25   we need a finding that nothing that Mr. Cardani did was

1  disrespectful at all to Islam, or, more importantly, was

2  intended to or did appeal to any kind of alleged jury

3  prejudice.  Rather it was simply proper argument based

4  on the evidence that was admitted at trial.  There was

5  no throwing of the Qur'an.  I was sitting right here.

6  Mr. Cardani was right there.  And the court was where

7  you are sitting today.  And he picked up the Noble

8  Qur'an that had the appendix that was introduced into

9  evidence, the call to jihad, and showed it to the jury,

10 and then put it back on the table.

11        I would have thought if there was something

12 outrageous that occurred then, either the court would

13 have stopped it or the defense would have objected, but

14 it didn't happen because there was nothing outrageous

15 about it.

16        And the court was able to observe the jury in

17 this case.  And this was not a jury of 12 angry men and

18 women.  They deliberated, by my count, for 13 hours

19 before they delivered their verdict.  And they returned

20 a special verdict that only unanimously found one of the

21 objects of the conspiracy.  So certainly it was hardly

22 evidence of a rush to judgment by a jury looking to get

23 all Muslims.  And for that reason, the motion for a new

24 trial should be denied.

25        But the other reason we're asking for these

1    findings is that I want it clear on the record that

2    Mr. Cardani did nothing wrong, so that if some

3    allegation is made of misconduct with the bar or with

4    the department, that the people that receive that

5    allegation will have the benefit of the court's finding

6    in that regard.  Thank you.

7                THE COURT:  Thank you.  Mr. Wax.

8                MR. WAX:  Good morning, Your Honor.

9                THE COURT:  Let me just -- Christy, if we do

10   make the connection, please tell me, okay?

11               THE CLERK:  Yes.

12               MR. WAX:  The motion for a new trial attempts

13   to point out to the court that the proceedings in this

14   case were infected from beginning to end by improper

15   efforts to link Mr. Seda to Osama bin Laden, radical

16   Islam, and to call for his conviction based not on the

17   facts that existed with respect to him alone, but in a

18   broader context.

19               At the outset of the proceeding in the release

20   hearings, the government introduced an e-mail that it

21   had to know was not a genuine e-mail that in any manner

22   related to Osama bin Laden.  Notwithstanding that, it

23   was introduced in evidence before the magistrate judge.

24               Mr. Matasar, who was handling the case at that

25   time, took that issue on.  That, regrettably, set a tone

1   that carried through in the prosecution, sometimes

2   beneath the surface, sometimes swirling around.  It

3   reached its regrettable flower not in the argument that

4   Mr. Gorder made, and I think it is critical for the

5   court to note that in reviewing the transcript of the

6   closing arguments, in Mr. Gorder's argument, he

7   discussed the call to jihad.  In his argument, he talked

8   about the specifics of some of the things that were

9   introduced.

10          Our motion is not addressed to that.  Our

11   motion with respect to the portion on which Mr. Gorder

12   is seeking findings is only addressed to the rebuttal,

13   which began with the phrase "the Qur'an is the

14   defendant," "the Qur'an is the defendant".  My client

15   Pete Seda, of course, Your Honor, is the defendant.  We

16   are not alleging and we do not believe the law requires

17   a finding on the motive of the prosecutor.

18          We attempted to make clear in the pleading and

19   I made clear in conversations that I had with the United

20   States Attorney Dwight Holton that the issue that we are

21   raising is not one that requires a finding of bad motive

22   or bad intent.  That's not the law as we understand it.

23          The issue is the effect.  And it's not just the

24   proven effect.  It is, as is said in the cases that we

25   cited for the court, a potential.  The Ninth Circuit's

1   language is it "may" have inflamed.  It "might."  That's

2   the legal standard.  And we respectfully submit that to

3   say the Qur'an is the defendant has that potential.

4           In that same paragraph the reference was made

5   to this "junk," not the call to jihad.  The word "junk"

6   is used while the Noble Qur'an is being held and waved

7   in the courtroom.

8           Now, we're all here.  We all observed what we

9   observed.  We know that the podium was set up perhaps

10  four or five feet from the table that is sitting in

11  front of the jury where it is right now, and Mr. Cardani

12  was either at or near the podium when he was saying that

13  and when he was done, whether he threw or tossed the

14  Qur'an, that's a semantic that I don't think has any

15  significance.  The reality is the book left his hand and

16  landed square in the middle of that table that's right

17  in front of the jury.

18          The potential is an appeal to prejudice.  The

19  context again, Your Honor, is critical.  In arguing this

20  case, on a couple of occasions, the government injects

21  Osama bin Laden, injects al-Qaeda into this trial.

22  There is absolutely no evidence, hint, suggestion, or

23  reality to any connection between Pete Seda and Osama

24  bin Laden, between Pete Seda and al-Qaeda.  That's

25  wrong.  That's out of bounds.  That shouldn't happen.

1    The morning that the jury is deliberating, in

2    terms of the national context, we come downstairs at the

3    hotel, *USA Today* is sitting there.  And on the front

4    page of *USA Today* was the photograph of and a story

5    about the Florida preacher who was -- made the national

6    media for talking about burning the Qur'an.  That's the

7    context.  A juror, with whom we did not have any

8    contact, is sitting there in the dining room.  That

9    newspaper is there in front of him.  So in the minds of

10   the jurors is that sort of inflammatory information.

11       Now, as the court is aware, we have been

12   sensitive to the concerns that the government raised,

13   and did not file in the public forum the declarations of

14   two people who observed and described for the court what

15   they saw.  But I would submit to the court that the

16   government's request that the documents be filed under

17   seal is strong evidence of its knowledge of the

18   potential inflammatory nature of what occurred in that

19   rebuttal argument.  There is no reason for the

20   government to request that a description of fact be

21   sealed unless it knows that the potential effect on this

22   jury and on the public at large was inflammatory.

23       I pointed out in my pleading that I do not

24   believe that it is appropriate for the government to be

25   asking this court in this sentencing proceeding to

1    engage in any preemptive discussion of any issues that

2    may or may not arise of a professional nature.  As I

3    said, our understanding of the law is that intent,

4    motive is not relevant.  It could be, of course, if one

5    were in a position to say and was saying that an

6    individual is, for example, in other settings, a racist.

7    That is not a claim that we are making.  We are making a

8    claim based on the law, the might, the may, the effect.

9         Calling the Qur'an junk, saying the Qur'an is

10   the defendant, waving it, and throwing it in front of

11   the jury, regrettably, is that.  And in the rest of our

12   pleading, we set out the other issues that have arisen.

13        We do not believe that this court should engage

14   in the fact finding that the government is requesting.

15   That's not the issue before you.

16        In terms of the judgment of acquittal motion,

17   we think that we have articulated the legal issue.  It

18   is, we believe, a matter of law, whether or not the

19   money was required to be reported at all.  We believe

20   that the unrebutted evidence is from the former head of

21   the charitable tax section of the Internal Revenue

22   Service.  He knows.  He wrote the book.  He was

23   responsible for the entire tax section dealing with

24   charities.  He said it did not.  As a matter of law,

25   that should end the matter.

1            And in addition to those, Your Honor, there are
2     several other legal issues, but I'll sit down unless
3     you'd like me to go forward with the other legal issues
4     that we perceived --
5            THE COURT:  As long as we are waiting for the
6     hookup, the video hookup, you filed some other motions,
7     if you have something you wish to add to your written
8     materials, go ahead at this time.
9            MR. WAX:  Well, I understand from Mr. Cardani
10    that our request to strike one of the tax exhibits as
11    something the government is prepared to do, we believe
12    that that needs to be stricken, you know, withdrawn from
13    the electronic record.  It contains information that
14    should not be in the public domain.  So we have that.
15    And I believe that there is agreement on that.
16           We filed a motion for discovery --
17           THE COURT:  You raised that, but was it a
18    separate motion?  I saw it in your briefing but --
19           MR. WAX:  I don't believe I filed it as a
20    separate motion.  I believe it was incorporated within
21    the other pleadings.
22           We have a separate motion for discovery.  If
23    the hookup with Moscow ever occurs, we believe that we
24    are entitled to substantial information before we're
25    required to cross-examine him.  We also include in our

1   pleadings a request to preclude his testimony entirely,

2   and make that request on a number of grounds, on

3   reliability, video hookup, and one or two others.

4           The one other issue, Your Honor, that --

5           THE COURT:  Actually, you did have a separate

6   motion on the exhibit, I'm sorry.

7           MR. WAX:  The one other issue with respect to

8   the new trial motion that I do want to mention involves

9   the juror misconduct issue.  And that, of course, as

10  we've articulated in the proceedings relates to the

11  potential for prejudice for it excluded juror number one

12  when juror number one complimented a government witness,

13  which we think is evidence of the bias that was in the

14  jury.

15          The court did not authorize an inquiry into the

16  other allegations of misconduct.  As you recall, the

17  government brought to our attention that one or more

18  jurors had also spoken to the government tech person,

19  Susan Cooke.  And we believe that a hearing should be

20  ordered on that.  We should get Ms. Cooke in.  We should

21  get other government witnesses.  And we should get the

22  jurors in to inquire into that.

23          The allegation was brought to the court's

24  attention by the government.  And we do not see how the

25  matter can proceed without an inquiry into what

1    occurred.

2              One moment, please.

3              THE COURT:  All right.  We do have a connection

4    now, so we're going to proceed with the testimony.

5              MR. GORDER:  Your Honor, before we do that, can

6    I just briefly respond to his rebuttal issue?

7              THE COURT:  Yes.

8              MR. GORDER:  Mr. Wax continues to take

9    Mr. Cardani's remarks out of context.  He didn't say

10   that the defendant was the Qur'an.  He was talking about

11   the Noble Qur'an that had been identified during the

12   trial as containing this appendix and that was the only

13   part that was introduced into evidence of a call to

14   jihad.  And it's clear if you read the entire paragraph

15   that what he's talking about is the defendant sending

16   that call to jihad to prisoners around the country.  So

17   he continues to take this out of context.

18             And I just want to make sure the court has also

19   received the declaration we filed under seal on this

20   issue also.

21             THE COURT:  I have.

22             MR. GORDER:  Okay.  Thank you.  Beyond that, we

23   are ready to go with the witness from Moscow.

24             THE COURT:  Has our interpreter been sworn?

25             THE CLERK:  No, not yet.

 1          THE COURT:  Let's do that, swear the

 2   interpreter and the witness.

 3          THE CLERK:  Agent Carroll, is this one of your

 4   agents that's on -- sitting next to the witness?

 5          MR. CARROLL:  No, that's not one of our

 6   witnesses.

 7          THE CLERK:  Is it on your screen now?  Mr. Wax,

 8   are you able to see?

 9          THE COURT:  If one lawyer from each side wants

10   to look at the screens up here, we can bring it up just

11   to make sure you have the same thing we have, you may do

12   that.  Why don't you come up and take a look now, if you

13   want to.  Two gentlemen sitting at a table with papers

14   in front of them.

15          MR. CASEY:  We have it now, Your Honor.

16          MR. WAX:  I don't think it's on the big screen

17   yet.

18          MR. GORDER:  And right now, Your Honor,

19   actually the witness is -- at least his face is blocked

20   on our screen.  There we go.

21          THE CLERK:  Mr. Papagni, can you see on the

22   large screen?

23          MR. PAPAGNI:  Yes.

24          MR. WAX:  Your Honor, Colonel Lang is in the

25   courthouse in the District of Columbia, and I'm

```
 1   wondering if we can check to determine whether or not
 2   he's able to be observing and hearing this as well.
 3           THE CLERK:  Colonel Lang, this is Christy from
 4   the U.S. Courthouse in Eugene, Oregon.  Can you hear me
 5   okay?
 6           COLONEL LANG:  Yes, I can.
 7           THE CLERK:  Thank you.  And the participants in
 8   Russia, can you hear me?
 9           INTERPRETER:  Yes, they are.
10           THE CLERK:  Please stand and raise your right
11   hand.
12           (The interpreter was sworn.)
13           (Proceedings translated with a Russian
14   interpreter.)
15           THE CLERK:  Sir, please stand and raise your
16   right hand.
17           (The witness was sworn.)
18           THE CLERK:  Thank you.
19           THE CLERK:  Sir, are you able to hear us okay?
20           THE WITNESS:  Yes, I hear you well.
21           THE CLERK:  Thank you.
22           MR. GORDER:  Your Honor, just for the record, I
23   understand that Vitaly Fedotov is the other gentleman
24   sitting next to him.  He's another officer with the FSB
25   in Moscow.
```

 1              THE CLERK:  Could he please spell his name for

 2      the record.

 3              MR. FEDOTOV:  V-I-T-A-L-Y, F-E-D-O-T-O-V.

 4              THE COURT:  You may proceed.

 5              MR. GORDER:  Thank you, Your Honor.

 6                          DIRECT EXAMINATION

 7      BY MR. GORDER:

 8      Q.    Sir, could you tell us your name and what you

 9      do for a living.

10      A.    My name is Ignatchenko Sergei Nikolayevich.  I

11      am an employee of the Federal Security Service.

12      Q.    And that's of the Russian Federation?

13      A.    Yes.

14      Q.    Do you have a particular rank?

15      A.    Colonel of the FSB of the Russian Federation.

16      Q.    Were you working with the FSB in the 1990s and

17      early 2000 period?

18      A.    Yes, I was working for the FSB at the end of

19      the '90s and at the beginning of the 2000.

20      Q.    And what was your particular responsibilities

21      at that time?

22      A.    At that time I was an operative.  And I was

23      investigating the activities on the territory of the

24      Russian Federation of a number of charity organizations,

25      and one of them was the international charity

1   organization al-Haramain.

2       Q.    And was that in the area of the Caucasus?

3       A.    Yes, the organization was, and its activities

4   were, located in the territory nearing Caucasus and in

5   the Caucasus.

6       Q.    And does that include Chechnya?

7       A.    This organization has an illegal activity on

8   the Russian territory.  And the territory it covered was

9   Chechnya, Ingushetiya, and Dagestan.

10      Q.    Now, when you say it was illegal activity, what

11  do you mean?

12      A.    They didn't follow the procedure of

13  registration in the territory of Russian Federation, so,

14  hence, their activity was illegal.

15      Q.    Did you learn what the activities of

16  al-Haramain were in Chechnya and the Caucasus?

17      A.    Yes.  We got all sorts of data.  This

18  organization was involved in financing terrorist

19  activity in the Caucasus.  In particular, they were

20  financing terrorist groups in the territory of

21  Ingushetiya and Chechnya.

22      Q.    And did they operate out of any particular area

23  near the Caucasus or in the Caucasus?

24      A.    So the structure of the organization was pretty

25  intricate.  They opened a number of branches.  And some

1    of them were in Azerbaijan and in Georgia, Republic of

2    Georgia.  To move finances from the Al-Barakah Bank,

3    they used Azerbaijan.

4        Q.    Was that headquartered in Baku?

5        A.    Yes, the branch office was in the city of Baku.

6    They also had the Kavkaz Institute on the territory of

7    Chechnya.  And that institute, in fact, was the

8    international camp training terrorists.

9        Q.    Can you describe the camp for us, where it was,

10   and --

11       A.    The camp was located in the village --

12   actually, near the village of Serzhen-Yurt.

13       Q.    And what occurred at that camp?

14             INTERPRETER:  I didn't hear what he said.

15       A.    It was close to the village of Serzhen-Yurt on

16   the left bank of the River Khulkhulau.  There were seven

17   training camps inside that big camp.  Up to -- the camp

18   accommodated up to 2000 people at a time who were

19   trained there.  The people who attended that camp came

20   from different countries.  The initial training started

21   with the general military training.  And the follow-up

22   were that the students were distributed among different

23   camps where they get specialty training.  For example,

24   the skills of sniper training, or the explosive

25   specialists, or diversion activity, or the murder for

1    hire.

2        Q.    How long did the camp operate?

3        A.    After graduation, the students returned to

4    their native countries.  It is interesting to point out

5    that at the opening, when the camp was opened in 1997,

6    Ayman Zawahari was there on the day when the camp was

7    opened.  I know that he's number two in the ranking of

8    the international terrorists that you have.

9        Q.    That's al-Qaeda?

10       A.    Yes.  At that time he was the head of jihad

11   al-Islami.

12             MR. WAX:  Your Honor, I'm going to object at

13   this point.  This is going so far afield, it is

14   irrelevant to the issues.  And it appears as though the

15   agent has documents in front of him that he's reading

16   from that we do not have.  And before there is any

17   further testimony from him, we would need to have those

18   documents produced to us in English so that we can

19   evaluate what this is.

20             THE COURT:  Response?

21             MR. GORDER:  Your Honor, I can't be certain

22   what he has.  They appear to be looking at a picture of

23   some kind.

24             MR. WAX:  It's not just the pictures.  It is

25   also the -- some the details that he has been reciting

1    from the papers that he appears to be reading while he's

2    testifying.  Neither Mr. Teesdale nor I recall ever

3    having seen previously in any of the materials the

4    government provided to us.

5         THE COURT:  Well, what we're going to do is

6    this:  That's probably enough background.  And I'm going

7    to allow the examination to go forward.  If we need to

8    continue it some other date for some reason, we'll

9    consider that after this.  All right?

10        MR. GORDER:  Thank you, Your Honor.

11        MR. WAX:  Your Honor, we would note that the TV

12   screen shows that the witness has now covered over some

13   documents, perhaps shutting a folder.  To the extent

14   that this court has any jurisdiction, we would like an

15   order to this witness to preserve intact all the

16   material that is on the table in front of him.

17        MR. GORDER:  Your Honor, we've given the

18   defense what we've received from the Russian government,

19   and I think that's sufficient at this point.

20        THE COURT:  To the extent I have jurisdiction,

21   the witness is to retain the material.  Thank you.  Go

22   ahead.

23        THE WITNESS:  I just wanted to stress, to point

24   out, that what I was saying is a known fact, it's an

25   open source, and it was in the media.

1              THE COURT:  Go ahead.

2              THE WITNESS:  Those were the photos of the

3    documents that he had at the time.  And this was the

4    photocopies of his Sudanese passport.

5              For me the most important thing here was to

6    stress that al-Qaeda was taking an active part in

7    setting up this camp.

8    BY MR. GORDER:

9        Q.    Can you tell us, how long did the camp operate?

10       A.    1997 to 2000.

11       Q.    And how was it financed?

12       A.    It was financed through Islamic Foundation.

13       Q.    And did that include al-Haramain?

14       A.    Yes, it does, sure.  Actually, al-Haramain was

15   playing the major role in financing of this camp.  At

16   that time the fund sent 25 operators in the border

17   regions of Chechnya, and they were sending ammo and

18   uniforms, sniper rifles, and a lot of other stuff.

19             Every field commander had a representative of

20   one of them.  Each had a representative of al-Haramain

21   who financed that particular commander.  Abd-al Latifbin

22   Dar'an was the representative from Saudi Arabia in the

23   camp of Makhachkala.

24       Q.    Can I ask you to take a look at some exhibits

25   that we sent you.  The first one is FSB Number 4.  Could

1   you tell us what these are.

2       A.    These vouchers confirming the receipt of funds.

3   So, for example, here there is the -- al-Haramain is

4   paying 100,000 U.S. dollars.  And there is $3,000 that

5   the Kavkaz Islami Center is paying.  And this center was

6   located in --

7           MR. CASEY:  Your Honor, if I may, excuse me,

8   please.

9           THE COURT:  Just a moment, just a moment, sir.

10  Go ahead, Counsel.

11          MR. CASEY:  Yes, thank you.  The witness is

12  answering specific questions with specific detailed

13  answers.  And he is reading.  And I think we need a

14  foundation by asking him with respect to these specific

15  answers exactly what it is that he is reading from.

16          THE COURT:  I think it was identified a few

17  moments ago.

18          MR. GORDER:  I think he's looking at FSB 4.

19          THE COURT:  That's what the question asked.  Go

20  ahead.

21          MR. CASEY:  I did not hear the FSB 4.

22          THE COURT:  That was the question.

23          MR. CASEY:  Thank you.

24          THE COURT:  You may proceed.

25  BY MR. GORDER:

1    Q.    Where were these vouchers obtained?

2          THE INTERPRETER:   The tape is breaking up.

3    A.    So we received it from our agent.

4    Q.    Now I'd like you to take a look at Exhibit FSB

5    5.  Could you tell us what this is.

6    A.    This is the circuit of explosives.  Those

7    diagrams were studied in detail at the Institute of

8    Kavkaz.  And these were one of the learning materials.

9    Q.    And does it appear to be a diagram of a

10   detonating device?

11   A.    Yes, it is.

12   Q.    And how about Government Exhibit FSB 6?

13   A.    Yes.  This is the dirty bomb diagram.  All

14   these documents are coming from the archive of Abu-

15   Qutaybah and his computer.  He is a citizen of the Saudi

16   Arabia.  His real name is Jamil Jamal Akhmed

17   Abdurakhman.

18   Q.    Before we get to him, I want to go back to FSB

19   6.  You said this was the diagram of the dirty bomb.

20   What do you mean by that?

21   A.    What I meant is that the terrorists were

22   planning how to create this sort of devices to later use

23   it in a terrorist act against civilians.  We also have

24   some information saying that they were trying to create

25   chemical weapons, too.  And also some devices using

Ignatchenko - D by Mr. Gorder                    28

1   poisons.

2      Q.    Now, where was this particular document, FSB 6,

3   found?

4      A.    This document was also found in the computer of

5   Abu Qutaybah.

6      Q.    And who is Abu Qutaybah?

7      A.    I created -- or my notes on him.  He is the

8   mastermind of terrorists.  I want to repeat and say once

9   again that he's a citizen of the Kingdom of Saudi

10  Arabia.  And his real name is Jamil Jamal Akhmed

11  Abdurakhman.  He was fighting in the so-called Kashmir

12  battalion in Bosnia prior to coming to Chechnya.  He

13  lost his leg there.  He was the number one after

14  Khattab, close associate.  He was number four after

15  Khattab, Abu Walid, and Abu-Hafs.

16          THE INTERPRETER:  I didn't hear what he said.

17     A.    So they -- all of them -- all the above

18  mentioned people were the representatives of al-Qaeda in

19  Chechnya.

20     Q.    And were they involved in the Kavkaz Institute?

21     A.    Yes.  Abu Qutaybah was teaching at the

22  institute.  He was teaching the explosives and how to

23  make them.

24     Q.    Now, could you identify for us FSB 7.

25     A.    This was also found in the computer of Abu

1   Qutaybah.  This is the form of martyrs and orphans.  So

2   there was -- actually there was a form for every suicide

3   terrorist, which is called shahid or martyr.  After the

4   act was committed, his family got assistance, financial

5   assistance.  That's one of the forms for the terrorists

6   to propagate their activity.

7       Q.   And where would the money come for the

8   financial assistance?

9       A.   As I already mentioned, the major financial

10  bodies were different charity organizations.  The major

11  one at that time was performed by al-Haramain.

12      Q.   Now, if we could look at Exhibit FSB 8.  Could

13  you identify that for us?

14      A.   This is the chain of command in -- that's the

15  way the emirs, as they call themselves, in the group of

16  Khattab.  After Khattab dies, Abu-Hafs became the major

17  emir.  His first deputy was Abu-Qutaybah.  The second

18  deputy was Abu-Rabi'ah.  Number three was Abu-Jabir.

