Steven T. Wax, OSB No. 85012
Federal Public Defender
101 SW Main Street, Suite 1700
Portland, OR  97204
Tel: (503) 326-2123
Fax: (503) 326-5524
Email: steve_wax@fd.org

Lawrence Matasar, OSB No. 74209
621 SW Morrison Street, Suite #1025
Portland, OR 97205
Tel: (503) 222-9830
Email: larry@pdxlaw.com

Attorneys for Defendant

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>  v.<br><br>PIROUZ SEDAGHATY,<br><br>      Defendant. | CR 05-60008 HO<br><br>DEFENDANT'S SUPPLEMENT TO MOTION FOR A NEW TRIAL<br><br>ORAL ARGUMENT REQUESTED |

  Defendant, Pirouz Sedaghaty, through counsel Lawrence Matasar and Steven T. Wax, hereby supplements his motion for a new trial on the basis of newly disclosed evidence that the government violated its duty to provide

Page 1  DEFENDANT'S SUPPLEMENT TO MOTION FOR A NEW TRIAL

pretrial discovery of critical impeaching evidence of payments and offers of payments of money to the Cabrals – one of whom testified at trial.  It is axiomatic that payments and offers of payments are among the most fundamental of tools for impeachment and that their pre-trial disclosure is required.

The central element of the prosecution's theory was that Mr. Sedaghaty falsified his tax returns in order to hide his attempt to provide money to the Chechen mujahideen.  Over nine years of investigation by numerous federal agents, only one witness – Barbara Cabral – directly linked Mr. Sedaghaty with attempting to raise money for the Chechen mujahideen.  Over ten days of trial, that witness – Barbara Cabral – so impacted the jury that one juror complimented her testimony.  Tr. September 1, 2010 at 4.

From the outset of these long proceedings, the government represented to the Court that it has fulfilled its discovery obligations.  We now learn for the first time, from FBI documents that are themselves suspect,[1] that the Cabrals were paid $14,500 in cash by the FBI, that Barbara Cabral, a testifying witness for the government, was told before the trial that the FBI would attempt to make a direct payment to her, but only after the trial in this matter, and that Barbara Cabral and her late husband, Richard Cabral, developed a close

---

[1] In the Post-Trial Motion for Discovery, Mr. Sedaghaty describes, *inter alia*, critical alterations in reports.

**Page 2**     **DEFENDANT'S SUPPLEMENT TO MOTION FOR A NEW TRIAL**

personal relationship with the principal FBI case agent.[2]  In all, the new information reveals at least twelve investigative contacts and interviews with the Cabrals that were not previously disclosed, some of which involved payments and discussions of potential further payments.  These new revelations raise questions about the integrity of the investigation and prosecution beyond those that have been previously raised in the Motion for New Trial.[3]

**I.    A NEW TRIAL IS REQUIRED BASED ON FLAGRANT VIOLATION OF THE GOVERNMENT'S DISCOVERY OBLIGATIONS.**

**A.    The Facts Provided To Date, Even Without Further Discovery And An Evidentiary Hearing, Reveal That The Government's Discovery Violations Deprived Mr. Sedaghaty Of A Fair Trial.**

On January 6, 2011, the government provided information for the first time revealing that the case agents provided substantial monetary payments to the Cabrals and an offer of payment to Barbara Cabral that was to be made

---

[2]The history of the discovery, including the new discovery, is set out in the declaration of Federal Defender Investigator James Strupp attached as Exhibit 1.

[3]*E.g.*: (1) the government appealed to prejudice by referring to the defendant's association with a "strident form of Islam" that "promoted acts of violence" and a "kill people" jihad, and by telling the jury that "The Noble Qur'an is the defendant," calling it "junk," waving it before the jury and slamming it down on the table; (2) the government materially changed the trial testimony of the chief IRS case agent from her grand jury testimony and influenced the trial testimony of accountant Tom Wilcox concerning who provided the false information on the tax form; (3) the government refused to use its unique ability to obtain authentication of evidence that undermined its theory that the El Fiki funds were diverted to Chechen mujahideen and used for personal gain.

**Page 3       DEFENDANT'S SUPPLEMENT TO MOTION FOR A NEW TRIAL**

after the trial.  FBI Special Agent Scott R. Jensen 302, December 29, 2010.  We now know that over a multi-year period beginning shortly after September 11, 2001, FBI Agent David Carroll and IRS Agent Colleen Anderson interviewed Barbara and Richard Cabral at least 20 times in connection with their investigation of Mr. Sedaghaty and, apparently, other Muslims living in or near Ashland.  Jensen 302, December 29, 2010.  The new disclosures also reveal Barbara Cabral's description of a close relationship with Agent Carroll and his wife.  Jensen 302, December 29, 2010.

>	Agent Carroll states:

>>	Richard Abdullah Cabral received a total of $14,500.00 in U.S. currency from the FBI.

