DWIGHT C. HOLTON, OSB #09054
United States Attorney
District of Oregon
CHRISTOPHER L. CARDANI
Assistant United States Attorney
405 East Eighth Avenue, Suite 2400
Eugene, Oregon 97401
(541) 465-6771
chris.cardani@usdoj.gov
CHARLES F. GORDER, JR., OSB# 912874
**KELLY A. ZUSMAN**, OSB #891843
Assistant United States Attorneys
1000 SW Third Avenue, Suite 600
Portland, Oregon 97204
(503) 727-1000
charles.gorder@usdoj.gov
kelly.zusman@usdoj.gov


## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CR 05-60008-HO** |
| **v.** | **GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENT TO MOTION FOR A NEW TRIAL** |
| **PIROUZ SEDAGHATY,** | |
| **Defendant.** | |

/////

/////

/////

## <u>TABLE OF CONTENTS</u>

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Summary Time Line (Cabral Discovery) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Defendant bears the burden of establishing justification for a new trial or dismissal. . . . . . . . . 5

Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      Richard and Barbara Cabral – Source and Trial Witness Information . . . . . . . . . . . . . . 9

      The Government's Discovery Process in General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      The Background on the December 2010 Cabral Payment Disclosure . . . . . . . . . . . . . . 14

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**A.**    **Context is Key:  Barbara Cabral was not a "central" or "significant" witness.** . . . 19

**B.**    **From Opening Statements to Closing Arguments:  The Accountant was the Key Witness** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**C.**    **Barbara Cabral provided helpful testimony to the defense too.** . . . . . . . . . . . . . . . 22

**D.**    **Cabral's testimony was minor given the nature of the defense.** . . . . . . . . . . . . . . . 23

**E.**    **Cabral's testimony was just one piece of a much larger puzzle: there was ample, independent evidence of defendant's willfulness** . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**F.**    **Richard Cabral was paid many years before trial.  Barbara Cabral was never paid and was unaware that payment to her was even contemplated, so the impeachment value of the information was minimal.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**G.**    **Defendant had other means to attack Barbara Cabral's story, but he chose not to do so.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**H.**    **This Court should have confidence in the jury's verdict and deny the new trial motion.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**I.**    **The Handwritten Notes from the Interviews of Barbara Cabral Added Nothing** . . 30

ii

**J.      The August 2007 Richard Cabral Interview Report provided to the defense on January 6, 2011, was a draft version of a report; the more complete version, that included the potentially exculpatory information, was provided to defense counsel well before trial** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**K.      There was nothing sufficiently remarkable about Agent Carroll's relationship with Barbara Cabral that created any additional disclosure obligations** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

# TABLE OF AUTHORITIES

*Brady v. Maryland*, 373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7, 19, 20

*Giglio v. United States*, 405 U.S. 150 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7, 19, 28

*Government of the Virgin Islands v. Fahie*, 419 F.3d 249 (3rd Cir. 2005) . . . . . . . . . . . . . . . . . 8

*Kyles v. Whitley*, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Monge v. California*, 524 U.S. 721 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Oregon v. Kennedy*, 456 U.S. 667 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Strickler v. Greene*, 527 U.S. 263 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*United States v. Bagley*, 473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Barrera-Moreno*, 951 F.2d 1089 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Blanco*, 392 F.3d 382 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 19

*United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Collins*, 551 F.3d 914 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 20

*United States v. Howell*, 231 F.3d 615 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Inzunza*, 580 F.3d 894 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Pettiford*, 627 F.3d 1223 (D.C. Cir. 2010),
    *citing United States v. Agurs*, 427 U.S. 97 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Ross*, 372 F.3d 1097 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Si*, 343 F.3d 1116 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Sipe*, 388 F.3d 471 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Struckman*, 611 F.3d 560 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

18 U.S.C. § 960 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

### U.S. v. Seda: Summary Time Line (Cabral Discovery)

- Spring 1999:  Defendant, several members of his family, the Cabrals, David Hafer, and Rob Brown attend a Hajj to Mecca.
- March 7-12, 2000:  Al But'he transports El-Fiki funds to Saudi Arabia.
- 2001:  The Seda Criminal Investigation begins.

Defendant
Leaves U.S.
2003-2007
Fugitive:
2005-07

- 2003: Richard Cabral opened as a source.
- 2004: Barbara Cabral opened as a source.
- July 30, 2004: Richard Cabral receives $4500 from the FBI for his work on this and other cases.
- Feb. 17, 2005:  Indictment
- March 21, 2005:  Richard Cabral receives $5000 from the FBI, and Barbara is present.
- Dec. 7, 2006:  Richard Cabral receives $5000 from the FBI.
- August 15, 2007:  Defendant makes his first appearance before MJ Coffin.
- March 21, 2008:  Richard Cabral dies.
- January & March 2009:  Trial team reviews files for *Brady* and *Giglio* material- Medford.
- Feb. 26, 2009:  Government produces R. Cabral interview (dated 8/17/07).
- August 10, 2009:  The government files its first witness list - no Barbara Cabral.
- March 17, 2010: Government's Amended Witness List - Barbara Cabral is added.
- April 2010:  Cabral mentions medical problems; sometime thereafter, Carroll makes a passing comment about doing "something" for her post-trial.
- May 2010:  Government produces investigative reports (6) of B. Cabral interviews
- June 2010:  Barbara Cabral remarries.
- June/August 2010:  Carroll tells Gorder B. Cabral has not been paid, but he intends to seek authorization to pay her something after the trial concludes.
- August 31, 2010:  Barbara Cabral testifies.
- October 4, 2010:  Carroll calls B. Cabral and tells her he hopes to pay her $7500.
- December 7, 2010:  Agent Carroll calls AUSA Cardani to approve payment, and they discuss earlier payments made to Richard Cabral.
- December 9, 2010:  Cardani and Gorder contact USA Holton.  Within the next few days, Holton declines to approve payment to Barbara Cabral.
- Dec. 10-20, 2010: Carroll is on annual leave.
- December 13, 2010:  Cardani and Gorder discuss need for details; Gorder asks Carroll to provide detailed information regarding payments to R. Cabral, and whether Barbara Cabral was aware of those payments.
- December 20, 2010:  Carroll tells prosecutors for the first time about his pretrial comment to B.Cabral, and gives details about the Richard Cabral payments; Cardani and Gorder decide that all of the Cabral payment and offer information must be disclosed, and they notify Holton.  Holton concurs.
- December 22, 2010:  Cardani notifies the court and defense counsel of additional information regarding Barbara Cabral that was not previously disclosed.
- December 27, 2010:  FBI Agent Jensen and IRS Special Agent McGeachy interview B. Cabral and prepare a report of that interview.
- December 27-28, 2010:  AUSA Gorder reviews the Cabrals' FBI source files.
- January 5, 2011: AUSA Zusman reviews the Cabral source materials gathered by Gorder.
- January 6, 2011: Cabral materials are delivered to defense counsel (Opposition, Att. A).

The United States of America, by and through Dwight C. Holton, United States Attorney, and Kelly A. Zusman, Assistant United States Attorney, offers the following response to defendant's supplemental motion for a new trial:

## Introduction

Richard Cabral served as a cooperating witness (or "source") for the FBI from 2003 until his death in March of 2008. Between 2004 and 2006, he was paid $14,500 for this work on this and other cases. The prosecution fully expected to call him as a witness at trial. But due to significant delays, including two and a half years in which defendant was an international fugitive, Richard Cabral died before this case could get to trial. When he died, Richard Cabral's FBI file was closed.

