United States District Court
District of Oregon

United States of America                Crim. No. 05-60008-HO

      v.

Pirouz Sedaghaty,
aka Pete Seda,

      Defendant

Declaration of David A. Carroll, Special Agent, Federal Bureau of
Investigation

    I, David A. Carroll, state as follows:

    I am a Special Agent with the Federal Bureau of
Investigation(FBI), where I have been employed since 1987. Since
1998 I have been assigned to the Medford Resident Agency of the
Portland Division of the FBI.

    As part of my duties, I was assigned to serve as the case
agent with regard to the FBI's investigation of Pirouz Sedaghaty.
During the course of the investigation I made contact with an
assortment of individuals who provided information about a
variety of topics. Through these contacts I developed sources of
information in the community. Besides Richard and Barbara Cabral,
no other witnesses who testified in Sedaghaty's trial were FBI
sources. To my knowledge, aside from Richard Cabral, there were
no other FBI sources who were related(by blood or marriage) to

1

any government witnesses.

**BARBARA CABRAL-COOPERATING WITNESS**

During the investigation, contact was made with Barbara Cabral regarding her knowledge of Sedaghaty's and others' activities as they related to a variety of topics.

My contacts with Barbara Cabral were professional in nature. During the normal course of operating Cabral as a Cooperating Witness I came to know her as a good person and grew to like her. I respected her willingness to provide information to the FBI. I have never socialized with her outside the context of my work contacts with her. My contacts with her outside of work have been brief and coincidental in nature. I only recall two occasions on which I saw Cabral outside of work. One was at a fashion show that my daughter was modeling in and which Cabral was doing hair and makeup on other models with a different agency. The other occasion was while walking into Rogue Valley Mall while shopping.

Barbara Cabral was opened in 2004 as a Cooperating Witness(CW), as opposed to being opened as a Source, for the purposes of documenting the information provided by her. In being operated under the classification as a Cooperating Witness, Cabral was identified as a source of information who was in a position to testify. Meaning SA Shawna Carroll, who initially opened Cabral, and I as the alternate agent, believed there was a likelihood she could at some point in time testify. Had she been

2

opened as a Source instead of as a CW, the expectation would have been that she would not be in a position to testify. However, if after being operated as a Source, an individual provided information that would put them in a position to testify, their file could be converted to that of a CW. It should be noted the FBI would attempt to protect Cabral's identity as a Cooperating Witness until such time a final decision was made regarding the need for her to testify.

Cabral was closed as a Cooperating Witness in 2006 because her husband at the time continued to provide useful information to the FBI and it appeared that he was the more likely of the two to be called as a trial witness. Although her CW file was closed in 2006, she periodically provided information through her husband's contacts with the FBI. After the death of Richard Cabral in 2008, Barbara Cabral was still in a position to provide information and was re-opened as a Confidential Human Source(CHS) within the FBI's current source management and record keeping system. The FBI's current source management and record keeping system eliminated the different types of classifications for sources in favor of a uniform system for all sources.

During an April 19, 2010 telephonic contact with Cabral to arrange a follow up interview and the service of a trial subpoena, she advised of having a heart attack approximately two weeks previous. I use the term "heart attack" in the generic

3

FBI SA Carroll Dec
Gov't's Response

sense in that Cabral advised of suffering from health issues related to her heart that caused her to be admitted to the hospital. I do not recall the specific heart condition which she suffered from causing her to stay in the hospital. She further advised she was now taking beta blocker medication and her out of pocket medical expenses associated with her treatment amounted to several thousand dollars. She did not ask for any payment from the FBI to cover her medical expenses; she simply related this information in conversation.

During a subsequent contact prior to Sedaghaty's trial, I commented to Cabral in words to the effect that I would attempt to get her something sometime after the trial. My recollection of this comment was that it was made in passing during a telephone call and made in the context of inquiring about her health and her medical bills. My meaning was to advise Cabral that I would attempt to provide her with a payment of U.S. currency after the conclusion of Sedaghaty's trial. No specific dollar amount or specific information regarding the timing of the payment was mentioned when I made this statement to Cabral. No promise was made that a payment would be forthcoming.

I do not recall talking about a payment with Cabral at any other time prior to my contacting her after trial. It did not occur to me to tell AUSA's Cardani and Gorder about this passing comment because I had not promised anything to Cabral. By not

FBI SA Carroll Dec
Gov't's Response

telling them about the comment, I was not deliberately attempting to avoid making a discovery disclosure. It was simply a case of me not attaching significance to the comment and its potential impact on the discovery process. In hindsight, I now believe that I should have told AUSA's Cardani and Gorder about it before trial.

At no time during her cooperation with the USG did Cabral ask for any payment. No payments have been made to Barbara Cabral at this time or any other during the investigation.

