IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. CR 05-60008-HO |
| | ) | |
| v. | ) | DECLARATION OF |
| | ) | CHRISTOPHER L. CARDANI |
| | ) | |
| PIROUZ SEDAGHATY, | ) | |
| | ) | |
| Defendant. | ) | |

I, Christopher L. Cardani, do declare as follows:

1) I am an Assistant United States Attorney (AUSA) for the District of Oregon. I have been a federal prosecutor since 1989. I am one of two AUSAs who prosecuted the case of United States v. Pirouz Sedaghaty, CR 05-60008-HO in the District of Oregon.

2) This Declaration addresses two matters. The first is a general review of the discovery procedures we engaged in prior to trial. The second discusses information which came to my attention concerning witness Barbara Cabral and her late husband Richard Cabral.

## General Discovery Procedures

3) Once defendant Sedaghaty returned to the United States and surrendered to the arrest warrant in August 2007, discovery was initiated.

4) Consistent with the general practice and philosophy in our district, I viewed our discovery obligations in this case expansively. I am quite familiar with the discovery requirements of Federal Rule of Criminal Procedure 16, 18 U.S.C. §3500 (witness statements), Brady v. Maryland (exculpatory information), and Giglio v. United States (impeachment material). The approach I have taken in my cases over the last eighteen years in this district has been to err on the side of disclosure when I have a question

1 - DECLARATION OF CHRISTOPHER L. CARDANI

over discovery, unless there are concerns about classified information or the protection of a witness or ongoing investigation. In this case, as in my prior cases, I erred on the side of disclosure when complying with the rules and Judge Hogan's discovery orders.

5) AUSA Charles Gorder and I were the two prosecutors on the case. IRS-CI Special Agent Colleen Anderson and FBI Special Agent Dave Carroll were the case agents. To assist us in complying with our discovery obligations, we on several occasions over close to three years met and discussed as a team what items needed to be discovered to the defense. We discussed what constituted exculpatory information, Rule 16 material, witness statements, and impeachment material, and erred on the side of disclosure of non-classified items when there was a discovery decision. As the trial approached and we became more confident of anticipated defenses, we also reviewed and provided additional materials which might be helpful to the defense. We also went to great lengths in assisting the defense in copying large amounts of discovery, viewing the search warrant materials, and assisting the defense in accessing the seized computer hard drives. We turned over statements of testifying witnesses well before trial.

6) While the case agents helped identify discoverable materials, the prosecutors made the final discovery decisions. Once done, SA Anderson would "Bates stamp" an item with a number, add it to a spreadsheet along with a description, copy the material, and deliver it to the defense in what we called a batch. This process was ongoing and was repeated several times over the course of the proceedings right up to trial. There were seventeen batches of discovery provided to the defense, as well as access to the search warrant materials, to include copies of the computer hard drives seized during the warrant, and bank account records. The team also reviewed Judge Hogan's discovery rulings (CR 191) on several occasions to ensure compliance. SA Anderson kept a detailed spreadsheet listing what we were, and were not, required to provide. When we had questions as to whether information fell within Judge Hogan's discovery order, we filed a motion for clarification (CR 223), or submitted material to him for an *in camera* review (CR 216). I believe we performed our discovery obligations in a serious and diligent manner.

### Richard Cabral and Barbara Cabral

7) During the Sedaghaty investigation I concurred with the FBI's decision to use Richard Cabral as a source of information and to pay him for his services and expenses. I did not learn the details of the amount, circumstances or dates of payments to Richard Cabral until after the Sedaghaty trial. I never met nor spoke to Richard Cabral.

8) We initially intended to call Richard Cabral as a witness at the Sedaghaty trial. When I learned that Richard Cabral had become seriously ill, I attempted to obtain his deposition to preserve his testimony for trial. This attempt was unsuccessful, as Mr. Cabral passed away in March 2008.

**2 - DECLARATION OF CHRISTOPHER L. CARDANI**

9) Our continuing discovery obligations included two trips to Medford, Oregon to review the investigative files of the FBI and IRS. The case agents and AUSA Gorder and I met in Medford on January 14, 15 and 16, 2009. Prior to this trip we had already disclosed five batches of discovery, as well as the search warrant material, hard drives and bank records.

10) The case files, especially from the FBI, were voluminous and took a great deal of time to review. Our goal was to identify materials which we needed to discover to the defense pursuant to *Brady*, Rule 16, or as impeachment evidence for witnesses we anticipated calling at trial. We identified additional items, not previously provided to the defense, that we decided should be provided in the next batch of discovery. Due to the volume of material to be reviewed, and the amount of time necessary to review the information, we did not complete our review of the FBI case files during this trip.

11) I have reviewed a document captioned "Discovery Spreadsheet - 6." This represents an inventory prepared by SA Anderson for Batch 6 of the discovery provided to the defense on February 26, 2009. It includes material we identified during our January 2009 meetings as potentially exculpatory, to include two investigative reports of Richard Cabral (Bates #1749-1752 & 1772-1773).

