**Steven T. Wax, OSB No. 85012**
**Federal Public Defender**
**101 SW Main Street, Suite 1700**
**Portland, OR  97204**
**Tel: (503) 326-2123**
**Fax: (503) 326-5524**
**Email: steve_wax@fd.org**

**Lawrence Matasar, OSB No. 74209**
**621 SW Morrison Street, Suite #1025**
**Portland, OR 97205**
**Tel: (503) 222-9830**
**Email: larry@pdxlaw.com**

**Attorneys for Defendant**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# EUGENE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CR 05-60008 HO** |
| **Plaintiff,** | |
| | **DEFENDANT'S REPLY TO** |
| **v.** | **GOVERNMENT'S RESPONSE TO** |
| | **DEFENDANT'S POST-TRIAL** |
| **PIROUZ SEDAGHATY,** | **DISCOVERY MOTION AND** |
| | **REQUEST FOR AN EVIDENTIARY** |
| **Defendant.** | **HEARING** |
| | |
| | **EVIDENTIARY HEARING** |
| | **REQUESTED** |

## TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT....................................... 1

INTRODUCTION. ............................................. 1

I.      MR. SEDAGHATY'S PRIMA FACIE SHOWING OF A
        CONSTITUTIONAL VIOLATION AND THE GOVERNMENT'S
        ADMISSIONS OF A BRADY VIOLATION ESTABLISH THAT
        DISCOVERY IS REQUIRED. ................................. 3

II.     INCONSISTENT AND INCOMPLETE STATEMENTS IN THE
        DECLARATIONS AND POST-TRIAL DISCOVERY REQUIRE
        CLARIFICATION AND TESTING THROUGH DISCOVERY. .......... 10

III.    THE LAW REQUIRES FULL DISCOVERY ON THE FACTS OF THIS
        CASE BECAUSE MR. SEDAGHATY'S REQUESTS ARE NARROWLY
        TAILORED, BASED ON ESTABLISHED FACTS, AND BECAUSE
        THE GOVERNMENT HAS WAIVED WHATEVER PRIVILEGES IT
        ASSERTS............................................... 17

        A.      When Government Misconduct Is at Issue And Its Attorneys
                And Agents Are The Primary Witnesses, The Government
                May Not Hide Behind Work Product Privileges............... 17

        B.      When The Government Seeks To Justify Its Conduct
                Through Declarations That Are Based On Written File
                Materials That Are Incomplete And Inconsistent It Must
                Allow Access To The Supporting Documentation In Its Files. ... 21

        C.      The Government Has Waived Any Claim Of Privilege.......... 21

        D.      The Law Cited By The Government Supports Discovery In
                This Case............................................ 23

        E.      An Evidentiary Hearing Is Required........................ 26

IV.     ADDITIONAL REPLIES TO THE GOVERNMENT'S RESPONSE ON
        SPECIFIC DISCOVERY PARAGRAPHS. .......................... 28

i

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## TABLE OF AUTHORITIES

**PAGE**

**FEDERAL CASES**

*Alderman v. United States,*
     394 U.S. 165 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Brady v. Maryland,*
     373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . 5, 9, 19, 22, 23, 24, 26, 27

*Denham v. Deeds,*
     954 F.2d 1501 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Dennis v. United States,*
     384 U.S. 855 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Giglio v. United States,*
     405 U.S. 150 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 23, 24

*Hayes v. Brown,*
     399 F.3d 972 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Kyles v. Whitley,*
     514 U.S. 419 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Ail, No. CR 05-325-RE,*
     2007 WL 1229415 (D. Or. Apr. 24, 2007). . . . . . . . . . . . . . . . 18, 19, 26

*United States v. Alexander,*
     695 F.2d 398 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Armstrong,*
     517 U.S. 456 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*United States v. Blanco,*
     392 F.3d 382 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*United States v. Cameron,*
     672 F. Supp. 2d 133 (D. Me. 2009). . . . . . . . . . . . . . . . . . . . . 29, 30

iii

*United States v. Colacuricio*,
    499 F.2d 1401 (9th Cir. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Fort*,
    472 F.3d 1106 (9th Cir 2007). . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*United States v. Jewell*,
    532 F.2d 697 (9th Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Nace*,
    561 F.2d 763 (9th Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Nobles*,
    422 U.S. 225 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*United States v. Siriprechapong*,
    181 F.R.D. 416 (N.D. Cal. 1998). . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Thompson*,
    335 Fed. Appx. 876 (11th Cir. June 30, 2009). . . . . . . . . . . . . . . 25, 26

*United States v. Velarde*,
    485 F.3d 553 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . 1, 2, 24, 25

*United States v. Zuno-Arce*,
    44 F.3d 1420 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Wade v. United States*,
    504 U.S. 181 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 25

**FEDERAL STATUTES**

Fed. R. Crim. P. 16(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21, 22, 23

**PRELIMINARY STATEMENT**

This pleading only addresses issues related to discovery.  It does not address any substantive issue with regard to the Motion for New Trial or the Motion to Dismiss.  A hearing is scheduled to address the discovery issues on March 1, 2011.  Full briefing and a hearing on the substantive issues with regard to the Motion for New Trial and the Motion to Dismiss will be set for a later date.

**INTRODUCTION**

The parties agree on several of the legal principles that are applicable to the discovery issues before the Court: the Court has discretion to order discovery and should exercise that discretion sparingly; discovery should not be ordered when the defense makes only general allegations; the defense should not be permitted to engage in a fishing expedition.  See *Wade v. United States*, 504 U.S. 181, 186 (1992); *United States v. Velarde*, 485 F.3d 553, 560 (10th Cir. 2007), both cited by the government at CR 530, p. 4. The parties disagree strongly, however, about the applicability of those principles.

This Court should order discovery because this is the rare case in which the undisputed facts establish serious irregularities by government actors.  The material provided by the government on January 6, 2011, and the six declarations submitted by the government on February 18, 2011, make clear that the government has violated Mr. Sedaghaty's constitutional, statutory, and

rule-based rights and the orders of this Court by failing to provide critical

impeachment material.  The issues before the Court do not involve a fishing

expedition.  Nor do they involve any dispute between the parties about the core

facts of the government's violations.  The only question that the Court must

answer at this time is the remedy to which Mr. Sedaghaty is entitled.

