Lawrence Matasar, OSB #74209
621 S.W. Morrison Street, Suite 1025
Portland, OR 97205
Telephone: (503) 222-9830
Fax: (503) 274-8575
Email: larry@pdxlaw.com

Steven T. Wax, OSB #85012
Federal Public Defender
101 SW Main Street, Suite 1700
Portland, OR 97204
Tel: (503) 326-2123
Fax: (503) 326-5524
Email: steve_wax@fd.org
Attorneys for Pirouz Sedaghaty

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | Case No. CR 05-60008-HO |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | DECLARATION OF JAMES J. WEDICK |
| | ) | |
| **PIROUZ SEDAGHATY** | ) | |
| | ) | |
| Defendant. | ) | |

I, James J. Wedick do declare as follows:

1. I was employed with the FBI from 1969 until 2004. During my almost 35-years with the Bureau, I've received numerous performance awards, including the prestigious Directors Award for "Outstanding Investigation," concerning a three-year undercover probe of the California State Legislature resulting in the conviction of four

[4] California State Senators, as well as the Assembly Minority Leader and I was nominated by the U.S. Attorney, in Sacramento, California for the Attorney General's Award as "Criminal Investigator of the Year." Retiring from the FBI as a squad supervisor, in April, 2004, Attorney General [AG] John Ashcroft personally recognized my accomplishments stating my investigations, "...were models for other agents to emulate," and my performance was in the "highest traditions of the Department of Justice [DOJ] and the FBI." Attached is a copy of AG Ashcroft's letter, dated April 30, 2004, as well as a copy of my Curriculum Vitae [CV].

2. I have reviewed and agreed in writing to the Court's December 18, 2007 Protective Order.

3. I have reviewed the pleadings filed by the government on February 18, 2011, including the declarations of David A. Carroll, Dwight C. Holton, Charles F. Gorder, Jr., Christopher L. Cardani, and Colleen Anderson.

4. I have been involved as an FBI agent in many cases involving Confidential Informants [CIs], Cooperating Witnesses [CWs], and FBI Undercover Agents, including cases where the FBI has paid CIs and CWs.

5. In accordance with FBI Policy & Procedure in connection with paying a Confidential Informant [CI] and/or a Cooperating Witness [CW], in routine situations, on each occasion, agents must first secure the opinion of an appropriate Assistant U.S. Attorney [AUSA] or Justice Department official connected with an investigation and, thereafter, confirm "in writing" their opinion, before any payment can be authorized and made by a Bureau official. Documents confirming the opinion should then be serialized in the Bureau's files and presumably the files of the appropriate Assistant U.S. Attorney and/or Justice Department official responsible for the investigation. In emergencies, payments can be made to CIs and or CWs based on an AUSA's verbal approval, but the opinion must still be confirmed in writing within several days.

6. Failure to obtain an "opinion" from an appropriate Justice Department official concerning making a payment to a Confidential Informant [CI] and/or a Cooperating Witness [CW], in my experience, would prevent a local FBI Special Agent-in-Charge and/or official at FBIHQ from authorizing a payment to a CI and/or CW.

7. Contrary to Special Agent [SA] David Carroll's declaration dated February 9, 2011, wherein he recites receiving only broad authorization in his interaction with AUSA Cardani when he states on page 10, "This was confirmed via letter to the U.S. Attorney's Office dated, November 4, 2003 ... [which] did not specify any amount or timing of payments or promises that payments would be made," in my opinion violates FBI Policy & Procedure, since payments can only be made to a CI and/or CW, on a case by case basis [given the facts and circumstances surrounding each payment] and "not" based on a single, broad authorization made by an Assistant U.S. Attorney when an agent seeks an opinion concerning using someone as a CI and/or CW.

8. SA Carroll's declaration describes seeking the specific authorization that is required when he acknowledges on pages 6 through 8, that during period December 7 thru December 8th, in an effort to make a monetary payment to Barbara Cabral, he had a number of conversations with officials at the U. S. Attorney's Office.

9. AUSA Christopher L. Cardani's declaration dated February 15, 2011, wherein he states on page 2, "During the Sedaghaty investigation ... [he] concurred with the FBI's decision to use Richard Cabral as a source of information and to pay him for his services and expenses ... [and he] did not learn the details ... [concerning] amount[s], circumstances or dates of payments to Richard Cabral until after the Sedaghaty trial," is inconsistent with FBI Policy & Procedure that SA Carroll was required to speak with AUSA Cardani in every instance where he sought to make a payment to Cabral and, thereafter, each conversation was required to be confirmed in writing, to include amounts of compensation and facts discussed.

10. Additionally, the declarant states in accordance with FBI Policy & Procedure, in order to make a payment to a Confidential Informant [CI] and/or a Cooperating Witness [CW], agents must first make contact with the prosecutor responsible for an investigation and discuss with them details concerning any proposed payment, to include the amount of any payment. After obtaining authorization, agents must thereafter confirm the prosecutor's opinion in writing, to include the details of their conversation noting some CIs and/or CWs might have been paid more than once so the conversation will also include prior payments, total amounts, and other details.

11. Because I was a squad supervisor for approximately 7-years and my duties included signing documents seeking SAC approval to make payments to witnesses, which also included communications documenting conversations between agents and prosecutors authorizing payments to Confidential Informants [CIs] and Cooperating Witnesses [CWs], in my experience the combined declarations of the prosecutors mentioned above concerning their lack of knowledge regarding the specifics of individual witness payments is incredibly "unusual," in particular as demonstrated in remarks made by AUSA Cardani stating, "I did not learn the details of the amount, circumstances or dates of payments to Richard Cabral until after the Sedaghaty trial;" or AUSA Gorder stating, "At some point during those discussions with AUSA Cardani and Special Agents Carroll and Anderson, I learned in general terms that Richard Cabral had been previously paid by the FBI for his service as a confidential source ... [but] I do not specifically remember when I learned that information and ... do not recall knowing ... [the] details of ... [any] payment[s]."

