```
1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF OREGON

3   UNITED STATES OF AMERICA,        )
                                     )
4                   Plaintiff,       ) No. 05-60008-2-HO
                                     )
5     v.                             ) March 1, 2011
                                     )
6   PIROUZ SEDAGHATY, et al.,        ) Eugene, Oregon
                                     )
7                   Defendants.      )

8

9               TRANSCRIPT OF ORAL ARGUMENT

10          BEFORE THE HONORABLE MICHAEL R. HOGAN

11           UNITED STATES DISTRICT COURT JUDGE

12

13                        -:-

14

15

16

17

18

19

20

21

22

23            Deborah Wilhelm, CSR, RPR
                   Court Reporter
24               P.O. Box 1504
              Eugene, OR  97440
25               (541) 431-4113
```

```
 1                        APPEARANCES OF COUNSEL

 2

 3     FOR THE PLAINTIFF:     KELLY ALEXANDRE ZUSMAN
                              CHARLES F. GORDER, JR.
 4                            United States Attorney's Office
                              1000 S.W. Third Avenue, Suite 600
 5                            Portland, OR  97204-2902
                              (503) 727-1009
 6
                              FRANK PAPAGNI
 7                            CHRISTOPHER L. CARDANI
                              United States Attorney's Office
 8                            405 E. 8th Avenue, Suite 2400
                              Eugene, OR  97401
 9                            (541) 465-6771

10     FOR THE DEFENDANT:     LAWRENCE H. MATASAR
                              Lawrence Matasar, P.C.
11                            621 S.W. Morrison Street
                              Suite 1025
12                            Portland, OR  97205
                              (503) 222-9830
13                            larry@pdxlaw.com

14                            STEVEN T. WAX
                              MICHELLE SWEET
15                            Federal Public Defender
                              101 S.W. Main Street, Suite 1700
16                            Portland, OR  97204
                              (503) 326-2123
17                            steve_wax@fd.org

18

19     ALSO PRESENT:          Colleen Anderson
                              David Carroll
20

21

22

23

24

25
```

```
 1              (Tuesday, March 1, 2011; 1:58 p.m.)
 2                    P R O C E E D I N G S
 3         THE CLERK:  This is the time set for Case
 4    05-60008, United States of America versus Pirouz
 5    Sedaghaty, time set for oral argument on motion for
 6    discovery Number 520.
 7         THE COURT:  Counsel, first, I want to apologize
 8    for being late.  I had a little additional preparation I
 9    wanted to do to make sure I was really ready for you, so
10    I took the freedom to do it.  I hope you understand.
11         All right.  I'm familiar with the materials you
12    have.  I've read them all.  And happy to hear any
13    comments you wish to make at this time.
14         Let me just also add that I've read not only
15    the discovery materials but there have been -- there is
16    a motion for new trial and dismissal and so on, and I've
17    read all that material also.
18         MR. WAX:  Well, Judge, in very brief form, I
19    think that what we're dealing with here is most unusual.
20    I think that in our most recent pleading, we pointed out
21    that with respect to some of the law that is applicable,
22    you do find that the parties are in agreement as to some
23    of what is applicable.  And even under a standard that
24    says in a rare case only should the court grant
25    discovery, we think this is a rare case.
```

1              The record includes the government's admission

2     that it withheld material to which Mr. Sedaghaty was

3     entitled, and that is a relatively unique factor.  I

4     don't think that we found that circumstance in -- I

5     don't want to say in any cases, certainly, it is far

6     outside the norm.

7              THE COURT:  Let me make sure I understood that.

8     When we had the motion on the release hearing, I tried

9     to be precise on this point because one of the things

10    that your pal here said was of concern to me, and it

11    sounded like he was saying that the prosecutors knew

12    that certain reports hadn't been turned over.  And

13    that's why I came back at it a few times.  But I may

14    have been imprecise in the words I used.  I haven't

15    looked back at the transcript.  And, frankly, I thought

16    it was a serious statement to say that the prosecutors

17    here knew that there was exculpatory material that they

18    hadn't turned over.  And is there something in this

19    record that would show that?

