**Steven T. Wax, OSB No. 85012**
**Federal Public Defender**
**101 SW Main Street, Suite 1700**
**Portland, OR  97204**
**Tel: (503) 326-2123**
**Fax: (503) 326-5524**
**Email: steve_wax@fd.org**

**Lawrence Matasar, OSB No. 74209**
**621 SW Morrison Street, Suite #1025**
**Portland, OR 97205**
**Tel: (503) 222-9830**
**Email: larry@pdxlaw.com**

**Attorneys for Defendant**

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**PIROUZ SEDAGHATY,**<br><br>**Defendant.** | **CR 05-60008 HO**<br><br>**REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENT TO MOTION FOR NEW TRIAL AND MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**<br><br>**ORAL ARGUMENT AND EVIDENTIARY HEARING REQUESTED** |

## TABLE OF CONTENTS

PAGE

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

I.   THE FAILURE TO PROVIDE THE DEFENSE WITH SIGNIFICANT
     IMPEACHMENT MATERIAL RELATING TO THE TESTIMONY OF
     BARBARA CABRAL WARRANTS A NEW TRIAL. . . . . . . . . . . . . . . . . .  1

     A.   Barbara Cabral's Testimony Was Central To The Charges
          And Theory Of Prosecution. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

     B.   The Government Acknowledges A Discovery Violation. . . . . . . . . 10

     C.   The Discovery Violation Concerned Information That
          Had Material Impeachment Value With Respect to Cabral. . . . . . 11

     D.   The Law Requires A New Trial When A Reasonable
          Probability Exists That The Results Of A Proceeding
          Would Have Been Different If The Government Had
          Disclosed Impeaching Evidence In Its Possession. . . . . . . . . . . . 13

II.  DISMISSAL IS WARRANTED BECAUSE THE ACTIONS OF
     THE TRIAL TEAM INCLUDED AT LEAST TWO SEPARATE
     DECISIONS TO NOT DISCLOSE THE FACT OF PAYMENT,
     WILLFUL BLINDNESS TO THE OFFER OF PAYMENT, AND
     ACTIONS BY THE FBI IN DISREGARD OF CLEAR POLICIES. . . . . . . 20

     A.   The Indictment Should Be Dismissed Because
          Mr. Sedaghaty's Right To Due Process Was Violated And
          In The Exercise Of This Court's Supervisory Authority.. . . . . . . . 21

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

i

# TABLE OF AUTHORITIES

**PAGE**

## FEDERAL CASES

*Bowen v. Maynard,*
    799 F.2d 593 (10th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Brady v. Maryland,*
    373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 21

*Carriger v. Stewart,*
    132 F.3d 463 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*East v. Johnson,*
    123 F.3d 235 (5th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Giglio v. United States,*
    405 U.S. 150 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Hayes v. Brown,*
    399 F.3d 972 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Kyles v. Whitley,*
    514 U.S. 419 (1995). . . . . . . . . . . . . . . . . . . . . . . . 10, 13, 16, 19

*Russell v. Rolfs,*
    893 F.2d 1033 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Silva v. Brown,*
    416 F.3d 980 (9th Cir. 2005). . . . . . . . . . . . . . . . . . 13, 14, 15, 17

*Strickler v. Greene,*
    527 U.S. 263 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Bagley,*
    473 U.S. 667 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*United States v. Barrera-Moreno,*
    951 F.2d 1089 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Blanco,*
    392 F.3d 382 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 30

*United States v. Chapman,*
    524 F.3d 1073 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Collins,*
    551 F.3d 914 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Fitzgerald,*
    615 F. Supp. 2d 1156 (S.D. Cal. 2009). . . . . . . . . . . . . . . . . . . . . 21, 22

*United States v. Howell,*
    231 F.3d 615 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Inzunza,*
    580 F.3d 894 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Jewell,*
    532 F.2d 697 (9th Cir 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Kohring,*
    No. 08-30170, 2011 WL. 833263
    (9th Cir. March 11, 2011). . . . . . . . . . . . . . . . . . . . . . . 13, 15, 16, 19

*United States v. Pettiford,*
    627 F.3d 1223 (D.C. Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Shaffer,*
    789 F.2d 682 (9th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*United States v. Si,*
    343 F.3d 1116 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Smith,*
    924 F.2d 889 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Zuno-Arce,*
    44 F.3d 1420 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Whaley v. Belleque,*
    520 F.3d 997 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**INTRODUCTION**

In the government's opposition to Mr. Sedaghaty's Motion for a New Trial, it argues that support for Chechen mujahideen and terrorism were not the focus of the trial, Barbara Cabral's testimony was on a collateral matter, the admitted discovery violation involved unimportant matters, and that the law supports its position. Its arguments are inconsistent with the record in this case.

**I.    THE FAILURE TO PROVIDE THE DEFENSE WITH SIGNIFICANT IMPEACHMENT MATERIAL RELATING TO THE TESTIMONY OF BARBARA CABRAL WARRANTS A NEW TRIAL.**

**A.    Barbara Cabral's Testimony Was Central To The Charges And Theory Of Prosecution.**

The defense accepts the government's assertion that the defense repeatedly attempted to portray this case as a tax case, not a terrorism case. But the defense failed. Instead, the government succeeded in turning a tax indictment into a terrorism trial. The Court has asked the parties to address whether the testimony of Barbara Cabral has more to do with willfulness or the terrorism enhancement. Because the government made the Chechen mujahideen a significant part of its case in chief, Barbara Cabral's testimony directly linking the defendant to the finances of the Chechen mujahideen was critical to the jury's verdict and also application of the terrorism enhancement.

Having made terrorism – specifically Chechen mujahideen terrorism - the driving force of the trial, the government now claims Mrs. Cabral's testimony "related to a collateral matter."  Gov. Resp. at 19, 22 (CR 536 at 23, 26).  That contention is false.  And it is repudiated by the factual record.

It is a <u>fact</u> – not an argument – that the central element of the prosecution's theory was that Mr. Sedaghaty falsified his tax returns in order to hide his attempt to provide money to the Chechen mujahideen.  Barbara Cabral was the only witness who directly linked Mr. Sedaghaty not just with the Chechen mujahideen but with *fund-raising* for the Chechen mujahideen, exactly the kind of conduct the government alleged was being concealed on the tax returns.  Her testimony hit its target.  Juror number one verbally told her "Nice job" as she left the stand.[1]  Tr. September 1, 2010 at 4.

