DWIGHT C. HOLTON, OSB #09054
United States Attorney
District of Oregon
CHRISTOPHER L. CARDANI
Assistant United States Attorney
405 East Eighth Avenue, Suite 2400
Eugene, Oregon 97401
(541) 465-6771
chris.cardani@usdoj.gov
CHARLES F. GORDER, JR., OSB# 912874
**KELLY A. ZUSMAN**, OSB #891843
Assistant United States Attorneys
1000 SW Third Avenue, Suite 600
Portland, Oregon 97204
(503) 727-1000
charles.gorder@usdoj.gov
kelly.zusman@usdoj.gov

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | CR 05-60008-HO |
| v. | **GOVERNMENT'S REPLY IN OPPOSITION TO DEFENDANT'S SUPPLEMENT TO MOTION FOR A NEW TRIAL & MOTION TO DISMISS** |
| **PIROUZ SEDAGHATY,** | |
| Defendant. | |

The United States of America, by and through Dwight C. Holton, United States Attorney, and Kelly A. Zusman, Assistant United States Attorney, offers the following reply to defendant's supplemental motion for a new trial and motion to dismiss:

1.  **The court's jury instructions form the basis for discerning what was directly or indirectly relevant to the charges**

Defendant's motion for dismissal and supplemental motion for a new trial are premised upon two incorrect assumptions: (1) that Barbara Cabral was a paid informant; and (2) that Barbara Cabral was a key government witness who offered "direct" evidence of defendant's guilt of the two charges. The first assumption is factually incorrect because it is contrary to all of the evidence in the record before this Court. The sworn declarations of Barbara Cabral, Agent Dave Carroll, and AUSA Charles Gorder all attest to the fact that Barbara Cabral was never paid for information she provided as an FBI source. (CR 536, Supporting Declarations). Defendant argues that this Court should nevertheless assume that Barbara Cabral was paid because she provided information to the FBI – sometimes at the same time as her late-husband Richard. But there is simply no precedent for drawing such an assumption from these facts. Moreover, the notes reveal that Barbara added little to the interviews with Richard, and Agent Carroll confirms that the $14,500 paid to Richard over a three-year period, several years before the Seda trial, was not all attributable to information Richard provided relative to this case. None of the money, however, was paid for information Barbara provided.[1]

---

[1] Defendant suggests that payment information is *Brady* material per se, and he points to the fact that AUSA Cardani asked the defense experts how much they had been paid for their testimony. (CR 547; Def's Reply at 16). There is no authority, however, for such a blanket assumption, and while it is routine for attorneys to ask about expert fees, it is would be unusual for an attorney to ask a witnesses whether any member of her family has ever been paid by the lawyers who called her to testify. Defendant also suggests that the payments to Richard might have been useful to challenge the investigation itself, but his claim is vague. He points out that he attacked Agent Anderson at trial over her alleged failure (or inability) to obtain more bank records from Saudi Arabia, but there is no connection between this complaint and payments to non-testifying sources. Defendant identifies no authority for the proposition that the government must disclose any impeachment material regarding non-testifying witnesses, and this Court
(continued...)

**Page 2 - Gov't's Reply to Def's Supplement to Motion for a New Trial & Motion to Dismiss**

Defendant's second assumption is also flawed. This Court's jury instructions provide the guidance needed to discern whether evidence offered by the prosecution was direct or indirect, and it provides a guidepost for which government witnesses were "key." As to the Count 1 conspiracy charge, this Court told the jury that it must consider the following elements:

> First, beginning in or about late 1999 and ending in or about October of 2001, there was an agreement between two or more persons to defraud the United States by obstructing the lawful functions of the former United States Customs Service or the Internal Revenue Service by deceitful or dishonest means as a charge in the indictment;
>
> Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and
>
> Third, one of the members of the conspiracy performed at least one overt act in or after late 1999 for the purpose of carrying out the conspiracy, with all of you agreeing on a particular overt act that you find was committed.

(Day 7, Trial Transcript, p.39).

