1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF OREGON

3    UNITED STATES OF AMERICA,        )
                                      )
4                    Plaintiff,       )   No. 6:05-cr-60008-2-HO
                                      )
5       v.                            )   June 7, 2011
                                      )
6    PIROUZ SEDAGHATY, et al.,        )   Eugene, Oregon
                                      )
7                    Defendants.      )

8

9         TRANSCRIPT OF EVIDENTIARY MOTION HEARING

10         BEFORE THE HONORABLE MICHAEL R. HOGAN

11           UNITED STATES DISTRICT COURT JUDGE

12

13                       -:-

14

15

16

17

18

19

20

21

22

23             Deborah Wilhelm, CSR, RPR
                     Court Reporter
24                   P.O. Box 1504
                 Eugene, OR  97440
25                   (541) 431-4113

```
 1                        APPEARANCES OF COUNSEL

 2

 3    FOR THE PLAINTIFF:      KELLY ALEXANDRE ZUSMAN
                              United States Attorney's Office
 4                            1000 S.W. Third Avenue, Suite 600
                              Portland, OR  97204-2902
 5                            (503) 727-1009

 6                            FRANK PAPAGNI
                              United States Attorney's Office
 7                            405 E. 8th Avenue, Suite 2400
                              Eugene, OR  97401
 8                            (541) 465-6771

 9    FOR THE DEFENDANT:      LAWRENCE H. MATASAR
                              Lawrence Matasar, P.C.
10                            621 S.W. Morrison Street
                              Suite 1025
11                            Portland, OR  97205
                              (503) 222-9830
12                            larry@pdxlaw.com

13                            STEVEN T. WAX
                              MICHELLE SWEET
14                            Federal Public Defender
                              101 S.W. Main Street, Suite 1700
15                            Portland, OR  97204
                              (503) 326-2123
16                            steve_wax@fd.org

17    ALSO PRESENT:           Charles F. Gorder, Jr.
                              Christopher L. Cardani
18

19

20

21

22

23

24

25
```

```
1                    INDEX OF EXAMINATIONS

2    FOR THE DEFENDANT:      Direct    Cross     ReD      ReX

3    David Carroll              5       60       82       --

4    Colleen Anderson          88      126      135       --

5    Shawna Carroll           139      156      160       --

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Tuesday, June 7, 2011; 1:41 p.m.)

 2                 P R O C E E D I N G S

 3         THE CLERK:  This is the time set for Criminal

 4  Case 05-60008, United States of America versus Pirouz

 5  Sedaghaty, time set for evidentiary hearing on

 6  Supplemental Motion for New Trial Number 517 and Motion

 7  to Dismiss Posttrial Number 538.

 8         THE COURT:  I've reviewed your papers.  If you

 9  have some little something to add, fine.  If not, let's

10  take the witnesses.

11         MR. MATASAR:  Okay.  Your Honor, Ms. Zusman I

12  talked about the order of proof.  And we thought that we

13  would -- since it's our motion, we would call the first

14  witness, which is David Carroll.

15         THE COURT:  Okay.

16         MR. MATASAR:  Mr. Carroll.  I also want to

17  point out, Your Honor, that we're proceeding under the

18  idea under the federal rules that when a party calls a

19  witness identified with the other side, they can ask

20  leading questions.  So some of my questions were -- to

21  get things over faster, and also under the rule, we may

22  be asking some leading questions on the direct part.

23         THE COURT:  Let's go ahead and swear the

24  witness.

25         MR. MATASAR:  Can we also move to exclude
```

1    witnesses, Your Honor?

2            THE COURT:  Yes.  Who are the other witnesses

3    that each side intends to call?

4            MR. MATASAR:  Just Colleen Anderson and Shawna

5    Carroll.

6            And the final preliminary matter, Your Honor,

7    is that instead of using the ELMO, we have prepared

8    binders with many of the documents that we may be asking

9    about.  There is one for the court.  There is one for

10   the government.  They all have dates on them, and so

11   we'll just proceed that way.  I don't think we're going

12   to introduce any of them, maybe one or two, but that's

13   how we'll proceed.  Old school.

14           THE COURT:  Old school.  You and I qualify.

15           (The witness was sworn.)

16           THE CLERK:  Please have a seat.  Please state

17   your full name, and then spell your name for the record.

18           THE WITNESS:  David Carroll, C-A-R-R-O-L-L.

19                      DIRECT EXAMINATION

20   BY MR. MATASAR:

21       Q.   Mr. Carroll, after the trial in this case, when

22   it became important to figure out exactly what happened

23   concerning discovery issues and other matters, you had

24   to review your notes and other documents concerning

25   statements made by Barbara Cabral; is that correct?

1      A.      Yes.

2      Q.      And there were other questions about payments

3    to Richard Cabral and also questions about different

4    versions of 302s?

5      A.      Yes.

6      Q.      And as a result of that, you prepared a

7    declaration or using those materials and others, you

8    prepared a declaration?

9      A.      Yes.

10     Q.      How did you determine what issues to address

11   and put in your declaration?

12     A.      Through discussions with the prosecutors

13   involved, a determination was made as to what was

14   pertinent to me.

15     Q.      I see, for example, that you have a separate

16   section -- do you have your declaration with you?  You

17   can see it on that binder.

18     A.      Is it in this book?

19     Q.      Yes.  Near the end, it says DC declaration,

20   there is a tab.

21     A.      Okay.

22     Q.      You'll see there, for example, there is a

23   separate section on the 302s, and on CR -- that's court

24   record document number 524.

25     A.      Within the declaration?

David Carroll - D by Mr. Matasar                    7

1    Q.    Yes, subheadings.  I'll point you to the pages.

2    A.    Okay.  Thank you.

3    Q.    There is a subheading on 10, 11, the one on 12

4  is about the 8/17/07 interviews, and the subheading on

5  14 is Sedaghaty's supplemental filing number 524.  Those

6  are there.

7          My question is, were those -- were you directed

8  to have all of those particular issues in the

9  declaration or was that your organizational tool?

10   A.    I think a little bit of both.

11   Q.    Did somebody at the FBI review your

12  declaration, maybe a supervisor, before you submitted

13  it?

14   A.    I don't recall.

15   Q.    You say at page 8 of the declaration that you

16  were asked to review your notes.  Let me --

17   A.    I see it.

18   Q.    Okay.  And what notes did you look at?

19   A.    Notes of phone logs that I've had.

20   Q.    Okay.  So those are personal notes?

21   A.    Yes.

22   Q.    I mean they are different from the notes that

23  you wrote when you interviewed a witness?

24   A.    Yes.

25   Q.    And many of the reports, the FBI reports that

1    were provided to the defense after the trial, had been

2    redacted either with the case number or the material in

3    the report.  Was it you that did the redactions?

4       A.    Primarily, yes.

5       Q.    Is it fair to say that one of the things you

6    were trying to determine by reviewing your notes was

7    when it was -- what time it was, what day it was, that

8    you made a comment to Barbara Cabral about trying to pay

9    her some money?

10      A.    Yes.

11      Q.    And at one point -- and you say in your

12   declaration at the top of page 9 that you were able to

13   determine that your comment to Barbara Cabral about

14   trying to get her some money occurred during a telephone

15   call after April 19th and before trial.

16            My question is, how did you pick April 19th?

17   What caused you to write in this declaration on page 9

18   that that was the time period, April 19th, for the

19   trial?

20      A.    Review of my notes revealed that that was the

21   first time that Mrs. Cabral told me of her medical

22   condition.

23      Q.    And in your mind, that was what started -- it

24   was in that conversation that you said you'd try to get

25   her some money?

David Carroll - D by Mr. Matasar                    9

1      A.     No.

2      Q.     It was after that, though?

3      A.     Yes.

4      Q.     Did you also review your e-mails in trying to

5  refresh your recollection?

6      A.     Yes.

7      Q.     Have you -- well, let me ask, first of all, is

8  there any sort of government policy about maintaining or

9  keeping e-mails on pending cases?

10     A.     Not to my knowledge.

11     Q.     Had you deleted any e-mails?

12     A.     Could you be more specific?

13     Q.     Had -- well, had you or have you deleted any

14  e-mails about this case?

15     A.     Yes.

16     Q.     Okay.  And under what guidelines, are there not

17  FBI guidelines or government guidelines that require you

18  to keep matters, not to delete them?

19     A.     To my understanding it's up to the individual

20  who would either be sending the e-mail or receiving the

21  e-mail as to make a determination as to its relevance

22  and necessity to retain.

23     Q.     And is it fair that if it's relevant and

24  necessary to retain, it should not be deleted?

25     A.     Could you say that again, please?

David Carroll - D by Mr. Matasar                    10

 1    Q.    I think you said that it's up to the individual

 2    agent to determine the necessity and whether a document,

 3    an e-mail, should be retained.  My question is, is there

 4    also a general policy that necessary or important

 5    e-mails or relevant e-mails about a case should not be

 6    deleted?

 7    A.    As I said, I think it's up to each individual

 8    to make that determination.  I'm not aware of an overall

 9    Bureau policy to dictate what be retained.

10    Q.    Okay.  And you are not aware of any Bureau

11    policy as to any guidelines whatsoever given to agents

12    about which e-mails to retain and which ones not to

13    retain?

14          MR. PAPAGNI:  I have a question in aid of

15    objection, Your Honor.

16          THE COURT:  You may.

17          MR. PAPAGNI:  Agent, are you aware that after

18    October 2010 there was a policy but before then there

19    was not?

20          THE WITNESS:  I couldn't tell you when a policy

21    has come into play, but you have -- it's up to the

22    individual to determine if there is a -- if something is

23    a record or to be retained or non-record.

24          MR. PAPAGNI:  Let me be more specific.  Do you

25    know of any policy before October of 2010 that required

1    that you retain e-mails from particular criteria?

2             THE WITNESS:  No.

3             MR. PAPAGNI:  Thank you.  Those are all my

4    questions.  As long as it's only pertinent to the date

5    before October 2010, we have no objection.

6    BY MR. MATASAR:

7       Q.    Mr. Carroll, you said you reviewed some notes

8    on April 19th -- about April 19th.  Those were not

9    provided to the defense.  Those are your own personal

10   telephone logs; is that fair to say?  Well, first of

11   all, were they provided to the defense, to your

12   knowledge?

13      A.    No.

14            MR. PAPAGNI:  I'm sorry, again, a question in

15   aid of an objection.  Only as far as Barbara Cabral is

16   concerned, and not Richard Cabral?  In other words, were

17   the notes provided to the defense of all Barbara

18   Cabral's notes that you have?

19            THE WITNESS:  Yes.

20            MR. PAPAGNI:  But as far as Richard Cabral,

21   that's a separate question in your mind?

22            THE WITNESS:  Yes.

23            MR. PAPAGNI:  Thank you.  Those are all I have

24   for the objection.

25   BY MR. MATASAR:

1    Q.    Was the call that you are talking about on

2    April 19th, was that with Richard Cabral?

3    A.    No.

4    Q.    It was with Barbara Cabral?

5    A.    Yes.

6    Q.    All right.  The documents concerning payments

7    of money to Richard Cabral were kept in a file; is that

8    correct?

9    A.    Yes.

10   Q.    Okay.  And isn't it true that all of the

11   relevant information regarding Richard Cabral's

12   cooperation with the government was made available to

13   Assistant United States Attorneys Gorder and Cardani in

14   January of 2009?

15   A.    Yes.

16   Q.    Okay.  And in January 2009, you were doing a

17   discovery review, correct?

18   A.    Yes.

19   Q.    The whole trial team:  You, Colleen Anderson,

20   Mr. Gorder, and Mr. Cardani?

21   A.    Yes.

22   Q.    And was all this information also made

23   available to the rest of the team, including AUSAs

24   Cardani and Gorder, in March of 2009 when this discovery

25   review continued?

 1      A.     I don't recall as to which session the topic

 2    was discussed.

 3      Q.     But in your declaration at the bottom of 10 and

 4    11, you said the -- all the relevant information was

 5    made available to AUSAs Cardani and Gorder in January

 6    and March of 2009?

 7      A.     Yes.

 8      Q.     Now, Mr. Gorder came into the case after

 9    Mr. Cardani, correct?

10      A.     Yes.

11      Q.     And Mr. Gorder was aware that Richard Cabral

12    had been paid cash by the FBI, was he not?

13      A.     Yes.

14      Q.     And what discussions were there within the

15    trial team that informed Mr. Gorder that cash had been

16    paid in this case?  Do you recall when and where they

17    were?

18      A.     I do not.

19      Q.     Do you recall if Mr. Cardani was present?

20      A.     I do not.

21      Q.     Now, you are familiar, are you not,

22    Mr. Carroll, with the court's discovery order in this

23    case?

24      A.     Generally, yes.

25      Q.     And isn't it true that you discussed the order

David Carroll - D by Mr. Matasar                    14

1    and the court's requirements with the trial team on

2    several occasions?

3        A.    Yes.

4        Q.    Ms. Anderson made a color coded chart, do you

5    recall seeing that chart?

6        A.    Yes.

7        Q.    And you are aware, are you not, that the court

8    required that the government shall provide notes

9    regarding interviews with the defendant and witnesses,

10   that notes were to be provided?

11       A.    Yes.

12       Q.    Now, you've worked with Chris Cardani on other

13   cases as well as this one?

14       A.    I don't believe so.

15       Q.    How about Colleen Anderson?

16       A.    No, I think this is the only case.

17       Q.    Charles Gorder, same?

18       A.    Same.

19       Q.    In your experience, was the requirement to

20   provide your notes to the defense unusual?

21       A.    Yes.

22       Q.    It was a topic of discussion among the trial

23   team, the requirement that notes be provided?

24       A.    Yes.

25       Q.    Now, during this discovery review in January

 1    and March 2009 in which you previously said that the

 2    information about Richard Cabral was made available to

 3    AUSAs Cardani and Gorder, during that meeting you

 4    considered whether to disclose Richard Cabral's

 5    cooperation and payments to the defense, did you not?

 6       A.   I don't specifically recall that conversation.

 7       Q.   Was one of the purposes of that meeting to

 8    determine which materials -- which exculpatory material

 9    gets provided to the defense?

10       A.   Yes.

11       Q.   That means things that would help the defense,

12    right?

13       A.   (Nodding head.)  I understand.

14       Q.   Now, wasn't there a discussion -- so are you

15    saying you don't recall a discussion at that meeting

16    about whether or not to provide the material, including

17    the payment material and such about Richard Cabral, to

18    the defense?

19       A.   I don't recall any discussion specifically

20    regarding payments.

21       Q.   Let me ask you about something in your

22    declaration.  Didn't you say -- well, at the bottom of

23    10 and 11 you said that all the relevant information

24    regarding Cabral's cooperation and schedule of payments

25    was made available to Cardani and Gorder in January and

1   March, correct?

2       A.    Yes.

3       Q.    And don't you also say that it was determined

4   through discussion with AUSAs Cardani, Gorder, Anderson,

5   and myself that the information regarding his

6   cooperation need not be provided in discovery?

7       A.    Yes.

8       Q.    So there was a discussion?

9       A.    Yes.

10      Q.    About whether or not to provide the information

11  about Richard Cabral?

12      A.    Yes.

13      Q.    And isn't it true that one of the reasons why

14  you did not feel that the information needed to be

15  provided -- well, you give two.  One is he's dead,

16  right, that was one reason at the time?  Wasn't the

17  other reason that there was no plan at that time to call

18  Barbara Cabral as a witness?  Look at the --

19      A.    As it relates to Mr. Cabral, the consideration

20  was the fact that he was deceased.

21      Q.    But don't -- didn't you say that the reasons

22  because -- you have "because" in there.  Didn't you say

23  that, A, because Richard Cabral was deceased that was

24  one reason not to provide it?  And didn't you also say

25  because there was no plan at that time to call Barbara

1    Cabral as a witness at trial either, it was determined

2    through discussion not to provide it?

3        A.    Yes, I said that.

4        Q.    And you still think it, one of the reasons that

5    after the discussion you decided not to provide the

6    information to the defense was that at that time it was

7    not contemplated that she would be a witness?

8        A.    That's correct.

9        Q.    Do you recall the discussions in that meeting

10   focusing on the language that you used at that time?

11       A.    No.

12       Q.    You don't recall any of the words that people

13   used in the meetings during those several days that

14   would cause you to believe that, who said what?

15       A.    No.

16       Q.    Do you recall if it was mentioned at that time

17   that the government, less than a year before, had listed

18   Barbara Cabral as a witness in a pleading it filed with

19   this court?

20       A.    I recall.

21             MR. WAX:  I'm sorry, I couldn't hear that?

22             THE WITNESS:  I said "I recall."

23   BY MR. MATASAR:

24       Q.    So there was a discussion that Barbara Cabral

25   had been listed as a witness.  And there was a

1    discussion that was, well, we're not contemplating

2    calling her as a witness at this time so we don't have

3    to provide the material?

4        A.    Could you please repeat that, I'm --

5        Q.    Well, you recall -- you recall the -- during

6    the discussion, what I'm trying to get at is --

7        A.    Which discussion?

8        Q.    The discussion that led to the decision, the

9    determination, you say it was determined through

10   discussion, do you see that language?

11       A.    Yes.

12       Q.    Okay.  What I'm asking about is, what you

13   recall about that discussion that led to that

14   determination.  Now, so far you've said in that

15   discussion we decided -- we talked about that Barbara

16   Cabral had been listed as a witness on a pleading filed

17   before the court, right?

18       A.    A possible witness is what I --

19       Q.    Correct, a potential witness.

20       A.    A potential witness.  There had been no

21   determination made at that time to -- that she was going

22   to be a witness.

23       Q.    And there really never is until the actual time

24   of the trial when a person is called on a witness stand,

25   really?

1    A.    I think in each witnesses -- that decision is

2    made differently for each witness.

3        Q.    But what I'm asking you, though, about is if

4    you recall anything more about those discussions that

5    led to the decision not to tell the defense about the

6    payments to Richard Cabral?

7        A.    I do not.

8        Q.    Was it discussed at that time that if Barbara

9    Cabral were to be a witness, we would have -- the

10   government would have to provide that information to the

11   defense?

12       A.    I don't recall that being talked about.

13       Q.    So you recall nothing more about the discussion

14   that led to that determination than what you've said

15   here today?

16       A.    I know the decision was made and we moved on.

17       Q.    I understand the decision was made and you

18   moved on, but I'm trying to get at before the decision

19   was made.  What did you talk about?  Who said what, if

20   you recall?

21       A.    I don't have any specific recollection of who

22   said what during the course of that meeting.

23       Q.    How about general, more general, if you don't

24   recall the words like would be in a transcript, what

25   about who took which position?  What was the content, if

1    you don't recall the exact words?

2        A.    I think we all came to the conclusion that

3    because Mr. Cabral was dead, he was no longer a witness.

4    And at that point in time Mrs. Cabral was not being

5    contemplated as a witness.  And we had a lot of work to

6    do during the course of this review, and we moved on.

7        Q.    At some time before trial, you and Charles

8    Gorder talked with Barbara Cabral; is that right?

9        A.    Yes.

10       Q.    And there were two separate interviews?

11       A.    Yes.

12       Q.    And these interviews were done because at that

13   time, the time you did the interviews, it was

14   contemplated that Barbara Cabral was going to be a

15   witness?

16       A.    Yes.

17       Q.    And once there was this plan to call Barbara

18   Cabral as a witness, did you provide the material about

19   Richard Cabral to the defense?

20       A.    No.

21       Q.    Was Mr. Cardani present for either the June or

22   the August 2010 interviews of Barbara Cabral?

23       A.    He was not present during the June interview

24   and was present for a short time during the August

25   interview.

1   Q.   And when you and Mr. Gorder interviewed Barbara

2   Cabral, at that point Mr. Gorder was aware that Barbara

3   Cabral had been providing information for some time; is

4   that correct?

5   A.   Yes.

6   Q.   He was aware that Richard Cabral was blind or

7   had serious visual impairment?

8   A.   I can't say.

9   Q.   Were you aware if -- or was Mr. Gorder aware

10   that Barbara Cabral was present during one of the

11   payments, at least one of the payments to Richard

12   Cabral?

13   A.   Are you referring to when we met with her in

14   August?

15   Q.   Yes.  At the time that you interviewed Barbara

16   Cabral in 2010, June and August, was Mr. -- you had said

17   Mr. Gorder was aware that Richard Cabral had received

18   payments, correct?

19   A.   In a general knowledge, yes.

20   Q.   Was he aware that Barbara Cabral was present

21   with Richard Cabral when he received a payment?

22   A.   Not to my knowledge.

23   Q.   You said that Mr. Gorder was aware in a general

24   way that Richard Cabral had been paid money.  Do you

25   know or do you recall any of the occasions where he was

1    so informed?

2        A.    No.

3        Q.    To prepare for these interviews with Barbara

4    Cabral, I assume you reviewed all of her statements that

5    she made to the government before you went in and talked

6    to her or before you talked to her?

7        A.    Yes.

8        Q.    That's the whole point of --

9        A.    Yeah.

10       Q.    -- talking to a witness, right?

11       A.    Correct.

12       Q.    And you provided all these statements to

13   Mr. Gorder?

14       A.    Yes.

15       Q.    To help him get ready to prep the witness for

16   trial, correct?

17       A.    Yes.

18       Q.    So as part of the preparation for those

19   interviews, that particular time when you and Mr. Gorder

20   were talking about going to see Barbara Cabral, did you

21   talk about the government's payments at that time?

22       A.    First off, I'd say we never went to see

23   Mrs. Cabral.  She came to us.

24       Q.    Sorry.

25       A.    And I don't have any recollection of ever

1    discussing the specifics regarding the payments to

2    Mr. Cabral with Mr. Gorder until after trial.

3        Q.    Isn't it true that after you and Mr. Gorder had

4    conducted the pretrial interview, either one or both

5    with Barbara Cabral, that he asked you if Barbara Cabral

6    herself had ever been paid by the FBI?

7        A.    Yes.

8        Q.    Okay.  Now, what do you make of his use of the

9    term "herself"?

10       A.    Could you repeat that?  I lost you for a

11   second.  I'm sorry.

12       Q.    I asked you if Charles Gorder asked you if

13   Barbara Cabral herself had ever been paid by the FBI.

14   And you said yes.  And my question to you was, what

15   was -- what did you take him to mean when he said

16   "herself"?  Was he trying to differentiate between

17   payments made to her and payments made to her husband?

18   Or what details do you remember of that conversation?

19       A.    I believe he was specifically asking me if she

20   had ever been paid by the FBI.

21       Q.    Okay.  On April 14, 2010, I think you can find

22   that in your binder there, could be --

23       A.    Within my declaration?

24       Q.    Look for 4/4/10.

25       A.    Okay.

1      Q.     Okay.  And the lower part of that is an e-mail

2    from Colleen Anderson to Chris Cardani and you, correct?

3      A.     Yes.

4      Q.     And she asks you, Dave, I need all Barbara

5    Cabral's interviews, and we may need the notes also,

6    correct?

7      A.     Yes.

8      Q.     When is the last time you saw this e-mail by

9    the way?

10     A.     Several months ago.

11     Q.     Did you reply to this e-mail?

12     A.     Only by physically providing the documents

13   requested.

14     Q.     Okay.  So in response to this e-mail, did you

15   send her the -- you can look on some of the dates here,

16   the September 12, 2003, interview report?  That's

17   September 12, 2003, it's near the beginning.

18     A.     Okay.  2003 you said?

19     Q.     Yeah, September 12, 2003.

20     A.     Pardon me.  September 12, 2003, is a report

21   related to Mr. Cabral.

22     Q.     Well, in this report Cabral's wife, Barbara,

23   identified a photo of somebody named Bilal Kareem, and

24   she also gave other information, did she not?

25     A.     She did.

1      Q.    And you did not send that to Colleen Anderson

2    in response to the e-mail?

3      A.    I don't believe I did.

4      Q.    What about the March 22, 2005, interview

5    report.  I think it's down there as March 21st on your

6    tab.  Did you send that?

7      A.    I don't believe I did.

8      Q.    And you didn't send her the -- let me ask about

9    the notes for that one, they are right behind it,

10   3/21/05 and with the notes.

11     A.    I don't believe I sent these either.

12     Q.    Do you have a doubt about this one?

13     A.    No, I said I don't believe.

14     Q.    You don't believe.  And what about the

15   January -- by the way, that's the one that talks about

16   the $5,000 payment; is that correct, the notes do?

17     A.    That's correct.

18     Q.    And the January 2, 2008, report, that's more

19   information by Barbara Cabral about Pete Seda?

20     A.    Yes, it is.

21     Q.    And you didn't send that one to her either?

22     A.    I don't believe I did.

23     Q.    And how is it that if Colleen Anderson, who is

24   in charge of the discovery obligation, asks you or says,

25   I need all of Barbara Cabral's interviews, that you

1   don't send these documents where she is providing

2   information about the defendant and about the rest of

3   the case to the FBI?

