FILED 10 AUG '11 15:07 USDC-ORE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Cr. No. 05-60008-HO |
| | ) | |
| Plaintiff, | ) | ORDER |
| | ) | |
| v. | ) | |
| | ) | |
| PIROUZ SEDAGHATY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Following the jury's guilty verdicts, defendant filed motions seeking a judgment of acquittal or a new trial. After the parties briefed those motions, the government disclosed additional discovery materials resulting in further motions. The court has considered all issues raised by defendant, singly and in combination, in determining whether a new trial or dismissal is warranted.

### Motion for Judgment of Acquittal (#478)

Under Fed. R. Crim. P. 29, a judgment of acquittal must be entered for any offense for which the evidence is insufficient to sustain a conviction. There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). In addition, any conflicts in the evidence are to be resolved in favor of the jury's verdict. United States v. Laykin, 886 F.2d 1534, 1539 (9th Cir. 1989).

At trial, the government had to prove, as an essential element of the tax charge, that the defendant made and signed a tax return for the year 2000 that he knew contained false or incorrect information as to a material matter. A matter is material if it has a natural tendency to influence, or is capable of influencing, the decisions or activities of the Internal Revenue Service. See United States v. Gaudin, 515 U.S. 506, 509 (1995) (material statement has a "natural tendency to influence, or [be] capable of influencing, the decision of the decision making body to which it was addressed") (quoting Kungys v. United States, 485 U.S. 759, 770 (1988)).[1]

---

[1]Defendant contends that the court's instruction on materiality was incorrect. The instruction accurately reflected the law on the issue and defendant's requested instruction number 23 did not.

Defendant argues that the asserted errors on lines 1 and 22 of the return were not false and that the mistake on line 57a was not material. Defendant also contends that the verdict cannot stand because it is based on suspicion or speculation.

While there was conflicting evidence with respect to the entries on lines 1 and 22 because of the asserted "earmark" defense, a rational trier of fact could have found that the donation at issue should have been reported or could have rejected the defense altogether as inconsistent with defendant's actions. The jury also rationally interpreted the evidence to demonstrate that the misrepresentation on line 57a was material to the IRS.

The evidence supported the government's theory in this case that defendant and others conspired to conceal a transaction destined for the Chechen mujahideen and the jury rationally concluded as much.

## MOTION FOR A NEW TRIAL (#477)

Defendant seeks a new trial asking the court to review previous evidentiary rulings and consider the cumulative impact of the manner in which the government proceeded. The court may vacate any judgment and grant a new trial if the interest of justice so requires. Fed. R. Crim. P. 33(a).

## A.   Image of Defendant

Defendant contends that the government presented a distorted image of defendant's beliefs and that he was not permitted to present the complete picture.  Specifically, defendant contends that the government sought to portray defendant as espousing extreme violent views of Islam and as being anti-Semitic, but could only do so through evidence which should not have been admitted. Defendant contends, as he has numerous times throughout the prosecution of the case, that e-mails located on Al-Haramain computers and videos seized from the Al-Haramain premises should not have been admitted.  Defendant also takes issue with evidence regarding the literature Al-Haramain sent to prisons.  Moreover, defendant asserts that the court erred in preventing the jury from seeing far more relevant evidence of writings by defendant and documentary evidence regarding mainstream concern over Chechnya.

Defendant likens this case to the recent Ninth Circuit decision in United States v. Waters, 627 F.3d 345 (9th Cir. 2010). There are numerous reasons why this case differs significantly from Waters, not the least of which were the issues for the jury to decide.

In Waters, the primary issue for the government's case was the presence of defendant at the crime scene.  Here, the issue was intent.    In that case, the government produced significantly inflammatory evidence of literature allegedly read and distributed

by Waters, that had little if anything to do with the issue to be decided by the jury. The Waters court did note that a defendant's choice of reading material will rarely have a particularly significant probative value and, therefore, attempts to use such evidence against a defendant must be viewed and reviewed with a careful and skeptical eye.

The evidence at issue in this case was significantly probative not only of intent in the government's case-in-chief, but as to the defense of the peaceful nature of defendant. The court did not simply allow the government to introduce all evidence found on the computers, but accepted the careful process by which the government culled information that was most relevant to the issues to be tried and accepted many exhibits offered by defendant from those same computer hard drives. The same is true of the videos and other literature introduced in the case. There was a sufficient basis to tie the defendant to the materials presented, such as defendant personally responding to e-mails and his supervision of distribution of literature. The exclusion of some evidence offered by defendant did not have the effect of preventing defendant from providing a "complete picture" or improperly distorting the jury's view of defendant. Even if every piece sought to be admitted by defendant were admissible, the probative value experienced diminishing returns such that the jury's time would have been wasted in a never ending trial. See Waters 627 F.3d at 354 (Waters

cannot transform exclusion of evidence into constitutional error by arguing that she was deprived of the right to present a defense because a defendant must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence). The government sufficiently tied the challenged material to defendant such that its probative value outweighed the danger of unfair prejudice, given the issues that the jury had to decide regarding the willfulness of defendant's alleged actions.

