Steven T. Wax, OSB No. 85012
Federal Public Defender
101 SW Main Street, Suite 1700
Portland, OR 97204
Tel: (503) 326-2123
Fax: (503) 326-5524
Email: steve_wax@fd.org

Lawrence Matasar, OSB No. 74209
621 SW Morrison Street, Suite #1025
Portland, OR 97205
Tel: (503) 222-9830
Email: larry@pdxlaw.com

Attorneys for Defendant

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>       v.<br><br>PIROUZ SEDAGHATY,<br><br>             Defendant. | CR 05-60008 HO<br><br><br>SUPPLEMENTAL DECLARATION OF CHIEF DEPUTY FEDERAL PUBLIC DEFENDER STEPHEN R. SADY |

I, Stephen R. Sady, declare:

   1.      I have reviewed the declaration of Charles Gorder, Jr., regarding the pending motion to supplement in the above entitled case dated October 7, 2011. I submit this supplement to my declaration of December 9, 2009, because at no time in the negotiations with Mr. Gorder regarding

**Page 1  SUPPLEMENTAL DECLARATION OF CHIEF DEPUTY FEDERAL PUBLIC DEFENDER STEPHEN R. SADY**

the material was "the government" limited to only "the Sedaghaty prosecution team." From my

recollection of the events and my detailed memorandum to file of January 14, 2008, there was no

discussion of "the Sedaghaty prosecution team." Further, in the initial phone call with Mr. Gorder,

I neither disclosed that the material at issue was related to the Sedaghaty case nor did I state the

nature of the material.

2.     The pre-negotiation plan was to obtain conditions for providing the material without

specifying the case at that point. After consulting with national experts and performing research, the

negotiation strategy, prior to any contact with Mr. Gorder, involved presentation of the matter

unlinked to a particular case, an agreement of production immunity, and transfer of possession. As

stated in the January 14th memorandum, transfer "would be conditioned upon the agreement of no

government access without our consent or an order of the Court with notice and an opportunity to

be heard." I obtained the agreement of both Mr. Matasar and Mr. Wax on these ground rules prior

to initiating discussion with Mr. Gorder. If an agreement could not be reached, we would then

consider proceeding formally under the Classified Information Procedures Act.

3.     I did not reference the Sedaghaty case in the initial phone call because we consciously

had decided that, as in similar situations regarding surrender of evidence or contraband, we do not

disclose the case until we at least have an agreement regarding production immunity. Although I

indicated concern that we had possession of material that needed to be secured – described as

"sensitive information" in my January 14th memorandum – I did not state anything with a degree

of certainty because I did not have certainty as to whether material in our possession was classified.

My concerns were, however, sufficient to invoke the government's assistance, after having consulted

with the Court Security Officer, with a plan to invoke the Classified Information Procedures Act if

**Page 2  SUPPLEMENTAL DECLARATION OF CHIEF DEPUTY FEDERAL PUBLIC DEFENDER
STEPHEN R. SADY**

an informal resolution was not achieved. I intended to speak hypothetically regarding the facts when

we met.

4.     Mr. Gorder's account of the meeting with Mr. Teesdale, Mr. Borgen, and myself does

not correspond with my memory or the January 14th memorandum to the extent he stated we agreed

that the case involved Mr. Sedaghaty and we limited the bar on government access to the material

to "the Sedaghaty prosecution team." The following is from my memorandum of January 14, 2008,

regarding the meeting, which is consistent with my declaration of December 9, 2009:

> [FPD Investigator William Teesdale] and I met with Mr. Gorder and [Security Specialist] Steve Borgen at 4:00 at the U.S. Attorney's Office. I advised Mr. Gorder that an issue had come up involving our need to protect attorney/client material and at the same time secure potentially sensitive documents. I told him that I believed it would be a matter that we would be able to negotiate but that we need to be sure that safe storage was occurring. I told him that we would need to have production immunity and that he would need to agree that there would be no access in the absence of our consent or a court order with notice and an opportunity to be heard.
>
> Mr. Gorder was concerned regarding an immunity agreement without knowing more facts. We agreed to provide some hypothetical information; I also advised that, in the spectrum of possible criminality, I believed that the matter fell on the side of the spectrum closest to no criminality. I advised that the discussion should assume an electronic medium and that the vast majority of information on it was attorney/client material that was not classified. I also stated that the assumption should be that the material is not only secret but top secret sensitive compartmentalized information. I stated that I had been in touch with [Court Security Officer] Erin Hogarty and that we had a plan for proceeding, emphasizing that although we could invoke CIPA formally, I believed that informal resolution was likely and reasonable.
>
> Mr. Gorder agreed to the pre-conditions on the storage question: he agreed to production immunity; he agreed that there would be no effort to examine the material in the absence of consent or an order of the court with notice and an opportunity to be heard; he agreed to email Erin Hogarty and commence her involvement as a Court Security Officer. I presented the issue as one for storage and for the Court Security Office to monitor access to items we considered all within the attorney/client privilege and necessary for representation of our client.

