# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,    )
                          )
             Plaintiff,   )No. 05-60008-2-HO
                          )
   v.                 )September 27, 2011
                          )
PIROUZ SEDAGHATY, et al.,   )Eugene, Oregon
                          )
         Defendants.   )

TRANSCRIPT OF SENTENCING PROCEEDINGS

BEFORE THE HONORABLE MICHAEL R. HOGAN

UNITED STATES DISTRICT COURT JUDGE

-:-

Deborah Wilhelm, CSR, RPR
Court Reporter
P.O. Box 1504
Eugene, OR  97440
(541) 431-4113

Page 19

1 defense.

2          THE COURT:  Mr. Cardani, that is unclear from

3 what I have.  But I will not authorize any of that money

4 to be released.  And my other -- my previous order

5 regarding any sums referred to in these sealed documents

6 stands at this point.

7          Now, I do see one other motion, I thought

8 probably needed a ruling.  You had a defense motion to

9 strike Government's Exhibit Number 1 because it included

10 Social Security and Taxpayer Identification Numbers.  I

11 think that motion should be granted, but I'll allow the

12 government to file a copy of those returns that don't

13 have that identifying information.

14          MR. CARDANI:  Excuse me, I think we already

15 dealt with that at the last hearing.

16          THE COURT:  Oh, we have?  Okay.  It was in my

17 file of paper and I didn't know why I missed it before.

18 So thank you very much.

19          MR. CARDANI:  If that motion hasn't been --

20          THE COURT:  I'll file that motion.

21          MR. CARDANI:  Okay.  If that ruling hasn't been

22 reflected in the record, we have no objection to

23 granting it.

24          THE COURT:  All right.  Is there anything at

25 this time besides the motion to remand to custody?

Page 20

1          MR. WAX:  Well, in addition to that matter,

2 Your Honor, we would request that the court recommend

3 that Mr. Seda be permitted to serve his sentence at the

4 camp at Sheridan.  We believe that given the --

5          THE COURT:  Granted.

6          MR. WAX:  Thank you.

7          MR. MATASAR:  Thank you.  Thank you.

8          THE COURT:  All right.  Is there any more

9 argument on the motion to remand?

10          MR. GORDER:  Your Honor, on behalf of the

11 government, we had prepared at the last hearing, and we

12 never got there, a spreadsheet of entries and exits from

13 various countries in the Middle East that Mr. Sedaghaty,

14 from his passports, U.S. and Iranian, I think we had

15 given a copy to the defense back in November, but I'd

16 submit it at this time for the court.

17          Just as summary, it shows that at least 20

18 occasions between 2003 and 2007 he entered and exited

19 various countries in the Middle East:  Oman, United Arab

20 Emirates, Kingdom of Saudi Arabia, Syria and Iran.

21          And I would also point the court to an exhibit

22 that the defense filed in CR 44 back early in the case,

23 Exhibit G, which was Mr. Sedaghaty's own explanation of

24 where he was during some of that time period.  And it

25 just shows, without a doubt, his abilities to float

Page 21

1 around the Middle East, all countries of which we do not

2 have extradition treaties with.

3          THE COURT:  Anything further?

4          MR. MATASAR:  Yes, Your Honor.  I'd like to

5 respond first to that.  It's in the memorandum

6 indicating that that issue and other issues were

7 addressed already by the court in deciding to release

8 Mr. Seda previously.

9          THE COURT:  It's a different situation now,

10 though.  He makes a good point.  It doesn't mean I'm

11 going to remand him, but we have a different situation

12 now.

13          MR. MATASAR:  I understand, Your Honor.  We

14 have a different situation.  But the situation is also

15 different because of the fact that Mr. Seda has an

16 appeal.  So I'm looking at this not just as should he be

17 taken into custody immediately, but should he be

18 released pending appeal?

19          And certainly this case -- and now is not the

20 time for me to be trying to convince Your Honor of the

21 incorrectness of your rulings, if you will, but clearly,

22 I think, the court could understand that there are some

23 unusual issues and important issues at stake in this

24 case.  That -- and you know better than we do that we

25 don't know what the appellate court is going to do.  And

Page 22

1 because the decision will likely not be until after he

2 has served his entire sentence, that that is an

3 important factor for the court to consider.

4           And, finally, let me address the government's

5 position.  They have really been wrong every step of the

6 way.  They said Mr. Seda was a flight risk before Judge

7 Coffin, and he was released.  They said he was a flight

8 risk before you.  They said he would not come here

9 today.  They said, in their motion, that he has lost

10 hope, there is no reason for him to have any hope, and

11 he continues to appear, he continues to prove them

12 wrong, and to justify the trust that Your Honor and

13 Judge Coffin gave in him.  He's going to appear.

14           Between his empirical data that we have that he

15 always comes to court, that he stays in touch with his

16 lawyers, which is a fact.  And the Pretrial Services, I

17 believe they have recommended that he be allowed to

18 voluntarily surrender.  Is that accurate?  I believe --

19           THE COURT:  I've got the report here, but I'm

20 going to decide that.

