**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>PIROUZ SEDAGHATY,<br>*Defendant-Appellant*. | No. 11-30342<br><br>D.C. No.<br>6:05-cr-60008-<br>HO-2<br><br>OPINION |

Appeal from the United States District Court
for the District of Oregon
Michael R. Hogan, District Judge, Presiding

Argued and Submitted
December 3, 2012—Seattle, Washington

Filed August 23, 2013

Before: Mary M. Schroeder, M. Margaret McKeown,
and Richard C. Tallman, Circuit Judges.

Opinion by Judge McKeown;
Partial Concurrence and Partial Dissent by Judge Tallman

●

2          UNITED STATES V. SEDAGHATY

## SUMMARY[*]

### Criminal Law

The panel affirmed in part and reversed in part a criminal judgment and remanded for a new trial in a tax fraud case — that involved significant amounts of classified materials and in camera, ex parte reviews as well as classified proceedings — stemming from charges that the defendant falsified a 2000 charitable organization tax return in order to conceal his support of an independence movement in Chechnya.

The panel was not persuaded by the defendant's arguments regarding the classified material, the district court's evidentiary decisions, the notion that the government was one-sided in its effort to obtain evidence abroad, or his view that the government's characterization of the evidence rose to the level of a constitutional violation.

The panel held that the government violated its obligations pursuant to *Brady v. Maryland* by withholding significant impeachment evidence relevant to a central government witness.

After reviewing the classified record, the panel determined that the district court erred in approving an inadequate substitution for classified material that was relevant and helpful to the defense. The panel held that the substitution did not satisfy the requirement in the Classified Information Procedures Act, 18 U.S.C. app. 3 § 6(c)(1), that

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

●

the summary "provide the defendant with substantially the same ability to make his defense as would disclosure of the specified classified information."

The panel also concluded that the search that the government conducted of the defendant's computer hard drives went well beyond the explicit limitations of the warrant, and remanded to the district court to consider the appropriate scope of items seized and whether the exclusionary rule should apply.

Considering the errors both individually as well as cumulatively in light of the evidence as a whole, the panel concluded that the errors were prejudicial.

The panel filed concurrently, under appropriate seal, a classified opinion with respect to the substitution.   That opinion also addresses in more detail the defendant's claim regarding foreign bank records.

Concurring in part and dissenting in part, Judge Tallman wrote that the opinion's recitation of the facts is inappropriately written from the perspective of the defense theory of the case, that the majority unduly constricts the text of the search warrant and disregards the underlying reason for the very existence of the exclusionary rule, that the opinion disregards the district judge's express factual findings and his rulings on the potential impact of challenged witness testimony following an evidentiary hearing, and that the opinion discounts the extraordinary efforts by the Department of Justice to abide by its criminal discovery obligations and the district court's extensive oversight of those efforts in dealing with extremely sensitive national security concerns.

4        UNITED STATES V. SEDAGHATY

## COUNSEL

Steven T. Wax (argued), Federal Public Defender, Portland, Oregon; Lawrence Matasar, Lawrence Matasar, P.C., Portland, Oregon, for Defendant-Appellant.

Kelly A. Zusman (argued), Christopher Cardani, and Charles Franklin Gorder, Jr., Assistant United States Attorneys, Office of the United States Attorney for the District of Oregon; Virginia Marie Vander Jagt, Counsel, United States Department of Justice, Washington, D.C., for Plaintiff-Appellee.

## OPINION

McKEOWN, Circuit Judge:

This is a tax fraud case that was transformed into a trial on terrorism. The case stems from charges that Pirouz Sedaghaty (known as Pete Seda) falsified a 2000 charitable organization tax return in order to conceal his support of an independence movement in Chechnya, a republic in the Caucasus mountains of southern Russia. Seda founded the U.S. branch of the Al-Haramain Islamic Foundation, Inc. ("Al-Haramain"), a Saudi Arabian charity that the U.S. government suspected of funding terrorist activities and supporting the Chechen mujahideen (holy warriors engaged in violent jihad against Russian forces) under the guise of humanitarian aid.[1]   Seda's defense was based on his claim

---

[1] Seda was indicted along with the U.S. chapter of Al-Haramain, which was later dropped as a defendant, as well as an alleged co-conspirator, Soliman Al-Buthe, who remains a fugitive abroad.

UNITED STATES V. SEDAGHATY                5

that any discrepancy on the tax return could be traced to his
accountant, as well as on his long history of peaceful
engagement on behalf of Islam and his track record of
charitable work in the United States and abroad.

The appeal illustrates the fine line between the
government's use of relevant evidence to document motive
for a cover up and its use of inflammatory, unrelated evidence
about Osama Bin-Laden and terrorist activity that prejudices
the jury. This tension was evident both before and during
trial and dominates much of the briefing on appeal.

Similarly, what was charged as a tax fraud case in fact
involved significant amounts of classified materials and
multiple in camera, ex parte reviews as well as classified
proceedings. These classified proceedings figure prominently
in the appeal. To the extent possible, we have written our
opinion without reference to classified materials so as to
allow the maximum transparency in this criminal case. To
supplement this opinion, we are filing concurrently, under
appropriate seal, a classified opinion with respect to the
substitution—a terse summary that the government provided
Seda in place of actual classified documents that are relevant
and helpful to his defense. That opinion also addresses in
more detail Seda's claim regarding foreign bank records.

We recognize that a system that permits ex parte hearings
and requires the court to pass on the legitimacy of claims
related to classified information places a heavy burden on the
court. We also recognize that defense counsel, who best
know their client's interests, are placed at a serious
disadvantage in challenging classified proceedings in a
vacuum. Toward that end, we take our duty very seriously

and undertake our review of classified information with special scrutiny.[2]

Following his conviction for tax violations, Seda challenges a host of rulings. In particular, he takes aim at the prosecution's failure to disclose its interview notes regarding payments to a key witness, the court's handling of classified information under the provisions of the Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. 3, the breadth of computer and other documents seized pursuant to a warrant, and various evidentiary rulings. Seda also claims that he was deprived of a fair trial by the government's refusal to aid him in obtaining evidence from overseas, by its appeal to religious preferences, and by its use of inflammatory evidence of guilt by association.

In the main, we are not persuaded by Seda's arguments regarding the classified material, the district court's evidentiary decisions, the notion that the government was one-sided in its effort to obtain evidence abroad, or his view

---

[2] Because of the strong public policy in favor of public access to judicial proceedings, we heard argument on nearly all of the issues on appeal in open court. On several very limited issues, we held an in camera hearing with counsel from the government and from the defense together, and then with the government ex parte. On one issue, we heard from a single government attorney who was not part of the prosecution team. The government trial lawyers were walled off from certain classified material so it would not taint the conduct of the prosecution.

We take note of the careful procedures instituted by the district court and followed by the government to protect classified information, as well as defense counsel's cooperation with these procedures. Our judgment as to the government's discovery violations is not a reflection on the trial court's good faith efforts to ensure a fair trial while protecting national security.

that the government's characterization of the evidence rose to the level of a constitutional violation. Nonetheless, there were significant errors that merit a new trial.

We conclude that the government violated its obligations pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding significant impeachment evidence relevant to a central government witness. After reviewing the classified record, we also determine that the court erred in approving an inadequate substitution for classified material that was relevant and helpful to the defense. The substitution did not satisfy CIPA's requirement that the summary "provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information." 18 U.S.C. app. 3 § 6(c)(1). We reject Seda's remaining challenges to the handling of classified information under CIPA. We also conclude that the search that the government conducted of Seda's computer hard drives went well beyond the explicit limitations of the warrant and remand to the district court to consider the appropriate scope of items seized and whether the exclusionary rule should apply.

