countervailing interest, restrict the defendant's ability to
consult with his attorney, but . . . when such a need is present
and is difficult to fulfill in other ways, a carefully tailored,
limited restriction on the defendant's right to consult counsel
is permissible.").

### 4. Fruits of Unlawful Surveillance

Seda speculates that the classified materials contain
evidence of prior unlawful surveillance that led to the search
warrant application. The record does not support a claim of
taint. *See Murray v. United States*, 487 U.S. 533, 542 (1988).
The affidavit attached to the warrant detailed the
investigation that established probable cause for the search.
The investigative interviews, grand jury subpoenas, and other
lawful investigative techniques that made up that
investigation were the legitimate basis for the decision to seek
the warrant.

## III.    SEIZURE BEYOND THE SEARCH WARRANT

Government agents searched Seda's home in 2004
pursuant to a valid search warrant authorizing the seizure of
a limited set of documents: financial records and
communications related to the preparation of the 2000 tax
return. The government emerged from the search, however,
with much more: news articles, records of visits to various
websites about Chechnya, photographs of Chechen war
scenes, and other documents that were introduced at trial as
evidence of Seda's desire to fund the Chechen mujahideen.

The Fourth Amendment famously protects the "right of
the people to be secure in their persons, houses, papers, and
effects, against unreasonable searches and seizures. . . ." U.S.

Const. amend. IV. To effectuate this right, it provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id.* The question we consider de novo is whether the search was unreasonable because agents relied on the affidavit in support of the warrant to expand the authorized scope of items detailed in the warrant itself. *See United States v. Hurd*, 499 F.3d 963, 965 (9th Cir. 2007) (considering whether a search is within the scope of a warrant is a question of law reviewed de novo).

The search warrant incorporated two attachments (A and B) and an affidavit supporting probable cause for the search. *See United States v. SDI Future Health, Inc.*, 568 F.3d 684, 699–701 (9th Cir. 2009) ("A warrant expressly incorporates an affidavit when it uses 'suitable words of reference.'") (quoting *United States v. Towne*, 997 F.2d 537, 545 (9th Cir.1993)). The affidavit described Al-Haramain-U.S. and its structure, detailed facts about the El-Fiki donation, Al-Haramain-U.S.'s purchase of the Ashland and Springfield prayer houses, and inconsistencies on the 2000 tax return. The affidavit also included background information from news articles about the conflict in Chechnya, investigations into connections between several Al-Haramain branches and the funding of terrorism, and statements of Al-Haramain's former director about funding for the Chechen mujahideen.

Attachment A described the location of Seda's home (also Al-Haramain-U.S. headquarters). Attachment B listed five

46          UNITED STATES V. SEDAGHATY

individuals and five entities associated with the violations and
it detailed the items to be seized:[16]

*Evidence Relating to the Tax Violation*

Evidence concerning the subscription to a
false Form 990 Tax Return, in violation of
Title 26, United States Code, Section 7206(1),
as described in the attached affidavit, for the
year 2000, *limited to the following*:

Records and communications, including
electronic records and communications
involving the individuals or entities above,
pertaining to the preparation of an IRS Form
990 for the year 2000;

Records relating to bank accounts, bank
transactions, bank records, safe deposit
records, asset purchases or sales, other
financial transactions, and donor and donee
lists, involving the year 2000 which relate to
the individuals or entities above; and

---

[16] The five individuals listed were: Pirouz Sedaghaty, Soliman Al-Buthe,
Aqeel Al-Aqeel, Mansour Al-Kadi, Mahmoud Talaat El-Fiki. The five
entities listed were: Al Haramain; Al Haramain Foundation; Al Haramain
Islamic Foundation, Inc.; Al Haramain Headquarters aka Al Haramain
Riyadh.

Records relating to credit card accounts, records, and transactions involving the year 2000, which relate to the individuals or entities above.

(emphasis added)[17]

The warrant contained similar language for the currency reporting (CMIR) violation, expressly limiting the evidence seizure to "records of financial transactions and communications" between October 1997 and February 2003 pertaining to the same named individuals and entities. Neither Attachment A nor B referenced Chechnya or the mujahideen.

Attachment B also permitted the government to review computer equipment to determine whether it would be practical to search or copy it on site and, if not, allowed the government to remove the computers in order to "extract and seize any data that falls within the list of items to be seized" described above. Attachment B required the government to return any data outside of that list within sixty days.

Agents removed nine computers from the house, and computer forensic experts used an evolving list of search terms to comb through the computers for useful materials. In addition to financial records and communications describing the preparation of the tax return, the agents seized hundreds of other items, including internal Al-Haramain-U.S. organizational documents, news articles, records of internet

---

[17] The dissent selectively quotes from the warrant to support its broad reading. In fact, the plain language of the warrant explicitly limits the items to be seized more narrowly.

access to various websites about Chechnya, webpages sent to
Al-Haramain-U.S. by various listservs, photographs of
Chechen war scenes, and articles about Seda's civic life.
Seda moved to stop the searches of electronic media and to
suppress the evidence that was beyond the scope of the
warrant.[18]

The district court denied Seda's motion, reasoning that
the "crimes charged require proof of intent and thus records
beyond simple financial records were appropriately seized,
such as evidence of support of the efforts of the Chechnyan
mujahideen." The district court cited *SDI Future Health*,
568 F.3d at 699, for the proposition that an affidavit
incorporated in the warrant is "potentially curative of any
defects."

Without doubt, the warrant references the affidavit, but
the question is to what effect. The plain meaning of the text
provides the answer: the warrant seeks "evidence concerning
the" tax and currency reporting violations "described in the
attached affidavit." The affidavit describes in separate
sections both the willful filing of a false return and the CMIR
violations, along with the requirements for each and evidence
supporting probable cause for the search. Adopting the
commonsense reading that the affidavit was incorporated for
the specific purpose of describing the offenses and
establishing probable cause does not require a hyper-technical
parsing of the language.

---

[18] Seda consistently argued that the seizure was unlawful because it
exceeded the scope of the warrant. At oral argument, Seda's counsel
argued that the seizure exceeded the warrant's scope even if the affidavit
was incorporated into the warrant.

The plain text of the warrant likewise clearly delineates what is to be seized. Under the heading "ITEMS TO BE SEIZED," Attachment B states that "[e]vidence concerning the" tax violation is "limited to the following," and then discusses tax documents, financial records, and associated communications "pertaining to the preparation of an IRS Form 990 for the year 2000." "Evidence concerning the" CMIR charge is similarly limited to records of financial transactions and associated communications between the listed individuals from 1997 to 2003. The only reference in the affidavit to the evidence sought is the concluding request for authorization to search "for the evidence listed in Attachment B and to seize the same." Therefore, there is no reason to read the affidavit as defining the scope of the items to be seized. Instead, that list is contained in Attachment B to the warrant.[19]

Even if the affidavit is understood to describe evidence "relevant" to the violations, that does not authorize the far flung scope of the agents' search. Relevance, of course, is not the standard; the language of the warrant controls. *United States v. Tamura*, 694 F.2d 591, 595 (9th Cir. 1982) ("As a

_____

[19] The affidavit, in fact, is consistent with a limited authorization focusing on financial records and communications pertaining to the 2000 tax return and the CMIR: in describing documents likely to be found at Al-Haramain-U.S.'s Ashland office in order to establish probable cause for the search, it lists "financial records" such as "correspondence, receipts, negotiated instruments, contracts, bank statements and other records," plus documentation concerning "income, expenses, asset purchases, communications with tax preparers and other officers." The affidavit specifically references an interest in "transaction details from the organization's Quickbooks program for the 1999 and 2000 years." The magistrate judge could not have known from the affidavit that the agents instead intended to seize records of Seda's internet browsing of religious websites or his correspondence with friends and co-workers.