19  And then Abu-Jihad.  Excuse me, number four is

20  Abu-Jabir.  And number five is Abu-Jihad.  And four

21  emissaries are essential at any time.

22      Q.   And where was this document found?

23      A.   So if one of the person is dead, then the next

24  goes up one step.  For example, if Abu-Hafs is dead,

25  then the major emir becomes Abu-Qutaybah.

1    Q.    Where was this document found?

2    A.    This document was also taken from the computer

3    of Abu-Qutaybah.

4    Q.    And how many of these other people besides

5    Abu-Qutaybah were involved in the Kavkaz Institute?

6    A.    According to the data received, there were 40

7    instructors at the camp.  For the major part, they were

8    of Arab nationality.  But at the time there were

9    Pakistani instructors.  There was also one from the

10   United States.  His name is Asadulla (phonetic).  And,

11   again, it's a nickname.  That's not the real name, of

12   course.

13   Q.    Okay.  If you could look at Exhibits 9, 10, and

14   11.  Could you tell us what they are.

15   A.    Financial accounting that was done by

16   Abu-Qutaybah.  Again, this one was taken from his

17   computer.  Here you can clearly see that the money that

18   came his way he spent for different things.  For

19   example, the making passports, purchasing ammo, and

20   uniforms and clothes, and also to finance terrorists and

21   their families.

22   Q.    Now, could you tell us who Abu Umar Muhammad

23   al-Sayf was?

24   A.    Abu Umar al-Sayf was one of the key figures in

25   the financing on that territory.

 1    Q.    Who did he work for?

 2    A.    We knew that he worked specifically for the

 3    headquarters of Khattab.

 4    Q.    And what was his --

 5    A.    And he was very active.

 6          THE INTERPRETER:  Excuse me, you wanted to say

 7    something?

 8    BY MR. GORDER:

 9    Q.    What was his role at the Kavkaz Institute?

10    A.    He was actively involved in the establishment

11    of the camp and in financing.

12          MR. CASEY:  I'm sorry, Your Honor, I lost the

13    name of that person that he's speaking of right now.

14    Can you repeat that, please?

15          MR. GORDER:  Abu Umar.

16          THE WITNESS:  Abu Umar al-Sayf.  Omar, O-M-A-R.

17    Abu Umar al-Sayf, A-L-S-A-Y-F.

18          MR. CASEY:  Thank you.

19    BY MR. GORDER:

20    Q.    How would he receive his money?

21    A.    As I've already mentioned, we found out that

22    through the branch office that is located in the City of

23    Baku, the finances came through that channel.  So then

24    the money was withdrawn from the bank account.  And then

25    they used couriers to ship that money to Dagestan and

1   Chechnya.

2       Q.    In the spring of -- in the spring of 2000, if

3   Abu Umar had received cash from al-Haramain, how would

4   it have been spent?

5       A.    Spring of 2000?  Specifically at that time

6   there were -- was war going on in the Caucasus.  He

7   would definitely use it and will use his associates to

8   create camps.  They would make the tent cities.  And the

9   purchase of ammunition and weapons that would later be

10  delivered to Chechnya.

11          MR. WAX:  Your Honor, excuse me, we'd like the

12  record to reflect that the other individual during the

13  last 30 to 45 seconds has been feeding information to

14  the witness.  And we would like to ask that that

15  individual be removed from the room so that this witness

16  testifies independently of any information being fed to

17  him by this other person.

18          THE COURT:  Go ahead and make a record on that,

19  please.

20          MR. GORDER:  Your Honor, I would object to

21  that.  I would just ask Mr. Fedotov if he could not

22  speak with the witness until after the testimony.

23          THE COURT:  That is important.  And also please

24  ask him -- please ask the witness what information was

25  given to him.

 1             MR. GORDER:  Sir, could you tell us what

 2    information was given to you by Mr. Fedotov.

 3             MR. WAX:  He just did it again, Your Honor,

 4    excuse me.

 5             THE WITNESS:  He brought up an interesting fact

 6    that probably we were not very clear that the associates

 7    of Abu-Qutaybah were operating on the territories of

 8    Azerbaijan and Georgia.  So Georgia was brought into the

 9    picture.

10             THE COURT:  Just a moment.

11             MR. CASEY:  If I may, Your Honor.

12             THE COURT:  Just a moment.  Excuse me, sir.

13    Please instruct the witness not to take information from

14    his associate there during his testimony.

15             THE INTERPRETER:  I already did.  I will repeat

16    it again.

17             MR. CASEY:  If I may, Your Honor, follow up on

18    that.  I think it's -- a logical follow-up is to move to

19    strike the last series of questions and answers because

20    they were obviously fed to the witness by Mr. Fedotov.

21             THE COURT:  The one statement that was

22    identified is stricken.

23             MR. CASEY:  Thank you, Your Honor.  One other

24    thing, Your Honor, I would ask at this point for

25    Mr. Fedotov to identify himself, number one; number two,

Ignatchenko - D by Mr. Gorder                    34

1  his position; number three, his role; and number four,

2  whether he understands English.

3              THE COURT:  Denied.  Please go ahead.

4              MR. GORDER:  Thank you, Your Honor.

5  BY MR. GORDER:

6     Q.    Sir, we were talking about the kinds of things

7  that Abu Umar could use money for in the spring of 2000.

8  Were there ever payments to commanders of their units?

9     A.    Sure.  In order to commit terrorist acts as

10  well as to assault federal troops, I can tell you that

11  every life costs money.  For example, to kill a soldier

12  it would cost you just $300.  $800 for an officer.

13             MR. CASEY:  Objection, Your Honor, far afield.

14             THE COURT:  Just a moment.  Yeah, sustained.

15  Let's go on to something else.

16  BY MR. GORDER:

17     Q.    Sir, could you tell us did you ever identify

18  someone named Mansour al-Qadi?

19     A.    Mansour al-Qadi.

20             THE INTERPRETER:  He repeats the name.

21             Don't remember, to tell you the truth.

22  BY MR. GORDER:

23     Q.    Okay.  Your Honor, he -- the witness has

24  produced a report, which is an exhibit to our sentencing

25  memorandum, and I'd ask if he could take a look at that.

Ignatchenko - D by Mr. Gorder                    35

1     A.     Yes, I did find that paragraph.

2     Q.     Does that refresh your recollection --

3            MR. CASEY:  Page, please.

4            THE WITNESS:  Yes, I see the name here.

5   BY MR. GORDER:

6     Q.     Did you tell --

7            MR. CASEY:  Can you refer us to the page,

8   please, in the report.

9            MR. GORDER:  Page 6.

10           THE INTERPRETER:  In our translation, it's

11  number 6.

12           THE WITNESS:  We received this digest through

13  using some technical means while we intercepted

14  communications.

15  BY MR. GORDER:

16    Q.     And what was the information --

17    A.     That's why I do not know those names myself.

18    Q.     And what was the information about Al-Qadi?

19    A.     So that name came up in one of the intercepted

20  communications.

21    Q.     And what did you learn about Al-Qadi?

22    A.     We learned about this name for the first time

23  at that time.  And when we placed it against our

24  records, we didn't see it, we didn't find it.

25           MR. CASEY:  Your Honor, if I could ask for

 1    clarification here.  It looks like the witness is again

 2    reading from a document that is being used to refresh

 3    his recollection, which is not permissible.  He may look

 4    at the document, as Your Honor knows, and then testify

 5    from -- as to whether it refreshed his recollection or

 6    not.  He cannot read the document into evidence.

 7                THE COURT:  Is that an objection?

 8                MR. CASEY:  That's an objection.

 9                THE COURT:  Overruled.

10    BY MR. GORDER:

11        Q.    Sir, did you learn that Al-Qadi sent 480,000

12    Saudi riyals to Chechnya?

13        A.    These data actually proved what we knew before,

14    that al-Haramain used a system of collecting charities.

15    I think that was one of the charities that they

16    received.

17        Q.    Now, did you or the Russian government, I guess

18    is -- should I ask, did the Russian government intercept

19    some phone calls between people in Chechnya and

20    al-Haramain representatives in Saudi Arabia?

21        A.    At that time we were intercepting all

22    communications between the masterminds of the terrorist

23    groups.  The al-Haramain was very active in

24    communicating with the gang leaders and so we got

25    sufficient proof for us to know that that was happening,

 1    they were communicating.

 2        Q.    Was there a February 2000 phone call with

 3    Aqil-Aqil, the head of al-Haramain in Saudi Arabia, that

 4    the Russian government intercepted?

 5        A.    Yes, I do.

 6        Q.    Could you tell us --

 7        A.    That was not the only communication that we

 8    intercepted.

 9        Q.    Could you tell us what the February 2000 one

10    was about?

11        A.    At that particular conversation Sheikh

12    Aqil-Aqil was giving his account of what particular

13    weapons they purchased to Khattab.

14        Q.    And --

15        A.    And at that time Khattab was asking Aqil-Aqil

16    to ship additional uniforms, weight uniforms, to his

17    units.

18        Q.    Can you tell us what kind of weapons were they

19    talking about?

20        A.    So there was different propel grenades and

21    machine guns, sniper rifles, and then also a special

22    device which is called PTUR named "Fagot," and that is

23    the anti-tank grenade launchers meant to destroy tanks.

24        Q.    Did you intercept a phone call about how much

25    money al-Haramain had?

 1     A.     They were constantly talking, and we

 2   intercepted plenty.  How much money they collected and

 3   where to -- how to distribute that money.  In February

 4   of 2000 in particular, al-Haramain was saying that they

 5   have -- they managed to collect $50 million specifically

 6   to deliver to Chechnya.  Abu Umar al-Sayf was personally

 7   responsible for the delivery of those funds.

 8     Q.     And did they use a code name for Abu Umar?

 9     A.     His code name over the phone was Abu Maleek

10   (phonetic).

11     Q.     Was there a phone call where Aqil-Aqil

12   discussed future operations against the Russians?

13     A.     Yeah.  We did intercept conversation of this

14   kind.  They were very interested in how Russian troops

15   were relocating.  And also they were discussing the

16   terrorist activity against Russian forces, Russian

17   troops.  al-Haramain was involved in the propaganda of

18   terrorism.  They were very active in placing different

19   sorts of advertisement on the Internet and in the mass

20   media.

21     Q.     Now, when you say "terrorist," do you mean the

22   mujahideen in Chechnya?

23     A.     Yeah, exactly.

24         MR. GORDER:  Your Honor, I have no further

25   questions.  I'd move the admission of Exhibits 4 through

 1  11 for purposes of sentencing.

 2          THE COURT:  Any objection?

 3          MR. WAX:  Yes, Your Honor.  We believe that it

 4  is not the best evidence, as the court is aware, and

 5  we'll get into in cross-examination the Russians alleged

 6  that they intercepted conversations, they allege that in

 7  the normal course they destroyed the tapes.  You have

 8  the declaration of Colonel Lang who, as you have heard

 9  in court, former head of human intelligence for this

10  country's Department of Defense who says that is an

11  absurdity.

12          This is not the best evidence.  This is

13  unreliable.  You will also note that many of these

14  exhibits have dates on them of 1997, '98, 2003, 2004.

15  There is no temporal relevance and most significantly,

16  there is absolutely no connection between anything that

17  was said and Pete Seda.  This is completely irrelevant

18  and unreliable, and we object.

19          THE COURT:  The exhibits are received.  Your

20  arguments go to the weight.

21          We'll take a 5- or 10-minute health break, and

22  then we'll continue.  Please tell the witness that we'll

23  be in recess for just a few minutes.  If he wants to use

24  the bathroom or something, he may.

25          (Recess:  9:52 until 10:03 a.m.)

1          THE COURT:  You may cross-examine.

2                    CROSS-EXAMINATION

3    BY MR. CASEY:

4      Q.    Sir, my name is Bernie Casey.  I'm one of the

5    lawyers for Mr. Seda -- Mr. Sedaghaty.  Sir, could you

6    identify the person next to you in terms of what his

7    role is today?

8      A.    He's an interpreter.  He's an employee of the

9    Federal Security Service, too.

10     Q.    So he is an interpreter for you this morning?

11     A.    Today we have the interpreter that is in the

12   courtroom.

13     Q.    That's correct.  So what is Mr. Fedotov's role

14   this morning or today?

15     A.    Excuse me, please, if I ask you that, what do

16   you mean by asking this question?

17     Q.    I think the question is self-explanatory, sir.

18   What is his function for you this morning?

19     A.    We -- there was an agreement before that there

20   will be an interpreter on each side.  For example, if

21   one of the interpreters get tired or something happens,

22   you know, then the second will step in.

23     Q.    So that is his only function as far as you

24   know?

25          THE INTERPRETER:  Laughing.

1    A.    I don't have an answer to your question.

2    Q.    What else is he doing there with you today

3    besides interpreting?

4         MR. GORDER:  Your Honor, it's been asked and

5    answered.

6         MR. CASEY:  He hasn't been answering it, Your

7    Honor.

8         THE COURT:  Well --

9         THE WITNESS:  He's also helping me out when you

10   name the documents, he helps me out to find exactly what

11   is there, sort of an assistant.

12   BY MR. CASEY:

13   Q.    He has been talking during the course of your

14   testimony.  What has he been telling you?

15   A.    We thought that there is some certain

16   misunderstanding on your end that al-Haramain sent 25

17   operatives to the borderline of Russian Federation.  And

18   he wanted me to reiterate what I already said to clear

19   this up.

20   Q.    Have you worked with Mr. Fedotov in connection

21   with your testimony this morning?

22        MR. GORDER:  Objection, Your Honor.

23        THE COURT:  Overruled.

24        THE WITNESS:  Yes.  He was sort of a liaison

25   with the federal prosecutor and all the legal

1   activities, yes, he was a liaison.  He is a liaison.

2   BY MR. CASEY:

3       Q.      Did he meet with the federal prosecutors from

4   the United States?

5       A.      Yes, we met over the telecommunications, over

6   the TV.

7       Q.      As I understand it, he is an agent of the FSB,

8   correct?

9       A.      He's an employee of the Federal Security

10  Service, and I am too.

11      Q.      Does he have a rank?

12      A.      Sure, he does.

13      Q.      What is --

14      A.      He works in the international unit, and so his

15  job is to -- the relationship with our American

16  counterparts.

17      Q.      What is his rank?

18      A.      He is lieutenant colonel.

19      Q.      Is he a supervisor of yours?

20      A.      We work in completely different units, and he

21  is not my supervisor.

22      Q.      Does he speak English?

23      A.      Yes, he has a very good command of English

24  language.

25      Q.      Do you speak English?

1       A.      Is the question to me?

2       Q.      Yes.

3       A.      A little, very little.  (In English):  Just a

4  little.

5       Q.      That's more than I speak Russian.  Tell me a

6  little bit about the FSB.  As I understand it, it's the

7  successor to the KGB, correct?

8       A.      Federal Security Service, it's very analogous,

9  it's similar to the functions that the FBI is doing.

10      Q.      It's the successor to the KGB, is it not?

11      A.      Not exactly.  In 1991, there were 15 different

12  organizations that branch out.  For example, we have the

13  SVR, which is our intelligent service.  Then there is

14  the federal protection service, and many other

15  departments that were successors.

16      Q.      I understand, sir.  It's an umbrella

17  organization.  Do you know what I mean by that?

18      A.      Not exactly.

19      Q.      Let me explain.  It's the agency that has

20  overall responsibility over all law enforcement and

21  intelligence agencies in the Russian Federation,

22  correct?

23      A.      No, absolutely not.  We have different

24  functions and different goals.

25      Q.      You have a responsibility for maintaining

 1   internal Russian national security?

 2       A.    Yes, internal investigations is part of our

 3   job.

 4       Q.    Yes.  And you also conduct --

 5             THE INTERPRETER:  I want to repeat because I

 6   didn't hear him.

 7             THE WITNESS:  So then as a counterintelligence

 8   body, that's us.

 9   BY MR. CASEY:

10       Q.    Okay.  You are responsible among -- for, among

11   other things, the interception of communications on --

12   in territories outside of the Russian Federation, are

13   you not?

14       A.    No, we don't have that capability.

15       Q.    Okay.  So you do not do any interceptions of

16   communications at all; is that what you are saying?

17       A.    If you are talking about what we were just

18   talking previously, yes, those communications were

19   intercepted because we were specifically monitoring the

20   leaders of gangs.

21       Q.    The leaders of what?

22       A.    Of the leaders of the gang formation.

23       Q.    I didn't understand.  The leaders of what

24   information?

25       A.    Gangs.  They call them gangs.  They are bands,

1    band formations.  So Abu-Qutaybah, Abu-Walid, Abu-Hafs.

2        Q.    So we understand your testimony today, and that

3    testimony related in part to interceptions of certain

4    individuals engaged in military conflict in the

5    Caucasus, correct?

6        A.    Yes, you got me right exactly.

7        Q.    And those interceptions were made by FSB

8    operatives, correct?

9        A.    Yes.  We have some technical units that are

10    involved in intercepting communications.

11        Q.    And that is a major part of the responsibility

12    of the FSB, is it not?

13        A.    The major role of the FSB and one of the major

14    roles is to combat terrorism, that's right.

15        Q.    So in that sense, the FSB is what you would

16    call a combat support agency for the Russian military,

17    that is part of its responsibility?

18        A.    I didn't understand.  I didn't fully understand

19    your question.

20        Q.    Part of the responsibility of the FSB is to

21    protect Russian national security?

22        A.    Yes, sure, that's true what you just said.  And

23    espionage is part of it.

24        Q.    All right.

25        A.    And also we combat, you know, narco traffic and

 1  mafia.

 2      Q.    Incidentally, sir, today can you actually see

 3  me?  Am I being -- is there videotape?

 4      A.    You mean -- yes, he does.

 5      Q.    Where are you physically located today?

 6      A.    I'm in Moscow.

 7      Q.    Where in Moscow?

 8      A.    In the very center.  I am at the Federal

 9  Security Service.

10      Q.    More specifically, I assume you are at the FSB

11  headquarters, is that --

12      A.    Yes, you are right.

13      Q.    And that's in Lubyanka Square, as I understand

14  it?

15      A.    You know a lot.

16      Q.    And that's the same headquarters that the KGB

17  had, am I right?

18      A.    No.  KGB was much bigger.  It was a huge

19  organization.

20      Q.    No, I'm not saying that.  I'm saying that you

21  are in the same building that was the headquarters that

22  the KGB was in.

23      A.    Of course, if we were part of the KGB, yes,

24  that's the same building.

25      Q.    Okay.  Now, there is a former KGB agent and FSB

1    director who is now -- I believe his title is president

2    of the Russian Federation, correct?

3        A.    Yes.

4        Q.    That would be Vladimir Putin?

5        A.    Yes, you're right, that's Putin.

6        Q.    Okay.  Tell me a little bit about your

7    background, sir, just a little bit more than we get into

8    on direct examination.  First of all, how long have you

9    been employed by Russian intelligence agencies?

10       A.    I want to once again stress the point that we

11   are not an intelligence organization.

12       Q.    Okay.  Call it what you will.

13       A.    No, that's -- that makes sense to me to stress

14   it once again that we are not intelligence.  We are not

15   involved in espionage.  We are trying to catch the

16   spies.

17       Q.    All right.  I'm not going to argue the point

18   with you, but how long have you been employed by the

19   FSB?

20       A.    More than 25 years.

21       Q.    Twenty-five years.  So that would go back to

22   the '80s, I guess, huh?

23       A.    Yes, yeah, correct.

24       Q.    How much more than 25 years?

25       A.    A little bit.

1      Q.     Okay.  So the FSB came into existence, as I

2    understand it, sometime in the '90s, correct?

3      A.     You know what, we had different acronyms.

4      Q.     So were you ever employed by -- were you ever

5    employed by what we know as the KGB?

6      A.     Yeah, sure.

7      Q.     What was your role with the KGB?

8      A.     Counterintelligence, same thing as I'm doing

9    now.

10     Q.     Counterintelligence.  Okay.  And -- well, so

11   you described yourself as an operative, right?

12     A.     Not anymore.

13     Q.     What is an operative?

14     A.     What is an operative activity, what we do,

15   participation in investigation of different crimes, so I

16   was involved in counterespionage, that was my specific.

17     Q.     Counterespionage, what -- can you tell me what

18   that means?

19     A.     So we have such a notion which is like

20   investigation of subversive activities.

21     Q.     Okay.  Do you get involved in -- as an

22   operative in counterespionage -- did you say

23   counterespionage?  As an operative involved in counter-

24   espionage, do you get involved with intercepting

25   communications?

1      A.     No.  The technical services are involved in

2   that activity.

3      Q.     Okay.  So you are not specially trained then in

4   the technical aspects of intercepting communications?

5      A.     No, I don't have this type of training.

6      Q.     Now, during the period let's say in the 1990s

7   through early 2000, were you involved as an operative in

8   counterespionage operations at that time?

9      A.     Yes.

10     Q.     And I believe you testified that part of your

11  responsibility during those years was to investigate

12  certain charities?

13     A.     Yeah, sure.

14     Q.     And did you -- in connection with those duties,

15  did you ever personally participate in intercepting

16  communications?

17     A.     I was never personally involved in intercepting

18  communications.

19     Q.     So is it fair for me to understand that you

20  have no personal knowledge with respect to any of the

21  communications that were intercepted that you testified

22  to today?

23     A.     I don't understand the question.

24     Q.     Let me repeat it.  You testified today, sir,

25  about various communications that were intercepted, did

1  you not?

2      A.    Yes, sure, I testified.

3      Q.    Did you intercept any of those communications

4  personally?

5      A.    I think I start to understand what you are

6  driving at.

7      Q.    Sir, the question is self-explanatory.  You may

8  consult with your counsel there.

9      A.    I was -- the reality is that I was the head of

10  the group that was supervising and was involved in

11  investigation of the terrorist activity in northern

12  Caucasus.  So I was receiving all of the detailed

13  information that was related to this.  And one of that

14  was the intercepted communications.

15     Q.    All right.

16     A.    And I had technical services doing that, and

17  they have specially trained people, technicians, who are

18  trained to intercept those types of communications.

19     Q.    All right.  So -- go ahead --

20     A.    So they are specialists, they are

21  professionals, they know what they are doing, so they

22  have the library of voices.

23     Q.    What is that now?

24     A.    So the library of voices means that we have the

25  voices of the terrorists recorded.

1      Q.    Well, now that you've raised that, let me ask

2   you some more questions about that library.

3            MR. GORDER:  Your Honor, can we at least have

4   the witness be able to finish --

5            MR. CASEY:  I'm trying, Your Honor.

6            THE COURT:  You actually interrupted him, but

7   allow the witness to finish his answer.

8   BY MR. CASEY:

9      Q.    Did you finish your answer?

10     A.    I continue.  With 100 percent accuracy, I can

11  testify that my specialists, highly trained specialists,

12  identified the voices of various people.  One of them

13  was Sheikh Aqil bin Abd-al-Aqil.

14     Q.    I'd like the names of those specialists

15  identified, any of the persons involved in the

16  communications that you testified to today.

17           MR. GORDER:  I'm going to object.  We're

18  getting far afield.

19           THE COURT:  Sustained.

20           THE WITNESS:  That's secret information and we

21  don't disclose that.

22  BY MR. CASEY:

23     Q.    Okay.  Now, tell me more about your

24  responsibilities during this time in question, during

25  the 1990s to early 2000s, you said you were the head of

Ignatchenko - X by Mr. Casey                    52

1    the investigative team.