Special Agent David A. Carroll 302, December 22, 2010.  From July 2004 to December 2006, the FBI made three payments of United States currency to Richard Cabral in the total amount of $14,500.  The first payment was made and witnessed by FBI Agents David Carroll and Shawna Carroll, the second and third payments were made and witnessed by Agent David Carroll and IRS Agent Colleen Anderson.  Many of the FBI interviews with the Cabrals were jointly conducted with Barbara and Richard.  Barbara was present when the second cash payment was made.

>	Agent Carroll further states:

> During a subsequent contact prior to trial, this writer [Special
> Agent David Carroll] commented to [Mrs. Barbara] Cabral in words
> to the effect that he would attempt to get her something after the

Page 4        **DEFENDANT'S SUPPLEMENT TO MOTION FOR A NEW TRIAL**

> trial.  Writer's meaning was ... that he would attempt to provide
> her with a payment of U.S. currency after the conclusion of trial. ...
> On October 4, 2010, Cabral was advised by this writer of efforts to
> provide her with a $7,500.00 payment.

Carroll 302, December 22, 2010.  Carroll states that during an April 19, 2010, telephone contact concerning arrangements for service of a witness subpoena, Barbara Cabral told him that she had suffered a heart attack[4] and that resulting medical expenses amounted to several thousand dollars.

April 19, 2010, was not the first time the topic of money was raised by Mrs. Cabral with David Carroll.  On April 14, 2008, Mrs. Cabral, a "master stylist" at JC Penney's, Tr. August 31, 2010 at 266, appears to have discussed the need for $2,500 incidental to her attending the Paul Mitchell School in Costa Mesa, California.  Government Discovery 3819.

At an undisclosed time prior to trial, Agent David Carroll offered to pay Cabral "U.S. Currency" after the conclusion of trial.  The offer was firmed up shortly after trial when David Carroll told Mrs. Cabral of his efforts to provide her $7,500.  Carroll 302, December 22, 2010.  Agent Carroll says no payments have been made directly to Barbara Cabral since the trial.  Carroll 302, December 22, 2010.

The government first disclosed the discovery violation to the defense on December 22, 2010, but did not provide any reports until January 6, 2011.

---

[4]Medical reports failed to confirm she had a heart attack.  Jensen 302, December 29, 2010.

Page 5      **DEFENDANT'S SUPPLEMENT TO MOTION FOR A NEW TRIAL**

Exhibit 1, Declaration of Federal Defender Investigator James Strupp.  The government has engaged in some investigation of the matter, including having a supervisory F.B.I. agent interview Barbara Cabral.  Jensen 302, December 29, 2010.  Barbara Cabral admitted she knew about the payments to her late husband for working with the FBI.  Contrary to Agent Carroll's report, Cabral allegedly "does not remember" talking to David Carroll prior to trial about receiving payments for herself.

While now protesting that she has no expectations of a special payment, she specifically remembers a post-trial discussion with David Carroll concerning a $7,500 payment for her.  Barbara Cabral views the payments as having been made for her as well as her husband, stating that she "has always felt the money Richard received from Carroll satisfied any monetary consideration that might have been due for her and Richard's help . . ."  She is also "grateful" for the standard witness stipend she has received.  Jensen 302, December 29, 2010.

The payments, offers of payments, and Cabral's views of the money received by her husband, are quintessential impeachment material.  Moreover, the inconsistency in Cabral's reported recollection and that of the FBI further undermines her testimony, and/or the integrity of the investigation.

Barbara Cabral also states:

Cabral considers them [the FBI case agents] close enough friends that [she] has felt comfortable greeting them with a hug' [and] 'even

invited them to her wedding. Special Agent Scott R. Jensen 302, December 29, 2010.  During the six to seven year period of communication, Barbara Cabral developed a personal relationship with the principal FBI case agent, David Carroll, and his wife, Shawna, who is also an FBI agent and who sometimes was present with David Carroll in the interviews.  Mrs. Cabral considers them "good friends."  The relationship was close enough that Barbara Cabral would greet them with hugs when she encountered them in the store where she worked.  Barbara Cabral even invited the Carrolls to her wedding after Richard Cabral's death in 2008.  The Carrolls did not attend but Barbara Cabral teases them about still owing her a wedding present.  Jensen 302, December 29, 2010.

### B. The Applicable Law Establishes That The Egregious Discovery Violation In This Case Requires, At The Least, A New Trial.

The facts set out above, without more, and without regard to any other issues in the case, require a new trial.  The defense is entitled to disclosure of any promises, inducements, deals, or payments to any witness.  *United States v. Bagley*, 473 U.S. 667 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Brady v. Maryland*, 373 U.S. 83 (1963).  The actions that are now disclosed were perpetrated by the agents and agencies that were driving this prosecution from day one.  Mr. Sedaghaty made all appropriate discovery requests for such information.  Because the cover letter the government submitted with the new material acknowledges that it failed in its obligations,

we will not belabor the record on discovery in this pleading, except to note that, in addition to violating the Constitution as indicated above, the government's failure to provide this information also violated this Court's July 1, 2009, discovery order in several different ways.  CR 191.