Nearly two years later, in the Spring of 2010, the prosecutors decided to call Richard Cabral's widow, Barbara Cabral, as a witness. Barbara Cabral has never been paid by the FBI. While Barbara Cabral did not have the direct relationship with defendant that her husband had, she could offer details concerning two events – not directly related to the tax and conspiracy charges – that reflected on defendant's desire to fund the Chechen mujahideen. This testimony, along with a lot of other evidence and testimony, was proffered by the government to establish the willfulness element of the charges. The prosecutors knew that Barbara Cabral's former husband had been a paid FBI informant, but they did not know until recently how much he had been paid, nor did they know until after trial that Barbara Cabral had been present for at least one of those payments. One of the prosecutors had confirmed before trial that Barbara Cabral had not been paid anything by the FBI, and while he knew that a post-trial payment was contemplated, he was unaware of the fact that anything had been said to Barbara Cabral about

**Page 2 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

this.  In fact, the case agent who had been working with Cabral for many years, made a passing comment to Cabral before trial to the effect that he would try to do "something" for her after trial.  The agent did not tell the prosecutors about this comment prior to trial.  Cabral does not remember the comment, and in fact, said that she did not expect any payment when she testified.

Once the prosecutors learned of the pretrial comment to Barbara Cabral, they informed defense counsel and this Court within two days.  While the prosecutors were unaware of this information prior to trial, the government recognizes that, under the law, prosecutors are charged with being aware of information if any member of the prosecution team knew of the pertinent facts.  Moreover, the government does not dispute that one of the case agents – a member of the prosecution team –  knew all of the relevant details prior to trial.  In retrospect, we agree that the entire bundle of information should have been turned over to the defense before trial.

The prosecutors who are ultimately responsible for deciding what was or was not discoverable did not know all of the pieces of that bundle of information, such that the failure to disclose what the government had in its possession was inadvertent.  At no time did any member of the prosecution team make a conscious decision not to turn over material in discovery because it might have been helpful to the defense.  In fact, as detailed in the declarations submitted with this brief, the prosecution team made every effort to find and disclose exculpatory information to the defense, and in fact did so on several occasions before trial.

Barbara Cabral's testimony was not key to the government's case, which explains in part, why the information about payments made to her deceased husband many years before trial did not seem significant.  In fact, at trial, the defense treated Barbara Cabral as a fairly insignificant witness.  Given the new information, and their desire to obtain a new trial, defense counsel have now done an about-face and depicted her in their motion as a critical witness.  This response will

**Page 3 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

refute that mischaracterization.  The real question for this Court is whether this discovery omission matters – whether the availability of this information about the Cabrals would have put the whole case in such a different light as to undermine confidence in the jury's verdict.  The answer to that question is no.

For the reasons explained in greater detail below, Barbara Cabral was neither a crucial witness to the government's case, nor did she provide critical testimony.  The relevant inquiry is not whether she provided the only evidence linking defendant to the Chechen mujahideen (she did not), but whether she was the only witness who testified on a critical element of the charge - that of willfulness.  Again, she was not alone.  Barbara Cabral was one piece of a puzzle that formed the government's proof of willfulness.  Most of the government's proof of defendant's willfulness bore no relation to the Cabrals.  Defendant lied to his accountant, Tom Wilcox, about the very transaction at issue in this case.  Defendant and Al But'he went to great lengths and great expense to smuggle the El-Fiki money out of the United States, in a manner that could not be easily traced.  In addition, there were emails between defendant and the Saudi accountant for Al Haramain that revealed defendant's lies to his U.S. accountant.  And there was substantial evidence retrieved from the computer seized from defendant's office that evinced defendant's passionate support for the Chechen mujahideen.  All of this other evidence was far more direct and compelling proof of willfulness than the single incident in 1999 involving defendant's plea to the Cabrals to make a $400 contribution for "blankets" for the mujahideen.

The jury's decision that defendant willfully filed a false tax return and conspired to covertly move $150,000 out of the United States was, at best, only minimally reliant on the testimony of Barbara Cabral.  Because the post-trial discovery would not have altered the trial in

**Page 4 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

any material way, and because it does nothing that should undermine this Court's confidence in the verdict returned by the jury, defendant's motion for a new trial should be denied.

Unfortunately, that ruling does not end the inquiry. Because the defense has raised new claims of government misconduct surrounding this discovery issue, and attempted to bootstrap these claims to its previous motions, this Court must also examine and decide whether the government engaged in "flagrant" misconduct that would justify an outright dismissal of the indictment.[1] To this end, the government has gathered sworn declarations from the members of the trial team, the United States Attorney, and Barbara Cabral to explain what happened, and to assure this Court that the government's discovery compliance in this case was undertaken in good faith. Dismissal of the government's indictment would be a drastic and disproportionate response to the challenged actions. Defendants' motions should be denied in their entirety.

**Defendant bears the burden of establishing justification for a new trial or dismissal.**

The Due Process clause requires that the prosecution disclose material evidence that is favorable to a criminal defendant and in the government's possession. *Brady v. Maryland*, 373 U.S. 83 (1963). *Giglio* applies the *Brady* rule to evidence affecting the credibility of key government witnesses. *Giglio v. United States*, 405 U.S. 150, 154-55 (1972). Defendant bears the burden of demonstrating that he is entitled to relief for a *Brady* violation. *Strickler v. Greene*, 527 U.S. 263, 291 (1999); *see also, United States v. Si*, 343 F.3d 1116, 1122 (9th Cir. 2003) (noting defendant bears the burden of establishing materiality of alleged *Brady* evidence). To meet this burden, defendant must satisfy three factors: (1) the undisclosed evidence must be

---

[1] Although defendant has not yet filed a motion to dismiss the indictment based upon this recent discovery issue, he has filed a motion for discovery to help bolster such a motion. (CR 520). This response opposing a new trial also addresses the issues raised in defendant's motion for discovery, and explains why dismissal would be wholly inappropriate.

**Page 5 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

favorable to the accused; (2) the evidence must have been suppressed by the prosecution – either

wilfully or inadvertently; and (3) "prejudice must have ensued." *Strickler*, 527 U.S. at 281-82.

"Prejudice" in this context means a "reasonable probability that, had the evidence been disclosed

to the defense, the result of the proceeding would have been different." *Id.* at 280.  Put another

way, the question for this Court is whether the recently produced evidence places "the whole

case in such a different light as to undermine the confidence in the verdict." *Kyles v. Whitley*,

514 U.S. 419, 435 (1995).

　　　In making this determination, courts should "evaluate the impact of the undisclosed

evidence not in isolation, but in light of the rest of the trial record." *United States v. Pettiford*,

627 F.3d 1223, 1229 (D.C. Cir. 2010), *citing United States v. Agurs*, 427 U.S. 97, 112 (1976)

(additional citations omitted).  This thorough examination of the entire record should include a

"careful, balanced evaluation of the nature and strength of both the evidence the defense was

prevented from presenting and the evidence each side presented at trial." *United States v.*

*Collins*, 551 F.3d 914, 923 (9th Cir. 2009).

　　　Impeachment evidence only rises to the level of *Brady* "when the reliability of the

witness may be determinative of a criminal defendant's guilt or innocence." *United States v.*

*Blanco*, 392 F.3d 382, 387 (9th Cir. 2004).  The mere fact that the government uncovers material

in its possession that it later determines should have been turned over under the discovery rules

or the Due Process clause does not mandate relief.  *See United States v. Bagley*, 473 U.S. 667,

678 (1985) (rejecting an "automatic reversal" rule for undisclosed impeachment evidence).  As

the Supreme Court has recognized:  "We do not automatically require a new trial whenever

combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the

defense but not likely to have changed the verdict . . . [a] finding of materiality of the evidence is

**Page 6 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

required." *Giglio,* 405 U.S. at 155 (internal quotation marks and citation omitted); *see also United States v. Inzunza*, 580 F.3d 894, 907 (9th Cir. 2009); *United States v. Howell*, 231 F.3d 615, 626 (9th Cir. 2000) (holding that *Brady* violation was not prejudicial in light of "substantial evidence independent of" the withheld evidence).   Indeed, relatively weak impeachment evidence that adds little value to a trial will not justify relief.  *Collins*, 551 F.3d at 924-25.