Subsequent to Sedaghaty's conviction in trial, several factors contributed to my intention to pay Cabral for her service to the United States Government(USG). I knew Cabral was aware the FBI previously paid her deceased husband for providing information that was of assistance to the USG. I was aware Cabral lost a husband to cancer and suffered a heart attack during the period of her cooperation with the USG. It was my impression that Cabral connected the stress associated with assisting the USG with the onset of her heart attack. She advised of having incurred several thousand dollars in out of pocket medical expenses as a result of having suffered health problems.

In addition, Cabral was one of only two members of the southern Oregon Muslim community formerly associated with Sedaghaty and the Al Haramain Islamic Foundation(AHF) to testify against Sedaghaty during trial and the only CW to testify. In

5

doing so, Cabral provided testimony in which she exposed herself to being branded an apostate at the hands of Islamic extremists.

Cabral knew the personal risks associated with testifying against Sedaghaty by declaring herself as an individual who no longer practiced the religion of Islam and did so. She extended herself on behalf of the USG through her time over the past six years assisting the USG by providing information on a variety of investigations, including the Sedaghaty matter. Further, in my impression she suffered health consequences as a result of the stress associated with helping the USG and was one of two Muslims in the community to expose herself to the considerable risk of being labeled an apostate. I believed she deserved payment for her time and efforts for her cooperation with the USG.

Review of my phone logs indicated I contacted Cabral on October 4, 2010, and advised her that I was trying to obtain a $7,500.00 payment for her. During this contact I advised her that sentencing for Sedaghaty had yet to occur and that any payment, were it to occur, would likely come after sentencing.

On December 7, 2010, in furtherance of obtaining a payment for Cabral, I contacted AUSA Cardani to obtain his concurrence in making a payment to her.  AUSA Cardani advised he was not comfortable authorizing payment to Cabral without first consulting with AUSA Gorder and IRS-CI SA Anderson.

Later on December 7, 2010, a telephone conference call was

6

conducted between AUSA's Cardani, Gorder and myself. During this call I initially requested more than $7,500.00 be authorized because I was aware Cabral had incurred several thousand dollars in out of pocket medical expenses and felt that through her service to the USG she should be compensated at a higher amount. During this call Cardani and Gorder expressed their reservations about making any payment to Cabral because of what they perceived to be her minimal contributions to Sedaghaty's conviction. Cardani and Gorder wanted to consult with SA Anderson, as well as their superiors in the U.S. Attorney's Office, on the matter before any payment was made to Cabral.

During the December 7, 2010 call, AUSA Gorder suggested I contact Cabral to determine her actual out of pocket medical expenses. Subsequent to the conference call on December 7, 2010, I telephonically contacted Cabral and she told me her medical expenses were approximately $30,000.00. I then shared this information with AUSA Gorder in a later telephone call the same day.

On December 8, 2010, a telephone conference call was conducted with AUSA's Cardani and Gorder, SA Anderson and myself. Further discussion was conducted regarding the merits of making payment to Cabral. Cardani advised that before final concurrence was provided by the U.S. Attorney's Office, he was going to consult with his superiors.

7

FBI SA Carroll Dec
Gov't's Response

Later in this conversation, we discussed the timing of making payment to Cabral. It was the AUSA's preference the payment be made after sentencing and if possible after the exhaustion of all appeals. I advised Cardani, Gorder and Anderson that I made contact with Cabral subsequent to Sedaghaty's conviction and told them of my comment to her about my possibly requesting a payment for her.

On December 10, 2010, I departed the State of Oregon on previously scheduled annual leave which extended through December 17, 2010 and did not return to the Medford Resident Agency until December 20, 2010.

On December 20, 2010, another conference call with AUSA's Cardani, Gorder and SA Anderson was conducted regarding the payment to Cabral and the issue of when I made the comment to Cabral was discussed. I told them that I did not specifically recall if I made the comment to Cabral about getting her something prior to or after Sedaghaty's trial. Because of my uncertainty of when the comment was made, AUSA's Cardani and Gorder asked me to refresh my recollection through a review of notes to determine as soon as possible when this comment was made.

During a subsequent conference call the same day, I advised AUSA's Cardani, Gorder and SA Anderson that after attempting to refresh my recollection about the statement to Cabral that it was

8

my belief that it occurred prior to trial. However, I still do not specifically recall when I made the comment to Cabral other than to say it occurred during a telephone call between April 19, 2010 and the beginning of Sedaghaty's trial on August 30, 2010. Also AUSA's Cardani and Gorder advised that after consulting with their superiors in the U.S. Attorney's office, that their office would not concur with making a payment to Cabral.

Immediately thereafter, AUSA's Cardani and Gorder advised they believed the fact I made the statement to Cabral prior to trial should be provided to Sedaghaty's defense team. Both Cardani and Gorder consulted with their superiors at the United States Attorney's Office and determined they would advise Sedaghaty's defense team of the fact that additional discovery will be provided them in the near future.