12) We returned to Medford to conduct additional review of the FBI case files on March 11, 12 and 13, 2009. We completed our review of the FBI case file at this time. SA Anderson subsequently prepared another batch of discovery for the defense which I believe included information we identified during this additional discovery review.

13) During the January and March 2009 Medford file reviews, we never considered payment(s) to Richard Cabral as information we needed to disclose because he was dead and would not be a trial witness. I do not recall looking at Richard Cabral's "source file" in Medford.

14) During the January and March 2009 file reviews we had no plans to call Barbara Cabral as a trial witness. It was not until about a year later, in approximately March 2010, that we decided to call her as a witness. The initial witness list I filed in August 2009 did not include Barbara Cabral as a government witness (CR 203). The amended witness list I filed in March 2010 included Barbara Cabral as a government witness (CR 293).

15) Discovery Spreadsheet - 14 was prepared by SA Anderson and reflects that on May 10, 2010 we turned over to the defense seven investigative reports of Barbara Cabral. They were provided to the defense pursuant to our obligation to discover statements of testifying witnesses. Trial had been scheduled for June 7, 2010 (CR 240) but was later continued to August 30, 2010 (CR 387).

16) Prior to trial, I met Barbara Cabral once, most likely on August 24, 2010, during a trip to Medford. I returned from a separate witness interview with SA Anderson and

**3 - DECLARATION OF CHRISTOPHER L. CARDANI**

went to the FBI office. There I was introduced to Barbara Cabral and her new husband, and joined an ongoing interview between her, AUSA Gorder and SA Carroll. This was my one and only contact with Barbara Cabral prior to trial.

17) The subject of Barbara Cabral potentially receiving a payment after trial was never discussed in my presence with her. Nor were there any discussions in my presence with Barbara Cabral about the payments to her deceased husband Richard.

18) The Sedaghaty trial concluded on September 9, 2010. During the week ending December 10, 2010, I was contacted by SA Carroll. He asked for my concurrence on a post-trial payment he wished to make to Barbara Cabral. During these discussions, SA Carroll indicated Barbara Cabral had not been paid anything previously, but that he wanted to now pay her for the assistance she provided over a period of time. We discussed the amount he wanted to pay her and why he wanted to pay her. Included in the reasons SA Carroll wanted to pay Barbara Cabral was that the FBI had previously paid her former husband Richard Cabral, that she had undergone expensive medical procedures, and that SA Carroll felt that Barbara Cabral had put herself somewhat at risk by leaving Islam and testifying at the trial.

19) I believe AUSA Gorder was on annual leave during the time of my discussions with SA Carroll about Barbara Cabral. No resolution was reached at this time with SA Carroll, as I wanted to discuss the matter with AUSA Gorder and my front office. SA Carroll then left for a planned vacation.

20) As the result of my conversations with SA Carroll, and subsequent conversations with others in my front office about the FBI request, a question arose as to whether the payments to Richard Cabral should have been provided in discovery. To help answer this question, we needed more information from the FBI, including whether Barbara Cabral was aware of the payments to her former husband and whether she had been offered anything.

21) On December 13, 2010 I spoke with AUSA Gorder and discussed this information. We agreed that we needed to gather additional information from SA Carroll, including the amount paid to Richard Cabral, the dates of the payment or payments, what the payments were for, whether Barbara Cabral was aware of the payments to Richard Cabral, and whether Barbara Cabral was offered anything prior to trial. AUSA Gorder agreed to e-mail SA Carroll, who was on vacation on the East Coast, to determine when he was returning and might be able to obtain the answers to these questions. At some point during this time period my U.S. Attorney advised he was opposed to paying Barbara Cabral any money.

22) On December 20, 2010 I participated in a telephone conference with AUSA Gorder and SA Carroll and SA Anderson. SA Carroll informed us that the FBI had paid Richard Cabral a total of $14,500 on three occasions from 2004 through 2006, and that Barbara Cabral was present on at least one occasion. SA Anderson was present for at

**4 - DECLARATION OF CHRISTOPHER L. CARDANI**

least one of the payments. The payments were made prior to defendant Sedaghaty's return to the United States in August 2007. This is the first time I learned the details of the payments to Richard Cabral, or that Barbara Cabral was present for one of the payments.

23) During this December 20, 2010 call, SA Carroll told us that at some point prior to the Sedaghaty trial he told Barbara Cabral that he was going to try and get her some cash after trial, or words to that effect. This was the first time I learned of this pretrial statement. AUSA Gorder and I requested SA Carroll to check his notes and promptly write the details for us. AUSA Gorder and I agreed we needed to disclose this information to defense counsel and to Judge Hogan.