      The answer to the question of the need for discovery and appropriate

remedy is based in large part on the extent of the government's misconduct.

The material provided to date includes strong evidence of misconduct

warranting dismissal.  As the declarations submitted by the government on

February 18, 2011, make clear, evidence that can resolve that question is

contained in the government's files. Mr. Sedaghaty should have access to those

materials to prove the extent of the violation.  The importance of providing

access to the material sought is underscored by the fact that the material

provided to date by the government is rife with inconsistencies and incomplete

accounts and statements strongly suggesting that more specific information

exists in the government files Mr. Sedaghaty seeks.

      Contrary to the government's view, the discovery sought is necessary

because the unusual facts before this Court clearly demonstrate: (1) this case

*is* the "rare case," contemplated by *Velarde, infra*; (2) the defense is not making

generalized allegations, but *specific* allegations; and, (3) the defense is plainly

not engaged in a mere fishing expedition based on mere hopes of finding

**Page 2**    **DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S POST-TRIAL DISCOVERY MOTION AND REQUEST FOR AN EVIDENTIARY HEARING**

exculpatory evidence.  The specific and extensive allegations Mr. Sedaghaty

makes are substantiated by government admissions that its agents violated Mr.

Sedaghaty's right to discovery.

The parties also disagree about the applicability of the work-product

privilege asserted by the government.  First, the cases relied upon by the

government have nothing to do with the issue currently before the Court.  The

questions that must be answered at this time do not involve traditional pre-

trial discovery matters.  Rather, they involve actions of the government agents

and prosecutors, many of which are documented in the notes, logs, computers,

emails, and other communications among the people whose actions are in

question.   Second, because the government's response and declarations rely

on their internal written materials, logs, e-mails, calendars, etc. it has waived

any privileges that might otherwise apply.

## I.   MR. SEDAGHATY'S PRIMA FACIE SHOWING OF A CONSTITUTIONAL VIOLATION AND THE GOVERNMENT'S ADMISSIONS OF A BRADY VIOLATION ESTABLISH THAT DISCOVERY IS REQUIRED

The specific and fact based nature of Mr. Sedaghaty's discovery motion is

established by even a cursory review of the facts underlying the current

dispute.  Even considering the lowest common denominator – the undisputed

facts – there is no dispute that Mr. Sedaghaty's rights were violated.[1]  There

---

[1] The government's filing on February 18, 2011, included a time line and attached several declarations.  CR 536. The government time line is incomplete and, in some respects, misleading.  A few examples include:

are, however, facts in dispute.  How those disputes are resolved will govern

decision on the remedy to which Mr. Sedaghaty is entitled.  The discovery

sought is intended to clarify the disputed facts.

The undisputed facts include the following:

---

1.      When Barbara Cabral was "opened as a source" in 2004, her status was that of a source "in a position to testify" and that both FBI case agents believed "there was a likelihood she could at some point in time testify." Carroll Decl. at 2 (CR 536-2 at 2).

2.      As early as November 2003, AUSA Chris Cardani specifically approved the payment of money to Richard Cabral.  Carroll Decl. at 10 (CR 536-2 at 10).

3.      On March 21, 2005, when Richard Cabral received $5,000 from the FBI in Barbara Cabral's presence, half of the trial team (David Carroll and Colleen Anderson) were present.  Carroll 302 of December 22, 2010 (CR 536-1 at 8 of 71).

4.      Well before the trial team's discovery review in January and March of 2009, Barbara Cabral was formally identified as a potential government witness in a court filing dated April 4, 2008.  CR 95.

5.      Regardless of what files were reviewed in January and March of 2009 (whether "case" or "source" files), all four members of the government trial team were aware of the FBI's monetary payments to Richard Cabral. Furthermore, at least two trial team members knew that Barbara was present for at least one payment to her husband.  Carroll 302 of December 22, 2010 (CR 536-1 at 8 of 71); Carroll Decl. at 10 (CR 536-2 at 10); Gorder Decl. ¶9 (CR 536-4 at 4-5).

6.      In June or August of 2010, when Agent Carroll informed AUSA Gorder that he intended to seek a monetary payment for Barbara Cabral, Gorder "cautioned him not to do so before" trial.  Gorder Decl. ¶¶ 6-7 (CR 536-4 at 3-4).

7.      On December 8, 2010, while discussing whether, when, and how much to pay Barbara Cabral, Agent Carroll was told that it "was the AUSA's preference the payments be made after sentencing and if possible after the exhaustion of all appeals."  Carroll Decl. at 7-8 (CR 536-2 at 7-8).

These issues will be fully addressed in Mr. Sedaghaty's reply to the government's response.

**Page 4      DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S POST-TRIAL DISCOVERY MOTION AND REQUEST FOR AN EVIDENTIARY HEARING**

- Barbara Cabral was told before she testified at trial that she might be paid money after trial for assisting the government.  Carroll 302 of December 22, 2010 (CR 536-1 at 7 of 71); Carroll Decl. at 8-9 (CR 536-2 at 8-9).

- Barbara Cabral, along with her husband, provided information to the government in numerous interviews over many years, starting as early as 2003.  Both Cabrals were present in person or on the telephone and provided information to the government jointly on a number of occasions.  CR 536-1 at 5 of 71; CR 536-1 at 12-71 of 71.

- Richard Cabral was visually impaired and depended greatly on Barbara Cabral.  *See, e.g.*, CR 536-1 at 9 of 71.

- While married to Barbara Cabral, Richard Cabral received three payments totaling $14,500 from the FBI.  Barbara Cabral was present for at least one of these payments, as was IRS Agent Anderson.  CR 536-1 at 8 of 71.

- Barbara Cabral "has always" viewed the payments to Richard as "satisfy[ing] any monetary consideration that might have been due for her and Richard's help."  Cabral 302 of December 29, 2010 (CR 536-1 at 11 of 71).[2]

---

[2] It is difficult to understand how the government prosecutors and agents continue to justify their position that "Barbara Cabral has never been paid by the FBI."  CR 536 at 6.  This position is correct only if payment is defined as an entry on the books of the FBI or as a hand-to-hand transfer from an FBI agent directly to a witness.  The defense believes that, as a legal matter under *Brady*, Barbara Cabral was paid by the FBI because: (1) she gave information to the FBI along with her husband; (2) in payment for information, the FBI handed her husband $14,500, of which at least $5,000 was handed to him in her presence; and (3) Barbara Cabral herself feels that the FBI money given to her husband satisfied the financial consideration due her and her husband's help to the FBI.  Carroll 302 of December 22, 2010 (CR 536-1 at 8 of 71); Cabral 302 of December 29, 2010 (CR 536-1 at 11 of 71).  Moreover, the government's belief that disclosure of the payment of $14,500 was required supports the view that Barbara Cabral benefitted from the monetary payment.