12. Additionally, the declarant states in connection with this investigation, he would be in a better position to offer the Court and counsel more input as to the conduct involved in this case if he was able to review the underlying documents concerning payments made by the FBI to individual witnesses.

13. Also, in accordance with documenting information received from a witness, including a Confidential Informant [CI] and/or a Cooperating Witness [CW], the declarant states the FBI's Manual of Administrative Operations and Procedures [MAOP] mandates information received in which a "witness may testify," and/or "...information which may be the subject matter of testimony of an FBI Agent, other FBI employee, or non—FBI employee involved in an investigation," that information should be reported using Form FD-302.

14. Additionally, the declarant states when making contact with a Confidential Informant [CI] and/or Cooperating Witness [CW], FBI agents are required to document those contacts using an FBI form also referred to as a, "contact sheet." And as noted above, when a CI and/or CW provides information that could become the subject matter of testimony, in accordance with the FBI's MAOP, agents are required to document/report that information on Form FD-302 and thereafter attach same to the contact sheet which is then filed in the appropriate CI and/or CW file.

I declare the above statement consisting of this and four [4] other pages are true and correct under the laws of the United States.

Dated: March 1, 2011

JAMES J WEDICK



# Office of the Attorney General

Washington, D. C. 20530

April 30, 2004

Supervisory Special Agent James J. Wedick, Jr.
Federal Bureau of Investigation
4500 Orange Grove Blvd.
Sacramento, CA 95841

Dear Jim:

Thank you for your service and your outstanding career spanning more than 31 years with the Federal Bureau of Investigation, culminating with your service for the past several years as a Supervisory Special Agent in the Sacramento Field Division.

You have a very impressive list of accomplishments, beginning as a young agent in the Indianapolis Field Division, and then in Sacramento. Your success on the undercover assignment Operation Fountain Pen, and the investigation that followed, led to your appointment in an undercover role in the ABSCAM investigation, one of the most prominent and successful public corruption prosecutions in our history. In Sacramento, your investigations of organized crime figure Joe Bonanno, California State Teachers' Retirement System Chairman Gil Chilton, Operation REZONE in Fresno and Clovis, and Operation BRISPEC were models for other agents to emulate. Your involvement in this operation rightly earned you the FBI Director's Award for Outstanding Criminal Investigation and a nomination by the U.S. Attorney for the Attorney General's Award as Criminal Investigator of the Year.

Throughout your career, your performance has been in the highest traditions of the Department of Justice and the Federal Bureau of Investigation. Congratulations on your retirement and thank you for your service to the nation.

Sincerely,

John Ashcroft

John Ashcroft
Attorney General

**JAMES J. WEDICK**
**WEDICK & ASSOCIATES**
**11230 Gold Express Drive, Suite 310**
**Gold River, CA 95670-4484**
**916.638.3566 [Direct] 916.290.0999 [Fax]**
**jwedick@FBIexpert.com**
**www.FBIexpert.com**
**FBI INVESTIGATIONS; WHITE-COLLAR-CRIME [WCC]; FRAUD**

# CURRICULUM VITAE

## EDUCATION:

B.S., College of Business Administration, Fordham University, New York City, NY, 1972.

## FEDERAL BUREAU OF INVESTIGATION (FBI):

12/1969 – 5/1973 Assigned to the FBI's New York Field Division supporting ongoing criminal investigations—performing administrative and clerical tasks.

5/1973 – 8/1973 Attended new agent's training at the FBI's Academy, in Quantico, VA.

8/1973 – 9/1974 Following new agent's training, assigned to the Indianapolis Field Division at Indianapolis, responsible for investigating violations of federal criminal statutes, including Bank Robbery, Fugitives, Interstate Transportation Stolen Property, and/or Thefts From Interstate Shipment.

9/1974 – 1976 Assigned to the Indianapolis Field Division at the Gary, Indiana Resident Agency [RA], responsible for investigating criminal matters, including Bank Robbery, Fugitives, and/or Thefts From Interstate Shipment Thefts.

1976 – 7/1978 Assigned to the Indianapolis Field Division at the Gary, Indiana Resident Agency [RA]—doing "undercover" work in connection with ongoing assignment—responsible for investigating crime figures whose notoriety included preferences for trotting the globe and orchestrating multi-million fraud schemes. Jointly responsible for initiating case code named, "OPFOPEN [OPERATION FOUNTAIN PEN – Major Case #1]," permitting the FBI and various members of the international law enforcement community to investigate/prosecute known swindlers, including PHILLIP KARL KITZER, JACK ELLIOTT, and JEAN CLAUDE CORNAZ both in the United States and Europe. Case also earmarked the Bureau's effort to pursue "quality" long-term investigations and was the precursor to the ABSCAM investigation where several members of Congress were prosecuted for soliciting "bribes."

1978 – 1997 Responsible for pursuing some of California's most celebrated and complex White-Collar-Crime [WCC] and Organized-Crime [OC] prosecutions, using both "conventional" and "undercover" means of investigation, including the use of Confidential Informants [CIs], Cooperating Witnesses [CWs], and FBI Undercover Agents—many electronically "wired" for sound—all in an effort to collect evidence, gather/analyze intelligence, and/or conduct "sensitive" investigations where prosecutions had been authorized by the U.S. Department of Justice and the FBI.