20             MR. MATASAR:  Your Honor, I have read the

21    transcript and the question --

22             THE COURT:  Sure.

23             MR. MATASAR:  -- you asked me was -- I think

24    there was a statement in our papers, I don't have them

25    right here, our supplement --

1          THE COURT:  I don't either, and it was
2    occasioned by the statement in the papers.
3          MR. MATASAR:  The statement said something like
4    the prosecutors were aware that Richard Cabral was paid
5    cash.  And I think you asked me how did I know that, and
6    I explained that.  So when you are saying today a
7    slightly different question, were the -- which one way
8    of looking at it is, did the prosecutors
9    intentionally -- were they aware of something and then
10   decide not to hand it to you.  That's a different
11   question than the question you had -- that I had stated
12   in the pleadings and that I was responding to.  I just
13   want to make that clear.
14         THE COURT:  Thank you for the clarification.  I
15   want to make sure I understood your position on that.
16   That's why I asked the questions before.
17         MR. WAX:  Your Honor, what the declarations
18   that were filed on November -- or, excuse me, February
19   18 recite is that in January and March of 2009, the
20   trial team, the two case agents and the two trial
21   prosecutors, met and reviewed material, and they
22   discussed what would be disclosed.
23         What I believe is said in those declarations is
24   that there can be no question but that they were aware
25   that Richard Cabral had been paid.  There is no question

1    that the case agents knew that Barbara Cabral had been

2    present.  There is no --

3              THE COURT:  On the '05 payment?

4              MR. WAX:  Correct.  And a decision about

5    discovery on what would be turned over was made.

6              We were not provided the reports that included

7    the Richard Cabral payments or the report or notes that

8    said that Barbara Cabral was present on one occasion.

9              Now, in terms of the question that you just

10   asked a moment ago, those are the facts that the

11   government has presented to date with respect to those

12   meetings.  What we believe is required at this point is

13   further exploration through the -- what the materials

14   we've requested, the notes, the memos, the e-mails,

15   et cetera, the communications among those four people

16   and others in the FBI and others in the United States

17   Attorney's Office.

18             THE COURT:  I want to make sure that we're very

19   clear about this, because I have --

20             MR. WAX:  Yes.

21             THE COURT:  -- some lawyers in front of me

22   we've spent our whole careers together, all of us, and

23   everyone here has my highest respect for their

24   integrity, and I hope that I have the same in return.

25   But if there really is an allegation or a question about

```
 1   assistant attorneys not turning over Brady material that
 2   they knew about, it wasn't turned over, then that can be
 3   a different question than whether some things were found
 4   later.
 5          MR. WAX:  Your Honor, there is no question that
 6   in the declarations Agent Carroll and Mr. Gorder both
 7   describe the meetings that they had with Barbara Cabral,
 8   and the descriptions include conversation between the
 9   two of them about Cabral's -- was Barbara Cabral paid?
10   Gorder to Carroll.
11          Carroll, no.  I am considering, thinking of
12   paying her.
13          Gorder, don't pay anything until after the
14   trial.
15          Now, given the fact that the declarations state
16   that a year, a year and a half earlier, there were
17   discussions about the payments to Richard and, from
18   Agent Carroll, the source files, which as we understand
19   it should include the detail of the payment, were
20   present in Medford when the four of them met for
21   multiple days in January and March --
22          THE COURT:  I haven't been precise enough.
23   Please turn to paragraph 15 of Mr. Gorder's declaration.
24          MR. WAX:  I have it in front of me.
25          THE COURT:  Where he describes the week of
```

1  December 27th, 2010.

2       MR. WAX:  Yes.

3       THE COURT:  And says down eight or nine lines,

4  I did come across handwritten notes for September 28,

5  2004, interview by the FBI.  I made further inquiries,

6  et cetera.  Do you have any indication that Mr. Gorder

7  or anyone else -- any other lawyer for the government

8  knew that notes such as that were not made available to

9  you?

10       MR. WAX:  The only information we have, Your

11  Honor, is the statement by Agent Carroll that the source

12  files were present in Medford on the days in January and

13  March of '09.  We have the record of the discovery that

14  the government provided to us.  And that record, of

15  course, shows that we were not provided information

16  about the payments and other information.

17       It seems to me that there is some inconsistency

18  between Agent Carroll's declaration that the source

19  files were present and Mr. Gorder's declaration.

20       THE COURT:  With all respect, I don't think you

21  are answering my question.  Do you have any information

22  that a member of the bar -- I take that back.  Some FBI

23  agents are lawyers.  That the Assistant U.S. Attorney

24  knew that there were these handwritten notes that

25  Mr. Gorder says that he found during the week of

1    December 27th, any indication that they knew those were

2    available and didn't turn them over?