It is a <u>fact</u> – not an argument – that Chechen mujahideen terrorism was a central theme throughout the government's case.

- During the pre-trial release hearing, the government introduced, through its "international terrorism consultant," a bogus email, which it claimed originated from "osama_bin_laden_moslem@hotmail.com."  Tr. August 22, 2007 at 86, 124-29.

---

[1]  On defense motion, the Court dismissed Juror number one following the report of her comment.

**REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENT TO MOTION FOR NEW TRIAL**

- The government's effort to focus the jury on terrorism and the mujahideen continued in pretrial filings when it proposed the testimony of Evan Kohlmann. The defense strongly objected, stating: "This is primarily a tax case . . . None of Mr. Kohlmann's many references to the violent history of jihad, which is his singular theme, is relevant. Even if some of it were relevant, its inevitable and intended impact is to sow prejudice and confusion . . . Without question, this testimony is not calculated to help the jurors, but to incite them." CR 329 at 3,4, 12.

- The prosecutors opened and closed the trial with a large picture board that displayed the face of Mr. Sedaghaty alongside faces of the most notorious mujahideen commander, Khattab, as well as of three other persons allegedly linked to the Chechen mujahideen. The poster board remained present in the courtroom for the duration of the trial. The defense objected to this display as violating basic prohibitions on "guilt by association" but the government insisted that this linkage was important to its case because it linked Mr. Sedaghaty to the mujahideen. As Mr. Cardani explained in his opening, pointing to the poster board, "Another name. Khattab. He made the chart. Khattab's over here. And you'll hear that at the time of these events, this was the big

**REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENT TO MOTION FOR NEW TRIAL**

cheese in Chechnya. This was the leader of the mujahideen." Tr.
August 30, 2010 at 32.

- Mr. Cardani's opening mentioned "mujahideen" 29 times and
  "jihad" 22 times. He stressed the relevance of Al-Haramain's fund-
  raising messages urging the need for "collecting as much money as
  possible from friends, families, relatives, contacts, in mosques,
  centers, everywhere" (Tr. August 30, 2010 at 32), exactly the kind
  of activity that Cabral, and only Cabral, said Mr. Sedaghaty
  engaged in on behalf of the Chechen mujahideen. Mr. Cardani's
  closing was punctuated with an insulting reference to and
  dramatic throwing of the Noble Qur'an. He told the jury the Noble
  Qur'an was the "defendant" in this case.[2]

- Barbara Cabral was the fourth witness to testify.  She followed
  three other witnesses (Czemerys, Christianson, and Kohlmann)
  who collectively used the word "mujahideen" 85 times in their
  testimony.

- Evan Kohlmann was the government's "international terrorism"
  expert. Tr. August 31, 2010 at 100.  The Court denied a defense

---

[2]  The references to the Qur'an and other matters requiring a new trial are the
subject of the initial pleading seeking a new trial.  CR 477.  While the discovery
violation, standing alone, requires a new trial, it should be considered in
conjunction with the numerous other matters.

**REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S
SUPPLEMENT TO MOTION FOR NEW TRIAL**

motion to exclude Kohlmann's testimony about actions of Chechen mujahideen and techniques used to provide funding and support for the mujahideen. The Court explained that this testimony is relevant to the government's theory "that defendant and co-conspirators at Al-Haramain sought to assist the mujahideen fighting the Russian forces in Chechnya and to hide such support through the filing of false tax returns and secretly removing currency from the United States." CR 407.

- Kohlmann's direct testimony on what the government now calls "collateral matters" comprises 78 transcript pages, in contrast to the 56 pages of direct testimony by the accountant Wilcox who the government now calls its key witness.  Tr. August 31, 2010 at 100-21, 126-83; September 1, 2010 at 180-236.

- Kohlmann provided a detailed discussion on the Chechen mujahideen's reliance on Al-Haramain and other charities for fund-raising activities, on Chechen mujahideen leadership in the persons of Khattab and Bassayev, and, for good measure, on their association with, and Al-Haramain's association with Osama bin Laden, Hamas and the Muslim Brotherhood.  In addition to the repeated, negative testimony about the mujahideen, the government used Kohlmann to link Khattab, whose photo on the

**Page 5**             **REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENT TO MOTION FOR NEW TRIAL**

chart was inches from Mr. Sedaghaty's, to Osama Bin Laden. Tr. August 31, 2010 at 120. Further, the government used Kohlmann to link Al-Haramain to Osama Bin Laden via another organization, the SJRC, (Tr. August 31, 2010 at 120) a theme continued in AUSA's cross-examination of Colonel Lang. Tr. September 3, 2010 at 124.

- Barbara Cabral was called immediately after Kohlmann. She closed the prosecutorial circle by providing the critical nexus between the mujahideen and Mr. Sedaghaty, most trenchantly in the context of fund-raising for the mujahideen, exactly the kind of activity that the government argued Mr. Sedaghaty tried to conceal on his tax forms. She referred to two instances of fund-raising, one said to have occurred in the Al Haramain premises by a number of women who regularly attended services, and the other by Mr. Sedaghaty as he and a group of people, including Mrs. Cabral, were returning to the United States from Saudi Arabia after the Hajj in 1999: "And when we came out, we were approached by Pete to give him the money because he said since they took care of us, and that it would also help send blankets and food and help the mujahideen in Chechnya." Tr. August 31, 2010 at 282-87; Tr. August 31, 2010 at 279.

**Page 6**          **REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENT TO MOTION FOR NEW TRIAL**

- The government has continued to stress the "terrorism" theme after trial by seeking a maximum statutory sentence based upon a sentencing terrorism enhancement.  CR 496 (filed November 17, 2010).  Indeed, Cabral's testimony becomes all the more important to the government's continuing effort to associate Sedaghaty with terrorism since its sensational terrorism witness at the sentencing hearing – former KGB operative Ignatchenko – could not deliver the goods.  Ignatchenko never heard of Mr. Sedaghaty or Dr. El Fiki and could provide no link between the $150,000 donation and Chechnya.  Tr. November 23, 2010 at 93.