To establish the conspiracy charged in Count 1, the government had to prove that defendant either agreed with others to file a false tax return to defraud the IRS, or that he entered into an agreement to fail to report exporting monetary instruments. The jury found that defendant intended to defraud the IRS, but made no finding on the government's alternative theory. (CR 466). To reach this conclusion the jury had to find the following elements – also relevant to Count 2 – established beyond a reasonable doubt:

> The defendant is charged in count 2 of the indictment with filing a false tax return in violation of Section 7206(1) of Title 6 (sic) of the United States Code. In order for the

---

[1] (...continued)
denied defendant's request for statements of non-testifying witnesses "to the extent they do not contain exculpatory material." (CR 191; Order at p.3, dated July 1, 2009).

**Page 3 - Gov't's Reply to Def's Supplement to Motion for a New Trial & Motion to Dismiss**

defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant made . . . and signed a tax return for the year 2000 that he knew contained false or incorrect information, as alleged in the indictment, as to a material matter;

Second, the return contained a written declaration that it was being signed subject to the penalties of perjury; and

Third, in filing the false tax return, the defendant acted willfully.

(Day 7, Trial Transcript, pp.42-43).

The Court defined the term "willfully" for the jury as proof "that the defendant knew federal tax law imposed a duty on him, and the defendant intentionally or voluntarily violated that duty." (Day 7, Trial Transcript, p.43).

At defendant's request, the Court also provided the jury with instructions regarding the theory of the defense. The Court told the jury that defendant disputed the materiality of any of the information provided in the tax return regarding the El-Fiki donation, that any errors on the return were caused by his accountant, Mr. Wilcox, and that the government had failed to prove that defendant had entered into any kind of an agreement with co-defendant Al But'he to hide the disposition of the El-Fiki donation. (Day 7, Trial Transcript, pp.44-45).

Notably absent from any of these elements or any of the trial defenses is any mention of whether defendant urged the Cabrals to donate a few hundred dollars to buy blankets and food for Chechen mujahideen at the conclusion of a Hajj in 1999. Barbara Cabral's testimony was indirect evidence of defendant's motive to lie on his tax returns in 2000. Her testimony was one of many items of evidence relied upon by the prosecution to demonstrate defendant's willfulness and his

motive to lie on his taxes about the disposition of the El-Fiki donation.  In his closing argument, AUSA Gorder highlighted eight different categories of such evidence of motive.  (Day 7, Trial Transcript, pp.48-51; *see also* CR 536, Gov't's Opp. to Supp. Motion for New Trial, pp.24-26). And contrary to defendant's claim, Cabral's testimony was not the only evidence of defendant's sympathies for the mujahideen.

For example, Daveed Gartenstein-Ross testified that immediately upon defendant's return from the 1999 Hajj, defendant solicited financial contributions from his congregation for Muslim fighters in Kosovo.  (Day 3, Trial Transcript, p.48).  Ross also said that he had several conversations with defendant about the Russian invasion of Chechnya and he described defendant's mental state as follows: "Mr. Seda was obviously very upset by the Russian prosecution of the war.  He was also upset about things that he considered as being negative or libelous said about the mujahideen."  (Day 3, Trial Transcript, p.55).  Defendant was so concerned about the war in Chechnya, that he wanted to raise money to establish an aid caravan that could go into Grozny and "send a signal" about the need to end the war.  (Day 3, Trial Transcript, p.57).  Yet despite evidence proffered by the defense that defendant was aware of Islamic Relief USA, a legitimate avenue for sending humanitarian relief to Chechen refugees in 1999-2000, defendant never sent any money to this organization.  (Day 6, Trial Transcript, p.151).  Ross expressed skepticism about defendant's plan after receiving an email in which defendant talked about "either kissing the Russian ambassador's filthy ass or kissing and bribing his filthy ass."  (Day 3, Trial Transcript, p.60).  Ross provided compelling and temporally more relevant evidence of defendant's hatred for the Russians and sympathy for the Chechen mujahideen; defendant's assertion that Barbara Cabral was the "only witness who testified to

**Page 5 - Gov't's Reply to Def's Supplement to Motion for a New Trial & Motion to Dismiss**

direct evidence of defendant's intent and actions to fund the Chechen mujahideen," (CR 547, Def's Reply at 33) is inaccurate.