4        A.    I made a mistake.

5        Q.    And there are several others -- you know, I

6   won't go through all of them.  There were several other

7   reports where Barbara Cabral made statements to you

8   that -- and you wrote in reports -- that were not

9   provided to Ms. Anderson as a result of her e-mail?

10       A.    One more time, please.

11       Q.    Were there any others?

12       A.    I know that posttrial you were provided with

13  discovery.  I can't tell you what the number of reports

14  were that Mrs. Cabral had provided information while we

15  did interviews with Mr. Cabral.

16       Q.    And -- okay.  And the same reason, you just

17  didn't get them?

18       A.    I made a mistake.

19       Q.    Made a mistake.  After trial, I'm going to ask

20  you some questions now about the 8/17/02 302s, I'm

21  sorry, do I have the wrong date?

22       A.    I believe 8/17/07.

23       Q.    Yes.  8/17/07.  Now, if you can look first at

24  the one -- there are two of these.  If you can first

25  look at the one that has D3849.  Do you see that?

1    A.    What does it say?

2    Q.    On the very bottom there is a number that says

3  3849?

4         THE COURT:  Is that in 8/17/07?

5         MR. MATASAR:  Yes.  Sorry, Your Honor, and this

6  witness.  There are several 8/17/07s.  The very first

7  8/17/07 -- no, I'm sorry.  The very first 8/17/07 R has

8  a number on the bottom right that says 1772 GOV.  Do you

9  see that one, Mr. Carroll?

10         THE WITNESS:  Yes, I do.

11  BY MR. MATASAR:

12    Q.    And do you also see, after the next tab, there

13  is one that says 3849 and 3850?

14    A.    Oh, within the same tab?

15    Q.    Well, the version I have is in another tab, I'm

16  sorry.

17    A.    What I have is 8/17/07 R, the first page of

18  this is 1772 GOV, 1773 GOV, and then there's 3849.

19    Q.    Okay.  Fine.  So those are two pages each of an

20  FBI 302, right, two different versions of the 302?  Yes?

21    A.    Yes.

22    Q.    And, first, the one that's got the 3849, can

23  you look at that one first.

24    A.    (Witness complies.)

25    Q.    This is the one that was provided to the

 1   defense after trial, correct?  Is that right?  I didn't

 2   hear.

 3       A.    Based on the Bate stamping, I would say yes.

 4       Q.    Okay.  And the version of the 302 in 3849, the

 5   second full paragraph ends with the words "United

 6   States," does it not?

 7       A.    Yes.

 8       Q.    And on 1772, the second paragraph has another

 9   sentence, does it not?

10       A.    Yes.

11       Q.    And it says "Cabral did not recall Sedaghaty

12   discussing the topic of Kosovo or supporting mujahideen

13   there," correct?

14       A.    Yes.

15            MR. PAPAGNI:  I'm sorry, is that Richard Cabral

16   or Barbara Cabral you are referring to?

17            MR. MATASAR:  Objection, Your Honor.  I don't

18   think that's an appropriate --

19            MR. PAPAGNI:  Oh, I'm sorry.

20            MR. MATASAR:  -- question in aid of an

21   objection.

22            MR. PAPAGNI:  I'm sorry.  I'm trying to clarify

23   in my mind, Judge, whether he's referring to Barbara

24   Cabral or Richard Cabral.

25            THE COURT:  You can ask him.

1          MR. PAPAGNI:  Agent, it says "Cabral" -- it

2     doesn't say 'Richard' or 'Barbara' -- "did not recall

3     seeing Sedaghaty discussing the topic of Kosovo or

4     supporting mujahideen there."  Is that referring to

5     Richard Cabral, the dead guy, or Barbara Cabral, the

6     witness who testified at trial?

7          THE WITNESS:  This was referring to Mr. Cabral.

8          MR. PAPAGNI:  The dead guy?

9          THE WITNESS:  Correct.

10          MR. PAPAGNI:  Thank you.  I don't know how it's

11     relevant to this hearing, but I just wanted that

12     clarification.  Thank you, Mr. Matasar.

13     BY MR. MATASAR:

14     Q.    Mr. Carroll, this report, 3849, was provided to

15     the defense after -- it was at the direction of Dwight

16     Holton, the United States Attorney, was it not?

17     A.    Yes.

18     Q.    You were told to provide reports that you

19     hadn't provided already, correct?

20     A.    Yes.

21     Q.    And -- okay.

22     A.    What I would say, though, is that we had

23     already provided this report previous to trial in

24     discovery.

25     Q.    Correct.  And that's why it's marked --

David Carroll - D by Mr. Matasar                    30

 1      A.      Not 3849 but --

 2      Q.      1772?

 3      A.      -- 1772.

 4      Q.      Correct.  But at the time you provided 3849 you

 5  weren't aware of that, were you?

 6      A.      I was not cognizant of the fact --

 7      Q.      Correct.

 8      A.      -- that this was provided.

 9      Q.      Correct.  That was my point.  Okay.  So when

10  you provided this 3849 after trial, it's your -- you

11  have said in your declaration that this is a draft, the

12  3849 one is a draft, correct?

13      A.      Yes.

14      Q.      And you made -- hold on a second.  So you made

15  1772 the final version.  You had used your draft first

16  and then you consulted with Colleen Anderson.  And then

17  you looked at your notes carefully, and that's what led

18  you to turn 3849 into 1772; is that correct?

19      A.      Could you restate that, please.

20      Q.      Well, why don't you just tell me.  It's in your

21  declaration, but why don't you just tell me if you

22  recall how you went from the draft version 3849 to 1772?

23      A.      We conducted the interview.  I wrote the

24  interview up, based on a review of my notes, my

25  recollections, and Mrs. -- Agent Anderson's notes, and

1    then we consulted after I prepared the first draft.

2        Q.    Okay.  And where was this consultation?  Was it

3    in -- first, was it in person or was it on the phone?

4        A.    I don't recall.

5        Q.    Were you reading it to her or was she looking

6    at it either on paper or in an electronic fashion?

7        A.    She had an opportunity to read it in paper

8    form.

9        Q.    Okay.  And then you made the changes after

10   that?

11       A.    After our discussion, yes.

12       Q.    Okay.  And then you printed it?

13       A.    Yes.

14       Q.    How -- and is it your statement in the

15   declaration that you never saved the final version onto

16   your computer?

17       A.    The only explanation I have is that I didn't

18   save that final version.

19       Q.    Is -- what software were you using to prepare

20   this report?  Is it some FBI word processing software?

21       A.    WordPerfect.

22       Q.    Oh, WordPerfect?

23       A.    Yeah.

24       Q.    And there is no auto save feature as far as you

25   know on the WordPerfect that you are using?

1      A.    I don't know.  I think it retains the last

2  version of whatever you've typed.

3      Q.    What's the distribution of the reports?  How

4  does your report -- I take it you printed it, you

5  printed 1772?

6      A.    Yes.

7           MR. MATASAR:  Could I have a moment, Your

8  Honor?

9           (Discussion held off the record between

10  co-counsel.)

11  BY MR. MATASAR:

12      Q.    So you -- after finalizing this 1772 GOV, how

13  does it get into the discovery that the government has?

14  Do you e-mail it?  I mean, what physically happens or

15  happened to this particular one?

16      A.    To get into the discovery?

17      Q.    Well, you -- when you write a report, you need

18  to transmit it in certain ways, correct?

19      A.    Yes.

20      Q.    It got to the defense?

21      A.    Correct.

22      Q.    Okay.  How -- can you just trace how the piece

23  of paper that we received in that FBI 302, how it gets

24  to the defense?

25      A.    The final version was submitted to the paper

1   file.  During the course of our discovery reviews in

2   January and March of 2009, I had the entire paper file

3   shipped down to the Medford resident agency so as to

4   allow the trial team to go through that material.  It

5   was during the course of that review that Mr. Gorder, to

6   my recollection, found that 302 and highlighted it as

7   something that needed to be turned over in discovery,

8   and was therefore turned over in discovery.

9       Q.    So there is no e-mailing, there is simply a

10  paper file?

11      A.    There is an electronic file as well.

12      Q.    Okay.  And was the electronic file used in this

13  case?

14      A.    Yes.

15      Q.    In what sense?

16      A.    To accumulate data from the case.

17      Q.    Was the electronic file transferred to paper at

18  some point?

19      A.    In a perfect world, they should have mirrored

20  each other.

21      Q.    Okay.  And do you know -- I take it by saying

22  that, you don't feel this was the perfect world,

23  something went wrong?

24      A.    In this case, related to this particular 302,

25  yes.

1    Q.    And you -- your view is that you saved -- you

2    did -- sorry.  You didn't save the 1772.  And the 3849

3    is in your computer, correct?

4    A.    To the best of my knowledge.

5    Q.    How is it -- how is it that this 3849 would be

6    printed?  What's the mechanism for printing this

7    particular document?  I take it one way could be you

8    could print it from your computer?  This is a version

9    that was on your computer, correct, the unsaved version

10   after you printed it out for Colleen Anderson?

11   A.    There is -- I'm not sure how this got printed

12   out other than to say I printed it, it came from the

13   electronic file, I don't know how this got into the

14   file, to be honest with you.

15   Q.    When did you print it?  After trial?

16   A.    This 3849?

17   Q.    Yes.

18   A.    Was only printed in response to our turning

19   over discovery to you posttrial.

20   Q.    I see.  So you printed it and gave it to

21   somebody?

22   A.    Yes.

23   Q.    Mr. Gorder or Mr. Cardani or a clerk?

24   A.    No.  I think Special Agent Anderson was the one

25   who was -- we were funneling all our -- what was going

1   to be discovered posttrial.

2      Q.    So after trial, you printed it and gave it to

3   her?

4      A.    It's my recollection, yes.

5      Q.    This document, 3849, then would not be in some

6   FBI file somewhere?

7      A.    It is now.

8      Q.    It is now -- obviously, it's got a number 3849

9   that's been produced in this case.  I'm saying that, how

10  would it be that when Charles Gorder was looking at FBI

11  files before this had been provided that this piece of

12  paper would have been found in a paper file at the FBI

13  office in Portland?

14     A.    I -- what you don't understand is that -- the

15  way I would explain it is this, I don't think Mr. Gorder

16  found this in his review of Mr. Cabral's source file.

17     Q.    Okay.  That's fine.

18     A.    This is as a result of me printing it out from

19  the electronic file, the substantive case file as it

20  relates to Mr. Sedaghaty, not Mr. Cabral's source file.

21     Q.    Okay.  Now, if you look at 1772 on your final

22  version, prepared after you reviewed your notes, at the

23  bottom of page 1772 and the top of 1773, it tells about

24  how upon arrival in Saudi Arabia everybody in the group

25  paid $200 to cover the cost of their transportation and

 1   only 100 had been used?

 2       A.    I see.

 3       Q.    Okay.  And if you look at your notes there,

 4   which is 8/17/07 N DC, if you see that, do you see that

 5   tab?

 6       A.    I see 8/17 N DC.

 7       Q.    Do you see your notes there, it's got a 3852 at

 8   the bottom?

 9       A.    Yes.

10       Q.    Now, that has numbers instead of 100 and 400 --

11   I'm sorry, instead of 200 and 100, it says 400 and 200,

12   correct?

13       A.    That's correct.

14       Q.    And if you look at 3849, which is your draft,

15   that's got the 400 and the 200, right?

16       A.    Yes.

17       Q.    So my question to you, then, Mr. Carroll, is,

18   if you prepared a draft and then you checked it with

19   your notes, and then you prepared the final, how is it

20   that the final, what you call a final, has different

21   numbers than your notes?

22       A.    Based on discussion with Special Agent

23   Anderson, I think we made certain changes.

24       Q.    Did you review Special Agent Anderson's notes

25   before you wrote the report?

David Carroll - D by Mr. Matasar                    37

1      A.    Yes.

2      Q.    Do you see them there?  They are right before

3  yours.  Do those talk about the 400, 200 or $100?

4      A.    No.

5      Q.    So you had 400, 200.  She had nothing.  And

6  what you say your draft had 400, 200, and your final has

7  200, 100, and the answer -- the reason for that is that

8  Colleen Anderson told you something?

9      A.    That would be my recollection.

10     Q.    Do you remember what she told you?

11     A.    Not in exact words, no.

12     Q.    How about in general?

13     A.    I think that in general our discussion revolved

14  around whether or not it was on an individual basis

15  versus an aggregate basis in terms of looking at Mr. and

16  Mrs. Cabral in an aggregate basis or on an individual

17  basis.

18     Q.    A witness file was opened for Richard Cabral in

19  November 2003; is that right?

20     A.    I don't know the exact date.

21     Q.    But at some point it was written -- it was

22  opened up and it was assigned to Shawna Carroll; is that

23  right?

24     A.    Yes.

25     Q.    And I think you said in your -- I know you said

1    in your declaration that AUSA Cardani concurred with her

2    intention to operate Richard Cabral as a CW and did not

3    foresee any problems with the FBI making payments to

4    him?

5        A.    Could you restate that, please.

6        Q.    Let me look at your declaration number -- on

7    page 10, Mr. Carroll.  Page 10.  It's in the second full

8    paragraph, "AUSA Cardani concurred with her intention to

9    operate him as a CW and did not foresee any problems

10   with the FBI making payments to Richard Cabral."

11       A.    Yes.

12       Q.    What words did Mr. Cardani use when he

13   expressed his concurrence?

14       A.    I don't know.  I wasn't party to that

15   conversation.

16       Q.    So you are just relating what somebody else

17   told you?

18       A.    There was a letter that -- dated after this in

19   2003 that confirms the conversation that my wife,

20   Special Agent Shawna Carroll, had with Mr. Cardani

21   regarding opening Mr. Cabral as a source.

22       Q.    Was there any more detail than just expressed

23   as concurrence in that letter that you recall?

24       A.    Without it in front of me, I can't get -- I

25   don't have it memorized verbatim.

1      Q.      When is the last time you looked at it?

2      A.      Probably within the last month.

3              MR. MATASAR:  Your Honor, we'd renew our

4  request to have that letter provided to the defense.  We

5  can take it up later, Your Honor, if you would like.

6  BY MR. MATASAR:

7      Q.      Was Mr. Cardani made aware of the amount of the

8  payments?

9      A.      Subsequent to trial, he was provided with the

10 details.

11     Q.      How about before?

12     A.      I don't recall any specific conversation.

13     Q.      Do you recall any conversations in general

14 about payments to Richard Cabral, even if not about the

15 specific amounts?

16     A.      No.

17     Q.      Who was this letter addressed to that Shawna

18 Carroll wrote about payment to Richard Cabral?  Who was

19 on the address line at the top?  Was it Chris Cardani?

20 Was it Dwight Holton or, I guess, Karin Immergut?

21     A.      I believe it was Karin Immergut, if she was the

22 United States Attorney at the time.

23     Q.      Who got copies of that letter?

24     A.      One would have gone to his source file and the

25 United States Attorney's Office.

1    Q.    And the source file is one of the files that

2  was made available to Mr. Cardani and Mr. Gorder in

3  January and March of 2009?

4    A.    Let me clarify that.  The source files are

5  maintained only in headquarter city, the Portland

6  office, Portland division of the FBI.  What I had was my

7  working files that I retained in the Medford resident

8  agency.  They had access to those working files.

9    Q.    And what did that say about Richard Cabral's

10  role in the case, if you will?

11    A.    What -- can you clarify that for me?  What did

12  what say about --

13    Q.    Well, what was the -- Richard Cabral was a

14  cooperating witness who was paid money by the United

15  States government, correct?

16    A.    He was paid money by the Federal Bureau of

17  Investigation.

18    Q.    Okay.  Sorry.  By the Federal Bureau of

19  Investigation.  And that information was in your working

20  file, I take it; is that correct?

21    A.    Yes.

22    Q.    Okay.  The first cash payment was for $4,500;

23  is that right?

24    A.    Yes.

25    Q.    When did Mr. Cabral know he was going to get

 1   that money?

 2       A.    I did not generate the request for that so I

 3   can't -- I don't know.

 4       Q.    How was the amount of $4,500 determined?

 5       A.    The agent makes an assessment based on the

 6   value of the information provided by the CW.  It's also

 7   subject to approval by my supervisor, assistant special

 8   agent in charge within the division, and it also is

 9   signed off by what we call our third-party draft system,

10   which is the people that generate the check that

11   ultimately ends up being the payment.

12       Q.    I see.  So the witness is paid with a check,

13   not with cash?

14       A.    No, the witness is paid with cash.

15       Q.    Oh, the witness is paid with cash?

16       A.    (Nodding head.)

17       Q.    So is there some rule for payments to a witness

18   of $5,000 or more that might cause this specific amount

19   here to be 4500?

20       A.    No.

21       Q.    Are you aware of any system that would have

22   been calculated to propose that amount of $4,500?

23       A.    No.

24       Q.    I want to go back for a second, though, to

25   your -- the file that was made available in January and

1   March 2009.  You said here that you thought it was your

2   working file and that it contained the information about

3   the payments.  But didn't you say earlier that you had

4   the source files shipped down from Portland to Medford

5   for these January and March 2009 meetings?

6       A.    No, I did not.

7       Q.    Were you present or are you aware of where the

8   payment was made to Richard Cabral, the first payment,

9   the $4500 one?

10      A.    I believe it was at his residence.

11      Q.    Okay.  You weren't present?

12      A.    Yes, I was.

13      Q.    You were present for the first one?

14      A.    Yes.

15      Q.    Okay.  Did he count it?

16      A.    I believe my wife counted it in front of him

17  and then I counted it a second time in front of him.

18      Q.    Did he have to sign some papers?

19      A.    He had to sign a receipt for it.

20      Q.    Okay.  Was he able to read the receipt or did

21  somebody have to read it to him?

22      A.    The receipt was read to him, I believe.

23      Q.    Because his -- he had visual problems, correct?

24      A.    Yes.

25      Q.    Was his wife present on that occasion?

1      A.     No.

2      Q.     What kind of report is written to reflect this

3   payment -- this kind of payment?

4      A.     The paperwork generated to initiate the payment

5   and the receipt for the actual physical handing over the

6   money is the report in and of itself.  It stands on its

7   own.  It's signed by the individual that received the

8   money and signed by the witnessing agents who have given

9   the money.

10     Q.     And that report is kept in which file, or those

11  receipts and that material is kept in which file?

12     A.     The source file.

13     Q.     Okay.  Is there a notification or a report to

14  the United States Attorney indicating the fact or the

15  amount of the payment when it is made?

16     A.     No.

17     Q.     When Richard Cabral's file was opened by the

18  FBI, it was assigned to Shawna Carroll; is that right?

19     A.     Yes.

20     Q.     And she's the one who spoke to Chris Cardani

21  about it?

22     A.     Yes.

23     Q.     She wrote the letter to Chris Cardani?

24     A.     Yes.

25     Q.     At some point, sometime in about 2004, she

1   stopped working for the FBI, is that right, or took a

2   leave?

3       A.    Yes.

4       Q.    About when was that?  The year, was it 2004?

5       A.    Yes.

6       Q.    And you didn't get assigned this case, that is

7   to say, you didn't get assigned Richard Cabral as a

8   witness until March 16, 2006, correct?

9       A.    I don't think I understand what you mean.

10      Q.    I don't know if you saw Agent Sweeney's

11  declaration, but I think we have reason to believe that

12  you were assigned this case on March 16, 2006, the

13  Cabral cooperating witness file.

14      A.    I don't have a specific recollection of when

15  the case was formally assigned to me.

16      Q.    Okay.  But there was a time that Shawna

17  Carroll, maybe as much as two years, who was assigned

18  the case wasn't working at the FBI before it was

19  assigned to you; is that correct?

20      A.    Yes.

21      Q.    And during a period like that where the

22  agent -- the assigned agent is not present in the

23  office, does that not impose a -- isn't more scrutiny

24  required by the United States Attorney assigned to the

25  case on that witness?

1     A.     No.

2     Q.     Is there any -- are there any guidelines

3 about -- once the United States Attorney concurs with

4 payment to a witness, is there any guidelines that the

5 FBI has about the amount that can be paid a witness

6 without going back to the United States Attorney?

7     A.     I think the limit now as of recent Attorney

8 General guidelines is $100,000.

9     Q.     How about then?

10    A.     You know --

11    Q.     Are you aware of any then?

12    A.     I don't think there was a limitation at that

13 point in time.

14    Q.     So from the time the file gets -- or the United

15 States Attorney gives the concurrence that payments can

16 be made and the whole rest of it is up to the FBI?

17    A.     Yes.

18    Q.     When initially opened as a witness by the FBI,

19 Barbara Cabral I'm asking about now, she was opened

20 under a classification for someone that was in a

21 position to testify; is that correct?

22    A.     Yes.

23    Q.     There was a likelihood that she could testify?

24    A.     There was the possibility that she could

25 testify.

1    Q.    Well, you said that there was a likelihood that

2    she could at some point testify, if you look at the

3    bottom of page 2 of your declaration, did you not?

4    A.    I do say that.

5    Q.    Okay.  So it's not my word, it's your word?

6    A.    No, but, you know, looking back at this in

7    hindsight, I mean there was no determination made at the

8    point in time when she was opened as a cooperating

9    witness that she was going to testify anywhere because

10   we didn't know what she was going to provide at that

11   time.

12   Q.    Of course, of course.  But at that time there

13   was many, many qualifications, and one of the

14   qualifications could be for someone who was in a

15   position to testify, right?  I mean, as opposed to some

16   people who could be classified as people who are never

17   going to testify?

18   A.    Yes.

19   Q.    Okay.  And she provided, during the time period

20   from when she was first opened which was in 2004, she

21   provided substantial information to the FBI to the

22   government from -- in those six years between the time

23   she was first opened and the time she testified,

24   correct?

25   A.    She provided information, yes.

1    Q.    Okay.  She gave information about -- all right.

2    Let me -- I want to ask a few questions about the

3    interview and the second cash payment on March 21, 2005.

4    I think I already called your attention to March 21,

5    2005.  If you look at the report there, do you see that,

6    the typed report?  I think it's 3845 on the bottom

7    right.

8    A.    Yes, I see it.

9    Q.    So at that time she provided information to the

10   FBI about Pete Seda, right?  She gave his e-mail

11   address, for example?

12   A.    Yes.

13   Q.    Okay.  And his fax number?  And at this time he

14   was not in the United States; is that correct?

15   A.    No, he was not.

16   Q.    Okay.  So also on March 21, 2005, as you

17   indicated before, there was a payment of $5,000,

18   correct?

19   A.    Yes.  The notes indicate there was a payment

20   that day.

21   Q.    Both Cabrals were present?

22   A.    Yes.

23   Q.    So she provided information that day and he

24   provided information that day and $5,000 was paid that

25   day in cash?  Was it in cash?

David Carroll - D by Mr. Matasar                    48

1      A.    Yes.

2      Q.    You were present?

3      A.    Yes.

4      Q.    Did you count it or did Mrs. Cabral count it?

5      A.    I counted it in front of Agent Anderson, who

6  was present with me during the course of this payment,

7  and Mr. and Mrs. Cabral.  And I --

8      Q.    Pardon?

9      A.    Nothing.

10      Q.    How exactly was the money transferred?  What --

11  the currency, did you have it when -- was this in their

12  house or was this at the office?

13      A.    This was at their house.

14      Q.    Okay.  Who brought the money into their house?

15      A.    I did.

16      Q.    It was in an envelope?

17      A.    Likely, yes.

18      Q.    Do you recall where you put the money to make

19  the payment to them?

20      A.    I handed it to Mr. Cabral.

21      Q.    Okay.  Did he sign a receipt?

22      A.    Yes.

23      Q.    Did you read it to him or did Mrs. Cabral read

24  it to him?

25      A.    I did.

David Carroll - D by Mr. Matasar                    49

1      Q.    Where was she when this payment was made?

2      A.    In the kitchen, in the living room, I don't

3  specifically recall.

4      Q.    Was she with him -- was she at the same

5  location where he was when the payment was made?

6      A.    She was at the residence, yes.

7      Q.    Okay.  And you don't recall how close she was

8  at the time the payment was made?

9      A.    No.

10     Q.    Now, Mr. Carroll, you indicated that you used

11 your notes to prepare your report, correct?

12     A.    Yes.

13     Q.    Now, in this case your notes reflect a payment,

14 do they not?

15     A.    Yes.

16     Q.    But the report does not?

17     A.    Without being able to read through redacted

18 handwriting, I can't say whether or not the $5,000 was

19 mentioned there, but as I said earlier, the receipt

20 stands on its own.

21     Q.    I understand.  Did you do the redactions of

22 this report?  You indicated that you redacted most of

23 these.  Did you redact this report?