## B. The Money Trail

Defendant next contends that the court allowed the government to impermissibly distort the record regarding the money.

### 1. Proposed Exhibits 704A-705B

Defendant contends that the government failed to properly investigate the money trail with respect to $21,000 in traveler's checks allegedly ending with Soliman Al-Buthe. Defendant argues that the refusal of the court to admit these exhibits allowed the government to present an inaccurate and speculative theory.

The receipts are hearsay and could not be offered for the truth. In addition, the exhibits are not sufficiently exculpatory to allow admission on the theory of government failure to investigate.

Page 6

## 2. Colonel Lang's Testimony

Defendant argues that the court impermissibly chilled the testimony of Colonel Patrick Lang contrary to the law on classified information. Defendant contends he was unable to fairly present his defense as a result of this alone and/or in combination with the rulings on proposed exhibits 704 and 705. The receipts were not necessary to evaluate Lang's testimony and the court did not err with respect to his testimony.

## 3. Muhammad Sui

Defendant next takes issue with the failure to continue the trial so that witness Sui could testify in person subject to a subpoena. The court granted the motion to have Sui testify by video. Defendant did not inform the court, during trial, that Sui had later refused to cooperate with the defense. Moreover, the proposed testimony was not potentially helpful to the defense.

## C. Appeals to Prejudice

Defendant argues that the government appealed to the prejudices of the jurors by resorting to guilt by association and anti-Islamic statements and actions.

Defendant complains about the chart the government used during trial, but not received as evidence, as a demonstrative aid. Although the charges involved a false tax return and failure to

report money leaving the country, the intent aspect of the tax charge created several layers of complexity. The conspiracy charge involved numerous players which created the possibility of juror confusion. The government's use of a demonstrative aid to help the jury in identifying those players was appropriate in light of the limiting instructions.

Defendant contends that the government presented testimony replete with guilt by association. Specifically, defendant contends the entire testimony of Evan Kohlmann was designed to invite conviction by generally stating that Islamic charities fund terrorism. The court determined in advance of trial the propriety of Kohlmann's testimony and the testimony did help the jury in understanding the history of the Chechan and Russian conflict and the role of the mujahideen in that conflict, funding practices of certain Islamic charities, the background of Al-Haramain and its alleged support of terrorist financing, and the use of internet technology to support the mujahideen. The testimony did not promote guilt by association, but rather related to the government's theory that co-conspirators at Al-Haramain sought to assist the mujahideen fighting the Russian forces in Chechnya and to hide such support through the filing of false tax returns and secretly removing currency from the United States.

Defendant contends that the government was allowed to inject the image of Osama Bin Laden and associate him with defendant while

the court prevented defendant from showing the jury his writings showing he abhors Bin Laden.   However, defendant referenced the Joint Saudi Relief Committee for Kosovo and Chechnya in his opening, and his experts identified the Committee as regulating the distribution of funds from Islamic charities such as Al-Haramain Saudi Arabia.   The crux of defendant's argument in this respect was that the Committee guaranteed that funds distributed by Al-Haramain would not be diverted to the Chechen mujahideen.   The government appropriately called this argument into question by producing evidence that the head of the Committee was described as a friend of Bin Laden and in 2002 was subject to sanctions and had his accounts frozen for his alleged role in financing paramilitary organizations.

Defendant asserts that the government appealed to the jurors' fears about terrorism in its closing rebuttal argument with respect to its contentions on the use of cash to finance terrorism. However, the government simply responded to the defense's attack on the convoluted way in which the currency at issue made its way around the globe in an attempt to argue that it was too open to amount to a conspiracy.

Defendant next asserts that the government put Islam itself on trial.   Specifically, defendant takes issue with the prosecutor's handling of the Qur'an.   Defendant contends that a reasonable juror would have viewed the prosecutor's actions as appealing to

prejudice and might have had the effect of motivating the jury to draw an impermissible inference. The government's reference to the *Call to Jihad* in the Noble Qur'an was permissible in light of the evidence. While the prosecutor did toss the Qur'an on a courtroom table, such actions did not rise to a level that would reasonably inflame the jury.