**Page 3  SUPPLEMENTAL  DECLARATION  OF  CHIEF  DEPUTY  FEDERAL  PUBLIC DEFENDER
STEPHEN R. SADY**

We began discussing where to proceed as far as negotiations on the specific case, then decided that, given the time of day, we should first get the material secured and proceed thereafter. Mr. Gorder stated that he assumed that we were there on the Seda case and that the document was a giant headache. He indicated that there was a good possibility that Washington would be very concerned – he mentioned that the FBI might be seeking to speak with us very soon. I told him that our conversation with him was the extent of any discussions we should be having on this subject. He stated at one point that we had done the right thing by taking the steps to secure the material. I did not confirm or deny which case was involved.

This account fully corresponds to my memory of the events as well as to the memory of Mr. Teesdale, who has reviewed the January 14 memorandum and the declarations prepared by Mr. Gorder and myself and advised me he believes the above is an accurate account of the meeting.

5. The condition of consent or notice before anyone accessed the material is supported by the notations on the envelopes provided to Mr. Borgen. Prior to the meeting, I had double-bagged the material in envelopes, following the Court Security Officer's protocol, with a Federal Public Defender investigator photographing the procedure. Pursuant to my request in preparing this supplement, Mr. Teesdale and Federal Public Defender Investigator Jim Strupp provided me photographs of the outside and inside envelopes. On the outside envelope, there is an instruction not to open without my consent or notice to me:

> Confidential Defense Material
>
> Do not open without the consent of or
> notice to:
>
> Stephen Sady 503-326-2123 or
> The Federal Public Defender for the District
> of Oregon 503-326-2123

Attachment A. On the inside envelope, the following appeared below my name, title, and telephone number:

ATTORNEY CLIENT PROTECTED MATERIAL

Do not open without the consent of above counsel or
order of the court.

CAUTION: May include protected classified
material requiring compliance with storage in a
Sensitive Compartmented Information Facility.

Attachment B.  The January 14th memorandum states, "I had previously described to Mr. Gorder

and Mr. Borgen how we wrapped and labeled the envelopes."  At the end of the meeting, Mr. Borgen

came to our office, took the double-wrapped envelopes, and patted them down.  I then placed them

in a courier bag, locked it, and gave the bag to Mr. Borgen, who later gave us an FBI receipt that Mr.

Teesdale provided me from his records describing the item as "Red bag being stored for Federal

Public Defender's office unopened" (Attachment C).

6.      There was not only no limitation to, or mention of, the "Sedaghaty prosecution team"

during the meeting, such a limitation would have undermined the rationale for the agreement.  By

permitting access by government agents to attorney/client material without consent or a court order,

after notice and an opportunity to be heard, we would have arguably failed in our duty to our client

to protect his interests.  A limitation that would allow government access to material would not only

have been inconsistent with the pre-meeting plan and the agreement of Mr. Sedaghaty's attorneys,

it would have rendered the agreement illusory because the attorney/client privilege would have been

broken and the government would be able to use the information gathered by other government

actors against our client's interests.  Further, all we were asking for was notice and an opportunity

to be heard, absent consent, so the exclusion of any government actors from the agreement would

be unreasonable.  I never heard any limitation to "the Sedaghaty prosecution team" and, as reflected

**Page 5  SUPPLEMENTAL  DECLARATION  OF  CHIEF  DEPUTY  FEDERAL  PUBLIC DEFENDER
STEPHEN R. SADY**

in my January 14th memorandum and as I remember, I did not even acknowledge what case the material related to at the January 10, 2008, meeting.

7.      I have reviewed the original declaration I filed in this matter on December 9, 2009, and believe it to be accurate in all respects.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct; that the statements set forth are based on my own knowledge, except where otherwise indicated, and as to those statements I believe them to be true. This declaration was executed on October 12, 2011, in Portland, Oregon.

Stephen R. Sady
Chief Deputy Federal Public Defender