21           MR. MATASAR:  I understand that.  But just as

22 they made a recommendation pretrial, they make a

23 recommendation here.  I'm not suggesting that it's their

24 decision.  I know it's Your Honor's decision.  But here

25 we have the empirical fact that he has always come, and

Page 23

1 so we'd ask the court to allow him to be out of custody

2 pending the appeal.

3          THE COURT:  All right.  Well, there is two

4 matters there.  One is if you're requesting pending

5 appeal or if I give him a reporting date.  And I -- if I

6 do not -- if I allow his release but not pending appeal,

7 how long do you wish for him to report?

8          MR. MATASAR:  Your Honor, I think if -- Mr. Wax

9 informs me that 60 days should be an appropriate time

10 for designation.

11          THE COURT:  It takes that long, at least.

12          All right.  Sir, I want you to understand this,

13 this is between you and me.

14          THE DEFENDANT:  Yes.

15          THE COURT:  Not the lawyers.  So far, you have

16 done what you've told me you'd do.  And I'm going to

17 deny the motion to remand because of that.  But don't do

18 something to break my confidence in that regard.

19          So I'm going to leave you on your current

20 release conditions.  But if I hear something even

21 slightly adverse to that, I'll end that state of

22 affairs.  Do you understand me?

23          THE DEFENDANT:  Yes, sir.

24          THE COURT:  So the motion is denied.  I'll

25 allow 60 days to self report.

Page 24

1          What else do we have this morning -- or this

2 afternoon, folks?  Thank you very much.  We're in

3 recess.

4          MR. WAX:  Excuse me, Your Honor, we would ask

5 that you withhold entry of the judgment until we've had

6 an opportunity to work on the issues with respect to the

7 record.  If you enter the judgment, then --

8          THE COURT:  Any objection?

9          MR. CARDANI:  No.

10          THE COURT:  Thank you.  I'll do it.

11          MR. WAX:  We'll let the court know when we're

12 further along with that.  Thank you.

13          THE COURT:  That's fine.

14          (The proceedings were concluded at 2:14 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Page 25

1                           CERTIFICATE

2        I, Deborah Wilhelm, Certified Shorthand Reporter

3 for the State of Oregon, do hereby certify that I was

4 present at and reported in machine shorthand the oral

5 proceedings had in the above-entitled matter.  I hereby

6 certify that the foregoing is a true and correct

7 transcript, to the best of my skill and ability, dated

8 this 5th day of October, 2011.

9

10

11

12

                            /s/ Deborah Wilhelm
13                          _____

                            Deborah Wilhelm, RPR
14                          Certified Shorthand Reporter
                            Certificate No. 00-0363
15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

**Steven T. Wax, OSB No. 85012**
**Federal Public Defender**
**101 SW Main Street, Suite 1700**
**Portland, OR  97204**
**Tel: (503) 326-2123**
**Fax: (503) 326-5524**
**Email: steve_wax@fd.org**

**Lawrence Matasar, OSB No. 74209**
**621 SW Morrison Street, Suite #1025**
**Portland, OR 97205**
**Tel: (503) 222-9830**
**Email: larry@pdxlaw.com**

**Attorneys for Defendant**

## UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**PIROUZ SEDAGHATY,**<br><br>**Defendant.** | **CA No. 11-30342**<br><br><br>**MOTION FOR RELEASE**<br>**PENDING APPEAL** |

Defendant Pirouz Sedaghaty, through counsel, Lawrence Matasar and

Federal Public Defender Steven T. Wax, pursuant to 18 U.S.C. §3143(b), Fed. R.

App. P.  9(b), and Circuit Rule 9-1.2, moves that he be released during the

pendency of the appeal of his conviction and sentence.

## I.    INTRODUCTION AND PROCEDURAL HISTORY

This unusual case involves an Islamic and peace movement leader from Southern Oregon, Pirouz Sedaghaty, known as Pete Seda.  Following his voluntary surrender, he was on pretrial release for more than three years.  He was taken into custody after a jury found him guilty, but was again released following post-trial disclosures that an FBI case agent told a trial witness before trial that he would seek a cash payment for her after trial.  The government also disclosed, after the trial, that it paid the witness's husband $14,500 in cash.  After resolution of post-trial motions and sentencing, Mr. Sedaghaty has been allowed to remain out of custody for another 60 days so he can voluntarily surrender after designation by the Bureau of Prisons.