We are particularly troubled by the cumulative effect of these errors, which resulted in admitting evidence illegally seized while denying Seda both material impeachment evidence and potentially exculpatory evidence. *See United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988) (emphasizing the cumulative effect of three trial errors improperly admitting impeachment evidence of a defense witness, erroneously bolstering the testimony of a prosecution witness, and admitting defendant's statements that should have been suppressed). Although each of these issues potentially merits a remand or a new trial on its own, given

8          UNITED STATES V. SEDAGHATY

these multiple, significant errors, "'a balkanized, issue-by-
issue harmless error review' is far less effective than
analyzing the overall effect of all the errors in the context of
the evidence introduced at trial. . . ." *United States v.
Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (quoting
*Wallace*, 848 F.2d at 1476). Considering the errors both
individually as well as cumulatively in light of the evidence
as a whole, we conclude that the errors were prejudicial and
reverse and remand for a new trial. As a consequence, we do
not address Seda's arguments regarding his sentence.

## BACKGROUND

In the 1990s, Al-Haramain was one of Saudi Arabia's
largest non-governmental organizations, with more than fifty
offices worldwide distributing humanitarian aid and funding
religious education. With close ties to the Saudi government,
it has been described by U.S. government officials as the
"United Way" of Saudi Arabia. Apart from humanitarian aid
and educational materials, however, some Al-Haramain
offices distributed funding and other support to terrorists.
Based on joint submissions by the governments of the United
States and Saudi Arabia, the United Nations implemented
sanctions against Al-Haramain offices in eleven countries
beginning in 2002. By 2004, the Saudi government had
dissolved Al-Haramain altogether. That same year, the
United States designated former Al-Haramain principals Aqil
Al-Aqil and Soliman Al-Buthe and the U.S. chapter of Al-
Haramain as "Specially Designated Global Terrorists" subject
to financial sanctions because of their role in providing
financial support to terrorist groups. Seda came under
investigation by the FBI and the IRS because of his role in the
U.S. chapter of Al-Haramain.

Seda moved from his native Iran to Ashland, Oregon, in the 1970s. After attending Southern Oregon University, he became a well-known arborist in the city. With the mission of promoting the understanding of Islam and building bridges within the community, Seda cofounded the Qur'an Foundation with his friend David Rodgers, who had grown up in Ashland. The Qur'an Foundation hosted public lectures and distributed the Qur'an locally and to prisoners who requested copies.

While working as a horse trainer in Saudi Arabia, Rodgers was approached by Al-Haramain officer Al-Buthe, who suggested that Al-Haramain could supply Qur'ans to the Ashland effort. In 1997, the two organizations entered into a partnership to "promote peace through understanding of Islam" and Al-Buthe and Seda opened Al-Haramain's only U.S. branch ("Al-Haramain-U.S."). Al-Aqil became the U.S. branch's president, Al-Buthe its treasurer, and Seda its secretary. Seda opened a bank account for Al-Haramain-U.S. at Bank of America and successfully applied for tax-exempt status.

In late 1999, both Al-Haramain and its U.S. branch solicited funds for aid to the people of Chechnya. Although the efforts of Al-Haramain were conducted under the supervision of the Saudi government and through a separate entity the government created, the Saudi Joint Relief Committee, at trial it was disputed whether these efforts were truly humanitarian in nature or a cover to fund the mujahideen operating in Chechnya.

In February 2000, an engineer and construction executive in England, Dr. Mahmoud Talaat El-Fiki, contacted Al-Haramain saying that he wanted to donate $150,000 for

10          UNITED STATES V. SEDAGHATY

Chechen relief. Al-Haramain instructed El-Fiki that he could
wire the money for "the poor, orphans and refugees" in
Chechnya to its Al-Rajhi Bank account in Riyadh, Saudi
Arabia, or its Bank of America account in Ashland. El-Fiki
transferred $150,000 to the Al-Haramain-U.S. account in
Ashland on February 24, 2000. On March 7, Al-Buthe
traveled from Saudi Arabia to Oregon. Seda and Al-Buthe
went together to a branch of Bank of America in Ashland on
March 10 and met with the branch manager to withdraw
$130,000 in travelers checks. The following day, Seda
withdrew a $21,000 cashier's check made out to Al-Buthe.
Al-Buthe later returned to Saudi Arabia, cashed the travelers
checks at his bank, and deposited the cashier's check into his
personal account, where he often commingled personal
money with Al-Haramain funds. The counter check signed
by Seda bore the notation "Soliman" and the actual cashier's
check deposited by Al-Buthe bore the notation "Donation for
Chichania Refugees."

At trial, the significance of Al-Buthe's use of travelers
checks was contested. The government characterized the use
of travelers checks, as opposed to a less-expensive wire
transfer, as highly suspicious and argued that it made the
transfer of funds more difficult to trace. The defense pointed
out that Al-Buthe regularly brought funds in the form of
travelers checks to the United States for Al-Haramain's
operating expenses and reported those checks to U.S.
Customs, so his use of travelers checks was not unusual, nor
did it correlate with an effort to conceal the movement of
funds.[3] The bank manager testified that Seda set up an

_____

[3] Between October 1997 and April 2001, Al-Buthe reported to U.S.
Customs his transportation of $777,845 into the United States over nine
different trips, seven of them involving travelers checks. Every time Al-

appointment in advance so that he and Al-Buthe could meet
with her in person, and that Al-Buthe came in his traditional
Saudi dress, produced his passport to be copied for the bank's
records, and personally signed each travelers check in front
of her.

What happened to the money after Al-Buthe cashed the
travelers checks and deposited the cashier's check was also
disputed. Seda's attorneys argued that it was given to Al-
Haramain and deposited in Al-Rajhi Bank account number
9889, which was used for humanitarian relief in Chechnya.
The government represented that "[a]n Al-Haramain
employee took most of El-Fiki's money to a representative of
Abu 'Umar [a leader of the Chechen mujahideen], to be
smuggled into Chechnya, claiming it was for needy Chechen
families."

In June 2000, Al-Buthe returned to Ashland, reporting to
U.S. Customs $300,000 in travelers checks from Al-
Haramain for the purchase of a building in Springfield,
Missouri, to serve as a prayer house. Having already made an
initial deposit of $60,000, Al-Haramain-U.S. then paid
$318,291 to complete the purchase of the Springfield
building.

Four days after the September 11, 2001, terrorist attacks,
several FBI agents came to speak with Seda. The
interviewing agent testified that Seda had volunteered

---

Buthe reported the transportation of currency was when he was arriving
in the United States and was presented with a customs form, like all other
arrivals. Seda's attorneys maintained that Al-Buthe failed to report the
transfer of El-Fiki's donation out of the United States because he did not
know that it was required.

12        UNITED STATES V. SEDAGHATY

information about Al-Haramain-U.S.'s purchase of the
Springfield property and told him Al-Haramain-U.S. had paid
between $300,000 and $325,000, reflecting the closing price.

One month later, Tom Wilcox, Al-Haramain-U.S.'s
accountant and a former IRS agent, filed a Form 990 for Al-
Haramain-U.S. for the year 2000, reviewed and signed by
Seda. Filing a Form 990 is an annual reporting requirement
for tax exempt organizations. The Form 990 was inaccurate
in several respects. Line 57a inaccurately represented the
cost of the Missouri building purchase as $461,542 because
the $130,000 withdrawn by Al-Buthe was marked as a
payment for the prayer house. Line 1 underestimated the
donations that Al-Haramain-U.S. had received because it
misdesignated the $21,000 check to Al-Buthe as a returned
donation. Line 22, representing outgoing donations, was also
inaccurate because it failed to record whatever portion of the
$150,000 El-Fiki donation was transferred to Al-Haramain.[4]

In 2004, the government obtained a warrant to search for
financial records and communications pertaining to the
preparation of the 2000 Form 990 and Al-Buthe's failure to
report the $150,000 he was carrying when he left the country.
The government searched Seda's house, which doubled as the
Al-Haramain-U.S. office and prayer hall, and seized nine
computers together with books, videos, and religious
materials. Before trial, Seda challenged the seizures as going
beyond the scope of the warrant; the district court denied his
motion to suppress.