50          UNITED STATES V. SEDAGHATY

general rule, in searches made pursuant to warrants only the
specifically enumerated items may be seized.") (citation
omitted). The warrant was expressly limited in scope and did
not include items such as the records of visits to websites
about Chechnya, the communications unrelated to the
preparation of the tax return with individuals never named or
referenced in the affidavit, or the general background
information about the Chechen mujahideen that were seized.
The dissent suggests that all of this evidence is necessary to
establish the required *mens rea*. But it is not authorized by
the warrant. Upon failing to find evidence of willfulness in
the records pertaining to the preparation of the tax return that
were authorized to be seized, the government should not be
able to comb through Seda's computers plucking out new
forms of evidence that the investigating agents have decided
may be useful, at least not without obtaining a new warrant.
*See United States v. Heldt*, 668 F.2d 1238, 1266 (D.C. Cir.
1981) ("[T]he particularity requirement of the fourth
amendment prevents the seizure of one thing under a warrant
describing another. As to what is to be taken, nothing is left
to the discretion of the officer executing the warrant.")
(internal quotation marks and citation omitted). In light of
the specific limitations of the warrant, it is difficult to
embrace the government's justification that the search terms
"bore a logical connection to the affidavit" and that all of the
materials seized "were relevant given the nature of the
charges."

To adopt the government's approach would permit a
kitchen sink probable cause affidavit to overrule the express
scope limitations of the warrant itself. The issue here is not
whether the warrant incorporated the affidavit. That is not in
doubt—instead the issue is the scope of the reference. May
a broad ranging probable cause affidavit serve to expand the

UNITED STATES V. SEDAGHATY          51

express limitations imposed by a magistrate in issuing the warrant itself? We believe the answer is no. The affidavit as a whole cannot trump a limited warrant.

Our cases have not dealt with this situation directly. Rather, we have considered cases in which an affidavit could cure a defective warrant. That circumstance has arisen when there is a clerical error or when the warrant is overbroad but could be cured by a particularized affidavit. *Towne*, 997 F.2d at 544 (affirming the "well-settled principle that a warrant's overbreadth can be cured by an accompanying affidavit that more particularly describes the items to be seized") (citation omitted); *United States v. Bowler*, 561 F.2d 1323, 1326 (9th Cir. 1977) (holding that the presence of the correct address in the sworn affidavit could correct a typographical error in the warrant). Here, however, there is no error in the warrant for the affidavit to cure. The error is with the seizure, which exceeded the warrant's scope. *See United States v. Angelos*, 433 F.3d 738, 746 (10th Cir. 2006) (noting that "it is apparent that the problem lies in the execution, and not the constitutionality, of the search warrant"). We have never held that an affidavit could expand the scope of a legitimate warrant beyond its express limitations nor do we do so here.

Our approach resonates with the D.C. Circuit's treatment of a warrant in *United States v. Kaye*, 432 F.2d 647, 649 (1970): "It is the description in the search warrant, not the language of the affidavit, which determines the place to be searched." The same principle—that it is the warrant and not the affidavit that controls—applies equally to the items to be seized. The court in *Kaye* explicitly rejected the argument that "the scope of the search warrant was determined or broadened by the . . . supporting affidavit." *Id.; see also Angelos*, 433 F.3d at 746 (concluding that a search congruent

with the affidavit but beyond the explicit terms of the warrant exceeded the warrant's scope).

This approach is also supported by the Third Circuit's decision in *Doe v. Groody*, 361 F.3d 232, 240 (3d Cir. 2004). Although the affidavit in *Groody* was not incorporated into the warrant, the court reasoned more generally that while an affidavit can be used to cure an otherwise overbroad warrant by narrowing its scope, an affidavit cannot be relied upon to authorize a search beyond the scope of a judicially authorized warrant. *Id.* at 241. ("Bluntly, it is one thing if officers use *less* than the authority erroneously granted by a judge [by relying on an affidavit to narrow the warrant]. It is quite another if officers go *beyond* the authority granted by the judge.") (emphasis added). Indeed, "the warrant provides the license to search, not the affidavit." *Id.*

The supervising agent here may well have believed that the affidavit took precedence over the warrant, but the subjective state of mind of the officer executing the warrant is not material to our initial inquiry. *United States v. Ewain*, 88 F.3d 689, 694 (9th Cir. 1996) ("A policeman's pure heart does not entitle him to exceed the scope of a search warrant . . . ."). Any other conclusion would elevate the author of the incorporated probable cause affidavit over the judge issuing the warrant. *Cf. Johnson v. United States*, 333 U.S. 10, 13–14 (1948) (noting that the Fourth Amendment requires that any inferences from the evidence be "drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime").

The district court determined that the "fact that a further warrant was requested when information possibly relating to

UNITED STATES V. SEDAGHATY          53

a separate crime was discovered belies the allegations that the
search was a general fishing expedition." That may be. But
the fact that the government sought a separate warrant for
*some* materials outside the scope of the warrant does not
somehow countenance the seizure of other materials outside
its scope. *Cf. United States v. Crozier*, 777 F.2d 1376, 1381
(9th Cir. 1985) ("A search must be limited to the terms of the
warrant."). To the extent the agents wanted to seize relevant
information beyond the scope of the warrant, they should
have sought a further warrant.

The Supreme Court has emphasized that "there are grave
dangers inherent in executing a warrant authorizing a search
and seizure of a person's papers" as opposed to physical
objects, and that given the danger of coming across papers
that are not authorized to be seized, "responsible officials,
including judicial officials, must take care to assure that
[searches] are conducted in a manner that minimizes
unwarranted intrusions upon privacy." *Andresen v.
Maryland*, 427 U.S. 463, 482 n.11 (1976). The search
warrant here was properly issued and clearly stated the
locations to be searched and the items that could be seized.
The government agents responsible did not minimize
intrusions on privacy, however, but instead seized papers and
records beyond those the warrant authorized. *See United
States v. Rettig*, 589 F.2d 418, 423 (9th Cir. 1978)
(concluding that although the warrant was sufficiently
particular, the executing "agents did not confine their search
in good faith to the objects of the warrant, and that while
purporting to execute it, they substantially exceeded any
reasonable interpretation of its provisions" ). Unlike cases
where the magistrate judge erred in filling out the warrant but
the government reasonably relied on the judge's approval,
here the magistrate judge properly authorized the warrant but

the agents did not follow it. *See Hurd*, 499 F.3d at 969 (holding that officers reasonably relied on the warrant, though judge inadvertently failed to initial the appropriate line); *United States v. Hitchcock*, 286 F.3d 1064 (9th Cir. 2002) (determining that magistrate's error in post-dating one line of the warrant did not require suppression of the evidence seized).

The government's seizure of items beyond the terms of the warrant violated the Fourth Amendment. In the absence of "flagrant disregard for the terms of the warrant," a district court need not "suppress all of the evidence, including evidence that was not tainted by the violation." *United States v. Chen*, 979 F.2d 714, 717 (9th Cir. 1992) (internal quotation marks omitted). "Th[e] extraordinary remedy [of suppressing evidence seized within the scope of the warrant] should be used only when the violations of the warrant's requirements are so extreme that the search is essentially transformed into an impermissible general search." *Id.*

Because the record does not reflect a flagrant general search, we reject Seda's contention that the violation requires suppression of *all* of the evidence seized. However, the exclusionary rule generally bars admission of the evidence seized that was beyond the scope of the warrant. *See United States v. Payton*, 573 F.3d 859, 864 (9th Cir. 2009) (reversing conviction where "search of [defendant's] computer without explicit authorization in the warrant exceeded the scope of that warrant"). The illegal seizure of this evidence was not without consequence, as much of the illegally seized evidence was admitted to bolster the government's theory that Seda sympathized with and sought to aid the mujahideen. *Cf. Tamura*, 694 F.2d at 597 (declining to order a new trial where, despite unlawful seizure of items outside the scope of

UNITED STATES V. SEDAGHATY          55

the warrant, "[a]ll of the documents introduced at trial were seized and retained lawfully because described in and therefore taken pursuant to the valid search warrant").

The district court erroneously concluded that the items seized were within the scope of the warrant, and thus did not consider the applicability of the exclusionary rule. Nor did the parties brief this issue on appeal. For this reason, we part company with the dissent and conclude that it is not appropriate for us to make the initial determination of good faith on appeal. On remand, the district court should determine in the first instance which specific items seized can be understood to be "records or communications pertaining to the preparation of an IRS Form 990 for the year 2000" or otherwise authorized by Attachment B and whether the seizure of items beyond that scope implicates the principles of *United States v. Leon*, 468 U.S. 897 (1984), and *Herring v. United States*, 555 U.S. 135, 140–48 (2009).