2        A.    Yes, the subunit.

3        Q.    All right.  Describe the unit for me, please,

4    just in terms of how many people worked for you?

5        A.    That's classified information and I cannot tell

6    you.

7        Q.    Where were you located during these years?

8        A.    Very often I was in the Caucasus.  In 1997

9    alone, I had more than 30 trips to that region.

10       Q.    What about 1999 and 2000?

11       A.    Same, a lot of trips there, and all of them

12   were related to the investigation.

13       Q.    You are no longer an operative, correct?

14       A.    No, I'm not involved in this type of work any

15   longer.

16       Q.    Let me back up a second.  What was your rank

17   during the years of 1990s to early 2000?

18       A.    Colonel from 2000.

19       Q.    Before that?

20       A.    Lieutenant colonel.

21       Q.    All right.  And what is your -- you are no

22   longer an operative today, but how would you describe

23   your responsibilities today?

24       A.    I am the head of the center of our

25   communications for the Federal Security Service.

Ignatchenko - X by Mr. Casey                    53

1    Q.    So you are a spokesperson for the FSB?

2    A.    Yeah, yeah, I -- we can call it that.

3    Q.    Okay.  When did you assume those

4    responsibilities?

5    A.    From 2001.

6    Q.    Okay.  Let me ask you some questions about the

7    circumstances leading up to your testimony today,

8    please.  As I understand it, you were interviewed in

9    Lubyanka Square by a Lieutenant Colonel Romanov -- I'm

10   sorry, Romanovsky on December 3, 2008, am I correct?

11   A.    Can you please repeat the date.

12   Q.    You may refer to your report, sir.

13   A.    Oh, okay, yeah, sure, that's the date.

14   Q.    Who is Lieutenant Colonel Romanovsky?

15   A.    He's deputy chief of a unit of investigative

16   unit.

17   Q.    Who was present in the room during this

18   interview?

19   A.    I don't remember.  I can find out.  I don't

20   remember.

21   Q.    Was there -- were there other people there

22   besides you and the lieutenant colonel?

23   A.    Yes, there was an investigator.

24   Q.    Was Mr. Fedotov there?

25   A.    No, he had no -- no, he was not there.

1     Q.     Okay.  Was -- are you familiar with the

2   prosecution team in this case?

3     A.     You mean the federal prosecutor?

4     Q.     I mean the American prosecutors.

5     A.     Yeah, I understand the general prosecutor and

6   the employees of the FBI.

7     Q.     Were they there?  Was anybody from the

8   prosecution team there during this interview?

9     A.     So you are referring to the interview of

10  Romanovsky?

11    Q.     That's right.

12    A.     No, nobody was there.

13    Q.     Okay.  So Mister -- do you know Mr. Cardani?

14    A.     Who is Cardani?

15           MR. CARDANI:  I'm irrelevant to this

16  proceeding.  Can you have him hold off.  Judge, just to

17  get this going, Mr. Gorder and I and the agents took a

18  trip to Moscow as part of this information gathering

19  process.  We met with this witness and others.  That's

20  different than the interview report itself.

21           MR. CASEY:  Understood.  Thank you.  That helps

22  speed things along.

23  BY MR. CASEY:

24    Q.     You have met Mr. Cardani and Mr. Gorder then

25  and had an interview with them, correct?

1      A.      You know, I tell you this, I'm a little bit

2  confused with the names.

3      Q.      Sure.  But you met with representatives of the

4  prosecution team in this case?

5      A.      Yes.  There was the federal side, there were

6  the prosecution team, yes, I met with them.

7      Q.      How did this all come about?  Do you know what

8  led to your involvement with the American prosecution

9  team?

10     A.      We received a request from the Federal Bureau

11 of Investigation regarding al-Haramain.  And this is in

12 the frame of our partnership relationship, we exchange

13 information.

14     Q.      And the partnership, I believe it's called the

15 joint counterterrorism working group, does that --

16     A.      Yes, that is exactly as it is, it is our joint

17 work against terrorism.

18     Q.      And in --

19     A.      I think that this is a very rewarding work

20 because terrorism has many, many forms.  And they adjust

21 to the particular country they dwell in.  So they

22 somehow work out their relationship with the rulers of

23 that country, so I don't think that we can fight this

24 animal without joint work.

25     Q.      Okay.  And so the -- the Russians received a

1    request for information about al-Haramain, correct?

2        A.    Yeah.

3        Q.    And the Russians requested the Americans give

4    them some information, too, right?

5        A.    No, we didn't send any requests regarding any

6    information.  Actually, we stopped our investigation in

7    2001.

8        Q.    Okay.  Did you receive any intelligence

9    information from the American team?

10            MR. GORDER:  Your Honor, I'm going to object.

11   We're getting beyond the --

12            MR. CASEY:  Your Honor, this goes to the heart

13   of credibility.

14            THE COURT:  I'll allow this question to be

15   answered.

16            THE WITNESS:  Yeah, intelligence information?

17   BY MR. CASEY:

18       Q.    Any kind of information.

19       A.    So you are -- you are trying to say that we

20   recruited some of the employees of the FBI?

21       Q.    Was there an exchange of information between

22   the Russians and the Americans in connection with your

23   being interviewed in this case?

24       A.    Okay.  I understand what you are asking me.

25       Q.    So what's the answer?

1     A.     Our colleagues from the FBI told us that they

2  are investigating financial activities of --

3            THE INTERPRETER:  I asked him to repeat what he

4  said because I missed the second part.

5     Q.     Yeah.  What did the FBI or any member of the

6  American prosecution team give to the Russians in this

7  connection?

8     A.     So what period are you talking about?

9     Q.     During the time that you were being interviewed

10 for the purposes of this prosecution.

11    A.     No, I didn't receive any.

12    Q.     I'm not asking about you personally.  I'm

13 talking about the Russian government, if you know.

14    A.     I am not the one who is involved in exchange of

15 the information.  We have different units who do that.

16    Q.     Okay.  Fine.  I'm just asking you what you know

17 yourself, sir.  If you don't know, you don't know.

18    A.     So I was asked to come over and to be

19 interviewed and answer questions regarding al-Haramain,

20 that's all.

21    Q.     I know that.  My question is, if you know, what

22 information did the American team give to you or the

23 Russians in connection with this investigation?

24    A.     I am not aware of any information.  I was

25 invited to attend the discussion as an employee who was

1   involved in the activities of al-Haramain.

2      Q.   Did you see any files that -- I'm sorry, finish

3   your answer, please.

4           THE INTERPRETER:  Excuse me, please, when both

5   of you talk, I miss the entire conversation --

6           MR. CASEY:  I'm sorry.

7           THE INTERPRETER:  -- and that makes it very

8   difficult.

9           MR. CASEY:  I'm sorry.

10          THE INTERPRETER:  So I will ask him to repeat

11  everything.  I didn't hear a single word.

12          Again, I was invited to give evidence regarding

13  al-Haramain and all of the activities in the Caucasus.

14  BY MR. CASEY:

15     Q.   I know that.  I have another question.  Are you

16  aware of any information of any kind given by the

17  American prosecution team to the Russians about this

18  case?

19     A.   The only thing that I know, and that is all, is

20  that the employees of the FBI are involved in the

21  investigation of financial activity of al-Haramain, and

22  that's all I know.

23     Q.   Did they show you or anybody that you know, did

24  they show any files, any computers, any hard drives, any

25  videotapes, any recordings, any pictures, any documents?

 1      A.     I didn't see any information.  And I want to

 2  reiterate that no printouts, no computers, no hard

 3  drives, nothing, I've seen nothing, and I want to again

 4  repeat that.

 5      Q.     What have you done to prepare yourself for this

 6  testimony today?

 7      A.     I collected a lot of confidential information

 8  that we -- for example, I have the protocols of the

 9  reports that we interviewed one of the students at the

10  Kavkaz Institute.  He is Uighur by nationality.  And he

11  was trained at the Al Kavkaz Institute in 1997, so he

12  was an explosives specialist, he was trained as such.

13      Q.     When did you interview him, sir?

14      A.     1997, August 1997.

15      Q.     Okay.  But I'm talking about in specific

16  preparation for your appearance here today.

17      A.     This one that you just mentioned?

18      Q.     No.

19      A.     Then also the terrorist Dekyushev, his report.

20      Q.     I'm sorry, I missed --

21      A.     Who was sentenced -- who got a life sentence in

22  2004.  His name is Dekyushev, D-E-K-Y-U-S-H-E-V.  For

23  his explosions in the cities of Moscow of the living

24  quarters of the high-rises in Moscow and Volgodonsk.

25      Q.     When did you interview him?

1     A.     2004.

2     Q.     What else?

3     A.     Also the leaders of the -- the terrorist

4  leaders, we created a list of them with international

5  terrorists --

6     Q.     And that list is included in your report?

7     A.     -- who were the head of those band formation

8  that is northern Caucasus.

9            THE INTERPRETER:  And I will repeat your

10 question.

11           No, I haven't sent it to you yet.

12    Q.     What -- you are looking at papers there.  Can

13 you tell me what those papers are?

14    A.     That is the list I am talking about.

15    Q.     Okay.  So some of your testimony today is based

16 on those papers; is that right?

17    A.     Yes, specifically for the report we prepared

18 some, we have some notes.

19    Q.     As you go forward with this examination this

20 morning, sir, if you are referring to any particular

21 papers, please identify them, and please let us know if

22 you have --

23    A.     Can you please explain in more detail what you

24 want from me?

25    Q.     Yes.  You have a number of papers before you.

 1   You've been referring to them on and off.

 2      A.    Different reports?  This is the report of one

 3   of the interviews.

 4      Q.    Now, as I understand it, we do not have copies

 5   of those reports.

 6      A.    And also some of the information that we

 7   sent -- the majority is the documents that we sent to

 8   you before.

 9      Q.    The documents you sent to us before do not

10   include your witness interviews, do they?

11      A.    Again, I don't understand why you ask this.

12      Q.    Let me -- go ahead.

13      A.    What interview are you talking about?

14           THE INTERPRETER:  He said something.

15      Q.    Let's move on.

16      A.    I don't understand what you are asking me then.

17      Q.    We're going to move on.  You were supposed to

18   testify at the trial of this case but you did not.  Why

19   not?

20           MR. GORDER:  Objection, Your Honor.

21           THE COURT:  Sustained.

22   BY MR. CASEY:

23      Q.    Were you supposed to testify as a witness at

24   the trial of this case, sir?

25           MR. GORDER:  Objection.

1          THE COURT:  Sustained.

2    BY MR. CASEY:

3      Q.    Sir, you have testified that during the 1990s

4    and 2000, your principal responsibility was to

5    investigate certain charities operating in the Caucasus;

6    is that correct?

7      A.    Yes, that's right.

8      Q.    Were all of those charities Mideastern in

9    origin?

10     A.    For the most part, yes.  They are primarily all

11   of them had roots in the Middle East.

12     Q.    And you said that you were investigating

13   illegal activity, correct?

14     A.    Yes, that's right.

15     Q.    And I believe you described the illegal

16   activity as meaning that the organizations were not

17   properly registered with the Russian Federation.  Did I

18   understand you correctly Russian?

19     A.    According to our laws, any activity that is not

20   properly registered is considered to be illegal.

21     Q.    And that's why you were investigating the

22   charities because they were not properly registered,

23   correct?

24     A.    No, not just because of that.  Those

25   organizations were hurting, were damaging Russia.

1   Q.    And I believe you said that they were

2   damaging --

3   A.    So they were damaging the Russian Federation.

4   Q.    And I believe you said they were damaging the

5   Russian Federation because they were engaged in

6   financing terrorism; is that correct?

7   A.    Not just because of that, no.  As I already

8   mentioned, there was one of the key figures who was Abu

9   Umar al-Sayf, and he's one of the key figures in the

10  organization.

11  Q.    Most of your testimony, as I recall, though,

12  was related to the involvement of charities in financing

13  what you call terrorism, am I not correct?

14  A.    I want to continue that one of the projects was

15  al-Haramain, and also they were recruiting new members

16  into terrorist activity.  I can use one example.  In the

17  Republic of Dagestan, which has a border with Chechnya,

18  there are two villages, Karamakhi and Chabanmakhi both

19  in the mountain regions.  So Abu Umar al-Sayf, so one of

20  his projects, so he was financing some terrorist cells,

21  so he was also involved in creating the bands that are

22  sort of guerrilla bands, guerrilla gangs.  So the local

23  militia, the local police, was not active there, so they

24  chased it away.  So the local peasants, they were

25  building concrete walls.  And when there was a terrorist

1    invasion of Chechnya into Dagestan in 1999, they used

2    the terrorist cells that were already created on the

3    territory of Dagestan.

4        Q.    Now --

5        A.    And Abu Umar al-Sayf was personally involved in

6    the creation of those cells.

7        Q.    I'm going to be asking you some questions about

8    some of these incidents that you testified to.  And I

9    believe you stated that during the time in question,

10   during the 1990s and early 2000s, there was a war going

11   on in the Caucasus.

12       A.    War?

13       Q.    Those were your words, at least that was the

14   translation.

15       A.    In summer of 1999 --

16       Q.    Let's back up.  Let's back up.  Before we do,

17   I'm going to ask you one more question about --

18       A.    In August of 1999, so the terrorist band

19   formations from Chechnya, came from Chechnya into the

20   Dagestani territory, and they tried to capture power of

21   the -- of Dagestan, so we -- and there was definitely

22   the response of the local people who battled them,

23   combated them.  And at the end of the 1999, to establish

24   the constitutional regime, the federal forces --

25       Q.    Okay, sir --

Ignatchenko - X by Mr. Casey                            65

1      A.      -- were pulled into the Republic.

2      Q.      I'm sorry.  Sir, I understand that you have

3  considerable knowledge about the conflicts that went on

4  with Chechnya.  And I have specific questions about

5  that, so if you bear with me, my first question goes

6  back to your use of the term "terror" and "terrorists."

7  And I noticed that you use that term only in connection

8  with people that were fighting against Russia and not

9  with respect to Russians.  Did I hear your testimony

10  correctly?

11      A.      That is not exactly right.  I think that

12  "terrorist" and "terrorism" is an international term.

13  We don't have our own understanding or definition of

14  terrorism.  If I use international terrorism, I mean

15  people who got educated at the International Institute

16  of Kavkaz, and they went to the country they came from.

17  So, for example, there was a person from the U.S.A. --

18      Q.      Understood.  And you are talking now

19  specifically about the Kavkaz Institute?

20      A.      I'm specifically talking about the Kavkaz

21  Institute because it was the international camp of the

22  preparation of terrorists.

23      Q.      And -- and --

24      A.      And there is a reason why I took the report of

25  this Uighur person because he graduated from there.

 1   Every student who graduated from that institute, his

 2   diploma work was to commit a terrorist act.

 3       Q.    Now, you are not telling me that the only --

 4   the only instances of terror are those that were

 5   committed by people who were trained at the

 6   international center in Kavkaz, are you?

 7       A.    Of course not.

 8       Q.    All right.

 9       A.    No.

10       Q.    So --

11       A.    We have Russian terrorists.  So if we start

12   talking about nationalities, there were Russian people

13   among those.

14       Q.    I think you would agree with me --

15       A.    And those were those Russians I'm talking

16   about, they also committed terrorist acts.

17       Q.    I think you would agree with me, would you not,

18   that sometimes it's difficult to distinguish between

19   acts of terror on the one hand and acts of warfare on

20   the other.

21            MR. GORDER:  I'm going to object.  I think

22   we're getting beyond the scope of sentencing.

23            MR. CASEY:  Your Honor, if I may address that,

24   one of the elements, one of the many elements in our

25   position that the terrorism enhancement does not apply

1    is that it's just -- it does -- the terrorism

2    enhancement and federal crimes of terrorism are not

3    intended to cover acts that occur in conventional war.

4    And I want to ask this witness specific questions.  I'm

5    trying to be very precise with this, and concise, but

6    this is a central element -- one of the central elements

7    of our position.

8              THE COURT:  I'll allow a few questions.

9              MR. CASEY:  Thank you, Your Honor.

10   BY MR. CASEY:

11      Q.    Let me ask you some questions about the

12   struggle with Chechnya.  It goes back many centuries,

13   doesn't it?

14      A.    I think that if we start going back into

15   history, our discussion will be very long.

16      Q.    I don't want to go back into history.  I just

17   want you to answer yes or no.

18      A.    My point is that the graduates of the Institute

19   of Kavkaz, they were blowing up the civilian -- the

20   high-rises where civilians live.  You know, those

21   terrorist acts were not against the military personnel.

22   They were against civilians.  And that is my major

23   point.

24      Q.    Understood.  Let me talk to you first about the

25   first war in the 1990s.  It started, as I recall, in

Ignatchenko - X by Mr. Casey                          68

1    1994 and ended in August of 1996; is that correct?

2        A.    End of '94, right.  And then there was an

3    agreement signed where we were giving certain rights so

4    Chechnya didn't secede from the Russian Federation.  It

5    was an autonomous republic.  It was given some rights.

6        Q.    Okay.  Now, before the war actually started,

7    the Soviet Union had basically disintegrated, correct?

8        A.    In 1991, yes.

9        Q.    Right.  And in some of the federation

10   republics, the ethnic republics, there was pressure and

11   demands for independence, correct?

12       A.    No, that's not right.

13       Q.    Now, are you saying that none of the republics

14   were pressing for independence from Russia during that

15   time?

16       A.    Not a single republic wanted to.

17       Q.    Oh, I see.  And wasn't there actually a

18   struggle -- let's just talk about Chechnya, if I could.

19       A.    Not to secede from Russia.

20       Q.    But they wanted independence, they wanted --

21   they wanted autonomy.

22       A.    I don't understand a little bit.

23           THE INTERPRETER:  And let me probably say a

24   little word.  There is a difficulty with the "republic"

25   word.  There are republics that are autonomous, which

1   are Chechnya, or whatever you want, and there is a

2   republic which was like Estonia, Latvia, Lithuania, that

3   got their independence in 1991.  So maybe it's confusion

4   about the word.  That's all I wanted to --

5   BY MR. CASEY:

6       Q.    All right.  During that period of time, the

7   early 1990s, in Chechnya there was a struggle within

8   Chechnya between those who wanted more autonomy and

9   those who wanted more close relationship with Russia, if

10  you know.

11      A.    That's a tough question.

12      Q.    But you know, don't you, that during that

13  period of time --

14      A.    In the early 1990s, the Islamic adversaries

15  started flooding into Chechnya.

16      Q.    That's not answering my question, sir,

17  respectfully.

18      A.    And Sheikh Abu-Aqil, famous Islamic ideologist,

19  came to Chechnya in early 1990.

20      Q.    Sir, if you'd just let me ask my question.

21      A.    So the process of Islamization started -- of

22  different circles started at that time.  So the

23  adversaries promised a lot of financial support.  And

24  one of the terms for those finances to actually reach

25  Chechnya was if Chechnya agrees to create an Islamic

1    state outside of the Russian territory.  That was 1990.

2       Q.    Okay.  Now, during that point in time -- sir,

3    just let me ask my question, please.

4           MR. GORDER:  He's asking these broad questions

5    and not letting the witness answer.

6           MR. CASEY:  Oh, please.

7           MR. GORDER:  And I'm not sure how relevant they

8    are to the purposes of --

9           MR. CASEY:  Your Honor, I am trying to get to

10   the point, but we are getting soliloquies here.

11          THE COURT:  It was a broad question, Counsel.

12   BY MR. CASEY:

13      Q.    All right.  During the 1990s, early 1990s, it

14   is true, is it not, that Russia was clandestinely

15   supporting the pro-Russian forces within Chechnya?

16      A.    I wouldn't say that it's correct.  What do you

17   mean "clandestinely"?  It was part of the Russian

18   Federation, so nobody chased it out.

19      Q.    There was an undeclared civil war in Chechnya

20   at that time?

21      A.    So with all the ethnic difficulties that Russia

22   was suffering from at that period of time, there were

23   just criminal elements at that time.  That started the

24   formation of bands, gangs on this territory, and they

25   were involved in simple thefts in the territory of

1    Chechnya.

2        Q.    And then in December of 1994, the Russian

3    troops actually invaded the territory of Chechnya,

4    right?

5        A.    No.  The paratroopers battalion actually

6    entered the territory of Chechnya.  It was not Russian

7    troops.

8        Q.    I'm sorry, what was the distinction there?

9        A.    So when you say the "troops," I mean army.  And

10   it's a lot.  And I'm talking about one battalion.

11       Q.    All right.  And during the period December of

12   '94 through January of '95, there was the battle of

13   Grozny, correct?

14       A.    Yeah.

15       Q.    And -- and Grozny was bombarded more than any

16   city in the history of the world during that time; isn't

17   that correct?

18       A.    Yes, after this paratrooper battalion was

19   actually murdered, we started the war, we started the

20   combat activities.

21       Q.    And it leveled lots of civilian apartment

22   houses and residences throughout the city?

23       A.    Yeah, possibly, yes.

24       Q.    And there were hundreds of thousands of

25   Chechnyan refugees that were displaced because of this?

1      A.      Yes, there were refugees.

2      Q.      And there were massacres of civilians in

3  various villages, including the village of Samashki

4  which is notorious, is it not?

5      A.      No, this is not right.  This is not the way it

6  was.

7      Q.      Are you personally familiar with the

8  circumstances in Samashki?

9      A.      Yes, I remember it very well.

10      Q.      And after the Russians -- I'm sorry, I didn't

11  hear you.

12      A.      So the story was very simple because all those

13  gangs, they were hiding in little village, which

14  belonged to civilians, right.  So when we started the

15  assault, unfortunately the civilians were involved, but

16  we were fighting the gangs that were hiding in the

17  village.

18      Q.      Okay.  So after the Russians took over or

19  controlled Grozny, Russian troops expanded into the

20  mountain areas?

21      A.      I think so, yeah, probably.

22      Q.      Now, you used the term "gangs" in the villages

23  that were killed, some of these were Russian -- were

24  Chechen soldiers, were they not?  By "gangs" you meant

25  Chechen soldiers?

1    A.    So nobody was killing anybody in the villages.

2    Q.    I see.

3    A.    I think this is -- we are now in the sphere of

4    the terrorist propaganda.  That's not right.

5    Q.    Okay.  So if I have read reports about

6    massacres by Russian soldiers in the various villages,

7    massacres of civilians, you would say that's all

8    terrorist propaganda?

9    A.    Unfortunately, yes, I would agree with you that

10   is just -- that is part of the propaganda.  And more

11   than that, I can tell you that America is not immune

12   from that, because you became part of the same

13   propaganda that was waged in the course of these years.

14   Q.    Sir, I'm not here to debate Russian-American

15   spheres of influence or points of agreement or

16   disagreement.  I'm asking you to talk about Chechnya.

17         You made reference to the Kavkaz Institute in

18   the village of Serzhen-Yurt.  And it's a point of fact,

19   is it not, that that was -- the village of Serzhen-Yurt

20   is the village that the Russian soldiers forced the

21   Chechens to retreat to when the Russians were trying to

22   take over the mountainous regions?

23   A.    No, that's not that village.

24   Q.    Well, it is the village where they were

25   forced -- where the Chechen soldiers set up their

1    headquarters in the Kavkaz Institute, is it not?