When the government has withheld information, a new trial is required when it is material, that is if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Silva v. Brown*, 416 F.3d 980, 985 (9th Cir. 2005) (citing *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)).  That is the only logical conclusion on these facts.  The trial was hotly contested, no more so than with respect to whether Mr. Sedaghaty intended to fund the Chechen mujahideen.  The government's evidence of Mr. Sedaghaty's intent and actions – here his desire to fund Chechen mujahideen as opposed to provide humanitarian relief in Chechnya – was almost entirely circumstantial.  The <u>only</u> direct evidence on that issue came from Barbara Cabral in her account of Mr. Sedaghaty's supposed statements at the end of a Hajj in Saudi Arabia in March 1999:

> We were approached by Pete to give him the money because he said since they took care of us, and that it would also help send blankets and food and help the mujahideen in Chechnya.

Tr. August 31, 2010 at 279-80.

The defense had little to work with in cross-examination of Mrs. Cabral.  Her testimony was so well received and so significant that a juror

**Page 8**     **DEFENDANT'S SUPPLEMENT TO MOTION FOR A NEW TRIAL**

complimented her as she left the witness stand, a fact that led to the removal of that juror. In closing argument, both prosecutors referred to Cabral's testimony. In the initial closing argument, Mr. Gorder described Cabral's testimony about the money and the Hajj.

> When they went on the Hajj, the pilgrimage to Mecca, Barbara Cabral who testified before you was told that when she got her money back from the Saudi government because they were so well taken care of by al-Haramain, that the defendant went to her and said, can we get that money for the mujahideen in Chechnya?

Tr. September 8, 2010 at 52 (Gorder closing). On rebuttal, Mr. Cardani reiterated the testimony, then emphasized the lack of impeachment.

> Barbara Cabral tells you she went to the Hajj with Mr. Sedaghaty, big international flight, a big pilgrimage, sponsored by who? al-Haramain. On the way out of the country, Mr. Seda says let's give our money to the mujahideen. No mention of that from Mr. Wax. Why is that?

Tr. September 8, 2010 at 154 (Cardani's closing). The closing arguments underscore the centrality of the Cabral testimony – especially in unimpeached form – to the government's case.

The requirement of a new trial is underscored by comparison to several recent cases, including *United States v. Price*, 566 F.3d 900 (9th Cir. 2009), and *United States v. [Senator] Ted Stevens*, No. 08-cr-231-EGS, CR 372 (D.D.C. April 7, 2009). In *Stevens*, the prosecution failed to provide key *Brady* material. The government dismissed the case against Senator Stevens. In *Price*, a new trial was ordered when the government failed to disclose evidence

of a government witness's criminal history.

Unlike cases in which disclosures have not led to reversal, the information withheld from the defense here was central, not collateral; unique, not cumulative; was offered in a case that was not overwhelming, and relied on by the prosecution in opening and closing. *See Horton v. Mayle*, 408 F.3d 570, 578-79 (9th Cir. 2005) (concluding that unique impeachment evidence suggesting the willingness of a critical prosecution witness to fabricate evidence was material and that the failure to disclose deal between police and central prosecution witness whose testimony violated *Brady*); *Silva v. Brown*, 416 F.3d 980, 987 (9th Cir. 2005) (suppressed evidence "is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case"); *United States v. Collins*, 551 F.3d 914, 924 (9th Cir. 2009) (suppression of impeachment evidence did not require reversal where substantial impeachment evidence was presented at trial); *United States v. Gil*, 297 F.3d 93, 103 (2d Cir. 2002) ("where the evidence against the defendant is ample or overwhelming, the withheld *Brady* material is less likely to be material than if the evidence of guilt is thin."); *United States v. Price*, 566 F.3d at 914 ) (*Brady* violation where prosecutor relied on witness's truthfulness and withheld information that went to witness's credibility); *Kyles*, 514 U.S. at 444, (concluding that evidence tending to impeach the reliability of the testimony of key eyewitness testimony was material); *United States v. Shaffer*, 789 F.2d 682,

691 (9th Cir. 1986) (affirming grant of new trial where failure to disclose impeachment evidence regarding key government witnesses undermined confidence in trial outcome).  Further, the misconduct occurred in a case in which there are a host of other significant issues.

While a new trial is required based on the impact on Cabral's testimony alone, we also note that the materiality of the withheld information goes beyond its importance in cross-examination of Barbara Cabral.  It is also relevant to the defense efforts throughout the trial to demonstrate to the jury that the government investigation was biased.

A new trial must be ordered.

Respectfully submitted this 12th day of January, 2011.

/s/ Steven T. Wax
Steven T. Wax
Federal Public Defender

/s/ Lawrence H. Matasar
Lawrence H. Matasar