For purposes of his new trial motion, the reasons for the government's failure to disclose potential impeachment information prior to trial are irrelevant.  *Giglio*, 405 U.S. at 154.  If this Court deems the information favorable to the defense and of a character that its omission undermines the confidence in the verdict, then the new trial inquiry ends there.  *See Howell*, 231 F.3d at 624 (noting that suppression of favorable evidence violates *Brady* "irrespective of the good faith or bad faith of the prosecution") (citations omitted).  The Double Jeopardy Clause only bars a retrial in two situations:  (1) where the court deems the evidence insufficient; or (2) if defendant establishes that government conduct was "intended to goad the defense into moving for a mistrial." *Monge v. California*, 524 U.S. 721, 729 (1998); *Oregon v. Kennedy*, 456 U.S. 667, 676 (1982).  For reasons set forth in the government's earlier response to defendant's post-trial motions (CR 485), there was more than sufficient evidence to sustain the jury's verdict.  As for the second Double Jeopardy exception, defendant has not (yet) alleged that the government intentionally scuttled its own trial.  The declarations submitted with this response should put any concerns about sabotage to rest.

If this Court concludes that the late-disclosed information was neither material nor prejudicial in light of the entire trial record, there is no due process violation to justify dismissal. Dismissal of an indictment brought by the United States is a "drastic" and "disfavored" remedy. *United States v. Barrera-Moreno*, 951 F.2d 1089, 1092 (9th Cir. 1991).  It is only warranted

**Page 7 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

when the government's actions violate due process or constitute "flagrant" misconduct resulting in "substantial" prejudice to defendant. *United States v. Ross*, 372 F.3d 1097, 1110 (9th Cir. 2004). This Court has wide discretion, under its supervisory powers, to dismiss an indictment upon a finding of "flagrant" misconduct, but even then, there is nothing that compels it to do so. The Ninth Circuit reviews such determinations according broad discretion to the trial judge. *Compare United States v. Struckman*, 611 F.3d 560, 582 (9th Cir. 2010) (affirming trial court's decision to deny dismissal even after investigating agents failed to comply with court orders), *with United States v. Chapman*, 524 F.3d 1073, 1077, 1087 (9th Cir. 2008) (affirming trial court's dismissal of an indictment based upon prosecutor's inability to prove discovery compliance and finding of specific prejudice to defense). Dismissal is a powerful deterrent and should not be employed when the failure to produce discovery was not intended to impair the defense, when the information was neither critical nor related to a key witness, or where government simply misjudges material in its possession. *See, Government of the Virgin Islands v. Fahie*, 419 F.3d 249, 255-56 (3rd Cir. 2005) (reversing dismissal as an abuse of discretion where prosecutor failed to turn over an ATF report because she "overlooked the significance" of the document).

## Factual Background

Because this Court is familiar with the facts surrounding this case and the trial, this section will focus on investigative details not previously addressed, and what has transpired since the post-trial motions and sentencing disputes were argued and submitted. The relevant facts are as follows:

**Page 8 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

Richard and Barbara Cabral – Source and Trial Witness Information

■    Richard Cabral was an Ashland resident who knew defendant.  Carroll Dec. at 10.  In November of 2003, Richard Cabral began serving as a source for the FBI and he provided information for this and other investigations.  Carroll Dec. at 10-11.  On July 30, 2004, the FBI paid Richard $4,500 in cash for his work as a source.  *Id.* at 11.  On March 21, 2005, the FBI paid Richard $5,000 in cash, and on December 7, 2006, the FBI paid Richard $5,000.  *Id.* Barbara Cabral was present for the 2005 payment.  Carroll Dec. at 12.  When Richard Cabral died in March of 2008, the FBI closed his source file.  Carroll Dec. at 11.

■    Barbara Cabral was opened by the FBI as a cooperating witness in 2004.  Carroll Dec. at 2.  She was identified as a source of information who was in a position to testify.  *Id.*  The FBI closed her as a cooperating witness in 2006, because they were relying primarily upon her husband for information.  *Id.* at 3.  After Richard Cabral's death in 2008, the FBI re-opened Barbara Cabral as a confidential human source who was still in a position to testify.  *Id.*  Barbara Cabral has never been paid for her cooperation or testimony.  Carroll Dec. at 5, 16; see also Cabral Dec. at 2.

■    Defendant left the United States in 2003.  The government sought and obtained an indictment in 2005.  (CR 1).  Defendant did not return to the United States to face charges until August of 2007.  (CR 23).

■    Prior to his death in March of 2008, the government intended to call Richard Cabral as a trial witness.  Gorder Dec. ¶ 9; Cardani Dec. at ¶ 8.  Richard could have testified that defendant said that he wanted to join the mujahideen fighters in Chechnya.  Govt. Sent. Memo at 14-15.

■    It was only after Richard's death that Barbara Cabral was considered a potential witness. Gorder Dec. at ¶ 10; Cardani Dec. at ¶ 14.  Barbara was identified as a potential witness in a

**Page 9 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

government motion seeking to modify the conditions of defendant's release to include that he have no contact with several individuals, including Barbara Cabral. (CR 95). However, the government did not begin working with Barbara Cabral as a trial witness until early Spring of 2010. Cardani Dec. at ¶14; Gorder Dec. ¶ 10. The timing is confirmed by the fact that the government's first witness list filed on August 10, 2009 (CR 203), does not identify Barbara Cabral as a witness, while she is included on an Amended Witness List that the government filed on March 17, 2010 (CR 293). Cardani Dec. at ¶ 14; Gorder Dec. ¶ 10; Anderson Dec. ¶ 8.

■    While several members of the trial team knew prior to trial that Richard Cabral had been a paid informant, the prosecutors were unaware of the amount of those payments or the fact that Barbara Cabral was present for at least one of those payments. Gorder Dec. ¶¶ 9, 12, 14; Cardani Dec. ¶¶ 17, 22. For this reason, and because Richard had died approximately two years before they began working with Barbara Cabral as a trial witness, the prosecutors did not believe at that time that the payments to Richard were discoverable. Gorder Dec. ¶ 12. Agent Carroll knew that Barbara Cabral was present for at least one of the payments made to Richard in 2005, but the prosecutors were unaware of this fact until post-trial. Carroll Dec. at 12; Gorder Dec. ¶ 14; Cardani Dec. ¶ 22. During the government's trial preparation with Barbara Cabral, the subject of Richard's payments simply did not come up. Gorder Dec. ¶¶ 11-12 Cardani Dec. ¶¶ 16, 17.

■    After Barbara Cabral was identified as a likely trial witness, she was interviewed several times between March and April of 2010, and reports generated by these contacts, along with several earlier reports, were turned over to the defense in May of 2010 (Bates numbers 3557-

**Page 10 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

3577).[2]  Gorder Dec. ¶ 10; Cardani Dec. ¶ 15.  The handwritten notes used to draft these reports were inadvertently omitted from the government's discovery production.  Gorder Dec. ¶¶ 10, 15; Anderson Dec. ¶ 11.

■        Sometime between April of 2010 and the trial in August of 2010, Agent Carroll recalls that during the course of one of many conversations with Barbara Cabral, he made a passing comment "in words to the effect that I would attempt to get her something sometime after the trial."  Carroll Dec. at 4.  Carroll neither mentioned any specific dollar amounts, nor did he make any promises.  Carroll Dec. at 4.  His intent was to seek FBI approval for a payment post-trial. Carroll Dec. at 5.  Cabral does not remember Carroll's comment and, when she testified, she did not expect to be paid.  Cabral Dec. at 1.  Agent Carroll did not tell the prosecutors about his comment prior to trial, because he made no promises and believed his comment was not significant. Carroll Dec. at 4-5.