After the matter of my making the pre-trial statement to Cabral regarding possible payment became an issue in December, 2010, AUSA Gorder refreshed my memory about a conversation between the two of us after a pre-trial witness preparation interview with Cabral. He refreshed my memory of him having asked me if Cabral had ever been paid. My recollection of this exchange was that I advised him that Cabral had not been paid, but that I may try to provide her funds after completion of the trial. I did not advise him at that time of my passing pre-trial statement to Cabral about trying to do something for her because I did not

9

attach any significance to it because I had not promised her
anything.

## RICHARD CABRAL-COOPERATING WITNESS

Richard Cabral was opened in 2003 as a Cooperating Witness
for the purposes of documenting the information provided by him.
In being operated under the classification as a Cooperating
Witness, Richard Cabral was identified as a source of information
who was in a position to testify. Meaning SA Shawna Carroll, who
initially opened Mr. Cabral, and I, as the alternate agent,
believed there was a likelihood Mr. Cabral could at some point in
time testify. It should be noted the FBI would attempt to protect
Mr. Cabral's identity as a Cooperating Witness until such time a
final decision was made regarding the need for him to testify.

FBI SA Shawna Carroll telephonically contacted AUSA Cardani
and advised of her intention to open Richard Cabral as a
cooperating witness. AUSA Cardani concurred with her intention to
operate him as a CW and did not foresee any problems with the FBI
making payments to Richard Cabral for expenses and/or services
during his cooperation. This was confirmed via letter to the U.S.
Attorney's Office dated, November 4, 2003. The letter did not
specify any amount or timing of payments or promises that
payments would be made.

All the relevant information regarding Richard Cabral's
cooperation with the USG, to include his source reports and

10

schedule of payments was made available to AUSA's Cardani and Gorder in January and March of 2009 during a discovery review of FBI and IRS files. My recollection of this review is that because Richard Cabral had been deceased for approximately one year at this time and would no longer be a witness at trial, and because there was no plan at that time to call Barbara Cabral as a witness at trial either, it was determined through discussion with AUSA's Cardani, Gorder, SA Anderson and myself that the information regarding his cooperation with the USG need not be provided in discovery. Richard Cabral died on March 21, 2008. His Cooperating Witness file was closed on April 21, 2008.

## PAYMENTS TO RICHARD CABRAL

During the investigation, Richard Cabral was contacted regarding his knowledge of Sedaghaty's and others' activities as they related to a variety of topics. Three payments were made to Richard Cabral based on information he provided on several different FBI investigations, to include the Sedaghaty matter. These payments were made while Sedaghaty was outside the United States and living in the Middle East.

The first payment of $4,500.00 was made on July 30, 2004 by FBI Special Agent Shawna Carroll and witnessed by me. The second payment of $5,000.00 was made on March 21,2005 while the third payment of $5,000.00 was made on December 7, 2006, respectively. Both the March 21, 2005 and the December 7, 2006  payments were

11

made by me and witnessed by IRS-CI SA Anderson. Barbara Cabral
was present during the second payment made on March 21, 2005.

It should be noted that not all CW's and/or Sources are paid
by the FBI. Payment is made based on an assessment of the CW or
Source's contribution to the FBI while considering a number of
factors. Those factors would include the risk taken by the
source, the amount of time spent in cooperation with the FBI and
the nature, timeliness and impact of the information on an
investigation. This assessment is made by the handling agent,
with concurrence from a supervisor and an AUSA if the individual
is a CW who is in a position to testify. The FBI also has the
ability to pay an individual who is not an opened CW or Source if
they have provided what is assessed as a significant contribution
to an investigation.

## 8/17/07 INTERVIEW AND REPORT OF INTERVIEW OF RICHARD CABRAL.

Sedaghaty was taken into federal custody upon his arrival in
the United States on August 15, 2007. Richard Cabral was
interviewed by IRS-CI SA Colleen Anderson and myself on August
17, 2007 in anticipation of his possibly testifying at
Sedaghaty's upcoming detention hearing.

Both SA Anderson and I took notes during the course of the
interview. SA Anderson provided me with her notes so as to allow
me to prepare the FD-302, Report of Interview. I utilized both
her notes and my own in preparing the report. After doing so, I

12

afforded SA Anderson an opportunity to review it for any changes she felt necessary based on her recollection of the interview. SA Anderson and I discussed what changes she felt needed to be made. This is standard operating procedure for interviews I conduct jointly with other agents. Changes to the original draft of the report were made and a final version was printed and submitted to the paper file.