24) Later that same day I participated in a conference call with AUSA Gorder, SA Carroll, SA Anderson, and two FBI supervisors. SA Carroll briefed the group on the discussions we had been having about the Cabrals, including SA Carroll's pretrial statement to Barbara Cabral on a potential payment post trial. AUSA Gorder and I stated this information needed to be disclosed to the defense and to Judge Hogan. All agreed. We discussed whether to have Barbara Cabral interviewed on these subjects, and if so, whether we should request that it be done by an agent not working on the case. We agreed to hold off on the interview briefly, so that AUSA Gorder and I could discuss the matter with our front office. The FBI agreed to move towards memorializing the Richard Cabral payments and the pretrial statement to Barbara Cabral.

25) On December 21, 2010 AUSA Gorder and I briefed some of the United States Attorneys Office supervisors on the issues relating to the Cabrals. All agreed that this information needed to be flushed out and disclosed to Judge Hogan and defense counsel. All agreed that Barbara Cabral should be interviewed by an agent not on the case.

26) On December 22, 2010 I spoke with my U.S. Attorney, who had been briefed on the issues. We discussed a concern that AUSA Gorder and I had that the information should be disclosed to Judge Hogan and defense counsel quickly, especially because we wanted Judge Hogan and defense counsel to have this information before Judge Hogan ruled on the pending motion for a new trial or sentenced the defendant. My U.S. Attorney authorized me to contact Steve Wax and Judge Hogan to advise them of the issue.

27) That same day I called Steve Wax, one of defendant's attorneys, and told him that we had new information about government witness Barbara Cabral and a pretrial statement made to her by the FBI about a potential cash payment to be made to her after trial. I informed Steve Wax that we were collecting the underlying information, and that he may want to supplement his motion for a new trial. I suggested we contact Judge Hogan and advise him of the matter. He agreed.

**5 - DECLARATION OF CHRISTOPHER L. CARDANI**

28) Steve Wax and I then immediately contacted Judge Hogan by telephone. I told Judge Hogan that we had acquired new potential impeachment information about Barbara Cabral that we had not previously disclosed and that Steve Wax wanted an opportunity to brief it before Judge Hogan ruled on the pending new trial motion. Judge Hogan agreed to defer ruling on the motion.

29) I apprised my U.S. Attorney of the conversation with Judge Hogan and Steve Wax. We discussed the need to review the FBI source files, which were in Portland, to determine whether there was anything else which should be discovered to the defense. AUSA Kelly Zusman was asked and agreed to coordinate the interview of Barbara Cabral.

30) Quickly collecting and reviewing the new information became a challenge because of the holiday season, with various individuals away on leave. I advised Steve Wax of the reason for the brief delay.

31) On December 27, 2010 I received copies of two FBI reports written by SA Carroll concerning the details of the payments to Richard Cabral and the statement to Barbara Cabral. They were distributed to the members of my office who were by then involved. AUSA Gorder started the process of reviewing the FBI source files in Portland.

32) On December 28, 2010 I participated in a conference call with AUSA Gorder and SA Carroll and SA Anderson. AUSA Gorder advised that from his day and a half review of the source files, he found no other payments to Richard Cabral and no payments to Barbara Cabral. AUSA Gorder advised that in Richard Cabral's source file there was some information related by his spouse (Barbara Cabral), some of which mentioned defendant Sedaghaty. We also discussed with the case agents every other trial witness to determine whether there was any additional undisclosed potential impeachment information. We identified nothing else, but through this process we discovered that the agents' interview notes of Barbara Cabral not been disclosed, although the reports themselves had been disclosed.

33) On December 29, 2010 I received fax and e-mail copies of the material identified by AUSA Gorder, and the agents' notes. I participated in a lengthy conference call with AUSA Gorder, SA Carroll and SA Anderson, wherein we discussed what information we felt should be disclosed. Later that day we briefed our U.S. Attorney and others on the status of our review.

34) On January 3, 2011 I received the package of information from SA Anderson which we had previously discussed. We decided that we would all physically meet at the U.S. Attorney's Office in Portland on January 5, 2010 to meet with AUSA Zusman and review the information to be provided. It was determined that she would make the final decisions on what information should be disclosed.

35) On January 5, 2011 I participated in an all day meeting in Portland with AUSA

**6 - DECLARATION OF CHRISTOPHER L. CARDANI**

Gorder, SA Carroll and SA Anderson to review the materials at issue. AUSA Zusman later met with us. We reviewed the government's witness list and together discussed whether there was any other undisclosed potential impeachment evidence, and found nothing. We then together reviewed all of the Cabral materials that had been collected. AUSA Zusman reviewed our proposed discovery additions and made the final decisions on disclosure. SA Anderson agreed to prepare a discovery inventory listing the items to be discovered in Batch 18.

36) On January 6, 2011 SA Anderson finalized the discovery inventory, copied the materials to be discovered and sent them to AUSA Zusman. These materials, which included the new FBI reports on the payments to Richard Cabral and the pretrial statement to Barbara Cabral, were sent to defense counsel that same day.

I declare the foregoing to be correct under the penalties of perjury.

2-15-11
Date

Christopher L. Cardani
Assistant U.S. Attorney
District of Oregon

7 - DECLARATION OF CHRISTOPHER L. CARDANI