**Page 5     DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S POST-TRIAL DISCOVERY MOTION AND REQUEST FOR AN EVIDENTIARY HEARING**

- Agent Carroll told AUSA Gorder that he wanted to pay Barbara Cabral after trial.  Gorder Decl. at ¶12 (CR 536-4 at 7).

- Prior to trial, the government failed to provide the defense with information regarding the past payments to the Cabrals, Agent Carroll's statement to Cabral of a payment to be sought after trial, and several sets of notes of interviews with the Cabrals.

- Barbara Cabral testified in Mr. Sedaghaty's trial and was the only witness who knew Mr. Sedaghaty personally and testified that Mr. Sedaghaty wanted to give funds to the Chechen mujahideen.  She was the only witness who described his gathering and using money for the Chechen mujahideen, the principle aspect of the government's case on willfulness.  One juror so appreciated her testimony that she complimented the witness and as a result, this Court removed that juror from the jury.

- Before trial the government provided an FBI 302 report of interview of Richard Cabral dated August 17, 2007.  CR 536-2 at 19-20 of 25.  After trial, the government provided a different version of this report.  CR 536-2 at 22-23 of 25.  When the second version was provided, the government did not recall that it had provided a copy of the report.  Both versions contain information that the other does not.[3]

---

[3] In its response, the government repeatedly applauds its trial team for discovering what it calls "errors" and for bringing them to the attention of  this Court.  The factual declarations filed on February 18, 2011, sparse as they are, paint a far different picture of the government's actions and efforts to make a substantial cash payment to a fact witness.  On December 7, 2010, FBI Agent Carroll asked AUSA Cardani that more than $7,500 be authorized to pay Barbara Cabral for "her service to the USG."  Carroll Decl. at 7 (CR 536-2 at 7).  The defense believes that if an FBI agent requests that an AUSA authorize a large cash payment to a fact witness after the witness has helped the government obtain a conviction, the answer is a simple, strong "no."  Instead, after Carroll's request:

1.    AUSA Cardani decided to consult AUSA Gorder and IRS-CID Agent Anderson about the request.  Cardani Decl. at 4 (CR 536-5 at 4);  Gorder Decl. at 7 (CR 536-4 at 7); Anderson Decl. at 7 (CR 536-6 at 7); Carroll Decl. at 6 (CR 536-2 at 6);

**Page 6**      DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S POST-TRIAL DISCOVERY MOTION AND REQUEST FOR AN EVIDENTIARY HEARING

In addition to the undisputed facts that, on their face, require a new trial, the declarations include comments about the prosecutors' actions that should lead to dismissal. These will be developed in more detail after full discovery and an evidentiary hearing.

In brief, one involves that statements that the trial prosecutor was unaware of the details of the payments to Richard Cabral before December

_____

2.   AUSA Cardani and AUSA Gorder expressed reservations about paying Cabral, not because it was wrong, but "because of what they perceived to be her minimal contributions to Sedaghaty's conviction" (Carroll Decl. at 7; CR 536-2 at 7);

3.   In an apparent effort to justify a payment to the witness, AUSA Gorder asked Agent Carroll to determine Cabral's medical expenses. Carroll Decl. at 7 (CR 536-2 at 7);

4.   The next day, December 8, 2010, after sleeping on the request, the payment was still being pursued by the entire trial team. Agent Carroll and others had "further discussions regarding the merits of making payment to Cabral." Carroll Decl. at 7 (CR 536-2 at 7);

5.   Also on December 8, 2010, the AUSAs discussed the timing of the payment to Cabral, and expressed a "preference the payment be made after sentencing and if possible after the exhaustion of all appeals." Carroll Decl. at 8 (CR 536-2 at 7);

6.   On December 9, 2010, AUSAs Cardani and Gorder, according to Gorder's declaration, "brought the request to the attention of the United States Attorney." Gorder Decl. at ¶13 (CR 536-4 at 7). Mr. Cardani, Mr. Gorder, and Mr. Holton do not provide details on this request, nor do they indicate the reasons Mr. Cardani and Mr. Gorder reduced the request to $7,500 from the larger amount originally sought by Mr. Carroll.

7.   Mr. Holton says, "after considering the request, I ultimately decided that payment was not appropriate and within a few days, I communicated that to AUSA Cardani." Holton Decl. at 1 (CR 536-7 at 1). It was at this same time that the United States Attorney "asked whether the Richard Cabral payments had been disclosed and if not, whether this information should be disclosed." *Id.*

**Page 7    DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S POST-TRIAL DISCOVERY MOTION AND REQUEST FOR AN EVIDENTIARY HEARING**

2010.  That is inconsistent with the requirements in the Department of Justice Manual available to the defense and with information provided by a retired F.B.I. agent.  Several possibilities exist that would support dismissal–the F.B.I. agent did not follow the requirements or the records show something different than what has been disclosed to date.

A second inconsistency involves the existence of the two versions of the F.B.I. 302 report of the August 17, 2007 interview of Richard Cabral.  The information provided to date does not add up.  It is moreover, inconsistent with information provided by a retired F.B.I. agent about the manner in which such reports should be prepared and preserved.