10/1997 – 4/2004 Assigned to supervise/manage the FBI's Sacramento based Corruption Squad totaling approximately14 FBI Agents and 7 support personnel responsible for investigating/prosecuting approximately 350 criminal cases with losses totaling in excess of $500 million. Also, at the request of the FBI's Office of Professional Responsibility [OPR] conducted various *internal affair* investigations involving employees suspected of criminal behavior, employee violations of FBI Policies & Procedures, malfeasance, and/or suspected unethical behavior and/or illegal activity.

2001 – 4/2004 White-Collar-Crime [WCC] Program Coordinator responsible for monitoring Sacramento's resources totaling 35 FBI Agents and 10 support personnel were used to investigate/prosecute White-Collar-Crime within California's Central or San Joaquin Valley from Bakersfield to Redding, California involving prominent lending-institutions, corporations, government agencies, insurance companies, money laundering, mail/wire fraud, corruption, members of Organized Crime [OC], telemarketing, intellectual property crimes, securities fraud, ID theft, economic espionage, and/or health care fraud.

**PROFESSIONAL ACCOMPLISHMENTS:**

1974 – Using a Confidential Informant [CI], located an "illegal" chop-shop operation—solving numerous pending truck cases in both the Chicago and Indianapolis Divisions—recovering diesel engines, cut-up cabs, and loads of steel—all valued in excess of hundreds of thousands of dollars.

1975 -1976 Using Confidential Informants, located/arrested JAMES ROOSEVELT KEEBE and JAMES EDWARD BEARD—two dangerous fugitives wanted in connection with fleeing local authorities to avoid confinement or prosecution. KEEBE was sought as an escapee from an Alabama prison and BEARD was wanted in connection with a double-homicide, in which he reportedly executed two men after they were dragged from their homes because of a dispute.

1977 – Using a Confidential Informant to help establish criminal bona-fides—penetrated a group of professional swindlers—causing federal prosecutors to charge a number of individuals both in the United States and Europe with selling "bogus" securities in an effort to defraud numerous banks. Initiated case code named, "OPFOPEN [OPERATION FOUNTAIN PEN – Major Case #1], enabling the Justice Department to investigate/prosecute a number of international conmen, including PHILLIP KARL KITZER, PAUL CHOVANEC, JACK ELLIOTT, JEAN CLAUDE CORNAZ, ANDREW D'AMATO, ARMAND MUCCI, FREDERICK PRO, SY GUTHIE, JOSEPH TROCCHIO and SONNY SANTINI. Case involved extensive liaison with executive management at FBIHQ, various Legal Attaché Offices located in Europe, U.S. Department of Justice, INTERPOL, and members of the International Law Enforcement Community.

1978 – Brief undercover roles in the FBI's ABSCAM probe—working closely with MEL WEINBERG—in a case where swindlers sought to use "bogus" gold certificates to secure funding. While the ABSCAM investigation was originally designed to investigate/prosecute professional swindlers as in the OPFOPEN case, the focus of the investigation changed when one defendant suggested a member of Congress was seeking "bribe" payments.

1980 – Undercover agent in horserace "fixing" probe code named OVERDUE that concerned several individuals associated with Organized Crime [OC] suspected of "fixing" races. The investigation used a variety of sophisticated law enforcement techniques to collect evidence, including a year-long FBI Undercover Operation, Confidential Informants, and the Use of Electronic Devices in order to Record/Monitor conversations between suspects and FBI Undercover Agents. Prosecution was "declined," when horses used in the operation became disabled and investigators could not establish systemic corruption warranting a federal prosecution.

1981 – 1987 Using Confidential Informants and several Cooperating Witnesses, initiated investigation concerning a local bar being used to recruit "bogus" jack-pots by a slot-cheating ring—defrauding millions from Nevada casinos. Subsequent investigation caused Nevada prosecutors to charge sixteen [16] defendants, including Organized Crime [OC] figure JOHNNIE VACARRO with defrauding almost $8 million from casinos. After executing several search warrants and placing witnesses in the Witness Security Program, assisted the Las Vegas Division with RICO prosecution noting witnesses testified more than 1500 jack-pots were collected during a 5-year period.

1982 – Shortly before the FBI was given concurrent jurisdiction in narcotics investigations, was appointed to monitor/coordinate investigations with DEA for the FBI in the Sacramento Division. Was undercover agent in major narcotics investigation undertaken by the FBI's Mobile Division charging/convicting two individuals with distribution/sales concerning methamphetamine.

1982 – 1986 Using a Cooperating Witness "wired" for sound, investigated/prosecuted JOSEPH CHARLES BONANNO JR. and SALVATORE V. BONANNO with conducting an illicit wire/mail fraud scheme—defrauding investors hundreds of thousands of dollars located in California and Utah. The BONANNOs were sons of New York mobster JOE BONNANO who at one time controlled the BONNANO crime family. Following the presentation of the government's case, trial jurors returned "guilty" verdicts concerning JOSEPH CHARLES BONANNO and three [3] associates, but acquitted SALVATORE V. BONANNO.

1982 – 1986 Using a Cooperating Witness "wired" for sound, investigated/prosecuted former California State Teachers' Pension Fund Executive GILBERT WINFIELD CHILTON with soliciting/receiving a $1-million "bribe" in exchange for orchestrating a $50 million loan to a Denver area con-man. Case received extensive media attention including articles in the WALL STREET JOURNAL and BARRONS News Magazine.