3            MR. WAX:  Could I have a moment, please?

4            THE COURT:  Of course.

5            (Discussion held off the record between Mr. Wax

6    and Mr. Matasar.)

7            MR. WAX:  Your Honor, the only information that

8    we have is the information that is currently before you.

9            THE COURT:  Go ahead with the rest of your

10   argument.

11           MR. WAX:  In terms of the, you know, *Brady*

12   issue, what the agent knows the prosecutor is deemed to

13   know.

14           THE COURT:  I realize where the buck stops, I

15   get that.

16           MR. WAX:  And with respect to that particular

17   statement, I put it into the context of what seems to me

18   to be the inconsistency between what appears in the

19   different declarations about what was present and/or

20   what was reviewed.  And if there is a question of

21   someone forgetting something, that's one thing.  If

22   there is a question of someone not asking the question,

23   that is something else.  And I think that those are the

24   types of issues that the court needs to resolve and that

25   the court can only resolve after having the opportunity

1    to look at all of the communications that are, we

2    believe, extant.  Mr. Gorder has told you in his

3    declaration a list of things that he reviewed prior to

4    preparing.  We don't have similar lists from the other

5    declarants, but I think it's reasonable to assume that

6    they reviewed similar materials.

7         And in a case of this nature, with the amount

8    of time and energy that went into it, I think that it is

9    reasonable for us all to assume that each of the

10   participants was making the types of notes and logs that

11   some have described as having reviewed and that others,

12   we have evidence of some of them before us.

13        We recognize, Judge, that these are not --

14   these are unpleasant matters.  Nobody wants to be making

15   an allegation or suggesting that an area needs to be

16   inquired into that involves the integrity of people with

17   whom we work all the time.  Regrettably what we have in

18   front of us starting with the admission that something

19   was not turned over, and then looking at what has been

20   provided, as we see it, it raises further questions that

21   require inquiry, and there is some statements that are

22   just not reconcilable without looking at additional

23   material.

24        And what we're seeking is the opportunity to

25   look at that material, to test these recollections, to

1    inquire into the inconsistencies, armed with the

2    necessary material, and to do it through an evidentiary

3    hearing after we've had that stuff provided.

4          I'm not sure that there is much more to say

5    about that.  The only other point that I think might be

6    worth emphasizing is that in terms of the legal

7    standards, what it is that the court is dealing with,

8    the questions before you are entirely distinct from the

9    types of questions that arise in the normal pretrial

10   discovery phase of the case.  The questions that must be

11   answered now are which members of the prosecution team

12   knew what when and said what to whom when?  Those

13   questions involve a different paradigm, if you will,

14   than the types of issues that are discussed in the

15   traditional discovery cases.

16         And the government's pleading approaches this

17   as a discovery matter in the context of the normal

18   pretrial discovery process or in a setting in which the

19   defense has no basis on which to be suggesting that any

20   constitutional rights have been intruded upon.  We have

21   that here.  We have the first leg in the government's

22   admission stuff wasn't turned over.  We have the second

23   leg in what it is that they have now provided in these

24   declarations.  And what we're seeking is to complete

25   that picture.

```
 1              And Rule 16(a)(2), the work product privilege,
 2     we think the Supreme Court hit it head-on in the Nobles
 3     case when it said once you put the integrity of your
 4     office, if you will, on the line, and the integrity of
 5     your actions on the line, you cannot say that work
 6     product protects the very documents that are needed to
 7     determine precisely what the truth is.
 8              And the government's pleadings, we do not
 9     believe, recognize that we are dealing with that very
10     different type of situation.
11              THE COURT:  Thank you.  Ms. Zusman.
12              MS. ZUSMAN:  Thank you, Your Honor.  I think at
13     the outset I'd kind of like to -- I appreciate that the
14     court has read all of our pleadings, and so I'm not
15     going to repeat any of that.  I think it's helpful to
16     kind of get a frame of reference as to what we're
17     talking about here with the defense's discovery request,
18     and the first is that they haven't said any of their
19     discovery requests relate to their new trial motion.
20     New trial stands or falls on really your determination
21     about whether or not that Barbara Cabral was a key or a
22     star witness, and whether or not any of the information
23     we provided posttrial about the payments to her deceased
24     husband Richard or the comments that Agent Carroll made
25     to her before trial, whether any of that matters.
```

1    That's something that you can decide right now with what

2    you have before you.