As revealed in the foregoing discussion, the government's present position that Barbara Cabral's testimony was "collateral" is at odds with this factual record.

The government has acknowledged that Barbara Cabral's  "testimony . . . was proffered by the government to establish the willfulness element of the charges."  Gov. Resp. at 2 (CR 536 at 6).  Indeed, the government stressed willfulness and the Cabral testimony in its original response to our new trial motion.  CR 485.  The government stated, "The Court recognized prior to trial that the key issue for the jury was the element of willfulness; . . .".  It concluded the paragraph about its proof on willfulness by referring to the "witnesses who testified that he [Sedaghaty] directly engaged in fund-raising for the mujahideen."  CR 485 at 2-3.  In that pleading the government argued that

**REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENT TO MOTION FOR NEW TRIAL**

"[t]he fact that defendant Sedaghaty shook down the Cabals (sic) to turn over their refunds to help the mujahideen in Chechnya, and that fund-raising for the mujahideen in Chechnya occurred at the Ashland office/mosque supervised and run by the defendant, was clearly probative of the defendant's knowledge, intent, and motive in acting as he did." CR 485 at 27. Further, the government recognized that it had "stated repeatedly, the main issue for the jury was whether the defendant <u>acted willfully</u> in 2000 and 2001 to cover up the true nature of the El Fiki transaction and his knowledge of the intended use of that money by Al Haramain to <u>fund the mujahideen in Chechnya</u>." CR 485 at 26 (emphasis added).   On that point the government argued and quoted a portion of its closing argument that "[t]he willfulness is represented by those e-mails, the fatwas, the prisoner books, the fact that he's raising money at about the same time for the Kosovo mujahidden, the – after the Hajj with Cabral, direct fund-raising, direct requests by Mr. Sedaghaty himself, doing the work, our web site, using that Ptichka, his wife . . ." CR 485 at 22.

Because Cabral's testimony was about funding the Chechen mujahideen in 1999 and 2000 (the time period prior to, and shortly after February 2000 when the El Fiki donation was received), it went directly to the willfulness element in the government's case.[3] The government recognized the importance

---

[3] As argued in our Supplemental Motion for New Trial (CR 517) both prosecutors relied on Cabral's testimony in closing argument to prove that Mr.

**REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENT TO MOTION FOR NEW TRIAL**

of this evidence pre-trial, at trial, and in its subsequent pleadings on this motion. The government's effort to downplay the importance of this issue and testimony now should be rejected. *Cf. Whaley v. Belleque*, 520 F.3d 997, 1002 (9th Cir. 2008) (discussing estoppel and inconsistent positions); *Russell v. Rolfs*, 893 F.2d 1033, 1037-38 (9th Cir. 1990) (same).

The government also now says Mrs. Cabral's testimony was cumulative, citing evidence of videotapes and other suggestions that Mr. Sedaghaty harbored sympathy for the Chechens fighting for independence from Russian domination. Gov. Resp. at 26 (CR 536 at 30). But the issue is not whether Mr. Sedaghaty sympathized with the Chechen cause, most nations around the world did. The issue is whether Mr. Sedaghaty participated in a scheme to fund the mujahideen and tried to conceal that fact on his tax forms. No other witness and no other evidence directly touched the Chechen mujahideen funding subject – only Barbara Cabral.

Similarly the government's effort to downplay Cabral's testimony and contrast her with accountant Wilcox misses the mark. Gov. Resp. at 20-21 (CR 536 at 24-25). First, a case can have more than one important or critical witness. Second, Wilcox contributed nothing about Mr. Sedaghaty's interest in or fundraising for the Chechen mujahideen. Barbara Cabral's testimony, and

---

Sedaghaty wanted to raise money for the Chechen mujahideen and also emphasized the lack of impeachment on the part of the defense. CR 517 at 9.

Page 9          **REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENT TO MOTION FOR NEW TRIAL**

only her testimony, provided the vital direct personal link between the defendant and funding the mujahideen that best explained why Mr. Sedaghaty would want to lie to the accountant and to conceal this relationship and these activities from the government on his tax forms, precisely as the prosecution charged and argued.

Cabral's testimony was undeniably key to the prosecution theory. It cannot persuasively be argued that there is no "reasonable probability"[4] that a disclosure of the social relationship and financial arrangements between the Cabrals and members of the prosecution team might not have affected the jurors' perception of the witness's credibility as well as the outcome of the trial.

**B.    The Government Acknowledges A Discovery Violation.**

On January 6, 2011, AUSA Kelly Zusman informed the defense that the government failed to disclose the fact of payment and promise of payment to the Cabrals and nearly 60 pages of discovery[5] related to Barbara Cabral that

---

[4] *Kyles v. Whitley*, 514 U.S. 419, 433 (1995).

[5] In all, the new information reveals at least twelve investigative contacts and interviews with the Cabrals that were not previously disclosed, some of which involved payments and discussions of potential further payments. Strupp Decl. at 2-6 (CR 518 at 2-6). This included the failure to provide reports of interviews with the Cabrals and handwritten notes of 14 interviews that specifically involved Barbara Cabral. CR 536-1 at 5 of 71. The history of the discovery, including the new discovery, is set out in the declaration of Federal Defender Investigator James Strupp submitted with the Defendant's Supplement to Motion for New Trial (CR 518).

Page 10        **REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENT TO MOTION FOR NEW TRIAL**

should have been provided prior to trial.  CR 536-1 at 2 of 71.  *See also* Gov.

Resp. at 3 (CR 536 at 7).

### C.    The Discovery Violation Concerned Information That Had Material Impeachment Value With Respect to Cabral.

A detailed description of the withheld material has previously been

provided to the Court.  In brief, Barbara and Richard Cabral provided

information to the government in numerous interviews over many years.  They

provided information to the government jointly on a number of occasions.  CR

536-1 at 5 of 71; CR 536-1 at 12-71 of 71.  While married to Barbara Cabral,

Richard Cabral received three payments totaling $14,500 from the FBI.

Barbara Cabral was present for at least one of these payments, as was IRS

Agent Anderson.  CR 536-1 at 8 of 71.