2.      **Defendant has not met his burden of establishing justification for a new trial**

Defendant must satisfy three factors to justify receiving a new trial: (1) the undisclosed evidence must be favorable to him; (2) the evidence must have been suppressed by the prosecution – either wilfully or inadvertently; and (3) "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Prejudice in this context means that the recently produced evidence places "the whole case in such a different light as to undermine the confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). As the Ninth Circuit recently observed: "As to the prejudice prong, the Supreme Court has stated that 'strictly speaking, there is never a real *Brady* violation unless the non-disclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.'" *Smith v. Almada*, 2011 WL 941606, at *6 (9th Cir. (Cal.) March 21, 2011) (Nos. 09-55334, 09-55346).

In making this determination, courts should evaluate the impact of the undisclosed evidence not in isolation, but in light of the rest of the trial record. *United States v. Agurs*, 427 U.S. 97, 112 (1976); *United States v. Collins*, 551 F.3d 914, 923 (9th Cir. 2009).[2] The 60 pages of material produced by the government post-trial is largely not favorable or helpful to the defense. The handwritten notes from the Barbara Cabral interviews add nothing material to the reports that were provided, and the few reports from Richard Cabral in which Barbara adds a

---

[2] In his reply, defendant argues that the government misstated the relevant test, and that other evidence proffered by the government of willfulness is irrelevant. (Def's Reply at 19). The government's argument simply relies upon the well-settled proposition that the undisclosed evidence must be viewed in the context of the entire trial – not in isolation.

**Page 6 - Gov't's Reply to Def's Supplement to Motion for a New Trial & Motion to Dismiss**

comment or remark are similarly unhelpful to either party.  The two primary areas of concern raised by the post-trial disclosures are:  (1) the 2004-2006 payments to Richard Cabral, including at least one payment in which Barbara was present; and (2) Agent Carroll's pre-trial comment to Barbara Cabral that he would try to do "something" for her after the trial.  The government agrees that the payments to Richard may have shed light on Barbara Cabral's motivation to testify, and that the prospect of a post-trial payment (had she known about it) was  potential impeachment, and we do not dispute that the information was not provided to the defense prior to trial.  We also do not dispute that this undisclosed material was not cumulative of any other information, and this factor distinguishes this from many of the other cases addressing *Brady* issues.

But Barbara Cabral's role at trial was in no way comparable to that of Bill Allen in the *Kohring* trial.  *United States v. Kohring,* 2011 WL 833263 (9th Cir. (Alaska) March 11, 2011)(No. 08-30170).  Allen and just one other witness were critical to both the indictment and prosecution in that case – but for their testimony, there would have been no case, and their testimony related directly to elements of the charges.  Allen was the person who allegedly gave the Alaska State Representative cash in exchange for favorable legislative action.  The court described Allen as "the prosecution's star witness," and determined that the thousands of pages of undisclosed information about Allen – including numerous contradictory factual statements about the amount of payments he made to Kohring – "would have added an entirely new dimension to the jury's assessment" of Allen.  *Kohring*, 2011 WL 833263, at *8.

By contrast, nothing Cabral provided to the government was used to indict this case, and nothing in her testimony directly related to any element of any of the crimes charged.  She was not a key or "star" witness, but instead was a 404(b) witness proffered as indirect proof of

**Page 7 - Gov't's Reply to Def's Supplement to Motion for a New Trial & Motion to Dismiss**

willfulness and intent, and she was not even included in the government's first witness list. Moreover, the 60 pages of previously undisclosed material would not have transformed her in the jury's eyes. Barbara Cabral – unlike Allen – has consistently provided the same information about the 1999 Hajj and the Shokatfard jewelry sale since 2004. Despite being interviewed multiple times, her version of events has never varied. Moreover, the fact that her late-husband was paid by the FBI for providing information about this and other cases – and the fact that he died – might have motivated her to cooperate with the government for as long as she did, but this does not undermine her credibility. And the fact that she doesn't even recall Agent Carroll's pre-trial passing remark also means that his comment to her could not have been terribly effective for impeachment purposes. In these respects, this case is more analogous to the Ninth Circuit's recent decision in *Smith v. Almada* than to *Kohring* because *Smith* involved a claim that a prosecutor violated *Brady* by failing to disclose that a witness falsely stated that the defendant gloated about committing the charged arson. The undisclosed evidence was not cumulative of any other evidence, but because the court determined that the witness who could have been impeached by the prior falsehood "was not crucial to Smith's trial," defendant's *Brady* claim failed because he could not establish prejudice. *Smith*, 2011 WL 941606, at *8.