24     A.    I can't specifically say, but I -- probably so.

25     Q.    Do you recall if the $5,000 is in this report

1    or not?

2        A.    I do not.

3            MR. MATASAR:  We'll request that the government

4    provide us the non-redacted report.

5    BY MR. MATASAR:

6        Q.    Your declaration says no payments have been

7    made to Barbara Cabral; is that correct?

8        A.    That's correct.

9        Q.    It says that.  As far as you know the Cabrals

10   shared their money, if you know?

11       A.    I don't know.

12       Q.    Could Richard Cabral -- did he have good

13   eyesight from what you saw to be able to count the money

14   himself?

15       A.    Not being a doctor, I could not say; however, I

16   do know he watched TV.

17       Q.    Okay.  Did you see him read anything himself or

18   did you read things to him when he had to review FBI

19   documents?

20       A.    I'm not sure what FBI documents you are

21   referring to.

22       Q.    Well, he had to sign a receipt --

23       A.    Yes.

24       Q.    -- for the money?

25       A.    Yes.

1    Q.    And you read those to him, correct?

2    A.    Yes.

3    Q.    Was it your typical practice, when you gave a

4    cooperating witness money, to read the receipt to them

5    or just let them read it themselves?

6    A.    Common practice was to read the receipt to them

7    because the receipt also has a clause that helps us as

8    agents making the payments to remind the cooperating

9    witness that they are required to report this as income

10   to the IRS.

11   Q.    Didn't -- did he not sign any other FBI

12   documents?

13   A.    I'm only aware of him signing receipts for the

14   three payments made to him.

15   Q.    He's not signed up as a cooperating witness in

16   some formal way?

17   A.    He's never required to sign anything.

18   Q.    Barbara Cabral herself believed that the

19   payment that was given to them satisfied any

20   consideration due to her for the information that she

21   provided, did she not?

22   A.    Well, the payment wasn't to them.  Any payments

23   were to Richard Cabral.  I can't speak to what her

24   sentiment was as to how she felt about those payments.

25   Q.    She didn't tell you that?

```
 1    A.    Not that I recall.

 2          MR. MATASAR:  I'm sorry, that was Agent

 3    Sweeney.  Hold on a second.

 4          MR. PAPAGNI:  Is this what you are looking for,

 5    Cabral's statement?

 6          (Discussion held off the record between

 7    Mr. Papagni and Mr. Matasar.)

 8          MR. MATASAR:  I'm sorry, never mind.  I'm

 9    sorry, it was a different agent.

10    BY MR. MATASAR:

11    Q.    Before the trial you told Barbara Cabral that

12    you would attempt to get her some money from the

13    government after the trial, correct?

14          MR. PAPAGNI:  Objection to the form of the

15    question.  If he can refer to a specific place where he

16    said those words, I'll be quiet, but I object to the

17    form of that question.

18          THE COURT:  Ask the question again, please.

19    BY MR. MATASAR:

20    Q.    At some point did you have a conversation with

21    Barbara Cabral about paying her money?

22    A.    Yes.

23    Q.    When was that?

24    A.    I don't have a specific date.

25    Q.    But it was between April 19, 2010, and the day
```

David Carroll - D by Mr. Matasar                    53

1    of the trial?

2        A.    Yes.

3        Q.    Okay.  What was the original amount you wanted

4    to pay her?

5        A.    $10,000.

6        Q.    Was this the amount proposed to the United

7    States Attorney, Mr. Holton, I mean?

8        A.    I've never had a conversation with Mr. Holton

9    about these payments.

10        Q.    Do you know what the amount that was proposed

11    by an assistant United States attorney that she get

12    paid?  Was it $10,000?

13        A.    I'm sorry, could you say that again?  I

14    apologize.

15        Q.    Wasn't there a request made from somebody to

16    somebody, if you don't know if it was Mr. Holton, that's

17    fine, from somebody to somebody that Barbara Cabral get

18    paid an amount of money that was not $10,000?  It was

19    $7500?

20        A.    That's correct.

21        Q.    Okay.  Who made that request?

22        A.    I did.

23        Q.    Okay.  What was Mr. Cardani's position and

24    Mr. Gorder's position?

25        A.    They felt that was too much money because they

1   didn't believe she had made a large enough contribution

2   to the trial for Mr. Sedaghaty.

3       Q.    For the conviction?

4       A.    Correct.

5       Q.    And they felt that 10 was too much but they

6   were happy with the 7500?

7       A.    I don't think they wanted to pay her at all.

8       Q.    So you were permitted to make a request that

9   they disapproved of?

10      A.    I never -- never submitted the request to my

11  front office because of the circumstances that followed.

12      Q.    But --

13      A.    This never got past the discussion stage.

14      Q.    Okay.  Is this type of payment to a witness

15  called a "reward"?

16      A.    No.

17      Q.    Maybe not by the FBI, but might the United

18  States Attorney's Office use the term "reward" to

19  describe this kind of payment?

20          MR. PAPAGNI:  Objection to the form of the

21  question.  Asking the witness to speculate what the U.S.

22  Attorney's Office would say.

23          THE COURT:  Sustained.

24  BY MR. MATASAR:

25      Q.    When is a witness normally told that they might

1    receive money for their testimony?  How early in the

2    case?

3        A.    I can't say.  Every case is different.

4        Q.    You have indicated that Mr. Gorder and

5    Mr. Cardani didn't feel that she contributed enough to

6    the conviction to get paid money.  Is the witness aware

7    that -- when is a witness aware that they might get

8    money?

9            MR. PAPAGNI:  Objection to the form of the

10   question as being irrelevant as far -- considering

11   Ms. Cabral, I have no objection.

12           MR. MATASAR:  I'll ask it about Ms. Cabral.

13   BY MR. MATASAR:

14       Q.    When was Ms. Cabral -- well, Ms. Cabral knew

15   that her husband was getting paid money for cooperating

16   with the government, correct?

17       A.    Yes.

18       Q.    When was she made aware, if at all, that she

19   might get money for cooperating with the government?

20       A.    I made a statement to her at some time between

21   April of 2010 and the beginning of the trial on August

22   of 2010.

23       Q.    So she was not aware of it before that

24   statement of -- and explicitly from you?

25       A.    No.

David Carroll - D by Mr. Matasar                      56

1    Q.    When you had your conversation with her, did

2  you make her aware that her contribution to the

3  conviction is a factor that the United States Attorney's

4  Office would consider in determining how much money she

5  got paid?

6    A.    No.

7    Q.    Did you talk to her about the amount at all?

8    A.    No, not at the time I made that statement, no.

9    Q.    Or later?

10   A.    Later, after trial, I did.

11   Q.    Okay.  Not before trial?

12   A.    Correct.

13   Q.    When you told her about getting her money, you

14 told her that she couldn't get paid until after the

15 sentencing; is that correct?

16   A.    I didn't specify any -- I did not say any

17 specific time, to my recollection.

18   Q.    Look at page 6 of your declaration, doesn't the

19 end of the second full paragraph say that you advised

20 her that sentencing had yet to occur and that if any

21 payment were to occur, it would likely come after

22 sentencing?

23   A.    Page 6?

24   Q.    The bottom of your declaration page 6.  I'm

25 sorry, the bottom of second full paragraph.

1      A.    I said it would likely come after sentencing.

2      Q.    Okay.

3      A.    Okay.

4      Q.    But that was your term, "after sentencing," not

5 mine, right?  It's what you wrote?

6      A.    Yes.

7      Q.    And then -- is that the FBI policy?

8      A.    As far as I'm aware, there is no FBI policy

9 dictating when you tell anybody when you are going to

10 make a payment to them.

11      Q.    So why did you tell Ms. Cabral in this case

12 "after sentencing"?

13      A.    On my discussions with Mr. Cardani and

14 Mr. Gorder, they didn't want me to pay her at all, and

15 it just seemed to be the appropriate time.

16      Q.    Well, they didn't want you to pay her until

17 after all appeals were done; isn't that correct?

18      A.    They didn't really want me to pay her at all.

19      Q.    Correct.  But if you were -- but they told you

20 that if you were going to pay her, it would have to be

21 after all appeals were completed, correct?

22      A.    That was something they suggested.

23      Q.    All right.  And that was after you had advised

24 her "after sentencing"?

25      A.    Yes.

1    Q.    So you told her "after sentencing," and then

2    they told you something else?

3    A.    No, no, back up for a second.

4    Q.    Okay.  You told Ms. Cabral that payment would

5    likely come, if at all, after sentencing?

6    A.    Yes.

7    Q.    Okay.  And then you spoke with Mr. Cardani and

8    Mr. Gorder, and they said that preference -- the payment

9    be made after sentencing and, if possible, after the

10   exhaustion of all appeals?

11   A.    Yes.

12   Q.    Did you also relay that to her later?

13   A.    No.

14         (Discussion held off the record between

15   co-counsel.)

16   BY MR. MATASAR:

17   Q.    Mr. Carroll, the last question concerns your --

18   what you call your personal notes.  In this book that's

19   in front of you on the witness stand, you have looked at

20   some handwritten notes that are in that book, correct?

21   A.    Yes.

22   Q.    And you've indicated that you've also consulted

23   other notes to write your declaration and for this case,

24   correct?

25   A.    Yes.

1    Q.    And a telephone log, what is that?  Is that

2    handwritten or typed?

3    A.    It would be what you see here in this book.

4    Handwritten.

5    Q.    Okay.  Where are the notes -- where -- let me

6    put it this way:  Are there handwritten notes, whether

7    they be telephone logs to personal notes, that have not

8    been provided to the United States Attorney's Office or

9    I guess more -- strike the United States Attorney's

10   Office, as far as you know to the defense?

11   A.    No.

12   Q.    Didn't you talk about an April 19th report in

13   which you consulted your notes -- I'm sorry, the -- no

14   notes, no report, correct?

15   A.    You --

16   Q.    Hold on a second.

17   A.    You lost me again.

18        THE COURT:  That's all right.  No question.

19   BY MR. MATASAR:

20   Q.    I'm sorry, I'm sorry, yes.  You testified --

21   I'm sorry.  You testified that you picked the date

22   April 19th from looking at something, right?  Remember,

23   you had testified that you had this conversation about

24   paying money to Barbara Cabral between April 19th and

25   the trial.  And I asked you at the very beginning where

1    did you get that April 19th date.  And you said

2    something like a telephone log or something.  What is

3    that that has April 19th?

4        A.    It would be a telephone log.

5        Q.    And that was not given to the defense, was it?

6        A.    To my understanding, that's been provided to

7    the judge in camera regarding our lead-up to this

8    hearing.

9             MR. MATASAR:  Okay.  Well, no further

10   questions, Your Honor.  We renew our request for that

11   material.

12            MR. PAPAGNI:  Do you want a break, Judge, or do

13   you want me to go?

14            THE COURT:  No.

15            MR. PAPAGNI:  Okay.

16                        CROSS-EXAMINATION

17   BY MR. PAPAGNI:

18       Q.    April 19th was a date of interest to you

19   because that's when Barbara Cabral had something that

20   she thought was a heart attack?

21       A.    Yes, she advised me of that.

22       Q.    And before April 19, 2010, after she became a

23   witness in this case, or at least the government put it

24   in their witness list that she was going to be, she

25   apparently was having stress, at least you thought and

1    her husband thought, because of her cooperation here?

2        A.    Yes.

3        Q.    So that date sticks out in your mind?

4        A.    Yes.

5        Q.    And you had not mentioned before that date at

6    all that you would try to get her something after this

7    case was over, had you?

8        A.    Not prior to that time, no.

9        Q.    But after she had these heart problems, and she

10   lost her husband, and she was having some other

11   difficulties, that's when you first brought it up,

12   right?

13       A.    Yes.

14       Q.    Okay.  Let's back up a little bit so the record

15   would be complete on this one.  This declaration you've

16   been referring to, will you affirm today that you wrote

17   this declaration and everything in it that Judge Hogan

18   is going to consider is accurate to the best of your

19   recollection?

20       A.    Yes.

21       Q.    And you did not tell either the prosecutors

22   about this pretrial statement to Barbara Cabral that you

23   were going to try to get her something until after the

24   trial was done and, in fact, it was not until December

25   of 2010?

David Carroll - X by Mr. Papagni                    62

1      A.    That's correct.

2      Q.    And the reason why you didn't do it is that you

3  hadn't promised her anything and you just didn't think

4  it was that significant?

5      A.    That's correct.

6      Q.    As far as these notes of Bobbie Cabral, when

7  you are providing the notes to the defense, did you give

8  it to the defense or did that go through your trial

9  team, either the federal prosecutors or Colleen

10 Anderson?

11     A.    Both, both the prosecutors and Ms. Anderson,

12 Agent Anderson.

13     Q.    Now, Agent, what I'm going to try to do is

14 break this down into a few parts here.  I'm going to

15 first try to go over some of the areas covered by

16 Mr. Matasar, then I want to ask you some questions about

17 what motivated you to seek this money for Ms. Cabral,

18 and then ask you about how you went about that.

19           So the questions that Mr. Matasar was asking

20 you, I may get back to this, but he asked you when you

21 were trying to get something for her, he asked you if

22 that was money.  Did you tell her money or did you just

23 simply say you were going to try to do something for her

24 or get something for her when the trial was done?

25     A.    No, I never mentioned money.  I said I would

1    try and get her something.

2        Q.    But you meant money?

3        A.    Yes.

4        Q.    Okay.  And when you finally got around to

5    telling the prosecutors, which was after the trial was

6    over, the two prosecutors, Gorder and Cardani, didn't

7    want to give her anything because her involvement, her

8    contribution to the trial, was minimal?

9        A.    That's correct.

10       Q.    They didn't see her as a critical witness, did

11   they?

12       A.    No, they did not.

13       Q.    Now, all this money that you gave to

14   Mr. Cabral, this $14,500, that all occurred how many

15   years before the trial happened?

16       A.    The last payment was four years before the

17   trial.

18       Q.    And then he died?

19       A.    Correct.

20       Q.    And did you ever hand any of this cash to him

21   personally?

22       A.    Only to Mr. Cabral.

23       Q.    Well, did he ever tell you, hey, what about

24   Barbara here, she's helping out, why not some money for

25   her, that ever happen?

1      A.      No.

2      Q.      Did Barbara ever object saying, well, you gave

3  some money to my husband, how about giving me a few

4  dollars here, I'm giving you some information?  Did that

5  ever happen?

6      A.      No.

7      Q.      Now, when you were talking about -- Mr. Matasar

8  was saying Barbara was providing the information about,

9  and then he kind of stopped in the middle of his

10  sentence, I'm going to see if I can finish that

11  sentence, isn't it true that Barbara Cabral and Richard

12  Cabral are not only giving you information about this

13  defendant but about other investigations?

14     A.      Yes.

15     Q.      So that kind of went into what you were

16  figuring was -- you and Shawna Carroll thought was a

17  fair amount of money to pay for these people's help?

18     A.      Yes.

19     Q.      So it wasn't just this defendant?  It concerned

20  some other matters, correct?

21     A.      Yes.

22     Q.      Now, you talked about at one point that you

23  wanted to give this woman $10,000, not $7500.  Why did

24  you want to her give more than 7500 bucks?

25     A.      I felt it was the right thing to do.

1    Q.    But the two prosecutors were having none of it,

2  were they?

3    A.    No.

4    Q.    We'll get -- at the time, from what your

5  testimony is, Agent, is that nowadays you can't give

6  them more than $100,000 without some sort of approval,

7  but back then, you could have given her or asked for up

8  to whatever you wanted to, right?

9    A.    That's correct.

10    Q.    And all you asked the prosecutor for was 7500

11  bucks?

12    A.    Yes.

13    Q.    Now, you were asked a question -- some

14  questions by Mr. Matasar referring to Agent Sweeney's

15  letter.  I'm only going to refer to two paragraphs in

16  that.  Paragraphs 4 and paragraph 7 --

17        MR. MATASAR:  I'm going to object, Your Honor.

18  It was only, I think, a misstatement that I asked this

19  witness about another witness's testimony or

20  declaration, I don't think it's an appropriate question.

21        MR. PAPAGNI:  Well, I'll tell you what I'm

22  going to go into and the court can make a ruling.  In

23  paragraph 7, it involves Mr. Cardani's concurrence

24  regarding payments to Mr. Richard Cabral and the

25  circumstance --

1          THE COURT:  The objection is overruled.

2    BY MR. PAPAGNI:

3      Q.     And, Agent, I'm going to read this paragraph to

4    you, and if you can confirm it or not, that's all I

5    want.

6          To your personal knowledge, did this letter

7    specifically confirm that AUSA Cardani's verbal

8    concurrence granted -- which was in this case the

9    previous day regarding Special Agent Shawna Carroll's

10   request to make anticipated but unspecified FBI payments

11   to Mr. Cabral, Richard Cabral, for expenses and/or

12   services during the course of the investigation.  And

13   the letter went on to say AUSA Cardani foresees no

14   problem with the FBI making payments to the captioned

15   individual, that'd be Richard Cabral, for expenses and/

16   or services during the investigation.

17         Is that your understanding, sir, yes or no?

18     A.     Yes.

19     Q.     In paragraph 4, Special Agent Sweeney, this

20   involves the questions Mr. Matasar asked you about when

21   Shawna Carroll became the agent and then you later took

22   it over.  Sweeney -- is this consistent with your

23   recollection, Agent Carroll, David Carroll, my review of

24   this CHS file, that's Mr. Sweeney's review, what's CHS?

25     A.     Confidential human source.

1    Q.    Was first opened and assigned to Special Agent

2    Shawna M. Carroll on the basis of her written request

3    and upon Assistant United States Attorney Chris

4    Cardani's verbal concurrence given on November 3, 2003.

5    The file was subsequently reassigned to Special Agent

6    David Carroll on March 16, 2006.  Correct?

7    A.    Yes.

8    Q.    Now, your wife, Special Agent Shawna Carroll,

9    she started a process to leave the FBI in 2004, correct?

10   A.    I wouldn't characterize it as leaving the FBI

11   at that point in time.

12   Q.    She didn't actually leave the FBI, retire from

13   the FBI completely, until 2006; is that correct?

14   A.    That's correct.

15   Q.    And that's all I have regarding --

16        THE WITNESS:  Your Honor -- Your Honor, could I

17   have a restroom break?

18        THE COURT:  Yeah, we'll take a break, health

19   break, everyone.

20        MR. PAPAGNI:  I've got about 15 or 20 more

21   minutes and that's all, Judge.

22        (Recess:  3:22 until 3:29 p.m.)

23   BY MR. PAPAGNI:

24   Q.    May it please the court, Agent Carroll, just

25   before we broke, we were covering some topics, and one

1   of them was -- at least one of them was going to be --

2   Mr. Matasar asked you some questions about these

3   redactions in these reports that were turned over to the

4   defense.  And you told him you were the one that did the

5   redactions, you lined out lines.  And these reports were

6   pertaining primarily, if not exclusively, to Richard

7   Cabral, true?

8       A.   Yes.

9       Q.   And, in fact, when you did that, did you do it

10  in consultation with the lady seated next to me,

11  Assistant United States Attorney Kelly Zusman?

12          MR. MATASAR:  I'm going to object, Your Honor.

13  I don't think it's appropriate to ask questions about

14  what is blacked out in reports that we haven't been able

15  to see.  I think if they ask questions like this, we

16  have to be able to see the unredacted versions.

17  Otherwise it's impossible to question the witness about

18  these -- this information.

19          MR. PAPAGNI:  I understand Mr. Matasar's

20  concern, but I think his question was who did the

21  redactions.  And that's the only question I'm asking.

22          THE COURT:  That's fine.  Go ahead.

23          MR. MATASAR:  I thought the question was about

24  Richard -- the word -- weren't they about Richard Cabral

25  and what was the content?  That's what I'm objecting to.

1           THE COURT:  The objection was overruled.

2  BY MR. PAPAGNI:

3       Q.    Who assisted you in doing the redaction of

4  these reports that Mr. Matasar was asking you about?

5       A.    Ms. Zusman.

6       Q.    Thank you.  Now, I think that what I'd like to

7  focus in now, as I told you before the break, is I have

8  some questions regarding your declaration and your

9  motivations for seeking this payment for Barbara Cabral.

10          Now, in your declaration before trial you tell

11  Barbara Cabral you are going to try to get her

12  something, and you meant money, true?

13      A.    Yes.

14      Q.    And before trial you talked to Assistant United

15  States Attorney Gorder, and he asked you if she had been

16  paid any money and you say no?

17      A.    That's correct.

18      Q.    Okay.  What else did he ask you at that time or

19  tell you at that time?  If you need to look at your

20  declaration, go ahead and do that.

21      A.    In my declaration I don't mention anything

22  beyond that, but my recollection is that he may have

23  mentioned "don't pay her until after trial."

24      Q.    He didn't want you to pay her until the case

25  was done?

David Carroll - X by Mr. Papagni                          70

1    A.    Correct.

2    Q.    Didn't want her to be paid until then?

3    A.    Correct.

4    Q.    Okay.  Now, as we established before the break,

5  the first time in all the years that you were dealing

6  with Richard Cabral and Barbara Cabral, the first time

7  you even suggested to Barbara Cabral that you were going

8  to give her money was after she had this heart problem

9  that put her in the hospital?

10    A.    Yes.

11    Q.    And as the pleadings sometimes refer to the

12  fact that she kind of viewed you as a friend, correct,

13  you and Shawna?

14    A.    Yes, yes.

15    Q.    Yes?

16    A.    Yes.

17    Q.    In fact, invited both of you to her wedding

18  when she remarried, right?

19    A.    Yes, she did.

20    Q.    You didn't go?

21    A.    No, we did not.

22    Q.    Now, when you're working informants or

23  witnesses as an agent you try to develop a friendship

24  with witnesses and informants because there needs to be

25  some trust and confidence, right?

1    A.    Yes.

2    Q.    And you are not allowed, as an agent, to let

3 that personal relationship interfere in evaluating how

4 valued and useful their information is or how much you

5 should pay them, right?

6    A.    Correct.

7    Q.    Now, you were working with Barbara Cabral for

8 about, what, six, seven years?

9    A.    Approximately, yes.

10   Q.    And apparently, did you have personal knowledge

11 that she was suffering quite a bit of stress because

12 every time there was a hearing and the newspaper down

13 there would report her cooperation and where she worked,

14 that caused her problems?

15   A.    Yes.

16   Q.    Were you aware or did she tell you that before

17 you offered to pay her some money, or tried to anyway,

18 that she had a fear that some radical Muslims would

19 retaliate against her for cooperating and repudiating

20 the religion?

21   A.    She had concerns about that.

22   Q.    And did -- at one point did she tell you that

23 there was some financial stress because of her medical

24 expenses?

25   A.    Yes.

1    Q.    Now, there's some pleadings that suggested that

2    maybe she brought that up because she was trying to get

3    some cash out of you.  When she told you this, did she

4    ever ask for any money?

5    A.    No.

6    Q.    Did you ever offer it?

7    A.    No.

8    Q.    You said you'd try to get some, and that was

9    the extent of it, something for her?

10   A.    That's correct.

11   Q.    Now, these emotional, social, and financial

12   stresses that we've just talked about, did she ever

13   express any reluctance about testifying unless she was

14   paid?

15   A.    No.

16   Q.    And wasn't she one of only two members in the

17   southern Oregon Muslim community willing to come forward

18   and testify in this case against the defendant?

19   A.    Yes.

20   Q.    Now, you already said she provided information

21   about other investigations.  Did that go into your

22   consideration about whether you would try to get this

23   woman some money?

24   A.    Yes.

25   Q.    Now, Barbara Cabral never testified before the

1    grand jury, did she?

2        A.    No.

3        Q.    In fact, she was never mentioned by the

4    government in its opening statements at trial, was she?

5             MR. MATASAR:   Objection.   How does he know?

6             MR. PAPAGNI:   Well, you're right.   I should lay

7    a foundation.

8    BY MR. PAPAGNI:

9        Q.    Were you present during the trial?

10       A.    Yes.

11       Q.    Did you hear opening statements?

12       A.    Yes.

13       Q.    Did -- was there any mention by the government

14   of Barbara Cabral in the opening statements to your

15   recollection, sir?

16       A.    Not to my recollection, no.

17       Q.    Well, the reason why I'm going into this, sir,

18   is that it was after the trial that you went to the

19   prosecutors to get her some money for the benefit and

20   the valuable testimony information that she gave, wasn't

21   that why you waited?   You didn't tell Mr. Gorder until

22   after trial?

23       A.    A contributing factor to several factors of why

24   I wanted to pay her.

25       Q.    Now, when you are trying to evaluate how much

 1    you are going to ask the prosecutors for, did you take

 2    into consideration that when she testified about the

 3    Hajj to Mecca in 1999 with the defendant, there were

 4    eight other persons, including, David Hafer, H-A-F-E-R,

 5    and Rob Brown, who were defendant's witnesses on that --

 6    their list, but they didn't testify about that trip?