## D.    Rule 404(b) Rulings

### 1.    Gartenstein-Ross Check

Defendant argues that the court erred in admitting a check allegedly showing defendant's intent to misrepresent tax matters different from the tax matter at issue in this case. The check falls under Rule 404(b) as to the issue of intent and plan. The court was initially reluctant to admit this evidence, but given defendant's position that it was his accountant who engaged in the wrong-doing and that he wanted to honestly deal with the IRS, the prejudice in admitting the check did not outweigh its probative value.

### 2.    Jewelry Sale and Fund Raising while on Hajj

Defendant takes issue with the testimony of Barbara Cabral about a jewelry sale used to raise money for the mujahideen. Defendant contends there is no link to him and that the court improperly excluded evidence that allegedly would have demonstrated

he would not allow Al-Haramain to be involved in such a sale.[2]
Defendant further contends that the court erred in allowing
testimony regarding solicitations for food and blankets for
mujahideen in Kosovo because it was an unfair expansion of the
case. As with the Gartenstein-Ross check, the evidence was highly
probative of intent and plan.

## E.   Distortion of Evidence

### 1.   Insertion of Facts not Part of the Evidence

Defendant contends that the government included a hypothetical
with prejudicial facts that were not in evidence or supported by
the evidence with respect to the El-Fiki donation. Nothing in the
question posed by the government asked the witness to assume guilt.
Moreover, the hypothetical was invited by the defense's own
hypothetical regarding El-Fiki and was fairly based on the
evidence.

### 2.   Wilcox Coding of Gartenstein-Ross Check

Defendant contends the government argued that accountant
Wilcox coded a check into QuickBooks that the evidence undeniably
confirmed he did not code. While defendant interprets the evidence

---

[2]Defendant     failed     to     authenticate     the     e-mail
evidence.

contrary to showing Wilcox coded the check, the evidence could very well be interpreted as the government stated.

## F.   Voir Dire and Jury Issues

Defendant also contends that the court failed to allow a fair and thorough review of the jury pool resulting in a tainted jury. Defendant maintains the court insufficiently inquired regarding anti-Islamic sentiment. The court disagrees. The questioning of the jury pool was designed to elicit information about juror bias in a very sensitive subject area. The questions were successful in eliciting open answers to the sensitive issue of religion and provided defendant with more than enough information to make any challenges for cause and certainly with sufficient information to make his peremptory challenges. Further highlighting the difficult subject matter handled through voir dire, the court granted defendant additional peremptory challenges, but declined the defense invitation, through various motions, to conduct what would have amounted to days worth of questioning and form completion.

Defendant next contends that the court failed to properly inquire of pro-prosecution bias. Although the court dismissed one juror in this case out of an abundance of caution based on a borderline innocuous comment made to a witness, the contacts in this case were de minimus and could not have influenced the verdict.

Page 12

Defendant asserts that during deliberations, a USA Today article about burning Qu'rans appeared and that there was significant television coverage regarding the issue and then speculates that the exposure likely tainted at least one juror. The court instructed the jury about outside materials. Defense counsel did not apprise the court of the issue regarding the USA Today article during deliberations, and defense counsel's speculation now does not demonstrate juror prejudice.

## G.   Public Trial

Defendant complains about closed sessions that occurred during the trial with counsel and without the presence of defendant. The closed sessions were held because of the need to prevent disclosure of classified information during discussion of procedural matters to prevent such disclosure in the public forum. Precluding defendant, who does not have a security clearance, from these conferences was necessary and did not violate his rights to be present and to a public trial.

Similarly, the ex parte sessions held with government counsel and case agents did not violate defendant's rights due to the overriding necessity to protect "sensitive information." The ex parte proceedings related to CIPA filings from the government involved such sensitive information.

Page 13

## H.    The Sealed Document

Defendant renews his arguments concerning the document placed in the secure facility by defendant and reviewed by this court. Defendant's argument concerning the May 18, 2009 order is not well-taken.

## I.    Indictment

Defendant maintains that the government presented speculation and false information to the grand jury to secure an indictment in this case in violation of his due process rights.  Defendant did not raise this issue prior to trial. The court, nonetheless, finds no impropriety in the conduct of the government with respect to the grand jury proceedings.

### Motion to Dismiss (#538)

As noted above, the government provided information concerning a witness post trial.  Barbara Cabral testified at the trial that while waiting in the Jeddah airport to return from the Hajj, defendant encouraged her and fellow travelers to donate a portion of their refunded expenses to the Chechan mujahideen.  Also one of the jurors was dismissed after complementing Cabral for a good job as she left the stand.