The government charged Mr. Sedaghaty with filing an incorrect charitable tax return and with conspiring to defraud the United States by filing that incorrect return and by his co-defendant's failure to report that he possessed more than $10,000 in travelers checks when he left the country.  The essence of the accusation was that Mr. Sedaghaty, through the Ashland branch of the Saudi-based Al Haramain charity, received a donation in 2000 from an Egyptian philanthropist, Dr. El Fiki, that he attempted to send to Chechen mujahideen to help in fighting the Russians and that he lied on his 2000 tax return about the donation's use.  At the time the indictment was filed, Mr. Sedaghaty was out of the country.  He returned voluntarily to face the charges.  At sentencing, the court

rejected the government request to apply the advisory guideline terrorism enhancement, finding a "failure to prove a link between the defendant and the money being used for terrorist activities." CR 588 at 6 (09/27/11).

This case involves a significant number of substantial appellate issues. These run the gamut from the government's withholding impeachment evidence until after trial and appealing to anti-Islamic prejudice in closing, evidentiary rulings that deprived Mr. Sedaghaty of a fair trial, a challenge to extensive computer searches, and erroneous application of an advisory guideline tax loss. The appeal also presents a significant issue of first impression at the intersection of the Constitution and national security.

On September 27, 2011, Mr. Sedaghaty was sentenced to 33 months in custody, with a recommendation that his time be served at the Federal Prison Camp in Sheridan, Oregon. CR 603 (Amended Judgment). Judgment entered on November 23, 2011. CR 599. He is to report to the designated facility by January 23, 2012. Mr. Sedaghaty may well serve his entire sentence before this case is decided on the merits.

## II.    PRINCIPLES FOR RELEASE PENDING APPEAL

18 U.S.C. § 3143(b)(1) authorizes release pending appeal when the Court finds:

(A)    by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community . . . and

(B)    that the appeal is not for the purpose of delay and raises a substantial

question of law or fact likely to result in – (i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

A "substantial question of law or fact" exists when the issues are "fairly debatable," i.e., slightly more than non-frivolous. *United States v. Handy*, 761 F.2d 1279, at 1281, 1282 (9th Cir. 1985) (citations omitted). *See also United States v. Montoya*, 908 F.2d 450, 450 (9th Cir. 1990).

## III.    MR. SEDAGHATY IS NEITHER A FLIGHT RISK NOR A DANGER TO THE COMMUNITY

Mr. Sedaghaty spent nearly four years on pretrial supervision "with no noncompliance issues." Presentence Report, ¶50. Witnesses, including rabbis, ministers, and teachers testified at the release hearings, trial, and sentencing that Mr. Sedaghaty was not a danger to the community, but rather a positive force for peace and tolerance.[1]

Even after sentence was imposed, the Pretrial Services office found him

---

[1]    For example, former Jackson County, Oregon Commissioner Jeff Golden testified at the release hearing: "I feel very strongly he's a positive force in the community, and I believe there's a very wide consensus in Ashland that would say the same thing. . . . I would say that it has to do with the steadiness and tenacity of his effort to reach out, to represent Islam as a legitimate and peaceful religion in a time of – when that's been brought into question. His efforts to not just speak about Islam, but to interface with other faith traditions and try to understand and build common ground with them, and a sense of philanthropic work he has done around the world over time, preceding 9/11 by quite a few years. And people just really find him a – an easy listener and a good person." CR 46 at 147 (08/22/07). *See also, e.g.*, CR 461 at 33-41(09/03/10) (Rabbi David Zaslow testimony); CR 461 at 155-60 (09/03/10) (Minister Caren Caldwell testimony).

appropriate for voluntary surrender to a prison facility, and the court agreed. CR 588 at 22-23 (09/27/11).

Mr. Sedaghaty's voluntary surrender, his exemplary behavior while on pretrial and post-trial release, together with the modern monitoring tools available to the Court, demonstrate that Mr. Sedaghaty is not a danger and is "not likely to flee." *See Truong Din Hung v. United States*, 439 U.S.1326, 1327 n. 3, 1329-30 (1978) (bail granted after 15 year sentence for espionage-related charges notwithstanding lack of permanent USA residence, maintenance of foreign contacts involved with the espionage, and unavailability of extradition should he return to Vietnam).

## IV.    MR. SEDAGHATY'S APPEAL WILL RAISE SUBSTANTIAL QUESTIONS OF LAW LIKELY TO RESULT IN REVERSAL

This pleading highlights several substantial appellate issues.

### A.    The District Court Should Have Granted A New Trial When It Was Revealed After Trial That An Important Government Witness Was Promised, Prior To Testifying, A Substantial Payment To Be Paid After Trial, And The Witness's Husband Was Paid $14,500 Prior To Trial.

(1)    The Non-Disclosed Information.