_____

[4] The defense argued that because the donation merely passed through
Al-Haramain-U.S. on its way from El-Fiki to Al-Haramain in Riyadh,
none of the mistakes are material because the tax code did not require the
"pass-through" to be recorded at all.

The grand jury indicted Seda, Al-Buthe, and Al-Haramain in a three count indictment. Count One alleged a conspiracy to defraud the United States through the crimes alleged in counts Two and Three, in violation of 18 U.S.C. § 371. Count Two alleged filing a false Form 990, in violation of 26 U.S.C. § 7206(1). Count Three charged Al-Buthe with failing to file a Currency and Monetary Instrument Report (CMIR) form when he left the United States with $150,000, in violation of 31 U.S.C. § 5316(a)(1)(A). The charges against Al-Haramain were eventually dismissed because, by the time of trial, it was little more than a shell organization.

The central issue at trial was whether the errors on the Form 990 were willful. The prosecution's theory was that Seda wanted to fund the Chechen mujahideen and intentionally reported false information to his accountant in an effort to cover up the diversion of El-Fiki's donation to the mujahideen. The primary defense theory was that Wilcox was responsible for these careless mistakes, that Seda had given the money to Al-Buthe to give to Al-Haramain, and that Seda was transparent and forthright with Wilcox, the FBI, and the public about the disposition of Al-Haramain-U.S.'s funds and his desire to provide humanitarian aid to refugees in Chechnya.

When the IRS questioned Wilcox in June of 2003 about the price of the building as reported on the 2000 tax return, Wilcox said that someone at Al-Haramain-U.S. had prepared the schedule of purchase costs in Quickbooks and that he had just based the purchase price in the tax return on that schedule. At trial, however, Wilcox admitted that he had actually been the one to code the $130,000 withdrawal of travelers checks as related to the building purchase and that he had created the schedule with the erroneous purchase

price. He maintained, however, that the schedule was based
on Seda's instructions as to how to categorize the checks.[5]

The parties vigorously debated evidence related to the
"money trail." After introducing evidence demonstrating that
Al-Buthe cashed the travelers checks in Saudi Arabia and
deposited the cashier's check into his own account, the
government said that it had followed the money trail as far as
it could go and that Al-Buthe's actions were consistent with
his misappropriation of some funds and diversion of others to
fund the mujahideen. Seda attempted to introduce receipts
documenting his transfer of the donation to Al-Buthe, and Al-
Buthe's transfer of the donation to Al-Haramain for Chechen
relief, but he was unable to authenticate the records.

To establish willfulness, the government called two
former members of the Ashland prayer house: David
Gartenstein-Ross and Barbara Cabral. Among other subjects,
the government questioned Gartenstein-Ross about the
distribution of Qur'ans to prisoners, donations made to
support Kosovan refugees, and fundraising at the prayer
house for two individuals planning to go to Kosovo to fight
against the Serbs. Cabral, a convert to Islam who abandoned
the religion before trial, described the mosque and prayer
services at the Al-Haramain-U.S. prayer house in Ashland as
well as Seda's marriage to a Russian-speaking wife.
Providing the only direct evidence of Seda's alleged desire to

---

[5] The government also introduced emails between Seda and Al-
Haramain's accountant in Riyadh regarding the budget and expenses of
Al-Haramain-U.S. Those documents include a spreadsheet sent from the
Al-Haramain accountant that records the travelers checks and cashier's
check from the El-Fiki donation as going to Al-Buthe. The emails also
include desperate pleas from the Al-Haramain accountant to Seda to keep
better records.

fund the Chechen mujahideen, Cabral testified that Seda
solicited funds for the mujahideen in Chechnya after Cabral
and others from Oregon joined Seda in a pilgrimage to Mecca
sponsored by Al-Haramain.

In addition to the witnesses from the prayer house, the
government introduced a number of exhibits seized in the
search, including videos related to the Chechen mujahideen,
religious edicts regarding support for the Chechen
mujahideen, plus emails Seda received and websites Seda
visited about Chechnya. The government also introduced an
email from Seda to Al-Buthe titled "What support?" that
reproduced an excerpt of a published interview with Chechen
mujahideen leader Ul-Khattab stating:

> I'm sorry to say there is not a single Islamic
> charity organization active inside Chechnya at
> present. Only the Red Cross is present in
> Chechen towns and cities. Therefore, we
> advise the Muslims in the Muslim countries to
> take a sincere stand with the Mujahideen in
> the land of the Caucasus.

The government also relied extensively on the testimony
of its expert, Evan Kohlmann, who drew connections between
Al-Haramain officials and figures such as Ul-Khattab and
Osama Bin-Laden. Kohlmann, who had no direct knowledge
of the facts of the case, testified, among other things, that the
former director of the Saudi Joint Relief Committee through
which Al-Haramain provided relief in Chechnya, had been an
"old friend" of Bin-Laden's in the 1980s.

At trial, the government frequently referred to a large
(3 foot by 4 foot) chart with photographs of Seda and his co-

16          UNITED STATES V. SEDAGHATY

defendant Al-Buthe, along with a photograph of an Al-
Haramain officer in Riyadh who sent out frequent emails
about Chechnya, a shadowed cutout of a figure representing
Al-Haramain's accountant in Riyadh, and a photograph of the
armed mujahideen leader Ul-Khattab, whom Seda did not
know and whom Kohlmann had connected to Bin-Laden.
The jury also watched a violent video provided by Kohlmann
of a training camp for the Chechen mujahideen, which was
introduced on the ground that the existence of a still image
from the video on Al-Haramain-U.S.'s computers "tended to
make it more likely that [Seda] intended that the El-Fiki
money end up in the hands of the Chechen mujahideen."

During trial, the government referenced Bin-Laden on
five different occasions, including at closing, where the
prosecution referred to the director of the Saudi Joint Relief
Committee as Bin-Laden's "best friend." The prosecution's
arguments repeatedly emphasized the concept of jihad,
referring to it thirty-two times over the course of the six-day
trial.

The government highlighted Seda's religious activities
with Al-Haramain-U.S., including the distribution to
prisoners of an edition of the Qur'an (entitled the "Noble
Qur'an") supplied by Al-Haramain that contained an
appendix called "A Call to Jihad." The prosecution stated at
closing:

> The Noble Qur'an is the defendant, after he
> started working for al-Haramain, sending to
> U.S. prisons around this country, in the
> thousands, 10 to 15,000 prisoners, violent
> people serving time, getting junk like this

UNITED STATES V. SEDAGHATY          17

> from al-Haramain saying jihad is an
> obligation for Muslims.

After offering this statement, the prosecutor threw or tossed
the Qur'an onto a courtroom table in front of the jurors. The
government did not mention that Seda worked successfully to
have Al-Haramain publish for distribution a new edition of
the Noble Qur'an without the inflammatory appendix that the
government referenced. The defense made no objection at
the time, but now cites the prosecutor's statement as an
example of the government's inflammatory rhetoric.

   The prosecution also insinuated a connection between
Seda and violent jihad:

> It [i.e., sending Qur'ans to U.S. prisoners] was
> a huge project sponsored by al-Haramain
> Saudi Arabia with their Wahhabi, violent
> jihad propaganda. They get a foothold in the
> United States. Pete Seda becomes their man.
> And out goes this hateful, crazy jihad stuff
> into prisons.