## IV.   OTHER CLAIMS

### A. EVIDENTIARY ISSUES

#### 1. Receipts

In 2004, Seda turned over a number of records to the government, including four receipts. Seda claimed that two of those receipts recorded his transfer of the El-Fiki donation to Al-Buthe (termed AHIF-2 and AHIF-3) and the other two receipts recorded Al-Buthe's transfer of the donation to Al-Haramain in Riyadh (rejected defense exhibits 704 and 705). Seda was unable to authenticate any of these four exhibits.

The district court properly excluded exhibits 704 and 705 because they were unauthenticated. Fed. R. Evid. 901; *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("[a]uthentication is a condition precedent to admissibility") (internal quotation marks and citation omitted). At trial, the government introduced the other receipts—AHIF-2 and AHIF-3—through multiple witnesses, not for their substance, but so it could argue the receipts were fabricated. The district court's admission of these exhibits "not for their truth" but to corroborate the fabrication theory, was not an abuse of discretion nor did it deprive Seda of a fair trial. The hearsay rule does not apply to evidence offered "to establish a foundation for later showing, through other admissible evidence, that it was false." *See United States v. Knigge*, 832 F.2d 1100, 1108 (9th Cir. 1988) (quoting *Anderson v. United States*, 417 U.S. 211, 220 (1974)). Contrary to Seda's assertion, the limited admission of these receipts did not preclude him from arguing his theory to the jury.

## 2. Distortion of the Fact-Finding Process

Seda claims that he suffered from an uneven playing field because the government used its resources to obtain foreign evidence that was inculpatory but failed to assist him in obtaining exculpatory evidence, specifically bank records from Saudi Arabia and depositions from Egypt. The net result was, according to Seda, a distortion of the evidence. Seda analogizes his case to *United States v. Westerdahl*, 945 F.2d 1083, 1086 (9th Cir. 1991), in which we held that even though a defendant may not compel the government to offer use immunity to a witness, intentional distortion of the fact-finding process by denying immunity may constitute prosecutorial misconduct. *See also United States v. Straub*,

538 F.3d 1147, 1160 (9th Cir. 2008) ("Even where the
government has not denied a defense witness immunity for
the very purpose of distorting the fact-finding process, the
government may have stacked the deck against the defendant
in a way that has severely distorted the fact-finding process
at trial."). Not only does the record not support the argument,
Seda also misunderstands the role of the court vis-a-vis the
discovery he seeks.

This case involved substantial evidence from abroad,
which presented obstacles for both parties. Nevertheless,
both parties conducted investigations overseas and were able
to obtain some evidence from foreign countries.    For
example, Seda sent an investigator to Egypt and Saudi Arabia
to interview witnesses, including Seda's codefendant Al-
Buthe. Seda located a potential witness in China, and the
court granted Seda's motion to allow testimony by
videoconference. The government sent agents to observe an
interview by Egyptian authorities with El-Fiki.    The
government also sought records pursuant to international
treaties and through its powers to subpoena documents from
financial institutions. *See* 31 U.S.C. § 5318. Some of these
efforts were successful, while others were not. Although both
sides faced obstacles in obtaining evidence from abroad, there
was no "stacked deck."

To assist in obtaining evidence from Egypt, Seda asked
the court to order the government to use a Mutual Legal
Assistance Treaty ("MLAT") between the United States and
Egypt on his behalf.    The express terms of the MLAT
preclude Seda's reliance on it as a source of discovery:
"[T]he provisions of this Treaty shall not give rise to a right
on the part of any private person to obtain . . . any
evidence. . . ." Treaty Between the Government of the United

States of America and the Arab Republic of Egypt on Mutual
Legal Assistance in Criminal Matters, U.S.-Egypt, art. 1(4),
May 3, 1998, T.I.A.S. No. 12948; *see also Medellin v. Texas*,
552 U.S. 491, 506 n.3 (2008) (describing the "background
presumption . . . that '[i]nternational agreements, even those
directly benefiting private persons, generally do not create
private rights or provide for a private cause of action in
domestic courts'" (quoting Restatement (Third) of Foreign
Relations Law of the United States § 907, Comment a, p. 395
(1986))).

Not only does Seda's claim fail under the express terms
of the treaty, the district court had no authority to order the
Executive Branch to invoke the treaty process to obtain
evidence abroad for a private citizen. *See United States v.
Rosen*, 240 F.R.D. 204, 213–14 (E.D. Va. 2007) (explaining
that "the right to compulsory process extends only as far as a
court's own process powers, and cannot be stretched to
include compelling the invocation of treaty process powers
available only to the Executive Branch"). Seda's *Westerdahl*
analogy, which relates to immunity in the domestic context,
does not extend to the world of international treaties. Our
review of the complete record also reveals that the
government's discovery conduct did not distort the fact-
finding process.

Seda's *Westerdahl* analogy also fails with regard to the
letters rogatory. The government's position on Seda's
motions for letters rogatory could hardly skew the discovery
process because the decision to issue a letter rogatory rests
squarely within the discretion of the court, not the
government. *See United States v. Staples*, 256 F.2d 290, 292
(9th Cir. 1958). Upon Seda's request, the district court issued
a letter rogatory asking the government of Saudi Arabia to

UNITED STATES V. SEDAGHATY          59

assist in obtaining a deposition from Al-Sanad or facilitating
his voluntary testimony at trial. The court received no
response. The court declined to issue letters rogatory to
Egypt with respect to El-Fiki, his son, and his employee
because the potential testimony was not material. *See United
States v. Liner*, 435 F.3d 920, 924 (8th Cir. 2006) (explaining
that in a criminal case, "the moving party must show the
witness's unavailability and the materiality of the witness's
testimony"). El-Fiki and the associated witnesses in Egypt
did not know Seda, did not communicate with Seda, and had
no knowledge of either Seda's intent with regard to the tax
return or the ultimate disposition of the donation. The court
did not abuse its discretion in concluding that El-Fiki's intent
regarding use of the money was not probative of Seda's own
state of mind and thus was neither material nor necessary to
ensure a fair trial.

## B. APPEALS TO FEAR

Seda argues that the government appealed to religious
prejudices and guilt by association and thus deprived him of
a fair trial, especially in light of the exclusion of some of his
rebuttal evidence. *See United States v. Waters*, 627 F.3d 345,
354–56 (9th Cir. 2010). Because this case is being sent back
for a new trial, we need not reach this issue. It suffices to say
that the charge here relates to a false tax return filed on behalf
of a tax-exempt organization, and does not allege material
support to terrorism. We are confident that the district court
will recognize the fine line separating necessary and
probative evidence of willful falsity from evidence that would
cast Seda in the role of a terrorist based on appeals to fear and
guilt by association and thereby unduly prejudice the
proceedings. *United States v. Elfgeeh*, 515 F.3d 100, 127 (2d
Cir. 2008) (recognizing that "evidence linking a defendant to

terrorism in a trial in which he is not charged with terrorism
is likely to cause undue prejudice").

## AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR A NEW TRIAL.

TALLMAN, Circuit Judge, concurring in part and dissenting
in part:

This is a tax fraud case arising from a false declaration on
a charitable organization's tax return claiming a donation was
used to purchase a mosque in Missouri when it was actually
sent to terrorists in Chechnya. The conviction and sentence
imposed on Pirouz Sedaghaty, also known as Pete Seda,
should be affirmed. To the extent my colleagues wish to
reverse the district court's rulings and remand this case for a
new trial, I respectfully dissent.[1]

Overall, the majority's opinion fails to take into account
the exemplary manner in which a seasoned trial judge
handled this case to ensure that the defendant received a fair
trial, despite its substantive and logistical challenges. There
are several critical flaws in the majority's analysis. First, and
in contravention of the deference we owe the jury's verdict,
the opinion's recitation of the facts is inappropriately written
from the perspective of the defense theory of the case.
Second, the majority unduly constricts the text of the search

[1] Readers of this opinion should be cautioned that to completely
understand my analysis requires the necessary security clearance to review
the classified portion of this dissent, contemporaneously filed under seal
in the custody of the Classified Information Security Officer.