2        A.    The international terrorist camp --

3              THE INTERPRETER:  He was breaking up --

4        A.    So the Kavkaz Institute as the -- so I can tell

5    you the address of the institute.  It is an

6    international terrorist camp.

7              THE INTERPRETER:  And he's looking through his

8    papers to give us the exact address of the Institute of

9    Kavkaz.

10       Q.    It's not necessary from my point of view.  We

11   can agree it's in the village of Serzhen-Yurt, right?

12       A.    No.  They were on the left bank of the river.

13             And the river was broken up, I can't hear.

14             We are referring to Serzhen-Yurt as being in

15   the vicinity of where the Institute of Kavkaz was.

16       Q.    Fair enough.  Sir, Kavkaz Institute you

17   described as a training institute.  You say it's a

18   terrorist training institute.

19       A.    That's not my description.  That's a

20   description that the students give.

21       Q.    Okay.  The student gave that, okay.  And the

22   student -- this is the Uighur you're speaking of?

23       A.    Dagestan and Uighur and many others.

24       Q.    Many others meaning how many others?

25       A.    Okay.  Just imagine, 2000 people approximately

1    were trained there at any given time.  So every three

2    months, they graduated them and then the new people came

3    on board.

4         Q.    Where did you get this information?

5         A.    At that time, I am talking about 1997, I was --

6    I had many, many trips to Dagestan.

7         Q.    Did you ever go to --

8         A.    And I was --

9         Q.    Did you ever go to the Kavkaz Institute?

10        A.    No.  After graduation, no, they were going back

11   to the countries they came from.

12        Q.    I didn't understand that.  Who is going back to

13   the country?

14        A.    The students graduating from the Kavkaz

15   Institute, they were returning to their native

16   countries.

17        Q.    Sir, I have a simple question.  How do you know

18   as much as you proclaim to know about Kavkaz?

19        A.    I was a witness myself.  I was taking

20   interviews, I was interviewing people.

21        Q.    You've mentioned a couple of people you

22   interviewed.  Anybody else?

23        A.    If you want, I can make a list and send it over

24   of many students that I interviewed.

25        Q.    Let's move on.  You talked about their -- sir,

1   I have a question for you.

2      A.    So from all these interviews that I can prepare

3   for you, it's visual that what --

4          THE INTERPRETER:  And he's showing a picture of

5   some explosive devices that these people were trained as

6   explosive specialists.

7      Q.    We're going to get into that.

8      A.    And there is different diagrams, different

9   circuits and --

10     Q.    We're definitely going to get into that.  I

11  have a lot of questions on that.  Bear with me first, I

12  have some other questions.  You said that this is a

13  terror training camp because they taught things such as

14  sniper, explosives, diversionary activities, and murder

15  for hire, right?

16     A.    Yes.  We have all the evidence that we -- from

17  the interviews.

18     Q.    And they were teaching these things to people

19  who were fighting the Russians?

20     A.    No, that's an international terrorist camp.

21     Q.    Wait, wait, wait.

22     A.    They were going back to the countries they came

23  from.  So I can read you something from the evidence --

24  the same Uighur person that I brought with me today for

25  the court.

Ignatchenko - X by Mr. Casey                          77

 1    Q.    That's all right.

 2    A.    Who after graduation had to go back to Turkey

 3  and blow up the Chinese embassy there.  That was his

 4  graduation task.

 5    Q.    All right.  They were also teaching it to

 6  Chechens who were fighting Russia, were they not?

 7    A.    Yeah, no, they were just trained there, right,

 8  who were paid money to murder, to kidnap.

 9    Q.    Okay.

10    A.    And those Chechens who later went to

11  Afghanistan and other countries.  And, again, I want to

12  point out that this was all for money.  They were paid

13  money for that.

14    Q.    Does it surprise you that the Chechens would

15  have a training camp from military purposes?

16    A.    I want to tell you that I have a lot of

17  friends, personally I have a lot of friends who are

18  Chechen, and we have a wonderful relationship.  Of

19  course, there were Chechens in that camp.  So, yes,

20  there were Chechens, and there were representatives from

21  many other republics there, too.  But I wanted to stress

22  the point again, so what the major point -- my major

23  point is that this terrorist camp was established there

24  in order to conduct international terrorism.  And they

25  were training not Chechens in that camp.  They were

1    training many different nationalities and many

2    terrorists who would go to their countries, so I

3    consider this place to be an international terrorist

4    training camp.

5        Q.    All right.  And the Russians had training

6    camps, too, didn't they?  And the Russians train their

7    soldiers in snipers, in explosives?

8        A.    You are -- you want me to talk about the

9    Russian Army.

10       Q.    I do.

11       A.    If that's what you mean.

12       Q.    Yeah, da.

13       A.    I think the United States Army also have the

14   same subunits.

15       Q.    All right.

16       A.    And train the different --

17            THE COURT:  We've been over this enough.  Let's

18   go on to something else.

19   BY MR. CASEY:

20       Q.    The -- both the first and second Chechen wars

21   in the 1990s ended with treatises, did they not?

22       A.    The agreement was in 1996, if you mean the

23   first Chechen war, 1994, 1996.

24       Q.    That's right.  High representatives of

25   Mr. Yeltsin, who was the president at the time, and the

1    Chechen forces signed treatises ending these conflicts,

2    supposed to be ending the conflicts, right?

3        A.    Yeah, they stopped, all the combat activity

4    stopped.

5        Q.    Okay.  Getting back to your testimony about

6    financing from al-Haramain, you referred to certain

7    exhibits which purport to be vouchers of expenses.  I'm

8    talking about the FSB Exhibits 5, 6, 7, 8, 9, 10, 11.

9        A.    Yeah.

10       Q.    Also Exhibit 4.  Now, if you look through those

11   exhibits, sir, they either involve transactions that

12   allegedly occurred in 1994 or in the years 2003 and

13   2004, correct, one also in 1997?

14       A.    I don't understand what you --

15       Q.    Well, look at them, sir.

16       A.    Yes, all the dates are there.

17       Q.    Right.

18       A.    So each of the vouchers has a date.

19       Q.    Yeah.  1994, 1997, and 2003, and 2004.

20       A.    So what is the question?

21       Q.    First of all, you don't disagree with that, do

22   you?

23             THE COURT:  Let's move on, Counsel, please.

24   BY MR. CASEY:

25       Q.    None of these vouchers occurred during the

1    period 1999 through the year 2000, did they?

2        A.    According to the dates that you referred to,

3    no.

4        Q.    Right.  And do I correctly understand that

5    these documents were all taken off the computer of Abu-

6    Qutaybah?

7        A.    No, they were different, different sources.

8        Q.    Tell me the sources of the other documents.

9        A.    So this is our -- the agents got those

10   documents and we already answered this question to the

11   prosecution.

12       Q.    Could you just refresh my recollection.  I

13   heard the Qutaybah computer.  Where else?

14       A.    So from the Qutaybah's computer, FSB 5, that's

15   Qutaybah's computer.  FSB 6, FSB 7, FSB 9, and that's

16   it.

17       Q.    Okay.  Now, the Kavkaz Institute was not

18   operating beyond the year 2000, was it?

19       A.    End of 2000, yeah, it was not functioning

20   anymore.

21       Q.    Did you say 1997 to 2000?

22       A.    Yeah, that's right.

23       Q.    All right.  Was the material on the Qutaybah

24   computers, was that coded or not?

25       A.    No, no, they were not.

1      Q.     So he just -- this is all written in what,
2   Arabic or Russian or what was it written in?
3      A.     No, Russian is a translation and --
4      Q.     Were they translated by the FSB?
5      A.     Yeah.
6      Q.     Your testimony was that we, meaning the FSB,
7   intercepted all communications between the terrorist
8   masterminds, right?
9      A.     Yes, I confirmed that.
10     Q.     And some of those interceptions took place
11  under your supervision?
12     A.     I was the head of the group that was
13  investigating the activity of the organizations that
14  were involved in subversive activity.
15     Q.     Okay.
16     A.     According to my requests, I received intercepts
17  of those communications that were related to my sphere
18  of activity.
19     Q.     And did you receive the -- what would you
20  actually receive from the people who were intercepting
21  the communications?  Would you receive the audiotape?
22     A.     Yes, we received audiotapes and also we
23  received the transcripts.
24     Q.     And when would you receive this information
25  relative to the time that the interception actually took

1    place?

2         A.    Actually it is -- I referred to that in my

3    testimony.  Beginning with the 1997 and up to 2001.

4         Q.    But how much time would elapse between the time

5    of the interception and the time you got the information

6    in your official position?

7         A.    This is our technical secrets and this is our

8    technical capabilities that are classified and I can't

9    talk about that.

10        Q.    All right.  Let's talk about the specific

11   interceptions that you did talk about.  Okay.  So you

12   talked about interceptions that occurred -- bear with me

13   for a second.  Before we talk about that, the specifics,

14   I just want to ask you an overall question.  You

15   testified that this information was obtained through

16   technical means.  Can you tell me what the technical

17   means were.

18        A.    I'm not a specialist in technology.  I have no

19   idea how it is even -- how they do it.

20        Q.    Radio, satellite, telephone, fax, what was it?

21        A.    That's it.

22        Q.    As we say --

23        A.    My speciality is -- I'm a humanitarian, so

24   please.

25        Q.    I'm sorry?

 1              THE INTERPRETER:  His speciality is humanity.

 2     He doesn't know technical stuff at all.

 3              THE COURT:  Counsel, you may have up to 25 more

 4     minutes.

 5              MR. CASEY:  Thank you, sir.  I think that's all

 6     it should take.

 7     BY MR. CASEY:

 8        Q.    Okay.  I want to ask you about specific

 9     intercepts that you did testify about.  And you

10     mentioned in particular a communication in February of

11     the year 2000.  And you testified that that was a

12     communication involving emissaries from Chechnya and

13     Mr. Aqil, who was the head of al-Haramain.  Do you

14     remember that?

15        A.    Yeah, February of 2000, yes, I do remember.

16        Q.    Okay.  And you testified that a communication

17     was intercepted in which the emissary from Chechnya,

18     whose name you did not disclose, talked to Aqil about a

19     major terrorist operation against Russian troops,

20     correct?

21        A.    Yes, that's what I said.

22        Q.    And do you now know the name of the Chechen

23     that was involved in that communication?

24        A.    Unfortunately, we couldn't identify all of

25     them.

Ignatchenko - X by Mr. Casey                                84

1      Q.     Okay.  But here you are talking about a

2   particular communication.  Did you actually hear that

3   communication?

4      A.     Yes, I have the tapes and I was listening to

5   those tapes, too.  Yes, I can testify that those

6   communications I listened myself to.

7      Q.     When?

8      A.     So if we are talking about the year 2000, then

9   I listened to them in the year 2000.

10     Q.     When?  When in 2000?

11     A.     So if we're talking about February, then it was

12  either in February or in March.

13     Q.     So there was an audiotape of that

14  communication?

15     A.     Yes, there was a recording, special recording.

16     Q.     This is the year 2010.  Do you have an

17  independent recollection of listening to that particular

18  communication?

19     A.     Of course I have my own notes, and I used my

20  own notes.

21     Q.     We haven't seen those notes.  Where are they?

22     A.     Here they are in my report, in my interview.

23     Q.     We have seen a report.  Who prepared this

24  report?

25     A.     In 2008.

1      Q.     Did you prepare this report?

2      A.     I didn't understand the question.

3      Q.     Did you prepare the report that we're looking

4   at today?

5      A.     This report is typed according to what I said

6   to my evidence.

7      Q.     All right.  So I'm asking about the notes that

8   you took when you first heard the telecommunication in

9   February of 2000 in which a Chechen operative told Aqil

10  about an imminent major military operation over

11  apparently live wire.  Those are the notes that I'm

12  talking about.  Where are they?

13     A.     So all the notes are part of the file, of the

14  case file.

15     Q.     Whose file -- I'm sorry.  Whose file?  We have

16  not seen them, have we?

17     A.     So the investigation file.

18     Q.     Do you have that file?

19     A.     No, I don't have it.

20     Q.     Who has it?

21     A.     This is the archived case.  This is the entire

22  case, not just the pack of documents.

23     Q.     That's right.  The FSB has a large archive of

24  documents and tapes, don't they?

25     A.     Sure.

1      Q.    Yes.  And why haven't we seen them?  We've

2    asked for them.

3      A.    Because it is classified as top secret.

4      Q.    You told us in your report that the reason you

5    don't have the audiotape of this is because it was

6    destroyed pursuant to a record retention policy, did you

7    not?

8      A.    Yeah, that's true.  We don't have the tapes.

9    Those were destroyed according to the policy.

10     Q.    According to the policy, you have -- okay.  So

11   there are two tapes that we're talking about here, the

12   one in which some unknown Chechen spills the beans about

13   an imminent major military operation to somebody in

14   Saudi Arabia, that's one tape.

15          The other tape is the -- other tape, sir, is

16   one that you say involves the leader of the Chechen

17   forces Khattab with the top leader of al-Haramain, Aqil,

18   in which they are talking over a live wire about RPG's,

19   bullets, other ammunition systems, machine guns,

20   Kalashnikov rifles, sniper rifles, et cetera.  You

21   remember your testimony about that, don't you?

22     A.    Yeah, sure.

23     Q.    Yeah.  And there was an audiotape of that, too,

24   wasn't there?

25     A.    Yes, there was.

1    Q.    And you heard that audiotape yourself, didn't

2  you?

3    A.    Many a times.

4    Q.    Many a times.  Why many a times?

5    A.    During that investigation, representatives from

6  Saudi Arabia came visiting us.

7    Q.    And that's critical information, isn't it?

8    A.    So we played those tapes.  So they are --

9    Q.    Please answer my question.

10   A.    And so we identified that the person was Aqil

11  bin Abd-al-Aziz-al-Aqil.

12   Q.    Please answer my question.  That was critical

13  information in the context of a war against Chechnya,

14  wasn't it?

15   A.    What do you mean by "critical information"?

16   Q.    I'll let the record stand on that.  I think we

17  both know.

18         MR. GORDER:  Objection, Your Honor.

19         THE COURT:  Sustained.  Counsel, please.

20         MR. CASEY:  Withdrawn, withdrawn.

21  BY MR. CASEY:

22   Q.    What happened to that audiotape?

23   A.    So we demagnetized those audiotapes that were

24  never requested by the court or by anybody.

25   Q.    You destroyed those, right?

1      A.      Yes.

2      Q.      Yeah, because of a five-year record retention

3    plan?

4      A.      Yes.

5      Q.      Why doesn't the record retention plan pertain

6    to paper records, do you know?

7              THE INTERPRETER:  There was something said.

8      A.      So we have certain documents we adhere to and

9    we have to destroy the tapes.  That's our policy.

10      Q.      Okay.  So there are no tapes in the archives

11    after five years?

12      A.      If you requested those a little bit earlier, of

13    course we would give them to you.

14      Q.      The -- al-Haramain I believe you -- I don't

15    know whether you said it today or not, but it's in your

16    report, al-Haramain has a close connection with the

17    government of Saudi Arabia, correct?

18      A.      Yes, true.  So the Islamic charity

19    organization, which is al-Haramain, so that's the Holy

20    Foundation of Two Shrines, of two shrines.

21      Q.      So there is a close relationship between the

22    government of Saudi Arabia and al-Haramain?

23      A.      So the royal family actually sent part of the

24    funds received by al-Haramain was -- came from the royal

25    family, yes, that's true.

1      Q.    All right.

2      A.    They were unaware that when they transferred

3  these large sums of money that the money would go to the

4  terrorists.

5      Q.    Oh, is that so?  Do you know Prince Al Turki?

6      A.    His rep came over.

7      Q.    What's that?

8      A.    His representatives of Prince Turki, he came to

9  us, and we were working the information.

10     Q.    That's right.  He works closely with the --

11  both the United States and with the Russian government,

12  correct?

13     A.    Of course, since I'm a representative of this

14  information, we have contacts between our governments,

15  that's true.

16     Q.    And Turki is on the board of directors and was

17  on the board of directors of al-Haramain during this

18  relevant time period in the late '90s and early 2000,

19  right?

20     A.    I wouldn't say -- partner he was not, but I can

21  tell you one thing, that he was -- paid great attention

22  to charity and to charitable contributions.

23     Q.    That's right.  And al-Haramain was created

24  sometime in the, I believe, late 1980s not just for the

25  purpose -- or not for the purpose of financing terrorism

1    but for legitimate charitable purposes, was it not?

2        A.    The mission -- yeah, sure, the mission of the

3    organization was to help Muslims who were in need.  That

4    was the major mission initially.

5        Q.    And they had a budget of between 30 and

6    $50 million a year, right?  Do you know that?

7        A.    I think much more, much more, because at that

8    moment the organization had approximately 70 branches in

9    different countries in the world.

10       Q.    Sir, you may think that, but have you read any

11   specific information about their annual budgets?

12       A.    To tell you -- to be exact, I want to say that

13   the Saudi representatives who came visiting us, they

14   told us that their budget is pretty big.

15       Q.    Have you read the 9/11 Report that was prepared

16   by the American government in the aftermath of 9/11?

17       A.    Yes, of course, I was -- I don't remember the

18   details right now, but definitely I know where and I

19   read it.

20       Q.    Just to cut to the quick, their report was that

21   the al-Haramain annual budget was about $50 million a

22   year.  Would you disagree with that?

23       A.    Doesn't it refer to only what was collected in

24   the territory of the United States?

25       Q.    No, sir, it doesn't.  That was their

1    international budget.  And they accounted for how they

2    expended most of it, operating 20 orphanages around the

3    world and other humanitarian causes.  Do you remember

4    that, sir?

5        A.    No, I don't remember the details.

6        Q.    All right.

7        A.    But I think that the money they had was in

8    their found was -- their foundation had much more money

9    than you quote.

10       Q.    All right.  Because one of the intercepts that

11   you talk about, at least in your report, I'm not sure

12   you did explicitly this morning, maybe you did, I think

13   you did actually, you made reference to al-Haramain

14   setting aside $50 million specifically to assist the

15   Chechen -- what you call Chechen mujahideen.

16       A.    Yes, that was part of the information that they

17   communicated.

18       Q.    Okay.  Now, "they" being who?

19       A.    al-Haramain.

20       Q.    To whom?

21       A.    To the leaders.

22       Q.    What?

23       A.    To the leaders.

24       Q.    To the leaders.  Sorry.  And I assume that's on

25   audiotape, too, right?

1      A.    Yes, it was on the tape.

2      Q.    And you heard those tapes, and you have a

3    specific recollection of hearing that particular tape;

4    is that right?

5      A.    Yes, I did personally.

6      Q.    When?  When, sir?

7      A.    More than that, I had a report prepared on that

8    tape.

9      Q.    I'm sorry?

10          THE COURT:  She said, "more than that, I had a

11    report prepared on that tape."

12   BY MR. CASEY:

13     Q.    Okay.  And that report is in writing, correct?

14     A.    It's in writing.  Definitely, it's in writing.

15     Q.    It's in the archives?

16     A.    Yes, it is in archive, if you mean that report

17    that the FSB prepared.

18     Q.    No, I mean your report personally.

19     A.    You know, I don't have anything personally.  I

20    work for the government, so it's a government report.

21     Q.    Sir, among the -- we're wrapping up, Your

22    Honor.

23          Among the many people that you identified in

24    your report as being associated with al-Haramain, there

25    is one name that I did not see.  The name -- in fact,

1   most of the names were all Saudi Arabians, correct?

2       A.    Could you please repeat the question.  I

3   didn't --

4       Q.    Of all the names that you've identified in your

5   report, none of them includes Mr. Seda, right,

6   Sedaghaty?

7       A.    No, no, I didn't come across that name

8   personally.

9       Q.    Okay.  Do you know Mr. Sedaghaty or know

10  anything about him?

11      A.    No, I never knew about him, and I never heard

12  about him.

13      Q.    What about Dr. El-Fiki, do you know anything

14  about Dr. El-Fiki?

15      A.    No, can't tell you anything.

16      Q.    So of the money that you testified was

17  transferred by al-Haramain into the hands of the

18  Chechens, you're not able to trace any of that back to

19  either Dr. El-Fiki or Mr. Seda, are you?

20      A.    We didn't know exactly which country the money

21  came from.

22      Q.    Okay.

23      A.    And at that time, I'm now talking of 1999 and

24  2000, we couldn't monitor the flow of finances.

25            MR. CASEY:  Thank you.  Your Honor, I believe

 1   that's it.  If you give me just two minutes to confer

 2   with co-counsel, I think we should wrap it up.

 3            THE COURT:  Fine.

 4            (Discussion held off the record.)

 5   BY MR. CASEY:

 6       Q.    Colonel Ignatchenko, can you hear me now?

 7       A.    Yeah.

 8       Q.    Could I ask what time it is in Russia now?

 9       A.    In Russia?

10       Q.    Yes.

11       A.    It's 2310.

12            MR. CASEY:  You had a long day, and I am

13   through with you from here.

14            MR. GORDER:  Nothing further, Your Honor.

15            THE COURT:  Thank you very much.  Good day.

16   We're in recess until 1:20.

17            MR. CARDANI:  Judge, can we excuse the

18   translator?  Is there any more need for Russian

19   translation?

20            (Recess:  12:12 until 1:30 p.m.)

21            THE COURT:  Your next witness.

22            MR. CARDANI:  Judge, conferring with Mr. Wax,

23   it's my understanding that they are not calling Mr. Lang

24   as a witness.  And if that's the case, we're prepared to

25   call our last -- I think our last sentencing witness.

1          Before I go, I want to introduce the type of

2     testimony that we're going to hear.  This is on the tax

3     loss issue identified in the presentence report.  The

4     presentence report includes a figure of about $80,000

5     for the tax loss under the sentencing guidelines.

6          This is an interesting tax case because it's

7     not a typical tax case by anybody's definition.  And

8     under the sentencing guidelines that are applicable

9     here, that's the 2000 guideline books, under 2T1.1 it

10    refers to a table 2T4.1, and depending on what they call

11    the tax loss, it equates to the offense level for

12    purposes of the guidelines.

13         In the application notes in the commentary,

14    there is an understanding from the Sentencing Commission

15    that in situations where it's difficult to nail down an

16    actual tax figure, the court is to make a reasonable

17    estimate based on the available facts and a reasonable

18    calculation of the tax loss in situations where it's

19    hard to nail down the tax loss.

20         Before I call this witness for some brief

21    testimony introducing the -- how the $80,000 figure was

22    derived, in meeting with the IRS in preparation for

23    sentencing, it's difficult, because you have to assume

24    certain things that helps drive the tax loss figures.

25    And for purposes of this next witness's testimony, we

1  asked him to assume that Mr. El-Fiki intended to donate

2  to widows and orphans true humanitarian aid.  And then a

3  series of assumptions off of that.  That al-Haramain

4  U.S. opposed acts of violence, opposed terrorism, could

5  not help fund it, so on and so forth.  He will testify

6  that based on those assumptions that there is an $80,000

7  tax loss.  And he'll explain why that is.

8           At the risk of sounding duplicitous, if

9  Mr. El-Fiki's intent was different, and, you know, we

10 don't know truly what Mr. El-Fiki's intention was

11 because he wasn't a witness.  He has given statements to

12 the Egyptian police.  And there was information all over

13 the Web site.  He may have had a different intention.