■        During the course of preparing for trial, Gorder asked Agent Carroll if Barbara Cabral had ever been paid.  Gorder Dec. ¶ 12.  Agent Carroll told him that she had not, but that he intended to seek approval to provide her with some kind of payment in the future.  Gorder Dec. ¶ 12; Carroll Dec. at 9.  Gorder cautioned him not to do so before trial.  Gorder Dec. ¶ 12.

■        Gorder was aware of Agent Carroll's intent to seek payment after trial, but he did not know that Agent Carroll had said anything to Cabral about his intent. Gorder Dec. ¶ 12. Gorder did not believe, at this time, that there was any duty to disclose the Cabral payment information because he did not know that Barbara Cabral knew about the payments to Richard or that she knew of Carroll's intent to seek payment for her post-trial.  *Id.*

---

[2]  The "Bates numbers" refer to the government's tracking system for discovery, whereby each physical document provided to the defense is stamped with its own number.

**Page 11 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

■       When Cabral testified, she was not asked by either side about any benefits received or

payments made to her or her late husband for their work in this case.  Day 2, Tr. 266-295.

The Government's Discovery Process in General

■       The prosecutors worked with the case agents to identify discoverable information.

Gorder Dec. ¶ 6; Cardani Dec. ¶¶ 4-6; Anderson Dec. ¶ 5.  The prosecutors met with the case

agents on several occasions to discuss discovery compliance.  Cardani Dec. ¶ 5.  This included a

review for any information related to defendant's charitable works, community involvement, or

stated opposition to violence.  Anderson Dec. ¶ 5.  IRS Special Agent Colleen Anderson was the

member of the trial team tasked with organizing, copying, inventorying, and providing discovery

once it had been identified by the trial team.  Cardani Dec. ¶ 6; Anderson Dec. ¶ 3.  Anderson

tracked all information gathered and produced on spread sheets that were then delivered to the

defense along with the discovery materials.  Anderson Dec. ¶¶ 12-14, Exh. A.  In addition,

Anderson tracked this Court's orders to ensure that the government comply with those orders.

Anderson Dec. ¶ 9.

■       The government gathered and produced 17 batches of materials over a three-year period

to the defense prior to trial.  This production included the following:

        – 3800 single pages of itemized discovery, including investigative reports;

        – 43,000 pages of bank and Al Haramain corporate records, scanned and produced to the

defense electronically, per their request;

        – unfettered access to evidence seized pursuant to a search warrant, including complete

copies of hard drives from the Al Haramain computers and boxes of seized video tapes.  Gorder

Dec. ¶ 8; Anderson Dec. ¶¶ 12-14.  The government also provided significant technical

assistance to the defense computer expert to help facilitate his work.  Anderson Dec. ¶ 13.

**Page 12 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

■    The prosecution team spent several days in the Medford offices of the FBI and the IRS in January and March of 2009, reviewing numerous boxes of records collected or generated during the investigation.  Cardani Dec. ¶ 9; Gorder Dec. ¶ 6; Anderson Dec. ¶ 6.  This review included a witness-by-witness file search for discoverable information.  Cardani Dec. ¶ 10; Anderson Dec. ¶ 6.  The Cabral witness files were reviewed at that time for exculpatory material.  *Id.*  The prosecutors specifically looked for potentially exculpatory material given their understanding of the defense case, and turned over that discovery to the defense.  Gorder Dec. ¶¶ 6-7; Cardani ¶ 5.  The government produced reports of interviews with the Cabrals that addressed the 1999 Hajj trip and which revealed that, at one point, Richard claimed that someone else solicited donations for Chechen refugees, and at other times identified the intended recipients of the money as "the people of Chechnya," and "Chechen refugees."  Gorder Dec. ¶ 7 (Bates numbers 1751, 1773).  The government also produced to the defense an email from defendant in which he refused to accept a donation of money for the "mujahideen."  Gorder Dec. ¶ 7 (Bates numbers 2010-11).

■    The FBI maintained "source" files for the Cabrals that were separate from the main case files that were reviewed in Medford in March of 2009.  Gorder Dec. ¶ 15.  Information regarding Richard Cabral's cooperation, including his source reports and schedule of payments, was available to the trial team during its January/March 2009 case review, but the team discussed the fact that because Richard Cabral had died, and because there was no plan to call Barbara Cabral at that time, details regarding Richard Cabral's cooperation need not be provided in discovery.  Carroll Dec. at 10-11.

/////

**Page 13 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

■      Approximately one year later, when Barbara Cabral was added to the government's witness list, the government produced copies of her investigative reports to the defense. *Id.;* Anderson Dec. ¶ 8 (Batch 14); Cardani Dec. ¶ 15.[3]

The Background on the December 2010 Cabral Payment Disclosure

■      October 4, 2010:  Several weeks after trial, Carroll called Cabral and told her of his intent to seek authorization to pay her $7500 for her work as a source in this case.  Carroll Dec. at 6.

■      December 7, 2010:  Carroll contacted Cardani about the FBI making a payment to Barbara Cabral.[4]  Carroll Dec. at 6.  During this conversation, Carroll explained why he thought Barbara Cabral should be paid and his rationale included the fact that the FBI had provided source payments to Richard Cabral in the past.  Carroll Dec. at 5-7; Cardani Dec. ¶ 18.

■      December 7- 9, 2010:  Cardani and Gorder talked further with Carroll about the proposed payment, including the amount and timing.  Gorder Dec. ¶ 13.  Cardani said he wanted confer with his front office.  Cardani Dec. ¶ 19.

■      December 9, 2010:  Cardani and Gorder contacted USA Dwight Holton about payment authorization for Cabral.  Gorder Dec. ¶ 13; Cardani Dec. ¶ 21; Holton Dec. at 1.  Holton recalls that he asked if Barbara Cabral was told she would be paid prior to trial, and he discussed the need to find out more details about the payments made to Richard Cabral.  Holton Dec. at 1.

---

[3]  Another example of potentially exculpatory materials was delivered to the defense in December of 1997, in the form of an investigative interview with El-Fiki in which he claimed that his $150,000 donation was for "widows, orphans and refugees in Chechnya."  Gorder Dec. ¶ 7 (Bates number 42).

[4]  As he explains more fully in his Declaration, Carroll was concerned about Cabral's health, he felt that her assistance to the government may have contributed to her health problems and concomitant medical bills, and he felt that she had placed herself at risk by testifying given her departure from the Muslim faith. Carroll Dec. at 5-6.

**Page 14 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

■    December 10-20, 2010:  Agent Carroll is on annual leave.  Carroll Dec. at 8.