The government provided a copy of the final version of this FD-302, Report of Interview of Richard Cabral on August 17, 2007, which was maintained in the FBI's hard copy investigative file, to Sedaghaty's defense team prior to trial on February 26, 2009 in Discovery batch #6, Bates numbered 1772-1773. (Att. A to my declaration.) The Government's January 6, 2011 provision of discovery materials to Sedaghaty's defense team contained a draft version of this same FD-302, Report of Interview of Richard Cabral on August 17, 2007, Bates numbered 3849-3850.(Att. B to my declaration.)

Shortly after this report of interview was provided to Sedaghaty's defense team on January 6, 2011, I learned that there were two different versions of this same report. The most recent report is simply an earlier draft version of the more complete report produced in discovery before trial. These differences are a result of my not electronically saving the final version of the report after changes were made pursuant to SA Anderson's and my

13

FBI SA Carroll Dec
Gov't's Response

review of the draft copy.

The defense's suggestion that there were "materially altered reports" attributable to some bias within the government trial team is simply false.

It should be noted this report was recorded in Richard Cabral's true name on an FD-302, "Report of Interview" form. Interviews with Richard Cabral while he was open as a CW prior to this August 17, 2007 FD-302, identified him in reports as a CW, who was in a position to testify. This particular FD-302 was in his true name because there was potential for him to be a witness during the anticipated detention hearings for Sedaghaty. Richard Cabral did not testify during Sedaghaty's detention hearings. Subsequent interviews were recorded on an FBI form called an FD-1023, Confidential Human Source Reporting Document. This is because in June, 2007, the FBI adjusted its approach for managing records in support of the Confidential Human Source(CHS) program. As a part of this process, the FBI eliminated different types of classifications for sources in favor of a uniform system for source management and record keeping.

## SEDAGHATY'S SUPPLEMENTAL FILING #524

In Sedaghaty's Supplemental to motion for release, discovery and new trial, #524, his defense team alleged "Barbara Cabral falsely stated to government agents, both on February 7, 2008(No. 3841-44) and on March 2, 2010(No. 3824), that Pete Seda went to

14

FBI SA Carroll Dec
Gov't's Response

Saudi Arabia for the Hajj in 2000." Sedaghaty's attorney's
further alleged the Government "extensively investigated Mr.
Seda's life during February and March, 2000," and "knew these
statements from Ms. Cabral were incorrect, yet the Government did
not provide these documents to the defense before trial."

Barbara Cabral was consistent in both of the above
referenced reports in her belief that Sedaghaty went on the Hajj
in 2000. She was mistaken about the destination of Sedaghaty's
travel in 2000, however, investigation revealed from review of
his 1999 Iranian passport, page 40, that he entered Iran through
Mehrabad Airport on April 26, 2000 and exited via the same route
on May 7, 2000, approximately a month after the Hajj that
year.(See Att. C. to this declaration-Passport Summary Chart) A
review of Sedaghaty's 1994 United States passport, page 11,
reflected he entered the U.S. on May 7, 2000. Investigation
determined Sedaghaty entered the U.S. that day via Lufthansa
flight 454 from Frankfurt, Germany.

It was noted when comparing the March 2, 2010, Barbara
Cabral FD-1023, Confidential Human Source Reporting Document,
turned over in Discovery batch #14, Bates pages 3566-3567, with
the notes in Discovery batch #18, Bates page 3824, that there was
no reference in the report regarding her belief that Sedaghaty
went on the Hajj in 2000 as indicated in the notes. The omission
of this information in the report was an inadvertent oversight on

15

my part. In the same motion, #524, in paragraph #10, sub

paragraph A,  Sedaghaty's defense team questioned if a reference

in the agent's notes of a 4/14/08 interview with Barbara Cabral

was a reference to a cash payment by the USG. It was not. No

payments have ever been made to Barbara Cabral. It was simply

Barbara Cabral advising of the possibility she may be leaving

town for a period of time to attend a Paul Mitchell Hairdressing

School. She further advised the cost of the school was $2,500.00.

In the same motion, #524, in paragraph #10, subparagraph B,

Sedaghaty's defense team questioned if a reference in the agent's

notes of a 4/14/08 interview with Barbara Cabral was a reference

to a cash payment by the USG. It was not. No payments have ever

been made to Barbara Cabral. It was simply Barbara Cabral

advising of the possibility she may be leaving town for a period

of time to go on a cruise up the coast of Maine.

16

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 9, 2011.


David A. Carroll

Special Agent

Federal Bureau of Investigation

17

Attachment A to Carroll Declaration:
Final Version of 8/17/2007
Richard Cabral Report Delivered
to the Defense 2/26/2009

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    08/18/2007

Richard "Abdullah" Cabral, ████████ REDACTED ████████
████████ REDACTED ████████, was contacted at his
residence regarding his knowledge of Pirouz Sedaghaty. He provided
the following information.