A third inconsistency involves the alleged failure of the government prosecutor to make an inquiry that should have been made regarding the payments to Richard Cabral and the offer of payment to Barbara Cabral.  Mr. Gorder states that Agent Carroll told him that he might attempt to obtain money for Barbara Cabral in the future and that Gorder advised Carroll against any payment.  Mr. Gorder also states that he asked Agent Carroll at the end of a pre-trial preparation meeting with Barbara Cabral if she had been paid any money.  The declarations are silent on the question of whether Mr. Gorder asked whether Cabral had been told of the agent's intent to seek a payment.  If Mr. Gorder did not, under the circumstances that were known to him, he failed

in his responsibilities.  As stated in *Kyles v. Whitley*, 514 U.S. 419, 437-38

(1995):

> While the definition of *Bagley* materiality in terms of the
> cumulative effect of suppression must accordingly be seen as
> leaving the government with a degree of discretion, it must also be
> understood as imposing a corresponding burden. On the one side,
> showing that the prosecution knew of an item of favorable evidence
> unknown to the defense does not amount to a *Brady* violation,
> without more. But the prosecution, which alone can know what is
> undisclosed, must be assigned the consequent responsibility to
> gauge the likely net effect of all such evidence and make disclosure
> when the point of "reasonable probability" is reached. *This in turn
> means that the individual prosecutor has a duty to learn of any
> favorable evidence known to the others acting on the government's
> behalf in the case, including the police.* But whether the prosecutor
> succeeds or fails in meeting this obligation (whether, that is, a
> failure to disclose is in good faith or bad faith, *see Brady,* 373 U.S.,
> at 87, 83 S.Ct., at 1196-1197), the prosecution's responsibility for
> failing to disclose known, favorable evidence rising to a material
> level of importance is inescapable.

(emphasis added).  In conspiracy cases, similar conduct is often called "wilfull

blindness" by the government.  *See e.g. United States v. Jewell*, 532 F.2d 697,

700 (9th Cir. 1976) (*en banc*) ("(T)he rule is that if a party has a suspicion

aroused but then deliberately omits to make further enquiries, because he

wishes to remain in ignorance, he is deemed to have knowledge.") (quoting G.

Williams, Criminal Law: The General Part, s 57 at 157 (2d ed. 1961)).

Many of the paragraphs in the discovery motion are directed at evidence

that would establish the extent of the violation of Mr. Sedaghaty's rights in the

interaction between Mr. Gorder, Agent Carroll and Ms. Cabral and, thereby,

**Page 9**    **DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S POST-
TRIAL DISCOVERY MOTION AND REQUEST FOR AN EVIDENTIARY HEARING**

would assist the Court in determining the appropriate remedy.  Others are directed at evidence that would assist the Court in determining the appropriate remedy based on the payments and 302 report issues.

## II.    INCONSISTENT AND INCOMPLETE STATEMENTS IN THE DECLARATIONS AND POST-TRIAL DISCOVERY REQUIRE CLARIFICATION AND TESTING THROUGH DISCOVERY

The government urges the Court to deny much of Mr. Sedaghaty's post-trial discovery motion, including sections 1-8, 12, 18, and 19 on the ground that it seeks work-product and internal memoranda.  As articulated below, whatever privileges may exist in other situations do not exist here.  All of the information sought in these sections of the motion is necessary to refute the claims made in the  government's declarations.  The material provided to date is replete with inconsistencies and incomplete statements that can only be clarified and tested with full disclosure.

At the outset, the government declarants appear to selectively rely on written material.  For example, Agent Carroll states in his declaration that he maintains a "phone log."  Carroll Decl. at 6 (CR 536-2 at 6).  Mr. Gorder states in his declaration that he maintains a "personal daily log of activity."  Gorder Decl. at ¶2 (CR 536-4 at 2).  Mr. Gorder states that prior to preparing his declaration, he reviewed his "Outlook calendar, my personal daily log of activity, my working file on Barbara Cabral, and certain internal work-product memoranda and e-mails generated during the litigation of this case."  Gorder

Decl. at ¶2 (CR 536-4 at 2). While the other declarants do not recite what they reviewed prior to preparing their declarations, it would be hoped and assumed that they reviewed similar material. All of the declarations of the government personnel refer to communications and meetings, yet they contain very few references to any source material. The Court can reasonably conclude that many of the communications were via email and others recorded in notes or logs of some sort.

All of the material described above is relevant to the issues before the Court. It is precisely the type of material Mr. Sedaghaty seeks in his discovery requests. It is necessary for Mr. Sedaghaty to review it so that he can address the incomplete statements and inconsistencies that run throughout the declarations. Some of the inconsistencies and incomplete statements are set out below.

1.  Agent Carroll states that he reviewed "phone logs" to pinpoint October 4, 2010, as the day on which he "advised" Cabral he was trying to obtain a $7,500 payment. Carroll Decl. at 4 (CR 536-2 at 4).

However, Agent Carroll makes no reference to his phone logs with respect to the date on which he told her before trial that he would seek to compensate her after the trial. Carroll Decl. at 6 (CR 536-2 at 6).

2.  Agent Carroll states that Mr. Cardani signed off on payments to Richard Cabral in the fall of 2003. He states this was memorialized in a letter dated November 4, 2003. Carroll Decl. at 10 (CR 536-2 at 10).

**Page 11    DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S POST-TRIAL DISCOVERY MOTION AND REQUEST FOR AN EVIDENTIARY HEARING**

Agent Carroll suggests in his declaration that an AUSA is involved in the assessment of whether a CW and/or Source is paid by the FBI. Carroll Decl. at 12 (CR 536-2 at 12). However, Mr. Cardani states that he was not aware of the details of the payments until after Mr. Sedaghaty's trial. Cardani Decl. at ¶7 (CR 536-2 at 2). The manuals sought by Mr. Sedaghaty are necessary to ensure that the Court has a proper understanding of the regulations in place during the relevant time frames. The communications between Mr. Cardani and Agent Carroll, and from Agent Carroll to any other agent of the FBI and from any agent of the FBI to any member of the United States Attorney's office from 2003 to December 2010 are necessary to determine who approved the payments, when, and any other communications about the payments. The information provided to date is inconsistent with the Department of Justice Manual available to the defense.

3.   Agent Carroll states that in January and/or March 2009, he, Agent Anderson, and Messrs. Cardani and Gorder discussed the need, vel non, of providing the defense with information on the payments he made to Richard Cabral. He says that he had the "source" files with him in Medford. Carroll Decl. at 10-11 (CR 536-2 at 10-11).

Agent Carroll states that these files had the "schedule of payments" in them. Carroll Decl. at 10-11 (CR 536-2 at 10-11). Yet Mr. Cardani and Mr. Gorder state that they were unaware of the details, including Ms. Cabral's presence for at least one payment, until after the trial. Cardani Decl. at ¶7 (CR 536-5 at 2), Gorder Decl.¶14 (CR 536-4 at 7-8). The notes of those meetings

and the content of the source files are necessary to test the reliability of these

denials.