1984 – 1985 Upon receiving allegations suggesting "elected" members of the CALIFORNIA STATE LEGISLATURE were soliciting bribes in exchange for introducing/supporting legislation, authored GROUP I FBI "undercover" proposal seeking authority to conduct "sting" operation, using FBI Undercover Agents, Cooperating Witnesses [CWs], Fictitious Bank Accounts, and Electronic Devices to record/monitor conversations, and draft "bogus" legislation to expose illicit bribery schemes.

1985 – 1988 Code named SHRIMPSCAM by the media, conducted 3-year "undercover" probe—collecting evidence and corroborating allegations—indicating certain "elected" members of the CALIFORNIA STATE LEGISLATURE had solicited "bribes" in exchange for introducing two "bogus" measures sought by a fictitious FBI company.

1985 – 1990 Responsible for probe involving Sacramento County Board Chairman WILLIAM MILROY BRYAN suspected of violating federal corruption statutes and California's 1974 Fair Political Practices Act. On June 29, 1988, WILLIAM BRYAN along with cable-TV contractor JOSEPH PARKS were both "indicted" by the Federal Grand Jury [FGJ], Eastern District of California [EDC], Sacramento and charged with Conspiracy and violations of the federal Travel Act inasmuch as BRYAN traveled to both Washington DC and New York City, NY in an effort to influence Sacramento's cable-TV contract—using PARKS as a component. As alleged in the Indictment, on June 22, 1990, PARKS pled "guilty" as did BRYAN on August 14, 1990. BRYAN was also charged with False Statements and Obstruction of Justice, where on July 8, 1990 he pled guilty to making False Statements.

1988 – Executed seven [7] search warrants inside California lawmakers' offices at the State Capitol, on August 24, 1988, concerning California State Senators' JOSEPH B. MONTOYA, FRANK C. HILL, ALAN E. ROBBINS, PAUL BRUCE CARPENTER, and California Assemblyman PATRICK NOLAN—all suspected of taking "bribe" payments in the SHRIMPSCAM probe.

1989 – 1990 Successfully investigated/prosecuted California State Senator JOSEPH B. MONTOYA with violations of the RICO, Money Laundering, and Hobbs Act - Extortion statutes. On April 23, 1990 Senator MONTOYA was sentenced to 78 months incarceration, 3-years probation, fined $35,000 and ordered to make restitution totaling $8000.

1990 – 1991 In the SHRIMPSCAM probe, successfully prosecuted TYRONE NETTERS and DARRYL FREEMAN with violations of the RICO, Money Laundering, and Hobbs Act – Extortion statutes. Following a 2-month trial, NETTTERS was sentenced to 24 months incarceration, placed on 3-years probation, and fined $5000. Defendant FREEMAN was sentenced to 51 months incarceration, 4-years probation, fined $450, and ordered to forfeit $15,600.

1991 – As case agent, assisted prosecutors with securing "guilty" plea arrangement with California State Senator ALAN E. ROBBINS concerning violations of the RICO and Tax Fraud statutes. ROBBINS also agreed to voluntarily record conversations if he was approached by special interests with a "bribe" in an effort to secure/influence legislation. Because ROBBINS agreed to wear a wire and record conversations—in accordance with FBI Policies & Procedures—the case agent was required to monitor/direct ROBBINS [now a cooperating witness] so conversations were "only" recorded when agents had the appropriate "predication." Agents did "not" have authority to record conversations while lawmakers, staff members, constituents, and/or other individuals discussed legitimate issues with ROBBINS inside the state Capitol.

1991 – Initiated investigation concerning Sacramento lobbyist CLAYTON R. JACKSON after California State Senator ALAN E. ROBBINS advised he suspected JACKSON might offer him a "bribe" concerning workers-comp legislation.

1991 – Filed Information charging California State Senator ALAN E. ROBBINS with one [1] count violation of the RICO and Tax Fraud statutes. Thereafter, on December 16, 1991, ROBBINS pled "guilty" to RICO and Tax Fraud violations and resigned his position as a California State Senator.

1992 – 1993 Conducted investigation resulting in multi-count Indictment being returned charging California Coastal Commission [CCC] member MARK L. NATHANSON with "extorting" Hollywood celebrities actor/director SYLVESTER STALLONE, music composer BURT BACHARACH, lyricist CAROLE BAYER SAGER, entertainment moguls JEFFREY KATZENBERG, BARRY DILLER, and DAVID GEFFEN, movie-producer BLAKE EDWARDS and wife JULIE ANDREWS, SANDY GALLIN [business manager for MICHAEL JACKSON], and IRWIN WINKLER—producer of the ROCKY film sequels. On June 3, 1993, NATHANSON appeared before U.S. District Court Judge LAWRENCE KARLTON, Eastern District of California, Sacramento, and pled "guilty" to violations of the RICO, Hobbs Act-Extortion, Money Laundering, and Tax Fraud statutes and, thereafter, was sentenced to 57-months incarceration, 3-years probation, fined $84,000, and ordered to make restitution totaling $116,000.