3          The discovery request instead relates to the

4    defendant's attempt to accuse the trial team of

5    outrageous or flagrant government misconduct.  And what

6    they want us to do is open up our files, provide them

7    with our trial strategies and our work product at a time

8    when we have this new trial motion pending, and show

9    them everything we have.  Not appropriate.  And they

10   haven't met the threshold that would entitle them to

11   that kind of extraordinary relief.

12         Couple of points there.  The inconsistencies

13   that Mr. Wax has noted between the declarations, I am

14   probably to blame for those.  And that's because I told

15   each of these four individuals not to talk to each other

16   when they prepared those declarations.  My instructions

17   to them were to prepare their declarations based on

18   their own memory and whatever material that they had

19   would help refresh their memories, so that what they

20   were providing you was something helpful and not just a

21   bunch of "I don't know," "I don't remember," because I

22   was asking them to go back several years in a very -- in

23   a case that involved a lot of discovery, thousands of

24   pages, I wanted them to tell you what they did in terms

25   of their good-faith efforts to comply fully with the

1    rules that apply to discovery, from the Criminal Rules

2    of Procedure, from the due process clause, and from this

3    court's orders, and they did precisely that.  They

4    didn't confer amongst each other, they didn't collude.

5    I think it's entirely reasonable to expect that the

6    declarations that they provided are going to differ in

7    what they remember and what they may have emphasized.

8              Now, when Mr. Wax talks about an inconsistency

9    about what took place in Medford when they were

10   reviewing the files and they are doing this scrub in

11   order to make sure that they turn everything over, and

12   Mr. Gorder outlined for you all of the exculpatory

13   material that they culled and they produced to the

14   defense.  So the notion that somehow we're going to hold

15   back on the payments made to Richard Cabral years after

16   he died in order to gain some sort of tactical advantage

17   simply doesn't make sense.

18             But leaving that aside, if we go back to

19   this -- when we're doing the March 2009 review, Agent

20   Carroll brought the information about Richard Cabral,

21   and both Mr. Cardani and Mr. Gorder what they tell you

22   with their declarations is, look, it may have been

23   there, I don't remember.  My only memory was Richard

24   Cabral was dead in 2009, so we knew we weren't going to

25   be calling him as a witness.

1          Now, Mr. Wax has told you that this is a rare

2     case, one in which you should order this extraordinary

3     discovery and have us clear out our files and show you

4     all of our trial strategies and show it to the defense,

5     but why is it a rare case?  He tells you it's a rare

6     case because of our declarations, because we have

7     candidly come forward and admitted, not a *Brady*

8     violation, as they've said in their reply, we have

9     admitted that there was material about one of our

10    witnesses that should have been disclosed, but

11    disclosure is a far cry from admissibility, and an even

12    further cry from a *Brady* violation.  And we have never

13    conceded a *Brady* violation.

14         They have also told you that we waived our

15    privilege under Rule 16(a)(2) by filing those

16    declarations.  And they cite you to the Supreme Court's

17    decision in *Nobles*.  False.  Absolutely false.

18         Prior to filing those declarations, we asserted

19    our privilege under Rule 16(a)(2) in the response that

20    we filed to their discovery requests.

21         And, second, the Ninth Circuit in *Fort* tells

22    you that *Nobles* was not a 16(a)(2) case.  It involved

23    the work product privilege.  And 16(a)(2) is broader

24    than that.

25         So for all of these reasons, Your Honor, there

1    is no basis for you to -- there is -- I would suggest

2    there is no basis to grant the defendant's request for

3    this extraordinary discovery that they have asked for.

4            Now, one final point, they have raised a claim

5    in their reply brief that Agent Carroll violated FBI

6    policy in making the payments to Richard Cabral.  We

7    think that's irrelevant, but even if it was, they

8    submitted to you just a couple of hours ago this

9    declaration of James Wedick, a former FBI agent.  He

10   retired in April of 2004.  Now, that was just about the

11   time that the policy that was in place when Agent

12   Carroll first made the payment in July of 2004 came into

13   effect.  So agent -- former Agent Wedick wasn't around

14   when the policy was in place that applied to Agent

15   Carroll's actions.

16           If this court has any questions or any concerns

17   at all about what that policy was, because Agent Wedick

18   does not address it, I have it for you here in court,

19   and I can make it available to you in camera.  I will

20   tell you I have reviewed it, and nothing in the policy

21   that applied to Agent Carroll was violated.  I will also

22   tell you it is sensitive, it is not public material.