While the government continues to claim that "Barbara Cabral was never

paid," (e.g. Gov. Resp. at 2, 27(CR 536 at 6, 31)), Mrs. Cabral provided

information to government agents at the same time as Richard Cabral, was

present for at least one of the cash payments to Richard, and "has always"

viewed the payments to Richard as "satisfy[ing] any monetary consideration

that might have been due for her and Richard's help."[6]  Cabral 302 of December 29, 2010 (CR 536-1 at 11 of 71).

Barbara Cabral developed a social relationship with Agent Carroll and his wife.  Cabral 302 of December 29, 2010 (CR 536-1 at 9 of 71).   Prior to trial, Barbara Cabral discussed health related issues and medical and other personal expenses with Agent Carroll.  Carroll 302 of December 22, 2010 (CR 536-1 at 7 of 71); Carroll Decl. at 3-5 (CR 536-2 at 3-5).

Prior to trial, Agent Carroll told Barbara Cabral he would try to get her payments after she testified. (Carroll 302 of December 22, 2010 (CR 536-1 at 7 of 71); Carroll Decl. at 8-9 (CR 536-2 at 8-9)).[7]

---

[6]  As stated in Mr. Sedaghaty's Discovery Reply, "[i]t is difficult to understand how the government prosecutors and agents continue to justify their position that 'Barbara Cabral has never been paid by the FBI.' CR 536 at 6.  This position is correct only if payment is defined as an entry on the books of the FBI or as a hand-to-hand transfer from an FBI agent directly to a witness.  The defense believe that, as a legal matter under *Brady*, Barbara Cabral was paid by the FBI because: (1) she gave information to the FBI along with her husband; (2) in payment for information, the FBI handed her husband $14,500, of which at least $5,000 was handed to him in her presence; and (3) Barbara Cabral herself feels that the FBI money given to her husband satisfied the financial consideration due her for her and her husband's help to the FBI. Carroll 302 of December 22, 2010 (CR 536-1 at 8 of 71); Cabral 302 of December 29, 2010 (CR 536-1 at 11 of 71).  Moreover, the government's belief that disclosure of the payment of $14,500 was required supports the view that Barbara Cabral benefitted from the monetary payment."  CR 539 at pg 5 n.2.

[7]  In its Response, the government notes that in December 2010, Cabral professed no memory of Agent Carroll's statement.  Gov. Resp. at 18 (CR 536 at 22).  This does not establish that she was unaware of his intent at the time she testified.

Page 12          **REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENT TO MOTION FOR NEW TRIAL**

In addition, the notes reveal that Cabral mistakenly told Agent Carroll that Mr. Sedaghaty went to Hajj twice, when in fact he only went once in 1999.

### D. The Law Requires A New Trial When A Reasonable Probability Exists That The Results Of A Proceeding Would Have Been Different If The Government Had Disclosed Impeaching Evidence In Its Possession.

While the government admits that it did not disclose facts, reports, and notes it was obligated to provide to Mr. Sedaghaty, it nevertheless resists a new trial, arguing that the withheld information was not exculpatory or material. CR 536 at 3-4, 19.  Its arguments are at odds with the relevant facts and law.

The parties agree that the defense is entitled to disclosure of any promises, inducements, deals, or payments to any witness.   *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Brady v. Maryland*, 373 U.S. 83 (1963).  When the government has withheld information, a new trial is required when it is material, that is if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Silva v. Brown*, 416 F.3d 980, 985 (9th Cir. 2005) (citing *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)).  As the Ninth Circuit recently said in *United States v. Kohring*, No. 08-30170, 2011 WL 833263 at *7-8 (9th Cir. March 11, 2011), the failure to provide impeaching information implicates a defendant's rights under the Confrontation Clause of the Sixth Amendment because it can impair a

**REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENT TO MOTION FOR NEW TRIAL**

defendant's right of effective cross-examination.  "Impeachment evidence is
especially likely to be material when it impugns the testimony of a witness who
is critical to the prosecution's case." *Silva*, 416 F.3d at 987 (relying in part on
*East v. Johnson*, 123 F.3d 235, 239 (5th Cir. 1997) ("[W]hen the withheld
evidence would seriously undermine the testimony of a key witness on an
essential issue or there is no strong corroboration, the withheld evidence has
been found to be material.")).  As argued above there can be no question but
that Mrs. Cabral was an important witness on an essential issue.

Payments and offers of payment such as have been belatedly disclosed
here constitute classic impeachment material that goes to bias and motive to
lie either for self-enrichment or to curry favor with the government.  *Bagley*,
473 U.S. at 676 (evidence of the benefits given to witness in exchange for
testimony was material and the failure to produce the information undermined
the confidence in the outcome of the trial); *see also United States v. Shaffer*,
789 F.2d 682, 689 (9th Cir. 1986).  Their failure to provide additional evidence
of payments was held to require a new trial.

Contrary to the government's assertion, the information at issue is core
impeachment material, going directly to bias, hardly the type of information
that can be characterized as only "possibly" useful.  CR 536 at 28.  Whether or
not Cabral recalled the offer of payment in December 2010, the government
ignores the fact that Cabral admitted that she considered that the payments

**REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S
SUPPLEMENT TO MOTION FOR NEW TRIAL**

made in 2004-2006 compensated her work as well as that of her husband. Moreover, the fact of payment could well lead to further impeachment for Barbara Cabral's violation of the law if she had failed to declare the income on her tax return. *See Shaffer*, 789 F.2d at 685 (noting usefulness for impeachment of fact government had failed to initiate civil tax proceedings).

There is a reasonable likelihood that availability of the withheld information would have had a dramatic impact on the impeachment of Ms. Cabral. The government's suggestion that the defense might have been well advised not to cross-examine Ms. Cabral harshly (CR 536 at 29) underscores the importance of the withheld material. Cabral was a difficult witness. She was local, had left Islam, and presented well. Armed with evidence of the payments, the tenor of the cross-examination would have been entirely different because the defense would have had clear evidence of payments that support a claim of bias.[8] Arguing bias as a result of payment would have had no downside. As in *Kohring*, the powerful evidence of bias "would have added

---

[8]The government has acknowledged that Mrs. Cabral suffered medical issues due to the stress that she was under because of her involvement in the government's case against Mr. Sedaghaty. The stress and medical issues were tied to the promise of payment by Agent Carroll. As in *Silva v. Brown*, information regarding the stress and resulting medical issues could have been used by the defense to call into question Mrs. Cabral's competency and credibility as a government witness. 416 F.3d at 987-88.

**REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENT TO MOTION FOR NEW TRIAL**

an entirely new dimension to the jury's assessment of [Cabral]." *Kohring*, 2011

WL 833263 at *8  Paraphrasing *Kohring*:

> Indeed, had the evidence of [the payment and offer of payment to
> Cabral] been disclosed, 'there is a reasonable probability that the
> withheld evidence would have altered at least one juror's
> assessment' regarding [Cabral's] testimony against [Sedaghaty].
> (citations omitted).

2011 WL 833263 at *8.

The government has not provided any case that would support a finding

that the evidence of payment and promise of payment were not material in this

case, and it fails to recognize the facts that distinguish this case from those on

which it relies.   In fact, Mr. Cardani began his cross-examination of two key

defense witnesses, Marcus Owens and Jeff Cone, with questions about

receiving payment for their testimony.  Tr. September 7, 2010 at 31, 209.  The

payments would also have been useful to impeach the government agent's

conduct of the investigation.  In *Kyles v. Whitley*, the court explained that

information which might "have raised opportunities to attack . . . the

thoroughness and even good faith of the investigation . . ." constitutes

exculpatory, material evidence.  514 U.S. at 445; *see also Bowen v. Maynard*,

799 F.2d 593, 613 (10th Cir. 1986) ("A common trial tactic of defense lawyers

is to discredit the caliber of the investigation or the decision to charge the

defendant and we may consider such evidence in assessing a possible *Brady*

violation.").

Page 16          **REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S
                 SUPPLEMENT TO MOTION FOR NEW TRIAL**

The Ninth Circuit has also recognized that the government's own conduct can highlight the importance of the nondisclosed evidence in terms of analyzing materiality.  *Silva*, 416 F.3d at 990 (the prosecutor's own conduct in keeping the deal secret underscores the deal's importance); *Hayes v. Brown*, 399 F.3d 972, 987 (9th Cir. 2005) ("Presumably, the importance to the State's case of [the witness] James's testimony is what initially led the prosecution to make the secret deal").  Here, the government concedes (Gov. Resp. at 3 (CR 536 at7)), that some members of the trial team were fully aware of all of the highly relevant impeaching information when the decisions were made on multiple occasions not to provide the information to Mr. Sedaghaty.

In all of the cases the government relied on, the non-disclosed evidence was either cumulative, insignificant, or related to a witness who did not provide significant testimony.  In *Strickler v. Greene*, 527 U.S. 263, 293-94 (1999) the court found that the nondisclosed impeachment information was not material because there were two other eyewitnesses who provided direct evidence of the crime besides the eyewitness who could have been impeached.  In *United States v. Pettiford*, 627 F.3d 1223, 1229 (D.C. Cir. 2010), the court found that even if the nondisclosed evidence would have prevented the 404(b) information from coming in at trial, there was specific evidence of the charged event and that there was no "reasonable probability" the jury would have reached a different result.  In *United States v. Collins*, 551 F.3d 914, 924-25 (9th Cir. 2009), the

Page 17          **REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENT TO MOTION FOR NEW TRIAL**

failure to turn over audiotape of conversation between a confidential informant and another person was not material because the defense was provided a DEA report of the conversation and the defense was able to cross examine the confidential informant about the conversation at trial.  In *United States v. Inzunza*, 580 F.3d 894, 908 (9th Cir. 2009), the nondisclosed information "simply duplicated evidence presented.  Its possible impact was so small that [the court could not] regard the evidence as material."  In *United States v. Howell*, 231 F.3d 615, 626-27 (9th Cir. 2000), the failure to alert the defense about a mistake in two police reports, was not material because the government presented independent evidence of the crime including the defendants confession and testimony of the co-defendant.  In addition, the defense was able to cross examine the officers about the inconsistencies in the police reports and their trial testimony.  Finally, in *United States v. Si*, 343 F.3d 1116, 1123 (9th Cir. 2003), the government disclosed information about an informant's criminal history and his activities as an informant in Si's case, but did not disclose information pertaining to his involvement in unrelated and ongoing investigations.  The court concluded that while the non-disclosed information would be impeachment evidence, it was not material, because he was cross-examined extensively about his criminal activities and his agreement with the government in Si's case.

Page 18          **REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENT TO MOTION FOR NEW TRIAL**

While Mr. Sedaghaty believes he has established materiality by more than a preponderance, that degree of proof is not required under *Kyles*. "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . *Bagley*'s touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important."[9] 514 U.S. at 434 (citations omitted). Payment and offer of payment is unquestioningly important.

The analysis of "reasonable probability" is **not** a sufficiency of evidence test. A defendant **need not** demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. 514 U.S. at 434-35. "[A] 'reasonable probability' may be found 'even where the remaining evidence would have been sufficient to convict the defendant.'" *Kohring*, 2011 WL 833263 at * 4. As a result, the government arguments about the existence of other evidence of willfulness (Gov. Resp. 24-27 (CR 536 at 28-31)) is not germaine under *Kyles* and *Kohring*.

---

[9] "Reasonable probability," is not a preponderance. *Kyles,* 514 U.S. at 434 (1995))." The government has misstated the test in its pleadings and in oral argument. *See, e.g.*, "The relevant inquiry is . . . whether she was the only witness who testified on a critical element of the charge – that of willfulness." CR 536 at 8 of 7; "New trial stands or falls on really your determination about whether or not that Barbara Cabral was a key or a star witness . . . ." Tr. March 1, 2011 at 12.

Page 19          **REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENT TO MOTION FOR NEW TRIAL**

The government withheld impeaching material about an important witness.  The withheld material included core impeachment evidence.  Armed with the newly revealed material, the tenor of cross-examination would have been markedly different.  A reasonable probability exists that the result of the proceeding would have been different.  A new trial is required.