     Defendant also had other material – produced before trial – and other witnesses in the wings that he could have called to counter Cabral's testimony about the Hajj or the jewelry sale, but he chose not to take that path. (Gov't's Opp. at 28-29). Instead, he used Cabral to distance defendant from the anti-Semitic Sheik Hassan. (Day 2, Trial Transcript, p.280).[3] The trial

---

[3] Defendant has repeatedly referred to the "good job" comment made by *dismissed* juror #1 to Barbara Cabral at the conclusion of her testimony. Because that juror was dismissed and
(continued...)

**Page 8 - Gov't's Reply to Def's Supplement to Motion for a New Trial & Motion to Dismiss**

transcript refutes the defendant's post-hoc assertion that Barbara Cabral was a key witness for the prosecution – this was a case that hinged on the evidence from the accountant Tom Wilcox and the bank manager Debra Ingram, and all of the evidence seized from Al Haramain Oregon.

That the El-Fiki money ended up in the hands of the Chechen mujahideen is, however, directly relevant to the government's position at sentencing relative to application of the terrorism enhancement; sentencing has yet to occur, however, so the credibility of the Cabral information is still something that this Court may consider when it weighs the value of this evidence in deciding whether to apply the terrorism enhancement, and ultimately what sentence to impose. Guideline section 3A1.4 increases the base offense level applicable to the tax counts to a level 32 for an offense that involves a felony "intended to promote a federal crime of terrorism." As set forth in the government's sentencing memorandum, this enhancement applies if this Court finds by clear and convincing evidence that the offense of conviction "was calculated to influence or affect the conduct of the Russian government by intimidation or coercion, or to retaliate against Russia for its conduct." (Gov't's Sent. Memo at 11). The evidence relied upon by the government to support the enhancement included the testimony of Colonel Sergey Ignatchenko and Evan Kohlmann, evidence from the Al Haramain computers, and statements defendant made to Richard Cabral about his desire to travel to Chechnya to provide direct assistance to the mujahideen. (Gov't's Sent. Memo at 12-15). That Richard Cabral was paid by the FBI for information about

---

[3] (...continued)
did not deliberate or play any role in the verdict, and because there is no evidence that any other juror shared this view, this fact cannot support the defense theory that Barbara Cabral was a critical government witness.

**Page 9 - Gov't's Reply to Def's Supplement to Motion for a New Trial & Motion to Dismiss**

this, and other cases, should be considered by this Court in assessing whether the government has carried its burden of proof relative to the terrorism enhancement.

But the impeachment value of the payments to Richard is minimal relative to Barbara Cabral – it is certainly not the devastating blow defendant suggests. That her deceased husband was paid by the FBI many years prior to trial might have made it more likely that she was willing to come forward and testify, but it does nothing to undermine the accuracy of the information that she provided at trial. Cabral has sworn under oath that she does not recall Agent Carroll's pre-trial comment, and that when she testified she "assumed that I would not be paid." Asking her about Agent Carroll's intent would have done nothing to undermine her credibility.

Barbara Cabral's testimony spans 29-pages of a 1200 page trial record. She is never mentioned in the opening statements of either party, she is mentioned only once in the government's closing, only once in the defense's 69-page closing (to highlight how she helped the defense), and only twice in rebuttal. This is precisely the type of situation contemplated by the Supreme Court in *Giglio* when the Court observed: "We do not automatically require a new trial whenever combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." *Id.*, 405 U.S. 150, 154 (1972). Defendant has failed to meet his burden to show that this new material undermines the verdict, and thus, his motion for new trial should be denied.