 7    Take that into consideration?

 8        A.    Yeah.

 9        Q.    And when she testified at trial about a jewelry

10    sale -- in fact, you were present when Barbara Cabral

11    testified, weren't you?

12        A.    Yes.

13        Q.    You heard her testify about a jewelry sale at

14    the defendant's home to raise money for the Chechnyan

15    mujahideen, and that the woman who participated in that

16    jewelry sale was a -- I can't pronounce her name.  What

17    was her name?

18        A.    I believe you are referring to Raya Shokatfard.

19        Q.    Yeah, she was on the defendant's witness list,

20    and she was flown out from Egypt, but she didn't testify

21    either, did she?

22        A.    No.

23        Q.    Defendants didn't call her to the stand?

24        A.    No.

25        Q.    And during Ms. Cabral's testimony, Mr. Wax

1   objected to Ms. Cabral referring to any of her dead

2   husband's statements as hearsay, and rightly so, but you

3   heard that, right?

4       A.    Yes.

5       Q.    And were you present for the closing arguments?

6       A.    Yes.

7       Q.    And isn't it true in closing arguments, the two

8   federal prosecutors, Gorder and Cardani, they only

9   referred to Barbara Cabral three times in all their

10  argument?

11      A.    It's my understanding, yes.

12      Q.    And Mr. Wax, who argued for two hours, only

13  referred to her once; is that true?

14      A.    Yes.

15      Q.    And you reviewed those transcripts, have you

16  not?

17      A.    Yes.

18      Q.    So after that, in October, you go to Barbara

19  Cabral, in October, and you mentioned at this point you

20  are going to try to get her some money, correct?

21      A.    Yes.

22      Q.    How much were you going to try to get her?

23      A.    I told her $7500.

24      Q.    And didn't Daveed Gartenstein-Ross testify at

25  trial about the same topics that Ms. Cabral testified

David Carroll - X by Mr. Papagni                          76

1   to?

2       A.     Daveed Gartenstein-Ross did testify.

3       Q.     So you had two witnesses about this Hajj in

4   1999, was it, that were trying to aid the mujahideen, I

5   should say?

6       A.     Yes.

7       Q.     And there were exhibits, computer exhibits and

8   exhibits, that were offered, too?

9       A.     Yes.

10      Q.     So when it came to Barbara Cabral as far as her

11  impact and importance on the trial, when you were

12  evaluating how much money she should get paid, when you

13  told Cardani and Gorder that you wanted to get this

14  $7500 for her, in your declaration you said the impact

15  was what?  How valuable was her testimony?

16      A.     Minimal, is what they said.

17      Q.     And originally you wanted to get her 10 grand,

18  didn't you?

19      A.     Yes.

20      Q.     In fact, if you could have got her more, you

21  probably would have tried for more, wouldn't you, Agent

22  Carroll?

23      A.     Yes.

24      Q.     Now, Agent Carroll, you'd acknowledge to Judge

25  Hogan, would you not, that it was a mistake to not tell

1    the prosecutors so they could tell the defense that you

2    had mentioned to Ms. Cabral before trial that you would

3    try to get her something.

4       A.    Yes, it was a mistake.  I should have told the

5    prosecutors before trial.

6       Q.    And after trial you tried to get her this

7    money.  And you just got through testifying, all these

8    leading questions that I asked you, that she wasn't that

9    important a witness but you still tried to get her

10   money.  What were you thinking?  What did you think

11   justified you going to these prosecutors to get this

12   woman money and not Daveed Gartenstein-Ross or somebody

13   else?

14      A.    I thought she deserved it.  She had guts to

15   testify.  She had contributed quite a bit to the

16   intelligence, basically, of the FBI about other

17   investigations.  She had a husband who died.  She had

18   health problems directly related to this case.  That was

19   my belief.  She deserved it.

20      Q.    Agent, when I was asking you questions, I told

21   you -- or asked you, I should say, in my questions, that

22   when you have an informant or a witness, you build a

23   relationship but you can't give them money based upon

24   your emotions, you got to give it based on the value of

25   their testimony; is that true?

1    A.    It's true.  I let my heart get in the way of my

2    decision-making process with Ms. Cabral.

3    Q.    But when you asked Mr. Cardani and

4    Mr. Gorder -- Mr. Gorder asked you, what, about her

5    medical expenses?

6    A.    Yes.

7    Q.    Mr. Cardani wasn't concerned about that, was

8    he?

9    A.    Not really.

10   Q.    He looked at what she offered at trial, right?

11   A.    Yes.

12   Q.    And they told you long before we had a single

13   motion on this matter filed by the defense lawyers that

14   her contributions were minimal and they weren't going to

15   support that request?

16   A.    That's correct.

17   Q.    But they ran it up the flagpole to the U.S.

18   Attorney, correct?

19   A.    Yes.

20   Q.    And he agreed with them, didn't he?

21   A.    Yes.

22   Q.    During the course of you trying to get this

23   woman some money, you pointed out -- you were the one

24   that pointed out that before trial you had said you'd

25   try to get her something, right?

David Carroll - X by Mr. Papagni                    79

1    A.    Yes.

2    Q.    So it's crystal clear, no one from the

3  prosecution team, not Colleen Anderson, or some other

4  FBI agent ratted you out or came to the prosecutors and

5  said, hey, there was a promise here?

6    A.    No.

7    Q.    You reported on yourself, didn't you?

8    A.    Yes.

9    Q.    Now, the last little issue regarding Ms. Cabral

10 is that, Barbara Cabral, before you had mentioned that

11 you'd try to get her something, you had all these

12 statements of these interviews you did regarding her

13 statements concerning the defendant, correct?

14   A.    Yes.

15   Q.    And then you're making your comment you'd try

16 to get her something and then she testifies at trial,

17 correct?

18   A.    Yes.

19   Q.    So you heard what she said before you said

20 you'd try to get her something and you heard what she

21 said at trial, correct?

22   A.    Yes.

23   Q.    Was her testimony at trial any more damning to

24 the defendant or incriminating to the defendant than

25 what she said before you made that comment on the

1    telephone that you'd try to get her something?

2        A.    No.

3        Q.    Now, as far as outrageous government conduct is

4    concerned, Agent, I'm going to ask you some questions to

5    put in perspective what you did.  You just got to

6    acknowledge that you did wrong.

7              Now, before trial at any time did you promise

8    her any cash, direct money?

9        A.    No.

10       Q.    You said you'd try to get her some money?

11       A.    That's correct.

12       Q.    Did you tell her the amount of money you'd try

13   to get her?

14       A.    No.

15       Q.    Did you ever give her some money?

16       A.    No.

17       Q.    Did you ever secretly arrange a meeting

18   intending to give her some money?

19       A.    No.

20       Q.    Did you ever give her anything else of value

21   like gold or jewelry or some other things that couldn't

22   be traced?

23       A.    No.

24       Q.    Did you secretly give her second husband any

25   money so no one would know?

David Carroll - X by Mr. Papagni                    81

1      A.      No.

2      Q.      And did you ever deposit any cash into her or

3  her second husband's bank accounts so no one would find

4  out?

5      A.      No.

6      Q.      Did you tell her to keep a secret from the

7  prosecutors and Agent Anderson and even her second

8  husband that you would be trying to get her something

9  after trial?

10     A.      No.

11     Q.      Did you tell her that you would try to get her

12 something if her testimony at trial would make sure this

13 defendant would be convicted?

14     A.      No.

15     Q.      In other words, you connect any of her

16 testimony with her getting paid if you could get the

17 money for it?

18     A.      No.

19     Q.      And did you tell her that even if you couldn't

20 get the approval of the United States Attorney's Office

21 or your FBI supervisor's for the money, that you still

22 would somehow make sure she'd get something in the

23 future?

24     A.      No.

25     Q.      You've never given her a dime, have you?

1     A.    No.

2           MR. PAPAGNI:  Your witness.

3                    REDIRECT EXAMINATION

4     BY MR. MATASAR:

5     Q.    You didn't give her second husband any money,

6     but you gave her first husband $14,500, right?

7     A.    Yes.

8     Q.    And there was a meeting in which it was decided

9     not to tell the defense about this money because she

10    wasn't going to be a witness, right?

11    A.    I believe I stated earlier here the decision

12    was made based on the fact that he was deceased.

13    Q.    Mr. Carroll, you testified before and you wrote

14    in your declaration that there were two reasons?

15    A.    Yeah.

16    Q.    The second reason was what?

17    A.    She wasn't going to be a witness.

18    Q.    Right.  And you knew once she was going to be a

19    witness that the fact that the money was paid to her

20    husband and he was disabled and she took care of him

21    should have been -- that fact should have been given to

22    the defense?

23    A.    In hindsight now, yes, it should have been

24    turned over to the defense.

25    Q.    And you didn't tell that to the prosecutors at

 1    the time?

 2        A.    Right.

 3        Q.    You acknowledge that?

 4        A.    The prosecutors were aware that he had been

 5    paid.

 6        Q.    And they were aware that the reason that you

 7    weren't giving the information about the payment to the

 8    defense was that she didn't testify, one of the two

 9    reasons -- or, I'm sorry, she wasn't listed as a

10    witness?

11        A.    Could you --

12              THE COURT:  I lost track of that question.

13              MR. MATASAR:  I'll withdraw the question.

14    BY MR. MATASAR:

15        Q.    You were present during the trial?

16        A.    Yes.

17        Q.    You saw Evan Kohlmann testify?

18        A.    Yes.

19        Q.    You saw Evan Kohlmann testify for longer than

20    any other single government witness, even longer than

21    Mr. Wilcox?

22        A.    I didn't keep track of the time, to be honest

23    with you.

24        Q.    It was pretty long, though, wasn't it?

25        A.    Yeah, it was quite a while.

1       Q.     All right.  And then in this time Evan Kohlmann

2    kept talking the mujahideen, the mujahideen, the

3    mujahideen, did he not?

4       A.     To some degree.

5       Q.     Would you be surprised that it was 77 times

6    that he uttered the word "mujahideen"?

7       A.     I didn't keep track.

8       Q.     All right.  And remember that chart that the

9    government had, this big chart that had Mr. Seda's

10   picture on it and the leader of the Chechen mujahideen?

11      A.     I recall the chart.

12      Q.     Do you recall Kohlmann talking about that?

13      A.     Not -- could you be more specific?

14      Q.     Do you remember Evan Kohlmann saying -- well,

15   first of all, do you remember the opening statement

16   where Mr. Cardani said another name, Khattab, he made

17   the chart, Khattab is over here, and you'll hear that at

18   the time of these events, this was the big cheese in

19   Chechnya, this was the leader of the mujahideen, do you

20   remember that part in Mr. Cardani's opening?

21      A.     Generally speaking, yes.

22      Q.     And do you remember Evan Kohlmann linking the

23   mujahideen in Chechnya to Osama bin Laden?

24      A.     Not specifically.

25      Q.     Do you remember that he said that Khattab was

1    involved in the Afghan war, and that he and a number of

2    other senior Arab Afghan leaders, including Osama bin

3    Laden, waged a struggle -- that the man on the chart and

4    Osama bin Laden waged a struggle together?

5        A.    I don't have a specific recollection of him

6    making that statement.

7        Q.    Do you remember anybody at the trial other than

8    Barbara Cabral linking the defendant to raising money

9    for the Chechen mujahideen?

10       A.    Mr. Gartenstein-Ross did, I believe.

11       Q.    The Chechen mujahideen?  Was it Kosovo or

12    Chechnya?

13       A.    If I recall, Mr. Gartenstein-Ross spoke about

14    Mr. Sedaghaty's desire to engage in getting aid to

15    Chechen people, refugees.

16       Q.    Chechen refugees, correct.  Wasn't Barbara

17    Cabral the only person that talked about the mujahideen,

18    the Chechen mujahideen?

19       A.    I don't recall her being the only one, because

20    I believe that there was the computer material that was

21    introduced into evidence was also --

22       Q.    I understand.  There is a lot of computers --

23    there were several computers at the site.  There was

24    documents.  There were pieces of paper.  But as far as a

25    person talking about the defendant and the Chechen

 1    mujahideen, do you recall anybody other than Barbara

 2    Cabral?

 3        A.    I believe Mr. Ross did as well.

 4        Q.    Do you remember what he said?

 5        A.    Not specifically, no.

 6        Q.    You were just asked if Barbara Cabral didn't

 7    ask for money for herself, right?  And you were asked if

 8    Richard Cabral didn't ask -- if he asked, I'm sorry, for

 9    money for his wife, correct?

10        A.    I'm sorry.

11        Q.    Did -- I'm sorry.  Richard Cabral -- the

12    government just asked you, did Richard Cabral ask for

13    money for his wife, correct?

14        A.    Yes.

15        Q.    You were also just asked if Barbara Cabral

16    asked for money for herself, correct?

17        A.    Yes.

18        Q.    And you said no to both?

19        A.    Yes.

20        Q.    Isn't it true that husbands and wives often

21    consider their affairs linked together?

22             MR. PAPAGNI:  I'm going to object to the

23    question as being general.  If he wants to ask about

24    Richard and Barbara, that's fine.  Otherwise, Judge,

25    what two people do with their money when they're married

 1    varies a lot from married couple to married couple.

 2            THE COURT:  Sustained.

 3    BY MR. MATASAR:

 4    Q.    What do you know about Richard -- do you have

 5    any reason to believe that they kept their money

 6    separate?

 7    A.    I have no idea how they accounted for their

 8    finances.

 9    Q.    Wasn't the reason that Barbara Cabral didn't

10    ask for money was as indicated -- and I'll give you the

11    full amount in the statement that she gave -- wasn't the

12    reason that she has always felt that the money Richard

13    received from you satisfied any monetary consideration

14    that might have been due for her help and for Richard's

15    help?

16    A.    I have no knowledge of that.

17            MR. MATASAR:  Okay.  That's all I have.

18            MR. PAPAGNI:  Nothing further.

19            THE COURT:  Thank you.  You may step down.

20    Your next witness, please.

21            MR. WAX:  Colleen Anderson.

22            THE CLERK:  Please raise your right hand.

23            (The witness was sworn.)

24            THE CLERK:  Thank you.  Please speak into the

25    microphone.  Please state your full name and spell your

Anderson - D by Mr. Wax                    88

 1    last name for the record.

 2            THE WITNESS:  Colleen Anderson,

 3    A-N-D-E-R-S-O-N.

 4                    DIRECT EXAMINATION

 5    BY MR. WAX:

 6        Q.    Good afternoon, Agent Anderson.

 7        A.    Good afternoon, Mr. Wax.

 8        Q.    Could you tell us, please, generally what your

 9    practice was during the course of your investigation in

10    this case with respect to taking of notes.

11        A.    Taking of notes during interviews?

12        Q.    The investigation during interviews of

13    witnesses.

14        A.    Okay.  Well, during any interview with a

15    potential witness, either myself or the other case agent

16    or sometimes both of us would take notes pertaining to

17    what the witness said.

18        Q.    Was it your practice to always take notes of

19    the interviews that you participated in?

20        A.    No, not always.  If I was lead in the

21    interview, if I had a rapport with the witness, and I

22    was doing more of the talking with the witness, then the

23    other agent would generally write more of the notes.

24        Q.    If, conversely, the other person was taking the

25    lead, would you then be taking notes?

 1     A.     Yes.  And, again, on some occasions both of us

 2  would take notes.

 3     Q.     Right.  For example, we have the August 17 of

 4  2007 interview with Richard Cabral, and we have notes

 5  taken by both you and Dave Carroll.

 6     A.     I would have to see that, but if you have

 7  notes.

 8     Q.     They are in the tab, August 17.

 9     A.     This book right here?

10     Q.     Yes.

11     A.     Okay.

12     Q.     There are several tabs with the August 17th

13  date.  Some of them have an N on the right-hand side of

14  the tab.  N indicates notes.  R indicates report.  So if

15  you could take a look, just for an example, at the two

16  8/17 tabs with the N on them.

17     A.     The one dated -- or Bate stamped 3851?

18     Q.     Sure.  Whose notes are those?

19     A.     Those are mine.

20     Q.     All right.  And then the other 8/17 tab with an

21  N on it.

22     A.     Those appear to be from Special Agent Carroll.

23     Q.     Do you recognize his handwriting?

24     A.     I believe so.  It looks like his handwriting.

25     Q.     During the course of this case, have you had

 1    the opportunity to see notes written by him on multiple

 2    occasions?

 3       A.    Yes.

 4       Q.    And while I'm not asking you to qualify as a

 5    handwriting expert, the reality is you can look at a set

 6    of notes like that and say, well, yeah, it looks like

 7    Dave's notes, doesn't it?

 8       A.    Well, the reason I know these are Dave's notes

 9    is because I believe he was there at the interview.  I

10    don't know if I were to see these separate that I would

11    recognize it and say those are Dave's notes, no.

12       Q.    What do you recall about this August 17

13    interview that would have resulted in the two sets of

14    notes, one by you and one by Agent Carroll?  Who was

15    taking the lead?  Who was not taking the lead?  I mean,

16    that sort of thing.

17       A.    The only thing I can specifically recall about

18    this particular interview is that at one point in time,

19    I believe I started asking some specific questions that

20    are in my notes.  Other than that, as far as who's

21    taking lead or not, I would say with different agents, I

22    do my interviews with different agents.  Specifically

23    with Agent Carroll, it varies.  We can both be lead at

24    different times.

25            So if there are certain questions that I want

 1   to ask that he hasn't asked, then I -- that's probably

 2   why there are specific notes as to what I asked on this.

 3        Q.    You prepared a declaration for these posttrial

 4   motions in February of this year?  Without looking, I

 5   mean, do you recall preparing a declaration for the

 6   posttrial motions?

 7        A.    Yes, I just don't recall what the date was.

 8        Q.    Okay.  Do you recall whether you reviewed any

 9   material prior to preparing that declaration?

10        A.    Yes, I reviewed material.

11        Q.    What do you recall reviewing?

12        A.    Specifically one of the things that comes to

13   mind that helped the most were my discovery spreadsheets

14   as to when things were discovered and when they weren't,

15   that kind of thing.

16        Q.    Okay.  What else do you recall reviewing?

17        A.    Right now that's pretty much what I recall.

18        Q.    Do you recall whether you reviewed any of your

19   handwritten notes taken during the course of the

20   investigation in the case?

21        A.    I believe I might have reviewed my -- you know,

22   I'm not sure, but I might have reviewed my handwritten

23   notes for that particular interview because I believe

24   there was an allegation made that there were two

25   different interviews made or two different reports of

Anderson - D by Mr. Wax                    92

1    the same interview.  And so I reviewed the notes to

2    check them against the two different interviews to

3    figure out exactly what the allegation was.

4        Q.    Do you recall if you reviewed any other of your

5    handwritten notes prior to preparing that declaration?

6        A.    I don't specifically recall.

7        Q.    Do you recall a hearing in this matter on

8    March 1st of this year at which there was argument about

9    discovery issues?

10       A.    There has been a lot of hearings, I'm sorry, I

11   don't specifically remember that, but --

12       Q.    Do you recall a hearing that took place in this

13   court on March 1 of this year on these posttrial motions

14   at the conclusion of which the government prosecutors

15   handed the court a stack of documents, I don't recall if

16   it was four inches or six inches thick, but some sizable

17   quantity of documents?

18       A.    Yes, I do recall that.

19       Q.    Did you participate in any way in reviewing

20   material prior to that hearing?

21       A.    I believe my participation prior to the hearing

22   was providing AUSA Zusman with some of the materials

23   that I used for my declaration, that was my

24   participation.

25       Q.    Okay.  So let me then ask you, again, please,

Anderson - D by Mr. Wax                                    93

1    what do you recall having reviewed for preparation of

2    your declaration other than the spreadsheets that you've

3    mentioned and your notes of the August 17, 2007,

4    interview of Richard Cabral?

5        A.    Well, specifically, those items.  And anything

6    I'm not recalling right now would have been what I've

7    given AUSA Zusman for the court.

8        Q.    Did you review any material prior to your

9    appearance in the court today in the last, you know,

10   week or so?

11       A.    Yes, I've got my declaration.  I'm not sure

12   what the date is, but I can look that up, if you'd like.

13   February of 2011.  And I reviewed a few e-mails

14   pertaining to requests by the defense during May of

15   2010.

16       Q.    Did you review any other material?

17       A.    I believe I have in front of me an e-mail

18   regarding case notes per Barbara Cabral.

19       Q.    An e-mail dated what?

20       A.    April 14th.

21       Q.    Is that the e-mail that was provided to the

22   defense by the court back in March when the court ruled

23   on one aspect of this matter?

24       A.    I believe it was provided to the defense on one

25   of the last hearings, yes.

1      Q.     Let me shift topics for a moment, please, and

2   ask you to describe your role in the production of

3   discovery process throughout this case from August of

4   2007 through the trial.  What was your role?

5      A.     My role was to collect, Bates number, and

6   document any evidence that would be going to the

7   defense.

8      Q.     Some of the material came from IRS files?

9      A.     Yes.

10     Q.     Some of the material came from FBI files?

11     A.     Some of the material I got from Special Agent

12   Carroll, yes.

13     Q.     Well, so you're anticipating my question.  We

14   received during the course of the pretrial process a

15   number of FBI 302 reports and other material that we

16   were told was generated by the FBI.  How did that

17   material come into your possession prior to its

18   provision to us, to the defense?

19     A.     Pretrial it came to me from Special Agent

20   Carroll.  So any 302s that were Bates numbered and

21   produced in the, I believe, 18 batches of discovery were

22   provided by Agent Carroll.

23     Q.     Did you ever personally look into any files,

24   like I've got a red one, so this is a defense file, did

25   you ever look into any files of the FBI personally?

1      A.    I have asked permission to go into Special

2   Agent Carroll's office to review files on occasion but

3   not -- I'm not sure that it was specific to this case.

4      Q.    Did you, with respect to this case, mark any

5   documents in the FBI file in any such review that you

6   thought should be provided to the defense in discovery?

7      A.    I do not mark FBI files, no.

8      Q.    Put a yellow sticky on, I mean do anything to

9   identify any documents in the FBI file that you believed

10   should be provided in discovery, did that ever happen in

11   this case?

12      A.    No.

13      Q.    Did you receive any documents generated by the

14   FBI, whether FBI 302 reports, the 1023 reports or

15   others, from any person other than Agent Dave Carroll?

16      A.    Pretrial, no, I believe they all came from

17   Agent Carroll.

18      Q.    All right.  Now, in terms of the process for

19   deciding what material should be provided to the defense

20   in discovery, have you had the opportunity to read Agent

21   Dave Carroll's declaration that was prepared in February

22   of this year?

23      A.    No, I don't recall.  Specifically a certain

24   part of his declaration?

25      Q.    Have you had an opportunity to read his

1   declaration, the one that was filed with the court and

2   that is dated -- executed February 9, 2011, and was

3   filed with the court on February 18, 2011?

4       A.    I believe I may have read his declaration some

5   time after the March hearing.

6       Q.    Well, did you or didn't you?  I mean, Agent

7   Anderson --

8       A.    I believe I did.

9       Q.    So you believe you did or you did?

10      A.    I believe I did.  Specifically I'd have to read

11  it to have it come back, but I believe I read it after

12  the March hearing.

13      Q.    Do you recall -- and perhaps this would help

14  refresh your recollection -- reading on paragraph or

15  pages 10 and 11 of his declaration a discussion or

16  description of a discussion with you, with AUSAs Gorder

17  and Cardani, about the provision of discovery at

18  meetings in January and March of 2009?

19      A.    I don't specifically recall that.  Is it in the

20  book?  Would you like me to review it?

21      Q.    Sure.

22      A.    Okay.

23      Q.    Let's start this way:  First, do you

24  independently recall that there were discussions among

25  the four of you on the trial team, the two prosecutors,

Anderson - D by Mr. Wax                    97

1    Dave Carroll, and yourself, about what material should

2    be turned over?  Did this have to go?  Did that have to

3    go?  Should we?  Shouldn't we?  Do you recall any

4    discussions about that sort of action by the government

5    in the discovery process and in the pretrial process?

6        A.    Yes.  I believe in my statement what I

7    specifically recall, and I'd have to get the date, it

8    may have been, like you said, in January -- yeah, in

9    January of 2009, March of 2009, we had met both at the

10   FBI office and the IRS office to review materials for,

11   you know, exculpatory information and anything that

12   would be -- would fit what we thought was the

13   defense's -- I want to say -- theory of the

14   investigation, of their defense.

15       Q.    All right.  And in those meetings, let's start

16   there, there were discussions among the four of you

17   about what should or should not be turned over?

18       A.    Specifically for exculpatory information and

19   things that fit the defense's theory.