Prior to trial, the government disclosed notes and reports for eight interviews of Mr. and Mrs. Cabral.[3]  However, the government conducted 20 such interviews through IRS agent Colleen Anderson and FBI agent David Carroll.  On January 6, 2011, the government, asserting inadvertence, disclosed the reports for the other 12 interviews as well as information about David Carroll's alleged personal friendship with Barbara Cabral.

The recently disclosed information provided defendant, for the first time, with what appears to be impeaching information related to $14,500 in payments to Richard Cabral over a three year period and an apparent promise to seek an additional $7,500 for Barbara Cabral after testifying at trial.  Additionally, Barbara Cabral apparently had a close enough relationship with David Carroll to invite him to her wedding.

An indictment can be dismissed under two theories: (1) on the ground of outrageous government conduct if the conduct amounts to a due process violation; or (2) if the conduct does not rise to the level of a due process violation, the court may nonetheless dismiss under its supervisory powers. United States v. Barrera-Moreno, 951 F.2d 1089, 1091 (9th Cir. 1991).  Under the first theory, the government's conduct must be so grossly shocking and so outrageous as to violate the universal sense of justice. United States v.

---

[3]Richard Cabral died prior to the trial and Barbara Cabral has since remarried.

Ramirez, 710 F.2d 535, 539 (9th Cir. 1983). The Government's involvement must be malum in se or amount to the engineering and direction of the criminal enterprise from start to finish. United States v Citro, 842 F.2d 1149, 1153 (9th Cir. 1988).

A district court may exercise its supervisory power "to implement a remedy for the violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct." United States v. Simpson, 927 F.2d 1088, 1090 (9th Cir. 1991). However, because "[d]ismissing an indictment with prejudice encroaches on the prosecutor's charging authority," this sanction may be permitted only "in cases of flagrant prosecutorial misconduct." Id. at 1091.

The government has gone to great lengths to correct its errors and has provided in camera materials for the court's own review as well. Any violation here was inadvertent. David Carroll should have expressed the issues to government counsel once the witnesses were finalized for trial. However, the nature of the investigation and defendant's own fugitive status spread the investigation over a very long period of time and the payments that actually had been made were to Richard Cabral. There is no support for a finding of a flagrant prosecutorial misconduct. This is especially true given that Barbara Cabral's testimony does not directly relate to the charges for which defendant was actually convicted (tax fraud and

conspiracy to defraud the government). The testimony is of greater significance to the sentencing issues in which the government essentially seeks to double defendant's sentence based on a terrorism enhancement, but that is an issue for the court, not the jury.

## Supplemental Motion for a New Trial (#517)

The defense may have been entitled to the information about payments to Richard Cabral given his marital relationship with Barbara Cabral at the time of payment and her presence for one of the payments.

The government had intended to call Richard Cabral to testify that defendant said he wanted to join the mujahideen fighters in Chechnya. Richard Cabral began serving as an FBI source in November of 2003. On July 30, 2004, the FBI paid Richard $4,500 for his work as a source. On March 1, 2005, the FBI paid him another $5,000 and on December 7, 2006, the FBI paid him another $5,000.[4] Barbara Cabral was only present for the March 1, 2005

---

[4]During this time period, defendant was a fugitive. Defendant did not return to face charges until August of 2007.

Page 17

payment.[5] Richard Cabral died in December of 2008 and the FBI closed the source file on him.

Barbara Cabral began as a cooperating witness for the FBI in 2004, but the FBI closed her as a cooperating witness in 2006 because it was relying primarily on Richard. The FBI reopened Barbara Cabral as a confidential source in 2008 following her husband's death. She has not been paid for cooperation or testimony. The government began working with Barbara Cabral as a trial witness in the Spring of 2010 and, accordingly, she was not identified as a witness when the government filed its first witness list in August of 2009. The government's amended witness list of March 2, 2010, lists Barbara as a potential witness. The issue of payments to Richard did not come up during the government's preparation of Barbara as a witness.

Sometime between April of 2010 and August of 2010, David Carroll recalls making a comment to Barbara that he would attempt to get something for her after the trial and his intent was to seek FBI approval for payment post-trial. He did not mention specific amounts or make promises. Barbara Cabral states that she does not recall Carroll's comment and she also states that she did not expect to be paid for her testimony. Barbara Cabral does, however,

---

[5]Government prosecutors were unaware of Barbara's presence for the payment or even the amounts of the payments to Richard. Government prosecutors were only asked for authorization for the FBI to explore payment to Richard prior to trial.

recall that after trial she was told by David Carroll he would seek authorization to pay her $7,500. Government counsel Charles Gorder did ask Carroll if Barbara Cabral had been paid and Carroll told him she had not, but that he intended to seek approval for payment in the future.[6] The government did also fail to disclose interview materials directly related to Barbara Cabral such as handwritten notes.