Several months after the verdict, the government revealed that Barbara Cabral, a government fact witness, was offered a payment before trial to be made after trial. CR 536-1 at 2-4, 7. In addition, the government disclosed that, prior to trial, it had made three payments to Cabral's husband, Richard, who was blind. CR 536-1 at 8. Barbara Cabral had also provided significant information to the

FBI, she was present for at least one $5,000 cash payment to her husband (CR 536-1 at 8), and she stated after trial that she "has always" viewed the payments to Richard as "satisfy[ing] any monetary consideration that might have been due for her and Richard's help. . . ." CR 536-1 at 11.

The prosecution team made decisions on multiple occasions not to disclose the fact of the payments. CR 536-2 at 11; CR 536-4 at 5; CR 536-5 at 3. This included one of the prosecutors telling the case agents not to disclose notes, notwithstanding a court order requiring such disclosure. CR 191 at 7; 543 at 12-13. After trial, the government acknowledged that this information should have been provided to the defense before trial. CR 536 at 3 (7 of 37).

> (2)    A New Trial Is Required When The Government Fails To Disclose Material Inducements To An Important Witness.

The defense is entitled to disclosure of any promises, inducements, deals, or payments to any witness. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Brady v. Maryland,* 373 U.S. 83 (1963). When the government has withheld information, a new trial is required if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Silva v. Brown*, 416 F.3d 980, 985 (9th Cir. 2005) (citing *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)). As this Court recently found in *United States v. Kohring*, 637 F.3d 895, 904-06 (9th Cir. 2011), the failure to provide impeaching information implicates a defendant's rights under the Confrontation Clause of the Sixth Amendment

because it can impair a defendant's right of effective cross-examination.
"Impeachment evidence is especially likely to be material when it impugns the
testimony of a witness who is critical to the prosecution's case." *Silva*, 416 F.3d at
987.

(3)    Barbara Cabral's Testimony Was Material.

The central element of the government's theory was that Mr. Sedaghaty
falsified a tax return in order to hide his attempt to provide money to the Chechen
mujahideen. Cabral was the only witness who directly linked Mr. Sedaghaty with
fund-raising for the Chechen mujahideen, the conduct the government alleged was
concealed on the tax returns. *See* CR 475 at 279-80 (08/31/10).

Ms. Cabral's testimony hit its target. As she left the witness stand, Juror
Number One told her "good job." CR 457 at 4-5 (09/01/10). Both prosecutors
relied on Cabral's testimony in closing argument to claim that Mr. Sedaghaty
wanted to raise money for the Chechen mujahideen and they also emphasized the
lack of impeachment on the part of the defense. CR 471 at 52 and 154 (09/08/10);
*see also* CR 517 at 9. The government recognized the importance of this evidence
in its pretrial pleadings. CR 381; CR 415 at 21; CR 496 at 14-15; CR 475 at 279-
80 (08/31/10). Before trial, the government had also argued that evidence
regarding the funding of Chechen mujahideen during Hajj, testified to *only* by
Barbara Cabral, was "critical state of mind, and motive, opportunity evidence."
CR 436 at 7 (08/26/10). After disclosure of the cash payments to the Cabrals, the
government reversed its position and argued that Cabral's testimony was

unimportant, related to a collateral matter (CR 536 at 23 of 37, 26 of 37) and was cumulative. But these arguments ignore that Barbara Cabral was the only witness to give direct testimony of acts by Mr. Sedaghaty to fund the Chechen mujahideen.

Important to Mr. Sedaghaty's claim that reversal is required because of the materiality of Cabral's testimony, the trial court's post-trial order specifically found such materiality: "the materiality of Cabral's testimony to that question ["the issues surrounding the mujahideen"] is a little more clear given that this was really **the only direct evidence about defendant's desire to fund the mujahideen**." CR 570 at 21.[2] (Emphasis added).

> **B.    The District Court Erred In Issuing And Declining To Modify An Order Dated May 16, 2008, Prohibiting Defense Counsel, The Defense Team, And Their Client From Discussing Or In Any Manner Using Material That The Defense Had Provided to A Court Security Officer.**

During the early stages of this case, counsel became aware they may have been in possession of important classified material.[3] Counsel arranged to secure

---

[2]    The trial court also specifically approved of evidence that "related to the government's theory that co-conspirators at Al-Haramain sought to assist the mujahideen fighting the Russian forces in Chechnya . . . ." CR 570 at 8. Notwithstanding the trial court's specific finding of "materiality" regarding Cabral's testimony on Chechen assistance, and notwithstanding its decision to allow evidence regarding the assistance to the mujahideen, the trial court found: "Cabral's testimony was immaterial to the jury's conviction. . . ." CR 570 at 20.