   Seda's witnesses testified, among other things, to Al-
Haramain-U.S.'s role as a charity, Seda's good character, and
his moderate political and religious beliefs. A former
Congregational Church pastor in Ashland related Seda's
active participation in Ashland's interfaith and peace
communities over the twenty years she was a pastor and his
role speaking out at a rally against homophobic violence after
the murder of a lesbian couple in Ashland in the 1990s. A
local rabbi testified about how Seda in the late 1980s began
coming to his synagogue to learn about Judaism, how Seda
welcomed students from the synagogue's Hebrew school to

18          UNITED STATES V. SEDAGHATY

the Ashland prayer house, and how Seda met with the Israeli
Consul General in 2002 in an effort to gather support for a
charitable relief effort that could bring together Israelis and
Palestinians.

The jury convicted Seda of conspiracy to defraud the
United States and filing a false return on behalf of a tax
exempt organization.   He was sentenced to thirty-three
months' imprisonment, three years of supervised release, and
restitution to the Department of the Treasury of $80,980.

After trial but before sentencing, the government
produced reports and notes for twelve previously undisclosed
interviews the FBI conducted with government witness
Barbara Cabral and her husband Richard Cabral.  Among
other things, the notes and reports revealed to the defense for
the first time that the FBI had paid Richard Cabral $14,500
over the course of the investigation, that at least one of those
payments was made in the presence of Barbara Cabral, and
that the FBI had made an offer of payment to Barbara Cabral
before trial.

Seda filed two separate motions for a new trial: the first
motion focused on what he characterized as the prosecution's
appeal to prejudice and the second motion, which
alternatively sought dismissal of the charges, related to the
*Brady* violation. The district court denied both motions.[6]

---

[6] The dissent takes issue with our recitation of the background
information.  This purported debate over a standard of review is a
distraction.  If there were a challenge to the sufficiency of the evidence,
we would review that challenge drawing all inferences in favor of the
prosecution. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *United
States v. Alvarez–Valenzuela*, 231 F.3d 1198, 1201–02 (9th Cir. 2000).
But the jury's verdict based on the evidence before it is not at issue. What

## ANALYSIS

### I. THE *BRADY* CLAIM

As the district court found, "the only direct evidence about [Seda's] desire to fund the mujahideen," came from Barbara Cabral, a witness who the prosecution showcased as critical. Despite a defense request, the government withheld material, significant, and non-cumulative impeachment evidence about Cabral, including government payments and interview notes. This *Brady* violation therefore merits a new trial.

FBI Special Agents contacted Cabral and her husband Richard Cabral, members of the Ashland prayer house, shortly after September 11, 2001. The agents "opened" Cabral as a cooperating witness in 2004 but closed her file in 2006 after deciding that Richard was more likely to be a trial witness. The FBI re-opened Cabral as a witness in 2008 after Richard passed away. The FBI interviewed the Cabrals either individually or together twenty times between 2003 and 2010, paid Richard $14,500, and offered Barbara additional financial assistance with medical bills after Richard's death. An FBI Special Agent told Cabral that he would seek authorization to pay her $7,500. Before trial, the district court ordered the government to produce exculpatory materials, materials for impeaching potential witnesses, and agent notes. The government, however, disclosed reports for only eight of the twenty interviews and revealed nothing about payments to either spouse.

---

*is* at issue is whether the appropriate evidence was actually before the jury. We review each of Seda's claims regarding these procedural errors according to the appropriate standard.

20          UNITED STATES V. SEDAGHATY

Cabral's testimony was the only evidence directly linking
Seda to an effort to fund the Chechen mujahideen. Cabral
testified that after a Hajj—a pilgrimage to Mecca—that she
made with Richard, Seda, and others, Seda asked the group to
return to him unused money received from Al-Haramain
Saudi Arabia's sponsorship of their Hajj. Cabral quoted Seda
as saying the money "would . . . help send blankets and food
and help the mujahideen in Chechnya."

After trial, but before sentencing, the government
disclosed that it had failed to produce in discovery a
significant amount of evidence relating to Cabral.    The
withheld material documented the previously undisclosed
$14,500 in FBI payments to Richard (including a payment for
$5,000 made in Barbara's presence) and a separate offer of
payment to Barbara Cabral shortly before trial when she was
experiencing financial difficulty.[7] The materials additionally
included a number of undisclosed reports, draft reports, and
notes of multiple interviews with both Cabrals as well as
handwritten notes of interviews with Barbara Cabral.   The
government acknowledged that one of the case agents, a
member of the prosecution team, knew all of the relevant
details of the suppressed material prior to trial. Seda moved
for a new trial.

The district court made several findings with regard to
Seda's *Brady* claims. First, the district court found that the
withheld information was favorable to Seda because it was

---

[7] One FBI summary of a post-trial interview of Cabral reported her
belief that these payments were for the assistance of both Cabrals: "Cabral
has always felt the money Richard received from [the FBI] satisfied any
monetary consideration that might have been due for her and Richard's
help. . . ."

impeachment evidence. Second, the district court found that
the information was in the government's possession and was
withheld by the government.    Accordingly, the district
concluded that the failure to disclose the information was a
discovery violation.

Although the court recognized that "[t]here was some
significance to the terrorist issue [i.e., soliciting funds for the
mujahideen] because the government ostensibly wanted to
establish a reason for the tax fraud," it nevertheless
determined that Cabral's testimony was not material to the
conviction because "it did not matter where the money
fraudulently reported on the tax return actually went and
because of other significant evidence regarding willfulness."
The court opined that "the government made great
significance of the terrorist aspect of the case and presented
a great deal of evidence and argument about the mujahideen
in Chechnya" but felt that this argument "was collateral to the
charges" because Wilcox was the government's key witness.
Even though the district court denied Seda's motion for a new
trial, it determined that Cabral's testimony was material to the
terrorism sentencing enhancement sought by the government
because "this was really the only direct evidence about
defendant's desire to fund the mujahideen."[8]

The *Brady* standard is familiar: "the suppression by the
prosecution of evidence favorable to an accused upon request
violates due process where the evidence is material either to
guilt or to punishment, irrespective of the good faith or bad

---

[8] The district court ultimately did not apply the sentencing enhancement,
concluding that "there has been a failure to prove the terrorist
enhancement . . . [a] failure to prove a link between the defendant and the
money being used for terrorist activities."

faith of the prosecution." *Brady*, 373 U.S. at 87. The
Supreme Court emphasized that "[s]ociety wins not only
when the guilty are convicted but when criminal trials are
fair; our system of the administration of justice suffers when
any accused is treated unfairly." *Id.*

To establish a *Brady* violation, a defendant must show
that: (1) the evidence at issue is favorable to the accused,
either because it is exculpatory or because it is impeaching;
(2) the evidence was suppressed by the government,
regardless of whether the suppression was willful or
inadvertent; and (3) the evidence is material to the guilt or
innocence of the defendant. *See Brady*, 373 U.S. at 87; *see
also United States v. Jernigan*, 429 F.3d 1050, 1053 (9th Cir.
2007) (en banc). Although there is no convincing evidence
of bad faith on the part of the prosecution, the government
concedes, as the district court found, that the withheld
information is favorable to Seda and that it should have been
turned over before trial. Our *Brady* analysis therefore hinges
on materiality.

We review de novo a district court's denial of a new trial
motion based on a *Brady* violation. *See United States v.
Pelisamen*, 641 F.3d 399, 408 (9th Cir. 2011). Likewise, "the
question of 'materiality[]' is a legal matter that we review de
novo." *United States v. Price*, 566 F.3d 900, 907 n.6 (9th Cir.
2009); *see also United States v. Oruche*, 484 F.3d 590,
595-96 (D.C. Cir. 2007) ("[O]nce the existence and content
of undisclosed evidence has been established, the assessment
of the materiality of this evidence under *Brady* is a question
of law."). We see no error in the district court's underlying
factual findings and, in any event, the level of deference
accorded to those findings is not dispositive here.