UNITED STATES V. SEDAGHATY                61

warrant and disregards the underlying reason for the very
existence of the exclusionary rule in declaring the search
unlawful.    Third, the opinion disregards District Judge
Michael Hogan's express factual findings and his rulings on
the potential impact of challenged witness testimony
following an evidentiary hearing.  And, fourth, the opinion
discounts the extraordinary efforts by the Department of
Justice to abide by its criminal discovery obligations and the
district court's extensive oversight of those efforts in dealing
with the extremely sensitive national security concerns that
underpin the investigation and prosecution of this case.

I

Contrary to the approach taken by the majority in its
factual recitation, in a case involving a criminal conviction,
"all reasonable inferences are to be drawn in favor of the
government, and any conflicts in the evidence are to be
resolved in favor of the jury's verdict." *United States v.
Alvarez-Valenzuela,* 231 F.3d 1198, 1201–02 (9th Cir. 2000).
Furthermore, "[t]he evidence is to be considered in the light
most favorable to the government to determine whether any
rational trier of fact could have found the essential elements
of the crime beyond a reasonable doubt." *Id.* at 1201.  The
jury convicted Seda after an eight-day trial and the majority
opinion has failed to faithfully apply this legal principle of
deference to the jury's resolution of contested facts on
appellate review.  The rule respecting the jury's fact-finding
is not confined to sufficiency of the evidence challenges as
posited by the majority. *United States v. Kim,* 25 F.3d 1426,

1432 (9th Cir. 1994) ("[O]n appeal we review the factual
record in the light most favorable to the verdict.").[2]

A prime example of the majority's slant in favor of the
defense is its dismissive discussion of the government's key
evidence of Seda's willfulness in structuring the funds
transfer to hide its intended purpose.[3] The defendants'
decision to structure the transaction in the form of traveler's
checks to move the money from Oregon to Chechnya makes
no sense if their intentions were benign and there was nothing
to conceal. Once the Al-Haramain Islamic Foundation, Inc.
branch office based in Ashland, Oregon (Al-Haramain-US)
received the $150,000 deposit wired from London by the
Egyptian donor, Dr. Mahmoud Talaat Hasan El-Fiki,
defendants could have easily and quickly wire-transferred the
funds to Al-Haramain Islamic Foundation, Inc.'s main office
in Saudi Arabia (Al-Haramain) through international
correspondent banks at a cost of about $15.

---

[2] The majority implies that our court must only view the facts in the light
most favorable to the jury verdict when the defendant has challenged the
sufficiency of the evidence. This is not only wrong, *see SEC v. Jasper*,
678 F.3d 1116, 1120 (9th Cir. 2012) (stating that "[w]e relate the facts
here in the way most favorable to the jury verdict" even though
sufficiency of the evidence was not raised on appeal), but it defies logic.
When a jury reaches a verdict on any issue, we must respect the facts the
jury necessarily found to reach that verdict. That prerogative is even
stronger when, as here, the defendant acknowledged that the evidence
supports the verdict by opting not to challenge the evidence's sufficiency.

[3] The charge that Seda was ultimately convicted of, filing a fraudulent
tax return under 26 U.S.C. § 7206, requires that a violator "*willfully* makes
and subscribes any return, statement or other document . . . not believe[d]
to be true and correct as to every matter." (emphasis added).

Instead, the defendants spent $1,300 in service charges to divide $130,000 into $1,000-denomination American Express traveler's checks that are extremely difficult to trace once cashed. To further obscure their plan they withdrew another $21,000 as a cashier's check made payable to co-defendant, Soliman Al-Buthe, personally. Evidence showed he later deposited it in his personal bank account in Riyadh, Saudi Arabia. A reasonable jury could have concluded on this evidence that this was Al-Buthe's "cut" for serving as the courier.

Al-Haramain advertised more than a dozen bank accounts to collect donations, maintained a global presence in at least 50 countries, and operated with an annual budget of $30–$80 million for its charitable work. One would expect an organization of this size to keep automated banking records tracking its donations. Yet, when pressed during the investigation for documentation of the $150,000 transaction, Al-Haramain could only present through legal counsel two purported "receipts" with hand-written differing amounts for the same transaction. The government convincingly argued these documents were phony, and the district court properly admitted them only for the limited purpose of impeachment. The jury very well could have believed from the evidence presented that the transaction was structured in this manner so that the traveler's checks could be easily converted into untraceable cash in the Middle East with Al-Buthe taking his $21,000 for personal or nefarious use.

In addition to this evidence, the jury heard evidence of other related suspicious behavior by Seda and his confederates. Most significantly, there was the deceitful manner in which Seda hid the actual use of the $150,000 "donation" from his Oregon accountant, Tom Wilcox, by

64          UNITED STATES V. SEDAGHATY

falsely claiming it was kept in the United States and included
in the $462,000 price of the Springfield, Missouri, mosque
purchased to expand Al-Haramain-US operations. Then there
is the fact that Al-Buthe properly declared the transport of
negotiable instruments on nine other occasions, totaling
$777,845, over a two-and-a-half-year period prior to the
events in question. He filed a Currency and Monetary
Instrument Report each time he traveled, but significantly did
not do so when he carried the $151,000 in negotiable
instruments from Oregon to Saudi Arabia.

    The jury obviously thought the entire handling of the
money reeked of criminal intent, as evidenced by its verdict.
The complexity of the structured transactions was powerful
evidence of Seda's willfulness to hide the true use of the
money from the Internal Revenue Service (IRS) when he
subscribed the false non-profit tax return. Despite this
laundry list of nefarious behavior, the majority fails to
recognize the cumulative effect of this important evidence,
which ultimately resulted in the jury's verdict.

    Aside from the financial disparities, there was other
evidence introduced at trial to show Seda's intent to lie on the
tax form and hide the real purpose to which the funds were
put. An incriminating email was found during the search of
Seda's residence in which Seda was communicating directly
with Al-Haramain in Saudi Arabia following receipt of a
battlefield report on activities in Chechnya. On January 22,
2000, just a month before the El-Fiki donation, the defendant
copied into an email to co-defendant Al-Buthe a portion of a
statement by Chechen commander of the Islamic Army of the
Caucasus, Ibn Ul-Khattab, complaining that Islamic charities
were not providing support to the mujahideen. The email
contained the subject line "What Support?" Only a month

later Seda received the $150,000 from El-Fiki with a notation of "Use Zakat in order to participate in your noble support to our muslim Brothers in Chechnia."[4]

The jury also heard testimony from government expert witness Evan Kohlmann, who described the role of Al-Haramain in the Chechen conflict and its funding of terrorist activity under the guise of charitable donations. The "normal" process he described was that a "foreign national, in other words, a non[-]Chechen national, would travel with a suitcase of between [$]100 and $500,000, would bring it to a country nearby to Chechnya," and "[f]rom there the money would be couriered across the border into the Caucasus in Chechnya and be distributed to help support the mujahideen in the field." The Al-Haramain website also included an original copy of a fatwa[5] by Sheikh Abdallah Bin Jibrin, a senior influential cleric. It called for Muslims to "[s]upply [the mujahideen] with weapons and material support which they would utilize to struggle and fight those who fight them." Muslims were obligated to "[s]upport [the Mujahideen] financially as they [we]re in dire need for food and clothing."

It is not hard to see why the jury found that Seda willfully failed to disclose to the IRS the true activities of his

---

[4] Zakat is one of the pillars of Islam and is the giving of obligatory alms or charity, similar to a tithe. "Zakat means to provide charity to suffering Muslims," which some interpret to include "distribut[ion] to Muslim fighters who are fighting a larger opponent," like the Chechen mujahideen at war with the Russian army.

[5] A fatwa issued by a cleric "is the equivalent of a ruling on a particular issue regarding Islam or Muslims, and it is incumbent upon anyone who follows the person issuing the fatwa to follow the advice given."

§ 501(c)(3) charitable organization when he signed the
informational Form 990 tax return. The defendants' activities
and the circumstantial evidence surrounding them mirrored
the *modus operandi* employed by those who smuggled money
to Chechnya, as called upon by the fatwa announced publicly
on Al-Haramain's own website. Coupled with incriminating
computer evidence recovered by forensic examiners from his
deleted hard drives, the jury could reasonably infer that Seda
was well aware of the intended recipient's use for any
donations from Al-Haramain-US.