14 He may have intended to fund the mujahideen and helped,

15 you know, this conspiracy afoot.

16          If that's the case, this witness is also ready

17 to testify that that too would result in a tax loss but

18 under a different set of calculations.  So I don't want

19 to be sounding like I'm speaking out of both sides of my

20 mouth, but some of these assumptions, the result of the

21 tax loss drive off of what the donative intent of

22 Mr. El-Fiki was.

23          MR. MATASAR:  May I be heard in brief response,

24 Your Honor?

25          THE COURT:  Yes.

1          MR. MATASAR:  Your Honor, Mr. Cardani took the

2     position during the trial, specifically in a

3     hypothetical question that he asked Mr. Wooten, that

4     Mr. El-Fiki intended that the money go to Chechen

5     mujahideen.  He indicated, when we objected, that

6     Mr. El-Fiki was linked to the Muslim brotherhood and

7     that that was the basis for their position.

8          In our view, they cannot take one position in

9     the trial to get -- to gain a benefit, which is to say

10    El-Fiki intended the money to go to Chechen mujahideen,

11    and then take a different position later on in the case.

12         We believe they should be estopped from taking

13    the other position and that they must go forward here at

14    sentencing with the position that they took during the

15    trial, especially since they took that position during

16    the trial not just as an afterthought but with the

17    specific goal of gaining advantage in the trial.

18         Therefore, we ask that they be restricted to

19    only one argument at sentencing.

20         THE COURT:  We'll take the evidence.  I'll sort

21    that out later.

22         MR. CARDANI:  May I call the witness?

23         THE COURT:  Yes.

24         MR. CARDANI:  Greg Wooten.

25         MR. MATASAR:  Can I ask if Mr. Owens can hear

1    the proceedings in the court?

2              MR. OWENS:  Yes, I can.

3              MR. MATASAR:  Thank you.

4              (The witness was sworn.)

5              THE CLERK:  Please state your full name and

6    spell your name for the record.

7              THE WITNESS:  Gregory Wooten, G-R-E-G-O-R-Y.

8    W-O-O-T-E-N.

9              MR. CARDANI:  Excuse me one minute, Mr. Wooten.

10             Judge, some housekeeping matters, we have an

11   Exhibit 1 to our sentencing memo, which is a tax form.

12   I erroneously included some identification numbers that

13   I shouldn't have.  And Mr. Wax pointed that out in the

14   form of a motion to strike it.  I agree with that

15   motion.  And I -- I'll offer in -- to replace it what we

16   call Redacted Sentencing Exhibit 1.  I've given a copy

17   to Mr. Wax.  I've provided a copy to the court.  And we

18   would offer this as our sentencing Exhibit 1 at this

19   time.

20             THE COURT:  Any objection?

21             MR. MATASAR:  No objection, Your Honor.

22             MR. WAX:  No objection, Your Honor.

23             THE COURT:  Thank you.  Your other motion is

24   granted on the original version.

25             Go ahead.

DIRECT EXAMINATION

BY MR. CARDANI:

Q.    Mr. Wooten, you testified during this -- during

the trial of this matter?

A.    Yes, I did.

Q.    And, once again, your position?

A.    I am currently a manager of Exempt

Organizations revenue agents for the Pacific Northwest

area.  My position entails the management of revenue

agents that do exempt organizations' audits in the

states of Washington, Oregon, Idaho, Alaska, Hawaii, and

some bordering states occasionally.

Q.    And you personally have done -- engaged in

numerous audits of 501(c)(3) organizations.

A.    That's correct.

Q.    And supervised hundreds more?

A.    That's correct.

Q.    You were aware that after the convictions in

this case the IRS was asked to come up with an

estimation of the tax calculations based on the

convictions in the case?

A.    Yes, I was aware of that.

Q.    Were you further aware that there were certain

assumptions that the IRS was asked to assume that are on

the government's sentencing memo pages 3 and 4, are you

Wooten - D by Mr. Cardani                          100

1    aware of that?

2        A.    Yes, I'm aware of those assumptions.  I have a

3    copy of the assumptions from the sentencing memo.

4        Q.    Okay.  Did you personally prepare those tax

5    numbers?

6        A.    I did not personally prepare the calculations

7    in the redacted sentencing exhibit, no, I did not.

8        Q.    All right.  But are you aware, nevertheless, of

9    the information contained in the -- what we call the

10   form 4549-A?

11       A.    Yes, I'm aware of 4549-A.

12       Q.    Do you have that in front of you?

13       A.    Yes, I do.

14       Q.    Based on the assumptions that are outlined in

15   pages 3 and 4 of the government's sentencing memorandum,

16   do you have an opinion as to whether these are

17   reasonable tax estimates in the government's redacted

18   sentencing Exhibit Number 1?

19       A.    Based on the assumptions that I was provided,

20   the calculations in the 4549-A are a reasonable,

21   conservative estimate of taxes that would be due based

22   upon the assumptions, yes.

23       Q.    What do you mean by "conservative"?

24       A.    There are some additional taxes that could also

25   have been imposed that likely -- if I, as a revenue

1    agent, were doing an examination, I potentially would

2    have.  There is, for example, an assessment of excise

3    taxes for excess benefit transaction here.  There is

4    actually a second tier excise tax on those types of

5    transactions if the transactions are not corrected

6    within a taxable period that would significantly

7    increase the numbers here.

8        Q.    Okay.  So looking at these -- what you consider

9    to be conservative numbers, it's my understanding that

10   there are essentially two types of taxes imposed on

11   Mr. Sedaghaty based on the assumptions in the sentencing

12   memo?

13       A.    Well, actually there are three types of taxes

14   that are being assessed here.  First, there are taxes

15   that are being imposed based upon the 1040 personal

16   income tax return based upon the assumptions that are in

17   the guidelines I was given.  Those are based upon the

18   assumption that the funds were removed from the tax

19   exempt organization and are being, therefore, taxed to

20   the individual on the Form 1040.

21       Q.    Before you move on, is the general assumption,

22   though, that the donation was made by El-Fiki for

23   benevolent purpose?

24       A.    Yes.  The assumption that I was given is that

25   it was given for benevolent purposes, then removed by

1    the defendant for what amounts to personal purposes.

2        Q.    So a lay word for that might be embezzlement?

3        A.    Yes.

4        Q.    So with those assumptions and with that kind of

5    embezzlement theory, what are the three types of taxes

6    that have been imposed on this 4549?

7        A.    The first tax being imposed is, as I just

8    discussed, relates to the 1040 return.  Essentially the

9    funds that were removed from the exempt organization for

10   individual benefit are being taxed to that individual.

11         The second tax has to do with an excess benefit

12   transaction, that is a tax that is imposed upon an

13   individual that removes funds.  It's a 25 percent excise

14   tax imposed upon an individual that removes funds from

15   an exempt organization with -- that the funds are not

16   considered compensation.  There is no quid pro quo, so

17   to speak, in a situation where it is an excess benefit

18   over what was earned.

19         There is also a smaller tax being assessed.  We

20   generally call it a foundation manager tax.  It's an

21   additional tax being assessed on a manager of an

22   organization that removed -- knowingly removes those

23   funds as well.

24       Q.    All right.  So with those three taxes in mind,

25   and those are all delineated in this 4549-A?

1     A.     They're summarized in the 4549-A, yes.

2     Q.     Okay.  And the net effect is the bottom line,

3  line 16, a balance due of $80,980?

4     A.     That's correct.

5     Q.     And is that giving Mr. Sedaghaty a benefit

6  of -- up at line 1a, of $24,000 loss that he asserted

7  from -- on his 1040?

8     A.     Yes.  That is giving him the benefit of a

9  $24,000 loss from a business.  I understand -- I believe

10  it was an arborist business from what I remember from

11  reviewing the documentation.  It was later determined

12  that potentially that $24,000 loss should not have been

13  allowable because the basis in the pass-through

14  corporation that we're talking about had been reduced to

15  zero, so that is something potentially that should not

16  have been included here, but was.  Therefore, it's

17  actually reducing the amount of tax that would be

18  otherwise listed on line 16.

19     Q.     So that's reducing -- giving him a benefit and

20  lowering his taxes?

21     A.     That's correct.

22     Q.     All right.  So is the upshot of all this,

23  Mr. Wooten, that based on these adjustments and

24  considering this embezzlement theory, that

25  Mr. Sedaghaty's Form 1040 for the year 2000, this is

1    essentially adjusting that, and giving him the benefits

2    of the tax -- of the credits and the deductions he

3    asserted, but with the additional taxation based on the

4    embezzlement, that there's an $80,980 balance due?

5        A.    Not quite.  There are actually two returns that

6    are being affected here, a Form 4720-A, which is the

7    return which the excess benefit transaction would be

8    reported on, as well as the Form 1040.  The cumulative

9    effect on those two returns is the dollar amount that's

10   listed here, though, that's correct.

11       Q.    All right.  Now, you understand the -- where

12   those figures came from under tax law -- the basis --

13   the basis for that?

14       A.    Yes, I do.

15       Q.    Okay.  If the assumptions changed somewhat,

16   Mr. Wooten, and if Mr. El-Fiki didn't intend it to be a

17   benevolent donation, that was embezzled by Mr. Sedaghaty

18   and Mr. al-But'he, but instead that he intended to fund

19   the mujahideen, in essence was a conspirator, would that

20   change the taxation issues?

21       A.    Absolutely it would.  Then potentially what we

22   would have is we would have a situation where the excess

23   benefit would be eliminated here.  The -- or a good

24   portion of the excess benefit would be eliminated here.

25   The taxability on the Form 1040 would be eliminated.

1   However, we would have a situation where the nonprofit

2   organization would be potentially subject to revocation.

3   And their 990 return, which is a nontaxable return,

4   would be converted to an 1120 return, which is subject

5   to taxation.  The --

6       Q.    Okay.  Hold on a second.  Let's break that down

7   a little bit.

8       A.    Sure.

9       Q.    So 501(c)(3) tax exempt organizations file Form

10  990 annually with the IRS?

11      A.    That is correct.

12      Q.    But profitable -- but businesses file a Form

13  1120?

14      A.    They file a Form 1120 depending on their

15  corporate structure.  This organization would be subject

16  to filing an 1120.

17      Q.    Okay.  So if Mr. El-Fiki was intending to

18  donate to the mujahideen, are you saying that that could

19  have the effect of collapsing the entire tax exempt

20  nature of al-Haramain U.S. and convert the business to

21  one that has to file an 1120 with the IRS?

22      A.    The contribution specifically for the purposes

23  of funding the mujahideen to this organization would be

24  a nonexempt transaction, which would result in the

25  proposal for revocation of the exempt status of this

 1    organization.  That, when that went through, would also

 2    result in the conversion of the 990 to a Form 1120.  The

 3    receipts of the organization on that 990 then would turn

 4    into what amounts to gross income on the Form 1120.  And

 5    that amount would then be taxed at corporate rates.

 6         Q.    Is that 34 percent?

 7         A.    It's a graduated -- excuse me, they're

 8    graduated tables, but, yes, that's correct.

 9         Q.    Okay.  Have you done some rough math on this,

10    Mr. Wooten, prior to your testimony today?  And if you

11    altered those assumptions and went with Mr. El-Fiki was

12    intending to fund the mujahideen, would there be more or

13    less taxation owed?

14         A.    I did a rough estimate of the amount of tax

15    that would be owed based upon the revocation of this

16    organization using some different assumptions that these

17    funds were coming in for nonexempt purposes, and the tax

18    that would be owed then by the organization upon

19    conversion would be up to possibly about $180,000.

20         Q.    Okay.  That's far more than what's proposed in

21    this 4549, $80,000?

22         A.    That's correct.

23              MR. CARDANI:  That's all I have.  Thank you.

24              THE COURT:  Cross.

25

                        CROSS-EXAMINATION

BY MR. MATASAR:

    Q.    Mr. Wooten, these calculations that you made

concerning the scenario that Mr. El-Fiki intended the

money to go to the Chechen mujahideen and, that,

therefore, the 990 would be converted to an 1120, when

did you make those calculations?

    A.    I actually had considered those previously but

had not done the calculations based upon the assumptions

that I was given.  I made those calculations or, as I

said, I did an estimate of those calculations today.

    Q.    Today?  First time?

    A.    Yes.

    Q.    There is no documents that you prepared that

you gave to Mr. Cardani concerning your claim in court

today that there is over $100,000 in loss?

    A.    No, there is no document.  I simply informed

him that based upon the -- that assumption that I --

since it may have been a question asked of me in court

today, I did a rough calculation and the tax could be up

to $180,000.

    Q.    Let me first ask about the original theory,

which is that Mr. Sedaghaty -- well, I guess both

theories are based on the idea that Mr. Sedaghaty took

the money for himself; is that right?

1        A.      No.

2        Q.      The first one is?

3        A.      The first theory is that he removed the funds

4    for a personal purpose.

5        Q.      And that theory would simply have no effect

6    whatsoever if the assumption was that Mr. El-Fiki

7    intended the money to go to the mujahideen, right?

8        A.      I'm not sure --

9        Q.      That first theory.

10       A.      I'm sorry, I'm not sure if I understand the

11   question.

12       Q.      Okay.  You have two theories of taxation here.

13   One is that Pete Seda embezzled the money?

14       A.      Yes.

15       Q.      And what is that theory -- what is

16   Mr. El-Fiki's intent -- how is Mr. El-Fiki's intent

17   relevant to that theory?

18       A.      In that theory, Mr. El-Fiki's intent is for the

19   funds to come into a tax exempt organization.  He then

20   makes the transfer of those funds into a tax exempt

21   organization, the tax exempt organization, whose purpose

22   is not specifically to fund terrorism, it actually

23   states in the tax exempt organization's articles of

24   creation that it stands against all forms of terrorism.

25   Therefore, since it is not an act of the organization,

1    it is an act of the person that removed those funds from

2    the organization for personal purposes.

3        Q.    And that is your view even if Mr. Seda did not

4    use the money for his own personal purposes?  He did not

5    buy a car, or put it in his bank account, or anything

6    like that, but that he simply gave the money to another

7    organization?

8        A.    That is -- that is the view, yes.  If I'm

9    understanding your question, yes, that is the view.

10   It's similar to a situation where, for example, an

11   individual made the payment for their child's college

12   tuition out of the organization instead of transferring

13   the funds directly to themselves, they did still receive

14   a benefit from that.

15       Q.    Well, in that case that you are talking about,

16   they received a direct personal benefit, they didn't

17   have to pay their child's tuition.  In this case, there

18   was no financial benefit to Mr. Seda; is that correct?

19   He achieved some sort of psychic benefit, the money went

20   somewhere, under your assumption, where he wanted it to

21   go?

22       A.    If he felt that this was his personal

23   obligation, then he received something that would amount

24   to a financial benefit.

25       Q.    That's what your basis -- I'm just trying to

1    find out the basis.  That if he saw it as his personal

2    financial obligation, is that what is required?

3        A.    I don't know if I can differentiate his

4    personal financial obligation from someone just feeling

5    it is just overall their personal obligation.

6        Q.    Well, let me put it this way:  If somebody were

7    to give money to a charity, and if the condition of

8    giving the money was that you changed the name of your

9    charity to my name, I gave money to a charity that maybe

10   wants to save the whales, and I wanted it to be called

11   the Lawrence H. Matasar Foundation, that's not a

12   personal financial benefit, but is that the kind of

13   benefit that you are talking about --

14       A.    They are --

15       Q.    -- would that be taxable to me if I did

16   something like that?

17       A.    There is certainly some value to that benefit,

18   yes.

19       Q.    So I would be taxed under that approach, is

20   what I'm saying?

21       A.    It would depend on the value -- the perceived

22   value, yes.

23       Q.    And what is the perceived value to Mr. Seda for

24   giving money to Chechens?

25       A.    I don't believe that the perceived value is

1    anything other than the value of the funds that were

2    transferred.  You perceived the value that you

3    transferred, the 150 or $130,000, to the cause.

4       Q.    So if I gave money to the Save the Whales for

5    $150,000, that would be an excess tax to me?

6       A.    In this circumstance we're talking about

7    something that is not a charitable activity.  We're

8    actually talking, from the assumptions, we're talking

9    about here an illegal activity.

10      Q.    I see.  So it's based on, not the fact that he

11   took the money, but it's on where he sent it.  If

12   Mr. El-Fiki gave the money, as he did, under the

13   assumptions that you gave, and Mr. Seda gave it to the

14   Red Cross, are you saying that then there would not be a

15   benefit?

16      A.    I don't think we would be here today if that

17   had happened.

18      Q.    That's not my question.  My question is:  If a

19   person takes money or redirects money from a charity

20   toward a purpose that is not in the charter, that is not

21   in the intent of the donor, if under those circumstances

22   the person who does so, the board member of the charity,

23   is subject to excess benefit tax, or any other tax up to

24   the $80,000?

25      A.    If someone made this transfer to an

1  organization that was a 501(c)(3) charity, then likely,

2  no, they will not be subject to that.

3     Q.    Okay.  So the purpose -- so the basis of your

4  opinion is not on the embezzlement, it's not on anything

5  other than the fact that the money went somewhere that

6  it shouldn't go?

7     A.    The money was directed somewhere that it

8  shouldn't go by an individual, I suppose, yes.

9     Q.    Is the requirement as far as where the money

10 goes that it be a 501(c)(3) or is it that it be

11 humanitarian?

12         Let's say the money was given to another

13 humanitarian cause that maybe isn't technically a

14 501(c)(3) organization.  Maybe it'd be Save the Whales,

15 maybe it'd be a lobbying organization that lobbies for

16 Save the Whales, maybe it's something of that nature,

17 bandages for --

18         THE COURT:  Whales.

19    Q.    -- people -- for whales.  Bandages for whales.

20    A.    I'm sorry, I'm missing your point here, I

21 think.  Are you saying that the distributions made from

22 exempt organizations in general, do they have to be to

23 another 501(c)(3) or can they be to a documented

24 humanitarian purpose?  Is that what you're asking?

25    Q.    No.  I'm not understanding your point.  What

1    I'm trying to figure out, what triggers the tax?  Is the

2    tax triggered -- you are saying and the presentence

3    writer is asking for $80,000 tax loss be awarded in this

4    case, which increases the sentence dramatically, what

5    I'm asking you is, is the basis of your opinion where

6    the money goes?

7              You said before if it went to the International

8    Red Cross, the tax would not be assessed, right?  Didn't

9    you testify to that?  If instead of the Chechen

10    mujahideen, it went to the American Red Cross, it would

11    not be assessed, right?

12    A.    I believe I said that, okay.

13    Q.    Okay.  And so if not the American Red Cross,

14    let's say it went to another organization, the Whale

15    Band-Aid Fund or something else which is not -- they

16    have no tax status, nothing, if it went to an

17    organization like that, is the donor -- or is the board

18    member who directs it there subject to this tax you are

19    talking about?

20    A.    If the board member is directing it to that

21    location of their own accord without the approval or

22    consent of the organization for their own purposes, then

23    yes.

24    Q.    And why isn't that true for the Red Cross?

25    A.    The Red Cross would be another charitable

1    501(c)(3) organization.

2        Q.    Yeah.  But it has nothing -- with the things

3    you just said, it's his own idea, it's not part of the

4    charter, why do you get a pass for that?

5        A.    Simply put, I believe that the differentiation

6    here, we're talking about theoreticals, but the

7    differentiation that I would put on it, if the funds are

8    going to another organization that can -- that would

9    then be documenting that it used those funds for

10   charitable purposes.

11       Q.    You spoke of the foundation management tax.

12       A.    Yes.

13       Q.    And you are aware that there -- as you talk

14   about, there are tax consequences that you've testified

15   under the second of the two scenarios, to a private

16   foundation that contributes money to an improper

17   organization, right?  Do you know the number?  Do you

18   know the number of the regulation?

19       A.    You're talking about a private foundation now?

20       Q.    Yes, yes.  When you talked about the foundation

21   manager tax.

22       A.    What I was referring to is the additional tax

23   under IRC Section 4958 on an officer of an organization,

24   yes.  I don't believe that has to do with private

25   foundations, but yes.

1    Q.    Didn't you call it the foundation management

2    tax?

3    A.    I may have misspoken and used the wrong term.

4    Q.    Well, isn't it a fact that there are rules for

5    private foundations that would impose a tax in

6    circumstances similar to yours, but there are no such

7    rules for public charities?

8    A.    4958 does impose excess benefit transactions on

9    public charities.  If you are asking me if there's a

10   mirror to the private foundation taxes for public

11   charities, no.

12          MR. MATASAR:  Nothing further.

13          THE COURT:  Do you have anything more?

14          MR. CARDANI:  No, I have nothing else.

15          THE COURT:  Thank you.  You may step down.

16          MR. MATASAR:  Your Honor, could we just have

17   maybe 10 minutes so I can result with Mr. Owens before I

18   call him to make his testimony as quick as possible?

19          THE COURT:  Yeah.

20          MR. MATASAR:  I'll leave for five minutes, Your

21   Honor.

22          THE COURT:  We'll have a short recess.

23          (Recess:  1:59 until 2:05 p.m.)

24          THE COURT:  Your next witness, please.

25          MR. MATASAR:  Marcus Owens.  Can you hear us,

 1    Mr. Owens?

 2              MR. OWENS:  Yes, I am.

 3              THE CLERK:  Mr. Owens, would you please stand

 4    and raise your right hand.

 5              (The witness was sworn.)

 6              THE CLERK:  Please state your full name and

 7    then spell your name for the record.

 8              THE WITNESS:  My name is Marcus Sherman Owens.

 9    That's spelled M-A-R-C-U-S.  Middle name Sherman,

10    S-H-E-R-M-A-N.  Last name Owens, O-W-E-N-S.

11                       DIRECT EXAMINATION

12    BY MR. MATASAR:

13    Q.    Mr. Owens, you testified at the trial in this

14    case, did you not?

15    A.    Yes, I did.

16    Q.    And I'd ask just the court and counsel to

17    accept all of Mr. Owens' qualifications from the trial

18    here so I need not requalify him.

19              THE COURT:  Please don't.  Go ahead.

20    BY MR. MATASAR:

21    Q.    But in short, Mr. Owens, you were the head of

22    the Exempt Division of the Internal Revenue Service,

23    correct?

24    A.    The Exempt Organizations Division, yes.

25    Q.    And you have submitted two memoranda as part of

 1    the sentencing process, correct?  One is eighteen pages

 2    and the other was two pages?

 3        A.    Correct.

 4        Q.    And you were present here today during the

 5    testimony of Mr. Wooten; is that right?

 6        A.    By telephone, yes.

 7        Q.    Correct.  So I'm going to ask you in general to

 8    address the two circumstances that were relied upon by

 9    Mr. Wooten in his determination that there would be a

10    tax loss in this case.

11            First of all, I'm going to ask you to address

12    the circumstance where the donor, Dr. El-Fiki, intended

13    this $150,000 to go to, let's say, Chechen widows and

14    orphans, and that it was instead sent to the Chechen

15    mujahideen.  Do you understand my general question,

16    first?