■    December 13, 2010:  Cardani and Gorder discuss the need to gather information from Carroll regarding the Cabral payments.  Cardani Dec. ¶ 21.  Gorder calls Carroll to find out details about the Richard Cabral payments.  Gorder Dec. ¶ 13.  Agent Carroll tells Gorder that he thought Richard Cabral had been paid approximately $14,500 and that Barbara Cabral may have been present for one of those payments.  Gorder Dec. ¶ 13.  Carroll said that he would need to confirm that information when he returned to his office in Medford.  *Id.*

■    December 20, 2010:  When Carroll returned from annual leave, he spoke by phone with Cardani, Gorder, and Anderson.  Gorder Dec. ¶ 14; Cardani Dec. ¶ 22; Anderson Dec. ¶ 16; Carroll Dec. at 8.  During this conversation, Cardani and Gorder learned for the first time that Carroll had said something to Barbara Cabral prior to trial about a potential payment.  Cardani Dec. ¶ 23; Gorder Dec. ¶ 14.  Cardani and Gorder also learned, for the first time, details regarding the payments to Richard Cabral, and that Barbara Cabral was present for at least one of the payments.  Cardani Dec. ¶ 22; Gorder Dec. ¶ 14.  Cardani and Gorder asked Carroll to check his paperwork and to write up the details promptly.  Cardani Dec. ¶ 23.  Cardani and Gorder agreed that they needed to disclose this information to defense counsel and to Judge Hogan.  *Id.*

■    December 20, 2010:  Cardani and Gorder promptly notified Holton, and Holton agreed with their proposal that the information should be disclosed to the defense.  Holton Dec. at 1.  Holton directed that Carroll document all payment information regarding the Cabrals in an investigative report (an FBI 302).  Holton Dec. at 2.  Holton also agreed that Barbara Cabral should be interviewed to ascertain her memory of any conversations with Agent Carroll, and that this interview should be conducted by agents unconnected with this case.  *Id.*

**Page 15 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

■     December 22, 2010:  Cardani spoke with Holton to discuss Cardani and Gorder's concern that the government alert defense counsel and the court to the new information.  Holton Dec. at 2; Cardani Dec. ¶ 26.  Holton agreed and authorized Cardani to contact Steve Wax and Judge Hogan and inform them of the nature of the new material.  *Id.*

■     December 22, 2010:  Cardani then called defense counsel (Wax) and told him that there was new information about Barbara Cabral and a pretrial statement to her about a potential cash payment.  Holton Dec. at 2; Cardani Dec. ¶ 27.  Cardani told Wax that the supporting documentation was being prepared and would be disclosed.  Cardani Dec. ¶ 27.  In the meantime, Cardani suggested, and Wax agreed, that Judge Hogan be notified.  *Id.*  Cardani and Wax then called Judge Hogan, advised him of the issue, and asked him to refrain from deciding the pending motion for a new trial until defense counsel had an opportunity to brief the effect of the new material.  Cardani Dec. ¶ 28.  Judge Hogan agreed.  *Id.*  Returning a call from Wax, Holton  explained that it would take some time to do a thorough review, and that he wanted the eventual disclosure to be complete.  Holton Dec. at 2.

■     December 22, 2010:  Agent Carroll prepared a written report detailing payments made to Richard Cabral.  Att. 1, p.7.  He also confirmed that Barbara Cabral was present during the second payment made in March of 2005.  *Id.*; Carroll Dec. at 12.  In a second report, Carroll also described the comment that he had made to Barbara Cabral prior to trial that he would try to do "something for her" after the trial.  Carroll Dec. at 4 & 9; Att. 1, p.6.

■     December 27-28, 2010:  Gorder reviewed the original FBI source files for Barbara and Richard Cabral.[5]  Gorder Dec. ¶ 15.  His purpose was to insure that there was no additional

---

[5]  Barbara Cabral was the only cooperating witness/source who testified at trial, and
(continued...)

**Page 16 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

discoverable material regarding Barbara Cabral.  *Id.*  Gorder confirmed that Barbara Cabral had

never been paid.  *Id.*  During his review, Gorder discovered handwritten notes of interviews of

Barbara Cabral that had not previously been disclosed to the defense.  *Id.*

■    December 27-28, 2010:  In reviewing Richard Cabral's source file, Gorder confirmed

that Richard Cabral had been paid a total of $14,500 between 2004 and 2006.  Gorder Dec. ¶ 15.

In addition, Gorder found some reports of debriefings with Richard Cabral that included

information obtained from Barbara Cabral that had not been previously disclosed.  *Id.*  He also

discovered a draft copy of an investigative interview of Richard Cabral dated August 17, 2007,

and copied it because it appeared to contain information relevant to Barbara Cabral's testimony.

*Id.*; *See* Att. 1, pp.47-48.  A final version of this same interview report had in fact been produced

in discovery on February 6, 2009 (Batch 6).  Anderson Dec. ¶ 14.  The differences between the

draft and the final version reflect additions that Carroll incorporated into the final report after

consulting with Agent Anderson.  Carroll Dec. at 12-14.  The draft version, rather than the final

version, was found in Richard Cabral's source file because Agent Carroll failed to save the

document electronically after making the additions.  *Id.;* Anderson Dec. ¶¶ 21-22.

■    December 27, 2010:  At USA Holton's direction, FBI Agent Scott Jensen and IRS

Special Agent Scott McGeachy interviewed Barbara Cabral and asked her about the payments

made to her late husband.  Holton Dec. at 2; Att. 1.  Agents Jensen and McGeachy were

supervised by AUSA Kelly Zusman.  *Id.*  Barbara Cabral confirmed that she was aware of one

$5,000 payment made to her late husband, she might have known that there was one other

---

[5]  (...continued)
Richard Cabral was the only FBI source who was related to a testifying government witness.
Carroll Dec. at 5.

**Page 17 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

payment, but she had no idea and was surprised to hear that Richard had received a total of $14,500.  Cabral Dec. at 1.  She had no memory of any conversation with Agent Carroll about a payment to her for her assistance with either the investigation or the testimony she provided in the case prior to trial.  *Id.*  When she testified, she did not expect to receive any money from the FBI or any other federal agency for her work on the case, and said that she testified because she "felt it was [her] duty to come forward and tell the jury what [she] knew," and because she wanted to "finish[] the work that had been started by . . . Richard."  *Id.*; Att. 1, p.9.  She did recall having a conversation with Agent Carroll after the trial, when he told her he would seek authorization for a $7,500 payment.  *Id.*; Att. 1, p.9.  She said that Agent Carroll made no promises.  Att. 1, p.9.  This interview was documented in an FBI 302 report.[6]

■    January 6, 2011:  The government produced the following documents to the defense:

– the handwritten notes from the pretrial Barbara Cabral interviews;

– the redacted Richard Cabral interviews that cited Barbara Cabral;

– the draft version of the August 17, 2007, interview of Richard and Barbara Cabral;

– December 22, 2010, reports (302s) from Agent Carroll that detail the payments made to Richard Cabral and his comments about a potential payment both pre- and post-trial to Barbara Cabral;

– a December 27, 2010, investigative interview (302) with Barbara Cabral by FBI Agent Jensen. Att. 1, pp.8-10; Anderson Dec. ¶¶ 19-20.

_____

[6] Barbara Cabral was interviewed a second time by FBI Agent Scott Jensen and AUSA Zusman on January 14, 2011.  A copy of the investigative report prepared as a result of that interview, along with the agent's handwritten notes, were provided to defense counsel on January 21, 2011.

**Page 18 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

<u>**Argument**</u>

**A.      Context is Key:  Barbara Cabral was not a "central" or "significant" witness.**

While the government endeavors to achieve perfect compliance with the discovery rules, a defect in producing potential impeachment information for every trial witness, while regrettable, is not legally sufficient to justify a new trial absent actual prejudice.  It is only when the reliability of that particular witness is determinative of guilt or innocence that impeachment material rises to the level of *Brady*.  Thus, this Court must evaluate the witnesses's centrality and significance to the government's case and determine whether the government presented other evidence addressing the same element of the charge.  The record before this Court, including defendant's own treatment of Barbara Cabral, establishes that she was not a central witness and that her testimony related to a collateral matter.  This Court should therefore find that the failure to disclose the Cabral payment information was not prejudicial and that no new trial is warranted.