Cabral previously advised, pursuant to the issuance of a
federal grand jury subpoena, of being present at Sedaghaty's
residence located on Valley View Road in Ashland, Oregon, when
Sedaghaty played a video depicting the war in Chechnya. He recalled
viewing the video in a trailer located behind the main house on the
property. Cabral recalled that after watching the video, Sedaghaty
expressed his desire to travel to Chechnya to fight with the Muslim
brothers there. Cabral advised this was not the only occasion when
Sedaghaty discussed his desire to fight in Chechnya against the
Russians. He described 3-4 occasions before viewing the
aforementioned video when Sedaghaty talked about going to Chechnya
to fight. Cabral thought Sedaghaty was "shooting off his mouth"
when discussing this topic. Cabral thought this because he did not
think Sedaghaty would leave the comfort of his life with his three
wives in the United States. Cabral did not recall Sedaghaty
discussing the topic of Kosovo or supporting mujahedin there.

Cabral recalled traveling to Saudi Arabia to attend the
Hajj in March, 1999. Cabral's wife, Barbara Cabral, was
telephonically contacted at her place of employment during this
interview. She indicated they returned from Saudi Arabia on April
3, 1999. Cabral recalled the occasion when he viewed the Chechnyan
war video at Sedaghaty's Valley View Road house to be approximately
a year or more after returning from the Hajj in 1999. Cabral
advised his vision was better at that time than it is currently. He
described being a little farther than an arm's length away from the
television while watching the video.

Cabral advised of the occasion when they were departing
Saudi Arabia after attending the Hajj. Cabral and the others in the
group from Ashland, Oregon, surrendered their passports upon
arrival in Saudi Arabia. He recalled being at the airport prior to
their departure to collect their passports. Upon arrival everyone
in the group paid $200.00 to cover the costs of their
transportation to and from the various events during the Hajj. At
the airport, Cabral recalled Soliman Albuthe's brother, Adil

| | | | |
|---|---|---|---|
| Investigation on | 8/17/07 | at | White City, Oregon |

| | | | |
|---|---|---|---|
| File # | ████ REDACTED ████ | | Date dictated  8/1/07 |

SA David A. Carroll
by    IRS-CID SA Colleen Anderson

1772

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

Att. A, Carroll Dec.
Gov't's Response

v. 10-6-95)

REDACTED

Continuation of FD-302 of ___Richard "Abdullah" Cabral_____ , On 8/17/07 , Page ___2___

Albuthe, advising that only $100.00 of the $200.00 had been used to cover the costs of transport. Adil requested everyone consider contributing the remaining $100.00 to Chechnyan refugees for blankets and tents. Cabral donated his and his wife's portion of their money to this cause. He also recalled everyone else in the group did the same.

Cabral recalled an occasion during his trip to the Hajj when a sheik came to the apartment where the men in the group were residing. He could not recall the sheik's name. Cabral believed Soliman Albuthe and the Al Haramain Islamic Foundation arranged for this sheik to make this visit. Cabral recalled members in his group discussing the fact this sheik was not allowed to lecture in public by the government in Saudi Arabia because he was too radical. The men residing in the apartment included, Sedaghaty, Bijan Sedaghaty, Rob Brown, David Hafer, Jonah and Joseph Sedaghaty and Cabral.

Cabral described Sedaghaty being involved with three woman at one time. He described Sedaghaty being secretive about his wives. Sedaghaty's wives included a Russian girl named Sofia Last Name Unknown (LNU), Laheh Zahedi, Summer Rife and a young female from Iran whose name he could not recall. Cabral recalled the young female from Iran was not involved with Sedaghaty for an extended period of time and that she may have returned to Iran. Cabral recalled Sofia already being Sedaghaty's wife when he (Sedaghaty) returned from Iran with Zahedi. Cabral recalled Zahedi not being happy with the presence of Sofia. Cabral believed Zahedi was legally married to Sedaghaty, however, he did not know if Sedaghaty married Rife Islamicly.

Att. A, Carroll Dec.
Govt's Response

Attachment B to Carroll Declaration:
Draft Version of 8/17/2007
Richard Cabral Report Delivered
to the Defense 1/6/2011

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   08/18/2007

Richard "Abdullah" Cabral, was contacted at his residence regarding his knowledge of Pirouz Sedaghaty. He provided the following information.

Cabral previously advised, pursuant to the issuance of a federal grand jury subpoena, of being present at Sedaghaty's residence located on Valley View Road in Ashland, Oregon, when Sedaghaty played a video depicting the war in Chechnya. He recalled viewing the video in a trailer located behind the main house on the property. Cabral recalled that after watching the video, Sedaghaty expressed his desire to travel to Chechnya to fight with the Muslim brothers there. Cabral advised this was not the only occasion when Sedaghaty discussed his desire to fight in Chechnya against the Russians. He described 3-4 occasions before viewing the aforementioned video when Sedaghaty talked about going to Chechnya to fight. Cabral thought Sedaghaty was "shooting off his mouth" when discussing this topic. Cabral thought this because he did not think Sedaghaty would leave the comfort of his life with his three wives in the United States.