4.      Agent Carroll says that he was provided Agent Anderson's notes
        before or while he was drafting the FBI 302 report of the August
        17, 2007, interview of Richard Cabral.  He further states that she
        reviewed the "draft" report.  Carroll Decl. at 12-13 (CR 536-2 at 12-
        13).

Agent Anderson states that the version of the report provided to the

defense pre-trial was the completed version.  Anderson Decl. at ¶¶14, 21-22

(CR 536-6 at 4-9).  Yet both versions contain information that the other does

not.  In addition, the post-trial version contains the monetary amount as

reflected in the notes, contrary to the pre-trial version.  All communications

between Agents Carroll and Anderson and records each made regarding those

communications and the report are necessary to test the reliability of the

statements made regarding this report.

5.      Agent Carroll states that the reason two versions of the FBI 302
        report exist is that he did not save the "final" version electronically.
        Carroll Decl. at 12-13 (CR 536-2 at 12-13).

Forensic electronic review of his computer is necessary to test the

reliability of this statement.

6.      Agent Carroll states in his FBI 302 report of December 22, 2010,
        that Barbara Cabral stated that she had had a "heart attack" in
        the spring of 2010.  Mr. Cardani states in his declaration that on
        December 10, 2010, Agent Carroll told him that Barbara Cabral
        had undergone "extensive medical procedures."  Cardani Decl. at
        ¶18 (CR 536-5 at 4).

Mr. Gorder makes no reference to Cabral's medical condition in his declaration.  In his declaration, Agent Carroll states that he used the term "heart attack" in a "generic sense" to describe heart issues.  Carroll Decl. at 3-4 (CR 536-2 at 3-4).   Agent Carroll gives Cabral's medical condition as one of the reasons why he wanted to provide her money.  Carroll Decl. at 5 (CR 536-2 at 5).  All of the participants' notes and communications regarding the meetings that occurred in December and notes that mention Cabral's medical condition are necessary to determine what Agent Carroll told the prosecutors, and others, about Cabral's medical condition and what, if any, investigation he, or any other agent of the FBI, conducted into Cabral's medical condition from October 2010, to the present.

7.   Agent Carroll's 302 report dated December 22, 2010, makes no reference to his communication with Barbara Cabral on December 7, 2010, in which he spoke with her about the extent of her medical expenses.  That call was directed by Mr. Gorder on or about December 7, and the report was ordered to be prepared by Mr. Holton.  The agent's declaration submitted on February 18, 2011, refers to his contact with Cabral on December 7, 2010, but provides no detail.  Carroll 302 (CR 536-1 at 7 of 71); Carroll Decl. at 7 (CR 536-2 at 7); Holton Decl. at 2 (CR 536-7 at 2).

The detail of the December 7, 2010, conversation is relevant to the issues before the Court.

8.   The declarations of the five government attorneys and agents are replete with vague, incomplete, and inconsistent statements about the communications and activities from October 2010, to the present.

In light of the references to logs, phone logs, and e-mails, the seriousness of the issues they were addressing, and common knowledge about record keeping requirements, it is highly likely that the records of the participants contain detail that is omitted from the declarations or will reveal significant inconsistencies.  Examples from Mr. Cardani's declaration include:

- Paragraph 18 states only generally: "During the week of December 10, 2010, I was contacted by SA Carroll . . ."

- Paragraph 20 includes references to undated and unspecified conversations with "others in my front office."

- Paragraph 21 states only that "At some point" my US attorney advised "he was opposed to paying . . ."

- Paragraph 24 refers to a meeting held on December 20, 2010, at which Agent Carroll briefed Mr. Cardani and Mr. Gorder and Agent Anderson and two FBI supervisors, yet there are no reports or declarations from those people describing the meeting.

Examples from Agent Anderson's declaration include:

- Paragraph 15 describes "phone calls" in which the Cabral matter was discussed without specification of dates or content.

- Paragraph 18 describes "a long awkward silence" described only as occurring "during one call"

Examples from the combination of Messrs. Holton, Cardani, and Gorder's declarations include:

- None of the declarations state whether Mr. Cardani and Mr. Gorder made any recommendation regarding the payment to Cabral.  All use vague language such as "brought the request to the attention of the United States Attorney."  Gorder Decl. at ¶13 (CR 536-4 at

7); Cardani Decl. at ¶¶18-21 (R 536-5 at 4); Holton Decl. at 1 (CR 536-7 at 1).

Issues from Mr. Gorder and Holton's declarations include:

- Paragraph 12 in Mr. Gorder's declaration states that Mr. Gorder asked Agent Carroll at the end of a pre-trial preparation meeting with Barbara Cabral and Agent Carroll whether "Cabral herself" had ever been paid. The paragraph recites that Agent Carroll said no, but also stated that he might attempt to get her some payment in the future. While the paragraph contains a caution not to do so, it is silent on whether Mr. Gorder asked whether the agent had told Cabral of his intention. This silence contrasts with Mr. Holton's declaration which recites that when he learned of the request for payment of Barbara Cabral, he asked "if Cabral had been told she would be paid prior to trial . . ." Gorder Decl. at ¶12 (CR 536-4 at 6-7); Holton Decl. at 1 (CR 536-7 at 1).

Issues from Mr. Gorder and Cardani's declaration:

- Paragraph 13 in Mr. Gorder's declaration states that either he or Mr. Cardani told Agent Carroll of Mr. Holton's decision not to authorize a payment to Cabral. Mr. Cardani's declaration is silent on the matter. Gorder Decl. at ¶13 (CR 536-4 at 7); Cardani Decl. (CR 536-5)

The examples set forth above underscore the fact that the Court cannot

fairly resolve the issues before it without allowing the tailored discovery Mr.

Sedaghaty seeks.

III.    **THE LAW REQUIRES FULL DISCOVERY ON THE FACTS OF THIS CASE BECAUSE MR. SEDAGHATY'S REQUESTS ARE NARROWLY TAILORED, BASED ON ESTABLISHED FACTS, AND BECAUSE THE GOVERNMENT HAS WAIVED WHATEVER PRIVILEGES IT ASSERTS**

A.    **When Government Misconduct Is at Issue And Its Attorneys And Agents Are The Primary Witnesses, The Government May Not Hide Behind Work Product Privileges.**

The discovery issue before the Court involves concerns that are entirely distinguishable from those present in most discovery disputes that arise pre-trial. The issue in dispute here is the conduct of the government attorneys and agents themselves, not statements of non-governmental people. The relevant facts involve what government attorneys and agents knew, and did and said to whom and when. The extent of the government's failings in this unique situation also include the nature and timing of communications between the case agents and the case attorneys. Those facts are necessarily proven by the notes, logs, e-mails, and other communications of the government employees. Unlike the normal situation, the government personnel are the relevant witnesses to the issues in dispute.