1993 – 1994 Secured twelve [12] count Indictment returned by Federal Grand Jury [FGJ], Eastern District of California [EDC], Sacramento charging Sacramento lobbyist CLAYTON R. JACKSON and former California State Senator PAUL B. CARPENTER with violations of RICO, Mail Fraud, and Obstruction of Justice statutes. During a 2-month jury trial [that commenced October 12, 1993], the investigating agent worked closely with prosecutors presenting evidence, including providing testimony and playing recorded conversations wherein JACKSON offered ROBBINS a $250,000 "bribe" in an effort to move workers comp legislation from one Senate select committee to another. On December 1, 1993, trial-jurors found both defendants "guilty" as charged. On February 14, 1994, U.S. District Court Judge EDWARD J. GARCIA sentenced JACKSON to 78-months incarceration. Because CARPENTER failed to appear for sentencing, Judge GARCIA issued a bench warrant for his arrest. From the bench, Judge GARCIA indicated CARPENTER had sent a letter to the court indicating rather than risk being sent to prison, he was fleeing the jurisdiction of the United States Government.

1993 – 1994 Secured multi-count Indictment, on April 27, 1993, returned by Federal Grand Jury [FGJ], Eastern District of California [EDC], Sacramento charging California State Assembly Minority Leader PATRICK J. NOLAN, California State Senator FRANK C. HILL, and Sacramento lobbyist TERRY E. FROST with violations of the RICO, Conspiracy to Commit Extortion, Hobbs Act-Extortion, and Money Laundering statutes. Also, assisted prosecutors with negotiating plea agreement, wherein on February 18, 1994, Assemblyman NOLAN pled "guilty" to one [1] count violation of the RICO statute in exchange for a recommended prison sentence totaling 33-months, 3-years probation, and fined $10,000. Following 2-month jury trial, on June 16, 1994, defendants HILL and FROST were found "guilty" as charged, with HILL later being sentenced to 48-months incarceration, 3-years probation, and $2,500 fine and FROST sentenced to 21-months incarceration, 3-years probation, and $2,000 fine.

1994 – 1995 Assisted local authorities in Costa Rica with locating/arresting former California State Senator PAUL B. CARPENTER, on April 14, 1994—just two months after his disappearance. When CARPENTER previously "failed" to appear for his sentencing hearing on federal corruption charges, U.S. District Court Judge EDWARD J. GARCIA, Eastern District of California [EDC], Sacramento issued a bench warrant for his arrest. In accordance with the Costa Rican/U.S. Extradition Treaty, on November 18, 1994 Costa Rican authorities returned CARPENTER to the United States and on January 17, 1995, Judge GARCIA sentenced CARPENTER to 85-months incarceration, 3-years probation, and $25,000 fine.

1994 – 1999 Using a Cooperating Witness "wired" for sound, initiated probe code named REZONE in the Fresno-Clovis, California area that concerned local officials, land owners, and developers soliciting, receiving, and/or paying "bribes" in exchange for favorable zoning. During the course of the probe, the REZONE investigation caused twenty-six [26] Indictments to be returned and/or criminal Informations to be filed—charging seventeen [17] individuals—including elected officials, land owners, and developers with fourteen [14] defendants pleading "guilty" to violations of the federal RICO, Mail Fraud, Witness Tampering, Obstruction of Justice, Bankruptcy, and Tax Fraud statutes. Additionally, following a jury trial, two defendants were found "guilty," with a third sentenced utilizing pre-trial diversion. Also, at the time of one defendant's "guilty" plea, he was found responsible for the largest bankruptcy fraud in the district's history totaling more than $6.5 million.

1998 – 1999 Choreographed plan to investigate/prosecute medical-providers defrauding the Medi-Cal Program wherein the average violator defrauded the program $700,000 or more and personally presented same to California Governor GRAY DAVIS who not only endorsed the plan, but included same in his State of the State Address in January 1999.

1998 – 2001 Was responsible for designing three [3] Health Care Fraud Initiatives code named PHONY PHARM, UNWHOLESUM, and BLOOD SPIN resulting in three-hundred twenty-four [324] medical providers being prosecuted responsible for defrauding funds totaling in excess of $228 million from California's Medicaid Program.

2000 – At the request of California Governor GRAY DAVIS, on September 5, 2000 helped commemorate into law Assembly Bill [AB] 1098 that gave California authorities the ability to pursue grand jury investigations concerning health care fraud violations—a law enforcement tool long enjoyed by federal authorities, including both the FBI and U.S. Department of Justice.

2000 – 2003 Responsible for supervising investigation concerning allegations suggesting the REDDING MEDICAL CLINIC had conducted many "unnecessary" heart related medical procedures. Subsequent investigation later caused TENET HOSPITALS to reach civil settlement with the U.S. Attorney's Office totaling $54 million—which at the time represented the *largest* recovery secured by the U.S. Department of Justice concerning the Medicaid Program.

2001 – Squad secured more Health Care Fraud "convictions" than any other FBI Field Division and placed 2nd concerning Indictments/Informations returned/filed—even though divisions like New York and Los Angeles had three times the amount of agent resources assigned to investigate Health Care Fraud.

9/2001 – Following the September 11th Terrorist attacks assisted with supervising the FBI's Command Post [CP], in Sacramento, California noting activities included authorizing terrorist related investigations, discussing investigations with FBIHQ and various Field Divisions, and monitoring manpower assignments.

2003 – Received recommendation from various elected officials, two former U.S. Attorneys, and the local U.S. Attorney's Office to head California's Homeland Security under the administration of Governor Arnold Schwarzenegger.

4/2004 – After almost 35-years employment, retired from the FBI and opened WEDICK & ASSOCIATES—a consulting and licensed private investigations agency.

2005 – Retained as FBI *consultant* and *expert witness* in terrorism prosecution before U.S. District Court Judge Garland Burrell, Eastern District of California [EDC], Sacramento concerning defendants UMER and HAMID HAYAT charged with making False Statements and Supporting Terrorist Activities. The HAYATs were represented by attorneys JOHNNY L. GRIFFIN III and WAZHMA MOJADDIDI.