23           And for all of these reasons, the defendant's

24   discovery motion should be denied.  And we should simply

25   move on to this court's consideration of the motion for

1   new trial.

2          THE COURT:  Thank you.

3          MR. WAX:  A couple of points, Your Honor.

4   First, Ms. Zusman is, in her argument, significantly

5   overstating our discovery request.  We are not asking

6   the government to open its files.  We are not asking the

7   government to open its files and discuss trial strategy

8   with us, or to look into why and how they prepared this

9   case.

10          Our discovery requests are very narrowly

11   tailored to the issues before this court.  All that we

12   are seeking are the copies of the relevant guidelines

13   from the Department of Justice and the FBI.  We have

14   access to some that are in the public record.  We do not

15   have access to them all.  The ones that are available to

16   us say to us that if they were applicable, and one I

17   think is from 2001, which would be applicable, perhaps,

18   and the other from 2006, that there -- they were not

19   complied with.

20          Depending on what those guidelines say, it is

21   a -- one of two things appears to be the case if either

22   of the guidelines that we have access to are applicable.

23   Either the FBI did not comply with the guidelines, and

24   there is a potential for an outrageous conduct dismissal

25   based on that, or if they did comply with the

1    guidelines, then somebody in the United States

2    Attorney's Office was in a position where he or she

3    would have to have signed off on the payments that were

4    made to Cabral.  We seek that type of information.

5         We seek information with respect to the Cabrals

6    and the communications about the Cabrals and the

7    payments to the Cabrals.  Our discovery requests go no

8    further than that.

9         THE COURT:  Also A.U.S.A. communication about

10   those with them, right?

11        MR. WAX:  Excuse me?

12        THE COURT:  Also AUSA communication about those

13   and with those witnesses.

14        MR. WAX:  Yes, Your Honor, yes.  Our requests

15   are related solely to the issue that we see that is

16   before the court.  Did Mr. Cardani, did Mr. Carroll, did

17   Mr. Gorder, did Ms. Anderson, communicate with each

18   other or take notes at the time of the payments?

19        Is there an e-mail from Dave Carroll to Chris

20   Cardani in 2005 discussing this?

21        And if that type of e-mail exists, you need to

22   see that to know whether or not the government's

23   attorneys knew certain things that their declarations

24   say they did not.  Perhaps they have forgotten.  But

25   that's different than not having known.  And there would

1    be other inquiries that would need to be made.

2            If there is a log note in Mr. Cardani's file

3    from 2006 about communication with Agent Carroll, about

4    Richard or Barbara Cabral, it seems to me you need to

5    see that.

6            That's the only type of information we're

7    requesting.

8            With respect to the 302s, you have a position

9    taken by the agents that we respectfully submit is on

10   its face something that must be questioned further.

11   They tell you that the version of the FBI 302 of the

12   August 17, 2007, interview of Richard Cabral is a draft.

13   Yet when you look at the 302 that was provided earlier,

14   the 302 that was provided later, and the handwritten

15   notes that are provided later but were apparently made

16   contemporaneously, you see that both 302 reports contain

17   statements not present in the other.

18           It is difficult for us to understand why a

19   statement that is in what is called the draft, the later

20   discovered report, Summer Rife came from Alaska, which

21   is in the handwritten notes, if that's a draft, why is

22   it removed from the final version of the report?

23           The handwritten notes have the numbers --

24   dollar values 200 and 400, that's the handwritten notes.

25   That's what is in what is called the draft.  Yet the

1    final version has 1 and 200.  So on its face, calling

2    one a draft and calling the latter discovered one a

3    draft, just is not consistent with the other facts that

4    are before you.

5         Agent Carroll says in his declaration, he

6    affirmatively states, I didn't save that electronically.

7    Your Honor, he referred at one point to a telephone log.

8    He looked at it for an October 4 conversation, says I

9    have a telephone log, I know this conversation with

10   Barbara Cabral took place on October 4.  If he has a

11   telephone log, why is he not able to tell us when the

12   other conversation that he says he had with Barbara

13   Cabral took place with similar precision?  Does he have

14   a log that tells him that he forgot to hit "save

15   electronically"?