**II.    DISMISSAL IS WARRANTED BECAUSE THE ACTIONS OF THE TRIAL TEAM INCLUDED AT LEAST TWO SEPARATE DECISIONS TO NOT DISCLOSE THE FACT OF PAYMENT, WILLFUL BLINDNESS TO THE OFFER OF PAYMENT, AND ACTIONS BY THE FBI IN DISREGARD OF CLEAR POLICIES.**

This case was prosecuted by a "trial team" consisting of four primary actors – AUSAs Cardani and Gorder, IRS Agent Anderson, and FBI Agent Carroll.  The government has acknowledged the "team" prosecution in its pleadings.  *See, e.g.*, Gov. Resp. at 3, 5, 10, 12, 13 (CR 536 at 7, 9, 14, 16, 17).  The facts that should lead to dismissal can be grouped into four sets of actions: (i) the decision in January or March 2009 not to provide the defense information on the payments made to Richard Cabral; (ii) the decision in April 2010 not to turn over the agents' notes of interviews of Barbara Cabral; (iii) the communication between Agent Carroll and Mr. Gorder in June or August 2010 regarding the intent to pay Barbara Cabral after trial; and (iv) the production of two different versions of an FBI 302 report of interview on August 17, 2007.

### A. The Indictment Should Be Dismissed Because Mr. Sedaghaty's Right To Due Process Was Violated And In The Exercise Of This Court's Supervisory Authority.

An indictment may be dismissed on two grounds: (1) "outrageous government conduct if the conduct amounts to a due process violation"; or (2) "[i]f the conduct does not rise to the level of a due process violation, the court may nonetheless dismiss under it supervisory powers."  *United States v. Chapman*, 524 F.3d 1073, 1084 (9th Cir. 2008) (citing *United States v. Barrera-Moreno,* 951 F. 2d 1089, 1091 (9th Cir. 1991)).

To dismiss on the first ground, "the Government's conduct must be so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991) (citations omitted). Regarding the second ground, the district court may exercise its supervisory power "'to implement a remedy for the violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations; and to deter future illegal conduct.'" *Chapman*, 524 F.3d at 1085 (citations omitted).  "A court may dismiss an indictment under its supervisory powers only when the defendant suffers 'substantial prejudice,' and where 'no lesser remedial action is available.'" *Chapman*, 524 F.3d at 1087 (citations omitted).  Applying *Chapman* in *United States v. Fitzgerald*, 615 F.Supp. 2d 1156, 1160 (S.D. Cal. 2009), the court ordered dismissal for a *Brady* violation.  Its discussion reiterated that

government conduct need not be intentional to be flagrant.  *Id.* at 1159.

Instead, "reckless disregard" satisfied the standard for dismissal.  *Id.*

 This case was prosecuted by a trial team, including prosecutors and

government agents.  Moreover, in every case, "[T]he prosecutor is deemed to

have knowledge of and access to anything in the custody or control of any

federal agency participating in the same investigation of the defendant."  *United

States v. Zuno-Arce*, 44 F.3d 1420, 1427 (9th Cir. 1995) ("it is the government's,

not just the prosecutor's, conduct which may give rise to a *Brady* violation.");

*see United States v. Blanco*, 392 F.3d 382, 388 (9th Cir. 2004) (*citing Zuno-Arce*)

("Exculpatory evidence cannot be kept out of the hands of the defense just

because the prosecutor does not have it, where an investigating agency does.");

*Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997) (en banc) ("Because the

prosecution is in a unique position to obtain information known to other agents

of the government, it may not be excused from disclosing what it does not

know but could have learned.").

The facts set out below demonstrate that the prosecution team made

critical decisions that deprived Mr. Sedaghaty of a fair trial.  The facts reveal

circumstantially that the prosecutors were aware of the effect of their actions,

i.e., what they chose not to disclose.  There can be no question but that the

agents had full knowledge of the contents of their files when decisions not to

disclose the payments to and intent to pay the Cabrals were made.  The

**REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENT TO MOTION FOR NEW TRIAL**

misconduct in this case was committed by the "trial team" as a whole and was flagrant. A finding that Mr. Cardani or Mr. Gorder acted with independent intent is not required.[10]

> **i.    The facts set out in the government declarations establish that the trial team made an intentional decision to withhold exculpatory material about the payment of $14,500.**

1.    AUSA Cardani knew that the FBI was going to pay Richard Cabral at least as early as November 2003. Carroll Decl. at 10 (CR 536-2 at 10).

2.    FBI Agent Carroll made three payments to Richard Cabral totaling $14,500. Carroll 302 of December 22, 2010 (CR 536-1 at 8 of 71).

3.    Agent Anderson was present for at least one payment to Richard Cabral, and possibly two payments. *Id.*

4.    Barbara Cabral was present for at least one of the payments to her husband. *Id.*

5.    In 2008, the FBI opened, reopened, activated, or reactivated Barbara Cabral as a Confidential Human Source who was in a position to testify. Carroll Decl. at 3 (CR 536-2 at 3).

---

[10]If the Court disagrees, an evidentiary hearing at which Mr. Sedaghaty has the opportunity to inquire into this issue is required. The existing record establishes far more than is necessary to support such a hearing.

Page 23          **REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENT TO MOTION FOR NEW TRIAL**

6.    The FBI documented its interactions with Barbara Cabral in 2008 and 2010 on Form 1023 rather than Form FD 302.  Form 1023 is used for informants, as contrasted with Form FD 302 that is used for standard percipient witnesses.  Anderson Decl. at 30 (CR 536-6 at 30).

7.    On April 4, 2008, the government listed Barbara Cabral as a potential trial witness in a filing on the conditions of Mr. Sedaghaty's release. CR 95.

8.    In January and March 2009, the prosecution team (Cardani, Gorder, Carroll, and Anderson) met in Medford.  On each occasion, they met for several days.  Cardani Decl. at ¶¶ 9-12 (CR 536-5 at 3).

9.    During the January and March meetings, the FBI "source file" on Richard Cabral was present.  That file contained the specifics of the payment information to Richard Cabral.  Carroll Decl. at 10-11 (CR 536-2 at 10-11).  At least Carroll knew of the payments and Richard and Barbara Cabral's presence for at least one payment because he made the payments himself.   In addition, because she was present, Anderson knew of at least two of the payments, including one in which Barbara was present.   Indeed, the government concedes that "information regarding Richard Cabral's cooperation, including source reports and schedule of payments, was available to the **trial team** during its January/March review . . ."  CR 536 at 13. (Emphasis added).