**3.   Defendant fails to carry his burden to justify an outright dismissal of the indictment**

Over forty thousand pages of documents produced as reflected in 17 spread sheets that carefully logged and tracked nearly all of the evidence gathered and produced by the government demonstrates the time, effort and care that went into the government's good faith compliance with

its discovery obligations in this case. Mistakes were made. The trial team has candidly and in great detail provided this Court with an explanation for what happened and why, and every effort has been made to correct the error and bring the issue to light for a full and fair consideration of whether it justifies a new trial. This Court has already found in its March 3, 2011, Order (CR 543) that the failure to disclose the information about the Cabrals was inadvertent, and that holding should resolve the dismissal issue. An inadvertent discovery error regarding a collateral, non-critical witness simply cannot be the type of "flagrant" misconduct that would justify the ultimate sanction of an outright dismissal and the rejection of a jury's well-considered verdict that this defendant is, in fact, guilty of the crimes charged.[4] Nevertheless, the government will respond to each of defendant's specific theories that this prosecution involved bad faith.

First, defendant focuses upon the trial team's decision not to reveal payment information regarding Richard Cabral. While he correctly notes that Barbara Cabral was identified as a potential government witness in 2008, he then fails to acknowledge that AUSAs Cardani and Gorder both explained in their declarations that they did not actually decide to call Barbara Cabral as a trial witness until early 2010.[5] (CR 536, Gorder Dec. at ¶ 10; Cardani Dec. at ¶ 14). So

---

[4] This is particularly true in this case, where the government brought in new counsel to review and respond to the discovery claims, promptly gathered and disclosed the new information to defense counsel and the court, and took no position on defendant's release from custody for the time period necessary to resolve this discovery matter. *Compare Kohring*, 2011 WL 833263, at *16, n. 5 (explaining why dismissal would be an inappropriate remedy for the government's discovery violations in that case).

[5] That trial witness lists in criminal cases are highly fluid should come as no surprise to a defendant who himself submitted three "amended potential witness lists," that included dozens of witnesses never actually called at trial.

**Page 11 - Gov't's Reply to Def's Supplement to Motion for a New Trial & Motion to Dismiss**

when the trial team met in Medford in January and March of 2009 to perform its discovery review, Richard Cabral was dead and there were no plans at that time to call Barbara Cabral.[6]

Second, defendant cites the April 10, 2010, email from AUSA Cardani to Agent Anderson instructing her to turn over all of the Barbara Cabral reports, but not the handwritten notes. Again, this was clearly a mistake in light of this Court's July 2009 Order (CR 191). But there was no prejudice, and the defense never even noticed the omission until the government brought the error to light.[7]

Third, defendant accuses AUSA Gorder of "willful blindness" because he did not ask Agent Carroll or Barbara Cabral during trial prep sessions if Carroll had ever spoken with her prior to trial about a post-trial payment. Hindsight is always 20-20, so one can now suggest that this might have been a prudent course of action, but the omission can hardly be termed misconduct – blind, flagrant, or otherwise – for anyone who has prepared a complex two-week case for trial. AUSA Gorder was responsible for preparing the direct and cross examination of several government and many defense witnesses – several of which involved extensive, expert testimony regarding the history of Chechnya, terrorist financing, and the culture and religious practices of the Middle East. AUSA Gorder has explained in his declaration previously filed with this Court that he had no knowledge that Barbara Cabral was aware of any FBI payment to her

---

[6] Defendant also mistakenly claims that the FBI "source files" for the Cabrals were present for these review sessions in Medford in early 2009 – they were not. Agent Carroll's declaration actually states that the source payment information was present – not the actual files that are securely stored in the FBI offices in Portland. (CR 536, Carroll Dec. at 10-11).

[7] The handwritten note from one of the interviews with Richard Cabral in which Barbara Cabral was present (Bates no. 3847) would not likely have been produced under this Court's June 2009 Order because Richard Cabral was not a trial witness, and the note did not relate to any statement of Barbara Cabral relevant to her trial testimony.

**Page 12 - Gov't's Reply to Def's Supplement to Motion for a New Trial & Motion to Dismiss**

deceased husband, and that he inquired whether Barbara Cabral had ever been paid by the FBI, was assured that she had not been paid, and cautioned Agent Carroll not to take any action on a post-trial payment until after the trial was concluded. (CR 536, Gorder Dec. ¶ 12). That was hardly misconduct.