20       Q.    My question is:  Were there -- do you recall

21   discussions?  Someone might say, hey, I think this

22   should be turned over.  Someone else would say, well, I

23   think that should be turned over.  Someone might say,

24   well, I'm not so sure.  Do you recall discussions of

25   that nature taking place among the four of you?

1       A.    Yes, specific to exculpatory and the defense's

2   theory of investigation, yes.

3       Q.    Okay.  Do you recall such discussions taking

4   place on more than the two occasions, that is, the

5   couple of days in January and in a couple of days in

6   March of 2009?

7       A.    At other times there would have been

8   discussions -- I'm not specific on the dates and

9   times -- but there would be discussions regarding a

10  witness and the interviews being turned over and that

11  kind of thing, yes.

12      Q.    And do you recall in those discussions that on

13  occasion people would voice, you know, differing

14  opinions?

15      A.    Different opinions on witnesses' statements?

16      Q.    Yes.  Discussion about, look, do we need to

17  turn this report over, and then discussion about that?

18      A.    Okay, generally what I recall --

19      Q.    Yes.

20      A.    -- is there would be discussion about whether

21  or not it was exculpatory or it fit the defense's

22  theory.  I recall different opinions about that type of

23  discovery.

24      Q.    That's what I'm asking.

25      A.    Okay.

Anderson - D by Mr. Wax                          99

1     Q.    So different opinions being expressed and

2     discussion among the four of you.

3     A.    Correct.

4     Q.    Thank you.  Now, in terms of the process of

5     providing discovery to the defense, you've indicated, I

6     believe, and -- well, you've indicated in your

7     declaration you had a significant role in that, did you

8     not?

9     A.    Yes, I did.

10    Q.    You were the person who in nearly all, if not

11    all, instances actually provided the material to a

12    member of the defense team?

13    A.    Yes.  Not only did I provide the material,

14    Bates numbered it, cataloged it, you know, sent it over,

15    but then I would also engage in e-mails and phone calls

16    with the defense team regarding what they might believe

17    to be discoverable.

18    Q.    You had a significant role in that process

19    obviously?

20    A.    Yes.

21    Q.    The provision of discovery in this case you've

22    indicated involved numerous batches, 17 batches of

23    discovery pretrial?

24    A.    Yeah, I believe it was 17 pretrial.  Do you

25    want me to check?  But it was something like that.

Anderson - D by Mr. Wax                                    100

 1     Q.    Okay.  And in terms of what it was that you
 2  were to turn over, you were guided by a number of
 3  different things, the law generally, correct?  You have
 4  some understanding of what is generally required in the
 5  nature of exculpatory material or impeaching material?
 6     A.    Rule 16 material?
 7     Q.    Yes.
 8     A.    Yes.
 9     Q.    Okay.  You are familiar with Rule 16 of the
10  Rules of Criminal Procedure?
11     A.    Yes, I've -- yeah, we've discussed it.
12     Q.    Sure.  And in addition in this case, you were
13  guided by a specific order issued by Judge Hogan?
14     A.    Actually, I believe there were multiple orders;
15  two, possibly three.
16     Q.    All right.  You were guided -- I believe you
17  referenced an order that was issued in July of 2009.  I
18  think it's CR 191.  Do you recall that order issued by
19  the judge?
20     A.    I believe recalling that I had listed that
21  order in one of my spreadsheets and some of the rulings,
22  yes.
23     Q.    All right.  And if I understand correctly, what
24  you have written in your declaration, one of the tasks
25  that you performed in the discovery process was to track

1    what the government had provided consistent with the

2    judge's order, what the government was still in the --

3    needed to provide, and a third category of things that

4    needed clarification?

5        A.    Correct.  And I believe that that specific

6    document was created in January.  I'm sorry, I lost one

7    of my documents.  Maybe January of 2009, once the orders

8    first came out.

9        Q.    Okay.  You prepared something that was actually

10   color coded to help you keep track of things, did you

11   not?

12       A.    Yes.  I got a little teasing about that, yes.

13       Q.    All right.  And it seems to me from the nature

14   of the interactions we had during the last now nearly

15   four years, that you are pretty meticulous in your work;

16   think that's a fair description?

17       A.    I try.

18       Q.    Now, you are aware that in the court's order of

19   July 2009, which is CR 191, that the court required the

20   prosecution to provide the defense with notes of agents

21   that were taken during interviews of witnesses?

22       A.    Yes, I recall that.

23       Q.    And among the things that you were responsible

24   for in the discovery process and that you marked in the

25   notes, excuse me, the color coded chart, were notes,

1    notes to be provided, or notes to -- other things to be

2    provided, but notes were included, correct?

3        A.    Yes.  Specifically that is one of the items,

4    now that you mention it, that I recall reviewing prior

5    to my declaration, the color coded spreadsheet that had

6    document, you know, 191 on there with the notes and the

7    interviews, yes.

8        Q.    Okay.  Now, in terms of the requirements in the

9    court's order of July 2009 to turn over notes, in your

10   experience was that unusual?

11       A.    Actually, yes.  In my experience it was unusual

12   in the sense that this was the first case where I was

13   required to turn over notes for testifying witnesses

14   versus in the other trials that I had been involved in,

15   we generally just turn over the notes for the subject

16   interviews.

17       Q.    Do you recall whether there was any discussion,

18   if you asked any questions, let me put it this way, do

19   you recall if you asked any questions of Mr. Cardani or

20   Mr. Gorder about that provision of Judge Hogan's order?

21       A.    Specifically that provision?

22       Q.    Yes, about the notes.

23       A.    I don't recall specifically asking about that

24   provision.

25       Q.    You know, hey guys, I've never had to do this

 1  before, is this something we should challenge or ask for

 2  clarification on; do you remember any discussions along

 3  those lines at all?

 4      A.    I recall we had filed one motion for

 5  clarification, and I don't believe that that was one of

 6  the issues, no.

 7      Q.    The question was:  Do you recall if there was

 8  any discussion at any point after the judge issued the

 9  order with respect to notes?

10      A.    Well, the only thing that came close to that

11  would be that e-mail from April 14th.

12      Q.    I'll get to that e-mail.

13      A.    Okay.

14      Q.    Other than that e-mail and prior to that

15  e-mail, do you recall asking any questions of Chris

16  Cardani or Charles Gorder about the provision of notes?

17      A.    Right now I do not specifically recall that.

18      Q.    Okay.  Now, with respect to the provision of

19  notes, if I have read back through this discovery

20  accurately, in batch nine of the discovery, which was

21  provided, if I am reading all this correctly, on

22  August 14 of 2009.  I think that's the last tab in

23  the --

24      A.    It's in your book.

25      Q.    In the notebook.  If you have your own copy,

1    that's fine.

2         A.    Discovery spreadsheets, okay.  And you are

3    talking about batch nine, I'm sorry?

4         Q.    Yes.  We were provided interview notes from FBI

5    interviews with Pete Seda.  Do you see that?

6         A.    Yes.

7         Q.    Do you recall that?

8         A.    Yes.

9         Q.    I'm reading this accurately?

10        A.    Yes.

11        Q.    And then in batch 11, if I'm reading this

12   correctly, and my review of the discovery is accurate,

13   material provided on January 19, 2010, included notes

14   and interviews with notes of Greg Wooten, Thomas Wilcox,

15   Daveed Gartenstein-Ross, Helen Moore, Debra Ingram and

16   Rajhi Kanan, correct?

17        A.    Correct.  May I explain why those specific

18   individuals are --

19        Q.    Let's just stay with -- I'm reading this

20   correctly, you did provide us notes of -- agent notes of

21   interviews of those witnesses on this date in batch 11?

22        A.    Yes.  These particular people were listed on

23   the government's witness list, I believe, at this time.

24        Q.    Okay.  We'll get to that.  So the question that

25   I'm trying to get at, I suppose, is that you understood

1   very clearly, as reflected in these discovery

2   transmittals, that the court's order required you to

3   provide notes of interviews of witnesses the government

4   intended to call at trial?

5       A.    I would say specifically what I recall knowing

6   at the time was that the judge's order stated that we

7   would provide notes for case-in-chief witnesses, yes.

8       Q.    All right.  And on March 17th you provided a

9   updated case-in-chief witness list?

10      A.    I believe so.

11      Q.    And Barbara Cabral was listed on that list as a

12  case-in-chief witness on that date?

13      A.    I believe at that time we had removed her from

14  the potential rebuttal witness -- potential rebuttal

15  witness category and put her on the case-in-chief

16  witness list, yes.

17      Q.    All right.  Let me shift gears again, if I may,

18  please, and ask you about a different subject matter.

19  Have you ever seen the November 4, 2003, letter from FBI

20  agent or then FBI Agent Shawna Carroll to someone in the

21  United States Attorney's Office with respect to payment

22  or potential payment of money to Richard Cabral?

23      A.    I believe I may have seen that posttrial but

24  not pretrial.

25      Q.    You do not recall having seen it pretrial?

1       A.      I do not recall seeing it pretrial.

2       Q.      Do you recall when you first became aware that

3    the FBI had sought authorization -- excuse me, that

4    either Shawna or Dave Carroll had sought authorization

5    to pay Richard Cabral?

6       A.      I am not familiar with FBI's procedures with

7    paid informants, so I believe the first time that I

8    recall this coming up at all would have been probably

9    December of 2010.

10      Q.      When did you first become aware that any money

11   had been paid to Richard Cabral by FBI Agent Dave or

12   Shawna Carroll?

13      A.      Well, I was specifically at Mr. Cabral's

14   residence when he was paid on one occasion, so I do

15   recall that.

16      Q.      On how many occasions were you present when

17   Richard Cabral was paid as an informant as you recall it

18   today?

19      A.      I believe two.

20      Q.      When was the first one?

21      A.      I'd have to check my records.

22      MS. ZUSMAN:  Just to speed this along, I think

23   the second one was March 21, 2005.

24   BY MR. WAX:

25      Q.      I'm curious as to what records you are

1   checking, Agent Anderson?

2       A.    I was checking my declaration because it goes

3   by date order, but my declaration starts in 2007, so I

4   don't have any written materials pertaining to --

5       Q.    You specifically recall being present for two

6   payments made to Richard Cabral?

7       A.    I specifically recall being present during one

8   payment but I believe I've reviewed materials posttrial

9   that showed that I was at a -- I was at his residence a

10  second time when he was paid.

11      Q.    Do you recall why you were present at the

12  residence the first time you were there?  Let me put it

13  differently --

14      A.    No.

15      Q.    Did you and Dave Carroll go to the Cabral

16  residence for another joint interview similar to the one

17  reflected in the August 17, 2007, notes and report?

18      A.    Specifically, I don't recall.  If there is an

19  interview, I could review it and it might refresh my

20  memory, but I don't specifically remember the purpose

21  for that visit.

22          As I stated in my declaration, there were

23  occasions when I would accompany Special Agent Carroll

24  over to Mr. Cabral's and he would be giving information

25  on different cases.

Anderson - D by Mr. Wax                          108

1      Q.    And when that would happen, you would see Dave

2   Carroll taking notes?

3      A.    Yes, yes, I believe so.

4      Q.    When that would happen, sometimes you would

5   take notes?

6      A.    I specifically don't remember taking notes

7   unless it pertained to this particular case.

8      Q.    Well, if you would please turn to the tab that

9   is marked May 21 of 2005, excuse me, March 21 of 2005,

10   the one that has an R on it.  Do you have that in front

11   of you now?

12      A.    Yes.

13      Q.    And do you see -- unfortunately, the version we

14   have is heavily redacted -- but down toward the bottom

15   of 3845 and then at the top of 3846, there is reference

16   to some information, it appears, that was provided by

17   CW's spouse.  Our understanding is that this would be

18   Richard Cabral's spouse, Barbara Cabral, that relates to

19   Pete Seda and Summer Rife and Laleh Zahedi.  Do you see

20   that?

21      A.    Yes.

22      Q.    So this is a report that at least in part

23   pertains to the investigation in this matter?

24      A.    It appears so.

25      Q.    Now, am I recalling correctly that the

1    indictment in this case was returned shortly before this

2    interview?

3        A.    I believe the indictment was in February of

4    '05.

5        Q.    Right.  So a month or so before this interview

6    took place was when the indictment was returned?

7        A.    Yes.

8        Q.    And is it safe to assume that you were heavily

9    involved in the investigation of the matter in

10   preparation for the grand jury presentation?

11       A.    I was heavily involved in preparing for the

12   indictment, yes.

13       Q.    And that means heavily involved in preparing

14   for the grand jury presentation as well?

15       A.    Yes.

16       Q.    All right.  And you prepared some material that

17   was presented to the grand jury?

18       A.    A PowerPoint presentation, yes, yes.

19       Q.    All right.  And after the grand jury

20   indictment, you all were interested in finding out

21   whatever you could about Mr. Seda's whereabouts and

22   seeing if you could get him before the court?

23       A.    That's correct.

24       Q.    And part of this interview was related to those

25   efforts, was it not?

1      A.     It appears so, but I'm not sure that I was

2   present during this particular interview.  I'm just

3   speculating based on what is in here.  My name is not at

4   the bottom.  I'm not sure if I was present during this

5   interview or not.

6      Q.     I believe we've been provided information in

7   other sources that says you were present?

8      A.     Okay, let me --

9             MR. WAX:  Is that correct?  Is that agreed by

10  the government?

11            MS. ZUSMAN:  I agree she was present for the

12  payment because she witnessed the payment.  I don't know

13  that she was present for the interview.

14  BY MR. WAX:

15     Q.     Do you recall on an occasion when you were

16  present at the Cabral residence when a payment was made

17  and Barbara Cabral was also present?

18     A.     Yes, I believe that.

19     Q.     Do you recall whether you and Agent Carroll

20  went to the residence together?

21     A.     I believe we did.

22     Q.     All right.  And do you recall whether you left

23  together?

24     A.     I believe we did.

25     Q.     Is it then reasonable to assume that you would

1   have been present during whatever interviewing took

2   place on that occasion?

3       A.    Yes.  What I'm trying to say is if this

4   interview occurred at the time of a payment, then I

5   would have been present for this interview, yes.

6       Q.    Okay.  And then if you'd look at the next tab,

7   pages 3847 and 3848, I mean those have been provided to

8   us in the posttrial discovery process with a

9   representation on -- I believe it's on the spreadsheet

10  that you prepared, spreadsheet batch 18, that these are

11  handwritten notes taken by Dave Carroll of a portion of

12  the interactions that took place on March 21 of 2005,

13  correct?

14      A.    They appear to be Dave Carroll's notes, yes.

15      Q.    And on page 3847, the notes show a payment,

16  it's hard to read but "w/Colleen and Barbara, payment

17  5000."

18      A.    Yes, I see that.

19      Q.    Okay.  So it's your understanding then that

20  these notes are notes taken by Agent Carroll during that

21  interview that reflect the payment of $5,000 in Barbara

22  Cabral's and your presence?

23      A.    Yes.  I recall Barbara Cabral being present

24  when Agent Carroll paid Mr. Cabral.

25      Q.    And is it your understanding that these notes

1    reflect some recordation of that payment?

2        A.    I believe so, yes.

3        Q.    Do you recall if there were any documents

4    signed by Richard or Barbara Cabral on that occasion?

5        A.    I believe, which is standard procedure, I

6    believe that Mr. Cabral signed the document because he

7    received the money, and I believe I might have signed as

8    a witness.

9        Q.    All right.  Now, let's see if we can probe your

10   recollection about another payment that you apparently

11   were present for.  What recollection, if any, do you

12   have of present at a payment that was made in 2006?

13       A.    I don't specifically recall that payment until

14   posttrial where I reviewed a document that I signed.  I

15   don't specifically recall that particular payment.

16       Q.    What document did you review posttrial that

17   reflected your presence for a payment in 2006?

18       A.    I thought it was the standard receipt when you

19   pay an informant, and there is a witness, that's what I

20   believe I reviewed.

21       Q.    Do you recall having signed a similar document

22   on March 21 of 2005?

23       A.    Yes, yep.

24       Q.    Did you search your files to see if you had

25   taken any notes at either the 2005 or 2006 interview,

1    slash, payment?

2        A.    No.    My standard procedure for an interview of

3    this sort or meeting with an FBI informant would be that

4    if I had any notes, I would have given them to Special

5    Agent Carroll.

6        Q.    You might have taken notes in your own

7    handwriting but then would have given them to Agent

8    Carroll rather than keeping a copy in your IRS file?

9        A.    Correct.    Mr. Cabral was an FBI informant.    He

10   was not an IRS informant.    And Special Agent Carroll

11   would be writing up the interview, and the -- any notes

12   pertaining to the meeting and the payment.

13       Q.    Okay.    Let me switch back, please, to the

14   question of the provision of discovery and the court's

15   order.    We have established, I believe, that in several

16   discovery batches prior to April 14 of 2010, you

17   understood the court's order to require that notes be

18   turned over.

19       A.    Correct.    My understanding was that notes were

20   to be turned over for case-in-chief witnesses on the

21   government's list, yes.

22       Q.    And in going through the discovery spreadsheet,

23   there was another batch of discovery provided on May 10,

24   I believe it's batch 14.    And I think there were notes

25   turned over then as well.    Yes, notes from interview

1    with Daveed Gartenstein-Ross and it's the top entry,

2    correct?

3        A.    Yeah.  I believe Daveed Gartenstein-Ross's

4    notes from most, if not all, of his interviews were

5    provided much earlier than that; however, I believe

6    Agent Carroll found a random note somewhere pertaining

7    to a specific interview and so it was thrown in this

8    batch.

9        Q.    Okay.  And in that May 10 batch of discovery,

10   there are a number of FBI 302s and FD 1023s that relate

11   to interviews of Barbara Cabral individually or of

12   Richard and Barbara together, correct?

13       A.    Yes.  I believe one or two of these interviews

14   had been provided previously under our initial review

15   for potentially exculpatory, slash, might-meet-the-

16   defense's theory of investigation, so one or two of

17   these interviews had been produced twice, yes.

18       Q.    Let's go to this e-mail of April 14, please.

19   It's in the notebook with the date -- I believe there is

20   a typo, I think the tab says 4/4/10 e-mail.  It's

21   actually April 14th.  Do you have that in front of you?

22       A.    I do.

23       Q.    So March 17 you have provided a revised witness

24   list and Barbara Cabral now is included as a case-in-

25   chief witness, correct?

1      A.    Correct.   Previously she was a potential

2   rebuttal witness.

3      Q.    And your understanding on March 17 and up

4   through April 14 was that Judge Hogan's order required

5   the provision of notes for a person now in Barbara

6   Cabral's situation?

7      A.    I was aware of the order when I created my

8   spreadsheet.   Whether I specifically recalled the order

9   at the time I produced this, I'm unclear.

10     Q.    All right.   You certainly knew on May 10 when

11  we were provided batch 14, I think it was, that the

12  order was in place and the order required the provision

13  of notes because you've indicated that you included some

14  notes of a Daveed Gartenstein-Ross interview that hadn't

15  been provided previously?

16     A.    Specifically what I remember is that Daveed's

17  had been provided -- Daveed Gartenstein-Ross's notes had

18  been provided previously.   The notes that were provided

19  in this batch was something that had been missed prior.

20  It was thrown in this batch.   I did provide the

21  interviews, but I frankly just forgot to provide the

22  notes, that they were part of the order.

23     Q.    Well, Agent Anderson, on April 14 you were

24  fully aware of the provision of Judge Hogan's order of

25  July 2009 when you sent the e-mail to Chris Cardani; is

1    that not correct?

2           MS. ZUSMAN:  Your Honor, I'm going to object.

3    That has been asked and answered several times.

4           THE COURT:  It's true.

5           MR. WAX:  Well, I haven't asked about when the

6    e-mail was sent, Your Honor.  I mean, she's just told us

7    she forgot the notes.  And I don't think that's

8    consistent with what we have here.  And that's what I'm

9    getting to.

10          THE COURT:  Go ahead.

11          MR. WAX:  Thank you.

12   BY MR. WAX:

13     Q.    You sent this e-mail on April 14th, correct?

14     A.    Yes.

15     Q.    It has your name on it.  Let's just establish,

16   please, take a look at it, you sent this e-mail?

17     A.    I did.  I specifically sent the e-mail

18   regarding Barbara Cabral being added as a case-in-chief

19   witness, yes.

20     Q.    And you addressed it to Chris Cardani and to

21   David Carroll?

22     A.    Yes.

23     Q.    As reflected in the e-mail document, correct?

24     A.    Correct.

25     Q.    And you referred to the notes, "I need all of

1   Barbara Cabral's interviews and we may need the notes

2   also," correct?

3       A.    Correct.  And the reason I said "we may need

4   the notes also" is I was looking for some clarification

5   because I wasn't quite sure how the judge's orders

6   necessarily pertained to this witness as she was being

7   moved over from a potential rebuttal witness to a case-

8   in-chief witness.  I'd already handled all the other

9   witnesses, so I'm just looking for direction basically.

10      Q.    Yet on May 10 you turned over the notes of a

11  case-in-chief witness Daveed Gartenstein-Ross.  Agent

12  Anderson, you knew what the court's order directed,

13  correct?

14      A.    I knew of the court's order previously.  And at

15  the time that I produced this batch of discovery, I was

16  unsure specifically how to comply with the judge's order

17  being that she was being moved from a potential rebuttal

18  witness to a case-in-chief witness, so I was asking for

19  direction, that is what this e-mail is about, yes.

20      Q.    Did you ask Chris Cardani for any clarification

21  after he responded to the e-mail?

22      A.    I don't recall asking for clarification, no.

23      Q.    Did you ever ask him for clarification about

24  the provision of notes of any witness?

25      A.    If I specifically would have recalled the

1   judge's order and reviewed it, I would have asked for

2   clarification.  And I did not because I did not recall

3   it.

4       Q.    On May 10, when you provided the Daveed

5   Gartenstein-Ross notes, did you recall the judge's

6   order?

7       A.    Well, I knew specifically that we had turned

8   over all Daveed's interview notes previously -- what I

9   thought was all of Daveed's interview notes, and this

10  was one that needed to go.

11      Q.    Did you receive any response from Agent David

12  Carroll to your e-mail of April 14th?

13      A.    I don't specifically recall getting anything

14  via e-mail.  Generally he would just call me and say,

15  yeah, okay, I'll do it.

16      Q.    Do you have any e-mail response from him to

17  this e-mail of yours?

18      A.    I did not find any e-mail responses, no.

19      Q.    On May 10, when you provided to the defense the

20  memorandum of interview, the FBI 302s, and the FD 1023s

21  of the Barbara Cabral interviews, that was at the

22  specific direction of and based on the decision of AUSA

23  Cardani?

24      A.    I took direction from AUSA Cardani on providing

25  these statements and 302s, yes.

1      Q.    So you took his response to your April 14

2   e-mail as a decision, yes, reports; no, notes; and you

3   followed his direction?

4      A.    Yes.

5      Q.    Now, subsequent to the trial in the posttrial

6   provision of discovery, we were provided reports of

7   interviews of Barbara Cabral that were not turned over

8   pretrial; you are aware of that?

9      A.    I'm aware that there were comments made by

10  Barbara Cabral that were in Richard Cabral's interviews

11  that were not turned over.

12     Q.    Was there any conversation between you and

13  Agent Carroll at any time between April 14, 2010, the

14  date of the e-mail, and December 31 of 2010 about the

15  provision of discovery with respect to Barbara Cabral?

16     A.    No.  I believe the only indication is this

17  e-mail asking for all of her interviews.

18     Q.    Let me go back to this FBI 302 report of

19  August 17, 2007, for a moment.  And let's look, please,

20  first at the report that is paginated in the lower

21  right-hand corner 1772 and 1773.

22     A.    Okay.

23     Q.    This, based on this Bates stamp numbering, was

24  provided to the defense in pretrial discovery?

25     A.    I believe so.

Anderson - D by Mr. Wax                              120

1     Q.     Okay.  How did it come into your possession

2   prior to it being provided to the defense?

3     A.     I would have received it from Special Agent

4   Carroll.

5     Q.     Do you specifically recall receiving it or is

6   that just that would have happened in the normal course?

7     A.     That would have happened in the normal course.

8     Q.     Please look at the version of that report with

9   page number 3849 and 3850 that was provided posttrial.

10  Did that ever physically come into your possession?

11    A.     It would have physically come into my

12  possession at the time that I prepared the discovery

13  spreadsheet number 18 posttrial.

14    Q.     Okay.  So you received this -- excuse me, you

15  were the person who provided that to the defense

16  posttrial?

17    A.     I collected all of the documents, made sure

18  that the redactions were proper, and Bates numbered

19  them, put it on a spreadsheet, provided them to AUSA

20  Kelly Zusman, and I believe she may have provided them

21  to the defense.