Given the length of the investigation and the circumstances resulting in the government dropping Richard as a witness and then later adding Barbara as a witness, any Brady, violation certainly could be classified as inadvertent. Discovery in this case involved thousands and thousands of pages of documents. The discovery by the prosecution of the promise to pay was discovered post-trial when David Carroll asked for permission to pay. That inquiry raised a red flag with acting United States Attorney Dwight Holton who then asked for further details. This lead to government counsel Chris Cardani and Gorder learning for the first time about the promise. While the payments to Richard could arguably be described as non-discoverable (with the exception of the 2005 payment), the promise to pay and the failure to provide all notes of interviews (Gorder discovered these in late December 2010) is a discovery violation.

---

[6]Gorder was unaware of Carroll's statement to Barbara that he intended to try get payment for her.

The suppression of material impeaching information justifies a new trial irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, 373 U.S., 83, 87 (1963). A new trial is not automatically required whenever combing the prosecutors' files after the trial reveals evidence possibly useful to the defense but not likely to have changed the verdict. United States v. Keogh, 391 F.2d 138, 148 (2d Cir. 1968). A new trial is required if the affected testimony could have any reasonable likelihood of effecting the judgment of the jury. Napue v. Illinois, 360 U.S. 264, 271 (1959).

The key to the charges before the jury was the accounting information and the testimony of defendant's accountant. While the government made great significance of the terrorist aspect of the case and presented a great deal of evidence and argument about the mujahideen in Chechnya, it was collateral to the charges the jury had to consider. Indeed, of the nearly 1800 page transcript generated from the trial, Barbara Cabral's testimony takes up only 28 of those pages. She was aggressively cross-examined. There was some significance to the terrorist issue because the government ostensibly wanted to establish a reason for the tax fraud. But Cabral's's testimony was immaterial to the jury's convictions on the charges presented because it did not matter where the money fraudulently reported on the tax return actually went and because

of other significant evidence regarding willfulness.[7]    The
government's case centered on the accountant, Thomas Wilcox's
testimony.

The government's focus on the issues surrounding the
mujahideen has a greater relation to any enhancement during the
sentencing phase.  The materiality of Cabral's testimony to that
question is a little more clear given that this was really the only
direct evidence about defendant's desire to fund the mujahideen.
The court has expressed its concerns to the government about trying
the case to the jury with significant overtones of terrorism
funding rather than to simply present the issue during the
sentencing phase.  But that is an issue that the court will
evaluate in determining an appropriate sentence.[8]

Under Brady, a new trial would be warranted here if: (1) the
evidence at issue is favorable to the defendant because it is
impeaching; (2) the government suppressed the evidence even if just
inadvertently; and (3) defendant was prejudiced in his defense as
a result.  See Strickler v. Greene, 527 U.S. 253, 281-82 (1999).

---

[7]The jury convicted on the conspiracy charge because
of the tax fraud and was silent on the issue of the
failure to disclose the money leaving the country to
U.S. Customs.

[8]In that regard, the requested enhancement can only be made
if the crime of conviction was intended to promote a federal crime
of terrorism.    The court reserves the issue of precluding
government reliance on evidence obtain from either Richard or
Barabara Cabral with respect to the enhancement.

The major question here is whether the failure to disclose the impeaching information prejudiced defendant.   As noted above, Cabral's testimony did not have a reasonable probability of affecting the jury's verdicts on tax fraud or conspiracy to commit tax fraud.   Accordingly, the defense was not prejudiced by the suppression of the evidence regarding the Cabral's and the motion for a new trial is denied.

## Sentencing Discovery (#494)

One other matter that the court needs to dispose of prior to sentencing in this case is defendant's request for sentencing discovery.   Defendant seeks information related to Russian FSB agent Sergey Ignatchenko and his proposed testimony regarding the terrorism enhancement.   For the reasons stated in the government's response (#497), the motion is denied.

## CONCLUSION

For the reasons stated above, defendant's motions for judgment of acquittal (#478), for a new trial (#477), for discovery (#494), for a new trial (#517) and to dismiss (#538) are denied.

DATED this _____ day of August, 2011.

United States District