[3]    Because of the May 16, 2008 order at issue herein, counsel cannot discuss the contents of the material in question. In *Al-Haramain Islamic Found. Inc. v. Bush*, 507 F.3d 1190 (9th Cir. 2007), this Court discussed a secret document related to Al Haramain. It explained that in August 2004, a "TOP SECRET" document was inadvertently provided in civil discovery proceedings to Al-Haramain's civil counsel, who "copied and disseminated the materials . . . to

the material by delivering it to the Segmented Compartmentalized Information
Facility in Washington, D.C. with an agreement that the government would not
have access without notice, consent, or court order. CR 587, 591, 592; Writ of
Mandamus at Ex. 2. *In Re Pirouz Sedaghaty*, No. 09-73924 (9th Cir. Dec. 14,
2009).[4] Counsel for the defendant considered that the material belonged to the
defense and was necessary for the representation of their client. *Id.*

Thereafter, defense counsel contacted the Court Security Officer for access
to the material for purposes of preparing a defense, including motions to suppress.
Shortly after that contact, on May 16, 2008, the district court, *sua sponte*, issued
an extraordinary order prohibiting any discussion about the document's contents
under any circumstances. CR 103. The adverse impact of the order was immediate

---

Al-Haramain's directors and co-counsel," and that "the FBI retrieved all copies of
the Sealed Document from Al-Haramain's counsel, though it did not seek out Al-
Haramain's directors to obtain their copies." 507 F.3d at 1194-95. In August,
2004, Mr. Sedaghaty was a director of Al-Haramain USA.

This Court also noted that soon after the New York Times published a story
by Eric Lichtblau concerning a secret surveillance program, President Bush and
then-Attorney General Gonzales disclosed details about the program. *Id*. at 1192.
Mr. Lichtblau wrote in his book, BUSH'S LAW: THE REMAKING OF AMERICAN
JUSTICE, p.160 (2008): "a team of NSA technicians, analysts and translators
working round-the-clock . . . had eavesdropped without warrants on the phone
calls and e-mails of several thousand people in the United States suspected of ties
to terrorism. An Islamic charity in Oregon had apparently been monitored."

[4]    Belatedly, the government offered a somewhat more limited account
of the agreement. CR 589. The attorney who negotiated the agreement for Mr.
Sedaghaty and his investigator countered the government's declaration. CR 591,
592. Counsel submitted photographs of the envelope he gave to the government
and quoted from his contemporaneous notes, both of which reflected his
understanding of the scope of the agreement. CR 591.

and continues through post-trial motions and appeal. As discussed in sections D and E below, the prohibition of any communication about the document may well have prevented Mr. Sedaghaty from raising important issues concerning government misconduct leading to the search of his home and possessions. *See Murray v. United States*, 487 U.S. 533, 543 (1988). It also likely hindered his development of discovery motions and trial defenses.

After several unsuccessful attempts for reconsideration and/or modification at the district court level, Mr. Sedaghaty filed a petition for mandamus in this Court. On May 12, 2010, a panel of this Court denied the petition on the ground that the issue could be raised in the ordinary course on appeal after final judgment. Order, *In re Pirouz Sedaghaty*, No. 09-73924 (9th Cir. May 12, 2010).[5]

The government's interest in protecting national security is not incompatible with protecting an appellant's constitutional rights. Federal Rule of Criminal Procedure 16(d) and the Classified Information Procedures Act, 18 U.S.C. App. 3 (CIPA) are carefully designed to harmonize these competing interests.[6] Neither

---

[5] Mr. Sedaghaty's Motion for Reconsideration of this Court's order was denied on May 25, 2010.

[6] CIPA permits the court to conduct in camera, ex parte reviews of classified material with a view toward working out an acceptable method – through summaries, redactions, substitutions, sealing and/or protective orders – for using classified material in the litigation. Members of the defense team with appropriate security clearances are permitted to participate in this decision-making procedure. *In re Nat'l Sec. Agency Telecomm. Records Litig.*, 595 F. Supp. 2d 1077, 1089 (N.D. Cal. 2009); *In re Nat'l Sec. Agency Telecomm. Records Litig.*, 700 F. Supp. 2d 1182, 1190-91 (N.D. Cal. 2010).

CIPA nor Rule 16(d) requires or contemplates a total ban on discussion by counsel of relevant documents. The district court failed to invoke CIPA and failed to issue an appropriate protective order. [7] CR 194, 276.

Particularly important to Mr. Sedaghaty's claim that he is likely to prevail on appeal in this Court, the district court's complete gag order in this case is strikingly different from the manner in which Sealed Document issues were treated by this Court in *Al-Haramain Islamic Found. Inc. v. Bush*, (*supra* at 8 n.3) where there was no ban on counsel's discussion of the Sealed Document.