In evaluating materiality, we focus on whether the withholding of the evidence undermines our trust in the fairness of the trial and the resulting verdict. The touchstone is the "reasonable probability" of a different result, that is, "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (citation omitted).

As the Supreme Court has explained, the test of materiality "is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434–35. "Consistent with 'our overriding concern with the justice of the finding of guilt,' *United States v. Agurs*, 427 U.S. at 112, a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 678 (1985). Materiality is defined "in terms of suppressed evidence considered collectively, not item by item." *Kyles*, 514 U.S. at 436.

Here, we zero in on whether the suppressed materials could have provided an effective means of impeachment. This is not a case where the impeachment evidence would have been cumulative or marginal. Rather, as to Cabral, the defense was empty handed at trial precisely because the government did not disclose a substantial amount of relevant information. *See Gonzalez v. Wong*, 667 F.3d 965, 982 (9th Cir. 2011) ("Where the withheld evidence opens up new avenues for impeachment, [even if significant impeachment

evidence was already introduced] it can be argued that it is
still material."). Seda consistently denied that he solicited
funds for mujahideen after the Hajj, and before trial, Seda
moved to exclude Cabral's testimony.    Seda's counsel
highlighted that "those facts [concerning the request for funds
after the Hajj] are contested. We do not believe that that
occurred." In response, the government argued strenuously
for admission of Cabral's testimony, which it characterized
as "critical state of mind, and motive, opportunity evidence."
The district court ultimately admitted the testimony,
concluding that it was evidence of "motive, opportunity,
intent, knowledge, and absence of mistake."

At trial, Cabral presented as a straightforward citizen
witness; she had no tawdry or unsavory past and no apparent
reason to shade the truth. Of modest means, she worked at
J.C. Penney's as a master stylist; her visually impaired
husband of thirty-five years had passed away two years
before trial. At times relevant to the case, she attended
services at the Ashland prayer house, but before trial
renounced the Muslim faith. However, because of the
suppression, Seda's counsel had virtually no material with
which to question her neutrality.

The records of the FBI's payments provide significant
impeachment evidence that would have shaded the jurors'
perceptions of Cabral's credibility. Although Cabral testified
about Seda's motive, Cabral's motive for testifying was left
untouched. Payments to a government witness are no small
thing. *See Singh v. Prunty*, 142 F.3d 1157, 1162 (9th Cir.
1998) (reversing conviction because of *Brady* violation where
key witness received undisclosed "substantial benefits in
exchange for his testimony," because "disclosure of an
agreement to provide . . . benefits, as well as evidence of the

benefits themselves, could have . . . substantially impeached
[the witness's] credibility").

Withheld notes also revealed that Cabral told the case
agent that she had been experiencing serious medical issues
that left her with several thousand dollars of out-of-pocket
medical expenses. The agent responded to this by indicating
that the FBI might be able to help her out financially after
trial. Although Cabral later said that she did not recall the
offer, her relatively modest position and unpaid medical bills
would have supported an inference that the FBI payments,
together with the offer of possible future payment, were a
substantial influence on Cabral's testimony. This inference
is particularly strong because of the uncertain nature of the
promise. *See Sivak v. Hardison*, 658 F.3d 898, 916 (9th Cir.
2011) ("[W]itnesses have greater incentives to lie if the
potential benefits are 'not guaranteed through a promise or
binding contract.'") (quoting *Bagley*, 473 U.S. at 683);
*Bagley v. Lumpkin*, 798 F.2d 1297, 1302 (9th Cir. 1986)
("The more uncertain the agreement, the greater the incentive
to make the testimony pleasing to the promisor.") (citation
omitted).

The payments and notes also would have provided an
opening for the defense to highlight significant
inconsistencies in the couple's stories. For instance, Richard
at different times told the case agents that Seda had identified
the intended recipients of the funds collected simply as "the
people of Chechnya" and "Chechen refugees," without
reference to the mujahideen. The notes also revealed that
Cabral erroneously informed the FBI that Seda traveled to
Saudi Arabia for a Hajj in 2000. Draft interview summaries
revealed additional inconsistencies. For example, one draft
summary of an interview with Richard contained the

26          UNITED STATES V. SEDAGHATY

statement that "[Richard] Cabral did not recall Sedaghaty
discussing the topic of Kosovo or supporting mujahedin
there" while another draft of the summary excluded that same
statement. Another early draft revealed a conflict about the
amount of the supposed payments that were collected at the
end of the Hajj.

Without the suppressed materials, Seda's counsel was
severely limited on cross examination, unable to explore, let
alone establish, grounds for Cabral's possible bias. *See
United States v. Schoneberg*, 396 F.3d 1036, 1042 (9th Cir.
2005) (recognizing that the defense must be given the
opportunity to cross-examine a witness and explore any
motive to falsely testify in order to assist government).
Taken together with the substantive issues described above,
the undisclosed material would have allowed the defense to
paint a picture of, at best, a witness whose shaky recollection
was influenced by her gratitude to the FBI for its financial
assistance; at worst, a witness making up a story to obtain
money for medical bills, with the FBI revising its materials to
match her anticipated testimony. Either story could have had
a substantial impact on the jury.

This conclusion is buttressed by Supreme Court precedent
highlighting the importance of witness credibility: "The
jury's estimate of the truthfulness and reliability of a given
witness may well be determinative of guilt or innocence, and
it is upon such subtle factors as the possible interest of the
witness in testifying falsely that a defendant's life or liberty
may depend." *Napue v. Illinois*, 360 U.S. 264, 269 (1959).
"[T]he exposure of a witness' motivation in testifying is a
proper and important function of the constitutionally
protected right of cross-examination." *Davis v. Alaska*,
415 U.S. 308, 316–17 (1974) (citation omitted). Where, as

here, important additional grounds for impeachment have been suppressed, we have held that it "would have added an entirely new dimension to the jury's assessment of [the witness]" such that "'there is a reasonable probability that the withheld evidence would have altered at least one juror's assessment [of the evidence]'" *United States v. Kohring*, 637 F.3d 895, 905–06 (9th Cir. 2011) (quoting *Price*, 566 F.3d at 914). Such is the case here.

Although proof of the precise destination of the funds was not essential to the conviction, proof of willful misreporting beyond a reasonable doubt was required. The government's briefing before the district court confirms that "the main issue for the jury was whether the defendant acted willfully in 2000 and 2001 to cover up the true nature of the El Fiki transaction and his [Seda's] knowledge of the intended use of that money by Al Haramain to fund the mujahideen in Chechnya." Cabral's testimony provided the only direct evidence that Seda intended to conceal the transactions and her testimony was therefore crucial to the question of willfulness. The government's other evidence of motive was circumstantial. We emphasize the district court's view: "this was really the only direct evidence about defendant's desire to fund the mujahideen."

"Impeachment evidence is especially likely to be material when it impugns the testimony of a witness who," like Barbara Cabral here, "is critical to the prosecution's case." *Silva v. Brown*, 416 F.3d 980, 987 (9th Cir. 2005). It is ironic that when arguing that Cabral should be allowed to testify, the government deemed her "critical" but, in its appeal brief, portrayed her as a "minor witness." The government's attempt to minimize her role because her time on the witness stand was comparatively brief is not persuasive. In fact, the

opposite is true: given the limited scope of her testimony, the
only reason to call Barbara Cabral was because her testimony
was critical to the crucial point of wilfullness. *See Weiler v.
United States*, 323 U.S. 606, 608 (1945) ("The touchstone is
always credibility; the ultimate measure of testimonial worth
is quality and not quantity.").