II

The incriminating evidence seized from Seda's Ashland
prayer house properly fell within the scope of the search
warrant. On behalf of the defense, the majority opinion
manufactures its argument to limit the scope of the search.
We agree that Seda's steadfast argument advanced in his
briefs—that the affidavit was not incorporated—is untenable.
However, the majority's newly created argument invalidating
the search is also flawed. First, it refuses to acknowledge that
when properly read as a whole the warrant's language
allowed for the collection of the records seized. And, second,
even if the agents exceeded the intended scope of the search
warrant, the exclusionary rule should not bar the use of the
collected evidence based on the good faith exception.

A

The search warrant described the "ITEMS TO BE
SEIZED" as all "[r]ecords and communications" to include
all "[e]vidence concerning the subscription to a false Form
990 Tax Return, in violation of 26 U.S.C. § 7206(1), *as
described in the attached affidavit,* for the year 2000."

(emphasis added).    Records and communications were
defined as "electronic records and communications involving
the individuals or entities" associated with the violations.
The subjects of the search warrant included the two
defendants, two other known Al-Haramain officials, the
donor of the money ultimately delivered to the Chechen
mujahideen, as well as five related Al-Haramain entities.
Furthermore, the search warrant defined a careful procedure
to search computers for all "records stored or modified in any
form." If during the search the law enforcement computer
personnel determined it was not practical to complete the
search of the computers on-site, then the computers could be
"seized and transported to an appropriate law enforcement
[forensic] laboratory for review."

The difference in the way the majority approaches the
search warrant inquiry reflects a fundamental difference in
our views of how searching agents are guided by the court's
authorization of items to be seized in light of the more
detailed statements in the incorporated (and physically
present) affidavit of facts establishing probable cause for its
issuance. The majority focuses upon the words "limited to
the following" while ignoring the 33 pages of detail outlining
the multi-year joint FBI/IRS/ICE investigation "as described
in the attached affidavit" incorporated by reference.

"The complexity of an illegal scheme may not be used as
a shield to avoid detection when the State has demonstrated
probable cause to believe that a crime has been committed
and probable cause to believe that evidence of this crime is in
the suspect's possession." *Andreson v. Maryland*, 427 U.S.
463, 480 n.10 (1976). A search warrant may include a class
of generic items or goods to be searched, as it did here, "if
there are objective, articulated standards for the executing

68            UNITED STATES V. SEDAGHATY

officers to distinguish between property legally possessed and
that which is not." *United States v. Hilyard*, 677 F.2d 1336,
1340 (9th Cir. 1982). "The standards may be contained in the
search warrant or . . . in the accompanying affidavit" if
properly incorporated. *Id.*

Seda does not challenge the sufficiency of the showing of
probable cause to support issuance of the warrant. And once
armed with the court's authority to search the Ashland
premises utilized by the subjects of the investigation, agents
were certainly entitled to seize items of obvious evidentiary
significance to that investigation as detailed in the
accompanying statement of probable cause. In short, there is
no requirement in law that limits items to be seized solely to
those expressly listed in the search warrant. The overarching
Fourth Amendment principle is, as set forth in this dissent,
one of "reasonableness" under the totality of the
circumstances. *See United States v. Villamonte-Marquez*,
462 U.S. 579, 588 (1983).

1

To determine whether the seized items fell within the
scope of the search warrant, it is important to consider the
*mens rea* the government is required to prove beyond a
reasonable doubt in this type of case. The statutory language
of 26 U.S.C. § 7206 requires that a person *willfully* completes
and signs a tax return that the person "does not believe to be
true and correct as to every matter." In order to establish the
*mens rea* that Seda "willfully" filed a false tax return, the
government needed to explain the context in which he
directed his accountant to prepare the 2000 tax return for his
organization. The government knew when requesting the
search warrant that gathering evidence to show why Seda

UNITED STATES V. SEDAGHATY          69

wanted to hide the true use of the donation was an important element of their case. Why else would Seda and his confederates have structured their transactions in such deceitful ways?

To that end, the search warrant incorporated by reference and the magistrate reviewed an affidavit with background materials describing the probable cause related to the El-Fiki payment to Al-Haramain in support of the armed conflict in Chechnya. The affidavit includes more than five pages of sworn testimony by the case agent[6] specifically attesting to the connections between Seda, Al-Haramain, the Chechen conflict, donations, and mujahideen military forces. The materials collected by the government were relevant to these topics and helped establish the necessary *mens rea* for conviction. Although the majority argues that no "hyper-technical parsing of the language" of the search warrant affidavit is required, to interpret it as my colleagues suggest renders a large portion of the affidavit superfluous.

As suspected and later confirmed by the excessive quantity of materials found in his possession, Seda had an obsessive interest in Chechnya and the armed forces involved in the conflict. The seized materials supported the government's contention that Seda's zealous interest rose to a level that compelled him to send money to aid the struggle, which then drove him to falsify the non-profit tax return to cover up his support. The majority's benevolent characterization of the evidence as "Seda's internet browsing of religious web sites" or "correspondence with friends and co-workers," overlooks the fact that these web sites and

---

[6] The IRS case agent in charge of the Seda investigation was IRS Special Agent Colleen Anderson.

listserv emails encouraged a call to arms and corroborated the description of Al-Haramain and its terrorist activities in the affidavit. Judge Hogan's factual determinations regarding the express terms of the search warrant and incorporated affidavit were not clearly erroneous. *United States v. Giberson*, 527 F.3d 882, 886 (9th Cir. 2008) ("We review . . . the district court's underlying factual findings for clear error.").

The majority's concern regarding the scope of the search is unfounded, and even my colleagues agree that the warrant actually incorporated the case agent's sworn affidavit. We have held that:

> [t]he warrant requirement is a means of preventing arbitrary and unreasonable invasions of privacy; the search warrant itself is the tangible evidence that precautions have been taken to ensure that no such invasion has occurred. When the officer who requests authorization for the search, the magistrate who grants such authorization, and the officers who execute the search expressly rely upon a given set of papers containing a given series of words, they identify *that* set of papers and *that* series of words as the proof that proper precautions were taken to prevent an unreasonably invasive search.

*United States v. Towne*, 997 F.2d 537, 548 (9th Cir. 1993).

It is a "well-settled principle that a warrant's overbreadth can be cured by an accompanying affidavit that more particularly describes the items to be seized." *Id.* at 544 (citing *United States v. Luk*, 859 F.2d 667, 676 (9th Cir.

1988)). An affidavit is "part of a warrant, and therefore potentially curative of any defects, . . . if (1) the warrant expressly incorporated the affidavit by reference and (2) the affidavit either is attached physically to the warrant or at least accompanies the warrant while agents execute the search." *United States v. SDI Future Health Inc.*, 568 F.3d 684, 699 (9th Cir. 2009). "When we say that a warrant may be so facially deficient that it precludes reasonable reliance, what we mean is that '[o]fficers poised to conduct a search should be able to ascertain that such a warrant fails to offer sufficiently detailed instruction and instead leaves them guessing as to their task.'" *Towne*, 997 F.2d at 549 (quoting *Ortiz v. Van Auken*, 887 F.2d 1366, 1370 (9th Cir.1989)).

The majority mischaracterizes the warrant as underinclusive and then determines that an affidavit cannot be read to broaden the scope of the warrant. However, if these documents are correctly read, this argument fails. The warrant in this case is not underinclusive. It broadly allows for the collection of all evidence related to the preparation of a false tax return. It is the affidavit that then zeros in on the evidence the investigation had already uncovered related to Al-Haramain and its connections to funding the mujahideen's activities in Chechnya. The affidavit appropriately narrowed the search to these activities, the underlying reason why Seda falsified the Al-Haramain-US's tax return. Just as described in *Luk, supra*, the appropriately incorporated affidavit "cured" any potential overbreadth of the warrant, and the majority's argument collapses.