17        A.    Yes, I do.

18        Q.    And could you describe the tax consequence --

19    well, let me first ask the conclusion.  In your view

20    would such a fact pattern result in a loss to the

21    Internal Revenue Service, a financial loss?

22        A.    No, it would not.

23        Q.    Could you explain why it would not?

24        A.    Well, the contribution that was given was

25    clearly under the assumption earmarked for a different

1    organization for relief in Chechnya.  It was not

2    intended by the donor to go to al-Haramain Oregon, but

3    instead was intended to be used elsewhere by another

4    organization.  So the amounts were transmitted to

5    al-Haramain Oregon as agent for the transshipment, if

6    you will, of the funds to al-Haramain Saudi Arabia, and

7    then on to Chechnya.  The --

8        Q.    And, again, Mr. Owens, this is the circumstance

9    where the money is ultimately intended by the donor to

10   be used by Chechen widows and orphans.

11       A.    That's right, I understand.

12       Q.    Okay.  So go ahead.

13       A.    So the funds so transmitted are not income

14   under Internal Revenue Service interpretations of the

15   tax law under Section 61, so they don't flow into the

16   income of al-Haramain Oregon and are not within the

17   control, if you will, of al-Haramain Oregon.

18   al-Haramain Oregon is simply the agent for transmission

19   of the funds.  So the transmission of the funds doesn't

20   give rise to any particular tax.  Transmission of a

21   contribution is not going to support revocation of tax

22   exemption where the funds are ultimately intended to be

23   used for an appropriate charitable purpose.  And it

24   certainly doesn't support any individual tax

25   consequences either of an income tax or an excise tax

1   nature on the officials who were involved in the

2   assumption of a -- the assumption that the ultimate

3   recipient is for a charitable purpose.

4       Q.    Well, didn't, under this scenario, Mr. Seda

5   embezzle this money and take it away from the Chechen

6   widows and orphans and embezzle it and determine himself

7   that it should go to Chechen fighters and doesn't that

8   count as a benefit to him of $150,000?

9       A.    As I understand, that's the second scenario

10  that you are presenting now?

11      Q.    No, that's the first one where --

12      A.    Where Mr. Seda redirected --

13      Q.    Yes, yes.  El-Fiki intended it to go one place,

14  Mr. Seda redirected it somewhere to a place that he

15  wanted it to go to, not Mr. El-Fiki wanted it to go to.

16      A.    If it's simply a redirection of funds, that

17  redirection, assuming the ultimate recipient or the

18  ultimate purpose for which the funds were used was a

19  charitable purpose, would not jeopardize tax exempt

20  status of the U.S. charity, nor would it create any sort

21  of income or excise tax obligation on Mr. Seda --

22  Sedaghaty.

23      Q.    I'm not asking about the effect on the charity.

24  I'm just asking the effect on Mr. Sedaghaty, on his

25  personal taxes.  It's not some sort of embezzlement

Owens - D by Mr. Matasar                          120

1   which would subject him to excise taxes?

2       A.      That is correct.  That is correct.  It's simply

3   a redirection to a different charitable purpose.

4       Q.      And doesn't he get a benefit by getting it --

5   by making a decision that it goes to his own personal

6   purpose?

7       A.      Under federal tax law, there is no tax

8   recognition of that benefit.  That's a longstanding

9   position of the Internal Revenue Service set out in

10  revenue rulings which have been approved by the Treasury

11  Department.  There simply is no tax value in being able

12  to indicate or identify recipients of charitable giving.

13  It's -- it is simply a tenuous, ephemeral benefit

14  without tax value.

15      Q.      A kind of psychic benefit?

16      A.      Correct.

17      Q.      What about a benefit, say somebody gives money

18  to an organization with the idea that the organization's

19  name would be changed to reflect the donor?

20      A.      That also is a psychic or ephemeral or tenuous

21  benefit, and, in fact, is the fact pattern in a Revenue

22  ruling that has been issued by the Internal Revenue

23  Service from the Treasury Department.

24      Q.      So that specifically determined that that

25  sort -- that psychic benefit is not the kind of thing

1    that there is a tax on?

2        A.    Correct.  And a Revenue ruling is approved both

3    by the Internal Revenue Service and the Treasury

4    Department as an accurate interpretation of those

5    agencies' views of the Internal Revenue Code.

6        Q.    What about if the money -- different -- the

7    second scenario -- was intended by Dr. El-Fiki to go to

8    the Chechen mujahideen, and Mr. Sedaghaty then gave it

9    to the mujahideen, I take it under such a circumstance,

10   Mr. Seda could never be seen to have embezzled that

11   money, is that fair to say, if he just sent it to where

12   it was intended to go?

13       A.    That is correct.

14       Q.    And you heard Mr. Wooten say today that if

15   that -- those were the facts, that al-Haramain would

16   have lost its tax exempt status, and then would have

17   been deemed to be a corporation and would have had to

18   file an 1120, first of all, is that part of his analysis

19   correct?

20       A.    That part is generally correct.

21       Q.    Okay.

22       A.    A payment as part of conspiracy to support

23   terrorism would jeopardize the tax exempt status of the

24   charity involved.

25       Q.    And if the tax exempt status were revoked and

 1    they were declared an 1120 -- declared a corporation,

 2    they'd have to file an 1120; is that part also correct?

 3        A.    That is correct.

 4        Q.    But the question then becomes -- the major

 5    question becomes is the $150,000 income to the

 6    corporation, and would they have to pay tax on it?

 7        A.    The answer to that question is no, is not

 8    income.  It would be excluded from the calculation of

 9    income by Section 102, 102 of the Internal Revenue Code,

10    which excludes gift income from taxable income.

11            And that analysis, incidentally, was part of

12    the holding in the case of *Branch Ministries versus*

13    *Rossotti* involving the revocation of a church that

14    engaged in political campaign activity.  That is a bad

15    use of charitable money.  And the court acknowledged

16    that the government had no ability in that case to tax

17    the church; that the gifts received by the church, even

18    though they were used for an improper charitable

19    purpose, were simply not taxable income in the hands of

20    the church.  The Internal Revenue Code did not reach

21    those amounts.

22        Q.    And you are familiar with the *Bob Jones*

23    *University* case as well, a Supreme Court case?

24        A.    Yes, I am, and I was personally involved in

25    that case.

1    Q.    And in that case essentially the university was

2    acting in a racist manner, and their tax exemption was

3    taken away.  But as I understand it, the directors

4    didn't have to pay any personal tax; is that fair to

5    say?

6    A.    That is correct.  The university lost its tax

7    exempt status because it used its funds to impose a

8    racially restrictive set of rules on students and

9    faculty.  And the United States Supreme Court said that

10   violated the requirements for 501(c)(3) status, for tax

11   exempt status, but the only tax that arose from that was

12   an income tax applicable to the university.

13        Now, university of course has earned income.

14   It has tuition payments which would be taxed.  It would

15   not be excluded by Section 102.

16   Q.    Mr. Owens, you've been involved, have you not,

17   in the Internal Revenue Service's consideration of

18   whether or not the excise tax benefits would be expanded

19   to create -- expanded beyond where it is now; is that

20   right?

21   A.    That is correct.

22   Q.    Could you tell the court about that process?

23   A.    Yes.  The process essentially began in 1993

24   with a series of hearings before the House Ways and

25   Means Oversight Subcommittee.  I participated in those

1    hearings along with officials from the Treasury

2    Department and the Internal Revenue Service.  From those

3    hearings, Congress began drafting a penalty excise tax

4    modeled on the excise taxes -- the penalty excise taxes

5    that private foundations pay, and which have been part

6    of tax law since 1969.

7            By way of background, the Congress enacted

8    taxes on private foundations that used money for the

9    personal economic benefit of the insiders, and that was

10   enacted in Section 4941.  That was the model for Section

11   4958.

12           In addition, there were other excise taxes

13   enacted in 1969, including one under Section 4945 that

14   taxes bad grants, that is taxable expenditures.

15   Congress did not create a similar tax for public

16   charities when it enacted Section 4958 in 1996.

17   Congress only looked to Section 4941.

18           At the time I was director of the Exempt

19   Organizations Division.  And I and my immediate

20   supervisor, the assistant commissioner for Employee

21   Plans and Exempt Organizations, as is the case were

22   involved in discussions with the Treasury Department,

23   and the staffs of the oversight subcommittee and the

24   Joint Committee on Taxation for purposes of working out

25   the actual statutory language that subsequently was

1    enacted of Section 495.

2           As IRS officials, I and my supervisor made a

3    strong case to the Treasury Department that the statute

4    should be extended to tax private benefit transactions,

5    which would have been a tax that would have reached a

6    bad grant along the lines of what Mr. Wooten was

7    discussing.  However, the Treasury Department adamantly

8    refused to go forward.  Congress also declined to enact

9    that sort of tax.  And so the only tax that was enacted

10   in Section 4958 is one on economic benefits that accrue

11   directly to the individual in control of the

12   organization.  And it is modeled after Section 4941, the

13   excise tax on self dealing that has the same effect on

14   private foundations.  It was not modeled under Section

15   4945, which taxes bad grants by private foundations.

16          So the statute, Section 4958, was simply never

17   intended by Congress to be convertible into a tax on bad

18   activities of an organization.  It only reaches those

19   transactions that rebound to the economic benefit, the

20   clear economic benefit of the individual who is in the

21   position of control, and uses those assets to his own

22   personal benefit.

23          MR. MATASAR:  Thank you, Mr. Owens.  I have no

24   further questions.

25          THE COURT:  Cross.

```
 1                    CROSS-EXAMINATION

 2   BY MR. CARDANI:

 3       Q.    Mr. Owens, this is Chris Cardani.  We -- I

 4   cross-examined you during trial.

 5       A.    Yes, you did.

 6       Q.    Yes.  Now, on the scenario number one, where

 7   it's given by Mr. El-Fiki for genuine humanitarian

 8   relief, Mr. Sedaghaty gets it and sends it off to Saudi

 9   Arabia, your testimony in criticizing Mr. Wooten's

10   numbers, the IRS's numbers, if I understand it

11   correctly, in essence, resurrects your trial testimony

12   concerning the earmark defense; is that a fair

13   statement?

14       A.    That is a fair statement.

15       Q.    And that's a -- one we spent a lot of time

16   during the trial and you are saying that if it was an

17   earmark, Mr. Seda really had no control over the

18   disposition of those funds, correct?

19       A.    Correct.

20       Q.    And so if he gave $21,000 to Mr. al-But'he, not

21   for humanitarian purposes but to be put in the personal

22   account of Mr. al-But'he, that would show some type of

23   control over those funds, would it not?

24       A.    It depends on the reason the funds were

25   transferred into his account.  For example, if they were
```

Owens - X by Mr. Cardani                                        127

1    transferred into Mr. al-But'he's account in order to

2    facilitate transshipment of the money to al-Haramain

3    Saudi and subsequently to Chechnya, that would be an

4    appropriate part -- part of that same purpose.

5           If the funds were, in other words, put into the

6    account as a similar agency relationship en route to the

7    ultimate disposition of the whole amount, it would be --

8    it would not be a diversion for the personal benefit of

9    Mr. al-But'he.

10   Q.    Okay.  And your understanding is that it costs

11   about $40 to wire transfer money from the United States

12   to Saudi Arabia; is that right?

13   A.    I believe that's the figure.

14   Q.    Now, you talked about giving money for

15   charitable purposes.  Can we agree that giving money to

16   the mujahideen to fund acts of violence is not a

17   charitable purpose within the understanding of the

18   Internal Revenue Code?

19   A.    Yes, we can agree on that.

20   Q.    Then into scenario number two, if the intent by

21   Mr. El-Fiki was to fund the mujahideen, I need some help

22   understanding this testimony, but you are saying that it

23   wouldn't -- it may jeopardize the 501(c)(3) nature of

24   the company, probably would, and if it did collapse into

25   a taxable entity, there would be no income to the

1    company based on the fact that this was a gift; is that

2    right?

3        A.    Not quite.  There would be no taxable income to

4    the revoked charity.  And the reason for that is Section

5    102 of the Internal Revenue Code excludes gift income.

6    And as I indicated, that's exactly the scenario in the

7    *Branch Ministries versus Rossotti* court case involving

8    revocation of a church for political campaign

9    intervention.

10       Q.    So to help understand this, if Mr. El-Fiki or

11   let's just say a donor was a drug dealer and had drug

12   income and contacted a charity of the United States and

13   said I want you to accept my drug dealing money and send

14   it for whatever purposes, and this collapsed the

15   charity, caused them to be revoked, are you saying that

16   that's not a taxable income to the company?

17       A.    I didn't hear you say that the drug dealer made

18   a free will gift to the charity.  I heard you say that

19   he -- as he paid the money, he told the charity to

20   accept his money.  Free will gifts are excluded from

21   income of the recipient under Section 102 regardless of

22   the source of the money.

23       Q.    Even illegal income, sir?

24       A.    If the illegal income is not earned by the

25   charity, in other words, if the charity simply receives

1   a gift that turns out to have been obtained illegally by

2   the donor, that doesn't change the tax treatment in the

3   hands of the charity.

4       Q.   So if Mr. El-Fiki was kind of let's say just

5   say in on it, that there was this agreement to fund the

6   mujahideen to commit acts of violence, and sent money

7   over here in the form of $150,000 gift, and it was not

8   an earmark, and it was used by Mr. Sedaghaty and

9   Mr. al-But'he to fund the mujahideen, and part of the

10  money was diverted to Mr. al-But'he and put in his

11  personal account, are you saying that if there was

12  revocation, there'd be no taxable consequences to that

13  transaction?

14      A.   There would be taxable consequences in the form

15  of the charity would have to file a Form 1120, but the

16  particular gift income from Mr. El-Fiki would not be

17  taxed.

18          If the charity had earned income of some sort,

19  and in my earlier testimony this afternoon I described

20  how Bob Jones University was taxed on its tuition income

21  because that was earned income, if there was that income

22  in the hands of the charity, there would be whatever

23  income tax would be due after appropriate expenses had

24  been deducted.

25      Q.   Okay.  But if this was not an earmark, not a

1    passthrough, we can agree that there would be taxation

2    to Mr. Sedaghaty, correct?

3        A.    No, there would be no tax to Mr. Sedaghaty.

4        Q.    If it was not a passthrough or an earmark?

5        A.    If the money was given as part of a conspiracy

6    by Mr. El-Fiki or at least an intention by Mr. El-Fiki

7    given to al-Haramain Oregon to be then used to fund

8    terrorism by the mujahideen, and it was passed through

9    to Mr. al-But'he for that purpose, there would be no tax

10   consequence personally to Mr. Sedaghaty.  There would be

11   consequences for the charity involved, but not for him

12   personally under federal tax law.

13       Q.    Okay.  And that's the scenario number two that

14   we've described today.  But if it's scenario number one

15   where Mr. El-Fiki is making an humanitarian gift, and

16   there is a diversion that's not a passthrough, not an

17   earmark, then there would be taxation to Mr. Sedaghaty,

18   correct?

19       A.    No.  There would be no taxation to

20   Mr. Sedaghaty under either scenario.  There would only

21   be tax consequences in the event of a bad use of the

22   money, that is to support terrorism, which would support

23   revocation of the charity.  And then the only tax would

24   be if there was earned income in the hands of the

25   charity.  And certainly would not reach the contribution

1    from Mr. El-Fiki.

2        Q.    But if there was an embezzlement, sir, okay, in

3    scenario number one, there was an embezzlement by the

4    director of the 501(c)(3), not a passthrough, not an

5    earmark, but an embezzlement of funds, that would lead

6    to personal taxation, would it not?

7        A.    A theft would lead to personal taxation, but

8    the elements of theft are that the funds are taken into

9    the possession of the individual and become their asset,

10   their property.

11           MR. CARDANI:  Okay.  That's all I have.  Thank

12   you.

13           MR. MATASAR:  Nothing further, Your Honor.

14   Thank you, Mr. Owens.

15           THE COURT:  Thank you, Mr. Owens.  Good day.

16           Your next witness, please.

17           MR. CARDANI:  Judge, we have no other

18   witnesses.

19           MR. WAX:  We don't have any witnesses, Your

20   Honor.  At some time later on in the proceeding,

21   Mr. Seda's wife would like to address the court, but

22   that, I think, would come later on.

23           THE COURT:  All right.

24           MR. MATASAR:  And we also have a short video,

25   Your Honor, about a ten-minute video we want to play,

1    but I think --

2            THE COURT:  Is that the one you submitted as --

3    on your CD?

4            MR. MATASAR:  Yeah.  It's a short version, even

5    shorter than that.

6            THE COURT:  I watched that already.  Showed

7    some tree activities and delivering water to residents

8    in Ashland and so on.

9            MR. MATASAR:  Yes, Your Honor.

10           THE COURT:  I looked at it yesterday as part of

11   my preparation to do this now.  If you want to --

12           MR. MATASAR:  Well, let's do the legal

13   argument, and then we'll take this matter up in a

14   moment.  Let's just move along, if that's okay.

15           THE COURT:  Uh-huh.

16           MR. CARDANI:  Judge, all that I have remaining

17   is just some arguments on sentencing and a request for

18   some findings on some of the contested issues.

19           THE COURT:  All right.

20           MR. CARDANI:  May I proceed, Judge?

21           THE COURT:  Yes.

22           MR. CARDANI:  First of all, Judge, in terms of

23   the challenges to the presentence report, the court

24   needs to make findings on -- starting in order -- tax

25   loss.  And the guidelines, as I said earlier, do talk

1    about when you have a difficult situation where you

2    can't nail down taxation, the court's allowed to make a

3    reasonable estimate based on the available evidence.

4              And this Mr. El-Fiki's intent has been a big

5    unknown since the beginning of this case.  He wasn't

6    here as a witness.  And we went back and forth at trial

7    on what he did intend and what he didn't intend.  But

8    the fact is we don't know.

9              And if we assume that he made this for

10   benevolent purposes and sent it to the United States,

11   there was plenty of information to show -- to allow the

12   jury to refuse to accept Mr. Owens' earmark argument.

13   And, again, that was the basis for the motion for

14   judgment of acquittal filed by the defense, that was

15   CR478.

16             We filed a response to that in 486.  And we

17   outlined some of those reasons why the jury was entitled

18   to reject the earmark defense.  And that would include

19   the fact that Mr. Sedaghaty treated this money as his

20   own before it left the country by contacting other aid

21   organizations himself or indirectly through his other

22   employees using his other business, the Qur'an

23   Foundation, things that are inconsistent with what his

24   requirements were for an earmark.  And that is, if it's

25   an earmark, he has no control, it's got to go right out.

1          And as the court knows, the easiest way to do

2     that, and the best evidence of -- that would have

3     reflected some type of earmark would have been if

4     Mr. Sedaghaty quickly wired out that money, or at any

5     time wired that money out for $40 to Saudi Arabia or

6     wherever rather than go through this elaborate attempt

7     to conceal the movement of the money, spending $21,000,

8     diverting it to Mr. al-But'he.  It ends up in the Al

9     Rajhi Bank and Mr. al-But'he's personal bank account.

10    And then the money itself gets reduced to cash, smuggled

11    out of the country, no forms filed on the way out, so on

12    and so forth.

13          So the jury was entitled in our opinion to

14    reject the earmark defense and did so.  And that

15    affects, somewhat, the tax calculations.  And in our

16    estimation, the court is entitled to accept the figure

17    of $80,980 not as a hard and fast tax figure that would

18    be used in an audit necessarily, but for purposes of

19    estimating the tax loss for purposes of the advisory

20    guideline calculations.

21          So we would ask first that at some point the

22    court make findings on the tax loss figures.  And if the

23    court accepts the figures in the presentence report, in

24    the 2001 guidelines, that equates to a base offense

25    level of 14.

1          MR. MATASAR:  Do you want to hear our response

2     to each issue, Your Honor, as he goes or are we going

3     to --

4          THE COURT:  No.

5          MR. MATASAR:  No?  He'll make all his points.

6          THE COURT:  No.

7          MR. CARDANI:  Then, Judge, the next issue that

8     is contested and we need findings on is the

9     recommendation of the presentence report for a two point

10    enhancement under the advisory guidelines for

11    sophisticated concealment.

12         I'm not going to belabor that either, but on

13    page 5 and 6 of the government's sentencing memo, we

14    talk about the various evidence that supports the

15    sophisticated concealment enhancement:  Offshore bank

16    accounts, smuggling cash, lying to an accountant to hide

17    the transaction, filing a Form 990 ultimately, so on and

18    so forth.  We think that those are clearly facts that

19    the court can rely on to impose the sophisticated

20    concealment enhancement.

21         The next one is the two point enhancement for

22    obstruction.  And, again, the presentence report

23    recommends this, and the government concurs.  It's been

24    challenged and we'll need a finding.

25         On page 7 of the government's sentencing memo,

1   we again cover some of the evidentiary support for the

2   obstruction, but it involves these two receipts that

3   were provided to the government during the

4   investigation, some of them emanating from Saudi Arabia

5   at the time that Mr. Sedaghaty was overseas.  He signed

6   both of these receipts, as did Mr. al-But'he apparently,

7   and they purport to represent a transaction that never

8   occurred.

9          And we know that -- from the various reasons

10  listed on page 7, page 8, and in the testimony this

11  court has heard repeatedly in the run up to trial and

12  during trial, that those receipts are false, they were

13  provided to the investigators, to the government that

14  is, in response to grand jury subpoena.  And

15  Mr. Sedaghaty's involvement in that warrants a two point

16  enhancement for obstruction.

17         The next one, again, we'll need a finding on,

18  is the application 3A1.4, the so-called terrorism

19  enhancement.  And if I can take aside for a moment, we

20  agree for purposes of today's hearing that these

21  findings should be based on a clear and convincing

22  evidentiary standard, certainly for the terrorism

23  enhancement and the tax loss under Ninth Circuit law,

24  that appears to be the appropriate burden of proof.

25         Page 12 of the government's sentencing

1   memorandum talks about not only the legal basis for it

2   but also the factual basis for it.  And the legal basis

3   for it is that the circuits are in agreement now, that

4   if the court finds that Mr. Sedaghaty in conducting the

5   criminal activity that he's been convicted of now, if he

6   did these acts with an intention to promote a federal

7   crime of terrorism, then the enhancement is appropriate.

8          Now, the defense has spent a lot of time

9   objecting to this in their paper and again today, but

10  they keep trying to focus on the filing of the tax

11  return as the, in essence, only criminal act that

12  Mr. Sedaghaty participated in.  And that's just not the

13  case.  He was convicted of conspiracy that started when

14  Mr. El-Fiki sent that money in way back in early 2000,

15  and then all of the elaborate attempts to conceal that

16  from the government.

17         It was a continuing set of criminal activity

18  that culminated in the filing of the false tax return,

19  but we believe that the activity that the court should

20  focus on in making the findings on the enhancement for

21  the terrorism 3A1.4 should focus on all of that

22  underlying activity, because there Mr. Sedaghaty and

23  Mr. al-But'he best expressed their intent to promote the

24  crime of terrorism.  It was everything about funding the

25  Chechen mujahideen that the Russians call terrorists,

1  but in trial referred to them as mujahideen.  The court

2  knows from Mr. Kohlmann in the *Daubert* hearing,

3  Mr. Kohlmann at trial, Mr. Kohlmann's report, which

4  we've offered, as well as the Russian testimony, and all

5  of the evidence in this case that the court received,

6  that Mr. Sedaghaty clearly had an intent to fund the

7  mujahideen.