To be sure, the government's *Brady* obligations concerning exculpatory evidence encompass impeachment information where that evidence undermines a "significant" witness.  *United States v. Blanco*, 392 F.3d 382, 387 (9th Cir. 2004).  Thus, in *Giglio*, the prosecution failed to disclose that it had granted immunity to the "only witness linking" defendant to the crime.  405 U.S. at 152.  Moreover, the government's failure to disclose in *Giglio* was magnified because the witness falsely denied that he had received immunity when asked at trial whether he had received any benefits from the government.  Indeed, so central was that testimony to the government's case, the *Giglio* Court noted that, "[w]ithout that immunized witness, the case could not even have been indicted." *Id.* at 155.  Thus, for undisclosed impeachment material to

**Page 19 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

justify relief under *Brady*, both the witness and the impeachment material must be significant to the case.  But, the mere fact that every witness that the government called in this case was called for a specific purpose – to address some element of the offenses charged – does not transform that witness into a significant one for purposes of *Brady*.  On this point, context is key.  *See Collins*, 551 F.3d at 923.

**B.     From Opening Statements to Closing Arguments:  The Accountant was the Key Witness.**

Examining the entire trial record in this case leads to the inescapable conclusion that there was a key government witness – a linchpin – critical to establishing that the admittedly false statements included in the 2000 Al Haramain Form 990 were material, false and that defendant was the source of the lies that appeared on that return.  But it was not Barbara Cabral.  Rather, the government's key witness was Thomas Wilcox, defendant's accountant who testified that defendant provided him with false information regarding the El-Fiki donation.  Wilcox was in the spotlight at the beginning of the trial, and he served a dual role at the end of the trial in that he was both the government's "star" and the defendant's whipping post.  A review of the opening and closing arguments demonstrates this point.

In his opening statement, defendant told that jury that "accounting is at the core of this case."  Day 1, Tr. 25.  He recounted the Quickbooks issue in some detail, then told the jury that it did not matter where the El-Fiki money actually went:  "Even if it went where they said . . . it's not material."  Day 1, Tr. 39.  Defendant's closing argument made these points even more emphatically.  Nearly one-half of the defense's two-hour closing targeted Wilcox:  "Mr. Wilcox is absolutely essential to the government's case."  Day 7, Tr. 85.  At no point did the defense

**Page 20 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

suggest that Barbara Cabral held a similar, significant position.  Instead, defendant attacked

Wilcox savagely by repeatedly impugning his character and his professional reputation:

>     "Tom Wilcox lied to Agent Anderson."  Day 7, Tr. 89

>     "I don't think that Tom Wilcox had the courage, had the innate humanity, if you

will, to acknowledge what had happened."  Day 7, Tr. 90

>     "You [the jury] had the misfortune to see a weak human being, a weak human

being who lied to you, who was making things up in the courtroom."  Day 7, Tr. 97

>     "He lied to you here in this courtroom . . . the lies that he told are on the *core*

*issues* in this case."  Day 7, Tr. 99-100 (emphasis added).

>     "He made up a story in front of you."  Day 7, Tr. 103

After 25 transcript pages of this excoriation, defense counsel even acknowledged to the jury that

he would "leave this horse flayed enough."  Day 7, Tr. 110.

Wilcox never testified about where the El-Fiki money actually went, and he denied

knowing anything about defendant's intentions relative to Chechnya.  The "core issues" Wilcox

addressed related directly to the false 990 return, and the source of the false information included

on that return.  It was the defendant's lies about Al Haramain's finances that formed the core

structure of the case and represented the government's most compelling evidence of willfulness.[7]

Wilcox's testimony went to the heart of the tax case, and his credibility was vital to the

prosecution.  The defense recognized this and built its case around an attempt to destroy his

credibility by portraying him as incompetent and a liar.

---

[7] Barbara Cabral did not testify before the grand jury, and no information from Cabral
was presented to the grand jury.

**Page 21 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

### C.    Barbara Cabral provided helpful testimony to the defense too.

By contrast, Barbara Cabral was mentioned only once in defendant's closing argument, and it was not to discount her testimony altogether, but instead to tell the jury to parse out her testimony, and to accept those points that helped the defense:

> Bobbie Cabral was asked, hey, did things change when Al Haramain came. And the government expected, oh, yes, for the worse. Well, no, no. Was there any call for money to mujahideen after the Hajj? I submit not. I don't think that is reliable. Bottom line it is contrary to everything else you know about Pete Seda.[8]

Day 7, Tr. 150. While not dispositive, the closing argument is emblematic of how the trial played out: Wilcox's testimony dominated the floor.[9]

Cabral's testimony related to a collateral matter offered to support the willfulness element of the government's case. Day 2, Tr. 266-295. Cabral met defendant in 1991, and she

---

[8]  By contrast, the government never mentioned Cabral's anticipated testimony in its opening statement. In its closing argument, the prosecution mentions her testimony once (Day 7, Tr. 52), then twice in rebuttal (Day 7, Tr 154-56; 185). The government's closing argument told the jury that the evidence in the case was like a "jigsaw puzzle," and then highlighted each piece reflecting defendant's willfulness described above. Barbara Cabral was one of many pieces of that puzzle.

[9]  Defendant also minimized the import of Cabral's testimony in his post-trial motion for new trial (docket 477), by arguing that her testimony was *not* part of the government's "core" evidence:

> Throughout the trial, the government sought to portray Mr. Seda as espousing extreme and violent views of Islam and of being anti-Semitic. They called two witnesses who offered testimony on this subject – Bobbie Cabral and Daveed Gartenstein-Ross. Neither, however, went as far as the government apparently hoped. For example, the government sought to portray Mr. Seda as changing after Al Haramain came to Ashland, but when they asked Ms. Cabral, she said, "not really." Tr. 275 (August 31, 2010). . . . As a result, the core of the government's evidence on this point was from exhibits.

If the core of the government's case was in the exhibits, that argument impliedly concedes the defendant's view that Cabral's testimony was not part of that "core."

**Page 22 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

attended prayer services and participated in various projects at Al Haramain in Ashland.  Day 2,

Tr. 268.  In the Spring of 1999, she and her late husband traveled to Saudi Arabia on a Hajj to

Mecca with defendant and several others.  Day 2, Tr. 275.  As they were preparing to leave

Saudi Arabia and return to the United States, defendant asked Cabral's husband to contribute

some leftover spending money – approximately $400 – "to send blankets and food and help the

mujahideen in Chechnya."  Day 2, Tr. 279-80.[10]  Cabral also described a jewelry sale organized

by Raya Shokatfard that raised approximately $1600 for the mujahideen.  Day 2, Tr. 282-286.

On cross-examination, Cabral confirmed that she also heard that the jewelry fund raiser was for

"the brothers and sisters of Chechnya" and for "blankets and food."  Day 2, Tr. 289.  Cabral

agreed with defense counsel's statement that defendant's actions were inconsistent with the anti-

American, anti-Semitic comments of Shokatfard's husband, Sheikh Hassan: "Q:  So Hassan was

saying one thing, and Mr. Seda was doing something different.  A.  Yes."  Day 2, Tr. 292.

**D.    Cabral's testimony was minor given the nature of the defense.**

Cabral's testimony was no bombshell, especially when examined in the light of how the

case was defended.  In his opening statement, defense counsel told the jury that defendant, "like

people throughout the world, was concerned" about the Chechens."  Day 1, Tr. 16.  He also told

the jury that defendant was reading information about Chechnya and the Russian occupation in

1999-2000, and "looking to raise money" to get "aid to the Chechens."  Day 1, Tr. 17-20.  David

Gartenstein-Ross, another former participant in Al Haramain, testified that when defendant

---

[10]  The defense repeatedly claimed that there was nothing illegal about providing humanitarian aid to mujahideen.  Day 4, Tr. 165 (Wooten Cross); Day 7, Tr. 124-25 (Wax Closing, citing Marcus Owens Day 6, Tr. 14): *But Cf.* 18 U.S.C. § 960.  According to Colonel Patrick Lang, a defense expert who testified at trial, a charitable "zakat" contribution could permissibly be used for mujahideen since "they have to eat too."  Day 5, Tr. 120.