Cabral recalled traveling to Saudi Arabia to attend the Hajj in March, 1999. Cabral's wife, Barbara Cabral, was telephonically contacted at her place of employment during this interview. She indicated they returned from Saudi Arabia on April 3, 1999. Cabral recalled the occasion when he viewed the Chechnyan war video at Sedaghaty's Valley View Road house to be approximately a year or more after returning from the Hajj in 1999. Cabral advised his vision was better at that time than it is currently. He described being a little farther than an arm's length away from the television while watching the video.

Cabral advised of the occasion when they were departing Saudi Arabia after attending the Hajj. Cabral and the others in the group from Ashland, Oregon, surrendered their passports upon arrival in Saudi Arabia. He recalled being at the airport prior to their departure to collect their passports. Upon arrival everyone in the group paid $400.00 to cover the costs of their transportation to and from the various events during the Hajj. At the airport, Cabral recalled Soliman Albuthe's brother, Adil Albuthe, advising that only $200.00 of the $400.00 had been used to

| | | | |
|---|---|---|---|
| Investigation on | 8/17/07 | at | White City, Oregon |

File #

Date dictated   8/1/07

SA David A. Carroll
by   IRS-CID SA Colleen Anderson

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

3849

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of ___Richard "Abdullah" Cabral___ ,On 8/17/07 ,Page 2

cover the costs of transport. Adil requested everyone consider
contributing the remaining $200.00 to Chechnyan refugees for
blankets and tents. Cabral donated his and his wife's portion of
their money to this cause. He also recalled everyone else in the
group did the same.

Cabral recalled an occasion during his trip to the Hajj
when a sheik came to the apartment where the men in the group were
residing. He could not recall the sheik's name. Cabral believed
Soliman Albuthe and the Al Haramain Islamic Foundation arranged for
this sheik to make this visit. Cabral recalled members in his group
discussing the fact this sheik was not allowed to lecture in public
by the government in Saudi Arabia because he was too radical. The
men residing in the apartment included, Sedaghaty, Bijan Sedaghaty,
Rob Brown, David Hafer, Jonah and Joseph Sedaghaty and Cabral.

Cabral described Sedaghaty being married Islamicly to
three woman at one time. Sedaghaty's wives included a Russian girl
named Sofia Last Name Unknown(LNU), Laheh Zahedi, Summer Rife and a
young female from Iran whose name he could not recall. Cabral
recalled the young female from Iran was not involved with Sedaghaty
for an extended period of time and that she may have returned to
Iran. Cabral believed Zahedi was legally married to Sedaghaty. He
believed Rife came to southern Oregon from Alaska.