The issue before the Court is also unique because the government acknowledges the core underlying issue: it failed to provide Mr. Sedaghaty material to which he was entitled pre-trial. This is not a situation in which a defendant speculates that he may have been the victim of an improper

government action. It is, rather, a situation in which that is known and the only issue is the extent of the government's mistakes or misconduct.

The government pleading fails to recognize that its attorneys and agents are the primary witnesses to the conduct in question. As a result, the discovery motion is not overly broad. While in the traditional sense it may touch on materials that are protected against disclosure by Fed. R. Crim. P. 16(a)(2), in light of the allegations set forth in the Motion for New Trial and Motion to Dismiss, the government cannot avoid disclosing information related to its own misconduct. Mr. Sedaghaty has presented clear evidence that the prosecution violated the Constitution. Discovery that is directly related to the failure of the prosecution to disclose the information related to the payment and/or promise of payment to the Cabrals, including a review of internal communications, is entirely appropriate. *See infra*, *A.ii.*

The law on discovery in this type of situation is relatively sparse. The Supreme Court decision in *United States v. Armstrong*, 517 U.S. 456, 470 (1996), provides clear support for disclosure of the material Mr. Sedaghaty seeks. The Supreme Court reviewed the decision of the trial court granting discovery as to the defendant's claim of selective prosecution. There the Supreme Court held that the government files are not immune from discovery in cases where the defense presents "some evidence tending to show the existence" of the essential elements of a selective-prosecution claim. 517 U.S.

at 469.    The Court stated: "If discovery is ordered, the Government must assemble from its own files, documents which might corroborate or refute the defendant's claim."  *Armstrong*, 517 U.S. at 468.

In *United States v. Ail*, No. CR 05-325-RE, 2007 WL 1229415 *2 (D. Or. Apr. 24, 2007), Judge Redden ordered the government to produce the documents requested by the defense and reviewed those in camera.  Relying on *Armstrong* (517 U.S. at 470), Judge Redden found that while "discovery in a criminal case is limited to information that is material to the 'defendant's response to the Government's case-in-chief,' a defendant may obtain additional discovery if there is a credible showing of 'some evidence' that the government has engaged in misconduct which violates due process."

Whatever presumption might ordinarily attach to the regularity of the government's actions has already been overcome in this case by the government's admissions.  Mr. Sedaghaty has presented "clear evidence to the contrary" to the presumption that the prosecutor here did not violate the Constitution.  *See United States v. Siriprechapong*, 181 F.R.D. 416, 424-25 (N.D. Cal. 1998) (relying on *Armstrong*).  There is no dispute that the government failed to disclose the payments to the Cabrals and the offer of a payment to Barbara Cabral.  This is in direct violation of the due process clause of the Constitution.  *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972).

The facts that led up to the failure to disclose are relevant to the motion to dismiss and the motion for new trial.  In *Hayes v. Brown*, 399 F.3d 972, 987 (9th Cir. 2005), the court, en banc, considered the materiality of a prosecutor's secret agreement (secret even from the testifying witness) to drop felony charges against his star witness in a capital murder trial.  It found the prosecutor's furtive conduct highly relevant and stated: "Presumably, the importance to the State's case of [the witness] James's testimony is what initially led the prosecution to make the secret deal; likewise, the importance to James's credibility of his false testimony regarding the absence of a deal is what led the prosecution to endeavor to keep that deal secret."  These facts include what the proper procedures were and whether they were followed.  "[I]t is the government's, not just the prosecutor's, conduct which may give rise to a *Brady* violation . . . [It] would undermine *Brady* by allowing the investigating agency to prevent production by keeping a report out of the prosecutor's hands until the agency decided the prosecutor ought to have it, and by allowing the prosecutor to tell the investigators not to give him certain materials unless he asked for them."  *United States v. Zuno-Arce*, 44 F.3d 1420, 1427 (9th Cir. 1995).

**B.    When The Government Seeks To Justify Its Conduct Through Declarations That Are Based On Written File Materials That Are Incomplete And Inconsistent It Must Allow Access To The Supporting Documentation In Its Files.**

Disclosure of the material Mr. Sedaghaty seeks is necessary to ensure that his right to due process is met.  The government is seeking to have the Court accept at face value the declarations it has filed and preclude Mr. Sedaghaty from testing the information presented.  This procedure would violate fundamental notions of fairness and run contrary to all established norms.

The government's position is analogous to that of a witness who refuses to respond to questions in cross-examination.  *See Denham v. Deeds*, 954 F.2d 1501, 1503 (9th Cir. 1992) ("[I]f the witness by invoking the privilege precludes inquiry into the details of his direct testimony, there may be a substantial danger of prejudice because the defense is deprived of the right to test the truth of his direct testimony . . ." )(quoting *United States v. Cardillo*, 316 F.2d 606, 611 (2d Cir. 1963)).  The government cannot present its story to the defense and to this Court and not have that account tested.

**C.    The Government Has Waived Any Claim Of Privilege.**

In its response to defendant's motion for discovery, the government relies upon Rule 16(a)(2) in an effort to shield its work product.  CR 530 at 2, 3, 5, 7,

8, 9, 10.  However, the government clearly waived this privilege in the
declarations submitted to the Court on February 18, 2011.

In *United States v. Nobles*, 422 U.S. 225 (1975), the Supreme Court held
that the work product doctrine protects agents for attorneys as well as
attorneys.  In *United States v. Fort*, 472 F.3d 1106, 1120 (9th Cir 2007), the
Ninth Circuit explained that while internal documents prepared by government
attorneys and agents are normally protected by this rule, the "general
principles of waiver" apply.  The court was also careful to explain that the case
did not involve an analysis of the government's *Brady* or other disclosure
obligations.  *Fort*, 472 F.3d at 1110.