2005 – 2007 Assisted in-house counsel at BARCLAYS GLOBAL INVESTORS and lawyers at PAUL, HASTINGS, JANOFSKY & WALKER LLP, both San Francisco with internal affairs investigation regarding a "dismissed" employee.

2006 – Assisted HAYAT defense team with two-month jury trial before U.S. District Court Judge Garland Burrell, EDC, Sacramento, CA. While HAMID HAYAT was found *guilty* as charged, UMER HAYAT was later *released* after jury was *unable to render* verdict and he pled guilty to a US Customs violation. Immediately following trial, the writer secured juror affidavits indicating *racial bias* and *outside influences* affected the jury's verdict which also became the basis for a *misconduct* motion. In December 2008, the HAYAT case was still under appeal in the 9th Circuit Court of Appeals, San Francisco.

8/2006 – 9/2006 Retained by the Law Firms of DLA PIPER RUDNICK GRAY CARY US LLP and STEVENS & O'CONNELL LLP for assistance with civil litigation involving client in employee suit.

10/2006 – Retained by the Law Firm of FENWICK & WEST LLP, Mountain View, CA to conduct investigation concerning fraudulent website and conduct interview.

11/2006 – 1/2007 Retained by the Law Firm JENNINGS, STROUSS & SALMON as *FBI consultant* and testified as an *expert witness* concerning FBI Policies & Procedures in ongoing matter before an Arizona Administrative Law Judge, Phoenix, AZ. Issue concerned client who had pending matter concerning the Arizona Department of Gaming.

11/2006 – 5/2008 Retained as *FBI consultant* and testified as an *expert witness* concerning FBI Policies & Procedures at *evidentiary* hearing before U.S. District Court Judge SYLVIA RAMBO, Central District of Pennsylvania [CDP], Harrisburg, PA. in ongoing *appeal* of FRANKLIN C. BROWN represented by the Law Firm of DERSHOWITZ, EIGER, & ADELSON, New York City, NY.

12/2006 – 1/2007 Retained by CARLTON DISANTE & FREUDENBERGER LLP, Irvine, CA as *FBI consultant* and *expert witness* concerning FBI Policies & Procedures in ongoing civil lawsuit in California Superior Court. Issue concerned criminal records and National Crime Information Center maintained the FBI.

3/2007 – Made presentation and provided training concerning, "The Use Confidential Informants and Cooperative Witnesses," to investigators/auditors at the Office of Inspector General [OIG], Tennessee Valley Authority [TVA], Memphis, TN.

4/2007 – Invited/Attended panel discussion at UCLA LAW SCHOOL concerning Immigrant Communities and Reduced Evidentiary Standards in Terrorism Cases and The Effects US Domestic Policy has on Immigrant Communities Post 9/11.

7/2007 – 8/2007 Retained by STOEL RIVES LLP to conduct investigation for the MADERA IRRIGATION DISTRICT, Madera, CA.

9/2007 – 11/2007 Retained as *FBI consultant* and testified as an *expert witness* concerning FBI Policies/Procedures in *deportation* proceedings before U.S. Immigration Judge WALTER A. DURLING, U.S. Department of Justice, Executive Office for Immigration Review in the U.S. Immigration Court at York, Pennsylvania concerning FAYSAL SNOUSSI represented by VALERIE BURCH and the AMERICAN CIVIL LIBERTIES UNION [ACLU], Harrisburg, PA. On 11/7/2007, JUDGE DURLING ruled in *favor* of defendant SNOUSSI commenting he gave "significant" weight to WEDICK's testimony. In accordance with provisions of the UN Convention Against Torture, Judge DURLING found if SNOUSSI was returned to MOROCCO he most likely would be tortured; consequently, he denied US efforts to return him to Morocco. Specifically, JUDGE DURLING said [in part], "[A]s former Special Agent Wedick *testified*, it would have been '*criminal negligence*' for the FBI in the United States not to follow up with its foreign counterparts as part of such an investigation. Being a special agent with the FBI for 35 years, the *court gives significant weight to such testimony*."

9/2007 – 4/2008 Retained as *FBI consultant & expert witness* by joint defense team representing seven [7] defendants known as the LIBERTY CITY SEVEN charged with attempting to form an alliance with OSAMA BIN LADEN and bomb the Chicago Sears Tower and an FBI Building, in Miami, FL. . Because the FBI failed to collect physical evidence suggesting the defendants represented a serious threat, two trials ended in "hung" juries with one defendant being "acquitted." In January 2009, the case was expected to again be tried by the U.S. Attorney's Office in an effort to secure a verdict.

12/2007 – 4/2008 Retained as FBI consultant & expert witness by The Law Offices of ROBERT BLOOM, Oakland, CA in federal terrorism prosecution titled USA vs. BRIANA WATERS involving a 32-year old single mother charged when the FBI identified her as being the reported lookout in a team of suspected EARTH LIBERATION FRONT [ELF] saboteurs who firebombed the University of Washington's Center of Urban Horticulture in 2001. While the Tacoma, WA jury had trouble with the government's evidence—deadlocking on the three most serious counts involving planting the firebomb—they did find her guilty of arson and District Court Judge Franklin D. Burgess later sentenced WATERS to 6-years incarceration.