16        We all know from this case that computers

17   contain a lot of information.  And the FBI computer may

18   well provide clarity to what, on its face, is

19   inconsistent in what has been said.  That's the type of

20   thing we're seeking, not trial strategy, not the inner

21   workings of the government in terms of putting this case

22   together, only on this subject matter.

23        THE COURT:  Anything further?

24        MR. MATASAR:  Your Honor, let me address the

25   *Fort* case.  Counsel says it's not a 16(a)(2) case.  This

1    is about waiver.  She says it's not a 16(a)(2) case.  We

2    said that we're keeping our privilege, therefore, it's

3    inapplicable.  But in our view, Your Honor, *Fort* is a

4    logical and clear way to resolve this problem of waiver.

5         The court said, as she indicates, Rule 16(a)(2)

6    is not strictly speaking a work product privilege, but

7    the court says, therefore, we look for guidance to the

8    general principles of waiver.  And that's all we're

9    saying, the general principles of waiver.  They looked

10   at the phone logs, they looked at their files, they

11   looked maybe at their e-mails, I can't recall exactly

12   what they said they looked at, they relied on all of

13   that information to create -- and they talk all about

14   their internal team meetings, they gave us information

15   about all of those internal team meetings.  In our view,

16   if you look at the general principles of waiver, that's

17   a waiver.  That was our point.

18        THE COURT:  Go ahead if you have something.

19        MS. ZUSMAN:  Thank you, Your Honor.  Very, very

20   briefly.  The work product privilege that we have

21   asserted as to the documents that the lawyers, in

22   particular, relied upon in preparing their declarations,

23   Mr. Gorder, in fact, relied upon many of the trial

24   strategy notes that he had in order to help him remember

25   the sequence of events.  So if they want to look at

1   everything that Mr. Gorder relied upon to prepare his

2   declaration, that is going to get us into what's

3   critical trial strategy.

4           The other thing I would offer to the court is

5   that if you are concerned about anything that they have

6   raised here today, I personally have been through every

7   single scrap of paper that Agent Carroll, Assistant U.S.

8   Attorney Cardani and Assistant U.S. Attorney Gorder had

9   that they used to help them remember the sequence of

10  events in order to draft their declarations.  I can make

11  it available to the court to review in camera.

12          I can tell you, though, that in reviewing all

13  of the documents that they have, and just to quickly

14  answer the suggestion about Agent Carroll's phone log,

15  he had a few notes on a notepad of a few phone calls.

16  It was never intended to be a complete summary of every

17  single phone call he had made, and that's why he

18  attempted to determine when that call took place with

19  Barbara Cabral, but he couldn't, he couldn't be more

20  specific, I've got the log, I've got the notes.  I can

21  tell you that in reviewing all of this material, all of

22  it is entirely consistent with what each of these

23  individuals has said in their declarations.  But if

24  there is any doubt at all in the court's mind, it's

25  here, and I can make it available to the court.

1      I don't think it should be given to the

2  defense.  They haven't made a showing that there is any

3  outrageousness, any bad faith on the part of this trial

4  team.

5      THE COURT:  Anything further?

6      The record is important here, so I'm going to

7  do this in writing.  I think it's wise for me to go

8  ahead and review the material and the FBI policy that

9  you have in camera.  And so I'll require that.

10      With regard to when I would hope to have an

11  order out, because I have to go to -- right now I'm

12  scheduled to be in San Diego on Thursday and New York on

13  Friday through Tuesday, and so while I have some pretty

14  strong thoughts about how this may happen, depending on

15  what I see, maybe there is some other questions, I'm

16  going to try to get something out right away on this,

17  but right away is not going to be tomorrow.

18      And what I would like to do is address

19  scheduling a little bit, though.  I don't want this to

20  drag on forever, either we're going to have another

21  trial or we're not, and we need to get that addressed.

22      So I want you to assume for a minute, and if it

23  comes out differently, when I've reviewed other

24  materials, that's fine, assume I deny the motion for

25  discovery, when are you ready to argue the motion to

1    dismiss and for new trial?

2         MR. MATASAR:  Your Honor, we'd like to be able

3    to submit our reply to the government's response, so I

4    think that would be the next date.  Probably -- I said a

5    time at lunch that was too soon, so I want to consult

6    here to make sure we can ask for the right time.