Page 24            **REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENT TO MOTION FOR NEW TRIAL**

10.     During the January and March meetings, all four members
of the prosecution team discussed what discovery needed to be provided to Mr.
Sedaghaty.  Those discussions included Richard Cabral's cooperation.  Carroll
Decl. at 11 (CR 536-2 at 11).

11.     The conclusion reached by all four members of the
prosecution team about providing Mr. Sedaghaty information about the
payments was that it would not be provided.  *Id.*

12.     The reason given by Agent Carroll for the decision not to
disclose was that Richard Cabral had died.  *Id.*

13.     On February 26, 2009, between the January and March
meeting, the government made its sixth discovery delivery.  This batch of
discovery included the FBI 302 report of interview of Richard Cabral dated
August 17, 2007.  Anderson Decl. at 20-21 of 48 (CR 536-6 at 20-21 at 48).

The foregoing 13 facts include the government agents' admission of a
deliberative process that led to disclosure of one report of an interview of
Richard Cabral on February 26, 2009, and the decision not to disclose
information about payments to which Mr. Sedaghaty was entitled.  This
intentional conduct by the trial team not to disclose critically important
impeaching information is misconduct warranting dismissal.

**ii.     The communication in April 2010 between AUSA Cardani and Agent Anderson reveals that Mr. Cardani explicitly directed the agent not to include Agent notes of interviews of Barbara Cabral in an impending batch of discovery in direct violation of the Court's order of July 1, 2009. CR 191.**

1.     On July 1, 2009, this Court granted Mr. Sedaghaty's motion for production of agent notes of testifying witnesses.  CR 191 at 7.

2.     On February 26, 2010, this Court granted the government's motion for clarification of its discovery order of July 1, 2009, and confirmed that the government was required to produce notes of, and only of, testifying witnesses.  CR 276 at 3.

3.     On March 17, 2010, the government included Barbara Cabral on its list of trial witnesses.  CR 293.

4.     On April 14, 2010, Agent Anderson sent an email to Agent Carroll telling him "I need all of Barbara Cabral's interviews and we may need the notes also."  The email also asked "Chris, since Barbara is listed as a case in chief witness, do you want me to add all of her interviews to the next batch of discovery?  Do I have to include notes with the discovery?"  CR 543 at 13. Mr. Cardani responded: "Yes on reports.  No on notes."  *Id.*[11]

---

[11]This information was disclosed through a letter dated March 1, 2011.  Mr. Sedaghaty appreciates that the Court promptly disclosed to him the letter submitted by the government ex parte on March 2, 2011.  Its submission,

5.     On May 10, 2010, in discovery batch 14, consistent with its obligation to provide agents' notes, the government turned over six pages of notes of an interview of trial witness Daveed Gartenstein-Ross.  Anderson Decl. at 30 of 48 (CR 536-6 at 30 of 48) (Bates #3548-53).  In addition, the government had provided agent notes only four months before in discovery batch 11.  Anderson Decl. at 7, 27 of 48 (CR 536-6 at 7, 27 of 48).

6.     At the time Mr. Cardani issued his directive, the FBI files included an FD 302 report of joint interview of Richard and Barbara Cabral on March 21, 2005.  The files included handwritten notes of that interview that included the fact of a $5,000 payment and that "Barbara" was present.  CR 536-1 at 46 of 71.  Neither the report nor notes were produced to the defense until January 6, 2011.

These facts establish the trial team's knowing and intentional violations of this Court's order and Mr. Sedaghaty's rights.  Mr. Cardani's email of April 14, 2010, and letter of March 1, 2011, reveal that assertion in the government's pleading that the notes were "inadvertently omitted"  (CR 536 at 11) is incorrect.  The team knew of the court order to produce notes.  It complied with the court order shortly before and shortly after the April 14,

_____

however, underscores the extent to which the government has lost perspective in this matter.  Inclusion in the letter of argument and explanation is inappropriate in an ex parte communication of this nature.

**Page 27**          **REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENT TO MOTION FOR NEW TRIAL**

2010 non-disclosure directive.  Three of four members of the team were involved in the communication, including the author of notes memorializing the payment.  This is misconduct warranting a new trial.

### iii.    The communication between Agent Carroll and Mr. Gorder in June or August 2010 reveals willful blindness by the prosecutor to the nature of the communications between the Agent and Barbara Cabral.

1.    When Barbara Cabral was "opened as a source" in 2004, her status was that of a source "in a position to testify."  Both case agents believed "there was a likelihood she could at some point in time testify."  Carroll Decl. at 2 (CR 536-2 at 2).

2.    As early as November 2003, AUSA Chris Cardani specifically approved the payment of money to Richard Cabral.  Carroll Decl. at 10 (CR 536-2 at 10).

3.    On March 21, 2005, when Richard Cabral received $5,000 from the FBI in Barbara Cabral's presence, half of the trial team (David Carroll and Colleen Anderson) were present.  Carroll 302 of December 22, 2010 (CR 536-1 at 8 of 71).

4.    Well before the trial team's discovery review in January and March of 2009, Barbara Cabral was formally identified as a potential government witness in a court filing dated April 4, 2008.  CR 95.

**Page 28**          **REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENT TO MOTION FOR NEW TRIAL**

5.      Regardless of what files were reviewed in January and March of 2009 (whether "case" or "source" files), and whether the notes memorializing the payment in Barbara Cabral's presence were in a source or case file, all four members of the government trial team were aware of the FBI's monetary payments to Richard Cabral.  Furthermore, at least two trial team members knew that Barbara Cabral was present for at least one payment to her husband.  Carroll 302 of December 22, 2010 (CR 536-1 at 8 of 71); Carroll Decl. at 10 (CR 536-2 at 10); Gorder Decl. ¶9 (CR 536-4 at 4-5).

6.      In June or August of 2010, Mr. Gorder and Agent Carroll had two pretrial interviews with Barbara Cabral.  Gorder Decl. ¶ 11 (CR 536-4 at 6).

7.      When Mr. Gorder and Agent Carroll met with Barbara Cabral, Mr. Gorder was aware that payments had been made to Richard Cabral.  Gorder Decl. at ¶ 9 (CR 536-4 at 4-5).