Moreover, the trial team's voluntary disclosure of the information which is the subject of this motion and its candid descriptions of what happened further militate against any finding of flagrancy or bad faith. Agent Carroll did the right thing by disclosing the comment he made to Cabral prior to trial – even though no document memorialized it, and even though Barbara Cabral herself does not even recall the remark – and AUSA Gorder candidly described for the court what he recalled of his interactions with Carroll. The fact that USA Holton – when discussing the discrete issue about whether a post-trial payment to Ms. Cabral should be made asked whether she had been offered the payment pre-trial says nothing about a professional standard of care.

Fourth is the August 17, 2007, report of interview with Richard and Barbara Cabral and the defense's unsupported and fanciful claim that one of these documents – either the draft or the final – was "intentionally altered." Both versions of this document were attached to Agent Carroll's declaration so that this Court could compare the documents side-by-side. The final version provided to the defense pre-trial includes the arguably exculpatory information that Richard Cabral did not recall defendant ever discussing Kosovo or the mujahideen there. The only fact included in the draft version provided to the defense post-trial that was not in the final version is that one of defendant's ex-wives was from Alaska – something completely irrelevant to this case. And the only material change between the draft and the final was a clarification about the amount of money from the transportation deposit that defendant asked the Cabrals to

**Page 13 - Gov't's Reply to Def's Supplement to Motion for a New Trial & Motion to Dismiss**

contribute at the conclusion of the 1999 Hajj. The draft refers to the total amount deposited for both Cabrals ($400) with $200 remaining at the end of the trip; the final version simply provides the same figures but on a per person basis, rather than per couple: $200 pledged per person, with $100 per person returned at the end of the trip. The numbers are actually the same – the report simply changed how it conveyed the information.

The defense's "intentional alteration" theory simply makes no sense, when the more helpful version of the document is what was produced pre-trial. Agent Carroll and Special Agent Anderson have explained how and why the minor changes were made to the draft before it was finalized, and Agent Carroll has explained that he simply failed to save the final version. There is nothing sinister, and certainly nothing about the comparison of these two documents to suggest any form of misconduct – intentional or otherwise.

Fifth and finally, defendant relies upon a former-FBI Agent – who now earns a living testifying as a defense "expert" against the FBI – who claims that there was an FBI policy in place that would have required Agent Carroll to seek and obtain approval prior to making each and every payment to Richard Cabral. He then surmises that either Agent Carroll or the AUSAs are lying or extremely forgetful. Neither of Wedick's declarations address the fact that Agent Shawna Carroll sought and received blanket authorization from AUSA Cardani in 2003 – prior to making any payments to Richard Cabral. And consistent with FBI policy, that was all she needed to do. While the government has already provided the Court with the "sensitive" FBI policy that expressly permitted an agent's reliance upon such a blanket authorization without the need to seek subsequent approval for each specific payment, we have also obtained a declaration from the FBI's current source coordinator, Special Agent Michael Sweeney, who confirms that Agent

**Page 14 - Gov't's Reply to Def's Supplement to Motion for a New Trial & Motion to Dismiss**

Carroll complied with the relevant FBI policy for the source payments to Richard Cabral. Wedick fails to address the blanket authorization policy, and none of the AG policies that he cites would have required such specific payment approval either. Moreover, even if an internal FBI policy had been violated – there is simply no support for the defense claim that such a policy violation (particularly relative to a non-testifying witness) justifies dismissal of an indictment. Indeed, in *United States v. Ross*, 372 F.3d 1097, 1110-1111 (9th Cir. 2004), the court refused to overturn a district court's decision not to dismiss an indictment where a government agent illegally procured a green card for a government witness, and then failed to turn over that information to the defense. In this case, the FBI agents followed FBI policy by relying upon AUSA approval given prior to making any payments, and by seeking and receiving FBI supervisory approval prior to each payment made to Richard Cabral thereafter.

## CONCLUSION

Defendant's supplemental motion for a new trial and motion to dismiss should be denied.

DATED this 24th day of March 2011.

        Respectfully submitted,

        DWIGHT C. HOLTON
        United States Attorney

        *s/ Kelly A. Zusman*
        KELLY A. ZUSMAN
        Assistant United States Attorney