22    Q.     Okay.  But you provided them to her?

23    A.     Correct.

24    Q.     All right.  Now, how did this document, 3849

25  and 3850, physically come into your possession prior to

1    your turning it over to Ms. Zusman?

2        A.    It was during a posttrial review, I believe,

3    that this was found in one of the files and it was put

4    to the side.

5        Q.    My question is:  How did it physically come

6    into your possession?

7        A.    It may have come from AUSA Kelly Zusman.  She

8    may have handed it to me and said "add it to the pile."

9        Q.    Well, it may have or it did?

10       A.    I don't recall specifically if it was AUSA

11   Zusman or possibly AUSA Cardani or Gorder that handed me

12   this document.  All I know --

13       Q.    You did not find it in IRS files?

14       A.    No.

15       Q.    You did not find it in FBI files?

16       A.    I don't have access to FBI files without

17   permission.

18       Q.    Okay.  So you did not find it in FBI files, you

19   personally?

20       A.    No, I didn't, no.

21       Q.    All right.  You recall it being handed to you

22   by someone from the United States Attorney's Office, but

23   as you sit here today, you don't recall specifically

24   who?

25       A.    Correct.

1    Q.    What, if anything, do you recall about

2    reviewing the version of -- any version of this report

3    of interview?  Do you recall having any occasion when

4    you and anyone else were looking at a version of this

5    interview typed report sometime in 2007?

6    A.    In 2007?

7    Q.    Yes.

8    A.    You are talking about the report Bates number

9    3849 posttrial?

10   Q.    Or 1772, either one.  Do you recall anytime in

11   the year 2007 reviewing with anybody any version of this

12   typed report?

13   A.    Well, specifically I did not see the posttrial

14   version that was given until posttrial.  And the prior

15   version I would have had it in my possession, I don't

16   specifically recall reviewing it, but I would have Bates

17   numbered it and put it in the discovery batch.

18   Q.    Do you recall having any conversation with

19   anybody about the content of either version of these

20   documents?

21   A.    I believe so.  Let me double-check.  Do you

22   recall which batch this came from?

23   Q.    1772?

24   A.    Yeah, which discovery batch that this document

25   came from?

Anderson - D by Mr. Wax                    123

1    Q.    Number six, it's in batch six.

2    A.    Okay.  Yeah, this would have been, I believe,

3   one of the earlier documents, yeah, that fit the

4   potentially exculpatory could-meet-the-defense's-theory-

5   of-the-investigation batch.  That's where this would

6   have came from.

7    Q.    All right.  Batch six was provided in 2009.  My

8   question is directed to 2007.  Did you have any

9   conversation with anybody about the content of either

10  version of these -- of this report?  And if I heard you

11  correctly, you said you didn't see 3849 until after the

12  trial.  Did I understand that correctly?

13   A.    I believe I did not see 3849, 3850 in the

14  format it is right now until after trial.  I may

15  have seen -- I may have saw some version of this in a

16  draft format.

17   Q.    But my question -- you may have.  Do you have a

18  recollection of sitting down with anybody and going over

19  the content of any version of either of these reports in

20  the year 2007?  Do you have such a recollection?

21   A.    May I have a moment to look at this?  Because

22  if this contains a comment about Kosovo, then, yes, I do

23  recall that.

24        MR. PAPAGNI:  Please the court, I'm afraid I

25  need to ask the indulgence of the defense and the court,

 1   I need to leave because I need to go out of town on

 2   another case matter and I won't be back until next week,

 3   so with your permission, Your Honor?

 4          THE COURT:  Yes.

 5          MR. PAPAGNI:  Thank you, sir.

 6          (Mr. Papagni exits the courtroom.)

 7          THE WITNESS:  I don't specifically see it right

 8   now, but I believe this was the interview in which I

 9   specifically wanted to talk to the Cabrals about whether

10   or not Mr. Sedaghaty had asked them for money for the

11   Kosovo mujahideen.

12   BY MR. WAX:

13   Q.    Well, take a look, please, at page 3851, which

14   is under tab 8/17/07 CA, with an N on it.  Do you find

15   that tab?

16   A.    Yes, I do.

17   Q.    Are these -- is this your handwriting?

18   A.    Yes.

19   Q.    And it's a little bit difficult to read at the

20   top, but it appears to be an indication of an interview

21   on August 17, 2007, in which Dave Carroll and you were

22   both present and speaking with -- shows here at the top

23   Richard Cabral?

24   A.    Yes.

25   Q.    Okay.  Do you see anything in your handwritten

1    notes about that subject matter that you just

2    referenced?

3        A.    I don't, but I believe that that subject matter

4    might have been in Special Agent Carroll's notes.  And I

5    believe, because I was asking the question at the time,

6    it would have been in Special Agent Carroll's notes.

7        Q.    Okay.  Do you recall at any time going over the

8    content of any version of the report of interview that

9    took place on August 17, 2007?

10       A.    I believe so.  I believe I might have had a

11   conversation with -- yes, here it is in his notes.  I

12   believe this was the interview where I had a

13   conversation with Special Agent Carroll about the Kosovo

14   issue.  I believe I had just -- somewhere around that

15   time period -- interviewed Daveed Gartenstein-Ross who

16   stated that Mr. Sedaghaty had requested money from some

17   of the members for Kosovo mujahideen, and I wanted to

18   make sure that we asked the Cabrals whether or not they

19   were present during one of those requests.

20       Q.    All right.  Do you have any other recollection

21   of any other aspect of that interview?

22       A.    I believe that's what I was most interested in,

23   yeah.

24            (Discussion held off the record between

25   co-counsel.)

```
 1              MR. WAX:  I have no further questions.  Thank
 2    you.
 3              MR. MATASAR:  Wait a second, wait a second.
 4              MR. WAX:  I'm sorry, give us a moment, please.
 5              (Discussion held off the record between
 6    co-counsel.)
 7              MR. WAX:  Thank you.
 8                        CROSS-EXAMINATION
 9    BY MS. ZUSMAN:
10       Q.    Agent Anderson, did you prepare a declaration
11    for this case?
12       A.    Several.
13       Q.    And did you prepare a declaration for these
14    posttrial issues?
15       A.    Yes, I did.
16       Q.    And was that declaration complete and accurate?
17       A.    Yes.
18       Q.    I want to turn to some of the things that
19    Mr. Wax has covered.  First off, do you make a report
20    every time you meet with a witness or have a discussion
21    with a witness?
22       A.    Trying to think.  Generally if it's a phone
23    call where I'm setting up an interview with them, a more
24    lengthy interview, then no.  I'll basically say, okay,
25    we'll discuss this at the time of the meeting and I
```

Anderson - X by Ms. Zusman                              127

1   won't do a report.

2       Q.    So there are times you may have contact with a

3   witness or a potential witness but it doesn't

4   necessarily mean it's going to generate a report,

5   correct?

6       A.    Correct.  Specifically when it's something that

7   has already been documented, they are saying the same

8   thing over and over and over again, and it's already

9   been documented, it's a little --

10      Q.    Is it also true that when you take notes during

11  these interviews, that those notes are not a verbatim

12  recitation of what the witness says, correct?

13      A.    That's correct.

14      Q.    It's just general impressions, and then later

15  on you prepare a more detailed report, or the agent that

16  you are with prepares a more detailed report, correct?

17      A.    Correct.

18      Q.    So the fact that something may appear in a

19  report but not in your notes would not be unusual?

20      A.    No.

21      Q.    The review that you did in January and March of

22  2009, with the members of the trial team in Medford, do

23  you recall that?

24      A.    Yes.

25      Q.    Is it true that when you were doing that

1    review, Barbara Cabral was not an anticipated witness?

2        A.    That's true.

3        Q.    Is it also true that during that review, you

4    nevertheless reviewed the file of Richard Cabral for

5    exculpatory material, you or some member of the trial

6    team did?

7        A.    Correct.  Exculpatory or something that would

8    fit what we thought was the defense's theory, yeah.

9        Q.    Okay.  And is it also true that after that

10   review that you did in Medford you, in fact, produced

11   several 302s for Richard Cabral to the defense because

12   it contained material that might, in fact, be

13   exculpatory?

14       A.    Yes.  I believe those two that were provided

15   were pulled out for those reasons.

16       Q.    Is it also true that in compliance with Judge

17   Hogan's order, you provided a number of handwritten

18   notes for other government witnesses?

19       A.    Correct.

20       Q.    And you did not, though, provide the

21   handwritten notes from the interviews with Barbara

22   Cabral until posttrial, correct?

23       A.    Yeah, that's correct.

24       Q.    And was that a mistake?

25       A.    Yes, it was a mistake.  I went back and

1    reviewed my color coded spreadsheet and she wasn't

2    listed.

3        Q.    And your failure to turn over those handwritten

4    notes for Barbara Cabral, did you do that to try and

5    gain an advantage in this case?

6        A.    No.

7        Q.    Did you do it because you thought there was

8    something that might be helpful to the defense in those

9    notes?

10       A.    No.  It was complete unintentional, and I

11   expected that if there was something of any value to the

12   defense, that they would contact me about it because

13   they've contacted me several times.

14       Q.    And you, in fact, responded to all of those

15   contacts that you had from the defense, did you not?

16       A.    Correct, yes.

17       Q.    And you provided technical assistance to help

18   them work their way through the computers?

19       A.    Yes.

20       Q.    And is it also true that if the defense had

21   written to you saying, hey, we don't have the Barbara

22   Cabral notes, would you send those over, you would have

23   followed up on that?

24       A.    Yes.  In fact, when I reviewed my file, I had

25   at least four e-mails from the defense after I provided

Anderson - X by Ms. Zusman                           130

1   the Barbara Cabral interviews where they are requesting

2   QuickBooks files, information for one of their

3   witnesses, the accountants, and why, and notes, and

4   search warrant materials.

5       Q.    And did you respond to those inquiries?

6       A.    I did.

7       Q.    Is that because you wanted to be helpful to the

8   defense?

9       A.    Yes, I wanted to comply and I wanted to keep

10  the ball rolling per se and give them what pertained to

11  the judge's orders.

12      Q.    Is it true that both Richard and Barbara Cabral

13  were FBI sources, correct?

14      A.    Correct.

15      Q.    They were not IRS sources?

16      A.    No.

17      Q.    And did you yourself ever have access to the

18  FBI source files?

19      A.    No.

20      Q.    Have you reviewed those FBI source files?

21      A.    No.

22      Q.    You witnessed two payments that were made to

23  Richard Cabral in 2005 and 2006, correct?

24      A.    Correct.

25      Q.    Did the FBI pay Barbara Cabral?

Anderson - X by Ms. Zusman                    131

1      A.    No.  They only paid Richard Cabral.

2      Q.    There were several questions raised about why

3   you provided handwritten notes for Daveed

4   Gartenstein-Ross after providing the reports from

5   Barbara Cabral.  Is it true that Daveed Gartenstein-Ross

6   was always on the government's case-in-chief, and he

7   himself was never listed as a rebuttal witness?

8      A.    Correct.  And the defense had sent e-mails

9   pertaining to wanting additional information for Daveed

10  Gartenstein-Ross.

11     Q.    Okay.  Posttrial, there were several reports of

12  interviews, I just want to be clear on this, those

13  posttrial reports that were produced were of

14  interviews -- these are FBI 302 interviews of Richard

15  Cabral in which Barbara Cabral made a statement,

16  correct?

17     A.    That's my understanding, yes.

18     Q.    And were any of those materials deliberately

19  withheld from the defense?

20     A.    No.

21     Q.    Is it just that they happened to be Richard

22  Cabral file -- in Richard Cabral's file?

23     A.    I believe that's what happened.  I believe that

24  because it was a Richard Cabral interview and Barbara

25  Cabral had made a comment, that it didn't make it into

1    Barbara Cabral's file.

2        Q.    But that file was reviewed for exculpatory

3    material, correct?

4        A.    I believe so, yes.

5        Q.    So these documents would not have been produced

6    pursuant to Judge Hogan's order because they weren't

7    exculpatory?

8        A.    Correct.

9        Q.    I just want to briefly touch on a comparison,

10   we've had a lot of testimony and a lot of questions

11   about those August 17, 2007, reports.  There was a final

12   version, as I understand it, that was produced to the

13   defense prior to trial, correct?

14       A.    Yes.

15       Q.    In 2009, so well over a year before trial?

16       A.    Yes.

17       Q.    And that 2009 production, it included the

18   remark that there was a question placed to Richard

19   Cabral about whether or not the defendant ever sought to

20   generate support for mujahideen in Kosovo, correct?

21       A.    Correct.

22       Q.    And that addition was a question that you asked

23   Richard Cabral, correct?

24       A.    Yes.

25       Q.    And that's because you had just spoken with

1   Daveed Gartenstein-Ross who had told you about the

2   defendant's efforts to aid the mujahideen in Kosovo?

3       A.    Correct.  And I wanted to be complete and make

4   sure that I asked them the same question, yeah.

5       Q.    And Richard Cabral, in fact, said, no, he

6   wasn't aware of any such efforts, correct?

7       A.    Correct, that's what he said.

8       Q.    And that bit of information was then included

9   in the report that was provided to the defense prior to

10  trial, correct?

11      A.    Yes.

12      Q.    And the second version, that draft report that

13  was provided to the defense after trial, that draft

14  version does not, in fact, include any reference to

15  Kosovo, does it?

16      A.    I believe it doesn't.

17      Q.    And also there is -- the other difference

18  between those two reports is that one refers to $200 and

19  one refers to $400.  Was it your suggestion to Agent

20  Carroll that he clarify and provide those numbers on a

21  per person rather than a per couple basis?

22      A.    I believe so.  I believe I was a little

23  confused as to how initially it had been written up

24  because it was -- I believe that they were giving the

25  numbers as a couple basis, and I thought it would be

Anderson - X by Ms. Zusman                           134

1   more appropriate maybe to do a per person basis, I

2   believe.

3       Q.    But there was no attempt to change information,

4   was there?

5       A.    No.

6       Q.    To modify it or in any way substantively change

7   what the witness had said?

8       A.    No.

9       Q.    And the draft report that was produced

10  posttrial, it also includes a reference to the fact that

11  defendant had an ex-wife from Alaska.  Do you recall

12  that?

13      A.    Yeah, I believe there was a reference to a wife

14  from -- that originally came from Alaska, yeah.

15      Q.    But that sentence is not in the final version

16  that was produced to the defense pretrial.  And was

17  there a reason to -- was there any attempt on your part

18  to deceive the defense by eliminating that sentence

19  about his ex-wife being from Alaska?

20      A.    No, I believe I probably just didn't even

21  notice that it wasn't in the final version because I

22  didn't see the relevance.

23           MS. ZUSMAN:  I have no further questions.

24           MR. WAX:  A couple additional questions,

25  please, Your Honor.

1                      REDIRECT EXAMINATION

2    BY MR. WAX:

3        Q.    Agent Anderson, in terms of your understanding

4    of the exculpatory material, you understand that to

5    include material that is significant for impeaching

6    purposes?

7        A.    I believe so.

8        Q.    You would understand, then, that the fact of

9    payment to a person would be considered exculpatory?

10       A.    Payment to a testifying witness, yes.

11       Q.    Okay.  And in terms of the payments that you

12   observed, you were aware that at that time, at least on

13   one occasion, and your recall, I think, is vague on the

14   other, Barbara Cabral was present when one of the

15   payments was made?

16       A.    I recall Barbara Cabral being present when

17   Mr. Cabral was paid, yes.

18       Q.    And at that time you were aware that Barbara

19   Cabral was being treated as a source by the FBI as well

20   as Richard Cabral?

21       A.    I was aware that she was an unpaid source.

22       Q.    You were aware that she was a source, correct?

23       A.    An unpaid source, yes.

24       Q.    Were you aware that she was a source, yes or

25   no?

1    A.    Yes.

2    Q.    Thank you.  In terms of the discovery back and

3  forth here, is it your view that notwithstanding the

4  fact that there is a fair amount of give and take

5  between defense and prosecution, that it is necessary

6  for there to be some level of trust between the sides?

7    A.    I had assumed that, yes.

8    Q.    And that when something is ordered to be

9  provided by the court, it would be reasonable for the

10 opposing side to trust that the prosecution and its

11 agents would be complying with that order?

12   A.    Yes.

13   Q.    In terms of the August 17, 2007, 100, 200, 200,

14 400 issue, as we have gone through the reports of

15 interviews of Richard and Barbara Cabral, if I'm reading

16 these correctly, on October 5 of 2004, the description

17 that was written up in the report -- excuse me -- in the

18 notes I think it is, one second, please.  I'm sorry,

19 September 27 of 2004 report describes money being

20 provided and money being turned back from each

21 individual, not any sort of collective description, do

22 you see that, the second paragraph from the bottom

23 that's not redacted?

24       MS. ZUSMAN:  If I may, Ms. Anderson, it's at

25 the bottom of page 3866 is the Bates stamp number.

Anderson - ReD by Mr. Wax                    137

1          THE WITNESS:  3866?

2          MS. ZUSMAN:  3866.

3          THE WITNESS:  I'm sorry.  I don't believe I was

4     there for this interview.

5     BY MR. WAX:

6     Q.    Did you -- prior to August 17 of 2007, and your

7     participation in an interview of Richard and/or Barbara

8     Cabral, had you reviewed any of the FBI interviews that

9     had taken place previously?

10    A.    I may have.  I don't recall.  I don't believe

11    this interview dated 9/27/04, it looks like it was

12    conducted by Special Agent Shawna Carroll.  I don't see

13    my name on it.  I don't believe I was present for this

14    one.

15    Q.    Okay.  Let's turn to December 3 through 6,

16    2004, page 1749.

17    A.    Okay.

18    Q.    It appears as though you were present for that

19    interview?

20    A.    Yes.  I wrote this MOI, memorandum of

21    interview.

22    Q.    And then on page 1751, paragraph 10, the

23    Cabrals said that each of the 11 members were asked to

24    give the 200 in transportation money.  Do you see that

25    notation, paragraph 10, middle of the page?

1    A.    Yes.

2    Q.    So in this one, while you were present, the

3  discussion was of giving over $200, you know, each, no

4  collective discussion?

5    A.    I believe so.  That's how I wrote it up, $200

6  each.

7    Q.    So in Agent Carroll's notes of the August 17

8  interview, 2007, he reflects 200 and 400, right?

9    A.    Correct.  I believe what's meant by that, my

10 understanding was that 200 each, being that they're a

11 pair, that made $400.

12   Q.    You had been present previously when each had

13 been discussed in that December '04 interview?

14   A.    Yes.

15   Q.    He took the notes in December -- in August of

16 '07?

17   A.    Some of the notes in August of '07.  I did have

18 a few notes, yes.

19   Q.    The ones that's related to the amount of money

20 are in his handwriting and his report, not yours,

21 correct?

22   A.    Correct.

23   Q.    Did you go back and review the report of

24 December 3 and 6, 2004, in whatever process of editing

25 you say you went through with respect to this August

1   interview?

2     A.    No.

3           MR. WAX:  I have nothing further.  Thank you.

4           MS. ZUSMAN:  Nothing further, Your Honor.

5           THE COURT:  Thank you.  You are excused.  Your

6   next witness, please.

7           MR. WAX:  Shawna Carroll, please.

8           THE WITNESS:  Your Honor, should I leave the

9   courtroom?

10          THE COURT:  Yes, thank you.

11          MR. MATASAR:  Your Honor, may I be briefly

12  excused?  Mr. Wax can continue without me.

13          THE COURT:  Yes.

14          MR. MATASAR:  Thank you.

15          (Mr. Matasar exits the courtroom.)

16          THE CLERK:  Please raise your right hand.

17          (The witness was sworn.)

18          THE CLERK:  Please have a seat.  Please speak

19  into the microphone here.  Please state your full name

20  and then spell your full name for the record.

21          THE WITNESS:  Shawna M. Carroll, S-H-A-W-N-A,

22  C-A-R-R-O-L-L.

23                      DIRECT EXAMINATION

24  BY MR. WAX:

25    Q.    Good afternoon, Ms. Carroll.  I'm Steven Wax.

Shawna Carroll - D by Mr. Wax                          140

1    I'll be asking some questions on behalf of

2    Mr. Sedaghaty.  Can you tell us, please, are you a

3    former FBI agent?

4        A.    Yes.

5        Q.    And were you so employed from 2001 through

6    2006?

7        A.    Yes.

8        Q.    Are you -- did you participate in any manner in

9    the investigation of Pete Seda?

10       A.    Yes.

11       Q.    When did your involvement in the investigation

12   begin?

13       A.    Probably shortly after 2001, 2002.

14       Q.    Do you recall how close in time to the incident

15   of September 11, 2001, if that can help brain you in

16   time in some way?

17       A.    I don't recall.

18       Q.    Can you tell us, please, what the nature of

19   your involvement in the investigation was?

20       A.    I assisted my husband, David Carroll, in his

21   portion of the investigation.

22       Q.    Did you have any other role in the case?

23       A.    I mean just primarily assisting him.

24       Q.    All right.  During the course of your work on

25   the case, did you meet individuals named Richard and

1   Barbara Cabral?

2       A.    I met -- I have met them, yes.

3       Q.    Do you recall when you first had contact with

4   Richard Cabral?

5       A.    I don't remember the exact date.

6       Q.    Prior to coming to court today, did you have

7   the opportunity to review any reports, FBI 302 reports

8   or FD 1023s, or handwritten notes of any contacts

9   between you or your husband or any other FBI agent and

10  either Richard or Barbara Cabral?

11      A.    No.

12      Q.    Have you, in the last five years since you

13  retired from the FBI or since you left service, I don't

14  want to use any judgmental word there, had the

15  opportunity to review any reports?

16      A.    No.

17      Q.    Do you recall what role, if any, you had with

18  respect to Richard Cabral's service as an informant?

19      A.    Can you restate that?

20      Q.    What role, if any, you had with respect to

21  Richard Cabral's service as an informant or a human

22  source or whatever the term was that was used in the

23  early 2000s.

24      A.    I met Richard Cabral.  And then after I spoke

25  with him, I opened him up as a source.

Q. What does that mean? When you opened him up as a source physically, what did that mean?
A. I asked him if he would be willing to cooperate in giving information and he said he would.
Q. Did you have any similar conversation with Barbara Cabral?
A. No.
Q. Are you aware of whether she --
A. Oh, excuse me, I retract that. Yes, I did.
Q. Okay. And she was also opened as a source?
A. Yes.
Q. Did you do that opening, if you recall?
A. Yes.
Q. Is there paper -- was there at that time paperwork involved in opening someone as a source?
A. Yes.
Q. Can you please describe for us what you did with respect to Richard Cabral to open him as a source.
A. You documented -- I'm trying to go from memory here. There is a piece of paper in a file that your coordinator from Portland provides, and you follow it, you know, down the line as to what you do. You do DMV checks and checks like that to check to make sure that everything is -- they're okay. And then you put together a memo that says that you would like to open up

Shawna Carroll - D by Mr. Wax                          143

1  this source and what kind of information that you think

2  that individual will be able to provide to you.

3      Q.    You did that with respect to Richard Cabral?

4      A.    Yes.

5      Q.    You did that with respect to Barbara Cabral?

6      A.    Yes.

7      Q.    Do you recall roughly how many times you met

8  with Barbara Cabral either in person or by phone?

9      A.    The first time I met her was when I was talking

10 with Richard Cabral, and it just so happened she was at

11 the house.  I believe she was getting ready for work.

12          (Mr. Matasar enters the courtroom.)

13     A.    I may have spoken to her on two other -- one

14 other occasion.

15     Q.    Do you recall how many times you met with or

16 spoke with Richard Cabral?

17     A.    Could be from 5 to 10 times maybe.

18     Q.    Did you at some point go through any paperwork

19 process with respect to paying Richard Cabral?

20     A.    Yes.

21     Q.    Tell us about that, please.  What was required

22 and what did you do?

23     A.    Usually you draft a memorandum that states what

24 kind of information that he's given so that you can

25 justify in paying him.

1      Q.     Did you do that in this case?

2      A.     Yes.

3      Q.     Do you recall whether you reviewed any FBI or

4  Department of Justice manuals or guidelines with respect

5  to informants prior to opening up Richard Cabral for the

6  payment through this process you just described?

7      A.     I didn't have to review them because I was

8  already aware of them.

9      Q.     And what guidelines, if any, did you -- were

10 you aware of?  Department of Justice or FBI?

11     A.     FBI.

12     Q.     And what was the year of the guideline on which

13 you acted when you initiated the payment process for

14 Richard Cabral?

15     A.     I don't recall.

16     Q.     Do you recall that you initiated in some way a

17 payment process in the fall of 2003?

18     A.     That could be.

19     Q.     Okay.  If we have been -- not provided a copy

20 of -- but advised of a letter written on November 4,

21 2003, with respect to payment of Richard Cabral, would

22 that refresh your recollection as to the time frame in

23 which this occurred?