The disparate treatment between counsel for the civil plaintiffs in *Al-Haramain Islamic Found. Inc.* and counsel for Mr. Sedaghaty here is particularly significant because a criminal defendant's rights concerning such material are far broader than the rights of a civil plaintiff.  Mr. Sedaghaty enjoys Fifth and Sixth Amendment rights to due process, compulsory process, and effective assistance of counsel that are inapplicable in a civil matter. As the Supreme Court stated in *United States v. Reynolds*, 345 U.S. 1, 12 (1953),

> [t]he rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.

The May 16, 2008 gag order violates fundamental Fifth and Sixth

---

[7]  When he issued the May 16, 2008 order, the trial court noted the possibility of an appropriate protective order in the future.  ("[This order is in effect] [u]ntil such time as the court has heard the matter and issued a protective order, if necessary . . ." CR 103.

amendment rights. *See Geders v. United States*, 425 U.S. 80, 91 (1976) (Sixth

Amendment violated by order forbidding communication with counsel during 17-

hour overnight recess); *Doe v. Dist. of Columbia*, 697 F.2d 1115, 1121 (D.C. Cir.

1983) (protective order forbidding disclosure by defense counsel to defendants of

information produced in discovery "certainly impaired their ability to prepare their

case."); *In re Search of KindHearts for Charity Humanitarian Dev.*, 594 F. Supp.

2d 855, 859-62 (N.D. Ohio 2009) (protective order involving OFAC's seizure of

assets of charitable organization infringed charity's Fifth and Sixth Amendment

rights). The May 16, 2008 order also violates Appellant's right to compulsory

process under the Sixth Amendment which, in a criminal case, is greater than

many government privileges. *United States v. Nixon*, 418 U.S. 683, 711-12

(1974). *Jencks v. United States*, 353 U.S. 657, 672 (1957). *See also Mohamed v.*

*Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1077 n. 3 (9th Cir. 2010) (*en banc*),

(noting that the state secrets doctrine applies more narrowly in criminal than in

civil cases).

### C.   The Government's Pervasive Appeals To Prejudice And Fear Denied Mr. Sedaghaty A Fair Trial.

Mr. Sedaghaty was tried in September, 2010, at a time when issues of

Qur'an burning and Chechen bombings in Russia dominated the daily headlines.

The government opened its case by associating Mr. Sedaghaty's "mindset" with a

"strident form of Islam" that "promoted acts of violence" and a "'kill people'"

jihad. CR 474 at 21 (08/30/10). Even though Mr. Sedaghaty abhors Osama Bin

Laden, the government brought Bin Laden's name before the jury, trying to link him to the defendant. CR 475 at 169-71 (08/31/10); CR 461 at 124 (08/03/10); CR 471 at 74 (09/08/10).

A central element of the government's strategy throughout the trial was to associate Mr. Sedaghaty with the "mujahideen." In his opening statement, the prosecutor used the term "jihad" twenty-two times and the word "mujahideen" twenty-nine times. CR 474 at 2-42 (08/30/10). This occurred in a case charging taxes and fraud, involving one alleged effort to send money to Chechnya.

The prosecutors opened and closed with a large "rogues gallery" picture board, practically a "most wanted" poster, that displayed the face of Mr. Sedaghaty alongside faces of the notorious "mujahideen" commander, Ibn ul-Khattab, as well as other Saudi Arabians linked to the "mujahideen." *See, e.g.,* CR 474 at 8 (08/30/10); CR 471 at 56 (09/08/10). The poster remained present in the courtroom for the duration of the trial. AUSA Cardani explained in his opening, "Another name. Khattab. He made the chart. Khattab's over here. And you'll hear that at the time of these events, this was the big cheese in Chechnya. This was the leader of the mujahideen." CR 474 at 32 (08/30/10).

The government continued this theme in its closing argument. On the same day that General David Petraeus said a Florida pastor's plan to burn the Qur'an could endanger U.S. troops, and on the same day that the Attorney General of the

United States called the planned burning of the Qur'an idiotic and dangerous,[8] an

AUSA in this case argued to the jury, "The Noble Qur'an is the defendant. . .;"

and, while arguing to the jury, the AUSA threw the Qur'an down onto counsel

table and called the Qur'an "junk."  CR 471 at 152, 187 (09/08/10) (Government's

closing).  These tactics "invited the jury to give in to their prejudices and to buy

into the various stereotypes that the prosecutor was promoting." *Bains v. Cambra*,

204 F.3d 964, 974 (9th Cir. 2000). Such appeals to base impulses violate a

defendant's Fifth Amendment right to a fair trial.  *United States v. Nobari*, 574

F.3d 1065, 1073 (9th Cir. 2009) (citing *United States v. Cabrera*, 222 F.3d 590,

594 (9th Cir. 2000)); *Sandoval v. Calderon*, 241 F.3d 765, 776 (9th Cir. 2001);

*United States v. Leon-Reyes*, 177 F.3d 816, 822 (9th Cir. 1999); *see also Viereck v.*

*United States*, 318 U.S. 236, 247-48 (1943); *United States v. Sanchez*, 659 F.3d

1252, 1255-60 (9th Cir. 2011).  As argued in Section D, the appeals to prejudice

were also seen in many of the government's exhibits.