Cabral's importance is confirmed by her starring role in
the government's closing argument, where the prosecution
referred to her testimony four separate times. Discussing
jihad and questioning Al-Haramain-U.S.'s status as a charity,
the government stated: "Barbara Cabral . . . testified . . . that
the defendant went to her and said, 'can we get that money
for the mujahideen in Chechnya?'" Addressing the key issue
of willfulness, the prosecution turned again to Cabral's
testimony: "The willfulness is represented by . . . after the
Hajj with Cabral, direct funding [of mujahideen]." The
defense also saw Cabral's testimony as sufficiently damaging
to raise in its closing argument. Counsel stated: "Was there
any call for money to mujahideen after the Hajj? I submit
not. I don't think that that is reliable. Bottom line it is
contrary to everything else you know about Pete Seda."

There is also evidence that Cabral's testimony in fact had
a significant impact on the jury. Cabral was a particularly
sympathetic witness, as a local resident who had converted to
Islam when she joined the prayer house Seda led and then
later left the faith. The government's other witnesses were
either significantly less sympathetic, had no direct knowledge
of Seda, or were shown by the defense to have possible bias
or ulterior motives. Cabral appeared to be the government's
only disinterested witness who was actually close to Seda,
and she testified in a terrorism-tinged prosecution about an
effort to help Muslim guerilla combatants. Notably, as

Cabral was leaving the witness stand after completing her testimony, one of the jurors whispered a compliment to her on her testimony. The juror was excused, but the fact that the juror complimented Cabral's testimony underscores her impact as a witness.

The prosecution's earlier description of Cabral's testimony as "critical" only confirms this conclusion. *Kyles,* 514 U.S. at 444 ("The likely damage [of suppressed evidence] is best understood by taking the word of the prosecutor . . . ."). Viewing the suppressed evidence holistically in light of the other evidence, the withheld evidence "undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678. We conclude that Cabral's testimony was important enough that a changed perception of her credibility creates a reasonable probability of a different verdict. *See United States v. Shaffer*, 789 F.2d 682, 688-89 (9th Cir. 1986) (noting that where a witness's testimony "was critical to . . . conviction, the jury's assessment of . . . credibility was crucial to the outcome of the trial."). In light of the "importance of allowing a full and fair cross-examination of government witnesses whose testimony is important to the outcome of the case," Seda has established a *Brady* violation that merits a new trial. *United States v. Brooke*, 4 F.3d 1480, 1489 (9th Cir. 1993).

## II. CIPA CLAIMS

Although this is a tax fraud case, the prosecution discovered that the government possessed some relevant classified information, which was handled under CIPA procedures. Those procedures endeavor to harmonize a defendant's right to a fair trial with the government's right to protect classified information. *See United States v. Abu-*

30          UNITED STATES V. SEDAGHATY

*Jihaad*, 630 F.3d 102, 140 (2d Cir. 2010).   While the
government must safeguard classified information in the
interest of national security, "courts must not be remiss in
protecting a defendant's right to a full and meaningful
presentation of his claim to innocence." *United States v.
Fernandez*, 913 F.2d 148, 154 (4th Cir. 1990).

The government filed six motions seeking protection for
classified materials, all of which were granted by the district
court. Seda challenges the court's handling of these classified
matters, including its approval of an unclassified summary,
the use of ex parte proceedings, and the restriction on defense
counsel's use of classified material that the defense had
placed in safekeeping.

## A. CIPA PROVISIONS

Congress enacted CIPA in 1980 "to help ensure that the
intelligence agencies are subject to the rule of law and to help
strengthen the enforcement of laws designed to protect both
national security and civil liberties." S. Rep. No. 96-823, at
3 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4294, 4296. CIPA
does not expand or restrict established principles of discovery
and does not have a substantive impact on the admissibility
of probative evidence. *United States v. Johnson*, 139 F.3d
1359, 1365 (11th Cir. 1998); S. Rep. No. 96-823 at 8,
*reprinted in* 1980 U.S.C.C.A.N. at 4301–03. Instead, CIPA
"establishes procedures for handling classified information in
criminal cases," *United States v. Aref*, 533 F.3d 72, 78 (2d
Cir. 2008), so that district courts may rule "on questions of
admissibility involving classified information before
introduction of the evidence in open court," *United States v.
Sarkissian*, 841 F.2d 959, 965 (9th Cir. 1988) (citation
omitted).   Two sections of CIPA are relevant here: § 4

governs the pretrial discovery of classified information by defendants, and § 6 sets out procedures to safeguard classified information, both before and during trial.

CIPA § 4 was intended "to clarify the court's powers under Fed. R. Crim. P. 16(d)(1) to deny or restrict discovery in order to protect national security."[9] *Sarkissian*, 841 F.2d at 965; S. Rep. No. 96-823 at 6, *reprinted in* 1980 U.S.C.C.A.N. at 4299. Section 4 provides that:

> [t]he court, upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure, to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove.

18 U.S.C. app. 3 § 4.

---

[9] Federal Rule of Criminal Procedure 16(d)(1) provides that:

> At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief. The court may permit a party to show good cause by a written statement that the court will inspect ex parte. If relief is granted, the court must preserve the entire text of the party's statement under seal.

Fed. R. Crim. P. 16(d)(1).

When considering a motion to withhold classified information from discovery, a district court must first determine whether, pursuant to the Federal Rules of Criminal Procedure, statute, or the common law, the information at issue is discoverable at all. *United States v. Rewald*, 889 F.2d 836, 847–48 (9th Cir. 1989). If the material at issue is discoverable, the court must next determine whether the government has made a formal claim of the state secrets privilege, "'lodged by the head of the department which has actual control over the matter, after actual personal consideration by that officer.'" *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1261 (9th Cir. 1998) (quoting *United States v. Reynolds*, 345 U.S. 1, 7–8 (1953)). Once a court concludes that the material is discoverable and that the state secrets privilege applies, then the court must determine whether the evidence is "relevant and helpful to the defense of an accused." *Roviaro v. United States*, 353 U.S. 53, 60–61 (1957); *United States v. Gurolla*, 333 F.3d 944, 951 (9th Cir. 2003). If the information meets the "relevant and helpful" test, CIPA § 4 empowers the court to determine the terms of discovery, if any. 18 U.S.C. app. 3 § 4.

CIPA § 6, which applies to both pre-trial and trial proceedings, guides the procedures for making "determinations concerning the use, relevance, or admissibility of classified information. . . ." 18 U.S.C. app. 3 § 6(a). Specifically, CIPA § 6(c)(1) deals with substitutions and provides that a court may authorize a substitution for classified material in the form of a statement or summary "if it finds that the statement or summary will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information." 18 U.S.C. app. 3 § 6(c)(1). This requirement arises out of the Constitution's guarantee that all criminal

UNITED STATES V. SEDAGHATY                33

defendants must have "'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). Indeed, the "need to develop all relevant facts in the adversary system is both fundamental and comprehensive." *United States v. Nixon*, 418 U.S. 683, 709 (1974).

The substitution need not be of "precise, concrete equivalence," and the "fact that insignificant tactical advantages could accrue to the defendant by the use of the specified classified information should not preclude the court from ordering alternative disclosure." H.R. Rep. No. 96-1436, at 12-13 (1980) (Conf. Rep.), *reprinted in* 1980 U.S.C.C.A.N. at 4310–11. Nevertheless, the fundamental purpose of a substitution under CIPA is "to place the defendant, as nearly as possible, in the position he would be in if the classified information . . . were available to him." *United States v. Moussaoui*, 382 F.3d 453, 477 (4th Cir. 2004); *see also United States v. Rezaq*, 134 F.3d 1121, 1143 (D.C. Cir. 1998) (approving substitutions where "[n]o information was omitted from [them] that might have been helpful to [the] defense, and the discoverable documents had no unclassified features that might have been disclosed").