2

The government went to great pains to comply with the limitations of the warrant. Before giving his independent

approval, United States Magistrate Judge John Cooney read the search warrant, supporting attachments, and the case agent's sworn affidavit, incorporated by reference. Prior to conducting the search, the prosecution and the case agent developed a search procedure to be followed with a designated seizing officer and computer-search protocol. The case agent briefed the nearly 20 agents on site and gave each agent a copy of the search warrant to read.[7] All of the search warrant documents were available on site for further reference during the search. Seda's personal attorney also

---

[7] Because the case agent was both the affiant and led the execution of the search warrant, any concerns regarding the seizures should be foreclosed. As noted by the Tenth Circuit:

> [i]t would be anomalous to permit an officer's knowledge of the terms of the affidavit to cure a lack of particularity on the face of a warrant but not permit the officer's knowledge to clarify the practical meaning of a term in a facially valid warrant. Because an affidavit can be used to demonstrate that a warrant is not constitutionally invalid for lack of particularity when the same officer produces the affidavit and executes the warrant, an affidavit also may be used to clarify with 'practical accuracy' the meaning of a disputed term in a warrant when the same person is both affiant and executing officer.

*United States v. Ortega-Jimenez*, 232 F.3d 1325, 1329 (10th Cir. 2000); *see also Massachusetts v. Sheppard*, 468 U.S. 981, 989 n.6 (1984) ("the officer who [wrote the affidavit and] directed the search, knew what items were listed in the affidavit presented to the judge, and he had good reason to believe the warrant authorized the seizure of those items."); *United States v. Durk*, 149 F.3d 464, 466 (6th Cir. 1998) (recognizing that where the same officer applies for and executes the warrant, a mistaken search is unlikely); *United States v. Beaumont*, 972 F.2d 553, 562 (5th Cir. 1992) (relying on the executing officer as the affiant for support in upholding particularity of the warrant).

reviewed the search warrant and affidavit when he was summoned to the property by Seda's son. The case agent consulted throughout the search with the prosecutor for legal guidance regarding the seizure of particular items. Some documents were seized only after Seda's son talked with Seda's attorney on site and gave voluntary consent.

The majority's concerns regarding a "kitchen sink" affidavit and the possible dangers of coming across papers not authorized by the search are misguided. My colleagues barely acknowledge the extensive forensic reconstruction required to salvage any usable evidence from the deleted hard drives. The investigation then employed an independent taint team, unrelated to this investigation, to sift through the electronic materials gained from the search and distinguish between those that were within the scope of the search, and those that were not. The case agent developed specific search terms in conjunction with forensic examiners to cull the relevant data and focus on the individuals and items listed in the affidavit of probable cause. When the computer search revealed evidence of an unrelated crime, agents immediately sought and obtained a second search warrant.

3

Additionally, the district court conducted an evidentiary hearing on this issue, and Judge Hogan specifically found that the search was reasonable and that agents faithfully followed the issuing magistrate judge's directions in conducting the computer searches, employing appropriate protocols. The district judge concluded that "the warrant, including the affidavit incorporated into the warrant, was reasonably specific as to the items sought and the government followed appropriate protocols to separate intermingled materials."

And, "[t]he crimes charged require proof of intent and thus records beyond simple financial records were appropriately seized, such as evidence of support of the efforts of the Chechnyan [Chechen] mujahideen." Furthermore, Judge Hogan determined that "[g]iven the nature of the data and the fact that it had been deleted, the actions taken by the government were reasonable and permitted by the warrant as approved by Magistrate Cooney." We must defer to factual findings unless they are clearly erroneous. *Giberson*, 527 F.3d at 886.

4

The seized inculpatory evidence did not exceed the scope of the search warrant. The majority's reliance on *Doe v. Groody*, 361 F.3d 232 (3d Cir. 2004), is misplaced and easily distinguishable when the search warrant is considered in conjunction with the incorporated affidavit. Based on *Groody*, the majority states that "an affidavit cannot be relied upon to authorize a search beyond the scope of a judicially authorized warrant." *See id.* at 241.

However, the search in *Groody* exceeded the scope because the warrant failed to incorporate the affidavit. *Id.* at 236, 239–41. This detail, disregarded by the majority, drove the Third Circuit's entire analysis. It is simple logic that when an affidavit is not incorporated then law enforcement is precluded from relying upon it and to do so would exceed the scope of the warrant. As noted in that decision, "[w]]ere we to adopt the officers' approach to warrant interpretation, and allow an unincorporated affidavit to expand the authorization of the warrant, we would come dangerously close to displacing the critical role of the independent magistrate." *Id.* at 241.

UNITED STATES V. SEDAGHATY                75

But here, the majority agrees that the affidavit was incorporated, and it was available during the search to guide the agents executing the warrant. This undermines any application of the *Groody* decision to this case. The critical role of the neutral and detached magistrate was not displaced. Because the scope of the search was permitted under the warrant and was reasonable on the facts of the case, there was no Fourth Amendment violation. *See Michigan v. Fisher*, 558 U.S. 45, 47 (2009) ("[T]he ultimate touchstone of the Fourth Amendment . . . is 'reasonableness.'").

The majority's reliance on *United States v. Kay*, 432 F.2d 647 (D.C. Cir. 1970), and *United States v. Angelos*, 433 F.3d 738, 746 (10th Cir. 2006), also misses the mark. In both of the cases the issue on appeal was whether law enforcement searched a permissible location, such as Kay's upstairs apartment which had a "separate and distinct" entrance and a different street address than the one listed on the warrant. *Kay*, 432 F.2d at 649. The express language of the warrant in *Kay* only included the location of the search as 3618 14th Street, whereas the apartment's actual address was 3618 ½ 14th Street. *Id.* at 648–49. The affidavit included a reference to the "entire premises" of "a two story brick building" at "3618 14th Street." *Id.* at 649. On appeal, the court held that based on the facts of that case, "the description in the search warrant, not the language of the affidavit . . . determin[ed] the place to be searched." *Id.* In *Angelos*, the Tenth Circuit held the officers exceeded the scope of the warrant where the listed search location on the face of the warrant was a safe and a car, but officers additionally searched the entire home based on two references to the "residence/premises" made in the affidavit. 433 F.3d at 745–46.

First, these cases are not applicable because this case is not about an incorrect search location. Here, the agents dutifully searched the appropriate premises and received consent to extend the search to trailers not included in the description of places to be searched in Attachment "A." It is telling that these are the best cases the majority can find to make their argument. There are no cases on point denying that an affidavit can be used to clarify and narrow the warrant when it comes to determining which evidence may be seized.

And, second, as previously discussed, the majority's argument that the affidavit in this case expanded the scope of the warrant is a mischaracterization. The affidavit appropriately limited the warrant to the focused evidence described therein. Furthermore, although the majority attempts to analogize searching an incorrect location to seizing items outside the scope, that gloss ignores the inherent difference between these two elements of the Fourth Amendment. A particularized location is a requisite element for a reasonable search. Regardless of the items seized, law enforcement must first be at the right location. Location is a finite concept, whereas the search warrant's description of all "[e]vidence concerning the subscription to a false Form 990 Tax Return, in violation of 26 U.S.C. § 7206" requires factual context, the role of the affidavit. The analysis from these cases is not an apples to apples comparison, and it cannot be extended to cover the search here. At bottom, the evidence was appropriately seized because, just as Judge Hogan found, the warrant combined with the affidavit authorized the collection of evidence indicative of Seda's willful intent to falsify the Al-Haramain-US tax return.

UNITED STATES V. SEDAGHATY                77

B

But, even if the majority is correct in finding that the
search exceeded the scope of the warrant, under the good
faith exception recognized by the Supreme Court in *Leon* and
*Herring*, suppression would not serve the purpose of
deterrence. *See United States v. Leon*, 468 U.S. 897 (1984);
*Herring v. United States*, 555 U.S. 135 (2009). "Suppression
of evidence . . . has always been our last resort, not our first
impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).
The Supreme Court has rejected reflexive application of the
exclusionary rule. *Id.* "[T]he exclusionary rule serves to
deter deliberate, reckless, or grossly negligent conduct, or in
some circumstances recurring or systemic negligence."
*Herring*, 555 U.S. at 144. There is no evidence of any such
misconduct here. "Whether the exclusionary sanction is
appropriately imposed in a particular case . . . is 'an issue
separate from the question whether the Fourth Amendment
rights of the party seeking to invoke the rule were violated by
police conduct.'" *Leon*, 468 U.S. at 906 (quoting *Illinois v.
Gates*, 462 U.S. 213, 223 (1983)). "[T]he exclusionary rule
has never been applied except where its deterrence benefits
outweigh its substantial social costs." *Hudson*, 547 U.S. at
594 (internal quotation marks omitted).