8         And in terms of whether it was to buy weaponry

9  or to support the mujahideen for tents, clothing,

10  medicine, it's all for the good of the order.  And if

11  it's done to affect Russian policies, the Russian

12  populace, things along those lines, those are violations

13  of 18 U.S.C. 956 and 18 U.S.C. 2339A, and so those are

14  the two crimes that we've identified, and in the

15  presentence report those -- at least one of those

16  crimes, the 2339A, material support of terrorism is the

17  underlying crime of terrorism that the crimes of

18  conviction were intended to promote.

19         So if the court finds -- and we believe that

20  the jury did -- that Mr. Sedaghaty's intent was not

21  benevolent but to fund the mujahideen in their effort to

22  retaliate against the Russians, to commit acts of

23  violence against the Russian, so on and so forth, then

24  we think by any standard the enhancement for 3A1.4 is

25  appropriate.

1          Now, in terms of the net effect of that, Your

2    Honor, it's a significant enhancement.  There is no

3    question about that.  It jacks the offense level up by,

4    I believe, 12 levels, and also sets a minimum of offense

5    level, I believe, 32.  So it's a significant

6    enhancement.  But because Mr. Sedaghaty's statutory cap

7    is 8 years, that is 96 months, then the real net effect

8    of that terrorism enhancement is substantially blunted

9    by the statutory cap.  And I did want to point that out.

10          THE COURT:  Actually, isn't it a 16-level

11    increase?

12          MR. CARDANI:  Thank you.  But it brings it up

13    to an offense level 32, which is 121 to 151, but it also

14    says Criminal History Category VI.  So if it weren't for

15    the statutory cap, what I'm trying to say is the

16    terrorism enhancement would put the advisory guidelines

17    at 210 to 262.  And what I'm saying is because the

18    statutory cap is 96 months, the effect of the terrorism

19    enhancement is substantially reduced by this statutory

20    cap.

21          With -- so we would ask that the court adopt --

22    accept all of the recommendations in the presentence

23    report.  And if that's the case, then what we have is 14

24    for the tax loss, 2 for the obstruction, sophisticated

25    means, and the terrorism enhancement, you are up at the

1    262 to 327, but the statutory maximum is 96 months.

2           Now, does the court wish me to address the

3    3553(a) factors now or after the defense has had an

4    opportunity to make its presentation?

5           THE COURT:  I think you can do it now as far as

6    I'm concerned.  I think what I've decided to do -- I do

7    want to take the allocution today, because I want

8    everything in front of me, but I'm probably not going to

9    impose the sentence this afternoon.  I'm probably going

10   to have a couple of week delay, because there -- the

11   findings are complicated enough here that I think they

12   should be prepared in writing before the actual

13   sentencing, so that's what I intend to do.  Go ahead.

14          MR. CARDANI:  In terms of the 3553(a) factors,

15   Your Honor, the court knows that the sentencing

16   guidelines are not mandatory, they are advisory, one

17   factor, a starting point, for the court to consider.

18          In terms of recognizing the peaceful work that

19   Mr. Sedaghaty has done in his past, as I said in the

20   sentencing memo, that shouldn't be ignored.  It

21   shouldn't be rejected.  It's true.  And all of the

22   witnesses that testified on his behalf at trial and that

23   have come up with him today and support him have seen a

24   very different side to him.  And he's done some very --

25   some good things down in the Ashland area promoting

1    multicultural atmosphere, differing religions, and an

2    atmosphere of acceptance, which are contrary to the type

3    of things that were revealed during trial.

4        And what I think that speaks to is that he has

5    a side to him that is peaceful and law abiding on one

6    hand, but in terms of promoting the cause overseas in a

7    fight that the mujahideen were involved in, I think what

8    we saw from the trial is that Mr. Sedaghaty, if he could

9    get away with it, is certainly willing to throw his

10   efforts for the cause, and he got involved in accepting

11   money from al-Haramain, and got brought into the

12   ideologue, the extreme ideologue that's involved in

13   al-Haramain's causes that the court has seen so much of

14   during trial, and knowingly accepted that, knowingly

15   promoted that, the prison literature, all of the stuff

16   in the computers, and the Russian wife helping out

17   translating for these radical Web sites, so on and so

18   forth, his eyes were wide open, Judge, in terms of

19   getting involved with al-Haramain and promoting its

20   causes.  And that's what this trial is about and that's

21   what he needs to be held accountable for.

22       So we would ask that the court make the

23   findings supporting the enhancements and recognize that

24   regardless of the findings, if the -- that the statutory

25   maximum is 96 months, we think that that is a fair

1     sentence for the conduct he engaged in.

2          I also want to address the repayment of legal

3     fees issue at some point.  Do you want me to hear (sic)

4     it?

5          THE COURT:  Yes.

6          MR. CARDANI:  In our sentencing memo, we

7     identified that early on in this case the court got a

8     letter after Mr. Sedaghaty received free counsel from

9     Mr. Matasar and Mr. Wax, the court received some type of

10    letter, and the CR's are identified.  CR 20 -- excuse

11    me, some type of letter was sent to the court.  We

12    weren't part of that.  It's docketed under seal, but it

13    led to a minute order imposed by the court, which is

14    CR61, and this court ruled that "the defendant is

15    ordered not to access or disburse or cause to be

16    disbursed any funds in the trust accounts of any of the

17    attorneys identified in Mr. Wax's letter to the court

18    dated 25 October 2007.  The court requires that these

19    sums and other assets identified in the financial

20    affidavit attached to that letter be preserved and

21    remain available for consideration of repayment of funds

22    paid pursuant to the Criminal Justice Act for costs of

23    representation in this case."

24         We're there now, Judge.  And any funds that

25    were identified by the court or any other assets that

1    were alluded to should be deemed funds available under

2    18 U.S.C. Section 3006A(f) as funds that are presently

3    available to help reimburse the government for the

4    considerable amounts of money that have been expended to

5    represent him.

6          And the case law supporting that, the court

7    needs to make findings that he does have the present

8    ability to pay.  And so there seems to be some type of

9    link between money that was posted for his bail, $58,000

10   at one point, and some of the money that came in to the

11   attorneys.

12         If that's the case, certainly that money which

13   is being held on to by the clerk are funds that are

14   presently available, at the very least, for partial

15   reimbursement to the government for legal fees.  But

16   also anything else that the court may find in addition

17   to that as reflected in its minute order would likely

18   also be presently available for reimbursement.

19         If I may have a moment to confer with counsel.

20         THE COURT:  Yes.

21         (Discussion held off the record.)

22         MR. CARDANI:  That's all I have, Judge, unless

23   the court has any questions.

24         THE COURT:  I don't.  Go ahead.

25         MR. WAX:  Thank you, Your Honor.  Our plan

1   would be for me to go through the list of the legal

2   issues that we believe we need a ruling on; Mr. Casey

3   will then address more specifically the terror

4   enhancement; Mr. Matasar will address the tax loss and

5   the 3553(a) factors.

6           In terms of the legal issues, the discovery

7   motion with respect to Ignatchenko, I believe now has

8   two additional pieces that arose from his testimony.

9           We had urged the court not to hear his

10  testimony.  We now urge the court to strike his

11  testimony.  We urge the court to do so on several

12  grounds.  One, the inherent unreliability.  Second, in

13  his testimony, he refused to answer a number of the

14  critical questions asserting a Russian state secret

15  privilege.  Clearly, the lack of availability of the

16  tapes and any notes of his alleged review of the tapes

17  is central to the credibility question of whether any

18  such tapes ever existed; and if so, who was on them; and

19  if so, what was said.

20          Second, the testimony should be stricken

21  because it violates the rights of confrontation and the

22  right to due process.  And interestingly, Your Honor, we

23  believe that his acknowledgement that his participation

24  with the United States government in this joint task

25  force brings into play in terms of the discovery the

1    cases that we cited, including U.S. v. Bryan (phonetic)

2    out of this district in which the government is

3    responsible for providing discovery when there is a

4    joint investigation, and the Classified Information

5    Procedures Act.  This court has not had the opportunity

6    with respect to Ignatchenko to review, as it would with

7    respect to any United States classified material, to

8    determine what the defense needs access to.  So when he

9    says this is a joint group, and then asserts a state

10   secret privilege, the government should not be permitted

11   to proceed, and the defense cannot be left in the

12   position in which we are where we cannot effectively

13   challenge the testimony.

14          The next issue that we believe the court needs

15   to rule on, we have alleged a violation of the

16   Classified Information Procedures Act with respect to

17   government sentencing Exhibit 3.  As you recall earlier

18   on in the case, we were provided this unclassified

19   summary of material that discusses Sami Al-Sanad.  Our

20   understanding is that was provided to us because it was

21   understood either by the court or by the government to

22   be exculpatory.

23          What we now have is the government relying on

24   that unclassified summary in this sentencing proceeding

25   in a situation in which they acknowledge they have a

1    burden by clear and convincing evidence.

2          As we searched the case law under CIPA, we

3    found no situation in which anything of this nature has

4    ever occurred.  And we do not believe the government can

5    be permitted to use against the defendant under the CIPA

6    that unclassified summary.

7          We believe that there are two options:  Either

8    provide -- three options, actually:  Provide us the

9    classified material for our review in an appropriate,

10   secure manner so we can determine what is necessary to

11   preserve Mr. Seda's confrontation and compulsory process

12   and due process rights; or preclude the government from

13   doing what it is doing, which is parsing that document

14   and saying, Judge, please accept as true what we say

15   about Abu Umar, and then look at all these other

16   circumstances that we present you about Abu Umar that

17   says he's a bad guy, and, Judge, ignore the one piece of

18   that document that relates to the charges in this case

19   where Sami Al-Sanad is reported to have said this money

20   went for humanitarian purposes in Chechnya.

21         We just don't see how they can have it both

22   ways.  We think it violates CIPA.  We think there's an

23   estoppel argument, confrontation, due process, and

24   compulsory process.  So we believe you need to make a

25   specific ruling on those several CIPA issues.

1          We've then articulated what we believe you need

2     to rule on in terms of several other estoppel arguments.

3     Mr. Matasar mentioned one estoppel with respect to the

4     tax issue.  Another estoppel argument in the sentencing

5     proceeding goes back to our arguments with respect to

6     the Exhibits 704 and 705, the receipts from al-Haramain

7     that contain the Al Rajhi Bank number 9889.

8          The government is asking the court to determine

9     that there is an obstruction of justice based on AHIF 2

10    and 3, the 188 and $186,000 documents.

11         The government had within its power the ability

12    to subpoena the proof that we believe exists to confirm

13    what's on 704 and 705.  They chose not to exercise their

14    power independently.  When we requested a letter

15    rogatory and the assistance of the court and further

16    assistance of the government, they declined to do that.

17         They should then be estoped from doing what

18    they are doing now, which is saying that there was an

19    embezzlement of this $21,000; that these AHIF 2 and 3s

20    are phony when the evidence that would prove that they

21    are not was in their power, and they chose not to get

22    it.  So that's an estoppel ruling that we believe is

23    needed there.

24         The next legal issue we believe you need to

25    rule on involves the government's request, it would

1    seem, for this court to take a position contrary to the

2    position taken by the Executive Branch in 1999 and 2000

3    with respect to the nature of the conflict in Chechnya.

4    And Mr. Casey will go into this, so I'm just going to

5    touch on it in terms of what I believe you need to rule

6    on, and that is the distinction between terrorism and a

7    mujahideen fighting in a war.

8            We've pointed out the places in the transcript

9    where the government said this is not a case about

10   terrorism.  We had testimony at a *Daubert* hearing.  We

11   had testimony at the trial from Colonel Lang, from

12   Dr. Long, and from Evan Kohlmann that there's a

13   significant distinction between acts of terror and

14   warfare engaged in by mujahideen.

15           The government recognized in '99 and 2000, the

16   relevant time frame, what was taking place in Chechnya

17   was a war.  The government's own exhibits that they

18   introduced were exhibits from the computer that they

19   seized that describe the activities of the mujahideen

20   entirely as warfare activities.

21           This court, under the cases we've cited, we

22   would respectfully submit, cannot trump the position

23   taken by the Executive ten years ago, that this was a

24   war involving indigenous Chechen forces, foreign forces

25   engaged in battle, particularly when the government

1  presents these videos showing the preparation for and

2  training for warfare.

3         Next, with respect to the guideline issues,

4  clearly there are the four that Mr. Cardani has

5  articulated.  I will not mention tax or terrorism, but

6  with respect to sophisticated concealment and

7  obstruction, we have pointed out in our pleadings the

8  evidence on that point and why we believe the evidence

9  on that point makes it entirely inappropriate to assess

10  either of those enhancements.  Openly and notoriously

11  going into one's own bank in Ashland, openly and

12  notoriously going into one's own bank in Saudi Arabia, I

13  mean it's most peculiar to say this case involves

14  offshore banking when the offshore bank is

15  Mr. al-But'he's own bank in Saudi Arabia.  There just is

16  no concealment here of a sophisticated nature.

17         The same is true with respect to obstruction.

18  The one additional point that I would make is that on

19  that score, the government ignores the one piece of

20  direct evidence, and that is from Mr. Sui, that I signed

21  that document in the year 2000.  And the receipts that

22  we have in 704 and 705, roughly $187,000, essentially

23  match the AHIF 2 and 3 numbers.

24         We believe that you need to make a specific

25  ruling on the Rule 32 violation, the manner in which the

1    presentence report was put together, and each of the

2    paragraphs where we believe that comes in is set out in

3    our memo.

4           We also believe you'll need to rule on each of

5    the specific objections in our sentencing memo to all of

6    the paragraphs that are listed there.

7           On the legal fee issue, that is something this

8    court is familiar with in terms of the material that you

9    have, the sources of the money, and, you know, bail

10   money being posted by people, you know, unrelated to

11   Mr. Seda.  It's not his money.  Other money, the

12   questions that were presented to you to which the

13   government is not privy.

14          And we do ask Your Honor to rule on a request

15   for release pending appeal.  And we also will be asking

16   for -- or do ask you for a recommendation for placement

17   in Sheridan camp if we do get to the point where you are

18   denying the motion for a new trial, denying the motion

19   for judgment of acquittal and imposing a sentence other

20   than the sentence we have requested, which is a sentence

21   to time served.

22          Now Mr. Casey will talk about the terrorism

23   enhancement in some more detail.  Thank you, Judge.

24          THE COURT:  Thank you.  Mr. Casey.

25          MR. CASEY:  Thank you, Your Honor.  The

1    government's position on the terrorism enhancement

2    stands on what we used to call and probably still call

3    the shifting sands.  Their position for sentencing

4    purposes in two very critical respects is fundamentally

5    at odds with their position at the trial.

6         At the trial they said, A, the El-Fiki money

7    cannot be traced to Chechnya.  And, B, they said on at

8    least two occasions, explicitly and unequivocally, this

9    is not a terrorism case.

10        They were right at trial.  They are wrong now.

11   But right or wrong, it's inconsistent, it's

12   irreconcilable, and they should be judicially estopped

13   for sentencing purposes to try to punish Mr. Sedaghaty

14   for something that, A, was not charged; or, B, was not

15   part -- an essential part of the case.

16        We are not, as we said in our sentencing memo,

17   blind to the fact that there is a Chechnya connection

18   here, but for purposes of imposing the terrorism

19   enhancement, the touchstone issue is the offense of

20   conviction, and the offense of conviction involved tax

21   fraud that occurred in October of 2001.

22        Yes, the government says that the tax fraud was

23   part of an overall conspiracy that dates back to the

24   actions that took place in March of 2000, 19 months

25   before.  But for sentencing purposes, that is not the

1       question that has to be asked, respectfully.

2               Under 3A1.4, the terrorism enhancement, the

3       government must prove by clear and convincing evidence

4       that the offenses of conviction either involved or were

5       intended to promote a federal crime of terrorism.

6               Now, the government does not even argue that it

7       involved a federal crime of terrorism inasmuch as that

8       has been construed to mean that the act itself, not the

9       purpose behind it, the act itself must be a federal

10      crime of terrorism.  The government's theory here has

11      been that the actions involved in the tax fraud counts

12      intended to promote a federal crime of terrorism.  So a

13      federal crime of terrorism is defined -- I think it's 18

14      U.S.C. 2332b(g)(5), there is a whole list -- a very long

15      list of specific federal crimes that constitute federal

16      crimes of terrorism.

17              In this case, there have been fits and starts

18      in terms of the government's identification of what that

19      crime is.  They started at 2332b, went to 2332c, and we

20      show that they don't apply.  Now they're at 2332a,

21      providing material support.  And of course as you know,

22      he wasn't charged with providing material support.  He

23      doesn't have to be, I understand that in terms of

24      sentencing purposes, but the actions involved in the --

25      the intention to promote terrorism must be identified.

1    What were those actions?  What is it about the tax fraud

2    that occurred in -- 19 months after the alleged

3    diversion of funds to the mujahideen that has a

4    terrorist connection that is intended to promote

5    terrorism?

6            There is no suggestion that at that time in

7    March of 2001 Mr. Sedaghaty was in the business of

8    facilitating financial transfers to the mujahideen or in

9    any way supporting mujahideen at that time.

10           So the -- that is the offense of conviction.

11   And basically what the government is saying is, well,

12   that tax fraud was intended to cover up the earlier

13   diversion of funds.  Well, maybe, maybe not.  But the

14   critical question is why was he trying to cover it up?

15   Was the purpose of covering it up to promote a federal

16   crime of terrorism?  There is a logical gap there.  I

17   don't see it.  I don't see the connection.

18           I see what the government explained to the jury

19   as what that motivation was.  And they were clear about

20   it.  The motivation for the tax fraud, they told the

21   jury on several -- at several different points, which we

22   identified in our memorandum, was to cover himself from

23   tax sanctions, from civil sanctions, from criminal

24   sanctions from the IRS, to preserve a tax exemption,

25   which he would feel was in jeopardy.

1           That was -- if there was a coverup here, that

2   was the purpose.  It was not to promote a federal crime

3   of terrorism.

4           With respect now to the organic crime of

5   terrorism that has lately -- and I mean very lately --

6   surfaced as the underpinning of their terrorism

7   enhancement claim, 2339A, that has to do with providing

8   material support for acts of terror or for terrorists.

9   And it does not apply to conventional acts of war.

10          I tried, in cross-examination today with

11  Mr. Ignatchenko, to get him to differentiate between war

12  and terror on one hand.  That's a soft issue.  It's hard

13  to translate in terms of back and forth questioning, but

14  we all know there is a difference.  I mean, for him --

15  you know, one man's terror is another man's conventional

16  war.

17          It was really interesting to hear him testify

18  about that this morning.  I'm sure it didn't escape your

19  ears, Your Honor, when he was saying time and again that

20  the acts of terror were those committed by the Chechens

21  in their war against Russia.  So I asked him, well, what

22  about acts that were committed in those wars by Russia?

23  And he says propaganda.  It's propaganda.  Period.  End

24  of case.

25          So I believe this court is in a position to

1    take judicial notice of U.N. resolutions cited in our

2    memo and so on.  It is clear beyond cavil that world

3    condemnation came down resoundingly time and time again

4    against the Russian's barbaric acts in those wars in the

5    1990s precisely at the time that these events were

6    taking place, the late '90s, early 2000.

7        The U.N. condemned the bombing of Russia as the

8    worst example of human devastation recorded on earth.

9    They have condemned the Russians for one act of barbaric

10   cruelty after another in these wars against civilians.

11   They are still digging up the graves, the massive graves

12   in Chechnya, still today as we sit here they are doing

13   that of Chechens, Chechen civilians, by the Russians.

14       Now, do you think they weren't trained, don't

15   you think they have their own Kavkaz Institute?  And

16   does it make a difference that these were for Russians

17   instead of for an international group?  Does that make a

18   difference in the analysis?  I don't think so.  Again,

19   you can take judicial notice that the Russians in this

20   case, like the Americans, they are no different in this

21   sense, that they use allies, we train allies, we have

22   camps for allies, we have -- you know the United States'

23   camps in South America, Central America, for our allies

24   for counterinsurgencies.  Where are these lines to be

25   drawn?  The lines between war and terror are frankly --

1    one candid thing he did say, Ignatchenko -- are frankly

2    hard to define.  The lines between trying to provide

3    humanitarian support and the lines between blankets and

4    bullets, humanitarian, for military, very, very

5    nebulous.  The lines between indigenous insurgents,

6    foreign insurgents, very, very blurry.

7            What was not blurry?  What came through

8    unequivocally in this testimony this morning was that

9    this man -- the man who was charged with knowing the

10   universe of information about financial contributions by

11   charities to what he called terrorism in the Caucasus,

12   this man has never heard of Pete Sedaghaty, has never

13   heard of Dr. El-Fiki, was not in a position, neither he

14   nor his agency was in a position to monitor or trace

15   this money, not just the mujahideen, but to Chechnya

16   period.

17           They can't segregate out the El-Fiki money.  So

18   where is the evidence?  The vouchers, the vouchers that

19   he talked about, they show -- on their face they show

20   al-Haramain expenses, purportedly al-Haramain vouchers,

21   but they are all dated well -- and he was trying to tie

22   it into al-Haramain support of the Kavkaz Institute,

23   they're all dated well before or well after Kavkaz

24   either opened or was still operating.

25           We are not indifferent to national concerns

1  here on national security, generally speaking, but I
2  have to say, I came into this case late, I don't know
3  whether that gives me any more of a perspective or not,
4  it was midstream, it was well on the way, this case has
5  never, to me, had a flavor of real terrorism.  The -- I
6  look at this as dealing with -- we're dealing with a --
7  I won't say a small man, but I'll say a small player,
8  local player, and I can't speak for him on this, I'm
9  speaking for myself, he get in over his head with the
10  money, al-Haramain, if there is a lesson here, the
11  lesson is be careful who you do business with.
12         But it's vastly disproportionate, Your Honor,
13  and totally unfounded to try to tag him with every act,
14  horrific act of terror committed in the name of the
15  Chechen mujahideen or even by certain people within this
16  vast organization.  This organization is vast.  He's a
17  small player in this organization.  It is -- I don't
18  want to overstate it, but it is inappropriate,
19  inappropriate in the extreme to try to associate him
20  with acts of terror going as far back as, you know,
21  early '90s and as far forward as today, 2010.
22         He is no more than responsible for every act of
23  Saudis in al-Haramain than Mr. Ignatchenko is
24  responsible for every act, many sordid acts, of his
25  organization, the KGB or FSB.

1          So, Your Honor, for all these reasons, legal,

2     factual, we ask that you not brand this man as a

3     terrorist, not enhance a sentence for this first time

4     offender, tax offender, to the extent that the terrorism

5     enhancement calls upon you to do.

6          Thank you.

7          MR. WAX:  Your Honor, two brief legal points

8     before Mr. Matasar concludes, I neglected to include in

9     my list of points on which we need a ruling or statement

10    from the court, we articulate in our pleadings the

11    question of whether or not you ever reviewed the

12    material that we caused to be placed into the SCIF.  It

13    is not clear from the record.  And we believe the record

14    needs to be clear on that point whether you did or not.

15         The second point, just an additional aspect of

16    the estoppel argument --

17         THE COURT:  Let me just stop you a second.  You

18    are not indicating that material was submitted that I

19    didn't look at.  You are saying it needs to be on the

20    record.

21         MR. WAX:  We do not know whether you have ever

22    had access to the material that we provided and provided

23    under an agreement with the government with respect to

24    how and when it would be accessed.  We do not know if

25    you personally reviewed that material.  And we believe

1    that that does need to be on the record.