**Page 23 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

returned from the 1999 Hajj, he urged the congregation to give money for Muslim fighters in Kosovo. Day 3, Tr. 48. Gartenstein-Ross also recalled conversations he had had with defendant about the Russians in Chechnya, and that defendant was very upset about negative comments made about the mujahideen. Day 3, Tr. 55. Defendant wanted to put together an "aid caravan" to take supplies into Grozny in the winter of 2000. Day 3, Tr. 57. Add to this the defendant's subscription to an e-mail list serv that circulated news updates supportive of the efforts of the mujahideen in Chechnya against Russian forces (the "Sheeshan group"), and emails between defendant and Al But'he on this same topic (e.g., SW 11, SW 23), and there is little question that defendant was highly motivated to get money, aid, or a combination of the two into Chechnya. And as defendant acknowledged in his opening statement, where the money went mattered far less than the question of whether defendant was willing to lie to the IRS to accomplish his goal of getting aid into Chechnya.

**E.    Cabral's testimony was just one piece of a much larger puzzle: there was ample, independent evidence of defendant's willfulness.**

Evidence of defendant's desire to get money into Chechnya was just one part of a much larger whole that formed the government's proof of willfulness. When this Court examines the import of Cabral's testimony, the relevant question is not whether she provided the only evidence of defendant's feelings about the Chechen mujahideen (she did not, as demonstrated in the preceding paragraph), but whether there was other evidence in the record to support the same element of the offense that her testimony was directed towards – that of willfulness. And the answer to that question is yes – there was other substantial and compelling evidence of defendant's wilfulness supporting the jury's verdict. "When the testimony of the witness who might have been impeached by the undisclosed evidence is strongly corroborated by additional

**Page 24 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

evidence supporting a guilty verdict, the undisclosed evidence generally is not found to be material." *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004).

First, Wilcox provided direct evidence of wilfulness because defendant lied to him about the central transaction at issue:  defendant told Wilcox that the $130,000 he and Al But'he converted into traveler's checks and then smuggled into Saudi Arabia was used to purchase a mosque in Missouri, and that the $21,000 Al But'he deposited into his Saudi Arabian bank account had been returned to the donor (El-Fiki).  The lies and circumstances surrounding this transaction itself presented the most compelling evidence of willfulness.  Debra Ingram, the Bank of America manager described the odd details surrounding defendant's disposition of the El-Fiki funds, and testified that she offered defendant far less expensive alternatives to the traveler's checks, but defendant refused.  Top that with the expense of flying Al But'he to Saudi Arabia with the checks and his failure to complete the same currency transaction reports that he had filled out on at least nine prior occasions, and the jury had enough suspicious details to find willfulness.  Moreover, the $21,000 that Al But'he took off the top and deposited into his own, personal account in Saudi Arabia was entirely inconsistent with El-Fiki's stated objective of providing "zakat" to Chechen refugees.

Other particularly compelling evidence of wilfulness came from an exchange of emails between Saudi Al Haramain accountant Abdulaziz Al-Shoumar and defendant.  Defendant told Al-Shoumar that the $21,000 check went to Soliman, while he told Wilcox that those same funds were returned to the donor, El-Fiki.  (Ex. SW 32, SW 43).  Al-Shoumar told defendant not to put the payment to Al But'he on the expense sheet, then reiterated in a later email that defendant should get this transaction off the books "to avoid any possible trails from anybody."  *Id.*  These and other pieces of the puzzle provided the jury with a picture of defendant's role in his

**Page 25 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

conspiracy to defraud the IRS, and revealed his motivation to file a false tax return to hide the movement of the El-Fiki funds out of the U.S.

Some of the other pieces included extensive evidence from defendant's Al Haramain computer reflecting his keen interest in funding the mujahideen.[11]  It was undisputed that defendant ran Al Haramain Ashland.  He was the man in charge, such that the actions of Al Haramain were the actions of defendant.  Defendant also orchestrated an extensive program to supply Qurans to prisoners, and part of that program involved a screening process by which only certain individuals who passed the test would receive a copy of the "Noble" Quran – a document that included an appendix that supported violent jihad – and  anti-Semitic Islamic Guidelines. Defendant raised money for the mujahideen in Kosovo when he solicited funds from his brothers at the prayer house and when he supported Shokatfard's jewelry sale efforts for mujahideen in Chechnya.  Defendant's wife provided translation services for the Qoqaz website, the official site for the Islamic Army of the Caucasus and the official propaganda site for the mujahideen. Defendant was clearly aware of his wife's activities as reflected in Exhibit SW-29 (an email from defendant asking for a copy of a map of Chechnya to add to the site).  There were mujahideen fund-raising videos found in the Al Haramain library in Ashland.  Finally, there were the two bogus receipts signed by defendant and Al But'he that were designed to try to cover the transaction (AHIF-2 and AHIF-3).  A reasonable jury could well have inferred a guilty

---

[11]  For example:  (1) defendant's email to Al But'he questioning "what support" was being received by the Chechen mujahideen from the Islamic charities (Ex. SW-11); (2) defendant's subscription to the Chechen mujahideen email newsgroup (Ex. SW- 10; SW- 12 "How can we help the mujahideen in Chechnya?" SW-13, 14, 27 & 28); and (3) co-defendant Al But'he's forwarded email to defendant that warned of FBI investigations into terrorists' use of charities to raise money (SW-23).

**Page 26 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

state of mind from defendant's efforts to falsely create a paper trial to explain why El-Fiki's money was transported to Saudi Arabia in such an unusual manner.

When all of this evidence is considered together, it provides context for the Cabral testimony. Her testimony was relevant to willfulness, but it was neither the only evidence of willfulness, nor the most compelling evidence of willfulness. Moreover, the undisclosed information about payments to Cabral's late husband and the unrecalled statement of a potential payment to her would not have so undermined her testimony such that it would have rendered it unusable. The payments to Richard were remote by the time of trial, Cabral was unaware of the full extent of the payments, and an attack on Cabral's credibility would not have inured to defendant's benefit.

**F.    Richard Cabral was paid many years before trial. Barbara Cabral was never paid and was unaware that payment to her was even contemplated, so the impeachment value of the information was minimal.**

Richard Cabral was used as an FBI source for this, and other, investigations many years predating the trial in this case. Carroll Dec. at 10-11. Richard was paid $14,500 over a three-year period (2004-06) for information he provided 4-6 years prior to trial, and during a time in which defendant had intentionally removed himself from the U.S. and had become an indicted fugitive (2003-07). Barbara was present for at least one $5,000 payment to Richard, but she did not know the total amount Richard received nor did she know any other details about the money. The payments might arguably have given some individuals in that situation hope that they too would eventually receive some form of compensation, but Barbara had no expectation of payment. While Agent Carroll mentioned to Barbara that he would try to do "something" for her after the trial, Barbara does not recall the comment and has affirmatively stated that she harbored

**Page 27 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

no such hopes.  Thus, had the defense been given the payment information, they might have

inquired about the payments to Richard, and Barbara would have confirmed that Richard

received $5,000 approximately 5 years prior to trial.  And if the defense had been given the

information from Agent Carroll about his passing remark, Barbara would have rejected it and

denied that she harbored any expectation of payment.

The Supreme Court has held that new information "possibly useful to the defense" will

not justify relief.  *Giglio*, 405 U.S. at 155.  None of this information would have shaken the

jury's confidence in Barbara's testimony.  Barbara Cabral confirms in her declaration that she

told the truth and that the accuracy of her testimony was in no way influenced by the remote

payments made to her late husband.  Cabral Dec. at 2.