Att. B, Carroll Dec.
Gov't's Response

**PIROUZ SEDAGHATY**

Summary of Travel Details
Per Current and Expired US and Iranian Passports

| Date | Enter/Exit | Passport No. | Country Issue/Entry | US/Iranian Passport | Details |
|---|---|---|---|---|---|
| 4/8/1999 | | Non-Employment | K.S.A. | 1994 US Passport pg. 9 | Visa valid for pilgrimage session; accompanied by his two wives, and children. |
| 4/26/2000 | ENTER | | Iran | 1999 Iranian Passport pg. 40 | Enter via Mehrabad Airport |
| 5/7/2000 | EXIT | | Iran | 1999 Iranian Passport pg. 40 | Exit via Mehrabad Airport |
| 12/15/2000 | ENTER | | K.S.A. | 1994 US Passport pg. 12 | Entered via King 'Abd al 'Aziz International Airport |
| 1/1/2001 | EXIT | | K.S.A. | 1994 US Passport pg. 12 | Stamp illegible as to what country subject exited. |
| 2/9/2002 | ENTER | | Canada | 1994 US passport pg. 14 | |
| 6/30/2002 | | | Jordan | 1994 US Passport pg. 18 | Queen 'Alia' Airport; Illegible as to whether subject entered or exited country. |
| 1/17/2003 | | Unknown | K.S.A. | 2002 US Passport pg. 8 | Validity: 2 months; Issued in Washington; period of stay: 1 month; reason: to visit Ratwa Auto Company |
| 2/8/2003 | | | | 2002 US Passport pg. 8 | Stamp completely illegible aside from the date |
| 3/5/2003 | | Unknown | Unknown | 2002 US Passport pg. 10 | Good for the duration of 2 months; other details illegible on stamp |
| 5/13/2003 | | Unknown | Unknown | 2002 US Passport pg. 11 | Good for the duration of two months to exit on 6/11/2003 |
| 6/23/2003 | ENTER | | K.S.A. | 2002 US Passport pg. 8 | Entered via King Fhad International Airport |
| 8/18/2003 | | 581865 | Oman | 2002 US Passport pg. 14 | Visa; Permitted to stay in Oman from 8/18/2003 - 9/16/2003 |
| 8/21/2003 | | 581970 | Oman | 2002 US Passport pg. 18 | Visa; Permitted to stay in Omn from 8/21/2003 - 9/19/2003 |
| 8/21/2003 | ENTER | | Oman | 2002 US Passport pg. 18 | Wadi Al-Jizzi Passport Center [Border Checkpoint] |
| 8/21/2003 | EXIT | | Oman | 2002 US Passport pg. 18 | Wadi Al-Jizzi Passport Center [Border Checkpoint] |
| 8/27/2003 | EXIT | | U.A.E. | 1999 Iranian Passport pg. 13 | Exit via Dubai International Airport |
| 9/4/2003 | EXIT | | K.S.A. | 2002 US Passport pg. 16 | Exit via King Khalid International Airport. |
| 9/4/2003 | | 670680 | U.A.E. | 2002 US Passport pg. 19 | Visa; Valid for one month stay from date of arrival |
| 10/31/2003 | EXIT | | U.A.E. | 2002 US Passport pg. 19 | Exit via Dubai International Airport |
| 11/12/2003 | ENTER | | U.A.E. | 2002 US Passport pg. 20 | Enter via Dubai International Airport |
| 12/20/2003 | EXIT | | U.A.E. | 2002 US Passport pg. 20 | Exit via Dubai International Airport |
| 12/21/2003 | ENTER | | K.S.A. | 2002 US Passport pg. 16 | Enter via King Khalid International Airport |
| 12/22/2003 | ENTER | | U.A.E. | 2002 US Passport pg. 14 | Enter via Dubai International Airport |
| 12/22/2003 | | 45408410 | Unknown | 2002 US Passport pg. 21 | Visa; Passport office illegible; Multiple exit and re-entry visa; Permitted to leave within two months from 12/22/2003 and return within six months of the date of first departure. |
| 12/23/2003 | EXIT | | K.S.A. | 2002 US Passport pg. 20 | Exit via King Khalid International Airport. |
| 1/1/2004 | EXIT | | U.A.E. | 2002 US Passport pg. 14 | |
| 1/1/2004 | ENTER | | Oman | 2002 US Passport pg. 22 | Wadi Al-Jizzi Passport Center [Border Checkpoint] |
| 1/2/2004 | ENTER | | U.A.E. | 2002 US Passport pg. 23 | Khatm Al-Shaklah Passport Center [Border Checkpoint] |
| 1/27/2004 | EXIT | | U.A.E. | 2002 US Passport pg. 23 | Exit via Dubai International Airport |
| 1/28/2004 | ENTER | | K.S.A. | 2004 US Passport pg. 9 | Entered via King Khalid International Airport |
| 2/6/2004 | EXIT | | K.S.A. | 2004 US Passport pg. 9 | Exit via King Khalid International Airport. |
| 2/11/2004 | EXIT | | U.A.E. | 2004 US Passport pg. 8 | Exited via Dubai International Airport |
| 2/12/2004 | ENTER | | K.S.A. | 2004 US Passport pg. 8 | Entered via King Khalid International Airport. |
| 2/18/2004 | ENTER | | U.A.E. | 2004 US Passport pg. 10 | Enter via Dubai International Airport |
| 2/19/2004 | EXIT | | K.S.A. | 2004 US Passport pg. 8 | Exited via King 'Abd al 'Aziz International Airport |
| 4/9/2004 | | | Oman | 2004 US Passport pg. 10 | Illegible as to whether subject entered or exited country on this date. |
| 4/9/2004 | EXIT | | U.A.E. | 2004 US Passport pg. 10 | |
| 4/9/2004 | ENTER | | U.A.E. | 2004 US Passport pg. 11 | |
| 5/2/2004 | EXIT | | U.A.E. | 2004 US Passport pg. 11 | Exit via Dubai International Airport |