In *Fort*, the Court held that voluntary pretrial production of certain
police reports did not waive the government's Rule 16(a)(2) protection.  The
present case is far different.  In its February 18, 2011, declarations,
government attorneys and agents repeatedly discussed the substantive content
of prosecution team meetings and internal government communications
concerning payments of cash to Richard and Barbara Cabral.  Additionally,
Agent Carroll specifically relied upon his "phone log," and Mr. Gorder relied on
his "personal daily log of activity," his "Outlook calendar", his "working file on
Barbara Cabral," and on "certain internal work-product memoranda and
emails generated during the litigation of this case."  Carroll Decl. at 6 (CR 536-
2 at 6); Gorder Decl. at ¶ 2 (CR 536-4 at 2).

**Page 22    DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S POST-
TRIAL DISCOVERY MOTION AND REQUEST FOR AN EVIDENTIARY HEARING**

*Nobles* involved an agent of an attorney, an investigator, testifying as a witness. The Supreme Court articulated the general principle of waiver:

> The privilege derived from the work-product doctrine is not absolute. Like other qualified privileges, it may be waived. Here respondent sought to adduce the testimony of the investigator and contrast his recollection of the contested statements with that of the prosecution's witnesses. Respondent, by electing to present the investigator as a witness, waived the privilege with respect to matters covered in his testimony. Respondent can no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination.

422 U.S. at 239-40.

Since *Fort, supra*, holds that the "general principles of waiver" apply to Rule 16(a)(2), the government cannot be permitted to sustain its unilateral testimonial use of its work-product materials. This Court should allow defendant's request for discovery.

### D.    The Law Cited By The Government Supports Discovery In This Case.

While the government has belatedly made disclosures of critical impeaching information, this disclosure does not negate the concern that there may be additional information that should be revealed to the defense. As the Ninth Circuit recognized in *United States v. Blanco*, 392 F. 3d 382, 387-89 (9th Cir. 2004), concerns can exist as to whether there is additional *Brady* and *Giglio* material that has yet to be disclosed to the defense.

We believe the better course is to flush out the truth from behind
the government's veil an then determine what to do with it in the
light of its implications, if any, with respect to Cabrera-Diaz's
credibility.  Moreover, the government should be required under
these circumstances, for prophylactic reasons at least, to
demonstrate whether it discharged its obligations under *Brady v.
Maryland* and *Giglio* to provide the defense with material
exculpatory evidence within the government's possession,
including evidence that could have been used to impeach the
informant's credibility. . .[W]e may be dealing with the "tip of an
iceberg" of other evidence that should have been revealed . . .
Thus, resolution of this matter is best served by the light of a
hearing, not the darkness of an assumption on appeal.

*Blanco*, 392 F.3d at 393 (quoting *United States v. Bernal-Obeso*, 989 F.2d 331,

332 (9th Cir. 1993))(emphasis added).

Review of the law cited by the government supports the conclusion that

Mr. Sedaghaty's case is the rare case in which discovery should be ordered.

*See, e.g., Velarde*, *supra* (court found that the district court should have

granted discovery because the circumstances of that case warranted it).  In

*Velarde*, just before the defendant's second trial for sexually abusing a minor,

the victim falsely accused a school teacher and vice principal of inappropriately

touching her.  485 F.3d at 554-55.  A school investigation took place, and it

was determined that it was false.  The teacher's union representative told the

FBI about the false accusation before the second trial began and reminded the

FBI agent about his legal obligation to fully disclose this type of evidence.  The

defendant did not learn about this until years after his second trial.  The union

representative wrote an affidavit relaying the above, and the government

countered with an affidavit reporting that the FBI agent never had a conversation with the union representative nor did he know about the false accusations from a second source.  The circuit court recognized that based on what the defendant had by way of affidavit was probably not enough to hold an evidentiary hearing without more information.  *Velarde*, 485 F.3d at 560.  The court concluded that the case presented the circumstances in which discovery is appropriate.  *Id.*

The government cites to several cases where discovery was not granted. These cases all reflect factual situations that are vastly different in nature and involve far less evidence of government action compared to the present case.  In *Wade*, the Supreme Court agreed that discovery was not warranted because the defendant did not meet the appropriate threshold because "[h]e has never alleged, much less claimed to have evidence tending to show, that the Government refused to file a motion for suspect reasons such as his race or religion."  504 U.S. at 186.  *United States v. Thompson*, 335 Fed. Appx. 876, 878-79 (11th Cir. June 30, 2009) involved a situation where many years after the defendant's conviction, the police officers (from defendant's case) were convicted of several civil rights violations in a case entirely unrelated to defendant's case.  The court found that the defendant presented no evidence that any of the officers behaved badly during any part of the defendant's case.

**Page 25    DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S POST-TRIAL DISCOVERY MOTION AND REQUEST FOR AN EVIDENTIARY HEARING**

*Thompson*, 335 Fed. Appx. at 881.  Therefore, the defendant should not get a new trial, nor an evidentiary hearing.  *Thompson*, 335 Fed. Appx. at 881.

As cited above, Judge Redden held in *Ail,* 2007 WL 1229415 *3 that "to obtain discovery in support of an outrageous misconduct claim, a 'defendant must present "clear evidence to the contrary" to the presumption that the prosecutor has not violated the Constitution.'"  Judge Redden, after ordering the government to provide numerous materials to be reviewed in camera, found that upon review of the documents, the defendants' contention that the government's facilitation of transactions involving stolen merchandise did not sufficiently demonstrate "clear evidence" of outrageous governmental misconduct so as to compel the government to disclose all internal documents related to the investigation.  *Ail*, 2007 WL 1229415 *4.

Unlike the defendants in the cases cited by the government, Mr. Sedaghaty has presented clear evidence to support the claim that the government has violated the Constitution.  Discovery is necessary in this rare case.

### E.    An Evidentiary Hearing Is Required.

Mr. Sedaghaty agrees with the government that the decision to hold a hearing or proceed by affidavit is within the discretion of the trial court.  But, contrary to the government's position, the *Brady* issue in this case cannot be resolved by declaration/affidavit alone.  Discovery must be ordered, subpoenas

issued, and an evidentiary hearing must be held.  There are several factual assertions in this case that cannot be resolved via declaration/affidavit.  Some of these have been identified above.