5/2008 – 8/2008 Retained as FBI consultant & expert witness in People vs. Guillermo Ramirez ET AL by the Law Office of DOUGLAS W. HUDSON, Sacramento, California. On August 18th, Mr. Wedick appeared in California Superior Court in Yolo County as an expert witness where he testified that an FBI agent's comments during a polygraph and interrogation session were "threats" made to induce a witness to change her statements. He testified the threats were a violation of the FBI's Policy as detailed in the FBI's Legal Handbook for Special Agents in section concerning, "Confessions and Interrogations." Both defendants later acquitted.

5/2008 – 9/2008 Retained by SAN JOAQUIN COUNTY COUSEL DAVID E. WOOTEN, Stockton, CA to conduct internal-affairs investigation regarding county employee.

3/2009 – Retained as consultant and expert witness concerning Nigerian Scams and the difficulty prosecuting the scams in the United States by the Law Firm of SANFORD H. PERLISS, Alhambra, CA as a result of representing a defendant charged in NORWALK SUPERIOR COURT with cashing a fraudulent check at a local Wells Fargo Bank.

7/2009 – 11/2009 Retained as consultant and expert witness concerning FBI Policies & Procedures by the Law Firm of DAVID R. DENIS representing RYAN JAMES WEDDING a former Olympic snow border suspected/charged by the Justice Department with operating a cocaine cartel between San Diego, CA and Vancouver, British Columbia, Canada. Testified as an expert witness for the defendant concerning FBI Policies & Procedures and using Informants before U.S. DISTRICT COURT JUDGE JEFFREY MILLER, Southern District of California [SDC], San Diego, CA.

3/2009 – Present. Retained as consultant and expert witness by the Law Firms of ALAN M. SIMPSON P.C., Carefree, AZ and BARHAM & OSTROW, Los Alamitos, CA concerning FBI Policy & Procedures as a result of a Bivens action and 42 U.S.C Section 1983 lawsuit brought in Phoenix, AZ on behalf of plaintiff wrongly prosecuted/incarcerated as a result of an FBI investigation involving six bank robberies in the Phoenix, AZ area. Litigation is ongoing.

**MEDIA:**

1988 – 1995 SHRIMPSCAM investigation received extensive media coverage and is often credited with *term limits* being established by California voters. Aside from the case agent and the original Cooperating Witness being featured on ABC's PRIME TIME LIVE, the investigating agent was also featured in LA TIMES SUNDAY MAGAZINE dated December 1994. Also, Editorial Boards in Los Angeles, San Francisco, San Diego, and Sacramento all "lauded" the FBI's efforts in pursuing the FBI's undercover probe, as well as the Bureau's commitment to investigate and prosecute corrupt public officials.

1994 – 2001 In numerous editorials that appeared in both the SACRAMENTO BEE and FRESNO BEE, the last dated July 6, 2001, captioned, "Operation REZONE's Painful Lessons," the FBI was credited with exposing corrupt land use practices where it was "…clear that the local political system ha(d) been manipulated for extraordinary personal gain at the cost of public trust."

1998 – 1999 Because public awareness can be an extremely helpful tool in detecting/combating fraud, the investigating agent sought/received the cooperation of broadcast journalists MIKE WALLACE on 60 MINUTES, CNN's WOLF BLITZER, and the LOS ANGELES TIMES who did a nine-part series detailing the millions being lost annually to California's Medicaid Program. In the 60 MINUTES piece—aired October 1999—WALLACE credited the investigating agent with marshalling sufficient federal resources so that those suspected of praying on California's $25 Billion MEDICAID PROGRAM were prosecuted to the fullest extent allowed by the law.

2005 – 2006 While a member of the legal defense team representing two Lodi, CA men charged with making *false statements* and *supporting terrorist activities*—reviewing the evidence—Mr. WEDICK became an outspoken critic of the government's case suggesting shoddy interrogation tactics, lack of corroboration, and a mishandled FBI informant were grounds for *dismissing* the prosecution. Stung by defense counsel's arguments, the government sought to squelch Mr. WEDICK's proposed testimony and the resulting controversy became *cover* story, in May 2006, that appeared in the Los Angeles Times Sunday Magazine captioned, "MUZZLED." And his criticism of the government's case became the subject of a PBS FRONTLINE documentary titled, "ENEMY WITHIN," that aired in October 2006, as well as mentioned in a NEW YORK TIMES article titled, "FBI STRUGGLING TO REINVENT ITSELF TO FIGHT TERROR," dated October 10, 2006.

10/2006 – Presentation made to students at University of California's [UC] Graduate School of Journalism, Berkeley, CA concerning the FBI's Use of Confidential Informants, Cooperating Witnesses, and Undercover Operations.

9/2007 – Traveled to New York City, NY and assisted FOX NEWS, New York City, NY and Correspondent EDIE HILL with producing "special" captioned, "Jihad USA: Confronting the Threat of Homegrown Terror," that aired March 29, 2008.

2007 – Assisted the British Broadcasting Corporation [BBC], in London, England with producing anniversary special concerning the FBI's – 100th year anniversary. Expected to be aired in 2008.

10/2008 – Presentation made to students at University of California's [UC] Graduate School of Journalism, Berkeley, CA concerning the FBI's Use Confidential Informants, Cooperating Witnesses, and Undercover Operations.

2009 – Provided commentary to local Sacramento news stations concerning the FBI investigation surrounding the March 27, 2009 disappearance of SANDRA CANTU, in Tracy, California.

**AWARDS, CITATIONS, and COMMENDATIONS:**

1975 – Letter of Commendation, dated August 11, 1975 issued by FBI Director CLARENCE M. KELLEY concerning the arrest of JAMES ROOSEVELT KEEBE—wanted in connection with Unlawful Flight to Avoid Confinement – Robbery.