7         (Discussion held off the record between Mr. Wax

8    and Mr. Matasar.)

9         MR. MATASAR:  How about, Your Honor, just two

10   weeks after your order?  Whenever you issue the order,

11   we'll have our reply within two weeks, because that will

12   tell us whether we're getting discovery or not, and then

13   we'll figure out how to deal with it.

14        THE COURT:  Well, I'm going to make it ten

15   days.

16        MR. MATASAR:  Fine.

17        THE COURT:  And I'll give the government a week

18   to respond, and we'll set the motion after that.

19        MR. MATASAR:  Great.

20        THE COURT:  And what -- in that regard, a

21   question I would like -- you've already addressed it

22   somewhat, certainly it's addressed somewhat in the

23   government's brief, a question I have that could be

24   significant here is whether -- on the testimony of

25   Barbara Cabral, whether it has more to do with

1    willfulness or as compared to the terrorism enhancement

2    that the government is seeking on sentencing, because

3    that's a question I have.  Two separate questions to me.

4            All right.  Yes.

5            MR. PAPAGNI:  On the materials that Ms. Zusman

6    offered, we intended to give the court everything so

7    that the record -- you review everything in camera to

8    verify Ms. Zusman's records as well as the trial team,

9    that's what you want, right?

10           THE COURT:  Yes.  And then it will be sealed

11   and made part of the record.  All right.

12           MR. WAX:  Will there be a log or index of all

13   of the material, Your Honor, in the event that there is

14   a need for appellate review of this?

15           THE COURT:  I haven't seen it.

16           MR. WAX:  I guess what I'm requesting is that

17   you request that the government provide, so that we can

18   know, you know, if you are getting 26 e-mails or if you

19   are getting no e-mails.  Because we do not know from

20   what Ms. Zusman has said whether they are going to

21   provide you with any e-mails.  And I think it's --

22           THE COURT:  Well, why don't you provide me --

23   I'd like to go ahead and take the materials so I can

24   start work on it.  And can I do that and you still give

25   me something, would be also in camera, that would just

1    sort of summarize what I have, documents I have, just so

2    that there can be -- if someone wants to read these

3    later on, they can, and make sure they know they're

4    looking at what I'm getting today.

5            MS. ZUSMAN:  Your Honor, I think we can prepare

6    an index, but we would need -- I brought the originals

7    with me.  If we could have just this afternoon to

8    prepare an index --

9            THE COURT:  Of course.

10           MS. ZUSMAN:  -- and then deliver them to you

11   right away.

12           THE COURT:  That's fine.  No problem.  Anything

13   else today?

14           MR. WAX:  Judge, I have to say this, I'm sorry,

15   and that's this:  We had suggested to Ms. Zusman and to

16   Dwight Holton that the United States Attorney's Office

17   for the District of Oregon should not be handling this

18   matter.  And I need to raise that issue with the court.

19   I appreciate that Ms. Zusman is handing up a stack of

20   material.  It seems to me that given the nature of the

21   issues that the court must resolve, some independent

22   entity must be involved in taking a look at the totality

23   of the communications that exist in this matter within

24   the FBI, the IRS, and the U.S. Attorney's Office, and

25   that that cannot be someone from the U.S. Attorney's

1    Office here in the District of Oregon.  And to the

2    extent that I need to put that in the form of a motion

3    to you to recuse the office, I'm doing so.

4         THE COURT:  If you wish to, that's fine.  I'm

5    not going to act on an oral statement at this time.  I'm

6    going to try to look up the law on things first before

7    we give them the order.

8         All right.  Anything further?  All right.

9    Thank you.  We're in recess.

10        (The proceedings were concluded at 2:36 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         CERTIFICATE
 2         I, Deborah Wilhelm, Certified Shorthand Reporter
 3    for the State of Oregon, do hereby certify that I was
 4    present at and reported in machine shorthand the oral
 5    proceedings had in the above-entitled matter.  I hereby
 6    certify that the foregoing is a true and correct
 7    transcript, to the best of my skill and ability, dated
 8    this 2nd day of March, 2011.
 9
10
11
12
                                /s/ Deborah Wilhelm
13                              _____
                                Deborah Wilhelm, RPR
14                              Certified Shorthand Reporter
                                Certificate No. 00-0363
15
16
17
18
19
20
21
22
23
24
25
```