8.      After a pretrial interview with Barbara Cabral, Mr. Gorder asked Agent Carroll if Barbara Cabral had been paid by the FBI.  Agent Carroll said she had not been paid.  Gorder Decl. ¶ 12 (CR 536-4 at 7).

9.      At that time, Agent Carroll informed AUSA Gorder that he intended to seek a monetary payment directly to Barbara Cabral.  Gorder Decl. at ¶ 12 (CR 536-4 at 6-7).

10.    When Agent Carroll advised Mr. Gorder of his intention, Mr. Gorder "cautioned him not to do so before" trial.  Gorder Decl. at ¶ 12 (CR 536-4 at 6-7).

11.    When Mr. Gorder and Agent Carroll discussed payment to Barbara Cabral, Mr. Gorder, apparently, did not ask whether she had been paid, he did not ask whether Agent Carroll had advised her of his intention to seek payment after trial, nor did he ever ask Cabral.  Gorder Decl. at ¶ 12 (CR 536-4 at 6-7).

12.    When United States Attorney Dwight Holton was advised that Agent Carroll had advised Mr. Gorder of his intent to pay Barbara Cabral, Mr. Holton promptly asked whether she had been made aware of that fact. Holton Decl. at 1 (CR 536-7 at 1).

Failure to ascertain the facts on an issue so critical to the reliability of a witness – discussion of a monetary payment to be made only after trial – is flagrant misconduct.  This is especially true when the prosecutor has knowledge of prior, non-disclosed payments.  The government's argument that it did nothing wrong because Mr. Gorder did not know that Agent Carroll had mentioned payment to Mrs.  Cabral (CR 530 at 11) ignores the obligations of the prosecution.  *Blanco*, 392 F.3d at 388 (recognizing the obligation under *Brady* for the prosecutor to obtain information known to other agents in the government); *United States v. Jewell*, 532 F.2d 697, 699 (9th Cir 1976) ("The

rule that wilful blindness is equivalent to knowledge is essential, and is found throughout the criminal law.")(internal citations omitted).  This conduct warrants dismissal.

**iv.    The production of two different versions of the FBI 302 report of an August 17, 2007, interview of Richard Cabral and the explanation offered for the existence of the two reports support a finding of misconduct.  In addition, this problem with the FBI 302s of the Cabral's is not isolated.**

1.    Before trial the government provided an FBI 302 report of an interview of Richard Cabral dated August 17, 2007.  CR 536-2 at 19-20 of 25.

2.    After trial, the government provided a different version of this report.  CR 536-2 at 22-23 of 25.

3.    When the second version was provided, the government did not recall that it had provided a copy of the report.  CR 524 at 3.

4.    Both versions contain information that the other does not. The first version, the one identified as final,  contains information that is inconsistent with the agent's notes while the one identified as a draft, contains information on the same subject that is consistent with the agent's notes. Specifically, the version called final includes a sentence about Kosovo that is missing from the draft.  The version called the draft contains a sentence about Summer Rife being from Alaska that is missing from the version called final.

Page 31          **REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENT TO MOTION FOR NEW TRIAL**

The information about Ms. Rife is contained in the agent's notes.  The version called final says that the people on the Hajj had to pay $200 and were asked to contribute the remaining $100; the version called a draft uses $200 and $400.  The agents notes contain $200 and $400.  *See* Strupp Decl. at 7 (CR 518 at 7); CR 536-1 at 51 of 71.

      5.    Agent Carroll's declaration of February 18, 2011 states that the version produced after trial was a draft.  Carroll Decl. at 12-14 (CR 536-2 at 12-14).  He further states that the problem occurred because he did not save the final version electronically.  *Id.*

      6.    Agent Carroll failed to include information that appears in his notes but not in a FBI 1023 report that he prepared given by Barbara Cabral about Mr. Sedaghaty which was known by him to be false.  In his note of interview of March 2, 2010, Agent Carroll wrote that Cabral stated that Mr. Sedaghaty had attended Hajj in 2000 as well as 1999.  CR 536-1 at 23 of 71.  That information is false.  It does not appear in his 1023 report of that interview. Gorder Decl. at 35 of 45 (CR 536-4 at 35-45).

The government's recitation of the facts about the reports fails to mention that both contain facts the other does not and that it is the "draft" that follows the notes on the dollar amounts.  The explanation offered for the altered reports makes no sense in light of the alterations that were made.  Intentional alteration would be a serious matter warranting dismissal.

Mr. Sedaghaty argued in his Post-Trial Motion for Discovery at 7 (CR 520) and in his Reply to Government's Response to Post-Trial Discovery Motion (CR 539) that the Department of Justice and FBI guidelines for payment of informers both required far more from the United States Attorney to report the payments made from 2004-2006 than the letter of November 7, 2003.  He submitted a declaration from retired FBI Agent James Wedick in support of his assertions.  CR 570.  In argument on March 1, 2011, and in an ex parte submission, the government suggested that Mr. Wedick and Mr. Sedaghaty are incorrect.  Submitted herewith is a follow-up declaration from Mr. Wedick responding to the government and confirming his earlier declaration.  (CR 546). Mr. Sedaghaty continues to believe that the record supports his assertion that the government files should either include approval of Assistant United States Attorneys for earlier payment made from 2004-2006 or that the FBI violated its, and DOJ, guidelines.

This record requires dismissal.  At the least, it requires further inquiry into the production of the 302 report.

**CONCLUSION**

Before the trial, the government withheld valuable impeaching information and witness reports and notes from Mr. Sedaghaty.  The information was material.  It related to an important witness – the only witness who testified to direct evidence of Mr. Sedaghaty's intent and actions to fund

the Chechen mujahideen.  The information was significant because it involved core impeachment material that went directly to bias and a motive for the witness to lie or embellish.  A new trial is required.

The evidence before the Court establishes that the government trial team acted intentionally and recklessly.  The government team made collective and intentional decisions not to disclose the impeachment information.  Certain members of the trial team knew precisely what was not disclosed.  Others may have known and if they did not, their failure to inquire was reckless at best. Dismissal of the indictment is required.

Respectfully submitted on March 18, 2011.


/s/ Steven T. Wax
Steven T. Wax
Federal Public Defender


/s/ Lawrence H. Matasar
Lawrence H. Matasar

**REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENT TO MOTION FOR NEW TRIAL**