24     A.     If I saw the letter, it would refresh.

25     Q.     I'd love to show it to you but I can't.

1          MR. WAX:  So we have agreement that that was

2    the date of the letter?

3          MS. ZUSMAN:  We do.

4    BY MR. WAX:

5      Q.    Okay.  Does that sound like the right ballpark?

6      A.    Sure.

7      Q.    Okay.  There would be an impossibility, then,

8    that you would have relied on any 2004 guidelines when

9    you initiated the process for payment of Richard Cabral

10   in 2003?

11     A.    I don't think I understand your question.

12     Q.    If you are setting up Richard for payment in

13   2003, I think it would be obvious you could not have

14   relied on guidelines that were published in 2004?

15     A.    If those guidelines changed, yes.

16     Q.    Yes, if they had changed.

17     A.    Yes.

18     Q.    Okay.  Do you recall whether you had in your

19   office, or at least in the Medford FBI office, a set of

20   the FBI guidelines at the time in 2003 that you

21   initiated the process for paying Richard Cabral?

22     A.    They were available in the Medford office.

23     Q.    Okay.  Now, did you have any discussion with

24   any supervisor in the Medford office with respect to

25   paying Richard?

1    A.    Our supervisor for the Medford office was in

2    Bend.

3    Q.    Did you have a discussion with the supervisor

4    who was located in Bend?

5    A.    No.

6    Q.    Did you have a discussion with any other person

7    within the FBI when you were initiating this process for

8    payment to Richard?

9    A.    Not that I can recall.

10    Q.    Okay.  Do you recall if you had a discussion

11    with your husband, Agent Carroll?

12    A.    I might have.  But since he was my source, I

13    probably may have mentioned it to him but I don't

14    recall.

15    Q.    Okay.  In the fall of 2003, do I understand

16    correctly that both you and your husband were working on

17    the Seda, slash, al-Haramain investigation?

18    A.    I might have still been assisting him but my

19    primary focus was in another area.

20    Q.    Okay.  Now, did you have a conversation with

21    anyone in the United States Attorney's Office about

22    payment to Richard Cabral?

23    A.    Yes.

24    Q.    And what do you remember?  Who?  What?  Where?

25    Why?  And when?

Shawna Carroll - D by Mr. Wax                    147

1     A.    I recall having a conversation with Assistant

2  United States Attorney Chris Cardani about opening

3  Mr. Cabral.

4     Q.    What else do you recall?

5     A.    Normally in those circumstances, not knowing

6  what Mr. Cabral could be as a source, what information

7  he may have, you normally discuss the possibility that

8  this source may, you know -- you may have a potential of

9  putting a wire on the source, or you go down just a

10  gamut of different things that may happen.  It doesn't

11  mean that it's going to, but you just kind of cover all

12  your bases.  And one of those is the potential of paying

13  the source, and not necessarily meaning you are going to

14  or you anticipate it but that you have discussed that

15  that could be something that you do.

16     Q.    Okay.  In reading through a version of an FBI

17  and DOJ manual that have been available to me from 2002,

18  I saw a use of the phrase FPO.  Is that a phrase that's

19  familiar to you from the manuals?

20     A.    Not that I recall.

21     Q.    Federal prosecuting official, FPO, no?

22     A.    It's been a while, sorry, no.

23     Q.    Do you recall any discussion with Mr. Cardani

24  specifically about payment to Richard Cabral?

25     A.    No, not specifically about any one particular

1   payment.

2      Q.    What do you recall discussing with him about

3   payment?

4      A.    That potentially we could pay the source.  It

5   wasn't discussed that it was a done deal or it was a for

6   sure thing.  I had no -- in the beginning, I really

7   don't have intentions of paying sources.

8      Q.    Okay.  Did you personally participate in any

9   payments to Richard Cabral?

10     A.    Yes.

11     Q.    Do you recall on how many occasions you

12  personally participated?

13     A.    Once.

14     Q.    Prior to that one payment, did you have any

15  discussion with anybody about whether or not the payment

16  could or should be made?

17     A.    I might have discussed it with Dave Carroll.

18     Q.    Do you recall if you discussed it with any

19  supervisor in the FBI, Bend, Portland, anywhere?

20     A.    No.

21     Q.    Do you recall if you had a discussion with

22  Mr. Cardani?

23     A.    No.

24     Q.    Do you recall in November of 2003 actually

25  writing a letter with respect to Richard Cabral and the

1    potential for payment?

2        A.    I remember writing a letter to him confirming a

3    conversation that we had had relaying what I just

4    explained to you that there could be a potential of

5    paying this source.  And getting the concurrence that if

6    that was what I decided, that that would be authorized.

7        Q.    Do you recall to whom that letter was

8    addressed?  Was it addressed to Chris Cardani?  Or was

9    it addressed to the U.S. Attorney or supervisor?

10       A.    I believe it was addressed to the U.S. Attorney

11   with a copy going to Chris Cardani and copies going to

12   my supervisor.

13       Q.    Why would you have addressed the letter to the

14   U.S. Attorney?

15       A.    I don't recall.  I mean, it could have been.  I

16   mean, if you're normally writing an attorney or, you

17   know, the U.S. Attorney's Office, that would go there,

18   but it could have been just to Mr. Cardani also.

19       Q.    Do you recall if there was a requirement in the

20   manuals or guidelines that you were following that the

21   United States Attorney, the head of the office, be

22   advised?

23       A.    No.

24       Q.    You have no recollection if such exists or your

25   recall is there is no such requirement?

1      A.     I don't believe there is a requirement.

2      Q.     Okay.  With respect to the payment in which you

3 participated, what was provided to Richard Cabral,

4 check, cash, money order, gold bullion, what?

5      A.     Cash.

6      Q.     Okay.  You handed that to him personally?

7      A.     Yes.

8      Q.     Where did you get the cash from?

9      A.     After you complete the paperwork, it goes

10 through your supervisor to request the payment, and it

11 goes to the Portland office, and the informant

12 coordinator processes the request, and then sends you a

13 cashier's check.

14      Q.     There is, then, a process that is spelled out

15 for signoff by a number of people within the FBI in

16 order for a payment such as you made to Richard to be

17 made?

18      A.     Yes.

19      Q.     You went through all of the steps that you

20 understood were necessary to get all of the necessary

21 signatures?

22      A.     Yes.

23      Q.     Now, the payment that you participated in took

24 place while the investigation of Pete Seda was ongoing,

25 correct?

1     A.     Yes.

2     Q.     He was -- he Richard Cabral -- was providing

3  information about Pete Seda, al-Haramain, and others?

4     A.     I believe.

5     Q.     Okay.  We've seen FBI 302 reports and other

6  things from --

7     A.     Okay.

8     Q.     -- '03 and '04, at least as I'm reading them,

9  suggest that was the case?

10    A.     Yes.

11    Q.     Okay.  Is that consistent with your

12 recollection?

13    A.     I believe so.

14    Q.     All right.  You had no belief that you had any

15 obligation to communicate with the U.S. Attorney's

16 Office, you know, hey, guys, you're investigating this

17 guy for potential prosecution, we'd like to pay this

18 person who might be a witness in the case?

19    A.     Can you restate that?

20    Q.     Did you have any understanding that you should

21 advise the U.S. Attorney that you wanted to pay a person

22 who might end up as a witness in a case that they might

23 prosecute?

24    A.     That wasn't -- we were still in the

25 investigative stages, so there wasn't a timeline for

1    anything that was going to come up legally.  I mean, it

2    was just an open investigation.

3         Q.    So how about after an indictment is returned,

4    does that change things?

5         A.    That wasn't my case, that wasn't my involvement

6    in this case.

7         Q.    Your recollection of the requirements for an

8    FBI agent after an indictment was returned -- had there

9    been an indictment in 2004 when you handed Richard

10   Cabral the $4500, is it your understanding that you

11   would have been required to let the U.S. Attorney's

12   Office know, hey, we want to pay a person, you've

13   indicted this person -- you've indicted someone.  We

14   want to pay someone you may want to call as a witness.

15   Is it your understanding that that's what you should

16   have done?

17        A.    I would -- I probably would have spoke to

18   somebody about it, but I've never run across that in my

19   career as having to pay somebody after the fact.

20        Q.    I'm sorry, you have never had the experience of

21   having to pay a person who is a potential witness at a

22   trial after an indictment has been returned?

23        A.    Correct.

24        Q.    Do you have any recollection of whether the

25   guidelines that were available to you in the Medford

Shawna Carroll - D by Mr. Wax                    153

 1  office in 2003 required that you make the disclosure,

 2  get the concurrence of the U.S. Attorney when you want

 3  to pay a person after they've indicted someone?

 4      A.    I don't recall that.

 5      Q.    Do you recall who else was present when you

 6  made the payment to Richard Cabral?

 7      A.    I believe it was my -- Dave Carroll.

 8      Q.    Do you recall if anyone else was present?

 9      A.    I don't recall.

10      Q.    Do you recall if Richard Cabral was asked to

11  sign any forms?

12      A.    Yes.

13      Q.    What do you recall that he was asked to sign?

14      A.    After counting the money to Mr. Cabral, he

15  would have signed a form indicating that he had received

16  the money.

17      Q.    Do you recall specifically that he did that?

18      A.    Yes.

19      Q.    Do you recall if he was provided any advice by

20  you or your husband with respect to a tax obligation?

21      A.    If I recall, there is a statement at the bottom

22  of the receipt that you have them sign that tells them

23  about his obligation, and I would have read that out and

24  made sure that he understood it.

25      Q.    And what do you recall happening with the

1    receipt after Richard Cabral signed it?

2        A.    I would have returned it to the office and put

3    it in an envelope and sent it to the informant

4    coordinator.

5        Q.    Do you recall if a copy would have been kept in

6    any file in Medford?

7        A.    No.

8        Q.    Do you recall if a copy would have been sent to

9    anyone in the United States Attorney's Office?

10       A.    No.

11       Q.    Do you recall any communication to or from then

12   United States Attorney Karin Immergut with respect to

13   the payment to Richard Cabral?

14       A.    No.

15             MR. WAX:  One moment, please, Your Honor.

16             THE COURT:  Yes.

17             (Discussion held off the record between

18   co-counsel.)

19   BY MR. WAX:

20       Q.    Ms. Carroll, I am not sure I understood one of

21   the things you said.  When I asked about notification to

22   the U.S. Attorney if you are paying a witness after an

23   indictment has been returned, you are aware of the rules

24   of discovery in criminal cases?

25       A.    Yes.

1      Q.     You are aware that the government is required

2  to provide the defense exculpatory information and that

3  that's been defined as including impeaching information

4  and that that includes payments?

5      A.     I'm sorry, but I have not come across that, so

6  I'm not aware of it.

7           MR. WAX:  Judge, I have one more question that

8  I want to ask.  I noticed that Mr. Slade was here.  And

9  I'm not sure if this question involves anything that

10 would relate to him, but out of an abundance of caution,

11 I want to bring it to your attention before I ask the

12 question.

13          THE COURT:  All right.  Mr. Slade has been here

14 most of the time, although he did slip out for a minute.

15          MR. WAX:  He's back.

16          THE COURT:  I think what we'll do is we'll take

17 that in the robing room.  I'm sorry, Deb.

18          (Discussion held off the record from 5:38 until

19 5:46 p.m.)

20          THE COURT:  With regard to the matter out of

21 the courtroom, the government's objection is sustained.

22 And we can -- if you want to make a record on it, we can

23 do that at the end of the day because our reporter will

24 have to get other equipment and so on, all right.

25          MR. WAX:  Thank you.  I have no further

 1    questions.

 2              THE COURT:  Thank you.

 3              MS. ZUSMAN:  Just a few questions.

 4                      CROSS-EXAMINATION

 5    BY MS. ZUSMAN:

 6       Q.    Ms. Carroll, you mentioned that you met with

 7    Richard Cabral several times.  You said between 5 and

 8    10; is that right?

 9       A.    That's just an estimate.  I don't really

10    recall.

11       Q.    But it was more than two or three?

12       A.    Yes.

13       Q.    And you mentioned that you only met with

14    Barbara Cabral perhaps once, maybe twice?

15       A.    I recall once or -- once or twice.

16       Q.    And that was very brief, right?

17       A.    Yes.

18       Q.    So in all of your interactions with Richard

19    Cabral when you made that first payment to him in July

20    of 2004, that was for information he provided, correct?

21       A.    Yes.

22       Q.    And not for information Barbara Cabral had

23    provided?

24       A.    No.

25       Q.    In order to do -- you talked a lot about the

1    paperwork that you have to fill out in order to make a

2    payment to a witness.  I want to ask you about that.

3    You draft a memo, correct, that explains why you want

4    the money?

5         A.    Yes.

6         Q.    And in addition to the memo, you also have to

7    fill out a pretty detailed form, correct?

8         A.    Yes.

9         Q.    And all of that -- the form and your memo then

10   goes to your supervisors, right?

11        A.    Yes.

12        Q.    And in this case, when you did all that

13   paperwork for the payment for Richard Cabral in 2004, it

14   was, in fact, authorized by three separate supervisors,

15   correct?

16        A.    Yes.

17        Q.    And they signed off on the form?

18        A.    Yes.

19        Q.    And included on the form was also one of the

20   checked boxes was for "have you sought and received the

21   approval of an Assistant United States Attorney,"

22   correct?

23        A.    Yes.

24        Q.    And within that, you had let your supervisors

25   know that you had, in fact, consulted with AUSA Cardani

1  and you specifically referred to that November 2003

2  letter, right?

3      A.    I'm sorry, can you say that again?

4      Q.    Yeah.   The form -- the standard form that you

5  filled out included a box for "have you consulted with

6  an Assistant United States Attorney," correct?

7      A.    Yes.

8          MR. WAX:   Judge, I'm sorry, this is another

9  document we don't have.   And if there is going to be

10 this kind of detail on it, I think we should be provided

11 it.

12         MS. ZUSMAN:   Your Honor, my only point in the

13 questions -- there have been a number of questions about

14 whether or not Agent Carroll complied with FBI policy,

15 and I'm simply seeking to establish that she did, in

16 fact, comply with their protocol.

17         MR. WAX:   In order to know that, Judge, we

18 would need to see the 2002 protocol, which is what Agent

19 Wedick described in his declaration, which is the only

20 thing that could have been available to her in 2003 when

21 she wrote this letter.   So if there is a protocol, and

22 if there are, you know, letters and documents that

23 reflect that, we really need to see them.

24         THE COURT:   You may continue.   The objection is

25 overruled.

 1          MS. ZUSMAN:  Thank you, Your Honor.

 2    BY MS. ZUSMAN:

 3    Q.    In fact, you made the very first payment to

 4    Richard Cabral in 2004, correct?

 5    A.    Yes.

 6    Q.    Not in 2003?

 7    A.    That I recall.

 8    Q.    Okay.  And when you filled out the paperwork to

 9    do that, you had to let your supervisors know that you

10    had, in fact, consulted with an Assistant United States

11    Attorney, correct?

12    A.    Yes.

13    Q.    And, in fact, the letter -- the opening letter

14    that we've been discussing confirming your discussion

15    with AUSA Cardani was included within the source file,

16    correct?

17    A.    Yes.

18    Q.    So if any of your supervisors had questioned

19    your consultation with that AUSA, that would have been

20    in the source file that your supervisors had access to,

21    correct?

22    A.    Yes.

23    Q.    So although you testified in response to

24    Mr. Wax's questions you didn't have any discussions with

25    anyone before paying Richard Cabral except perhaps Dave

1    Carroll, you, in fact, had prepared a detailed memo and

2    filled out paperwork that was then reviewed by your

3    supervisors prior to your making any payment to Richard

4    Cabral?

5        A.    Yes.

6             MS. ZUSMAN:  Nothing further, Your Honor.

7                      REDIRECT EXAMINATION

8    BY MR. WAX:

9        Q.    Ms. Carroll, I'm a little confused by your

10   answers to the number of times you met with and the

11   length of these conversations with Barbara Cabral.  In

12   front of you there's a notebook.  And I'd ask you to

13   please take a look, we will start from the first tab,

14   we're just going to go through the first few, which I

15   think are the ones that relate to you.  First tab,

16   September 12, 2003, your name is at the bottom?

17       A.    Yes.

18       Q.    And while this is captioned at the very top

19   "Richard Cabral," when you turn to the second page,

20   lower right-hand corner 3856, there is a paragraph

21   reflecting information provided by Barbara Cabral?

22       A.    Yes.

23       Q.    And your name appearing on the bottom of the

24   first page indicates that you were present for the

25   interview?

Shawna Carroll - ReD by Mr. Wax                161

1    A.    Yes.

2    Q.    Do you recall if Barbara Cabral was present for

3    the entire interview?

4    A.    No.

5    Q.    You don't -- she was not or you don't have any

6    recollection?

7    A.    The only time I recall her ever being around

8    was in a very brief, she was getting ready to go to

9    work, and she would not have been around during my

10   entire conversation with him.

11   Q.    So this paragraph reflects that she was around

12   for some portion of it?

13   A.    Probably the very end.

14   Q.    If you'd turn, please, to the tab that says

15   September 28, 2004, there is one that has an R in the

16   right-hand side of it.  Do you see that?

17   A.    Yes.

18   Q.    Okay.  And if you'd look, please, I see an FBI

19   302 report, your name at the bottom.  Is this an

20   indication that you conducted this interview?

21   A.    Yes.

22   Q.    I'm not seeing another agent's name.  Would

23   that indicate that you did this interview alone?

24   A.    Yes.

25   Q.    A source who was in a position to testify, the

1    source is not identified here.  Do you recall that with

2    the discussion about women and jewelry sales and Raya

3    Shokatfard that the person you were speaking with on

4    this occasion was Barbara Cabral?  It might help you

5    refresh your recollection if you look at the next tab,

6    9/28/04 N.  These appear to be notes -- is this your

7    handwriting?

8         A.    Yes.

9         Q.    And are these your notes of a conversation

10   that's reflected in the September 28, '04, 302 report?

11        A.    Appears to be.

12        Q.    And at the very top is the name "Barbara"?

13        A.    Yes.

14        Q.    Does that refresh your recollection that this

15   was an interview of Barbara Cabral?

16        A.    It appears to be.

17        Q.    Okay.  The typed report is three pages.  It

18   includes some information that appears to have been

19   provided to you by her?

20        A.    Yes.

21        Q.    If you'd look, please, at the tab 10/5/04?

22        A.    Yes.

23        Q.    Is this your handwriting?

24        A.    Yes.

25        Q.    Do you recall whether this is -- the W/B, is

Shawna Carroll - ReD by Mr. Wax                    163

 1    that indicating another conversation between you and

 2    Barbara Cabral?

 3        A.    It does.  It's probably a telephone call,

 4    actually.

 5        Q.    Okay.  But a communication that resulted in

 6    your taking these notes?

 7        A.    Yes.

 8        Q.    And then if you'd go to the tab, please,

 9    12/3-6/04, page 1749 has your name on it, as well as

10    Colleen Anderson's?

11        A.    That's marked N?

12        Q.    Yes.  No, excuse me, it's marked R.

13        A.    12/3?

14        Q.    12/3-6/04.

15        A.    Okay.

16        Q.    All right.  So page 1749 has your name and

17    Colleen Anderson's?

18        A.    Yes.

19        Q.    Paragraph 1 begins "on the above dates and

20    times, FBI Special Agent Shawna Carroll and I spoke with

21    Richard and Barbara Cabral"?

22        A.    Yes.

23        Q.    So is this -- does this refresh your

24    recollection that on those two dates you had what at

25    least appears to be a pretty extensive conversation with

1    Richard and Barbara perhaps together?

2        A.    It appears to be.

3        Q.    All right.  Ms. Carroll, when Ms. Zusman was

4    asking you questions, if I understood correctly, she

5    asked whether one of the documents, that you had to sign

6    and pass along when you were actually seeking the

7    payment to Richard Cabral in 2004, indicated that you

8    had consulted with the United States Attorney; did I

9    understand that correctly?

10       A.    I think what she is referring to is a -- it's a

11   document that you stick in front of your file that's a

12   checklist of the things that you've done on -- you know,

13   you've gone down and made note of the things that you've

14   done, and one of those is that you've consulted with the

15   attorney.

16           I don't recall what was in the letter on the

17   request for payment.  It would have indicated in that, I

18   believe, that on such-and-such a date, I had received

19   authority for this payment.  So that my supervisor and

20   anybody on the way up would know that that document is

21   in that file.  It's going to refer back to the document

22   where you prior got the authority.  So when you get

23   ready to do the payment, you can refer to that

24   particular document which is already in the file.

25       Q.    So this is not having consulted about the

1   payment that you are about to make?  If I understood

2   correctly, you said that in '03 there was just a

3   potential, possibly, maybe this guy would pan out and

4   you'd want to pay him some money?

5       A.    Pretty much that's what you -- yes.

6       Q.    Okay.  So then at some point in '04 you've

7   decided, hey, I've gotten good information, I want to

8   pay?

9       A.    Yes.

10      Q.    And the consultation that you had to report on

11  was not a contemporaneous consultation?

12      A.    No.  Are you asking do I have to go back and

13  ask again?

14      Q.    You know, hey, guys, I thought a year and so

15  ago, whatever, that, you know, maybe this guy would pan

16  out, now he has, and, you know, is it okay to pay?

17      A.    I didn't have to reconsult with him, no.

18      Q.    And you're saying you didn't?

19      A.    No, I did not.

20      Q.    All right.  If I'm understanding correctly, you

21  don't believe that you needed to get approval for the

22  specific payment?

23      A.    Correct.

24      Q.    And you don't need to report to the U.S.

25  Attorney that you've made the payment?

1    A.    Correct.

2    Q.    How is the defense ever supposed to find out,

3    to use for cross-examination, that a payment has been

4    made?

5    A.    Eventually it's going to come up in the

6    discussion.  It's not like he probably didn't know about

7    it.  It would have come up in a conversation.  I

8    wouldn't have kept something like that away from him.

9         MS. ZUSMAN:  Your Honor, I am going to object

10   to any further questions along this line, because Agent

11   Carroll retired well before the indictment in this case

12   issued.  Actually, she left service well before the

13   indictment.  She had no involvement in the discussions

14   or the production of discovery.

15        THE COURT:  The objection is sustained.

16        MR. WAX:  I have no further questions, Judge.

17   Thank you.

18        MS. ZUSMAN:  Nothing further for the

19   government, Your Honor.

20        THE COURT:  Thank you.  You may step down.

21   Your next witness, please.

22        MR. WAX:  I believe, Your Honor, that those

23   three were the ones that you had permitted us to call.

24   We would still love to call Mr. Cardani and Mr. Gorder,

25   and I believe you've ruled against us, so we would rest.

```
1              THE COURT:  All right.  Thank you.

2              MR. WAX:  Unless you reconsider.

3              THE COURT:  And for the government?

4              MS. ZUSMAN:  We have no witnesses, Your Honor.

5              THE COURT:  Thank you.  Now, do you have folks

6     have any argument?

7              MR. CARDANI:  Can the witnesses be allowed to

8     return if we're done with their testimony?

9              THE COURT:  Yes.

10             MS. ZUSMAN:  Your Honor, if you wanted to hear

11    argument on the two pending motions before you, we are

12    prepared to proceed.

13             THE COURT:  I don't require it.  I'm pretty

14    familiar with these things.  But there is a motion for

15    discovery, by the way, and I understand that that is

16    moot at this time; is that correct?

17             MR. WAX:  The motion for discovery on this

18    proceeding, Judge?

19             THE COURT:  Well --

20             MR. WAX:  I mean, you had ruled against the

21    discovery request earlier on.  And during the course of

22    the questioning, we have re-raised the issue, and I

23    suppose we're asking you to reconsider.

24             We've -- the government is asking witnesses

25    about documents that we can't see.  And where the
```

1    information contained on the documents we think goes

2    directly to the issues before the court, our questioning

3    is handicapped significantly.

4         THE COURT:  What I have is a note that the last

5    discovery motion or requests have been resolved.  I did

6    hear Mr. Matasar talk about a letter today.  And I've

7    reviewed that again during this proceeding.  And my

8    ruling remains the same on that.

9         So what specific other discovery materials do

10   you request?

11        MR. WAX:  All of the documents referred to by

12   Agents Carroll and Anderson; the forms that were filled

13   out in preparation for the payment; the receipts that

14   were signed; the notes that they reviewed.

15        And in terms of the discovery matters having

16   been resolved, they were not resolved, from our

17   perspective, by any agreement between the parties.  They

18   were resolved by the ruling that you had issued in

19   March.

20        THE COURT:  All right.  Do our records show an

21   open motion?

22        THE CLERK:  No.

23        THE COURT:  No?  All right.  Then I don't have

24   anymore on that.

25        If you want to argue the motions further, you

1   can do so at this time.