### D.    The District Court's Rulings On A Series Of Evidentiary Issues Deprived Mr. Sedaghaty Of Due Process, Compulsory Process, And The Right To Present A Defense.

In *United States v. Waters*, 627 F.3d 345, 354-57 (9th Cir. 2010) this Court

reversed a conviction based on the manner in which evidentiary rulings allowed

the government to present inflammatory evidence while preventing the defendant

---

[8] *A.G. Holder:  Quran Burning Idiotic, Dangerous,* CBSNews.com,
September 9, 2010, www.cbsnews.com/stories/2010/09/08/national/main
6844703.shtml:

Page 14 MOTION FOR RELEASE PENDING APPEAL

from presenting his defense. The *Waters* principle is equally applicable here. Consistent with its inflammatory rhetoric, the government offered, and was permitted to present, highly inflammatory emails, websites, and videos even though Mr. Sedaghaty had not prepared or sent them and with minimal evidence that he had ever reviewed them. It was permitted to use records obtained from overseas while Mr. Sedaghaty was denied the opportunity to rebut the government's theory with other overseas evidence.

Another of the significant evidentiary issues to be raised on appeal is the manner in which the government was permitted to present evidence and argue that it had assiduously followed the "money trail" but Mr. Sedaghaty was prevented from showing that it had not. CR 460 at 210-11 (09/02/10). This enabled the government to argue, using Al Rajhi bank records obtained from Saudi Arabia, that Mr. Al Buthe had pocketed $21,000 of Dr. El Fiki's donation. CR 460 at 214-17, 220-21, 229-30, 237 (09/02/10).

Mr. Sedaghaty proffered copies of receipts showing that Mr. Al Buthe had deposited the entire amount with Al Haramain Saudi for their Chechen relief account – #9889 – at the Al Rajhi bank. CR 460 at 243-46 (09/02/10). The government had knowledge of that account number at least since 2004 and had copies of the receipts at least since 2004-2005 as well. CR 460 at 242-46, 273-76 (09/02/10). Mr. Sedaghaty's proffers of the exhibits were rejected. CR 461 at 108 (09/03/10). The government refused to subpoena anything other than Mr. Al Buthe's records or assist Mr. Sedaghaty in obtaining the records from account

Page 15 **MOTION FOR RELEASE PENDING APPEAL**

#9889.  These rulings and actions violated due process.  They also violated the

reciprocity principle of *United States v. Westerdahl*, 945 F.2d 1183, 1086-87 (9th

Cir. 1991).

### E.    The District Court Erred in Denying Mr. Sedaghaty's Motion to Suppress.

The district court denied Mr. Sedaghaty's motion to suppress evidence

seized pursuant to a search warrant.  CR 324.  The warrant, issued on February 18,

2004, authorized seizure of evidence relating to a suspected false Form 990 Tax

Return, and a suspected failure to file a currency and monetary instrument

reporting form.  CR 183-2 at 5-7 of 7.  The ensuing search of Al-Haramain USA's

premises in Ashland, Oregon resulted in the seizure of numerous documents,

videotapes, and books, including all of the hard drives from the computers on the

premises. These should have been suppressed.

(1)    The Decision To Seek The Warrant Was Tainted.

The circumstances leading to the search strongly suggest that the warrant

and the decision to seek it were the product of unlawful surveillance. The district

court's May 16, 2008, order and rulings on Mr. Sedaghaty's CIPA notices

deprived the defendant of a reasonable opportunity to develop that record.  *See,*

*e.g.,* CR 103, 191, 276.  It is publicly known that various agencies of the U.S.

government had been conducting closely coordinated investigations and

surveillance of Al-Haramain USA from the mid 1990's including, at some point

unlawful, warrantless surveillance. CR 183 at 3 (10 of 44).  The likelihood is

great that the decisions to conduct a criminal investigation of Mr. Sedaghaty and

Al-Haramain USA and to seek a search warrant for the Al- Haramain premises

were influenced by the unlawful surveillance.  Accordingly, suppression is

warranted.  *Murray*, 487 at 543. At the very least, it was critical that Mr.

Sedaghaty and his counsel be given a reasonable opportunity to discuss this issue

and to develop this record including, under appropriate safeguards, the

examination of and discussion of classified material relating to the government's

surveillance of Al-Haramain USA. (See issue B above.)