## B. THE SUBSTITUTION

The government acknowledged in advance of trial that it had classified information that was helpful to Seda's defense. The government proposed, and the court authorized, the following unclassified summary of classified material responsive to Seda's discovery requests:

34          UNITED STATES V. SEDAGHATY

> The U.S. Government obtained information
> that Sami 'Abd Al 'Aziz Al-Sanad worked
> during 2000 and 2001 for the Al-Haramain
> organization and was responsible for
> providing currency supplied by Al-Haramain,
> including the currency obtained by
> codefendant Soliman Al-Buthe from Al-
> Haramain USA, to a representative of
> Muhammad Al-Sayf, aka Abu Umar, to be
> smuggled into Chechnya.   Al-Sanad has
> claimed that the monies he provided to Al-
> Sayf's representative were destined for needy
> Chechen families.

Seda objected to the substitution and asked either for "an
uneditorialized summary" or for the production of the
underlying material. After careful review of the materials at
issue, we conclude that the substitution's language unfairly
colored presentation of the information and, even more
problematic, that the substitution omitted facts helpful to
Seda's defense. Further detail and analysis of the substitution
is contained in the classified opinion with respect to the
substitution.    The substitution is statutorily inadequate
because it does not provide Seda with "substantially the same
ability to make his defense as would disclosure of the specific
classified information." 18 U.S.C. app. 3 § 6(c)(1).

The brief summary contains both inculpatory and
exculpatory information. On the one hand, it supports the
government's theory that the El-Fiki donation went to fund
the mujahideen in Chechnya because it indicates that Al-
Sanad gave the money to a representative of Al-Sayf, who the
government established at trial was a religious leader
associated with the Chechen mujahideen at the time. On the

other hand, it supports Seda's claim that, as far as he knew, the donation was to be used to fund humanitarian relief.

The wording of the summary bolsters the inculpatory section while discrediting the exculpatory section. For example, the first sentence presents Al-Sanad's transfer of the El-Fiki donation to Al-Sayf's representative as a fact about which the government has "obtained information." The second sentence, by contrast, embeds skepticism into Al-Sanad's exculpatory statement about the destination and use of the funds, dismissing it as something Al-Sanad "has claimed." This is but one example of the neutrality deficiencies in the statement. It is no surprise that Seda ultimately chose not to use the substitution at trial.

Because the underlying documents are classified, we are constrained in our comments about the summary. But it is a fundamental principle underlying CIPA that the summary should be evenhanded, worded in a neutral fashion and not tilted or shaded to the government's advantage. *See* S. Rep. No. 96-823 at 9 (1980), *reprinted in* 1980 U.S.C.C.A.N. at 4302-03 (stating that the "judge should ensure that a substitution . . . is crafted so that the Government obtains no unfair advantage in the trial").

In isolation, the characterization of the evidence may not be a sufficient basis to reject the substitution. More troubling, however, is the exclusion from the summary of further information that is helpful to Seda's defense. The classified nature of the material highlights the awkward nature of our review: Seda is forced to argue for the relevance of the material without actually knowing what the classified record contains, while we know what it contains but are unable to describe it on the public record. *See United States*

36          UNITED STATES V. SEDAGHATY

*v. Amawi*, 695 F.3d 457, 471 (6th Cir. 2012) (without the
benefit of "the adversarial process, we must place ourselves
in the shoes of defense counsel, the very ones that cannot see
the classified record, and act with a view to their interests")
(citation omitted).[10] We can say, however, that the summary
excludes exculpatory information and fails to provide crucial
context for certain information that it does convey.

Although there is no indication of bad faith, the
government appears to have looked with tunnel vision at
limited issues that it believed were relevant. Even granting
the district court wide latitude in its evidentiary decision-
making, as we must, we conclude that the summary is
inadequate not only because of its slanted wording but more
fundamentally because it is incomplete. *United States v.
Clegg ("Clegg I")*, 740 F.2d 16, 18 (9th Cir. 1984)
(upholding rejection of a substitution where the classified
documents "are relevant to the development of a possible
defense" and the "government's proposed summaries of the
materials are inadequate"). It would be illogical to conclude
that a substitution that excludes non-cumulative exculpatory
information could "provide the defendant with substantially
the same ability to make his defense as would disclosure of
the specific classified information" as required by CIPA § 6.
18 U.S.C. app. 3 § 6(c)(1); *see also Moussaoui*, 382 F.3d at
478–79 (rejecting proposed substitutions that failed to include
exculpatory information); *Fernandez*, 913 F.2d at 158
(upholding rejection of proposed substitutions because the
"substitutions would have required the jury to judge [the
defendant's] role . . . , and thus the truth of his statements
about it, in a contextual vacuum").

---

[10] The defense did file an ex parte submission outlining its theory of the
defense to aid the court in its review of the classified material.

The dissent attempts to minimize the importance of the substitution by taking the position that the evidence would be inadmissible hearsay and that Seda waived his objection to the substitution. The dissent overlooks the most important fact about the substitution's admissibility—the government agreed to stipulate to its admission at trial. The government did not argue that the substitution was hearsay or otherwise inadmissible. Rather, recognizing that it was in a difficult position with respect to the possession of exculpatory information and Seda's right to a fair trial, the government made the calculated move to agree to stipulate to the admission of the substitution as a trial exhibit. Not surprisingly, in the face of a slanted and unhelpful summary, Seda's counsel ultimately withdrew the substitution as a stipulated exhibit just before trial. But defense counsel ought not be put in a Catch-22 situation whereby it has to accept the government's deficient summary or none at all.

The dissent also manufactures an argument not presented by the government—that Seda waived his objections to the substitution.[11] On August 20, 2010, Seda filed objections to the summary substitution and moved for "an uneditorialized summary." Without being able to access any of the underlying documents, Seda objected that the summary omitted relevant and helpful information about the individual to whom Al-Sanad transferred the funds. He also objected to the fact that the summary included language that questioned Al-Sanad's veracity and argued that the defense should be entitled to offer the exculpatory statements actually provided by Al-Sanad. Alternatively, Seda moved for access to more complete unclassified versions of the underlying materials on

---

[11] The government simply replied to Seda's objections on the merits.

38          UNITED STATES V. SEDAGHATY

which the summary was presumably based. Seda never
withdrew or waived this objection.

At a hearing the week before trial, the defense reiterated
its objections to the summary substitution. The government
replied that it would stipulate to the admission of the
summary, but would not revise or alter it, saying, "we think
it's either all or nothing." In response, the court said only,
"Okay," and moved on to another topic. Later in that same
hearing, as the judge was making final rulings on the exhibits,
the government reiterated its position with regard to the
summary and stated that the only decision was whether the
defense wanted to accept the summary in its current form or
not. The defense responded, "At this time, Your Honor, we
would not be offering it. *We've pointed out what we believe
needs to be done.*" (emphasis added). The defense withdrew
the exhibit in that form, at that time, but explicitly referenced
and reiterated its objection. Seda did not withdraw or waive
his objection to the court's approval of the government's
summary substitution. Nor could Seda's counsel have been
expected to offer an intelligent substitution or alternative
language, since he did not have access to the underlying
classified documents.    Having been unsuccessful at
challenging the substitution before trial, Seda's recourse is in
this appeal.