Here, the balance weighs strongly in favor of not applying
the exclusionary rule. "[W]hen law enforcement officers
have acted in objective good faith or their transgressions have
been minor, the magnitude of the benefit conferred on such
guilty defendants offends basic concepts of the criminal
justice system." *Leon*, 468 U.S. at 908. The government
went to great lengths to conduct a reasonable search. The
search warrant incorporated a lengthy affidavit for the
magistrate's review. There was an established on-site search

procedure and computer search protocol with defined search
terms. The case agent consulted with the prosecutor
throughout the execution of the warrant to make sure the
search was appropriately conducted. The exclusion of
evidence in this case would not serve to deter misconduct in
the future where every indication was that law enforcement
agents complied with the scope of the search warrant. Agents
acted in good faith under *Leon* and *Herring,* and accordingly,
exclusion is not warranted.

III

Judge Hogan conducted a full evidentiary hearing to
consider the proposed impeachment evidence regarding
Barbara Cabral discovered after trial. We should defer to the
district court's factual findings, which were not clearly
erroneous, in upholding his legal determination that the
undisclosed evidence was not material under *Brady v.
Maryland*, 373 U.S. 83 (1963). The majority applies
complete de novo review to the three-step inquiry and fails to
give the appropriate level of deference we owe the trial court.
Unlike here, for its standard of review, the majority relies
upon a case that did not involve an evidentiary hearing
regarding the *Brady* violation. *United States v. Pelisamen*,
641 F.3d 399 (9th Cir. 2011); *see also United States v.
Howell*, 231 F.3d 615 (9th Cir. 2000).

This procedural difference is telling. As we noted in
*United States v. Price*, "[w]hile it is clear that the legal
questions at issue in a *Brady* claim are reviewed de novo, this
circuit has not yet 'had the opportunity to consider what, if
any deference should be afforded to a district court's factual
findings . . . .'" 566 F.3d 900, 907 n.6 (9th Cir. 2009) (citing
*United States v. Jernigan*, 492 F.3d 1050, 1062 (9th Cir.

2007) (en banc) (Bea, J. dissenting)). In *Price*, we avoided
this open question because the judge ruled on the motion for
a new trial from the bench. *Id.* However, in this case Judge
Hogan denied Seda's motion for a new trial in a written order
with express factual findings after taking testimony in both
written and oral form and holding an *in camera* hearing.
These facts cannot be ignored on appellate review.

We should follow the First, Second, Third, Fifth, Seventh,
Eighth, Tenth and Eleventh Circuits and the United States
Court of Appeals for the District of Columbia, all of whom
have recognized this difference in procedural posture and
given the requisite deference to the trial court's factual
findings on appeal. *Jernigan*, 492 F.3d at 1062, 1062–64
(Bea, J., dissenting) (citing and discussing each case). This
is because although legal issues are analyzed de novo, "a
*Brady* determination is inevitably a contextual inquiry,
involving questions of both law and fact." *United States v.
Sipe*, 388 F.3d 471, 479 (5th Cir. 2004). Our sister circuits
apply appellate deference to a district court's factual findings
bearing on *Brady* materiality, and recognize that the trial
judge—who listened to the witnesses, heard their testimony,
and watched as they gave it—is in a far superior position to
assess materiality than we are on a cold record. *United States
v. Boyd*, 55 F.3d 239, 242 (7th Cir. 1995).

The *Brady* analysis depends on "nested" factual
determinations which strongly influence the legal
determination. *See United States v. Sanchez*, 917 F.2d 607,
618 (1st Cir. 1990); *United States v. Thornton*, 1 F.3d 149,
158 (3d Cir. 1993). The correct standard of review must be
applied to each step of the analysis. In this case Judge Hogan
necessarily had to analyze: (1) the impact of the undisclosed
impeachment evidence specifically on Cabral's overall

testimony; (2) the impact, if any, of that determination on all
the other evidence presented in the case (28 out of 1,800
pages of trial testimony); and (3) whether it was significant
enough to undermine our confidence in the outcome of the
jury's verdict. Thus, while question three is a legal question
subject to de novo review, questions one and two are
inherently factual determinations that require our deference
unless they are clearly erroneous. To rule otherwise would
amount to appellate fact-finding. *Jernigan*, 492 F.3d at 1059
(Bea, J., dissenting).

Accordingly, after conducting an *in camera* proceeding to
review the contested evidence and taking evidence from
various witnesses, including Barbara Cabral, Judge Hogan
properly determined that the withheld information did not
violate the standard of *United States v. Bagley*, 473 U.S. 667,
682 (1985). "Evidence is material only if there is a reasonable
probability that, had the evidence been disclosed to the
defense, the result of the proceeding would have been
different." *Id.*

*Brady* requires the disclosure of evidence only if it is
"both favorable to the accused and 'material either to guilt or
to punishment.'" *Id.* at 674 (quoting *Brady*, 373 U.S. at 87).
A prosecutor only violates a "constitutional duty of
disclosure" where the "omission is of sufficient significance
to result in the denial of the defendant's right to a fair trial."
*United States v. Agurs*, 437 U.S. 97, 108 (1976). While the
government admits it erred by not turning over possible
impeachment evidence related to the testimony of Barbara
Cabral, when the district court's factual findings are
considered, within the context of the eight-day trial as a
whole, Judge Hogan correctly determined that the withheld

UNITED STATES V. SEDAGHATY          81

information did not rise to a level that deprived Seda of a fair
trial.

On March 17, 2010, well before commencement of trial
on August 30, 2010, the United States disclosed Barbara
Cabral as a witness who would "testify a[b]out observations
made while attending functions at the Al-Haramain Islamic
Foundation, Inc. in Ashland, Oregon." The most damaging
testimony she offered was that at the conclusion of the Hajj
in the Spring of 1999, while she, Seda, and others were in
Saudi Arabia traveling on money provided by Al-Haramain,
Seda collected $200 from each group members' remaining
funds for blankets and food for Chechen freedom fighters.
The evidence was only circumstantially relevant since El-Fiki
did not make his $150,000 "donation" until nearly a year
later. The disputed tax return for Al-Haramain-US, which
misstated how those funds were actually used, was not filed
until October 2001, more than 18 months after the Hajj.

The defense claims that the government's failure to
disclose information regarding Barbara Cabral warrants a
new trial under *Brady* and *Bagley*. But the district court held
an evidentiary hearing on this issue and entered findings of
fact adverse to the defense position:

> Indeed, of the 1800 page transcript generated
> from the trial, Barbara Cabral's testimony
> takes up only 28 of those pages. She was
> aggressively cross-examined. There was some
> significance to the terrorist issue because the
> government ostensibly wanted to establish a
> reason for the tax fraud. But Cabral's
> testimony was immaterial to the jury's
> convictions on the charges presented because

> it did not matter where the money
> fraudulently reported on the tax return
> actually went and because of other significant
> evidence regarding willfulness.        The
> government's case centered on the accountant,
> Thomas Wilcox's testimony.
>
> The government's focus on the issues
> surrounding the mujahideen has a greater
> relation to any enhancement during the
> sentencing phase. The materiality of Cabral's
> testimony to that question is a little more clear
> given that this was really the only direct
> evidence about defendant's desire to fund the
> mujahideen.

Ultimately, Judge Hogan chose not to impose the sentencing
enhancement for terrorism to which Cabral's testimony was
relevant. U.S.S.G. § 3A1.4(a).