2            The next point that -- with respect to the

3    estoppel is to point out that the government introduces

4    as FSB 4 or 4 and 5 vouchers of al-Haramain that are

5    quite similar in appearance to the documents in 704 and

6    705 that they object to as being fraudulent.  And we

7    believe, again, they should not be permitted to have it

8    both ways.

9            MR. MATASAR:  Your Honor, concerning the tax

10   loss, it's remarkable that the government is here

11   scrambling at the last minute to claim a tax loss

12   because, of course, at trial, one of the main issues

13   they had to prove was materiality of this tax return,

14   which was a nonprofit tax return.

15           They said throughout the pretrial arguments,

16   from time to time in chambers, maybe on the record

17   during the trial, that there is no tax loss, but we have

18   to show materiality in a different way, we have to show

19   materiality by showing that it was an informational tax

20   return.  We can show materiality for other reasons.

21   But, really, Your Honor, if they thought there was a tax

22   loss, that would have been a major part of the trial and

23   they would have proven materiality that way.

24           They came to this -- these arguments, one today

25   at the very last minute, literally the last possible

1    day, and the rest right before -- I'm sorry, after the

2    trial.

3         As far as the legal issues go, it's important,

4    and Mr. Cardani said both of these things, it's

5    important to remember on one hand that you can make a

6    reasonable determination of the tax loss, however, the

7    main issue is is there clear and convincing evidence

8    of -- that there is a tax loss, we feel there is not.

9         Mr. Owens' written statements go far beyond his

10   oral testimony.  We ask that you rely on those.  I think

11   the very direct, two-page one that he submitted at the

12   end, after having a chance to see the government's memo,

13   is definitely the clearest, simplest way of resolving

14   this, in which he says there is no foundation in the

15   federal tax law for a tax loss.

16        While Mr. Cardani's argument sought to make

17   Mr. Owens say that his argument was based totally on his

18   earmark theory that he raised in the trial, the

19   testimony of Mr. Owens was that it was not.  He said

20   that even without that, we -- Mr. Cardani asked various

21   hypotheticals well after that, it's clear that under

22   either of the theories of the government there is no tax

23   loss.  Either Mr. El-Fiki intended the money to go to

24   the Chechen mujahideen and it went there.  In that case,

25   of course, there is no embezzlement.  The only possible

1    claim they could make is that which they thought of

2    today, I guess, that it's some sort of -- would have

3    resulted in a loss of the tax exempt status to the

4    organization.  However, of course, if that were the case

5    and they filed a corporate tax return, a gift that comes

6    into a corporation is not income.  There is no tax on

7    that.  And certainly there's no tax to Mr. Sedaghaty.

8         If Mr. El-Fiki intended it to go to the Chechen

9    widows and orphans, and this is an argument that we

10   believe the government cannot make given their trial

11   arguments, the case is still not an embezzlement under

12   their theory.  Mr. Owens said that.  This psychic

13   benefit that is the only thing they can really rely on

14   since there was no personal inurement, it's a tax term,

15   there was no personal use to Mr. Sedaghaty, simply

16   somewhere that he wanted the money to go is not

17   sufficient.

18        You heard Mr. Owens say that if somebody, for

19   example, gives money to a cause and wants them to change

20   the name of the organization, that's not the kind of

21   thing that would result in taxes.

22        Probably most importantly what Mr. Owens says

23   is that really the fact that something is bad is not

24   enough to make it taxable, to make a tax loss, even

25   under the government's hypothetical where the conduct

```
 1   went somewhere -- where the money went somewhere where
 2   it shouldn't go, that's not sufficient.  Bob Jones
 3   University and the other cases show that.
 4           THE COURT:  That's footnote 53 in his report.
 5           MR. MATASAR:  Pardon me?
 6           THE COURT:  It's footnote 53 in his report.
 7           MR. MATASAR:  Yeah.  Which brings me, Your
 8   Honor, to the videotape.  I think really --
 9           THE COURT:  Do you want to show it again now?
10   That's fine.
11           MR. MATASAR:  No, I don't.
12           THE COURT:  There are two videos.  Actually,
13   the other was a shorter one with CNN footage about
14   fighting --
15           MR. MATASAR:  That's what I'm saying --
16           THE COURT:  -- in the Caucasus and so on.
17           MR. MATASAR:  -- we don't.  The fact that not
18   only did you -- you told us you saw it, you articulated
19   the parts of it that I think are most important to us.
20           THE COURT:  Standing next to lithia water --
21           MR. MATASAR:  Correct --
22           THE COURT:  -- being interviewed.
23           MR. MATASAR:  Why we would show it would --
24           THE COURT:  Have you ever drank lithia water?
25           MR. MATASAR:  Why we would show it would be to
```

1    communicate its content to the court.  The court has the

2    content.  So we're not going to show it.  We appreciate

3    your concern.

4         Let me just say a few words about Mr. Sedaghaty

5    before his wife and he address the court.  Some -- much

6    of this there is no dispute about and it was in the

7    video and other places.  He's a well-known community

8    person.  His place in the community is unquestioned by

9    Mr. Cardani and others.  He is the most well-known,

10    articulate spokesman for his faith in Southern Oregon.

11    And he is the kind of spokesman that is what we all

12    would want.  He speaks for peace, for tolerance.  He

13    speaks against Islamic leaders who are doing terrible

14    things to their own people.  He speaks against Saddam

15    Hussein.  He says terrorism is the opposite of what

16    Islam teaches.  He talks about Islamic leaders who he

17    calls dictators who create an atmosphere of terror

18    within their countries, build their military, suppress

19    their own people.

20         Rabbi Zaslow explains in a letter that we

21    attached to the sentencing material as well as in the

22    release hearing that at personal cost to himself, he

23    speaks out in favor of Israel in his community.  Not a

24    popular, perhaps, position, but he takes it, it's part

25    of his interfaith and peace beliefs.

1          Another thing that's interesting, Your Honor,

2    is that when he talks, he talks as an American.  He

3    talks as an inside American, not as an outsider.  He

4    tells people his views, his ideas are more acceptable

5    here than anywhere else on earth.  This is the place

6    where he can talk, where he can speak.  He talks about

7    after 9/11, the recording talks about those, he says

8    how -- talks about the pain and suffering of our people,

9    of what our nation is going through.  At the end of the

10   video, he talks to a woman, a very upset Christian

11   woman, and eventually they reach an understanding

12   because of his ability to speak out for peace and

13   interfaith harmony.

14          He tells the people of Ashland on the

15   television that he hopes to God that we live to be

16   mature enough to come out of this dark, dark hole that

17   these people have thrown us into.  And we share his

18   views on that.

19          We ask Your Honor that you recognize that the

20   world is different now than it was then.  I understand

21   the role of deterrence in the law.  I understand the

22   role of general deterrence, particularly here; however,

23   the conduct here, the money from El-Fiki, the purchase

24   essentially of a prayer house, that conduct occurred

25   before September 11th.  That conduct is what's at issue

1  here.  There is very little reason to deter people given

2  that this conduct occurred so long ago.  There is no

3  real deterrence to punish him based on when these events

4  occurred.

5        We ask you to sentence him as a tax offender

6  under the guidelines and not as a terrorist.  A case

7  where the government didn't charge terrorism, and where

8  the government's evidence of terrorism only comes from

9  information that it and its sophisticated analysts, such

10  as Evan Kohlmann, have developed in the post-9/11

11  period, he should be sentenced for the tax offense, not

12  for the terrorism enhancement.

13        He's a good man.  He's done many good things.

14  The statute talks about what is necessary, that a

15  sentence greater than necessary is not required.  We

16  believe our requested sentence of six months credit for

17  time served is sufficient under the statute, and that

18  nothing more is necessary.

19        So with that, we -- I see Mr. Gorder --

20        THE COURT:  If there is a response on the

21  argument, I'll take that.

22        MR. GORDER:  Yes, Your Honor, just briefly

23  before we get to the allocution.

24        With regard to the discovery motion concerning

25  getting additional material from Russia, we -- I just

1    want the record to be clear, we have provided the

2    defense with all the material that we received over a

3    year ago.  And to argue that for the purposes of

4    discovery that there is some joint venture between the

5    FBI and the IRS and the Russian government is just

6    ludicrous.  That's not the kind of joint venture that

7    the discovery cases talk about.

8            With regard to the use of Defense Exhibit 730,

9    ironically as a piece of circumstantial evidence in the

10   sentencing, I would just point out we're not suggesting

11   that we ignore -- or the court ignore Sami Al-Sanad's

12   claim that they were providing this money to -- for

13   humanitarian purposes.  I'd just ask that you evaluate

14   that in light of who he said he was providing it to, Abu

15   Umar al-Sayf.

16           When you go through all the legalese on the

17   terrorism enhancement, where it really comes down to is

18   the terrorism enhancement applies if the defendant

19   intended to have this money go to the mujahideen in

20   Chechnya.  And we started out this case by saying we

21   weren't taking sides between the Russians and the

22   Chechen separatists in that conflict, but that's not --

23   you know, the terrorism enhancement under the guidelines

24   does not say you get the enhancement if you intend to

25   promote a federal crime of terrorism unless you think

 1  it's a war and you are supporting the side that you

 2  support.  It gives a very clear list of federal criminal

 3  statutes, one of which is Title 18 United States Code

 4  Section 956, which boils down to providing support in a

 5  conflict in a country that we are at peace with.

 6          And despite whatever criticism they can bring

 7  up about the Russian government in the 1990s and in

 8  early 2000 period, the United States was at peace with

 9  Russia, and the statute applied and the terrorism

10  enhancement applies.

11          With regard to this judicial estoppel argument,

12  I think they are trying to mix apples and oranges here.

13  We were limited at the trial to admissible evidence.  We

14  couldn't use Defense Exhibit 730 because it was hearsay.

15  But in the sentencing process, it's a piece of evidence

16  that the court can consider.

17          The purpose of the offenses that Mr. Sedaghaty

18  committed is not just that on October 15th he decided to

19  lie on a tax return.  There was a conspiracy count that

20  he was also convicted of that went over several year

21  period.  And if the purpose of those crimes was to

22  assist the al-Haramain organization in continuing to

23  fund the mujahideen in Chechnya, then it was intended to

24  promote a federal crime of terrorism.

25          The point of the testimony this morning I hope

1   that the court got is that the activities of al-Haramain

2   in Chechnya and in support of the Kavkaz Institute and

3   the Chechen mujahideen continued from 1997 through 2004.

4   And they needed to cover that up.

5          And you recall the exhibit in late September of

6   2001, when the accountant in Riyadh specifically told

7   Mr. Sedaghaty in an e-mail, make sure that there are no

8   trails.  We've got to cover up what we're doing.

9          Finally, with regard to the tax loss issues, we

10  proffered a person who was working at the IRS today, who

11  is involved in auditing exempt organizations rather than

12  Mr. Owens who has been out of the game for ten years.  I

13  think that we've met that burden.

14         THE COURT:  Thank you.  Anything more on the

15  arguments?  If not, I'll take the allocution.  If you

16  want to call the defendant's wife up, that's fine.

17         MR. CARDANI:  While he's doing that, Judge, a

18  matter of housekeeping.

19         THE COURT:  Yes.

20         MR. CARDANI:  We offer all of the sentencing

21  exhibits.  I'm not sure if I made a formal offer, but we

22  offer all of the sentencing exhibits which are attached

23  to our sentencing memo and redacted sentencing Exhibit 1

24  as well.

25         THE COURT:  I know you offered many of them and

1   they were received, but any other objections that we

2   haven't heard?

3          MR. WAX:  We've made the objections, and we

4   still have them, Your Honor.

5          THE COURT:  Thank you.  The exhibits are

6   received.

7          MR. CARDANI:  Thank you.  The only other matter

8   is I didn't know if the court wants to be heard on

9   arguments on release pending appeal but I do have --

10         THE COURT:  Not at this time.

11         MR. CARDANI:  Okay.  But I do want to be heard

12   at some point.

13         THE COURT:  If we have argument, we'll do it on

14   the date I actually impose the sentence.

15         MR. CARDANI:  Thank you.

16         MR. MATASAR:  Your Honor, Ms. Rife, Pete Seda's

17   wife, has asked to be able to sit down so I've given --

18         THE COURT:  No, I think that's fine.  Just make

19   sure, please, that you're near the microphone.  And then

20   say your name.  I need you to spell your name for our

21   record, please.

22         MS. RIFE:  S-U-M-M-E-R, Rife, R-I-F-E.

23         THE COURT:  Thank you.  Go ahead.

24         MS. RIFE:  I met Pete in early 2001 and have

25   gotten to know him very well since then.  I worked and

1    lived in the al-Haramain Ashland prayer house for about

2    a year and a half.  I was with Pete overseas.  And I

3    came back to the U.S. with Pete and was involved in the

4    trial preparation phase of this case.  I heard the

5    testimony at the trial.  And I am aware of the opinions

6    and statements about Pete, that he has a private,

7    insidious side, that he is an extremist, and promotes

8    violence, that he is a con man who deceives, conspires

9    and conceals when it is to his benefit, and that he

10   intended to fund mujahideen in Chechnya.

11          For whatever it's worth, from my almost ten

12   years living with this man, Pete is not those things.

13   He doesn't have a private dark side.  He does not

14   support extremism or terrorism.

15          In fact, he has spent a great deal of his life

16   openly opposing those things.  When he was in Saudi

17   Arabia, he publicly spoke against terrorism, and

18   received threats to his personal safety for doing so.

19          Pete doesn't believe in giving money to further

20   fighting conflict.  He would never knowingly do anything

21   that involved terrorism or was intended to promote

22   terrorism, never.

23          Pete believes in helping the victims of

24   conflict, the starving, the widows and orphans who have

25   lost everything.

1          One of Pete's dreams has always been to put

2     together a humanitarian aid truck convey and drive it

3     into refugee camps to relieve pain and suffering.

4          Pete is someone who lives and breathes to help

5     others, whether they be destitute widows and orphans in

6     Chechnya, elderly people without water in Ashland, or

7     the homeless on the streets of Portland, Pete is always

8     thinking of ways to help people.  He isn't someone that

9     anyone in this room should be afraid of.  And he isn't

10    someone we need to be protected from.

11         Last year when it snowed in Portland, Pete

12    spent the whole night driving around in his Suburban

13    pulling people out of the ditch.  By the end of the

14    night, I think he pulled about 15 cars and a tow truck

15    back onto the road.

16         Barbur Boulevard, a main artery out of downtown

17    Portland, was at a standstill, and traffic was moving

18    excruciating slow.  The problem was a TriMet bus that

19    had slid into the road so that it was blocking all but

20    one lane.  When Pete drove up to the bus, the bus driver

21    had been just sitting in the bus all alone for hours.

22    Pete, being Pete, would never just leave like the rest

23    of us assuming that someone else would deal with it.  He

24    worked the lady through how to drive the bus onto the

25    shoulder, which freed up traffic that had backed all the

way into downtown Portland.

I know Pete isn't perfect.  His ideas tend to be grandiose.  He's not a detail guy.  And over the years, he associated with people who didn't hold the same moderate views that he does.  But Pete shouldn't be punished for a phone call made by someone else in Saudi Arabia, or the e-mails or translations done by people Pete knew.

Everyone learns as they go.  Pete and I have discussed this.  And one of the lessons Pete and I have both learned through this experience is how important it is to counter people who hold intolerant and extreme views.

Before 9/11, I think Pete was more of a live-and-let-live kind of guy.  If some of the people around him on occasion voiced a more extreme or intolerant view than he himself might have held, he might not have always thought it necessary to take a stand against or counter that at the time.

In today's world, with the unique problems we all face, I think what Pete and I have both learned is that when you encounter someone who voices extreme intolerant or violent opinions, it is very important to not only counter it but to strongly and openly condemn that type of thinking right then and there.

1              What has occurred in the last nine years has

2       been incredibly painful to him, to me, and to his

3       family.  It has been devastating to a see a good man

4       broken by lies, innuendo, fear and hate.

5              While we have suffered tremendously, while I

6       feel something somewhere went terribly wrong, I do still

7       believe that in the end justice will prevail.  I will

8       never let go of that hope.  And I look forward to that

9       date.

10             THE COURT:  Thank you very much.

11             Mr. Sedaghaty, have you read the presentence

12      report?

13             MR. MATASAR:  Is it okay if he sits closer to

14      the mike?

15             MR. WAX:  Judge, do you need him to stand?

16             THE COURT:  He may or not, I don't care.  I

17      want him to be heard, most of all, by the court

18      reporter, that's most important.

19             Have you read the presentence report?

20             THE DEFENDANT:  Yes, I have.

21             THE COURT:  And have you talked to your lawyers

22      about it?

23             THE DEFENDANT:  Yes, I have.

24             THE COURT:  Is there anything you would like to

25      tell me about what is in that report or do you have any

1  other statement that you would like me to consider in

2  imposing sentence in this case?

3         THE DEFENDANT:  Nothing more than my counsel

4  have shared.

5         THE COURT:  All right.  Fine.  Well --

6         MR. WAX:  Your Honor, with respect to the

7  presentence report.  He does have a statement that he

8  would like to make to you.

9         THE COURT:  Well, that's fine.  That's what I

10 would like, sir.  Now is your chance to say something to

11 me about sentencing.

12        THE DEFENDANT:  Your Honor, I have difficulty

13 reading, but I'll do my best.  I can't really go off of

14 my head, I'm not very clear these days.  It's a lot.

15        Thanks for giving me a chance to speak, Your

16 Honor.  My faith instructs me to promote peace and

17 understanding and mercy.  That is what I have dedicated

18 as a goal in life.  I love to see that as a human

19 community, we can work out our problems and coexist in

20 peace.

21        I have tried my best to direct those goals

22 toward all people and the people of my faith, trying to

23 keep our eyes on the prize of coexistence and offer help

24 toward the poor as numerous efforts of my work has

25 shown.

1          I hope and pray that God will honor me to

2    dedicate my life to help the poor, the orphans, and the

3    needy.  And I hope to be encouraged to continue that

4    work, to help with the understanding and peace, to make

5    this world a better and kinder place for the coming

6    generation.

7          In all my lectures and my writings, I

8    relentlessly promoted peace and coexistence.  I rejected

9    terrorism all my life, and it is not compatible with my

10   faith and belief.

11         I have never or will ever allow any resource or

12   money in my control to pass to promote war or violence.

13   That is against my faith, as I always have said and

14   wrote.

15         I am ashamed of some statements in some of the

16   books that was distributed.  They are not my words or

17   belief.  They are clearly against my work in life.  And

18   all my writing supports my intention for coexistence.

19   And I have been and always will dispel prejudice and

20   hatred.

21         Islam is a religion of peace, justice, and

22   mercy, forgiveness.  It is my -- and it is misunderstood

23   and misrepresented.

24         Terrorism is and always was clearly rejected by

25   me and my faith.  Terrorism can never be good, positive

1    or helpful.

2          I hope for the truth to be known, and I believe

3    that justice will be served.  I pray that the court

4    allow me to move forward by learning from my past and my

5    mistakes to see an example for the world that is going

6    to be kinder and more compassionate place.

7          I hope that over the 20 years of my tireless

8    community volunteer work effort, like planting thousands

9    of trees around the city and the county, working and

10   teaching in schools, volunteering in city and county

11   parks, working for libraries, forest fire prevention

12   programs, emergency health, food for needy, homeless

13   food programs, and interfaith bridge building, while

14   being a relentless advocate for peace are taken into

15   account.

16         Justice, love, compassion, and mercy will

17   endure, even if it appears as darkness has enveloped us

18   all to extinguish the last flickers of light.  It is a

19   light that we all have been gifted, a small kernel of

20   kindness toward the poor, the orphans and refugees.

21   Allow it to die or we are going to let it shine.

22         I hope that all people will join in making this

23   a world of tolerance, understanding, kindness, and

24   peace.

25         Thank you, Your Honor.

```
1              THE COURT:  You are welcome.

2              Anything further at this time?  All right.

3         Mr. Wax?

4              MR. WAX:  No, thank you.

5         THE COURT:  All right.  I'm going to at this

6    point recess the sentencing for a date that I'll inform

7    you of.  I don't have the date for you right now.  We

8    are getting into a holiday season for some.  And I

9    wonder if there are times that counsel -- that you are

10   just not available because you have family trips or

11   something like that.  Are there -- if there are those,

12   would you please tell me.

13             MR. WAX:  I know that I will be out of town

14   December 15, 16, and 17.

15             THE COURT:  Okay.

16             MR. MATASAR:  I'm available, Your Honor,

17   throughout.

18             THE COURT:  Okay.  That's it?

19             MR. CARDANI:  This would be before the

20   Christmas season?

21             THE COURT:  Yes.  I expect it to be.  Mr. Wax

22   has given me quite a few things -- and so have you --

23   that you've told me you would like findings on, so I'm

24   going to give them to you.  I don't understand the one

25   request Mr. Wax has, frankly, but --
```

```
 1            MR. CARDANI:  In terms of availability, Your

 2   Honor, we're all available right up until Christmas.

 3            THE COURT:  If you could explain that any

 4   further, Mr. Wax, I'd be happy to hear it.  Material

 5   submitted to me, I certainly do my duty with regard to

 6   that.

 7            MR. MATASAR:  Your Honor --

 8            THE COURT:  Just a moment.

 9            (Discussion held off the record.)

10            THE COURT:  Do you have anything more?

11            MR. WAX:  Well, in answer to your question,

12   Your Honor, the only thing that I'm referring to is the

13   material that is the subject of the May 2008 order which

14   we had, as you recall -- and I'm trying to remember -- I

15   think everything I am about to say I can say in this

16   open setting -- we had caused to be placed in the SCIF

17   in Washington.  And we had caused that to be placed in

18   the SCIF pursuant to an agreement that we had entered

19   into with the government.

20            I'm not referring to any of the discovery

21   materials that were provided by the government for the

22   court's review.  I'm only referring to the one

23   material -- set of materials, documents, that I

24   cannot --

25            THE COURT:  I'm going to have to confer with
```

1    the court security officer.  I'm not even sure I can

2    answer your question, frankly.

3          MR. WAX:  As you look at the -- look back at

4    the pleadings that we have filed with respect to that, I

5    believe that you will see that we have raised this

6    question at a number of points in the pleadings.  And in

7    terms of an appellate process, if there is to be an

8    appellate process after the sentencing, that fact would

9    need to appear somewhere on the record for us to be able

10   to make arguments about the agreement that was entered

11   into with the government, and what it is that we can

12   say, recognizing that what we can say is limited by the

13   order which remains in place.  So that's what I'm

14   referring to.

15         THE COURT:  So you're -- well, okay.  We're in

16   recess.

17         (The proceedings were concluded at 3:48 p.m.)

18

19

20

21

22

23

24

25

```
 1                         CERTIFICATE

 2        I, Deborah Wilhelm, Certified Shorthand Reporter

 3   for the State of Oregon, do hereby certify that I was

 4   present at and reported in machine shorthand the oral

 5   proceedings had in the above-entitled matter.  I hereby

 6   certify that the foregoing is a true and correct

 7   transcript, to the best of my skill and ability, dated

 8   this 29th day of November, 2010.

 9

10

11

12
                         /s/ Deborah Wilhelm
13                       _____
                         Deborah Wilhelm, RPR
14                       Certified Shorthand Reporter
                         Certificate No. 00-0363
15

16

17

18

19

20

21

22

23

24

25
```