## G.    Defendant had other means to attack Barbara Cabral's story, but he chose not to do so.

Had Barbara's testimony about the 1999 Hajj been critical, there were several other

people who attended that same Hajj who could also have been called as witnesses by the

defense.  Indeed, David Hafer and Rob Brown joined the 1999 Hajj, and they were included on

defendant's witness list, but never called.  And had Barbara's testimony about the jewelry sales

to raise money for Chechen mujahideen been critical, Raya Shokatfard was not only included on

defendant's witness list, she was actually in attendance at the trial after having traveled from

Egypt to Oregon for the defense.  She was, however, never called to the stand.

To the extent that the defense now claims that it did not seek to challenge Barbara's

"mujahideen" claim because it had no basis to do so at the time of trial – this is simply false.

The government provided defendant pretrial a Memorandum of Interview of Richard and

Barbara Cabral, dated December 6, 2004 (Bates number 1749), in which it is reported that "the

**Page 28 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

Cabrals" said that defendant "told them that he was going to use the funds for the people of

Chechnya." The government also provided the defense with an interview report of Richard

Cabral in which he told the agents that defendant collected the money following the Hajj for

"Chechen refugees." (Bates number 1773).[12] The fact is that defendant had ammunition at his

disposal that he could have used to challenge Barbara Cabral's trial testimony that $400

collected at the end of the Hajj was for the Chechen mujahideen. He chose not to do so, and

strategically that call makes sense since it effectively minimized the point. Rigorous cross-

examination would have put the issue squarely into the spotlight, and it could well have offended

the jury. Moreover, he government's comments during its rebuttal closing (Day 7, Tr. 154-56)

did not, as defendant claims, emphasize the lack of impeachment. D. Motion at 9. Instead, the

government's remarks noted that defendant simply did not address her testimony at all, in stark

contrast to the defense attacks on other witnesses, like Wilcox, Daveed Gartenstein-Ross, and

Evan Kohlmann.

**H.     This Court should have confidence in the jury's verdict and deny the new trial motion.**

The proof is all in the trial record, and it shows that Barbara Cabral was never a star or

critical witness. It was not until after the government came forward with additional discovery

post-trial that the defense elevated her testimony to critical status. The recently disclosed

information is, however, neither material nor sufficient to undermine the outcome of a trial in

which the conviction was based upon substantial and compelling evidence that bore no relation

to the Cabrals. The fact that her deceased former husband was paid for providing information

---

[12] The defense was also provided with numerous documents prior to trial that identified
Barbara Cabral as a "confidential human source, who is in a position to testify." (Bates numbers
3563, 3564, 3566, 3568, 3572).

**Page 29 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

about this and other cases several years before the trial, coupled with the fact that an FBI Agent

wanted to pay her – but she didn't know it – is certainly not evidence that puts the "whole case in

such a different light as to undermine confidence in the verdict."

**I.      The Handwritten Notes from the Interviews of Barbara Cabral Added Nothing.**

In a discovery order issued July 1, 2009, this Court directed the government to supply

copies of agents' handwritten notes used to write interview reports.  The government endeavored

to comply with this order, and in fact, provided handwritten notes for other interviews.  The

notes from the Barbara Cabral interviews were simply overlooked because she was added to the

witness list after the government had already turned over agents' notes of interviews of those

persons on the government's previous witness list.  Tellingly, defendant never brought the

omission to the government's attention prior to trial.  Anderson Dec. ¶ 11; Gorder Dec. ¶¶ 10,

15.  The error was harmless.

Defendant argues that he was disadvantaged by this omission because the notes reveal

that Barbara Cabral told the agents that defendant attended a Hajj in the Spring of 2000, and this

fact was not true.  Defendant then reasons that he might have impeached Barbara Cabral with

this error.  Yet Cabral did not testify at all about a Hajj in 2000 – her testimony related to the

Hajj  that she and her former husband took with defendant and several others in 1999.  Day 2, Tr.

275-279.  Moreover, the problem the defense would have with the tactic, is that it would have

opened the door to other evidence that would have established that while defendant was not on a

Hajj in 2000, he was out of the country (which provides a reasonable explanation for Barbara's

error), and that defendant was in fact traveling in Iran at that time.  Carroll Dec. at 15.  The jury

would have been left to speculate about why defendant was in Iran, what he may have been

**Page 30 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

doing, and how he would have been supporting himself financially. Defendant fails to identify

anything else about the handwritten notes that differs in any material way from the formal

reports that were timely delivered prior to trial. The bottom line is that none of this material was

relevant or would have worked to defendant's advantage and, thus, there is no prejudice.

**J.      The August 2007 Richard Cabral Interview produced on January 6, 2011, was a draft version of a report; the more complete version, that included the potentially exculpatory information, was provided to defense counsel well before trial.**

This issue is fully explained in the Declarations of Agent Carroll and Special Agent

Anderson. The copy of Richard Cabral's August 17, 2007, investigative report that was found

during the post-trial review (Bates numbers 3849-50) was simply an earlier draft of the final

version that *was* provided to defense counsel on February 26, 2009 (Bates numbers 1772-1773).

Carroll Dec. at 12-14; Anderson Dec. ¶¶ 21-22. The earlier draft does not include the additional

comments, some of which are reflected in the agents' notes, that were later incorporated into the

final version. When two agents attend a witness interview, it is common protocol for one agent

to take the lead in writing the report, and then the other agent reviews and supplements the

reports with any additional, material comments not covered by the author. Carroll Dec. at 13.

No evidence was "manufactured," and the version more favorable to defendant is the version

produced well in advance of trial. Defendant's document creation theory is simply wrong.

**K.      There was nothing sufficiently remarkable about Agent Carroll's relationship with Barbara Cabral that created any additional disclosure obligations.**

Defendant's argument that there was something unique about the relationship between

Barbara Cabral and Agent Carroll such that the government had an obligation to disclose it

should be rejected. The fact that Barbara Cabral personally liked Agent Carroll after meeting

with him and his wife (a fellow FBI Agent) several times over the course of several years is

**Page 31 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

simply not discoverable information under any of the rules applicable to criminal cases. Such professional friendships are common, particularly in lengthy cases and smaller communities, and Agent Carroll neither said nor did anything to cross that line. *See* Carroll Dec. at 1-2; Cabral Dec. at 2. When Cabral invited him to her wedding, he politely declined and maintained a professional distance. *Id.*

### Conclusion

The government takes its discovery obligations seriously. As reflected in the Declarations submitted with this response, the U.S. Attorney's Office for the District of Oregon works to scrupulously adhere to the requirements of the rules, the Due Process Clause, and pragmatic considerations of fair play. When a mistake is made in a long-running and complex case, the government's actions here demonstrate that it continues to act responsibly by investigating the error, promptly bringing the issue to the attention of the defense and this Court, and then relying upon the process to fairly sort out whether or not the error was of a magnitude that merits relief. With the benefit of hindsight, and with details not known to the prosecutors until after trial, the payment information regarding the Cabrals should have been delivered to

/////

/////

**Page 32 - Gov't's Resp to Def's Supplement to Motion for a New Trial**

 defense counsel prior to trial, and ideally it would have been.  This omission was a mistake, not a deliberate attempt to gain an advantage, and a rational review of the record yields an inescapable conclusion that there was no prejudice to the defense and that the error was harmless.  Defendant's supplemental motion for a new trial and motion to dismiss should be denied.

DATED this 18th day of February 2011.

Respectfully submitted,

DWIGHT C. HOLTON
United States Attorney

*s/ Kelly A. Zusman*
KELLY A. ZUSMAN
Assistant United States Attorney

**Page 33 - Gov't's Resp to Def's Supplement to Motion for a New Trial**