1

Att. C, Carroll Dec.
Gov't's Response

| Date | Enter/Exit | Visa | Country | Passport Issue Date | Details |
|---|---|---|---|---|---|
| 5/11/2004 | ENTER | | U.A.E. | 2004 US Passport pg. 10 | Enter via Dubai International Airport |
| 6/10/2004 | EXIT | | U.A.E. | 2004 US Passport pg. 10 | Exit via Dubai International Airport |
| 6/11/2004 | ENTER | | U.A.E. | 2002 US Passport pg. 17 | Enter via Dubai International Airport |
| 6/17/2004 | ENTER | | U.A.E. | 2004 US Passport pg. 12 | Enter via Dubai International Airport |
| 6/18/2004 | EXIT | | K.S.A. | 2004 US Passport pg. 20 | Exit via King Khalid International Airport |
| 7/5/2004 | EXIT | | U.A.E. | 2004 US Passport pg. 12 | Exit via Dubai International Airport |
| 7/8/2004 | ENTER | | U.A.E. | 2004 US Passport pg. 12 | Enter via Dubai International Airport |
| 8/2/2004 | EXIT | | | 2004 US Passport pg. 13 | Country illegible on stamp, but most likely Oman |
| 8/2/2004 | | | U.A.E. | 2004 US Passport pg. 13 | Stamp illegible as to whether subject entered or exited the UAE |
| 8/2/2004 | EXIT | | U.A.E. | 2004 US Passport pg. 12 | |
| 8/2/2004 | ENTER | | Oman | 2004 US Passport pg. 13 | Al-Wajaja Passport [Checkpoint] |
| 9/28/2004 | EXIT | | U.A.E. | 2004 US Passport pg. 13 | Hatta Passport Center [Checkpoint] |
| 9/28/2004 | ENTER | | Oman | 2004 US Passport pg. 13 | Al-Wajaja Passport [Checkpoint] |
| 9/28/2004 | EXIT | | | 2004 US Passport pg. 13 | Country illegible on stamp, but most likely Oman |
| 9/28/04 | ENTER | | U.A.E. | 2004 US Passport pg. 14 | Hatta Passport Center [Checkpoint] |
| 11/7/2004 | ENTER | | | 2004 US Passport pg. 21 | Country illegible on stamp |
| 11/20/04 | EXIT | | | 2004 US Passport pg. 15 | King [illegible] Airport; Country exited illegible, but presumed to be K.S.A. |
| 11/26/04 | ENTER | | U.A.E. | 2004 US Passport pg. 14 | |
| 11/26/2004 | ENTER | | U.A.E. | 2004 US Passport pg. 16 | Hatta Passport Center [Border Checkpoint] |
| 11/26/2004 | ENTER | | Oman | 2004 US Passport pg. 21 | Al-Wajaja Passport [Border Checkpoint] |
| 1/22/05 | ENTER | | Oman | 2004 US Passport pg. 16 | Al-Wajaja Passport [ Border Checkpoint] |
| 1/22/05 | EXIT | | U.A.E. | 2004 US Passport pg. 16 | Hatta Passport Center [Border Checkpoint] |
| 1/22/2005 | ENTER | | U.A.E. | 2004 US Passport pg. 17 | Hatta Passport Center [Border Checkpoint] |
| 1/30/2005 | EXIT | | U.A.E. | 2004 US Passport pg. 17 | Exit via Dubai International Airport |
| 2/17/2005 | ENTER | | Iran | 1999 Iranian Passport pg. 40 | Enter via Mehrabad Airport (Stamp hard to read, could possibly be 2004 rather than 2005) |
| 9/16/2006 | | 68278 | Embassy of Syrian Arab Republic in Tehran | 2006 Iranian Passport pg. 8 | Category: Entry; Number of journies: One |
| 10/28/2006 | | 688 | Syrian Arab Republic | 2006 Iranian Passport pg. 9 | Province of Damascus Police HQ Immigration and Passports Branch; Allowed to stay until 1/7/2007 |
| 8/14/2007 | EXIT | | Syrian Arab Republic | 2006 Iranian Passport pg. 10 | Exit via Damascus Airport |
| ?/?/2004 * | EXIT | | K.S.A. | 2004 US Passport pg. 21 | Month and date illegible on stamp (Possible date of November 2004) |
| 11/?/2004 | EXIT | | | 2004 US Passport pg. 14 | of 2004, and as to what country was exited |
| 11/21/? * | ENTER | | U.A.E. | 2004 US Passport pg. 14 | Enter via Dubai International Airport; year entered illegible, but presumed to be 2004. |
| 2/17/? | EXIT | | U.A.E. | 1999 Iranian Passport pg. 41 | Flight from Dubai to Tehran, Iran. Year of travel not stated. |
| 2/17/? | | | Iran | 1999 Iranian Passport pg. 41 | Flight to Tehran from Dubai. Year of travel not stated. |
| 2/3/? | ENTER | | U.A.E. | 1999 Iranian Passport pg. 11 | Enter via Dubai International Airport; year entered illegible |
| Unknown | ENTER | | U.A.E. | 1999 Iranian Passport pg. 13 | Enter via Sharjah International Airport |
| Unknown * | | 950440156 | Oman | 2002 US Passport pg. 22 | Visa; Multiple entry for one year; Permitted to stay in Oman for 3 weeks each visit then return after 3 weeks. (Possible date of early 2004) |
| Unknown * | ENTER | | K.S.A. | 2004 US Passport pg. 20 | Date illegible; King Fahd International Airport (Possible date of June 2004) |

* date estimation is derived from placing travel event in context with surrounding passport entries

2

Att. C, Carroll Dec.
Gov't's Response