Most importantly, the issue of payment of a government witness is not cumulative of anything presented at trial, nor can it be claimed that the government was unaware of these facts. *United States v. Nace*, 561 F.2d 763, 772 (9th Cir. 1977) (no need to hold a hearing because the statement  was simply "further impeachment" evidence, of which the prosecution had no knowledge of); *United States v. Alexander*, 695 F.2d 398, 402 (9th Cir. 1982) (proceeding by affidavit acceptable because the impeaching evidence was cumulative as that witnesses was already impeached at trial by another witness);  *United States v. Colacuricio*, 499 F.2d 1401, 1406 (9th Cir. 1974)(court held an evidentiary hearing even though third person statement was a weak showing in the motion for new trial).  The *Brady* violation has not been cured by the government's disclosure of the bare facts of the violation. Further examination, by way of discovery and an evidentiary hearing is necessary to determine the extent of the *Brady* violation in this case.

## IV.    ADDITIONAL REPLIES TO THE GOVERNMENT'S RESPONSE ON SPECIFIC DISCOVERY PARAGRAPHS

The government's response raises a number of specific issues with respect to paragraphs in Mr. Sedaghaty's discovery motion.  This section of his reply addresses those concerns.

Discovery Paragraph 3.  The I.R.S. manual on payments to informants should be disclosed notwithstanding the statement that the I.R.S. did not make any informant payments because Agent Anderson was present for, and aware of, payments to the Cabrals in a case in which she was one of two primary agents.

Review of the manual is necessary to determine what obligation is placed on Agent Anderson in this situation

Discovery Paragraphs 5-8.  The government argues that these requests for notes, memos, etc. are overly broad.  They are not. They are, rather, specifically related to Richard and/or Barbara Cabral and the government's interactions with them.  These interactions, and the decisions that resulted from these interactions, led up to the failure to disclose the facts at issue in this case.  These facts are relevant to Mr. Sedaghaty's motion to dismiss for outrageous government misconduct.

The government's suggestion that the Court could review this information in camera should be rejected.  There is no basis to keep this

information from the defense.  As stated in *Alderman v. United States*, 394 U.S.

165, 182 (1969),

> An apparently innocent phrase, a chance remark, a reference to
> what appears to be a neutral person or event, the identity of a
> caller or the individual on the other end of a telephone, or  event
> he manner of speaking or using words may have special
> significance to one who knows the more intimate facts of an
> accused's life.  And yet that information may be wholly colorless
> and devoid of meaning to one less well acquainted with all relevant
> circumstances.  Unavoidably, this is a matter of judgment, but in
> our view the task is too complex, and the margin for error too
> great, to rely wholly on the in camera judgment of the trial court to
> identify those records which might have contributed to the
> Government's case.

*See also Dennis v. United States*, 384 U.S. 855, 874-75 (1966) "[It is not]

realistic to assume that the trial court's judgment as to the utility of material

for impeachment or other legitimate purposes, however conscientiously made,

would exhaust the possibilities. In our adversary system, it is enough for

judges to judge.  That determination of what may be useful to the defense can

properly and effectively be made only by an advocate.").

    Discovery Paragraph 9.  The government takes issue with the form of

this request for information on the treatment of the Cabrals as informants,

referring to it as a "civil-like interrogatory" and that they need not respond.

While the government may not be required to "create" materials that do not

exist, the government overreaches when it claims that it need not respond to

those types of requests.  The government's reliance on *United States v.*

*Cameron*, 672 F. Supp.2d 133, 137-38 (D. Me. 2009) is misplaced.  First, that case involved a traditional pretrial discovery matter.  Second, the actions of government agents that could lead to a new trial or dismissal was not an issue. Third, even in that situation, the court did not dismiss the discovery request out of hand.  The court stated: "[T]herefore, [the court] has interpreted the interrogatory-like demands as only asking for existing documents or existing tangible items.. . . If the document would be discoverable if it exists, the Court orders the Government to turn it over.  If an otherwise discoverable document does not exist, the Court will not require the Government to manufacture it." *Cameron*, 672 F.Supp. 2d at 138.  Its ruling was based, in part, on facts that do not exist here.  There, the government had made affirmative representations that it was engaged in open file discovery.  Here, pretrial the government affirmatively stated that this was not an open file case and discovery was hotly contested.  In this post-trial matter, while the government has provided reports on interviews of the Cabrals, it has provided no reports on the relevant facts of its agents and attorneys' actions.  It is very likely that documents exist that memorialize the information sought above.  The government should provide any documents that relate to the above request.

Discovery Paragraph 10.  The government answer appears satisfactory.

Discovery Paragraph 11.  *See* reply to 9.

Discovery Paragraph 13.  It appears from Agent Carroll's declaration that he, or others in the FBI performed some investigation into Cabral's medical condition at some point after October 4, 2010.  Given the inconsistencies in the descriptions of her condition and the large sum allegedly expended by her, any information gathered by the government about her condition should be produced.

Discovery Paragraphs 14 and 15.  The government states that it does not possess these records.  Mr. Sedaghaty will seek them elsewhere.

Discovery Paragraph 16.  The government response is satisfactory.

Discovery Paragraph 17.  With respect to the notes disclosed on January 6, 2011, beyond what was redacted, questions exist regarding some of the notations on the handwritten notes that were provided to the defense on January 6, 2010.  Inspection of the originals is necessary.

Discovery Paragraph 18.  The answer is satisfactory.

Discovery Paragraph 19.  The government should be required to produce any telephone records it has of phone calls to or from the Cabrals.  Mr. Sedaghaty will seek non-governmental records elsewhere.

Discovery Paragraph 20.  The government states that no other witnesses were paid.

Discovery Paragraph 21.  United States Attorney Holton's declaration explains what steps his office has taken.  The other declaration states that

supervisory FBI agents were involved in the investigation at least from December 2010 on.  Information is required from those individuals.

Discovery Paragraph 22.  A full inquiry by some independent entity or full disclosure as sought herein and a full evidentiary hearing before this Court are required for the reasons set forth in this pleading.

## CONCLUSION

For all of the reasons set forth herein and in his earlier pleadings, the Motion for Discovery should be granted.

Respectfully submitted on February 23, 2011.


/s/ Steven T. Wax
Steven T. Wax
Federal Public Defender


/s/ Lawrence H. Matasar
Lawrence H. Matasar

Michelle Sweet
Assisting on the Memorandum