1976 – Letter of Commendation, dated July 29, 1976 issued by FBI Director CLARENCE M. KELLEY concerning the arrest of JAMES EDWARD BEARD—wanted in connection with Unlawful Flight to Avoid Prosecution – Murder.

1979 – Letter of Commendation, dated May 3, 1979 issued by Deputy Assistant Commissioner R.C. STEVENTON, New Scotland Yard, London, England concerning the prosecution of Defendant JACK KARL ELLIOTT charged with Going Equipped to Cheat and Defraud and Forgery. Commissioner STEVENTON said Special Agent WEDICK gave "extremely important evidence" as a witness and was subjected to "rigorous cross-examination," while providing testimony in London's Central Criminal Court.

1980 – Letter of Commendation, dated May 28, 1980 issued by Special Agent-in-Charge RAYMOND P. YELCHAK, FBI, Sacramento Division concerning Defendant JOHN KARL ELLIOTT who was prosecuted by AUSA GORDON CAMPBELL, in Salt Lake City, Utah with the special assistance provided by Special Agent WEDICK.

1981 – Letter of Commendation, dated August 27,1982 issued by Special Agent-in-Charge MOSS J. STACK, FBI, Mobile Division concerning Defendants SIDNEY GERHARDT and Attorney JOSEPH ADORNATO who were charged with White-Collar-Crime [WCC] violations and prosecuted/tried in Mobile.

1983 – Quality Salary Increase [QSI] received for Exceptional Performance, dated April 25, 1983.

1985 – Quality Salary Increase [QSI] received for Exceptional Performance, dated April 28, 1985.

1985 – Law Enforcement Award presented by Carmichael Elks, dated July 15, 1985 for investigating/prosecuting JOHNNIE VACARRO ET AL for operating a slot cheating ring responsible for defrauding Nevada casinos totaling approx $8 million, including two progressive jack-pots totaling $1.7 million and $2.3 million a piece.

1986 - 1995 Rated "Exceptional" in each annual FBI performance rating.

1987 – Letter of Commendation, dated April 7, 1987 issued by FBI Director WILLIAM H. WEBSTER concerning the investigation surrounding SALVATORE and JOSEPH BONANNO ET AL charged with conducting an illicit mail/wire fraud scheme. Director WEBSTER congratulated Special Agent WEDICK on the effective use of a confidential informant and the meticulous planning needed to orchestrate the undercover scenario in the investigation.

1987 – Quality Salary Increase [QSI] received for Exceptional Performance, dated April 24, 1987.

1989 – Quality Salary Increase [QSI] received for Exceptional Performance, dated April 23, 1989.

1990 – Cash Award for Exceptional Performance, dated January 31, 1990.

1990 – Letter of Commendation, dated August 9, 1990 issued by Assistant Director WILLIAM BAKER, Criminal Investigative Division, FBIHQ, concerning the ongoing corruption investigation initiated by Special Agent WEDICK concerning the California State Legislature, in particular the prosecution of SENATOR JOSEPH B. MONTOYA. He said he thought SA WEDICK represented the FBI in a "commendable" manner on ABC's PRIME TIME LIVE—July 26th.

1992 – Quality Salary Increase [QSI] received for Exceptional Performance, dated April 21, 1992.

1992 – Special Note for conducting thorough interview regarding Special Inquiry at the White House, dated July 22, 1992.

1993 - Nominated by U.S. Attorney CHARLES J. STEVENS for the Attorney General's award as "Criminal Investigator of the Year" for successfully conducting California's 3-year undercover probe concerning members of the California State Legislature suspected soliciting "bribes" in exchange for supporting legislation.

1994 - Cash Award for Exceptional Performance, dated January 5, 1994.

1994 – FBI Director's award titled, "Outstanding Criminal Investigation" for conducting a highly successful 3-year undercover probe involving members of the California State Legislature suspected soliciting "bribes" in exchange for supporting legislation. Performance also cited in the U.S. Congressional Record.

1994 – Letter of Recognition, dated October 24, 1994 issued by Section Chief THOMAS T. KUBIC, Financial Crimes Section, FBIHQ concerning Special Agent WEDICK's successes in case management and informant development and his participation in a national conference concerning White-Collar-Crime Intelligence.

2001 – Quality Salary Increase [QSI] received for Exceptional Performance, dated April 22, 2001.

2002 – Letter of Recognition, dated November 8, 2002 for making presentation to the FBI's White Collar Crime – ASAC Strategic Planning In-Service concerning Health Care Fraud investigations.

2003 - Letter of Commendation, dated July 29, 2003 issued by FBI Director ROBERT S. MUELLER III for demonstrating "exceptional leadership" in connection with the FBI's on-going Health Care Fraud Program.

2004 – Letter of Recognition, dated April 9, 2004 issued by Assistant Director GRANT D. ASHLEY, FBI's Criminal Investigative Division commenting Supervisory Special Agent WEDICK's accomplishments topped all comparative listings in the FBI's Health Care Fraud Program stating they were great examples of "efficiency" and "productivity."

2004 – Letter of Recognition, dated April 30, 2004 issued by Attorney General JOHN ASHCROFT, U.S. Department of Justice, Washington, D.C. commenting Supervisory Special Agent WEDICK had an "impressive" list of accomplishments noting his cases were models for other agents to "emulate."

2006 – Presented with the Distinguished Service Award for Promoting Justice by the COUNCIL on AMERICAN-ISLAMIC RELATIONS [CAIR] in November 2006.

[NOTE: Curriculum Vitae (CV) dated November 1, 2010 with all dates approximate].