2           MR. MATASAR:  Your Honor, we had thought this

3   was an evidentiary hearing.  We do want to --

4           THE COURT:  You were right.

5           MR. MATASAR:  -- have an -- that was right,

6   part of it.  And had, I suppose, expected that the

7   complicated new trial and dismiss motions would be set

8   for argument at another time.  And so I guess that would

9   be my request.

10          THE COURT:  All right.  Ms. Zusman?

11          MR. MATASAR:  If you want to have a time limit,

12  Your Honor, we would be amenable to a time limit at that

13  time.

14          THE COURT:  I will have a time limit.

15          MS. ZUSMAN:  Your Honor, we're prepared to

16  proceed with argument today.  It would be our preference

17  that we get this wrapped up today.  But I will defer to

18  the court, if you want to schedule a further hearing.

19          THE COURT:  Ms. Wright.

20          (Discussion held off the record.)

21          THE COURT:  I'll hear the argument, if you have

22  any, at 1 o'clock next Tuesday.

23          MR. MATASAR:  Give us a minute.

24          MR. WAX:  Mr. Matasar would need to handle

25  that, Your Honor.  The Ninth Circuit has a meeting that

1    I have been asked to attend next Monday, Tuesday, and

2    Wednesday, so I will not be in town.  Do you have

3    anything open Thursday or Friday?

4           THE COURT:  I'll be at a Ninth Circuit meeting

5    on those days.

6           MR. MATASAR:  You're separated -- they separate

7    the lawyers and the judges?

8           MR. WAX:  Do you have anything the beginning of

9    the following week?

10          MS. ZUSMAN:  I am unavailable the beginning of

11   the following week.

12          THE COURT:  You are not available the following

13   week?

14          MS. ZUSMAN:  That's correct, Your Honor.

15          MR. MATASAR:  The entire week?

16          MS. ZUSMAN:  The entire week.

17          MR. MATASAR:  Judge, just give us a minute.

18          THE COURT:  We've had so much briefing on

19   these, I just can't imagine that I'd need too much

20   argument.

21          MR. MATASAR:  Okay.  Let's go then.

22          THE COURT:  But if you want to have it, I'll

23   let you have an hour on Thursday, but the rest of the

24   week is full of settlement conferences.  Well, why don't

25   you just go ahead and argue it now.  That's fine.  We

1    don't need any delay on this.  I've gotten lots of paper

2    on it already.

3         MR. MATASAR:  There is one -- give me a moment,

4    just give me a second.

5         (Discussion held off the record between

6    co-counsel.)

7         MR. MATASAR:  Your Honor, given the short

8    notice of the argument, I think we might as well just do

9    it now.

10         THE COURT:  All right.

11         MR. MATASAR:  We're not -- as long as the court

12    understands that we're not exactly as ready as we could

13    be.  I think it's -- and we understand the court has

14    asked for us to come some other time, but I think given

15    the scheduling and such, we'd just like to do it.

16         THE COURT:  Okay.  Let's go ahead and take it.

17    Do you want to argue first?

18         MR. MATASAR:  Yes, Your Honor.  There is just a

19    few things I want to say.  First of all, concerning the

20    comments that Mr. Carroll made today, I'd simply say

21    there was a meeting they had in January and March of

22    2009.  They talked about whether to provide the material

23    about Richard Cabral getting paid.  They decided that

24    one of the two -- one of the reasons they wouldn't was

25    that he had died.  The other reason was that they hadn't

1    yet decided to call Barbara as a witness.

2           It seems to us that that requires, as they

3    should have known, that once they decided to call

4    Barbara as a witness, they had to inform the defense.

5    The court heard it, I'm not going to go into it any

6    further.

7           The biggest problem, Your Honor, for us is --

8    and this is hard to say, Your Honor.  I haven't spoken

9    that much -- as much as Mr. Wax in this trial, but the

10   biggest problem for us in this case is really your

11   comments early on in this case when we raised them, I

12   think I may have them here, that you spent your whole

13   career with Mr. Cardani.  I think you said something

14   like we've spent our whole careers together.

15          THE COURT:  And you and Mr. Wax.

16          MR. MATASAR:  Yeah, I understand.

17          THE COURT:  And you'll remember, Mr. Matasar,

18   there was a lot of pressure on me to have you called as

19   a witness.  You remember the position I took on that.

20          MR. MATASAR:  Your Honor, I am not at all

21   saying, nor do I feel in one way, that I have been

22   treated improperly by this court.  I know my actions and

23   my voice, I hope, does not reflect that.  I know your --

24   you would understand that if that's what I'm saying.

25          On the other hand, what we saw in this case is

1    conduct that is, from Mr. Cardani, that is far, far

2    different than we typically see.  He has been, in all of

3    the other cases for which I am aware, and others, as he

4    says, to err on the side of disclosure when there is a

5    question about discovery, to give everything that is

6    available.

7              However, this was not that case.  He says in

8    his declaration this was that case but it wasn't.  We

9    were told from the very beginning we'd have to file

10   motions.  We were told specifically this wasn't like

11   every other case.  At times we were having trouble with

12   the computer material, getting it from the files.

13             While it's true that they offered to help our

14   computer consultant, typically what is done is they just

15   give us what they have.  And that was not done.

16             Throughout the case we had a different Chris

17   Cardani than we're typically used to seeing.  That is

18   the issue.

19             This is a case of extreme difficulty and

20   importance given the issues.  We have Mr. Slade here,

21   which is very atypical.  And it's just a different case.

22             And if we're also arguing about the new trial

23   motion, Your Honor, I need to talk about the incident

24   involving the Qur'an on the table.  The Chris Cardani

25   that I knew, that you knew, would not have stood before

1    the jury and taken the holy book, admittedly a holy book

2    that has some bad part at the end, and thrown it on the

3    table and called it "junk."  That is at a time -- and

4    the other thing that is really important, Your Honor,

5    this was very close to September 11th of 2010.

6           The TV news, our hotel where we were, it was

7    full, from beginning to end, of 24/7 on the news

8    networks about this nut that was going to burn the

9    Qur'an.  That's all that was on the news.  Attorney

10   General Holder made comments about that.  I think it was

11   also -- General Petraeus, David Petraeus, talked on the

12   news about how horrible that was.  There was this

13   feeling in the United States at that time, this fervent

14   anti/pro Qur'an.  It's the kind of conduct that in our

15   view is so unlike what we've seen, it still must be

16   considered by the court.  We really rely on our papers

17   that we've submitted about the importance of that, the

18   cases we've prepared.

19          One more thing, the last thing I want to say

20   also about that comment, Your Honor, concerns the

21   discussions that were had with Mr. Cardani about his

22   comment.  Initially the government simply said it didn't

23   happen.  Evidently they talked to enough people that

24   observed it and saw that it did happen.  And what is, I

25   think, an explanation of the way that Mr. Cardani sees

1   this case as different from every -- from the other

2   cases that he works on is he went from saying to us that

3   he didn't do it, he didn't put the Qur'an on the table

4   and call it junk.  Then when it was explained to him

5   that he did do that, in filing his papers with the

6   court, instead of saying, which would have been totally

7   understandable, I got caught up the moment, I'm sorry, I

8   didn't know I did it, I didn't mean to do it, the

9   written paper said, in fact, it was a measured response

10  to the defense statements.  That it was something

11  calculated caused by Mr. Wax's comments.  That's just

12  not -- it's just not -- could not have been the case.

13          We simply rely, for the rest of it, Your Honor,

14  on our pleadings.  We just think that given the fact

15  that we didn't get the material about the payment to a

16  witness, they say they are different, you can pay one

17  but not pay -- pay Richard Cabral is not the same as

18  paying Barbara Cabral, we think their own meetings show

19  that that was not the case.  We should have been told.

20          The importance of her testimony, we think, is

21  sufficient, as I said in some of my statements about my

22  questions, she linked Pete Seda to the mujahideen.

23  Whether she's the only witness who did that or not, we

24  don't have the documents to show you.  We had said she

25  was.  They say maybe it was Gartenstein-Ross.  And we

1  say Gartenstein-Ross really was talking about Kosovo.

2  But when you get right down to it, they spent their --

3  the time of their most important witness, Evan Kohlmann,

4  talking about how evil the Chechen mujahideen were.

5  They had this chart which puts Pete Seda's picture right

6  next to the leader of the Chechen mujahideen.

7        They talk about the Chechen mujahideen leader

8  being linked to the most evil person in the world, Osama

9  bin Ladin.  And it is Barbara Cabral who completes the

10  link between Pete Seda and Osama by saying that they are

11  both supporters of the Chechen mujahideen.

12        We think all of these reasons, the reasons we

13  have written in our documents, are sufficient for the

14  new trial.

15        Similarly, we'll rely on our submissions for

16  the dismissal motion.

17        THE COURT:  I'd have to look at a transcript,

18  Mr. Matasar, to see exactly what I said on a previous

19  occasion, but certainly what my intent was to express my

20  confidence in all the trial lawyers here.  And you are

21  excellent lawyers.  And you are.  And the others have

22  been.  We have the cream of the crop here.  And so if I

23  misspoke myself, I don't know that I did, because I know

24  what I intended to say at the time, then so be it, but I

25  feel the same way about you as I do him.

1              MR. MATASAR:  Your Honor, I understand, but at

2      least in this case, maybe there will be another one

3      where it's mine, but in this point, it's his.  And

4      that's what my point was.  I did not mean to imply or

5      state anything.

6              THE COURT:  All right.  Thank you.  Ms. Zusman.

7              MS. ZUSMAN:  Thank you, Your Honor.  First off,

8      I am here and part of this case because of the discovery

9      issues that arose posttrial.  U.S. Attorney Holton

10     appointed myself and Mr. Papagni to both investigate the

11     discovery issues, and in large part because U.S.

12     Attorney Holton did not want Mr. Gorder or Mr. Cardani

13     to be in a position where they were having to defend

14     themselves.

15             I'm not prepared to address any of the other

16     new trial related issues that have been raised and

17     briefed, and as I understand, argued before you

18     regarding the Qur'an or any statements made during

19     closing arguments.  So I'm going to confine my comments

20     to the supplemental motion for new trial that's based

21     upon the Barbara Cabral material that was produced

22     posttrial and the defendant's motion to dismiss the

23     indictment based upon those same factors.  And I

24     appreciate the lateness of the hour.  I'm not going to

25     be long-winded with this.  I'm going to be brief.

1          New trial.  It's the defendant's burden to

2    prove to you that a new trial is justified based upon

3    discovery that was provided posttrial.  We produced and

4    this was prompted by Mr. Cardani and Mr. Gorder who as

5    soon as they heard that Agent Carroll had made some

6    comment to Barbara Cabral about possibly paying her

7    prior to trial, they immediately brought it to

8    Mr. Holton's attention.  Immediately notified him that

9    that material had to be provided to the defense.

10          Now, the Richard Cabral payments, just standing

11   alone, Richard Cabral was not a witness.  If he had

12   been, there would be absolutely no dispute that the

13   payments that were made to Richard Cabral should have

14   been disclosed, if Richard Cabral had testified at this

15   trial.

16          Now, I'm not aware, and the defense has not

17   cited a single case in which a payment to the spouse of

18   a witness then constitutes impeachment as to the

19   witness.  So in terms of was it crystal clear that once

20   Barbara Cabral was finally added to the witness list

21   just a few months before trial, that someone should have

22   thought, oh, we have to disclose the payments to Richard

23   Cabral.  No, no.  It was only once the trial team put

24   the pieces together and learned about the comment that

25   Dave Carroll made.  And learned that, in fact, Barbara

1    Cabral had been present for one of those payments.  And
2    it's really that tangential would that maybe have made
3    her think it was more likely that she might potentially
4    someday get paid?  That's the relevance.  And the
5    relevance is very, very limited.
6        Barbara Cabral was never paid.  And the defense
7    has repeatedly attempted to combine those two, to treat
8    them as one unified individual.  But all of the
9    testimony that you've heard today, the declarations you
10   received from Dave Carroll, from Charles Gorder, confirm
11   that Barbara Cabral was never paid.
12       So I think we've explained to you why it was
13   the Richard Cabral payments were not disclosed until
14   posttrial when the issue arose about whether Barbara
15   Cabral was ever going to be paid.
16       In addition, we found some handwritten notes of
17   interviews with Barbara Cabral that should have been
18   turned over.  And we have been very candid with
19   everyone.  That was a mistake.  Agent Anderson has
20   testified it was a mistake.  Mr. Gorder has told you in
21   his sworn declaration it was just a mistake.
22       But what is in those notes, Your Honor?  It's
23   not *Brady* if there is nothing that caused any prejudice
24   to the defense.  It's just not *Brady* material.  It was a
25   mistake.  But it's not a discovery violation that should

 1    result in a new trial, and certainly not dismissal.

 2           The changes to the August 17, 2007, report that

 3    you've heard so much about, the fact that one of the

 4    defendant's ex-wives used to live in Alaska, is that

 5    material?  Is that *Brady*?  Absolutely not.  In fact,

 6    what we thought was exculpatory, the reason we produced

 7    the report at all was because at Agent Anderson's

 8    insistence, we added in the information that Richard

 9    Cabral didn't recall hearing anything about Kosovo.  We

10    turned that report over well before trial because it was

11    potentially exculpatory.

12           You've heard a tremendous amount of testimony

13    from Agent Anderson and in the declarations about all of

14    the good-faith efforts that went into complying with

15    discovery in this case.

16           You've got Agent Anderson's spreadsheets.

17    You've got the fact that they met, they talked about

18    these things.  There was never an attempt on the part of

19    any of the members of this trial team to try to pull one

20    over on the defense.  It just didn't happen.  In fact,

21    they bent over backwards to look for information that

22    they thought might be helpful.

23           And I'd invite the court to look at the

24    exhibits that are attached to Mr. Gorder's declaration,

25    because he gives you the exhibits that he pulled out

 1    that he thought were exculpatory, and we provided those.

 2          None of these tidbits of information, the

 3    handwritten notes, none of that was helpful to the

 4    defense, none of it was *Brady* material.  So when we get

 5    to the new trial, legally there is really kind of a

 6    sliding scale approach that has developed in the law,

 7    and those two recent cases that both parties have cited,

 8    *Kohring* and *Smith versus Almada* case, it's a sliding

 9    scale.

10          To determine whether or not there needs to be a

11    new trial here based upon this posttrial potential

12    impeachment material that was disclosed regarding

13    Barbara Cabral, you need to look at two things:  The

14    role of Barbara Cabral in this case, and the value of

15    the impeachment material that was produced.

16          Now, as for the role of Barbara Cabral, she was

17    one of 23 witnesses called at this trial.  This trial

18    that spanned approximately two weeks, 1200 pages of

19    transcript, Barbara Cabral takes up 29 of those pages.

20    And her testimony about the defendant in 1999 at the end

21    of the Hajj asking she and her husband to kick over a

22    couple hundred bucks for blankets and food for Chechen

23    mujahideen, it's 404(b).  It's not direct evidence that

24    relates to any element of the offense.  Barbara Cabral

25    was a 404(b) witness.  She was not the key witness that

1    the Supreme Court talked about in *Giglio*, that crucial

2    witness that the government needs in order to get an

3    indictment, in order to convict a defendant.  That was

4    not Barbara Cabral.  Barbara Cabral was a 404(b) witness

5    at best.  If we had to try the case without her, we

6    could do it.  And I know that's not the test, but

7    context is important.  There were some very key

8    witnesses in this case.  Barbara Cabral was not one of

9    them.

10           Now, in addition, you also look at the

11   impeachment value of the material.  And here that recent

12   case out of Alaska, the *Kohring* case, I think is

13   particularly helpful for a contrast.  What was the

14   material that the government didn't provide about the

15   witness, Bill Allen in that case?  It was that he had

16   shifted his story several times, about key elements of

17   the case he had changed.  And also that he was himself

18   facing charges of child sex abuse.  And his testimony,

19   he was hoping, was going to help him out with that.

20           So let's compare him to Barbara Cabral.

21   Barbara Cabral has consistently told the same story

22   about that 1999 Hajj and about the jewelry sale.  Her

23   story hasn't changed over time.  It's always been a

24   couple of hundred bucks, Pete Seda wanted to send it to

25   the Chechen mujahideen.  And Raya Shokatfard had this

1  jewelry sale to raise money for the mujahideen.  Barbara

2  Cabral's story has never changed.

3          You look at the 302s that were generated by her

4  before trial, and they are -- and generated well before

5  Agent Carroll made that passing remark to her.  And if

6  you compare those reports to what she testified to at

7  trial, they match up precisely.  There was no change.

8  There was no embellishment.  There was nothing.

9          So the remark that Agent Carroll made to her

10  before trial, Barbara Cabral has told you in a sworn

11  declaration she doesn't even remember the remark.  The

12  fact that maybe she could get paid wasn't something that

13  entered her mind, had nothing to do with her testimony.

14  None of this material would have made any difference at

15  this trial.  It would not have been effective

16  impeachment for Barbara Cabral at all.

17          It shouldn't undermine this court's confidence

18  in this jury's verdict.  So the new trial motion should

19  be denied.

20          As to dismissal, dismissal, as the court has

21  already acknowledged in your discovery order, dismissal

22  requires -- you want to throw out our entire case

23  because of flagrant prosecutorial misconduct, flagrant

24  misconduct.  And so what do we have here?  We have Agent

25  Carroll who has candidly told you he made a mistake.  He

1    shouldn't have made that remark to Barbara Cabral.   But

2    why did he do it?  He felt sorry for her.   Is that

3    outrageous government conduct?   It was a moment, it was

4    a moment in time that Barbara Cabral didn't even

5    remember, but Agent Carroll did.   And Agent Carroll was

6    candid.  He didn't try to hide it.   It wasn't a

7    deceitful moment.   It wasn't a manipulative moment.   It

8    wasn't a moment in which Agent Carroll was trying to

9    pull one over on the defense.   Your Honor, it was a

10   human moment.   It was a moment in which Agent Carroll

11   simply out of compassion made a comment that he later

12   regretted.   Outrageous government conduct, though?   No

13   way.  No way.   We can't label outrageous government

14   conduct that kind of human compassion.

15          Or Agent Anderson when she doesn't turn over

16   the notes, it's a mistake.   She turned over over 40,000

17   pages of documents.   She organized them in spreadsheets

18   for discovery purposes.   She answered all of the

19   defense's questions.   She responded to them quickly.

20   Every effort was made.   Not outrageous government -- not

21   even close.   It's not even close.

22          So the dismissal, throwing out our entire case

23   because of 60 pages of documents about the Cabrals that

24   was produced posttrial, absolutely not, Your Honor.

25          The government in this case has done absolutely

 1   everything it can to bring this to the attention of the

 2   court.  We didn't hide it.  We knew that this

 3   information about the Cabrals was something that the

 4   defense would want to know.  And we knew that it was

 5   something that our view of it was going to be different

 6   than theirs.  So instead of hiding it, we brought it to

 7   you.  We brought it to them.  Let's litigate it.  And

 8   that's what we're doing here.  But outrageous government

 9   conduct, absolutely not.

10          Both of these motions should be denied.  Unless

11   the court has further questions, I would submit.

12          THE COURT:  I don't.

13          MR. MATASAR:  Let me just respond briefly, Your

14   Honor.

15          THE COURT:  Yes, you may.

16          MR. MATASAR:  We appreciate the openness which

17   Ms. Zusman is explaining the government is taking at

18   this point.  However, all you have to do is look at

19   Mr. Cardani's --

20          THE COURT:  Please argue to the court.

21          MR. MATASAR:  All you have to do is look at

22   Mr. Cardani's April 2010 e-mail which says yes to the

23   reports, no to the notes.  That's the approach that was

24   taken in this case.  That's not openness.  That's not

25   "give them what they need to help their case."  That's,

1    in the face of a clear order that says the notes have to

2    be provided, that's how it was going from their side.

3            Same thing with the team decision in January

4    and March of 2009.  It was not "let's give them

5    everything."  It's "let's parse this down as narrow as

6    we can."

7            It's true, Your Honor, we couldn't find a case

8    about payments to a spouse.  Maybe that's because --

9    that's either because it's okay to pay the spouse or

10   it's because nobody else has tried it before, because

11   it's not been argued, it's not -- the government has

12   never relied on that sort of analysis to avoid

13   responsibility for payment in this situation.

14           And Mrs. Cabral gave the best explanation of

15   this herself in the declaration or in the statement to

16   the FBI agent, she thought she was paid.  It's obvious

17   that she was paid.  She gave information.  Her husband

18   gets $15,000 in cash.  He can't read.  He can't -- we

19   don't know who does the banking.  This money, as she

20   said, she has always felt that the money received from

21   Carroll, importantly she says money received from

22   Carroll, not money paid to her husband by Carroll, she

23   has always felt that the money received from Carroll

24   satisfied any monetary consideration that might have

25   been due for her and for Richard's help.  And that's

1    just common sense.  That's not a hyper-technicality.

2    It's the government that's making the hyper-technical

3    argument that, oh, we never paid her.  And it's the kind

4    of thing that must be provided to the defense.

5          While not specifically an issue here, Shawna

6    Carroll's view that you just get this general view

7    about, well, maybe sometime -- or the U.S. Attorney says

8    maybe sometime you may want to pay, it's okay with me,

9    and then the FBI feels that they can make unlimited

10   payments up to $100,000, no papers, nothing to the U.S.

11   Attorney, that's -- it just makes no sense to us.  But

12   the main thing here is that this -- the discovery

13   material is something that we should have had.  They

14   admit that we should have had it.

15         There is the -- one of their papers, page 7,

16   says the government agrees that the payments to Richard

17   may have shed light on Barbara Cabral's motivation to

18   testify and that the prospect of a posttrial payment,

19   had she known about it, was potential impeachment.

20         They say that the government recognizes that

21   under the law prosecutors are charged with being aware

22   of information, if any information of the prosecution

23   team knew of the pertinent facts.  They said in their

24   papers that it's necessary.

25         As far as the comments that Barbara Cabral is

1  not an important witness, I don't remember them all now,

2  Your Honor, we pointed these out to you in the

3  pleadings.  We talked about how Mr. Cardani mentioned it

4  in his closing and how the government mentioned Barbara

5  Cabral in their posttrial motions filed before the

6  discovery matter came up.

7          We think she was an important witness.  We

8  think that she provided important information.  We were

9  not given this material about impeachment.  There is no

10 indication that I've seen from any case that says that

11 if you pay a witness, that that need not be disclosed,

12 if the government is paying a witness.  We believe we

13 should have had that information.  We believe a new

14 trial is necessary for the other reasons, and don't

15 forget those in our papers, including the throwing down

16 of the Qur'an in September of 2010.  So we ask that the

17 court grant our motions.

18          THE COURT:  Thank you.  Is there anything

19 further on this motion?  If not, do you wish to make a

20 record, Mr. Wax, on the matter that we took outside the

21 court?

22          MR. WAX:  Yes.  Thank you.

23          THE COURT:  And so what we're going to do is

24 take a recess so our reporter can get the appropriate

25 equipment.  And those who are not with counsel, please

1   be sure everyone is excluded.

2           (Discussion held off the record from 6:32 until

3   6:36 p.m.)

4           MS. ZUSMAN:  Is it okay if I make a proffer for

5   the record to be complete?

6           THE COURT:  We have to wait until we get our

7   reporter -- are you ready?

8           THE REPORTER:  Yes.

9           THE COURT:  We'll go back on the record.  Go

10  ahead.

11          MS. ZUSMAN:  Thank you, Your Honor.  Mr. Wax

12  wanted to pose a question to the witness that raised

13  some classified material concerns.  I would like to

14  proffer, with Mr. Wax's concurrence, that I've consulted

15  with agent -- former agent Shawna Carroll about a

16  comment that she made.  This is at page 42 of the

17  deposition that she provided in the civil case about

18  some work that she did in 2002.  And that, in fact, that

19  work was on an unrelated case.  It was not related to

20  Mr. Seda.

21          THE COURT:  Is that satisfactory?

22          MR. WAX:  Thank you.

23          THE COURT:  All right.  We're in recess.

24          MS. ZUSMAN:  Thank you, Your Honor.

25          (The proceedings were concluded at 6:37 p.m.)

1                          CERTIFICATE

2          I, Deborah Wilhelm, Certified Shorthand Reporter

3    for the State of Oregon, do hereby certify that I was

4    present at and reported in machine shorthand the oral

5    proceedings had in the above-entitled matter.  I hereby

6    certify that the foregoing is a true and correct

7    transcript, to the best of my skill and ability, dated

8    this 23rd day of June, 2011.

9

10

11

12                              /s/ Deborah Wilhelm

13                              _____
                                Deborah Wilhelm, RPR
14                              Certified Shorthand Reporter
                                Certificate No. 00-0363
15

16

17

18

19

20

21

22

23

24

25