      (2)    The Search Exceeded The Scope Authorized In The  Warrant.
The seized materials substantially exceeded the scope of the
search warrant.

The issuing magistrate specifically limited the search to evidence relating to

a false Form 990 Tax Return for the year 2000 and the failure to file a currency

and monetary instrument form.  CR 183-2 at 5-6 of 7.  The warrant did not

authorize a rummaging through e-mail accounts or miscellaneous saved files to

seize personal and private e-mails, attorney-client e-mails, photographs, news

articles, web pages, and internal organization documents.

As this Court has explained, the unique nature of a search and seizure of

computers requires exacting attention to "maintain the privacy of materials that are

intermingled with seizable materials, and to avoid turning a limited search for

particular information into a general search of office file systems and computer

databases." *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162,

1170 (9th Cir. 2010).  That was not done here.  While the search warrant itself

Page 17 **MOTION FOR RELEASE PENDING APPEAL**

appears expressly designed to prohibit the type of rummaging condemned in a pre-

computer context in *United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982), the

government rummaged through the computer.

**F.      The District Court's Refusal To Examine Jurors Who
          Complimented A Member Of The Prosecution Team  During
          Trial Resulted In The Denial Of Mr. Sedaghaty's Right To A Fair
          And Impartial Jury.**

During the trial, Juror number 1 complimented a government witness as the

witness got off the stand.  CR 457 at 4 (09/01/10).  On request of the defense, the

Court removed that juror.  CR 457 at 10 (09/01/10).  In addition, the government

advised the court that certain jurors complimented the work of the government's

supervisory litigation support specialist.  CR 457 at 4-5 (09/01/10).  The court

declined the defense request to examine the government employees or those jurors

and remove those who revealed bias for the government.  CR 457 at 6-7

(09/01/10).

The Court's failure to act violated the "bright-line rule" prohibiting

unauthorized communication between a juror and a witness or interested party.

*Caliendo v. Warden of Cal. Men's Colony*, 365 F.3d 691, 696 (9th Cir. 2004).

Such communications are "presumptively prejudicial.*" Id.; Mattox v. United*

*States*, 146 U.S. 140, 150 (1892); see also *Turner v. Louisiana*, 379 U.S. 466, 473-

74 (1965).

**G.     The District Court Erred In Finding A Tax Loss Of $80,900, Thereby Increasing Mr. Sedaghaty's Advisory Guideline Range From 10-16 Months To 27-33 Months.**

At trial the government argued that the donation at issue was intended for "the Chechnyan mujahideen" and that the mistakes on the tax return were material to the IRS determination of Al Haramain's tax exempt status.  CR 460 at 171 (09/02/10).  There was no reference to any tax loss at trial.  The government took a completely different and inconsistent approach at sentencing in an effort to show a tax loss of $80,900.  CR 496 at 3; CR 510 at 95-96, 106 (11/23/10).  Not citing any controlling rules or regulations, the government asked the Court to make "certain assumptions, based on the evidence and convictions, [which] drive the tax loss calculations."  CR 496 at 3.  These assumptions included: the donations were intended for "widows and orphans;" and that the defendant diverted the funds to the Chechen mujahideen.  CR 496 at 3.  The change in theory should not be permitted.

Even if this diversion argument is permitted, it does not result in personal income to Mr. Sedaghaty.  As pointed out by the defense expert Marcus Owens, the head of the IRS Exempt Organizations Division in 2000, the government's treatment of this money as a tax loss "is unprecedented."  CR 501-1 at 2 of 3.  Mr. Owens also noted that these funds were intended by the donor to go to the Al Haramain branch in Saudi Arabia, that Mr. Sedaghaty send the funds to Saudi Arabia, that there was no evidence that the funds were deposited in Mr. Sedaghaty's personal account.  CR 501-1 at 3 of 3.  Mr. Owens concluded: "The

Page 19 MOTION FOR RELEASE PENDING APPEAL

Government appears to take the position that when a charity makes a grant for a noncharitable purpose, the amount of that noncharitable expenditure should be treated as personal income to the officer of the charity who signed the check. To my knowledge this position has no foundation in the tax law." CR 501-1 at 2 of 3. The trial court erred in applying the tax loss calculation presented by the government.

**Conclusion**

Mr. Sedaghaty has demonstrated, and the district court has found, that he is neither a danger nor a flight risk. His appeal will include substantial issues likely to result in reversal, a new trial, or a shorter sentence. He should be ordered released pending the outcome of his appeal.

Respectfully submitted on December 1, 2011.


/s/ Steven T. Wax
Steven T. Wax
Federal Public Defender

/s/ Lawrence H. Matasar
Lawrence H. Matasar