We are fully cognizant of the delicate task entrusted to the
district court in matters involving classified information. To
that end, CIPA lays out a defined process for substitutions
such that, when classified information is relevant and helpful
to his defense, the defendant should be placed, "as nearly as
possible, in the position he would be in if the classified
information were available to him." *Moussaoui*, 382 F.3d at
477; *see also*, 18 U.S.C. app. 3 § 6(c)(1). In the end, the

inadequate substitution interfered with Seda's ability to present a complete defense. Although the government argues that substitution was sufficient, it does not make any argument that the facts omitted are harmless. *See United States v. Boulware*, 384 F.3d 794, 898 (9th Cir. 2004).

## C. OTHER CIPA CLAIMS

Seda raises four other claims related to CIPA: the ex parte nature of many of the CIPA proceedings; the potential withholding of additional classified information that is relevant and helpful to the defense; the exclusion of a classified document in his counsel's possession; and the claim that classified evidence reveals the search warrant was prompted by prior illegal surveillance.

### 1. Ex Parte Proceedings

Seda's broadside challenge to the in camera and ex parte proceedings is a battle already lost in the federal courts.[12] Long ago we underscored that "[e]x parte hearings are generally disfavored," but held that "[i]n a case involving classified documents, however, *ex parte*, *in camera* hearings in which government counsel participates to the exclusion of defense counsel are part of the process that the district court may use in order to decide the relevancy of the information." *Klimavicius-Viloria*, 144 F.3d at 1261.

---

[12] Seda moved to strike the classified, ex parte appellate briefs and excerpts of record filed by the government or, in the alternative, to request access for his security-cleared counsel and expert to the documents. We denied the motion for the same reasons discussed below with regard to the requirements of CIPA. We reviewed the classified briefs and excerpts of record from both parties.

40          UNITED STATES V. SEDAGHATY

Seda especially protests three occasions during trial in
which the court held closed hearings with cleared counsel for
both parties and then excused defense counsel and met ex
parte with the prosecutors.[13] These brief ex parte hearings,
which directly followed the hearings with defense counsel,
were held at the court's request to clarify issues related to the
court's prior CIPA rulings. CIPA does not limit the court's
discretion to hold an ex parte conference if it is required by
some overriding necessity such as the necessity to protect
sensitive information related to national security, as it was
here. *See United States v. Thompson*, 827 F.2d 1254, 1258
(9th Cir. 1987) (recognizing that "situations where the court
acts with the benefit of only one side's presentation are
uneasy compromises with some overriding necessity, such as
the need to act quickly or to keep sensitive information from
the opposing party").

Apart from his general objections to the ex parte
proceedings, Seda claims that he should have received more
fulsome notice of the subject of the filings and that his
security-cleared counsel should have had access to the
classified documents in discovery. The government filed six
notices informing Seda that it had filed in camera, ex parte
submissions to the court. All of these notices apprised Seda
that the submissions were filed pursuant to CIPA § 4, thus
notifying him that the government requested authorization
from the court to withhold items from discovery that were not
relevant and helpful to Seda's defense.

---

[13] For whatever reason, the docket sheet does not reflect these closed
hearings. The hearings should have been docketed but the failure to do so
is harmless in light of defense counsel's knowledge of the hearings and
the fact that the transcripts are available for appellate review.

UNITED STATES V. SEDAGHATY                41

Seda is of the view that the failure of the notices to describe in unclassified terms the nature of what had been provided to the court makes the filings inadequate. Both Federal Rule of Criminal Procedure 16(d)(1) & § 4 of CIPA, however, explicitly provide for ex parte filings and do not require that detailed notice of the content of the filing be provided. Fed. R. Crim. P. 16(d)(1) ("The court may permit a party to show good cause by a written statement that the court will inspect ex parte."); 18 U.S.C. app. 3 § 4 ("The court may permit the United States to make a request for such authorization in the form of a written statement to be inspected by the court alone."). The notices complied with CIPA and were constitutionally adequate—Seda has no due process right to receive a description of materials in the government's possession that are not discoverable.[14]  *See United States v. Mejia*, 448 F.3d 436, 458 (D.C. Cir. 2006) (noting that, in the context of CIPA, as in other discovery in criminal cases, the defendant is "'not entitled to access to any of the evidence reviewed by the court . . . to assist in his argument' that it should be disclosed") (citation omitted). Similarly, the simple fact that defense counsel held security clearances does not mean that the attorneys were entitled to access the government's classified filings. *See United States v. El-Mezain*, 664 F.3d 467, 568 (5th Cir. 2011) (approving, in the context of the Foreign Intelligence Surveillance Act, denial of discovery to cleared defense counsel because of the government's substantial interest in maintaining secrecy).

---

[14] For the limited material that was discoverable, CIPA § 4 allows the government to either turn over the original material or create an adequate substitution. 18 U.S.C. app. 3 § 4. An adequate substitution obviates the need for counsel to access the underlying classified material itself (although the government may share it with security-cleared defense counsel to craft an appropriate substitution if the nature and classification of the material permits and the government so chooses).

In sum, the ex parte proceedings were authorized by
CIPA, Federal Rule of Criminal Procedure 16(d)(1), and the
compelling justification and overriding necessity required by
common law. The proceedings did not violate Seda's rights.
Our careful review of the classified record confirms that all
of the classified filings and transcripts of all of the hearings,
including the classified ex parte hearings, have been
preserved and made available to us on appeal. The district
judge, now retired, was meticulous in his review of the
classified material.

## 2. Relevant and Helpful Information

The district court did not improperly withhold relevant
and helpful information from discovery under CIPA § 4 or
Federal Rule of Criminal Procedure 16(d)(1). *See Gurolla*,
333 F.3d at 951. We have reviewed the government's
classified submissions in their entirety. The bulk of the
information the government sought to withhold was not
discoverable. Apart from the classified material underlying
the inadequate substitution discussed above, those few items
that were discoverable were not relevant and helpful to the
defense. The defense provided an analysis by Colonel Lang,
former head of Human Intelligence for the Department of
Defense. Although we credit Colonel Lang's experience and
expertise, his speculation concerning the documents (to which
he did not have access) is just that.

## 3. Classified Material in Seda's Possession

Before trial, Seda's counsel came into possession of a
classified document. Counsel took appropriate steps to
safeguard access and negotiated an agreement to turn the
material over to a Classified Information Security Officer for

placement in a secure facility in Washington, D.C. After the
district court issued what Seda terms a "gag order"—
prohibiting counsel from referencing or disclosing the
document—Seda sought reconsideration of that order six
times. Seda's counsel also gave notice under CIPA § 5 of its
intent to use the classified information at trial. The district
court reviewed the material in camera, determined that the
material was not relevant to the charges, and denied
reconsideration of the protective order.[15] Upon reviewing the
document and the district court's in camera determinations
with a fresh eye, we affirm the district court's determination
and conclude that there was no violation of CIPA §§ 5–6.
*See Rewald*, 889 F.2d at 847–48 ("[W]e decline [the
defendant's] invitation to undertake an all-encompassing
analysis of this issue, and simply confine our review to the
relevancy and admissibility of the classified materials. . . .").

The district court's limited protective order did not violate
Seda's right to counsel or his right to present a defense. *See
Moussaoui*, 591 F.3d at 289 ("The right to communicate with
counsel at any point in the proceedings is not absolute.").
The order was justified by compelling national security
concerns and the restrictions were limited to a single
document that was not relevant to the charges. *See Morgan
v. Bennett*, 204 F.3d 360, 367 (2d Cir. 2000) ("[T]he court
should not, absent an important need to protect a

---

[15] Seda also raises a concern that government attorneys or agents
participated in the district court's review of the material that was placed
in the secure facility. The records and representations of the Classified
Information Security Officers entrusted with the material reflect that no
one has accessed the documents except the court and the Classified
Information Security Officer on one occasion, and the defense counsel
together with the Classified Information Security Officer, on another
occasion.