Also, relevant to willfulness, there was other significant,
independent evidence supporting the jury's finding. Daveed
Gartenstein-Ross, a former employee of Al-Haramain-US,
independently testified that Seda talked about gathering
money for mujahideen forces in Kosovo. There was ample
evidence in the record from emails and other items seized
from Seda's computers at the Ashland prayer house that
showed his intent to covertly support the mujahideen in
Chechnya, including visits to multiple Jihadi web sites, a pro-
Chechen mujahideen listserv, and battlefield photographs of
the mujahideen. The government obtained still photos from
Seda's home taken from a mujahideen fundraising video
showing a training camp, as well as other seized items, with
the consent of defendant's son, whose counsel was present

UNITED STATES V. SEDAGHATY            83

during the search.    The jury heard background expert testimony about the Chechen conflict and the relationship between Al-Haramain, the Saudi Joint Relief Committee, and support for the mujahideen.

Most damning, the jury was certainly entitled to infer from the deletion of the computer hard drives that Seda acted with criminal intent.    Experienced prosecutors, criminal defense lawyers, and judges know that juries give heightened weight to a suspect's efforts to destroy or secrete incriminating evidence. Seda had ample notice since 2001 that he was under investigation prior to execution of the search warrant in February 2004.  When agents seized his computers three years into the investigation, they discovered that the hard drives had been deleted. It was only through forensic computer examination that the government was able to laboriously restore the incriminating information and piece together the inculpatory evidence in this case.

Given the quantity of alternative, independent evidence, and when considered cumulatively, it is unlikely that the failure to disclose the payments to Cabral's husband, Richard, and the interview notes, which arguably might have impeached her testimony, materially prejudiced the defense. As Judge Hogan, who presided over the trial, so found.

The majority opinion's reference to discrepancies in the interview notes of Richard Cabral are irrelevant. Because he passed away during the investigation of this case and was therefore unavailable during trial for cross-examination, any relevant statements he made during the investigation would have been inadmissible under Federal Rule of Evidence 802 as hearsay within hearsay, not subject to an exception.

The district court's factual findings are not clearly erroneous, and the majority errs in failing to give appropriate deference. Judge Hogan correctly determined that the error was not so substantially injurious as to warrant a new trial because the result would have been no different. *See Bagley*, 473 U.S. at 682. The jury could easily have reached the same conclusion without even considering Barbara Cabral's testimony and accordingly its exclusion did not serve to undermine confidence in the outcome of the trial.

## IV[8]

Contrary to the majority's ruling, the unclassified summary complied with the requirements of the Classified Information Procedures Act (CIPA). 18 U.S.C. app. 3, § 4. The law permits the creation of an unclassified summary report or substitution of a statement admitting relevant facts helpful to the defense in lieu of disclosing state secrets. *Id.* The government has the burden under Federal Rule of Criminal Procedure 16 to disclose evidence "both favorable to the accused and material either to guilt or to punishment." *Bagley*, 473 U.S. at 674 (citing *Brady*, 373 U.S. at 87). CIPA authorizes the government to submit an *ex parte* motion to the district court to reveal that it is in possession of relevant documents and to conduct *in camera* proceedings *ex parte* where classified information responsive to this obligation exists. 18 U.S.C. app. 3, § 6.

---

[8] The analysis in the unclassified dissent is constrained to a discussion of only unclassified evidence. A more complete analysis of the substitution is included in the classified dissent under the protection of the Classified Information Security Officer.

This left the government and the court in the awkward position of having to sift through classified documents from the intelligence community to try to determine if any contained exculpatory information helpful to Seda's defense. *United States v. Amawi,* 695 F.3d 457, 471 (6th Cir. 2012) ("Rather than neutrally deciding disputes with an open record based on the adversarial process, [the court] must place [itself] in the shoes of the defense counsel, the very ones who cannot see the classified record, and act with a view to their interests."); *see also United States v. Mejia,* 448 F.3d 436, 458 (D.C. Cir. 2006) (noting the difficult predicament of "the defendants and their counsel, who are in the best position to know whether information would be helpful to their defense, [but] are disadvantaged by not being permitted to see the information and . . . assist the court in its assessment of the information's helpfulness"). The court must determine whether there is exculpatory material and whether an unclassified summary or statement of admitted facts can be crafted to effectively substitute for production of the documents themselves, which cannot be disclosed for reasons of national security. 18 U.S.C. app. 3 § 4.

The unclassified summary report given to Seda 18 months before trial complied with the requirements of CIPA as defined in § 6(c)(1). "The district court must accept [the substitution] if it will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information." *United States v. Moussaoui,* 382 F.3d 453, 477 (4th Cir. 2004) (internal quotation marks omitted). There was no abuse of discretion here because the court provided the defense with all the necessary details from the withheld documents to follow any potential investigative leads.

The underlying documents themselves were inadmissible
under Federal Rule of Evidence 802 as hearsay within
hearsay, not subject to an exception. The court issued letters
rogatory submitted by the defense asking the Kingdom of
Saudi Arabia for access to Sami Al-Sanad, the subject of the
summary document substitution, while he was in its custody.
The defense had already interviewed Soliman Al-Buthe, the
other individual named in the summary, on multiple
occasions, while ironically the prosecution was refused
official access to interview any Saudi citizens.

The defense objected to the introduction of the
government's summary, but it offers no explanation for not
proposing a stipulation in slightly revised form so as to get
before the jury Al-Sanad's claim that the money was to be
used for legitimate humanitarian purposes in Chechnya. The
defense initially marked the summary as Defense Exhibit
730, but then just ten days before trial raised its first concern
regarding its contents. In a hearing seven days later, Judge
Hogan stated, "I want to look at that again." Defense counsel
reiterated his concern regarding the summary, but in the same
hearing and prior to Judge Hogan ruling on the objection,
defense counsel withdrew the exhibit. At trial, the defense
team did not renew the objection to the unclassified summary.

An issue is preserved for appeal "where the substance of
an objection has been thoroughly explored and the trial
court's ruling was explicit and definitive." *United States v.
Palmer*, 3 F.3d 300, 304 (9th Cir.1993). Although "there is
no requirement that a party engage in a futile and formalistic
ritual to preserve the issue for appeal," that is not this case.
*United States v. Varela-Rivera*, 279 F.3d 1174, 1177–78 (9th
Cir. 2002).

The summary had been provided to the defense with
sufficient time to litigate over its contents. The defense team
never offered an alternative version to the trial court for
consideration as a possible compromise.[9] The defense team
did not afford Judge Hogan an opportunity to make an
"explicit and definitive" ruling on its objection prior to
withdrawing the exhibit. Nor did the defense team reiterate
its objection at trial to preserve the issue on appeal.

By failing to offer an acceptable alternative, failing to
seek an "explicit and definitive" ruling on the objection,
failing to object to the summary's language at trial, and
choosing to withdraw the exhibit prior to trial, Seda waived
any challenge to this claim. Deference is owed to defense
counsel's trial strategy, and we cannot speculate now after the
jury has spoken as to why defense counsel chose not to
pursue their objection further, nor offer the exhibit at trial.
We should not countenance this tactical maneuver on appeal
where Seda waived any objection by failing to preserve it at
trial.

Judge Hogan went to extraordinary lengths to conduct
multiple *in camera* proceedings and appropriately review
related classified information in an effort to meet the
commands of CIPA. There was no abuse of discretion in the
court's authorization of the substituted summary, but because
of the waiver, we should not even reach this issue.

---

[9] The majority argues that defense counsel was not in the position to
offer alternative language. However, ten days before trial, defense
counsel could certainly have brought the court's attention to the specific
words which it considered "editorialized" and recommended less
pejorative alternatives.

88          UNITED STATES V. SEDAGHATY

V

A capable district court judge had a daunting task in overseeing this complex case, and the record shows he fairly balanced the competing interests at stake. The search did not exceed the scope of the properly authorized warrant and its incorporated affidavit. The procedures employed in its creation and execution were measured and appropriate. The district court's factual findings were not clearly erroneous, and the determination that the potential impeachment evidence regarding Barbara Cabral did not warrant a new trial was correct. The unclassified summary appropriately complied with the requirements of CIPA and balanced the need to protect national security with Seda's right to present a defense. Under these difficult circumstances, Seda got a "fair trial," even though it might not have been a "perfect one." *Ross v. Oklahoma*, 487 U.S. 81, 91 (1988). For these reasons, I would affirm the conviction and the trial court's rulings.